```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 20-CR-00152-PAB
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    JAYSON JEFFREY PENN,
 7  MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
 8  ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
 9  WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12       Defendants

13  _____

                        REPORTER'S TRANSCRIPT
14                      James Hearing (Vol. 2)

15  _____

16           Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:34 a.m., on the 8th day of September,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
1                          APPEARANCES

2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3   Torzilli, U.S. Department of Justice, 450 Fifth Street N.W.,

4   Washington, DC 20530, appearing for Plaintiff.

5          Anna Tryon Pletcher and Michael Tubach of

6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7   San Francisco, CA 94111-3823;

8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9   N.W., Washingon, DC 20006;

10         Chad David Williams and Jacqueline Roeder of Davis

11  Graham & Stubbs, LLP, 1550 17th Street, Suite 500, Denver, CO

12  80202 appearing for Defendant Penn.

13         David Beller, Richard Kornfeld and Kelly Page of

14  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

15  CO 80202, appearing for Defendant Fries.

16         Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

17  LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

18          Laura Kuykendall and Megan Rahman of Troutman Pepper

19  Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

20  appearing for Defendant Brady.

21         Michael Felberg of Reichman, Jorgensen, Lehman,

22  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

23  10017;

24

25
```

1                    APPEARANCES (Continued)

2           Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5           Caroline Rivera of Latham & Watkins LLP, 1271 Avenue

6    of the Americas, New York, NY 10020;

7           Elizabeth B. Prewitt of Latham & Watkins, LLP,

8    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

9           Marci Gilligan LaBranche of Stimson, Stancil,

10   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

11   80218, appearing for Defendant Mulrenin.

12          James A. Backstrom, Counselor at Law, 1515 Market

13   Street, Suite 1200, Philadelphia, PA 19102-1932;

14          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

15   Bethesda, MD 20814, appearing for Defendant Kantola.

16          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

17   Street, Suite 1100, Los Angeles, CA 90017;

18          Dennis J. Canty, Canty Law Corporation,

19   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

20   appearing for Defendant Little.

21          John Anderson Fagg, Jr. and James McLoughlin of

22   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

23   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

24

25

```
1              APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4   Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7   for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15                  PROCEEDINGS

16         THE COURT:  We are back on the record in the Penn

17  matter, a continuation of our James hearing.  I will take

18  entries of appearances, but I am going to restrict it just to

19  those attorneys who anticipate speaking today, all right, so

20  that we cut that down.

21         First of all, on behalf of the United States.

22         MR. KOENIG:  Thank you, Your Honor.  Michael Koenig on

23  behalf of the United States.

24         THE COURT:  Good morning to you.

25         And next on behalf of Mr. Penn?
```

1          *MR. TUBACH:*  Good morning, Your Honor.  Michael Tubach

2     on behalf of Jayson Penn who is with me today.

3          *THE COURT:*  Yes, and give the status of your client,

4     thank you.

5          Mr. Fries?

6          *MR. KORNFELD:*  Good morning, Your Honor.  Rick

7     Kornfeld on behalf of Mr. Fries.  He is appearing via VTC

8     through the Court's courtesies.  Thank you.

9          *THE COURT:*  Yes, thank you.

10          Mr. Brady?

11          *MR. LAVINE:*  Good morning, Your Honor.  Brian Lavine.

12     And Mr. Brady is also appearing through the VTC.

13          *THE COURT:*  And by the way, each of the defendants

14     requested permission or at least gave me notice that they would

15     like to do so.  Thank you, and good morning.

16          Mr. Austin?

17          *MR. FELDBERG:*  Good morning, Your Honor.  Michael

18     Feldberg for Mr. Austin.  Mr. Austin is also participating by

19     VTC and we thank the Court.

20          *THE COURT:*  Good morning to you.

21          And on behalf of Mr. Mulrenin?

22          *MS. PREWITT:*  Good morning, Your Honor.  Elizabeth

23     Prewitt on behalf of Mr. Mulrenin who is here today.

24          *THE COURT:*  Good morning to both of you.

25          On behalf of Mr. Kantola?  These people are all in the

1    same seats.  What a great system.

2           *MS. HENRY:*  Roxann Henry on behalf of Mr. Kantola who

3    is here with me.

4           *THE COURT:*  And good morning to you.

5           On behalf of Mr. Little?

6           *MR. BYRNE:*  Yes, Your Honor.  Mark Byrne appearing on

7    behalf of Mr. Little who is appearing remotely.  Mr. Lovette.

8           *THE COURT:*  Okay.  And good morning to you.  And on

9    behalf of Mr. Lovette.  Mr. Fagg, go ahead.

10          *MR. FAGG:*  Good morning, Your Honor, John Fagg on

11   behalf of Mr. Lovette.  And Mr. Lovette is here on VTC.

12          *THE COURT:*  Good morning to you.

13          *MR. FAGG:*  Good morning.

14          *THE COURT:*  And on behalf of Mr. Roberts?  Mr. Gillen

15   is here.

16          *MR. GILLEN:*  Craig Gillen on behalf of Mr. Roberts and

17   Mr. Roberts is here.

18          *THE COURT:*  Good morning to both of you.

19          And on behalf of Mr. Blake?

20          *MR. POLLACK:*  Good morning, Your Honor.  Barry Pollack

21   on behalf of Mr. Blake, and Mr. Blake is present in the

22   courtroom.

23          *THE COURT:*  And good morning to each of you as well.

24          Just a reminder, I mentioned this last time, but if

25   you are listening by VTC or if you are here for that matter,

1    make sure there is no recording of this hearing allowed.

2         First of all, let's take up a matter, namely the

3    government's motion filed yesterday, I think, afternoon, United

4    States' Motion for Leave to Amend with Additional *James* Hearing

5    Exhibits and for Related Relief, Docket No. 448.  I don't think

6    any of the defendants filed a response.  It was kind of last

7    minute.  I don't -- I can't hear from everyone, but perhaps we

8    have -- Ms. Prewitt looks like she is ready to go.  Is there

9    any type of consolidated response to that?  Or Ms. Prewitt, go

10   ahead.

11        *MS. PREWITT:*  Your Honor, the defendants object just

12   given the lateness, Your Honor.  There is a lot of preparations

13   have gone in and we haven't had the opportunity considering the

14   hearing and what's at stake.

15        *THE COURT:*  Anyone else want to be heard briefly?

16        I am going to grant the motion.  It appears to me that

17   it's not very substantive.  It purports to be corrections.  I

18   assume that that's true.

19        So next question, Mr. Koenig, is did you distribute as

20   part of that motion the revised conspiracy guide?

21        *MR. KOENIG:*  We did the electronic filing, of course,

22   and we do have paper copies that we were ready to go with for

23   both you and the defendants.

24        *THE COURT:*  Okay.  Let's distribute those real quick.

25        *MR. KOENIG:*  And there is paper copies of other items

1    in there as well.

2         THE COURT:  And what does that mean?

3         MR. KOENIG:  Both of the amended exhibits or the new,

4    the .1 exhibits.

5         THE COURT:  Oh, a new exhibit list?

6         MR. KOENIG:  No, no, the new paper copies of the

7    additional exhibits, the .1.  We marked them as like 1-010.1 as

8    the additional exhibit.

9         THE COURT:  Okay.  Let's distribute those real quick.

10        MR. KOENIG:  Thank you.

11        THE COURT:  Go ahead.

12        MR. McLOUGHLIN:  Good morning, Your Honor.  Jim

13   McLoughlin on behalf of Mr. Lovette.  One question on behalf of

14   the defendants.  The filing was a little unclear.  Can we get a

15   confirmation from the government that the only changes that

16   were made to the log was to correct actual errors and there

17   were no other modifications made to the log?

18        THE COURT:  I am not quite sure that's true, but I

19   will let Mr. Koenig speak to that.

20        MR. KOENIG:  Sure.  We, as I noted in I believe a

21   footnote, we did clean up some very minor type of errors.

22        THE COURT:  Yeah, I think that Mr. McLoughlin is

23   asking is there anything that is not in the nature of a

24   correction, but instead is in the nature of an addition or

25   something a little bit more substantive?

1          *MR. KOENIG:*  No, no, Your Honor.

2          *MR. McLOUGHLIN:*  Thank you, Your Honor.

3          *THE COURT:*  Let's get those quickly distributed.  And

4    then Ms. Prewitt, why don't we do a mic check while we are

5    waiting.

6          Mr. Taylor, why don't you resume your seat.

7          Special Agent Taylor, do you understand that you are

8    still under oath?

9          *THE WITNESS:*  Yes, Your Honor.

10         *THE COURT:*  One moment, Ms. Prewitt.  And by the way,

11   a couple of things.  So if we get to the point that we are at

12   11:30 and the government hasn't had an opportunity to do what

13   we'll call a rebuttal case -- I am not sure how things are

14   going to go -- we will allow the government to do it at that

15   time.  Also, unlike the last hearing where I had a few minutes

16   after 12:00 p.m. to talk about miscellaneous things, I have a

17   judges meeting at 12:15, so I just do not have time to do that

18   today.  So we may want to -- if we have some things to talk

19   about, I am sure there are probably a lot, but if we really

20   need to talk about them, we should probably contemplate

21   stopping at about 11:55 just so we can take up those other

22   issues.

23         *MR. POLLACK:*  Your Honor, Barry Pollack on behalf of

24   Mr. Blake.  Hopefully this doesn't become an issue, but I will

25   certainly object to that if that means that Mr. Blake does not

1   have an adequate opportunity to cross-examine, being defendant

2   10 out of 10.

3           THE COURT:  Right.  Well, we have got to manage it

4   somehow.  I understand, and maybe the defendants agree on

5   taking it up in reverse order next time or this time or do a

6   lottery or something, but we will just have to see how it goes.

7           MR. POLLACK:  I understand, Your Honor.  This is

8   obviously a highly unusual case.  I have certainly never been

9   involved in a case where the government tried to introduce over

10  300 hearsay states under the co-conspirator rule, so we are

11  where we are and each defendant needs the opportunity to

12  address the evidence against them.

13          THE COURT:  Well, as I said last time, each defendant

14  had an opportunity to file a brief and they have done so.  And

15  I have read them, so that is --

16          MR. POLLACK:  I completely understand, Your Honor, and

17  I appreciate that.  That's obviously different than having the

18  opportunity to cross-examine in an evidentiary hearing.

19          THE COURT:  Yeah, but this is a *James* hearing and the

20  Rules of Evidence are greatly relaxed.  And there is typically

21  one witness and that's true today.  But I hear you.  Okay.

22  Thanks.

23          MR. POLLACK:  Thank you, Your Honor.

24          THE COURT:  Mr. Koenig, you can hand it up.

25          Ms. Prewitt?

1        (**LaNard Taylor** was previously sworn.)

2                    **CROSS-EXAMINATION CONTINUED**

3    *BY MS. PREWITT:*

4    *Q.*  Agent Taylor how are you today?

5    *A.*  I am doing well, Ms. Prewitt.  How are you?

6    *Q.*  I am doing fine.  Thank you.

7           As a preliminary matter, Agent Taylor, have you

8    communicated with anyone on the prosecution team regarding your

9    testimony last week or how you might respond to questions

10   today?

11   *A.*  No, ma'am, I have not.

12   *Q.*  In your earlier testimony, I asked you a question about

13   whether there was any individual who has admitted participation

14   in the charged conduct.  Do you remember that?

15   *A.*  I do.

16   *Q.*  And you identified Mr. Bryant and Mr. Pepper specifically;

17   isn't that correct?

18   *A.*  That's correct.

19   *Q.*  And to your recollection, Mr. Bryant did not make any

20   statement relating to defendant -- Mr. Mulrenin.

21   *A.*  I don't recall specifically whether he said anything about

22   Mr. Mulrenin.

23   *Q.*  Well, we have the agent reports that you have written and

24   your colleagues have written, and you reviewed those in

25   preparation for your testimony today.

LaNard Taylor - Cross

 1   A.   Yes, ma'am.

 2   Q.   And if I were to show you those statements on the break,

 3   you would be able to confirm whether or not he made any

 4   statements regarding Mr. Mulrenin.

 5   A.   Yes, ma'am.

 6   Q.   But sitting here today do you have a recollection having

 7   participated in that interview whether Mr. Bryant offered any

 8   statements directly in reference to Mr. Mulrenin?

 9   A.   Again, I don't recall specifically whether he named

10   Mr. Mulrenin or not.

11   Q.   Now, you referred to Mr. Pepper in your testimony several

12   times earlier; isn't that correct?

13   A.   I don't know about several times, but certainly I referred

14   to him, yes, ma'am.

15   Q.   By my count about 15.  Does that sound about right to you?

16   A.   I will go with your number.

17   Q.   Okay.  Thank you.  So Mr. Mulrenin was Mr. Pepper's

18   supervisor during much of the charged period at Tyson Foods; is

19   that correct?

20   A.   I believe that's the case, yes, ma'am.

21   Q.   And Mr. Pepper was a cooperator in the government's

22   investigation beginning in approximately July 2019, right?

23        MR. KOENIG:  Objection, misstates the facts.

24        THE COURT:  Overruled.  He can answer.

25   BY MS. PREWITT:

LaNard Taylor - Cross

1   Q.   So Mr. Mulrenin has been a cooperator with the government's

2   investigation for approximately two years.  Does that sound

3   about right?

4   A.   I don't know that I would classify him as a cooperator.  I

5   don't know what the government classifies him as, but he

6   certainly has participated in interviews.

7   Q.   Apologies.  Just to correct the record, I was referring to

8   Mr. Pepper in the context of being a government cooperator.

9   A.   Yes, ma'am.  I would not -- I don't know if I would

10  classify him as a cooperator, but he certainly has been a

11  participant in interviews that we have conducted.

12  Q.   Well, he was interviewed 11 times by the government; isn't

13  that correct?

14  A.   Somewhere in or around 11 times, yes, ma'am.

15  Q.   And he wore a consensual recording device at the

16  instruction of the FBI on several occasions; isn't that right?

17  A.   He didn't wear one, but he certainly --

18  Q.   So he consensually recorded telephone calls with electronic

19  devices; isn't that correct?

20  A.   Yes, ma'am.

21  Q.   Now, in these interviews of Mr. Pepper, you were present

22  for each one; isn't that right?

23  A.   I was present for the majority of them.  I don't know if I

24  was present for every single one, but certainly the majority of

25  them.

LaNard Taylor - Cross

1    Q.   In your view based on your testimony you're saying you

2    would not classify Mr. Pepper as a cooperator; is that right?

3    A.   I am saying I am not sure what to classify him as other

4    than I know he participated in a number of interviews with us.

5    Q.   Now, each of those interviews involved many participants;

6    isn't that correct?

7    A.   That is correct.

8    Q.   So Mr. Pepper's lawyers were present for those interviews?

9    A.   That's correct.

10   Q.   And lawyers for Tyson Foods were present for those

11   interviews as well; isn't that right?

12   A.   Yes, ma'am.

13   Q.   And many government agents and lawyers, as many as a dozen

14   or more during some of those interviews; isn't that right?

15   A.   Combined, yeah, sure, somewhere around that number I am

16   sure.

17   Q.   And during each of those interviews Mr. Pepper was asked

18   many questions about his participation in the conduct reflected

19   in the charged conspiracy and about the participation of

20   Mr. Mulrenin and others; isn't that right?

21   A.   That is correct.

22   Q.   But in the course of all those interviews, Mr. Pepper never

23   said that Mr. Mulrenin asked him to fix, align or coordinate

24   prices with any competing supplier; isn't that right?

25   A.   I don't know that exact quote is what he said.  I don't

LaNard Taylor - Cross

1    know.

2    *Q.* You were present during all those interviews, right?

3    *A.* I was, and there were quite a bit of them.

4    *Q.* And you, in fact, wrote up the agent report in connection

5    with a number of those interviews; isn't that right?

6    *A.* That is correct.

7    *Q.* Now, in fact, Mr. Pepper has talked to you in the course of

8    these interviews and other government agents about how

9    obtaining competitor prices provided comfort for prices Tyson

10   quoted to customers, but he denied awareness of any agreement

11   to fix prices or that his superiors, Brian Roberts or Timothy

12   Mulrenin, were participants that entered into any agreement to

13   fix prices; isn't that right?

14   *A.* I don't know that is accurate, no, ma'am.

15   *Q.* But the government -- but you know, in fact, the government

16   at times specifically questioned Mr. Pepper about his

17   statements and expressed their dissatisfaction; isn't that

18   right?

19   *A.* No.  What statements are you talking about?

20   *Q.* The statements that Mr. Pepper made during the course of

21   interviews conducted by government agents, those are the

22   interviews I am talking about.

23   *A.* Are you saying statements in totality or specific

24   statements?

25   *Q.* I am talking about over the course of the statements that

LaNard Taylor - Cross

1    Mr. Pepper provided to the government in the course of at least

2    11 interviews, right?

3    A.  Yes, ma'am.

4    Q.  That's what I am referring to.  Are we on the same page?

5    A.  We are.

6    Q.  Now, during the course of those interviews isn't it in fact

7    the case that Mr. Pepper never said that he entered into an

8    agreement to fix, coordinate or align prices as is reflected in

9    the charged conspiracy?

10   A.  I don't know over the course of those 11 or 12, however

11   many interviews, whether he said those exact words.  I cannot

12   recall that.

13   Q.  Agent Taylor, that was the thrust of the government's

14   interviews of Mr. Pepper over the course of the last years --

15   last two years; isn't that correct?

16   A.  Rephrase your question, please.

17   Q.  The question about whether he or others participated in an

18   agreement to fix prices or align prices was the thrust of the

19   interviews of Mr. Pepper over the course of the two years he

20   was interviewed by government agents; isn't that correct?

21   A.  That was a portion of the interview, yes, ma'am.

22   Q.  And, in fact, he was questioned many times on the subject

23   as to whether he participated in its conspiracy to fix prices

24   or align prices or whether others participated in the

25   conspiracy to fix prices or align prices, correct?

LaNard Taylor - Cross

1   A.  He was questioned about his behavior.  I don't know that we

2   specifically asked, you know, sir, did you participate in a

3   conspiracy to fix or align prices, but he certainly was

4   questioned about his behavior, his actions.

5   Q.  I will represent to you I do not have your underlying

6   notes.  I don't have access to those underlying notes.  I have

7   shorthand summaries of your reports of what took place.  I will

8   represent that to you, right?  But in the course of those

9   interviews that you participated in, isn't it a fact that

10  government agents questioned Mr. Pepper about whether he

11  participated in an agreement to fix prices or rig bids, full

12  stop.

13  A.  Yes, though I don't know it was phrased like that in an

14  interview.

15  Q.  I am not asking you whether that's exactly how it was

16  phrased.  I was not participating in the interview and I do not

17  have your raw notes.  Do you understand that?

18  A.  Yes, ma'am, I do.

19  Q.  I am asking about the substance and the line of questioning

20  that were posed to Mr. Pepper.  Do you understand that?

21  A.  I certainly do.

22  Q.  Now, at various points in the course of all of these

23  interviews, isn't it in fact the case that government agents

24  expressed to Mr. Pepper that they did not believe his denial

25  about his nonparticipation in agreements to fix prices or rig

LaNard Taylor - Cross

1    bids; isn't that right?

2    A.   I don't believe that to be the case that we expressed that

3    to Mr. Pepper.

4    Q.   Is it in fact the case that government agents expressed to

5    his counsel that they did not believe his denials about his

6    participation and the participation of others in the charged

7    conspiracy?

8    A.   I am not privy to whatever communications that happened

9    between the government attorneys and Mr. Pepper's attorneys.

10   Q.   Isn't it a fact that in his June 2021 interview, an

11   interview that you participated in, Mr. Pepper protested that

12   he had been, quote, a hundred percent transparent since his

13   first interview; isn't that right?

14   A.   I believe that's correct, yes, ma'am.

15   Q.   In fact, you understand that Mr. Pepper was told he was at

16   risk of not receiving immunity because the government did not

17   believe his denials about his participation in the conspiracy

18   and the participation of Mr. Mulrenin and the other defendants

19   in this case; isn't that right?

20   A.   I don't know that to be the case, no, ma'am.

21           MR. KOENIG:   I would object to the term immunity.

22           THE COURT:   Overruled, and the objection was late.

23           Go ahead.

24   BY MS. PREWITT:

25   Q.   Agent Taylor, isn't it a fact that the terms of

LaNard Taylor - Cross

1    Mr. Pepper's cooperation letter agreement with the government

2    changed from August to February 2021?

3    *A.*  I have no idea.  I don't know what that letter -- what the

4    agreement between the government and Mr. Pepper entailed.

5    *Q.*  Agent Taylor, you were present during these interviews.

6    *A.*  I certainly was.

7    *Q.*  You were present at a point in time at the beginning of the

8    interview when Mr. Pepper was presented with a proffer letter.

9    Do you recall that?

10   *A.*  I wasn't present when he was presented with it.  That was

11   done in advance of the interview.

12   *Q.*  But you understood that there was a point in time where

13   Mr. Pepper's status changed vis-a-vis his role as a government

14   cooperator.

15   *A.*  I don't know that, no, ma'am.

16   *Q.*  You were aware at a point in time that either Mr. Pepper or

17   his lawyer were told that he would no longer be considered a

18   potential candidate for immunity under Tyson Foods' immunity

19   application; isn't that right?

20   *A.*  Again, I was not privy to whatever conversation that

21   happened between the government attorneys and Mr. Pepper's

22   attorney, so I am not aware of that.

23   *Q.*  You were not informed at any point in time that the

24   government had serious questions about the veracity of

25   Mr. Pepper because what he told them did not align with the

158

LaNard Taylor - Cross

1   charged conduct?

2   *A.* I don't -- the way you are characterizing it I don't agree

3   with, but I will say that Mr. Pepper was unlike -- he was not

4   different from any other witness in that after any interview we

5   talk about, you know, the interview and whether we believe that

6   person was truthful or not, so Mr. Pepper was not different in

7   that regard.

8   *Q.* But you know, in fact, that the government expressed

9   frustration with Mr. Pepper's testimony and pushed him on

10  various points because they believed what he was saying did not

11  align with their view of how the conspiracy functioned; isn't

12  that right?

13  *A.* I don't believe that's correct.

14  *Q.* Now, I would like to ask you some questions -- sitting here

15  today do you expect that Mr. Pepper will be a witness at trial?

16  *A.* I have no idea who the government plans on -- well, I am

17  not saying no idea.  I don't know whether Mr. Pepper is going

18  to be called as a witness.

19  *Q.* But you don't consider him today a cooperating witness in

20  your case, do you?

21  *A.* Again, I don't know what to classify him as.  I just know

22  that he participated in these interviews.

23  *Q.* But you understand the terms of his participating and

24  submitting to these interviews was for the purpose of

25  cooperating with the government's investigation, correct?

LaNard Taylor - Cross

1   A.   Repeat the question, please?

2   Q.   You understood that the terms of him sitting and

3   participating in these interviews and making consensual tapes

4   was because he was a candidate to cooperate with the

5   government's investigation as a government witness; isn't that

6   right?

7   A.   He was certainly cooperating in that he participated in

8   interviews and made recorded calls, yes, ma'am.

9   Q.   Is it your testimony today that the government was

10  satisfied with the testimony that Mr. Pepper was offering over

11  the course of the 11 interviews he submitted to?

12  A.   It is my testimony that whatever Mr. Pepper offered to us

13  at his interview were his statements, and whether I was

14  satisfied or not, I don't believe I have an opinion whether I

15  was satisfied or not.

16  Q.   Agent Taylor, you were a witness to those interviews.  You

17  were the agent taking notes.  You were participating in those

18  interviews; isn't that right?

19  A.   That is correct.

20  Q.   And, in fact, you know Mr. Pepper was questioned and there

21  was frustration about the fact that his statements did not go

22  far enough to align with the charged conspiracy; isn't that

23  correct?

24  A.   There was conversation about that, but not with Mr. Pepper.

25  Q.   With his attorney; isn't that right?

LaNard Taylor - Cross

1    A.   I don't know what their conversation was between the

2    attorneys.

3    Q.   There was conversation amongst the prosecution team that

4    there were concerns about the veracity of his statements.

5    A.   There were concerns.  I don't know about the veracity, but

6    more -- but certainly concerns that we didn't know if we were

7    able to get everything from him that he was -- that we believed

8    he possessed, I should say.  I don't know if that questions his

9    veracity, though.

10   Q.   Have those concerns regarding Mr. Pepper's truthfulness

11   been resolved at this point?  You understand he is taking the

12   Fifth.  He is asserting his Fifth Amendment right against

13   self-incrimination in connection with this hearing.  You are

14   aware of that.

15   A.   I heard it when you heard it last week.

16   Q.   Have the government's concern regarding the truthfulness of

17   Mr. Pepper been resolved?

18   A.   I can only speak about my perspective.  I don't know what

19   the government attorneys have discussed among each other.

20   Q.   I would like to direct your attention to Government

21   Exhibit 3, Page 24.

22        Okay.  Now, you testified last week that both

23   Mr. Ilardi and Mr. Wildes had joined the conspiracy by

24   February 1st, 2014.  Do you recall that?

25   A.   I do.

LaNard Taylor - Cross

1    *Q.* And they were both employees of Purdue on that date.

2    *A.* Yes, ma'am.

3    *Q.* And you testified the reason you believe they both joined

4    the conspiracy then was because of an e-mail exchange on that

5    date; is that correct?

6    *A.* For an e-mail exchange and a series of phone calls

7    combined.

8    *Q.* So let me direct your attention to Government Exhibit 2-88.

9          Now, Agent Taylor, I would like to direct your

10   attention to the prices listed below.  These are not ABF

11   prices, correct, antibiotic-free.  That's not the portion of

12   the e-mail that refers to ABF prices, correct, under April?

13   *A.* I don't know specifically without having time to actually

14   read this e-mail exactly what pricing are you referring to.  I

15   have seen the pricing, but I don't know exactly what the e-mail

16   is referring to.

17   *Q.* Below you see a reference to Pilgrim's is going to upcharge

18   approximately 3.3124 per pound on ABF product.  It says,

19   Claxton will be around the same cost.

20         That's referring to ABF product, correct?

21   *A.* It sounds like it, but if you don't mind, I would like to

22   read the document before I say anything about it.

23   *Q.* You've read this document a few times.  In fact, you

24   testified to it.

25   *A.* I have read a few documents, so I don't want to confuse

LaNard Taylor - Cross

1   this one with a different one.  Okay.

2   Q.  Thank you.  And now so looking at those prices that are

3   listed under April, those are not ABF prices being quoted,

4   correct?

5   A.  Even still reading this e-mail, I am not entirely sure in

6   part because the last line says he also found out that

7   Pilgrim's is going to upcharge, but then he says on the ABF

8   product.

9   Q.  Thank you.  So Agent Taylor, I will ask you about that

10  portion, but I am asking you about these prices here we are

11  showing under April.  Those are current prices, in other words.

12  Those are already quoted in our contract price, correct?

13  A.  I can't say definitively, but ...

14  Q.  Assuming -- does it look like that to you?

15  A.  It could very well be.

16  Q.  So assuming that's the case, that's not a basis of

17  competition, prices that are even set.  If that's the case, if

18  there are prices, contract prices are already being delivered

19  on, that would not be a basis of competition between suppliers

20  because the price has already been set, correct?

21  A.  When you say basis of competition, what exactly do you

22  mean?

23  Q.  You can't fix a contract price that's already been fixed,

24  correct?

25  A.  You can't fix a contract price that's already been fixed --

163

LaNard Taylor - Cross

1    Q.  So if these prices are reflected in a current contract

2    between Chick-fil-A and these particular suppliers, those can't

3    be rigged because those are contract prices that are being

4    charged the customer already, right?

5    A.  I am not really sure what you are asking, but I do know

6    that these prices change by period, I mean, so the prices while

7    they are a fixed price or a prenegotiated price in most

8    instances, by period some of these things change because I

9    understand there is different variables.  I can't say all the

10   variables, but it can change.

11   Q.  So assuming the fact that we have an annual price that's

12   been charged.  You testified earlier that there are price

13   negotiations at the end of the year and then they were fixed

14   and put into place in contracts in the beginning of the next

15   year, correct?

16   A.  Yes, ma'am.

17   Q.  If that's the case, those prices can't be -- could not be

18   rigged between suppliers because they are already entered into

19   with the customer, correct?

20   A.  When you say they could not be rigged, I mean, I am

21   assuming you are talking about after -- you are talking about

22   after the prices have already been agreed upon, right?

23   Q.  After the prices have already been submitted and a contract

24   has been entered into between the customer and the supplier for

25   that product.

164

LaNard Taylor - Cross

1   *A.*  That sounds about right.  On the contract you are right,

2   yeah.  I believe that's the case.

3   *Q.*  So just with respect to Mr. Ilardi's response to this whole

4   e-mail, he says, "great info," correct?

5   *A.*  I cannot see that e-mail.

6   *Q.*  He says "great info" in response to hearing about the

7   current contract prices being charged vis-a-vis ABF and also

8   the ABF charge related to Pilgrim's, correct?  He reads this

9   and says "great info."  Can you read the words "great info"?

10  *A.*  Yes, ma'am.  I was reading the entire e-mail, but yes, he

11  says "great info" at the beginning.

12  *Q.*  So there is nothing here that indicates Mr. Ilardi's

13  awareness that Mr. Wildes may have sourced this information

14  from a competitor.  Mr. Ilardi does not know based on the

15  evidence you have before you that this was information sourced

16  from a competitor, the ABF information.

17  *A.*  I can't say what Mr. Ilardi knew.

18  *Q.*  But you don't have any basis testifying here today to say

19  that Mr. Ilardi had any idea about where this information was

20  sourced from, do you?

21  *A.*  Ma'am, I think if you look at this document in particular

22  and you just look at the four corners of the document you can

23  make that argument.  But when you use it in context, when you

24  view the document in context --

25  *Q.*  Mr. Taylor, please tell us the context because I will

LaNard Taylor - Cross

1   represent to you that there is nothing on the conspiracy guide.

2   This is Mr. Ilardi saying great info.  And I have not seen

3   anything that identifies that the source of this information

4   was made aware to Mr. Ilardi.  Does that sound wrong to you?

5   A.  I don't know that it sounds wrong, but I don't know -- I

6   can't remember every single document that Mr. Ilardi was on.

7   Q.  As you are testifying here today, you cannot cite any basis

8   for an understanding that Mr. Ilardi had any knowledge this

9   information was sourced from a competitor, do you?

10  A.  I don't know what Mr. Ilardi knew in this particular

11  e-mail.  Again, it would have to be viewed in some context of

12  other e-mails and communications.

13  Q.  You cannot testify to any basis to claim that there is an

14  awareness on Mr. Ilardi's part that this information was

15  sourced from a competitor, do you?

16  A.  Again, I can't say one way or the other based on this

17  particular document in isolation.

18          MS. PREWITT:  Thank you.

19          THE COURT:  Mr. Tubach?

20          MR. TUBACH:  Thank you, Your Honor.

21                      **CROSS-EXAMINATION**

22  BY MR. TUBACH:

23  Q.  Agent Taylor, my name is Michael Tubach.  I represent

24  Jayson Penn.  I want to ask you some questions about Exhibit

25  2-001.  It's Page 2 of the "as of" presentation.  If we can

LaNard Taylor - Cross

1  pull that up on the screen.

2          This is the document that you testified about

3  previously was the evidence that led you to conclude that

4  Mr. Penn and Mr. Lovette had joined in an agreement to fix

5  prices.  Do you recall that?

6  A.  I do, though I don't know it was one single document that

7  led me to conclude that, but I certainly testified that this

8  was the "as of" date.

9  Q.  Page 2 of Exhibit 3 is the document that you testified was

10 the basis for deciding when Mr. Lovette and Mr. Penn joined the

11 conspiracy; is that right?

12 A.  I don't see the document -- I don't see the page, but ...

13 Q.  Now you do.

14 A.  Yes, sir.

15 Q.  And that's why they are underlined in red on the left of

16 that document, correct?

17 A.  That is correct.

18 Q.  And this is an e-mail from my client, Mr. Penn, to Bill

19 Lovette, the CEO of Pilgrim's, summarizing negotiations between

20 Pilgrim's Pride and Pollo Tropical for 2012 pricing; is that

21 correct?

22 A.  That appears to be correct, yes, sir.

23 Q.  Let me get one issue out of the way right up front.  There

24 are references in this document to fixed prices.  You

25 understand, don't you, that the reference to the fixed prices

LaNard Taylor - Cross

1   has nothing to do with illegal price fixing under the Sherman

2   Act, correct?

3   A.   I think that's correct, yes, sir.

4   Q.   Fixed prices in this context means flat or unchanging

5   prices over the course of a year as opposed to prices that

6   might vary during the year, correct?

7   A.   That is my understanding, yes, sir.

8   Q.   And in this e-mail -- if we can go back to the document to

9   2-001.

10          Now, in this e-mail Mr. Penn writes that the buyer is

11   insisting on fixed pricing; is that correct?

12   A.   Yes, sir.

13   Q.   They are pushing hard for fixed pricing in 2012, correct?

14   A.   Yes, sir.

15   Q.   The "they" there refers to Pollo Tropical, correct?

16   A.   Presumably, yes, sir.

17   Q.   And Mr. Penn also relays in this e-mail that Pollo Tropical

18   has told Pilgrim's Pride that he has several -- a couple of

19   people willing to do the fixed pricing, correct?

20   A.   It appears so, yes.   That's what he says.

21   Q.   And that means their suppliers who have indicated to Pollo

22   Tropical that they are willing to do fixed pricing for 2012,

23   correct?

24   A.   Yes, sir.

25   Q.   And Pollo Tropical is telling Pilgrim's Pride that their

LaNard Taylor - Cross

1   other suppliers are willing to do that, correct?

2   A.  Yes, sir.

3   Q.  And Mr. Penn writes:  We have heard Claxton is willing to

4   fix his pricing for next year, correct?

5   A.  Yes, sir.

6   Q.  And that's the sentence that led you to conclude that

7   Mr. Penn and Mr. Lovette joined a conspiracy as of this date,

8   correct?

9   A.  Not just that sentence alone, but in this document that was

10  one of the contributing factors to make that conclusion, yes,

11  sir.

12  Q.  Is there anything else in this document that led you to

13  that conclusion?

14  A.  In this document, again viewed in isolation, I would say

15  no.

16  Q.  You testified on direct examination that you believed the

17  information about Claxton came from Claxton because it said "we

18  have heard" as opposed to specifically saying "the buyer told

19  us," correct?

20  A.  I don't think I testified to that, no, sir.  I don't think

21  I said that.

22  Q.  You don't believe you said that?

23  A.  I do not believe I said this information came from Claxton.

24  I don't believe I said that.

25  Q.  So you don't have any idea where the information came from.

LaNard Taylor - Cross

1   A.   I do not believe it -- I don't believe I testified it came

2   from Claxton, but I believe what I testified to was I didn't

3   believe it came from the buyer.

4   Q.   And so you understand there is many sources of

5   information -- let me finish my question.  There are many

6   sources of information in the broiler chicken industry other

7   than customers and competitors, right?

8   A.   Yes, sir.

9   Q.   Did you do anything to investigate where the information

10  about Claxton came from?

11  A.   For this particular e-mail from 2011, I don't know about

12  this document in particular, but I have interviewed the buyer

13  for Pollo Tropical.

14  Q.   Did the buyer for Pollo Tropical tell you anything about

15  where the information about Claxton came from?

16  A.   I know it didn't come from him.

17  Q.   He told you specifically that he did not tell anyone at

18  Pilgrim's Pride or anyone else in the industry that Claxton was

19  willing to do fixed pricing for 2012?

20  A.   So that's different.  I don't recall this document

21  specifically, but I do recall Mr. Brink telling us that he

22  would not -- when he talked about pricing, he did not

23  communicate specific supplier names to other suppliers when

24  they were related to pricing.

25  Q.   So the information could have come from somewhere else, but

LaNard Taylor - Cross

1   you believe it didn't come from Pollo Tropical?

2   A.   That's correct.

3   Q.   And I appreciate you're not a lawyer, Agent Taylor, but you

4   do understand that for there to be a violation of the Sherman

5   Act, there has to be an agreement among competitors.   You

6   understand that, don't you?

7   A.   To reiterate your point, I am not a lawyer, but that is

8   what I have been briefed on.   That's my understanding, that

9   there has to be an agreement, yes, sir.

10  Q.   And is there anything in Document 2-001 that suggests to

11  you that Claxton and Pilgrim's are aligning their pricing for

12  Pollo Tropical?

13  A.   So the short answer is no.   However, I think back to my

14  earlier point, I think you can do that with many documents if

15  you take it out of any type of context.   I mean, things can be

16  said about any other conversation we had.   If you take it out

17  of context, it can mean something totally different.

18  Q.   I am not taking anything out of context, Agent Taylor.   I

19  am asking about the document you testified showed that my

20  client joined a conspiracy.   That's the document I am asking

21  about.   Do you understand that?

22  A.   I do understand that, yes, sir.

23  Q.   That document doesn't say anything about Mr. Penn or

24  Mr. Lovette joining any conspiracy, does it?

25  A.   I believe again when you look at it in isolation, just

LaNard Taylor - Cross

1   looking at this document, you can make that argument.  But

2   again, I think if you look at it in context, it's a different

3   story.

4   Q.  Agent Taylor, it's not about remaking the argument.  This

5   is your testimony, sir.

6   A.  But I am not making an argument.  I am just presenting the

7   facts to you, sir.

8   Q.  Let's turn to Exhibit 9 of the "as of" presentation.

9   A.  Okay.

10  Q.  This is Exhibit 2-041 in the *James* log.

11       This is the document you testified on direct

12  examination led you to believe that Tommy Lane joined the

13  conspiracy as of the date of this e-mail, correct?

14  A.  Yes, sir.

15  Q.  That's why Tommy Lane's name is underlined on the left of

16  Page 9 of Exhibit 3, correct?

17  A.  I think that's right, yes, sir.

18  Q.  Now, Mr. Lane -- this document that's up here as Page 9 of

19  Exhibit 3, that's not actually the way this appears on the

20  document itself, correct?

21  A.  Repeat that?

22  Q.  This is sort of a mash-up of two different documents; is

23  that correct?

24  A.  Without seeing the underlying document, I can't say for

25  sure.

172

LaNard Taylor - Cross

1   Q.  Let's go to the underlying documents.  Let's show the

2   e-mail first.  Is that the e-mail?

3   A.  I do, yes, sir.

4   Q.  There is nothing in the body of that e-mail at all, is

5   there?

6   A.  No, there is not.  Well, besides the sent from my iPhone,

7   but short of that -- or sent from my iPad, but short of that,

8   no, sir.

9   Q.  That is something that's included automatically.

10  A.  Depending on the device settings or whatever, somebody's

11  signature line, but ...

12  Q.  What's listed in Exhibit 3, Page 9 is not actually on the

13  e-mail itself.  It's in the attachment to the e-mail, correct?

14  A.  I think that's correct, yes, sir.

15  Q.  And the attachment to the e-mail -- why don't we pull that

16  up.

17          The attachment to the e-mail has lots of information

18  in it, correct?

19  A.  I don't see the attachment, but --

20  Q.  But that's your recollection, correct?

21  A.  I believe so.

22  Q.  It's a whole pricing model with all kinds of costs and

23  everything, right?

24  A.  Yeah.  Without actually seeing it, yeah, that sounds about

25  right.

LaNard Taylor - Cross

1    Q.  And the basis for your concluding that Tommy Lane joined

2    the conspiracy as of February 6, 2013 is that it has the word

3    "competition" in the spreadsheet, correct?

4    A.  Would you mind going back to the -- to that original?

5    Q.  Sure.  Let's skip the attachment for now if that's too

6    difficult to pull up.  Oh, you've got it.  Okay, good.  If you

7    can -- let's go back to Page 9 of Exhibit 3.

8            Is the use of the word "competition" that's

9    highlighted here in Page 9 of Exhibit 3, that's what led you to

10   conclude that Tommy Lane joined the conspiracy as of

11   February 6, 2013, correct?

12   A.  Not just the word competition.  It was more so the exact

13   pricing down to the, you know, decimal.  We are talking four

14   decimals, so it wasn't just the word competition.

15   Q.  Understood.  And you testified I believe on direct

16   examination that because this was pricing down to the fourth

17   decimal point, that showed you that it came from a competitor

18   as opposed to the customer; is that correct?

19   A.  I don't know that that's exactly what I said, but I do

20   believe that something that exact in my understanding, in my

21   investigation, I did not, you know, believe that that would

22   come from a buyer or a customer with that exact pricing.

23   Q.  Because in your investigation of this industry buyers did

24   not share customers.  Buyers did not share information down to

25   the fourth decimal point, right?

LaNard Taylor - Cross

1    A.   That's not -- that didn't happen every single time.   There

2    were at least one instance in which that happened which is

3    reflected I believe in one of the *James* log documents, but for

4    the most part that did not happen from my understanding.

5    Q.   Who is the customer in this exhibit?

6    A.   KFC.

7    Q.   Who was the buyer for KFC in 2013?

8    A.   So I don't know when they did the name change, but it was

9    RSCS, UFPC.   I don't know exactly when they did the name

10   change.

11   Q.   That's the entity, correct?

12   A.   Correct.

13   Q.   The actual buyer, what was the name of the actual person

14   who negotiated at UFPC?

15   A.   I don't recall.

16   Q.   Does the name Mike Ledford ring a bell?

17   A.   It does ring a bell.

18   Q.   He was the person negotiating on behalf of KFC in 2013,

19   correct?

20   A.   I don't recall exactly where he was in 2013.

21   Q.   I will represent to you that he was the person negotiating

22   on behalf of KFC in 2013, okay?

23   A.   Okay.

24   Q.   But you don't remember that as you sit here.

25   A.   I am sure if I saw one of the documents that would lead me

LaNard Taylor - Cross

1    to that, but obviously he has moved companies.  So I don't want

2    to represent to you that he was at one company and he wasn't.

3    I don't want to go down that path.

4    Q.  Understood.  Is it your testimony, Agent Taylor, that Mike

5    Ledford did not share pricing information with suppliers down

6    to the fourth decimal point?

7    A.  I do not know exactly everything Mike Ledford has done.

8    Q.  But as you sit here today, you don't know one way or the

9    other whether Mike Ledford shared pricing information down to

10   the fourth decimal point, do you?

11   A.  I believe he has represented that he may not have, but if

12   he -- I mean, if you pull up a document where he shared it, I

13   wouldn't refute it.  I am not saying it doesn't exist ever, but

14   sitting here right now I don't recall a document in which that

15   happened.

16   Q.  So you are not testifying he didn't share pricing down to

17   the fourth decimal point.

18   A.  Sir, I can't testify that he didn't do one thing or -- I

19   can't do that.

20   Q.  Let's look at one document.  Let's look at Document

21   CLA-0192875.

22        MR. TUBACH:  I believe for the record, Your Honor,

23   this is A -- apologies, Your Honor.  I believe this is Exhibit

24   A-028 I am told for the record.

25   BY MR. TUBACH:

176

LaNard Taylor - Cross

1   Q.   And you understand that A-028 is an e-mail from Mr. Ledford

2   to someone at Claxton, correct?

3   A.   Yes, sir.

4   Q.   And that top line reads:  You would be my second highest

5   supplier with price by only .0003 from the highest.  I don't

6   think that's where y'all want to be.  I take business away from

7   the highest every chance I get.

8         Do you see that?

9   A.   Yes, sir.

10  Q.   So this is Mr. Ledford in the same year, 2013, sharing

11  prices down to the fourth decimal point with a supplier,

12  correct?

13  A.   Yes, though I will note he does not say where that price

14  came from.  There is no other supplier attached to that number.

15  Q.   He says another supplier is .0003 higher than Claxton,

16  correct?

17  A.   That is correct.

18  Q.   And Claxton presumably knows its own price, right?

19  A.   Presumably, yes.

20  Q.   So it's not going to be too hard to figure out where the

21  highest supplier is, correct?

22  A.   I mean, I don't know that to be the case.  But like I said,

23  I will note that there is no other supplier name that's coming

24  from Mr. Ledford that's attached to that four decimal point

25  number.

177

LaNard Taylor - Cross

1    *Q.*  You interviewed Tommy Lane, didn't you?

2    *A.*  I believe we did, but I don't -- I don't specifically

3    recall when.  Again, there was a ton of interviews, but...

4    *Q.*  You interviewed him on June 2nd of this year, Agent Taylor;

5    isn't that right?

6    *A.*  I don't recall the exact date.

7    *Q.*  Do you recall that you interviewed him this year?

8    *A.*  I believe so, but I don't necessarily recall the interview.

9    *Q.*  You participated in the interview, didn't you?  Strike

10   that.

11           Do you recall interviewing Tommy Lane this year at

12   all?

13   *A.*  I believe so, yes, sir.  But like I said, the only reason

14   I'm fuzzy is because we've interviewed a lot of people.

15   *Q.*  And you were one of two agents at that interview, correct?

16   *A.*  Okay.

17   *Q.*  And there were six lawyers there?

18   *A.*  I don't recall exactly how many lawyers.

19   *Q.*  You didn't show Tommy Lane this document that's reflected

20   in Page 9 of Exhibit 3, did you?

21   *A.*  I don't -- I honestly don't recall.  Without actually

22   seeing the interview report, I don't recall what was shown to

23   him and what wasn't.

24   *Q.*  Let me show you Exhibit A-29.

25           *MR. TUBACH:*  Your Honor, this is a lengthy document.

LaNard Taylor - Cross

1    Could I approach the witness or how do you want to handle this?

2            THE COURT:  Ms. Grimm will hand it up.

3            MR. KOENIG:  Your Honor, we haven't been provided a

4    copy of this.

5            MR. TUBACH:  I have a copy here for counsel.

6    BY MR. TUBACH:

7    Q.  Agent Taylor, this is a summary of an interview with Tommy

8    Lane on June 2nd, 2021, correct?

9    A.  Yes, sir, written by the Department of Commerce, Office of

10   Inspector General.

11   Q.  And you participated in that interview, didn't you?

12   A.  It appears I was present, but I don't know exactly what

13   involvement I had in the interview.

14   Q.  You never asked Tommy Lane about the document that is on

15   Page 9 of Exhibit 3; isn't that right?

16   A.  Again, without actually seeing what was shown in this

17   interview --

18   Q.  Look on Page 2, sir, the two documents listed here.

19   A.  I don't have the documents.

20   Q.  I handed it to you.

21   A.  No, you didn't.

22   Q.  My apologies.

23           THE COURT:  I think I ended up with two, Mr. Tubach.

24           MR. TUBACH:  My apologies, Your Honor.

25   BY MR. TUBACH:

LaNard Taylor - Cross

1    Q.  You showed Tommy Lane two documents in this interview,

2    correct?  Look on Page 2.

3    A.  Okay.  And it appears as though there was two documents,

4    yes, sir.

5    Q.  And neither of those documents is a document you concluded

6    showed that Tommy Lane joined the conspiracy in February 2013,

7    correct?

8    A.  I don't -- I don't remember what the Bates number was for

9    that original one, but these do not appear to be that document,

10   no, sir.

11            MR. TUBACH:  Thank you.  I have no further questions.

12            THE COURT:  All right.  Thank you.

13            Who is next?

14            Mr. Fagg, go ahead.

15                          **CROSS-EXAMINATION**

16   BY MR. FAGG:

17   Q.  Good morning, Special Agent Taylor.

18   A.  Good morning, sir.

19   Q.  I am John Fagg and I represent Bill Lovette.

20            Special Agent Taylor, you would agree with me, would

21   you not, that in order for Mr. Lovette to enter into an illegal

22   conspiracy to violate the anti-trust laws, that he would have

23   to agree to enter into that agreement to be a part of the

24   conspiracy and that he would have to do so --

25   A.  I don't want to cut you off, but I can barely hear what

LaNard Taylor - Cross

1    you're saying.  I am sorry.

2    Q.  Sure.  You would agree with me, would you not, that in

3    order for Mr. Lovette to enter into an anti-trust conspiracy,

4    that he would have to agree to enter into that conspiracy and

5    he would have to do so with the knowledge that that conspiracy

6    was to restrain trade.  You would agree with that, would you

7    not?

8    A.  I -- I don't know that I would -- again, not being an

9    attorney, I don't know that I can come to that conclusion that

10   he has to have this element and this element in order to be a

11   part of the conspiracy.  I don't know that I can make that type

12   of conclusion.

13   Q.  You would agree with me that he has to agree to enter into

14   the conspiracy, correct?

15   A.  So when you say agree, I guess the reason I am struggling

16   is obviously there is no conversation where he says, hey, I

17   agree to partake in a conspiracy.  I am not sure that's what

18   usually happens.

19   Q.  I didn't ask you if it was a conversation.  I asked you if

20   he had to agree.  And is it your testimony as the lead case

21   agent on this and as the witness testifying for the government

22   that Mr. Lovette would have to agree to be a part of that

23   conspiracy?  Yes or no?

24   A.  I -- I don't have an answer to that question.

25   Q.  Special Agent Taylor, the government contends that

LaNard Taylor - Cross

1    Mr. Stiller is a part of this conspiracy that's been charged,

2    correct?

3    *A.*   Yes, sir.

4    *Q.*   And the government contends that Mr. Stiller joined the

5    conspiracy as of September the 19th of 2014, correct?

6    *A.*   That's -- I don't know the exact date, but that time frame

7    sounds about right.

8    *Q.*   Well, let's pull up Slide 6 which is from Exhibit 3 of the

9    government's exhibits, okay?

10   *A.*   Yes, sir.

11   *Q.*   Sir, Mr. Stiller is underlined here to the left, correct?

12   *A.*   He is, yes, sir.

13   *Q.*   So this indicates that this is the date that the government

14   contends that Mr. Stiller joined the conspiracy, true?

15   *A.*   At least on this date.  It's not exact, but it's at least

16   by this time we believe.

17   *Q.*   So let's pull up the actual e-mail that this text is

18   excerpted from.  This is from the *James* log, 2-151.

19          Now, this is an e-mail chain that includes a number of

20   Pilgrim's personnel, correct?

21   *A.*   It appears to be two Pilgrim's personnel, yes, sir.

22   *Q.*   If you look at the entire chain, it is entirely between

23   Pilgrim's personnel, correct?  Mr. Stiller, Lonnie Justice,

24   Thomas Lane, those are all Pilgrim's employees, correct?

25   *A.*   Yes, sir.

LaNard Taylor - Cross

1   Q.  And there is no one external to Pilgrim's on this e-mail,

2   right?

3   A.  No, sir.

4   Q.  So a part of this e-mail that the government contends

5   indicates that or evidences that Mr. Stiller joined this

6   conspiracy is the language in which he says, Mr. Stiller:  Got

7   KFC and BM.  Rest still to come.  Everybody is getting that

8   price increase.

9          That's the language, correct?

10  A.  Yes, sir.

11  Q.  So let's break this down.  That indicates that Pilgrim's

12  obtained a price increase from its customer KFC, correct?

13  A.  And Boston Market, yes, sir.

14  Q.  And there is nothing illegal, is there, about a company

15  having as its strategy to try and increase prices to its

16  customers, correct?

17  A.  So I again don't want to say what is legal and what's not,

18  though I will say --

19  Q.  As your -- in your role as an investigating officer with

20  the Federal Bureau of Investigation, do you believe in your

21  opinion that there is anything wrong with a company having its

22  strategy to try and increase its prices to its customers?

23  A.  It depends.

24  Q.  In and of itself, is there anything illegal about that?

25  A.  Again, I don't want to make a conclusion illegal or not,

LaNard Taylor - Cross

1    but it definitely depends on a lot of different variables.  It

2    depends on how that pricing was derived.

3    Q.  I am not asking you about variables, sir.  I am asking you

4    about in and of itself in isolation, if a company has as its

5    strategy to increase prices, in your opinion is there anything

6    wrong with that?

7    A.  I don't think you can view that in isolation by itself and

8    make that type of conclusion.  You have to look at the other

9    context.  You cannot take it out of context just to say that it

10   doesn't go one way or the other.

11   Q.  Well, let's look at this document.

12   A.  Sure.

13   Q.  There is nothing on the face of this document that

14   indicates that these prices are anything other than Pilgrim's

15   own prices, correct?

16   A.  Repeat your question, please?

17   Q.  Sure.  If you look at the face of this document where they

18   are talking about price increases --

19   A.  Yes, sir.

20   Q.  -- there is nothing in this document that indicates that

21   those prices, those price increases were anything other than

22   Pilgrim's own strategy, correct?

23   A.  I don't know -- I don't know that based on this document in

24   isolation, of course.

25   Q.  But there is nothing on the document itself that indicates

LaNard Taylor - Cross

1    otherwise, is there?

2    A.  No, there is nothing on the four corners of this document

3    that says otherwise.

4    Q.  And with respect to the statement in there "Everybody is

5    getting that price increase," if everybody refers to the

6    buyers, again there is nothing wrong with that in and of

7    itself, is there?

8    A.  Repeat your question one more time.

9    Q.  In and of itself, right, in isolation if "Everybody is

10   getting that price increase" refers to customers and all of the

11   customers are getting a price increase, in isolation there is

12   nothing wrong with that, is there?

13   A.  I think I struggle to answer your question because it's

14   hard to look at it just in isolation when you know what the

15   context of these e-mails are.  So to put it in isolation, it's

16   hard for me to do that knowing --

17   Q.  I am asking you about the face of the document, sir.

18   A.  Yeah, I can't answer just in isolation for this particular

19   document.  I guess I am not sure what you're asking me.

20   Q.  There is nothing on the face of this document that

21   indicates to you or that would indicate to the Court that this

22   is anything other than Pilgrim's internal strategy.

23   A.  I would say no, on the face of this document in the four

24   corners there is nothing that says this is something other than

25   Pilgrim's strategy.

LaNard Taylor - Cross

1    Q.   Thank you.

2         Sir, you are familiar with the phrase "price

3    discovery," correct?

4    A.   I have heard it though I mean, I don't know --

5    Q.   You have heard it in the course of this investigation,

6    right?

7    A.   Yes.

8    Q.   There is nothing illegal about price discovery, correct?

9    A.   Again, I don't know what -- I don't want to get into a

10   determination of what's legal and what's illegal.  Sir, I don't

11   have an answer for that.

12   Q.   In your opinion as if not the lead, one of the leading

13   agents, in your opinion is there anything illegal in and of

14   itself of price discovery?

15   A.   I would need to know what context that you're -- the term

16   "price discovery" is used because you can use that term, I am

17   sure, in plenty different industries and it would mean one

18   thing or the other.  So if you provide me with a little more

19   context of what -- I guess what sentence you are trying to use

20   it in.

21   Q.   Let me ask it this way.  With respect to price discovery,

22   right, one way to compete against competitors is to determine

23   what price those competitors are charging and to beat their

24   price, correct?

25   A.   I think that's -- yeah, I think that's right.

LaNard Taylor - Cross

1    *Q.*  Sir, you recall your testimony that at times some of the

2    suppliers who are involved in this alleged conspiracy entered

3    into bilateral transactions with one another, correct?

4    *A.*  Yes, sir.

5    *Q.*  And in order to have those discussions, those bilateral

6    discussions, you have to discuss price, correct?

7    *A.*  That is correct.

8    *Q.*  And there is nothing about senior executives at a company

9    or companies having those discussions that somehow or another

10   makes those discussions of price in connection with a bilateral

11   transaction somehow or another illegal, correct?

12   *A.*  I don't know that I can draw that conclusion.  Again, I

13   think there is a lot of different things that go into pricing

14   discussions.

15   *Q.*  If there is a bilateral transaction that is happening, it

16   doesn't matter who it is at the company who is having the

17   discussions if those discussions are about the bilateral

18   transaction, true?

19   *A.*  I don't -- I don't know if I would agree with that, no,

20   sir.  When you say it doesn't matter who's having the

21   discussions, I don't.

22   *Q.*  If it is someone who is talking about the transaction, a

23   bilateral transaction between two chicken suppliers --

24   *A.*  Okay.

25   *Q.*  -- it doesn't matter what status or title that person has

LaNard Taylor - Cross

1    in having those discussions, does it, as long as that

2    discussion is in furtherance of a bilateral transaction?

3    A.   I mean, I don't know.  I don't know what -- it depends on

4    what I guess the companies make about it.  I don't know.

5    Q.   Let's look at Exhibit 1-021.  This is an e-mail from

6    Mr. Lovette's assistant, Sheri Garland, to Mr. Lovette

7    informing him that Mr. Grendys from Koch Foods had called and

8    wants to talk about boneless, correct?

9    A.   Yes, sir.

10   Q.   And boneless chicken is a product that Pilgrim's sold,

11   correct.

12   A.   Yes, sir.

13   Q.   And it is a product that Pilgrim's sold to other chicken

14   suppliers, correct?

15   A.   I presume they did.  I couldn't tell you exactly an

16   instance, but presumably I believe they did.

17   Q.   Did you not investigate that?

18   A.   Sure, but there are a lot of products, so I can't tell you

19   whether they sold boneless specifically to another supplier.

20   Q.   You know that this is a product that Pilgrim's sold to Koch

21   Foods around this same time?

22   A.   I don't recall a transaction off the top of my head.

23   Q.   Can we please pull up Exhibit A-026?

24        Sir, this is an e-mail from Mr. Lovette on March 27th

25   of 2013.  That's the same day that we were just talking about

LaNard Taylor - Cross

1    the e-mail with Sheri Garland, correct?

2    A.   Yes, sir.

3    Q.   And what this e-mail shows is that Mr. Grendys was calling

4    Mr. Lovette to talk about Koch purchasing five to seven loads

5    per week for the rest of the year, for the next nine months,

6    correct?

7    A.   Yes, sir.

8    Q.   So Special Agent Taylor, isn't it true that the statement,

9    the earlier e-mail that we talked about, the one from

10   Ms. Garland to Mr. Lovette, is, in fact, not in furtherance of

11   any conspiracy and is in regard to an actual bilateral

12   transaction between Pilgrim's and Koch?

13   A.   That appears to be the case based on the e-mails that I am

14   reading, yes.

15   Q.   And isn't it true, sir, that this e-mail from Ms. Garland

16   does not evidence either Mr. Lovette or Mr. Grendys being a

17   member of a conspiracy?

18   A.   This particular e-mail chain does not suggest that from my

19   understanding.

20   Q.   Let's look at Exhibit 1-025.  This is a document that also

21   appears on the *James* log at Entry No. 66A.

22          Sir, this is an e-mail from -- this is an e-mail

23   exchange between Mr. Grendys and Mr. Lovette, correct?

24   A.   Yes, sir.

25   Q.   And this e-mail came after Pilgrim's had publicly disclosed

LaNard Taylor - Cross

1   its financial reporting the day before, yes?

2   A.  It sounds like it, yes, sir.

3   Q.  So point out to the Court the words in this e-mail -- and

4   please restrict your answer, sir, to the words on this page --

5   what evidence it is that you contend that this e-mail evidences

6   the charged conspiracy as it relates to Mr. Lovette.

7   A.  Okay.  So I can't answer your question by saying this --

8   you know, these particular words or, you know, go to the

9   conspiracy.  I don't think you can do that with this particular

10  document.  I think -- I believe this document is -- shows the

11  competitor, you know, the relationship communication between

12  the two of them, not necessarily that they're sharing prices or

13  anything in this type of document, I think, if that answers

14  your question.

15  Q.  No, it doesn't, but I'll take your answer.

16  A.  Thank you.

17  Q.  Sir, I want to ask you about you interviewed a gentleman

18  named Roberto Esteves, true?

19  A.  Yes, sir.

20  Q.  And Mr. Esteves is a former employee of Pilgrim's Pride,

21  correct?

22  A.  Yes, sir.

23  Q.  And when you -- you said you reviewed the conspiracy guide,

24  yes?

25  A.  I have, yes, sir.

LaNard Taylor - Cross

1    Q.  And one of the categories at the end of the conspiracy

2    guide that the government concluded was plausible deniable,

3    right?

4    A.  That's correct, yes, sir.

5    Q.  And there is only one document that relates to plausible

6    deniable, yes?

7    A.  I don't know there was one.  There could have been two,

8    but --

9    Q.  Will you take my representation that there is only one?

10   A.  Yes.  If you are representing that to me, then I will take

11   that, but I don't know that to be a fact.

12   Q.  So if we can pull up this 302 of Mr. Esteves, please.

13   A.  Yes, sir.

14   Q.  This is Exhibit 2-320 from the government's *James* log.  I

15   want to focus in on this.

16          If we look at the page where it talks about

17   Mr. Esteves talking about an export issue in Russia.  Do you

18   remember that?

19   A.  Yes.

20   Q.  And you were at that interview.

21   A.  I was, yes.

22   Q.  And what Mr. Esteves described was an issue that Pilgrim's

23   ran into related to the export of chicken products to Russia

24   and a problem that they encountered with customs in Russia,

25   yes?

LaNard Taylor - Cross

1    A.   That's correct, yes, sir.

2    Q.   And Mr. Esteves was seeking to come up with a solution for

3    that, right?

4    A.   Yes, sir.

5    Q.   And that problem that Mr. Esteves had encountered related

6    to the labeling of products, correct?

7    A.   Yes, sir.

8    Q.   And it did not have anything to do with the sale of chicken

9    in the United States, did it?

10   A.   It did not.

11        MR. FAGG:  No further questions.

12        THE COURT:  Thank you.

13        Let's see, who is going next?

14        MR. FELDBERG:  May I proceed, Your Honor?

15        THE COURT:  Could you identify your name for the court

16   reporter.

17        MR. FELDBERG:  For the Court and Special Agent Taylor,

18   I am Michael Feldberg.  I represent Rober Austin.

19        THE COURT:  Go ahead, Mr. Feldberg.

20                         **CROSS-EXAMINATION**

21   BY MR. FELDBERG:

22   Q.   You testified last week that Robbie Bryant admitted to

23   acting as a co-conspirator in the charged conspiracy.  Do you

24   recall that?

25   A.   I do, yes, sir.

LaNard Taylor - Cross

1   *Q.* You have interviewed Mr. Bryant twice, have you not?

2   *A.* Yes, sir.

3   *Q.* On June 22nd of this year and July 12th of this year,

4   correct?

5   *A.* I don't recall exact dates, but I take it you are looking

6   at the documents, so I assume what you are saying is correct.

7   *Q.* And you prepared reports of those interviews on FBI Form

8   302, correct?

9   *A.* Yes, sir. Yes, sir, I did.

10  *Q.* And you know from your training and experience that it's

11  important that 302s accurately record everything that is said

12  in an interview, correct?

13  *A.* I don't believe that is correct.

14  *Q.* You don't believe it's important that a 302 record

15  everything that it said in an interview?

16  *A.* Sir, when we are writing -- when we are interviewing

17  somebody multiple hours, it's nearly impossible to capture

18  every single thing that is said. So that's the part I am

19  saying I don't believe that's correct.

20  *Q.* But it's certainly important to try to capture everything

21  important that's said, correct?

22  *A.* Yes, sir. That is your goal in writing a 302, yes, sir.

23      *MR. FELDBERG:* The two 302s are in evidence as

24  Government Exhibits 2-323 and 2-327. With the Court's

25  permission may I hand them to the witness or to the Court's

LaNard Taylor - Cross

1    clerk at the same time?

2          THE COURT:  You may.  Do you have a copy for the

3    United States?

4          MR. FELDBERG:  I have a copy for the Court and a copy

5    for DOJ.

6          THE COURT:  Okay.  I think I have two copies of the

7    same thing, but probably not -- sorry.  They are different.

8    BY MR. FELDBERG:

9    Q.  Special Agent Taylor, you both prepared and have reviewed

10   these 302s, correct?

11   A.  Yes, sir, that's correct.

12   Q.  Where does it say that Mr. Bryant admitted to acting as a

13   co-conspirator in the charged conspiracy?

14   A.  In one of these.  I don't recall exactly which one.

15   Q.  Please find where he says that.

16   A.  I am sorry?

17   Q.  Please find where he says that.

18   A.  Well, it doesn't say those words.

19   Q.  Oh, he doesn't.

20   A.  Not those words, but he does say he asked I believe it was

21   Scott Tucker to go get prices from a competitor, which is the

22   behavior that goes to this overall conspiracy.  So those exact

23   words are probably not going to be found in here, but the

24   behavior does, yes, sir.

25   Q.  Did Mr. Bryant say to you that he admitted acting as a

LaNard Taylor - Cross

1  co-conspirator in the conspiracy charged in this case?  Did he

2  say that?

3  *A.*  I believe last week I told Ms. Prewitt that no one said

4  those exact words, but I also don't believe that would be

5  reasonable to expect that somebody would say those exact words

6  to me in an interview.

7  *Q.*  Well, let's look at exactly what you said, the transcript

8  of last week's testimony, A-006.  Let's look at Page 110,

9  Line 9.  We are having technical difficulties with the display.

10  I will read you the Q and A, sir.  It's at Page 110, Line 9.

11  The question beginning at Line 4:

12        And in the context of all of those interviews, there

13  is not a single witness that admitted to acting as a

14  co-conspirator within the charged conspiracy; is that right?

15        Answer:  That is not right.

16        Question:  Well, who admitted to their participation?

17        Answer:  Mr. Bryant.

18        Were you asked those questions and did you give those

19  answers?

20  *A.*  I did, sir.  My answers are the same, yes, sir.

21  *Q.*  And is there anything in either of your 302s in which

22  Mr. Bryant admits that he acted as a co-conspirator in the

23  charged conspiracy?

24  *A.*  Yes.

25  *Q.*  What is it?

LaNard Taylor - Cross

1    A.  If you give me a second, I will find the line, at least one

2    of the lines that I am referring to.

3            THE COURT:  Mr. Feldberg, I think the technical

4    problem has been solved too.

5            MR. FELDBERG:  If the government would like to assist

6    the witness, that's fine with us in trying to find where Mister

7    -- the agent says Mr. Bryant admitted participating in the

8    conspiracy.

9    BY MR. FELDBERG:

10   Q.  I will represent to you, Special Agent Taylor, that there

11   is nothing in either 302 in which Mr. Bryant admits to acting

12   as a co-conspirator in the charged conspiracy.

13   A.  There is in there.  And like I just said, the particular

14   statement about -- I mean, I can't control find, so I would

15   have to go through and read all of it, but there is a

16   particular statement in there which he admits to asking I

17   believe it was Scott Tucker to go to competitors and find -- to

18   get pricing, which is him admitting to his role in this

19   conspiracy.

20   BY MR. FELDBERG:

21   Q.  Your testimony was he admitted participation in the

22   conspiracy.  Are you telling the Court that you're interpreting

23   what you just described as Mr. Bryant's statement to be an

24   admission of participation in the charged conspiracy?

25   A.  Yes, sir.  If the underlying behavior or the underlying

1    actions in the conspiracy are that competitors call competitors

2    to get pricing to better inform their decisions or whatever

3    about pricing and Mr. Bryant admitted that he did that and he

4    asked someone to go do that, I believe so.

5    Q.  But Agent Taylor, didn't you just testify that the essence

6    of the crime charged here is an agreement, not one competitor

7    asking what another competitor's prices are so that competitor

8    one can make its own determination, but the essence is an

9    agreement.  Isn't that what you just testified to?

10   A.  I did, but there is a lot of different things that go into

11   that agreement, one being calling each other to share prices to

12   better inform your decision about what pricing strategy -- or

13   what pricing to go in for a particular customer.

14   Q.  So we are on the same page, you acknowledge that Mr. Bryant

15   did not say the words that he admitted participating in the

16   charged conspiracy, correct?

17   A.  I do acknowledge that he did not say the words.  I think I

18   acknowledged that last week as well.  And I also said I don't

19   think that would normally happen in an interview, somebody

20   would say those exact words.

21   Q.  And what you are telling us is that you've interpreted

22   various things he said he said to support your statement that

23   he admitted participation; is that correct?

24   A.  No, sir.  I am not interpreting things on my own.  I'm

25   going off of what he told us that he did, his actions.

LaNard Taylor - Cross

1    Q.  And you're interpreting that as an admission of

2    participation in the conspiracy, correct?

3    A.  If he's telling me that his actions were to instruct

4    someone to go get pricing, then yes, sir.  I am taking his

5    word.

6    Q.  Now, you also testified last week that in the affidavits

7    you swore out to support search warrants, you didn't

8    necessarily describe the conduct in your affidavits as a crime.

9    Do you recall that testimony?

10   A.  I believe what I said -- I don't have the transcript, but I

11   believe what I said is I did not -- I don't believe I represent

12   to a magistrate what's a crime, what's not a crime, what's

13   illegal, what's -- what's legal and what's illegal.  I believe

14   I testified that I provide the facts and tell a magistrate I

15   believe this is in support -- that this is, you know, support

16   of probable cause that a crime may have been committed.

17   Q.  Well, let's look at your actual testimony.  Can we call up

18   Page 115 of last week's transcript, please, Lines 5 and 6?

19        Are you able to see your answer on 115, Lines 2

20   through 6, Special Agent Taylor?

21   A.  Yes.

22   Q.  And is that -- the court reporter accurately described

23   your -- wrote down your testimony, correct?

24   A.  Yes, sir.

25   Q.  Okay.  And you testified that:  I don't necessarily say I

LaNard Taylor - Cross

1    say this is a crime.

2            Correct?

3    A.  Yes, sir, that's what it says.

4            MR. FELDBERG:  Could we call up Defense Exhibit A-101,

5    Paragraph 5.?  And let's let Agent Taylor see the beginning of

6    this so he can identify the document.

7    BY MR. FELDBERG:

8    Q.  Is this an affidavit you swore out for a search warrant,

9    sir?

10   A.  It is, yes, sir.

11   Q.  Can we take a look at Paragraph 5, please?

12           Did you say in Paragraph 5 that the facts you're

13   describing constitute probable cause of crime?

14   A.  Yes, sir, but -- yes, that's exactly what I said.

15   Q.  Can we call up A-0002?

16   A.  Can I just go back?  In that sentence, I said, I further

17   believe there is probable cause to believe.  I don't say, this

18   is a crime.

19           MR. FELDBERG:  Let's call up Exhibit A-002.

20   BY MR. FELDBERG:

21   Q.  And is this another search warrant affidavit that you swore

22   out, Agent Taylor?

23   A.  It is, yes, sir.

24   Q.  Can we take a look, please, at Paragraph 9, the first

25   sentence?

LaNard Taylor - Cross

1     And once again, sir, you swear in this affidavit that
2  the facts you're describing constitute probable cause of a
3  crime.
4  A.  Yes, sir.  I represent that it's -- I believe it's probable
5  cause, yes, sir.
6  Q.  Now, you testified both last week and today that when there
7  is a specific exact price down to three or four decimal or five
8  decimal points, that generally comes from a competitor, whereas
9  when customers provide price information, it comes within a
10  range.  Do you recall that testimony?
11  A.  I don't recall me saying that if it was four decimal, five
12  decimal, it came from a competitor.  What I recall saying was
13  that I did not believe that came from a buyer.
14  Q.  And you recall saying that if customers provided prices, it
15  would generally come in a range.
16  A.  Generally, yes, sir.  That's not absolute, but I said
17  generally, yes, sir.
18       MR. FELDBERG:  Could we call up GX1, log entry 113?
19  Do you have it up there?
20  BY MR. FELDBERG:
21  Q.  Agent Taylor, to save time while we are trying to get the
22  document up --
23       THE COURT:  It's up.
24  BY MR. FELDBERG:
25  Q.  Oh, it's up.  Good.

LaNard Taylor - Cross

1              This is the checking around e-mail, is it not?

2    *A.*  It is, yes, sir.

3    *Q.*  Are the prices that are expressed in that e-mail down to

4    three, four or five decimal points or are they expressed in

5    ranges?

6    *A.*  They are expressed in ranges.

7              MR. FELDBERG:  Okay.  Could we pull up, please, Page 3

8    of Exhibit 3, the "as of" document?

9    *BY MR. FELDBERG:*

10   *Q.*  This is the document, Agent Taylor, that you testified is

11   the "as of" date when you believe Roger Austin joined the

12   conspiracy, correct?

13   *A.*  Yes, sir.

14   *Q.*  And you focused on the phrase "group consensus" in that

15   document, correct?

16   *A.*  Yes, sir.

17   *Q.*  What did you do to try to investigate whether the group

18   consensus referred to in that document was simply a group of

19   Pilgrim's executives or it was a different group?

20   *A.*  So as it relates to this particular e-mail, I'm not sure,

21   you know, what other documents or what else we've reviewed or

22   whoever we have interviewed about this particular document, but

23   what I will say is that based on the interviews we have done

24   and some of the other documents that we've seen where we've

25   seen this type of verbiage used when we talk about group

1    consensus, when we viewed that, those documents in that

2    context, our understanding -- my understanding of the documents

3    was that when you see this term "group consensus," in many

4    instances they are referring to other suppliers.

5    Q.   As we sit here today, Agent Taylor, do you know one way or

6    the other what the term "group consensus" in this document

7    refers to?

8    A.   I believe it refers to competitors.

9    Q.   What is the basis for that belief, sir?

10   A.   Based on the further investigation that I've done in which

11   we've seen, like I said, phrases or verbiage that is similar to

12   this in which it did refer to competitor.

13   Q.   Did you ask anybody what is meant by the phrase "group

14   consensus" in this particular e-mail?

15   A.   I don't recall every question we asked every witness, so I

16   can't say one way or the other.

17   Q.   And you think as we sit here today, can you identify anyone

18   you asked what that phrase means in this e-mail?

19   A.   Again, I can't recall any specific question for a

20   particular interview.  And I am not trying to be smart, but

21   there is a ton of interviews that we've done and I can't say

22   every single question that was asked.

23   Q.   Mr. Taylor, what is your independent evidence that

24   Mr. Austin was ever in the conspiracy with anyone from Purdue?

25   A.   I -- I would have to review, you know, documents to

LaNard Taylor - Cross

1    determine whether Mr. Austin had phone calls with anybody at

2    Purdue.  I can't recall any of the phone calls off the top of

3    my head.

4    Q.  So you can't identify any independent evidence that

5    Mr. Austin was ever in a conspiracy with anyone from Purdue,

6    correct?

7    A.  I can't cite a particular phone record.  I am not saying it

8    doesn't exist.  I am just saying I can't cite one off the top

9    of my head.

10   Q.  What about Case, what is your independent evidence that

11   Mr. Austin was in a conspiracy with anyone from Case?

12   A.  I think the same answer is true.  I can't cite a particular

13   phone log or e-mail off the top of my head, but that doesn't

14   necessarily mean it doesn't exist.

15   Q.  What is your independent evidence that Mr. Austin was ever

16   in a conspiracy with anyone from Tyson?

17   A.  Sorry.  Again, I can't cite a particular phone call or

18   e-mail or communication without having the ability to review

19   the document.  I can't cite one off the top of my head.

20        MR. FELDBERG:  No further questions.  Thank you,

21   Mr. Taylor.

22        THE COURT:  Thank you, Mr. Feldberg.

23        MR. BYRNE:  Mike Byrne on behalf of Jimmie Little.

24        THE COURT:  Go ahead.

25                        **CROSS-EXAMINATION**

LaNard Taylor - Cross

1    *BY MR. BYRNE:*

2    Q.  Good morning, Special Agent Taylor.

3    A.  Good morning.

4    Q.  Let me direct your attention, please, to Slide 8 of

5    Government Exhibit 3.

6            Can we put that up?

7            This relates to Robbie Bryant's entry into the

8    conspiracy; is that correct?

9    A.  Yes, sir.  Before you go -- in relation to that last

10   question, can I -- I just thought of something where he

11   asked --

12   Q.  The last question that I asked?

13   A.  No, I am sorry, that Mr. Feldberg asked.

14           *MR. FELDBERG:*  I asked a question and he gave the

15   answer, Your Honor.

16           *THE COURT:*  We will do that on redirect.

17           Go ahead, Mr. Byrne.

18   *BY MR. BYRNE:*

19   Q.  So you testified last week that this slide and this e-mail

20   or series of e-mails on the 24th of December of '13 shows that

21   Mr. Bryant was a participant in the conspiracy.  This is his

22   "as of" date, correct?

23   A.  That's correct, yes, sir.

24   Q.  And that's because, according to you, Mr. Little

25   communicated to Mr. McGuire and Mr. Bryant about competitor

LaNard Taylor - Cross

 1   pricing for that particular year, correct?

 2   A.  Yes, sir.

 3           MR. BYRNE:  Can I have put up, please, Government

 4   2-315?  It's referenced on Slide 8.

 5   BY MR. BYRNE:

 6   Q.  Do you see that?

 7   A.  I do, yes, sir.

 8   Q.  Starting at the bottom, this appears to be an e-mail from

 9   Dean Bradley at Church's asking Jimmie Little to help Church's

10   cover a short.  Is that what it looks like?

11   A.  It happens so, yes, sir.

12   Q.  So Little e-mails Bryant, who is another Pilgrim's

13   employee, and he asks if Pilgrim's can help, correct?  I am

14   reading further up.

15   A.  Yeah.  I can't tell exactly where that e-mail comes from

16   based on the format of it, but it appears as though it

17   certainly at least went to another Pilgrim's employee.

18   Q.  Well, it goes to Bryant, right?

19   A.  At least, yes.

20   Q.  And then Bryant says no, we can't help, correct?

21   A.  Yes, sir.

22   Q.  They can't cover the short.

23   A.  Yes, sir.

24   Q.  And then Little tells Bryant and McGuire, who is also

25   another Pilgrim's employee, on the e-mail that he found out

LaNard Taylor - Cross

1    Tyson's price is lower than Pilgrim's in 2014, correct?

2    A.   That is correct.

3    Q.   So Little sends an e-mail to Bryant about covering shorts.

    And at the end of the e-mail he says, oh, and by the way,

5    Tyson's price is lower than Pilgrim's in '14.

6             That's what's going on on this e-mail string, right?

7    A.   Yes, sir.

8    Q.   And that's enough to bring Mr. Bryant into the conspiracy,

9    receiving an e-mail from Mr. Little about Pilgrim's' prices?

10   In your opinion, is that enough to bring him into the

11   conspiracy?

12   A.   When you say bring him --

13   Q.   This is the "as of" date.

14   A.   Sure.   I am sorry, I got you.   Well, I think possessing the

15   competitor pricing and information, if you just looked at this

16   document by itself, I think you would say that, you know, okay,

17   maybe not.   But then when you look at the pattern of conduct

18   by, you know, others throughout the investigation, then I think

19   you go back to this earlier incident when at what point can we

20   at least say he began to possess this type of customer --

21   competitor information, so on and so forth.

22   Q.   Okay.   But you said at some point.   But this is the point

23   where you have pegged Mr. Bryant as a member of the conspiracy,

24   correct?   And it's based upon the information on Slide 8 of

25   Government's Exhibit 3, correct?

LaNard Taylor - Cross

1    A.  This is the "as of" date, yes, sir.

2    Q.  Okay.  Let me switch gears slightly.  And now you're aware,

3    Special Agent Taylor, that Jimmie Little retired from Pilgrim's

4    as of September 30th of 2016.  Are you aware of that?

5    A.  I am aware he retired.  I don't know the exact date, but I

6    take it that whatever date you give me as accurate.

7         MR. BYRNE:  Well, let me ask for an exhibit to be put

8    up.  It's been marked A-23.  It's been provided to the

9    government, Your Honor.

10   BY MR. BYRNE:

11   Q.  So this is an e-mail from Roger Austin internally to

12   Pilgrim's employees dated September 22nd of '16 announcing that

13   Jimmie Little will be retiring as of September 30th, 2016,

14   correct?

15   A.  Yes, sir.

16        MR. BYRNE:  And if I could ask that the next exhibit,

17   A-24, be put up.

18   BY MR. BYRNE:

19   Q.  And this is a bounce-back from Jimmie Little's e-mail on

20   October 1st showing that his e-mail at Pilgrim's had been

21   disabled as of October 1st, correct?

22   A.  Yes, sir.

23   Q.  So as you sit here today, are you aware of any evidence

24   that Jimmie Little participated in this conspiracy that you've

25   testified about after September 30th of 2016, as you sit here

LaNard Taylor - Cross

1   today?

2   A.   Yeah, off the top of my head, I don't recall any evidence

3   post-retirement for Mr. Little, no, sir.

4        MR. BYRNE:   Okay.   I have no further questions and I

5   would like to cede the rest of my time to Mr. Russell to the

6   extent that's possible.

7        THE COURT:   Sure.   If there is no objection to that,

8   let's do that.   Thank you, Mr. Byrne.

9        Mr. Kornfeld, go ahead.

10       MR. KORNFELD:   Rick Kornfeld on behalf of Mr. Fries.

11                         **CROSS-EXAMINATION**

12   BY MR. KORNFELD:

13   Q.   Good morning, Agent.

14   A.   Good morning, sir.

15   Q.   You understand, do you not, that Claxton is a little bit

16   different than the rest of these companies we are talking

17   about.   It'll privately held, correct?

18   A.   Yes, sir.

19   Q.   It controls less than 1 percent of the broiler chicken

20   market for QSRs; isn't that true?

21   A.   I don't know exactly what portion of the industry that they

22   control.

23   Q.   But it's small in any event.   You know that.

24   A.   Absolutely, yes, sir.

25   Q.   They don't answer to Wall Street because they are not

LaNard Taylor - Cross

1   publicly held, correct?

2   A.  I don't know about that characterization whether they

3   answer to Wall Street, but they are not publicly held, yes,

4   sir.

5   Q.  And Mr. Fries relatively speaking doesn't appear too often

6   in the 14 or 15 or 16 million documents produced by the

7   government; isn't that true?

8   A.  I don't think that is true.

9   Q.  You are saying that he appears a lot in 16 million

10  documents?

11  A.  I believe so.

12  Q.  Okay.  Well, let's talk about the 333 statements in the

13  *James* log.  It's true, is it not, that only 12 of those list

14  him as a declarant.  I counted, so I will represent that, all

15  right?

16  A.  Yes, sir.

17  Q.  And of those 12, 10 are with his national account sales

18  managers, Mr. Brady, a co-defendant, or Mr. Cooper who we have

19  heard about, correct?

20  A.  Okay.  That sounds right.

21  Q.  So 10 out of 12 he is talking to his own people about

22  selling chicken, right?

23  A.  Though there are phone calls at least with him

24  communicating with a competitor, so I will note that.

25  Q.  Yeah, I am not asking about that.  I am asking you about

LaNard Taylor - Cross

1   the *James* log.

2   A.   This is in the *James* log, yes, sir.  Well, in the

3   conspiracy guide, I apologize.

4   Q.   Right.  And you've interviewed you talked about 50 to a

5   hundred different people in this case, right?

6   A.   Yes, sir, somewhere in that range, yes, sir.

7   Q.   And not a single one implicates Mikell Fries in a

8   conspiracy to fix prices in the broiler chicken industry; isn't

9   that right?

10  A.   I don't know that to be correct, no, sir.

11  Q.   Well, who implicates him?

12  A.   I can't recall -- like I say, I can't recall every single

13  interview, but I have reviewed the documents myself.

14  Q.   Are you telling this Court that there is a witness or

15  witnesses that say Mikell Fries participated in a conspiracy to

16  fix prices in the broiler chicken industry?

17  A.   No, sir, I am not representing that to you, no, sir.

18  Q.   And your cooperator, Mr. Bryant, he doesn't talk about

19  Mr. Fries.  Those 302s are in evidence, right?

20  A.   That is correct.

21  Q.   And your erstwhile cooperator, Mr. Pepper, was subject of

22  11 302s.  Have you ever had a case where one witness was the

23  subject of 11 302s?

24  A.   Yes.

25  Q.   But that's unusual in your experience, is it not?

LaNard Taylor - Cross

1    A.  I would not consider it unusual.  It certainly happens.

2    Q.  Well, unusual or not, he doesn't implicate Mr. Fries.  He

3    doesn't even really mention Mr. Fries as engaged in illegal

4    activity; isn't that true?

5    A.  I don't recall exactly what he said about Mr. Fries.

6    Q.  Well, you don't recall that he did say something.  I mean,

7    we are here in a *James* hearing.  Don't you think you would

8    recall if Carl Pepper told you that Mr. Fries committed a

9    crime?  Don't you think you would recall that?

10   A.  I'm not sure.  To your point, if there is 11 or 12 302s, I

11   don't recall every single line of every single 302.

12   Q.  But the point is you don't as you sit here today recall

13   Mr. Pepper saying Mr. Fries broke the law.

14   A.  I don't recall whether he did or didn't.

15   Q.  Well, if you don't recall that he did, then by implication

16   he didn't in your memory, correct?

17   A.  I can't make that same statement you're making, sir.

18        MR. KORNFELD:  Can you please call up Slide 10 of

19   Government Exhibit 3.?  This is the "as of" date pertinent to

20   Mr. Fries.

21   BY MR. KORNFELD:

22   Q.  Okay.  So, sir, you understand, do you not, that pricing in

23   the chicken industry is different for eight-piece than it is

24   for wings than it is for dark meat, right?

25   A.  Yes, sir.

LaNard Taylor - Cross

1   Q.  And dark meat are sort of -- the price that everything is

2   pegged to as to dark meat is the eight-piece price, correct?

3   A.  Yes, sir.

4   Q.  So when you say .30 back as in this slide, it's .30 back

5   from the eight-piece price, correct?

6   A.  That is my understanding, yes, sir.

7   Q.  So in order to know what a competitor's actual price is as

8   to future price, you would have to know what their eight-piece

9   price is and what their .30 back or .31 back, their back price

10  is, correct?

11  A.  I believe that's accurate, although I can't say, you know,

12  definitively a hundred percent, but yes, generally speaking

13  that's my understanding.

14  Q.  Now, in this slide Mr. Brady says to Mr. Fries:  George's

15  is .30 back on dark meat.

16          Do you see that in the second line?

17  A.  I do.

18  Q.  But nowhere does he say what the actual eight-piece price

19  is, right?

20  A.  In this particular text message, he does not.

21  Q.  Yeah, this text message that is the "as of" date for my

22  client, right?

23  A.  That is correct.

24  Q.  And then Mr. Fries says, Ol Mike, referring to Mr. Ledford

25  who we heard about, he's bluffing hard.

LaNard Taylor - Cross

1                Do you see that?

2    *A.*   I do.

3    *Q.*   Nothing illegal about salespeople or customers bluffing, is

4    there?

5    *A.*   Again, as I represented before, I don't know what's -- I

6    can't say what's illegal and legal.

7    *Q.*   Have you ever bought a car?

8    *A.*   I have.

9    *Q.*   Has anyone ever told you a price that turned out not to be

10   the actual price?  Have you ever played poker, Agent?

11   *A.*   I have not.

12   *Q.*   Do you know that people commonly bluff and don't commonly

13   tell the truth about their prices during negotiations?

14   *A.*   Are you talking about poker or --

15   *Q.*   Poker, buying cars, selling houses.

16   *A.*   I have no idea.

17   *Q.*   Well, you talked to a bunch of people in this case, right?

18   *A.*   I have.

19   *Q.*   And witnesses told you -- you talked to buyers and

20   representatives about their suppliers, did you not?

21   *A.*   Of the customers or --

22   *Q.*   Yeah.  You talked to representatives.  You talked to

23   co-ops.

24   *A.*   Yes.

25   *Q.*   You talked to the customers, right?

LaNard Taylor - Cross

1    A.   That's correct, yes, sir.

2    Q.   And a bunch of witnesses told you that during pricing

3    events they would bluff either about the price they were

4    offering or the price that others were selling at in order to

5    get a better price, right?

6    A.   I don't believe I would say a bunch.  Certainly some have.

7    Others said they did not, so I think again it varies.

8    Q.   Okay.  In some of the communications, for example, they

9    would tell each other they were going to hold on a price.  We

10   heard that as, you know, sort of nefarious jargon.  And it

11   turns out they, in fact, didn't hold.  They moved, right?

12   A.   I don't recall a particular instance in which you are

13   referring to.

14   Q.   But you're not quibbling with me, are you, that bluffing

15   about price is not part and parcel of this industry, are you?

16   Can we agree on that?

17   A.   I believe that did happen, yes, sir.

18   Q.   Okay.  Now, here Mr. Austin apparently says to raise our

19   prices.  You don't know if he is referring to eight-piece, dark

20   meat or wings, right?  You don't know what he is referring to.

21   A.   The message, he says on wings he is market, market plus 10,

22   so I presume he is referring to not the eight-piece, but I

23   don't know exactly which one he is talking about.  I can only

24   go off the message.

25   Q.   Not the eight-piece, which sort of is the bellwether for

214

LaNard Taylor - Cross

1    the other pricing, right?

2    *A.*   Yes.  Actually, if you go to the message two messages up,

3    he actually says the price, .03 higher.  That's on eight-piece,

4    so he is referring to the eight-piece in that message.

5    *Q.*   He says, .03 higher than us on eight-piece.

6           Do you know if he is talking current or future?  You

7    don't know, do you?

8    *A.*   Based on this message, my interpretation of him saying this

9    month, I believe he is talking current.

10   *Q.*   Okay.  Now, let me ask you, let's move on to -- by the way,

11   the fact that suppliers are talking in the, you know, "we

12   should raise our prices, tell them we're trying," that's not

13   against the law, raising prices, is it, in and of itself?

14   *A.*   Again, I can't say one way or the other what's against the

15   law and, you know, what's legal and what's not.

16   *Q.*   Let's talk about that.  You are a case agent and a sworn

17   federal agent of the preeminent law enforcement agency in this

18   company, the FBI, correct?

19   *A.*   I am, yes, sir.

20   *Q.*   You were shown by Mr. Feldberg, you tell federal judicial

21   officers, I believe that certain conduct constitutes probable

22   cause of a crime, right?

23   *A.*   Yes, sir.

24   *Q.*   You are not saying that that statement is not your legal

25   determination even though you don't have a law degree, are you?

LaNard Taylor - Cross

1   A.  It is not a legal determination.

2   Q.  It's your opinion based on your understanding of the law,

3   right?

4   A.  That is correct.

5   Q.  Okay.  Let's go to Slide 12, Exhibit 3.  This is the

6   Mr. Cooper.

7        Mr. Cooper is an employee of Claxton Poultry, correct?

8   A.  Yes, sir.

9   Q.  And McGuire and Pate are Pilgrim's employees, right?

10  A.  Yes, sir.

11  Q.  You don't have any evidence that either called Mr. Cooper

12  on or about November the 7th, 2012, do you?

13  A.  I don't know what the call logs show.  I would have to

14  review the call logs in order to say one way or the other.

15  Q.  You don't know the source in any event of Mr. Pate's

16  information as depicted in this slide, do you?

17  A.  Again, I don't have the call logs or the other documents

18  that support this, so I can't say one way or the other whether

19  that call actually took place.

20  Q.  That's not my question.  My question is you don't know the

21  source of the information, Mr. Pate's information in this

22  slide.  You don't know where he got that information as you sit

23  here today, do you?

24  A.  Again, without having seen the contents of other documents,

25  I can't say one way or the other because I don't know if a call

LaNard Taylor - Cross

1    took place.  I don't know if a text message took place without

2    seeing the documents.

3    Q.  Agent, do you know as you sit here right now the source of

4    Mr. Pate's information?  Yes or no?

5    A.  I think again my answer is without reviewing the other

6    contextual documents, I can't say one way or the other where it

7    came from, if a call took place or any other type of

8    communication took place, sir.

9    Q.  Are you aware that Mr. Brink -- Mr. Brink worked for Fiesta

10   Restaurant Group, a customer, right?

11   A.  Yes, sir.

12   Q.  Are you aware that he and Mr. Pate met in San Antonio that

13   very week?

14   A.  I -- I don't know.  I don't know.

15   Q.  Are you aware of a November 7th, 2012 e-mail from Mr. Brink

16   to Mr. Pate where he says, "You'll be at 89"?

17   A.  Without reviewing the e-mail, I can't say for sure.

18   Q.  Are you aware of the fact that indeed Claxton ended up at

19   89, exactly what Mr. Brink told them they were going to end up

20   at in an e-mail?  Are you aware of that fact?

21   A.  Without reviewing the actual underlying documents, I can't

22   say one way or the other.

23   Q.  And if Mr. Pate proposed 89 to Brink rather than 90,

24   wouldn't that be contrary to the very purpose of the alleged

25   conspiracy which is to raise prices, not lower them?

LaNard Taylor - Cross

1   A.   Repeat the question one more time, please?

2   Q.   If, in fact, Mr. Pate proposed 89 cents or Claxton proposed

3   89 cents for that matter rather than 90 cents, wouldn't that be

4   contrary to the purpose of the conspiracy which is to raise

5   prices, not lower prices on broiler chicken in the QSR

6   industry?

7   A.   If you don't mind, there is a lot to unpack in your

8   question.  If you don't mind, can you kind of rephrase it?

9   Q.   Let's talk basically Newtonian physics, okay?  Up is up and

10  down is down, correct?

11  A.   Sure.

12  Q.   So if you're going up, that's contrary to going down,

13  correct?

14  A.   I think that's right, yes, sir.

15  Q.   And conversely if you are going down in price, that's

16  contrary to going up.  Can we agree on that?

17  A.   I think they are opposites, yes, sir.

18       MR. KORNFELD:  Can we see Exhibit 3, Slide 23, please.

19  BY MR. KORNFELD:

20  Q.   Okay.  This is the "as of" date.  This is the Greg Tench

21  e-mail or the situation that you testified about last week.  Do

22  you recall that?

23  A.   Yes, sir.

24  Q.   And you testified, and I think you're right, when Tench is

25  at 11, they were talking about what time Mar-Jac was meeting

LaNard Taylor - Cross

1    with RSCS in Louisville, Kentucky, right?

2    A.  I believe that, yes, sir.  I believe that to be the case.

3    Q.  And Claxton -- I mean, everybody sort of got called to the

4    principal's office by KFC, right?

5    A.  I think that's fair to say, yes, sir.

6    Q.  And that's kind of a routine journey to Louisville,

7    Kentucky, KFC's headquarters, right?

8    A.  Yes, sir.

9    Q.  Now, and by the way, there is nothing wrong with telling a

10   competitor, is there, hey, I'm going to the principal's office

11   at 11 o'clock.  What time are you going?

12   A.  I don't know -- I don't necessarily know if that's right or

13   wrong, but I don't think that what I testified to last week, I

14   don't know if that particular line was what I said contributed

15   to the conspiracy.

16   Q.  Well, there is nothing proprietary about Mr. Tench telling

17   someone at Claxton what time they're meeting with RSCS, right?

18   A.  You know, again I don't know for sure.  I am sure there is

19   other factors that go into it, but just those words --

20   Q.  Not my question.  There is nothing proprietary about a

21   meeting time.  It's not a price.  It's a meeting time, right?

22   There is nothing proprietary, is there, sir, about what time

23   Mar-Jac is meeting with RSCS.  That's my question.

24   A.  Yeah, and I don't -- I don't know.  I'm sure there could be

25   other things that go into it, but I don't know.

LaNard Taylor - Cross

1  Q.  This is August 27, 2014.  This is the beginning of the

2  negotiation period, right?

3  A.  I believe this was the year that started a little bit

4  sooner than this.  I don't think it was August 27.  I think it

5  started earlier in this month, so we are talking a month in at

6  this point.

7  Q.  Okay.  But, I mean, negotiations went into the fall, right?

8  This is not the final time.

9  A.  Yes, sir.

10 Q.  And you are not testifying in your review of these millions

11 of documents that an agreement has ever been reached at least

12 as it involves RSCS or KFC in August.  I mean, I understand

13 maybe it fluctuates, but there is no agreement, solid agreement

14 in August, right?  It happens in the fall for the next year or

15 period of years.

16 A.  I believe in this particular instance that the bid was due

17 August 19th, and I think the second -- the second round or what

18 have you, however you classify it, was the beginning of

19 September, September 2nd or 3rd or somewhere around there.

20 Q.  So no agreement at this point, right?

21 A.  Between the buyer and the supplier, no, sir.

22 Q.  And you testified earlier the other day, you put in the

23 "not," they are not agreeing to anything today just listening

24 to contextualize what you believe my client, Mr. Fries, meant,

25 right?

LaNard Taylor - Cross

1   *A.*  I believe that based on the sentence, yes, I believe that.

2   *Q.*  So you are testifying that Mr. Fries didn't agree or

3   whoever the "they" is, right?  Who is the "they"?

4   *A.*  Again, I believe he is referring to Mr. Tench at Mar-Jac.

5   *Q.*  But in any event, no agreement according to your

6   interpretation and interlineation in this exhibit, correct?

7   *A.*  That's correct, that they did not agree to anything that

8   day.  I believe that's what the text message was supposed to

9   say.

10  *Q.*  And Claxton or Mr. Fries knowing that two groups are not

11  agreeing to anything, you're not testifying that that is direct

12  evidence of an agreement, are you?

13  *A.*  Well, no, they're not -- no.

14          *MR. KORNFELD:*  Thank you, Agent.

15          *THE COURT:*  Why don't we go ahead and take our

16  mid-morning break at this time and plan on reconvening a little

17  bit before 10:30.  All right.  We will be in recess.  Thank

18  you.

19      (Recess at 10:13 a.m.)

20      (Reconvened at 10:30 a.m.)

21          *MR. TUBACH:*  Michael Tubach.  Very briefly, I would

22  like to move into admission for purposes of this hearing A-028

23  and A-029.

24          *THE COURT:*  A-028 and A-029?

25          *MR. TUBACH:*  Yes, Your Honor.

LaNard Taylor - Cross

1      THE COURT:  Any objection by the United States?

2      MR. KOENIG:  No objection.

3      THE COURT:  Any objection by anyone else?  Those

4  exhibits will be admitted for purposes of this hearing.

5      MR. LAVINE:  Brian Lavine representing Scott Brady.

6                        **CROSS-EXAMINATION**

7  BY MR. LAVINE:

8  Q.  Agent Taylor, good morning.

9  A.  Good morning.

10      MR. LAVINE:  I would like you to bring up Exhibit 3,

11  please.

12  BY MR. LAVINE:

13  Q.  Agent Taylor, you testified on direct that this exhibit

14  contains the date that at least you believe each of these

15  individuals were involved in the conspiracy; is that correct?

16  A.  Yes, sir.

17  Q.  And to confirm the accuracy of these dates, you testified

18  that you reviewed the exhibit itself and the underlying

19  documents referenced in this exhibit; is that correct, sir?

20  A.  That's correct, sir, yes.

21  Q.  So you fully understand the documents that are listed on

22  Slides -- whatever it is -- 2 through 25.

23  A.  When you say fully understand, I mean, if there is -- yeah,

24  well, I understand, you know, the interpretation of the

25  document, but the reason I hesitate on that is because if there

222

LaNard Taylor - Cross

 1   is something they are talking about in there, I don't

 2   understand every single thing in the industry, so if there is

 3   something in the document --

 4   Q.   I am not asking about the industry, sir.   I am asking about

 5   the documents that you have testified to in this exhibit.

 6   A.   I would have to see the document, sir.

 7   Q.   All right.   Let's do it.   Let's start with Exhibit 11,

 8   please.   So Agent Taylor, to confirm the accuracy of

 9   Mr. Brady's "as of" date, you reviewed the document referenced

10   in Exhibit 11; is that correct?

11   A.   That's correct, yes, sir.

12   Q.   And based on that exhibit you believe that Mr. Brady became

13   a participant in the conspiracy as of December 26, 2011.

14   A.   No, sir.   I think what I testified to was that I believe

15   that at least on this date.   It could have been before that,

16   but at least on this date.

17   Q.   Okay.   That's fine.   And I believe you testified that you

18   believe that Mr. Brady became a participant in the conspiracy

19   as of this date because he spoke to Mr. Kantola, was aware of

20   the pricing Koch Foods received on dark meat from Church's, and

21   he communicated that pricing information to another employee of

22   Pilgrim's.   Is that accurate, sir?

23   A.   I believe that's accurate, yes, sir.

24   Q.   And that's what you testified to on direct.

25   A.   Yes, sir.

LaNard Taylor - Cross

1   Q.  So looking at this Slide No. 11, at the time Mr. Brady is

2   working for Pilgrim's; is that correct?

3   A.  That's correct.

4   Q.  And during the course of your investigation, I am sure you

5   became aware that Mr. Brady was responsible for negotiating

6   further processed chicken products on behalf of Pilgrim's.

7   A.  Yes, sir.

8   Q.  Correct?

9   A.  Yes, sir.

10  Q.  And during your investigation you also became aware that he

11  was not involved in pricing of eight-piece COB or chicken on

12  the bone while at Pilgrim's.

13  A.  I don't know of everything he was responsible for at

14  Pilgrim's primarily because the bulk of the time of the

15  investigation was focused around his time at Claxton, so I

16  don't know exactly what he was responsible for while he was at

17  Pilgrim's in 2011.

18  Q.  You are saying while he was at Pilgrim's as of December 26,

19  2011, that's his "as of" date.

20  A.  Yes, sir.

21  Q.  Are you aware of him being involved in any business related

22  to the eight-piece COB while at Pilgrim's?

23  A.  Again, I don't know exactly -- I don't know everything he

24  was involved with.

25  Q.  Will you take my word for it that he was not, sir?

LaNard Taylor - Cross

1    *A.* If that's your word. That's not my testimony, but that's

2    your word.

3    *Q.* All right. So based on your investigation, you would

4    agree --

5            *THE COURT:* Sorry, Mr. Lavine. Let me interrupt you

6    for just a second. We are getting some feedback. Somebody

7    probably has a phone that's not on airplane mode or that's on

8    too close to the microphone.

9            *MR. LAVINE:* That could be me, Your Honor. I am

10   sorry.

11           *THE COURT:* That's all right. Go ahead.

12   *BY MR. LAVINE:*

13   *Q.* So based on your investigation, you would agree that

14   eight-piece prices and dark meat prices are totally different

15   than the pricing for further processed chicken.

16   *A.* You mean the prices themselves?

17   *Q.* Right.

18   *A.* Well, yes, but my understanding is they are all kind of

19   correlated where the eight-piece uses the benchmark to set

20   prices for other items.

21   *Q.* But the eight-piece is not used as a benchmark for the

22   processed chicken, is it, sir?

23   *A.* That's what you are representing. I don't know exactly.

24   It could be or could not be. I don't know exactly for the

25   processed.

LaNard Taylor - Cross

1   Q.  Well, you sitting here testifying today, is it or is it

2   not?  I mean, Agent Taylor, you have been investigating this

3   case for two and a half years.

4   A.  Just over two years.

5   Q.  That's a pretty straightforward question, whether or not

6   the eight-piece pricing and the dark meat pricing has anything

7   to do with the further processed chicken pricing.

8   A.  Yeah.  I can't give you an answer to that.

9   Q.  You don't know.  As you sit here today, you cannot answer

10  that question.

11  A.  It could be.  It could not be.  I don't know the exact

12  answer to your question.

13  Q.  Would you agree, sir, that the dark meat is part of the

14  negotiations of the eight-piece COB?

15  A.  That they are part of the negotiations for the eight-piece

16  COB?  I know it's -- they're set from the eight-piece COB, but

17  I don't know if they are a part of it.

18  Q.  But that relates to the eight-piece COB.

19  A.  Yes, sir.

20  Q.  Would you also agree, sir, that the dark meat price is not

21  part of the negotiations for further processed chicken.

22  A.  I think that's kind of similar to the same question you

23  just asked.

24  Q.  Either you know or you don't know, sir.

25  A.  Yeah, it could be or could not be.

226

LaNard Taylor - Cross

1    Q.  It could be or couldn't be.  So you don't know.  Sitting

2    here today, you cannot answer that question.

3    A.  About a particular further processed item, yeah.

4    Q.  I am not asking for the processed item.  I am asking about

5    further processed chicken.

6    A.  Say that again?

7    Q.  Agent Taylor, it's a simple question.  Does dark meat

8    pricing have any bearing on further processed chicken pricing?

9    A.  I -- I don't know.

10   Q.  Okay.  Thank you.

11          Now, based on this e-mail, sir, would you agree that

12   Mr. Little, who works for Pilgrim's, is concerned that Koch

13   might get more of Church's further processed business by

14   leveraging Koch's dark meat price?

15   A.  It appears as though that's what's happening in this

16   e-mail, that Koch is -- Pilgrim's is worried about losing

17   business.

18   Q.  Not Pilgrim's.  Mr. Little is, correct?

19   A.  Repeat your question?

20   Q.  Agent Taylor, it appears that Mr. Little is concerned that

21   Koch might get more of Church's further processed business by

22   leveraging Koch's dark meat price; is that correct, sir?

23   A.  You made a distinction between Mr. Little and Pilgrim's,

24   right?

25   Q.  If you want to use Pilgrim's, go ahead, but Mr. Little is

LaNard Taylor - Cross

1   the one that's in this e-mail.

2   A.   Yes, he is.

3   Q.   Okay.   And does it appear that Mr. Little is the one that's

4   making the statement here?

5   A.   Yes, where he says "I'm concerned," yes.   But I said that

6   because he represents Pilgrim's.

7   Q.   That's fine.

8   A.   I just wanted to make sure I understood.

9   Q.   No, I agree with that.   And we also agree that it appears

10  that Mr. Little is concerned and he is asking whether or not

11  Pilgrim's has its further processed agreement in place with

12  Church's to promote price and volume for 2012.   Agent Taylor?

13  A.   Were you asking me or telling me?

14  Q.   Yeah, I am asking you.   Is that what he is saying in this

15  exchange?

16  A.   Can you repeat your -- I didn't know it was a question.   I

17  am sorry.

18  Q.   Do you agree, sir, that Mr. Little is asking whether or not

19  Pilgrim's has in place its further process agreement with

20  Church's for 2012 for both price and volume?

21  A.   That's what it appears as though he is asking, yes, sir.

22  Q.   Thank you, sir.

23          So Mr. Little asked Mr. Brady, because Mr. Brady is

24  responsible for the further processed chicken at Pilgrim's, he

25  is asking him whether or not Pilgrim's has an agreement with

228

LaNard Taylor - Cross

1    Church's for 2012 for further processed price and volume; is
2    that correct, sir?
3    A.   That's what it appears is in this e-mail, yes.
4    Q.   And in this e-mail Mr. Little indicates that Koch's dark
5    meat is alleged to be between 27 back and 30 back.  Would you
6    agree that's in the e-mail, sir?
7    A.   I agree, yes, sir.
8    Q.   And Mr. Brady responds that he talked to Mr. Kantola --
9    that's Bill -- and found out that Koch got 27 back on dark
10   meat; is that correct?
11   A.   Yes, sir.  He doesn't say dark meat.  He says 27 back, but
12   you can --
13   Q.   Can you infer that it's dark meat, sir?
14   A.   Sure.
15   Q.   Would you agree that the 27 back is an already negotiated
16   price?
17   A.   Between -- yes, yes.
18   Q.   Thank you.  And Mr. Brady also expresses concern to
19   Mr. Little in this same e-mail his concern about losing
20   additional business.
21   A.   Yes.
22   Q.   Thank you.  Now, in this e-mail, Agent Taylor, Mr. Brady is
23   not agreeing to fix a price, is he?
24   A.   No, sir.
25   Q.   And Mr. Brady is not agreeing to rig a bid.

LaNard Taylor - Cross

1    *A.*   In this e-mail, no, sir.

2    *Q.*   And Mr. Brady is not agreeing to align a price.

3    *A.*   In this particular e-mail, no, sir.

4    *Q.*   And in fact -- and this is the e-mail that you have

5    testified to on direct that is the "as is" date that Mr. Brady

6    joined the conspiracy.  So we want to focus on this because you

7    and government counsel spent a lot of time on this exhibit,

8    correct?  So we are looking at an "as is" date.  So as of this

9    date with this document here, Mr. Brady is not agreeing to do

10   anything in this e-mail, is he, sir?

11   *A.*   No, sir, but I think when you say we spent a lot of time, I

12   think it's important to note that not every single document is

13   somebody is agreeing or in the e-mail shows they are agreeing

14   to do something, but every single document including this one

15   is important to show a part of it.  It's a necessary part of

16   the conspiracy.  But the document in and of itself doesn't

17   necessarily say, hey, I agree with Koch to do so and so.

18   *Q.*   Agent Taylor, you testified that this document formed the

19   basis of your opinion that the "as of" date for Mr. Brady is

20   December 26, 2011, no other document, this document right here;

21   is that true?

22   *A.*   No, sir.  I am able to make my conclusion based on a series

23   of documents, but this particular document was the date that --

24   I mean, represented the date that we believe that as of this

25   date --

LaNard Taylor - Cross

1    Q.  Right.

2    A.  -- yes.  But to say this is the only document that I was

3    referring to, I think that's a little bit inaccurate.

4    Q.  Agent Taylor, you were asked about this document and only

5    this document for an "as of" date for Scott Brady; is that

6    correct, sir?

7    A.  That's correct, yes, sir.

8    Q.  You were not asked by government counsel about any other

9    document relating to Mr. Brady for an "as of" date; is that

10   correct?

11   A.  That is correct.

12   Q.  Now, one last question on this document right here.  There

13   is, in fact, not yet any mention of competitor pricing for

14   further processed chicken in this e-mail, which is the pricing

15   that Mr. Brady was negotiating with Church's; is that correct,

16   sir?

17   A.  You said there is no pricing about further processed in

18   this e-mail?

19   Q.  There is no mention of a competitor pricing for further

20   processed in this e-mail, which is the pricing that Mr. Brady

21   was dealing with with Church's; is that accurate, sir?

22   A.  That is not accurate.

23   Q.  Would you like to tell me where there is competitor

24   information regarding further processed in this slide aside

25   from Church's?

231

LaNard Taylor - Cross

1   A.   Sure.  So on the first line of the e-mail it says, I am

2   currently .01 back of Bill on the further processed, which is a

3   price point which would indicate that Scott Brady, who was

4   writing this e-mail, is one step back on further processed,

5   which means he would know the price of what Bill, Mr. Kantola

6   was.

7   Q.   I will give you that.  But he also says:  I can't afford to

8   lose any more business.

9        Is that correct, sir?

10  A.   That's correct.

11  Q.   Now, aside from this e-mail, as of December 26, 2011 when

12  you say this is the "as of" date, you don't have other

13  independent evidence to show that Mr. Brady joined the

14  conspiracy, do you, sir?  We are focused in on December 26,

15  2011, which is the "as of" date that you testified to in this

16  courtroom.

17  A.   You said besides this e-mail.

18  Q.   No, I said as of December 26, 2011, you don't have other

19  independent evidence to show that he joined that conspiracy.

20  A.   Can you rephrase the question?  I want to make sure I

21  answer it correctly.

22  Q.   Agent Taylor, you have testified to that the "as of" date

23  for Scott Brady is December 26, 2011.

24  A.   At least.

25  Q.   And I'm asking you as of December 26, 2011, you don't have

LaNard Taylor - Cross

1    any other independent evidence to show that he joined the

2    conspiracy aside from his e-mail.

3    A.   I -- I would not go as far to say there is no evidence.

4    Q.   I didn't say that, sir.  I asked independent evidence.

5    A.   And that's what I am saying.  I wouldn't go so far to say

6    there is no evidence.

7    Q.   Okay.  As of December 26, 2011?

8    A.   Yeah.  I won't go as far as to say there is no evidence.

9    Q.   Well, what is the evidence as of December 26, 2011?

10   A.   Well, to be clear, you are asking me is there any other

11   evidence.

12   Q.   No, no.  I am asking you what is the independent evidence

13   as of December 26, 2011 to show that he joined the conspiracy?

14   A.   I guess I am just not understanding what you're asking me.

15   Q.   Let me see if I can do it one more time, sir.

16         As of December 26, 2011, which is the "as of" date

17   that you have testified to, as of this date do you have any

18   other independent evidence to show that he joined the

19   conspiracy?

20   A.   If you're talking about on this particular day, then, I

21   mean, there is several other documents, but if you are talking

22   about one particular day, I mean, maybe there is no other

23   documents on this particular day, but there is certainly other

24   documents that indicate that Mr. Brady was involved in the

25   conspiracy.

LaNard Taylor - Cross

1  *Q.*  I am asking you as of the "as of" date, December 26, this

2  is the date that you testified to.

3  *A.*  Yes, sir.

4  *Q.*  Do you have other independent evidence as of this date?

5  *A.*  Well, no, sir.  What I'm saying is as of -- on this date if

6  you are asking for any other documents, I don't know if any

7  other -- off the top of my head, I don't know if any other

8  documents exist for this particular date or documents before

9  and there very well could be.

10  *Q.*  But you don't know, sir.

11  *A.*  Off the top of my head, I don't know, that's correct.

12  *Q.*  Thank you.

13      Could we turn to Slide 16, please?

14      *THE COURT:*  Because we are getting more feedback now,

15  I am going to ask that everyone in the courtroom turn off his

16  or her phone.  Also if you have a laptop computer and it's

17  connected to the internet, disconnect it.  Once again,

18  Mr. Tubach may have solved the problem.

19      *MR. TUBACH:*  I think that's correlation, not

20  causation.

21      *THE COURT:*  Yeah, I think we are only operating on

22  correlation, but it's getting stronger.

23      Go ahead.

24  *BY MR. LAVINE:*

25  *Q.*  Agent Taylor --

LaNard Taylor - Cross

1    A.   Yes.

2    Q.   -- would you take a look at Slide 21, please.

3    A.   Yes, sir.

4    Q.   And you testified on direct that Kevin Grindle was a

5    participant in the conspiracy as of February 14, 2014 because

6    he was sharing period pricing with Mr. Brady; is that correct,

7    sir?

8    A.   Yes, sir.

9    Q.   And period pricing is current pricing; is that correct,

10   sir?

11   A.   It -- yeah, I don't -- I don't know about current.  It

12   could be past pricing too, so I can't say just current.

13   Q.   It could be what, sir?

14   A.   It could be the past price too.

15   Q.   Okay.  All right.  And what's being discussed here is an

16   exchange of current pricing for period three for KFC, correct?

17   A.   Not to try to get too locked down on words, but you keep

18   saying current.  And I don't know --

19   Q.   How about for period pricing.

20   A.   Yes, sir.

21   Q.   Period three, right?

22   A.   Yes, sir.

23   Q.   And at this time in February '14, you are not aware of any

24   pricing event or contract negotiations that were occurring with

25   KFC, are you, sir?

LaNard Taylor - Cross

1    *A.*  I am not off the top of my head aware of any particular

2    pricing event.

3    *Q.*  At this time in February 2014, the 2014 KFC contract prices

4    were already negotiated, established and being followed by the

5    suppliers and the buyers; is that correct, sir?

6    *A.*  Yes, sir, I believe that is the case.

7    *Q.*  All right.  Now, other than this exchange, you don't have

8    any other independent evidence showing Mr. Grindle joined the

9    conspiracy, do you, sir?

10   *A.*  Certainly there are other documents, but I think you're

11   honing in on this date as --

12   *Q.*  That's correct, sir, I am.

13   *A.*  So on this particular day or any date before?  There could

14   very well be documents that exist, but they are not presented

15   here and I don't know off the top of my head.

16   *Q.*  I didn't mean to interrupt you.

17   *A.*  No, I apologize.

18   *Q.*  The only evidence establishing Mr. Grindle as a member of

19   the conspiracy is the exchange of this current pricing with the

20   competitor.

21   *A.*  Can you repeat that?

22   *Q.*  Agent Taylor, the only evidence that you are offering here

23   establishing Mr. Grindle as a member of the conspiracy is the

24   exchange of current period pricing with a competitor.

25   *A.*  That is what this -- this document represents period three

236

LaNard Taylor - Cross

1    pricing, so --

2    Q.  Correct.  And this is the document that you're saying shows

3    the "as of" date that Mr. Grindle joined the conspiracy.

4    A.  Yes, sir.

5    Q.  There is nothing in this e-mail or this document that shows

6    that Mr. Grindle was aware of the conspiracy, is there, sir?

7    A.  Again, in the four corners of this e-mail, he doesn't

8    acknowledge that, hey, I know that there is a conspiracy and

9    here is my period three pricing, no.

10   Q.  And there is nothing in this e-mail exchange to show the

11   Mr. Grindle knew the scope of any conspiracy.

12   A.  In this e-mail, no, there isn't.

13   Q.  Thank you.  And finally, there is nothing in this e-mail

14   exchange that shows that Mr. Grindle knew of the objectives of

15   any conspiracy.

16   A.  Again, in this e-mail when viewed in isolation, no, sir.

17   Q.  Thank you.

18          MR. LAVINE:  No further questions, Your Honor.

19          THE COURT:  Thank you, Mr. Lavine.

20          Mr. Gillen.

21          MR. GILLEN:  Thank you, Your Honor.

22                         **CROSS-EXAMINATION**

23   BY MR. GILLEN:

24   Q.  Agent Taylor, my naming is Craig Gillen.  I have a few

25   questions for you.

LaNard Taylor - Cross

1    *A.*  Yes, sir.

2    *Q.*  Let's talk a little bit about the scope of your

3    investigation.  15 to 16 million pages of documents, correct?

4    *A.*  Yes, sir, somewhere in that range.

5    *Q.*  And you got those documents through subpoenas.  You got

6    those documents -- correct, some through subpoenas?

7    *A.*  Yes, sir.

8    *Q.*  You got some of them or a lot of them through cooperation

9    with corporate counsel for some of the companies, correct?

10   *A.*  I don't -- my understanding is that most of the documents

11   came via subpoena.  Exactly which ones came from a corporate

12   counsel between the government attorneys and the corporate --

13   that, I am unclear of.  I don't know what the exchange was like

14   between the two attorneys.

15   *Q.*  You also know that some of the corporates counsel would

16   assist in trying to review their own documents to assist the

17   government in your investigation; isn't that correct?

18   *A.*  That is correct, that corporate counsel I believe at least

19   reviewed their documents that pertained --

20   *Q.*  So what you had is you would have all of the whatever might

21   be relevant in the internal bowels of the records of Tyson, for

22   example, you would have access to it if it was relevant to this

23   investigation to your knowledge, right?

24   *A.*  To my knowledge if it was relevant, I believe they would

25   have produced it pursuant to whatever legal authority that DOJ

LaNard Taylor - Cross

1  sent to them.

2  Q.  And a battery of folks such as yourself to look at the

3  documents, to review them and to ferret out what you think is

4  relative to the case, correct?

5  A.  I certainly was one part, one person that was reviewing the

6  documents, yes, sir.

7  Q.  And in addition you had outside counsel like Tyson's

8  counsel assisting in that respect also, correct?

9  A.  I don't know that to be the case that they reviewed our

10  documents.  I don't know that to be the case.

11  Q.  And then you had other investigative techniques.  You made

12  consensual recordings, correct?

13  A.  Correct.

14  Q.  And you had that.  You also went and you did interviews of

15  folks that -- in their homes, correct?

16  A.  I did, yes, sir.

17  Q.  How many interviews did you conduct in people's homes?

18  A.  I can't even give you a number.  I mean, it was -- there

19  were a number of them, but I just don't remember the exact

20  number.

21  Q.  And when you went to their homes, you introduce yourself

22  along with your co-agent.  And who was that for the record?

23  A.  I believe every time it was Special Agent Matthew

24  Koppenhaver with the Department of Commerce, Office of

25  Inspector General.

239
LaNard Taylor - Cross

1  *Q.* And people would invite you into their homes and you would

2  speak with them, correct?

3  *A.* Not everybody.

4  *Q.* Many people would invite you into their homes and you would

5  speak with them and they would speak with you, correct?

6  *A.* Yes, sir.

7  *Q.* And answer your questions and sit down in their dens and

8  talk with you, correct?

9  *A.* That is accurate, yes, sir.

10  *Q.* Now, those people didn't know you were recording them, did

11  they?

12  *A.* Well, we didn't record everybody, so I can't say

13  absolutely, so not everybody got recorded.

14  *Q.* Well, the people that you were recording in their dens that

15  let you through the front door of their homes did not know that

16  you were recording them during the interview with them,

17  correct?

18  *A.* For the ones that we actually did record, that is correct.

19  *Q.* And then you had access to all of those recordings to find

20  out what they said to you and what they didn't say to you in

21  order to determine the scope of your investigation, right?

22  *A.* I don't know that -- I didn't need the recording to know

23  what they said to me because I was present, so I don't know if

24  I understand your question correctly.

25  *Q.* Well, you've got the recordings to show exactly what they

240

LaNard Taylor - Cross

1  said to you, correct?

2  A.  That's correct.

3  Q.  We don't have to rely on Agent Taylor's recollection or

4  memory, do we?

5  A.  Yeah, that's absolutely correct.

6  Q.  Now, you didn't record Mr. Pepper, did you?

7  A.  That is correct, we did not.

8  Q.  Okay.  So the 11 times that he spoke with you, that wasn't

9  recorded, but folks that were being recorded in their homes,

10  you would go in and then you would take that back to your

11  office, correct?

12  A.  Yes, but it wasn't that -- it's not exactly that simple the

13  way you explained it, but yes.

14  Q.  Okay.  Now, when you went into these folks' homes, did you

15  or your co-counsel -- excuse me, co-agent ever make any false

16  representations to the people in their homes?

17  A.  I don't recall making any false representations.

18  Q.  Of course, you're an FBI agent.  You don't want to be going

19  into someone's home when they let you through the front door

20  and then you or the co-agent would say anything to them that

21  would be untrue or false, correct?

22  A.  I mean, it's not -- it certainly can happen, but I don't

23  recall an instance that you were referring to in which I made

24  any representations that was false to anybody, but I mean, if

25  you --

LaNard Taylor - Cross

1  *Q.*  And that would apply also to your co-agent, correct?  You

2  don't recall your co-agent making any false or misleading

3  statements, do you?

4  *A.*  I don't recall any false statements that were made by

5  either one of us to anybody.

6  *Q.*  So we've got all these documents.  We've got the 15 million

7  documents.  We've got corporate counsel helping you, correct,

8  collect documents.  And I want to ask you a few very pointed

9  specific questions.  Here we go.

10        Now, in the course of the 15 million documents,

11  looking at all of the material records in the bowels of Tyson,

12  would you agree with me that there is not one single e-mail,

13  one single text where Brian Roberts is e-mailing anyone inside

14  Tyson or outside Tyson agreeing to fix prices for chicken

15  prices?

16  *A.*  We are talking 15 million documents.  I can't say that in

17  the 15 million documents that one of those documents don't

18  exist.

19  *Q.*  You're the case agent and you are up here testifying about

20  why this Court should find Brian Roberts to be -- having

21  participated in the conspiracy.  You understand your role

22  today, don't you?

23  *A.*  I certainly do.

24  *Q.*  Now, we are relying on you to know your investigation,

25  correct?

242

LaNard Taylor - Cross

1    *A.*   Yes, sir.

2    *Q.*   Let me phrase it a different way.  If there was an e-mail,

3    a text showing that Brian Roberts had agreed to with someone

4    inside Tyson or outside Tyson to fix chicken prices, that would

5    be the No. 1 document that you would focus on, wouldn't it,

6    Agent Taylor?

7    *A.*   I don't know that to be the case.  And I will say there is

8    documents that exist where there was pricing information

9    exchanged with Mr. Roberts or sent to Mr. Roberts.  But to your

10   point about whether there was a document that said, you know,

11   talked about particularly fixing prices --

12   *Q.*   You need to focus on my question.  My question was do you

13   have an e-mail or a text or any documentation of any kind

14   reflecting Brian Roberts engaging in an agreement to fix prices

15   in the chicken industry?  Yes or no?

16   *A.*   There could be.  I mean, the documents that I'm referring

17   to, it could have gone -- it could have been a part of an

18   agreement between two suppliers to fix the price, but I can't

19   tell you like specifically.  I will tell you there is documents

20   that refer to him.

21   *Q.*   This isn't the land of maybe and make believe and fantasy.

22   This is the land of do you know or don't you know.  Can you

23   tell us here -- and this is the last time I am going to ask it.

24   Answer it, please, directly.  Are you aware of one single

25   document, e-mail or text, where Brian Roberts engaged in a

LaNard Taylor - Cross

1    communication with someone outside of Tyson or within Tyson

2    documenting that he was involved in any conspiracy to fix

3    prices in the chicken industry?

4    A.   Yes.

5    Q.   And what is that document?

6    A.   There is one document, I believe it's in the *James* log, in

7    which Mr. Brady sends Mr. Roberts a slew of pricing.  And then

8    he tells him, hey, don't forget about me.  And then shortly

9    after that e-mail there is a phone call between Mr. Brady -- I

10   believe Mr. Roberts called Mr. Brady.  So if you are asking

11   about whether he is a part of the conspiracy, I would say yes.

12   Q.   There wasn't even an RFP going on at that time of that

13   document, was there, Agent Taylor?

14   A.   I don't know the exact date of the document.

15   Q.   You told us about the RFPs where these pricing events are

16   dealing with RFPs, correct?  That's when you want to have --

17   the price fixing is going to be during the bidding process,

18   right?

19   A.   No, sir, that's not exactly what I testified to.  I believe

20   when we talked about pricing events, RFP was just one of them.

21   There was other things that occurred throughout the year

22   whether it be discounts or ingredient changes, I believe that's

23   what I testified to, that it wasn't just solely RFPs for

24   pricing events.

25   Q.   So you are saying -- and we'll deal with that later.

LaNard Taylor - Cross

1    You're saying that the e-mail that was unresponded to, correct,

2    by -- Mr. Roberts never responded to Mr. Brady's e-mail,

3    correct?

4    A.   There was a phone call that Mr. Roberts spoke to Mr. Brady

5    after that e-mail where Mr. Brady said, don't forget about me.

6    Q.   First of all, there is no e-mail -- answer yes or no -- no

7    e-mail response, correct?

8    A.   From Mister -- there is two e-mails.  So he sent from

9    Mr. Roberts back to Mr. Brady.

10   Q.   There is no e-mail from Mr. Roberts on either occasion,

11   correct?

12   A.   That is correct.

13   Q.   Now, so we've got now in terms of the documentation, do you

14   have any testimony -- you have interviewed people in their

15   homes.  You recorded it.  Has anyone told you that they were

16   directed to enter into an agreement to fix prices in the

17   chicken business?

18   A.   I think to not get too bogged down in the word "agreement,"

19   there was testimony, there was communicated to us in interviews

20   where at least Mr. Pepper was instructed by his supervisors to

21   call competitors and get pricing from them and bring them back

22   to Tyson.

23   Q.   You are missing the point of my question.  My question was

24   did anyone, Mr. Pepper or anybody, tell you that they were

25   directed by Mr. Roberts to go out and agree to a price fixing

1   with a competitor?  And the answer to that is no, isn't it?

2   A.  That's not my answer, no, sir.

3   Q.  Well, the truthful answer is no because the answer you gave

4   went into pricing information, not pricing agreement.  Do you

5   understand your answer?

6   A.  Well, sir, yeah, but it's important to understand in order

7   to make a pricing determination, you have to first get the

8   pricing information.

9   Q.  All right.  Well, so let's move on to the -- you have as

10  exhibit -- let's go to E3 and Page 13.  Let's talk a little bit

11  about this.

12         Do we have this up?

13         This is the date that has the "as of" date for

14  Mr. Roberts, correct?

15  A.  Along with Mr. Mulrenin and Mr. Pepper, yes, sir.

16  Q.  Now, this is a -- you have on June the 3rd, Pepper to

17  Roberts:  Pilgrim's told me they would be around .205 (sic) to

18  .03 on eight-piece and dark meat.  And Koch told me they were

19  .205 (sic) on eight-piece.  And about this time we're not

20  charging for dark, but would probably change to .205 (sic) for

21  the next year.

22         That's when you're saying is when Brian Roberts

23  entered the conspiracy, correct?

24  A.  Yes, although I will note it doesn't say .205.  It says

25  .025.  I don't know if you want to make that distinction,

LaNard Taylor - Cross

1    but ...

2    *Q.*   Yeah, .025.  Now, this has to do with the issue of the

3    freezing matter, correct?  This has to do with the freezing

4    charge, correct?

5    *A.*   I believe so.

6    *Q.*   There was no RFP at that time.  No one was bidding for

7    anything.  The contract had already been signed; isn't that

8    right?

9    *A.*   That's right.  But when we are talking about pricing

10   events, like I said a few minutes ago, a pricing event was, at

11   least in my testimony, was not solely RFPs.

12   *Q.*   But here -- answer this question -- the contract had

13   already been signed, right?

14   *A.*   A contract for this -- for this year, yes.

15   *Q.*   Okay.  And so this had to do with -- they're asking about

16   whether they could get Pilgrim's qualified for their freezing

17   program, correct?

18   *A.*   That's -- that's what it appears, yes, sir.

19   *Q.*   Now, if we look at the follow-up here -- let's go to E-53,

20   please.

21         Now, this is the e-mail, is it not, or now you say a

22   co-conspirator declaration where it's tied up to that "as of"

23   date, correct?

24   *A.*   I believe, yes, sir, this is the underlying document.

25   *Q.*   But in the "as of" date that we had in your exhibit of the

LaNard Taylor - Cross

1   "as of" date joining the conspiracy, we didn't have

2   Mr. Roberts' response, did we?

3   A.   No.   That was just Mr. Pepper's e-mail, yes, sir.

4   Q.   Because here we have his response saying -- Mr. Roberts is

5   saying, I want to discuss this before we submit.  I want to

6   understand what the storage expectation is.  Is this cut,

7   freeze and ship deal and then distributor stores in frozen

8   state or are we going to have longer than a month frozen?

9         You understand that was his response to Mr. Pepper,

10  correct?

11  A.   Correct.  That's his response to Mr. Pepper telling him

12  what the competitor prices would be, yes, sir.

13  Q.   Did you have any e-mail from Mr. Roberts asking Mr. Pepper

14  to find out anything about anybody else's freezing costs?

15  A.   No, sir.

16  Q.   You didn't.

17  A.   Well, let me not say no, but not off the top of my head.  I

18  don't know if there is a document that exists, but I can't

19  testify to one right now.

20  Q.   And you understand from your investigation that when we are

21  talking about freezing costs, there is sort of an industry

22  standard, isn't there, about how a penny in and then a penny

23  for a month and then a penny out.  Do you agree?

24  A.   I don't know that.

25  Q.   You have never heard that before.

LaNard Taylor - Cross

1    A.   I have not.

2    Q.   No one has ever told you that it's standard or it's a part

3    of the cost analysis that has to be passed on for a penny in, a

4    penny out, and then the duration which would be a penny a

5    month.

6    A.   No, sir, I don't know the analysis that goes into the

7    freezer costs.

8    Q.   Did you interview anyone in their home that told you about

9    the freezing cost being a part of --

10   A.   It's possible.  Yeah, it's possible.

11   Q.   But here again, what Mr. Roberts is focusing on is how much

12   is going to be expected in terms of duration and cut, correct?

13   A.   I think that's right, yes, sir.

14   Q.   He is not responding to whether somebody had a range or

15   not, correct?

16   A.   Well, he certainly is responding to that e-mail where

17   Mr. Pepper talks about those prices.

18   Q.   He is not responding to any part of the e-mail which dealt

19   with what somebody else might be doing, correct?

20   A.   That is not correct.  He is responding to that e-mail.

21   Q.   He is responding about what he wanted to know what their

22   expect of the qualifications were for the frozen meat, correct?

23   A.   That is correct, but that's -- he is still responding to

24   that e-mail.

25   Q.   And as a matter of fact, you know, don't you, that as of

249
LaNard Taylor - Cross

1    May the 31st when Pepper first got the e-mail about this issue,

2    that there wasn't -- when he was calling around, there wasn't

3    any agreement or any conspiracy with the folks that he had

4    allegedly on this call like a Jimmie Little, was there?

5    A.  So are you asking me, just so I am clear, are you asking me

6    prior to getting the e-mail from Church's about the freezer

7    costs, are you asking whether there was an agreement between

8    the suppliers before the freezer costs were asked for?

9    Q.  In the calls referenced in here where he is talking about

10   calling others folks.  There is no conspiracy on May the 31st

11   between Jimmie Little and Carl Pepper about fixing freezer cost

12   prices, was there?

13   A.  I don't know about that particular date.  I don't know -- I

14   can't recall exactly when the calls occurred.  I would have to

15   go back to the previous exhibit, but...

16        THE COURT:  Mr. Gillen, I am worried that we are

17   running out of time.

18        MR. GILLEN:  If I can make just one quick --

19        THE COURT:  Okay.  Just one quick question.

20        MR. GILLEN:  If we could do -- if we could do 52 real

21   fast.

22        THE COURT:  You mean Page 52 of Exhibit 3?

23        MR. GILLEN:  Exhibit 2, Log 52.

24   BY MR. GILLEN:

25   Q.  Do you see at the bottom here -- there is Jimmie Little

LaNard Taylor - Cross

1    getting the same e-mail regarding freezing.  And do you see

2    down here where Jimmie Little is talking to Tommy -- that would

3    be Tommy Lane -- when will we have pricing?

4         And then the response is:  Will have something on

5    Monday.

6         Correct?

7    A.  That is correct.

8    Q.  That was before Pepper was communicating inside of Tyson,

9    correct?

10   A.  I don't know exactly what time it was.

11        MR. GILLEN:  That's all I have, Your Honor.

12        THE COURT:  Thank you, Mr. Gillen.

13        Ms. Henry, go ahead.

14                      **CROSS-EXAMINATION**

15   BY MS. HENRY:

16   Q.  Good morning, Agent Taylor.

17   A.  Good morning.

18   Q.  Let's pull up Government Exhibit 2, which is the log of the

19   statements that the government is seeking to admit as

20   co-conspirator statements.  I am going to direct your attention

21   to Entry 2.  There you identify Mr. Kantola as a declarant, yet

22   you've testified and that's reflected on Government Exhibit 5

23   the earliest "as of" date for Mr. Kantola was not until well

24   after this entry.

25        So my question is you're not saying that he was a

LaNard Taylor - Cross

1    co-conspirator declarant as of the time of this entry?

2    A.  I don't know that this is -- I don't know that in this

3    e-mail Mr. Kantola actually responded.

4    Q.  My question is are you contending that with regard to this

5    entry, Mr. Kantola was a co-conspirator declarant such that his

6    statements should be admitted under 801(d)(2)(E)?

7    A.  Yeah, I think I need to see the entire -- the actual

8    underlying document.

9         MS. HENRY:  All right.  Let's call that up, please.

10   It's 2-002.

11   BY MS. HENRY:

12   Q.  Agent Taylor, does that refresh your recollection that

13   you're not, in fact, alleging or that Mr. Kantola was a

14   co-conspirator or declarant as of the time of this entry?

15   A.  Can you scroll down to the first e-mail?  Yeah, I don't

16   believe that this document was the date for Mr. Kantola.

17   Q.  And, in fact, there are a lot of statements on Government

18   Exhibit 2 that are not attributed to someone that you claim is

19   a co-conspirator; is that correct?

20   A.  I don't know that to be correct.

21   Q.  Well, let's look at the rest of that entry.

22         Are you claiming that MB is a co-conspirator?

23   A.  No.

24   Q.  You are not saying -- right?

25   A.  No, correct.

LaNard Taylor - Cross

1   Q.  So there is a lot of statements on here.  Let's just move

2   on to Government Exhibit 2 -- 3, I am sorry, Page 18.

3        You testified that this showed that Mr. MacKenzie was

4   a co-conspirator because it was clear to you that he has

5   possession of competition's pricing.  But you did not try to

6   state the source for that pricing.  And in this instance you,

7   in fact, know that you've seen that type of information coming

8   from customers, don't you?

9   A.  Yes.  So I don't -- I think -- I agree with you that I

10  didn't state the source, but in that last sentence

11  Mr. MacKenzie kind of explains where the source -- that

12  Mr. Kantola is going to get the prices.

13  Q.  Well, no.  In fact, the e-mail on 11/2/2012 contains

14  pricing, does it not?  Let's pull it up.  It's Exhibit 2-023.

15  It doesn't talk in the first e-mail there about getting

16  pricing.  It says:  I have -- you know, where the competition

17  is, right?

18  A.  Just to understand, I think you said -- your question was

19  on 11/2 does it contain pricing, and I don't see pricing in

20  this 11/2 e-mail.

21  Q.  Keep scrolling.

22  A.  He says, I know where the competition is, but there is no

23  prices listed on this e-mail.  I think the price actually came

24  in on the 11/5 e-mail.

25  Q.  It says:  Here is the pricing.  I also list what we

LaNard Taylor - Cross

1    believe, right?  And the only thing Mr. Grendys says is to

2    please add a column for our current pricing.  So you see the

3    Page 2 which is of 2-023 which is right there?  It's the second

4    page.  It's Koch Foods 0000542731?  It is the attachment to

5    this e-mail.

6    A.  I don't see the attachment.

7    Q.  I am trying to get it pulled up for you.  So let's go

8    back -- so this is the second page of the e-mail, correct?

9    A.  It appears to be, yes, ma'am.

10   Q.  And it, in fact, does give pricing, right?

11   A.  Yes, we can agree on that.

12   Q.  And that is exactly the type of pricing that usually comes

13   from the customers, right?

14   A.  I -- I don't know that to be exact.

15   Q.  Well, you've seen it coming from customers, let's put it

16   that way.  I think we have already seen some of that.

17   A.  On every single item I don't know that I have seen a

18   customer say, you know, this is -- this is where your

19   competition on every single item, so I can't agree with that.

20   Q.  But you have seen Mike Ledford giving current and specific

21   pricing, correct?

22   A.  If you're referring to that document where he gives the

23   pricing but didn't attach the other supplier name, I think

24   that's what you are referring to?  In that instance, then yes.

25   Q.  There is no supplier name on this, is there?

LaNard Taylor - Cross

1    A.   There is not, you're right.

2    Q.   So you're agreeing that this is the type of information you

3    have seen coming from customers, right?

4    A.   Not this particular document, but again if you are

5    referring to the document we talked about earlier, then sure.

6    Q.   Well, let's pull up two -- Exhibit 2-022, which I believe

7    is on the *James* log as Exhibit Log No. 22.  And you'll see in

8    there too this is Mr. Ledford giving prices and you will see

9    where he says some suppliers were at 30 back this year and some

10   at 32.  Mike is asking us to go to 31.  With regard to wings

11   they range from going down 10 cents up 20, up 47, up 90.

12   Another one, right?

13   A.   Yes, ma'am.

14   Q.   So let's go back to Government Exhibit 3, Page 18.

15            The next statement of Mr. MacKenzie here is:  You gave

16   your opinion that "Bill is getting us pricing" meant to you

17   that Mr. Kantola was going to call his competitors and get

18   pricing.  But there is nothing on the face of this document

19   that says that, is there?

20   A.   That Bill is going to get pricing or he is going to call

21   the customers?

22   Q.   That he is going to get competitor pricing from customers.

23   A.   That he is going to get --

24   Q.   It says "Bill is getting us pricing," correct?

25   A.   Yes.

LaNard Taylor - Cross

1   *Q.* It doesn't say anything about getting competitor pricing,

2   calling competitors, nothing like that, right?

3   *A.* That's correct.

4   *Q.* And, in fact, a salesman job usually is to get together and

5   pull pricing, right?

6   *A.* Yes, but not from the competitors.

7   *Q.* Right, exactly.  My point.

8        *THE COURT:* Ms. Henry, hold on one second.

9        Mr. Koenig, how long do you estimate the redirect is

10  going to last?

11       *MR. KOENIG:* I think the 25 minutes you assigned would

12  be sufficient, but we can always accelerate a little bit more.

13       *THE COURT:* Okay.  So Ms. Henry, I am going to give

14  you three more minutes, and then after that we will check in

15  with Mr. Pollack, all right?

16       *MS. HENRY:* All right.

17  *BY MS. HENRY:*

18  *Q.* With regard to Mr. MacKenzie, neither the conspiracy guide

19  nor any of the hundreds of other *James* log statements that you

20  have offered for this hearing show anything else related to

21  Mr. MacKenzie joining a conspiracy; isn't that correct?

22  *A.* I don't know that he is not on another document, but this

23  is the "as of" date.

24  *Q.* No, I am not asking if this is the "as of" date.  I am

25  asking whether you have any other independent evidence aside

256

LaNard Taylor - Cross

1  from these two statements that you have offered into evidence

2  here relating to Mr. MacKenzie joining a conspiracy, any type

3  of conspiracy?

4  A.  I would have to review the rest of the 300 or so exhibits.

5  Q.  You can't think of a single thing today, right?  And we

6  will let anybody clear it up later.  Can you?

7  A.  I would have to review the other documents.

8  Q.  I asked whether you could understand or give us anything

9  here today.

10  A.  And I would have to review the other documents in order to

11  say one definitively.

12  Q.  Well, the record will state for itself.

13      Mr. Fagg already covered other materials related to

14  Mr. Grendys, but you are certainly not saying that Mr. Grendys'

15  statement here, "Add a column for our current pricing," somehow

16  shows that he was involved in the conspiracy, right?

17  A.  I am not making that suggestion, no, ma'am.

18  Q.  I want to turn quickly to the *James* log, Entry 23.  Do you

19  see the column on the far right with the letter codes A, B, G,

20  H, R?

21  A.  Yes.

22  Q.  Starting with the last R means according to the

23  government's papers that the statement was intended to avoid

24  detection by law enforcement personnel.

25      Now, let me just see if I can save some time here.

LaNard Taylor - Cross

1   This column was added by the lawyers; is that correct?

2   A.  Yes, ma'am.

3   Q.  It's not part of your testimony?

4   A.  It is a part of a log, but yeah, I am not the lawyer that

5   added this.

6           MS. HENRY:  All right.  I will turn it over.

7           THE COURT:  Thank you, Ms. Henry.

8           Mr. Pollack?

9           MR. POLLACK:  Thank you, Your Honor.

10          THE COURT:  I will give you 15 minutes, Mr. Pollack.

11                          **CROSS-EXAMINATION**

12  BY MR. POLLACK:

13  Q.  Agent Taylor, I am going to start by calling up the

14  transcript from the first day of this hearing, and if we can go

15  to Page 13.  The transcript is 008.

16          Agent Taylor, you testified that the conspiracy as you

17  understood it was achieved by the suppliers through their

18  employees communicating with one another, getting on the same

19  page about pricing events or bids and raising prices or

20  agreeing to raise prices together, correct?

21  A.  Yes, sir.

22  Q.  And on Page 14 you were asked:

23          Then did they use the information they received to

24  inform their decision making going forward?

25          And you said:  Yes.

LaNard Taylor - Cross

1          Correct?

2    *A.*  Yes, sir.

3    *Q.*  And then after describing the conspiracy, you were asked

4    about Mr. Blake in particular and that's at Page 21.  And you

5    were asked:

6          Did Mr. Blake have responsibility for sales,

7    negotiation or pricing?

8          And your answer was:  Yes, sir.

9          Correct?

10   *A.*  Yes, sir.

11   *Q.*  And the "or" is important there because you certainly

12   weren't trying to suggest to the Court, were you, that he had

13   responsibility for all three of those things, correct?

14   *A.*  I was not.  In fact, what I was responding to was saying I

15   don't know every single responsibility he had.

16   *Q.*  Well, in fact, one responsibility you know that he did not

17   have was that he had no authority for pricing, correct?

18   *A.*  I don't know that to be the case.

19   *Q.*  Okay.  I would like to put up A-13, which is an excerpt

20   from a submission by counsel for George's to the Department of

21   Justice dated November 9, 2020.  In that excerpt, I would like

22   to look at the very first paragraph and I am going to read it

23   to you, Agent Taylor.

24        *MR. KOENIG:*  Your Honor, could we get a copy?  I guess

25   it's on the screen.  Never mind.

LaNard Taylor - Cross

1    *BY MR. POLLACK:*

2    *Q.*   Mr. Blake was not part of George's management team.

3    Instead, Mr. Blake was a salesperson who focused on national

4    accounts, including fast-food chains like KFC and Popeye's.

5    During the time period at issue in the superseding indictment,

6    Mr. Blake did not have any pricing authority for those

7    customers.  For each of the bidding events at issue in the

8    superseding indictment, George's final pricing decisions were

9    made by Mr. Blake's superiors.

10          Did the Department of Justice share with you that

11   factual representation that was made by George's counsel?

12   *A.*   I have not seen this document.

13   *Q.*   I would like to go to Exhibit 3.  And if you would look at

14   Slides 4 and 19.  Four and 19 are the "as of" dates for

15   Mr. Little and for Mr. Blake, correct?

16   *A.*   Sounds right, yes, sir.

17   *Q.*   And they both refer to the same e-mail chain on the same

18   dates, correct?

19   *A.*   Yes, sir.

20   *Q.*   And if we go to 2-002, which is the exhibit that is

21   referred to in both of those slides, it is an e-mail chain that

22   starts with Mr. Kantola submitting to Church's, if you go to

23   the bottom of the chain.

24          Attached please find our recommended steps towards

25   claims, product issue reporting and management, correct?

260

LaNard Taylor - Cross

1    A.   Correct.

2    Q.   And that relates to quality assurance issues, correct?

3    A.   Yes, sir.

4    Q.   Things like spoilage, correct?

5    A.   Sure.

6    Q.   And then Church's turns around and Church's sends

7    Mr. Kantola's submission about quality assurance to a number of

8    competitors, correct?

9    A.   Yes, sir.

10   Q.   In a single e-mail, correct?

11   A.   That's correct.

12   Q.   To Mr. Roberts, to Mr. Blake, to Mr. Kantola, to

13   Mr. Little, correct?

14   A.   Yes, sir.

15   Q.   So it's the customer that is sharing this with all the

16   suppliers at the same time, correct?

17   A.   That is correct.

18   Q.   And asking for a response from all the suppliers together,

19   correct?

20   A.   I don't know if it's together.  Could you scroll up for

21   just one second?

22   Q.   Well, he sends out a single e-mail to all of the suppliers,

23   correct, not individual e-mails to individual suppliers.

24   A.   He does, but he also in that e-mail says, can you each by

25   separate e-mail confirm your agreement?  So he asks them to

261

LaNard Taylor - Cross

1   respond separately.

2   Q.  Okay.  And then a couple weeks later he says he has only

3   gotten one response; is that correct?

4   A.  That's correct.

5   Q.  And he says that if you don't respond, I am just going to

6   assume that you're agreeing with me, correct?

7   A.  Yes, sir.

8   Q.  And then Mr. Little responds, correct?

9   A.  Yes, sir.

10  Q.  And then Mr. Blake responds, correct?

11  A.  He does, though I don't know that he actually sent it to

12  Mr. Malin.

13  Q.  Mr. Little replied to all, correct?

14  A.  He did.

15  Q.  And then Mr. Blake may have replied to Little's e-mail as

16  opposed to hit reply all?

17  A.  He could have, yes, sir.

18  Q.  And the information that is at issue you said in 02 is a

19  related e-mail chain that appears in 04?

20          MR. POLLACK:  Would you call that up?

21  A.  Yes, sir.

22  BY MR. POLLACK:

23  Q.  And that talks about the sharing of data, correct?

24  A.  That's correct.

25  Q.  And the data being discussed there is data related to

LaNard Taylor - Cross

1   issues like spoilage, correct?

2   A.   Yes, sir.

3   Q.   And the phrase "holding firm" is used, correct?

4   A.   Yes, it is.

5   Q.   And you said that that phrase is indicative of conspiracy

6   of suppliers to share prices with each other, correct?

7   A.   Say that again?

8   Q.   Your testimony at the first part of the hearing was that

9   that is a phrase that to you is indicative of a conspiracy

10  about prices, correct?

11  A.   Not that -- I thought you said sharing prices.  It is

12  indicative of them not moving on price.  I think that's what I

13  agreed -- I think that's what I testified to, that they would

14  not move on price or change the price or something like that.

15  Q.   And you talked about similar phrases.  You were asked, and

16  this is at Page 102 of the transcript:

17          What type of information were they using, the

18  co-conspirators, to "follow suit"?

19          And you said:  If I understand your question

20  correctly, they were using information that was -- I mean, I

21  guess price sensitive information that -- for instance, to give

22  the example again with Mr. Blake and Mr. Little, that was

23  Pilgrim's position in which Mr. Little had asked Mr. Blake:

24  Are you onboard with this?  So it was a position that Pilgrim's

25  held and he wanted to see if George's, who Mr. Blake worked

263

LaNard Taylor - Cross

1   for, was going to do the same thing as Pilgrim's.

2        But this e-mail exchange isn't about pricing

3   information at all.  It's about quality assurance issues,

4   correct?

5   A.  You are right, yes, sir.

6        MR. POLLACK:  I would like to move to Brenda Ray, who

7   was one of the declarants, and go to -- if I didn't, I would

8   like to move the admission of A-013.

9        THE COURT:  Any objection to the admission of A-013?

10        MR. KOENIG:  Do we have it?

11        THE COURT:  You may not, but you are about to.

12        MR. POLLACK:  And to be clear, it's the excerpts of

13   the first paragraph.

14        THE COURT:  Okay.  So the only portion of A-013 that's

15   being admitted is some excerpt on the first paragraph?

16        MR. POLLACK:  It is the entirety of the first

17   paragraph.

18        THE COURT:  Okay.  That's all you are moving to admit.

19        MR. POLLACK:  Right.

20        THE COURT:  Any objection?

21        MR. KOENIG:  No objection.

22        THE COURT:  Any objection by anyone else?  All right,

23   that will be admitted.

24   BY MR. POLLACK:

25   Q.  So I would like to talk about Brenda Ray.  And this is an

264

LaNard Taylor - Cross

1    Exhibit A-003.  And this is where Ms. Ray says to Mr. Pate that

2    she's talked to a "friendly competitor."  Do you remember that?

3    A.   I do.

4    Q.   And the friendly competitor is identified as George's?

5    A.   Yes, sir.

6    Q.   But I want to be clear.  You're not suggesting that it was

7    Mr. Blake at George's that Ms. Ray was talking to, were you?

8    A.   I don't know who she talked to at George's.

9    Q.   Well, did you interview Ms. Ray?

10   A.   I was present for that interview, at least a portion of it.

11   Q.   And let's put up 04, which is the 302 from that interview.

12   And if we can go to the bottom paragraph of Page 3, you were

13   shown a particular document and it is the e-mail exchange that

14   is referenced in the entry that we just discussed.  And she

15   says that:  Greg Nelson worked with Ray at WLR before he moved

16   to George's.  Ray spoke with Nelson "from time to time" and

17   related this information that Pilgrim's was increasing prices

18   to cut up WOGs in the northeast.  Penn and Lovette encouraged

19   others to have "pricing courage" and Ray passed this message in

20   her August 31, 2012 response, "Courage ..... keep it up guys."

21          It was Mr. Nelson that Ms. Ray spoke to, correct?

22   A.   According to this MOI, that is the case, though I will say

23   like this interview --

24   Q.   I will let you save anything else you want to say that is

25   not responsive to my question for your redirect.

LaNard Taylor - Cross

1   A.  I don't have any independent knowledge of this.  I wasn't

2   present for the entirety of the interview.

3   Q.  Okay.  So were you there when what was said on Page 6 of

4   that interview that Mr. Ray does not even know Mr. Blake?

5   A.  No, sir, I was not there.  I had training that day, so I

6   had to leave the interview early, which is why I didn't write

7   this.

8           MR. POLLACK:  Move the admission of A-04.

9           THE COURT:  Any objection to -- actually, I thought it

10  was 03.

11          MR. POLLACK:  The 302 for Ms. Ray is A-004.  I think

12  the e-mail is A-003.

13          THE COURT:  Any objection to the admission of Defense

14  Exhibit A-004?

15          MR. KOENIG:  No, Your Honor.

16          THE COURT:  Any objection?

17          MR. McLOUGHLIN:  Tim McLoughlin.  This is solely for

18  the James hearing and no other purpose.

19          THE COURT:  Right, everything admitted today or last

20  week was only for purposes of the James hearing.  Exhibit A-004

21  will be admitted.

22          Make sure Ms. Grimm has a copy of any exhibit that we

23  have admitted.

24          MR. POLLACK:  Absolutely, Your Honor.

25          THE COURT:  Go ahead.

LaNard Taylor - Cross

1   *BY MR. POLLACK:*

2   Q.   If you can go to Page 25 of Government Exhibit 3.

3           This is the "as of" date for Mr. Sharp, Chris Sharp?

4   A.   I don't know if I --

5   Q.   We will put it up.

6           Do you recall Mr. Sharp who was at Kelly Foods?

7   A.   Yes, sir.

8   Q.   And Kelly Foods is not a competitor to the suppliers,

9   correct?

10  A.   They are not.

11  Q.   And there is a reference to an e-mail in the first box,

12  right?  And it says:  Tench at Mar-Jac e-mailed Kelly Foods.

13          But it doesn't say that he e-mailed Mr. Sharp, does

14  it?

15  A.   It does not.

16  Q.   That's because he didn't.  He e-mailed Dale Kelly, correct?

17  A.   That's possible.

18  Q.   Can you bring up A9, A-009?  And while your box talked

19  about Mr. Tench submitting a price that was lower than

20  Claxton's or Pilgrim's, the e-mail itself doesn't say anything

21  about Claxton's or Pilgrim's.  It's just Mr. Tench from Mar-Jac

22  submitting a price, correct?

23  A.   Can you go back to the other e-mail?

24  Q.   The chart, Exhibit 3, No. 25?

25  A.   Yes, sir.  All right.  What was your question again?

1    *Q.*  My question is the e-mail doesn't reference Claxton or

2    Pilgrim's.  It's just Mr. Tench giving Mar-Jac's prices,

3    correct?

4    *A.*  This -- the top box does say --

5    *Q.*  I understand what the box says, but what I am saying what's

6    in the box is not actually what's in e-mail, correct?

7    *A.*  I see what you mean.  Yes, sir.

8    *Q.*  And in the second box and the third box are reference to

9    phone calls that Mr. Sharp was not a participant in, correct?

10   *A.*  That's correct.

11   *Q.*  And then the fourth box referenced an e-mail that is

12   government -- well, let me do it this, A-021.  And this one is

13   Mr. Tench to Mr. Sharp, correct?

14   *A.*  Yes, sir.

15   *Q.*  And it's simply submitting pricing information for Mar-Jac,

16   correct?

17   *A.*  That is correct.

18   *Q.*  I would like to talk about one of the bidding episodes in

19   the indictment, the 2013 bidding for KFC dark meat.

20           And if we can go to A-019.

21           So the bidding for 2013 takes place in 2012, correct?

22   *A.*  Yes, sir.

23   *Q.*  And the 2012 price was established at the end of 2011,

24   correct?

25   *A.*  Yes, sir.

LaNard Taylor - Cross

1    *Q.*  And A-019 is the 2011 price model for 2012.

2    *A.*  Yes, sir, a portion of it, yes, sir.

3    *Q.*  And if you go to the second page of that submission, you

4    see that the dark meat is 30 cents back?

5    *A.*  Where are you on --

6    *Q.*  Where it says:  Supplemental dark meat formula,

7    parenthesis, meaning negative 30 cents.

8    *A.*  Yes, sir.

9    *Q.*  That's submitted by Darrell Keck of George's?

10   *A.*  I believe that's on the signature block, but I can't see it

11   right now.

12   *Q.*  Can you go down to the signature block?

13   *A.*  Yes, it appears to be from Mr. Keck.

14   *Q.*  When the 2012 bidding is going on, the 2012 price for dark

15   meat for George's is 30 back, correct?

16   *A.*  Yes, sir.

17   *Q.*  Let's go to the superseding indictment.  If we go to

18   Paragraph 52B.  Do you not have it?  52B of the superseding

19   indictment says that Supplier 6, Employee 2, and that would be

20   Darrell Keck, correct?

21   *A.*  I would have to see the legend.  I don't know the number

22   off the top of my head, but I take it --

23   *Q.*  Submitted Supplier 6 bid.  You do remember Supplier 6 was

24   George's?

25   *A.*  I believe so.

LaNard Taylor - Cross

1   *Q.* For dark meat for the calendar year 2013 at 28 back, okay?

2   *A.* Okay.

3   *Q.* So they are at 30 back currently in 2012, and he is

4   submitting a price for 2013 of 28 back, correct?

5   *A.* Correct.

6   *Q.* Then Paragraph 56 of the superseding indictment, you have a

7   call between Blake and Brady, correct, 4:17 p.m. on

8   November 13th.

9   *A.* Yes, sir.

10  *Q.* And then a few minutes later Brady texts Fries and says

11  George's is at 30 cents back, correct?

12  *A.* That's correct.

13  *Q.* So if Mr. Blake told Mr. Brady in that phone call that

14  George's is at 30 cents back, he was giving the 2012 price of

15  30 cents back, not the current bid for the next year of 28

16  back, correct?

17  *A.* I think that appears to be the case, yes, sir.

18       *THE COURT:* One minute left.

19  *BY MR. POLLACK:*

20  *Q.* If I can talk about episode in the indictment for the

21  eight-piece COB for 2015.  And in Paragraph 94B, Mr. McGuire of

22  Pilgrim's e-mails Mr. Penn a spreadsheet and has a range for

23  George's of 15 to 18 cents, correct, not a precise price?  It

24  should be in Paragraph 94B.

25  *A.* Okay.

270

LaNard Taylor - Cross

1    *Q.*  Is that correct?

2    *A.*  This is not dark meat, though.  This is just talking about

3    margin.  This is two totally separate pricing points.

4    *Q.*  Okay.  But what he knows about margin about George's, he

5    doesn't know what George's exact margin is.  He knows a range,

6    correct?

7    *A.*  The new margin, yes, sir.  It appears that's correct, sir.

8    *Q.*  And you said the customers tend to talk in ranges, not

9    precise amounts, correct?

10   *A.*  In general.

11          *THE COURT:*  All right.  Mr. Pollack, unfortunately I

12   have got to cut you off at this time.

13          *MR. POLLACK:*  Your Honor, I am going to object to

14   that.  I don't think that I have been repetitive.  I think

15   Mr. Blake is entitled to confront the witnesses and --

16          *THE COURT:*  He had approximately the same amount of

17   time as other people did, so we have a limited amount of time

18   today and it's got to be rationed.  Thank you, Mr. Pollack.

19          *MR. POLLACK:*  Your Honor --

20          *THE COURT:*  You are wasting time arguing and you are

21   taking away from the government.  Thank you, Mr. Pollack.

22   Please sit down.

23          *MR. POLLACK:*  Thank you, Your Honor.

24          Redirect?

25          *MR. BYRNE:*  Mark Byrne on behalf of Jimmie Little.

LaNard Taylor - Redirect

1    Can I just introduce into evidence two of the exhibits we

2    discussed on our cross?

3         THE COURT:  You are taking away from the government

4    once again.  I will give you a chance to do that if we have

5    time at 11:55, okay?

6         All right.  Redirect?

7                    **REDIRECT EXAMINATION**

8    BY MR. KOENIG:

9    Q.  Agent Taylor, you were asked on cross-examination whether

10   the mere sharing of prices standing alone is illegal price

11   fixing.  Do you remember that?

12   A.  I do.

13   Q.  Is the mere sharing of prices what you discovered in your

14   investigation?

15   A.  It is not.

16   Q.  What did you discover?

17   A.  It was the sharing of the prices and then also the

18   coordination of wanting to increase prices or hold on prices.

19   It was what they did with the information, not necessarily the

20   mere sharing of the pricing.

21        MR. KOENIG:  Can we bring up the conspiracy guide,

22   Exhibit 1 or 1.1?  It doesn't matter for this.  Can I direct

23   your attention to Row 113 of the conspiracy guide?

24        Your Honor, may I move over there so I can actually

25   see the --

LaNard Taylor - Redirect

1          *THE COURT:*  Absolutely.

2     *BY MR. KOENIG:*

3     Q.  All right.  I assume you are familiar with Row 113.

4     A.  Yes, sir.

5     Q.  Did a price exchange occur in Row 13?

6     A.  Ask that question again, please?

7     Q.  Was there a price exchange that occurred as evidenced by

8     Row 113?

9     A.  Yes, sir.

10    Q.  And how do you know that?

11    A.  Again, it says Roger did some checking around.  And it

12    appears as though Mr. Austin gave a little more details about

13    George's where he presumably gave them these prices.

14    Q.  Is that all that happened as evidenced by Row 113?

15    A.  It is not.

16    Q.  What else happened?

17    A.  It appears as though Mr. McGuire based on that information

18    suggested pricing points for the increase based on the

19    information that he received.

20    Q.  Did you find in various pricing exchanges that the prices

21    that were exchanged were used to undercut one another by

22    competitors?

23    A.  I don't think that was the objective, so -- of the

24    exchanging of the prices.

25    Q.  Why is that?

LaNard Taylor - Redirect

1  *A.* Well, as communicated to us and in the interview, they

2  didn't do that to undercut.  And I believe it was primarily

3  because they didn't want to -- you don't want to upset, you

4  know, the competitors that, you know, that you're changing

5  prices with.  You want to be able to go back to them and get

6  more pricing.  And if one competitor knows that the other one

7  is undercutting them with that information, they are not going

8  to give you the information anymore.

9  *Q.* Mr. Feldberg asked about Mr. Austin conspiring with Case.

10  Do you remember that?

11  *A.* I do.

12  *Q.* On Row 113, do you see Case listed?

13  *A.* Yes, sir, I do.

14  *Q.* And I believe Mr. Feldberg also asked you about Tyson.

15  *A.* Yes.

16  *Q.* And you mentioned that you had something that you

17  remembered that we would take care of on redirect?

18  *A.* Yes, sir.  I believe in one of the interviews with

19  Mr. Pepper, he communicated to us that he had talked to

20  Mr. Austin about pricing.  And I believe that was in one of the

21  302s that I wrote for Mr. Pepper.  So that was -- in that case

22  that was -- that was Tyson communicating with Mr. Austin.

23  *Q.* And Mr. Feldberg also asked about conspiring with Purdue by

24  Mr. Austin.  Do you recall that?

25  *A.* He did, yes, sir.

274

LaNard Taylor - Redirect

1   Q.  Is it your experience in the investigation that every

2   conspirator knows everyone else in the conspiracy?

3            MR. FELDBERG:  Objection, leading.

4            THE COURT:  Sustained.

5   BY MR. KOENIG:

6   Q.  What is your experience about what co-conspirators know

7   about the scope of the conspiracy?

8   A.  I believe not everyone knows everybody, but not everyone

9   communicates with everybody either.  And that was evident in

10  that sometimes pricing came through a third -- a third

11  competitor, for instance.  So for instance, one competitor may

12  have given another one two prices as opposed to just their own

13  price.

14           MS. PREWITT:  Objection, Your Honor.  It's still

15  unclear what he is talking about in terms of the conspiracy.

16           THE COURT:  The objection is late.  Overruled.

17           MR. KOENIG:  All right.  Can we go to Rows 15 to 24 of

18  the conspiracy guide, please?

19  BY MR. KOENIG:

20  Q.  Do you see that?

21  A.  Yes, sir.

22  Q.  Does the price exchange occur there?

23  A.  Yes, sir.

24  Q.  How do you know that?

25  A.  It's -- to me it was clear by the text message that

275

LaNard Taylor - Redirect

1    Mr. Blake had just talked to Mr. Brady and that Mr. Brady

2    texted Mr. Fries that George's is 30 back.  That's just in the

3    first two messages.

4    Q.  Is that all that happened?

5    A.  It is not.

6    Q.  What else happened?

7    A.  They go on to discuss other prices.  Then toward the end he

8    said Mr. Austin told them, so he is instructing Claxton to

9    raise their prices.  And Mr. Fries responded to him that

10   they're trying.  Well, they will do, I'm sorry.

11   Q.  In this example, are you -- well, scratch that.  You were

12   also asked about the wings and market and market plus 10; is

13   that correct?

14   A.  I believe he asked me about whether the eight-piece price

15   was known or something along those lines.

16   Q.  Well, I think, if I recall, did he ask you, the raising of

17   price relate to the wings?

18   A.  So I thought he asked me was the prices -- yeah, I can't

19   recall exactly which question he asked.

20   Q.  Let's move on.

21         What's the date of that e-mail about Austin says he

22   says to raise our prices?

23   A.  It was a text message and they are dated November 13, 2012.

24   Q.  And can you just read that text into the record one time

25   quick?

LaNard Taylor - Redirect

1   *A.*  He said to raise our prices, on wings he is market and

2   market plus .10.

3             *MR. KOENIG:*  Can we see Exhibit 2-029?  We don't have

4   2-029?  All right.  We will come back to it.

5   *BY MR. KOENIG:*

6   *Q.*  You were asked about competing chicken suppliers covering

7   each other's shortages for common customers.  Do you remember

8   that?

9   *A.*  Yes, sir.

10  *Q.*  Based on your investigation, was it necessary for them to

11  know the prices to the -- was it -- in order to do that

12  exchange, that covering of shortage, what information was

13  needed to be exchanged?

14  *A.*  So in my understanding of how the shortages were covered,

15  whatever supplier, so supplier A who was providing the product

16  would just send over a purchase order with, you know, whatever

17  they were going to charge that -- the second supplier would be

18  supplier B.  I will say that in at least one of the interviews

19  I believe with Mr. Campisano, he indicated to us that RSCS or

20  KFC had a mechanism by which the suppliers didn't have to

21  exchange prices and RSCS would kind of -- there was a system in

22  place where they were able to, I guess, make the other supplier

23  whole if there was a shorter -- I mean, a smaller price that

24  was charged.

25            *MR. KOENIG:*  All right.  Thank you.  Can we go back --

277

LaNard Taylor - Redirect

1    can we do the Elmo for the screen?  I don't know if they are

2    called Elmos anymore.

3            THE COURT:  It's not.  We call it the Document Viewer.

4    We don't want to call it Elmo when it's not really an Elmo in

5    federal court, trademark sensitivity and all.

6            MR. KOENIG:  Okay.

7    BY MR. KOENIG:

8    Q.  All right.  So you testified previously that he said to

9    raise our prices.  His wings are at market, market plus 10.  Do

10   you recall that?

11   A.  I do.

12   Q.  And do you recall what date that was?

13   A.  I don't recall exactly which date that text message

14   exchange was on.  It was just in the previous exhibit, but I

15   can't remember what it was.

16   Q.  Does November 13 of 2012 -- all right.  I am showing you

17   what's been marked as 2-029.

18           MR. KOENIG:  And it's foggy.  How do I focus?

19           THE COURT:  There should be an auto focus button.

20           MR. KOENIG:  Oh, auto focus, there we go.

21   BY MR. KOENIG:

22   Q.  Who is this e-mail from?

23   A.  Mr. Scott Brady.

24   Q.  Who is it to?

25   A.  Mark, I don't know how to pronounce the last name, but an

LaNard Taylor - Redirect

1    employee of UFPC, which is the purchasing cooperative for KFC.

2    Q.  What's the date?

3    A.  November 14, 2012.

4    Q.  And what -- can you read the second sentence from

5    Mr. Brady?

6    A.  Mr. Brady says, "On the wings we would like to be at market

7    for the bulk packed and market plus .10 on the precounted."

8         MR. KOENIG:  Thank you.  Can we go back to the other

9    screen that we were on?

10        And Your Honor, is it 11:55 is my cutoff?

11        THE COURT:  Yes.

12   BY MR. KOENIG:

13   Q.  Do you recall testifying about Chick-fil-A's

14   antibiotic-free chicken?

15   A.  I do recall some testimony about that product of some sort.

16   I just can't remember exactly what it was.

17   Q.  Did you interview anyone from Chick-fil-A regarding

18   antibiotic-free chicken?

19   A.  Yes, sir.

20   Q.  Who was that?

21   A.  David Rothmeier.

22   Q.  And what, if anything, did Mr. Rothmeier say about

23   competing suppliers with regard to antibiotic-free chicken?

24   Did he suggest that they collaborate?

25        MS. PREWITT:  Objection, Your Honor.

LaNard Taylor - Redirect

1           THE COURT:  Overruled.  He can answer.

2    A.  No, he did not suggest that they collaborate on their

3    pricing.

4    BY MR. KOENIG:

5    Q.  But my question was did he ask that they collaborate on

6    anything?

7    A.  So I believe as they were moving to the antibiotic-free,

8    there was discussion about, you know, since it was new about

9    different companies, you know -- I think Purdue had done the

10   antibiotic-free for a long time, so they kind of used Purdue

11   as, I guess, the base or the model to go by for other suppliers

12   to follow.

13   Q.  Did he indicate anything during his interview about whether

14   he thought that -- about prices in that regard?

15   A.  I -- I don't recall.

16   Q.  You were asked about current pricing.  Do you remember

17   that?

18   A.  I do.

19   Q.  And in the course of your investigation, did you learn

20   anything about how current pricing can be used in furtherance

21   of a price fixing conspiracy?

22   A.  Yes, sir.

23   Q.  What did you learn?

24   A.  So my understanding was that a lot of times -- in some

25   instances the current pricing was used to form the basis of a

1    pricing decision in the future.  So for instance, if there

2    was -- for the next negotiations and like I said before, the

3    period pricing changed and I know there is different variables

4    that went into that.  So I don't know exact -- I don't know

5    everything, you know, that the current pricing is used for, but

6    I do know at least it informed some basis of some pricing

7    decisions going forward.

8    Q.  All right.  So after a collusive event why would it be in

9    furtherance of the conspiracy for co-conspirators to exchange

10   current prices?

11   A.  I'm sorry, repeat your question?

12   Q.  Why would it be in furtherance of the conspiracy after the

13   collusion has already occurred for competitors then to see each

14   other's current period pricing going forward?

15   A.  Well, at least one part of it was so they could know that

16   each of the suppliers was holding up their end of the bargain

17   and they were at the prices where they said they were.  Again,

18   I don't know every single reason why they would do that, but I

19   believe that's at least one of the parts of it.

20   Q.  Okay.  Were there other reasons possibly?

21   A.  Sure, there is possibly other reasons.

22        MR. KOENIG:  Can we bring up 2-058, and then switch

23   the Document Viewer real quick.  Okay.

24   BY MR. KOENIG:

25   Q.  Who is this e-mail to and from?

LaNard Taylor - Redirect

1   *A.*   The top e-mail is from Mr. Fries to Mr. Brady.

2   *Q.*   Okay.  The bottom e-mail, the first one in the chain, do

3   you see where it says:  I talked to Bill and Koch is .9884 for

4   period 6?

5   *A.*   Yes, sir.  That is from Mr. Brady to at least Mr. Fries.

6   *Q.*   And what does the second to the last sentence say?

7   *A.*   It says:  Bill thinks we could increase by .005 to .0075.

8   *Q.*   Okay.  And what is Mr. Fries' response?

9   *A.*   He responded, quote:  Yeah, I agree, but we need to do it

10   in smaller increments, .0025 to .0040 at a time.

11   *Q.*   And they are talking again about current/period pricing?

12   *A.*   Yes, sir.

13            MR. KOENIG:  I want to just switch to Mr. Bryant real

14   quick.  Can we show 2-323 at Page 3?  Let's zoom in with the

15   heading McGuire and Austin.

16   *BY MR. KOENIG:*

17   *Q.*   Have you seen this before?

18   *A.*   I have.

19   *Q.*   Can you explain what was going -- what's going on here?

20   *A.*   Mr. Bryant communicated to us during the interview that

21   previously, I believe in around 2010 as is noted here, that

22   Mr. Austin had provided competitor pricing positions and

23   consensus on those positions.  And he also indicated that he

24   believed it was likely a two-way street.  If Mr. Austin

25   provided information to a competitor, they would in turn

1    provide pricing information back to Mr. Austin.  Yeah, that's

2    what he communicated.

3    Q.  Okay.  And as of this time what did Mr. Bryant say the

4    purpose was?

5            MR. POLLACK:  Objection.  I am not sure what "as of

6    this time" means.  It's vague.

7            THE COURT:  Overruled.

8    A.  Can you repeat the question?

9    BY MR. KOENIG:

10   Q.  What did Mr. Bryant say the purpose of what he was

11   describing Mr. Austin doing?  What was the purpose of that?

12   A.  I think as noted in at least Line 2, he is talking about

13   getting consensus on pricing, you know, I guess making sure

14   that each of the suppliers are in consensus as it relates to

15   pricing.

16   Q.  One more topic here real quick.  Mr. Pepper.

17           THE COURT:  Actually, you're out of time.  Sorry,

18   Mr. Koenig.

19           MR. KOENIG:  Thank you.

20           THE COURT:  Special Agent Taylor, you are excused.

21   Thank you.

22           Mr. Byrne go ahead.  I think Mr. Byrne was first.  We

23   will take some brief motions to admit exhibits.

24           MR. BYRNE:  Exhibit A-0023 and A-0024.  We discussed

25   those during the cross.

1        *THE COURT:*  Any objection, Mr. Koenig?

2            *MR. KOENIG:*  No, Your Honor.

3            *THE COURT:*  Those will be admitted.

4            Mr. Fagg?

5            *MR. FAGG:*  Thank you, Your Honor.  We would move to

6    admit Exhibit A-026 which is an e-mail we discussed with

7    Special Agent Taylor.

8            *THE COURT:*  Any objection to A-026?

9            *MR. KOENIG:*  No, Your Honor.

10           *THE COURT:*  A-026 will be admitted.

11           Mr. Gillen?

12           *MR. GILLEN:*  Your Honor, we obtained the declaration

13   of Mr. Pepper.  I would like to have that into evidence.  I

14   haven't premarked it.  We could file it as an exhibit

15   electronically or mark it right now, but we obtained it

16   yesterday from Mr. Pepper.

17           *THE COURT:*  What's the last number?  So that would be

18   the next one.  Anyone know?

19           *MR. GILLEN:*  The last defense exhibit number.

20           *THE COURT:*  Do they go beyond --

21           *MR. BYRNE:*  I have 24.

22           *THE COURT:*  Let's mark it A-030, okay?  Any objection

23   to A-030?  We want to be safer, so Mr. Gillen, we will mark

24   that as A-033, okay?  All right.  That will be admitted.

25           Go ahead, Mr. Pollack.

1          MR. POLLACK:  Your Honor, on behalf of Mr. Blake, I

2    discussed both A-003 and A-004.  I think the record is clear

3    that A-004 is in evidence.  I am not sure if the record is as

4    clear as A-003, but it was my intent to introduce both.

5          THE COURT:  Okay.  A-003 has not been admitted, but

6    you are moving its admission now?

7          MR. POLLACK:  If it's not been admitted, I am moving

8    its admission now, yes.

9          MR. KOENIG:  No objection.

10         THE COURT:  A-003 will be admitted.

11         MR. POLLACK:  Thank you, Your Honor.

12         THE COURT:  All right.  Let me mention the following:

13   So apparently the following defendants because of the pandemic

14   did not actually appear physically in the courthouse, and as a

15   result, the marshals need information from them today.

16   Those -- some of these defendants were excused, but some are

17   here today.  So for the ones that are here today, you should go

18   up to the third floor.  So a lawyer and the defendant should go

19   up to the third floor.  Mr. Austin, Mr. Roberts, Mr. Blake,

20   Mr. Lovette, Mr. Mulrenin and Mr. Penn, okay?

21         Okay, great.  Anything else we should take up briefly?

22   Mr. Fagg?

23         MR. FAGG:  On that, Your Honor, Mr. Austin is not here

24   today.  He will be happy to do whatever needs to be done the

25   next time he is here.

1              THE COURT:  Exactly.  That's what I meant.  I wanted

2      to alert you to the fact, even though Mr. Austin is not here,

3      that that is something he will need to do when he is back in

4      town.  It doesn't have to be in connection with the hearing,

5      but if you could at some point make an arrangement for him to

6      go to the marshals, okay?  Okay, great.

7              Mr. Tubach?

8              MR. TUBACH:  About 30 seconds, Your Honor.  I

9      understand the Court is not going to take argument now.  I am

10     not going to give the Court any argument.  Would the Court be

11     amenable to us submitting a short post-hearing brief

12     summarizing why we believe what Agent Taylor testified to does

13     not support the admission of this evidence under 801(d)(2)(E)?

14             THE COURT:  In addition to being our informal IT

15     person, Mr. Tubach is our setup man, and yes, that was going to

16     be my suggestion.  And that is how about this because I'm going

17     to give the defendants five pages due 5:00 p.m. Friday.  I know

18     it's short, but we just can't drag this stuff out.  Don't focus

19     on generalities.  Try to focus on the evidence or lack of

20     evidence, but understand I've looked at your stuff already, so

21     just don't be repetitive.  Five pages by 5:00 p.m. mountain

22     time Friday, okay?

23             MR. TUBACH:  We will get it done.

24             THE COURT:  The government, Tuesday 5:00 p.m. mountain

25     time, 15 pages, okay?

1          MR. KOENIG:  Five pages each for them?

2          THE COURT:  Each for them.

3          MR. KOENIG:  And 15 for us.

4          THE COURT:  Yeah, I don't think you need 20.  But if

5     you really think you need 20, I will give you 20, but I just

6     don't think you do.

7          MR. KOENIG:  I just wanted to know what to expect.

8          THE COURT:  Sure.  Five pages, okay.

9          Anyone else?  Real quick, Mr. Kornfeld.

10         MR. KORNFELD:  Very quick, Your Honor.  I am just

11    concerned -- and I appreciate the Court's indulgence on the

12    brief -- I am concerned we may not have the transcript.  And I

13    would wonder if the Court would indulge us and allow us to file

14    the defense briefs Monday and the government Wednesday rather

15    than Friday and Tuesday.  If the court reporter, if that's

16    going to work, then I am not worried about it, but I know you

17    all have other things to do besides this case.

18         THE COURT:  That is true.  Let's ask Ms. Coppock.

19    Ms. Coppock says we should have the transcript not today, but

20    tomorrow afternoon late.  Would that work?

21         MR. KORNFELD:  If we could have until Monday, I think

22    you will get a much better work product rather than a rush work

23    product.

24         THE COURT:  All right.  Monday 8:00 a.m. and

25    government Wednesday noon, okay?

1           MR. KOENIG:  May I ask for a little extra time?  We

2    are talking about 10 five-page briefs that they are having

3    three extra days for.

4           THE COURT:  Okay, Thursday noon.  I just don't want

5    to -- we've got to kind of get rolling on these things.  We're

6    getting tight.

7           All right.  Anything else real quick?  Hearing

8    nothing --

9           MR. FAGG:  The pretrial conference, is it Your Honor's

10   practice that our clients should plan to attend that or if our

11   clients ask to appear at the pretrial conference remotely, is

12   that something that the Court --

13          THE COURT:  I think remote is acceptable, okay?  But

14   they do need to attend remotely.  I do want -- I want the

15   defendants to hear what's going on in that hearing, obviously,

16   because it will be important to shape their expectations.

17          Then the defendants' bonds will be continued and the

18   Court will be in recess.  Thank you.

19       (Recess at 12:03 p.m.)

20

21

22

23

24

25

|  |  |  |
|---|---|---|
| 1 | **INDEX** | |
| 2 | WITNESSES | |
| 3 |    LaNard Taylor | |
| 4 |         Cross-Examination Continued By Ms. Prewitt | 149 |
| 5 |         Cross-examination By Mr. Tubach | 165 |
| 6 |         Cross-examination By Mr. Fagg | 179 |
| 7 |         Cross-examination By Mr. Feldberg | 191 |
| 8 |         Cross-examination By Mr. Byrne | 203 |
| 9 |         Cross-examination By Mr. Kornfeld | 207 |
| 10 |         Cross-examination By Mr. Lavine | 221 |
| 11 |         Cross-examination By Mr. Gillen | 236 |
| 12 |         Cross-examination By Ms. Henry | 250 |
| 13 |         Cross-examination By Mr. Pollack | 257 |
| 14 |         Redirect Examination By Mr. Koenig | 271 |

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| A-003 | | 284 | | | |
| A-004 | | 265 | | | |
| A-013 | | 263 | | | |
| A-023 | | 283 | | | |
| A-024 | | 283 | | | |
| A-026 | | 283 | | | |
| A-028 | | 221 | | | |
| A-029 | | 221 | | | |
| A-033 | | 283 | | | |

1                        REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  Dated

4   at Denver, Colorado, this 9th day of September, 2021.

5

6                              S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25