IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **JAYSON JEFFREY PENN,**
2. **MIKELL REEVE FRIES,**
3. **SCOTT JAMES BRADY,**
4. **ROGER BORN AUSTIN,**
5. **TIMOTHY R. MULRENIN,**
6. **WILLIAM VINCENT KANTOLA,**
7. **JIMMIE LEE LITTLE,**
8. **WILLIAM WADE LOVETTE,**
9. **GARY BRIAN ROBERTS,**
10. **RICKIE PATTERSON BLAKE,**

    Defendants.

---

## UNITED STATES' POST-*JAMES* HEARING BRIEF

---

The government respectfully submits this brief, in accordance with the Court's order, ECF No. 490, to demonstrate that the co-conspirator statements offered in the government's *James* log satisfy the requirements of Rule 801(d)(2)(E) of the Federal Rules of Evidence.

To prove the existence of the conspiracy, the government met its burden by introducing the testimony and exhibits relating to the 2014 conduct alone, to say nothing of the conduct that occurred in the surrounding years. The conspiracy was fully operating then, but the evidence shows that the conspiracy went into overdrive in 2014.

The defendants and their co-conspirators coordinated and colluded to impose double-digit price increases to small-bird customers across the board—KFC, Chick-fil-A, Boston Market, Pollo Tropical, to name a few. And although the defendants' and their co-conspirators' efforts to rig bids and fix prices were the most pernicious in 2014, the evidence reveals a repeating pattern of the same or similar cast of characters conspiring to rig bids and fix prices for several years before and several years after 2014.

To prove almost every *James* log declarant's participation in the conspiracy, the government again satisfied its burden by introducing the testimony and exhibits relating to the 2014 conduct taken alone. The collusion surrounding the KFC negotiations in 2014, for example, involved all ten defendants in this case, all four defendants in *United States v. McGuire*, et al., and numerous unindicted co-conspirator declarants, all of whom played a significant role in the coordinated and collusive effort to obtain price increases of historic proportions.

Finally, the evidence proves that the statements in the *James* log—whether the statement was made to someone at a competing supplier, to someone internal to a supplier, or to a customer—were made during the course, and in furtherance, of the conspiracy. Without question, text messages and emails between competing suppliers, especially those concerning price negotiations, furthered the conspiracy. But so too did statements internal to a supplier (*e.g.*, conversations about upcoming bids) and statements to a customer (*e.g.*, representations made to a customer during

negotiations), as those were steps necessary to execute the conspiratorial objectives: rigging bids and fixing prices.

Simply put, between the agent testimony and the documents entered into evidence at the *James* hearing, the government carried its burden to show by a preponderance of the evidence that the offered co-conspirator statements meet the Rule 801(d)(2)(E) requirements.

## ARGUMENT

For a statement offered under Rule 801(d)(2)(E), the government must demonstrate by a preponderance of the evidence that: "(1) a conspiracy existed; (2) the declarant and the defendant were members of the conspiracy; and (3) the hearsay statements were made in the course of and in furtherance of the conspiracy." *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996); *see also United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). The statement must be considered, along with independent evidence, to establish the existence of the conspiracy and the declarant's participation in the conspiracy.

The independent evidence does not need to be substantial, *see Lopez-Gutierrez*, 83 F.3d at 1242, and a court is not bound by the rules of evidence, other than privilege, in deciding the admissibility of co-conspirator statements, *see* FED. R. EVID. 104(a); *see also Bourjaily*, 483 U.S. at 176–181; *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995).

### A. The Government Proved the Existence of the Conspiracy

The existence of a conspiracy can be established by direct or circumstantial evidence. *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). Proof of a formal or explicit agreement is not required. Rather, a conspiracy may be inferred from coordination by, or the concerted action of, two or more persons working together with a common design, purpose, or understanding. *See United States v. Thompson*, 518 F.3d 832, 853 (10th Cir. 2008). An inference "more than mere speculation or conjecture" is sufficient to establish a conspiracy. *See United States v. Delgado-Uribe*, 363 F.3d 1077, 1083 (10th Cir. 2004). There is also no requirement that a given co-conspirator knew or had contact with each and every other member of the conspiracy, *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006), or that he/she knew all of the details of the conspiracy or participated in every part of the conspiracy, *United States v. Fishman*, 645 F.3d 1175, 1190 (10th Cir. 2011). "Changes in the cast of characters do not preclude a finding of a single overarching conspiracy." *Id.* (quoting *United States v. Smith*, 413 F3d 1253, 1276 (10th Cir. 2005).

The events of 2014 alone prove that the conspiracy existed. At the *James* hearing, FBI Special Agent LaNard Taylor testified not only to the existence and duration of the conspiracy, *James* Hr'g Tr. 12:11-13, 12:16-13:15 (hereinafter "Tr."), but also to the conspiracy's aggressive ambitions in 2014 to impose historic price increases to small-bird customers, *id.* 32:11-33:20. The documents entered into evidence at the *James* hearing corroborate SA Taylor's testimony and show the breadth of the

conspiratorial plan to raise small-bird prices across the board. *See, e.g.*, Exs. 2-106; 2-111; 2-134; 2-135; 2-151.

SA Taylor testified at length about the conspiracy in 2014, Tr. 27:17-44:15, but his testimony went further and showed that the conspiracy stretched across many years. Most notably, SA Taylor sponsored a summary exhibit, referred to as the Conspiracy Guide, Tr. 23:7-27:15, which reveals continuous conspiratorial conduct from the end of 2011 to the end of 2017, *see* Exs. 1; 1.1 (corrected version of Ex. 1). SA Taylor testified that the conspiracy uncovered by his investigation was a single conspiracy based on many factors, including his observations, across episodes, that there were repeating patterns of conduct, "the same network of individuals" plugged into the conspiracy's network, the co-conspirators did not "start from ground zero every time" they used the network, there was a "common objective among all of [the co-conspirators] . . . to raise their prices," and they used mutually understood jargon. Tr. 45:4-49:2.

Despite all of the evidence in the *James* hearing record, the defendants assert that the government has not shown the existence of the conspiracy. Some defendants assert that the government failed to present independent evidence of the conspiracy. Defendant Austin, who urged a competitor to raise his future wings price among other conspiratorial actions, went so far as to argue that there was "no independent evidence" of a conspiracy. ECF 463 (Austin) at 1-2. That is not true. The government's *James* presentation was full of independent evidence that the conspiracy existed. The

government submitted a summary exhibit that identifies numerous phone[1] calls between co-conspirators—including defendant Austin—and set the context in which those calls occurred, often proximate to bid submissions or negotiations with a common customer. *E.g.*, Ex. 1.1 (D141-D159). In addition, SA Taylor testified on direct examination to actions that Robbie Bryant witnessed and undertook to further the conspiracy. *E.g.*, Tr. 31:8-35:19. And on cross examination, the defendants elicited additional independent evidence when SA Taylor testified that yet another individual admitted to participation. Tr. 110:4-11. Thus, the defendants' argument that there is no independent evidence of the conspiracy is unfounded.

### B.  The Government Proved the Declarants were Members of the Charged Conspiracy

Only "slight evidence" is required to connect a particular co-conspirator to the conspiracy, *United States v. Andrews*, 585 F.2d 961, 964 (10th Cir. 1978), and participation in a conspiracy may be inferred from the circumstances and from the co-conspirator's actions, *cf. United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990) (upholding conspiracy conviction because "[t]he connection of the defendant to the conspiracy need only be slight"). "A defendant who acts in furtherance of the object of the conspiracy may be presumed to be a knowing participant." *Id.* And although not conclusive standing alone, "mere presence" at the scene of a crime or close association

---

[1] The government has identified two corrections to the phone number information appearing in Supplemented Attachment D (ECF No. 448-3). (1) The second number associated with Scott Tucker has a typo in the area code. The correct area code is 205. (2) The second number listed for Robert Lewis, ending in 4184, was a number that Lewis inherited from Mike Ledford when Ledford departed RSCS in May 2014.

with others involved in a criminal offense are probative factors that may be considered as circumstantial proof of membership in conspiracy. *See United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1988).

As above, the events of 2014 alone prove that almost all of the *James* log declarants—25 of 30[2]—were members of the conspiracy. *See* Ex. 1.1 (B65, B76, B90, B91, B162, B188, B208). A significant portion of SA Taylor's testimony was focused on the KFC negotiations in 2014. Tr. 27:17-44:15. Coupled with his testimony, Exhibit 1.1 and its underlying exhibits adequately demonstrate the government has carried its burden in proving that 21 declarants—Penn, Fries, Brady, Austin, Mulrenin, Kantola, Little, Lovette, Roberts, Blake, McGuire, Stiller, Gay, Tucker, Bryant, Francis, Lane, Martin, Mitchell, Pepper, Tench—each had role in the coordinated and collusive effort to impose historically high price increases on KFC. Ex. 1.1 (D91-D161). With respect to the other four—Cooper, Ilardi, Sharp, Wildes—each had a substantial role in collusive conduct aimed at either Chick-fil-A or Pollo Tropical. Ex. 1.1 (D65-D75, D76-D89, D162-D187). And the five declarants not identified in Exhibit 1.1's 2014 episodes are nevertheless identified in other years as significant participants in the conspiracy: Grendys, Ex. 1.1 (D12-D14, D45, D51-D52, D226-D228); Grindle, Ex. 2 (Row 333); MacKenzie, Ex. 1.1 (D12-D14); Pate (D7-D10, D34-D35); and Ray (D7-D10).

In addition to establishing each declarant's participation in the conspiracy, SA Taylor also testified about the "as of" date for each declarant. SA Taylor explained that

---

[2] The government originally submitted 31 *James* log declarants, but subsequently withdrew the statement of Steven Cullen. Tr. 78:23-79:15. As the government made clear, however, Cullen is still considered a co-conspirator. Tr. 56:21-23.

7

Exhibits 3 & 5 do not contain the date each declarant *joined* the conspiracy, but instead reflect the date by which it was apparent that the declarant had *previously* joined the conspiracy. Tr. 57:12:23.

Defendants wrongly claim that there is insufficient independent evidence that they joined the conspiracy. *See, e.g.*, ECF 470 (Penn) at 4-5; ECF 465 (Blake) at 2. Exhibit 1.1 identifies numerous phone calls between competitors, and sets the calls in the context of documentary evidence (*i.e.*, texts and e-mails). For example, Exhibit 1.1 shows two phone calls on August 15, 2014, between defendant Roberts of Tyson and defendant Penn Pilgrim's in the context of the collusive KFC bid submissions. Ex. 1.1 (D99-D100). Exhibit 1.1 also shows a phone call on September 6, 2017, between Carl Pepper of Tyson and defendant Blake of George's in the context of collusive Popeye's bid submissions. *Id.* (D250). Shortly afterwards, Pepper texted defendant Mulrenin: "Popeyes proposal . . . Got a general idea what Georges is doing." *Id.* (D254-D255). Independent evidence such as that, when considered in conjunction with the 801(d)(2)(E) statements, abounds throughout SA Taylor's testimony and the government's *James* exhibits.

**C.     The Government Proved that the Statements in the *James* Log Were Made in the Course, and in Furtherance, of the Conspiracy**

Statements by a co-conspirator are in furtherance of the conspiracy when they are "intended to promote the conspiratorial objectives." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (citing *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986)). Statements in furtherance of a conspiracy need not actually advance the conspiracy. *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990). Instead, the

focus is "on the declarant's intent in making the statement." *Perez*, 989 F.2d at 1578. Thus, whether a statement promotes the objectives of a conspiracy depends on "the context in which the challenged statement was made." *Id.* As such, a statement may be admissible even if it is subject to alternative interpretations, so long as a reasonable interpretation of the statement is consistent with an intent to promote the objectives of the conspiracy. *United States v. Marin*, 7 F.3d 679, 690 (7th Cir. 1993).

In its initial brief, the government identified how each statement furthers the conspiracy, using a non-exhaustive list of 21 illustrative categories of statements that courts have found in furtherance of a conspiracy under 801(d)(2)(E), ECF No. 358 at 6-7; ECF No. 380-4 (Column entitled "801(d)(2)(E) Bases for Admissibility"), and offered into evidence the full documents containing the relevant co-conspirator statements. The government also offered Exhibit 1.1 to aid the Court's evaluation of the conspiratorial context of those statements.

Several defendants argue that communications among employees of the same company cannot be statements in furtherance of the conspiracy. ECF 473 (Little) at n.2; ECF 475 (Lovette) at 4; ECF 478 (Brady) at 2-3. That is incorrect. Throughout the *James* Log, there are communications solely internal to a company that advance the conspiracy. Some of those statements reference competitive information (*e.g.*, *James* Log Entry 1), some are part of formulating a rigged bid or fixed price (*e.g.*, Entry 124), others reinforce courage, confidence, or consensus among conspirators (*e.g.*, Entry 11), and still others relay information about a co-conspirator's collusive intentions (*e.g.*, Entry 136). Even where internal

9

communications do not contain obvious references to the conspiracy—such as where defendant Austin wrote to Tim Stiller, both co-conspirators at Pilgrim's, that a customer "told me that the level for the product they are seeing is $49 a case . . . [t]ranslated that means 3.75 - 4.0 cents lower than we bid," *James* Log Entry 319—they nevertheless further the conspiracy because such communications are necessary to achieve the goal of rigging bids and fixing prices.[3]

D.   **Defendants' Other Arguments are Misguided**

    1.   <u>The Defendants Did Not Engage in Mere Information Sharing</u>

The defendants argue that the government only proved that the defendants exchanged information, with nothing more, and so did not violate the Sherman Act. ECF 461, 1-2 (Fries); ECF 470, 1-2 (Penn); ECF 473, 1-2 (Little); ECF 475, 1-2 (Lovette); ECF 478, 4 (Brady); ECF 463, 2-3 (Austin); ECF 469, 2-3 (Roberts).

Although pure information sharing might not amount to a *per se* violation of the antitrust laws, the evidence in this case proves far more. When SA Taylor was asked if "the mere sharing of prices" was discovered in the investigation, he answered: "It was what they did with the information, not necessarily the mere sharing of the pricing." Tr.

---

[3] Defendants' Lovette and Kantola's reliance on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), is misplaced. In *Copperweld*, the Court held that companies do not violate the Sherman Act "by the internally coordinated conduct of a corporation and one of its unincorporated divisions," or by "coordinated activity of a parent and its wholly owned subsidiary." *Id.* At 770-71. That is not what happened here. The defendants colluded with competitors outside their own corporations, and in so doing communicated with people internally to further the conspiracy.

271:13-20. SA Taylor also testified to a specific example—the "Roger did some checking around" email, Ex. 1.1 (D113)—that proves the point:

> McGuire in this particular e-mail . . . is giving [defendant Penn] a list of total increases for all the competitors that are listed. And then after [McGuire] gives the list of price increases, the total increases, he then goes on to say, you know, considering we want to be the leaders in this, this being the price increases, that would put us at .1616 per pound increase.

Tr. 46:8-14.

SA Taylor then explained more generally that "once [the co-conspirators] gathered the pricing, they then used . . . that information to formulate their own pricing opinion or their own position on whatever the pricing event was before reporting that back to the customer." Tr. 46:16-20. The documents admitted into evidence and cited in Exhibit 1.1 bear out SA Taylor's testimony in other episodes, *e.g.*, Ex. 1.1 (D15-D24), and prove that the conspiracy was not simply about mere information exchanges.

    2.    <u>Statements by Carl Pepper are Admissible under Rule 801(d)(2)(E)</u>

Defendants Mulrenin and Roberts argue that any co-conspirator statements by Carl Pepper should be discounted because he was not a member of the conspiracy, and because he exercised his Fifth Amendment right against self-incrimination. ECF No. 469 at 3 (Roberts); ECF No. 477 at 3-4 (Mulrenin).

Neither argument is availing. The government has proven that Pepper is a co-conspirator, through the email and text message statements themselves, through independent evidence provided by SA Taylor—including his testimony regarding Pepper's admission to participation in the conspiracy—and through documents

underlying Exhibit 1.1 and Exhibit 2. As such, the government has met its burden with regard to Pepper's statements and they should be admitted under Rule 801(d)(2)(E).

Defendant Mulrenin also accuses the government of gamesmanship in the exercise of its prosecutorial discretion regarding which witnesses to whom it provides immunity or non-prosecution agreements. "The decision to grant immunity lies in the exclusive discretion of the prosecutor." *United States v. Dalton*, 918 F.3d 1117, 1130-31 (10th Cir. 2019). Therefore, any decision by the government not to provide Pepper with such protection is not subject to scrutiny. In any event, many other declarants in the government's *James* log—including the defendants—do not have protection from prosecution, so Pepper's lack of protection is no more relevant to the Court's Rule 801(d)(2)(E) determinations than any of the defendants' similar lack of protection.

   3. <u>Defendant Little's Withdrawal Argument is Insufficient</u>

Defendant Little argues that he withdrew from the conspiracy in 2016 when he retired, and statements made by coconspirators after that time are not admissible against him. ECF No. 473 at 4-5. Withdrawal is an affirmative defense, which "the defendant bears the burden of proving." *United States v. Varah*, 972 F.2d 357 (10th Cir. 1992). "Mere cessation of one's participation in a conspiracy is insufficient to demonstrate withdrawal." *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir.1999). To withdraw from a conspiracy, a defendant needs to show he took an "affirmative action, either by reporting to the authorities or by communicating his intentions to the coconspirators." *United States v. Powell*, 982 F.2d 1422, 1435 (10th Cir. 1992). Although retirement *may* demonstrate withdrawal in some cases, it does not

necessarily do so, especially where retirement amounts to nothing more than "passive nonparticipation." *Smith v. United* States, 568 U.S. 106, 114 (2013). Here, defendant Little points to an email announcing his retirement and a document showing that his corporate email account was no longer active after his retirement. That evidence is plainly insufficient and, in any event, withdrawal is an issue for the jury to decide; it is not an issue relevant to the *James* hearing.

    4.    *Defendant Austin's Argument Regarding Case, Perdue, and Tyson is Legally Incorrect*

Defendant Austin asserts that there is no independent evidence linking him to Case, Perdue, and Tyson. ECF No. 463 at 4-5. By negative implication, defendant Austin concedes that there *is* independent evidence linking him to co-conspirators at other competing chicken suppliers, such as defendant Brady at Claxton. Indeed, there is plenty of independent evidence linking defendants Austin and Brady. *E.g.*, Ex. 1.1 (D17, D27, D42-D43, D53, D104, D127, D143, D153, D158, D230, D232-D233). No more is needed. *Savaiano*, 843 F.2d at 1294 ("A defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role.").

    5.    *Defendant Roberts' Claim about his Role in the 2014 KFC Negotiations is Irrelevant*

Defendant Roberts asserts that there are no emails or texts that reflect any attempts by him "to collude on KFC bids." ECF No. 469 at 5. Even if true, it is irrelevant, as Exhibit 1.1 reveals phone calls between defendant Roberts and competitors in the days preceding competitors' bid submissions to KFC in 2014. Ex. 1.1 (D96, D99-D100).

6. *Defendant Blake's Argument Regarding his Lack of Pricing Authority at George's is Irrelevant*

Defendant Blake argues that he "could not have joined" the price-fixing conspiracy because he lacked pricing authority at his employer, George's. ECF No. 465 at 1,3. The *James* hearing record identifies actions that defendant Blake took to advance the objections of the conspiracy, including by providing George's bidding information to competitors. *E.g.*, Ex. 1.1 (D26, D31). The fact, if it is a fact, that he did not have authority to give final sign-off of George's fixed prices or rigged bids is of no moment.

## CONCLUSION

For the reasons described above, as well as those in the government's *James* brief, ECF No. 358, and the facts elicited in the hearing on September 2 and 8, the government urges the Court to find that the statements listed in the *James* log, ECF No. 380-4, satisfy the requirements of Federal Rule of Evidence 801(d)(2)(E).

Dated: September 16, 2021          Respectfully submitted,

/s/ Michael Koenig
MICHAEL KOENIG
HEATHER CALL
PAUL TORZILLI
CAROLYN SWEENEY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 616-2165
michael.koenig@usdoj.gov
Attorneys for the United States