1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
    UNITED STATES OF AMERICA,
4
            Plaintiff,
5
            vs.
6
    JAYSON JEFFREY PENN,
7   MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GARY BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12          Defendants.

13  --------------------------------------------------------
              REPORTER'S TRANSCRIPT
14           Trial Preparation Conference
    --------------------------------------------------------
15          Proceedings before the HONORABLE PHILIP A. BRIMMER,
    Chief Judge, United States District Court for the District of
16  Colorado, commencing on the 8th day of October, 2021, in
    Courtroom A201, United States Courthouse, Denver, Colorado.
17
                    APPEARANCES
18  For the Plaintiff:
    MICHAEL KOENIG, CAROLYN SWEENEY, HEATHER CALL, and PAUL
19  TORZILLI, U.S. Department of Justice, 450 Fifth St. N.W.,
    Washington, DC 20530
20
    For Defendant Penn:
21  ANNA TRYON PLETCHER and MICHAEL TUBACH, O'Melveny & Myers,
    LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA
22  94111

23  For Defendant Fries:
    RICHARD KORNFELD and KELLY PAGE, Recht & Kornfeld, PC, 1600
24  Stout St., Ste. 1400, Denver, CO 80202

25     Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108

```
 1   APPEARANCES (Cont'd)

 2   For Defendant Brady:
     BRYAN B. LAVINE, Troutman Pepper Hamilton Sanders, LLP, 600
 3   Peachtree St. N.E., Ste. 3000, Atlanta, GA 30308
     MEGAN RAHMAN, Troutman Pepper Hamilton Sanders, LLP, 1001
 4   Haxall Point, Ste. 1500, Richmond, VA 23219

 5   For Defendant Austin:
     MICHAEL S. FELDBERG, Reichman Jorgensen Lehman & Feldberg,
 6   LLP, 750 Third Ave., 24th Floor, New York, NY 10017
     LAURA E. CARWILE, Reichman Jorgensen Lehman & Feldberg, LLP,
 7   100 Marine Parkway, Ste. 300, Redwood Shores, CA 94065
     JULIE WITHERS, Harris St. Laurent, 40 Wall St., New York, NY
 8   10005

 9   For Defendant Mulrenin:
     ELIZABETH B. PREWITT, Latham & Watkins, LLP, 555 11th St.
10   N.W., Ste. 1000, Washington, DC 20004
     MARCI GILLIGAN LABRANCHE, Stimson Stancil LaBranche Hubbard,
11   LLC, 1652 North Downing St., Denver, CO 80218

12   For Defendant Kantola:
     ROXANN HENRY, Roxann E. Henry, Attorney at Law, 5410 Wilson
13   Lane, Bethesda, MD 20814
     JAMES A. BACKSTROM, James A. Backstrom, Counsellor at Law,
14   1515 Market St., Ste. 1200, Philadelphia, PA 19102

15   For Defendant Little:
     MARK A. BYRNE, Byrne & Nixon, LLP, 888 West Sixth St., Ste.
16   1100, Los Angeles, CA 90017
     DENNIS J. CANTY, Canty Law Corporation, 1990 North California
17   Blvd, 8th Floor, Walnut Creek, CA 94596

18   For Defendant Lovette:
     JOHN ANDERSON FAGG and FRANK EUGENE SCHALL, Moore & Van Allen,
19   PLLC, 100 North Tryon St., Ste. 4700, Charlotte, NC 28202

20   For Defendant Roberts:
     CRAIG ALLEN GILLEN, Gillen Withers & Lake, LLC, 400 Galleria
21   Parkway, Ste. 1920, Atlanta, GA 30339
     RICHARD TEGTMEIER, Sherman & Howard, LLC, 633 17th St., Ste.
22   3000, Denver, CO 80202

23   For Defendant Blake:
     WENDY JOHNSON, RMP, LLP, 5519 Hackett Road, Ste. 300,
24   Springdale, AR 72762
     BARRY J. POLLACK, Robbins Russell Englert Orseck & Untereiner,
25   LLP, 2000 K Street N.W., 4th Floor, Washington, DC 20006
```

20-CR-00152-PAB     Trial Prep. Conference      10/08/2021    3

1                   *        *        *        *        *

2       (The proceedings commenced at 2:01 p.m.)

3               THE COURT:  All right.  Thank you.  Please be seated.

4   All right.  The matter before the Court is United States of

5   America versus Jayson Jeffrey Penn and others.  This is

6   criminal case 20CR152.  I'll take entries of appearances,

7   first of all, on behalf of the United States.

8               MR. KOENIG:  Good afternoon, Your Honor.  Michael

9   Koenig on behalf of the Government.  With me is Carolyn

10  Sweeney, Heather Call, and Paul Torzilli.

11              THE COURT:  All right.  And good afternoon to each of

12  you.

13              On behalf of Mr. Penn?

14              MR. TUBAC:  Good afternoon, Your Honor.  Michael

15  Tubac from O'Melveny & Myers on behalf of Jayson Penn who is

16  here today.  With me also is Anna Pletcher of my office.

17              THE COURT:  Okay.  Great.  Good afternoon to each of

18  you as well.

19              And on behalf of Mr. Fries?

20              MR. KORNFELD:  Good afternoon, Your Honor.  Rick

21  Kornfeld and also my colleague Kelly Page on behalf of

22  Mr. Fries.  He is appearing through the Court's courtesies via

23  VTC.

24              THE COURT:  Okay.  And is Mr. Fries visible?

25              MR. KORNFELD:  That's not him.

                    Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   4

 1          THE COURT:  Mr. Fries, can you hear us?

 2          MR. KORNFELD:  He indicated earlier, Your Honor, that

 3  he was on.

 4          THE COURT:  Yeah, let's see if we can't confirm.  We

 5  don't need to -- you can work on that, but if you don't mind,

 6  Mr. Kornfeld, if you could make sure that he's on.

 7          MR. KORNFELD:  Yes, Your Honor.  I will confirm that.

 8          THE COURT:  That sounds great.  And good afternoon to

 9  each of you.

10          On behalf of Mr. Brady?

11          MR. LAVINE:  Yes, Your Honor.  Bryan Lavine and Megan

12  Rahman on behalf of Mr. Brady.  He is appearing also via

13  video.

14          THE COURT:  And do you know, Mr. Lavine, is he hooked

15  up?  Is he appearing?

16          MR. LAVINE:  We can check.  I thought he was, Your

17  Honor, but we will check.

18          THE COURT:  Maybe Mr. Keech knows.  Do you know,

19  Mr. Keech?

20          THE COURTROOM DEPUTY:  As to Mr. Fries, I don't see

21  him on, but do I see Mr. Brady on the list.

22          MR. LAVINE:  Thank you, Your Honor.

23          THE COURT:  So we'll confirm on Mr. Brady.  Thank

24  you, and good afternoon to each of you.

25          On behalf of Mr. Austin?

                    Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   5

1              MR. FELDBERG:  Your Honor, Michael Feldberg for

2    Mr. Austin.  My colleagues Julie Withers and Laura Carwile are

3    with me.  Mr. Austin is appearing via video conference.  I saw

4    him briefly on the screen for a moment.  We can check to make

5    sure he's on there.

6              THE COURTROOM DEPUTY:  That's correct.  It appears he

7    is on from the list of participants I see.

8              THE COURT:  Okay.  Great.  And good afternoon to each

9    of you.  Good afternoon Mr. Austin as well.

10             And Mr. Mulrenin?

11             MS. PREWITT:  Good afternoon, Your Honor.  Elizabeth

12   Prewitt for Mr. Mulrenin.

13             THE COURT:  You're sitting over by the Government?

14   Okay.  Sorry.  Go ahead, Ms. Prewitt.

15             MS. PREWITT:  And with me also is Marci LaBranche.

16             THE COURT:  And good afternoon to each of you.

17             And on behalf of Mr. Kantola?

18             MS. HENRY:  Your Honor, Roxann Henry and James

19   Backstrom on behalf of Mr. Kantola who is with us here in

20   person today.

21             THE COURT:  All right.  And good afternoon to each of

22   you.

23             And on behalf of Mr. Little?  I know that Mr. Little

24   is appearing by VTC.

25             MR. BYRNE:  That's correct, Your Honor.  Mark Byrne

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021     6

1    and Dennis Canty appearing for Mr. Little.  He texted me and

2    said he's on audio, but it wouldn't let him on the video, but

3    he is on the audio.

4              THE COURT:  Is that Mr. Little?

5              MR. BYRNE:  That is not Mr. Little.

6              THE COURT:  That's not him.  Someone is just

7    protecting -- I'm not sure who that is.

8              MR. BYRNE:  Your Honor, I think he's -- go ahead.

9              MR. LITTLE:  Your Honor, this is Jim Little.

10             THE COURT:  Great.  Good afternoon, Mr. Little.

11             MR. LITTLE:  Good afternoon, Judge.

12             THE COURT:  Okay.  And on behalf of Mr. Lovette?

13             MR. FAGG:  Good afternoon, Your Honor.  John Fagg,

14   and I'm here with my partner Frank Schall, and we're on behalf

15   of Mr. Lovette who is here with us in the courtroom.

16             THE COURT:  Okay.  Good afternoon to each of you.

17             Mr. Roberts?

18             MR. GILLEN:  Craig Gillen on behalf of Mr. Roberts.

19   Mr. Roberts is here.  Also Richard Tegtmeier is here as well.

20             THE COURT:  Good afternoon to each of you.

21             And on behalf of Mr. Blake?

22             MS. JOHNSON:  Good afternoon, Your Honor.  Wendy

23   Johnson and my colleague Barry Pollack here on behalf of

24   Mr. Blake.

25             THE COURT:  Okay.  And good afternoon to each of you.

 1          MR. POLLACK:  Good afternoon, Your Honor.

 2          THE COURTROOM DEPUTY:  Your Honor, I'm sorry to

 3  interrupt.  Mr. Fries is on now.

 4          THE COURT:  I was just going to check on that.  Okay.

 5  Great.  So we're here today for a trial preparation

 6  conference.  We're set for trial for 32 days beginning on

 7  October 25th.  First of all, obviously I've ruled on some

 8  motions and not others.  The fact that I got to the

 9  defendants' motions first has no significance.  It's just I

10  happened to tackle them first.  I'll try to get out orders on

11  the other pending motions as soon as I can.

12          One motion that -- and we're not going to argue

13  motions today, but one motion that we might take up is the

14  Government's motion to dismiss Count 2.

15          Mr. Byrne, did you want an opportunity to file a

16  written response?  I don't want to preclude you from being

17  able to do that.  If you'd like to, that's fine.  We can not

18  rule on that today.  I wasn't sure.

19          MR. BYRNE:  That's fine, Your Honor.  The only issue

20  is really with or without prejudice.  We don't oppose the

21  dismissal.  But, yes, we would like an opportunity to file a

22  response, if you don't want to hear argument today.  I was

23  prepared to argue today.

24          THE COURT:  Why don't you file a written response,

25  and that way I can look up any case law that you may have for

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    8

1    me, okay?

2         MR. BYRNE:  We will do that.  Thank you.

3         THE COURT:  When do you think you might be able to do

4    that, Mr. Byrne?

5         MR. BYRNE:  Well, we've got a lot going on.  How

6    about Wednesday?

7         THE COURT:  That's fine.

8         MR. BYRNE:  Perfect.  Thank you.

9         THE COURT:  Thank you.  Okay.  Let's now get into the

10   specifics of the trial.  So we'll -- I'd like you here at

11   8:00 a.m., and we'll try to get going with the jury selection

12   process by 8:30.  I don't want any surprise motions the first

13   day of trial.  If there's -- if that motion is something that

14   did not come up for the first time sometime after midnight, it

15   is going to be deemed waived.  Otherwise you need to file it

16   even if it's Sunday or Saturday or whenever, but the first day

17   of trial is for jury selection.  It is not a motions hearing,

18   and so don't use it as an opportunity to spring some type of

19   motion on the Court, because we've got a lot to do, and it

20   would be great if we could finish up jury selection on that

21   first day.  I'm hopeful that we can.

22        With any luck, by about 8:30 we should be able to

23   perhaps even bring the jury in.  We'll see.  We can time that

24   according to when we're ready.  What will happen is that the

25   jury division will bring in a randomized list of the jurors,

1    and that list will then be distributed.  I'm not sure if

2    you're familiar with the opinion of Judge Alsup in *Oracle vs.*

3    *Google* -- it was reported at 172 F.Supp.3d 1100 -- but I am

4    going to ban you from using any type of Internet research on

5    the jurors during the course of jury selection.  You will not

6    be able to do it.  You can't have any -- you can't use

7    paralegals to do it or anyone to do it.  We're not going to do

8    that.  And that is for the reasons that Judge Alsup identified

9    in that particular opinion.

10           We're going to, of course, tell the jurors they can't

11   do Internet research on any of you or your clients or the

12   case, and it is just inconsistent to have the attorneys have

13   looked at all the jurors' everything they've ever posted on

14   the Internet for purposes of jury selection.  I'm also going

15   to prohibit you from using information that you may obtain

16   through Internet research on the jurors as a way of tailoring

17   your arguments.  Judge Alsup discusses that issue as well.

18           So, for instance, you know, if you were able to find

19   out that a particular juror -- this is an example he used --

20   has a favorite book.  You know, theoretically you could then

21   use references in that book as a way of ingratiating yourself

22   with that juror in opening or closing argument or do something

23   like that.  I'm going to prohibit you from doing that.  That

24   doesn't mean that during the course of jury selection when

25   people are asking the jurors questions you can't find out the

1    same information.  You can ask people what their favorite

2    books are.  You can ask them all sorts of things.  And if you

3    want, after having determined that information, you know, you

4    can use it however you want to.

5           Also I'm not going to prohibit you from researching

6    jurors if you want to do it during the course of the trial.

7    I'm not going to go that far because maybe there will be an

8    instance of some type of juror misconduct that we might

9    otherwise miss if you weren't able to do that.  So I'm not

10   going to prohibit you from doing that.  But you can't use that

11   type of research for some type of thematic thing.  How will I

12   know?  I won't know because I'm not going to do it, but the

13   other side might be checking on those things just to see

14   whether you are or someone is doing it.

15          So anyway, that's the -- that's the story on that

16   type of -- now, that doesn't mean that you can't -- of course

17   you can have your jury consultants.  It's been a long time

18   since I was working for a private firm.  I am way out of it in

19   terms of what the cutting edge thing to do is.  You know, if

20   you want to use one of the seats that you have up here for a

21   juror consultant who has done all sorts of mock trials or uses

22   these things, that's, once again, perfectly fine.  It's just

23   that that person cannot be crunching through big data to

24   figure out all sorts of things about those names that will be

25   passed out on the list.

                         Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   11

1           So I'm going to use two alternates.  I think that

2    that will be sufficient.  That will give each side one

3    additional peremptory challenge, but it also will bring a more

4    -- it means we'll have 32, so the group of people that will be

5    -- that you'll be able to question will be 32 in number.  I am

6    going to designate the following seats as the alternates:

7    Seat 3 and Seat 11, okay?  I just picked those at random.

8    Now, make sure that you don't tell the persons sitting in Seat

9    3 and Seat 11 that they are the alternates.  We don't want the

10   alternates to know that they're the alternates, okay?

11           And the only way to work that in this bizarre world

12   of social distancing where, as you might have noticed, there

13   are little numbers on all the seats is to play musical chairs,

14   and by that I mean when one of the people in the first 14,

15   because you've got 12 plus 2, is replaced, we'll have -- the

16   first replacement will be the 33rd person on the list, and

17   that person then goes into the empty seat, okay?  That way we

18   maintain, you know, the seat makes a difference.  Otherwise I

19   haven't figured out a good way to pick the alternates other

20   than one judge suggested that after we get the 14 we reach a

21   hand into a hat and pull out the alternates, but the federal

22   rules contemplate that you know who the alternates are, so

23   we're not going to do that.

24           This happens all the time.  So those of you who may

25   be listening in on VTC, if you could figure out a way to mute

Sarah K. Mitchell, RPR, CRR

1    your microphones, okay?

2              They're not really visible too well, but after we're

3    done today you can take a look, but you might be able to see

4    the numbers on the seats there.  So in the jury box we can get

5    some people, and then in the first row you'll see that we have

6    -- I think it starts with maybe number 11.  I can't quite see.

7    10?  Okay, 10.  So because of that -- so we'll have some

8    people here -- the reason is there's three feet of social

9    distancing, okay?  If we had six feet of social distancing, I

10   don't know, we'd have to do jury selection at Mile High or

11   something.  So we've got three feet, and all the numbers

12   you'll see in the back.

13             So that's why you'll have to make a decision, because

14   only those of you who are in chairs as opposed to benches are

15   going to be able to be in the courtroom during jury selection.

16   Once we're done with jury selection, of course it will be

17   different.  The gallery will mostly be free.  I'll talk about

18   the mostly business in just a second.  But we just necessarily

19   have to limit the number of people.  And also you're not going

20   to be able -- you'll have to think this through, because of

21   course during jury selection I'm not going to allow a parade

22   of people back and north.

23             In other words, you can't swap out people at your

24   table.  You know, a jury consultant going back and forth, all

25   sorts of things like that.  That's going to be too confusing.

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021    13

1   So you'll have to decide on who you want.  The defendant has

2   to be one of the people obviously at the table, and I think

3   assuming that each of you has now three seats, so you've got

4   your client, attorney, and then one other person, okay?

5        Here's the mostly part that I just referred to.  As

6   you'll know from taking a look at the revised jury protocols,

7   if one of the 14 is unvaccinated, and I actually am not going

8   to ask them whether they're vaccinated or not, and I'm not

9   going to allow you to either, but I will tell them that

10  unvaccinated people have to socially distance, but other

11  people -- a vaccinated person who chooses to want more space

12  -- because we don't have six feet -- we've got three feet --

13  can sit and we'll have them sit, if there are any, in that

14  first row.  If we have more than enough for the first row, it

15  will go to the second row, okay?  Unfortunately, if we have

16  that it's going to take up gallery seating, and we'll have at

17  least one buffer row so we don't have any person sitting

18  immediately behind a juror.

19       You just never know in a trial whether you have

20  people who are either unvaccinated or who want extra social

21  distancing.  What typically happens is the following, and that

22  is people kind of like the idea, because after all, they're

23  all strangers -- the stranger thing, they get over that in

24  about an hour after the jury gets picked.  All of a sudden

25  they feel perfectly comfortable sitting altogether in the jury

1   box, and that's my anticipation here too is that almost

2   everyone will probably feel perfectly comfortable sitting in

3   the jury box.  But there may be someone who's not, and maybe

4   that person is unvaccinated and has to sit apart from

5   everyone, or maybe there's someone who's, you know,

6   particularly sensitive.  We just don't know.

7            In a couple of recent trials, sure enough there were

8   a couple of jurors who did want to sit apart from everyone

9   else.  Now, at the same time, during breaks those same people

10  all go back in the jury room, so, you know, we'll see.  The

11  protocols have a system for that as well, and mainly someone

12  who's especially sensitive can sit in chairs in the hallways

13  outside of the jury room.  And if we need to, they can

14  deliberate in a -- we'll find a bigger space for them to do

15  that.  But we'll keep our fingers crossed, and maybe everyone

16  will feel comfortable in the jury box, and that way we'll have

17  lots of room.

18           Mr. Byrne?

19           MR. BYRNE:  Yes, on behalf of Jimmie Little.  So I'm

20  just kind of looking around right now, as long as we're

21  talking about where everyone's going to sit, and Mr. Canty and

22  I are here and Mr. Little is not here, and I'm wondering where

23  we're going to sit.

24           THE COURT:  Well, I don't want to have to be the

25  seating director.

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    15

1          MR. BYRNE:  I understand.

2          THE COURT:  We should be able to get six chairs

3    around every table, and that's not the case now, so I

4    apologize, and --

5          MR. BYRNE:  I'm not worried about today.

6          THE COURT:  Okay.  That's fine.  But we should be

7    able to do that.  And, you know, maybe defense counsel can

8    talk amongst themselves about, you know, the Risk board and

9    all those good things.

10          MR. BYRNE:  We can figure it out.  I was just

11    wondering because you were talking --

12          THE COURT:  You absolutely are right.  We will not

13    have a situation where, you know, a client and at least two

14    attorneys can't fit above the first row of seating.

15          MR. BYRNE:  Thank you, Your Honor.

16          THE COURT:  So right.  We'll have to make sure --

17    this courtroom was just recently used this morning for some

18    purpose, and we should have made sure that we put chairs

19    around each -- all the tables so that we had a sufficient

20    number.  It's a little bit tough over in that corner, but

21    we'll try to do the best we can.  We're also -- as you may

22    have heard, because I think Mr. Kornfeld and maybe

23    Ms. LaBranche saw the new seating arrangement, but if we get

24    lucky and we don't have to put any jurors in the front row, I

25    think that we're going to put like -- I think the defendants

                    Sarah K. Mitchell, RPR, CRR

1   have agreed to have one IT person or someone who's going to be

2   doing the exhibits, so we'll try to establish like a station

3   in the front row over on this side, and I think that maybe you

4   talked about some table or something that might be movable or

5   something like that.  We'll make sure that we run power to

6   that area.  We'll also try to run power, once again, depending

7   on whether we have any jurors who are spreading out to the --

8   at least the first two rows in the gallery, so if you have

9   some of your support team, you know, maybe their computers

10  will last all day, but we'll still try to get power strips on

11  the floor so they can plug in.

12          Okay.  So we're going to bring in quite a few jurors.

13  The 32 will be the people that you are able to ask questions

14  of, but there are more than 32 seats you'll see over on that

15  side of the courtroom.  So we'll have to somehow try to

16  instruct the person in the courtroom that attorneys will just

17  be asking the first 32.  If someone is excused for cause, then

18  we'll plug in the next person on the list .  We'll keep going

19  that way.  We're going to be using -- you may have seen a

20  reference to this in the revised jury protocols -- a

21  transceiver system, and that system we've been using

22  throughout the pandemic.

23          It essentially consists of a unit, fairly small,

24  headphones, and that allows people to hear without everyone

25  else in the courtroom hearing and to talk really just a

1   whisper and have everyone hear very well.  It's -- I'm

2   impressed by how well that particular technology works.  We

3   are going to use the transceiver system for jury selection

4   both for exercising -- well, not for exercising peremptories,

5   but for exercising challenges for cause, and also in the event

6   that certain jurors want to -- what we would otherwise call a

7   bench conference -- have some bench conferences to mention

8   something they regard as particularly private.

9         I've been trying to figure out -- we don't want the

10  jurors, because if they're sitting back there and have that

11  transceiver and the headset on, I'm worried that other jurors

12  will overhear.  We'll probably have to have the juror come

13  forward, and I'm thinking that perhaps we'll have the juror

14  come up here.  It's awkward because normally of course the

15  juror is there.  I can see the juror.  The attorneys who are

16  at the bench conference can see the juror.  It's hard to

17  figure out a way for everyone to be able to see the juror.

18  But I think maybe we're going to have to use this area up here

19  or maybe over there.  I don't know.  I'll think some more

20  about that.  But you'll be able to hear the juror.  As long as

21  the other jurors can't overhear, I think our objective is met.

22        Mr. Keech, can you demonstrate the white noise

23  system.  We'll probably use that too.  It's not too loud, and

24  it won't interfere with the transceiver system.

25        Let me tell you some more things about the

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    18

1   transceiver system.  We'll also be using them during the trial

2   for bench conferences.  It will obviate the need for everyone

3   to troop up here, which would be difficult even if it weren't

4   a pandemic, but it's not so good during a pandemic.  It will

5   allow you, as I said before, to speak very softly.  If for

6   some reason you're worried, particularly those of you who are

7   closer to the jury, about being overheard, you can always step

8   away.  It doesn't matter where you go.  You can step away and

9   make sure that you're not overheard.

10       When we're done with this -- and let me say this too.

11  So that transceiver system, I'll assign one transceiver per

12  defendant, one to the Government as well.  They'll have

13  numbers on them.  Take care of them.  You'll leave them in the

14  courtroom overnight.  We'll charge them up overnight, but

15  we'll also try to charge them during the lunch hour.

16  Apparently there's a danger that they can fail.  So it's a bit

17  of a pain.  The jury protocols mention that you can bring your

18  own headsets.  When I talked to IT today, they weren't too

19  keen on that.  Apparently you can try it, but apparently some

20  of the headsets just don't work all that well, ones that you

21  bring in.  The ones that come with it work very well, so it's

22  probably good to use that.

23       We will have sanitary wipes around, you know, if you

24  want to be careful.  If you use the Clorox ones, apparently

25  those are okay to use with that electronic device.  You won't

Sarah K. Mitchell, RPR, CRR

1   have to worry about ruining it with bleach.  And the other

2   thing is that when we're done with this hearing, IT is going

3   to come down with some transceivers, and if you would like --

4   assuming that we don't go past five -- but that way you can

5   see what they look like.  You can test them, if you wish.

6   They're pretty easy to work.

7          During the height of the pandemic we used that for

8   attorneys not only to do bench conferences, but to communicate

9   with their clients, because this was before vaccines, and

10  people might not want to sit right next to their client.  We

11  won't have to worry about that.  So as a result, it's really

12  simply a matter of hitting a button, but there are buttons

13  that you don't want to hit, and IT will explain that to you,

14  okay?

15         So basically what we'll be doing then is I will

16  obviously conduct voir dire first.  I tend to ask a lot of the

17  stock questions.  I'll ask about marital status, employment.

18  I'll go down several layers of jobs.  I'll try to -- I think

19  perhaps the Government in this case -- or maybe the

20  questionnaire asked for ten years.  I usually try to get about

21  ten years.  I'll ask about multiple jobs.  I'll ask if a

22  spouse is working, what the spouse does, children, ages, if

23  children are working, what the child does.  I don't need

24  children's histories, but what their current job is.  I'll ask

25  about hobbies.

Sarah K. Mitchell, RPR, CRR

1          I might ask -- you know, if they've done jobs I might

2     ask them, because I know that both sides are interested in

3     this, whether they were in some type of a leadership position

4     within their organization.  I ask about prior jury service.

5     Obviously we won't be asking what anyone's verdict was, but

6     ask about jury service, whether that might have any effect on

7     them.  I'll ask what type of case it was.  I'll explain the

8     difference between the burden of proof in a civil case and a

9     criminal case.  Hobbies.  Not too much on hobbies.  I think

10     that both sides may be more interested in asking hobby

11     questions.  That's fine if you do that.

12          Obviously even if the attorneys have not proposed a

13     particular question, if in response to a question the Court

14     asks, or in the case of the defendants, in response to a

15     question the Government may ask and one of the prospective

16     jurors mentions something, you've got the right to ask

17     questions about that particular topic and follow up with the

18     prospective juror about those things.

19          And then the United States will go first.  Each side,

20     as I said in the order from last night, will have 45 minutes.

21     That's a long time, but I can understand why the defendants

22     would want an opportunity.  The reason I allow attorneys to

23     ask questions is I think it gives them an opportunity to

24     personalize themselves a little bit at the beginning of the

25     case, and I think that's a good idea, although, of course, it

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   21

1  would just be one attorney from the team, but nonetheless, it

2  will give the attorneys an opportunity to do that.

3          When it comes time to exercise peremptory challenges,

4  take a look at the website that has the order in which I will

5  ask each side to exercise their peremptories, and then there

6  will be an 11th one too.  For the 11th challenge, the rules

7  require -- Rule 24(b) indicates that the last challenge has to

8  be exercised on the alternate.  If everyone agrees, I am

9  perfectly willing to not do that and allow both sides, if they

10 wish, to exercise peremptories on the alternate, or not.

11 Whatever you want to do.  You can exercise all your

12 peremptories on the alternate.

13         What do you think about that?  Or we can just stick

14 -- stick strictly with the rule.  Anyone have any thoughts

15 about how to do that?

16         MS. LABRANCHE:  I think we're fine with that on

17 behalf of at least Mr. Mulrenin and Mr. Roberts to have that

18 challenge be able to be used on any of the jurors.

19         THE COURT:  Anyone disagree?  Okay.  All right.  So

20 that will be the rule then by unanimous acclaim.  So in other

21 words, if you want to exercise your challenges at any point in

22 time on the alternate or not exercise any challenges at all to

23 the alternate, you can do that, okay?  When the strikes are

24 exercised, we'll do it in open court.  Probably most of you

25 are used to doing that, but sometimes maybe people are used to

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    22

1   using a piece of paper.  We're not going to be using a piece

2   of paper.  You can just stand up and excuse so and so.  When

3   that person is excused, we'll wait until the person actually

4   leaves the courtroom, and then I'll ask for the next

5   peremptory challenge.

6        If during the course of exercising peremptories you

7   think that the other side is perhaps, you know, having a

8   Batson violation, let me know that you -- what we don't want

9   to do is let the juror -- one of the jurors leave.  Once they

10  leave, they're gone.  So let me know.  We might ask that juror

11  to hold on for just a second and sit in the back for a little

12  bit.  Maybe that will then give you an opportunity to see

13  whether a pattern is developing or something of that nature.

14  But try to do that so that we can preserve the ability to make

15  a good record or to cure the Batson problem or something of

16  that nature.

17        All right.  Any questions about anything that I've

18  said so far?  Okay.

19        MR. FAGG:  Your Honor --

20        THE COURT:  Mr. Fagg.

21        MR. FAGG:  John Fagg for Mr. Lovette.  Did I hear you

22  correctly you said that each party would have one lawyer or

23  other individual in the well for the jury selection?

24        THE COURT:  Well, I think that given the fact that we

25  put additional tables in, I think we have -- I'm not sure.

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    23

1  We'll have to count them again.  Basically we just have to

2  divide it up evenly in some way.  So that's the story.

3          MR. FAGG:  That's great.  Thank you, Your Honor.

4          MR. KORNFELD:  I'm sorry, Your Honor, just a related

5  question.  I understand you don't want people parading around

6  back and forth during jury selection, but because we're

7  collectively exercising -- we're effectively collectively

8  exercising --

9          THE COURT:  That's the exception.  Yeah, obviously

10  when it comes time to collectively decide how to exercise

11  those challenges -- what I meant is people leaving the

12  courtroom, that type of thing.

13          MR. KORNFELD:  Sure.

14          THE COURT:  It's going to be awkward, and it may take

15  a little more time, and maybe the defense can think about the

16  best way to do it, but obviously there's going to be a need to

17  communicate with one another and huddle up and move around so

18  that the defendants can decide what to do.

19          MR. KORNFELD:  Great.  Thank you.

20          THE COURT:  That's -- I'm glad you brought that up,

21  Mr. Kornfeld.  It will be a little bit challenging to do that,

22  but I'll obviously give the defendants the ability to confer

23  and make sure that they're making informed choices about the

24  exercise of those challenges.  All right.

25          MR. KORNFELD:  Your Honor, I'm sorry, a related

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021     24

1   question.

2          THE COURT:  Go ahead.

3          MR. KORNFELD:  One thing we talked about with

4   Mr. Colwell who was kind enough to spend a great deal of time

5   talking to a representative group of us is because not

6   everyone will be in the courtroom for jury selection because

7   of the reasons that the Court has stated, is it possible to

8   have a spillover room where the other lawyers who are not in

9   the courtroom can at least listen to what is happening?

10          THE COURT:  Yes.  There's going to be an audio link.

11   That will provide the public link, but if the -- but here's

12   the problem.  We'll probably have a video link back down to

13   the jury assembly room, but that's just for the extra jurors

14   so they can follow along with what's going on, and perhaps if

15   we need them, won't have to repeat everything to them.  And

16   then there's the public audio link.

17          I think maybe, Mr. Kornfeld, what I would suggest is

18   talk to Mr. Colwell next week.  Maybe we can identify a

19   courtroom that we can use as an overflow courtroom.  I don't

20   know if we can actually put the video in there too, but we can

21   at least put the audio in there, I believe, and perhaps put it

22   on a speakerphone, and as -- and by virtue of doing that, you

23   know, have people who can't fit in the courtroom at least be

24   able to hear.

25          MR. KORNFELD:  I appreciate that, Your Honor.  He

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   25

1    made that type of suggestion and even suggested perhaps that

2    at least during jury selection your courtroom might be

3    available or others.  But he had indicated to our small group

4    that we should take it up directly with you, so with the

5    Court's guidance, I'm happy to reach back out to him and say

6    we discussed it at this --

7              THE COURT:  I'll talk to him about that.

8              MR. KORNFELD:  Terrific.  Thank you.

9              THE COURT:  Yeah, I'll talk to him about that, and

10   we'll see if we can make the best arrangement possible.  VTC,

11   if we can swing it, I'm not sure about that, but at the least

12   audio.

13             MR. KORNFELD:  Great.  Thank you.

14             THE COURT:  Now, let's talk about voir dire

15   questions.  Both sides submitted questions, and I'll go

16   through those in just a second.  So I appreciate -- the

17   attorneys I think have tailored those questions quite nicely.

18   I don't -- my philosophy on voir dire is that you're asking

19   questions to determine whether there's some type of interest

20   or bias.  You're not indoctrinating the jury.  You're not

21   asking the jury to promise they're going to do a certain

22   thing.  No one has submitted questions of that nature.

23             There are questions that I'll talk about in just a

24   second that border on introducing facts from the case.  I

25   think that we're going to have to -- and I will let the jury

 1   know the basics about this particular case, that it's an

 2   antitrust case involving the broiler chicken market.  I think

 3   we've got to do that.  If you want to try your hand, and I'll

 4   take one from each side, just like three sentences describing

 5   what this case is about.  Otherwise, I'll do it.  It's not to,

 6   you know, be a James Joyce like three sentences that it goes

 7   two pages because there's no punctuation, but it would just be

 8   a real simple explanation letting the jury know the very

 9   basics about it so that the jury understands what the essence

10   of the case is.

11           But some of the questions that are proposed get a

12   little bit too specific into the facts, and we'll talk about

13   that.  When we go through the questions in just a minute,

14   understand that if I tell you that your question is fine or no

15   problem, it doesn't mean that I'm asking it.  It means that if

16   you have time, you can ask it.  And as I said before, even if

17   you haven't proposed a question, you can ask a reasonable

18   follow-up question to something that one of the jurors has

19   said.

20           So let's take a look at the Government's proposed

21   voir dire.  This is Docket Number 583.  Many of the first

22   questions are ones that the Court will probably have asked

23   already, but that doesn't mean that you can't ask them in the

24   event that I somehow forget.  I do ask people about their

25   education.  If you ask people about what clubs or

1   organizations that they belong to, you should indicate to them

2   that you are not asking about any type of political

3   organizations that they belong to and they should not tell you

4   about any political organizations that they belong to.  We're

5   not going to go into party affiliation or political

6   organizations.

7          Question number nine, this is the first example of

8   something that I do not allow, and that is making a statement

9   and then asking a question.  You can't do that.  You just need

10  to ask questions.  It's not hard to reformulate your question

11  so that you include that information, but once you get

12  attorneys who start giving little speeches first and then

13  asking questions later it tends to get out of control, so no

14  prefaces to any questions.

15         If you want I can read to the jury before I start

16  asking them questions some of the very basic principles of

17  criminal law.  Like, I can read them the stock question -- I

18  mean, sorry -- the stock instruction on burden of proof,

19  presumption of innocence, that type of thing.  That way -- and

20  some may have questions along those lines.  For instance,

21  asking people if they can apply the burden of proof or

22  something.

23         Do people want me to go ahead and read those basic

24  instructions?

25         MR. KOENIG:  That's fine.

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    28

1      THE COURT:  I think we're good on that.  So I will do

2  that.  I'll do burden of proof, presumption, okay.  I'm fine

3  with the Government's questions up to 14.  I'm going to ask

4  them about hardship, but you can do questions about hardship

5  if you want later, but I'll be asking the question about

6  hardship before that point.  18 has a preface.  21 is -- I

7  think needs to be reformulated.  It's very vague.  I really

8  think it's best not to go into punishment at all.  It's just

9  going to set the jurors off on speculating about that stuff.

10  I will, of course, at the end of the trial give them an

11  instruction that they can't consider what the punishment is,

12  but if you get people starting to think about punishment at

13  the beginning of the case, I just think that doesn't serve any

14  good purpose.

15      Question on page 5 under case specific, that's a bad

16  title, case specific, but I will allow questions about asking

17  about the broiler chicken industry.  The first three

18  questions, good.  The fourth one, no.  I really don't think

19  there's any useful purpose to be served by that.  I don't

20  think that anyone who's thought about it thinks that there

21  aren't various laws against fraud or corruption or all sorts

22  of things that involve people working for companies.  So the

23  concept of a corporate person being held liable for a crime is

24  -- is something that I just don't think we need to explore, so

25  I won't let you ask four.

Sarah K. Mitchell, RPR, CRR

1    Obviously it's fine to ask about whether people have

2  heard about this particular case, but the second question in

3  that, in number five, no, we're not going to get into news

4  articles about other related cases or things of that nature.

5  I think, again, the potential for jurors to get confused about

6  that or have their mind poisoned about what someone else might

7  say is just too great.  Seven, I'm not going to allow the

8  Government to ask question number seven.  The Court will be

9  giving an instruction about credibility, but that -- that's

10  kind of a -- I don't like that question number seven.

11    Question number eight, once again, it has a premise.

12  I would suggest that the best way to ask about different law

13  enforcement agencies is to ask whether people had a especially

14  good or especially bad experience, or whether they've had any

15  contact with that law enforcement agency, whether they've had

16  especially good or especially bad experience with a law

17  enforcement agency.  That's fine.  Same with number nine.  I

18  would suggest taking it one by one, but I don't like the way

19  that number nine is phrased.  Like, Oh, well, if they're on

20  the case, is that a problem?  I just think that that's going

21  to trigger a bunch of speculation.  I wonder, well, maybe

22  there is a reason.  Well, I never thought about that.  But the

23  real issue is whether for some reason they have some bias

24  against each of those different agencies or law enforcement

25  organizations.

20-CR-00152-PAB      Trial Prep. Conference      10/08/2021    30

1           Number ten, this is an exception.  That's a tricky

2    subject.  The preface there is fine.  So you can ask ten as it

3    is stated.  Not number -- number 11, no.  Number 12, no.  Yes,

4    those issues may come up, but you don't get to preview all

5    your problems in jury selection, so 11 and 12 out.

6           Any questions about the rulings on those questions --

7    on those proposed questions?

8           MS. SWEENEY:  Not on the rulings, Your Honor.  Just

9    if you could clarify when you'd like us to submit our three

10   sentences about the summary?

11          THE COURT:  Yes, thank you.  Why don't we have that

12   by Friday one week from today.

13          Let's take a look at the defendants' proposed voir

14   dire questions.  This is Docket Number 584.  So I'm not going

15   to identify each specific question, but a lot of these

16   questions have prefaces to them, so you can't do the prefaces.

17   I'm looking at question number three.  If you want, I can give

18   the stock instruction about defendants have a right not to

19   testify.

20          MS. LABRANCHE:  Yes, please.

21          THE COURT:  I will do that one too.  I think it's --

22   I think it's always better for that to come from the Court.

23   For some reason I thought maybe one of the questions might be

24   asking a given juror if just looking at someone they thought

25   that person might be guilty or not.  Maybe that's not true,

1   but just in case someone does that, make sure that you only

2   ask about your particular client, not one of the other

3   defendants, okay?

4           I am good on the other questions except -- yeah, so

5   number 14, there's a statement in there about how it's not

6   illegal for competitors to share their bid pricing so long as

7   they do not agree to price fixing.  I'm going to exclude that.

8   It may very well be true that's an instruction that's given at

9   the end of the case, but the elements that I have put in the

10  preliminary instruction is all that I'm going to allow you to

11  have at this point in time.

12          Obviously any actual conspiracy to fix prices that's

13  illegal almost invariably involves price sharing, so price

14  sharing may be necessary for bid rigging or price fixing.

15  It's not sufficient, but I don't want to tell the jury some

16  principle of law like that and then have them start to tune

17  things out or have preconceived ideas and not appreciate

18  possible nuances or other things.  I'm not -- there's a reason

19  that they're called opening statements and not opening

20  arguments.  We're not going to be arguing the law during

21  openings, and so other than what I have indicated in the

22  preliminary instruction, we're not going to be going into

23  principles of law such as the one that is included in number

24  14, so that pretty much most of 14 I don't think is going to

25  be appropriate.

 1          Let's switch -- go over to question number 21.  I'm

 2   not going to allow defendants to ask the question at

 3   subparagraph A.  I think that that could be just too easily

 4   misunderstood by the jurors.  I just don't think that they

 5   would -- you know, talking about guilt by association, it gets

 6   mixed up with ideas of, you know, liability or mixed up with

 7   ideas of conspiracy or other things like that.  I just think

 8   for laypeople that one could be too easily confused.  Not that

 9   the defendants can't explore with the jurors, you know, can

10   you look at the evidence as to, you know, Mr. So-and-So, and

11   can you judge his -- and can you make sure that the Government

12   is held to its burden of proof as to my client?  That type --

13   that's fine, but I don't want to get into these ideas of guilt

14   by association particularly in a conspiracy case.  I think

15   it's a little bit too confusing.  I don't have any other

16   comments on anything else.

17          Any questions from the defendants about those

18   rulings?

19          MS. LABRANCHE:  No thank you, Your Honor.

20          THE COURT:  Okay.

21          THE COURTROOM DEPUTY:  I'm sorry to interrupt, Your

22   Honor.

23          THE COURT:  Yes.

24          THE COURTROOM DEPUTY:  If we can just have counsel

25   state their names for the court reporter.

                         Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021   33

1            THE COURT:  Yeah, I apologize.  We should.  That's

2      Ms. LaBranche who just spoke.

3            MR. FAGG:  Your Honor?

4            THE COURT:  Yes.  Mr. Fagg, go ahead.

5            MR. FAGG:  John Fagg.  Just one clarification on the

6      sentences that we should submit.  Should we submit those to

7      chambers, to the e-mail address?

8            THE COURT:  That's fine.

9            MR. FAGG:  Thank you.

10           THE COURT:  Okay.  Now let's switch our attention

11     over to let's talk about witnesses, first of all, and let me

12     ask about the length of the trial.  So the Government I think

13     initially estimated that its case in chief will probably go

14     about 15 days.  Now, when you add up the time, it looks like

15     maybe the Government may rest on around day ten.  This is what

16     I'm thinking.  What do you think of that, Mr. Koenig?

17           MR. KOENIG:  I think that depends largely on whether

18     we get stipulations and don't have to call all these --

19           THE COURT:  Yeah, there are various things.  But if

20     you add up the time just for your estimations of direct, like

21     seven days.  I don't know, I'm thinking that maybe -- maybe

22     about 10.  But here's what I'm thinking, and, of course, the

23     defendants have listed lots of witnesses, but I'm not sure,

24     especially with the Government's estimate, realistically how

25     many you'll call.  But in any event, if we tell the jury

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021     34

1    during jury selection that the case is likely to end the week

2    of Christmas as opposed to sometime before then, I guarantee

3    you that that will make it easier to get a jury.  So I would

4    like you to really think about those things, because Christmas

5    week is just going to be a red flag, you know, groaning and

6    moaning type stuff.  Whereas, even if we were to finish the

7    week before, I will feel a lot better about that.  And I

8    understand that everyone wants to make sure that it fits in.

9            My intuition is that we're going to go a little bit

10   faster than we have it scheduled for.  As some of the

11   defendants have commented, the Government's case is document

12   intensive, not witness intensive, and I think that as a result

13   it's probably going to go faster.  I'll talk about the

14   exhibits in a little bit more detail in just a second.  But

15   think hard about that, because this trial happened to fall

16   during, you know, Thanksgiving and then with Christmas, and

17   it's -- people are going to be really worried about their

18   schedules.

19           MR. KOENIG:  Your Honor?

20           THE COURT:  Yes.

21           MR. KOENIG:  Maybe you're going to address this

22   later.  If so, apologize.  But as far as cross time goes, that

23   kind of plays into --

24           THE COURT:  Sure.  I'm just kind of predicting.

25   We'll have to see how it plays out.  I don't know.  Once

                        Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    35

1    again, if a lot of the cross is just being directed at people

2    who know about documents as opposed to people who know about

3    things they've seen or heard, maybe it won't last quite as

4    long.  I would anticipate that there would be probably lots of

5    cross for witnesses who have seen and heard things.

6         MR. KOENIG:  When we had submitted our estimate, we

7    had just factored in sort of a one-to-one direct to cross.

8         THE COURT:  Oh, your estimate already factored in

9    time for cross?

10        MR. KOENIG:  Yeah.

11        THE COURT:  Okay.  That's good.  Well, I was

12   inflating it for cross, so that would suggest that we might be

13   finished even sooner.  But think about that.  It will make a

14   big difference in terms of what we tell the jurors.

15        All right.  So a couple of things with witnesses.

16   Number one, make sure that you have your witnesses here.  We

17   don't want to waste time waiting for someone to show up.  What

18   typically happens in trials and may very well happen with this

19   trial too is that once some of the basic facts have been

20   established through the initial witnesses, things move

21   quickly.  So it's not uncommon to be off schedule at the

22   beginning of the trial, but then you get right back on

23   schedule, and then you're ahead of schedule because each

24   witness doesn't have to repeat a bunch of facts that the

25   jurors have already heard about.

                        Sarah K. Mitchell, RPR, CRR

1           It's going to be a little bit different of course --

2     or at least the chance it will be different because we have so

3     many different companies involved here, and perhaps that will

4     mean that different witnesses will be explaining some things

5     about different companies, but that is a dynamic that

6     oftentimes happens.  So when we get into those witnesses at a

7     later point in time, they may go faster than you thought when

8     you prepared your examination, and as a result you need to

9     have those witnesses here even if you have to stack them up

10    and they don't like you and they're mad about having to sit

11    around.

12          MR. KOENIG:  May I ask one more question?

13          THE COURT:  Yes.

14          MR. KOENIG:  Speaking of witness availability and

15    making sure they're here, you know, if something unexpected

16    happens, is the Court amenable to taking a witness out of

17    order?

18          THE COURT:  Of course.  I mean, that always happens.

19    In this case we don't have too many experts, but there's some

20    people that have very bad schedules, and I hope that the

21    attorneys will be open minded about making accommodations,

22    because it typically plays out that both sides need to get

23    some consideration at some point in time --

24          MR. KOENIG:  So --

25          THE COURT:  -- for that.

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    37

1          MR. KOENIG:  Sorry.  I apologize.  Can I say one more

2     thing?

3          THE COURT:  Yes.

4          MR. KOENIG:  When I said that -- so if you look at

5     our witness list, the estimated time on there is for direct,

6     but then in the count -- the dates account for cross.  So

7     we've, you know, counted for like half the day --

8          THE COURT:  I don't think it will be the same amount

9     of cross as direct, but that's just my prediction.  We'll see.

10    I mean, I think we're going to fit in to the allotted days.

11    We will end I guarantee you -- I guarantee you we will end on

12    the last day we have scheduled, because I will make it end

13    then.  I tell people we won't be using a chess clock.  It's

14    hard to use a chess clock in a criminal case, but we will end.

15    It will be a Procrustean bed that the case will be chopped off

16    to fit in the time allotted, okay?

17          One -- one thing to keep in mind is a Tenth Circuit

18    case on point, and that is when you're conducting a witness

19    examination, you can't refer to the witness just by his or her

20    first name.  You have to -- you have to be formal enough.  You

21    have to use the witness's -- call them Mr. or Ms. or something

22    in that nature.  That does not apply to witnesses.  Witnesses

23    can talk about people however they talk about them.  They can

24    use first names.  They can do whatever they want.  But the

25    attorneys need to call their clients -- or call people who

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    38

1  they're examining including their clients in a more formal

2  fashion.

3           Any other questions about witness issues?

4           MS. CALL:  Yes, Your Honor, very briefly.

5           THE COURT:  Can you state your name?

6           MS. CALL:  Heather Call for the Government.

7           THE COURT:  Go ahead.

8           MS. CALL:  After conferring with the defendants, we

9  did learn that there was a witness who appears to be an expert

10  witness on the defendants' list who's not previously noticed.

11  We do understand that Defendant Blake did not request

12  discovery under Rule 16(a)(1)(G) so the Government may not be

13  entitled to notice of that expert, but we would ask that the

14  Court order expert disclosure to happen before trial so

15  there's no need for a *Daubert* hearing in the middle of trial.

16           THE COURT:  You should file a motion on that

17  particular issue so that we can have it set forth.

18           MS. CALL:  Is there any particular timing on that

19  Your Honor would like?

20           THE COURT:  ASAP.

21           MS. CALL:  Very well.  Thank you.

22           THE COURT:  What else are you going to do on the

23  plane ride back?  Okay.  Any other questions about witness

24  issues that we should talk about?  Okay.  So exhibits.  Both

25  sides have submitted a phenomenal number of exhibits, so let's

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021   39

1   talk about that.  First of all, in terms of the defendants'

2   witness list, it's -- the advantage to the Court, the reason

3   Courts require witness lists is so that you can, number one,

4   keep track of what's admitted or not, but potentially also

5   like write pages so-and-so to so-and-so only.  The defendants'

6   witness list is -- and believe me I can write small, but it

7   would actually be a little bit challenging for me to be able

8   to write anything in any of those lines because it is so

9   compact.  So it needs to be redone and made so that there's a

10  little bit more space so I can note things about various

11  exhibits.

12          You need to leave -- I didn't actually have -- I can

13  check it now -- yes, so, for instance, the Government's book

14  does not have any extra spaces at the end.  That's a violation

15  of the practice standards because invariably some exhibit gets

16  admitted that's not on the list.  That just happens.  The

17  defendants have room for about 100 extra exhibits I think,

18  but, once again, it's just so small it's difficult to write

19  anything in there.  So if you don't mind expanding that a

20  little bit, that would be good.

21          So here's one thing to think about in terms of the

22  exhibits, and that is the following:  So keep in mind that

23  throughout the trial I'm going to be telling the jurors on

24  multiple times during each day, ladies and gentlemen, keep in

25  mind that until the Court tells you, you can't deliberate.  So

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021    40

1   they're going to be hearing that 100 times.  But then believe

2   it or not, one day I am going to tell them that they can.  So

3   what do you think the jurors are going to do after I tell them

4   they can deliberate and they all get back in the jury room?

5   This is kind of a setup question.  They're going to

6   deliberate.  They are not going to systemically review

7   exhibits.  They're not going to do that.

8          They are not -- if both sides or one side or whoever

9   introduces all these volumes of exhibits, they are not going

10  to systemically pass those exhibits around to each other.  You

11  know, let's assume that each side admits 100 exhibits, which

12  is far less than both sides have proposed.  Think of how long

13  it would take the jury to systemically read those and pass

14  volumes around.  I mean, a day?  Two days?  A week?  They

15  won't do that.  They're going to start deliberating.  That's

16  what jurors do.  And I talk to jurors.  They don't do that.

17  Even in document-intensive cases they're only going to look at

18  a very small volume of documents, a really small volume of

19  documents.

20         So query why would you do that?  What's the purpose

21  of it?  Now, you can say to yourself, well, one purpose is to

22  make our record on appeal.  Well, it's always better to win at

23  the trial phase than to be holding out for appeal, but I can

24  understand that maybe you want to do some of that.  But what

25  I'm suggesting is you think about that before you admit

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    41

1   something, because jurors just do not tend to do that.  They

2   want to start talking about things.  They want to talk about

3   their recollection of the evidence.  And sure there will be

4   some exhibits that they'll probably pay attention to, and

5   maybe even in this case if you really beg and plead with them

6   they might even look at a little bit more than you think, but

7   25?  Are they going to look at 50?  I doubt it.  So, you know,

8   before you admit things, think about it.

9       The other thing is it may be that your exhibits are

10  all -- that you really aren't going to admit all the exhibits,

11  but you just want to have them because you never know, maybe

12  you'll need them, and that's fine.  I mean, I understand in a

13  case like this you probably have a lot of things that are

14  marked just to make sure that you have the ability without the

15  other side complaining that you're surprising them.  But, you

16  know, if you just do the math on this, you know, talk about

17  what time -- if you just add up your hours, and I think the

18  defendants have an estimate of 134 hours but like 1,800

19  exhibits, just do the math on that.

20      You would have -- to admit those exhibits, you'd be

21  introducing -- like the Government would be introducing 160

22  exhibits an hour.  We'll need more alternates because we're

23  going to have a lot of suicides if that's the case.  You know,

24  document cases are boring.  Jurors don't like it.  Jurors

25  don't like deposition cases.  Deposition cases are boring.

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    42

1    They like witness cases.  That's interesting to them.  So keep

2    those principles in mind, because when I see all these

3    exhibits, it makes me think that we're heading for a train

4    wreck.

5            Here's another thing, and that is with this vast

6    amount of documents it also makes me worry about my own health

7    because I'm worried about the notebook avalanche falling on me

8    during the course of the trial.  For the Court's notebook I do

9    not want any exhibit that you don't reasonably think will be

10   admitted.  Just in case one is you can always hand up a

11   duplicate for me.  That's okay.  But I really want my --

12   number one, you should have all those exhibits on a thumb

13   drive, assuming there are thumb drives that big.  I think

14   nowadays there are.  But that would probably be a good idea.

15   And then it is good to have a physical copy of the books, but,

16   once again, we would be talking about so many volumes of

17   material and killing so many trees that it doesn't make any

18   sense.  But if we have real pared-down exhibit books, I think

19   that that would be good.

20           The problem with showing the witness electronic

21   exhibits is it prevents the witness from flipping to the page

22   before and after.  A lot of witnesses think that you're

23   tricking them, especially on cross.  They like to flip around

24   a little bit.  Maybe it's a document they've seen before, but

25   they just want to get a feel for that, and of course the

20-CR-00152-PAB      Trial Prep. Conference      10/08/2021   43

1    witness can ask you to flip a few pages before, a few pages

2    after.  So it is nice to have it, but let's think about that,

3    because while I would like to have some notebooks with

4    physical exhibits in them, and I kind of like having them

5    myself because, once again, I can flip through and I can

6    annotate things, things that may come up again, if there are

7    just so many volumes of it, it really -- it's hard to pull

8    things up.  We can put a cart over in that area, and we can

9    have lots of notebooks on it.  That's okay.  But, once again,

10   no reason to put every exhibit in.

11          Another thing, and that is I won't admit voluminous

12   exhibits where there's just a couple of pages that are

13   relevant.  Instead that exhibit should just consist of perhaps

14   the cover page and then those pages that are relevant, not the

15   whole thing.  If there's some objection based on that, it

16   would be nice for you to have the real document here, and we

17   can then deal with it at that time.  But otherwise we just

18   don't need that.  I will allow you to come in, and we'll have

19   to remember this on the Friday before to move all your stuff

20   in, because you'll have a lot of stuff, and we don't want to

21   do that on the day of trial because all the jurors are going

22   to be pouring in, and the lines are going to be long, and it

23   will be rough.

24          So why don't you -- why don't you call my chambers

25   either the day before or just remind us about that and see

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB   Trial Prep. Conference   10/08/2021   44

1   what time is good.  But we'll open the courtroom up.  I have

2   to make sure that no one is in the courtroom at that time, but

3   we'll try to clear it so that you can come in and start

4   situating all your stuff, because you will have a lot of

5   stuff.  But if we had all the notebooks and all the exhibits

6   that you mentioned so far, I don't know where we'd put it all.

7   You might need to bring in some file drawers or something, and

8   we can try to stash them in back in those areas there.  We

9   have to remember that that area that -- the door over there is

10  for the marshals, so in the event someone on a day that we

11  don't have trial were to have a trial in here with an

12  in-custody person, we can't block that door off.  Okay?

13          Other things to add, make sure your exhibits have

14  consecutive numbers on the pages.  They don't have to be --

15  they don't have to start with one.  For instance, let's assume

16  it's some report.  If it's a section of the report like I

17  suggest you use instead of the full report, as long as there

18  are consecutive numbers, that's good.  But if you have some

19  Frankenstein monster of an exhibit that is a hodgepodge of

20  stuff, have someone get out his or her pencil and just put a

21  1, a 2, a 3, use their hand to handwrite them in.  But it's

22  very difficult for witnesses to be able to find what you're

23  talking about in an exhibit if you don't have some type of

24  consecutive numbering, and that's really what I'm worried

25  about.  And also it's important for you to make good records

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021    45

1   when you're asking witnesses about documents, that you

2   identify by some page number that the Court of Appeals will be

3   able to figure out later what page you're directing the

4   witness's attention to.

5           Any other questions about exhibits?

6           MR. KOENIG:  Your Honor?

7           THE COURT:  Yes, Mr. Koenig.

8           MR. KOENIG:  Under the rules we're supposed to

9   provide our exhibits in, you know, binders to each set of

10  defendants, but I'm wondering how that could --

11          THE COURT:  I think that we should do thumb drives or

12  some electronic means.

13          MR. KOENIG:  For the Court as well?

14          THE COURT:  Yes, for me as well.  But I do want -- if

15  you can boil down your exhibits, those that you reasonably

16  think you're going to use for a Court set of hard copies,

17  that's good.  But if that's going to be, you know, ten

18  volumes, that's bad.  They really become very, very

19  cumbersome.  So I wish I could tell you in advance.  I do know

20  that I certainly don't want either side's full set in paper,

21  because I don't -- it would be way too much.  So maybe you can

22  let chambers know how many volumes you have of your boiled

23  down copy, defense counsel on that, and we can respond back to

24  you.

25          MR. KOENIG:  Thank you.  One other thing with

Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    46

1   numbering, would it be your recommendation that if there's

2   Bates numbering that's consecutive, is that --

3          THE COURT:  Bates numbering is fine.  Bates numbering

4   is fine, as long as it's consecutive.  What occasionally

5   happens -- I'm not sure it would happen here -- is that you

6   have exhibits that are made up for some reason a compilation

7   of different pages that have all sorts of number ranges and

8   they're out of order, and it makes it very difficult for a

9   witness to try to figure out -- or me, for instance -- what

10  page you're asking the witness about, okay?

11         MR. FAGG:  Your Honor?

12         THE COURT:  Yes.

13         MR. FAGG:  May I follow up on one thing?  John Fagg.

14  As relates to documents that are going to be shown to

15  witnesses, would the Court be amenable to the requirement that

16  the parties give each party a copy of each document that is

17  shown to the witness that could be done either at the

18  beginning of the day or before a witness testifies so that the

19  defendants as well as the Government have a physical copy of

20  each document that's going to be shown to a witness?

21         THE COURT:  I'm worried about that.  I think that

22  logistically it may be very difficult to do, especially with a

23  document-intensive case.  There would be so many pages of

24  things.  But if you can talk to the Government about that and

25  reach some type of mutual agreement, I can see the advantage

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021    47

1   of it for sure, because there would be just so many volumes of

2   material, and it may be difficult for someone without advanced

3   notice to be able to, you know, find that page right away.

4   That could cause delays too, so that would be a disadvantage

5   in terms of the time necessary for the other side to know

6   exactly what is being asked about.  So why don't you talk to

7   the Government about that and see if you can work some type of

8   arrangement.  If you can, maybe that's a good idea.

9           MR. FAGG:  Will do, Your Honor.

10          THE COURT:  But it would be a lot of paper exchanged

11  but maybe that's the lesser of two evils.

12          MR. FAGG:  I think for a number of the extremely

13  voluminous documents I think we can reach an agreement along

14  the lines of what you were talking about or suggesting, so

15  we'll talk to the Government about that.  Thank you.

16          THE COURT:  Appreciate that.  Any other questions

17  about exhibits that we should take up at this time?  All

18  right.  And then in terms of the jury instructions, we won't

19  get to that for a while.  I'll take a look at that.  When we

20  get closer towards the end of the trial, then we'll start

21  meeting on jury instructions.  We'll do that probably after

22  5 o'clock.  We won't eat into the time that we can use for

23  testimony, but I'll give you advance notice of when we're

24  going to be having those particular meetings.

25          Also, just so you know, let me describe what a

1    typical trial day is.  So we'll convene at 8:30.  We'll have a

2    break at around 10:15 for 15 minutes.  We'll break for lunch

3    at noon.  We'll reconvene at 1:30.  And we'll take a break at

4    3:15, once again for 15 minutes.  And then we'll break right

5    at five.  It would be rare occasions that we go much past

6    5 o'clock.  It's going to be dark by then very shortly, and we

7    don't want jurors who may be parking some distance away to be

8    worried about their safety or things of that nature, so we'll

9    usually break right at 5 o'clock, even if we're close to being

10   done with a witness.

11            I commonly hear the refrain, Your Honor, well, can we

12   finish up the witness?  We just have two more questions.

13   Never -- this is a practice pointer -- never say you have one

14   more question, because no one ever has one more question.  But

15   usually even if we're close, unless it's a witness who has a

16   terrible schedule, you know, a witness that's -- the

17   difference is between making her flight tonight back to

18   wherever or having to come back tomorrow for just a few

19   questions, we might go a little past five in that situation,

20   but otherwise we probably won't.

21            If there are issues that come up during the course of

22   the trial that you think we really need to talk about, flag

23   that early, because maybe the attorneys can get together at

24   eight or early so that we can not cut into our time.  In my

25   experience we'll typically get 6.25 hours of testimony in per

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    49

1    day.  That's the average during the trials.  So we want to

2    preserve that as much as we can so that we can wrap the trial

3    up on schedule or as soon as we can.

4         Anything else that we should take up at this time?

5         Mr. Keech, do you mind calling IT and giving them a

6    heads-up we may be close, depending upon what Mr. Kornfeld

7    says.

8         THE COURTROOM DEPUTY:  I'll send them a message, Your

9    Honor.

10        MR. KORNFELD:  Your Honor, I won't belabor this.

11   Another thing we talked about with the clerk of the court was

12   the possibility of a, for lack of a better phrase, war room or

13   just a place --

14        THE COURT:  We're not going to do that.  Once upon a

15   time the U.S. Attorney's Office asked for a war room, but the

16   court didn't want to do that because it might be perceived as

17   some type of bias.  I apologize for that, but we really don't

18   have a good room that can be used for that purpose.

19        MR. KORNFELD:  Understood.

20        THE COURT:  And I know it would be extremely

21   convenient, and I know it's very inconvenient not to have one,

22   but I don't think I could get permission even as the chief

23   judge to do that.  And it sets a bad precedent for us, I hate

24   to say.  Even with a big unusual trial like this, it's just

25   not a good precedent, okay?

                        Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    50

1           Anything else that we should take up?  Mr. Byrne?

2           MR. BYRNE:  Yes, on behalf of Mr. Little.  If we

3    could, Your Honor, have until Wednesday to file a follow-up

4    brief addressing your order not allowing Mr. Little to appear

5    remotely.  I understand you've issued an order, so I don't

6    know if it would be a reconsideration, but we'd like to brief

7    it a little further, if that's okay.

8           THE COURT:  I don't want to encourage motions for

9    reconsideration because it's really bogging me down if we just

10   have -- that's the norm, but I know it's a very important

11   issue for Mr. Little.  I wish the rules were different.  I am

12   very sympathetic to Mr. Little's situation.  So I will allow

13   you to do that even though it's a bit of an exception, but,

14   yeah, if you want to provide some additional information,

15   that's okay.

16          MR. BYRNE:  Thank you, Your Honor.  We'll do that by

17   Wednesday when our other brief is due, if that's okay.

18          THE COURT:  That's fine.

19          MR. LAVINE:  Your Honor?

20          THE COURT:  Yes.

21          MR. LAVINE:  Bryan Lavine.  I wonder if we can just

22   address opening statements.

23          THE COURT:  Yes, good.  I forgot to do that.  Let's

24   talk about openings.  How -- go ahead.  What did you want to

25   say?

                    Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021    51

1           MR. LAVINE:  Defendants had talked about this, and

2   we're wondering whether we could allot 30 minutes per

3   defendant for an opening statement; and, number two, for the

4   defendants to decide the order of which they want to give them

5   amongst themselves.

6           THE COURT:  The order is fine.

7           MR. LAVINE:  If that would be amenable with the

8   Court.

9           THE COURT:  30 minutes per defendant, I think that is

10  an awfully long time.  It would probably overlap -- if we're

11  lucky -- it depends, once again, when we get the jury, but

12  that's going to take up an enormous amount of time.  We would

13  be spending almost a whole day on openings.  That's a lot of

14  time.

15          MR. LAVINE:  Your Honor, with all due respect,

16  there's a lot to cover for each one of us.

17          THE COURT:  Yeah, but this is opening.  I mean, I

18  don't know.  I just -- I really question whether 30 minutes

19  per defendant, especially if there is a lot to cover, it's

20  just going to cause people's heads to spin.  In my experience,

21  and I don't want to suggest that you haven't experienced

22  otherwise, but I think that the jurors are going to just be

23  daydreaming during most of it because it would be so -- if

24  each defendant is going into a lot of detailed information, it

25  really could cause people to tune out and therefore not be a

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    52

1   good use of time.  I'll think about it.  Is -- I may not give

2   each defendant that, but obviously each defendant will get the

3   opportunity to give an opening statement.

4            Anything else, Mr. Lavine, on openings?

5            MR. LAVINE:  No.  Thank you, Your Honor.

6            THE COURT:  How much does the Government think that

7   its opening will go?

8            MR. KOENIG:  Your Honor, well, last time I timed

9   myself it was just under 20 minutes.  One other question I

10  have, if I may?

11           THE COURT:  Uh-huh.

12           MR. KOENIG:  We have a single-page demonstrative for

13  the opening just because there's so many defendants, and we

14  provided it to the defendants.  Is that something the Court

15  would allow?

16           THE COURT:  Here's the rule on being able to show

17  things during openings, and that is if you have a reasonable

18  good-faith expectation that something's going to be

19  admissible, you can show it to the jury during opening.  Now,

20  obviously I don't think you'll be admitting that, but what is

21  it a demonstrative of?  Is it names?

22           MR. KOENIG:  I have copies.  Can I hand it up?

23           THE COURT:  Sure.  Have you shown that to the other

24  side?

25           MR. KOENIG:  Yeah.  And I have extra paper copies if

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021     53

1   anybody --

2            THE COURT:  Mr. Keech will hand it up.

3            MR. KOENIG:  It just basically groups defendants by

4   their employers.

5            THE COURT:  You can show that.

6            MR. KOENIG:  Thank you.

7            THE COURT:  Any other questions that you'd like to

8   bring up at this time?

9            MR. GILLEN:  Craig Gillen, Your Honor, just to follow

10  up on the issue about the opening.  If the Court -- we really

11  -- I candidly need to know how long each defendant --

12           THE COURT:  Oh, I'll let you know.  I won't keep you

13  in the dark.  I just want to think about it a little bit,

14  because that would be five hours of opening, which is -- just

15  a colossal amount of time.

16           MR. GILLEN:  I understand that, Your Honor.  The

17  Government is the one that brought this party to this

18  courtroom.  There are ten of us here.  We represent an

19  individual.  It means an awful lot to each individual without

20  saying that, of course, we know that.  We would like to have a

21  reasonable amount of time for our opening statements so that

22  we can address the many issues that have been brought forth in

23  this indictment.

24           THE COURT:  What I'm suggesting, Mr. Gillen, is that

25  in my experience I think that a cumulative five hours is not

                    Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    54

1    going to have much bang for the buck even though each

2    individual defendant has an interest and wants to make sure

3    the jury understands all those unique interests.  But when you

4    take into account the reality of the situation, ten

5    defendants, I don't know whether the jury would really be able

6    to assimilate, assuming that each defendant believes that

7    there's that much information to cover, would really be able

8    to follow just that barrage of information one after another.

9    It would be very -- it would be very difficult.  But I'll

10   think about it, and I'll issue an amended order or some order

11   and let you know so that you have lots of advanced notice how

12   long you have.

13            MR. GILLEN:  Thank you, Your Honor.

14            THE COURT:  Okay.  Mr. Tubac?

15            MR. TUBAC:  Your Honor, I just want to reiterate what

16   others have said.  I don't know if we need to join in anyone

17   else's request for time, but we have done quite a bit of

18   thinking about the open statements also.  30 minutes, I know

19   that's long in the Court's view to do ten times, but my client

20   Mr. Penn is very differently situated from other clients, and

21   the other clients are differently situated from Mr. Penn, and

22   we're certainly mindful of not wanting to bore the jury or

23   have them start daydreaming.  It's not in our interests to do

24   that, and of course we will do everything we can not to have

25   them daydreaming, but we do think 30 minutes is --

20-CR-00152-PAB    Trial Prep. Conference    10/08/2021    55

1        THE COURT:  Yeah, I am sure everyone does.  Sincerely

2   I am sure that you've all thought carefully about it, and

3   there's a tradeoff, the last thing you all want to do is put

4   the jury to sleep either, and having thought about that issue

5   have decided that nonetheless 30 minutes per defendant is

6   necessary.  So believe me, I'll give that quite a bit of

7   weight.

8        MR. TUBAC:  Thank you, Your Honor.

9        THE COURT:  Okay.  Anything else that we should take

10  up at this time?  Okay.  So here's what we'll do then, and

11  that is we have someone from IT.  He's got some of those

12  transceivers, and so not only take a look at those

13  transceivers, make sure that you understand how those work.

14  Like I said, we're going to have one per side.  So during the

15  course -- think through the logistics of it, but if we have a

16  bench conference, you have to make sure there would be just

17  one attorney that will be able to listen in for that

18  particular bench conference, and then obviously using that

19  system we'll have to all get very good -- well, not me, but

20  you -- at identifying who you are in advance, because, who

21  knows, maybe the lead attorney is not handling that particular

22  bench conference.

23        As to a witness, if we have -- if a given attorney is

24  handling a given witness, another attorney cannot be making

25  objections or being part of the bench conference.  Rather, the

 1   attorney handling the witness is going to be also -- is going

 2   to be the one who is addressing the Court during that

 3   particular bench conference or making objections during that

 4   testimony, okay?

 5          All right then -- oh, I was going to say one other

 6   thing, and that is make sure that you -- each of you who is

 7   going to be doing arguing or handling a witness knows how to

 8   work the document viewer.  You need to practice with it, make

 9   sure you know how to zoom in and out and turn it on and all

10   those good things, because just almost invariably in the

11   course of a trial, particularly a long trial, one day if for

12   some unexplained reason the technology fails, and if it does,

13   you'll need to -- we're not going to take a break.  You're

14   going to need to switch over to using, you know, perhaps paper

15   and to display the paper through the document viewer.  It

16   works really great, and it's very sharp picture.  So make sure

17   that you know how to do that.  That way you won't look like

18   you're fumbling around, and just in case the problem comes up

19   you'll know how to use the plan B system.

20          One other thing I want to mention, you can see a

21   couple of monitors that are in the jury area.  You might want

22   to take a look at those after I leave the bench too.  So in

23   between each of the various chairs there are monitors, and the

24   documents -- or any display will be displayed on those

25   monitors.  And I think we're also going to put a monitor -- a

 1   flat screen right up here too, but it will only display things

 2   that have been admitted, not going to be displaying things

 3   that the jury is not supposed to see.  But the jurors -- so

 4   don't use poster boards, any of those things.  Bad idea.  It

 5   just does not work.  They will not be visible.  Don't plan on

 6   using a flip chart.  It will not be visible.  And where would

 7   we put it?  You'd have to have something that you can be able

 8   jack up to like ten feet high just to clear all of you.  Those

 9   things don't work well at all.

10        What does work well is some type of electronic

11   display.  Or, you know, you could even use the document viewer

12   to put, you know, you could write something and you can

13   display that.  There are lots of ways to do that.  One thing I

14   would ask you not to do is when using the document viewer you

15   have your piece of really super thin rice paper and then use a

16   Sharpie to write on it and permanently wreck our document

17   viewer.  We don't want you to do that.  That can work too.

18   But use some type of electronic display.  Timelines, they are

19   notoriously hard -- that's one thing -- no one has come up

20   with a particularly good solution to timelines.  Some people

21   have thought, well, we can't do our timeline electronically,

22   so we'll do our timeline with poster boards, and it just looks

23   awful.  It's like -- it looks like a train of poster boards on

24   their easels.  It's real tricky.

25        MR. POLLACK:  Your Honor, Barry Pollack on behalf of

20-CR-00152-PAB      Trial Prep. Conference      10/08/2021   58

1    Mr. Blake.  I just want to follow up on Mr. Fagg's point

2    particularly in light of Your Honor's comment to maybe having

3    to pivot to plan B and using the document viewer I think is a

4    real argument in favor of having paper copies of documents

5    that are actually being used with the witness, because on

6    cross you'll need a paper copy.  So I know we're going to be

7    discussing that with the Government, but I wanted to highlight

8    that for the Court.

9            THE COURT:  I think that's an excellent point,

10   because that way each day -- things can happen and the

11   schedules could get off, but each day we might be ready for an

12   electronic failure, and to have those -- those paper copies

13   readily available could save us a lot of time.  So that's a

14   good point.

15           MR. POLLACK:  Thank you, Your Honor.

16           MR. KOENIG:  So, Your Honor, that would be paper

17   copies for the witness and the Court and the jurors?

18           THE COURT:  No.  No.  I think it's to exchange among

19   the other side.

20           MR. KOENIG:  Okay.

21           THE COURT:  And -- but that might -- it could be a

22   lot of brain damage, but it could be a good practice to get

23   into because it would allow us to display on the document

24   viewer just in case we have trouble pulling something up.  So

25   anyway, you're going to talk about it.  We haven't agreed to

                        Sarah K. Mitchell, RPR, CRR

20-CR-00152-PAB     Trial Prep. Conference     10/08/2021     59

1    that yet, but I do think that there's some merit to it.

2              MR. KOENIG:  And if I could ask one other question?

3    I apologize if I didn't see it in the rules, but how many

4    copies of the admitted exhibits go back to the jury room?

5              THE COURT:  One.

6              MR. KOENIG:  One.  Okay.

7              THE COURT:  One.  When we get to that point, it's a

8    long ways off, but I'll make sure that everyone checks those

9    very, very carefully so that each admitted exhibit goes back

10   to the jury and no other pages go back to them just by

11   accident.

12             All right.  Okay.  Also, if you need to set an

13   appointment with the IT person, have your IT person make an

14   appointment and come in and -- for the Government too -- and

15   put the -- put it through the paces, get it hooked up and see

16   how it works.  For instance, if you have an IT person sitting

17   in that front row, and you have a table or something, let's

18   get that in here, and let's just try to run it as close to

19   what it would be like during trial as possible so that we can

20   try to iron out issues that may come up in advance.  Our IT

21   department can do a lot of problem solving, but only with

22   adequate notice.

23             Okay.  All right.  Then for those -- for all the

24   defendants, their bond will be -- the bonds will be continued,

25   and the Court will be in recess.  Thank you.

                        Sarah K. Mitchell, RPR, CRR

1          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

2      (The proceedings were concluded at 3:41 p.m.)

3

4

5

6

7                        REPORTER'S CERTIFICATE

8

9          I, SARAH K. MITCHELL, Official Court Reporter for the

10   United States District Court for the District of Colorado, a

11   Registered Professional Reporter and Certified Realtime

12   Reporter, do hereby certify that I reported by machine

13   shorthand the proceedings contained herein at the time and

14   place aforementioned and that the foregoing pages constitute a

15   full, true and correct transcript.

16          Dated this 9th day of October, 2021.

17

18

19

20          _____/s/ Sarah K. Mitchell_____

21               SARAH K. MITCHELL
                Official Court Reporter
22         Registered Professional Reporter
              Certified Realtime Reporter
23

24

25

                    Sarah K. Mitchell, RPR, CRR