IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. **WILLIAM WADE LOVETTE**,
9. GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

      Defendants.

## WILLIAM LOVETTE'S MOTION FOR JUDGMENT OF ACQUITTAL

The government should not have charged William Lovette in this alleged price fixing and bid rigging conspiracy. The government's evidence is, as a matter of law, insufficient to sustain a conviction for the single charge against Mr. Lovette as no jury could reasonably find beyond a reasonable doubt that he knowingly and intentionally agreed to conspire with other individuals to fix prices or rig bids. Mr. Lovette respectfully moves this Court for a judgment of acquittal.[1]

---

[1] Mr. Lovette submits this written motion to supplement his oral motion made on November 24, 2021. *See* Doc. No. 871.

1

## INTRODUCTION

Robert Bryant—a Pilgrim's Pride ("PPC") employee and the only government witness to claim (wrongly) that there was some "agreement" among suppliers—did not identify Mr. Lovette as a participant in any such agreement even when asked to list the participants. No witness testified that Mr. Lovette did anything with respect to a bid, a price, or a negotiation process. No witness testified that Mr. Lovette knew of any alleged misconduct or directed any alleged misconduct in violation of Section 1 of the Sherman Act. Taking the testimony in the light most favorable to the government simply established Mr. Lovette's role as PPC's CEO.

The government is left to prove Mr. Lovette's guilt beyond a reasonable doubt from communications either to which he is not a party or which the government must take out-of-context, because none were accompanied by foundational testimony to explain the context. The government has winnowed down the 16 million documents it obtained in its investigation to approximately 500 exhibits that constitute the documentary evidence in its case. From those exhibits, no document shows Mr. Lovette (i) entered into an agreement with any competitor in violation of Section 1, (ii) directed any employee of PPC to enter into any agreement with any competitors, (iii) was informed of any alleged agreement, or (iv) sought or shared competitor's pricing information. At most, the documents suggest that another PPC employee sent Mr. Lovette information about other suppliers' current or past prices or bids. However, the government offered no proof that Mr. Lovette was informed that any information was received from a competitor in the bidding process—if any was so obtained. The evidence establishes Mr. Lovette could not know the source unless informed because the information could have come from a non-competitor, such as a customer or distributor, or from the process of covering a short. Regardless, the mere

2

receipt of this information on a few occasions over eight years, whatever its source, is insufficient without much more to prove a Section 1 violation or Mr. Lovette's knowing participation in an eight-year conspiracy.  Mr. Lovette's conduct is at least as "consistent with permissible competition" as it is with a Section 1 violation (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 763-64 (1984)), or his communications are protected because they evidence no interaction with a competitor and prove only his interaction with PPC employees "to implement a single, unitary" PPC policy, which "does not raise the antitrust dangers that § 1 was designed to police."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

Even in the light most favorable to the government, the government's case against Mr. Lovette is based on "impermissible speculation and conjecture" and "piling inference upon inference."  *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998); *United States v. Berger Indus., Inc.*, No. 79-278, 1983 WL 725, at *5-6 (E.D. Pa. Feb. 25, 1982) (granting acquittal motion where evidence proved that defendant participated in price discussions with conspirators, but evidence that he engaged in price fixing discussions was "sparse, vague, and inconclusive").

## ARGUMENT

Rule 29 "is not so heavily weighted in favor of the prosecution that . . . the Court must blindly and uncritically accept that every inference the prosecution argues can reasonably be drawn from the circumstantial evidence in the record."  *United States v. Gen. Elec. Co.*, 869 F. Supp. 1285, 1290 (S.D. Ohio 1994).  The Court should acquit when the evidence is "nothing more than

piling inference upon inference . . . or where the evidence raises no more than a mere suspicion of guilt." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (citations omitted).

The government must prove beyond a reasonable doubt that there was only one conspiracy and Mr. Lovette knowingly participated in it. "A defendant's knowledge of the purpose of the criminal conspiracy must be shown by 'clear, unequivocal evidence.'" *E.g.*, *id.* (citation omitted). This is particularly apposite in the antitrust context in which the line between legitimate business conduct and conduct in violation of the Sherman Act is difficult to distinguish. *Matsushita*, 475 U.S. at 588; *Monsanto*, 465 U.S. at 763-64. Evidence of a conspiracy and others' participation in it is insufficient. The Tenth Circuit warns that "[t]he tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse" and that courts "must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy" because the "risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants." *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992).

## I.   THE TESTIMONY FROM MR. BRYANT AND OTHERS REVEALS THE ABSENCE OF EVIDENCE TO SUSTAIN A CONVICTION OF MR. LOVETTE.

Mr. Bryant is the *only* witness to claim that there was any "agreement" between suppliers. (Bryant Tr.[2] 218:6-219:7.) When asked to identify those at PPC who engaged in the conduct he (wrongly) described as price-fixing, Mr. Bryant did not identify Mr. Lovette. (*Id.* 22:16-22.) Mr. Bryant's only testimony about Mr. Lovette was that certain individuals reported to Mr. Penn who,

---

[2] "Bryant Tr." citations refer to the official, certified transcript of government witness Robert Bryant. Mr. Lovette has included citations to the remaining unofficial, draft transcripts ("Trial Tr.") only for the convenience of the Court. Mr. Lovette defers to the Court to the extent its recollection differs from what is included in the draft transcript.

in turn, reported to Mr. Lovette. (*See, e.g., id.* 9:19-10:9.)  No other witness testified that an agreement existed.  No witness testified Mr. Lovette participated in one.  Moreover, Mr. Bryant did not claim to know of any agreement spanning eight years and involving multiple customers.  In describing his (mistaken) understanding of an "agreement," Mr. Bryant claimed that there was "an effort to build pricing support" and that suppliers submitted higher prices.  (*Id.* 218:11-14.)  But other evidence, including testimony from Mr. Bryant himself, confirms that these higher prices were driven by market forces, not any agreement.  Mr. Bryant testified that a price increase was warranted because supply had contracted while demand increased.  (*Id.* 161:21-162:6, 249:3-25.)  Witnesses who worked for customers such as RSCS and Golden Corral also agreed that these market forces resulted in increased prices.  (*See, e.g.*, 10/27/21 Trial Tr. 143:5-8 (Olson); 11/08/21 Trial Tr. 70:23-71:4 (Smith).)  The government introduced no evidence to rebut this market condition testimony by its own witnesses, thereby leaving the legitimate explanation for any price increases on an equal footing with its theory even giving every inference to the government.

At best, the government's evidence suggests that certain other individuals—not Mr. Lovette—may have shared pricing information with each other.  The exchange of pricing information, without more, is insufficient as a matter of law to prove the existence of the charged conspiracy beyond a reasonable doubt. *See, e.g.*, *United States v. Nat'l Gypsum Co.*, 438 U.S. 422, 435-36, 441 (1978) (price information exchanges alone are not a *per se* violation of the Sherman Act); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal[.]").  In *General Electric Co.*, the court granted a motion for acquittal because of the prosecution's "fundamental flaw" in relying on price-sharing evidence that was "consistent with [a] . . . customer interested in receiving

5

information about a proposed price increase and willing to give information about one supplier to another supplier." 869 F. Supp. at 1300. Although individual defendants "exchanged information," the court found this evidence unpersuasive because "[t]his [was] not an information exchange case, but a price-fixing case," and these actions were "as consistent with the perfectly legal conduct of a supplier and a customer as they [were] with the government's theory." *Id.*

Here, witnesses explained how suppliers obtained pricing information, including from customers or to cover each other's supply shortage. (*See, e.g.*, Bryant Tr. 282:3-5; 11/10/21 Trial Tr. 165:4-13, 171:2-15 (Ledford).) In any event, as to Mr. Lovette, there is no communication from which the jury could reasonably infer he knowingly sought, used, or endorsed use of that information as part of any agreement to restrict competition. The purported information-sharing with any connection to Mr. Lovette was "as consistent with the perfectly legal conduct." *See Gen. Elec.*, 869 F. Supp. at 1300. Mr. Lovette's few communications about competitors do not establish that he joined in any conspiracy, but rather that he was a ferocious competitor focused on PPC forging its own strategy as to product mix, key customers, and pricing.[3] (*See, e.g.*, GX2005.)

## II. THE EVIDENCE FAILS TO SHOW THAT MR. LOVETTE KNEW OF, OR HAD ANY ROLE IN, INFORMATION-SHARING AND THUS CANNOT PROVE MR. LOVETTE KNOWINGLY JOINED THE CHARGED CONSPIRACY.

There is no evidence that Mr. Lovette directed, instructed, or otherwise played any role in price sharing with the agreed purpose to restrict competition. *Cf. Evans*, 970 F.2d at 674 (each

---

[3] The government elicited testimony from customers about their reaction to pricing proposals or their expectations that pricing and bid information should not be shared. (*See, e.g.*, 11/04/21 Trial Tr. 174:13-24 (Fisher).) None of these customers testified that the suppliers shared pricing information as part of any agreement. And, in fact, the government conceded that customers are not capable of speaking about an agreement between suppliers. (11/12/21 Trial Tr. at 170:10-17.)

6

defendant entitled to individualized assessment of evidence against him). The Court should be "mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement." *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991).[4]

### A. The Testimony Proves Only That Mr. Lovette Served as PPC's CEO, Which Is Not Proof of Participation in a Criminal Antitrust Conspiracy.

None of the government's witnesses testified to having any knowledge that Mr. Lovette entered into a price-fixing or bid-rigging conspiracy.[5] Nor did any of these witnesses testify that Mr. Lovette directed even a single customer contract negotiation.[6] The testimony confirms only that Mr. Lovette was PPC's CEO. (*See* Bryant Tr. 9:25-10:1; *see also* GX9166.)

In *United States v. Kalahar*, the court invoked Rule 29 to set aside a guilty verdict against a business owner where an employee's supervisor—not the owner—directed the employee to commit the misconduct. No. 06-20514, 2007 WL 1500536, at *10 (E.D. Mich. May 23, 2007). The court found no support in the record that the owner "knowingly directed [the charged activity] at issue." *Id.* Similarly, in *United States v. Recognition Equipment Co.*, the court acquitted two executives of a conspiracy charge under Rule 29 because the prosecution did not produce sufficient

---

[4] The issue of a willful blindness instruction has not been resolved. Such an instruction would be an impermissible amendment of the Superseding Indictment. Regardless, the evidence does not support such an instruction as to Mr. Lovette because the government has made no effort to show he ignored facts presented to him that would lead to an inference of the charged conspiracy.

[5] *See, e.g.*, 11/04/21 Trial Tr. 2:18-3:10 (Lewis); 11/05/21 Trial Tr. 24:9-13 (Fisher); 11/10/21 Trial Tr. 38:1-5 (Ledford).

[6] *See* 11/03/21 Trial Tr. 99:12-14, 11/04/21 Trial Tr. 2:6-15 (Lewis); 11/08/21 Trial Tr. 148:4-10 (Smith); 11/17/21 Trial Tr. 100:12-23 (Brink).

7

circumstantial evidence that the executives knew and voluntarily joined the conspiracy, even though lower-level employees had criminally conspired. 725 F. Supp. 587, 589-90 (D.D.C. 1989).

These principles apply here. That Mr. Lovette served as PPC's CEO is insufficient as a matter of law to prove *his* participation in the conspiracy. An employment position "'or association with co-defendants is not enough to support a conspiracy conviction.'" *United States v. Riggins*, 15 F.3d 992, 994 (10th Cir. 1994) (citation omitted) (reversing defendant's conspiracy conviction).

### B. The Documents Do Not Prove Mr. Lovette Engaged Even in Price Sharing, Let Alone an Agreement to Fix a Price or Rig a Bid.

The government's circumstantial case against Mr. Lovette "can in no way lower the standard of proof which this Court must hold the government to in establishing its prima facie case." *Recognition Equip.*, 725 F. Supp. at 596. The government's exhibits would, at most, allow an inference that Mr. Lovette (i) received pricing information in select instances or (ii) engaged in business conduct at PPC that was at least "as consistent with permissible competition"—if not plainly legitimate. *See Matsushita*, 475 U.S. at 588. Granting a Rule 29 motion is proper when the evidence, as is the case here, "tending to establish that [a defendant] participated in price-fixing activities . . . was insufficient in quantity and quality to enable a reasonable jury to conclude beyond a reasonable doubt that such conduct occurred." *See Berger Indus.*, 1983 WL 725, at *6.

#### 1. Mr. Lovette's Receipt of Pricing Information is Insufficient Evidence of His Knowing Agreement to Join in the Charged Conspiracy with the Intent to Restrain Trade.

The Court "'cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference.'" *Riggins*, 15 F.3d at 994 (citation omitted). That is so because "'the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate

8

conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one.'" *United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005) (citation omitted). In *Riggins*, the Tenth Circuit reversed the defendant's drug conspiracy conviction under Rule 29. 15 F.3d at 994. The court reasoned that, "even if the jury inferred [the defendant] knew her mother and sister were hiding drugs in the van, that evidence is not sufficient to establish that [the defendant] knowingly and voluntarily became part of the conspiracy." *Id.* The Tenth Circuit held that "evidence of mere presence at the scene of the crime or association with co-defendants is not enough to support a conspiracy conviction." *Id.*

The documents offered against Mr. Lovette suffer the same fatal flaw. The jury must make leaps based on a pile of inferences because the documents provide incomplete narratives and were admitted with no foundational context. The government's exclusive reliance on the documents and the record of a single call with Roger Austin (PPC) invites the jury to engage in "a degree of speculation and conjecture that makes an inference unreasonable." *Rahseparian*, 231 F.3d at 1263.

Consider the communication purportedly showing that Mr. Lovette was exposed by a colleague (*not* by a competitor) to other suppliers' pricing information for KFC. (*See* GX1522-23.) There is no basis to infer from this communication, which makes no mention of a communication or agreement with a competitor to rig the bid, that Mr. Lovette had any knowledge of, or participated in, obtaining this information. Even if one could infer that Mr. Lovette saw this information, the leap to knowing participation in bid rigging is too great.

The government also offers a summary of exhibits to show that Roger Austin allegedly communicated with individuals at other suppliers in the two days before Mr. Lovette received pricing information from Mr. Penn. (GX14-3.) Even taken in the light most favorable to the

9

government, there is no evidence that could lead one to reasonably conclude that Mr. Lovette knew the source of this information, let alone was aware such information was part of an alleged conspiracy to rig bids. Even if it can be inferred that the pricing information did come from a supplier, no evidence proves that Mr. Lovette sought to obtain this information or to use it to facilitate an agreement to restrict competition as opposed to making independent decisions that would make PPC competitive and successful. *See Kalahar*, 2007 WL 1500536, at *10. These documents illustrate the same failings:

- GX920: The government offered no evidence showing from whom this information was obtained, who "players in the arena" refers to, or that "players in the arena" refers to something other than customers, which is a natural inference from the communication discussing Mr. Ledford's leaving RSCS to join Chick-Fil-A, both customers. On its face, the communication also shows that Mr. Lovette asked only about his colleague's view of Mr. Ledford's move. The government offers a series of communications that allegedly took place among another PPC employee, Scott Brady, and Mikell Fries nearly two months later. (GX9-1.) There is no evidence Mr. Lovette had any connection to these latter conversations.

- GX3025: Mr. Penn's remark refers to unknown statements Mr. Lovette made "at the NCC," a trade association of suppliers and purchasers as members and whose meetings are attended broadly by parties with an interest in the industry. (11/17/21 Trial Tr. 123:3-17 (Brink).) While Mr. Lovette receives (unsolicited) Tyson's apparent pricing to two customers, there is no evidence that Mr. Lovette requested this information, that he or anyone else at PPC acted on it, or that it was part of any agreement—much less an agreement to which Mr. Lovette was a participant.

- GX1864: Mr. Penn invites Mr. Stiller to "Come to BL office" purportedly to "discuss KFC." Assuming via an inference that the meeting took place, no evidence was offered to support an inference of what was discussed. The government notes that communications allegedly took place between others at PPC and individuals at competitors before and after Mr. Penn's invitation to Mr. Stiller. (GX18-3.) Even if true, there is no evidence that Mr. Lovette had any knowledge of or connection to these conversations.

The stack of inferences upon which the government relies becomes more tangential when considering the documents in which Mr. Lovette is only mentioned. For example, in GX1074,

10

Mr. Penn writes that he would "review with Bill in am." GX1074 contains a variety of information and, viewed in any light, Mr. Penn's email is entirely unclear about what he was planning to discuss with "Bill." The government submitted no evidence that a discussion with Mr. Penn ever took place and, even if it did, what was discussed. The government instead offers a series of communications—none of which involve or mention Mr. Lovette—that occurred internally at PPC and with individuals at competitors before Mr. Penn claimed he would "review with Bill in am." (GX10-1.) The government offers no evidence from which to infer that Mr. Lovette directed or knew about any of these communications or that, even if he did know about them, he did anything with the information that would support an inference that he knowingly joined the charged conspiracy.[7] See Butler, 494 F.2d at 1249.

### 2. Internal Communications Reflecting PPC's Independent Strategies Cannot Prove Mr. Lovette's Membership in the Charged Conspiracy—Indeed, They Prove the Opposite—Independent Decision-Making.

Further compounding its evidentiary failures, the government draws on communications that are "as consistent with permissible competition as with illegal conspiracy" that do not "without more, support even an inference of conspiracy." See Matsushita, 475 U.S. at 588; Monsanto, 465 U.S. at 763-64. The government relies upon strained inferences based on conduct that, at most, shows PPC setting its own internal and independent strategy decisions. Copperweld, 467 U.S. at 769. The critical impact of Copperweld is that communications with no reference to coordination with a competitor, either express or reasonably inferred, cannot support a finding that a defendant

---

[7] No reasonable jury could infer that "Bill" in Mr. Brady's communication to Mr. Fries (GX10-3 and 1238) refers to Mr. Lovette, where Mr. Brady had spoken with Bill Kantola just prior. In fact, Special Agent Taylor admitted in the James hearing that this exchange relates to Bill Kantola, not Bill Lovette. (See 9/2/21 James Hr'g Tr. 75:16-20.)

11

joined a conspiracy. Applying *Copperweld*, communications reflecting implementation of PPC's own policies or strategies do not evidence antitrust violations because they are equally consistent with competition so cannot be relied upon by the government to oppose a Rule 29 motion.

Consider as an example the compilation of exhibits reflecting internal PPC communications about whether to cover Tyson's supply shortage. (*See* GX20-1; *see also* GX2000-02, 2005.) Ultimately, PPC declined to help Tyson's struggles with its customers after Tyson could not supply product. (*See* GX2005.) Mr. Lovette explained PPC's business strategy to compete against Tyson to secure customers' long-term business by demonstrating an ability to meet the customers' needs. (*Id*.) Mr. Bryant confirmed this unilateral strategy, which was nicknamed "Otis" within PPC. (Bryant Tr. 359:1-360:17; *see also* GX2002.) There is absolutely no evidence supporting any inference the decision was based upon Tyson violating any agreement to fix a price or rig a bid in an earlier negotiation. The communications establish PPC's internal motive to secure business—pure competition permissible under *Copperweld*. As Mr. Bryant testified, this was "hard-nose competition." (*Id.* 366:1-3.)

Communications reflecting efforts to become a better and more profitable company with no reference to conspiratorial conduct also run afoul of *Matsushita* and *Copperweld*. For example, the government submitted an email from Mr. Lovette passing along *PPC's* pricing model for KFC in 2011 with a note that it is "Profitable business." (GX9026; GX9718.) Mr. Lovette did not suggest he would share or coordinate any pricing with competitors. Nor did he indicate that PPC had coordinated with other suppliers in determining this pricing. A plain text reading shows only that Mr. Lovette as CEO commented that PPC's own business with a particular customer was

profitable for PPC.  There is no reasonable inference that can twist this into evidence of Mr. Lovette's participation in the charged conspiracy.

The government also identified internal PPC communications surrounding its decision to maintain a price increase during the 2014 RSCS negotiations.  (*See* GX1051; GX1236-37; GX1247.)  The government identified a subsequent communication purportedly reflecting that Mr. Austin relayed to Scott Brady that "Greeley told him not to come down on price" after Mr. Austin had a variety of communications, including a phone call with Mr. Lovette (GX10-2; *see also* GX1238).  There is no evidence that Mr. Lovette (or anyone else) instructed Mr. Austin to relay any information to Mr. Brady because across the government case there is no instance in which Mr. Lovette instructs anyone to convey any information to a competitor.  Even if the Court were to make the inference that there was such an instruction, Mr. Austin purportedly communicated PPC's own business decisions.  He did not ask Mr. Brady or anyone else to take a similar approach with RSCS.  Taken in the light most favorable to the government, Mr. Austin simply conveyed that someone at PPC told him (Mr. Austin) "not to come down on price."  There is no evidence of any agreement to fix prices or rig bids, or evidence of Mr. Lovette's participation in any agreement.

Similarly, internal discussions about choosing to pursue a price increase in the best interest of PPC, regardless of any potential negative reaction from a customer (GX449-51; *see also* GX9707-09, GX9711-13), illustrate the type of business decisions all corporations must make on a daily basis.  The government has not ruled out, as it must, the explanations "consistent with permissible competition."  *See Matsushita*, 475 U.S. at 588; *Monsanto*, 465 U.S. at 763-64.  The government offers a series of internal and a few external PPC communications (not involving Mr. Lovette) that took place before Mr. Lovette's exchange with Mr. Penn.  (GX4-1.)  There is no

13

evidence, however, that Mr. Lovette knew about, let alone directed, any of these communications, or that he was ever informed about those conversations. (*Id.*) That Mr. Lovette had a conversation with a PPC colleague around the same time that others at PPC may have spoken with a competitor is insufficient evidence to prove Mr. Lovette's knowing participation in the charged conspiracy.

### C. An Isolated Discussion About a Credit Term Rumor Is Insufficient to Prove Membership in an Eight-Year Conspiracy Beyond a Reasonable Doubt.

The government offered a single example (GX803) in which Mr. Lovette communicated with a competitor: one email exchange with Joseph Grendys of Koch Foods in 2016 about the market-wide rumor of Sysco's effort to unilaterally impose new payment terms. (11/17/21 Trial Tr. 208:3-209:11 (Hoyt).) *Per se* culpability can exist only when competitors agree to fix credit terms or to deny credit. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 650 (1980). The government's evidence is wholly insufficient to sustain a conviction against Mr. Lovette based on his isolated exchange with Mr. Grendys.

Fatal to the government, neither Mr. Lovette nor Mr. Grendys asked the other to agree to fix a term, to deny credit to that customer, or to refrain from negotiating terms with the customer. Indeed, PPC never said "no" to Sysco's efforts for new credit terms. PPC immediately offered to negotiate new credit terms. (11/22/21 Trial Tr. 120:4-19 (Hoyt).) The government offered no evidence of subsequent communications between Mr. Lovette (or anyone else at PPC) and Mr. Grendys (or anyone else at Koch Foods) on Sysco's credit terms. Each company went on to negotiate with Sysco under different timelines. (*Id.* 117:5-20, 125:3-126:1.) PPC renegotiated a deal for unique terms with Sysco within months of the RFP (*Id.* 116:18-117:20); Koch Foods separately negotiated for years before reaching a much different agreement (11/17/21 Trial Tr. 198:4-18, 11/22/21 Trial Tr. 125:3-126:1 (Hoyt).) *Cf. United States v. Bestway Disposal Corp.*,

724 F. Supp. 62, 68, 70 (W.D.N.Y. 1988) (acquitting defendants for lack of agreement because there was no "meeting of the minds" where defendants "did not, and knew they could not, trust each other enough to work together"). Moreover, Ms. Hoyt conceded that Sysco's price term changes were not related to any bid or RFP for chicken, but rather applied equally to its thousands of suppliers of every product imaginable. (11/17/21 Trial Tr. 208:3-21 (Hoyt).) Under any reading of this email exchange, this episode has no logical connection to the charged conspiracy.

Even if the Court were to infer that Messrs. Lovette and Grendys conspired, no reasonable inference can be drawn from a single, isolated exchange in 2016 that Mr. Lovette knowingly joined an eight-year conspiracy involving multiple suppliers and multiple customers. *See Evans*, 970 F.2d at 670 ("[H]e or she must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator.").

## CONCLUSION

For all these reasons, Mr. Lovette respectfully moves for a judgment of acquittal.

Dated: November 29, 2021                          Respectfully submitted,

*s/ James P. McLoughlin, Jr.*
James P. McLoughlin, Jr.
John A. Fagg, Jr.
Frank Schall
Kaitlin Price
Catherine Prater
MOORE & VAN ALLEN PLLC
Attorneys for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
jimmcloughlin@mvalaw.com
johnfagg@mvalaw.com
frankschall@mvalaw.com
kaitlinprice@mvalaw.com
catherineprater@mvalaw.com

15

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/James P. McLoughlin, Jr.*