```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 20-CR-00152-PAB
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    JAYSON JEFFREY PENN,
 7  MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
 8  ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
 9  WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12       Defendants
```

_____

                     REPORTER'S TRANSCRIPT
                   Excerpt of Trial to Jury
                  Testimony of Darrell Bowlin

_____

        Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 8:50 a.m., on the 6th day of December,

2021, in Courtroom A201, United States Courthouse, Denver,

Colorado.

        Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Janet M. Coppock, 901 19th Street,
           Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                            APPEARANCES

 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

 5   for Plaintiff.

 6           Anna Tryon Pletcher and Michael Tubach of

 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 8   San Francisco, CA 94111-3823;

 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washington, DC 20006, appearing for Defendant Penn.

11           David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16            Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19           Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25
```

```
 1                      APPEARANCES (Continued)

 2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7              Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
1                       APPEARANCES (Continued)

2            Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5            Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                          PROCEEDINGS

16           THE COURT:  Okay.  We will proceed with that, then.

17           Ms. Prewitt, Mr. Mulrenin may call his first witness.

18           And Ms. Prewitt, who is that witness?

19           MS. PREWITT:  Darrell Bowlin.

20        (Darrell Bowlin was sworn.)

21           THE WITNESS:  I do.

22           COURT DEPUTY CLERK:  Please state your name and spell

23   your first and last name for the record.

24           THE WITNESS:  My name is Darrell Bowlin,

25   D-A-R-R-E-L-L, B-O-W-L-I-N.
```

Darrell Bowlin - Direct

1      **DIRECT EXAMINATION**

2  *BY MS. PREWITT:*

3  Q.  Thank you, Mr. Bowlin.  I represent Timothy Mulrenin.  And

4  you know Mr. Mulrenin, don't you?

5          Okay.  Now, we have not met before today, have we?

6  A.  Not that I know of.

7  Q.  And you have met with the government more than once; isn't

8  that right?

9  A.  Yes, ma'am.

10  Q.  And the prosecutors sitting at this table, is that right,

11  or some of them at least?

12  A.  Yes, ma'am.

13  Q.  But this is the first time that you and I have spoken.

14  A.  Yes, ma'am.

15  Q.  So if I ask a question you don't understand, let me know

16  and I will rephrase it or we can have it read back by the court

17  reporter, okay?

18  A.  Yes, ma'am.

19  Q.  Now, I'm going to ask you questions about your involvement

20  in pricing chicken products at Tyson Foods, okay?  Just to

21  orient you, those are the questions that I am going to put to

22  you, okay?

23  A.  Yes, ma'am.

24  Q.  Now, I'll sort of skip to the punchline here.  Where do you

25  work?

1   A.  I work for Tyson Foods.

2   Q.  And what is your current position?

3   A.  Director and cut-out manager.  I manage the whole body

4   business in that category.

5   Q.  Now, under Tyson's organizational structure, what unit does

6   your position lie within?

7   A.  Small bird BU.

8   Q.  Is that a business unit?

9   A.  Yes, ma'am.

10  Q.  Now, and how is a business unit different from some of the

11  other departments at Tyson?  What does it do?

12  A.  The business unit owns the birds from a planning

13  perspective.  We also -- live weights, we control that.  We own

14  the birds.  We also own the pricing that we tell our

15  customers -- our sales team to go get.  There is multiple

16  things.  We have different mixes.  And ultimately I manage the

17  WOGs and the eight-piece primarily.

18          THE COURT:  Mr. Bowlin, do you mind, could you lean

19  forward just a bit so you can speak into the microphone a bit?

20          THE WITNESS:  Yes, sir.

21  BY MS. PREWITT:

22  Q.  Sorry.  With the masks it's a little hard sometimes, so if

23  you don't hear me, let me know, and otherwise raise your voice

24  so the jury can hear you.

25          So you mentioned you have a role in coming up with

7
Darrell Bowlin - Direct

1  pricing, is that right, for small birds?

2  A.  Ultimately we make the final decision on pricing.

3  Q.  Thank you.  And so how long have you held the position that

4  you have now as a cut-out manager at Tyson?

5  A.  I honestly don't know.  I have been in this role, similar

6  role maybe 10 years.

7  Q.  And then let's talk about the customers that you're

8  involved in coming up with pricing for.  What are the types of

9  customers?

10 A.  We have QSRs.  We have deli customers.  We have

11 distribution, food service type business as well.  We also do

12 boneless.  We do, I mean, the whole line.  We do a lot of the

13 different products.

14 Q.  Let's break it down.  QSRs, what are QSRs?

15 A.  I would consider a QSR -- when we use the term national

16 account, I would reference a Popeye's or a KFC or even a

17 Church's or even a Boston Market.

18 Q.  So with my questions, I am really going to focus on the

19 period from 2013 to 2019, okay?  So when I ask you questions,

20 that's the time period I am generally referring to, all right?

21 A.  Yes, ma'am.

22 Q.  Now, can you give us some examples -- let's walk through

23 the process by which prices to QSR customers are quoted, okay?

24 A.  Yes, ma'am.

25 Q.  I am going to ask you a few questions about your

Darrell Bowlin - Direct

1    involvement in that.  Which departments at Tyson or units are

2    involved in coming up with pricing to QSR accounts, QSR

3    customers, like the ones you mentioned?

4    A.  If we were doing an RFP, for example, we would engage our

5    pricing team.  We would engage our supply versus demand, our

6    demand planning team as well.  The BU would be in the middle of

7    it as well.  Sales would be collaborating as well.  You would

8    engage multiple groups to formalize a final supply versus

9    demand and also the pricing.

10   Q.  Would that also include forecasting, for example?

11   A.  Forecast is also in there as well.

12   Q.  And even though all those departments had a role in that

13   RFP pricing process, who owned and made the final decision?

14   A.  Ultimately, the BU had the final decision.

15   Q.  When you say BU, you are referring to what?

16   A.  The business unit.

17   Q.  Thank you.  Now, and the sales department does not function

18   within the business unit, does it?

19   A.  No, ma'am, they're separate.

20   Q.  I want to walk through each of these departments.  You

21   listed several that are involved in pricing at Tyson, okay?  So

22   we are just going to walk through some of them, if that's all

23   right.

24   A.  Yes, ma'am.

25   Q.  Now, let's talk about the pricing department.  You

Darrell Bowlin - Direct

1   mentioned the pricing department.  Who was in that unit

2   generally speaking over that period of time, 2013 to 2019

3   generally, and what did they do when it came to pricing and

4   contributing to this pricing decision?

5   A.  Keep in mind I did not remember their names until I get

6   prepping for this position -- or this testimony.  I would say

7   we were going back to the e-mails and I believe one of them was

8   Rollin Barnes.  We had Ritchey Collyar.  I also remember seeing

9   Shane Free.  These were people that represented the pricing

10  department back to the BU, the small bird BU.  So we would

11  engage them.  And they would look at our most recent cost

12  structures.  They would see where we were from a financial

13  perspective.  And then they would recommend this is the price

14  we need to go after.

15  Q.  And would it be fair to say that their role is to support

16  the business unit?

17  A.  Yes, ma'am.

18  Q.  You mentioned supply and demand production planning.  Who

19  do you recall being within that department who would have

20  helped provide input to your pricing decisions?

21  A.  Debbie Baker (ph), and I have been together for many years,

22  so that's the first name that comes to mind.  And she would

23  have managed the demand planning at that time.

24  Q.  So what would that entail, for example?

25  A.  Supply versus demand, taking our forecast, throwing it up

10

Darrell Bowlin - Direct

1   against our supply, and can we supply, right?  Are we going to

2   be short or are we going to have excess, whatever that comes to

3   be.

4   Q.  Now, and moving forward you mentioned sales.  Broadly

5   speaking, what was sales role when it came to dealing with QSR

6   customers?

7   A.  They would meet with the customer and they would -- our

8   team, let me say that, our team would make the decisions on

9   pricing, for example, and then we would go back to the sales

10  team and ask them to go get that price.

11  Q.  So they would message the price to the customer; is that

12  right?

13  A.  Yes, ma'am.

14  Q.  Now, let's -- at the end of the day -- who was your boss

15  during this period of time I mentioned while you were working

16  within the business unit for small bird?

17  A.  I am remembering two names.  One of them would have been a

18  Charlie Solomon.  The other would have been a Steven Cullen.

19  Q.  And did you consult with them when it came to coming up

20  with pricing on occasion?

21  A.  Yes, ma'am.  On the QSRs it was not uncommon to engage

22  multiple groups and have multiple conversations, multiple

23  conversations.

24  Q.  Okay.  Now, moving forward, what would you tell -- what

25  information would you provide to the sales team to -- on price

Darrell Bowlin - Direct

1    in terms of what they could share with the customer?

2              MS. CALL:  Objection, hearsay.

3              THE COURT:  Overruled.

4    BY MS. PREWITT:

5    Q.  You can answer the question.

6    A.  Please repeat the question.

7    Q.  What would be the type of information that you would

8    provide to the sales team that they could then communicate to

9    the customer in terms of the price quote?

10   A.  So we would gather, we would have conversations.  Pricing

11   would come in and they would say "Hey, we recommend this

12   price."  More than not you would see more kick-back from our

13   sales team as far as taking price.  For whatever reason it

14   was -- it wasn't a black and white scenario where I said, "Hey,

15   go get 3 cents," and they said, "Yes, sir."  So they

16   represented the customer and they would kick back and give me

17   information that they believed to be true.

18   Q.  Tell me a little bit more about what you mean by that,

19   kick-back.  What was the push-back?  Is kick-back push-back?

20   That what you are referring to?

21   A.  There would be instances where, hey, if you go after a

22   3 cent price increase, you are at risk of losing 30 percent of

23   the business or, hey, if you're going in too high, why are you

24   going in too high, just things like that.  I would call it a

25   beat-down somewhat.

12

Darrell Bowlin - Direct

1   *Q.*  So the sales was trying to beat you down on the price

2   increases that you were trying to quote to the customers.

3   *A.*  That's what I remember more than the other.

4   *Q.*  Okay.  And do you have any understanding as to why they

5   would try to do that, beat you down to lower the price to the

6   customer?

7   *A.*  My perception was they were representing the customer.

8   *Q.*  How so?

9   *A.*  Meaning that was their account.  They were selling pounds

10  to the customer that they serviced.  And, I mean, there had

11  been times when I made the comment, "You work for Tyson Foods.

12  You don't work for KFC."  And what I mean by that is what we

13  are trying to do is go get price and I have to fight with my

14  own salespeople to get that pricing.  And that was my

15  frustration.

16  *Q.*  Because they kept trying to take the price lower; is that

17  right?

18  *A.*  Yes, ma'am.

19  *Q.*  And those conversations you were having where they were

20  trying to price lower involved Timothy Mulrenin and Brian

21  Roberts; is that right?

22  *A.*  I believe that to be true, yes.

23  *Q.*  I would like to show you -- you have a binder in front of

24  you, Mr. Bowlin.  Do you see it right there?

25  *A.*  Yes, ma'am.

Darrell Bowlin - Direct

1   Q.  And if you just flip open to -- it's going to have a tab

2   that says G-934.  Do you see that?

3   A.  Yes.

4   Q.  This is just for identification, not to present for the

5   jury, just for identification purposes for now.  Do you see

6   that, Mr. Bowlin?

7   A.  Yes, ma'am.

8   Q.  And if you would like a hard copy, we have a binder in

9   front of you in case that's easier for you.

10  A.  I see.  Yes, ma'am.

11  Q.  Now, do you recognize what this document is?

12  A.  It looks like an organization chart for Tyson Foods at a

13  period of time.  I do recognize some of these people on here.

14  Q.  Okay.  Does this look to you to be a true and accurate

15  representation of the sales team within this chart?

16  A.  I believe that to be true, but I mean, I don't -- some of

17  these names I don't know either.

18  Q.  And was it the practice of Tyson Foods to create

19  organizational charts like this in the ordinary course of

20  business?

21  A.  Yes, ma'am.

22  Q.  And to update them from time to time to reflect the current

23  state of the organization; is that right?

24  A.  Yes, ma'am.  Positions may change and they may put a

25  different name in that bucket or that box.

Darrell Bowlin - Direct

1    *Q.* And people within Tyson that had knowledge of these things

2    who was in what position made the entries on a chart like this.

3    That's how it was created.

4    *A.* Yes, ma'am.

5    *Q.* And was this -- and this is the type of document that

6    people at Tyson would refer to and rely upon in their ordinary

7    course of business; is that right?

8    *A.* Yes, ma'am, I believe that to be true.

9            *MS. PREWITT:* Your Honor, we move G-934 into evidence.

10           *THE COURT:* Any objection to the admission of G-934?

11           *MS. CALL:* Objection as to relevance.  There is no

12   indication as to what time period this chart reflects.

13           *THE COURT:* Response?

14           *MS. PREWITT:* I can ask a few questions of the

15   witness.

16           *THE COURT:* That's fine.  It will be sustained for

17   now.

18   *BY MS. PREWITT:*

19   *Q.* Now, is this -- does this chart more or less reflect the

20   sales unit that existed within the period of approximately

21   around 2013?

22   *A.* I believe that to be true.  I don't know for sure, but I do

23   see salespeople on here.  I also see FSQA, senior directors.  I

24   don't see business units in here.  I see this more as a

25   different chart that represents some of our vice-presidents,

Darrell Bowlin - Direct

1   some of our senior vice-presidents.  And as I go through it, it

2   looks more like a sales and a QA and R&D as well.

3   MS. PREWITT:  I would renew the request to admit this

4   document.

5   THE COURT:  Any objection to the admission of G-934?

6   MS. CALL:  Just a foundation, Your Honor.  It doesn't

7   appear this witness has the ability to qualify this as a

8   business record.

9   MS. PREWITT:  There is a transmittal e-mail with a

10   date on it that goes with this.  I could show that to the

11   government if that would be helpful.

12   THE COURT:  Well, if you want to show it to the

13   witness, you can do something of that nature, but I will

14   sustain the objection for now.

15   MS. PREWITT:  In the interest of moving through this,

16   we will move on.  We don't need to display this to the jury.

17   BY MS. PREWITT:

18   Q.  I will just ask you questions about the sales team, okay,

19   Mr. Bowlin?  We will do that way.  How about that?

20   A.  Yes, ma'am.

21   Q.  So let me ask you about individuals that you recall who

22   were in the sales department during the time we discussed, 2013

23   through 2019.  Who do you recall was involved in the QSR

24   accounts where Tyson sold small bird?

25   A.  Again, prepping for this testimony, I mean, it would have

Darrell Bowlin - Direct

1    been Brian Roberts.  It would have been Tim Mulrenin, Carl

2    Pepper.  Those are the names that are coming to mind.  Andy

3    Lubert even.

4    Q.  Mr. Lubert?  What about Tim Scheiderer?

5    A.  Tim Scheiderer as well.

6    Q.  And how would you describe your relationship with

7    Mr. Mulrenin?

8    A.  We worked together.  He had the sales side.  I had the BU

9    side.  I wouldn't say that we were best friends at all.  I

10   mean, we were cordial to each other.

11   Q.  And how was your relationship with Mr. Brian Roberts?

12   A.  Pretty much the same.

13   Q.  Now, I am going to ask you specifically to focus on how you

14   interacted with the sales team when it came to working up price

15   quotes and costs.  Tell us more about the dynamic you described

16   earlier, sort of the push and pull.  Why was it the case to

17   your knowledge that sales was trying to get you to lower the

18   price for these QSR accounts?

19   A.  More than not.  I mean, that's what I remember near that

20   period of time.

21   Q.  Now, do you recall any salesperson at Tyson ever pushing or

22   urging you to increase prices with a QSR customer?

23   A.  I wouldn't say that it never happened, but I don't recall,

24   but I would not say that it never happened.

25   Q.  But do you have any recollection of that happening?

Darrell Bowlin - Direct

1  A.  No, ma'am, not at this time.

2  Q.  But you have a recollection of the sales pushing down

3  price?

4  A.  Yes, ma'am.

5  Q.  Did that happen every once in a while or frequently?

6  A.  It felt frequent.

7  Q.  Now, what would the motivation be for a salesperson at

8  Tyson to try to push down prices that you wanted to quote, push

9  back -- push down prices from what you wanted to quote to QSR

10  customers?

11        MS. CALL:  Objection, foundation.

12        THE COURT:  Overruled.

13  BY MS. PREWITT:

14  Q.  You can answer.

15  A.  I would believe it was -- I did not know for sure how they

16  were graded on their bonuses or even their performance, but I

17  have accused them, "All you care about is pounds.  I have to

18  care about everything."

19  Q.  So when you say, "You only care about the pounds," what are

20  you referring to?

21  A.  I accused them of protecting their pounds.

22  Q.  Is that volume?

23  A.  Meaning the business that we're selling to those customers,

24  that they were held to a different standard than I was.

25  Q.  And the standard you were held to was what?

Darrell Bowlin - Direct

1    A.  We need to make money.

2    Q.  So it was price.

3    A.  Yes, ma'am.

4    Q.  Now, I want to focus now on your role developing prices to

5    quote to certain QSR customers, okay?  I am going to ask you

6    some questions about certain QSR customers.

7             Now, how did you come up -- I am sorry.  Let's -- you

8    are familiar with the QSR by the name of KFC, correct?

9    A.  Yes, ma'am.

10   Q.  I'm going to focus my questions on that for now just so you

11   know where I am going.

12   A.  Yes, ma'am.

13   Q.  Now, do you recall developing a pricing model for a KFC

14   supply contract that would last from 2015 to 2018?

15   A.  I do recall that after reviewing the documents.

16   Q.  And who were the decision makers at Tyson in terms of

17   developing the pricing model for that annual supply contract?

18   A.  I believe you're referencing the one where Brandon Campbell

19   worked on a new cost model or an updated cost model for KFC

20   specifically.

21   Q.  Is that what you recall?

22   A.  That's what I -- yes, ma'am.  That's what I am referring

23   to.

24   Q.  And tell us about Mr. Campbell and what his role was.

25   A.  He would have managed a group of customers that would have

19
Darrell Bowlin - Direct

 1  been -- I would have been the leader at that time, and I

 2  believe Brandon Campbell would have had QSR accounts.  He would

 3  have specific accounts that he was overseeing as well.  And

 4  then there would have been someone else like a deli or even

 5  food service, those type of roles.  But what I remember

 6  specifically about that was he came to me and said, "Hey, this

 7  cost model, this cost model is old."  It hadn't been updated in

 8  several years.  "What do you think about going in and updating

 9  some of the numbers?"  And I said "Heck yeah.  I mean, let's

10  get it as accurate as it can be."

11  Q.  And that's with respect to KFC.

12  A.  To KFC specifically.

13  Q.  And those negotiations took place around the summer of 2014

14  for the 2015 to '18 supply?

15  A.  That's what I remember reviewing those documents.

16  Q.  So it was Mr. Campbell who developed that model.

17  A.  He didn't develop that model.  That model was given to us

18  by the customer is what I believe.

19  Q.  By KFC?

20  A.  But through the years there is inputs that you can update.

21  And it felt like that model had been -- I don't know how many

22  years, maybe five years, and we hadn't even touched it.  And if

23  we had any cost implications, we haven't adjusted that as well.

24  Q.  So I think you said when he suggested that somehow that the

25  inputs should be changed to that model, I think you said, "Heck

Darrell Bowlin - Direct

1    yes"?

2    *A.*   Yes, ma'am.

3    *Q.*   Did I hear you correctly?

4    *A.*   Yes, ma'am.

5    *Q.*   Why was your reaction "Heck yes"?

6    *A.*   Because it gives us an opportunity to make money if we're

7    not making money, right?  If our cost has gone up 3 cents a

8    pound and we're not charging the customer for that additional

9    cost, then we lose that 3 cents.

10   *Q.*   So was that your sense at the time, that KFC -- that you

11   were not making money on the KFC account?

12   *A.*   There was a period of time when we were making some money,

13   and then I remember through the years that we stopped making

14   money.

15   *Q.*   And that was with KFC.

16   *A.*   That was with KFC specifically.

17   *Q.*   So why?  Why weren't you making money with the KFC

18   contract?

19   *A.*   Part of our e-mail and some of the other documents you may

20   not be referencing now, but part of it was due to the way you

21   got paid for KFC is you got paid on a green weight case weight.

22   It's green weight.  This product is also marinated and we were

23   not getting credit for all the pounds in the box at that time.

24   So part of our strategy was, hey, what if you change your model

25   to represent all pounds in the box, and that would mean we

Darrell Bowlin - Direct

1   would get paid more.

2   Q.  So at this point in time when you were trying to get --

3   change the model to reflect what was going into the box, what

4   was your view of KFC in terms of a customer?

5   A.  I didn't like them.

6   Q.  Why not?

7   A.  Because we weren't making money at the time.

8   Q.  Now, did you ever have conversations with anybody about the

9   fact that you didn't like them and you weren't making money at

10  the time?

11  A.  I believe I have.

12  Q.  And what was your view about what should be done?

13  A.  Well, there were times where we had to -- I will say the

14  word maybe settle.  There were times where we had to settle in

15  the sense of we had to keep supplying them because we had the

16  birds and we needed to sell those birds.  If I am not able to

17  sell it to a different customer at a higher price, then I may

18  go in and settle and stay with this customer one more year

19  depending on the contracts.

20  Q.  But what did you want to do with KFC as a customer?

21  A.  There has been times when I wanted to fire them, but I

22  couldn't.

23  Q.  On one occasion or more than one occasion?

24  A.  At least three times, I believe.

25  Q.  So you wanted to fire KFC because it wasn't a profitable

Darrell Bowlin - Direct

1   account three times.

2   A.   Yes, ma'am, I believe that to be true.

3   Q.   Now, you talked to us about the desire to change the KFC

4   model to make it more profitable occurring in the context of

5   working up the pricing for this 2015 to 2018 supply contract.

6   Do you recall that?

7   A.   Yes, ma'am.

8   Q.   Now, did that ever happen?  Was the model ever changed?

9   A.   I don't believe it did, no, ma'am.

10   Q.   Now, do you recall when Mr. Campbell first came up with a

11   pricing model to submit -- that was going to be submitted to

12   KFC?

13   A.   Let me be clear.  That model was given to us, right, and

14   then we were trying to update it to where -- and then we also

15   showed them a different strategy or a different model, if you

16   want to call it, where we just looked at our price versus our

17   pounds and then the case weights as well.

18   Q.   Well, do you remember when Mr. Campbell first came up with

19   the pricing for the existing KFC model?  Do you remember that?

20   A.   Yes, ma'am.

21   Q.   When was that approximately?

22   A.   Well, again prepping for this testimony, it was around

23   2014, I believe.

24   Q.   Approximately what month?

25   A.   I think it was maybe June or July.

23

Darrell Bowlin - Direct

1   Q.  Now, it would help if I showed you a document to refresh

2   your recollection as to that date?

3   A.  Yes, ma'am.

4   Q.  Can you take a look at G-624?  Now, do you recall -- and

5   you can look away from that document once you feel you've had a

6   chance to review the document.  Take your time.

7   A.  Yes, ma'am.

8   Q.  Now, so looking away from the document, does that refresh

9   your recollection of the date that the pricing team,

10  Mr. Campbell, came up with the --

11  A.  I am sorry, I didn't even look at the date.

12  Q.  I am sorry?

13  A.  I did not even look at the date.  I apologize.

14  Q.  So you recalled it independently.

15  A.  No.  I am talking -- oh, yeah, as far as that goes.

16  Q.  Okay, thank you.  Now, what do you recall about who was

17  involved besides Mr. Campbell in coming up with this price?

18  Who from the pricing team or business unit was also involved?

19  A.  You would have had either Rollin Barnes or Ritchey Collyar.

20  You also would have had -- Brandon would have been involved

21  right in the middle of it.

22  Q.  Would Mr. Tim Mulrenin have been involved in coming up with

23  this pricing?

24  A.  I don't know that he would come up with it, no, ma'am.

25  Q.  But this model was developed outside the sales unit.

Darrell Bowlin - Direct

1    A.   Yes.  We were trying to change the model.

2    Q.   The business unit was trying to change the model.

3    A.   Yes, ma'am.

4    Q.   Now, what was the margin price increase that Tyson was

5    going with at this time to submit to KFC?

6    A.   They showed like a 19-cent price increase versus current.

7    Q.   Now, did the model ever change, the KFC model?

8    A.   Did we get to do that?

9    Q.   Did you ever get to do it, change the model?

10   A.   No.

11   Q.   So it didn't work.

12   A.   No.

13   Q.   You didn't convince KFC to change the model.

14   A.   Not to my knowledge.

15   Q.   Now, so what was the model that was proposed later on that

16   KFC rejected?  What were the features of it to your

17   recollection?

18   A.   Are you talking about no longer doing the moisture tare, no

19   longer doing the inject tare?

20   Q.   Is that what you recall as being the --

21   A.   That was the point of contention on the whole conversation.

22   Q.   Okay.  And that was what you were trying to change.

23   A.   Yes, ma'am.

24   Q.   And that didn't work?

25   A.   No, ma'am.

Darrell Bowlin - Direct

1    Q.  So to your recollection was a different pricing model

2    developed and sent that relied on the -- sorry.

3         To your knowledge was a different pricing model

4    submitted that was in conformity with what KFC expected, their

5    old model?

6    A.  Ultimately we just went back to doing what we were doing,

7    and that's what I believe to be true.

8    Q.  And do you remember what the price of -- what the price

9    increase was in the model that was submitted finally to KFC?

10   A.  Yeah.  If you got paid for every pound in the box, it was

11   going to be equal to 19 cents per pound, I believe, from what I

12   saw.

13   Q.  In essence the model that was reflected in -- the model in

14   June 2014 was the same as the one that was submitted later on

15   and finally to KFC.

16   A.  I am getting mixed up here.  There was a change.  We were

17   trying to change the model to where we got paid for everything

18   in the box.

19   Q.  But that didn't work.

20   A.  And that did not work.  So we went back to the original

21   price model that KFC came up with years ago.  We just kept

22   using that model.

23   Q.  Thank you.

24   A.  Yes, ma'am.

25   Q.  Now, throughout this process did any salesperson try to

Darrell Bowlin - Direct

1   push to increase the price quoted to KFC?

2   *A.*   I should never say never, right?  I just don't remember.

3   *Q.*   Do you think it happened?  Do you have any recollection of

4   that happening?

5   *A.*   I don't have any recollection, no, ma'am.

6   *Q.*   Would sales people pushing to increase a price to a

7   customer like KFC make sense to you based on your interactions

8   with the sales people at Tyson?

9   *A.*   I just don't remember them asking me to do that.

10  *Q.*   Now, moving on to Popeye's as a QSR customer, okay?  Now,

11  with respect to the 2018 and '19 annual supply contract, do you

12  remember that?  Do you remember --

13  *A.*   Yes, ma'am, after prepping for this testimony.

14  *Q.*   Now, I will ask you some questions about that.  When did

15  that -- when did those negotiations take place to your

16  recollection?

17  *A.*   I don't remember the dates, the months, per se.

18  *Q.*   Let me show you -- and it's in your binder if you want to

19  look at the hard copy -- just for your identification and

20  review G-800.  Do you see that document?

21  *A.*   Yes, ma'am.

22  *Q.*   Now, approximately when did those negotiations take place?

23  You can look away.  If it refreshes your recollection, just

24  look away from the document and answer the question, please.

25  *A.*   Wednesday the 23rd of August 2017.

Darrell Bowlin - Direct

1   Q.   That refreshes your recollection looking at the document?

2   A.   Yes, ma'am.

3   Q.   Now, what do you recall about what prompted these

4   negotiations in August 2017?

5   A.   What I recall, what I recall of this is 2017 Popeye's

6   was -- had a strategy to double their volume or double their --

7   yeah, volume over the next five years.  They did meet with us

8   at Tyson Foods and they told us their strategy.  And I am

9   taking you down a path here, I am sorry, but they shared their

10  strategies with us on doubling over the next five years.  And

11  what comes to mind is we were not -- we were -- my guess is --

12  or not guess, but during this period of time we knew that we

13  were not going to gain any more share on Popeye's and we were

14  trying to gain share on KFC.

15  Q.   Now, what, if any -- did the sales team have any reaction

16  in terms of the pressure coming from Popeye's to lower price?

17  Did they have a position?

18  A.   Say this again?

19  Q.   Did the sales team have a position and have a point of view

20  about whether prices should be lowered in response to the

21  request from Popeye's?

22  A.   I don't recall that type of conversation.

23  Q.   Now, who ultimately decided the price to be quoted?

24  A.   The business unit.

25  Q.   The business unit.

Darrell Bowlin - Direct

1   A.   Yes, ma'am.

2   Q.   Now, I am going to ask you some questions about cost

3   pass-throughs.  Is that a term you are familiar with?

4   A.   Yes, ma'am.

5   Q.   What are cost pass-throughs?

6   A.   It can be packaging.  It can be ingredients.  It can be,

7   you know, frozen versus fresh.  It can be multiple things.

8   Q.   Okay.  And would -- who would ask for these?  How would

9   this start that you would quote a cost pass-through?

10  A.   A customer would reach out to us and ask -- in this

11  scenario they would ask can you freeze the Church's

12  eight-piece, for example.  It's primarily fresh, and then they

13  wanted a frozen version of it as well.

14  Q.   So you are thinking about the freezer cost for Church's

15  Foods.

16  A.   Yes, ma'am.

17  Q.   That's an example.  So at what point in the life of a

18  contract would a customer ask you to price a cost like that?

19  A.   It can happen mid term.  It can happen, you know, a month

20  in.  It can happen a month -- by the end of it.  They made a

21  decision and they are changing something that's different than

22  what we are doing today.

23  Q.   And they are asking you to cost that, to price that.

24  A.   Yes, ma'am.

25  Q.   Did that include -- at Tyson would that cost be developed

29

Darrell Bowlin - Direct

1    by you or someone else?

2    A.   It would be multiple people, meaning the pricing team would

3    have a hand in it.

4    Q.   And the business unit?

5    A.   The business unit would be part of it to include the --

6    think about distribution, think about warehousing, things like

7    that as well.

8    Q.   So lots of different units within Tyson would be involved

9    in pricing a cost.

10   A.   Yes, ma'am.

11   Q.   So who would pay for that cost?

12   A.   Ultimately the customer.

13   Q.   So would there be profit usually built into that cost?

14   A.   I don't think so, ma'am.  Usually we would just treat it as

15   a pass-through.  It was something different than what we were

16   doing today, and then I would expect them to cover that cost,

17   meaning the customer to cover that cost.

18   Q.   Okay.  Would the customers expect to see the backup for

19   that sometimes, how you came up with those costs?

20   A.   I am sure there has been times that that's been asked.

21   Q.   Because it was considered to be a straight pass-through; is

22   that right?

23   A.   I believe that to be true, ma'am.

24   Q.   Now, and so when it came to cost pass-throughs, do you have

25   any recollection of the sales team trying to push up the price

Darrell Bowlin - Direct

1    of a cost pass-through quoted to a customer?

2    *A.*   I don't -- I don't think so, no, ma'am.

3    *Q.*   Would that have made sense to you?  Would you expect that

4    to happen that the sales team would ask you to push up the cost

5    to a customer when it's a pass-through?

6    *A.*   I don't think so.  I don't think so.

7    *Q.*   But you have no recollection of something like that

8    happening?

9    *A.*   No, ma'am.

10    *Q.*   Okay.  Now, let me talk to you a bit about the Church's

11    freezing charge, right?  You mentioned that, right?

12    *A.*   Yes, ma'am.

13    *Q.*   Do you have a recollection of Church's asking for a cost

14    for a freezing charge?

15    *A.*   As I was prepping for this testimony, yes, ma'am.

16    *Q.*   It refreshed your recollection.

17    *A.*   It refreshed.

18    *Q.*   So let's talk about for just a little bit, let's talk about

19    freezing charges and what they are.  What is a freezing charge?

20    What goes into pricing that?  Could you just walk us through

21    that?

22    *A.*   Just the energy, so think about the energy you use to

23    freeze it.  Think about you have to put egg crates -- we call

24    them egg crates or egg shells that goes between the layers to

25    allow air flow to have a better freezing experience.  Also we

Darrell Bowlin - Direct

1    may have a different box.  You tend to want to do like a 6-inch

2    flat pack versus a 12-inch box type thing.  So there would be

3    handling and there would be freezing, the actual freezing

4    process, and then there would be more handling.  And then there

5    would be warehousing and then there would be shuttling.

6    Q.   So is it fair to say there would be many different folks at

7    Tyson who would be involved in trying to come up with a cost

8    estimate for that type of cost pass-through?

9    A.   Yes, ma'am.  I would make sure that -- our team would make

10   sure that we get the right people so we have the right cost.

11   Q.   Okay.  And so how would that work in terms of let's say

12   Church's is coming to Tyson and saying, hey, I want you to

13   quote a freezer cost pass-through for us.  How would that work?

14   Just walk us through the process, please.

15   A.   I believe I would have went through our pricing team first,

16   what's it going to cost to take this fresh and freeze it.

17   Think about all your packaging, think about everything, go

18   through the model and see what it's going to cost.

19   Q.   How would that be communicated?  How would folks within

20   Tyson communicate about figuring this out?

21   A.   Are you referencing an e-mail?

22   Q.   I mean, would e-mail be something that was used?

23   A.   Yes, ma'am.  E-mails was what I would have done, I am sure.

24   There may have been times where I pick up the phone and call

25   somebody, but in this reference I do know that we engaged on

Darrell Bowlin - Direct

1  e-mails and we got multiple departments involved as well.

2  Q.  And when e-mail was utilized to have these discussions

3  within Tyson, was it the understanding that these had to be

4  accurate because you were trying to come up with accurate cost

5  figures to provide that freezer pass-through cost?

6  A.  I wanted it to be accurate.

7  Q.  And the people who were sending the e-mails and receiving

8  them were the people who had knowledge about the various inputs

9  and the cost factors that were quoted in those e-mails, right?

10         MS. CALL:  Objection, leading.

11         THE COURT:  Sustained.

12         MS. PREWITT:  Now, let me move forward.

13         Can we pull up -- and this has been admitted into

14  evidence -- the Government Exhibit 127.

15         Mr. Bowlin, it's in your binder if it's more helpful

16  for you to read a printed copy versus what's on your screen.

17         THE COURT:  I don't show that as having been admitted,

18  127.

19         MS. PREWITT:  Well, I can certainly move through this,

20  then.

21  BY MS. PREWITT:

22  Q.  Taking a look at this document -- let me just pull back

23  from that.  Do you remember when a freezing cost was -- do you

24  remember that there was a freezer pass-through cost quoted in

25  December of 2012?

Darrell Bowlin - Direct

1    A.  Yes, ma'am, after review of the documents.

2    Q.  Independent of looking at the document you that

3    recollection.

4    A.  After reviewing the documents, that's what I see, yes,

5    ma'am.

6    Q.  And what was the freezing quote cost at the time that was

7    arrived at by the pricing team?

8    A.  4 cents.

9    Q.  So it was 4 cents.

10   A.  Yes, ma'am.

11   Q.  Now, and what was factored into that estimate?

12   A.  It would have been everything we discussed earlier, whether

13   it be the freezing cost, the packaging, the egg shells, the

14   labor, the housing, the shuttling.  Multiple things would have

15   gone into it.

16   Q.  And that would be -- more or less those kind of

17   considerations would be the same considerations if you were

18   quoting that type of cost to a customer over that period of

19   time.

20   A.  X, Y, Z, yes, ma'am.

21   Q.  Now, with respect to coming up with this type of pricing

22   that the pricing team came up with, that 4 cents freezing

23   charge for Church's, what involvement did sales have in coming

24   up with that cost quote?

25   A.  The 4 cents, I don't believe they had anything to do with

Darrell Bowlin - Direct

1   that 4 cent quote.

2   Q.  Did there come a time later on in the spring of 2013 -- so

3   now here we are in December 2012 moving forward to the spring

4   of 2013.  Did there come a time when Tyson again quoted a

5   freezer cost?

6   A.  I don't recollect that.

7   Q.  Okay.  Now, would that quote have been more than 4 cents or

8   less than 4 cents?

9   A.  On the scenario that we were talking about on the Church's

10  eight-piece, it wind up -- the true cost came in lower than 4

11  cents.

12  Q.  In terms of what you quoted was less than 4 cents.

13          MS. CALL:  Objection, foundation, any recollection of

14  this later.

15          THE COURT:  Overruled.  He can answer if he recalls.

16  A.  Ask your question again, please?

17  BY MS. PREWITT:

18  Q.  So with respect to the --

19          MS. PREWITT:  Actually, can we read back -- do you

20  mind reading back the question?

21          (The record was read by the court reporter.)

22  A.  In terms of what I quoted was less than 4 cents?

23  BY MS. PREWITT:

24  Q.  In the spring of 2013.

25  A.  Ultimately we went in with a cheaper price than 4 cents per

Darrell Bowlin - Direct

1    pound.

2    *Q.*  So less than your actually cost.

3    *A.*  Less than what I actually told them to begin with.

4    *Q.*  And did there come a time later on in the fall of 2013 when

5    Tyson again quoted Church's for freezing charge?  Do you recall

6    that that happened again?

7    *A.*  I don't recall.  I am getting confused on the ask and then

8    recalling as well.

9    *Q.*  Let me show you just to refresh your recollection if you

10   look at Exhibit G-320.  It's in the binder in front of you.

11   And just take your time.  And then when you have a chance to

12   review that, just, you know, look up and we'll continue.

13   *A.*  Yeah, I got confused on the dates and I apologize.  But to

14   me this is the same conversation that we were having in

15   reference to we landed on 2.7 cents versus 4 cents.

16   *Q.*  So the price actually quoted to the customer was 2.7 cents

17   instead of the actual cost of 4 cents?

18   *A.*  The actual cost was not 4 cents.  It was derived that we

19   were overstating the price.

20   *Q.*  But it's what they thought it was.  The belief was it was a

21   4-cent cost.

22   *A.*  Yes, ma'am.

23   *Q.*  And who quoted the 2.7 cents?

24   *A.*  We worked with our -- we worked directly with our sales

25   team, I believe Tim Mulrenin.

Darrell Bowlin - Direct

1    *Q.*  He is the one that quoted 2.7 cents?

2    *A.*  To our customer.

3    *Q.*  Which was lower than the estimated 4-cent cost?

4    *A.*  Yes, ma'am, because the true cost had come in below.

5              *MS. PREWITT:*  Your Honor, we would like to move into

6    evidence G-320.

7              *THE COURT:*  Any objection to the admission of G-320?

8              *MS. CALL:*  Yes, Your Honor.  I believe it's all

9    hearsay.

10             *THE COURT:*  Response?

11             *MS. PREWITT:*  I would be happy to take all that on,

12   Your Honor.  It's non-hearsay.  It also falls under several

13   different hearsay exceptions.  I have plenty to say on that.

14   And if you want to do a side bar, we can do that, or we can

15   work through it right now.

16             *THE COURT:*  We can do a side bar.

17      (At the bench:)

18             *THE COURT:*  Ms. Prewitt, go ahead.

19             *MS. PREWITT:*  Thank you, Your Honor.  If you take a

20   look at this document first of all just for context, Your

21   Honor, I want to point out that the government in their opening

22   specifically referenced the 2013 Church's freezing charge and

23   noted that Defendant Mulrenin and others conspired to raise

24   that price.  In addition, they talked repeatedly about a

25   pattern of responding to customer requests for quotes and then

37

Darrell Bowlin - Direct

1    circling up comparing notes to present a united front as to

2    lowering price.  So this is relevant.  It goes to the fact at

3    issue.

4           THE COURT:  I am sorry, Ms. Prewitt, but is the

5    microphone off, just because you are at the podium.

6           MS. PREWITT:  Ms. Call thankfully turned it off.

7           Just to provide context, what this e-mail shows is

8    that in October of 2013, Mr. Dean Bradley from Church's has

9    received a 4-cent freezing charge quote from Tyson.  He comes

10   back and says that I have other customers that are coming in at

11   prices of 2 to 3 cents.  There is a flurry of e-mails

12   internally involving Mr. Pepper, Mr. Mulrenin looking to get

13   that price down.  So it's specifically in response to this

14   pressure from the customer.

15          It is ultimately Mr. Mulrenin that actually buckles to

16   this pressure.  Instead of calling competitors as the

17   government is -- you know, has alleged in their indictment and

18   their proof they put on, he accedes to that request and

19   responds to competitive pressure.  So it's clearly relevant

20   with respect to the time period, the product, the economic.  It

21   rebuts the government's theory of the case.  So that's the

22   relevance piece.

23          On the admissibility piece I would say there are a

24   couple grounds here, Your Honor.  It's non-hearsay.  You will

25   see with Mr. Mulrenin, he says, "Can we go with 2.7 cents?"

Darrell Bowlin - Direct

 1   That in and of itself is a question.  It's not an assertion.

 2   So it is non-hearsay on that basis.  It's an important context

 3   to show the relationship between how the pricing unit and the

 4   sales team engages in response to pressure from customers like

 5   this.  And it's relevant for effect on the listener because

 6   Mr. Pepper after this, after hearing this from Mr. Mulrenin,

 7   proposes a 3 percent -- 3-cent cost quote, in other words, a

 8   reduction from what they had originally quoted to Church's.

 9   It's also -- so it's effect on the listener and Mr. Pepper

10   acting in conformity and it helps explain that.

11        But also, Your Honor, I think this falls clearly

12   alternatively under 803(3), state of mind exception, in the

13   sense that it's a -- you have case law that's very helpful in

14   the 10th Circuit, *Faulkner v. Super Valu* stores, as well as

15   *U.S. v. Tome*.  And I can give Your Honor the citations to

16   those.  I have the cases here.  But it's -- the question of

17   "Can we go with 2.7 cents" expresses his insecurity, his belief

18   that he has to respond to competitive forces and his belief

19   about how he needs to act in the future.

20        There is nothing that's reflective, there is nothing

21   that goes to memory, so it has that indicia of reliability.  So

22   Your Honor, I think it also is a business record that would

23   fall as such.  You heard him talk about the fact that all of

24   these e-mails were developed as part of the pricing process.

25   They were relied upon in terms of providing quotes to customers

Darrell Bowlin - Direct

1    that Tyson would be held to.  And so there is that indicia of

2    reliability as well.  So that's my overview.

3              Thank you, Your Honor.

4              *THE COURT:*  Thank you.

5              Ms. Call?

6              *MS. CALL:*  Yes, Your Honor.  I will note there is 24

7    e-mails in this chain and I think that each and every one of

8    them are hearsay.  First as to relevance, I will just point out

9    that this e-mail is in October 2013, which is five months after

10   the allegations regarding Church's.  I haven't quite heard

11   anything as to how the defendants' actions and the defendants'

12   knowledge and the defendants' state of mind at that time

13   reflect on what it was five months earlier when they were

14   coordinating with their competitors.

15             As to the admissibility, however, I do think this is

16   frankly all hearsay.  It's the defendant's own statements, it's

17   co-conspirator statements, both rules that are not available

18   for the defendants to the admission of evidence under the

19   Federal Rules of Evidence.

20             As to their 803(3) argument regarding Defendant

21   Mulrenin's state of mind, it really seems like the argument is

22   that his state of mind is based on the truth of the matters

23   asserted in the underlying e-mails and really not a statement

24   of intent or motive or anything like that that falls within

25   what is squarely and typically held admissible under 803(3).

Darrell Bowlin - Direct

1   It simply isn't meant to show a defendant's state of mind

2   because, you know, saying he believes what he said under

3   803(3), I think there is just no argument that internal banter

4   within the company about various pricing decisions is going to

5   be a business record that's made and maintained in the normal

6   course of business, so I don't think that's proper either.  So

7   generally I think this is really all hearsay here.

8           THE COURT:  Ms. Prewitt, anything else?

9           MS. PREWITT:  Your Honor, I don't think you can say

10  all the discussions of all on the pricing team about what to

11  quote and be bound by a customer would be characterized

12  properly as banter, idle banter.  These are normal course

13  business discussions.  But, Your Honor, I think it's a 106

14  argument in that the e-mails below provide the context for

15  Mr. Mulrenin to express the need to respond to competitive

16  forces quoted -- in response to competitive forces that have

17  been cited by the customer.  And his whole, you know, response

18  in that e-mail reflects his belief and understanding, so it's

19  not being offered for the truth of the 2.7 cents.  It's his

20  belief that he needs to react and respond.

21          It's very similar to what we saw in *U.S. v. Tome*.  And

22  this is a sexual abuse case.  The declarant was expressing a

23  sense, an emotion of fear and concern based on circumstances.

24  It was that state of mind that was critical.  And the part that

25  was included under 803(3) was the part that was forward looking

Darrell Bowlin - Direct

1    and motivated future actions, not the identification of the

2    alleged assailant which was excluded.   And I think this

3    statement in and of itself merely expresses his belief at the

4    time.

5         *THE COURT:*   The objection will be sustained.   I do

6    find it's relevant despite what the government says about some

7    time periods.   Still, it might have some tendency to support or

8    contradict a matter at issue.   In terms of the question that

9    Mr. Mulrenin poses at the very top on Page 1 as not being

10   hearsay or frankly it being a state of mind, I don't find any

11   basis for either of those as being a hearsay exception.

12        I do agree with Ms. Call that the fact that

13   Mr. Mulrenin says "Think we can just go with 2.7 cents," any

14   statement by anyone may have some -- it was obviously motivated

15   for some reason, but I don't find that that particular question

16   is either a state of mind type of thing under 803(3) and, as

17   Ms. Call says, it's really a culmination of a lot of the

18   different e-mails in this very long e-mail chain and most of

19   which are totally hearsay.

20        But also I don't find any effect on the listener to be

21   relevant here.   In fact, Mr. Mulrenin as opposed to there being

22   some inference or relevance to his fear or concern or things of

23   that nature, he is just simply having a -- throughout this

24   everything he says is he is just asking questions in the normal

25   course of asking questions about some decision that he

Darrell Bowlin - Direct

1   ultimately is going to have to make, but that doesn't somehow

2   change it into a state of mind exception.

3          Moreover, this e-mail chain is not a business record

4   at all.  It is -- even though the witness testified that they

5   tried to make sure e-mails are accurate, accurate e-mails don't

6   constitute business exception in and of itself.  There has to

7   be some regular course of business, some type of duty.  This

8   type of back-and-forth regarding a business decision doesn't

9   fall within the business records exception, and I find no other

10  grounds for an exception here, so I will sustain the objection

11  as to hearsay.

12         MS. PREWITT:  Your Honor, may I submit briefing on

13  this issue?

14         THE COURT:  No.  I can't imagine this coming in in any

15  way, shape or form.  As the government pointed out, there are

16  26 different e-mails here and it's just not the type of

17  document that would come in under any of this.  I think I have

18  read that Tome case because it involves a sexual abuse case, so

19  that to me does not appear to have any relevance, so I will

20  sustain the objection.

21     (In open court:)

22         THE COURT:  The objection will be sustained.

23  BY MS. PREWITT:

24  Q.  So Mr. Bowlin, so sales came to you and it was when you

25  were pricing a cost pass-through, right?  In the circumstances

Darrell Bowlin - Direct

1  when you were working up the pricing for a cost pass-through,

2  if someone from the sales team came to you and said that a

3  competitor was quoting more for that cost pass-through, would

4  that have any influence on your decision?

5  A.  I don't believe that to be true.  I don't know that it

6  would impact me at the time.

7  Q.  But would you take that consideration, what other suppliers

8  were charging on a cost pass-through, would that cause you to

9  raise your cost pass-through price?

10  A.  I am going to say historically we would not have.

11  Q.  And that's because you were trying to quote your true cost,

12  correct?

13  A.  Yes, ma'am.

14       MS. CALL:  Objection, leading.

15       THE COURT:  Overruled.

16  A.  We had to get -- we had to get the cost covered by the

17  customer.

18  BY MS. PREWITT:

19  Q.  Now, I would like to ask you about another type of cost

20  quote to Chick-fil-A.  Do you remember there being a request

21  for a cost quote for converting to no antibiotics ever for

22  Chick-fil-A?

23  A.  Yes, ma'am, I am familiar with that.

24  Q.  Okay.  So do you recall that Tyson provided a price with

25  respect to Chick-fil-A for that NAE?

Darrell Bowlin - Direct

1   *A.*  Just so you know, I do not manage the Chick-fil-A business.

2   That's someone else on our BU that manages it.

3   *Q.*  But you are aware of the pricing on that?

4   *A.*  I did see an e-mail while we were prepping as well.

5   *Q.*  And you have experience with quoting NAE conversion costs,

6   right?

7            *MS. CALL:*  Objection, leading.

8   *A.*  Yes, ma'am.

9            *THE COURT:*  Overruled.

10  *A.*  Yes, ma'am.

11  *BY MS. PREWITT:*

12  *Q.*  Now, which unit is responsible for coming up with that kind

13  of pricing at Tyson?

14  *A.*  Say that again, please?

15  *Q.*  Which unit is responsible for coming up with the costs to

16  convert NAEs that are quoted to customers like Chick-fil-A?

17  *A.*  We worked with our pricing group as well and we would

18  formulate the true cost for NAE.  And what I remember

19  specifically on NAE is we come up with a certain amount of cost

20  that we were -- that we would incur and then we were going to

21  pass that through to our customers.

22  *Q.*  Okay.  And are you familiar with what is called a live

23  weight cost assumption?

24  *A.*  Yes, ma'am, somewhat.

25  *Q.*  What is live weight?

45

Darrell Bowlin - Direct

1   A.  Live weight is the weight of the bird when you slaughter it

2   or the strategy that you want to grow the bird at, the weight

3   that you want to grow the bird at, that's live weight.

4   Q.  So that's before processing.

5   A.  Yes, ma'am.

6   Q.  So a finished price is not the same as a live weight price.

7   A.  No, ma'am.  I don't do live weight pricing, no, ma'am.

8   Q.  I am sorry?

9   A.  I don't do live weight pricing.  Everything we sell has

10  been processed.

11  Q.  Thank you.

12  A.  Yes, ma'am.

13  Q.  But a live weight price would be a starting point to come

14  up with the finished price, correct?

15  A.  Yes, ma'am.

16  Q.  Now, would knowing what other suppliers were charging or

17  quoting for a cost for NAE, would you have used that to decide

18  what you would quote for NAE cost?

19  A.  Early on the strategy was to determine what our true cost

20  was for NAE, and some of them was speculating because we didn't

21  have the true cost flowing through.  And we formulated a number

22  that we would incur once we went to NAE.

23  Q.  Based on your true costs.

24  A.  Well, you didn't have the true cost at that time.  You were

25  still waiting for the true cost, but you were strategizing and

46

Darrell Bowlin - Direct

1   saying, hey, our cost, it's going to be X.

2   Q.  Because at the time that Tyson was being asked to quote for

3   NAE, the specifications weren't really known.

4   A.  That's correct.  To my knowledge, that's correct.

5   Q.  Now, I just have a few more questions for you, maybe more

6   than a few.  I don't want to lead you on that you're leaving

7   just yet, sir.

8   A.  Yes, ma'am.

9   Q.  Now, was there ever a time when you and the sales team

10  disagreed over whether to keep a client because of

11  profitability?

12  A.  I don't know specifically.  Is it possible, yes, ma'am, but

13  I don't know specifically.

14  Q.  Did the sales team ever tell you that they had received

15  pricing information from competing suppliers?  Were you ever

16  told that?

17  A.  I don't believe that.  I don't believe I heard that, no,

18  ma'am.

19  Q.  And do you have any firsthand knowledge that anyone at

20  Tyson communicated with any competing suppliers on price to

21  coordinate prices or bids in any way?

22  A.  Not that I know of, ma'am.

23  Q.  But do you have any -- sitting here today, do you have any

24  recollection of that happening?

25  A.  Not that I know of.

Darrell Bowlin - Cross

1    Q.  So you have no knowledge.

2    A.  No, ma'am.

3            MS. PREWITT:  May I have a minute?

4            THE COURT:  Yes.

5            MS. PREWITT:  Thank you, Your Honor.

6            I have no further questions at this time.

7            THE COURT:  Thank you, Ms. Prewitt.

8            MS. PREWITT:  Thank you very much, Mr. Bowlin.

9            THE COURT:  Cross-examination by any other defendants.

10   Mr. Gillen?

11           MR. GILLEN:  Briefly, Your Honor.

12           THE COURT:  Go ahead.

13                       **CROSS-EXAMINATION**

14   BY MR. GILLEN:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  My name is Craig Gillen.  I represent Mr. Roberts.

18   A.  Okay.

19   Q.  Very briefly, a quick question here.

20           In terms of when Mr. Roberts was at Tyson, in terms of

21   his responsibility and area that he had for covering particular

22   stores, did he have any responsibility whatsoever for

23   Albertson's or for Super Valu, to your knowledge?

24   A.  I don't believe he had it.  That was a deli customer.

25   Q.  Excuse me?

Darrell Bowlin - Cross

1    A.   That was a deli customer, not a national account customer.

2    Q.   So that was a deli customer and he would not have any

3    responsibility for that.

4    A.   Not that I know of.

5              MR. GILLEN:   Thank you.

6              THE COURT:   Thank you, Mr. Gillen.

7              Any of the other defendants?

8              Mr. Beller, go ahead.

9                        **CROSS-EXAMINATION**

10   BY MR. BELLER:

11   Q.   Good morning, Mr. Bowlin.

12   A.   Good morning.

13   Q.   Just a couple questions for you.

14             You testified to the jury that Tyson has a business

15   unit for pricing and the pricing for the business unit is

16   separate from the sales unit, right?

17   A.   So you had a BU, a business unit, you had a pricing

18   department and then you had a sales group.

19   Q.   Understood.   And the sales unit does not decide or

20   influence the price of broiler chicken products.

21   A.   We collaborate, but ultimately it's the BU that makes the

22   final decision.

23   Q.   Very good.   And so that's because the sales unit is

24   responsible for the customer service.

25   A.   I believe that to be true, yes, sir.

Darrell Bowlin - Cross

1    Q.  All right.  Doing what is in the best interests of the

2    relationship with the customer, right?

3    A.  Yes, sir.

4    Q.  And that -- what is in the best interest of the

5    relationship with the customer is sometimes different than what

6    is in the best interest of the company and raising prices,

7    correct?

8    A.  You would believe, yes.

9    Q.  As far as you know, Mr. Bowlin, that's the way it works

10   across the entire broiler chicken industry with all the

11   suppliers, right?

12        MS. CALL:  Objection, foundation.

13   A.  I don't know.

14   BY MR. BELLER:

15   Q.  Do you know?

16   A.  I don't know how other companies manage their business.

17   Q.  Understood.  And while you may not know how other companies

18   manage their business, would it surprise you if that's the way

19   it works with other suppliers?

20   A.  You would think it would be similar.

21   Q.  You would think in the same way?  Is that what you said?

22   A.  It would be similar, but I don't know that to be true.

23   Understood.

24        MR. BELLER:  Thank you, Mr. Bowlin.

25        THE COURT:  Thank you, Mr. Beller.

Darrell Bowlin - Cross

1              Additional cross by defendants?

2              All right.  Cross-examination by the United States?

3                        **CROSS-EXAMINATION**

4    *BY MS. CALL:*

5    *Q.*  Good morning, Mr. Bowlin.

6    *A.*  Good morning.

7    *Q.*  So Mr. Bowlin, you testified that you've worked in several

8    different units at Tyson, correct?

9    *A.*  I have had several different roles, yes, ma'am.

10   *Q.*  And in the time we've been talking about today, so 2013 to

11   2019, that's when you were in the business unit?

12   *A.*  Yes, ma'am, I believe that to be true.

13   *Q.*  And as you testified, part of your role in the business

14   unit was coming up with the margin for Tyson, correct?

15   *A.*  Yes, ma'am.

16   *Q.*  And margin, does that mean profit?

17   *A.*  Yes, ma'am.

18   *Q.*  Now, as I believe you just testified, that process of

19   coming up with the pricing, so a bid, that was a collaborative

20   process between different units at Tyson?

21   *A.*  Yes, ma'am.

22   *Q.*  Involved the pricing unit?

23   *A.*  Yes, ma'am.  You are talking and referencing the QSR

24   renegotiations?

25   *Q.*  Yes.

Darrell Bowlin - Cross

1   A.  Yes, ma'am, it was not uncommon to collaborate.

2   Q.  And with respect to those QSR negotiations, did you also

3   collaborate with the sales team?

4   A.  They would have been in the room, yes, ma'am.  I believe

5   that to be true.

6   Q.  You had meetings with them to talk about the pricing?

7   A.  Yes, ma'am, I am sure we did.

8   Q.  Now, once you landed on a price to submit to the customer,

9   is it correct it was sales' job to communicate that price to

10  the customer?

11  A.  Yes, ma'am.

12  Q.  And then Defendant Mulrenin here, he was in the sales

13  group?

14  A.  Yes, ma'am, I believe that.

15  Q.  And Defendant Roberts, he was in the sales team as well?

16  A.  Yes, ma'am.

17  Q.  Was there also an individual named Carl Pepper in the sales

18  team?

19  A.  Yes, ma'am.

20  Q.  Did Defendant Roberts supervise both Defendant Mulrenin and

21  Mr. Pepper?

22  A.  I believe he did.  I can't tell you for sure other than

23  looking at the org chart, but I believe he did.  Yes, I think

24  he was managing that group.

25  Q.  Now, as you said, these were separate units.  You weren't

52

Darrell Bowlin - Cross

1 in the sales team, right?

2 *A.* No, ma'am.

3 *Q.* You didn't sit in the same office as the sales team?

4 *A.* No, ma'am. When you say office, we have a building, right?

5 They were definitely over here and I was over on the other

6 side.

7 *Q.* Different parts of the building?

8 *A.* Yes, ma'am.

9 *Q.* And when it comes to the negotiations with the customer,

10 generally speaking -- well, let me rephrase. You only ever

11 attended one meeting with a customer; is that right?

12 *A.* I believe it was one time Kent from Popeye's came to our

13 business, our building, and I did meet with him.

14 *Q.* So outside of that one meeting, you didn't attend other

15 meeting that were between the sales and the customers?

16 *A.* Not that I know of, no, ma'am.

17 *Q.* When the sales team had calls with their customers, you

18 weren't on those calls either, right?

19 *A.* There may be a time or two, but I don't remember how many,

20 but surely there is probably one. But no, ma'am, I don't

21 recall getting on all the sales calls every time they

22 communicated.

23 *Q.* And when Defendant Mulrenin and Defendant Roberts had phone

24 calls with their competitors, you weren't on those phone calls

25 either; is that right?

53

 1 | A.  Not to my knowledge, no.

 2 | Q.  So you weren't privy to everything that the sales team did

 3 | in their role.

 4 | A.  No, ma'am.

 5 | Q.  Now, I want to talk generally speaking about this

 6 | negotiating process for QSR contracts.  So you said you

 7 | recommended a margin and then sales, they conveyed the price to

 8 | the customer, right?

 9 | A.  Yes, ma'am.

10 | Q.  For a customer like KFC, that process, it generally

11 | involves several rounds of negotiations, right?

12 | A.  It's possible, yes, ma'am.

13 | Q.  And would you agree with me that generally in those

14 | negotiations the customer, they would ask for a lower price?

15 | A.  Yes, ma'am.

16 | Q.  And on the other side of the bargain table would you agree

17 | with me that part of the sales team job was getting as high a

18 | price as possible for Tyson?

19 | A.  That would be their job I would say.

20 | Q.  That would be their job?

21 | A.  That's what I would ask them to do.

22 | Q.  That's because Tyson, they are in the business of making a

23 | profit, right?

24 | A.  Yes, ma'am.

25 | Q.  Let's talk about 2014.  In 2014 do you recall recommending

Darrell Bowlin - Cross

1   price increases for QSR customers?

2   *A.*   Again, going through the prepping for this testimony, yes,

3   ma'am, I remember having some of those conversations.

4   *Q.*   And were those price increases fairly significant?

5   *A.*   In that scenario, yes, ma'am, it was.

6   *Q.*   Now, I believe you testified on direct about a drain-back

7   tare and a marination tare that you were trying to eliminate;

8   is that correct?

9   *A.*   Yes.   I was trying to get paid for all pounds in the box.

10  *Q.*   And the price for what's in a box, that involves both a

11  price per pound and a case weight; is that correct?

12  *A.*   Yes, ma'am, in this scenario.

13  *Q.*   So is it right that to get like an apples-to-apples

14  comparison between two prices, you need to know both those

15  components, right?

16  *A.*   Yes, ma'am.

17  *Q.*   So when you were recommending changes to this marination,

18  would you agree with me that that was just another way to make

19  more of a profit on that KFC business?

20  *A.*   Yes, ma'am.

21  *Q.*   It was just another way to increase the price?

22  *A.*   Yes, ma'am.

23  *Q.*   Okay.   Now, when you recommended that price increase, is it

24  correct to say that you considered the fact that Tyson could

25  lose business to a competitor?

Darrell Bowlin - Cross

1   A.   At the time I would have.

2   Q.   And you testified on direct that even a 3-cent increase

3   would create that risk of loss of volume to a competitor?

4   A.   I have seen that happen, yes, ma'am.

5   Q.   And that increase in 2014, that was higher than 3 cents,

6   right?

7   A.   Yes, ma'am.  We were -- it was higher than that.

8   Q.   And that business with the QSR customers, like let's say

9   KFC, their business mattered to Tyson, right?

10  A.   Yes, ma'am, it mattered.

11  Q.   They were a relatively large customer?

12  A.   Yes, ma'am.

13  Q.   So in proposing those price increases, you considered the

14  risk that Tyson would lose business to a competitor?

15  A.   I would have.  I believe that to be true.

16  Q.   And that's just basic competition, right?

17  A.   Yes, ma'am.

18  Q.   Okay.  Now, the sales team, including Defendant Roberts and

19  Mulrenin in that year, they were the ones actually conveying

20  that price increase to KFC, right?

21  A.   Yes, ma'am, I believe that to be true.

22  Q.   So their job was to secure that price increase that you

23  were seeking?

24  A.   Yes, ma'am.

25  Q.   And as we established earlier, you don't know what steps

Darrell Bowlin - Redirect

1   Defendant Roberts and Mulrenin took to ensure that they got

2   those price increases?

3   A.  No, ma'am, I don't know.

4   Q.  And that's because you weren't in the calls with their

5   customers, right?

6   A.  No, ma'am.

7   Q.  And you weren't in the meetings with their customers.

8   A.  No, ma'am.

9   Q.  And you weren't in the calls with their competitors.

10  A.  No, ma'am.

11          MS. CALL:  All right.  No further questions.

12          THE COURT:  Thank you.

13          Redirect?

14                  **REDIRECT EXAMINATION**

15  BY MS. PREWITT:

16  Q.  You aren't aware of there being any calls between

17  Mr. Mulrenin and Mr. Roberts and their competitors in relation

18  to these contracts sitting here today, do you?

19  A.  Not that I know of.

20  Q.  Now, you testified in response to Ms. Call's questions

21  about sales being in the room when pricing quotes to customers

22  were being considered or discussed, correct?

23  A.  Okay.

24  Q.  Now, the business unit decided what the prices were going

25  to be, correct?

Darrell Bowlin - Redirect

1    A.   Yes, ma'am, collaboration.

2    Q.   I am sorry?

3    A.   It was collaboration, as I said earlier.

4    Q.   But ultimately it was your --

5    A.   Ultimately the BU made the final call.

6    Q.   Thank you.  But there were many different units that were

7    involved in that discussion process, correct?

8    A.   Yes, ma'am.  There would have been multiple people.

9    Q.   So when Ms. Call asked you about the sales people providing

10   the message of the quote of the prices that you came up with to

11   the customer, those were prices that you told them they could

12   quote, right?

13   A.   Yes, ma'am, I believe --

14          MS. CALL:  Objecting, leading.

15          THE COURT:  Sustained.

16   BY MS. PREWITT:

17   Q.   Whose job was it to ask -- whose job was it to seek --

18   determine price increases?

19   A.   Ultimately, the BU would on the price increase.

20   Q.   And so the message passed from the sales to the customer

21   was based on that decision.

22   A.   That would have been the number that we all agreed upon and

23   that's the direction that we were given.

24   Q.   In the business unit?

25   A.   From the business unit.

1  *Q.*  And you testified earlier that what the salespeople were

2  concerned about was pounds; isn't that right?

3  *A.*  That's how it felt, yes, ma'am.

4  *Q.*  And you believe that they were looking to get volume,

5  correct?

6          *MS. CALL:*  Objection, leading.

7          *THE COURT:*  Sustained.

8          *MS. PREWITT:*  I have no further questions.  Thank you

9  very much, Mr. Bowlin.

10          *THE WITNESS:*  Yes, ma'am.

11          *MS. PREWITT:*  Safe travels.

12          *THE WITNESS:*  Thank you.

13          *THE COURT:*  Thank you, Ms. Prewitt.

14          Is the witness subject to recall?

15          *MS. CALL:*  No, Your Honor.

16          *THE COURT:*  Thank you, Mr. Bowlin.  You are excused.

17

18

19

20

21

22

23

24

25

1                                   **INDEX**

2    **WITNESSES**

3        **Darrell Bowlin**

4            **Direct Examination By Ms. Prewitt**              **5**

5            **Cross-examination By Mr. Gillen**               **47**

6            **Cross-examination By Mr. Beller**               **48**

7            **Cross-examination By Ms. Call**                 **50**

8            **Redirect Examination By Ms. Prewitt**           **56**

9                         **REPORTER'S CERTIFICATE**

10       **I certify that the foregoing is a correct transcript from**

11   **the record of proceedings in the above-entitled matter.   Dated**

12   **at Denver, Colorado, this 21st day of November, 2017.**

13

14                              S/Janet M. Coppock

15

16

17

18

19

20

21

22

23

24

25