IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,

    Defendants.

---

**UNITED STATES' MOTION FOR LEAVE TO FILE A MOTION TO SUPPLEMENT *JAMES* LOG AND FOR RECONSIDERATION**

---

The government respectfully moves to supplement its *James* Log with additional entries appearing in the attached Exhibit A, many of which were elicited in trial testimony that the defendants did not object to, consideration of two entries that were on the government's original *James* Log but withdrawn for efficiency reasons, and reconsideration of eight entries from the original Log. The supplemental entries comprise Fed.R.Evid. 801(d)(2)(E) statements (1) elicited from witnesses at the first

trial, (2) anticipated to be elicited from new witnesses, (3) contained in exhibits not received until trial, (4) that occurred in interviews conducted after the *James* Log was submitted and may be elicited at the re-trial, (5) contained in new exhibits, and (6) from exhibits that the government sought to introduce (or contemplated introducing) at trial.[1]

The government also asks that the Court rule on two entries that appeared on the government's original *James* Log, but in the interest of streamlining the *James* proceeding, were withdrawn. Last, the government requests reconsideration of eight entries because of changed circumstances warranting reconsideration. The Court now has the benefit of trial evidence including from witnesses that were subject to cross examination. The trial evidence demonstrates by a preponderance of the evidence that the statements were made during the course and in furtherance of a conspiracy.

## DISCUSSION

The *James* proceeding "was designed as a prophylactic measure so that the jury would not hear inadmissible and possibly prejudicial evidence." *United States v. Marquardt*, 695 F.2d 1300, 1304 (11th Cir. 1983). This purpose is accomplished by resolving the admissibility of co-conspirator statements ahead of trial and in particular discerning as a threshold matter whether the conspiracy existed. Here, there is abundant evidence that the conspiracy existed. The Court found a conspiracy existed after conducting a *James* hearing, ECF 559, and confirmed it when denying the

---

[1] If the Court grants this motion, the government will provide the Court with copies of the exhibits and interview reports underlying the supplemental log entries.

defendants' Rule 29 motions, ECF 932. Granting the government's motion is therefore fully consistent with the purpose of the *James* proceeding.

Second, it is appropriate to allow the government to supplement its *James* Log because a party has the right to adapt its approach based on what it has learned about the case. By the time trial starts, it will have been more than six months since the government submitted its *James* Log. Since that time, the case has been to trial, where the parties had the opportunity to examine and cross-examine witnesses, and obtain evidentiary rulings on documents and testimony.

Third, the rulings that the government seeks would not involve significant resources. The Court has already ruled after the *James* hearing that the charged conspiracy did exist and that all ten defendants and numerous other individuals knowingly joined the conspiracy. The Court's denial of the defendants' Rule 29 motions confirms the earlier findings. The Court would need simply to determine whether each of the statements was during the course and in furtherance of the already-established conspiracy, many of which were already admitted into evidence at trial without objection from any defendant. No hearing is necessary.

## The Supplemental James Log Entries

The Supplemental *James* Log entries[2] principally fall into six categories.

(1) <u>Co-Conspirator Statements Elicited from Witnesses at the First Trial</u>

---

[2] In the supplemental Log, the government's "Bases of 801(d)(2)(E) admissibility" column uses the same letter coding as it used in the initial Log. A key for the letter coding appears at ECF 358-5.

For most of the first trial, the defendants did not object to witnesses testifying to hearsay statements by co-conspirators that were not contained in documents and that were not on the original *James* log. For example, Robert Bryant testified that the three non-Pilgrim's employees that he heard most often engaging in price fixing were Carl Pepper, and Defendants Brady and Kantola. Bryant Tr. T. at 41 (11/1/2021). Also during Mr. Bryant's testimony, he described Defendant Austin telling RSCS at a 2014 meeting "that there was not a negotiation on price, that [Austin] just needed to know how many loads [RSCS] wanted to buy." *Id.* at 211 (11/2/2021). Those statements and others, made during the course of the defendants' conspiracy and in furtherance of it, were admitted into evidence at the first trial without objection.

Toward the end, however, beginning with the testimony of Mr. Joseph Brink of Pollo Tropical, the defendants started objecting to such testimony on that basis. This included testimony relating Defendant Little's statements to Mr. Brink that furthered Little's–and the rest of the conspiracy's–objective to raise prices to customers such as Pollo Tropical. The Court permitted Mr. Brink to testify to those statements, but they were received into evidence as party admissions, and therefore were only admissible against Defendant Little rather than admissible against all defendants.

To the extent witnesses testified to co-conspirator statements without objection from any defendant, the government respectfully submits that any failure at the first trial to object on *James* log grounds—whether prior to, during, or after Mr. Brink's testimony—constitutes a waiver that should carry over into the second trial in the interest of fairness. The government, out of an abundance of caution, nevertheless

4

requests the co-conspirator statements elicited from witnesses at the first trial be added to the *James* log, and ruled admissible ahead of the re-trial. The statements of which the government is presently aware that fall into this category are identified in supplemental *James* Log entries: 45-S to 47-S, and 53-S to 83-S.[3]

(2) <u>Co-Conspirator Statements to be Elicited from New Witnesses</u>

The government anticipates calling witnesses at the re-trial that it did not call in the initial trial. At least two of those witnesses—Pete Suerken and Carl Pepper—will likely testify to out-of-court statements made by the defendants and their co-conspirators during the course and in furtherance of the conspiracy. The statements of which the government is presently aware that would be offered against all defendants under Rule 801(d)(2)(E) are identified in supplemental *James* Log entries: 23-S to 44-S, 85-S to 89-S.[4] In addition, 19-S (GX-6337-38) and 22-S (GX-9743) are exhibits that the government intends to use with its new witnesses.

(3) <u>Co-conspirator statements in exhibits produced to the government during trial</u>.

Midway through trial, Claxton Poultry produced documents to the government. The government moved one of the exhibits, GX-9740, into evidence and it was admitted

---

[3] The government continues to analyze trial testimony and continues to receive certified trial transcripts as they are prepared. The government may identify additional co-conspirator statements elicited in trial testimony that it may seek to elicit at the re-trial. If the government identifies any such additional statements, it may seek to supplement this submission or otherwise seek a ruling of admissibility under Rule 801(d)(2)(E).

[4] The government will conduct additional interviews of these and other witnesses in preparation for trial. During those interviews, the government may learn of additional co-conspirator statements that they may testify to. If the government identifies any such additional statements, it may seek to supplement this submission or otherwise seek a ruling of admissibility under Rule 801(d)(2)(E).

against all defendants. Because the government did not possess the documents when the *James* Log was due, the government has now added three of the documents to its supplemental *James* Log: 6-S (GX-9730), 7-S (GX-9739), and 8-S (GX-9740).

(4) <u>Witness statements or reports after the *James* Log was submitted</u>.

After the *James* Log was submitted, the government continued to conduct witness interviews and receive reports of interviews that were conducted in the days leading up to the *James* Log submission. Because the government had no opportunity to place those statements onto its initial *James* Log, the government has submitted them on its supplemental Log: 48-S to 52-S, and 84-S.

(5) <u>New Exhibits containing co-conspirator statements</u>.

The government has added to its exhibit list documents that were not on its exhibit list for the first trial. One group of such documents is a set of handwritten documents, some of which contain co-conspirator statements. The government intends to call a new witness to authenticate the handwriting. Because the exhibits were not part of the exhibit list for the first trial and have been added for the re-trial, the government seeks a pre-trial ruling that the statements are admissible under Rule 801(d)(2)(E). These exhibits are *James* Log entries 9-S (GX-4968), 10-S (GX-1966), 11-S (GX-1967), 12-S (GX-1969), and 13-S (GX-6345).

In addition, the government has added to its exhibit list the following exhibits that contain co-conspirator statement relating to the 2014 KFC negotiations: 15-S (GX-1252), 16-S (GX-1253), 18-S (GX-1256), 20-s (GX-8098), and case weights for KFC, 4-S (GX-9869) and 90-S (GX-9870).

(6) <u>Exhibits not considered for Rule 801(d)(2)(E) because not on initial *James* Log</u>.

The government has added four supplemental *James* Log entries to account for documents that were not on the initial *James* Log but that the government intends to offer into evidence at the re-trial. In large part, these documents were not on the initial *James* Log because the Log was submitted on August 13, 2021, which was ten weeks before trial commenced. In the intervening ten weeks, the government continued to refine its case, identify additional potential trial exhibits and made choices about which documents to include/exclude from its exhibit list. These small number of documents did not make the *James* Log and when offered into evidence at trial were received as party admissions rather than admissible against all defendants (GX-247, GX-1713, and GX-9703), or not offered at all (GX-6179). The government believes it would be appropriate for the Court to now take up fully the merits of whether these exhibits contain statements admissible under Rule 801(d)(2)(E). These appear as entries: S-1, S-2, S-3, and S-5.

### *James* Log Entries for Reconsideration

The government asks the Court to reconsider eight *James* Log entries because of changed circumstances. For those entries, based on the additional information adduced at trial, the government has established by a preponderance of the evidence that each statement was made both during and in furtherance of the conspiracy. The statements fall into four main categories: (1) statements by co-conspirators Carl Pepper, Jimmie Little, and Thomas Lane made as part of the conspiracy's effort to not compete on price to supply Church's Chicken with frozen product, (2) statements by co-

conspirators Walter Cooper and Mikell Fries fixing prices in 2014 for chicken sold to Pollo Tropical, (3) Defendant Brady's statement to Defendant Fries relating to seeking information from competitors regarding KFC bids in October 2013. The government also seeks the Court's consideration of *James* Log entries 46 and 245, which the government had submitted as part of its initial *James* Log but subsequently withdrew as part of the government's effort to streamline the *James* hearing.

(1) Church's Frozen (Entries #50, 51, 52, 56, and 57). Mr. Pepper was a co-conspirator whose involvement in the conspiracy included fixing the price of frozen chicken to Church's with Jimmie Little. As part of the *James* hearing, the Court ruled that Mr. Pepper participated in the conspiracy by at least May 31, 2013 in part because he possessed competitor pricing information obtained from Defendants Little and Kantola. ECF 559 at 16. The information relates to a freezing charge that was being imposed on Church's Chicken. Mr. Pepper is expected to testify that he obtained the competitive information in telephone calls with these defendants shortly after he received a request from the customer about the prices to be charged for frozen chicken. He is expected to testify that he then shared this competitive information with two other co-conspirators, Defendants Roberts and Mulrenin. Mr. Pepper's statements to his co-conspirators and employees of Church's Chicken furthered the objective of the conspiracy, which was to use competitive information for the purpose of charging as high a price as could be sustained and without undercutting the prices of the competitors from whom the competitive price information was obtained.

Log #50 (GX-113). This email includes a message from Mr. Pepper to the Church's buyer stating, "I will get with our pricing group. I would think just a freezer cost but I will find out and get back with you[.]" Mr. Pepper's deception, giving the customer the false impression that Tyson's pricing will be purely an internal assessment, concealed the reality that Mr. Pepper consulted Defendants Little and Kantola about the price to be charged for frozen product. Efforts at concealment aid the conspiracy by helping to avoid its detection. This statement was therefore in furtherance of the conspiracy.

Log #51 (GX-108). On the same day that Little's statement in Log entry 51 was written, he had telephone calls with co-conspirator Carl Pepper. Mr. Pepper is expected to testify that, as a result of those calls, he learned the price that Pilgrim's was likely to charge for freezing Church's chicken. GX-120. Little's statement furthered the conspiracy because it gives the customer the impression that Little was consulting only with employees of his company, when in fact it concealed that Little was communicating with a competitor about the freezing charge. Efforts to conceal the conspiracy, like this one by Little, are statements that furthered the conspiracy.

Log #52 (GX-109). On May 31, 2013, Defendant Little and his co-conspirator, Thomas Lane, exchanged e-mails regarding the timing of when Mr. Lane will have pricing. This conversation occurred around the same time that Little and Pepper had telephone calls in which Little informed Pepper what Pilgrim's price will likely be. This set of statements furthered the conspiracy because it was a discussion informing

9

Defendant Little when to expect to receive price information that would advance the conspiratorial objective to conspire with his competitors on the price of frozen chicken.

Log #56 (GX-118). Four days later, on June 3, 2013, after securing competitive information from his conspirators, Mr. Pepper wrote an email to Defendants Roberts and Mulrenin with a draft response to Church's, which Defendant Mulrenin commented on and then Defendant Roberts re-wrote. The draft proposed a price at the high end of the competitive information Mr. Pepper obtained, *see* GX-120. Mr. Pepper's draft e-mail was a step in the direction of achieving the conspiracy's objective at this point in time: to use competitive information for the purpose of charging as high a price as could be sustained and without undercutting the prices of the competitors from whom the competitive price information was obtained. Mr. Pepper's statement also apprised other conspirators of the status of his efforts to achieve the conspiracy's objectives and sought each of their input on how best to achieve that objective which both then provided.

Log #57 (GX-119). Later that day, Mr. Pepper provided Church's with Tyson's price proposal, which was at the highest end of the range of prices Mr. Pepper obtained from his calls with Defendants Little and Kantola (and that he shared with Defendants Mulrenin and Roberts). This statement from Mr. Pepper was the completion of the objective of the conspiracy at that point in time: to propose the highest feasible price in consultation, rather than competition, with other suppliers.

(2) Pollo Tropical (Entries 152 and 163). The Court should reconsider statements that Jimmie Little, Walter Cooper, and Mikell Fries made as part of negotiating together

10

higher prices to supply chicken to Pollo Tropical because of the changed circumstances of Joseph Brink's trial testimony and Claxton's mid-trial production of documents. As the Court recognized in denying Jimmie Little's Rule 29 motion, there is sufficient evidence to conclude Defendant Little joined the conspiracy. The Court based this conclusion in part on Little's actions in price negotiations with Pollo Tropical. ECF 932 at 23. What was not available to the government at the time of the *James* submission was Mr. Brink's trial testimony which included his testimony that "Mr. Little refused to negotiate and told him that 'this is the price.'" *Id.* Also not available at the time of the government's *James* submission, because Claxton did not produce the document until mid-trial, was GX-9740. In GX-9740, Mr. Cooper states to Mr. Brink, echoing Defendant Little's negotiation position, that Pilgrim's is likely saying to Mr. Brink: "the price is the price with no consideration or explanation, take it or leave it." Mr. Cooper was aware of Defendant Little's negotiating position because during the negotiations with Pollo Tropical he "repeatedly communicated with Walter Cooper of Claxton." ECF 932 at 23.

As a result of these additional circumstances, the Court should revisit the following two rulings from the *James* Hearing:

Log #152 (GX-563).[5] Defendant Little's September 22, 2014, e-mail to co-conspirators Thomas Lane and Timothy Stiller said, regarding Pollo Tropical: "I need 2015 pricing for splits and breasts!" Little's request came shortly before he had calls with Mr. Brink and then Mr. Cooper. Given Mr. Brink's testimony, Little's request was made with the intent to obtaining price information from his conspirators in order to

---

[5] At trial, this Exhibit was moved into evidence by the defendants.

convey them to Mr. Brink and/or his co-conspirator, Mr. Cooper. As an alternate to ruling that this statement is admissible under Rule 801(d)(2)(E), the government asks the Court to rule that the defendants have waived any hearsay objection to Little's statement being admissible against all ten defendants.

Log #163 (GX-500). This is another exhibit that the defendants moved into evidence. This Exhibit starts as an email exchange between Mr. Brink and Mr. Cooper (whom the Court ruled had joined the conspiracy in 2012, ECF 559 at 15-16) regarding the price negotiations in 2014 for Pollo Tropical chicken supply. The Exhibit then became a discussion between Cooper and Defendant Fries in which Cooper reported to Fries regarding the status of the negotiations with Mr. Brink. Cooper's statements to Brink furthered the core conspiracy objective of fixing prices of chicken sold to Pollo Tropical. Cooper's statements to Defendant Fries furthered the conspiracy by reporting to another conspirator regarding the progress of the conspiracy and Fries' response to Cooper are receipt of feedback on how Cooper is handling his work seeking to achieve the conspiracy's objective. As an alternate to ruling that these statements are admissible under Rule 801(d)(2)(E), the government asks the Court to rule that the defendants have waived any hearsay objection to Cooper and Fries' statements being admissible against all ten defendants.

(3) KFC 2013 (Entry 73). The Court should reconsider Defendant Brady's statement to Defendant Fries made as part of Brady's effort to secure information from competitors during bidding for KFC's contracts in the fall of 2013. These changed circumstances include completion of a phone records analysis of the October-

November 2013 time frame that revealed Brady's calls with competitors, and the trial testimony of Michael Ledford. In denying Defendant Brady's Rule 29 motion, the Court noted that the evidence was sufficient to support a finding that he knowingly joined the conspiracy by November 2012. ECF 932 at 12. At trial, Michael Ledford testified that if competing chicken suppliers are communicating with each other about their negotiations with a customer, it would increase the supplier's bargaining power over the customer undermining price competition for the customer. Ledford Tr. T. at 528-30 (11/10/2021).

<u>Log #73 (GX-1700)</u>. In October 2013, during RSCS's contract negotiations with chicken suppliers, RSCS provided feedback to Defendant Brady on Claxton's Round 1 bid. Upon receipt of the feedback e-mail, Defendant Brady informed co-conspirator Defendant Fries: "Fyi. I will make some calls." Phone records indicate, as promised, Defendant Brady did make calls. The next day, he had calls with co-conspirators Timothy Mulrenin (see GX-9720, GX-9716), Jimmie Little (GX-9722), William Kantola (GX-9716), and Justin Gay (GX-9716). As the Court concluded in denying the defendants' Rule 29 motions, calls among competitors regarding bidding is part of the conspiracy. ECF 932 at 15 ("A reasonable jury could conclude that Mr. Mulrenin, whose company Mr. Bryant testified was part of the charged conspiracy, was speaking with Mr. Brady in order to shore up support for the price increase Tyson had included in its bid submission."). Defendant Brady's calls with competitors on November 1, 2013, enabled Defendant Brady to obtain information—"intel"—on bid information from co-conspirators. And Brady's statement to Defendant Fries that he will make some calls furthers the

conspiracy because it informed another conspirator of activities of the conspiracy. As an alternative to admission under Rule 801(d)(2)(E), Brady's statement is also admissible as a statement of his future plan or intent—"I will make some calls" in the context of receiving feedback on Round 1 bids—to prove that he acted in accordance with that plan or intention. *See* Fed.R.Evid. 803(3).

(4) Previously withdrawn entries (Entries 46 and 245). The government withdrew several *James* Log entries prior to the *James* hearing, in an effort to streamline the hearing and the Court's work in making rulings on a voluminous number of documents. The government now asks for rulings on two of the withdrawn entries because it intends to offer the exhibits at trial.

Log #46 (GX-6283). This is an e-mail from Tommy Francis to Brian Roberts dated May 7, 2013 in which he asked Roberts: "Do you have everyone's Popeye's price?" Though the government as part of the James hearing did not ask the Court to adjudicate whether this statement was admissible against all defendants by virtue of Rule 801(d)(2)(E), the Court did rule that the statement showed that Mr. Francis joined the conspiracy by at least May 7, 2013, the date of his email to Defendant Roberts, which itself implies that the statement was made as part of and to further the conspiracy. As the Court noted:

> On May 7, 2013, Tommy Francis of Mar-Jac Poultry emailed Mr. Roberts, who worked at Tyson Foods, asking whether he had "everyone's Popeye's price." Special Agent Taylor testified that, based on his investigation, "everyone" meant other competitors. He testified that this term was frequently used in other instances when gathering "intel" or other information on competitor's pricing. Special Agent Taylor's investigation and the context of this email, which occurred when supplies were attempting to set a price, is

14

> independent evidence that Mr. Francis joined the conspiracy by this date.

ECF 559 at 17-18. By seeking "intel" from Defendant Roberts, Mr. Francis was acting to further the conspiracy and his statement is admissible under Rule 801(d)(2)(E).

<u>Log # 245 (GX-1890-91)</u>. This is an e-mail exchange dated February 3, 2017, between two conspirators—Robert Bryant and Timothy Stiller—to discuss the pricing model that they planned to submit to KFC. Mr. Bryant testified that an objective of the conspiracy was for competitors to join together to minimize the price decrease during KFC negotiations. Submission of a pricing model to KFC would be part of advancing that objective, and therefore meeting convened for purpose of formulating the price submission would similarly be for the purpose of advancing that conspiratorial objective.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the requested relief.[6]

DATED: January 27, 2022           Respectfully submitted,

/s/ Michael Koenig
MICHAEL T. KOENIG
HEATHER D. CALL
CAROLYN L. SWEENEY
PAUL J. TORZILLI
Trial Attorneys
U.S. Department of Justice - Antitrust Division
450 Fifth Street NW, Suite 11300
Washington D.C. 20530
Tel: (202) 476-0435
michael.koenig@usdoj.gov

---

[6] In the event that the Court rules certain out-of-court statements do not satisfy the requirements of Rule 801(d)(2)(E), the government may nevertheless seek to establish admissibility at trial under an alternate basis.

15