1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 6

15 _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:35 a.m., on the 2nd day of November,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5   for Plaintiff.
 6           Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washingon, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16            Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

APPEARANCES (Continued)

1

2        Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5        Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7        Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10        James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12        Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14        Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16        Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19        John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1              APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                       PROCEEDINGS

16         THE COURT:  We are back on the record in 20-CR-152.

17   It looks like everyone is here.

18         Are we ready to bring the jury in?  I will take that

19   as yes.  Let's bring the jury in.

20         (Jury present.)

21         THE COURT:  Good morning, ladies and gentlemen.  Hope

22   you had a good evening.  As you recall, we are in the middle of

23   the direct of Mr. Bryant.

24         So Mr. Koenig, go ahead.

25         (**Robert Bryant** was previously sworn.)

1          **DIRECT EXAMINATION CONTINUED**

2      *BY MR. KOENIG:*

3      *Q.*  Thank you.

4              Good morning, Mr. Bryant.

5      *A.*  Good morning.

6      *Q.*  I would like to pick up where we left off yesterday.  I

7      have a few little random questions I would like to ask you.

8              Are you familiar with someone named Brenda Ray?

9      *A.*  I am.

10     *Q.*  Who is Brenda Ray?

11     *A.*  At the time when I worked with her, she was responsible for

12     our broad line accounts.

13     *Q.*  Meaning?

14     *A.*  Sysco, US Food Service, Gordon Food Service, those

15     customers I mentioned yesterday.

16             *MR. KORNFELD:*  Your Honor, can we ask the witness to

17     speak up a little bit?

18             *THE COURT:*  Sure.  If you don't mind, Mr. Bryant, if

19     you could just lean into the microphone just a little bit.

20     Obviously, you can adjust it a little bit too.  Thank you.

21     *BY MR. KOENIG:*

22     *Q.*  Could you just repeat what you said about broad line?

23     *A.*  Yes.  So Brenda Ray, she was responsible for the broad line

24     accounts when I worked with her, Sysco, US Foods, Gordon Food

25     Service, among some others.

Robert Bryant - Direct

1   *Q.* All right. And did she have that responsibility in 2012 as

2   well?

3   *A.* I believe so.

4   *Q.* Okay. And who was her supervisor in 2012?

5   *A.* I believe it was Jayson Penn.

6   *Q.* Okay. I want to see if you recognize an exhibit.

7           *MR. KOENIG:* Can you pull up, please, Ms. Pearce, 9262

8   and not for publication to the jury, of course.

9   *BY MR. KOENIG:*

10  *Q.* Do you recognize that exhibit?

11  *A.* I have seen this before, yes.

12  *Q.* And what is it?

13  *A.* It is a map of the U.S. with different regions and

14  different salespeople and their responsibilities, who is

15  responsible for those different areas.

16  *Q.* And what was it used for?

17  *A.* To assign responsibility of different accounts in regions

18  of the country. We gave contact information.

19  *Q.* Okay. Was this given to people outside the company?

20  *A.* I believe it was.

21  *Q.* All right. Is it something that was relied upon?

22  *A.* It was used, yes.

23  *Q.* All right. By whom?

24  *A.* Well, a lot of people inside and outside the company. It

25  was used to look and know who to contact.

Robert Bryant - Direct

1    *Q.*  Contact for what?

2    *A.*  Sales, you know, products, various chicken products that we

3    would sell.

4    *Q.*  And did you use this from time to time?

5    *A.*  I did.

6         *MR. KOENIG:*  Your Honor, the government offers 9262

7    into evidence.

8         *THE COURT:*  Any objection to the admission of

9    Exhibit 9262?

10         *MR. FELDBERG:*  May I just look at it, Your Honor?

11         *THE COURT:*  Yes.

12         *MR. TUBACH:*  It's hearsay, Your Honor.  The government

13    is attempting to rehabilitate Mr. Bryant's answers from

14    yesterday.

15         *MR. KORNFELD:*  Your Honor, I additionally think it

16    lacks foundation.

17         *MR. FELDBERG:*  I join the objection.

18         *MR. TUBACH:*  We could have a side bar if that's

19    easier, Your Honor.

20      (At the bench:)

21         *THE COURT:*  All right.  Mr. Tubach, go ahead.

22         *MR. TUBACH:*  Your Honor, yesterday the witness

23    testified he knew Mr. McGuire's telephone number and he got it

24    wrong.  And he is now attempting to get him to look at the

25    document and get him to give him the right number when the

Robert Bryant - Direct

1  witness' testimony is quite clear.  He originally tried to

2  refresh his recollection with this document yesterday and the

3  Court sustained the objection on the ground that he didn't need

4  his recollection refreshed because he remembered the number.

5  This is just another attempt to get him to change his testimony

6  about the telephone number for Mr. McGuire.

7       THE COURT:  Well, the question is the admissibility of

8  the document, not what his strategy is.

9       Mr. Kornfeld?

10      MR. KORNFELD:  Your Honor, I think the witness also

11 has not established foundation for his knowledge of the

12 document.  It contains a number of names.  There has been no

13 testimony he knows these people.  A number of alleged or

14 attributed e-mails and phone numbers, no testimony about that.

15 It breaks the country apparently into different regions, no

16 testimony about that.  So I think from a simple foundational

17 standpoint the government has failed to lay the requisite

18 foundation.  Thank you.

19      THE COURT:  Mr. Koenig, response?

20      MR. KOENIG:  Well, I mean, I think he said they used

21 this in the ordinary course of business and it's used by people

22 both internal and external and relied upon so they know who to

23 contact.  It has all the indicia of reliability.

24      THE COURT:  Objections are overruled.  I do find it's

25 a business record.  It's -- this witness knows about the

Robert Bryant - Direct

1    different regions, the map.  He identified the map as the

2    regions.  He indicated that it's used within the company, that

3    it's sent outside the company which is an indication of its

4    reliability as well.  I find it is admissible.  Objection is

5    overruled.

6         (In open court:)

7              THE COURT:  The objection will be overruled and

8    Exhibit 9262 will be admitted.

9              MR. KOENIG:  Thank you, Your Honor.  Permission to

10   publish to the jury?

11             THE COURT:  You may.

12   BY MR. KOENIG:

13   Q.  All right, Mr. Bryant.  Can I direct your attention to the

14   second to the last line of the exhibit?

15   A.  Yes.

16   Q.  Yesterday do you recall testifying that Jason McGuire's

17   desk phone number ended in 4711?

18   A.  I do.

19   Q.  Okay.  After reviewing the bottom line --

20             MR. KOENIG:  And Ms. Pearce, could you just blow this

21   up?

22   BY MR. KOENIG:

23   Q.  After reviewing this exhibit, do you still want to stand by

24   that answer?

25   A.  No.  I hadn't called Jason McGuire in many years and

Robert Bryant - Direct

1   thought I remembered his number.  I must have gotten that

2   incorrect.

3   Q.  Okay.  So do you believe that 7511 are the actual last four

4   digits of his number?

5   A.  Yes.

6       MR. KOENIG:  Thank you.  You can take that down.

7   BY MR. KOENIG:

8   Q.  Okay.  Yesterday when we left off we were talking about KFC

9   negotiations in 2014; is that right?

10  A.  That's correct.

11  Q.  If we could just back up to the first round of negotiations

12  or first round of bid submissions that you said occurred in

13  August, correct?

14  A.  That's correct.

15  Q.  And I think that you also testified that -- did the plan to

16  raise prices apply just to KFC?

17  A.  No.

18  Q.  What else did it apply to?

19  A.  The rest of the QSR business and other customers that we

20  serviced out of the small bird.

21  Q.  Such as?

22  A.  Including the retail deli.  The primary focus initially was

23  the QSR business.  We did attempt to raise prices in the retail

24  deli business also.

25  Q.  But, I mean, when I said such as, I meant QSRs such as

Robert Bryant - Direct

1  what?

2  A.   KFC, Popeye's, Church's, Bojangles.  The goal was to get

3  price increases from all of them.

4  Q.   Boston Market?

5  A.   Yes.

6  Q.   Was Boston Market sometimes referred to by a short like

7  acronym?

8  A.   Yeah, but I don't recall what we called them back then.

9  It's been several years since we had that business now.  I

10  don't recall what -- off the top of my head, I don't recall

11  what we called them back then.

12  Q.   Have you ever seen the initials BM?

13         MR. FAGG:  Objection, leading.

14         THE COURT:  Overruled.

15  A.   Yes, and that could have been Boston Market in an e-mail,

16  short for them.

17  BY MR. KOENIG:

18  Q.   So was there any sort of strategy in terms of which QSRs,

19  which fast-food restaurants to increase with price first?

20  A.   Yes.

21  Q.   And what was that strategy?

22  A.   We wanted to get KFC done first.

23  Q.   Why?

24  A.   They were the largest customer, anchor customer.  And we

25  had a belief that if we got the price increases done at KFC,

Robert Bryant - Direct

1   that it would make the rest of the negotiations easier.

2   Q.  How so?

3   A.  We got the anchor customer done and that there would be

4   momentum out there and that word would spread about the price

5   increase and that it would make the future negotiations easier.

6   Q.  Okay.  And did that strategy of going after KFC first, was

7   it effective?

8   A.  It was.

9   Q.  Could you explain that?

10  A.  We were able to get KFC done first.  And after that the

11  intensity level went down and the rest of the negotiations went

12  rather smoothly after that.

13  Q.  Okay.  All right.  If you could just remind the jury, you

14  talked yesterday about sort of the different steps in an RFP

15  process.  There was the invitation.  Do you remember that?

16  A.  Uh-huh.

17  Q.  And then there is the invitation, the bid, and then the

18  deadline, right?

19  A.  Correct, yes.

20  Q.  And then what happens?

21  A.  So typically there is the invitation to bid.  You submit

22  pricing.  You get feedback from your pricing and there is

23  usually an ask for revised pricing, revise your price down.

24  Typically there is -- and generally I would ask going into

25  negotiations how many rounds do we think there is going to be

Robert Bryant - Direct

1   after our first submission and sometimes there is two or three

2   rounds.  So in that first submission you build in some cushion

3   so you could offer some concessions in those rounds.

4   Q.  And do you remember yesterday testifying about the term

5   blind bid?

6   A.  I do.

7   Q.  And just remind the jury, please, what you meant -- your

8   understanding of the word blind bid.

9   A.  Yeah, a blind bid is, as I said yesterday, would be similar

10  to you sealing your bid in an envelope and keeping it secret

11  and then only the person on the other side would know what your

12  bid was.

13  Q.  And do you have an understanding of the purpose of a blind

14  bid?

15  A.  Yes.

16  Q.  What is the basis for that understanding?

17  A.  To increase competition for the bid.

18  Q.  Meaning what?

19  A.  Meaning that if you're unsure how aggressive your

20  competition is going to be, then you have to put forth your

21  most competitive or aggressive price during the bid process.

22  Q.  Okay.  And I believe you testified yesterday that it was

23  your understanding that that is what KFC expected.

24        MR. LAVINE:  Objection, Your Honor, leading.  Not only

25  leading, Your Honor, but he has already gone through this

Robert Bryant - Direct

1    yesterday.  This is a repeat of testimony from yesterday.

2          THE COURT:  Right.  I am going to sustain the

3    objection.  You can remind him of a topic, but let's not

4    recount the testimony.

5          Go ahead.

6    BY MR. KOENIG:

7    Q.  Okay.  Well, just to reset, can you just -- what is the

8    purpose of a blind bid?  Can you just repeat that?

9          MR. LAVINE:  Object, Your Honor.  This has already

10   been asked and answered.

11         THE COURT:  Sustained.

12   BY MR. KOENIG:

13   Q.  In 2014 in negotiations for KFC, how did the bidding work

14   in reality?

15   A.  In reality?

16   Q.  Yes.

17   A.  From KFC?

18   Q.  For KFC, the bidding for KFC.

19   A.  It was --

20         MR. LAVINE:  Objection, Your Honor.  This was asked

21   and answered yesterday.

22         THE COURT:  Overruled.

23   A.  In 2014 there was a bid submission request from KFC, and we

24   used a model to submit a price for our bid in 2014.

25   BY MR. KOENIG:

917

Robert Bryant - Direct

1  Q.  Okay.  Did you use a blind bid?

2  A.  Not that I'm aware of.

3  Q.  What did you use instead of a blind bid?

4        MR. TUBACH:  Objection, lacks foundation.

5        THE COURT:  Sustained.  If you could ask for his

6  foundation for that.

7  BY MR. KOENIG:

8  Q.  Did you have an understanding that something other than

9  blind bid was used?

10  A.  Yes.

11  Q.  What's the basis for that understanding?

12  A.  Conversations with my manager, Jason McGuire, and

13  additionally the e-mail that we reviewed yesterday about "that

14  should help y'all out some."

15  Q.  So what was your understanding of what was used instead of

16  a blind bid?

17  A.  My understanding was that we had competitor information

18  that we used during the bid process to influence the outcome of

19  the bid.

20  Q.  Influence in what way?

21  A.  To maintain the price increases that we asked for.

22  Q.  So by "we," who do you mean?

23  A.  We being Pilgrim's and our competitors.

24  Q.  So what was the goal?

25  A.  The goal was to raise -- to increase prices.

918

Robert Bryant - Direct

1    *Q.*  Together?

2    *A.*  Together, yes.

3         *MR. KOENIG:*  Can we pull up, please, Exhibit 1085?

4    *BY MR. KOENIG:*

5    *Q.*  Do you recognize 1085?

6    *A.*  I do.

7    *Q.*  What is it?

8    *A.*  It's an e-mail from Roger Austin to myself, Jason McGuire,

9    Tommy Lane, Justin Gay, on August 20th of 2014.

10   *Q.*  And what does the e-mail relate to?

11   *A.*  It relates to our KFC bid for -- in 2014.

12   *Q.*  Okay.  And does it have attachments?

13   *A.*  It does.

14        *MR. KOENIG:*  Your Honor, we offer Government Exhibit

15   1085 into evidence.

16        *THE COURT:*  Any objection to the admission of

17   Exhibit 1085?

18        *MR. FELDBERG:*  None from us, Your Honor.

19        *THE COURT:*  Exhibit 1085 will be admitted.

20        *MR. KOENIG:*  And if we could also pull up 1086.

21   *BY MR. KOENIG:*

22   *Q.*  Do you recognize 1086?

23   *A.*  Yes.

24   *Q.*  What is it?

25   *A.*  It's part of the cost model or bid submission for KFC in

Robert Bryant - Direct

1    2014.

2    Q.  Is it the attachment to 1085?

3    A.  It is.

4         MR. KOENIG:  Your Honor, we move the admission of

5    1086.

6         THE COURT:  Any objection to the admission of 1086?

7         MR. KORNFELD:  Yes, Your Honor, objection is hearsay.

8         THE COURT:  Response?

9         MR. KOENIG:  Well, I don't think it is hearsay.  It's

10   a bid submission.  And, you know, Your Honor in the *James*

11   ruling -- this one --

12        THE COURT:  Let's side bar.

13      (At the bench:)

14        THE COURT:  We have to be real careful not to recount

15   in front of the jury court rulings.  Those will have an undue

16   influence over the jury and also would perhaps necessitate me

17   mentioning other things about it, so we can't do it.  If you

18   really need to talk about it, you could say something such as

19   we previously talked about this or something of that nature,

20   okay?

21        So go ahead, Mr. Koenig, with what you wanted to say.

22        MR. KOENIG:  There is a couple things.  This wasn't in

23   the *James* log, but Your Honor already in the *James* ruling ruled

24   that a bunch of other very, very similar type bid submissions

25   qualified under 801(d)(2)(E).  Also, Mr. Sangalis the other day

Robert Bryant - Direct

1   testified that bids are maintained in the ordinary course of

2   business, laid a foundation.  So we think not only would this

3   come in as a co-conspirator statement, but also under 803(6) as

4   a business record.

5         THE COURT:  Mr. Kornfeld, anything else?

6         MR. KORNFELD:  A couple things.  No. 1, this is a

7   draft bid.  No. 2, this wasn't subject to the government's

8   James log.  They picked the things they wanted you to rule on

9   under 801(d)(2)(E) and they didn't pick this one.  So I think

10  it's classic hearsay and I don't think this has been properly

11  authenticated.

12        THE COURT:  All right.  The objection will be

13  overruled.  Mr. Koenig is exactly right.  Mr. Sangalis

14  testified that contracts of this nature were business records

15  used in the ordinary course of business.  There is, of course,

16  every reason to believe that information on a bid submission

17  such as this would be correct.  After all, it's being submitted

18  to the anchor client.  Moreover, this is a document that was,

19  according to the testimony Mr. Sangalis, was kept in the

20  ordinary course of business.  I do find it comes in under the

21  business records exception.  Thank you.

22     (In open court:)

23        The objection will be overruled and Exhibit 1086 will

24  be admitted.

25        MR. KOENIG:  Permission to publish to the jury 1086?

Robert Bryant - Direct

1          *THE COURT:*  You may.

2    *BY MR. KOENIG:*

3    *Q.*  All right, Mr. Bryant.  What is the jury looking at here?

4    *A.*  It's the KFC cost model for the bid submission in 2014.

5    *Q.*  If you could read to the jury --

6          *MR. KOENIG:*  If you could just blow up that top left

7    corner.

8    *BY MR. KOENIG:*

9    *Q.*  Mr. Bryant, what does all that mean?

10   *A.*  This model is based off current pricing and current cost,

11   current up to period nine, and then it's comparing it to our

12   proposed cost with a difference, whether or not those

13   individual cost or profit line items were going up and down.

14   *Q.*  Can you explain to the jury what a period is?

15   *A.*  Yeah.  There is -- similar to the month and the years,

16   there is different periods inside the year.  So in this

17   particular one, and I don't know if this particular one is

18   based off KFC's period or Pilgrim's period, I don't recall

19   that, but each -- the counting calendar is different for

20   different companies, so they call them periods rather than

21   months.

22   *Q.*  Okay.  So what is the purpose of -- you heard the term

23   period pricing?

24   *A.*  Yes.

25   *Q.*  What is period pricing?

Robert Bryant - Direct

1    *A.*  Period pricing, this would be a way that we would come up

2    with period pricing and it would be reflective of if there was

3    adjustment in the case weight or the grain position for the

4    current period.

5    *Q.*  Okay.  So every period what happens?

6    *A.*  The cost, most of the cost does not change on this model

7    during the course of the contract, but grain does change based

8    off the KFC's position on grain.

9    *Q.*  Okay.  So even though a contract may be negotiated for a

10   given year, does that mean the pricing can still change through

11   the year?

12   *A.*  It can.

13   *Q.*  Okay.  So how often does it change?

14   *A.*  It could change each period if there is changes in grain or

15   other factors.  I mean, the basis technically stays the same.

16   But particularly with KFC, they are called cost models, and the

17   customer has some influence in their price by they can -- they

18   take positions on grain and grain is a large factor in the

19   total cost of the product that they're producing.  And they can

20   choose to take a short position, which would mean that they

21   would be month to month or a very short position or they could

22   take a longer position if they think grain is going to be

23   relatively cheap for a longer period of time.  And that would

24   lock in their price that they perceive to be cheaper for a

25   longer period of time.  So the customer had some influence in

Robert Bryant - Direct

1    that.

2             MR. KOENIG:   Okay.  Ms. Pearce, can you just blow up

3    like the first five or six lines?

4    BY MR. KOENIG:

5    Q.  All right.  So if you could just walk us through like what

6    is chick cost?

7    A.  That's our cost to produce like a baby chick.

8    Q.  Like you buy an egg and hatch it?

9    A.  Well, breeders and pullets and get it through the hatchery

10   to a baby chick.

11   Q.  Then you buy the chick.  And what's grower pay?

12   A.  That's how much we were paying.  So we don't have the

13   housing ourselves for the growers, so we contract with

14   individual farmers to grow the birds and that's the pay to

15   those growers.

16   Q.  All right.  Now, do you see the second -- well, do you see

17   the line that says feed cost per pound?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  That's how much it costs us to feed those birds per pound

21   of meat, so that's the feed cost.

22   Q.  Is that the grain you were talking about?

23   A.  That's the grain, yes, among others, yes.

24   Q.  The grain is just shorthand for the food the chickens eat.

25   A.  Yes.

924

Robert Bryant - Direct

1   Q.  And that's what you said can fluctuate from period to

2   period?

3   A.  Yes.

4   Q.  Of all the costs there, what is the most significant cost?

5   A.  The feed cost.

6        MR. KOENIG:  All right.  And then if we could, can you

7   unzoom for a second, please?  Go up to the column headers

8   purple.

9   BY MR. KOENIG:

10  Q.  Can you explain what those different words mean?

11  A.  Yeah.  So current is current pricing and current cost for

12  each of those line items.  And then purple proposed is -- would

13  be what we were proposing to submit to KFC for this bid.  And

14  then difference would be just the subtraction from between the

15  two.

16  Q.  So let's back up.  What does purple refer to?

17  A.  Purple is -- was the traditional eight-piece that KFC

18  bought.

19  Q.  Why is it called purple?

20  A.  We put a purple label on it because it just made it easier

21  to identify in the store for their employees.  So there was

22  another product, and it's on this page orange which at the time

23  was the grill product, so instead of store employees having to

24  memorize different codes from different suppliers, they had a

25  purple label and an orange label on it and the dark meat was

Robert Bryant - Direct

1    red label.

2    *Q.*  Okay.  So when you hear somebody say purple label, that

3    refers to what, the traditional --

4    *A.*  Eight-piece.

5    *Q.*  Okay.  The fried chicken?

6    *A.*  Correct.

7    *Q.*  Is that the kind you get in a bucket?

8    *A.*  Yes.

9    *Q.*  All right.  Now, the column that says current, was that

10   column there, was that the then current period nine pricing?

11   *A.*  That's correct, yes.

12   *Q.*  And proposal means what again?

13   *A.*  That's what we were proposing to submit to KFC, our

14   proposal to KFC.

15   *Q.*  That was your proposal to KFC for what?

16   *A.*  The 2014 negotiations.

17   *Q.*  For what years would that cover?

18   *A.*  That would cover 2015, 2016 and 2017.

19   *Q.*  All right.  And then the difference is just subtracting

20   those two columns?

21   *A.*  That's right.

22       *MR. KOENIG:*  Can you please, Ms. Pearce, blow up the

23   bottom three, four rows in a half page?

24   *BY MR. KOENIG:*

25   *Q.*  All right.  Can you explain to the jury what supplier

Robert Bryant - Direct

1    margin, what that line means?

2    A.   That line would be our profit per pound.

3    Q.   Okay.  So have you ever heard the term above the line?

4    A.   Yes.

5    Q.   What does that mean?

6    A.   Generally we use that term above the line to mean things

7    above the supplier margin line.  We are really dealing with

8    cost.  So this was the profit line so we commonly called it

9    above the line, so the rest of the page above that line.

10   Q.   All right.  So the things that are above the line, meaning

11   above supplier margin, those are what?  You said costs?

12   A.   Generally speaking, yes, costs, yes.

13   Q.   And I don't mean everything above, but in general are those

14   the kind of things that can vary from period to period?

15   A.   I don't recall changing these, the above the line, other

16   than the feed, the feed line on this model.

17   Q.   All right.  And then so the supplier margin, who is the

18   supplier in this case?

19   A.   That would be Pilgrim's.

20   Q.   Okay.  And the margin refers to what?

21   A.   Profit per pound.

22   Q.   Profit per pound.  So in the current column, that's the

23   first column, right?

24   A.   That's correct.

25   Q.   So for period nine in 2014, what was Pilgrim's profit per

927

Robert Bryant - Direct

1    pound of eight-piece?

2    A.   .1175 cents per pound.

3    Q.   So 11 and three-quarter cents per pound?

4    A.   That's correct.

5    Q.   And what did Pilgrim's propose for calendar year '15 for

6    its margin?

7    A.   .2175.

8    Q.   All right.  Per pound?

9    A.   That's correct.

10   Q.   And so how much of an increase per pound to the profit

11   would that represent?

12   A.   10 cents.

13   Q.   Okay.  And did Pilgrim's end up getting that 10 cents

14   increase in profit?

15   A.   Yes.

16   Q.   All right.  As of this time how many pounds of eight-piece

17   chicken on the bone did Pilgrim's anticipate selling to KFC in

18   2015?

19   A.   I don't recall exactly, but it was probably around a

20   hundred million pounds.  No, it would have been more than that.

21   We were probably closer to 200 million pounds.  It was when we

22   had the orange, we were -- at one time we were between a

23   hundred and 130 loads a week.  A hundred loads a week would be

24   200, 200 million pounds.

25   Q.   And so what was the extra anticipated revenue, then?

Robert Bryant - Direct

 1          MR. FAGG:  Objection, Your Honor, calls for

 2    speculation.  He just said that he doesn't know how many pounds

 3    they were selling to KFC and how many pounds they anticipated

 4    selling to KFC.  It's a very large range.

 5          THE COURT:  He can answer to his recollection.

 6    Overruled.

 7          MR. KORNFELD:  Your Honor, excuse me, I also interpose

 8    a relevance objection.

 9          THE COURT:  I will allow this question.  Overruled.

10    A.  On 200 million pounds, that would be approximately

11    $20 million annually.

12    BY MR. KOENIG:

13    Q.  And how did you say that your bonus was structured?

14    A.  Basically off profitability.

15    Q.  Meaning what as far as profitability?

16    A.  The more profit, you know, the larger the potential bonus,

17    so it could be as high as 200 percent as I said before.

18    Q.  And you said -- I believe you said before that you got

19    similar type price increases from other fast-food restaurants

20    other than KFC?

21    A.  That's correct.

22    Q.  Going into these negotiations, you know, in like say 2014,

23    2013, do you recall what percent your bonus was at?

24    A.  I don't recall what our bonus funding was at prior to 2014.

25    Q.  Was it maxed out?

Robert Bryant - Direct

1   *A.*  Not that I recall, no.

2   *Q.*  What about 2015 and 2016 and 2017?

3   *A.*  I think 2015 it was 200 percent.  I think 2016 was as well

4   in that business unit.  2017, I don't think it was.  We had

5   some depreciation in the market, like I mentioned before, and I

6   think it might have slipped to 125 or 150.

7   *Q.*  But for the two years following your bonus was maxed out.

8   For the two years following 2014 your bonus was maxed out?

9   *A.*  I believe it was, yes.

10  *Q.*  And it hadn't been previously.

11  *A.*  Not that I remember, no.

12  *Q.*  We looked yesterday at the end of the day at Exhibit 1066.

13  Do you recall that?

14       *MR. LAVINE:*  Objection, Your Honor.  I believe if he

15  is done with this exhibit, it should come down.

16       *MR. KOENIG:*  I am sorry, yeah.

17  *BY MR. KOENIG:*

18  *Q.*  Do you recall 1066, the one we ended on yesterday?

19  *A.*  The should help you out some?

20  *Q.*  The what?

21  *A.*  Where Jason McGuire made the comment:  This should help

22  y'all out some?

23  *Q.*  Yes.  And I am having a little trouble hearing you.

24  *A.*  Sorry, I am leaning in.

25  *Q.*  Right.  And so what did you say, just to reorient the jury,

Robert Bryant - Direct

1   what did you say the effect on your mindset was of receiving

2   that e-mail?

3   A.   It was -- Jason McGuire was trying to build my confidence

4   and reassure me that we were going to get the price increases

5   and that our competitors were going along.  And it did reassure

6   me.

7   Q.   Okay.  Did you also say you had a meeting the day or two

8   after that?

9   A.   We did.

10  Q.   Who was that meeting with?

11  A.   KFC.

12  Q.   And RSCS?

13  A.   Yes.

14  Q.   Did you attend that meeting?

15  A.   I did.

16  Q.   Who else from Pilgrim's attended that meeting?

17  A.   I believe it was myself, Roger Austin and Scott Tucker.

18  Q.   And who from RSCS or KFC attended the meeting?

19  A.   I believe it was Pete Suerken, Steve Campisano, Rich

20  Eddington and Sara Fisher or Mary Hester.

21  Q.   What happened at that meeting?

22  A.   It was a meeting about supply availability and there was

23  conversations about our previous bid submission.

24  Q.   So this is after Pilgrim's submitted that bid that we just

25  looked at?

931

Robert Bryant - Direct

1    A.  That's correct, yes.

2    Q.  All right.  And what was the discussion that was --

3    A.  On the bid or --

4    Q.  Yeah.

5    A.  Yeah.  What I recall is that KFC asked was there any room

6    in that -- the bid that we submitted.  You know, it was a

7    significant price increase.  And Roger, Roger clarified to them

8    that --

9    Q.  Last names too, please.

10   A.  Roger Austin clarified to KFC that there was not a

11   negotiation on price, that he just needed to know how many

12   loads they wanted to buy.

13        MS. HENRY:  Your Honor, could we have the documents

14   put up and down when they are being moved instead of just

15   keeping them up?

16        MR. KOENIG:  Well, it's not published to the jury, but

17   you can take this down.

18        THE COURT:  Right.  Unless it's published to the jury,

19   obviously Mr. Koenig can leave it up.

20   BY MR. KOENIG:

21   Q.  All right.  I am sorry, can you repeat what it is that --

22   you said they asked for -- if there was room to go down in

23   price?

24   A.  That's correct, yes.

25   Q.  And what was the response?

Robert Bryant - Direct

1   *A.*   Roger Austin told them that there was no negotiation on

2   price, that he just needed to know how many loads that they

3   wanted to buy.

4   *Q.*   All right.  And how would you -- did you have an

5   opportunity to observe Mr. Austin's demeanor in that meeting?

6   *A.*   Yes.

7   *Q.*   What did you observe?

8   *A.*   He was very confident in his negotiating position.

9   *Q.*   Okay.  When you first took the stand this morning, I

10  believe you talked about building in room in the first round

11  bid.  Do you recall that?

12  *A.*   I do.

13  *Q.*   Can you just remind the jury what it is you said?

14          *MR. TUBACH:*  He is asking for testimony he gave

15  earlier.

16          *THE COURT:*  Sustained.

17  *BY MR. KOENIG:*

18  *Q.*   Why did you build in room in the first round bid typically?

19  *A.*   So you could offer some pricing concessions in the rounds,

20  each round that they asked for something.

21  *Q.*   All right.  And were pricing concessions offered in the

22  round in 2014?

23  *A.*   Not that I recall.

24  *Q.*   Now, after -- well, what was your typical practice with

25  regard to customer meetings like this?  And what I mean is did

933

Robert Bryant - Direct

1   you have pre-meetings, post-meetings, that kind of thing?

2          *MR. TUBACH:*  Lacks foundation.  He testified this is

3   his first entry into national accounts.

4          *THE COURT:*  Sustained as to foundation.

5   *BY MR. KOENIG:*

6   *Q.*  In this August 22nd-ish meeting, did you have pre-meetings

7   and -- a pre-meeting and a post-meeting?

8   *A.*  Yes.

9   *Q.*  And what was the purpose of those pre and post-meetings?

10  *A.*  The pre-meeting was to set expectations for the bid

11  submission.  And then the post-meeting was to review the bid

12  submission and give the -- the customer would normally ask for

13  some concessions and for us to explain our position why they

14  weren't warranted.

15  *Q.*  Okay.  At some point during either the pre-meeting or the

16  post-meeting, did you observe Roger Austin on the telephone?

17  *A.*  I did.

18  *Q.*  Could you please describe what you observed to the jury?

19  *A.*  I just remember in 2014 after the bid submission when I was

20  in Louisville for a follow-up meeting with KFC, we generally

21  met before the meeting and again after the meeting.  And I

22  don't recall exactly when the phone call took place, but I just

23  remember walking into Roger's office and he was on the phone

24  with someone.  And he was saying something to the effect of, "I

25  told them the price is the price.  I just need to know how many

Robert Bryant - Direct

1   loads they want at that price."

2          And when he hung up the phone, he told me that it was

3   either Bill Kantola or Scott Brady.  And then it was a very

4   short time later he was on the phone with someone else and

5   basically repeated the same sentence, you know, "The price is

6   the price.  I just need to know -- I told him the price is the

7   price.  I just need to know how many loads they want at that

8   price."  And he announced who he was on the phone with at that

9   time as well and same thing -- I don't remember the order, that

10  it was Scott Brady and Bill Kantola.

11  Q.  So there were two calls you observed.

12  A.  That's correct.

13  Q.  One with Scott Brady.

14  A.  That's correct.

15  Q.  One with Bill Kantola.

16  A.  That's correct.

17  Q.  But you just don't remember which order.

18  A.  That's correct.

19  Q.  Who was first, who was second.

20  A.  I was pacing around the office a little bit, walking, and I

21  was in and out of Roger's office at the time.  And I just

22  remember walking in and hearing him because he was pretty loud

23  when he was saying those words.  And then when he hung up, he

24  announced who it was that he was speaking to.  And that

25  happened twice in a short period of time while I was pacing

935

Robert Bryant - Direct

1    inside -- at the time we had an office in Louisville.

2    Q.  And what was your understanding of, "The price is the

3    price.  I just need to know how much you need," or whatever

4    words to that effect?

5    A.  It was basically our position with KFC and our refusal to

6    negotiate in 2014.

7    Q.  All right.  Did you have an understanding as to why

8    Pilgrim's -- well, or why Mr. Austin refused to negotiate in

9    2014?

10             MR. FELDBERG:  Objection, foundation.

11             THE COURT:  Overruled.

12   A.  I mean, he had --

13   BY MR. KOENIG:

14   Q.  Well, just yes or no.  Did you have an understanding?

15   A.  Yes.

16   Q.  What was the basis for your understanding?

17   A.  The e-mails from Jason McGuire and conversations with Jason

18   McGuire.

19   Q.  And so what was your understanding of why Roger Austin

20   refused to negotiate with KFC?

21   A.  Because we knew that our competitors were raising prices

22   similar to what we were raising prices and they were not going

23   to concede price either, so there wasn't a need to negotiate.

24   Q.  So how did the conduct you just described in 2014, how does

25   that compare in relation to 2017 with KFC?

936

Robert Bryant - Direct

1   *A.* I mean, it's similar. It's just rather than getting a

2   price increase, it was meant to help negate a price decrease in

3   2017.

4   *Q.* Okay. Did you have -- in 2014 did you have an

5   understanding as to whether there was an agreement among the

6   competitors who were bidding for KFC?

7        *MR. KORNFELD:* Objection, Your Honor. That goes to

8   the ultimate issue.

9        *THE COURT:* Overruled.

10       *MR. TUBACH:* And it's a legal conclusion, Your Honor.

11       *THE COURT:* I am sorry, what was that?

12       *MR. TUBACH:* It's a legal conclusion.

13       *THE COURT:* Overruled.

14       *MR. POLLAK:* Your Honor, lack of foundation with

15   regard to unspecified competitors, plural.

16       *THE COURT:* I will sustain the objection as to

17   vagueness. If you can clarify that.

18   *BY MR. KOENIG:*

19   *Q.* Who were Pilgrim's competitors in 2014 for KFC?

20   *A.* Same ones that we've reviewed yesterday, so Tyson, Mar-Jac,

21   Koch, Claxton, George's. I think I covered them all there.

22   *Q.* So among those companies did you have -- and including

23   Pilgrim's too, did you have an understanding as to whether

24   there was an agreement among those competitors in the 2014 KFC

25   negotiations?

1          MR. POLLAK:  Your Honor, same objection.  He has

2    identified who the competitors were, but he has not laid a

3    foundation for having the basis of knowledge for competitors

4    other than the two who he says he heard phone calls with.

5          THE COURT:  He can answer the question yes or no.

6    A.  Yes.

7    BY MR. KOENIG:

8    Q.  What is the basis for your understanding?

9    A.  The e-mails from my manager McGuire and conversations with

10   Jason McGuire.

11   Q.  All right.  What conversations?

12   A.  There was a conversation after the e-mail where he was

13   reassuring me --

14          MR. LAVINE:  Objection, Your Honor, hearsay.

15          THE COURT:  Response?

16          MR. KOENIG:  Your Honor, Mr. McGuire is -- it would be

17   an 801(d)(2)(E) statement.

18          THE COURT:  Overruled.

19   A.  He reassured me that our competitors were going along with

20   the price increases.  And when he used the word competitors, I

21   understood that to mean all of them, not just the two that I

22   heard the conversation about.

23   BY MR. KOENIG:

24   Q.  Why was it your understanding it was all of them?

25   A.  That was -- that was the discussion that we had.  It wasn't

Robert Bryant - Direct

1   just Pilgrim's.  It was everybody went in with a higher price,

2   and by everybody I meant everybody with a bid submission to

3   KFC.

4   Q.  Those companies you just named?

5   A.  That's correct, yes.

6   Q.  So what was your understanding as to whether there was an

7   agreement among those companies in the 2014 KFC negotiation?

8        MR. LAVINE:  Objection, Your Honor.  It's already

9   asked and answered.

10       THE COURT:  Overruled.

11  A.  My understanding was that there was, you know, an effort to

12  build pricing support within the industry and ultimately they

13  submitted higher prices.  And then we chose not to negotiate in

14  2014 and ultimately we received higher prices.

15  BY MR. KOENIG:

16  Q.  Okay.  I guess what I asked you is what was your

17  understanding of whether there was an agreement?

18       MR. FELDBERG:  That's been asked and answered, Your

19  Honor.

20       THE COURT:  Overruled.

21  A.  It was my understanding that there was an agreement.

22  BY MR. KOENIG:

23  Q.  And what was the nature of the agreement in your

24  understanding?

25  A.  To raise prices.

Robert Bryant - Direct

1    *Q.*   Together.

2    *A.*   Together, yes.

3    *Q.*   As competitors.

4    *A.*   That's correct.

5    *Q.*   And is it your understanding that all the competitors did,

6    in fact, receive price increases?

7    *A.*   That's my understanding, yes.

8    *Q.*   I believe that you mentioned before something about the

9    size of the price increases in 2014.  Did you?

10   *A.*   I did.

11   *Q.*   How would you describe the size of the price increases?

12   *A.*   For the KFC product in particular, I think I used the word

13   historic before because I had not seen on a national account,

14   particularly KFC, a price increase of that large.

15         *MR. FELDBERG:*  Your Honor, objection.  This was his

16   first year on national accounts, so he had no prior experience.

17         *THE COURT:*  He testified about prior experience

18   yesterday.  Overruled.

19   *BY MR. KOENIG:*

20   *Q.*   Can you say that again?  I couldn't quite hear.

21   *A.*   Yeah.  I said that they were historic in my view.  I had

22   not seen a price increase this large, particularly to a

23   national account like KFC at that time.

24         *MR. KOENIG:*  Your Honor, may I have a moment to

25   confer?

Robert Bryant - Cross

1          THE COURT:  You may.

2          MR. KOENIG:  No further questions.

3          THE COURT:  All right.  Cross-examination?

4          MR. FELDBERG:  Your Honor, I know it's not the normal

5    time for a morning break, but could we possibly have five or 10

6    minutes to get our notes organized?

7          THE COURT:  Well, I don't want to do that because I

8    don't want to get in the habit of taking breaks before

9    cross-examination, so my guess is there could be multiple

10   defendants who wish to cross him, so I don't care what order

11   people go in.

12         Go ahead, Mr. Feldberg.

13                        **CROSS-EXAMINATION**

14   BY MR. FELDBERG:

15   Q.  Good morning, Mr. Bryant.

16   A.  Good morning.

17   Q.  My name is Michael Feldberg.  I am Roger Austin's lawyer.

18   We have never met or spoken, have we?

19   A.  Not that I can recall, no.

20   Q.  And you were unwilling to speak with any defense counsel;

21   is that correct?

22   A.  I took the advice of my attorney on who to -- who I should

23   speak with.

24   Q.  And is it fair to say that you declined to speak with any

25   defense counsel?

Robert Bryant - Cross

1    *A.*  It's fair to say that I took the advice of my attorney on

2    whether or not to speak with defense counsel.

3            *MR. KOENIG:*  Objection, Your Honor.  I think this is

4    getting close to attorney/client privilege.

5            *THE COURT:*  Overruled.  Mr. Feldberg, sorry to

6    interrupt.  Let's have a brief side bar, if you don't mind.

7        (At the bench:)

8            *THE COURT:*  Sorry, I may have kind of missed your

9    suggestion.  Did you want to take just a real quick break

10   yourself?

11           *MR. FELDBERG:*  I would, Your Honor.

12           *THE COURT:*  Yeah, I apologize.  We will go ahead and

13   do that.  Would five minutes work or 10?

14           *MR. FELDBERG:*  Yes, five.

15           *THE COURT:*  I am sorry to not catch that.  Thank you.

16       (In open court:)

17           *THE COURT:*  Ladies and gentlemen, actually we are

18   going to take a real quick break a little bit off schedule.  I

19   wanted to let you know too we are going to shift the lunch

20   break just a little bit earlier, just 10 minutes, so we will be

21   breaking at 11:50 for lunch and coming back at 1:20, okay?  So

22   let's take 10 minutes right now.  So if you could plan to be

23   back quarter of 10:00, all right?  The Court will be in recess.

24   Thank you.

25               (Jury excused.)

Robert Bryant - Cross

1          We will be in recess.  Thank you.

2      (Recess at 9:36 a.m.)

3      (Reconvened at 9:46 a.m.)

4          THE COURT:  All right.  Let's get the jury.

5          (Jury present.)

6          THE COURT:  Go ahead, Mr. Feldberg.

7          MR. FELDBERG:  Thank you, Your Honor.

8   BY MR. FELDBERG:

9   Q.  Mr. Bryant, without getting into any conversations you had

10  with your lawyers, you were unwilling to meet with defense

11  counsel, correct?

12  A.  Once again, I was acting on the advice of my lawyer.

13  Q.  Did you meet with any defense counsel prior to your

14  testimony, Mr. Bryant?

15  A.  No.

16  Q.  And you told us yesterday that you met with the prosecutors

17  and the agents about 20 times, correct?

18  A.  That's correct.

19  Q.  And that was all in the last few months, correct?

20  A.  I believe so, yes.

21  Q.  And in your very first interview with the prosecutors and

22  the agents on June 22nd of this year, you told them, quote, "It

23  was important for Pilgrim's to know competitor information."

24          MR. KOENIG:  Objection.  He is reading from an

25  interview report that's not in evidence.

 1          THE COURT:  He is just asking a question.  He can ask

 2   the question.  Go ahead.

 3          MR. KOENIG:  He said, I quote.

 4          THE COURT:  He is quoting a statement of the witness,

 5   right?

 6          MR. FELDBERG:  Yes.

 7          THE COURT:  He can do that.

 8          MR. KOENIG:  That's the agent's statement.

 9          THE COURT:  Mr. Feldberg, is it a purported quote of

10   the witness?

11          MR. FELDBERG:  Yes.

12          THE COURT:  Overruled.

13   BY MR. FELDBERG:

14   Q.  In your very first interview on June 22nd, Mr. Bryant, you

15   told the prosecutors and agents, "It was important for

16   Pilgrim's to know competitor information because they were

17   trying to maximize sales volume and reach a more desirable

18   position," didn't you?

19   A.  I don't recall that exact statement, no.

20          MR. KOENIG:  Objection, Your Honor.  Mr. Feldberg is

21   incorrect.  It is not a purported quote -- we found it now --

22   of Mr. Bryant.  This is totally improper.

23          MR. FELDBERG:  Let's call up the exhibit.

24          THE COURT:  Hold on.  Let me rule on the exhibit.  So

25   the witness can be confronted with his own statements as

1    reflected in interview memos of the special agents in one of

2    these meetings, but you're right, he can't be confused as to

3    some statement that's not one of his quotes.  So to the extent

4    that's true, I don't know, the objection is sustained.

5         MR. FELDBERG:  Let's call up Defense Exhibit H-752 not

6    published to the jury, please.

7    BY MR. FELDBERG:

8    Q.  Mr. Bryant, Exhibit H-752 is an excerpt from the interview

9    report of your interview on June 22nd, 2021.  Does that refresh

10   your recollection that you --

11        MR. KOENIG:  Objection.  Did he say he needs his

12   recollection refreshed?

13        MR. FELDBERG:  He said he didn't recall, Your Honor.

14        THE COURT:  Overruled.

15   BY MR. FELDBERG:

16   Q.  Does this refresh your recollection that you told the

17   agents in your very first interview that it was important for

18   Pilgrim's to know competitor information because they were

19   trying to maximize sales volume and reach a more desirable

20   position?

21   A.  I don't remember that.  I am sorry.

22   Q.  You don't remember that.

23   A.  I don't remember this statement, no.

24   Q.  And in your third interview on September 8th of this year,

25   you told the prosecutors and agents, did you not, quote --

945

Robert Bryant - Cross

1          MR. KOENIG:  Objection.

2          THE COURT:  He hasn't asked the question yet.

3     BY MR. FELDBERG:

4     Q.  Quote --

5          MR. KOENIG:  I think it's going to be the damage is

6     done once the question is asked.

7          THE COURT:  Well, once again, he can be asked about

8     his own purported statements as recorded in interview memos.

9          MR. KOENIG:  I would also suggest this is improper

10    refreshment.  Generally it's does this refresh your

11    recollection, yes or no, and then, you know, it's reading from

12    a statement that's not his.  And in some sense from

13    Mr. Feldberg's perspective it doesn't matter if he remembers

14    now.

15         THE COURT:  Once again, if the witness doesn't recall

16    as he just indicated in a previous answer, he can so indicate,

17    but the form of the question is not improper.  Overruled.

18    BY MR. FELDBERG:

19    Q.  Mr. Bryant, in your third interview on September 8th of

20    this year, you told the prosecutors and agents, did you not,

21    quote, "The competitors discussed and knew what each other were

22    doing though there was no agreement in place that prevented a

23    supplier from arriving at a different price point." Do you

24    recall that?

25    A.  I do.

Robert Bryant - Cross

1  Q.  And you said that, correct?

2  A.  I did.

3  Q.  And you were telling the truth in that instance, correct?

4  A.  That's correct.

5  Q.  In that same interview on September 8th, you also said,

6  "Austin obtaining competitor information was part of the

7  decision making process," correct?

8  A.  That's correct.

9  Q.  And by decision making process, you meant the internal

10  decision making process at Pilgrim's.

11  A.  Yes.  When we received that information, we used that to

12  help formulate our bids, yes.

13  Q.  And that was Pilgrim's formulating its bids independently,

14  correct?

15  A.  That was -- yes.  As I testified before, even after the

16  2017, you know, Tim, myself -- Tim Stiller, myself and Roger

17  Austin discussed the bid after receiving that information, yes.

18  Q.  And in that same third interview on September 8th of this

19  year, you also told the prosecutors and agents that you, quote,

20  used the competitor information --

21      MR. KOENIG:  Objection.  He keeps saying quotes and

22  these are not quotes.

23      MR. FELDBERG:  I will delete the word quote, Your

24  Honor.

25      THE COURT:  All right.  The objection will be

Robert Bryant - Cross

1    sustained.

2    *BY MR. FELDBERG:*

3    *Q.*   And in that third interview on September 8th, Mr. Bryant,

4    you also told prosecutors and agents that you used the

5    competitor information to make the best economical decision for

6    Pilgrim's, correct?

7    *A.*   That's correct.

8    *Q.*   And that was the truth, correct?

9    *A.*   Yes.

10   *Q.*   And you also told the prosecutors and agents in that same

11   interview on September 8th that Pilgrim's got competitor

12   information so they could make decisions based on that

13   information, correct?

14   *A.*   We did.

15   *Q.*   And the "they" in that sentence is Pilgrim's making

16   decisions.

17   *A.*   That's correct.

18   *Q.*   And in that same interview on September 8th, you told the

19   prosecutors and agents that having competitor period prices

20   helped inform pricing decisions.  All information from a

21   competitor helped inform pricing decisions, correct?

22   *A.*   That's correct.

23   *Q.*   And those were pricing decisions made independently by

24   Pilgrim's, correct?

25   *A.*   Correct.

948

Robert Bryant - Cross

1    Q.  And by the way, those decisions were made by the financial

2    analyst team in Greeley, Colorado, correct?

3    A.  Not exactly, no.

4    Q.  Well, Roger Austin didn't have authority to determine what

5    prices Pilgrim's could offer.

6    A.  I think I did mention that yesterday, that in general the

7    sales director formulated the price with -- and gave that to

8    the salesperson that was responsible for the account, and they

9    were responsible for obtaining that price.

10   Q.  So the sales director.  That's somebody other than Roger

11   Austin, correct?

12   A.  That's correct.

13   Q.  Would give the salesperson, that is Mr. Austin, the price,

14   correct?

15   A.  That is correct.

16   Q.  So Mr. Austin didn't decide what the price was.

17   A.  He had influence in that, but ultimately it was not his

18   final decision.

19   Q.  Then in your seventh interview with the prosecutors and

20   agents on October 12th of this year, you told the prosecutors

21   and agents, "If you increase your gap to the competition in

22   profitability, then you could receive award at Pilgrim's,"

23   which led to an award which you, Mr. Bryant, received, correct?

24   A.  I'm not sure which award you're talking about, but there --

25   we do benchmarking data.  And measuring our profitability

Robert Bryant - Cross

1    against our competitors was reviewed regularly, yes.

2    Q.   And you received an award from Pilgrim's because of an

3    increased gap to the competition in profitability, correct?

4    A.   I'm not sure if that was the reason why I received the

5    award or not.  I did receive an award at Pilgrim's.  You may be

6    talking about the vision award, I'm not sure, but it was for

7    leading a successful business unit, yes.  And profitability may

8    have played a part in that, but there were a lot of other

9    factors that played a part in that award as well.

10   Q.   So Pilgrim's kept track of its profitability in relation to

11   its competitors, correct?

12   A.   Yes.

13   Q.   And it gave awards on the basis, at least in part, of

14   better profitability than its competitors, correct?

15   A.   Once again, on the award I wasn't part of that decision

16   making process, so I don't know what all factors went into me

17   receiving that award.  I just -- I was recognized for being

18   successful, yes, but I don't know what all factors played into

19   that.

20   Q.   Fair enough.  But in any event, Pilgrim's tracked its

21   profitability in comparison to its competitors, correct?

22   A.   Yes.

23   Q.   That sounds like competition, doesn't it?

24   A.   I mean, that's -- that's a practice I would say most

25   companies would do, yes.

Robert Bryant - Cross

1   *Q.* And it sounds like competition, doesn't it?

2   *A.* It -- yes.

3   *Q.* Mr. Bryant, in fact it was you who asked Mr. Austin to get

4   competitor information, as you told the prosecutors and agents

5   in your sixth interview on September 27th this year, correct?

6   *A.* Are you referring to 2017?

7   *Q.* Yes.

8   *A.* Yes, in January 2017, yes.

9   *Q.* So it was you, Mr. Bryant, who asked Mr. Austin, who is

10  sitting in the defendant's chair here, to get competitor

11  information, correct?

12  *A.* Yes.

13  *Q.* In your 20 or so meetings with the prosecutors and agents,

14  it was clear to you what they wanted you to say, correct?

15  *A.* It was.

16  *Q.* They wanted you to say things that would help their case,

17  correct?

18  *A.* They wanted me to give them the -- my recollection to the

19  best of my ability.

20          *MR. KOENIG:* Your Honor, objection, foundation.

21          *THE COURT:* Overruled.

22  *A.* They wanted me to give my recollection to the best of my

23  ability.

24  *BY MR. FELDBERG:*

25  *Q.* And you knew they wanted you to say things that would help

1    their case, correct?

2    *A.*   They asked a lot of questions.  Some I could answer.  Some

3    I could not.  The ones that I could answer I did and the ones

4    that I couldn't answer I didn't.

5    *Q.*   Mr. Bryant, you would rather be sitting today in the

6    witness chair where you're sitting than in a defendant's chair

7    like Mr. Austin and your other former colleagues, correct?

8    *A.*   That's correct.

9    *Q.*   And the prosecutors and agents have the power to decide

10   which chair you sit in, don't they?

11   *A.*   That's correct.

12   *Q.*   And you know that they've already revoked other witnesses'

13   immunity.

14         *MR. KOENIG:*  Objection.

15         *THE COURT:*  Sustained.

16   *BY MR. FELDBERG:*

17   *Q.*   You have every incentive to make the prosecutors and agents

18   happy, don't you, Mr. Bryant?

19   *A.*   Well, I mean, I am trying to live up to the spirit of the

20   cooperation agreement.  You know, if I'm not transparent with

21   the Department or if I am not truthful here today, then that

22   would potentially void that agreement.

23   *Q.*   And you know that they have the power in their own

24   discretion to decide whether you are a witness or a defendant,

25   correct?

Robert Bryant - Cross

1  A.  That's correct.

2  Q.  So you want to make them happy, correct?

3  A.  I want to live up to the spirit of the cooperation

4  agreement.

5  Q.  And yet as we've just seen you have told the prosecutors

6  and agents time after time that your company, Pilgrim's, wanted

7  competitor information so it could better determine what

8  decisions it could make on its own, correct?

9  A.  That's correct.

10  Q.  And you told the prosecutors and agents that there was no

11  agreement, correct?

12  A.  I don't know that I said there was no agreement.

13  Q.  Well, let's go back to --

14       MR. KOENIG:  Objection, Your Honor.  This is hearsay

15  as well.

16       THE COURT:  Overruled.

17       MR. FELDBERG:  Let's go back to DX-H-753, not

18  published.

19  BY MR. FELDBERG:

20  Q.  This was your third interview, September 8th, sir.  You

21  told the prosecutors and agents the competitors discussed and

22  knew what each other were doing though there was no agreement

23  in place, no agreement in place, that prevented a supplier from

24  arriving at a different price point.

25       Does that refresh your recollection?

Robert Bryant - Cross

 1   *A.*  I am sorry, the only thing I see here which I haven't seen

 2   before is just a list of names.

 3   *Q.*  I am sorry, look at -- could we scroll down to -- sorry, I

 4   don't have the screen in front of me.  Go to the second page,

 5   please.

 6        *MR. KOENIG:*  Your Honor, may we have a side bar?

 7        *THE COURT:*  Yes.

 8     (At the bench:)

 9        *THE COURT:*  Mr. Koenig, go ahead.

10        *MR. KOENIG:*  Yes, Your Honor.  This -- I have to

11   really strenuously reiterate the objection that this is

12   improper, attributing statements to him, out-of-court

13   statements, to prove the truth of the matter asserted.  It's

14   completely out of context.  He is taking things -- you know,

15   there is a sentence after that no agreement where he says, "I

16   don't ever think that happened actually."  I mean, this is just

17   grossly misleading and it's attributing statements to him that

18   he did not make.

19        *THE COURT:*  Well, once again, I don't have these

20   interview memos in front of me, and as a result, it sounds like

21   this is a memo or Mr. Feldberg is deriving these questions from

22   an interview memo of this witness.  As a result, the source of

23   the information appears to be this witness.  As a result, I

24   think Mr. Feldberg has a perfectly good faith basis to ask

25   those questions.

1           The witness can, of course, disagree with him.  The

2    witness should not be misled if there is something in the memo

3    that is not properly attributable to information that

4    Mr. Bryant provided.  However, this is cross-examination.  Of

5    course, the United States will have the ability on redirect to

6    clarify any misleading characterization that was made or to

7    point out other parts of the memorandum that would cast these

8    statements in a different light, but I haven't heard anything

9    that's improper.

10          I am a little bit concerned that with a multi-page

11   exhibit and he has only been shown selective pages, if the

12   witness asks for the entire memo, we'll have to -- hopefully we

13   will be in a position to supply that to him so he can look at

14   the whole thing.

15          MR. FELDBERG:  Your Honor, if the witness indicates a

16   need to do that, we have them available.

17          MR. KOENIG:  I would suggest letting him review the

18   whole thing without -- he doesn't know that he has the option

19   to ask for the whole document.

20          THE COURT:  Well, we'll see.  Witnesses don't have to

21   be shown the entire document at the beginning, so we'll see if

22   there is a need; and if so, then we can supply it to him.

23          MR. KOENIG:  I would suggest he needs to be shown the

24   very next sentence after what he is being misled with.

25          THE COURT:  Well, once again, that's a redirect issue.

Robert Bryant - Cross

1    All right.  Thank you.

2        (In open court:)

3            THE COURT:  The objection is overruled.  Go ahead.

4    BY MR. FELDBERG:

5    Q.  Could we call up on the screen, not to the jury, the second

6    page of Exhibit H-753?

7            Mr. Bryant, do you see the excerpt at the top of the

8    page, "The competitors discussed and knew what each other were

9    doing though there was no agreement in place that prevented a

10   supplier from arriving at a different price point." Do you see

11   that?

12   A.  I do.

13   Q.  And that's what you said, correct?

14   A.  I believe so, yes.

15   Q.  Now, you said there was no agreement, but after 20

16   interviews, about 20 interviews, the prosecutors and agents did

17   get you to use the word price-fixing, correct?

18   A.  It's the agreement -- the question, is it about I said

19   there was no agreement or that the DOJ said that -- got me to

20   use price-fixing?

21   Q.  I will try to ask the question again, Mr. Bryant.  After 20

22   or so interviews, the prosecutors got you to say on the witness

23   stand yesterday that there was price-fixing, correct?

24   A.  Correct.

25   Q.  And that's a term that in your 19 of your 20 interviews you

Robert Bryant - Cross

1   never used, correct?

2   A.  I didn't use that exact term.  I think the way that I

3   expressed it was just the actions that took place.

4   Q.  The first time you used the term price-fixing was in your

5   very last interview on Sunday, October 31st, two days ago,

6   correct?

7   A.  I don't know.

8   Q.  Would you accept my representation that the first time you

9   used it in 20 or so interviews?

10  A.  Yes.

11  Q.  In fact, in your first interview on June 22nd of this year,

12  you told the prosecutors and agents that you talked to

13  competitors, but not about price-fixing or bids; isn't that

14  right?

15  A.  I think I was talking about me personally speaking to

16  competitors.  In the course of my career, I did occasionally

17  have a need to speak directly to competitors, but the outside

18  sales team generally handled the contacts with competitors.

19  But there was times when I had to buy product in when I was in

20  different roles and create purchase orders for those products.

21  So I handled some USDA bids where I had to purchase in product

22  that USDA awarded to for other -- so there were times.

23  Q.  And my question is, Mr. Bryant, isn't it true that in your

24  very first interview with the prosecutors and agents on

25  June 22nd of this year, you told them that you talked to

Robert Bryant - Cross

1    competitors, but not about price-fixing or bids?

2    A.   I don't remember making that exact statement.  I could

3    have.  And I don't recall speaking to -- me personally directly

4    to competitors about price-fixing or bids.

5    Q.   You don't recall speaking to competitors about price-fixing

6    or bids.

7    A.   Not me personally directly, no, during those negotiations,

8    no.

9    Q.   Mr. Bryant, you don't have any antitrust training, do you?

10   A.   We've had some recently.  I know I attended one in 2019,

11   but part of that, I mean, there could have been something in my

12   undergrad, but I don't recall it.

13   Q.   So you don't know what the law says is or is not

14   price-fixing, correct?

15   A.   That's correct.

16   Q.   So would it be okay if we called it price sharing?

17   A.   Yes.  I'm fine with that.

18   Q.   Thank you.

19            MR. KOENIG:  Your Honor, objection.  It was vague.

20   What does get to?

21            THE COURT:  Overruled.

22   BY MR. FELDBERG:

23   Q.   Now, Mr. Bryant, you testified yesterday that you lied to

24   the prosecutors and agents in some of your interviews, correct?

25   A.   I did.

Robert Bryant - Cross

1   *Q.*  Those lies had nothing to do with antitrust issues,

2   correct?

3   *A.*  That's correct.

4   *Q.*  They were about other activities?

5   *A.*  That's correct.

6   *Q.*  And you lied on multiple times.

7   *A.*  That's correct.

8   *Q.*  About multiple issues in your interviews with the

9   prosecutors, correct?

10   *A.*  That's correct.

11   *Q.*  None of them having anything to do with antitrust.

12   *A.*  That's correct.

13   *Q.*  And none of them having anything to do with any defendant

14   in this case, correct?

15   *A.*  That's correct.

16   *Q.*  Are you aware, Mr. Bryant, that out of all of the thousands

17   of employees of the eight suppliers involved in this case,

18   you're the only person the prosecutor is calling as a witness?

19        *MR. KOENIG:*  Objection.

20        *THE COURT:*  Sustained.

21   *BY MR. FELDBERG:*

22   *Q.*  You know, do you not, Mr. Bryant, that it's a federal

23   crime, a felony, to make false statements to government

24   officials.

25   *A.*  Yes.

Robert Bryant - Cross

1    *Q.*  The prosecutors and agents told you that, correct?

2    *A.*  They did, yes.

3    *Q.*  And you know that Mr. Little has been charged with

4    violating that law, correct?

5    *A.*  I've heard that, yes.

6    *Q.*  You've not been charged with making false statements to

7    government officials even though you lied to them on multiple

8    occasions about multiple issues, correct?

9    *A.*  That's correct.

10   *Q.*  But you know they could charge you.

11   *A.*  That's correct, yes.

12   *Q.*  It's solely within their discretion.

13   *A.*  That's correct, yes.

14   *Q.*  So would you agree that you have every incentive to say

15   what they want you to say?

16   *A.*  No.

17   *Q.*  You know they could charge you.

18   *A.*  I do.

19   *Q.*  You know they have the sole power and discretion to charge

20   you.

21   *A.*  I understand that.

22   *Q.*  And you know they've already charged Mr. Little for lying

23   in an interview.

24   *A.*  And I understand that.

25          *MR. KOENIG:*  Objection.

1          THE COURT:  Overruled.

2    BY MR. FELDBERG:

3    Q.  Let's talk about August of 2014, correct?  Withdrawn.

4          Let's talk about August of 2014.  Is that all right,

5    Mr. Bryant?

6    A.  Okay.

7    Q.  Now, you say you overheard Mr. Austin speaking on the phone

8    with both Mr. Brady and Mr. Kantola after a meeting with RSCS

9    on August 22nd of 2014, correct?

10   A.  I believe I said I don't recall if it was before or after

11   the meeting, but yes, I recall those phone calls, yes.

12   Q.  And where were you in relation to Mr. Austin when you

13   overheard -- when you say you overheard these phone calls?

14   A.  He had a desk in his office.  When you went down hall, you

15   would walk in.  The desk would be on the left and I think there

16   was a couple chairs on the right and a little path there or

17   space in front of his desk.

18   Q.  And that office was in Louisville, Kentucky, correct?

19   A.  That's correct, yes.

20   Q.  And at the time you worked in Mayfield, Kentucky, right?

21   A.  That's right.

22   Q.  And correct me if I'm wrong, but that's about a

23   three-and-a-half-hour drive, maybe a four-hour drive west of

24   Mr. Austin's office?

25   A.  Yes, it's -- yes, yes.  It would be southwest of

Robert Bryant - Cross

1    Louisville.

2    *Q.*   About four hours from Mr. Austin's office?

3    *A.*   Three, three and a half, yes, with the time change.

4    *Q.*   And Mr. Austin's office was east of RSCS's office by about

5    20 minutes, correct?

6    *A.*   I don't recall exactly how far it was.

7    *Q.*   Now, the meeting that you were talking about was on

8    August 22nd of 2014, correct?

9    *A.*   I believe so, yes.

10   *Q.*   And do you recall what time of day it took place?

11   *A.*   I do not.

12          *MR. FELDBERG:*   Can we call up the calendar invitation,

13   please?  Could we call up, please, Exhibit E-162 and not yet

14   publish to the jury.

15          *MR. KOENIG:*   Your Honor, may we have a copy?

16          *MR. FELDBERG:*   Oh, I am sorry.

17   *BY MR. FELDBERG:*

18   *Q.*   Mr. Bryant, do you see Exhibit E-162?

19   *A.*   I do.

20   *Q.*   It's a calendar invitation for the August 22nd, 2014

21   meeting, correct?

22   *A.*   Yes, it appears to be, yes.

23   *Q.*   And you are one of the recipients of it?

24   *A.*   Yes.

25   *Q.*   Did you receive this?

1    *A.*  It appears I did, yes.

2            *MR. FELDBERG:*  We offer it, Your Honor.

3            *THE COURT:*  Any objection to the admission of Exhibit

4    E-162?

5            *MR. KOENIG:*  No.

6            *THE COURT:*  Exhibit E-162 will be admitted.

7    *BY MR. FELDBERG:*

8    *Q.*  Mr. Bryant, the meeting with RSCS was scheduled for

9    3:00 p.m. to 5:00 p.m. on August 22nd, correct?

10   *A.*  That's correct.  That's what the calendar invite shows,

11   yes.

12           *MR. FELDBERG:*  Could we publish this exhibit to the

13   jury, Your Honor?

14           *THE COURT:*  You may.

15   *BY MR. FELDBERG:*

16   *Q.*  So the meeting was scheduled from 3:00 to 5:00, correct?

17   *A.*  Correct, yes.

18   *Q.*  And to the best of your recollection, is that when it took

19   place?

20   *A.*  I really don't remember, but with the e-mail, yes.

21   *Q.*  And the people invited to the meeting were Mr. Eddington

22   from RSCS, Mr. Lewis from RSCS, Ms. Hester from RSCS,

23   Mr. Imhoff from RSCS, Justin Gay from Pilgrim's, yourself,

24   Mr. Austin, Scott Tucker and Steve Campisano from RSCS,

25   correct?

Robert Bryant - Cross

1   A.   Correct.

2   Q.   And to the best of your recollection, did all of those

3   people attend?

4   A.   I don't recall Justin Gay attending, but the rest were more

5   than likely there, yes.

6   Q.   Jason McGuire did not attend this meeting, correct?

7   A.   That's correct.

8   Q.   Now, when in relation to this meeting on the afternoon of

9   August 22nd did you overhear Mr. Austin speaking with

10  Mr. Kantola and Mr. Brady?

11  A.   As I said before, I don't recall if it was before or after

12  the meeting.  We usually had a meeting -- when we had the

13  office in Louisville, we normally had a meeting, a pre-meeting

14  where we kind of role played who was going to answer what

15  questions, what questions they may before the meeting.  And

16  then we normally had a meeting after the meeting where we

17  discussed whatever happened during the meeting.  And that could

18  have been at the office or it could have been -- there was

19  times that we met and just went to lunch, for instance, if it

20  was at lunchtime or it could have been over a dinner, dinner

21  meeting or something like that, but this particular one I don't

22  recall.

23  Q.   You don't remember when?

24  A.   No.  I just remember being in the office and hearing those

25  two phone calls, but I don't remember if they were before or

Robert Bryant - Cross

1    after the meeting or a specific time.

2    Q.  So you don't remember when.  Did you make any notes of what

     you say you overheard Mr. Austin saying?

4    A.  Not that I remember, no.

5    Q.  Did you discuss it with anybody other than Mr. Austin?

6    A.  Not that I remember.

7    Q.  Do you remember telling the prosecutors and agents in one

8    of your interviews that Mr. McGuire was present when you

9    overheard -- you say you overheard Mr. Austin on the phone?

10   A.  No, I don't remember saying that.

11   Q.  We'll come back to that.

12        What you say you overheard Mr. Austin saying to both

13   Mr. Brady and Mr. Kantola is in substance, "I told them the

14   price is the price," correct?

15   A.  More or less, yeah.

16   Q.  He didn't ask anybody to agree with him, did he?

17   A.  I only heard the one -- that comment.  That's all I really

18   remember from that conversation is, you know, "The price is the

19   price.  I just need to know how many loads you want at that

20   price."  That's really all I remember.

21   Q.  So you don't remember Mr. Austin asking either Mr. Brady or

22   Mr. Kantola to agree with him on anything, do you?

23   A.  During that phone call, no, no.

24   Q.  He just said, according to your memory, "I told them the

25   price is the price," correct?

Robert Bryant - Cross

1   A.   More or less, yes.

2   Q.   Mr. Brady worked at the time for Claxton, correct?

3   A.   That's correct.

4   Q.   Before that he worked for Pilgrim's, correct?

5   A.   That's correct.

6   Q.   Until about the middle of 2012?

7   A.   Somewhere in there, yeah.  I don't recall when he

8   transitioned over, but yes.

9   Q.   Now, Claxton is a much smaller company than Pilgrim's,

10  correct?

11  A.   That's correct.  At the time I think they had one plant.

12  They may have expanded since then, but yes, at the time.

13  Q.   At the time they had one plant.

14  A.   One plant that I was aware of.

15  Q.   Primarily serviced Florida?

16  A.   Yeah.

17  Q.   And how many plants did Pilgrim's have at the time?

18  A.   At that time I am not sure, but approximately 25 to 28 in

19  totality, six or seven in the small bird arena.

20  Q.   So does that mean that Pilgrim's had 27 or 28 times as much

21  capacity as Claxton?

22  A.   In totality, yes.  However, they were -- small bird to

23  small bird, you know, they had one and then we had either six

24  or seven at the time.

25  Q.   Now, you also testified yesterday, Mr. Bryant, that you

Robert Bryant - Cross

1    had -- that you -- withdrawn.

2          You also testified yesterday that Mr. Austin told you

3    that he had had conversations with Carl Pepper from Tyson,

4    correct?

5    A.   That's correct.

6    Q.   When did Mr. Austin tell you that?

7    A.   Various times between 2014 and 2017.  Just like I testified

8    yesterday when there would be some discussion about a customer

9    ask of some sort, that we would get information back from

10   various competitors.  And I think I said that, you know, he was

11   one of the three names I heard most commonly.

12   Q.   Well, Mr. Bryant, the prosecutors and agents have

13   subpoenaed many, many, many --

14          MR. KOENIG:  Objection.

15          THE COURT:  Well, I haven't heard the question yet.

16   Let's hear the question.

17   BY MR. FELDBERG:

18   Q.   -- many phone records.  Are you aware of that?

19          MR. KOENIG:  Objection.

20          THE COURT:  Overruled.

21   A.   I know they subpoenaed my own.  I don't know what else

22   they've subpoenaed.

23          MR. KOENIG:  Let's call up Exhibit H-927 and not

24   publish to the jury.

25   BY MR. KOENIG:

Robert Bryant - Cross

1    Q.  Mr. Bryant, I will represent to you that this is an

2    extraction from the phone records the government has subpoenaed

3    and it shows all of the calls --

4            MR. KOENIG:  Objection.

5    BY MR. FELDBERG:

6    Q.  -- between Carl Pepper and Roger Austin between 2012 and

7    2019.

8            MR. KOENIG:  Foundation and copy, please.

9            MR. FELDBERG:  Sorry about the copy.

10           MR. KOENIG:  Essentially we are taking his word for

11   it.

12           THE COURT:  One second, Mr. Koenig.  Why don't you

13   have a chance to look at it and then I will let you supplement

14   your objection if you wish.

15           MR. KOENIG:  I have never seen this before and I don't

16   see any citations to evidence that's in the record.

17           THE COURT:  What's the objection?

18           MR. KOENIG:  Foundation.

19           THE COURT:  Sustained.

20           MR. KOENIG:  Authenticity too.

21           MR. FELDBERG:  Your Honor, could we be heard on this

22   at a break in the proceedings?  I don't want to interrupt the

23   flow now.

24           THE COURT:  Well, you always can do that, but I ruled

25   on this particular objection.

Robert Bryant - Cross

1   *BY MR. FELDBERG:*

2   Q.  Mr. Bryant, was there an event in the chicken industry

3   affecting Kentucky Fried Chicken around Mother's Day in 2014?

4   A.  I wouldn't call it an event, but normally around Mother's

5   Day that was a very high sales volume for KFC.

6   Q.  Mother's Day was KFC's biggest day of the year, correct?

7   A.  Yes, traditionally, yes, it was.  It wasn't -- what I was

8   trying to convey, it wasn't unique to 2014 is all.  That was

9   my --

10  Q.  But uniquely to 2014 a number of KFC locations ran out of

11  chicken on Mother's Day, correct?

12  A.  I don't recall if that's -- possibly.  There were a lot of

13  shortages in the summer of 2014.  I don't remember exactly who

14  was short.  I don't know if KFC stores actually run out or not,

15  but there was a supply crunch in 2014.

16  Q.  And you've heard KFC people refer to the Mother's Day

17  disaster in 2014, haven't you?

18  A.  I don't -- I don't remember hearing Mother's Day disaster

19  during 2014.  And I don't remember how much we shorted them in

20  2014.  I just don't.

21  Q.  Are you aware, sir, that there was a shortage of the small

22  birds that KFC bought in 2014?

23  A.  Yes.

24  Q.  And are you aware, sir, that those smaller birds were in

25  short supply not just for KFC, but for all potential customers

Robert Bryant - Cross

1   of that size bird?

2   A.  Yes.

3   Q.  And you are aware that supply was tight and demand was

4   high, correct?

5   A.  That's correct, yes.

6   Q.  And what usually happens when supply is tight and demand is

7   high?

8   A.  I mean, that's when you try to get price increases.

9   Q.  And those were the market forces that were at work in the

10  summer of 2014, correct?

11  A.  That's what I remember, yes.

12  Q.  And those market forces were not a secret that only

13  Pilgrim's knew about, correct?

14  A.  That's correct.

15  Q.  Everybody knew that there was a tight supply --

16          MR. KOENIG:  Objection.

17          MR. FELDBERG:  I will rephrase, Your Honor.

18  BY MR. FELDBERG:

19  Q.  Everyone in the broiler chicken business knew that there

20  was a tight supply of small birds.

21          MR. KOENIG:  Objection, foundation.

22          THE COURT:  Overruled.

23  A.  There was enough publicly available data that they should

24  have known.  If they didn't, then they probably shouldn't be in

25  the business.

Robert Bryant - Cross

1    *BY MR. FELDBERG:*

2    *Q.*  So not just Pilgrim's, but all of the other broiler chicken

     suppliers knew the demand was tight, correct?

4    *A.*  They should have.

5    *Q.*  And KFC knew that demand was tight, correct?

6    *A.*  They did.

7    *Q.*  So everyone knew in the summer of 2014, everyone in the

8    business, that prices were going to go up, correct?

9    *A.*  They should have.

10   *Q.*  And you knew that, correct?

11   *A.*  I did.

12   *Q.*  You understood that a price increase was virtually certain

13   because of the supply and demand factors that were at work.

14   *A.*  I wouldn't use the word certain.  I would use the word that

15   a price increase was warranted.

16   *Q.*  And highly likely, correct?

17   *A.*  It was warranted, yes.

18   *Q.*  And those same market forces affected all of the suppliers,

19   correct?

20   *A.*  That's correct, in the small bird arena that we've been

21   discussing.  I don't remember what the market forces were in

22   the other segments of the business.

23   *Q.*  And you were aware in the summer of 2014 that small birds

24   were less profitable for the suppliers than larger birds,

25   correct?

Robert Bryant - Cross

1    *A.*  That's correct.

2         *MR. FELDBERG:*  Could we call up government

3    Exhibit 1055, please, and scroll to Page 8.

4         And I believe this is in evidence, Your Honor, so if

5    we could show it to the jury.

6         *THE COURT:*  It has been admitted and it may be shown

7    to the jury.

8         *MR. FELDBERG:*  Mr. Bryant -- let's show Mr. Bryant the

9    cover page of Exhibit 1055.

10   *BY MR. FELDBERG:*

11   *Q.*  Mr. Bryant, this is a presentation that Pilgrim's made to

12   RSCS on August 1st, 2014, correct?

13   *A.*  That's correct.

14   *Q.*  And you were at that meeting, correct?

15   *A.*  That's correct.

16        *MR. FELDBERG:*  Now can we scroll to page 8, please?

17   *BY MR. FELDBERG:*

18   *Q.*  Page 8 summarizes profit margin, small bird/big bird.  Do

19   you see that?

20   *A.*  I do.

21   *Q.*  And you were involved in the preparation of this document,

22   correct?

23   *A.*  I was.  Like I testified earlier, the supply side I helped

24   build and I recall this slide being presented.  This was the

25   second piece of the presentation to the customers.

Robert Bryant - Cross

1   Q.   Okay.   And you were part of that -- making that

2   presentation to the customers.

3   A.   That's correct.

4   Q.   And you made a similar presentation to other customers,

5   correct?

6   A.   That's correct.

7          MR. FELDBERG:   Let's look at the bottom line.   Can we

8   enlarge the bottom line, please?

9   BY MR. FELDBERG:

10  Q.   What is the bottom line May-14 refer to, Mr. Bryant?

11  A.   Profitability of the different segments.

12  Q.   And does it refer to profitability as of May of 2014?

13  A.   That's correct.

14  Q.   What was the profitability of big bird?

15  A.   It looks like it was 68.86.

16  Q.   And what was the profitability of small bird?

17  A.   Negative 39.67.

18  Q.   And what do those numbers mean?

19  A.   I believe these are -- I don't remember if these were cents

20  per pound or cents per bird or if this was to the average

21  company.   My assumption is this is profitability per bird to

22  the average company.   So it's been a few -- but I believe that

23  each big bird they were making 68.86 per bird on compared to

24  the average industry profit.   And I think small birds would

25  have been almost 40 cents below the average company --

Robert Bryant - Cross

1    Q.  So you would agree, would you not --

2    A.  -- per bird.

3    Q.   -- that from the suppliers' perspective big birds were

4    much more profitable than small birds?

5    A.  That's correct.

6    Q.  So you would agree, would you not, that if you were a

7    supplier in the summer of 2014, you would be incentivized to

8    produce more big birds than small birds, correct?

9    A.  That was part of our presentation, yes.

10   Q.  That would be a sensible business thing to do, correct?

11   A.  Rational.

12   Q.  Rational.  And KFC needed small birds, correct?

13   A.  That's correct.

14   Q.  Did you attend a presentation to RSCS by McKinsey &

15   Company?

16   A.  I don't recall attending one with them, no.

17   Q.  Do you recall knowing that RSCS retained McKinsey & Company

18   in the summer of 2014 for advice?

19   A.  No, I don't.

20   Q.  Do you know what McKinsey & Company is?

21   A.  Do not.

22   Q.  You have never heard of McKinsey Consulting Firm?

23   A.  No.

24   Q.  Did you hear any discussion of the presentation that

25   McKinsey made to RSCS?

974

Robert Bryant - Cross

1    *A.*  Not that I can remember, no.

2    *Q.*  Okay.  Now, is it fair to say, Mr. Bryant, that you

3    anticipated in the summer of 2014, your first go-around in

4    national accounts, that prices for small birds would go up,

5    correct?

6    *A.*  Yes.

7    *Q.*  And you've told us based on your experience that you didn't

8    expect them to go up quite as much as they did; is that fair?

9    *A.*  That's fair.

10   *Q.*  But this was your first year of working on national

11   accounts, correct?

12   *A.*  That's correct.

13   *Q.*  So you had no prior experience with national accounts,

14   correct?

15   *A.*  Well, not customer facing.  But going back to the 2000s, I

16   monitored national account pricing on a weekly basis.  You

17   know, for the complex manager at Mayfield I did a one-page

18   report basically tying revenue to our P&L.  And inside that I

19   had our major customers and I put their price per pound in

20   that.

21         So for probably 10 years or somewhere in that

22   neighborhood before I took the promotion to Jason McGuire, I

23   was monitoring our price to KFC, Popeye's, EPL among others.

24   The larger book of business for Mayfield, I was tracking that

25   on a weekly basis, so I was accustomed to seeing those prices

Robert Bryant - Cross

1    weekly.  And, you know, at the transition of the year, I would

2    look at -- I would see what those increases were or decreases,

3    so I was familiar with it, although I hadn't participated in

4    the negotiations.

5    Q.   This was your first year on national accounts, correct?

6    A.   It was my first year really on the negotiations, yes.

7    Q.   And Mr. Bryant, in the summer of 2014, there was an

8    internal discussion at Pilgrim's, was there not, that you were

9    part of about converting a plant in Louisiana.  I may have

10   trouble pronouncing the name.  Do you know the one I am

11   referring to?

12   A.   Natchitoches, Louisiana.

13   Q.   Natchitoches, Louisiana.  There was a discussion within

14   Pilgrim's about converting the plant in Louisiana from small

15   bird to big bird unless Pilgrim's could achieve a significant

16   price increase for small bird, correct?

17   A.   That's correct.

18   Q.   And Mr. Penn told you that Pilgrim's was going to convert a

19   plant in Natchitoches, Louisiana from small to big bird unless

20   Pilgrim's could get a significant price increase for small

21   bird, correct?

22   A.   I don't remember Jayson Penn telling me that.  I do

23   remember Jason McGuire telling me that we were going to look at

24   it, but McGuire told me that that was not a real thing that we

25   were going to do.  It was meant to put -- apply pressure to

Robert Bryant - Cross

1    Roger to get the price increases.

2    Q.  Apply pressure to Roger Austin?

3    A.  Yes.

4    Q.  Well, he knew there was discussion about converting that

5    plant, correct?

6    A.  Yes.

7    Q.  And he was -- he understood that there was a real

8    discussion about converting that plant from small to big,

9    correct?

10          MR. KOENIG:  Foundation.

11          THE COURT:  Sustained.

12   BY MR. FELDBERG:

13   Q.  Do you know whether Mr. Austin knew that there was a plan

14   to convert the Louisiana plant from small bird to big bird

15   unless a significant price increase could be obtained?

16   A.  That was my understanding, he did, yes.

17   Q.  He did understand that.

18   A.  He was made aware of that, that plan.  Like I said, my

19   manager at the time, Jason McGuire, said that was probably not

20   a reality and it was meant to apply pressure to Roger Austin.

21          MR. FELDBERG:  Let's call up, please, defense Exhibit

22   D-925.

23   BY MR. FELDBERG:

24   Q.  Mr. Bryant, do you recognize Exhibit D-925?

25   A.  I do.

Robert Bryant - Cross

1    *Q.* It's an e-mail exchange among you, Mr. McGuire,

2    Mr. Lovette, Mr. Austin, Mr. Little, Chad Baker, Mr. Penn, et

3    cetera, correct?

4    *A.* Correct.

5    *Q.* And you were part of this e-mail chain, correct?

6    *A.* Yes.  Jason McGuire forwarded it to me.

7            *MR. FELDBERG:* We offer D-925, Your Honor.

8            *THE COURT:* Any objection to the admission of D-925?

9            *MR. KOENIG:* Yes, Your Honor, hearsay.

10           *THE COURT:* I find that it falls within 801(d)(2)(E)

11   and will admit D-925.

12           *MR. KOENIG:* Your Honor, if I may.

13           *THE COURT:* I have ruled already.  It's admitted.

14           *MR. FELDBERG:* Could we publish D-925 to the jury,

15   Your Honor?

16           *THE COURT:* You may.

17   *BY MR. FELDBERG:*

18   *Q.* Mr. Bryant, is it fair to say that the discussion in this

19   e-mail is about the idea of converting the plant in Louisiana?

20   *A.* It was.

21           *MR. FELDBERG:* And could we enlarge the top entry in

22   D-925, please.

23   *BY MR. FELDBERG:*

24   *Q.* That top entry is from you to Mr. McGuire, correct?  Let's

25   set it up so you can see that.

978

Robert Bryant - Cross

1           Do you see that?

2    A.  I do.

3    Q.  And what did you say to Mr. McGuire about the idea of

4    converting the plant in Louisiana?

5    A.  I wish we would pull the trigger soon...

6    Q.  That's what you felt at the time, correct?

7    A.  I don't remember why I sent that e-mail out.  What I

8    remember is Jason McGuire telling me that this was not a real

9    scenario that was going to happen and it was meant to apply

10   pressure to Roger to get the price increases and that -- I

11   mean, that's what -- I remember the discussions about

12   converting the plant and the threat to the customers, telling

13   customers, look, if we don't get a price increase, we're going

14   to take a plant.  I just don't remember how serious that --

15   that was as far as if that was a real threat or not.  I just --

16   Q.  Well, Mr. Bryant, when you wrote to Jason McGuire on

17   August 26, 2014, "I wish we would pull the trigger soon," you

18   weren't trying to mislead Mr. McGuire, were you?

19   A.  No, I wouldn't have.  I just don't remember this.  Like I

20   said, I remember the discussion.  And I remember some phone

21   calls with Jason McGuire about the possibility of Natchitoches.

22   I am just not -- I am just not sure how realistic it was for us

23   to actually convert the plant.

24   Q.  But when you said, Mr. Bryant, "I wish we would pull the

25   trigger soon," to Mr. McGuire who was your boss at the time,

Robert Bryant - Cross

1   you weren't trying to mislead him.  You were telling him what

2   you thought, correct?

3   A.  It could have been that -- and like I said, I am not a

4   hundred percent clear here.  I remember the conversations.  I

5   don't remember this particular e-mail.  It could have been that

6   we were short and by removing a plant or removing a whole lot

7   of business, it would have made my stress level a lot better

8   that particular day because I was probably dealing with a lot

9   of shortages at the time like we've discussed in 2014, so I

10  just don't remember why I sent that.

11  Q.  But you did say you wished that you would pull the trigger

12  soon.

13  A.  I'm not debating my statement.

14  Q.  Fair enough.

15          MR. FELDBERG:  Let's call up Defense Exhibit H-797 for

16  identification.

17  BY MR. FELDBERG:

18  Q.  Mr. Bryant, do you recognize H-797?

19  A.  It's an e-mail from me to Justin Gay in November 19th of

20  2014.

21  Q.  And you were part of this e-mail discussion with Mr. Gay on

22  that day, correct?

23  A.  That's correct.

24          MR. FELDBERG:  Can we offer 797, Your Honor?

25          THE COURT:  Any objection to the admission of H-797?

Robert Bryant - Cross

1            MR. KOENIG:  Yes, Your Honor.  It is hearsay and I

2    will add that 801(d)(2)(E) only applies to statements offered

3    against a party opponent, so this is not admissible by the

4    defendants.

5            THE COURT:  Response?

6            MR. FELDBERG:  Your Honor, we are not offering it for

7    the truth.  We are offering it for the fact that this

8    communication occurred.

9            THE COURT:  I think he has already admitted to the

10   fact that it occurred.  Sustained.

11   BY MR. FELDBERG:

12   Q.  Mr. Bryant, did you say to Mr. Gay on November 19th, 2014,

13   "Does that mean we're too cheap"?

14   A.  I am looking for it on this.

15   Q.  Look in the middle.

16   A.  Yes.

17           MR. KOENIG:  Objection.

18           THE COURT:  Hold on.  What's the objection?

19           MR. KOENIG:  Your Honor just sustained the previous

20   objection and now he is just reading from the document.

21           THE COURT:  Is it being used to refresh recollection?

22   If so, it needs to be done properly.  Sustained.

23   BY MR. FELDBERG:

24   Q.  Without looking at the document, do you remember what you

25   said to Mr. Gay on November 19th?

1    A.  Not independently.

2    Q.  Does Exhibit H-797 refresh your recollection about that

3    communication?

4    A.  It does.

5    Q.  And what do you now recall?

6            MR. KOENIG:  Objection.

7            THE COURT:  He can answer.  Overruled.

8    A.  What I remember about this document is that Justin was

9    asking about some more volume from Popeye's, and I was just

10   asking the question "Does that mean we are too cheap," because

11   someone was offering us business.

12   BY MR. FELDBERG:

13   Q.  So you had a concern in November of 2014 that Pilgrim's

14   prices were, quote, too cheap, correct?

15   A.  I think I was -- I meant it more jokingly because generally

16   you had to work to get business and it wasn't handed to you

17   unless your price was attractive to the customers.  And it goes

18   back to what I had mentioned before where if you had a better

19   price, then they would try to buy all they could from the

20   cheaper priced person, but I think in this e-mail I meant it

21   jokingly to Justin.

22   Q.  But you did ask the question, "Are we too cheap," correct?

23   A.  I did, I did.

24           MR. FELDBERG:  Could we call up, please, Government

25   Exhibit 1085?  And Your Honor --

Robert Bryant - Cross

1           THE COURT:  Actually, why don't we take -- I am

2   worried we took that early break and I don't think we can go

3   until 11:50 probably without another quick one.  So ladies and

4   gentlemen, why don't we try to hold it to 10 minutes, if

5   possible, and plan on reconvening at 11:00 o'clock.  Keep the

6   admonitions in mind.

7           The jury is excused.  Thank you.

8           (Jury excused.)

9           The Court will be in recess.  Thank you.

10      (Recess at 10:51 a.m.)

11      (Reconvened at 11:02 a.m.)

12          THE COURT:  Let's bring the jury back in.

13          (Jury present.)

14          Go ahead, Mr. Feldberg.

15          MR. FELDBERG:  Thank you, Your Honor.

16  BY MR. FELDBERG:

17  Q.  Mr. Bryant, we were talking about 2014.

18          MR. FELDBERG:  Could we call up, please, Government

19  Exhibit 1085, which I believe is in evidence, so I would ask

20  that it be published to the jury.

21          THE COURT:  It may be.

22  BY MR. FELDBERG:

23  Q.  Mr. Bryant, this Exhibit 1085 is an e-mail from Mr. Austin

24  to you, Mr. McGuire and Mr. Lane on August 20th, 2014, correct?

25  A.  That's correct.

Robert Bryant - Cross

1          MR. POLLAK:  I am sorry, I think the courtroom deputy

2     needs to change the screen so it's on the jury's screens.

3          COURT DEPUTY CLERK:  Do you want it published?

4          THE COURT:  Yes.  It's been admitted.

5          MR. FELDBERG:  And could you enlarge this, please, so

6     that we can all see it?  Thank you.

7     BY MR. FELDBERG:

8     Q.  Mr. Austin asked you and the others, Mr. McGuire and

9     Mr. Lane, to please review -- well, didn't say please, review

10    real quick and let me know you agree, then I will send,

11    correct?

12    A.  Correct.

13    Q.  And what he was proposing to send was the attachment which

14    is Government Exhibit 1086, also admitted.

15          MR. FELDBERG:  Can we call that up, please?  Could we

16    enlarge it a little bit so folks can see it?

17    BY MR. FELDBERG:

18    Q.  And that 1086 which is now on the screen is the attachment

19    to 1085, correct?

20    A.  Correct.

21    Q.  And that's what you described as the pricing model.

22    A.  Correct.

23    Q.  Would it be fair to say from Exhibit 1085 that

24    Mr. Austin --

25          MR. KOENIG:  Objection, Your Honor.

Robert Bryant - Cross

1              THE COURT:  What?

2              MR. KOENIG:  Mischaracterizing what he said.  This was

3       not what he was shown.

4              THE COURT:  I am sorry?

5              MR. KOENIG:  This was not what he was shown or

6       described was a pricing model.  It's a different page entirely.

7              THE COURT:  I can't tell exactly.  The objection is

8       overruled.  The witness can answer.

9       BY MR. FELDBERG:

10      Q.  And would it be fair to say, Mr. Bryant, that Mr. Austin

11      asked you and the others to agree before he sent this on to

12      RSCS, correct?

13      A.  He was asking for approval.

14      Q.  And you approved, correct?

15      A.  In 2014, I wouldn't have been able to approve the pricing.

16      Q.  In Exhibit 1085 -- let's go back to 1085, please.

17             In 1085 Mr. Austin said:  Review real quick and let me

18      know you agree, then I will send.

19             Do you see that?

20      A.  I do.

21      Q.  And you are one of the people he asked to let him know you

22      agree, correct?

23      A.  That's correct.

24      Q.  You didn't disagree, did you?

25      A.  I don't recall disagreeing with the model, no.

Robert Bryant - Cross

1    Q.   Okay.   And do you recall saying that you were initially

2    concerned that the price increase was too large and customers

3    would find business elsewhere, but by the time of this

4    attachment you were more comfortable with the price increase?

5    A.   I am not sure if it was the time of this attachment is what

6    I said.   I said -- I believe I said I got more comfortable over

7    time with it.

8    Q.   With the price increase?

9    A.   With the price increase.

10   Q.   In 2014.

11   A.   In 2014.

12   Q.   Now, in fact, in 2014, Mr. Bryant, the prices that the

13   eight suppliers involved in this case charged RSCS or KFC were

14   all different, weren't they?

15          MR. KOENIG:   Objection, foundation.

16          THE COURT:   Sustained.

17   BY MR. FELDBERG:

18   Q.   Do you know if they were, different, sir?

19          MR. KOENIG:   Objection to foundation if there were

20   eight suppliers.

21          THE COURT:   Sustained as to that, too.

22          MR. FELDBERG:   I will rephrase.

23   BY MR. FELDBERG:

24   Q.   Mr. Bryant, how many suppliers are you aware of who

25   supplied eight-piece to KFC in 2014?

Robert Bryant - Cross

1   A.  Several.  I have mentioned those.

2   Q.  How many?

3   A.  Several, at least six or seven.  There may have been a

4   couple more that I haven't listed.

5   Q.  And you don't remember who they are?

6   A.  The others?

7   Q.  Yes.

8   A.  Back then I'm not sure.  I would have to...

9   Q.  So among the six or seven or perhaps more suppliers to KFC

10  in 2014, isn't it true that all of their prices for the 2015,

11  '16, '17 contracts were different?

12  A.  I don't remember what their prices were after the bids.  It

13  was later on, but -- I think there was a range there.  I just

14  don't recall the range.

15  Q.  So they were different, but you don't recall exactly the

16  range.

17  A.  Correct, yes.

18  Q.  Would you agree with me that a difference of even, say,

19  half a cent would amount to a substantial amount of money given

20  the volume of business involved?

21  A.  It could be, yes.

22  Q.  So the prices were different among the suppliers.  Even

23  small differences amount to a lot of money.  You just don't

24  recall the range, correct?

25  A.  It depends on your volume, yes.

Robert Bryant - Cross

1   *Q.* Speaking of volume, you've testified I believe yesterday

2   that the customers -- I am sorry, the suppliers were not taking

3   volume from each other. Do you recall testifying something to

4   that effect?

5   *A.* In general. In this circumstance, yes. Now, in other

6   areas of the business, it was -- it was different, but ...

7   *Q.* Do you recall, Mr. Bryant, that the volume of sales from

8   Pilgrim's to KFC decreased substantially from 2014 to 2015?

9   *A.* Yes.

10   *Q.* And do you recall, sir, that the volume of sales from

11   Pilgrim's to KFC decreased substantially during the entire time

12   of the alleged conspiracy 2012 to 2019?

13   *A.* I do. I believe KFC closed approximately 2000 stores

14   during that time frame which caused their buying to go -- go

15   down, but I don't remember exactly how many stores, but I

16   believe it was in that time frame that caused a lot of that

17   attrition.

18   *Q.* Some of it perhaps, but do you recall that other suppliers

19   increased their volume of sales to KFC during the 2012 to 2019

20   period?

21       *MR. KOENIG:* Objection, foundation.

22       *THE COURT:* He asked if he recalled. Overruled.

23   *A.* I don't recall. I do recall it may have been in 2015,

24   2016, there was a new entrance into the small bird market which

25   set up the price decrease as I mentioned in 2017. I believe OK

Robert Bryant - Cross

1  Foods came into the mix and took some volume in that time

2  frame -- or possibly that's where part of our volume went in

3  2018, I don't recall exactly, but I recall more birds

4  available.

5  BY MR. FELDBERG:

6  Q.  And do you recall that in 2015 George's and Koch and

7  Mar-Jac took volume away from Pilgrim's because they offered a

8  lower price?

9  A.  I do not recall that.  I don't.  I don't.

10  Q.  You don't recall one way or the other.

11  A.  No.

12  Q.  We'll come back to that with another witness.

13          And do you recall, sir, that there were years that

14  Pilgrim's prices to KFC went up -- there was one year, 2015 --

15  and there were years when it went down.

16  A.  Yes.

17  Q.  For example, going from 2013 to 2014 Pilgrim's prices to

18  KFC decreased substantially, correct?

19  A.  What context are you using substantially?  I used

20  substantially to describe 15 to 20 cents, so I don't remember

21  them going down 15 or 20 cents, but...

22  Q.  Well, they did go down in 2014, correct?

23  A.  Correct.

24  Q.  And they went down again in 2018, correct?

25  A.  That's correct.

Robert Bryant - Cross

1    Q.  And they went up in 2015, correct?

2    A.  That's correct.

3    Q.  And 2015 was the year when there was a substantial shortage

4    of the kind of birds KFC needed, correct?

5    A.  There was a shortage, yes.

6    Q.  And that was a three-year contract, correct?

7    A.  That's correct.

8    Q.  First time there was a three-year contract between

9    Pilgrim's and KFC, correct?

10   A.  That I can recall, yes.

11   Q.  And a three-year contract created more risk for Pilgrim's,

12   didn't it?

13   A.  I don't know that it created more risk for us because it

14   was -- or for Pilgrim's because it was a margin over feed

15   contract, so I think -- my view would be I would view that

16   oppositely.  It created less risk because of the grain side

17   even though the commodity side, so I would view it as less

18   risk.

19   Q.  But you would agree, would you not, Mr. Bryant, that by

20   locking in a contract for three years, Pilgrim's was locked

21   into every component of that contract other than grain feed for

22   three years.

23   A.  That's correct.

24   Q.  So if the market moved against Pilgrim's in the course of

25   three years rather than in one year, it could be

1  disadvantageous to Pilgrim's, correct?

2  *A.*  You are speaking of the opportunity cost if the market were

3  to surpass the contract.

4  *Q.*  Yes.

5  *A.*  Yes, that could be perceived as a risk.  When I spoke about

6  less risk, the reason why I said less risk is because it was a

7  margin over feed.  So we had our cost locked in and then if

8  grain went up, then we got that cost covered too so we

9  protected the margin.

10  *Q.*  Well, you are protected on grain.

11  *A.*  Correct.

12  *Q.*  But you are not protected on all the other components.

13  *A.*  We would not be protected on labor, for instance, or

14  packaging or something like that, which in my view wasn't a big

15  of a risk as the grain side.

16  *Q.*  Labor is a pretty big percentage of your cost, isn't it?

17  *A.*  Not as large as grain.

18  *Q.*  So you are protected on grain, but you are not protected on

19  labor, on what else did you say?

20  *A.*  I said labor and packaging.  And normally packaging went up

21  a few points a year, labor the same thing because of annual

22  increases.

23  *Q.*  So in a three-year contract labor goes up, you're locked

24  in, but both labor and packaging go up a few points a year.

25  *A.*  That's correct.

Robert Bryant - Cross

1    *Q.*  Let's talk about 2017, Mr. Bryant.

2           You testified that you received a call from Mr. Austin

3    and he gave you competitor pricing.  Do you recall that?

4    *A.*  I do.

5    *Q.*  When was that call?

6    *A.*  It was around the first week of February.  I don't recall

7    the exact day of that call.

8    *Q.*  Where were you when you received that call?

9    *A.*  I was at my home office in Kentucky.

10   *Q.*  And do you know where Mr. Austin was?

11   *A.*  I don't know if he told me where he was when he called me.

12   I don't remember that coming up in the conversation.

13   *Q.*  To the best of your recollection, what did Mr. Austin say?

14          *MR. KOENIG:*  Objection, hearsay.

15          *THE COURT:*  Sustained.

16   BY MR. FELDBERG:

17   *Q.*  Did you make any notes of the call?

18   *A.*  I did.

19   *Q.*  And are those the notes that you testified about yesterday

20   that you made in your notebook?

21   *A.*  They are, yeah.

22          *MR. FELDBERG:*  Could we call up, please, Government

23   Exhibit 1919?

24          I believe it's in evidence, Your Honor, and assuming

25   that it is, I would ask that it be published.

992

Robert Bryant - Cross

1          *THE COURT:*  Let me just double-check.  It's in?  Yes.

2          *MR. KOENIG:*  Only Pages 11 and 12 are in.

3          *THE COURT:*  Good point.  Pages 11 and 12.  So those

4     two pages may be displayed.

5          *MR. FELDBERG:*  Let's go to Page 11, then, please.

6     Could we go to Page 12, please?  Thank you.

7     *BY MR. FELDBERG:*

8     *Q.*  Mr. Bryant, are those the notes that you say you made based

9     on the conversation with Mr. Austin?

10    *A.*  That's correct.

11    *Q.*  And you testified yesterday that the top line was Pilgrim's

12    current price, correct?

13    *A.*  I believe that's correct, yes.

14    *Q.*  But the other entries for different companies were their

15    future bids, correct?

16    *A.*  That's the way I understood it, yes.

17         *MR. FELDBERG:*  Could we call up, please, Defense

18    Exhibit F-828.

19         And this should not be published to the jury yet.

20    *BY MR. FELDBERG:*

21    *Q.*  Exhibit F-828 for identification, Mr. Bryant, is Pilgrim's

22    fresh -- I am sorry, it's RSCS's fresh poultry pricing sheet --

23         *MR. KOENIG:*  Objection.  Shouldn't he ask the witness

24    a question or tell him what the document is about.

25         *THE COURT:*  Sustained.

Robert Bryant - Cross

1   BY MR. FELDBERG:

2   Q.   Do you recognize F-828, sir?

3   A.   I do not.

4   Q.   Do you know whether it's Pilgrim's -- I am sorry, RSCS's

5   fresh poultry pricing sheet for period two, January 29, 2017

6   through February 25th, 2017?

7   A.   I do not.  I have not seen this.

8   Q.   Is that what the title of the document is?

9   A.   I have not seen this document before.

10          MR. KOENIG:  Objection.

11          THE COURT:  Documents can't be read to the witness,

12   especially given the fact that the witness has indicated he is

13   not familiar with it.  Objection is sustained.

14   A.   I have not seen this document before or one similar to this

15   that I'm aware of.

16   BY MR. FELDBERG:

17   Q.   As of the first week in February, Mr. Bryant, do you know

18   whether the companies listed in your notes on Page 12 of

19   Exhibit 1919 had or had not determined their bid prices for the

20   following year?

21   A.   By when?

22   Q.   By the first week in February.

23   A.   They were due the first week of February.

24   Q.   But do you know whether or not at the time you spoke -- you

25   say you spoke with Mr. Austin that week -- the various

Robert Bryant - Cross

1    companies had determined what they were going to bid?

2    A.  I only know the information he provided me.  I don't know

3    where they were at in their process or if anything further than

4    the information I wrote down.

5    Q.  Isn't it a fact, Mr. Bryant, that the information that

6    Mr. Austin gave you in early February 2017 was the suppliers'

7    current prices?

8            MR. KOENIG:  Objection.

9            THE COURT:  Overruled.  He can answer.

10   A.  That's not what I recalled.

11   BY MR. FELDBERG:

12   Q.  Are you certain of that, sir?

13   A.  That's not what I recall.  And, I mean, I can expand on

14   that if you'd like, but...  Because I remember using that

15   information to develop a model that put us second in price

16   based on the information that I wrote down and later it was

17   changed.  So I was acting under -- I and Tim Stiller, my boss,

18   used that for the pricing submission for that first round.

19           And I remember developing a model that placed us

20   second in that list of pricing.  Later it was adjusted a little

21   bit down from there to be more middle the pack and that's what

22   I remember.  So whether or not the pricing was or was not, I

23   was acting as though it was the bid submission and that's what

24   I remember.

25   Q.  Are you saying, sir, that you acted as if the information

Robert Bryant - Cross

1   you heard -- you say you heard from Mr. Austin -- was future

2   bids, but you don't remember one way or the other whether he

3   gave you current prices or future bids?

4   A.  My recollection is in the way that I used that information

5   is that was the pricing they intended to submit.

6   Q.  Are you certain of that?  That may be the way you used it.

7   I am asking you are you certain of what you say you heard

8   Mr. Austin say?

9   A.  That is the way I remember it is that it was -- that was

10  their intended bid price and that's the way I used the

11  information, myself and Tim Stiller used that information.

12        MR. FELDBERG:  We will come back to Exhibit F-828 with

13  a subsequent witness.

14        If we could call up 1919 again, Page 12.

15  BY MR. FELDBERG:

16  Q.  Those prices are all different, aren't they?

17  A.  They are.

18  Q.  And to see the magnitude of the difference, the range of

19  prices is as much as 5 cents per pound, correct?

20  A.  That's correct, almost, yeah.

21  Q.  So whatever these prices represent, the suppliers all had

22  different prices.

23  A.  That's correct.

24  Q.  Now, you testified that you wanted to be No. 2 in price,

25  correct?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   You did not want to have the same price as your

3    competitors, correct?

4    A.   That's correct.

5    Q.   And as the process went on, you changed your view from

6    wanting to be No. 2 to wanting to be more in the middle of the

7    pack among your competitors, correct?

8    A.   I didn't change my view.  My view was changed by -- and I

9    don't remember if it was Tim Stiller, Roger Austin, that made

10   the comment that we needed to be more middle of the pack, but I

11   conceded that.

12   Q.   So it started out as Pilgrim's wanting to be No. 2 and it

13   evolved to Pilgrim's wanting to be in the middle of the pack

14   among its competitors, correct?

15   A.   That's correct.

16   Q.   And that -- those decisions were decisions made

17   independently by Pilgrim's as to how it wanted to position

18   itself in relation to its competitors, correct?

19   A.   That's correct.

20   Q.   It didn't want to have the same price, correct?

21   A.   That's correct.

22   Q.   It wanted to be either the second highest or in the middle

23   of the pack, correct?

24   A.   That's correct.

25   Q.   And those were independent decisions by Pilgrim's acting in

Robert Bryant - Cross

1   its own economic self-interest, correct?

2   A.   Those were -- we did, you know, like I've stated, myself

3   and I don't remember if it was Roger Austin or Tim Stiller,

4   yes, the three of us discussed the price before submission and

5   came in at middle of the pack.

6   Q.   Nothing wrong with wanting to be in the middle of the pack,

7   is there, Mr. Bryant?

8   A.   I don't guess.   That's average.

9   Q.   You testified yesterday that Mr. Austin kept track of

10  current pricing, correct?

11  A.   That's correct.

12  Q.   Current pricing was reasonably well-known through the

13  broiler chicken industry, correct?

14  A.   I'm not aware of that, no.

15  Q.   Well, you testified yesterday that suppliers often covered

16  shorts for each other, correct?

17  A.   That's correct.

18  Q.   And let's discuss what a short is.   A supplier has an

19  obligation to supply chicken to a customer, correct?

20  A.   That's correct.

21  Q.   But something goes wrong, correct?

22  A.   It happens all the time.

23  Q.   It happens all the time.

24  A.   Uh-huh.

25  Q.   They don't have as many of the particular size chicken as

998

Robert Bryant - Cross

1   they need, correct?

2   A.  There's a down time, logistics, labor, there's sizing.

3   There is a host of reasons you can have problems in a

4   processing plant.

5   Q.  And as you said, it happens all the time.

6   A.  Yes.

7   Q.  And when it happens, the suppliers communicate with each

8   other to see if somebody can cover the short for them, correct?

9   A.  I mean, there's ways to handle it, yes.  You know,

10  Pilgrim's being a larger company, you know, having at one time

11  seven plants, six plants, we had two daily calls, one in the

12  morning, one in the afternoon to -- we would move orders around

13  independently.  And a lot of times we would cover our own

14  internal problems and overcome those with those two conference

15  calls.  There were times when we needed outside help.

16  Q.  And when you needed outside help for this shortage

17  situation that happened all the time, Pilgrim's would

18  communicate with other suppliers to see if they could cover or

19  other suppliers would communicate with Pilgrim's to see if

20  Pilgrim's could cover, correct?

21  A.  That would happen, and obviously you communicate with the

22  customer as well.

23  Q.  And when that happened you would find out what your

24  competitor's price was because that was the price you were

25  going to end up selling at, correct?

Robert Bryant - Cross

 1   *A.*  It -- for -- yes, in a sense.  Most of the time it was

 2   their per case price.  You could probably find some instances

 3   where they sent the full math problem with the pound and their

 4   case price or the max billable and the case, but what I

 5   remember is most of the time getting the per case price, like

 6   640 at $50 per case, for instance.  But yes, there are -- there

 7   are times when that information's shared.

 8        *MR. FELDBERG:*  Let's look at a couple documents.

 9   Could we pull up H-914 for identification.

10        *MR. KOENIG:*  Objection, Your Honor.  We have not been

11   provided -- not the physical copies, but notice in advance of

12   this.  My understanding is their exhibit list goes through

13   H-607.

14        *MR. FELDBERG:*  Your Honor, this is cross-examination.

15   It's impeachment.

16        *THE COURT:*  Well, right, exhibits should normally be

17   shared.  I think there was a discussion about that, but I am

18   not going to rule on this particular exhibit in regard to it

19   not having been shown before now.

20        Mr. Koenig has got a copy now.  Let's give Mr. Koenig

21   an opportunity to take a look at it.

22        Objections?

23        *MR. KOENIG:*  Well, if it's offered, there will be.

24        *THE COURT:*  Okay.

25        *MR. FELDBERG:*  I don't intend to offer this, Your

Robert Bryant - Cross

1    Honor.

2    *BY MR. FELDBERG:*

3    *Q.*  Mr. Bryant, have you had a chance to look through Exhibit

4    H-914?

5    *A.*  Yes.

6    *Q.*  This is an exchange between Scott Tucker of Pilgrim's and

7    Scott Brady of Claxton, correct?

8    *A.*  That's correct.

9    *Q.*  And it has to do with covering a short, correct?

10         THE COURT:  Hold on.  Because the document won't be

11   admitted, it can't be read to the witness.

12         *MR. FELDBERG:*  I am not reading it, Your Honor.

13         THE COURT:  You're indicating things about the

14   exhibit.  The witness has to be able to answer the questions

15   independently through some type of independent knowledge, but

16   the substance or even other information from the exhibit cannot

17   be mentioned to the jury unless it's been admitted, all right?

18         *MR. FELDBERG:*  Fair enough.

19   *BY MR. FELDBERG:*

20   *Q.*  Let's move on, then, to Exhibit H915.

21         Mr. Bryant, Exhibit H-915 is an e-mail from Scott

22   Tucker to you, correct?

23   *A.*  It is.

24   *Q.*  On December 29, 2016, correct?

25   *A.*  Correct.

Robert Bryant - Cross

1    *Q.* And it has to do with covering shorts, correct?

2         *MR. KOENIG:* Objection. The document has not been

3    authenticated and it's not in evidence.

4         *THE COURT:* It's overruled. It's sent to Mr. Bryant,

5    so we'll see if he has recollection of it.

6         *MR. KOENIG:* Even on authenticity?

7         *THE COURT:* He hasn't offered it yet.

8    *A.* I mean, we are buying a load from Mar-Jac here. My

9    assumption is yes, it's to cover shorts. I don't remember this

10   particular e-mail, but yes, we're buying a load.

11   *BY MR. FELDBERG:*

12   *Q.* Do you have any reason to doubt that this e-mail was sent

13   to you and you received it on December 29 of 2016?

14   *A.* No.

15        *MR. FELDBERG:* We offer 915, Your Honor.

16        *THE COURT:* Any objection to the admission of H-915?

17        *MR. KOENIG:* Hearsay.

18        *THE COURT:* Hold on.

19        *MR. KOENIG:* And authenticity.

20        *THE COURT:* Response?

21        *MR. FELDBERG:* No. 1, it's authentic. He received it.

22   It's produced by Pilgrim's. He received it. He has no reason

23   to doubt its authenticity, so authenticity is established.

24   It's not offered for the truth. It's offered simply to

25   establish that this short e-mail was sent.

Robert Bryant - Cross

1    *THE COURT:*  Sustained.  It's hearsay.

2    *BY MR. FELDBERG:*

3    *Q.*  Mr. Bryant, is it the case that sometimes when competitors

4    covered shorts for each other they learned each other's prices?

5    *A.*  That's correct.

6    *Q.*  Okay.  You participated in the negotiations with RSCS in

7    the winter of 2017, correct?

8    *A.*  You mean January or February?

9    *Q.*  January and February.

10   *A.*  Yes, yes.

11   *Q.*  And the lead negotiator for RSCS was Mr. Suerken, correct?

12   *A.*  That's correct.

13   *Q.*  Would it be fair to say that it was unusual for the

14   negotiations to begin as early in the year as January and

15   February?

16   *A.*  That's correct.

17   *Q.*  In prior years negotiations usually began in the late

18   summer, early fall, correct?

19   *A.*  That's correct.

20   *Q.*  Would you characterize -- would you agree with the

21   characterization that the negotiations with RSCS were vigorous?

22   *A.*  They were -- it was tense.

23   *Q.*  I think you testified yesterday that Mr. Suerken of RSCS

24   threatened to hit you with a baseball bat to get Pilgrim's to

25   lower its price.

Robert Bryant - Cross

1   A.  Well, I don't think he meant that figuratively.  I think he

2   meant that he was going to beat us down on price.

3   Q.  And that's what he said, correct?

4   A.  Yes.

5   Q.  And that's what he did, correct?

6   A.  Ultimately, yes.

7   Q.  Pilgrim's reduced its price.

8   A.  That's correct.

9   Q.  And I think you testified yesterday that Mr. Suerken

10  threatened to take volume from you because he was punishing you

11  for the price increase in 2015, correct?

12  A.  That's correct.

13  Q.  And he did, in fact, take volume from you.

14  A.  I believe he -- what I remember is he took 10 loads a week

15  from us, I believe is what he did.  It ended up being more, but

16  yes.

17  Q.  So he took 10 or more loads a week.  And a load is a

18  truckload, correct?

19  A.  That's correct.

20  Q.  And a truckload is about 32,000 pounds?

21  A.  Of meat weight, that would be correct, yes.

22  Q.  So he took 10 or more loads a week, 520 or more loads a

23  year times 32,000 pounds -- I can't do the math.

24  A.  320,000 pounds a week.

25  Q.  Thank you -- to punish you because he was angry about the

Robert Bryant - Cross

1  price increase in 2015, correct?

2  A.  That's correct.

3  Q.  And he took those loads away from you and he gave them to

4  your competitors, correct?

5  A.  Yeah.  I don't know who received those loads.  My

6  assumption was it was OK Foods at the time.  Like I mentioned

7  earlier, I think they were a new entrant into the small bird,

8  but I don't know for sure who ended up with those loads.

9  Q.  Somebody got them?

10  A.  That's correct.

11  Q.  Somebody who could supply broiler chicken.

12  A.  That's correct.

13  Q.  And there were only a small number of companies who met

14  KFC's specifications for broiler chicken, correct?

15  A.  That's correct.

16  Q.  So in terms of the volume issue, Pilgrim's lost volume and

17  one of your competitors gained volume.

18  A.  Yes.

19  Q.  Correct?

20  A.  That's correct.

21  Q.  So if there was some kind of an agreement among the

22  suppliers about prices and volume, how come there were these

23  tense negotiations with RSCS and RSCS beat Pilgrim's down on

24  price and took volume away from it and gave it to others?

25  A.  The volume piece was predetermined, so I don't know that

1005

Robert Bryant - Cross

1  there was anything that we could have done to prevent that

2  volume from going away.  Like I had mentioned earlier, the

3  volume piece, Pete was upset about 2014 and, you know, he was

4  very vocal about taking volume and pushing us down on price.

5  Q.  And that's exactly what happened, correct?

6  A.  Yeah, on -- yes, he did take volume and we did reduce the

7  price in the end.

8  Q.  Because of the tense negotiations between Pilgrim's and

9  RSCS, correct?

10  A.  Well, I mean, there was some outside interest in those

11  pricing negotiations and things that were happening during the

12  2017 time frame that I don't know what I can say on that that

13  probably influenced those negotiations.

14  Q.  But the tense negotiations were between RSCS led by

15  Mr. Suerken and the Pilgrim's team, correct?

16  A.  That's correct.

17  Q.  And the result of those negotiations was Pilgrim's reduced

18  its price and RSCS took volume away from Pilgrim's, correct?

19  A.  That's correct.

20  Q.  Now, do you recall, Mr. Bryant, when Pilgrim's made its

21  initial bid to RSCS for the 2018 contract?

22  A.  I believe it was the first week of February.

23  Q.  Do you recall that you were the person who told Mr. Austin

24  what Pilgrim's could bid?

25  A.  Yes.

Robert Bryant - Cross

1    Q.  So the decision about what Pilgrim's was allowed to bid

2    came from you to Mr. Austin.

3    A.  Ultimately, yes, that's correct.

4    Q.  And you made that decision in consultation with the other

5    financial people in Greeley?

6    A.  What I remember is having conversations with Roger Austin

7    and Tim Stiller about it.  You know, there is obviously someone

8    that helps with the model, but it was primarily the three of us

9    that determined the final bid price.

10   Q.  But the instruction to Mr. Austin on what he was permitted

11   to bid came from you to him, correct?

12   A.  That's correct.

13   Q.  It wasn't Mr. Austin's decision, correct?

14   A.  No.  Like I said, it was -- we consulted each other.  You

15   know, he weighed in on -- you know, he was responsible

16   ultimately for the count, so he was giving guidance to me on

17   what he felt was appropriate.  The same with Tim Stiller, my

18   boss, he was giving guidance to me as well.  And then, you

19   know, ultimately I adjusted the model based on those

20   consultations and sent it to Roger to submit.

21   Q.  Ultimately you adjusted the model and made the final

22   decision, correct?

23   A.  That's correct.

24   Q.  Now, Mr. Austin retired in August of 2018, correct?

25   A.  I don't remember exactly when he retired.  If you would

Robert Bryant - Cross

1  have asked me without telling me, I probably would have said it

2  was 2017, but 2017, 2018 he retired I remember.

3  Q.  And you continued after Mr. Austin retired to share pricing

4  information with competitors, correct?

5  A.  I don't -- I don't recall.

6         MR. FELDBERG:  Let's call up DX-H-783.  Actually,

7  let's call up DX-H-782 for identification, not publishing it.

8  BY MR. FELDBERG:

9  Q.  Mr. Bryant, have you had a chance to look at H-782?

10  A.  I am reviewing it now.  Okay.

11  Q.  Is this an e-mail to you from Mr. Paul Canon, correct?

12         MR. KOENIG:  Objection.

13         THE COURT:  And the objection is?

14         MR. KOENIG:  It's not in evidence and he is reading

15  from it.

16         THE COURT:  Sustained.

17  BY MR. FELDBERG:

18  Q.  Is this an e-mail you received, Mr. Bryant?

19  A.  It is.

20  Q.  Is it an e-mail you received on or about January 31st,

21  2019?

22  A.  It is.

23         MR. FELDBERG:  We offer it, Your Honor.

24         THE COURT:  Any objection to the admission of H-782?

25         MR. KOENIG:  Authenticity and hearsay.

Robert Bryant - Cross

1        THE COURT:  Response?

2        MR. FELDBERG:  Your Honor, it's authentic.  It's

3   Pilgrim's document.  Mr. Bryant testified he received it.  And

4   as to the hearsay objection, we are offering it not for the

5   truth of the matter asserted, but for the fact that there was

6   price sharing information long after Mr. Austin had retired.

7        THE COURT:  Objection is sustained.  It's hearsay.  He

8   can be asked about it, but the document itself is hearsay.

9   BY MR. FELDBERG:

10  Q.  Mr. Bryant, does Exhibit H-782 refresh your recollection

11  that there continued -- that you continued to share competitor

12  pricing information after Mr. Austin had retired?

13  A.  This did not come from a competitor.

14  Q.  Does the exhibit refer to the pricing for Tyson WOGs?

15  A.  It does.  But however, this is retail product and --

16        MR. KOENIG:  Objection.

17        THE COURT:  Overruled.

18  A.  This is retail product and sometimes those buyers in the

19  retail world, the supermarkets would be very direct in saying

20  something, for example, I am buying a Tyson WOG today, which is

21  just a chicken.  It stands for without gibs.  I am getting it

22  for a dollar.  If you guys can meet or beat that, then I will

23  transition the business from you.  And this e-mail is from one

24  of those supermarket chains that is telling us they're buying

25  product from a competitor and they're telling us what delivered

Robert Bryant - Cross

1    cost they expect us to match or beat in order to win the

2    business.

3    *BY MR. FELDBERG:*

4    *Q.* So you had competitor information about Tyson WOGs pricing

5    on January 31st, 2019, correct?

6    *A.* Yes. Now, I don't know whether or not -- I mean, it was on

7    me and the rest of the folks on this e-mail whether or not we

8    believed that buyer or not, if this is a true and accurate

9    representation of the pricing that they were actually -- they

10   actually had with Tyson. Do you understand the distinction?

11   *Q.* Well, every now and then somebody bluffs, correct?

12   *A.* There you go. So, yes, this is where the buyer is telling

13   us this is what he is buying it for. It may or may not be

14   true. It was a judgment call on us whether or not we chose to

15   use that information.

16   *Q.* Sometimes buyers bluff?

17   *A.* Absolutely.

18   *Q.* And sometimes competitors bluff too, don't they?

19   *A.* It could be.

20        *THE COURT:* We are at 10 minutes of, ladies and

21   gentlemen, so we will go ahead and take the lunch break.

22   Remember, we will be coming back a little -- 10 minutes earlier

23   at 1:20.

24        Keep the admonitions in mind. If you go outside of

25   the courthouse or even within the hallways, make sure to keep

Robert Bryant - Cross

1  your yellow juror buttons visible if you can.  The jury will be

2  excused.  Thank you.

3            (Jury excused.)

4            We will be in recess.  Thank you.

5        (Recess at 11:50 a.m.)

6        (Reconvened at 1:20 p.m.)

7            THE COURT:  Is there something to bring up or no?  If

8  so, we should either do it by side bar or excuse Mr. Bryant.

9            MR. KOENIG:  Side bar is fine.

10      (At the bench:)

11            MR. KOENIG:  Your Honor, it keeps going on mute.  Can

12  you hear me now?

13            THE COURT:  I can.  Go ahead.

14            MR. KOENIG:  Yes, Your Honor.  There is a couple

15  things we would like to address.  One, Mr. Feldberg is

16  continuing saying or multiple times saying, "We'll cover that

17  with another witness."  I just don't think that's appropriate

18  and I would ask him not to continue doing that.

19            The second issue is to the extent there is going to be

20  more of these summary or demonstrative-type exhibits, that's

21  really not something we can, you know, absorb on the fly and

22  make any judgment calls on, so I would ask that those be

23  produced in advance.

24            THE COURT:  And when you say a summary or

25  demonstrative exhibit, what's an example of that?  I don't

Robert Bryant - Cross

1    really recall.

2         MR. KOENIG:  I think it was that first one with all

3    the telephone numbers when he says, I will represent to you

4    that these are something.

5         THE COURT:  Okay.  I'm not sure if that was something

6    that was prepared by Mr. Feldberg or the defendants or whether

7    that was something else, I don't know, but obviously it's

8    difficult to try to absorb something with that much information

9    on the fly, but I don't know whether -- exhibits I think were

10   supposed to have been exchanged, but maybe I will hear from

11   Mr. Feldberg on that issue.

12        MR. FELDBERG:  Your Honor, on the phone records

13   exhibit, which I think is the only demonstrative-type exhibit

14   that we used today or tried to use, Your Honor did exclude it.

15   Second of all, it is an extraction from the phone records

16   database that the prosecution created.  And that database has

17   not been fully authenticated yet because one of the witnesses

18   who was supposed to precede Mr. Bryant had his flight canceled

19   and I think is going to now succeed Mr. Bryant.  In terms of --

20   and I will be guided by whatever the Court decides.

21        I had understood the rule to be that impeachment

22   documents did not have to be exchanged.  If I am wrong on that,

23   I apologize.  We are happy to exchange them at the time we use

24   them, but we did not have to give our adversaries a preview of

25   our cross by sharing our impeachment exhibits with them in

Robert Bryant - Cross

1    advance.

2         THE COURT:  Typically that's true.  And if there is no

3    agreement with the government about impeachment exhibits, then

4    I think you're right.  That doesn't mean that Mr. Koenig has to

5    proceed without being able or anyone else from the government

6    proceed without having a chance to take a look at them.  There

7    could be delays because of that, but right, if there is no

8    agreement, then an impeachment exhibit like that is typically

9    not part of it, although once again, if you can reach

10   agreements to facilitate the trial moving along, that's good,

11   but I'm not going to try to enforce any agreement that didn't

12   exist.

13        MR. FELDBERG:  Thank you, Your Honor.

14        THE COURT:  And Mr. Feldberg, the other thing is that

15   I do agree with Mr. Koenig, I mean, I recall you indicating to

16   the witness that you would return to a given topic with the

17   witness and that's fine to mention.  To the extent that there

18   is a reference to "We'll take that up with another witness,"

19   because that's irrelevant to this witness, it's best not to

20   make that type of comment.

21        MR. FELDBERG:  Fair enough.  Just so I understand,

22   Your Honor, it's okay to say, "We'll take that up with another

23   witness"?

24        THE COURT:  No, it's not okay.  But you had mentioned

25   on a few occasions that you would take it up with Mr. Bryant or

Robert Bryant - Cross

1    we'll come back to that, and that's perfectly fine if you're

2    going to come back to it with Mr. Bryant.

3              Mr. Koenig, anything else?

4         *MR. KOENIG:*  No, Your Honor.  Thank you.

5         *THE COURT:*  Okay, thanks.

6       (In open court:)

7              Ms. Grimm, let's bring the jury in.

8              (Jury present.)

9         *THE COURT:*  Mr. Feldberg, go ahead.

10        *MR. FELDBERG:*  Thank you, Your Honor.

11   *BY MR. FELDBERG:*

12   *Q.*  Mr. Bryant, you testified yesterday about a meeting with

13   Popeye's in the summer of 2014; is that correct?

14   *A.*  That's correct.

15   *Q.*  That meeting was actually with SMS.

16        *MR. KOENIG:*  The microphone?

17        *MR. FELDBERG:*  Is that better?

18        *THE COURT:*  It doesn't seem to be on.

19   *BY MR. FELDBERG:*

20   *Q.*  Mr. Bryant, you testified yesterday about a meeting with

21   Popeye's in the summer of 2014, correct?

22   *A.*  That's correct.

23   *Q.*  And that meeting was actually with SMS, the buying

24   cooperative, correct?

25   *A.*  That's correct.

Robert Bryant - Cross

1    *Q.*  Did you get a calendar invitation for that meeting?

2    *A.*  I don't recall if I did or did not.

3          *MR. FELDBERG:*  Let's call up Exhibit DX-E-174 for

4    identification, please.

5    *BY MR. FELDBERG:*

6    *Q.*  Does that refresh your recollection that you received a

7    calendar invite?

8    *A.*  Yes.

9    *Q.*  And is this the calendar invite?

10   *A.*  It appears to be.

11         *MR. FELDBERG:*  We offer it, Your Honor.

12         *THE COURT:*  Any objection to the admission of E-174?

13         *MR. KOENIG:*  Yes, Your Honor.  It's hearsay.

14         *THE COURT:*  Response?

15         *MR. FELDBERG:*  I don't say any hearsay in it.  It's a

16   calendar invitation.  It's clearly a business record.

17         *THE COURT:*  Yeah, at the bottom of it seems to be

18   statements of someone other than Mr. Bryant.  Objection is

19   sustained.

20         *MR. FELDBERG:*  We don't need to offer that, Your

21   Honor.  We can just get the invite date, time, invitees.

22         *THE COURT:*  So where would you cut off this particular

23   exhibit then?

24         *MR. FELDBERG:*  There is some characters about

25   one-third of the way down the page that are not letters or

Robert Bryant - Cross

1  numbers.  It's below the phrase that begins "Note."  I would

2  cut it off there.

3        THE COURT:  As the exhibit is amended, any objection

4  to Exhibit E-174?

5        MR. KOENIG:  No.

6        THE COURT:  So even though through the magic of screen

7  manipulation this exhibit has been amended, we will have to

8  make sure that there is a hard copy that reflects the version

9  that's just about to be shown to the jury.  But as revised, I

10  will admit Exhibit E-174.

11        MR. FELDBERG:  Thank you, Your Honor.  And we will

12  take care of having hard copies available as amended.

13        Could this be displayed to the jury, please, but only

14  the top third, the part that's been --

15        THE COURT:  I think, Mr. Feldberg, I don't know -- it

16  has not been displayed yet, but the screen being displayed

17  right now to me is appropriate and that may be shown to the

18  jury.

19  BY MR. FELDBERG:

20  Q.  Mr. Bryant, the calendar invite was sent to whom?

21  A.  Kent Kronaugue.

22  Q.  And who was Mr. Kronaugue?

23  A.  I don't remember what his title was then, but currently he

24  is the president of SMS.  Jason McGuire, myself and Larry

25  Higdem.

Robert Bryant - Cross

1   *Q.*  Who is Larry Higdem?

2   *A.*  He is another Pilgrim's employee.

3   *Q.*  And the meeting was scheduled for July 24th of 2014 from

4   1:00 p.m. to 5:00 p.m.?

5   *A.*  That's correct.

6   *Q.*  Not reflecting daylight savings time adjustments?

7   *A.*  That's right.

8   *Q.*  Is it correct, sir, that some parts of Kentucky are in

9   different time zones than other parts?

10   *A.*  That's correct.

11   *Q.*  Mr. Austin is not on the calendar invite, is he?

12   *A.*  That's correct.  And I do think this was more of a

13   placeholder because I don't recall having a meeting from -- for

14   four hours from 1:00 to 5:00, so I think it was just blocking

15   off the afternoon.  I don't think this was the exact times of

16   the meeting.

17   *Q.*  Are you a hundred percent certain that Mr. Austin was at

18   that meeting, sir?

19   *A.*  At the Popeye's meeting, I am not 100 percent certain if he

20   was there or not.

21   *Q.*  So as we sit here today, you don't recall whether or not

22   Mr. Austin was at the Popeye's meeting that you testified about

23   yesterday.

24   *A.*  If you're -- I mean, I have been to a lot of customer

25   meetings.  If you're referring to the comment about "Put it out

Robert Bryant - Cross

1  to the industry," I do remember that specific comment.

2  *Q.*  Mr. Bryant, I am sorry.  The question is as we sit here

3  today, do you recall with a high degree of confidence whether

4  or not Mr. Austin was at the Popeye's meeting you testified

5  about yesterday?

6  *A.*  No.

7  *Q.*  You do not recall.

8  *A.*  I'm not a hundred percent certain who all was in the room.

9  *Q.*  Okay.  Now, you testified yesterday about a request by

10  Popeye's for a 2-cent promotional discount.  Do you recall

11  that?

12  *A.*  I don't recall a 2-cent.  What I remember is I thought it

13  was a nickel, but it could have been 2 cents.  I don't -- I

14  recall testifying it was a request for a discount.  I wasn't

15  certain of the exact amount.

16  *Q.*  And what exactly was Popeye's request?

17  *A.*  That there was a promotional period that they wanted to --

18        *MR. KOENIG:*  Objection, hearsay.

19        *THE COURT:*  Overruled.

20  *A.*  There was a promotional period where they wanted to

21  basically have an ad campaign and they were requesting a

22  discount on their contracted price for that promotional period.

23  *BY MR. FELDBERG:*

24  *Q.*  And they made that request of all of their suppliers,

25  correct?

Robert Bryant - Cross

1    A.   That's my understanding.

2    Q.   Including Pilgrim's.

3    A.   That's correct.

4    Q.   And it was not unusual for Popeye's to request a

5    promotional discount, was it?

6    A.   No.  I think like I said yesterday, they done those

7    approximately twice a year.  I remember one was called a

8    pay-day promotion or something to that effect.

9    Q.   In your experience when Popeye's made a request to its

10   suppliers a for promotional discount, the suppliers went along

11   with it, correct?

12   A.   There was -- there was times.  That particular time I

13   remember saying that I didn't think it was warranted.

14   Q.   But somebody at Pilgrim's did, correct?

15   A.   I conceded eventually, yes.

16   Q.   Who thought it was warranted?

17   A.   At the time Justin Gay did.

18   Q.   And he was on the Popeye's account.

19   A.   That is correct.

20   Q.   Mr. Austin had nothing to do with this incident, did he?

21   A.   Not that I recall.  I don't recall discussing that with

22   Roger Austin.

23   Q.   And Mr. Austin had nothing to do with the Popeye's account,

24   correct?

25   A.   He did, but, I mean, Justin Gay was delegated that

Robert Bryant - Cross

1  responsibility.  Roger was Justin's manager.

2  Q.  But on a day-to-day basis it was Mr. Gay who dealt with the

3  Popeye's account, correct?

4  A.  That is correct.

5  Q.  Not Roger -- not Mr. Austin, excuse me, correct?

6  A.  That is correct.

7  Q.  Now, you were asked a lot of questions on direct

8  examination, Mr. Bryant, about your bonus structure.  Do you

9  recall that?

10  A.  I do.

11  Q.  You're not familiar with Mr. Austin's bonus structure, are

12  you?

13  A.  I don't know what his current -- what his personal bonus

14  structure.  I have a general idea of how -- I don't know what

15  his bonus percentage was.  I have a general idea of how his

16  bonus was funded, but not exactly.

17  Q.  You don't know how his bonus was funded.

18  A.  Not exactly.

19  Q.  All right.  And you said you don't know how -- you

20  mentioned a moment ago that you don't know how it is funded,

21  but Mr. Austin is retired now, correct?

22  A.  That's correct.

23  Q.  Now, you testified earlier today that Claxton is a small

24  company with one plant.  Do you recall that?

25  A.  I do.

Robert Bryant - Cross

1   *Q.*  Tyson is a big company, isn't it?

2   *A.*  It is.

3   *Q.*  Do you know how many plants it had in, say, 2018?

4   *A.*  Tyson?

5   *Q.*  Tyson.

6   *A.*  I don't know.

7   *Q.*  Was it larger than Pilgrim's?

8   *A.*  I don't know if it was more plants than Pilgrim's, but by

9 volume I believe they were -- they produced more pounds than

10 Pilgrim's.

11   *Q.*  And Tyson and Pilgrim's were the two largest broiler

12 chicken suppliers in the period 2012 through 2019, correct?

13   *A.*  I believe that's correct.

14   *Q.*  Was there a rivalry between Pilgrim's and Tyson?

15   *A.*  Possibly.  I mean, we compared our numbers against Tyson

16 and Sanderson numbers because they were two publicly traded

17 companies.

18   *Q.*  And did Pilgrim's try to beat Tyson and as far as you know

19 Tyson try to beat Pilgrim's?

20   *A.*  I don't know about Tyson, but yes, Pilgrim's did want to

21 outperform Tyson.

22   *Q.*  And Pilgrim's treated Tyson as a rival, correct?

23   *A.*  That's correct.

24   *Q.*  Going back to 2014, sir, when there was a discussion

25 internally about trying to obtain a price increase for all the

Robert Bryant - Cross

1    reasons we've discussed, would it be fair to say that when a

2    price increase was initially proposed, Mr. Austin was skeptical

3    about the size of the proposed price increase?

4    A.   That could be fair.

5    Q.   And would it be fair to say, sir, that in your experience

6    Mr. Austin was frequently an advocate for lower prices within

7    Pilgrim's for KFC?

8    A.   I would say that Roger was an advocate for his customer,

9    knew his customer well, and would have the tough conversations

10   internally that he felt was -- that he felt he needed to have

11   for his customer.

12   Q.   He was an advocate for his customer; is that correct, sir?

13   A.   That's correct.

14          MR. FELDBERG:   Nothing further, Your Honor.

15          THE COURT:   Thank you.

16          Additional cross-examination?

17          Go ahead, Mr. Canty.

18                          **CROSS-EXAMINATION**

19   BY MR. CANTY:

20   Q.   Good afternoon, Mr. Bryant.

21   A.   Good afternoon.

22   Q.   My name is Dennis Canty.   I represent Mr. Little.   I want

23   to take you back, if we could, to yesterday when we first began

24   talking about -- you talked with Mr. Koenig about shortages.

25   And you described the shortage problems in two capacities

Robert Bryant - Cross

1   really, a supply side problem and a demand side problem; fair

2   so far?

3   A.  Yes.

4   Q.  Okay.

5   A.  You have to have both.

6   Q.  On the supply side you were talking about variability

7   dealing with a live animal, right?

8   A.  Correct.

9   Q.  And in those situations those problems that you dealt with

10  an inability to produce enough chicken within specifications to

11  meet what you were supposed to deliver to a customer under the

12  contract, right?

13  A.  That's correct.

14  Q.  And in those situations you might need the help of a

15  competitor in order to meet your contractual obligations,

16  right?

17  A.  At times.

18  Q.  And conversely if a competitor didn't produce enough

19  chicken within specification, then a competitor might need

20  Pilgrim's help to meet its obligations, right?

21  A.  That's correct.

22  Q.  Okay.  You also talked about problems on the demand side.

23  And I wanted to talk to you a little bit about those, make sure

24  we understand them.  One of the things that you said was that

25  there would be demand spikes when a customer orders more

Robert Bryant - Cross

1    chicken.  Can you give me an example of what you're talking

2    about there?

3    A.  I think -- I think it was Mr. Feldberg asked me about

4    Mother's Day.  That's a good example of the demand spike, one

5    that we know is coming generally most years and try to do some

6    planning for that, but it's still a moving target.  So -- or

7    there is a feature that may not have been communicated to us by

8    the customer so we didn't have enough supply in the supply

9    chain to supply that increased demand.

10   Q.  And when you say a feature, what do you mean by a feature?

11   A.  A feature could be a sales ad or a promotion.  Just because

12   they were promoting it didn't mean they were asking for a

13   discount, but they may run some national media campaign.

14   Q.  So one of your customers might run an ad campaign that

15   required them to need more chicken and then you would have to

16   deliver it, right?

17   A.  That's correct.

18   Q.  And in those instances sometimes you might have to call

19   around to a competitor and see if they could help you supply

20   chicken, right?

21   A.  If we couldn't figure out the shortage on our own.

22   Q.  Okay.  And it worked in the other direction as well.  When

23   a competitor might need to do that, they could reach out to

24   Pilgrim's to try to figure out whether Pilgrim's could help

25   them, right?

1024

Robert Bryant - Cross

1    A.   That is correct.

2    Q.   And we can refer to all of these various problems, both

3    supply side and demand side, with a shorthand of shorts, right?

4    A.   It's short.  Someone's short.

5    Q.   Now, you were -- I think you testified you were in the

6    supply chain from probably the 2000s to 2016, right?

7    A.   That's correct.

8    Q.   Okay.  And you dealt with those type of issues on a daily

9    basis when you were in that position, right?

10   A.   That's correct.

11   Q.   They were regular occurrences.

12   A.   That's fairly regular internal.  External was more unique.

13   Q.   It was a big part of your job to deal with these problems,

14   right?

15   A.   It took up a large portion of my time.

16   Q.   Is it also fair to say that helping out with such issues

17   was part of Mr. Little's job?

18   A.   As account owner, yes.

19   Q.   And frequently you would ask for his help in dealing with

20   those kinds of issues if those issues involved his accounts,

21   right?

22   A.   If I couldn't solve them myself without involving him, then

23   yes, I would have to reach out so he would know what was

24   affecting his customer.

25   Q.   One of the ways that the two of you would deal with those

Robert Bryant - Cross

 1  kinds of issues is you would ask people in sales positions like

 2  Mr. Little to contact competitors, right?

 3  A.  I don't know if it was that explicit that I asked him to

 4  contact a competitor or not.  I don't remember exactly.  I

 5  mean, the conversations would be that we were going to be short

 6  and, you know, what are we going to do about it?  And, you

 7  know, Jimmie Little may have said that he was going to -- he'll

 8  make some calls and see if he can find some product or, "Do you

 9  want me to buy a load," or something to that effect.  But I

10  don't know if I actually -- I don't remember actually asking

11  him, for instance, to call Tyson to see if they had a load.

12  There may have been sometimes I asked that, but I'm not sure if

13  I was like directing him to do that, if that's your question.

14          MR. CANTY:  Okay.  Could we put up Exhibit H-860 for

15  identification, please?

16  BY MR. CANTY:

17  Q.  Mr. Bryant, could you take a minute and familiarize

18  yourself with Exhibit H-860?

19          THE COURT:  Do you have a copy for Mr. Koenig?

20          MR. CANTY:  My apologies.  May I have a minute?

21  BY MR. CANTY:

22  Q.  Can you identify Exhibit H-860 for us?

23  A.  It's an e-mail from myself to Jimmie Little, September 10,

24  2014.

25  Q.  On September 10, 2014 at 8:33 a.m. what did you ask

Robert Bryant - Cross

1    Mr. Little to do?

2            *MR. KOENIG:*  Objection.

3            *THE COURT:*  What's the objection?

4            *MR. KOENIG:*  Not in evidence and it's hearsay.

5            *THE COURT:*  Yes, sustained.  You're asking him to

6    testify about an exhibit that hasn't been admitted.

7    *BY MR. CANTY:*

8    *Q.*  Mr. Bryant, does this document refresh your recollection as

9    to whether or not you had asked Mr. Little to contact --

10            *MR. KOENIG:*  Objection.

11   *BY MR. CANTY:*

12   *Q.*  -- his competitors to help you with shorts?

13           *THE COURT:*  Let's hear the question.

14           Now the objection?

15           *MR. KOENIG:*  He never said he didn't recall as far as

16   I can remember, but --

17           *THE COURT:*  Sustained.

18   *BY MR. CANTY:*

19   *Q.*  Mr. Bryant, when you encountered shortage problems and you

20   had to find chicken to supply to your customers, would you

21   communicate with customers on these issues?

22   *A.*  Yes.

23   *Q.*  Would you communicate with the Pilgrim's sales team on

24   these issues?

25   *A.*  Yes.  When I answered -- when I communicate with customers

1027

Robert Bryant - Cross

1   on these issues, it would be through the Pilgrim's sales team,

2   not normally directly.

3   Q.  So one of the things that you would do is you would reach

4   out to the Pilgrim's sales team and then have them contact

5   competitors; is that right?

6           MR. KOENIG:  Objection, foundation.

7           THE COURT:  Overruled.

8   A.  Like I said earlier, it wasn't that I was directing them to

9   reach out directly to competitors.  Our customers would

10  normally let us know if you're in trouble, so and so has a

11  load.  And those -- or our outside sales team would generally

12  know where those loads were available.

13  BY MR. CANTY:

14  Q.  When you needed to communicate with the Pilgrim's sales

15  team about issues such as shorts, would you do so via e-mail?

16  A.  Both, e-mail, phone call, text, you know, whatever was

17  available or depending on the circumstance.  If I was on a

18  conference call, I may send an e-mail or may send a text.  If

19  not, I may call.

20  Q.  Do you recall sending the e-mails that appear on Exhibit

21  H-860?

22  A.  Is that that exhibit?

23  Q.  Yes.

24  A.  I don't recall this e-mail specifically, no.

25  Q.  Do you have any reason to believe that it wasn't sent at

Robert Bryant - Cross

1 the time indicated in the header?

2 A. No.

3        MR. CANTY: We would offer H-860 at this time, Your

4 Honor.

5        THE COURT: Any objection to the admission of Exhibit

6 H-860?

7        MR. KOENIG: Yes, hearsay.

8        THE COURT: Response?

9        MR. CANTY: Business record exception, Your Honor.

10 It's regularly conducted activity of the company and he said he

11 regularly used e-mail to communicate about it.

12        THE COURT: As I indicated in a previous order,

13 e-mails don't fall within that particular exception

14 necessarily. Moreover, this contains hearsay of other people

15 which is independently objectionable. Objection is sustained.

16 BY MR. CANTY:

17 Q. Let's talk about do you recall testifying that in 2014 that

18 there was an even higher frequency of shortages than you were

19 used to seeing?

20 A. I recall testifying that there were some significant

21 shortages in 2014.

22 Q. If there were a lot of shortages, is it fair to say there

23 would be a lot of contact with competitors trying to solve

24 those problems?

25 A. There could be.

Robert Bryant - Cross

1  Q.  Do you recall testifying about how Mr. Little had contact

2  with Holmes Foods?

3  A.  I do.

4  Q.  Can you describe Holmes Foods for us?

5  A.  Another small chicken processor in Texas.

6  Q.  If I were to describe Holmes Foods as a poultry company

7  with about 400 employees who processes 700,000 broilers per

8  week, would that be fair?

9  A.  It could be.  I don't know what their current production

10  capacity is.

11  Q.  Does that sound about right, though?

12  A.  I know they were a single -- a single plant outfit.

13  Q.  How many employees does Pilgrim's have?

14  A.  I don't know the exact number anymore.  At one time we were

15  40.  It may be 56,000 now after some acquisitions.

16  Q.  How many chickens does Pilgrim's process in a day?

17  A.  I don't know exactly how many, no.

18  Q.  7 million a day sound right?

19  A.  It could be.

20  Q.  Can you name any national account for which Holmes Foods is

21  a competitor with Pilgrim's?

22  A.  Not off the top of my head, no.

23  Q.  I recall that you told Mr. Feldberg that you didn't know

24  how Mr. Austin's bonus was calculated.  Same question with

25  respect to Mr. Little.  You don't know how his bonus was

Robert Bryant - Cross

1    calculated, right?

2    A.  Not exactly.  I have an idea of theirs, but not exactly.

3    Q.  Mr. Little retired in 2016, right?

4    A.  I'm not sure of the exact date on that.

5    Q.  Do you recall that his last day was September 30, 2016?

6    A.  I don't.

7            MR. CANTY:  Let me show H-322 for identification,

8    please.

9    BY MR. CANTY:

10   Q.  Can you identify Exhibit H-322 for us?

11   A.  It's an e-mail from Roger Austin to a pretty big group of

12   Pilgrim's people announcing Jimmie's retirement -- or not

13   announcing, but reminding of his last day.

14   Q.  Do you recall receiving this e-mail?

15   A.  I did not recall receiving this e-mail.

16   Q.  Do you now recall that Mr. Little's last day was

17   September 30, 2016?

18   A.  I mean, I am sorry --

19           MR. KOENIG:  Objection.

20           THE COURT:  Overruled.  He already mentioned that date

21   before.  He can answer if he knows.

22   A.  I trust that the date is right.  I don't recall his last

23   date independently.

24   BY MR. CANTY:

25   Q.  Do you have any information that Mr. Little did any work

1031

Robert Bryant - Cross

1  with Pilgrim's following September 30, 2016?

2  *A.*  After his retirement I don't recall him coming back to work

3  at Pilgrim's, no, or actually contact with him I don't recall.

4  *Q.*  Now, you've met with the government 20 times, right?

5  *A.*  Somewhere around there, yes.

6  *Q.*  And beginning on June 22, 2021?

7  *A.*  I don't remember the exact date we started.

8  *Q.*  Each time you met with the government you were represented

9  by a lawyer, right?

10  *A.*  That's correct.

11  *Q.*  You are aware that trial in this case was set to begin on

12  October 25?

13  *A.*  Well, I am aware that it was set to begin several times.

14  *Q.*  October 25 sound right?

15  *A.*  I believe so, yes.

16  *Q.*  And you've met with the government three times since the

17  trial began, right?

18  *A.*  I met with them last week in the evenings.

19  *Q.*  October 25?

20  *A.*  Possibly.

21  *Q.*  Pardon me.  October 26 sound right?

22  *A.*  Possibly.

23  *Q.*  Are you aware that opening statements from the Pilgrim's

24  defendants were given on October 26?

25  *A.*  On what date?

Robert Bryant - Cross

1    *Q.*  October 26?

2    *A.*  I'm not -- I know opening statements, I believe they

     started on Tuesday of last week.

4    *Q.*  And Mr. Koenig met with you that night, right?

5    *A.*  I believe we did.

6    *Q.*  And Agent Taylor was there, right?

7    *A.*  I don't recall who all was there.

8    *Q.*  Ms. Pearce, who has been doing such a great job with the

9    exhibits, she was there too, right?

10   *A.*  I think she has been in most meetings, yes.

11   *Q.*  And that night you discussed with the government some of

12   the issues that the defendants talked about in opening

13   statements, right?

14   *A.*  I don't know that.

15   *Q.*  Did you talk about the net docs report, Mr. Bryant?

16   *A.*  We have talked about the net doc report.

17   *Q.*  On that night did you talk about bonus structure?

18   *A.*  I don't know if that was that night or not, but I think

19   we've talked about that more than once.

20   *Q.*  On the night of October 26, you told the government agents

21   that Pilgrim's bonus structure was funded based on

22   profitability, right?

23           *THE COURT:*  What's the objection?

24           *MR. KOENIG:*  Hearsay.

25           *THE COURT:*  Overruled.

Robert Bryant - Cross

1   *A.*  Basically it is funded based off profitability.

2   *BY MR. CANTY:*

3   *Q.*  And that's what you told them the night of October 26 after

4   opening statements, right?

5   *A.*  I don't recall specifically our conversation from that

6   night.  I think we've talked about that more than once.

7   *Q.*  And you told them that night that net doc reported in

8   produced pounds and not simply sales?

9   *A.*  That is correct.  It is produced pounds, so it's -- sales

10  is a component of the net doc, that is correct, but it's total

11  produced pounds for the week.

12  *Q.*  And you told them that the director of sales were the

13  owners of pricing that night, right?

14  *A.*  Director of sales do own pricing.

15  *Q.*  Did you review any documents that night?

16  *A.*  I'm not sure.  I've looked at a lot of documents.

17  *Q.*  You don't recall whether you reviewed documents that night

18  with the government that you eventually testified to yesterday?

19  *A.*  I mean, I don't know if we reviewed new documents or not or

20  if -- I don't recall.  I just -- I don't recall.

21  *Q.*  You are aware that opening statements concluded on

22  October 27, right?

23  *A.*  I'm not aware when they concluded.

24  *Q.*  You met with the government on the evening of October 27 as

25  well, didn't you?

Robert Bryant - Cross

1   *A.*   I think we met two or three times last week.

2   *Q.*   And you met with the same people that are sitting here at

3   counsel table that we just talked about, right, Ms. Pearce,

4   Agent Taylor and Mr. Koenig?

5   *A.*   I don't know that they were all in the room each time we

6   met.  I do remember that Mr. Koenig was in the room each time.

7   *Q.*   And you met with the government again on the evening of

8   Sunday, October 31, before we resumed trial this week, right?

9   *A.*   Yes, we did meet.

10  *Q.*   Mr. Bryant, are you consulting with the government on the

11  trial of this case?

12  *A.*   I don't understand the question.

13  *Q.*   Are you helping the government understand all the issues as

14  the arguments are made and the testimony comes in?

15  *A.*   I mean, we did trial prep and reviewed evidence.

16  *Q.*   Every single time you've met with the government you had a

17  lawyer represent you, right?

18  *A.*   That I -- yes, that I can recall, yes.

19  *Q.*   And the same lawyer that advised you not to speak with

20  defense counsel?

21          *MR. KOENIG:*  Objection, privilege.

22          *THE COURT:*  He can answer without identifying who.

23  You can answer the question.  Overruled.

24  *A.*   What was the question?

25  *BY MR. CANTY:*

Robert Bryant - Cross

1    Q.  Every single time you've met with the government you had a

2    lawyer to represent you, and it was the lawyer that advised you

3    not to speak to defense counsel, right?

4         MR. KOENIG:  Objection.  It identifies the source.

5         THE COURT:  Overruled.

6    A.  That's correct.

7    BY MR. CANTY:

8    Q.  And whenever the government was asking you questions you

9    had a lawyer to represent you and look after your interests,

10   right?

11   A.  I did have a lawyer.

12   Q.  And you wanted your lawyer to make sure that the questions

13   the government asked you were clear, right?

14   A.  I don't -- I don't remember having a conversation like

15   that.

16   Q.  Whether you had a conversation or not, did you want your

17   lawyer to make sure that the questions the government asked you

18   were clear?

19   A.  I don't -- I don't remember having a conversation with my

20   attorney about government questions.

21        THE COURT:  Mr. Bryant, you should be cautioned that

22   none of the questions that Mr. Canty asks you -- and if he asks

23   you a question, you don't have to answer it -- would require

24   you to indicate anything that your lawyer told you, okay?

25        THE WITNESS:  Okay.

Robert Bryant - Cross

1    THE COURT:  Because that's privileged.  You don't have

2    to reveal that.  And the questions, Mr. Canty hasn't asked you

3    any questions to that effect.  So I just wanted to make sure

4    that you understood that, okay?

5         Go ahead, Mr. Canty.

6    BY MR. CANTY:

7    Q.  I will reiterate, there is no question I am going to ask

8    you that's going to ask for the substance of a conversation

9    you've had with your lawyer.  That's not what I am interested

10   in here.  What I am interested in these series of questions is

11   to figure out what your desires and expectations were with

12   respect to having a lawyer by your side when the government was

13   asking you questions.

14        You wanted your lawyer to make sure that the questions

15   the government asked you were clear to you, right?

16   A.  I'm having trouble with this in not crossing into

17   conversations I had with my attorney, but that's not how I

18   would characterize our relationship.

19   Q.  Okay.  The lawyer was there to make sure that the

20   government played fair, right?

21   A.  My lawyer was there because -- to assist me through this

22   process -- I am not used to this process -- and to help guide

23   me through this process.

24   Q.  You wanted your lawyer to make sure that you understood the

25   questions that the government asked you, right?

Robert Bryant - Cross

1    A.   Once again, my lawyer was there to help me through this

2    process.  It's a new process for me that I don't understand and

3    to help me -- help guide me through this process.

4    Q.   Because it's a difficult one, right?

5    A.   It's -- it's different for me, yes.

6    Q.   Just a few more questions.

7         You lied to the government, right?

8    A.   I said I did.

9    Q.   And you're not being prosecuted for lying to the

10   government, right?

11   A.   Not that I'm aware of.

12   Q.   And instead you are meeting with the government during this

13   trial, right?

14   A.   Excuse me?

15   Q.   And you're meeting with the government during this trial,

16   right?

17   A.   I did last -- well, up until Sunday of this week.

18   Q.   And throughout the process you had a lawyer, right?

19   A.   Yes.

20         MR. CANTY:  Nothing further, Your Honor.

21         THE COURT:  Thank you, Mr. Canty.

22         Additional cross?  Mr. Tubach.

23         MR. TUBACH:  Thank you, Your Honor.

24                        **CROSS-EXAMINATION**

25   BY MR. TUBACH:

Robert Bryant - Cross

1   Q.   Mr. Bryant, I represent Jayson Penn.  I have some questions

2   for you.

3   A.   Okay.

4   Q.   You testified earlier about a potential plant conversion,

5   converting potential Pilgrim's plants?

6   A.   That's right.

7   Q.   That you called Natchitoches, right?

8   A.   Natchitoches, Louisiana.

9   Q.   Just so we are clear for the record, even though it's

10  pronounced Natchitoches, am I right that it's spelled

11  N-A-T-C-H-I-T-O-C-H-E-S?

12  A.   N-A-T-C-H-I-T-O-C-H-E-S.

13  Q.   Is that correct?

14  A.   I believe so.

15  Q.   It's pronounced Natchiotches.

16  A.   Yes.

17  Q.   When a plant gets converted, the idea was to convert the

18  plant from a small bird plant, which it was at the time, to a

19  larger size bird, right?

20  A.   That's correct.

21  Q.   And if you converted the plant from a small bird plant to a

22  larger size bird, that meant you could no longer sell those

23  chickens to KFC, right?

24  A.   That's correct.

25  Q.   Because they would be outside the weight, outside the

Robert Bryant - Cross

1   weight range that KFC was buying chickens in, right?

2   A.  That's correct.

3   Q.  And you testified earlier that this discussion and

4   potential plan to convert Natchitoches to a larger size bird

5   was, as you put it, quote, not a real thing, right?

6   A.  That was my understanding from my manager at the time, yes.

7   Q.  It was your understanding because it's your testimony that

8   Mr. McGuire told you that, right?

9   A.  That is correct.  And that's the conversations I had was

10  with Jason McGuire.

11          MR. TUBACH:  Let's look at Exhibit D-925, if we could.

12          I believe that's been admitted, Your Honor.  I would

13  ask it be published to the jury.

14          THE COURT:  It has and it may be.

15  BY MR. TUBACH:

16  Q.  The bottom e-mail there, there is an e-mail where

17  Mr. McGuire is explaining to his bosses why he believes

18  Natchitoches is the right plant to convert from small bird to a

19  bigger bird, right?

20  A.  That's correct.

21  Q.  And he goes through that in some detail, right?

22  A.  That's correct.

23  Q.  And that was in response to Mr. Lovette's question about

24  which plant he thought should be converted to a bigger size

25  bird, right?

Robert Bryant - Cross

1    *A.*   That's correct.

2    *Q.*   And he forwarded you that e-mail exchange, didn't he?

3    *A.*   He did.

4    *Q.*   And what did he say when he forwarded you that e-mail

5    exchange?  Can you read that for the jury?

6    *A.*   He said:  FYI, getting real -- or really real, sorry.

7    *Q.*   FYI, getting really real, right?

8    *A.*   Right.

9    *Q.*   That's what he told you in that e-mail, right?

10   *A.*   That's correct.

11   *Q.*   And your response was you wish you could do it sooner,

12   right?

13   *A.*   That's correct.

14   *Q.*   Now, earlier today you testified that the reason why you

15   said "Wish it could happen sooner" is you just wanted to reduce

16   your stress, right?

17   *A.*   I think I said I don't really remember why I did respond

18   that way.  Perhaps I was dealing with a lot of shortages or

19   something to that effect, but I don't really remember why I

20   sent that.

21   *Q.*   And the stress that you would be feeling about shortages

22   would be because you didn't have enough chicken, small bird

23   chicken, to supply all the customers that wanted to buy it,

24   right?

25   *A.*   That would be correct.

Robert Bryant - Cross

1    Q.  Okay.  So if the plan was to take another small bird plant

2    away, that would reduce the amount of small birds you would

3    have available to sell to your customers, right?

4    A.  That's correct.

5    Q.  But that would reduce your stress?  You would have even

6    less chicken to sell to your customers?

7    A.  Yes, it would.

8    Q.  Why would it reduce your stress when you had less supply

9    and more demand?

10   A.  Well, we would have -- I would use the term right side of

11   the business.  So if we would have taken a plant away, then we

12   would have not had as many customers at that point.

13   Q.  So basically you are agreeing with the idea that we convert

14   the plant, maybe we get rid of some business to KFC.

15   A.  Well, that wouldn't have been my decision who didn't get

16   the business -- the birds, but yes.

17   Q.  That was way above your pay grade, right?

18   A.  At the point, yes.

19   Q.  At this point in time when you were writing that e-mail,

20   right?  That was way above your pay grade on the date you were

21   writing that e-mail.

22   A.  That's correct.

23   Q.  But this whole business about stress, you basically just

24   made that up this morning.  You don't really know why you wrote

25   it.

Robert Bryant - Cross

1  A.  I don't recall.  I think I said I could have been under

2  stress or something to that effect, but I think I said that I

3  don't really recall.

4  Q.  So you just made that up.

5  A.  Like I said, I said I didn't really recall.  I could have

6  been under stress or something like that to that effect.

7  Q.  Now, there was another plant that was, in fact, converted

8  away from small bird, wasn't there?

9  A.  I believe in 2016 we did convert another plant.

10  Q.  And that plant was the Mayfield plant, wasn't it?

11  A.  It was.

12  Q.  And that plant you know very well, don't you?

13  A.  I do.

14  Q.  You grew up in Mayfield?

15  A.  Not exactly Mayfield, but in that general area.

16  Q.  Very near Mayfield?

17  A.  Yeah.

18  Q.  Yes?

19  A.  Yes.

20  Q.  Okay.  And you went to high school in Mayfield?

21  A.  Yes.

22  Q.  And you went to college in Mayfield?

23  A.  Yes.

24  Q.  And you worked at the plant in Mayfield?

25  A.  I did.

Robert Bryant - Cross

1   Q.   Okay.  So you know the Mayfield plant pretty well, right?

2   A.   I do.

3   Q.   And the whole idea was to take that Mayfield plant and

4   convert it to a plant that would do small bird deboning and

5   deli, right?

6   A.   That's correct.

7   Q.   And that again would take it outside the range of the

8   chicken that KFC needed to buy for its restaurants, right?

9   A.   That's correct.

10  Q.   And is it your testimony that that plan got underway in

11  2016?  Is that what you just said?

12  A.   We believe we started that in 2016, yes.

13  Q.   So the planning for that happened -- the plan to convert

14  that started in 2016; is that right?

15  A.   I don't remember exactly when we started to plan that

16  conversion.  It could have happened in 2015.

17  Q.   So the plan to convert the plant was either in 2015 or

18  2016.  That's your testimony?

19  A.   We would have started developing models, bird availability

20  models, a long time before we invested capital and had a sales

21  plan and transition plan for that plant.  I just don't recall

22  exactly when that started.

23  Q.   What's your best memory about when you first started

24  looking at converting the Mayfield plant?

25  A.   My best estimate would be that we probably would have

Robert Bryant - Cross

1    started looking at that at least a year prior to we actually

2    converting the plant.

3    *Q.*   And the plant was actually converted in 2016, right?

4    *A.*   Yes.  I don't remember when in 2016, but --

5    *Q.*   I am sorry?

6    *A.*   I don't remember exactly when in 2016, but yeah, I believe

7    it was 2016 we started that transition.

8    *Q.*   And the Mayfield plant was in fact the largest fresh food

9    plant in the country, wasn't it?

10   *A.*   I believe it was the largest fresh food plant in the

11   country and specifically for Pilgrim's the largest single KFC

12   supplier in our system.

13   *Q.*   And so when I say largest in the country, I don't mean just

14   the largest Pilgrim's one in the country.  It was the largest

15   fast-food chicken plant in the entire country for all

16   suppliers, right?

17   *A.*   I believe it was.

18   *Q.*   And it was very favorable to KFC because there is corn all

19   around that plant, isn't there?

20   *A.*   That's correct.

21   *Q.*   So it's very cheap to get the corn into the plant, right?

22   *A.*   That's correct.

23   *Q.*   So it's very cost advantageous for whoever is going to be

24   doing that to be buying chicken from that plant because they

25   keep the cost down, right?

Robert Bryant - Cross

1    A.   That's correct.

2         *MR. TUBACH:*  Now, if we could pull up H-722.

3         With the Court's permission, I can hand a physical

4    copy to the witness unless the witness is okay reading from the

5    screen.

6         *THE COURT:*  He can let us know.

7         *MR. TUBACH:*  Thank you.

8    *BY MR. TUBACH:*

9    Q.   Did you have a chance to look at H-722?

10   A.   Yes.  I am reviewing it.

11   Q.   Have you had a chance to look at it?

12   A.   I have.

13   Q.   The top e-mail is an e-mail from Mr. McGuire to you on

14   July 2, 2014; is that right?

15   A.   That's correct.

16   Q.   Do you recall getting this e-mail on about July 2, 2014?

17   A.   I don't.

18   Q.   Was it a big deal to you, sir, they were going to

19   potentially convert the Mayfield plant to a different size

20   bird?

21   A.   What I see here --

22   Q.   That wasn't my question what you see.  I am asking you

23   whether it was a big deal to you that they were going to be

24   converting the Mayfield plant potentially to a different size

25   bird.

Robert Bryant - Cross

1    *A.* I don't see that they are.

2    *Q.* I am not asking you to look at the document, sir.  I am

3    asking you was it a big deal to you that they were going to be

4    converting potentially the plant to a different size bird?

5    *A.* It would have been.

6    *Q.* And that's partly because that plant fell under your

7    jurisdiction at the time, right?

8    *A.* Well, I would have had to help plan the new sales mix for

9    that conversion.

10   *Q.* Is that another way of saying yes?

11   *A.* Yes.

12   *Q.* You were the regional planner for the region that included

13   the Mayfield plant, right?

14   *A.* At the time, yes.

15   *Q.* So if they are going to convert that plant to a different

16   size bird, that was going to affect your job quite a bit,

17   right?

18   *A.* It would.

19   *Q.* So when Mr. McGuire sent you this e-mail on July 2, 2014,

20   did you already know that it was in the works to convert the

21   plant?

22   *A.* Not that I can remember.

23   *Q.* Do you recall that Stacey Crump did a pro forma to try and

24   figure out what that benefit and cost would be to convert that

25   plant?

Robert Bryant - Cross

1    *A.*  No, I don't remember that.

2    *Q.*  You know who Ms. Crump is.

3    *A.*  I do know Ms. Crump, yes.

4    *Q.*  She is the accountant for the plant, right?

5    *A.*  She is the regional -- she at the time, I believe she was

6    the regional account manager for the business unit.

7    *Q.*  So it's your testimony that even though Mr. McGuire sent

8    you an e-mail saying, by the way, one of your plants, we are

9    planning to convert that to a totally different bird, you have

10   no memory of that?

11        *MR. KOENIG:*  Objection.  He is starting to reveal the

12   contents without it being in evidence.

13        *THE COURT:*  He only mentioned contents that had

14   already been discussed.  Overruled.

15   *A.*  Can you ask the question again?  Sorry.

16   BY MR. TUBACH:

17   *Q.*  Sure.  Are you telling us that even though your boss had

18   sent you an e-mail confidentially disclosing potential plant

19   conversion that was your responsibility, you have no memory of

20   that?

21   *A.*  I don't recall this e-mail, no.

22   *Q.*  Do you recall the general idea of converting the Mayfield

23   plant started around July of 2014?

24   *A.*  I do not.

25   *Q.*  Let's take a look at another document, H-717.

Robert Bryant - Cross

1           Do you see that document?

2    *A.*  I do.

3    *Q.*  This is an invitation for a conference call, correct?

4    *A.*  That's correct.

5    *Q.*  And you are one of the invitees, right?

6    *A.*  I am.

7    *Q.*  And the invitation for the conference call was going to be

8    on July 11, 2014, correct?

9    *A.*  That's correct.

10   *Q.*  And do you recall -- that's your e-mail address right

11   there, right, Robbie.Bryant@pilgrims.com?

12   *A.*  Yes.

13   *Q.*  And you received this invitation from your boss to a

14   conference call, didn't you?

15   *A.*  It appears so.  I just don't remember it.

16   *Q.*  And the purpose of this conference call was to discuss the

17   Mayfield plant conversion, right?

18   *A.*  It appears so.

19   *Q.*  And other people who were going to be attending that were

20   Eric Rotermund, the general manager of the Mayfield complex,

21   right?

22   *A.*  At the time, yes.

23   *Q.*  And Todd Hicks, the plant manager, right?

24   *A.*  Correct.

25   *Q.*  And Kevin Crider, the sales manager at Mayfield?

1049

Robert Bryant - Cross

1    A.   No, Kevin was the live manager.

2    Q.   The live manager, my apologies.  And you, right?

3    A.   That's correct.

4    Q.   And Matthew Herman, who was the head of operations for

5    fresh food service at the time, correct?

6    A.   That's correct.

7    Q.   And Darren Lamb, what was his role?

8    A.   He was the sales manager at Mayfield.

9    Q.   Thank you.  And David Stone?

10   A.   He was the -- yes, he was the production planner at

11   Mayfield.

12   Q.   And Jason McGuire, your boss, was the head of sales for

13   FFS, right?  Fresh food service, right?

14   A.   Correct.

15   Q.   And you attended this conference call on July 11, 2014,

16   didn't you?

17   A.   I assume so.  I don't remember, but I assume so.

18            MR. TUBACH:  I will move H-717 into evidence, Your

19   Honor.

20            THE COURT:  Is it just what's appearing on the screen

21   right now?

22            MR. TUBACH:  Yes.  That's the entire document.

23            THE COURT:  Any objection to the admission of Exhibit

24   H-717?

25            MR. KOENIG:  No, Your Honor.

Robert Bryant - Cross

1        THE COURT:  Exhibit H-717 will be admitted.

2   BY MR. TUBACH:

3   Q.  Let me show you one more document, H-718, if I could.

4        Do you see that, sir?

5   A.  I do.

6   Q.  You, in fact, accepted the invitation.  This is your

7   acceptance of the invitation from Mr. Bryant to attend that

8   conference call.

9   A.  Yes, from Mr. McGuire.

10  Q.  From Mr. McGuire, thank you.

11       And he was your boss at the time?

12  A.  Correct.

13  Q.  And you attended that conference call on July 11, 2014,

14  didn't you?

15  A.  I just don't remember attending.

16  Q.  Now, getting all those people together at Mayfield, that's

17  sort of a big deal, isn't it?

18  A.  Yes.  I mean, we had -- we planned a lot.

19  Q.  About that conversion, right?

20  A.  In general.

21  Q.  And you planned a lot about that conversion specifically,

22  didn't you?

23  A.  Yes.  This one took many different forms.  I just -- I just

24  don't remember the meeting.  I apologize.

25       MR. TUBACH:  I will move Exhibit H-718 into evidence,

1051

Robert Bryant - Cross

 1  Your Honor, the document that's being shown.

 2          THE COURT:  Any objection to the admission of H-718?

 3          MR. KOENIG:  Yes, Your Honor.  There is no

 4  authentication for this document.

 5          THE COURT:  The objection is overruled.  The testimony

 6  of Mr. Challa, Mr. Sangalis and also Mr. King would establish

 7  the authentication of it and I also find it's a business

 8  record.  It falls within the exception.

 9          MR. KOENIG:  This particular document?  He had a long

10  list of documents.

11          THE COURT:  Well, the testimony of those three

12  witnesses would include this type of document as well according

13  to their testimony, so yes.

14  BY MR. TUBACH:

15  Q.  On Exhibit H-722 briefly, do you recall why Mr. McGuire

16  told you to keep it to yourself for now, the plan to convert

17  the Mayfield plant?

18  A.  I don't recall.

19  Q.  But you understand this is Mr. McGuire's e-mail to you,

20  correct?

21  A.  That's correct.

22  Q.  And it's a Pilgrim's document that's been produced?

23  A.  It appears so, yes.

24          MR. TUBACH:  I would move H-722 into evidence, Your

25  Honor.

Robert Bryant - Cross

1    THE COURT:  Any objection to the admission of H-722?

2    MR. KOENIG:  Yes, Your Honor, hearsay.

3    THE COURT:  Response?

4    MR. TUBACH:  It's not being offered for the truth,

5   Your Honor.  It's being offered to show it was being kept

6   confidential which is what it says in the top.

7    THE COURT:  That's for the truth.  Objection is

8   sustained.

9   BY MR. TUBACH:

10  Q.  I would like you to take a look, switching gears, take a

11  look at Government Exhibit 1086, Mr. Bryant.  You testified

12  earlier this was a bid that was being submitted to RSCS for

13  contract pricing for 2015 to KFC, correct?

14  A.  Yes.  It was the other page.

15    MR. TUBACH:  Yeah, that's the first page.  If we could

16  go to the second page.  If we could blow up the top half of

17  that second page.

18    Your Honor, if we can publish it to the jury.  I

19  believe it's been admitted.

20    THE COURT:  Yes, you are right.  It can be.

21  BY MR. TUBACH:

22  Q.  Do you see that?

23  A.  I can.

24  Q.  And you testified earlier that the purple is the

25  eight-piece chicken on the bone, right?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   That's their main -- their flagship product.

3    A.   Yes.

4    Q.   KFC's flagship product.

5    A.   Yes.

6    Q.   And the line -- the column on the left where it says

7    current, that was a then current contract price, right?

8    A.   That's correct.

9    Q.   Or in this case the current cost leading up to the total

10   price at the bottom, right?

11   A.   That's correct.

12   Q.   The proposed was what was going to be bid to KFC for the

13   following year, right?

14   A.   That was the proposal, yes.

15   Q.   And then the difference is simply subtracting one from the

16   other, correct?

17   A.   That's correct.

18   Q.   If you look down those various cost items, some items are

19   going up and some items are going down.

20   A.   That's correct.

21   Q.   Some costs increase, some costs decrease, right?

22   A.   That's correct.

23   Q.   One in particular, I want to look at WOG yield.  Just so we

24   understand that, the current WOG yield is 71.75 percent; is

25   that right?

Robert Bryant - Cross

1    A.  That's correct.

2    Q.  And the proposal was to increase the WOG yield to

3    73.25 percent, right?

4    A.  That's correct.

5    Q.  That would actually, just so we are all clear, that would

6    be a cost reduction for the customer, right?

7    A.  That is correct.

8    Q.  Because you are getting a bigger amount of usable chicken

9    out of the total chicken.  Is that a fair way of putting it?

10   A.  That's correct.

11   Q.  In layman's terms.

12   A.  Yes.

13   Q.  The other one I want to ask you about is fat and tail

14   yield.  There it's going from 96.5 to 98.5 percent, correct?

15   A.  That's correct.

16   Q.  And that again would be a reduction in price to the

17   customer?

18   A.  It would be.

19   Q.  So those two resulted in a reduction of the cost to the

20   customer.

21   A.  Correct.

22   Q.  And for all the others we can just see whether it goes up

23   or down to see whether the cost went up or down.

24   A.  That's correct.

25   Q.  Now, you testified earlier that it was the strategy of

Robert Bryant - Cross

1  Pilgrim's to try to get this 2015 contract finalized early so

2  you could then go work on the other customer; is that right?

3  A.  We wanted KFC -- it was my understanding we wanted KFC done

4  first, yes.

5  Q.  You testified it was Pilgrim's strategy to get KFC done

6  first.

7  A.  When I said Pilgrim's strategy, that was -- that's what I

8  was told by Jason McGuire, so I was taking his direction as

9  Pilgrim's strategy.

10  Q.  And you testified earlier that the reason to do that was so

11  that then you could all increase prices to the other customers,

12  right?

13  A.  It would make the subsequent negotiations go more easily,

14  yes.

15  Q.  And you even testified it had something to do with the

16  other suppliers, right?

17  A.  Excuse me?

18  Q.  Did you testify that that had something to do with the

19  other suppliers also?

20  A.  I don't recall that.  I just recalled the other customers.

21  It would make those other negotiations with the other QSR

22  customers go more easily.

23  Q.  So then it's your testimony now that the timing of those

24  negotiations had nothing to do with the other suppliers.  That

25  was purely a Pilgrim's thing.

1056

Robert Bryant - Cross

1   *A.* I don't know if it had anything to do with the other

2   suppliers or not.

3   *Q.* So you have no evidence that it did have anything to do

4   with the other suppliers.

5   *A.* That's correct.

6   *Q.* Okay. And were you aware that -- I know you testified

7   earlier you never heard of McKinsey & Company, right?

8   *A.* That's correct, yeah.

9   *Q.* Were you aware that RSCS had hired a consultant of any kind

10  to help them through these shortages and how to address them?

11  *A.* I don't remember that. I just don't -- I just don't

12  remember that being brought to my attention, no.

13  *Q.* Do you recall that RSCS asked Pilgrim's to come down to

14  Louisville and make a presentation about Pilgrim's view of the

15  small bird industry in June of 2014?

16  *A.* I vaguely remember an ask from KFC earlier that summer from

17  Pilgrim's. However, I didn't remember -- I thought that they

18  came to Mayfield and it was done at Mayfield. I didn't recall

19  us going to Louisville.

20  *Q.* Let me show you --

21          *MR. TUBACH:* If we can put on the screen Exhibit

22  D-445.

23          Your Honor, this is such a large document, it might be

24  easier if I can hand a copy to the witness through Ms. Grimm.

25          *THE COURT:* You may.

Robert Bryant - Cross

1          Mr. Koenig, do you have a copy?

2          *MR. KOENIG:*  I do have a copy.  I would ask to look

3   through it, but it's probably not practical.

4          *THE COURT:*  Probably not.  But if you need when the

5   witness is asked to look at a particular page, if you need to

6   time to review that, just let me know.

7          *MR. TUBACH:*  I can assure the Court I am not going to

8   ask him to look at all these documents.

9   *BY MR. TUBACH:*

10  *Q.*  Just glancing through that, Mr. Bryant, do you recall

11  seeing this before, this June 2014 presentation to KFC?

12  *A.*  I don't.  I am not saying I haven't.  I just don't remember

13  it.

14  *Q.*  Do you recall ever being asked to put together, be part of

15  putting together a presentation to RSCS to explain to them what

16  the reality was for the short bird market in 2014?

17  *A.*  I do recall from Jason McGuire that was -- that histogram

18  that -- the bird availability model that was shown earlier, I

19  do recall being asked to put that together.

20  *Q.*  And that was a meeting you attended yourself, right?

21  *A.*  That's correct.

22  *Q.*  But this presentation, do you recall having any role

23  putting this presentation together?

24  *A.*  I don't remember this presentation.

25  *Q.*  Do you recall that there was a meeting on June 27, 2014 at

1058

Robert Bryant - Cross

1  which Mr. Penn, Mr. Higdem and Mr. Austin presented to RSCS on

2  their view of the small bird industry using that presentation?

3  A.  I don't.  I don't recall.

4  Q.  You were not invited to that meeting, were you, sir?

5  A.  I don't recall being invited to that meeting.

6  Q.  You can put that document aside, sir.

7          Do you recall that during the pre-negotiations, before

8  the negotiations with KFC, before they asked for bids to be

9  submitted, they had already asked Pilgrim's what margin it

10 needed and how that compared to big bird profitability?

11 A.  I don't recall that.

12 Q.  You were not copied on that e-mail?

13 A.  I don't know if I was or wasn't.  I don't recall that.

14          MR. KOENIG:  Objection.  He is saying that he doesn't

15 recall and then he is bringing in that there was some e-mail.

16          THE COURT:  Right.  Facts can't be assumed that aren't

17 in evidence.  Sustained.

18 BY MR. TUBACH:

19 Q.  You don't recall ever receiving an e-mail that had anything

20 about RSCS asking Pilgrim's what margin it needed.

21 A.  I don't remember that.

22 Q.  Or how it compared to big bird profitability.

23 A.  I don't remember that.

24 Q.  You weren't really in the loop on that part, were you?

25 A.  Like I say, I don't remember that.

Robert Bryant - Cross

1   Q.   Now, you testified earlier that this contract that was

2   being negotiated for 2015 was actually a three-year contract,

3   right?

4   A.   That's correct.

5   Q.   And that's the first time in the history of negotiations

6   with KFC that you know of that there was a three-year contract

7   being negotiated, right?

8   A.   So that's the first time I could recall it, yes.

9   Q.   All the others had been one-year contracts.

10  A.   That I can remember, yes.

11  Q.   And do you recall it was actually KFC's idea that it should

12  be a three-year contract?

13  A.   I don't.

14  Q.   You don't know whose idea it was.

15  A.   No, I don't.

16  Q.   You testified earlier in response to Mr. Feldberg's

17  questions about there being a risk in doing a three-year

18  contract, right?

19  A.   That's correct.

20  Q.   And you talked about labor costs and a few other costs like

21  that.  My question, though, to you is wasn't the greatest risk

22  to Pilgrim's entering into a three-year contract that it would

23  be obligated to supply those birds to KFC for three years?

24  A.   I mean, my opinion was I didn't view that as a risk then.

25  I viewed it as that we had a good portion of business locked up

Robert Bryant - Cross

1060

1   for three years at a margin we felt comfortable with.

2   Q.   And if the big bird margin continued to run away from small

3   bird margins over those three years, Pilgrim's would be stuck

4   selling that lower margin bird to KFC for three years at the

5   volumes it had promised, right?

6   A.   That would be correct.

7   Q.   That would be correct?

8   A.   Uh-huh.

9   Q.   I am sorry, did you say correct?

10  A.   That's correct, yes.

11  Q.   Thank you.

12       One other issue quickly here.  You testified earlier

13  about asking Scott Tucker to call Mar-Jac about some price

14  increase related to US Foods.  Do you remember that?

15  A.   I do.

16  Q.   That had nothing to do with Jayson Penn, right?

17  A.   That's correct.

18  Q.   Now, you testified earlier that Jayson Penn -- sorry,

19  strike that.

20       You testified earlier that Scott Tucker made that call

21  and reported back to you, right?

22  A.   That's correct.

23       MR. TUBACH:  And let's take a look at GX-9140,

24  Government Exhibit 9140 which I believe is in evidence, Your

25  Honor.  If we could blow up just that top part with only the

Robert Bryant - Cross

1   top e-mail and publish it to the jury, please.

2          THE COURT:  Let me just check it.  Yes, it has been

3   admitted and may be published.

4          MR. TUBACH:  Thank you, Your Honor.

5   BY MR. TUBACH:

6   Q.  It was your testimony earlier that even though this e-mail

7   only mentioned Sysco, that what you wrote, I've got feedback

8   from Mar-Jac, related to US Foods, right?

9   A.  That's correct.

10  Q.  And what you testified to earlier is that this e-mail was

11  your getting back to Mr. Stiller based on Mr. Tucker's

12  conversation with Mar-Jac, right?

13  A.  That's correct.

14  Q.  And part of that conversation you testified was that

15  Mar-Jac and Scott Tucker had agreed that Mar-Jac would wait

16  several weeks to increase its price so that it would look like

17  it was staggered, right?

18  A.  Yes.  I believe it was two weeks.

19  Q.  Two weeks.  And as of April 18th, 2017, at 1:15 p.m. and 21

20  seconds, Mar-Jac, according to what you testified to, hadn't

21  had any conversations with US Foods about increasing those

22  prices because the whole idea was to stagger for two weeks,

23  right?

24  A.  I don't -- at this point in time I don't know -- I don't

25  remember where we were at in those negotiations.  They could

Robert Bryant - Cross

1    have submitted pricing already to them.  I'm not sure.  I just

2    remember that I had gotten some feedback from Scott Tucker.

3    Q.  Well, you hadn't even reported the feedback from Scott

4    Tucker to Tim Stiller yet, had you?

5    A.  Well, this is -- this was an attempt to report some

6    feedback.  It may not have been all.  I don't remember how long

7    those negotiations played out.

8    Q.  But Exhibit 9140 is your telling Mr. Stiller that you're

9    going to report back to him on this supposed conversation

10   between Mr. Tucker and Mar-Jac, right?

11   A.  One of those conversations, yes.  There was more than one.

12   Q.  Well, you only testified about one, sir, so far.

13   A.  I was -- I was -- I was giving him whatever information I

14   had received from Mr. Tucker.

15   Q.  And that was the information about the staggering of the

16   two weeks, right?

17   A.  That I recall -- or I'm not sure exactly because there was

18   a few conversations I had with Mr. Tucker about that, about

19   that negotiation.  Obviously, the first one was about, you

20   know, whether or not they would be inclined to get a price

21   increase or not.  And then, you know, US Food Service did give

22   feedback to both of us before they agreed.

23   Q.  Mr. Tucker -- when you testified earlier about what that

24   feedback meant on Government Exhibit 9140, what you said was

25   the feedback that I got from Scott Tucker from Mar-Jac is that

Robert Bryant - Cross

1    they agreed to raise prices similar to ours.  However, they

2    wanted to wait a couple weeks to submit those price increases

3    so there would be the appearance that we were not working

4    together, right?

5    A.  That sounds accurate.

6    Q.  And that's the feedback you're talking about on

7    Exhibit 9140?

8    A.  Yeah.

9    Q.  That's what you testified to earlier, right?

10   A.  Yes.

11   Q.  Now, take a look at 9139.

12        MR. TUBACH:  I believe this has been introduced in

13   evidence and ask it be published to the jury also.

14        THE COURT:  And you may.

15        MR. TUBACH:  If we could blow up the very top e-mail.

16   BY MR. TUBACH:

17   Q.  This e-mail was sent on April 18, 2017 at 1:15 and 50

18   seconds.  That was 29 seconds after the last e-mail, right?

19   A.  That's correct.

20   Q.  And this e-mail you are saying they told Mar-Jac the same

21   thing on boneless, right?

22   A.  That's correct.

23   Q.  "They" there is US Foods, correct?

24   A.  That's correct.

25   Q.  Now, I want to ask you a little bit about these meetings

Robert Bryant - Cross

1   with KFC for 2015 pricing.  First, though, about Popeye's,

2   there is this July 2014 meeting you testified about Popeye's.

3   That's got nothing to do with Jayson Penn, right?

4   A.  That's correct.

5   Q.  And the August 1st, 2014 meeting, Mr. Penn wasn't at that

6   meeting, right?

7   A.  Not that I can recall, no.

8   Q.  He wasn't invited to the pre-meeting?

9   A.  Not that I can remember, no.

10  Q.  Didn't attend it.

11  A.  Not that I can remember.

12  Q.  He was not on a conference call in some way, right?

13  A.  Not that I can remember.

14  Q.  And he didn't attend the post-meeting either, did he?

15  A.  Not that I can remember, no.

16  Q.  And on the August 22nd meeting again with RSCS in

17  Louisville, do you recall that?

18  A.  Which meeting?

19  Q.  The August 22nd meeting after the bids had been submitted?

20  A.  I do recall.

21  Q.  You attended that meeting, right?

22  A.  That's correct.

23  Q.  Mr. Penn did not attend that meeting?

24  A.  That's correct.

25  Q.  He wasn't at the pre-meeting?

Robert Bryant - Cross

1  A.  Not that I can remember, no.

2  Q.  Not at the RSCS meeting?

3  A.  No.

4  Q.  And he wasn't at the post-meeting either, right?

5  A.  That's correct.

6  Q.  Okay.  Now, the 2017 negotiations with KFC, you

7  participated in those.  And I am talking about the negotiations

8  in 2017 for 2018 and beyond pricing, correct?

9  A.  That's correct.

10  Q.  You had participated in those, correct?

11  A.  That's correct.

12  Q.  At that point you had been promoted to what position?

13  A.  Director of sales.

14  Q.  So that 2018 contract that would be negotiated in 2017,

15  that was your responsibility, right?

16  A.  That's correct.

17  Q.  You had ownership of that, right?

18  A.  That's correct.

19  Q.  You owned it, right?

20  A.  That's correct.

21  Q.  And Mr. Penn was not involved in those negotiations at all,

22  was he?

23  A.  Not that I can recall, no.

24  Q.  He didn't attend that January 27, 2017 meeting?

25  A.  No.

1066

Robert Bryant - Cross

1  *Q.*  He did not attend, as far as you know, any internal

2  meetings at Pilgrim's about this.

3  *A.*  Not that I can recall, yeah.

4  *Q.*  And you testified earlier that part of this agreement

5  you've testified about here was an agreement not to take volume

6  away from each other, right?

7  *A.*  That's correct.

8  *Q.*  I believe your exact words were "not to go after volume,"

9  right?

10  *A.*  That's correct.

11  *Q.*  Now, in fact, people went after volume all the time against

12  each other, didn't they?

13  *A.*  They did.

14  *Q.*  And, in fact, in response to your question by Mr. Feldberg,

15  you agreed that Pilgrim's lost a lot of business to KFC in

16  2015, didn't they?

17  *A.*  I did.

18  *Q.*  And you testified on cross that you thought that might have

19  been because KFC was closing stores.

20  *A.*  At the time, yes, that's what I -- that's what I attributed

21  it to.  I don't recall the word volumes in 2015.

22  *Q.*  Now, do you recall that the amount of business that

23  Pilgrim's lost between 2014 and 2015 on eight-piece chicken on

24  the bone was about 20 percent?

25  *A.*  Between what times?

Robert Bryant - Cross

1    *Q.*   2014 contract and 2015 contract.

2    *A.*   I would have estimated higher than that.

3    *Q.*   You would have estimated they would have lost more business

4    than that.

5    *A.*   That's correct, yes.

6    *Q.*   And that's because you thought the amount of business

7    was -- they lost something like 20 loads?

8    *A.*   I don't remember that.  I just -- I don't recall when -- at

9    one point we were supplying between 100 and 130 loads a week.

10   And I know that that volume fell from that peak of 130ish, 120,

11   130ish down to -- 2018, I believe it was, 2017, 2018 we were

12   down to 32 loads a week.

13   *Q.*   From what to what?

14   *A.*   We had a peak, but I don't remember exactly what year that

15   peak was.

16        *MR. TUBACH:*  Let's take a look at Exhibit D-341.  Your

17   Honor, I believe this has been admitted, but I am not entirely

18   sure.  D, as in dog, 341.

19        *THE COURT:*  Let me just check.

20        *MR. TUBACH:*  If not, I am happy to lay the proper

21   foundation.

22        *THE COURT:*  I don't believe it has been.

23        *MR. TUBACH:*  Thank you, Your Honor.

24   *BY MR. TUBACH:*

25   *Q.*   Do you have D-341 in front of you?

Robert Bryant - Cross

1    A.   I do.

2    Q.   I think it's easier because it's a multi-page document, why

3    don't I show you D-341 and the next one which is F-792.  It

4    might be easier for you, Mr. Bryant, to look at the hard copy

5    document.

6         Take a look at Exhibit D-341, if you would,

7    Mr. Bryant.

8    A.   Okay.

9    Q.   What is this?

10   A.   This is the eight-piece pricing model for KFC.

11   Q.   This is the contract, isn't it?

12   A.   It is.

13   Q.   Signed by Mr. Austin?

14   A.   It is.

15   Q.   And signed by Restaurant Supply Chain Solutions, right?

16   A.   It appears.  I don't recognize the signature.

17   Q.   And this is the contract for pricing for 2015 for 2017

18   between Pilgrim's Pride and RSCS or KFC, right?

19   A.   That's correct.

20   Q.   And this is a document that's kept in the ordinary course

21   of business for Pilgrim's?

22   A.   Excuse me?

23   Q.   Contracts such as these are kept in the ordinary course of

24   business with Pilgrim's?

25   A.   That's correct, yes.

Robert Bryant - Cross

1  *Q.* And they use this in their business.

2  *A.* That's correct.

3          *MR. TUBACH:* I move D-341 into evidence.

4          *THE COURT:* Any objection to the admission of D-341?

5          *MR. KOENIG:* No, Your Honor.

6          *THE COURT:* Exhibit D-341 will be admitted.

7  *BY MR. TUBACH:*

8  *Q.* We will go back to that in a minute.

9          Take a look at F-792, if you would. And putting aside

10 that first page, I don't expect you have ever seen that first

11 page before, have you?

12 *A.* I don't remember seeing that, no.

13 *Q.* Take a look at the second page and beyond.

14         This is the 2014 contract between Pilgrim's Pride and

15 RSCS for KFC, correct?

16 *A.* It appears so.

17 *Q.* It has signatures for both Pilgrim's Pride and for UFPC

18 down there, doesn't it?

19 *A.* Yes.

20 *Q.* For the record, UFPC is just the earlier name for RSCS,

21 right?

22 *A.* United Food Purchasing Co-op I believe is what it stood

23 for, but they changed the name to RSCS.

24 *Q.* But they are the same entity.

25 *A.* Yes.

Robert Bryant - Cross

1   *Q.*  Just a different name.

2   *A.*  Yes.

3   *Q.*  And this contract between Pilgrim's and RSCS for KFC

4   chicken is a contract kept in the ordinary course of business

5   at Pilgrim's Pride, correct?

6   *A.*  That's correct.

7   *Q.*  And other than the first page --

8       *MR. TUBACH:*  -- which Your Honor, I believe we will

9   remove it from the exhibit because it's not part of the

10   contract and we'll relabel.

11       *THE COURT:*  You don't have to relabel it necessarily.

12   You can only offer a certain page range.

13       *MR. TUBACH:*  Thank you, Your Honor.  I will offer all

14   pages except the first page into evidence.

15       *THE COURT:*  Any objection to the admission of all

16   pages except the first of F-792?

17       *MR. KOENIG:*  Yes, Your Honor.  This by appearance of

18   the Bates stamp is an RSCS document.  It's not a Pilgrim's

19   document.  And Mr. Bryant hasn't testified that -- I just don't

20   think there is enough foundation for the business record

21   exception based on his testimony that this is something that

22   Pilgrim's kept when it came from another source.

23       *THE COURT:*  The objection is overruled.  Mr. Sangalis

24   testified that contracts of this nature were kept in the

25   ordinary course of business and that he had -- even though he

Robert Bryant - Cross

1    hasn't worked there that long, he did go back and look at past

2    practices.  So this does fall within the business record

3    exception.  F-792 except for the first page will be admitted.

4           MR. TUBACH:  Thank you, Your Honor.

5    BY MR. TUBACH:

6    Q.  Now, I would like to turn if you could to -- if you look at

7    the numbers on the bottom on F-792, turn to the one that's

8    marked 1565.

9           MR. TUBACH:  Can we publish this to the jury, Your

10   Honor.

11          THE COURT:  You may.

12          MR. TUBACH:  If we could blow up that chart so it's

13   more visible.  Thank you.

14   BY MR. TUBACH:

15   Q.  Do you have that in front of you?

16   A.  I do.

17   Q.  These were the volumes that Pilgrim's was contracting to

18   provide to KFC for the different kinds of meat here, correct?

19   A.  That's correct.

20   Q.  The KFC eight-piece COB, that was the flagship fried

21   chicken on the bone, right?

22   A.  Yes, normal eight-piece.

23   Q.  That was 2.6 million roughly pounds, right?

24   A.  Yes.

25   Q.  Per week, right?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   That's about 80 loads a week give or take, right?

3   A.   Correct.

4   Q.   Because KFC used the 33,500.

5   A.   32-five of meat weight, that's correct.

6   Q.   So that's about 80 loads.  And then the dark meat was about

7   22 loads, if I have done my math right.  Does that sound right?

8   A.   That's correct.

9   Q.   Take a look at Exhibit D-341.  And if you could look at the

10  number at the bottom that ends in 4545.

11       MR. TUBACH:  If we could blow up the part that has the

12  top two parts of that chart.  Thank you.

13  BY MR. TUBACH:

14  Q.   Do you see that?

15  A.   I do.

16  Q.   Okay.  And there, this is the volume to KFC for 2015

17  through 2017, right?

18  A.   That's correct.

19  Q.   And there the volume is 2.1 million pounds, right?

20  A.   That's correct.

21  Q.   And the dark meat is 450,000 pounds a week, right?

22  A.   That's correct.

23  Q.   And if I have done my math right, does that mean there is

24  about a 20 percent drop in COB volume between 2014 and 2015?

25  A.   That would be pretty close, yes.

Robert Bryant - Cross

1    Q.   And about a 38 percent drop in dark meat from 2014 to 2015?

2    A.   That's correct.

3    Q.   I am sorry?

4    A.   That would be correct.

5    Q.   You're not suggesting, are you, that KFC closed 20 percent

6    of its stores between 2014 and 2015, are you?

7    A.   I don't know how many stores they closed.  Like I said, I

8    thought they closed approximately 2000 between that time frame.

9    Q.   Listen to my question very carefully, Mr. Bryant.  You are

10   not suggesting, are you, that between 2014 and 2015 KFC closed

11   20 percent of its stores, are you?

12   A.   Not inside of a year, no.

13   Q.   So some of this volume went to somebody else, didn't it?

14   A.   Yes.

15   Q.   Okay.  And so those are the suppliers you have testified

16   about here, right?

17   A.   Yes.

18   Q.   OK Foods is nowhere on the horizon yet, right?

19   A.   Not that I am aware.  I don't think they came till 2015.

20   Q.   So it's one of the other suppliers that you testified about

21   earlier, right?

22   A.   That's correct.

23   Q.   Now, there were other customers that Pilgrim's lost a lot

24   of business to, right, between 2014 to 2015?

25   A.   There were some, yes.

Robert Bryant - Cross

1    *Q.*  Take a look at Exhibit D-770-1.

2         *MR. TUBACH:*  I'll represent to the Court that -- and

3    with the Court's permission I will hand this up to the witness.

4    D-770-1 is a color and a larger version of D-770.  It just

5    makes it easier.

6         *THE COURT:*  You can hand that up.

7         *MR. TUBACH:*  Thank you.

8    *BY MR. TUBACH:*

9    *Q.*  Take a look at D-770-1 and tell me if you have ever seen

10   that document before.

11        *MR. KOENIG:*  I object to the extent we don't have

12   D-770 as well.

13        *THE COURT:*  Were both handed to the witness?  I

14   thought maybe just D-770-1 was.

15        *MR. TUBACH:*  Your Honor, I have D-770 right here.  As

16   I represented to the Court, it's just a smaller black and white

17   version of what I have shown the witness.

18        *THE COURT:*  But that hasn't been handed to the

19   witness, just D-770-1?

20        *MR. TUBACH:*  That's correct.

21   *BY MR. TUBACH:*

22   *Q.*  Have you ever seen that document before, sir?

23   *A.*  I don't remember it.

24   *Q.*  You don't remember ever seeing this?

25   *A.*  I don't.

Robert Bryant - Cross

1   Q.  Do you remember there being ever any calculations done

2   within Pilgrim's as to how much business they had won and lost

3   in the fresh food service business unit between 2014 and 2015?

4   A.  I'm sure that took place.  I just don't remember that.

5   Q.  Is that something that would have been above your pay grade

6   at this time?

7   A.  At this time, yes.

8   Q.  So you wouldn't have been involved in the strategic

9   decision of which customers to prefer and which customers not

10  to prefer going between 2014 and 2015, right?

11  A.  That's correct.  I mean, my manager may have asked my

12  opinion based on sizing and things like that, but no, not from

13  the profitability standpoint, if that's your question.

14  Q.  Not in profitability.  Just in terms of which customers we

15  are going to try to sell more to and which customers we are not

16  going to prefer.

17  A.  It would have been more from a sizing standpoint at that

18  point.

19  Q.  Now, do you recall that in fact for 2015 Pilgrim's lost a

20  substantial volume of business to Wal-Mart?

21  A.  I do recall.

22  Q.  And that was a big deal, wasn't it?

23  A.  Yes.

24  Q.  And they lost something like 850,000 pounds a week in sales

25  to Wal-Mart; isn't that right?

1076

Robert Bryant - Cross

1  A.  I don't recall exactly how much they lost, but it was

2  substantial.

3  Q.  And who picked up that Wal-Mart business?

4  A.  I believe it was Tyson, but I'm not --

5  Q.  And Keystone picked it up too, right?

6  A.  I'm not sure on that.

7  Q.  But you recall that Tyson was one of the companies that

8  took it, right?

9  A.  Yes.

10  Q.  And as you sit here today, you don't recall who picked up

11  the KFC business, do you?

12  A.  I don't, no.

13  Q.  Now, on the flipside Pilgrim's also took a lot of business

14  away from other suppliers between 2014 and 2015, correct?

15  A.  That's correct.

16  Q.  One of them was Roundy's?

17  A.  Yeah.  It was primarily on the retail deli side.

18  Q.  One was Roundy's, right?  They are on the retail side,

19  right?

20  A.  The retail deli side is where I remember our growth during

21  that time frame, yes.

22  Q.  Do you recall that Roundy's was one of them?

23  A.  Yes.

24  Q.  Who did Pilgrim's take the business away from for Roundy's?

25  A.  I believe that was Tyson.

Robert Bryant - Cross

1    *Q.*  And what about King Soopers?  We took a lot of business

2    away from other suppliers.  King Soopers too, right?

3    *A.*  That would be Kroger.

4           *MR. KOENIG:*  Objection, we.

5           *THE COURT:*  Sustained, a little confusing.

6           *MR. TUBACH:*  I am sorry?

7           *THE COURT:*  He objected to your use of the term "we"

8    as being vague.

9           *MR. TUBACH:*  I thought I rephrased it, but I am happy

10   to ask it again.

11          *THE COURT:*  You did, but then you subsequently used

12   it. That's all.

13          *MR. TUBACH:*  I am sorry.  Let me rephrase.

14   *BY MR. TUBACH:*

15   *Q.*  Pilgrim's took a lot of business away from other suppliers

16   in relation to customer King Soopers, right?

17   *A.*  That's correct.

18   *Q.*  And who did they take that business away from?

19   *A.*  I believe it was Tyson.

20   *Q.*  And they took a lot of business away from other suppliers

21   to Raley's, didn't they?

22   *A.*  I remember picking up Raley's, but I don't think we

23   retained that business.

24   *Q.*  Are you sure?

25   *A.*  I remember picking it up, but I don't think we retained the

Robert Bryant - Cross

1   business for -- I think it went back and forth is what I mean.

2   Q.  I got it.  So initially for 2015 Pilgrim's took the

3   business away from another supplier, right?

4   A.  I believe it was Tyson.

5   Q.  And then sometime later your testimony is Tyson took it

6   back.

7   A.  I believe that's the case, yes.

8   Q.  And what about Bob Evans?

9   A.  That one I don't remember.

10  Q.  You don't remember that?  Was that also retail?

11  A.  No, that should have been QSR.  I just don't remember that

12  one.

13  Q.  You don't remember Pilgrim's taking away 200,000 pounds a

14  week in business away from another supplier --

15          MR. KOENIG:  Objection, facts not in evidence.

16          THE COURT:  Fact-loaded questions like that have a

17  tendency to suggest, but I will overrule that one.

18          MR. TUBACH:  Thank you, Your Honor.

19  BY MR. TUBACH:

20  Q.  Do you recall?

21  A.  I don't recall.

22  Q.  What about Popeye's, do you recall whether or not Pilgrim's

23  took any business away from other suppliers to Popeye's that

24  year?

25  A.  I don't.

1079

Robert Bryant - Cross

1    Q.  Now, some of that business was taken away because the other
2    suppliers could not supply the volume of chicken that they had
3    told the customer they would supply; is that right?
4    A.  I don't remember why we gained that business, if it was on
5    price or service.
6    Q.  But you recall that there were times where a customer was
7    unhappy that another supplier was not fulfilling its supply
8    obligations to the customer, correct?
9    A.  That's correct, yes.
10   Q.  And there were times where Pilgrim's, including yourself,
11   refused to cover those shorts for the other supplier, correct?
12   A.  That's correct, yes.
13   Q.  Now, why did they do that?
14   A.  If you, for lack of a better way to explain it, if you're
15   just a fair weather friend to a customer that when they're in
16   need, then they will never convert their business for the
17   long-term with you.  And that was the reason for us not to just
18   fill in for shorts.  So we wanted the business for the
19   long-term and we didn't want to just be called upon by these
20   customers just in their time of need.
21   Q.  You didn't want to be just the Band-Aid.  You wanted to be
22   the solution, right?
23   A.  That's correct.
24   Q.  And you did that with a number of customers in the 2014,
25   2015 time period, correct?

Robert Bryant - Cross

1    A.  I would say probably longer than that, yes.

2    Q.  It was the thought that -- what did you call it a strategy

3    or --

4    A.  Yes, strategy.

5    Q.  Had been going on for a while?

6    A.  I would say yes.  I was just going to say that was the

7    strategy that lasted longer than the time frame that you

8    mentioned, yes.  I would still that strategy exists.

9    Q.  And the idea is I am not going to help you, customer, with

10   this Band-Aid to fix another supplier's problem, but I will be

11   happy to take all of their business and do it myself, right?

12   A.  That is correct.

13   Q.  And Pilgrim's even had a name for that within Pilgrim's,

14   didn't it?

15   A.  We did, yes.

16   Q.  And what was that name?

17   A.  Otis.

18   Q.  Otis.  What was that coming from?

19   A.  I believe it was Andy Griffith.

20   Q.  There is a character on the Andy Griffith Show, right?

21   A.  That's correct, yes.

22   Q.  Now, just on the off chance that anyone doesn't remember

23   characters on the Andy Griffith Show, Otis was Otis Campbell,

24   the town drunk, right?

25   A.  That's correct.

Robert Bryant - Cross

1    *Q.*  And the reason why this strategy was called Otis was

2    because supplying that little bit of chicken when the others

3    had problems is essentially just like giving a drink to the

4    town drunk, right?

5    *A.*  That was the analogy that we used, yes.

6    *Q.*  And he would never have to mend his ways if you just kept

7    feeding him the beer, right?

8    *A.*  Yes.

9    *Q.*  And you personally engaged in that behavior, right?

10   *A.*  I have.

11   *Q.*  Let me specify the behavior.  You personally engaged in the

12   behavior of taking business away from other suppliers using

13   that strategy, right?

14   *A.*  I have, yes.

15          *MR. TUBACH:*  And let's take a look at H-726, if we

16   could.

17          *MR. KOENIG:*  Your Honor, this appears to be the wrong

18   exhibit.

19          *MR. TUBACH:*  Counsel is exactly right.  I want to show

20   a series of texts that go from H-727 to H-743 and then H-726 is

21   simply a demonstrative.  And I am not going to show the witness

22   H-726 at the moment.

23          If I could with the Court's permission hand this set

24   of texts up to the witness.

25          *THE COURT:*  You may.

Robert Bryant - Cross

1      MR. KOENIG:  Your Honor, may we have time to review

2   the summary with this big pile of exhibits?

3      THE COURT:  I don't think the summary is going to be

4   displayed yet.  And depending on how long it takes, we might

5   hit the break.  But if you -- if at the point in time that the

6   summary is either moved into evidence or there is a request to

7   display it for some reason and we're not at the break, I will

8   certainly give you time to do that.

9      Go ahead, Mr. Tubach.

10  BY MR. TUBACH:

11  Q.  Mr. Bryant, take a look at this packet of documents in

12  front of you that are Bates labeled H-727 through H-743.  Do

13  you have that in front of you?

14  A.  I do.

15  Q.  And these are all texts between you and Mr. Stiller; is

16  that right?

17  A.  It appears so, yes.

18  Q.  And you recognize Mr. Stiller's cellphone number?

19  A.  I do.

20  Q.  And you recognize your own number there, right?

21  A.  That's correct.

22  Q.  And unfortunately, the way these are all printed out, there

23  is a single text on each page.

24  A.  Yes.  I'm flipping through those.

25  Q.  And I will represent to you we have accurately -- let me

Robert Bryant - Cross

1    first do this.  Take a look at the Exhibits H-727 through H-743

2    and tell me if these are all texts that you either received or

3    sent to or from Mr. Stiller on April 26, 2018.

4    A.  It appears so, yes.

5    Q.  And the subject of these texts is the shorts that we've

6    been talking about, correct?

7    A.  That's correct, yes.

8    Q.  And the customer is who?

9    A.  Fresh Market.

10   Q.  And you recall receiving and sending these texts on or

11   about April 26, 2018?

12   A.  I do.

13          MR. TUBACH:  I would move H-727 through H-743 into

14   evidence.

15          THE COURT:  Any objection to the admission of H-727

16   through H-723?

17          MR. KOENIG:  Yes, hearsay, 801(d)(2)(E), party

18   opponent.

19          THE COURT:  I don't have a copy of these.  If you

20   could hand those to Ms. Grimm and she will hand them up.

21          MR. TUBACH:  I might as well hand up the

22   demonstrative.  I am happy to continue wherever the Court --

23          THE COURT:  I am still looking at them.  There are

24   quite a few.

25          Okay.  Response?  I think that you had moved their

Robert Bryant - Cross

1  admission and there was a hearsay objection, I believe, right?

2       MR. KOENIG:  Yes.

3       MR. TUBACH:  Your Honor, putting aside H-726 for the

4  moment, the underlying texts themselves are not being

5  introduced to prove the truth of the matter asserted, but to

6  show that the witness used the term Otis that he has testified

7  about in relation to the strategy he has discussing.

8       THE COURT:  He has already stated that.

9       MR. TUBACH:  But this would not be hearsay, then.

10      THE COURT:  What?

11      MR. TUBACH:  It's not being offered for hearsay

12  purposes.

13      THE COURT:  Well, that may apply to -- well, bottom

14  line is a number of these, in fact, most of them contain

15  statements of someone other than Mr. Bryant.  What's the

16  hearsay exception for those?

17      MR. TUBACH:  That goes to show the context.  You can't

18  really have a text exchange with only one of the parties.

19  That's not going to make any sense.

20      THE COURT:  Right.  But Mr. Bryant hasn't said

21  anything to the contrary as to what point that you just made.

22  In fact, he agreed to it beforehand.

23      MR. TUBACH:  I am not using it to impeach the witness

24  with this.  I am using it to confirm this is what he used.

25  This is not an impeachment document.

Robert Bryant - Cross

1         *THE COURT:*  What page is the confirmation?

2         *MR. TUBACH:*  That he learned about it would be on --

3    well, let's start on Exhibit 730 and then 731, 732.

4         *THE COURT:*  I see.  How he learned about it, that's

5    not -- he has already admitted to it.  And as a result, the

6    purpose of it is not for any proper purpose and it's hearsay,

7    and therefore the objection is sustained.

8         *MR. TUBACH:*  Thank you, Your Honor.

9    *BY MR. TUBACH:*

10   *Q.*  Mr. Bryant, do you recall employing this Otis strategy as

11   we talked about here to Fresh Market?

12   *A.*  I do.

13   *Q.*  With customer Fresh Market?

14   *A.*  I do.

15   *Q.*  And Fresh Market is a customer that had been with somebody

16   else, with another supplier, right?

17   *A.*  So we lost that business to Tyson.

18   *Q.*  And then in these -- in 2018 you are taking it back, aren't

19   you?

20   *A.*  Attempting to.

21   *Q.*  And were you successful in taking it back?

22   *A.*  I don't remember if we were or were not successful in

23   taking that business back.

24   *Q.*  But you tried to.

25   *A.*  Yes, we tried to.

Robert Bryant - Cross

1  Q.  And this whole Otis strategy of taking business away from

2  each other, that's just flat out hard-nose competition, right?

3  A.  Yeah.

4  Q.  It's got nothing to do with any agreements or price-fixing

5  or anything at all, right?

6  A.  That's correct.  It's more between us and the customer, not

7  necessarily the competitor.

8  Q.  And the whole point is to take the business away from the

9  competitor, right?

10  A.  That's correct.

11  Q.  Take a look at, if you would, at H- -- sorry, F-414.

12       MR. TUBACH:  Again, this is a multi-page document,

   Your Honor.  I would ask to approach and hand the witness a

13

14  physical copy.

15       THE COURT:  Yes, you may.

16  BY MR. TUBACH:

17  Q.  Take a look at Exhibit F-414, if you would, Mr. Bryant.

18  A.  Okay.

19  Q.  Do you recall receiving this e-mail from Mr. Stiller on or

20  about February 20th, 2015 up at the top there from him to you?

21  A.  I don't recall it, no.

22  Q.  Okay.  Do you recall that there was an effort to take away

23  business from Keystone?

24  A.  Not specifically Keystone, no.

25  Q.  Take a look at the last page of the document and see if

Robert Bryant - Cross

1    that refreshes your recollection, the very first e-mail in this

2    string.

3    A.  I do recall -- I recall this transition, yes.

4    Q.  And the transition was that Pilgrim's was taking business

5    away from Keystone to a customer called H-E-B, right?

6    A.  That is correct.

7    Q.  Who is H-E-B?

8    A.  It's a supermarket chain in Texas.

9    Q.  In the south, in Texas.

10   A.  They may have it in other states, but primarily Texas.

11   Q.  And that was approximately 15 million pounds of business?

12   A.  That's what it says, yes.

13   Q.  Is that what you recall?

14   A.  Well, what I recall is that that business was split between

15   us and another supplier and we became H-E-B's 100 percent deli

16   supplier after that.

17   Q.  And Keystone was another supplier, correct?

18   A.  That's correct.

19   Q.  And we took all that business away from Keystone, correct?

20         MR. KOENIG:  Objection.

21   BY MR. TUBACH:

22   Q.  Sorry, I misspoke again.  Pilgrim's took all that business

23   away from Keystone, correct?

24   A.  That's correct.

25   Q.  And this is another instance of the use of that Otis

Robert Bryant - Cross

1    strategy we have been talking about, correct?

2    *A.* I don't recall that specifically on this.  What I do recall

3    is taking that business and becoming H-E-B's 100 percent

4    supplier for their deli.

5    *Q.* Do you recall Mr. Bryant sending you the e-mail?

6    *A.* Mr. Stiller?  I don't recall this.  I recall us getting a

7    hundred percent of that deli business from -- and I didn't

8    recall who the incumbent was on that business when we got it.

9    *Q.* But now you recall it was Keystone.

10   *A.* Yes.

11            *MR. TUBACH:*  Thank you.

12            *THE COURT:*  Would now be a good time for the break?

13            *MR. TUBACH:*  It would be.  Thank you, Your Honor.

14            *THE COURT:*  Ladies and gentlemen, we will go ahead and

15   break for 20 minutes, so plan on reconvening 25 minutes to

16   4:00.  Keep the admonitions in mind.  If you go out of the

17   courthouse, keep the juror buttons visible if you can.  The

18   jury is excused.  Thank you.

19            (Jury excused.)

20            We will be in recess.

21            *MR. KOENIG:*  One of the jurors left their notebook

22   open.

23            *THE COURT:*  I will have Ms. Grimm shut that.  Thank

24   you.

25            *MR. TUBACH:*  When are we coming back?

Robert Bryant - Cross

 1            THE COURT:  25 minutes of 4:00, 20 minutes.

 2            (Recess at 3:16 p.m.)

 3            (Reconvened at 3:37 p.m.)

 4            Let's get the jury back in, Ms. Grimm.

 5            (Jury present.)

 6            THE COURT:  Go ahead, Mr. Tubach.

 7            MR. TUBACH:  Thank you, Your Honor.

 8     BY MR. TUBACH:

 9     Q.  Mr. Bryant, a couple more questions here.

10            It's true, is it not, that you never reported to

11     Jayson Penn, right?

12     A.  No, I have not reported to Jayson Penn.

13     Q.  There was always at least one layer between you and

14     Mr. Penn at the company; is that correct?

15     A.  That's correct.

16     Q.  Now, you understand he set high standards from what you

17     learned being there, right?

18     A.  Yes.

19     Q.  And for himself and for others, right?

20     A.  That's correct.

21     Q.  He was a hard worker?

22     A.  Yes, very hard.

23     Q.  Extremely hard worker, right?

24     A.  Yes.

25     Q.  Now, at one point in 2017 you learned that your expense

Robert Bryant - Cross

1   reports were no longer going to be sent to your boss,

2   Mr. Stiller.  Do you recall that?

3   A.  I do.

4   Q.  And they had been going to Mr. Stiller because he was your

5   boss, but then he got promoted, right?

6   A.  That's correct.

7   Q.  So for a short time there your expense reports were going

8   directly to Mr. Penn, correct?

9   A.  That's correct.

10  Q.  And Mr. Stiller told you about that, right?

11  A.  He did.

12  Q.  And, in fact, he warned you to be careful because the

13  expense reports were no longer going to Mr. Stiller, but

14  directly to Mr. Penn, right?

15          MR. KOENIG:  Objection, hearsay.

16          THE COURT:  Sustained.

17  BY MR. TUBACH:

18  Q.  Do you recall ever being -- receiving any warning from

19  anyone that you should be careful that your expense reports

20  were going directly to Mr. Penn rather than Mr. Stiller?

21          MR. KOENIG:  Objection, hearsay.

22          THE COURT:  Overruled.

23  A.  Yes.

24  BY MR. TUBACH:

25  Q.  And who did you hear that from?

Robert Bryant - Cross

1   A.   Tim Stiller.

2   Q.   And your response to that was what, if you recall?

3   A.   I don't recall exactly.

4         THE COURT:  Hold on one second, Mr. Bryant.  What was

5   the objection?

6         MR. KOENIG:  Objection, hearsay, his response.

7         THE COURT:  I think it was Mr. Bryant's response.

8         MR. TUBACH:  Yes, Mr. Bryant's response.

9         THE COURT:  Overruled.

10  BY MR. TUBACH:

11  Q.   Do you recall what it was?

12  A.   I just recalled -- I don't really recall.  I just -- I

13  don't remember exactly, but it was like -- I don't think -- I

14  didn't have anything to worry about.

15  Q.   Do you want me to show you a couple documents and refresh

16  your recollection?

17        MR. TUBACH:  With the Court's permission, can I

18  approach the witness?

19        THE COURT:  You can approach Ms. Grimm.

20        MR. TUBACH:  I handed the witness what is Exhibit

21  H-745 through 747.

22  BY MR. TUBACH:

23  Q.   These are three texts between yourself and Mr. Stiller,

24  correct?

25  A.   That's correct.

Robert Bryant - Cross

1    Q.   And do you recall now what your response was when

2    Mr. Stiller told you to be careful on your expense reports

3    because they were now going directly to Mr. Penn?

4    A.   Yes.

5    Q.   What was that?

6    A.   I'm behaving, LOL, joking.

7    Q.   And then what else did you say?

8    A.   Did the last two?

9    Q.   Meaning did the last two reports already go to Mr. Penn,

10   correct?

11   A.   That's correct, possibly because I had some very large

12   expenses for meals or something where I was entertaining

13   customers, but I don't recall the why, but...

14   Q.   Now, Mr. Bryant, you have no knowledge of Jayson Penn

15   agreeing with a competitor to fix prices, right?

16   A.   Not that I'm aware of, no.

17   Q.   So that's a yes, right?  You have no knowledge, correct?

18   A.   Not that I'm aware of, yes.

19   Q.   And you're not aware of Jayson Penn agreeing with

20   competitors to rig bids, right?

21   A.   I don't have any personal knowledge of that.

22   Q.   And you have no personal knowledge of Jayson Penn telling

23   anyone to fix prices, right?

24   A.   That's correct.

25   Q.   And you have no personal knowledge of Jayson Penn telling

Robert Bryant - Cross

1   anyone to rig bids, right?

2   *A.*   Not that I'm aware of, no.

3   *Q.*   And you have no personal knowledge that Jayson Penn

4   instructed anyone to coordinate prices or bids with a

5   competitor, correct?

6   *A.*   That's correct.

7   *Q.*   And you have no knowledge that Jayson Penn knew of anyone

8   fixing prices or rigging bids, right?

9   *A.*   I don't.

10           *MR. TUBACH:*   I have no further questions.   Thank you.

11           *THE COURT:*   Thank you, Mr. Tubach.

12           Additional cross-examination?

13           Mr. Fagg?

14           *MR. FAGG:*   Yes, Your Honor.   Can I have one moment?

15           *THE COURT:*   You may.

16           *MR. FAGG:*   Your Honor, we have no questions for this

17   witness.

18           *THE COURT:*   Ms. Henry, go ahead.

19                          **CROSS-EXAMINATION**

20   *BY MS. HENRY:*

21   *Q.*   Good afternoon, Mr. Bryant.   My name is Roxann Henry.   I

22   represent Mr. Bill Kantola.

23   *A.*   Good afternoon.

24           *MR. HENRY:*   If we could bring up --

25           *THE COURT:*   Is the microphone working, Ms. Henry?

1094
Robert Bryant - Cross

1    Let's just check.  Yup, it's working.  Go ahead.

2            *MS. HENRY:*  If we could bring up Government

3    Exhibit 9140.  And that's already been admitted, Your Honor, so

4    it can be brought up on the screen.

5            *THE COURT:*  It can.

6    *BY MS. HENRY:*

7    *Q.*  Yes.  This relates to the time that you said that you and

8    Mr. Stiller were trying to figure someone to talk to about

9    pricing, but you didn't know who to call; is that right?

10   *A.*  This is after we had figured out who to talk to.

11   *Q.*  Looking at the document, the "yes, and Janine" isn't

12   related to the conversation that you were testifying about

13   regarding Mar-Jac?

14   *A.*  That's correct.  The "yes, and Janine" is answering Tim

15   Stiller's question in the previous e-mail.

16   *Q.*  So it's just in the nature of e-mail that you tucked in a

17   totally different topic onto the one topic, right?

18   *A.*  In this particular one, yes.

19           *MS. HENRY:*  And could you call up 9139?

20   *BY MS. HENRY:*

21   *Q.*  Again, in this e-mail you just basically hit reply to

22   Mr. Stiller so that you could give him further information.  It

23   wasn't about the topic that was on the e-mail.

24   *A.*  That's correct.

25   *Q.*  And again, that's just in the nature of e-mails.  That's

Robert Bryant - Cross

1    the sort of thing that happens, right?

2    A.   In this particular case, that's what I did.

3    Q.   You have done that in other instances too, I suspect?

4    A.   Possibly.

5    Q.   Now, this whole issue that you were talking about,

6    Mr. Kantola had nothing to do with it, right?

7    A.   The previous two e-mails?

8    Q.   Yes, the thing you talked about with US Foods that you were

9    doing.

10   A.   That is correct.

11   Q.   Now, you tried to help us out a little bit to understand

12   the poultry supply chain.  Is it fair to say that you've got

13   purchasing agents, distributors, suppliers and restaurants that

14   are all part of the poultry supply industry?

15   A.   So to speak, yes.

16   Q.   And each plays a role in that industry.

17   A.   That's correct.

18   Q.   Now, you've testified that you were feeling some pressure

19   on you and maybe Mr. Austin to give your superiors some

20   competitive intelligence on where you thought the competition

21   would be, right?

22   A.   Are you referring to 2017?

23   Q.   Well, in 2017 did you?

24   A.   Yes.

25   Q.   Did you feel it at any other time?

1096

Robert Bryant - Cross

1   *A.*   There were other times, but those are the two that come to

2   mind.

3   *Q.*   But I think you also said you didn't check the accuracy of

4   the future pricing numbers that Mr. Austin provided you because

5   you trusted Mr. Austin and you were just trying to get together

6   some competitive intelligence, right?

7   *A.*   Yes, I trusted the information.

8   *Q.*   When you are guessing or extrapolating information, it may

9   not be fully accurate, right?

10  *A.*   Could you repeat?   I am sorry.

11  *Q.*   When you are guessing or extrapolating information, it may

12  not always be fully accurate, right?

13  *A.*   Not sure what you mean by guessing or extrapolating.

14  *Q.*   Well, what do you mean when you say guessing or

15  extrapolating?

16  *A.*   I am sorry, I am not understanding the context of the

17  question.   When you say guessing or extrapolating, what do you

18  mean by guessing or extrapolating about?

19  *Q.*   Well, can you give me an example of what it is to guess or

20  extrapolate about something?

21  *A.*   I guess --

22          *MR. KOENIG:*   Your Honor, relevance objection.

23          *THE COURT:*   Sustained.

24  *BY MS. HENRY:*

25  *Q.*   How about guessing or extrapolating information about where

Robert Bryant - Cross

1    your competitors are?

2    *A.*   You could possibly guess.  I'm not sure.  I'm not sure.  I

3    mean, there is benchmarking data out there, so you could guess.

4    I'm not sure that -- I mean, it wouldn't give you -- you could

5    guess.  I don't know.  I'm struggling with this.

6    *Q.*   Okay.  So let me help you out.  When a customer tells you

7    what his lowest number is, do you always believe that that's

8    his real low number or maybe the number might even be lower.

9    *A.*   It depends on the customer.

10   *Q.*   So is that a situation where you might extrapolate or guess

11   from something?

12   *A.*   I don't know extrapolate or guess.  I would say it would be

13   a judgment based off a lot of things, you know, the account

14   owner or the relationship with that particular customer and,

15   you know, whether it was built on trust or not.

16   *Q.*   And if they give you sort of an average of something, can

17   you sort of think about what you've got in terms of other

18   information to sort of think about where things might be?

19   *A.*   I mean, we would -- I would consult other benchmarking data

20   to see if I felt like the information provided was in line with

21   what I seen -- let's call it industry.

22   *Q.*   And Mr. Austin knew a lot of the folks at RSCS, didn't he?

23   *A.*   I believe so, yes.

24   *Q.*   I mean, that's why he was based in Louisville?

25   *A.*   I mean, yes.  From what I remember he relocated to

Robert Bryant - Cross

1    Louisville because he was originally, you know, our account

2    owner for Yum Brands and added on from there, yes.

3    Q.  Now, on direct you talked first about sort of overhearing

4    phone conversations with Mr. Austin and Mr. Kantola, and then

5    you kind of talked about a phone conversation.  Isn't it true

6    that there was only one call between them that you think you

7    overheard?

8    A.  The one I testified about, yes; that particular one, yes.

9    Q.  And in that instance you could only hear what Mr. Austin

10   said; isn't that correct?

11   A.  That's correct.

12   Q.  You didn't hear what Mr. Kantola may have said to

13   Mr. Austin.

14   A.  That's correct.

15   Q.  And you personally have never talked to Mr. Kantola about

16   prices.

17   A.  Not that I can remember.

18   Q.  In fact, you could probably count on your fingers every

19   time you've ever even seen Mr. Kantola; isn't that correct?

20   A.  That's probably a fair statement.

21           MS. HENRY:  No further questions, Your Honor.

22           THE COURT:  Thank you.

23           Additional cross-examination?

24           Mr. Pollack, go ahead.

25                          **CROSS-EXAMINATION**

Robert Bryant - Cross

1    *BY MR. POLLAK:*

2    *Q.*   Good afternoon, Mr. Bryant.

3    *A.*   Good afternoon.

4    *Q.*   So you testified yesterday, I believe it was, on direct

5    examination that when Pilgrim's would buy chicken from other

6    suppliers because they couldn't cover a short internally, that

7    generally the other supplier would give you a price per case.

8    And so it wouldn't convey to you the information that they were

9    charging per pound to KFC; is that correct?

10   *A.*   I believe I said that generally, but there are times that

11   they provided the additional information also, yes, both.

12   *Q.*   Both.  So there are times that when Pilgrim's is buying

13   from another supplier, that other supplier is conveying to

14   Pilgrim's exactly to the thousandth of a cent what their prices

15   to KFC for, for example, eight-piece chicken on the bone.

16   *A.*   That's correct.

17   *Q.*   And the reverse is also true, isn't it?

18   *A.*   Do you mean that Pilgrim's would provide -- I don't

19   remember seeing the level of detail that Pilgrim's provided to

20   a competitor when we sold to them.

21   *Q.*   Okay.  So Pilgrim's would sell chicken to other suppliers

22   when they had a short, correct?

23   *A.*   Yes.  I think most of the time we were in need.

24   *Q.*   But there were occasions that you would sell to other

25   suppliers, correct?

Robert Bryant - Cross

1    A.  Correct.

2    Q.  And your testimony as I understand it is you don't recall

3    one way or the other whether when Pilgrim's would do that it

4    would convey information that would tell the other suppliers

5    precisely what it was charging KFC.

6    A.  I don't remember -- I don't remember what we shared at that

7    point.

8    Q.  You had years of experience at Pilgrim's by 2013, 2014; is

9    that correct?

10   A.  That's correct.

11   Q.  And you were certainly familiar with the fact that

12   Pilgrim's did sell to competitors on occasion, correct?

13   A.  By that time, yes.  I really wasn't involved before the

14   promotion, approximately 2010.

15   Q.  But from 2010 onwards you were certainly aware of that?

16   A.  Yes.  I don't recall when we actively started buying from

17   them, when that practice really started.  There was a period of

18   time where we didn't and then I don't recall how that practice

19   got started.

20   Q.  And what about sales from Pilgrim's to other suppliers, you

21   became familiar with that, the fact that those occurred?

22   A.  Yes.

23   Q.  And you were aware when Pilgrim's sold to other suppliers,

24   they would invoice those other suppliers for whatever chicken

25   the other suppliers were buying, correct?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And you were familiar with at least generally the Pilgrim's

3   invoice process?

4   A.   Somewhat, yes.

5   Q.   Do you know what a Pilgrim's invoice looks like?

6   A.   I do.

7   Q.   You would recognize a Pilgrim's invoice if you saw it?

8   A.   I should, yes, I should.

9        MR. POLLACK:   Brian, can you put up what has been

10   marked for identification as H-895?

11   BY MR. POLLACK:

12   Q.   And take as much time as you need, Mr. Bryant, but does

13   that look to you like a Pilgrim's invoice?

14   A.   It does.

15   Q.   That's a format you are familiar with?

16   A.   It is.

17   Q.   And you knew that Pilgrim's regularly invoiced other

18   companies when they sold them chicken?

19   A.   Well, if we sold chicken, we would have to, yes.

20   Q.   You would have to.  And you knew that people at Pilgrim's

21   would rely on those invoices to be accurate, right?

22   A.   That's correct.

23   Q.   Invoices were kept in the regular course of business at

24   Pilgrim's.

25   A.   That's correct.

Robert Bryant - Cross

1        MR. POLLAK:  I would move the admission of H-895.

2        THE COURT:  Any objection to the admission of H-895?

3        MR. KOENIG:  No, Your Honor.

4        THE COURT:  H-895 will be admitted.

5        MR. POLLAK:  And if we can go ahead and publish that

6   to the jury, please.

7        THE COURT:  You may.

8        MR. POLLACK:  If we can blow up the top line.  Let's

9   just see if we can do like the top third there before we get to

10   all the blank space.

11   BY MR. POLLACK:

12   Q.  Mr. Bryant, this is an invoice from Pilgrim's to George's,

13   correct?

14   A.  Yes.

15   Q.  And so this would be a situation where Pilgrim's had sold

16   chicken to George's.

17   A.  It appears so, yes.

18   Q.  And specifically they were selling KFC eight-piece to

19   George's, correct?

20   A.  That's correct.

21   Q.  And this information -- this invoice conveys some

22   information about the chicken that's being sold, correct?

23   A.  That's correct.

24   Q.  So, for example, under the description column it tells us

25   what kind of chicken is being sold, correct?

Robert Bryant - Cross

1    *A.*  It does.

2    *Q.*  And then in the next column it tells us the quantity, 640

3    cases, correct?

4    *A.*  That's correct.

5    *Q.*  And it then tells us the weight, 31,976.44 pounds?

6    *A.*  That's correct.

7    *Q.*  And then it tells us the price per case, correct?

8    *A.*  That's correct.

9    *Q.*  And then it tells us just doing the multiplication that at

10   that price and for that amount of weight or that number of

11   cases, that the total cost to George's is going to be

12   $31,315.20, correct?

13   *A.*  That's correct.

14        *MR. POLLACK:*  Brian, can you put up H-896?  And Your

15   Honor, this is a demonstrative exhibit only.  I'm not seeking

16   to move its admission, but I would like to publish it to the

17   jury.  I can hand up a copy to the Court if the Court would

18   like it.

19        *THE COURT:*  I can see it.  It's just this one page,

20   Mr. Pollack?

21        *MR. POLLACK:*  Correct.

22        *THE COURT:*  Let me just look at it for a second.

23        *MR. POLLACK:*  Certainly, Your Honor.

24        *THE COURT:*  And these are numbers from the previous

25   exhibit?

Robert Bryant - Cross

1           MR. POLLACK:  Correct, Your Honor.  All the

2    information is coming from H-895 other than the math.

3           THE COURT:  Okay.  And you would tend to use it with

4    the witness?

5           MR. POLLACK:  Correct.

6           THE COURT:  And then at some point display it to the

7    jury or what do you want to do about that?

8           MR. POLLACK:  I would like to display it to the jury

9    as I am using it with the witness, but again, it's only a

10   demonstrative.  I am not seeking its admission.

11          THE COURT:  I understand.

12          Mr. Koenig, any objection to the use of H-896 for

13   demonstrative purposes?

14          MR. KOENIG:  Well, other than the fact that I can't do

15   this kind of math in my head.

16          THE COURT:  Someone's got a cellphone there.  I bet

17   you could crunch those numbers.

18          MR. KOENIG:  The other thing I would request is I'm

19   not sure that the foundation has been laid for the need for a

20   demonstrative.

21          THE COURT:  For the exact same reason you mentioned

22   it's hard to do in your head, that's the need.  Whatever

23   objection you may have will be overruled.  H-896 can be used

24   just for demonstrative purposes.

25          MR. KOENIG:  Thank you.

1    MR. POLLACK:  Thank you, Your Honor.

2         Can we go ahead and publish for the jury -- and Brian,

3    I am just looking at the first line of the exhibit at this

4    point.

5    BY MR. POLLACK:

6    Q.  Mr. Bryant, we just looked at that invoice, and the invoice

7    told George's that they were being sold 640 cases, correct?

8    A.  That's correct.

9    Q.  And it told George's that the price was $48.93 per case,

10   correct?

11   A.  I believe so.

12   Q.  Do you want me to hand you up a hard copy --

13   A.  That would be helpful.

14   Q.  -- of the invoice so you can compare the two?

15        MR. POLLAK:  Is that all right, Your Honor?

16        THE COURT:  Yes, that's fine.

17   BY MR. POLLAK:

18   Q.  Am I correct, Mr. Bryant, it was 640 cases at $48.93 a

19   case?

20   A.  Correct.

21   Q.  And that total is the $31,315.20, correct?

22   A.  That's correct.

23   Q.  And let's go down to the next line.  That invoice also told

24   George's that the weight of those 640 cases was

25   31,976.44 pounds, correct?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   And we can go to the next one.  We are going to do a little

3    bit of math here.  And if you would like a calculator, I am

4    more than happy to supply it, Mr. Bryant.  But if you have got

5    these 31,976.44 pounds divided by the 640 cases, that would

6    tell me that each case is 49.963 pounds per case.  Does that

7    sound right?

8    A.   I'm not questioning your math, but I would tend not to

9    agree with that, that case weight.

10   Q.   Okay.

11   A.   Because there is a max billable.  So those -- if it was

12   under that, then you could be charged under that.  Then the

13   weight could be more than what's technically on the invoice

14   because of the billable -- max billable pounds, so it may not

15   be reflective of the actual case weights.  I know on our bill

16   of ladings, and I don't recall, that there was some

17   discrepancies between weights and what's actually on the truck

18   and things like that, so...

19   Q.   There might be some discrepancy, but at least that's the

20   information that --

21   A.   Yeah, I don't know how far this would be off.  And this is

22   for eight-piece and I don't recall having an average case

23   weight that low.  And I think we've talked about it before

24   where I believe we were in the 51 to 52 and a half, so --

25   Q.   This seems a little low to you.

Robert Bryant - Cross

1    A.  Yes, that's correct, a couple pounds.  And I think it's

2    because of that max billable and all the pounds are not

3    represented here.

4    Q.  Okay.  But you would agree with me that that was what was

5    communicated to George's in this invoice.

6    A.  Yes.  That would be the billable piece.

7    Q.  Okay.  And let's go down to the next segment.  You can skip

8    that.  We have already talked about that.  And we know that

9    this was the total price charged, right?

10   A.  That's correct.

11   Q.  And we know if we scroll up or down, whichever it is, that

12   that was the total number of pounds.

13   A.  Yes.

14   Q.  So you would agree with me again if you will accept my math

15   that if you take the total amount that was charged and you

16   divide it by the number of pounds, you would get a price per

17   pound, correct?

18   A.  You would.  I'm not sure that that's accurate, but yes,

19   based off what I said about not all the pounds being captured

20   and so forth, so yes.

21   Q.  But George's could take this invoice -- anybody at George's

22   could take this invoice and do the same math that I just did,

23   correct?

24   A.  They could, yes.

25          MR. POLLACK:  All right.  Thanks, Brian.

1108

Robert Bryant - Cross

1    *BY MR. POLLACK:*

2    *Q.*  I would like to, Mr. Bryant, go back to your notes from

3    January of 2017, and these were on Exhibit 1919, which is

4    already in evidence.  And let's go to Page 11 of that exhibit,

5    so you can go ahead and show that to the jury.

6            And these were your notes, am I right, Mr. Bryant, of

7    the meeting that you participated in, you at Pilgrim's with the

8    buying cooperative for KFC on January 27th, 2017, correct?

9    *A.*  That's correct.

10   *Q.*  And if you go to the next page -- we saw that preceding

11   page was dated January 27, 2017.  This page is not dated,

12   correct?

13   *A.*  That's correct.

14   *Q.*  So when do you think this page -- you are reflecting notes

15   from what date?

16   *A.*  It would be the following week.  I don't know if it was

17   Tuesday, Wednesday or Thursday of that week, but -- I don't

18   remember which day of the week it was.

19   *Q.*  Do you believe it was before Pilgrim's submitted its first

20   round bid to KFC?

21   *A.*  I do.

22   *Q.*  And this portion you recall is being notes of a call that

23   you had with Mr. Austin, correct?

24   *A.*  That's correct.

25   *Q.*  Mr. Austin's name does not appear here?

Robert Bryant - Cross

1    *A.*  It does not.

2    *Q.*  And on the undated notes with the section that doesn't

3    refer to Mr. Austin, that first number, the 1.0234, you said it

4    was your understanding that that was Pilgrim's current price,

5    right?

6    *A.*  That's what I remember, yes.

7    *Q.*  And we talked -- you talked a little bit about this with

8    some of the other attorneys, but once a contract was entered

9    into, the price would fluctuate a little bit from period to

10   period?

11   *A.*  That's correct.

12   *Q.*  And a period could be four weeks or it could be a month

13   depending on the customer?

14   *A.*  Generally a period was a month, but...

15   *Q.*  Generally a period was a month.  So if we're at the

16   beginning of February, we're talking about period two prices

17   for the year 2017, correct?

18   *A.*  I don't remember if this -- I don't remember when the

19   periods changed.  You know, like I said before, I don't know if

20   that was reflective of KFC's period or Pilgrim's periods and if

21   they aligned.

22   *Q.*  But one thing that you are pretty confident of is that this

23   1.0234 is Pilgrim's current price.  It's not what Pilgrim's was

24   intending to bid the following week.

25   *A.*  I don't recall that being our intended bid.  Like I said

1110

Robert Bryant - Cross

 1   before, our intended bid was second in price.  The 1.0234 I

 2   wrote up there for a reason.  I believe it could have been

 3   Pilgrim's current price, but I'm not a hundred percent certain

 4   on why I wrote that, that 1.0234 above the competitor pricing.

 5   It could have been -- I don't remember exactly why I wrote that

 6   one above the other, the other prices.

 7   Q.  The other prices you have testified that you believed were

 8   what the other suppliers intended to bid?

 9   A.  That's correct.

10   Q.  So you believe that the 1.0234 was a current price, but you

11   believed that these other prices were future prices?

12   A.  I believe the prices I wrote down next to the individual

13   company's name were prices they intended to bid.  And then I

14   then used that to develop Pilgrim's bid.

15   Q.  Now, you testified I believe in response to a question by

16   Mr. Feldberg that you didn't know where the competitors were in

17   the bid process; is that correct?

18   A.  That's correct.  I assumed we all had the same due date of

19   that Friday, but I did not ask where they were in the bid

20   process after I received this information.

21   Q.  So you just simply assumed that.  You didn't have any

22   actual basis for that, correct?

23   A.  Typically when a customer solicits a bid, they expect all

24   the bids back on the same day.  They don't expect them

25   staggered.  There are times that we have asked for additional

Robert Bryant - Cross

1   time to submit bids in other occasions that I can remember and

2   they may give you over the weekend to submit a bid or they may

3   come back and say you've had two weeks.  But for the most part

4   when they set a deadline for a bid submission, they expect all

5   the participants to have that back on that particular day.

6   Q.  Well, all of the participants -- are you aware, Mr. Bryant,

7   that George's was not invited to submit a bid as Pilgrim's had?

8   A.  Excuse me?

9   Q.  Pilgrim's was invited to submit a bid, correct?

10  A.  Yes.

11  Q.  By the week of February 3rd.

12  A.  Yes.

13  Q.  And you had your pre-meeting with KFC or KFC's buying

14  cooperative on January 27.

15  A.  That's correct, yes.

16  Q.  Are you aware that George's was not invited to submit a bid

17  the week of February 3rd?

18          MR. KOENIG:  Object, assumes facts not in evidence.

19          THE COURT:  Sustained.

20  BY MR. POLLAK:

21  Q.  Are you aware one way or the other?  Do you have any

22  knowledge about whether or not for this particular bid George's

23  had been invited to submit a bid on the same schedule that

24  Pilgrim's had?

25  A.  I do not have that information.

Robert Bryant - Cross

1    Q.  Do you know one way or the other whether George's had had

2    any meeting with RSCS at the time that you had written those

3    notes?

4    A.  No, I did not.

5    Q.  Next to George's you have .9652?

6    A.  That's correct.

7    Q.  You would agree with me, would you not, that if George's

8    wasn't submitting a bid, whatever that .9652 was, it couldn't

9    have been a bid of George's.

10   A.  It was my understanding that George's did participate in

11   the bid.

12   Q.  I understand.  So my question is if that understanding was

13   incorrect and George's was not submitting a bid in this time

14   frame, then that .9652 must not have been George's bid; is that

15   fair?

16        MR. KOENIG:  Objection, he is asking him to speculate.

17   He has already said he doesn't know.

18        THE COURT:  He can answer that question.  Overruled.

19   A.  Can you ask one more time, please?

20   BY MR. POLLAK:

21   Q.  Sure.  If George's wasn't submitting a bid in this time

22   frame, that amount was not George's bid, correct?  That amount

23   must have reflected something else.

24   A.  It -- I don't know -- I don't know that.

25   Q.  Do you know one way or another, Mr. Bryant, whether .9652

Robert Bryant - Cross

1    was precisely to the thousandths of a penny what George's

2    current 2017 period two price was?

3              MR. KOENIG:  Objection.

4              THE COURT:  Sustained.

5    BY MR. POLLAK:

6    Q.  Do you know one way or the other what George's period two

7    price was?

8    A.  I don't know that.

9    Q.  Now, your notes do not reflect that Mr. Austin or anybody

10   else has said that they had gotten this information from anyone

11   at George's, correct?

12   A.  That's correct.

13   Q.  And you were aware, I believe you testified, Mr. Bryant,

14   that Mr. Austin kept track of period prices or current prices,

15   correct?

16   A.  I don't know if I phrased it that way.

17   Q.  Well, am I correct?

18   A.  I believe I said that Mr. Austin told me that he had

19   everybody's prices back to the nineties.

20   Q.  Okay.  So based on that you understood, did you not, that

21   for a couple of decades he had kept track of what the period

22   price was or what the current price was at any given period of

23   time going back to the nineties.

24   A.  Yeah.  He had pricing data, yes.

25   Q.  And that's current or past pricing that we're talking

Robert Bryant - Cross

1   about, not future bid information, correct?

2   A.   In that context, that's correct, yes.

3   Q.   Did you know that Mr. Blake also kept track of current or

4   past prices?

5            MR. KOENIG:   Objection.

6            THE COURT:   I'll sustain the objection to the form.

7   If you could rephrase.

8   BY MR. POLLAK:

9   Q.   Okay.   Do you know one way or the other whether Mr. Blake

10  similarly kept track of current or past prices?

11  A.   I did not.

12  Q.   And, in fact, you don't even know Mr. Blake; is that

13  correct?

14  A.   No, not really.   I think I may have seen him once or twice,

15  but I don't recall ever speaking to him.   If I did, maybe it

16  was just a hello at some conference or some passing.

17  Q.   You certainly never reached an agreement with him.

18  A.   No, me personally, no.

19  Q.   Now, if Mr. Austin kept track of what the current prices

20  were, he wouldn't need to talk to a competitor to convey to you

21  or anybody else what current prices were, correct?

22  A.   How would he obtain the current prices?

23  Q.   We just saw that you can obtain current prices from

24  invoices, for example, correct?

25  A.   Yeah.   I mean --

Robert Bryant - Cross

1        *MR. KOENIG:*  Objection, misstates the record.

2        *THE COURT:*  Overruled.

3   *A.*  I mean, I didn't necessarily agree with that, that way to

4   obtain a price.

5   *BY MR. POLLAK:*

6   *Q.*  Mr. Austin, do you know one way or the other -- Mr. Bryant,

7   I am sorry.

8        Mr. Bryant, do you know one way or the other whether

9   George's ever at any point in time in 2017 submitted a bid to

10  the buying cooperative for KFC in the amount of .9652?

11  *A.*  I do not.

12  *Q.*  And lastly, Mr. Bryant, you said on direct that tracking

13  period prices could be used to enforce some agreement that

14  competitors had about what they were going to bid?

15  *A.*  It could be used, yes.

16  *Q.*  But it could only be used in that fashion if one had an

17  agreement and knew what competitors were bidding, correct?

18  *A.*  I don't follow your question.

19  *Q.*  You can't very well enforce an agreement that doesn't

20  exist.  You would agree with me on that, wouldn't you?

21  *A.*  Yes.

22  *Q.*  And you certainly have no knowledge whatsoever about how

23  Mr. Blake may have used current prices.

24  *A.*  That's correct.

25        *MR. POLLAK:*  Nothing further, Mr. Bryant.  Thank you.

Robert Bryant - Cross

1      *THE COURT:*  Thank you, Mr. Pollack.

2           Additional cross-examination?

3           Mr. Lavine?

4           *MR. LAVINE:*  Yes.

**CROSS-EXAMINATION**

6   *BY MR. LAVINE:*

7   *Q.*  Mr. Bryant, my name is Bryan Lavine and I represent

8   Mr. Brady.

9           How are you today?

10  *A.*  Good.  How are you?

11  *Q.*  Great.  Thank you.

12          Mr. Bryant, you first met Mr. Brady at Pilgrim's

13  Mayfield plant; is that correct?

14  *A.*  That's correct.

15  *Q.*  And at the time Mr. Brady was working at Pilgrim's.

16  *A.*  That's correct.

17  *Q.*  And this would have been prior to August of 2012 when

18  Mr. Brady started working at Claxton.

19  *A.*  That's correct.

20  *Q.*  In fact, the last you saw Mr. Brady was at Pilgrim's

21  Mayfield plant before Mr. Brady left Pilgrim's.

22  *A.*  I am not sure that's accurate.

23  *Q.*  All right.  Did you see him after that time?

24  *A.*  Possibly.  I'm not sure if he attended a trip that -- it

25  was a gathering with some folks to go hunting, part of a

Robert Bryant - Cross

1   Popeye's thing.  He may have been there, but I am not a hundred

2   percent certain.

3   Q.  I am sorry to interrupt you.

4   A.  I thought he was, but I am not a hundred percent certain if

5   he was there or not.

6   Q.  So you are not a hundred percent certain one way or the

7   other, correct?

8   A.  That's correct.

9   Q.  Now, we are talking when he left was about nine, 10 years

10  ago?

11  A.  That's correct.

12  Q.  In fact, sir, you had a difficult time, in fact, you could

13  not even identify Mr. Brady in this courtroom yesterday, could

14  you, sir?

15          MR. KOENIG:  Objection, misstates the record.

16          THE COURT:  Overruled.  He can answer.

17  BY MR. LAVINE:

18  Q.  In fact, at first you identified someone else.

19  A.  Yes.  When first asked, I was confused about the amount of

20  people on the defense side and I thought it was just these two

21  areas here.  I didn't realize there was another table further

22  over to look.  And as you said, it's been a few years since

23  I've seen him.  I don't recall all the gray hair that he has

24  now and I surely didn't have glasses.

25  Q.  But then after picking out the wrong person initially, you

Robert Bryant - Cross

1   weren't really able to identify him until government counsel

2   gave you a hint that he was wearing glasses; isn't that

3   correct, sir?

4   A.  I don't recall that statement, but I do identify him.  I

5   can identify him.  It does make it more difficult because it

6   has been a while since I have seen him, and we have both aged

7   and we are all wearing masks.

8   Q.  But you had a problem trying to identify him yesterday.

9   A.  Yes.  And like I said, I was confused by the -- I didn't

10  anticipate -- I have not been in this setting before.  I had a

11  misperception that the defense would be on one side and the

12  prosecution on another side, and I didn't expect them to be

13  commingled the way they were and I was not looking in the right

14  direction.

15  Q.  Are you still confused, sir?

16  A.  No.

17  Q.  Just want to make sure.

18        Now, when Mr. Brady worked at Pilgrim's, he never

19  shared with you that he spoke with competitors; is that

20  correct?

21  A.  I don't recall that.

22  Q.  In fact, he never shared competitor pricing with you at

23  Pilgrim's, did he?

24  A.  Not that I can recall.

25  Q.  And once Mr. Brady left Pilgrim's and joined Claxton, you

Robert Bryant - Cross

1   never spoke to him about pricing; is that correct?

2   A.   Not that I can remember, no.

3   Q.   When Mr. Brady joined Claxton, you never spoke with

4   Mr. Brady about competitors, did you, sir?

5   A.   I don't recall having conversations with Brady after he --

6   Scott Brady after he left Pilgrim's.   I may have, but I don't

7   recall any conversations of any significance.

8   Q.   Once he left you don't recall any conversations with

9   Mr. Brady.

10  A.   No.

11  Q.   That's fine.

12        Now, are you aware that Mr. Brady had no pricing

13  authority at Claxton?

14  A.   I am not aware of that.

15  Q.   Okay.   Now, Mr. Bryant, I want to talk about this phone

16  call that you recall that Mr. Austin had with Mr. Brady.   Do

17  you recall that when you testified yesterday?

18  A.   Yes.

19  Q.   In fact, you testified that there was one phone call with

20  Mr. Brady.   You couldn't remember whether it was the first

21  phone call or the second phone call; is that correct?

22  A.   That's correct.

23  Q.   But you remember one phone call with Mr. Austin that

24  happened with Mr. Brady.

25  A.   That's -- what I remembered is when he hung up the phone,

Robert Bryant - Cross

1    he said, "That was Brady."

2    Q.  And at the time you were walking in and out of Mr. Austin's

3    office, right?

4    A.  That's correct.

5    Q.  And you didn't hear the whole conversation, correct?

6    A.  That's correct.

7    Q.  In fact, the only thing that you remember out of that

8    conversation is, "I told him the price is the price and then

9    what loads they wanted," correct?

10   A.  Similar to that.

11   Q.  You heard nothing else.

12   A.  I did hear other comments, but none that I can recite or

13   remember.

14   Q.  You don't recall any other comments.

15   A.  No, I don't recall.

16   Q.  As you sit here today, that's the best that you can recall.

17   A.  That's all I can recall.

18   Q.  And you don't remember whether this call was before or

19   after the meeting with KFC; is that correct?

20   A.  That's correct.

21   Q.  And you didn't hear what Mr. Brady had to say on the phone,

22   if anything.

23   A.  That's correct.

24   Q.  And you weren't listening on that phone call, were you?

25   A.  That's correct.

Robert Bryant - Cross

1    *Q.* So as you sit here today, you can't even say whether there

2    was any discussion about future prices, can you?

3    *A.* That's correct.

4    *Q.* Now, this conversation whenever it occurred, it occurred

5    about seven, eight years ago; am I right, sir?

6    *A.* That's correct.

7    *Q.* And you were in and out of Mr. Austin's office.

8    *A.* That's correct.

9    *Q.* So you weren't there for the whole conversation.

10   *A.* That's correct.

11   *Q.* And during that time you were full-time at Pilgrim's.  You

12   were busy.  You had a full-time job.

13   *A.* That's correct.

14   *Q.* And you were very busy on a daily basis, were you not, sir?

15   *A.* That's correct.

16   *Q.* And so here we are eight years later.  And I want to make

17   sure I understand this.  You remember this call.  You don't

18   remember when it was.  You didn't hear anything that Mr. Brady

19   had to say, but you remember this call from about eight years

20   ago.  Mr. Austin relayed to you the information.  You didn't

21   participate in this call; is that correct?

22   *A.* That's correct.

23   *Q.* You didn't disclose this call until eight years later?

24   *A.* That's correct.

25   *Q.* While being interviewed by the government 20 times; is that

Robert Bryant - Cross

1    correct, sir?

2    A.   That's correct.

3    Q.   All right.  Thank you.

4         Mr. Bryant, I want to ask, you testified yesterday

5    about a meeting with Mr. Stiller and Mr. Austin and yourself in

6    relation to the 2018 KFC negotiations.  Do you recall that,

7    sir?

8    A.   I do.

9    Q.   And I believe the meeting was after -- the meeting that you

10   had with Mr. Austin and Mr. Stiller was after the meeting you

11   had with KFC.

12   A.   We had more than one meeting.

13   Q.   Right.  But the one that I'm talking about is where KFC

14   wanted a large price decrease.

15   A.   So after the first bid submission and after we got first

16   round feedback is what you are talking about?

17   Q.   No, you tell me.  I don't know, sir.  I am asking you.

18   A.   I am trying to determine which one because, you know, we

19   did have meetings about our bid submission and then we had

20   meetings after we got our feedback.

21   Q.   I am talking about the meeting that you had with

22   Mr. Stiller and Mr. Austin where there was a comment about

23   complaining about how much of a decrease they wanted.  And if I

24   recall, sir, that the response was, "We're going to hold our

25   price."?

Robert Bryant - Cross

1    A.   Yes.

2    Q.   Do you recall that conversation?

3    A.   I do.

4    Q.   And, in fact, they were not going to reduce the price.  And

5    you were surprised when the comment was made about "tell the

6    industry," correct?

7    A.   I don't remember saying I was surprised about tell the

8    industry in 2017.

9    Q.   You don't recall a conversation between Mr. Austin and

10   Mr. Stiller where I believe it was Mr. Stiller said, "Let's

11   tell the industry we're going to hold price"?

12   A.   Yes, I recall that conversation.

13   Q.   And did that surprise you at all?

14   A.   No, not at that time, it didn't surprise me.

15   Q.   Okay.  That's fine.  Do you have any personal knowledge

16   that that statement about holding price was conveyed to

17   Mr. Brady?

18   A.   I do not.

19   Q.   Or to Claxton?

20   A.   I do not.

21   Q.   Well, sir, do you know that for the 2018 to 2020 KFC

22   contract that Claxton did exactly what KFC wanted it to do and

23   reduced its price to the price KFC wanted?

24        MR. KOENIG:  Objection.

25        THE COURT:  Sustained.  It wasn't quite clear when

Robert Bryant - Cross

 1   your question mark was, but I will sustain the objection.

 2   *BY MR. LAVINE:*

 3   *Q.*  So you don't know what their price was for the 2018 to 2020

 4   contract, do you?

 5   *A.*  Not that I'm aware of, no.

 6   *Q.*  And you're not aware of anybody conveying that message

 7   about holding price to Mr. Brady, are you?

 8   *A.*  I'm not aware.

 9   *Q.*  All right.  Now, sir, you said that you -- you don't recall

10   speaking to Mr. Brady since he left Pilgrim's; is that correct?

11   *A.*  I don't recall.

12   *Q.*  Right.

13   *A.*  We could have, but I don't remember.

14   *Q.*  And you never entered into any agreement with Mr. Brady to

15   fix any price, did you?

16   *A.*  Not that I can recall, no.

17   *Q.*  Well, you would remember something like that, wouldn't you,

18   sir?

19   *A.*  I would think I would.

20   *Q.*  And you never entered into an agreement with Mr. Brady to

21   raise any prices, did you, sir?

22   *A.*  Not that I'm aware of, no.

23   *Q.*  That's something you would recall if that was the case,

24   wouldn't you?

25   *A.*  I would think so.

Robert Bryant - Cross

1    *Q.*  Yes.  And you personally have never spoken to Mr. Brady

2    about prices, have you, sir, since he went to Claxton?

3    *A.*  Not that I can remember.

4    *Q.*  And you've never spoken to Mr. Brady about volume, have

5    you, sir?

6    *A.*  Not that I can remember.

7            *MR. LAVINE:*  No further questions, Your Honor.

8            *THE COURT:*  Thank you, Mr. Lavine.

9            Mr. Gillen?

10           Mr. Kornfeld.

11           *MR. KORNFELD:*  Thank you, Your Honor.

12                          **CROSS-EXAMINATION**

13   *BY MR. KORNFELD:*

14   *Q.*  Mr. Bryant, I am Rick Kornfeld.  I represent Mikell Fries.

15           You've met Mr. Fries a few times at most; isn't that

16   true?

17   *A.*  Probably a handful of times at most.

18   *Q.*  Fishing trips, things like that?

19   *A.*  Yeah, I was going to say he may have been at a couple

20   fishing trips down in the Keys and possibly that hunt I

21   mentioned earlier.

22   *Q.*  And in those meetings, the fishing trips, the hunt,

23   whatever, you never spoke business with him.

24   *A.*  Not that I can recall.

25   *Q.*  You have never spoken with Mikell Fries ever about

1126

Robert Bryant - Cross

 1 | Claxton's pricing; isn't that true?

 2 | A.  Not -- I can't recall pricing ever coming up in a

 3 | conversation.

 4 | Q.  You have never talked to him about Claxton's pricing

 5 | process, in other words, how Claxton goes about pricing its

 6 | chicken; isn't that right?

 7 | A.  That's correct.

 8 | Q.  And you've never talked to him about Claxton's volume;

 9 | isn't that correct?

10 | A.  Yes.

11 | Q.  You've never discussed pricing with Jerry Lane, Mr. Fries'

12 | predecessor as president of Claxton; isn't that right?

13 | A.  I don't even believe I know Jerry -- that may be the first

14 | time I've heard that name.

15 | Q.  You have never spoken with Mr. Fries about competitor

16 | pricing either, correct?

17 | A.  Not that I can remember.

18 | Q.  Now, you testified on your direct examination yesterday a

19 | lot about what "competitors" intended when they exchange

20 | pricing information.  Do you generally recall that testimony?

21 | A.  In general, yes.

22 | Q.  Okay.  And you have only worked at Pilgrim's.  Unlike many

23 | of the other folks involved in the chicken industry, you've

24 | been at the same company since you were 18 years old; isn't

25 | that true?

Robert Bryant - Cross

1   *A.* Yeah, well, originally it was Seaboard, but it was all

2   through acquisition, yes.

3   *Q.* So you don't know firsthand how any other supplier goes

4   about pricing its chicken, do you?

5   *A.* Well, I mean, I guess if you consider the other companies I

6   did work for that were acquired by Pilgrim's, yes.

7   *Q.* But I'm talking about the "competitors" in this case that

8   you reeled off yesterday, Claxton, Koch, et cetera.

9   *A.* I have not been a part of their process.

10  *Q.* Okay. And you have no knowledge -- when you talk about

11  what competitors intended, you have no knowledge about what

12  Claxton intended or didn't intend; isn't that right?

13  *A.* That's correct.

14  *Q.* You never talked to Mr. Fries or Mr. Brady, as you just

15  testified, about anything having to do with their pricing

16  negotiations; isn't that true?

17  *A.* Not that I can remember.

18  *Q.* And that includes their pricing negotiations with KFC in

19  the 2014, 2015 time frame that we've talked about, right?

20  *A.* That's correct.

21  *Q.* And that includes Claxton's discussions with KFC in the

22  2017, '18 time frame that we've been discussing, right?

23  *A.* That's correct.

24  *Q.* You never overheard -- you talked about a conversation a

25  minute ago that you say you overheard that involved Mr. Austin

Robert Bryant - Cross

1    and allegedly Mr. Brady.  Bottom line is you never overheard a

2    conversation that involved Mikell Fries; isn't that true?

3    A.  That's true.

4    Q.  So the bottom line is it's fair to say, is it not, that you

5    don't know a thing about Claxton's internal process of setting

6    its prices, do you?

7    A.  Not that I'm aware of.

8    Q.  Well, if you were aware of it, tell us now.

9    A.  Yeah, I'm not.

10   Q.  Okay.  You don't know who has pricing authority at Claxton,

11   correct?

12   A.  That's correct.

13   Q.  You don't know who's involved in the pricing process at

14   Claxton, correct?

15   A.  That's correct.

16   Q.  You don't know what things or data points Claxton considers

17   in its pricing decisions, do you?

18   A.  I do not.

19   Q.  You don't know their business strategy as a one-plant

20   regional supplier, do you?

21   A.  I do not.

22   Q.  You don't know how they determine not only their prices,

23   but you also don't know how they determine their bids; isn't

24   that right?

25   A.  That's correct.

Robert Bryant - Cross

1    Q.   Whether it be the first round bid or the subsequent bid;

2    isn't that right?

3    A.   That's correct.

4    Q.   Now, when you referred to Claxton in your direct testimony

5    as a competitor, what percentage of the QSR market does

6    Pilgrim's have?

7    A.   I don't know.

8    Q.   Well, can you give us a ball park?

9    A.   I don't off the top of my head.  I'm sorry.

10   Q.   I think you testified Pilgrim's has 32 plants around the

11   country, correct?

12   A.   That's correct.

13   Q.   Six or seven are dedicated to small bird, right?

14   A.   That's correct.

15   Q.   And I think you also testified earlier -- and forgive me, I

16   don't recall if it was on direct.  I think it might have been

17   in response to some of Mr. Feldberg's questions on cross -- you

18   are aware that Claxton is a one-plant operation, correct?

19   A.   That's correct.

20   Q.   And that it is a regional supplier unlike Pilgrim's that

21   supplies all over this country, correct?

22   A.   That's correct.

23   Q.   Do you have -- I think you testified in your direct that

24   Pilgrim's wanted to be a price leader.  That was part of their

25   business strategy, right?

Robert Bryant - Cross

1   A.   In 2014, yes.

2   Q.   Is that a fancy way of saying they wanted to have the most

3   expensive chicken?

4   A.   We wanted to -- yeah, we wanted to have --

5   Q.   The highest prices?

6   A.   The highest prices.

7   Q.   Okay.  You have no knowledge that Claxton's strategy was

8   ever to be a "price leader," do you?

9   A.   I do not.

10   Q.   And, in fact, Claxton, like Pilgrim's, is part of a supply

11   chain for KFC, correct?

12   A.   As far as I know, yes.

13   Q.   And what do you understand based on your years of

14   experience in the industry, what do you understand the term

15   supply chain to mean in the context of the broiler chicken

16   business?

17   A.   Well, the total supply chain, is that what you're asking?

18   Q.   Yeah, just kind of if you can just give us supply chain

19   101, what that basically means in the context of your business.

20   If two suppliers are in KFC's supply chain, what does that

21   mean?

22   A.   If they are in KFC's supply chain, that just means that

23   they're a supplier to KFC.

24   Q.   So both authorized by KFC to supply chicken, right?

25   A.   That's correct.

1131

Robert Bryant - Cross

1    Q.  And when you were talking about the covers and the shorts,

2    if I am going to cover for you for KFC, I have to be in KFC's

3    supply chain just like you are, right?

4    A.  That's correct.

5    Q.  Otherwise KFC won't accept my product, right?

6    A.  KFC has to do an audit of your site and approve the site to

7    be able to produce their products.

8    Q.  And so when you were speaking about covers and shorts to

9    KFC, you were talking about covers and shorts by suppliers in

10   the KFC supply chain, right?

11   A.  That's correct.

12   Q.  And is Claxton to your knowledge in the KFC supply chain?

13   A.  They are.

14   Q.  And, in fact, they have -- Claxton has covered for

15   Pilgrim's on occasion; isn't that right?

16   A.  Yes.

17   Q.  And frankly, it's not a rare thing, is it, in your

18   experience?

19   A.  I think Claxton covered -- they were probably the company

20   that covered most often for Pilgrim's.

21   Q.  And they continue -- putting aside KFC 2017, that continues

22   to happen to this day to your knowledge; isn't that right?

23   A.  I left that business unit in the fall, winter of 2020, so

24   I'm not aware of what they're doing there now.

25   Q.  Okay.  You were asked yesterday about US Foods and Sysco

Robert Bryant - Cross

1   and alleged price-fixing related to suppliers selling them

2   boneless breast.  Do you generally remember that testimony?

3   *A.*   I do.

4   *Q.*   Do you know whether Claxton sells boneless breast to Sysco

5   and US Foods?

6   *A.*   I am not aware if they do or do not.

7   *Q.*   Do you have any knowledge that Claxton participated in a

8   price-fixing conspiracy against Sysco and US Foods?

9   *A.*   I do not.

10   *Q.*   And would it surprise you if Claxton didn't sell boneless

11   breast to US Foods and Sysco?

12   *A.*   It wouldn't surprise me that they didn't.  I've heard that

13   they're a large Chick-fil-A supplier, so my assumption would be

14   they probably sell their boneless to Chick-fil-A.

15   *Q.*   They being Claxton.

16   *A.*   They being Claxton, yes.

17   *Q.*   You talked in your direct testimony generally about market

18   influences.  Do you recall that testimony generally?

19   *A.*   Yes.

20   *Q.*   And you said in your direct and I think also in response to

21   some of the cross by some of my colleagues that the chicken

22   business is no different than any other business in this

23   country in the sense that there are outside market influences

24   that affects prices.  Is that a fair general statement about

25   your testimony in that regard?

Robert Bryant - Cross

1    A.   Yes.

2    Q.   Supply and demand affect chicken prices, right?

3    A.   Correct.

4    Q.   And there is other factors.  I think you talked about the

5    price of corn, correct?

6    A.   Correct.

7    Q.   Labor?

8    A.   Correct.

9    Q.   Transportation?

10   A.   Correct.

11   Q.   Probably a whole list of other factors, right?

12   A.   Yes, that's correct.

13   Q.   Now, you said 2014, '15 the prices were unprecedented.  And

14   you suggested that the alleged -- that there was alleged

15   conspiring by the producers to drive up the prices.  Do you

16   recall that testimony?

17   A.   Yes.

18   Q.   And you said you were part of that conspiracy to drive up

19   prices in that time frame, correct?

20   A.   Correct.

21   Q.   And again, you have no direct knowledge that anybody at

22   Claxton was part of that conspiracy, do you?

23   A.   That's correct.

24   Q.   Are you aware of what -- have you heard of something called

25   the Urner Barry Index?

Robert Bryant - Cross

1   A.  I have.

2   Q.  What is that?

3   A.  It is a market primarily for spot business in the poultry

4   industry, so there are some contracts or agreements that are

5   based off the Urner Barry market.  You can sell various parts

6   off the Urner Barry including boneless breast, leg quarters, a

7   whole range of items off the Urner Barry.

8   Q.  It's a price index, right?

9   A.  It is.

10  Q.  And it's publicly available.

11  A.  Well, I think you are supposed to subscribe to it, but yes,

12  it is publicly available data.

13  Q.  I am assuming in your experience chicken producers

14  subscribe to Urner Barry, right?

15  A.  They do.

16  Q.  So they can then -- if you subscribe, you can look up the

17  cost, right -- or the price, excuse me.

18  A.  Yes.  That would be considered a market price.

19  Q.  And among the data points that Urner Barry reports is the

20  yearly average per pound for chicken, right?

21  A.  There's a section where you can go and pull up the history

22  of pricing on various chicken products, the ones that they

23  post, yes.

24  Q.  You talked a lot about the marketplace in '14 and 15 in

25  your direct testimony.  Do you generally recall that testimony?

Robert Bryant - Cross

1    A.   I do.

2    Q.   And do you recall in rough numbers what the Urner Barry

3    average for 2014, '15 was, the average price?

4    A.   I don't.

5    Q.   Would it surprise you if it was in the $1.15 range?

6         MR. KOENIG:   Objection, assumes facts not in evidence.

7         THE COURT:   Sustained.

8    BY MR. KORNFELD:

9    Q.   Sir, let me ask you this.   Do you believe the information

10   in the Urner Barry Index to be accurately reported, whoever

11   reports to Urner Barry?

12   A.   Yes.   There may be some challenges in the data since they

13   sold -- last time I was in there it seemed like there was some

14   gaps in that data because they did sell at some point recently.

15   Q.   But in any event, there is an average price, however you

16   want to break it down, monthly, yearly, whatever, correct?

17   A.   That's correct.

18   Q.   And average being average, that's nationally average?

19   A.   The -- I believe so.

20   Q.   And so if a producer sold chicken below whatever that

21   average number is, at the risk of stating the obvious, you

22   would agree that that number would be lower than the average,

23   correct?

24   A.   I didn't follow your question.

25   Q.   It was a lousy question.   It was a lousy question.

1136
Robert Bryant - Cross

1    A.  I am sorry.

2    Q.  Let me ask it this way.  Because an index has an average

3    price, some prices are going to be below that number and some

4    prices are going to be above it.  Would you agree with that?

5    A.  Yes.

6    Q.  You talked about conversion to big birds.  We had a lot of

7    discussion about the factories moving to big birds and the

8    profitability of big birds versus small birds.  Do you

9    generally remember that testimony?

10   A.  Yes.

11   Q.  And I think you agreed, and tell me if you don't, that

12   there was a significant decrease in supply of small birds in

13   2014.

14   A.  There was a shortage.

15   Q.  A shortage, exactly.  And KFC you've come to learn ran out

16   of chicken Mother's Day 2014; isn't that true?

17   A.  Like I say, I don't remember that specifically.  I just

18   don't recall.

19   Q.  You knew they were short, right?

20   A.  I really don't remember that.  I would have to --

21   Q.  Well, you knew during your meeting, your subsequent

22   meetings with them that they wanted to move from a one-year

23   contract to a three-year contract in order to ensure supply for

24   '15, '16 and '17, right?

25   A.  We did move to a three-year contract.

1137

Robert Bryant - Cross

1    Q.  Because KFC wanted to assure supply.

2    A.  I didn't -- I don't remember who initiated that, the

3    three-year contract.

4    Q.  Forget the amount of time.  What I am asking you is was it

5    your understanding either then or today that KFC after the 2014

6    contract was trying hard to ensure supply given that there had

7    been shortages in 2014?

8    A.  Yes, they were trying to ensure supply.

9    Q.  And I understand you didn't know about McKinsey Consulting,

10   but you are aware of the fact that they hired a consultant,

11   they being KFC, they hired a consultant to help them, KFC,

12   figure out ways to ensure supply; is that not correct?

13   A.  I don't remember being aware of them hiring a consultant.

14   Q.  Okay.  But you are aware that supply was going down for

15   small birds as demand was going up, correct?

16   A.  Like I said, I knew there was a shortage in the industry

17   and we were -- during 2014.

18   Q.  And both your experience and your current MBA education at

19   Colorado State University and your testimony I believe reflects

20   the fact that you understand, do you not, that a decrease in

21   supply coupled with an increase in demand leads to higher

22   prices.  That's basic economics, right?

23   A.  I believe I have said that, yes.

24   Q.  So you agree with me.

25   A.  Yes.

1138

Robert Bryant - Cross

1  Q.  Now, on the covers and shorts issue yesterday you

2  testified -- and I don't want to belabor this because

3  Mr. Pollack asked you some questions, I think Mr. Feldberg did

4  too -- but yesterday you testified that shorts and covers were

5  supposed to be coordinated through KFC and not among the

6  suppliers.  Do you remember that?

7  A.  I don't believe I phrased it quite that way.  I believe I

8  said that there was two ways that you could cover a short.  And

9  one way was through KFC, particularly if you needed a --

10 someone to reissue a PO or something like that or you could

11 reach out to a competitor.

12 Q.  Okay.  And we've gone through the basic math, Mr. Pollack

13 took you through the basic math of figuring -- you don't have

14 to be a mathematical genius to figure out per pound price if an

15 invoice has case weight, total price and total pounds, right?

16 A.  The math example I didn't necessarily agree with that we

17 went through earlier, but if you are provided the price per

18 pound and the max billable, then you could determine -- you've

19 got to have -- from what I've seen earlier you have to have

20 more information than what was on -- what was presented

21 earlier.

22 Q.  But the bottom line is -- let me ask you this.  You have

23 been in the business 30-plus years, right?

24 A.  That's correct -- well, close to 30 years.

25 Q.  Okay.  25-plus years?

Robert Bryant - Cross

1    A.   Correct.

2    Q.   You've seen many PO's relating to covers and shorts, right?

3    A.   I haven't actually -- I didn't actually look at a lot of

4    the actual purchase orders.  A lot of times especially early on

5    they requested me to create a PO for them, but I never -- I

6    generally didn't actually see the invoice that went out.

7    Q.   You're familiar with invoices in general in the chicken

8    business, right?  We are not quibbling about that, are we?

9    A.   That's correct.

10   Q.   And you know generally that an invoice will have the

11   weight, right, the total weight that's being sold or purchased

12   depending on what side of the transaction you're on?

13   A.   That's correct.

14   Q.   It will have the total amount.  I mean, you have got to be

15   invoiced for a dollar number, right?

16   A.   That's correct.

17   Q.   Okay.  And, in fact, if it didn't have those two things if

18   you were the seller, you would never get paid, would you?

19   A.   You have to have an amount and at least a purchase order

20   number.

21   Q.   Right.  And with a calculator you can do the math.  Whether

22   you agree with Mr. Pollack's particular example, you as a

23   25-plus year experienced chicken executive, you could do the

24   math and figure out the per pound price, couldn't you?

25   A.   I don't recall ever going through that exercise myself.

Robert Bryant - Cross

1  *Q.*  I'm not asking you if you did.  I'm saying we've sat

2  through a day and a half of this testimony.  You just told me

3  that the full amount -- the invoice dollar amount is on an

4  invoice, as is the total weight.  Through simple division and a

5  calculation you could if you wanted to or I could if I wanted

6  to or anybody could if they wanted to do the math to figure out

7  the per pound price.  It's simple division, is it not?

8  *A.*  Well, with the max billable it's not that simple.  I think

9  I have said that before.  You can attempt to do that.  I think

10  you would have to make some assumptions about some things in

11  order -- but I don't know the degree of confidence in that in

12  this particular.  There are some other scenarios where it's

13  strictly a catch weight or a fixed case, so every case is 40

14  pounds and then you have the price per pound.  And yes, you can

15  figure that out.  In this scenario, I am not sure.

16  *Q.*  Fair enough.  But in your business you go four numbers to

17  the right of a decimal point, correct, in general?

18  *A.*  Sometimes, yes.  It depends, yes.

19  *Q.*  So I understand there is variables, et cetera, et cetera,

20  but bottom line even rough math would give you a pretty decent

21  idea of the per pound price even though it may not be exact

22  depending on some of these variables you talked about; isn't

23  that true?

24  *A.*  Once again, though, you are making an assumption on the

25  fixed billing weight.  For instance, if --

Robert Bryant - Cross

1  *Q.*  Let me ask a better question.  Here is the assumption I am

2  making.  The assumption I am making is if I take the total

3  pounds on an invoice -- let's say I am Claxton, you're

4  Pilgrim's, and you are buying a certain amount of pounds from

5  me to cover for KFC.  Are you with me so far?

6  *A.*  I am.

7  *Q.*  And my invoice we have agreed is going to show you the

8  total pounds I am selling you and you are buying from me,

9  correct?

10  *A.*  I am not sure, and that's I guess where we're having this

11  back and forth.  With the max billable, I am not sure that you

12  capture all that.

13  *Q.*  Well, it may show the weight that you're purchasing.

14  *A.*  And the weight may be accurate on there, but if you can

15  charge 50 pounds per case and most of your birds fall below

16  that and your average case weight, for instance, in the example

17  that was given in fact was 49 and a half pounds per case, but

18  you're still able to bill 50, then your price per pound is not

19  going to be correct.

20      *MR. KORNFELD:*  Let's do this.  Brian, could you please

21  put up --

22  *A.*  I am not trying to --

23      *MR. KORNFELD:*  Can you please put up Exhibit H-906?

24  *BY MR. KORNFELD:*

25  *Q.*  Sir, do you have Exhibit H-906 in front of you?

Robert Bryant - Cross

1   A.   I do.

2   Q.   What does that appear to be?

3   A.   It looks like a Claxton Poultry invoice to Pilgrim's.

4   Q.   Okay.  And on the left what's the first column?

5        MR. KOENIG:  Objection.  This is not in evidence.

6        THE COURT:  Sustained.

7   BY MR. KORNFELD:

8   Q.   All right.  Let me ask you this.  Have you ever seen an

9   invoice from Claxton before?

10  A.   Not that I can remember.

11  Q.   In your experience do invoices generally reflect the case

12  count?

13  A.   Yes.

14  Q.   Okay.  Do they generally include the weight?

15  A.   Yes.

16  Q.   So you could divide the total weight by the case count to

17  come up with a case weight, correct?

18  A.   Once again, I would go back.  I am not sure that the

19  invoice reflects the total weight because of the max billables.

20  Q.   I am not asking about this invoice.  I'm saying --

21  A.   I don't know that it captures all the weight.

22  Q.   Let me ask you this.  Are you testifying to this jury that

23  it is not possible to figure out the per pound price when you

24  cover for somebody else who is in the same supply chain?  Is

25  that your testimony?

Robert Bryant - Cross

1   *A.*  Once again, I personally don't recall ever --

2   *Q.*  I am not asking you about that?

3   *A.*  -- going through this exercise.

4   *Q.*  I am not asking you about the exercise.  You just went

5   through it with Mr. Pollack.  I am asking you a simple

6   question.  The debate we're having is can you do division to

7   come up with case weight, so that's what I am asking you, or

8   are you saying that because there is so many variables, you

9   can't figure out the price?  What are you telling this jury?

10  *A.*  I don't know that you can't do that.

11  *Q.*  That you cannot do that.

12  *A.*  That's what I'm saying.  I don't know that you can or

13  cannot do that.  I just don't think that that's an accurate way

14  to do it.

15  *Q.*  In any event, you testified previously on cross-examination

16  that there are times where you do discover or you are informed

17  of the price that the company for whom you're covering is

18  charging the customer, right?

19  *A.*  That's correct.

20  *Q.*  And it is the tradition in your industry that if I,

21  Claxton, am covering for you, Pilgrim's, for KFC, I am selling

22  that chicken at your price, not my price, right?

23          *MR. KOENIG:*  Objection.  Again, it's facts not in

24  evidence.

25          *MR. KORNFELD:*  I am asking the question.  He is 25

Robert Bryant - Cross

1    years into this industry, Your Honor.

2              THE COURT:  Overruled.  He can answer.

3    A.  Can you repeat?

4    BY MR. KORNFELD:

5    Q.  Yeah.  My question is, is it not a fact that in your

6    industry that if I am covering for you, the customer pays your

7    price, not my price, regardless of whether it's higher or

8    lower?

9    A.  I'm not sure on that.

10   Q.  How many covers and shorts have you been involved in can

11   you guesstimate or estimate in your career?

12   A.  A lot.

13   Q.  And are you saying to this jury you don't know what price

14   Pilgrim's paid to producers who covered for them?

15   A.  When we purchased from -- directly from we'll use Claxton,

16   for instance --

17   Q.  Okay.

18   A.  -- my understanding is Pilgrim's would pay Claxton's

19   contracted price.

20   Q.  Okay.

21   A.  If we issued a PO, for instance, we said we could not --

22   Q.  You answered my question.  I appreciate it.

23              You talked yesterday briefly about the NHA issue.

24   What does it mean, no human antibiotic?

25   A.  That's correct.

1145

Robert Bryant - Cross

1   Q.  Is that similar to NAE, no antibiotic ever?

2   A.  It's similar, but not the same.

3   Q.  Okay.  And similar -- do you know a term ABF?

4   A.  Yes.

5   Q.  What's that mean?

6   A.  That's more similar to NAE, so NAE, no antibiotics ever;

7   ABF, antibiotic-free; NHA, no human antibiotics.  It's a step

8   below those other two.

9   Q.  And do you recall that your notes that have been put before

10  the jury, and we can pull them up if you want to see them

11  again, but your notes reflected -- it said Claxton, it had a

12  number, and then it said NHA.  Do you remember that?

13  A.  I do.

14  Q.  And that indicated -- I think you testified that indicated

15  that Claxton had already converted to NHA, right?

16  A.  That was my understanding, yes.

17  Q.  So you don't know what Claxton charged KFC for NHA, do you?

18  A.  No.  That was part of the discussion.

19  Q.  In fact, you don't know if Claxton even charged extra to

20  KFC for NHA having already converted to NHA.  You just don't

21  know, right?

22  A.  Like I said, that was part of the discussion.

23  Q.  Part of the discussion was wondering if they had or they

24  hadn't, not that they told you that they had or hadn't, right?

25  A.  That's correct.

1    Q.  Now, you talked about your prebid meeting at Popeye's in

2    July of '14?

3         THE COURT:  Mr. Kornfeld, if you are going to go into

4    a different subject matter, maybe this would be a good time to

5    break just because we are at 5:00 now.

6         MR. KORNFELD:  You know what, Your Honor?  I can cut

7    this short and finish today.

8         THE COURT:  I am sure you can finish today because we

9    have got seven hours left in today.  No, actually, we went a

10   little bit longer yesterday.  I don't want to get in the habit

11   of doing that, so we can always resume tomorrow.

12        MR. KORNFELD:  Thank you, Your Honor.

13        THE COURT:  Ladies and gentlemen, we will go ahead and

14   recess for the day.  We will reconvene tomorrow same time.

15   Make sure you make an effort to be here so that assuming we are

16   ready at 8:30, you will be too.  Keep the admonitions in mind.

17   Don't talk to those family members about anything other than

18   those highly limited things we talked about before.  The jury

19   is excused.  Thank you.

20             (Jury excused.)

21        Mr. Bryant, you are excused.  Thank you very much.

22   Can you be back here by tomorrow at 8:30?  Thank you.

23             Anything to take up before we recess?

24             Mr. Tubach?

25             MR. TUBACH:  Very briefly, Your Honor, I think I

1  neglected to move into evidence, H-745, 746 and 747.  Those are

2  the three texts that Mr. Bryant testified about.

3        *THE COURT:*  I don't recall.  Part of the problem is

4  that my exhibit list is not being brought up-to-date.  I mean,

5  this is a very bizarre trial where the judge doesn't have an

6  exhibit list that's accurate and doesn't have the exhibits.

7  Now, obviously I can ask you for the hard copies if I need

8  them, but so I don't have good records.  But let's ask

9  Ms. Grimm whether those were offered.

10        *COURT DEPUTY CLERK:*  They are not admitted.

11        *THE COURT:*  Were they offered?  I can't remember?

12        *COURT DEPUTY CLERK:*  I don't know.

13        *MR. TUBACH:*  I don't believe I did offer them.

14        *THE COURT:*  Do you have hard copies?

15        *MR. TUBACH:*  They are the three texts about the

16  expense reports.

17        *THE COURT:*  Let me take a look at those.

18        Ms. Grimm, if you can hand those up.

19        Mr. Koenig, what's your recollection?  I don't think

20  that they were offered.

21        *MR. KOENIG:*  I would have to check.  I thought we

22  objected on hearsay grounds, but -- and I thought it was --

23        *THE COURT:*  I will check overnight.  In any event, we

24  can't do anything about them now because evidence is only

25  admitted in front of the jury.

1           MR. TUBACH:  Of course, Your Honor.

2           THE COURT:  But I'll figure that out and then as an

3      order of business tomorrow we can take care of that, okay?

4           Anything else that we should discuss?

5           All right.  We will be in recess until tomorrow at

6      8:30.  Thank you.

7          (Recess at 5:05 p.m.)

1       INDEX

2    **WITNESSES**

3       Robert Bryant

4            Direct Examination Continued By Mr. Koenig        907

5            Cross-examination By Mr. Feldberg               940

6            Cross-examination By Mr. Canty                 1021

7            Cross-examination By Mr. Tubach                1037

8            Cross-examination By Ms. Henry                 1093

9            Cross-examination By Mr. Pollak                1099

10            Cross-examination By Mr. Lavine               1116

11            Cross-examination By Mr. Kornfeld             1125

12                    EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| E-162   |         | 962      |         |          |           |
| E-174   |         | 1015     |         |          |           |
| D-341   |         | 1069     |         |          |           |
| H-717   |         | 1050     |         |          |           |
| H-718   |         | 1051     |         |          |           |
| F-792   |         | 1071     |         |          |           |
| H-895   |         | 1102     |         |          |           |
| D-925   |         | 977      |         |          |           |
| 1085    |         | 918      |         |          |           |
| 1086    |         | 920      |         |          |           |
| 9262    |         | 911      |         |          |           |

# REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 20th day of January, 2022.


S/Janet M. Coppock