1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 20-CR-00152-PAB

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,
     MIKELL REEVE FRIES,
8    SCOTT JAMES BRADY,
     ROGER BORN AUSTIN,
9    TIMOTHY R. MULRENIN,
     WILLIAM VINCENT KANTOLA,
10   JIMMIE LEE LITTLE,
     WILLIAM WADE LOVETTE,
11   GAR BRIAN ROBERTS,
     RICKIE PATTERSON BLAKE,

12       Defendants
     _____

13
                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 7
     _____

15

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:45 a.m., on the 3rd day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

Michael Koenig, Carolyn Sweeney, Heather Call and Paul Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing for Plaintiff.

Anna Tryon Pletcher and Michael Tubach of O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, San Francisco, CA 94111-3823;

Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street N.W., Washingon, DC 20006, appearing for Defendant Penn.

David Beller, Richard Kornfeld and Kelly Page of Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver, CO 80202, appearing for Defendant Fries.

Bryan B. Lavine of Troutman Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

Laura Kuykendall and Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219, appearing for Defendant Brady.

Michael Felberg of Reichman, Jorgensen, Lehman, Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY 10017;

```
 1                    APPEARANCES (Continued)

 2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4   CA 94065; appearing for Defendant Austin.

 5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7          Marci Gilligan LaBranche of Stimson, Stancil,

 8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9   80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

```
 1              APPEARANCES (Continued)

 2              Craig Allen Gillen and Anthony Charles Lake of

 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4    Atlanta, GA 30339;

 5              Richard L. Tegtmeier of Sherman & Howard, LLC,

 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7    for Defendant Roberts.

 8              Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11              Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                        PROCEEDINGS

16         THE COURT:  We are back on the record in 20-152.  We

17    have Mr. Byrne back.  Good to see you, Mr. Byrne.  And we have

18    all of the defendants and counsel are present.  Anything to

19    take up before we begin?

20         MR. KORNFELD:  Just very briefly.

21         THE COURT:  Go ahead.

22         MR. KORNFELD:  Your Honor, at 8:31 this morning the

23    government filed Document 780 pertaining to the Markman notes.

24    It's effectively captioned as a notice of an alternative way to

25    try to get these notes in because under the Court's prior
```

1    ruling the government wasn't able to do so.  And I haven't had

2    time and I don't think any of my colleagues have had time to

3    digest it, but I would express some concern on behalf of

4    defendants of sort of a pattern.

5         I mean, this isn't captioned as a motion to

6    reconsider.  It effectively is.  At a certain point we are

7    relying, as is the government, on the Court's rulings to

8    fashion our presentation, to fashion our case and to do our

9    jobs on behalf of our respective clients.  So, you know, I

10   understand in a long trial all of us probably have a list of

11   rulings that we may respectfully disagree with the Court's

12   ruling, but you got to live with them.  And to paraphrase

13   former Defense Secretary Rumsfeld, you've got to fight with the

14   Army you have, not with the Army that you want.

15        So on behalf of defendants, I would just ask the Court

16   not to entertain what are effectively motions to reconsider,

17   particularly on in-court trial rulings that have been made.

18        THE COURT:  Well, I've been entertaining the numerous

19   motions from the defendants which are in effect motions for

20   reconsideration, so I don't know why I would all of the sudden

21   stop.  I don't know what 730 is.  It's a motion?

22        MR. KORNFELD:  It's 780 and it's captioned as a

23   notice.

24        THE COURT:  I don't know.  I haven't seen it.

25        MR. KORNFELD:  I am not asking for relief.  I am just

1    expressing I think on behalf of all of us some concern about

2    this and just alerting the Court to that concern.

3           THE COURT:  Okay.  Well, we'll see.

4           MS. PREWITT:  Your Honor, just to add to that -- thank

5    you -- for Mr. Mulrenin, as part of that motion, I skimmed

6    through it very quickly they are attempting to elicit testimony

7    from the agent in connection with their attempt to, you know,

8    to authenticate Exhibit No. 1030.  Now, that is a witness that

9    we understand will be testifying on direct today possibly.  In

10   addition to all the changes in exhibits that we've been seeing

11   over the last several days, this is something that defendants

12   are concerned about.

13          THE COURT:  Okay.  Is it handwriting authentication?

14   Sorry, that was a question to Mr. Koenig.  Mr. Koenig, what is

15   the testimony going to be?

16          MR. KOENIG:  Actually, Ms. Call is probably --

17          THE COURT:  Sorry.  Ms. Call, go ahead.

18          MS. CALL:  Yes, Your Honor.  I believe all the notice

19   said is it would be offered into evidence during the testimony

20   of the agent.  There will be no handwriting analysis.  The

21   government's intention is to offer it as just a document that

22   was provided by Mar-Jac, a document of Mar-Jac as you will see

23   when you do see the notice, but we don't intend to offer proof

24   through the agent that this is actually handwriting of Pete

25   Martin necessarily.  It's essentially an unknown

Robert Bryant - Cross

1   co-conspirator.

2           MR. TUBACH:  Briefly, we just got a few minutes ago I

3   think a 10-page filing.  It's also been the subject of some

4   briefing already.  Before any agent testifies about this, we

5   would like an opportunity to respond.  We are be happy to do so

6   in writing.  I have someone already working on a response, but

7   obviously it was filed 10 minutes ago.

8           THE COURT:  It's premature to take up right now.

9           MR. TUBACH:  Thank you.

10          THE COURT:  Let's bring the jury in.

11          (Jury present.)

12          THE COURT:  Good morning, ladies and gentlemen.  I

13  guess a couple of you had some traffic issues.  I suppose

14  that's not all together uncommon.  As you will recall, we were

15  perhaps almost finished with Mr. Kornfeld's cross-examination,

16  so we will do that now.  Mr. Kornfeld, go ahead.

17          MR. KORNFELD:  Thank you, Your Honor.

18       (**Robert Bryant** was previously sworn.)

19                    **CROSS-EXAMINATION CONTINUED**

20  BY MR. KORNFELD:

21  Q.  Good morning, Mr. Bryant.

22  A.  Good morning.

23  Q.  Sir, you were asked I think both on your direct examination

24  by the government and also perhaps by Mr. Feldberg and maybe

25  others about your understanding that the Federal Government,

Robert Bryant - Cross

1    the Department of Justice, is not intending to prosecute you.

2    Do you recall those general questions?

3    A.   Yes.

4    Q.   And it is true, is it not, that that is your understanding;

5    i.e., the folks sitting at this table or any of their

6    colleagues at the Department of Justice are not going to

7    prosecute you.

8    A.   Not that I'm aware of.

9    Q.   Okay.  And they are not going to prosecute you for anything

10   to and including your admission under oath in this courtroom

11   that you lied to them on numerous occasions; isn't that true?

12   A.   That's my understanding.

13   Q.   And I think you -- well, you understand that the Department

14   of Justice, including counsel to my right, these are the folks

15   that could set that in motion, correct?

16   A.   I believe so.

17   Q.   And, in fact, you also understand that they are not shy,

18   the Department of Justice is not shy about prosecuting people

19   for lying to them.

20            MR. KOENIG:  Objection.

21            THE COURT:  Sustained.  No foundation.

22   BY MR. KORNFELD:

23   Q.   Sir, I think you testified on cross-examination that you

24   understand that Mr. Little is charged with lying to the Federal

25   Government, correct?

Robert Bryant - Cross

1    *A.* I don't know the foundation for that.  I know he has an

2    additional charge.  I don't know what led to that charge.

3    *Q.* Fair enough.  But when you met with the government at least

4    at the beginning of the 20 or so times you met with them, it's

5    true, is it not, that they informed you that lying to a federal

6    agent or lying to a federal prosecutor is, in fact, a federal

7    crime, correct?

8    *A.* I believe they did.

9    *Q.* And so you would agree with me that the folks that informed

10   you of that fact, that it is a federal crime to lie to the

11   government, are the very people that could initiate the process

12   of prosecuting you for the felony that you have admitted to

13   under oath in this courtroom; isn't that right?

14   *A.* I don't know that process myself.  I understand that they

15   have judgment in those matters.

16   *Q.* All right.  Well, you don't want to be charged maybe at the

17   risk of stating the obvious, do you?

18   *A.* I would prefer not to be charged.

19   *Q.* You don't want to go to jail, do you?

20   *A.* I would prefer not to go to jail.

21   *Q.* And you do not want to have a felony on your record, do

22   you?

23   *A.* I would prefer not to have a felony on my record.

24   *Q.* And most fundamentally you would prefer to be sitting in

25   the seat you're sitting in rather than at the defense table;

Robert Bryant - Cross

1  isn't that right?

2  A.  That's correct.

3  Q.  All right.  Now, sir, it's true, is it not, that you have

4  no personal knowledge that Mr. Fries, my client, exchanged

5  pricing information with any other supplier; isn't that right?

6  A.  That's correct.

7  Q.  And it's similarly correct, is it not, that you have no

8  personal knowledge that Mr. Fries entered into an agreement to

9  rig bids or fix prices; isn't that right?

10  A.  That's correct.

11  Q.  And it's similarly correct, is it not, you have no personal

12  knowledge that Mr. Fries told anyone else to enter into an

13  agreement to rig bids or fix prices.

14  A.  That's correct.

15  Q.  And, sir, you have no personal knowledge, do you, that

16  Mr. Fries knew of anyone rigging bids or fixing prices; isn't

17  that correct?

18  A.  That's correct.

19          MR. KORNFELD:  Thank you, sir.

20          Nothing further, Your Honor.

21          THE COURT:  Thank you, Mr. Kornfeld.

22          Additional cross?

23          Yes, Mr. Gillen.

24                      **CROSS-EXAMINATION**

25  BY MR. GILLEN:

Robert Bryant - Cross

1   *Q.*  Good morning.

2   *A.*  Good morning.

3   *Q.*  I represent Mr. Brian Roberts.  Just a few questions.

4         On direct and also on cross you talked about being in

5   a room or an office of Mr. Austin and listening to telephone

6   calls.

7   *A.*  That's correct.

8   *Q.*  His side of the telephone call.  You couldn't hear what was

9   said on the other side, correct?

10   *A.*  Correct.

11   *Q.*  Now, to be clear you were not present in any room listening

12   to anybody talk to anyone from Tyson, correct?

13   *A.*  Not that I can remember.

14   *Q.*  Not that you can remember.  You never sat in a room whether

15   it was Mr. Austin or anybody else listening to somebody talk

16   from Tyson, correct?

17   *A.*  Not that I can recall.

18   *Q.*  Now, you also indicated on direct examination that you had

19   a conversation with Jason McGuire, correct, about the 2014

20   negotiations for Kentucky Fried Chicken.

21   *A.*  That's correct.

22   *Q.*  Now, in that you said that Mr. McGuire indicated to you

23   that the competitors of the companies were going to be raising

24   their prices, something to that effect, correct?

25   *A.*  Yes, something to that effect, yes.

Robert Bryant - Cross

1    Q.   Now, what he did not say to you is he did not name any

2    specific companies, did he?

3    A.   I don't recall him giving me a list of names, no.

4    Q.   So there were no specific names of any other suppliers

5    stated by Mr. McGuire to indicate to you that they were going

6    to be raising their prices, correct?

7    A.   Not that I can remember, no.

8    Q.   Okay.  In addition, during your examination you were asked

9    about the Otis strategy, correct?

10   A.   I was, yes.

11   Q.   And the Otis strategy is a strategy -- first of all, the

12   Otis is Tyson, right?

13   A.   Not necessarily Tyson.  It turned out to be Tyson quite a

14   bit of times, but it was not just -- in my opinion it was not

15   just one company, no.

16   Q.   Not exclusive to Tyson, but it turned out, as you say just

17   a moment ago, that it happened to be Tyson on many occasions,

18   correct?

19   A.   That's correct.

20   Q.   And when you talk about the Otis strategy, what you're

21   talking about is that Pilgrim's was upset that competitors like

22   Tyson would take away some business from them by selling

23   chicken more cheaply and then need help to try to cover their

24   loads, right?

25   A.   Not exactly, no.  I mean, that could be one scenario, but

Robert Bryant - Cross

1    in general it was like I said yesterday that if a customer was

2    short, not to fill in the short, just try to convert the

3    business to us.

4    Q.   Okay.  But a subset of that would be, for example, if Tyson

5    took away -- and I believe on cross-examination you went over a

6    number of companies where in some instances Tyson had taken

7    business away from Pilgrim's and others where Pilgrim's had

8    taken business away from Tyson, correct?

9    A.   That's correct.

10   Q.   So the ongoing competition between Tyson and Pilgrim's

11   where Tyson is trying to take business from Pilgrim's and

12   Pilgrim's is trying to take business from Tyson, that's what

13   you were talking about, correct?

14   A.   The Otis strategy, it was more -- like I say, it was more

15   about shortages, right, not filling in the shortage and trying

16   to convert business.

17   Q.   Going back to my question, my question was yesterday when

18   you talked about the ongoing relationship between Tyson and

19   Pilgrim's, there would be a situation where in some instances

20   Tyson is taking away business from Pilgrim's and Pilgrim's is

21   taking away business from Tyson; yes or no?

22   A.   That would be correct.

23   Q.   Okay.  And so in that situation what Pilgrim's wanted to do

24   if someone had taken their business away, the last thing in the

25   world they wanted to do was to help them out by selling them

Robert Bryant - Cross

1    some truckloads to help them over shorts, correct?  That's

2    fair, isn't it?

3    A.  Most of the time businesses converted service and quality

4    which shortage would fall into that or price.  So if you don't

5    fill in on a shortage, then there is a higher probability you

6    could convert that business.

7    Q.  Yeah.  So the bottom line is that in plain English that

8    would be, hey, we're not going to help them out because we want

9    to end up taking that client back or taking it over, correct?

10   A.  That's correct.

11   Q.  And that's called competition, isn't it?

12   A.  Yes.

13   Q.  Last question.  Were you aware -- you talked about the 2017

14   Kentucky Fried Chicken negotiation.  Remember that?

15   A.  Yes.

16   Q.  Now, were you aware that Brian Roberts left Tyson in

17   February of 2016?

18   A.  I'm not aware of when he left.

19            MR. KOENIG:  Objection.

20            MR. GILLEN:  That's all I have, Your Honor.

21            THE COURT:  Thank you, Mr. Gillen.

22            Any additional cross?

23            Redirect?

24            MR. KOENIG:  Your Honor, may we have a brief side bar?

25            THE COURT:  You may.

Robert Bryant - Cross

1      (At the bench:)

2           THE COURT:  Can you hear me, Mr. Koenig?

3           MR. KOENIG:  Yes.

4           THE COURT:  Go ahead.

5           MR. KOENIG:  Your Honor, it's the government's

6    position that Mr. Kornfeld yesterday opened the door to

7    inquiries into some of the litigation events that were going on

8    in 2017.  In particular he elicited from Mr. Bryant testimony

9    that there were other things going on that may have contributed

10   to the -- what I think he said was essentially, you know, why

11   things in 2017 weren't going as well as they had in 2014.  And

12   Mr. Bryant said, well, there were other things, but I don't

13   think I can talk about those.  And so now that's sitting there

14   on the record without any explanation and without the United

15   States being able to rebut.

16          And what I would propose is not necessarily to bring

17   up any civil litigation, but just be able to ask him if there

18   had been -- if there came a time in 2017 where there was

19   increased scrutiny.  And it would help explain, you know, not

20   only it would help explain the no comp names in e-mail --

21          THE COURT:  I am sorry, the what in e-mail?

22          MR. KOENIG:  The text message where Tim Stiller said

23   to Robbie Bryant no comp names, competitor names in e-mails,

24   and that the reason for that was the increased scrutiny.  We

25   had stayed away from that earlier because of Your Honor's

Robert Bryant - Cross

1    rulings, but now that Mr. Feldberg has elicited testimony that,

2    you know, essentially there was other things happening during

3    the time frame that Mr. Bryant said he couldn't talk about, we

4    think it only be fair that we be able to mention there was some

5    increased scrutiny in that time frame and that's why they had

6    to start being more careful.

7         THE COURT:  Okay.  Did you identify those questions as

8    coming from Mr. Feldberg or Mr. Kornfeld?

9         MR. KOENIG:  Mr. Feldberg.

10        THE COURT:  Oh, okay.  Mr. Feldberg, response?

11        MR. FELDBERG:  Your Honor, respectfully, I don't

12   recall asking questions that elicited testimony about other

13   things happening in 2017 that would create any opening.  I

14   don't have the transcript fully digested in my head, but if

15   there is a particular question and answer that counsel can

16   identify, I would be happy to look at it, but at this point I

17   can't identify anything that would open the door to that kind

18   of inquiry.

19        THE COURT:  Well, here is my comment, and that is I

20   can vaguely recall something to that effect.  But despite my

21   vague recollection even with your description, Mr. Koenig, it's

22   so subtle, I just don't think that it would -- the jury would

23   have understood it in any way to cause prejudice to the United

24   States.

25        Moreover, your suggestion about being able to go into

Robert Bryant - Cross

1  it I think would then cause the jury to speculate about, you

2  know, exactly what was going on.  In short, I don't see any

3  prejudice to the United States by Mr. Bryant's answer.  I don't

4  see any prejudice to the United States from the question, but I

5  think that we would be opening up a can of worms were you to

6  attempt to clarify that.  And moreover, I'm just not sure that

7  the witness would really know what he could say in response.

8  And there is a real danger that he might go into something that

9  would then cause greater problems, so I will reject the notion

10  that the door has been opened.

11          Anything else?

12      *MR. KOENIG:*  If I may, Your Honor, can we have an

13  opportunity to just perhaps bring to you an application to sort

14  of limit what the defendants are able to do with that on, say,

15  closing pointing out that he said that there were other things,

16  but he never answered the question or he never explained that

17  further?

18      *THE COURT:*  If anyone had time in closing to talk

19  about that, I think that they would have totally lost track of

20  the fundamentals of persuasion because it would be a confusing

21  off point attempt to make something out of nothing, so I think

22  that the probability of that is very low.

23      *MR. KOENIG:*  Okay.  Well, very well, Your Honor.

24      *THE COURT:*  I mean, we'll see if it happens and if it

25  does -- but it would be just such a slim read to hang anything

1168

Robert Bryant - Cross

1    on.

2        (In open court:)

3    *BY MR. KOENIG:*

4    *Q.*  Good morning, Mr. Bryant.

5    *A.*  Good morning.

6    *Q.*  Mr. Bryant, do you recall yesterday being asked about your

7    handwritten notes in a government exhibit?

8    *A.*  I do.

9    *Q.*  And that was government Exhibit 1919.  Do you remember

10   that?

11   *A.*  I don't remember the exhibit number, but I do remember

12   my -- my notes.

13   *Q.*  Okay.  Do you recall being asked if those were actually --

14   well, what did you say that those notes represented?

15   *A.*  Those notes represented what I -- what I thought were

16   future bids.

17       *MR. KOENIG:*  Can we please bring up 1919?  Permission

18   to publish Page 12 to the jury?

19       *THE COURT:*  You may.

20       *MR. KOENIG:*  Ms. Pearce, if you could just blow up the

21   bottom.

22   *BY MR. KOENIG:*

23   *Q.*  All right.  If you could just remind the jury what you

24   believed to be future pricing.

25   *A.*  Yes.  I believe this to be future pricing for the 2017 bid.

Robert Bryant - Cross

1    Q.  Okay.  Do you recall being asked if those were actually the

2    Pilgrim's competitors' current prices?

3    A.  I do.

4    Q.  Now, is there another example from around this time frame

5    where price information that you exchanged with a competitor

6    could not possibly have been competitor -- or, I mean, current

7    pricing information?

8         MR. TUBACH:  Objection, leading and beyond the scope

9    of cross-examination, Your Honor.

10        THE COURT:  Overruled.

11   BY MR. KOENIG:

12   Q.  Let me point you -- what information was exchanged in the

13   Mar-Jac, US Foods conduct that we talked about?

14   A.  That was future pricing.

15   Q.  Why do you know it was future pricing?

16   A.  Because at the time we hadn't submitted the pricing to US

17   Foods.  And I was -- I do not think US Foods was even aware we

18   were going to ask for a price increase at that time.

19   Q.  And what was the nature of the information exchanged?  Was

20   it an absolute price or was it a price increase?

21   A.  It was a price increase and it was a range, so to speak,

22   not an exact price.  A similar price I think is the word that

23   was used.

24   Q.  Right.  So you didn't actually exchange the current pricing

25   with Mar-Jac.

Robert Bryant - Cross

1        *MR. TUBACH:*  Leading, Your Honor.

2        *THE COURT:*  Sustained.

*BY MR. KOENIG:*

3

4    Q.  Is that the extent of what was exchanged?

5    A.  Yes.  It was just the items and the amount of increase that

6    we were seeking.

7    Q.  Thank you.  And again that's future pricing?

8    A.  That's correct.

9    Q.  Even if -- going back to 1919, Page 12, did you have an

10   understanding of whether current prices could help in

11   formulating Pilgrim's price bid submissions?

12   A.  Yes.

13   Q.  What was that -- what was the basis for your understanding?

14   A.  I had seen that information before and how those -- that

15   information could be used to know if you were behind a

16   competitor or ahead of a competitor.

17   Q.  All right.  So if you could just explain to the jury what's

18   your understanding how current pricing of the competition could

19   help formulate your bid.

20   A.  If you know, for instance, that your price was a nickel

21   behind your competitor's price, then when the bid came due and

22   say market conditions were stagnant, like there is not an

23   increase really sought, I mean, in theory you could raise your

24   price equal to your competitor's and still be equal without

25   losing business.  On the other side, if you were higher than,

Robert Bryant - Cross

1   you know that you could be at risk and you may want to offer a

2   little bit of a price decrease to protect business.

3   Q.  All right.  And I believe you testified earlier that in the

4   2017 time frame the agreement between competitors was to limit

5   the downside.

6   A.  That's correct.

7   Q.  Okay.  And would exchange of current pricing information

8   have facilitated that agreement?

9   A.  It could help.

10  Q.  And help -- just to be clear, help resist together going

11  down in price?

12          MR. FELDBERG:  Objection, leading.

13          THE COURT:  Sustained.

14  BY MR. KOENIG:

15  Q.  Mr. Bryant, do you recall saying that you were testifying

16  here under an agreement where you will not be prosecuted?

17  A.  I do.

18  Q.  Have you read that agreement?

19  A.  I have.  It's been some time ago, but yes, I have.

20  Q.  All right.

21          MR. KOENIG:  Your Honor, permission to hand Mr. Bryant

22  through your clerk --

23          THE COURT:  Yes, you may.

24          MR. KOENIG:  Could we pull up Exhibit 9671, not for

25  publication to the jury?

Robert Bryant - Cross

1  *BY MR. KOENIG:*

2  *Q.*  If you could just take a minute to read through it,

3  Mr. Bryant.

4  *A.*  Okay.

5  *Q.*  Do you recognize the text on Government Exhibit 9671?

6  *A.*  Yes.

7  *Q.*  What is it?

8  *A.*  It's basically the cooperation agreement that I have with

9  the government.

10       *MR. KOENIG:*  All right.  The government would then

11  offer 9671 into evidence?

12       *THE COURT:*  Any objection to the admission of

13  Exhibit 9671?  Mr. Feldberg?

14       *MR. FELDBERG:*  Can I have a moment, Your Honor?

15       *THE COURT:*  You may.

16       *MR. FELDBERG:*  No objection, Your Honor.

17       *THE COURT:*  Exhibit 9671 will be admitted.

18       *MR. KOENIG:*  Permission to publish to the jury?

19       *THE COURT:*  You may.  And that's a multi-page exhibit,

20  right?

21       *MR. KOENIG:*  Yes.

22       *THE COURT:*  All right.  Go ahead.

23  *BY MR. KOENIG:*

24  *Q.*  Could I draw your attention to Paragraph 1(d)?

25  *A.*  Okay.

Robert Bryant - Cross

1    *Q.* All right. What is your understanding --

2         *MR. KOENIG:* Actually, can we first go to the intro to

3    Paragraph 1, the very top, and starting with the testimony?

4    There you go.

5    *BY MR. KOENIG:*

6    *Q.* All right. If you could please read that to the jury.

7    *A.* The testimony of Robert Bryant is pursuant to the following

8    terms of immunity: The full, truthful and continuing

9    cooperation of Bryant will be subject to the procedures and

10   protections of this paragraph, and will include, but not be

11   limited to:

12   *Q.* Now please look at Paragraph (d). That's a fairly long

13   sentence, but what is your understanding of Paragraph (d)?

14   *A.* That I need to comply with the Department of Justice or the

15   United States Government in their efforts to prosecute this

16   case, and that in doing so I need to be truthful and honest and

17   bring forth even things that they haven't asked me about.

18   *Q.* And what is -- well, let's go to now Paragraph 2 and the

19   first sentence of Paragraph 2, just so you see where it says:

20   The United States agrees to the following?

21   *A.* I do. Do you want me to read that sentence?

22   *Q.* Yes, please, 2(a), yes.

23   *A.* The United States agrees that it will not bring criminal

24   charges against Bryant for any act or offense committed before

25   the date of this signature of this agreement and while Bryant

1174

Robert Bryant - Cross

1   was acting as director, officer, or employee of Pilgrim's Pride

2   Corporation that was undertaken in furtherance of an antitrust

3   conspiracy involving the sale of broiler chicken products in

4   the United States.

5   Q.  Now let's look at Paragraph (b).  Could you read that,

6   please?

7   A.  If Bryant fails to comply fully with his obligations under

8   Paragraph 1, then the terms of this agreement and the agreement

9   not to prosecute Bryant granted in this agreement will be

10  rendered void, and the United States may prosecute Bryant

11  criminally for any federal crime of which the United States has

12  knowledge, including, but not limited to, any relevant offense.

13  Q.  What is your understanding of those two paragraphs?

14  A.  If I don't fully cooperate, that this agreement would be

15  void.

16  Q.  And what could happen as a result?

17  A.  Then the United States could choose to indict and charge me

18  for any offense that they have knowledge of.

19  Q.  And is part of your obligation to testify truthfully at

20  this trial?

21  A.  It is.

22  Q.  So it's your understanding you could be prosecuted if you

23  don't testify truthfully at this trial.

24  A.  That's correct.

25  Q.  Thank you.  Do you recall testifying I believe it was

Robert Bryant - Cross

1   yesterday that Pilgrim's and its competitors had an agreement

2   in 2014 to raise prices?

3   *A.*   Yes.

4   *Q.*   And do you recall saying that George's was one of those

5   competitors?

6   *A.*   Yes.

7   *Q.*   Mar-Jac?

8   *A.*   Yes.

9   *Q.*   Claxton?

10   *A.*   Yes.

11   *Q.*   Koch?

12   *A.*   Yes.

13   *Q.*   Pilgrim's?

14   *A.*   Yes.

15   *Q.*   Do you recall that you left Tyson out of the list?

16   *A.*   I did not recall that.

17   *Q.*   If you did leave Tyson out, was that intentional?

18   *A.*   No, it was not intentional.

19          *MR. GILLEN:*   Objection, Your Honor, leading.  Move to

20   strike his answer.

21          *THE COURT:*   Sustained as to leading.  The jury is

22   instructed to ignore that last answer.

23          You can reask the question.

24   *BY MR. KOENIG:*

25   *Q.*   So what was your understanding of the competitors that had

Robert Bryant - Cross

1   an agreement that you testified to in 2014 to raise prices to

2   KFC?

3           MR. GILLEN:  Objection, Your Honor, as to his

4   understanding.  He gave his testimony about what he heard,

5   period, and we would object to his "understanding."

6           THE COURT:  Overruled.  He can answer.

7   A.  So, I mean, I made that list several times and, you know,

8   it's several names and I tried to repeat those, but obviously

9   Tyson, George's, Koch, Claxton, Mar-Jac, Pilgrim's.  You know,

10  I don't have that list in front of me, but I can recite those

11  names, but, you know, I did view those, all those as

12  competitors.

13  BY MR. KOENIG:

14  Q.  And as part of the agreement in 2014?

15          MR. FELDBERG:  Objection, leading.  He just testified

16  he viewed them all as competitors.

17          THE COURT:  Sustained.  If you can ask a new question.

18  BY MR. KOENIG:

19  Q.  Of those competitors you just named, which ones were part

20  of the 2014 agreement to raise prices to KFC?

21  A.  All of those.

22  Q.  Thank you.  Do you recall yesterday defense counsel asking

23  you about plant conversions?

24  A.  I do.

25  Q.  And to be clear, were you testifying about two different

Robert Bryant - Cross

1  plant conversions?

2  A.  Yes, that was two different plant conversions yesterday.

3  Q.  And I guess regardless of whether there were any confusion

4  over which plant conversion you were talking about, was there

5  any real dispute about the fact that there were supply issues

6  in 2014?

7  A.  There were definitely supply issues in 2014.

8  Q.  And what was Pilgrim's and its competitors doing with those

9  supply issues?  How was it using those with respect to

10  customers?

11  A.  Using it to --

12      MS. HENRY:  Objection, lack of foundation with regard

13  to the competitors.

14      THE COURT:  Overruled both.

15  A.  We were using those to -- the supply issues were part of

16  our justification to increase prices.

17  BY MR. KOENIG:

18  Q.  Okay.  And I believe you testified if you recall that you

19  believed some price increase was warranted.

20  A.  That's correct, yes.

21  Q.  But yet you also testified that you were nervous about the

22  price increases that you were requesting, right?

23  A.  That's correct, yes.

24  Q.  And why was that?

25  A.  Because I had not seen a price increase that large before

1178

Robert Bryant - Cross

1  and I was concerned we were going to lose business.

2  Q.  Okay.  And how -- so just if you could explain to the jury

3  the -- how it is that you thought there was a justification for

4  some price increase, but not -- but you were concerned about

5  the size of this one at the same time.

6          MR. TUBACH:  Asked and answered multiple times.

7          THE COURT:  Overruled.

8  A.  Like I said before, I was monitoring pricing and, you know,

9  before I got into that divisional role and seeing the pricing

10  change year to year and just not seeing a price increase this

11  large and was -- initially I was concerned that the industry or

12  all of our competitors wouldn't do a similar price increase,

13  and if we asked for one that large, that we would lose business

14  and not be in a very good shape.

15  BY MR. KOENIG:

16  Q.  Okay.  Can you remind the jury, what was the size price

17  increase you were going after?

18  A.  It was between 15 and 20 cents.

19  Q.  And that was in conjunction with the competition as well.

20  A.  That's correct, yes.

21  Q.  With the supply issues that you believed existed, what size

22  price increase approximately did you think would be warranted?

23          MR. TUBACH:  Objection, lacks foundation, calls for

24  speculation.

25          THE COURT:  Overruled.  He has got foundation and

Robert Bryant - Cross

1  basis for knowledge.  Go ahead.

2  A.  You know, in the past what I had seen was price increases

3  of a few cents up or down.  And if my manager would have told

4  me that he was seeking a nickel price increase, I wouldn't have

5  been concerned.  I would have felt like he could have gotten

6  that done fairly easily.

7  BY MR. KOENIG:

8  Q.  Okay.  So could you explain -- could you explain how you

9  were using market conditions to get what you described as a

10  historic price increase?

11  A.  You know, we've talked a lot about supply and demand and

12  supply is one side of that.  And just because supply decreases,

13  that doesn't necessarily warrant a price increase because if

14  demand matches, then the supply chain is still in balance.  But

15  this particular year there was a supply crunch, but there was

16  also demand that goes along with it.  So there were shortages.

17  When your customer feels those shortages, then they know that

18  there is a supply problem.  We have talked a lot about

19  shortages, so they actually felt that supply crunch in 2014.

20  Q.  But you said you were worried, though, that the price

21  increase wasn't -- of that magnitude wasn't warranted?

22      MR. FELDBERG:  Objection, leading.

23      THE COURT:  Overruled.

24      MR. KORNFELD:  Your Honor, a separate objection is

25  this is beyond -- this isn't redirect.  This is putting in

Robert Bryant - Cross

1    direct testimony again.  We're just rehashing the same stuff

2    over and over.  I don't even know what this pertains to in the

3    cross-examination.

4         THE COURT:  That objection is overruled as well.

5    A.  Can you ask it again?  Sorry.

6         MR. KOENIG:  There were a number of objections.  I

7    can't remember exactly how I phrased it.  Could it be read

8    back?

9         (The record was read by the court reporter.)

10   A.  That's correct.

11   BY MR. KOENIG:

12   Q.  Did you have an understanding as to whether Pilgrim's and

13   competitors were taking advantage of the market conditions to

14   get the historic price increases?

15   A.  I don't know if -- if we were or not, I don't know that.  I

16   know it was discussed internally with Pilgrim's.

17   Q.  What was discussed?

18   A.  That the shortages to the customers were a good thing for

19   us helping to get those price increases.

20   Q.  Thank you, Mr. Bryant.

21        Do you recall defense counsel showing you what they

22   had characterized as excerpts of writeups from a few of the

23   interviews you had with the government?

24   A.  I recall that, yeah.

25   Q.  And do you recall having a document put in front of you and

Robert Bryant - Cross

1    being asked questions about an interview that occurred on

2    September 8th, 2021?

3    *A.*  I remember the document being put in front of me and some

4    questions about it, yes.

5    *Q.*  About the interview on that date?

6    *A.*  Yes.

7    *Q.*  If you recall, and I know you didn't probably have a stop

8    watch going, but about how long was that interview?

9    *A.*  I don't remember.

10   *Q.*  How long were your typical interviews?

11   *A.*  One hour to two hours.

12        *MR. KOENIG:*  Okay.  I don't have this on our screen,

13   but can we pull up the defense exhibit that you were shown, not

14   for publication to the jury.  I believe it was defense Exhibit

15   H-753?  Is that something you can pull up?  I am asking Your

16   Honor, could one of the defendants pull it up?

17        *THE COURT:*  It's here.  It's been pulled up.

18        *MR. KOENIG:*  Oh, there it is.

19   *BY MR. KOENIG:*

20   *Q.*  All right.  Can you take a look at Defense Exhibit H-753,

21   please?

22        *MR. POLLACK:*  Your Honor?

23        *THE COURT:*  Yes.

24        *MR. POLLACK:*  I am going to object.  There has been no

25   lack of recollection.  There is no reason to be showing this

Robert Bryant - Cross

1    document to the witness.  There is not a pending question.

2         THE COURT:  Response?

3         MR. KOENIG:  I am just establishing what he was shown.

4    And I think this goes to the completeness objection that we

5    raised yesterday and Your Honor I believe said that, you know,

6    that's basically in essence what redirect was for.

7         THE COURT:  He can be shown it pursuant to 613 in

8    order to bring out whether it was a prior statement of his.

9    Overruled.

10        MR. KOENIG:  All right.  Thank you.

11        And can we go to the second page?

12   BY MR. KOENIG:

13   Q.  All right.  Do you see that, Mr. Bryant?

14   A.  I do.

15   Q.  How many sentences would you say are on that page?

16   A.  Five.

17   Q.  All right.  And do those five sentences recap the sum and

18   substance of what you said in your two-hour interview?

19        MR. POLLACK:  Objection, Your Honor.  Can we have a

20   side bar?

21        THE COURT:  Yes.

22        Mr. Pollack, can you hear me?

23      (At the bench:)

24        THE COURT:  Mr. Pollack, can you hear me?

25        MR. POLLACK:  I can, Your Honor.

Robert Bryant - Cross

1    THE COURT:  Mr. Koenig?  Can you hear me, Mr. Koenig?

2  I can't hear you.

3        MR. KOENIG:  Yes.

4        THE COURT:  Mr. Pollack, go ahead.

5        MR. POLLACK:  Your Honor, this document is not in

6  evidence.  It wasn't shown to the jury.  I think that

7  Mr. Koenig can certainly ask Mr. Bryant did you also say the

8  following in the interview, but the number of sentences that

9  are on a document that's not in evidence just strikes me as

10  wholly irrelevant and improper examination.

11        THE COURT:  Mr. Koenig, response?

12        MR. KOENIG:  Well, I think that the fact that there

13  was a one or two-hour interview and they showed him a selection

14  of five sentences goes to the issue of completeness.  It really

15  shows that there was an attempt to get Mr. Bryant to say

16  something that he really didn't say.

17        THE COURT:  Yeah, I agree with Mr. Pollack.  While a

18  document like this could be used perhaps to point out to the

19  witness that what was recounted to him on cross is somehow

20  inaccurate or it wasn't -- what he didn't say, the fact that a

21  memo is long or he made statements is too far afield.  And as a

22  result, he shouldn't be shown a document for that purpose.  It

23  would really only be to clarify some statement that he

24  allegedly made and was suggested on cross-examination that he

25  did make, but that perhaps the document itself would help the

1184

Robert Bryant - Cross

1 │ witness recall that he didn't say it. But your question did

2 │ not go to that issue, all right?

3 │        MR. KOENIG:  Thank you, Your Honor.

4 │     (In open court:)

5 │        THE COURT:  The objection will be sustained.

6 │        MR. KOENIG:  Your Honor, may I pass up for Ms. Grimm

7 │ Government Exhibit 9635?

8 │        THE COURT:  9635?

9 │        MR. KOENIG:  Yes.

10 │        THE COURT:  Yeah.

11 │ BY MR. KOENIG:

12 │ Q.  All right, Mr. Bryant.  No need to look through it right

13 │ now at this point.  Do you recall yesterday being asked by

14 │ defense counsel whether you had said in this interview that

15 │ competitors discussed and knew what consensus prior -- I am

16 │ sorry.  I got lost on my lines here.  Do you recall being asked

17 │ that there was no agreement in place that prevented a supplier

18 │ from arriving at a different price point?

19 │ A.  I don't really recall that exchange.

20 │ Q.  Can I direct your attention to -- is there something I

21 │ could do to refresh your recollection?

22 │ A.  Yes.

23 │ Q.  Let's point you to Page 3.

24 │        MR. POLLACK:  Your Honor, objection, his lack of

25 │ recollection is about what defense counsel asked him.  He can't

Robert Bryant - Cross

1   refresh his recollection from this 302 on what defense counsel

2   asked him.

3        MR. KOENIG:  Your Honor, I believe that defense

4   counsel was, in fact, using the word quotes in asking about

5   this document to which we objected several times, so I think

6   it's only fair that we could elicit the exact question he was

7   asked.

8        THE COURT:  Well, I think you may be able to figure

9   out the exact question that he was asked from the transcript,

10  but I do agree that he doesn't need his recollection refreshed

11  as to what he was asked.

12       MR. KOENIG:  He does not need it?  Respectfully, he

13  just said he doesn't remember the exact exchange.

14       THE COURT:  Right.  But the problem is that what he is

15  looking at now is not necessarily the exact question that he

16  was asked.  You could quote him through your question the exact

17  question that was asked.

18       MR. KOENIG:  Okay.  May I have a minute to bring that

19  up?

20       THE COURT:  Yes.

21  BY MR. KOENIG:

22  Q.  All right, Mr. Bryant.  Do you recall being asked by

23  Mr. Feldberg -- I will just quote the question:  Mr. Bryant, do

24  you see the excerpt at the top of the page, "The competitors

25  discussed and knew what each other were doing though there was

Robert Bryant - Cross

1  no agreement in place that prevented a supplier from arriving

2  at a different price point."

3          Do you recall that?

4  A.  Yes, I recall that, yes.

5          MR. KORNFELD:  Your Honor, I am going to object to the

6  extent that this is a prior consistent statement and therefore

7  has nothing to do with 613.  That's not proper rehabilitation.

8          THE COURT:  We don't know that yet.  Mr. Koenig is

9  just asking him about something he was asked yesterday, so we

10  will see what follows.

11          Go ahead, Mr. Koenig.

12  BY MR. KOENIG:

13  Q.  Now, do you recall in that interview if you provided any

14  additional context around that purported statement?

15  A.  I believe I did.

16  Q.  All right.  Did you provide context about what years that

17  comment related to?

18  A.  I don't -- I believe that was probably for 2017.

19  Q.  Do you recall any additional context that you provided for

20  that statement, purported statement?

21  A.  I mean, I remember giving more context than that one

22  statement, yes.

23  Q.  But you don't remember specifically the content -- context?

24          MR. POLLACK:  Objection, Your Honor, leading.

25          THE COURT:  Overruled.

Robert Bryant - Cross

1    A.   I mean, yes, I remember additional context that I gave

2    regarding that statement, yes.

3    BY MR. KOENIG:

4    Q.   And what context did you give?

5    A.   I believe I said something to the effect that the

6    competitors would agree on a range of price, that yes, they

7    could adjust their price inside that range.  And I think the

8    example I was using was in 2017 when I wanted to be second in

9    price after I had the handwritten note, but later on we

10   adjusted our price to be more middle of the pack.

11        MR. POLLACK:  Your Honor, I believe that the witness

12   may be reading from the document which is not appropriate at

13   this point.

14        THE COURT:  Let's take the document down for now.  It

15   doesn't seem to have a use right now.

16        MR. POLLACK:  The witness has a hard copy, I believe.

17   It's not on the screen.

18        THE COURT:  Right.  Mr. Bryant, if you don't mind, if

19   you can turn that upside down.

20        THE WITNESS:  I hadn't opened it.

21        THE COURT:  We will do that just for extra measure of

22   comfort.

23        Go ahead.

24   BY MR. KOENIG:

25   Q.   All right.  So you do recall the question, though, that

Robert Bryant - Cross

1   there was no agreement in place, that question that we just

2   read from the transcript?

3   A.   Yes.

4   Q.   Do you recall saying during the interview words to the

5   effect that suppliers were free to make independent decisions?

6   A.   Possibly.

7   Q.   Do you recall saying during the interview that you couldn't

8   recall that ever happening?

9           MR. FELDBERG:   Objection, leading.

10          THE COURT:   Sustained.

11  BY MR. KOENIG:

12  Q.   Do you recall testifying -- or not testifying, saying in

13  your interview your opinion?  If you gave an opinion about

14  independent decision making by competitors, what was that

15  opinion, if you recall?

16          MR. FELDBERG:   Objection, Your Honor.  The witness is

17  not qualified to give opinions.

18          THE COURT:   Well, I don't think that that is exactly

19  what he intended by that.  That objection is overruled.  He can

20  answer.

21  A.   Yes, I remember.

22  BY MR. KOENIG:

23  Q.   What do you remember?

24  A.   I remember giving a statement to the effect that, you know,

25  once there was this range, that I didn't recall a competitor

Robert Bryant - Cross

1    stepping outside that range.

2    Q.  Okay.  Thank you.

3         Do you recall yesterday being asked about -- asked by

4    defense counsel about Roger Austin?

5    A.  I do.

6    Q.  Do you recall being shown a calendar invite?

7    A.  I do.

8    Q.  What did that calendar invite relate to?

9    A.  I was shown several.  Are you talking about the Popeye's

10   meeting in 2014?

11   Q.  Do you recall seeing an invitation about that?

12   A.  I do.

13   Q.  And do you recall whether defense counsel asked you to --

14   whether Roger Austin was on the invite?

15   A.  That's correct.

16   Q.  And was he on the invite?

17   A.  I don't remember -- he was not that I can remember, no.

18   Q.  But you testified that you remember him being at the

19   Popeye's meeting, right?

20        MR. FELDBERG:  Objection, that's not what he

21   testified.  He testified he didn't recall one way or the other.

22        MR. KOENIG:  I believe on direct he did.

23        THE COURT:  If you could ask a nonleading question

24   about that.  Sustained.

25   BY MR. KOENIG:

Robert Bryant - Cross

1    *Q.*  How certain were you that Mr. Austin was at that meeting?

2    *A.*  Fairly certain.

3    *Q.*  Okay.

4         *MR. FELDBERG:*  I just didn't hear it.

5    *A.*  I said fairly certain, yes.

6    *BY MR. KOENIG:*

7    *Q.*  And can you tell the jury what it is you remember

8    Mr. McGuire saying to Mr. Austin?

9    *A.*  Yes.  I am certain on the statement.  I remember the

10   statement clearly that Jason McGuire told Roger to put it out

11   to the industry.  I do remember that clearly.

12   *Q.*  What was it?

13   *A.*  It was the information or the justification that we were

14   presenting to customers on price increases.

15   *Q.*  Okay.  So is it fair to say, then, that your recollection

16   of the statement -- how would you characterize how sure you are

17   that that statement happened at a customer meeting?

18   *A.*  Certain.

19   *Q.*  Okay.  And by industry, what did you understand that to

20   mean?

21   *A.*  Our competitors.

22   *Q.*  Okay.  Do you recall saying that Austin was an advocate for

23   his customers?

24   *A.*  I do.

25   *Q.*  Did you also testify previously on direct that as you

Robert Bryant - Cross

1  understand the term price-fixing, that Roger Austin had engaged

2  in that conduct?

3       MR. FELDBERG:  Objection, leading, just repeating

4  direct.

5       THE COURT:  Overruled.

6  A.  That was my understanding, yes.

7  BY MR. KOENIG:

8  Q.  Okay.  And do you have an understanding as to whether

9  engaging in price-fixing as you understand that term, do you

10  have an understanding of whether that is being an advocate for

11  the customer?

12       MS. HENRY:  Objection, relevance.

13       MR. TUBACH:  And Your Honor additional objection to

14  the continued use of the word price-fixing.  It's a misleading

15  term.

16       THE COURT:  I am going to sustain it as to the use of

17  the term price-fixing.  We talked about that earlier.  If you

18  could rephrase.

19  BY MR. KOENIG:

20  Q.  The activity that's the subject matter of the agreement we

21  just looked at, do you recall that activity?

22  A.  Yes.

23  Q.  And did you testify that Roger Austin engaged in that

24  activity?

25  A.  I did.

Robert Bryant - Cross

1  *Q.*  All right.  And do you have an understanding as to whether

2  engaging in that activity is being an advocate for the

3  customer?

4  *A.*  That is not.

5  *Q.*  Thank you.  Finally, do you recall being asked whether

6  there is nothing wrong with Pilgrim's being in the middle of

7  the pack with respect to the 2017 negotiations?

8  *A.*  I do.

9  *Q.*  And what was your answer?

10  *A.*  I don't recall exactly.  I think I said no or you're

11  average or something to that effect.

12  *Q.*  How would your answer have changed, if at all, if the

13  question had been phrased:  Is there anything wrong with

14  Pilgrim's coordinating bids with its competitors to be in the

15  middle of the pack?

16       *MR. TUBACH:*  Your Honor, speculation, lacks

17  foundation.

18       *THE COURT:*  Overruled.

19  *A.*  It would have been different, yes.

20  *BY MR. KOENIG:*

21  *Q.*  And how so?

22  *A.*  I would have said that was wrong.

23       *MR. KOENIG:*  No further questions.

24       *THE COURT:*  I am going to make an exception to the no

25  recross.  If anyone wants to ask Mr. Bryant a few questions

1    about Exhibit 9671.  If you need a little time to confer, you

2    certainly can.

3              MR. TUBACH:  If we can have just five minutes.

4              MR. KORNFELD:  Two minutes.

5              THE COURT:  I don't think we will recess, but you can

6    huddle up if you need to.

7              MR. KOENIG:  Your Honor, just about 9671?

8              THE COURT:  Yes, just about 9671.

9                          **RECROSS-EXAMINATION**

10   BY MR. FELDBERG:

11   Q.  Mr. Bryant, with respect to Government Exhibit 9671 --

12   A.  Which exhibit is that?

13   Q.  That's the immunity agreement.

14   A.  Okay, sorry.

15   Q.  Do you understand, sir, that the protection that's provided

16   to you in this agreement for antitrust issues can be pulled and

17   your immunity withdrawn if someone decides that you have not

18   testified truthfully?

19   A.  Yes.

20   Q.  And who is the decider?

21   A.  The Department of Justice, I assume.

22   Q.  The Department of Justice, the folks at this table,

23   correct?

24   A.  That's my understanding.

25              MR. FELDBERG:  Thank you, sir.

1     *THE COURT:*  Thank you, Mr. Feldberg.

2            Additional recross?

3            All right.  Mr. Bryant, then you are excused.  Thank

4     you very much.

5            I am sorry, Mr. Feldberg?

6            *MR. FELDBERG:*  Can I have an issue at side bar before

7     the witness is excused?

8            *THE COURT:*  You may.

9            One second, Mr. Bryant.

10       (At the bench:)

11           *THE COURT:*  Mr. Feldberg, go ahead.

12           *MR. FELDBERG:*  Your Honor, it's quite clear from the

13    first series of questions that were asked on redirect about

14    Government Exhibit 1919 that the prosecution has now realized

15    that those handwritten notations that list prices for various

16    companies are current prices.  They match up exactly to the

17    period two pricing information that's current pricing that we

18    offered yesterday.  Your Honor determined we hadn't yet

19    established a foundation.  We will be attempting to offer it

20    through another witness.  But it's quite clear from the

21    questions that they now realize from the testimony that

22    Mr. Bryant gave that Mr. Austin told him future bids was not

23    correct.

24           And I think that should be corrected.  I don't think

25    it should be -- testimony that's clearly wrong should not be

1   permitted to stand.  And they know it's wrong at this point.

2   They know that those prices in his handwritten notes match up

3   to current prices, not future.

4         THE COURT:  Well, that's what trials are for.  The

5   witness doesn't know that.  In fact, he testified just the

6   opposite.  He assumed that they were true.  And logically it

7   would seem, you know, he had a logical basis to assume that.

8   Whether or not the government feels otherwise or whether or not

9   the government has some obligation in the search for the truth

10  to disabuse the jury's view is something that I can't talk

11  about, but certainly the defendants in the course of their case

12  or through cross-examination of other witnesses may be able to,

13  so I am not sure why we are holding the witness up for that

14  reason now.

15        MR. FELDBERG:  Understood, Your Honor.  Thank you.

16        THE COURT:  Thank you very much, Mr. Bryant.  You are

17  excused.

18        MR. KOENIG:  Your Honor, is he subject to recall?

19        THE COURT:  Is he?  Hearing none, no.

20        The United States may call its next witness.

21        MS. BUTTE:  The United States calls Mr. Philip Fanara.

22     (**Philip Fanara** was sworn.)

23        THE WITNESS:  I do.

24        COURT DEPUTY CLERK:  Please state your name and spell

25  your first and last name if the record.

Philip Fanara - Direct

1    THE WITNESS:  Philip Fanara, P-H-I-L-I-P, F-A-N-A-R-A.

2    THE COURT:  Ms. Butte, go ahead.

3    **DIRECT EXAMINATION**

4    BY MS. BUTTE:

5    Q.  Good morning, Mr. Fanara.

6    A.  Good morning.

7    Q.  Where do you work?

8    A.  I am a trial analyst for AT&T.

9    Q.  What are your responsibilities as a trial analyst?

10   A.  Provide testimony for them in court.

11   MS. BUTTE:  Your Honor, I would like permission to

12   hand Ms. Grimm a binder of the exhibits for the witness and a

13   list of those documents.

14   THE COURT:  Yes, you may.

15   BY MS. BUTTE:

16   Q.  I will give you a moment to look through that.

17   A.  I have seen this before.  It was yesterday and also on a

18   couple of conference calls prior to that.

19   Q.  And what does this binder of documents contain?

20   A.  It shows different parts of reports from AT&T.

21   Q.  And what types of reports?

22   A.  They are considered billing reports, but they are mobility

23   usage reports, subscriber information and the like.

24   Q.  Does it include toll records?

25   A.  Yes, mobility usage, yes.

Philip Fanara - Direct

1   Q.   Are you familiar with how AT&T creates toll records?

2   A.   Yes.

3   Q.   Could you describe that process?

4   A.   Once the information is in our database and once a request

5   for a report is needed, we print out a report or send it

6   electronically.

7   Q.   Is that an automated process?

8   A.   It's an automated process to collect the information, but

9   when a report is generated, it's a request via like, for

10  example, a subpoena.

11  Q.   Is it a manual process to generate those documents?

12  A.   Yes.

13  Q.   Are you familiar with how toll records are stored?

14  A.   Yes.

15  Q.   Could you explain how they are stored?

16  A.   Once information is captured whether it's voice or data or

17  text, it's captured within our databases and all that

18  information is stored and ready for request.

19  Q.   Are toll records generated at or near the time calls are

20  made and received?

21  A.   Yes.

22  Q.   Are they kept in the course of AT&T's regularly conducted

23  business?

24  A.   Yes.

25  Q.   Are they kept as a regular practice?

Philip Fanara - Direct

1    A.   Yes.

2    Q.   Are the systems that generate these toll records reliable?

3    A.   Yes.

4    Q.   Are they accurate?

5    A.   Yes.

6    Q.   And does AT&T rely on that information, the information in

7    the toll records, in the course of its regularly conducted

8    business?

9    A.   Yes.

10   Q.   In your role at AT&T, are you familiar with subscriber

11   information?

12   A.   Yes.

13   Q.   What is subscriber information?

14   A.   Subscriber information is showing the financial liable

15   person who is responsible for the AT&T wireless service for

16   paying the AT&T wireless service.

17   Q.   Are you familiar with how subscriber information is stored?

18   A.   It's stored within a database just like all the other

19   reports.

20   Q.   And how does AT&T generate subscriber information?

21   A.   When a request is made, we generate a report for that.

22   Q.   Is subscriber information kept in the course of AT&T's

23   regularly conducted business?

24   A.   Yes.

25   Q.   Does AT&T rely on the information in the subscriber records

Philip Fanara - Direct

1   in the course of its regularly conducted business?

2   A.   Yes.

3   Q.   Are the systems that generate the subscriber information

4   reliable?

5   A.   Yes.

6   Q.   Are they accurate?

7   A.   Yes.

8   Q.   Are you familiar with how the subscriber information listed

9   in the binder in front of you was retrieved and copied in

10   response to the Department of Justice's subpoena?

11   A.   Say that again?

12   Q.   Yes.   Are you familiar -- so the subscriber information in

13   the binder in front of you, are you familiar with how that was

14   generated to respond to the subpoena by the Department of

15   Justice?

16   A.   Yes.

17   Q.   Could you describe that process?

18   A.   Once a subpoena was sent, we then created a report that was

19   sent to law enforcement, and they had that report in front of

20   them.

21   Q.   To the best of your knowledge, are the records in the

22   binder in front of you true copies of the original records that

23   were stored in AT&T's systems?

24   A.   Yes.

25   Q.   In your role at AT&T, are you familiar with the type of

1200

Philip Fanara - Cross

1    account called a post-paid account?

2    *A.*   Yes.

3    *Q.*   What is a post-paid account?

4    *A.*   A post-paid account is an account set up for a customer who

5    pays on a monthly basis.

6    *Q.*   What does AT&T require to set up a post-paid account?

7    *A.*   With a post-paid account we do a credit background check on

8    a person.

9    *Q.*   Do you require any other information?

10   *A.*   Generally ask for name and address, other contact

11   information.

12   *Q.*   Is there any proof that a subscriber must give to provide

13   their name and address and contact information?

14   *A.*   There is government ID that is needed for a post-paid

15   account.

16          *MS. BUTTE:*   Thank you.   May I have a moment to confer?

17          *THE COURT:*   You may.

18          *MS. BUTTE:*   No further questions.

19          *THE COURT:*   Thank you.

20          Cross-examination?

21          *MR. SCHALL:*   Your Honor, may I hand up a binder to

22   Mr. Fanara?

23          *THE COURT:*   You may, or Ms. Grimm will hand it to him.

24                          **CROSS-EXAMINATION**

25   *BY MR. SCHALL:*

Philip Fanara - Cross

1   Q.   Mr. Fanara, can you hear me?

2   A.   Yes.

3   Q.   My name is Frank Schall.  I want to ask you a few questions

4   about the documents that you have in front of you.

5   A.   Okay.

6   Q.   First what I would like to talk to you about is just better

7   understanding the records and the information contained in

8   there.

9   A.   Okay.

10  Q.   Can you help me walk through some of them?

11  A.   I'll do my best.

12  Q.   I'm sorry, what was that?

13  A.   I'll do my best.

14  Q.   Perfect.  So what all type of information is contained in

15  toll records itself?

16  A.   Well, generally speaking when people say toll records, they

17  are sometimes called call details, mobility usage report,

18  subscriber information, wire line information.  There is a

19  number of different reports.

20  Q.   Okay.  Why don't we take a look at one of those -- it might

21  help -- walk through it.

22        Can you turn to Tab 31 in the binder in front of you?

23  Do you have that up?

24  A.   Yes, I do.  Yes.

25  Q.   So what is this report?

Philip Fanara - Cross

1   *A.*  It's a mobility usage report.

2   *Q.*  I just want to run through some of the headers so we

3   understand what's in here.

4   *A.*  Sure.

5         *MS. BUTTE:*  Your Honor, I believe this is outside the

6   scope of Mr. Fanara's examination.

7         *THE COURT:*  It is outside of the scope.

8         Response?

9         *MR. SCHALL:*  Your Honor, Mr. Fanara is here to verify

10  the authenticity of the documents.  These questions are meant

11  to elicit his familiarity with these documents and then get

12  into how he verified these are authentic.

13        *THE COURT:*  And why would he have to be familiar with

14  the content of the documents?

15        *MR. SCHALL:*  Well, Your Honor, the only thing that

16  Mr. Fanara has testified to is that he is familiar with the

17  process.  He has not laid a foundation as to how he has

18  verified these document came from the process.

19        *THE COURT:*  He testified that the documents that he

20  was asked to look at were true copies.

21        *MR. SCHALL:*  Yes, Your Honor, without a foundation for

22  how he considered them true copies.

23        *THE COURT:*  Okay.  And why would questions about

24  header information go to the issue of true copies?

25        *MR. SCHALL:*  Your Honor, these questions, if they are

Philip Fanara - Cross

1  outside the scope, were just meant for all of us to better

2  understand what sort of information is in the documents.  If

3  the government objects to us trying to figure out what's in

4  there, I can move on.

5         THE COURT:  Yeah, I am not sure why header information

6  would have anything to do with whether or not they are true

7  copies.  Sustained.

8  BY MR. SCHALL:

9  Q.  So Mr. Fanara, you testified that these are true copies of

10  documents out of AT&T; is that correct?

11  A.  Yes.

12  Q.  What did you do to verify that?

13  A.  I had several conference calls with people within the AT&T

14  compliance center reviewing the documentation that was sent to

15  law enforcement, along with reviewing these documents prior to

16  coming here today as well.

17  Q.  Okay.  And what did you specifically review?  Did you

18  review hard copies?  Did you review electronic copies?

19  A.  Both, actually.

20  Q.  Okay.  And the electronic copies that you reviewed, where

21  did you obtain those?

22  A.  With AT&T compliance center.  They had the electronic

23  copies.

24  Q.  So you obtained those copies from AT&T, not from the

25  government that you reviewed?

Philip Fanara - Cross

1  A.  No.  I shared them with -- they shared them with me.  I

2  didn't have them physically in my hand.  The physical copies

3  here I have seen before and I reviewed them with AT&T

4  compliance center.

5  Q.  So when you say they shared --

6  A.  Right, they shared via -- I don't know if it's Zoom.  I

7  forget whatever the format was that we used to share the

8  documentation.

9  Q.  I am just trying to understand who they is.

10  A.  AT&T compliance center.

11  Q.  Okay.  Thank you.  Now, in your review of these documents

12  that the government provided you, there were some that you

13  couldn't authenticate; is that correct?

14  A.  Some that I couldn't authenticate?

15  Q.  Yes.  Were there some documents that you could not

16  authenticate?

17  A.  No, I don't believe so.

18  Q.  None of the documents that you reviewed in preparation for

19  your testimony were you unable to authenticate?

20  A.  Nothing from this binder here.

21  Q.  Overall, not just the binder.

22  A.  Oh, there were probably other documentations that I can't

23  authenticate.

24  Q.  Do you remember why you couldn't authenticate those?

25  A.  Well, some in particular in a .TXT form, that's a delimited

Philip Fanara - Cross

1    form, and that stuff can be manipulated, so I can't testify to

2    that.

3    Q.   So did you look at the underlying documents provided from

4    AT&T to verify whether or not those were produced as PDFs or

5    produced as .TXTs or delimited files?

6    A.   Yes.

7    Q.   All the other ones were produced as PDFs?

8    A.   The ones that I can attest to are the PDFs.  I can't attest

9    to the .TXTs.

10   Q.   Can you pull up Government Exhibit 9656 in front of you

11   that the government handed you?

12   A.   What number?

13   Q.   It is I believe just 9656, an individual document the

14   government handed you.

15   A.   Okay.

16   Q.   Do you see that in front of you?

17   A.   Yes.

18   Q.   Is that a list of the documents that the government said is

19   in the binder that they handed you?

20   A.   I believe so, but I can't attest to this.

21   Q.   Okay.  Why don't we turn to one of those, then.  Can you

22   pull up Document GX-8000 in the binder in front of you?

23   A.   You said GX?

24   Q.   Just government exhibit.  It should be just 8000.

25   A.   Do you know where it's located specifically?

Philip Fanara - Cross

1    *Q.* I don't in the government's binder, but it's also in the

2    binder that I handed you as well.  Do you have that?

3    *A.* Yes.

4    *Q.* What is that document?

5    *A.* It's a place holder document.

6    *Q.* Is there anything behind it?

7    *A.* No, there is nothing behind it.

8    *Q.* Okay.  Is that a document you reviewed to authenticate

9    GX-8000 or did you review something else?

10   *A.* No, the report, the mobility usage report I reviewed.  This

11   is just a place holder image.

12   *Q.* Do you remember how big that document was?

13   *A.* If I remember correctly, it's fairly big.  I don't remember

14   the number of pages.  It was thousands, if I am not mistaken.

15   *Q.* Does over 99,000 sound correct?

16   *A.* It might be.  I don't remember the exact page number.

17   *Q.* Can you turn to Tab 8000 in the binder that I provided to

18   you, sir?

19   *A.* Yes.

20   *Q.* What is that document?

21   *A.* A place holder image and documentation for a mobility usage

22   report.

23   *Q.* And how many pages are behind that document?

24   *A.* This one has 124 pages and for the -- let's see --

25         *MS. BUTTE:* Your Honor, it appears these are not

Philip Fanara - Cross

1  consecutively paginated, so I am not sure the question, if the

2  witness can answer it.

3       *THE COURT:*  He can answer if he knows.  Overruled.

4  *A.*  It just shows up to Page 124 on the text messages.  Voice

5  message section goes up to 630 -- 1630 pages.

6  *BY MR. SCHALL:*

7  *Q.*  Okay.  So is that a complete document of GX-8000 of those

8  over 99,000 pages?

9  *A.*  It's an excerpt from the report.

10  *Q.*  But AT&T keeps and stores its records on excerpts, but has

11  entire documents, correct?

12  *A.*  Yes.

13  *Q.*  Will you turn back to Government Exhibit 9656?  If you look

14  at the first couple of pages and the first word in the

15  description, what is that word?

16  *A.*  They say Excerpts.

17  *Q.*  The second page?

18  *A.*  Excerpt.

19  *Q.*  Top of the third page?

20  *A.*  Excerpt.

21  *Q.*  And then if you go to the last page, the last entry.

22  *A.*  Excerpt.

23  *Q.*  Okay.  AT&T doesn't keep and store their documents as

24  excerpts, correct?  They keep the entire toll records?

25  *A.*  That's correct.

Philip Fanara - Redirect

1           MR. SCHALL:  May I have one moment, Your Honor?

2           THE COURT:  You may.

3           MR. SCHALL:  Your Honor, no further questions for the

4      witness, but we would request under Rule 106 of the entire

5      documents that are understating these excerpts are admitted

6      into evidence if Your Honor rules they are business records as

7      opposed to just the excerpts.

8           THE COURT:  Well, we haven't had anyone move them into

9      evidence yet, so we will wait until that time.

10          MR. SCHALL:  Understood, Your Honor.  We are just

11     trying to not have to recall the witness.  No further

12     questions.

13          THE COURT:  Thank you, Mr. Schall.

14          Additional cross?

15          All right.  Redirect?

16                       **REDIRECT EXAMINATION**

17     BY MS. BUTTE:

18     Q.  Mr. Fanara, were you able to review the full set of toll

19     records that were produced to the Department of Justice?

20     A.  Yes.

21     Q.  And you were able to review the excerpts that are in your

22     binder?

23     A.  Yes.

24     Q.  Are the excerpts true and accurate copies of those full

25     toll records, the portions of them?

Philip Fanara - Redirect

1    A.  Yes.

2        MS. BUTTE:  Your Honor, at this time we would like to

3    move into evidence the exhibits listed on Mr. Fanara's exhibit

4    list which is marked as Government Exhibit 9656.

5        MR. SCHALL:  Again, we would like to object to the

6    extent that only excerpts are admitted.  We would request under

7    Rule 106 the full records that AT&T produced would be admitted

8    as business records.

9        THE COURT:  Let's first of all take up -- we will get

10   to that, Mr. Schall, in just one second.  But first of all,

11   let's determine -- and I don't have a copy of 9656, but I need

12   one.  All right.  So let me do this in a shorthand way.  To the

13   extent we have documents admitted, I will then read those to

14   the jury, but any objection to the exhibits listed on

15   Exhibit 9656 subject to Mr. Schall's point?

16       MR. SCHALL:  That would be our objection,

17   completeness.

18       MS. PREWITT:  Your Honor, I would like to join that

19   objection as well, just looking at the snippets that the

20   government has selected of the full set of records.

21       THE COURT:  Then those will be admitted.  I will read

22   those in just one moment.

23       Now let's take up the issue of whether documents of

24   which are listed -- and I believe that they are described on

25   9656 as being excerpts; is that right, Mr. Schall?

Philip Fanara - Redirect

1            MR. SCHALL:  Yes, Your Honor.  I believe there are 36

2      of the 66 listed as excerpts.

3            THE COURT:  And do you have those, Mr. Schall?  Do you

4      have those in a form that would be admissible?  I mean, do you

5      have those exhibits?

6            MR. SCHALL:  Yes, Your Honor.  We can provide those.

7      Also I believe the underlying records are on here for those

8      documents.  They are seeking to submit the records, but also

9      excerpts as well.  We haven't been able to verify all of them

10     on this list are the full records, though.

11           THE COURT:  Okay.  So in other words, you think that

12     the complete records may be part of this even though other

13     exhibits are described as excerpts?

14           MR. SCHALL:  Yes, Your Honor.  There is an overlap of

15     both the excerpts and a full record that appears on 9656.

16           THE COURT:  Ms. Butte, let's get clarification of that

17     issue first.

18           MS. BUTTE:  Yes.  We have sought to admit into

19     evidence the full sets of toll records, but as Mr. Schall

20     noted, some of them are quite voluminous.  And for that reason

21     we have also sought to excerpt out portions that are relevant

22     because the voluminous records are not easy to show to

23     witnesses and also not easy to print out.

24           THE COURT:  And are there -- of the documents

25     described on 9656 as being excerpts, are any of those the

Philip Fanara - Redirect

1   complete version of any of those listed elsewhere on 9656?

2           MS. BUTTE:  They should be listed by the Bates number.

3   For example, Government Exhibit 8000 is a complete set of toll

4   records that is over 99,000 pages.  And many of these excerpts

5   are from that toll record in particular.

6           THE COURT:  And so Exhibit 8000, you actually intend

7   if I admit it to send back to the jury 8,000 pages of just

8   numbers?

9           MS. BUTTE:  So I think that's the question, Your

10  Honor.  We do have a native copy of that document that we

11  provided to defense counsel and to Your Honor.  I do not think

12  it would be wise to probably try to print out 99,000 pages of

13  documents.

14          THE COURT:  How would you give it to the jury?

15          MS. BUTTE:  If Your Honor prefers, we can just --

16          THE COURT:  I am saying like what utility would that

17  have with the jury, 8,000 pages?  How many pages?

18          MS. BUTTE:  It's 99,000 pages.

19          THE COURT:  99,000 pages of numbers?  I mean, why

20  would you do that?

21          MS. BUTTE:  That's why we are -- we do want to submit

22  the excerpts into evidence because we believe those are more

23  readily available to read and to be able to look at rather than

24  a 99,000-page document.

25          THE COURT:  But Exhibit 8000 is that.  You've moving

Philip Fanara - Redirect

1    to admit it.

2         MS. BUTTE:  Yes.  We sought to admit it in order --

3    for completeness to have the entire toll record where many of

4    these excerpts are from.

5         THE COURT:  Yeah, but why would completeness do the

6    jury any good?  I mean, why would we do that other than some

7    bugaboo of completeness?

8         MS. BUTTE:  We are happy to withdraw 8000 and rely on

9    the excerpts.

10        THE COURT:  Same question for you, Mr. Schall.  What

11   would be the purpose -- is there anything that's outside of

12   those excerpts that you think is going to be brought up during

13   this trial?

14        MR. SCHALL:  Yes, Your Honor.

15        THE COURT:  Okay, which ones?

16        MR. SCHALL:  Your Honor, we would like all the toll

17   records entered in because we anticipate performing and

18   presenting an analysis through a witness that we've already

19   identified, and we need all of the underlying documents to do

20   that, not just excerpts of what the government deems relevant.

21        THE COURT:  Right, but you have that already.

22        MR. SCHALL:  I'm sorry, Your Honor?

23        THE COURT:  You have that information already through

24   discovery, correct?  Why can't whoever might be preparing a

25   summary exhibit do that already?

Philip Fanara - Redirect

1     MR. SCHALL:  Your Honor, what we are attempting to do

2  is have to recall this witness to authenticate those exact same

3  underlying toll records.

4     THE COURT:  Well, why can't you ask him questions now.

5  And actually I think he has already answered the question as to

6  Exhibit 8000, he has already testified about that.  That's not

7  an excerpt.  That apparently is the whole thing.  You could ask

8  him additional questions if you didn't think they had already

9  been properly authenticated, but if they have been properly

10  authenticated through this witness, he wouldn't need to be

11  recalled, right?  You could move the admission of everything

12  or, you know, a summary and those underlying documents would

13  have already -- the authenticity would have already been

14  established.

15     MR. SCHALL:  Your Honor, we would love to move through

16  this witness all the AT&T records that we previously identified

17  before the government --

18     THE COURT:  I am just asking, and I haven't heard a

19  good answer, why would the jury need 99,000 pages of numbers?

20     MR. SCHALL:  Your Honor, the underlying information

21  would need to be admissible for that.

22     THE COURT:  Admissible isn't admitted.  It's

23  admissible, all right?  And if you don't have an objection to

24  the admissibility of that or if you want to establish the

25  authenticity of that through the witness, then it would seem

Philip Fanara - Redirect

1    that you wouldn't have a problem under the rule having a

2    summary exhibit.

3         MR. SCHALL:  So, Your Honor, just so that I

4    understand, you would be willing for us to authenticate

5    additional AT&T documents through this custodian so he doesn't

6    have to be recalled or --

7         THE COURT:  If Exhibit 8000, which seems to be

8    everything, has already been authenticated, which it sounds

9    like it has, then what additional foundation would need to be

10   laid through Mr. Fanara in order to prepare a Rule 1006

11   exhibit?

12        MR. SCHALL:  So to be clear, Your Honor, Exhibit 8000

13   is not the entirety of the AT&T records.  There are a number of

14   underlying toll records.  All the non-excerpted documents on

15   this, as well as additional records that we have identified, so

16   8000 isn't all encompassing the AT&T records.  It's just one

17   complete toll record.

18        THE COURT:  The bottom line is that until you are able

19   to have Mr. Fanara authenticate whatever is outside of the

20   excerpts that he looked at or ask him questions that would

21   establish that despite the fact that he was only asked to

22   authenticate excerpts that he has looked at the rest of the

23   documents, not just the excerpts, and can authenticate that, I

24   don't see a way for us now to be able to prevent his return.

25   But if you have additional questions for him, I would be happy

Philip Fanara - Redirect

1   to entertain those so that we can save Mr. Fanara a return

2   trip.

3           MR. SCHALL:  Our questions would necessarily go

4   outside the scope, if Your Honor is okay with that.

5           THE COURT:  Any objection to that, Ms. Butte?

6           MS. BUTTE:  We would like to have some notice of --

7           THE COURT:  You have notice.  Every one that says

8   Excerpt on your list, those.

9           MS. BUTTE:  We don't object to the authentication of

10  those documents and --

11          THE COURT:  The entirety of those?  You will stipulate

12  to the authenticity of the documents that -- for everything

13  that's listed on 9656 that says Excerpt, you are stipulating to

14  the authenticity of the entirety of that document?

15          MS. BUTTE:  Yes.  And I believe Your Honor actually

16  already previously ruled on these records as part of your

17  ruling on the 902(14) as authentic records.

18          THE COURT:  Yeah, I don't know that, but that may be

19  true.  The question is you are stipulating to the authenticity?

20          MS. BUTTE:  Yes.  We believe these documents are

21  authentic.  And just for point of clarification, there are

22  excerpts on here.  There are also full sets of toll records.

23  But there is also subscriber information which is a different

24  form of record that Mr. Fanara has testified about.  And the

25  subscriber information we have listed here are not excerpts of

Philip Fanara - Redirect

1      those documents.  They are not voluminous.  They vary from 10

2      to 20, 30 pages.

3              THE COURT:  I understand, but what we are talking

4      about now are the excerpts.

5              MS. BUTTE:  I just wanted to make sure that it was

6      clear that --

7              THE COURT:  We don't want to go too far afield.  We

8      are trying to pin this one down.  So we are only talking about

9      excerpts.

10             Mr. Schall, does that then satisfy the concern that

11     you had?

12             MR. SCHALL:  The stipulation as to authenticity of

13     excerpts?

14             THE COURT:  No, the authenticity of the entirety of

15     the record, you know, because your concern was going outside of

16     the excerpt; not just the authenticity of the excerpt, but the

17     authenticity of whatever the entirety of that particular

18     document was.  And Ms. Butte has stipulated to the authenticity

19     of the entirety of the document for everything listed on 9656

20     that says Excerpt.

21             MR. SCHALL:  Yes, that would help with the

22     authenticity of the underlying records identified here.  I

23     think we were also talking about additional AT&T records to

24     avoid recalling this custodian which would be necessarily

25     outside the scope as well.

Philip Fanara - Redirect

1        THE COURT:  Additional records that aren't listed

2    here.

3            MR. SCHALL:  Yes, Your Honor.

4        THE COURT:  I don't know how we avoid that.

5            Ladies and gentlemen, we are way past what the break

6    should have been, and as a result, let's go ahead and take our

7    break now.  We will plan on reconvening at quarter of, all

8    right, quarter of 11:00.

9            The jury is excused for the mid-morning break.

10           (Jury excused.)

11           We will be in recess.

12       (Recess at 10:25 a.m.)

13       (Reconvened at 10:48 a.m.)

14       THE COURT:  Let's bring the jury back in and let's

15   bring Mr. Fanara back in.

16           (Jury present.)

17       THE COURT:  All right.  So here is my ruling, and that

18   is I am admitting each of the exhibits, those listed on

19   Exhibit 9656.  I am also going to admit 9656 which is the list.

20   And Ladies and Gentlemen of the Jury, you'll remember that we

21   displayed a list of documents to you way back when, it was last

22   week, that had a long list of exhibits.  I am going to admit

23   that document too.  It was shown to you, so we are going to go

24   ahead and admit that.  That was Exhibit 9556.

25           And Mr. Schall, as to your request, I am going to deny

Philip Fanara - Redirect

1    that because I can't figure out what those documents actually

2    are.  But once again, if you wanted to lay some additional

3    foundation with Mr. Fanara right now, you can, but right now I

4    just don't see how we could necessarily prevent Mr. Fanara from

5    having -- from being subject to recall.

6            MR. SCHALL:  Yes, Your Honor, if I can ask maybe a

7    handful of questions.

8            THE COURT:  You may do so right now.  Go ahead.

9            MS. BUTTE:  May I just have one clarification?  The

10   exhibit list is 9656.

11           THE COURT:  Yes, I am sorry.  If I misspoke, the

12   exhibit list that we're talking about right now is 9656, but I

13   admitted 9556 from last week.

14           MS. BUTTE:  Thank you.

15           THE COURT:  Mr. Schall, go ahead.

16   BY MR. SCHALL:

17   Q.  Mr. Fanara, the process you talked about AT&T going through

18   collecting and producing documents, is that the same process

19   AT&T uses for all subpoenas that it receives?

20   A.  Yes.

21   Q.  The exact same collection, the exact same production?

22   A.  Well, it's a different report and so forth.

23   Q.  But it would follow the exact same process?

24   A.  Yes.

25           MR. SCHALL:  No further questions, Your Honor.

Kenneth Oliver - Direct

1    *THE COURT:*  Any additional follow-up questions as to

2    Mr. Schall's question?

3         *MS. BUTTE:*  No further questions, Your Honor.

4         *THE COURT:*  So Mr. Fanara, you're subject to recall,

5    we'll see, but if that's necessary, someone will let you know.

6    Thank you very much, Mr. Fanara.  You are excused.

7         And Ms. Butte, if you would like at this time to -- in

8    fact, I will ask that you display through the document viewer

9    Exhibit 9656.

10        *MS. BUTTE:*  Thank you, Your Honor.

11        *THE COURT:*  Okay.  We can do that for the second page.

12   And third page.  Everyone done with that?  Okay, and the fourth

13   page.  And last, but not least, the fifth page.

14        All right.  Thank you, Ms. Butte.  Anything else?  You

15   have a next witness?

16        *MS. BUTTE:*  Our next witness is ready, Your Honor.

17        *THE COURT:*  You may call your next witness.

18        *MS. BUTTE:*  The United States calls Ken Oliver.

19      (**Kenneth Oliver** was sworn.)

20        *THE WITNESS:*  I do.

21        *COURT DEPUTY CLERK:*  Please state your name and spell

22   your first and last name for the record.

23        *THE WITNESS:*  Kenneth Oliver, K-E-N-N-E-T-H,

24   O-L-I-V-E-R.

25                    **DIRECT EXAMINATION**

Kenneth Oliver - Direct

1    *BY MS. BUTTE:*

2    Q.   Good morning, Mr. Oliver.  Where do you work?

3    A.   I work at FTI Consulting as a managing director in the

4    digital forensics investigations team.

5    Q.   Where did you work before FTI Consulting?

6    A.   Before FTI Consulting I spent two years working for

7    Consilio.

8    Q.   Where did you work before Consilio?

9    A.   Before Consilio I worked at The Oliver Group.

10   Q.   What were your responsibilities at The Oliver Group?

11   A.   At The Oliver Group I was vice-president and partner for

12   the data acquisition and forensics team which I managed for our

13   international group.

14   Q.   Was The Oliver Group retained by Tyson Foods or a firm on

15   behalf of Tyson Foods?

16   A.   It was.

17   Q.   What was The Oliver Group retained to do?

18   A.   It was retained to forensically collect evidence.

19   Q.   What type of evidence did The Oliver Group forensically

20   collect?

21   A.   In this matter, computer hard drives.

22   Q.   Did that include laptops of Tyson Foods employees?

23   A.   It did.

24   Q.   What did The Oliver Group do to collect data from those

25   laptops?

Kenneth Oliver - Direct

1  *A.*  We had the custodians meet us in a conference room where I

2  was -- where I had them log into their devices.  And I used FTK

3  imager to perform a live forensic image.

4  *Q.*  Did you image the laptop of Richard Collyar?

5  *A.*  I did.

6  *Q.*  When did that occur?

7  *A.*  That was on July 10th, 2019.

8  *Q.*  Could you briefly explain the process for imaging

9  Mr. Collyar's laptop?

10  *A.*  Sure.  Again, as described, I met with the custodian in a

11  private conference room where they logged into their device to

12  give us access to the file system.  We then used a forensic

13  tool called FTK imager to create a bit level image of the

14  device.

15  *THE COURT:*  Mr. Oliver, do you mind, if you could lean

16  into that microphone just a little bit.

17  *BY MS. BUTTE:*

18  *Q.*  Did you do anything to verify the image once you collected

19  it?

20  *A.*  Yes.  As part of our standard process, we provide a hash

21  verification of the forensic image.

22  *Q.*  What is a hash verification?

23  *A.*  Basically it's a -- it would be considered to be a digital

24  fingerprint of the image -- the forensic image file which

25  identifies it as being unique.

Kenneth Oliver - Direct

1    *Q.*  And is your imaging process and hash verification value

2    analysis a reliable process?

3    *A.*  It is.

4    *Q.*  Is it accurate?

5    *A.*  It is.

6            *MS. BUTTE:*  I would like permission to hand the

7    witness through Ms. Grimm Government Exhibit 3074.

8            *THE COURT:*  You may.

9            *MR. TUBACH:*  Do you have a copy for counsel?

10           Can we be heard briefly on side bar?

11           *THE COURT:*  Yes.

12       (At the bench:)

13           *THE COURT:*  Mr. Tubach, go ahead.

14       *MR. TUBACH:*  Your Honor, I believe we had a rule in

15   place that the government was to provide two days' notice of

16   any exhibit they intended to show a witness.  I don't believe

17   we got this within two days.  I believe this came in late last

18   night sometime.  And this witness is a new witness that was

19   disclosed to us just recently.

20           *THE COURT:*  All right.  And for relief what are you

21   seeking?

22       *MR. TUBACH:*  That the witness not be allowed to be

23   shown the document.

24           *THE COURT:*  Response, Ms. Butte?

25           *MS. BUTTE:*  Yes, Your Honor.  These were documents

Kenneth Oliver - Direct

1    that we had tried to authenticate with Mr. Gresch.  He

2    testified Mr. Oliver was the one who actually performed the

3    database collection process for these; and as a result, we

4    sought to call Mr. Oliver.  Unfortunately, due to his travel

5    schedule, today was the only day he is available to testify

6    within the next week and a half.  He is going to be flying to

7    London tomorrow.

8            *THE COURT:*  Okay.  Anything else, Mr. Tubach?

9            *MR. TUBACH:*  No, Your Honor.

10           *THE COURT:*  All right.  I will overrule the request.

11   It seems as if this is one of those instances where due to

12   witness availability, the government could not give the

13   appropriate advance notice.  That does, of course, happen in

14   the course of a trial.  And Ms. Butte has described his

15   availability as being -- would only be available after the

16   point that the government finished its case according to its

17   most recent estimation.

18           Thank you.

19      (In open court:)

20   *BY MS. BUTTE:*

21   *Q.*  Mr. Oliver, have you reviewed Government Exhibit 3074?

22   *A.*  I have.

23   *Q.*  When did you review it?

24   *A.*  Yesterday.

25   *Q.*  What did you do to review it?

Kenneth Oliver - Direct

1   *A.*  We -- I looked at the evidence in the review platform and

2   was able to understand that it came from a forensic image that

3   we were then able to look at the file path.  And we were able

4   to validate the image file using the hash values of the

5   original versus what was ingested into the review platform?

6   *Q.*  And where did the document originate from?

7   *A.*  Mr. Collyar's laptop.

8   *Q.*  To the best of your knowledge, is this document a true and

9   accurate copy of the original that was from Mr. Collyar's

10  laptop?

11  *A.*  It is.

12  *Q.*  And how do you know that?

13  *A.*  Because we were able to validate it back through the

14  forensic validation process using the hash value from the

15  original image.

16  *Q.*  Did you ever image the laptop of Carl Pepper?

17  *A.*  Yes.

18  *Q.*  When did that occur?

19  *A.*  July 10th, 2019.

20  *Q.*  Could you briefly explain the process for imaging

21  Mr. Pepper's laptop?

22  *A.*  Sure.  We had Mr. Pepper meet us in a private conference

23  room where I required him to log into his machine to give us

24  access to the file system.  We then used FTK imager to write

25  out his forensic level image to an external USB hard drive.

Kenneth Oliver - Direct

1    Q.  Did you perform any other verification analysis once you

2    created the image?

3    A.  Once the image is completed, there is a self-validation

4    process that runs through and calculates the MD5 and SHA-1

5    Checksum, which is the -- which validates the image as

6    identical.  We also open up the image to validate that we're

7    able to access the information.

8    Q.  Is the imaging and hash verification value process

9    reliable?

10   A.  It is.

11   Q.  Is it accurate?

12   A.  It is.

13           MS. BUTTE:  Permission to hand the witness through

14   Ms. Grimm Government Exhibits 9211 and 9212.

15           THE COURT:  You may.

16   BY MS. BUTTE:

17   Q.  And Mr. Oliver, have you reviewed Government Exhibits 9211

18   and 9212?

19   A.  I have.

20   Q.  When did you review them?

21   A.  Yesterday evening.

22   Q.  What did you do to review them?

23   A.  We were able to -- I was able to log into the review

24   platform where these documents were produced from and follow

25   the logical file path back to the original image which it was

Kenneth Oliver - Direct

1    captured from.  We were able to then validate the hash values

2    of the image to ensure that they were identical to the original

3    evidence that was captured on July -- in July.

4    Q.  And where did the document originate from?

5    A.  A PST file located on Mr. Pepper's laptop.

6    Q.  To the best of your knowledge, are these documents true and

7    accurate copies of the originals that were on Mr. Pepper's

8    laptop?

9    A.  They are.

10   Q.  And how do you know that?

11   A.  Because we could validate the evidence through the

12   verification process using the hash values.

13           MS. BUTTE:  May I have a moment to confer?

14           THE COURT:  You may.

15           MS. BUTTE:  No further questions.

16           THE COURT:  Thank you.

17           Cross-examination?

18           All right.  Thank you very much, Mr. Oliver.  You are

19   excused.  One or more of the defendants may request that you be

20   called in the event that they choose to present evidence, but

21   someone will get ahold of you in the event that that is

22   necessary, all right?

23           THE WITNESS:  Great.

24           THE COURT:  All right.  Thank you.

25           The United States may call its next witness.

Robert Lewis - Direct

1       MR. TORZILLI:  Thank you, Your Honor.  The United

2   States calls Bob Lewis.

3       THE COURT:  That was Robert Lewis?

4       MR. TORZILLI:  Yes.

5    (**Robert Lewis** was sworn.)

6       THE WITNESS:  I do.

7       COURT DEPUTY CLERK:  Please state your name and spell

8   your first and last name for the record.

9       THE WITNESS:  Robert, R-O-B-E-R-T; B-U-R-L; Lewis,

10  L-E-W-I-S.

11                      **DIRECT EXAMINATION**

12  BY MR. TORZILLI:

13  Q.  Good morning, Mr. Lewis.

14  A.  Good morning.

15  Q.  Can you tell the Ladies and Gentlemen of the Jury what your

16  current occupation is?

17  A.  I am currently retired.

18  Q.  Did you ever work in the chicken business?

19  A.  Yes.

20  Q.  What year did you start working in the chicken business?

21  A.  1973.

22  Q.  When you started working in the chicken business in 1973,

23  what were you doing?

24  A.  I was a buyer in the purchasing department with the USA

25  division.

Robert Lewis - Direct

1   Q.   Of what?  Of what company?

2   A.   Oh, of KFC Corporation.

3   Q.   And KFC corporation, what does that stand for?

4   A.   Kentucky Fried Chicken.

5   Q.   How long were you in that position?

6   A.   Approximately, 10 years.

7   Q.   And then where did you go to work?

8   A.   In 1984 I was promoted to director and transferred to

9   Miami, Florida, to run an export operation there for KFC

10  International.

11  Q.   How long were you in Miami in that position?

12  A.   Approximately, four years.

13  Q.   Then where did you go?

14  A.   I was transferred back to Louisville as the director of

15  purchasing and distribution for KFC International.

16  Q.   How long did you stay in that position?

17  A.   Approximately, five years or so.

18  Q.   And then what did you do, Mr. Lewis?

19  A.   I moved back into the KFC USA division and became a member

20  of the poultry team.

21  Q.   What did you do next?

22  A.   Purchased further processed and fresh chicken for KFC.

23  Q.   And what was your next position after that?

24  A.   In 1999 I moved to a purchasing cooperative called UFPC or

25  Unified Food Service Purchasing Co-op and continued working in

Robert Lewis - Direct

1    the fresh chicken area.

2    *Q.*  Did UFPC change its name at some point in time?

3    *A.*  It did.  It became RSCS, which is Restaurant Supply Chain

4    Solutions.

5    *Q.*  How long were you with Restaurant Supply Chain Solutions or

6    RSCS?

7    *A.*  Approximately, 11 years.

8    *Q.*  So approximately until the year 2009?

9    *A.*  That's correct.

10   *Q.*  And what did you do in the year 2009?

11   *A.*  In 2009 I retired.

12   *Q.*  Just a couple of follow-ups on RSCS.  Can you tell the

13   Ladies and Gentlemen of the Jury what RSCS is, what it does?

14   *A.*  RSCS is a purchasing cooperative exclusively for Yum Brands

15   which owns KFC, Taco Bell, Pizza Hut.  Its purpose is to manage

16   the supply chain for all products used by those three concepts.

17   *Q.*  Does RSCS buy chicken?

18   *A.*  Yes.

19   *Q.*  Okay.  Does it negotiate contracts --

20   *A.*  Yes.

21   *Q.*  -- for the purchase of chicken?

22   *A.*  Yes.

23   *Q.*  And who actually buys the chicken that's sold in KFC

24   restaurants?

25   *A.*  RSC actually buys it, but then, of course, it's sold to the

Robert Lewis - Direct

1   KFC restaurants.

2   Q.  And who sells the chicken that's sold in KFC restaurants?

3   A.  The individual operators.

4   Q.  So there is the individual KFC store operators, and who do

5   they buy the chicken from?

6   A.  The individual operators by their chicken through RSCS from

7   approved suppliers.

8   Q.  Mr. Lewis, do you know how a chicken gets from the

9   slaughterhouse to a KFC restaurant?

10  A.  Yes.

11  Q.  Can you describe that process, please?

12  A.  Live birds are brought in from the field to the processing

13  plant.  At the processing plant the birds are placed on a

14  moving shackle line.  The birds are carried into an area where

15  they are stunned and then they are slaughtered.  And then they

16  go through a hot scald to help facilitate the removal of

17  feathers.  The head and feet are then removed.  The birds go

18  through an evisceration process where the internal organs are

19  all removed.  The birds then go through a chilling operation

20  and from there they are dropped into vats by weight or size.

21       And from there they move to what is called second

22  processing for the KFC birds, in this case would be moved to a

23  cut-up line where the product would be cut up, marinated and

24  packaged for delivery to the restaurants.

25  Q.  Are you familiar with the term WOG?

1231

Robert Lewis - Direct

1   *A.*   WOG?  Yes, sir.  Without giblets is what WOG stands for.

2   *Q.*   How is WOG spelled?

3   *A.*   WOG is just W-O-G.

4   *Q.*   And it stands for what?

5   *A.*   Without giblets.

6   *Q.*   What's a WOG?

7   *A.*   A WOG is a whole bird.

8   *Q.*   What's removed from the whole bird?

9   *A.*   The viscera or the internal organs.

10  *Q.*   Are you familiar with a term called eight-piece?

11  *A.*   Yes.

12  *Q.*   Is that a chicken product?

13  *A.*   It is.

14  *Q.*   What's an eight-piece chicken product?

15  *A.*   The birds that I described earlier that are moved into the

16  second processing are cut into eight pieces from the WOG, and

17  those are the products that end up in the restaurants in cut-up

18  form.

19  *Q.*   How popular is eight-piece chicken products in KFC

20  restaurants?

21  *A.*   Extremely.  It's the primary item sold in a KFC store.

22  *Q.*   Does eight-piece have bone-in?

23  *A.*   Eight-piece is a bone-in product, yes.

24  *Q.*   So it's a bone-in chicken product?

25  *A.*   Yes.

Robert Lewis - Direct

1   Q.   Where are KFC restaurants located?

2   A.   All across the country and around the world.

3   Q.   Do chicken products going to KFC restaurants from the

4   slaughterhouses, so the chicken processing facilities, do they

5   cross state lines?

6   A.   Yes.

7   Q.   How do you know that?

8   A.   From experience.

9   Q.   You said you retired from RSCS approximately 2009; is that

10  correct?

11  A.   That's correct.

12  Q.   Was there a time when you returned to RSCS?

13  A.   Yes.

14  Q.   Approximately when did that occur?

15  A.   2014.

16  Q.   Why did you return to work at RSCS?

17  A.   The individual who had been heading up the poultry group

18  left abruptly and KFC was in the middle of the Mother's Day

19  period, which is the highest demand period for KFC throughout

20  the year, and they wanted me to come back to help them secure a

21  supply.

22  Q.   When you first came back to RSCS in 2014, how long were you

23  supposed to stay?

24  A.   Two months.

25  Q.   How long did you in fact stay?

Robert Lewis - Direct

1    *A.*   Seven months.

2    *Q.*   Why did you stay seven months rather than the two months

3    you were supposed to stay when you started?

4    *A.*   Well, after the two-month period was about to end, which

5    would have covered the Mother's Day period, July the 4th

6    holiday became -- well, it came upon us.  And we had the same

7    issue with supplies, so they asked me to stay for a couple more

8    months.  And then the contract I had with them was extended

9    again that carried me till the end of the year.

10   *Q.*   Approximately what time of year did you return to RSCS in

11   2014?

12   *A.*   Early May.

13   *Q.*   What was the first task you were asked to work on when you

14   returned to RSCS in May of 2014?

15   *A.*   Secure fresh chicken supply for KFC stores.

16   *Q.*   What issues -- what, if any, issues was RSCS facing with

17   respect to the supply of chicken at that time?

18   *A.*   Well, they were facing store closures if sufficient product

19   wasn't secured.

20   *Q.*   Store closures?

21   *A.*   Yes.

22   *Q.*   Could you explain what was happening that was leading to

23   potential store closures of KFC restaurants?

24   *A.*   Well, fresh bone-in chicken is the most critical item for a

25   KFC restaurant.  And if they don't have a supply, then many

Robert Lewis - Direct

1  times the only alternative they have is to shut the restaurant

2  down.

3  Q.  What's the consequence of a KFC restaurant shutting down?

4  A.  Lost sales and profit that they will never regain.

5  Q.  How bad -- how widespread was the supply shortage when you

6  came on to the scene again at RSCS in May of 2014?

7  A.  It was a national issue.

8  Q.  You mentioned Mother's Day a few moments ago.  Can you

9  explain to the Ladies and Gentlemen of the Jury the

10  significance of Mother's Day for KFC restaurants?

11  A.  Well, traditionally it was a time when children who wanted

12  to celebrate and honor their mother would come to KFC and buy

13  meals to have on Mother's Day and perhaps that weekend.

14  Q.  Is there a busier week in the calendar for KFC restaurants

15  than Mother's Day week?

16  A.  No.

17  Q.  So it's the busiest week of the year?

18  A.  Yes.

19  Q.  Do you have an understanding -- did you develop an

20  understanding in 2014 from KFC restaurant operators as to how

21  they viewed the supply issues that you were facing when you

22  returned to RSCS in May of 2014?

23  A.  Yes.  There was a great deal of anxiety and concern

24  throughout.

25  Q.  And can you explain the nature of the anxiety and concern

Robert Lewis - Direct

1    that you came to understand KFC restaurant operators to be

2    feeling at that time?

3    A.  Well, I would explain it as a near crisis situation.

4    Q.  Okay.  And how about do you have an understanding as to

5    within RSCS as to the feelings or views that they had towards

6    the supply issues that you identified in May of 2014?

7    A.  Yes.  I would call that also a crisis situation.

8    Q.  At around this time, so the May of 2014 time frame when you

9    first came back on the scene at RSCS, how much chicken was the

10   network of KFC restaurants in the United States purchasing?

11   A.  As a total system, chicken on the bone was in the

12   neighborhood of about 400 million pounds per year.

13   Q.  Per year?

14   A.  Per year.

15   Q.  And is that all products or is that just the eight-piece

16   bone-in chicken?

17   A.  That would be the eight-piece product plus the supplemental

18   dark meat, wings and white meat, which represents a small

19   percentage of the total, but it includes all bone-in product.

20   Q.  Can you explain what supplemental dark, white and wings

21   meat are?

22   A.  Supplemental dark, white and wings are exactly the same

23   product as the full eight-piece product.  It's just that some

24   markets have customers that prefer white meat over dark meat so

25   they needed extra supplies while other areas prefer dark meat

Robert Lewis - Direct

1  over white meat so they purchased dark meat to satisfy their

2  customers.

3  Q.  What did you do to address what you described as the crisis

4  level of supply shortage that the KFC restaurant network in the

5  United States was facing in May of 2014?

6  A.  I'm sorry, would you repeat that question?

7  Q.  Absolutely, sir.

8       What did you do to attempt to address the supply

9  issues that you described as being at crisis level in the

10 May 2014 time frame?

11 A.  When I first got there, the first thing I did was try to

12 assess the situation to determine how serious was the problem,

13 what had already been done in an attempt to rectify the

14 situation, take a look at the existing contracts to see the

15 suppliers -- who the suppliers were that were involved and how

16 much they were committed to supplying, and just had general

17 conversations with the folks that were already in place just to

18 get a feel for what we were facing.

19 Q.  So one of the things you did was review the existing

20 contracts you said?

21 A.  Yes.

22 Q.  And so can you explain what existing contracts you reviewed

23 at that time?

24 A.  Those contracts took the form of an SBRA addendum which

25 would be attached to the master SBRA, as we call it, that we

Robert Lewis - Direct

1  had signed with the suppliers.

2  Q.  So for what calendar year were the SBRA addendums for?

3  A.  2014.

4  Q.  And for the benefit of the Ladies and Gentlemen of the

5  Jury, can you explain what SBRA stand for and what it means?

6  A.  SBRA stands for Supplier Business Relationship Agreement.

7  It is a confidential agreement that we sign with each of the

8  approved suppliers that basically contains two major pieces.

9  One would be the master agreement itself which covers all the

10  terms and conditions that govern the relationship.  And the

11  second part of it would be the SBRA addendums which I just

12  mentioned that cover the details of the products that we are

13  securing from each supplier.

14  Q.  You said that as part of your first task, you were trying

15  to rectify the supply crisis that KFC restaurants were facing.

16  Can you describe to what extent you were successful in that

17  effort?

18  A.  We were successful in covering the Mother's Day demand.

19  Q.  How did you go about doing that?

20  A.  Working with the existing approved suppliers.

21  Q.  Did there come a time in that process, Mr. Lewis, where you

22  had to purchase chicken at prices that were above the agreed to

23  contracted prices?

24  A.  Yes.

25  Q.  Could you explain that situation, please?

Robert Lewis - Direct

1  A.  Well, product that was required over and above the

2  contractual agreement, I don't remember the number of loads

3  exactly, but those truckloads of product were purchased at a

4  premium to the price that was in the SBRA addendums.

5  Q.  Do you remember approximately how much of a premium above

6  the contracted prices?

7      MR. McLOUGHLIN:  Objection, Your Honor.  Unless we are

8  going to ask about every supplier's contract price, each one

9  would be different so you would have a different amount.

10     THE COURT:  Overruled.  He can answer if he knows.

11 BY MR. TORZILLI:

12 Q.  You can answer.

13 A.  I don't recall the specific numbers.

14 Q.  Okay.  Do you remember approximately?

15     MR. McLOUGHLIN:  Objection.  The witness has said he

16 doesn't recall.

17     MR. TORZILLI:  He said he didn't recall specifically.

18     THE COURT:  Overruled.  He can give a general answer.

19 A.  I'm going to say that it was probably in the neighborhood

20 of 6 to 8 cents per pound premium for part of it.  And then at

21 one stage after we had secured the product that we felt we

22 needed, senior management at RSCS instructed me to go out and

23 buy 10 insurance loads, and they told me the price to pay for

24 that 10 loads of product.  It was not negotiated.

25 BY MR. TORZILLI:

Robert Lewis - Direct

1   Q.   Do you recall for the 10 truckloads of insurance what the

2   price was above the contracted price?

3   A.   The price was $1.40 FOB the plant per pound.

4   Q.   So $1.40 for eight-piece chicken-on-the-bone product?

5   A.   Correct.

6   Q.   And approximately how much within a range, if you recall,

7   was the contract price at that time?

8   A.   The contract price at that time averaged approximately 92

9   cents per pound.

10  Q.   So almost a 50-cent premium above contracted price?

11  A.   Correct.

12  Q.   After you were successful in rectifying the supply issues

13  that you described, what did you wind up taking on next as a

14  task at RSCS in 2014?

15  A.   In the absence of a department head, they asked me to stay

16  on and to be the point person for 2015 price negotiations.

17  Q.   Can you describe what you mean by 2015 price negotiations?

18  A.   That was a process where each of the approved suppliers

19  were contacted and we pursued proposals from them to cover the

20  calendar year 2015 chicken demand from KFC.

21  Q.   Did you work with others at RSCS to conduct the price

22  negotiations for the following year, 2015?

23  A.   Yes.

24  Q.   Who did you work with?

25  A.   Well, I worked with the individual that I was -- I guess

Robert Lewis - Direct

1  you could say was reporting to, a gentleman by the name of Pete

2  Suerken, who was senior vice-president of RSCS, and an

3  individual that was on the poultry team by the name of Steve

4  Campisano.  And then eventually the new department head that

5  was hired came into the team, and his name was Rich Eddington.

6  Q.  So first taking Mr. Suerken, what was Mr. Suerken's role in

7  the price negotiations?

8  A.  I guess you could call Mr. Suerken the quarterback of the

9  team.  He was -- he was the individual that I had to go to to

10 get final approval on everything that I was attempting to

11 accomplish.

12 Q.  And what was Mr. Eddington's role in price negotiations?

13 A.  Mr. Eddington's role was basically an observer for a period

14 of time because he was new to the business.  And part of my

15 responsibility during that period was to help Mr. Eddington get

16 acclimated, but he eventually took over the day-to-day

17 activities and actually ended up signing all of the SBRA

18 addendums.

19 Q.  Do you recall an approximate time frame where Mr. Eddington

20 took over for you as the day-to-day or the point person on

21 these price negotiations?

22 A.  I would say that was in the September, October period

23 perhaps.

24 Q.  And Mr. Campisano, what was his role in the price

25 negotiations?

Robert Lewis - Direct

1    A.   Mr. Campisano was basically the poultry group's

2    representative from the distribution side.  Once the product is

3    purchased from the supplier, of course, we have to get the

4    product to the restaurants.  And he was involved in that part

5    of the business, to work with the distribution companies to get

6    the product to the restaurants.

7    Q.   So Mr. Lewis, in your role participating in the price

8    negotiations in 2014, did you have communications with chicken

9    suppliers that Mr. Suerken or Mr. Eddington or Mr. Campisano

10   weren't a party to?

11   A.   No.

12   Q.   So they were involved in all the communications that you

13   had with chicken suppliers?

14   A.   They were involved in all of the meetings that we had with

15   suppliers.  They were not necessarily the originators of

16   written correspondence to the suppliers.  I did most of that.

17   Q.   And you mentioned approved chicken suppliers.  Who were the

18   approved chicken suppliers going into the contract negotiations

19   in 2014?

20   A.   There were six approved suppliers at that time, Pilgrim's

21   Pride, Tyson Foods, Mar-Jac Poultry, Koch Foods, Claxton

22   Poultry and George's.

23   Q.   Can you describe the process that you and the team you were

24   working with went about to conduct the contract price

25   negotiations in 2014?

Robert Lewis - Direct

1    A.   The first step was to obtain from KFC Corporation a demand

2    forecast.   The demand forecast told us pretty much on a weekly

3    basis how many pounds of the chicken-on-the-bone product would

4    be required to keep the restaurants operating.   Once we had

5    that information, then we approached the suppliers and asked

6    them to submit proposals to include the FOB price and the

7    number of truckloads or pounds that they were willing to commit

8    to for the following year for 2015.

9         And once we received those initial proposals, they

10   were analyzed.   And if there were any questions or concerns,

11   then we would approach the suppliers to get clarification.   And

12   then we eventually finalized the proposals.   We had final

13   agreement.   And then the SBRA addendums were prepared and

14   distributed.

15   Q.   Through that process, Mr. Lewis, did you consider those six

16   approved chicken suppliers to be in competition with each other

17   during these price negotiations?

18   A.   Yes, I did.

19   Q.   In what ways were these six approved chicken suppliers

20   competing against one another during these price negotiations?

21   A.   Well, we worked with each one of them independently and

22   sought to receive from each one their proposal.

23   Q.   And what were the principal parts of the proposal that you

24   were looking to receive from each of the six competing

25   suppliers?

1243

Robert Lewis - Direct

1   *A.* Well, at that particular point in time since supply had

2   been so top of mind with everyone, we were first looking to see

3   how much product they could supply, were willing to supply.

4   And then secondarily, we were interested in the lowest FOB

5   cost.

6   *Q.* The lowest FOB -- I didn't hear that last word.

7   *A.* FOB cost.

8   *Q.* Lowest FOB cost.

9   *A.* Uh-huh.

10  *Q.* Who at Pilgrim's were you conducting price negotiations

11  with in 2014?

12  *A.* Roger Austin.

13          *MR. TORZILLI:* Can we call up Exhibit 9235?

14          Your Honor, with the assistance of Ms. Grimm, can I

15  hand up a binder?

16          *THE COURT:* Yes, you may.

17  *BY MR. TORZILLI:*

18  *Q.* Mr. Lewis, you have a binder in front of you.  Can you turn

19  to Tab 7?  Tab 7 should have Government Exhibit 9235.

20  *A.* Yes.

21          *MR. TORZILLI:* Your Honor, this I believe has been

22  admitted into evidence and would ask that it be published to

23  the jury.

24          *THE COURT:* It may.

25  *BY MR. TORZILLI:*

Robert Lewis - Direct

1   Q.   Mr. Lewis, do you recognize Exhibit 9235?

2   A.   Yes.

3   Q.   What is 9235?

4   A.   It's a picture of Roger Austin.

5   Q.   And a fair and accurate -- is it a fair and accurate

6   depiction of Defendant Roger Austin?

7   A.   Yes.

8   Q.   How long have you known Roger Austin?

9   A.   Approximately, 15 years.

10  Q.   Do you know him professionally?

11  A.   Yes.

12  Q.   In what capacity do you know him professionally?

13  A.   He and I worked very closely together to supply KFC with

14  chicken.

15  Q.   So you have negotiated prices with Mr. Austin even before

16  2014?

17  A.   Yes, prior to my retirement, yes, I did.

18  Q.   And would you consider yourself to have had a personal

19  relationship with Mr. Austin?

20  A.   Yes.

21       MR. TORZILLI:  We can take that down.

22  A.   I am sorry, may I ask you what you consider personal

23  relationship?

24  BY MR. TORZILLI:

25  Q.   Well, let me ask you, sir, if you can explain what the

Robert Lewis - Direct

1  totality of your relationship is, then, if you're maybe unsure

2  of whether it's personal or professional.

3  A.  We did things together outside of the business realm.

4  Might play golf, might go to dinner.  I have been in his home a

5  couple of times.  I know his wife.  I have met his children.

6  Pretty much it.

7  Q.  Sir, if you'll go to Tab 8 in your binder.  It's an exhibit

8  marked as 9237.

9          MR. TORZILLI:  And I believe it's already been

10  admitted.  And Your Honor, I would ask permission to publish.

11          THE COURT:  Let me just check that.  It has been.  You

12  may.

13          MR. TORZILLI:  Thank you, Your Honor.

14  BY MR. TORZILLI:

15  Q.  Mr. Lewis, what is Exhibit 9237?

16  A.  9237 is a picture of Scott Brady.

17  Q.  In 2014 was Scott Brady someone that you were negotiating

18  prices with?

19  A.  Yes.

20  Q.  What company was Scott Brady working for at that time?

21  A.  He was working for Claxton Poultry.

22  Q.  Claxton Poultry?  Is the picture that's contained within

23  Exhibit 9237 in your view a fair and accurate depiction of

24  Defendant Scott Brady?

25  A.  Yes.

Robert Lewis - Direct

1    Q.  How long have you known Defendant Scott Brady?

2    A.  Probably more than 10 years.

3    Q.  Did you negotiate prices with Scott Brady before 2014, if

4    you recall?

5    A.  I -- I am not sure about that.

6    Q.  During 2014 was there anyone else working for Claxton

7    Poultry that was involved in the price negotiations that you

8    were conducting?

9    A.  Yes.

10   Q.  Who else?

11   A.  Mikell Fries.

12   Q.  Can you turn to Tab 9 in the binder in front of you?  You

13   should see Government Exhibit 9240.  Are you there?

14   A.  Yes.  I am sorry, yes.

15   Q.  What's Government Exhibit 9240?

16   A.  That is a picture of Mikell Fries.

17   Q.  Is it a fair and accurate depiction of Defendant Mikell

18   Fries?

19   A.  Yes.

20         MR. TORZILLI:  Your Honor, move to admit 9240.

21         THE COURT:  Any objection to the admission of Exhibit

22   9240?

23         MR. KORNFELD:  Your Honor, just reiterating the

24   arguments we made in the pleadings regarding the photos.  There

25   is no question that these gentlemen know each other.

Robert Lewis - Direct

1          THE COURT:  Any objection?  Exhibit 9240 will be

2    admitted.

3          MR. TORZILLI:  May we publish, Your Honor?

4          THE COURT:  You may.

5    BY MR. TORZILLI:

6    Q.  How long have you known Defendant Mikell Fries?

7    A.  Probably more than 15 years.

8    Q.  Did you negotiate prices with Defendant Mikell Fries prior

9    to 2014?

10   A.  Yes.

11   Q.  I would ask you to turn to Tab 10 in your binder,

12   Government Exhibit 9251.

13   A.  Yes.

14   Q.  What's Government Exhibit 9251?

15   A.  It's a picture of Brian Roberts.

16   Q.  Did you negotiate prices in 2014 with Brian Roberts?

17   A.  Yes.

18   Q.  What company was he working for at that time?

19   A.  Tyson Foods.

20         MR. TORZILLI:  Your Honor, I believe 9251 has already

21   been admitted.

22         THE COURT:  It has.

23         MR. TORZILLI:  And would ask to publish.

24         THE COURT:  You may.

25         MR. TORZILLI:  Thank you.

Robert Lewis - Direct

1   *BY MR. TORZILLI:*

2   Q.  How long have you known Defendant Brian Roberts?

3   A.  Probably more than 15 years.

4   Q.  Do you consider Brian Roberts to be a friend of yours?

5   A.  Yes.

6   Q.  Did you know him personally or do things that were beyond

7   business dealings?

8   A.  Yes.

9   Q.  Could you describe some examples of that?

10  A.  Similar things as I said before, played golf together, had

11  dinner together, lunch together.  I have been to his home a

12  couple of times.  I know his wife.  I have met his children.

13  That's about it, I guess.

14  Q.  Besides Mr. Roberts was anyone else from Tyson Foods

15  involved in the 2014 price negotiations that you undertook?

16  A.  It seems as though there might have been other individuals

17  there, but I don't remember.  I don't recall if they were.

18  Q.  Can you turn to Tab 14 of your binder?  You should see

19  there Government Exhibit 9247.  Are you there?

20       *MS. PREWITT:*  Objection, Your Honor.  He is leading

21  the witness.

22       *THE COURT:*  Overruled.

23  *BY MR. TORZILLI:*

24  Q.  What do you see in Government Exhibit 9247?

25  A.  A picture of Tim Mulrenin.

1  Q.  Is that a true and accurate depiction of Defendant Timothy

2  Mulrenin?

3  A.  Yes.

4        MR. TORZILLI:  Move to admit 9247.

5        THE COURT:  Any objection to the admission of

6  Exhibit 9247?

7        MS. PREWITT:  Yes, Your Honor.  I object to the

8  admission.  And I don't like my chances prevailing, Your Honor,

9  because I understand you overruled similar objections, but I

10  would like to make one point regarding prejudicial impact.  We

11  are all in this court with masks on our faces.  In essence,

12  this gives the government an opportunity to control my client's

13  image with an unflattering image, although we have offered a

14  substitute, so I am lodging the objection on that basis, Your

15  Honor.

16        THE COURT:  That objection is overruled.  The witness

17  testified that it's a fair and accurate photo.  Exhibit 9247

18  will be admitted.

19        MR. TORZILLI:  Thank you, Your Honor.  Permission to

20  publish?

21        THE COURT:  You may.

22  BY MR. TORZILLI:

23  Q.  Mr. Lewis, do you recall whether Mr. Mulrenin had any role

24  in the price negotiations that you undertook in 2014?

25  A.  I do not recall.

Robert Lewis - Direct

1    *Q.* Can you turn to Tab 11 of your binder?  You should see

2    there Government Exhibit 9242.

3    *A.* Yes.

4         *MR. TORZILLI:* And Your Honor, I believe this was

5    already received into evidence.

6         *THE COURT:* It has been.

7         *MR. TORZILLI:* Ask permission to publish?

8         *THE COURT:* You may.

9    *BY MR. TORZILLI:*

10   *Q.* Mr. Lewis, what's Exhibit 9242?

11   *A.* It's a picture of Bill Kantola.

12   *Q.* Is it a fair and accurate picture of Mr. Kantola?

13   *A.* Yes.

14   *Q.* Did Mr. Kantola have any role in the 2014 price

15   negotiations that you were involved in?

16   *A.* Yes.

17   *Q.* What company was Defendant Bill Kantola working for at that

18   time?

19   *A.* Koch Foods.

20   *Q.* Was that the first time, was 2014 the first time you had

21   done price negotiations with Mr. Kantola?

22   *A.* No.

23   *Q.* So you had done it prior to your retirement?

24   *A.* Yes.

25   *Q.* And how long have you known Defendant Bill Kantola?

Robert Lewis - Direct

1   *A.*  I would say 15 years or so.

2   *Q.*  You mentioned George's as a chicken supplier that was

3   competing in price negotiations at RSCS in 2014.  Did I

4   remember your testimony correctly?

5   *A.*  Yes.

6   *Q.*  What is George's?

7   *A.*  George's is an approved supplier of both fresh chicken, the

8   chicken on the bone and further processed chicken for KFC.

9   *Q.*  Who at George's were you negotiating with in 2014?

10  *A.*  Darrell Keck.

11  *Q.*  Darrell Keck?

12  *A.*  Keck, K-E-C-K.

13  *Q.*  Was anyone else at George's involved?

14  *A.*  Yes.  Ric Blake was involved.  And I believe one of the

15  George's owners was involved, but I'm not definite about that.

16  *Q.*  Can you explain your understanding of the George's

17  ownership structure?

18  *A.*  The George's owners are the George family.  And I believe

19  the father has retired by now, but the two twins, the sons --

20  Charles is one.  I can't remember the other -- are co-CEOs of

21  the company.

22  *Q.*  To the best of your recollection, one of those two twin

23  brothers who are co-CEOs were also involved in the 2014 price

24  negotiations.

25  *A.*  Yes, that's my recollection.

Robert Lewis - Direct

1252

1    *Q.* Along with Mr. Keck?

2    *A.* Yes.

3    *Q.* And along with Mr. Blake?

4    *A.* Yes.

5    *Q.* If you can turn to Tab 12 of the binder in front of you.

6    You should have what's been marked as Government Exhibit 9236.

7         *MR. TORZILLI:* And Your Honor, I believe this has been

8    received into evidence.

9         *MR. POLLAK:* Your Honor, it has not, but we have no

10   objection and we'll stipulate that this is a picture of

11   Mr. Blake.

12        *THE COURT:* 9236 has been admitted.

13        *MR. TORZILLI:* Permission to publish?

14        *THE COURT:* It may be.

15   *BY MR. TORZILLI:*

16   *Q.* Sir, what is Exhibit 9236?

17   *A.* It's a picture of Ric Blake.

18   *Q.* And is it in your view a fair and accurate depiction of

19   Defendant Ric Blake?

20   *A.* Yes.

21   *Q.* Have you negotiated price -- you conducted price

22   negotiations with Defendant Ric Blake prior to 2014?

23   *A.* Yes.

24   *Q.* How long have you known Defendant Ric Blake, approximately?

25   *A.* I would say 10 to 12 years perhaps.

Robert Lewis - Direct

1    Q.   Would you consider Mr. Blake a friend of yours?

2    A.   Yes, I would.

3    Q.   And can you describe maybe some of the things that you did

4    with him if you did that were not necessarily strictly business

5    dealings?

6    A.   Dinners, lunches.  I know he is a great golfer.  I am not

7    sure if I ever golfed with him, but that's probably about the

8    extent of it.

9    Q.   One last photo.  Tab 13 of your binder should have what's

10   been marked as Exhibit 9245.  Are you there?

11   A.   Yes, yes.

12   Q.   What do you see in Exhibit 9245?

13   A.   A picture of Bill Lovette.

14   Q.   Who is Bill Lovette?

15   A.   I know Bill Lovette primarily as an executive with two or

16   three different poultry companies over the years.

17   Q.   So he's someone you know from the chicken business?

18   A.   I'm sorry?

19   Q.   He is someone you know from the chicken business?

20   A.   Correct, yes.

21   Q.   Is the photo appearing in 9245 a fair and accurate

22   depiction of Mr. Lovette?

23   A.   Yes.

24        MR. TORZILLI:  Your Honor, at this time we would offer

25   9245.

Robert Lewis - Direct

1          MR. McLOUGHLIN:  Objection, Your Honor.

2          THE COURT:  It's already been admitted.

3          MR. TORZILLI:  Permission to publish?

4          THE COURT:  You may.

5    BY MR. TORZILLI:

6    Q.  Have you ever in your career negotiated chicken prices with

7    Mr. Lovette?

8    A.  Not that I recall.

9    Q.  You mentioned that one of the steps that you undertook

10   during the price negotiations that you undertook in 2014 was to

11   ask for and receive price proposals; is that accurate?

12   A.  Yes.

13   Q.  Were there any meetings that you were involved in with the

14   competing chicken suppliers in 2014 prior to the submission of

15   those price proposals?

16   A.  Yes.

17   Q.  Could you just describe first generally what your purpose

18   was for conducting those prepricing proposal meetings?

19   A.  In general, it was to talk about what we needed in the way

20   of chicken for the year 2015 and that we were wanting them to

21   submit proposals that would include their price and the supply

22   commitment.  And we also had some other items that were

23   designed to help increase supply over the long term and maybe

24   soften the prices some.  And we had asked them to address those

25   and respond as well.

1255

Robert Lewis - Direct

1    Q.   Did you as part of those meetings meet with Defendant Roger

2    Austin?

3    A.   Yes.

4    Q.   Approximately when did that meeting occur?

5    A.   Early August.

6    Q.   Did you meet with representatives of Claxton Poultry?

7    A.   Yes.

8    Q.   Who from Claxton Poultry did you meet with?

9    A.   That would have been Scott Brady and Mikell Fries.

10   Q.   When approximately did you meet with Defendants Brady and

11   Fries?

12   A.   Early August.

13   Q.   Did you meet with representatives of Tyson?

14   A.   Yes.

15   Q.   Who from Tyson did you meet with?

16   A.   Brian Roberts.

17   Q.   When approximately did that meeting occur?

18   A.   Early August.

19   Q.   Do you recall whether Defendant Timothy Mulrenin was there?

20   A.   No, I do not recall that.

21   Q.   Did you meet with representatives of Koch Foods?

22   A.   Yes.

23   Q.   Who from Koch Foods did you meet with?

24   A.   Bill Kantola.

25   Q.   When did the meeting with Defendant Bill Kantola occur?

Robert Lewis - Direct

1  A.  Early August.

2  Q.  Do you know a precise date?

3  A.  It seems to me it was August 7th.

4  Q.  Do you remember the precise start time of that meeting?

5  A.  9:00 o'clock.

6  Q.  Do you recall how much time was budgeted for that

7  9:00 o'clock meeting on August 7th with Defendant Bill Kantola?

8  A.  Two hours.

9  Q.  So the meeting was budgeted for 9:00 a.m. to 11:00 a.m. on

10  August 7th?

11  A.  Yes.

12  Q.  Did during that meeting Mr. Kantola say he planned to call

13  his competitors after the meeting concluded?

14  A.  No.

15  Q.  Did you ever ask Mr. Kantola to call any of his competitors

16  after the meeting concluded?

17  A.  No.

18  Q.  Did you meet with George's?

19  A.  Yes.

20  Q.  Who from George's did you meet with?

21  A.  Darrell Keck, Ric Blake, and I believe one of the George

22  brothers.

23  Q.  When approximately did the meeting with George's occur?

24  A.  First of August.

25  Q.  Did you meet with Mar-Jac representatives?

Robert Lewis - Direct

1   A.   Yes.

2   Q.   Who from Mar-Jac did you meet with?

3   A.   Greg Tench and Pete Martin.

4   Q.   When did that meeting occur approximately?

5   A.   First part of August.

6   Q.   Sir, if you can now turn to Tabs 15 to 20 in the binder in

7   front of you.

8        MR. TORZILLI:   For the record, those tabs should

9   contain Exhibits 1139, 1138, 1137, 1136, 1135, and 1134.

10  A.   Okay.

11  BY MR. TORZILLI:

12  Q.   Sir, what are those six exhibits?

13  A.   Those are e-mails that I wrote to each of the suppliers

14  that we were negotiating with as a follow-up to the meeting

15  that had been conducted with them in the early part of August.

16       MR. TORZILLI:   Your Honor, at this time we offer those

17  six exhibits.

18       THE COURT:   Can you state them again?

19       MR. McLOUGHLIN:   Objection, hearsay, Your Honor.

20       THE COURT:   Let's take them one at a time, okay?

21  What's the first one, Mr. Torzilli.

22       MR. TORZILLI:   1139.

23       THE COURT:   Any objection to the admission of Exhibit

24  1139?  And I am going to need copies of each.

25       MR. TORZILLI:   Absolutely.  Your Honor, actually if it

1258

Robert Lewis - Direct

1     would facilitate things, I can hand up a copy of this binder.

2             MS. HENRY:  Does the government have copies for the

3     defendants as well, please?

4             MR. TORZILLI:  We provided you the exhibits --

5             THE COURT:  Mr. Torzilli, you don't talk to -- you

6     always address things to the Court.

7             MR. TORZILLI:  Your Honor, we provided exhibit numbers

8     for all these exhibits days ago.

9             THE COURT:  So the answer is no?

10            MR. TORZILLI:  The answer is indeed no.

11            THE COURT:  If you could have Ms. Grimm hand up those

12    copies.

13            MR. GILLEN:  Your Honor, it would be helpful if the

14    government would put on the screen the exhibits to which they

15    are referring to so we don't have to be dealing with a hard

16    copy.

17            THE COURT:  I think that that would be a good idea.

18            MR. GILLEN:  Thank you.

19            THE COURT:  So what tab am I supposed to look at for

20    1139?

21            MR. TORZILLI:  15 to 20.  And Your Honor, I think it

22    can be sort of taken together because the e-mails are -- with

23    one exception that I can get into -- are virtually identical,

24    at least for purposes of the ruling that Your Honor is

25    presently facing.

Robert Lewis - Direct

1          THE COURT:  Through 20?

2          MR. TORZILLI:  Tabs 15 through 20.

3          THE COURT:  They are very similar.  Why don't we take

4     them as a whole.  So the question is any objection to the

5     admission of Exhibits 1139, 1137, 1138, 1135, 1134 and 1136?

6          MR. McLOUGHLIN:  Your Honor, I will withdraw the

7     objection.

8          THE COURT:  Each of those exhibits will be admitted.

9          MR. TORZILLI:  Thank you, Your Honor.

10         THE COURT:  Here is the notebook back unless this is a

11    copy the Court can have, but if you need it, you can take it.

12         MR. TORZILLI:  Thank you.

13         THE COURT:  Ladies and gentlemen, let's -- is this a

14    convenient breaking spot, Mr. Torzilli?

15         MR. TORZILLI:  Yes, sir.

16         THE COURT:  Ladies and gentlemen, we will go ahead and

17    break for lunch.  Keep the yellow juror buttons visible.  Even

18    if you are walking around the hallways of the courthouse, good

19    idea, because of course we will have some witnesses who have

20    never seen you before.  And keep the admonition in mind about

21    not talking to either yourselves -- don't deliberate yet -- and

22    anyone else.

23         The jury is excused for lunch.  We will plan on

24    reconvening at 1:30.  Thank you.

25              (Jury excused.)

Robert Lewis - Direct

1260

1          We will be in recess.  Thank you.

2     (Recess at 12:00 p.m.)

3     (Reconvened at 1:35 p.m.)

4     THE COURT:  Are we ready to go?  Mr. McLoughlin, did

5  you have anything?

6     MR. McLOUGHLIN:  Your Honor, we have one preliminary

7  matter that we would like to try to deal with.

8     THE COURT:  If you don't mind, Mr. Lewis, we are not

9  quite ready for you.  Sorry.  If you don't mind, if you can go

10  back to the witness room for just a minute.  It turned out

11  there was a preliminary issue.

12     MR. McLOUGHLIN:  Your Honor, as you may imagine, we

13  have been scrambling.  I am raising an issue, Your Honor, for

14  either now or whenever Your Honor would like to address it

15  which is Exhibit 9168, which the government moved to admit

16  after the testimony of Mr. Sangalis.  We have because it was

17  listed for Agent Koppenhaver had the opportunity to review it

18  and it is a Form 8-K, which I have for Your Honor and the

19  government if you would like to do it now, that we believe the

20  way it was redacted and not redacted is a clear violation of

21  the Court's order that's document 603 in which you addressed

22  the issue of not disclosing the compensation of Mr. Lovette and

23  Mr. Penn.

24          The document as the government redacted it includes a

25  variety of their compensation, Mr. Lovette's compensation,

Robert Lewis - Direct

1    including his guaranteed bonus of a half million dollars which

2    was guaranteed regardless of the production.  It includes the

3    fact that the company was going to buy his house in Arkansas.

4    And it has unredacted that he was going to get 200,000 shares

5    of restricted stock, all of which goes to his wealth and his

6    lifestyle and was not redacted.

7           Moreover, where they talk about compensation, the

8    government's interpretation of your order was that if the total

9    compensation apparently was not disclosed, they have complied.

10   And therefore the exhibit shows that if the 2011 EBITDA was

11   $400 million, Mr. Lovette would get a bonus that is cash that

12   is disclosed in the exhibit, as is the $500 million EBITDA

13   figure which was a million dollars and above $500 million.  And

14   so the dollar figures or his bonuses are there.

15          It was our belief based on Your Honor's ruling that in

16   order to address this issue of whether there was an incentive

17   for the rise of chicken prices, it would just address the

18   percentages.  Further, this compensation figure --

19          THE COURT:  I am sorry, Mr. McLoughlin, but when you

20   say percentages, what do you mean?

21          MR. McLOUGHLIN:  So if your compensation -- if the

22   EBITDA is above a certain number, then your bonus is 5 percent

23   higher or 10 percent higher.

24          THE COURT:  In other words, the bonus would vary

25   depending on, for instance, profitability.

Robert Lewis - Direct

1          MR. McLOUGHLIN:  Yes, which, of course, isn't directly
2     related to chicken prices at all.  Chicken prices, you think
3     about a company as complex as this company, if you had merely
4     the small percentage of revenue that is addressed by QSR
5     prices, the number of additional factors that affect his bonus
6     and his compensation, the international division and billions
7     of sales --
8          THE COURT:  Let's not get distracted on that issue
9     because that's another argument, but back to this one as to the
10    8-K.
11         MS. CALL:  Your Honor, we can broadcast it if it would
12    be helpful and we have the relevant page up.
13         THE COURT:  I am not sure yet that we are going to
14    take a bunch more time on this issue, but I will let
15    Mr. McLoughlin wrap it up, although maybe he has.
16         MR. McLOUGHLIN:  I have, Your Honor.
17         THE COURT:  Would it be fair, Mr. McLoughlin, to say
18    that the essence of your argument is that the information
19    contained in the 8-K is not information that would suggest to
20    the jury the variability of the bonus based upon chicken sales?
21         MR. McLOUGHLIN:  Yes, and that there is also numbers
22    in here that are clearly totally unrelated to chicken sales
23    because they are guaranteed and there were things like, you
24    know, in signing you're going to get your house bought.
25         THE COURT:  Right.  That's the flip-side of the coin

1263

Robert Lewis - Direct

1    is the other -- the information about salary because it's not

2    linked to those things would be prejudicial.

3         MR. McLOUGHLIN:  Exactly, Your Honor.  It's just the

4    basis in which Your Honor ruled in its order.

5         MR. TUBACH:  I join in this objection on behalf of

6    Mr. Penn.  I won't make any further argument.

7         THE COURT:  Go ahead and give your response.  I am not

8    necessarily ruling on it, but when do you think this may come

9    up, Ms. Call?

10        MS. CALL:  It is towards the latter -- or middle to

11   latter part of Agent Koppenhaver's testimony, so I don't think

12   we will get there today, but there is a possibly.  He is our

13   next witness.

14        THE COURT:  Then why don't you give me your real quick

15   response.

16        MS. CALL:  Sure, yes.  The only portion of the

17   document that the government intends to actually show the jury,

18   and we are happy to redact the rest if necessary, is the

19   portion titled Compensation where we have redacted out the

20   total compensation figure.  The only part we would direct them

21   to is how the bonus structure is tied to EBITDA.

22        THE COURT:  To what?  Spell that for the court

23   reporter just so -- the acronym.

24        MS. CALL:  And correct me if I'm wrong because I am no

25   expert, EBITDA.  And it's frankly just not a percentage based

Robert Lewis - Direct
1264

1    number.  It is based to the actual profits of the company, and

2    then the bonus amount is then a number, so I quite frankly

3    don't know how we could do it as percentages without perhaps

4    another summary.  But that is the only portion we intended to

5    draw the jury to and we would say that the bonus that Defendant

6    Lovette stood to gain from the profits of the company are

7    relevant to the price increases he sought to obtain.

8            THE COURT:  But how would the document itself explain

9    that because Mr. McLoughlin just said it's a fixed number.

10           MS. CALL:  The financial term?

11           THE COURT:  No, he said that the bonus.  He was

12   talking about at least one component of the bonus that's on the

13   document is just a fixed number.

14           MS. CALL:  It varies based on different amounts of the

15   EBITDA term.  It's a chart that has I think three different

16   levels and how the bonus varies based on that.

17           THE COURT:  But presumably there is going to be

18   someone else testifying about how that bonus is calculated,

19   right?

20           MS. CALL:  I don't quite understand, Your Honor.

21           THE COURT:  How does this document -- why would this

22   document explain or show the variability in the bonus?

23           MS. CALL:  Because I believe that's what is clear on

24   the face of the document.  And the only term that requires an

25   explanation is that EBITDA term and how that relates to the

Robert Lewis - Direct

1    company's profit.  And I will note that Mr. Bryant has already

2    noted that the company's profit did directly relate to the

3    price increases that were achieved in various years because of

4    that margin term in the contracts.  So basically a higher

5    margin means higher profit means high EBITDA means higher

6    bonus, sort of the steps of that.

7         THE COURT:  Well, when we take the mid-afternoon

8    break, I want to see that page so I can better familiarize

9    myself with it.  And we won't take this issue up until we have

10   had a chance to discuss it which we may be able to do at the

11   mid-afternoon break.  I don't want to spend more time on it at

12   the moment, okay?

13        MS. CALL:  Would you like us to provide a copy of that

14   page to Ms. Grimm at the break?

15        THE COURT:  Yes, at the beginning of the break so I

16   can look at it over the break.

17        MR. McLOUGHLIN:  I will hand up the document to the

18   clerk, Your Honor.  It's actually -- the compensation section

19   that they referred to that they want to use is actually two

20   pages, and it includes the fact that the first 500,000 in bonus

21   is guaranteed notwithstanding any productivity or

22   profitability.  And that has not been redacted so --

23        THE COURT:  And you think you have the redacted copy?

24        MR. McLOUGHLIN:  I am sorry?

25        THE COURT:  Mr. McLoughlin, does the copy that you

Robert Lewis - Direct

1    have seem to contain other redactions?

2            *MR. McLOUGHLIN:*  It does, Your Honor.

3            *THE COURT:*  Yeah, maybe you can have Ms. Grimm put a

4    post-it note on those pages that you believe are relevant.  And

5    he has indicated 10 and 11.  Are those the ones?

6            *MS. CALL:*  It is only Page 10 that the government

7    actually plans to --

8            *MR. McLOUGHLIN:*  If it's an exhibit, it can go back to

9    the jury room.  They can do whatever they want with it.

10           *THE COURT:*  No, this is just to call my attention to.

11           Let's bring the jury back in.

12           *MS. CALL:*  I briefly misspoke.  It's Page 7.

13           (Jury present.)

14           *THE COURT:*  We will let Mr. Lewis get seated too.

15           *MR. TORZILLI:*  While that's happening, Your Honor, it

16   might be helpful for the afternoon session if I hand up to the

17   bench a copy of the witness exhibit binder for this witness.

18           *THE COURT:*  Yes, that's fine.

19           Go ahead, Mr. Torzilli.

20           *MR. TORZILLI:*  Thank you.

21   *BY MR. TORZILLI:*

22   *Q.*  Good afternoon, Mr. Lewis.

23   *A.*  Good afternoon.

24   *Q.*  I would like you to first turn to Tab 16 of the binder in

25   front of you.  It should be an exhibit marked and admitted into

Robert Lewis - Direct

1267

1   evidence as Government Exhibit 1137.

2          *MR. TORZILLI:*  And request permission to publish?

3          *THE COURT:*  You may.

4   *BY MR. TORZILLI:*

5   *Q.*  Mr. Lewis, what is Government Exhibit 1137?

6   *A.*  It's an e-mail from myself to Mikell Fries at Claxton

7   Poultry dated August the 7th.

8   *Q.*  You sent the e-mail to who at Claxton Poultry?  I am sorry,

9   I didn't hear the entirety.

10  *A.*  Mikell Fries and Scott Brady.

11  *Q.*  When did you write that e-mail?

12  *A.*  August the 7th, 2014.

13  *Q.*  What was the e-mail about?

14  *A.*  Meeting follow-up.

15  *Q.*  And did you as part of your meeting follow-up e-mail ask

16  Mr. Fries and Mr. Brady to do anything?

17  *A.*  Yes.

18  *Q.*  What did you ask them to do?

19  *A.*  I asked them to provide certain information that's

20  contained in the e-mail.

21  *Q.*  Okay.  And did you have a deadline by which you wanted them

22  to provide you that information?

23  *A.*  Yes, August 19.

24  *Q.*  What were you expecting to receive from them around

25  August 19th?

Robert Lewis - Direct

1        *MR. McLOUGHLIN:*  Objection, Your Honor.  He can ask

2   the question of what they were asked to provide which is in the

3   writing, but to the extent this witness' expectations are

4   somewhat different, they are simply not relevant.

5        *THE COURT:*  Overruled.  He can answer.

6   *A.*  I asked them for their initial proposal for 2015 and

7   included in the body a number of things that we wanted to

8   consider over and above the price and the volume.

9   *BY MR. TORZILLI:*

10  *Q.*  So what were you asking Mr. Fries and Mr. Brady to provide

11  you in terms of the initial proposal?

12  *A.*  A price, an FOB price.

13  *Q.*  An FOB price for what product?

14  *A.*  For chicken on the bone product.

15  *Q.*  And besides FOB price for chicken on the bone, anything

16  else that you asked them to provide in the initial proposal?

17  *A.*  Yes, the volume they were willing to commit to and then a

18  response to the bullet items contained in the body of the

19  e-mail.

20  *Q.*  Thank you.  You can put that exhibit aside.

21       Did the August 19 deadline that you asked Mr. Fries

22  and Mr. Brady to respond by, was that a deadline that you asked

23  other suppliers to comply with as well?

24  *A.*  Yes.

25  *Q.*  Which suppliers?

Robert Lewis - Direct

1    *A.*  Tyson, Pilgrim's, Koch, Mar-Jac, George's.

2    *Q.*  So all the -- you asked all the suppliers to provide a

3    response to you by August 19?

4    *A.*  Yes.

5    *Q.*  And did you want all the suppliers to provide you similarly

6    a pricing proposal?

7    *A.*  Yes.

8    *Q.*  Let's look at -- should be Tab 15 in your binder.  It's

9    been marked as Government Exhibit 1139.

10         *MR. TORZILLI:*  That's been received into evidence and

11   ask permission to publish.

12   *A.*  You may.

13   *BY MR. TORZILLI:*

14   *Q.*  Are you there, Mr. Lewis?

15   *A.*  Yes.

16   *Q.*  What is Government Exhibit 1139?

17   *A.*  It's an e-mail again from me to Roger Austin at Pilgrim's

18   Pride.

19   *Q.*  And what were you asking -- what, if anything, were you

20   asking of Defendant Roger Austin in this e-mail that's been

21   marked as Government Exhibit 1139?

22   *A.*  We were asking for his proposal for chicken-on-the-bone

23   product for 2015.

24   *Q.*  And if you look at the bottom of your e-mail here in 1139,

25   do you see a sentence in there asking for or providing a

Robert Lewis - Direct

1  deadline by which Mr. Austin was supposed to provide the

2  information?

3  A.  I do not see a deadline.

4  Q.  But did you, in fact, convey, perhaps not by means of this

5  e-mail, but convey to Mr. Austin to provide the information by

6  August 19?

7          MR. McLOUGHLIN:  Objection, leading.

8          THE COURT:  Overruled.

9  A.  That would have been a consistent request of all six

10  suppliers.

11  BY MR. TORZILLI:

12  Q.  Thank you, sir.

13          And last, if you can turn to Tab 19.

14          MR. TORZILLI:  And Tab 19 is marked as Government

15  Exhibit 1134 and has been received into evidence and ask

16  permission to publish.

17          THE COURT:  You may.

18          MR. TORZILLI:  Thank you, Your Honor.

19  BY MR. TORZILLI:

20  Q.  And Mr. Lewis, what is Government Exhibit 1134?

21  A.  It is an e-mail from me to Kevin Phillips and Mitch

22  Mitchell at Case Farms.

23  Q.  What's Case Farms?

24  A.  Case Farms is an approved poultry supplier for KFC.

25  Q.  Was Case Farms a competitor in price negotiations for

Robert Lewis - Direct

1   contracts that begin in 2015?

2   A.   Yes.

3   Q.   And again, what were you asking Mr. Phillips and

4   Mr. Mitchell in this e-mail?

5   A.   Their initial proposal for KFC's chicken-on-the-bone

6   product.

7   Q.   And what was the deadline you provided to them for their

8   response?

9   A.   August 19.

10  Q.   Thank you.  You can put that exhibit aside and we can take

11  that down.  Thank you.

12          Okay.  So turning back to the time frame here that

13  we're talking about, August 2014, what was the next step in the

14  process that you were undertaking to conduct price negotiations

15  with the competing chicken suppliers?

16  A.   At that point we would have begun the -- began analyzing

17  the proposals to determine the price they provided, the volume

18  they were willing to commit to, and then answers, of course, to

19  the other questions we had asked.

20  Q.   So what happened on or about August 19th?

21  A.   The proposals were received.

22  Q.   And who did you receive them from?

23  A.   The six approved KFC suppliers.

24  Q.   You said that you reviewed the proposals when they came in.

25  Did I understand you correctly?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   And what did you do to go about reviewing the proposals?

3    A.   I'm sorry, would you repeat?

4    Q.   What did you do to review the proposals?  What in

5    particular did you do?

6    A.   Well, I just reviewed the information that they provided

7    again which was pricing, volume, and responses to the six or

8    seven bullets that were in the bottom of our meeting follow-up

9    request.

10   Q.   Did you say you analyzed the proposals as well?

11   A.   Yes.

12   Q.   And did you draw any conclusions based on your analysis of

13   the proposals?

14   A.   Yes.

15   Q.   What conclusions did you draw?

16   A.   I was quite surprised, perhaps shocked at the magnitude of

17   the price increases that were being presented.

18   Q.   What was surprising and shocking about the magnitude of the

19   price increases?

20   A.   As long as I can remember, I don't recall prices being that

21   high.

22   Q.   So in your entire experience in the chicken industry, you

23   hadn't seen prices that high that you recalled?

24   A.   That's correct.

25   Q.   And can you remind us when you first started in the chicken

Robert Lewis - Direct

1  industry?

2  A.  I'm sorry?

3  Q.  Can you remind us what year you started in the chicken

4  industry?

5  A.  1973.

6  Q.  1973?

7  A.  Yes, but I worked in the poultry group beginning in the

8  early nineties, so the time we are talking about would have

9  been early nineties until I left.

10  Q.  Early nineties until 2009 when you retired.

11  A.  Correct.

12  Q.  When you received the proposals on or around August 19 of

13  2014, were you aware that the supply of the types of birds,

14  types of chickens that KFC restaurants used was tight or in

15  short supply?

16  A.  Yes.

17  Q.  How did you know that?

18  A.  Well, we were having great difficulty sourcing enough

19  product to meet KFC's demand.

20  Q.  And that was the problem you encountered when you first

21  came back on the scene at RSCS in May of 2014.  Is that fair to

22  say?

23  A.  That's correct.

24  Q.  So even taking into account that you knew supply was tight,

25  was it still true that you were surprised and shocked by the

Robert Lewis - Direct

1    magnitude of the price increases you were facing?

2    A.   Yes.

3    Q.   I'm sorry, I didn't hear --

4    A.   Yes, I'm sorry, yes.

5    Q.   So after you reviewed and analyzed the proposed prices that

6    came in, what did you do next?

7    A.   Well, I contacted all the suppliers again and began to

8    challenge them on the proposals.

9    Q.   And what form did challenging the suppliers take?  What

10   specific communications?

11   A.   Telephone conversations.

12   Q.   Telephone conversations?

13   A.   Yes.

14   Q.   Let's take a look at -- sir, if you could turn to tab -- it

15   should be Tab 29 in your binder.  It's marked as Government

16   Exhibit 1132.

17   A.   I have it.

18   Q.   Are you there?  What is Government Exhibit 1132?

19   A.   The top portion of that is an e-mail from Scott Brady at

20   Claxton Poultry to me and two other individuals in the poultry

21   group, Rich Eddington and Mary Hester.

22   Q.   What date is the e-mail that Mr. Brady sent to you and

23   others?

24   A.   August 19.

25   Q.   And what was included in the e-mail that Mr. Brady sent to

Robert Lewis - Direct

1   you and others on August 19?

2   A.   The 2015 proposal.

3   Q.   So this was the pricing proposal that you had asked them to

4   provide?

5   A.   That's correct.

6   Q.   Can you turn now to Tab 30, the next tap?  That should be

7   marked as Government Exhibit 1133.  Are you there?

8   A.   Yes.

9   Q.   What is Government Exhibit 1133?

10   A.   This is part of the SBRA addendum showing the FOB price for

11   various poultry products from Claxton.

12   Q.   Can you tell whether this Exhibit 1133 is the attachment to

13   the e-mail that we just looked at as Government Exhibit 1132?

14   A.   Yes.

15   Q.   It is?

16   A.   Yes.

17        MR. TORZILLI:  Your Honor, at this time we would offer

18   into evidence Government Exhibit 1132 and Government Exhibit

19   1133.

20        THE COURT:  Any objection to the admission of those

21   two exhibits?

22        MR. LAVINE:  No objection, Your Honor.

23        MS. PREWITT:  No, Your Honor.

24        THE COURT:  Exhibits 1132 and 1133 will be admitted.

25        MR. TORZILLI:  Thank you, Your Honor.  Permission to

Robert Lewis - Direct

1    publish 1133?

2          *THE COURT:*  You may.

3          *MR. TORZILLI:*  Thank you.

4    *BY MR. TORZILLI:*

5    *Q.*  Sir, if you can look at the front page of Government

6    Exhibit 1133, can you tell us what the very first entry in the

7    chart on the left-hand side, the entry that says injected

8    eight-piece, what that means?

9    *A.*  That is actually the eight-piece chicken-on-the-bone purple

10   label as we referred to it, which is a primary eight-piece

11   product.

12   *Q.*  What does purple label mean?  Why is the chicken labeled

13   purple?

14   *A.*  It was a way for the restaurants to distinguish between

15   other products that were shipped into the store.

16   *Q.*  Thank you.  And then next to that on the right is 1.1099.

17   Do you see that?

18   *A.*  Yes.

19   *Q.*  What does that mean?

20   *A.*  That's the FOB price per pound that's being proposed for

21   2015.

22   *Q.*  And then to the right of that there is a parenthetical that

23   says:  FOB price from cost model.  What does that mean?

24   *A.*  That means the page that we just -- that's attached.  It's

25   the bottom line number from that model.

Robert Lewis - Direct

1    Q.   What does FOB stand for?

2    A.   Free onboard.

3    Q.   What does it mean?

4    A.   Well, in this case it means that the supplier has loaded

5    the product onto a truck, but the freight to get that to its

6    destination is not included in the price.

7    Q.   So if someone wanted to receive the product from the

8    processing facility, they would still have to pay on top of the

9    FOB price some sort of freight or delivery charge; is that

10   fair?

11   A.   Actually, both.  They had to pay freight either directly to

12   the restaurant or to a distributor.  If a distributor is

13   involved, there is a distribution fee that's added as a third

14   component.

15          MR. TORZILLI:  Thank you.  If you can turn to the next

16   page of the exhibit.

17   BY MR. TORZILLI:

18   Q.   Can you tell us what this is generally?

19   A.   This is the cost model that shows the total FOB plant cost

20   for the purple label and orange label product.

21   Q.   And about seven lines up from the bottom there is an entry

22   that says Total FOB Plant Cost, and then has some numbers

23   there.  Can you tell us what that is?

24   A.   Yes.  That is the FOB plant cost per pound which is

25   $1.1099.

Robert Lewis - Direct

1  Q.  Is that the same number we looked at on the previous page?

2  A.  It is, yes.

3  Q.  Three lines up from that is an entry called Supplier

4  Margin.  Do you see that?

5  A.  Yes.

6  Q.  Can you tell us what Supplier Margin means?

7  A.  That is the margin the supplier receives for these products

8  on a per-pound basis.

9  Q.  And what's margin?  What is that?  Can you define that for

10  us, please?

11  A.  It's their profit.

12  Q.  That's the supplier's profit?

13  A.  The supplier's profit.

14  Q.  So is the proposed price that in this case Claxton

15  submitted to you on August 19th of $1.1099, is that an example

16  of a price proposal that surprised and shocked you by its

17  magnitude?

18  A.  Yes.

19  Q.  Can you give the Ladies and Gentlemen of the Jury a sense

20  of what your expectation was in terms of a price that would be

21  proposed at this time by the competing suppliers?

22        MR. McLOUGHLIN:  Objection to the witness'

23  expectation, Your Honor.

24        THE COURT:  Overruled.

25  A.  Based on some history involving the big birds demand, we

Robert Lewis - Direct

1   actually anticipated a small increase in the pricing.  And we

2   would have readily accepted that, but the magnitude of the

3   change was, well, very surprising.

4   *BY MR. TORZILLI:*

5   Q.  You can put that exhibit aside.  I want to hand up to you

6   an exhibit that is not in your binder.

7           *MR. TORZILLI:*  If I can elicit the assistance of

8   Ms. Grimm to hand up to the witness.

9           *THE COURT:*  Yes, you may.

10  *BY MR. TORZILLI:*

11  Q.  Mr. Lewis, have you had an opportunity to familiarize

12  yourself with the document in front of you?

13  A.  Yes, I have just now.

14  Q.  And for the record it's a two-page document.  The first

15  page bears exhibit number -- Government Exhibit 1104 and the

16  second page is Government Exhibit 1105-1.

17          Does this document look familiar to you, sir?

18  A.  The top sheet of this document does not look familiar to

19  me.

20  Q.  Okay.  What is it?  What do you understand it to be?

21  A.  It's an e-mail from Roger to Rich Eddington and copying

22  myself.  Well, I am sorry, to Rich Eddington and to me.

23  Q.  What's the date of it?

24  A.  August 20th, 2014.

25  Q.  And what does it appear that Mr. Austin is providing to you

Robert Lewis - Direct

1   in this e-mail of August 20th, 2014?

2   A.  His proposed pricing for 2015.

3   Q.  Is this the proposed pricing for 2014 that was due on

4   August 19th?

5   A.  I'm sorry, you said 2014?

6   Q.  Of 2014, yes.

7   A.  It is, yes.

8        MR. TORZILLI:  At this time, Your Honor, Government

9   moves to admit 1104 and 1105-1.

10       MR. FELDBERG:  No objection, Your Honor.

11       THE COURT:  1104 is already into evidence.  I am not

12   sure about 1105-1.  Ms. Grimm, do you know?

13       COURT DEPUTY CLERK:  I am checking.  1105-1 is not in

14   and 1104 is in.

15       THE COURT:  Ms. Grimm indicated that according to her

16   records 1105-1 has been admitted.

17       COURT DEPUTY CLERK:  Has not.

18       THE COURT:  What?

19       COURT DEPUTY CLERK:  1105-1 has not been admitted.

20   1104 has.

21       THE COURT:  Right.  And 1105 has been admitted, but

22   not 1105-1.  So any objection to the admission of 1105-1?

23       MR. FELDBERG:  Not from us, Your Honor.

24       MR. TUBACH:  No objection to that, Your Honor.  This

25   is an additional attachment.  This is an incomplete document.

1281
Robert Lewis - Direct

1    There is an additional attachment to the e-mail that's not

2    reflected in this and we'd ask it be included also.

3         MR. McLOUGHLIN:  For Mr. Lovette we would object to it

4    being an excerpt.  If they are going to attach the attachment

5    to the e-mail, it should be the complete document and not an

6    excerpt.

7         THE COURT:  Is 1105 the complete document,

8    Mr. Torzilli?

9         MR. TORZILLI:  1105 is a printout that is almost a

10   duplicate of 1105-1.  The differences are that 1105-1 is a

11   bigger printout, easier to see.  And 1105-1 has a column that

12   was hidden because it's a printout of an Excel spreadsheet that

13   was hidden in the printout of 1105.  So this is a more accurate

14   representation of the Excel file than 1105.

15        THE COURT:  But does Exhibit 1105 meet

16   Mr. McLoughlin's objection?

17        MR. TORZILLI:  I'm not certain.

18        THE COURT:  And Mr. Tubach, let me ask you, the

19   portion that's not in 1105-1, is it in 1105?

20        MR. TUBACH:  I don't believe so, Your Honor.  It's a

21   separate PowerPoint that's also attached to this e-mail as is

22   evidenced on the cover of 1104.

23        THE COURT:  I am going to overrule the objections and

24   allow in Exhibit 1105-1.

25        MR. TORZILLI:  Thank you, Your Honor.

Robert Lewis - Direct

1    *BY MR. TORZILLI:*

2    Q.  Mr. Lewis, if you can turn to Exhibit 1105-1, so the second

3    page of the document now in front of you.  Can you tell us what

4    this is?

5    A.  This is a pricing proposal for both purple and orange label

6    product that shows the current pricing and the proposed pricing

7    and then the difference between the two.

8    Q.  Thank you.

9         MR. TORZILLI:  Permission to publish, Your Honor?

10        THE COURT:  1105-1?

11        MR. TORZILLI:  Yes.

12        THE COURT:  Yes, you may.

13        MR. TORZILLI:  Thank you, Your Honor.

14   *BY MR. TORZILLI:*

15   Q.  Can you explain, then, sir, what the column heading Current

16   means?

17   A.  Well, since it shows period nine in the upper left corner,

18   I'm assuming that that is the price in effect for period nine

19   of 2014.  That total is 9240 in the first column.

20   Q.  And what does the column Purple Proposed mean?

21   A.  That is Pilgrim's' proposed price for 2015.

22   Q.  And then what do you understand the next column that says

23   Difference to represent?

24   A.  The difference between Columns 1 and 2.

25   Q.  So the difference between the current price and the price

Robert Lewis - Direct

1   that Mr. Austin was proposing?

2   *A.*  Yes.

3   *Q.*  Let's go to, if you would, the very bottom of those

4   columns.  It says Total Cost.  Do you see that entry?

5   *A.*  Yes.

6   *Q.*  Can you explain what's happening to total cost for the

7   purple label product?

8   *A.*  It is increasing by nearly 18 cents per pound.

9   *Q.*  And is that an example of a shocking and surprising

10  proposed price?

11  *A.*  Yes.

12  *Q.*  Thank you.  And then a couple of entries above that there

13  is Supplier Margin.  Do you see that?

14  *A.*  Yes.

15  *Q.*  Can you remind us what supplier margin is?

16  *A.*  It's the supplier's profit.

17  *Q.*  And what was happening to supplier margin in this document?

18  *A.*  It was nearly doubling up by 10 cents per pound.

19  *Q.*  And is that an example of surprising and shocking and high

20  magnitude?

21  *A.*  Yes.

22  *Q.*  Okay.  You can put this exhibit aside.

23        And just one more exhibit that's not in your binder.

24        *MR. TORZILLI:*  If I can enlist the assistance of

25  Ms. Grimm one more time.

1284
Robert Lewis - Direct

1  *BY MR. TORZILLI:*

2  *Q.*  Mr. Lewis, have you had an opportunity to review the

3  document now in front of you?

4  *A.*  Yes.

5           *MR. TORZILLI:*  Just for the record, this has been

6  marked as -- it's a two-page document.  The first page is

7  marked as be Government Exhibit 1028 and the second page has

8  been marked as Government Exhibit 1029.

9  *BY MR. TORZILLI:*

10 *Q.*  What do you understand this to be, Mr. Lewis?

11 *A.*  An e-mail from Greg Tench at Mar-Jac Poultry to Rich

12 Eddington and myself attaching the KFC cost model or the

13 proposed price for 2015.

14 *Q.*  So do you understand this to be Mar-Jac's pricing proposal

15 for the following contract year?

16 *A.*  Yes.

17           *MR. TORZILLI:*  Government moves to admit 1028 and

18 1029.

19           *THE COURT:*  Any objection to the admission of Exhibits

20 1028 and 1029?

21           *MR. TUBACH:*  No, Your Honor.

22           *THE COURT:*  And just so you know, you don't actually

23 have to say no if you don't want to.  I just want to make sure

24 everyone has a fair shot at objecting if they wish to.

25           Exhibits 1028 and 1029 will be admitted.

1285

Robert Lewis - Direct

1    MR. TORZILLI:  Thank you, Your Honor.

2    BY MR. TORZILLI:

3    Q.  You can put that aside, Mr. Lewis.

4         You had said after the proposals came in that you were

5    speaking to the competing chicken suppliers about their

6    proposals.  And my question to you is if you can summarize what

7    you were communicating to them at that time.

8    A.  Well, our disappointment that the prices changed so

9    dramatically.  We again expected a small increase, but this

10   level of increase was -- was very surprising.

11   Q.  Did you and your team at RSCS have meetings with any of the

12   competing chicken suppliers to discuss their pricing proposals?

13   A.  Yes, I believe we did, although I cannot answer that

14   definitely.

15   Q.  Was there a time when you asked the competing chicken

16   suppliers to lower their prices from what they had proposed?

17   A.  Yes.

18   Q.  And what, if any, response did you get from the suppliers

19   to your request?

20        MR. TUBACH:  Your Honor, it's a compound question.

21        THE COURT:  Overruled.

22   BY MR. TORZILLI:

23   Q.  You can answer.

24   A.  Every supplier, that is all six suppliers gave us a slight

25   decrease in the pricing.

Robert Lewis - Direct

1    *Q.* So all six suppliers you were negotiating with lowered

2    their price a little bit?

3    *A.* Yes.

4    *Q.* And after they lowered their price a little bit, where did

5    it stand in terms of you had said it was a shocking order of

6    magnitude.  What happened after they lowered their price?

7    *A.* It didn't change our thinking.

8    *Q.* It didn't change your thinking.

9    *A.* No.

10   *Q.* I would like you, sir, to turn to Tab 21.  You should find

11   there a document that's been marked as Government Exhibit 1160.

12            Are you there?

13   *A.* Yes.

14   *Q.* What is this?

15   *A.* It's an e-mail from me dated August the 29th to all

16   representatives of the six suppliers we were negotiating with.

17   *Q.* What was the purpose of your message?

18   *A.* It was a follow-up on our chicken-on-the-bone negotiations.

19   *Q.* And when did you write this e-mail that was a follow-up on

20   your chicken-on-the-bone negotiations?

21   *A.* August 29th of 2014.

22            *MR. TORZILLI:* Your Honor, government offers 1160 into

23   evidence.

24            *THE COURT:* Any objection to the admission of Exhibit

25   1160?

Robert Lewis - Direct

1           *MR. KORNFELD:*  Objection, hearsay, Your Honor.

2           *THE COURT:*  And response to that, Mr. Torzilli?

3           *MR. TORZILLI:*  Sure.  It's not offered for the truth,

4    but offered for the effect on the individuals that are in the

5    To field of this e-mail.  They are being asked to do something

6    and a deadline is provided.

7           *MR. KORNFELD:*  What they are being asked to do is the

8    truth of the matter asserted.

9           *THE COURT:*  All right.  The objection is overruled.

10   However, I will only admit this, ladies and gentlemen, so this

11   is Exhibit 1160, I will only admit this for the effect on the

12   listener, in this case the recipient.  So you should not assume

13   that the content of the statements in Exhibit 1160 are true.

14   Rather, it would just be for you to assess the effect of it on

15   the recipients.  Exhibit 1160 will be admitted with that

16   limitation.

17          *MR. TORZILLI:*  Thank you, Your Honor.

18          Permission to publish?

19          *THE COURT:*  You may.

20   BY MR. TORZILLI:

21   *Q.*  Mr. Lewis, returning your attention to Government Exhibit

22   1160, what were you telling the recipients of your e-mail that

23   you wanted them to do?

24   *A.*  To submit their final proposals by the middle of the

25   following week.

Robert Lewis - Direct

1   *Q.* So their final what proposals?

2   *A.* Final pricing proposals along with the volume commitment.

3   *Q.* And you wanted it the following week?

4   *A.* Yes.

5   *Q.* So how many days after you wrote this e-mail were you

6   asking the recipients of this e-mail to provide you their

7   responses?

8   *A.* About three work days -- working days, sorry.

9   *Q.* And generally speaking, without necessarily going into

10  individual names but generally speaking, to whom were you

11  sending this e-mail?

12  *A.* To all the individuals that we had been meeting with and

13  discussing with about the 2015 price.

14  *Q.* Were these the lead negotiators for each of the competing

15  chicken suppliers at that time?

16  *A.* Yes.

17  *Q.* You in your e-mail sent it to all of them in one To field

18  rather than individual e-mails to each company like you did in

19  e-mails we looked at earlier.  Can you explain why you did it

20  this way?

21  *A.* It was basically a matter of convenience.  Rather than send

22  out all these individual notes like we would ordinarily do,

23  there was so many people involved and the message was the same

24  that I decided to send it to all.  And besides, there is no

25  competitive information that's mentioned or asked for in there

Robert Lewis - Direct

1    that would interfere with the confidentiality we were trying to

2    protect.

3    Q.  Did you at any time ask any of the recipients of this

4    e-mail to communicate with any of their competitors before they

5    submitted their final proposal?

6    A.  No.

7    Q.  Did any of the recipients of this e-mail ever tell you they

8    were in communication with any of their competitors about their

9    proposals they were going to submit?

10   A.  No.

11   Q.  Okay.  What happened next?

12   A.  Well, we finalized the proposals, reached agreement with

13   each of the suppliers and then prepared the SBRA addendums.

14   Q.  Do you know any of the suppliers in their final proposal

15   lowered their prices?

16   A.  From their bid price to their final price, yes.  All of

17   them dropped it slightly.

18   Q.  And even with the slight drop, what was your view or

19   reaction to the proposed pricing that you were receiving?

20   A.  The magnitude of the price increase was disturbing.

21   Q.  So you got to a point where you reached contracts with each

22   of the competing suppliers.  Is that what you said?

23   A.  Yes.

24   Q.  Could you now turn to Tabs 23 through 28 of your binder?

25   And that should be where you find Government Exhibits 1121,

Robert Lewis - Direct

1    1119, 1123, 1125, 1126 and 1127.

2            Have you had an opportunity to look at those?

3    A.  Yes.

4    Q.  What are those six exhibits?

5    A.  These are the SBRA agreements, the addendums for the

6    agreement with each of the six suppliers summarizing the

7    agreement we have on pricing, volume for 2015 through 2017.

8    Q.  Are these signed contracts between RSCS and each of the six

9    competing chicken suppliers?

10   A.  Yes.

11   Q.  And are these the signed contracts that you were

12   negotiating in 2014 with the competing chicken suppliers?

13   A.  I'm sorry, I didn't understand the question.

14   Q.  Were these the contracts that you had been conducting price

15   negotiations with during 2014?

16   A.  Yes.

17           MR. TORZILLI:  Your Honor, move to admit 1119, 1121,

18   1123, 1126, 1127 and 1125.

19           THE COURT:  Looks like we have potentially a lot of

20   objections.  Why don't we take, first of all, Exhibit 1121.

21   Any objection to the admission of Exhibit 1121?

22           MR. TUBACH:  Your Honor, I have the same objection to

23   all of them.  I have no objection to the admissibility, the

24   admission of the contracts themselves, but the first page of

25   the exhibit is not actually part of the contract and we ask

Robert Lewis - Direct

1    that that page not be admitted.

2           MR. GILLEN:  Your Honor, also I believe we were going

3    to see the exhibit so we can look at them on the screen.  So if

4    they could do that, that would be helpful.

5           THE COURT:  That may take a while.  Does the

6    government have hard copies for Mr. Gillen?

7           MR. TUBACH:  I have a hard copy I am happy to share.

8           THE COURT:  Let me know when you are ready,

9    Mr. Gillen.  We are going to talk just about -- we will take

10   them one at a time.  Mr. Tubach has indicated a general

11   objection, but why don't we take them one at a time.

12          MR. GILLEN:  I am fine, Your Honor.

13          THE COURT:  And response, Mr. Torzilli, as to the

14   objection by Mr. Tubach?

15          MR. TORZILLI:  The document was produced the way it

16   appears here with the cover sheet, so it is part of the

17   document.  So we would ask that the document be moved into

18   evidence as a complete document which is what appears here.

19          MR. TUBACH:  Your Honor, this witness can't possibly

20   authenticate anything about the first document.  He had retired

21   long before and left the company long before this first

22   document was created.

23          THE COURT:  Well, I think there is general agreement

24   the first page is really not part of the original document.  It

25   may have been part of -- added subsequently to it.

1292

Robert Lewis - Direct

1    Mr. McLoughlin?

2    MR. McLOUGHLIN:  Your Honor, if you are considering at

3    all keeping that first page, I think a side bar might be

4    appropriate.  But if Your Honor is ruling these out, there is

5    no need.

6    THE COURT:  I will sustain the objection.  If the

7    government could -- it doesn't have to be done now, but we will

8    need to make sure that the exhibit is remarked because the

9    exhibit sticker is on the first page, and then we'll have a

10   hard copy for later.

11   MR. TORZILLI:  As an alternative, Your Honor, can we

12   redact the information down to where the marked sticker is?

13   THE COURT:  Yes.

14   MR. TORZILLI:  Okay.  We will redact from the top all

15   the way down so it just has the sticker and the Bates number at

16   the very bottom.

17   THE COURT:  Any objection to that, Mr. Tubach or

18   Mr. McLoughlin?

19   MR. TUBACH:  No, Your Honor.  As long as the first

20   page only has the sticker, we are fine with that.

21   THE COURT:  And the Bates number?

22   MR. TUBACH:  Yeah, and the Bates numbers.  We are fine

23   with that.

24   THE COURT:  I think as a practical matter that would

25   be much easier.

Robert Lewis - Direct

1    Any objections to any of the other exhibits noted in

2    the list that Mr. Torzilli is moving the admission of?

3    MR. TUBACH:  Consistent with the Court's ruling as

4    long as the same thing happens with all those, we have no

5    objections.

6    THE COURT:  I understand.  Anyone else?

7    MR. McLOUGHLIN:  Your Honor, we join with Mr. Tubach

8    as long as it's the same.  But with respect to Exhibit 1129 --

9    THE COURT:  I don't think that one was part of the

10   motion, not yet.

11   MR. TORZILLI:  It's not.

12   THE COURT:  All right.  Then Exhibits 1119, 1121,

13   1123, 1125, 1126 and 1127 will be admitted subject to the

14   redaction of the first page as we have discussed.

15   Go ahead, Mr. Torzilli.

16   MR. TORZILLI:  Thank you.  Permission to publish the

17   second page of 1126?

18   THE COURT:  You may.

19   BY MR. TORZILLI:

20   Q.  Mr. Lewis, if you can go to Tab 23 of your binder and turn

21   to the second page of it.

22   Are you there?

23   A.  Yes.

24   Q.  Can you tell us what this is, please.

25   A.  This is the signed SBRA agreement with Pilgrim's Pride to

Robert Lewis - Direct

1    cover eight-piece COB for the years 2015 through 2017.

2    Q.   This is a three-year contract?

3    A.   It is a three-year supply contract in effect.  The prices

4    were subject to change annually.

5    Q.   Was it typical for RSCS to negotiate three-year contracts

6    for its chicken supply?

7    A.   No.

8    Q.   What was the typical time frame for supply contracts for

9    chicken?

10   A.   One year.

11   Q.   Why the change?

12   A.   Well, given all the issues we'd had with supply, it was a

13   way to try to ensure that KFC was going to be covered

14   volume-wise for an extended period of time.  And we also felt

15   that it was an advantage for the supplier because it was volume

16   that they could look forward to for an extended period of time.

17   Q.   Do you see a supplier margin entry on this page?

18   A.   Yes.

19   Q.   And what's the amount associated with the supplier margin?

20   A.   21 and three-quarter cents per pound.

21   Q.   Do you recall whether Pilgrim's Pride's original pricing

22   proposal had a supplier margin amount?

23   A.   Yes.

24   Q.   What was the supplier margin amount in its original pricing

25   proposal?

Robert Lewis - Direct

1    A.   .2175.

2    Q.   So did Pilgrim's Pride reduce its profit or its supplier

3    margin proposal at any point in the price negotiations?

4    A.   No.

5    Q.   Who signed the agreement on behalf of Pilgrim's Pride?

6    A.   Mr. Austin.

7    Q.   If you can now turn to the page in Exhibit 1126 that has

8    the production number or Bates number ending in 1580.  Up at

9    the top it says Exhibit 2.  Are you there?

10   A.   Yes.

11   Q.   What does this page convey?

12   A.   This page shows the individual products that are to be

13   supplied by Pilgrim's along with the FOB price per pound and

14   the weekly volume commitment.

15   Q.   How much chicken was Pilgrim's Pride going to be providing

16   to KFC restaurants on a weekly basis under this contract?

17   A.   2,110,500 pounds or 63 truckloads.

18   Q.   So as a relatively small increase in the price, what effect

19   does that have on the KFC system as a whole?

20   A.   In 2015 if you take the volume from the SBRA agreements

21   that were signed, the total volume would exceed

22   400 million pounds of chicken on the bone, so 1 cent would be

23   $4 million.

24   Q.   And what were the magnitude of the price increases that you

25   were facing at this time in 2014?

Robert Lewis - Direct

1  *A.* 15 to 20 cents per pound.

2  *Q.* If you could now turn to the next tab.  It's Tab 24 in

3  Government Exhibit 1119.

4       *MR. TORZILLI:*  Permission to publish Page 2?

5       *THE COURT:*  You may.

6  *BY MR. TORZILLI:*

7  *Q.* If you could turn to Page 2 of this exhibit.

8       What is it?

9  *A.* It's the SBRA agreement for Claxton Poultry covering

10 chicken on the bone for 2015 through 2017.

11 *Q.* Is the agreement signed?

12 *A.* It is signed.

13 *Q.* Who signed it on behalf of Claxton Poultry?

14 *A.* Mikell Fries.

15 *Q.* If you can go to the next tab, it's Tab 25, and it's

16 Government Exhibit 1127.

17       *MR. TORZILLI:*  Permission to publish Page 2, Your

18 Honor?

19       *THE COURT:*  You may.

20 *BY MR. TORZILLI:*

21 *Q.* If you can go to Page 2 of that exhibit.

22       What is it?

23 *A.* It's the SBRA addendum between RSCS and Tyson Foods for

24 chicken-on-the-bone product covering years 2015 through 2017.

25 *Q.* Is it signed on behalf of Tyson Foods?

Robert Lewis - Direct

1    A.  Yes.

2    Q.  Who on behalf of Tyson Foods signed this contract?

3    A.  Brian Roberts.

4    Q.  Thank you.  If you can go to Tab 26 of your binder,

5    Government Exhibit 1123.

6           Permission to publish Page 2.

7           THE COURT:  You may.

8           MR. TORZILLI:  Thank you, Your Honor.

9    BY MR. TORZILLI:

10   Q.  Mr. Lewis, if you can go to Page 2 and tell us what it is.

11   A.  This is the SBRA agreement RSCS signed with Koch Foods

12   covering poultry for the years 2015 through -- or 2017, I am

13   sorry, 2015 through 2017.

14   Q.  And Mr. Lewis, for these SBRA pricing addendums --

15   A.  I am sorry?

16   Q.  Is the price -- let me start my question again.  I am

17   sorry.

18           In the SBRA pricing addendums like the one we are

19   looking at now, is the price that's contained in here fixed for

20   the entirety of the year?

21   A.  No.

22   Q.  It changes during the course of the year?

23   A.  It does.  The price that you see in this exhibit is really

24   the price for period one of 2015, but by agreement the

25   suppliers had the opportunity to change feed costs each and

Robert Lewis - Direct

1    every period through the course of the contract.

2    Q.   How long is a period?

3    A.   A period is four weeks.

4    Q.   Four weeks?

5    A.   Yes.

6    Q.   Are there 13 periods in a year?

7    A.   There are.

8    Q.   So the price can change 13 times during a year?

9    A.   That's correct.

10   Q.   And who signed this contract on behalf of Koch Foods?

11   A.   Bill Kantola.

12   Q.   If you can flip to the next tab in your binder, Tab 27.  It

13   should be Government Exhibit 1121.

14        MR. TORZILLI:  Your Honor, permission to publish the

15   second page of 1121?

16        THE COURT:  You may.

17   BY MR. TORZILLI:

18   Q.   What is this?

19   A.   This is the signed SBRA agreement between RSCS and George's

20   covering poultry products for 2015 through 2017.

21   Q.   Is it signed?

22   A.   Yes.

23   Q.   Who signed it on behalf of George's?

24   A.   Charles George.

25   Q.   Is that one of the twin brothers who's co-CEO of the

Robert Lewis - Direct

1   company?

2   *A.*  Yes.

3   *Q.*  If you can turn to Tab 28 of Government Exhibit 1125 and go

4   to the second page of that.

5          *MR. TORZILLI:*  And permission to publish the second

6   page of that, Your Honor.

7          *THE COURT:*  You may.

8          *MR. TORZILLI:*  Thank you.

9   *BY MR. TORZILLI:*

10  *Q.*  What's this?

11  *A.*  This is an SBRA addendum between RSCS and Mar-Jac Poultry

12  for poultry products to be supplied 2015 through 2017.

13  *Q.*  Is it signed on behalf of Mar-Jac?

14  *A.*  Yes.

15  *Q.*  Who signed it on behalf of Mar-Jac?

16  *A.*  Greg Tench.

17  *Q.*  Now, you mentioned this morning before our lunch break that

18  when you were working on the first project when you came back

19  to RSCS, the supply price I think you called it, you reviewed

20  the contracts that were then in place.  Did I understand your

21  testimony correctly?

22  *A.*  Yes.

23  *Q.*  So if you could turn to Tab 3.  Tab 3 is Government Exhibit

24  1129.

25          Are you familiar with Government Exhibit 1129?

Robert Lewis - Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   It's a Tyson Foods pricing that was in effect for period

4    one, 2014.

5    Q.   So this is a Tyson Foods pricing model that was in effect

6    for period one?

7    A.   Correct.

8    Q.   So can you remind us what period of time period one would

9    be in that calendar year?

10   A.   It would be January.

11   Q.   So, for example, on January 1st of 2014 if you wanted to

12   know Tyson's price, would you be able to look at this?

13   A.   Yes.

14   Q.   And is this something that you reviewed, you looked at in

15   the ordinary course of your business when you arrived on the

16   scene at RSCS in 2014?

17   A.   Yes.

18        *MR. TORZILLI:*  Your Honor, move to admit 1129.

19        *THE COURT:*  Any objection to the admission of Exhibit

20   1129, Ms. Prewitt?

21        *MS. PREWITT:*  Yes, Your Honor.  There is handwriting

22   it and I don't know that the witness has authenticated who that

23   handwriting is from.

24        *THE COURT:*  He has not done so.

25        Response?

Robert Lewis - Direct

1          *MR. TORZILLI:*  May I inquire?

2          *THE COURT:*  Yes.

3     *BY MR. TORZILLI:*

4     *Q.*  Mr. Lewis, there is handwriting on Government Exhibit 1129.

5     Do you see that?

6     *A.*  I do.

7     *Q.*  And do you have an understanding of the source of that

8     handwriting?

9     *A.*  Yes.  This was actually submitted to Carol Knight who was

10    our administrative assistant, and she went through each of

11    these documents that are included in this exhibit for accuracy

12    and checked them for accuracy.

13         *THE COURT:*  Are you reoffering the exhibit?

14         *MR. TORZILLI:*  Yeah, I am offering the exhibit.

15         *THE COURT:*  Any objection to the admission of Exhibit

16    1129?

17         *MS. PREWITT:*  No, Your Honor.

18         *THE COURT:*  All right.  Exhibit 1129 will be admitted.

19         *MR. TORZILLI:*  Thank you, Your Honor.

20    *BY MR. TORZILLI:*

21    *Q.*  And now, sir, if I can direct your attention to Tabs 1, 2,

22    4, 5 and 6 which are Government Exhibits 1120, 1122, 1124, 1728

23    and 1729.

24         *MR. McLOUGHLIN:*  Your Honor, could we ask to have him

25    read that out one more time, please?

Robert Lewis - Direct

1          *THE COURT:*  Do you mind, Mr. Torzilli?

2          *MR. TORZILLI:*  Don't mind at all.  Government Exhibit

3    1120, Government Exhibit 1122, Government Exhibit 1124,

4    Government Exhibit 1728, and Government Exhibit 1729.

5          *MR. McLOUGHLIN:*  Thank you, Your Honor.

6          Thank you, Mr. Torzilli.

7    *BY MR. TORZILLI:*

8    *Q.*  Sir, have you had an opportunity to review these five

9    documents?

10   *A.*  Yes.

11   *Q.*  What are these five documents?

12   *A.*  These are the signed SBRA agreements for 2014.

13   *Q.*  Are these signed SBRA agreements ones that you reviewed,

14   you looked at, you referred to when you arrived back at RSCS in

15   May of 2014 when you were working on the supply crisis issue?

16   *A.*  Yes.

17         *MR. TORZILLI:*  Your Honor, we move to admit these five

18   exhibits.

19         *THE COURT:*  Any objection to the admission of the five

20   exhibits that Mr. Torzilli has moved to admit?

21         Mr. Tubach?

22         *MR. TUBACH:*  Yes, Your Honor, just the same objections

23   previously about the first page.  We would be fine with the

24   same redaction as previously indicated.

25         *THE COURT:*  Okay.  Anyone else?

Robert Lewis - Direct

1          Exhibits 1120, 1122, 1124 and 1728 and 1729 will be

2    admitted subject to the redaction of Page 1 in the manner that

3    we had referred to earlier in the case of the cover sheets that

4    were mentioned including 1119.

5          MR. TUBACH:  Two of those documents were admitted

6    yesterday, but --

7          THE COURT:  Oh, they were?  Well, under different

8    exhibit numbers?

9          MR. TUBACH:  Yes, Your Honor.  They were admitted when

10   Mr. Bryant testified.

11         THE COURT:  Yes, but were the exhibit numbers the

12   same?

13         MR. TUBACH:  No, the exhibit numbers were, but they

14   were the same document.

15         MR. TORZILLI:  They were produced by different

16   parties.

17         THE COURT:  Well, it doesn't really matter.  If the

18   copy is the same, we should not be admitting duplicates.

19         MR. TORZILLI:  Understood.

20         THE COURT:  So which are the duplicates?  Maybe

21   Mr. Tubach will be able to tell us because the last thing that

22   we want is more exhibits.

23         MR. TUBACH:  Exhibit 1729, Your Honor, is one.

24         THE COURT:  Do you know what that was admitted

25   yesterday under?

1304

Robert Lewis - Direct

1        MR. TUBACH:  What number it was yesterday?

2        THE COURT:  Yeah, exhibit number, do you happen to

3   know?  Maybe not.

4        MR. TUBACH:  Now you are testing my memory.  I

5   apologize.

6        MR. TORZILLI:  May I suggest a meet and confer with

7   the other side to iron this out because I do --

8        THE COURT:  I am going to make an exception this time

9   because I don't want to get bogged down with this issue, but on

10  the whole both sides should make sure that we avoid introducing

11  duplicates.  It just leads to a lot of confusion.  But I will

12  at this time admit those five exhibits subject to the redaction

13  that we noted before, all right?

14       MR. TORZILLI:  Thank you, Your Honor.

15  BY MR. TORZILLI:

16  Q.  Mr. Lewis, I would like to return to the brief discussion

17  we were having about period pricing.

18  A.  Yes.

19  Q.  We were talking about that's pricing that can change

20  periodically.  What typically accounts for the change in price

21  from period to period?

22  A.  Feed cost.

23  Q.  Can you say what feed cost is, please?

24  A.  Well, chickens require corn and soybean meal, and of course

25  that's a market that changes very often.  Feed cost is also a

1305

Robert Lewis - Direct

1   very large percentage of the total cost, probably runs in the

2   neighborhood of 30, 35 percent of the total cost.  So as feed

3   price changes, the suppliers use a rolling three-month average

4   and recalculate that each period and report that with their new

5   period pricing.

6   Q.  So if the price of feed, the price of corn and soy is going

7   up, what happens to the period price of chicken?

8   A.  The price increases.

9   Q.  And by the same token, if feed prices go down, what happens

10  to the period price for chicken?

11  A.  The price declines.

12  Q.  Do you know what was happening to feed prices in 2014?

13  A.  I do not.

14  Q.  If you can look at Tab 22 in your binder.  You should find

15  a document marked as Government Exhibit 1243.

16          Are you there, sir?

17  A.  Yes.

18  Q.  What is this?

19  A.  This is a price summary by supplier for various poultry

20  products covering period 13 of 2014.

21  Q.  What would period 13 of 2014 be in the annual cycle?

22  A.  That's the last period of the year.

23  Q.  So it would be the last four weeks of calendar year 2014?

24  A.  Generally, yes.

25  Q.  And is this -- are the period prices within RSCS something

1306

Robert Lewis - Direct

1    that's documented on a period-by-period basis?

2    A.   Yes.

3    Q.   And are the period pricing charts something that's created

4    in the ordinary course of business at RSCS?

5    A.   Yes.

6    Q.   Is it a regular part of RSCS's business to keep and

7    maintain records about period prices?

8    A.   Yes.

9    Q.   And is it important for the information that's documented

10   about period pricing to be accurate?

11   A.   Yes.

12        MR. TORZILLI:  Your Honor, we would move to admit

13   1243.

14        THE COURT:  Any objection to the admission of Exhibit

15   1243?

16        MR. TUBACH:  The only -- there is some handwriting on

17   some of the pages we haven't established yet I believe on the

18   second page and on the fourth page.

19        THE COURT:  Right.  You can ask additional questions

20   if you wish, Mr. Torzilli.

21        MR. TORZILLI:  Thank you, Your Honor.

22   BY MR. TORZILLI:

23   Q.   Mr. Lewis, do you see handwriting on the second page of

24   Exhibit 1243?

25   A.   I do.

Robert Lewis - Direct

1    *Q.* Do you have an understanding of what that handwriting

2    pertains to?

3    *A.* I do not.

4    *Q.* And will you turn to the fourth and final page of Exhibit

5    1243?

6            Are you there?

7    *A.* I'm there.

8    *Q.* Do you see handwriting on this page?

9    *A.* Yes.

10   *Q.* Do you have an understanding of what that handwriting is?

11   *A.* Yes.

12   *Q.* Can you explain?

13   *A.* Yes.  The suppliers were allowed a fuel surcharge.  And

14   again Carolyn Knight has reviewed this document for accuracy

15   and the checkmarks indicate that the numbers were accurate.

16         *MR. TORZILLI:* Your Honor, we offer 1243 and offer

17   redactions to the handwriting that appears on the second page.

18         *THE COURT:* All right.  So you are moving the

19   admission of 1243 with the handwriting on Page 2 redacted, but

20   no redactions as to Page 4.

21         *MR. TORZILLI:* Yes, sir.

22         *THE COURT:* Any objection -- or sorry, any objection

23   to the admission of that exhibit as redacted?

24         All right.  As redacted on Page 2, Exhibit 1243 will

25   be admitted.

Robert Lewis - Direct

1      MR. TORZILLI:  Thank you, Your Honor.  And permission

2  to publish?

3      THE COURT:  You may.  Well, but not Page 2.

4      MR. TORZILLI:  Permission to publish Page 1?

5      THE COURT:  Yes, you may.

6  BY MR. TORZILLI:

7  Q.  Sir, if I can direct your attention to Page 1 of Exhibit

8  1243, and can you explain to us what the first entry of the

9  chart at the top is?

10  A.  The first entry shows the FOB price for period 13 for each

11  of the seven suppliers listed for KFC's purple label product.

12  Q.  And what's the price being expressed as?  It's price per

13  what?

14  A.  Per pound FOB the plant.

15  Q.  Mr. Lewis, was period pricing like the period pricing we're

16  looking at now, was that already part of an agreed to contract?

17  A.  Yes.

18  Q.  Okay.  So is it fair to say that a period price is a price

19  as opposed to, say, a bid or a proposed price?

20  A.  Yes.

21  Q.  Okay.  And can you explain your answer?

22  A.  Well, a bid price is a proposed price.  It's what the

23  supplier is proposing to us to accept.  These prices are

24  already under contract.  They are locked in place.

25  Q.  So this is part of an agreed to contract that's just an

Robert Lewis - Direct

1   adjustment from your original price.  Is that fair to say?

2   A.  That's correct, yes.

3   Q.  Did any of the defendants you've identified in court today

4   ever call you to ask for their competitors' period pricing?

5   A.  No.

6   Q.  Did you expect any of the defendants that you've identified

7   to ever call you to ask about their competitors' period prices?

8   A.  No.

9   Q.  Why not?

10   A.  Well, I believe that that would be --

11          MR. McLOUGHLIN:  Your Honor, excuse me, objection to

12   the witness' personal beliefs here.

13          THE COURT:  Sustained.

14          MR. McLOUGHLIN:  It's not relevant to the question

15   before the jury.

16          THE COURT:  Sustained.

17   BY MR. TORZILLI:

18   Q.  Can you explain rather than your belief why you did not

19   expect any of the defendants you have identified here today to

20   ever call you to ask for their competitors' period pricing?

21          MR. McLOUGHLIN:  Your Honor, same objection.  Putting

22   the same drink in a different bottle does not change the issue

23   here.

24          MR. KORNFELD:  Your Honor, I would additionally

25   interpose a relevance objection to an expectation of something

Robert Lewis - Direct

1    that didn't happen.

2           THE COURT:  I am going to sustain both objections.

3    There is no foundation for him even expecting such a thing.

4    BY MR. TORZILLI:

5    Q.  Sir, you testified that period pricing is part of the

6    contract; is that right?

7    A.  Yes.

8    Q.  Okay.  And can you tell me whether RSCS's contract prices

9    are public information or private information?

10   A.  Private.

11          MR. McLOUGHLIN:  Objection, Your Honor, to the

12   question and to the answer.  What is private when, in fact, for

13   example with respect to Pilgrim's, Pilgrim's knows the price of

14   the contract.  The man on the street may not know it and so,

15   quote, it's private, but that's simply irrelevant to the issues

16   here.

17          THE COURT:  He has answered.  The objection is

18   overruled as well.

19   BY MR. TORZILLI:

20   Q.  Can you explain the basis for your answer?

21   A.  I believe that it is morally wrong.  In fact, I think

22   it's --

23          MR. McLOUGHLIN:  I object to the witness' belief which

24   has already been ruled improper.

25          THE COURT:  Overruled.  He can answer.

1311

Robert Lewis - Direct

1  BY MR. TORZILLI:

2  Q.  Please complete your answer, sir.

3  A.  I believe it's morally wrong.  In fact, I think it's a form

4  of cheating.

5  Q.  What do you mean by cheating?

6  A.  Well, it's not right.

7  Q.  What do you mean not right?

8  A.  Well, it's against all the moral standards that I live by.

9       MR. LAVINE:  Your Honor, I'm going to object to this.

10 This has no relevance whatsoever.

11      THE COURT:  I don't want -- I think he has answered

12 the question.  Let's move on.

13      MR. McLOUGHLIN:  For the record, Your Honor, I would

14 like to state this individual's morality has nothing to do with

15 the issue before this jury and the legality or illegality of

16 the allegations.

17      THE COURT:  I don't consider that to be an objection,

18 but I've already directed Mr. Torzilli to move on.

19      Go ahead.

20 BY MR. TORZILLI:

21 Q.  Sir, can you turn to Tab 31 of your binder?  It's the

22 document that's been marked as Government Exhibit 10-4.

23 A.  Yes.

24 Q.  Do you recognize this?

25 A.  Yes.

Robert Lewis - Direct

1    *Q.* Have you seen it before?

2    *A.* Yes.

3    *Q.* What is it?

4    *A.* It is a summary by supplier of the 2014 contract price and

5    margin along with the 2015 contract price and margin. The

6    middle column is the price that was in effect in period 13 of

7    2014.

8    *Q.* Have you seen this before testifying here today?

9    *A.* Yes.

10   *Q.* Have you reviewed what's been marked as Government

11   Exhibit 10-4 before you came to court today?

12   *A.* Yes.

13   *Q.* Have you reviewed it for accuracy?

14   *A.* Yes.

15   *Q.* Can you describe what you did to review Exhibit 10-4 for

16   accuracy?

17   *A.* I looked at the SBRA agreements for 2014 and 2015 to get

18   the FOB price and the margin that's shown. And I looked on the

19   period report that we reviewed earlier to get the prices for

20   the period 13 of 2014.

21   *Q.* And after conducting your review for accuracy, what did you

22   determine?

23   *A.* I determined that all the numbers shown are accurate.

24        *MR. TORZILLI:* At this time, Your Honor, the

25   government moves for the admission of Exhibit 10-4.

Robert Lewis - Direct

1        THE COURT:  Any objection to the admission of

2   Exhibit 10-4?

3        MS. HENRY:  Your Honor, we object to the column with

4   the period 13 prices as being irrelevant.

5        MR. KORNFELD:  We would object to the last column

6   regarding margin.  That number is a compilation of several

7   numbers on the contract that have already been admitted.  That

8   is not an accurate reflection of the margin that this witness

9   already talked about in the contracts that were admitted.

10       THE COURT:  And I am sorry, Mr. Kornfeld, it says

11   margin in a couple of places.  I wasn't --

12       MR. KORNFELD:  I am talking on the far right where it

13   says 2015 contract price and margin.  The original contract for

14   Claxton is an example that the margin was 10 cents.  Now it's a

15   larger number.  There is a reason for that that I don't think

16   this accurately reflects the contracts that have been admitted

17   into evidence.

18       THE COURT:  Okay.  Both Ms. Henry's and Mr. Kornfeld's

19   objections will be overruled.  The witness has laid the

20   foundation for it.  The Court has already ruled on this in a

21   separate order.  The Court will admit Government Exhibit 10-4.

22       MR. TORZILLI:  Thank you, Your Honor.  And permission

23   to publish 10-4?

24       THE COURT:  You may.

25   BY MR. TORZILLI:

1314

Robert Lewis - Direct

1  Q.  Mr. Lewis, can you explain to the Ladies and Gentlemen of

2  the Jury what this exhibit represents?

3  A.  Well, it clearly shows the prices that were in effect under

4  the 2014 contract and how dramatically they changed for the

5  2015 contract.  It also shows the change from the 2014 margin

6  to the 2015 margin and the amount of change there.  The most

7  important message I think this sends is that the price that was

8  in effect --

9         MR. McLOUGHLIN:  Objection, Your Honor.  The witness

10  can explain what it says, but the message he thinks it sends to

11  the jury, the message is for the jury, not for this witness to

12  lecture.  This is argument in the form of testimony.

13         THE COURT:  It sounds like it might be straying into

14  that.  If you could ask a more narrow question, Mr. Torzilli.

15         MR. TORZILLI:  Yes, Your Honor.

16  BY MR. TORZILLI:

17  Q.  Mr. Lewis, looking at Government Exhibit 10-4, can you

18  explain what the middle column of numbers represents?

19  A.  The middle column are the period 13, 2014 FOB prices by

20  supplier.

21  Q.  For each of the competing suppliers?

22  A.  Yes.

23  Q.  So is that an actual price that someone was paying for a

24  pound of chicken?

25  A.  Yes.

Robert Lewis - Direct

1   Q.  At what time period was someone actually paying those

2   prices for a pound of chicken?

3   A.  Period 13, which would be roughly December of 2014.

4   Q.  So, for example, December 31st of 2014?

5   A.  Yes.

6   Q.  If someone was buying a pound of Pilgrim's chicken, they

7   would pay about 88-1/2 cents?

8   A.  Yes.

9   Q.  And then what about the column to the right of it, what is

10  that?

11  A.  That is the new FOB price that takes effect January the 1st

12  of 2015.

13  Q.  So if someone was going to buy a pound of Pilgrim's chicken

14  on January 1st, 2015 under the RSCS contract, they would be

15  paying how much per pound?

16  A.  $1.0856.

17  Q.  And that would be how much of an increase from the day

18  before?

19  A.  Roughly 10 to 12 cents per pound.

20  Q.  And in your --

21  A.  I am sorry.

22  Q.  Approximately how much of an increase did you say?

23  A.  My mind is not working that fast, I'm sorry.

24  Q.  If you had a calculator, if you had a calculator, would you

25  be subtracting 88-1/2 cents from $1.08?

Robert Lewis - Direct

1    A.  Yes, I would.

2    Q.  That should be about 20 cents.  So when you were testifying

3    earlier about being shocked about the magnitude of the price

4    increases, is this an example of what you were talking about?

5    A.  Yes.

6         MR. KORNFELD:  Objection, leading, Your Honor.

7         THE COURT:  Sustained.

8    BY MR. TORZILLI:

9    Q.  Can you relate your earlier testimony about being shocked

10   at the magnitude --

11        MR. KORNFELD:  Your Honor, I am going to object to

12   Mr. Torzilli repeatedly articulating in the form of a question

13   this witness' prior testimony.  We've heard it on multiple

14   times.  The jury knows what his testimony was.  I think it's

15   improper to couch a question and repeat testimony in the form

16   of a question.

17        THE COURT:  I am going to sustain the objection

18   because it does -- it's been repeated.  There are occasions

19   when it's appropriate such as when a topic hasn't been

20   discussed for a while, but I would ask -- I don't think he

21   needs to be reminded, so if we could avoid that.

22        Go ahead, Mr. Torzilli.

23        MR. TORZILLI:  Thank you.

24   BY MR. TORZILLI:

25   Q.  Sir, going back to Government Exhibit 10-4, and again

Robert Lewis - Direct

1    concentrating on the Pilgrim's row here, there is an entry that

2    says .1175 and then an entry that says .2175.  Do you see that?

3    A.  Yes.

4    Q.  Can you explain the relationship between those two numbers?

5    A.  Well, the .1175 is the profit margin for 2014.  The .2175

6    is the profit margin for the new contract covering 2015.

7    Q.  So does that reflect the profit margin increase for

8    Pilgrim's?

9    A.  Yes.

10   Q.  And then if you were to go down to Claxton and Tyson and

11   Koch and George's and Mar-Jac and do the same comparison, would

12   that be the change in the profit for each of those competing

13   suppliers from 2014 to 2015?

14   A.  Yes.

15   Q.  Thanks.  You can put that exhibit aside.  Just a couple

16   more questions, Mr. Lewis.

17           I want to ask you about the spread in prices across

18   suppliers.  And my question is whether RSCS had a strategy to

19   try to keep the prices of chicken products close across

20   suppliers or not close across suppliers?

21   A.  Our strategy was to keep the prices close together.

22   Q.  Why did you want to keep the prices close together?

23   A.  It enables us to better manage the landed cost to the

24   stores and keep it consistent across the country.

25   Q.  Did you ever ask the competing chicken suppliers to

Robert Lewis - Cross

1  coordinate their prices amongst themselves to achieve that?

2  A.  No.

3  Q.  When you were at RSCS in 2014, did you ever ask any of the

4  competing suppliers to communicate with each other about their

5  bids or their pricing proposals or their negotiations with you?

6  A.  No.

7  Q.  Did any of the competing suppliers ever tell you that they

8  were in communication with each other about their bids or their

9  pricing proposals or their negotiations with you?

10       MR. McLOUGHLIN:  Objection, assumes facts not in

11  evidence.

12       THE COURT:  Sustained.

13       MR. TORZILLI:  Your Honor, one minute to confer?

14       THE COURT:  Yes.

15       MR. TORZILLI:  Nothing further, Your Honor.

16       THE COURT:  Cross-examination.

17       Mr. Lavine, go ahead.

18       MR. LAVINE:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20  BY MR. LAVINE:

21  Q.  Mr. Lewis, my name is Bryan Lavine and I represent

22  Mr. Brady.

23       How are you today?

24  A.  Very well, thank you.

25  Q.  Good.  So we've heard the government go through talking to

Robert Lewis - Cross

1  you about when you came in in 2014 and what you did.  I want to

2  go back and kind of start when you first came in and I want to

3  kind of see if I can fill in some holes.  Is that all right

4  with you?

5  *A.*  All right.  If I may make a request, can you speak more

6  into the microphone?

7  *Q.*  I am sorry.  Can you hear me now?

8  *A.*  Yes, thank you.

9  *Q.*  I usually think I talk loud enough, but maybe not.

10         So you had worked at RSCS for many years; is that

11  correct?

12  *A.*  Yes, sir.

13  *Q.*  And you retired in 2009.

14  *A.*  Correct.

15  *Q.*  And you were asked to come back to RSCS in about 2014.

16  *A.*  Yes.

17  *Q.*  And that was to help negotiate the contract for the 2015 to

18  2017 KFC contract.

19  *A.*  No, sir.  The original reason was to help KFC get through

20  the Mother's Day --

21  *Q.*  The supply problem?  I didn't mean to interrupt you.

22  Please finish.

23  *A.*  The original agreement was for two months.

24  *Q.*  Right.  And at the time an individual by the name of Mike

25  Ledford who had previously handled the pricing negotiations had

Robert Lewis - Cross

1   left the company; is that correct?

2   A.  Yes.

3   Q.  And you came back as a consultant for that two-month

4   period?

5   A.  Yes.  I didn't have a title, but I think that describes it.

6   Q.  And so in your role you helped to try and work through the

7   supply problems that KFC was having at that time.

8   A.  Yes.

9   Q.  Now, an individual came in by the name of Rich Eddington

10  shortly thereafter; am I correct?

11  A.  Yes.

12  Q.  And he was the replacement for Mr. Ledford.

13  A.  Yes.

14  Q.  All right.  Now, when you returned as I think you said on

15  direct, the chicken market appeared to be encountering an

16  extreme supply shortage.  Would that be fair to say?

17  A.  Yes.

18  Q.  Now, I want to ask you when you retired in 2009 to the time

19  that you came back, did you keep current on chicken prices?

20  A.  No.

21  Q.  I wouldn't either if I retired.  I don't blame you for

22  that.

23  A.  No, I did not.

24  Q.  And so it's fair to say you didn't really keep up with the

25  market changes that occurred from let's say 2009 to 2014.

Robert Lewis - Cross

1  A.  I did not keep up with it, no.

2  Q.  It's a good thing you didn't.  Enjoy your retirement.

3       Now, you agree, sir, that RSCS negotiates the price of

4  chicken for KFC.

5  A.  Yes.

6  Q.  And it also negotiates for KFC the volume of chicken that's

7  going to be allocated to the KFC suppliers.

8  A.  Yes.

9  Q.  Now, RSCS wants to make sure there is enough chicken to

10 supply all of the KFC all year round.  And that's the reason

11 you were brought in, is that right sir, because of the supply

12 problem?

13 A.  I was brought in, yeah, but the specific problem at the

14 time was the Mother's Day demand.

15 Q.  Right.  We're going to get to that, sir.

16       Now, even with your history at RSCS, RSCS focuses on

17 trying to get the best price possible.

18 A.  Yes.

19 Q.  And there are several suppliers that provide chicken that

20 KFC acquires for their franchisees.  And in 2014 let's say

21 you've listed out the suppliers that were the main suppliers to

22 KFC.

23 A.  Yes.

24 Q.  And each supplier has to be approved by RSCS or KFC in

25 order to sell chicken to KFC.

1322

Robert Lewis - Cross

1  A.  Yes, they have to be approved by KFC.

2  Q.  By KFC.  It's KFC's specifications, not RSCS.

3  A.  That's correct.

4  Q.  Right.  Now, in fact, sir, every plant a supplier uses for

5  KFC must be approved by KFC.

6  A.  Yes.

7  Q.  And each supplier has to produce chicken according to the

8  specifications demanded by KFC.

9  A.  Yes.

10  Q.  And as part of the supply chain, if one supplier cannot

11  supply the chicken for KFC for whatever reason, one of the

12  other approved suppliers can step in and deliver that chicken.

13  A.  Yes.

14  Q.  And that's because they both are following the

15  specifications as demanded by KFC.

16  A.  Yes.

17  Q.  Now, many of these suppliers have been supplying KFC for

18  chicken for years; is that correct?

19  A.  Yes.

20  Q.  And there is transparency as to cost and margin with each

21  supplier.  Would you agree with that, sir?

22        MR. TORZILLI:  Objection, vague.

23        THE COURT:  Overruled.  He can answer.

24  A.  May I have the question again, please?

25  BY MR. LAVINE:

Robert Lewis - Cross

1    Q.   Sure.   There is transparency as to the cost and margin with

2    each supplier for each year with -- I am going to say with RSCS

3    because they negotiate the contracts on behalf of KFC.

4    A.   Yes.

5    Q.   So up until the time of the 2015 contract, it was an annual

6    contract, was it not?

7    A.   Yes.

8    Q.   So each year RSCS had the cost and the margin for each of

9    these suppliers.

10   A.   Yes.

11   Q.   So they could look back three years.   They could look back

12   four years.   They could track their costs, their labor costs?

13   A.   Yes.

14   Q.   Their margin?

15   A.   Yes.

16   Q.   Everything, because you have all of the information from

17   these suppliers.

18   A.   Yes.

19   Q.   So you're able, you being RSCS, is able to track the

20   expenses of each supplier on an annual basis.

21   A.   Yes.

22   Q.   And they are able to track the margin on an annual basis.

23   A.   Yes.

24   Q.   And RSCS also has access to costs and prices from various

25   outside sources as to market conditions and the costs of

Robert Lewis - Cross

1    producing the chicken; is that accurate, sir?

2    *A.*  Yes.

3    *Q.*  All right.  Now, when we talk about the negotiation

4    process, as you said the first -- when you came in 2014, they

5    went to a three-year contract.

6    *A.*  Yes.

7    *Q.*  And before that they were annual contracts.

8    *A.*  Yes.

9    *Q.*  And in 2015 was the first time that the three-year contract

10   concept had been introduced into the negotiation process.

11   *A.*  Yes.

12   *Q.*  And the idea was to help guarantee the supply on behalf of

13   KFC.

14   *A.*  Yes.

15   *Q.*  And the benefit to the supplier was that they would know

16   what the volume was going to be on a three-year basis.

17   *A.*  Yes.

18         *THE COURT:*  Mr. Lavine, would this be a good time to

19   break or if you have a couple more, whatever you want to do.

20         *MR. LAVINE:*  Your Honor, you know you give a lawyer a

21   chance to ask a couple questions and I'm going to keep going.

22   This is the perfect time to break.

23         *THE COURT:*  All right.  Ladies and gentlemen, we will

24   go ahead and take the mid-afternoon break, 20 minutes, so if we

25   could plan on reconvening 25 minutes until 4:00.

1325

Robert Lewis - Cross

1    Keep the admonitions in mind.  The jury is excused.

2    Jury excused.

3    We will be in recess.  Thank you.

4    (Recess at 3:16 p.m.)

5    (Reconvened at 3:36 p.m.)

6    THE COURT:  Let's go ahead and get the jury back in.

7    Yes, Ms. Prewitt?

8    MS. PREWITT:  One housekeeping issue, Your Honor.

9    With respect to Government Exhibit 1129, Your Honor might

10   remember this is the period pricing.  This is one of the late

11   editions in terms of additional exhibits assigned to this

12   particular witness.  I did notice that the last page there is a

13   transmittal letter with that contract pricing that is hearsay,

14   Your Honor.  I would just ask, and I don't know if the

15   government would have any objection to this, but it just be

16   removed from the exhibit.

17   THE COURT:  Let me take a look at it.  What tab number

18   is that, Mr. Torzilli?

19   MR. TORZILLI:  It's not a tab.

20   THE COURT:  It was a loose one?

21   MR. TORZILLI:  Yeah, one of the loose ones.

22   THE COURT:  Hold on.  I am not finding it.  Do you

23   happen to have a copy?

24   MR. TORZILLI:  May I?

25   MS. PREWITT:  I don't have a hard copy.  I just have

Robert Lewis - Cross

1      it on the computer.

2              THE COURT:  Okay.  Sorry, Ms. Prewitt.  What were you

3      mentioning?

4              MS. PREWITT:  Your Honor, it's a 13-page exhibit

5      ending with Bates No. 004337.  Perhaps this is actually what

6      the government is seeking to admit in which I would have no

7      issue, but it's the 13-page exhibit --

8              MR. TORZILLI:  1129?

9              MS. PREWITT:  This is Exhibit 1129.

10             MR. TORZILLI:  I am sorry, I misheard you.  I thought

11     you were saying 1029. Tab 3.

12             THE COURT:  Tab 3.  Oh, right, the very last page

13     which is an e-mail, okay.

14             So Mr. Torzilli, do you intend to include that page as

15     part of Exhibit 1129?

16             MR. TORZILLI:  Yes.  It is part of the document as it

17     was transmitted to us.  It looks like it is a transmittal

18     e-mail that accompanied the rest of the exhibit.

19             THE COURT:  I think Ms. Prewitt's question was because

20     it is of a different character than the rest of the exhibit and

21     because there could be a hearsay objection to it -- did we

22     admit 1129?

23             MS. PREWITT:  Yes, we did, Your Honor.

24             THE COURT:  Right.  She is just asking can we take

25     that out since it's of a different character.  You can correct

Robert Lewis - Cross

 1   me if I'm wrong, Ms. Prewitt.

 2         *MS. PREWITT:*  That's right, Your Honor.  It's hearsay.

 3   And look, it's not something that this witness would be able to

 4   testify to in terms of he didn't create the document.  The

 5   underlying records are what was put into evidence here, Your

 6   Honor.

 7         *MR. TORZILLI:*  May I have a moment to confer?

 8         *THE COURT:*  Yeah, real quick.

 9         *MR. TORZILLI:*  We will withdraw that portion of the

10   exhibit.

11         *THE COURT:*  Okay.  Not that it can't be separately

12   admitted as a newly marked exhibit.  So just for the record,

13   then, as to Exhibit 1129, what was admitted as the last page

14   which ends in the following Bates stamp Nos. 4337, that last

15   page will be withdrawn.

16         *MS. PREWITT:*  Thank you, Your Honor.

17         *THE COURT:*  Let's bring in the jury, Mr. Keech.

18         *MR. TORZILLI:*  May I retrieve?

19         *THE COURT:*  Yes, you may, Mr. Torzilli.

20         (Jury present.)

21         *THE COURT:*  Go ahead, Mr. Lavine.

22         *MR. LAVINE:*  Thank you, Your Honor.

23   *BY MR. LAVINE:*

24   *Q.*  Mr. Lewis, if I ask a question that you don't -- I am not

25   clear on, just ask me to repeat the question and I will be

Robert Lewis - Cross

1    happy to do so.

2    A.   Thank you.

3           THE COURT:  And one other thing.  Mr. Lewis, in the

4    event that you want to use a calculator, I found one in my

5    chambers.  It is the lowest tech calculator you can imagine,

6    but just in case you want to crunch a number or something, we

7    have that available for you.

8           Okay.  Go ahead, Mr. Lavine.

9    BY MR. LAVINE:

10   Q.   Mr. Lewis, before we broke we started to talk a little

11   about the negotiation process.  And I want to go through that

12   because I think it's important for the Ladies and Gentlemen of

13   the Jury to understand this.

14          So now the negotiations that you started in in 2014

15   for the three-year contract, they are not a take-it-or-leave-it

16   type of negotiations, are they?

17   A.   I'm not sure I understand what you mean by that.

18   Q.   Well, what I mean by that is it's not they submit a number

19   and that's it.  I mean, when I say they, the suppliers.

20   A.   No, it's not -- no.

21   Q.   Poor question on my part.  I apologize for that.  When the

22   supplier submits their bids, it's not a take-it-or-leave-it.

23   It's not a one-time deal and that's it.

24   A.   That's correct.

25   Q.   There is a negotiation process.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   All right.  And that negotiation process a lot of times

3    will start, for example, a call from you to the supplier to

4    just start the process and tell them that you're going to be

5    following up with questions and you're going to be eventually

6    asking them to submit a proposal; is that correct, sir?

7    A.   That's correct.

8    Q.   And after that there can be e-mail exchanges.  For example,

9    the bid proposals are many times e-mailed to you or people at

10   RSCS by the suppliers; is that correct, sir?

11   A.   Yes.

12   Q.   And that -- once that is submitted there can be follow-up

13   phone calls by you or Mr. Eddington or Mr. Suerken, whoever is

14   there and responsible for the negotiation, there can be follow

15   up phone calls.

16   A.   Yes.

17   Q.   And after the submission of the first proposal, you can

18   follow up with a meeting.  You can send out a calendar invite

19   or you can send out an e-mail as we saw that you did earlier

20   today saying there is certain things we need to address and we

21   plan on meeting on such and such a date.

22   A.   Yes.

23   Q.   Or you could also have a meeting and follow up that meeting

24   with an e-mail saying:  We appreciate you meeting on such and

25   such a date.  We look forward to working with you and here is

Robert Lewis - Cross

1  what we would like to address.

2  *A.*  Yes.

3  *Q.*  So in a sense it's a very fluid negotiation process.

4  *A.*  Yes.

5  *Q.*  Now, as I said, some of the communication occurs by e-mail

6  between you and the supplier.  When I say you, sir, I am not

7  picking on you.  I am just saying RSCS.  The communication can

8  be by e-mail.

9  *A.*  Yes.

10  *Q.*  By telephone call.

11  *A.*  Yes.

12  *Q.*  Or by meeting, face-to-face meeting.

13  *A.*  Yes.

14  *Q.*  Now, a lot of times as you said with the suppliers that you

15  mentioned before, they had contracts already in place with

16  RSCS.

17  *A.*  Yes.

18  *Q.*  And so you would be looking for them to renew their

19  contract with RSCS for the following year or in the situation

20  of 2015 it would be for the three-year period.

21  *A.*  Yes.

22  *Q.*  And unless -- and for each renewal period -- and when I say

23  that, I know previously you did annual and you went to three

24  years -- unless there was a problem with a supplier, the same

25  suppliers will negotiate price and RSCS will allocate volume

                                    1331
                         Robert Lewis - Cross

1    among those same suppliers.

2    A.   Yes.

3    Q.   And part of the reason for that is they have been qualified

4    or approved by KFC and they meet KFC's specifications; is that

5    correct, sir?

6    A.   Yes.

7    Q.   So as I said, when the negotiation process begins, someone

8    from RSCS, and in this situation with the 2015 contracts it

9    would have been you, sir, you have a discussion with each

10   supplier as to issues that you want to address in trying to

11   discuss with them to find out what their proposed volume or

12   what the amount of loads that they can provide to KFC; is that

13   correct?

14   A.   Yes.

15   Q.   Now, when I use loads, if you would explain to the Ladies

16   and Gentlemen of the Jury, what exactly is a load?

17   A.   A load -- I am sorry, a load is approximately 33,500 pounds

18   of product.

19   Q.   So 10 loads would be about 333,000 pounds of chicken.

20   A.   That's correct.

21   Q.   That's a lot of chicken.  So after you start this process,

22   then you send out a cost-plus model for each supplier to fill

23   out, correct?

24   A.   No.  The supplier developed the cost-plus model and sent it

25   to us.

1332

Robert Lewis - Cross

1   Q.  But you have a form, that's true, but the form was

2   developed by RSCS; is that correct?

3   A.  That is correct.

4   Q.  In fact, sir, in all honesty with you, you were involved in

5   developing that cost-plus model, were you not, sir?

6   A.  I was.

7   Q.  And is it accurate to say that Paul Sinowitz was also

8   helping you in the development of that model?

9   A.  I don't recall that.

10  Q.  Okay.  That's fine.  Now, the cost-plus model which we saw

11  in a sense with the contracts has lines for the suppliers to

12  enter all of the suppliers' costs and margin so RSCS can see

13  how the suppliers reached the COB price.

14  A.  Yes.

15  Q.  And the COB is the chicken on the bone that we're talking

16  about.

17  A.  Yes.

18  Q.  And during the negotiation process, RSCS is negotiating the

19  price, correct?

20  A.  Yes.

21  Q.  And RSCS is sometimes -- you are trying to push that price

22  down.

23  A.  Always.

24  Q.  Absolutely.  Because you are trying to get the best

25  possible price you can.

Robert Lewis - Cross

1   A.   Yes.

2   Q.   And eventually RSCS decides what volume of chicken is going

3   to be allocated to each supplier.

4   A.   Yes.

5   Q.   And that's a determination that is made only by RSCS.

6   A.   Yes.

7   Q.   All right.  Now, if there is a cost or a line item input on

8   that model that RSCS or you, sir, thinks is too high, you're

9   going to address those items with the supplier and get them to

10  reduce those line items; is that correct, sir?

11  A.   Yes.

12  Q.   And that's because you know basically what a lot of the

13  costs are.  And if a supplier comes in with one line item that

14  you think is a little out of whack, you are going to go back

15  and say, we're not paying this.  You're just way too high.

16  A.   I do not know what makes up the individual cost components

17  in the model.  Those numbers are developed by the supplier and

18  we have no way of auditing those numbers to know if they are

19  exactly correct.

20  Q.   That's correct, sir.  But you do know in a sense what the

21  industry is doing or what other suppliers are doing.  So if you

22  see a line item that is out of -- that is way too high, you're

23  going to address that point, are you not, sir?

24  A.   Yes.

25  Q.   Yes, okay.  Now, as I think was mentioned on direct, during

Robert Lewis - Cross

1    this process RSCS tries to negotiate the price of the suppliers

2    to be paid so that the suppliers are in the tightest narrowest

3    possible range, correct?

4    A.   We were actually more interested in negotiating the lowest

5    possible price.  If they were close together, that was -- that

6    would be great.

7    Q.   But you also wanted to try and keep them as tight as

8    possible.  I know you wanted the lowest possible price, but you

9    also wanted them in the narrowest possible range you could get

10   them; isn't that correct, sir?  And there are reasons for that

11   and we are going to address that.

12   A.   Yes.

13   Q.   All right.  And is it fair to say, sir, and this is a term

14   we've heard, that RSCS gives in a sense directional guidance to

15   suppliers to try and get them to a specific range or try and

16   get them to a lower price.

17   A.   Yes.  Directional is a good word.

18   Q.   Okay.  Fair enough.  And, in fact, many times RSCS will try

19   to direct the supplier prices toward the price of the lowest

20   priced supplier.

21   A.   Yes.

22   Q.   Okay.  Now, when you're negotiating with them, you on

23   behalf of RSCS, you're not going to tell them what your lowest

24   bottom number is.

25   A.   No.

Robert Lewis - Cross

1   Q.   Okay.  Now, as we talked about this idea of being in a

2   narrow, narrow range, the reason for this tight range is

3   because RSCS is dealing with multiple KFC customers across the

4   country.  That's one of the reasons, isn't it?

5   A.   Yes.

6   Q.   And you don't want KFC franchisees complaining because one

7   supplier has a lower price than another.

8   A.   Yes.

9   Q.   All right.  So if I can summarize it in a sense of in

10  negotiating with suppliers, you wanted to avoid disparity of

11  prices between suppliers in order to maintain harmony among the

12  franchisees.

13  A.   Again, my primarily goal was the lowest price.

14  Q.   Absolutely, sir.

15  A.   If they happened to be close together, that would be a

16  great outcome.

17  Q.   Right.  But you couldn't have -- you couldn't have

18  suppliers with a great deal of price disparity because that

19  would cause a problem with your franchisees; would it not, sir?

20  A.   Potentially, yes.

21  Q.   Okay.  So I want to turn now a little bit toward knowledge

22  of the suppliers, if we can.  And I'm going to focus right

23  here -- as I told you initially, I represent Mr. Brady of

24  Claxton Poultry.  Now, one of the suppliers that KFC uses or

25  RSCS uses is Claxton Poultry, correct?

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And you are familiar with Claxton Poultry.

3    A.   Yes.

4    Q.   It has one plant located in Claxton, Georgia?

5    A.   It was when I was there.  I assume that's the same today.

6    Q.   Yes, sir, I believe so.  And Claxton only produces the

7    small bird.

8    A.   That I am not certain about either.

9    Q.   Okay.  So you don't know that Claxton does not produce a

10   big bird.

11   A.   I have not kept up with that, sir.  I don't know.

12   Q.   When you -- in 2009, if you recall, and I realize it's

13   several years ago, do you recall at that time that Claxton only

14   produced a small bird?

15   A.   I don't recall.

16   Q.   Okay.  And Claxton has been part of the supply chain for

17   many years; has it not?

18   A.   Yes.

19   Q.   And it was there as part of the supply chain when you were

20   working there prior to 2009.

21   A.   Yes.

22   Q.   And you dealt with Mikell Fries over the years?

23   A.   Yes.

24   Q.   And you recall meeting Mr. Fries in 2014 in the

25   negotiations of that 2015 contract.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And you also dealt with Mr. Brady during that period of

3    time; is that correct, sir?

4    A.   Yes.

5    Q.   Now, you do know that Mr. Fries is the one that has the

6    pricing authority at Claxton.

7    A.   Yes.

8    Q.   And for the 2015 negotiations -- and when I say that, sir,

9    it's a short term for me instead of saying 2015 to 2017, so

10   please bear with me on this.  The 2015 negotiations Scott Brady

11   was your main point of contact for Claxton, was he not?

12   A.   Yes.

13   Q.   And Mr. Fries was also involved in several of the meetings

14   with RSCS personnel, including yourself.

15   A.   Yes.

16   Q.   Now, I want to talk a little bit now about the whole supply

17   issue in 2014.  And I know you testified on direct that the

18   reason you were brought in was to try and remedy that supply

19   chain situation in May of 2014.

20        Now, when you testified earlier, you said there was a

21   crisis situation as far as the supply of chicken; is that

22   right?

23   A.   Yes.

24   Q.   In fact, sir, would you agree that it was -- and I am going

25   to use your terminology here -- it was in a state of near panic

Robert Lewis - Cross

1   with those responsible for purchasing chicken; is that correct,

2   sir?

3   *A.*   Yes.

4   *Q.*   And there was a great deal -- and I am using your words --

5   there was a great deal of anxiety that their restaurants would

6   not be able to meet demand.

7   *A.*   That the restaurants would --

8   *Q.*   Not be able to meet the demand, would not have enough

9   chicken to be able to sell to their customers.

10  *A.*   Yes, that's correct.

11  *Q.*   And as you said, sir, KFC on Mother's Day ran out of

12  chicken in 2014.

13  *A.*   I did not say that.

14  *Q.*   All right.  Well, please correct me, then.

15  *A.*   I do not recall saying that.

16  *Q.*   Okay.  Do you recall that KFC ran out -- many of the

17  franchisees ran out of chicken on Mother's Day in 2014?  Take

18  your time.

19  *A.*   That was a long time ago.

20  *Q.*   Yes.  I am saying take your time.

21  *A.*   I can remember I believe that there was some restaurants

22  that borrowed from other restaurants and maybe an occasion or

23  two where some actually used some product from grocery stores.

24  Whether they ran out and shut down, I don't recall.

25  *Q.*   And that's fair enough, sir.  It is eight years ago.

Robert Lewis - Cross

1    Do you recall in 2014 that because of the supply

2  concerns, and that's the reason that you were brought in was

3  because to try and remedy the supply concerns, that RSCS went

4  to Mar-Jac and purchased 10 loads of chicken at a very high

5  price?

6  *A.*   I do.

7  *Q.*   And so the jury understands this -- I did the math

8  earlier -- but when you are talking about 10 loads, you are

9  talking about 335,000 pounds of chicken.

10  *A.*   Yes.

11  *Q.*   And also at one point as I think you've testified on direct

12  that during the summer of 2014 management instructed you to

13  offer $1.40 a pound for chicken.

14  *A.*   Yes.   That was a directive from the senior management team

15  at RSCS and it was positioned as, okay, you seem to have the

16  demand covered, but we want some insurance.

17  *Q.*   We want to make sure this doesn't happen again.

18  *A.*   Well, we want to be sure even though we think we've got

19  everything covered, we want 10 more loads just to make sure

20  that we have it covered.   And that was 335,000 pounds of

21  product, but at $160,000 incremental cost.   That was a pretty

22  good investment we thought from a coverage standpoint.

23  *Q.*   Absolutely.   Makes all the sense in the world, sir,

24  absolutely.   But you still paid $1.40 a pound for the chicken?

25  *A.*   We did.

Robert Lewis - Cross

1  *Q.* I realize that this was eight years ago, but do you recall

2  calling Mr. Brady, and this would have been in the same time of

3  May of 2014, offering to pay a premium to Claxton in order to

4  deliver additional chicken?

5  *A.* I don't recall that specifically, but I won't deny that it

6  happened.

7  *Q.* Okay. That's fine. Now, I want to go back -- I know we're

8  in 2014, but I want to go back to 2009. Prior to your

9  retirement in 2009, the market had an abundance of small birds,

10  did it not, sir?

11       *MR. TORZILLI:* Objection, scope.

12       *THE COURT:* Overruled.

13  *A.* The supply in 2009 was much easier to obtain than in 2014.

14  *BY MR. LAVINE:*

15  *Q.* Right. You didn't have the mammoth problem -- when I say

16  mammoth, it was a mammoth problem in 2014 as far as supply.

17  You didn't have that type of problem in 2009 or 2008 when you

18  were still working at RSCS.

19  *A.* That's correct.

20  *Q.* And at that time in the 2008 time frame or 2009 where you

21  didn't have that supply problem, the buyer, this being KFC or

22  in a sense RSCS, had more negotiating power against the

23  suppliers because there was not a supply issue.

24  *A.* That's fair. I agree, yes.

25  *Q.* In 2014 there was a supply shortage of the small bird.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   As a result, the suppliers didn't have to compete so hard

3    for the KFC business.

4    A.   That's not totally true.   We were still pushing to get

5    lower prices than what they had proposed.

6    Q.   Absolutely, I agree with that, sir.   But in the 2014 time

7    frame, the demand for chicken was much greater than the supply.

8    Would you agree with that, sir, in 2014?

9    A.   Yes, I would agree.

10   Q.   All right.   Now, turning back to this 2014 time frame, do

11   you recall that KFC brought in some consultants by the name of

12   McKinsey to help and assess KFC's supply chain and other

13   issues?

14   A.   I didn't remember that happening until someone prompted me

15   the other day that they were there.   I had forgotten that they

16   were even there.

17   Q.   But sitting here today whatever the prompt was, which I

18   assume the prompt was from the government?

19   A.   I am sorry, repeat that?

20   Q.   Who prompted you about the McKinsey consultants, if you

21   recall?

22   A.   There were a series of questions that were presented to me

23   from one of the defense attorneys that I was asked to answer,

24   and that was one of the questions.

25   Q.   That's fair enough.   Now, McKinsey, if you know, sir, they

1342

Robert Lewis - Cross

1  were consultants, could you tell the Ladies and Gentlemen of

2  the Jury what McKinsey does, if you know?

3  A.  No.  All I know is they're consultants.

4  Q.  And they came in in 2014 to assess the operations and the

5  supply and distribution of KFC.

6         MR. TORZILLI:  Objection, foundation.

7         THE COURT:  Sustained.  It assumes facts not in

8  evidence too.

9  BY MR. LAVINE:

10  Q.  Do you know whether -- you do know that McKinsey was

11  brought in in 2014.

12  A.  Yes.

13  Q.  And do you know why they were brought in?

14  A.  I don't know why.  I don't recall that.

15  Q.  Do you recall meeting with KFC, RSCS and McKinsey

16  individuals?

17  A.  I don't recall, no.

18  Q.  Okay.  Do you recall that KFC in the 2014 time frame had

19  very poor margins with suppliers?

20  A.  I'm not sure I understand your question, sir.

21  Q.  Well, in 2014 the suppliers weren't making a lot of money

22  on the small birds, were they, sir?

23         MR. TORZILLI:  Objection, facts not in evidence.

24         THE COURT:  That was a question.  He can answer.

25  Overruled.

Robert Lewis - Cross

1    *A.* Answer the question? I am sorry. I have no idea whether

2    their margin was fair or not. We have no way of auditing those

3    numbers, so we trust the supplier that they have given us the

4    correct information.

5    *BY MR. LAVINE:*

6    *Q.* Right. When you were brought in as a consultant, I realize

7    you were also brought in to deal with the supply, but when you

8    stayed on, you tried to develop a different approach with the

9    suppliers; is that correct, sir?

10   *A.* Yes, you could say that, yes.

11   *Q.* Because KFC was not the customer of choice at that point in

12   time for the suppliers.

13   *A.* I don't know that.

14   *Q.* Okay. Now, in 2014 RSCS and you, sir, realized that the

15   margin for big bird had increased over time; is that accurate,

16   sir?

17   *A.* We had been told for a period of time that the margins for

18   big bird --

19         *MR. TORZILLI:* Objection, hearsay.

20         *THE COURT:* Overruled.

21   *BY MR. LAVINE:*

22   *Q.* You can go ahead.

23   *A.* We had been told over time that the suppliers were

24   receiving a greater margin for big birds than for small birds.

25   Again, we had no way of verifying that, but that's what they

Robert Lewis - Cross

1    were telling us, but I didn't realize that it was going to be

2    the magnitude of difference that we saw in 2015.

3    Q.  Fair enough.  You also knew at that time that some

4    suppliers were considering converting some of their additional

5    small bird plants to big bird plants.

6    A.  That's what they were saying.

7    Q.  Right.  In fact, the industry was shifting to bigger bird

8    sizes; is that correct, sir?

9    A.  I am sorry, what?

10   Q.  In fact, the industry was shifting to bigger bird sizes.

11   A.  Yes.

12   Q.  And so the bird size that KFC used was becoming less

13   readily available.

14   A.  Yes.

15   Q.  And, sir, on the plant conversion if a plant was converted

16   from a small bird to a big bird plant, it wasn't going to be

17   converted back again; is that correct, sir?

18   A.  Understand it was impossible if not very difficult to

19   convert it back.

20   Q.  Thank you.  In fact, sir, Sanderson Farms was one of the

21   largest small bird suppliers for KFC.  And they moved to big

22   birds sometime in the '13, '14 time frame, so their supply of

23   small birds was no longer available; is that correct, sir?

24        MR. TORZILLI:  Objection, foundation.

25        THE COURT:  Sustained.

1345

Robert Lewis - Cross

1        MR. LAVINE:  I will rephrase the question.

2    BY MR. LAVINE:

3    Q.  Are you familiar with Sanderson Farms?

4    A.  Yes.

5    Q.  And Sanderson Farms would produce small birds; is that

6    correct, sir?

7    A.  Yes.

8    Q.  Did there come a time that Sanderson Farms stopped

9    producing small birds?

10   A.  For KFC, yes.

11   Q.  Right.

12   A.  I don't know if they stopped altogether, but for KFC, yes.

13   Q.  I didn't mean to interrupt.

14       They stopped producing for KFC.

15   A.  Yes.

16   Q.  So that was a supply area that KFC didn't have anymore.

17   A.  That's correct.

18       MR. LAVINE:  Could we bring up I think it's 1137,

19   which I think has already been admitted?

20       COURT DEPUTY CLERK:  I show it is admitted, Your

21   Honor.  Is it okay to publish?

22       THE COURT:  Yes.

23   BY MR. LAVINE:

24   Q.  Mr. Lewis, if you would take a look at what has been marked

25   as Government Exhibit 1137 which you have already looked at

1346

Robert Lewis - Cross

1    earlier today?

2    A.   Yes.

3    Q.   Now, if you would read the first sentence of the first

4    paragraph, please.

5    A.   Thanks for a very productive meeting on August 5th.  You

6    can see that RSCS has a very different mindset concerning

7    supplier relationships, and is taking a totally different

8    approach to negotiations versus prior years.

9    Q.   Thank you.  Now, can you explain to me what you mean by

10   that sentence?  And that's a sentence that you wrote, sir.

11   A.   When I arrived at RSCS in May of 2014, while analyzing the

12   situation it came to my mind that the relationships with

13   suppliers had been strained.  And apparently there wasn't a lot

14   of transparency and so the relationships apparently were

15   suffering.  So the idea was we wanted to be friendlier, if you

16   will, in our dealings with suppliers, that we wanted to share

17   more information with them, that we wanted to communicate more

18   effectively, and that's what we meant by a different approach.

19   Q.   And do you recall, sir, that the prior year, 2014, the

20   negotiations had not gone well and left a bad taste in the

21   suppliers' mouths?

22   A.   I didn't say that and I don't know that.

23   Q.   All right.  Fair enough.  So after assessing the situation,

24   you had worked to try and improve the suppliers' communication

25   and relationship with the suppliers; is that correct, sir?

Robert Lewis - Cross

1    A.  Yes.

2    Q.  Do you know what happened with the prices to suppliers in

3    2014?

4    A.  I'm sorry, I don't understand.

5    Q.  Whether or not the chicken prices for suppliers was reduced

6    in 2014?

7          MR. TORZILLI:  Objection, vague as to 2014.

8          THE COURT:  He can answer if he understands.

9    Overruled.

10         MR. LAVINE:  Let me rephrase the question, Your Honor.

11         THE COURT:  Go ahead.

12   BY MR. LAVINE:

13   Q.  I am referencing here the negotiations for the final

14   contract of 2014, that the chicken prices for suppliers was

15   decreased in 2014.  Do you recall that, sir?

16   A.  The difference between the final contract price and the

17   original bid price were slightly different.  All the suppliers

18   did drop their original price by -- well, I considered it a

19   miniscule amount.

20   Q.  I'm sorry, I wasn't clear on that, sir.  I am talking when

21   you came in and you assessed the situation, you looked at the

22   2014 contracts.

23   A.  Yes.

24   Q.  Not the 2015.  I am not talking about the '15 to

25   '17 contract.

Robert Lewis - Cross

1    A.  Okay.

2    Q.  I am talking about the 2014 price of chicken.

3    A.  Okay.

4    Q.  That RSCS negotiated the prices down for suppliers in 2014.

5           MR. TORZILLI:  Objection, foundation.

6           THE COURT:  Overruled.

7    A.  I don't know the answer to that.

8    BY MR. LAVINE:

9    Q.  Okay.  That's fair enough.

10          So I would like to now turn to the negotiation for the

11   2015 to 2017 contract.  Now, do you agree that in 2014 that the

12   negotiations would have started in all likelihood with a phone

13   call from you, sir?

14   A.  Yes.

15   Q.  And you would have -- for example, with regard to Claxton,

16   you would have reached out and spoken to a Mr. Scott Brady.

17   A.  Yes.

18   Q.  And that in a sense was the way that you started

19   negotiations with most of the suppliers was by just a phone

20   call.

21   A.  Yes.

22   Q.  And during that call you would have discussed the upcoming

23   contract with Mr. Brady.

24   A.  Yes.

25   Q.  And you were taking a different approach to the

1349

Robert Lewis - Cross

1    negotiations.

2    A.   I'm not sure that would have been mentioned over the

3    telephone, our position.

4    Q.   Do you recall also saying that RSCS would be looking at the

5    margin needed to compare to the big bird profitability?

6    A.   Yes.

7    Q.   Thank you.

8         Now, during that call, if you recall, sir, it was

9    mentioned that RSCS was going to address the discrepancy

10   between the big bird margin and the small bird margin.  Do you

11   recall that, sir?

12   A.   I do not.

13   Q.   All right.  Do you recall any discussions of having to

14   address that discrepancy?

15   A.   I recall that we needed to have a discussion about big bird

16   margin versus small bird margin, but I don't remember details

17   around that discussion.

18   Q.   Fair enough, sir.  And that discrepancy would have been --

19   you would have had to address that with each of the suppliers.

20   A.   Yes.

21   Q.   And even Claxton who at the time, sir, only produced a

22   small bird.

23   A.   Yes.  I guess I wasn't aware they didn't produce the big

24   bird.

25   Q.   Yes.  Now, this discrepancy or big bird issue would be

Robert Lewis - Cross

1    offered also to Claxton.  Let me retract that question.

2         The big bird discrepancy really was to some of the

3    bigger producers that may be considering moving to the big bird

4    or converting some of their plants to big bird plants, correct?

5    A.  I don't understand if Claxton was not producing the big

6    bird why that would matter with them.

7    Q.  Right.  We'll get to that in a second, sir.

8    A.  Okay.

9    Q.  But the discrepancy with the big bird really started with

10   the larger producers who produced the big bird; is that

11   correct?

12   A.  Yes.

13   Q.  Because they were getting a bigger margin on the big bird

14   versus a small bird.

15   A.  So they said.

16   Q.  Correct.  And so there was a big bird premium that was

17   offered to the suppliers during the negotiations in 2014 for

18   the '15 to '17 contract; is that correct?

19   A.  That's correct.

20   Q.  And that big bird premium was offered to all of the

21   suppliers.

22   A.  A premium was offered to all suppliers.  It was not the

23   same premium.

24   Q.  Okay.  But in a sense you were offering it to the bigger

25   producers to continue producing the small bird.

Robert Lewis - Cross

1    *A.*  In all due respect, I do not like the word offering.

2    *Q.*  Okay.

3    *A.*  I would be more inclined to say accepting.

4    *Q.*  Accepting.  How about incentivize?

5    *A.*  I don't believe we were in a position to do anything but

6    accept it.

7    *Q.*  Okay.  Were you also not trying to incentivize the larger

8    producers to continue producing the small bird for KFC?

9    *A.*  Yes.

10   *Q.*  And would you also be fair to say you would be

11   incentivizing Claxton to continue supplying KFC?

12   *A.*  Yes.

13   *Q.*  And so whatever premium and however you want to

14   differentiate between one supplier to the other, you in a

15   sense, you were offering that -- when I say offering, it was in

16   the price basically to incentivize them to continue producing

17   small bird for KFC.

18   *A.*  Yes, but we were again very uncomfortable with the

19   magnitude of that so-called premium.

20   *Q.*  I understand that, sir.  You've made that clear and I

21   accept that.  But if you were not to offer or include in the

22   price for Claxton some type of premium, their number would be

23   completely out of whack of those producers who produced big

24   birds; is that correct, sir?

25   *A.*  That's correct.

1352

Robert Lewis - Cross

1    Q.  And that goes back to in a sense of your attempt while you

2    were trying to get the best price possible, you still want to

3    try and keep those producers -- those suppliers' price in

4    somewhat of a narrow range.  Do you agree with that, sir?

5    A.  We were more interested in the lowest price.  And if they

6    happened to be close together, then that was a good thing.

7    Q.  Correct.  But if there was a 9-cent differential, that

8    would be pretty significant, wouldn't it, sir?

9    A.  Yeah, 9 cents is pretty significant.

10   Q.  Yeah.  You wouldn't want a 9-cent disparity between

11   suppliers' prices when you are dealing with your franchisees.

12   A.  No, we wouldn't.

13   Q.  Okay.  Now, after you reached out to, for example,

14   Mr. Brady, there would be a meeting in early August with RSCS;

15   is that correct?

16   A.  Yes.

17   Q.  Do you remember, sir, sending an e-mail to Mr. Brady

18   confirming the initial telephone call you had with him and you

19   outlined various things that you were looking for from Claxton

20   Poultry?

21   A.  I believe that memo was actually the result of a meeting,

22   not a telephone call.

23   Q.  Okay.  And do you recall in that -- when you communicated

24   with Mr. Brady again that you addressed the issue of the profit

25   margin needed and how it compares to big bird profitability?

Robert Lewis - Cross

1    A.  Yes.

2    Q.  And so you expected Claxton to respond to that inquiry.

3    A.  Yes.

4    Q.  All right.  Thank you.

5            Now, when we referred back to the meeting that you had

6    in reference to the e-mail that we showed before, which I think

7    was Government Exhibit 1137, you outlined what -- if we could

8    bring that up -- you outlined what you were looking for from

9    Claxton and you requested they submit a cost model?

10   A.  Yes.

11   Q.  And you requested that be submitted by August 19.

12   A.  Yes.

13           MR. LAVINE:  If we could bring up -- you can take that

14   down, please.  If we could bring up Government Exhibit 1132.

15           And Your Honor, I believe it has been admitted.

16           COURT DEPUTY CLERK:  Yes, Your Honor, it has.  Is it

17   okay to publish?

18           THE COURT:  Would you like it published?

19           MR. LAVINE:  I would like it published, please.

20           THE COURT:  Yes, we can do that.

21   BY MR. LAVINE:

22   Q.  Now, the first page of this is an e-mail, at the bottom is

23   an e-mail that you sent to Scott Brady and Mr. Fries on August

24   the 7th, which was a follow-up to the August 5th meeting; is

25   that correct, sir?

Robert Lewis - Cross

1    *A.*   Yes.  I'm sorry, yes.

2    *Q.*   And again it talks about a different approach that you're

3    going to take with the suppliers.

4    *A.*   Yes.

5    *Q.*   And it goes through and you've got various questions that

6    you ask, correct?

7    *A.*   I'm sorry, what was that?

8    *Q.*   At the bottom of this are the questions that you pose to

9    Mr. Brady and Mr. Fries.

10   *A.*   Yes.

11   *Q.*   If you look at the top part of this e-mail, this is from

12   Mr. Brady to you, Rich Eddington and Mary Hester.

13   *A.*   Yes.

14   *Q.*   And just so we're clear, Mr. Eddington was brought in and

15   he replaced Mr. Ledford, and he took an active role in the

16   negotiations of this contract, did he not, sir?

17   *A.*   He did, yes.

18   *Q.*   Thank you.  Now, with this Mr. Brady is attaching the 2015

19   pricing model for COB.

20   *A.*   Yes.

21            *MR. LAVINE:*  All right.  If we can bring up I guess

22   the second page of this?  Where is the contract?  Hold on.

23            If you could bring up, Your Honor, 1133, which I

24   believe has been admitted.

25            *COURT DEPUTY CLERK:*  It has.  Okay to publish?

Robert Lewis - Cross

1           THE COURT:  It has.  And yes, it may be published.

2           MR. LAVINE:  Thank you, Your Honor.

3    BY MR. LAVINE:

4    Q.  Now, on the first page of this government counsel went

5    through with you, but the one I want to focus on is the first

6    line which is injected eight-piece.  Do you see that there?

7    A.  Yes.

8    Q.  The price there is $1.1099.

9    A.  Yes.

10   Q.  Now, if we go to the second page --

11          THE COURT:  Let's hold on for one second.  Some device

12   is going off.

13          All right.  Go ahead.

14          MR. LAVINE:  Thank you, Your Honor.

15   BY MR. LAVINE:

16   Q.  Now, what would you say the second page is, sir?

17   A.  That is Claxton's proposal, price proposal for 2015 for

18   purple and orange label chicken on the bone.

19   Q.  And if you would look on the purple column --

20          MR. LAVINE:  If you would go down, if we could

21   highlight where it says corporate overhead to total FOB plant

22   cost, please.  I am sorry, the bottom part of the numbers, I

23   would like plant cost excluding plant administration down, if

24   you could highlight that, please.  Perfect.  Thank you.

25   BY MR. LAVINE:

Robert Lewis - Cross

1  Q.  Now, Mr. Lewis, as you can see, it has a supplier margin of

2  10.

3  A.  Yes.

4  Q.  And that in a sense would be your normal -- when I say

5  normal, give or take the normal supply margin that you would

6  expect to see in one of these cost models; is that correct,

7  sir?

8  A.  That was actually Claxton's profit margin for 2014.

9  Q.  Well, actually this is for 2015.

10  A.  I realize that.

11  Q.  Are you sure that the profit margin was 10 cents?

12  A.  Yes.

13  Q.  Are you sure it wasn't .0673?

14  A.  Okay.  I'm not sure.

15  Q.  Okay.  This number is the profit margin being proposed by

16  Claxton for 2015.

17  A.  Yes.

18  Q.  And you also see it has a big bird profitability line of

19  12.

20  A.  Yes.

21  Q.  It's not including the big bird profitability in the

22  supplier margin.  There is a distinction here, is there not,

23  sir?

24  A.  I'm sorry, what was the question?

25  Q.  This proposal is different from some of the others that you

Robert Lewis - Cross

1   looked at.  In fact, all of the ones that you looked at to

2   verify the government's summary, demonstrative summary, they

3   just had a supplier margin of X dollars.  Claxton broke it down

4   between --

5   A.  I believe you are correct, sir.

6   Q.  And the reason it's broken down would be, sir, because it's

7   two different margins that they are discussing with you; is

8   that correct, sir?

9   A.  No.  We're talking a single margin for the small bird

10  purple label and orange label product.

11  Q.  But, sir, we talked a little while ago about the fact that

12  you were discussing with them trying to deal with the disparity

13  with the big bird versus the small bird margin and that

14  something had to be given to the suppliers to incentivize them

15  to continue supplying small bird; is that correct, sir?

16  A.  Yes.

17  Q.  And that incentivizing for Claxton is the big bird

18  profitability of 12.

19  A.  That was the amount we eventually agreed to, yes.

20       MR. LAVINE:  You can take that down now.  Thank you.

21  BY MR. LAVINE:

22  Q.  Now, would it be fair to say, sir, that RSCS is the one

23  that initiated this -- whatever you want to call it, big bird

24  premium, whatever, to incentivize the suppliers to continue

25  supplying KFC.

Robert Lewis - Cross

1    *A.*  No.

2    *Q.*  It didn't come from RSCS?

3    *A.*  No.  The suppliers had been talking about that over a

4    period of time, so they are the ones that started the

5    discussion.

6    *Q.*  Well, they may have started the discussion, but the money,

7    the dollars or cents that RSCS was going to pay to deal with

8    that disparity was initiated -- came from RSCS.

9    *A.*  I'm not sure how to answer that question.

10   *Q.*  All right.  Let me -- it's my fault.  Let me try and

11   rephrase the question if I can, sir.

12           We know, sir, that Claxton only produces a small bird,

13   all right?  And so they are not producing a big bird.  They

14   don't have a plant to convert to a big bird plant.  And as we

15   talked about before, if Claxton doesn't get some type of

16   compensation similar to what the big producers are getting,

17   you're going to have a very wide disparity of price between

18   your suppliers.

19           *MR. TORZILLI:*  Your Honor, I object to the question.

20   He says he doesn't know whether at the time Claxton was

21   producing big birds or not.

22           *THE COURT:*  Yeah, I will sustain the objection.

23   Mr. Lewis has indicated several occasions he didn't know

24   whether they only produced small birds.

25           If you could rephrase.

Robert Lewis - Cross

1    *BY MR. LAVINE:*

2    Q.   Do you agree, sir, that Claxton has one plant?

3    A.   Yes.

4    Q.   And Claxton has been producing for KFC for many years.

5    A.   Yes.

6    Q.   Have you ever known Claxton to produce a big bird?

7    A.   I thought maybe they did, but again I'm not certain.

8    Q.   So as you stand here today, you don't know whether they

9    produce a big bird or not.

10            *MR. TORZILLI:*  Asked and answered.

11            *THE COURT:*  Overruled.

12   A.   No.

13   *BY MR. LAVINE:*

14   Q.   Now, there was a follow-up meeting I believe on August 28th

15   with yourself, Mr. Eddington, Mary Hester, Todd Imhoff,

16   Mr. Fries and Mr. Brady to discuss the proposal.

17   A.   Yes, I believe that is correct.

18   Q.   And who is Todd Imhoff?

19   A.   Todd Imhoff was Steve Suerken's boss.  He was the No. 2 guy

20   at RSCS.

21   Q.   And Rich Eddington was the one that came in to replace Mike

22   Ledford and he took over the negotiations.  He was involved

23   heavily with the negotiations of the 2015 contract.

24   A.   I wouldn't use the word heavy, but he was involved in the

25   negotiations.

1360

Robert Lewis - Cross

1  Q.  All right.  Now, at this meeting, sir -- well, let me ask

2  it a different way.  Generally during negotiations some

3  suppliers would start off with the answer of no as far as

4  negotiating; is that correct?

5  A.  I am sorry, what was that?

6  Q.  Some suppliers would come in and say they are not going to

7  negotiate.

8  A.  No.  All suppliers were willing to negotiate.

9  Q.  No suppliers were willing to negotiate?

10  A.  Every supplier that we had contacted was willing to

11  negotiate.

12  Q.  So they were all willing to negotiate.

13  A.  Yes, all six --

14  Q.  I am sorry?

15  A.  All six approved suppliers were willing to negotiate.  They

16  were willing to make proposals.

17  Q.  Okay.  And Claxton was willing to negotiate.

18  A.  Yes.

19  Q.  And Claxton never walked away from the table?

20  A.  No.

21  Q.  Now, during this meeting with Mr. Fries and Mr. Brady, you

22  learned of Claxton's general price negotiation strategy.  Would

23  that be fair to say, sir?

24  A.  I don't understand the question.

25  Q.  Well, every supplier's got their own strategy as to how

Robert Lewis - Cross

1   they are going to negotiate.

2   *A.*  I would assume so.

3   *Q.*  And Claxton had its own type of strategy.

4   *A.*  I would assume so.

5   *Q.*  And did you become aware that Claxton's strategy was that

6   they didn't want to be the highest priced supplier?

7         *MR. TORZILLI:*  Objection, foundation as to Claxton's

8   strategy.

9         *THE COURT:*  Sustained.

10  *BY MR. LAVINE:*

11  *Q.*  During this meeting did you learn of or did you become

12  aware of Claxton's strategy?

13  *A.*  No.  I don't recall that.

14  *Q.*  Okay.  Now, during this meeting -- now, you've negotiated

15  with Mr. Fries before, have you not?

16  *A.*  Yes.

17  *Q.*  And he has always been willing to negotiate?

18  *A.*  Yes.

19  *Q.*  He has never said this is it, I'm leaving?

20  *A.*  Not that I recall.

21  *Q.*  He never threatened to switch to a big bird?

22  *A.*  I don't recall him saying that if he did, no.

23  *Q.*  And he didn't threaten to take his business elsewhere, did

24  he, sir?

25  *A.*  No.

Robert Lewis - Cross

1   *Q.*  And is it fair to say that in your dealings with Mr. Fries

2   that they responded to your directional guidance?

3   *A.*  Yes.

4   *Q.*  All right.  Now, after that meeting in August, do you

5   recall you placed a call to Mr. Brady, as I think you did with

6   other suppliers to try and get them to negotiate the price of

7   this, of the COB, correct?

8   *A.*  I would assume that I did.

9   *Q.*  And do you recall at that time that Mr. Brady agreed to

10  come down 2 cents?

11  *A.*  I recall that Mr. Brady made an adjustment to his margin.

12  *Q.*  Which would -- which correspondingly would mean that the

13  COB price would come down.

14  *A.*  Correct.

15  *Q.*  In a sense he's listening to your directional guidance?

16  *A.*  I don't remember what prompted that change, but I did not

17  guide him on that that I remember.  I don't remember that.

18  *Q.*  Okay.  And, in fact, with all due respect, Mr. Lewis, I

19  mean, I realize this happened eight years ago, but there is a

20  lot of things you just don't remember about the negotiation

21  process for the 2015-2017 contract; is that correct, sir?

22  *A.*  Yes, that's correct.

23  *Q.*  Now, we've looked at the initial bid price for Claxton

24  which was $1.1099.  Do you recall that, sir?

25  *A.*  I believe that.

Robert Lewis - Cross

1  *Q.* And the initial margin was 10 cent supplier margin and 12

2  cent big bird premium.

3        *MR. TORZILLI:* Objection. That misstates the

4  evidence.

5        *MR. LAVINE:* I will be happy to bring it up, Your

6  Honor.

7        *THE COURT:* Rephrase it -- or I am sorry, I did not

8  understand.

9        *MR. LAVINE:* I will bring up the exhibit to show.

10       *THE COURT:* Okay.

11       *MR. LAVINE:* It doesn't misstate the evidence at all,

12  Your Honor, but I will be happy to do that.

13       *THE COURT:* Okay. That's fine.

14       *MR. LAVINE:* Could we bring up Exhibit 1133?

15       And Your Honor, this has been admitted.

16       *THE COURT:* It has been.

17 *BY MR. LAVINE:*

18 *Q.* On Page 1 you can see that it is $1.1099, correct?

19 *A.* Yes.

20 *Q.* And I want to turn to Page 2, please. And at the bottom

21 you can see where the supplier margin is 10 and the big bird

22 profitability is 12. Do you see that, sir?

23 *A.* Yes.

24 *Q.* So you agree with me that when the bid proposal that was

25 submitted by Claxton had a supplier margin of 10 and a big bird

Robert Lewis - Cross

1  profitability of 12?

2  A.  Yes.

3          MR. LAVINE:  You can take that down now, please.

4          If you could bring up 1119, please.

5          COURT DEPUTY CLERK:  This exhibit is admitted.  Is it

6  okay to publish to the jury?

7          THE COURT:  Do you want it published?

8          MR. LAVINE:  Yes, please, Your Honor.

9          THE COURT:  Yes, it may be published.

10          MR. LAVINE:  If you can go to the second page.

11  BY MR. LAVINE:

12  Q.  The COB price on this is 1.0669; is that correct?

13  A.  Yes.

14          MR. LAVINE:  And if we could go to the next page,

15  please.

16          COURT DEPUTY CLERK:  Your Honor, my notes indicate

17  here that -- oh, is it just Page 1 is redacted?  I am sorry, I

18  may be misreading it.  My apologies.

19          THE COURT:  Just Page 1 was.

20          Go ahead, Mr. Lavine.

21  BY MR. LAVINE:

22  Q.  On the second page you can see that the supplier margin is

23  10?

24  A.  Yes.

25  Q.  And the big bird adjustment is .094.

Robert Lewis - Cross

1   *A.*  Yes.

2   *Q.*  It has been reduced since the bid proposal; is that

3   correct, sir?

4   *A.*  Yes.

5   *Q.*  And, in fact, the COB price has come down to 1.0669; is

6   that correct, sir?

7   *A.*  Yes.

8        *MR. LAVINE:*  Thank you.  You can take that down now.

9        I would like to bring up a demonstrative, Your Honor.

10  It's H-684.

11  *BY MR. LAVINE:*

12  *Q.*  Would you please look at this demonstrative.

13       *MR. TORZILLI:*  Your Honor, I am going to object.

14       *THE COURT:*  Hold on one second.  Mr. Lavine, is this a

15  one-page document or several?

16       *MR. LAVINE:*  One page.

17       *THE COURT:*  Go ahead.

18       *MR. TORZILLI:*  We haven't seen this before and it

19  looks like it's drawing from numerous exhibits.  They are

20  voluminous exhibits and we haven't had an opportunity to verify

21  the information on it.

22       *THE COURT:*  Mr. Lavine just has gone over at least

23  some of that information in regard to Claxton.  I will overrule

24  the objection.  H-684 may be used for demonstrative purposes

25  only.

Robert Lewis - Cross

1      MR. LAVINE:  That's all I am asking for, Your Honor.

2      May we publish it?

3      THE COURT:  You may.

4  BY MR. LAVINE:

5  Q.  Now, Mr. Lewis, in front of you is a demonstrative exhibit.

6  The title is Initial Bids to Contract Prices 2014 to '15 Bid

7  Cycle.

8      Now, do you see the blue is the August 2014 bid of

9  $1.1099.  Do you see that, sir?

10 A.  Yes.

11 Q.  The green is to show that the final contract number was

12 1.0669.

13 A.  Yes.

14 Q.  And so Claxton's number came down over 4 cents from the bid

15 proposal to the final contract; is that correct, sir?

16 A.  That's what this indicates, yes.

17 Q.  And that follows the numbers of the bid proposal you and I

18 just went over, as well as the final contract that we just

19 discussed.

20 A.  Yes.

21 Q.  So you don't have any question -- to question the accuracy

22 of these numbers, do you, sir?

23 A.  No.

24      MR. LAVINE:  You can take it down now.  Thank you.

25 BY MR. LAVINE:

1367

Robert Lewis - Cross

1  Q.  Now, sir, I think we showed when we went through the bid

2  proposal to the contract that the margin, the big bird premium

3  went from 12 to .094 -- 40.  It reduced also, did it not, sir?

4  A.  Yes.

5  Q.  Now, sir, even though we've talked about margins here

6  today, isn't the real number that RSCS is concerned about is

7  the bottom line number?  It's the cost for the COB.  That's

8  what you're concerned about.

9  A.  Yes.

10 Q.  That's what you're trying to bring down to the lowest

11 number possible, isn't it?

12 A.  Yes.

13 Q.  And the margin number is just another number that you look

14 at in assessing the bid; is that correct, sir?

15 A.  Yes.

16 Q.  All right.  Is it fair to say, sir, that the initial

17 submission by suppliers is in a sense a hope list.  It's what

18 they are hoping they can get.

19 A.  Yes, that's fair.

20 Q.  And the supplier and RSCS both know that there is -- this

21 is going to be negotiated over several rounds of negotiations.

22 A.  Yes.

23 Q.  Because RSCS doesn't come in and look at the first number

24 and say done, negotiation over.

25 A.  No, we don't.

1368
Robert Lewis - Cross

1   *Q.* And the margin that's stated in this cost model, it's not

2   really the profit in the strictest sense, is it, sir?

3           *MR. TORZILLI:* Object to foundation.

4           *THE COURT:* Overruled.  He can answer if he

5   understands.

6   *BY MR. LAVINE:*

7   *Q.* Let me see if I can explain it -- not explain it.  Let me

8   ask a question, Your Honor.  I apologize.

9           When this -- when the cost proposal comes in, it is

10  the supplier's in a sense best guesstimate of what their

11  expenses are going to be, what the margin may be, and in this

12  case over a three-year period.

13          *MR. TORZILLI:* Objection as to the supplier's state of

14  mind.

15          *THE COURT:* He can answer if he understands.

16          Go ahead.

17  *A.* Yes.

18  *BY MR. LAVINE:*

19  *Q.* And the reason for that, sir, is that as the year

20  progresses, if their plant costs go up, that margin comes down.

21  *A.* The margin doesn't change for the duration of the

22  agreement.

23  *Q.* As far as the contract is concerned.  But to the individual

24  supplier, for example, Claxton -- let's just focus on Claxton

25  for a second.  In this contract they had a margin of 10 cents

Robert Lewis - Cross

1    supplier margin and .0940 big bird premium.  If their plant

2    costs go up, labor, for example, if their labor costs go up,

3    they can't renegotiate this contract with you, can they?

4    *A.*  No.

5    *Q.*  If their plant costs go up, if their labor costs go up,

6    that means they have to absorb that cost.

7    *A.*  Yes.

8    *Q.*  And that's going to come out of their margin, isn't it,

9    sir?

10   *A.*  Yes.

11   *Q.*  Now, sir, I want to bring up government's -- wait a second.

12        Do you recall talking to the government and making the

13   statement that you would expect that there would be similar

14   margin numbers between some suppliers who have identical plant

15   setups?

16   *A.*  Yes.

17   *Q.*  And an example that I think you used was Mar-Jac and

18   Claxton; was that correct, sir?

19   *A.*  I don't remember giving examples.

20   *Q.*  But my statement is accurate, is it not, sir?  Forget the

21   Mar-Jac and Claxton as far as --

22   *A.*  Yeah, your statement is correct, yes.

23   *Q.*  Do you also recall saying, sir, and considering your

24   experience -- and undoubtedly you have a tremendous amount of

25   experience in this area -- do you agree that if the prices for

Robert Lewis - Cross

1    the 2015 KFC contract had been set by an agreement, you would

2    expect the contract prices to be closer.

3    A.   Yes.

4    Q.   Thank you, sir.

5              MR. LAVINE:   If we could bring up Government's 10-4,

6    please.

7              THE COURT:   And you can publish that.   Would you like

8    it published?

9              MR. LAVINE:   Absolutely.   I want it published to the

10   jury, absolutely.

11             THE COURT:   It's been admitted.

12             MR. LAVINE:   Thank you.   Apologize for the delay, Your

13   Honor.

14             THE COURT:   That's all right.

15             MR. LAVINE:   All these documents, it's tough to keep

16   them all straight.

17   BY MR. LAVINE:

18   Q.   Now, government counsel asked you a lot of questions about

19   period pricing and made an emphasis to show the period 13

20   prices.   Do you see that, sir?

21   A.   Yes.

22   Q.   So I want to talk about period pricing for a second.

23             Now, would you agree that period pricing is a method

24   in which the calendar year is broken down into 13 periods of

25   four weeks?

Robert Lewis - Cross

1    A.  Yes.

2    Q.  And for each of these periods the contract price is

3    adjusted.

4    A.  Correct.

5    Q.  And based on the corn and soybean price and the suppliers'

6    freight and basis cost; is that right, sir?

7    A.  Yes.

8    Q.  Corn and soybean is the feed for the birds.

9    A.  Yes.

10   Q.  I want to take it step by step.  And freight and basis are

11   the suppliers' delivery cost.

12   A.  Yes.

13   Q.  When feed prices go down, it exacerbates the small bird

14   differential, does it not, sir, because it costs less to feed a

15   big bird and you make more money on the big bird.

16        MR. TORZILLI:  Objection, foundation.

17        THE COURT:  Overruled.

18   A.  I'm not sure I know how to answer your question.

19   BY MR. LAVINE:

20   Q.  Well, sir, if your feed costs go down, it costs less to

21   feed a big bird.  So if it costs less --

22   A.  Yes.

23   Q.  So that's an accurate statement.

24   A.  Yes.

25   Q.  In some periods the period price will be less than the

1372

Robert Lewis - Cross

1  contract price for the eight-piece COB due to the fluctuation

2  of the pricing of the corn and soybean.

3      MR. TORZILLI:  Objection.  He's testified that the

4  period price is a contract price.

5      THE COURT:  Overruled.  He can answer.

6  A.  Yes.

7  BY MR. LAVINE:

8  Q.  And would you agree, sir, that the customer -- that is you,

9  sir, or RSCS -- tells the supplier at what price to purchase

10  the corn and soybean.

11  A.  Yes.

12  Q.  Now, in looking at government's exhibit where it has period

13  13 pricing is based on a 2014 contract that was negotiated and

14  agreed to in December of 2013.

15  A.  Yes.

16  Q.  One year before.

17  A.  Yes.

18  Q.  And the price reflected in the period 13 pricing does not

19  take into account or consideration any market conditions aside

20  from the corn and soybean meal; is that correct, sir?

21  A.  Yes.

22  Q.  And the reason for that is all you're looking at is a

23  contract that was negotiated in December of 2013.  That

24  contract is not going to change.  If the market goes haywire,

25  that's the price between RSCS and the supplier.

Robert Lewis - Cross

1    A.   Yes.

2    Q.   And so when you look at this period 13 pricing, this

3    doesn't take into consideration any market fluctuations outside

4    of the feed costs.

5    A.   That's correct.

6    Q.   And so in a sense, sir, there is no comparison between this

7    period 13 pricing and your 2015 contract prices, is there, sir?

8    A.   There is a comparison.  It's just been adjusted for feed.

9    Q.   Adjusted for feed.  But it doesn't take into consideration

10   any market fluctuations aside from the feed.

11   A.   It does not.

12   Q.   Thank you.

13        Now, Mr. Lewis, they have asked you a lot of questions

14   about communication with suppliers.  You don't have any

15   personal knowledge that Mr. Fries entered into any agreement

16   with anyone to fix a price, do you, sir?

17   A.   I do not.

18   Q.   And you don't have any personal knowledge that Mr. Fries

19   entered into any agreement to raise a price, do you, sir?

20   A.   I do not.

21   Q.   And you don't have any personal knowledge that Mr. Fries

22   entered into an agreement to maintain prices, do you, sir?

23   A.   I do not.

24   Q.   And you have no personal knowledge that Mr. Brady entered

25   into an agreement with anyone to fix a price, do you, sir?

1    *A.*   No.

2    *Q.*   And you don't have any personal knowledge that Mr. Brady

3    entered into an agreement with anyone to raise prices, do you,

4    sir?

5    *A.*   No.

6    *Q.*   And you don't have any personal knowledge that Mr. Brady

7    entered into an agreement with anyone to maintain prices, do

8    you, sir?

9    *A.*   No.

10         *MR. LAVINE:*  Your Honor, if I can just have one

11   moment, please.

12         *THE COURT:*  You may.

13         *MR. LAVINE:*  Thank you.  Mr. Lewis, thank you very

14   much for your time.  I greatly appreciate it.

15         Your Honor, I pass the witness.

16         *THE COURT:*  All right.  Thank you.

17         Ladies and gentlemen, it's almost 5:00.  We will go

18   ahead and break for the day.  Please keep the admonitions in

19   mind.  Don't try to visit anywhere.  I am not sure you heard

20   anywhere that's nearby, but don't do that.  Keep your vigilance

21   up with family members.  Don't let yourself slip and start

22   talking or even to let people hear or let people talk to you

23   about the case.  Don't let them try to do that.  Tell them they

24   can't.  Try to avoid any press just in case you happen to all

25   of the sudden hear something or something comes up.  Obviously,

1    don't search for anything either, all right?

2         See you back tomorrow.  The jury is excused for the

3    evening.

4         (Jury excused.)

5         Please be seated.

6         And Mr. Lewis, you are excused for the day.  Thank you

7    very much.

8         Why don't we go ahead and talk about the 8-K at this

9    time.  One question that I have -- Ms. Call, you were the one

10   handling this, right?

11        *MS. CALL:*  Yes.

12        *THE COURT:*  So what was supplied to Ms. Grimm,

13   Exhibit 9168, is that still what the government would be

14   attempting to admit?

15        *MS. CALL:*  With one correction, Your Honor.  I did

16   speak with Mr. McLoughlin.  I think in trying to address his

17   concerns we missed one paragraph.  So we would also redact the

18   third page with the Bates number ending in 736106, the

19   paragraph that starts with "The company agrees" and ends with

20   "restricted share agreement below," so redact that on top of

21   what we had proposed.

22        *THE COURT:*  I am sorry, what was the last part?

23        *MS. CALL:*  I said we would redact that on top of what

24   we had already proposed and what Ms. Grimm provided Your Honor.

25        *THE COURT:*  Right.  I had a question about that

1  paragraph, so that's out.

2          Okay.  Let's go over to Page 6110, which I think is

3  the last page of this agreement.  And this indicates how the

4  bonus amount varies.  Mr. McLoughlin --

5          MR. McLOUGHLIN:  Yes, Your Honor.

6          THE COURT:  -- let's just focus on that last page.

7  This is the one that ends in 6110.

8          MR. McLOUGHLIN:  Yes, Your Honor.

9          THE COURT:  What information on that page did you have

10  an objection to?

11          MR. McLOUGHLIN:  Your Honor, what the government is

12  leaving in here is -- there are two things.  First, the far

13  left column you have the 2011 EBITDA and then you have the

14  bonus amount which they have in the actual numbers.  So the

15  first thing here is the actual numbers tell the jury just what

16  his bonus is in certain conditions.  So those numbers have

17  exactly the issue that we have of saying this is what the class

18  warfare problem is.

19          The second thing is that they make clear in the

20  paragraph below, they only redact the numbers.  So it's also

21  clear from the paragraph below that no matter what happens he

22  is going to get a fixed bonus and it invites the jury to

23  speculate about just how big it is.

24          I would note also, Your Honor, that this is for the

25  year 2011.  If I recall the superseding indictment correctly,

1    the conspiracy period is 2012 to 2019.  The 8-K says in that

2    last paragraph that after 2011 the process for calculating his

3    bonus will change.  And it is going to be exclusively up to the

4    discretion of the board of directors.  And so what we have here

5    in terms of this misleading issue is you put all of these large

6    numbers in front of the jury for a year that's not within the

7    scope of the conspiracy, and then for the years where there is

8    something within the scope of the conspiracy they don't have an

9    exhibit, which they shouldn't in the first place, but this

10   invites the jury --

11        THE COURT:  Why don't we hear Ms. Call's response just

12   on that part of it, if you don't mind.  Remind me,

13   Mr. McLoughlin, if there is other aspects of that page or the

14   rest of the exhibit that you have objections to, but why don't

15   we just focus on what you just mentioned.

16        MR. McLOUGHLIN:  It's those two columns which give the

17   jury significant numbers and invite further speculation.

18        THE COURT:  Ms. Call, response?

19        MS. CALL:  Yes, Your Honor.  I don't know that I have

20   a response on speculation other than we can remove the

21   redaction, but I don't think that solves Mr. McLoughlin's

22   problem there.  But in terms of the term, and I think the third

23   page of the document did say that this agreement covered into

24   2013, but that is now redacted to address some of

25   Mr. McLoughlin's other concerns, which does go into the

1    conspiracy period.  And this is simply the employment agreement

2    from when Defendant Lovette I believe joined the company.

3              THE COURT:  I am sorry, I missed that.  What goes into

4    that?

5              MS. CALL:  The term of this agreement went into the

6    end of 2013.  I am happy to pass up an unredacted portion if

7    you would like to confirm that.

8              THE COURT:  When you say this agreement, what are you

9    talking about?

10             MS. CALL:  The 8-K identifies this as Defendant

11   Lovette's employment agreement.  I am trying to find the page

12   where I noticed that.

13             THE COURT:  Because Mr. McLoughlin is quite correct

14   that the page that we were talking about before that ends in

15   6110 has the language that he mentioned about how for purposes

16   of 2011 the annual bonus will be determined by the board and is

17   subject to board approval.  So his point is that the numbers

18   reflected by the terms of this page would only include a time

19   period outside of the charged conspiracy.

20             MS. CALL:  One moment, Your Honor.  Your Honor, how

21   about as a suggestion we will meet and confer on this because I

22   think there are some board meeting minutes that we also were

23   planning to use, and we might be able to come to resolution on

24   proper redactions between the parties.

25             THE COURT:  Yeah, because this page I think is

1    irrelevant and for the reasons -- and I also have a concern

2    that Mr. McLoughlin mentioned which is that my order allowed in

3    evidence that would demonstrate that Mr. Lovette could be

4    incentivized by the bonus structure to fix prices because that

5    would increase the profitability of the company.  That was

6    appropriate, but that I wanted to avoid discussions of his

7    salary, lifestyle, things of that nature.  And that's why

8    putting in front of the jury a bonus that doesn't fluctuate at

9    all, just his base bonus, it doesn't have anything to do with

10   his incentives.  That's just what he gets.  And that's

11   irrelevant to this particular case.  The incentives are

12   relevant, but just his base bonus is not relevant.

13        MS. CALL:  Yes, Your Honor.  And to make sure I am

14   understanding you correctly, we did redact out the base bonus,

15   so the only thing that's still left on this page is the

16   variability between different amounts of the EBITDA term we

17   spoke about earlier.  So the second redaction on the page was

18   the base bonus amount which I believe was 500,000 there.

19        THE COURT:  My copy does not have that redacted.

20        MS. CALL:  I can pass up another.

21        THE COURT:  Well, that's not really relevant.  We

22   don't have to get into that because you are going to talk about

23   it.

24        MS. CALL:  Yeah.  I understand your order, Your Honor.

25   Thank you.

1           THE COURT:  Anything else, Mr. McLoughlin, about this

2     document that you want to bring up even though it may be talked

3     about between the two sides?

4           MR. McLOUGHLIN:  Just so the record is clear, Your

5     Honor, am I correct the government is withdrawing this exhibit

6     and it is no longer in evidence?

7           THE COURT:  I don't know that, but she has clearly

8     indicated that she is going to work on that last page.

9           MR. McLOUGHLIN:  Your Honor, just for the record, for

10    the reasons stated we would move to strike the exhibit.

11          THE COURT:  Well, it hasn't been offered yet.

12          MR. McLOUGHLIN:  It has been and admitted.  It was

13    yesterday after the testimony of Mr. Sangalis.  We have been

14    trying to catch up, Your Honor.  It has not been displayed to

15    the jury.

16          THE COURT:  Do you show that, Mr. Keech?

17          MR. McLOUGHLIN:  It's at the close of his testimony,

18    but it was never displayed to the jury, so we have a no harm,

19    no foul at this point.

20          COURT DEPUTY CLERK:  You said yesterday?

21          THE COURT:  It would have been last week.

22          MR. McLOUGHLIN:  Ms. Rogowski moved it in.

23          THE COURT:  I am going to assume that it was admitted.

24    So we have the indication from Ms. Call that the page that ends

25    6106 will be -- that one paragraph will be redacted.

1           And then, Ms. Call, I would like you to work with

2   Mr. McLoughlin on redactions to that last page.

3           And then Mr. McLoughlin, did you have additional

4   concerns with the admitted pages?

5           *MR. McLOUGHLIN:*  Yes, Your Honor.  Just for the

6   record, it was at Page 184 of our transcript that it was

7   admitted, the daily transcripts.  And yes, Your Honor is right,

8   Your Honor identified the fact that you have the numbers up

9   above invites speculation as to the base bonus, but also we

10  have the circumstances as I indicated that this is for 2011.

11  It doesn't apply in 2012.  It says for future year -- your

12  bonus opportunity for years after 2011 will be set by the

13  board.  So all of this only applies not to -- it's not a

14  formula to be used in the future in 2012.  It only applies for

15  the year of 2011.  So the risk, the 403 risk here in

16  combination with the irrelevancy is an issue, particularly

17  given that the government wants to keep the numbers.

18          *THE COURT:*  I will take a look at the transcript of

19  when it was admitted.  I don't want to spend time going over

20  exhibits that were already admitted because this trial will

21  hopelessly bog down, but I will let Ms. Call think about that

22  too.  I do have concerns about the relevancy because it seems

23  to be talking about a time period that is outside of the

24  charged conspiracy period.

25          *MR. McLOUGHLIN:*  And just for the record, Your Honor,

1    and we will discuss it with the government, Paragraph 2B on the

2    prior page ending Bates No. 36109, 2B also has material that we

3    would request to be redacted in part because they address the

4    issues of the compliance and the code of conduct which Your

5    Honor has already excluded.  We don't need to go into that now

6    at this point, Your Honor, but you have already made a ruling

7    about the code of business conduct, and so we would also seek

8    to have that redacted in compliance with your order, but we can

9    talk to the government.

10             THE COURT:  Okay.  And that's on Page 6109?

11             MR. McLOUGHLIN:  Yes, Your Honor, the prior page.

12             THE COURT:  What paragraph is it?

13             MR. McLOUGHLIN:  Paragraph 2B under position and

14   responsibilities.  It says during the term, you will be bound

15   by the policies and procedures of the company applicable to you

16   including the company's codes of ethics and business conduct.

17             THE COURT:  Okay.  I can rule on that right now.

18   There is no problem with that mentioned.  What would be a

19   problem is that if a code or a portion of a code were brought

20   in front of the jury suggesting that or perhaps creating

21   confusion about what standard would apply to the defendants in

22   this case.  This mention wouldn't do that, so that's not a

23   problem, okay?  Are we done with this particular exhibit?

24             Ms. Prewitt?

25             MS. PREWITT:  Just very briefly, Your Honor.  We were

1    just handed a thumb drive with additional exhibits slotted for

2    Agent Koppenhaver.  That's a witness that Ms. Hall represented

3    was going to be testifying today.  Obviously, that's not the

4    case.  But the more serious issue is updated summary charts we

5    are receiving.  Look, we are doing everything we can to digest

6    this material as it's coming in, but at this point we have 10

7    individual defendants and each of us have a limited range to be

8    combing through additional exhibits that come through the door.

9    Your Honor, I would just like some representation from the

10   government that midnight, 2:00 a.m. as has been the habit in

11   this case, we are not going to get another set of exhibits

12   attributed to this witness and we will not be getting updated

13   summary charts.

14        MR. McLOUGHLIN:  And Your Honor, on behalf of

15   Mr. Lovette we would move to exclude the exhibits.  The

16   government represented to the Court and to us we would get the

17   exhibits 48 hours in advance.  We are not 48 hours before

18   Mr. Koppenhaver is going to testify and it is virtually

19   impossible for us to prepare given that we keep getting, as

20   Ms. Prewitt said, multiple e-mails a night with new exhibits

21   and some removed, some added.  It is impossible.

22        THE COURT:  Let's talk about Special Agent

23   Koppenhaver.  So he appears to be someone from whom -- or

24   through whom a lot of exhibits are going to be admitted, so can

25   someone from the government give me a preview of how is that

1384

1  going to happen?  What is that going to look like?  Why does he

2  have foundation or why would he be a sponsoring witness for

3  this large number of exhibits?

4       MS. CALL:  Yes, Your Honor.  Would you like me to go

5  straight to the exhibits or perhaps give a broader outline of

6  the types of testimony we would expect?  I would be happy to do

7  either.

8       THE COURT:  Why don't you give me a quick broad

9  outline.  I don't want to get too bogged down because it's

10  getting later.

11       MS. CALL:  I think there is four general categories he

12  would testify to.  First would be the background of the

13  investigation and investigative techniques to include review of

14  phone records, which have already for the most part been

15  admitted as business records.  The second would be --

16       THE COURT:  What would he say about review of phone

17  records?

18       MS. CALL:  Essentially that he conducted a review and

19  identified certain calls between certain participants.  I

20  believe Your Honor has already seen several summary exhibits.

21  The first one would be 90-10 associating certain individuals

22  with certain phone numbers.  So it would essentially be

23  identifying the calls he identified between two particular

24  phone numbers.

25       THE COURT:  Okay.

1    MS. CALL:  So the second would be then introducing

2  other documents aside from those phone records after

3  establishing relevancy.  It's generally just going to be on the

4  face of the document.  We in line with the Court's previous

5  ruling don't intend to have him interpret documents in any way

6  aside from reading perhaps header information and then actual

7  sentences word for word from the documents and no

8  interpretation.  So the relevance would be established, and

9  admissibility for most of them I believe is going to be the

10  co-conspirator exception, so that's what we would be

11  establishing.

12    THE COURT:  But what would you ask him about each one?

13  Why would he be the guy to get them in through as opposed to

14  you just standing up with him sitting in the witness room and

15  you moving the admission of those exhibits?

16    MS. CALL:  It would mostly be establishing time frames

17  that he investigated during the course of his investigation, so

18  identifying phone calls occurring around the times of

19  particular e-mails or text messages.

20    THE COURT:  But that's not how he looked at or

21  examined these documents.  He is not gathering documents in

22  some chronological fashion, right?  I just don't understand why

23  he is needed as a witness for any of these things.

24    MS. CALL:  I believe, Your Honor, that would be a part

25  of his testimony that as a part of his investigation, he

1    focused on certain time frames and gathered particular evidence

2    relating to those time frames.

3         THE COURT:  But these are mainly documents that are

4    just coming to the government in some huge batch from a Grand

5    Jury subpoena, right?

6         MS. CALL:  In addition to search warrants and other

7    investigative techniques, yes.

8         THE COURT:  Okay.  But, I mean, for instance, e-mails

9    that would come in through the co-conspirator hearsay

10   exception, he isn't gathering them on some type of yearly basis

11   or anything like that.  He's just presumably looking through

12   large masses of documents that got produced through subpoenas.

13        MS. CALL:  Yes, Your Honor.

14        THE COURT:  Okay.

15        MS. CALL:  There is just two more points, I think.

16   The third point would be using just I think two or three

17   demonstratives showing some of that chronology I was discussing

18   between the calls and the documents that he reviewed, and the

19   last thing is describing the interview of Defendant Little as

20   relevant to the obstruction count.

21        THE COURT:  Okay.  Because he has personal knowledge

22   of that?

23        MS. CALL:  Correct, Your Honor.

24        THE COURT:  Okay.  And I forget when, but I think

25   early maybe today a motion was filed on summary witnesses.  I'm

 1   not sure if the government has had a chance to respond to that,

 2   but obviously it sounds like it could come up with Special

 3   Agent Koppenhaver.  Is the government going to respond or -- I

 4   mean, there has been a lot filed on that already.

 5         MS. CALL:  Yes, Your Honor.  I think we would propose

 6   submitting a short response and we can get that in this

 7   evening.  We are drafting it at the moment.  But I will note

 8   that I think some of the concerns expressed in that filing seem

 9   to be based on introduction of hearsay through a summary agent

10   which is not at all what the government intends to do.

11         THE COURT:  I don't think so.  I really think that --

12   you know, there are 10th Circuit cases like the *Brooks* case, I

13   would urge you to take a look at the *Brooks* case, but usually

14   an overview witness, and maybe that's what Special Agent

15   Koppenhaver is, but the rule of such a witness is very limited

16   as to describe some basics.  And what I am concerned about

17   possibly with Special Agent Koppenhaver, but in particular with

18   Special Agent Taylor, who, of course, will be the summary

19   witness, is that there will be -- that he is going to be giving

20   a closing argument and he is not going to be giving a closing

21   argument.  So you have to take -- I want to make sure the

22   government looks over that case law very carefully because, you

23   know, Special Agent Taylor is scheduled for five hours.  You

24   know, maybe there is five hours of fact testimony from him, but

25   maybe not, okay?

1          All right.  We'll be in recess.  Thank you.

2      (Recess at  5:22 p.m.)

3                          INDEX

4  WITNESSES

5     Robert Bryant

6          Cross-Examination Continued By Mr. Kornfeld      1157

7          Cross-examination By Mr. Gillen                  1160

8          Recross-examination By Mr. Feldberg              1193

9     Philip Fanara

10         Direct Examination By Ms. Butte                  1196

11         Cross-examination By Mr. Schall                  1200

12         Redirect Examination By Ms. Butte                1208

13    Kenneth Oliver

14         Direct Examination By Ms. Butte                  1220

15    Robert Lewis

16         Direct Examination By Mr. Torzilli              1227

17         Cross-examination By Mr. Lavine                  1318

18                        EXHIBITS

19  Exhibit       Offered   Received   Refused   Reserved   Withdrawn

20  10-4                    1313

21  1028                    1285

22  1029                    1285

23  1119                    1293

24  1120                    1304

25  1121                    1293

| | INDEX (Continued) | | | | | |
|---|---|---|---|---|---|---|
| | EXHIBITS | | | | | |
| Exhibit | Offered | Received | Refused | Reserved | Withdrawn | |
| 1122 | | 1304 | | | | |
| 1123 | | 1293 | | | | |
| 1124 | | 1304 | | | | |
| 1125 | | 1293 | | | | |
| 1126 | | 1293 | | | | |
| 1127 | | 1293 | | | | |
| 1129 | | 1301 | | | | |
| 1132 | | 1275 | | | | |
| 1133 | | 1275 | | | | |
| 1134 | | 1259 | | | | |
| 1135 | | 1259 | | | | |
| 1136 | | 1259 | | | | |
| 1137 | | 1259 | | | | |
| 1138 | | 1259 | | | | |
| 1139 | | 1259 | | | | |
| 1160 | | 1287 | | | | |
| 1243 | | 1308 | | | | |
| 1728 | | 1304 | | | | |
| 1729 | | 1304 | | | | |
| 9240 | | 1247 | | | | |
| 9247 | | 1249 | | | | |
| 9556 | | 1217 | | | | |

1    INDEX (Continued)

2    EXHIBITS

3    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4    9656                     1217

5    9671                     1172

6    REPORTER'S CERTIFICATE

7    I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.  Dated

9    at Denver, Colorado, this 21st day of January, 2022.

10

11                          S/Janet M. Coppock

12

13

14

15

16

17

18

19

20

21

22

23

24

25