1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 20-CR-00152-PAB

     UNITED STATES OF AMERICA,
4

         Plaintiff,
5

     vs.
6

     JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 14

15   _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:18 a.m., on the 15th day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Janet M. Coppock, 901 19th Street,
25          Room A257, Denver, Colorado, 80294, (303) 335-2106

```
1                        APPEARANCES
2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
3  Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
4  Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
5  for Plaintiff.
6           Anna Tryon Pletcher and Michael Tubach of
7  O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
8  San Francisco, CA 94111-3823;
9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10 N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12 Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13 CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15 LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17 Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18 appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20 Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21 10017;
22
23
24
25
```

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

| | |
|---|---|
| 1 | APPEARANCES (Continued) |
| 2 | Craig Allen Gillen and Anthony Charles Lake of |
| 3 | Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920, |
| 4 | Atlanta, GA 30339; |
| 5 | Richard L. Tegtmeier of Sherman & Howard, LLC, |
| 6 | 633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing |
| 7 | for Defendant Roberts. |
| 8 | Barry J. Pollack of Robbins, Russell, Englert, Orseck |
| 9 | & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington, |
| 10 | DC 20006; |
| 11 | Wendy Johnson and Christopher Plumlee of  RMP, LLP, |
| 12 | 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing |
| 13 | for the Defendant Blake. |
| 14 | |
| 15 | PROCEEDINGS |
| 16 | THE COURT:  We are back on the record in 20-CR-152. |
| 17 | It looks like everyone is present.  We got a call this morning. |
| 18 | One of our jurors, the juror who sits normally in seat No. 14, |
| 19 | he is ill.  He is going to a -- what is it, Ms. Grimm? |
| 20 | COURT DEPUTY CLERK:  Urgent Care. |
| 21 | THE COURT:  Urgent Care.  And as part of that, he |
| 22 | plans on getting a rapid test.  He does not -- in any event, |
| 23 | regardless of what the results of the rapid test are, he |
| 24 | doesn't feel well enough to come in today.  However, depending |
| 25 | on the results of the rapid test and depending on how he may |

 1   feel tomorrow, we might -- you know, if he is well enough to

 2   come in tomorrow, I think that that would be good.  I don't

 3   want to go through the rest of this trial with no alternates.

 4   I think that that would be bad.

 5          In the meantime, we have Mr. Skalak who has an

 6   obligation tomorrow.  So what we need to figure out, and I

 7   can't remember all the details with Mr. Skalak, but he has an

 8   obligation tomorrow, but would he be available later?  I don't

 9   know what his procedure is or whatever, but do you happen to

10   know, Ms. Sweeney?

11          MS. SWEENEY:  Carolyn Sweeney for the United States.

12   His procedure is in early December and I believe it was a four

13   to six-week at least recovery period.

14          THE COURT:  Okay.  But tomorrow he has what without

15   going into too much detail?

16          MS. SWEENEY:  I believe there were things that started

17   tomorrow.  His flight out is tomorrow morning.  I don't have it

18   in front of me what exactly happens before surgery, but I think

19   it was --

20          THE COURT:  We need to figure that out.  The question

21   is whether before he has the major operation or whatever he

22   would be available to come back even though perhaps he is

23   unavailable tomorrow because he needs to go in for some

24   advanced testing or I don't know what, but that's what we need

25   to figure out.  Assuming he could come back, he could come

 1    back, you know, like maybe later this week or something of that

 2    nature.

 3         MS. SWEENEY:  I can speak to his counsel.  I know he

 4    is on cross-examination, but as long as it's okay to speak to

 5    his counsel about this scheduling issue, I am happy to do that.

 6         THE COURT:  Yes, you can.

 7         So let's initiate that, if we can, now because that's

 8    going to determine what we do for the rest of the day.  If

 9    Mr. Skalak might be able to come back, then it may be

10    worthwhile for us to send the jury home and we'll get the

11    results.  I think in any event, we will need to wait to get the

12    results of the rapid test back because if that's positive, then

13    it doesn't matter.  If it's negative, then there is at least a

14    possibility that the juror may feel better tomorrow and we

15    might be able to have him come back.  But I really don't want

16    to lose him, especially given the fact that we are going to be

17    taking off some time to go through exhibits anyway.

18         All right.  Any questions or thoughts about that plan

19    of action?

20         Okay.  Why don't we, while we're waiting, then, go

21    ahead and talk about some of the other things that are at

22    issue.  And I am not sure -- yeah, go ahead, Mr. Fagg.

23         MR. FAGG:  Your Honor, this is just a completely

24    personal issue.  My son broke his femur yesterday and I'm

25    waiting to -- he is going to the surgeon this morning.  And I

1    was just going to seek the Court's attention to keep my phone

2    on, but on vibrate, just as we are waiting to hear from the

3    surgeon.

4            THE COURT:  Absolutely.

5            MR. FAGG:  Thank you.

6            THE COURT:  Anyone want to take up the remaining

7    motions that were filed some of them over night in any

8    particular order?

9            Mr. Kornfeld?

10           MR. KORNFELD:  Thank you, Your Honor.

11           Your Honor, over Saturday night, actually, the

12   government filed its motion to exclude sequestered documents at

13   Docket No. 831.  We responded, we being Mr. Fries and

14   Mr. Brady, in Docket No. 832 yesterday morning.

15           I think there are really two issues, Your Honor.  And

16   this is around the issue of the Pollo Tropical documents and

17   the 12 that have been produced, et cetera.  I think there is

18   two issues.  There is a substantive issue about the documents,

19   and we can update the Court on that in a second, and then there

20   is the actual motion, No. 831, and some of the allegations

21   contained in the motion that are floating out there.

22           I am not a believer, Your Honor, that cases are about

23   the lawyers.  I think the lawyers and their egos have to get

24   out of the way and cases have to focus on what -- criminal

25   cases whether the government can meet its burden to prove its

1    case beyond a reasonable doubt.  The problem with 831 is that

2    the government without inquiry of us, as counsel for Mr. Brady

3    or counsel of Mr. Fries, or without any facts contained in 831

4    essentially not only accuses counsel, and that's one issue, but

5    more fundamentally accuses Mr. Fries and Mr. Brady effectively

6    of seeking to manipulate Rule 16, Rule 17, Judge Durkin in

7    Chicago, this Court's process, without facts, without inquiry,

8    and frankly, Your Honor, without merit.

9         And the motion reads -- you know, we had some e-mail

10   exchanges with the government where we basically said, hey, we

11   would ask you to withdraw that motion.  You shouldn't be

12   accusing us of this without any, you know, facts.  You didn't

13   reach out to us.  That's discourteous.  It's unprofessional,

14   frankly, and it's inconsistent with the practice standards in

15   my experience with the Department of Justice and the U.S.

16   Attorney's Office and the defense bar in this district.

17        The fallback position essentially was, well, we're not

18   saying you, the lawyers, did anything.  We are really sort of

19   implicating your clients.  And that's even more disturbing as

20   if Mr. Fries and Mr. Brady are sitting back in their lair in

21   Claxton, Georgia petting their white Persian cat and

22   manipulating the Winston & Strawn corporate lawyers in Chicago.

23   That did not happen.

24        So I would ask, I would reiterate my request

25   particularly in light -- and I will get to the second issue of

1    what's going on with the actual documents -- I would reiterate

2    my request that that pleading be withdrawn because not only is

3    that unfair to the clients, but essentially it puts before the

4    Court alleged improper conduct by two defendants that are

5    sitting on trial before this Court.  So I think that's also

6    prejudicial.

7            In terms of the substance of the issue, Your Honor,

8    there are 12 documents that have been produced.  It turns out

9    there is 250,000 documents that were produced in the civil case

10   by Pollo Tropical.  The government -- not only did the

11   Department of Justice writ large, but some of these very

12   prosecutors are entered in Chicago in the case before Judge

13   Durkin, *In Re: Broilers* litigation, so the government is aware

14   of the documents.  We've asked them -- there were numerous

15   e-mail going back and forth about documents "in this matter,"

16   what does in this matter mean.  The bottom line is you didn't

17   have to be a genius to read the Bates numbers and to figure out

18   there were more than 12 documents and indeed there were.

19           It turns out that counsel for Claxton, which has

20   entered in Chicago, moves to have a handful of documents

21   released.  That creates a fire storm.  We do not know about

22   that and, more importantly, our clients don't know about that.

23   And then over the weekend counsel for Pollo Tropical says,

24   look, if Judge Brimmer allows these documents to be used, we

25   will release them from the confidentiality agreement for

1   purposes of use in *United States v. Penn, et al.*, without

2   waiving, you know, whatever rights we otherwise have under the

3   confidentiality agreement.

4        So I think as a substantive matter, obviously the

5   Court needs to rule about whether or not those documents can be

6   used before the Brink examination.  As a substantive matter, I

7   think it's a bit of a tempest in a teapot.  I think the

8   government has withdrawn its emergency motion before Judge

9   Durkin to prevent the release of the documents.  That's a moot

10  point because Pollo Tropical, as I said, has agreed to lift the

11  protection.

12       So, you know, those are sort of the two issues before

13  the Court.  And again, and Mr. Lavine may want to address on

14  behalf of Mr. Brady that, you know, the shot across the bow at

15  the clients, but I will just tell the Court as a long-time

16  practitioner in this district in particular, but a long-time

17  criminal practitioner as most of all of my colleagues are, that

18  was very disturbing to me personally, professionally, but most

19  fundamentally as counsel for Mr. Fries because that was an

20  unwarranted meritless uncalled for shot at a defendant who is

21  sitting here on trial.

22       And the last thing I'll say, Your Honor, is in the

23  motion the government talks about gamesmanship and accuses

24  criminal counsel, civil counsel and, most importantly, the

25  clients of "gamesmanship."  I will assure the Court at the risk

 1   of stating the obvious that this matter and sitting here as

 2   criminal defendants in U.S. District Court is no game.  It's no

 3   game for Mr. Fries.  It's no game for Mr. Brady.  And I am

 4   confident in saying it is no game for the other eight

 5   defendants.  So the parties can hit hard and litigate hard, but

 6   you've got to litigate fair and that was unfair.

 7            Thank you, Your Honor.

 8            THE COURT:  Response from the United States.

 9   Mr. Torzilli?

10            MR. LAVINE:  Your Honor?

11            THE COURT:  I am sorry, Mr. Lavine.  Yeah, why don't

12   you go first.

13            Sorry, Mr. Torzilli.  Why don't we hear from

14   Mr. Lavine first.

15            MR. LAVINE:  Your Honor, I am not going to repeat

16   everything Mr. Kornfeld said.  I was not about to get embroiled

17   in the e-mails that government counsel sent out yesterday, but

18   I will say as a practitioner for a long time, I found the

19   actions of the government to be unprofessional.  I think they

20   crossed a line that they don't come back from.  I don't mind

21   taking a shot at me.  It doesn't phase me at all.  I know what

22   I've done.  I know what I didn't do.  But you don't take a shot

23   at my client.  My client had no notice of this filing.  I had

24   no notice of this filing until it came out.

25            And government counsel, I am not going to mention

1    names, they can live with it themselves, but they crossed a

2    line.  When they allege impropriety by myself or they say

3    gamesmanship by my client, I draw the line at that.  And that

4    motion should be withdrawn and there is no excuse for this type

5    of action in this courtroom at all by any lawyer whatsoever.

6              Thank you, Your Honor.

7              THE COURT:  Thank you, Mr. Lavine.

8              Mr. Torzilli?

9              MR. TORZILLI:  Your Honor, first of all, just to maybe

10   make the record even clearer, and I realize there is some

11   information that you're not aware of because it involves that

12   case in the Northern District of Illinois, but you did just

13   hear Mr. Kornfeld accuse the Department of moving to prevent

14   "release of the documents," which is false.  That's a

15   misrepresentation.  We moved the Court in the Northern District

16   of Illinois for relief from our protective order obligations.

17   And I am happy to file and provide Your Honor with a copy of

18   the motion that we filed to seek the relief -- release of the

19   documents and release of our obligations under the protective

20   order, so that's false.

21             Going to the motion, I think the motion speaks for

22   itself.  I don't think it is accusatory of the lawyers who are

23   representing Mr. Fries and Mr. Brady, but I think the facts are

24   indeed the facts.  There is a manipulation of Rule 16 here that

25   ought not to be approved in any way, and that is the basic

1    rationale for having the documents excluded from use in this

2    case.

3         As far as the 250,000 Pollo Tropical documents, as I

4    said on the record on numerous occasions and written e-mails to

5    the defendants, we do not possess those documents.  We never

6    have.  And as our status as intervenor in the case, we do not

7    routinely receive document productions from parties or third

8    parties in that case.

9         We asked in a number of e-mails over the weekend that

10   went back and forth, we asked counsel for an explanation as to

11   what they knew and when they knew it about the transmittal of

12   the 14 documents to us on Friday afternoon, and they responded

13   that a response is unnecessary and unwarranted.  So I just

14   wanted to clear the record on those points and I think that the

15   motion ought to be granted.

16        THE COURT:  Well, let's talk about Mr. Kornfeld's

17   point that this may be a tempest in a teapot.  I haven't read

18   the protective order in the Northern District of Illinois case,

19   but is it true based upon your understanding that Pollo

20   Tropical can, since they're Pollo Tropical's documents,

21   essentially approve and unilaterally release certain documents

22   outside of the scope of the protective order?

23        MR. TORZILLI:  They have the power to stand down on or

24   consent to the use and disclosure of documents that they have

25   designated as confidential or highly confidential.  With

1    respect to the 14 documents that we still have sequestered,

2    they have done that.  And that's the reason why we withdrew the

3    motion that we filed in Chicago to seek relief from the

4    protective order because it's effectively moot because on

5    Sunday Pollo Tropical said that they will consent to the use

6    and disclosure of those 14 documents solely for purposes of

7    this case.

8           THE COURT:  Okay.  And have the 14 documents been

9    produced, then, to the defendants?

10          MR. TORZILLI:  They are still sequestered.  They are

11   waiting from guidance from Your Honor.  And as soon as we get

12   the guidance if it is to not exclude those documents, we are

13   happy to produce them and so forth.

14          THE COURT:  Okay.  Well, it sounds like Docket No. 831

15   is now moot and will be denied as such.  And also I direct that

16   the documents be produced to the defendants, the 14 documents.

17   I was going to say that we should probably wait for Judge

18   Durkin, but I don't think that -- if the representation and

19   understanding on both sides is that Pollo Tropical has the

20   ability without an order from the judge in that case to take

21   them out of the scope of their protective order, then they

22   should be produced.

23          MR. TORZILLI:  Absolutely, Your Honor.  And just to be

24   clear on that point, we withdrew the motion, so there is

25   nothing, in fact, before the court there in any event.

1          *THE COURT:*  Yeah, I understand that now too, so --

2     okay.

3          *MR. TORZILLI:*  Thank you.

4          *THE COURT:*  All right.  Should we talk about

5     confidentiality agreements, then?  This will come up, I guess,

6     with Mr. Brink, right?  Yeah, okay.  Let's talk about that.

7          So whoever -- who from the United States is handling

8     Mr. Brink?  If you don't mind going to the podium,

9     Mr. Torzilli, I have got some questions for you.

10          *MR. TORZILLI:*  Sure.

11          *THE COURT:*  So what is -- so Mr. Brink, do you

12     anticipate that he is going to testify that the confidentiality

13     agreements -- there are two of them at different periods of

14     time -- prevented a supplier of chicken products to Pollo

15     Tropical from disclosing to the suppliers' competitors persons

16     or entities who may be competing on an ongoing bid with Pollo

17     Tropical to share price information?

18          *MR. TORZILLI:*  Yes, that's his -- his expectation as a

19     counter-party to those confidentiality agreements, which

20     incidentally are part of their annual contracts with the

21     suppliers, give him an expectation that their suppliers would

22     be keeping the communications about negotiations between Pollo

23     Tropical and the chicken supplier confidential as between them.

24          *THE COURT:*  Okay.  And was a representation made to

25     suppliers when it came time to submit bids independent of the

1   confidentiality agreements that they were not to share prices

2   with -- or bids with competitors?

3          MR. TORZILLI:  Independent of what's contained in the

4   agreement you are asking about?  Not that I'm aware of.

5          THE COURT:  Okay.  And what information is he assuming

6   would be improper to share, just the bid information?

7          MR. TORZILLI:  The price and negotiation status.

8          THE COURT:  Negotiation status, what does that mean?

9          MR. TORZILLI:  As far as whether they have got an

10  agreement with supplier A or whether they are still negotiating

11  or whether they are at an impasse.

12         THE COURT:  Who is they?

13         MR. TORZILLI:  Pollo Tropical and the counter-party,

14  so here the chicken suppliers.

15         THE COURT:  Okay.  And does Mr. Brink focus on a

16  particular provision of the confidentiality agreement?

17         MR. TORZILLI:  In particular, there is a provision in

18  there that indicates that confidential information shouldn't be

19  used to unfairly compete, I think are the words, or something

20  to that effect against Pollo Tropical.

21         THE COURT:  Yeah, but take a look at that.  I mean,

22  what does it say that would have anything to do with a person's

23  bid price?  Because the thing is that like most confidentiality

24  agreements, these confidentiality agreements, and while it's

25  not crystal clear, it does definitely seem to be written in the

1    sense that confidential information is information given to you

2    by the other party, so it's confidential to the other party and

3    you can't just share it.

4         And if the meaning of confidential information was

5    that once you give your own information to the other side, now

6    it's confidential and you're restricted from sharing the

7    information, you know, it would create all sorts of havoc and

8    wouldn't seem to have any purpose in terms of why you had the

9    confidentiality agreement in the first place.

10        I am not sure about bid status.  That's a little bit

11   different, but the defendants claim that certainly since the

12   bid information is the information of the suppliers, that these

13   confidentiality agreements don't really seem to cover their

14   ability to share that information with third parties.

15        MR. TORZILLI:  Well, the bids in the context of

16   negotiations which he views as the negotiations being one on

17   one and confidential, which I think his view is that's a common

18   commercially reasonable way to think about negotiations and

19   it's commonly reflected in NDA's nondisclosure agreement.

20        THE COURT:  All right.  Anyone from the defense want

21   to address that one?

22        MR. CANTY:  Yes, Your Honor.  I think Your Honor has

23   nailed it right on the head.  I don't think the confidentiality

24   agreements apply to information moving this direction, bid

25   information in possession of a supplier moving toward a buyer.

1            One thing that I would also add to this point -- and

2    Brian, can we pull up Government Exhibit 5-1, summary

3    Exhibit 5-1?  That's the exhibit where the government sets

4    forth the Pollo Tropical episode, for lack of a better word,

5    and it frankly ends in October of 2014.  The agreement that

6    Mr. Little is supposed to have signed was not executed until

7    July of 2015.  It cannot apply to the conduct that the

8    government is complaining of, so with that addition.

9            THE COURT:  What about bid status, Mr. Canty?

10           MR. CANTY:  I am not even sure what the bid status

11   means.  Essentially what we are talking about here is -- the

12   conduct we are complaining about is sharing a price and the

13   price didn't come from the buyer.  The price came from the

14   supplier.

15           THE COURT:  Mr. Torzilli, with the Pollo Tropical

16   bidding process, we heard lots of evidence regarding other

17   chicken purchasers and it was a fairly open process.  A lot of

18   times e-mails are sent to all the suppliers and they all knew

19   what the -- when the rounds were.  And, in fact, that could be

20   good from the purchaser's standpoint because everyone knows

21   that they are competing with each other and they have got to

22   come up with a good price.  Is that how the Pollo Tropical

23   people conducted their bidding process too?

24           MR. TORZILLI:  No.  They had three different -- in

25   2014, which is the year principally at issue here, they had

1    three incumbent suppliers that they were negotiating with, a

2    company called Holmes, but the two main ones in terms of the

3    quantity of the evidence are Pilgrim's and Claxton.  And they

4    were, they meaning Pollo Tropical, were having one-on-one

5    dealings.  So at least as far as I am aware, their aren't the

6    sort of mass e-mails that we've seen in connection with, for

7    example, the RSCS negotiation.

8              *THE COURT:*  Mr. Canty?

9              *MR. CANTY:*  Your Honor, I think you will see as we go

10   through the examination of Mr. Brink that particularly with the

11   negotiations, the bid processes for 2012 and 2013 if we are

12   going to get into that, Mr. Brink freely shared competitor

13   information with other competitors in order to drive the price

14   down.  We will see that.  So for someone to say that there was

15   an expectation that that information wouldn't be shared by

16   anyone is kind of a stretch.

17             *THE COURT:*  Okay.  But Mr. Torzilli, just to be clear,

18   did Mr. Brink have -- did he have any reason to know that the

19   people who were submitting the bids had read the

20   confidentiality agreements?

21             *MR. TORZILLI:*  I think his assumption is that the

22   people knew the contracts.  These are explicitly -- the

23   confidentiality agreements are explicitly referenced in the

24   contracts, I think it's on Page 9 of these contracts, and is

25   explicitly material -- incorporated explicitly and is viewed as

1    a material term.

2              THE COURT:  When you say these contracts, what do you

3    mean?

4              MR. TORZILLI:  The annual contracts that Pollo

5    Tropical enters into with chicken suppliers for the supply of

6    chicken to Pollo Tropical restaurants for that year.

7              THE COURT:  All right.  Thank you.

8              Mr. Beller?

9              MR. BELLER:  Thank you, Your Honor.

10             I think there is slightly two different issues.

11   Mr. Canty is appropriately discussing the confidentiality

12   contracts related to Pilgrim's.  It is my understanding the

13   government is also interested in introducing confidentiality

14   agreements with Claxton Poultry.

15             Your Honor, I want to be clear, I actually just did a

16   quick search of all the government's interviews that they have

17   provided us of Joe Brink and also the confidentiality

18   agreements themselves.  I don't believe that many of the terms

19   that were represented to the Court are contained in these

20   documents.  That doesn't mean, of course, that Mr. Brink did

21   not advise the government that he deemed -- you know, I think

22   he said bidding status as part of these, but I would simply

23   note I can't find that record anywhere and it's not included in

24   the confidentiality agreements themselves.

25             Your Honor, as to Claxton Poultry, there is a

2887

1   confidentiality agreement that was signed by my client, Mikell

2   Fries, in 2009, and that is the only confidentiality agreement

3   that is executed that I've seen provided by the government.

4   The confidentiality agreement that is contained not on Page 9,

5   but in Exhibit D of the 2014-2015 contract is not executed.

6   It's not executed by either Mr. Brink nor is it executed by any

7   representative at Claxton Poultry.

8          In addition to that, I believe that if this line of

9   questioning is permitted on examination, Mr. Brink took the

10  position that the contract and the -- I shouldn't say and --

11  the contract that includes the confidentiality provision was

12  not executed, and therefore he could not be in breach of it

13  when he refused to operate under the agreement that was at

14  least reached verbally because he never signed it and therefore

15  he wasn't going to be bound by it.  So Mr. Brink said he is not

16  going to be bound by it, and yet now we are in court arguing

17  that it somehow has some legal significance and legal binding.

18         I would also note as to Claxton Poultry that

19  Mr. Cooper's name -- and Mr. Walter Cooper was the one that was

20  negotiating these contracts on behalf of Claxton Poultry -- his

21  name does not appear anywhere on either the contract or the

22  confidentiality agreement and instead Mr. Greg Finch, the CFO,

23  is mentioned.

24         So to answer the Court's question, which is is there

25  any information that the salesperson who was engaging in these

1    discussions had knowledge of the confidentiality agreement, I

2    will advise the Court that if the answer is yes, it's not

3    contained anywhere on the contracts or anywhere on the

4    documents.

5         Finally, I would note for the Court in reading the

6    different provisions of the confidentiality agreement really

7    what we're talking about is trade secrets and trade secrets of

8    Pollo Tropical being confidential.  I think to read otherwise

9    you would have to read much more broadly to imply that it has

10   to do with any sort of specific pricing from the supplier being

11   provided to the purchaser.  And, in fact, as the Court noted,

12   this is information that is in the possession of and owned by

13   the supplier themselves.

14        Finally, Your Honor, as the Court has ruled, and I

15   won't belabor the motion that's already been filed, the Court

16   has found that related civil actions, although I am using the

17   term more broadly than perhaps the Court, is not relevant for

18   determination.

19        And so even arguing, even assuming that the

20   unexecuted, unsigned confidentiality agreement and contract is,

21   in fact, enforceable, really what we're talking about is a

22   civil breach.  We're talking about a contract breach.  And the

23   contract breach that can be argued through court is simply not

24   relevant for this jury as to whether or not Mr. Cooper of

25   Claxton Poultry somehow engaged in an antitrust violation.

1      THE COURT:  Mr. Beller, can you explain one more

2  time --

3      MR. BELLER:  Yes, please.

4      THE COURT:  -- what did Mr. Brink say was

5  unenforceable and because it was unsigned, he was not bound by

6  it or Pollo Tropical was not bound by it?

7      MR. BELLER:  Yes, Your Honor.  In December of 2014,

8  Mr. Brink entered into a two-year contract with Claxton

9  Poultry.  The pricing was going to go up 18 cents.  Mr. Brink

10  had said that he does not want an 18-cent increase all at one

11  time and instead would rather have that be stepped up

12  incrementally over the course of a period of time.

13      Claxton Poultry agreed to this slow step-up of

14  pricing.  Once the price had reached the maximum amount,

15  Mr. Brink said, never mind.  I no longer want to be engaged in

16  this contract.  Claxton Poultry took the position of, what do

17  you mean?  We have given you this discounted price for this

18  period of time with the expectation that we would have a

19  two-year contract and he would be paying the full 18-cent

20  increase after this step-up.

21      Mr. Brink's position was, I don't have a signed

22  contract.  You don't have a signed contract.  I'm not doing it.

23  I know that you've committed this volume to me for two years.

24  You have no one else to give the volume to.  Therefore, I now

25  am in a better argument or have better leverage and you need to

1    negotiate with me because I know that you have no home for this

2    chicken, and therefore our contract, our written contract, is

3    not enforceable because I never signed it and you never signed

4    it.  And Claxton did, in fact, renegotiate the contract at that

5    time.

6              *THE COURT:*  Okay.  Thank you.

7              Mr. Torzilli, last word?

8              Well, let's hear from Mr.  McLoughlin real quick.

9              *MR. McLOUGHLIN:*  Your Honor, for Pilgrim's I will --

10   the Pilgrim's contract with respect to Mr. Lovette -- I will be

11   brief.  The discussion here I think demonstrates one of the

12   critical issues is the difference between a person's personal

13   expectations, whatever they might be, and a contractual

14   obligation where here we have the difference between testimony

15   under Rule 701 and 702 because what the government is really

16   asking for in an opinion that this might be a breach of a

17   contract is a legal opinion, which this man, of course, not

18   being a lawyer is not qualified to give.

19             And I think this discussion indicates and Your Honor's

20   comments indicate that there is a real question about looking

21   at the terms of this confidentiality agreement.  Whether in

22   fact it applies to this information or not, these are opinions

23   this man is not qualified to give.

24             The second point on that is if as Your Honor

25   identified in terms of the legal analysis one thinks about

1    time, the contract is a contract signed upon the acceptance of

2    a bid.  If Pilgrim's is bidding for 2015, it hasn't signed a

3    2015 contract yet.  It is submitting a bid not pursuant to a

4    2014 contract, but in an effort to get the 2015 contract, which

5    means that its information, of course, is still its

6    information.  Pollo Tropical has not purchased the right at

7    that time to make the bid confidential.  Because no contract

8    has been executed with respect to that information, that

9    contract that could in theory relate to that information will

10   not be signed until the contract is accepted.

11        So when one thinks about the law school exam that we

12   are talking about here, the qualitative difference under the

13   Rules of Evidence with respect to the two issues are

14   dramatically different.  And this is why this gentleman, who is

15   a lay witness and who clearly hasn't analyzed this issue, I

16   would respectfully suggest the government hasn't analyzed it

17   correctly either based on the argument they are making today,

18   simply should not be permitted.  Thank you.

19        *THE COURT:*  Thank you, Mr. McLoughlin.

20        Mr. Torzilli?

21        *MR. TORZILLI:*  Just a couple of rebuttal points.

22        First is that's not a correct understanding what you

23   just heard of the confidentiality agreements.  And I have a

24   copy and we have them marked as exhibits.  They are evergreen

25   contracts, so a contract -- confidentiality agreement signed in

1    2009 would be operative in 2013, 2014, 2015, et cetera, unless

2    it was terminated, and there is no evidence of that.

3          In terms of the relevance points here and the time

4    frames, certainly Mr. Fries signing the confidentiality

5    agreement in 2009 is clear indication that he was on notice of

6    confidentiality expectations up to and including 2014 when he

7    was involved behind the scenes in assisting Mr. Cooper in his

8    negotiations with Pollo Tropical.  And this is in no way

9    reflective of a legal opinion.  It's simply to provide

10   information about Mr. Brink's expectations about the

11   confidential nature of his negotiations with the chicken

12   suppliers in 2014.

13         THE COURT:  Okay.  So I am going to grant the motion

14   to exclude any reference to the confidentiality agreements.

15   The problem is this and that is, No. 1, the confidentiality

16   agreements are confidentiality agreements and that's not the

17   ultimate issue here.  The fact that there may be a breach of

18   the confidentiality agreements could have an effect of

19   confusing the jury as to what type of breach we're talking

20   about here.  We're talking about the Sherman Act, not

21   confidentiality agreements.

22         The other thing is that to the extent that Mr. Brink's

23   expectations regarding price sharing have their basis in the

24   confidentiality agreements, not only is that potentially

25   confusing and irrelevant, but also based upon my review of the

1   confidentiality agreements, it appears to be at least arguably

2   wrong.

3        The confidentiality agreement is -- may not

4   necessarily be limited to trade secrets, but there is certainly

5   nothing in those confidentiality agreements that I see that

6   would form a basis for anyone having an expectation that a

7   supplier couldn't share its own bid information with another.

8   To the extent that maybe, although it's certainly not obvious

9   reading through them, there could be -- they could potentially

10  keep someone from discussing the status of negotiations with

11  other suppliers, something like that, there just doesn't seem

12  to be any evidence that that was the expectation that Mr. Brink

13  had anyway because he doesn't -- he doesn't have any

14  information that they were sharing prices to begin with, much

15  less someone sharing information about the status of

16  negotiations, especially given the fact that Pollo Tropical's

17  bid process is a little bit different.

18       There were just three people.  They appear to have

19  been conducted somewhat independently, not similar to, say,

20  Kentucky Fried Chicken or SMS's negotiations that involved more

21  suppliers.  So I will exclude any reference to that and the

22  government should structure its direct of Mr. Brink to avoid

23  that particular topic.

24       Anything else that we should take up while we are

25  waiting for our juror to get back to us?

1          Ms. Call?

2          *MS. CALL:*  Two, I think, housekeeping matters.  First

3    was the instruction we discussed on Friday regarding the

4    dismissed counted regarding Mr. Little.  The government did

5    have some more time to consider a proper instruction for the

6    jury and will note there are Seventh and Ninth Circuit pattern

7    instructions on kind of how to handle when a count is dismissed

8    during trial.  And I am happy to review those for Your Honor,

9    but I think we would perhaps suggest one of those that rather

10   than saying, you know, why a count was dismissed, it informs

11   the jury more simply that it's not before them and it's not for

12   them to speculate as to why it was dismissed.

13          So we are happy to -- I am happy to read them now.  We

14   are happy to submit suggested briefing with suggested wording

15   for an instruction, whatever Your Honor would prefer.

16          *THE COURT:*  Do you have copies for the defendants of

17   those?

18          *MS. CALL:*  We could get them.  Not at the moment.

19          *THE COURT:*  As I said, we are not bringing the jury in

20   anytime soon, or at least we may not be, so why don't you go

21   ahead and supply those to the Court and make copies for the

22   defendants.  But what we talked about on -- was it Friday --

23   there is nothing prejudicial about that either.  The government

24   moved and Mr. Little doesn't oppose.

25          *MR. BYRNE:*  Your Honor, maybe we could brief it after

1    we see what their authorities are because we would not want to

2    give the jury the wrong impression about why it was dismissed.

3         THE COURT:  Well, Ms. Call's point is that usually the

4    reason is not relevant to the jury because there could be lots

5    of reasons that counts are dismissed and the jury doesn't need

6    to know, so that's why we'll take a look at it.

7         MR. BYRNE:  Right.

8         THE COURT:  But on the other hand, I think what we

9    talked about on Friday is not necessarily a problem, but I'll

10   take a look at that authority.

11        MR. BYRNE:  Our concern is that the jury, if they

12   start speculating about why, and I am not suggesting we go into

13   great detail about why the government dismissed.  I don't know

14   why they dismissed.  I have some theories, but I don't know.  I

15   am not suggesting we do that.  But on the other hand, we don't

16   want the jury speculating, for example, oh, I wonder if

17   Mr. Little pleaded guilty or something like that, so that's

18   what I would be afraid of.  We will see what the cases say and

19   we will see -- we can do some research, but we would like to

20   brief the issue first.

21        THE COURT:  That's fine.  I don't think that we are

22   necessarily in a rush on it.

23        MR. BYRNE:  I think that's true.

24        THE COURT:  Anything else, Ms. Call?

25        MS. CALL:  One other item is the pending -- I believe

1   we discussed it as a supplemental 902(14) motion.  We were

2   hoping that the Court could perhaps consider ruling on that

3   soon given that if it is not granted, we do need to get a

4   witness out here probably tomorrow to testify as to

5   authentication of the, I think, one record at issue.

6          THE COURT:  What is that one record at issue?

7          MS. CALL:  That is a good question.  Let see if I can

8   pull the exhibit number.  It is an extraction of one device,

9   and we are pulling the exhibit number in a moment.  I am almost

10  certain it is Government Exhibit 9010, which is an extraction I

11  believe of Mr. Brady's device, 9010.  And we have it up on the

12  screen right now.

13         THE COURT:  So are we talking about the government

14  motion being 824?

15         MS. CALL:  Yes.

16         THE COURT:  Because the document referenced in that is

17  8010.

18         MS. CALL:  That may very well be a typo, but let me

19  confirm with my table.

20         THE COURT:  Okay.

21         MS. CALL:  We have confirmed the typo, so the Bates

22  number is correct in the filing, but the exhibit number should

23  be 9010, not 8010.

24         THE COURT:  I haven't had a chance to really look over

25  that one, so maybe I can do that if we go into recess for a

1    time period.

2              Ms. Sweeney perhaps has an update on Mr. Skalak.

3         *MS. SWEENEY:*  I do, Your Honor.  I spoke with his

4    counsel and the earliest he can come back is the 23rd and 24th

5    of November, which perhaps I am being optimistic.  The

6    government may no longer be in its case in chief at that point.

7    We do have an alternate proposal.  He will be going back to

8    Atlanta tomorrow but will be available to testify from a

9    courthouse in Atlanta or from his attorney's office tomorrow if

10   the Court is amenable to that.

11             *THE COURT:*  Tomorrow?

12             *MS. SWEENEY:*  Tomorrow.

13             *THE COURT:*  What time tomorrow?

14             *MS. SWEENEY:*  I did not confirm that timing.  His

15   flight is in the morning, so likely the afternoon.  He is,

16   however, here today if we were to proceed today which I

17   understand there is a number of factors outside of our control.

18             *THE COURT:*  But he needs to be back in Atlanta

19   tomorrow?

20             *MS. SWEENEY:*  Yes.  He has some unmoveable

21   appointments for the rest of the week, but he would be able to

22   testify from a courthouse in Atlanta tomorrow or his attorney's

23   office.  Otherwise, he could come back the 23rd or 24th, but we

24   just fear that may be a little late.

25             *THE COURT:*  Why don't we do this while we're waiting

1     to hear back from our juror, and that is why don't the

2     defendants think about those two possible options with

3     Mr. Skalak.  Of course, he is -- we just barely started

4     cross-examination of him.  I am not sure how many others would

5     have cross-examination.  Obviously, it could be a fair amount

6     of cross-examination.  But if he, especially if we could

7     arrange for him to testify from the courthouse, you know, maybe

8     that would be an agreeable substitute or to take him out of

9     order later on would be the other possibility for us to do

10    that.  Once again, it all depends on what we're going to hear

11    about the rapid test, but I really do think that we should

12    think out of the box in the event that we can possibly keep our

13    juror on the jury, okay?

14          Mr. Beller?

15          Thank you, Ms. Sweeney.

16          MR. BELLER:  If I may inquire of Ms. Sweeney, and that

17    is I understand that Mr. Skalak has some immoveable

18    appointments.  Do we know if those are medical appointments and

19    are they medical appointments such that he cannot appear at all

20    this week versus some other business or other type of

21    personal-related appointments unrelated to his medical

22    condition?

23          THE COURT:  Do you have any idea, Ms. Sweeney?

24          MS. SWEENEY:  I don't have specifics, but I do

25    understand that is -- because he will be out, you know, during

1   his surgery and then for a number of weeks after, even if the

2   appointments are not related specifically to medical, they are

3   unmoveable because they are things that need to get done

4   because he will be out for a while, but I don't have any

5   specifics on the type of unmoveable commitment.

6        *THE COURT:*  Go ahead, Mr. Beller.

7        *MR. BELLER:*  Respectfully, I think that's a crucial

8   question, Your Honor.  If these are immoveable medical

9   appointments, I think that that is a very different analysis

10  than, quite frankly, any other type of appointment that he may

11  have over the course of the week as well as early next week,

12  No. 1.  No. 2, I am also wondering if Mr. Skalak's flight

13  tomorrow -- I understand he is flying out tomorrow -- may be

14  able to be moved back.  I can speak from some personal

15  experiences over the course of the last several months that

16  there is a 6:00 p.m. flight to Atlanta that runs every single

17  day.  And so if he is planning on currently being in the air

18  all day tomorrow, if he may be able to take that later flight.

19       As to whether we need to potentially consider any

20  other creative alternatives, Your Honor, I clearly need a break

21  because I have got a lot of lawyers behind me who have very

22  different opinions, I am sure.

23       *THE COURT:*  Yeah, it is something that has to be

24  discussed.  It's unusual.

25       Ms. Prewitt?

1          MS. PREWITT:  I would just like to add on that perhaps

2   we can take the approach we did when we were interviewing the

3   jury panel of just having -- going through it with the

4   transceivers with Mr. Skalak just so we don't have to do all

5   this back-and-forth and we have a clear view and yet it's not

6   something that we need to discuss in court.

7          THE COURT:  Right now you mean?

8          MS. PREWITT:  Since he is here and with the

9   transceivers just have this inquiry with him.

10         THE COURT:  Well, I trust the conversation between

11  Ms. Sweeney and his attorney will figure it out.

12         MS. SWEENEY:  Your Honor, I have addressed with his

13  attorney the possibility of having a later flight tomorrow and

14  I understand that that's not possible.

15         THE COURT:  I do think that that distinction

16  Mr. Beller made is a good one because I was at least operating

17  under the assumption that there was some medical appointment

18  that required his absence.  And believe me, I understand if he

19  is going to be out of the loop for a long period of time, he

20  has probably got a lot that he needs to take care of, but a lot

21  of witnesses have a lot to take care of too.  So I do think

22  that there is a bit of a distinction between a medical issue

23  that is -- you can't just delegate that.  You've got to deal

24  with it versus something that potentially at least could be

25  rescheduled or be delegated to someone else, okay?

1          *MS. SWEENEY:*  Yes, Your Honor.  And I will get more

2     information.

3          *THE COURT:*  Anything else we should take up?

4          Ms. Call?

5          *MS. CALL:*  I think there is also pending the motion to

6     exclude Mr. Brink's testimony.  I didn't know if Your Honor

7     wanted any argument.

8          *THE COURT:*  Why don't we go ahead and take that up

9     right now.

10          *MS. CALL:*  Mr. Torzilli will be doing that.

11          *THE COURT:*  Mr. Torzilli, go ahead.

12          *MR. TORZILLI:*  Sure, Your Honor.  Just frankly there

13     is no good basis to exclude his testimony.  He is a witness

14     we've called.  He has relevant information, highly relevant

15     information about the conspiracy.  He will be talking about the

16     2014 negotiations.  He was also involved in another aspect of

17     the conspiracy that we highlighted in the *James* proceeding in

18     2012.

19          In the defendant's motion to exclude, they indicate

20     that Pollo Tropical isn't mentioned in the Indictment.  That's

21     not a reason to exclude a witness.  We certainly haven't

22     included every scrap of evidence that we've presented at trial

23     or intend to present at trial within our Indictment, so there

24     is no good reason to exclude his testimony from this trial.

25          *THE COURT:*  Were interview summaries of Mr. Brink

1    provided to the defendants at some point in time?

2            MR. TORZILLI:  All the interview summaries have been

3    provided.  I think the first production of interviews occurred

4    in the summertime.  It may have been June of 2021.  And then we

5    have had subsequent interviews with Mr. Brink and those have

6    been produced on a rolling basis relatively close in time to

7    when the interviews occurred.

8            THE COURT:  Okay.  Thank you, Mr. Torzilli.

9            Anything else?

10           MR. TORZILLI:  Actually, one other thing, Your Honor,

11   just to remind the Court that there are numerous Pollo

12   Tropical-related documents on the *James* log and were a part of

13   the *James* proceeding.  And many, I don't think all, but nearly

14   all received favorable rulings as a result of that proceeding.

15           THE COURT:  Okay.  Thank you, Mr. Torzilli.

16           Mr. Kornfeld?

17           MR. KORNFELD:  Thank you, Your Honor, just briefly.

18           Your Honor, the government says there is no good

19   reason.  There is plenty of good reasons to exclude his

20   testimony.  He is not mentioned in the Indictment or Pollo

21   Tropical.  It's not mentioned in the Superseding Indictment.

22   It's not subject of 404(b) notice.  Now, we're not saying we

23   have never heard of Joseph Brink to the Court's point, but --

24   and this is why we were so focused also on getting some of

25   these documents.  So on the one hand, the government is saying

1     it's intrinsic, intrinsic, intrinsic.

2           And by the government's -- we are all well aware of

3     conspiracy law and sort of the broad breadth and scope of

4     conspiracy law, but that doesn't mean anything having to do

5     with chicken by definition from 2012 to 2019 is intrinsic to

6     the charges in this case.  I just -- I don't think that's a

7     fair reading of that case law.

8           And No. 2, that's why this whole issue with the

9     documents -- you know, the government is kind of, you know, if

10    you will pardon the pun a little bit, cut it pretty close to

11    the bone.  On the one hand, they are saying it's intrinsic,

12    intrinsic, intrinsic.  And on the other hand they are saying,

13    well, despite the quarter of a million documents sitting in

14    Chicago, we've got 12.  And, oh, a year and a half after the

15    Indictment, we'll send you over a couple of interviews.

16          So, you know, I think the Court in its discretion can

17    preclude it.  It's a side show.  It's -- we believe it's

18    extrinsic to the charges in the Indictment, and for the other

19    reasons we set forth in our moving papers we would ask you to

20    consider precluding Mr. Brink's testimony.

21          *THE COURT:*  Thank you, Mr. Kornfeld.

22          Mr. Lavine, did you want to add anything?

23          *MR. LAVINE:*  No, Your Honor.  I join in Mr. Kornfeld's

24    comments.

25          *THE COURT:*  Mr. Torzilli, go ahead.

1          Let's hear from Ms. Henry real quick.

2          *MS. HENRY:*  Your Honor, I would just like to make it

3     clear that Defendant Kantola also joins in the motion to

4     exclude testimony from Mr. Brink and adds that with regard to

5     Defendant Kantola, it only became extremely clear in the more

6     recent interview that the testimony has absolutely nothing to

7     do with him.

8          *THE COURT:*  Okay.

9          Mr. Torzilli?

10         *MR. TORZILLI:*  One brief point, Your Honor.  Just to

11    respond be to this documents business, to be clear, there are I

12    think by our count, our search this morning of the document

13    database yielded I think a number of hits in the thousands of

14    order of magnitude of Joe Brink documents and/or Pollo Tropical

15    documents that were produced by, of course, other people to us,

16    so there are plenty of documents in the database that the

17    defendants have had for months and months that relate to both

18    the company and to this particular individual.

19         *MR. KORNFELD:*  Judge, I will just take issue with

20    that.  I mean, I guess it depends on your definition of many.

21    But out of 16 or 15 or 17 million documents, I don't know what

22    the final number is, there are precious few.  And that's why we

23    have -- we are not trying to create issues in a case with a

24    million issues, but that's why we have been trying to get a

25    little more clarity on what this witness will say when a

1    witness is going to take the stand on an issue that's not set

2    forth in the charging documents, not set forth in a 404(b)

3    notice, and I am sorry, but the discovery is hardly replete

4    with Joe Brink or Pollo Tropical documents.  If it were, we

5    wouldn't be having this conversation.

6           THE COURT:  Mr. Kornfeld, one thing that we haven't

7    talked about was the last point in your client's motion about

8    the rebate from suppliers.  Maybe if we can hear from.

9    Mr. Torzilli about that one.

10           MR. TORZILLI:  I can cut through that issue.  We don't

11    intend to ask Mr. Brink about rebates or related-type issues

12    from distributors, so I think that's moot.

13           THE COURT:  Does that handle that issue, Mr. Kornfeld?

14           MR. KORNFELD:  Yes, Your Honor.

15           THE COURT:  So the motion is going to be denied.  I

16    have already covered the issue about the confidentiality

17    agreements, so I guess in a sense that part of it has already

18    been ruled on.  The fifth point about the rebates, it seems

19    like it's a moot point.  But the -- in terms of notice, the

20    Superseding Indictment does not have to include a reference to

21    every single person or company or piece of evidence that the

22    government is going to later introduce.  The Superseding

23    Indictment I think does provide ample notice.  This Pollo

24    Tropical issue is extrinsic evidence to it, and therefore there

25    is not any type of lack of notice.

1            As Mr. Torzilli indicated, and I recall there are lots

2    of Pollo Tropical documents that were referenced in the *James*

3    hearing.  There have been interview memos produced.  Certainly

4    it's been an issue that the defendants have been aware about

5    for some time.  And therefore, the fact that the government

6    didn't include it in the 404(b) motion is irrelevant because

7    the Court finds that it is intrinsic.  So I will deny the

8    motion to exclude Mr. Brink's testimony.

9            Anything else that we should talk about?

10           Okay.  So we'll be in recess.  We won't know exactly

11   how much time, but I also will have Ms. Grimm go back and let

12   the jurors know that we're waiting to hear about the juror who

13   they have undoubtedly noticed is not here.  And then once we

14   know that information, we will proceed.

15           In the meantime, Ms. Sweeney, she probably maybe has

16   gone out to check -- unless you have an update now.

17           *MS. SWEENEY:*  Not at the moment, Your Honor.

18           *THE COURT:*  So she will gather that information and

19   then we will figure that out based upon what we hear from our

20   juror.

21           Ms. Call?

22           *MS. CALL:*  As far as perhaps options for the day, to

23   the extent that we can plan ahead and try to create some

24   efficient use of the time if we do not bring the jury in, was

25   Your Honor's thought to perhaps keep going through the document

```
 1    objections?
 2          THE COURT:  Yeah, that would be my thought.  So we'll
 3    try to reach the juror and see if we can get a status.  We
 4    might even, if it seems like the test results, there is some
 5    delay in them or he anticipates that he won't get them until a
 6    little bit later, we might actually start in on that process,
 7    but with our estimation and given what time it is now, we might
 8    be able to spend the rest of the day on the project that we
 9    were working on on Friday.
10          MS. CALL:  Okay.
11          THE COURT:  Okay?  All right.  We will be in recess,
12    then.  Thank you.
13       (Recess at 9:22 a.m.)
14       (Reconvened at 10:16 a.m.)
15          THE COURT:  All right.  So the jury is not present and
16    we are still waiting on the rapid test results.  Why don't
17    we -- can we take up Docket No. 824?  That's the docket -- or
18    that's the motion, rather, as to authentication of Mr. Brady's
19    cellphone.  Can we take that one up?  Let's find out if there
20    is any opposition to that motion.  If so, why don't we hear
21    argument on that.
22          MS. RAHMAN:  Good morning, Your Honor.
23          No, there is no opposition so long as the entirety of
24    Mr. Brady's contacts is being admitted into evidence and not
25    just the six pages on 9010.
```

1          THE COURT:  Well, I think that --

2          MS. RAHMAN:  We don't object to the certification of

3    Mr. Brady's cellphone.  We don't have any objection to that.

4          THE COURT:  All right.  Anyone else?

5          All right.  So I will grant the motion finding that

6    the authentication -- that it's self-authenticating, okay?

7          Now, was there something else, Ms. Sweeney?  Do you

8    want to report, then, on Mr. Skalak?

9          MS. SWEENEY:  Yes, Your Honor.  So I spoke with his

10   counsel.  I still don't have a further understanding as to the

11   nature of his appointment.  If we don't do testimony here

12   today, he would be flying back to Atlanta tonight and could

13   testify from the Atlanta courthouse as early as tomorrow

14   morning.  He is also available the 23rd and the 24th.  If Your

15   Honor is interested in further information regarding the nature

16   of his availability, his counsel would like to speak to you in

17   camera if that would be possible.

18         THE COURT:  It kind of goes back to what we were

19   talking about before.  Is it medical related?  Because the --

20   it sounds like it may make a different to defense counsel

21   whether they're accommodating a medical issue or whether

22   they're accommodating a business schedule.

23         MS. SWEENEY:  And for that information his counsel has

24   offered to disclose to you in camera.  They think that would be

25   the most appropriate way to share that information with you.

 1    I've shared with you the information the government has.

 2          THE COURT:  Why just me?  Why couldn't it be

 3    non-public but with other people?  I am not sure of that.

 4          MS. SWEENEY:  I think it relates to the sensitive

 5    nature of the commitment he has later this week.  I don't have

 6    further information.

 7          THE COURT:  Okay.  Later this week.  But that

 8    commitment would prevent him from coming back later this week?

 9          MS. SWEENEY:  Correct.  The earliest he could come

10    back, he could testify on the 23rd or 24th.

11          THE COURT:  Ms. Prewitt?

12          MS. PREWITT:  Is he here in the courthouse,

13    Mr. Skalak?

14          THE COURT:  Well, he is available.  Obviously, he

15    could go back on the witness stand today.

16          MS. PREWITT:  I am just raising that to kind of cut

17    through this, but I will sit down now.

18          THE COURT:  Well, I assume that he is here or

19    available.

20          MS. SWEENEY:  He is available to testify if we were to

21    have a jury now.

22          THE COURT:  Right.

23          Mr. Beller?

24          MR. BELLER:  Thank you, Your Honor.

25          I think the question as the Court likely knows is

2910

 1    quite a bit more complex, and that is the defendants have

 2    specific confrontation clause rights.  So it's not as simple as

 3    he can't be here given that there has already been a

 4    presentation of direct testimony and starting

 5    cross-examination.  Your Honor, a quick search during the

 6    break, especially in light of COVID, there are a significant

 7    number of cases that analyze these particular issues.

 8            I would draw the Court's attention to *United States v.*

 9    *Casher*, C-A-S-H-E-R.  Your Honor, that is a district court case

10    out of the District of Montana.  I have the Westlaw citation

11    which is 2020 WL 3270541.  I use that one only because, Your

12    Honor, I think it sets forth the different requirements quite

13    well in terms of confrontation rights.  And while I understand

14    that there may be some sensitive issues that may potentially be

15    happening, the Courts have routinely found that the right of

16    confrontation may not be dispensed with so lightly in terms of

17    simply discussing either inconvenience, expense or also certain

18    risks regarding medical issues.

19            And so in trying to ascertain the underlying nature of

20    the appointments this week, it's not for the purpose of doing

21    anything other than making a determination as to what argument

22    to make, if any, regarding our clients' right of confrontation.

23    I think the convenience to the witness in testifying either at

24    his lawyer's office tomorrow or at the courthouse in Atlanta on

25    Wednesday indicates that there are, in fact, some issues

1    available or -- and I may have gotten those dates wrong -- some

2    flexibility in his schedule such that the Court does not have

3    the appropriate information before it at this point to make a

4    determination as to whether or not our clients' confrontation

5    rights would somehow be compromised by allowing any

6    accommodation.

7            My understanding is he is, in fact, under subpoena.

8    And so I would ask the Court to require absent an additional

9    record or finding being offered that he be required to testify

10   pursuant to that subpoena.  If the government wishes to not, in

11   fact, have that enforced, the fallback option at this point

12   would be to simply strike his direct testimony, as well as the

13   start of his cross-examination.

14           Your Honor, I do not believe that it is appropriate

15   for there to be ex parte communications, quite respectfully.  I

16   do not believe that that's appropriate at this time.

17           *THE COURT:*  What about the other option?  He

18   testifies -- when was it -- the 23rd or 24th, either one of

19   those?

20           *MS. SWEENEY:*  If the United States' case in chief is

21   still going on at that point.

22           *THE COURT:*  And if not, out of order?

23           *MS. SWEENEY:*  If not, out of order.

24           *MR. BELLER:*  Your Honor, my understanding is that the

25   government's case is not going to be still ongoing at that time

1    based upon some of the scheduling estimates that they gave us

2    last week.  I believe that asking for a 14-day lapse in time

3    between his direct testimony and his cross-examination

4    testimony is simply not reasonable and that would be the last

5    option that we would choose, and that is to have a two-week

6    delay between testimony.  And certainly since we believe the

7    government will be resting or will have rested by that period

8    of time, it simply just schedule-wise is not viable.

9              THE COURT:  Ms. Sweeney?

10             MS. SWEENEY:  Yes, Your Honor.  Just to clarify, if

11   there is no testimony here today, Mr. Skalak would be able to

12   return to Atlanta today and could testify as early as tomorrow

13   morning from a courthouse there.

14             With regard to -- he is under subpoena.  That is

15   confirmed.  And before Your Honor makes any decisions, we would

16   simply ask that you have the ability to speak with his counsel

17   again given the sensitive nature of his commitments before

18   making a final determination.

19             MR. BELLER:  Your Honor, may I inquire of Ms. Sweeney

20   as to whether Mr. Skalak or Mr. Skalak's lawyer is present?

21   And I believe that's what Ms. Prewitt was asking.  And if so,

22   perhaps this is something that we can do in a closed courtroom.

23             THE COURT:  Well, yeah, let's see.  Is his attorney

24   present?

25             MR. LEE:  Yes, Your Honor.

1          THE COURT:  Do you mind coming up to the podium?

2          MR. LEE:  Yes, Your Honor.

3          THE COURT:  Do you mind stating your name and spelling

4    your last name for the record?

5          MR. LEE:  Of course, Your Honor.  My name is Craig

6    Lee, L-E-E.

7          THE COURT:  Mr. Lee, first of all, I am not going to

8    have you mention anything about the sensitive commitment or

9    anything of that nature, but the question is whether or not --

10   so it doesn't sound like he has a medical appointment tomorrow,

11   is that correct, or is it something else that is part of the

12   sensitive issue?

13         MR. LEE:  That is correct, Your Honor, there is

14   something else.  And, Your Honor, we would like to discuss this

15   in camera because the full context is of a very personal and

16   sensitive nature.

17         THE COURT:  And why would it -- well, here is what I

18   am going to do.  I am going to, despite Mr. Beller's concerns,

19   I am going to find out in camera what the issue is because that

20   may affect my determination as to whether or not I allow the

21   testimony to take place after a period of time, in other words,

22   on November 23rd or 24th.

23         So what I am going to do, I am going to take a brief

24   recess.  I will have it reported.  I will have Ms. Coppock come

25   and it will be part of the record, although it won't be

1    available to counsel, if I -- because it will be in camera in

2    order for me to determine whether or not there is some

3    justification for allowing his testimony to be postponed until

4    a later time, all right?

5         MR. LEE:  Thank you, Your Honor.

6         MR. BELLER:  If I may, Your Honor, I would request

7    that the Court find out availability or unavailability not

8    simply for tomorrow, but rather for every court day between now

9    and the 23rd, please.

10        THE COURT:  I will inquire, not necessarily in that

11   detail, but I will make that inquiry.

12        MR. BELLER:  Understood.  Thank you.

13        THE COURT:  So Mr. Lee, in just a minute I will have

14   my law clerk lead you back to chambers where I will ask you

15   about that, all right?

16        MR. LEE:  Thank you, Your Honor.

17        THE COURT:  We will be in recess.  Thank you.

18      (Recess at 10:27 a.m.)

19      (The in camera portion of the proceedings was sealed.)

20        THE COURT:  So the information provided to the Court

21   in camera from Mr. Lee does not influence me one way or the

22   other as to Mr. Skalak's schedule.  I am going to allow

23   Mr. Skalak to finish his testimony on the 23rd or the 24th even

24   if that means taking him out of order in the defendants' case.

25   We will see.

1            One thing that we do know about Mr. Skalak is he has

2     been available on multiple occasions.  Like a lot of witnesses,

3     he has been around, but he just hasn't been called.  He finally

4     was called, and then, of course, we didn't know what was going

5     to happen today.  So I will allow him to testify out of order.

6            Now, let's switch our attention over to -- well,

7     Mr. Beller maybe has a quick -- let's do this quickly, if we

8     can.

9            Mr. Beller, go ahead.

10           MR. BELLER:  Two things.  Understanding we don't know

11    the record that was made, we continue to object under

12    confrontation grounds.  With that said, Your Honor, another

13    alternative is that we call Mr. Skalak to the stand now and we

14    videotape his cross-examination, his redirect, and then we play

15    that for the jury tomorrow.  I don't know what the video

16    capabilities are in the courtroom, but I imagine there are

17    enough court reporters in town, we could probably have video

18    equipment brought over relatively quickly if that is an option.

19           THE COURT:  We might even be able to have our IT

20    department make that possible too.

21           Government's reaction to that?

22           MS. SWEENEY:  Can we just have a moment to confer,

23    Your Honor?

24           MR. BELLER:  Your Honor, while they are doing that, I

25    make that suggestion generally having consulted, but if I can

1    just have a moment --

2            THE COURT:  Sure.

3            MR. BELLER:  -- to see if everyone consents to that

4    possibility.

5            MR. McLOUGHLIN:  Your Honor, while the government is

6    consulting, just for the record, in addition to the issue of

7    confrontation rights, we would object on the grounds that by

8    the 23rd or the 24th it appears the government will have

9    otherwise finished its case, and we would object to hearing

10   testimony with respect to a government witness after the

11   government has or should be required to close its evidence.

12           THE COURT:  Okay.

13           MR. TUBACH:  We join in that on behalf of Mr. Penn.

14           THE COURT:  Sure.

15           Ms. Sweeney, go ahead.

16           MS. SWEENEY:  Your Honor, if all 10 defendants

17   consent, the government does not have an objection to

18   proceeding like that.

19           THE COURT:  Yeah, we need the consent of everybody.

20           MR. BELLER:  Your Honor, this is an opportunity for

21   anyone to say no, but my understanding is that all 10

22   defendants do, in fact, consent to this procedure in lieu of

23   the Court obviously requiring his testimony this week otherwise

24   and in lieu of a motion to strike his direct testimony.  So

25   given the Court's inclination to not grant those motions, the

1    third option would be doing this and that is videotaping it

2    now.

3           THE COURT:  I would be denying those motions.

4           So let's talk about the logistics real quick.  Should

5    I have someone from IT come down and we can get their opinion

6    too or do we look like we have a quick option privately like

7    someone who might be able to come in to do it?

8           MR. BELLER:  Your Honor, so if I can answer, that is

9    if IT can do this, great.  And if not, we can reach out to a

10   videographer and see if we can have someone over quickly.

11          THE COURT:  I will have Ms. Grimm ask someone from IT

12   come down and we can pose some questions to them and see what

13   we can get set up.

14          Let me report now on the juror.  The juror went to

15   a -- Ms. Grimm?

16          COURT DEPUTY CLERK:  Urgent Care.

17          THE COURT:  For some reason I can't remember -- and

18   had a variety of tests done, all negative.  And he would like

19   to rest up today.  He is willing to come back tomorrow.  He is

20   hopeful that he'll be feeling well enough to come in tomorrow.

21   That's really good news, really good news.  So my proposal

22   would be to then excuse the jury who have been patiently

23   waiting back in the jury room and have them come back tomorrow

24   at 8:30.

25          I am going to go ahead and bring them into the

 1    courtroom right now just to let them know, but I am not going

 2    to go into any great explanation, although they obviously know

 3    that the juror who was missing was not feeling well today, but

 4    I will explain just that to them and then have them come back

 5    tomorrow.

 6            Anyone want to make a point or should we just go ahead

 7    and just bring the jury back in?

 8            Let's bring the jury in.

 9            Hold on.  More information from the juror.

10            Please be seated.

11            Ms. Grimm is going to give the juror a call.  He

12    raised an additional concern, so let's just figure that one

13    out.

14            Mr. Beller?

15            MR. BELLER:  Your Honor, so long as you are waiting, I

16    will let you know that we do have a resource to a videographer,

17    so we are having that person lined up as a backup plan to be

18    available today in the event that IT cannot facilitate this for

19    us.

20            THE COURT:  Okay.  Right.  And so what we would do is

21    we would -- our IT department does occasionally operate videos,

22    but not for this purpose.  So although, of course, a

23    videographer may be a little bit unfamiliar with these

24    surroundings too, typically not -- operating in a different

25    room, but we will see if we can get someone from IT in here and

1    we will see what the best setup would be.

2          Mr. Beller, do you know, would the videographer

3    simultaneously be doing video of the questioner and the

4    witness?  Probably not I would assume since --

5          MR. BELLER:  To be honest with you, Your Honor, I

6    don't know, so if somebody else does.

7          MR. FELDBERG:  Your Honor, I have had a fair amount of

8    experience with video depositions in civil litigation, and

9    generally speaking the videographer keeps the camera focused on

10   the witness, at least in my experience.

11         THE COURT:  And we really wouldn't have any ability to

12   switch between them anyway, so that would make sense.

13         MR. BELLER:  Your Honor, I did confirm with our IT

14   individual that when the video is played to the jury, that to

15   the extent there is a document that is published, that we will

16   be able to publish that and just do a side by side or a split

17   screen on the monitors.  So this should be relatively seamless.

18         THE COURT:  Yes, we can do that.  And that would

19   probably be a good way to do it because through our system we

20   couldn't, I think -- we could always stop the video, display

21   the document, go back on, but that's an option too.  So I guess

22   there are at least a couple of ways that we could approach

23   documents.

24         MR. BELLER:  Thank you.

25         THE COURT:  Well, why don't we do this instead of all

1    just sitting here like this.  Why don't we go into recess and

2    once Ms. Grimm gets the word, we will go back on the record.

3            Thank you.

4        (Recess at 10:56 a.m.)

5        (Reconvened at 11:10 a.m.)

6            THE COURT:  So our absent juror was concerned about

7    how the other jurors may feel about him coming back tomorrow.

8    I had Ms. Grimm mention to the rest of the jury that his

9    numerous tests all came back negative, but they are just the

10   tests today and he might get retested within the next 48-hours

11   or so which he can do in Denver pretty easily.  So I don't know

12   what their -- the purpose of her doing that was so they can

13   think about it as a group.

14           So we will go ahead and bring them in now and I will

15   ask them whether they feel comfortable if he comes back

16   tomorrow and they are with him in the jury room and out here.

17           MR. TUBACH:  Your Honor, the Court did indicate that

18   there is some ability to have a juror sit in the hallway not in

19   the jury room potentially.

20           THE COURT:  You are right, that's mentioned in the

21   protocols that you can --

22           (Jury present.)

23           THE COURT:  All right.  Ladies and gentlemen, sorry

24   about the delays today, but obviously you know why.  So

25   Ms. Grimm had just mentioned to you that a juror who is absent

1   had some tests done and the tests all came back negative.

2   Obviously, he might be able to get some retests later in the

3   week.  But the question is whether you would feel comfortable,

4   assuming that he feels good enough to come back tomorrow, he

5   anticipates that he would be, whether you would be comfortable

6   being around him.  Obviously, you would all be masked up.

7            He could, if he chose or if you requested, he could

8   always, instead of being in the jury room with you, he could be

9   like in the hallway.  We could try to figure out a new seating

10  arrangement here in order to try to isolate him a little bit,

11  maybe have Mr. Kahler give up his hallowed folding chair.

12  There are a few things that we could do in the event that you

13  were uncomfortable.  I know that Ms. Grimm asked you about

14  that.  People feel comfortable if tomorrow if he rejoins you?

15  Okay, great.

16           Now, given the fact that we can't have -- we can't do

17  anything really too much without him, I am going to excuse you

18  for the rest of the day.  Sorry that you came all the way down,

19  but we didn't know until just this morning about that, so I

20  will go ahead and dismiss you for today.  Plan on we will start

21  at 8:30 tomorrow.  We will cross our fingers.  And keep the

22  admonitions in mind, ladies and gentlemen, and see you tomorrow

23  at 8:30.  The jury is excused.

24           (Jury excused.)

25           *THE COURT:*  In terms of the video equipment, I talked

1    to our IT department.  They could do it and it's the way that

2    we do when we have a VTC hearing.  The cameras are located in

3    one of those two black boxes there, black squares back there.

4    And I am not sure that it would be as high quality as if you

5    brought a videographer in.  My guess is that to get -- the most

6    reliable thing would be to get the videographer in.  I think

7    that we would get better quality.  And, you know, once again,

8    we could do a VTC thing and they do it all the time, but to

9    have something more deposition quality like, a video deposition

10   quality, I think we should bring the videographer in.

11          Do you have any idea of when the videographer might be

12   available?

13          *MR. BELLER:*  Your Honor, in the brief break we had, I

14   think that we have reached out to three or four different

15   videographers trying to get individuals lined up, so I do not

16   have an answer for the Court.  If the Court is amenable to it,

17   my suggestion would be to probably start on exhibits.  And then

18   I will step into the hallway with a couple of other individuals

19   and see if we can make arrangements for the videographer to

20   come in.

21          *THE COURT:*  Yeah, I think that that makes sense, as

22   long as people want to go that route.  Once again, we could use

23   the VTC route.  We could use the cameras.  But one -- another

24   disadvantage is you wouldn't have the opportunity to see

25   exactly what that's going to look like in advance.  We would

1    just go with it, and then once we are done with it, you would

2    know.  But it might be a little bit safer, although there is

3    the danger of delay in trying to make the arrangement, to go

4    the videographer route.

5            MR. BELLER:  If the Court would allow us or me just 15

6    minutes to make some calls and see what I can find and then

7    report back, I think that makes sense.  If we have to go the

8    courtroom route, we will, but I agree.  In order for the jury

9    to be able to observe him, his reactions granted masked, I

10   think it's better to have something higher quality if that's an

11   option.

12           THE COURT:  Yes.  Mr. Beller, would you request that

13   we hold off on going through exhibits while you are outside

14   trying to make those arrangements?

15           MR. BELLER:  I am getting nods of yes, please, delay

16   it if we could.  In other words, allow us to try to get the

17   videographer here and then maybe revisit on that subject as

18   soon as we can.

19           THE COURT:  Yeah.  Ms. Sweeney?

20           MS. SWEENEY:  Your Honor, I just have one logistical

21   question with regard to the videographer.  If the sort of -- is

22   there a backup plan for if the audio does come out and it's

23   garbled and hard to understand?  The government may propose

24   that we get a certified transcript of Mr. Skalak's testimony on

25   cross-examination again if the audio is scrambled and enter

1   that into evidence, but we just wanted to know if Your Honor

2   had an idea of a backup plan in case there was issues with the

3   audio.

4          THE COURT:  Well, I don't think we should go down that

5   rabbit hole.  This would be a professional videographer.  They

6   are going to know if it's working, not like the ancient film

7   camera days where not until you got home after your vacation

8   did you realize that your movie camera wasn't working.

9          MS. SWEENEY:  Thank you, Your Honor.

10          THE COURT:  We will be in recess.

11          Mr. Beller, let me know what the results are, and then

12   we will figure out what our schedule is going to be.  Hopefully

13   we will get someone in and get going with the cross maybe right

14   after lunch or something of that nature, okay?

15          MR. BELLER:  Okay.

16          THE COURT:  We will be in recess.  Thank you.

17      (Recess at 11:18 a.m.)

18      (Reconvened at 11:43 a.m.)

19          THE COURT:  Mr. Beller, go ahead.

20          MR. BELLER:  Thank you for your indulgence, Your

21   Honor.

22          We have reached out to more contacts in large law in

23   Denver that you can imagine.  We are fairly confident that we

24   will, in fact, have a professional videographer here by this

25   afternoon.  However, we do not have a commitment at this point,

1    but we have many different people that are assisting us.

2         So our request to the Court is that we reconvene at

3    1:30.  And if we can have a professional videographer that is

4    already here and set up at that time, we will use that

5    videographer.  If for some reason we are not able to secure

6    somebody, then all defendants will agree to use the Court's

7    in-house VTC system in lieu of a professional videographer.

8         THE COURT:  Over the lunch hour too, I will keep

9    talking to IT because I think we might be able to use a video

10   camera, have IT do that too.  They are not in the business of

11   doing video depositions, but let me just explore that

12   alternative as well so that if people feel comfortable, we

13   might be able to do that.  And we might even -- with that setup

14   if we have someone, we could do maybe at 1:30 a test just to

15   see how that looks and if that might be acceptable.

16        MR. BELLER:  That would be ideal, Your Honor.  I also

17   understand in speaking to the government that Mr. Skalak does

18   need his testimony to be finished today.  That was something

19   that we knew about last week.  I also understand that he may be

20   available to testify even after the 5:00 o'clock hour.

21        Your Honor, I have the majority of the examination for

22   Mr. Skalak.  I think it is extraordinarily unlikely that I

23   would go that late, but I also don't know what the government's

24   redirect is going to be.  So I mention that now with no

25   disrespect intended for your staff, but we are prepared and

1    able to go past 5:00 if necessary.

2         THE COURT:  I will talk to them and the court security

3    officers and we'll see.  Things tend to shut down here at 6:00,

4    but there is a possibility we may be able to go a little bit

5    later which under the circumstances may be a good idea, once

6    again, assuming that people are available.

7         MR. BELLER:  Understood.  Thank you.

8         THE COURT:  Ms. Call?

9         MS. CALL:  It may make sense for scheduling for

10   tomorrow and the next day as far as getting through the rest of

11   the bulk of documents, based on at least Mr. Tubach's math, it

12   sounds like we have almost a full day's worth still of going

13   through exhibits.  I think for the government either Tuesday or

14   Wednesday would be fine, but I would defer to perhaps the

15   group's consideration.

16        THE COURT:  I think Wednesday.  I would like to do

17   testimony since we are bring the people back to do that,

18   although I suppose we could call the jury off again.  That's a

19   possibility, but we definitely want to get Mr. Skalak done.

20   Yeah, if the government has witnesses, let's plan on testimony

21   tomorrow.

22        MS. CALL:  Sure.  I thought maybe with the juror's

23   current illness, I thought a second day off would maybe

24   mitigate additional issues, but we have our witnesses available

25   and that's why we wanted to address it now.

1        *THE COURT:*  We will keep that in mind and why don't we

2   plan on testimony tomorrow.

3            So we will be in recess, then, until 1:30.  Thank you.

4        (Recess at 11:47 a.m.)

5        (Reconvened at 1:35 p.m.)

6        *THE COURT:*  Okay.  Now, one thing that we should talk

7   about -- by the way, we are back on the record and the jury is

8   not present, but we are set to continue with the

9   cross-examination of Mr. Skalak, but by videotape testimony

10  outside of the jurors' presence.

11           Do you want to run the camera during bench

12  conferences?

13       *MR. BELLER:*  Well, it's funny that you say that,

14  Judge, because we just had that discussion.  And what we think

15  is appropriate is a couple of things.  No. 1, if the Court

16  would consider still using the headsets for bench

17  conferences --

18       *THE COURT:*  Of course.

19       *MR. BELLER:*  -- since we are going to have a witness

20  on the stand.

21       *THE COURT:*  Right.

22       *MR. BELLER:*  Our thought is to continue to run the

23  video.  And if the Court will allow our IT person can then edit

24  out the bench conferences and provide the government and the

25  defense with both unedited, as well as edited versions, so that

1    the jury doesn't have to sit through minutes of white noise.

2    That's generally our thought.  That way we are not stopping and

3    starting the actual video equipment.  If the Court wish

4    something different, we are certainly open to the Court's

5    preference.

6           THE COURT:  I think that sounds like a good plan.

7    That way we will have an uninterrupted original.  Of course,

8    Ms. Coppock is going to be taking down all the testimony

9    including the bench conferences anyway, but as long as there is

10   no objection from the government of editing out the bench

11   conferences for purposes of showing that to the jury, I think

12   that will spare some time, will save some time.

13          MS. SWEENEY:  No objection from the government on

14   that, Your Honor.

15          The one other thing I wanted to point out is the date

16   and time will show on the video itself.  So the jury may see a

17   jump in time if there is an edit.  And if Your Honor would just

18   instruct the jury it's just the bench conference they have been

19   spared, we would ask for that.

20          MR. BELLER:  I agree.  Ms. Sweeney and I discussed

21   this briefly.  Your Honor, we can have the videographer remove

22   the date and time.  I will tell you both Ms. Sweeney and I are

23   a little indifferent.  We are not sure what the right call is

24   in terms of having the jury be able to see the date and time

25   actually on the screen.  So if the Court has a preference, we

1    are happy to do it either way.

2           THE COURT:  I don't.  I don't think that the jury is

3    going to be too worried about that, especially with an

4    explanation from me.  I just -- I don't think that that would

5    be a matter that they would pay much attention to or be

6    concerned about even if they did pay attention to it.

7           MR. BELLER:  That was our thought as well, Your Honor.

8           THE COURT:  Might as well spare the extra time that

9    would occur to remove that.

10          MR. BELLER:  Very good.

11          THE COURT:  Okay.

12          MR. BELLER:  And I think those are the immediate

13   issues with this setup that we needed to address with Your

14   Honor.

15          THE COURT:  Okay.  Has the videographer done a test?

16   Are we all ready to go?  For instance, once we get Mr. Skalak

17   situated, can we just at that point in time begin?

18          MR. BELLER:  Yes.

19          THE COURT:  And then everyone should understand that

20   we'll proceed as if the jury is present.  Objections and

21   everything else will go forward just as if the jury were

22   present, so we won't be taking time-outs, for instance, unless

23   there is a bench conference or there is a technical problem,

24   okay?

25          MR. BELLER:  Understood.

1          And then the one piece that I would just stress is not

2    knowing exactly what the microphones are picking up, that if

3    anyone is going to be speaking on an objection, to please just

4    make sure they are actually speaking into a microphone, whether

5    it's at the lectern or the microphone on their table, to make

6    sure the videographer is able to pick it up on the video.

7          THE COURT:  Yes.  And just for the record, the

8    videographer has situated some microphones.  There is one --

9    this is a supplemental microphone, one at the bench, one at the

10   podium, one at the witness stand and one for the government,

11   okay.  So yes, if there is an objection, we'll take the time

12   necessary for -- perhaps we can articulate the objection from

13   one's seat, but then that will stop the action, proceed to the

14   podium, articulate the objection if it's going to be in open

15   court.  And then that will be a little bit slower, but I think

16   that's best for purposes of making a good record, okay?

17          Are we ready for the witness at this time?

18          MR. BELLER:  Yes, please.

19          THE COURT:  Let's go ahead and bring Mr. Skalak in.

20          Mr. Skalak, if you don't mind, if you could go back up

21   to the bench and resume your seat at the witness stand.

22          THE WITNESS:  Okay.  Thank you.

23          THE COURT:  All right.  We are ready at this time to

24   resume the cross-examination.

25          Mr. Beller, go ahead.

1      MR. BELLER:  Thank you, Your Honor.

2      (**Meyer Skalak** was sworn.)

3              **CROSS-EXAMINATION CONTINUED**

4  BY MR. BELLER:

5  Q.  Good afternoon again, Mr. Skalak.

6  A.  Good afternoon.

7  Q.  Mr. Skalak, when we were finishing up chatting on Wednesday

8  afternoon, we were talking about whether Chick-fil-A had

9  requested this antibiotic-free conversion as a cost or whether

10  it was a price increase.  And so I mention that now so we can

11  sort of orient you on where we were -- where we left off.

12          So you would agree with me, Mr. Skalak, that when a

13  supplier converts to antibiotic-free products, numerous changes

14  must be made to their processes, right?

15  A.  Yes.

16  Q.  Each involves an additional cost to that supplier.

17  A.  I would not fully agree with that statement.  The removal

18  of antibiotics would be something that they wouldn't have to

19  pay for, so they might be costs that they could defer.

20  Q.  Mr. Skalak, do you recall meeting with the Department of

21  Justice on October the 18th, 2021?

22  A.  I met with the Department of Justice several times during

23  the month of October.  I'm sure I did.  If you have reference

24  to that -- I can't recall a specific date, but I do know I met

25  with them in October, yes.

2932

Meyer Skalak - Cross

1   *Q.*  Understood.  And you met with the Department of Justice and

2   Ms. Sweeney was present, right?

3   *A.*  She was present --

4        *MS. SWEENEY:*  Objection, Your Honor, as to relevance

5   of who was present at the interview, who at government counsel

6   table was present at the interview.

7        *THE COURT:*  Well, I will overrule the objection at

8   this time.

9        Go ahead.

10  *BY MR. BELLER:*

11  *Q.*  And Mr. Torzilli was present.  Do you recall that?

12  *A.*  I know Ms. Sweeney was present.  There were a number of

13  folks on a conference call and I can't recall the exact names

14  of all the individuals.  I apologize, but it was --

15  *Q.*  Well, do you recall that there was a special agent who was

16  present taking notes?

17  *A.*  Yes.

18  *Q.*  Agent Repp.

19  *A.*  I do recall there was someone taking notes.

20  *Q.*  And do you recall on October the 18th, 2021 being asked the

21  very same question that I asked you, and your response to the

22  government is:  Each one of these different changes involves an

23  additional cost.

24       *MS. SWEENEY:*  Objection, Your Honor, reading from

25  direct words from the report.

Meyer Skalak - Cross

1          THE COURT:  Overruled.  He can confront the witness

2   with a statement that is purportedly having been made by the

3   witness.  Overruled.

4   A.  So I believe in reference that would be the discussion of

5   the changes they were making that we had talked about, so the

6   ones that we had talked about with the government would have

7   been increases.  I don't think I ever spoke to the government

8   about them not providing antibiotics.

9   BY MR. BELLER:

10  Q.  Understood.  So let me ask my question again because it's a

11  fairly simple one that I'm asking.

12          You told the government that each one of these changes

13  involves additional costs.

14  A.  Yes, sir.  The discussion of those, we do discuss, yes.

15  Q.  Understood.  That's what you said to the government on

16  October the 18th when Ms. Sweeney was present and Mr. Torzilli

17  was present and Agent Repp was taking notes.  Your testimony to

18  them, your statement to them was that each one of these

19  processes involves additional costs.

20  A.  Okay.  I am sorry.  I didn't know there was a question

21  there.  So in that meeting the changes that we had talked

22  about, it was my understanding those would cost more.

23  Q.  Thank you.  And one of those costs were fewer birds being

24  in the house together, right?

25  A.  Yes, sir, yes.

Meyer Skalak - Cross

1    *Q.*  This means either cutting volume or it means building more

2    broiler houses.

3    *A.*  It would mean less birds out of a house or if you needed

4    the same volume, you would have to add more houses, yes.

5    *Q.*  Very good.  Fair to say that you did not want fewer

6    chickens, right?

7    *A.*  That would be correct.  At the time we needed additional

8    pounds, yes.

9    *Q.*  So when you say it means either reducing volume, that means

10   either buying or supplying fewer chickens or it means building

11   more houses.

12   *A.*  It means we would need more product from them.  So if they

13   had to reduce the volume, they would have to add houses to get

14   us the same volume, yes.

15   *Q.*  Very good.  You had indicated that it includes a different

16   feed than standard poultry; is that right?

17   *A.*  That was my understanding from the conversations with the

18   suppliers, that it would require a different feed regimen, yes.

19   *Q.*  And it would require third-party auditing, correct?

20   *A.*  Yes, for certification of the program.

21   *Q.*  That's a yes?

22   *A.*  Yes.

23   *Q.*  It would require the isolation of sick birds.

24   *A.*  So my understanding was that if birds got sick, they would

25   be treated and they would not come to Chick-fil-A.  So I am not

Meyer Skalak - Cross

1   sure by isolation if that's what you mean, but that was my

2   understanding.

3   Q.  Well, let's go back to your interview that you did with the

4   government on October the 18th, 2021, okay?

5   A.  Uh-huh.

6   Q.  The government asked you what these different processes and

7   changes would be.  And you stated to the government to a

8   special agent writing down your words that it would require the

9   isolation of sick birds, right?

10  A.  And so by that, I would mean that birds would not be sent

11  to Chick-fil-A and they would have to be -- we never told them

12  not to treat birds.  If they had to isolate or treat them, that

13  was acceptable, just we wouldn't receive them.

14  Q.  So let me try this again because I need you to answer the

15  questions that you're asked, okay?

16  A.  Uh-huh.

17  Q.  And the question that you were asked is whether or not on

18  October the 18th, 2021 with Special Agent Repp writing down

19  your words you said to the United States Government that one of

20  the processes is the isolation of sick birds.

21  A.  So I don't have reference to the same notes, but if that's

22  what I said, then that's what they would have written down.

23  Q.  Very good.  You also said -- well, let me back up.

24          One of the additional processes is the removal of sick

25  birds, correct?

Meyer Skalak - Cross

1    *A.*  Again, I don't have the exact notes you're referencing, but

2    I think when birds are sick, they are treated and sometimes

3    removed from the houses.

4    *Q.*  And that is one of the additional costs that suppliers

5    would have taken on by converting to antibiotic-free.

6    *A.*  It could be an initial cost, yes.

7    *Q.*  Chick-fil-A also incurred additional costs due to only

8    purchasing the breast meat and the tenders, right?

9    *A.*  Yes, that is correct.

10   *Q.*  And that reason -- and that also led to additional costs

11   because Chick-fil-A was the only quick-serve restaurant seeking

12   to purchase NAE product, right?

13   *A.*  As far as I knew, that would be correct.

14   *Q.*  So suppliers were left with product with no market for

15   sale.  In other words, if they're growing an NAE bird for

16   Chick-fil-A and Chick-fil-A is only purchasing, for example,

17   the breast meat, that would leave additional NAE product for

18   sale to another buyer, fair?

19   *A.*  That would be my understanding as well, yes.

20   *Q.*  And Chick-fil-A incurred the extra cost associated with

21   that market discrepancy, right?

22   *A.*  Yes, that was my understanding as well.

23   *Q.*  And you knew that there would be cost implications to the

24   supplier for the NAE changes.

25   *A.*  Yes.

Meyer Skalak - Cross

1    *Q.*  And Chick-fil-A would absorb the expected increase in

2    chicken cost due to the NAE conversion, right?

3    *A.*  Yes.

4    *Q.*  So given all of these different moving parts, Mr. Skalak,

5    fair to say that you had a team at Chick-fil-A who was tasked

6    with getting the NAE program up and running, right?

7    *A.*  That is correct.

8    *Q.*  Okay.  And that's because in the winter of 2014, you were

9    the executive director of supply continuity.

10   *A.*  That is correct.

11   *Q.*  David Rothmeier worked for you.

12   *A.*  David Rothmeier at that time reported to Mike Ledford and

13   Mike Ledford reported to me, so David Rothmeier would have been

14   under my team.

15   *Q.*  Good.  And you mentioned Mr. Ledford.  You would agree with

16   me that Mr. Ledford joined Chick-fil-A in May of 2014, right?

17   *A.*  I don't have that specifically in front of me, but I know

18   he joined in 2014, so...  I don't know the exact date, but if

19   that's what you have, then yeah, that sounds about right.

20   *Q.*  And so December of 2013, January, February, March of 2014,

21   Mr. Rothmeier was reporting to you.

22   *A.*  Yes, sir.  I am sorry.  I thought you had asked me in the

23   winter of 2014, and that's why I said he was reporting to

24   Mr. Ledford at that time.

25   *Q.*  And to be fair to you, I think you are exactly right.  I

Meyer Skalak - Cross

1    think I did, so let me orient you to the winter of -- the end

2    of 2013, beginning of 2014.

3    A.   Okay.

4    Q.   Okay.  So Mr. Rothmeier is reporting to you during that

5    period of time.

6    A.   That would be correct.

7    Q.   And Mr. Rothmeier you would agree with me is -- or was

8    responsible for the day-to-day category lead for chicken,

9    right?

10   A.   Yes, that is correct.

11   Q.   He had the responsibilities directly relating to

12   interacting with the different chicken suppliers.

13   A.   Yes.

14   Q.   And there was another gentleman who also worked with

15   Mr. Rothmeier by the name of Steve Hester, right?

16   A.   Yes, sir.  Mr. Hester was involved in the process.

17   Q.   And there is another individual, Steve Lyons, L-Y-O-N-S.

18   He was also on the team, correct?

19   A.   He was part of the team as well, yes.

20   Q.   And Dr. Lyons was on the team because of his education and

21   experience, right?

22   A.   Yes, education, experience as it relates to quality and

23   things of that nature, yes.

24   Q.   Sure.  And his role, this is Dr. Lyons' role, was among

25   many was to also speak with the different veterinary staffs of

Meyer Skalak - Cross

1   the different supplier companies, right?

2   A.   I know he was interacting with multiple members of the

3   chicken suppliers.  I can't say with certainty exactly who, but

4   it would have been normal for him to talk to them, yes.

5   Q.   Okay.  And another one of his roles was compiling and

6   benchmarking best practices throughout this NAE rollout, right?

7   A.   I think he was trying to understand what the best program

8   was.  I don't know that I would term that best practices.

9   Q.   Well, certainly which program is chosen is important

10  because of overall supply stability, right?

11  A.   That would be one of the factors, yes.

12  Q.   Okay.  Another one would be predictability; you would agree

13  with me?

14  A.   Predictability specific to what?

15  Q.   To the supply contain.

16  A.   Predictability of supply and -- yeah, I think that's a fair

17  statement.

18  Q.   Okay.  So we're talking about Mr. Rothmeier, Dr. Lyons,

19  Mr. Hester.  It's fair to say that you oversaw their work.

20  A.   I oversaw the program -- their work as it related to that

21  program, yes.

22  Q.   You yourself were not doing the day-to-day on-the-ground

23  work with the suppliers.

24  A.   Yes, sir, that's correct.

25  Q.   And it's Mr. Rothmeier who had these daily conversations

Meyer Skalak - Cross

1  with suppliers, right?

2  A.  Yes, sir, that would be correct.

3  Q.  He had these conversations via e-mail.

4  A.  I'm sure that would be one of the modes, yes.

5  Q.  Via telephone.

6  A.  Again, that would be normal, yes.

7  Q.  And via text.

8  A.  I would assume again that he had all of those modes of

9  communication, yes.

10  Q.  Well, and you say that you would assume.  And I want to go

11  there for just a moment because you would agree with me that if

12  Mr. Rothmeier is the one who had the day-to-day conversations

13  with the suppliers, that Mr. Rothmeier certainly had -- has

14  more knowledge about those day-to-day communications than you

15  do.

16  A.  He would -- yes, he would have more knowledge about his

17  communications with the suppliers than I would, yes.

18  Q.  Well, and he can likely answer some of the questions better

19  than what you can answer them, right?

20        MS. SWEENEY:  Objection, calls for speculation.

21        THE COURT:  Overruled.  He can answer if he knows.

22  A.  Would you please repeat the question?

23  Q.  Yeah.  As you are talking about -- you're testifying about

24  the 2014 NAE rollout, and Mr. Rothmeier is the one who had the

25  majority of the communications with the suppliers, from your

Meyer Skalak - Cross

1    perspective who oversaw the big picture rollout, is it fair to

2    say that Mr. Rothmeier may have some answers on how it occurred

3    or what occurred that you yourself would not have?

4    A.   I would not know all the communications that Mr. Rothmeier

5    had, so I think that would be a fair statement.

6    Q.   Very good.  So as we go through my questions, if there is a

7    question that is better suited for Mr. Rothmeier than you, will

8    you tell me so?

9    A.   If I know that to be the case, I will tell you, sure.

10   Q.   Very good.  Mr. Skalak, you yourself are uncertain if

11   guidelines were ever given to the different suppliers outlining

12   what topics of communication between the suppliers are or are

13   not permitted, right?

14   A.   That would be correct.

15   Q.   Because you were involved with some of the preliminary

16   discussions with the suppliers regarding the costs associated

17   with the NAE, right?

18   A.   Yes.

19   Q.   And the discussions that you had were at a high level,

20   correct?

21   A.   I think it would be fair to say they were at a high level,

22   yes.

23   Q.   You were early in the process.

24   A.   I think that would be a fair statement as well.

25   Q.   Okay.  And you were not the primary point of contact for

1  the suppliers interacting with Chick-fil-A.

2  A.  That would be correct as well.

3  Q.  Each one of the different suppliers would have gone through

4  a member of your team, right?

5  A.  Yes.

6  Q.  So I want to talk with you about one of the items that you

7  testified about on Wednesday, November the 10th.  In your

8  direct examination, you were asked if any of the -- if you ever

9  asked any of the chicken suppliers to coordinate with each

10  other on price during those negotiations.  Do you recall that

11  question?

12  A.  I do.

13  Q.  Do you recall also that you answered no, that you did not?

14  A.  That is correct.

15  Q.  Because it's your belief that prices between suppliers and

16  customers are proprietary, right?

17  A.  It's my belief that prices between -- between myself and a

18  supplier is between myself and that supplier.  I don't believe

19  suppliers should coordinate on price, but I know in the course

20  of negotiation, we talk about pricing with suppliers.  So I am

21  not sure that I completely understand your question.  I am

22  trying my best to answer it as you're asking it, but I don't

23  know that I can say with certainty that I am answering what

24  you're asking me.

25  Q.  Understood, and I appreciate the effort, Mr. Skalak.

Meyer Skalak - Cross

1          Mr. Skalak, you would agree with me that Chick-fil-A

2     did, in fact, share pricing of one supplier with another

3     supplier in order to get a lower price, right?

4     *A.*  I don't think I was copied on the communication to that

5     effect, but I know we do share pricing with suppliers to

6     negotiate a lower price.

7     *Q.*  Understood.  So the government also asked if you wanted

8     suppliers sharing cost information and you were asked a

9     follow-up question of why.  Do you recall that line of

10    questioning?

11    *A.*  Yes.

12    *Q.*  So whether you yourself wanted suppliers sharing cost

13    information, you would agree with me that you are not a lawyer.

14    *A.*  Yes, I would agree with that, yes.

15    *Q.*  All right.  And you're certainly not a judge, right?

16    *A.*  Yes, that is correct.

17    *Q.*  You're not a juror in this case.

18    *A.*  That is correct.

19    *Q.*  You yourself, Mr. Skalak, have not heard the judge's jury

20    instructions, correct?

21    *A.*  No, sir, I've not heard those.

22          *MS. SWEENEY:*  Objection, Your Honor, as to relevance.

23          *THE COURT:*  Sustained.

24          *MR. BELLER:*  Your Honor, may we go side bar, please?

25          *THE COURT:*  Yes.

Meyer Skalak - Cross

1       (At the bench:)

2           THE COURT:  Go ahead, Ms. Sweeney or Mr. Beller.

3           MR. BELLER:  Your Honor, I am happy to.

4           Judge, as the Court knows, the government has

5   repeatedly asked witnesses whether they ever asked individual

6   suppliers to share information, whether they wanted those

7   suppliers to share information, whether in the witness' opinion

8   it was moral or ethical for them to be able to share that

9   information time and time and time again.  Without fail the

10  defense objected to that line of questioning as being

11  irrelevant to this jury's determination over whether or not an

12  antitrust violation actually happened.

13          The government asked the same exact series of

14  questions to this particular witness that was also allowed over

15  objection.  I believe that this continues to be an irrelevant

16  question, but given the fact that the Court has overruled that

17  and the jury has heard what this witness' opinion is, I believe

18  that it is extremely relevant to now ask this witness to

19  describe the relevance of his opinion for the purpose of this

20  jury being able to understand what weight to give that

21  particular testimony elicited on direct examination.

22          THE COURT:  All right.

23          Ms. Sweeney?

24          MS. SWEENEY:  Yes, Your Honor.  The government has

25  asked the witnesses factual questions about what they have

Meyer Skalak - Cross

1    instructed their subordinates to do, what they have

2    instructed -- or what they have asked of their suppliers,

3    excuse me.  The government has not asked our witnesses to opine

4    on the law.  And based on Mr. Beller's most recent question

5    asking about if the defendant -- I'm sorry, I am being signaled

6    that the microphone is nearby, so I am stepping away -- that if

7    the witness' -- the jury instruction seems to be questioning

8    much more along the lines of getting an opinion of law from the

9    witness which is clearly improper.

10          *MR. BELLER:*  And, Your Honor, if I may, the last thing

11   I want to do is to have this witness opine on whether or not my

12   client engaged in or did not engage in an activity that is

13   ultimately left for the jury to make that determination.  So to

14   the extent that the government is concerned that I am going to

15   ask him to opine on the law, that's the exact opposite of what

16   I plan on doing.

17          What I plan on doing is now after he explains that he

18   is not trained in the law, that he is not trained on antitrust

19   violations, is to compare this to, for example, to an employer

20   not wanting the employees to share their salary information,

21   but that that is not insofar as he is aware a federal criminal

22   act.  Your Honor, I will assure the Court that I do not have

23   much more on this chapter and will be moving on.

24          *THE COURT:*  Yeah, there is no problem with asking if a

25   witness is an attorney.  There is no problem with asking a

Meyer Skalak - Cross

1    witness if, for instance, he has been trained in antitrust law.

2    Those are relevant.  However, the attorney should not ask

3    witnesses rhetorical questions about whether they are a member

4    of the jury, whether they have looked over the Court's jury

5    instructions.  Those don't have any real purpose other than, as

6    I said, a rhetorical device, and the jurors shouldn't be

7    directed to start thinking about things in that light.  But in

8    terms of his -- the basis of an opinion that he may have held,

9    including the one that Mr. Beller referenced about, you know,

10   his opinion about whether someone should -- whether a supplier

11   should be trading prices or sharing prices, some questions can

12   be asked about the basis for that opinion.  That's fine.

13            Anything else?

14        MS. SWEENEY:  Nothing from the United States, Your

15   Honor.

16            THE COURT:  Thank you.

17      (In open court:)

18   BY MR. BELLER:

19   Q.  Mr. Skalak, as we established, you supervise employees,

20   right?

21   A.  Yes, sir.

22   Q.  You would agree with me that as a supervisor, you would not

23   want your employees knowing what another employee's salary is,

24   right?

25   A.  I think that's an accurate statement, yes.

Meyer Skalak - Cross

1    Q.  All right.  You certainly don't want them sharing their

2    salary information with each other.

3    A.  I don't think I would want them, but I don't think I would

4    restrict them.

5    Q.  And you would agree with me that, you know, while you as an

6    employer may not want employees sharing salary information, you

7    have no basis to believe that doing so is a federal criminal

8    violation, right?

9            MS. SWEENEY:  Objection, Your Honor.

10           THE COURT:  Overruled.

11   A.  I'm not aware of there being any law that restricts them

12   from sharing their salaries.

13   BY MR. BELLER:

14   Q.  And you are also not trained in the law as to an antitrust

15   violation, correct?

16   A.  No, sir, I am not trained in the law as to an antitrust

17   violation.

18   Q.  So Mr. Skalak, turning topics for just a moment, now that

19   we've spoken a little bit about the costs associated with NAE,

20   I want to talk with you a little bit about exactly how NAE is

21   defined, okay?

22   A.  Okay.

23   Q.  One important role that you took on in your role with

24   Chick-fil-A was figuring out exactly how the U.S. Department of

25   Agriculture defined NAE, right?

Meyer Skalak - Cross

1   A.  I would stay Steven Lyons led that more than myself.

2   Q.  Very good.  You oversaw Mr. Lyons.

3   A.  I did.

4   Q.  So would these be questions that are better suited for

5   Mr. Lyons or are you prepared to -- or are you able to answer

6   some of these questions?

7   A.  I think it would be specific to the question, but I am

8   happy to hear the questions and do my best.

9   Q.  Very good.  And anything that I ask you that is better

10  suited for somebody else, just let me know, okay?

11  A.  Uh-huh.

12  Q.  We also had -- is it Rob Dugas?  He was part of your team,

13  correct?

14  A.  So Rob was my manager at the time, so I don't know that I

15  would say he was part of my team.  I reported to Rob,

16  Mr. Dugas.

17  Q.  Very good.  Dugas being D-U-G-A-S, correct?

18  A.  Yes, sir, that is correct.

19  Q.  So the individuals at CFA that were working on figuring out

20  how USDA defined NAE, that included googling the term, right?

21  A.  It would have included research via the internet, yes, sir.

22  Q.  Okay.  Well, and I don't want to split hairs.  It was

23  googling the term.

24  A.  I know I personally googled.  I can't say if other people

25  used a different search engine.  I know that I would have

Meyer Skalak - Cross

1  googled the term.  That's generally the search engine I use,

2  but I can't speak to others, how they would have searched for

3  that.

4  Q.  Sure.  And that occurred the beginning of February of 2014,

5  right?

6  A.  I don't recall the exact time line under which I would have

7  googled that term, but it would have been in early 2014.  I

8  don't know the exact month.

9  Q.  Well, would it help refresh your recollection if you had

10  the opportunity to view a document?

11  A.  It may, sure.  I don't know the document, but it may, yes,

12  sir.

13  Q.  Understood.

14       MR. BELLER:  If we could please show the witness, not

15  for the jury, please, Defense Exhibit A-170.

16  BY MR. BELLER:

17  Q.  That exhibit is going to show up on your screen,

18  Mr. Skalak.  Let me know when you have had an opportunity to

19  review that exhibit.  And let me say this is three pages.

20  Mr. Skalak, if it would be easier for you to have a physical

21  copy, I can have one brought to you, sir.

22  A.  It may be easier to read on a physical copy versus --

23       MR. BELLER:  May I hand this to Ms. Grimm, Your Honor.

24       THE COURT:  You may.

25       MR. BELLER:  Thank you.

Meyer Skalak - Cross

1    *A.*  Thank you.

2    *BY MR. BELLER:*

3    *Q.*  Mr. Skalak, does reviewing Defense Exhibit A-170 refresh

4    your recollection as to whether you or a member of your team

5    was googling NAE in approximately February 5th or February 6th

6    of 2014?

7    *A.*  In reading the document, it appears Rob Dugas googled NAE

8    USDA February the 5th.

9    *Q.*  Okay.  And Mr. Dugas was actually reporting back to you

10   what he was able to find or the fact that he wasn't able to

11   find anything on that topic; fair enough?

12        *MS. SWEENEY:*  Objection, Your Honor.  The question is

13   about the document as opposed to his recollection and the

14   document is not in evidence.

15        *THE COURT:*  Overruled.  He can answer.

16   *A.*  I can read what Mr. Dugas says if that's --

17   *BY MR. BELLER:*

18   *Q.*  I am not asking you to read from the document.

19   *A.*  Okay.

20   *Q.*  And I should have been more clear in terms of I am going to

21   ask you questions off of the document now, Mr. Skalak.  So if

22   you can put that down.

23        Does that refresh your recollection as to whether you

24   or a member of your team was googling NAE February 5th or

25   February 6th of 2014?

Meyer Skalak - Cross

1   *A.* So from reading the document, I can tell that Mr. Dugas did

2   that. I am not really familiar with the term refresh memory,

3   so I can read the document and tell you that's what it says.

4   *Q.* Understood. Thank you. Fair to say that one of the other

5   things that either you or a member of your team was doing was

6   looking at the USDA website, right?

7   *A.* I believe Mr. Lyons was doing that, and I believe I also

8   looked at links that may have been shared with me at that time.

9   *Q.* Understood. And Mr. Rothmeier was reaching out to contacts

10  at Perdue to provide him contacts at the USDA, correct?

11  *A.* According to the documents, yes, Mr. Rothmeier was doing

12  that.

13          *MS. SWEENEY:* Objection, Your Honor. Again, the

14  answer is based on the document as opposed to his recollection.

15          *THE COURT:* Yeah, Mr. Skalak, refreshing memory is

16  just -- you can look at something, and then if it refreshes

17  your memory, great. But the question would not be what do you

18  remember from the document you just read. It would be whether

19  the document refreshes an independent memory that you have of

20  it, okay?

21          *THE WITNESS:* Thank you, Your Honor.

22  *BY MR. BELLER:*

23  *Q.* So do you have knowledge or memory of Mr. Rothmeier

24  reaching out to Perdue to obtain a contact at the USDA?

25  *A.* Not to repeat myself, but my memory at that time aside from

Meyer Skalak - Cross

1  reading this document would be I don't recall.

2  Q.  Okay.  So would that be a better question for

3  Mr. Rothmeier?

4  A.  He may recall what he did better than I would.

5  Q.  Very good.  And the reason why your team was doing all of

6  this research was because you wanted to make sure that you were

7  being very clear with your messaging about this antibiotic-free

8  product, right?

9  A.  That's correct.  I think there was a lot of nuance to it

10  and we did not want to mislead or confuse anyone.

11  Q.  Absolutely.  And, in fact, on February 6, 2014, you were

12  still trying to figure out the USDA definition of these

13  different antibiotic-free programs, right?

14  A.  When you say you, if you are referring to Chick-fil-A, I

15  think that is an accurate statement.

16  Q.  Very good.  This was all days before a public announcement

17  is made, right?

18  A.  The public announcement was made in February as well.  I

19  don't know the exact date.  I guess it would be in the same

20  month, yes.

21       MR. BELLER:  If we can please have government

22  Exhibit 356.

23       And Your Honor, I believe this has already been

24  admitted and published to the jury.

25       THE WITNESS:  I can see the date on the document as it

2953

Meyer Skalak - Cross

1    relates to the date on these documents so...

2         *MR. BELLER:* Understood.  Just one moment, Mr. Skalak.

3         *THE WITNESS:* Apologies.

4         *MR. BELLER:* No problem.

5         *THE COURT:* Yes, it has been admitted and may be

6    published.

7         *MR. BELLER:* Very good.  If we can publish that to the

8    jury, please.

9    *BY MR. BELLER:*

10   *Q.* Mr. Skalak, this is the formal announcement to the public

11   about your transition to NAE, right?

12   *A.* Yes, sir.

13   *Q.* Okay.  And the date on this is February 11th, correct?

14   *A.* Yes, sir, that is the date.

15   *Q.* And in looking at Government Exhibit 356, you would agree

16   with me that the public announcement that was made regarding

17   CFA going antibiotic-free does not use the terms ABF,

18   antibiotic-free, and it does not use the term NAE or no

19   antibiotics ever, right?

20   *A.* It states at the top antibiotic-free chicken, but I think

21   in reference -- I don't see NAE.  I do see the term

22   antibiotic-free.

23   *Q.* And when it uses the term antibiotic-free, you would agree

24   with me that it uses the term antibiotic-free, but what it

25   didn't use or wasn't intended to use is the actual ABF program

Meyer Skalak - Cross

1    as certified and sanctioned by the USDA, right?

2    A.   That would be correct, yes.

3    Q.   Very good.

4         MR. BELLER:   And I am done with that document.   Thank

5    you.

6    BY MR. BELLER:

7    Q.   So even after the public announcement of February 11th,

8    2014, you would agree with me that CFA continued to struggle

9    with how the USDA defined NAE, right?

10   A.   I think we struggled with how to explain it with customers,

11   and we probably were continuing to understand what the USDA's

12   definition would be, yes.

13   Q.   Sure.   Continued to understand what the USDA's definition

14   would be because there are different requirements for raised

15   without antibiotic versus antibiotic-free versus NAE or no

16   antibiotics ever.   There are, in fact, distinctions between

17   those programs, correct?

18   A.   That is my understanding, yes.

19   Q.   Okay.   And so which program Chick-fil-A was going to adopt

20   remained in flux even after this public announcement.

21   A.   I honestly don't recall at what point we made the decision

22   of which program we were going to pursue, so I cannot say with

23   a hundred percent certainty.   I don't think I can answer your

24   question with a hundred percent certainty, no.

25   Q.   Understood.   Would it help if you had the opportunity to

Meyer Skalak - Cross

1  view an e-mail from March of 2014?

2  A.  Again, it may.  I don't know what the e-mail would

3  reference, but it may.

4  Q.  Understood.

5         MR. BELLER:  If we can please show the witness Defense

6  Exhibit A-204.  This is not for the jury.

7  BY MR. BELLER:

8  Q.  If you could please take a moment and review that

9  particular e-mail, and then once you've reviewed it, let me

10  know if that refreshes your recollection regarding whether or

11  not CFA had a definition for its program as of March of 2014.

12  A.  Okay.  Can you repeat the question, please?

13  Q.  Yes.  Does that refresh your recollection as to whether or

14  not CFA had decided on what exactly the specifics of the

15  program was going to be as of March of 2014?

16  A.  So based on reviewing this e-mail, it appears we had not

17  decided that.

18  Q.  And, in fact, even May of 2014 CFA still had not yet

19  decided the specifics of the NAE program, correct?

20  A.  So again, I wouldn't recall those specifics.  There may be

21  documents that would allow that, but I don't recall that from

22  memory.

23  Q.  Would it help you if you had the opportunity to refresh

24  your recollection with defense Exhibit I-246, a May 11th, 2014

25  e-mail?

Meyer Skalak - Cross

1    A.  I would be happy to review it and let you know.

2    Q.  Thank you, Mr. Skalak.

3          MR. BELLER:  If we can please show the witness, not

4    the jury, I-246.

5    BY MR. BELLER:

6    Q.  Mr. Skalak, if you could please review this e-mail and let

7    me know if it refreshes your recollection regarding CFA's

8    definition or requirements of NAE as of May of 2014.  Does that

9    refresh your recollection?

10   A.  Again, in reviewing this it would appear by May we had not

11   determined the exact program.

12   Q.  And fair to say that by May of 2014, CFA or Chick-fil-A

13   still had not decided exactly which program to use.  And you

14   would agree with me that the suppliers were also confused

15   regarding what the requirements were for being NAE or no

16   antibiotic ever?

17   A.  I think we were seeking clarity on the specifics, so we

18   weren't able to get to -- there were some areas where we still

19   needed clarity, yes.

20   Q.  And the suppliers themselves also expressed confusion.

21   A.  I don't know that they expressed confusion because I'm not

22   aware of their specific conversations, but I know we were not

23   able to provide the clarity, so they would need that clarity to

24   know the final specification.

25   Q.  Understood.  Do you know -- do you recall that on March the

Meyer Skalak - Cross

1    7th of 2014, Mr. Lyons reported to you that Pilgrim's was

2    confused?

3    A.  I don't remember that.

4         MR. BELLER:  If we can have Exhibit A-204 up again,

5    please, again only for the witness.

6    BY MR. BELLER:

7    Q.  And I'm going to draw your attention to the bottom part of

8    Page 1.  If you can review that and let me know if that

9    refreshes your recollection as to whether you had knowledge

10   that Pilgrim's was confused in March of 2014.

11   A.  I reviewed the document and it appears according to

12   Mr. Lyons that Pilgrim's was not aware.

13        MS. SWEENEY:  Objection.

14        THE COURT:  Sustained.  Mr. Skalak, once again, the

15   question is whether the document refreshes your memory as

16   opposed to what the document says.

17   BY MR. BELLER:

18   Q.  So do you recall having knowledge that in March of 2014

19   that Pilgrim's was confused as to the requirements for going no

20   antibiotics ever?

21   A.  I apologize.  I am not trying to be difficult.  Other than

22   reading the document, I don't have recollection for that period

23   of time.

24   Q.  You're not being difficult at all.

25        Is it fair to say that that would be a better question

2958

Meyer Skalak - Cross

1   for either Dr. Lyons or for Mr. Rothmeier?

2   *A.*   I think Mr. Lyons was the one tasked with the specifics and

3   the clarity around the specification.   He would be more

4   knowledgeable.   That would be my answer.

5   *Q.*   So your -- switching gears just a little bit, your

6   testimony to the jury last Wednesday is that the terms ABF and

7   NAE are terms that are used interchangeably, right?

8   *A.*   I think they are terms that are often confused and people

9   use them interchangeably, yes.

10  *Q.*   Okay.   But you would agree with me that there is a

11  difference between ABF and NAE?

12  *A.*   As I understand it, there is a difference as those are

13  defined, yes.

14  *Q.*   And converting a chicken plant, a broiler plant to be NAE

15  is actually more expensive than an ABF program, right?

16  *A.*   I know it's different.   I can't speak to specifics around

17  those specific costs.   I don't have that specific knowledge.

18  *Q.*   Well, one of the differences is whether or not the

19  suppliers are able to use ionophores in treating their

20  chickens, right?

21        *MS. SWEENEY:*   Objection, foundation.   The witness said

22  he didn't have any knowledge.

23        *THE COURT:*   Overruled.   He can answer if he

24  understands the question.

25  *BY MR. BELLER:*

Meyer Skalak - Cross

1   Q.  Do you want me to ask that again?

2   A.  Please.

3   Q.  One of the differences between no antibiotics ever or NAE

4   and ABF meaning antibiotic-free, one of the differences is the

5   use of ionophores in treating a sick chicken.

6   A.  Okay.  Yeah, I understand ionophores are given as part of a

7   program to treat chickens, yes.

8   Q.  And so those would be differences between NAE and ABF.

9   A.  Yes.

10  Q.  Another one is the use of Gentamicin, right?

11  A.  Yes.

12  Q.  Gentamicin is an antibiotic that is given in ova or in egg

13  almost like a vaccine for an unhatched chick, right?

14  A.  Again, that is my understanding, yes.

15  Q.  Well, and these were distinctions that are important to the

16  suppliers in the spring of 2014 in determining what the cost

17  would be to CFA in raising an antibiotic-free bird.  Would you

18  agree with that?

19       MS. SWEENEY:  Objection, calls for speculation.  The

20  witness doesn't necessarily know what's in the mind of the

21  suppliers.

22       THE COURT:  He can answer if he understood based upon

23  his involvement.

24  A.  I would say suppliers need to know the specifications in

25  order to effectively cost and price their product, yes.

2960

Meyer Skalak - Cross

1   *BY MR. BELLER:*

2   *Q.*  Okay.  And so the suppliers would need to know the

3   specifications in order to determine cost.  You asked the

4   suppliers to give you a cost in January, February, March of

5   2014, but CFA had not determined those specifications until at

6   least May.  Is that a fair summary?

7   *A.*  Yes, we asked them -- and again I would delineate between

8   cost and price, but we asked them what a price would be for us,

9   yes.

10  *Q.*  Sure, a price would be for you for a program that was not

11  yet defined.

12  *A.*  That we still were seeking final definitions around, yes.

13  *Q.*  Very good.  All right.  Thank you, sir.

14          Now, you would agree with me that some of the

15  suppliers going into this time period already had some limited

16  experience in trying to raise chickens without antibiotics,

17  right?

18  *A.*  It was my understanding some of the suppliers had some

19  experience, yes.

20  *Q.*  Well, Perdue, for example, Perdue had already started the

21  process of trying to figure out what it would take to raise a

22  chicken without antibiotics.

23  *A.*  I knew Perdue was one of the ones that was further ahead

24  than others, yes.

25  *Q.*  Okay.  And, for example, Perdue would be, because they had

Meyer Skalak - Cross

1  started this process, they presumably would know what the

2  mortality rate is for an unvaccinated chicken, right?

3  A.  I don't know how far along they were in the process, so I

4  can't speak specifically to what knowledge they would or would

5  not have.

6  Q.  Well, would that be a better question for Mr. Rothmeier?

7  A.  I think that would be a better question for Perdue.  I

8  don't know that David would know that either.

9  Q.  Very good.  Tyson had an ABF chicken, ABF chicken that had

10  them some insight into raising a NAE chicken, correct?

11  A.  I know Tyson also had some experience.  I don't recall the

12  specifics of that experience.

13  Q.  And so Tyson, if they had an ABF chicken, would just have

14  to figure out how to transition their chickens from ABF to NAE.

15  A.  That would be logical to me.

16  Q.  And you would agree with me that Claxton Poultry in the

17  winter and spring of 2014 to the best of your knowledge had

18  zero experience raising an antibiotic-free chicken, right?

19  A.  I don't recall Tyson having that experience, to the best of

20  my knowledge.

21  Q.  Excuse me, I may have spoken over you.  My question was as

22  to Claxton.

23  A.  I'm sorry.  I apologize.  I don't recall Claxton -- to my

24  knowledge, Claxton did not have that experience.

25  Q.  And you also know, don't you, Mr. Skalak, that Claxton is a

1    single plant operation.

2    A.   Yes, sir, I am aware that they were at the time a single

3    plant operation, yes, sir.

4    Q.   Okay.  Meaning all of their broiler chickens in all of the

5    different chicken houses would be brought to a single plant for

6    processing, right?

7    A.   That was my understanding, yes.

8    Q.   And when we're talking about raising an antibiotic-free or

9    an NAE chicken, you cannot process one broiler house that is

10   raised with antibiotic at the same time you're processing a

11   broiler house that is raised without antibiotic because one

12   would contaminate the other; is that fair?

13   A.   To my knowledge, I am not sure how they would be able to

14   separate the two, so I am not aware of a way they could do

15   that.  It could be possible, but I wouldn't be aware of a way.

16   Q.   And so the other larger producers that had multiple plants

17   could presumably modify a plant to be NAE.

18   A.   They could certainly process at that facility and then

19   process at other facilities that wouldn't be NAE.  So I -- I

20   don't know the specific plant modifications that would be

21   required, but they would have more flexibility.

22   Q.   Sure.  Now, because Claxton -- well, let me back up.

23          I think your testimony was that in the spring --

24   winter and spring of 2014, so early 2014 that Claxton did not

25   have an NAE model.  You would agree with me that it would have

Meyer Skalak - Cross

1   required a great deal of research on their part, right?

2   A.  I would say it would require research on their part.  I

3   wouldn't feel comfortable with saying to what degree that would

4   require because I don't know.

5   Q.  So those are statements fair to say that would have been

6   communicated presumably to Mr. Rothmeier.

7   A.  They weren't communicated to me.  If they were

8   communicated, it would have likely been to Mr. Rothmeier.

9   Q.  And Chick-fil-A, I believe you said, encouraged suppliers

10  to speak to each other from time to time, right?

11  A.  There were times that we asked suppliers to speak to each

12  other regarding certain elements of their business, yes.

13  Q.  Sure.  So to coordinate on quality decisions.

14  A.  Quality and safety were the type of conversations that I

15  think we would ask suppliers to speak to, yes.

16  Q.  And you would also ask them to discuss product consistency,

17  correct?

18  A.  To me, that would be part of the quality conversation, so I

19  think that's fair, yes.

20  Q.  For example, if a supplier is struggling in a particular

21  area when executing the Chick-fil-A specification, you may put

22  them in contact with another supplier to resolve that issue.

23  A.  I believe that has been done in the past, yes.

24  Q.  And you would agree with me that when it comes to the

25  transition to no antibiotic ever, Chick-fil-A encouraged the

2964

Meyer Skalak - Cross

1   suppliers to speak with one another about how to get that

2   program up and running.

3   A.  I think that is a fair statement.

4   Q.  That because Pilgrim's had the -- excuse me, because Perdue

5   had the most experience raising an antibiotic-free chicken,

6   suppliers were encouraged to reach out to Perdue to discuss the

7   logistics, right?

8   A.  By logistics, yes; the processes or the different ways that

9   they were doing that, yes.

10   Q.  I think you testified on direct examination that all the

11   different suppliers were competitors, right?

12   A.  That was my understanding, that they are competitors.

13   Q.  So Chick-fil-A is encouraging the competitors to reach out

14   to Perdue for instruction on what it would take to convert

15   their plants to be antibiotic-free, right?

16   A.  We're encouraging them to seek out clarity on the how to

17   raise NAE birds.

18   Q.  Right.  So for all the questions that we had talked about

19   before like is there a feed requirement or is there a housing

20   requirement, right?

21   A.  I think those would be part of the how, yes.

22   Q.  Including whether or not the laying pens were required to

23   be antibiotic-free.

24   A.  I am sorry, I would not know that level of detail.

25   Q.  And so if you would not know that level of detail, you

Meyer Skalak - Cross

1   would agree with me that you certainly didn't tell the

2   suppliers whether or not their laying pens had to be

3   antibiotic-free.

4          *MS. SWEENEY:*  Objection, calls for hearsay.

5          *THE COURT:*  Overruled.

6   *A.*  I did not tell them specifically that, no, sir.

7   *BY MR. BELLER:*

8   *Q.*  The program at Perdue was overseen by a gentleman called

9   Dr. Stewart Brown, right?

10  *A.*  That is my understanding, yes.

11  *Q.*  Dr. Stewart Brown was someone that Chick-fil-A trusted in

12  this process.

13  *A.*  That would be a fair statement, yes.

14  *Q.*  And Dr. Stewart Brown at Perdue was the individual that

15  Chick-fil-A consulted with in trying to reach an answer about

16  what NAE requires, right?

17  *A.*  He would certainly be one that David Lyons would have

18  spoken to.  I can't say that he was the only, but I know that

19  David would have sought his -- would have asked him or spoken

20  to him.

21  *Q.*  Very good.  When you say David, you are talking about --

22  *A.*  I am sorry, Steven.  I meant Steven Lyons.  I am sorry, I

23  said David Lyons.  I meant Steven Lyons, Dr. Steven Lyons.

24  *Q.*  Very good.  Now, Dr. Lyons, since you mentioned Dr. Lyons,

25  would get some of those details, as you said, by reaching out

Meyer Skalak - Cross

1   to Dr. Stewart Brown?  Yes?

2   A.  Yes, I am sorry.

3   Q.  And as we said, possibly reaching out to veterinarians.

4   A.  He may have.  Again, I don't know that -- I don't know -- I

5   know he reached out to USDA and I know he probably spoke with

6   Perdue's veterinarian.

7   Q.  And I believe that you had testified on direct examination

8   that it was your assumption that the suppliers also reached out

9   to their own consultants.

10  A.  I think they would reach out to their consultants or people

11  they know in the industry on NAE, is that the question?

12  Q.  Yeah.

13  A.  I would assume they would, yes.

14  Q.  There are individuals called nutritionists who assist in

15  formulating the feed for chickens, right?

16  A.  That's my understanding, yes.

17  Q.  So after all of these different, I guess, factors are taken

18  into account, the supplier would then advise Chick-fil-A what

19  their best estimate is for the price for supplying a

20  no-antibiotic-ever chicken, right?

21  A.  Yes, that would be a fair statement.

22  Q.  And then for Chick-fil-A the anticipated rollout was slated

23  to be or scheduled to be over a five-year period of time,

24  right?

25  A.  Yes, sir, that was our plan.

2967

Meyer Skalak - Cross

1    Q.  So some of the suppliers may be providing an

2    antibiotic-free or no-antibiotic-ever chicken in 2015 and

3    others not until as much as 2020, right?

4    A.  I think the program was designed to be completed in 2019,

5    but yes, that would be true.  There would be times when some

6    would and some would not.

7    Q.  And all of them, regardless of when they were supposed to

8    actually roll out their program, were tasked with providing you

9    approximate cost in 2014.

10   A.  Yes, sir.  We asked all of them at that time for that.

11   Q.  Okay.  So you would agree with me, Mr. Skalak, that the

12   expectation of NAE chicken would still have to conform with

13   Chick-fil-A's high standard of quality, right?

14   A.  Yes, sir, that would be accurate.

15   Q.  And that the product amongst all the different suppliers

16   would still have to be as uniform as possible.

17   A.  Be as -- to match our specifications as closely as

18   possible, yes.

19   Q.  Right.  But because you don't want the customer in Florida

20   receiving a different or an inferior chicken sandwich to the

21   customer in Colorado, right?

22   A.  We would like for our customers to receive as close to

23   like-in-kind product as possible.

24   Q.  And consistency and quality was amongst your -- amongst the

25   important factors that you required of your suppliers.

Meyer Skalak - Cross

1   A.  That would be a fair statement, yes.

2   Q.  And you would agree that that consistency and quality also

3   extended to the NAE product.

4   A.  Yes, as it related to our specifications, yes, that would

5   continue.

6   Q.  Now, you've been in the chicken industry for a very long

7   time, right?

8   A.  I've been working for Chick-fil-A for 20 years, so if

9   that's a long time, I would say that's how long I've been with

10  them.

11  Q.  A relatively small community of people.

12  A.  The chicken industry is -- I would say people know each

13  other very well in that community, so it's a well-known

14  community.

15  Q.  Fair to say that they are probably all using or many are

16  using the same consultants to assist them?

17  A.  Yeah, I'm sorry.  I wouldn't know who they were using to

18  assist them, so I don't feel like I would be educated enough to

19  answer that question.

20  Q.  Well, you had testified that this is a relatively small

21  industry, that people know each other.

22  A.  Yes.

23  Q.  Would you agree with me that there are not a whole lot of

24  broiler chicken veterinarians that are out there?

25  A.  Again, I don't know specifically that answer.  You know,

2969

Meyer Skalak - Cross

1    it's not an area of the business that I had enough detail to be

2    able to -- that I could give you a fair and accurate answer.

3    Q.  Well, we know that Chick-fil-A at least advised them to

4    consult with Dr. Stewart Brown for a determination of these

5    factors.  Do you believe that they also likely consulted with

6    the same nutritionist, for example?

7    A.  Again --

8             MS. SWEENEY:  Objection, calls for speculation.  The

9    witness says he doesn't know.

10            THE COURT:  He can answer if he knows.  Overruled.

11   A.  Again, I don't know who they would speak to or if those

12   would be the same people.

13   BY MR. BELLER:

14   Q.  You would agree with me that asking the different suppliers

15   to convert their plants to be antibiotic-free, they are by and

16   large working with the same logistical issues.

17   A.  I think they are working with primarily the same changes

18   that are necessary, yes.

19   Q.  And so if they are working with the same changes that would

20   be necessary, you would also agree with me that you wouldn't

21   expect vastly different price estimates or cost estimates for

22   making these very similar changes.

23   A.  I don't know that I would say that.  They all have

24   different cost.  They all approach their business differently.

25   And again how they price their product to us is not always

2970

Meyer Skalak - Cross

1   exactly relative to their cost, so I don't know that I can say

2   that with certainty.

3   Q.  Fair enough.  You would agree with me, however, that it's

4   going to be roughly the same amount to build an additional

5   chicken house, broiler house.

6   A.  So my experience is that construction costs across the

7   country are different.  I don't know that I would answer

8   your -- I don't know that I would agree with your statement.

9   Q.  Very good.  Let's talk about your experience building

10  chicken houses.  So if you --

11  A.  Yeah, I am sorry, I didn't say chicken houses.  I just said

12  my experience in building costs.  I don't know what the

13  different cost of building a chicken house is across the

14  country.

15  Q.  Oh, I am sorry.  I believe that you had said to the jury

16  that in your experience with building costs, you would expect

17  them to be different across the country.  And so my question is

18  what is that experience?

19  A.  So my experience in getting costs from -- I'm not sure I'm

20  completing following.  Are we talking about building chicken

21  houses here or are we talking about --

22  Q.  Yes.

23  A.  So I don't recall saying I had experience in building

24  chicken houses.

25  Q.  So let me ask you the question again.  Perhaps we got

2971
Meyer Skalak - Cross

1    sidetracked.

2    A.  Sure.

3    Q.  Let's back up.  You would agree with me that you would

4    expect the cost of building a broiler chicken house to be

5    relatively the same across all suppliers.

6    A.  Yeah.  And so I think the way I tried to answer the

7    question was I know that building costs across the country are

8    not always the same, so I don't know that to be the case.

9    Q.  So you don't know is the answer; is that correct?

10   A.  Yeah, that would be very accurate, yes.

11   Q.  Very good.  You would expect the same amounts to be spent

12   on new feed formulations across all suppliers.

13   A.  Again, I know they have different suppliers, so I don't

14   know their cost of feed.

15   Q.  So you don't know is the answer.

16   A.  I don't know.

17   Q.  You would expect the same amount of chicken mortality

18   across the industry, correct?

19   A.  Again, I'm not sure that I would know what their chicken

20   mortality rates are and how those would be different across

21   suppliers.

22   Q.  You would expect roughly the same amount of bird density to

23   keep the birds from getting sick, right?

24   A.  Again, that level of specifics I can't speak to.

25   Q.  And because you don't know the answers to these questions,

Meyer Skalak - Cross

1     it would be fair to say that you also did not disclose any of

2     this or tell the suppliers any of these specifics as to what

3     was required of them.

4     A.   I -- I never told the suppliers any of those things, so

5     yes, that would be accurate.

6     Q.   So let's go back to when you had initially sort of come to

7     the decision that CFA was going to go antibiotic-free.  I think

8     you had testified that at the time you had six chicken

9     suppliers; is that right?

10    A.   That is correct.

11    Q.   Okay.  And one of the chicken suppliers, but it was only

12    for a very brief period of time, was Koch; is that right?

13    A.   Koch was a supplier for a short period of time, yes.

14    Q.   And when Koch was a supplier, is it fair to say that you

15    did not work with Bill Kantola?

16    A.   No, sir, I do not recall working with Bill Kantola.

17    Q.   So your goal in transitioning to NAE, no antibiotic ever,

18    was to get the big three suppliers onboard first, right?

19    A.   No, sir.  I would think we were trying to ascertain that

20    with as many of our suppliers as we could as quickly as we

21    could.  I don't recall specifically saying the big three.

22         MR. BELLER:  Just one moment, please.

23         If we can show the witness, please, Government

24    Exhibit 308.  Your Honor, I believe that this was introduced.

25    I do not remember if it was actually published, so if the Court

Meyer Skalak - Cross

1    would please confirm.

2         *THE COURT:*  I do not show that as having been

3    admitted.

4    *BY MR. BELLER:*

5    *Q.*  Do you see Exhibit 308 on your screen?

6    *A.*  Yes, sir, I see it.

7    *Q.*  And do you recognize what is shown in Exhibit 308?

8    *A.*  I do recognize it.

9    *Q.*  Okay.  This is the same exhibit that the government had

10   shown you and asked you about, I believe.  Do you recall that?

11   *A.*  Yes.

12   *Q.*  Fair to say that this PowerPoint presentation is the

13   presentation that you had testified to and that it was created

14   in the ordinary course of Chick-fil-A's business?

15   *A.*  That would be correct.

16   *Q.*  And that this particular PowerPoint presentation is

17   something that Chick-fil-A relied on in the ordinary course of

18   its business.

19   *A.*  We certainly utilize it in the ordinary course of our

20   business.

21   *Q.*  And that the PowerPoint presentation that is depicted as

22   Government's Exhibit 308 appears to be correct and accurate.

23   *A.*  Yes, sir.  To the best of my knowledge, it is correct and

24   accurate.

25         *MR. BELLER:*  Based on that, Your Honor, at this time I

Meyer Skalak - Cross

1    would move for the introduction of Government's Exhibit 308.

2              THE COURT:  Any objection to the admission of

3    Exhibit 308?

4              MS. SWEENEY:  Yes, Your Honor, on two grounds.  First,

5    it's hearsay.  And second, on his direct examination I believe

6    he testified that this was a draft presentation that was

7    created for a later presentation to the executive committee and

8    this was not a final.

9              THE COURT:  Response?

10             MR. BELLER:  Your Honor, I am a bit befuddled by that

11   because this is a government's exhibit and a government exhibit

12   that has already been shown to the witness and the witness was

13   questioned about this particular exhibit.

14             With that said, Your Honor, based upon the questioning

15   that just occurred, certainly the factors for a business record

16   exception have been laid which means it is not, in fact,

17   hearsay.  If the government wants to ask on redirect about this

18   document and the credibility of this document, they are

19   certainly welcome to do so, but that does not go to the

20   admissibility of the underlying document based upon the

21   foundation that was simply laid.

22             MS. SWEENEY:  Your Honor, if I may, this document was

23   used to refresh the witness' recollection as to the percentage

24   of share of Pilgrim's and I believe of Claxton and was used for

25   no other purpose.

2975

Meyer Skalak - Cross

 1           MR. BELLER:  If Ms. Sweeney will excuse me for having

 2   interrupted her.  Your Honor, based upon the fact that it was

 3   introduced -- or rather shown to the witness for the purposes

 4   of refreshing recollection, I believe that it is under 612 that

 5   says when a writing is shown to a witness for purposes of

 6   refreshing recollection, the opposing party is permitted to

 7   introduce the entire document and give the entire document to

 8   the witness which was done.  And so I also offer it based on

 9   the argument made by Ms. Sweeney.

10           THE COURT:  Okay.  The objection will be sustained.

11   It's hearsay.  It does not meet the business record exception.

12   BY MR. BELLER:

13   Q.  Mr. Skalak, so what we were talking about was whether or

14   not you had used the term the big three; is that right?

15   A.  Yes, as I recall.

16   Q.  Okay.  So I am showing you Government Exhibit 308.  This is

17   not to be shown to the jury.  If you could take a moment and

18   review Government's Exhibit 308 and let me know whether or not

19   reviewing that document will refresh your recollection

20   regarding the term the big three.  I would direct your

21   attention to Page 2.

22           Have you had the opportunity to review Government

23   Exhibit 308?

24   A.  Yes.

25   Q.  And does it refresh your recollection as to whether or not

Meyer Skalak - Cross

1    the term the big three suppliers were used?

2    A.  Yeah, I can read the document.  I don't know that I recall.

3    Q.  That's okay.  And let me say I am not asking you to read

4    the document.  I am asking you if you now recall or if it

5    refreshed your recollection, your memory.

6    A.  I can recall after reading the document that the term big

7    three was used.  I don't refresh my memory, though.  I am

8    sorry, I am struggling with what that means.  And I apologize,

9    I am not trying to be difficult.

10   Q.  You are not being difficult.  There is no need to

11   apologize.

12        You would agree with me that the three largest

13   producers were Tyson, Pilgrim's and Perdue, right?  I am not

14   asking you to look at the document.

15        MS. SWEENEY:  Your Honor -- never mind.

16        THE COURT:  He can answer.

17   BY MR. BELLER:

18   Q.  So let me ask you the question again.  You would agree with

19   me that the three largest producers were Tyson, Pilgrim's and

20   Perdue.

21   A.  I think the document showed that Wayne was actually larger.

22        MS. SWEENEY:  Objection to what the document showed.

23        THE COURT:  Once again, Mr. Skalak, the question would

24   just be from your memory whether refreshed or not, but you

25   would have to have a memory, not from just -- not a memory of

2977
Meyer Skalak - Cross

1  just having recently read the document.

2  A.  Yeah, so with that specific instruction, I don't recall the

3  utilization of how we would define the big three.

4  BY MR. BELLER:

5  Q.  Understood.  Three of your producers were Tyson, Pilgrim's

6  and Perdue.

7  A.  That would be correct.

8  Q.  And you wanted Tyson, Pilgrim's and Perdue locked in to NAE

9  or no antibiotic ever before February the 3rd of 2014.

10  A.  Yeah, I don't recall the specific dates.  I think we wanted

11  all of our suppliers -- to know that all our suppliers had the

12  capability would be a more accurate representation of my

13  memory.

14  Q.  And you wanted -- according to you and your statement, you

15  wanted all of the suppliers locked in before February 3rd.

16  A.  I think we wanted to understand their capabilities.  I'm --

17  I'm not comfortable with the term locked in because I don't

18  know that that was a term that -- I think we wanted to

19  ascertain what their abilities were and could they do it.  We

20  wanted to know from them.

21  Q.  And you wanted a cost estimate.

22  A.  We wanted to know what the price for Chick-fil-A would be,

23  yes.

24  Q.  Very good.  And you wanted to know a price for Chick-fil-A.

25  This is prior to the February 11th announcement.

2978

Meyer Skalak - Cross

1    A.  Yes, sir.  We would have needed and wanted to know what the

2    price would be prior to us making an announcement.

3    Q.  And you wanted their price estimate prior to Chick-fil-A

4    even coming up with logistics or specifics on what the program

5    would entail.

6    A.  I think it's fair to say we did not know all of what the

7    program would entail.

8    Q.  And Pilgrim's specifically submitted a cost estimate before

9    that February 3rd deadline, right?

10   A.  Again, I don't recall exactly when the different suppliers

11   submitted the different price estimates.

12        MR. BELLER:  If we can show the witness Government

13   Exhibit 300.  This is for the witness only.

14   BY MR. BELLER:

15   Q.  Before you read that, let me ask you a series of questions,

16   okay?  Did you sometimes receive pricing in the form of an

17   e-mail from the different suppliers?

18   A.  I believe that pricing would have been sent to Chick-fil-A.

19   I don't know that I specifically received it, but Chick-fil-A

20   would have received it in the form of an e-mail.

21   Q.  And were these -- if there was an -- well, actually you

22   know what?  Let me back up just a little bit.  Give me just one

23   moment.  I am going to back up just a moment and ask you a

24   series of questions again regarding refreshing your

25   recollection, okay?

Meyer Skalak - Cross

 1    *A.* Okay.

 2    *Q.* So the question that I had asked you was whether or not

 3    Pilgrim's submitted a cost estimate prior to the February 3rd

 4    deadline.  And I believe your answer was I don't know; is that

 5    fair?

 6    *A.* I don't know.  I don't recall, yes, sir.

 7    *Q.* Do you know if you had an opportunity to review an e-mail

 8    between Mr. Gay and Mr. Rothmeier, whether or not that may

 9    assist in refreshing your recollection as to your knowledge?

10    *A.* I am sure it would assist me in reading the e-mail to

11    refresh my memory of that specific point in time.  Other than

12    being able to read the e-mail, likely not.

13    *Q.* So what I am going to do based on your statement that it

14    may is I am going to ask you to look at the e-mail.  I will not

15    ask you questions about what the e-mail says.  I am only going

16    to ask you questions as to whether or not this refreshes your

17    recollection as to whether you had this knowledge at the time,

18    okay?

19         *MS. SWEENEY:*  Objection, Your Honor, to the

20    refreshing.  The witness I believe said that it would help him

21    in reading the e-mail, that it would likely not refresh his

22    recollection.

23         *THE COURT:*  I wasn't quite sure what he meant, but he

24    can be shown the document to demonstrate whether or not it

25    assists him in refreshing his recollection.  Is this Exhibit

Meyer Skalak - Cross

1    300?

2              *MR. BELLER:*  This is Government Exhibit 300.

3              *THE COURT:*  If you have a copy that you want the

4    witness to look at, you can hand that up.

5              *MR. BELLER:*  I do.  If I may.

6              *THE COURT:*  If he can see it on the screen, that's

7    fine too, whatever.

8    *BY MR. BELLER:*

9    *Q.*  Mr. Skalac, I am going to show you this exhibit on the

10   screen.  If you rather have a hard copy, let me know and I

11   would be happy to provide one.

12   *A.*  I have finished reading the document.

13   *Q.*  Does that refresh your recollection as to whether or not

14   you had knowledge of Pilgrim's submitting a cost estimate for

15   providing antibiotic-free chicken?

16   *A.*  I'm sorry, it doesn't refresh my knowledge.

17   *Q.*  No problem.  Do you have knowledge or do you recall whether

18   or not Pilgrim's did, in fact, supply a price estimate for

19   providing antibiotic-free chicken?

20   *A.*  I believe all suppliers supplied a price estimate at some

21   point.  I don't recall the timing, so the answer would be yes,

22   that Pilgrim's would have provided a price estimate at some

23   point.

24   *Q.*  Understood.  So I am going to -- would it assist you in

25   recalling the timing if you had an opportunity to review an

2981

Meyer Skalak - Cross

1    e-mail where you, in fact, are a recipient?  May that possibly

2    refresh your recollection?

3    *A.*  It -- it's possible.

4         *MR. BELLER:*  If we can show the witness Defense

5    Exhibit I-174.  This is not for the jury.

6    *A.*  I've read the e-mail.

7    *BY MR. BELLER:*

8    *Q.*  And does that refresh your recollection as to whether or

9    not you asked suppliers, specifically Pilgrim's Pride, to

10   provide you with a cost estimate by January the 22nd, 2014?

11   *A.*  Aside from reading the e-mail, I wouldn't have refreshed --

12   I wouldn't know and it wouldn't refresh my memory of it.

13   *Q.*  Do you recall that Pilgrim's Pride did, in fact, submit a

14   price estimate and that that was communicated by Justin Gay?

15   *A.*  I don't specifically recall that.  It would be normal for

16   that to occur, but I don't specifically personally recall that.

17   *Q.*  Understood.  And now, to back up just a little bit to make

18   sure that we're clear, it's actually Mr. Rothmeier that is

19   having all these communications with the suppliers, right?

20   *A.*  The day-to-day communications would have been primarily the

21   responsibility of Mr. Rothmeier, yes.

22   *Q.*  So when we're asking questions about specific information

23   being exchanged between CFA and suppliers, you would agree with

24   me that Mr. Rothmeier really is the best one to answer some of

25   these questions.

Meyer Skalak - Cross

1    A.  Specific to those communications if it occurred between he

2    and the suppliers, he would certainly have better knowledge

3    than I would.

4    Q.  Certainly.  And as we're talking about the actual price

5    estimates that were provided to Chick-fil-A, you would agree

6    with me that by and large those went from the supplier to

7    Mr. Rothmeier, right?

8    A.  That would have been normal course of business.

9    Q.  And I think you said that you have knowledge that Pilgrim's

10   did, in fact, supply a price to Chick-fil-A, right?

11   A.  To my understanding, all suppliers at some point provided

12   pricing, so Pilgrim's would have been one of those, yes, sir.

13   Q.  Well, and you say at some point, and so I realize you may

14   not remember the specific day, so let me try it this way.

15        You recall that all of the suppliers provided their

16   best price estimate to Chick-fil-A prior to Chick-fil-A -- at

17   least prior to May 7 of 2014 to Chick-fil-A determining what

18   exactly the requirements of the program is.

19   A.  Yes, sir.  That would in my memory be a correct statement.

20   Q.  And do you recall or do you know that Pilgrim's Pride's

21   estimate, price estimate, was 31 cents per finished pound?

22   A.  I don't recall other than what was in the e-mail and what

23   you're telling me.

24   Q.  And do you know that Tyson also submitted a cost estimate

25   before February 3rd, 2014?

2983

Meyer Skalak - Cross

1    *A.*  Again, my answer would be the same as for Pilgrim's.  I

2    wouldn't know the exact date and timing of when they supplied

3    that.

4    *Q.*  Do you recall that Tyson, Mr. Roberts, submitted a price

5    estimate of 1.5 cents per pound live weight?

6    *A.*  If I was aware of that, it's not something that I remember

7    at this point in time.

8    *Q.*  And Perdue submitted a cost estimate before February 3rd,

9    2014.

10   *A.*  Again, I would answer it the same, that I wouldn't know the

11   specifics of the time line or the exact percent that they

12   supplied.

13   *Q.*  Do you know or do you remember whether Perdue submitted

14   their price estimate of 15 to 20 percent for antibiotic-free

15   product?

16   *A.*  No, sir.  I'm sorry, I don't recall that specifically.

17   *Q.*  Well, fair to say that you testified that you were

18   personally present for at least some of these meetings, right?

19   *A.*  The early meetings talking, yes.

20   *Q.*  And you would also agree with me, Mr. Skalak, that Claxton

21   Poultry was not brought in for a meeting with you.

22   *A.*  I don't believe we met at our office.  I seem to recall

23   being in Claxton and having a meeting with Claxton.

24   *Q.*  And the meeting with Claxton occurred after the

25   February 11th public announcement that Chick-fil-A was going

Meyer Skalak - Cross

1   antibiotic-free.

2   A.   Honestly, I don't recall the date of the meeting.   That

3   could be, but I don't recall the exact date.

4   Q.   So Claxton Poultry was not informed of Chick-fil-A going

5   antibiotic-free until a press release was released to the world

6   announcing this program, right?

7   A.   I'm sorry, I don't know the time line with which Claxton

8   was specifically told that, so I can't provide testimony to

9   that.

10   Q.   Completely understood.   And again at the risk of sounding

11   like a broken record, it's because you weren't the one who was

12   having daily communication with the suppliers.

13   A.   That would probably be accurate, yes.

14   Q.   So we talked a little bit about the different amounts that

15   was submitted and whether or not you actually remember those.

16   So I want to understand a little bit more about how these

17   different costs work.

18          It's fair to say that pricing or the cost, calculating

19   cost is frequently done in one of two ways.   It can be done on

20   the cost per pound of the live weight of the bird or it could

21   be cost per pound of the processed weight or finished weight of

22   the bird; is that fair?

23   A.   So my experience would only be with seeing pricing on the

24   finished weight.

25   Q.   And so when we talked about Tyson's submitting their price

2985

Meyer Skalak - Cross

1    of 1.5 cents per live weight, that does not make sense to you

2    or that's not your recollection?

3         MS. SWEENEY:  Objection, Your Honor.  The witness said

4    he didn't recall what Tyson price had been, so making this

5    distinction is asking him to make a distinction based on

6    something he does not recall.

7         MR. BELLER:  And excuse me.  And I followed up the

8    question with is that something you don't remember.

9         THE COURT:  Yeah, he can answer if he understands the

10   question.  Overruled.

11   A.  I'm sorry.  Would you please repeat the question for me?

12   BY MR. BELLER:

13   Q.  Yes.  So you had testified that your belief or your memory

14   is that cost was always transmitted as finished weight or

15   processed weight.  And so my question is so if Tyson's

16   submitted a cost estimate of 1.5 cents per live weight, that is

17   not something you would have seen before or understood.

18   A.  It's not something I recall seeing.  It's not something

19   that I'm familiar, personally familiar enough with those

20   details to translate that and understand what that would mean.

21   Q.  Understood.  So now we've spoken a little bit about your

22   memory regarding Pilgrim's, Tyson's and Perdue.  So I want to

23   speak for just a moment specific about Claxton Poultry.

24        Mr. Brady of Claxton Poultry provided his cost

25   estimate for producing an NAE bird, right?

Meyer Skalak - Cross

1   *A.*  Again, I don't recall specifically who at Claxton provided

2   that.  It would have been normal for him to because he was a

3   primary relationship holder, but I can't recall specifics.

4   *Q.*  And if you had the opportunity to review an e-mail from

5   Mr. Brady during this period of time, do you think that that

6   may refresh your recollection as to what knowledge you had?

7   *A.*  Based on my previous reviewing of e-mails, I probably would

8   be able to read the e-mail and tell you what's on the e-mail,

9   but I don't think it would refresh my memory specifically of

10  what happened at that time.

11  *Q.*  Understood.  And that's because again Mr. Rothmeier was the

12  one who was communicating, right?

13       *MS. SWEENEY:*  Objection, Your Honor, asked and

14  answered.

15       *THE COURT:*  Overruled.

16  *A.*  I think it's because I was not involved in the day-to-day

17  and that it's been quite a number of years ago.

18  *BY MR. BELLER:*

19  *Q.*  Sure.  Now, do you recall Claxton providing a price of 31

20  to 32 cents finished weight?

21  *A.*  No, sir, I don't personally recall that information.

22  *Q.*  Do you recall Claxton Poultry also calculating the live

23  weight as 2 to 2-1/2 cents per pound of live weight?

24  *A.*  Similarly, no, sir, I don't recall that specific

25  information.

Meyer Skalak - Cross

1    *Q.*  Do you recall that by and large all five, six minus Koch,

2    so five of your suppliers all estimated their cost to convert

3    their houses and their plants to being antibiotic-free was

4    approximately 2 cents per pound of live weight?

5    *A.*  I'm sorry, I don't recall the specific cost, the specific

6    cents or percentages.

7    *Q.*  And now, you are here and you're testifying because you

8    were called by the Department of Justice to testify on behalf

9    of Chick-fil-A, right?

10   *A.*  Yes, sir.

11   *Q.*  And you met with the Department of Justice many times to

12   prepare you for your testimony in front of this jury.

13   *A.*  I think we met maybe four to five times.

14   *Q.*  And you know supervising Mr. Rothmeier that Mr. Rothmeier

15   also met with the Department of Justice, correct?

16          *MS. SWEENEY:*  Objection, Your Honor, as to relevance.

17          *THE COURT:*  Overruled.

18   *A.*  I have been informed that he met with the Department of

19   Justice.

20   *BY MR. BELLER:*

21   *Q.*  And so having you meet with the Department of Justice,

22   Mr. Rothmeier meet with the Department of Justice, you are the

23   one that's here testifying before this jury, correct?

24   *A.*  Yes, sir.

25   *Q.*  And in testifying before this jury, you knew that what was

Meyer Skalak - Cross

1   going to be at issue were the different pricing amounts that

2   these suppliers offered to CFA for the cost of converting their

3   plants to antibiotic-free plants, right?

4   A.   I think what I knew were the questions that they asked me

5   ahead of time which didn't get into specifics of exact price.

6   Q.   Absolutely.  Because the Department of Justice did not show

7   you contracts with the suppliers from January, February, March

8   of 2014.

9   A.   I don't recall seeing that information in terms of pricing

10   during that time.

11   Q.   And the Department of Justice did not show you e-mails

12   reflecting the different estimates that these different

13   suppliers provided to Chick-fil-A for converting their plants

14   to antibiotic-free plants.

15   A.   I don't recall reviewing that information, no, sir.

16   Q.   But what the Department of Justice did ask you is whether

17   you anticipated or asked these different suppliers to

18   communicate regarding this cost.

19   A.   I'm sorry.  Can you ask that one more time?

20   Q.   Yeah.  So I am understanding that the Department of Justice

21   did not actually show you the specific numbers, but they did

22   instead ask you to testify or ask you the question of whether

23   you asked the suppliers to compare pricing.

24   A.   Yes, I believe that would be accurate.

25   Q.   Now, let's talk for just a little bit about that pricing

Meyer Skalak - Cross

1  because your memory is that 2 cents per pound of live weight is

2  not a specific number that sticks out in your mind, right?

3  A.  I don't recall the specific number, yes.

4  Q.  And 31 cents is not something that sticks out in your mind,

5  correct?

6  A.  Again, I don't recall the specific cost numbers that were

7  supplied to us.

8  Q.  And you would agree with me that what you were asking for

9  is how much is chicken going to go up, right?

10  A.  I would agree that we were asking what will the price to

11  Chick-fil-A be with the assumption that there would be an

12  increase.

13  Q.  And so a number such as 31 cents of processed weight, you

14  are not selling chicken breasts for 31 cents a pound, right?

15  Let me ask that again.  You are not buying chicken breasts for

16  31 cents a pound.

17  A.  Yes, sir, that would be correct.

18  Q.  So what that is, what 31 cents or some figure like that,

19  what that represents is the amount of cost that's going to go

20  up in addition to the price that Chick-fil-A has already

21  negotiated with these suppliers.

22  A.  It would be my understanding that would be the additional

23  cost in relation to what we were already paying.

24  Q.  And the contract between Chick-fil-A and the suppliers is

25  negotiated every year, right?

Meyer Skalak - Cross

1    A.  Yes, sir.  Traditionally those are negotiated on an annual

2    basis.

3    Q.  So 31 cents as an example does not represent the contract

4    cost, but rather an estimate in how much the chicken is going

5    to go up for providing antibiotic-free chicken.

6    A.  That would in my estimation be an accurate statement, yes.

7    Q.  So if I were to say to you that Claxton Poultry's chicken

8    price in 2016 went up 31 cents, you cannot tell me how much

9    Claxton Poultry charged you for chicken, right?

10   A.  I can't tell you how much that they charged me per chicken

11   or per pound of chicken?  I am just seeking clarity on your

12   question.

13   Q.  For a pound of chicken.

14   A.  No.  That would only be the increased amount, not the total

15   amount.

16   Q.  That's right, because that doesn't include the contract

17   price that had already been negotiated.

18   A.  It doesn't include all the pricing that was already in

19   place, yes.

20   Q.  Understood.

21        MR. BELLER:  Your Honor, I see that it's 3:15.  Would

22   the Court like me to continue?

23        THE COURT:  Why don't we go ahead and take our break

24   now.  So we will plan on taking a break for 15 minutes and we

25   will reconvene at 3:30.  The Court will be in recess.

Meyer Skalak - Cross

1    (Recess at 3:15 p.m.)

2    (Reconvened at 3:31 p.m.)

3         *THE COURT:*  Mr. Beller, go ahead.

4         *MR. BELLER:*  Thank you.

5    *BY MR. BELLER:*

6    *Q.*  Mr. Skalak, we had spoken a little bit about the

7    communications that Mr. Rothmeier had with different suppliers.

8    And so I want to start with a question and that is

9    Mr. Rothmeier's e-mail address.  Do you agree with me that

10   Mr. Rothmeier's e-mail address is

11   david.rothmeier@Chick-fil-A.com with dashes between Chick and

12   fil?

13   *A.*  At the time in question, that would have been his e-mail,

14   yes, sir.

15   *Q.*  Very good.  And you say at the time.  Does that mean it's

16   changed over the years?

17   *A.*  Yes, sir.  We updated our e-mails.  I don't recall the

18   timing, but all of our extensions at the end changed to a

19   different extension.

20   *Q.*  And the extension at the end changed.  If you could say

21   what Mr. Rothmeier's e-mail address is following the change.

22   *A.*  It would be david.rothmeier@cfacorp.com.

23   *Q.*  And we were talking just a little bit about communications

24   that you had with different suppliers, specifically you had

25   with different suppliers in January of 2014.  Do you recall,

Meyer Skalak - Cross

1    Mr. Skalak, requesting that Pilgrim's specifically provide you

2    directional guidance on price and time line for providing you

3    with antibiotic-free chicken?

4          *MS. SWEENEY:*  Objection, Your Honor.  Counsel is

5    reading from a document that's not in evidence.

6          *THE COURT:*  Overruled.  He can ask the question.

7    *A.*  I know from the document that I was shown earlier that

8    e-mail went out.  I don't recall any more details than that.

9    *BY MR. BELLER:*

10   *Q.*  Well, and I am not asking you about a document.

11   *A.*  Or e-mail, I am sorry.

12   *Q.*  No, that's okay.  What I am asking about specifically is

13   that you testified to the jury that you had requested specific

14   pricing.  And my question for you is you would agree with me

15   that what you actually sought was directional guidance on

16   pricing, right?

17   *A.*  I think that would be a fair assumption, yes, that we were

18   looking for direction and guidance from our suppliers on that

19   cost.

20   *Q.*  Understood.  So I want to talk a little bit about pricing

21   for Claxton and Claxton specifically.  You would agree with me,

22   Mr. Skalak, that in 2013 Claxton Poultry was on a model that's

23   called the breast market, right?

24   *A.*  So I know there was a different model at the time.  I don't

25   recall the specifics of that model.

Meyer Skalak - Cross

1    Q.  No problem.  So when you say you know there was a model at

2    the time, do you recall that the model at the time for Claxton

3    Poultry was based on the Urner-Barry Market?

4    A.  I know that the Urner-Barry Market was used.  I just know

5    very generally that terminology.  I don't know specifics.

6    Q.  Again, a question that's better for Mr. Rothmeier?

7    A.  That would be a question that he can answer better than

8    myself.

9    Q.  And by being on the Urner-Barry Market, you would agree

10   with me that that is different than another model that is a

11   grain-based cost-plus model, right?

12   A.  Yes, those would be different pricing models.

13   Q.  So a grain-based cost-plus model calculates all the cost

14   from the supplier including the feed.

15   A.  It's intended -- that is my understanding of the intent,

16   yes.

17   Q.  And the Urner-Barry model on the other hand would use the

18   previous month's average of the Friday Urner-Barry northeast

19   select boneless skinless breast or select line run tender,

20   right?

21          MS. SWEENEY:  Objection as to foundation.

22          THE COURT:  Overruled.  He can answer if he

23   understands.

24   A.  I wouldn't know the specific Urner-Barry model that was

25   used.

Meyer Skalak - Cross

1    *BY MR. BELLER:*

2    Q.  Well, do you know, then, that Tyson's was the first

3    supplier to transition to the grain-based model in 2012?

4    A.  No, sir, I don't recall that specific information.

5    Q.  Again, better question for Mr. Rothmeier?

6    A.  At that time I think Mr. Rothmeier would be better suited

7    than I would to answer that question.

8    Q.  Well, and by 2015 most suppliers had switched from the

9    Urner-Barry-based model to the cost-plus model, correct?

10   A.  I know over time.  I don't know the exact date, so...

11   Q.  Do you know that by 2015 Claxton Poultry was the only

12   supplier that was still on the Urner-Barry or breast model?

13   A.  No, I did not know that fact.

14   Q.  Would you agree that comparing pricing for a supplier on a

15   cost-plus model and an Urner-Barry model are different

16   comparisons?

17   A.  I would agree that they are different comparisons.

18   Q.  So it would be comparing apples to oranges, right?

19   A.  I don't know enough about the particulars of those models

20   to quantify or clarify that, but it would definitely be

21   different.

22   Q.  Well, if we take 2013 as an example, did you participate in

23   the contract finalization with Claxton Poultry?

24   A.  Not to my knowledge, I did not participate in that contract

25   finalization.

Meyer Skalak - Cross

1    *Q.*   So knowing how Claxton Poultry's contract was written in

2    2013 for 2014 is something you were unaware of.

3    *A.*   That would be accurate.

4    *Q.*   And pricing for Claxton Poultry in 2013 for 2014 is also

5    something that you were unaware of.

6    *A.*   That would be correct as well.

7    *Q.*   And the contract pricing on the grain-based model for

8    Pilgrim's Pride is something you were unaware of.

9    *A.*   Again, I would not know the details around those pricings.

10   *Q.*   And contract pricing for Tyson's on the grain-based model

11   in 2013, 2014 and 2015 is something that you were unaware of.

12   *A.*   That would be correct as well.

13   *Q.*   So we spoke a little bit about Chick-fil-A estimating going

14   into the antibiotic-free transition what the cost would be.

15   Chick-fil-A tried to figure it out, right?

16   *A.*   We tried to put a number to that, yes.

17   *Q.*   And I believe that you testified on direct examination that

18   the number that you had come up with was approximately

19   10 percent, right?

20   *A.*   That's what I recalled, yes.

21   *Q.*   So I guess the question is 10 percent of what from your

22   perspective?

23   *A.*   My understanding and recollection would have been

24   10 percent above what we were currently paying per pound of

25   chicken.

Meyer Skalak - Cross

 1   *Q.*  And so the estimate for Claxton Poultry was what?

 2   *A.*  I don't know what the specific estimate for Claxton

 3   Poultry.  It would have been the same 10 percent.  We didn't

 4   delineate that, but I don't know what their cost of chicken was

 5   at that point in time.

 6   *Q.*  And so if you are unaware of what the contract price was,

 7   when I ask you 10 percent of what, you cannot give the jury an

 8   answer because you don't know, right?

 9   *A.*  I can't say what that specific number would have been,

10   correct.

11   *Q.*  Okay.  And same thing with Pilgrim's Pride.

12   *A.*  That would be correct.

13   *Q.*  Same thing with Tyson's.

14   *A.*  Yes.

15   *Q.*  And so when the government says, well, what was the price

16   estimate, and you said 10 percent, you don't know what that

17   actual number is, correct?

18   *A.*  What the 10 percent equates to I would not know right now,

19   no.  I would not recall.

20   *Q.*  You would agree with me that Mr. Rothmeier was crucial in

21   estimating that NAE cost, right?

22   *A.*  I think he would have had strong input into that, yes.

23   *Q.*  And you are aware that Mr. Rothmeier estimated that cost at

24   being 50 cents per pound.

25   *A.*  I'm sorry, I don't recall the specific number that

Meyer Skalak - Cross

1    Mr. Rothmeier came up with.  I just recall the 10 percent

2    number from that time.

3    Q.  So 50 cents of Claxton's price would have been about a

4    20 percent increase; would you agree?

5              MS. SWEENEY:  Objection as to foundation.

6              THE COURT:  Overruled.  He can answer if he

7    understands.

8    A.  Yeah, again, I don't recall what Claxton's price per pound

9    was, so I don't know what percentage 50 cents would represent.

10   BY MR. BELLER:

11   Q.  And the government didn't ask you to have those numbers

12   prior to testifying.

13   A.  Not that I recall, no, sir.

14   Q.  And the government didn't prep you with any numbers prior

15   to you testifying.

16   A.  Not that I recall.

17   Q.  And you prepped with the government on October 6, 2021?

18   A.  Again, I know I prepped with the government on four or five

19   occasions.  I don't recall the exact dates that those meetings

20   occurred.

21   Q.  Do you recall that October 6, 2021 was one of those dates?

22   A.  I'm sorry, I don't recall the exact date that I met with

23   them.

24   Q.  Do you recall that October 18th was one of those dates?

25   A.  Previously we talked about that earlier today and I recall

Meyer Skalak - Cross

1    that that was one of the dates that was shared.

2    Q.  So is that a yes?

3    A.  Again, I don't remember the exact date I met with them.  I

4    remember us talking about that date.

5    Q.  Do you recall that last Sunday -- excuse me.  Do you recall

6    that October 22nd was one of those dates?

7    A.  Again, I don't recall the exact date.

8    Q.  Do you recall that as recently as last Sunday, November

9    7th, you met with the government to prepare for your testimony?

10   A.  I do remember meeting last Sunday, yes, sir.

11   Q.  And in none of those meetings, not a single one, did the

12   government actually ask you about the numbers that the

13   suppliers provided you for an NAE conversion.

14   A.  If they did, I don't recall, and I don't remember that.

15   Q.  And in not one of those meetings did the government show

16   you an estimate from Claxton Poultry in April of 2014 telling

17   Chick-fil-A what the estimate would be for an NAE conversion.

18   A.  Again, I don't recall or remember that.

19   Q.  Do you recall that you were not shocked by the prices that

20   were provided by any of the suppliers?

21   A.  I don't recall having a reaction, so I don't know that I

22   would say that I was not shocked.  I don't recall any reaction.

23   Q.  Fair to say that you do not remember being either shocked

24   nor excited about the proposed NAE prices?

25   A.  I think that would be a more accurate representation, yes,

Meyer Skalak - Cross

1    sir.

2    Q.  So to summarize, you estimate, you are guessing that the

3    cost estimate was 10 percent, but you personally cannot

4    describe how that rough estimate was derived.

5    A.  Yes, that would be correct.

6    Q.  Someone else did that prior to you being involved, correct?

7    A.  Yes, that would be correct.

8    Q.  And those individuals just shared that final result with

9    you.

10   A.  Yes.  I just recall again a specific 10 percent was part of

11   my recollection at that time.  I honestly don't recall how it

12   was shared with me or who shared it with me.

13   Q.  Again, all questions better for Mr. Rothmeier.

14   A.  He most likely would be able to answer that question better

15   than I would.

16   Q.  Mr. Rothmeier who also met with the government.

17   A.  So the DOJ did not tell me that they met with

18   Mr. Rothmeier.

19   Q.  I am asking if you have knowledge, not what the Department

20   of Justice may have told you.

21   A.  I had conversations with my attorneys which I believe --

22             MS. SWEENEY:  Objection.

23             THE COURT:  You shouldn't reveal any information that

24   your attorneys passed on to you.

25             THE WITNESS:  Okay.

Meyer Skalak - Cross

1   *A.*  Then aside from that, I would not know the answer to that

2   question.

3   *BY MR. BELLER:*

4   *Q.*  You, while you don't remember the exact day, you recall

5   meeting with the government sometime in the beginning of

6   October 2021, right?

7   *A.*  Yes, I remember meeting with the government in October of

8   2021, yes, sir.

9   *Q.*  You would agree with me it was two to three weeks prior to

10  the start of trial.

11  *A.*  I don't know when trial started, but I know it was early

12  October, yes.

13  *Q.*  And that is the very first time that you have ever been

14  interviewed by the Department of Justice related to this

15  prosecution, correct?

16  *A.*  To the best of my knowledge, yes, that's the first time I

17  have ever been interviewed by the Department of Justice on this

18  or any other matter, yes, sir.

19  *Q.*  The Department of Justice asked you whether Chick-fil-A

20  came up with a price estimate for converting plants from

21  conventionally raised birds to antibiotic-free birds, right?

22  *A.*  They asked me if we had an estimate for what we thought the

23  cost would be for NAE.

24  *Q.*  You were forthcoming with the government?

25  *A.*  I told them to the best of my recollection what I

Meyer Skalak - Cross

1    remembered.  Again, it's been many years ago, so I don't know

2    that I would know the exact number, but I told them to the best

3    of my recollection, yes, sir.

4    Q.  You were honest with the government.

5    A.  Again, to the best of my recollection, I think I told the

6    government what I remembered at the time.

7    Q.  And so you said from years ago.  I'm not asking you about

8    years ago.  I am asking you about a discussion that you had

9    with the Department of Justice with a federal agent present

10   three weeks ago.  That's what I am asking you about.

11   A.  Yeah.

12   Q.  So three weeks ago when they asked you questions, you were

13   honest with them.

14   A.  I think I told them -- yeah.  I was not reviewing

15   documents.  I told them what I remembered at the time they

16   asked me.

17   Q.  And when you testified before this jury, you were also

18   honest with the jury, right?

19   A.  Again, I told them as best of my recollection what I

20   remember those estimates to be, yes, sir.

21   Q.  So I am taking all of that as a yes.  Is that a yes?

22   A.  Again, yes, to the best of my knowledge, I told what the

23   numbers were that I recalled.

24   Q.  And when you spoke to the jury and you were asked to

25   estimate the cost to the suppliers for converting plants from

Meyer Skalak - Cross

1    conventionally raised birds to NAE birds, you testified that it

2    was 10 percent.

3    A.  Again, that's what I remembered at the time, yes, sir,

4    10 percent.

5    Q.  When you spoke to the Department of Justice three weeks ago

6    and you were asked the exact same question, you told the

7    Department of Justice that Chick-fil-A estimated the cost of

8    converting plants from a conventionally raised bird to an

9    antibiotic-free bird to be 20 percent, right?

10   A.  Again, I could have.  I don't recall exactly what I told

11   them.  I mean, again I am remembering things from a long time

12   ago.  If that's what I said, then that's what I was remembering

13   at that time.

14   Q.  And, in fact, all of these different suppliers provided

15   Chick-fil-A with a price estimate for converting their plants

16   from conventionally raised birds to antibiotic-free birds, and

17   the sum total or the average is approximately 12 percent,

18   8 percent lower than the dollar amount that you told the

19   Department of Justice three weeks ago.

20   A.  I don't know what the average is and I don't know that

21   number, but if I told the Department of Justice 20 percent and

22   if you're telling me it's 12 percent -- I don't know that it's

23   12 percent, but if it is, then that would be a correct

24   statement.

25   Q.  And you would agree with me that Mr. Rothmeier would

Meyer Skalak - Cross

1    probably be able to answer all of these questions, right?

2    A.  He would know better than I would what that average was.  I

3    don't know specifically what his knowledge would be.

4           MR. BELLER:  Thank you.

5           If I may have just one moment, Your Honor.

6           THE COURT:  You may.

7           MR. BELLER:  Thank you, Your Honor.  I do not have any

8    further questions.

9           THE COURT:  Okay.  Additional cross-examination?

10          Mr. McLoughlin, go ahead.

11          MR. McLOUGHLIN:  Thank you, Your Honor.

12                        **CROSS-EXAMINATION**

13   BY MR. McLOUGHLIN:

14   Q.  Good afternoon, sir.  My name is Jim McLoughlin and I

15   represent Bill Lovette.  And I will just have a few questions

16   for you.

17   A.  Yes, sir.

18   Q.  Mr. Skalak, you were asked a couple minutes ago about

19   pricing by live weight.  Do you recall being asked that

20   question a few minutes ago?

21   A.  Yes, sir.

22   Q.  And if I understood you, you had some lack of recollection

23   or confusion about the term; is that fair?

24   A.  I understand the term in general.  I think what I was

25   trying to say is I don't know how to convert the term live

Meyer Skalak - Cross

1    weight to the product we purchase.

2    Q.  Okay.  Would you agree with me that for Chick-fil-A the

3    term live weight is important, and you expected suppliers to

4    talk about live weight when they were discussing quality and

5    specifications.

6    A.  So I don't think I can say it's not.  I don't think I'm

7    well versed enough in the specifics of that to tell you what

8    they should or shouldn't do.

9    Q.  You've been asked a couple times about your meetings with

10   the Department of Justice.  Do you recall meeting with them on

11   October 25, about three weeks ago, and meeting with Special

12   Agent LaNard Taylor who I think is over here and trial attorney

13   Carolyn Sweeney virtually?

14   A.  I know that I met with them virtually.  I do recall them

15   being in that meeting.  I don't know the exact date, but that

16   sounds in the neighborhood of it, yes, sir.

17          MR. McLOUGHLIN:  Can we pull up Exhibit I-128 for

18   Mr. Skalak, not to be published?

19   BY MR. McLOUGHLIN:

20   Q.  And Mr. Skalak, I will represent to you this is a form of

21   interview report provided to the defendants by the government.

22   And I'm going to ask you to look at Page 2 to the very first

23   paragraph.

24          And I'll ask you did you, in fact, tell the government

25   that the terms live weight and finished product were important

Meyer Skalak - Cross

1   and you expected suppliers to talk about them while discussing

2   quality and specifications or did the FBI special agent who did

3   the report of this interview get it wrong?

4           MS. SWEENEY:  Objection, Your Honor.  He is leading

5   from the report.

6           MR. McLOUGHLIN:  Yes, Your Honor, I am.

7           THE COURT:  He is not leading from the report, but he

8   is confronting the witness with the report.  The witness can

9   answer.  Overruled.

10  A.  So in the course of that meeting, I may have used that

11  term.  I honestly don't know if he recorded that wrong or I

12  used the term.  I mean, I can't recall with certainty.  I am

13  sorry.

14  BY MR. McLOUGHLIN:

15  Q.  So you just have no recollection of three weeks ago.

16  A.  I don't recall this specific item from three weeks ago, no,

17  sir.

18  Q.  Do you recall it generally?

19  A.  I know I had meetings with the DOJ and we talked about a

20  lot of different things.  I have heard the term live weight

21  before.  I have heard the term finished product before, but I

22  am not an expert on those terms.

23  Q.  But you were expect enough to tell the FBI and the

24  prosecutors that it was important and that you, not

25  Chick-fil-A, you expected suppliers to talk about those terms

Meyer Skalak - Cross

1  while discussing quality and specifications, did you not?

2  A.  Again, I don't recall specifically using those terms in

3  that meeting.  If they are in the notes, it's probable that I

4  could have.  I just don't recall specific language.

5  Q.  Okay.  Let's talk -- let's switch gears for a minute, sir.

6  Oh, let me ask you, the term live weight in discussion of live

7  weight to the best of your recollection didn't come out of the

8  blue, did it?  Wasn't it because you were talking about the

9  pricing live weight with the government?

10 A.  Again, I don't remember the exact context of how it came up

11 in that conversation.

12 Q.  Do you remember generally whether it was about pricing?

13 A.  I -- it could have been, but I can't remember specifically.

14 And generally if you're asking me could it have been, yes, it

15 could have been, but I don't remember the full context of that.

16 I'm sorry.

17 Q.  So let's switch gears for a minute.

18        Which term are you more comfortable with, quick-serve

19 restaurant or fast-food restaurant to describe Chick-fil-A's

20 market?

21 A.  To describe Chick-fil-A's market, I think the more common

22 term at this point is quick-serve.

23 Q.  Quick-serve, great.  Isn't it fair to say that the

24 quick-serve restaurant market is very competitive?

25 A.  Yes, sir.  I think that would be an accurate statement.

Meyer Skalak - Cross

1    *Q.*  And you might even say it's ferociously competitive, would

2    you not?

3    *A.*  I would definitely say it's competitive.

4    *Q.*  And among the companies that you compete with are

5    McDonald's; is that right?

6    *A.*  They would be considered in that category, yes.

7    *Q.*  Tough competitor, yes?

8    *A.*  I would consider them a challenging competitor, yes, sir.

9    *Q.*  And Chipotle, would that be another competitor of yours?

10   *A.*  They are a competitor.  I think they are commonly thought

11   to be in a category called fast casual and would not be

12   commonly referred to in quick-serve.

13   *Q.*  Well, do you remember when talking to the government

14   including Special Agent Derrick Repp on or about October 18

15   when you listed your competitors, you said Chick-fil-A

16   competitors include other quick-service restaurants to include

17   McDonald's, Chipotle.  Do you recall that?

18   *A.*  Quite possible I could say that.  I think we would consider

19   anywhere anybody -- I have heard us say anywhere anyone would

20   eat is actually considered a competitor of Chick-fil-A.

21   *Q.*  And Wendy's is also a competitor.

22   *A.*  Yes, sir, I would consider them a competitor.

23   *Q.*  And then, of course, if we are talking about chicken, we

24   are talking about Kentucky Fried Chicken and Popeye's and

25   Church's; is that right?

Meyer Skalak - Cross

1    A.  They would be competitors in that set, yes, sir.

2    Q.  Okay.  And is it fair to say that Chick-fil-A has been a

3    successful player in the quick-serve restaurant arena?

4    A.  I think that would be an accurate statement, yes.

5    Q.  And as a player in the quick-serve restaurant arena, you

6    compete not just on price, but also on quality and service, do

7    you not?

8    A.  I think those are factors that customers consider in dining

9    with us, yes, sir.

10   Q.  And those are factors that you consider when you're

11   choosing suppliers; is that correct?

12   A.  We definitely consider factors beyond just price, yes, sir.

13   Q.  Now, you have the ability as Chick-fil-A, do you not, to

14   get a pretty good idea of your competitors' pricing; isn't that

15   correct?

16          MS. SWEENEY:  Objection, Your Honor.

17          THE COURT:  Overruled.  He can answer.

18   A.  Yes.  Our competitors' pricing are public knowledge.

19   BY MR. McLOUGHLIN:

20   Q.  Yes.  And so if they run a promotion, for example, you see

21   the advertising on that promotion and you can decide how best

22   to respond to that promotion, can't you?

23   A.  We would see the promotion, yes, sir.  And if we warranted

24   a response, I am sure we could consider that, yes, sir.

25   Q.  And you use that information, do you not, to make the best

Meyer Skalak - Cross

1    business decisions to compete most effectively; isn't that

2    right?

3    A.  It's part of the input into a decision is what your

4    competitors are doing.

5    Q.  Right.  And there are many other factors, aren't there?

6    A.  Yeah, there is many factors in how we build our

7    proposition, if you will, to the customer.

8    Q.  And in evaluating all of those factors, you do so

9    independently, don't you?

10    A.  We do so independently.

11    Q.  Right.  And so that doesn't -- the fact that you may know

12    your competitors' pricing doesn't make the QSR market less

13    competitive, does it?

14    A.  I wouldn't think so, no.

15          MR. McLOUGHLIN:  Okay.  Thank you, Your Honor.

16          Thank you, sir, I have no further questions.

17          THE COURT:  Thank you, Mr. McLoughlin.

18          Additional cross-examination?

19          Yes, Ms. Johnson, go ahead.

20          MS. JOHNSON:  I just have a couple of quick questions,

21    Your Honor.

22          THE COURT:  Sure.

23                        **CROSS-EXAMINATION**

24    BY MS. JOHNSON:

25    Q.  Mr. Skalak, my name is Wendy Johnson and I represent Ric

3010

Meyer Skalak - Redirect

1    Blake.  You don't know Mr. Blake, do you?

2    A.   No, ma'am, I do not know Mr. Blake.

3    Q.   And Chick-fil-A does not do any business with George's, the

4    company; is that correct?

5    A.   No, ma'am, we do not do business with George's.

6    Q.   And you never have; is that right?

7    A.   To the best of my knowledge and in my career, no, ma'am, we

8    have not done business with them.

9         MS. JOHNSON:  Thank you.  Nothing further, Your Honor.

10        THE COURT:  Thank you, Ms. Johnson.

11        Additional cross-examination?

12        All right.  Redirect?

13                          **REDIRECT EXAMINATION**

14   BY MS. SWEENEY:

15   Q.   Good afternoon, Mr. Skalak.

16   A.   Good afternoon.

17   Q.   Mr. Skalak, you testified on cross-examination that during

18   negotiations Chick-fil-A would share one competitor's price

19   with another competitor supplier; is that right?

20   A.   That is correct.

21   Q.   What was the purpose of sharing the prices of one supplier

22   with another?

23   A.   It was notably to try and negotiate a lower price.

24   Q.   I am sorry?

25   A.   It would be to negotiate a lower price.

Meyer Skalak - Redirect

1    Q.  Did that -- how did that help Chick-fil-A's negotiation

2    position?

3    A.  I think when you have a counter price point for a similar

4    or same product and you are able to share that with someone who

5    is charging a higher price point, it can incentivize them to

6    lower their price and it gives you reason to say you should be

7    able to do this at a lower price.

8    Q.  Were you ever aware of Chick-fil-A sharing the highest

9    priced supplier's price with the lowest priced supplier's

10   price?

11   A.  Can you ask that a different way, please?

12   Q.  Sure.  It was a confusing question.

13        Did you ever learn that Chick-fil-A would share --

14   when they would receive the bids in from the competing chicken

15   suppliers, they would take the price, the highest price they

16   received, and share that with the lowest -- the bidder, the

17   person who bid the lowest price?

18        MR. BELLER:  Objection, form, Your Honor.

19        MR. McLOUGHLIN:  Is he talking about this man

20   personally or Chick-fil-A as a corporation?

21        MR. BELLER:  Foundation and vague.

22        THE COURT:  Yeah, I think you need to establish

23   foundation.  Sustained.

24        MS. SWEENEY:  Yes, Your Honor.

25   BY MS. SWEENEY:

Meyer Skalak - Redirect

1    *Q.* So you testified that Chick-fil-A in the bidding process

2    would share the prices from one chicken supplier with another

3    chicken supplier; is that right?

4    *A.* I think at times we would do that, yes.

5    *Q.* And you said the purpose was to put Chick-fil-A in a better

6    negotiation position?

7              MR. McLOUGHLIN:  Object to leading.

8              THE COURT:  Sustained.

9    BY MS. SWEENEY:

10   *Q.* Mr. Skalak, in those negotiations do you understand if the

11   chicken suppliers were ever asked to raise their prices?

12   *A.* To my knowledge, we have never asked anyone to raise their

13   prices.

14             THE COURT:  I didn't hear the objection, but it's

15   overruled.

16             MR. McLOUGHLIN:  Objection to form, Your Honor.

17             THE COURT:  Overruled.

18   BY MS. SWEENEY:

19   *Q.* I am sorry, Mr. Skalak, could you say that again?

20   *A.* To my knowledge, we never asked anyone to raise their

21   prices.

22   *Q.* Why not?

23             MR. McLOUGHLIN:  Objection, Your Honor.  Unless we can

24   establish that this gentleman is qualified to speak for

25   Chick-fil-A for all time, there is a lack of foundation that

Meyer Skalak - Redirect

1    cannot be cured.

2           THE COURT:  I think the objection is vague.  Could you

3    pin down the time?  Sustained.

4           MS. SWEENEY:  Sure.

5    BY MS. SWEENEY:

6    Q.  So Mr. Skalak, you testified that Chick-fil-A you believe

7    never asked its suppliers to raise price.  Was that true in

8    2014?

9    A.  To the best of my knowledge, that was true in 2014, yes,

10   ma'am.

11   Q.  Was that true in the entirety of your time in your position

12   as I believe it was senior director of continuity supply --

13   excuse me, executive director of supply continuity?

14   A.  During my tenure at Chick-fil-A and during that time where

15   I had that title, to my knowledge we never asked anyone to

16   raise their prices.

17   Q.  And why not?

18   A.  Well, that would be counter to common business practices.

19   And our goal was always to get the best price from our

20   suppliers so we could offer the best price to our customers.

21   Q.  Did Chick-fil-A in your time in that role ever ask your

22   chicken suppliers to find out the bids from the other suppliers

23   that Chick-fil-A wasn't sharing?

24          MR. BELLER:  Your Honor, I'm going to object as to

25   foundation as well as vague regarding this witness' ability to

Meyer Skalak - Redirect

1    be able to speak on behalf of a corporation.

2            *MR. McLOUGHLIN:*  And, Your Honor, I also would object

3    with respect to leading.

4            *THE COURT:*  Both objections will be overruled.  He can

5    answer.

6    *A.*  Could you please ask the question again?

7            *MS. SWEENEY:*  I apologize.  With all of the

8    objections, I would ask the court reporter if she could repeat

9    the question.

10           (The record was read by the court reporter.)

11   *A.*  I have no knowledge of us ever asking suppliers to do that.

12   *BY MS. SWEENEY:*

13   *Q.*  Did you ever ask chicken suppliers to coordinate with the

14   other suppliers to increase price?

15   *A.*  No, I never asked suppliers to do that.

16   *Q.*  When you were in that role, did you want competitive

17   pricing for Chick-fil-A?

18   *A.*  Yes, I wanted competitive pricing for Chick-fil-A.

19   *Q.*  And why was that?

20   *A.*  Again, we always wanted the best pricing we could get so

21   that we could offer the best pricing to our customers and make

22   it -- we felt it would be a win-win.  Better prices for

23   customers meant they were buying more product from us and we

24   could then buy more product from our suppliers.

25   *Q.*  Now, you said on direct examination and you confirmed on

Meyer Skalak - Redirect

1   cross-examination that you did not want competitors

2   coordinating on price; is that right?

3          MR. McLOUGHLIN:  Object to leading, Your Honor, and

4   asked and answered multiple times.

5          THE COURT:  Sustained as to leading.

6   BY MS. SWEENEY:

7   Q.  Mr. Skalak, did you want competitors coordinating on price?

8          MR. McLOUGHLIN:  Same objections.

9          MR. BELLER:  I also object because it assumes a fact

10  that hasn't been testified to or stated.

11         THE COURT:  Overruled.  He can answer.

12  A.  May you repeat the question one more time, please?

13  BY MS. SWEENEY:

14  Q.  Yes.  Mr. Skalak, did you want competitors coordinating on

15  price?

16  A.  We did not want competitors coordinating on price.

17  Q.  Why not?

18         MR. McLOUGHLIN:  Your Honor, I apologize, but I think

19  you sustained my objection to leading on that question, and

20  counsel just asked the exact same question.  I object to the

21  leading and move to strike.

22         MR. BELLER:  This is also outside the scope, Your

23  Honor.  This is just rehashing the direct.

24         THE COURT:  I don't think so.  Both objections will be

25  overruled.

Meyer Skalak - Redirect

1    *A.* So I don't think we want suppliers talking and coordinating

2    on price because I don't believe we thought that was necessary.

3    They should be able to independently price their own product,

4    and in doing so we felt that gives us the most competitive

5    price that they were able to provide.

6    *BY MS. SWEENEY:*

7    *Q.* Now, was that based on your common sense?

8    *A.* It's based on practice throughout my years in supply chain

9    and purchasing.

10          *MS. SWEENEY:* The Court's brief indulgence?

11          *THE COURT:* Sure.

12          *MS. SWEENEY:* May I confer?

13          *THE COURT:* You may.

14          *MS. SWEENEY:* Thank you, Your Honor.

15   *BY MS. SWEENEY:*

16   *Q.* You testified or you've been talking to the jury today and

17   last week about the transition to NAE by Chick-fil-A; is that

18   right?

19   *A.* That is correct.

20   *Q.* And you testified that you had some high-level negotiations

21   or high-level meetings with chicken suppliers about that

22   transition; is that right?

23   *A.* I would say high-level meetings, not necessarily

24   negotiations.

25   *Q.* Then was it your understanding that those meetings were

Meyer Skalak - Redirect

1    confidential?

2          *MR. BELLER:*  Objection, vague.  And I am not sure who

3    the meeting is with.  It's also a leading question, Your Honor.

4          *THE COURT:*  Mr.  McLoughlin?

5          *MR. McLOUGHLIN:*  Yes.  And Your Honor, his expectation

6    if not communicated to anyone that the meeting is confidential

7    was simply irrelevant.

8          *THE COURT:*  I am going to sustain the objection in

9    terms of vagueness.  If you could find out what he means or

10   what you mean by confidential and also what time period you're

11   talking about.

12   *BY MS. SWEENEY:*

13   *Q.*  So Mr. Skalak, when were those initial meetings with regard

14   to the transition to NAE with the chicken suppliers?

15   *A.*  To the best of my knowledge, those were early first quarter

16   of 2014.

17   *Q.*  And did you have one of those meetings with Pilgrim's

18   Pride?

19   *A.*  Yes, I did have one of those meetings with Pilgrim's Pride.

20   *Q.*  Did you understand -- did you understand that that meeting

21   was -- let me start again.

22          What was your understanding, if any, of the

23   confidentiality of the matters discussed in that meeting?

24          *MR. BELLER:*  Objection, relevance, foundation.

25          *THE COURT:*  I think it's beyond the scope really.  I

Meyer Skalak - Redirect

1    don't recall this having been raised before.

2         MS. SWEENEY:  Your Honor, on cross-examination

3    Mr. Beller engaged in an extended discussion which the

4    government objected to about confidentiality and information

5    being proprietary with regard to those -- I believe with regard

6    to bid and pricing information.

7         THE COURT:  Mr. Beller?

8         MR. BELLER:  Your Honor, what I inquired about was

9    whether this witness claiming that he didn't want suppliers

10   sharing information is simply not relevant for this jury's

11   determination.  I don't believe that the word "confidentiality"

12   ever left my mouth.  I will also say that this witness

13   testified repeatedly that he had no knowledge or memory of any

14   of the meetings or any of the negotiations.

15        THE COURT:  Yeah, I am going to sustain it.  I don't

16   find that that question is -- I think it is beyond the scope,

17   so I will prohibit the government from asking that.

18   BY MS. SWEENEY:

19   Q.  Okay, Mr. Skalak.  You spoke with Mr. Beller about the

20   prices that were submitted to Chick-fil-A in that early

21   transition to no-antibiotic-ever chicken; is that right?

22   A.  Yes.  He asked me about that.

23   Q.  And there were a number of questions about cost versus

24   price in that early negotiations.  What specifically were you

25   asking for from the suppliers?

3019

Meyer Skalak - Redirect

1   A.  We were asking for the price that they would charge for the

2   NAE product to be sold to Chick-fil-A.

3   Q.  When you say price, could you clarify what specifically

4   that you meant -- that you mean?

5   A.  We looked at price per pound of product that would come to

6   Chick-fil-A.  I wasn't asking what their cost to do that was.

7   It's what the price they would charge us to do that.

8   Q.  So what Chick-fil-A would have to pay?

9   A.  What Chick-fil-A would be paying to our suppliers.

10  Q.  Did Chick-fil-A rely on those prices?  Did Chick-fil-A

11  receive those prices?

12  A.  We did receive those prices.  I don't recall the -- what

13  the prices were or the exact timing of receiving those.

14  Q.  And did Chick-fil-A rely on those prices?

15          MR. BELLER:  Objection, foundation.

16          THE COURT:  Sustained.

17          MR. McLOUGHLIN:  And vague.

18          THE COURT:  Sustained as to foundation, if you could

19  establish that.

20  BY MS. SWEENEY:

21  Q.  So you said Chick-fil-A received those prices?

22          MS. HENRY:  Objection, vague.  I don't know which

23  prices you are referring to, what suppliers.

24          THE COURT:  Overruled.  He can answer.

25  A.  My understanding is yes, we received those prices from the

Meyer Skalak - Redirect

1   supplier regarding what the price that Chick-fil-A would be

2   charged for NAE.

3   *BY MS. SWEENEY:*

4   *Q.*  And could you remind us which suppliers it is that you

5   received prices from?

6   *A.*  It would have been the suppliers that we talked about, so

7   Pilgrim's, Perdue, Claxton, Wayne Farms and Tyson.  I don't

8   recall or know if Koch ever supplied any of that pricing.

9   *Q.*  And in the pricing that Chick-fil-A received, did you rely

10   on those prices?

11         *MR. BELLER:*  Objection, foundation, vague based upon

12   this witness' answer that he doesn't recall any of the prices.

13         *THE COURT:*  Mr.  McLoughlin?

14         *MR. McLOUGHLIN:*  Not only that, Your Honor, but again

15   to the extent there were various rounds of pricing and

16   discussion, the question is contrary to the evidence that in

17   fact they didn't rely, that they negotiated on those prices.

18   So the question makes no sense as to form.  It's contrary to

19   the evidence the government elicited.

20         *THE COURT:*  I am going to sustain it as to foundation.

21   You can lay the foundation for reliance.

22   *BY MS. SWEENEY:*

23   *Q.*  What was the purpose of asking for those prices?

24   *A.*  We needed to understand what impact that would have on the

25   price that we would be able to charge customers and if we

1    thought that would be a price that would be acceptable.

2    Q.   And were those prices used in the analysis you just

3    described?

4    A.   It would have been used in the analysis, yes.

5    Q.   So for these particular prices for the Chick-fil-A sought

6    and received prior to the transition to any chicken, did you

7    want the suppliers to coordinate with each other on those

8    prices prior to submitting them?

9              MR. BELLER:   Objection, asked and answered now three

10   times.

11             MR. McLOUGHLIN:   Same objection, Your Honor, except I

12   think Mr. Beller understates the count.

13             THE COURT:   I am going to sustain the objection.

14             MS. SWEENEY:   Your Honor, may I confer?

15             THE COURT:   What's that?

16             MS. SWEENEY:   May I confer?

17             THE COURT:   Yes, absolutely.

18             MS. SWEENEY:   No further questions.   Thank you.

19             THE COURT:   All right.   Mr. Skalak, you may step down.

20             Is he subject to recall?   All right.   Thank you very

21   much, Mr. Skalak.

22             Should we take a recess and allow our videographer to

23   collect his belongings up and clear the courtroom?   And then

24   think about this.   Why don't we take -- how long do you think

25   it might take you?

3022

1          *VIDEOGRAPHER:*  20 minutes, 15, 20.

2          *THE COURT:*  Why don't we take a break.  And whenever

3   he is done, Ms. Grimm can be notified.  And in the meantime why

4   don't we think about whether you want to go over some exhibits

5   for the rest of the day and we might as well use the day.  We

6   don't necessarily have to stay late tonight, but we could stay

7   a little bit late.  I would say maybe we could stay until

8   5:30 if you would like to do that or we can break at 5:00,

9   whatever the preference is.

10          Mr. Beller?

11          *MR. BELLER:*  Would the Court be okay if our clients

12  decided to leave for the afternoon if we are doing exhibits?

13          *THE COURT:*  That is no problem.  As we previously

14  mentioned, if they would like to stay, they can.  If they would

15  like not to stay, that is perfectly fine as well.  Totally up

16  to them, all right?

17          We will be in recess.  Thank you.

18      (Recess at 4:18 p.m.)

19      (Reconvened at 4:35 p.m.)

20          *THE COURT:*  We are back on the report with no

21  videographer.

22          *MR. McLOUGHLIN:*  Your Honor, if I may, Mr. Fagg asked

23  me to report to the Court that for the medical needs of his

24  son, he did have to leave.  We expect if all goes well, he will

25  be back maybe tomorrow night, maybe the next night.

1        *THE COURT:*  Understood.  I noticed that he was gone

2   and assumed it was because of the issue that he mentioned.

3   Thank you.

4        All right.  Ms. Call, where did we leave off?

5        *MS. CALL:*  I believe the next document is 108.  We'd

6   gone slightly out of order at the very end, so I will skip one

7   after that, but we are starting at 108.  Your Honor, it's a

8   two-page document.  The second page is just the signature line,

9   so we'll show the first page.

10       *THE COURT:*  All right.  Ms. Call, did you want to make

11  argument as to that one?

12       *MS. CALL:*  Yes.  This is an e-mail chain between

13  Defendant Little and Mr. Bradley from Church's.  I will note

14  this was on the government's *James* log as entry 51.  It was not

15  favorably ruled on by Your Honor.  It would still be the

16  government's position that this is admissible under

17  801(d)(2)(E).  And I will provide you with some I think what is

18  newer information from the time of the *James* hearing which is

19  that when this e-mail was sent, which I believe the face of the

20  document says 6:49 p.m., and that's when Defendant Little says,

21  "I'll have pricing for you Monday, but there will need to be a

22  freezing charge for both."  And this is in relation to Church's

23  Chicken.

24       We now, of course, have the testimony from Mr. King of

25  Consilio which would place the time of this I believe at 2:49

1    Eastern rather than 6:49 p.m., which makes it within one minute

2    of Defendant Little getting off the phone with Carl Pepper at

3    Tyson.  So we believe some of that new information makes it

4    much more clear that this decision to charge Church's for

5    freezing was a result of that phone call he had basically

6    literally just hung up on.

7         But I will note otherwise if Your Honor is not

8    inclined to reconsider the 801(d)(2)(E) argument, that this

9    would of course be admissible against Defendant Little under

10   801(d)(2)(A).

11        THE COURT:  All right.  Objections?

12        MR. CANTY:  We object.  It's hearsay.

13        THE COURT:  All right.

14        MR. CANTY:  I would also say that especially if you're

15   putting it in the context of this conspiracy charge, it would

16   have to be in furtherance of the conspiracy.  What we do have

17   is Mr. Little not communicating a price, but saying wait a

18   minute, I'll get back to you on Monday.  So if anything, this

19   is not a statement in furtherance of the conspiracy.

20        THE COURT:  All right.  Any other objections?

21        All right.  So I am going to rule that it cannot be

22   admitted against all the defendants.  It can only be admitted

23   against Mr. Little.  And the Court will also rule that the

24   statement of Mr. Bradley can only be considered for the -- not

25   for the truth, but as to the effect on the listener.

3025

1            All right.  Next one?

2            *MS. CALL:*  The next is Government's Exhibit 224.  This

3    again is a two-page document, but the second page is just

4    e-mail signature information so we'll keep up the first page.

5    Your Honor, this was contained on the government's *James* log as

6    entry No. 78 which was ruled on favorably.

7            *THE COURT:*  Objections?

8            *MR. BELLER:*  Your Honor, I would note that the only

9    co-conspirators, and that is Mr. Carl Pepper uncharged, of

10   course, and Mr. Tim Mulrenin.  Mr. Hannigan is not an uncharged

11   co-conspirator.  And obviously Ms. -- I don't know if it's

12   Knust or Knust, K-N-U-S-T, is also not a co-conspirator.  So

13   based on that, we believe that everything other than the

14   statements of Mr. Carl Pepper and the statements of Tim

15   Mulrenin having received this are all hearsay.

16           *THE COURT:*  Response?

17           *MS. CALL:*  Yes, Your Honor.  Those statements aren't

18   offered for the truth, but are in fact just very necessary

19   context here.  For example, just that second e-mail down when

20   Mr. Hannigan says, "Wonder how the other suppliers will react,"

21   and then Conspirator Carl Pepper replies, "Might call a couple

22   of them and ask," there would just be no basis of understanding

23   who he meant by them without knowing what Mr. Hannigan said.

24   So while they are not offered for the truth, I think those are

25   very necessary context for an understanding of the

1    conspiratorial statements that are in Exhibit 224.

2           THE COURT:  Mr. McLoughlin?

3           MR. McLOUGHLIN:  Yes.  Consistent with Your Honor's

4    prior ruling for the reasons Mr. Beller identified, this would

5    be hearsay with respect to everyone else.  The only person in

6    theory it could be admitted against is Mr. Pepper and obviously

7    he is not here.  And so we would object with respect to either

8    effect on the listener, Mr. Pepper, which might be the

9    exception they are trying to use, it's unclear, but otherwise

10   there is no hearsay exception here and there is no one making a

11   statement on trial here.

12          THE COURT:  Mr. Beller might have something too.  Do

13   you want to add on?

14          MR. BELLER:  Just briefly, Your Honor.  First of all,

15   it is being offered for the truth of the matter asserted.  And

16   the truth of the matter asserted is that Church's Chicken has

17   entered into a final contract.  And after the final contract

18   has been signed and executed, it's now asking for a

19   modification.  And so the discussion is that would have been

20   nice to know prior to the finalizing of the contract.

21          And so I understand Ms. Call is saying it's not being

22   offered for the truth of the matter asserted, but rather the

23   effect of Mr. Pepper saying I'll make some calls.  But the

24   reality is that does require the jury consider it for the truth

25   of the matter asserted, both Mr. Hannigan's statement as well

1    as Ms. Knust statement.

2         THE COURT:  Anything else, Ms. Call?

3         MS. CALL:  Just very briefly.  I think, you know, this

4    is really just a prime example of effect, especially for

5    Ms. Knust's statement.  It's somewhat irrelevant here, but

6    there is a -- well, irrelevant for the purpose this is being

7    offered for that there is a final contract.  The point is the

8    change in QA requirements that then motivates Mr. Pepper to

9    take conspiratorial steps.  So there really is an effect on the

10   listener here that a new requirement is made.  Tyson gets

11   upset.  Carl Pepper decides to reach out to his competitors

12   about this.  So it really is at its core a non-hearsay purpose.

13        THE COURT:  Mr. McLoughlin?

14        MR. McLOUGHLIN:  Your Honor, at the risk of belaboring

15   this, if it is for the effect on the listener, that being Carl

16   Pepper, he is not in the courtroom.  Your Honor has limited

17   that admissibility to the effect on the co-conspirator who was,

18   quote, the listener upon who it had an effect.  So the document

19   is simply not admissible here.

20        MS. CALL:  Very briefly.  I think Mr. McLoughlin may

21   be missing the fact that Your Honor has already ruled that the

22   statements by Carl Pepper here are admissible under

23   801(d)(2)(E) as co-conspirator statements, and there is no

24   limitation on effect on the listener that the listener needs to

25   be a defendant in this case.

1          MR. McLOUGHLIN:  The government forgets, Your Honor,

2   that this rule -- you have already rejected this document under

3   the James hearing.

4          THE COURT:  No, this --

5          MR. McLOUGHLIN:  I apologize.

6          THE COURT:  This is a different one.  So this one was

7   favorably ruled on.

8          Okay.  Mr. Beller?

9          MR. BELLER:  Thank you.  At the risk of interrupting

10  Mr. McLoughlin, I would also note for the Court that while an

11  801(d)(2)(E) is as to hearsay, that still doesn't -- as to

12  hearsay of a co-conspirator, that still doesn't overcome the

13  relevancy issues.  And what we have here is not a discussion

14  about price or pricing terms.  What we have is QA issues.  And

15  for that reason I do believe that there is a substantial risk

16  that this will confuse the jury and that it is more prejudicial

17  than it is probative only in the sense that it does, in fact,

18  confuse the jury.

19         I would note as to my client, we don't sell to

20  Church's.  There has been no one on the stand to be able to

21  testify that Claxton Chicken does not sell to Church's at all.

22  And so that is an added reason as to why I have concerns about

23  this being confusing as to my client.

24         THE COURT:  All right.  The 403 objection that

25  Mr. Beller just made will be overruled.  I don't find that it

1    would be -- meet the requirements of Rule 403.  I don't think

2    it would be confusing to the jury.  There are two hearsay

3    statements in it.  Ms. Knust is from Church's.  Mr. Hannigan is

4    not, I believe, identified as a co-conspirator.  Therefore,

5    their statements are hearsay.

6          I previously ruled on this document.  I do believe

7    it's relevant.  I will rule it admissible, but I will give the

8    jury a limiting instruction, namely that as to the statements

9    of Ms. Knust and as to the statements of Mr. Hannigan, those

10   will be admitted not for the truth of the matter asserted in

11   their statements, but rather only for the effect their

12   statements may have on the listener.

13         Next document?

14   MS. CALL:  Next is Government's Exhibit 209.  209 is

15   an e-mail from Sarah Knust at Church's to Defendant Kantola

16   informing him of these new QA requirements.  And I will just

17   note that QA does impose -- or quality assurance, which is what

18   it's short for, does impose cost for suppliers.  And I believe

19   we all just heard a long recitation of cost-plus models and how

20   chicken suppliers tie their prices to their costs, which at

21   least in this instance actually led to Tyson adding a new

22   component of their pricing.  So I would disagree with the

23   representation that this does not relate to price.

24         But regardless, for this specific document, this is

25   not offered for the truth of anything in it, but more so the

3030

1    effect on the listener, which is Defendant Kantola's knowledge

2    of these new requirements and the fact that he was on notice of

3    the new requirements which provides necessary context and

4    motive for his call to Defendant Little that happened within an

5    hour of his receipt of this e-mail.

6         THE COURT:  So tell me this.  In terms of the

7    relevance, so what was the result of the QA requirements?  Did

8    that end up in becoming a component of pricing?  And is there

9    any evidence that there was a sharing of QA information?

10        MS. CALL:  Yes, Your Honor.  So the -- first off,

11   there was a call between Mr. Pepper and Defendant Little the

12   day of this e-mail earlier in the day, I believe.  Then

13   following this there were more calls and we'll get to some of

14   these documents in a moment, so perhaps I should go backwards

15   to show the effect.  But the day -- three days after this Carl

16   Pepper writes to his supervisors, Defendant Mulrenin and

17   Roberts, saying that he talked to Jimmie Little and they were

18   planning on adding to their cost to do this.  So he learned

19   from Pilgrim's that they would add to their pricing for

20   Church's based on this QA requirement, and then that -- within

21   several days, I believe, Tyson then adds a cost to their

22   pricing for Church's as well.

23        MR. GILLEN:  Your Honor --

24        MR. CANTY:  There will be no evidence whatsoever --

25        THE COURT:  Hold on one second, Mr. Canty.  Anything

1    else, Ms. Call, in terms of was this ruled on at the *James*

2    *hearing*?

3           MS. CALL:  No, this is not a statement by a

4    conspirator.  This is by a Church's employee.

5           THE COURT:  Right.

6           Now, Mr. Canty, go ahead.

7           MR. CANTY:  There will be no evidence whatsoever that

8    there was any QA charge imposed by Pilgrim's.

9           THE COURT:  Okay.

10           Ms. Henry?

11           MS. HENRY:  It's hearsay.  It's a denial of our

12    confrontation rights and the prejudice outweighs any potential

13    relevance.  And let me make it very clear here if we were to

14    proffer with regard to what we would expect that Ms. Knust

15    would say if she was actually on the stand about this document,

16    I believe that she would say that this was being provided to

17    Mr. Kantola only for information purposes, that he had nothing

18    to do with it, that indeed the information would be discussed

19    between the QA teams only.  And that with regard further, there

20    is no evidence in the record that anyone with Koch paid any

21    extra on QA with regard to this.

22           THE COURT:  All right.

23           Mr. Gillen?

24           MR. GILLEN:  Thank you, Your Honor.

25           To answer the Court's question about what happened, my

3032

1  recollection, and I don't have the documents in front of me,

2  but my recollection of how it played out with Tyson was that

3  ultimately Church's had a business situation with Tyson where

4  out on the West Coast there was some transaction that they paid

5  Tyson like I think 270,000, in that neighborhood.  I am giving

6  my general recollection.  In exchange for that, Tyson then my

7  understanding is absorbed the QA cost.  So it turns out to be

8  basically a nothing burger in terms of Tyson.

9          So this is a very odd episode that they have in this

10  Indictment where initially it seems that after the contract

11  there is a -- they throw up the question of the additional QA

12  as a business matter.  That has to be absorbed -- happens to be

13  absorbed.  But to answer the Court's question directly, my

14  recollection is with Tyson, they end up absorbing the QA cost

15  in exchange for some money that was paid on another deal they

16  had with Church's out west.  That's our recollection.

17          THE COURT:  I am not sure we are supposed to use the

18  term burger in this trial, but...

19          MR. GILLEN:  Just a little variety in our diet, Your

20  Honor.

21          MS. CALL:  I think the end result of whatever happened

22  here with Church's is somewhat irrelevant to the fact that

23  there was coordination between the suppliers after receiving

24  these new requirements leading to after Carl Pepper was told

25  Defendant Little at Pilgrim's would add to his cost, Carl

1    Pepper then decided to do the same and on January 26 sent a

2    pricing model to Church's containing a new cost for this

3    quality assurance.  If it fell apart after the fact, that

4    doesn't, you know, undo the fact that this -- these

5    conspiratorial acts occurred.

6        *THE COURT:*  Ms. Henry?

7        *MS. HENRY:*  Your Honor, there is no evidence

8    whatsoever of conspiratorial conduct with regard to Mr. Bill

9    Kantola with regard to the QA things.  I believe as Mr. Little

10   pointed out, neither Pilgrim's nor Koch ever had any pricing

11   issue that even came up with regard to the QA costs and her

12   allegation that there is collusion here is simply without

13   foundation.

14       *THE COURT:*  And I assume it's not identified

15   specifically in the Superseding Indictment.

16       *MS. CALL:*  Let me check.  I believe it is.

17       *THE COURT:*  Oh, it is?  The QA issue?

18       *MS. CALL:*  Yes.  And I'll note obviously a number of

19   these -- let me double-check before I say that, but I believe a

20   number of actual conspiratorial communications were contained

21   on the *James* log as well.  This, of course, would not be one

22   because this is a statement by a customer.

23       *MS. PREWITT:*  Your Honor, on behalf of Mr. Mulrenin, I

24   will note that Mr. Bradley was interviewed by the DOJ on this

25   subject and they did not put him forth as a witness.

1          *MS. CALL:*  I think perhaps we have gotten afoul of the

2    admissibility argument that we're making at the moment.  Your

3    Honor has already ruled statements in furtherance of the

4    conspiracy relating to this episode.  The question before us

5    right now is simply this statement from Ms. Knust at Church's

6    had an effect on Defendant Kantola.  And the argument the

7    government is making is that this put him on notice of the

8    requirements, which likely informed his discussion with

9    Defendant Little the very next day.

10         *MR. CANTY:*  Just one more time, Your Honor.

11         Really if you focus this on we have price-fixing and

12   we have bid rigging and that's the subject of the complaint.

13   What we have in this situation here is after the 2014 contract

14   is bid on and complete, we have an additional pass-through cost

15   that's suggested by Church's.  And in response there will be no

16   evidence that Pilgrim's charged it.  There will be no evidence

17   that Koch charged it.  There is an e-mail that says that Tyson

18   thought about it.  But you'll find out in evidence later that

19   it was never charged.  So it's a burger.

20         *THE COURT:*  Ms. Henry?

21         *MS. HENRY:*  It is hearsay.  It is being asked -- it is

22   being put in for the truth of the matters asserted here and it

23   is a total denial of our confrontation rights.

24         *THE COURT:*  The reason it's being offered is for

25   purposes of I think, Ms. Call, you said notice.  And what I

3035

```
 1    find here is given what I've been told about the circumstances
 2    of the QA requirements, I think it begs the question of what
 3    notice this document would have given to Mr. Kantola regarding
 4    what was going to then happen with the QA requirements.  I'm
 5    not sure exactly how this e-mail would establish any type of
 6    nexus of notice establishing relevance to Mr. Kantola given
 7    what appears to have subsequently transpired in terms of how QA
 8    ever became a component of cost increases.

 9         So that's why I struggle to find out exactly why this
10    provides that type of -- why we would assume notice to
11    Mr. Kantola based upon this hearsay statement from Church's.
12    What's your explanation, Ms. Call?

13         MS. CALL:  I think it's essentially just that the
14    requirements have changed or that there is some sort of new
15    requirement which is simply kind of just inferred from the fact
16    that there is an attachment here.  But as we also saw in
17    Exhibit 224, Ms. Knust was sending these same requirements to
18    Tyson saying, I've attached the new requirements, and then
19    internally at Tyson you see complaints about the changes in it
20    followed by Carl Pepper saying, I might call a couple companies
21    and ask how they're going to respond, which is then exactly
22    what we see happen over the course of the next month of Carl
23    Pepper reaching out to Defendant Little and then putting in an
24    e-mail that he talked to Defendant Little.  And he said they
25    were planning on adding to their cost to do this.
```

1              And then there are additional calls between Defendant

2    Little and Kantola which ultimately led to at least Conspirator

3    Pepper putting that new cost into the price for Church's.  The

4    fact that the other conspirators didn't necessarily follow

5    through doesn't take away the relevance of what was going on

6    here.

7              THE COURT:  Ms. Henry?

8              MS. HENRY:  I think it's important to note here that

9    this whole issue of what Carl Pepper did, Carl Pepper never had

10   any conversations with Bill Kantola about this.  There has been

11   no evidence that's been proffered or even suggested that.

12             THE COURT:  I am going to refuse this particular

13   exhibit because I don't think that the exhibit on its face

14   provides any context for what the relevance is of a notice to

15   Mr. Kantola.  It doesn't -- on it's face it's just a notice of

16   some QA thing, but although the Superseding Indictment may

17   mention that, it doesn't have sufficient evidentiary value as

18   to the notice to be admissible, so I will sustain the objection

19   on that one.

20             MS. CALL:  All right.  And just for the record, Your

21   Honor, I will note it was Paragraph 77 to 83 of the Superseding

22   Indictment.

23             THE COURT:  Okay.  Thank you.

24             Next one?

25             MS. CALL:  Next is Government Exhibit 247.  Your

1    Honor, this is in the same time period, actually the same day

2    as the e-mail we were just looking at several minutes later

3    after these requirements were sent to Defendant Little.  This

4    is his response to Dean Bradley.  And we'll offer this just

5    under 801(d)(2)(A) with regard to Defendant Little.

6            THE COURT:  Okay, because this was not on the *James*

7    log?

8            MS. CALL:  I don't believe so.  The top of my page is

9    cut off, but I don't believe it was.

10           THE COURT:  And Dean Bradley is with Church's, right?

11           MS. CALL:  Correct.  And then the sequence here is

12   this e-mail is sent on December 23rd to Church's from Defendant

13   Little.  The following day Defendant Little calls Defendant

14   Kantola, which is just two days before Carl Pepper writes about

15   how he spoke to Defendant Little about these QA charges, and

16   they were planning on adding to their cost to do it.

17           THE COURT:  Okay.  Objection?

18           MR. CANTY:  The only objection we have is if it's

19   going to come in, it should have its attachment by the rule of

20   completeness.  So when Mr. Little says, "We need to discuss

21   this," we should have an idea of what he wants to discuss.

22           MR. BELLER:  Judge, did I hear the government properly

23   that this is being offered as to Mr. Little only?

24           MS. CALL:  Yes.

25           MR. BELLER:  Thank you.  Excuse me.  I think I missed

1    that.  And Your Honor, I would object even though it's not

2    being admitted against my client only because I believe that

3    the limiting instructions are becoming cumulative.  And I do

4    not believe that a reasonable juror is going to be able to

5    decipher all of the limiting instructions given their volume at

6    this point.

7              THE COURT:  All right.

8              Anything else?

9              Mr.  McLoughlin?

10             Sorry, Ms. Henry.  I missed you.  Go ahead, Ms. Henry.

11             MS. HENRY:  Your Honor, I was going to reiterate the

12   objection that Mr. Beller made, but make it particular

13   prejudice with regard to Defendant Kantola because as we have

14   just heard, the government intends to argue that it is, in

15   fact, relevant to Mr. Kantola.  That's what they just said.  So

16   if that's the argument that they're planning to make, a

17   limiting instruction will not cure any concerns here.  And I

18   would also object on the grounds of relevance.

19             THE COURT:  All right.

20             MR. McLOUGHLIN:  And, Your Honor, to quote an imminent

21   jurist, the James hearing means something or it must mean

22   something or both.  The fact of the matter is the government

23   did not put this on the James log.  They did not offer it.  It

24   is clearly being offered for Mr. Little's statement which is

25   the government having not put it on the James log will try and

1    circumvent that for the purpose of establishing an act in

2    furtherance of the conspiracy.

3            And the government should not able to back-door these

4    issues by inventing some other much less direct way to get it

5    in where, as Mr. Beller indicated, we are now as a result of

6    the government's process building up limiting instruction upon

7    limiting instruction upon limiting instruction to the point

8    where it would be very difficult for the jury to manage all of

9    that.

10           THE COURT:  Thank you, Mr.  McLoughlin.

11           Anyone else?

12           Ms. Call, anything more?

13           MS. CALL:  Two quick points just to respond briefly.

14   I will note that there is evidence that is relevant, probative

15   and admissible in a conspiracy case that doesn't need to come

16   in under 801(d)(2)(E), and this is simply one of those.  But as

17   to Defendant Kantola, I will note there are and will be facts

18   in evidence establishing his relevance to Church's and his

19   involvement in those negotiations, including one we just looked

20   at -- it may have been Friday, if I can place it in the right

21   date -- including Government's Exhibit 120 which -- where Carl

22   Pepper reports with respect to Church's that, "Koch told me

23   they were at 2-1/2 cents on eight-piece."  And that's the same

24   day he spoke to Defendant Kantola.  So there is extreme

25   relevance of Defendant Kantola in these negotiations with

1   Church's, so I just want to point that.

2          THE COURT:  The objections will be overruled.  I will

3   overrule Mr. Canty's objection about rule of completeness.  I

4   think that the statement by Mr. Little does not require any

5   such thing.  It will only -- this document will only be -- I

6   will instruct the jury that they can only consider it against

7   Mr. Little.

8          I will also instruct them that as to the statements of

9   Ms. Knust and also Mr. Adams, who I believe has not been

10  identified as a co-conspirator, that those statements can only

11  be considered for the effect on the listener and not for the

12  truth of the matters asserted.

13         Next exhibit?

14         MS. CALL:  Next is Government's Exhibit 230 and its

15  attachment, 232.  Showing both side by side, this is the change

16  in costs we have been talking about which is Carl Pepper

17  sending prices to Church's including a new QA audit charge,

18  which is seen in the attachment in the middle of the page.  As

19  far as admissibility, this would essentially be an act of

20  independent legal significance.  While period pricing may not

21  be considered something like a bid, it certainly is pricing

22  sent to the customer to bind them over the course of the next

23  month, so it would be admissible on that basis.

24         THE COURT:  Just one second, Ms. LaBranche.  So this

25  is not on the *James* log, right?

1           MS. CALL:  No, Your Honor.

2           THE COURT:  Ms. LaBranche, go ahead.

3           MS. LaBRANCHE:  Objection, hearsay.

4           THE COURT:  All right.  And what about your response

5     to it having legal significance, the attachment?

6           MS. LaBRANCHE:  Your Honor, what this appears to be is

7     this appears to be a pricing model that's being sent from

8     Mr. Pepper to Mr. Bradley.  This is not a contract of any kind.

9     I don't think it falls under the independent legal significance

10    doctrine.

11          MR. GILLEN:  Your Honor, also for Mr. Roberts we would

12    also object.  It is hearsay.  If they wanted to have a document

13    like this authored by Mr. Pepper, that would be -- the

14    appropriate time would have been the *James* hearing.  They

15    didn't do that and so we would object.

16          And again to incorporate my earlier remarks about the

17    ultimate conclusion, which is something the Court I think

18    should and could consider, and the government knows that at the

19    end of the day, that Tyson is my understanding absorbs the QA

20    cost and does not pass it along.  So not only is this hearsay,

21    but candidly it's misleading because ultimately Tyson does, in

22    fact, absorb the QA cost and does not pass it along.  So this

23    is something that we think not only is hearsay, but it's 403.

24          THE COURT:  Anyone else?

25          Ms. Call, anything else from you?

3042

1          MS. CALL:  Nothing further, Your Honor.  I will just

2     notice what this is -- I think we are familiar with the term

3     now, but period pricing was the monthly kind of contractual

4     adjustments that these companies would send in the normal

5     course of their business with these customers hence the legal

6     significance of it that it is the price to be paid for the next

7     month essentially.

8          THE COURT:  I'm sorry, can you repeat that?

9          MS. CALL:  Yes.  So at times in this case made a

10     distinction between bids and contracts versus period pricing.

11     So with many of these small bird customers there is a yearly

12     contract negotiated, but because of fluctuations in cost like

13     corn and feed, every month or what they call a period the

14     prices fluctuate.  So they send new pricing out on a monthly

15     basis based on those fluctuating costs.  So this is the

16     February pricing for Church's that year which is a period

17     price.

18          THE COURT:  Ms. LaBranche?

19          MS. LaBRANCHE:  Your Honor, I understand that's what

20     the government thinks this is and that's what they are telling

21     the Court this is, but again to Mr. Gillen's point, if they

22     wanted to bring a witness in who could explain that that is, in

23     fact, what this is, they had the opportunity to bring

24     Mr. Pepper in.

25          MR. GILLEN:  Your Honor, one more point.  In addition,

3043

1    I think the government knows that, you know, they know the end

2    story.  There is no passing on.  But the reality of the

3    situation is from our numbers that this e-mail or this exhibit

4    contains what would be about a $10,800 charge which is

5    ultimately absorbed by Tyson.  But this -- I again I reiterate

6    my 403 point and also hearsay.

7            THE COURT:  Anything else, Ms. Call?

8            MS. CALL:  No, Your Honor.

9            THE COURT:  I am going to sustain the hearsay

10   objection.  The problem is that this could be just period

11   pricing, but I don't know enough to be able to attribute legal

12   significance to this one.  I don't know if it was the

13   equivalent of an offer, whether it would have been negotiated.

14   And there is nothing within Exhibit 230 that would help explain

15   that fact.  It does as you say include QA audit.  Once again,

16   nothing really to explain exactly what that is other than it

17   seems to be responsive to the --

18           MS. CALL:  I believe to some extent the document does

19   speak for itself in that the header on the attachment says

20   Church's Chicken-Tyson, Formula Based Cost Model, Time Period:

21   February 2014.  And we have testimony from multiple witnesses

22   about the nature of contracts in this business being frequently

23   covering a yearly basis with monthly fluctuating prices, so I

24   think that the month time period on here would show the nature

25   of what this is.

1            THE COURT:  Once again, I will refuse the exhibit as

2     hearsay, insufficient information to establish that it has

3     independent legal significance constituting a hearsay

4     exception.

5            MS. CALL:  Very briefly, just because I was just

6     handed the document, Exhibit 224 which we were looking at a

7     moment ago does contain a statement from Mr. Pepper saying, "My

8     opinion of this is this should have been discussed before the

9     contract was finished," implying that at this time there is an

10    executed contract which leads to the support of the statement

11    that this is that kind of monthly pricing that they sent.

12           And following this e-mail the next document we are

13    actually getting to is the buyer e-mailing him back saying this

14    new cost wasn't agreed to.  So there is basically from the

15    before and after an establishment of what this document is and

16    what significance it has between the companies.

17           THE COURT:  I've ruled.

18           Next document?

19           MS. CALL:  Next is Exhibit 6134.  6134 is an e-mail

20    from Defendant Kantola saying this is why Tyson is so popular

21    with Church's from the same time period and containing

22    competitors' pricing.  I will note this was not on the *James*

23    log and would be offered just against Defendant Kantola under

24    801(d)(2)(A).

25           THE COURT:  All right.  Ms. Henry?

3045

 1          MS. HENRY:  Actually, I have to confess it was on the

 2     part of James log and you did admit it.  And we have no further

 3     objections than those made in the James hearing.

 4          THE COURT:  Thanks for that clarification, Ms. Henry.

 5          MR. TUBACH:  I believe it's No. 314 on the James log.

 6     It's a different --

 7          THE COURT:  Oh --

 8          MR. TUBACH:  I believe it's 6136.

 9          MR. CALL:  They seem to be completely the same in

10     substance and I apologize for my error and thank counsel for

11     the correction, but given the prior ruling we would admit this

12     against all 10 defendants.

13          THE COURT:  Yes, it does appear that those are two

14     duplicates.  And any objections by anyone else?

15          MR. BELLER:  For purposes of clarification, so if it's

16     6134 or 6136 that is going to be offered?  And there is no

17     difference, but I want to be clear.  We are trying to track our

18     internal notes.

19          MS. CALL:  Yes.  We are offering 6134.

20          THE COURT:  Okay.  So that will be admitted as a

21     co-conspirator statement.

22          Next exhibit?

23          MS. CALL:  Next is Exhibit 221.  This contains some

24     internal e-mails of Tyson culminating with an e-mail from Carl

25     Pepper to Defendants Roberts, Mulrenin and others.  This was

1    contained on the government's *James* log, entry 79, and it was

2    favorably ruled on.  I'll note there's some underlying e-mails

3    from others at Tyson that aren't being offered for the truth of

4    any matter asserted therein.

5         *MS. LaBRANCHE:*  Your Honor --

6         *THE COURT:*  One moment, Ms. LaBranche, if you don't

7    mind.  Let me just take a look at it.

8         *MS. LaBRANCHE:*  I was going to actually ask if the

9    Court would allow me to take a look at the government's hard

10   copy, if they are okay with that.

11        *THE COURT:*  Yeah.  Who is Mr. Lubert with?

12        *MR. GILLEN:*  I'm sorry?  I thought it was a question.

13        *THE COURT:*  The question was to Ms. Call.  I was

14   wondering who Mr. Lubert, who he is associated with.

15        *MS. CALL:*  He is associated with Tyson Foods.

16        *THE COURT:*  With Tyson, okay.

17        Objection?

18        *MR. GILLEN:*  This was on the *James* log, correct?

19        *THE COURT:*  Yes, it was.

20        *MR. GILLEN:*  We would renew our objection to the *James*

21   log and also note 403, Your Honor.

22        *THE COURT:*  Mr. Beller?

23        *MR. BELLER:*  Thank you, Your Honor.  As to any of the

24   communication from nonindicted or unindicted co-conspirators,

25   we would note that those are hearsay.  We believe that those

1    should not be admitted.  And to the extent they are, we would

2    ask for a limiting instruction as to those, again noting my

3    ongoing objection to the number of limiting instructions.

4              THE COURT:  Any other objections?

5              All right.  The objections will be overruled.  I don't

6    find a basis for any type of 403 issues here.  Those weren't

7    articulated.  I don't believe that there is a cumulative effect

8    on the limiting instructions.  I will be providing a limiting

9    instruction to the jury as to this document as to statements of

10   Ms. Knust.  I think Mr. Scheiderer, he is not identified as a

11   co-conspirator, is he?

12             MS. CALL:  No.

13             THE COURT:  Same true as to Mr. Lubert, I assume.

14             MS. CALL:  Correct, he is not.

15             THE COURT:  And --

16             MS. CALL:  He is not.  He was not identified in Your

17   Honor's *James* ruling.

18             THE COURT:  So I will indicate to the jury that the

19   statements of those three individuals cannot be considered for

20   the truth of the matters asserted by them, but rather only for

21   the effect on the listener.

22             MR. BELLER:  Your Honor, and if I may, and the

23   government can correct me, I believe the same is true for

24   Mr. Ramsey and also for Mr. Bowlin.

25             MS. CALL:  Correct.  I don't believe they were

3048

1    identified in Your Honor's *James* ruling.

2            THE COURT:  I see statements from Bowlin, that's

3    correct, but --

4            MR. BELLER:  Your Honor --

5            THE COURT:  I see it now.  Yes, that is correct.  And

6    I will give a limiting instruction mentioning those two

7    additional names.

8            MS. CALL:  I don't know if Your Honor identified Mike

9    Hannigan as well from Tyson.  He is another individual who has

10   a statement in here who was not identified in Your Honor's

11   *James* ruling.

12           THE COURT:  Right.

13           Probably have time for another one.

14           MS. CALL:  The next is Government Exhibit 234.

15           THE COURT:  All right.  And anything else, Ms. Call?

16           MS. CALL:  Very briefly, this is just an e-mail from

17   the customer.  There is essentially no assertions in this.

18   It's questions and commands.  It's following up on the e-mail

19   we reviewed earlier with the period pricing for Mr. Pepper.  So

20   I will say kind the non-hearsay purposes are both the

21   statements are not assertions, being questions and commands,

22   and then there is independent legal significance in that this

23   is essentially a contract dispute brought up by the customer

24   which is legally significant for the negotiations between these

25   two companies.

3049

1           THE COURT:  Ms. LaBranche?

2           MS. LaBRANCHE:  Yes.  It's hearsay, Your Honor.  I

3    think if you read the e-mail as a whole, what Mr. Bradley is

4    saying is that there is a charge on -- there is a QA audit

5    charge that we have not agreed to, which I think is hearsay.

6           THE COURT:  Ms. Henry?

7           MS. HENRY:  It's also a denial of our confrontation

8    rights.

9           Mr. Gillen?

10          MR. GILLEN:  Thank you, Your Honor.  Again, this is an

11   assertion.  "That was not agreed to."  The reference is to a QA

12   charge.  It can't be more of an assertion that specifically

13   states, "That was not agreed to.  Please advise."  This is

14   hearsay and we would ask the Court to exclude it.

15          THE COURT:  All right.  Ms. Call?

16          MS. CALL:  One thing I should have noted for Your

17   Honor is that as far as Carl Pepper is concerned in this and

18   the effect that this e-mail had on him, rather than reaching

19   out to the customer after receiving this e-mail, the next day

20   he called Defendant Little who then called Defendant Kantola.

21   And we think this essentially spurred additional conspiratorial

22   acts.

23          THE COURT:  Ms. LaBranche?

24          MS. LaBRANCHE:  Your Honor, my response to that would

25   be, and I think what the government just said is very telling,

1    we think that this spurred conspiratorial acts.  The government

2    has no idea what these conversations were about that occurred

3    the next day or in the following days.  And the Court has heard

4    testimony repeatedly that there are reasons for suppliers to be

5    having this conversation.

6         So again, if the government wanted to bring in

7    Mr. Pepper and have him testify and have him talk about how

8    this e-mail affected him and what steps he took next, they

9    could get over hearsay, but that's not the way they are trying

10   this case.  And therefore they should not be allowed to

11   hypothesize about what they think may have been said in order

12   to justify a hearsay exception.

13        MR. GILLEN:  In addition, Your Honor, my understanding

14   of what happened here is that Tyson put as a line item in their

15   bill to Church's this specific QA charge so that they would be

16   on notice about it.  I'm not sure anybody else did that.  And

17   as I said, down the road Tyson absorbed the QA issues.  So we

18   would again state this isn't about under the government's

19   analysis everything that is ever sent by anybody to Carl Pepper

20   would have an influence on the listener.

21        There is no indication to my knowledge that any of the

22   other suppliers had a line item added for a QA audit charge.

23   So in that respect, I think the government's arguments, they're

24   jumping at again straws that do not support their position.  We

25   would ask that the document be excluded as hearsay.

1          THE COURT:  Ms. Call, last word.  Anything else?

2          MS. CALL:  I think the indication that these

3   communications with the customer was spurring conspiratorial

4   acts is, for example, Government's Exhibit 221 we were just

5   looking at where Carl Pepper the day before this e-mail said he

6   talked to Jimmie Little and they said they were planning on

7   adding to their cost to do this.  So I think there are

8   indications of exactly what kind of things were being said

9   during this time between conspirators.

10          THE COURT:  I am going to sustain the objections.

11   This is clearly an assertion.  It's therefore hearsay.  It's

12   not just questions and commands.  Also I don't find any

13   independent legal significance to this particular exhibit.

14          And in terms of effect on the listener, that's just

15   too far afield.  It can't be connected up.  Basically effect on

16   the listener has to be something that is typically apparent on

17   the face of the document, explains something in the document.

18   At least with this one, as I said before, whatever connection

19   there may be is just too expansive of a concept with this

20   particular document, so I will exclude it.

21          All right.  So we are at just about 5:30.  So we'll

22   plan on starting up hopefully, we will keep our fingers

23   crossed, at 8:30 tomorrow.  And hopefully everyone will be back

24   and will be ready to go.

25          Mr. Feldberg?

3052

1          MR. FELDBERG:  Your Honor, may I inquire of the

2    government their order of proof for tomorrow so we can be

3    prepared?

4          THE COURT:  If Ms. Call knows that, that might be

5    helpful.

6          MS. CALL:  Yes.  Just one moment.

7          MR. BELLER:  I suppose while Ms. Call is conferring,

8    part and parcel of that is also when we are going to play the

9    cross-examination of Mr. Skalak.  And it is my preference given

10   where we ended on Wednesday that we start with that in the

11   morning.

12         THE COURT:  Yeah, I think that that would be

13   appropriate that we begin with that.

14         So do you agree, Ms. Call?

15         MS. CALL:  Yes, Your Honor.  And I can provide the

16   kind of remainder, if that would be helpful.

17         THE COURT:  Yes.  Go ahead.

18         MS. CALL:  So following that we had a number of

19   documents we did want to show the jury before the next witness.

20   It's about 30.  And that would be followed by the testimony of

21   Mr. Weeks, who is a custodian from George's.  I believe there

22   would be then I want to say 14, but I could be inaccurate,

23   documents we wanted to show after the testimony of Mr. Weeks,

24   and he will be followed by Joe Brink from Pollo Tropical.

25         THE COURT:  Okay.

1         MR. FELDBERG:  Thank you.

2         MR. BELLER:  One additional question, Your Honor, and

3    that is if I may inquire as to how the Court is going to

4    instruct the jury regarding the fact that Mr. Skalak's

5    cross-examination is done via video recording.

6         THE COURT:  I'm open to suggestion.  I would -- my

7    thought would be simply to let them know that because we were

8    short a juror today and because of his schedule, that his

9    cross-examination and the redirect was videotaped so that we

10   could play it to the jury now.  That would be by suggestion,

11   but I am open to others if people think differently.

12        MR. BELLER:  That's fine with me.  Absent hearing

13   something from the co-defendants, my co-defendants, I think

14   that's appropriate.

15        THE COURT:  Okay.  And then we'll take a break

16   whenever it's time for the break.  And then the question would

17   be, I'm not sure, do you know how documents will appear?  Will

18   they be side by side the way the videographer does it or would

19   we need to take a break, pause the video.  We could display a

20   document to the jury, go back to the video?  I'm not sure.

21        MR. BELLER:  At the risk of putting our IT

22   professional in the hot spot, I hope he doesn't mind maybe

23   coming up and addressing the Court.  Is that okay with Your

24   Honor?

25        THE COURT:  Sure.  Can you state your name for the

 1   record?  We always hear your first name.

 2          MR. FRONZAGLIA:  Brian, B-R-I-A-N,

 3   F-R-O-N-Z-A-G-L-I-A.

 4          THE COURT:  Go ahead.

 5          MR. FRONZAGLIA:  It would be just like you see

 6   normally.  It will be the video on the left side and the

 7   document on the right.  There is only one document that was

 8   allowed to be published to the jury.

 9          THE COURT:  We'll see.  If the jury is able to see the

10   document, I am a little bit worried about that.  But if they

11   seem to be having difficulty, we can always stop the videotape,

12   display the document on a separate screen, go back, but let's

13   play that by ear because you're right, there is just that one

14   document.

15          MR. BELLER:  And I am very open, and I am happy to

16   chat with Ms. Sweeney tonight about her preference for doing

17   this.  I can also bring hard copies tomorrow to hand out if we

18   absolutely have to and then collect again.  We can use the

19   document viewer.  So I am open to, you know --

20          THE COURT:  I don't want to let the jurors know that

21   there is a possibility of handing out hard copies.

22          MR. BELLER:  That's fair.  Understood.  We'll play it

23   by ear and then we'll be ready to, you know, look at different

24   options if there should be any problems, but I am not

25   anticipating any.

3055

1          THE COURT:  It may not be snowing outside, but we

2     don't want to be snowing in the jury box with lots of paper.

3          MR. BELLER:  Understood.  Thank you.

4          THE COURT:  Anything else we should take up?

5          MS. CALL:  One, I think, minor item.  I think the need

6     to hire a professional videographer was perhaps the first

7     experience for some of us.  We wanted to inquire because we

8     weren't quite sure the parties should bear that cost, in which

9     case the government will certainly confer with the defense and

10    split it, or if it's something the Court anticipated covering.

11         THE COURT:  And by anticipated, I can guarantee you I

12    have no power to obligate the Federal Government to spending

13    money.  It won't be for that purpose, so...

14         MS. CALL:  Likewise.

15         THE COURT:  Hopefully that answers your question.

16         MS. CALL:  All right.  Thank you.

17         MR. McLOUGHLIN:  Your Honor, on behalf of Mr. Lovette,

18    I think the United States Government has a far larger budget

19    than we do.  It was their witness.  The issues here were of no

20    fault of the defendants and we would object to anyone other

21    than the Justice Department writing that check.

22         THE COURT:  Well, use guys can work that out, okay?

23         Anything else?  We will be in recess until tomorrow.

24    Thank you very much.

25              (Recess at 5:35 p.m.)

1                                    INDEX

2    WITNESSES

3        Meyer Skalak

4            Cross-Examination Continued By Mr. Beller        2931

5            Cross-examination By Mr. McLoughlin              3003

6            Cross-examination By Ms. Johnson                 3009

7            Redirect Examination By Ms. Sweeney              3010

8                        REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.   Dated

11   at Denver, Colorado, this 27th day of November, 2022.

12

13                                S/Janet M. Coppock

14

15

16

17

18

19

20

21

22

23

24

25