1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12        Defendants

13   _____

REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 15

15   _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:32 a.m., on the 16th day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                           APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3  Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4  Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5  for Plaintiff.
 6           Anna Tryon Pletcher and Michael Tubach of
 7  O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8  San Francisco, CA 94111-3823;
 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10  N.W., Washington, DC 20006, appearing for Defendant Penn.
11           David Beller, Richard Kornfeld and Kelly Page of
12  Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13  CO 80202, appearing for Defendant Fries.
14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15  LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17  Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18  appearing for Defendant Brady.
19           Michael Felberg of Reichman, Jorgensen, Lehman,
20  Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21  10017;
22
23
24
25
```

1                    APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4  CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9  80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1              APPEARANCES (Continued)
 2         Craig Allen Gillen and Anthony Charles Lake of
 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4   Atlanta, GA 30339;
 5         Richard L. Tegtmeier of Sherman & Howard, LLC,
 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7   for Defendant Roberts.
 8         Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10   DC 20006;
11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13   for the Defendant Blake.
14
15                    PROCEEDINGS
16         THE COURT:  The finger crossing may have worked.  It
17   looks like we are ready to go.
18         Anything briefly before we bring the jury back in?
19         MS. SWEENEY:  Yes, Your Honor.  I think Mr. Beller was
20   standing up for the same reason.  In reviewing the recording of
21   the cross-examination and redirect of Mr. Skalak yesterday,
22   Mr. Fronzaglia discovered that the microphone that was on
23   government's table picked up some of the two times the
24   government asked to confer with counsel at table.  So those
25   privileged communications were recorded in the large recording.
```

1        Mr. Fronzaglia did edit, make those conversations

2    silent in the version we will play to the jury today.  The

3    government has reviewed both the original and the unedited

4    version and they do not contain the privileged conversations.

5    We just wanted to make Your Honor aware.

6        Mr. Beller made us aware of this last night, and he

7    reported that he had not heard any of the privileged

8    communications.  He asked Mr. Fronzaglia not to share with any

9    of the defense counsel those communications, so the government

10   is not concerned that the defendants have heard any of the

11   privileged communications.  The only thing the government would

12   and is if Your Honor would advise Mr. Fronzaglia to not further

13   disclose in conversation any of the privileged communications

14   that he may have heard.

15        THE COURT:  Right.  And I am assuming that -- he is

16   nodding his head that he agrees with that.  It was appropriate

17   obviously to -- it sounds like he notified Mr. Beller and

18   Mr. Beller has taken the appropriate steps, so it sounds like

19   the appropriate steps were taken to protect the privilege, so

20   that's great.

21        Mr. Beller, anything else?

22        MR. BELLER:  Thank you, Your Honor.

23        The only thing I would add is that we had discussed on

24   the record yesterday that both the defense and the government

25   would receive copies of both the edited and unedited in order

1    to be able to confirm Mr. Fronzaglia's accuracy in editing out

2    the side bar conversations.  Given this disclosure or given

3    Mr. Fronzaglia's discovery, the defense is not going to be

4    reviewing the original for purposes of checking the accuracy.

5           The government has been provided both recordings and

6    the defense group trusts that Mr. Fronzaglia has edited those

7    appropriately, and we are deferring to the government for the

8    same purposes.  So we do not have access to that nor will we

9    gain access to that, and we are simply trusting it's edited

10   properly.

11         THE COURT:  However, will defense counsel be given a

12   version that's unedited except to eliminate the communications

13   that took place at the government table when they were

14   conferring?

15         MR. BELLER:  To the extent any defendant wishes that

16   to be the case and that's sufficient with the Court, the answer

17   is yes.

18         THE COURT:  It doesn't matter to me.  I was just

19   curious about that one nuance, but okay, great.

20         MR. BELLER:  Thank you.

21         THE COURT:  I will bring the jury in.  We will explain

22   that we're going to play the cross-examination and redirect of

23   Mr. Skalak.  And then once that is done, we'll see -- I can't

24   remember how long that will last, but we will take the break as

25   needed and then we will just proceed with the live witnesses

1     after that.

2             All right.  Let's go ahead and bring the jury back in.

3     And have we tested the video?  Will it play and all those good

4     things?

5             MR. BELLER:  Your Honor, it has been tested.  It's two

6     hours and 11 minutes.  My understanding is there is external

7     speakers to allow everyone to be able to hear the audio.

8             THE COURT:  Great.

9             (Jury present.)

10            THE COURT:  Good morning, ladies and gentlemen.  And

11    in particular, good morning, Mr. Reynolds.  You are a trooper

12    and I really appreciate you being here today.  Let us know if

13    there is -- for some reason you need to take a more frequent

14    break or something like that.  Just raise your hand and let us

15    know.

16            Ladies and gentlemen, we are going to do something a

17    little bit different.  And that is because of Mr. Skalak's

18    schedule, we videotaped the cross-examination and the redirect

19    of him yesterday afternoon, and we're going to play that for

20    you now.  So if you could situation your monitors accordingly

21    so you can see, we'll go ahead and begin with that.

22            All right.  Let's stop it for just a second.

23            Ladies and gentlemen, you should consider this

24    testimony as if it took place live in front of you, all right?

25            All right.  We can go ahead and play that.

 1              (Videotape was played.)

 2              THE COURT:  We are going to go ahead and stop it,

 3    ladies and gentlemen, so we can take our mid-morning break.

 4    Why don't we plan on reconvening 25 minutes to 11:00, all

 5    right?

 6              The jury is excused.

 7              (Jury excused.)

 8              We will be in recess.  Thank you.

 9         (Recess at 10:16 a.m.)

10         (Reconvened at 10:37 a.m.)

11              THE COURT:  Ms. Grimm, let's go ahead and get the

12    jury.

13              (Jury present.)

14              THE COURT:  Ladies and gentlemen, we will go ahead and

15    resume, then, with the playing of the cross-examination.

16              (Videotape was played.)

17              THE COURT:  All right, ladies and gentlemen.  That

18    concludes the testimony of Mr. Skalak.  And now the United

19    States may call its next witness.

20              MS. CALL:  Your Honor, may we have a very brief side

21    bar?

22              THE COURT:  You may.

23         (At the bench:)

24              MS. CALL:  Your Honor, as I indicated yesterday, we

25    have several documents we would like to introduce at this time.

1    For an efficient presentation of evidence, I think we have

2    whittled down the number to publish to the jury to about 10

3    from the 30 that we are going to seek to admit.  And for the

4    others, we'll seek for the jury to review them in the summary

5    form later in trial in summary that were subject to your

6    previous rulings in Docket 741 and 781.

7            However, this does raise the question of how to

8    provide limiting instructions for exhibits that we may not

9    publish at this time.  Just briefly thinking it through, I

10   think I have several options.  One is we could just publish any

11   exhibits now that do contain the limiting instructions.

12   Another would be for the government to list the exhibits with

13   the limiting instructions on the summary charts, any of those

14   that would be contained within.  And another would be to

15   list --

16           THE COURT:  I think for any exhibit for which there is

17   a limiting instruction the exhibit needs to be displayed to the

18   jury so that the jury can understand what the exhibit is about

19   and what the limiting instruction pertains to.  It would be

20   virtually impossible for the jury to remember it or even if it

21   were in a summary exhibit, I am not sure how you could pull

22   that off.  I think it would be -- the effect of the limiting

23   instruction would probably be greatly diminished without the

24   ability of the jury to review the exhibit itself.

25           MS. PREWITT:  This is Elizabeth Prewitt for

1    Mr. Mulrenin.  May I be heard?

2         *THE COURT:*  Yes.

3         *MS. PREWITT:*  I am going to raise the objection that's

4    already been raised in the context of this case where the

5    government is sprinkling evidence not through a sponsoring

6    witness, but stopping and starting essentially a slide show

7    without defendants having an opportunity to confront a witness

8    on the actual context, the meaning of those documents, so I

9    just would like to raise that objection.

10        I would think that the government has these exhibits.

11   They are ready to display.  They should display them now as

12   opposed to just putting some out there now for the impact and

13   then saving others later for the incremental impact without our

14   ability to cross-examine.

15        *THE COURT:*  Okay.  That objection will be overruled.

16   The government, first of all, has the ability to introduce some

17   documents, assuming they are otherwise admissible, without a

18   witness.  And the fact that the government is choosing perhaps

19   for strategic purposes to introduce some of them at various

20   times is not inappropriate and perhaps makes some sense in

21   terms of not boring the jury, so it's appropriate that they can

22   choose at various times to do that.

23        *MR. BELLER:*  Your Honor, this is David Beller speaking

24   for Mr. Fries.  And I am sorry, I am going back here and I am

25   reading the real-time transcript.  Is the government proposing

1    at this point they are going to be publishing evidence that has

2    already been gone through and they are going to be presenting

3    it to the jury or instead are what they are talking about is

4    the presentation of summary exhibits at this point that have

5    not yet been provided to the Court and authorized by the Court?

6    Because obviously the latter would require a great deal more

7    discussion.

8              THE COURT:  I will let Ms. Call explain that in

9    greater detail.

10             MS. CALL:  It is the former.

11             MR. BELLER:  Understood.  I have no further response

12   to that, Your Honor.

13             There are two additional issues, but I don't want to

14   jump ahead until we are done discussing this one.

15             THE COURT:  Okay.  Anything else on this topic,

16   Ms. Call?

17             MS. CALL:  No, Your Honor.

18             THE COURT:  Okay.  Mr. Beller?

19             MR. BELLER:  Thank you, Your Honor.

20             There are two brief matters.  No. 1 is if the Court

21   can provide us some direction, we can do this on a break if

22   necessary as to how to properly label the flash drive and

23   preserve it in the Court's file for whatever reason, so that is

24   No. 1.

25             And No. 2, Your Honor, a bit more sensitive, and that

1   is Mr. Perez is wearing an ear bud.  I don't know if he has

2   also been wearing ear buds in other hearings that we have had,

3   but it is something that we are noticing.  Obviously, we don't

4   know if this may potentially be a hearing aid that he needs or

5   if instead it's an ear bud, some type of a blue tooth device.

6         I simply point it out to the Court now.  I don't know

7   if there is a very discrete way in which we can handle that,

8   such as Ms. Grimm possibly ask him about this particular issue,

9   but obviously we do have some concerns if, in fact, he is

10  wearing an ear bud and listening to anything other than the

11  actual evidence being admitted in this case.

12        THE COURT:  I agree with you on that.  I can't see

13  anything in his --

14        MS. PREWITT:  Your Honor, I see it's visible from

15  my --

16        THE COURT:  It's not from mine, so it must be only in

17  his left ear.  I can see his right ear and I can't see anything

18  in that.  I will instruct Ms. Grimm to go up and talk to him

19  right now.

20        Anything else, Mr. Beller?

21        MR. BELLER:  No, thank you, Your Honor.

22        THE COURT:  Okay.  I think what we'll do so we have

23  this -- have Ms. Grimm's visit take place in the context of

24  white noise is we'll -- I'll try and send her a message right

25  now.

1              MR. TUBACH:  Your Honor, this is Michael Tubach.  To

2     perhaps do this in a way that won't embarrass Mr. Perez, we

3     could do this outside the presence of the other jurors so he

4     doesn't feel like he is on the spot immediately.

5              THE COURT:  Well, I think we need to address it now.

6     The only way that we could possibly do that without -- I think

7     Ms. Grimm was listening in on the --

8              MR. TUBACH:  It's already been done, Your Honor.

9              THE COURT:  All right.  Problem taken care of.  But I

10    appreciate your bringing that to my attention.

11             Anything else that we should talk about?  Okay.  Thank

12    you.

13       (In open court:)

14        MS. CALL:  The government has several exhibits to

15    offer into evidence at this time.  The first is Exhibit 9714

16    and it's attachment 9715.  I believe there was a limiting

17    instruction here, Your Honor.

18             THE COURT:  What day did we talk about that one?  9714

19    and 9715?

20             MS. CALL:  Yes, Your Honor.

21             THE COURT:  Yes.  Ladies and gentlemen, by previous

22    ruling both of those have been admitted.

23             MS. CALL:  Permission to publish 9714?

24             THE COURT:  You may.

25             MS. CALL:  If my colleague could zoom in on the

 1    e-mail, please.  It may be easier to read if we just zoom in on

 2    the contents.

 3         THE COURT:  All right.  Everyone good on that?

 4         MR. BELLER:  If I may, I believe there is a limiting

 5    instruction on this.

 6         THE COURT:  I don't believe that there is, no.

 7         MR. BELLER:  Excuse me.  Thank you.

 8         MS. CALL:  Your Honor, I do have in my notes that

 9    there may have been one.

10         THE COURT:  Okay.  Then can you zoom out of it,

11    please?  Let's do a side bar real quick.

12       (At the bench:)

13         THE COURT:  Was this -- was the limiting instruction

14    that you believe applies to this one because it wasn't on the

15    James log it can only be admitted as to Mr. Mulrenin?

16         MS. CALL:  Yes, Your Honor.  Attempting to check the

17    transcript now to confirm.

18         THE COURT:  Mr. Beller, is that what you believe?

19         MR. BELLER:  That is also in my notes.

20         MS. PREWITT:  That's what I remember.  Your Honor, one

21    small point.  We did have a discussion earlier about the

22    government zooming in on particular parts.  I think, you know,

23    the jurors have monitors right in front of them.  The document

24    is appearing to them as if it would be almost a printed

25    document, so I feel like that is just inappropriate and not

1    consistent with how we understood these were to be displayed to

2    the jury.

3         THE COURT:  Yeah, I am going to overrule that

4    objection.  Some of the jurors, in particular Mr. Kahler and

5    Mr. Perez, have to look over to the other monitor.  Mr. Kahler

6    in the past is appreciative to having things enlarged.  So in

7    order for the jurors to be able to see the exhibits, it's not

8    inappropriate for the government to, or any party, to blow

9    things up and then look at different sections of pages

10   sequentially.

11      (In open court:)

12         Ladies and gentlemen, there is a limiting instruction,

13   and namely that this exhibit, Exhibit 9714, can only be

14   considered as against Mr. Mulrenin, all right, for

15   Mr. Mulrenin.

16         MS. CALL:  I believe we have shown the entire contents

17   of the e-mail.  If we can now show the attachment, 9715.

18         THE COURT:  You may.

19         MS. CALL:  If you can zoom in on the top half first.

20         THE COURT:  Everyone good?

21         Let's go to the next section.

22         All right.  Anything more on that one?  Okay.  We're

23   good.

24         MS. CALL:  The next exhibit is Government Exhibit 355.

25         THE COURT:  What day did we talk about that?

1          *MS. CALL:*  I believe this was --

2          *THE COURT:*  I see that one.  Ladies and gentlemen, by

3     prior ruling, 355 has been admitted.

4          *MS. CALL:*  Permission to publish?

5          *THE COURT:*  You may.

6          *MS. CALL:*  If you could zoom in on the content there.

7     Thank you.

8          *THE COURT:*  All right.  The next is Government's

9     Exhibit 920.  And we are offering this at this time, but we are

10    not seeking to publish it.

11         By previous ruling, ladies and gentlemen, Exhibit 920

12    has been admitted.

13         Go ahead.

14         *MS. CALL:*  The next is Government Exhibit 982.

15         *THE COURT:*  And by previous ruling, ladies and

16    gentlemen, Exhibit 982 has been admitted.

17         *MS. CALL:*  Permission to publish?

18         *THE COURT:*  You may.

19         Everyone good on that one?

20         Okay.  Next exhibit?

21         *MS. CALL:*  Moving on, the next is Government's

22    Exhibit 1615.

23         Your Honor, this was discussed on the 12th.

24         *THE COURT:*  Yes, I see that.  By previous ruling,

25    ladies and gentlemen, Exhibit 1615 has been admitted.

1          *MS. CALL:*  Permission to publish?

2          *THE COURT:*  You may.

3          Everyone good?

4          All right.  Next?

5          *MS. CALL:*  Next is Government's Exhibit 1700.

6          *THE COURT:*  So ladies and gentlemen, as to this

7     exhibit, it is admitted, but as to the top e-mail in 1700, that

8     exhibit is only admitted as to -- as against Mr. Brady.

9          *MS. CALL:*  Permission to publish?

10         *THE COURT:*  You may.

11         Everyone good on this one?

12         Okay.  Next?

13         *MS. CALL:*  The next exhibit the government offers is

14    Exhibit 1713.  We will seek to publish this as well.

15         *THE COURT:*  Ladies and gentlemen, as to Exhibit 1713,

16    it is admitted.  However, Mr. Ledford's statements in the lower

17    part of this exhibit are not admitted for the truth of the

18    matters Mr. Ledford asserts, but rather only for the effect on

19    the listener.  Mr. Austin's statement in the middle can only be

20    considered as against Mr. Austin.

21         *MS. CALL:*  Permission to publish?

22         *THE COURT:*  You may.

23         All right.  Everyone good?

24         All right.  Next?

25         *MS. CALL:*  I believe there is a top portion of this

1    e-mail as well.

2              *THE COURT:*  Oh, okay.  Yes.

3              Everyone good on that?

4              All right.  Next?

5              *MS. CALL:*  The government next offers Exhibit 1734.

6              *THE COURT:*  By previous ruling, ladies and gentlemen,

7    Exhibit 1734 has been admitted.

8              *MS. CALL:*  Permission to publish?

9              *THE COURT:*  You may.  Everyone good?

10             All right.  Next?

11             *MS. CALL:*  Next offer and we are not seeking to

12   publish at this time is Exhibit 1822.

13             *THE COURT:*  By previous ruling, ladies and gentlemen,

14   that has been admitted.

15             *MS. CALL:*  The next five are a group of text messages,

16   so I would offer them each at once, if I can name off their

17   exhibit numbers.

18             *THE COURT:*  Hold on one second.  Okay.  Go ahead.

19             *MS. CALL:*  6235.

20             *THE COURT:*  And that has been admitted.

21             How were you going to display that or were you going

22   to display that?

23             *MS. CALL:*  If it makes sense to Your Honor, if we name

24   all five and confirm they are admitted, then we can just

25   display them one by one since they are somewhat short.

1              THE COURT:  Go ahead.

2              MS. CALL:  The next and a bit back in exhibit

3    numbering is 1846 sequentially through 1849.

4              THE COURT:  Yes.  And ladies and gentlemen, each of

5    those has been admitted and may be displayed.

6              MS. CALL:  Start with 6235, please.

7              We can now publish 1846.

8              THE COURT:  All right.  Next?

9              MS. CALL:  Can we please publish 1847?

10             THE COURT:  All right.  Next?

11             MS. CALL:  1848.

12             THE COURT:  All right.

13             MS. CALL:  And now 1849.

14             THE COURT:  All right.

15             MS. CALL:  The government now offers and does not seek

16   to publish at this time 1850.

17             THE COURT:  By previous ruling, ladies and gentlemen,

18   that has been admitted, 1850.

19             Next?

20             MS. CALL:  Then the next there is several text

21   messages we are seeking to offer but not publish at this time,

22   1851 sequentially through 1854.

23             THE COURT:  And by previous ruling, ladies and

24   gentlemen, those have been admitted.

25             MS. CALL:  Next is Government's Exhibit 1855.

1          THE COURT:  By previous ruling, ladies and gentlemen,

2     1855 has been admitted.

3          MS. CALL:  Permission to publish?

4          THE COURT:  You may.

5          MR. TUBACH:  Could we have a side bar, Your Honor?

6          THE COURT:  Yes.

7     (At the bench:)

8          THE COURT:  Go ahead, Mr. Tubach.

9          MR. TUBACH:  Your Honor, we object to publishing of

10    1855 and 1856 together.  If the government was intending to

11    publish 1856, the only purpose in doing so now or the only

12    purpose in doing so is to draw an inference that Mr. Penn was

13    somehow involved in Mr. Stiller's text on 1856 from which there

14    is zero factual support.  And that would be misleading and

15    prejudicial to Mr. Penn under 403, and there is no factual

16    basis for making that inference.  And the government has

17    attempted to draw this inference repeatedly without a factual

18    basis.

19         THE COURT:  Response, Ms. Call?  Did the government

20    then next intend to display 1856?

21         MS. CALL:  Yes, Your Honor.  That is the next document

22    sequential and contextual in terms of time order.  And I

23    believe we already did discuss this on the record when we first

24    discussed the admissibility of these documents.  I think the

25    jury can read the phone numbers and see the difference in

1     participants.  And I believe it is probative and relevant the

2     fact that this text message with Defendant Penn occurred near

3     in time to the next text message and shows his involvement at

4     least in these negotiations as well which is extremely

5     relevant.

6               *MR. TUBACH:*  I think the government is not going to be

7     able to look at these telephone numbers and tell who is who.

8     The natural inference is that Mr. Penn was on this text string

9     in some way and directed Mr. Stiller to make the statement

10    "Need you tell the industry we are going to hold," and the

11    government has no good faith basis to make that inference.

12              *MS. CALL:*  Mr. Penn's name is on Exhibit 1855 and it's

13    not on Exhibit 1856.

14              *MR. TUBACH:*  It's entirely misleading, Your Honor, and

15    should not be allowed.  I am not objecting to the admissibility

16    of 1855.  That's been ruled on.  But what I am objecting to is

17    the government trying to draw an inference between 1855 and

18    1856 for which it has no factual basis.

19              *THE COURT:*  Ms. Call, as I recall when we talked about

20    this, I think it was on Friday.  This is somewhat of a -- this

21    is an unnatural flow of the e-mail chain that otherwise

22    constitutes 18 -- I am not sure the rest of these exhibits that

23    were admitted at this time, perhaps 1858 and 1855; is that

24    correct?

25              *MS. CALL:*  Yes, Your Honor.  So they are text

1    messages, but they were produced each as one document.  And

2    this is the order in time that they appear in.  And if you also

3    see the Bates numbers, they were produced that way in that

4    order as well.

5         THE COURT:  Okay.  Yeah, I am going to sustain the

6    objection.  I think that if we're putting these in displaying

7    them one after another but they don't have a natural

8    relationship to one another except for the fact that there may

9    be a time stamp correspondence, it could create an inference

10   that they are related in some other way than time, which for

11   1856 is really not any relationship at all.  So I am going to

12   sustain that.  The government can display the exhibit -- can

13   display 1856, but not right after 1855.

14        MS. CALL:  Your Honor, I will note I wasn't planning

15   to publish 1858 and 1862, so it was not going to in the first

16   place appear it was part of that conversation, but if you would

17   prefer I can publish that conversation followed by 1856.

18        THE COURT:  What I am saying is the government should

19   publish some other exhibit, then come back to 1856.

20        MR. TUBACH:  Your Honor, 1858 isn't going to do the

21   trick because it's the same text.  It's basically saying he was

22   part of a conversation he wasn't a part of.  The government

23   should move on to an entirely new set of exhibits.  And if they

24   want to come back to it, that's fine, but the jury should not

25   be given the opportunity to draw inferences Mr. Penn was part

1    of a conversation with Mr. Austin and Mr. Stiller that he was

2    not a part of.

3         *MS. CALL:*  1856 was actually the last we were seeking

4    to publish today or at this time, if Your Honor would prefer, I

5    can publish one more just to not create that inference.

6         *THE COURT:*  Why don't you publish one more.

7         *MS. CALL:*  I will raise it just so counsel are aware.

8    The only one I would publish would be 1864.  And I take it the

9    same objection may apply to publishing that in this order as

10    well.

11         *MR. TUBACH:*  Yes, Your Honor.  I think we can stop

12    publishing documents and she can come back to it later if she

13    doesn't have another one that's not related to this.

14         *THE COURT:*  Because I think you were going to put some

15    more documents in with another -- or not with another witness,

16    but after another witness; is that right?

17         *MS. CALL:*  Yes, Your Honor.  But I think there is an

18    issue here as to prejudice to the government's case and the

19    jury's understanding of the evidence that all of these

20    documents relate to one subject matter which is the

21    negotiations for KFC during this year.  And to present them in

22    piecemeal fashion just to make it appear that certain

23    defendants weren't involved in those negotiations is itself

24    misleading.  And I think the government should be able to

25    present what was going on in this time frame, you know, around

1    the same time as the other documents in the same time frame

2    with the same negotiations with the same customer.

3              THE COURT:  Generally, I agree.  It's just that the

4    only thing being requested is to not publish 1855 and 1856

5    sequentially because of the lack of relationship between them.

6    That's it.  So that's not much of a limitation on the

7    government's order of presentation of evidence.

8              MR. TUBACH:  Thank you, Your Honor.

9              THE COURT:  All right.  Thank you.

10             (In open court:)

11             THE COURT:  1855 is being displayed now?

12             MS. CALL:  Yes, Your Honor.

13             THE COURT:  All right.

14             MS. CALL:  Your Honor, we will now offer five

15   additional documents, but will not seek to publish any at this

16   time.

17             THE COURT:  Go ahead.

18             MS. CALL:  First is 1856.

19             THE COURT:  By previous ruling, ladies and gentlemen,

20   1856 has been admitted.

21             MS. CALL:  Next is 1858.

22             THE COURT:  And by previous ruling 1858 has been

23   admitted.

24             MS. CALL:  1862.

25             THE COURT:  Same thing for 1862.  That has been

 1    admitted.

 2           *MS. CALL:*  1894.  And let me know if I need to slow

 3    down.

 4           *THE COURT:*  By previous ruling 1894 has been admitted.

 5           *MS. CALL:*  And last is 1864.

 6           *THE COURT:*  And by previous ruling 1864 has been

 7    admitted.

 8           *MS. CALL:*  Your Honor, the government's next witness

 9    is ready now.  I realize it is --

10           *THE COURT:*  Yeah, I think it's close enough that we

11    will go ahead and break for lunch now.

12           *MS. CALL:*  But I do want to note he does have a flight

13    at 4:00 p.m. this afternoon and we were wondering if we could

14    perhaps do a shorter lunch break.  He is a custodial witness,

15    so we don't think he will take long, but we did want to raise

16    that so if we could start again earlier than usual.

17           *THE COURT:*  You think he may, however, last two and a

18    half hours?  Oh, he has a flight at 4:00, so he needs to leave

19    here obviously a lot earlier than that.

20           Well, ladies and gentlemen -- how long do you think

21    the direct will take?

22           *MS. CALL:*  10 minutes.  I believe he is testifying

23    regarding two documents.

24           *THE COURT:*  Two documents?  Okay.  Ladies and

25    gentlemen, would you be willing to start the witness now or

Gary Weeks - Direct

1    it's up to you.

2         Let's call the witness now.  Does that work for

3    everybody?  Let's call the witness now and see whether we can

4    maybe even finish the witness up.

5         MS. CALL:  Thank you, Your Honor.  We appreciate it

6    from everyone.  My colleague, Ms. Butte, will take this

7    witness.

8         MS. BUTTE:  Thank you, Your Honor.  The government

9    calls Gary Weeks.

10       (**Gary Weeks** was sworn.)

11        THE WITNESS:  I do.

12        COURT DEPUTY CLERK:  Please state your name and spell

13   your first and last name for the record.

14        THE WITNESS:  Yes.  I am Gary Weeks, G-A-R-Y,

15   W-E-E-K-S.

16                    **DIRECT EXAMINATION**

17   BY MS. BUTTE:

18   Q.  Good morning, Mr. Weeks.

19        Do you represent George's, Inc.?

20   A.  I do.

21   Q.  Have you represented George's with respect to collecting

22   documents?

23   A.  I have.

24   Q.  And what did you do with respect to collecting documents

25   for George's generally?

Gary Weeks - Direct

1          MR. POLLACK:  I am going to object on relevance

2     grounds.

3          THE COURT:  Overruled.

4     A.  Well, my recollection is that I only had one occasion in

5     which I actually collected documents.

6     BY MS. BUTTE:

7     Q.  Could you describe that occasion?

8     A.  I was at the George's headquarters, and I went by Ric

9     Blake's office and collected some documents.

10    Q.  When did you collect documents from Mr. Blake?

11    A.  Sometime on or about the time that he was set to retire.

12    Q.  Do you recall that time frame?

13    A.  My recollection is that it was in September of 2018.

14    Q.  Do you recall what the documents looked like?

15    A.  I'm sorry?

16    Q.  Do you recall what the documents looked like that you

17    collected for Mr. Blake?

18    A.  Were what?

19    Q.  What the documents looked like.

20    A.  Yes, I do.

21    Q.  And what did they look like?

22    A.  Well, it consisted of two plain folders.

23    Q.  Did the folders have any writing or anything on them?

24    A.  Each folder had handwriting on the outside.

25    Q.  And without revealing the substance of any potentially

Gary Weeks - Direct

1   privileged communications, at the time you collected the

2   documents from Mr. Blake, did you have any reason to believe

3   that the documents Mr. Blake handed to you were not his

4   documents?

5   A.   I didn't have any reason to believe that those were not his

6   documents.

7   Q.   At the time that you collected the documents, did you have

8   any reason to believe that the documents Mr. Blake handed to

9   you belonged to someone else?

10   A.   At that time I didn't have any reason to believe that they

11   belonged to someone else.

12   Q.   What did you do with the documents after Mr. Blake gave

13   them to you?

14   A.   I took them to my office.

15   Q.   And what did you do with them next?

16   A.   I placed them in a cabinet.

17   Q.   And did you do anything with them after you placed them in

18   a cabinet?

19   A.   At some point in time in the future, we provided those

20   to -- to another law firm.

21   Q.   Before you provided them to another law firm, did you

22   change or alter the documents in any way?

23   A.   No.

24   Q.   Do you know if those documents were subsequently produced?

25   A.   I have reason to believe they were.

Gary Weeks - Direct

1   Q.   Okay.

2        MS. BUTTE:   Your Honor, if I may through Ms. Grimm, I

3   would like to hand the witness Government's Exhibit 6086 and

4   6087.

5        THE COURT:   All right.

6   A.   Okay.

7   BY MS. BUTTE:

8   Q.   And have you reviewed the documents that are marked as

9   Government Exhibit 6086 and 6087?

10  A.   I have.

11  Q.   When did you review them?

12  A.   I just reviewed them.

13  Q.   Was there ever a time before that you reviewed these

14  documents?

15  A.   Yes.

16  Q.   And when was that?

17  A.   Sometime within the last week.

18  Q.   And how did you review them?

19  A.   I reviewed them electronically.

20  Q.   Did you compare Exhibits 6086 and 6087 to the documents

21  that you collected from Mr. Blake?

22  A.   I did.

23  Q.   And just to confirm, were those documents handed to you by

24  Mr. Blake?

25  A.   These appear to be the files that he handed to me, yes.

Gary Weeks - Direct

1   Q.  Are Exhibits 6086 and 6087 true and accurate copies of the

2   documents that were handed to you by Mr. Blake?

3   A.  They appear to be.

4          MS. BUTTE:  May I have a minute to confer, Your Honor?

5          THE COURT:  You may.

6   BY MS. BUTTE:

7   Q.  And Mr. Weeks, can you just let me know what you did to

8   confirm that these appear to be the same documents that were

9   handed to you by Mr. Blake?

10  A.  Well, I mean, I compared -- I compared them to the ones

11  that I received from him.

12         MS. BUTTE:  Okay.  I have no further questions, Your

13  Honor.

14         Your Honor, I would like to offer Government

15  Exhibit 6086 into evidence.

16         MR. POLLACK:  Objection, Your Honor.

17         THE COURT:  Go ahead, Mr. Pollack.

18         MR. POLLACK:  Your Honor, may we have a side bar?

19         THE COURT:  Yes.

20     (At the bench:)

21         THE COURT:  Go ahead, Mr. Pollack.

22         MR. POLLACK:  Yes, Your Honor.  What 6086 and 6087 are

23  are photocopies of two manila folders that have a variety of

24  documents inside.  The documents inside are hard copy printouts

25  of various documents.  Some of those documents have at least

Gary Weeks - Direct

1    from the photocopies appear to have post-it notes on the hard

2    copies and handwritten notations on the post-it notes.  There

3    are also handwritten notations on the outside of the manila

4    folder and then also some handwritten notations on documents

5    directly onto the hard copies that were printed out in the

6    files.

7              We have not heard any testimony about any discussion

8    that Mr. Weeks had with Mr. Blake, in other words, what it was

9    that Mr. Blake was asked to provide, whether he was asked to

10   provide his own files, asked to provide sales files.  We don't

11   even know if Mr. Blake maintained files that everything in them

12   is his own work product or his own handwriting.  Mr. Weeks has

13   not been asked if he could identify Mr. Blake's handwriting.

14             The documents themselves are hearsay, do not meet the

15   business records exception.  And as a general rule simply the

16   fact that a document was in the possession of a particular

17   person is not sufficient to authenticate that the documents

18   belong to that person, much less the handwriting on those

19   documents is the handwriting of the defendant, so therefore

20   they would not qualify as admissions of Mr. Blake.

21             I point the Court to an opinion written by Judge

22   Krieger of this Court in a case called *United States v. Kalu*,

23   K-A-L-U.  And it was Docket No. 12-CR-106 in a June 13th

24   opinion that can be found at docket entry 229.  Judge Krieger

25   says, and I quote, "The mere fact that a document such as

Gary Weeks - Direct

1   Exhibit 3209 was in Mr. Kalu's possession does not suffice to

2   demonstrate that the document is what it purports to be."

3            The Court went on to say that the document's relevance

4   was interrelated to "the strength of the evidence supporting

5   authentication and the degree to which the use being made of it

6   comports with the hearsay rule."  Thus, for example, if the

7   relevance of the document is "to prove the truth of the matters

8   contained in the exhibit, it would be appropriate to require

9   that the Government's showing of authenticity include some

10  verification of Mr. Kalu's signature on it."

11           Before the Court can use the handwriting in this

12  exhibit as a party admission of Mr. Blake, it must meet the

13  requirements of 901(b)(2) to authenticate the handwriting

14  through a witness who has obtained familiarity with Mr. Blake's

15  handwriting outside the context of litigation.

16           And indeed the case for admission here is weaker than

17  it was in *Kalu* because in *Kalu* the document was a -- or

18  purported to be a promissory note signed by Mr. Kalu with a

19  signature line and Mr. Kalu's signature, whereas here there is

20  nothing that on the face of the document associates the

21  handwriting with Mr. Blake or purports to be his signature, so

22  Your Honor, I would object on that basis.

23           And, Your Honor, I would also point the Court to a

24  10th Circuit case, *Reyes*, R-E-Y-E-S, 798 F.2d 380, and that's a

25  1986 case.  In that case, like in *Kalu*, documents were seized

Gary Weeks - Direct

1   from the defendant's home pursuant to a search warrant as

2   opposed to an office that's shared where a number of employees

3   have access.   In *Reyes* the 10th Circuit found it had not been

4   an abuse of discretion to allow a document into evidence, but

5   in that case it was a drug conspiracy and there were notations

6   on the document about the number of ounces.   And so in that

7   case the notations as the Court found clearly identified that

8   they were written by a co-conspirator.

9          In this case, the first of the files contains e-mails

10  to Mr. Blake, but also contains e-mails to Mr. Coan, who is not

11  alleged to be a co-conspirator.   And in the second file there

12  are no documents --

13         *THE COURT:*   That hasn't been offered yet, so why don't

14  we hold off on that, assuming that by the second file you mean

15  6087.

16         *MR. POLLACK:*   That's correct, Your Honor.

17         I raised it only because there are a lot of common

18  issues between the two files, but I would note here what is

19  contained within the files is period pricing, which as

20  Mr. Ledford testified, he was not concerned about that fact

21  because, one, he believed that it was possible that suppliers

22  did know each other's period pricing; and two, that that did

23  not concern him because it did not affect the competitiveness

24  of the RFP process.   So there is nothing in the files that on

25  its face demonstrates that anybody who maintained the files or

Gary Weeks - Direct

1    authored any portion of it was a co-conspirator as opposed to

2    in the drug case on the face of the document notations about

3    the number of ounces being sold.

4         THE COURT:  Ms. Butte, response?

5         MS. BUTTE:  Yes, Your Honor.  I believe Mr. Weeks

6    testified that Mr. Blake handed him the documents.  My

7    understanding is actually George's is claiming privilege on any

8    actual communications between Mr. Weeks and Mr. Blake because

9    Mr. Weeks did collect these documents in response to the civil

10   matter, which was what we are trying to avoid mentioning.

11        And in addition, I think there is indicia particularly

12   in document 6086 that this file does belong to Mr. Blake.

13   There are e-mail printouts with his name at the top indicating

14   that they came from his files which we believe is sufficient

15   indicia to reflect that these are Mr. Blake's files and his

16   documents.

17        MR. POLLACK:  Your Honor, if I might on that, that

18   does not indicate that the handwritten notations are

19   Mr. Blake's.  The handwritten notations were clearly added

20   after the hard copies were printed out.

21        THE COURT:  Ms. Butte, as to this particular exhibit,

22   I don't see any e-mails specifically -- I mean, he is just

23   copied.  Mr. Blake was just copied on a couple of them; is that

24   right?

25        MS. BUTTE:  So I believe for 6086 on Pages 9, 10, 11

Gary Weeks - Direct

1    and 14 there are -- you can see at the top of the e-mail his

2    name is at the top.

3         THE COURT:  Oh, I see.  Right.  I got it.  I see what

4    you mean, yeah.  So he is copied on it, but it's also something

5    that he appears to have or commonly you would print -- if one

6    printed that out, that type of header would show up.  Okay.

7         MS. BUTTE:  Yes, Your Honor.

8         THE COURT:  Mr. Pollack, anything else?

9         MR. POLLACK:  No, Your Honor.  But the handwriting is

10   on a post-it note that appears to be applied to the printed out

11   document, so clearly the handwriting could have been applied to

12   anyone after the document was printed out.  And the document

13   goes to a number of individuals, Mr. Blake being only one of

14   them, and not all of them being co-conspirators.  And again,

15   there is nothing about the notations themselves that are

16   conspiratorial.

17        It looks like on the page that ends in Bates No. 5723,

18   for example, which is one where Mr. Blake's name is at the top

19   of the hard copy, on the post-it note with the handwriting

20   there seem to be numbers that are all in the hundreds of

21   thousands.  I don't know what those mean and neither does the

22   government.  There is no foundation for them.  But presumably

23   they relate to volume, not to prices at all.

24        THE COURT:  I am sorry, which page were you looking

25   at, Mr. Pollack, by Bates stamp?

Gary Weeks - Direct

1          MR. POLLACK:  Yes, Your Honor.  I am looking at

2     Exhibit 6086, and I am looking at the document that ends in the

3     Bates stamp with the last four digits 5723.

4          THE COURT:  Okay.  So as to Exhibit 6086, first of

5     all, I do agree with Mr. Pollack that there are at least two

6     levels separation in terms of this file from an association

7     with Mr. Blake.  For one thing is that this is a document that

8     was collected from Mr. Blake's office, but the file itself,

9     other than the e-mails that have a printout with his name at

10    the very top which would suggest that Mr. Blake was the one who

11    printed them out, the file doesn't have any direct association

12    with Mr. Blake.

13          The second thing is that we don't have any

14    identification of the handwriting, and therefore the

15    handwriting is unidentified and there is no foundation for it.

16    The fact that there may be some pages with -- that Mr. Blake

17    would assume to have printed out, for instance, 5723 which is a

18    printout of an e-mail that came from Mr. Campisano of RSCS

19    containing what appears to be a post-it note with handwriting

20    and even the one at 5725 that has handwriting on it, still

21    there is insufficient evidence that that is the defendant's

22    handwriting.  It could be; but on the other hand, it could be a

23    notation from someone else that Mr. Blake printed out and asked

24    someone to comment on it.  It's impossible to say.

25          Page 5726 contains another post-it, but it's on a page

Gary Weeks - Direct

1    that I can't even tell whether that's even associated with the

2    previous page.

3            MS. BUTTE:  Your Honor, could we submit some briefing

4    on this issue?

5            THE COURT:  What I would suggest in terms of being

6    efficient with this witness who has a flight is that you put on

7    whatever testimony needs to take place.  And then if the

8    government wishes to offer the other exhibit at a later time

9    and withdraw the admission of this one, you would have an

10   opportunity to submit some briefing.  But I think our goal here

11   is to terminate this before the jury starves to death, and

12   we're not making good progress on that front.

13            What would you like to do, Ms. Butte?

14            MS. BUTTE:  I understand, Your Honor.  I may have one

15   follow-up question for the witness, and then we can see if

16   there is any cross and then let the witness go.  We will

17   withdraw the admission at this time.

18            THE COURT:  Mr. Pollack, how does that work for you?

19            MR. POLLACK:  Your Honor, if the government is

20   withdrawing its attempt to admit these documents, I certainly

21   have no objection to them asking Mr. Weeks an additional

22   question and then providing me an opportunity to ask any cross

23   I might have.

24            THE COURT:  Thank you.

25        (In open court:)

Gary Weeks - Direct

1              THE COURT:  Is the government still offering 6086?

2              MS. BUTTE:  We withdraw the admission of that exhibit

3    at this time.

4              THE COURT:  Any further questions of Mr. Weeks?

5    BY MS. BUTTE:

6    Q.  Mr. Weeks, without revealing the contents of -- any

7    privileged contents, was the request to Mr. Blake such that

8    Mr. Blake understood he was being asked for his own files?

9              MR. POLLACK:  Objection, Your Honor.

10             MR. GREEN:  Your Honor, William Green, counsel for

11   George's, Inc.  The question implicates attorney/client

12   privilege.  I would like to be heard on that at side bar.

13             THE COURT:  I am going to sustain the objection.

14             Go ahead.  Anything else, Ms. Butte?

15             MS. BUTTE:  No further questions at this time.

16             THE COURT:  Cross-examination?

17             MR. POLLACK:  No, Your Honor.  I have no questions.

18             THE COURT:  Okay.  Any questions by anyone else?

19             All right.  May Mr. Weeks be excused?

20             Thank you, Mr. Weeks.  You are excused.

21             THE WITNESS:  Thank you, Your Honor.  Thank you.

22             THE COURT:  Thank you.

23             Ladies and gentlemen, now we will do the lunch break.

24   So we will still plan on taking a break of the normal amount,

25   and by my calculation that should work out to us reconvening at

Gary Weeks - Direct

1    about 10 minutes to 2:00, okay?  If you could, be ready.

2         Keep the admonitions in mind.  I know it's been a

3    little while, but if you go outside, keep the yellow juror

4    buttons visible.  Remember not to talk to anyone and have a

5    good lunch.  The jury is excused.

6         (Jury excused.)

7         Anything that we should take up before we break for

8    lunch?

9         Mr. Beller?

10        *MR. BELLER:*  Only, Your Honor, I am a little uncertain

11   as to how the video testimony -- it's not admitted into

12   evidence.  I just want to make sure that it's preserved for the

13   record.

14        *THE COURT:*  Obviously, I think that -- and was that

15   the question that you had asked earlier?  I didn't quite

16   understand it at the time.

17        *MR. BELLER:*  Yes.

18        *THE COURT:*  So it sounds like the video testimony as

19   edited, so we took out any inadvertently recorded conversations

20   of the government among themselves, but also we edited that one

21   side bar.  It's preserved on a thumb drive; is that correct?

22        *MR. BELLER:*  Yes, that is correct, Your Honor.  And to

23   be clear, the transcript was -- well, there was a transcript

24   made yesterday of testimony.  Today's says video played which

25   is absolutely correct.  And I just want the record to be clear

Gary Weeks - Direct

 1   as to what video was played and how that is preserved.  And I

 2   don't need to waste everybody's lunch hour addressing this

 3   issue.  That's just a concern that I have for appellate record.

 4        THE COURT:  Right.  I think that the appropriate way

 5   to do it is take the thumb drive, attach a tag to it.  Let's

 6   mark it as an exhibit.  It can be -- do we have any court

 7   exhibits marked yet, Ms. Grimm?

 8        COURT DEPUTY CLERK:  We do not.

 9        THE COURT:  Why don't we mark it as Court Exhibit 1.

10   Court Exhibit 1 I will identify for the record is the edited

11   copy of Mr. Skalak's cross-examination and redirect that was

12   shown to the jury today.

13        MR. BELLER:  Very good.  Thank you, Judge.

14        Mr. Pollack?

15        MR. POLLACK:  Briefly, Your Honor.  There was an issue

16   raised at a side bar earlier about one of the jurors.  And I

17   know that the issue was addressed by Ms. Grimm, but just for

18   the record, can we get an explanation as to what it was and how

19   it was addressed?

20        THE COURT:  Some counsel who had a view of Mr. Perez

21   from an angle other than I had thought he had some sort of ear

22   bud or earphone.  And Ms. Grimm who was monitoring the side bar

23   overheard the fact that I was going to direct her to talk to

24   Mr. Perez about that.  She then did and he removed whatever he

25   had.  I didn't see it.

Gary Weeks - Direct

1          MR. POLLACK:  Do we know what it was or how long he

2     had it in?

3          THE COURT:  Let me ask Ms. Grimm.  Ms. Grimm, did you

4     happen to see what the device was?

5          COURT DEPUTY CLERK:  I didn't.  I just motioned to my

6     ear and he saw me and he took something out.

7          MR. POLLACK:  I would request, Your Honor, that we

8     have some kind of an inquiry to find out whether he was

9     listening to something other than the proceedings, and if so,

10    for what period of time.

11         THE COURT:  Okay.  And how would you like for that

12    inquiry to take place?

13         MR. POLLACK:  I obviously have not conferred with the

14    other defendants.  For my purposes, I would be fine with

15    Ms. Grimm simply making an inquiry and reporting back to Your

16    Honor and having Your Honor report to the court.  I am not

17    suggesting that it be done in open court or it even recorded,

18    but again I haven't had time to confer.

19         THE COURT:  That's fine.  Why don't we do this,

20    because we do have the opportunity during the lunch break and

21    Ms. Grimm would be able to find an opportunity to talk to him,

22    it would be closer to the time that we reconvene, but do you

23    think it's possible for everyone to talk real quick just while

24    I am sitting here to confer about how you would like to make

25    that record, then why don't we do that, and Ms. Grimm can look

Gary Weeks - Direct

1    for the opportune time to make that inquiry.

2         MR. POLLACK:  Your Honor, I visually inquired, and

3    based on the reaction of my colleagues, what I proposed is

4    acceptable to defendants.

5         THE COURT:  Okay.  Then I will have Ms. Grimm ask

6    Mr. Perez two questions.  No. 1, what type of device he had,

7    and No. 2 -- actually three questions -- No. 2, how long he was

8    wearing it before she asked him to remove it, and No. 3,

9    whether it was -- he was listening to something other than the

10   trial when he had it in his ear while he was in court, okay?

11        MR. GILLEN:  Just for the record, we had -- we could

12   see the left side of his face and he had the device in his left

13   ear for a considerable period of time.  It wasn't just in for a

14   few minutes and then we noticed it.  So it was a considerable

15   period of time during the cross-examination that it was there.

16   We were wondering over here whether it was a hearing aid or

17   what it might be, and then the whole matter was brought to the

18   Court's attention.  In any event, we can say that it was for a

19   long period of time that we observed the device in his left

20   ear.

21        THE COURT:  Okay.  I will then report back to you on

22   what Ms. Grimm learns from the questions, all right?

23        Anything else that we should take up?

24        MS. PREWITT:  Your Honor, just briefly, I think just

25   in front of the jury Ms. Call made a statement about the plans

Gary Weeks - Direct

1    of the witness in terms of travel and then also that might have

2    an effect of condensing the lunchtime for the jurors.  My

3    understanding is that this is something that we should be

4    discussing outside the presence of the jury.  In this

5    circumstance in particular, there were two documents that were

6    being put before this witness which would have been the subject

7    of a fair amount of cross-examination, the implication being

8    the defense would have -- the defense would have been

9    responsible for a shortened lunchtime.  So my understanding is

10   that should be happening outside the presence of the jury, and

11   if Your Honor feels differently, then you can so advise.

12           THE COURT:  Oftentimes those things should be

13   discussed at side bar.  Of course, the jury's lunch hour is not

14   decreased in this particular case, all right?

15           We will be in recess.  Thank you.

16           (Recess at 12:33 p.m.)

17           (Reconvened at 1:52 p.m.)

18           THE COURT:  All right.  Mr. Koenig, did you have

19   something you needed to raise?

20           Ms. Call?

21           MS. CALL:  Yes, Your Honor.  Very briefly, there was

22   one thing we wanted to flag for the Court as well as the

23   parties.  As Your Honor is familiar, there were a couple, a

24   handful of additional documents produced by Pollo Tropical in

25   the last week.  Upon receipt and review of those documents,

Gary Weeks - Direct

1    several of them we believe are relevant to the government's

2    case in chief and we plan to introduce during Mr. Brink's

3    testimony.  At least one of those documents we believe to

4    contain co-conspirator statements that would be admissible

5    under 801(d)(2)(E), but were not on the government's *James* log

6    because we didn't have them.

7           They relate to Conspirator Walter Cooper who Your

8    Honor did find to be a member of the conspiracy at least as

9    early as November 2012.  Because of this new kind of relation,

10   we would also seek to offer, although we can wait until

11   tomorrow just for notice to the parties, but wanted to bring it

12   up now, Exhibit 518, which is the document Your Honor found to

13   be the date on which Mr. Cooper joined the conspiracy.  So we

14   won't offer 518 today, but we wanted to flag it for your

15   awareness as establishing Mr. Cooper's participation in the

16   conspiracy as relevant to the later introduction of

17   Exhibit 9740, which is one of the new Pollo documents that we

18   will try to introduce later today.

19          *THE COURT:*  Okay.  At 5:00 o'clock or when we end the

20   testimony for today, we will need to talk about what are

21   actually -- we will need to talk before we release the jury

22   today what our schedule is going to be for tomorrow too, so

23   think about that as well.  We still need to go through some

24   exhibits and I don't know what the government's timing is, so

25   we need to talk about all those things so we can tell the jury

Gary Weeks - Direct

1  the appropriate thing in terms of when they come back tomorrow,

2  okay?

3      MS. CALL:  Certainly.  We can do some math before the

4  afternoon break and perhaps have a proposal.

5      MR. TUBACH:  I have done the math, Your Honor, and it

6  seems to be we are heading to Zeno's paradox, which is we are

7  never actually going to get to the end.

8      THE COURT:  We just go halfway every time.

9      MR. TUBACH:  Exactly.  Based on the current effort, we

10  are still 4 hours, 51 minutes out from the conclusion which is

11  roughly where we were before we did the last round.

12      THE COURT:  But now we have got some additional

13  documents.

14      MR. TUBACH:  We are still at the slightly under

15  five-hour stage if assuming we keep the same pace.

16      THE COURT:  Let me report on Ms. Grimm's conversation

17  with Mr. Perez.  Mr. Perez confirmed that the device he had was

18  some type of blue tooth or something that you could listen to

19  things on.  He said he had it in his ear the entire time up

20  until he was asked to remove it because he had forgotten it.

21  He is comfortable wearing it and just forgot to remove it from

22  his ear.  He said that he did not -- he wasn't listening to

23  anything during the morning's testimony and was very apologetic

24  for causing any type of a problem, so that is the report.

25      Are we ready for the jury?

Gary Weeks - Direct

1          THE COURT:  Let's go ahead and return the jury.

2          (Jury present.)

3          THE COURT:  Ms. Call, go ahead.

4          MS. CALL:  The government has some additional

5     documents to offer into evidence at this time.

6          THE COURT:  All right.

7          MS. CALL:  It starts with Government Exhibit 1856.

8          THE COURT:  And ladies and gentlemen, by prior ruling

9     that document has been admitted.

10          MS. CALL:  Permission to publish?

11          THE COURT:  You may.

12          All right.  I think we are good on that.

13          MS. CALL:  The next exhibit is Government's

14    Exhibit 739.

15          THE COURT:  Ladies and gentlemen, in relation to

16    Exhibit 739 which has been admitted, it is not admitted for the

17    truth of statements by Mr. Kronaugue, Mr. Bryant or Mr. Gay,

18    but only for purposes of determining whether Mr. Gay received a

19    notice of the proposal.

20          MS. CALL:  Permission to publish, Your Honor?

21          THE COURT:  You may.

22          MS. CALL:  If Ms. Pearce could zoom in on the bottom

23    half.

24          THE COURT:  Okay.  It looks like people are good.

25          MS. CALL:  Ms. Pearce, if you could please zoom in on

Gary Weeks - Direct

1    the top portion of the e-mail.

2         THE COURT:  All right.  You can go to the next part.

3    Was that it?  Okay.

4         MS. CALL:  Yes.  Government will now offer and seek to

5    publish Exhibit 744.

6         THE COURT:  Ladies and gentlemen, Exhibit 744 is

7    admitted, but not for the truth of the matter asserted by

8    Mr. Kronaugue, but rather to consider his statements only for

9    the effect on the listen.

10        MS. CALL:  If Ms. Pearce could publish and first zoom

11   in on the bottom e-mail of the chain.

12        THE COURT:  She may.

13        Okay.  I think we can go to the next portion.  Okay.

14        MS. CALL:  Before we publish another, there is a

15   handful of documents I will seek to offer but not publish at

16   this time starting with 710 and 711.

17        THE COURT:  By previous ruling, ladies and gentlemen,

18   both Exhibits 710 and 711 have been admitted.

19        Go ahead.

20        MS. CALL:  The next is Government Exhibit 733.

21        THE COURT:  And by previous ruling, ladies and

22   gentlemen, Exhibit 733 has been admitted.

23        MS. CALL:  And then the next that we are also seeking

24   to admit but not publish is 731, and it has an attachment 732,

25   which is the native file, and then 9723 which is the paper copy

Gary Weeks - Direct

1   of the attachment.

2          THE COURT:  So ladies and gentlemen, by previous

3   ruling all three of those exhibits have been admitted.  So as

4   Ms. Call just mentioned, Exhibit 732 is a native version of a

5   document, meaning instead of being like a paper copy, it's an

6   Excel spreadsheet.  You will have the ability during

7   deliberations to view documents that may happen to be in native

8   format, all right?

9          Ms. Call?

10         MS. CALL:  One more to be offered and not published at

11  this time is 702 and its attachment 703.

12         THE COURT:  And both of those, ladies and gentlemen,

13  have been admitted, 702 and 703.

14         MS. CALL:  The next is a text message chain that we

15  will be publishing one at a time.  Would you like me to read

16  off the numbers for each again?

17         THE COURT:  Why don't you start off and let me find in

18  my notes where those are.

19         MS. CALL:  The first is 752.

20         THE COURT:  Oh, okay.  And you're going to ask to

21  publish these; is that correct?

22         MS. CALL:  Yes, Your Honor.

23         THE COURT:  Okay.  So ladies and gentlemen, as to

24  Exhibit 752, that document is not to be considered for the

25  truth of the matter asserted, but rather only as to the effect

Gary Weeks - Direct

1   that it may have on the listener.

2          *MS. CALL:*  Permission to publish 752?

3          *THE COURT:*  You may.  All right.

4          *MS. CALL:*  The government next offers 753.

5          *THE COURT:*  By previous ruling, 753 is admitted.

6          *MS. CALL:*  Permission to publish?

7          *THE COURT:*  You may.  All right.

8          *MS. CALL:*  Next government offers and seeks to publish

9   754.

10         *THE COURT:*  Ladies and gentlemen, Exhibit 754 will be

11  admitted not for the truth of the matter asserted, but rather

12  only as to the effect on the listener.

13         *MS. CALL:*  Permission to publish?

14         *THE COURT:*  You may.  Okay.

15         *MS. CALL:*  Next, the government offers 755.

16         *THE COURT:*  755 has been admitted, ladies and

17  gentlemen.

18         *MS. CALL:*  Permission to publish, please?

19         *THE COURT:*  You may.  Okay.

20         *MS. CALL:*  Government next seeks to offer and publish

21  756.

22         *THE COURT:*  That has also been admitted, ladies and

23  gentlemen.  That may be published.  Okay.

24         *MS. CALL:*  Next the government seeks to offer and

25  publish 757.

1    THE COURT:  That has been admitted and may be

2  published.

3    MS. CALL:  All right.  The government next seeks to

4  offer and publish 758.

5    THE COURT:  758 has been admitted, ladies and

6  gentlemen, and may be published.  Okay.

7    MS. CALL:  Next the government seeks to offer 751, but

8  will not publish this at this time.

9    THE COURT:  All right.  And ladies and gentlemen, 751

10  has been admitted.

11    MS. CALL:  The government next offers and is not

12  seeking to publish 748 and its attachment 749, which is a

13  native, and 9724 which is the printout.

14    THE COURT:  And ladies and gentlemen, those three have

15  been admitted.  And as Ms. Call said, 749 is a native version

16  of that and 9724 is the paper.

17    Go ahead.

18    MS. CALL:  The government will now call its next

19  witness, and I will pass off to my colleague, Mr. Torzilli.

20    THE COURT:  Go ahead, Mr. Torzilli.

21    MR. TORZILLI:  Thank you, Your Honor.  The United

22  States calls Joseph Brink.

23    (**Joseph Brink** was sworn.)

24    THE WITNESS:  I do.

25    COURT DEPUTY CLERK:  Please state your name and spell

Joseph Brink - Direct

 1   your first and last name for the record.

 2          THE WITNESS:  Joseph Wade Brink, J-O-S-E-P-H, Brink,

 3   B-R-I-N-K.

 4          MR. TORZILLI:  Your Honor, may I with the assistance

 5   of Ms. Grimm pass up a binder both to the witness and the

 6   bench?

 7          THE COURT:  Yes, you may.

 8          MR. TORZILLI:  May I inquire, Your Honor?

 9          THE COURT:  You may.

10                    **DIRECT EXAMINATION**

11   BY MR. TORZILLI:

12   Q.  Good afternoon, Mr. Brink.

13          Where do you work?

14   A.  I work for Fiesta Restaurant Group.

15   Q.  What's your job title at Fiesta Restaurant Group?

16   A.  I am the chief procurement officer.

17   Q.  How long have you been the chief procurement officer at

18   Fiesta Restaurant Group?

19   A.  For about six years.

20   Q.  Can you explain what your principal job responsibilities

21   are in your current position?

22   A.  My current responsibilities is to procure all packaging and

23   food items for the restaurants.  And I also am in charge of

24   securing electricity, gas, trash, other services for the

25   restaurants.

Joseph Brink - Direct

1    Q.  Does the procurement of food items also include chicken?

2    A.  Yes, it does.

3    Q.  Does it include the negotiation of chicken supply with

4    chicken producers?

5    A.  Yes, it does.

6    Q.  Have you held any other positions at Fiesta Restaurant

7    Group?

8    A.  Yes.

9    Q.  What positions have you held?

10   A.  Prior to being the chief procurement officer, I was the

11   vice-president of supply chain management.

12   Q.  For what time period were you in that role?

13   A.  From 2011 through 2015.

14   Q.  When you concluded that role in 2015, what role did you

15   assume?

16   A.  Chief procurement officer.

17   Q.  Your current position?

18   A.  Yes, sir.

19   Q.  Could you describe your principal job responsibilities in

20   your prior role of vice-president of supply chain management?

21   A.  My job back then was to secure all food and packaging items

22   for the restaurants.

23   Q.  Did it include chicken?

24   A.  Yes.

25   Q.  What restaurants does Fiesta Restaurant Group presently

Joseph Brink - Direct

1    operate?

2    A.  We currently operate Pollo Tropical.

3    Q.  Did Fiesta Restaurant Group operate Pollo Tropical in 2012

4    to 2016?

5    A.  Yes.

6    Q.  For people who have never been to Pollo Tropical or don't

7    know what it's about, can you describe what Pollo Tropical is,

8    please?

9    A.  Pollo Tropical is a restaurant chain based in Florida.

10   It's a Caribbean-inspired restaurant with chicken that is

11   marinated with citrus and spices in the restaurants.  And it's

12   grilled on a grill with rice and beans and other Caribbean

13   food.

14   Q.  What type of restaurant or what format of restaurant is

15   Pollo Tropical?

16   A.  We're a hybrid between a quick service restaurant and a

17   fast casual restaurant.

18   Q.  Approximately how many locations in the United States does

19   Pollo Tropical operate?

20   A.  138.

21   Q.  Is chicken on the menu at Pollo Tropical?

22   A.  Yes.

23   Q.  How important is chicken as a menu item at the restaurant?

24   A.  It is the main item at our restaurant.

25   Q.  What are Pollo Tropical's principal -- or can you name a

Joseph Brink - Direct

1  few principal competitors of Pollo Tropical?

2  *A.*  Kentucky Fried Chicken, Chipotle, Raising Cane's,

3  Chick-fil-A, Boston Market.  Any chicken restaurant chain is a

4  competitor.

5  *Q.*  Would Pollo Tropical continue to exist if it didn't have an

6  adequate supply of chicken?

7  *A.*  No, it would not.

8  *Q.*  Why not?

9  *A.*  Because primarily the entire menu is chicken-based

10  products.

11  *Q.*  Does Pollo Tropical have a value proposition that it seeks

12  to deliver to its customers?

13  *A.*  Yes, we do.

14  *Q.*  Can you explain what that value proposition is?

15  *A.*  Our value proposition is for our companies -- our

16  restaurants and we offer a value-priced menu of chicken, rice

17  and beans for our customers.

18  *Q.*  Can you explain what you mean by value-priced menu?

19  *A.*  We price our menu to accommodate those who are lower income

20  who have limited income for buying food to provide a meal for

21  their families.

22  *Q.*  Does Pollo Tropical study or survey the types of customers

23  that dine at the restaurant?

24       *MS. NIELSEN:*  Objection, relevance.

25       *THE COURT:*  Overruled.  He can answer.

Joseph Brink - Direct

1    *A.*  Yes, we do.

2    *BY MR. TORZILLI:*

3    *Q.*  And have you developed an understanding of the types of

4    customers that dine at Pollo Tropical?

5         MR. BELLER:  Your Honor, I am also going to object and

6    ask we go on side bar, please.

7         (At the bench:)

8         THE COURT:  Mr. Beller or Ms. Nielsen, go ahead.

9         MR. BELLER:  Your Honor, this particular issue has

10   been litigated at length and the Court has issued orders on

11   this, which is that the end user and any sort of harm to the

12   end user is not admissible.  That is something that the

13   government conceded.  This is something that was included in

14   the motions *in limine*.  The Court ultimately denied the motion

15   *in limine* and that was because the government conceded that it

16   was not going to be going to end user.

17         So that begs the question of why the profile of the

18   Pollo Tropical customer and what their financial situation is,

19   and I imagine that one of the answers is going to be the

20   ethnicity of the customer, as to why any of that is relevant

21   given the extensive litigation that has been done on this.  I

22   think it's incredibly inappropriate given this Court's prior

23   rulings and the positions of the parties that have been taken

24   over the course of the last many months.

25         THE COURT:  Ms. Nielsen, anything else to add?

Joseph Brink - Direct

1        MS. NIELSEN:  Yes, Your Honor.  Under 403 we would

2    also object.  This seems to be an attempt by the government to

3    elicit sympathy, and I think it's misleading and inappropriate

4    both with respect to relevance and 403.

5        THE COURT:  Mr. Torzilli?

6        MR. TORZILLI:  Thank you, Your Honor.

7        A couple points.  One is I think the arguments suggest

8    or kind of miss the point of the testimony here.  I have no

9    interest in trying to prove up harm to an end user or customer

10   base, but we are very interested in both establishing that for

11   Mr. Brink's purchases of chicken from chicken suppliers, he had

12   to be very mindful of the price that he was going to negotiate

13   because he had very little flexibility in terms of being able

14   to raise his price downstream, which is in contrast to, for

15   example, the testimony that the jury heard from Mr. Skalak and

16   Mr. Ledford and Chick-fil-A where they just have a different

17   profile and strategy that enables them to have a little bit

18   more flexibility to negotiate even if it's a little higher

19   price.  They have more flexibility to be able to negotiate a

20   little higher price.

21       Pollo Tropical doesn't have that because, as Mr. Brink

22   is about to explain, these customers are price sensitive.  So

23   if he negotiates higher prices from his suppliers, he has to

24   pass that along in the form of higher prices and he loses

25   customers.  And that gives him a huge incentive to do

Joseph Brink - Direct

1    everything he can to negotiate the absolute lowest price he can

2    from Claxton and Pilgrim's and other chicken suppliers, so it's

3    highly relevant on that point.

4         And then secondly, Your Honor, it's also highly

5    relevant to help to rebut the defendants' defense.  We have

6    heard now for weeks about how 2014 is all about supply and

7    demand and the price sensitivity of customers.  It seems highly

8    relevant to the type of economically driven analysis,

9    micro-economically driven analysis that the defendants want to

10   insinuate into the trial, and it seems like we should have some

11   flexibility to be able to rebut that.

12        MR. BELLER:  Your Honor, I would note as to the second

13   argument that it would be a 701, 702 issue.  If the government

14   wanted to qualify Mr. Brink as an expert on microeconomics as

15   defined by Mr. Torzilli, they certainly had the opportunity to

16   do so and they did not.  Your Honor, to the extent Mr. Torzilli

17   is asking for some sort of instruction that this is, in fact, a

18   per se antitrust violation, that's something that we can

19   absolutely further discuss, but my understanding is that the

20   reason the government avoided getting into any sort of end user

21   cause and effect issue is because they did not want to, in

22   fact, put forth a per se argument in front of this jury.

23        MS. NIELSEN:  Judge, I would like to renew my

24   objection to relevance based on Mr. Torzilli's offer here.  The

25   Sherman Act does not impose a duty to sell chicken at a certain

3114

Joseph Brink - Direct

1   price to the benefit of Pollo Tropical.  It is irrelevant what

2   the flexibility of Pollo Tropical is and has no bearing on

3   whether there is a conspiracy to raise the price of chicken or

4   rig bids.

5       MR. TORZILLI:  May I, Your Honor, because I think the

6   record -- and I am happy to elaborate, but just -- if Your

7   Honor is prepared to rule, I just want to make the record

8   incredibly clear that the case we are trying, the case that we

9   have indicted is a per se illegal violation of Section 1 of the

10  Sherman Act.  So if any of this side bar indicates in any way

11  to the contrary, that is a misconception that I want to clarify

12  with these comments.

13      MR. BELLER:  And Your Honor, I stated a per se

14  violation.  My intention was to indicate the word "not" in

15  there.  So to the extent that was misspoken that wasn't my

16  intention.  And I would be incredibly surprised if anyone

17  understood the exclusion of the word not to somehow create a

18  confusion over that point.

19      THE COURT:  I am going to sustain the objection.

20  We've heard testimony about a lot of price sensitivity.  Of

21  course, KFC is a very price sensitive customer, but yes, it

22  didn't necessitate and there weren't any questions about the

23  end user product.  Similarly here, this witness can, of course,

24  talk about price sensitivity in terms of negotiations with his

25  suppliers, but it wouldn't seem to require and, in fact, I

Joseph Brink - Direct

1   agree with both Mr. Beller and Ms. Nielsen that the agreement

2   was that we would not be getting into end user impacts.  And it

3   seems like the testimony about the end users is unnecessary and

4   could potentially have a prejudicial effect if it was brought

5   in front of the jury and could somehow suggest that there was

6   an adverse impact upon lower socioeconomic customers, all

7   right?

8       (In open court:)

9           THE COURT:  Objection will be sustained.

10  BY MR. TORZILLI:

11  Q.  Mr. Brink, have you negotiated contracts with chicken

12  suppliers for supply of chicken to Pollo Tropical restaurants?

13  A.  Yes.

14  Q.  What considerations do you take into account when you

15  conduct those negotiations?

16  A.  We look at the price of -- current price of grain at the

17  time.  We look at the availability of suppliers --

18  Q.  Mr. Brink, if I can interrupt you.  If you can lean into

19  the mic a little more so your voice projects a little more.

20  A.  I'm sorry.  We look at the location of the manufacturing

21  plants to have product strategically placed across the country.

22  And we look at the number of facilities suppliers have and the

23  ability for a supplier to produce our product to our product

24  specifications and have it delivered to our distributor.

25  Q.  When you are looking at grain information, what are you

Joseph Brink - Direct

1   doing?  Can you explain what you're doing there and what you're

2   trying to accomplish?

3   *A.*  We're looking at grain prices as grain is one of the key

4   ingredients for chicken producers for cost.

5   *Q.*  And ultimately how do you use the information that you

6   glean from your review of grain information in your negotiation

7   with chicken suppliers?

8   *A.*  I use the grain prices as a scanning point to look at what

9   the market is doing for prices of grain and how that should

10  correlate for price of chicken.

11  *Q.*  And what's your purpose in doing that?  What's your

12  ultimate goal?

13  *A.*  Is to have an idea of what the prices should be looking

14  like before the negotiation process starts.

15  *Q.*  How important is price in your consideration of the things

16  you are trying to accomplish in your negotiations with chicken

17  suppliers?

18  *A.*  Pricing is a very critical element for our business.

19  *Q.*  By very critical, could you rank it relative to the other

20  ones that you mentioned, for example, plant locations and

21  adherence to specs?

22  *A.*  Price, No. 1.

23  *Q.*  What would be No. 2 do you think?

24  *A.*  Locations of manufacturing plants.  Followed right behind

25  it would be the ability to adhere to our specifications and

Joseph Brink - Direct

1   making the product and getting it to us on time.

2   Q.  And what are you trying to accomplish in achieving your

3   goal of having price be the No. 1 consideration that you have

4   in mind when you negotiate with chicken suppliers?

5   A.  We're trying to get the best price for our chickens that

6   would match our product specifications and quality

7   specifications and having it delivered to our distributors on a

8   timely basis.

9   Q.  Do you have a process that you typically try to use to help

10  get the best price and to fulfill your other key goals in your

11  negotiations with suppliers?

12  A.  I don't understand your question.  I'm sorry.

13  Q.  Sure.  Do you have a process that you use to go about

14  achieving your goals, the goals you just mentioned a few

15  moments ago, in your negotiation process with chicken

16  suppliers?

17  A.  Yes, we have a process.  We send out our requests for

18  proposals.  We ask our suppliers to give us -- we give them

19  estimated volumes and we have them submit pricing to us.

20  Q.  And then what do you do after that?

21  A.  We will take the pricing proposals, we will then review it.

22  And then we will go back to the suppliers and ask them maybe to

23  sharpen their pencils one more time and finalize the process to

24  secure the chicken.

25  Q.  When you are in the process of going back to the suppliers

Joseph Brink - Direct

1    and, as you say, sharpen their pencils, what form do those

2    communications take?

3    A.  Communication to the suppliers?

4    Q.  Yes.

5    A.  Typically either through phone calls or e-mails.

6    Q.  Do they ever involve face-to-face meetings?

7    A.  Yes.

8    Q.  Did you use the process that you just summarized a moment

9    ago in your negotiations in 2014?

10    A.  Yes.

11    Q.  And can you summarize your personal role in the

12    negotiations that Pollo Tropical undertook with chicken

13    suppliers in that year?

14    A.  I was the one person who took care of procuring all chicken

15    for the brand.

16    Q.  In 2014 where did Pollo Tropical have its restaurant

17    locations?

18    A.  We had restaurants located in Florida.  We had restaurants

19    located in Texas, restaurants located in Georgia.  And I do

20    believe at that time we were in Tennessee also.

21    Q.  Did the negotiations that you undertook in 2014 with the

22    chicken suppliers, was that for supply to all those restaurants

23    in all those locations?

24    A.  Yes.

25    Q.  Going into those contract negotiations in 2014, what

Joseph Brink - Direct

1   chicken suppliers were you doing business with?

2   A.  At the time we were doing business with Pilgrim's, Claxton,

3   Holmes for our fresh chicken.

4   Q.  Mr. Brink, what is Claxton?

5   A.  Claxton is a chicken producing company based out of

6   Claxton, Georgia.

7   Q.  In 2014 do you know how many plants Claxton had?

8   A.  One.

9   Q.  In 2014 do you know what type of birds Claxton was

10  producing in that one plant?

11  A.  They were producing small birds.

12  Q.  And can you explain what your understanding of the term

13  small birds is as you just used it?

14  A.  Small birds are birds that are around -- after they've been

15  processed they are around 3 pounds, a little heavier than

16  3 pounds.  They are smaller chickens.  They are typically

17  younger.  And they are usually utilized in fast-food

18  restaurants.

19  Q.  Have you ever heard the term big birds?

20  A.  Yes.

21  Q.  What are big birds?

22  A.  Big birds are birds that are bred to be a lot larger, and

23  they are used at plants to produce and debone breast chickens

24  and everything else.

25  Q.  In 2014 did Claxton produce big birds?

Joseph Brink - Direct

1    A.   No.

2    Q.   To your knowledge, has Claxton ever produced big birds?

3    A.   I don't think so.

4    Q.   What is Holmes?

5    A.   Holmes is a chicken supplier based out of Nixon, Texas.

6    Q.   In 2014 how many plants did Holmes have?

7    A.   One.

8    Q.   In 2014 what types of birds did Holmes produce at its one

9    plant?

10   A.   Small birds.

11   Q.   Did Holmes produce big birds?

12   A.   I do not believe so.

13   Q.   In 2014 did you negotiate a chicken supply contract with

14   Pilgrim's?

15   A.   Yes.

16   Q.   Who was your main contact for your negotiations with

17   Pilgrim's?

18   A.   Jimmie Little.

19   Q.   In 2014 did you negotiate a chicken supply contract with

20   Claxton Poultry?

21   A.   Yes.

22   Q.   Who was your main contact for your negotiations with

23   Claxton Poultry?

24   A.   Walter Cooper.

25   Q.   And in 2014 did you negotiate a chicken supply contract

3121
Joseph Brink - Direct

1    with Holmes?

2    *A.*   Yes.

3    *Q.*   Who was your main contact at Holmes?

4    *A.*   John Cottrill.

5    *Q.*   Can you spell that, if you know?

6    *A.*   C-O-T-T-R-I-L-L.

7    *Q.*   Were Pilgrim's, Claxton and Holmes competitors of each

8    other during those contract negotiations?

9    *A.*   Yes.

10   *Q.*   Can you explain in what ways they were competing against

11   each other during those contract negotiations in 2014?

12         *MS. NIELSEN:*   Objection as to foundation.

13         *THE COURT:*   Sustained.  If you could lay a foundation.

14   *BY MR. TORZILLI:*

15   *Q.*   Were the three firms that we're talking about Pilgrim's,

16   Claxton and Holmes, in your view competitors of each other for

17   Pollo Tropical's chicken supply?

18   *A.*   Yes.

19   *Q.*   Okay.  And what's the basis for you saying yes to that

20   question?

21   *A.*   Because they all produce the specifications and the correct

22   product that we utilize in our restaurants, and they were

23   currently our current suppliers providing product for our

24   restaurants at the time.

25   *Q.*   In what ways were those three firms, Pilgrim's, Claxton and

Joseph Brink - Direct

1    Holmes, competitors of one another during your contract

2    negotiations for chicken supply in 2014?

3              MS. NIELSEN:  Objection, foundation.

4              THE COURT:  Overruled.

5    A.  They all -- they all produced chicken.  They all had the

6    ability to provide product to our restaurants, and so we gave

7    them the opportunity to bid for the business for 2015.

8    BY MR. TORZILLI:

9    Q.  And what were you looking for in the bids and any

10   subsequent discussions you were having with them?  What were

11   you looking for from them in your negotiation process?

12   A.  We were -- we want to have fair and competitive pricing

13   that we can utilize to analyze the pricing against each company

14   to determine how we're going to allocate the chicken for the

15   following year's contract.

16   Q.  What product or products were you negotiating with these

17   three chicken suppliers in 2014?

18   A.  We were negotiating our whole chickens without giblets.

19   They are calls WOGs and they're split to our specifications,

20   cut basically.  And then we were also securing our sized

21   breast, 4 to 6-ounce sized breast.

22   Q.  How is the product -- the whole chicken, you call it a

23   split WOG?

24   A.  Yes.

25   Q.  Can you explain how that split WOG is used and prepared at

3123

Joseph Brink - Direct

1  the restaurant?

2  *A.*  The split WOG comes to the restaurant unmarinated.  We take

3  the chickens.  We have tumblers.  We add our spices and our

4  marination.  The restaurants will tumble the chicken to

5  marinate it.  Then afterwards it will sit in marination for 24

6  hours before the restaurants can use the chicken to serve to

7  the customers.

8  *Q.*  And for the breasts, how are they used and prepared at the

9  restaurant?

10  *A.*  They too come to the restaurants unmarinated.  We put them

11  in the marination tumbler.  We add our marination, our spices.

12  We tumble to marinate them and they sit in marination for 24

13  hours also.

14  *Q.*  What category of size bird do you use for your whole

15  chicken products?

16  *A.*  Our whole chicken products comes from a small bird.

17  *Q.*  Could you use a big bird rather than a small bird in the

18  restaurant for that product?

19  *A.*  No, we cannot.

20  *Q.*  Can you explain why?

21  *A.*  The jumbo large birds are extremely large, and we would not

22  be able to marinate it and cook it.  It would just take too

23  long and it won't work at the restaurant.

24  *Q.*  For the sized breast product is that -- what category size

25  bird is that product coming from?

Joseph Brink - Direct

1   A.   That also comes from a small bird.

2   Q.   Could you use a big bird product instead of a small bird

3   product for your sized breast products?

4   A.   No, we cannot.

5   Q.   Can you explain why not?

6   A.   The larger the breast comes from a chicken, the tougher the

7   meat is.  Large chickens have what's called woody breast

8   syndrome and they get very chewy and very tough.  And again,

9   natural fall chicken breasts are from 4 to 6-ounce.  You cannot

10  get it from a large bird.

11  Q.   So what would likely happen in the event you did try to use

12  large bird rather than small bird for your sized breast

13  products at the restaurant?

14  A.   They wouldn't work because large birds naturally are not a

15  4 to 6-ounce chicken breast.

16  Q.   The 2014 negotiations before you received any pricing

17  proposals or bids from any of the three firms that were

18  competing for your business, did you have any discussions with

19  any of those firms about supply for the following year?

20  A.   Yes.

21  Q.   Did you have discussions with Mr. Cooper?

22  A.   Yes.

23  Q.   Can you summarize the discussions that you had with

24  Mr. Cooper, and again focusing on the time period before any

25  submission of a bid or a pricing proposal.

Joseph Brink - Direct

1              MR. BELLER:  Objection, calls for hearsay.

2              THE COURT:  Response?

3              MR. TORZILLI:  Just asking him to summarize what he's

4    learned, gleaned, understood from his conversations.

5              THE COURT:  Sustained.

6    BY MR. TORZILLI:

7    Q.  Mr. Brink, did you develop an understanding as to the

8    position that Mr. Cooper had with respect to the negotiations

9    during the time period prior to his submission of any pricing

10   proposal or bid?

11             MR. BELLER:  Objection, the same including foundation.

12             THE COURT:  Response, Mr. Torzilli?

13             MR. TORZILLI:  I am asking for his understanding.

14             THE COURT:  Well, it sounds like you want him to

15   describe something to describe what his actions were then in

16   response, the witness'?

17             MR. TORZILLI:  The witness', yes.

18             THE COURT:  Then if you could rephrase the question.

19   BY MR. TORZILLI:

20   Q.  Based on your interactions with -- well, first let me ask

21   and confirm, did you have interactions with Mr. Cooper prior to

22   the time that he submitted a pricing proposal or bid?

23   A.  Yes.

24   Q.  So now focused on your point of view at that time, so

25   before any bid or pricing proposal was submitted by Claxton,

Joseph Brink - Direct

1    what was your point of view or understanding of what you would

2    be receiving from Claxton in terms of a bid or a pricing

3    proposal?

4            MS. NIELSEN:  Objection, calls for hearsay.

5            THE COURT:  Overruled.

6    A.  When I spoke to Walter about chicken and going into 2015,

7    we were talking about what it was going to be looking like for

8    pricing.

9            MR. BELLER:  Objection.  This is all hearsay.

10           THE COURT:  One moment.  Overruled.

11   A.  The discussion was what was the plan for chicken.  We were

12   talking about chicken and the discussion was that chicken

13   prices shouldn't be that bad going into 2015.

14   BY MR. TORZILLI:

15   Q.  Did you have a sense prior to receiving a proposal or a bid

16   of what -- numbers-wise I'm asking -- what you were likely to

17   receive or what you expected to receive in terms of a bid or

18   pricing proposal from Claxton?

19           MS. NIELSEN:  Objection, calls for hearsay.

20           THE COURT:  Overruled.

21   A.  There was no pricing discussed at that time.

22   BY MR. TORZILLI:

23   Q.  Did you have an expectation as to what level of pricing you

24   would be receiving from Claxton?

25   A.  There was no pricing discussed, but with the price of corn

Joseph Brink - Direct

1    going down significantly, that was the conversation.

2    Q.  So did there come a time when a bid or pricing proposal for

3    Mr. Cooper came in?

4    A.  Yes.

5    Q.  Did you review it when it came in?

6    A.  Yes.

7    Q.  Did you have a reaction when it came in after you reviewed

8    it?

9    A.  Yes.

10   Q.  What was your reaction?

11   A.  I was shocked.

12   Q.  Can you explain what you mean?

13   A.  The pricing that came in was extremely high, way higher

14   than we ever imagined it would be, the highest ever recorded

15   for our company to receive on chicken.

16   Q.  What did you do after you received and reviewed

17   Mr. Cooper's bid?

18   A.  Called and e-mailed Walter to find out what was happening

19   with these prices that were submitted.

20   Q.  In what form did Mr. Cooper submit that initial bid or

21   pricing proposal?

22   A.  He submitted it I do believe through e-mail.

23   Q.  Did you respond to the e-mail?

24   A.  I'm sure I did.

25            MR. TORZILLI:  Your Honor, if I may enlist Ms. Grimm's

Joseph Brink - Direct

1    assistance in handing up to the witness a document and hand it

2    up to the bench as well.

3            THE COURT:  You may.

4            MR. TORZILLI:  This is Government Exhibit 9740.

5    A.   Okay.

6    BY MR. TORZILLI:

7    Q.   Have you had an opportunity to review Exhibit 9740?

8    A.   Yes.

9    Q.   Do you recognize it?

10   A.   Yes.

11   Q.   What is it?

12   A.   This is a string of e-mails that was from Walter Cooper to

13   myself starting on Monday, September 22nd, 2014.  It was

14   regarding pricing and stair-stepping our prices and then going

15   into our issues with our weights in the box of chickens and

16   everything else.

17   Q.   Does Exhibit 9740 contain a written pricing proposal from

18   Mr. Cooper to you?

19   A.   Yes, it does.

20   Q.   And does it contain your response to him?

21   A.   Yes.

22   Q.   And then does it contain subsequent communications between

23   you and him about the pricing proposal?

24   A.   Yes.

25   Q.   And is this all part of the negotiations that you undertook

Joseph Brink - Direct

1    to secure chicken supply for Pollo Tropical Restaurants to

2    begin in January of 2015?

3    A.  Yes.

4         MR. TORZILLI:  Your Honor, the United States offers

5    9740 into evidence.

6         MR. CANTY:  No objection from us, Your Honor.

7         THE COURT:  Any objections to Exhibit 9740?

8         Exhibit 9740 will be admitted.

9         MR. TORZILLI:  Thank you, Your Honor.  And permission

10   to publish.

11        THE COURT:  You may.

12   BY MR. TORZILLI:

13   Q.  Mr. Brink, if we can look at the very first e-mail in the

14   string.  It begins on the bottom of the second to the last page

15   and then goes onto the very last page.

16   A.  Right.

17   Q.  And it should be on your screen.  Do you see it?

18   A.  Yes, I do.

19   Q.  Okay.  So can you explain what you understood -- well,

20   first of all, let me ask you, who is this communication from?

21   A.  This is from Walter Cooper to myself sent on Monday,

22   September 22nd, 2014.

23   Q.  Okay.  And what's your understanding if you could summarize

24   what Mr. Cooper is conveying to you in this e-mail?

25   A.  In this e-mail they provided pricing for our split WOG

Joseph Brink - Direct

1   chickens.  And they were talking here about case weights to be

2   determined for the previous quarter's average and increasing in

3   volume on the chicken splits and then showing an -- a option of

4   stair-stepping the price increase over a period of time instead

5   of it having an all at one time on January 1st.

6   Q.  Let's break that down a little bit.  So item No. 1, do you

7   see that?

8   A.  Yes.

9   Q.  Could you read that into the record, please?

10  A.  "Pricing delivered to Kelly Foods for the splits, $1.07 per

11  pound."

12  Q.  What did you understand that to mean?

13  A.  That is the price of the chickens that we purchased for

14  Pollo Tropical, our split chickens, that would be delivered to

15  Kelly Foods, our chicken distributor, at $1.07 per pound.

16  Q.  Is that delivered pricing delivered to Kelly Foods?

17  A.  Correct.

18  Q.  Would there be an additional step that would be required to

19  get the chicken from Kelly Foods to the Pollo Tropical

20  restaurants?

21  A.  Yes.

22  Q.  Is there an additional cost associated with that effort?

23  A.  Yes.

24  Q.  Would that be like a delivery fee?

25  A.  Correct.

Joseph Brink - Direct

1  Q.  Then switching to item No. 2, if you could read that into

2  the record, please.

3  A.  "Case weights to be determined from the previous quarter's

4  average."

5  Q.  So what are case weights?

6  A.  We have 15 chickens in a box.  And we purchase the chickens

7  15 per box and there's 46 pounds per case.  We pay by the case

8  delivered to Kelly Foods.

9  Q.  And what did you understand the determination from the

10  previous quarter's average to refer to?

11  A.  They were talking about taking the weights, the case

12  weights average from the previous quarter, and putting that as

13  the case weight price for the following quarter.

14  Q.  Item No. 3, do you mind reading that into the record,

15  please.

16  A.  "Increase in volume between 500,000 to 1 million pounds on

17  the splits."

18  Q.  What did you understand Mr. Cooper to be saying there?

19  A.  They wanted to have extra chicken for next year, have a

20  half a million pounds to a million pounds more on the chickens.

21  Q.  So Claxton was asking you if Claxton could sell you more

22  chicken?

23  A.  Correct.

24  Q.  And item No. 4 says, "Step pricing in 2014."  Can you

25  explain what your understanding of that entry is, please?

Joseph Brink - Direct

1   *A.*  That was a proposal to give us our price increase over a

2   period of time, that we would not be hit with it all at one

3   time.

4   *Q.*  You testified a few moments ago about being shocked when

5   you saw the proposal.  Can you describe what, if any, aspect of

6   this e-mail caused you to have the reaction that you had?

7   *A.*  The pricing.  And then also on the stair-step proposal,

8   they wanted to start taking the price increase in October 1st

9   and then November 1st and December 1st and continuing on until

10  January 1st, but we still have a contract in place from

11  October 1st through December 1st.

12  *Q.*  So Claxton wanted the increase to start before the end of

13  calendar year 2014?

14  *A.*  Correct.

15  *Q.*  If we can now turn to the next e-mail in the chain.  It's

16  on the middle of Page 3.  Middle of Page 2, thank you.

17          Do you see that e-mail, Mr. Brink?

18  *A.*  Yes.

19  *Q.*  Who wrote this?

20  *A.*  I did to Walter Cooper on 9/22 -- September 22nd, 2014.

21  *Q.*  Can you read the first sentence to the jury, please?

22  *A.*  "Walter, this is a larger increase than Pilgrim's."

23  *Q.*  So what were you intending to tell Mr. Cooper there?

24  *A.*  That his pricing was way too high.

25  *Q.*  You make a reference to Pilgrim's.  Why did you reference

Joseph Brink - Direct

1   Pilgrim's by name?

2   A.   Pilgrim's was the -- one of the suppliers that we were

3   dealing with at the time.

4   Q.   How typical was it for you to explicitly mention one

5   supplier when you're negotiating with another supplier?

6   A.   Typically we don't like doing it, but with such large

7   increases, I needed to figure out why we're having these

8   increases as trying to give them guidance and help to figure

9   out why.

10  Q.   We can turn to the third and final sentence of this.  Can

11  you read that to the jury, please?

12  A.   "If we are paying these higher prices, we will not pay for

13  more than our spec allows."

14  Q.   What were you intending to tell Mr. Cooper there?

15  A.   He said that our box weight chickens will be increasing

16  because they're putting more weight on the birds going into our

17  boxes.  That would exceed our product specification sizing.

18  Therefore, we would be paying more money for our product that's

19  too big for us.

20  Q.   And you used the word or the abbreviation "spec" there.  So

21  what does that mean?

22  A.   That means specifications.

23  Q.   And what -- if you could summarize, what were your

24  specifications at this point in time?

25  A.   Our product specifications at that time were 2.88 pounds

Joseph Brink - Direct

1    each chicken on the small end, and the large end is 3.12 pounds

2    on the large end with a target of 3 pounds.  And our bill

3    weight was 3.06 pounds per case.

4    Q.  Did Mr. Cooper respond to your message?

5    A.  Yes.

6    Q.  Let's take a look at the next e-mail in the string about

7    two-thirds of the way down.  This is a little bit longer

8    e-mail, but I do want to ask you about some of the passages in

9    it.

10   A.  Okay.

11   Q.  In the first paragraph three lines down there is a sentence

12   that begins, "Pilgrim's should"?

13   A.  Yes.

14   Q.  Do you see that?  Can you read that sentence to the Jim,

15   please?

16   A.  Yes.  It states, "Pilgrim's should be your lowest cost

17   supplier as they have more pounds to spread their cost over and

18   more pounds to sell than we do."

19   Q.  Do you have an understanding what Mr. Cooper was trying to

20   tell you with that sentence?

21   A.  That Pilgrim's was a larger supplier than Claxton and they

22   had the ability to spread out their cost accordingly.

23   Q.  And what would that mean for the -- what did you understand

24   him to be saying something about the price that Pilgrim's ought

25   to be offering Pollo Tropical for the split WOG product?

Joseph Brink - Direct

1   A.  He was referring to in this e-mail that Pilgrim's should be

2   lower than Claxton and Holmes.

3   Q.  If I can direct your attention now to the next paragraph,

4   the second to the last sentence that starts with, "We are able

5   to accept."  Do you see that?

6   A.  Yes.

7   Q.  Will you read that sentence to the jury, please?

8   A.  "We are able to accept more volume if need be and we are

9   willing to stair-step the pricing so there will not be a hit

10  for Pollo.  Is Pilgrim's willing to do all this"?

11  Q.  What was your understanding of what Mr. Cooper was trying

12  to message to you with that passage?

13  A.  That Claxton was willing to take on more of our chicken

14  volume needs and they were willing to stair-step the increase

15  so it wouldn't hit us all at one time for Pollo Tropical.  And

16  then basically he asked, is Pilgrim's willing to do all of

17  this?

18  Q.  Mr. Brink, whose idea was it to potentially stair-step the

19  increase?  Was it Pollo Tropical's idea or Mr. Cooper's idea?

20  A.  It was Pollo Tropical's.

21  Q.  And when was the idea first conveyed to Mr. Cooper?

22  A.  Shortly after I got the price increase.

23  Q.  And what was the overall purpose of trying to stair-step

24  the increase from your perspective, Mr. Brink?

25  A.  The purpose was to try and mitigate the price increase to

Joseph Brink - Direct

1   hit our restaurants all at one time.  That would allow us to

2   gradually get the price increase.

3   Q.  Okay.  Thank you, Mr. Brink, and apologies for cutting you

4   off.

5           But just if we can move on to the next paragraph.

6   A.  Yes.

7   Q.  And there I want to direct your attention to the second

8   sentence that says, "They have already been billing catch

9   weight to Kelly."  Do you see that?

10  A.  Yes.

11  Q.  And first I want to ask who you understood "they" to be

12  referring to there?

13  A.  Pilgrim's.

14  Q.  And what did you understand the sentence as a whole to

15  mean?

16  A.  That Pilgrim's has been billing catch weight to Kelly's.

17  Q.  What's catch weight?

18  A.  Catch weight is the actual weight of the box on the chicken

19  as invoiced to the supplier, meaning our distributor, Kelly

20  Foods.

21  Q.  Is catch weight advantageous to Pollo Tropical or

22  disadvantageous?

23  A.  It's disadvantageous.

24  Q.  Can you explain why?

25  A.  When we have catch weights coming in and being billed as

Joseph Brink - Direct

1   catch weight, therefore Kelly Foods, our food distributor, has

2   to take all the catch weights and put them on all of our

3   invoices.  At the time of receiving the invoices the restaurant

4   will have to sit there and match up every single case catch

5   weight on label and match it up on the invoice.

6   Q.  Is that a more labor intensive process for Pollo?

7   A.  Yes, it is.

8   Q.  The next sentence says, "They probably."  Do you see that

9   sentence?

10  A.  Yes.

11  Q.  Could you read that to the jury, please?

12  A.  "They probably have told Pollo or will tell Pollo no extra

13  pounds and the price is the price with no consideration or

14  explanation, take it or leave it ... I hope for Pollo that

15  Pilgrim's will consider stair stepping -- step pricing," sorry.

16  Q.  What's your understanding of what Mr. Cooper was telling

17  you in that message?

18  A.  That message was telling me that Pilgrim's -- that he was

19  referring that Pilgrim's was not going to work with us on

20  providing us extra chicken.  And they were going to give us

21  pricing with no consideration or explanation with a

22  take-it-or-leave-it mentality, and he was hoping for Pollo's

23  sake that Pilgrim's would work with us on a stair-stepping

24  proposal.

25  Q.  There is a phrase in there that Mr. Cooper writes to you.

Joseph Brink - Direct

1    He says, "The price is the price."  What did you understand

2    that to mean?

3    A.   The price is the price was whatever price I was given, that

4    was the price that was going to be for my new contract for next

5    year.

6    Q.   Is the term "The price is the price" something that is --

7    that you heard at any point in time besides seeing it in the

8    e-mail that Mr. Cooper wrote to you?

9         MS. NIELSEN:  Objection, calls for hearsay.

10        THE COURT:  Overruled.

11   A.   Yes.

12   BY MR. TORZILLI:

13   Q.   Can you explain those circumstances, please?

14   A.   In regards to Walter Cooper?

15   Q.   In regards to your familiarity with the term "The price is

16   the price," other than seeing it in this e-mail.

17   A.   The price is the price, when someone gives that price and

18   says that, that is the price that you're given and there is no

19   negotiation or ability to negotiate the price or get

20   explanation on why.

21   Q.   And was that a term that you encountered at all in the

22   negotiations in this year other than seeing it in this e-mail?

23   A.   Yes.

24   Q.   And can you explain where and when approximately you

25   encountered that term?

Joseph Brink - Direct

1  *A.*  I encountered that term on -- with another supplier,

2  Pilgrim's, when we had our phone conference on Monday,

3  September 22nd, 2014.

4  *Q.*  So on the same -- well, on the same day that you received

5  this e-mail from Mr. Cooper?

6  *A.*  Yes.  I had a meeting with Pilgrim's at 11:30, a phone

7  conference on September 22nd, 2014.

8  *Q.*  Tell us about that phone conference, Mr. Brink.

9  *A.*  That phone conference was to discuss the chicken pricing

10  for 2015 and found out the pricing was going to be 19 cents a

11  pound increase.  We asked why when the price of grain was going

12  down.

13       *MS. NIELSEN:*  Judge, I'm sorry to interrupt, but I am

14  objecting to hearsay.

15       *THE COURT:*  Sustained.  If you could identify the

16  declarant.

17  *BY MR. TORZILLI:*

18  *Q.*  Mr. Brink, can you identify on the call that you had with

19  individuals from Pilgrim's who all the participants were?

20  *A.*  The participants were Jimmie Little from Pilgrim's, myself,

21  and Lynn Schweinfurth, our CFO, was in my office.

22  *Q.*  Would you be so kind as to spell that name?

23  *A.*  S-C-H-W-E-I-N-F-U-R-T-H.

24       *MR. TORZILLI:*  Can we have a brief side bar, please?

25       *THE COURT:*  Yes.

Joseph Brink - Direct

1        (At the bench:)

2        *MR. TORZILLI:*  Your Honor, this is co-conspirator, so

3   I think it's excluded from the definition of hearsay.  Anything

4   that Mr. Little said on the call is co-conspirator.

5        *THE COURT:*  Anything, Ms. Nielsen?

6        *MS. NIELSEN:*  Your Honor, we would object.  I don't

7   believe this was presented at the *James hearing*, and as to a

8   group conversation with the CFO, certainly his statements would

9   be hearsay.  We continue to object to hearsay.

10        *THE COURT:*  Okay.

11        *MR. TORZILLI:*  So, Your Honor, if I may, just to

12   remind Your Honor about the *James* proceeding, I believe we had

13   about 15 entries on the *James* hearing that related to documents

14   for this episode.  By episode, I mean the negotiations with

15   Pollo Tropical.  And I believe 13, if memory serves, certainly

16   in the neighborhood of 13 of those 15 were ruled in the

17   government's favor, meaning conditionally admissible.

18        And we have learned, because we just have had this

19   document about 24 hours since it was unsequestered after Your

20   Honor's ruling on our motion to exclude, that Mr. Brink has

21   made the connection between the 22nd date.  So the statements

22   by Mr. Little, which prior to the last few hours certainly

23   hadn't been connected in terms of how they related to the

24   conspiracy, have now come into focus.  So that's my explanation

25   for why the statements were not on the *James* log.

Joseph Brink - Direct

1        MR. BELLER:  This is David Beller speaking for Mikell

2   Fries.  Your Honor, as the Court may or may not know, Mr. Brink

3   was first examined by the government in March of 2021.  There

4   were significant interviews conducted following that date, and

5   so certainly the government could have been or should have been

6   on notice as to this particular meeting.  This is the first

7   that we are hearing or at least that I recall about a meeting

8   on September 22nd, which these statements were, in fact,

9   communicated and communicated specifically by Mr. Little and by

10  someone else.

11       Your Honor, we don't need to go into the fact that the

12  government, Department of Justice, is, in fact, a party to that

13  civil action, but certainly there was the opportunity for the

14  government to obtain whatever documents they chose to obtain in

15  advance of the *James* hearing.  And the fact that the government

16  did not do so should not be prejudiced against the defense now

17  because the government has come across documents and come

18  across additional information from the witness that they wish

19  to offer under 801(d)(2)(E).  We join Ms. Nielsen's objection

20  as to hearsay.

21       MR. TUBACH:  Michael Tubach.  If I could, the witness

22  is not being asked about this document.  He is being asked

23  about a meeting and a conversation.  There is nothing about

24  this document that the government needed to be able to elicit

25  the conversation and present the statements of an alleged

Joseph Brink - Direct

1   co-conspirator at the *James* hearing.

2       THE COURT:  Mr. Torzilli, I wasn't quite clear.  So

3   did the government through its interviews of Mr. Brink know

4   about the September meeting before the government gained

5   possession of this particular exhibit recently?

6       MR. TORZILLI:  We have the phone record of a call

7   between Mr. Little and Mr. Brink on -- in the phone records

8   that have been admitted into evidence, as well as summary

9   exhibits we've tendered.  But when we received this document

10  and seen the content of the document, which is explicitly

11  drawing on information from Pilgrim's including a quote that

12  Your Honor may remember Mr. Bryant focusing on, "The price is

13  the price," that made a connection that hadn't existed in our

14  minds that related this e-mail from Mr. Cooper to the call that

15  we were aware occurred.

16      And so I think when we take those two together, it

17  very much comes into focus that this was very conspiratorial.

18  And I will also add there was a call between Mr. Little and

19  Mr. Cooper shortly after the call between Mr. Brink and his

20  colleague and Mr. Little concluded.

21      THE COURT:  Okay.  What I am not quite clear on is

22  when Mr. Brink was interviewed sometime before the government

23  getting possession of this particular document, did he recall

24  the meeting and did he provide statements regarding that?  I

25  know that you said that the United States has put two and two

3143

Joseph Brink - Direct

1   together, but what I am wondering is whether the witness

2   already had this information or is he testifying based on some

3   refreshed recollection.

4           MR. TORZILLI:  He certainly looked at the document,

5   Your Honor, before he came here.  We interviewed him this

6   morning, and he in the interview this morning brought up the

7   timing issue when he was looking at this document in the

8   interview.  So I would answer Your Honor's question as yes.  I

9   mean, he made a connection that at least as far as I'm aware

10  hadn't been as sharp in terms of the exact dates and certainly

11  we hadn't appreciated that Mr. Brink knew about prior to the

12  interview this morning.

13          MR. TUBACH:  This is Michael Tubach again.  On

14  March 5th, 2021 Mr. Brink was interviewed and he stated -- and

15  I am quoting from the summary of interview on Page 4 -- quote,

16  there was no compromise or discussion, the suppliers' attitudes

17  were "take it or leave it."  So it's quite clear that Mr. Brink

18  was aware of these conversations.  Obviously, the document they

19  are looking at is one in Mr. Brink's possession and his

20  company's possession.  And the fact that the government either

21  through -- for whatever reason, intention or otherwise, didn't

22  seem to get this document until we were able to get it recently

23  shouldn't be the government gets to introduce all these

24  801(d)(2)(E) that they didn't elicit previously.

25          MR. TORZILLI:  Your Honor, just to go back to

Joseph Brink - Direct

1    yesterday, we were the ones to ask these documents be excluded.

2    But now they are included, it seems like we should be able to

3    present a case based on the evidence that the defendants wanted

4    to be included in the evidentiary record or at least available

5    for inclusion in the evidentiary record.

6         THE COURT:  I think we are getting back to a point

7    that I believe that Mr. Beller made which is that the exhibit,

8    the document does not have the hearsay statement; is that

9    right?

10        MR. TUBACH:  The witness was testifying about a

11   conversation that he had with Mr. Little that's not referenced

12   in the document.

13        MS. NIELSEN:  Your Honor, this is Dru Nielsen.  I also

14   would indicate that we received handwritten notes today about

15   the recent interview of Mr. Brink where they indicate there was

16   a phone conference; however, there is no information included

17   in those handwritten notes about the content of the

18   conversation.  So we have no notice of what this conversation

19   is prior to today.  And I would object to them being able to

20   elicit this information, which they clearly have a plan to do

21   it, when they haven't disclosed the content of the

22   conversation.  And I would also note that an oral conversation

23   does not have the same reliability as a document or even an

24   e-mail that we can actually review and know the content of.

25        THE COURT:  Okay.  Anything else, Mr. Torzilli?

Joseph Brink - Direct

1          MR. TORZILLI:  No, other than Mr. Brink will -- if the

2     objection is overruled, he'll say whatever he is going to say

3     from his memory about the conversation.  And the defendants can

4     cross-examine him with appropriate questions on the reliability

5     of what he's testified to.

6          THE COURT:  Okay.  Where I think we started on this

7     particular objection was whether or not Mr. Brink could testify

8     about something that Mr. Little stated and have that be

9     received as co-conspirator hearsay.  Mr. Torzilli's position

10    appears to be that because the government has recently come

11    into possession of certain Pollo Tropical documents that they

12    otherwise did not have access to for purposes of this case,

13    that that helped the government put two and two together.

14          Mr. Brink has been interviewed on several different

15    occasions and it sounds like Mr. Brink would only be testifying

16    or maybe his review of the document this morning may have only

17    sharpened his memory in regard to timing.  But going back to

18    what we originally were talking about, and that is a

19    description of what was being stated to him by Mr. Little.  The

20    document doesn't seem to have affected his memory, for

21    instance, refreshed it as to something that he otherwise

22    wouldn't have known about on that issue, and as a result, I

23    think the fact that it was not on the *James* log does not

24    provide a basis for the government to admit the statement as

25    co-conspirator hearsay now because that's really not the -- it

Joseph Brink - Direct

1    doesn't have anything to do with the recent receipt of the

2    document.  So as a result, I will sustain the objection as to

3    him testifying as to a statement of Mr. Little as

4    co-conspirator hearsay.

5            MR. TORZILLI:  One last point in terms of the

6    admissibility is that if Your Honor is inclined to, as you just

7    indicated, rule that it's not admissible under 801(d)(2)(E) as

8    co-conspirator, I would ask that it be admitted under

9    801(d)(2)(A) as a party statement attributable to Mr. Little.

10           THE COURT:  And Mr. Canty, can you hear me?

11           MR. CANTY:  Yes, Your Honor.

12           THE COURT:  I just wanted to make sure that you were

13   in on this loop.  Okay.  Any objections as to that?

14           MS. NIELSEN:  Judge, this is Ms. Nielsen.  I would

15   continue to object in terms of the lack of disclosure.  They

16   interviewed Mr. Brink today.  They noted this conversation, but

17   they did not give any notice of the content of that alleged

18   phone conversation.  I think this is a violation of Rule 16 and

19   it's essentially trial by ambush at this point because we don't

20   know what the witness is going to say.  They had this

21   information and they failed to disclose it.

22           THE COURT:  Mr. Torzilli, what is the witness going to

23   say about this call that he just described the participants to?

24           MR. TORZILLI:  I think he is going to say something

25   very much along the lines of what Mr. Tubach was relating when

Joseph Brink - Direct

1   he was reading off the March -- I think it was the March 2021

2   interview report that in essence Mr. Little was saying there is

3   not going to be any negotiation here.  You're going to have to

4   take it or leave it.  And I am potentially overstating it here,

5   but essentially it's a take-it-or-leave-it situation and

6   essentially the price is the price.  To quote Mr. Cooper and

7   Mr. Bryant, the price is the price and that's it.

8           THE COURT:  And anything new that he said this morning

9   that wasn't passed on to defense counsel?

10          MR. TORZILLI:  The key thing from this morning is that

11  he related dates that were the exact same dates.  The phone

12  call and Mr. Cooper's e-mail occurred on the exact same date,

13  but almost the exact same time.

14          THE COURT:  Anything else, Ms. Nielsen?  Sorry, I

15  can't hear you.

16          MS. NIELSEN:  Your Honor, I am going to note the

17  prejudice to the defense.  This witness has testified there was

18  another witness on this alleged call, the CFO.  And because

19  we've had no notice of this alleged conversation, we have not

20  had the opportunity to interview that person who may have a

21  very different recollection of what the content of that call

22  was.  And now that the government has given us no notice, we

23  don't have that opportunity.  And there is extreme prejudice to

24  this type of information coming in at this late date.

25          MR. TUBACH:  I will just note, Your Honor, that the

Joseph Brink - Direct

1  summary we got in March simply said the suppliers' attitudes

2  were.  There is no way for us to know who that is and who he is

3  talking about.  And the fact that the government has apparently

4  failed to get ahold of the very documents that would refresh

5  this witness' memory until it was brought to their attention

6  very recently means we shouldn't be subject to this kind of

7  sandbagging.

8           THE COURT:  Mr. Torzilli?

9           MR. TORZILLI:  In terms of the documents, we had no

10  possession of the documents until the Norman Fries Company,

11  which is being referred to in this case as Claxton Poultry,

12  sent them to us.  We wanted to exclude them from the case.

13  Your Honor decided that wasn't an appropriate way to go.  So we

14  think it's appropriate for us to use these documents like it's

15  any other piece of evidence is that point.

16           And then certainly on the point about the CFO, I don't

17  think the -- I would have to check the interview reports, but I

18  don't think we ever got to the point of asking Mr. Brink who

19  all the people were on the call until the defendants objected

20  which necessitated me asking the question of identifying all of

21  the individuals on the call and then that information was

22  elicited.

23           THE COURT:  Okay.  The objections will be overruled.

24  I don't find any malfeasance or impropriety by the government

25  in terms of this document or any of the recently produced

Joseph Brink - Direct

1    Claxton documents.  This is a document that was sent to the

2    government.  The government made efforts to get a ruling on it

3    and then later learned that Pollo Tropical was -- consented to

4    have the document released from under the protective order in

5    the Northern District of Illinois case.

6              And I do agree with Mr. Torzilli, too, it was only by

7    way of objection that it came out who all the different

8    participants to the conversation were.  So the fact that there

9    may be some additional information regarding the date

10   admissible only against Mr. Little is not unduly prejudicial,

11   not a discovery violation, so those objections will be

12   overruled.  Thank you.

13             The objection is overruled.

14        *MS. HENRY:*  Your Honor, can we go back on?

15      (At the bench:)

16        *THE COURT:*  Ms. Henry, go ahead.

17        *MS. HENRY:*  It was my understanding that you were

18   admitting this as a statement of Mr. Little under 801(d)(2)(A).

19        *THE COURT:*  I am not sure what you mean by this.

20        *MS. HENRY:*  The testimony that is about to be

21   elicited.

22        *THE COURT:*  Yes.

23        *MS. HENRY:*  And then will there be a limiting

24   instruction, and if there is -- because it would only be

25   admissible against Mr. Little under that.

1          THE COURT:  Yes, that's what I indicated.

2          MS. HENRY:  And then I will make an objection that we

3     don't feel a limiting instruction will cure the prejudice

4     because of the way the jury is hearing so many of them, et

5     cetera.  I just want to put that on the record.

6          THE COURT:  Okay.  That objection will be overruled.

7          MS. HENRY:  Thank you.

8          MR. TORZILLI:  Thank you, Your Honor.

9       (In open court:)

10         THE COURT:  Why don't we go ahead and take our break

11    now.  We should have taken it before, but I wasn't watching the

12    clock, ladies and gentlemen.  So let's take our break.  We will

13    go for 20 minutes.  Why don't we plan on reconvening 20 minutes

14    until 4:00.  Keep the admonitions in mind, ladies and

15    gentlemen.  And the jury is excused for the afternoon break.

16            (Jury excused.)

17            Thank you, Mr. Brink.  You are excused for the break

18    and we'll reconvene at 10 minutes until 4:00.

19            Just by way of reminder, before we bring the jury back

20    in, we will talk about the schedule so that we'll know what to

21    tell them regarding tomorrow morning.  We don't have to

22    necessarily work out all the details, but we need to agree on

23    what time to have the jury return tomorrow, all right?

24            We will be in recess.  Thank you.

25         (Recess at 3:31 p.m.)

Joseph Brink - Direct

1        (Reconvened at 3:50 p.m.)

2            *THE COURT:*  Let's go ahead and bring the jury back in.

3        Ms. Call?

4            *MS. CALL:*  We wanted to discuss timing for tomorrow.

5            *THE COURT:*  Yes.  So what do we think is the best

6    plan?

7            *MS. CALL:*  So I think we have about 50 documents left,

8    which by at least Mr. Tubach's math is approximately four

9    hours.  Given that that's the majority of a court day, I think

10   our suggestion -- I think the government's suggestion would be

11   to just excuse the jury for tomorrow.

12           And I think there is two reasons that would be

13   helpful.  The first is the government may have to make

14   adjustments to the summary exhibits based on any rulings, and

15   we do want to give the parties an opportunity to check those

16   revised summaries for accuracy before we attempt to introduce

17   them.

18           The second being we think we are very close to

19   reaching a stipulation on those hundred additional documents

20   that have been sources for phone numbers and employers, and

21   when I say stipulation, I mean to the information, not to the

22   admissibility of the documents.  But we have been trading some

23   drafts back and forth.  And we haven't heard back from

24   yesterday, but I think we are very near resolution.  So ideally

25   if we can accomplish that tomorrow, that will put us in a good

Joseph Brink - Direct

1  position to get to the final witnesses in the government's case

2  on -- I guess that would be Thursday if I am doing my days of

3  the week correct.

4      *THE COURT:*  Mr. Tubach?

5      *MR. TUBACH:*  Yes, Your Honor.  It seems unlikely we

6  are going to finish Mr. Brink this evening.

7      *THE COURT:*  Right.

8      *MR. TUBACH:*  So we -- our strong preference would be

9  to bring him back and finish him up tomorrow morning so we are

10  done and then go through the rest of the witnesses.  I believe

11  there are two more witnesses and perhaps others beyond that,

12  but do the witnesses that we can do before the government wants

13  to get into introducing documents where we have to talk about

14  the admissibility of other documents.  So my suggestion would

15  be that we come back and do as many witnesses as we can while

16  we have the jury at least here and healthy and then get to the

17  business of doing documents.

18      *THE COURT:*  Well, why don't we think about this

19  proposition, that we come back and finish up Mr. Brink.  How

20  long do we think that that could take?

21      *MS. CALL:*  I think our estimate for direct is probably

22  going right up until the end today.

23      *THE COURT:*  Okay.  Any idea how long the crosses may

24  last?

25      *MR. TUBACH:*  I don't.  Your Honor.  That's not my

Joseph Brink - Direct

1    responsibility.  I think there are also two other witnesses,

2    Ms. Hoyt and Mr. Dawson, that could testify without the need

3    for any other documents being admitted, I believe.  The

4    government can correct me if I'm wrong about that.  Once the

5    jury is here in the morning, it would seem to make sense to get

6    the testimony on and off and get the witnesses done and gone

7    before sending the jury home.  And maybe if we spend the rest

8    of the day tomorrow if we have extra time doing the documents,

9    and if we need more time, then we spend Thursday.

10            *THE COURT:*  Ms. Call?

11            *MS. CALL:*  Yes, Your Honor.  I think the only issue I

12   am foreseeing is this notice with the summaries, and we, like I

13   said, want to provide defense counsel as much time as possible.

14   I think both the stipulation and rulings on evidence will alter

15   them in form, and I don't think it will be significant in terms

16   of substance, but I just want to make sure they have time.  So

17   if we are rushing to put on witnesses rather than get through

18   the documents, which the government has been waiting for quite

19   some time to kind of get to these hearings on the documents,

20   it's kind of --

21            *THE COURT:*  Well, I think that -- let's assume that we

22   did witnesses tomorrow.  How much of the day do you think would

23   be devoted to that, once again, not all witnesses, but Ms. Hoyt

24   and Mr. Dawson?

25            *MS. CALL:*  I think it would be the entire day.

Joseph Brink - Direct

1          *THE COURT:*  The entire day?

2          *MS. CALL:*  To include cross for Mr. Brink and then

3    direct and cross for Ms. Hoyt likely based on how timing of

4    witnesses has worked thus far in trial.

5          *MR. TUBACH:*  Your Honor, if we have to come back

6    tomorrow anyway to finish up Mr. Brink, it would make sense to

7    do Mr. Dawson and Ms. Hoyt tomorrow while the jury is here so

8    they are not coming in and out.

9          *THE COURT:*  That's my inclination too.  I know what

10   you mean by the notice issue, and I don't want the government

11   to have to end on a whimper if it's just all documents at the

12   end, but --

13         *MS. CALL:*  And I think the timing that would happen

14   would be we would do witnesses all day tomorrow, and then we

15   would have exhibits all day Thursday.  And then I suppose it

16   would be -- I suppose defense counsel would have the weekend

17   then until we put on the next witness if timing worked out like

18   that.

19         *THE COURT:*  Well, yeah, I think that maybe that might

20   work out.  I think maybe why don't we plan on telling the jury

21   to come back at 8:30, but let's try to do witnesses tomorrow.

22   I think that they will feel like that was a better week since

23   it was a little bit disrupted obviously yesterday.

24         Mr. Gillen?

25         *MR. GILLEN:*  For planning purposes, Your Honor, it

Joseph Brink - Direct

1    sounds as though the government doesn't feel like -- they may

2    or may not rest on Thursday, correct?  May I ask the Court to

3    inquire about what the government's scheduling is in terms of

4    when they realistically think they are going to rest in

5    anticipation of planning to bring people in for the defense.

6         THE COURT:  Well, as I just heard, I think what the

7    government anticipates is with just the witnesses that we

8    referred to finishing up Mr. Brink, calling Mr. Dawson, putting

9    on Ms. Hoyt, and they anticipate that that will take all day

10   tomorrow, so yes.  And then given the fact that we would devote

11   Thursday sounds like to documents and we would probably tell

12   the jury take that day off, and given the fact that we don't

13   have court on Friday, yes, I think that you're quite correct,

14   that the government would not be resting this week.

15        MR. GILLEN:  Until Monday?  I am just trying to figure

16   out when we need to prepare to have people come in for the

17   defense.

18        THE COURT:  Ms. Call?

19        MS. CALL:  I think Monday would probably be our

20   estimate.  I will note, and this might be a good time, that in

21   terms of the government's notice and in terms of defense

22   witnesses, right now we have a multi-page witness list that's

23   alphabetically organized.  And we perhaps could use some notice

24   of who the first several defense witnesses would be.  But in

25   terms of timing, yes, I think it would likely be Monday for the

3156

Joseph Brink - Direct

1   government resting.

2           THE COURT:  Okay.  I will let everyone talk about that

3   because, yeah, it's always tricky to know when the government

4   is going to rest and who's going to be available for the

5   defense, so that needs to be coordinated as best we can.  But

6   we'll certainly know more by the end of the day tomorrow and

7   the end of the day tomorrow would be Wednesday, so that should

8   provide some notice for next week.

9           MR. GILLEN:  I think that will be enough Your Honor.

10  Thank you.

11          MS. CALL:  Just to be crystal clear, so if on Thursday

12  we only spend four hours on documents, I think the suggestion

13  would be to rest for the day then.  And the government will

14  finalize its summaries, get them to the defense so they can

15  review them before we would put on the next witness who we

16  would expect to offer them through on Monday rather than doing

17  it right there and then, throwing them at the defense and

18  having to enter them without the defendants seeing the final

19  versions right away.

20          THE COURT:  Could you repeat that again?  I wasn't

21  following at the beginning, so I didn't understand.

22          MS. CALL:  The point was since the summaries may be

23  adjusted based on admissibility determinations on Thursday, we

24  would anticipate finalizing them after Thursday, getting them

25  to the defendants so that they can review them for accuracy and

Joseph Brink - Direct

1   then likely not calling a next witness no matter what time we

2   finish with documents on Thursday, calling the next witness on

3   Monday so that they can review them before we seek to admit

4   them into evidence.

5          MS. PREWITT:  I understand there is some issues

6   regarding just verifying which documents have been admitted.  I

7   think if we could just have the final versions.  And, you know,

8   those that haven't been admitted yet could be not bolded, those

9   that are admitted could be bolded, and we could still verify

10  the accuracy, Your Honor.  I don't think -- we don't need to

11  wait for Thursday to know what those charts are going to look

12  like.

13         THE COURT:  I guess it depends on what the nature of

14  them.  Perhaps they could be if they have quotes.  I just don't

15  know.

16         MS. PREWITT:  My understanding is that's all been

17  verified.  I think the issue is just there is a column with

18  notations about which are the correlating exhibits if they

19  would say or the foundation.  My understanding is that may

20  change based on Your Honor's rulings.  But if we could have a

21  final version except for that variable, I think we could -- you

22  know, I don't know that we would need to be waiting, Your

23  Honor.

24         THE COURT:  Oh, and the idea being that we could then

25  use the rest of the day on Thursday to --

Joseph Brink - Direct

1           MS. PREWITT:  Sure, absolutely, Your Honor.

2           MR. McLOUGHLIN:  Your Honor, the point I was going to

3   make is I think there may be some controversy with respect to a

4   number of those summary exhibits at least in their current

5   form.  We don't forecast that that form that raises the issues

6   will change.  So the implication that we are going to be able

7   to resolve all that with alacrity on Monday I think would be

8   unrealistic.  And I think the most prudent thing would be to

9   plan for discussing those summary exhibits in whatever form

10  they are in on Thursday so that we can, you know, give our 4.2

11  minutes a piece to resolve it.

12          THE COURT:  Mr. Kornfeld?

13          MR. KORNFELD:  Just to amplify what Mr. McLoughlin

14  said, another reason why that's important is the summaries are

15  going to be potentially relevant to our written Rule 29

16  motions.  And to the Court's point last week, if we file those,

17  the Court under the rule can take them under advisement.  We

18  don't have to necessarily hit the brakes on the whole trial.

19  But for those to be meaningful written submissions, we have to

20  know the state of the evidence.  And the summaries are looming

21  as a potentially significant piece of the government's case

22  depending on what is admitted and what perhaps is not admitted.

23          THE COURT:  Ms. Call, so what would be the downside to

24  working Thursday afternoon based on summaries that have some

25  contingent aspects to them?

3159

Joseph Brink - Direct

1          MS. CALL:  For clarification, when you say working, do

2     you mean moving on to another witness or --

3          THE COURT:  No, taking them up on Thursday with the

4     remaining time that we have, assuming we go through the

5     documents that we didn't -- that we were working on a little

6     bit yesterday.

7          MS. CALL:  Yes.  I am perhaps not quite sure what the

8     remaining issues are.  Obviously Your Honor has had two rulings

9     on these summaries.  The item that's -- that's I think Docket

10    741 and 781.  The thing that is in flux right now is really

11    depending on the stipulation we are working on between the

12    parties which is like how many sources are cited in each row

13    whether the government is going to be using exhibits to prove

14    whose phone number is what and who works where or whether that

15    information will be stipulated to by the parties.

16         And that's why I am hesitant knowing that we are just

17    waiting to hear back at this point.  And the defendants have

18    requested structural changes based on that to the summaries.

19    We want to make sure we make those changes accurately, but we

20    can't do that until we hear back, so we are a bit in limbo

21    right now.

22         THE COURT:  Let's assume that you do hear back one way

23    or the other.  By Thursday afternoon could we have a draft of

24    them that we could then start working on even though we may

25    have -- you know, hopefully by that time I would have made

Joseph Brink - Direct

1    rulings on all of those, and then we could figure out maybe

2    some portions of them would have to be X'd out, but other

3    portions we would know are okay.

4          MS. CALL:  Yes.  And the defendants do have them, but

5    we'll send the kind of most up-to-date version.

6          THE COURT:  So let's try to do that, then, as

7    Ms. Prewitt suggests, and I think that that would avoid the

8    unrealistic chance of alacrity on Monday.  That --

9          MS. CALL:  Perhaps so the government can be informed,

10   what would we be taking up Thursday with respect to the

11   summaries, because at least I believed everything to already

12   have been briefed and ruled on.

13         THE COURT:  Well, I don't exactly know.  I'm not sure.

14   I think that the -- my sense was the defense just wanted to see

15   the final version to double-check them against the documents

16   and see whether there were any issues.

17         Ms. LaBranche?

18         MS. LaBRANCHE:  Just because I am going to be the one

19   handling thing this for our team, I can just tell the

20   government the real issue for us at least is going to be when

21   you look at a lot of these exhibits, there is a column that has

22   exhibit number which it appears.  The government is identifying

23   it as a source of exhibit and there are -- a source of whatever

24   the statement on the chart is.  And they are just wildly

25   inaccurate, misleading, confusing.  We are going to try and get

3161

Joseph Brink - Direct

1    something on file to the Court as soon as tonight to outline

2    what our concerns are initially so the Court will know where

3    we're coming from, but to me that's the real issue that I want

4    to address on Thursday afternoon.

5         THE COURT:  Mr. Lavine?

6         MR. LAVINE:  Your Honor, I think there is a little

7    confusion going on here and if I can quickly get this resolved.

8    Where there is going to be discussion as far as these

9    summaries, and I think there is a difference of opinion, but

10   what is being referred to as far as exhibit column, if we have

11   a stipulation worked out, which I believe we will tonight, most

12   of those, if not all of those exhibit numbers are gone.  So you

13   won't have that issue and it will be refined to just the

14   e-mails and the phone numbers in there.  All of those exhibit

15   numbers will be gone.  And I believe firmly I will get that

16   stipulation worked out tonight.

17        MS. LaBRANCHE:  May I inquire?  Would that be as to

18   all of the exhibits or just to those Exhibit 1, Exhibit 2 that

19   were on the back charts?  So like, for instance, 10-1, is the

20   government still going to want the right-hand column on

21   Exhibit 10-1?

22        MS. CALL:  Yes.  So my understanding from discussions

23   with Mr. Lavine about the proposed stipulation would be -- it's

24   a little circular because we were proposing stipulating to the

25   phone number and employer information, but as the government

Joseph Brink - Direct

1    understood it, the defendants did not want the government

2    citing a stipulation in our summaries to give it credence, so

3    we have agreed to have a different summary that contains the

4    information in the stipulation and cite to that in the

5    remaining summaries.  But yes, it would be so all of the -- I

6    will just call them the orange, green and blue summaries would

7    have one cite per row provided we do reach a stipulation.

8          THE COURT:  Okay.  Well, I don't want to spin our

9    wheels here, so I think what would be most productive is that

10   the government got them shaped up to the extent that, you know,

11   as much as it can.  And then once we get through the rest of

12   the exhibits, we will take those summaries up even though they

13   may not quite -- you know, some aspects of them may change a

14   little bit based upon rulings that would be made earlier, but

15   nonetheless, I would like to try to work through them as best

16   we can.

17         MS. CALL:  Would Your Honor like electronic copies of

18   them before Thursday or paper?

19         THE COURT:  Are they in color?

20         MS. CALL:  Yes.

21         THE COURT:  Paper if you don't mind just because I

22   could print them in color, but I don't have a color copier in

23   chambers, so it would be a little more convenient if we could

24   get them in paper.

25         All right.  Are we ready to bring the jury back in?

3163

Joseph Brink - Direct

1          All right.  Let's do.

2              (Jury present.)

3          THE COURT:  Mr. Torzilli, go ahead.

4     BY MR. TORZILLI:

5     Q.  Mr. Brink, to go back to the phone call, the conference

6     call that you were having on September 22nd, 2014, can you

7     state who the participants on that call were?

8     A.  It was Jimmie Little from Pilgrim's, myself and Lynn

9     Schweinfurth in my office.

10    Q.  And can you remind us what position he holds?

11    A.  Lynn Schweinfurth, she was our controller, our chief

12    financial officer, our CFO.

13    Q.  What was discussed on the call?

14    A.  We discussed 2015 pricing, that Jimmie presented a 19 cents

15    a pound.  And I asked why was this high.  I wanted to talk

16    about why so high when the cost of grain was going down.  And I

17    was -- I was told we're not doing that this year.  That was in

18    the past.  Going forward we want the same margins as the large

19    bird plants.  There is no discussion and this is the price.

20         MR. POLLACK:  Your Honor, can we request a limiting

21    instruction?

22         THE COURT:  Yes.  Ladies and gentlemen, any statements

23    regarding this particular call from Mr. Little can only be

24    considered against Mr. Little, not the other defendants, okay?

25         Go ahead, Mr. Torzilli.

Joseph Brink - Direct

1          MR. TORZILLI:  Thank you, Your Honor.

2   BY MR. TORZILLI:

3   Q.  Did you have an understanding as to what Mr. Little was

4   trying to convey to you when he was talking about large bird or

5   big bird margins?

6   A.  I was under the impression that they wanted -- Pilgrim's

7   wanted the same margin as the large bird plants as the small

8   bird plants make less margin.

9   Q.  Did you have a response that you provided to Mr. Little on

10  the call?

11  A.  I told them that's not acceptable.  That's not how we've

12  been doing it for years and years with chicken and they changed

13  the game.

14  Q.  You talked about a 19 cents coming up on the call.  Do you

15  recall that?

16  A.  Yes.

17  Q.  Can you explain what 19 cents related to?

18  A.  19 cents per pound increase of our chicken -- on the split

19  chickens.

20  Q.  And an increase from what?

21  A.  19 cents from the previous price.

22  Q.  The price you were currently paying in essence?

23  A.  Correct.

24  Q.  Do you recall anything else occurring on the call other

25  than what you've just testified to?

Joseph Brink - Direct

1    A.  That was the pricing we had to have and I needed to make a

2    commitment very shortly.  They had customers who had -- who

3    wanted the business and we had to secure our volume

4    immediately, as they had other ones who wanted the business.

5    Q.  Was any deadline discussed on that call?

6    A.  Yes.  I had until 2:00 o'clock to make a commitment with

7    Pilgrim's.

8    Q.  To maybe skip ahead a little bit here, but did you

9    ultimately come to an agreement with Pilgrim's at the

10   conclusion of your negotiations in 2014?

11   A.  Yes, we did.

12   Q.  How did the prices that you ultimately agreed to at the

13   conclusion of the negotiations compare to the initial proposals

14   that you were provided?

15   A.  They did not change.

16   Q.  So didn't go down, didn't go up?

17   A.  Correct.

18   Q.  And then how about with respect to Claxton, did you arrive

19   at an agreement with Claxton on the prices at the conclusion of

20   the negotiations?

21   A.  Yes, we did.

22   Q.  How did the prices you agreed to at the conclusion of the

23   negotiations compare to the initial proposal that you were

24   provided?

25   A.  The pricing was basically the same, what we had before, but

Joseph Brink - Direct

1    they did stair-step our proposal to get the increase over a

2    six-month period, so that did help us for the company.

3    Q.  You said basically the same.  Did they come down at all?

4    A.  Yes.  There was -- I do believe the FOB price did not

5    change.  That means what the cost of the chicken costs at the

6    plant.  They were able to get I do believe a penny a pound

7    lower on freight going from the plant to Kelly's Distribution

8    Company.

9    Q.  So the delivery price went down.

10   A.  A penny, I do believe.

11          MR. TORZILLI:  If we could go back to Exhibit 9740 and

12   permission to publish that again to the jury, Your Honor.

13          THE COURT:  You may.

14          MR. TORZILLI:  Thank you.

15   BY MR. TORZILLI:

16   Q.  If we can now focus on the very top e-mail.

17          Who wrote that one?

18   A.  I did on Monday, September 22nd, 2014, to Walter Cooper.

19   Q.  Is this a continuation of your communications with

20   Mr. Cooper about the 2014 pricing proposal?

21   A.  Yes.

22   Q.  I want to ask you about the first sentence which is a

23   sentence that occupies the entirety of that first paragraph.

24   Can you read that sentence to the jury, please?

25   A.  "If we are paying the higher prices for the chicken, then

Joseph Brink - Direct

1   you all are getting more margin and we will not pay -- this

2   includes Pilgrim's and Holmes -- more than our spec requires."

3   Q.  You used the term "you all" there.  What did you mean when

4   you used you all?

5   A.  Suppliers.

6   Q.  So Claxton -- suppliers, plural, meaning Claxton plus

7   others?

8   A.  Correct.

9           MS. NIELSEN:  Objection, leading.

10          THE COURT:  Overruled.

11  BY MR. TORZILLI:

12  Q.  I am sorry, sir.  I didn't hear your answer.

13  A.  Correct.

14  Q.  And then you refer to, "You all are getting more margin."

15  And what did you mean to tell Mr. Cooper when you said margin?

16  What's margin?

17  A.  The profit that the company is making on our chicken.

18  Q.  And so what was that phrase meant to convey, "You all are

19  getting more margin?"  What were you trying to identify for

20  Mr. Cooper there?

21  A.  That they were getting more money for the chicken and more

22  than our spec requires as they were going to be packing our

23  chicken in larger weights, so that makes our chicken costs go

24  up even more.

25  Q.  And you didn't want to pay for the larger packaging?

Joseph Brink - Direct

 1   A.  Correct.

 2   Q.  You referred to Pilgrim's and Holmes in here, the two other

 3   suppliers that were competing for your business.  Why did you

 4   refer to them explicitly in this message to Mr. Cooper of

 5   Claxton?

 6   A.  I wanted to make them understand that not just one

 7   supplier, all suppliers were not going to be charging us more

 8   for chicken than required.

 9   Q.  So Claxton wouldn't be disadvantaged by the position you're

10   taking here?

11   A.  Correct.

12   Q.  You refer to Holmes.  Can we talk a little bit more about

13   Holmes for a second?  Can you summarize the state of your

14   negotiations with Holmes during this time period, the 2014 time

15   period?

16   A.  Yes.  Holmes, we were negotiating with Holmes chicken, and

17   I had pricing from them also for 2015.  And their prices were

18   significantly lower than Claxton and Pilgrim's.

19   Q.  When you say significantly lower than Claxton and

20   Pilgrim's, can you give us a ball park?

21   A.  About 10 cents a pound lower.

22   Q.  So would it be fair to say about half as much of an

23   increase?

24   A.  That's about correct, yes.

25   Q.  Now, Holmes you mentioned is located in Nixon, Texas?

Joseph Brink - Direct

1   A.   Yes.

2   Q.   So what Pollo Tropical restaurants was Holmes serving?

3   A.   Primarily the Texas market.

4   Q.   Did you ultimately arrive at an agreement with Holmes at

5   the conclusion of the negotiations in 2014?

6   A.   Yes, we did.

7   Q.   And what approximately did you end up with in terms of a

8   price with Holmes?

9   A.   I do believe we had 9 cents a pound price increase for

10  2015.

11  Q.   So of the three suppliers that you were negotiating with

12  through the 2014 negotiation process, Holmes was the lowest?

13  A.   Yes, sir.

14  Q.   Did you consider purchasing more product from Holmes and

15  less product from Pilgrim's and Claxton because of the

16  difference in price between them?

17  A.   Yes, I did.

18  Q.   And what did you ultimately determine?

19  A.   We were able to get Texas covered and they were able to

20  fill in some weights going to Florida, but they did not have

21  the capacity to take on our entire business.  And we can't do

22  that.  I didn't want to have all my chicken coming from Texas

23  going all the way to Florida.

24  Q.   Why didn't you want to have all your chicken coming from

25  Texas to Florida?

Joseph Brink - Direct

1    *A.*  It defeats the purpose of having multiple plants located

2    around the country to protect us from storms, hurricanes,

3    freezing temperatures.  It's better to have your chickens

4    spread across the country.

5    *Q.*  The second paragraph, first sentence, you say, "The

6    increase is 19 cents per case."  Do you see that?

7    *A.*  Yes.

8    *Q.*  What did you mean by 19 cents per case?

9    *A.*  I meant to say 19 cents per pound.

10   *Q.*  And then you say, "That is basically what Pilgrim's is

11   charging us."  What did you mean by that?

12   *A.*  I was giving him guidance that the pricing that he's giving

13   us is the same price as -- basically pretty darn close to

14   Pilgrim's.

15   *Q.*  That's pretty explicit guidance referring to Pilgrim's

16   there by name.  What was your purpose for doing that?

17   *A.*  Because previously we were talking about that Pilgrim's

18   should be lower in price because they're bigger than Claxton.

19   I was referring back to them to tell him that his prices were

20   basically the same price as Pilgrim's.

21   *Q.*  I would like to go back in time just a little bit to before

22   you actually received a formal proposal from Pilgrim's.

23   *A.*  Okay.

24   *Q.*  Did you have any meetings or any discussions with

25   Mr. Little about chicken supply for 2015 before he submitted

Joseph Brink - Direct

1   the proposal to you?

2        *MR. BELLER:*  Objection, calls for hearsay.

3        *THE COURT:*  It was a yes/no question.  He can answer.

4   Overruled.

5   *A.*   Yes.

6   *BY MR. TORZILLI:*

7   *Q.*   You did have a discussion with him?  And where and

8   approximately when did that discussion occur?

9   *A.*   It was late August, early September, we had a lunch meeting

10  at the Pollo Tropical restaurant in Addison, Texas.

11  *Q.*   And what was the purpose of the -- before you actually got

12  to the restaurant, what was the purpose of the meeting?

13  *A.*   Really, we had not seen each other for a while.  It was to

14  catch up, to go over are there any issues, you know, anything

15  to discuss about chicken product specs not being correct,

16  delivery issues, anything that would pertain to something that

17  Jimmie could help fix.

18  *Q.*   Did the subject of chicken supply and prices for the

19  following year come up during the meeting?

20  *A.*   Yes, it did.

21  *Q.*   Can you summarize the discussions on that topic, please?

22        *MR. BELLER:*  Objection, calls for hearsay.

23        *THE COURT:*  Response?

24        *MR. TORZILLI:*  801(d)(2)(A).

25        *THE COURT:*  Overruled.  He may answer.

Joseph Brink - Direct

1          MR. BELLER:  If that's the case, Your Honor, I would

2    request a limiting instruction under 801(d)(2)(A).

3          THE COURT:  Let's have a side bar, then, real quick.

4       (At the bench:)

5          THE COURT:  I may have misunderstood.

6          So Mr. Torzilli, did you mention that this was only

7    offered pursuant to 801(d)(2)(A)?

8          MR. TORZILLI:  Yes, sir.  This is a statement by a

9    party that we are offering against the party.

10          THE COURT:  I will provide that limiting instruction.

11   Thank you.

12       (In open court:)

13          THE COURT:  Ladies and gentlemen, for purposes of this

14   meeting any statement of Mr. Little can only be considered

15   against Mr. Little, not the other defendants.

16          Go ahead, Mr. Torzilli.

17   BY MR. TORZILLI:

18   Q.  Mr. Brink, can you summarize what occurred at the meeting

19   on the topic of chicken prices and chicken supply to Pollo

20   Tropical for the then following calendar year 2015?

21   A.  Towards the end of our lunch, the topic of chicken came up

22   for pricing for next year.  And Jimmie said, "It's going to be

23   2."  I said, "2 cents"?  He said, "No.  It will start with a

24   2."  And that's when our meeting ended and I left the

25   restaurant.

Joseph Brink - Direct

 1   *Q.*  So what did you understand him to be saying when he said,

 2   "It's going to start with a 2"?

 3   *A.*  Meaning it was going to be at 20 cents or more of an

 4   increase per pound.

 5   *Q.*  And what, in fact, was the initial proposal from Mr. Little

 6   to you?

 7   *A.*  Two weeks later it was 19 cents a pound.

 8   *Q.*  After you completed the meeting, you walked out as you

 9   said, when was the next time you had person-to-person

10   communication approximately with Mr. Little?

11   *A.*  That would be our meeting we arranged to have on

12   September 22nd, 2014 at 11:30 a.m.

13   *Q.*  You had said earlier in your testimony that one of the

14   things you do is follow grain?

15   *A.*  Yes.

16   *Q.*  And did you have any forecast based on your review of grain

17   as to what you expected chicken prices to be for the following

18   year, so for calendar year 2015?

19   *A.*  I did not have a definite number yet, but it should have

20   been lower than we were paying now.  So I was really waiting

21   for the proposals to come in to really kind of get more of a

22   guidance from the suppliers on their pricing.

23   *Q.*  What were you seeing in your study of grain information

24   about what the then current trends were?

25   *A.*  The grain prices were taking -- they were going down in

Joseph Brink - Direct

1    price.  There was a correction in the market on grain prices.

2    Q.  Did that lead you to an expectation about chicken prices?

3    A.  Yes, it did.

4    Q.  And what was the expectation you formed?

5    A.  Expected the prices to be lower.

6    Q.  One more question.  To go back to the September 22nd call

7    that you had with your controller and with Mr. Little, what

8    time did that call take place?

9    A.  11:30 a.m. central time.

10   Q.  How do you know or what leads you to believe that the call

11   occurred at that time?

12   A.  Because I gave the call-in information, the dial number and

13   the pass code to dial in for the meeting.

14   Q.  So you were the meeting host?

15   A.  I was the host, yes.

16   Q.  Sir, if you can open -- you should have a binder -- yeah, a

17   white binder in front of you.  If you can open that up and it

18   should be tabbed.  And behind Tab 1 you should see a document

19   that's been marked as Government Exhibit 548.

20   A.  Yes.

21   Q.  Do you recognize this?

22   A.  Yes, I do.

23   Q.  What is it?

24   A.  It's an e-mail from Jimmie Little to myself sent to me on

25   9/16/2014.

Joseph Brink - Direct

1    Q.  So this is a point in time before you received any pricing

2    proposal from him?

3    A.  Correct.

4    Q.  And what is the -- just generally speaking, what is the

5    topic of the communications contained in Government

6    Exhibit 548?

7    A.  It's discussing chicken pricing for 2015.

8    Q.  And these are e-mails you exchanged with Mr. Little?

9    A.  Yes, it is.

10          MR. TORZILLI:  Your Honor, the government offers 548

11   into evidence.

12          THE COURT:  Any objection to the admission of

13   Exhibit 548?

14          MR. CANTY:  No objection.

15          MR. BELLER:  Your Honor, Exhibit 548 is nothing but

16   hearsay.

17          THE COURT:  Response?

18          MR. TORZILLI:  May we have the response on the side

19   bar?

20          THE COURT:  Yes, you may, sure.

21      (At the bench:)

22          THE COURT:  Mr. Torzilli, go ahead.

23          MR. TORZILLI:  Sure.  The response is and the reason I

24   wanted to go on side bar is this is 801(d)(2)(E) material.  I

25   believe it's *James* log entry No. 147 and the ruling resulting

Joseph Brink - Direct

1   from the *James* proceeding.  The Court ruled that the statements

2   contained here are during the course and in furtherance of the

3   conspiracy.

4          THE COURT:  Mr. Beller?

5          MR. BELLER:  Your Honor, if, in fact, that's true, my

6   apologies to the Court and to Mr. Torzilli for taking the time

7   with this.  I am quickly trying to access several charts that

8   we have made on this -- I have made on this.  I didn't see this

9   particular exhibit, so it may be a fallacy of my charts.  To

10  the extent this is, in fact, included, this is something that

11  we already have been heard on and my apologies.

12         THE COURT:  No problem.

13         Anyone else that may be listening?  Okay.  I will

14  overrule the objection, then, and it will come in as

15  801(d)(2)(E) statements.  Thank you.

16     (In open court:)

17         THE COURT:  The objection will be overruled.  Go

18  ahead, Mr. Torzilli.

19         MR. TORZILLI:  Thank you.  I'd offer 548 into

20  evidence, then, if it's not already been received.

21         THE COURT:  Exhibit 548 will be admitted.

22         MR. TORZILLI:  And permission to publish 548?

23         THE COURT:  You may.

24  BY MR. TORZILLI:

25  Q.  Mr. Brink, I would like to draw your attention in

Joseph Brink - Direct

1    Government Exhibit 548 to the first e-mail, so the e-mail at

2    the bottom from Mr. Little where he says, "When works for you

3    to know 2015 pricing?  I don't want you to be ready," which let

4    me first ask whether you understood Mr. Little to have a typo

5    in that sentence?

6    A.  Correct.

7    Q.  And then did you have a discussion with Mr. Little around

8    this time about the pricing?

9    A.  Yes.  That was when -- after our meeting we had at the

10   restaurant, this was the follow-up e-mail that Jimmie sent to

11   me.

12   Q.  And then in the next e-mail, this is an e-mail that you

13   wrote; is that right?

14   A.  Yes, it is.

15   Q.  And can you read your e-mail to the jury, please?

16   A.  Yeah.  On September 15, 2014, I wrote, "After our last

17   conversation has something changed?  There is no justification

18   for the price increase that you talked about."

19   Q.  You refer to "no justification for the price increase."

20   What did you mean to tell Mr. Little with that part of your

21   message?

22   A.  That the pricing that was initially hinted at at our lunch

23   was way too high.

24   Q.  And you use the term "justification."  What's your basis

25   for saying there was no justification.

Joseph Brink - Direct

1    A.  Because of the grain prices and that's the main reason.

2    Q.  Now, Mr. Little had told you in -- I realize it's a

3    subsequent conversation about big bird versus small bird and

4    relative margins.  What was -- when you heard that from

5    Mr. Little, did you give that consideration in terms of how

6    your negotiating position might be changed?

7    A.  I don't understand your question.  I'm sorry.

8    Q.  Sure.  There came a time, am I correct, when Mr. Little

9    related to you about the need for small bird margins to be

10   increased in some way to relate more closely to big bird

11   margins?

12   A.  Correct.

13   Q.  And when you heard that, did you give that any

14   consideration?

15   A.  No, I did not.

16   Q.  Okay.  Why did you give it no consideration?

17   A.  Because it's not the same chicken.  You can't buy large

18   chickens and use it in our restaurants.  In our current format,

19   it will not work.

20   Q.  Why not?

21   A.  The final output of a large chicken plant yields more

22   pounds of chicken with the same amount of labor as it takes for

23   a small bird plant.  Therefore, they can -- their output of

24   chicken on a large bird plant is greatly more than a small bird

25   plant utilizing the same amount of labor.  Therefore, that

Joseph Brink - Direct

1    justifies their higher margins.

2    Q.  If you could turn to Tab 2 in your binder, and there you

3    should find Government Exhibit 566.

4         Do you recognize this, sir?

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  These are e-mails from Jimmie Little and myself going back

8    and forth on chicken prices.

9    Q.  What's the time frame for these e-mails?

10   A.  Starting on September 29th and ending through October 2nd.

11   Q.  Are these e-mails a continuation of the discussions and

12   negotiations you were having with him about supply and prices

13   for 2015?

14   A.  Yes, it was.

15        MR. TORZILLI:  Your Honor, the government offers 566

16   into evidence.

17        THE COURT:  Any objection to the admission of

18   Exhibit 566?

19        MR. CANTY:  No objection.

20        THE COURT:  Exhibit 566 will be admitted.

21        MR. TORZILLI:  Thank you, Your Honor.  And permission

22   to publish?

23        THE COURT:  You may.

24        MR. TORZILLI:  And if we can go to the second page to

25   call up the initial e-mail.

Joseph Brink - Direct

1  *BY MR. TORZILLI:*

2  *Q.*  So on the screen, Mr. Brink, should be the initial e-mail

3  in this set of communications between you and Mr. Little.  Do

4  you see it?

5  *A.*  Yes, I do.

6  *Q.*  And who wrote the initial communication?

7  *A.*  This is from Jimmie Little to myself received on

8  September 29th, 2014.

9  *Q.*  And can you please summarize what this e-mail is about?

10  *A.*  This is an e-mail from Jimmie Little offering the official

11  2015 pricing proposal.  And he offered us a packaged offer and

12  the pricing is FOB.  He did not have the freight cost added

13  into it.  And the package deal is for split chickens and the

14  boneless breast meat chickens.

15  *Q.*  What did you understand packaged deal to mean -- packaged

16  offer, excuse me, to mean?

17  *A.*  That I cannot take one of the chickens without the other.

18  *Q.*  Did you have an understanding as to what might happen to

19  the price of the products if you decided to not proceed with

20  the products on a package basis?

21  *A.*  I would get a new pricing proposal which would be higher.

22  *Q.*  You mentioned FOB.  What does that stand for and what does

23  it mean?

24  *A.*  Basically it's freight onboard.  It's the pricing of the

25  chicken that's at the manufacturing plant before it gets

Joseph Brink - Direct

1   shipped from the plant to the final destination.

2   Q.   Is FOB a delivered price?

3   A.   No.

4   Q.   What would need to be included to convert FOB to a

5   delivered price?

6   A.   They would have to add the cost of the freight.

7   Q.   Mr. Brink, in the second line of the e-mail that we are

8   focused on, there is a part of a sentence that says, "Visit

9   with your team to explain the small bird supply issue."  Do you

10  see that?

11  A.   Yes, I do.

12  Q.   What did you understand Mr. Little to be raising with you

13  there?

14  A.   That he was willing to come to our office to meet with the

15  executive team to explain the small bird supply issue at my

16  convenience.

17  Q.   What did you understand the small bird supply issue that he

18  is raising here to refer to?

19  A.   That there was a lack of smaller birds in the market.

20  Q.   Is that the dynamics you just explained a couple minutes

21  ago?

22  A.   Yes.

23  Q.   Let's look at the next message.  It's at the top of Page 2,

24  Exhibit 566.  So what's this?

25  A.   This is an e-mail I sent to Jimmie questioning about the

Joseph Brink - Direct

1  pricing he gave to us that did not have the total amended cost

2  for the freight included in the pricing.

3  Q.  What did you want -- what, if anything, did you want

4  Mr. Little to do?

5  A.  Give him guidance to get better pricing so we could have

6  our FOB and delivered costs together and get pricing back in

7  line, helping them to give them guidance.

8  Q.  You say in the second sentence, "Your competitors have

9  submitted pricing that matches you but it was delivered

10  pricing."  Do you see that?

11  A.  Yes.

12  Q.  Now, first I want to ask you about that term "competitors."

13  It's plural there.  Who are you referring to when you say your

14  competitors?

15  A.  Our current suppliers that we had bids coming in from.

16  Q.  So that would be -- you were intending there both Claxton

17  and Holmes?

18  A.  Yes.

19  Q.  And then what did you mean by that sentence that it matches

20  but it was delivered pricing?

21  A.  Basically telling him that his pricing, his FOB pricing was

22  just way too high compared to my other competitors that I had

23  pricing with.  We had delivered pricing lower than his FOB

24  pricing.

25  Q.  And then in the third paragraph there is a sentence, the

Joseph Brink - Direct

1  first sentence there, it says, "Since you all."  Do you see

2  that?

3  A.  Yes.

4  Q.  Can you read that sentence to the jury, please?

5  A.  "Since you all are charging us these exorbitant pricing, I

6  want to know the pricing formula, which markets, etc."

7  Q.  You use the term "you all" there.  Who are you referring to

8  when you use you all?

9  A.  Pilgrim's.

10  Q.  And then in the last -- what do you mean by exorbitant

11  pricing?

12  A.  The prices were way too high compared to what it should be.

13  Q.  So the proposal that you had received from him that appears

14  in the initial e-mail, is that what you're referring to?

15  A.  Yes, sir.

16  Q.  And then in the last sentence -- I'm sorry, in the last

17  paragraph and the last sentence, you say "match your

18  competitors."  Do you see that?

19  A.  Yes.

20  Q.  Okay.  What are you trying to refer to when you say "then

21  you match your competitors?"

22  A.  That he should have his final delivered pricing in to us so

23  I could match up the final cost going into a distributor, so I

24  can match apples to apples or chicken to chicken.

25  Q.  And what was your overall purpose of this e-mail?  What

Joseph Brink - Direct

1    were you trying to get Mr. Little to do?

2    A.   They were one of our incumbents.  I was trying to guide and

3    help him to get him to lower his pricing.

4           MR. TORZILLI:  If we can go to the next set of e-mails

5    in 566.

6    BY MR. TORZILLI:

7    Q.   So on your screen are the next set of e-mails.  Can you

8    just summarize what's going on in that set of e-mails?

9    A.   Jimmie was sending me e-mails as he had the pricing now for

10   freight.  And he was basically telling me what the new price

11   would be for the freight added for the chicken.

12   Q.   And once you add the freight, what did that make the total

13   delivered price?

14   A.   Where is the freight here?  There was no pricing here for

15   freight.  He said here there was "No change in FOB but will add

16   freight."  He wanted to know if he can come by the new store

17   and I told him that we're just busy.  So he had not given us

18   the freight rate yet.

19   Q.   That's what you had requested, though.

20   A.   Correct.

21   Q.   And then in the e-mail that -- if you look at the screen

22   that's at the top of the screen, the one that begins with "I",

23   "I am in Houston?"

24   A.   Yes.

25   Q.   Can you read that second sentence that begins with,

Joseph Brink - Direct

1    "Again"?

2    A.  "Again your competitors are lower than you with delivered

3    pricing compared to your FOB pricing.  Pilgrim's needs to match

4    to show compromise."

5    Q.  And what was the message you were trying to convey to

6    Mr. Little there?

7    A.  That his pricing, his FOB pricing was higher than I had

8    from my competitors.

9    Q.  And what was the purpose of delivering that message to him?

10   A.  To help guide my supplier to lower his pricing.

11   Q.  And let's look at the next set of e-mails here in 566.

12   Let's start with the one -- what is now at the bottom of the

13   screen from Mr. Little.  And what's going on in that message?

14   A.  This was the e-mail that Jimmie sent to me on October 2nd,

15   2014, and he did provide the freight cost delivered to Kelly's

16   Food Service.

17   Q.  What was the amount of the freight for those deliveries to

18   Kelly's?

19   A.  .05125 cents a pound.

20   Q.  And what did that make the total delivered price that was

21   being proposed for the splits?

22   A.  Makes it .19125 cents per pound.

23   Q.  How did you come up with that computation?

24   A.  I took the FOB price of $1.02 plus Kelly's freight rate of

25   .05125 cents per pound to get a total cost of 1.07125 per

Joseph Brink - Direct

1    pound.

2    Q.   1.07125?

3    A.   Yes.

4    Q.   Thank you.  And then what was your response to Mr. Little?

5    A.   Basically told him this is not going to work.  He needs to

6    lower his pricing.

7    Q.   And again you used the term "your competitors" with a

8    plural, right?

9    A.   Correct.

10   Q.   And why did you use competitors with plural?

11   A.   Because both competitors delivered pricing was still lower

12   than Pilgrim's.

13   Q.   Did you have anything in mind in terms of how much you

14   wanted Pilgrim's to lower its price at this point in time?

15   A.   I don't recall.

16   Q.   Let's look at the final message here.

17        MR. BELLER:  Your Honor, I am going to object at this

18   point.  It's just unnecessarily cumulative.  This is redundant.

19   The document is in front of the jury.  And this has been going

20   on for multiple hours that we have the witness testify about

21   statements that the jury can read for themselves.  I think for

22   purposes of moving the trial along, I am objecting.

23        THE COURT:  All right.  Overruled.

24        Go ahead, Mr. Torzilli.

25   BY MR. TORZILLI:

Joseph Brink - Direct

1    *Q.* Who wrote the top e-mail in 566?

2    *A.* Jimmie Little wrote the e-mail to myself on 10/3/2014.

3    *Q.* Can you read that first sentence to the jury, please?

4    *A.* It says, "Joe, we will need to hold on our current

5    pricing."

6    *Q.* You see the use of the term "hold" here?

7    *A.* Yes.

8    *Q.* Do you have an understanding of what Mr. Little was trying

9    to convey to you with hold?

10   *A.* Meaning he was not going to change the pricing proposal

11   that he just gave to me.

12   *Q.* Is that a term -- hold a term that in your experience

13   negotiating contracts has come up from time to time?

14   *A.* Yes.

15   *Q.* And so generally speaking, what did you understand that to

16   mean based on your experience?

17   *A.* That there was no further discussion on pricing, that the

18   pricing proposal that was submitted was the final pricing

19   proposal.

20   *Q.* And what does Mr. Little ask you to do at the conclusion of

21   this e-mail?

22   *A.* He said "I've tried to call you multiple times," and I was

23   traveling opening up new restaurants.  It says, "We need to

24   discuss by end of day as both companies need to make plans for

25   supply for 2015."

Joseph Brink - Direct

1    *Q.*  And he left you his number?

2    *A.*  Yes, he did.

3    *Q.*  Did you call him?

4    *A.*  I'm sure I did.

5    *Q.*  Do you recall the phone conversation that you initiated as

6    a result of this e-mail?

7    *A.*  I was at the restaurant, a new store opening.  I called

8    Jimmie and we had to secure the chicken for 2015.

9    *Q.*  What do you mean by secure the chicken for 2015?

10   *A.*  Make an agreement that we are going to proceed with 2015 as

11   Pilgrim's being a supplier for us.

12   *Q.*  Is that what Mr. Little told you?

13           *MR. BELLER:*  Objection, calls for hearsay.

14           *THE COURT:*  Response?

15           *MR. TORZILLI:*  801(d)(2)(A).

16           *THE COURT:*  All right.  Ladies and gentlemen, the

17   response of Mr. Little can only be considered against

18   Mr. Little, not the other defendants as to this particular

19   conversation.

20           Go ahead.

21   *BY MR. TORZILLI:*

22   *Q.*  What do you recall Mr. Little saying to you on the phone

23   conversation you had with him?

24   *A.*  That the pricing that we have submitted, meaning Pilgrim's,

25   was the final pricing, and we have to secure chicken for both

Joseph Brink - Direct

1  companies.  And he gave me our volumes, and the volumes he gave

2  to us that he was going to let me have for the company was less

3  than we had before.

4  Q.  After you had the conversation you just related with

5  Mr. Little, what, if anything, did you do next?

6  A.  I don't understand your question.  I'm sorry.

7  Q.  Okay.  After you completed your conversation that you just

8  testified to --

9  A.  Yes.

10  Q.  -- what was the next thing you did in the negotiations to

11  secure chicken supply from Pilgrim's for the following calendar

12  year?

13  A.  We had to secure the chickens and we got -- we had to now

14  agree to how much volume of chicken they were going to provide

15  for us.  Typically we book our annual usage, but this time

16  Pilgrim's was only going to allow me to buy it by the week plus

17  or minus 10 percent.

18  Q.  Can you explain what that means?

19  A.  When we purchase chicken for the whole year, we give a

20  supplier X amount of pounds and that's how much we're going to

21  hit our target to buy for the year.  When a supplier changes

22  that and gives us a per-week usage, you're allowed to have a

23  hundred thousand pounds plus or minus 10 percent.  So if I

24  exceed -- my demand for chicken exceeds more than 10 percent,

25  they would not fill my needs for chicken.

1    Q.  Was that approach to supplying you a change from what you

2    had experienced with Pilgrim's in previous years?

3    A.  Yes.

4    Q.  Do you have an understanding as to why Pilgrim's changed

5    their approach to supplying Pollo Tropical?

6    A.  No, I do not.

7    Q.  Is that something you ever asked Mr. Little or anyone else

8    at Pilgrim's about?

9    A.  I don't remember.

10   Q.  Did you eventually come to an agreement with Pilgrim's?

11   A.  Yes, we did.

12   Q.  And if you can turn to Tab 5.  You should find what's been

13   marked as Government Exhibit 572.

14         THE COURT:  Maybe, Mr. Torzilli, since we are just

15   about at 5:00, would this be a convenient breaking spot?

16         MR. TORZILLI:  Perfect time, Your Honor.

17         THE COURT:  Okay, great.

18         Ladies and gentlemen, we will go ahead and break for

19   the day.  We will have you come back tomorrow at the usual

20   time, 8:30.  Remember to keep the admonitions in mind.  Don't

21   let people talk to you about the case.  Obviously, don't talk

22   among yourselves about the case.  And we'll see you back

23   tomorrow at 8:30.

24         The jury is excused.

25         (Jury excused.)

1          Mr. Brink, you are excused until tomorrow at 8:30.

2    Thank you very much.

3          Anything we should talk about before we recess?

4          Ms. Nielsen, go ahead.

5          MS. NIELSEN:  Your Honor, I need to ask the Court's

6    permission to not be present tomorrow.  I have a trial set in

7    Weld County.

8          THE COURT:  You are double dipping?

9          MS. NIELSEN:  I am double dipping.  I wish I wasn't.

10   I was making objections today and I anticipated that I would

11   get through my cross-examination.  So I apologize to the Court

12   and I will ask -- Mr. Fagg will be back tomorrow.

13         THE COURT:  Oh, he will?  Given the conflict, Mr. Fagg

14   can make objections.

15         MS. NIELSEN:  And I apologize to the Court.

16         THE COURT:  No problem.  Thank you.

17         Mr. McLoughlin?

18         MR. McLOUGHLIN:  Mr. Fagg is in the air.  We haven't

19   figured out who is going to do what yet, but...

20         THE COURT:  Right.  Obviously, were something to

21   prevent Mr. Fagg from being here, then we would go to plan C.

22         MR. McLOUGHLIN:  I am happy to be plan C, I guess.

23         THE COURT:  Well, the next plan.  I don't want to be

24   disparaging in terms of alphabetical order.

25         MR. McLOUGHLIN:  I have been lowered down.

1              *THE COURT:* Anything else we should talk about today?

2              All right.  We will be in recess then until 8:30.

3      Thank you.

4         (Recess at 5:01 p.m.)

5                              INDEX

6      WITNESSES

7         Gary Weeks

8              Direct Examination By Ms. Butte              3082

9         Joseph Brink

10             Direct Examination By Mr. Torzilli           3107

11                            EXHIBITS

12     Exhibit        Offered  Received  Refused  Reserved  Withdrawn

13     355                     3072

14     548                     3176

15     566                     3179

16     702                     3104

17     703                     3104

18     710                     3103

19     711                     3103

20     731                     3104

21     732                     3104

22     733                     3103

23     739                     3102

24     744                     3103

25     748                     3106

1                         INDEX (Continued)

2                             EXHIBITS

3    | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
     |---------|---------|----------|---------|----------|-----------|
4    | 749 |  | 3106 |  |  |  |
5    | 751 |  | 3106 |  |  |  |
6    | 752 |  | 3105 |  |  |  |
7    | 753 |  | 3105 |  |  |  |
8    | 754 |  | 3105 |  |  |  |
9    | 755 |  | 3105 |  |  |  |
10   | 756 |  | 3105 |  |  |  |
11   | 757 |  | 3106 |  |  |  |
12   | 758 |  | 3106 |  |  |  |
13   | 920 |  | 3072 |  |  |  |
14   | 982 |  | 3072 |  |  |  |
15   | 1615 |  | 3073 |  |  |  |
16   | 1700 |  | 3073 |  |  |  |
17   | 1713 |  | 3073 |  |  |  |
18   | 1734 |  | 3074 |  |  |  |
19   | 1822 |  | 3074 |  |  |  |
20   | 1846 |  | 3075 |  |  |  |
21   | 1847 |  | 3075 |  |  |  |
22   | 1848 |  | 3075 |  |  |  |
23   | 1849 |  | 3075 |  |  |  |
24   | 1850 |  | 3075 |  |  |  |
25   | 1851 |  | 3075 |  |  |  |

1                          INDEX (Continued)

2                              EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    1852                   3075

5    1853                   3075

6    1854                   3075

7    1855                   3076

8    1856                   3080

9    1856                   3102

10   1858                   3080

11   1862                   3081

12   1864                   3081

13   1894                   3081

14   6235                   3074

15   9714                   3069

16   9715                   3069

17   9723                   3104

18   9724                   3106

19   9740                   3129

20                      REPORTER'S CERTIFICATE

21       I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.  Dated

23   at Denver, Colorado, this 28th day of January, 2022.

24

25                              S/Janet M. Coppock
                              _____