1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB

3

UNITED STATES OF AMERICA,

4

     Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,

7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,

8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,

9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,

10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,

11 RICKIE PATTERSON BLAKE,

12     Defendants

13 _____

                    REPORTER'S TRANSCRIPT

14                   Trial to Jury, Vol. 29

15 _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 7:58 a.m., on the 16th day of December,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

5255

1                              APPEARANCES

2              Michael Koenig, Carolyn Sweeney, Heather Call and Paul

3      Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng,

4      U.S. Department of Justice, 450 Fifth Street N.W., Washington,

5      DC 20530, appearing for Plaintiff.

6              Anna Tryon Pletcher and Michael Tubach of

7      O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

8      San Francisco, CA 94111-3823;

9              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10     N.W., Washington, DC 20006, appearing for Defendant Penn.

11             David Beller, Richard Kornfeld and Kelly Page of

12     Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13     CO 80202, appearing for Defendant Fries.

14             Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15     LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16              Laura Kuykendall and Megan Rahman of Troutman Pepper

17     Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18     appearing for Defendant Brady.

19             Michael Felberg of Reichman, Jorgensen, Lehman,

20     Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21     10017;

22

23

24

25

1          APPEARANCES (Continued)

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
1                    APPEARANCES (Continued)

2              Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5              Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8              Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11             Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                         PROCEEDINGS

16        THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.  We are talking about proposals to

18   answer the jury's latest questions.  Both the defendants and

19   also the United States filed briefs.  Anything more from anyone

20   on those issues before we -- otherwise, I am just going to go

21   ahead and indicate what my answer will be to the jury.

22        Mr. Koenig?

23        MR. KOENIG:  Thank you, Your Honor.  I will just speak

24   loudly.  One other thing that occurred to us this morning is

25   that adding on the last two lines of the defendants' proposed
```

1    instruction kind of leads to a slippery slope where I feel like

2    we are going to then have the jury asking about tiny issues

3    with regard to membership in the conspiracy, and I just feel

4    like it's going to lead down a path that, you know,

5    instructions are clear and this extended proposal is just going

6    to lead to more confusion.  That's all.

7              THE COURT:  Anyone else?

8              Mr. Fagg?

9              MR. FAGG:  Thank you, Your Honor.

10             With respect to this issue, it goes to the most

11   fundamental issues of the case which is the conspiracy.  And it

12   also goes to one of the most fundamental issues in criminal law

13   which is the burden that the government prove the defendants

14   guilty beyond a reasonable doubt.  So I think we have two

15   issues here that need to not -- make sure we don't lose sight

16   of.  One, this is a question about venue which it only requires

17   one single act in the state of Colorado.  Someone just needs to

18   step foot in there and act in furtherance of the conspiracy.

19   But for every other place where this phrase is used in the

20   instructions it refers to the single and continuous conspiracy

21   that the government has alleged.

22             And so we have not only a different factual issue with

23   respect to Instruction No. 22; we also have -- making it

24   exponentially worse is this issue of preponderance of the

25   evidence.  And so I think when you look at *Zimmerman*, the 10th

1    Circuit case that we cited, and the need to make sure that

2    there is no misunderstanding from the jury about what the legal

3    issues are, just reemphasizing the need here to ensure that

4    there is no confusion given the fundamental rights that are at

5    issue for the defendants.

6         *THE COURT:*  Okay.  Is there anyone else?

7         Okay.  First of all, let me take up the defendants'

8    proposed language.  First of all, it introduces the word -- it

9    mentions the word venue.  We haven't mentioned venue anywhere,

10   and while it's true to lawyers, I think it would be confusing

11   to the jury.

12        It then goes on to say "meaning whether the charges

13   could be filed in the District of Colorado."  That's, of

14   course, not what the jury is determining.  You could file these

15   charges in the state of Washington and, you know, the jury is

16   trying to figure out whether or not the venue requirement is

17   met, not whether the government could have charged it in the

18   District of Colorado.  And then after introducing that concept,

19   "whether the charges could be filed in the District of

20   Colorado, no," could be very confusing to the jury about -- it

21   almost seems like the answer to the question whether the

22   government could have filed it in the District of Colorado.

23   And then as the government pointed out, there are portions of

24   it, the latter portion of it really are gratuitous and aren't

25   in answer to the question that the jury posed.

1          I do agree with the government that the jury asked a

2   question about Instruction No. 22.  That same phrase as we know

3   is used in Instructions 14 and 15, but they asked about 22.

4   And it really is speculative to try to even, you know, assume

5   confusion, as Mr. Fagg just referred to, because the jury may

6   not be confused.  We don't exactly know.  But the instructions

7   as a whole I think are not confusing about the burden of proof.

8   14 and 15 are not confusing.  And to assume that the jury is

9   somehow confused I think would be inappropriate.

10          I do think that the answer to the question as to 22 is

11   no.  The defendants have cited a number of different cases, all

12   of which are not on point.  *Evans*, while it may seem to have

13   some good language, is not on point.  *Evans* is a case where the

14   problem that the *Evans* court was dealing with is that the

15   government charged this big conspiracy, but when you're talking

16   about some little small-fry person who is like a street-level

17   dealer, the government in order to prove that the person joined

18   the big conspiracy bought itself a problem because that

19   small-fry person didn't have interdependence or not other

20   reasons.  There are lots of reasons that the government would

21   have difficulty proving some low-level person was part of this

22   big conspiracy.  That doesn't have anything to do with the time

23   period.

24          And *Carnagie*, *Carnagie* is a case that involves

25   interdependence.  It doesn't have anything to do with the

1    question that the jury posed in regard to Instruction No. 22.

2    The government, however, did identify a case which I think

3    confirms other cases that maybe don't address the issue quite

4    as directly, but that Second Circuit case that the government

5    noted, I do believe the *Heimann* case, 705 F.2d 662, that stands

6    for the general proposition which a lot of other cases talk

7    about which is that the government does not have to prove that

8    the conspiracy happened exactly within the time periods

9    alleged.

10           And as the Second Circuit noted, you would never

11   expect that because the indictment is -- you know, doesn't have

12   the powers of prediction exactly how the evidence would

13   necessarily come in, so that there is some inability of the

14   government to prove the time periods exactly does not

15   constitute some type of fatal defect in terms of the

16   government's ability to prove it.

17           So as a result, I am going to answer the question in a

18   straightforward fashion, but I am going to make sure that it's

19   directed just at Instruction No. 22.  I will say, In answer to

20   question No. 1 -- sorry, I will say:  No. 1, As to instruction

21   No. 22, the answer is no.  And then No. 2, I am going to say:

22   Yes.  A copy of the instruction that the Court read to you on

23   Wednesday, December 15th, is attached, marked as Instruction

24   No. 41.

25           And of course I will provide a copy of that answer.

1          Mr. Tubach?

2          *MR. TUBACH:*  Your Honor, would the Court be inclined

3    to -- recognizing the Court has told us what it's inclined to

4    do, is going to do, would the Court be willing to add something

5    to the instruction, to Instruction 22, to explain to them that

6    this is a venue-type issue?  I recognize the Court didn't like

7    the language we had proposed.  We are obviously not wedded to

8    that language in any way, but the idea of what 22 is getting

9    them to answer is whether or not venue is met, however the

10   Court would want to phrase that.  I think that would be

11   terribly important so that the jury is not somehow thinking

12   that the answer that you have provided, "no," means that once

13   they answer the question with respect to 22, that's it.  I

14   think it's -- given that not a single defendant argued venue in

15   this case, not one.  The idea they asked a question and are

16   confused about venue, they picked --

17          *THE COURT:*  Yeah, no, here is one thing that we could

18   do, but I don't think -- I think that it's somewhat off topic,

19   but on the other hand, I don't think that it would do anything

20   more than call attention to what exists already in the

21   instructions is after what I propose to say, you have a

22   separate paragraph.  And then you say, please keep in mind that

23   the phrase -- you quote the phrase, the time phrase -- is also

24   used in instructions No. 14 and 15, which instructions involve

25   a different burden of proof than Instruction No. 22.  You could

1    say something like that.

2          *MR. TUBACH:*  I think that would be --

3          *THE COURT:*  All it does is just point out what's

4    obvious in the instructions already.

5          *MR. TUBACH:*  Yes.  Thank you.

6          *THE COURT:*  Ms. Henry?

7          *MS. HENRY:*  I agree with that.  There is two other

8    points I want to make.  One is the *Heimann* case, it involved

9    mail and wire fraud cases which were very specific about the

10   concept that the scheme had to be in effect at exactly the time

11   that the mailing was done or the wire conversation was done,

12   and that is why those cases are -- come out the way they do.

13         *THE COURT:*  I am sorry, *Heimann* you said?

14         *MS. HENRY:*  Yes.

15         *THE COURT:*  Go ahead.

16         *MS. HENRY:*  And secondly, I just wanted to preserve

17   with regard to the second issue here, we did have an objection

18   to giving that instruction and want to make certain that that

19   objection is preserved.  Obviously, we would feel that giving a

20   copy of it exacerbates the problems that we noted in our

21   original objections.

22         *THE COURT:*  Oh, I see, right, what I have now marked

23   as Instruction No. 41.

24         *MS. HENRY:*  Correct.

25         *THE COURT:*  Yes.  Your objection will be preserved, of

 1    course.

 2             Mr. Koenig, as to that proposed second paragraph in

 3    answer to the Instruction 22 issue?

 4             *MR. KOENIG:*  Well, Your Honor, I think that the

 5    original answer that you proposed to give was correct.  I think

 6    the instruction is clear in the sense that it says before you

 7    convict, you must also find this.  So, you know, they have

 8    presumably gotten through the Instructions 14 and 15 and then

 9    they get to, hold on, one last hurdle.  So I don't really think

10    there is any confusion there at all.  I mean, the 14 and 15 say

11    the burden is the high one.  Instruction 22 says this is a

12    lower burden.  All we're saying is then duplicating what we

13    said and saying and it's not a higher burden.  It just strikes

14    me as --

15             *THE COURT:*  Yeah, I think that your theory that the

16    government is systematically and consecutively going through

17    the instructions is just as speculative as some of the things

18    that the government is criticizing.  We know the jury has been

19    through the instructions a number of times.  I asked that they

20    read them through and the jury indicated that they had gone

21    back over them, so I don't know that that's true.  All we do

22    know is that the jury focused a question on Instruction No. 22.

23             *MR. KOENIG:*  Yeah, I guess I wasn't meaning to point

24    on the consecutive nature of it, but just the phrasing it says.

25    They may not have gotten it, but it does say before you convict

```
 1   you have to do this.  What we do know is that's the instruction
 2   they are considering.  Whether they are doing it out of order
 3   or not, who knows, but you know, this last sentence does say
 4   this is a lower burden of proof.  And so it seems like all we
 5   are adding is the same statement, just in the inverse.  It
 6   doesn't seem necessary to me, but --
 7             THE COURT:  Yeah, I think the proposed second
 8   paragraph, as I said, all it does is point out that venue has a
 9   different burden of proof than those instructions that used the
10   same phrase earlier in the instructions, so I will go ahead and
11   give that paragraph.
12             Anything else?
13             All right.  We will be in recess, then, until a
14   question or a verdict or 5:00 o'clock.  Thank you.
15        (Recess at 8:12 a.m.)
16        (Reconvened at 3:12 p.m.)
17             THE COURT:  We have received a communication from the
18   foreperson of the jury -- I assume he is the foreperson of the
19   jury -- indicating that they don't believe that they can reach
20   a consensus on any of the 10 defendants.  So the question is
21   whether at this time we bring the jury in and dismiss them and
22   declare a mistrial.
23             Response by the government?
24             MR. KOENIG:  Yes, Your Honor, a couple things.  It
25   is -- it has been only Monday, Tuesday, Wednesday and part of
```

1    Thursday.  It was a very long trial.  I don't think that giving

2    up at this point makes sense.  We don't know if, for example,

3    they've had movement at all.  They've said that they are not

4    unanimous yet, but that doesn't mean there hasn't been movement

5    and that there couldn't be movement.

6          One thing I would ask the Court to revisit is the

7    issue of testimony read-back.  It seems to me at this point

8    there is testimony they have asked for and we have not given

9    them and it's, you know, a month and a half since they heard

10   it.  And it would be -- while a bit long to do, it would be

11   something that could move things along, something easy so that

12   we don't have to relatively speaking do this all again.  It

13   seems like it will be a tremendously low cost relative to

14   retrying and spending another six weeks doing this if we just

15   took a day, read the transcript if they still want it, and then

16   see if that proves some movement.

17         Testimonial evidence and documentary evidence, they

18   are both evidence.  So the idea that one type of evidence is

19   back there for them to scrutinize over and over and over, but

20   then to recall -- to rely on their recollection for some other

21   evidence of an eyewitness, it seems that, you know, that seems

22   inequitable.  It doesn't seem like -- they have already asked

23   for the testimony.  It doesn't seem like it's unfairly

24   highlighting anything if the testimony is just read back in

25   full.  And I think that could possibly really help move things

 1   forward.

 2          The other thing I would suggest is I haven't gotten

 3   through it, but I just got e-mailed a Third Circuit pattern

 4   instruction on what to do if a jury says they are still stuck

 5   after an Allen instruction.  I have it on my phone.  It's kind

 6   of long, but we could --

 7          THE COURT:  I have got the Third Circuit instruction

 8   right here.

 9          MR. KOENIG:  Oh, you do?  Okay.

10          THE COURT:  What number is it?

11          MR. KOENIG:  9.06.  And it involves, you know, before

12   making that choice of a mistrial, making some inquiry of the

13   foreperson, polling the jury, not revealing the numbers and --

14   well, it's quite long.  I can't read it on the phone right

15   here, but I guess the bottom line is our thought is it's only

16   been three and a half days.  They've asked for witness

17   testimony that's going on six, going on seven weeks old.  It's

18   right there for us to give it to them, and that's what we

19   should do before taking any steps to suggest that there is a

20   mistrial.

21          THE COURT:  I am going to have Ms. Grimm copy this so

22   for your benefit you can take a look at it.

23          Thoughts from the defense?

24          Mr. Kornfeld?

25          MR. KORNFELD:  Sure.  May we have the number of that?

1    I appreciate it's getting copied, but may we have the number of

2    the pattern that the government and you are referring to?

3            THE COURT:  9.06, I think.

4            MR. KORNFELD:  On behalf of Mr. Fries, and I suspect

5    others, I couldn't disagree more with the government.  First,

6    the testimony, this is making an issue of a nonissue.  They

7    asked for that back on Monday.  For the reasons the Court

8    articulated then, I think it's absolute inappropriate.  It's an

9    invitation for error to give them testimony which the record

10   clearly indicates they haven't asked for since, so I think that

11   would be a crucial mistake.

12           We would also again on behalf of Mr. Fries object --

13   so the record is clear, I am moving for a mistrial, reiterating

14   Mr. Beller's motion from yesterday.  I think it's appropriate

15   at this stage, Your Honor.  We had a note on Monday and part of

16   that note -- and forgive me, I don't have it in front of me --

17   but it indicates the obvious, which is there is some

18   disagreement.  We did not have a Tuesday note, but you will

19   recall that the note we received Wednesday which clearly

20   indicated, you know, a day and a half or roughly a day ago that

21   there was no consensus as to element one, the overarching

22   conspiracy, and there was no consensus as to any of the 10

23   defendants.

24           The latter is not a surprise because if they can't

25   agree there is an overarching conspiracy, they absolutely by

 1   definition shouldn't be able to agree on any of the 10
 2   defendants.  They received the Allen charge.  It was a
 3   comprehensive and well thought-out Allen charge.  And to this
 4   jury's credit rather than trotting back in an hour or two later
 5   and saying, "Hey, we tried," they really did, I mean,
 6   temporally if that's any evidence.  We obviously don't know
 7   what's going on.
 8        At this point the note we received at 2:45 p.m.
 9   today -- excuse me, 2:42 p.m. says, "We do not believe we can
10   reach consensus on any of the 10 defendants."  Now, to be fair,
11   I haven't seen the language of the new Allen, but at a certain
12   point I think we have to respect the jury and their clear
13   indication that not only are they not reaching consensus on the
14   conspiracy, but they are not reaching consensus on any of the
15   10 defendants.  So at this point, Your Honor, I would argue
16   that it would be coercive to send them back yet again.
17   Frankly, I can't imagine what language is in that pattern that
18   would alleviate those concerns.
19        THE COURT:  I haven't read it, but I think just when I
20   glanced at it, and one of the suggestions, and maybe this is
21   just a piece of it, may be an alternative and I think I have
22   heard of this before, and that is that you ask the foreperson,
23   Mr. So and so, are you the foreperson?  Yes.  Do you believe
24   that further deliberations would be appropriate?  And then if
25   the foreperson says no, you would -- one thing you could do is

1   stop at that point.

2          Something that I read in the Third Circuit pattern

3   indicated that a court could then poll each of the jurors with

4   that same question.  I am probably disinclined to do that

5   because what if the polling vote was 10 to 2 or -- I mean, what

6   good would that really do if most people said no?  But anyway,

7   I just wanted to give you a flavor of it.

8          MR. KORNFELD:  I appreciate that, Your Honor.  And I

9   guess my concern when you -- I think one could argue there is

10  an even more coercive effect to that where you have the chief

11  federal district court judge one by one putting each juror on

12  the spot in light of this note.

13         So I appreciate what the Court is saying, but I think,

14  you know, again from the perspective of the defense and

15  certainly of our client, it starts to feel -- you know, at a

16  certain point the jury said we've tried, we've tried, we've

17  tried.  We have no consensus as to again all 10 defendants and

18  yesterday as to the overarching conspiracy.  And to keep

19  sending them back I think sends a subliminal message in light

20  of some of the language in the Allen that we objected to that,

21  boy, this is a lot of time.  This is a lot of, you know, big

22  effort.  I forgot what we took out and what we kept in.  But

23  for all those reasons, Your Honor, we do appreciate the jury's

24  service.  We do believe it's an appropriate time to grant a

25  mistrial and again that would be our request.

1          Thank you.

2          THE COURT:  And Ms. Grimm is passing out copies of the

3    Third Circuit pattern at this time.  And why don't we take just

4    a moment for everyone to take a look at that and then I will

5    hear from Mr. Tubach.

6          Mr. Kornfeld, are you ready?

7          MR. KORNFELD:  Yes, Your Honor, thank you.  I

8    appreciate Ms. Grimm's courtesies and the Court's courtesies in

9    having that copied for all of us.  Our perspective is we would

10   still object to it.  And the other thing I would -- for the

11   reasons I stated, Your Honor, before.

12         The other thing I would note that's a little

13   concerning in this note is the second sentence from Mr. Bird

14   where he writes, "We have tried creating graphic summaries of

15   our thoughts and using evidence to prove guilt or innocence,

16   respectively." Of course, the concept of proving innocence is

17   completely counter to the burden of proof and all the rights

18   associated with that.

19         So if in any way, shape or form the Court is inclined

20   over at least our objection and I suspect others to send them

21   back regardless of any additional charge, we would ask you to

22   again clarify not only the burden of proof which they've heard

23   now three or four times, but more significantly emphasizing the

24   fact that it is the government's burden, the government's

25   burden alone to prove guilt.  It's not a contest of guilt

1    versus innocence.  It's a contest of whether the government has

2    met its burden period.  And obviously if the answer in the

3    jurors mind is it has not, then, you know, there should be an

4    acquittal.

5            Thank you.

6            *THE COURT:*  Thank you, Mr. Kornfeld.

7            Mr. Tubach?

8            *MR. TUBACH:*  On behalf of Mr. Penn, we also move for a

9    mistrial.  The jury in its latest note could not have been much

10   clearer that they have firm convictions on both sides of the

11   debate.  The Court has already given what could be called three

12   Allen charges in this case, the first soft one in Instruction

13   No. 40, the fourth paragraph of which took the fourth paragraph

14   from the modified Allen charge at 1.42 pattern instruction, and

15   then the Court gave the oral modified Allen charge in response

16   to their earlier note that they were deadlocked, and then at

17   their request gave them the written instruction.  So there are

18   arguably three Allen charges at this point.

19           We have looked as exhaustively as we can.  We cannot

20   find a case where there would be a fourth.  We have not found a

21   case in the 10th Circuit where there have even been three.  And

22   we have looked at a number of -- many, many 10th Circuit cases.

23   At this point telling them to go back after they received the

24   Allen charge, the modified Allen charge, telling them to, as

25   strongly as the 10th Circuit will allow, to go deliberate, they

1    are presumed to follow that instruction.  And to now tell them

2    to go do it again is basically telling them you are not

3    following that instruction, which is almost the definition of

4    coercion, that you are trying to force a minority to agree with

5    the majority in some way.  So for those and the reasons stated

6    by my colleagues, we move for a mistrial.

7              THE COURT:  Thank you, Mr. Tubach.

8              Mr. Fagg?

9              MR. FAGG:  Thank you, Your Honor.  I would join in the

10   arguments of my colleagues, Mr. Kornfeld and Mr. Tubach.  And

11   the other thing I would note, Your Honor, in addition to what

12   they have raised is that in the Allen charge that was read to

13   the jury and then at their request was provided to them, they

14   were specifically instructed not to surrender their honest

15   convictions.  And in this note they say, "We still have firm

16   convictions."  So I think it is clear that they are following

17   the Court's instruction, and there is no indication whatsoever

18   in this note that there is any room for further deliberations.

19   Obviously, there is no question presented in here.  It's only

20   statements.  I think the point that they said, "We still have

21   firm convictions," is very important in light of the Allen

22   charge that's already been given.

23             THE COURT:  Thank you, Mr. Fagg.

24             Anyone else?

25             Let me ask the defendants.  Any defendant believe that

1    a mistrial is not appropriate at this point?

2              Okay.  No one has indicated.

3              Mr. Koenig?

4              *MR. KOENIG:*  One moment, please.

5              *THE COURT:*  Yeah.

6              *MR. KOENIG:*  Well, again to respond to Mr. Kornfeld's

7    point saying they haven't -- you know, returning to the Bryant

8    testimony, they just don't know that they can ask that

9    read-back is a possibility.  All they know is, you know, that

10   the Court said no.  And at this point I think it just -- it

11   really makes a lot of sense and there is nothing coercive about

12   giving them the testimony that they asked for.  So for that

13   reason we would urge the Court to strongly consider that if the

14   jury so desires, and they have already indicated a desire for

15   it.

16             And as the counsel have said, one of the issues seems

17   to be, and it's in the note, that they are having trouble

18   agreeing on the overarching conspiracy.  Well, Mr. Bryant's

19   testimony was squarely on that point.  So I think there is real

20   reason to believe that could break this deadlock or seeming

21   deadlock.  If Your Honor -- I know that the way things go in

22   this court, not -- but with this trial, you know, trying to

23   select portions would probably take longer than just reading

24   the testimony.  And reading the testimony in full is generally

25   favored over taking portions out, so we would be fine with

5275

1    that.

2          The only other thing is on the mistrial point, again

3    three and a half days after six weeks of trial is not that

4    long.  And, you know, if you are inclined -- Your Honor is

5    inclined to declare a mistrial, they are very -- the case law

6    that I have seen says it's a very grave finding, thankfully,

7    and it is not to be made lightly, not to suggest that Your

8    Honor would do that, and we would also request, if you are

9    inclined, a manifest necessity finding as well.

10          THE COURT:  Right.  And taking that up from the Third

11   Circuit?

12          MR. KOENIG:  Yes, but it is based on Supreme Court

13   precedent.

14          THE COURT:  Anything else?

15          First of all, let me address some of the government's

16   arguments.  I have already ruled on the suggestion that I read

17   back Mr. Bryant's testimony and have rejected that idea.  I

18   think that it would be especially inappropriate when there

19   hasn't been any more mentions by the jury of Mr. Bryant to

20   suddenly read that back to them, so I am not going to do that.

21          I am not going to follow the suggestions in the Third

22   Circuit pattern instruction 9.06 either.  There is no 10th

23   Circuit precedent for that.  You might ask the foreperson

24   whether there is any -- there would be -- whether he or she

25   believes that further deliberations would be appropriate, but

1    in light of the note, I am not going to do that.  I just don't

2    think that there is any reasonable basis to believe that the

3    answer would be anything other than no.

4          It is true that if you compare this case to some other

5    cases, especially taking into consideration the length of it

6    that maybe you could consider three and a half days not that

7    long, but I haven't seen any case that would suggest that the

8    length of deliberations is the factor that you use in

9    determining whether to give another Allen instruction.  We've

10   given another -- Instruction No. 40 has, as the 10th Circuit

11   suggests, is the appropriate practice to include some of the

12   language from the Allen instruction in the regular set of

13   instructions.  We did that.

14         Moreover, I gave the Allen instruction.  Now, I don't

15   quite agree with Mr. Tubach that we've given three, but the

16   jury asked for a copy of it which means that the jurors were

17   well aware of what I said in the modified Allen instruction and

18   would have that language to make sure that everyone was well

19   aware of that and heard it correctly, but yet they are not able

20   to reach a verdict.

21         The note that we are talking about right now I think

22   is telling.  For one thing, as Mr. Kornfeld pointed out, I

23   think that this jury has tried hard.  I really think that

24   they've tried hard.  You know, we know from the note that we

25   got before -- I am kind of losing track of the dates too, but I

1    think it was the one we got on Tuesday -- no, it was the note

2    that we got Tuesday morning, but as you will recall, they

3    crossed out the date.  They actually had written that note at

4    4:00 p.m. the day before, but they crossed that out and they

5    kept trying to deliberate until mid-morning or so on Tuesday.

6         After the modified Allen was given to them, they went

7    back to work.  They had the question that we spent time this

8    morning on.  They just didn't go back and as was suggested wait

9    for an hour or two until it looked good and say they were

10   deadlocked again, so I think they have been working in good

11   faith.

12        Moreover, the note that we've just received, it

13   indicates "Many of us have looked through every document in the

14   binders," and you know because you have looked through them

15   too, that's a lot of stuff.  So despite my telling you at the

16   very beginning of this case that not that many jurors are going

17   to look through all the exhibits that you put in, some members

18   of this jury did that, looked at every document, every document

19   anyone found important.  They've tried various ways to come up

20   with ways of organizing the evidence.  They have created

21   graphic summaries.

22        I don't agree with Mr. Kornfeld's spin on, you know,

23   this phrase "using evidence to prove guilt or innocence."  I

24   don't think that's a misunderstanding of what the burden of

25   proof is.  I think they are trying to look at the evidence in

1    different lights, trying to look at the evidence in different

2    facets and explore it in an effort to reach consensus.  It says

3    "after scouring the evidence," not looking at the evidence.

4    They are scouring the evidence.  They are working hard to try

5    to do that.  We still have firm convictions.

6           And I do agree with Mr. Fagg that that phrase

7    reflecting what the Allen charge says I think was probably

8    purposeful, that still despite all those efforts, the two

9    different sides in terms of the juror split, they have firm

10   convictions and they don't believe that they can reach

11   consensus on any of the 10 defendants.

12          So I do think it would be quite extraordinary, as

13   Mr. Tubach mentioned.  And I haven't heard of -- after you give

14   a modified Allen instruction, to tell them to go back to work?

15   What would you tell them, probably just go back to work?  I

16   don't think that that would be appropriate at this point in

17   time.  So I am going to bring them back in.  I am going to

18   dismiss them.  And then after that I am going to declare a

19   mistrial.  I will make a finding of a manifest necessity

20   because I don't believe that this particular jury will be able

21   to reach a verdict in this case.  They are deadlocked.

22          Mr. Koenig?

23          *MR. KOENIG:*  Thank you, Your Honor.  In light of the

24   positions that the defendants have taken moving for a mistrial,

25   it would be helpful, I think, for the record to get each

1   defense counsel on the record saying that they agree that there

2   is no double jeopardy problem to retrying the case.

3          THE COURT:  Well, let me ask this, and that is if any

4   of the defendants believes that there is not -- I can't

5   remember what the Third Circuit's word was -- yeah, so the

6   issue is this.  Assuming that the Third Circuit is a correct

7   description of the law, as you will see this is at the very

8   last of that Third Circuit pattern, I find that the jury is

9   unable to reach a verdict, that further deliberations would be

10  futile and that there is no alternative but to declare a

11  mistrial for reasons of manifest necessity and to dismiss the

12  jury.

13         Any defendant disagree with that?  No one has

14  indicated that they do.

15         Okay.  Then Ms. Grimm, let's bring the jury back in.

16         MR. KORNFELD:  Your Honor, may I ask the Court one

17  other thing?

18         THE COURT:  Yes.

19         MR. KORNFELD:  I think while the government has

20  indicated that it will, in fact, retry the defendants, I am

21  hopeful that when the fog of war clears, there might be some

22  discussions about that statement.  To that end it would

23  certainly be helpful to gain any insights that any jurors that

24  would be willing to talk to the parties could give the parties.

25  It might facilitate those discussions.

1        And I know under the rule -- I don't know frankly what

2    the protocol is with a hung jury, but I know under the rule

3    that obviously we need to make that request of the Court, so I

4    would make that request.  And perhaps at the risk also of

5    stating the obvious, I think all parties understanding the

6    splits would be informative to all parties.

7        So I would ask the Court to consider -- well, two

8    things; one, making inquiry about the splits, and No. 2,

9    allowing any jurors who are so inclined to talk to the parties,

10   plural, both sides at the same time, to do that so that we

11   collectively might be able to gain any insights about this

12   case.

13       *THE COURT:*  I am not inclined to do that.  If anyone

14   else wants to make a record, you can make a record right now.

15       Mr. Fagg?

16       *MR. FAGG:*  Thank you, Your Honor.  Yes, we join in

17   Mr. Kornfeld's request.

18       *MR. BYRNE:*  Mr. Little does also.

19       *MR. FELDBERG:*  Mr. Austin does as well.

20       *MR. TUBACH:*  As does Mr. Penn.

21       *MS. PREWITT:*  As does Mr. Mulrenin.

22       *MR. LAVINE:*  As does Mr. Brady.

23       *MS. HENRY:*  Mr. Kantola does as well.

24       *MR. GILLEN:*  Mr. Roberts does as well.

25       *MR. POLLACK:*  I join on behalf of Mr. Blake.  And I

1    offer just as an observation having had this experience on

2    multiple occasions in the past, although not in this district

3    and I understand the practice may be different here, that it

4    would be helpful, I think, to the parties to know the split.

5    And even if the Court is not inclined to allow the parties to

6    communicate with the jury at all, if the Court would be willing

7    to ask the jury what the split was and simply communicate that

8    back to the parties, I think that would be valuable

9    information.  I have seen that done.

10          THE COURT:  Let me ask you this, Mr. Pollack.  What do

11   you mean by the split?  Assuming that there is a block that was

12   the same for everyone or --

13          MR. POLLACK:  Well, I think you would have to make

14   that inquiry.  The question would be as to each defendant.  It

15   may be it's the same as to each defendant.

16          THE COURT:  So if it wasn't the same for each

17   defendant, then ask the jurors for each defendant?

18          MR. POLLACK:  Yes, Your Honor, that would be my

19   request.

20          THE COURT:  All right.  Thank you.

21          Mr. Koenig, any thoughts?

22          MR. KOENIG:  On the issue of asking them questions,

23   just for the record, we don't take a position on that, you

24   know, the probing-type questions that were contemplated.  I am

25   not sure I fully grasped what was just proposed.

1              THE COURT:  Sure.  What Mr. Pollack was suggesting is

2    that if the Court is not going to allow the parties or the

3    attorneys or their agents to contact the jurors in any manner

4    about their service in this case, that the Court outside of the

5    presence, of course, of any of the attorneys or parties ask the

6    jurors what the split was as to each defendant.  So, for

7    instance, as to a given defendant maybe it was 10-2 conviction

8    or maybe it was 10-2 acquittal, something of that nature.  I

9    think that's what the proposal was.  Is that right,

10   Mr. Pollack?

11             MR. POLLAK:  Yes, Your Honor, exactly.

12             THE COURT:  One thing, I would tell the jury that they

13   don't have to tell me that if they don't want to.  I wouldn't

14   compel them to tell me that.  I would make it clear to them if

15   they wanted to share that information, some of the parties

16   thought that might be helpful to them, but I wouldn't force

17   them or even suggest that they'd have to tell me that

18   information.

19             MR. KOENIG:  Well, I guess we just -- we take no

20   position on that.

21             THE COURT:  I'll do that.  Here is what I'm going to

22   do, and I will tell you this.  The reason I am not going to

23   allow you to talk to them and I am going to order you, and this

24   is an order that you do not contact them and ask them about

25   their service in this case or their deliberations.  And you

1    can't have obviously someone do it on your behalf is because I

2    did it in one case and it was after a mistrial.

3            Now, in that case it was a little bit different

4    because the government wasn't sure that it was going to retry

5    the case, but the government did retry the case.  And I just

6    didn't find that it was helpful at all.  People just kind of

7    hear what they want to hear and they just use it to prepare for

8    the next trial and it really just isn't that productive at all,

9    so I am not going to do that.  But I will follow Mr. Pollack's

10   suggestion, and if the jurors wish as to some or all of the

11   defendants indicate that, I will dutifully record it and let

12   you know.

13           What I would like to do, then, is the following, and

14   that is I'll bring the jury in.  I will dismiss the jury.  I

15   will indicate to the jurors that I would like to personally

16   thank them.  I will then go back.  And they don't have to stay.

17   Some people may high-tail it out of here, but those who remain,

18   I will thank them.  And I will pose the question to them.  I

19   will then come back out, so if you don't mind waiting.  And

20   then when I come back, we'll take care of a few orders of

21   business.  One of them will be to continue the defendants'

22   bonds.  The next one will be to formally declare the mistrial

23   and also we'll set the new trial.

24           As you may have perhaps figured out, we'll need to set

25   the trial on February 22nd.  That's within speedy trial, not

1   that there -- perhaps there will be motions to continue the

2   trial, but in any event, we will have to set it within speedy

3   trial which would be on February 22nd, okay?

4        Mr. Gillen?

5        *MR. GILLEN:*  One more point, Your Honor.  Would the

6   Court instruct the jurors that they are not permitted to

7   contact counsel?  I've had that happen.

8        *THE COURT:*  Oh, have you?

9        *MR. GILLEN:*  If you would do that, I would appreciate

10   it.

11        *THE COURT:*  Anyone disagree with that?  I have never

12   done that before, but I could.

13        *MR. BELLER:*  Your Honor, Mr. Gillen and I stood up at

14   the same time because that has also been my experience that not

15   often, but from time to time, especially a trial that has been

16   lengthy or at times emotional, I have had jurors reach out to

17   me wanting to discuss the case.  And my request differs from

18   Mr. Gillen's just a little bit.  Mine is more an understanding

19   of the extent of the Court's order.  And that is if a juror

20   should reach out to one of us, do we have permission or

21   authority to be able to, you know, participate in that

22   conversation so long as it's initiated by the juror?  Unlike

23   Mr. Gillen, I don't see a need for there to be an order

24   prohibiting them from doing so.  I am just more interested in

25   whether I could participate in that conversation.

1        *THE COURT:*  That's a good question.  The answer to

2    that question is no, you may not.  So if you were to be

3    contacted, you would have to politely inform the juror that you

4    are not allowed to do that.

5            Mr. Koenig?

6        *MR. KOENIG:*  One more issue.  There are other cases

7    related to this conspiracy pending.  There is the United States

8    v. McGuire.  There is United States v. Claxton.  And I do -- I

9    would request maybe that your order, if it's possible, to limit

10   those parties from also reaching out to jurors because I do

11   think there is a real possibility of harassment, but I don't

12   know if that's really within the power of the Court to do, but

13   just something that raised --

14       *THE COURT:*  I don't think I can do that.  But the

15   government team -- and you are, of course, a common member, at

16   least of the case in front of Judge Domenico, so I don't think

17   that anyone on the team in Judge Domenico's case could do that.

18   But the jurors may be contacted by some other people.  I don't

19   really think I have the authority to prohibit that, but --

20       *MR. KORNFELD:*  Your Honor, I am sorry, I understand

21   the government's concern, but I just think obviously I don't

22   represent Claxton.  I represent Mr. Fries.  But a comment that

23   there is a very real possibility of harassment, having worked

24   with those lawyers for months, I would take issue with that.

25   They are professionals and they will conduct themselves

1    professionally.

2         THE COURT:  Yeah, I have never had a situation where

3    there has been harassment.  And I would -- I really don't think

4    this is the type of case you would ever expect such a thing, so

5    I don't think that that's a real possibility.

6         All right.  Anything before we bring the jury back in?

7         All right.  Ms. Grimm.

8         (Jury present.)

9         THE COURT:  Ladies and gentlemen, we received your

10   latest note and it appears that the jury is deadlocked.  I am

11   going to declare a mistrial in this case.  And what that means

12   is that I am going to dismiss you from your service as jurors

13   in this particular case.

14        Let me tell you that I very much appreciate the really

15   extraordinary effort that each of you has put in in this case.

16   It started a long time ago, and you were here on schedules that

17   weren't always the ones that you anticipated.  And you had days

18   off without very much notice and you nonetheless continued at

19   it and were here listening carefully to the evidence, so I

20   really appreciate that.

21        The question may now come up, ladies and gentlemen, as

22   to whether or not once you are dismissed as jurors, whether you

23   can talk to others about this case.  I will inform you that I

24   have ordered that the attorneys and the parties to this case

25   may not contact you, all right?  And I am sure that they won't.

5287

1   If for some reason one of them, you know, did contact you and

2   persisted in trying to talk to you about the case, you can

3   always call my chambers and report that, but I am sure that

4   they won't.

5            But that doesn't mean that other people may not

6   contact you.  It could be that other interested people may want

7   to talk to you about the case, and if so, understand that you

8   can talk to anyone as much or as little about the case as you

9   want.  You have a perfect right to ask anyone who wants to talk

10  to you about the case who that person is and whether they

11  represent someone else and other questions like that to figure

12  out who exactly the person who wants to talk to you about the

13  case is.  But, you know, if you want to talk about the case,

14  you can.  You can write a book about the case.  You can never

15  think about the case again.  That's all completely up to you

16  going forward.  But I would ask that you not contact the

17  parties either on your own.  But once again, if you want to

18  talk to other people about the case, you are perfectly free to

19  do so.

20           I know that you've already devoted a tremendous amount

21  of time to this case.  I would love if you have just a few

22  extra minutes to be able to swing by the jury room and

23  personally thank you for your service in this case.  So once I

24  dismiss you, if you have that time, I would love to swing by.

25  I will swing by right away and just give you my personal

1    thanks.

2           All right.  Ladies and gentlemen, then at this time

3    the jury is dismissed.

4           (Jury excused.)

5           Thank you.  Please be seated.  So I will go talk to

6    the jury right now.  As soon as I am done doing that.  I will

7    come back in and we'll do the things that I talked about, all

8    right?  The Court will be in recess.

9        (Recess at 3:55 p.m.)

10       (Reconvened at 4:10 p.m.)

11          *THE COURT:*  All right.  So I will at this time declare

12   a mistrial.  And I will continue the defendants' bonds to the

13   next hearing in this case.

14          I have talked to the jury and the jury did give me the

15   splits and they provided those numbers defendant by defendant.

16   So let me -- and just to make the record clear, I made sure

17   that the jurors were aware that -- of what I would do, that I

18   would report it back in the court.  And I gave them an

19   opportunity to talk amongst themselves outside of my presence

20   to make sure that this was voluntary, and they were all fine

21   with sharing those numbers, so let me give those numbers to you

22   now.  And I think that this goes in caption order.

23          As to Mr. Penn, there were 8 votes to convict, 4 to

24   acquit; as to Mr. Fries, 8 votes to convict, 4 to acquit; as to

25   Mr. Brady, 8 votes to convict, 4 to acquit; as to Mr. Austin, 8

1    votes to convict, 4 to acquit; as to Mr. Mulrenin, there were 3

2    votes to convict, 9 votes to acquit; as to Mr. Kantola, there

3    were 7 votes to convict, 5 votes to acquit; as to Mr. Little,

4    there were 3 votes to convict, 9 votes to acquit; as to

5    Mr. Lovette, there were 5 votes to convict, 7 votes to acquit;

6    as to Mr. Roberts, 3 votes to convict, 9 votes to acquit; as to

7    Mr. Blake, there were 3 votes to convict, 9 votes to acquit.

8            All right?  Anything else that we should talk about

9    today?

10           Mr. Pollack, go ahead.

11           MR. POLLACK:  Your Honor, just one question about the

12   Court's order in terms of talking to the jurors.  There was, of

13   course, one alternate who will now be discharged.  I assume

14   that the Court's prior order with respect to the jurors that

15   deliberated is the same with respect to the alternate, but I

16   just wanted to --

17           THE COURT:  Yes, thank you for that, Mr. Pollack, but

18   you are right.  Yes, it will apply to her as well.  And we will

19   let her know, by the way, that the jury has completed its

20   service.

21           MR. POLLACK:  Thank you, Your Honor.

22           THE COURT:  Anything else that we should discuss at

23   this time?

24           Mr. Koenig?

25           MR. KOENIG:  Thank you, just in terms of logistics

1    for -- understanding that February might change, February 22nd

2    I believe you said, but it will be here before you know it.

3    And the government would like the opportunity to update its

4    *James* log I think based on the events of trial, what came in

5    and what didn't, subsequent documents that came to our

6    attention and so forth.  And I think it makes sense to be able

7    to pivot in that regard.

8         THE COURT:  I think you would need to move for

9    permission to do that.  I am not sure that I am going to

10   revisit anything.  We are not starting from scratch.

11        MR. KOENIG:  To be clear, not reconsider everything,

12   but just, you know, to supplement.  I think part of the issue

13   is notice and making the trial go as smooth as possible.  And I

14   think at this point now the *James* log was submitted in early

15   August of 2021 for a February 2022 trial.  I think it's

16   reasonable to allow some supplementation of that, especially in

17   light of developments at trial and Your Honor's rulings on

18   various things.  You know, when we submitted the *James* log,

19   we -- we had never appeared before you before, so we didn't

20   have as good of feel for which documents we should have

21   submitted or should not have submitted.  And I just think that

22   with that amount of time between the *James* log submission and

23   trial, it makes good sense.  And I don't think there is any

24   real prejudice to the defendants on that.

25             THE COURT:  Well, once again, I would -- if anyone

5291

1    wants to revisit things, you need to file a motion asking

2    because I am not -- I don't think that the fact that there was

3    a mistrial is a license to try to change rulings unless there

4    is some really good reason to do so.

5         MR. KOENIG:  So does that mean for 801(d)(2)(E)

6    documents that were not on the *James* log that we tried to

7    introduce and you said I am not going to do that because it

8    wasn't on the *James* log, those would be out?  But if we had

9    subsequent documents that we haven't tried to introduce, is

10   that kind of the fair game you are thinking about?

11        THE COURT:  I am not sure, but probably.  I just

12   don't -- the fact that there was a mistrial you could chalk up

13   to -- you could almost call it a coincidence.  It was something

14   that wasn't necessarily expected.  It happened.  But that

15   eventuality, unless there has been some type of change that

16   would really suggest that it's equitable, fair to allow

17   revisiting something, I don't want to go through the

18   inefficiencies of relitigating things again.

19        MR. KOENIG:  And I guess one thing I would add is, you

20   know, we may have a different set of witnesses next time.

21        THE COURT:  Right.  And, you know, obviously I think

22   that the government in particular, given the fact that it's got

23   the burden of proof, should think hard about whether to retry,

24   and if so, the approach.  And in the event that there are

25   different witnesses or something of that nature, obviously we

5292

 1     will have to deal with that as it comes up.  There obviously

 2     would perhaps need to be litigation and motion practice in

 3     regard to issues that come up as a result.

 4          MR. KOENIG:  Sure.  Just for the record, we do intend

 5     to retry the case.

 6          THE COURT:  Yes, you have stated that a couple of

 7     times.  Thank you, Mr. Koenig.

 8          Mr. Pollack?  I think I know what Mr. Pollack is going

 9     to say, but ...

10          MR. POLLACK:  What am I going to say?

11          THE COURT:  Rule 29.  That will be my next order of

12     business.  I will turn my attention to the Rule 29 motions.

13          MR. POLLACK:  Thank you, Your Honor.  I appreciate

14     that.

15          On the off chance that after the Court rules on that

16     motion if this is still relevant, what I was going to raise is

17     I have a federal criminal trial in Baltimore that is scheduled

18     to start January 11th and is scheduled to last five to six

19     weeks.  Now, I know that the February 22nd date is the 70-day

20     date.  But assuming that at least some of the parties would

21     like to have an adjustment in that date, what is the best way

22     for us to do that?  Should we confer amongst ourselves and try

23     to find a date that works on our calendars and then come back

24     to the Court or does the Court want to you give us some

25     guidance of when the Court would have the availability for a

1    trial of this length?

2           THE COURT:  Well, obviously when we set this trial, we

3    were operating under an exclusion and we could set it -- we

4    were able to set it out in the future.  Because we are not

5    operating under an exclusion now, but rather under the

6    statutory 70-day period, we have to set it within speedy trial.

7           MR. POLLACK:  Understood.

8           THE COURT:  But I think that the best approach is

9    obviously for people -- I mean, 70 days -- when I looked at the

10   calendar was like February 22nd, that soon?  So people have

11   schedules.  You have trials.  I think that the best approach is

12   to coordinate amongst everyone to the best of people's

13   abilities.  It has to obviously be justifiable, a justifiable

14   exclusion under the Speedy Trial Act, but once people get a

15   sense for it, then file a motion, a motion to exclude time.

16          MR. POLLACK:  Thank you, Your Honor.  I am not sure

17   what the answer to this is, but whether or not the pendency of

18   the Rule 29 motions are actually currently tolling so that we

19   don't need --

20          THE COURT:  I am not sure that it is.  Ms. Prewitt is

21   shaking her head no.  I think that under the Speedy Trial Act,

22   that it's 70 days from the date of whatever caused the

23   mistrial.  So I think that speedy --

24          MR. POLLACK:  Normally a pending motion is an

25   exclusion.

1          THE COURT:  I would have to look that up.  Have you

2     had that before, Mr. Pollack?

3          MR. POLLACK:  I have not.  I don't know the answer to

4     that question.  I was just noting that it may be that the clock

5     is not actually running.

6          THE COURT:  It could be.  You could be right.  I will

7     look into that issue, but in any event, I will still turn my

8     attention to the Rule 29s.  But assuming that the clock is

9     running, a motion to exclude time would be the best.  And the

10    motion to exclude time could even -- you know, you could file a

11    separate brief on whether the Rule 29 motions, because they are

12    still pending, whether they have the effect of tolling.  Maybe

13    they do.

14         MR. POLLACK:  Thank you, Your Honor.

15         THE COURT:  Go ahead, Mr. Byrne.

16         MR. BYRNE:  The current bond prohibits the defendants

17    from speaking with one another outside the presence of counsel,

18    and I would like to ask that prohibition be removed.  I don't

19    see any reason for that.  There is also a prohibition for them

20    not talking to witnesses.  Maybe that's still justified, but I

21    don't see -- these people are all friends, most of them

22    friends, and I don't see any reason why that prohibition should

23    remain.

24         THE COURT:  Was that the product of a motion brought

25    by the government and then the magistrate judge?

1          *MR. BYRNE:*  Correct, at the initial arraignment that

2   was discussed, and that was insisted upon by the government and

3   that was the order.

4          *THE COURT:*  Sure.

5          Mr. Koenig?

6          *MR. KOENIG:*  Well, I mean, nothing has really changed,

7   so I think it was justified then and it continues to be

8   justified now.

9          *THE COURT:*  What I will do is I will entertain a

10  motion if you want to brief that a little bit more.  I don't

11  know the circumstances.  That is a standard order, but if there

12  is a little more justification for it, I will certainly take a

13  look at that.

14         *MR. BYRNE:*  Thank you.

15         Mr. Feldberg?

16         *MR. FELDBERG:*  The exclusion included a large number

17  of people who, I guess, potential witnesses, most of whom were

18  not witnesses.  Would Your Honor entertain an application that

19  would include at least some of the prohibited contacts?

20         *THE COURT:*  Why don't you, once again, if you don't

21  mind putting that in the form of a motion and we will have the

22  names in front of us.  And the government can weigh in on that

23  because, of course, there is still a case in front of Judge

24  Domenico and that could affect some people that may be former

25  Pilgrim's employees, for instance.

1      MR. FELDBERG:  Understood.  I don't think those

2   defendants are people that we would --

3      THE COURT:  No, I am sure not, but I am just saying

4   that there could be names on the list that are relevant.  I

5   don't know.

6      MR. FELDBERG:  Thank you, Your Honor.

7      THE COURT:  Mr. Fagg?

8      MR. FAGG:  As the Rule 29 motions are still pending,

9   on behalf of Mr. Lovette, we would move to join in the argument

10   that was filed by Mr. Kantola regarding the unconstitutionality

11   of the per se standard for purposes of our Rule 29.

12      THE COURT:  Yeah.  If I agreed with Mr. Kantola's

13   argument in that regard, I would apply it to everybody.

14      MR. FAGG:  Thank you, Your Honor.

15      THE COURT:  Go ahead, Mr. Kornfeld.

16      MR. KORNFELD:  Just on behalf of the defense, we would

17   express our gratitude to the Court, to the Court's staff, for

18   all of their courtesies.  As I told Mr. Colwell yesterday when

19   I bumped into him, many of my colleagues who are not from our

20   district have indicated how much they appreciate the culture in

21   our courthouse, in the courtroom, from literally the moment you

22   walk in the door of this building.  So it's been a long trial

23   and people have worked hard to make our lives easier and we

24   appreciate that.

25      THE COURT:  Yeah.  And I am not trying to fish for

1    compliments, but I appreciate it, Mr. Kornfeld.  If there is

2    anything that we can do -- you know, it's an unusual case and

3    we have an unusual number of people in the courtroom.  And

4    because we are going to be doing this again, if there is some

5    things that you think would improve your lives, for instance, I

6    felt bad that I didn't offer you this week, make sure that you

7    understood that you could hang out in my courtroom, for

8    instance.  But if there are things like that that would make

9    your life during the retrial more convenient, let us know that.

10          Because some of these things are things which we may

11   not have thought of because we haven't had a trial like this or

12   there is not this many people or even if it's just

13   practicalities of, you know, what restrooms are accessible

14   within the amount of time you are given.  It could be mundane

15   things, but things to help make things go more smoothly or

16   better.  Don't hesitate to let us know.  You can do it

17   anonymously too, you know, get Mr. Kornfeld to say it or

18   whatever you want to do, but we do want to make sure that we

19   don't unnecessarily inconvenience people or cause you to take

20   unnecessary steps, all right?

21          Mr. Koenig?

22          MR. KOENIG:  Of course, the government echos what

23   Mr. Kornfeld said.

24          THE COURT:  Yes.  I appreciate that.

25          All right.  Anything else before we recess?

1        Then as I said before, the defendants' bonds will be

2   continued and the Court will be in recess.   Thank you.

3        (Recess at 4:25 p.m.)

4                    REPORTER'S CERTIFICATE

5     I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.   Dated

7   at Denver, Colorado, this 4th day of March, 2022.

8

9                         S/Janet M. Coppock

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25