IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    JAYSON JEFFREY PENN,
2.    MIKELL REEVE FRIES,
3.    SCOTT JAMES BRADY,
4.    ROGER BORN AUSTIN, and
5.    **WILLIAM WADE LOVETTE**,

Defendants.

---

**WILLIAM LOVETTE'S RENEWED MOTION FOR
JUDGMENT OF ACQUITTAL**

---

    Mr. Lovette respectfully submits this renewed motion for acquittal at the close of the evidence in conjunction with his prior motion for acquittal. (*See* ECF No. 1215.)

## INTRODUCTION

    "While undoubtedly deferential, [Rule 29] review has some bite." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015). "[T]he 'evidence presented to support a conviction must be ***substantial***.'" *Id.* (emphasis added) (quoting *United States v. Morales*, 108 F.3d 1213, 1221 (10th Cir. 1997)). In this extraordinary case in which the government has twice failed to obtain a single conviction of any of the ten Defendants, it is abundantly clear that no reasonably minded jury could find beyond a reasonable doubt that the evidence against Mr. Lovette supports a conviction. Two hardworking juries that made a sincere effort to reach a verdict have

demonstrated this loud and clear. (*See* Day 29 Official Tr. 5276:22-5277:5; Day 22 Trial Tr. 6:22-7:3; 17:1-9.)

The government's case against Mr. Lovette hinges not on any evidence the government presented at trial, but rather on the government's desire to convict a CEO. The evidence against Mr. Lovette rises or falls on a single telephone call with Mr. Austin, two possible meetings—one with Mr. Penn and one with Mr. Penn and Mr. Stiller—and two e-mail communications admitted without any context.[1] The government offers only two pieces of evidence in which Mr. Lovette engages in any *meaningful affirmative conduct* over eight years—responding to an email from Joseph Grendys and calling Roger Austin. (ECF No. 1215.) Nothing in the direct or circumstantial evidence connects Mr. Lovette to the charged conspiracy. The government relies on a series of inferences, one built upon another, and conjecture, that do not allow a jury *reasonably* to conclude that Mr. Lovette "knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it." (ECF No. 932 at 6.)

The government's closing arguments reveal just how much it relies on conjecture irreconcilable with its burden of proof. In attempting to connect Mr. Lovette to the charged conspiracy in 2014, the government refers to a phone call and a meeting between Mr. Lovette and other Pilgrim's employees. The government argues that Messrs. Penn and Lovette had a meeting on August 20, 2014 because in GX1074 (dated August 19, 2014) Mr. Penn tells Mr. McGuire he will review a proposed price increase with Mr. Lovette "in the am." (GX1074.) The government argued in its closing that "[y]ou know exactly what he was reviewing with Defendant Lovette, the

---

[1] Faced with a stunning lack of evidence against Mr. Lovette, the government listed two documents that were not even in evidence as "key" evidence against Mr. Lovette and 25% of the documents it listed as "key" did not have any connection to Mr. Lovette.

plan with the conspirators and the competitors to [sic] as a prices." (Day 19 Trial Tr. 46:9-13.[2]) The government offers no evidence to support such a conclusion and instead asks the jury to make at least five consecutive inferences to reach that conclusion. (*See* ECF No. 1215 at 7.)[3] The "inferences do not logically flow from the evidence adduced at trial" and devolve into pure conjecture. *See United States v. Debrew*, No. CR 09-2054, 2011 WL 13190112, at *7 (D.N.M. Apr. 26, 2011). Furthermore, the Defense evidence, some discussed below, rebuts the conjecture that an agreement among competitors was made or that Mr. Lovette ever joined such an agreement.

The Defense evidence reaffirms that no reasonable inference can be drawn from the exhibits or testimony to show that Mr. Lovette joined the charged conspiracy. The uncontested and unrefuted testimony of Ms. Ray established that upon being named CEO, and before allegedly joining the charged conspiracy, Mr. Lovette implemented an independent strategy for all Pilgrim's business units to increase prices to a fair market price. (Day 16 Trial Tr. 195:5-14 (Ray).) The first affirmative act in evidence is Mr. Lovette's call to Mr. Austin on August 26, 2014. The Defense evidence rebuts the conjecture that Mr. Lovette's call with Mr. Austin was about an agreement; rather, the call follows Mr. Austin's report that the RSCS CEO was likely to call Mr. Lovette and that Mr. Lovette was preparing for the call with Mr. McCormick (GX1051), which subsequently

---

[2] Mr. Lovette cites the unofficial, draft transcripts for the convenience of the Court. Mr. Lovette defers to the Court to the extent its recollection differs from what is included in the draft transcript.
[3] The email references the "Cost Model" Mr. McGuire previously discussed with Mr. Penn and includes nothing more than ranges of proposed price increases. There is no follow-up whatever to Mr. Penn's email or evidence what, if anything, involved Mr. Lovette thereafter. The jury must infer (1) Messrs. Penn and Lovette met; (2) the pricing ranges were shown to Mr. Lovette; (3) that the other suppliers' possible pricing estimates were provided by other suppliers; (3) that Mr. Penn knew the estimates came from other suppliers, not Pilgrim's own team; (4) that the men discussed the comparison estimates; (5) most critically, that the two discussed an agreement with competitors despite there being no evidence either ever communicated with anyone about an agreement; and (6) they agreed to price Pilgrim's bid based on such an agreement.

occurred. (Day 6 Trial Tr. 145:3-146:16 (Suerken).) Even assuming the evidence allowed a jury to make three inferences regarding what was discussed on the call—(1) Messrs. Austin and Lovette discussed pricing, (2) Mr. Lovette is "Greeley", and (3) Mr. Lovette instructed Mr. Austin not to lower Pilgrim's bid—such inferences are not sufficient evidence Mr. Lovette joined the alleged conspiracy. In fact, two reasonable juries have refused to make the fourth leap to infer that any instruction from Mr. Lovette was based on an alleged agreement with competitors instead of the more logical inference that the instruction was driven by the fair market pricing strategy described by Ms. Ray. This is not surprising as it is a leap too far.

In its closing the government argued expressly that its case against Mr. Lovette is grounded in the fact that he "supervised" Pilgrim's employees who obtained—from unidentified sources—competitor bid information. (Day 17 Trial Tr. 232:17-233:6.) But there were approximately 56,000 employees that Mr. Lovette "supervised" just as much as he did Messrs. Austin, Little, McGuire, and Bryant, and others in pricing[4] as well as more than ten departments reported directly to him.[5] (Day 11 Trial Tr. 24:10-11; 16:18-18:17 (Bryant).) The argument lays bare the government's rationale for prosecuting Mr. Lovette: the government wants the public to see it pursuing CEOs, even though the evidence against Mr. Lovette is wholly insufficient.

## LEGAL STANDARD

The Court should grant an acquittal "when the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury must have a reasonable doubt as to the

---

[4] Evidence that Mr. Lovette supervised employees at Pilgrim's who were involved in pricing is not evidence that Mr. Lovette knowingly consented to his subordinates' participation in the alleged conspiracy or treated his subordinates as "his boots on the ground." (*See* ECF No. 900 at 19-20.)

4

existence of any of the essential elements of the crime charged." *United States v. Frol*, 518 F.2d 1134, 1137 (8th Cir. 1975) (quotation omitted). When the evidence is "nothing more than piling inference upon inference . . . or where the evidence raises no more than a mere suspicion of guilt", a reasonably minded jury would have reasonable doubt and therefore a Court must acquit. *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (quotations omitted).

In determining whether the government has adduced sufficient evidence to permit a reasonable jury to return a guilty verdict, the Court should consider the burden of proof. *Debrew*, 2011 WL 13190112, at *2. Specifically, "[w]hen the government depends upon inferences to carry its burden of proof", the Court must conclude that those inferences are "reasonable and probative ones, and amount to more than just speculation and conjecture", otherwise the Court should grant the motion for acquittal. *Id.* at *6-7 (granting an acquittal motion when the government argued that reasonable inferences could be drawn regarding the defendant's knowing participation in a conspiracy, but "such inferences do not logically flow from the evidence adduced at trial"); *see also United States v. Valentich*, 737 F.2d 880, 882 (10th Cir. 1984) (affirming grant of acquittal because evidence that "required inferences to be added one to the other in order to develop even some circumstantial evidence" was "much too speculative to withstand the motion for acquittal"); *United States v. Rufai*, 732 F.3d 1175, 1194 (10th Cir. 2013) (reversing convictions where the evidence and arguments about the defendant's knowledge and intent to participate in the fraud scheme "pile inference upon inference to the point that the evidence raises no more than a mere suspicion of guilt") (quotation omitted).

## ARGUMENT

In this case, the government encouraged the jury to convict Mr. Lovette based on suspicion alone, which "would be tantamount to 'permit[ting] speculation to substitute for proof beyond a reasonable doubt.'" *Debrew*, 2011 WL 13190112, at *6 (quoting *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995)). As a result, the Court should carefully examine whether the inferences a jury must make to conclude the government has carried its burden of proof are *permissible.* An inference "is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist" and not "[i]mpermissible speculation . . . [which is] a complete absence of probative facts to support the conclusion reached." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quotations omitted). "A jury may draw an inference only where that inference can be made beyond a reasonable doubt." *Rahseparian*, 231 F.3d at 1264.

The Defense case highlights the flawed logic of the government's prosecution against Mr. Lovette. The government argues that Mr. Lovette's normal business conduct and communications are sufficient to justify the jury's speculation that Mr. Lovette knowingly entered the charged eight-year conspiracy. In truth, the inferences the government has twice failed to persuade the jury to make are both unreasonable and impermissible.

**I.   NO REASONABLE JURY COULD FIND A SHERMAN ACT VIOLATION BASED ON MR. LOVETTE'S PARTICIPATION IN PILGRIM'S KFC CONTRACT NEGOTIATIONS BECAUSE THE NECESSARY INFERENCES ARE UNREASONABLE.**

The government introduced two emails, evidence of two possible meetings, and one phone call in its effort to prove that Mr. Lovette participated in the conspiracy in 2013, 2015, and 2018 to fix prices for those KFC contracts. All that his communications prove, however, is his limited participation in the negotiations in his role as CEO–nothing more. The rest is conjecture

6

irreconcilable with the government's burden of proof.

      A.    <u>Defendants' Evidence Precludes Any Reasonable Inference that Mr. Lovette Knowingly Joined the Conspiracy to Fix Prices Related to the 2015 KFC Contract.</u>

When evaluating the sufficiency of the evidence, the Court must consider "'the collective inferences to be drawn from the evidence as a whole,' rather than examining the evidence in 'bits and pieces.'" (ECF No. 932 at 3 (quoting *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021.))) In its closing argument, the government told the jury three times that it need not look further than 2014. (*See* Day 17 Trial Tr. 177:13-16, Day 19 Trial Tr. 43:13-16, 48:11-15.) But, Defendants' unrebutted evidence as to Pilgrim's alleged participation in a conspiracy and Mr. Lovette's alleged decision to join it establishes that: (1) prior to 2014, Pilgrim's adopted its price courage strategy, which meant it was willing to lose RSCS volume to obtain a higher, fair market price (Day 16 Trial Tr. 195:5-14 (Ray))[6]; (2) one of RSCS's goals was to reduce its dependence on Pilgrim's and, therefore, reduce Pilgrim's volume (Day 13 Trial Tr. 110:14-111:1 (Eddington)); and (3) Pilgrim's had other customers to whom it could sell its chicken at a higher price (*see* Day 6 Trial Tr. 69:9-16 (Suerken)); and (4) the final contract price was equal to or lower than prices Pilgrim's secured from other buyers, as evidenced by Professor Snyder's benchmarking analysis, which showed that the price was not artificially inflated by a price fixing agreement. (Day 16 Trial Tr. 34:14-35:1; 41:23-46:22; J-219.) In order to convict Mr. Lovette, the jury must ignore these facts "known to exist." *See Pauling*, 924 F.3d at 656. Instead, the jury must infer that Mr. Lovette was informed and approved of "the plan with the conspirators and the competitors to as a price"

---

[6] This strategy is completely contrary to the description of the supposed conspiracy offered by Messrs. Bryant and Pepper who testified the purpose of the conspiracy was *not* to lose volume. (Day8 Trial Tr. 144:25-145:2 (Pepper); Day 9 Trial Tr. 165:23-166:3; 166:9-13 (Bryant).)

when he received information about and met with Pilgrim's employees to discuss the KFC contract negotiations. (Day 19 Trial Tr. 46:12-13.) There is no evidence from which a reasonable jury can infer that (1) Mr. Lovette was ever informed there was a conspiracy regarding KFC or any other buyer or (2) that Mr. Lovette knowingly joined such a conspiracy.

First, Defendants presented evidence of the pricing strategy Mr. Lovette implemented in 2011 when he arrived at Pilgrim's—prior to any alleged act by Mr. Lovette to join the charged conspiracy. Brenda Ray explained that when Mr. Lovette arrived at Pilgrim's he implemented a new pricing strategy, referred to as "price courage." (Day 16 Trial Tr. 161:3-11; 195:9-12.) Prior to Mr. Lovette's arrival, Pilgrim's "did not sell product for what fair market value was for the product," and, in part, as a result, Pilgrim's "had been through two bankruptcies." (*Id.* 195:6-12 (Ray).) Ms. Ray testified that "when Mr. Lovette came onboard, he gave us all the instructions to sell your product with price courage. We can always find another avenue to sell it, but sell it at market value, at fair values." (*Id.* 195:9-12.) While simple, this strategy was very impactful in summer and fall of 2014, when the demand for small birds was high and the supply was low. (*See, e.g.*, Day 13 Trial Tr. 77:20-78:17 (Eddington); Day 15 Trial Tr. 206:12-21 (Snyder).)

The numerous cost and pricing model spreadsheets Defendants put in evidence demonstrate the extensive analysis the Pilgrim's pricing team conducted to determine bids, including bids to RSCS. (*See, e.g.*, D-408, D-410, D-149, D-151, D-160, D-162, D-165, E-546.) These spreadsheets reflect the multiple, complex factors that Pilgrim's considered when making pricing decisions. And a change in any of these factors would impact Pilgrim's bidding. Based on these analytics and its price courage strategy (Day 16 Trial Tr. 161:3-11 (Ray)), Pilgrim's independently demanded a significant price increase in 2014 for the 2015 contract. (*See* Day 13

8

Trial Tr. 111:2-112:10 (Eddington).) There is no evidence to support a finding Mr. Lovette did anything outside the bounds of this wholly independent strategy.

Second, the history of the relationship between RSCS and Pilgrim's provides important context for the 2015 RSCS and Pilgrim's negotiations. Pilgrim's was supplying more than 40% of KFC's COB volume (Day 13 Trial Tr. 112:2-10 (Eddington)), which empowered Pilgrim's to demand a higher price. (*Id.* 110:14-111:1 (Eddington).) KFC knew Pilgrim's would continue to have leverage so long as Pilgrim's held such a high percentage of its volume, so KFC began awarding volume to other suppliers. (*Id.*)

Third, Pilgrim's had customers willing to pay more than RSCS, and Pilgrim's sold them chicken at higher prices. (*See* GX979.)

Fourth, market prices evidenced by the Urner Barry index were above $1.17 per pound at this time, and spot market transactions executed by RSCS itself in the summer of 2014 were up to $1.45 per pound for small birds, giving the jury concrete evidence of the market price at the time.

Fifth, as Professor Snyder's benchmarking analysis demonstrated, which was confirmed by 2014 spot prices, the pricing was inconsistent with the government's theory of a price fixing conspiracy. (Day 16 Trial Tr. 34:14-35:1; 41:23-46:22 (Snyder).)

   B. <u>The Inferences the Government Asks the Jury to Make Regarding Mr. Lovette's Alleged Participation in the Conspiracy as Relates to KFC Are Unreasonable.</u>

     (1) *A jury cannot reasonably infer that Mr. Lovette joined the conspiracy, even if it could reasonably infer from GX1074 that Mr. Lovette approved Pilgrim's initial bid to KFC in 2014.*

In GX1074, Mr. Penn receives two emails from Jason McGuire that initially attached a cost model for KFC and then, in a follow-up email, provides a myriad of additional information including what appears to contain a range of suppliers' possible price increases to RSCS. Mr. Penn

9

writes that he would "review with Bill in the am." (GX1074.) Mr. Lovette did not receive either email or the cost model. At no point did the government introduce evidence of what, if anything, was ever discussed with Mr. Lovette about this information. There are no follow-up communications. Mr. Lovette's initial Rule 29 brief lays out the series of inferences the government must persuade the jury to make to accept its theory. (ECF No. 1215 at 6-7.)

Left with this glaring hole, the government's closing argument simply assumed a meeting occurred and demanded the jury speculate about that meeting, arguing "[y]ou know exactly what he was reviewing with Defendant Lovette, the plan with the conspirators and the competitors to [sic] as a prices because you saw that he did the same thing in 2012[7]." (Day 19 Trial Tr. 46:9-13.) There is "a complete absence of probative facts to support the conclusion reached" by the government. *See Pauling*, 924 F.3d at 656 (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). While the jury is permitted to make reasonable inferences, it is not permitted to speculate, even "reasonably." *Pauling*, 924 F.3d at 656. "Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached *is nevertheless unreasonable* because it is not logically based on another fact known to exist." *Id.* (emphasis added). That is precisely what the government did ask and must ask a jury to do—to speculate what parts of a lengthy email Mr. Penn reviewed with Mr. Lovette and to speculate that they discussed something that is *not* contained anywhere in the email: an alleged inter-company agreement. But this conclusion would be based on argument, not facts known to

---

[7] The government's flawed argument is further illustrated by its reference to Mr. Penn's actions in 2012 because the uncontroverted evidence shows that, in 2012, Mr. Penn forwarded a Pilgrim's "***Price Reduction Impact***" analysis, containing its independent analysis of how different potential price reductions to KFC would impact Pilgrim's strategy. (GX1522-23.)

exist, and such argument that is directly contradicted by the evidence that information exchange was expected in the broiler chicken industry and served a legitimate and legal purpose. (Day 15 Trial Tr. 199:15-17 (Snyder).)

Even if Mr. Penn did "review with Bill" the content in GX1074, the estimated competitor price increases are one data point Pilgrim's considered when determining Pilgrim's price increase for its 2015 bid. Given the Court's jury instruction that "[t]here may be legitimate reasons that would lead competitors to exchange price information other than fixing prices or rigging bids" (ECF No. 1232 at Instruction No. 21), and Professor Snyder's testimony that information exchange is *expected* in the industry due, in part, to its relational contracting, information sharing when standing alone is an insufficient indicator of bid rigging or price fixing. (Day 16 Trial Tr. 19:2-20:8.) Normal business activity, such as discussion of a bid and estimates of competitors' bids is not remotely sufficient evidence that Mr. Lovette knowingly entered into an agreement to rig bids or fix prices. *See Pauling*, 924 F.3d at 656 ("[I]n a criminal case, 'the government must do more than introduce evidence at least as consistent with innocence as with guilt.'" (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)).

Moreover, the government's suggestion that Pilgrim's "wanted to be the leader" (GX1074) on pricing has no logical connection to whether Mr. Lovette knowingly joined the charged conspiracy. As the Court instructed the jury, "[i]t is not illegal for a competitor to obtain, rely upon, and act on pricing and other information received from competitors . . . and others involved in the production and sale of broiler chicken products so long as there is no agreement to fix prices or to rig bids." (ECF No. 1232 at Instruction No. 21.) Therefore, even if Mr. Penn shared the estimated competitor price increase information with Mr. Lovette, that fact still would not allow a reasonable

11

jury to infer that Mr. Lovette (a) understood the alleged conspiracy existed and (b) joined the conspiracy, knowing of its goals and intending to advance them. Instead, when considering the reasonable inferences that can be drawn from GX1074 along with the testimony of Ms. Ray regarding Pilgrim's pricing strategy and other evidence of Pilgrim's internal analyses related to its KFC cost models, (*see, e.g.*, D-408, D-410, D-149, D-151, D-160, D-162, D-165, E-546), the reasonable inference grounded in fact—not speculation—is Mr. Lovette knew that competitors' potential bids were one data point Pilgrim's pricing team considered when determining Pilgrim's bid for KFC, which is not a violation of the Sherman Act.

> (2) *A reasonable jury cannot infer that Mr. Lovette joined the alleged conspiracy based on one fifteen-minute phone call with Pilgrim's Vice President of Sales for KFC.*

The government relies upon a fifteen-minute telephone call between Messrs. Lovette and Austin on August 26, 2014, to argue that Mr. Lovette was directing Mr. Austin's price negotiations pursuant to an agreement to fix prices. (GX11 at 1.) There is no direct evidence of what was discussed on the Lovette-Austin call. The government, therefore, must support the inference that Mr. Lovette directed Mr. Austin not to reduce Pilgrim's bid *pursuant to the charged agreement*. The government relies on the text message later that day in which Mr. Brady informs Mr. Fries that "[he] talked to Roger about KFC and Greeley told him not to come down on price. He called bob today and told him." (GX1238.)

The Tenth Circuit's decision *United States v. Hanson*, 41 F.3d 580 (10th Cir. 1994) is instructive. There, the Tenth Circuit reversed convictions because the "evidence is susceptible of different interpretations." *Id.* at 582. The alleged co-conspirator "could not identify any agreement or understanding" with the defendant, and "[n]o reasonable trier of fact could find that these phone

12

calls of unknown relevance facilitated a scheme to defraud" because there was no evidence "such that a jury could reasonably infer the content of any of the calls." *Id.* at 583-84. The principles of *Hanson* apply here. Even construing the evidence in the light most favorable to the government—inferring that Greeley is Mr. Lovette, not Mr. McGuire or Mr. Penn, and assuming that Mr. Lovette agreed that Pilgrim's should not "come down on price" (GX1238; *see* GX1051), that instruction is consistent with Pilgrim's independent "price courage" strategy that Mr. Lovette sought to implement beginning in 2011 and the current conditions of the market, not an agreement with competitors. (Day 16 Trial Tr. 161:3-16; 195:5-14 (Ray).)

Furthermore, the logical inference is that Mr. Lovette called Mr. Austin to prepare for the call that Mr. Austin had told him to expect from the CEO of RSCS. (GX1051.) Mr. Austin then scheduled a call between Mr. McCormick and Mr. Lovette. (Day 6 Trial Tr. 145:8-15 (Suerken).) Mr. Suerken testified that during that call Mr. Lovette "gave a methodical economic case" that was based on the current market situation. (*Id*. 146:2-16) That required preparation. It is logical to infer that during this fifteen-minute call Messrs. Austin and Lovette discussed the meetings with RSCS, Mr. Austin's discussions with RSCS as outlined in GX1051, and what Mr. Lovette should expect to hear from Mr. McCormick, but there is no evidence sufficient to infer that any agreement with competitors was discussed.

## II. THE ADDITIONAL TWO EMAILS THE GOVERNMENT RELIES ON DO NOT SUGGEST MR. LOVETTE ENTERED INTO THE ALLEGED CONSPIRACY.

### A. Mr. Lovette's Welcome Remarks at the 2013 NCC Seminar Cannot Be Used To Reasonably Infer that He Knowingly Joined the Alleged Conspiracy.

With no witness or explanation, the government offered an email in which Mr. Penn jokes to Mr. Lovette about an "illegal spiel" made "at the NCC." (GX3025.) Rather, it was Mr. Lovette

who provided context through Michael Brown, the President of the National Chicken Council ("NCC"). Mr. Brown made it abundantly clear there was nothing illegal said or done by Mr. Lovette while at the July 2013 NCC conference referenced in GX3025. As the 2013 NCC Chairman, Mr. Lovette was expected to present the opening remarks at its July Marketing Seminar. (B-849; Day 14 Trial Tr. 164:14-165:6 (Brown).) The NCC drafted the speech, not Mr. Lovette. (E-078; Day 14 Trial Tr. 168:11-20 (Brown).) The speech was vetted by at least four members of the NCC, including its general counsel (Day 14 Trial Tr. 168:11-20; 169:1-14 (Brown)) and Mr. Lovette did not deviate from the speech as written. (*Id.* 170:2-13; 175:10-18 (Brown).) Mr. Penn—who made the joke about the "illegal spiel" in GX3025—did not even attend the conference. (*Id.* 195:17-196:8 (Brown).) There is no relevance of GX3025 to this case.

  B.  <u>GX803 Is Not Evidence that Mr. Lovette Knowingly Joined the Alleged Conspiracy.</u>

GX803—a single email between Messrs. Lovette and Joseph Grendys of Koch Foods—is insufficient to prove any illegal agreement. The email is discussed in Mr. Lovette's initial motion. (ECF No. 1215 at 14-15.) Further, the evidence offered by Mr. Lovette established unequivocally that Mr. Lovette was ***not*** involved in the negotiations with Sysco over its credit terms and never communicated about the Grendys email with anyone involved in the Sysco negotiations. (Day 16 Trial Tr. 151:25-152:10; 193:20-23.) Decisions related to Sysco's credit terms were handled by Ms. Ray and Pilgrim's CFO, Fabio Sandri. *Id.* 132:23-133:9; 136:14-22; 153:7-11 (Ray).)

Ms. Ray reinforced what Robert Bryant had already established: there was no conspiracy in Pilgrim's broadline segment, which served Sysco. (Day 9 Trial Tr. 150:5-7; 154:3-9 (Bryant).) Ms. Ray had no knowledge that Pilgrim's communicated with or received information from

14

another supplier about Sysco's request. Ms. Ray testified that Pilgrim's did not coordinate in any way with another supplier during the negotiations. (Day 16 Trial Tr. 152:11-153:6.)

The undisputed Defense evidence demonstrates that after GX803, Pilgrim's and Koch went on independently to negotiate different terms under different timelines. Pilgrim's started negotiating with Sysco on May 2, 2016 (*Id.* 149:6-8; D-989-90) and two months later finalized an agreement that included some of the 14-day terms Sysco had requested (GX850-51, GX9700; Day 16 Trial Tr. 149:14-18.) Koch, by contrast, did not start negotiating with Sysco until a month *after* Pilgrim's finalized its terms with Sysco and sent back terms *different* from the Pilgrim's-Sysco agreement. (GX9701.) The Defense evidence confirms what GX803 and Mr. Bryant made clear: GX803 does not prove the charged conspiracy or Mr. Lovette's membership in it.

## CONCLUSION

For all these reasons, and for all the reasons set forth in Mr. Lovette's Motion for Judgment of Acquittal (ECF No. 1215), Mr. Lovette respectfully moves for a judgment of acquittal.

Dated:  April 4, 2022                                           Respectfully submitted,

*s/ John A. Fagg, Jr.*
John A. Fagg, Jr.
James P. McLoughlin, Jr.
Kaitlin M. Price
MOORE & VAN ALLEN PLLC
Attorneys for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
johnfagg@mvalaw.com
jimmcloughlin@mvalaw.com
kaitlinprice@mvalaw.com

15

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

Dated:  April 4, 2022                                             *s/ John A. Fagg, Jr.*