# EXHIBIT 1

MANISH KUMAR (CSBN 269493)
LESLIE A. WULFF (CSBN 277979)
MIKAL J. CONDON (CSBN 229208)
ANDREW SCHUPANITZ (CSBN 315850)
U.S. Department of Justice, Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
leslie.wulff@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18-cr-00203-EMC |
| v. | **UNITED STATES' OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29** |
| CHRISTOPHER LISCHEWSKI, | |
| Defendant. | Date: March 18, 2020<br>Time: 2:30 p.m.<br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor |

**INTRODUCTION**

Following a four-week trial featuring hundreds of exhibits and testimony from ten witnesses, including senior executives at each of the three packaged-seafood companies, the jury returned a guilty verdict against defendant.  In delivering its guilty verdict, the jury used a special verdict form as requested by defendant.  It found that defendant participated in a price-fixing conspiracy involving both StarKist and Chicken of the Sea.  (Dkt. No. 640.)  Defendant's cursory motion for judgment of acquittal provides nothing more than citations to previous argument.  Defendant does not—and cannot—point to any evidence that would require the Court to overturn the jury's verdict.  The jury's verdict should stand, and defendant's motion must fail.

**LEGAL STANDARD**

Defendant cannot meet the burden for overturning the jury's verdict under Rule 29. While Rule 29 allows the court to set aside a jury's verdict and grant a judgment of acquittal based on the insufficiency of the evidence, the defendant "bears a heavy burden."  *See United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) (citation omitted).  In ruling on a post-verdict Rule 29 motion, the Court must presume that the trier of fact resolved any conflicting inferences in favor of the prosecution.  *United States v. Johnson*, 229 F.3d 891, 895 (9th Cir. 2000) (overruling the district court's grant of motion for acquittal after a jury verdict).  Courts defer to the jury's findings because "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts."  *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (citation omitted).  Moreover "[j]uries have broad discretion in deciding what inferences to draw from the evidence presented at trial."  *United States v. Ramirez*, 714 F.3d 1134, 1138 (9th Cir. 2013) (internal quotation marked and citations omitted).  When considering a Rule 29 motion, the court views the evidence presented at trial in the light most favorable to the prosecution, and the verdict must be sustained where "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Mosley*, 465 F.3d 412, 415 (9th Cir. 2006) (emphasis in original) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United*

*//*

1  *States v. Merriweather*, 777 F.2d 503, 507 (9th Cir. 1985); *United States v. Nevils*, 598 F.3d

2  1158 (9th Cir. 2010) (en banc).

3        A Rule 29 motion may not be used to challenge jury instructions or to strike evidence

4  presented at trial.  *United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009); *United States v.*

5  *Cooper*, No. 14-CR-228, 2016 WL 4087109, at *5, n.40 (D. Nev. Jul. 29, 2016).

6                              **PROCEDURAL BACKGROUND**

7        Defendant moved for acquittal under Rule 29 during trial, arguing that there was

8  insufficient evidence to establish an agreement between defendant and Shue Wing Chan, then-

9  CEO of Chicken of the Sea, and that such agreement alone therefore could not justify a guilty

10  verdict (Trial Tr. at 2464:10-2465:12; *see also* Appendix A attached hereto containing all

11  transcript excerpts cited by defendant in his motion.)   At the Court's request, the parties fully

12  briefed the issue.  (Dkt. Nos. 603 and 604.)  Defendant renewed his motion at the close of

13  evidence, providing no further argument.  (Trial Tr. at 3157:8-12.)  The Court reserved ruling on

14  defendant's motion.  (Trial Tr. at 3157:13-14.)

15        The Court properly instructed the jury that, in order to find defendant guilty, it had to find

16  three elements beyond a reasonable doubt:

17        • the existence of the charged price-fixing conspiracy;

18        • that defendant knowingly became a member; and

19        • that the conspiracy occurred within the flow of or substantially affected interstate

20            commerce.  (Dkt. No. 626.)

21                                    **ARGUMENT**

22        The jury's verdict has abundant evidentiary support as to each element of the offense.[1]

23  Indeed, during his Rule 29 argument at trial, defendant did not appear to contest the sufficiency

24  of the evidence that a price-fixing conspiracy existed, that defendant knowingly participated, or

25  that the conspiracy involved products sold in interstate commerce.  On the complete and

26  extensive factual record presented at trial, defendant's motion must fail.  The thrust of

27      //

28  _____

[1]      The government incorporates by reference its arguments and factual citations in its
previous brief.  (Dkt. No. 604.)

U.S. OPP. TO RENEWED
MOT. FOR ACQUITTAL
No. 18-cr-00203-EMC                              2

1    defendant's novel argument was that the evidence pertaining to an agreement with Chan could

2    not, on its own, sustain a guilty verdict.  (Trial Tr. at 2458:4-6 (describing the evidence

3    introduced by Chan and arguing "[t]hat's not an agreement.  That is not evidence sufficient to

4    permit a reasonable juror to find beyond a reasonable doubt that there was a price-fixing

5    conspiracy").)  Defendant rested his Rule 29 motion on this basis notwithstanding the Court's

6    earlier holding that "[t]o obtain a conviction, the jury must find unanimously that Defendant

7    participated in a conspiracy involving Bumble Bee and either StarKist or Chicken of the Sea (or

8    both) during the time period charged in the Indictment."  (Dkt. No. 495 at 10.)  As discussed

9    further below, the argument that the jury relied solely on evidence of the Lischewski-Chan

10   agreement in reaching its verdict has been foreclosed by the jury's special verdict form, which

11   expressly found a conspiracy among all three tuna companies.

12          With regard to the first two elements of the crime, that the conspiracy existed and that

13   defendant knowingly participated, the jury heard testimony and saw evidence sufficient to

14   sustain its verdict.  Defendant's direct reports and coconspirators Scott Cameron and Kenneth

15   Worsham testified to the existence of the conspiracy.  Their testimony was corroborated by the

16   testimony of Steve Hodge from StarKist.  (Trial Tr. at 1191:6-1193:21; 1294:15-1295:3;

17   1322:18-1323:20.)  Cameron and Worsham also testified that defendant was intimately involved

18   in the formation of the conspiracy and its implementation over the next three years.

19   Specifically, Cameron and Worsham testified that defendant instructed his subordinates to reach

20   a "truce" with StarKist in the fall of 2010 and to coordinate pricing with competitors as fish costs

21   increased dramatically between November 2010 and December 2013.  (Trial Tr. at 529:6-530:16;

22   579:4-22; 1643:21-1645:21.)  This evidence linked defendant with the very foundation of the

23   conspiracy.  Furthermore, both Cameron and Worsham testified that defendant was aware of the

24   agreements they reached with their counterparts at StarKist and Chicken of the Sea and

25   repeatedly and knowingly approved the pricing actions they had agreed upon with their

26   competitors.  (Trial Tr. at 538:4-539:15; 1520:25; 1530:25-1531:16.)  Both Cameron and

27   Worsham testified that defendant wanted to be kept informed of their communications with

28   competitors about price and pricing agreements, and that they kept him so informed.  (Trial Tr. at

586:6-587:10; 597:5-21; 609:4-14; 1750: 3-1751:2; 1678:17-1679:22; 1735:20-1728:19; 1790:3-1791:14.)  Further, they testified that defendant approved the price increases they had agreed upon with their competitors after he was informed of those agreements.  (Trial Tr. at 598:9-24; 1598:1-9; 1627:8-1628:2; 1680:8-13; 1738:20-25.)  The evidence demonstrated that defendant authorized and directed agreements on three list price increases and coordination of pricing guidance and promotional price points for each quarter during the conspiracy.  Their testimony was corroborated by ample evidence of defendant's hands-on management style.  (*See, e.g.*, Ex. 105 (defendant's resume in which he described his "aggressive, results oriented management style"); Ex. 855 (an interview with the Wall Street Journal in which defendant described Bumble Bee's "cohesive management team" where "information is shared openly amongst management"); Ex. 2106 (a list of senior executives' pending tasks maintained by defendant).)

Defendant's participation was not limited to starting the conspiracy and maintaining it through his supervision of Cameron and Worsham—although such evidence alone would be sufficient to sustain a conviction and overcome defendant's Rule 29 motion.  The jury also heard testimony from Chan regarding his conspiratorial emails and conversations with defendant, in which Chan agreed that Chicken of the Sea would refrain from aggressive discounts and defendant enforced Chicken of the Sea's participation in the conspiracy.  (Trial Tr. at 2239:11-21; 2245:4-11; 2251:5-8.)  These conversations took place during in-person meetings, including a one-on-one breakfast conversation at Milton's restaurant in Del Mar and another at a Tuna Council meeting in Chicago.  (Trial Tr. at 2235:11-20; 2255:3-13.)  The jury also heard evidence regarding phone conversations surrounding several of the email exchanges.  (Trial Tr. at 2199:24-2200:11; 2246:4-2247:17; Exs. 627; Exs. 650 and 651; Ex. 657.)

The testimony of these witnesses was supported by evidence of defendant's own statements demonstrating his knowledge of and participation in the conspiracy and his desire to keep it a secret.  For example, emails admitted into evidence included a "peace proposal" written by defendant allocating market share between Bumble Bee and StarKist shortly before the start of the charged conspiracy.  (Ex. 131.)  Other emails proved that defendant directed Cameron and Worsham to discuss pricing with competitors and that he had advance knowledge of

1  competitors' pricing actions.  (Exs. 147, 228, and 276.)  Emails also revealed defendant's

2  communications with StarKist coconspirator Joe Tuza, confirming the details of Bumble Bee's

3  winning bid at Kroger.  (Ex. 451.)

4      Evidence of defendant's statements about the conspiracy was also admitted through

5  testimony of other witnesses, including Renato Curto, CEO of Tri-Marine International, a tuna

6  supply firm.  Mr. Curto testified regarding defendant's statements about StarKist from before the

7  conspiracy, during which he talked about a war for market share, and defendant's statements

8  during the conspiracy, where defendant talked about the fact that the two companies were

9  "talking constantly" and had been discussing how to go to market intelligently.  (Trial Tr. at

10  1109:13-1110:16; Exs. 755 and 757.)

11      The jury also heard testimony that defendant attempted to impede the government's

12  investigation by telling Cameron that Bumble Bee would support Cameron with regards to the

13  investigation as long as Cameron and Worsham "don't fuck it up."  (Trial Tr. at 671:19-672:13.)

14  Witnesses also testified that defendant spoke in coded language in group meetings, attempting to

15  keep non-participants from learning about the conspiracy.  (Trial Tr. at 530:12-19; 1791:23-

16  1792:3.)  This testimony was consistent with defendant's own emails, in which he removed

17  references to pricing communications with Chan from emails with Bumble Bee's private-equity

18  owners.  (Exs. 298 and 299.)

19      From top to bottom, the trial evidence proved that defendant orchestrated the very start of

20  the conspiracy, kept it going through his direct supervision of Cameron and Worsham and his

21  own communications with Chan, and attempted to keep the government from uncovering

22  evidence of the conspiracy's existence during its investigation.  This evidence is more than

23  sufficient to support the jury's verdict on the first two elements of the crime: the existence of the

24  conspiracy and defendant's knowing participation.

25      With regard to the third element of the crime, the jury received evidence that cans of tuna

26  affected by the conspiracy traveled in interstate commerce.  For example, Cameron and

27  Worsham testified that cans of Bumble Bee tuna are manufactured in Lyons, Georgia and Santa

28  Fe Springs, California before they are shipped to distribution centers outside those states and

1    sold in grocery stores in all fifty states.  (Trial Tr. at 498:6-499:25; 1526:17-1527:7.)  Michael

2    Baribeau also testified that, during the conspiracy, Safeway purchased tuna from the three

3    packaged-seafood companies for its warehouses in eight different states before that tuna was

4    transferred to its nationwide stores.  (Trial Tr. at 1012:13-1013:24.)

5         To the extent that defendant renews his argument that the agreement between Shue Wing

6    Chan and defendant is not in and of itself sufficient to sustain a conviction, the special verdict

7    form forecloses that argument.  The jury found that defendant participated in a single conspiracy

8    with both Chicken of the Sea and StarKist.  (Dkt. No. 640.)  The Court has already found that it

9    would be sufficient for the jury to find that defendant participated in a conspiracy with *either*

10   StarKist *or* Chicken of the Sea to sustain the guilty verdict.  (Dkt. No. 495 at 8.)  Here, the

11   government proved, and the jury found, that executives from both companies participated in the

12   conspiracy with Bumble Bee.  This finding is more than sufficient to sustain the conviction.

## CONCLUSION

14        After weighing the evidence presented through four weeks of trial, the jury unanimously

15   found defendant guilty of participating in a conspiracy with executives of both StarKist and

16   Chicken of the Sea.  Defendant has not and cannot meet his substantial burden to overturn the

17   jury's verdict.  His renewed Rule 29 motion must fail.

19   Dated: February 10, 2020                        Respectfully submitted,

21                                                   /s/ *Leslie A. Wulff*
                                                     MANISH KUMAR
22                                                   LESLIE A. WULFF
                                                     MIKAL J. CONDON
23                                                   ANDREW SCHUPANITZ
                                                     Trial Attorneys
24                                                   U.S. Department of Justice
                                                     Antitrust Division

# Appendix A

1   doesn't -- to me, I don't see the harm, Your Honor, in --

2           THE COURT:  All right.  I'm going to abide by my

3   ruling.  I'm not going to make any statement.  I don't think it

4   needs one.  But along with that, I will make it clear that I'm

5   not going to allow any suggestion that's along the lines of the

6   missing witness instruction.

7           MR. KUMAR:  Thank you, Your Honor.

8           MR. PETERS:  Yeah.  We're just going to argue the

9   evidence, which is here's what he said when he was interviewed.

10  That's what's in the record.  That's what we'll argue.

11      Your Honor, one other item, if I may.

12          THE COURT:  Yeah.

13          MR. PETERS:  We move, pursuant to Federal Rule of

14  Criminal Procedure 29, for a judgment of acquittal.  We would

15  ask to -- and I think we have that right under the rule to

16  supplement it at a later time with a written motion, to the

17  extent that seems appropriate.

18      But I would just like to be heard very, very briefly on

19  one aspect of that motion --

20          THE COURT:  Go ahead.

21          MR. PETERS:  -- which is as it pertains to the witness

22  Shue Wing Chan, who Your Honor heard on Wednesday.

23      The way the evidence is, the Chan piece is pretty much of

24  a freestanding agreement between Mr. Chan and Mr. Lischewski,

25  according to the Government.  There was, I think, a question or

 1   an answer that he was aware of what Mike White was doing in

 2   terms of timing.  It was just a teeny bit of evidence about

 3   that.

 4       But the alleged understanding about not pricing

 5   aggressively is a straight Mr. Chan/Mr. Lischewski thing.  And

 6   he testified that he told no one else at Chicken of the Sea

 7   about it.  So it really is -- it's pretty much of a

 8   freestanding thing.

 9       And based on the testimony, which Your Honor heard -- and

10   Your Honor was obviously listening very carefully to it based

11   on your comments at the two-minute lunch hour about what the

12   evidence was -- that evidence is insufficient to establish the

13   existence of any agreement.

14       He claims -- the Government claims that there was some

15   agreement reached at lunch -- at breakfast, I mean.  But what

16   Mr. Chan actually testified to was that he raised this topic.

17   He said something along the lines of:  It's not my strategy to

18   price low and Mr. Lischewski basically said nothing, and that

19   was it, and that they never talked about -- Mr. Lischewski

20   never said anything to him about Bumble Bee's pricing.  He

21   never said anything to him about Bumble Bee's promotions.

22       These phone calls, which the Government made so much of,

23   offering two demonstratives, contained absolutely no evidence

24   about pricing.

25       And what you're left with is a purported agreement created

1    by a person saying, "I said something to someone else who

2    didn't say anything to me, and I formed an understanding in my

3    own mind."

4         And that's it.  That's not an agreement.  That is not

5    evidence sufficient to permit a reasonable juror to find beyond

6    a reasonable doubt that that was a price-fixing conspiracy.

7         And so that's our argument about Mr. Chan and that that

8    cannot go to the jury.

9              **THE COURT:**  All right.  Your response, briefly.

10             **MR. KUMAR:**  Yes.  And, Your Honor, my colleague,

11   Andrew Schupanitz, who has been working very hard on this case,

12   is going to address the Rule 29 issue.

13        But I just want to put a marker down, Your Honor, that I

14   wanted to say something with regard to Mr. Handford and

15   something that Mr. Peters just said.  But we can return to that

16   maybe after we're given an opportunity to respond to the

17   argument regarding the testimony yesterday.

18             **THE COURT:**  Okay.

19             **MR. SCHUPANITZ:**  Good morning, Your Honor.  So I think

20   some of this sounds like an argument about the credibility of

21   Mr. Chan's testimony and the weight of the evidence, but I want

22   to address two things that defense counsel said.

23        One, the idea that, you know, the agreements between

24   defendant and Mr. Chan were somehow just one-sided, I think

25   Ninth Circuit case law is clear on this, that, you know, a sort

 1   of concerted plan of action and then people acting according to

 2   that contemplated plan is sufficient.  That's an agreement

 3   under the Sherman Act.

 4        **THE COURT:**  What the defendant is arguing here is the

 5   word "concerted."  There has to be a concerted plan of action.

 6   And I guess that's going to be the question.  What is the

 7   concerted?  There has to be some degree of bilateralness;

 8   right?  I mean, somebody's got to -- doesn't there have to be

 9   some understanding or agreement to do something?

10        **MR. KUMAR:**  Yes, Your Honor.  And Mr. Chan testified

11   that his expectation was that when his company did not promote

12   products aggressively, that Bumble Bee would also not promote

13   aggressively.  You don't just unilaterally offer to do

14   something to your chief rival --

15        **THE COURT:**  So essentially, it was a tacit

16   understanding?

17        **MR. KUMAR:**  Yes, which is entirely --

18        **THE COURT:**  There's no testimony of anything explicit

19   coming from --

20        **MR. KUMAR:**  Yes, Your Honor.  But a tacit

21   understanding can, nevertheless, constitute a violation of

22   Section 1.

23        And Your Honor's proposed jury instructions also make it

24   clear that a conspiracy can include subagreements and

25   subconspiracies.  And so the fact that -- I'm not sure exactly

1   what Mr. Peters is saying with regard to that -- attempting to

2   claim that this is some sort of separate agreement.  To the

3   extent that it involves the defendant, it could be part of an

4   overall conspiracy between -- involving all three packaged

5   seafood companies.  And so we just want to make sure that that

6   is clear in the record as well.

7          THE COURT:  All right.  You had a second point,

8   I think.

9          MR. SCHUPANITZ:  Yes.  And I think this is related to

10  the first, which is that the idea that these agreements between

11  defendant and Shue Wing Chan were totally separate ignores the

12  defendant's knowledge and the defendant's role and the people

13  at Bumble Bee, who knew he were talking -- he was talking to

14  Shue Wing Chan.  I think we saw e-mails to that effect.  Both

15  Mr. Worsham and Mr. Cameron knew that the defendant was talking

16  to Mr. Chan, was talking to him about pricing.

17      So the idea that this is wholly apart from the rest of the

18  conspiracy ignores that piece.

19          THE COURT:  Okay.

20          MR. PETERS:  Your Honor, my point -- and I think

21  Your Honor understands it -- is that it's basic law.  I learned

22  in law school, an agreement involves some kind of promise

23  for -- in exchange for a promise.  Sure, it can be tacit.

24      But Mr. Lischewski -- there has to -- the relevant state

25  of mind is not Shue Wing Chan's.  He told us what his

1   understanding was.  There has to be evidence arising from his

2   interactions with Mr. Chan from which you could infer -- not

3   just infer, from which a jury could find beyond a reasonable

4   doubt that Mr. Lischewski was entering into an agreement with

5   Mr. Chan, that he had an understanding that there was an

6   agreement.  And there's simply no such evidence.

7        The only interaction which actually contains any content

8   at all is this Milton's breakfast, and there simply is no

9   evidence that Mr. Lischewski did or said anything that could

10   allow a reasonable juror to conclude beyond a reasonable doubt

11   that he was intending to agree with Mr. Chan about pricing.

12        He said nothing.  He never said anything.  I'm repeating

13   myself now.  But that's the point.  It's, this is -- it's an

14   inchoate crime.  But they have to prove an agreement, and

15   there's no evidence that Mr. Lischewski did anything which

16   could constitute an agreement with Mr. Chan.

17        If Mr. Chan left and said, "I'm not going to be

18   aggressive," which, obviously, he did anyway, but putting that

19   aside, that's neither here nor there.  There's simply no

20   evidence.

21            **THE COURT:**  Let me ask the Government.

22        Do you agree that as a matter of legal principle, a jury

23   would have to find intent, on the part of Mr. Lischewski, to

24   enter into some kind of agreement with Mr. Chan?

25            **MR. SCHUPANITZ:**  Or I think they could find that there

1    was an intent to further the broader conspiracy by discussing

2    pricing and by trying to get Chan to -- Mr. Chan to relent on

3    aggressive pricing.  I mean, the Government has not --

4         **THE COURT:**  To further a conspiracy assumes there's a

5    conspiracy in the first place.  So the question, more

6    precisely, is, it seems to me -- put aside the evidence for a

7    minute.  In order to convict, would the jury have to find that

8    not only Mr. Chan had an understanding, but Mr. Lischewski had

9    an understanding?

10        **MR. SCHUPANITZ:**  Well, I don't think we can put aside

11   the evidence because the Government hasn't charged the

12   agreements between Mr. Chan and the defendant as a stand-alone

13   charge.  The Government has charged --

14        **THE COURT:**  Well, but if it's part of the conspiracy,

15   whether you call it a subagreement that's part of the larger

16   agreement or just one part of the larger agreement, would you

17   agree that, as a legal matter, there has to be a finding --

18   never mind the evidence, whether it supports it or not, because

19   you can make the argument tacit, et cetera, et cetera.  I just

20   want to know whether the Government agrees that, as a legal

21   matter, there has to be a finding that Mr. Lischewski intended

22   to have a price-fixing agreement with Mr. Chan.

23        **MR. SCHUPANITZ:**  I think, as a legal matter, the jury

24   could think the interactions between Mr. Chan and the defendant

25   had nothing to do with a conspiracy and still find the

1   defendant guilty if they find that in his supervision of the

2   activities of Mr. Cameron and Mr. Worsham, that he was

3   encouraging them and -- so, again, I don't think we can just

4   isolate the --

5           THE COURT:  So that would rely on the Mike White

6   agreement, then?  Or what?

7           MR. SCHUPANITZ:  Well, or the interactions with

8   StarKist, the defendant's sort of encouragement --

9           THE COURT:  Okay.  Yeah, I'm not saying that -- I

10  don't think there's a motion here to dismiss the entire

11  indictment, because we're not talking about the StarKist side

12  of things.  We're only talking about the Chicken of the Sea.

13      And in order to find that the Chicken of the Sea part of

14  this was part of the conspiracy, my question is:  Does there

15  have to be some understanding on Mr. Lischewski's part that

16  there was an agreement?

17          MR. SCHUPANITZ:  I think that would be -- if

18  the Government had charged this as a sort of isolated count of

19  Section 1.  I mean, again, this is part -- the Government has

20  charged a single overriding conspiracy.

21          THE COURT:  So if they had charged this as an

22  isolated -- forget StarKist -- they charged two conspiracies,

23  for instance.  I know it didn't, but let's say it did.  Would

24  you agree under that circumstance that you'd have to find --

25  that a jury would have to find the defendant had the intent or

 1   understanding that there was an agreement?

 2          **MR. SCHUPANITZ:**  Yes.  But, again, this is -- the

 3   purpose of Rule 29 is not to exclude portions of the evidence.

 4   And as I understand it, defense counsel is not challenging the

 5   rest of the evidence here.  This is isolated to the

 6   interactions between the defendant and Mr. Chan.  And that's

 7   not -- that's not the purpose of Rule 29.

 8       I mean, they can't Rule 29 part of the evidence in a

 9   single conspiracy case.

10          **THE COURT:**  Are you moving for -- what are you moving

11   for exactly?

12          **MR. PETERS:**  I'm moving for a judgment of acquittal

13   under Rule 29 of everything.

14          **THE COURT:**  Of everything?

15          **MR. PETERS:**  Of everything.

16       But the argument I'm making this morning is simply focused

17   on this agreement with Mr. Chan, because it is a stand-alone

18   agreement that the Government -- they didn't charge it

19   separately.

20       But clearly, the point of all the testimony was that

21   Mr. Chan and Mr. Lischewski had entered into an agreement, and

22   no one else at Chicken of the Sea knew about it.  It didn't

23   involve Worsham.  It didn't involve Cameron.  It didn't involve

24   White.  It was just those two.

25       And if Your Honor -- if that goes to the jury, the charge,

1   including that piece of it, which is a stand-alone piece, the

2   way it's been presented -- and evidentially it's a stand-alone

3   piece -- and the jury convicts, they could convict on that

4   alone, and that would not be proper because there is not

5   sufficient evidence to do that.

6        So Your Honor should so find under Rule 29 and eliminate

7   that part of the case, because it can't -- if the Government

8   wants the evidence to stay in for some purpose, I guess they

9   can; but the jury should be instructed that you've entered a

10  judgment that there's insufficient evidence that that

11  interaction could be considered an illegal agreement, because

12  it can't.

13        **THE COURT:**  You want the Court to issue an instruction

14  that basically says that it cannot base its finding on any

15  alleged agreement between Chicken of the Sea and Bumble Bee?

16        **MR. PETERS:**  Or between Shue Wing Chan and

17  Mr. Lischewski, because I see the evidence a little bit

18  different than just, sort of, Chicken of the Sea versus

19  StarKist.  And I can explain that if it's helpful.

20        But I'm focused on this Shue Wing Chan/Chris Lischewski

21  evidence, because that cannot form the basis of a conviction

22  because there's insufficient evidence of an agreement.  There's

23  no evidence of an agreement.  And so that's -- and I'm trying

24  to be as clear as I can.

25        And I think the Government has conceded that they need

1   evidence of an agreement.  Of course they do.  This is a

2   criminal trial of Mr. Lischewski.  Mr. Chan had his own state

3   of mind.  That's not -- that's not sufficient to convict

4   Mr. Lischewski.  They have to prove beyond a reasonable doubt

5   that Mr. Lischewski agreed.  And there's just not evidence of

6   that with respect to Mr. Chan.

7           **MR. SCHUPANITZ:**  Your Honor, if I can respond.

8           **THE COURT:**  Yeah, briefly.

9           **MR. SCHUPANITZ:**  That doesn't sound like a Rule 29

10   motion to me.  That sounds like a motion to strike a portion of

11   the evidence and then instruct the jury as such.

12           **THE COURT:**  Well, it's not necessarily striking the

13   evidence.  It's adding a jury instruction that makes clear

14   there are certain things that a verdict cannot be based or that

15   there can be no finding of, for instance, a conspiracy between

16   Chan and Lischewski.

17           **MR. SCHUPANITZ:**  So this is a --

18           **THE COURT:**  Which doesn't preclude anything else, but

19   it would take out of the equation that piece.

20       I think that's what you're asking for, essentially.

21           **MR. PETERS:**  Yes, Your Honor.

22           **MR. SCHUPANITZ:**  So then this is a multiple -- a

23   single versus multiple conspiracies instruction.

24           **THE COURT:**  Well, I've already indicated what I'm

25   going to do about the single -- but this would be -- this would

 1   not mean an entry of an acquittal.  This would mean that the

 2   jury would be instructed that, at least to the extent of that

 3   part of the alleged conspiracy, this one section, this one

 4   corner between these two individuals does not amount to an

 5   agreement or a conspiracy.

 6          **MR. SCHUPANITZ:**  Your Honor, I mean, if the defense is

 7   not moving for an acquittal, then we're not talking about

 8   Rule 29 here.  And I mean, at the very least, I think we should

 9   brief this.

10          **THE COURT:**  I do want to have this briefed, because, I

11   mean, whether it's a Rule 29, I think you're making this partly

12   to preserve the record and your position, but also to start

13   this process in motion.  And given this, it may make sense to

14   have some briefing as we approach the end, because this may

15   affect the jury instructions or the verdict form.

16          **MR. PETERS:**  Your Honor, I want to be totally candid.

17   The breadth of my Rule 29 motion was to protect the record,

18   yes.  The focus on the Chan/Lischewski piece is based on the

19   fact that there is not sufficient evidence to permit a

20   reasonable juror to find beyond a reasonable doubt that that

21   was a crime.  And other -- unless the jury -- the Court

22   instructs the jury of that, they're going to have the

23   opportunity to bring in a guilty verdict based on that, and

24   then that's -- and that would be based on insufficient

25   evidence.

1      And so I think if the Court agrees with us that the

2   evidence with respect to Mr. Chan and Mr. Lischewski cannot

3   form the basis of a conviction, then it should so conclude

4   under Rule 29 and instruct the jury of that, because they

5   shouldn't be permitted -- that's the purpose of Rule 29, that

6   you don't send to the jury a theory of guilt for which there's

7   insufficient evidence.

8      **MR. KUMAR:**  Your Honor, there is sufficient evidence

9   to find the existence of an agreement between Shue Wing Chan

10  and Chris Lischewski:  Mr. Chan's testimony to that fact; the

11  eight e-mails that the Mr. Chan received from the defendant

12  asking him why he wasn't pricing in accordance with their

13  agreement.

14     **MR. PETERS:**  He didn't ask that.  You're making up

15  evidence.

16     **THE COURT:**  Hold on.  Hold on.

17     If there was no understanding, those jabs are not -- don't

18  make a contract.  They don't make an agreement.

19     **MR. KUMAR:**  Sure, Your Honor.

20     **THE COURT:**  Jabs can happen without that, and jabs --

21  but jabs could be evidence of an understanding.  But there was

22  no -- there certainly was no explicit commitment on the part of

23  Mr. Lischewski.  There was no evidence that he agreed to

24  anything.  You would be arguing that those jabs -- which were

25  one way, by the way.

1    Maybe the evidence would be a little different if they

2    were two-way jabs as it was with respect to the StarKist

3    people.  There were things back and forth.

4    Here, it was a one-way situation.  In other words, what

5    would have been more probative, frankly, is if Mr. Chan sent a

6    jab to Bumble Bee saying:  Hey, what are you doing here?

7         **MR. KUMAR:**  Your Honor --

8         **MR. PETERS:**  The evidence is that, instead, that

9    Mr. Chan told Mr. Roszmann, "I just ignore him."

10         **THE COURT:**  Well --

11         **MR. KUMAR:**  Your Honor, this is --

12         **THE COURT:**  -- this is worth briefing.

13    What I do want to ask you is this, is whether there is a

14    way -- if I do not rule and take it under submission, as often

15    is done under Rule 29 until after the verdict, is there a way

16    to fashion the verdict form so we can have a clear

17    understanding, if there is a verdict of guilt, conviction,

18    whether that is based, for instance, on the StarKist piece, the

19    Chicken of the Sea piece, or both?  So that, should the Court

20    grant the Rule 29 later, we'll know whether it's consequential

21    or not.

22         **MR. PETERS:**  We've asked for a special verdict form.

23    I haven't looked at it in some time.  But there has to be a

24    special verdict form which requires the jurors to identify what

25    the conspiracy was that they all unanimously agreed on if they

1   find that there was a price-fixing conspiracy that

2   Mr. Lischewski participated in.

3       So it's our view that there would have to be a special

4   verdict form.  The Government has submitted a very simple,

5   general verdict form, to which we object.

6           **THE COURT:**  All right.  I'd like briefing on this.

7   And we don't have a lot of time because we're still expecting

8   evidence to conclude next Tuesday?

9           **MR. PETERS:**  Yeah, Your Honor.  But we've told

10  the Government, and we'll tell you very plainly, we intend to

11  call Professor Levinsohn; we intend to call Wayne Kay as a

12  character witness; we intend to call Chris Lischewski; we

13  intend to read in these odds and ends that Handford and the

14  Worsham impeachment.  There's a stipulation about phone

15  records.  I think that's it, but some odds and ends.

16      And we think Mr. Lischewski probably gets on this

17  afternoon.  He probably testifies till -- on direct till the

18  middle of the day Monday.  He's then crossed Monday afternoon,

19  Tuesday.  And then subject to any rebuttal case, we should be

20  done Tuesday, probably not even by -- probably before the end

21  of the day on Tuesday, but anybody making such predictions is a

22  fool.

23      But I do believe because of the way things --

24  the Government resting Wednesday, I do think we're on track, as

25  I've said repeatedly, for our case to take three days and for

**PROCEEDINGS**

 1           THE COURT:  Yes.

 2           MR. KEARNEY:  Since counsel prepared to argue based on

 3   the numbering of instructions, would it be possible just to

 4   skip Instruction Number 10?

 5           THE COURT:  Okay.  Fair point.  I'll just skip it.

 6           MR. KEARNEY:  Thank you, Your Honor.

 7           THE COURT:  Nobody will notice.

 8           MR. PETERS:  Your Honor, one more housekeeping matter.

 9   We -- not a housekeeping matter, but we moved for a judgment of

10   acquittal pursuant to Rule 29 at the close of the Government's

11   case.  I'm renewing that motion now at the close of all the

12   evidence.

13           THE COURT:  All right.  So noted and I'll reserve

14   ruling on that.  Thank you.

15           MS. WULFF:  And, Your Honor, I found the citation.

16           THE COURT:  Okay.

17           MS. WULFF:  It's page 8.  It's under the header

18   "4. Stipulations of fact which may be deemed proven at trial

19   without further proof by either party and limitation of

20   witnesses."

21           THE COURT:  So either by way of stipulation -- which

22   also underscores the lack of prejudice here; it was stipulated

23   to -- I'm going to take judicial notice of that fact and

24   announce that to the jury before I read the instructions.

25           MS. WULFF:  Thank you, Your Honor.