1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn II
     UNITED STATES OF AMERICA,

4

         Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GARY BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 7

15   _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:02 a.m., on the 3rd day of March,

19   2022, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                         APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4    Washington, DC 20530, appearing for Plaintiff.
 5          Anna Tryon Pletcher and Michael Tubach of
 6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7    San Francisco, CA 94111-3823;
 8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10          David Beller, Richard Kornfeld and Kelly Page of
11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12    CO 80202, appearing for Defendant Fries.
13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15           Laura Kuykendall and Megan Rahman of Troutman Pepper
16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17    appearing for Defendant Brady.
18          Michael Felberg of Reichman, Jorgensen, Lehman,
19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20    10017;
21
22
23
24
25
```

 1                    APPEARANCES (Continued)

 2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4   CA 94065; appearing for Defendant Austin.

 5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7          Marci Gilligan LaBranche of Stimson, Stancil,

 8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9   80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1    APPEARANCES (Continued)

2         Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5         Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8         Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11        Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                 PROCEEDINGS

16        THE COURT:  We are back on the record in 20-152.  The

17   jury is not present.  We are going to talk about a number of

18   things.  Why don't we take up, first of all, the recently filed

19   Docket No. 1118, the government's motion for curative

20   instruction and notice regarding lay witness.  I am not sure

21   exactly what that means, but I am going to deny that.

22        First of all, in terms of the coaching things, we

23   talked about that yesterday.  And I indicated that it was

24   improper to make such an accusation in open court as opposed to

25   during a side bar, but I am not going to give a curative

1    instruction because whether or not someone has been coached or

2    how they were prepared for testimony is a legitimate issue for

3    cross-examination.  So to tell the jury that something was

4    improper like that I don't think -- I think has a real danger

5    of confusing the jury on it.

6         And then second, in terms of the understanding, the

7    problem yesterday was not that the term understanding is per se

8    improper.  It can be, as I said yesterday, but there was just

9    absolutely no foundation or explanation laid for what

10   Mr. Pepper was suggesting by an understanding, just what

11   understanding.  It wasn't clear what exactly what the

12   understanding was, how it was derived, who it was between, any

13   of those things, so that's the real problem.

14        And to the extent that Mr. Pepper in the past has used

15   the term common understanding, you've got to explain what that

16   means, how it was derived, who it was between, all those little

17   foundational details before he all of the sudden uses some term

18   that at least as of yesterday was completely mysterious in

19   terms of why it was, how it came about, who it was between,

20   that type of thing.

21        Ms. Call?

22        MS. CALL:  Respectfully, Your Honor, in reviewing the

23   transcript, there did appear to be several times where

24   Mr. Pepper was asked about particular phone calls he had with

25   particular defendants.  I believe it was in the August 2014

1    time frame.  And when asked about the substance of those

2    discussions, his answer became, you know, in describing the

3    substance, he was also describing his own understanding from

4    the calls, which was where then the interruptions became very

5    apparent from defense counsel which was obviously not an

6    objection to the question because it was what were the

7    discussions that you had, which I think was a question asked

8    two times in a row.

9         And the issue they took was that the answer elicited

10   his understanding, which it did seem particularized.  It did

11   seem framed in a particular time frame, particular defendants,

12   particular discussions.  And he was then expounding on the

13   inferences or understanding that he had as a result of those

14   discussions.  So I think at least for some of the questions

15   there did seem that foundation laid and we were trying to --

16        THE COURT:  Yeah, I disagree.  To use the term

17   particular in regard to his testimony is stretching the term

18   beyond its ordinary meaning.  I mean, you know, he couldn't

19   identify which conversation.  It was unclear if he had five, it

20   was the very last or it was towards the end.  And he didn't

21   indicate anything about, you know, what was said by the other

22   party to the conversation or any questions that he had or

23   hardly any details about the conversation, period, before all

24   of the sudden he is talking about some understanding, which was

25   just very, very difficult to figure out why he would have any

1    understanding about anything given the fact that he hadn't

2    described anything about the phone call.

3            So, you know, that's part of the problem.  Once again,

4    it's okay for witnesses to talk about understandings and so

5    forth, but to all of the sudden almost out of the blue talk

6    about an understanding that came from an undescribed

7    conversation is problematic because it's unclear what he means

8    by the term understanding, where it came from, with whom, you

9    know, all those other foundational details that did not come

10   out yesterday.

11           *MS. CALL:*  Yes, Your Honor.  So we will moving forward

12   try to ask more particularized questions to lay that

13   foundation.  But I will note, you know, there may be some more

14   problematic issues in the prosecution of white collar cases if

15   a witness cannot testify to their recollection of the substance

16   of calls that happened six years ago if they don't recall

17   specific words that were said.  And I think it is fairly

18   frequent in white collar cases that it is the impact you had or

19   the recollection you have and how you felt or the substance of

20   what was said and not the particular word that a witness will

21   be able to testify in cases like this and has been the

22   substance of many witnesses' testimony in the government's case

23   and the defendants' case in the last trial more to these

24   overall understandings, and not just using the term

25   understanding, but their recollection of the substance of calls

1   rather than particularly what was said.

2        THE COURT:  Once again, it could be, but if he gained

3   some type of understanding, then he must have gained it from

4   something.  And we didn't even get the something yesterday or

5   it didn't seem so at all.  Moreover, as I said before, it was

6   just very, very unclear, you know, what the understanding was

7   in any event.  So all of those were -- you know, so without any

8   type of -- some detail about how they arose.  Obviously, he may

9   have a difficult time remembering certain things, but

10  nonetheless, he can't just come out with a -- describing some

11  understanding without some explanation of what it involved,

12  who -- how it came about, that type of thing.

13       MS. CALL:  Yes, Your Honor.  Thank you.

14       MR. BYRNE:  So I was called out in the filing, so I

15  just want to get clarification that if we're going to continue

16  to object, that we can still object obviously on the grounds

17  that he is stating his understanding without the facts and

18  everything.  Essentially what happened was I objected and then

19  you basically sustained the objection, and now they are

20  complaining about that.  So I just want to get clarification

21  going forward.

22       THE COURT:  Well, once again, there is nothing wrong

23  with him stating an understanding about certain things.  What

24  was problematic yesterday was just he was using some term which

25  it was hard to understanding what it was about.  It seemed to

1    be very conclusory, but because it lacked foundation and it

2    lacked any type of definition, it was improper because there

3    had to be some explanation for who it was between, how it came

4    about, blah, blah, blah.

5         Mr. Tubach?

6         MR. TUBACH:  Yes, Your Honor.  And for us particularly

7    problematic is the word understanding itself because one can

8    have an understanding within yourself about something, and you

9    can have an understanding with someone that it's going to rain

10   tomorrow and then you can have an agreement with someone that

11   you are going to out and commit a crime.  And those things are

12   very different.  And it's that critical distinction that we

13   weren't getting from him at all yesterday and that was the

14   basis for many of the objections.

15        THE COURT:  Right.  I mean, the term understanding can

16   have a variety of meanings and it was unclear yesterday, you

17   know, what type of understanding he was even talking about.

18        MS. CALL:  I think we understand the Court's ruling,

19   but I do think it would have became clear if he got past the

20   word there was an understanding and could describe the

21   substance of the understanding.

22        THE COURT:  If that's true, then you just need to

23   reverse the order.

24        MS. CALL:  Yes, we will, Your Honor.

25        THE COURT:  Why don't we take up the defendants'

1    supplemental brief in support of the request that the

2    government's summary exhibits be treated as demonstrative

3    exhibits.  I am going to deny that motion.  There hasn't been

4    any new development based upon the government's opening in this

5    case that would change anything from what the Court ruled on in

6    the last trial, the same point in particular with regard to the

7    confrontation clause.

8            The Court in the last trial, and this is in the

9    transcript at Page 4167, addressed those confrontation clause

10   issues.  I don't think that the mere fact that Ms. Evans was a

11   paralegal somehow kept the defendants from being able to

12   cross-examine.  As a matter of fact, there was -- even in the

13   cross-examination she even admitted that various decisions were

14   made by the attorneys.  She doesn't know whether all the phone

15   calls were in there or not, various matters like that, which

16   puts into perspective exactly what the summaries consist of and

17   the limitations and omissions from them.  And nothing else in

18   that motion I consider to be new as opposed to something that

19   was rejected in the last trial, so I will deny that one.

20           So I think maybe should we use our remaining time

21   unless there is a new issue to go on to summary exhibits?

22   Actually, instead of doing that, we need to talk about the

23   motion regarding Mr. Pepper to -- on the prior consistent

24   statements, so I think we should take that up, that issue up at

25   this time.

1          Ms. Call, anything more on that?  Explain to me this.

2    Do you intend to ask Mr. Pepper about prior consistent

3    statements -- or I should say Ms. Sweeney, or are you going to

4    try to get the prior consistent statements before the jury

5    through testimony through Special Agent Koppenhaver?

6          Mr. Koenig?

7          *MR. KOENIG:*  Thank you, Your Honor.

8          We would get those prior consistent statements from

9    Mr. Pepper on redirect to the extent he is crossed on it.

10   Either way, whether it was raised on direct or redirect, there

11   is still satisfies the confrontation clause issue because they

12   can cross on what he said in interviews.  So that answers Your

13   Honor's first question, I believe.

14         But the bigger issue is the defendants' statements or

15   their brief in response to our notice.  And I have basically

16   three points to say on that.  The first is that they

17   unquestionably opened the door.  Mr. Kornfeld stood at the

18   podium right here and told the jurors that some non-existent

19   agreement with the government was yanked and thereafter he

20   changed his story after denying the existence of the conspiracy

21   or not admitting the existence of the conspiracy.  And there is

22   no question that in this case that opens the door for all

23   defendants.

24         As you can see from the motion *in limine* on the issue

25   of whether he could talk about his retirement, all 10

1     defendants joined that motion because they are all on this

2     theory that sometime in the middle of last summer Mr. Pepper

3     changed his story, so I think that it's clear that the door is

4     open for this now.

5          As far as the *Tome* case goes about the -- some sort of

6     triggering event that gave rise to the motive to fabricate, the

7     defendants quite frankly are taking two inconsistent positions

8     as it suits their needs.  In the one -- on the one hand, they

9     are taking the position that this yanking of the agreement, in

10    their quotes, caused him to change his statements, right?  And

11    so there is where the inconsistency is and that's where the

12    triggering event is.

13         *THE COURT:*  And on what date does that appear to be?

14         *MR. KOENIG:*  August 11th, I think, or it was somewhere

15    in there, mid August of 2011 -- of 2021.  But then for purposes

16    of whether the government can rebut that, they want to back the

17    triggering event up to when leniency was -- became an issue.

18    And so, you know, they want to say that there is two different

19    triggering events.  And even if when leniency became an issue

20    as a triggering event, their position is it didn't have any

21    effect because he was not admitting the purpose of the

22    conspiracy.  And so it wasn't until this August time frame that

23    he allegedly changed his story.  And so those are the main two

24    points.

25         The third thing is about Agent Koppenhaver's

1    testimony.  Part of their brief is dedicated to saying, well,

2    you know, he is going to talk about his understanding and

3    that's improper -- understanding of what Mr. Pepper said in

4    interviews and that's somehow improper.  But the reality is

5    Mr. Koppenhaver, Agent Koppenhaver is going to testify to his

6    recollection of what was said.  By contrast they want to

7    impeach him on interview reports which is exactly the agent's

8    understanding of what Mr. Pepper said.  So it's kind of -- it's

9    backwards, I guess is what I would say.

10        So I think it's, you know, it's very appropriate under

11   the case law.  It's appropriate because the door is opened on

12   this.  And, you know, we have the right to present evidence

13   that he did, in fact, have a consistent story throughout.

14        THE COURT:  Yeah, but what I was asking is it seems

15   like you could do that through Mr. Pepper because your motion

16   talks about having him adopt previous statements.  And if

17   that's true, why do you need Koppenhaver?

18        MR. KOENIG:  Well, I suppose, you know, we could just

19   enter the "Roger did some checking around" e-mail, but why do

20   we need all the e-mails around that as well.  It's not a

21   situation where you're bolstering.  It's something that's been

22   challenged and called into question and we have the right to

23   rebut it with not just one piece of evidence, a couple pieces

24   of evidence.  I don't think there is anything really

25   controversial about that.  It's not as though Special Agent

1253

1  Koppenhaver is going get up there and say, you know, he was

2  believable.  He is not talking about his credibility.  He is

3  talking about this is what I remember him saying.

4      THE COURT:  If Mr. Pepper was shown previous -- what

5  are considered to be previous consistent statements, he adopts

6  them, and then you call Special Agent Koppenhaver to do the

7  same, why wouldn't an objection to it being cumulative be

8  sustained?  In other words, even if you could use different

9  means to get the prior consistent statements in, if they

10  already in through Mr. Pepper, why would they -- why could

11  Special Agent Koppenhaver then go back and try to do the same

12  thing?

13      MR. KOENIG:  Well, I think the main issue is that it's

14  his credibility that is being questioned.  And so it's entirely

15  appropriate to have someone say something consistent with what

16  he said or their memory -- using the word consistent in two

17  different contexts here is a little confusing.  But, you know,

18  to say that he's going to say I've been consistent this whole

19  time because I said X, Y, Z, he is the source of that

20  information and that is what is being questioned, his

21  credibility.  You know, it's not cumulative to have some

22  independent witness who saw it then testify, yeah, that's what

23  I heard.

24      THE COURT:  But is Special Agent Koppenhaver going to

25  testify as to the statements based upon what's in the interview

1  memos?

2  　　　MR. KOENIG:  It's not like we will walk him through

3  the memos.  If he can't remember, they can obviously be used to

4  refresh.  But, you know, he was at the 11 interviews that

5  occurred up through July of 2021, and he does have distinct

6  independent memory of what was said.

7  　　　THE COURT:  And is that distinct independent memory

8  embodied in the interview memos?

9  　　　MR. KOENIG:  Well, his memory -- as a matter of fact,

10  first of all, he wrote about half of the interview memos for

11  those interviews.

12  　　　THE COURT:  And why wouldn't the interview memos if he

13  wrote half of them be the only thing he would be testifying

14  about anyway?

15  　　　MR. KOENIG:  I am sorry, I couldn't hear that last

16  part.

17  　　　THE COURT:  If he authored -- concerning a memo that

18  he authored, if Mr. Pepper on the witness stand were to adopt

19  that, what, if anything, different would Koppenhaver say about

20  that?

21  　　　MR. KOENIG:  So what he would be adopting is his

22  memory of what he said.  Mr. Pepper has never seen the

23  interview reports.  We are not going to show him the interview

24  reports.  He is going to report what he said and adopt that.

25  Someone else who was in the interview who witnessed what he

1   said is going to corroborate that.  And I think there is some

2   sort of blurry -- a line being blurred between corroborating

3   and cumulative.  But even if it were viewed as somewhat

4   cumulative, the *Brooks* case said, they said, yeah, maybe this

5   is cumulative, but it was okay.

6           So I don't think there is any major prejudice.  And,

7   you know, we've seen how vigorously defense counsel is, you

8   know, questioning Mr. Pepper's credibility and is going to on

9   cross-examination.  And so, you know, to limit us to a single

10  source whose credibility has been questioned not only in

11  opening, but will be on cross, I think it's just very

12  appropriate, not unfairly prejudicial to have someone who

13  witnessed it up there.

14          And, you know, of course, Special Agent Koppenhaver

15  will be subject to cross himself.  So, you know, it's -- and

16  it's pretty short testimony too.  It's not -- he is not going

17  to be up there talking about for hours and hours about every

18  last detail that was said.  He is just going to give his

19  memory.

20          THE COURT:  Okay.  Thank you.

21          Ms. Henry?

22          MS. HENRY:  Your Honor, just a point of clarification.

23  The government seems to be confused about the openings.

24  Defendant Kantola did not say anything in its opening that

25  could possibly have opened this issue.  And the government is

1    confused if they think that there is any case law that says

2    that another defendant can open the door to a different

3    defendant.  That is not actually appropriate here.  I don't

4    know whether this is relevant any more since they said they are

5    not going to put in their statements until redirect, so maybe

6    it doesn't really come up, but I did want to make that

7    clarification because there is absolutely nothing in the

8    statements of the opening of Mr. Kantola that could possibly

9    have opened the door.

10           THE COURT:  Ms. Prewitt?

11           MS. PREWITT:  Thank you, Your Honor.

12           First off, I think that in terms of *U.S. v. Tome*, the

13   motive to fabricate was basically when Carl Pepper walked in

14   the door pursuant to the --

15           THE COURT:  Walked into what door?

16           MS. PREWITT:  When he walked in the door to be

17   interviewed pursuant to the antitrust division's leniency

18   program because, as we talked about, the leniency program

19   awards with non-prosecution benefits a confession.  So I think

20   that that's really sort of one of the issues here.

21           THE COURT:  What about the statement in opening that

22   Mr. Fries made that his -- he got yanked?  That's what the

23   government wants to rebut.

24           MS. PREWITT:  I understand that, and I think that can

25   be addressed through cross-examination.  Lawyers make

1    statements to the jury at their peril if they don't come to be

2    during the course of the trial and --

3         THE COURT:  Yeah, but the case law is crystal clear.

4    You can open the door in an opening which Mr. Fries did.

5         MS. PREWITT:  I understand.  Defendant Mulrenin did

6    not do that.

7         THE COURT:  Yeah, but I disagree with Ms. Henry.  The

8    case that's cited in the response brief is distinguishable.  It

9    had to do with the privilege issue.  I am going to rule that

10   the door has been opened and the testimony can come in without

11   any limiting instructions as to the other defendants who didn't

12   make that because it's out in front of the jury that he lacks

13   credibility because of the fact that he had this -- his

14   immunity was yanked, and as a result he made some inconsistent

15   statement.

16        MS. PREWITT:  Your Honor, there was a continuum in

17   terms of his statements.  I don't think there has been any

18   dispute about that in terms of how the word agreement -- he did

19   not get his non-prosecution benefits until that word came out.

20   Your Honor, so I think that that's, in terms of what they are

21   trying to do with the agent, I think that's troubling in the

22   sense that he seems to be or will be offering independent

23   statements, statements that we have not seen in terms of the

24   underlying notes that have been provided to us vis-a-vis what

25   Mr. Pepper would say, and these would go to the ultimate issue.

1     THE COURT:  Special Agent Koppenhaver you mean?

2     MS. PREWITT:  Special Agent Koppenhaver.  In other

3  words, it seems that he is going to be proffering some

4  statement that we are not privy to.  Really what he is going to

5  be doing is interpreting because, as Your Honor observed,

6  understanding is a very vague statement.  He can testify to it

7  on the stand.  He can testify that, you know, this is something

8  he said all along.  And I think in a recent report he has said

9  that.  Mr. Pepper said he said understanding all along.  That

10  can be elicited on direct.  It can be elicited on cross.  It

11  can be elicited on redirect.  So I think that can really play

12  out in terms of his testimony at trial.

13     And I will say if this becomes an ultimate issue, we

14  have a subpoena out there for another witness to those

15  statements that were made by Mr. Pepper.  And that's something

16  that we will need to explore in our defense case and this will

17  become an issue that we have to delve into.

18     THE COURT:  Understood.  Thanks, Ms. Prewitt.

19     Mr. Gillen, real quick.  We are going to start on time

20  today.

21     MR. GILLEN:  How odd that the government would argue

22  that they can call their co-case agent to testify what his

23  understanding was about what Mr. Pepper said when he wrote a

24  report and did not put down the words that we are talking about

25  now such as agreement.  How odd that he could then come on the

1  stand and say, well, what I remember and what I think -- I was

2  there.  This is what he really meant and this is what he said.

3  To allow that, Your Honor, would be improper.

4       If he, Koppenhaver, thought that he said that, which

5  is the key bell-ringer for DOJ in an antitrust case agreement,

6  why is that word not in any of those interviews prior to this

7  year?

8       Thank you, Your Honor.

9       *THE COURT:*  Yeah.  Real quick, Mr. McLoughlin.

10      *MR. McLOUGHLIN:*  With respect to the issue of the

11 yanking of the benefit, we respectfully suggest that the

12 statement colloquially captures exactly what happens in these

13 circumstances.  And to determine what happens in these

14 circumstances, if the government is taking the position that

15 under *Tome* he did not have motive in his first and early

16 interviews, then it is incumbent upon the government to

17 demonstrate that he did not have that motive.

18      And under *Jencks* and *Brady*, the defense should have

19 been by now, but should be provided not later than when

20 Mr. Pepper leaves the stand the communications between Tyson's

21 counsel and Mr. Pepper's counsel or communications between

22 Mr. Pepper and Tyson and the government with respect to this

23 issue.  Because if you are someone who does this all the time,

24 what most often happens in these circumstances is the leniency

25 application is made.  Corporate counsel then negotiates with

1    the government that there will be interviews.  Corporate

2    counsel -- whether the individual is represented or not

3    frequently depends on what the corporate counsel believes is

4    the peril to that witness, but let us assume for the moment

5    Mr. Pepper had corporate counsel into those interviews.  There

6    is a meeting and a discussion in which the individual is

7    educated about the fact that a leniency application has been

8    made.  There is a duty of cooperation.  And individuals who are

9    interviewed will under the leniency application have the

10   benefit of a non-prosecution agreement.

11            Mr. Pepper is then interviewed multiple times.  And

12   exactly as was said, that expectation, that benefit was yanked

13   from him and with respect to the entire organization only him.

14   So if the government is going to do any of this, they first

15   have to establish the factual predicate that Mr. Pepper and his

16   lawyer and company counsel had no understanding in his first

17   interviews that any benefit was -- there was no such thing as a

18   benefit, that he did not understand.  He was talking to the

19   government under some protection or benefit.  That foundation

20   has not been laid, and so I think the government's argument

21   fails for a factual predicate.  Thank you.

22            THE COURT:  Thank you, Mr. McLoughlin.

23            Yeah, so I agree with Mr. Koenig that the defendants

24   seem to be taking two different inconsistent positions, but the

25   position that the government is entitled to rebut in the

1  government's motion which is Docket 1104 cites the *Chavez* case

2  which indicates that, "It is widely recognized that a party who

3  raises a subject in an opening statement 'opens the door' to

4  admission of evidence on that same subject by the opposing

5  party."

6         So the government is entitled to rebut this argument

7  that by virtue of Mr. Pepper's agreement being yanked, that

8  somehow created some material change in what had happened and

9  then caused him to make these -- a different type of statement.

10  Moreover, the government can do it in both of the ways that the

11  government mentioned, although I am not saying it won't be

12  cumulative.  Could be cumulative.  We will have to see.  I am

13  not 100 percent clear on exactly how this is going to play out.

14         I will let Special Agent Koppenhaver sit in for the

15  testimony as long as he is only going to be testifying about

16  those statements.  I will also order that -- well, I don't know

17  if there is enough time, but I am concerned, you know, Special

18  Agent Koppenhaver is the author of several of these memos.  If

19  he has some understanding or recollection different from the

20  memo, it seems problematic, although it also would seem to be

21  great fodder for cross-examination.  But hopefully if there is

22  any -- if he recollects something different than in those

23  memos, that has already been produced because that would seem

24  to be material.

25         But I do think that the -- and I also reject the

1    theory that just because one defendant opened the door, it

2    doesn't apply to everyone.  In the context of this case, it

3    was -- I think it's appropriate that the jury be allowed to

4    hear it and no limiting instructions would be appropriate.  I

5    think the government can do as their brief outlines which is to

6    rebut that by introducing prior consistent statements.

7            Mr. Tubach?

8            MR. TUBACH:  Just very briefly, Your Honor.  I know

9    the Court has ruled.  I want to make sure that we object on the

10   ground of Mr. Penn on the same grounds Ms. Henry raised earlier

11   about we did not open the door in our opening statement.

12           THE COURT:  Yes.  And I would assume that all

13   defendants who did not make a similar statement in opening

14   would make the same objection.

15           MS. JOHNSON:  With regard to the Court's order just

16   now or the ruling just now, I would make an additional request

17   for *Jencks* material in light of the fact that Agent Koppenhaver

18   is going to be testifying.

19           THE COURT:  Meaning exactly what?

20           MS. JOHNSON:  His notes from the interviews that he

21   participated in and he wrote, if his notes are different.  And

22   if he is going to take the stand and testify if there was a

23   word, understanding or agreement that was mentioned and he did

24   not put it in a 302, Your Honor, I think that the agent notes

25   are relevant for all of us to examine and review and cross him

 1    on based on what was presented in the 302.

 2          THE COURT:  Response by the government?  It seems

 3    appropriate.

 4          MR. KOENIG:  Well, I don't know that that is required

 5    under the rule or under *Jencks* and we have been turning things

 6    over.  We have been abiding by our obligations.  We certainly

 7    go through the notes.  And, you know, if there is something

 8    that isn't reflected in the report, we turn the facts over.  We

 9    have been very diligent about this.

10          THE COURT:  That's fine.  But for any interview where

11    Special Agent Koppenhaver was the author of the memo, I am

12    going to order that his notes be turned over as *Jencks*

13    material, not as to the other ones, but as to that one.

14          MR. TUBACH:  Your Honor, as to the ones where he is

15    not the author, in fact, the notes are more important because

16    he can't -- he could adopt or not adopt whatever statement is

17    made in the memos he didn't author.  What's going to be

18    important is this witness will be testifying about what his

19    recollection is of what someone said.  And if he wrote notes

20    about that --

21          MR. KOENIG:  There aren't any.

22          THE COURT:  Well, that's easy enough, then.  If there

23    are, then I will order that those be produced as *Jencks*

24    material as well.

25          MR. KOENIG:  There aren't any that I know of sitting

1    right here.  We will, of course, check that.

2         THE COURT:  Yeah, right.  Obviously, you can't produce

3    what you don't have.

4         Mr. Kornfeld?

5         MR. KORNFELD:  Your Honor, I think the other thing

6    that is relevant is any correspondence between the government

7    and Mr. Pepper's counsel regarding the applicability or the

8    eventual inapplicability of the leniency agreement as to him.

9    I don't know that any such correspondence exists, but it's a

10   little bit of angels on the head of a pin.  Apparently the

11   colloquial verb "yanked" is what gets us here.  And whether,

12   you know, it's an affirmative action of yanking or whether it's

13   a decision that the agreement no longer pertains to this

14   specific Tyson's employee, that's really the macro issue and

15   what effect, if any, that had on Mr. Pepper.  So I would make a

16   request that if there is any correspondence on that issue

17   between the government and counsel representing Mr. Pepper, I

18   think we should be entitled to see it in light of the Court's

19   ruling.

20        THE COURT:  I will reject that request.  I am not

21   sure -- ultimately it boils down to what Mr. Pepper understood.

22   That can be explored already.  I doubt that Pepper would be

23   exposed to that, but I am going to reject that request.

24        MR. KORNFELD:  Thank you, Your Honor.

25        THE COURT:  Let's get the jury.  We really need to get

Carl Pepper - Direct

1    the jury in.  I do not want to make them think we are always

2    late, which we so far have always been late, but that's only

3    been since they have been on time.

4            (Jury present.)

5            THE COURT:  Ms. Sweeney, whenever you are ready.

6            Good morning, ladies and gentlemen, by the way.

7        (**Carl Pepper** was previously sworn.)

8                    **DIRECT EXAMINATION CONTINUED**

9    BY MS. SWEENEY:

10   Q.  Good morning, Mr. Pepper.

11   A.  Good morning.

12   Q.  Yesterday we were talking about some conversations that you

13   had with Mr. Jimmie Little.  Do you recall that?

14   A.  Yes, ma'am.

15   Q.  When did you first meet Mr. Little?

16   A.  10-plus years ago.

17   Q.  Have you met him in person?

18   A.  Yes, ma'am.

19   Q.  About how many times?

20   A.  Probably a hundred plus.

21   Q.  Over the course of how long?

22   A.  10-plus years.

23   Q.  And Mr. Pepper, I would ask you to lean into the

24   microphone.

25            Would you recognize Mr. Little if you were to see him

Carl Pepper - Direct

1    face to face?

2    *A.*  Yes, ma'am.

3    *Q.*  Mr. Little, I would ask you to look around the courtroom

4    and let me know if you see Mr. Little.  And if you do, please

5    identify him by describing where he is sitting and an article

6    of clothing he is wearing.

7    *A.*  Yes, ma'am.  He is sitting right in front of me on the end

8    of this table right here.

9    *Q.*  And could you describe an article of clothing he is

10   wearing?

11   *A.*  I believe it's a black jacket.  He is standing up.

12          *MS. SWEENEY:*  Your Honor, government would ask the

13   record reflect that the witness has identified Defendant

14   Little.

15          *THE COURT:*  It shall.

16   *BY MS. SWEENEY:*

17   *Q.*  Mr. Pepper, would you recognize a picture if I were to show

18   you a picture?

19   *A.*  Yes, ma'am.

20   *Q.*  I would ask you to turn to Tab 10 in the binder in front of

21   you and that's government exhibit -- I apologize -- yes, Tab

22   10, that's Government Exhibit 9270.

23          *THE COURT:*  What was the number again?

24          *MS. SWEENEY:*  9270.

25   *A.*  Yes, ma'am.

Carl Pepper - Direct

1    *BY MS. SWEENEY:*

2    Q.  What type of document is this?

3    A.  A picture.

4    Q.  What's depicted in the picture?

5    A.  A picture of Jimmie Little.

6    Q.  Is this a fair and accurate representation of Mr. Little as

7    you knew him?

8    A.  Yes, ma'am.

9         *MS. SWEENEY:*  The government moves to admit Government

10   Exhibit 9270.

11        *THE COURT:*  Any objection to the admission of 9270?

12        *MR. BYRNE:*  No objection.

13        *THE COURT:*  9270 will be admitted.

14   *BY MS. SWEENEY:*

15   Q.  Now, Mr. Pepper, yesterday you also mentioned the name

16   Scott Brady.  Do you recall that?

17   A.  Yes, ma'am.

18   Q.  When did you first meet Mr. Brady?

19   A.  10-plus years ago.

20   Q.  Have you ever met him in person?

21   A.  Yes, ma'am.

22   Q.  How many times?

23   A.  A hundred plus.

24   Q.  Over the course of about what period of time?

25   A.  10-plus years.

Carl Pepper - Direct

1  *Q.* Would you recognize Mr. Brady if you were to see him face

2  to face?

3  *A.* Yes, ma'am.

4  *Q.* I would like you to look around the courtroom.  And if you

5  see Mr. Brady, could you please identify him by describing

6  where he is sitting or an article of clothing.

7        *MR. LAVINE:* We will stipulate the witness can

8  identify Mr. Brady who is standing presently in the courtroom.

9        *THE COURT:* The government accept the stipulation?

10        *MS. SWEENEY:* Yes, Your Honor.

11        *THE COURT:* So stipulated.

12  *BY MS. SWEENEY:*

13  *Q.* Mr. Pepper, would you recognize a picture of Defendant

14  Brady if I were to show you one?

15  *A.* Yes, ma'am.

16  *Q.* I'd ask you to open your binder to Tab 8, and this is for

17  the record Government Exhibit 9267.

18        What type of document is this?

19  *A.* It's a picture.

20  *Q.* What's depicted in the picture?

21  *A.* Scott Brady.

22  *Q.* Is this a fair and accurate representation of Mr. Brady as

23  you knew him?

24  *A.* Yes, ma'am.

25        *MS. SWEENEY:* The government moves to admit Government

Carl Pepper - Direct

1  Exhibit 9267.

2          *THE COURT:*  Any objection to the admission of 9267?

3          *MR. LAVINE:*  No objection, Your Honor.

4          *THE COURT:*  9267 will be admitted.

5  *BY MS. SWEENEY:*

6  *Q.*  You also mentioned Mr. Ric Blake.  Do you recall that?

7  *A.*  Yes, ma'am.

8  *Q.*  Have you met Mr. Blake -- when is the first time you met

9  Mr. Blake?

10  *A.*  10-plus years ago.

11  *Q.*  Have you ever met him in person?

12  *A.*  Yes, ma'am.

13  *Q.*  About how many times?

14  *A.*  A hundred plus.

15  *Q.*  Over the course of how long?

16  *A.*  10-plus years.

17  *Q.*  Would you recognize Mr. Blake if you were to see him in

18  person?

19  *A.*  Yes, ma'am.

20  *Q.*  Look around the courtroom and let me know if you see

21  Mr. Blake and if you do if you could identify him.

22  *A.*  Yes, sir.  He is sitting right at the end of that table in

23  a gray jacket.

24          *MS. JOHNSON:*  Your Honor, we will stipulate that

25  Mr. Pepper identified Mr. Blake.

Carl Pepper - Direct

1    THE COURT:  Government accept the stipulation?

2        MS. SWEENEY:  Yes, Your Honor.

3        THE COURT:  All right.  So stipulated.

4    BY MS. SWEENEY:

5    Q.  So Mr. Pepper, would you recognize a picture of Defendant

6    Blake if I were to show you one?

7    A.  Yes, ma'am.

8    Q.  I would ask you to please turn to Tab 7 of your binder and

9    that is Government's Exhibit 9266.

10   A.  Yes, ma'am.

11   Q.  What type of document is this?

12   A.  It's a picture.

13   Q.  What's depicted in the picture?

14   A.  Ric Blake.

15   Q.  Is this a fair and accurate representation of Mr. Blake as

16   you knew him?

17   A.  Yes, ma'am.

18        MS. SWEENEY:  The government moves to admit Government

19   Exhibit 9266 into evidence.

20        MS. JOHNSON:  No objection, Your Honor.

21        THE COURT:  9266 will be admitted.

22   BY MS. SWEENEY:

23   Q.  Mr. Pepper, you also discussed Mr. Brian Roberts.  When did

24   you first meet Mr. Brian Roberts?

25   A.  10-plus years ago.

1271

Carl Pepper - Direct

1   *Q.*  Have you met him in person?

2   *A.*  Yes, ma'am.

3   *Q.*  About how many times?

4   *A.*  A hundred plus.

5   *Q.*  Over the course of how long?

6   *A.*  10-plus years.

7   *Q.*  Would you recognize Mr. Roberts if you were to see him face

8   to face?

9   *A.*  Yes, ma'am.

10  *Q.*  I would ask you to look around the courtroom and let me

11  know if you see Mr. Roberts.

12  *A.*  Yes, ma'am.

13  *Q.*  Can you identify him, please?

14  *A.*  He is standing up in a blue jacket.

15        *MS. SWEENEY:*  The government would ask that the record

16  reflect the witness identified Defendant Roberts.

17        *THE COURT:*  It shall.

18  *BY MS. SWEENEY:*

19  *Q.*  Mr. Pepper, would you recognize a picture of Defendant

20  Roberts if I were to show you one?

21  *A.*  Yes, ma'am.

22  *Q.*  I would ask you to turn to Tab 5 of your binder and that's

23  Government Exhibit 9274.  What type of document is this?

24  *A.*  That's a picture.

25  *Q.*  What's depicted in the picture?

Carl Pepper - Direct

1  A.  Brian Roberts.

2  Q.  Is that a fair and accurate depiction of Mr. Roberts as you

3  knew him?

4  A.  Yes, ma'am.

5      MS. SWEENEY:  The government moves to admit Government

6  Exhibit 9274.

7      THE COURT:  Any objection to the admission of 9274?

8      MR. GILLEN:  No objection, Your Honor.

9      THE COURT:  Exhibit 9274 will be admitted.

10  BY MS. SWEENEY:

11  Q.  Yesterday, Mr. Pepper, you also mentioned Mr. Timothy

12  Mulrenin.  When did you first meet Mr. Mulrenin?

13  A.  10-plus years ago.

14  Q.  Have you met him in person?

15  A.  Yes, ma'am.

16  Q.  About how many times?

17  A.  A hundred plus.

18  Q.  Over the course of how long?

19  A.  10-plus years.

20  Q.  Would you recognize Mr. Mulrenin if you were to see him

21  face to face?

22  A.  Yes, ma'am.

23  Q.  I would ask you to look around the courtroom and let me

24  know if you see Mr. Mulrenin.  And if you do, please describe

25  either where he is sitting or an article of clothing he is

Carl Pepper - Direct

1  wearing.

2  A.  Yes, ma'am.  He is right behind you.

3      MS. PREWITT:  Your Honor, we will stipulate to the

4  identification of Mr. Mulrenin.

5      THE COURT:  Does the government accept the

6  stipulation?

7      MS. SWEENEY:  Yes, Your Honor.

8      THE COURT:  So stipulated.

9      MS. PREWITT:  And also to save time, we will stipulate

10 to the photo image of Mr. Mulrenin.

11     THE COURT:  Okay.  We will have that offer now.

12     MS. SWEENEY:  At this point the government offers

13 Government Exhibit 9272.

14     THE COURT:  All right.  Go ahead, Ms. Sweeney.

15     MS. SWEENEY:  I am sorry, is it admitted?

16     THE COURT:  Sorry.  You are offering that.  9272 will

17 be admitted.

18     MS. SWEENEY:  Thank you, Your Honor.

19 BY MS. SWEENEY:

20 Q.  Now, Mr. Pepper, do you someone by the name of Bill

21 Kantola?

22 A.  Yes, ma'am.

23 Q.  How do you know Mr. Kantola?

24 A.  How do I know him?

25 Q.  Or do you know Mr. Kantola?

Carl Pepper - Direct

1    A.   Yes, ma'am.

2    Q.   When did you first meet?

3    A.   Probably 10-plus years ago.

4    Q.   Have you ever met Mr. Kantola in person?

5    A.   Yes, ma'am.

6    Q.   About how many times?

7    A.   75 to a hundred times.

8    Q.   Over the course of how long?

9    A.   10-plus years.

10   Q.   Would you recognize Mr. Kantola if you were to see him face

11   to face?

12   A.   Yes, ma'am.

13          MS. HENRY:  Your Honor, we will stipulate that the

14   witness can identify Mr. Kantola.

15          THE COURT:  Does the government accept the

16   stipulation?

17          MS. SWEENEY:  Yes, Your Honor.

18          THE COURT:  So stipulated.

19          MS. SWEENEY:  Your Honor, if I heard correctly, I

20   believe Defendant Kantola's attorney said that they would

21   stipulate to the photo, so the government moves Government

22   Exhibit 9269 into evidence.

23          THE COURT:  Is that correct, Ms. Henry?

24          MS. HENRY:  Yes.

25          THE COURT:  Yes.  9269 will be admitted.

Carl Pepper - Direct

1    *BY MS. SWEENEY:*

2    Q.  Now, Mr. Pepper, do you know someone by the name -- are you

3    familiar with someone by the name of Mikell Fries?

4    A.  Yes, ma'am.

5    Q.  Have you ever met him?

6    A.  A few times, yes, ma'am.

7    Q.  Have you ever met him face to face?

8    A.  Yes, ma'am.

9    Q.  And who is Mr. Fries?

10   A.  I believe he was the president and owner of Claxton

11   Poultry.

12   Q.  Have you ever met him face to face?

13   A.  Yes, ma'am.

14   Q.  Approximately how many times?

15   A.  Probably five, maybe 10 times.

16   Q.  Over the course of how long?

17   A.  Probably five -- five years.

18   Q.  Would you recognize a picture of Mr. Fries if I were to

19   show you one?

20   A.  Yes, ma'am.

21   Q.  I would ask you to turn to Tab 11 of your binder.  That's

22   Government Exhibit 9267.  What type of document is this?

23   A.  It's a picture.

24   Q.  What's depicted in the picture?

25   A.  Mikell Fries.

Carl Pepper - Direct

1        *MR. KORNFELD:*  Your Honor, we will stipulate to the

2    admission of this photo.

3        *THE COURT:*  Okay.  Do you want to offer that at this

4    time?

5        *MS. SWEENEY:*  Yes, Your Honor.  For the record, it's

6    Government Exhibit 9268 that the government moves into

7    admission.

8        *THE COURT:*  And Exhibit 9268 will be admitted.

9    *BY MS. SWEENEY:*

10   *Q.*  Now, Mr. Pepper, do you know someone by the name of Roger

11   Austin?

12   *A.*  Yes, ma'am.

13   *Q.*  Have you met Mr. Austin?

14   *A.*  Yes, ma'am.

15   *Q.*  When was the first time you met him?

16   *A.*  Probably 10-plus years ago.

17   *Q.*  Have you met him in person?

18   *A.*  Yes, ma'am.

19   *Q.*  About how many times?

20   *A.*  75 to a hundred times.

21   *Q.*  Over the course of how long?

22   *A.*  10-plus years.

23   *Q.*  Would you recognize Mr. Austin if you were to see him face

24   to face?

25   *A.*  Yes, ma'am.

Carl Pepper - Direct

1        MR. FELDBERG:  We stipulate to the identification of
2    Mr. Austin.
3        THE COURT:  Does the government accept the
4    stipulation?
5        MS. SWEENEY:  Yes, Your Honor.
6        THE COURT:  So stipulated.
7        MR. FELDBERG:  If a photo was coming, we will
8    stipulate to that too.
9        THE COURT:  We'll see.
10       MS. SWEENEY:  At this point, Your Honor, we would like
11   to pull up Government Exhibit 9265.  Government moves
12   Government Exhibit 9265 into evidence based on Mr. Austin's
13   stipulation.
14       THE COURT:  9265 will be admitted.
15   BY MS. SWEENEY:
16   Q.  Okay, Mr. Pepper.  Let's go back to talking about the year
17   2014.  Yesterday you testified about a substantial price
18   increase that Tyson planned for KFC.  Do you recall that?
19   A.  Yes, ma'am.
20   Q.  And you testified that you learned about that price
21   increase in early June of 2014.  Do you recall that?
22   A.  Yes, ma'am.
23   Q.  Did you have conversations with anyone at Tyson about the
24   planned price increase?
25   A.  Yes, ma'am.

1278

Carl Pepper - Direct

1  Q.  Who within Tyson did you speak with about the planned price

2  increase?

3  A.  Brandon Campbell in the pricing group, Steven Cullen,

4  Darrell Bowlin, Brian Roberts, Tim Scheiderer, Tim Mulrenin.

5  Q.  Did you ever speak to Steven Cullen about the planned price

6  increase?

7  A.  Yes, ma'am.

8  Q.  And when was that?

9  A.  That was in around the beginning of June and around the

10  beginning of August also.

11  Q.  Did there come a time in the summer of 2014 as you just

12  described where you attended a meeting in Mr. Cullen's office?

13  A.  Yes, ma'am.

14  Q.  And in that meeting was this planned price increase

15  discussed?

16  A.  Yes, ma'am.

17  Q.  Who was at that meeting?

18  A.  Steven Cullen, Darrell Bowlin, Debbie Baker, Brandon

19  Campbell, Tim Mulrenin, Brian Roberts.  I just don't remember

20  if Brian was there or if he was on the telephone.

21  Q.  Do you recall, whether he was in person or whether he was

22  on the telephone, do you recall if Defendant Roberts was at

23  that meeting or attending that meeting?

24  A.  Yes, ma'am.  I believe he attended, yes, ma'am.

25  Q.  What was the purpose of the meeting?

Carl Pepper - Direct

1   A.   To discuss the presentation for the price increase to RSCS.

2   Q.   So let's go through who attended that meeting.   First you

3   mentioned Mr. Steven Cullen.   What was his role at the time?

4   A.   I don't know Steven's exact title, but he was basically --

5   he dealt with the pricing group and then was over the

6   production side of the business that would give -- that would

7   tell us if we had birds available or if there was any kind of

8   issues of meeting with -- RSCS was asking for.

9   Q.   Mr. Campbell, what was his role at the time?

10   A.   He was the person that put the pricing -- he is the one

11   that put the RFP together with the pricing in the cost model.

12   Q.   So he was involved with pricing?

13   A.   Yes, ma'am.

14   Q.   You mentioned someone by the name of Mr. Bowlin.   What

15   group did he work with?

16   A.   He worked in the small bird group which was production

17   group.

18   Q.   Ms. Baker, what group was Ms. Baker with?

19   A.   She was also in the small bird group.   It worked with the

20   production group.

21   Q.   You also mentioned Defendant Roberts.   What group did he

22   work in at the time?

23   A.   In the national account sales.

24   Q.   Finally, you mentioned Defendant Mulrenin.   What group was

25   he with at the time?

Carl Pepper - Direct

1    A.   In national account sales.

2    Q.   What was Defendant Roberts' role with the national account

3    sales at the time?

4    A.   Brian was the VP over that part of national accounts.

5    Q.   And what was Defendant Mulrenin's report in national

6    account sales at the time?

7    A.   Tim was the director that I answered directly to.

8    Q.   So he was your boss?

9    A.   Yes, ma'am.

10   Q.   So I apologize.  What was the purpose of the meeting?

11   A.   The purpose of the meeting was to discuss the RFP that was

12   going to be presented to RSCS for the 2015 contract.

13   Q.   And what, if anything, about the price increase that we

14   just discussed did you say at this meeting?

15   A.   I wanted to make sure everybody was sure that they were

16   really wanting to go after that type of price increase because

17   it could jeopardize a lot of business.

18   Q.   Can you describe what you meant when you said jeopardize a

19   lot of business?

20   A.   With the amount of the price increase that Tyson was

21   looking for, if other companies were basically somewhere in

22   that substantial pricing range, we could possibly lose business

23   to them.

24   Q.   When you say we could possibly lose business, can you

25   explain who you are talking about?

1281

Carl Pepper - Direct

1    A.   Tyson Foods.

2    Q.   When you said we could possibly lose business to them, what

3    did you mean?

4    A.   To the other poultry companies that supplied RSCS.

5    Q.   And what were the other poultry companies that supplied

6    RSCS at this time?

7    A.   I don't know all of them, but Pilgrim's, Claxton, George's,

8    Tyson and some other ones.  I don't really know who all

9    supplied KFC.

10   Q.   So you said you don't know who all supplied KFC, but do you

11   know that Pilgrim's, Claxton, George's and Tyson supplied KFC

12   at this time?

13   A.   Yes, ma'am.

14   Q.   What, if anything, happened after that meeting?

15   A.   After the meeting Tim asked me to talk to some of the

16   people that I knew to see if they were considering doing the

17   same thing.

18   Q.   So let's break that down.  You said Tim asked me.  Who is

19   Tim?

20   A.   Tim Mulrenin, my boss.

21   Q.   When you said asked me to talk to some of the people I

22   knew, who are some of the people I knew?

23   A.   Jimmie Little, Ric Blake and Scott Brady.

24   Q.   And I apologize.  I forget the end of your sentence.  Can

25   you repeat what Defendant Mulrenin asked you to reach out to

1282

Carl Pepper - Direct

1    Defendants Little, Blake and Brady about?

2            *MR. McLOUGHLIN:*  Objection, Your Honor, asked and

3    answered.

4            *THE COURT:*  Overruled.

5    *BY MS. SWEENEY:*

6    *Q.*  Go ahead.

7    *A.*  He just asked me to see if those companies were talking

8    about if they were considering having a substantial price

9    increase also.

10   *Q.*  And did you take any actions as a result of that request

11   from Defendant Mulrenin?

12   *A.*  Yes, ma'am.

13   *Q.*  What actions?

14   *A.*  I made some phone calls to the three people we're talking

15   about.

16   *Q.*  And who were those?

17   *A.*  Jimmie Little, Ric Blake and Scott Brady.

18   *Q.*  Now, why did you call -- why did you make calls to those

19   three individuals?

20   *A.*  There was reason to see if they were considering doing a

21   substantial pricing increase for the upcoming RSCS contract.

22   *Q.*  What did you understand Defendant Mulrenin had asked you to

23   do?

24   *A.*  He asked me to see if they were going to do it and see if

25   there was an understanding that they were going to implement

Carl Pepper - Direct

1  it.

2  *Q.* I am sorry, Mr. Pepper. I didn't hear the end of your

3  sentence. Could you just say it again?

4  *A.* I asked them if they were definitely looking at doing it

5  and if there would be an understanding between us that -- those

6  companies that there would be a substantial pricing increase.

7  *Q.* So Mr. Pepper, I want to break that down just so I

8  understand. So you said you were going to ask if they were

9  looking at doing it. What did you mean by it?

10 *A.* A substantial price increase for the 2015 contract.

11 *Q.* And you said if there would be an understanding between us.

12 Who are you talking about there?

13 *A.* The understanding would be between Tyson, George's,

14 Pilgrim's and Claxton.

15 *Q.* And an understanding to do what or an understanding about

16 what?

17     *MS. PREWITT:* Objection, Your Honor, asked and

18 answered.

19     *THE COURT:* Overruled.

20 *A.* An understanding that everybody was going to do a

21 substantial pricing increase.

22 *BY MS. SWEENEY:*

23 *Q.* Everybody meaning Tyson, George's, Pilgrim's and Claxton

24 that you just described?

25 *A.* Yes, ma'am.

Carl Pepper - Direct

1    Q.  Did Defendant Mulrenin tell you why he wanted this

2    information?

3    A.  I don't remember him telling me exact -- the exact reason

4    why.  He just asked me to do it and then I believe he would

5    just relay it up to the chain of --

6         MR. McLOUGHLIN:  Objection, speculation about what

7    somebody might do.

8         THE COURT:  Sustained.

9    BY MS. SWEENEY:

10   Q.  Did Defendant Mulrenin tell you how to get the information?

11   A.  Well, he just told me to call the people that I had contact

12   information -- that I had contacts with that I trusted and

13   knew.

14   Q.  And those people that you trusted and knew, those were

15   Defendants Little, Defendant Brady and Defendant Blake; is that

16   right?

17   A.  Yes, ma'am.

18   Q.  Now, you just mentioned Defendant Little and that you spoke

19   with Defendant Little; is that right?

20   A.  Yes, ma'am.

21   Q.  Are those the calls that you were testifying about

22   yesterday with Defendant Little?

23   A.  I believe so, yes, ma'am.

24   Q.  And you mentioned -- I should take that one step back.  You

25   mentioned Defendant Little -- well, apologies.

Carl Pepper - Direct

1      You also mentioned Defendant Scott Brady.  Are those

2  the calls that you testified about with Scott Brady in 2014

3  yesterday?

4  A.  Yes, ma'am.

5  Q.  So now I would like to direct your attention to the

6  conversations you had in the summer of 2014 with Defendant

7  Blake.  In that summer how many calls did you have with

8  Defendant Blake?

9  A.  Numerous calls.  I can't tell you exactly how many.

10 Q.  More than a couple?

11 A.  Yes, ma'am.

12 Q.  Could you give it a ball park estimate?

13 A.  Five-plus, five times, five-plus times.

14 Q.  Mr. Pepper, do you remember having these calls?

15 A.  I don't remember the specific calls, no, ma'am.

16 Q.  Do you remember generally that you had these calls with

17 Defendant Blake in the summer of 2014?

18 A.  Yes, ma'am.

19 Q.  And do you have a general recollection of what was

20 discussed on those calls?

21      MS. JOHNSON:  Objection, leading, Your Honor.

22      THE COURT:  Overruled.

23 BY MS. SWEENEY:

24 Q.  Do you have a general recollection of what was discussed on

25 those calls?

Carl Pepper - Direct

1   *A.*  Yes, ma'am.

2   *Q.*  Do you have a specific recollection of what was discussed

3   on each call?

4   *A.*  No, ma'am.

5   *Q.*  And you testified that there were five-plus-calls with

6   Defendant Blake.  Over what period of time were those five-plus

7   calls?

8   *A.*  They were in sometime -- they were in the beginning of June

9   to the beginning of August of 2014.

10  *Q.*  So over the course of a month or more?

11  *A.*  Yes, ma'am.

12  *Q.*  In these series of calls that occurred over the month or

13  more, do you recall what was said in the earlier calls?

14  *A.*  Not the exact calls, but the general, yes, ma'am.

15  *Q.*  So generally what did you and Defendant Blake discuss in

16  the earlier calls?

17  *A.*  Talking about the same thing about are they thinking of

18  doing a substantial pricing increase also for the 2015

19  contract.

20  *Q.*  And when you say are they thinking of doing a substantial

21  price increase for the 2015 contract, who is they?

22  *A.*  George's.

23  *Q.*  Do you have a recollection of what was said in the later

24  set of calls?

25          *MR. TUBACH:*  Later and earlier is vague and ambiguous.

Carl Pepper - Direct

1    *THE COURT:*  Overruled.

2    *A.*  Say that again, please.

3    *BY MS. SWEENEY:*

4    *Q.*  Do you have a recollection of what was said in the later

5    set of calls?

6    *A.*  The later part of the calls is basically are you going to

7    do a substantial pricing increase and an understanding that

8    they were going to do a substantial pricing increase along with

9    Tyson Foods.

10   *Q.*  When you say there was an understanding that they were

11   going to do a substantial price increase along with Tyson

12   Foods, who is they?

13   *A.*  George's Poultry.

14   *Q.*  And did Defendant Blake work for George's Poultry at the

15   time?

16   *A.*  Yes, ma'am.

17   *Q.*  Now, Mr. Pepper, did you tell Defendant Blake that Tyson

18   was going to do a substantial price increase?

19   *A.*  Yes, ma'am.

20   *Q.*  And turning to the calls that we discussed yesterday, did

21   you tell Defendant Brady --

22        *MS. JOHNSON:*  Objection, Your Honor, leading.

23        *THE COURT:*  Let's hear the question.

24   *BY MS. SWEENEY:*

25   *Q.*  Did you tell Defendant Brady about Tyson's plans for the

Carl Pepper - Direct

1  substantial price increase?

2          *MR. LAVINE:*  Objection, leading, Your Honor.

3          *THE COURT:*  Overruled.

4  *A.*  Yes, ma'am.

5  *BY MS. SWEENEY:*

6  *Q.*  And what did you tell Defendant Brady about Tyson's plans

7  for the substantial price increase?

8  *A.*  That Tyson was going to do a substantial pricing increase.

9  *Q.*  What did you tell Defendant Blake about Tyson's plans for a

10  substantial price increase?

11  *A.*  That Tyson was also going to do a substantial pricing

12  increase.

13  *Q.*  And we also talked about calls with Defendant Little

14  yesterday.  Did you tell Defendant Little about Tyson's plans

15  for a substantial price increase in those calls that we talked

16  about yesterday?

17  *A.*  Yes, ma'am.

18          *MR. LAVINE:*  Objection, leading, Your Honor.

19          *THE COURT:*  Overruled.

20  *BY MS. SWEENEY:*

21  *Q.*  I am sorry, I didn't hear your answer.

22  *A.*  Yes, ma'am.

23  *Q.*  What about Tyson's plans did you tell Defendant Little?

24  *A.*  That Tyson was going to present a substantial pricing

25  increase.

Carl Pepper - Direct

1  *Q.* Now, you used the word substantial a number of times.  Did

2  you use a word substantial or a word like that in your calls

3  with Defendant Blake?

4  *A.* I used substantial.

5  *Q.* You used the word substantial?

6  *A.* I am pretty sure that's the word I used.

7  *Q.* Did you use the word substantial in your calls with

8  Defendant Brady?

9  *A.* Yes, ma'am.

10 *Q.* Did you use the word substantial in your calls with

11 Defendant Little?

12 *A.* Yes, ma'am.

13         *MR. LAVINE:*  Objection, vague, Your Honor.

14         *THE COURT:*  Overruled.

15 *BY MS. SWEENEY:*

16 *Q.* Now, when you used the word substantial on these calls with

17 Defendants Blake, Brady and Little, what did you mean by that?

18 *A.* I don't know --

19         *MR. TUBACH:*  Objection, Your Honor.  His unstated

20 intention is irrelevant.

21         *MS. SWEENEY:*  Your Honor, I am simply asking him what

22 he meant when he used a word in phone calls with the

23 defendants.

24         *THE COURT:*  Overruled.

25         *MR. McLOUGHLIN:*  May we have a side bar?

Carl Pepper - Direct

1        THE COURT:  Yes.

2     (At the bench:)

3        THE COURT:  Go ahead, Mr. McLoughlin.

4        MR. McLOUGHLIN:  Your Honor, I want to object to this

5   because what the government is asking Mr. Pepper is what he

6   meant by a substantial increase.  The only thing that is

7   relevant and admissible is the words he spoke to these

8   individuals.  And what their understanding might have been or

9   something else is completely beyond the scope of his knowledge

10   under Rule 701.  And if he had some unspoken implication as to

11   what substantial was, that is simply not relevant to any claim

12   the government has if it's not communicated to anybody else.

13        So we would object to getting him to use -- to try and

14   explain what substantial means.  The jury can make the

15   determination about the words that were spoken and what someone

16   might have taken from that, but he is not entitled to put a

17   gloss on that.  And again it's idiosyncratic to him, so it's

18   not relevant or material.

19        THE COURT:  The objection will be overruled.  He can

20   explain what he meant by certain terms, but of course on

21   cross-examination or whatever it can be explored as to whether

22   or not he explained that to anyone that he was talking about.

23   But he identified the fact he used a particular term.  He can

24   explain at least what he meant by that term or what he

25   considered to be the term's meaning.  Thank you.

Carl Pepper - Direct

1          MR. KORNFELD:  I am sorry, I wasn't quick enough on

2    the button, Your Honor.  Mr. Kramer, the juror in the upper

3    right-hand corner, is on his cellphone.  He appears to either

4    be texting or surfing the net during this bench conference, so

5    we are obviously concerned about that.

6          THE COURT:  Yes, I think that that is true.  Why don't

7    we have Ms. Grimm amble over and inform him he shouldn't be on

8    his cellphone while he is in the courtroom.  I will have

9    Ms. Butler communicate that to Ms. Grimm and we will just act

10   like we are still talking about things.

11          Anything else, Mr. Kornfeld?

12          MR. KORNFELD:  No, I appreciate that, Your Honor.  And

13   I appreciate your sensitivity to not necessarily making me the

14   so-called flipper on that issue.

15          THE COURT:  All right.  I think we are good.  Thank

16   you.

17       (In open court:)

18          Go ahead, Ms. Sweeney.

19   BY MS. SWEENEY:

20   Q.  Mr. Pepper, we were talking about the word substantial that

21   you used in your phone calls with Defendants Blake, Brady and

22   Little.  What did you mean when you said the word substantial?

23   A.  The conversations I was having with Jimmie and Ric and

24   Scott, I don't know who said it.  Somebody mentioned greater

25   than 10 cents.  I don't know who said that.  And that's --

Carl Pepper - Direct

1      MR. TUBACH:  I object.  That's not responsive to the

2  question that was asked.

3      THE COURT:  If you could -- agreed.  If you could pose

4  a question again to Mr. Pepper.

5      MS. SWEENEY:  Yes, Your Honor.

6  BY MS. SWEENEY:

7  Q.  So Mr. Pepper, when you used the word substantial without

8  talking about where your understanding came from at this

9  moment, what did you mean when you used the word substantial on

10  these calls with Defendants Blake, Brady and Little?

11  A.  What I meant over the years I have been doing this most of

12  the time when price increases were coming up for new contracts,

13  a lot of times they might be a penny to 4 cents a pound, not

14  the numbers that I specifically heard at Tyson.

15  Q.  And what numbers did you specifically hear at Tyson?

16  A.  A little bit over 19 cents a pound.

17  Q.  Did you communicate with Defendants Little, Blake and Brady

18  what you meant when you used the word substantial?

19      MR. TUBACH:  Your Honor, it's compound.

20      THE COURT:  Overruled.

21      MR. McLOUGHLIN:  Object also to leading.  The witness

22  already has been asked about what was said in the

23  conversations.  He says he doesn't really remember.  And now we

24  are flagging for him, oh, this.  The question is leading.

25      THE COURT:  Overruled.

Carl Pepper - Direct

1   *A.* Would you ask that question again, please?

2   *BY MS. SWEENEY:*

3   *Q.* When you had these conversations with Defendants Blake,

4   Brady and Little and you used the word substantial, did you

5   communicate to them what you meant by substantial?

6   *A.* No, ma'am.

7         *MS. SWEENEY:* Your Honor, I believe you overruled the

8   last objection.  I just asked the question again.

9         *THE COURT:* Yeah, objection is overruled.  He has

10  answered.

11  *A.* No, ma'am.

12  *BY MS. SWEENEY:*

13  *Q.* So Mr. Pepper, as a result of these calls, and now I am

14  speaking specifically about the calls that you had with

15  Defendant Blake, what, if any, understanding about a price

16  increase did you reach?

17  *A.* The understanding was that George's was going to have a

18  substantial pricing increase like Tyson was.

19  *Q.* Now, Mr. Pepper, I am going to ask you again about the

20  calls that you had and the conversations you had with

21  Defendants Little, Brady and Blake in the summer of 2014.  Did

22  you have any conversations with Defendant Mulrenin around the

23  times of the calls you had with Defendants Little, Brady and

24  Blake about the substantial price increases?

25  *A.* Yes, ma'am.

Carl Pepper - Direct

1    *Q.* Did you ever speak with Defendant Mulrenin after you spoke

2    to those competitors?

3    *A.* Yes, ma'am.

4    *Q.* Did you ever talk to Defendant Mulrenin immediately before

5    speaking to those competitors?

6          *MS. PREWITT:* Objection, Your Honor, leading.

7          *THE COURT:* Overruled.

8    *A.* On some occasions, yes, ma'am.

9    *BY MS. SWEENEY:*

10   *Q.* And did you ever have conversation with Defendant Roberts

11   after you had calls with Defendant Little?

12   *A.* Yes, ma'am.

13   *Q.* Now I am going to ask you some specific questions about the

14   calls you described.  Would a demonstrative help you explain

15   these calls to the jury?

16   *A.* Yes, ma'am.

17         *MS. SWEENEY:* Your Honor, at this time I would like to

18   pull up just for the witness and counsel Government

19   Exhibit 9984.  That's in Tab 68 of your binder, sir.

20         *THE COURT:* All right.

21         *MR. KORNFELD:* I am going to object to this.  I know

22   it's not before the jury, but this demonstrative appears to be

23   essentially a tool to refresh recollection.  And in that regard

24   I think it's improper given the detail on this demonstrative.

25         *THE COURT:* Okay.  I don't think we can tell that yet,

Carl Pepper - Direct

1   so I will overrule the objection for now.

2         *MS. SWEENEY:*  Thank you, Your Honor.

3   *BY MS. SWEENEY:*

4   *Q.*  So Mr. Pepper, have you reviewed your phone records from

5   the summer of 2014?

6   *A.*  Yes, ma'am.

7   *Q.*  And did you find records of the calls that we discussed

8   earlier today with Defendants Little, Blake, Brady, Roberts and

9   Mulrenin?

10  *A.*  Yes, ma'am.

11  *Q.*  Now, are those calls reflected in Government Exhibit 9984?

12  *A.*  Yes, ma'am.

13  *Q.*  Did you check this exhibit, Government Exhibit 9984, for

14  accuracy?

15  *A.*  Yes, ma'am.

16  *Q.*  And does this exhibit include the approximately five calls

17  you testified about earlier with Defendant Little?

18        *MR. LAVINE:*  Objection, Your Honor, pure speculation.

19  He does not remember these calls and when they basically

20  occurred.

21        *MR. BYRNE:*  I would join in that.  He specifically

22  said yesterday he did not remember -- of all five of them, I

23  think two of them he did remember.

24        *THE COURT:*  I will overrule the objections, but that

25  can be explored in terms of -- I will allow voir dire on the

Carl Pepper - Direct

1    exhibit.

2            MS. SWEENEY:  Thank you, Your Honor.  May I finish the

3    foundational questions?

4            THE COURT:  Yes, absolutely.

5    BY MS. SWEENEY:

6    Q.  Mr. Pepper, does this call contain the approximately five

7    calls you testified about earlier with Defendant Brady?

8    A.  Yes, ma'am.

9    Q.  And does this contain --

10           MR. LAVINE:  Objection, Your Honor.  May I be heard,

11   Your Honor?

12           THE COURT:  Yes.

13      (At the bench:)

14           THE COURT:  Go ahead, Mr. Lavine.

15           MR. LAVINE:  Yes, Your Honor.  Counsel's question

16   clearly misstates the evidence.  He has basically said that he

17   had four calls.  This only reflects two calls in which he is

18   asked -- what government counsel is asking whether or not this

19   reflects the four or five calls he had with Mr. Brady.  This is

20   not accurate according to this.  And this goes to the whole

21   notion of speculation, Your Honor, that this man has no

22   recollection about these phone calls one way or the other.  And

23   this is nothing more than a graph that the government has put

24   together after pulling the phone records.  This is pure rank

25   speculation and the government has misstated the evidence.

Carl Pepper - Direct

1          THE COURT:  Ms. Sweeney, in terms of your question

2     which Mr. Lavine is -- you asked about five.  Mr. Lavine is

3     saying that the summary doesn't show that many.  Response?

4          MS. SWEENEY:  Your Honor, I apologize.  I believe

5     yesterday Mr. Pepper did not recall specifically how many calls

6     he had with Mr. Brady and estimated about five.  The

7     demonstrative does not appear -- appears to reflect two calls,

8     so I am happy to rephrase the question.  I am simply attempting

9     to lay foundation for the demonstrative defendant by defendant

10    as Your Honor ordered yesterday as opposed to grouping them

11    together so the questions are clear and specific.

12         THE COURT:  On the specific objection, I will sustain

13    the objection and Ms. Sweeney can rephrase.

14         MS. PREWITT:  Your Honor, Mr. Pepper does not have an

15    independent recollection of these calls.  If he had an

16    independent recollection, he could use this to aid his

17    testimony.  This is essentially leading the witness for where

18    he does not have an independent recollection.

19         THE COURT:  Could be.  I am not 100 percent clear yet.

20    That's why I am going to allow voir dire on the exhibit so that

21    we can determine whether or not he, in fact, does have any

22    independent recollection of these calls.

23         MR. BYRNE:  Your Honor, this is Mark Byrne.  I would

24    join in the objections including Mr. Lavine's.  And I would

25    note just for cursory review there is at least seven calls

Carl Pepper - Direct

1  between Mr. Pepper and Mr. Little on this chart and he only

2  said there were five.

3       THE COURT:  Right.  The fact the witness may have an

4  imperfect recollection does not necessarily mean that the

5  exhibit is inadmissible.  But if he lacks an independent

6  recollection of the calls or what they were about, that could

7  go to that issue, so that can be explored on voir dire on the

8  exhibit.

9       Anything else, Ms. Sweeney?

10      MS. SWEENEY:  Nothing further.

11      THE COURT:  Thank you.

12    (In open court:)

13  BY MS. SWEENEY:

14  Q.  So Mr. Pepper, we were talking about Government

15  Exhibit 9984.  Does this government's exhibit contain any of

16  the calls that you testified about with Defendant Brady?

17  A.  Yes, ma'am.

18  Q.  And does this government's exhibit contain any of the calls

19  that you testified about earlier with Defendant Blake?

20  A.  Yes, ma'am.

21  Q.  Does this exhibit include any of the calls that you

22  testified earlier about with Defendant Mulrenin?

23  A.  Yes, ma'am.

24  Q.  And does this exhibit include any of the calls you

25  testified about earlier with Defendant Roberts?

Carl Pepper - Direct

1    *A.*  Yes, ma'am.

2         *MS. SWEENEY:*  The government now asks to display

3    Exhibit 9984 to the jury as a demonstrative.

4         *THE COURT:*  Any objection?

5         *MR. LAVINE:*  Yes, Your Honor.  We would object to it

6    as pure speculation.

7         *THE COURT:*  I am going to allow voir dire questions.

8         Ladies and gentlemen, as I explained to you I think

9    before, if we do voir dire of an exhibit, it means that I am

10   going to give the opposing attorneys an opportunity to ask some

11   questions about the exhibit before I rule on whether or not it

12   is admissible.

13        Anyone want to do that?

14        Ms. Johnson, go ahead.

15        *MS. JOHNSON:*  Yes, Your Honor.

16        *THE COURT:*  You can go to the podium, Ms. Johnson,

17   just to make sure you are amplified.

18        *MS. JOHNSON:*  Thank you, Your Honor.

19                         VOIR DIRE EXAMINATION

20   *BY MS. JOHNSON:*

21   *Q.*  Mr. Pepper, I am Wendy Johnson and I represent Ric Blake.

22   I am going to ask you a few questions about the document that

23   is before you.

24   *A.*  Okay.

25   *Q.*  In your earlier testimony, you stated that these calls that

Carl Pepper - Direct

1    we're discussing happened between June and August; is that

2    right?

3    A.  Yes, ma'am.

4    Q.  And you, if I ask you without looking at this document when

5    were the calls -- give me the date and the time of the calls,

6    do you have any independent recollection of that?

7    A.  Ask me that again, please.

8    Q.  Sure.  If I ask you do you have any independent knowledge

9    of the dates, the times of these calls from June to August.

10   A.  Just from the actual time of remembering, not until I saw

11   these call logs.

12   Q.  So not until the government presented you with this chart,

13   you had no real recollection of these calls, did you?

14   A.  Well, I knew there was calls being made, but not the exact

15   time frames and things.

16   Q.  Yes, sir.  So you knew generally that you had some phone

17   calls between June and August, but you don't remember the dates

18   or the times or the lengths of those calls.  Is that fair to

19   say?

20   A.  Yes, ma'am.

21            MS. JOHNSON:  Thank you, Your Honor.

22            THE COURT:  Thank you, Ms. Johnson.

23            Ms. Prewitt?

24                      VOIR DIRE EXAMINATION

25   BY MR. GILLEN:

1301

Carl Pepper - Direct

1  *Q.* Good morning, Mr. Pepper. My name is Craig Gillen. I

2  represent Brian Roberts. A few questions on this.

3       You mentioned that you had calls from June to August,

4  correct?

5  *A.* During that time frame, yes, sir.

6  *Q.* There are no calls in June on this log sheet; is that

7  correct?

8  *A.* Correct.

9  *Q.* Would that reflect that your recollection of about when

10 calls you may have had with folks who were working for

11 competitor companies was inaccurate?

12 *A.* No. I just didn't remember the exact dates. I just knew

13 somewhere between June and August is when the calls were.

14 *Q.* The very first call starts off on July the 16th. Is that

15 the first real record you could show to refresh your

16 recollection about when calls took place?

17 *A.* Yes, sir.

18 *Q.* So really, what you are really saying here is you are

19 modifying your testimony and saying calls that you had really

20 maybe started in July and went through August; is that right?

21 *A.* No, I'm not modifying anything. I am just going by the

22 logs that I've seen.

23 *Q.* I am just missing the calls in June that you were telling

24 us about. Do they exist?

25 *A.* I don't know. I hadn't -- I can't remember if I have seen

1302

Carl Pepper - Direct

1    any of those.

2    Q.   I see.  Well, the first call you have here on the log is

3    July the 16th.  And that -- and on that day you've got --

4    you've got a call that you are calling Brian Roberts, correct?

5    A.   After Jimmie Little called me, yes.

6    Q.   Now, Brian Roberts, you indicated that you worked -- that

7    your direct report was Tim Mulrenin and then up to Brian

8    Roberts, correct?

9    A.   At the --

10            MS. SWEENEY:  Objection as to scope.

11            THE COURT:  Overruled.

12   A.   Like I said, at the very beginning when Brian first came

13   there, I answered to Brian.  And then after I don't know how

14   long, then I answered to Tim.

15   BY MR. GILLEN:

16   Q.   July in 2014 you answered to Mr. Mulrenin.  And then

17   Mr. Roberts was above Mr. Mulrenin, correct?

18   A.   I believe so.

19   Q.   So now so the jury understands in terms of telephone calls,

20   your place of work and business was Arkansas, correct?

21   A.   Yes, sir.

22   Q.   And Mr. Roberts' place where he resided and where he worked

23   out of was Atlanta, Georgia, correct?

24   A.   Yes, sir.

25   Q.   And Mr. Mulrenin during this period of time, his place of

Carl Pepper - Direct

1    work and residence was Delaware, correct?

2    A.   Yes.

3    Q.   So any communications that you would have with them about

4    virtually anything concerning business would have been over the

5    phone or via e-mail, correct?

6    A.   Yes, sir.

7    Q.   In your meeting with them, you were talking with them on

8    the phone, right?

9    A.   Yes, unless they happened to be there in person.

10   Q.   And so we've got one call -- and you don't know what this

11   call on July the 16th, 2014 from Mr. Pepper and Mr. Roberts,

12   you have no idea what the call was about sitting here today, do

13   you?

14   A.   I don't -- I don't remember.

15   Q.   Okay.  That's fine.  If you don't remember, you don't

16   remember.  So you don't remember what was discussed when you

17   were talking to somebody long distance who worked for Tyson and

18   you worked for Tyson, right?

19   A.   Correct.

20   Q.   And noting the span between July the 16th and -- let's see

21   where we go here.  We go to the other page.  We don't see or I

22   don't -- can you show me another call that you had with

23   Mr. Roberts anytime in August of 2014?

24   A.   I don't see anything else.

25   Q.   So you got no calls between you and Mr. Roberts during this

1304

Carl Pepper - Direct

1  critical August 2014 period, right?

2  A.  Well -- right.

3  Q.  Because -- and you got these -- you didn't create this

4  chart, did you?

5  A.  No, sir.

6  Q.  The chart was created for you by the government here,

7  correct?

8  A.  Well, that and phone logs.

9  Q.  They handed you this chart and they handed you the phone

10  logs to look up to see whether those numbers were on the phone

11  calls, correct?

12  A.  Yes, sir.

13  Q.  And they were trying to find whatever calls they could find

14  between you and Mr. Roberts.  And there was zero from July the

15  16th until September the 4th; is that right?

16        MS. SWEENEY:  Objection as to the government's state

17  of mind.  This question seems to call for the government's

18  state of mind.

19        THE COURT:  Overruled.

20  A.  Would you ask that again, please?

21  BY MR. GILLEN:

22  Q.  I am sorry, I couldn't hear your answer.

23  A.  Could you ask that again, please?

24  Q.  Sure.  So from calls between you, an employee in the sales

25  division, and Brian Roberts, you and the government couldn't

Carl Pepper - Direct

1   find any calls between you and Mr. Roberts from July the 16th

2   all the way up to September the 4th; is that right?

3   A.  From July the 16th -- well, there is one right there from

4   July the 16th.

5   Q.  I said from July the 16th until September the 4th there is

6   not another call between you long distance with Mr. Roberts,

7   right?

8   A.  Correct.

9   Q.  Okay.  Now, you indicated that -- did you do any

10  independent searching of your phone records to create this

11  demonstrative?

12  A.  No, sir.

13  Q.  They just gave it to you and sort of said check it out and

14  we're going to try to use it with you on the stand, right?

15        MS. SWEENEY:  Objection, calls for hearsay or

16  objection to hearsay.

17        MR. GILLEN:  I am going to whether he created it or

18  not or whether it was handed to him.

19        MS. SWEENEY:  The question was about what the

20  government told Mr. Pepper.

21        THE COURT:  Overruled.

22  BY MR. GILLEN:

23  Q.  Right?  They hand it to you and say we want you to confirm

24  this, right?

25  A.  They handed it to me and made me confirm it from the logs

Carl Pepper - Direct

1  that I had been seeing with all the AT&T logs, yes.

2  Q.  You couldn't, try as you might, you couldn't find any calls

3  between you and Mr. Roberts between July the 16th and September

4  the 4th, could you?

5  A.  No, sir.

6  Q.  Even though you worked with him, but in separate locations,

7  right?

8  A.  Yes, sir.

9       MR. GILLEN:  That's all I have, Your Honor.

10      THE COURT:  Thank you, Mr. Gillen.

11      Ms. Prewitt?

12                    VOIR DIRE EXAMINATION

13  BY MS. PREWITT:

14  Q.  Hello, Mr. Pepper.  I represent Timothy Mulrenin, okay?

15  A.  Okay.

16  Q.  Now, this chart here, this was provided to you as an aid by

17  the prosecutors here, right, sitting at this table, correct?

18  And that's because in the course of interviews, many interviews

19  you had with the government, you struggled recollecting these

20  particular calls they asked you questions about; isn't that

21  right?

22  A.  Well, yes.  I couldn't remember every single call until I

23  saw --

24  Q.  I'd just ask you to answer the question.  You struggled

25  recollecting the calls that they were asking you to testify

Carl Pepper - Direct

1    about today.

2    A.  Yes, ma'am.

3    Q.  And so, in fact, what they did in the course of these

4    interviews is they put chats and e-mails in front of you and

5    asked you questions about what occurred during those chats,

6    correct?

7    A.  Yes, ma'am.

8    Q.  And then looking at the dates of those chats and e-mails,

9    then they put phone records in front of you, didn't they?

10   A.  Yes, ma'am.

11   Q.  And they asked you questions about whether the chats or the

12   conversations you told them about were connected to those phone

13   records, correct?

14   A.  Yes, ma'am.

15   Q.  Those calls listed.

16   A.  Yes, ma'am.

17   Q.  But you didn't have an independent recollection at the time

18   about what took place on those conversations that were

19   reflected in those phone logs, correct?

20   A.  Yes.  If I looked at a number, I wouldn't have known right

21   then and there.

22   Q.  But even after they showed you those phone records, you

23   yourself did not have an independent recollection of what was

24   discussed on those calls, correct?

25   A.  When they showed me those phone records, the dates?

Carl Pepper - Direct

1  Q.  When they showed you the phone records, you at the time

2  during those interviews did not have an independent

3  recollection of what was discussed on those calls.

4  A.  Not specific.

5  Q.  Okay.  And so let me just talk to you a little bit about

6  your day-to-day engagement with Mr. Mulrenin, okay?

7  A.  Okay.

8  Q.  So you lived in different states at the time in question,

9  correct?

10 A.  Yes.

11 Q.  At the time reflected on the chart you're looking at,

12 right?

13 A.  Yes, ma'am.

14 Q.  And you talked often, right?

15 A.  Yes, ma'am.

16 Q.  Sometimes multiple times a day.

17 A.  Sometimes.

18 Q.  So we have a period of time here reflected from July 16 to

19 August 28, 2014.  Does that look right to you?

20 A.  Yes, ma'am.

21 Q.  Okay.  And you have here one, and correct me if I'm wrong,

22 one, two, three, four, five, six, seven, eight calls with

23 Mr. Mulrenin; is that right?

24 A.  Yes, ma'am.

25 Q.  Is it your testimony that these are all the calls that you

Carl Pepper - Direct

1    had with Mr. Mulrenin over this period of time?

2    A.  Ask that again?

3    Q.  These eight calls that we talked about, are those all the

4    calls you had with Mr. Mulrenin over this period of time?

5    A.  I don't know.  I can't answer that.

6    Q.  And these, in fact, were calls selected by the prosecution

7    team as an aid to help you testify, correct?

8    A.  Yes, ma'am.

9    Q.  Even though you didn't independently recall at the time

10   when you were being asked about this or even today what exactly

11   was discussed on those calls; isn't that right?

12   A.  I didn't know specifically, yes.

13          MS. PREWITT:  Thank you.

14          THE COURT:  Anyone else?

15          Mr. Byrne, go ahead.

16                    VOIR DIRE EXAMINATION

17   BY MR. BYRNE:

18   Q.  Good morning, Mr. Pepper.  I represent Mr. Little.  Just to

19   go over some of the things that you have already gone over but

20   with respect to Mr. Little, you have no independent

21   recollection of any of these phone calls before this chart was

22   shown to you and your phone tolls, correct?

23   A.  Yes, sir.

24   Q.  So you didn't remember the dates.  You didn't remember the

25   times.  And you didn't remember the durations, correct?

Carl Pepper - Direct

1    A.   Correct.

2    Q.   Yesterday you testified that you had five phone calls with

3    Mr. Little during this approximate time period.  Do you

4    remember that?

5    A.   Yes, sir.

6    Q.   So if you look at this chart, in fact, there is nine calls

7    on there, correct?

8    A.   Yes, sir.

9    Q.   And you said yesterday that you only remembered what was

10   said on two of those five calls; is that correct?  Do you

11   remember saying that?

12   A.   No, sir, I don't.

13   Q.   So you have no independent recollection of what was said

14   during those calls, correct?

15   A.   Not specific.

16        MR. BYRNE:  Thank you, Your Honor.

17        THE COURT:  Anyone else?

18        Mr. Lavine.

19                    VOIR DIRE EXAMINATION

20   BY MR. LAVINE:

21   Q.   Mr. Pepper, my name is Bryan Lavine.  I represent Scott

22   Brady.

23   A.   Yes.

24   Q.   And I want to ask some more questions about this chart

25   that's been shown to you.

Carl Pepper - Direct

1        Now, how many pages of phone records did you review

2   when you met with the government?

3   A.   I don't know.  Number-wise, I don't know.

4   Q.   How many years of phone records did you review?

5   A.   I guess starting in -- I really don't know.

6   Q.   Okay.  How many months of phone records did you review?

7   A.   I can't give you an exact answer on those.  I don't know.

8   Q.   I appreciate that.  So let me see if I understand this.

9   When you met with the government, these lawyers sitting right

10  here, they gave you this chart, right?

11  A.   Yes, sir.

12  Q.   Did they give you phone records, then, to see if what is on

13  this chart is accurate?

14  A.   Yes.

15  Q.   So you had nothing to do with the preparation of this

16  chart.

17  A.   Nothing but just verify it.

18  Q.   Just verify.  And based on the phone records that these

19  lawyers gave you, right?

20  A.   Yes, sir.

21  Q.   Okay.  Now, before you saw this you had no independent

22  recollection of the number of calls or when they occurred;

23  isn't that correct?

24  A.   Yes, sir.

25  Q.   And, in fact, you testified earlier that you recalled four

Carl Pepper - Direct

1   to five calls; is that correct?

2   A.  I don't remember saying that, specifically remembering four

3   to five calls.

4   Q.  Yesterday when Ms. Sweeney was asking you questions on

5   direct examination, you said there were about four to five

6   calls from Mr. Brady.

7   A.  All right.

8   Q.  And you were asked by the government to identify your calls

9   that occurred with Mr. Brady in August of 2014, right?

10  A.  Yes, sir.

11  Q.  Whether you recalled them or not, whether you remembered

12  them independently of your own, that's what they asked you to

13  do, right?

14  A.  Yes, sir.

15  Q.  And what you found after reviewing this exhibit, you found

16  two calls.

17  A.  Are you talking about as of right now?

18  Q.  On this exhibit which you found there were only two calls;

19  is that correct?

20  A.  On this one, yes, sir.

21  Q.  All right.  Now, do you know Mr. Brady's telephone number?

22  A.  That's what I 90 percent of the time called him on.

23  Q.  Did they give you the telephone number for Mr. Brady?

24  A.  No.  It was on the AT&T, on the AT&T log.

25  Q.  So when you went through the log for August, which is -- I

Carl Pepper - Direct

1    assume all they gave you was the August log; is that right?

2    They gave you one month's?  They gave you one month's of phone

3    bills and asked you to compare it to what's on this sheet;

4    isn't that correct?

5    A.  No.  At one time I had a lot more than these phone logs

6    right here.

7    Q.  Right.  But for the verification of this sheet right here,

8    they only gave you one month.

9    A.  I know there is a couple of sheets I looked at.  I don't

10   know if there is a one-month span or a two-month span.

11   Q.  Do you recall what you reviewed to verify these numbers?

12   A.  Yes, yes, sir.

13   Q.  All right.  What months did you review?

14   A.  I guess I reviewed all of this and -- all this and up until

15   September -- through September.

16   Q.  August through September, but -- okay.  But you only found

17   two calls with Mr. Brady, right?  And you don't recall what

18   specifically was discussed on these calls, do you?  As you sit

19   here today, you don't independently recall what was discussed

20   on these calls; is that correct?

21   A.  Correct, specifically.

22   Q.  Right.  And you don't have -- as you sit here today, you

23   don't have an independent recollection of these actual calls

24   that are on this sheet, do you?

25   A.  Not -- no, sir.  I just know I made them or they called me.

1314

Carl Pepper - Direct

1  That's all I know on the biggest thing and during the time

2  frame that it was.

3  Q.  But you don't have an independent recollection of when

4  those calls occurred, right?

5  A.  Until I saw --

6  Q.  Until you saw this.

7  A.  Yes, sir.

8  Q.  Right.  And as you sit here today, you have no independent

9  recollection of what was said on these calls.

10  A.  I know -- the generality, I know what it was during the

11  time frame that the calls were made.

12  Q.  But you have no independent recollection specifically what

13  was said on these calls, do you?

14      MS. SWEENEY:  Objection, Your Honor, asked and

15  answered.

16      THE COURT:  Overruled.

17  BY MR. LAVINE:

18  Q.  It's a simple yes or no, sir.

19  A.  No, sir, I don't.

20  Q.  Thank you.  And the only reason you remember right now is

21  because they put this sheet in front of you.

22  A.  Along with the e-mails that were at that time frame, yes,

23  sir.

24  Q.  Along with e-mails?

25  A.  Or excuse me, not e-mails.  No, just the phone calls, yes.

Carl Pepper - Direct

1   Q.  Right.  If they hadn't given you this sheet, you would have

2   no real recollection of specifically when these calls occurred;

3   is that true, sir?

4   A.  Yes, sir.

5        MR. LAVINE:  No further questions, Your Honor.

6        THE COURT:  Thank you.

7        Ms. Sweeney, do you want to ask additional questions?

8        MS. SWEENEY:  Yes, Your Honor.

9        THE COURT:  Go ahead.

10  BY MS. SWEENEY:

11  Q.  Mr. Pepper, the calls listed on this demonstrative are on

12  Government Exhibit -- I apologize -- 9984, these were from

13  2014; is that right?

14  A.  Yes, ma'am.

15  Q.  And before you looked at these -- at your phone records or

16  at this government exhibit, did you remember having some of

17  these calls?

18  A.  Yes, ma'am.

19  Q.  Did you remember the specific dates and times of the calls?

20  A.  No, ma'am.

21  Q.  But did you remember the fact that you had had these

22  conversations?

23        MR. KORNFELD:  Your Honor, objection to the word

24  these.  That's a leading question.  You can ask if you remember

25  calls, but counsel is attributing the calls he remembers to

Carl Pepper - Direct

1    this specific exhibit.

2           THE COURT:  Sustained as being vague.  If you could

3    specify.

4           MS. SWEENEY:  Yes, Your Honor.

5    BY MS. SWEENEY:

6    Q.  So Mr. Pepper, you testified that prior to looking at toll

7    records, at call records or at this particular exhibit, you

8    recalled having conversations with defendants in the summer --

9    with Defendants Little, Brady, Blake, Mulrenin and Roberts in

10   the summertime approximately of 2014; is that right?

11   A.  Yes, ma'am.

12   Q.  But you did not remember the specific dates of the calls

13   you had with those five defendants.

14   A.  Correct.

15   Q.  But you recalled having those calls with those five

16   defendants prior to seeing your toll records or seeing this

17   government's exhibit?

18          MR. KORNFELD:  Same objection as before, Your Honor.

19          THE COURT:  Overruled.

20   A.  Would you ask me that again, please?

21   BY MS. SWEENEY:

22   Q.  But did you remember prior to seeing your toll records and

23   to seeing this government exhibit, you remember the fact that

24   you had those calls in that time frame with the five defendants

25   that we have been talking about.

1317
Carl Pepper - Direct

1   *A.*  Yes, ma'am.  During that time frame I know I had some.

2   *Q.*  And you recalled the subject matter -- did you recall the

3   subject matter of those calls?

4   *A.*  During that time frame, yes, ma'am, some of the calls I do.

5   *Q.*  Now, what do you remember about the calls with Defendant

6   Mulrenin that are listed on the government's exhibit?

7       *MR. McLOUGHLIN:*  Objection to form, Your Honor, if the

8   government has asked about a specific call on a specific day.

9   If we are going to -- if we are authenticating a chart with

10  specific calls, it has to be with respect to what do you

11  remember on that call that day.  This witness has already made

12  his answers to those questions quite clear.

13      *THE COURT:*  I am going to sustain that objection.  It

14  does need to be specific to calls on the record -- on the

15  demonstrative.

16      *MS. SWEENEY:*  Sure.

17  *BY MS. SWEENEY:*

18  *Q.*  So Mr. Pepper, directing your attention to I believe it's

19  August 15th.  You spoke with Ms. Prewitt about calls that you

20  had with Mr. Mulrenin on August 15th; was that right?

21      *MS. PREWITT:*  Objection, Your Honor.  That

22  mischaracterizes the exchange.

23      *THE COURT:*  Sustained.

24  *BY MS. SWEENEY:*

25  *Q.*  You spoke with Ms. Prewitt about calls you had with

Carl Pepper - Direct

1    Defendant Mulrenin in this chart, Government's Exhibit 9984; is

2    that right?

3            MS. PREWITT:  Objection, Your Honor.  That wasn't what

4    we posed, the question.  That wasn't what was posed to the

5    witness.

6            THE COURT:  That's sustained too.  If you could make

7    it more general.  Ms. Prewitt didn't ask that specific

8    question.

9    BY MS. SWEENEY:

10   Q.  Focusing on August 15th, there are two -- are there two

11   calls?  Do you see calls listed on that date?  I apologize.

12   Let me start again.

13           Focusing your attention on August 15, do you see calls

14   listed with Defendant Mulrenin on that date?

15           MS. PREWITT:  Objection, Your Honor.  If we are

16   talking about demonstratives in his testimony, he should be

17   looking away from the demonstrative and then testifying.

18           THE COURT:  Overruled.

19   BY MS. SWEENEY:

20   Q.  Do you see calls with Defendant Mulrenin on that date?

21   A.  Yes, ma'am.

22   Q.  What do you remember about those calls with Defendant

23   Mulrenin listed on August 15?

24   A.  I don't remember the specific -- what the specifics were.

25   Q.  Do you have a general recollection about those calls with

Carl Pepper - Direct

1   Defendant Mulrenin listed on August 15?

2   A.  Yes, ma'am.  Generality was about the 2014 KFC contract.

3   Q.  Do you have a general recollection about the call at

4   4:30 p.m. with Defendant Mulrenin on August 15th?

5   A.  Not the specific.

6   Q.  Do you have a general recollection of what was discussed on

7   that call?

8   A.  Yes, ma'am.  I gave him the information, whatever I had

9   found out from talking to Jimmie Little, Scott Brady and Ric

10  Blake.

11  Q.  And what about that information you got from Jimmie Little,

12  Scott Brady and Ric Blake, what did that have to do with the

13  call with Defendant Mulrenin at 4:30 on the 15th?

14          MS. PREWITT:  Objection, Your Honor.  The call that's

15  referenced is 17 seconds.

16          THE COURT:  Overruled.

17  BY MS. SWEENEY:

18  Q.  What did that information that you received from Defendants

19  Little, Brady and Blake, what did that have to do with the call

20  from Defendant Mulrenin on the -- the call to Defendant

21  Mulrenin on the 15th at 4:30 p.m.?

22  A.  It was giving him -- excuse me, information of what I found

23  out when I was talking to Jimmie, Scott and Ric, but I don't

24  remember the specifics.

25  Q.  Now, Mr. Pepper, the call with Defendant Mulrenin is listed

Carl Pepper - Direct

1   as 17 seconds.  Do you see that?

2   *A.*  Yes, ma'am.

3   *Q.*  Looking at the length of this call, do you think -- do you

4   still think that -- or do you think that you provided that

5   information you received from Defendants Little, Brady and

6   Blake?

7           *MR. McLOUGHLIN:*  Objection.

8           *THE COURT:*  Let's have a side bar.

9       (At the bench:)

10          *THE COURT:*  So obviously this is being offered as a

11  demonstrative, but now it's being used to ask the witness about

12  particular phone calls which he has already testified he

13  doesn't really specifically recall them, so I think that the

14  demonstrative is now being used basically to lead him.  So it

15  would be, of course, more appropriate for that purpose, you

16  know, if he is going to talk about specific phone calls, that

17  he, you know, be asked whether he had a phone call, whether he

18  remembers when it took place, you know, if he has to have his

19  recollection refreshed.  But it would be refreshed not

20  necessarily through this summary exhibit, but if he, in fact,

21  looked at a -- refreshed his recollection through the actual

22  phone record of his because we seem to have now opened up a gap

23  between what this record was purported to be, namely some type

24  of a summary, and what it's being used for now which is to have

25  him testify about specific calls which he doesn't really have a

Carl Pepper - Direct

1    specific recollection or at least may not.

2         *MR. McLOUGHLIN:*  Your Honor, on behalf of Mr. Lovette,

3    we would object to the government being permitted to use this

4    exhibit any further in any way.  This witness has already

5    testified that he doesn't remember anything about any calls.

6    He didn't put this chart together.  He doesn't know what was

7    said on what date.  And quite frankly, rehabilitation at this

8    point is impossible where what we then get to is the absurdity

9    of the government leading this witness to say a call that

10   lasted 17 seconds was a discussion of his conversations with

11   other defendants.

12         And, you know, as I said, we are in the theater of the

13   absurd here.  The purpose of this exhibit has already been

14   shown in the voir dire to be unsupported, so the exhibit should

15   simply be put away.  And we would respectfully suggest we

16   should move on because any use of this exhibit given the

17   factual predicate before it is simply unsupported by any rule

18   of evidence.

19         *THE COURT:*  Ms. Sweeney, response?

20         *MS. SWEENEY:*  Yes, Your Honor.  I was attempting to

21   ask more generally and not use it -- not ask about specific

22   dates, but I was responding to an objection that I received

23   that no question was proper unless specific dates were asked

24   about.  So I was trying to ask questions as directed and not

25   ask the objectionable questions which were more general which

Carl Pepper - Direct

1    was what I was originally attempting to do.

2         That said, Your Honor, I am happy to end this line of

3    questioning.  Again, I think I can anticipate the ruling, but

4    move to show this demonstrative to the jury.  And if that is

5    denied, I am happy to move on.

6         THE COURT:  And just so the record is clear, the

7    purpose of this demonstrative is what?

8         MS. SWEENEY:  The purpose was to aid in his discussion

9    of the calls that he had with the defendants.  As he has

10   testified many times, he does not remember the specific dates

11   or times of those calls, but he remembers and he remembered

12   before he looked at his toll records that he had these calls.

13   So it was simply to aid in his discussion of when

14   communications with the defendants took place and to describe

15   the course of communications over that summer.

16        THE COURT:  Okay.  I am going to rule that while it --

17   of course, like with other witnesses, someone can look through

18   his toll records and verify that he made a particular call at a

19   particular time, and that can be done in a way with Mr. Pepper,

20   but the purpose of this exhibit which is to "aid" his

21   recollection has been demonstrated through the voir dire

22   questions that while he certainly had conversations with these

23   people, the subject matter of the conversation is unclear.

24        He doesn't know what type of a conversation he had

25   and, therefore the purpose of the summary is not being achieved

Carl Pepper - Direct

1    through the use of it as a demonstrative.  So I will sustain

2    the objections to the use of this particular exhibit as a

3    demonstrative to his testimony.

4          Thank you.

5      (In open court:)

6    BY MS. SWEENEY:

7    Q.  So Mr. Pepper, you can put that away.  Thank you.

8          MR. McLOUGHLIN:  Your Honor, may we have another 10

9    seconds on the device?

10          THE COURT:  Sure.

11      (At the bench:)

12          THE COURT:  Mr. McLoughlin, go ahead.

13          MR. McLOUGHLIN:  Your Honor, I just want to note that

14   our discussions to the jury are a black box, so I would request

15   that the jury be informed that the objection to the further use

16   of the chart has been sustained so that the jury doesn't impute

17   bad things or wonder what happened.  I believe the jury is

18   entitled to know there was an objection to the further use of

19   the chart, that objection was sustained, and then we move on.

20   And the same I think probably holds for future conferences that

21   we have so that the jury understands what's proceeding.

22          THE COURT:  I am going to deny that request.

23   Oftentimes there is just a request for a side bar.  And I don't

24   want to try to reconstruct the side bar or even necessarily

25   encourage people to make an objection first, then make the

Carl Pepper - Direct

1   objection on the side bar.  So I am not concerned that the jury

2   will have the -- have that swirling curiosity that you suggest.

3   I think that it would -- it's ultimately if we adopt it, some

4   type of a rule like that, it would cause more problems than it

5   would solve, so I will reject that.  Thank you.

6        (In open court:)

7             THE COURT:  Go ahead, Ms. Sweeney.

8             MS. SWEENEY:  Thank you, Your Honor.  The Court's

9   brief indulgence?

10  BY MS. SWEENEY:

11  Q.  Now, Mr. Pepper, before we looked at the demonstrative --

12  or at Government Exhibit 9984, we I believe were discussing

13  calls that you had with Defendant Mulrenin after you had calls

14  with competitors.  Do you recall that?

15  A.  Yes, ma'am.

16  Q.  Do you have a specific recollection of what was said on

17  these calls?

18  A.  No, ma'am.

19  Q.  Do you have a general recollection of what was said on

20  these calls?

21  A.  Yes, ma'am.

22  Q.  What is your recollection of what was said on these calls?

23  A.  It was basic --

24            MR. McLOUGHLIN:  Objection, Your Honor, unless we are

25  talking about a specific call, a time or month or year.

Carl Pepper - Direct

1      MS. PREWITT:  And also asked and answered, Your Honor.

2      THE COURT:  I will overrule Ms. Prewitt's objection,

3  but I will sustain Mr. McLoughlin's objection.  If you could

4  just specify the time period that you are talking about.

5  BY MS. SWEENEY:

6  Q.  So Mr. Pepper, we were talking about calls in the summer of

7  2014; is that correct?

8  A.  Yes, ma'am.

9  Q.  And I believe you testified that you had calls with

10  Defendant Mulrenin in that summer of 2014 after you had calls

11  with your competitors, with Defendants Blake, Brady and Little

12  that you described; is that right?

13  A.  Yes, ma'am.

14  Q.  What's your general memory of these -- your general

15  recollection of these calls with Defendant Mulrenin?

16      MR. McLOUGHLIN:  Same objection, Your Honor, unless

17  it's a specific call.

18      THE COURT:  Overruled.

19  A.  The general information was that I was letting Tim know --

20  it had to do with the 2014 contract.  I just don't know exactly

21  the conversation that went on, but it was concerning the

22  contract.

23  BY MS. SWEENEY:

24  Q.  And you started saying, I was letting Tim know.  What were

25  you -- who is Tim?

Carl Pepper - Direct

1  *A.*  Tim Mulrenin, my boss.

2  *Q.*  And what were you letting Defendant Mulrenin know in these

3  calls?

4       *MS. PREWITT:*  Objection, Your Honor.  The witness

5  already answered the question.

6       *THE COURT:*  Overruled.

7  *A.*  I was letting him know what Scott Brady and Ric Blake and

8  Jimmie Little was telling me about whatever -- at that period

9  of times whatever we were talking about the 2014 contract and

10  the price increase.

11  *BY MS. SWEENEY:*

12  *Q.*  When you say whatever we were talking about, can you

13  describe what it is that you mean?

14  *A.*  The substantial pricing increase for that contract period.

15  *Q.*  Did you ever talk to -- I believe you testified earlier at

16  times you talked to Defendant Mulrenin immediately before

17  talking to your competitors; is that right?

18  *A.*  Yes, ma'am.

19  *Q.*  Do you recall specifically what was said on that call?

20  *A.*  No, ma'am.

21  *Q.*  Do you recall generally what was said on that call with

22  Defendant Mulrenin?

23       *MS. PREWITT:*  I would just like to know which call we

24  are talking about.

25       *THE COURT:*  I am going to sustain that objection.  If

Carl Pepper - Direct

1  you could specify what call and when it took place if he

2  recalls.

3          MS. SWEENEY:  Yes, Your Honor.

4  BY MS. SWEENEY:

5  Q.  Mr. Pepper, for this series of questions I am going to be

6  talking about the summer of 2014.

7          MS. PREWITT:  Objection, Your Honor.  There is several

8  months in the summer of 2014.

9          THE COURT:  Overruled.

10 BY MS. SWEENEY:

11 Q.  Did there come a time in the summer of 2014 where you spoke

12 with Defendant Mulrenin immediately before making calls to

13 competitors?

14 A.  Yes, ma'am.

15 Q.  Do you remember the specific date of that?

16 A.  No, ma'am.

17 Q.  Do you remember generally when it occurred?

18 A.  It was during the negotiations for 2014, 2015 contract.

19 Q.  And the negotiations of the 2014 -- sorry, the negotiations

20 for which contract?

21 A.  The 2015 contract.

22 Q.  And when were those negotiations?  When were those

23 negotiations?

24 A.  They started sometime in August through -- for a couple

25 months after.

Carl Pepper - Direct

1   *Q.* And specifically what customer's negotiations are you

2   referring to?

3   *A.* That particular one then was RSCS.

4   *Q.* And RSCS purchased for?

5   *A.* KFC.

6   *Q.* So in the time during the negotiations for the KFC contract

7   as I believe you testified in the summer of 2014 when you had a

8   call with Defendant Mulrenin immediately before calling your

9   competitors, what is your general recollection of what was

10  discussed?

11  *A.* General -- I asked -- he was asking me to find out some

12  more information or if I gotten anything -- if I had gotten any

13  information of what the other poultry companies were going to

14  do on the price increase.

15  *Q.* Now, you said to find out if you had more information.

16  What do you mean by that?

17  *A.* If there had been a -- if there had been a conclusion of

18  all the conversations that we were having if there was a

19  decision that was made that the other companies were going to

20  do a substantial price increase.

21  *Q.* Can you describe specifically what you mean by if a

22  decision was made?  If you could be more specific, please.

23  *A.* Basically if Pilgrim's --

24          *MR. McLOUGHLIN:* Objection.  I apologize, Your Honor.

25          *THE COURT:* Go ahead.

Carl Pepper - Direct

1          *MR. McLOUGHLIN:*  Objection to asking this witness what

2    Mr. Mulrenin or someone else meant.  He is not qualified to

3    testify about that.  He can testify what he said as to what was

4    said on a particular call, but he can't testify to what someone

5    else said.

6          *MS. SWEENEY:*  Your Honor, I am happy to clarify.  I am

7    asking Mr. Pepper what he understood.

8          *THE COURT:*  Why don't you go ahead and rephrase it.

9    *BY MS. SWEENEY:*

10   *Q.*  So Mr. Pepper, you testified that your general recollection

11   of this call was that Defendant Mulrenin asked for more

12   information about whether a decision has been made.  What did

13   you understand Defendant Mulrenin to be asking?

14   *A.*  Just to see if they had -- that they were going to do the

15   substantial pricing increase.

16   *Q.*  And I apologize, Mr. Pepper.  Who is they?

17   *A.*  Pilgrim's, Claxton and George's.

18   *Q.*  So what, if anything, did you do as a result of that

19   conversation with Defendant Mulrenin?

20   *A.*  The information -- and like I said, I don't know the

21   specifics, but the information, I called Tim back and gave him

22   what information I had found out.

23   *Q.*  And how did you find out information out?

24         *MS. PREWITT:*  Your Honor, I am not sure what call we

25   are talking about at this point in time.  The question is

Carl Pepper - Direct

1    unclear.

2              *THE COURT:*  Overruled.

3    *BY MS. SWEENEY:*

4    *Q.*  So you testified about an initial call with Defendant

5    Mulrenin.  And then you just said you called Defendant

6    Mulrenin.  Did you call him back?

7    *A.*  Yes, ma'am.

8    *Q.*  And you talked about you giving him the information that

9    you found out.  What information did you find out and how --

10   what information did you find out?

11   *A.*  I still don't know at that particular time what the final

12   decision was.

13   *Q.*  And who did you -- or where did you get the information

14   that you then called Defendant Mulrenin with?

15   *A.*  I got the information from Jimmie, Scott and Ric Blake.

16   *Q.*  And just to be clear, when you say Jimmie, who are you

17   referring to?

18   *A.*  Jimmie Little.

19   *Q.*  And when you say Scott, who are you referring to?

20   *A.*  Scott Brady.

21   *Q.*  And who was the last one?

22   *A.*  Ric Blake.

23   *Q.*  Earlier you testified, Mr. Pepper, that you had

24   conversations with Defendant Roberts after speaking with

25   Defendant Little; is that right?

Carl Pepper - Direct

1  A.  Yes, ma'am.

2  Q.  Do you remember the specific day or dates of that call or

3  calls?

4  A.  No, ma'am.

5  Q.  Do you recall that those -- do you recall having those

6  conversations?

7  A.  Yes, ma'am.

8  Q.  And what -- do you remember specifically what the

9  conversation with Defendant Roberts was about?

10  A.  No, ma'am.

11  Q.  Do you remember generally what the information with

12  Defendant Roberts was about?

13  A.  It was information or -- whatever Jimmie had called me

14  about and told me, I called Brian, but I don't remember the

15  specifics.

16  Q.  You said whatever Defendant Little called you about.  Can

17  you describe -- be a little more specific, if you can?

18          MR. BYRNE:  Your Honor, he just said he didn't

19  remember specific, so I object.

20          THE COURT:  Overruled.

21  A.  I don't remember what Jimmie specifically called me about

22  and I called Brian Roberts for.  I just -- Jimmie had told me

23  something that might have had something -- that would have had

24  something to do --

25          MR. TUBACH:  Objection, speculation, might have had.

Carl Pepper - Direct

1   THE COURT:  Sustained.  You need to rephrase it in

2   terms of whether he recalls information that was passed on or,

3   if not, what his general practice was.

4        MS. SWEENEY:  I am sorry, I didn't hear the last part.

5        THE COURT:  Or his general practice.

6   BY MS. SWEENEY:

7   Q.  So Mr. Pepper, do you recall specifically what you talked

8   with Defendant Roberts about on those calls?

9   A.  No, ma'am.

10  Q.  So why -- did you have a general practice of when you

11  called Defendant Roberts?

12  A.  I didn't -- I didn't call Brian that often.  Like I said, I

13  don't -- it had something to -- I don't know what it had to do

14  with, but I just know when Jimmie called me, it must have --

15        MR. GILLEN:  Your Honor, I object.  If he said he

16  didn't know what it was about, that should stop the inquiry.

17        MR. BYRNE:  And I also object because now it's

18  speculation on his part.

19        THE COURT:  Overruled.  He is not talking about the

20  content of any call.

21  BY MS. SWEENEY:

22  Q.  You can continue.

23  A.  I said I don't remember what the specifics were, but it had

24  to have been something if Jimmie Little called me for me to

25  turn right around and call Brian.

Carl Pepper - Direct

1    　　　　MR. GILLEN:  I renew my objection to him saying it had

2    to be.  He doesn't remember.  I would ask that be stricken.

3    　　　　THE COURT:  Sustained.  That calls for speculation.  I

4    will deny the request to striking.

5    BY MS. SWEENEY:

6    Q.  Mr. Pepper, was it your general practice to call Defendant

7    Roberts in the summer of 2014 throughout the negotiations of

8    the KFC contract?

9    A.  No, ma'am.

10   Q.  Was it your general practice to call Defendant Roberts

11   after you had conversations with Defendant Little in that

12   summer?

13   A.  It wasn't a general practice.  Like I said, I only talked

14   to Brian a few times during that time that I can remember

15   during that time frame.

16   Q.  And that you remember, why did you talk to Defendant

17   Roberts in that time frame?

18   　　　　MR. TUBACH:  Objection, asked and answered.

19   　　　　THE COURT:  Overruled.

20   A.  Because whatever, like I said, whatever information that

21   Jimmie had given me that could have had to do with the contract

22   for KFC.

23   　　　　MR. TUBACH:  I object.  He is speculating.

24   　　　　THE COURT:  Yeah.

25   　　　　MR. GILLEN:  Speculation again.

1334

Carl Pepper - Direct

1    THE COURT:  Sustained.

2    BY MS. SWEENEY:

3    Q.  Mr. Pepper, in your conversations with Defendant Little in

4    that summer during the negotiations of the KFC contract, I

5    believe you testified generally what the contents of those

6    communications were, which was about the potential price

7    increase; is that right?

8         MR. BYRNE:  Objection, Your Honor.  She is leading.

9         THE COURT:  Sustained.

10   BY MS. SWEENEY:

11   Q.  So in that summer the calls that you had with Defendant

12   Little, what was the general topic of conversation?

13        MR. TUBACH:  Asked and answered.

14        THE COURT:  Sustained as to asked and answered.

15        MR. BYRNE:  Asked and answered, Your Honor.

16   BY MS. SWEENEY:

17   Q.  Were there any other calls or any other reasons that you

18   would speak with Defendant Little in the summer of 2014?

19   A.  Not that I can -- not that I can remember.

20   Q.  Overall were there any other reasons that you would speak

21   with Defendant Little?

22        MR. LAVINE:  Objection, asked and answered, Your

23   Honor.

24        THE COURT:  Overruled.

25   A.  Ask me that again, please.

Carl Pepper - Direct

1  *BY MS. SWEENEY:*

2  *Q.*  Overall were there any other reasons that you would speak

3  with Defendant Little?

4  *A.*  I mean, it could -- it could be a lot of other topics

5  concerning quality control issues or things like that, but I

6  don't remember any specifics to that point.  I just remember

7  talking to Jimmie about the 2014 contract.

8  *Q.*  Now, Mr. Pepper, you said there could have been issues

9  relating to, for example, quality control.  Did you speak with

10  Defendant Little, for example, about quality control?

11  *A.*  Yes, ma'am.

12  *Q.*  And after you had those conversations with Defendant Little

13  about quality control, did you then call -- what steps, if any,

14  did you take next?

15  *A.*  Like I said, I don't know when I would have done it.  I

16  know we had conversations about things like that and I am not

17  even sure if it had to do with KFC.  I know we had some to do

18  with I believe Church's, but I don't remember the specific date

19  and time.

20  *Q.*  Turning back to a topic we talked about just a bit ago,

21  Mr. Pepper, do you recall the substance of what you told

22  Defendant Roberts relating to the conversations with Defendant

23  Little?  That's a yes or no question.

24  *A.*  No.

25          *MR. McLOUGHLIN:*  Asked and answered, Your Honor.

Carl Pepper - Direct

1        *THE COURT:*  Sustained.

2    *BY MS. SWEENEY:*

3    *Q.*  Now, Mr. Pepper, I am going to ask you questions about the

4    negotiations with RSCS or KFC in the summer of 2014.  Did there

5    come a time when you had a meeting with RSCS during those

6    negotiations?

7    *A.*  Yes, ma'am.

8    *Q.*  Where was that meeting?

9    *A.*  In Louisville, Kentucky.

10   *Q.*  When was that meeting?

11   *A.*  August the 5th.

12   *Q.*  And of what year?

13   *A.*  2014.

14   *Q.*  Did you attend the meeting?

15   *A.*  Yes, ma'am.

16   *Q.*  Did anyone else from Tyson Foods?

17   *A.*  Yes, ma'am.

18   *Q.*  Who attended the meeting from Tyson Foods?

19   *A.*  Tim Mulrenin, Brian Roberts.

20   *Q.*  Did anyone from RSCS attend the meeting?

21   *A.*  Yes, ma'am.

22   *Q.*  What was the purpose of the meeting?

23   *A.*  To discuss the 2015 contract, the beginning of the

24   discussions.

25   *Q.*  When you say the beginning of the discussions, can you

1337

Carl Pepper - Direct

1  describe what you mean?

2  A.  Yes, ma'am.  KFC was -- you never had one or two

3  discussions with KFC.  It was long and drawn out, so it was

4  just getting started.

5  Q.  So this meeting was at -- in the process of the

6  conversations you had with KFC -- you said they were long and

7  drawn out -- where in that process did this meeting fall?

8  A.  From August through I believe sometime in September, the

9  end of September, I believe.

10  Q.  And what was the tone of that meeting?

11      MR. TUBACH:  Objection, vague.

12      THE COURT:  Overruled.

13  A.  Well, it was cordial until we told them what the increase

14  was going to be.

15  BY MS. SWEENEY:

16  Q.  When you say we told them, who are you referring to?

17  A.  I don't know if Brian -- I believe Brian told them.  I

18  think Brian was the one who probably broke it to him first.

19      MR. LAVINE:  Objection, Your Honor, speculation.

20      THE COURT:  Sustained.

21  BY MS. SWEENEY:

22  Q.  What company are you referring to when you say we?

23  A.  Tyson Foods.

24  Q.  When you say we told them, who is them?

25  A.  Tyson Foods was relaying the information to RSCS or KFC.

Carl Pepper - Direct

1   Q.  You said it was cordial until that information was relayed.

2   How did the tone change or did the tone change and how?

3   A.  Well, it was friendly at the beginning.  And I guess it was

4   still friendly, but the tone changed drastically when they were

5   told what the increases would be for the cost for the next

6   couple years.  And then also there was a lot of discussions

7   about a lot of different parts of the contract.

8   Q.  And who had the reaction that you were describing?

9   A.  Most of the people there at RSCS.  I don't remember which

10  person first.

11  Q.  But it was RSCS that had that reaction?

12  A.  Yes, ma'am.

13  Q.  All right.  I would like to direct your attention to -- was

14  the change in tone a positive change in tone, negative change

15  in tone or something else?

16  A.  It became very disscusionable.

17  Q.  Can you describe what you mean when you say disscusionable?

18  A.  Well, I think they first -- I think they were totally

19  shocked.  And then after that the discussions started and to

20  the point basically I believe like, They are really?  Sure.

21  Q.  I would like to direct your attention to Government

22  Exhibit 9703, and that should be Tab 21 in your binder.

23          Mr. Pepper, do you recognize this e-mail or this

24  document?

25  A.  Yes, ma'am.

Carl Pepper - Direct

1    *Q.*  What type of document is it?

2    *A.*  It's an e-mail.

3    *Q.*  Who is it from?

4    *A.*  The very top?

5    *Q.*  The very top e-mail, who is it from?

6    *A.*  It's from Tim Mulrenin.

7    *Q.*  And who is it to?

8    *A.*  To Mark Milbrodt, myself, Brian Roberts and Tim Scheiderer.

9    *Q.*  What's the general subject of the e-mail?

10   *A.*  The KFC marinated model for the contract for 2015.

11        *MS. SWEENEY:*  The government at this point moves to

12   admit Government Exhibit 9703.

13        *THE COURT:*  Any objection to the admission of

14   Exhibit 9703?

15        *MR. BYRNE:*  No objection, Your Honor.

16        *MS. SWEENEY:*  Your Honor, I believe there are limiting

17   instructions for this.

18        *THE COURT:*  Yes, there are.  Exhibit 9703 will be

19   admitted.  Ladies and gentlemen, as to this particular exhibit,

20   it can only be considered against Mr. Roberts and Mr. Mulrenin.

21   Moreover, you will see on it that there are statements from

22   Mr. Eddington and from a gentleman named Milbrodt.  Those

23   statements can only be considered for their effect on the

24   listener, not for the truth that those two gentlemen asserted,

25   all right?  It can be displayed.

Carl Pepper - Direct

1      *MS. SWEENEY:*  Permission to publish, Your Honor?

2      *THE COURT:*  You may.

3   *BY MS. SWEENEY:*

4   *Q.*  Mr. Pepper, I would like to direct your attention to the

5   third page of this e-mail, the very last -- the very bottom

6   e-mail.

7   *A.*  Yes, ma'am.

8   *Q.*  Now, this e-mail, what date was it sent?

9   *A.*  It was sent Monday, August the 11th, 2014.

10  *Q.*  Who was it sent from?

11  *A.*  Brian Roberts.

12  *Q.*  Who was it sent to?

13  *A.*  Rich Eddington.

14  *Q.*  Who is Rich Eddington?

15  *A.*  He was the main negotiator for RSCS of the contracts.

16  *Q.*  So I would like to direct your attention to the next

17  e-mail.  Did Mr. Eddington reply to Mr. Roberts' bottom e-mail?

18  *A.*  Yes, ma'am.

19  *Q.*  If we could focus on the bottom e-mail, please.

20      Was Mr. Eddington involved in the RSCS negotiations at

21  this time?

22  *A.*  Yes, ma'am.

23  *Q.*  And was Mr. Eddington at that August 5th meeting that you

24  testified about earlier?

25  *A.*  I don't -- I don't remember on this.

1341

Carl Pepper - Direct

1    *Q.*  Is there a document that I could show you that would help

2    refresh your recollection?

3    *A.*  Yes, ma'am.

4          *MS. SWEENEY:*  The Court's indulgence.

5    *BY MS. SWEENEY:*

6    *Q.*  Mr. Pepper, I would like to direct your attention to Tab 15

7    which has been marked as G-350.

8          And if this could be displayed just to the witness and

9    counsel.

10   *A.*  Yes, ma'am.

11   *Q.*  Please take a look at it and look up at me when you're

12   done.

13   *A.*  Yes, ma'am.

14   *Q.*  If we could take that off the screens now.

15          Without looking at the document, does that refresh

16   your recollection?

17   *A.*  Yes, ma'am.

18   *Q.*  Was Mr. Eddington in attendance at the August 5th meeting?

19   *A.*  Yes, ma'am.

20   *Q.*  And now I would like to turn your attention to Government's

21   Exhibits 1145 and 1146, and that should be at Tab 22 of your

22   binder.  Mr. Pepper, do you recognize this document starting

23   with 1145?  Do you recognize this document?

24   *A.*  Yes, ma'am.

25   *Q.*  Generally what type of document is it?

Carl Pepper - Direct

1   *A.*  It's an e-mail.

2   *Q.*  Who is it from?

3   *A.*  Brian Roberts.

4   *Q.*  Who is it to?

5   *A.*  To Rich Eddington and copying Tim Mulrenin and Mark

6   Milbrodt and myself.

7   *Q.*  What's the general subject matter of this e-mail?

8   *A.*  The contract for the 2014 -- the marinated model for the

9   2015 contract with RSCS.

10  *Q.*  Is there an attachment reflected on this e-mail?

11  *A.*  Yes, ma'am.

12  *Q.*  I would like you to turn to Government Exhibit 1146.

13       Do you recognize this document?

14  *A.*  Yes, ma'am.

15  *Q.*  What type of document is this?

16  *A.*  It's a -- it's involved in the cost model that's presented

17  to RSCS for what their cost would be for the following

18  contract.

19  *Q.*  Is Government Exhibit 1146 attached to 1145?

20  *A.*  Yes, ma'am.

21       *MS. SWEENEY:*  The government moves to admits

22  Government Exhibit 1145 and 1146.

23       *THE COURT:*  Any objection to the admission of

24  Exhibits 1145 and 1146?

25       Both of those exhibits will be admitted.

1343

Carl Pepper - Direct

1    *BY MS. SWEENEY:*

2    *Q.*  So Mr. Pepper, we just looked at some documents from

3    different dates in the month of August in the negotiations of

4    KFC's contract.  The calls you testified about earlier with

5    Defendant Little that you recall, were those calls happening

6    throughout the time period of these e-mails to the best of your

7    recollection?

8    *A.*  Yes, ma'am.

9    *Q.*  The calls that you testified about earlier with Defendant

10   Blake, were those calls happening throughout the time period of

11   the documents we have just looked at?

12   *A.*  Yes, ma'am.

13   *Q.*  And the calls you testified about earlier with Defendant

14   Brady, were those happening through the time period of the

15   e-mails we just looked at?

16   *A.*  Yes, ma'am.

17   *Q.*  I will now --

18           *THE COURT:*  Ms. Sweeney, I am sorry, I haven't been

19   watching the clock.  Would this be a good convenient breaking

20   spot?

21           *MS. SWEENEY:*  Yes, Your Honor.

22           *THE COURT:*  So ladies and gentlemen, why don't we plan

23   on reconvening at 10:35.  The jury is excused for the

24   mid-morning break.

25           (Jury excused.)

Carl Pepper - Direct

1          Anything to take up?

2          Mr. Pepper, you can be excused at this time.  Thanks a

3    lot.  Everyone else can be seated.

4          Mr. Koenig?

5          *MR. KOENIG:*  Thank you, Your Honor.  Pursuant to your

6    Court's ruling this morning regarding Special Agent

7    Koppenhaver, I will note that he is in the courtroom for

8    Mr. Pepper's testimony, but he wasn't yesterday.  And I am

9    wondering if it would be acceptable for him to review the rough

10   transcript from yesterday to just familiarize himself with what

11   he did not see or hear.

12         *THE COURT:*  Response?

13         *MR. TUBACH:*  I would object to that.  If he wasn't

14   here to witness what he said, I don't think it would be

15   appropriate for him to review the transcript and have any

16   commentary about the transcript.  It would be pure hearsay.

17         *THE COURT:*  It might be a little bit awkward to have

18   him refer back to a transcript.

19         *MR. KOENIG:*  You know, on cross, then, I am wondering

20   if he -- it would seem a little unfair if he could be crossed,

21   well, you weren't here yesterday.

22         *THE COURT:*  Well, of course, he could always -- even

23   if he didn't attend -- him attending is kind of a shortcut

24   method so that he doesn't have to be presented with a statement

25   and then asked if that's consistent or not.  Yeah, I am going

Carl Pepper - Direct

1    to allow him to review it.  I just think we would shortcut it

2    quite a bit that way.

3           MR. McLOUGHLIN:  Your Honor, the failure in logic here

4    is that from the government is that Mr. Pepper did not testify

5    or was not cross-examined about any prior inconsistent

6    statement yesterday.  And to the extent Agent Koppenhaver is

7    going to be asked, well, did he say something in his interview,

8    it has to be okay.  What was he cross-examined about and

9    therefore did he say that.  And so since there was no

10   cross-examination yesterday, there is no reason for him to

11   review the transcript.

12          THE COURT:  Well, the predicate has to do with the

13   opening, so I will allow him to review that rough transcript.

14          MR. BYRNE:  Your Honor, I would point out, though, if

15   he were sitting in the courtroom, he wouldn't be privy to any

16   of the side bars, so he shouldn't be allowed to read the side

17   bars from the transcript.

18          THE COURT:  Yeah, that is a good question.  Sorry,

19   that's a good point.  It should be just the testimony.

20          MR. KOENIG:  Thank you.

21          THE COURT:  We will be in recess.

22      (Recess at 10:24 a.m.)

23      (Reconvened at 10:40 a.m.)

24          THE COURT:  All right.  Let's get the jury back in.

25          (Jury present.)

Carl Pepper - Direct

1    THE COURT:  Go ahead, Ms. Sweeney.

2    BY MS. SWEENEY:

3    Q.  So Mr. Pepper, before the break we were talking about the

4    KFC contract.  If we can just clarify, what contract was being

5    negotiated?

6    A.  The contract for RSCS for 2015.

7    Q.  So the contract for 2015?

8    A.  2015, '16, '17.

9    Q.  And when was that contract negotiation?  When did that take

10   place?

11   A.  In 2014.

12   Q.  So it was the 2014 contract negotiations for the 2015, '16

13   and '17 contract?

14   A.  Yes, ma'am.

15   Q.  Now, Mr. Pepper, you have been telling the Ladies and

16   Gentlemen of the Jury about communications you had with

17   competitors about that 2015 contract.  Were there other times

18   when you contacted employees at competing chicken suppliers?

19   A.  Yes, ma'am.

20   Q.  Are you familiar with the term production issues?

21   A.  Yes, ma'am.

22   Q.  What are production issues?

23   A.  Production issues can be mechanical issues in the plant.

24   It could be due to bird size issues at a plant.  Those are the

25   two main issues that could cause production issues.

Carl Pepper - Direct

1   Q.  In the time period that we're talking about, 2012 to 2019,

2   did you have a role in production issues?

3   A.  Yes, ma'am.

4   Q.  What was your role with regard to production issues at

5   Tyson in 2012 to 2019?

6   A.  If we had issues with supply, of supplying any of our

7   customers, I was responsible for doing whatever it took to make

8   sure that the orders got covered to help production so we

9   wouldn't short any orders.

10  Q.  So if there was a production issue that came up, you said

11  you were responsible to do what you needed to do or do anything

12  you needed to do.  What was that?

13  A.  That would mean if I -- if we had to buy product on the

14  outside or from other poultry companies to fill our orders,

15  that I had the responsibility to take care of that.

16  Q.  Can you describe what you mean when you say buy product

17  from the outside or from other poultry companies?

18  A.  Other poultry companies, like it could be Pilgrim's, could

19  be Claxton, could be George's, and there is a few other

20  companies.

21  Q.  And in that time period we are talking about, 2012 to 2019,

22  did there ever come a time where you did have to buy chicken

23  from other poultry companies?

24  A.  Yes, ma'am.

25  Q.  Did that happen one time or more than once?

Carl Pepper - Direct

1    *A.*  It happened more than once, but I really don't know how

2    many times during that time frame.  It was numerous sometimes.

3    *Q.*  Numerous throughout the time period of 2012 to 2019?

4    *A.*  Yes, ma'am.

5    *Q.*  So you mentioned that Tyson would purchase from Claxton; is

6    that right?

7    *A.*  Yes, ma'am.

8    *Q.*  What was your responsibility with regard to purchasing from

9    Claxton?

10   *A.*  Basically I found out exactly what we needed when we needed

11   if and how much we needed.  And I would contact Scott Brady and

12   ask him if they had any availability.  He would be one of the

13   poultry companies I would call to see if they had any

14   availability that we could buy from them.

15   *Q.*  So if you were purchasing from Claxton, is it fair to say

16   Defendant Brady was your point of contact?

17   *A.*  Yes, ma'am.

18   *Q.*  I believe you also mentioned you purchased chicken from

19   George's; is that right?

20   *A.*  Yes, ma'am.

21   *Q.*  Did you have a point of contact at George's?

22   *A.*  Yes, ma'am.

23   *Q.*  Who was that?

24   *A.*  That would have been Ric Blake.

25   *Q.*  Did you purchase chicken from Pilgrim's Pride?

Carl Pepper - Direct

1  A.  A few times, not many.

2  Q.  And who was -- did you have a point of contact at Pilgrim's

3  Pride?

4  A.  I'd call Jimmie just to ask him, Jimmie Little, just to ask

5  him who I needed to call if we needed to buy some.

6  Q.  Did you ever purchase chicken from Koch Foods?

7  A.  Yes, ma'am.

8  Q.  Did you have a point of contact at Koch Foods?

9  A.  Yes, ma'am.

10  Q.  Who was your point of contact?

11  A.  Bill Kantola.

12  Q.  What manner of communication did you use to call your

13  points of contact when you were purchasing chicken from other

14  competing chicken suppliers?

15  A.  Basically most of the time I would call them on their

16  cellphones.

17  Q.  And after you called your points of contact on their

18  cellphones, did you report what you learned about these chicken

19  shortages or purchases back to Defendant Mulrenin?

20  A.  No, ma'am.

21  Q.  And when you called the points of contact to purchase

22  chicken, did you report back what you learned to Defendant

23  Roberts?

24  A.  No, ma'am.

25  Q.  Why didn't you report back to Defendant Mulrenin?

Carl Pepper - Direct

1    A.  Because when Brian Roberts first came to Tyson, he knew

2    some of the issues we were having and struggling trying to get

3    orders covered sometimes.  And he gave me the authority to do

4    whatever I had to do to take care of the customers, to do it.

5    Q.  And why didn't you call Defendant Roberts after having

6    these chicken purchase conversations?

7    A.  Because basically he gave me the authority to do it and it

8    just wasn't something that I had to report to him.  When I did

9    it, if I saw him in a meeting or somewhere, I might tell him,

10   hey, I had to buy a couple loads two weeks ago or something.

11   But I didn't have to call Brian to get it okayed at that

12   particular time.

13   Q.  Now I would like to direct your attention it the year 2015.

14   Did there come a time when Popeye's asked for a discount from

15   its suppliers in 2015?

16   A.  Yes, ma'am.

17   Q.  How do you know that?

18   A.  Because there was an e-mail sent.

19   Q.  To who?

20   A.  To all the poultry companies.

21   Q.  Did you receive that e-mail?

22   A.  Yes, ma'am.

23   Q.  What type of discount was Popeye's seeking?

24   A.  They were looking for a discount for the month of

25   September, for the month of September a promotion, because

Carl Pepper - Direct

 1   that's usually one of the slow times of the year for a

 2   fast-food chain.

 3   Q.  I would direct your attention to Exhibit 617.  And

 4   Mr. Pepper, that's Tab 75 in your binder.  Mr. Pepper, I am

 5   showing you on the screen Government Exhibit 617 except for the

 6   top e-mail, so if you could refer to the screen, please, sir.

 7   A.  Yes, ma'am.

 8   Q.  Do you recognize this document on the screen?

 9   A.  Yes, ma'am.

10   Q.  Generally what type of document is it?

11   A.  It's an e-mail.

12   Q.  Who is it to?

13   A.  It's to Tim Scheiderer and Tim Mulrenin.

14   Q.  Who is it from?

15   A.  It's from myself.

16   Q.  What's the date of the e-mail?

17   A.  March 26, 2015.

18   Q.  What's the general subject the e-mail?

19   A.  September bone-in promotion.

20        MS. SWEENEY:  Government moves to admit Exhibit 617.

21        Your Honor, Mr. Pepper is not on the top portion of

22   the e-mail, but the full e-mail is by prior order.

23        THE COURT:  It's already been admitted.

24        MS. SWEENEY:  Oh, it's been admitted?  My apologies.

25   Thank you.

1352

Carl Pepper - Direct

1   *BY MS. SWEENEY:*

2   *Q.*  Mr. Pepper, I would like to direct your attention to 618.

3   And that's behind Tab 76 again with the top portion of the

4   e-mail redacted.

5   *A.*  Yes, ma'am.

6   *Q.*  Do you recognize this document that's on the screen,

7   Mr. Pepper?

8   *A.*  Yes, ma'am.

9   *Q.*  Generally what type of document is this?

10  *A.*  It's an e-mail.

11  *Q.*  And the top e-mail that you have on your screen, what's the

12  date of it?

13  *A.*  March the 27th, 2015.

14  *Q.*  I am sorry, could you just read the date again?  I don't

15  know that I heard you.

16  *A.*  March the 27th, 2015.

17  *Q.*  And who is it from?

18  *A.*  It's from Steven Cullen at Tyson Foods.

19  *Q.*  Did you receive this e-mail?

20  *A.*  Yes, ma'am.

21  *Q.*  What's the general subject matter of this e-mail?

22  *A.*  It's concerning the promotion for the month of September

23  for the 2017 contract for Popeye's.

24       *MS. SWEENEY:*  Your Honor, the government moves to

25  admit Exhibit 618.  Again, we're moving the admission of the

Carl Pepper - Direct

1    entire exhibit, but we will only be using the bottom portion

2    with Mr. Pepper.

3              THE COURT:  When you say using?

4              MS. SWEENEY:  Only displaying to Mr. Pepper the

5    portion that's on the screen, from that portion down to the

6    bottom of the e-mail.

7              THE COURT:  Okay.  But you are moving the entirety of

8    it.

9              MS. SWEENEY:  Yes.

10             THE COURT:  I can't see the entirety of it.

11             MS. SWEENEY:  I believe it should be on the screen

12   shortly.  It's also in the binder at Tab 76.

13             THE COURT:  Okay.

14             MS. SWEENEY:  This was again by prior order.

15             THE COURT:  Any objection to the admission of

16   Exhibit 618?

17             618 will be admitted.

18             MS. SWEENEY:  Permission to publish to the jury?

19             THE COURT:  You may.

20   BY MS. SWEENEY:

21   Q.  I would like to direct your attention, Mr. Pepper, to the

22   bottom e-mail in this chain.  So Mr. Pepper, this bottom

23   e-mail, who is it from?

24   A.  It's from Kent Kronauge.

25   Q.  Who is Kent Kronauge?

Carl Pepper - Direct

1    *A.*  At that time he was a senior vice-president of SMS, the

2    buying co-op for Popeye's.

3    *Q.*  And did you receive this e-mail?

4    *A.*  Yes, ma'am.

5    *Q.*  Can you read the first sentence out loud, please?

6    *A.*  "Popeye's is looking at running a Big Box promotion again

7    this September and they have asked that we reach out to the

8    Poultry suppliers to see if we can get any relief that month to

9    support the bone in chicken."

10   *Q.*  So when you say -- when it says big box promotion, what is

11   a big box promotion?

12   *A.*  A big box promotion is basically like two to maybe four

13   pieces of chicken in a box and then it has a side and a

14   biscuit, and they have a discounted price on it sometimes.

15   *Q.*  So what is the promotion of the big box promotion?

16   *A.*  It's a fresh fried chicken promotion.

17   *Q.*  And what is Mr. Kronauge asking here?

18   *A.*  He is asking for all the poultry suppliers to supply

19   Popeye's to get -- to see what kind of discount they can give

20   him for the month of September.

21   *Q.*  I would like to direct your attention to the next e-mail in

22   the chain from March 26 at 7:17 p.m.  Did you send the e-mail

23   that you received from Mr. Kronauge to anyone?

24   *A.*  Yes, ma'am.

25   *Q.*  Who did you send it to?

Carl Pepper - Direct

1   *A.*  I sent it to Tim Scheiderer and Tim Mulrenin.

2          *MS. PREWITT:*  Objection, Your Honor.  The answer is

3   non-responsive.  She asked who it was sent to.

4          *THE COURT:*  Sustained.

5   *BY MS. SWEENEY:*

6   *Q.*  Mr. Pepper, the e-mail you received from Mr. Kronauge, did

7   you send it to anyone?

8   *A.*  Yes, ma'am.

9   *Q.*  Who did you send that e-mail from Mr. Kronauge to?

10  *A.*  I sent it to Tim Scheiderer and Tim Mulrenin.

11         *MS. PREWITT:*  Same objection, Your Honor.  It's

12  nonresponsive.

13         *THE COURT:*  Overruled.

14  *BY MS. SWEENEY:*

15  *Q.*  At the time in March of 2015, what was Mr. Scheiderer's

16  role?

17  *A.*  He was -- he was in the national account sales, but he was

18  like -- I really don't know what his title was.  He was sort

19  was the negotiate -- or put things together from the sales side

20  over to the production side or possibly the pricing side.  He

21  was the in-between person that would make sure things got done

22  basically.

23  *Q.*  And at the time in March of 2015, what was Defendant

24  Mulrenin's role or position at Tyson's, I should say?

25  *A.*  He was the director of national accounts and he was my

Carl Pepper - Direct

1   boss.

2   Q.  Can you read the first three sentences of your e-mail,

3   please?

4   A.  Yes, ma'am.

5          "What you think?  We have done this over the years.  I

6   have talked to a couple companies and they are thinking

7   .021b for September."

8   Q.  You wrote that you talked to a couple companies.  Who were

9   you referring to?

10  A.  I was talking to Ric Blake at George's, Scott Brady at

11  Claxton and I believe Jimmie Little.  No, excuse me.  I believe

12  it was Scott Tucker at Pilgrim's.

13  Q.  Starting with Defendant Blake at George's, what did you

14  talk to Defendant Blake about?

15  A.  At first I asked him, which I knew he most likely did, if

16  he got the e-mail from Kent asking about the big box promotion

17  for the month of September.  And were they looking -- were they

18  going -- was George's going to agree to it and what type of

19  discount that they were looking for -- that they were willing

20  to do.

21  Q.  What type of discount?  Who was they in your answer, they

22  were going to do?

23  A.  George's.

24  Q.  What did Defendant Blake say?

25  A.  He told me that they were going -- that George's was going

Carl Pepper - Direct

1  to do the promotion -- the discount and that it would be

2  2 cents a pound.

3  Q.  Did you share what Tyson was thinking about -- did you

4  share Tyson's planned discount on that call?

5  A.  Yes, ma'am.  I told them I was pretty sure we would do it

6  also and it would be probably at the same price at 2 cents a

7  pound because of past histories.

8  Q.  When you say because of past histories, can you describe

9  what you mean?

10  A.  Popeye's had asked for this periodically over the years.

11  And most of the time it was 2 cents a pound what they usually

12  were looking for.

13  Q.  And you mentioned that you talked to Defendant Brady.  What

14  did you talk to Defendant Brady about?

15          MR. LAVINE:   Your Honor, foundation and vagueness.

16          THE COURT:  Overruled.

17  A.  I talked to Scott and I asked him, first of all, did he get

18  the e-mail from Kent and that -- Kent Kronauge.  And were they

19  going to participate in the 2-cent a pound -- excuse me, in the

20  discount for the September promotion for Popeye's and what

21  discount they looked like -- they were thinking about doing

22  also, Claxton was thinking about doing also.

23  BY MS. SWEENEY:

24  Q.  Did you share Tyson's planned discount with Defendant

25  Brady?

1358

Carl Pepper - Direct

1   *A.*  Yes, ma'am.

2   *Q.*  Now I would like to talk about the conversation you had

3   with Mr. Tucker that you testified about that you are reporting

4   in this e-mail.  What did you talk to Mr. Tucker about?

5   *A.*  I asked him also was he going -- was Pilgrim's going to

6   also do the discounted price for the month of September and

7   what pricing they were looking at giving Popeye's for the

8   discount.

9   *Q.*  And did you share Tyson's planned discount?

10  *A.*  Yes, ma'am.

11  *Q.*  Why did you call Defendants Brady, Blake and Mr. Tucker?

12  *A.*  Because between those three and Tyson Foods, we were mainly

13  their biggest suppliers.

14  *Q.*  When you say their biggest suppliers?

15  *A.*  Popeye's biggest suppliers.

16  *Q.*  So why did you call Popeye's largest suppliers?

17  *A.*  Ma'am?

18  *Q.*  Why did you call representatives from Popeye's largest

19  suppliers about the discount?

20  *A.*  Just to see if they were mainly going to agree to it and

21  see what the discount was going to be, because like I said,

22  those four companies was mainly the main suppliers for

23  Popeye's.

24  *Q.*  When you said seeing if they were going to agree to it, can

25  you describe specifically what you're talking about?

Carl Pepper - Direct

1   *A.*  Yeah, if they were going to agree, first of all, to do a

2   promotion for the month of September, and if everybody was

3   thinking 2 cents a pound is what the discount would be.

4   *Q.*  Now, you said if everybody was thinking 2 cents a pound,

5   that's what the discount would be.  Can you explain what you

6   mean by that?

7   *A.*  Well, this would be a nationwide promotion, so they had --

8   the discount basically had to be the same throughout the

9   country.  They couldn't do 2 cents in one area of the country,

10  3 cents in another area of the country.  So they were always

11  wanting -- Popeye's was always wanting to have basically the

12  same discount across the board.

13  *Q.*  And did Popeye's ask you to speak with individuals from

14  Popeye's largest suppliers to figure out what the discount

15  would be?

16  *A.*  No, ma'am.

17  *Q.*  Did you tell Popeye's or Mr. Kronauge that you were talking

18  to Popeye's largest suppliers to figure out what the discount

19  would be?

20  *A.*  No, ma'am.

21  *Q.*  Why didn't you?

22  *A.*  Because that wouldn't have been -- that would not have been

23  honest and --

24          *MR. KORNFELD:*  Objection, Your Honor.

25          *THE COURT:*  Sustained.  Let's have a side bar.

Carl Pepper - Direct

1        (At the bench:)

2        THE COURT:  I am not sure who went first.

3   Mr. Kornfeld it looks like.  Go ahead.

4        MR. KORNFELD:  Your Honor, thank you.  Obviously,

5   eliciting that is in direct contravention of both of the

6   Court's order -- I can't remember the docket number, I think

7   1069.  I could be wrong about that -- and also with the Court's

8   directive to work through Mr. Pepper's counsel so that that

9   doesn't happen.  So now it's hanging out there which is of

10  concern.

11        And, you know, I would ask the Court to strike it and

12  to instruct the jury specifically they are not to consider that

13  last answer.  And then I would further ask the Court to remind

14  the government -- and I am not suggesting that was purposeful

15  by Ms. Sweeney.  I think it was the witness -- his memory is so

16  vague and that he has been prepared, I think, perhaps by his

17  own counsel on this question without the communication between

18  the government and his counsel that this is absolutely off

19  limits.  So those are my concerns.

20        THE COURT:  Anything else?  Mr. McLoughlin?

21        MR. McLOUGHLIN:  Yes, Your Honor.  I agree with

22  counsel that this is -- this requires a limiting instruction

23  and striking it so that the record is clear and the jury

24  understands.  And the fact of the matter is that question about

25  why not is absolutely a trigger for this kind of testimony.

Carl Pepper - Direct

1    And the government absolutely should have known better and I

2    believe it did know better.  And this can't happen again.  This

3    is -- you know, we have been down this road for a very long

4    time and this just should not be happening.

5         THE COURT:  Ms. Sweeney?

6         MS. SWEENEY:  Yes, Your Honor.  I did not expect the

7    answer.  Honestly, I expected something more along the lines of

8    his personal disappointment to the customer, and I was not

9    intending to violate the Court order.

10        THE COURT:  What do you mean his personal

11   disappointment?

12        MS. SWEENEY:  I believed he was going to testify that

13   he and Mr. Kronauge were close and he felt like keeping this

14   information from him was disappointing to the customer.  That

15   said, I am happy to move on, Your Honor.

16        MS. JOHNSON:  Your Honor, that would be -- the

17   anticipated response would be equally violative of the Court's

18   order, so I am unclear as to why you would seek a response in

19   that manner.

20        MR. TUBACH:  What Ms. Sweeney just described is just

21   another way of saying dishonest.

22        THE COURT:  Ms. Sweeney, yeah, let me ask you this.

23   What proper response to that last question do you think that

24   Mr. Pepper would give in similar circumstances like later in

25   the examination?  Do you intend to elicit the same type of

1362
Carl Pepper - Direct

 1   question, you know, why did you do it?  And if so, what do you

 2   anticipate he is going to say?

 3        MS. SWEENEY:  Your Honor, the government had intended

 4   to elicit that type of question at the end of testimony.  And

 5   the government expected or anticipated that he would say that

 6   he did not want the customers to learn that he was talking to

 7   his competitors again because he wanted -- he thought that he

 8   had built a reputation of trust and he thought that what he was

 9   doing wasn't right.

10        Your Honor's order as I read it, and I apologize if I

11   misread it, relates to the propensity of information sharing as

12   it relates to, you know, not eliciting that it was wrong or

13   dishonest with regard to information sharing from customers.

14   This witness is testifying about a conspiracy of which he is a

15   part, so the government believes it's proper to elicit his

16   understanding of the conduct at the time.  But as I said, if I

17   misread your order, apologies.  And I am happy to not inquire

18   further on this occasion or future occasions.

19        MR. GILLEN:  Your Honor, may I comment?

20        THE COURT:  Go ahead.

21        MR. GILLEN:  The problem with that explanation by the

22   government is that when they say that this is what he thought

23   at the time that he was conducting his activity is inconsistent

24   with what the interview reports from this witness reflect and

25   that he didn't think that he was doing anything wrong until he

Carl Pepper - Direct

1   began his interviews with the government.  It's from those

2   interviews with the government and DOJ.  That is the source for

3   his conclusion that he was now doing something wrong.  It came

4   from those interviews.  I am afraid that the bell has been rung

5   and a continuation of these sorts of transgressions can lead me

6   to move for a mistrial.

7        THE COURT:  You are moving for a mistrial now based

8   upon that?

9        MR. GILLEN:  Yes, I am.

10       THE COURT:  Okay.  That will be denied.

11       MR. LAVINE:  This is Bryan Lavine, if I can respond on

12   one point, please.

13       THE COURT:  You may.

14       MR. LAVINE:  I think the problem here is this witness

15  for all of the interviews up until I think it was June or July

16  of 2021 basically said that what he thought was wrong was the

17  sharing of information would disappoint his customers and that

18  he felt bad about that.  And that answer is going to come out

19  if the government is allowed to continue asking the questions

20  that they want because that is a response that is what this guy

21  feels about for the first 11 or 12 interviews.  And then even

22  in the latter part, Your Honor, when he all of the sudden finds

23  this agreement term, he reverts back to, I thought it was wrong

24  because I would be hurting my customers.  So unless the

25  government is restricted from doing it, it's going to come out

Carl Pepper - Direct

1   again, and they know it's going to come out again.

2          Thank you, Your Honor.

3          *THE COURT:*  Let's talk about that.  So if he is

4   consistently saying in all his interviews or at least most of

5   them that he didn't tell the customers because he didn't want

6   to disappoint them, then what's the problem with that answer?

7          *MR. McLOUGHLIN:*  Your Honor, this is Jim McLoughlin.

8   This exactly goes to the *Connolly* issue which is the only

9   question for the jury to decide is whether or not there was a

10  violation of Section 1.  And conflating or substituting or

11  confusing issues about, well, I didn't want to disappoint him

12  because it was wrong or it was improper, was immoral, and

13  having confusion with the jury about that, and so guilt of the

14  Section 1 violation is exactly what the Second Circuit said in

15  that case in the fraud context is absolutely improper.  It was

16  what Your Honor has ruled is improper in your order at Page 3.

17         And the government's response to that is, yes, we know

18  you said we can't ask about information sharing he believed was

19  wrong and wrong in any way, but having read your opinion you

20  were talking about information sharing and this is about the

21  conspiracy and so we think it's okay.  So we get to question

22  about information sharing with respect to this discount.  And

23  then they come in and say, well, it's okay to ask him if it was

24  wrong because he's a member of the conspiracy, he is guilty and

25  so it's okay and it's not within the scope of your order.  That

1    reading of your order is simply impossible when giving it a

2    reasonable construction.  This is just a violation of your

3    order and they should be ordered not to do it again.

4           THE COURT:  Ms. Sweeney, last word?

5           MS. PREWITT:  Your Honor, it's not right to say that

6    he has consistently said throughout his interviews that he

7    thought it was wrongful.  That was something that really

8    emerged later through the preparation from the prosecutors.  In

9    a way it was to sort of make up for a gap for the fact he was

10   not saying agreement sufficiently to do what he needed to do

11   for the prosecution to secure his non-prosecution agreement.

12   So it's not right to say that he said it consistently.  His

13   belief about wrongfulness cannot be divorced from what the

14   prosecutors question him on.  That's all, Your Honor.

15          THE COURT:  Ms. Sweeney?

16          MS. SWEENEY:  I would just start by describing the

17   descriptions of the interview reports with regard to

18   wrongfulness by Mr. Pepper is inaccurate.  But putting that

19   aside, again it's our reading of the order that a cooperator or

20   co-conspirator can say something is wrong because he is talking

21   specifically about collusion, about the crime that's charged

22   here as opposed to just price sharing.  As I mentioned before

23   and I will mention again, I am happy to -- like I said, the

24   honest answer was not what I was expecting.  And I am happy to

25   refrain from asking that specific line of questions in the

1366

Carl Pepper - Direct

1       future questioning of this witness.

2              THE COURT:  I am going to sustain the objection.

3       No. 1, I will strike the last answer.  I will instruct the jury

4       they are to disregard it.  And I do agree that even if what he

5       has said in previous interviews, maybe not consistently, but at

6       least in previous interviews that he did it because he didn't

7       want to disappoint the customer, I do believe that the import

8       of the -- of my order was that that is irrelevant.  It's just

9       not a relevant issue for purposes of this trial.

10             And I will order that the United States shall not ask

11      similar questions to any witness in the future because, once

12      again, the answer that the government anticipated would not be

13      proper.  But it also just runs an incredible risk that this

14      particular witness is going to interject some type of, you

15      know, belief that it was wrong or so forth, and that is, you

16      know, precisely what that previous order had disallowed.

17             I won't rule on issues that Mr. Gillen and Ms. Prewitt

18      raised about, you know, how this all came about by means of

19      preparation.  We don't have to get to those issues just because

20      I don't think that the answer to the question would be relevant

21      in any event, all right?

22             MR. McLOUGHLIN:  Just so I am clear, I heard the

23      government say they are not going to ask this witness about it.

24      I would ask that the instruction from the Court be unambiguous

25      that they can't do this with respect to any witness and any

Carl Pepper - Direct

1    conduct which they allege as part of the Superseding Indictment

2    was improper.  We can't be having, well, we just said it was

3    about information sharing, but now it's about an agreement, so

4    we can ask him whether it was, quote, wrong or immoral or

5    whatever.

6           Because as soon as you -- this is a very, very

7    slippery slope.  And so as soon as you get in the neighborhood,

8    you don't know where you are going to wind up.  So we would ask

9    the Court to be unambiguous to the government.  And we would

10   like an unambiguous commitment from the government we are not

11   going to have a discussion like this again.

12          THE COURT:  I already ruled it applies to other

13   witnesses.  Thank you.

14      (In open court:)

15          THE COURT:  Ladies and gentlemen, the last answer of

16   Mr. Pepper I am going to strike and I am going to order you to

17   disregard his last answer, all right?

18          Ms. Sweeney, go ahead.

19   BY MS. SWEENEY:

20   Q.  Mr. Pepper --

21          JUROR:  What exactly was that last answer?

22          THE COURT:  If I told you, it would help you not

23   disregard it.  So if you don't recall, that's fine, because you

24   are supposed to disregard it anyway.

25          Go ahead, Ms. Sweeney.

Carl Pepper - Direct

 1 | *BY MS. SWEENEY:*

 2 | *Q.*  So Mr. Pepper, we have been talking about the telephone

 3 | calls that you've had from 2012 -- well, we have been talking

 4 | about telephone calls that you've had.  What is your general

 5 | practice with regard to telephone calls?  When you talk on the

 6 | phone, do you usually have long calls or shorts calls or

 7 | something else?

 8 |         *MS. PREWITT:*  Objection, Your Honor, vague.

 9 |         *THE COURT:*  Overruled.

10 |         *MS. SWEENEY:*  Your Honor, I apologize.  We can take

11 | this document from the screen.

12 | *A.*  Sometimes it can be long.  Sometimes it can be short.

13 | Depends on who I'm talking to.

14 | *BY MS. SWEENEY:*

15 | *Q.*  When you had conversations with Defendant Little, were

16 | they -- was your general practice to have long calls or short

17 | calls?

18 |         *MR. BYRNE:*  I object.  We have no idea what long means

19 | or short.

20 |         *MR. TUBACH:*  Lacks foundation, Your Honor.

21 |         *THE COURT:*  Overruled.

22 | *A.*  Sometimes they could be short depending on how many jokes

23 | he has and things like that, but that's why I am saying it

24 | could be a long call.  It could be a short call.  Sometimes,

25 | like I said, Jimmie was always pretty good about telling a lot

Carl Pepper - Direct

1    of jokes, so that's what would make the calls when you seen

2    some long ones could be that also.

3    *BY MS. SWEENEY:*

4    *Q.*  When you had conversations with Defendant Brady, were they

5    typically long calls or short calls?

6    *A.*  I think the majority of them with Scott, the majority of

7    them were probably short.

8    *Q.*  When you had conversations with Defendant Blake, were they

9    typically long calls or short calls?

10   *A.*  Sometimes they could be long depending upon talking about

11   sports or things like that.  They could also be short.

12   *Q.*  Did you ever call Defendant Brady just to talk about

13   sports?

14   *A.*  Not that I can remember.

15   *Q.*  Did you ever call Defendant Little or talk to Defendant

16   Little on the phone just to talk about jokes or have a friendly

17   conversation not related to business?

18   *A.*  I know I never called Jimmie to tell him jokes, but it

19   could be, like I said, it could be a lot of different things.

20   I might be talking to him about -- yeah, there could be some

21   long -- some extra calls or I don't mean extra, but a lot of

22   different subjects that might not even have anything to do with

23   one particular one.

24   *Q.*  Did you ever call Defendant Little just to chitchat and not

25   talk about anything related to business?

Carl Pepper - Direct

1        MR. BYRNE:  Your Honor, I object.  Asked and answered.

2        THE COURT:  Sustained.

3   BY MS. SWEENEY:

4   Q.  Did you ever -- I apologize.  I might even have said the

5   wrong word.  Did you ever talk to Defendant Blake and call just

6   to talk about sports?

7   A.  No, ma'am.

8   Q.  I would like to direct your attention to Tab 26 which is

9   Exhibit 5016.

10       Mr. Pepper, do you recognize this document?

11  A.  Yes, ma'am.

12  Q.  What type of document is it?

13  A.  It's an e-mail.

14  Q.  Who is it from?

15  A.  It's from --

16  Q.  The top e-mail.

17  A.  From Jimmie to myself, Jimmie Little to myself.

18  Q.  When was it sent?

19  A.  June the 9th, Tuesday, June the 9th, 2015.

20  Q.  What's the general subject matter of the e-mail?

21  A.  Boston Market.

22       MS. SWEENEY:  The government moves to admit Government

23  Exhibit 5016.

24       THE COURT:  Any objection to the admission of

25  Exhibit 5016?

Carl Pepper - Direct

1           Exhibit 5016 will be admitted.

2               *MS. SWEENEY:*  Permission to publish to the jury?

3               *THE COURT:*  You may.

4    *BY MS. SWEENEY:*

5    *Q.*  So Mr. Pepper, in the bottom e-mail, can you read what you

6    wrote?

7    *A.*  Yes, ma'am.  "You got any idea what your next qtr billing

8    weight will be."

9    *Q.*  What is a billing weight?

10   *A.*  It's what we were charging Boston Market for an exact case

11   weight for every case that they bought, basically.  It was if

12   we told -- if we was going to charge them 56 pounds, they would

13   be billed 56 pounds for every case of product that they buy.

14   *Q.*  Does billing weight ever change for Boston Market in 2015?

15   *A.*  Yes, ma'am.

16   *Q.*  How frequently did billing weight change in 2015?

17   *A.*  Quarterly.

18   *Q.*  If the billing weight changes, how if at all does that

19   affect the price that Boston Market is paying?

20   *A.*  If the billing weight goes down -- it all really depends.

21   I mean, it can affect their price, but it depends on what their

22   actual monthly price is versus what their billing weight is.

23   So if their monthly price had to go up, the billing weight went

24   down, then their price basically went down by case cost and

25   vice versa.

Carl Pepper - Direct

1   *Q.* So the billing weight affects the ultimate price that

2   Boston Market pays?

3   *A.* Yes, ma'am.

4   *Q.* Let's talk about Boston Market. What is Boston Market?

5   *A.* They are basically a rotisserie -- they sell marinated

6   rotisserie chickens. They are a QSR, but they sell a lot of

7   other things besides just chicken.

8   *Q.* Are you aware of where Boston Market is located, the

9   headquarters?

10   *A.* Yes, ma'am.

11   *Q.* And where is that?

12   *A.* Right here in -- well, it's in Golden.

13   *Q.* In Golden, Colorado?

14   *A.* Yes, ma'am.

15   *Q.* If we could turn to Government's Exhibit 9743. And that's

16   at Tab 27 of your binder.

17          Mr. Pepper do you recognize this document?

18   *A.* Yes, ma'am.

19   *Q.* Generally what kind of a document is it?

20   *A.* It's an e-mail.

21   *Q.* Who is it from?

22   *A.* It's from myself.

23   *Q.* To who?

24   *A.* To Neal Simco.

25   *Q.* Who is Neal Simco?

Carl Pepper - Direct

1   *A.*  Back in 2011 he was the vice-president over national

2   accounts.

3   *Q.*  What day was it sent?

4   *A.*  Wednesday, September the 7th, 2011.

5   *Q.*  What's the general subject matter of the e-mail?

6   *A.*  Church's.

7        *MS. SWEENEY:*  Move to admit government Exhibit 9743.

8        *THE COURT:*  Any objection to the admission of 9743?

9        *MR. TUBACH:*  Can we have a quick side bar?

10       *THE COURT:*  Yes.

11   (At the bench:)

12       *THE COURT:*  Go ahead, Mr. Tubach.

13       *MR. TUBACH:*  Your Honor, I believe this e-mail is

14   outside the scope of the charged Indictment.  We are checking

15   now to see whether it was on the *James* log.  I don't recall

16   that it was, but I can't definitively say it wasn't.  But we

17   believe it's outside the scope of the Indictment and we object

18   to its basis on that Indictment.

19       *MS. SWEENEY:*  Your Honor, this is supplemental log

20   22-S.  It was ruled favorably upon under 801(d)(2)(E) pending

21   authentication provisionally at ECF-1050.

22       *THE COURT:*  Mr. Tubach, anything more from you, which

23   is I understand a different objection, but anything more from

24   you?

25       *MR. TUBACH:*  No, Your Honor.

Carl Pepper - Direct

1        THE COURT:  Okay.  I will overrule the objection.  The

2   conspiracy was at least as of.  And I find that this is within

3   the scope of the conspiracy and will overrule the objection.

4        9743 will be admitted.

5        MS. SWEENEY:  Permission to publish, Your Honor?

6        THE COURT:  You may.

7   BY MS. SWEENEY:

8   Q.  Mr. Pepper, I would like to direct your attention to the

9   top e-mail.  Could you read the first sentence, please?

10  A.  Ric said everyone's saying they are going to be 28 back.

11  Q.  Now, in the first sentence, Ric, who did you mean by Ric?

12  A.  Ric Blake.

13  Q.  You also mentioned .28 back.  What does .28 back represent?

14  A.  That represents what Church's prices would be for their

15  dark meat.  It would be 28 cents back from whatever their

16  eight-piece price would happen to be.

17  Q.  So the dark meat price?

18  A.  Yes, ma'am.

19  Q.  At this time in September of 2011, who supplied Church's

20  Chicken?

21  A.  George's did at that time.  We did, Tyson did.  Pilgrim's

22  did.  Koch, I believe Koch did.  And I am not sure who else.

23  Q.  I would like to direct your attention to the bottom e-mail.

24  Could you read the first sentence of that, please?

25  A.  George's is calling Church's today and telling them they

Carl Pepper - Direct

1   are getting out of the business at the end of the year.

2   Q.   What did you mean when you wrote that?

3   A.   That I was -- that Ric Blake had told me that George's was

4   going to no longer produce Church's Chicken for the following

5   year.

6   Q.   So did George's supply Church's the following year?

7   A.   I don't believe so.

8   Q.   And again back to the top e-mail, it says, "Everyone is

9   saying they are going to go."  What did you mean when you wrote

10  that, going to go?

11  A.   Oh, okay.  What I meant was that all the poultry companies

12  that were going to supply Church's are talking about going to

13  28 cents back of their eight-piece price for the dark meat

14  price.

15  Q.   So you meant you understood that to be more than just

16  George's, but also the other suppliers of George's?

17         MS. JOHNSON:  Objection, leading.

18         THE COURT:  Sustained.

19  BY MS. SWEENEY:

20  Q.   You understood that to be more than just George's?

21         MR. McLOUGHLIN:  Same objection.

22  A.   Yes, ma'am.

23         THE COURT:  Overruled.

24  BY MS. SWEENEY:

25  Q.   And who did you understand that to be?

1376
Carl Pepper - Direct

1  *A.*  Whatever poultry companies are going to be supplying

2  Church's for their dark meat.

3  *Q.*  All right.  If we can turn to Tab 28, please, and that's

4  Government Exhibit 3074.

5          Mr. Pepper, do you recognize this document?

6  *A.*  Yes, ma'am.

7  *Q.*  Generally what kind of document is it?

8  *A.*  This is an agreement for -- a contract agreement.

9  *Q.*  Between whom?

10  *A.*  Tyson Foods and Church's.

11          *MS. SWEENEY:*  Government moves to admit Government

12  Exhibit 3074, which I believe is subject to agreement between

13  the parties.

14          *THE COURT:*  I am sorry, subject to what?

15          *MS. SWEENEY:*  Agreement between the parties.

16          *THE COURT:*  Regarding admissibility?

17          *MS. SWEENEY:*  Regarding admissibility, yes.

18          *THE COURT:*  Any objection to the admission of

19  Exhibit 3074?

20          Exhibit 3074 will be admitted.

21  *BY MS. SWEENEY:*

22  *Q.*  Mr. Pepper, at this point I am now directing your attention

23  to the year 2017.  So we would like to pull up Government

24  Exhibit 744 which is behind Tab 29 in your binder.

25          Do you recognize this document, Mr. Pepper?

Carl Pepper - Direct

1   A.   Yes, ma'am.

2   Q.   Generally what type of document is it?

3   A.   It's an e-mail.

4   Q.   And the top e-mail, who from?

5   A.   Tim Mulrenin.

6   Q.   Who is it to?

7   A.   To myself.

8   Q.   What date was it sent?

9   A.   Wednesday, August the 16th, 2017.

10  Q.   What's the general subject matter of the e-mail?

11  A.   It's concerning the Popeye's 2018 bone-in RFP contract.

12       MS. SWEENEY:   Government moves to admit Government

13  Exhibit 744.

14       THE COURT:   Any objection to the admission of

15  Exhibit 744 with a limiting instruction?

16       MR. KORNFELD:   Thank you, Your Honor.   No objection

17  with that instruction.

18       THE COURT:   Then 744 will be admitted.

19       However, ladies and gentlemen, within that particular

20  exhibit there are statements of Mr. Kronauge.   You can consider

21  Mr. Kronauge's statements not for the truth of the matter that

22  he asserts, but rather for the effect that his statements may

23  have on the recipients, the listener, all right?

24       MS. SWEENEY:   Permission to publish, Your Honor.

25       THE COURT:   You may.

1378
Carl Pepper - Direct

1    *BY MS. SWEENEY:*

2    Q.   Mr. Pepper, I would like to direct your attention to the

3    bottom e-mail from August 16 of 2017 at 3:16 p.m.

4    A.   Yes, ma'am.

5    Q.   Who is that e-mail from?

6    A.   It's from Kent Kronauge.

7    Q.   Did you receive this e-mail?

8    A.   Yes, ma'am.

9    Q.   Can you read the sentence that begins with, "I am aware"?

10   A.   "I am aware of what went on with Brand X and in fact the

11   change took place during the current agreement year."

12   Q.   Who is brand X?

13   A.   Kentucky Fried Chicken.

14   Q.   What did you do after you received this document?

15   A.   I forwarded it to Tim Mulrenin.

16   Q.   Did Defendant Mulrenin respond?

17   A.   Yes, ma'am.

18   Q.   If we could zoom in on that.

19             What did Defendant Mulrenin say?

20   A.   "Ouch.  I did not.  Definitely appears he's under the

21   impression we all dropped prices more than we did."

22   Q.   Who is he's, he's under the impression?

23   A.   Kent Kronauge.

24   Q.   And who is we all?

25   A.   All poultry companies that were supplying Kentucky Fried

Carl Pepper - Direct

1    Chicken.

2    *Q.*  And so in the bottom e-mail that we looked at, what was --

3    did Mr. Kronauge have a request?

4        *MR. KORNFELD:*  Your Honor, I am going to object.  I

5    think the document speaks for itself.  To the extent that

6    question is asking this witness to speculate, I object on that

7    basis.  And it's also subject to a limiting instruction.

8        *THE COURT:*  I am going to overrule that objection.

9    The question was simply was there a request.  He can answer

10    that question.

11    *BY MS. SWEENEY:*

12    *Q.*  So Mr. Pepper, again focusing your attention to the bottom

13    e-mail, if we could do that, please.

14    *A.*  Yes, ma'am.

15    *Q.*  Was there a request from Mr. Kronauge in this e-mail?

16    *A.*  Yes, ma'am.

17    *Q.*  And what was that request?

18    *A.*  The request was that, I would also like to keep in mind

19    while submitting your bid concerning what he knew that he would

20    entertain the discounted price either in one big -- in one big

21    one-year contract or spread it out over two years of the

22    discount that he is expecting.

23    *Q.*  So is Mr. Kronauge seeking a discount?

24    *A.*  Yes, ma'am.

25    *Q.*  And what were the options for the discount that you just

Carl Pepper - Direct

1    described?

2    A.  Either give it all to Popeye's in one year or spread it out

3    over two years.

4    Q.  Now I would like to direct your attention to Government

5    Exhibit 746-1.  And that's behind Tab 32.

6            Do you recognize this document?

7    A.  Yes, ma'am.

8    Q.  Generally what type of document is it?

9    A.  It's an e-mail.

10   Q.  Who is it from?

11   A.  Kent Kronauge.

12   Q.  Did you receive this e-mail?

13   A.  Yes, ma'am.

14   Q.  What's the general subject matter of the e-mail?

15   A.  Concerning the 2018 bone-in contract for Popeye's.

16           MS. SWEENEY:  Government moves to admit Government

17   Exhibit 746.

18           THE COURT:  -1?

19           MS. SWEENEY:  -1, yes.

20           THE COURT:  Any objection to the admission of 746-1?

21           MR. TUBACH:  I don't believe this witness can have any

22   information about Pages 2 and 3 of this exhibit.

23           THE COURT:  What tab is it?

24           MS. SWEENEY:  It was Tab 32.  Your Honor, if we may

25   have a brief side bar on this?

1381

Carl Pepper - Direct

1          THE COURT:  Yes.

2       (At the bench:)

3          THE COURT:  Mr. Tubach, go ahead.

4          Let's hear from Ms. Sweeney.

5          MS. SWEENEY:  The second and third pages I believe are

6    just the metadata associated with the cover e-mail, all of

7    which were admitted at the last trial under 801(d)(2)(E).  I

8    believe under ECF-1031-1, you ruled that this document with the

9    -1 was admissible non-hearsay, so on that basis the government

10   moves to admit this document.

11         THE COURT:  And do you recall, who laid the foundation

12   for the metadata?  Because as Mr. Tubach says, certainly

13   Mr. Pepper wouldn't be familiar with that.

14         MS. SWEENEY:  Your Honor, I don't believe there is a

15   witness.  I believe you recognized that the metadata was

16   non-hearsay that just related to the recipients of the e-mail.

17   So the metadata shows that this e-mail was in Mr. Pepper's

18   inbox.  And it's -- Mr. Pepper did not testify at the last

19   trial so could not testify who the undisclosed recipients were.

20   So the metadata shows he was a recipient.

21         THE COURT:  He meaning who?

22         MS. SWEENEY:  Mr. Pepper.

23         THE COURT:  But Mr. Pepper just testified that he got

24   it, so why do we need the metadata to prove that?

25         MS. SWEENEY:  So, Your Honor, the government is happy

Carl Pepper - Direct

1   to introduce Government's Exhibit 746.  I believe I am being

2   handed a note.  This was authenticated in the last trial.  The

3   government is happy to introduce 746 instead.  I will note,

4   however, that 746-1 was admitted in the last trial and is cited

5   in the summary exhibit.  So if 746 instead is admitted, we

6   would need to make that change to the summary exhibits.

7        THE COURT:  Okay.  Yeah, I will allow an amendment to

8   the summary exhibits to that effect, but the metadata is

9   irrelevant because Mr. Pepper has testified about it.  So if

10  746 constitutes Page 1 of 746-1, then that's an appropriate

11  substitution.

12       MS. SWEENEY:  Yes, Your Honor, it does.

13       THE COURT:  Yeah.  So why don't you go ahead, or the

14  other thing to do is just admit Page 1 of 746-1.  That might be

15  easier and we won't have to worry about trying to touch up the

16  summaries.

17       MS. SWEENEY:  I will do that.  That sounds like a good

18  plan, Your Honor.

19       THE COURT:  Anything else, Mr. Tubach?

20       MR. TUBACH:  No, Your Honor.  Thank you.

21     (In open court:)

22       THE COURT:  Ms. Sweeney, what portion of 746-1 does

23  the government wish to move the admission of?

24       MS. SWEENEY:  The government is seeking to move just

25  the first page of 746-1.  Your Honor, I believe there may be a

Carl Pepper - Direct

1   limiting instruction for this.

2          *THE COURT:*  If there is, I am not sure what it was.

3          *MS. SWEENEY:*  Your Honor, I believe the instruction is

4   listed in ECF-1031-1 with regard to statements by Mr. Kronauge.

5          *THE COURT:*  Okay.  One second.  Let me check that.

6   What was it, 1031?  The limiting instruction that

7   Mr. Kronauge's statements should only be considered for the

8   effect on the listener; is that right?

9          *MS. SWEENEY:*  Yes.

10         *THE COURT:*  Okay, yes.

11         Then ladies and gentlemen, as to Exhibit 746-1, which

12  is in part from -- it's from Mr. Kronauge, Mr. Kronauge's

13  statements should be considered for the effect on the listener

14  as opposed to the truth of the matters that Mr. Kronauge

15  asserts.

16         *MS. SWEENEY:*  Permission to publish Government's

17  Exhibit 746-1, just Page 1 as admitted?

18         *THE COURT:*  You may.

19         *MS. SWEENEY:*  If we could just zoom in on the text.

20  *BY MS. SWEENEY:*

21  *Q.*  So Mr. Pepper, this top e-mail, who is it from?

22  *A.*  It's from Kent Kronauge.

23  *Q.*  Did you receive this top e-mail?

24  *A.*  Yes, ma'am.

25  *Q.*  What date did you receive it?

1384

Carl Pepper - Direct

 1   *A.* On Wednesday, September the 6th, 2017.

 2        *MS. SWEENEY:* Your Honor, I apologize.  I believe you

 3   gave us permission to publish, but we may just need to turn the

 4   screen on.

 5        *THE COURT:* Yes.  You may publish it.

 6   *BY MS. SWEENEY:*

 7   *Q.* And what did Mr. Kronauge send you on September 6 of 2017?

 8   *A.* He sent out an e-mail saying, "I did not receive your bid?"

 9   *Q.* What, if anything, did you do after receiving this e-mail?

10   *A.* I believe I -- I know I had conversation with -- I don't

11   know.  I called a couple different suppliers.  I asked them if

12   they had sent in their bids, but right now I don't -- I don't

13   remember exactly who I called.

14   *Q.* If we could direct your attention to Tab 33.  And behind

15   Tab 33 are Government Exhibits 752 through 758.  So if you

16   could flip through those exhibits and look up at me when you're

17   ready.

18   *A.* Yes.

19        *MR. McLOUGHLIN:* Objection to refreshing recollection

20   to authenticate.  The witness has said he doesn't remember what

21   he did.

22        *THE COURT:* Is the purpose for refreshing

23   recollection?

24        *MS. SWEENEY:* No, Your Honor.  At this point we are

25   authenticating a new document.

Carl Pepper - Direct

1      THE COURT:  Go ahead.  Overruled.

2  BY MS. SWEENEY:

3  Q.  So Mr. Pepper, have you reviewed 752 through 758?

4  A.  Yes, ma'am.

5  Q.  What types of documents are these?

6  A.  Text messages.

7  Q.  Who are they between?

8  A.  They are between myself and Tim Mulrenin.

9  Q.  What's the general topic of these text messages?

10  A.  The Popeye's contract.

11      MS. SWEENEY:  The government moves to admit Government

12  Exhibits 752 through 758.

13      THE COURT:  Any objection to the admission of

14  Exhibit 752 through 758?

15      Those exhibits will be admitted.

16  BY MS. SWEENEY:

17  Q.  And now, Mr. Pepper, I would like to direct your attention

18  to Tab 34 and that's Government Exhibit 751.

19  A.  Yes, ma'am.

20  Q.  Do you recognize this document?

21  A.  Yes, ma'am.

22  Q.  What type of document is this?

23  A.  It's a text message.

24  Q.  And who is it -- who are the text messages between?

25  A.  I sent it to Tim Mulrenin and Tim Scheiderer.

Carl Pepper - Direct

1   Q.  What's the general topic of this text message?

2   A.  It's concerning the Popeye's contract for 2017 and

3   concerning the discounted price spread out over either one year

4   or two years.

5           MS. SWEENEY:  The government moves to admit Government

6   Exhibit 751.

7           THE COURT:  Any objection to the admission of

8   Exhibit 751?

9           That exhibit will be admitted.

10          MS. SWEENEY:  Your Honor, permission to publish

11  Government's Exhibits 752 through 758?  I believe they are

12  short, so we would do one at a time.

13          THE COURT:  You may.

14  BY MS. SWEENEY:

15  Q.  If we can start with 752, please.

16          So Mr. Pepper, Government Exhibit 752, who is this

17  from?

18  A.  It's from myself.

19  Q.  Who is it to?

20  A.  Tim Mulrenin.

21  Q.  What did you send to Tim Mulrenin?

22  A.  "U with your customers."

23  Q.  Why did you send this message to Defendant Mulrenin?

24  A.  I was trying to get ahold of him to let him know that we

25  still hadn't sent our contract in, that Kent was looking for

Carl Pepper - Direct

1    it.  And then also I'd find out some information on what the

2    other poultry companies were going to do with the discounted

3    price of the next contract.

4    Q.  If we can look at Government Exhibit 753.

5         Did Defendant Mulrenin respond to your text message?

6    A.  Yes, ma'am.

7    Q.  What did he say?

8    A.  He asked, "What's up?"

9    Q.  If we can look at Government's Exhibit 754.

10        Did you respond to his text message?

11   A.  Yes, ma'am.

12   Q.  What did you say?

13   A.  "Popeye's proposal."

14   Q.  And what time was this sent listed on this message?

15   A.  9/6/17 at 3:34 p.m.

16        *MS. SWEENEY:*  If we could publish Government's Exhibit

17   755.

18   *BY MS. SWEENEY:*

19   Q.  What time is listed on the face of the message?  What time

20   is Government's Exhibit 755 sent?

21   A.  September 6, 2017, 3:34 p.m.

22   Q.  Is that later in the same minute as the one we just read?

23   A.  Yes, ma'am.

24   Q.  And what did you send to Defendant Mulrenin?

25   A.  "Got a general idea of what George's is doing."

1   Q.  What did you mean when you said general idea?

2   A.  That I had -- I knew what -- I had a general idea how they

3   were going to spread out the discount.

4   Q.  The discount for whom?

5   A.  The discount for Popeye's.

6   Q.  When you say spread out the discount, can you describe what

7   you mean?

8   A.  It was going to be done over a two-year period.

9   Q.  What was going to be done over a two-year period?

10  A.  The discount was going to be spread out over two years of

11  the contract.

12  Q.  And who was going to spread the discount over two years for

13  the contract?

14  A.  George's said they were.  And then the other poultry

15  companies that I talked to were also saying the same thing.

16  They were going to spread it out over a two-year period, the

17  discount.

18  Q.  When you said -- it says I've got a general idea of what

19  George's is doing, where did that information come from?

20  A.  That came from Ric Blake.

21  Q.  Now did you communicate with Mr. Blake?

22  A.  On the cellphone.

23  Q.  Did you call him?  It was a call?

24  A.  Yes, ma'am.

25          MS. SWEENEY:  Permission for publish, Your Honor,

Carl Pepper - Direct

1   Government's Exhibit 756.

2           *THE COURT:*  You may.

3   *BY MS. SWEENEY:*

4   *Q.*  Did Defendant Mulrenin respond to your text message?

5   *A.*  Yes, ma'am.

6   *Q.*  And what time is listed there on the top of this text

7   message?

8   *A.*  3:34 p.m.

9   *Q.*  And was that within the same minute that you sent your text

10  message in 755?

11  *A.*  Yes, ma'am.

12  *Q.*  And what did Defendant Mulrenin say?

13  *A.*  He told me to call Cullen, Steve Cullen, and then he would

14  get back with me as soon as he could.

15  *Q.*  And who is -- what was Mr. Cullen's role at this period of

16  time in September of 2017?

17  *A.*  He was still basically tied in with the production side of

18  small bird along with the pricing group.  And he basically had

19  the same position that entire time that I can remember for 2012

20  all the way through 2019 probably.

21  *Q.*  So what did you understand you were supposed to do after

22  receiving this message?

23  *A.*  Call Steven Cullen and let him know, first of all, where is

24  the Popeye's proposal, and then also let him know what I found

25  out that George's was going to do on the discounted price.

1390

Carl Pepper - Direct

1  *Q.*  Did you call Mr. Cullen?

2  *A.*  Yes, ma'am.

3         *MS. SWEENEY:*  I would like to direct your attention

4  and permission to publish, Your Honor, Government's Exhibit

5  757?

6         *THE COURT:*  You may.

7  *BY MS. SWEENEY:*

8  *Q.*  Did you respond, Mr. Pepper, to Mr. Mulrenin's text message

9  from 756?

10  *A.*  Yes, ma'am.

11  *Q.*  What's the time listed at the top of this document here?

12  *A.*  3:44 p.m.

13  *Q.*  So is that about 10 minutes after the last text message we

14  just looked at?

15  *A.*  Yes, ma'am.

16  *Q.*  What did you say to Defendant Mulrenin?

17  *A.*  That I had called Steven Cullen, told him what I had found

18  out from George's on the discounted price, and also something

19  about Mar-Jac that had nothing do with the Popeye's pricing.

20  *Q.*  So we'll take that in turn.  Starting with, "What I heard

21  GEORGES was doing," what did you mean when you wrote those

22  words?

23  *A.*  That I had found out that George's was going to spread the

24  discounted price over two years.

25  *Q.*  And was that from what you had discussed with Defendant

Carl Pepper - Direct

1  Blake?

2  *A.*  Say that again?

3  *Q.*  Was that information from what you had discussed with

4  Defendant Blake?

5  *A.*  Yes, ma'am.

6  *Q.*  Now, the second part of the sentence talks about Mar-Jac.

7  What is Mar-Jac?

8  *A.*  It's another poultry company.

9  *Q.*  And you wrote, "also told him about Mar-Jac."  What were

10  you referring to here?

11  *A.*  This was about a franchisee that I was going to take some

12  business away from Mar-Jac that basically had called me to get

13  Tyson to take over their business away from Mar-Jac.

14  *Q.*  So it was information from a customer about Mar-Jac?

15  *A.*  Yes, ma'am.

16  *Q.*  Is it related to the information about George's?

17  *A.*  No, ma'am.

18  *Q.*  And at the time that this text was sent, was the final

19  contract with Popeye's finalized?

20  *A.*  I think so.  I know it was in September is when it was

21  completed, I believe.

22  *Q.*  So Mr. Pepper, at this time that you sent this text

23  message, were George's and Mar-Jac competitors at Tyson?

24  *A.*  Were they competitors?

25  *Q.*  Of Tyson for Popeye's.

Carl Pepper - Direct

1   A.  Yes, ma'am.

2   Q.  I would like to direct your attention to Government

3   Exhibit 758.

4        Did Defendant Mulrenin respond to your text message

5   saying that you called Cullen?

6   A.  Yes, ma'am.

7   Q.  And what did he say?

8   A.  "Thanks!"

9        MS. SWEENEY:  Your Honor, permission to publish

10  Government's Exhibit 751.

11        THE COURT:  You may.

12  BY MS. SWEENEY:

13  Q.  Mr. Pepper, I believe that's Tab 34 of your binder.

14        Now, what day did you receive this message?

15  A.  September --

16  Q.  I apologize.  What day did you send this message?

17  A.  What day?  Oh, September the 6th, 2017.

18  Q.  Can you read the first sentence, please?

19  A.  "Just got some info from Popeye's.  Everyone seems to be

20  doing 2 years and spreading it out."

21  Q.  Mr. Pepper, after that text exchange we just looked at with

22  Defendant Mulrenin, did you have any other calls relating to

23  the Popeye's contract that day?

24  A.  I don't --

25  Q.  Let me ask it this way.  The information --

Carl Pepper - Direct

1       MR. McLOUGHLIN:  Objection, Your Honor.  Can we get an

2   answer for the record, so the record is clear?  If the witness

3   doesn't remember, we request that the record be clear.

4       THE COURT:  He can answer.

5   A.  I think it's when I called Steven Cullen, but I don't

6   remember.

7   BY MS. SWEENEY:

8   Q.  I would like to -- if we could look at the first sentence

9   of Government Exhibit 751, "Just got some info from Popeye's."

10  A.  Yes, ma'am.

11  Q.  What were you referring to when you said, "Just got some

12  info from Popeye's"?

13  A.  That I -- that Popeye's had sent me -- had sent me an

14  e-mail basically telling us what we -- what we could do or

15  telling everybody that everyone seems to be doing a two-year

16  and he is going to spread it out over a two-year period.  And

17  basically I was being told it was anywhere from two and a

18  quarter, two and a half over a two-year period.  And that's

19  what Popeye's gave.  That's what Popeye's gave the information

20  to me.

21  Q.  So the information contained in Government's Exhibit 751 is

22  from Popeye's?

23  A.  Yes, ma'am.

24  Q.  Who at Popeye's gave you this information?

25  A.  It came from Kent Kronauge.

Carl Pepper - Direct

1  Q.  Did Mr. Kronauge tell you what George's was proposing for

2  the upcoming contract?

3          MR. KORNFELD:  Objection, Your Honor.  It calls for

4  hearsay.

5          THE COURT:  Response?

6          MS. SWEENEY:  Withdrawn.

7  BY MS. SWEENEY:

8  Q.  Did you learn -- after your communication with

9  Mr. Kronauge, did you know what specific other suppliers to

10  Popeye's were -- how they were handling the discount for the

11  next contract?

12          MR. McLOUGHLIN:  Objection, Your Honor, calls for

13  hearsay.

14          MS. SWEENEY:  Your Honor, I am asking for his

15  knowledge.

16          MR. McLOUGHLIN:  Your Honor, the knowledge comes from

17  the communication of Mr. Kronauge.  It's hearsay.

18          THE COURT:  Sustained.

19  BY MS. SWEENEY:

20  Q.  Mr. Pepper, I would like to direct your attention to the

21  second sentence of Government's Exhibit 751.

22  A.  Yes, ma'am.

23  Q.  "Everyone seems to be doing 2 years and spreading it out."

24  Does this relate to any particular specific supplier to

25  Popeye's?

Carl Pepper - Direct

1    *A.*   Yes, ma'am.  Say that again?

2    *Q.*   So the word, "Everyone seems to be doing 2 years and

3    spreading it out," does this relate to -- does this identify

4    any particular supplier of Popeye's?

5         *MS. PREWITT:*  Objection, Your Honor.  She is leading

6    the witness.

7         *THE COURT:*  Overruled.

8    *A.*   Not any specific, no, ma'am.

9    *BY MS. SWEENEY:*

10   *Q.*   I am now showing you Government Exhibits 748, 749, 750,

11   which are behind Tab 35 in your binder.

12         Have you had a chance to look through those documents,

13   sir?

14   *A.*   Yes, ma'am.

15   *Q.*   We'll start with Government's Exhibit 748.  Do you

16   recognize this document?

17   *A.*   Yes, ma'am.

18   *Q.*   Generally what type of document is it?

19   *A.*   It's a e-mail.

20   *Q.*   Who is it from?

21   *A.*   It's from myself.

22   *Q.*   And who is it to?

23   *A.*   To Kent Kronauge and copying Tim Mulrenin.

24   *Q.*   What's the general subject matter of this document?

25   *A.*   The Popeye's 2018 proposed cost model.

Carl Pepper - Direct

1   Q.  Are there attachments reflected on this e-mail?

2   A.  Yes, ma'am.

3   Q.  I would now like to pull up for you Government's Exhibit

4   749, which is a native document.

5          Mr. Pepper, do you recognize Government's Exhibit 749

6   as displayed on your screen?

7   A.  Yes, ma'am.

8   Q.  Was it this attached to Government's Exhibit 748?

9   A.  Yes, ma'am.

10  Q.  If we could pull up Government's Exhibit 750, which is also

11  in native.

12         Mr. Pepper, do you recognize Government's Exhibit 750?

13  A.  Yes, ma'am.

14  Q.  Is it the attachment to Government's Exhibit 748?

15  A.  Yes, ma'am.

16     MS. SWEENEY:  The government moves to admit

17  Government's Exhibit 748, 749 and 750.

18     THE COURT:  Any objection to the admission of 748

19  through 750?  Each of those will be admitted.

20     MS. SWEENEY:  Permission to publish Exhibit 748?

21     THE COURT:  You may.

22  BY MS. SWEENEY:

23  Q.  Now, Mr. Pepper, who wrote this e-mail or who is this from?

24  A.  It's from myself to Kent Kronauge and copying Tim Mulrenin.

25  Q.  What date was this e-mail sent?

Carl Pepper - Direct

1    A.  Thursday, September 7th, 2017.

2    Q.  Can you read the first sentence of this e-mail, please?

3    A.  "Kent, we will do .01lb a pound for 2017 & another .01lb a

4    pound 2018."

5    Q.  What are you referring to in this -- or what do you mean

6    when you wrote this first sentence?

7    A.  That we were going to give him the discounted price that he

8    was asking for.  We were going do give him a penny to his

9    bottom line in 2017 and then the same thing for 2018.

10   Q.  So earlier you were testifying about taking the discount

11   all at once or spreading it out over a few years.  What did

12   Tyson propose to Popeye's?

13   A.  Proposed doing it over two years.

14   Q.  And what date was this sent?

15   A.  September the 7th, 2017.

16   Q.  So I would like to direct your attention now at this point

17   to Government's Exhibit 755.

18          MS. SWEENEY:  Permission to publish, Your Honor?

19          THE COURT:  755?

20          MS. SWEENEY:  Yes.

21          THE COURT:  One second.  You may.

22   BY MS. SWEENEY:

23   Q.  And Mr. Pepper, what date was Government's Exhibit 755

24   sent?

25   A.  September the 6th, 2017.

Carl Pepper - Direct

1    *Q.*  Is that a day before Government's Exhibit 748, Tyson's sent

2    Mr. Kronauge the discount for 2017 and 2018?

3    *A.*  Yes, ma'am.

4         *MS. SWEENEY:*  We can take that down.

5         Your Honor, I see the time.  I am happy to continue,

6    but this would be a convenient breaking point.

7         *THE COURT:*  Ladies and gentlemen, keep the admonitions

8    in mind.  Even if you are walking around the courthouse, keep

9    your yellow juror buttons visible if you would.  Make sure you

10   don't talk among yourselves or deliberate in any way.  And the

11   jury is excuse until 1:30.  Thank you.

12        (Jury excused.)

13        Mr. Pepper, you are excused until 1:30.  Thank you.

14        Mr. Koenig?

15        *MR. KOENIG:*  Two very quick issues.  In light of Your

16   Honor's ruling at side bar about the question why didn't you

17   tell your customer, I assume that we still are able to ask:

18   Did you tell them?  I mean, the conspiracy was a secret.  And I

19   think that that without the follow-up question, it's fine.  I

20   just wanted to confirm that so we don't have another big side

21   bar.

22        *THE COURT:*  You are correct, yes.

23        *MR. KOENIG:*  And then regarding Mr. Pepper, would it

24   be okay if we contacted his lawyers just to reiterate some of

25   the, you know, avoid saying this or --

Carl Pepper - Direct

1      THE COURT:  Yes.

2      MR. KOENIG:  Thank you.

3      THE COURT:  Anything else before we break?  All right.

4   We will be in recess until 1:30.

5      (Recess at 12:00 p.m.)

6      (Reconvened at 1:31 p.m.)

7      THE COURT:  Let's get the jury back.

8      (Jury present.)

9      THE COURT:  Go ahead, Ms. Sweeney.

10      MS. SWEENEY:  Thank you, Your Honor.

11   BY MS. SWEENEY:

12   Q.  Good afternoon, Mr. Pepper.

13   A.  Good afternoon.

14   Q.  In your earlier testimony, Mr. Pepper, you referred to a

15   2014 contract.  What contract specifically were you referring

16   to?

17      MR. McLOUGHLIN:  Objection to form.  The 2014

18   contract?

19      MS. SWEENEY:  Your Honor, I am asking him to clarify.

20      THE COURT:  Overruled.

21   BY THE COURT:

22   Q.  What contract specifically were you referring to when you

23   referred to the 2014 contract?

24   A.  The RSCS KFC contract.

25   Q.  And what year did that contract go into effect?

Carl Pepper - Direct

1        MR. LAVINE:  Objection, Your Honor, asked and

2   answered.  We have already been down this road.

3        THE COURT:  Sustained.

4   BY MS. SWEENEY:

5   Q.  Now, Mr. Pepper, earlier you were asked whether you

6   conveyed information from Mr. Little to -- from Defendant

7   Little to Defendant Roberts.  Do you recall that?

8   A.  Yes, ma'am.

9   Q.  Was it your practice to convey price information that you

10  received from competitors to Defendant Roberts?

11       MR. McLOUGHLIN:  Objection, Your Honor, foundation,

12  but also form, time, place.

13       THE COURT:  Overruled.

14  A.  Would you ask that again, please?

15  BY MS. SWEENEY:

16  Q.  Sure.  Mr. Pepper, was it your practice to convey price

17  information that you received from competitors to Defendant

18  Roberts?

19  A.  Yes, ma'am.

20  Q.  I am sorry, Mr. Pepper.  If you could lean into the

21  microphone.

22  A.  I am not really sure how to answer that question because I

23  didn't talk to Brian Roberts.

24  Q.  Just to clarify, when you say you didn't talk to Defendant

25  Roberts, could you explain?

Carl Pepper - Direct

1   A.  I mean, I talked to him, but I -- I just don't understand

2   the question exactly what you're asking me.

3   Q.  So Mr. Pepper, when you received pricing information from

4   competitors, was it part of your practice to report that

5   information to others within Tyson?

6   A.  Yes, ma'am.

7   Q.  Who within Tyson?

8   A.  During this time it was Tim Mulrenin.

9   Q.  Did you have a practice to report it to anybody else within

10  Tyson?

11          MR. McLOUGHLIN:  Asked and answered, Your Honor.

12          THE COURT:  Overruled.

13  A.  He -- Brian could be on an e-mail that was going to Tim.

14          MR. GILLEN:  I object, Your Honor, speculation, if he

15  could be on an e-mail.

16          MS. SWEENEY:  Your Honor, could we have a brief side

17  bar?

18          THE COURT:  No.  Rephrase the question, but the

19  objection is sustained.

20  BY MS. SWEENEY:

21  Q.  So Mr. Pepper, in this time period, and this time period I

22  am talking about 2014, you testified that it was your practice

23  to share the price information that you received with Defendant

24  Mulrenin; is that correct?

25          MS. PREWITT:  Objection, Your Honor, with respect to

Carl Pepper - Direct

1    what price information?  Vague.

2         THE COURT:  Sustained.  If you could specify, ask the

3    witness to specify.

4    BY MS. SWEENEY:

5    Q.  So Mr. Pepper, you testified that it was your practice when

6    you received price information from competitors to share that

7    price information with Defendant Roberts in 2014; is that

8    correct?

9         MR. McLOUGHLIN:  Objection, Your Honor.

10        MR. TUBACH:  She misspoke.  She meant Mr. Mulrenin.

11        MS. SWEENEY:  I apologize.  I believe I misspoke.  I

12   meant Mr. Mulrenin.

13        THE COURT:  If you could rephrase.

14        MS. SWEENEY:  Yes, Your Honor.

15   BY MS. SWEENEY:

16   Q.  So you testified that it was your practice in 2014 to

17   convey the price information that you received from your

18   competitors with Defendant Mulrenin; is that right?

19   A.  Yes, ma'am.

20   Q.  Was it your practice in that time frame in summer of 2014

21   to share that price information received from competitors with

22   anyone else at Tyson?

23   A.  I don't have an answer to that one.

24   Q.  Okay.  So Mr. Pepper, I would like to direct your attention

25   to Government 113 which is in Tab 36 of your binder.

Carl Pepper - Direct

1    Mr. Pepper, have you found the document?

2  *A.*  Yes, ma'am.

3  *Q.*  Do you recognize this document?

4  *A.*  Yes, ma'am.

5  *Q.*  Generally what type of document is it?

6  *A.*  It's an e-mail.

7  *Q.*  Who is it from starting at the top e-mail?

8  *A.*  It's from myself.

9  *Q.*  Who is it to?

10 *A.*  To Dean Bradley at Church's.

11 *Q.*  What's the date of the e-mail?

12 *A.*  Friday, May the 31st, 2013.

13 *Q.*  What's the general subject matter of the e-mail?

14 *A.*  Church's frozen eight-piece and dark meat.

15        *MS. SWEENEY:*  The government moves to admit

16 Government's Exhibit 113.

17        *THE COURT:*  It's been admitted.

18        *MS. SWEENEY:*  Apologies, Your Honor.  Thank you.

19 *BY MS. SWEENEY:*

20 *Q.*  Now, Mr. Pepper, if you could direct your attention to

21 Government Exhibit 120 in Tab 37.

22 *A.*  Yes, ma'am.

23 *Q.*  Do you recognize this document?

24 *A.*  Yes, ma'am.

25 *Q.*  Generally what type of document is it?

Carl Pepper - Direct

1    *A.*   It's an e-mail.

2    *Q.*   Starting with the top e-mail, who is it from?

3    *A.*   It's from myself.

4    *Q.*   And what date was it sent?

5    *A.*   Friday, May the 31st of 2013.

6    *Q.*   Who was it sent to?

7    *A.*   Tim Scheiderer and copied to Tim Mulrenin and Brian

8    Roberts.

9    *Q.*   What's the general subject matter of this e-mail?

10   *A.*   Church's frozen 8pc and Dark Meat.

11          *MS. SWEENEY:*  The government moves to admit

12   Government's Exhibit 120.

13          *THE COURT:*  Any objection to the admission of

14   Government's Exhibit 120 subject to a limiting instruction?

15   Exhibit 120 will be admitted.

16          Ladies and gentlemen, in Exhibit 120 there are certain

17   statements from a Dean Bradley.  Those statements should be

18   considered by you not for the truth of the matters asserted,

19   but rather only for the effect those statements may have on the

20   listener.

21   *BY MS. SWEENEY:*

22   *Q.*  Mr. Pepper, I would like to direct your attention to the

23   bottom of this e-mail, the bottom of Page 1.

24   *A.*   Yes.

25   *Q.*   And to the top of the second page.  Who is this bottom

Carl Pepper - Direct

1   e-mail from?

2   *A.*   It's from Dean Bradley.

3          *MS. SWEENEY:*   Permission to publish, Your Honor?

4          *THE COURT:*   You may.

5   *BY MS. SWEENEY:*

6   *Q.*   And who is Dean Bradley?

7   *A.*   He is the -- he was the buyer at Church's Fried Chicken.

8   *Q.*   Who is this e-mail copy sent to?

9   *A.*   It's sent to myself and Sara Knust and Grace Pope.

10  *Q.*   Where did Ms. Knust and Ms. Pope work?

11  *A.*   They work in Church's quality control.

12  *Q.*   Did you understand Church's to be asking for something in

13  this e-mail?

14  *A.*   Yes, ma'am.

15  *Q.*   What did you understand Church's to be asking for?

16  *A.*   They were asking for some additional QA, quality control

17  audits on some product.

18  *Q.*   What's a quality control audit?

19  *A.*   It's where the quality control department has -- they take

20  audits on product that's been produced and/or running down the

21  production line and doing checks on it.  They have X amount of

22  checks where they look at thickness, tears, defects, make sure

23  the product is the correct size.

24  *Q.*   So what you were just describing, thickness and tears, are

25  those the quality control checks you were just describing?

Carl Pepper - Direct

1   A.   Yes, ma'am.

2   Q.   Who, if anyone, did you send this e-mail to?

3   A.   I sent it to --

4   Q.   I apologize.  I withdraw that question.

5        Is there an e-mail above this 8:54 a.m. e-mail -- or

6   after this 8:54 a.m. e-mail?

7   A.   Ask that question again.

8   Q.   Yes.  It's confusing.  So was there another e-mail sent by

9   Mr. Bradley after this Thursday, May 9th, 8:54 a.m. e-mail?

10  A.   Yes, ma'am.

11  Q.   And what did Mr. Bradley ask in that middle e-mail?

12  A.   He basically asked in terms of pricing, "What are you

13  thinking on both items?"

14       This e-mail is concerning the Tyson producing frozen

15  eight-piece and dark meat for Church's.

16  Q.   And up to this point had Tyson produced frozen eight-piece

17  and dark meat to Church's?

18  A.   No, ma'am.

19  Q.   So in this middle e-mail, Mr. Bradley says, "In terms of

20  pricing, what are you thinking on both items"?

21       Did you read this e-mail?

22  A.   Yes, ma'am.

23  Q.   What did you understand Mr. Bradley was asking you to do?

24  A.   He is asking us for what we were going to charge to produce

25  frozen eight-piece and frozen dark meat.

Carl Pepper - Direct

1    *Q.* Now I would like to direct your attention to the top

2    e-mail. Did you forward -- did you send these bottom two

3    e-mails to anybody?

4    *A.* Yes, ma'am.

5    *Q.* Who did you send them to?

6    *A.* Tim Scheiderer, Tim Mulrenin and Brian Roberts.

7    *Q.* And at this time in May of 2013, what was Mr. Scheiderer's

8    role?

9    *A.* He was the go-between guy between sales and production,

10   pricing group, quality control. He was the one that made sure

11   we got it all done in a timely manner.

12   *Q.* And at this time in May of 2013, what was Defendant

13   Mulrenin's role?

14   *A.* He was my boss.

15   *Q.* And at this time in May of 2013, what was Defendant

16   Roberts' role?

17   *A.* He was Tim Mulrenin's boss.

18   *Q.* Now, I would like to direct your attention to the second

19   sentence where it says, "Pilgrim's told me." Could you read

20   that from Pilgrim's until the end of that first line?

21   *A.* "Pilgrim's told me they would be around .025 to .03 on 8pc

22   & dark meat."

23   *Q.* So Mr. Pepper, where did this Pilgrim's information come

24   from?

25   *A.* This came from Jimmie Little.

Carl Pepper - Direct

1    *Q.*  After that you wrote ".025 to .03 on 8pc & dark meat."

2    What information were you intending to convey with that portion

3    of the sentence?

4    *A.*  That --

5          *MR. McLOUGHLIN:*  Objection, Your Honor.  The document

6    speaks for itself.

7          *THE COURT:*  Overruled.

8    *A.*  That it's saying what Pilgrim's is charging Church's for --

9    what they charged for their eight-piece and dark meat between

10   .025 to .03 for their frozen eight-piece and dark meat to

11   supply Church's.

12   *BY MS. SWEENEY:*

13   *Q.*  So is .02 to .03, is that a range as you understand it?

14   *A.*  Yes, ma'am.

15   *Q.*  And what product is that a range for?

16   *A.*  That's for frozen eight-piece and frozen dark meat that

17   they use.

18   *Q.*  So were those prices?

19   *A.*  Yes, ma'am.

20   *Q.*  Can you read the rest of the sentence starting with the

21   word Koch until the end of the sentence, please.

22   *A.*  "Koch told me they were at .025 on 8pc and at this time was

23   not charging for dark but would probably change to .025 for

24   next year."

25   *Q.*  Where did this information from Koch come from?

Carl Pepper - Direct

1    A.  From Bill Kantola at Koch.

2    Q.  And what manner of communication did you use to receive

3    this information from Defendant Kantola at Koch?

4    A.  I called him on the phone.

5    Q.  So at the time you wrote this e-mail, what was Koch

6    charging for eight-piece?

7    A.  For eight-piece, .025.

8           MS. HENRY:  Objection, lack of foundation.

9           THE COURT:  Overruled.

10   BY MS. SWEENEY:

11   Q.  And is that what they were charging for eight-piece or

12   frozen or what is that really, that .025 relating to?

13   A.  That's what they were charging for frozen eight-piece.

14   Q.  Was that the total cost of frozen eight-piece?

15   A.  No, ma'am.  That was freezer charge.

16   Q.  At the time what was Koch charging for dark -- frozen --

17   what was the freezer charge for dark meat?

18   A.  According to this, they wasn't charging anything.

19   Q.  I would like to direct your attention to the part where you

20   wrote, "would probably change to .025 for next year."  Do you

21   see that?

22   A.  Yes, ma'am.

23   Q.  What were you conveying or what did you mean when you wrote

24   those words?

25   A.  That right now according to what I found out, that Koch was

Carl Pepper - Direct

1   only charging .025 for frozen eight-piece for Church's, and

2   they probably would do that same price starting for the

3   following year for dark meat.

4   Q.  So Koch was not -- this was Koch's plan in the future to

5   charge for dark meat?

6           MS. HENRY:  Objection, lack of foundation.

7           THE COURT:  Overruled.

8   A.  Yes, ma'am.

9   BY MS. SWEENEY:

10  Q.  And these numbers in this e-mail we just talked about, the

11  .025 to .03 and the .025, so these were prices or related to

12  price?

13  A.  Yes, ma'am.

14  Q.  If we could now turn to Tab 39, which is Government Exhibit

15  118.

16          Mr. Pepper, do you recognize this document?

17  A.  Yes, ma'am.

18  Q.  Generally what type of document is it?

19  A.  It's an e-mail.

20  Q.  And who is it from?

21  A.  The top?

22  Q.  Starting with the top e-mail, yes.  Who is it from?

23  A.  Tim Mulrenin.

24  Q.  And who is it to?

25  A.  Brian Roberts and copying myself.

Carl Pepper - Direct

1    Q.  What's the date of the e-mail?

2    A.  Monday, June the 30th, 2013.

3    Q.  What's the general subject matter of the e-mail?

4    A.  Church's Frozen 8pc and Dark Meat.

5         MS. SWEENEY:  Government moves to admit Government

6    Exhibit 118.

7         THE COURT:  Any objection to the admission of

8    Exhibit 118?

9         Exhibit 118 will be admitted.

10   BY MS. SWEENEY:

11   Q.  Now, Mr. Pepper, I would like to direct your attention to

12   the e-mail from June 3rd, 2013 at 3:24 p.m.  It starts at the

13   very bottom of the first page and continues into the second

14   page.

15   A.  Yes, ma'am.

16        MS. SWEENEY:  Your Honor, permission to publish the

17   document?

18        THE COURT:  You may.

19   BY MS. SWEENEY:

20   Q.  Now, this e-mail from 3:24 p.m., who is that from?

21   A.  Tim Mulrenin.

22   Q.  The e-mail starting at the bottom of the very, very bottom

23   of the first page?  It's on your screen.

24   A.  It's from Tim Mulrenin.

25   Q.  I would like to direct your attention to the From line.  Do

Carl Pepper - Direct

1    you see the From line at the very top of your screen, top

2    left-hand corner?

3    A.   Are we on Page 2?

4    Q.   The information -- the e-mail starts I should say at the

5    very, very bottom of Page 1.

6    A.   Oh, okay.  It's from myself.

7    Q.   And who is this e-mail to?

8    A.   Tim Mulrenin.

9    Q.   Could you read the first sentence of this e-mail, please?

10   A.   "Does this look okay before sending to Dean?"

11   Q.   And then there is further text under that; is that right?

12   A.   Yes, ma'am.

13   Q.   So if we can go back to the first page.  Did Defendant

14   Mulrenin respond to your e-mail?

15   A.   Yes, ma'am.

16   Q.   And did he send his response to anybody other than just

17   you?

18   A.   He sent it to myself and to Brian Roberts.

19   Q.   Did Defendant Roberts respond?

20   A.   Yes, ma'am.

21   Q.   I would like to direct your attention to Tab 74 which is

22   Government Exhibit 119.

23            MR. TUBACH:  I don't believe I have seen 119 before.

24   If there is a copy for counsel.

25            MS. SWEENEY:  Your Honor, I believe we sent the notice

Carl Pepper - Direct

1    of 119 on Monday.  I am happy to share my copy with counsel,

2    but I only have one.

3            THE COURT:  Yeah, I think that Mr. Tubach is okay.

4    BY MS. SWEENEY:

5    Q.  Mr. Pepper, do you recognize this document?

6    A.  Yes, ma'am.

7    Q.  Generally, what is it?

8    A.  It's an e-mail.

9    Q.  Who is it from?

10   A.  It's from myself.

11   Q.  And who is it to?

12   A.  To Dean Bradley and copying Tim Mulrenin.

13   Q.  What's the date of the e-mail?

14   A.  Tuesday, June the 4th, 2013.

15   Q.  What's the general subject matter of the e-mail?

16   A.  Church's Frozen 8pc and Dark Meat.

17   Q.  Is this a response to Church's request for freezing costs?

18   A.  Yes, ma'am.

19           MS. SWEENEY:  The government moves to admit Government

20   Exhibit 119.

21           THE COURT:  Any objection to the admission of

22   Exhibit 119?

23           Exhibit 119 will be admitted.

24           MS. SWEENEY:  Your Honor, before we move on, I just

25   want to confirm with the Court that both Government Exhibit 113

1414

Carl Pepper - Direct

1    and 114 are admitted.  I believe they were offered, at least

2    114 was offered on Monday.

3         THE COURT:  Both are in evidence.

4         MS. SWEENEY:  Thank you, Your Honor.

5    BY MS. SWEENEY:

6    Q.  Mr. Pepper, are you familiar with the term quality

7    assurance?

8    A.  Yes, ma'am.

9    Q.  What is quality assurance?

10   A.  That's basically the quality control department that, like

11   I said, has all the -- they do all quality control checks on

12   product to make sure it's meeting the spec that's required for

13   the product to be produced and then sold.

14   Q.  Is that what you were describing just a little bit ago?

15   A.  Yes, ma'am.

16   Q.  Did there come a time when Church's made a request to its

17   suppliers regarding quality assurance?

18   A.  Yes, ma'am.

19   Q.  I would like you to direct your attention to Government

20   Exhibit 224 which is behind Tab 40.

21        Mr. Pepper, do you recognize this document?

22   A.  Yes, ma'am.

23   Q.  What type of document is it?

24   A.  An e-mail.

25   Q.  The top e-mail, who is it from?

Carl Pepper - Direct

1   *A.*  It's from myself.

2   *Q.*  Who is it to?

3   *A.*  It's to Mike Hannigan and copy to Tim Mulrenin.

4   *Q.*  What date did you send it?

5   *A.*  I sent it on Saturday the 21st of December 2013.

6   *Q.*  What's the general subject matter of the e-mail?

7   *A.*  Church's Chicken quality control requirements for the 2014

8   contract.

9         *MS. SWEENEY:*  Government moves to admit Government's

10  Exhibit 224.

11        *THE COURT:*  Subject to a limiting instruction, any

12  objection to the admission of Exhibit 224?

13        Exhibit 224 will be admitted.

14        Ladies and gentlemen, this particular exhibit has

15  statements from two people, one a Mr. Hannigan, second from a

16  Ms. -- I think her name is pronounced Knust, K-N-U-S-T.  The

17  statements of both of those individuals should be considered

18  not for the truth of the matters asserted, but rather for the

19  effect that those statements may have on the recipient or

20  listener.

21  *BY MS. SWEENEY:*

22  *Q.*  So Mr. Pepper, I would direct your attention to the bottom

23  e-mail at the bottom of the first page of Government's Exhibit

24  224.

25  *A.*  Yes, ma'am.

Carl Pepper - Direct

1        MS. SWEENEY:  Permission to publish Exhibit 224, Your

2    Honor?

3        THE COURT:  You may.

4    BY MS. SWEENEY:

5    Q.  Mr. Pepper, who wrote this bottom e-mail?

6    A.  Sara Knust.

7    Q.  And in December of 2013, what was Ms. Knust's role?

8    A.  She was the senior director of quality assurance.

9    Q.  Was Church's making a request in this bottom e-mail?

10   A.  Yes, ma'am.

11   Q.  And what was that request related to?

12   A.  It related to fresh strips and bone-in chicken.

13   Q.  What -- was the request relating to anything in particular

14   about fresh strips and bone-in chicken?

15   A.  Yes, ma'am.  They wanted to increase the QA checks on that

16   product, those two items.

17   Q.  Mr. Pepper, a few moments ago you testified about

18   Government's Exhibit 113 and a request from Church's.  Was that

19   about quality assurance costs or is Government Exhibit 224

20   about quality assurance cost?

21   A.  224 is about quality control, QA checks.

22       MS. SWEENEY:  So the prior exhibit, Government's

23   Exhibit 113 -- Your Honor, permission to publish Exhibit 113?

24       THE COURT:  Yes.

25   BY MS. SWEENEY:

Carl Pepper - Direct

1    Q.  I would ask you to take a look at the bottom e-mail on

2    Government's Exhibit 113.  And that's behind, Mr. Pepper,

3    Tab 36 and should be on your screen.

4    A.  Yes, ma'am.

5    Q.  I would just like to clarify, Government's Exhibit 113, is

6    there a request from Church's in the e-mail from Mr. Bradley in

7    this exhibit?

8    A.  Yes, ma'am.

9    Q.  And what is the request from Church's relating to?

10   A.  The request on this one is to be approved to produce frozen

11   eight-piece and dark meat for Church's.

12   Q.  And who was approved to produce frozen dark meat and --

13   A.  Tyson Foods.

14   Q.  So the request in 113 was about frozen, the frozen costs we

15   were just talking about?

16   A.  Yes, ma'am.

17   Q.  So we can go back to Government's Exhibit 224.

18          MS. SWEENEY:  Your Honor, permission to publish 224?

19          THE COURT:  You may.

20   BY MS. SWEENEY:

21   Q.  So Mr. Pepper, we just looked at the bottom e-mail.  Now I

22   would like to direct your attention to the top e-mail of this

23   chain in Government Exhibit 224.

24   A.  Yes.

25   Q.  Who wrote this e-mail?

Carl Pepper - Direct

1    A.   I did.

2    Q.   Can you read the first sentence, please?

3    A.   "I would be surprised if they don't say something."

4    Q.   Can you read the second sentence?

5    A.   "Might call a couple of them and ask."

6    Q.   When you wrote, "I would be surprised if they don't say

7    something," who were you referring to with the word they?

8    A.   Other poultry companies.

9    Q.   When you wrote the sentence, "Might call a couple of them

10   and ask," who were you referring to when you wrote them?

11   A.   Some of the poultry suppliers that supply Church's.

12   Q.   So Tyson's competitors for Church's business?

13   A.   Yes, ma'am.

14   Q.   And who was this e-mail copied to?

15   A.   Mike Hannigan.

16   Q.   And who was copied for this top e-mail?

17   A.   It was Mike Hannigan and Tim Mulrenin.

18   Q.   Now, Mr. Pepper, I would like to direct your attention to

19   Government's Exhibit 221, and that should be behind Tab 41 in

20   your binder.

21   A.   Yes, ma'am.

22   Q.   Do you recognize this document?

23   A.   Yes, ma'am.

24   Q.   What is it, what type of document?

25   A.   It's an e-mail.

Carl Pepper - Direct

1    *Q.*  Who is it from?

2    *A.*  From myself.

3    *Q.*  Who is it to?

4    *A.*  Brian Roberts, Jared Mitchell, Tim Mulrenin and Tim

5    Scheiderer.

6    *Q.*  What date was it sent?

7    *A.*  Thursday, December 26, 2013.

8    *Q.*  What is the general subject matter of Government's Exhibit

9    221?

10   *A.*  Church's Chicken quality control, QA requirements for 2014.

11        MS. SWEENEY:  Government moves to admit Government's

12   Exhibit 221.  I believe it's subject to an instruction.

13        THE COURT:  Subject to a limiting instruction, any

14   objection to the admission of Exhibit 221?

15        All right.  221 will be admitted.

16        Ladies and gentlemen, this has statements from a

17   number of different people.  And those people are Ms. Knust,

18   Mr. Lubert, Mr. Ramsey, Mr. Bowlin, Mr. Hannigan and

19   Mr. Scheiderer.  Those statements cannot be considered for the

20   truth of the matters that they assert, but rather they can only

21   be considered for the effect that those statements may have on

22   the listener or recipient.

23   *BY MS. SWEENEY:*

24   *Q.*  Now, Mr. Pepper, I direct your attention to the top e-mail.

25        MS. SWEENEY:  Permission to publish, Your Honor?

Carl Pepper - Direct

1    THE COURT:  You may.

2  BY MS. SWEENEY:

3  Q.  Could you read the first sentence, please?

4  A.  "Talked to Jimmie Little and he said they were planning on

5  adding to their cost to do this."

6  Q.  What manner of communication did you use to talk to Jimmie

7  Little?

8  A.  Cellphone.

9  Q.  Do you remember specifically what you discussed with

10  Defendant Little?

11  A.  Not specifically.

12  Q.  Do you remember generally what you discussed with Defendant

13  Little?

14  A.  Yes, ma'am.

15  Q.  What was said in that conversation?

16  A.  I was asking him if he had also seen this request from

17  Church's concerning the extra quality control issues for strips

18  and for bone-in chicken and if he had seen it, then what they

19  were thinking about what their opinion was of getting this

20  information from Church's.

21  Q.  And when you say their opinion, who are you talking about?

22  A.  Pilgrim's.

23  Q.  Did you provide any Tyson information in this call with

24  Defendant Little?

25  A.  I believe -- yes, ma'am.

Carl Pepper - Direct

1   *Q.* What information?

2   *A.* I told him that we didn't like the way they tried to slip

3   it in on us after the contract had basically been drawn up.

4   And we were trying to decide what we were going to do

5   concerning the extra QA audits because it would also be an

6   extra expense.

7   *Q.* When you say you didn't like them slipping it in on us, can

8   you describe what you mean?

9   *A.* The Church's quality control.  Just after the contract

10  basically was pretty close to being done and then all of the

11  sudden they decided they wanted to add some more requirements

12  to their contract for 2014.

13  *Q.* And I apologize, I cut you off.  The contract for what

14  year?

15  *A.* 2014.

16  *Q.* Now, you testified that it was an extra expense.  Can you

17  explain what you mean by that?

18  *A.* Well, depending on how much time it was going to take and

19  how many more quality control checks this product was being

20  produced, we could have had to add an extra person to the line

21  to grade out product.  That was the biggest thing, could have

22  to add extra labor to the process.

23  *Q.* I would like you to direct your attention to the end of

24  that first sentence.  "He said they were planning on adding to

25  their cost to do this."  What did you mean when you wrote this

Carl Pepper - Direct

 1    half of the sentence?

 2    A.   That Pilgrim's was planning on finding out what the actual

 3    cost of -- it was going to cost to do this extra step or more

 4    QA checks, and then they were going to add it to their -- to

 5    their contract cost.

 6    Q.   When you say add it to their contract cost, what are you

 7    referring to?

 8    A.   Whatever the cost was going to come down to supplying this

 9    extra quality control checks they wanted.

10    Q.   Who did you send this e-mail to?

11    A.   I sent it to Brian Roberts, Jared Mitchell, Tim Mulrenin,

12    Tim Scheiderer.

13    Q.   Do you remember if Defendant Roberts after you sent this

14    e-mail told you you shouldn't be doing this?

15         MR. McLOUGHLIN:   Objection to leading, Your Honor.

16    Objection to lack of foundation.

17         THE COURT:   Sustained.

18    BY MS. SWEENEY:

19    Q.   Did Defendant Roberts in your memory reply to you when you

20    sent this e-mail?

21    A.   No -- not -- no, ma'am.

22    Q.   Did Defendant Mulrenin reply to the information when you

23    sent this e-mail?

24    A.   No, ma'am.

25    Q.   Did either of them call you after -- to your memory after

Carl Pepper - Direct

1   you sent this e-mail?

2   *A.*  No, ma'am.

3   *Q.*  I would now like to turn your attention to Tab 42 which is

4   Government Exhibits 230, 231 and 232, as well as 231-1.

5          Starting with Government Exhibit 230, do you recognize

6   this document?

7   *A.*  Yes, ma'am.

8   *Q.*  Generally what is it?

9   *A.*  It's an e-mail.

10  *Q.*  Who is it from?

11  *A.*  It's from myself.

12  *Q.*  And who is it to?

13  *A.*  To Dean Bradley.

14  *Q.*  What date was it sent?

15  *A.*  Sunday, January the 26th, 2014.

16  *Q.*  What's the general subject matter of this e-mail?

17  *A.*  Cost plus changes to their 2014 contract for the month of

18  February.

19  *Q.*  Does it have any attachments to this e-mail?

20  *A.*  Yes, ma'am.

21  *Q.*  I would like to direct your attention to Government's

22  Exhibit 231 and 231-1.  I believe we can just have 231-1 up on

23  the screen.

24          Do you recognize this document?

25  *A.*  Yes, ma'am.

Carl Pepper - Direct

1   Q.  What type of document is this?

2   A.  This is a -- the February pricing that we do -- that we

3   were doing every month for Church's.

4   Q.  When you say we were doing it every month, describe what

5   you mean by we.

6   A.  This is Tyson Foods' February pricing that's sent to

7   Church's.

8   Q.  So is it the monthly pricing you were testifying about

9   earlier?

10  A.  Yes, ma'am.

11  Q.  Is Government's Exhibit 231-1 attached to Government's

12  Exhibit 230?

13  A.  Yes, ma'am.

14  Q.  I would like to direct your attention to Government's

15  Exhibit 232.

16          Do you recognize this document?

17  A.  Yes, ma'am.

18  Q.  Generally what kind of document is it?

19  A.  This is the former base cost model for the month of

20  February from Tyson to George's -- sorry, to Church's, excuse

21  me.

22  Q.  And is Government Exhibit 232 an attachment to Government

23  Exhibit 230?

24  A.  Yes, ma'am.

25          MS. SWEENEY:  At this point, Your Honor, government

Carl Pepper - Direct

1  moves to admit Government's Exhibit 230, 231, 231-1 and 232

2  into evidence.  The distinction is 231 is a native and 231-1 is

3  the printed version of that native.

4       THE COURT:  Any objection to those four exhibits?

5  Each of those exhibits will be admitted.

6       MS. SWEENEY:  Permission to publish Exhibit 232?

7       THE COURT:  You may.

8  BY MS. SWEENEY:

9  Q.  Now, Mr. Pepper, can you describe what is Government's

10  Exhibit 232?

11  A.  This is the cost model that showed all the different cost

12  and grain cost and everything involved and how we arrive at the

13  cost for the month of February 2014 for Church's and Tyson.

14  Q.  So you said this is for the month of February 2014?

15  A.  Yes, ma'am.

16  Q.  Is this related to the monthly pricing we were just

17  discussing?

18  A.  Yes, ma'am.

19  Q.  How is it related to the monthly pricing we were just

20  discussing?

21  A.  This is what we send them from the contract.  And Church's

22  pricing is January, February, each month.  And this is what is

23  sent to them every single month from Tyson to Church's.

24  Q.  So Mr. Pepper, I would like to direct your attention to the

25  line that says QA Audit which is three above the Total FOB

Carl Pepper - Direct

1    Plant Cost.  Do you see that line?

2    *A.*  Yes, ma'am.

3    *Q.*  Did Tyson include a charge for QA Audit in February 2014 to

4    Church's?

5    *A.*  Yes, ma'am.

6    *Q.*  And what was that cost?

7    *A.*  .0009 cents a pound.

8    *Q.*  I would like you to turn in your binder to Tab 33 and

9    Exhibit 234.

10          Do you recognize this document?

11   *A.*  Yes, ma'am.

12   *Q.*  Generally what is it?

13   *A.*  It's an e-mail.

14   *Q.*  Who is it from?

15   *A.*  It's from Dean Bradley.

16   *Q.*  Who is it to?

17   *A.*  To myself.

18   *Q.*  When was it sent?

19   *A.*  Monday, January the 27th, 2014.

20   *Q.*  What's the general subject matter of this e-mail?

21   *A.*  Church's pricing for the month of February 2014.

22        *MS. SWEENEY:*  The government moves to admit

23   Government's Exhibit 234.

24        *THE COURT:*  Any objection to the admission of

25   Exhibit 234?

Carl Pepper - Direct

1      All right.  Exhibit 234 will be admitted.

2          *MS. SWEENEY:*  Permission to publish?

3          *THE COURT:*  You may.

4    *BY MS. SWEENEY:*

5    *Q.*  If we could focus on the top e-mail.

6          Mr. Pepper, who is this e-mail from?

7    *A.*  From Dean Bradley.

8    *Q.*  And could you read the e-mail, please?

9    *A.*  "What is the QA audit charge of .0009 that is added to the

10   cost plus.  That was not agreed to.  Please advise."

11   *Q.*  After you received this e-mail, did you call anyone?

12   *A.*  Yes, I think so.

13   *Q.*  Do you have a specific memory of calling anyone after this

14   e-mail?

15   *A.*  I don't have a specific memory.

16   *Q.*  Do you have a general memory of calling anyone after this

17   e-mail?

18   *A.*  Yes, ma'am.

19   *Q.*  And what is your -- based on your memory, who did you call?

20   *A.*  I would have called Tim Mulrenin.

21          *MR. McLOUGHLIN:*  Your Honor, vague.

22          *THE COURT:*  Sustained.

23   *BY MS. SWEENEY:*

24   *Q.*  Mr. Pepper, who did you call?

25   *A.*  I don't know.  I don't remember.

Carl Pepper - Direct

1    MS. SWEENEY:  Moment to confer, Your Honor.

2    THE COURT:  Sure.

3    MS. SWEENEY:  We can take that document down.  Thank

4  you.

5  BY MS. SWEENEY:

6  Q.  So Mr. Pepper, I would like to clarify, yesterday you

7  testified about an agreement that you had with the government

8  where the government -- where you were promised not to be

9  prosecuted.  Do you recall that?

10  A.  Yes, ma'am.

11  Q.  Do you recall testifying that you entered into that

12  agreement on February 7th of this year?

13    MR. KORNFELD:  Your Honor, I am going to object as

14  asked and answered from yesterday's testimony.

15    THE COURT:  Overruled.

16  A.  Yes, ma'am.

17  BY MS. SWEENEY:

18  Q.  Did you have any other agreements before February 7th of

19  this year with the government where you were promised not to be

20  prosecuted?

21  A.  No, ma'am.

22  Q.  You also testified you were interviewed on several

23  occasions by the government starting in mid 2019; is that

24  right?

25  A.  That's right.

Carl Pepper - Direct

1   Q.  And you testified earlier about an understanding that you

2   had with certain competitors about prices.  Do you recall that?

3   A.  Yes, ma'am.

4   Q.  Do you recall speaking to the government in interviews from

5   the middle of 2019 to the late summer of 2021?

6   A.  Can you ask that again?

7   Q.  Do you recall speaking to the government in interviews from

8   mid 2019 until the late summer of 2021?

9   A.  Yes, ma'am.

10   Q.  Did you tell the government about those understandings that

11   you testified about the past two days with competitors about

12   prices prior to August of 2021?

13   A.  Yes, ma'am.

14   Q.  Do you recall precisely what you said?

15   A.  Not exactly what I said.

16   Q.  Do you recall generally what you said?

17   A.  That I had conversations --

18        MR. TUBACH:  Objection, Your Honor.  The question was

19   a yes or no.

20        THE COURT:  Correct.  He can answer yes or no.

21   BY MS. SWEENEY:

22   Q.  Mr. Pepper, yes or no question.  Do you recall generally

23   what you said?

24   A.  Yes, ma'am.

25   Q.  And what did you say?

1430

Carl Pepper - Direct

1        MR. TUBACH:  We need to specify which date.  There

2   were multiple interviews from 2019 to 2021.  He can't be

3   possibly summarizing all of them in one sentence.

4        MS. SWEENEY:  Your Honor, may we go to side bar?

5        THE COURT:  Yes.

6      (At the bench:)

7        THE COURT:  Ms. Sweeney, what are you launching into

8   now?  Is this a prior consistent statement part of it?

9        MS. SWEENEY:  Yes, Your Honor, this is the prior

10  consistent statement part of it.  We are asking him his general

11  recollection of what he said.  We will then ask the earliest

12  time he described his understanding to the government.  And I

13  believe there is one question after that and then we'll be done

14  with this portion.

15       THE COURT:  All right.  Mr. Tubach?  Then I will hear

16  from other people.

17       MR. TUBACH:  Your Honor, I don't believe he can simply

18  testify about interviews he had and what he generally said.  If

19  he wants to talk about specific memories he has about what he

20  told the government when, that's fine.  But to just say I

21  generally said this in prior interviews is not really

22  impeachable because there is no specificity to it.

23       THE COURT:  Ms. Sweeney?

24       MS. SWEENEY:  Your Honor, I think yesterday and

25  today's testimony shows Mr. Pepper does not have specific

Carl Pepper - Direct

1    memories of many conversations, including his specific words he

2    used when meeting with the government.  But he does generally

3    recall what he described and could be cross-examined on the

4    various dates of his interviews based on the reports.  But he

5    has not seen the reports at this point, so his recollection of

6    the interviews is what controls his memory.  He doesn't -- he

7    hasn't seen the reports and the reports are the understanding

8    of the agents and not of Mr. Pepper.

9         MS. HENRY:  Your Honor, this is Roxann Henry.  He has

10   already testified that -- he testified about an understanding.

11   And in terms of what the door was opened to during the opening

12   statements, all I ever heard was that he had -- indeed there

13   was a recognition that he had testified about understandings

14   previously, so there is nothing inconsistent with what was said

15   in the openings.

16        THE COURT:  Go ahead, Ms. Sweeney.

17        MS. SWEENEY:  I believe one of the openings -- and I

18   apologize, I don't have it right at hand -- talked about the

19   different words that Mr. Pepper used and focused on the fact

20   that the reports do not reflect he used the word understanding

21   until -- I don't remember the exact date.  I believe it was

22   February of 2021.  And so our understanding is indeed the door

23   was opened as to when he described his understanding to the

24   government.

25        MS. PREWITT:  Your Honor?

1    MR. McLOUGHLIN:  I apologize.

2    THE COURT:  I think I can hear you now.

3    MS. PREWITT:  Do I take this to understand this would

4  be in place of what would be anticipated of Agent Koppenhaver's

5  testimony, essentially that Mr. Pepper gets to testify to a

6  prior consistent statement, at least the government is

7  describing it, although we dispute that, and then the agent

8  will get up again and do the same?

9    THE COURT:  I am not sure we are at that point yet.

10    MR. McLOUGHLIN:  Your Honor, Jim McLoughlin.  As

11  Mr. Tubach said, if you are talking about a prior consistent

12  statement, it cannot be under the rule simply a prior general

13  understanding of -- general recollection of what I generally

14  told you, particularly here where we are talking about a real

15  nuance between an understanding or an agreement or we just

16  exchanged information.

17    This kind of sort of general this is what I told him

18  cannot be a prior consistent statement, particularly when the

19  government says he doesn't really remember.  So we have this

20  conundrum and the government's position is I have to ask him a

21  general question because he really doesn't remember what he

22  said when, but because he has been testifying for hours about

23  all of this, then I know he is going to give me a general

24  statement, so that's going to help me.

25    And that is inconsistent with the purpose of the rule,

Carl Pepper - Direct

1   which is for the witness to specifically recall exactly what he

2   said at a particular place and time.  And so, you know, the

3   government is trying to work around his lack of memory in a way

4   that the rule does not permit.

5           THE COURT:  Ms. Sweeney, go ahead.

6           MS. SWEENEY:  Yes, Your Honor.  In terms of the time

7   line, the motive to fabricate that was raised in openings was

8   prior to August 2021.  So in terms of time line, the questions

9   that we are asking are what happened before that motive to

10  fabricate summer of 2021.

11          THE COURT:  I am not sure that you put a date

12  limitation on it, which goes back to what Ms. Henry had

13  mentioned.

14          MS. SWEENEY:  I am happy to reword the question, Your

15  Honor, to make that time line clear.

16          THE COURT:  Well, but we still then have the problem

17  Mr. Tubach and Mr. McLoughlin have expounded on, and that is it

18  sounds like if he does not have any specific recollection of

19  when the statements were made, then, you know, how is the

20  consistency supposed to be compared?  Answer, it sounds like it

21  could be Special Agent Koppenhaver.  But if this witness

22  doesn't have any recollection except this very general one and

23  if all he is going to say is just he has -- that's kind of --

24  that's what I told him, then I am not sure that really counts

25  as a prior consistent statement, at least coming from this

Carl Pepper - Direct

1    witness, because it's just so vague.

2           MS. SWEENEY:  Your Honor, to specify, I believe he

3    will say that he shared this information with the Department of

4    Justice before late summer of 2021.  But I do take your point

5    as to he does not recall specifically what he said on each

6    specific date.

7           THE COURT:  Right.  And as you mentioned, you haven't

8    shown him the statements.  So that's fine, but once again, that

9    would simply suggest that this is not the right witness to try

10   to do that with.

11          MS. SWEENEY:  Yes, Your Honor.

12          THE COURT:  Anything else?

13          Mr. Tubach?

14          MR. TUBACH:  Will the Court note once we go off side

15   bar that the objection is sustained?

16          THE COURT:  My transcript is scrolled way past that

17   point.  Was there an objection articulated before the side bar

18   request was made?

19          MR. McLOUGHLIN:  Yes, Your Honor, there was.  We

20   objected although -- the government asked to go on side bar.

21   Excuse me, after we objected the government went for side bar.

22   There is an objection before the jury as I recall.

23          The other thing at a minimum for the record is the

24   government has articulated this August 21 date.  To be clear,

25   the position of the defendants is that from the first interview

Carl Pepper - Direct

1   when Mr. Pepper knew that there was a leniency application

2   which could benefit him as an employee, which we assert he knew

3   at the time, and again we renew our *Jencks* information request

4   on this and *Brady* for communications between the government --

5   as lawyers, between Tyson with he and his lawyer, anything

6   Tyson lawyers told him because that would not be privileged.

7   All of that made Mr. Pepper aware that he had a benefit coming

8   if he made the government happy on the first interview date.

9   So this August 21 date is an artifact that the government is

10  planting, but that is not the defendants' position as to when

11  the motive to fabricate arose.  It is from the first interview.

12          THE COURT:  I have rejected that theory already

13  because that was one that Mr. Fries articulated in his opening

14  statement which had to do with the yanking.  I understand that

15  there is a different theory as to that, but I have ruled that

16  the government is entitled to rebut that accusation, but that

17  still means the dates are important.  And but in any event, I

18  think we have gone past that.  To the extent a renewed *Jencks*

19  request has been made, I am not otherwise relieving the

20  government of the *Jencks* obligations.  To the extent I

21  previously ruled on it, my same ruling applies now.

22          MR. McLOUGHLIN:  And it would be *Giglio*, so we believe

23  the material is also *Giglio*.

24          THE COURT:  And I think I have ruled on that before,

25  but I will reject that request.

1436

Carl Pepper - Direct

1    Ms. Sweeney, anything else from you?

2         *MS. SWEENEY:*  Nothing further.  Thank you.

3    (In open court:)

4         *THE COURT:*  Objection will be sustained.

5         *MS. SWEENEY:*  Your Honor, may I briefly confer?

6         *THE COURT:*  Yes.  Ladies and gentlemen, during some of

7    these bench conferences if you want to stand up and stretch, as

8    long as you are quiet about it, because things can be overheard

9    despite the white noise, but feel perfectly free to stand up

10   and stretch if you would like to do so.

11   *BY MS. SWEENEY:*

12   *Q.*  Now, Mr. Pepper, you just testified about a conversation

13   you had with Defendant Kantola relating to Church's.  Do you

14   recall that?

15   *A.*  Yes, ma'am.

16   *Q.*  Did you trust Defendant Kantola?

17   *A.*  Yes, ma'am.

18   *Q.*  Did Defendant Kantola ever use price information that you

19   shared with him against Tyson?

20        *MR. TUBACH:*  Objection, lacks foundation, calls for

21   speculation.

22        *THE COURT:*  Sustained.  If you could lay foundation.

23   *BY MS. SWEENEY:*

24   *Q.*  Mr. Pepper -- with the Court's brief indulgence.

25        Mr. Pepper, you testified about price information that

Carl Pepper - Direct

1  you received from Defendant Kantola relating to the freezing

2  charge for Church's Chicken; is that right?

3  A.  Yes, ma'am.

4  Q.  That was in 2013?

5  A.  Yes, ma'am.

6  Q.  How did you communicate with Defendant Kantola?

7  A.  By cellphone.

8  Q.  Did you share anything about Tyson's pricing or thoughts on

9  pricing with Defendant Kantola on that call?

10  A.  Not at that time because we didn't know what we were going

11  to charge for pricing -- excuse me, for freezing product.

12  Q.  You also testified about your conversations with Defendant

13  Little over the years in the past few days, correct?

14  A.  Yes, ma'am.

15  Q.  And you testified about your conversations with Defendant

16  Little regarding future pricing and costs; is that correct?

17  A.  Yes, ma'am.

18      MR. LAVINE:  Objection, Your Honor.  I don't think

19  that's what the testimony is.

20      MR. BYRNE:  I agree, Your Honor.  I believe that

21  misstates the testimony.

22      THE COURT:  I am going to sustain that objection.  I

23  think that's correct.  I didn't hear that.

24  BY MS. SWEENEY:

25  Q.  Okay.  Mr. Pepper, did you trust Defendant Little?

Carl Pepper - Direct

1    A.   Yes, ma'am.

2    Q.   Did you ever provide Defendant Little with Tyson's pricing

3    information?

4    A.   Not that I can remember.

5    Q.   Mr. Pepper, you testified about a series of calls you had

6    with Defendant Little in the summer of 2014.  Do you recall

7    that?

8    A.   Yes, ma'am.

9    Q.   And in those calls you testified about a general -- your

10   general knowledge of what happened in those series of calls; is

11   that correct?

12   A.   Yes, ma'am.

13   Q.   And generally what happened in those series of calls?

14        MR. LAVINE:  Objection, Your Honor, asked and

15   answered.  We have already plowed this ground.

16        THE COURT:  Sustained.  That's true.

17   BY MS. SWEENEY:

18   Q.   In those calls with Defendant Little over the summer of

19   2014, did you share Tyson's pricing information with Defendant

20   Little?

21   A.   No, ma'am.

22        MS. SWEENEY:  All right.  Brief moment to confer.

23   BY MS. SWEENEY:

24   Q.   Mr. Pepper, when you talked with Defendant Little in the

25   summer of 2014, were you discussing -- did you discuss with him

1439
Carl Pepper - Direct

1  prices that were currently in place or Tyson's future pricing

2  strategy?

3      MR. BYRNE:  I object.  He said he didn't have any

4  pricing information he discussed with Mr. Little.

5      MS. SWEENEY:  Your Honor, I believe there may be a

6  confusion which I am trying to clarify.

7      MR. BYRNE:  Wait a minute.

8      THE COURT:  Okay.  Well, that would be a different

9  question, then.  So I will sustain the objection and you can

10  ask him a new question.

11     THE WITNESS:  Can I clarify what I said?

12     MR. BYRNE:  Your Honor, I object.  There is no

13  question pending.

14     THE COURT:  Ms. Sweeney, you can ask a question.

15 BY MS. SWEENEY:

16 Q.  So Mr. Pepper, in the summer of 2014 when you had these

17  conversations with Defendant Little, did you discuss Tyson's

18  future pricing plan with Defendant Little?

19     MR. BYRNE:  Objection, Your Honor.  That's the same

20  question.

21     MS. SWEENEY:  Your Honor, I believe it's been asked

22  and answered, but I don't believe it actually has been.

23     MR. BYRNE:  Objection, asked and answered.

24     THE COURT:  The term future was not used in the past.

25  Therefore, the objections are overruled.

Carl Pepper - Direct

1  *A.* I told him we had -- we were going to have a substantial

2  pricing increase, not an actual price.

3  *BY MS. SWEENEY:*

4  *Q.* So you shared -- the substantial price increase, was that

5  Tyson's future plan for the upcoming contract that you were in

6  the middle of negotiations for?

7       *MR. LAVINE:* Objection, leading, Your Honor.

8       *THE COURT:* Sustained.

9  *BY MS. SWEENEY:*

10  *Q.* When you say future pricing, can you describe what you

11  mean?

12  *A.* I meant for the contract for the RSCS/KFC contract for

13  2015, it was going to be a substantial pricing increase.

14  *Q.* And did Defendant Little use that information that you gave

15  him against Tyson?

16       *MR. BYRNE:* Objection, Your Honor, lack of foundation.

17       *THE COURT:* Sustained.

18  *BY MS. SWEENEY:*

19  *Q.* So Mr. Pepper, you have been testifying about conversations

20  you had with Defendant Kantola, Little, Blake and Brady; is

21  that correct?

22  *A.* Yes, ma'am.

23  *Q.* Now, with regard to these conversations, did you ever tell

24  Defendant Mulrenin about the price -- about prices and price

25  increases that you discussed with these defendants? And I can

Carl Pepper - Direct

1   rephrase that question.

2          So did you ever tell Defendant Mulrenin about the

3   conversations with Defendant Kantola, Little, Blake and

4   Brady --

5          MR. LAVINE:  Objection, Your Honor.

6          MS. JOHNSON:  Objection, vague.

7          THE COURT:  Have you finished your question,

8   Ms. Sweeney?

9   BY MS. SWEENEY:

10  Q.  --  about pricing and price increases?

11         THE COURT:  Overruled.

12         MR. LAVINE:  May I be heard, please?

13         THE COURT:  Yes.

14     (At the bench:)

15         THE COURT:  Go ahead.

16         MR. LAVINE:  Your Honor, what counsel has been doing

17  is what they have been typically doing and that is lumping

18  everybody together and asking a question.  We are talking about

19  future pricing.  And the only thing they got out with regard to

20  Mr. Brady is there was a discussion about a substantial price

21  increase, no prices, no future pricing whatsoever.  And so this

22  is totally inappropriate from the government's standpoint as

23  far as lumping these all together.  If she wants to ask it one

24  at a time, that's fine, but don't lump it together which is

25  what they have done.

Carl Pepper - Direct

1          *THE COURT:*  Ms. Sweeney, response?

2          *MS. SWEENEY:*  Your Honor, I am happy to move on.

3          *THE COURT:*  Okay.  You will withdraw the question?

4          *MS. SWEENEY:*  Yes, Your Honor.

5          *THE COURT:*  Anything else, Mr. Lavine?

6          *MR. LAVINE:*  No, Your Honor.  Thank you.

7      (In open court:)

8          *THE COURT:*  And you are withdrawing the question?

9          *MS. SWEENEY:*  Yes, Your Honor.

10         *THE COURT:*  Go ahead.

11  *BY MS. SWEENEY:*

12  *Q.*  So Mr. Pepper, you testified about having discussions with

13  your competitors regarding costs to Church's; is that right?

14  *A.*  Yes, ma'am.

15  *Q.*  When you had these conversations with your competitors that

16  you testified about today regarding costs to Church's, did you

17  ever dial Church's into those calls?

18  *A.*  No, ma'am.

19  *Q.*  And you also testified about discussing contracts, future

20  contracts with your competitors with regard to Popeye's as well

21  as discounts.  Do you recall that testimony over the past two

22  days?

23  *A.*  Yes, ma'am.

24  *Q.*  And do you recall testifying about calls that you had with

25  your competitors regarding Popeye's, the upcoming contracts and

Carl Pepper - Direct

1   discounts?

2   *A.*  Yes, ma'am.

3   *Q.*  And in those calls did you ever dial Popeye's into those

4   calls?

5   *A.*  No, ma'am.

6   *Q.*  You also testified about that you discussed future pricing

7   plans, the substantial price increase with competitors with

8   regard to a KFC contract in 2015.  Do you recall that

9   testimony?

10        *MR. LAVINE:*  Objection to the form of the question,

11  Your Honor.

12        *THE COURT:*  Overruled.

13  *A.*  Yes, ma'am.

14  *BY MS. SWEENEY:*

15  *Q.*  When you had those conversations with your competitors

16  about the substantial price increase to KFC on the phone, did

17  you ever dial KFC into those calls?

18  *A.*  No, ma'am.

19  *Q.*  Did Church's ever ask you to talk to your competitors about

20  prices or costs?

21        *MR. LAVINE:*  Objection, Your Honor, hearsay.

22        *THE COURT:*  Response?

23        *MS. SWEENEY:*  Your Honor, I am asking his

24  understanding of what Church's was asking him to do and effect

25  on the listener as well.

Carl Pepper - Direct

1    THE COURT:  I will overrule the objection.  However,

2  ladies and gentlemen, you should not consider any answer to be

3  a statement from the purchaser, but rather only the effect that

4  it may have had on Mr. Pepper.

5  BY MS. SWEENEY:

6  Q.  So Mr. Pepper, did Church's ever ask you to talk to your

7  competitors about prices or costs?

8  A.  No, ma'am.

9  Q.  And Mr. Pepper, did Popeye's ever ask you -- did Popeye's

10  ever ask you to talk to your competitors about upcoming bids or

11  discounts?

12    MR. LAVINE:  Same objection, Your Honor.

13  A.  No, ma'am.

14    THE COURT:  I will overrule the objection.  Once

15  again, the same limiting instruction, ladies and gentlemen.

16  Don't consider anything that Mr. Pepper may say was said to him

17  by the customer for the truth of the matter, but only for the

18  effect that it may have had on Mr. Pepper.

19    MS. SWEENEY:  May I reask the question?

20    THE COURT:  You may.

21  BY MS. SWEENEY:

22  Q.  So Mr. Pepper, did Popeye's ever ask you to talk to your

23  competitors about the upcoming bids or discounts?

24  A.  No, ma'am.

25  Q.  And Mr. Pepper, did KFC ever ask you to talk to your

Carl Pepper - Direct

1  competitors -- KFC or RSCS ever ask you to talk to your

2  competitors about upcoming bids?

3        *MR. LAVINE:*  Same objection, Your Honor.

4        *THE COURT:*  Same instruction, ladies and gentlemen.

5  Once again, just the effect on Mr. Pepper, not for the truth of

6  the matter asserted.

7  *A.*  No, ma'am.

8        *MS. SWEENEY:*  Moment to confer?

9        *THE COURT:*  You may.

10  *BY MS. SWEENEY:*

11  *Q.*  Mr. Pepper, did you ever tell Church's about your

12  conversations with competitors about costs?

13        *MR. KORNFELD:*  Objection, hearsay or calls for

14  hearsay.

15        *THE COURT:*  Overruled.

16  *A.*  No, ma'am.  Ask me that question again.

17  *BY MS. SWEENEY:*

18  *Q.*  Mr. Pepper, did you ever tell Church's about your

19  conversations with competitors about prices or cost?

20  *A.*  No, ma'am.

21  *Q.*  And did you ever tell Popeye's about your conversations

22  with competitors about upcoming bids or discounts?

23  *A.*  No, ma'am.

24  *Q.*  And did you ever tell KFC or RSCS about your conversations

25  with competitors about upcoming bids?

Carl Pepper - Cross

1    A.   No, ma'am.

2         MS. SWEENEY:  No further questions.

3         THE COURT:  All right.  Cross-examination?

4         Mr. Gillen.

**CROSS-EXAMINATION**

6    BY MR. GILLEN:

7    Q.   Good afternoon, Mr. Pepper.  My name is Craig Gillen.  I

8    represent Brian Roberts.  I have a few questions for you.

9         Now, I would like to start off talking a little bit

10   about your duties that you had at Tyson.  When did you start at

11   Tyson?

12   A.   January of 1989.

13   Q.   And your position there, what was your title there?

14   A.   When I first started?

15   Q.   Yeah, sure, when you first started.

16   A.   When I first started, I was a territorial manager and then

17   a regional manager and eventually national accounts sales

18   manager.

19   Q.   I am sorry, were you through?

20   A.   Yes, sir.

21   Q.   Now, what you would do is, sort of to describe your daily

22   activities, is it fair to say that what you did, you work out

23   of your home, correct, or you worked out of your home, correct?

24   A.   Not right off, not right away.

25   Q.   Well, during this relevant time period, you worked out of

Carl Pepper - Cross

1   your home, correct?

2   A.  Yes, sir.

3   Q.  So you weren't going into Tyson and sitting down and

4   talking with the employees there or the officers.  You were at

5   your house, right, for the most part?

6   A.  For the most part.

7   Q.  And again we went over this earlier today as it related to

8   Mr. Roberts.  He for the most part was in his home in Atlanta,

9   Georgia, correct?

10  A.  Yes.

11  Q.  And for the most part Mr. Mulrenin was in his home in

12  Delaware?

13  A.  Yes, sir.

14  Q.  So if you all chatted, it was either via e-mail or over the

15  phone, correct?

16  A.  Yes, sir.

17  Q.  We have gone over some of the lack of conversations in the

18  summer of 2014 that you had with Mr. Roberts earlier today,

19  right?

20  A.  Yes, sir.

21  Q.  Couldn't find a call with him between July 16, 2014 to

22  September the 4th, 2014, could you?

23  A.  No, not on that call, no.

24  Q.  And you went over all the phone records.  And would have --

25  you were then looking to see whether there was a telephone

Carl Pepper - Cross

1    number there for Mr. Roberts or whether he had called you or

2    you called him, right?

3    A.  Well, I went through a lot of phone records from when all

4    of this started, yes, sir.

5    Q.  And what you would do to start your day, what you would do

6    is you had kind of a production call at 9:00 o'clock, correct?

7    A.  Yes, sir.

8    Q.  Now, what we mean by production call, what we mean is that

9    you would dial into a number and you would be hooked in.  And

10   you would be listening to find out how things were working

11   within the Tyson system in terms of the deliveries of chickens

12   that were scheduled, correct?

13   A.  Yes, sir, and sometimes I attended them.

14   Q.  Well, you were either attending them or you're calling in,

15   but you are starting the day off.  And what you would do is,

16   for example, if there was a problem with a load from Texas to

17   wherever, your job would be make that -- make that happen.

18   Call somebody, get the chicken.  Call somebody that you know,

19   another supplier, buy a load if you have to, make the chicken

20   show up at the distribution center, right?

21   A.  Yes, sir.

22   Q.  And what you would do -- and in that respect you spent a

23   great deal of time talking to folks in the other companies that

24   were suppliers, right?

25   A.  Yes, sir.

Carl Pepper - Cross

1   *Q.* And you would call them up and if you needed chicken, you

2   would call them and see what they got and if you could get it

3   to a certain location. And same way around, if they needed

4   chicken, they would call you, right?

5   *A.* Yes, sir.

6   *Q.* I think you had a big notebook that you would write down

7   all the different calls from the different companies and the

8   buying and the selling going on, right?

9   *A.* I didn't have a big -- I had a day planner and I might have

10  some notes in it, but I didn't have a big thing that I wrote

11  down a whole lot of stuff every day, no, sir.

12  *Q.* You kept kind of written records of what you were doing to

13  keep up with the loads that you were either buying or selling

14  to keep the machinery going there at Tyson, right?

15  *A.* Yes, sir. I kept a log of product, yes, sir.

16  *Q.* And there was a lot of those calls going back and forth

17  between you and other suppliers about the different problems in

18  the system nationwide. And Mr. Roberts had given you

19  authority, just handle it, Mr. Pepper. If we need to buy a

20  load here, do it. If we need to sell a load, go ahead and do

21  it, right?

22  *A.* Correct.

23  *Q.* So that was sort of what you were focusing on when -- let's

24  talk about some of the things that weren't necessarily within

25  your job description. Now, tell the people on the jury a

Carl Pepper - Cross

1   little bit about what a business unit is at Tyson.

2   *A.*  A business unit is like, say, for instance, the small bird,

3   it consists of volume production people, quality control

4   people, salespeople, pricing groups.

5   *Q.*  Business -- the sales group is separate from the business

6   unit, wasn't it?

7   *A.*  Yes, sir.

8   *Q.*  So the business unit was separate from the sales group,

9   right?  Right?

10  *A.*  Correct.

11  *Q.*  And the business unit kind of what they say in the business

12  kind of owned the birds.  They were in charge of -- if it's the

13  small bird business unit, they were in charge of that bird,

14  right?

15  *A.*  Correct.

16  *Q.*  And when it came up time for bidding on various projects,

17  bids submitted by KFC or anybody else, the business unit, the

18  small bird business unit would develop their strategy and they

19  would send it over to the pricing unit, correct?

20  *A.*  Correct.

21  *Q.*  Now, the pricing unit is also separate from the sales unit,

22  correct?

23  *A.*  Yes, sir.

24  *Q.*  And so what the business unit and the pricing unit would do

25  is they would get together, find out kind of what the Tyson

1451

Carl Pepper - Cross

 1   business strategy was for that particular company and that

 2   particular marketplace at that time, right?

 3   A.   Yes, sir.

 4   Q.   And what would then happen is that there was a gentleman

 5   inside the pricing unit by the name of Brandon Campbell.  And

 6   Brandon Campbell would take the information from the business

 7   unit, and from the business unit he would then run the numbers

 8   and then he -- because that's basically his No. 1 job is to

 9   create a cost model, correct?

10   A.   Yes, sir.

11   Q.   So what you have is you've got -- when we think that there

12   is going to be an RFP coming out, then the business unit is

13   talking to the pricing units unit.  They are working the

14   numbers.  And Brandon Campbell, numbers guy, is running what

15   the cost model is going to be, correct?

16   A.   Yes, sir.

17   Q.   And that was his job, correct?

18   A.   Yes, sir.

19   Q.   And what would happen is that once the pricing unit and the

20   business unit had agreed on a strategy and on a price, then

21   they would call the sales unit in and kind of tell them what

22   their strategy was and describe the model to them, correct?

23   A.   Yes, sir.

24   Q.   So what they would do is that they would say, all right.

25   We have done our numbers.  We have run it.  We have checked out

Carl Pepper - Cross

1    the marketplace.  Call in the sales guys.  This is our plan.

2    This is what we're going to do.  And this is what we want you

3    to submit to the client, correct?

4    *A.*  Yes, sir.

5    *Q.*  And so what would happen is that when folks would go

6    into -- the salespeople would go in there and they are being

7    instructed by and educated by the business and the pricing

8    units about what the corporate strategy is going to be on a

9    particular bid, correct?

10   *A.*  Yes, sir.

11   *Q.*  Now, I think we have gone through the fact you were not in

12   the pricing unit and you were not in the business unit,

13   correct?

14   *A.*  Yes, sir.

15   *Q.*  All right.  That wasn't your job.

16   *A.*  Right.

17   *Q.*  And those cost models can get somewhat complicated, can't

18   they?

19   *A.*  Yes, sir.

20   *Q.*  That's the reason why when you set up the cost models,

21   you're going to let the numbers guys like Brandon Campbell or

22   Bowlin or Cullen, we are going to let those guys handle that to

23   let us set the price, right?

24   *A.*  Yes, sir.

25   *Q.*  So we have got the business unit and the pricing unit

Carl Pepper - Cross

1    setting the Tyson price.  And they give it to the folks in

2    sales and give them instructions on what -- you know, go forth

3    and present this to the customer, correct?

4    A.  Yes, sir.

5    Q.  Okay.  Now, I want to talk to you a little bit about what

6    Brian Roberts did and what he didn't do so everybody can

7    understand because there is a whole lot of chicken floating

8    around out there in America, isn't there?

9    A.  Yes, sir.

10   Q.  So, now, Mr. Roberts didn't have any responsibility over

11   retail business, did he?

12   A.  No, sir.

13   Q.  In other words, he didn't have any -- he wasn't -- one of

14   his clients.  He didn't have -- handle supermarkets or

15   Albertson's or Super Valu.  He didn't handle any of that, did

16   he?

17   A.  No, sir.

18   Q.  Somebody else handled that, but it certainly wouldn't have

19   been Mr. Roberts.  That wasn't in his bailiwick, correct?

20   A.  Yes, sir.

21   Q.  So we have got that general background here.  Now I want to

22   talk a little bit about sort of your progression here and what

23   brought you here today.  And I want to get into how that

24   process evolved.

25              Your first contacts with the Department of Justice, I

Carl Pepper - Cross

1   think that was in the summer of 2019, correct?

2   A.   Yes, sir.

3   Q.   Okay.  So you're aware there is an investigation going on.

4   You're aware that the Department of Justice and the FBI and

5   these folks from the antitrust division, they are coming and

6   they're looking and they're going to be taking a hard look

7   about whether they are going to change somebody's life, right?

8   A.   Yes, sir.

9   Q.   Yeah.  Because what you don't want to be is what we call in

10  the business south of the v., United States of America v.  And

11  you don't want to be the defendant, do you?

12          MS. SWEENEY:  Objection, calls for speculation.

13          THE COURT:  Overruled.

14  BY MR. GILLEN:

15  Q.   You don't want to be south of the v.  In other words, you

16  don't want to be a defendant, do you?

17  A.   I don't want to be a defendant?

18  Q.   No.  You don't want to be a defendant, do you?

19  A.   No.

20  Q.   No, of course not.  So when you began the journey with them

21  in the summer of 2019, one of your objectives was to make sure

22  that whatever happened in the investigation, that Carl Pepper

23  would not become a defendant, correct?

24  A.   No, sir.  My objective was to tell the truth.

25  Q.   And you hoped that what would happen is that they would not

Carl Pepper - Cross

1    prosecute Carl Pepper, right?

2    A.   That was in the back of my mind, but the bottom line was to

3    tell the truth.

4    Q.   In the back of your mind.  So you're telling the jury that

5    it was only in the back of your mind when the Department of

6    Justice came to see you.  It just happened to be in the back of

7    your mind that you may have had a fleeting thought about your

8    concerns about whether or not you were going to be a defendant;

9    is that right?

10   A.   No, sir.  When it first started, I didn't really understand

11   really what was going on at the beginning.

12   Q.   At the beginning.

13   A.   Yes, sir.

14   Q.   Well, the beginning for you started in the summertime.  And

15   you were prepared to do almost anything to express your

16   cooperation with the Department of Justice, weren't you?

17   A.   I am going to tell the truth.

18   Q.   You're willing to make secret telephone calls and tape

19   people, weren't you?

20   A.   I was asked to, yes, sir.

21   Q.   And you did, right?

22   A.   Yes, sir.

23   Q.   Whatever it took to make sure that the Department of

24   Justice didn't have a bad opinion of you and make you go south

25   of the v. and become a defendant, right?

Carl Pepper - Cross

1  A.  No, sir.

2  Q.  That was just in the back of your mind?

3  A.  Like I said, it took a while to really understand what in

4  the world was going on because a lot of times -- a lot --

5  part -- as it was going, I kept saying to myself, I don't even

6  know why I am in this because at first I didn't understand what

7  was going on, period.

8  Q.  Well, you had plenty of time to learn what was going on,

9  didn't you, because you talked with them for two and a half

10  years, didn't you?

11  A.  Yes, sir, I did.

12  Q.  Now, let's go to that -- they want to meet you in person.

13  And so you meet with them in person on October the 4th, 2019.

14  Do you remember that, your first interview with the government?

15  A.  I don't remember the date, no, sir.

16  Q.  Well, you remember it was right around October, correct?

17  A.  I don't remember the date.

18  Q.  Do you remember it was right around October 2019, correct?

19  A.  I don't remember the date or the month when it happened.

20  Q.  But you know it was in the fall.  Can you give me that?

21  A.  Yes.

22  Q.  Fall of 2019 suddenly the Department of Justice wants to

23  come and meet with you in person, right?

24  A.  Yes, sir.

25  Q.  And they didn't just send one agent or two.  They brought

Carl Pepper - Cross

1    nine prosecutors from the Department of Justice along with the

2    agents, didn't they?

3    *A.*   No.   I don't remember seeing anywhere near nine people.

4    Didn't count them, but there was definitely that I know of not

5    nine people.

6    *Q.*   Was Michael Koenig there, the gentleman right here?

7    *A.*   That came to visit me?

8    *Q.*   Yeah, that had the interview with you in the fall of 2019.

9         *MS. SWEENEY:*   Objection, Your Honor, as to relevance

10    of government attendees.

11         *MR. GILLEN:*   It is highly relevant as to who was in

12    the interview, how many people were there, what was going on,

13    the importance of that.   It is very important, Your Honor.

14         *THE COURT:*   Let's have a side bar.

15       (At the bench:)

16         *THE COURT:*   Ms. Sweeney, go ahead.

17         *MS. SWEENEY:*   Yes, Your Honor.

18         Mr. Gillen is attempting to elicit who exactly from

19    the government was present at this interview which I don't see

20    as relevant to his credibility or relevant to the issues in

21    this trial.   In addition, I have a further objection that it

22    misstates the facts.   Mr. Gillen said that the Department of

23    Justice went to Mr. Pepper, whereas Mr. Pepper traveled to

24    Washington DC for this meeting, so those are my two objections

25    on this.

Carl Pepper - Cross

1          *MR. GILLEN:*  I can certainly clear up that he went to

2    Washington.  As to who was there, how many and the importance

3    of the meeting, that's vital to understand his state of mind,

4    his motive, what he said, when he said it.  And all of this is

5    extremely relevant when he goes into a room with nine DOJ

6    lawyers and different agents and he is being asked about this.

7    What he has to say is extremely important to his future.

8          *THE COURT:*  I agree with Mr. Gillen that the number of

9    people is relevant, the fact that the prosecutors were present.

10   But we talked at the last trial about how, you know, calling

11   out specific names of prosecutors that are part of this

12   particular trial is just really not the focus.  And, you know,

13   I don't think that there is any problem with a general question

14   like, yeah, you know, were some of the people who were in this

15   room present, things of that nature, that's okay.  But I don't

16   want people being called out by name, was Mr. Koenig there, was

17   Ms. Sweeney there, and all those types of things because I just

18   don't think that's relevant or appropriate.

19          Once again, the fact that some of the people in the

20   courtroom were present, the number, that's fine, because that

21   affects the -- may affect the nature of the interview and

22   pressures or things of that nature.

23          *MR. GILLEN:*  And, Your Honor, that's how I started

24   off.  If you remember the examination, I didn't go into names

25   until he kind of said, I don't remember who was there and it

Carl Pepper - Cross

1    didn't seem like that many.  And that's why I then turned to

2    the specific names on the list.  I didn't start off with that.

3    And that was my intention was to sort of say -- to establish

4    the number of people that were there and to establish the

5    amount of pressure that was put on him and continued to be put

6    on him throughout this interview process, so that's what I

7    intended to do.

8         THE COURT:  Yeah, my suggestion is once again that it

9    can be referred to people in the room or -- Ms. Sweeney, go

10   ahead.  I am sorry, I can't hear you.

11        MS. SWEENEY:  Yes, Your Honor.

12        Just that I can hear Mr. Gillen through the ear that

13   doesn't have the transceiver, so if Your Honor could ask him to

14   speak more quietly.  I am worried his comments can be heard by

15   the jury.  I am sure it's unintentional.

16        THE COURT:  Yeah, we will have to speak a little bit

17   softer.  I am a little concerned.  And we can speak quite

18   softly with these.

19        MR. McLOUGHLIN:  With respect to identifying

20   particular persons, I understand Your Honor's concern, but the

21   defendant, as Mr. Gillen says, he doesn't remember who was

22   there or if there was that many.

23        And with respect to this whole issue of his consistent

24   statements and his inconsistent statements as to what he

25   remembers, I would respectfully suggest under *Crawford* the

Carl Pepper - Cross

1  defendants have the confrontation right to ask him about the

2  details and be very particular about what he remembers as to

3  who was there and what those individuals said to him, that that

4  is not a limitation that can be imposed under *Crawford*,

5  particularly where the defendant has, you know, heard in

6  cross-examination that, you know, not that many people were

7  there and what he said is such a critical issue here.

8        THE COURT:  All right.  Nonetheless, calling out

9  prosecutors by name and having them get identified, that type

10 of thing, is not relevant.  I agree that there could be

11 circumstances where the number of people may be important for

12 determining what his -- you know, the quality of his

13 recollection, but it would seem to me it probably would be a

14 fairly rare circumstance for that coming up.

15       MR. McLOUGHLIN:  And, Your Honor, I apologize.  I

16 think I kept saying defendant.  I meant to say the witness.

17       THE COURT:  Yeah, I understood what you meant.  Thank

18 you.

19     (In open court:)

20 BY MR. GILLEN:

21 Q.  Now, Mr. Pepper, in terms of the DOJ or antitrust lawyers

22 who were present, that would include some of the folks that are

23 in this room today, correct?

24 A.  Yes, sir.

25 Q.  Okay.  And what was happening is you were being

Carl Pepper - Cross

1  interviewed, but you weren't being recorded, were you?

2  A.  Correct.

3  Q.  So we really don't know exactly what you said because there

4  was no recording of your interview, correct?

5  A.  I guess an actual recording, yes, sir.

6  Q.  Well, it could have been, but it wasn't, was it?

7  A.  No, sir.

8  Q.  And, of course, you and the agents were familiar with

9  recording devices because you used one on their behalf earlier

10  that summer, hadn't you?

11  A.  Yes, sir.

12  Q.  Now, when you're talking with the agents, and I want to

13  kind of go over -- the agents and the lawyers -- what you did

14  and did not say to them is one of the things that I want to do.

15  During that interview in October -- and that interview was in

16  Washington DC, correct?

17  A.  I believe that's where that one was, yes, sir.

18  Q.  Do you have a recollection at all?

19  A.  I know it was sometime around then.  It was in Washington

20  DC.

21  Q.  So you flew to Washington, went into the Department of

22  Justice, went into a big conference room with all these lawyers

23  for Department of Justice and agents and began the process of

24  giving a lengthy interview to them, correct?

25  A.  Yes, sir.

Carl Pepper - Cross

1   Q.  And at that time you were explaining to them that in Tyson

2   that the pricing unit is the unit that determines the price

3   that is projected to the customer.  You explained that to them,

4   didn't you?

5   A.  Yes, sir.

6   Q.  You also on that occasion explained to them that any sort

7   of special promotions or requests for kind of anything, like I

8   assume a discount, but that request also went through the

9   pricing unit.  Do you remember that?  That's correct, right?

10   A.  I don't know if I told them exact that every bit of that

11   stuff went always through the pricing group.

12   Q.  You don't remember telling them that the special promos,

13   that the request went through the pricing unit?

14   A.  The special promos, right, correct, yes, sir.

15   Q.  So you told them in October of 2019 that special promos

16   also went through the pricing group just like setting the price

17   that would be submitted to the customer, correct?

18   A.  Yes, sir.

19   Q.  You also shared with them that you had started sharing

20   competitive information, pricing information, as early as 2011,

21   correct?

22   A.  Yes, sir.

23   Q.  Now, that was, of course, before Mr. Roberts even came to

24   work at Tyson, right?

25   A.  Yes, sir.

Carl Pepper - Cross

1   *Q.*  So you were explaining to them that your market

2   intelligence began before Mr. Roberts even came to Tyson.  He

3   came in 2012, right?

4   *A.*  There was only one thing at that particular time that I

5   remember had anything to do with before Brian Roberts came

6   there.

7   *Q.*  But I want to focus on what was said.  And by the way, Tim

8   Mulrenin wasn't your supervisor in 2011, was he?

9   *A.*  No, sir.

10  *Q.*  Okay.  So you indicated to them, did you not, that you were

11  having -- that obtaining sort of information about competitors'

12  pricing gave you comfort, gave you a comfort.  Do you remember

13  explaining that to the government?

14  *A.*  Yes, sir.

15  *Q.*  And that would determine whether or not -- sometimes that

16  would let you know as early as 2011 or whenever whether or not

17  a customer was bluffing you about what other people were doing

18  in the marketplace, correct?

19  *A.*  Yes, sir.

20  *Q.*  And that would -- giving you this comfort would allow you

21  to sort of get an understanding about where the nature of the

22  marketplace was at that time concerning pricing, right?

23  *A.*  It gave me a comfort knowing that whenever a customer

24  happened to call me up and tell me that we were out of line,

25  that I knew they were bluffing.

Carl Pepper - Cross

1   Q.  Yeah.  So that way if someone calls up and says -- tells

2   you something, and you know because you have been calling and

3   finding out generally what other folks are doing in the

4   market --

5   A.  Wrong.  I didn't call anybody.  I was called.

6   Q.  So people would call you.

7   A.  Yes, sir.

8   Q.  But the comfort came from your knowing whatever information

9   you had so that you could say to yourself, you know, the

10  customer is bluffing, right?

11  A.  Yes, sir.

12  Q.  Okay.  You also explained to the Department of Justice on

13  that very lengthy interview that you gave in October of 2019

14  that you had absolutely no knowledge or no information that any

15  of the information the market intelligence that you had

16  obtained was ever used by the pricing unit in Tyson, correct?

17  A.  Yeah, I never -- yes, sir, I believe I said that, I think.

18  Q.  And what you meant by that is you were out getting market

19  intelligence.  But we know that Tyson and the pricing unit,

20  they are the ones that set the price for Tyson, correct?  We

21  have gone over that.

22  A.  Yes, sir.

23  Q.  And that to your knowledge, you had no knowledge whatsoever

24  of any of your market intelligence being passed on to the

25  people who actually set the prices in the pricing unit,

Carl Pepper - Cross

1  correct?

2  A.  I didn't have any actual knowledge, but I knew how the

3  chain went.  The chain would go with Tyson if somebody knew

4  something.

5  Q.  Well, to your knowledge, we are talking about what you

6  know.  You have no knowledge whatsoever if any of that

7  information went up to the pricing unit where pricing was

8  actually set, correct?

9  A.  Yes, to -- yes, sir.

10  Q.  Now, did you tell them on that day that you had -- you

11  would never give any of the prices, competitor prices to anyone

12  including the pricing unit?  Did you tell the Department of

13  Justice that in October of 2019?

14  A.  I can't remember every single thing I said in that lengthy

15  conversation, but I know I had told them that -- say what you

16  just said again, please.

17  Q.  Did you tell them that you had never given the competitor

18  pricing information to anyone, including the pricing unit?

19  A.  Yes, sir.

20  Q.  So when they are in DC in the big conference room in

21  October of 2019, you are letting them know that you hadn't

22  given pricing information to anyone including the pricing unit.

23  And you also told them that on some occasions that you would

24  give out to other folks, other representatives of competitors,

25  you might give them false information, correct?

Carl Pepper - Cross

1  A.  Yes, sir.

2  Q.  So what you're doing is if you were talking to other folks,

3  you might say, well, we're dancing here on the phone about what

4  they're doing, what I'm doing.  And sometimes you might just

5  give them something that isn't true, correct?

6  A.  Yes, sir.

7  Q.  Okay.  Now, you also said that one of the things that folks

8  would want to know is whether or not the prices, the Tyson

9  prices were good, in other words, not in any specifics about

10  what anybody else was doing, but whether or not we are sort of

11  in the ball park, right?

12  A.  If somebody happened to bring that up, I would say all I

13  can tell is that we're not too high and we're not too low.

14  Q.  So that sort of went the way that you would relay

15  information.  And that's what you told them in October of 2019,

16  right, with all --

17  A.  I think so.  Like I said, I can't remember every single

18  thing I told them.

19  Q.  How big was that conference room to fit you all in there?

20  A.  Well, 2019 is a couple years ago, and I can't remember

21  every single word I've said since 2019.

22  Q.  Okay.  All right.  But one thing that you should remember

23  is that during that conversation -- or during that interview in

24  October of 2019, you never told them that there was any

25  agreement, that you had any agreement with anybody from any

Carl Pepper - Cross

1   other company to fix a price or to set -- excuse me, to set a

2   price in the marketplace, did you?  You never said that, did

3   you?

4   A.   I can't remember if I ever said an agreement or if I said

5   an understanding.

6   Q.   Well, on that day when you went in --

7   A.   The first time I believe I was there.  And I don't remember

8   if I said that that very first time I was there or not.

9   Q.   Well, so you then -- everything that you told them there,

10  you were doing your very best to tell them the truth, weren't

11  you?

12  A.   Yes, sir.

13  Q.   Because you know if you tell them a lie, then you could be

14  prosecuted for each and every lie, correct?

15  A.   Yes, sir.

16  Q.   So when you told them the things that I have gone over

17  earlier, the things that you told them about the pricing unit,

18  about what you did with information, all of that information

19  that you gave to them in your mind in October of 2019 was

20  correct, right?

21  A.   Yes, sir.

22  Q.   And then you wanted -- you wanted to have -- you hoped to

23  have an understanding that they weren't going to be prosecuting

24  you, correct?  That's what you hoped for, right?

25  A.   Yes, sir.

Carl Pepper - Cross

 1    Q.  But at the end of the meeting after you have given them all

 2    this information, they didn't give you what you wanted, did

 3    they?

 4    A.  I didn't expect it in the very first meeting.  I knew it

 5    was going to be a long, drawn-out thing.

 6    Q.  They didn't give you what you wanted, did they, after the

 7    first meeting?  You did not get a non-prosecution agreement,

 8    did you, sir?

 9    A.  After the very first meeting, I didn't even think about it.

10    I thought -- I didn't even think about that at that time

11    because I was just trying to get my head around what all was

12    going on.

13    Q.  So you're telling the jury that in October of 2019 after

14    you have made secret recordings for the government and have

15    flown to Washington and met with seven or nine Department of

16    Justice lawyers and then interviewed, that you had no idea in

17    your mind, it didn't cross your mind about whether or not you

18    were going to be prosecuted?

19    A.  No, sir, not at that time.

20    Q.  So we have established you had -- they offered you no deal

21    on that occasion, correct?

22    A.  Yes, sir.

23    Q.  Okay.  But now you go home and you start thinking about it

24    because this thing isn't going to end soon, is it, for you,

25    Mr. Pepper?

Carl Pepper - Cross

1   A.  Didn't seem like it, no, sir.

2   Q.  No, because then they are back at it with you.  In November

3   of 2019 they are back at it again with you, aren't they?

4   A.  I guess that's the time frame.  I don't know when --

5   Q.  That's the next one, November the 25th, 2019.

6   A.  Okay, if you say so.

7   Q.  And you were represented by counsel during these meetings.

8   Get that on the record.  And on that occasion was that meeting

9   again in Washington DC?

10  A.  I think so.

11  Q.  So you fly back to Washington DC.  At this time there were

12  eight Department of Justice lawyers in there speaking to you

13  along with the agents.  Do you remember that?

14  A.  I remember quite a few people, yes, sir.

15  Q.  Okay.  And they are back at it and they want to drill down

16  on some of the information that they wanted to ask you about.

17  And you are there to give them the absolute -- the absolute

18  truth, correct?

19  A.  Yes, sir.

20  Q.  And so that -- how long did that -- several hours?  How

21  long did that last?

22  A.  A few hours.

23  Q.  Okay.  And so during that -- on that occasion you tell them

24  about a meeting, a meeting.  And you discussed it a little bit

25  on direct examination, the Cullen meeting.  Remember that?

1470
Carl Pepper - Cross

1    *A.*  Yes, sir.

2         *MS. SWEENEY:*  Objection, Your Honor, as to improper

3    form.  He's telling the witness what he told the government as

4    opposed to asking first and then confronting if he doesn't know

5    or remember.

6         *MR. GILLEN:*  I am asking what he informed them and I

7    am going over, and he can agree or disagree with me about what

8    he said or didn't say.

9         *THE COURT:*  I will overrule the objection.

10        *MR. GILLEN:*  Thank you, Your Honor.

11        *THE COURT:*  Mr. Gillen, while we are talking, could

12   you look for a convenient breaking point?

13        *MR. GILLEN:*  Yes, it is, Your Honor.

14        *THE COURT:*  Great.  Ladies and gentlemen, we will go

15   ahead and take the mid-afternoon break.  Keep the admonitions

16   in mind.  We will reconvene at 3:30.

17        We will be in recess.  Thank you.

18     (Recess at 3:15 p.m.)

19     (Reconvened at 3:32 p.m.)

20        *MS. SWEENEY:*  Your Honor, may I address one thing?  I

21   just wanted to clarify when I made the objection that I made, I

22   believe I articulated poorly, and I will object again if it

23   comes up, but simply the objection was about improper

24   impeachment.  Putting the agreement aside, the fact that what

25   Mr. Pepper was testifying to, he should be asked about the

Carl Pepper - Cross

1    underlying fact first before he is impeached with what he told

2    the government.

3         So, for example, when he was testifying about the

4    different units within Tyson, he should have been asked what

5    the units were.  And only if those statements were inconsistent

6    with what he told the government should he be impeached with

7    his prior statement to the government as opposed to just going

8    through what he told the government issue by issue,

9    understanding his conversations with the government about the

10   agreement is a different matter.

11        MR. GILLEN:  I totally disagree, Your Honor.  We have

12   to establish when he said it and what he said and what he said

13   and what he didn't say.  And I would ask that the Court

14   continue to permit this examination.

15        THE COURT:  Yeah, I think Mr. Gillen's reference to

16   continue may even refer back to the previous trial.  We talked

17   about that.  I think that he can be confronted with his

18   statements from the past.  And I didn't find anything that

19   Mr. Gillen did in terms of bringing those things up was

20   improper.  Maybe there are other circumstances where there

21   could be some confusion or -- but I didn't see anything in the

22   manner in which he conducted his exam so far, not that you

23   can't object in the future.

24        MS. SWEENEY:  Thank you, Your Honor.

25        THE COURT:  Let's bring the jury back in.

Carl Pepper - Cross

1          (Jury present.)

2          THE COURT:  Mr. Gillen, go ahead.

3          MR. GILLEN:  Thank you.

4   BY MR. GILLEN:

5   Q.  Mr. Pepper, when we broke we were focusing on your

6   discussions with the government and back to this was the

7   November the 25th, 2019 period, okay?

8   A.  Okay.

9   Q.  And I was asking you questions about your giving

10  information to the government about the Cullen meeting in

11  August of 2014.  Do you remember that?

12  A.  Yes, sir.

13  Q.  And I had reminded you or I was raising the issue that you

14  had testified on direct examination about what you called the

15  Cullen meeting, correct?

16  A.  Yes, sir.

17  Q.  And that would be Steve Cullen, a high individual within

18  Tyson who had a meeting regarding the RSCS matter.  And I

19  believe you told them it was in August 2014.

20  A.  Yes, sir.

21  Q.  So now we have you were explaining to the government about

22  the Cullen meeting which took place in August of 2014.  And

23  then you explained to them that within Tyson -- and Mr. Cullen

24  is a superior to Mr. Roberts and to you and to Mr. Mulrenin,

25  correct?

Carl Pepper - Cross

1   A.  Yeah, I think he is, yes, sir, especially to me.

2   Q.  And one of the discussions that you explained to the

3   government on that day was that the industry was moving away

4   from small bird, correct?

5   A.  Yes, sir.

6   Q.  And that there had to be an increase, a financial increase

7   for Tyson in order to even stay in the small bird business.

8   You told the government that in November of 2019, didn't you?

9   A.  Yes, sir.  That conversation had been going on for a few

10  years, yes, sir.

11  Q.  But in particular, you explained that that conversation

12  took place in August of 2014 in Steve Cullen's office, correct?

13  A.  Yeah, part of it, yeah.  Yes, sir.

14  Q.  And that's kind of what -- so the topic is going on.  And

15  then you had kind of -- that meeting is over.  And but your

16  contacts with the government is not over.  After that meeting

17  in November of 2019, they didn't offer you immunity then, did

18  they?

19  A.  No, sir.

20  Q.  Okay.  So we've gone through two lengthy interviews.  And

21  by the way, who is conducting the interviews?  Are the

22  attorneys conducting them or are the agents conducting them?

23  Who is the asking the questions for the most part?

24  A.  The attorneys.

25  Q.  So the attorneys were asking you -- the attorneys were

Carl Pepper - Cross

1   asking you the questions.  And then the agents were taking

2   notes or one or more of them were taking notes, correct?

3   A.  Yes, sir.

4   Q.  Now, you don't get an immunity deal then in November of

5   2019, do you?

6   A.  No, sir.

7   Q.  Okay.  So it's not over because you are coming back in July

8   of 2020, aren't you?

9   A.  If you say so.  I don't remember the dates, but --

10  Q.  Do you remember on July the 9th, 2020 having an interview

11  with six attorneys from the Department of Justice antitrust

12  division with your attorney on a zoom call and the agents on

13  the zoom call?  Do you remember that?

14  A.  I remember having a zoom call.  I just don't remember the

15  exact dates.

16  Q.  On that occasion you didn't have to fly to Washington.  You

17  were able to do it from your home or around in your city.

18  A.  Yes, sir.

19  Q.  And so at that time you explained to them -- and they've

20  shown you an e-mail from Brandon Campbell about the KFC model

21  that he had created on June the 5th, 2014.  Do you remember

22  that?

23  A.  I remember seeing the model.  I don't remember the exact

24  date.

25  Q.  Well, it was in June of 2014 that you saw it.

1475

Carl Pepper - Cross

1   *A.*  Okay.

2   *Q.*  And that was a model that you explained to them, or did

3   you, that that model was created by Brandon Campbell in the

4   pricing unit, correct?

5   *A.*  Yes, sir.

6   *Q.*  So in June of 2014, Brandon Campbell at the pricing unit

7   has already sent out internally within Tyson the KFC pricing

8   model internally, correct?

9   *A.*  Yes, sir.

10  *Q.*  So before any RFP comes out from RSCS or from Kentucky

11  Fried Chicken, internally Tyson had already worked up their

12  model, their pricing model, correct?

13  *A.*  Yes, sir.

14  *Q.*  Okay.  So this is something that had been done in

15  conjunction with the business unit and the pricing unit and

16  Mr. Campbell is saying here you go, guys, right?

17  *A.*  Yes, sir.

18  *Q.*  So as a matter of fact, that pricing model, did you

19  remember that the margin increase in that pricing model was 19

20  cents?

21  *A.*  Yeah, a little over 19 cents.

22  *Q.*  And the pricing model set out by Brandon Campbell of 19

23  cents in June of 2014 was exactly -- or not exactly, but the

24  pricing, the margin in the contract in December when the dust

25  settled was 19 cents .3, wasn't it?

1476
Carl Pepper - Cross

1   *A.*   Yes, sir.

2   *Q.*   So basically the model that was set out by Brandon Campbell

3   and the pricing unit in June is kind of what Tyson ended up

4   with with RSCS at the end of the day, correct?

5   *A.*   Yes, sir.

6   *Q.*   And you explained that to them on that occasion, didn't

7   you?

8   *A.*   I guess it was that occasion.

9   *Q.*   You also explained to them that you had understood that the

10  competitors were planning an increase.  Although you did not

11  know the exact amount, you knew the increases would be greater

12  than 10 cents.  You heard it from somebody, but you didn't

13  recall who you heard it from, right?

14  *A.*   Correct.

15  *Q.*   So when you're telling them in November of 2019, you're

16  saying I was hearing that it's going to be over 10 cents, but I

17  don't know who said it, right?

18  *A.*   Yes, sir.

19  *Q.*   And, of course, you would have a better recollection of

20  what you remembered or didn't remember from conversations with

21  people in November of 2019 than you would, say, today; is that

22  fair?

23  *A.*   No, sir.

24  *Q.*   Your memory has gotten better?

25  *A.*   No, my memory has not gotten better.

Carl Pepper - Cross

1   Q.   Gotten worse?

2   A.   It usually does when you get older.

3   Q.   It's gotten worse.  And what you said to them in 2019 is

4   you didn't know who said that, correct?

5   A.   That's exactly right.

6   Q.   And you indicated to the government on that occasion that

7   the margin increase that you had just explained to us was

8   consistent with the current average was obtained by the pricing

9   group so that everybody within Tyson or everybody would be on

10  the same playing field regarding KFC, Popeye's and Church's,

11  right?

12  A.   It would be generally in that neighborhood, yes, sir.

13  Q.   So what you are saying to them there is that Tyson in June

14  of 2014 has got this model together for small bird that's going

15  to be sort of -- it's going to be something that's going to be

16  applied to the small bird business at Tyson which would be KFC,

17  Popeye's, Church, correct?

18  A.   Yes, sir.

19  Q.   And that way everybody would sort of know what the game

20  plan was from the small bird unit in the business unit and the

21  pricing unit.  This is our game plan, correct?

22  A.   Yes, sir.

23  Q.   You also indicated to the government that getting from

24  competitors sort of ball park numbers gave you a sense of

25  comfort, right?

Carl Pepper - Cross

1   A.   Yes, sir.

2   Q.   Gave you some idea that, you know, we are just not way, way

3   out of bounds on this.  It gave you a sense of comfort, right?

4   A.   Are you talking about KFC or what?

5   Q.   I am talking in general, getting numbers, getting -- the

6   way you phrased it, getting ball park numbers to provide a

7   sense of comfort.  Do you remember saying that to them?

8   A.   No, I don't remember, but -- I don't remember everything I

9   said, every single word I said at that time, but something on

10  that line, yes, sir.

11  Q.   Do you remember telling them also, you said if you started

12  getting exact numbers, you maybe thought that may not be

13  something you were doing, but you never asked Brian Roberts if

14  the practice was okay.  Do you remember telling the government

15  that?

16  A.   Yes.

17  Q.   So you told the government in November of 2019 that when

18  you started getting exact numbers, that you felt a little

19  uneasy about it, but you never asked Brian Roberts if the

20  practice was okay.  That's what you said, right?  Correct?

21  A.   I don't know if I ever said that about asking Brian Roberts

22  if that was okay.  No, sir, I don't.

23  Q.   Okay.

24  A.   He didn't tell me not to do it when I told him.

25  Q.   Well, would reviewing your interview notes or the

Carl Pepper - Cross

1    interview, the government's interview of that occasion refresh

2    your recollection?

3    A.   I've never seen their notes, so...

4    Q.   Would it refresh your recollection?

5    A.   I guess it would.

6              MR. GILLEN:  Well, what I'm going to do is I'm going

7    to -- if I may approach, Your Honor?

8              THE COURT:  You may.

9              MR. GILLEN:  There should be an index in there.

10   Actually, this took place in July the 17th.  We jumped ahead to

11   another one when I was asking my questions.  If you would find

12   that.  If you could find that, please.

13             For the record, that's Exhibit H-997 in the binder,

14   Your Honor.  We are going to have to come back to this one

15   because I have got the wrong interview up here.  Just a second.

16   Let's try July the 21st.

17   BY MR. GILLEN:

18   Q.   Do you see at the bottom of Page 4, could you read that

19   where it begins, "Pepper never thought to reach out?"  Could

20   you read that sentence?

21             MS. SWEENEY:  Objection, Your Honor, if the request is

22   for the witness to read out loud.

23             MR. GILLEN:  I am just directing him to it.  I didn't

24   finish the entire reading of the sentence.

25             THE COURT:  I am sorry, Mr. Gillen.  What exhibit are

Carl Pepper - Cross

1    you asking him to look at?

2            *MR. GILLEN:*  Actually, Your Honor, it is July 21st,

3    and it's Exhibit 992 in the binder.  I am addressing his

4    attention to Page 4 of that and the fourth line from the

5    bottom, if you could find that.

6            *THE COURT:*  Mr. Gillen, you are talking about H-992,

7    correct?

8            *MR. GILLEN:*  I am referring to H-992.

9            *THE COURT:*  When you asked Mr. Pepper to read that, do

10   you mean to himself?

11           *MR. GILLEN:*  Yes.

12   *BY MR. GILLEN:*

13   *Q.*  We have got a lot of binders up there, Mr. Pepper.  I am

14   sorry about that.

15   *A.*  You said Page 4?

16   *Q.*  There should be a binder there that references.  The

17   exhibit number is going to be H-992.

18   *A.*  Yes, sir.  I got that.

19   *Q.*  And if you can turn to the fourth page of that interview

20   and go down to the lower -- the last paragraph.  Do you see

21   that?

22   *A.*  Did not feel comfortable?

23   *Q.*  The sentence, "Pepper never thought."  Could you read that,

24   please?

25           *THE COURT:*  Once again, to himself; is that correct?

Carl Pepper - Cross

1           MR. GILLEN:  Yes, Your Honor.

2    BY MR. GILLEN:

3    Q.  Read it to yourself.

4    A.  I am on Page 4 and I can't -- okay.  Did not feel

5    comfortable.

6    Q.  The sentence that says, "Pepper never thought."  Have you

7    found that sentence there?

8           MR. GILLEN:  Your Honor, may I approach to assist the

9    witness in locating it?

10          THE COURT:  I think he is on the right paragraph.

11   It's the second to the last paragraph, Mr. Pepper, the second

12   sentence in that paragraph.

13          THE WITNESS:  "Pepper never thought."  I can't find

14   the sentence that we're talking about.  I am on Page 4.

15          MS. SWEENEY:  Your Honor, I believe it's highlighted

16   on the screen if that's helpful.

17          THE COURT:  Yeah, that is helpful.

18          MR. GILLEN:  That's very helpful.  It's on the screen.

19   Read that to yourself.

20   BY MR. GILLEN:

21   Q.  Does that refresh your recollection about what you told the

22   agents on July the 21st concerning whether -- you never thought

23   to reach out to Mr. Roberts or Johnny Hughes to ask if the

24   practice was okay?

25   A.  I have a hard time remembering that I said that.

1482

Carl Pepper - Cross

1    Q.  So that does not refresh your recollection?

2    A.  No, it doesn't refresh it, but I have a hard time

3    remembering that I said that to --

4    Q.  Whatever you said to the government, you would want to make

5    sure it was absolutely correct, wouldn't you?

6    A.  Yeah.  I said this is the first time I have ever seen this

7    record.

8    Q.  Okay.  And it doesn't refresh your recollection?

9    A.  No, sir, it doesn't.

10   Q.  So we will move on.

11          Now, we jumped ahead a little bit.  We jumped over

12   July the 17th.  And after you had your interview with the

13   government on July the 9th, you didn't get immunity on that

14   occasion either, did you?

15   A.  No, sir.

16   Q.  And now are you starting to think a little bit about --

17   were you getting a little worried?  You've gone through several

18   interviews and they still don't think you're quite there.  You

19   starting to worry a little bit?

20   A.  I am not -- I don't know if I am starting to worry, but

21   just getting a little curious of why.  But I don't know if I

22   was actually worried at that time.  I was just trying to --

23   because I knew I was telling the truth and I was just curious

24   of -- to myself.  I mean, I never voiced it or anything, but I

25   knew I had been telling the truth everything they had been

Carl Pepper - Cross

1   asking me.  And yes, I was curious to myself, but I am not

2   going to say I was worried.

3   Q.  And you were hopeful that what they were going to do is

4   after one of these marathon sessions they would say we have

5   decided to give you immunity so that you don't have to worry

6   about prosecution.  That's what you were hoping for, right?

7   A.  Yes, sir.

8   Q.  Okay.  So when you would go home after these interviews,

9   would you just put it out of your mind or would you think about

10  what you were going to say in the next one, the next round

11  where they would be asking you even more and more questions?

12  A.  I basically put it out of my mind because all I knew is I

13  was telling the truth on what they were asking me.

14  Q.  So you put it out of your mind.  And then again we got the

15  17th, July 17th.  Four days later, July the 21st, they are back

16  at you, right?

17  A.  Yes, sir.

18  Q.  So now the pace is picking up.  We went from recording in

19  the summer of 2019 to October Washington DC to November

20  Washington DC to now several interviews in July of 2020,

21  correct?

22  A.  Yes, sir.

23  Q.  Now, at that time in July of 2020 were you aware that they

24  had indicted people in these -- in this case?

25  A.  I don't know if I were or not because, like I said, I did

Carl Pepper - Cross

1    the interviews I had.  But as far as looking stuff up to see

2    what was going on, no, I didn't.

3    Q.  You're telling this jury that in the summer of 2020 you

4    were unaware that the Department of Justice had returned

5    Indictments against individuals in this courtroom.

6    A.  I don't remember when I finally realized it or found out

7    that there was some Indictments.  I don't remember the dates.

8    No, sir, I don't.

9    Q.  Now, when you found out that there had been Indictments, I

10   guess that made you feel a little bit more concerned about

11   whether Carl Pepper might be indicted, correct?

12   A.  Well, when I found out, heard about the indictments, yes, I

13   started thinking about it, yes, sir.

14   Q.  Started thinking about it because you hadn't gotten that

15   immunity and you met with these people for several times at

16   that stage, right?

17   A.  Yes, sir.

18   Q.  And it had gone on and on and on and still no immunity for

19   you, right?

20   A.  Yes, sir.

21   Q.  And folks are being indicted.  They are going to be in

22   federal court.  And you're continuing to be asked to give them

23   information, right?

24   A.  Yes, sir.

25   Q.  Now, you understood, didn't you, that the people who would

Carl Pepper - Cross

 1  be making the decision about whether you would be indicted and

 2  be in this courtroom or be on the witness stand are the people

 3  working for the Department of Justice, correct?

 4  A.  I had no idea who would be the one to make the decisions.

 5  Q.  You are telling this jury that you had no idea that the

 6  Department of Justice would be making the decision about

 7  whether you would be indicted or not.

 8  A.  I knew the Department of Justice would.  I didn't know what

 9  person or how many people or what.

10  Q.  The folks that you were meeting with.  You met with seven,

11  eight, nine lawyers at one time.

12  A.  There was probably more people than that in the Department

13  of Justice.  I don't know who all was involved in this thing.

14  Q.  And then you had another virtual with them on July the

15  23rd, don't you, 2020?  Short interview over a zoom, several

16  DOJ lawyers, agents and Carl Pepper, correct?

17  A.  If that was the date, yes, sir.

18  Q.  So now the pace is quickening.  And you talk to them

19  several times in the month of July 2020, correct?

20  A.  Yes, sir.

21  Q.  And by now you know that folks have been indicted, at least

22  by July the 23rd.  Did you know it by July the 23rd of 2020?

23  A.  I don't know when I knew it.  I just knew that I had heard

24  about it.  I didn't know who all was indicted.  I just knew

25  some people that I heard of.

Carl Pepper - Cross

1    Q.  I am sorry, I thought you were through.

2    A.  I am done.

3    Q.  Don't mean to cut you off.  Now, after the July 23rd zoom

4    meeting with seven or eight of the attorneys from DOJ and the

5    agents, you still don't get the cherished immunity deal, do

6    you?

7    A.  No, sir.

8    Q.  And so then we roll into August, August the 12th, and they

9    are back at you.  They want to talk to you some more, correct,

10   on August the 12th?

11   A.  If that's the date, yes, sir.  I don't remember the date.

12   Q.  And that was a zoom as well, wasn't it?

13   A.  Yeah, it would have been a zoom call, yes, sir.

14   Q.  So at that time the more information is given, and you are

15   telling them what you believe you know; is that right?

16   A.  Yes, sir.

17   Q.  But even after the 12th no immunity for you, right?

18   A.  Yes, sir, correct.

19   Q.  Starting to worry now, I would assume.

20   A.  Well, I'm thinking about it, yes, sir.

21   Q.  You've got to be thinking about it.  All these interviews,

22   haven't gotten the cherished home free card, the immunity deal,

23   but they're back at you.  A couple days later, so we've got

24   August the 12th, and then the next one is August the 14th, two

25   days later they are back asking you questions, correct?

Carl Pepper - Cross

1  A.  Yes, sir.

2  Q.  You meet with them again on a zoom, same large number of

3  DOJ lawyers, some of whom are in the court here.  And you give

4  them whatever information they ask you, correct?

5  A.  I give them the truthful information, yes, sir.

6  Q.  But no immunity deal for Mr. Pepper after the August the

7  14th zoom, is there?

8  A.  No, sir.

9  Q.  And then busy August.  August the 26th they are back at you

10 again, same group from DOJ, large contingents of attorneys and

11 agents.  And you're on the zoom and you talk to them again,

12 right?

13 A.  Yes, sir.

14 Q.  And you still don't get your immunity deal, do you?

15 A.  No, sir.

16 Q.  Well, you've got to be worried now, weren't you?

17 A.  I don't know if I can say I was worried.  I just couldn't

18 understand -- I couldn't understand why because I knew I was

19 telling them the truth.

20 Q.  Please tell the jury were you or were you not worried that

21 Carl Pepper was not going to get his immunity deal, but was

22 going to be indicted?  Yes or no?  Yes or no?

23 A.  I can't answer that yes or no because I don't know.

24 Q.  It's in -- it was in you.  It was how you felt.  It was

25 what you were worried about, what kept you awake at

Carl Pepper - Cross

1    3:00 o'clock in the morning.  Were you worried about being

2    indicted after all these interviews and no immunity?  Yes or

3    no?

4    A.  Well, I wasn't awake at 3:00 o'clock in the morning because

5    I wasn't worrying about it for some reason at that particular

6    time.  I was just saying if it's going to happen, I guess it's

7    going to happen.

8    Q.  Then back at you February the 12th, 2021.  DOJ is back

9    talking to you, right?

10   A.  Yes, sir.

11   Q.  But you have a little bit of the holidays off.  And now

12   February 12th, 2021, and that's when you told them that --

13   talking about KFC that Tyson's price increase was calculated

14   before they knew what their competitors' increase would be.

15   That's true, isn't it?

16   A.  Yes, sir.

17   Q.  So in February of 2021, you let these folks know that

18   Tyson's price had already been done, baked, before there was

19   any knowledge whatsoever about what any competitors might do,

20   right?

21   A.  Yes, sir.

22   Q.  Because as you explained earlier, Tyson had already done

23   their small bird model and the KFC model specifically back in

24   June with Brandon Campbell and Bowlin and Cullen and that

25   crowd, right?

Carl Pepper - Cross

1   A.   Yes, sir.  That's originally when we did it.

2   Q.   And you told these folks that on February the 12th, didn't

3   you?

4   A.   Yeah, I guess -- I don't remember if I did or not, but...

5   Q.   Well, that's the truth that Tyson had already baked in

6   their increase before there was any knowledge whatsoever about

7   what any competitors were doing.  That's true, isn't it?

8   A.   Yes, sir, they did the pricing, but prices changed a lot of

9   times depending on how negotiations go.

10  Q.   Did you tell the government that Tyson's price increase was

11  calculated before Tyson knew what their competitors' increase

12  would be?  Yes or no?

13  A.   Yes, sir.

14  Q.   And that Tyson had already increased its price when Tyson

15  learned other suppliers were increasing their prices, but Tyson

16  knew they would not be the only ones increasing the price,

17  right?

18  A.   They hadn't actually increased the price that was in the

19  contract, yes, sir.

20  Q.   Well, the model that was being presented by Tyson to RSCS

21  was baked in in June of 2014, right?

22  A.   Yes, sir, but that also could not have been -- that might

23  not have been the final one.  You don't know.

24  Q.   We just went over that.  You remember that I discussed this

25  a few minutes ago that you remember that the profit margin was

Carl Pepper - Cross

 1  19 in June, right?

 2  *A.*  Yes, sir.

 3  *Q.*  And you know what it was in December?

 4  *A.*  Yes, sir.  But when it first was done, that doesn't mean

 5  that at that particular moment that that's exactly what it's

 6  going to be.

 7  *Q.*  And did you know, Mr. Pepper -- we are going to get into

 8  this a little bit later when we go through the KFC chronology.

 9  When do you think the first time that Tyson presented its cost

10  model to an RSCS representative took place?

11  *A.*  I was absolutely shocked.

12  *Q.*  No, I am asking you, do you know when?

13  *A.*  Oh, when the very first time I saw it.

14  *Q.*  How about July the 10th when there was a -- when Tyson

15  forwarded an e-mail with their cost model dating June 2014 and

16  sent it to Mr. Pete Suerken and Robert Lewis.  Do you remember

17  that?

18  *A.*  I don't know -- I don't remember if I was on that e-mail.

19  *Q.*  You were not on that e-mail.  Do you remember that Tyson

20  sent that information on July the 10th on their cost model to

21  RSCS?

22         *MS. SWEENEY:*  Objection, foundation.

23         *THE COURT:*  Overruled.

24  *BY MR. GILLEN:*

25  *Q.*  Are you aware of that?

Carl Pepper - Cross

1   A.   No, sir, I'm not aware of that.

2   Q.   And are you aware that the cost model was sent over in July

3   by Tyson is exactly the cost model that Tyson submitted early

4   for August the 11th, on August the 11th?

5   A.   That's what I am saying, I don't remember seeing what was

6   sent to Pete Suerken.  But like you said, in June was the same

7   basically always when the contract was signed.  But I did not

8   see the e-mail because I was not copied on all conversations

9   with Pete Suerken or -- and even Rich Eddington.

10  Q.   You weren't really in the loop in terms of folks discussing

11  and making these decisions for Tyson, were you?

12  A.   No, sir.

13  Q.   And when I say not in the loop, you know, you went to a

14  couple meetings, but a lot of e-mails about the pricing and the

15  direction from the pricing unit you weren't even copied on,

16  were you?

17          MS. SWEENEY:  Objection, foundation.

18          THE COURT:  He can answer if he knows.

19  A.   Ask that question again, please.

20  BY MR. GILLEN:

21  Q.   A lot of the e-mails from the pricing unit or some of the

22  e-mails from the pricing unit to others within Tyson you

23  weren't even cc'd on, right?

24  A.   Well, I guess so.  I wouldn't know that if I wasn't cc'd on

25  it.

Carl Pepper - Cross

1  Q.  Well, we are going to get into that because do you remember

2  that the reason why you saw Brandon Campbell's pricing model

3  was because on June the 20th Brian Roberts forwarded it to you

4  and a bunch of others, and it had been sent out by Campbell on

5  June the 5th.  Do you remember that?

6  A.  I remember June 5th, yes.

7  Q.  And you remember that you didn't get it because it wasn't

8  even forwarded to you by Campbell until Mr. Roberts forwarded

9  it to you as a courtesy on June the 20th, right?

10  A.  Yes, sir.

11  Q.  Okay.  Now, what you also explained to the government --

12  now we're getting -- you have got to be getting a little bit

13  nervous here in February, getting a little bit nervous as we

14  get a little bit closer to February.  Are you worried now?

15  A.  Yes, sir.  I am still curious why it hadn't happened, yes,

16  sir.

17  Q.  You were worried you might get indicted, right?  You were,

18  weren't you?

19  A.  Yes, sir.

20  Q.  Okay.  And so you're talking to them again.  We mentioned

21  February the 12th they are back at you.  You talked about Tyson

22  calculating before knowing anything about anybody else's

23  numbers.  Then you also told them that -- when you had

24  conversations with market intelligence about what was going on,

25  no specific price was ever discussed with anybody, was it?

Carl Pepper - Cross

1        *MS. SWEENEY:*  Objection as to the term market

2    intelligence.  That wasn't a term that I believe was used on

3    direct or by the witness.

4        *THE COURT:*  Overruled.

5    *BY MR. GILLEN:*

6    *Q.*  You told them that no specific price -- when you talked to

7    anybody, nobody ever gave you a price.  And you didn't give

8    anybody a price, did you?

9    *A.*  Correct.

10   *Q.*  So all this stuff about the conversations and calls back

11   and forth and up and down, nobody said, Carl, this is our

12   number.  What's your number?  That never took place, did it?

13   *A.*  No, sir.

14   *Q.*  Just what you're telling us is that you talked to people

15   and said, yeah, I think there is going to be a big increase,

16   right?

17   *A.*  Yes, sir.  And then I said somewhere along the line there

18   was an over -- more than 10 cents, and I don't remember where

19   that came from.  That's the only number that basically I ever

20   heard.

21   *Q.*  I thought you were through.  Are you through?

22   *A.*  Yes, sir.

23   *Q.*  Okay.  Just want to make sure.  You also used the term

24   substantial increase during your testimony like a thing you

25   kind of repeated directly all the time.  Remember that on your

Carl Pepper - Cross

1    direct examination?

2    A.   Yes, sir.

3    Q.   In the tens of thousands of e-mails that Carl Pepper sent

4    during his time at Tyson, did you ever use the phrase to

5    anybody substantial price increase?

6    A.   No, sir.

7    Q.   Not in the tens and tens of thousands of e-mails that you

8    either received or sent is that phrase used, correct?

9    A.   Yes, sir, because I never saw a substantial pricing

10   increase like this in my years there.

11   Q.   I didn't mean to interrupt you.  I didn't want to talk over

12   you.  Go ahead and finish your answer.

13   A.   That's exactly what it is.  I said over the years I have

14   never seen a price increase anywhere near those numbers, so

15   that's where the word substantial came from.

16   Q.   It came from Brandon Campbell, didn't it?

17   A.   Substantial didn't come from Brandon Campbell.

18   Q.   The number came from Brandon Campbell.

19   A.   Yes, sir.

20   Q.   The Tyson number, because they make the final decisions on

21   pricing, right?

22   A.   Yes, sir.

23   Q.   So when you started using the term substantial price

24   increase, you and I can agree that nowhere in your notebooks,

25   in your e-mails, anywhere anytime did you ever write down or

Carl Pepper - Cross

1   receive the phrase substantial price increase, correct?

2   A.  Yes, sir.

3   Q.  But then you start talking with the government.  And then

4   during this evolution of your remembrance, we see the word --

5   the phrase substantial price increase suddenly become a part of

6   your vocabulary, right?

7   A.  Yes, sir.  And that's because they asked me why did I

8   consider this a substantial price increase and had I ever seen

9   anything like this.  And I told them usually they were anywhere

10  from a penny to maybe 5 cents.

11  Q.  So the government was the one that asked you about

12  substantial price increase?

13  A.  No, I told him it was a substantial price increase.  They

14  asked me what did I mean?  Why did I think it was substantial?

15  And I gave them the reason was because over the years I had

16  been there, I had never seen anything -- most of the time only

17  5 or 6 cents at the most.

18  Q.  Okay.  Then you have another -- after February nothing, no

19  immunity for Mr. Pepper, right?

20  A.  Yes, sir.

21  Q.  No deal.  You know, they continue to be interested in you.

22  They still want some more stuff from you, but you're not

23  getting your immunity deal then, are you?

24  A.  No, sir.

25  Q.  So they are not done with you yet.  June 14 they are back

Carl Pepper - Cross

1  at you asking some more, same crowd, nine DOJ lawyers and

2  agents, and they are talking to you again on June the 14th,

3  2021.  You remember that.

4  A.  If you say so, that's the date, yes, sir.

5  Q.  Now, you still don't get your deal, do you?

6  A.  No, sir.

7  Q.  And what happened is after that June 2021, you learned that

8  they were not going to give you that deal, right?

9  A.  What date?

10  Q.  In the summer of 2021, you learned that they were not going

11  to give you your cherished --

12  A.  I believe so.

13  Q.  So what happens is after all of the many meetings where you

14  have been working and giving information, you find out in the

15  late summer of 2021 that they are not going to give you what

16  you want, what you now desperately have to desire, and that is

17  a non-prosecution agreement, correct?

18  A.  Yes, sir.

19  Q.  And I don't want to embarrass you, but we have to set the

20  stage here and tell the truth.

21  A.  Okay.

22  Q.  When you learned that you wept, didn't you?

23  A.  No, sir, I didn't wept.  I had tears in my eyes.  There is

24  a little bit of a difference.

25  Q.  So you had tears in your eyes, but you didn't weep.  But

Carl Pepper - Cross

1   you had tears in your eyes because you had learned that the

2   Department of Justice wasn't going to give you what you wanted,

3   right?

4           *MS. SWEENEY:*  Object to the use of the term learned

5   for privilege.

6           *MR. GILLEN:*  He has already testified about that, Your

7   Honor.

8           *MS. SWEENEY:*  As opposed to his understanding.

9           *THE COURT:*  I will sustain the objection.  If you

10  could rephrase that.

11  *BY MR. GILLEN:*

12  *Q.*  So you got tears in your eyes because it was your

13  understanding they weren't going to give you your cherished

14  deal, correct?

15  *A.*  Yes, sir.

16  *Q.*  Okay.  And the tears welled up in your eyes and you were

17  upset because you were worried that all of the information that

18  you had given to them just wasn't good enough for the

19  Department of Justice to say, Carl Pepper, you don't have to

20  worry about being out here indicted with these folks.  You get

21  immunity, right?

22  *A.*  Ask that question again, please.

23  *Q.*  Bottom line is that you had tears in your eyes because you

24  were so upset that after all of the many, many, many, many

25  interviews that you had with them, with all the -- can we say

Carl Pepper - Cross

1    hundreds of hours with them?

2    *A.*  Yes, sir.

3    *Q.*  Hundreds of hours with them, after all of that, you then

4    have an understanding that they are not going to give you what

5    you want which is immunity and that you could end up just like

6    these gentlemen out here indicted, correct?

7    *A.*  I was upset and I was confused why I didn't get it, yes,

8    sir.

9    *Q.*  Yeah.  And you were worried, right?

10   *A.*  Yes, sir.

11   *Q.*  You were worried that you would be out here dressed in a

12   suit with a mask facing a jury and answering to folks who go up

13   and have immunity deals, right?

14   *A.*  Yes, sir.

15   *Q.*  And then what you do after you have the tears in your eyes,

16   then you file a sworn statement in federal court, in this

17   court, a declaration, don't you?  Do you remember a declaration

18   where you were asked under oath, isn't it true that you

19   provided false and misleading information to representatives of

20   the Department of Justice for the purpose of obtaining immunity

21   from criminal prosecution, leniency or other for preferential

22   treatment?  And you asserted your Fifth Amendment rights,

23   didn't you?

24        *MS. SWEENEY:*  Objection, Your Honor.  May we have a

25   side bar?

Carl Pepper - Cross

1           THE COURT:  Yes.

2       (At the bench:)

3           THE COURT:  Go ahead, Ms. Sweeney.

4           MS. SWEENEY:  Your Honor, what Mr. Gillen just read, I

5   believe twofold.  No. 1, I believe although I have not

6   confirmed, this may have been filed under seal or at least

7   under a restriction.  Second, this violates the prior order of

8   reference to leniency in any way.

9           THE COURT:  I am not familiar with the declaration.

10  Is it one of your exhibits, Mr. Gillen?

11          MR. GILLEN:  Your Honor, it is No. I-827.  This is a

12  declaration the Court may remember that was filed at the *James*

13  hearing.  Mr. Pepper was subpoenaed by me to appear at the

14  *James* hearing and give testimony.  His counsel desired to

15  handle the matter by our submitting questions to him.  And he

16  filed a declaration which is a part of the record.  I do not

17  believe there was anything restricted about it.  And it was

18  filed by him on September the 7th, 2021 where he asserts the

19  Fifth Amendment to the questions about whether he falsely

20  provided information to the Department of Justice regarding

21  Mr. Roberts and Mr. Mulrenin.

22          THE COURT:  Okay.  Ms. Sweeney, anything more?

23          MS. SWEENEY:  Your Honor, the declaration I believe

24  has been mischaracterized.  The first question is:  Mr. Pepper,

25  isn't it true that you provided false and misleading

Carl Pepper - Cross

1    information?  And the only response that Mr. Pepper gives is:

2    I hereby declare that if I am required to testify as a witness,

3    I will invoke my Fifth Amendment privilege.

4           So there is not an answer to the question of whether

5    he provided false or misleading information or any answer to

6    any of the other questions as opposed to invoking just his

7    Fifth Amendment privilege.

8           THE COURT:  Is that declaration a part of the

9    government's exhibit book?

10          MS. SWEENEY:  It is not, Your Honor.

11          THE COURT:  Does someone have a copy of the

12   declaration?  That might be helpful.

13          MS. SWEENEY:  Your Honor, while this is being passed

14   up, I believe the government moves to strike the question.

15          THE COURT:  Let's have Ms. Butler ask Ms. Grimm to

16   hand the declaration up.  Yeah, the preface that Ms. Sweeney

17   just referenced applies to a number of different questions.

18   The first question is the question that Mr. Gillen posed to

19   Mr. Pepper and the preface indicates that he would have invoked

20   his Fifth Amendment privilege.  It seems like a specific

21   question which Mr. Gillen correctly articulated.

22          What's the objection, Ms. Sweeney?

23          MS. SWEENEY:  So, Your Honor, the question, and I

24   apologize, my computer isn't working, but as I recall it, the

25   question was he asked the question and said Mr. Pepper, isn't

Carl Pepper - Cross

1    it true -- well, two things.  I apologize.  Yeah, so he asked

2    the question and then said something along the lines of isn't

3    it true that you answered yes.  And I may have misheard.

4         The second objection to the question is this includes

5    language of leniency which relates to the prior order you

6    issued.  And the third question that I have, and I see that

7    this declaration does not contain an ECF or filing number, so

8    the government asks counsel for a copy or for what docket

9    number this declaration was attached and filed to if it is

10   indeed part of the record.

11        THE COURT:  Well, it's Exhibit I-827, if you can

12   access the defense exhibits.

13        MR. GILLEN:  Your Honor, a bit of background here.

14   What happened is, as the Court remembers, at the *James* hearing

15   we had subpoenaed Mr. Pepper.  Counsel, his counsel asserted

16   that he was going to be asserting the Fifth Amendment to

17   questions propounded and suggested whether or not we would

18   be -- you know, so what we did is we pursuant to 28-1746

19   proposed a series of questions to him in which he then reviewed

20   and asserted the Fifth Amendment to these questions.

21        He, Mr. Pepper, signed the document on September the

22   7th of 2021.  As the Court may remember, at the end of the

23   *James* hearing this issue came up.  And I made a reference to

24   the declaration that we had received from him and my

25   understanding is that it was filed as part of the record at

Carl Pepper - Cross

1   that time.  The issue was raised and we did it that way,

2   frankly, as a convenience to Mr. Pepper and his counsel so they

3   wouldn't be flying him all the way out for him to assert the

4   Fifth to these questions, so that's how we ended up with the

5   declaration.

6         THE COURT:  Yeah.  In a way it doesn't really matter

7   how we ended up with it.  This is Mr. Pepper's declaration.

8         Anything else, Ms. Sweeney?

9         MS. SWEENEY:  No, thank you, Your Honor.

10        THE COURT:  Okay.  Ms. Prewitt, do you mind if I keep

11  your copy for a bit?

12        All right.  Mr. Tubach, did you have something?

13        MR. TUBACH:  Your Honor, we can print out a copy for

14  the Court and get it to you very quickly.

15        MR. KORNFELD:  Your Honor, may I raise a brief related

16  point?

17        THE COURT:  Sure.

18        MR. KORNFELD:  Your Honor, during this conversation,

19  this side bar conversation, Mr. Pepper's counsel, Ms. Manning,

20  came into the well of the court in open court and had a

21  conversation, a brief conversation with the prosecutors.

22  No. 1, I think that's literally under the jury's nose.  I think

23  that's wholly inappropriate, No. 1.

24        And No. 2, I wonder if the contents of that

25  conversation in light of the context when she comes running

Carl Pepper - Cross

1    into the well of the court might constitute Brady or *Giglio*

2    material.  So to the extent that that conversation may, I think

3    we are entitled to know it.  And while I respect very much any

4    lawyer is obviously defending their client, I am very concerned

5    about, you know, the jury seeing what happened even though

6    maybe they don't know who she is.

7            THE COURT:  Yeah, I don't think that the jury could be

8    influenced just by some person.  The jurors have no idea who

9    that person is and that person hasn't been identified in court.

10   But we'll have to be careful not to do that because I think

11   that then there at least would be the prospect of that.  But I

12   don't believe it would be appropriate for any curative

13   instruction right now because there is so many people in the

14   courtroom and so many people coming in and out and handing

15   things to people all the time.

16           Anything else, Ms. Sweeney?

17           MS. SWEENEY:  No, Your Honor.

18           THE COURT:  Anything else, Mr. Gillen?

19           MR. GILLEN:  No, Your Honor.

20           THE COURT:  Thank you.

21       (In open court:)

22           THE COURT:  Objection is overruled.

23   BY MR. GILLEN:

24   Q.  Now, Mr. Pepper, isn't it a fact that you signed under

25   penalty of perjury a declaration on September the 7th, 2021,

Carl Pepper - Cross

1   wherein you declared that if you were required to testify as a

2   witness at the hearing set on September the 8th, 2021, in the

3   above styled case, I would invoke my Fifth Amendment privilege

4   against self-incrimination under the United States Constitution

5   in response to the following questions:

6           Question 1:  Mr. Pepper, isn't it true that you

7   provided false and misleading information to representatives of

8   the Department of Justice for the purpose of obtaining immunity

9   from criminal prosecution, leniency or other preferential

10   treatment?

11          And you asserted your Fifth Amendment to that, didn't

12   you, sir?

13   A.  All I know is I signed something concerned the Fifth

14   Amendment.  I don't remember saying -- signing something.

15          MR. GILLEN:  If I may pass up I-827 so the -- may I?

16          THE COURT:  Yes.

17   BY MR. GILLEN:

18   Q.  Now, I would like you, Mr. Pepper, to look to the back

19   page.  That's your signature, correct?

20   A.  Yes, sir.

21   Q.  Executed on the 7th day of September of 2021, correct?

22   A.  Yes, sir.

23   Q.  And your signature, if you can review the first paragraph

24   and tell us whether or not I successfully read out the first

25   paragraph of your declaration.

Carl Pepper - Cross

1    *A.* I remember signing this for the Fifth Amendment privilege,

2    but I don't -- I don't remember reading the whole thing because

3    I know I did not falsely tell representatives of the Department

4    of Justice that Brian Roberts told you to reach out to

5    competitors.

6    *Q.* Well, you do admit, do you not, that you signed a sworn

7    declaration in a federal case invoking your Fifth Amendment

8    privilege against self-incrimination about whether or not isn't

9    it true that you provided false and misleading information to

10   representatives of the Department of Justice for the purpose of

11   obtaining immunity from criminal prosecution, leniency or other

12   preferential treatment?  And you took the Fifth, didn't you,

13   sir?

14        *MS. SWEENEY:*  Objection, Your Honor, may we have

15   another side bar?

16        *THE COURT:*  Yes.

17      (At the bench:)

18        *THE COURT:*  Go ahead, Ms. Sweeney.

19        *MS. SWEENEY:*  Your Honor, my concern is that the

20   questions also being posed are incredibly misleading.  As you

21   may recall, the defendants, and as Mr. Kornfeld explained, the

22   defendants provided these list of questions to Mr. Pepper and

23   it wasn't an all or nothing.  He didn't choose to plead the

24   Fifth to some and not to others because that's not how pleading

25   the Fifth works.

Carl Pepper - Cross

1    And there was an extensive discussion as I recall at

2    the hearing, at the first hearing, where the first part of the

3    hearing was about selective pleading of the Fifth.  And so I

4    worry how now what the jury is understanding is that Mr. Pepper

5    understood by this question that it seems like the premise of

6    these questions are what he is pleading the Fifth to as opposed

7    to -- the premise of each question, I apologize, is what he is

8    pleading the Fifth to as opposed to pleading the Fifth to each

9    question individually as opposed to all of the questions and

10   the subject matter as a whole.

11       So the way these questions are being presented to the

12   witness, I worry that it's misleading to the jury, as well as

13   being irrelevant and cumulative.  He already has testified

14   extensively that he understood he believed he could be

15   prosecuted.

16       THE COURT:  Well, the beginning paragraph of the

17   declaration indicates that he will invoke his Fifth Amendment

18   privilege in response to the following questions, so I think

19   it's clear.  I mean, it may be something that you want to ask

20   him on redirect about, but I think that the questions are not

21   misleading.  I think that the declaration the way it's being

22   posed to him is what he was invoking the Fifth Amendment about.

23   And also the other objections that the United States

24   interposed, I will deny each of those.

25       MR. KORNFELD:  Your Honor, Ms. Manning again walked

Carl Pepper - Cross

1    into the middle of the well.  To the credit of the government,

2    they directed her back outside, but I would ask if Mr. Torzilli

3    hasn't done it already to instruct this lawyer not to be

4    walking into the well of this courtroom in open court.

5            THE COURT:  Well, I don't know where Mr. Torzilli is.

6            MR. McLOUGHLIN:  Your Honor, Mr. Torzilli walked out

7    with Ms. Manning and I believe he is outside the courtroom with

8    her now.  I don't know whether they are conferring or what's

9    happening, but on behalf of my client, I would renew

10   Mr. Kornfeld's request that we under *Brady* and *Giglio* and

11   *Jencks* be provided with the information as to what, you know,

12   this man's lawyer is telling the government and vice versa

13   while this man is on the stand given her coming up to the

14   government's table and pulling Mr. Torzilli out of the

15   courtroom.  This is extraordinary.

16           THE COURT:  I don't think it's affecting the -- it's

17   obviously not affecting the witness and maybe Mr. Torzilli is

18   trying to keep her from doing that, but the government seems to

19   be monitoring what I am saying right now at the bench

20   conference.  And perhaps Mr. Torzilli has communicated that to

21   her.  Maybe -- so I don't know, but there is no -- I am not

22   going to make any directive and I won't say anything to the

23   jury at this point.  And I haven't heard enough to cause some

24   disclosure of anything that she's discussed with the

25   government, at least as of this point.

Carl Pepper - Cross

1        Let's continue on with the cross-examination.

2        (In open court:)

3    *BY MR. GILLEN:*

4    *Q.*  Now, Mr. Pepper, let me ask you another question.  Same

5    declaration.  Isn't it correct that you asserted your Fifth

6    Amendment right against self-incrimination when asked the

7    question under oath:  Mr. Pepper, isn't it true that neither

8    Brian Roberts or Tim Mulrenin ever asked or directed you to

9    obtain pricing or price-related information from other

10   suppliers of broiler chicken products or had any communications

11   with representatives of suppliers of broiler chicken products

12   for the purpose of coordinating or aligning pricing or strategy

13   in any way?

14        Do you see that question?

15   *A.*  Yes, sir, I see it.

16   *Q.*  And you, sir, asserted under oath your Fifth Amendment

17   right against self-incrimination, correct?

18   *A.*  I guess I did.

19   *Q.*  Because a truthful answer would have gotten you in trouble,

20   right, because you did give false and misleading information to

21   the government.

22   *A.*  No, I did not.

23   *Q.*  And that's why you asserted your Fifth Amendment rights,

24   right?

25   *A.*  I'm not sure why I did my Fifth Amendment right, but I know

Carl Pepper - Cross

1    I have not lied at all to the government, DOJ.

2    *Q.*  I am sorry, are you through with your answer?

3    *A.*  Yes, sir, I am.

4    *Q.*  You know how serious it is to file under oath in federal

5    court a declaration you swore to, correct?

6            *MS. SWEENEY:*  Objection to the characterization of

7    this document as filed, especially by Mr. Pepper.

8            *THE COURT:*  Overruled.

9    *A.*  I don't have an answer.

10   *BY MR. GILLEN:*

11   *Q.*  You don't have an answer?

12   *A.*  I have no answers.

13   *Q.*  You have no answer as to whether or not you do or do not

14   know how serious it is to file a declaration under oath

15   actually pursuant to 28 U.S.C. 1746, which is tantamount to the

16   same thing, and to have that thing as truthful and as accurate

17   as is possible, right?

18   *A.*  Yes, sir.

19   *Q.*  And you sat down and you signed your name and asserted the

20   Fifth Amendment to the questions in this declaration, didn't

21   you?

22   *A.*  Yes, sir, I guess I did.  I don't -- yes, sir.

23   *Q.*  You also in the same declaration after -- and this was sent

24   to you and you reviewed it and then you signed it, right?

25   *A.*  Yes, sir.

Carl Pepper - Cross

1   Q.  This wasn't done in five minutes.  You had time to review

2   it and then sign it and send it in, correct?  Correct?

3   A.  Yeah, I had time to do it.

4   Q.  Okay.  And this is a question that was asked of you in this

5   declaration:  Mr. Pepper, isn't it true that you falsely told

6   representatives of the Department of Justice that in 2014 and

7   2015 the suppliers of broiler chicken products had a common

8   understanding to increase prices?

9           And you took the Fifth Amendment to that question,

10  didn't you?

11  A.  Yes, I guess I did.

12  Q.  Because you needed to because you had given them false

13  information; isn't that right, sir?

14  A.  No, sir, it's not.

15  Q.  Now, then what happens is you then are in a situation now

16  where you've had the tears in the eyes.  You're not going to

17  get what you want.  The summer of 2014 is passing.  You have

18  taken the Fifth Amendment to questions about whether you lied

19  to the government about Brian Roberts, Mulrenin and any common

20  understanding among any of those people, right?  Right?

21  A.  Yes, sir.

22  Q.  But hope springs eternal, doesn't it?  Hope springs eternal

23  because the government comes back in January of this year and

24  suddenly there is still a chance for Carl Pepper to get his

25  immunity deal, right?

Carl Pepper - Cross

1   A.  Yes, sir.

2   Q.  And that's when you started saying these things and that's

3   when you started feeling, wow, a second chance.  That's how you

4   felt, right?

5   A.  No, sir, I did not feel it was a second chance.  I just

6   felt like they had been -- I had been telling the truth all

7   along and they realized I had been telling the truth all along.

8   Q.  Well, you know, you knew that after all those meetings with

9   you leading up from 2019 all the way for two years to summer of

10   2021, you know, they weren't buying what you had to say, right?

11  A.  That's what it seemed like, yes, sir.

12  Q.  You felt like they didn't trust you or believe you.  That's

13  how you felt, right?

14  A.  I couldn't figure out -- yes, that's exactly, because I

15  knew what I was doing was telling them the truth.

16  Q.  You felt like they didn't believe you, correct?

17  A.  I didn't know what I felt.  I just, like I said, I knew I

18  was telling the truth, period.

19  Q.  And then --

20  A.  I didn't know what the reasoning was.

21  Q.  And then we have January.  And there is new hope for you,

22  right?  Right?

23  A.  Yes, sir.

24  Q.  And now if you say just a few more things and get across

25  that line just far enough so that these folks over here will

Carl Pepper - Cross

1   say, good job, Mr. Pepper.  You now have your deal; isn't that

2   right?

3   A.   Yeah.

4   Q.   Okay.  That's right.  So what happens is the information

5   that we've been hearing here from you on direct examination

6   largely comes from a blizzard of interviews that you have given

7   to these folks since your proffer interview on January the

8   12th, right?

9   A.   Yes, sir.

10  Q.   So you have a proffer interview on January the 12th.  You

11  sign your deal.  It's the day -- it's dated February the 7th.

12  You sign it on February the 8th.  And you are off to the races,

13  right?

14  A.   Yes, sir.

15  Q.   And you are talking to these people almost every night or

16  every day, aren't you?

17  A.   Yes, sir.

18  Q.   And a little bit more, yeah, I remember now and now I

19  remember.  Now I remember.  Because you, you know that no

20  matter what happens in this courtroom to everybody here, the

21  one thing that you do know is that Carl Pepper is going to go

22  home and put his head on the pillow and sleep soundly knowing

23  the Department of Justice isn't going to drag him into court

24  under an indictment.  You know that, don't you?

25  A.   I know two things.  I know that and I know I have been

Carl Pepper - Cross

1    telling the truth.

2    Q.  Were you telling truth when you took the Fifth Amendment to

3    those questions we went over or were you lying under oath in a

4    declaration in federal court?

5    A.  I was not lying under oath.  I guess bottom line is I

6    signed it and I must not have paid attention to what I was

7    signing.

8    Q.  You are telling us that you took a declaration to be filed

9    in federal court in a criminal case and just didn't think as

10   much of it to even review it or think about it.  And you just

11   signed it on the back and said, well, I wonder what I just

12   signed.  Is that what you're telling us?

13   A.  I don't really know what I'm trying to tell you.  Like I

14   told you over and over again, I have told the truth from day

15   one whether you believe it or not.

16   Q.  Now, let's go back a little bit to the -- you can put that

17   aside.  Let's go back a little bit to the 2014 episode.

18            Now, I think we are going to need, Anthony, we are

19   going to need the exhibit binders out.

20            MR. GILLEN:  May I approach, Your Honor?

21            THE COURT:  You may.

22   BY MR. GILLEN:

23   Q.  I want you to take a look at 9885, if you would, please.

24            You recognize that document, don't you?

25   A.  Yes, sir.

Carl Pepper - Cross

 1          *MS. SWEENEY:*  Your Honor, I apologize.  May I have a

 2   copy of the document?

 3          *THE COURT:*  Yes.

 4          *MS. SWEENEY:*  Thank you.

 5   *BY MR. GILLEN:*

 6   *Q.*  9885, do you recognize that document?

 7   *A.*  Yes, sir.

 8   *Q.*  And is that a document the government has shown you?

 9   *A.*  Yes, sir.

10   *Q.*  And this is a -- can you just tell us --

11          *MR. GILLEN:*  Your Honor, I would move for the

12   admission of 9885, Government Exhibit 9885.

13          *THE COURT:*  Sorry, Mr. Gillen.  Is it 9985?

14          *MR. GILLEN:*  9885, Government Exhibit 9885.

15          *THE COURT:*  Any objection to the admission of

16   Exhibit 9885?

17          *MS. SWEENEY:*  Yes, Your Honor, at least the copy --

18   well, hearsay.

19          *MR. GILLEN:*  Your Honor, I believe this was admitted

20   previously and would be subject, I believe, to agreement.  And

21   so in that respect I believe it would be admissible.

22          *MS. SWEENEY:*  Your Honor, I could be mistaken.  I

23   believe the agreement was about authenticity, but not about

24   admissibility.  But we are confirming.

25          *THE COURT:*  Hold on one second.  So have you checked

Carl Pepper - Cross

1    Ms. Sweeney?

2            *MS. SWEENEY:*  Yes.  We confirmed this is not subject

3    to a prior agreement nor was it involved in a prior hearing.

4            *THE COURT:*  Any response, Mr. Gillen?

5            *MR. GILLEN:*  Well, Your Honor, in a prior proceeding

6    this was -- my understanding was that this was admitted, No. 1.

7    No. 2, I can ask him some follow-up questions that he received

8    it and was asked about it by the government for in an

9    interview.

10           *THE COURT:*  What's the objection?

11           *MS. SWEENEY:*  The objection is hearsay.

12           *THE COURT:*  Sustained.

13   *BY MR. GILLEN:*

14   *Q.*  Staying on 9885, I want to ask you a few questions,

15   Mr. Pepper.

16           Do you remember without looking at the contents, do

17   you remember receiving this?

18   *A.*  Yes, sir.

19   *Q.*  You had earlier testified on direct examination about an

20   e-mail that you had received in June of 2014, remember?

21   *A.*  Yes, sir.

22   *Q.*  And it was that e-mail that you received in 2014 that

23   indicated to you or told to you about the Tyson pricing,

24   correct?

25   *A.*  Yes, sir.

Carl Pepper - Cross

1   *Q.*  And when you were interviewed by the government, you

2   explained to them about this particular document, didn't you?

3   *A.*  Yes.  Yes, sir, I believe so.

4   *Q.*  And you explained to the government that this was the first

5   time that you learned on June the 20th about the Tyson pricing

6   model from Brandon Campbell, correct?

7   *A.*  I don't remember.  I don't remember.

8   *Q.*  Well, do you remember receiving this from Mr. Roberts?

9   *A.*  Yes, sir.  Yes, sir.

10   *Q.*  And this document is a document that was an internal Tyson

11   document that was created for the purpose of the folks within

12   Tyson understanding what the proposal is going to be to KFC,

13   correct?

14        *MS. SWEENEY:*  Objection, Your Honor.  This question is

15   about the document that is not in evidence.

16        *THE COURT:*  Yes, but the question doesn't have content

17   of the document in it.  He is just asking him if he recalls it

18   which is all he did, so the objection is overruled.

19   *BY MR. GILLEN:*

20   *Q.*  Does this document reflect an internal Tyson e-mail

21   communication regarding what the KFC model was going to be?

22   *A.*  Yes, sir.

23   *Q.*  And this was a document that was kept within the normal

24   course of Tyson's business, correct?

25   *A.*  Yes, sir.

Carl Pepper - Cross

1  *Q.* And it was relied upon by Tyson employees such as yourself

2  and others for the duty, work duty of Tyson to perform your

3  duties and activities, correct?

4  *A.* Yes, sir.

5  *Q.* And is your recollection that you received it

6  contemporaneous on or about June the 20th of 2014 from

7  Mr. Roberts?

8  *A.* I was thinking I received it around the very first of June

9  is when I found out that I knew that it was going to be a

10  19-cent increase.

11  *Q.* Looking at this document, would you agree with us, agree

12  with me that the dates on there would be accurate as to when

13  that document was forwarded to you?

14  *A.* Yes, sir.

15           *MR. GILLEN:* Your Honor, I would move for the

16  admission of Government's 9885.

17           *MS. SWEENEY:* It's still hearsay, Your Honor.

18           *THE COURT:* Sustained.

19           *MR. McLOUGHLIN:* We would also ask on behalf of

20  Mr. Lovette that if Your Honor will not admit it for the truth

21  of the matter asserted, it is admissible under the exception

22  for impact on the listener, that listener being Mr. Pepper and

23  whatever conduct he may have taken after that. And so with

24  respect to the effect on the listener, not for the truth of the

25  matter asserted, we would say it is admissible.

Carl Pepper - Cross

1          THE COURT:  On Mr. Lovette's cross-examination you can

2     make that point, but I won't entertain it in the course of

3     Mr. Gillen.

4          MR. GILLEN:  Well, Your Honor I would make the same.

5     This document, if he used this document and the effect on the

6     listener to then formulate his ideas.

7          THE COURT:  That foundation has not been laid.  It may

8     be, but it hasn't been laid at this point, so the exhibit is

9     refused.

10          MR. GILLEN:  I will work on that foundation.

11    BY MR. GILLEN:

12    Q.  Now, this document, you received this document without

13    getting into the contents, correct?

14    A.  Without getting into the context?

15    Q.  Without getting into the contents, you received this

16    document from Mr. Roberts, correct?

17    A.  Yes, sir.

18    Q.  And did you in receiving this, did you use this document to

19    formulate any ideas or any activities on behalf of Tyson as a

20    result of the contents of this document?

21    A.  Yeah.  Can you ask that question again?  I am not sure what

22    you're asking me.

23    Q.  The question is that you got this document.

24    A.  Right.

25    Q.  And you reviewed it, correct?

Carl Pepper - Cross

1    A.   Right.

2    Q.   Did you, as a result of this document, did you have -- did

3    this document have an impact on you in terms of your

4    understanding and activities regarding the KFC contract based

5    upon your having reviewed the information in this contract --

6    excuse me, in this e-mail?

7    A.   Like I said, I knew about the 19 cents before this e-mail.

8    Q.   Well, focus on my question.

9    A.   I am trying to.

10   Q.   Does this document, in this document, the information in

11   this document, did you use this information and the effect that

12   it had on you in order to carry on your work for Tyson

13   regarding KFC and the KFC contract?

14   A.   The biggest thing it did was when I realized the price, the

15   first thing I was thinking about was this kind of increase,

16   that we could potentially lose business off of this increase.

17   That's what my feeling was at that time.

18   Q.   That was the effect on you, correct?

19   A.   Yes, sir.

20   Q.   And so as a result -- for example, earlier in the direct

21   examination and on cross-examination, you were asked about a

22   June 2014 e-mail from Brandon Campbell.  Now, is this the

23   document you were referring to when you referenced on direct

24   examination and also on cross-examination?

25   A.   I guess it was.  I don't know.  I don't remember which

Carl Pepper - Cross

1  document I was looking at because I know there was another one

2  like this.

3  Q.  But you do remember explaining to the government about the

4  June 19th e-mail, did you not?

5  A.  The June 19 --

6  Q.  Excuse me, the June 20th?

7  A.  I don't know -- I mean, I don't know what you're asking,

8  period.  I just don't understand what you're asking me.

9  Q.  Did the government show you this exhibit when they

10  interviewed you?

11  A.  Yes.  I saw this.  I've seen this e-mail before, yes, sir.

12  Q.  Okay.  And did you explain to them what that e-mail meant

13  to you?

14  A.  Yes, sir.

15  Q.  What did you tell the government that that e-mail meant to

16  you?

17  A.  The biggest thing that it meant to me was that I was

18  worried about potentially losing business with that kind of an

19  increase.

20  Q.  And did you tell them how that e-mail was created?

21  A.  How the e-mail -- it came from -- well, they had the

22  e-mail, so they asked me who Brandon Campbell was.  I told them

23  who Brandon Campbell was.

24  Q.  So you explained to them that this e-mail, and this was on

25  the July the 9th of 2020 interview that you had with them, you

Carl Pepper - Cross

1    were shown the document that's in front of you, correct?

2    A.  I don't remember if I was shared it at that particular

3    time.

4    Q.  Now, did you share with the government what your

5    understanding was of the value of this e-mail?

6    A.  Yes, sir, I did.

7    Q.  And you explained to them, did you not, that this e-mail

8    was Brandon Campbell setting out the pricing model for Tyson in

9    this e-mail, correct?

10   A.  Yes, sir.

11   Q.  And you explained to them that you knew what the pricing

12   model and what the margin or the increase was going to be,

13   correct?

14   A.  Yes, sir.

15   Q.  And we went over earlier on cross-examination that the

16   number -- the increased number on Brandon Campbell's e-mail

17   that you told us about on direct and on cross-examination had

18   the 19-cent, correct?

19   A.  Yes, sir.

20   Q.  And then we talked about the margin that we had at the end

21   of the day in December at 19 cent .3, right?

22   A.  Yes, sir.

23   Q.  So you remember all that.

24   A.  Yes, sir.

25   Q.  When you saw this e-mail back in 2014, what if any action

Carl Pepper - Cross

 1   did you take as a result of seeing this e-mail?

 2   A.  I voiced my opinion to the pricing group.  That's my action

 3   that I took at that particular time.

 4   Q.  When did you speak with the pricing unit?  First of all,

 5   strike that.

 6         When the pricing model was set up, did they even send

 7   it to you initially or was it forwarded to you?

 8   A.  It was forwarded to me.

 9   Q.  So Brandon Campbell didn't even think to include you on the

10   folks that would be getting distribution on the pricing model

11   in June of 2014, right?

12         MS. SWEENEY:  Objection, foundation as to the

13   knowledge, the thoughts of Mr. Campbell.

14         THE COURT:  Sustained.

15   BY MR. GILLEN:

16   Q.  And when did you speak with Mr. Campbell about your

17   concerns about his pricing model?

18   A.  For sure it was in the Steve Cullen meeting when everybody

19   was in there and I told him, I said, "Are you really sure, sure

20   about this price increase, because it could jeopardize a lot of

21   business."

22   Q.  Now, we know that the Steve Cullen meeting was in August.

23   A.  Yes, sir.

24   Q.  We have got this e-mail in June in 2014, but the Steve

25   Cullen meeting doesn't take place until August; isn't that

Carl Pepper - Cross

1  correct?

2  *A.*  Yes, sir.

3  *Q.*  And since we're there at the Cullen meeting, let's kind of

4  fast-forward there a little bit and talk about that.  Because

5  what happens at the Steve Cullen meeting is you're there.

6  Others are there.  And you think Brian Roberts might have been

7  there by phone; is that right?  It could have been in person or

8  by phone.  You were not sure.

9  *A.*  Yes, sir.

10  *Q.*  But the one thing that you do know is that there was a

11  concern about Brandon Campbell and his model, right?

12  *A.*  Yes, sir.

13  *Q.*  Now, were you aware this model had already been sent to

14  RSCS in July?

15  *A.*  No, sir.

16  *Q.*  They didn't CC you on that either.

17  *A.*  No, sir.

18  *Q.*  Okay.  But what you say is that there is a discussion in

19  the meeting.  And then what happens is that Brandon Campbell

20  tells everybody why the price has to be and that the price is

21  going to be, right?

22       *MS. SWEENEY:*  Objection, hearsay as to what

23  Mr. Campbell is saying in this meeting.

24       *THE COURT:*  Sustained.

25  *BY MR. GILLEN:*

Carl Pepper - Cross

1   *Q.*  I will rephrase.  That's exactly what you told the

2   government when you met with them.  You told them that Brandon

3   Campbell said that they had to keep that price, right?

4   *A.*  Yes, sir.

5   *Q.*  So this is something that you told the government when you

6   met with them and you let them know in the Cullen meeting.  We

7   didn't hear that on direct examination, but you told them in

8   interviews that in the Cullen meeting, that Brandon Campbell

9   said this is it and this is why it's going to be it.  You told

10  the government that, didn't you?

11       *MS. SWEENEY:*  Objection, Your Honor, embedded hearsay

12  of the statements of Mr. Campbell.

13       *THE COURT:*  Sustained.

14       *MR. GILLEN:*  May I inquire as to what he told the

15  government, Your Honor?

16       *THE COURT:*  Well, it's right about 5:00.  We will take

17  that up.  But if you want to ask a few more questions, you can.

18       *MR. GILLEN:*  It's a good breaking point now.  It's

19  kind of an important point.

20       *THE COURT:*  Sure.  We can either talk about it outside

21  the presence of the jury if it's a side bar type thing or we

22  can take it up again on Monday morning.

23       *MR. GILLEN:*  Perhaps I can work at it from another

24  way.  I can go back to one of the interviews and ask if that

25  was said in the interview like I did with some of the others.

 1    I will work at it from that end and see how that goes.

 2          THE COURT:  Okay.

 3    BY MR. GILLEN:

 4    Q.  Now, on February the 14th of 2022, you explained to the

 5    government, did you not, that Brandon Campbell in the meeting

 6    told everybody why they had to keep the prices exactly where

 7    they were.

 8          MS. SWEENEY:  Objection, embedded hearsay.

 9          THE COURT:  I am going to sustain that objection.

10          MR. GILLEN:  So I cannot ask that question.  Okay.

11          THE COURT:  Mr. Gillen, we are now a little after

12    5:00, so if you can find a --

13          MR. GILLEN:  It's a good spot, Your Honor.  I can

14    clean up my binders here.

15          THE COURT:  Ladies and gentlemen, obviously we don't

16    have trial tomorrow, so it will be Monday when you come back.

17    So it's very important over the weekend because you may come in

18    contact with more people than you have so far.  And they may

19    even know that you're a juror.  So you need to really be

20    vigilant about cutting off any attempt by people to start

21    showing off that they know what you're doing or telling you

22    things that they may have read or any of those thing.  Just

23    don't go down that path.  It's just not worth it because you

24    don't want to get exposed to any other information.  And they

25    may not understand that fine point, but you do, so you really

1    need to be careful about that.

2            And also, of course, don't look up any information.

3    Don't -- and if you happen to hear anything about the case, you

4    know, immediately change your channel, avert your eyes, stop

5    your ears, whatever it takes.

6            I hope you have a great weekend, ladies and gentlemen.

7            *JUROR:*  8:30, Your Honor.

8            *THE COURT:*  Good point.  8:30 on Monday.  The jury is

9    excused.

10           (Jury excused.)

11           Please be seated.

12           Mr. Pepper, you are excused until Monday at 8:30.

13   Thank you.

14           *THE COURT:*  Mr. Koenig, go ahead.

15           *MR. KOENIG:*  Thank you, Your Honor.

16           I am going to make this fairly short, but I think that

17   we may have a serious issue here.  Mr. Pepper was just accused

18   of committing perjury by exercising his constitutional rights

19   and that is completely unacceptable.  We all know that pleading

20   the Fifth is an admission of nothing, nothing.  And the

21   questions on that sheet were all having to deal with his

22   interactions with the Department of Justice with his

23   involvement in the conspiracy.  He just says I am not answering

24   any of this stuff.  It doesn't mean that any of it is true.

25           And so it just -- it -- I am a little upset right now,

1   and I apologize for that, but I really would like the chance to

2   brief this because I think we've got a big problem.  And we

3   need a curative instruction for the jury and we need to strike

4   it is I think where we are going to end up.

5           THE COURT:  Well, of course, there was not any

6   objection by the government to that effect during any of those

7   questions.  Despite that fact, I think that it is appropriate

8   to brief that issue.  I think it's appropriate for people to

9   think about whether the Court should provide some type of an

10  instruction to the jury about what it means to invoke the

11  Fifth, what it doesn't mean to invoke the Fifth.  That would be

12  probably a worthy topic as well.

13          MR. KOENIG:  Thank you.  And again, I apologize if I

14  seemed a little upset.

15          THE COURT:  Mr. Tubach?

16          MR. TUBACH:  Of course, invoking the Fifth Amendment

17  in the context in which you are not a criminal defendant, there

18  is absolutely the possibility of an adverse inference.  In

19  civil cases adverse inferences are drawn all the time against

20  party who invoke the Fifth Amendment.  They invoke the Fifth

21  and the Court allows the jury to draw an adverse inference that

22  their refusal to answer the question would have incriminated

23  them.  That is the law.  We would be certainly happy to brief

24  it, but that is black letter law.

25          THE COURT:  I am not saying -- Mr. Koenig asked for

1   the opportunity to brief and I think that's appropriate.

2           MR. GILLEN:  Your Honor, one point.  He could have

3   said to those questions no, no.  Is it true?  He could have

4   said no and he chose not to.  And you can't just decide not to

5   participate in the system by simply saying I am going to invoke

6   the Fifth because I don't want to come to Denver or I don't

7   want to play in the game.  So he chose carefully those answers

8   that he gave to the questions propounded.  We did that as a

9   favor to his counsel so that he wouldn't have to come out here

10  to simply do that.  That's the dilemma that he chose, not us,

11  so we believe that all those questions were appropriate.

12          And the question would be -- that's all.  I will rest

13  at that.

14          THE COURT:  So Mr. Koenig, when do you think you can

15  get that in?

16          MR. KOENIG:  Tomorrow evening.

17          THE COURT:  That's fine.

18          Mr. McLoughlin?

19          MR. McLOUGHLIN:  Your Honor, yes, the defendants will

20  provide a response when we see the government's because I

21  believe there is Supreme Court precedent in favor of the

22  defendants' position that will address it.

23          Specifically, though, with respect to the

24  sequestration order, in light of the conduct of Mr. Pepper's

25  lawyer coming up to the well twice and pulling a prosecutor out

1     to confer, we renew our request under *Jencks*, *Giglio* and *Brady*

2     for disclosure of the communications that occurred while

3     Mr. Pepper was on the stand.  And we would specifically ask the

4     Court to instruct the government that to counsel for Mr. Pepper

5     that they under the sequestration order are not permitted to

6     communicate with her except with respect to travel arrangements

7     while he is on the stand, because clearly his counsel does not

8     believe that that's necessary.  And we request that the

9     government instruct his counsel that they may not talk with her

10    about anything while he is on the stand.

11         THE COURT:  That issue may benefit from briefing as

12    well.  I haven't had that situation before.  I am not sure if,

13    you know, the fact that the attorney for a witness communicates

14    with the government, you know, under circumstances where it's

15    not getting communicated right back to the witness is a

16    violation of the sequestration order.  I am not sure about

17    that.

18         MR. TUBACH:  Your Honor, indirect communications with

19    a witness are no less violative of the sequestration order than

20    direct communications with the witness.  And the problem is

21    indirect communications with this witness through his lawyer is

22    something we will never be able to test because we are not

23    going to be able to pierce that privilege between him and --

24    between Mr. Pepper and his lawyer.  And we know to a certainty

25    that when the lawyer came up and spoke with Mr. Torzilli, she

1    was not speaking about travel arrangements.  She was speaking

2    about the testimony that Mr. Pepper was giving and probably a

3    side bar that we were having.

4          So the conversation had to have been substantive of

5    some kind.  And I believe waiting to brief this is going to

6    give us a three-day weekend where the Court is going to get

7    very nice polished briefs and the horse will have left the barn

8    because there will be a three-day period where there is no

9    order that they shouldn't be communicating with Mr. Pepper's

10   lawyer about the substance of his testimony.  That's the

11   problem, I think, with briefing it.

12         *MS. PREWITT:*  Your Honor, I may be wrong, but I

13   believe Ms. Manning, co-counsel is in the courtroom now.  I

14   just want to make Your Honor aware.

15         *THE COURT:*  No, I can see her.  Let's have a response

16   from the government.

17         *MR. KOENIG:*  Well, Your Honor, we were up here, you

18   know, following the side bar and doing the case and we had no

19   control over what happened.  So, you know, there certainly was

20   no intent for this to happen on the government's behalf.  And I

21   was not -- oh, and, yeah, we of course would agree not to

22   contact during briefing.  That's for sure.

23         *THE COURT:*  I am sorry, what was the last part?

24         *MR. KOENIG:*  We -- obviously we would agree not to

25   contact her during briefing.  I mean, we wouldn't contact her

1   anyway, so --

2        THE COURT:  I think the concern wasn't necessarily

3   that.  It was that Mr. Pepper's attorney would be free to talk

4   to Mr. Pepper, her client, over the weekend.

5        MR. KOENIG:  Well, but my understanding -- I know that

6   she came up and talked to me.  And I don't even know what she

7   said.  And I just said I, you know, whatever.  I am going back

8   to this thing here.  I don't think Mr. Torzilli conveyed any

9   information other than -- the only thing I said is you've got

10  to get out of here.  So I don't know that it's -- I don't know

11  that the solution is that he can't consult with his attorney

12  over the weekend.  I mean, that seems -- especially when he has

13  just been accused of committing a crime.

14       THE COURT:  Yeah, I agree with that.  That would seem

15  to be a very harsh remedy.  But what about the notion of

16  stating right now even Mr. Torzilli whatever the attorney said

17  to the government, whatever the government said back to her.

18       MR. KOENIG:  She said -- I believe she said something

19  like, "You've got to fix this."  And I said, "Yeah, yeah."  I

20  just wanted to go back over to the screen.  And then I don't

21  know exactly what the conversation with Mr. Torzilli was.

22       THE COURT:  All right.  Mr. Torzilli?

23       MR. TORZILLI:  Your Honor, I think maybe we could do

24  it on side bar.

25       MR. TUBACH:  I don't think we need to do this on side

1   bar, Your Honor.  The witness is not here.

2           *MR. TORZILLI:*  Okay.

3           *MR. KOENIG:*  I would also say my response was not

4   meant to convey anything substantive.  It was just like...

5           *THE COURT:*  Mr. Torzilli?

6           *MR. TORZILLI:*  Sure.  So I asked her to leave the

7   courtroom for the purpose of telling her to stop coming by the

8   government table and near the jury to come speak to the

9   government.  Counsel for Mr. Pepper was incredibly agitated and

10  on numerous occasions told me that defense counsel's questions

11  were extraordinarily misleading and should not be permitted and

12  also indicated that she thought the questions violated previous

13  rulings of the court.

14          *THE COURT:*  And did you convey any information to her,

15  Mr. Torzilli?

16          *MR. TORZILLI:*  Not other than, "I understand what

17  you're saying, Amy, but I've got to go."  There was not any

18  substance, let alone I heard counsel talking about *Brady* and

19  *Giglio*.  I mean, nothing remotely like that, but certainly

20  great agitation and great frustration with what was being

21  permitted.

22          *THE COURT:*  Okay.  Mr. Tubach, back to you.  Do you

23  believe there needs to be anything further?  If so, what?

24          *MR. TUBACH:*  My request would be that the government

25  continue not to speak with Mr. Pepper's counsel, Ms. Manning,

1    during the break between now and Monday.

2                THE COURT:  Or during any breaks.

3            MR. TUBACH:  During any break, but particularly

4    between now and Monday.  And if there is any communication from

5    Ms. Manning about Mr. Pepper to the Department of Justice, that

6    we be notified about what is discussed.

7                THE COURT:  Mr. McLoughlin?

8            MR. McLOUGHLIN:  It is in some sense extraordinary,

9    but in other senses it is not.  So, for example, the general

10   rule in civil depositions is at breaks during the deposition

11   you are not permitted to talk to your client about the

12   substance of your client's testimony or coach your client.

13   That is not an extraordinary proposition in civil litigation.

14   I don't believe it's an extraordinary proposition in criminal

15   litigation.

16           Given what we've heard about Ms. Manning's statements

17   like "You have to fix this," and her apparent agitation that

18   she believes questions are unfair, I don't think it's an

19   unreasonable inference that she is going to talk to him about

20   those questions and what he could respond or what he might say

21   with respect to the future.  And I respectfully suggest that

22   despite Mr. Pepper's right to counsel, while he is on the stand

23   it is inappropriate.  It affects the confrontation rights of

24   the defendants.  And that order should be issued that she

25   cannot consult with him about his testimony or what he might

1    say.

2         THE COURT:  Yeah, I am going to deny that request.

3    Ms. Manning, I don't know where she is licensed to practice

4    law, but she is subject to the rules of this Court and also to

5    the -- I think because this Court incorporates the Colorado

6    Rules of Professional Conduct, she will be guided by that.  But

7    I won't bar her from being able to consult with her client, so

8    she can do what she can.

9         Mr. Koenig, any objection -- I think you offered this,

10   but any objection to agreeing that you should not contact

11   Ms. Manning -- I think that's her name -- in regard to the

12   testimony of Mr. Pepper while he is still on the witness stand?

13        MR. KOENIG:  No objection, but that's -- we hadn't

14   planned on it.  We don't do that.  We wouldn't do that, so I

15   think that's clear.  We take this very seriously.  And as Your

16   Honor may remember this morning, even when there was the

17   objection over the word honest, you know, I stood up and said

18   may we approach the attorneys and tell them, you know, here are

19   certain words not to use.

20        THE COURT:  Right.  There may be occasions just to

21   communicate something that's important in that regard where you

22   may need to do that, but I don't find that the government has

23   been any violation.  As Mr. Koenig and Mr. Torzilli explained,

24   someone came up and talked to them and they were just doing

25   their best to try to minimize that and make sure it didn't

 1    happen again.

 2         *MR. KOENIG:*  The only thing I will say is for purposes

 3    of when he needs to be here, we have agents and paralegals who

 4    coordinate that kind of stuff, but we, the attorneys, don't

 5    need to be in contact.  And they don't talk substance or

 6    anything.

 7         *THE COURT:*  Obviously there would be some

 8    communication just in terms of that basic coordination of when,

 9    where, that type of thing.

10         Okay.  Ms. Call is looking anxious.

11         *MS. CALL:*  Very briefly, Your Honor.  I know we had a

12    lofty goal this morning perhaps of finishing discussion on the

13    summary exhibits.  The government does hope to offer them again

14    after the conclusion of Mr. Pepper's testimony, so I am hoping

15    we can find the time to work through the remaining objections

16    of the defendants contained in the three pending motions

17    currently and hope that no more get filed over the weekend.

18         *THE COURT:*  I am sorry, what?

19         *MS. CALL:*  So I hope that no more get filed over the

20    weekend.  It does appear I will note that we are at a place

21    where the defendants are somewhat successfully controlling the

22    narrative of the government's case in chief and when it can

23    introduce its evidence.  So I would hope that we can resolve

24    the pending motions in a timely fashion now that the witness

25    testified four days ago about these exhibits.

1        THE COURT:  Yes, it's just been if we had the time.

2   Other issues came up.  We could do that -- we could take that

3   issue up and work on it a little bit now.  I don't think that

4   we're really close to finishing with Mr. Pepper's cross.  We

5   could work on that over the lunch hour for half an hour.  I

6   don't know how long the cross is going to go, but it doesn't

7   matter to me.  We could go until 6:00 tonight.

8        MR. TUBACH:  We are happy to take this up on Monday at

9   any point the Court wants.

10       THE COURT:  Okay.  Why don't we plan, then -- well,

11  you want to do Monday at 8:00?  Do we want to do Monday at

12  1:00?  And then if we don't finish, if we have time we could do

13  Monday 5:15?

14       MS. CALL:  Any of those work for the government.  I

15  will note since we all experienced this once before, to the

16  extent there is items removed as a result of our meeting or any

17  changes to the limiting instruction, it is preferable to do it

18  sooner so we are not sending new drafts to the defendants on

19  the day we close our case, so the government would prefer to do

20  it tonight.

21       THE COURT:  Regardless of when we talk about them and

22  I rule, that doesn't mean that there still won't be changes

23  that require new drafts, so I am not sure if that necessarily

24  drives it, but...

25       MS. CALL:  Yes, Your Honor.  Any of those times work

 1    for the government.

 2              *MR. TUBACH:*  8:00 o'clock would be fine with the

 3    defense, Your Honor.  We will stick with 8:00 o'clock if that's

 4    okay with the Court.

 5              *THE COURT:*  Yeah, that's a perfectly good time for me.

 6              And I thought -- just in case anyone needs it because

 7    there is a danger of spills at your table with so much clutter,

 8    but just in case, we have got a bunch of paper towels.  And hop

 9    up.  Don't let things get ruined.  I don't know if that

10    happened, but just in case it did.

11              A couple of real minor points.  You never -- we

12    double-check all the equipment and we double-checked it before

13    the trial, but then we had some technical issues.  Make sure

14    that you have -- make sure -- it's a good idea for the

15    attorneys to be familiar with how to work the document viewer

16    because you never know when you might need to or at least have

17    someone on the team who can pop up and do that.

18              And then here -- this is really nitpicky, but because

19    we have already invoked the no hat rule with Ms. Aukdahl,

20    Mr. Quinn, occasionally you have someone deliver documents to

21    you.  If you don't mind telling that gentleman, assuming you

22    ever see him again, if he could remove his hat.

23              Anything else we should take up today?  Have a good

24    weekend.  We will resume Monday at 8:00.  Thank you.

25         (Recess at 5:21 p.m. )

1    INDEX

2    WITNESSES

3        Carl Pepper

4            Direct Examination Continued By Ms. Sweeney       1265

5            Cross-examination By Mr. Gillen                    1446

6                        EXHIBITS

7    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

8    118                      1411

9    119                      1413

10   120                      1404

11   221                      1419

12   224                      1415

13   230                      1425

14   231                      1425

15   231-1                    1425

16   232                      1425

17   234                      1427

18   618                      1353

19   744                      1377

20   748                      1396

21   749                      1396

22   750                      1396

23   751                      1386

24   752-758                  1385

25   1145                     1343

INDEX (Continued)

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 1146 | | 1343 | | | |
| 3074 | | 1376 | | | |
| 5016 | | 1371 | | | |
| 9265 | | 1277 | | | |
| 9266 | | 1270 | | | |
| 9267 | | 1269 | | | |
| 9268 | | 1276 | | | |
| 9269 | | 1275 | | | |
| 9270 | | 1267 | | | |
| 9272 | | 1273 | | | |
| 9274 | | 1272 | | | |
| 9703 | | 1340 | | | |
| 9743 | | 1374 | | | |

REPORTER'S CERTIFICATE

    I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.   Dated

at Denver, Colorado, this 15th day of May, 2022.


                              S/Janet M. Coppock