IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB
In Re: Penn II
UNITED STATES OF AMERICA,

       Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

       Defendants

_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 9

_____

         Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 8:37 a.m., on the 8th day of March,

2022, in Courtroom A201, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4   Washington, DC 20530, appearing for Plaintiff.
 5           Anna Tryon Pletcher and Michael Tubach of
 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7   San Francisco, CA 94111-3823;
 8           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9   N.W., Washington, DC 20006, appearing for Defendant Penn.
10           David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15            Laura Kuykendall and Megan Rahman of Troutman Pepper
16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17   appearing for Defendant Brady.
18           Michael Felberg of Reichman, Jorgensen, Lehman,
19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20   10017;
21
22
23
24
25
```

1       APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3       Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4       CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6       555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8       LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9       80218, appearing for Defendant Mulrenin.

10             James A. Backstrom, Counselor at Law, 1515 Market

11      Street, Suite 1200, Philadelphia, PA 19102-1932;

12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13      Bethesda, MD 20814, appearing for Defendant Kantola.

14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15      Street, Suite 1100, Los Angeles, CA 90017;

16             Dennis J. Canty, Canty Law Corporation,

17      1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18      appearing for Defendant Little.

19             John Anderson Fagg, Jr. and James McLoughlin of

20      Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21      Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1              APPEARANCES (Continued)
 2          Craig Allen Gillen and Anthony Charles Lake of
 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,
 4   Atlanta, GA 30339;
 5          Richard L. Tegtmeier of Sherman & Howard, LLC,
 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing
 7   for Defendant Roberts.
 8          Barry J. Pollack of Robbins, Russell, Englert, Orseck
 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,
10   DC 20006;
11          Wendy Johnson and Christopher Plumlee of  RMP, LLP,
12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing
13   for the Defendant Blake.
14
15                    PROCEEDINGS
16       THE COURT:  Yes, Mr. Feldberg.
17       MR. FELDBERG:  Your Honor, I don't know if this is the
18   right time, but I would like to raise an issue with the Court
19   outside the presence of the jury before Mr. Bryant gets on the
20   stand.  And depending on where we are with jurors coming in, I
21   could do it now or at the break.
22       THE COURT:  How long do you think it will take?  I
23   don't want to start late.
24       MR. FELDBERG:  Three to five minutes, but I can do it
25   later at a break.
```

1854

Sara Fisher - Direct

1    THE COURT:  Why don't we do it later at a break
2    because I want to try to start us on time.  Why don't you have
3    Ms. Fisher come back.
4         (Jury present.)
5    THE COURT:  Good morning, ladies and gentlemen.  As
6    you recall, we started the testimony of Ms. Fisher, and will
7    continue with that now.
8         Ms. Sweeney, go ahead.
9    MS. SWEENEY:  Thank you, Your Honor.
10   (**Sara Fisher** was previously sworn.)

**DIRECT EXAMINATION CONTINUED**

11
12   BY MS. SWEENEY:
13   Q.  Good morning, Ms. Fisher.
14   A.  Good morning.
15   Q.  Now, before we ended last night, do you recall that we were
16   looking at documents relating to the RFP process for the 2017
17   negotiations with the chicken suppliers?
18   A.  Yes.
19   Q.  All right.  So now do you still have your binder in front
20   of you?
21   A.  I do.
22   Q.  I would ask you to look at the documents that are behind
23   it, Tabs 19 through 25.  And for the record, those are F-852,
24   F-853, Government's Exhibit 1825, 1826, 1930, 1920, and C-465.
25   Have you reviewed the documents?

1855

Sara Fisher - Direct

1    *A.*  Yes.

2    *Q.*  Ms. Fisher, do you recognize these documents?

3    *A.*  Yes.

4    *Q.*  Generally what types of documents are they?

5    *A.*  They are e-mail.

6    *Q.*  What is the general subject content of the e-mails?

7    *A.*  They were bids that were submitted as part of the contract

8    negotiation from the suppliers.

9    *Q.*  Did you and your team receive these documents?

10   *A.*  Yes.

11          *MS. SWEENEY:*  The government moves to admit F-852,

12   F-853, 1930, 1920 and C-465 which I believe the parties have

13   already agreed to the 803(6) foundation.

14          *THE COURT:*  Any objection to those exhibits?  All

15   right.  Those exhibit will be admitted.  Thank you.

16          *MS. SWEENEY:*  And Your Honor, just to confirm, I

17   believe 1825 and 1826 have already been admitted.

18          *THE COURT:*  Let me double-check.  Yes, you are

19   correct.

20          *MS. SWEENEY:*  Permission to publish Exhibit F-852?

21          *THE COURT:*  You may.

22   *BY MS. SWEENEY:*

23   *Q.*  Ms. Fisher, I would like to direct your attention to

24   Exhibit F-852 which should be behind Tab 19 of your binder.

25          You testified this was a first round bid; is that

Sara Fisher - Direct

 1    right?

 2    A.   Yes.

 3    Q.   I would like to focus on the bottom e-mail, if we could

 4    zoom in on that, please.   Who is this from?

 5    A.   Me.

 6    Q.   And who is it to?

 7    A.   It was to Scott Brady and Mikell Fries.

 8    Q.   Who is Scott Brady?

 9    A.   He was our day-to-day contact with Claxton Poultry.

10    Q.   And who is Mikell Fries?

11    A.   He was the owner of Claxton Poultry.

12    Q.   Are you -- do you know if there was a reporting

13    relationship between the two of them?

14    A.   I believe Scott reported to Mikell.

15    Q.   Now, Ms. Fisher, have you ever met Mr. Fries in person?

16    A.   Yes, I believe one time.

17    Q.   About how many years ago?

18    A.   It was the kickoff meeting for this negotiation, so in

19    January 2017.

20    Q.   Would you recognize Mr. Fries if you were to see him in

21    person?

22    A.   Yes.

23    Q.   I would ask you to look around the courtroom and let me

24    know if you see him, and if you do, describe that you see him

25    by describing an article of clothing he is wearing or where he

Sara Fisher - Direct

1    is seated.

2    A.  He is over there in a green tie.

3        MS. SWEENEY:  We would ask that the record reflect

4    that the witness has identified Defendant Fries.

5        THE COURT:  It shall.

6    BY MS. SWEENEY:

7    Q.  Turning back to the document on the screen, could you read

8    the sentence that begins with:  I know that.

9    A.  I know that the poultry show is next week, but we need to

10   get a firm offer from you by the end of next week,

11   February 3rd, that includes the cost model, volume and case

12   weights for both eight-piece and dark meat.

13   Q.  What did you mean when you said need to get a firm offer?

14   A.  We wanted them to provide an offer back as part of the

15   negotiation.

16   Q.  And what was the due date for that offer?

17   A.  February 3rd, the end of the week of February 3rd.

18   Q.  I would now, Ms. Fisher, ask you to turn to Tab 25.

19       MS. SWEENEY:  Your Honor, permission to publish C-465,

20   the first two pages.

21       THE COURT:  You may.

22       MS. SWEENEY:  Thank you.

23       Apology, Ms. Fisher.  I think we are having just a

24   little technical issue.

25   BY MS. SWEENEY:

Sara Fisher - Direct

1  *Q.*  On the screen should be the first two pages of Exhibit

2  C-465.  And you testified this was also an initial bid

3  proposal, right?

4  *A.*  Yes.

5  *Q.*  What company, what poultry supplier is this from?

6  *A.*  Koch Foods.

7  *Q.*  And who sent this letter?

8  *A.*  Bill Kantola.

9  *Q.*  What was Mr. Kantola's role?

10 *A.*  He was our main contact for the Yum Brands.

11 *Q.*  For what company?

12 *A.*  For KFC, Yum Brands.

13 *Q.*  The main contact from what company?

14 *A.*  Koch Foods, sorry.

15 *Q.*  Are you familiar with someone by the name of Joe Grendys?

16 *A.*  Yes.

17 *Q.*  Who is Joe Grendys?

18 *A.*  The owner of Koch Foods.

19 *Q.*  Now, Ms. Fisher, I would like to direct your attention to

20 the documents behind Tabs 26 through 32.

21        *MS. SWEENEY:*  And for the record, that's Exhibits

22 C-207, F-789, F-796, G-474, B-963, F-747, and F-783.

23 *BY MS. SWEENEY:*

24 *Q.*  Now, Ms. Fisher, do you recognize these documents?

25 *A.*  Yes.

Sara Fisher - Direct

1    *Q.*   Generally what types of documents are they?

2    *A.*   They are the exhibits that go to our SBRA document for

3    RSCS, so they are the contracts.

4    *Q.*   The contracts between who?

5    *A.*   RSCS and each supplier.

6    *Q.*   For what -- is it relating to what negotiation cycle?

7    *A.*   It was related to the 2017 negotiation.

8    *Q.*   And that's the negotiations you have been talking about?

9    *A.*   Yes.

10   *Q.*   You said they were exhibits to the SBRA.  What is the SBRA?

11   *A.*   It's a Supplier Business Relationship Agreement.  It's the

12   main agreement that RSCS uses with all of their suppliers.

13        *MS. SWEENEY:*  The government moves to admit the

14   exhibits I listed before and I can read them again:  C-207,

15   F-789, F-796, G-474, B-963, F-747 and F-783.  Your Honor, these

16   are also subject to the agreement between the parties on 803(6)

17   grounds.

18        *THE COURT:*  Any objection to the admission of any of

19   those exhibits?

20        Each of those exhibits will be admitted.

21   *BY MS. SWEENEY:*

22   *Q.*   Now, Ms. Fisher, did these contracts that we just looked

23   at, did they all go into effect at the same time?

24   *A.*   No.

25   *Q.*   When did they go into effect?

1860

Sara Fisher - Direct

1    A.   It varied.   Some started in 2017 and some started in

2    January 1 of 2018.

3    Q.   What was the contract term for these contracts?

4    A.   They ran through the end of 2020.

5    Q.   In your experience, was it typical that RSCS entered into

6    three-year or more contracts?

7    A.   Yes.   That was the previous contracts were long-term

8    contracts as well.

9    Q.   At any time during the bidding and negotiation process that

10   occurred for these contracts did you ever ask anyone at any

11   chicken supplier to communicate with any other chicken supplier

12   regarding the bids or negotiations?

13   A.   No.

14   Q.   I would like to turn to your responsibilities with regard

15   to supply assurance.   Are you familiar with the term shortage?

16   A.   Yes.

17   Q.   What is it?

18   A.   It could mean that, you know, a particular supplier would

19   be short birds for a particular day and would not be able to

20   fill an order to a distributor.

21   Q.   Do shortages happen at KFC or RSCS?

22   A.   Yes.

23   Q.   Can you give an example of what a shortage might look like?

24   A.   If supplier A, the birds came in heavy that day, they

25   couldn't fill all of their orders, they could -- they would

Sara Fisher - Direct

1    reach out to us, let us know.  I would then reach out to, say,

2    supplier B and see if they had enough product.  And then if

3    they did, I would then request that the distributor cancel the

4    PO with supplier A and place with supplier B.

5    Q.  So in your example, you described your own role with regard

6    to shortages.  Can you describe more specifically what your

7    role is, what the contours of your role were with regard to

8    shortages?

9    A.  I was the one that should be responsible for covering

10   shortages if there were shortages.

11   Q.  You said you were the one who should be responsible for

12   covering shortages.  Can you explain your answer?

13   A.  I was the one that was responsible for if there was a

14   shortage, I would be the one that would be reaching out to

15   other suppliers to see that the product could be covered.

16   Q.  How did you learn about shortages?

17   A.  Either from suppliers or distributors.

18   Q.  How would you learn about it from distributors?

19           Well, let me take a step back and strike the question.

20           Earlier in your example, was that an example of how

21   you would learn about a shortage from a supplier?

22   A.  Yes.

23   Q.  So how would you learn about a shortage from distributors?

24   A.  A distributor would reach out and just let me know that the

25   supplier had notified them that they potentially may not have

1862

Sara Fisher - Direct

1   the product.

2   Q.   And what did you do when you found out about shortages

3   whether from suppliers or distributors?

4   A.   I would work with the other approved suppliers to locate

5   additional product if we could -- if we could.

6   Q.   Aside from the ways you already described, are there any

7   other ways how shortages were covered?

8   A.   Yes.

9   Q.   Can you describe that, please?

10  A.   There were times where suppliers would reach out to other

11  suppliers to see if they could cover the product.

12  Q.   And what happened in those instances?

13  A.   When I found out about them, I would reach out to the

14  supplier and let them know that we didn't want them to handle

15  it that way.

16  Q.   And you told the suppliers that you didn't want them to

17  handle it that way?

18  A.   Yes.

19          MS. SWEENEY:  Moment to confer, Your Honor.

20          THE COURT:  You may.

21          MS. SWEENEY:  No further questions.

22          THE COURT:  All right.  Thank you.

23          Cross-examination.

24          Ms. Carwile?

25          MS. CARWILE:  Yes, thank you, Your Honor.

Sara Fisher - Cross

**CROSS-EXAMINATION**

1

*BY MS. CARWILE:*

2

*Q.*  Good morning, Ms. Fisher.

3

*A.*  Good morning.

4

*Q.*  My name is Laura Carwile and I represent Roger Austin.

5

        Ms. Fisher, other than at one previous hearing in this

6

case, you and I have never met or spoken, correct?

7

*A.*  Correct.

8

*Q.*  And outside of that same hearing, you have met or spoken to

9

the government lawyers sitting at this table on 10 separate

10

occasions, correct?

11

*A.*  I don't know the exact number.

12

*Q.*  Do you want me to count?  Is it too many that you don't

13

remember the exact number?

14

*A.*  I mean, I just don't remember the exact number.

15

*Q.*  Okay.  Well, would it refresh your recollection if I gave

16

you the dates of the interviews or discussions you had with the

17

government lawyers?

18

*A.*  Sure.

19

*Q.*  Okay.  So in 2021 you met with the lawyers March 3rd,

20

September 21st, October 18th, October 19th, October 24th and

21

November 3rd.  Does that refresh your recollection as to the

22

number of times you spoke with government lawyers in the year

23

2021?

24

*A.*  Yes, I guess so.

25

Sara Fisher - Cross

1    Q.  Okay.  And in this current year you met with or spoke to

2    the government lawyers on February 21st, February 25th,

3    March 2nd, and yesterday -- or excuse me, I am sorry, Sunday,

4    March 6, correct?

5    A.  I guess so, yes.

6    Q.  And despite the government indicting this case in the year

7    2020, you were first interviewed by these lawyers in March of

8    2021, correct?

9    A.  I guess.  I don't know exactly.

10   Q.  Okay.  Well, your first interview with the government

11   lawyers was in the year 2021, correct?

12   A.  Yes.

13   Q.  Okay.  Now, Ms. Fisher, you testified on direct that RSCS

14   is the sole supply chain management arm of Yum Brands.  Did I

15   represent that correctly?

16   A.  Yes.

17   Q.  So Yum Brands, just for refreshment sake, is KFC, Taco

18   Bell, Pizza Hut and Habit Grill?

19   A.  Habit Burger Grill, yes.

20   Q.  Say it again?

21   A.  Habit Burger Grill.

22   Q.  Habit Burger Grill, thank you very much.  And Yum Brands

23   does not include any other restaurants, quick service or

24   otherwise than those four.

25   A.  No.

Sara Fisher - Cross

1    Q.   And RSCS as the sole supply chain management arm for Yum

2    Brands doesn't service any other restaurants, correct?

3    A.   We service A&W still.  A&W used to be a part of Yum years

4    ago and there was an agreement in place to continue servicing

5    A&W.

6    Q.   Thank you for that clarification.

7          So other than A&W, which used to be part of Yum

8    Brands, RSCS does not do work on behalf of any other company

9    than the ones we have just listed, correct?

10   A.   Not that I'm aware of.

11   Q.   So is it fair to say that RSCS is the contract negotiation

12   arm for Yum Brands?

13   A.   We do more than just contract negotiation.

14   Q.   Right, I know that.  But you also do contract negotiation

15   for Yum Brands, correct?

16   A.   Yes.

17   Q.   And your other role with Yum Brands is that you source the

18   products and -- well, you source the products for Yum Brands,

19   correct?

20   A.   We do -- it's kind of larger than that.  We have separate

21   departments that do what we call program management that work

22   on marketing, the marketing calendars, national promotions.  We

23   do cost of goods.  There is many other things that RSCS does

24   other than just the purchasing contracts.

25   Q.   Right.  So you are sort of a full service arm of Yum

Sara Fisher - Cross

1   Brands.

2   A.   Yes, from a supply chain standpoint.

3   Q.   And in that respect, RSCS answers to KFC, which is part of

4   Yum Brands and its franchisees, correct?

5   A.   What do you mean by answers to?

6   Q.   Well, works on behalf of.

7   A.   Yes.

8   Q.   So in that way it would answer to KFC and its franchisees.

9   A.   If that's what you're saying, yes, we work on behalf of KFC

10  and Yum Brands.

11  Q.   Right.  So if KFC franchisees are upset about something,

12  RSCS would hear about it.

13  A.   Correct.

14  Q.   Now, Ms. Fisher, you have not previously been involved in

15  negotiating KFC chicken contracts before this 2018 contract

16  cycle.

17  A.   Correct.

18  Q.   You testified on direct yesterday you only started in this

19  role June of 2016, correct?

20  A.   Correct.

21  Q.   Prior to June of 2016, you did not have a role with regard

22  to contract negotiations on behalf of KFC for chicken products?

23  A.   That's correct.

24  Q.   And just so we all orient what I am saying, I am going to

25  use a shorthand.  When I say 2018 contract, I am going to be

Sara Fisher - Cross

1    referring to the three-year contract with KFC between suppliers

2    lasting from 2018 -- 2017 in some cases, but 2018 through 2020,

3    all right?

4    A.    Uh-huh.

5    Q.    So your boss for the 2018 contract negotiations was Rich

6    Eddington you testified yesterday?

7    A.    Yes.

8    Q.    And I think you called him the team leader who was

9    responsible for the poultry department, correct?

10   A.    Yes.

11   Q.    And to your knowledge, he had been involved in contract

12   negotiations for KFC's previous contract negotiation cycle,

13   2015 to 2017?

14   A.    I don't recall when he started with RSCS.

15   Q.    Okay.  But you understood that he had previously been in

16   the role of contract negotiations for some amount of time

17   before you entered the department.

18   A.    Yes, he was, but I don't think he was in the department

19   when that previous contract was put in place.  I don't think he

20   had started with RSCS yet.

21   Q.    You are not sure one way or the other.

22   A.    I am not positive, but I am pretty sure.

23   Q.    Now, in 2017 when he was your boss, he was the senior

24   director of procurement at RSCS.

25   A.    Yes.

1868

Sara Fisher - Cross

1  Q.  And you understood that he had extensive experience in the

2  chicken industry, correct?

3  A.  Yes.

4  Q.  Now, Ms. Fisher, on direct yesterday you testified about

5  the supply chain for fresh chicken.  And I believe your

6  testimony was that the chicken would go from the suppliers to a

7  distributor, and the distributor would provide the chicken to

8  the restaurants; is that right?

9  A.  Yes.

10  Q.  The distributor was sort of a middleman between the

11  suppliers and the restaurants?

12  A.  The distributor purchases from supplier and the restaurants

13  purchase from distributor.

14  Q.  So the distributors are in the middle of that process.

15  A.  Yes.

16  Q.  And the distributors are separate entities than the

17  suppliers, correct?  They are different companies?

18  A.  Yes.  I mean, there is an exception where there were some

19  suppliers that delivered direct to stores.

20  Q.  Right, okay.  So there were some suppliers that in some

21  instances might deliver directly to the restaurants?

22  A.  Yes.

23  Q.  But in the situation where there is a distributor, those

24  distributors are not part of the supplier companies.

25  A.  Correct.

Sara Fisher - Cross

1    *Q.*  They are separate companies.

2    *A.*  Yes.

3    *Q.*  And RSCS, as part of that supply chain, provided

4    distributors with the current or period prices for COB chicken

5    and other products from all of the suppliers for that period,

6    correct?

7    *A.*  Correct.

8    *Q.*  And you did that by some sort of documentation that you

9    gave to the distributors.

10   *A.*  Yes.

11         MS. CARWILE:  All right.  If I could show the witness

12   what has previously been marked as Defense Exhibit I-054.

13         I have a copy for counsel.  And may I approach

14   Ms. Grimm with a copy for the witness and the Court, Your

15   Honor?

16         THE COURT:  Yes, you may.

17   *BY MS. CARWILE:*

18   *Q.*  So Ms. Fisher, just for the record, I-054 is a two-page

19   document.  The one you are holding in your hand actually is

20   just a double-sided one-page document.  I am asking you to look

21   at the page in which the top left indicates Period 2, 2017

22   Margin Over Feed Price Summary.  Do you see that?

23   *A.*  Yes.

24         MS. CARWILE:  Your Honor, I am going to ask this be

25   admitted pursuant to a prior agreement between the parties.

Sara Fisher - Cross

1        THE COURT:  Any objection to the admission of I-054?

2        MS. SWEENEY:  No objection.

3        THE COURT:  I-054 there be admitted.

4        MS. CARWILE:  Thank you.  May I publish to the jury?

5        THE COURT:  You may.

6   BY MS. CARWILE:

7   Q.  So just sticking with this document briefly, Ms. Fisher, do

8   you see the top line where it indicates eight-piece purple

9   fresh and a few numbers and frozen and a few numbers.  Do you

10  see that?

11  A.  Yes.

12  Q.  Do you see the entirety of the rest of the row contains

13  four-digit prices?

14  A.  Yes.

15  Q.  And if we could highlight that.  And above those prices are

16  the supplier for whom those prices are related, correct?  For

17  instance, Case Farms which is the first column has a price

18  listed at .9842, correct?

19  A.  Yes.

20  Q.  And the rest of these prices are the current period prices

21  for the period 2 of 2017.

22  A.  Yes.

23  Q.  And roughly, while I understand the periods are four weeks

24  with KFC, they do not correspond to an exact month in the

25  calendar.  This would be roughly late January and February of

Sara Fisher - Cross

1   2017, period 2, correct?

2   *A.*   Yes.

3   *Q.*   And just so we're extremely clear, these are the prices

4   that are currently at that period being charged for chicken.

5   The restaurants are being charged for chicken, correct?

6   *A.*   Yes, they should be.

7   *Q.*   And Ms. Fisher, the periods -- the period pricing, excuse

8   me, changes from period to period due to grain pricing,

9   correct?

10   *A.*   Yes.

11   *Q.*   So these prices would not -- would likely not be the same

12   for the next period, for instance.

13   *A.*   Correct.

14   *Q.*   They are just applicable to the period in which they are

15   listed on this chart.

16   *A.*   Yes.

17   *Q.*   All right.  You can put that aside and we can take that

18   down.  Thank you.

19         So Ms. Fisher, you testified on direct that there were

20   eight suppliers who entered bids for the 2018 KFC contract.

21   *A.*   Yes.

22   *Q.*   And was Case one of those suppliers?

23   *A.*   Yes.

24   *Q.*   And Case provided RSCS with a bid for this cycle, correct?

25   *A.*   Yes.

1872

Sara Fisher - Cross

1    Q.   And RSCS ultimately awarded Case a contract, correct?

2    A.   Yes.

3    Q.   And OK Foods was another one of these suppliers that RSCS

4    received a bid from?

5    A.   Yes.

6    Q.   And RSCS ultimately provided a contract for.

7    A.   Yes.

8    Q.   And that was in the 2018 contract cycle.

9    A.   Correct.

10   Q.   And OK Foods was bidding on this particular type of

11   contract for the first time that year?

12   A.   No.  They were already a supplier in the system.

13   Q.   For COB?

14   A.   Yes.

15   Q.   Okay.  And for the eight suppliers that provided RSCS bids

16   for that cycle, all eight suppliers received contracts.

17   A.   Yes.

18   Q.   Now, you testified on direct that the eight suppliers were

19   competing for RSCS's business is what you called it.

20   A.   Yes.

21   Q.   Is it more accurate to say that the suppliers were

22   competing for -- with each other for volume of chicken?

23   A.   I mean, I think that's fair, same -- that's the same thing

24   that I was saying, yes.

25   Q.   Okay.  So when you said business yesterday, you meant

Sara Fisher - Cross

1  volume of fresh chicken.

2  *A.*  Yes.

3  *Q.*  All right.  And the suppliers were competing for that

4  volume.

5  *A.*  Correct.

6  *Q.*  And volume just means pounds of chicken, right?

7  *A.*  Yes.

8  *Q.*  So the suppliers were competing against each other to sell

9  RSCS more pounds of chicken than their other competitors,

10  right?

11  *A.*  Yes.

12  *Q.*  And RSCS would actually, depending on the contract

13  negotiations, take volume away from some suppliers and give

14  volume to other suppliers if it was in RSCS's interest to do

15  so.

16  *A.*  Yes.

17  *Q.*  RSCS didn't have a problem taking volume from one supplier

18  and giving it to another if it worked better for RSCS.

19  *A.*  Yes.

20  *Q.*  And, in fact, that did happen, right, for the 2018

21  contract?  Some suppliers were allowed to sell RSCS less pounds

22  of chicken than others.

23  *A.*  Yes.

24  *Q.*  They lost volume.

25  *A.*  Yes.

Sara Fisher - Cross

1  Q.  Pilgrim's Pride, for instance, was one of the suppliers

2  that lost volume from the previous contract to the 2018

3  contract for RSCS.

4  A.  Yes, I believe so.

5  Q.  So once the suppliers gave you the first round bid which

6  you testified about on direct, RSCS would compile all of these

7  competitor bids and compare them.

8  A.  Yes.

9  Q.  And RSCS would analyze these bids.

10  A.  Yes.

11  Q.  And you said on direct that RSCS would provide feedback on

12  these bids.

13  A.  Yes.

14  Q.  Now, you told the government in September of 2021 that RSCS

15  would give ranges or percentages in your understanding of what

16  RSCS provided as feedback.

17  A.  Yes.

18  Q.  So your understanding is that RSCS would either give a

19  range of prices or they would provide a percentage of how far

20  off, for instance, a supplier's bid price was from what RSCS

21  wanted.

22  A.  Yes.  That's typically how we do it.

23  Q.  From what other suppliers who are competing were bidding.

24  A.  From -- yes, from where we wanted to be, yes.

25  Q.  And you would give that feedback after you had analyzed all

Sara Fisher - Cross

1    of the suppliers' initial bids.

2    A.   Yes.

3    Q.   So you knew -- RSCS knew what each supplier was going in

4    with, for instance.  And then RSCS would provide feedback to

5    certain suppliers based on their understanding of the bids from

6    all eight suppliers.

7    A.   Yes.

8    Q.   And sometimes you said that feedback would come in ranges,

9    correct?

10   A.   Yes.

11   Q.   So the ranges would be something like RSCS

12   hypothetically -- I am not suggesting this is an actual piece

13   of feedback RSCS gave -- but hypothetically the feedback might

14   look like supplier X, your price is $1.05, and our ranges are

15   looking like $1 to $1.02.  You are too high.  Please reassess

16   your bid.

17          Is that a fair summary and substance of what RSCS

18   might provide to a supplier?

19   A.   Not necessarily.  We would never say our ranges are this.

20   We would just give feedback, like we would not indicate what

21   other suppliers had provided.  We would give feedback on where

22   we want them.  We may say they are too high and we want them to

23   be in a range of X.

24   Q.   Okay.  So your testimony here is that you were never privy

25   to a situation where someone from RSCS provided specific ranges

Sara Fisher - Cross

1  that it qualified as quotes from other suppliers; is that

2  correct?

3          MS. SWEENEY:  Objection, misstates prior testimony.

4          MS. CARWILE:  I am just trying to follow up, Your

5  Honor.

6          THE COURT:  Overruled.

7  A.  I don't recall that, no.

8  BY MS. CARWILE:

9  Q.  Okay.  Could I show you something that might refresh your

10 recollection, Ms. Fisher?

11 A.  Sure.

12 Q.  All right.  I am going to show you two documents, an e-mail

13 and an attachment that you are on.

14         MS. SWEENEY:  Objection as to describing the documents

15 to refresh recollection.

16         MS. CARWILE:  I am sorry, I will strike that, Your

17 Honor.

18         THE COURT:  Sustained.

19         MS. CARWILE:  I will provide such documents to

20 counsel.  For the record, they are I-945 and I-946.

21 Ms. Sweeney?

22         And Your Honor, if I may approach Ms. Grimm to provide

23 two copies, one for witness, one for Court.

24         THE COURT:  Yes, you may.

25 BY MS. CARWILE:

Sara Fisher - Cross

1  *Q.*  Ms. Fisher, take your time.  I am going to direct your

2  attention to the top of I-945 and the middle of I-946.  And

3  once you have read those two, if you could look up.  Okay.

4  Thank you.

5       Does looking at I-945 and I-946 refresh your

6  recollection as to whether at times RSCS would provide feedback

7  based on other quotes it had received?

8  *A.*  This is not a part of the fresh chicken negotiation.  This

9  is actually something totally different.

10  *Q.*  I am aware.  My question, though, is does it refresh your

11  recollection that at times RSCS on e-mails that you were on

12  would provide feedback based on other competitors' quotes?

13       *MS. SWEENEY:*  Objection as to relevance.  The witness

14  testified it doesn't have to do with negotiation she testified

15  about.

16       *THE COURT:*  It doesn't have to.  It could be --

17  recollection can be refreshed by anything, so that objection is

18  overruled.

19  *BY MS. CARWILE:*

20  *Q.*  So I guess just to clarify, this is on a product where raw

21  material --

22       *MS. SWEENEY:*  Objection to further testimony about the

23  document that's not in evidence and simply used to refresh.

24       *MS. CARWILE:*  That's fair.  I am really just asking a

25  yes or no question, so I can ask it again.

Sara Fisher - Cross

1          THE COURT:  If you would.

2     BY MS. CARWILE:

3     Q.  Ms. Fisher, yes or no, does this document refresh your

4     recollection that at times RSCS would provide feedback to

5     competitors based on other competitors' quotes?

6     A.  No.

7     Q.  It does not refresh your recollection as to that.

8     A.  No, because this isn't -- this is something totally

9     different.  We worked on something like this, we worked with

10    the raw -- another supplier was providing raw material into a

11    facility and you had to work together.  It was all -- it's not

12    what you're asking.  I'm sorry.

13    Q.  So in the situation in I-946, there is not competitive

14    bidding going on?

15          MS. SWEENEY:  Objection to further questioning about a

16    document not in evidence.

17          MS. CARWILE:  I think I am entitled to probe now.

18          THE COURT:  She has talked about it.  Overruled.

19    BY MS. CARWILE:

20    Q.  Am I correct?

21    A.  There is not -- the way I am reading this, there is not

22    competitive bidding going on between Case Farms and OK Foods in

23    this scenario.

24    Q.  So those suppliers are not competing for RSCS's business?

25    A.  I was not a part of this negotiation, but what I'm reading

Sara Fisher - Cross

1    in here, it's -- they were all -- OK Foods was purchasing raw

2    material from Case Farms as part of the scenario.

3    Q.  Ms. Fisher, I-946 says:  Your R2 bid is in the range with

4    other competitive R2 bids.

5              MS. SWEENEY:  Objection to reading now a document

6    that's not in evidence.

7              THE COURT:  Sustained.

8    BY MS. CARWILE:

9    Q.  So your testimony is that you do not recall RSCS providing

10   ranges as it related to other competitors' bids, yes?

11   A.  We provided ranges, but we typically did not say this is --

12   we provided a range to say this is where we want you to be, not

13   this is where all the other suppliers are.

14   Q.  Okay.  And that range was in no way related to the other

15   bids you were receiving.

16   A.  It absolutely was.

17   Q.  It was related to other bids you were receiving.

18   A.  Yes.

19   Q.  Okay.  That's all I wanted to know.  Thank you.

20              Now, one of the purposes of -- you can put that down.

21   Thank you.  You don't need it anymore.

22              One of the purposes of providing that feedback was to

23   get suppliers to be more aggressive with their pricing,

24   correct?

25   A.  Yes.

Sara Fisher - Cross

1   Q.  And aggressive meaning to get them to lower their prices.

2   A.  Yes.

3   Q.  And for the 2018 contract, all of the suppliers who bid

4   actually did end up lowering their prices.

5   A.  Yes.

6   Q.  Another reason for RSCS's feedback was to try to get

7   suppliers' prices in as close of a range as possible, correct?

8   A.  Yes.

9   Q.  And you would consider getting suppliers' prices in a close

10  range a goal of RSCS?

11  A.  Yes.

12  Q.  And that's because franchisees might compare their pricing

13  and complain if, for instance, another KFC restaurant was

14  paying less for its chicken.

15  A.  We wanted to provide the lowest landed cost to the system,

16  yes.

17  Q.  Because individual franchisees might be upset to find out

18  they are paying more for chicken than another KFC franchisee.

19  A.  I wouldn't say that was the reason, but yes, if the

20  franchisee was paying more in one location, if they had

21  restaurants out of two DCs and they were paying more in one

22  location than the other, they would not be happy, yes, that's a

23  correct statement.

24  Q.  And part of the reason that -- part of the reason that a

25  three-year contract was being negotiated rather than a one-year

Sara Fisher - Cross

1    contract was that RSCS believed that could reduce the range of

2    case cost between the highest priced supplier and the lowest

3    priced supplier, correct?

4    *A.*   The reason for the three-year contract was more we were

5    worried about capacity and we wanted to put a long-term

6    contract in place to make sure we had capacity for multiple

7    years.

8    *Q.*   Fair enough.  And we are going to get into that because I

9    agree with you.  But my question for now is in addition, the

10   contracts, the three-year contracts would assist RSCS with its

11   goal of reducing the range between the highest priced supplier

12   and the lowest priced supplier of their case weights.

13   *A.*   Yeah, that's fair.

14   *Q.*   Excuse me, of their case prices.

15   *A.*   Yes.

16   *Q.*   All right.  And, in fact, one of the results of the 2017

17   negotiations was that RSCS was able to tighten suppliers' case

18   prices -- the range, excuse me, between suppliers' case prices

19   from almost $4.24 to about 70 cents in the first period of

20   2018.  Do you remember that?

21   *A.*   I don't remember the exact numbers, but yes, we were able

22   to tighten that range.

23   *Q.*   All right.  If I show you a document, would it refresh your

24   recollection as to those numbers?

25   *A.*   Yes.

Sara Fisher - Cross

1          MS. CARWILE:  Your Honor, I am going to provide

2    government counsel and the witness with what has previously

3    been marked Defense F-812.

4          May I approach Ms. Grimm to provide copies?

5          THE COURT:  You may.

6    BY MS. CARWILE:

7    Q.  Ms. Grimm (sic), I am going to direct your attention to

8    what is labeled page 5 of this presentation, the bottom bullet

9    point let's call it.  When you are done reading that, if you

10   could look up.  Okay, great.

11         So Ms. Fisher, does reading this document refresh your

12   recollection that one of the results of the RSCS negotiation

13   for the 2018 contract cycle was to reduce the range of case

14   pricing from the highest priced supplier to the lowest priced

15   supplier from $4.24 in 2017 to about 70 cents in the first

16   period of 2018?

17   A.  Yes.

18         MS. CARWILE:  We can put that away.  Thank you.

19   BY MS. CARWILE:

20   Q.  So I believe you testified on direct that RSCS began its

21   negotiation cycle for the 2018 contracts in December of 2016;

22   is that right?

23   A.  Yes.

24   Q.  That's when you sent out those e-mails with different dates

25   for the suppliers to meet with RSCS.

Sara Fisher - Cross

1    A.  I sent out the kickoff e-mail in December, yes.

2    Q.  That's right.  You sent out the kickoff e-mail, correct.

3    And then later you sent out calendar invitations for separate

4    meetings with different suppliers in January and February of

5    2017?

6    A.  Yes.

7    Q.  And RSCS is the one who chose what dates those meetings

8    would be, correct?

9    A.  Yes.

10   Q.  Now, would you agree with me that in your experience at

11   RSCS, and perhaps the answer is you didn't have enough

12   experience to know, but if you know, would you agree with me

13   that starting contract negotiations over a year in advance was

14   a bit unusual for RSCS?

15   A.  Yes.

16   Q.  And I believe you already sort of previewed my question,

17   but part of the reason that RSCS wanted to begin contract

18   negotiations that early was its concern over tight small bird

19   supply?

20   A.  Yes.

21   Q.  So you've previously told the government that from a

22   long-term perspective the small bird segment was shrinking, so

23   the possibility existed that there could be a long-term

24   shortage of small birds, correct?

25        MS. SWEENEY:  Objection to improper impeachment to

1884

Sara Fisher - Cross

1    what she previously told the government.

2         MS. CARWILE:  I am not trying to impeach her.  I am

3    asking her what she testified to here.

4         THE COURT:  Overruled.

5    BY MS. CARWILE:

6    Q.  Do you want me repeat it?

7    A.  Yes, please repeat it.

8    Q.  No problem.  I can always repeat anything if you need me

9    to.

10        You told the government that from a long-term

11   perspective the small bird segment was shrinking, so the

12   possibility existed that there could be a long-term shortage of

13   small birds.

14   A.  Yes.

15   Q.  And you knew that small bird supply was a problem in 2014.

16   A.  Yes.  When I moved into the role, I was made aware that

17   the -- there was a small bird issue, yes.

18   Q.  And the issue was that there weren't enough small birds,

19   right?

20   A.  Yes.

21   Q.  So you've also previously said that prices in the 2015 to

22   2017 contract were higher because the supply of small birds was

23   tight that year.

24   A.  Yes.

25   Q.  And RSCS was worried that just like in 2014 for the 2015

Sara Fisher - Cross

1  contract, there could be a supply problem of small birds --

2  A.  Yes.

3  Q.  -- for the 2018 contract.

4  A.  Yes.

5  Q.  And that worry was actually well-founded because in

6  addition to a small bird shortage in 2014, some small bird

7  plants run by certain suppliers were actually being converted

8  to big bird plants?

9  A.  Yes.

10  Q.  And the reason for that conversion was that in your

11  understanding big birds were more profitable to suppliers than

12  small birds.

13  A.  Yes.

14  Q.  And by more profitable, I just mean they could make

15  suppliers more money.

16  A.  Yes.

17  Q.  So suppliers were converting plants where they had

18  previously been processing small birds to plants where they

19  could process large birds because for each large or big birds,

20  I guess we will call them, the supplier could make more money?

21  A.  Yes, that was my understanding.

22  Q.  And that meant that fewer small birds were being produced

23  because there were fewer plants to produce them.

24  A.  Yes.

25  Q.  And you have a background in finance you said on direct.

1886

Sara Fisher - Cross

1    It's a standard economic principle that a smaller supply will

2    lead to higher prices in the marketplace?

3    *A.*  Yes.

4    *Q.*  So small birds you testified on direct are vital to KFC's

5    business.

6    *A.*  Yes.

7    *Q.*  Because I think I heard you, and please correct me if I'm

8    wrong, but I think I heard you say that almost all of the

9    products KFC restaurants sell are from small birds.

10   *A.*  The fresh chicken, yes.  The further processed items are

11   different.

12   *Q.*  Thank you for that clarification.  As to fresh

13   chicken-on-the-bone products and its supplemental products, KFC

14   relies heavily on small birds.

15   *A.*  Yes.

16   *Q.*  That's because almost all of KFC's products are small bird

17   related that are fresh chicken.

18   *A.*  Yes.  The specification is small bird.

19   *Q.*  So it would go, then, it would follow, then, that without

20   enough small birds, KFC would not have enough product to sell

21   its customers.

22   *A.*  Yes.

23   *Q.*  And because of this issue in which it was possible KFC may

24   not have enough small birds to service its customers, RSCS was

25   worried there would not be enough small birds, so it began

Sara Fisher - Cross

1    contract negotiations earlier than usual in 2017.

2    A.   Yes.

3    Q.   Or excuse me, for the 2018 contract.

4    A.   Yes.

5    Q.   And you testified already, but I want to be clear, the

6    reason for doing that was to lock in volume you had.

7    A.   Yes.  We wanted to make sure that we locked in enough

8    volume.

9    Q.   And meaning that you would lock in enough birds for KFC --

10   small birds for KFC to sell its products.

11   A.   Yes.

12   Q.   Now, despite these concerns, RSCS was actually surprised

13   that in 2017, let's call it, for the 2018 cycle, contract

14   cycle, there was a higher supply of small birds.

15   A.   Yes.

16   Q.   And it was up from 2014.

17   A.   Correct.

18   Q.   Significantly enough that RSCS was pleasantly surprised by

19   how much volume it was able to lock in, correct?

20   A.   Yes.

21   Q.   So again, basic economic principle, there are more small

22   birds available now for this upcoming contract cycle.  It would

23   go to reason RSCS assumed it would pay less for those birds,

24   correct?

25   A.   Yes.

1888
Sara Fisher - Cross

1    Q.  So in that way RSCS had more leverage for the 2018 contract

2    cycle than perhaps in a previous cycle where there were less

3    small birds available.

4    A.  Yeah, I think that's fair.

5    Q.  Okay.  Now, in your very first interview with the

6    government you told them that RSCS was able to get a reduction

7    in price for the 2018 contract, correct?

8    A.  Yes.

9    Q.  And that's a reduction in price as to all of the suppliers.

10   A.  Yes.

11   Q.  And that is from their 2014 or 2015 contracts to their 2018

12   contracts.

13   A.  Correct.

14   Q.  And while perhaps you don't recall the exact amount of the

15   prices as you sit here today, you would agree with me it was

16   close to the target price RSCS wanted.

17   A.  Yes.

18   Q.  RSCS was satisfied with where they landed at the end of

19   2018 contract negotiations because RSCS was able to deliver

20   some savings to its system, correct?

21   A.  Yes.

22   Q.  And, in fact, the savings to RSCS over the life of the 2018

23   to 2020 contract was approximately $60 million; is that right?

24   A.  Yes, I think so.

25   Q.  Is it something you don't remember or would you --

Sara Fisher - Cross

1   A.   I believe it was around $20 million a year.

2   Q.   $20 million a year, so 60 million total.

3   A.   Yes.

4   Q.   Great.  And you also -- it's also true to say that RSCS was

5   able to obtain some cost savings, bring a couple of additional

6   plant locations on to help with geographical logistical issues

7   and secure the volume it needed based on projections, correct?

8   A.   Yes.

9   Q.   Now, RSCS went into these 2018 contract negotiations with a

10  price in mind that it considered fair.

11  A.   Yes.

12  Q.   And RSCS is essentially looking at the total COB or total

13  FOB price of chicken from each supplier's bid, right?

14  A.   Can you rephrase the question?

15  Q.   Of course, yes, I can.  RSCS isn't necessarily concerned

16  with the individual line items in a bid as long as the bid, the

17  total cost to RSCS is within the range RSCS wants.

18  A.   Well, what I would say is we would like for the line items

19  to be accurate and fair, but we have a bottom line FOB that was

20  the target, yes.

21  Q.   Of course.  Of course you want the line items that you are

22  being given in a bid to be accurate and fair, I understand

23  that.  But RSCS's focus is on the total COB cost that's being

24  provided in a bid, correct?

25  A.   Yes.

1890

Sara Fisher - Cross

1    Q.   Okay.  And so if RSCS obtains the price that it wants, the

2    total price it wants, the individual line items are not

3    necessarily a specific concern of RSCS's.

4    A.   I mean, again we want the models to be accurate and fair

5    and --

6    Q.   I am asking you a different question.  We already have

7    established you want the line items to be fair and accurate,

8    understandably.  I think that's just a truism.  But my question

9    is this.  If RSCS receives a bid which is within the range of

10   prices it has in mind as fair, RSCS does not necessarily care

11   about individual line items and their actual value, correct?

12   A.   I mean, I guess, yes.

13   Q.   Yes, right?  Because RSCS got the price it wanted, right?

14   A.   Yes.

15   Q.   And you actually told the government in your first

16   interview that if the competitive bidding process got the final

17   price lower than what RSCS had in mind, RSCS was, of course,

18   okay with that.

19   A.   Yes.

20   Q.   Because RSCS is a for-profit company and it's -- it's

21   working on behalf of a for-profit company, I should say, and

22   it's all right if its suppliers are making less money and it's

23   paying less money, correct?

24   A.   Yes.

25   Q.   Because this is a competitive bidding process between

Sara Fisher - Cross

1  companies negotiating on their own financial interests,

2  correct?

3  *A.*  Yes.

4  *Q.*  So you also told the government that RSCS received a

5  significant price decrease from the previous contract cycle in

6  2018, correct?

7  *A.*  Yes.

8  *Q.*  And for that contract RSCS ultimately ended up getting

9  close to the target price RSCS wanted from all of its

10  suppliers, correct?

11  *A.*  Yes.

12      *MS. CARWILE:*  I don't have anything further, Your

13  Honor.

14      *THE COURT:*  Thank you, Ms. Carwile.

15      Additional cross?

16      Ms. Bracewell.

17                    **CROSS-EXAMINATION**

18  *BY MS. BRACEWELL:*

19  *Q.*  Good morning., Ms. Fisher.  I am Tiffany Bracewell.  I

20  represent Mr. Scott Brady.

21      *MS. BRACEWELL:*  Your Honor may I approach with

22  documents?

23      *THE COURT:*  You may.

24  *BY MS. BRACEWELL:*

25  *Q.*  All right, Ms. Fisher.  I would like to flesh out a little

Sara Fisher - Cross

1    bit more of the detail for Claxton's negotiations specifically

2    during this contract period.  You testified that you first

3    reached out to the suppliers in December 2016, correct?

4    A.  Yes.

5    Q.  And that was just to advise them that RSCS was ready to

6    begin discussions about the 2018 contract.

7    A.  Yes.

8    Q.  And you had meetings I believe you testified beginning in

9    January with the suppliers.

10   A.  Yes.

11          MS. BRACEWELL:  Could we please call up 1947 which was

12   admitted yesterday.

13          And with Your Honor's confirmation, I would like to

14   publish this, please.

15          THE COURT:  You may.

16          MS. BRACEWELL:  Thank you.

17   BY MS. BRACEWELL:

18   Q.  Ms. Fisher, you also have a paper copy toward -- it's

19   around the fourth tab also labeled 1947, if you need it.

20          This is an e-mail from you to Mr. Brady, Mr. Fries and

21   Jeramie Martin, correct?

22   A.  Yes.

23   Q.  And you have copied Mr. Suerken, Mr. Eddington and

24   Mr. Campisano, correct?

25   A.  Yes.  Steve is copied and Pete and Rich are in the To line.

Sara Fisher - Cross

1    Q.  Yes.  Thank you for correcting me there.

2           And this was the meeting we were just talking about in

3    January to really kick off the negotiations; isn't that right?

4    A.  Yes.

5    Q.  And as we have established, you're thinking about at this

6    point a contract for 2018, '19 and '20, correct?

7    A.  Yes.

8    Q.  Meeting takes place on January 19th based on this calendar

9    notice, correct?

10   A.  Yes.

11   Q.  And to the best of your recollection, Mr. Brady and

12   Mr. Fries and Mr. Martin attended on behalf of Claxton; isn't

13   that right?

14   A.  I believe so, yes.

15   Q.  And you were present with Mr. Suerken, Mr. Eddington and

16   Mr. Campisano?

17   A.  Yes.

18   Q.  And you said Mr. Eddington was the team leader for this

19   negotiation, right?

20   A.  Correct.

21   Q.  And like you, Mr. Campisano reported to Mr. Eddington at

22   the time.

23   A.  Yes.

24   Q.  Great.  Now, Mr. Brady was your day-to-day contact at

25   Claxton, correct?

Sara Fisher - Cross

 1    A.   Yes.

 2    Q.   And I believe you already testified that this meeting was

      the very first time you had met Mr. Fries.

 3

 4    A.   Yes, I believe so.

 5    Q.   Thank you.  So at this meeting you testified on direct

 6    suppliers generally came in and made some type of initial

 7    presentation; isn't that right?

 8    A.   Yes.  That was what was asked, yes.

 9    Q.   And apologies for cutting you off there.

10    A.   That's okay.

11    Q.   RSCS also discussed its goals and expectations for this

12    negotiation cycle, correct?

13    A.   Yes, I believe so.

14    Q.   Okay.  And ultimately that ended up in a bid being

15    submitted, correct?

16    A.   Yes.

17         MS. BRACEWELL:  Could we please call up F-852 which

18    was admitted or offered earlier this morning by Ms. Sweeney?

19         THE COURT:  You may.

20         MS. BRACEWELL:  Permission to publish, please.

21         THE COURT:  You may.

22    BY MS. BRACEWELL:

23    Q.   Ms. Fisher, do you see 852?

24    A.   Yes, I do.

25    Q.   Okay, great.  Thank you.

Sara Fisher - Cross

1       So this is another e-mail in which you are on, and it

2   is from Mr. Brady to you and Mr. Eddington, correct?

3   A.   Yes.

4   Q.   And this is transmitting Claxton's bid submission.

5   A.   Yes.

6   Q.   And in this bid submission, Mr. Brady was seeking

7   additional volume, correct?

8   A.   Yes, he was.

9   Q.   Claxton specifically asked for four additional truckloads

10  of eight-piece and one additional truckload of dark meat per

11  week for this three-year upcoming contract period, correct?

12  A.   Yes.

13  Q.   Thank you.

14       MS. BRACEWELL:   Could we now call up F-853, which also

15  was admitted this morning, Your Honor, and permission to

16  publish.

17       THE COURT:   You may.

18       MS. BRACEWELL:   Thank you.

19  BY MS. BRACEWELL:

20  Q.   All right.   Ms. Fisher, this is the bid submission

21  referenced in the previous e-mail exhibit, correct?

22  A.   Yes.

23  Q.   And it is a cost model that made up Claxton's first round

24  proposal.

25  A.   Yes.

Sara Fisher - Cross

1   *Q.*  And we are already cued up on the second sheet there

2   labeled eight-piece pricing.  Claxton offered its chicken at

3   .9939; isn't that right?

4   *A.*  Yes, they did.

5          MS. BRACEWELL:  You can take that document down, thank

6   you.

7   *BY MS. BRACEWELL:*

8   *Q.*  Now, on direct Ms. Sweeney asked you to look at a variety

9   of e-mails transmitting first round bids; is that right?

10  *A.*  Yes.

11  *Q.*  She also asked you to look at some contracts, final

12  contracts, correct?

13  *A.*  Yes.

14  *Q.*  But there were more rounds of negotiation for this

15  particular contract, correct?

16  *A.*  Yes.

17  *Q.*  Okay, great.  So let's talk a little bit more about this

18  with this next round of bidding.  Mr. Brady sent you a revised

19  proposal after this February 3rd submission, correct?

20  *A.*  I believe so, but I would have to see it.

21          MS. BRACEWELL:  Great.  Can we call up F-915, please?

22          Your Honor, I believe this has been admitted by

23  agreement of the parties.

24          THE COURT:  It has not been admitted.  Are you moving

25  the admission now?

Sara Fisher - Cross

1      MS. BRACEWELL:  Yes.

2      THE COURT:  Any objection to the admission of F-915?

3      MS. SWEENEY:  Your Honor, if we could just have a

4  moment to confirm it was part of the agreement.

5      THE COURT:  Yes, you may.

6      MS. SWEENEY:  No objection.

7      THE COURT:  F-915 is admitted.

8      MS. BRACEWELL:  Permission to publish, please.

9      THE COURT:  You may.

10  BY MS. BRACEWELL:

11  Q.  Ms. Fisher, this is another e-mail from Mr. Scott Brady to

12  you and Mr. Eddington, correct?

13  A.  Yes.

14  Q.  And it's dated March 2nd, so about a month after the prior

15  submission we discussed.

16  A.  Yes.

17  Q.  And Mr. Brady says, Here is revised pricing for 2018,

18  right?

19  A.  Yes, that's correct.

20  Q.  So this is transmitting another bid submission.

21  A.  Yes.

22  Q.  And so Mr. Brady says this is revised pricing.  You and

23  Mr. Eddington presumably had provided some feedback to Claxton,

24  correct?

25  A.  Yes, I would assume so.

Sara Fisher - Cross

1    *Q.* And Claxton reacted to that feedback by sending you another

2    submission.

3    *A.* Correct.

4    *Q.* And like with the prior submission, there is an attachment

5    to the e-mail and that's a cost model, correct?

6    *A.* Yes, yes.

7    *Q.* Thank you.

8            *MS. BRACEWELL:* Could we call up F-916, please?

9            Your Honor, we offer this into evidence, and I believe

10   it's also subject to an agreement of the parties.

11           *THE COURT:* Any objection to the admission of F-916?

12           *MS. SWEENEY:* No objection.

13           *THE COURT:* F-916 will be admitted.

14   *BY MS. BRACEWELL:*

15   *Q.* All right, Ms. Fisher, this is the right pricing that was

16   referenced in the previous e-mail, correct?

17           *THE COURT:* Do you want that displayed, Ms. Bracewell?

18           *MS. BRACEWELL:* Yes, please, publish for the jury.

19           *THE COURT:* It may be.

20   *BY MS. BRACEWELL:*

21   *Q.* All right.  And just to repeat, so this is the revised

22   pricing that Mr. Brady sent you, correct?

23   *A.* Yes.

24   *Q.* And I would just like to quickly review that.  This round

25   Claxton offered its chicken at the price of .9334; isn't that

Sara Fisher - Cross

1   right?

2   A.   Yes.

3   Q.   And that means that Claxton reduced its price by more than

4   6 cents in this round of bidding, correct?

5   A.   Yes.

6           MS. BRACEWELL:   Thank you.   We can take that document

7   down, please.

8   BY MS. BRACEWELL:

9   Q.   All right.   Home stretch, one more step in this

10  negotiation.   So after Claxton submitted this March 2nd bid

11  more than 6 cents, RSCS sought further reductions; isn't that

12  correct?

13  A.   I don't recall.

14  Q.   Okay.   If you could please turn to the tab in your binder

15  marked F-868.   It's the top right tab toward the back,

16  Ms. Fisher.

17          And if we could pull that up just for identification,

18  please.

19          Ms. Fisher, do you recognize this document?

20  A.   Yes.

21  Q.   And this is an e-mail from you to Scott Brady copying

22  Mr. Eddington, correct?

23  A.   Yes, that's correct.

24  Q.   And you sent this e-mail in May 2017?

25  A.   Yes.

1900

Sara Fisher - Cross

1   *Q.*  So that's about two months after Claxton's previous bid

2   submission, correct?

3   *A.*  Yes.

4   *Q.*  Does this e-mail accurately reflect the information that

5   you sent Mr. Brady in May of 2017?

6   *A.*  Yes, I believe so.

7   *Q.*  Thank you.

8         *MS. BRACEWELL:*  At this time I move for admission of

9   F-868.

10        *THE COURT:*  Any objection to the admission of F-868?

11        F-868 will be admitted.

12        *MS. BRACEWELL:*  Permission to publish, please?

13        *THE COURT:*  You may.

14  *BY MS. BRACEWELL:*

15  *Q.*  Ms. Fisher, in this e-mail you propose a stair-step

16  decrease for Claxton, correct?

17  *A.*  Yes, that's correct.

18  *Q.*  And the stair-step decrease begins in period 6 of 2017 at

19  one penny per pound; isn't that right?

20  *A.*  Yes.

21  *Q.*  And P6 is roughly in the middle of the year for 2017,

22  right?

23  *A.*  Yes.

24  *Q.*  And when you started out this negotiation cycle as we

25  discussed, you originally were looking for a contract for '18,

1901
Sara Fisher - Cross

1    '19 and '20 and not '17.

2    A.   Yes.

3    Q.   So essentially in this e-mail RSCS is proposing that

4    Claxton renegotiate part of its existing contract for 2017.

5    A.   Yes.

6    Q.   And Claxton had no legal obligation to do that, correct?

7    A.   No.

8    Q.   Let's look at the stair-step decreases proposed for the

9    remainder of the years.  For 2018 RSCS proposes that Claxton

10   drop its price by 5-1/2 cents on eight-piece, another

11   approximately 5 cents for dark meat, correct?

12   A.   Yes.

13   Q.   And for 2019 and 2020 another decrease would be applied.

14   A.   Yes.

15   Q.   So under this proposal Claxton's price decreases two times

16   over the three-year contract period and it comes down for 2017,

17   correct?

18   A.   Yes.  We were asked to -- we asked the suppliers to pull

19   some of the savings forward, so when the negotiation was

20   complete, you had a set three-year savings from each supplier.

21   And so if you do the math on this, that's the exact same

22   dollars that was initially negotiated.  It was just pulled

23   forward a little bit.

24   Q.   Understood.  And we are going to look at how that worked

25   out in just a moment.

1902

Sara Fisher - Cross

1        We can take that document down, please.

2        Okay.  So once again, this process started in December

3  with the initial reach-out, correct?  And final contracts were

4  executed in roughly September; is that correct?

5  A.  I think it varied by supplier.

6  Q.  Okay.

7        MS. BRACEWELL:  Could we call up F-756, please.  And

8  Your Honor, we offer this into evidence at this time.  And I

9  believe this is also subject to the parties' agreement.

10        THE COURT:  Any objection to the admission of F-756?

11        MS. SWEENEY:  No objection.

12        THE COURT:  That will be admitted.

13        MS. BRACEWELL:  Thank you.  And I would like to

14  publish this, please.

15        THE COURT:  You may.

16  BY MS. BRACEWELL:

17  Q.  All right, Ms. Fisher.  This is, as Ms. Sweeney asked, an

18  exhibit to Claxton's Supplier Business Relationship Agreement,

19  correct?

20  A.  Yes, it is.

21  Q.  It is executed by Mr. Steven McCormick?

22  A.  Yes.

23  Q.  And he was the president of RSCS?

24  A.  Yes, at the time.

25  Q.  And it's also executed by Mr. Fries on behalf of Claxton,

Sara Fisher - Cross

1   correct?

2   *A.*  Yes.

3   *Q.*  And both execute this contract in September; isn't that

4   right?

5   *A.*  Yes, that's correct.

6   *Q.*  Okay.  And the applicable period for this particular

7   exhibit is May 21st, 2017 through year end 2017, right?

8   *A.*  Yes, it is.

9   *Q.*  And Ms. Fisher, consistent with what we just discussed,

10  this final contract reflects that Claxton renegotiated some of

11  its 2017 pricing for RSCS?

12  *A.*  Correct.

13  *Q.*  And you testified with Ms. Sweeney, too, that not all the

14  suppliers did this.  Some started in 2017.  Some started in

15  2018, correct?

16  *A.*  Correct.

17  *Q.*  Okay.  Let's go to page 2, please.  Ms. Fisher, for the

18  rest of 2017 Claxton's price was .9809; isn't that right?

19  *A.*  Yes.

20  *Q.*  Okay.

21  *A.*  That's holding feed constant, so --

22  *Q.*  Understood.  But the price and the final contract is .9809?

23  *A.*  Yes.

24  *Q.*  Ms. Fisher, do you recall what Claxton's price was in 2017

25  prior to the renegotiation of that number?

Sara Fisher - Cross

1    *A.*  I do not.

2    *Q.*  Okay.

3         *MS. BRACEWELL:*  Could we please call up F-754, please?

4         Your Honor, we offer this into evidence at this time,

5    and I believe it's also subject to the parties' agreement.

6         *THE COURT:*  Any objection to the admission of F-754?

7         *MS. SWEENEY:*  Your Honor, I believe it's subject to a

8    prior agreement with 803(6) foundation, but I don't know that

9    the witness has provided any basis for that, so just no

10   objection after foundation has been laid.

11        *THE COURT:*  It will be refused for now.  If you can

12   lay foundation.

13        *MS. BRACEWELL:*  May I have one moment to consult my

14   notes?

15        *THE COURT:*  You may.

16        *MS. BRACEWELL:*  May I consult with government counsel?

17        *THE COURT:*  Sure.

18   *BY MS. BRACEWELL:*

19   *Q.*  Ms. Fisher, do you have 754 in front of you?

20   *A.*  I do.

21   *Q.*  Okay, thank you.  So Ms. Fisher, this is another exhibit to

22   a Supplier Business Relationship Agreement for Claxton; isn't

23   that right?

24   *A.*  Yes, it is.

25   *Q.*  And the applicable period for this exhibit is January 1st,

Sara Fisher - Cross

1   2016 through December 31st, 2017, correct?

2   *A.*   Yes.

3   *Q.*   So this is the contract for the period immediately

4   preceding the negotiation in which you were involved.

5   *A.*   Yes.

6   *Q.*   And this reflects the contract in place was supposed to run

7   through December 31st, correct?

8   *A.*   Yes.

9   *Q.*   And this is -- this contract is the type of document that

10  RSCS would rely upon and maintain in the course of its usual

11  business, right?

12  *A.*   Yes.

13          *MS. BRACEWELL:*   Your Honor, we seek to reoffer this

14  exhibit.

15          *THE COURT:*   Any objection to the admission of F-754?

16          *MS. SWEENEY:*   No objection.

17          *THE COURT:*   F-754 will be admitted.

18          *MS. BRACEWELL:*   Thank you.  And if we could please

19  publish that to the jury.

20          *THE COURT:*   You may.

21  *BY MS. BRACEWELL:*

22  *Q.*   Can we turn to page 3 of that exhibit, please?

23          All right, Ms. Fisher.  This reflects that Claxton's

24  chicken-on-the-bone price in 2017 prior to renegotiating it

25  with you and Mr. Eddington was 1.0369, correct?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   And we just saw that its new price was .9809, correct?

3    A.   Correct.

4    Q.   So Claxton, as you suggested, gave you more than a penny.

5    They went ahead and brought forward a discount much larger than

6    that; isn't that right?

7    A.   Well, I don't know what was used on the feed for this

8    contract, so I -- I can't --

9    Q.   Understood.  But setting aside the feed varies, based on

10   the numbers in the contract, Claxton gave you about 5-1/2

11   cents, correct?

12   A.   Yes, it appears that way.

13   Q.   Okay.  Thank you.

14        MS. BRACEWELL:  We can take that down, please.

15   BY MS. BRACEWELL:

16   Q.   And I would like to go back to F-756, please.  Are you

17   there, Ms. Fisher?

18   A.   Yes.

19   Q.   Are you good?  Great.  So we have got 2017 out of the way.

20   Let's very quickly look at 2018 and beyond.  So let's turn to

21   page 4 of that contract, please.

22        MS. BRACEWELL:  Could we publish that again, Your

23   Honor?

24        THE COURT:  Yes.

25   BY MS. BRACEWELL:

Sara Fisher - Cross

1    Q.  All right.  So the next period in the contract that you

2    helped negotiate is January 1 through December 31st, correct?

3    A.  Yes.

4    Q.  Thank you.  Let's turn to page 5, please.  And this

5    reflects that Claxton's COB price was reduced again to .9371,

6    correct?

7    A.  Yes.

8    Q.  And that's a reduction of more than 4 cents, correct?

9    A.  Yes.

10   Q.  And so Claxton is implementing that step-down or that step

11   decrease that RSCS proposed; isn't that right?

12   A.  Correct.

13   Q.  If you can turn to page 7, please.

14            The period for this exhibit, Ms. Fisher, is

15   January 1st, 2019 to December 31st, 2020, correct?

16   A.  That's correct.

17   Q.  So we're covering a two-year period with this particular

18   document.

19   A.  Yes.

20   Q.  And this is also part of that original three-year contract

21   that you sought to negotiate.

22   A.  Yes.

23   Q.  And this reflects that Claxton's price again was reduced to

24   .9314, correct?

25   A.  Correct.

1908

Sara Fisher - Cross

1  Q.  Thank you.

2          MS. BRACEWELL:  You can take that down, thank you.

3  BY MS. BRACEWELL:

4  Q.  Ms. Fisher, so taking all of this together, the 2017

5  reduction and the stair steps that RSCS proposed, isn't it

6  right that Claxton came down more than 10-1/2 cents over this

7  contract period?

8  A.  Depending -- I can't speak to again what the grain was in

9  the previous contract, what was used, but I can speak for the

10  contract that I was a part of.

11         MS. SWEENEY:  Your Honor, can we have a brief side

12  bar?

13         THE COURT:  Yes.

14     (At the bench:)

15         THE COURT:  Ms. Sweeney, go ahead.

16         MS. SWEENEY:  Yes, Your Honor.  I just wanted to note

17  two things.  One, I think we may need a brief stretch break if

18  that he would be okay.  And second, the real-time transcript

19  appears to be frozen, but I would ask for the side bar if we

20  can take a 1 minute, 30-second stretch break.

21         THE COURT:  I think the real-time has frozen.  It is

22  the case with me.  And while we are working on that problem, we

23  will do the stretch break, okay?  Thank you.

24     (Brief recess.)

25     (In open court:)

1909

Sara Fisher - Cross

1    THE COURT:  Ladies and gentlemen, I think we are good.

2         Ms. Bracewell, go ahead.

3         MS. BRACEWELL:  Thank you, Your Honor.

4    BY MS. BRACEWELL:

5    Q.  So right before our little break, Ms. Fisher, we were

6    talking about kind of what the global impact for Claxton was

7    for 2017 through 2020.  And understanding that there may be

8    some grain fluctuation, based on the contract signed by

9    Mr. McCormick, the president of RSCS, and Mr. Fries at Claxton,

10   Claxton came down over 10-1/2 cents for that period, correct?

11   A.  Yes.

12   Q.  Thank you.  And as we saw through the bids, Claxton

13   responded to RSCS's directional guidance being downward in each

14   bid submission, correct?

15   A.  Yes.

16   Q.  And Claxton responded to RSCS's directional guidance when

17   it implemented this stair step; isn't that right?

18   A.  Yes.

19   Q.  And Claxton sought more volume in that process as well;

20   isn't that correct?

21   A.  Yes.

22        MS. BRACEWELL:  Thank you, Your Honor.  No further

23   questions.

24        THE COURT:  Thank you, Ms. Bracewell.

25        Additional cross?

Sara Fisher - Cross

1        Ms. Johnson?

2                        **CROSS-EXAMINATION**

3    *BY MS. JOHNSON:*

4    *Q.*  Good morning, Ms. Fisher.

5    *A.*  Good morning.

6    *Q.*  I have just a few questions.

7            *MS. JOHNSON:*  And I am going to pass up, if the Court

8    permits, a binder for you with some documents.

9            *THE COURT:*  You may.

10   *BY MS. JOHNSON:*

11   *Q.*  Ms. Fisher, don't be alarmed.  We are not going to talk

12   about all of those and we will try to move quickly.

13   *A.*  Okay.

14   *Q.*  So just to begin with, I want to make sure I understand,

15   you really started in your current work or the negotiation

16   process at the end of 2016 for the 2017 contracts.  Am I saying

17   that right?

18   *A.*  Yes.  We kicked off in end of 2016.

19   *Q.*  Okay.  So to begin those contracts, is it fair to say you

20   would review where the companies were currently with the 15 or

21   16 contracts and then negotiate from there?

22   *A.*  Yes.

23   *Q.*  Okay.  Now, you were at RSCS or its previous name for

24   several years before that, but this is the first time you began

25   assisting in the negotiation process, right?

Sara Fisher - Cross

1    A.   That's correct.

2    Q.   You were not the lead negotiator; is that correct?  Fair to

3    say?

4    A.   Yes, 100 percent.

5    Q.   And I believe it was Mr. Suerken, was he involved in the

6    negotiations?

7    A.   He was.

8    Q.   So part of those negotiations involved George's; is that

9    correct?

10   A.   Yes.

11   Q.   And have you ever met Ric Blake?

12   A.   Yes.

13   Q.   And was he part of that process?

14   A.   Yes, he was.

15   Q.   He didn't sign any of the George's contracts, did he?

16   A.   I don't recall.  I don't --

17   Q.   We are going to look through some of them, and you can

18   point out if you see his name anywhere, but do you recall

19   Mr. Suerken actually dealing with the head of George's, Charles

20   George?

21   A.   I believe they were at the initial meeting, yes.

22   Q.   And do you recall actually Mr. George signing some of the

23   contracts?

24   A.   I would have to look at them.

25   Q.   Okay.  And we'll do that.  What about Brian Coan?  Do you

Sara Fisher - Cross

1  remember Mr. Coan?

2  *A.*  I do know Brian, yes.

3  *Q.*  Okay.  And you knew him to be Mr. Blake's supervisor,

4  correct?

5  *A.*  I believe so, yes.

6  *Q.*  And do you recall him signing some of the George's

7  contracts?

8  *A.*  Again, I would have to see the contracts.

9  *Q.*  Now, specifically talking about this 2017 negotiation

10 process, is it fair to say and based on your recollection that

11 George's actually negotiated with RSCS, but RSCS was successful

12 in negotiating down over the course of those years for lower

13 prices with George's?

14 *A.*  I believe that George's did a similar stair-step approach

15 as well, yes.

16 *Q.*  And by stair-step approach, stair-step down, right?

17 *A.*  Yes.

18 *Q.*  Okay.  So let's take a quick look at that.  And the first

19 document I want to bring up to you actually isn't in the

20 binder, so surprise.  We failed to include this, so my

21 apologies.

22     *MS. JOHNSON:*  But I would like to call up F-764.  And

23 I believe, Your Honor, this was on the stipulation.  And I am

24 not sure if it's been admitted, but if not, we would like to

25 admit it and publish to the jury.

Sara Fisher - Cross

1          THE COURT:  Any objection to the admission of F-764?

2          MS. SWEENEY:  Your Honor, it appears to be a

3   multi-page document, so I'd just request a copy from counsel if

4   they have one.

5          MS. JOHNSON:  And we will get that, Your Honor.  I

6   apologize.  This is the one document we failed to include.  We

7   will do whatever the Court tells us to.  We can print that at a

8   break or we can --

9          THE COURT:  Perhaps what you could do, if it could be

10  displayed just to counsel, and then maybe Ms. Sweeney will have

11  a basis to understand exactly what it is.

12         MS. JOHNSON:  Absolutely.  And Ms. Fisher -- may I

13  proceed, Your Honor?

14         THE COURT:  Yes.

15  BY MS. JOHNSON:

16  Q.  Ms. Fisher, do you recognize this as the KFC or RSCS

17  contract with George's?

18  A.  It looks like it was the contract before I was involved,

19  yes.

20  Q.  Okay.  It was signed on January 12th; is that right?

21  A.  Yes.

22  Q.  And do you see the signature of Charles George?

23  A.  Yes.

24  Q.  And is it Pete Suerken who signed on behalf of RSCS?

25  A.  Yes, it is.

Sara Fisher - Cross

1        MS. JOHNSON:  If we could just scroll over, down -- I

2   think one page down, Mr. Brian.

3   BY MS. JOHNSON:

4   Q.  Do you see the total FOB plant cost?

5   A.  Yes.

6   Q.  Is it .9622?

7   A.  Yes.

8        MS. JOHNSON:  Your Honor, I am not sure if this is

9   satisfactory for the government for us to proceed with

10  publishing.

11       THE COURT:  We haven't admitted it yet.

12       Any objection to the admission of F-764?

13       MS. SWEENEY:  Yes, Your Honor.  I have confirmed it's

14  on our list and I have reviewed the documents and no objection.

15       THE COURT:  Then F-764 will be admitted and may be

16  published.

17       MS. JOHNSON:  Thank you, Your Honor.

18  BY MS. JOHNSON:

19  Q.  So this is where the negotiations started and the contract

20  is .9622, correct?

21  A.  Yes.

22  Q.  Okay.  So now let's take a look at F-765.  It is in your

23  binder, ma'am.  And you can let me know when you find it.

24  A.  Okay.

25  Q.  And do you recognize this as the RSCS contract with

Sara Fisher - Cross

1    George's from May 21st to the end of the year?

2    A.   Yes.

3    Q.   Okay.  And it was signed on September 1st, 2017 by

4    Mr. Coan?

5    A.   Yes.

6    Q.   For George's.

7    A.   Correct.

8    Q.   And then by Mr. Steve McCormick on behalf of RSCS?

9    A.   Yes.

10        MS. JOHNSON:  Your Honor, we would move if it's not

11   already been introduced to introduce F-765 and publish to the

12   jury.

13        THE COURT:  Any objection to the admission of F-765?

14        MS. SWEENEY:  No objection.

15        THE COURT:  F-765 will be admitted and may be

16   published to the jury.

17        MS. JOHNSON:  Thank you, Your Honor.

18   BY MS. JOHNSON:

19   Q.   So we just talked about this first page.  Let's move to

20   page 2.

21        Do you see that the stair step began and George's went

22   down in price to .9537?

23   A.   Yes.

24   Q.   And I think within this same document if we can scroll to

25   the next page.  And this is the following contract that

Sara Fisher - Cross

1    continues to stair step.  Do you see that signed in September

2    of 2017?

3    A.  Are we on page 4?  I think maybe the next page.

4    Q.  This says three, but can you see it on your screen?

5    A.  Yes.

6    Q.  Do you see that as the next stair step down, if you will?

7    A.  I think that's the continuation of the first page.

8    Q.  Let's go one more page.

9    A.  Yes.

10   Q.  Do you see this?

11   A.  Yes.

12   Q.  Is this the start of the next contract, the next section

13   down?

14   A.  Yes.

15   Q.  And signed by Brian Coan for George's?

16   A.  Yes.

17   Q.  And then Mr. McCormick for RSCS?

18   A.  Yes.

19   Q.  And the following page I believe shows the contract price.

20   Do you see it as .9445?

21   A.  .9455.

22   Q.  Pardon me, .9455.

23   A.  Correct.

24   Q.  And let's continue on down for the '19 through '20 section

25   of this contract.

Sara Fisher - Cross

1          If we can scroll another page to the FOB price.

2          George's wound up at .9412, right?

3   A.   Yes.

4   Q.   So we, George's, stair-stepped down continuously for a

5   cheaper price for chicken; is that right?

6   A.   Correct.

7          MS. JOHNSON:   Thank you.   We can remove that document.

8   BY MS. JOHNSON:

9   Q.   So if anyone thought that George's was holding firm on

10  their price for this negotiation period, that would be

11  incorrect; would you agree?

12  A.   Can you rephrase the question?

13  Q.   Absolutely.   If there was anyone that thought George's was

14  holding firm on their price during this negotiation period for

15  these years, that would be incorrect; would you agree?

16  A.   Well, the price, the final price was negotiated, and then

17  based on what that was equal to over three years, it was

18  basically stair stepped.   So the dollars are the same, just

19  over a longer -- instead of it being over three years, it was

20  over three and whenever they started.

21  Q.   I understand.   But what we just saw, what the jury just saw

22  was from 2017, mid 2017, 2018, 2019, the price of chicken that

23  George's made went down, down, down; would you agree?

24  A.   Yes.

25  Q.   Let's talk about volume.   You mentioned it and you talked

1918

Sara Fisher - Cross

1    about it with Ms. Carwile earlier this morning, but I want to

2    go through some documents for this same time period.  We are

3    going to start with the previous contract.  And I know you

4    weren't part of it, but I think you said on direct you reviewed

5    those because that's how you started the negotiation period.

6    So I want to talk about volume, and I want to talk about it in

7    terms of truckloads.  Can you help me explain to the jury how

8    many pounds of chicken is on a truckload?

9    A.   Typically it's 40,000 pounds, I believe.

10   Q.   If you've heard 33,500, does that sound close?

11   A.   Yeah, it ranges, yes.

12   Q.   So volume, can we talk in volume in terms of how many

13   truckloads a week the company is responsible for?

14   A.   Yes.

15   Q.   In fact, on the contract itself when it has however many

16   pounds of volume, it also will have TL which stands for

17   truckloads?

18   A.   I believe so, yes.

19   Q.   So I want to go through the different suppliers for this

20   time frame.  And let's look at and explain to the jury how the

21   volume changed for each company, okay?

22   A.   Okay.

23   Q.   Because I believe you said on your direct the companies

24   competed, and one of them might take volume away from another

25   at any given time, right, and they would negotiate for that

1919

Sara Fisher - Cross

1    volume.

2    A.   During the contract period, yes.

3    Q.   Yes.  Once the contract is set, it's set, correct?

4    A.   Correct.

5    Q.   So in addition to price, they also negotiated for volume;

6    is that fair?

7    A.   Yes.

8    Q.   So let's start with Case Farms.  They were part of the

9    suppliers that negotiated for this period, right?

10   A.   Right.

11   Q.   If we can pull up Exhibit F-744 and turn to Page 4.

12       Did Case Farms have eight truckloads of volume?

13   A.   Yes.

14   Q.   Okay.

15       MS. JOHNSON:  One moment, Your Honor.  I'm sorry.

16       THE COURT:  Sure.

17   BY MS. JOHNSON:

18   Q.   And then F-747, Page 17, do you see that?

19   A.   Yes.

20   Q.   Does Case's volume increase to 14 truckloads?

21   A.   Yes.

22   Q.   So Ms. Fisher, I want to start, and I am going to show at

23   the same time I-979.

24       MS. JOHNSON:  Your Honor, we would mark this for

25   demonstrative purposes at this point in time.

1920

Sara Fisher - Cross

1    THE COURT:  Just one moment.  Okay.  And by that do

2  you mean that you wish to display it to the jury at this time

3  for demonstrative purposes only?

4    MS. JOHNSON:  Your Honor, at this time I would like to

5  display just the first line that we have discussed for

6  demonstrative purposes.

7    THE COURT:  Can I see the top, the very top of the

8  exhibit?

9    MS. JOHNSON:  Just the line involving Case Farms, Your

10  Honor, that we just discussed.

11    THE COURT:  Any objection to the display of that,

12  what's being shown on the screen now, the heading and the first

13  line for demonstrative purposes only?

14    MS. SWEENEY:  No objection, Your Honor.

15    THE COURT:  All right.  It may be.

16    MS. JOHNSON:  Thank you, Your Honor.

17  BY MS. JOHNSON:

18  Q.  So Ms. Fisher, you agree with me that over this contract

19  period Case Farms increased their volume by six truckloads?

20  A.  Yes.

21  Q.  And to be specific, that's six truckloads per week,

22  correct?

23  A.  Correct.

24  Q.  So let's talk about Claxton briefly, if we could pull up

25  Exhibit 1119.  And scroll to Page 4.  Do you see it,

Sara Fisher - Cross

1    Ms. Fisher?

2    *A.*   Yes.

3    *Q.*   Was Claxton's volume for the 2015 contract 16 truckloads?

4    *A.*   Yes.

5    *Q.*   16 truckloads per week, right?

6    *A.*   Correct.

7    *Q.*   And now if we could look at F-756.  We are going to turn to

8    Page 16.

9           Do you see 16 truckloads?

10   *A.*   Yes.

11   *Q.*   So Claxton stayed the same throughout these contracts,

12   didn't they?

13   *A.*   Correct.

14   *Q.*   Same amount per week of chicken.

15   *A.*   Yes.

16        *MS. JOHNSON:*  If we could display the second line on

17   the demonstrative now for the jury.

18        *THE COURT:*  Any objection to displaying the second

19   line of I-979 at this time for demonstrative purposes only?

20        *MS. SWEENEY:*  No objection.

21        *THE COURT:*  It may be.

22   *BY MS. JOHNSON:*

23   *Q.*   Now let's talk about George's.  If we can look at Exhibit

24   1121, and we'll move to Page 4.

25           George's during the 2015 contract had 33 truckloads

1922

Sara Fisher - Cross

1  per week; is that correct?

2  *A.*  Correct.

3  *Q.*  And then let's compare the '17 contracts.  It's F-765,

4  Page 16.

5          George's lost volume, did they not?

6  *A.*  Correct.

7  *Q.*  To 29 truckloads a week?

8  *A.*  Yes.

9  *Q.*  So they lost four truckloads a week during this time

10  period, right?

11  *A.*  Yes.

12  *Q.*  And then they also, as we have already talked to the jury,

13  their prices were coming down, correct?

14  *A.*  Yes.

15  *Q.*  Okay.

16      *MS. JOHNSON:*  Your Honor, can we display the next line

17  on the demonstrative?

18      *THE COURT:*  Any objection to the display of the next

19  line in I-979?

20      *MS. SWEENEY:*  No objection.

21      *THE COURT:*  It may be.

22  *BY MS. JOHNSON:*

23  *Q.*  And then let's talk about Koch Foods.  Let's pull up

24  Exhibit 1123 and scroll to Page 4.

25          And do you see that Koch for the 2015 contract had

1923

Sara Fisher - Cross

1   34 truckloads per week --

2   A.   Yes.

3   Q.   -- in volume; is that correct?

4   A.   Yes.

5   Q.   Now let's compare to the 2017 contract negotiations, F-774.

6   And Ms. Fisher, we will look at Page 16.  Do you see that Koch

7   then had 28 truckloads of volume?

8        MS. SWEENEY:  Your Honor, objection.  I would just

9   like to clarify that this document has been admitted.  I

10  apologize if my records are --

11       THE COURT:  It has not, F-774.

12       MS. SWEENEY:  Then the government objects about

13  questioning of a document not in evidence.

14       THE COURT:  Well, it can be questioned, but the

15  contents of it should not be asked in a question.  Sustained.

16  BY MS. JOHNSON:

17  Q.   You are familiar -- you also negotiated with Koch, did you

18  not?

19  A.   Yes.

20  Q.   Okay.  And this -- take your time and look at this

21  contract.  But is this the 2017 contract that you were part of

22  the negotiation process with Koch?

23  A.   Yes.

24       MS. JOHNSON:  Your Honor, we would move to introduce

25  F-774.  I believe it's on the stipulation list.

Sara Fisher - Cross

1      *THE COURT:* Any objection to the admission of F-774?

2      *MS. SWEENEY:* No objection.

3      *THE COURT:* F-774 will be admitted.

4   BY MS. JOHNSON:

5   *Q.* Ms. Fisher, let's continue discussing this document.  So we

6   have established that during the 2015 negotiations, Koch had

7   34 truckloads.  During these negotiations they went down to

8   28 truckloads per week, right?

9   *A.* Correct.

10      *MS. JOHNSON:* Your Honor, we would like to publish the

11  next line on the demonstrative.

12      *THE COURT:* Any objection to Ms. Johnson doing so?

13      *MS. SWEENEY:* No objection.

14      *THE COURT:* All right.  You may do so.

15  BY MS. JOHNSON:

16  *Q.* Let's talk about Mar-Jac, and pull up document No. 1125,

17  Page 4.

18      Do you see that Mar-Jac had 35 truckloads?

19  *A.* Yes.

20  *Q.* And then let's pull up F-783, Page 16.

21      Is this the same -- the very same type of contracts we

22  have been talking about with all of the suppliers?

23  *A.* Yes.

24  *Q.* And Mar-Jac was involved in this same negotiation?

25  *A.* Correct.

1925

Sara Fisher - Cross

1          *MS. JOHNSON:*  Your Honor, again if these documents

2    have not been admitted, we would seek to introduce them.  I

3    believe all the bids and contracts were on the stipulation

4    list.

5          *THE COURT:*  F-783 has been admitted.

6          *MS. JOHNSON:*  Thank you, Your Honor.

7    *BY MS. JOHNSON:*

8    *Q.*  So did Mar-Jac decrease their truckloads per week to 28?

9    *A.*  Yes.

10   *Q.*  And OK Foods, Exhibit F-789.  We are going to be looking at

11   page 8, Ms. Fisher.  Now, OK Foods was new to the show for this

12   COB contracts; is that correct?

13   *A.*  I don't recall.  I thought they were already in, but maybe

14   they were new this go-around.

15   *Q.*  If there is no 2015 contract for COB, would you agree with

16   me that it appears they were new to this round?

17   *A.*  Yes.

18   *Q.*  And we are talking about the 2017 contracts for these

19   three-year periods, right?

20   *A.*  Yes.

21   *Q.*  And do you see that OK Foods received eight truckloads per

22   week?

23   *A.*  Yes.

24         *MS. JOHNSON:*  Your Honor, we would move to introduce

25   F-789.

1926

Sara Fisher - Cross

1    THE COURT:  It has already been admitted.

2    MS. JOHNSON:  Thank you, Your Honor.  May we publish

3  these last two?  I think I failed to publish the Mar-Jac, the

4  last two lines on our demonstrative.

5    THE COURT:  Any objection to her doing so?

6    MS. SWEENEY:  The government objects to the last line.

7  The witness has not provided foundation.  I believe her

8  testimony was just that she does not recall as to whether or

9  not there was a contract.

10    THE COURT:  The objection is overruled.  It can be

11  displayed.

12    MS. JOHNSON:  Thank you, Your Honor.

13    THE COURT:  Ms. Johnson, after that -- and has the

14  entire demonstrative been displayed now?

15    MS. JOHNSON:  No, Your Honor, just a couple more

16  lines.

17    THE COURT:  Would it be all right, can we take the

18  break now?

19    MS. JOHNSON:  Yes, sir, absolutely.

20    THE COURT:  Ladies and gentlemen, we will go ahead and

21  take the mid-morning break at this point in time, and because

22  we are starting a little bit late, why don't we plan on

23  reconvening at 10:35, all right?  The jury is excused.

24        (Jury excused.)

25        Ms. Fisher, you are excused for the break.

Sara Fisher - Cross

1        Based upon our timing, should we take up

2   Mr. Feldberg's points now regarding Mr. Bryant?  It sounds like

3   it would be appropriate.

4        Go ahead, Mr. Feldberg.

5        *MR. FELDBERG:*  Your Honor, thank you.

6        Before this trial we filed a trial brief at Docket

7   1054 dealing with the question of lay witness opinion

8   testimony.  And the concern that we had that led to the filing

9   of this brief is that witnesses would be asked questions that

10  essentially are not who, what, why, where, when, but give me

11  your understanding, give me your belief, and that that

12  testimony would be unfounded.  And Your Honor has been rigorous

13  in the Court's rulings in the testimony so far.

14       The recent -- the notes we have received of recent

15  interviews with Mr. Bryant are very light on the who, what,

16  when, where, how, and very heavy on the understandings and

17  beliefs and general amorphous feelings not tied to any specific

18  conversations or events.  And we just wanted to raise that

19  concern at this point along with a second concern that in the

20  most recent set of notes we've received, a three-page set, the

21  phrase "price-fixing" appears multiple times.

22       I can't tell from the notes whether Mr. Bryant is

23  saying it or one of the agents is injecting that phrase into

24  the notes; but nevertheless, I think we determined at the --

25  the Court determined at the first trial that the term

Sara Fisher - Cross

1    "price-fixing" is a legal conclusion that certainly Mr. Bryant

2    is not qualified to make and directed that that term not be

3    used.  And I wanted to raise that issue as well in advance of

4    Mr. Bryant's testimony.

5              Thank you.

6              *THE COURT:*  Ms. Call?

7              *MS. CALL:*  Yes, Your Honor, two points.  On the first

8    topic Mr. Feldberg raised, we did brief this recently as well.

9    I was just looking for the ECF number, but I was unable to

10   locate it.  But it is entirely proper for witnesses to testify

11   about their understandings, not just the who, what, when,

12   where, why of specific questions, but their perception, the

13   inferences that can be drawn from conduct.  That's all entirely

14   proper lay witness testimony, so we disagree with

15   Mr. Feldberg's contention there.

16             As to the term "price-fixing," Mr. Feldberg may not

17   recall, but this was also briefed pretrial for this trial, and

18   I believe it was Docket 1000, if not it was 1001 or 999, where

19   the defendants moved to prohibit the use of the term

20   "price-fixing" based on Mr. Feldberg's argument he just made

21   that it is a legal conclusion.

22             At the pretrial conference Your Honor ruled that it

23   was not, that it was not such a loaded term, that a witness

24   could not properly use it, and that such witnesses could use

25   that term as long as it was in their own words.  I believe

Sara Fisher - Cross

1    Mr. Tubach had raised it would be improper for the government

2    to recharacterize a witness' own testimony as price-fixing if

3    it was not a term that the witness used, and the government

4    agrees.  But to the extent a witness uses the term

5    "price-fixing," it is proper.  It is not a loaded term and is

6    not the ultimate conclusion in that way that would make it

7    improper testimony.

8              THE COURT:  Mr. Feldberg?

9              MR. FELDBERG:  Your Honor, I am looking at Your

10   Honor's ruling at the pretrial conference agreeing with

11   Mr. Tubach that Mr. Bryant started calling something

12   price-fixing.  And the Court said:  I agree with you because

13   that's redefining a term, so I do think that would be

14   inappropriate.

15             Mr. Bryant is not qualified to determine what is or is

16   not price-fixing.  He testified at the first trial that he has

17   no antitrust training.  Price-fixing is a term of art and a

18   legal term in the context of antitrust law.  Mr. Bryant has no

19   training or experience in that field; and therefore, his view

20   of what might or might not be price-fixing is at best

21   potentially confusing to the jury and certainly without any

22   legal foundation or basis, so we would urge the Court to stick

23   with the way we approached this in the first trial.

24             THE COURT:  Well, as I recall, Mr. Tubach made the

25   point that -- and I recall that during Mr. Bryant's testimony

Sara Fisher - Cross

1  in the first trial, he was asked a question something like, Is

2  it all right if we call that price-fixing?  Some type of

3  behaviors or activity was defined as such, and I indicated at

4  the final pretrial conference this trial that that was not

5  appropriate.

6          That doesn't mean to say that there couldn't be some

7  question that comes up, for instance, even a general question

8  like, Did you engage in any price-fixing, some common person's

9  understanding of it, so that's why I haven't prohibited the use

10  of the term completely, but it should not be used as some type

11  of a shorthand phrase because that could be easily misconstrued

12  by the jury.

13          Mr. Tubach?

14      MR. TUBACH:  Yes, thank you, Your Honor.  And just to

15  clarify, we don't think it should be used as a shorthand either

16  if the witness initiates or if the questioner initiates it.

17  Obviously, in the last trial it was Mr. Koenig who sort of

18  recharacterized what Mr. Bryant was saying as price-fixing when

19  he was talking about information sharing.  I don't think it's

20  any different if the witness talks about information sharing

21  and he re-characterizes it as price-fixing.  That is no more

22  proper than if the questioner does it.

23      THE COURT:  Right.  Were that to happen, then it

24  probably would be objectionable and it would have to be --

25  there would have to be some foundation laid for what the

Sara Fisher - Cross

1   witness is talking about.  But there is a danger that the jury

2   could get confused on that, so we have to be careful that a

3   layperson's use of a term is just the layperson's use of the

4   term so there is no confusion over that.

5        In terms of the trial brief that was filed by

6   Mr. Austin and the use of the terms understandings, essentially

7   Ms. Call is right.  People may have understandings about all

8   sorts of things.  The term "understanding" is not necessarily

9   objectionable.  However, if a witness is forming an opinion

10  about some type of activity that is not just within the ken of

11  an ordinary juror, then it could stray into a violation of 701,

12  but we will have to see.

13       I don't really think that Mr. Bryant's use of that

14  term or really any other witness' use of that term so far

15  during this trial infringes upon 701 or falls within the realm

16  of 702; but were it to do so, obviously an objection could be

17  made.

18       Anything else on that, Mr. Feldberg?

19       *MR. FELDBERG:*  Just one point, Your Honor.

20       As we understand the law, and we tried to set this out

21  in the trial brief, it's one thing if he gives his

22  understanding of a conversation in which he was a participant.

23  And it's quite another thing if he tries to interpret a

24  conversation in which he was not a participant.  And we tried

25  to draw the distinction between the two sets of circumstances,

Sara Fisher - Cross

1   and I just wanted to raise that point for you.

2          THE COURT:  Once again, it's been going on all

3   throughout the trial that you might ask someone:  Did you

4   receive this e-mail?  Yes.  What did you understand the person

5   to be asking?

6          That in and of itself is probably most of the time

7   completely a proper question because if you took some action

8   after having reviewed it, then your understanding of what it

9   said explains why you did what you did.  But there have been

10  cases where the witness has no foundation to know what was in

11  the head of the writer, and under those circumstances there

12  could be an objection.  It could be speculative or something of

13  that nature.  I think that those are different than what you

14  just mentioned.

15         If a witness is asked about things that he has no

16  personal knowledge of and then is being asked, you know, based

17  on those facts what's your opinion as to what -- something of

18  that nature, then it could be an improper opinion because the

19  witness doesn't have any knowledge of it, but is just rather

20  using something, perhaps his or her experience, to form an

21  opinion about what indeed happened.  So that could be an

22  example of an improper opinion question.

23         MR. FELDBERG:  Thank you, Your Honor.

24         THE COURT:  All right?  Ms. Call?

25         MS. CALL:  Two things.  First, if I may just seek

Sara Fisher - Cross

1    clarification.  Mr. Bryant is literally here to testify about

2    his participation in a price-fixing conspiracy.  To the extent

3    that he uses that term to describe his conduct, which the

4    government believes he will be doing, is that problematic, or

5    when Your Honor I think discussed maybe foundation being laid,

6    do you think it would be more proper to get an overview of the

7    type of conduct he is describing before he uses the term?

8         THE COURT:  Well, before he uses that term or before

9    he is asked a question, is it fair if we call that, that type

10   of thing, if he has a particular understanding of what he

11   considers it to be, then that may be fine, but it can't be a --

12   he has to explain exactly what he means by the term.

13        Ms. Henry?

14        MS. HENRY:  Your Honor, at the prior trial Mr. Bryant

15   testified that he had not used those words, that he had only

16   explained to the government -- I believe he said he described

17   his actions.  He was asked further and explained that he did

18   not know precisely what price-fixing meant.  So to the extent

19   that he now does, that is an understanding that has been

20   derived from between the past trial and the current trial, and

21   we would object that that type of opinion at this point would

22   not be appropriate to come in.

23        THE COURT:  Mr. Canty?

24        MR. CANTY:  I would also like to refer the Court to

25   the ruling in the prior trial on Page 76 of Mr. Bryant's

Sara Fisher - Cross

1    transcript where the Court -- the term is being used and the

2    Court does rule that:  There might be a better way to come up

3    with a different term.  That term is to a large extent the

4    ultimate issue.  So the witness' use of the term to describe

5    his view of things could cause confusion.

6            THE COURT:  Right.  I think that's what we were

7    referring to earlier.

8            Ms. Call, why don't you respond to Ms. Henry's point.

9            MS. CALL:  Yes, Your Honor.  Having reviewed his

10   testimony, that actually doesn't sound familiar to me.  Perhaps

11   they are asking about in a particular interview whether he used

12   the term, which I don't recall that testimony either, but I

13   could be refreshed.  But regardless, the references to the

14   prior trial are totally not recognizing the briefing and ruling

15   that we now have in this trial, which it is a colloquial term.

16           To the extent that is Mr. Bryant's belief in what he

17   participated in, which it is, he should be able to testify to

18   that.  There is no rule prohibiting testimony on the ultimate

19   conclusion.  And so long as Your Honor said Mr. Bryant explains

20   the basis for his use of the term or what he understands it to

21   mean, he is not instructing the jury on the law.  He is just

22   providing foundation for his testimony.

23           THE COURT:  Well, I think Henry's point is that, and I

24   don't know where it came from, but you can ask her on the break

25   which is going to be very abbreviated, is if he didn't have an

Sara Fisher - Cross

1   understanding about that before and during what he was doing --

2   he is a fact witness after all -- he didn't use those terms,

3   that wasn't how he was thinking, but now somehow he has gained

4   an understanding of what that means, I am not sure what the

5   source of that is, but it could be infected by legal opinions,

6   and now he is characterizing what he did as price-fixing, I do

7   think that that's problematic because that -- he is now using

8   some after-the-fact definition or something to now characterize

9   what he was doing, so that is, I think, potentially

10  problematic.

11          MS. CALL:  Yes, Your Honor.  I am trying to understand

12  quite the bounds of it.  You know, if someone testifies about

13  their participation in giving bribes to a senator, you know,

14  their words are, I gave this money, and at the time that's what

15  they are saying.  After the fact when they come to testify

16  about it, yes, they can testify to the belief that they gave

17  bribes.

18          And in the government's filing a couple weeks ago, and

19  I am still looking for the ECF number, so I apologize, but that

20  kind of testimony is allowed in criminal cases.  Witnesses can

21  testify to their participation in a fraud or bribery or

22  price-fixing, which is exactly what the topic of the

23  government's brief was.  So if the terms of art are used by the

24  witness and it's not a term of art in the first place have

25  changed since the time, you know, it's not based on a change in

Sara Fisher - Cross

1   the facts or his understanding of the facts or of the conduct.

2   So I don't see the concern in terms of what he is testifying

3   to, if he is just using a different term than what he may have

4   precisely used back eight years ago.

5           THE COURT:  Well, if he didn't use that term -- if he

6   didn't think of those terms before, then his testimony is not a

7   description of what he was thinking at the time, which arguably

8   it should be.  And instead if he is now appending a term to it

9   which is, as you say, going to the ultimate issue, and we know

10  from the jury instructions that that issue is not just -- you

11  know, it's not intuitive, there is a lot of ins and outs to it,

12  then I don't see why his use of that term is going to be

13  helpful as opposed to confusing to the jury because that -- he

14  is not describing how he thought about things.  He is just now

15  using some definition that he didn't before and calling it that

16  now.

17          So that after-the-fact characterization I don't

18  think -- that's something that he -- it's not part of his fact

19  testimony.  It's just something that he is just using that

20  particular terminology to describe what he did, but I think

21  that that's more confusing than helpful.

22          MS. CALL:  Okay.

23          THE COURT:  The bottom line is that he is a fact

24  witness, so, you know, the jury can take whatever he testifies

25  to in terms of facts, what he did during that period of time.

Sara Fisher - Cross

1   And then when they get the jury instructions, they can compare

2   it to the elements and see whether the government has satisfied

3   its burden of proof.

4        *MS. CALL:*  One very brief moment to confer.

5        Very respectfully, Your Honor, I think there is going

6   to be a difficulty in asking this witness why he is here and

7   what he is here to talk about without him being able to use the

8   term that in his mind is why he is here.

9        *THE COURT:*  I don't get it.  All he has to do is

10  explain what he did before, what he did.  You know, I don't

11  know why a label is -- somehow would flummox him.

12       *MS. CALL:*  All right, Your Honor.  Two other things I

13  wanted to mention because I know the break is running short.

14  The first is, and I provided notice last night, but I wanted to

15  make sure counsel were prepared, that the government will seek

16  to offer several summary exhibits following Ms. Fisher's

17  testimony.

18       And the second is we just did want to inform the Court

19  the government did last night inform the parties of the

20  anticipated timing regarding its witnesses and time for

21  documents, so we do anticipate or hope for some clarification

22  on witnesses in the defense case this evening.

23       *MR. BYRNE:*  On that point, I did some math on that.

24  And there is no way the government is going to finish its case

25  at 4:00 p.m. on Thursday at the earliest.  At the rate we are

1938

Sara Fisher - Cross

1  going now, it's going to be probably Monday based on their time

2  estimates.

3       THE COURT:  We don't really need to talk about that

4  now.  We will try to have a break as soon as possible.  I would

5  like to try to hold it to five minutes if possible because we

6  are already 20 minutes past what we told the jury.

7            We will be in recess.

8       (Recess at 10:40 a.m. until 10:52 a.m.)

9       THE COURT:  So we received a note from one of the

10  jurors just at the break as she was going out the door

11  indicating some questions about certain exhibits.  Each of

12  those exhibits, by the way, has been admitted, and I would

13  therefore propose when the jury is brought back in that I

14  inform the jurors that they will see all admitted exhibits, the

15  only exception being demonstrative exhibits which they will not

16  have for purposes of deliberations.

17            Any objection to that response?

18       MS. JOHNSON:  No, Your Honor.

19       MS. CALL:  No, Your Honor.

20       MS. JOHNSON:  I will tell the Court our plan is once

21  we finish is to move to introduce the demonstrative under

22  611(a).

23       THE COURT:  Yeah.  Generally demonstratives don't go

24  back to the jury.  If it changes its status, then it will be an

25  admitted exhibit which will go back to the jury.

Sara Fisher - Cross

1          MS. JOHNSON:  Yes, sir.

2          THE COURT:  Mr. Feldberg?

3          MR. FELDBERG:  I would just ask the Court to instruct

4    government's counsel to instruct Mr. Bryant's counsel of the

5    ruling the Court made at the beginning of the break so nothing

6    is blurted out that contravenes the Court's ruling.

7          THE COURT:  I assume that has happened or will happen.

8          MS. CALL:  I believe Mr. Bryant's counsel was in the

9    courtroom during it, but we do understand from his counsel that

10   Mr. Bryant did understand the term price-fixing as early as

11   2017, so I don't think it is an issue based on the Court's

12   ruling.

13         THE COURT:  Well, once again, I don't know.  I am not

14   sure what Ms. Henry was quoting from, but if that was from his

15   testimony at the previous trial, then --

16         MS. CALL:  I did, Your Honor, check the transcript,

17   although Ms. Henry was not able to give me a cite.  Page 957 he

18   was asked about whether he used the term price-fixing in

19   interviews with the government.  He said he didn't know and

20   that he accepted counsel's representation that he didn't based

21   on the notes.  They also asked if he had antitrust training and

22   he said that he had in at least 2019 and that he may have had

23   some in undergrad as well.

24         MR. FELDBERG:  Your Honor, first of all, on the

25   antitrust training, he said he didn't have any until 2019.

Sara Fisher - Cross

1  Second of all, he said at Page 956 of the transcript that he

2  just said what happened in the 20th.  In 19 of the 20

3  interviews he didn't use the term "price-fixing."  He just

4  described what happened.  In the 20th interview the term

5  "price-fixing" came up.  So there is nothing that's

6  contemporaneous about his use of the word "price-fixing."

7          THE COURT:  Mr. Canty?

8          MR. CANTY:  And that's a term that in your 19 of your

9  20 interviews you never used, correct?

10         Answer:  I didn't use that exact term.  I think the

11 way I expressed it was just the actions that took place.

12         MR. FELDBERG:  Question:  So you don't know what the

13 law says is or is not price-fixing, correct?

14         Answer:  That's correct.

15         THE COURT:  My previous ruling stands.  It doesn't

16 sound like Mr. Bryant used that particular term.  He may have

17 had some understanding of it, but it doesn't sound like in all

18 those different interviews if that wasn't a term that he used

19 to characterize his behavior, then having him characterize it

20 that way now I don't think is appropriate.

21         MS. CALL:  Very respectfully, just for additional

22 context, it was in 2017 that the class actions were filed

23 alleging price-fixing when Mr. Bryant was talking to many

24 conspirators about the price-fixing allegations and whether

25 that term did describe their conduct.  And much of that has

Sara Fisher - Cross

1    been excluded because of the class action, but we do think it's

2    entirely relevant in 2017 he had an understanding of the term

3    "price-fixing."  There was collusive action to drive

4    underground this conspiracy including evidence in this case

5    like no comp names in e-mail, which is a text message that

6    Mr. Bryant received during that time frame.  So it was entirely

7    his state of mind that what they were doing was price-fixing at

8    the time even if it may not have been used specifically in an

9    interview with the government.

10        *THE COURT:*  Well, once again, I can't remember exactly

11   what happened then, but as you say, a lot of it has been

12   excluded.  So I just -- I don't see any unfairness.  Once

13   again, we are just talking about that label, but he can

14   obviously describe his actions and other things that are

15   relevant to his testimony.  I don't think that interferes with

16   his ability to describe everything that he said or did.

17        All right.  Let's bring the jury in.

18        (Jury present.)

19        *THE COURT:*  Ladies and gentlemen, one of the jurors

20   gave a note to the Court concerning certain exhibits and

21   whether the jury will be able to see them in deliberations.  As

22   I indicated to you I think on day two at that preliminary

23   instruction -- Ms. Moore, do you mind putting your mask back

24   on?  Thank you -- any exhibit that is admitted will be

25   available to you during your deliberations.  The only exception

Sara Fisher - Cross

1    to that is that if an exhibit is admitted for demonstrative

2    purposes only, then although you may be looking at it in court

3    while it's being -- while there is some testimony concerning

4    it, that will not be available to you during your

5    deliberations, but all the admitted exhibits will be brought

6    back to you once you begin your deliberations, okay?

7            All right.  Ms. Johnson?

8            MS. JOHNSON:  Your Honor, one housekeeping matter.  I

9    believe that there have been -- there has been an exhibit

10   that's been admitted under two different numbers, but it's the

11   same exhibit.  F-774, which is an RSCS document, is the same as

12   C-207, which I believe was a Case document, but it's the same

13   contract.  My apologies to the Court.

14           THE COURT:  Okay.  I think what we'll do is we'll

15   obviously try to avoid that, but we'll let things be since both

16   have been admitted today.  But thank you for pointing that out

17   to me, Ms. Johnson.

18           MS. JOHNSON:  Thank you, Your Honor.

19   BY MS. JOHNSON:

20   Q.  Ms. Fisher, when we took the break, I think we were talking

21   about --

22           And if we could have the demonstrative displayed,

23   please, Mr. Brian.

24           When we took the break, we were talking about

25   OK Foods, right, and that on the new contracts, the 2017

Sara Fisher - Cross

1  negotiated contracts, they gained -- they had eight truckloads;

2  is that correct?

3  A.  Yes.

4  Q.  So would you agree with me if before they had zero and they

5  came to the party, so to speak, those eight truckloads would

6  have had to have been negotiated away from someone else, from

7  another supplier; is that fair?

8  A.  Yes.

9  Q.  Let's move on to Pilgrim's Pride and pull up document 1126

10  and page 3 of that document.  Do you have that in front of you?

11  A.  Yes.

12  Q.  And we are still talking about, just to be clear, the same

13  contract negotiations, right, 2017 through --

14  A.  Yes.  This document is the previous contract.

15  Q.  Okay.  The previous contract, do you see that Pilgrim's

16  Pride had 63 truckloads per week; is that right?

17  A.  Yes.

18  Q.  So now let's look at F-796.  And it will be on Page 18,

19  Ms. Fisher, of that contract.

20        Do you see that Pilgrim's Pride dropped to

21  40 truckloads per week?

22  A.  Yes.

23  Q.  So 23 truckloads of chicken every week were taken away,

24  negotiated away from Pilgrim's during this contract

25  negotiation.  Would you agree with me?

Sara Fisher - Cross

1    *A.*  Yes.

2               *MS. JOHNSON:*  And Your Honor, 1126 and F-796, I

3    believe they have been admitted.

4               *THE COURT:*  Both have been.

5               *MS. JOHNSON:*  Thank you, Your Honor.

6               If you could publish the next line on the

7    demonstrative, please, Mr. Brian.

8    *BY MS. JOHNSON:*

9    *Q.*  Finally, let's take a look at the Tyson contracts,

10   Ms. Fisher.  Can we compare 1127 --

11              *THE COURT:*  Ms. Johnson, did you want to display that

12   next line?

13              *MS. JOHNSON:*  Yes, sir.

14              *THE COURT:*  Any objection to displaying the next line?

15              *MS. SWEENEY:*  No, Your Honor.

16              *THE COURT:*  It may be displayed.

17              *MS. JOHNSON:*  Thank you, Your Honor.

18   *BY MS. JOHNSON:*

19   *Q.*  Now, if we can go to 1127, Page 3 of that contract.  Do you

20   see that?

21   *A.*  Yes.

22   *Q.*  And would you agree with me that on a previous contract

23   Tyson had 25 truckloads per week of chicken that they

24   negotiated with RSCS.

25   *A.*  Yes.

Sara Fisher - Cross

1    *Q.* And then let's compare that to G-474, and that's going to

2    be Page 12, ma'am, of that document.

3            And do you see that Tyson's increased their truckloads

4    to 34?

5    *A.* Yes.

6    *Q.* So an additional increase of nine truckloads per week that

7    Tyson negotiated with RSCS; is that correct?

8    *A.* Yes.

9    *Q.* So let me ask you this. Would you agree with me -- we've

10   talked about a lot of contracts. We've compared for all of the

11   suppliers all these contracts. If you were asked to explain

12   the changes in volumes between all of these companies from the

13   first contracts to these new contracts, would a chart --

14           If we can display the chart in the last line, Your

15   Honor?

16           *THE COURT:* Any objection to doing so?

17           *MS. SWEENEY:* No objection.

18           *THE COURT:* It may be.

19   *BY MS. JOHNSON:*

20   *Q.* Would a chart such as this assist you in being able to

21   quickly explain to the jury or anyone what the changes in

22   volumes were throughout these years?

23   *A.* Yes.

24           *MS. JOHNSON:* Your Honor, at this time we would move

25   to introduce this chart under 611(a) and 1006.

Sara Fisher - Cross

1      THE COURT:  Any objection to the admission of I-979?

2      MS. SWEENEY:  Yes, Your Honor.  I don't believe it

3  meets the standards of 1006 as the documents were easily gone

4  through in court which I believe is one of the requirements of

5  1006.

6      THE COURT:  Response?

7      MS. JOHNSON:  Your Honor, I think we have just been

8  talking for 30-plus minutes about numerous documents and the

9  comparison of both of those contract years.  I believe it's

10  helpful to the jury for them to be able to see this and

11  understand the difference, the changes in the truckloads that

12  have been negotiated by the various suppliers.

13      THE COURT:  Well, that's -- the last standard that you

14  mentioned is one that would apply to the use of a

15  demonstrative, so that doesn't go to the admissibility of the

16  demonstrative.  Ms. Call asked you about whether or not it --

17  as to the volume aspect which you mentioned at the first part.

18  I do find that this summarizes a number of different contracts;

19  and as a result, I will admit -- I will overrule the objections

20  and admit I-979.

21      MS. JOHNSON:  Is the demonstrative being fully

22  displayed on the screen?

23      THE COURT:  That, I have no control over.

24      MS. JOHNSON:  I don't either apparently, Your Honor.

25  Thank you, Your Honor.

Sara Fisher - Cross

1    *BY MS. JOHNSON:*

2    *Q.* And just finishing up, Ms. Fisher, I believe there is one

3    more line, so I apologize.

4          Can we show that first to Ms. Fisher?

5          Ms. Fisher, I am not going to ask you to do math on

6    the stand, but does this line show the totals, the total volume

7    that we are talking about, the total number of loads for the

8    2015 contract year versus the total number of contract volume

9    in truckloads for 2018?

10   *A.* Yes.

11   *Q.* And the change is negative 17 or there is a 17-truckload

12   change from 2015 to 2018?

13   *A.* Yes.

14         *MS. JOHNSON:* I apologize, Your Honor. I thought

15   there was a line missing. And we would move -- has the Court

16   admitted this?

17         *THE COURT:* Yes.

18         *MS. JOHNSON:* Thank you.

19   *BY MS. JOHNSON:*

20   *Q.* So to finish up, Ms. Fisher, sitting here today you have no

21   personal knowledge that suggests Mr. Blake, my client, entered

22   into any kind of agreement, certainly to raise prices,

23   negotiate volume or rig bids during this time frame, do you?

24   *A.* No.

25   *Q.* And, in fact, you don't have any knowledge of anyone

Sara Fisher - Cross

1    sitting in this courtroom of raising prices, negotiating volume

2    or rigging bids, do you?

3    A.   No.

4         MS. JOHNSON:   Thank you, Your Honor.

5         THE COURT:   Thank you, Ms. Johnson.

6         Mr. Quinn?

7         MR. QUINN:   Thank you, Your Honor.

8                        **CROSS-EXAMINATION**

9    BY MR. QUINN:

10   Q.   Good morning, Ms. Fisher.

11   A.   Good morning.

12   Q.   My name is Brian Quinn.  I represent Jayson Penn.  And just

13   to get something out of the way at the start, you don't know

14   Mr. Penn, right?

15   A.   No.

16   Q.   You have never spoken to Mr. Penn?

17   A.   No.

18   Q.   Okay, thanks.  I would like to ask you a couple questions

19   about some of the line items on the model that you talked about

20   a little earlier on direct examination.  You testified on

21   direct that you were responsible for the eight-piece COB

22   negotiations in 2017, right?

23   A.   Yes.

24   Q.   And you testified that you were responsible for

25   communications with the suppliers, right?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   And you also testified that you were responsible for some

3    behind-the-scenes analysis, right?

4    A.   Yes.

5    Q.   I would like to ask you about some of that

6    behind-the-scenes analysis.  Can we turn first to Government

7    Exhibit 1825?

8         MR. QUINN:  And Your Honor, I believe this is already

9    in evidence and can be published to the jury.

10        THE COURT:  Yes, it has been admitted and it may be

11   published.

12        MR. QUINN:  Thank you, Your Honor.

13   BY MR. QUINN:

14   Q.   Ms. Fisher, this is an e-mail dated February 3rd, 2017,

15   right?

16   A.   Yes.

17   Q.   And here Mr. Austin from Pilgrim's is sending an e-mail to

18   you and Mr. Rich Eddington; is that right?

19   A.   Yes.

20   Q.   And Mr. Eddington was your supervisor at RSCS, right?

21   A.   Correct.

22   Q.   And now, among other things Mr. Austin indicates in that

23   first line of the e-mail that he is attaching Pilgrim's bid for

24   2018, right?

25   A.   Yes.

Sara Fisher - Cross

1   Q.  Now, I would like to ask you some questions about that bid.

2   So if we can turn to it, that's Government Exhibit 1826.

3        MR. QUINN:  Your Honor, I believe this one has been

4   admitted as well.

5        THE COURT:  It has been.

6        MR. QUINN:  Thank you, Your Honor.

7        Brian, if we can publish the native version of that

8   file, 1826, and specifically the second sheet on the native

9   version entitled CP Pricing.

10  BY MR. QUINN:

11  Q.  So Ms. Fisher, just taking a look at this attachment, this

12  is the cost model that Pilgrim's submitted for the RFP you

13  worked on in 2017, right?

14  A.  Yes.

15  Q.  And it contains all of the various inputs that go into the

16  total bid cost for eight-piece COB, right?

17  A.  Correct.

18  Q.  Now, if you look there at row 35, and I think Brian can

19  help zoom in on that, this is the total price that Pilgrim's

20  proposes to charge KFC for eight-piece COB, right?

21  A.  Yes.

22  Q.  Okay, great.

23       MR. QUINN:  Now, Brian, if you could back up a little

24  bit from that to the entire spreadsheet.

25  BY MR. QUINN:

Sara Fisher - Cross

1   Q.  Now, you see that there is highlighting on the spreadsheet,

2   right, Ms. Fisher?

3   A.  Yes.

4   Q.  And the highlighting, it's a little tough to see now, maybe

5   we can zoom a little bit more, the highlighting indicates

6   whether the line items on this cost spreadsheet went up or

7   down, right?

8   A.  Yes.

9   Q.  The pinkish highlighting indicates the line item went up

10  and the yellow highlighting indicates that the line item went

11  down, right?

12  A.  Yes.

13  Q.  And that would be increases or decreases relative to

14  Pilgrim's existing pricing with KFC, right?

15  A.  Yes.

16  Q.  I want to look at a couple items in particular.  And the

17  first I want to look at is the item for WOG yield, and that's

18  in row 15 of the sheet.

19       MR. QUINN:  Brian, can you call that up for us?  I see

20  it right there.

21  BY MR. QUINN:

22  Q.  So the WOG yield in this Pilgrim's pricing model is

23  74.75 percent; is that right?

24  A.  Yes.

25  Q.  And that line item looks like it's highlighted in yellow,

Sara Fisher - Cross

1    right?

2    *A.*   Yes.

3    *Q.*   And can you read the note that appears next to that WOG

4    yield number?

5    *A.*   This went up, but that is to KFC advantage.

6    *Q.*   Okay.  Now, just so we are all clear, WOG yield refers to

7    the percentage of usable chicken that you get out of the total

8    chicken, right?

9    *A.*   Yes.

10   *Q.*   Okay.  Now, the higher the WOG yield, the bigger the

11   percentage of useable chicken as a portion of the whole, right?

12   *A.*   Yes.

13   *Q.*   And that number in this cost model results in a reduction

14   of cost to the customer; isn't that right?

15   *A.*   Yes.

16   *Q.*   Now, in this cost model that RSCS uses, as the WOG yield

17   gets higher, the cost goes down for the customer, right?

18   *A.*   Yes.

19   *Q.*   The higher the WOG yield, the lower the total cost; isn't

20   that right?

21   *A.*   Yes.

22   *Q.*   And that's why this note says this went up, but that is

23   better for KFC, right?

24   *A.*   Yes.

25   *Q.*   Let's look at another one kind of like that.

1953

Sara Fisher - Cross

1    MR. QUINN:  Brian, can you hone in on row 22?  And

2    that's entitled fat and tail yield.

3    BY MR. QUINN:

4    Q.  You see that, Ms. Fisher?

5    A.  Yes.

6    Q.  Now, the fat and tail yield in this bid looks like it's

7    98.5 percent, right?

8    A.  Yes.

9    Q.  And this cost line item is similar to WOG yield, right?

10   A.  I believe so, yes.

11   Q.  This line item is a cost reduction for the customer, right?

12   A.  I believe so, yes.

13   Q.  Gotcha.  And is this, similar to WOG yield, as the number

14   in this line item gets higher, the cost to the customer drops,

15   right?

16   A.  Yes.

17   Q.  Now, for many of the other line items on this model, the

18   total cost to the customer goes up as the number gets higher,

19   right?

20   A.  Yes.

21   Q.  So take, for example, packaging costs.  It's one of the

22   costs on there.  As packaging cost gets higher, the total cost

23   to the customer gets higher, right?

24   A.  Yes.

25   Q.  But the WOG yield and the fat and tail yield are different,

1954

Sara Fisher - Cross

1    right?

2    *A.*   Yes.

3    *Q.*   As those line items get higher, the total cost gets lower,

4    correct?

5    *A.*   Yes.

6    *Q.*   There is just a couple more line items I would like to ask

7    you about on this sheet.   There are a couple items entitled

8    credits on this cost model, right, Ms. Fisher?

9    *A.*   Yes.

10   *Q.*   One of them is in row 21.   That's the fat and tail credit.

11   Do you see that?

12   *A.*   Yes.

13   *Q.*   And kind of similar to WOG yield and fat and tail yield, as

14   that item gets higher, that's also a cost reduction for the

15   customer, right?

16   *A.*   Yes.

17   *Q.*   And that's true in this spreadsheet for any of the items

18   that appear in parenthesis and red ink, right?

19   *A.*   Yes, I believe so.

20   *Q.*   That means the total cost is going to be lower, right?

21   *A.*   Yes.

22          *MR. QUINN:*   Thank you, Ms. Fisher.

23          A moment to confer, Your Honor?

24          *THE COURT:*   You may.

25          *MR. QUINN:*   No further questions, Your Honor.   Thank

Sara Fisher - Cross

1    you.

2             *THE COURT:*  Thank you, Mr. Quinn.

3             One thing let me clarify, ladies and gentlemen, for

4    you is that you heard people refer to Brian and they ask Brian

5    to do various things.  Let me introduce you to Brian.  It's

6    Brian Fronzaglia.  I think, because his last name being

7    polysyllabic as it is, Brian is quicker, but just so you know.

8             Additional cross?

9             Yes, Ms. Price.

10            *MS. PRICE:*  Thank you, Your Honor.

11                     **CROSS-EXAMINATION**

12   *BY MS. PRICE:*

13   *Q.*  Good morning, Ms. Fisher.  My name is Kaitlin Price and I

14   represent Bill Lovette.  I just have a couple brief questions

15   for you.

16            You have never had any interactions with Mr. Bill

17   Lovette, have you?

18   *A.*  No.

19   *Q.*  And you have never even spoken with Mr. Lovette, did you?

20   *A.*  No.

21            *MS. PRICE:*  Thank you.  That's all.

22            *THE COURT:*  Thank you.

23            Ms. Prewitt?

24                     **CROSS-EXAMINATION**

25   *BY MS. PREWITT:*

Sara Fisher - Cross

1    *Q.* Hello, Ms. Fisher. I represent Timothy Mulrenin and I am

2    standing up here for Timothy Mulrenin. I didn't come with a

3    binder, so I am sure you are a little bit relieved about that

4    having seen so many binders.

5            So I just want to talk about Tyson's role in this

6    negotiation, okay?

7    *A.* Okay.

8    *Q.* That's what I am just going to be asking you about, okay?

9    I will have a couple documents I will show you, but that's

10   really the focus of my questions for you today, okay?

11   *A.* Okay.

12   *Q.* Now, talking about that negotiation for the 2018 forward

13   RFP for KFC, you know that it was Tyson's pricing position to

14   offer greater discounts for more volume.

15   *A.* Correct.

16   *Q.* Now, as we have established through your testimony that

17   there was -- at the time of the negotiation there were more

18   small birds in the market than were available previously,

19   correct?

20   *A.* Yes.

21   *Q.* And so you were able to secure greater discounts and more

22   favorable prices for KFC as a result of that.

23   *A.* Yes.

24   *Q.* Now, so I want to show you what has been admitted into

25   evidence as GX-1930, and we will just publish it for your

Sara Fisher - Cross

1  benefit.

2      *MS. PREWITT:*  And, Your Honor, may I display it to the

3  jury?

4      *THE COURT:*  Yes, you may.

5      *MS. PREWITT:*  Thank you.

6  *BY MS. PREWITT:*

7  *Q.*  Now, Ms. Fisher, can you see this document?

8  *A.*  Yes.

9  *Q.*  All right.  Now, this document is -- it's an e-mail, isn't

10  it?

11  *A.*  Yes, it is.

12  *Q.*  And who is the sender of this e-mail?

13  *A.*  Tim Mulrenin.

14  *Q.*  And you know Mr. Tim Mulrenin right here?

15  *A.*  Yes.

16  *Q.*  Right?  And he is sending this e-mail to you and a person

17  by the name of Rich Eddington?

18  *A.*  Yes.

19  *Q.*  And, in fact, Mr. Eddington was the one who ran the

20  negotiations, correct?

21  *A.*  Yes.

22  *Q.*  And I want to look at the date of this e-mail.  That's

23  February 6, 2017, correct?

24  *A.*  Yes.

25  *Q.*  Now, it talks about a summary of our discussion.  Do you

Sara Fisher - Cross

1    see that?

2    A.   Yes.

3    Q.   And this reflects a discussion you had on this subject,

4    correct?

5    A.   Yes.

6    Q.   And that really would have been a discussion led on RSCS's

7    part by Mr. Eddington, correct?

8    A.   Yes.

9    Q.   Because he was the chief negotiator for that contract.

10   A.   Yes.

11   Q.   Now, it says here:  Our pricing model will remain the same

12   with the exception of the pricing outlined below.

13        Do you see that?

14   A.   Yes.

15   Q.   And what that's referring to is that the pricing model

16   is -- the base model is the 2017 RFP pricing model, correct?

17   A.   Yes, the contract that was in place, yes.

18   Q.   Thank you.  And Tyson, their pricing position here that

19   Mr. Mulrenin is sharing with you on behalf of Tyson, is to

20   offer volume discounts, in other words, greater discounts for

21   selling more chicken, correct?

22   A.   Correct.

23        MS. PREWITT:  Now, let me turn to what's just been

24   admitted as I-979.  This is a demonstrative.  May I display it

25   to the jury, Your Honor?

Sara Fisher - Cross

1              *THE COURT:*  You may.

2      *BY MS. PREWITT:*

3      Q.  In fact, this is the result of the negotiations that you

4      have been testifying about today, correct?

5      A.  Yes.

6      Q.  And it compares the prior truckloads that were rewarded to

7      each supplier pursuant to the 2015 contract to those awarded to

8      the suppliers for the contracts -- the contract negotiation

9      process that resulted in the contracts in 2018.

10     A.  Yes.

11     Q.  That was a little bit of a long-winded question to you, but

12     do you understand my gist?

13     A.  Yes.

14     Q.  Now, here what we see is that Tyson picked up nine loads.

15     A.  Correct.

16     Q.  And those are truckloads?

17     A.  Correct.

18     Q.  And that's per week, correct?

19     A.  Correct.

20     Q.  And we've established that each load is approximately how

21     many pounds of chicken?

22     A.  33-five.

23     Q.  33,500?

24     A.  Yes.

25     Q.  Would it be fair to say it's about 300,000 pounds of

Sara Fisher - Cross

1   chicken a week that Tyson picked up in this negotiation

2   process?

3   A.  Yes, that sounds right.

4   Q.  Okay.  So let's go back to, if you don't mind, what we just

5   looked at, which is Exhibit 1930.

6        MS. PREWITT:  I would like to display it for the jury,

7   if that's all right, Your Honor.

8        THE COURT:  You may.

9   BY MS. PREWITT:

10  Q.  If we go down to the body of the e-mail, you see on the

11  left it says volume?

12  A.  Yes.

13  Q.  And that's the volume -- if that volume were awarded to

14  Tyson, that's what it refers to, right?

15  A.  Yes.

16  Q.  And it talks about those loads.  It specifies them to the

17  right, correct?

18  A.  Correct.

19  Q.  And then if you move down, it lays out under pricing how

20  that would work, right, how those discounts would increase with

21  the volume, assuming that a volume is awarded to Tyson,

22  correct?

23  A.  Yes.

24  Q.  And so -- and it talks about there would be additional

25  freight savings out of Cordon.  Am I saying that correctly?

Sara Fisher - Cross

1    A.   Yes.

2    Q.   And then below that you see a sentence that begins with:

3    Combination.

4    A.   Yes.

5    Q.   If you look at that.  A combination of the two above is

6    worth approximately 1 cent a pound, correct?

7    A.   Yes.

8    Q.   And just to be clear, this is not stair-step pricing, is

9    it?

10   A.   No.

11   Q.   It doesn't matter what the grow fluctuation is.  This

12   discount is just being a flat discount based on the volume

13   level, correct?

14   A.   Yes.

15   Q.   So it's -- in fact, if we look at the date in

16   February 2017, this is something that Mr. Mulrenin is passing

17   on from Tyson before the discussions you testified about

18   vis-a-vis Claxton, for example.

19   A.   I would have to look at the dates.

20   Q.   Will you accept my representation that that was going on in

21   May?

22   A.   Yes.

23   Q.   So, in fact, this is happening -- this discussion where

24   Mr. Mulrenin is passing on the Tyson pricing proposal, that

25   discussion is happening several months in advance of the

Sara Fisher - Cross                                          1962

1   discussion regarding stair-step pricing, correct?

2   A.  Yes, yes.

3   Q.  So, in fact, Tyson is really leading with this volume

4   discount, correct?

5   A.  That was -- yes, that's what they offered, yes.

6   Q.  And that's with Mr. Mulrenin as the person you dealt with

7   on that.

8   A.  I believe he was the one that led that, yes.

9            MS. PREWITT:  Thank you.  Now, I would like you to

10   turn to G- -- we will display it to you and to the -- for

11   identification purposes, Your Honor, G-474.  And I believe that

12   that has been admitted.

13            THE COURT:  Yes, it has been.

14            MS. PREWITT:  May I display it to the jury, Your

15   Honor?

16            THE COURT:  You may.

17   BY MS. PREWITT:

18   Q.  Do you see the document?

19   A.  Yes, I do.

20   Q.  Now, in fact, this is the pricing model that was submitted

21   by Tyson, correct?

22   A.  Yes, this is the exhibit, the final exhibit for the

23   contract, yes.

24   Q.  And this is the basis upon which ultimately RSCS awarded

25   300,000 pounds of additional chicken per week to Tyson,

1963

Sara Fisher - Cross

1  correct?

2  A.  Yes.

3  Q.  All right.  Now, I would like you to look at the bottom to

4  the left.  And who is it signed by?  It says at the bottom

5  left, it says Tyson sales and distribution.

6  A.  Joey White.

7  Q.  And he is the person who was authorized to sign this based

8  on your knowledge on behalf of --

9  A.  Yes, based on my knowledge, yes.

10  Q.  Now, let's turn to the fourth page.  And I would like you

11  to look at the top.  And at the top, you'll see at the very top

12  line it says 2018, eight-piece at 34 loads down from the

13  current formula by 2-1/2 cents on eight-piece, correct?

14  A.  Yes.

15  Q.  So that's the starting point at 34 loads for this

16  stepped-up increase.

17  A.  Correct.

18  Q.  Stepped-up, sorry, discount, right?

19  A.  Yes.

20  Q.  So if we move down from 34 loads where the amount of

21  chicken Tyson would be supplying goes up, the amount of the

22  discount increases to 3 cents.

23  A.  Correct.

24  Q.  And you'll see at the very bottom, if you scroll down

25  underneath this table, again it says this would be marked

Sara Fisher - Cross

1    against the 2017 base, correct?

2    A.   Yes.

3    Q.   That's that contract we talked about earlier, right?

4    A.   Yes.

5    Q.   So there is no grain models fluctuation and grain markets

6    doesn't influence this.  This is a flat discount.  The more

7    Tyson -- the more you buy from Tyson, the better the price.

8    A.   Yes.

9    Q.   Now, I would like you to turn to Exhibit 2, and that is

10   page 5.  And we will display it to you on the screen as a part

11   of the same admitted exhibit.  This is the same exhibit, just

12   the fifth page.  I can give you the number.  If you take a

13   closer look at that page, that exhibit refers to the dark meat

14   price, correct?

15   A.   Yes.

16   Q.   And if you look at that box in between, can you tell us

17   what is being offered there?

18   A.   They were offering a dark meat for 40 cents less than

19   eight-piece with a minimum of 60 cents, so a floor of 60 cents.

20   Q.   So that's an additional discount on dark meat from the

21   prior contract, correct?

22   A.   I don't recall what the previous contract was.

23   Q.   But it says with the less 40 cents a pound.  That was a

24   cheaper price.  That's a cheaper price for dark meat.

25   A.   Well, dark meat, typically the way it's priced is

Sara Fisher - Cross

1  eight-piece minus so many cents.

2  Q.  Now, I would like to talk to you about going back to the

3  loads that we talked about.  I would like to get a sense from

4  you about the volume of the savings that RSCS would secure for

5  KFC pursuant to this offer by -- the contract by Tyson, okay?

6  If we talked about 34 loads, and that's 33,000 pounds per load,

7  correct, per truckload?

8  A.  33-five, yes.

9  Q.  Is it fair to say that's a couple million dollars worth of

10  savings?

11  A.  I would have to do the math, but it sounds about right,

12  yes.

13       MS. PREWITT:  That's all I have for this witness.

14       Thank you very much, Ms. Fisher.

15       THE WITNESS:  Thank you.

16       THE COURT:  Thank you, Ms. Prewitt.

17       Ms. Henry, unless Mr. Tegtmeier wants to go first.

18       MR. TEGTMEIER:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20  BY MR. TEGTMEIER:

21  Q.  I am Richard Tegtmeier and I represent Brian Roberts.

22       MR. TEGTMEIER:  Brian, would you stand up and would

23  you just remove your mask for a moment?  Thank you.

24  BY MR. TEGTMEIER:

25  Q.  You have been testifying about a period of time beginning

1966

Sara Fisher - Cross

1   in June of 2016 and then on through '19 and '20, correct?

2   A.  Yes.

3   Q.  And that's -- that June of 2016 is when you began as the

4   director of poultry procurement.  That's kind of a tongue

5   twister.  Poultry procurement?

6   A.  Senior manager, yes.

7   Q.  Thank you.  And so before that Brian had left Tyson Foods

8   and went with another company; is that correct?

9   A.  Yes.

10  Q.  In fact, it was -- I don't know if you knew this, but it

11  was in February of 2016.  Does that sound about right that

12  Brian left Tyson?

13  A.  I wasn't involved, so I --

14  Q.  At least several months before you actually began working

15  in this area of senior director of poultry procurement that you

16  have been testifying about today and yesterday afternoon; is

17  that correct?

18          MS. SWEENEY:  Objection, foundation.  The witness

19  testified she doesn't know, so I don't know how she can put a

20  time period on it.

21          THE COURT:  Overruled.  She can answer if she

22  understands.

23  A.  I did not have any dealings with Brian at Tyson when I was

24  in my negotiation.

25          MR. TEGTMEIER:  Thank you.  That was my next question.

Sara Fisher - Cross

1    That's all I have, Your Honor.

2    THE COURT:  Thank you.

3    Ms. Henry.

4              **CROSS-EXAMINATION**

5    BY MS. HENRY:

6    Q.  Good morning, Ms. Fisher.

7    A.  Good morning.

8    Q.  I am Roxann Henry and I represent Mr. Bill Kantola.

9    A.  Okay.

10   MS. HENRY:  Can we pull up C-465, which I believe has

11   been admitted.  Maybe we can publish it.  Actually, also I

12   think it's in the government's binder, but may I please

13   approach through Ms. Grimm and give a copy to Ms. Fisher?  It

14   might help her.

15   THE COURT:  Yes, you may.

16   BY MS. HENRY:

17   Q.  Ms. Fisher, I believe you testified about that on direct,

18   and that was the proposal that was given by Koch Foods.

19   A.  Yes.

20   Q.  And can you see where on that --

21   THE COURT:  Sorry, Ms. Henry.  That has been admitted.

22   Would you like it displayed?

23   MS. HENRY:  Please.  Thank you so much.

24   THE COURT:  Yes, it may be displayed.

25   BY MS. HENRY:

1968

Sara Fisher - Cross

1    Q.  And the proposal explicitly says on here, this written

2    proposal, that it reflects the same numbers as presented to you

3    and your team January 20 of 2017?

4    A.  Correct.

5    Q.  So at that first initial meeting these numbers were

6    proposed to you, correct?

7    A.  Yes.

8    Q.  And if we could turn to the second page.  Do you see -- I

9    think it's the third paragraph down.  You were informed that

10   Koch Foods had invested heavily in the future of KFC and its

11   continued growth.  And Koch Foods felt exceptionally

12   comfortable to provide -- that it could provide the service and

13   quality you expect from a key supplier, correct?

14   A.  Yes.

15   Q.  And they also noted that Koch Foods was positioned for

16   growth.

17   A.  Yes.

18   Q.  And that was consistent with what you were understanding at

19   the time, correct?

20   A.  Correct.

21   Q.  If we could turn to the next page on that.

22         What is the actual price for eight-piece that was

23   proposed to you?  What was that actual number?

24   A.  .9935.

25   Q.  And that number is not 1.0125, is it?

Sara Fisher - Cross

1    A.  No.

2          MS. HENRY:  Can we pull up Exhibits C-264 and C-265?

3    And again I have got some copies here to make it easier.

4          MS. SWEENEY:  Your Honor, the government requests

5    through the Court a copy of these documents as well.

6    BY MS. HENRY:

7    Q.  Was this a bid submission that you received from Koch

8    Foods?

9    A.  Yes.

10   Q.  And was that bid submission made on February 26, 2017?

11   A.  February 24th?

12   Q.  24th, thank you.

13         MS. HENRY:  Your Honor, I move to admit C-264 and

14   C-265.

15         THE COURT:  Any objection to the admission of those

16   two exhibits?

17         MS. SWEENEY:  No objection.

18         THE COURT:  C-264 and C-265 will be admitted.

19   BY MS. HENRY:

20   Q.  So on the first full paragraph there, you will note that

21   you were told:  Along with the significant price decrease, we

22   would request your consideration for an even larger portion of

23   your eight-piece business, correct?

24   A.  Yes.

25   Q.  And that was consistent with what you were understanding

Sara Fisher - Cross

1    Mr. Kantola was asking for more volume.

2    A.   Yes.

3    Q.   And can we turn to -- I think it's the third page of C-265.

4         And what was the price that was being offered for the

5    eight-piece?

6    A.   .9596.

7    Q.   And that was lower than the initial price proposal that you

8    had been given on January 20?

9    A.   Yes.

10   Q.   So Koch Foods did not hold on its initial price proposal.

11   It, in fact, lowered it, correct?

12   A.   Correct.

13   Q.   And that number is not 1.0125 either, is it?

14   A.   No.

15   Q.   Thank you.

16        MS. HENRY:   You can take that down.

17        Can we pull up, please, C-207?  And again if I could

18   through Ms. Grimm, since it's a multi-page document, hand a

19   copy.

20        THE COURT:   Yes, you may.

21   BY MS. HENRY:

22   Q.   And you also understood that Koch Foods had invested in

23   extra capacity, production capacity for your fast-food product

24   for KFC as well, correct?

25   A.   I don't know that we knew that they invested in more

Sara Fisher - Cross

 1    capacity.  They just offered us more capacity.

 2    Q.  Okay.  Could we turn back, then, I am sorry, to C-264?

 3          Can you read the second paragraph there?

 4    A.  Koch Foods has invested heavily in the production capacity

 5    of your product and stands ready to supply you as such.

 6    Q.  Thank you.  Let's turn back, then, to C-207.

 7          And this is -- if we could focus on the applicable

 8    period there.  This was the contract that was actually entered

 9    into as a result of the negotiations that you've discussed,

10    correct?

11    A.  Yes.

12    Q.  And what was the applicable period first on this?

13    A.  April 23rd, 2017 through December 31st, 2017.

14    Q.  And I think you testified that there were a number of the

15    suppliers who, even though they had a contract price in place

16    for 2017, lowered that price even more than the actual contract

17    price, right?

18    A.  Yes.

19    Q.  And would April -- and I think you also testified that that

20    happened at various time frames over the year.

21    A.  Correct.

22    Q.  Wasn't April the earliest or among the earliest of any of

23    those changes?

24    A.  I don't recall exactly, but yes, I believe so.

25    Q.  And again, this was a negotiation of a lower price than

Sara Fisher - Cross

1    Koch had in place with RSCS at the time.

2    *A.*   Correct.

3    *Q.*   And for 2017 the price was .9988 for that 2017 period?

4    *A.*   Yes.

5    *Q.*   Let's go to 2018.  It was a stair step again?

6    *A.*   Correct.

7    *Q.*   And the prices continued to come down for 2018 and again

8    down for 2019 and 20, correct?

9    *A.*   Correct.

10   *Q.*   And the price for 2018 was .9487?

11   *A.*   Yes.

12   *Q.*   And it came down even further to .9390.

13   *A.*   Yes.

14   *Q.*   And none of those numbers are 1.0125, correct?

15   *A.*   Yes.

16   *Q.*   So after its first price proposal, Koch Foods did not hold

17   firm on those prices but continued to negotiate and lower its

18   prices.  And Mr. Kantola pleaded with you for more volume

19   throughout the course of your negotiations with him, correct?

20   *A.*   Correct.

21        *MS. HENRY:*  I have no further questions.  Thank you

22   very much.

23        *THE WITNESS:*  Thank you.

24        *THE COURT:*  Thank you, Ms. Henry.

25        Ms. Page?

Sara Fisher - Redirect

1           *MS. PAGE:*  No, Your Honor.  No, I will spare you.

2           *THE COURT:*  I thought that you were getting up.

3           Any other cross-examinations?

4           All right.  Then redirect.

5                        **REDIRECT EXAMINATION**

6     *BY MS. SWEENEY:*

7     *Q.*  Thank you.  Good morning, Ms. Fisher.

8     *A.*  Good morning.

9     *Q.*  This morning you were asked about getting suppliers into a

10    tight range of prices.  Do you recall that?

11    *A.*  Yes.

12    *Q.*  Did you ask competing chicken suppliers to communicate with

13    each other to get their prices to RSCS in that close range?

14    *A.*  No.

15    *Q.*  Did any of them ever inform you whether they were in

16    communication with each other for the purpose of getting their

17    prices in that tight range?

18    *A.*  No.

19           *MS. SWEENEY:*  No further questions.

20           *THE COURT:*  All right.  Is Ms. Fisher subject to

21    recall?

22           Ms. Fisher, you are excused.  Thank you.

23           *THE WITNESS:*  Thank you.

24           *THE COURT:*  The United States may call its next

25    witness.

Sara Fisher - Redirect

1        MS. CALL:  Your Honor, before the next witness, the

2   government has four exhibits to offer into evidence, Exhibits

3   1, 2, 3 and 7.

4        THE COURT:  One moment.  And you are offering those

5   exhibits?

6        MS. CALL:  Yes, Your Honor.

7        THE COURT:  Why don't we start with Exhibit 1.  Any

8   objection to Exhibit 1?  All right.  Exhibit 1 will be

9   admitted.  Any objection to Exhibit 2?  Exhibit 2 will be

10  admitted.  Any objection to Exhibit 3?

11       MR. TUBACH:  Just for the record the previous

12  objections.

13       THE COURT:  And this goes for all four of those, other

14  than the previous objections which have already been ruled

15  upon.  And Exhibit 3 will be admitted.  And any objections to

16  Exhibit 7?  And Exhibit 7 will be admitted as well.

17       MS. CALL:  Permission to publish Exhibit 1?

18       THE COURT:  You may.

19       MS. CALL:  Thank you, Your Honor.

20       Ms. Pearce, if you could zoom the part with the

21  content just with the exhibit sticker and up, please.

22       MR. POLLACK:  Your Honor, may we have a brief side

23  bar?

24       THE COURT:  Yes.

25     (At the bench:)

1975
Sara Fisher - Redirect

1      THE COURT:  I think I can anticipate what Mr. Pollack

2  is going to say, but go right ahead and say it, Mr. Pollack.

3      MR. POLLACK:  Yes, Your Honor.  I was going to inquire

4  about the Court's instruction in terms of the fact that the

5  summary is just that, and what the jury needs to rely upon is

6  only as good as its accuracy, and the jury needs to rely on the

7  underlying exhibits, and wanted to inquire whether the Court

8  would be giving that instruction prior to the summaries being

9  published to the jury.

10      THE COURT:  That is what I anticipated you were going

11  to say, and now I can't find what I provided before.

12      MR. TUBACH:  We could search the prior transcript and

13  try and provide the Court a copy of what it said before.

14      THE COURT:  Yeah, I think we are going to need to do

15  that.

16      Let me ask Ms. Butler, do I have that?

17      MS. BUTLER:  I can certainly try and find a copy, Your

18  Honor.

19      MR. FAGG:  Your Honor, this is John Fagg.  We do have

20  a copy.  I would be happy to e-mail it to chambers or to

21  Ms. Grimm if that would be helpful.

22      THE COURT:  Well, I think that -- yeah, I should have

23  armed myself with that, but unfortunately I did not.  I think

24  it should be presented when the summaries are published, so I

25  think we will need that before we proceed.

Sara Fisher - Redirect

1          Ms. Call, are you able to do something else in the

2     remaining 15 minutes?

3          MS. CALL:  Yes, Your Honor.  The government can call

4     its next witness.  I was trying to identify the page on the

5     transcript where the summaries are because I do think the

6     longer we get from the relevant witness' testimony, it's

7     prejudicial to the government's case not being able to show

8     these summaries at the time when the context is meaningful.  So

9     to the extent we can show them now, I do think we would want to

10    show these before the conclusion of Mr. Bryant's testimony

11    since that, at least part of Mr. Byrne's calculations, would be

12    a ways away.

13         THE COURT:  They can be taken up right after lunch.

14    You can do it whenever you want to, but I think we do need to

15    get that.  Also, I will indicate to the attorneys that if you

16    intend on displaying something that has a limiting instruction

17    appended to it, you should let me know at the time so that we

18    make sure that we do that, not that I'm blaming the government

19    for this because the government indicated it was going to do

20    so.  But just in the event that you are going to do a cross or

21    something else and use an exhibit that hasn't been published to

22    the jury yet, but it has a limiting instruction, it would be

23    helpful for me to know that at the time that it's asked to be

24    displayed.

25            So Ms. Call, you are ready to call a witness?

Robert Bryant - Direct

1        MS. CALL:  Yes, Your Honor.

2        THE COURT:  Mr. Pollack, anything else?

3        MR. POLLACK:  No, Your Honor.  Thank you.

4        THE COURT:  Thank you.

5     (In open court:)

6        Exhibit 1 and the other three exhibits have a limiting

7   instruction and I am trying to find it, so we are going to

8   delay that because I am going to give you a contemporaneous

9   limiting instruction when those exhibits are displayed to you.

10       All right.  The United States may call its next

11   witness.

12       MS. CALL:  The United States calls Robert Bryant.

13    (**Robert Bryant** was sworn.)

14       THE WITNESS:  I do.

15       COURT DEPUTY CLERK:  Please state your name and spell

16   your first and last name for the record.

17       THE WITNESS:  Robert Bryant, R-O-B-E-R-T, B-R-Y-A-N-T.

18                    **DIRECT EXAMINATION**

19   BY MS. CALL:

20   Q.  Good morning, Mr. Bryant.  Could you please tell the jury

21   where you are employed?

22   A.  Pilgrim's.

23   Q.  Is that Pilgrim's Pride?

24   A.  That's correct.

25   Q.  And how long have you worked in the chicken industry?

Robert Bryant - Direct

1  A.  About 30 years.

2  Q.  When did you start?

3  A.  It was supposed to be a summer job when I graduated high

4  school.

5  Q.  And around when was that, Mr. Bryant?

6  A.  June of 1992.

7  Q.  All right.  Now, back in 1992 what company were you working

8  for?

9  A.  At the time it was called Seaboard Farms.

10  Q.  And you said this was around when you graduated from high

11  school?

12  A.  That's correct.

13  Q.  Now, where were you physically working when you first

14  started in the industry?

15  A.  At the Mayfield, Kentucky plant.

16  Q.  What kind of facility is that?

17  A.  It's a poultry plant.

18  Q.  Now, did you say what kind of position you held when you

19  first started in the industry?

20  A.  I actually started cleaning up the place, so in the

21  evenings.

22  Q.  And if you could lean a little closer, Mr. Bryant.  When

23  you say cleaning up the place, do you mean literally?

24  A.  Literally cleaning up the place, the front offices, and

25  then out into the -- in the processing area they had a

Robert Bryant - Direct

1   department called sanitation.  So when I first started, the

2   first part of the night was doing the front offices and the

3   second part of the night was out on the processing floor

4   cleaning up.

5   Q.  And about how long did you have that position?

6   A.  Approximately, a year.

7   Q.  All right.  Now, I think you said it was meant to be a

8   summer job.  Did it wind up just being a summer job?

9   A.  No.  I elected to stay on and, you know, working in the

10  afternoons allowed me to start school in the fall.

11  Q.  Where did you start school?

12  A.  Originally it was a community college, PCC.  And later I

13  finished my bachelor's degree at Mid-Continent University.

14  Q.  And what was your bachelor's degree in?

15  A.  Business administration.

16  Q.  Since then have you pursued any additional degrees?

17  A.  I have.

18  Q.  What?

19  A.  Currently working on my MBA with a scheduled graduation of

20  this May.

21  Q.  And where are you seeking your MBA, Mr. Bryant?

22  A.  CSU, Colorado State University.

23  Q.  Now, you mentioned that you started your career back in the

24  nineties at Seaboard.  Is that a poultry supplier?

25  A.  At the time they did poultry and pork.

Robert Bryant - Direct

1    *Q.*   Now, did there come a time when you came to work for then

2    Pilgrim's Pride?

3    *A.*   I did, and it was through various acquisitions.

4    *Q.*   Acquisitions?

5    *A.*   That's correct.

6    *Q.*   Can you kind of describe the process?

7    *A.*   Yes.  So Seaboard built the Mayfield, Kentucky plant and

8    they had a poultry division.  That poultry division was sold to

9    Conagra Foods.  Conagra Foods divested their poultry or the

10   poultry division to Pilgrim's, and that's when I -- and that

11   was probably in the early 2000s when Pilgrim's acquired that

12   poultry division from Conagra Foods.

13   *Q.*   So fair to say it was early 2000s when you started working

14   for Pilgrim's Pride?

15   *A.*   That's correct.

16   *Q.*   Now, about how many roles would you say you've had in the

17   poultry industry?

18   *A.*   Probably around a dozen.  I have not tracked that

19   precisely, but I've had several promotions.

20   *Q.*   Have any of those roles you've had had relation to sales to

21   fast-food chains?

22   *A.*   They have.

23   *Q.*   When did those responsibilities begin?

24   *A.*   Initially -- you know, in 2010 I was promoted to the

25   regional or divisional planner for fresh food service which had

Robert Bryant - Direct

1    national account -- you know, handled national account supply

2    chain and then became more customer facing later on, and

3    through other promotions were directly responsible for those

4    various customers.

5    Q.  All right.  Now, that group you mentioned at Pilgrim's

6    Pride, you said fresh food service?

7    A.  That's correct.

8    Q.  Mr. Bryant, so the jury can understand the structure of

9    this group, let me ask you this.  Are you familiar with

10   organizational charts at Pilgrim's Pride?

11   A.  I am.

12   Q.  Have you reviewed organizational charts in preparation for

13   your testimony?

14   A.  I have.

15   Q.  Despite reviewing those charts, would a demonstrative

16   assist you in explaining the respective roles of certain

17   individuals in fresh food service?

18   A.  Yes.

19   Q.  Why is that that the demonstrative would help as opposed to

20   org charts?

21   A.  The org charts that I've seen are quite confusing.  A lot

22   of them the managers aren't exactly lined up and the direct

23   reports aren't exactly precise.  And it would be a lot of

24   unnecessary and confusing information on there.

25            MS. CALL:  All right.  For the witness, the parties

                              Robert Bryant - Direct

 1   and the Court, could we please pull up Government Exhibit 9994?

 2            And Mr. Bryant, that is in Tab 17 of your binder.

 3            THE WITNESS:  There is not a binder.

 4            MS. CALL:  Thank you, Mr. Bryant.

 5            May I please approach and hand the witness a binder?

 6            THE COURT:  You may.

 7   BY MS. CALL:

 8   Q.  Mr. Bryant, do you see Government Exhibit 9994?

 9   A.  I do.

10   Q.  What time period does this chart reflect at Pilgrim's

11   Pride?

12   A.  Around 2014.  There would be some change, so there would be

13   some changes to the reporting structure on this inside of 2014.

14   Q.  So there is a time period that this is --

15   A.  That's correct, that's correct.

16   Q.  And that is during the 2014 year?

17   A.  Yes, that's correct.

18   Q.  So does this demonstrative accurately reflect the reporting

19   structures during the period of 2014?

20   A.  That I recall, yes.

21            MS. CALL:  Your Honor, permission to publish

22   Exhibit 9994 as a demonstrative?

23            THE COURT:  Any objection to the admission of

24   Exhibit 9994 as a demonstrative exhibit?

25            MR. TUBACH:  Yes, Your Honor.  It's a misleading

Robert Bryant - Direct

1    chart.  There are sales organizational charts that were created

2    at the time.  This leaves out a vast amount of information.  We

3    can go further on side bar.  He also testified there were

4    changes in 2014 and he hasn't identified when this would have

5    been applicable within 2014.

6              THE COURT:  I will sustain the objection.

7              If you want to lay more foundation, Ms. Call, go

8    ahead.

9    BY MS. CALL:

10   Q.  Mr. Bryant, could you describe changes that occurred later

11   in 2014?

12   A.  Yes.  So I am not sure if I consider -- so there are two

13   individuals on here directly above me.  Those -- one of those

14   individuals stopped being my manager and the other one started

15   being my manager probably in Q4 of 2014.  So at the beginning

16   of 2014, this would be accurate to my memory, and by the end of

17   2014 there would be one change.

18   Q.  Do you believe it was the first three reporting -- or first

19   three-quarters of the year that this was the reporting

20   structure?

21   A.  That's what I remember, yes.

22             MS. CALL:  The government would again seek to display

23   this as a demonstrative.

24             THE COURT:  Any objection to the admission of 9994?

25             MR. TUBACH:  Same objection, Your Honor.

1984

Robert Bryant - Voir Dire

 1    *THE COURT:*  I will allow voir dire on it.

 2    *MR. TUBACH:*  Thank you.

 3    *MS. CALL:*  Permission to publish?

 4    *THE COURT:*  I am allowing voir dire on the exhibit.

 5    *MS. CALL:*  Oh, thank you, Your Honor.  Sorry.

 6    *THE COURT:*  Go ahead, Mr. Tubach.

 7                    VOIR DIRE EXAMINATION

 8    *BY MR. TUBACH:*

 9    *Q.*  Mr. Bryant, my name is Michael Tubach.  I represent Jayson

10    Penn.

11    *A.*  Uh-huh.

12    *Q.*  Do you have in your binder F-668?

13        *MR. TUBACH:*  Perhaps the government can assist in

14    identifying the tab.

15    *A.*  I don't see it?  F-668.

16        *MS. CALL:*  I don't believe it is a tab in the binder.

17        *MR. TUBACH:*  It was provided to us as an exhibit that

18    the government stated they intended to use on his direct

19    examination.

20        *THE COURT:*  Regardless, we can pull it up.

21        *MR. TUBACH:*  I have a copy for the witness.

22    *BY MR. TUBACH:*

23    *Q.*  Can you see it on the screen, Mr. Bryant, or would you like

24    a hard copy?

25    *A.*  I see it, yes.

Robert Bryant - Voir Dire

1    Q.  This is an actual organizational chart created by Pilgrim's

2    at the time you are testifying about, right?

3    A.  Yeah, and this is one that --

4    Q.  There is no question pending.  It's just a yes or no.  It

5    was yes, right?

6    A.  I was going to finish that this was the one that I felt was

7    confusing and that it was difficult to explain.

8    Q.  Well, Mr. Bryant, I am sorry, I didn't mean to cut you off.

9    Were you going to say something else?

10   A.  No, go ahead.

11   Q.  So what this chart shows is that there are, in fact, 14

12   direct reports reporting to Mr. Penn during this time period,

13   right?

14   A.  I do agree even with the demonstrative that the DOJ was

15   showing me that Jayson Penn had a lot more direct reports than

16   what was shown on that demonstrative.  And that was part of my

17   statement about this one was confusing and it was just

18   narrowing the field, so to speak, and realigning the reporting

19   structure so it was more clear than this one.

20   Q.  Well, this chart is pretty simple, isn't it?  It just has

21   14 boxes and they all point up to Jayson Penn.  And they have

22   the names?

23   A.  Yeah.

24   Q.  I am sorry, I am not done, sir.  They have the names, they

25   have the titles and they have what business unit they were in.

Robert Bryant - Voir Dire

1   There is nothing confusing about that, is there?

2   A.  Well, what I recall from back then, for instance, Jason

3   McGuire, I recalled that Tim Miller reported to him.  I don't

4   recall Jimmie Little being a direct report of Jayson Penn.  I

5   recall him reporting to Roger Austin.  I also recall that

6   Justin Gay reported to Roger Austin.  Then obviously there was

7   a couple more on here that -- I am not on here.  And then there

8   was another person, Tim Stiller, was not on here.  So those

9   were the differences that I've seen with this organizational

10  chart.

11  Q.  And Exhibit 1 does not contain the direct reports that

12  Jayson Penn had, all the direct reports that Jayson Penn had at

13  the time you are testifying about here, Exhibit 1, right?

14  A.  You are talking about the one the DOJ showed me?

15  Q.  Yeah.

16  A.  That's correct, it does not have all the direct reports,

17  that is correct.

18  Q.  And they created it.  You didn't create it, right?

19  A.  That is correct.

20  Q.  They just showed it to you, right?

21  A.  That's correct.

22  Q.  And this Robbie Bryant, Tim Stiller, there is not even a

23  dash between there.  That's just sort of -- were you guys in

24  the same level?

25  A.  At the beginning of 2014, we would have been equals.  And

Robert Bryant - Voir Dire

1   by the end of 2014, I would have reported to Tim Stiller, and

2   Jason McGuire would have went to a different position.

3   Q.  So we don't have the dates for when that happened.

4   A.  I don't recall the exact dates.  I remember it was later in

5   2014.

6           MR. TUBACH:  Your Honor, I have nothing further.  I

7   believe Exhibit 1 is misleading and not helpful.

8           THE COURT:  You are referring to Exhibit 1.  Are you

9   referring to Exhibit 9994?

10          MR. TUBACH:  I apologize.  The whole time I have been

11  referring to Exhibit 9994.  My apologies.

12          THE COURT:  Mr. Tubach, you continue to maintain your

13  objection; is that correct?

14          MR. TUBACH:  Yes, I maintain my objection.

15          THE COURT:  Ms. Call, anything else?

16          MS. CALL:  No, Your Honor.  I believe the witness has

17  testified to the inaccuracy of the actual organizational chart

18  and how the demonstrative would be useful for his testimony.

19          THE COURT:  The objection will be overruled and

20  Exhibit 9994 may be shown to the jury for demonstrative

21  purposes only.  And then after we do that, we will take our

22  lunch recess.

23          MS. CALL:  Ms. Pearce, if you could publish.

24          Your Honor, I think there may be a technical

25  difficulty with the government's screen because it is not

Robert Bryant - Voir Dire

1    showing any documents.  Would it perhaps make sense to break

2    now and republish this after the break?

3         THE COURT:  The jury is able to see it.  So once the

4    jury has had an opportunity to view 9994, we will take the

5    break and we will work on that problem over the lunch hour.

6         Ladies and gentlemen, we will break for lunch and we

7    will plan on, since we are starting the lunch break a little

8    bit late, we will plan on reconvening at 1:35.  Keep the

9    admonitions in mind.  The jury is excused.

10        (Jury excused.)

11        Mr. Bryant, you are excused for lunch.  If you could

12   be back and ready to go at 1:35.  Thank you.

13        So I have a copy -- this is the transcript of the

14   previous trial at Page 4181, so that would be the limiting

15   instruction that I would intend to read to the jury when we

16   display them next.  So over the lunch hour if you want to

17   double-check that, but I think that is the appropriate one to

18   give.

19        And Ms. Call, at any point in time if you want to have

20   the jury do that, the jury has already been notified that we

21   were going to defer the display of those summary exhibits until

22   such time as they had the limiting instruction ready.

23        MS. CALL:  Thank you.  We will seek to do that after

24   the lunch hour.  Scheduling-wise, I think we had been

25   discussing some exhibits over the lunch hour.  We can do so now

Robert Bryant - Voir Dire

1    or even at the end of the day.

2            THE COURT:  Let's do it at the end of the day so we

3    don't impinge on it too much, but we will do that first thing

4    at the end of the day so we check that off your list.

5            Anything else that we should talk about at the present

6    time?

7            We will be in recess until 1:35.  Thank you.

8        (Recess at 12:07 p.m. until 1:30 p.m.)

9            THE COURT:  All right.  Ms. Call, an issue?

10           MS. CALL:  Yes.  Thank you for entertaining starting

11   the break early -- or ending it early.  Two issues we wanted to

12   raise before the testimony of Mr. Bryant continued.  First is

13   the subject of our earlier discussion regarding the term

14   "price-fixing."  And the government is mindful of the Court's

15   order, but we would ask leave to ask a question which

16   defendants have now asked multiple government witnesses,

17   including essentially right after our discussion earlier, which

18   is:  Do you have any knowledge of price-fixing?

19           Because counsel for Mr. Blake and Mr. Fries, I

20   believe, both asked that of Mr. Ledford.  It was also the first

21   sentence in opening argument, I believe.  And then just after

22   we sat down earlier, Ms. Johnson asked the same question of

23   Ms. Fisher.  And the government should have the opportunity to

24   rebut that question by asking the very same question of a

25   witness who does have knowledge.  So that is the first thing I

Robert Bryant - Voir Dire                                    1990

1    wanted to raise.

2         I will go into the second because it is related.

3    Regarding 2017, we just had extended cross-examination of

4    Ms. Fisher which was obviously about prices going down in 2017,

5    which I assume was to create the appearance that that was

6    because there was no agreement to fix prices.  However, what

7    the evidence shows and what Mr. Bryant would testify to is that

8    the reason the conspiracy was less successful in 2017, although

9    the fix was in at the very beginning of the negotiations, is

10   because of the civil class action and because Mr. Bryant's and

11   other conspirators were having their documents collected by the

12   company at that time so they knew there was scrutiny into the

13   communications between competitors at this time in 2017, which

14   led to the kind of unraveling of some of the coordination that

15   year.

16        While we don't plan to elicit testimony about the

17   class action, we would seek to lead Mr. Bryant a little in

18   asking about the scrutiny, whether it was external or internal

19   at Pilgrim's and whether it related to communications between

20   competitors, because I think that is highly relevant and

21   probative, and the government should be able to elicit that to

22   rebut this implication that prices had gone down in 2017

23   because there was no conspiracy.

24        THE COURT:  When you say "it," you are referring to

25   scrutiny or what do you mean?

                      Robert Bryant - Voir Dire

1         MS. CALL:  Scrutiny would be the term I think

2    Mr. Bryant would use and I think would be appropriate.  So

3    essentially, Was there scrutiny at the time?  Was that scrutiny

4    external to Pilgrim's?  And did it relate -- did the scrutiny

5    relate to communications between competitors?

6         THE COURT:  Mr. Feldberg, response on the second

7    point.

8         MR. FELDBERG:  Your Honor, I will defer to others on

9    the second point who are more knowledgeable than I am, but I

10   could address the first point if the Court wants more argument

11   on it.

12        THE COURT:  I don't.

13        MR. TUBACH:  On the second point, it essentially

14   hamstrings us in cross-examining Mr. Bryant because the only

15   way we can elicit what that was, to probe the scope of that is

16   to say, Well, what was the scrutiny?  Was there really

17   scrutiny?  Did you really believe it?  Witnesses including

18   Mr. Bryant I believe have told the government that they

19   initially didn't take the civil class action seriously at all

20   and it got more serious later.  There is no way we could probe

21   that without getting into everything the Court has very clearly

22   held is out of bounds.

23        MR. LAVINE:  One brief point, if I may, please.  That

24   is completely contrary to what Mr. Bryant testified to in the

25   first trial.  We never heard anything like that from Mr. Bryant

Robert Bryant - Voir Dire                                    1992

1    the first time.  This is completely new.  And I think he got to

2    testify what he knew at the time and I don't think anything

3    like that came out in the first trial.

4         THE COURT:  Let's hear from Ms. Henry first.

5         MS. HENRY:  Mr. Bryant is also not capable of really

6    addressing the issue of who all knew what when, and that's

7    really a critical point here.  I mean, if the government wants

8    to make their own argument on testimony, there is really no

9    factual basis for that.

10        THE COURT:  When you say that, Ms. Henry, just so we

11   are clear?

12        MS. HENRY:  So what other people knew about the civil

13   proceeding and when they knew about it.  There is nothing in

14   the record on that and no way Mr. Bryant is capable of

15   testifying about what other people knew and when it all

16   occurred and how it played out and what their understandings

17   were, et cetera, et cetera.

18        THE COURT:  Mr. Fagg?

19        MR. FAGG:  Thank you, Your Honor.

20        Just to follow up on Mr. Tubach's point, Mr. Bryant

21   does say in a 302 what Mr. Tubach suggested, which is his

22   understanding was that people didn't take the civil litigation

23   seriously until the Department of Justice got involved.  And

24   that's in 2019 and that is in his 302.  That is clearly what he

25   said.  And so any argument that that's when they started

Robert Bryant - Voir Dire

1    thinking about it differently, that's also contradicted by his

2    302s where he said what they would try to do is market forces

3    had changed and they were trying to combat that, and that's why

4    there wouldn't be as much of a loss.

5           THE COURT:  Ms. Call?

6           MS. CALL:  First, regarding the prior trial testimony,

7    when discussing Government Exhibit 339, which is the text

8    message that says "no comp names in e-mail," Mr. Bryant

9    described his understanding is no competitor names in e-mail

10   and did in the first trial describe the scrutiny at the time,

11   but we didn't lead him further beyond that because of the

12   Court's ruling at the time.

13          Regarding Mr. Bryant's belief in his very first

14   interview of the government, this is in June 22nd of 2021, he

15   described his exact feelings in 2017.  The report reads that

16   Pilgrim's sent Bryant a box for him to pack all his relevant

17   documents and send back to the attorneys at the start of the

18   civil litigation.  The civil litigation was filed in 2016, but

19   I believe this document collection began in 2017.

20          This is something we had some prior briefing on.

21   Stiller, a co-conspirator, called Mr. Bryant and stated, I am

22   not telling you what to do, but you may want to comb through

23   some of the documents before you put them in that box.  Tim

24   Stiller knew there was potentially damaging information in the

25   documents and may have seen the moment as an opportunity to do

Robert Bryant - Voir Dire

 1   something about it.

 2          So he knew right in 2017 when he was giving his

 3   documents to the company that that was incriminating

 4   information regarding this price-fixing conspiracy, so I don't

 5   think anything has changed because that was the first meeting

 6   he had with the government where he disclosed that information.

 7          THE COURT:  So I am a little bit rusty on this, but

 8   tell me about the civil litigation again.  So you say it gets

 9   filed in one case?

10          MS. CALL:  September 6 of 2016 I believe is the date

11   of the first civil complaint.  It's a class action, so there

12   are a number of successive complaints.  They allege an

13   antitrust conspiracy including several different sorts of

14   allegations, one being output restraint, one being

15   price-fixing, and some allegations involving the manipulating

16   of an index called the Georgia Dock.  But it is that litigation

17   that put Mr. Stiller, obviously, and Mr. Bryant and other

18   conspirators on notice of scrutiny into their activities.

19          It was then in the spring or summer, I believe, of

20   2021 when at least Pilgrim's began collecting the cellphones

21   and the documents and the e-mails of some of the folks in this

22   room, so I think it is entirely relevant and at least goes to

23   Mr. Bryant's state of mind and the conduct in 2017 and the

24   government's ability to rebut what happened that year.

25          THE COURT:  But what was being done in terms of

Robert Bryant - Voir Dire

1   discovery between the filing of the lawsuit and, say, 2019?

2        MS. CALL:  So I believe it was in the spring of 2021,

3   as I said, that Pilgrim's put a document hold in place and

4   started collecting documents, so that's -- I think I said 2021.

5   I meant 2017 is when documents were being collected.  I believe

6   Mr. Bryant would testify that this was around the time of the

7   poultry show which is in the springtime or early springtime

8   that Pilgrim's was collecting documents.  And that was in the

9   middle of these negotiations with KFC in 2017 that that

10  happened.  It's in April of 2017, I believe, this "no comp

11  names," an e-mail Exhibit 3039 when Mr. Stiller clearly has

12  that hesitance to put competitors' names in e-mails because of

13  the civil litigation and what was going on.

14       THE COURT:  And who are the parties to the civil

15  litigation?

16       MS. CALL:  I believe about 22 chicken companies

17  including, and I could be wrong here, but all the defendants'

18  employers.  Several companies have filed class action suits or

19  are obviously a part of classes, including KFC.

20       THE COURT:  All right.  Anything more from anyone?

21  Mr. Tubach?

22       MR. TUBACH:  Very briefly, this is clearly a motion

23  for reconsideration.  The Court has already ruled that the

24  civil class actions, anything about the civil class actions

25  shouldn't come into evidence.  It's a total morass we will need

Robert Bryant - Voir Dire

1996

1   to explore.  And I didn't hear Ms. Call deny that Mr. Bryant

2   said initially nobody took this seriously until the DOJ got

3   involved.  We couldn't possibly explore that unless we get into

4   the whole thing.  The fact that the witness volunteered there

5   was increased scrutiny doesn't open the door in some way

6   because DOJ presumably wasn't trying to elicit that testimony.

7   We certainly didn't elicit it.

8           MS. PREWITT:  Your Honor, the allegations that were in

9   issue very early on in the civil complaint were very, very

10  different from what we are dealing with right now.  In fact, it

11  was after Tyson went forward and went public with its leniency

12  application that really sort of got this, the civil litigation,

13  moving in a different direction.  So I think it's very unfair

14  to say that somehow -- and in this industry there are class

15  actions lawsuits filed all the time.  I think it's a bit of a

16  stretch to say all the defendants here, everybody was on notice

17  that it would be turning in a certain direction.

18          THE COURT:  Anything more, Ms. Henry?

19          MS. HENRY:  I was just going to clarify that the

20  price-fixing in the initial allegations really was centered on

21  this issue of the use of the indices and people that were

22  involved in the indices, et cetera.  It certainly had nothing

23  to do with many of the individuals in this courtroom who would

24  have nothing to do with the types of allegations that were

25  involved in that first civil complaint that was done.

Robert Bryant - Voir Dire

1          THE COURT:  Ms. Call, last word?

2          MS. CALL:  Yes, Your Honor.  I believe defendants'

3    employers in the civil case have described the allegations as

4    very broad, and there is a catchall claim regarding the

5    antitrust allegations there.  Second, I think it belies the

6    point that many of these or at least some of these defendants

7    were document custodians whose documents were collected for the

8    civil case, so their conduct is clearly relevant to the

9    allegations there.

10          THE COURT:  Yeah, I think this is really a motion for

11   reconsideration.  I haven't heard anything that's been

12   materially changed, and I am going to stick with the previous

13   ruling on this one.  I don't -- especially in light of the fact

14   that it seems like at least initially it was more focused on

15   the indices, as Ms. Henry has talked about, and given the fact

16   that there has been no opposition to the point that Mr. Bryant

17   didn't really take it or other people didn't take it including

18   him seriously, so it comes with a -- the possibility of a great

19   deal of prejudice.  And that prejudice I find would

20   substantially be greater than the probative value of it, so as

21   a result, I will not allow that type of inquiry.

22          MS. CALL:  Just to inquire very briefly, may the

23   government elicit the same testimony or similar testimony,

24   obviously, from the last trial that there was scrutiny at the

25   time, because that is necessary for him to explain what

Robert Bryant - Voir Dire

1   happened in this US Foods episode, which is Mr. Stiller and

2   Mr. Bryant were coordinating about a contract for US Foods with

3   a competitor, Mar-Jac.  Mr. Bryant then e-mails Tim Stiller

4   about it, who texts him "no comp names in e-mail." And this is

5   something he testified about in the last trial.  We won't get

6   to totally the bases for the scrutiny, but he did discuss that

7   scrutiny as the reason why Mr. Stiller said that at the time.

8           THE COURT:  Yes, as long as Mr. Bryant is not going to

9   spontaneously launch into some prohibited testimony when he

10  hears the word "scrutiny."  You may have prepared him

11  differently, but I just want to make sure that that does not

12  happen.

13          MS. CALL:  One moment, Your Honor.

14          Thank you, Your Honor.

15          MS. LaBRANCHE:  In light of the rulings the Court just

16  made as well as the price-fixing one prior to us going on the

17  lunch break, can we just make sure that Mr. Bryant has been

18  informed of these?  These have kind of been happening on the

19  fly and I am wanting to make sure since the Court has taken

20  such care to carefully craft these orders that we are sure that

21  Mr. Bryant knows what the limitations are.

22          THE COURT:  Well, we already talked about the

23  price-fixing issue, but if Ms. Call needs some additional time

24  to transmit the information regarding the latest ruling, we can

25  do that.

Robert Bryant - Voir Dire

1          MS. CALL:  I don't believe so because our argument was

2     simply because of what happened on cross-examination this

3     morning.

4          THE COURT:  Okay.  Let's bring the jury back in.

5          MS. CALL:  Very briefly.  We do intend to publish the

6     summaries.

7          THE COURT:  That is a good point.  Why don't we hold

8     off on having Mr. Bryant come in, so that will take a little

9     bit.  So why don't we hold off and we will do the summaries

10    first.

11         (Jury present.)

12         THE COURT:  Ladies and gentlemen, I think -- are we

13    going to go back to the summaries right now?

14         MS. CALL:  Yes, Your Honor.

15         THE COURT:  So ladies and gentlemen, you will remember

16    that the government moved the admission of Exhibits 1, 2, 3 and

17    7, and you had an opportunity to look just for a short while at

18    Exhibit 1.  I am going to refer to those as summaries or

19    summary exhibits, and I want to give you a limiting instruction

20    about those.

21         So on those exhibits on the far right-hand side of

22    them there is a list of exhibit numbers.  Each of those

23    exhibits listed on the far right-hand side are exhibits that

24    have been admitted.  Overall, the summaries are being admitted

25    because they may assist you in understanding the evidence that

Robert Bryant - Voir Dire

1   has been presented, but keep in mind that a summary is not

2   evidence of the material it summarizes, and it is only as valid

3   and reliable as the underlying material that it seeks to

4   summarize.  You may give a summary exhibit entire weight, some

5   weight or no weight at all depending on your assessment of the

6   underlying material and the accuracy of the summary.

7              *MS. CALL:*  Permission to publish Government's Exhibit

8   1.

9              *THE COURT:*  You may.  All right.

10             *MS. CALL:*  Permission to publish Government Exhibit 2.

11             *THE COURT:*  You may.

12             *MS. CALL:*  Ms. Pearce, if you could start on the first

13  page and zoom in again above the exhibit sticker, please.

14             *THE COURT:*  All right.

15             *MS. CALL:*  Ms. Pearce, could you please turn to the

16  second page of Exhibit 2?

17             *THE COURT:*  All right.

18             *MS. CALL:*  Permission to publish Government's Exhibit

19  three?

20             *THE COURT:*  You may.

21             *MS. CALL:*  Thank you.

22             *THE COURT:*  All right.

23             *MS. CALL:*  Permission to publish Government Exhibit 7.

24             *THE COURT:*  You may.

25             *MS. CALL:*  Ms. Pearce, if you could start with the

Robert Bryant - Voir Dire

1    first page again.

2             THE COURT:  Okay.

3             MS. CALL:  Could you please turn to Page 2,

4    Ms. Pearce?

5             Thank you, Your Honor.  The government would now call

6    Mr. Robert Bryant back to the stand.

7             THE COURT:  Okay.  That's fine.

8             MS. LaBRANCHE:  May we have a brief side bar?

9             THE COURT:  Yes, sure.

10        (At the bench:)

11            THE COURT:  Go ahead, Ms. LaBranche.

12            MS. LaBRANCHE:  So, Your Honor, I just am looking for

13   a little clarification from the government.  While I don't know

14   if it was while we were looking at the exhibits or if it was

15   right before them, but we did, the defense attorneys, received

16   an e-mail from Mr. Torzilli at 1:33 this afternoon informing us

17   that the government writes to inform you of additional

18   information related to Mr. Bryant that we learned this morning

19   before the government called Mr. Bryant to testify.

20            At the time of the collection of his notebook,

21   Mr. Bryant knew that GX-1919, which is pages from that

22   notebook, was evidence of price-fixing.  I am not sure why

23   Mr. Torzilli just sent us that right now if they learned of

24   that this morning, but regardless, I just want it to be clear

25   that they are not going to be eliciting that testimony based on

Robert Bryant - Voir Dire

1    the ruling the Court made before we went to lunch.

2         THE COURT:  Okay.  Ms. Call, are you familiar with

3    that exhibit?

4         MS. CALL:  Yes, Your Honor.  Those are the notes I was

5    describing earlier that Mr. Bryant put in the box to give to

6    his company back in 2017 during the document collection.  I

7    believe that information Ms. LaBranche referenced was provided

8    by his counsel this morning when we were having that discussion

9    about Mr. Bryant's knowledge of price-fixing and when he became

10   aware that his conduct did constitute that.  Exhibit 1919 is

11   certainly one we will show as that relates to the 2017

12   collusion.  Mr. Bryant does believe that is evidence of

13   price-fixing, but he has been instructed not to use that term

14   in his testimony.

15        THE COURT:  Is the document in question, the exhibit

16   in question, is that one that has been produced for some time

17   now?  People are aware of that one?

18        MS. CALL:  Yes, Your Honor.  That was admitted in

19   evidence in the last trial.  Mr. Bryant testified about it.

20   And I referenced just earlier the very first meeting he had

21   with the government and the report for that that counsel has

22   had for at least a year where he discussed that document, but

23   of course, it was not referenced by exhibit number at that

24   time.  So when we learned from counsel the reference to the

25   exhibit number as that being the document in the box, we

Robert Bryant - Voir Dire

 1    disclosed that information to the extent counsel had not put

 2    two and two together.

 3            MS. HENRY:  Your Honor, Exhibit 1919 --

 4            THE COURT:  Ms. Henry, I think your microphone may be

 5    sticking up towards the ceiling.

 6            MS. HENRY:  Exhibit 1919 you will recall is the

 7    handwritten notes of Mr. Bryant that reflected some of the

 8    period pricing and that he said that he believed was bid

 9    submission stuff, but then was basically shown not true.

10            THE COURT:  I remember that now.  Thanks.

11            Ms. LaBranche, anything else?

12            MS. LaBRANCHE:  No, Your Honor.  If what the

13    government is informing us is they have specifically told him

14    he cannot testify to price-fixing related to anything, but

15    specifically not that government exhibit either, I don't have

16    anything else.

17            THE COURT:  I don't think that's quite right.  It was

18    use of the term.

19            MS. LaBRANCHE:  Correct.

20            THE COURT:  Anything else, Ms. Call?

21            MS. CALL:  No, but it is, of course, the government's

22    position that Mr. Bryant will be testifying to price-fixing,

23    but I think that is clear.

24            THE COURT:  Okay.  Thank you.

25            (Jury present.)

Robert Bryant - Voir Dire

1           All right.  Mr. Bryant is back on the witness stand.

2           Ms. Call, go ahead.

3    BY MS. CALL:

4    Q.  Good afternoon, Mr. Bryant.  I think when we left off, we

5    had just been starting to talk about the organizational

6    structure of Pilgrim's.  Am I correct you said it would be

7    helpful to you as a demonstrative to assist in your testimony?

8    A.  That's correct.

9           MS. CALL:  Your Honor, may we publish Exhibit 9994?

10          THE COURT:  You may.

11   BY MS. CALL:

12   Q.  Mr. Bryant, before the break you testified that you were I

13   believe a divisional planner in the fresh food service group;

14   is that correct?

15   A.  That's correct.

16   Q.  Could you describe using this demonstrative where did you

17   fall within the fresh food service group?

18   A.  I was a direct report of Jason McGuire at the beginning of

19   2014.  And by the end of 2014 I would have been a direct report

20   of Tim Stiller.

21   Q.  Now, what were your responsibilities in the divisional

22   planner role?

23   A.  I was basically responsible for the supply chain of the

24   fresh food service business unit inside of Pilgrim's, which

25   planning, demand and services customers from, you know, across

Robert Bryant - Voir Dire

1    the business unit.

2    Q.  Thank you, Mr. Bryant.  You might want to raise the

3    microphone a little bit.  It's a little tough to hear you.

4         MR. GILLEN:  I believe we are having technical issues

5    on some of the screens.  Our screen is down here.

6         THE COURT:  I apologize for that.

7         MR. GILLEN:  It's back on.

8         THE COURT:  Why these things happen or get fixed, I

9    have no clue, but I am glad to hear that.

10        Go ahead, Ms. Call.

11   BY MS. CALL:

12   Q.  Back in 2010 when you started as divisional planner,

13   Mr. Bryant, did you have responsibilities with respect to

14   pricing for the fresh food service group?

15   A.  Not initially.  I was consulted on pricing, but not direct

16   responsibility.

17   Q.  And did that change at some point?

18   A.  It did.

19   Q.  When?

20   A.  Started becoming more customer facing in 2014.

21   Q.  2014?

22   A.  That's correct.

23   Q.  Now, how did your responsibilities change in 2014?

24   A.  In 2014 we -- I was asked to participate in a lot of the

25   national accounts, in particularly QSR negotiations in 2014.

2006
Robert Bryant - Voir Dire

1    Q.   Did you say QSR negotiations?

2    A.   That's correct.

3    Q.   Now, I believe you said that your responsibilities changed

4    in 2014.  Did there come a time when your title then changed?

5    A.   Yes.  That would have been in the fall of 2016.

6    Q.   All right.  And using the demonstrative, could you describe

7    where your position moved to in 2016?

8    A.   I would have been in the space that Jason McGuire is in

9    there.  However, there would have been a layer in between

10   myself and Jayson Penn and that would have been Tim Stiller.

11   Q.   So did Mr. Stiller move up from where he is in the

12   demonstrative?

13   A.   That is correct.

14   Q.   Now, what was your title then in 2016?

15   A.   That would have been the director of sales for fresh food

16   service.

17   Q.   Could you describe what fresh food service is at Pilgrim's?

18   A.   Yes.  So fresh food service is -- it's a business unit

19   inside Pilgrim's.  So there is five business units in Pilgrim's

20   and fresh food service would be one of those business units.

21   It supplied three primary sales channels which would have been

22   the QSR group, the retail delis, like the supermarkets, the

23   rotisserie birds you would buy at the supermarket, and then the

24   broad line group which would be like Sysco, US Food Service,

25   Gordon, so those were the three primary channels inside fresh

Robert Bryant - Voir Dire

1   food service.

2   Q.  So is it correct within fresh food service there is three

3   different business channels?

4   A.  Yes, sales channels.

5   Q.  Thank you.  And are those the three you just described,

6   retail, broad line, and what was the third?

7   A.  QSR.

8   Q.  Now, how did your responsibilities relate to the three of

9   these channels?

10  A.  Well, you know, beginning in 2010 I would have been

11  responsible for the supply and demand inside those individual

12  channels, you know, working to cover orders, planning demand

13  and, you know, the service side of the business for those

14  customers.  After 2016 it would have been direct pricing for

15  those customers and that book of business for the business

16  unit.

17  Q.  So is it correct you had pricing -- did you have pricing

18  responsibility relating to all three of those channels?

19  A.  That's correct, yes.

20  Q.  Were there different sales employees in each of those

21  channels?

22  A.  Yes.

23  Q.  Using the demonstrative, who led the retail group?

24  A.  For the most part, John Curran.  Initially he was hired as

25  an outside salesperson and acquired the entire retail team

Robert Bryant - Voir Dire

1   under him.

2   Q.   And is Mr. Curran the one mentioned here in Exhibit 9994?

3   A.   Yes.

4   Q.   And who led the broad line sales team?

5   A.   That would have been Brenda Ray.

6   Q.   And then who led the QSR sales team?

7   A.   That would have been Roger Austin.

8   Q.   Defendant Roger Austin?

9   A.   That's correct.

10  Q.   Now, I would like to ask you about the processes used to

11  formulate Pilgrim's bid prices for these customers.  But let me

12  ask you this.  Based on your experience in fresh food service,

13  are you familiar with the general practices used in each of

14  these sales channels to formulate bid prices?

15  A.   Yes.

16  Q.   And did each of those channels have their own common

17  practices, performing bid practices?

18  A.   Yes.

19  Q.   What's the basis of your understanding of those practices?

20  A.   Participating and formulating bids from 2014 until as late

21  as 2021.

22  Q.   For each of these channels we are discussing?

23  A.   That's correct.

24       MS. CALL:  We can take the demonstrative down for now,

25  Ms. Pearce.

2009

Robert Bryant - Voir Dire

1  *BY MS. CALL:*

2  *Q.* Now, Mr. Bryant, if you could describe in several -- maybe

3  one or two sentences what conduct are you here today to testify

4  about?

5        *MR. FELDBERG:* Objection.

6        *THE COURT:* Overruled.

7  *A.* Cooperating with competitors to formulate bids and sharing

8  those prices amongst competitors to either increase or limit a

9  decrease in pricing.

10 *BY MS. CALL:*

11 *Q.* Was the term you just used cooperating?

12 *A.* Yes.

13 *Q.* Did you participate in that conduct you just described?

14 *A.* Yes.

15 *Q.* Did others at Pilgrim's participate in that conduct you

16 just described?

17 *A.* Yes.

18 *Q.* Based on your experience, who at Pilgrim's participated in

19 that conduct?

20 *A.* Roger Austin, Jimmie Little, Scott Tucker, Justin Gay, Tim

21 Stiller and Jason McGuire.

22 *Q.* Now, did others outside of Pilgrim's participate in that

23 conduct?

24 *A.* Yes.

25 *Q.* Based on your experiences, who are you aware of outside of

Robert Bryant - Voir Dire

1    Pilgrim's that participated in that conduct?

2           MR. LAVINE:  Objection, Your Honor.

3           MS. HENRY:  Lack of foundation and "your experiences"

4    is a vague issue, so also object to form of the question.

5           THE COURT:  Overruled as to the objection to the form.

6    Sustained as to foundation.

7           If you could lay foundation.

8    BY MS. CALL:

9    Q.  Mr. Bryant, what is the basis of your understanding that

10   others participated in this conduct you described?

11   A.  Conversations with Roger Austin, Justin Gay, Scott Tucker,

12   Jimmie Little, and overhearing phone calls with competitors.

13   Q.  In those conversations, were specific individuals named?

14   A.  Yes.

15   Q.  So based on those conversations, who do you understand

16   participated in the conduct from outside of Pilgrim's?

17          MS. PAGE:  Your Honor, I am going to object to

18   foundation.  It's not based on foundation.  Object to 702 and

19   701.

20          THE COURT:  Overruled.

21   A.  The three names I heard were Carl Pepper, Scott Brady and

22   Bill Kantola.

23   BY MS. CALL:

24   Q.  All right.  Now, I want to turn back to people at Pilgrim's

25   Pride that you listed.  Based on your experiences, did those

Robert Bryant - Voir Dire

1    who participated in this conduct at Pilgrim's either work in or

2    supervise one particular of those sales channels you described?

3    A.  For the most part, yes.

4    Q.  Which one?

5    A.  The QSR group.

6    Q.  The QSR group?

7         MS. CALL:  So if we could just briefly pull back up

8    Government's Exhibit 9994.

9    BY MS. CALL:

10   Q.  Where on this chart is the QSR group?

11   A.  That would be Roger Austin's group.

12        MS. CALL:  Permission to publish, Your Honor.

13        THE COURT:  You may.

14   BY MS. CALL:

15   Q.  You said Roger Austin's group?

16   A.  That's correct.

17   Q.  And who on this chart was within that group?

18   A.  Jimmie Little, Scott Tucker and Justin Gay.

19   Q.  Who on this chart supervised that group?

20   A.  That would have been Jayson Penn at this time.

21   Q.  2014?

22   A.  Correct, yes.

23   Q.  All right.  Now, Mr. Bryant -- we can take Exhibit 9994

24   down.  Earlier you testified about your familiarity with the

25   practices of formulating bid prices in these channels.  And I

Robert Bryant - Voir Dire

1    want to ask you more specifically, do you have an understanding

2    of the general practice as to how bids were determined in the

3    QSR channel?

4    A.   Yes.

5    Q.   What is the basis of that understanding?

6    A.   Participating in bids from 2014 until 2021 and actively

7    participating in those bids.

8    Q.   The bids for QSR customers?

9    A.   That's correct.

10   Q.   Now, do you have an understanding of the general practices

11   as to how bids were formulated outside of the QSR channel?

12   A.   I do.

13   Q.   And what's the basis of that understanding?

14   A.   Same basis.  I participated in many bids across all three

15   channels from 2014 until 2021.

16   Q.   Now, based on your participation in those bids, were there

17   differences in the practice of how bids were determined between

18   the QSR channel and outside of the QSR channel?

19   A.   Yes.

20        MR. LAVINE:  Your Honor, I am going to object to the

21   relevance as far as outside the QSR business, Your Honor.

22        THE COURT:  Overruled.

23   BY MS. CALL:

24   Q.   Could you please describe that difference?

25   A.   So just -- so to formulate a bid in which segment?

2013

Robert Bryant - Voir Dire

1    Q.   Could you please start with the QSR segment.

2    A.   Yes.  So when we formulated a bid inside the QSR segment,

3    generally most of the customers in QSR were done on what's

4    called a cost model or a margin over cost.  So we would run our

5    numbers internally after the customer asked for a RFP for

6    pricing.  And we would get our cost with our margin and that

7    would give us a price.  Then we would get pricing information,

8    bid information from competitors, and we would use that

9    information to ultimately change that price before submitting

10   it to the customer for the bid.

11   Q.   Did you say you would get pricing information from

12   competitors?

13   A.   That's correct.

14   Q.   What kind of pricing information?

15   A.   Bid information.

16   Q.   Bids for the contract under negotiation at that time?

17   A.   That's correct.

18   Q.   Now, how does that differ than the practice used outside of

19   QSR?

20   A.   Generally speaking, we would use prior bid experience,

21   feedback from a buyer, publicly available data, current market

22   conditions, benchmarking services, you know, to formulate a

23   bid.  And then that's what ultimately would have been turned in

24   to the buyer in the other channels.

25   Q.   Now, I want to start outside of QSR and ask you a little

2014

Robert Bryant - Voir Dire

1   more specifics.  Could you provide an example of a customer

2   outside of QSR?

3   A.  Many, Wal-Mart, Albertson's, Kroger, Publix, yes.

4   Q.  Let's go with Wal-Mart.  Based on your experience with

5   Wal-Mart negotiations, are you aware of anyone at Pilgrim's

6   sharing bid information with competitors?

7          MS. PAGE:  I am going to object to relevance and

8   404(b) at this point.

9          MR. TUBACH:  As well as waiver, Your Honor.  It has to

10  be personal knowledge.

11         THE COURT:  Both of the objections are overruled.

12  A.  No, I am not aware.

13  BY MS. CALL:

14  Q.  For Wal-Mart, do you have personal knowledge of anyone at

15  Pilgrim's sharing their negotiating strategy with competitors?

16         MR. FAGG:  Objection, asked and answered.

17         THE COURT:  Overruled.

18  A.  Not that I'm aware of, no.

19  BY MS. CALL:

20  Q.  In your experience with Wal-Mart negotiations, did you want

21  Pilgrim's bid prices shared with its competitors?

22         MS. PAGE:  Objection, relevance.

23         THE COURT:  Overruled.

24  A.  No.

25  BY MS. CALL:

2015

Robert Bryant - Voir Dire

1    *Q.*  Why not?

2    *A.*  There was not a -- first of all, it would be --

3         *MR. TUBACH:*  Objection.  I think the witness is about

4    to volunteer something in violation of the Court's order.

5         *THE COURT:*  I am not sure of that, but if you can ask

6    a more focused question, Ms. Call.

7    *BY MS. CALL:*

8    *Q.*  Mr. Bryant, was there a risk you believed if the company

9    was sharing bid prices with a competitor for Wal-Mart

10   negotiations?

11   *A.*  Yes.

12        *MR. FELDBERG:*  Objection, no foundation.

13        *THE COURT:*  Overruled.

14   *A.*  Yes.  I believe there would have been a risk that our

15   competitor would have used that information to undercut us on

16   price and potentially take volume from us.

17   *BY MS. CALL:*

18   *Q.*  You say there would be a risk that Pilgrim's would get

19   undercut by the competitor?

20   *A.*  Correct.

21        *MS. CALL:*  Can we have a brief side bar?

22        *THE COURT:*  Yes.

23      (At the bench:)

24        *MS. CALL:*  I have been informed it may be a good time

25   for a stretch break.

1          THE COURT:  Based on what?

2          MS. CALL:  I did not observe anything, Your Honor, but

3     I believe it appears some individuals in the courtroom may

4     appear a bit tired.

5          THE COURT:  Meaning jurors?

6          MS. CALL:  That is my understanding.

7          THE COURT:  Okay.  While we have the bench conference,

8     I will allow the jury to stretch.  Hold on one second.

9        (In open court:)

10         THE COURT:  Ladies and gentlemen, if you want to

11    stretch during this bench conference, go right ahead.  Feel

12    free to stand up and do so.

13       (At the bench:)

14         THE COURT:  Go ahead, Ms. Call.

15         MS. CALL:  That was the only purpose for the side bar,

16    Your Honor.  But I will note that this witness has the

17    instruction not to go into the areas that I believe defense

18    counsel were worried about with their last two objections.

19         THE COURT:  Yeah, I appreciate that.  It did seem a

20    little bit like he might be winding up to say something, but I

21    appreciate your having made sure that he was instructed

22    properly.  All right.  Thank you.

23       (In open court:)

24           Go ahead, Ms. Call.

25    BY MS. CALL:

Robert Bryant - Voir Dire

1  Q.  All right, Mr. Bryant.  I believe you just stated there was

2  a risk that you believed inherent in sharing a bid price for

3  Wal-Mart business.  Could you just describe that one more time?

4  A.  Yes.

5         MR. TUBACH:  Asked and answered, Your Honor.

6         THE COURT:  Sustained.

7  BY MS. CALL:

8  Q.  All right.  Mr. Bryant, did you consider it good business

9  to share Pilgrim's bid prices for Wal-Mart business?

10         MS. PAGE:  Objection, relevance, his opinion about the

11  business, Your Honor.

12         THE COURT:  Overruled.

13  A.  No.

14  BY MS. CALL:

15  Q.  Why not?

16  A.  The risk that would have been involved in losing business

17  had our pricing strategy or our overall negotiation strategy,

18  that had been shared with our competitor.

19  Q.  And now, as far as your understanding, are you aware of bid

20  prices being shared with competitors for Wal-Mart business?

21  A.  Not that I'm aware of, no.

22  Q.  Now, Mr. Bryant, I would like to reorient you and go back

23  to the QSR channel.  And my next several questions are going

24  for focus on the 2012 to 2017 time frame, okay?

25  A.  Okay.

2018

Robert Bryant - Voir Dire

1   Q.  Now, you testified earlier about the process used by the

2   QSR group to formulate bids.  For the QSR group are you aware

3   of anyone at Pilgrim's collaborating with competitors on bid

4   prices?

5         MR. TUBACH:  The question is preceded by a time frame

6   of 2012 to 2017.  There isn't any foundation for anything prior

7   to 2014.

8         THE COURT:  I think that may be true.  I will sustain

9   the objection.  If you could clarify the foundation for that.

10  BY MS. CALL:

11  Q.  Mr. Bryant, in 2010 when you were in your divisional

12  planner role, did you have awareness of the negotiations with

13  QSR customers?

14  A.  I did.

15  Q.  Could you describe that?

16  A.  I was often consulted by my manager at the time, Jason

17  McGuire, surrounding those negotiations and asked for my input

18  on what I thought, you know, based off feedback from the

19  negotiations.  Although I didn't participate, I was part of the

20  internal discussions.

21  Q.  Based on your participation in those internal discussions,

22  are you aware of anyone at Pilgrim's collaborating with

23  competitors on bid prices for QSR customers?

24  A.  Yes.

25  Q.  Yes?

2019

Robert Bryant - Voir Dire

1    A.   Yes.

2    Q.   I know it's difficult with the mask, Mr. Bryant, but if you

3    could speak up.

4    A.   Yes.

5    Q.   Thank you.  Are you aware of anyone at Pilgrim's

6    collaborating with competitors on negotiation strategy for QSR

7    customers?

8    A.   Yes.

9    Q.   And who are you aware of at Pilgrim's specifically directly

10   reaching out to competitors for that purpose?

11   A.   Directly reaching out to competitors would be Roger Austin,

12   Justin Gay, Jimmie Little and Scott Tucker.

13   Q.   And based on your participation in those negotiations,

14   which competitors are you aware of those individuals talking to

15   about bid prices?

16   A.   The three competitors that I heard most often --

17           MS. HENRY:  Objection, compound questions asking

18   generally about three people and how many people and it needs

19   to be separated out.

20           THE COURT:  Overruled.

21           Mr. Lavine?

22           MR. LAVINE:  Also objection on hearsay.

23           THE COURT:  Sustained.

24   BY MS. CALL:

25   Q.   Without disclosing the substance of any statements by

Robert Bryant - Voir Dire                                    2020

1    anyone at another company, Mr. Bryant, what competitors are you

2    aware of those individuals Mr. Austin, Little, Tucker and I

3    believe you said Gay, which companies are you aware of them

4    reaching out to?

5            MR. LAVINE:  Objection, Your Honor, same objection.

6    It's hearsay.

7            THE COURT:  Overruled.

8    A.  Tyson, Koch and Claxton.

9    BY MS. CALL:

10   Q.  Now, do you have an understanding, Mr. Bryant, as to the

11   purpose in discussing QSR bid prices with competitors?

12           MR. FELDBERG:  Your Honor, objection we discussed

13   earlier today and I object.

14           MR. TUBACH:  Also compound, Your Honor.  He has four

15   individuals talking to three competitors.  There is no

16   specificity at all.

17           THE COURT:  Overruled.

18   A.  Can you repeat, please?

19   BY MS. CALL:

20   Q.  Yes.  Do you have an understanding as to the purpose in

21   discussing bid prices with Pilgrim's competitors?

22   A.  I do.

23   Q.  And what is the basis of that understanding?

24   A.  Conversations in participation in bids from 2014 through

25   2017.

Robert Bryant - Voir Dire

1    *Q.*  All right.  Now, what is your understanding as to the

2    purpose of the communications with competitors about bid

3    prices?

4    *A.*  The purpose was to either increase prices or limit a

5    decrease in price together, you know, amongst the competitors.

6    *Q.*  All right.  So you said two things, to increase prices and

7    to limit a decrease; is that correct?

8    *A.*  That's correct.

9    *Q.*  All right.  Let's start with the first one.  What do you

10   mean by to increase prices?

11   *A.*  Get a substantial price increase.

12   *Q.*  And you said that was together with the competitors?

13   *A.*  That's correct.

14   *Q.*  Now, you also said to limit a price decrease.  What do you

15   mean by that?

16   *A.*  So depending on the market conditions, the customer may be

17   expecting a price decrease, so it was about limiting the amount

18   of the pricing concession that would be offered.

19   *Q.*  Together?

20   *A.*  Together, yes.

21   *Q.*  Now, did you ever, Mr. Bryant, receive competitors' bids

22   yourself for QSR business?

23   *A.*  Not directly from the competitor.

24   *Q.*  Did you receive it from elsewhere?

25   *A.*  I have, yes.

Robert Bryant - Voir Dire

1    Q.  Is that from other individuals at Pilgrim's?

2    A.  That's correct.

3    Q.  When you received your competitors' bids for QSR business,

4    did you use that information to undercut your competitors?

5    A.  No.

6    Q.  When you received your competitors' bids for QSR business,

7    did you use it to steal volume from your competitors?

8    A.  No.

9    Q.  Mr. Bryant, do you believe that when you received

10   competitors' bids, that you used it to compete with them?

11          MR. FELDBERG:  Objection, Rule 701.

12          THE COURT:  Overruled.

13          MR. FAGG:  Objection to leading, Your Honor.

14          THE COURT:  Overruled.

15   A.  No.

16   BY MS. CALL:

17   Q.  Why not?

18   A.  We wanted to --

19          MR. TUBACH:  Objection to the use of the word "we,"

20   Your Honor.  He testified about what we wanted to do.

21          THE COURT:  If you could ask the question again,

22   Ms. Call, narrower.

23   BY MS. CALL:

24   Q.  Why did you not use the information you received to compete

25   with your competitors?

Robert Bryant - Voir Dire

1    *A.*  We -- the information was used to help us formulate a bid

2    to be similar to our competitors, but it was not in an effort

3    to take volume.  If we would have used the information to --

4    against our competitors, then we would not receive that

5    information in the future.

6          *MR. TUBACH:*  Objection, calls for speculation, lacks

7    foundation.  And it's talking about "we" instead of "him,"

8    so ...

9          *THE COURT:*  Overruled.

10   *BY MS. CALL:*

11   *Q.*  Please proceed, Mr. Bryant.

12   *A.*  Like I said, had we or I or whoever -- I used the term we

13   because it was usually a few of us talking about the

14   information and in the bid process, so had we used that

15   information to undercut or use it to try to take volume, then

16   that information would have stopped.

17   *Q.*  Now, I believe you said you used it to make your price

18   similar to that of your competition.  Why just similar rather

19   than the same?

20   *A.*  If it was the same, it would be very obvious to the

21   customer that we were discussing pricing information amongst

22   the competitors.

23   *Q.*  You said obvious to the customer?

24   *A.*  That's correct.

25         *MR. FAGG:*  Objection.  Can we go to side bar?

Robert Bryant - Voir Dire

1          THE COURT:  Yes.

2      (At the bench:)

3          THE COURT:  Go ahead.

4          MR. FAGG:  Thank you, Your Honor.

5          We object to the questions as presented to this

6   witness in that every time the government gets an answer that

7   it likes from the witness, it repeats it back to the witness

8   which is improper.  They should just ask their question

9   seriatim and not repeat the answer back to the witness.

10         THE COURT:  Ms. Call?

11         MS. CALL:  Your Honor, respectfully, I believe the

12  witness is having a bit of a hard time with the microphone, so

13  it is even kind of difficult for myself to understand him, so I

14  am just clarifying that I am hearing his answers correctly.

15         THE COURT:  Yeah, I agree with Mr. Fagg.  I think that

16  while occasionally that can happen, if you want the witness to

17  repeat something, you can ask him to repeat the answer.  But

18  there has been an awful lot, not just with this witness, but a

19  lot of repetition of the answer and then the next question is

20  asked.  And it does seem to be a technique to emphasize certain

21  portions of the testimony and that should be avoided.

22         MS. CALL:  Thank you, Your Honor.  I will be mindful

23  of that.

24      (In open court:)

25  BY MS. CALL:

Robert Bryant - Voir Dire

1   Q.   Now, I think, Mr. Bryant, you said you did not use the bid

2   information to take volume.  What did you mean by that?

3   A.   That it was used for pricing purposes only, not to compete

4   in a sense for market share.

5   Q.   All right.  Now, when you actually formulated the bid with

6   the folks in the QSR team, that decision and the number you

7   arrived on, did you arrive on that just with people at

8   Pilgrim's or with a larger group of people?

9          MR. FAGG:  Objection, leading.

10          THE COURT:  Overruled.

11  A.   So the number we arrived at speaking specifically to 2017

12  was really in relation to the competitor bids.  So similarly I

13  described earlier we ran the model to see where Pilgrim's cost

14  is and we'd have put a price, but we changed the model to be in

15  line with the competitor bids that we received.

16  BY MS. CALL:

17  Q.   All right.  And just to make sure I ask the right question,

18  when you did change the model, who was the conversation with

19  when you actually landed on your numbers?

20  A.   The final number was -- what I recall is -- it was a call

21  between myself, Tim Stiller and Roger Austin where we had the

22  competitor --

23          MR. FAGG:  Objection, Your Honor, response.  He is not

24  responsive to the question.  She asked him who.

25          THE COURT:  Overruled.

Robert Bryant - Voir Dire

1    *A.* We had a list of competitors in there and the bid

2    information and then we -- we made our bid to be third highest

3    in price.

4    *BY MS. CALL:*

5    *Q.* So it was an internal discussion at Pilgrim's?

6    *A.* That's correct, yes.

7    *Q.* Did you consider the price that you landed on to be an

8    independent decision of Pilgrim's?

9    *A.* It was -- in my opinion, it was dependent on the pricing

10   information that we received from the competitors.  What I

11   recall is if we would have turned in the model in 2017 based

12   off our costs because our costs went up over the three years,

13   we actually would have asked for a price increase, but we used

14   the pricing information that was provided to actually lower our

15   price and be third in price.

16   *Q.* Third amongst whom?

17   *A.* The competitors.

18   *Q.* Now, Mr. Bryant, I have been asking you about your use of

19   competitors' bids that you received.  I want to ask you about

20   the other direction.  Did you have an understanding as to

21   whether Pilgrim's bid prices were shared with competitors?

22   *A.* Yes.

23   *Q.* And what is the basis of that understanding?

24   *A.* With the conversations with Roger Austin and, you know,

25   Justin Gay and the folks on that team that we've talked about

Robert Bryant - Voir Dire

1    already.

2    Q.   And what is your understanding as to whether Pilgrim's bids

3    were shared with its competitors?

4    A.   It's my understanding that our information was shared just

5    like our competitors' information was given to us.

6    Q.   Shared with whom?

7    A.   The various competitors.

8    Q.   Now, earlier you testified that for Wal-Mart business you

9    didn't want your bid prices shared.  So how do you reconcile

10   that with what you are saying now knowing that they were shared

11   in the QSR channel?

12   A.   The QSR channel was just -- was different than the other

13   segments, so it was this mutual trust or collaboration that

14   happened within that -- that -- the group of competitors.

15   Q.   So who was the mutual trust between?

16   A.   The various competitors.

17   Q.   Okay.  So did you have a concern that Pilgrim's competitors

18   would use your bids for QSR business to undercut Pilgrim's?

19            MS. PAGE:  I am going to object to vague as to

20   Pilgrim's competitors and ask for specification as to who the

21   competitors are.

22            THE COURT:  Overruled.

23   A.   No.

24   BY MS. CALL:

25   Q.   When you were aware that Pilgrim's bid prices were being

2028

Robert Bryant - Voir Dire

1    shared with competitors, did you have a concern that your

2    competitors would use it to steal volume?

3    A.  No.

4    Q.  Why not?

5    A.  Reassurances from my boss at the time, Tim Stiller, and

6    Roger Austin and what I witnessed in 2014.

7    Q.  All right.  Earlier you testified to two purposes of

8    sharing bids, the price increase and resisting a decrease.  Are

9    you aware of any instance where a bid price was shared with a

10   competitor for any other purpose?

11   A.  I am not aware, no.

12   Q.  All right.  Now, Mr. Bryant, I want to move on to some of

13   the individuals you named earlier as participating in this

14   conduct with you.

15          MS. CALL:  Could we please pull up 9265?

16          And I believe this has already been admitted, Your

17   Honor.

18          THE COURT:  Let me just double-check.  It has been

19   admitted.

20          MS. CALL:  Permission to publish?

21          THE COURT:  You may.

22   BY MS. CALL:

23   Q.  Mr. Bryant, what is this?

24   A.  It's a picture of Roger Austin.

25   Q.  All right.

Robert Bryant - Voir Dire

1        MS. CALL:  And we can take 9265 down, Ms. Pearce.

2   BY MS. CALL:

3   Q.  What was Roger Austin's role at Pilgrim's?

4   A.  He was responsible for our QSR group.

5   Q.  Did he have responsibility for particular accounts?

6   A.  Yes, direct responsibility for KFC, and then he had various

7   people working for him that were responsible for quite a large

8   book of business for Pilgrim's, all fast-food restaurants and

9   things like that, KFC, Church's, Popeye's, Bojangles, among

10  others.

11  Q.  You mentioned KFC.  Did others in Mr. Austin's group assist

12  him with KFC business?

13  A.  Yes.

14  Q.  Who?

15  A.  I don't remember.  Initially Justin Gay did, and then I

16  believe Scott Tucker took his place.  However, even if they

17  weren't directly responsible for KFC, usually during

18  negotiations Roger pulled in several members of his team even

19  if they didn't have direct responsibility.

20  Q.  And who was on Roger Austin's team?

21  A.  2014, Roger and Scott Tucker, Justin Gay, Jimmie Little,

22  and there was an R&D person, I think, had a secretary back

23  then.

24  Q.  Who did Defendant Austin report to?

25  A.  In 2014, it would have been Jayson Penn.

Robert Bryant - Voir Dire

1    Q.  And did there come a time when that changed?

2    A.  It did.  I am not exactly sure on the time frame, but at

3    some point Roger Austin began reporting to Tim Stiller, but it

4    was either 2017 or 2018.  I am not exactly sure on that time

5    frame.

6    Q.  Now, when Roger Austin came to report to Tim Stiller, who

7    did Tim Stiller report to?

8    A.  Jayson Penn.

9    Q.  Now, what is your basis for saying that Defendant Roger

10   Austin participated in the conduct you've described today?

11   A.  Receiving competitor pricing information from Roger based

12   on calls, you know.  I overheard a particular phone call

13   between him and competitors.

14   Q.  Okay.  Do you have an understanding as to why Defendant

15   Roger Austin called competitors?

16            MS. PAGE:  Objection, speculation.

17            MR. FELDBERG:  Speculation.

18            THE COURT:  Sustained.

19            MS. CALL:  It was a yes or no question, Your Honor.

20   May I ask it again?

21            THE COURT:  You may.

22   BY MS. CALL:

23   Q.  Do you have an understanding as to why Roger Austin called

24   competitors?

25   A.  Yes.

Robert Bryant - Voir Dire

1    *Q.*  And what is the basis of that understanding?

2    *A.*  Discussions with Roger Austin between him and I.

3    *Q.*  Between the two of you?

4    *A.*  That's correct, yes.

5    *Q.*  What is your understanding of why Defendant Austin

6    exchanged pricing with competitors?

7           *MR. FELDBERG:*  Your Honor, could we have the

8    conversation as opposed to the witness' understanding so we

9    could have a foundation here?

10          *THE COURT:*  Overruled.

11   *A.*  Could you ask it again, please?

12   *BY MS. CALL:*

13   *Q.*  What is your understanding as to why Defendant Austin

14   called competitors?

15   *A.*  To share information between -- in particular in 2017 he

16   did share bid information that he had received from competitors

17   with me.  And that was in an effort to, you know, for us to

18   formulate our bid in 2017.  Basically just like I said earlier,

19   it's to either get a price increase or limit a price decrease.

20   *Q.*  And Mr. Bryant, I didn't hear the beginning of your answer.

21   Could you repeat what kind of information you said Defendant

22   Austin shared with you?

23          *MR. FAGG:*  Objection, asked and answered.

24          *THE COURT:*  Overruled.

25   *A.*  Pricing information from competitors, you know,

Robert Bryant - Voir Dire

1    specifically in 2017.  He shared bid information from I believe

2    it was six or seven different competitors with me prior to our

3    bid submission.

4    BY MS. CALL:

5    Q.  All right.  Now, let's move on to another individual you

6    mentioned.

7           MS. CALL:  Could we please pull up Government

8    Exhibit 9270?  I believe, Your Honor, this is previously

9    admitted as well.

10          THE COURT:  It has been.

11          MS. CALL:  Permission to publish?

12          THE COURT:  You may.

13   BY MS. CALL:

14   Q.  Mr. Bryant, who is this?

15   A.  Jimmie Little.

16          MS. CALL:  All right.  And if we could take

17   Government's Exhibit 9270 down, Ms. Pearce.  Thank you.

18   BY MS. CALL:

19   Q.  Mr. Bryant, what was Mr. Little's position at Pilgrim's?

20   A.  He was in the QSR group, had various accounts, Church's, I

21   believe Boston Market, Pizza Ranch, Sbarro, worked on -- with

22   Roger Austin.

23   Q.  When you say he had various accounts, what do you mean?

24   A.  Jimmie Little retired at one point, so I don't recall exact

25   years.  That's why I said had various accounts.

                              Robert Bryant - Voir Dire

1   *Q.*  And to be clear, what does having an account mean to you?

2   *A.*  When you have an account, that means you have direct

3   responsibility for that customer across Pilgrim's no matter

4   which business unit they pulled for -- pulled from.  You dealt

5   with them directly and were responsible for that customer.

6   *Q.*  Do those responsibilities of account owners include

7   negotiations with QSR customers?

8   *A.*  Yes.

9   *Q.*  Now, I don't believe you mentioned KFC.  Did you have any

10  understanding as to whether Defendant Little had any role with

11  respect to KFC negotiations?

12  *A.*  I don't know if he had any -- I don't recall if he had any

13  direct role with KFC.  Possibly he could have been consulted by

14  Roger, but I don't remember attending any meetings with him

15  during KFC negotiations.

16  *Q.*  Okay.  Now, what is your basis for saying that Defendant

17  Little participated in the conduct that you have described?

18  *A.*  Phone conversations with Mr. Little where he had relayed

19  information after talking to a competitor during negotiations.

20  *Q.*  And do you have an understanding as to why Defendant Little

21  spoke to competitors during negotiations?

22  *A.*  For the same reason, to help Pilgrim's position their bid

23  against their competitors' price.

24  *Q.*  What do you mean by against?

25  *A.*  So, for instance, Holmes is going to go in at a dollar.  So

2034
Robert Bryant - Voir Dire

1    we would be similar to their price, and there would not really

2    be a difference to the buyer as to -- on the decision.  It

3    wouldn't be based on price.

4    Q.  And I don't believe you mentioned Holmes.  What is Holmes?

5    A.  It's another poultry company down in Texas that we had

6    some -- that Pilgrim's had some competing business with.  We

7    shared some customers in Texas.

8    Q.  And are you aware of conversations with Holmes during bid

9    negotiations?

10   A.  Yes.

11   Q.  By whom?

12   A.  Mr. Little.

13   Q.  All right.  Now, if we could talk about a couple of other

14   individuals you named.

15        MS. CALL:  And if we could please put up Exhibit 9994

16   one more time.

17        Permission to publish?

18        THE COURT:  You may.

19   BY MS. CALL:

20   Q.  I believe you mentioned Jason McGuire.  Who is Jason

21   McGuire?

22   A.  In the first part of 2014, he was my boss, but he was the

23   director of sales for fresh food service.

24   Q.  During that early period, 2014, who did Mr. McGuire report

25   to?

2035

Robert Bryant - Voir Dire

1    A.   Jayson Penn.

2    Q.   Now, you also mentioned someone named Tim Stiller.  Who is

3    Tim Stiller?

4    A.   He would have been my boss from late 2014 until 2021.

5    Q.   When Mr. Stiller was your boss, who did he report to?

6    A.   Jayson Penn.

7         MS. CALL:  And if we could pull up Exhibit 9273 just

8    for the witness, the Court and the parties at this moment.

9    BY MS. CALL:

10   Q.   Mr. Bryant, do you recognize Exhibit 9273?

11   A.   I recognize the person in it.

12   Q.   Who is the person in it?

13   A.   That would be Jayson Penn.

14   Q.   Is that a fair and accurate photograph of Jayson Penn?

15   A.   Yes.

16        MS. CALL:  The government offers 9273 into evidence.

17        THE COURT:  Any objection to the admission of

18   Exhibit 9273?

19        MR. TUBACH:  No objection, Your Honor.  Thank you.

20        THE COURT:  That exhibit will be admitted.

21        MS. CALL:  Permission to publish?

22        THE COURT:  You may.

23   BY MS. CALL:

24   Q.   Mr. Bryant, how does Jayson Penn spell his first name?

25   A.   J-A-Y-S-O-N.

2036
Robert Bryant - Voir Dire

1    Q.  Does anyone else at Pilgrim's spell their first name with a

2    Y in it?  Does anyone else named Jason that you are aware of at

3    Pilgrim's spell their name with a Y?

4    A.  Not that I'm aware of.

5    Q.  Okay.  Mr. Bryant, do you see Jayson Penn in the courtroom?

6    A.  Yeah.

7         MR. TUBACH:  We will stipulate that the witness can

8    identify Mr. Penn.

9         THE COURT:  Do you accept the stipulation, Ms. Call?

10        MS. CALL:  Yes, Your Honor.

11        THE COURT:  So stipulated.

12   BY MS. CALL:

13   Q.  What was Defendant Penn's role in 2014?

14   A.  I don't recall.  He was probably called a senior VP or

15   executive VP, I am not exactly sure, but he was responsible for

16   a pretty good bit of Pilgrim's.  So he was over -- responsible

17   for sales and operations I know for the fresh food service

18   business unit among other people at Pilgrim's, a lot of other

19   people at Pilgrim's.

20   Q.  Just to clarify, I think you started by saying "I am not

21   sure" and then saying "he was responsible for."

22   A.  When I am saying I am not sure, I am unsure of his exact

23   title in 2014 is what I mean by that.  He was a senior VP,

24   executive VP, I am not exactly sure of his exact title, but he

25   was responsible for fresh food service, sales and operations

Robert Bryant - Voir Dire

1    among other sales and operations people in Pilgrim's.

2    Q.   And that's the fresh food service you described earlier

3    involving the three channels?

4    A.   That's correct.

5    Q.   Did Mr. Penn's role change during his time at Pilgrim's?

6    A.   It did, yes.  You know, from 2014 I am not sure exactly the

7    scope of the -- total scope of his responsibilities, but

8    probably would be half the business.  And eventually he was

9    responsible for all the business and eventually made the CEO, I

10   believe it was in 2019.

11   Q.   2019?

12   A.   2019 or 2020.

13   Q.   All right.  Now, you mentioned him supervising fresh food

14   service at one point.  Was there ever a time in Defendant

15   Penn's time at Pilgrim's that he did not supervise fresh food

16   service at some level?

17   A.   Not that I'm aware of.  I believe when he was first hired,

18   that was one of his responsibilities.

19   Q.   Did his responsibilities include any role in pricing for

20   fast-food restaurants?

21          MR. TUBACH:  Objection, lacks foundation, calls for

22   speculation.

23          THE COURT:  Sustained.  If you could lay foundation.

24   BY MS. CALL:

25   Q.   Do you have an understanding as to Defendant Penn's

2038

Robert Bryant - Voir Dire

1   responsibilities with respect to pricing for fast-food

2   restaurants?

3   A.  Some, yes.

4   Q.  And what's the basis?

5   A.  Early he would have -- my understanding is that he was

6   involved in approving pricing.

7   Q.  Approving pricing?

8   A.  That's correct.

9   Q.  What was the nature of your relationship with Defendant

10  Penn?

11  A.  We -- I was not a direct report of his, but we did have

12  conversations.  You know, we had monthly sales meetings where

13  we reviewed our results and plans going forward, you know,

14  conversations like that, not weekly, definitely not daily, but

15  I would say monthly.

16  Q.  By means of comparison was it more or less frequent than

17  your communications with Defendant Austin?

18  A.  With Mr. Austin, I mean, we would have spoken weekly at

19  least, you know, a lot of times daily depending on the

20  circumstances at hand, more day-to-day.

21  Q.  I won't pull up the org chart again.  Is it correct to say

22  Defendant Penn was your boss's boss?

23  A.  That's correct.

24  Q.  Now, who did Defendant Penn report to?

25  A.  Bill Lovette.

Robert Bryant - Voir Dire

1          *MS. CALL:*  Could we please pull up Government's

2     Exhibit 9271 at this time for just the Court, the witness and

3     the parties?

4          *MR. FAGG:*  Your Honor, we will stipulate that the

5     witness can identify a photo of Mr. Lovette.

6          *THE COURT:*  Let's see what Ms. Call wants to ask.  Go

7     ahead.

8          *MS. CALL:*  Yes.  Well, I suppose based on that I would

9     offer Exhibit 9271.

10         *THE COURT:*  Any objection to the admission of 9271?

11         *MR. FAGG:*  No, Your Honor.

12         *THE COURT:*  9271 will be admitted.

13         *MS. CALL:*  Permission to publish?

14         *THE COURT:*  You may.

15    *BY MS. CALL:*

16    *Q.*  Now, Mr. Bryant, who is depicted in this photograph?

17    *A.*  Bill Lovette.

18    *Q.*  And do you see Bill Lovette in this courtroom today?

19    *A.*  Yes.

20    *Q.*  Could you please identify him based on an article of

21    clothing?

22    *A.*  Yes.

23         *MR. FAGG:*  Your Honor, we will stipulate to the

24    identification.

25    *A.*  He just stood up.

Robert Bryant - Voir Dire

1        THE COURT:  I think both has occurred, but -- so I

2    think we can go on.

3        MS. CALL:  Okay.  I will take it that the record

4    reflects the identification.

5        THE COURT:  Yes, it shall.

6        MS. CALL:  Thank you.

7    BY MS. CALL:

8    Q.  Now, did Bill Lovette have any -- do you have an

9    understanding as to Bill Lovette's role in pricing for

10   fast-food restaurants?

11   A.  Not -- not really.  I don't know what his level of

12   involvement would have been.

13   Q.  All right.  What was the nature of your relationship with

14   Defendant Lovette?

15   A.  Less frequent conversations than with Mr. Penn.

16   Mr. Lovette would have been in the monthly sales meetings and

17   ask questions, things of that nature, but not -- but less

18   frequently than Mr. Penn.

19   Q.  Okay.  And you said he was in monthly sales meetings.  Did

20   you attend monthly sales meetings?

21   A.  I did.  I believe I started going to those from 2015 on.

22   Q.  All right.  Now, moving on, outside of Pilgrim's, you

23   earlier mentioned several individuals outside of Pilgrim's that

24   you were aware of participating in this conduct.  Let's start

25   with Bill Kantola.  What is your basis for saying that Bill

Robert Bryant - Voir Dire

1  Kantola participated in the conduct you have described?

2  A.  Conversations with Mr. Austin and, you know, a phone call I

3  overheard in 2014.

4  Q.  And those conversations and phone calls, were they all in

5  2014?

6          MS. HENRY:  Objection, Your Honor.  It

7  mischaracterized what his testimony was.  She said phone calls

8  and he said phone call.

9          THE COURT:  Sustained.  If you could rephrase.

10  BY MS. CALL:

11  Q.  Was it one or more conversation you were describing

12  relating to Bill Kantola?

13  A.  One phone call that I overheard, but several phone calls

14  between myself and Roger Austin over a few years.

15  Q.  About Mr. Kantola?

16  A.  That's correct.

17  Q.  Now, you also mentioned Scott Brady.  Where did Scott Brady

18  work?

19  A.  He worked at Claxton.

20  Q.  And was Claxton a competitor of Pilgrim's?

21  A.  Yes.

22  Q.  What's your basis for saying that Scott Brady participated

23  in this conduct?

24  A.  Overhearing a phone conversation between Roger Austin and

25  Scott Brady and several phone calls between Roger Austin and

2042

Robert Bryant - Voir Dire

1    myself where he --

2              MR. LAVINE:  Your Honor, I object.  Can I request a

3    side bar, please?

4              THE COURT:  Sure.

5         (At the bench:)

6              THE COURT:  Go ahead, Mr. Lavine.

7              MR. LAVINE:  Your Honor, I understand your rulings as

8    far as the foundation before, but I think this is getting too

9    far afield here.  This individual, every time he says it's just

10   based on conversations or what he has heard from I think it's

11   2012 through 2019.  There is no specificity.  There is no basis

12   for a foundation of any of these comments one way or the other,

13   and I am objecting for the record on that basis, Your Honor.

14             THE COURT:  Ms. Call?

15             MS. CALL:  Your Honor, I believe we are about to move

16   into specifics.  We just wanted to establish foundation for

17   each individual.

18             MR. TUBACH:  One additional point.  To the extent that

19   any communications between Mr. Austin and Mr. Brady or any

20   other alleged co-conspirator has not been disclosed under

21   the -- pursuant to *James*, we would object to that being

22   elicited from this witness.

23             MS. HENRY:  And the same with regard to any

24   conversations between Mr. Austin and Mr. Kantola.

25             THE COURT:  We will have to see once we get into

Robert Bryant - Voir Dire

1    specifics, so all right.  Thank you.  Sorry, Mr. Lavine.  Your

2    objection will be overruled.  It does seem like this is

3    general, but it's going into specifics.  The question, though,

4    is appropriate at this point in time.  Thank you.

5        (In open court:)

6             MS. CALL:  May I inquire further, Your Honor?

7             THE COURT:  Yes, go ahead.  Sorry.

8    BY MS. CALL:

9    Q.  So Mr. Bryant, I am not sure if you answered what was the

10   basis of your understanding for listing Scott Brady as an

11   individual who participated in this conduct.

12            MR. LAVINE:  Objection, Your Honor, asked and

13   answered.

14            THE COURT:  Overruled.

15   A.  Overhearing a phone call between Roger Austin and Scott

16   Brady and numerous phone calls over -- between Roger Austin and

17   myself over the course of several years.

18   BY MS. CALL:

19   Q.  And lastly, you named Carl Pepper.  Who is Carl Pepper?

20   A.  He works or worked, I am not sure which, over at Tyson

21   Foods.  He was a salesperson there.

22   Q.  What is your basis for saying that Carl Pepper participated

23   in this conduct?

24   A.  Similar, various phone calls between Roger Austin and

25   myself or he was relaying information to me about his

2044

Robert Bryant - Voir Dire

1    discussions with Mr. Pepper.

2    Q.   All right.  Now, before we get into specifics of some of

3    those conversations, Mr. Bryant, are you here today under an

4    agreement with the government under which you will not be

5    prosecuted?

6    A.   That's correct.

7    Q.   And how many times have you met with the government?

8    A.   Approximately, 25.

9    Q.   Over how long?

10   A.   The first time I think we met was either in the end of May

11   of 2021 or the first part of June of 2021.

12           MS. CALL:  May we have one moment to confer, Your

13   Honor?

14           THE COURT:  You may.

15           MS. CALL:  Thank you, Your Honor.

16   BY MS. CALL:

17   Q.   Mr. Bryant, does that agreement relate to the conduct

18   you've described today?

19   A.   It does.

20   Q.   Now, in each of those interviews with the government, did

21   you discuss that conduct?

22   A.   I did.

23   Q.   And before I ask about some of the substance that you

24   shared, did you lie to the government during any of those

25   meetings?

Robert Bryant - Voir Dire

1    A.   I did.

2    Q.   In how many of the meetings?

3    A.   I recall one.

4    Q.   In one meeting?

5    A.   That's correct.

6    Q.   And did what you lie about have anything to do with the

7    conduct --

8         MS. CALL:  Your Honor, may I have a very brief side

9    bar?

10        THE COURT:  Yes.

11     (At the bench:)

12        THE COURT:  Go ahead.

13        MS. CALL:  Your Honor, I am trying to lead the witness

14   through these questions to be mindful of your orders from

15   earlier today, but I do want to inquire about the nature of his

16   agreement with the government and what conduct it relates to.

17   And I want to inquire if that is a fine question to ask

18   pursuant to your order from this morning regarding

19   price-fixing.

20        THE COURT:  It would seem to me that if you just ask

21   concerning the conduct that you've described so far, something

22   like that, it wouldn't seem to necessitate using the term

23   "price-fixing."  He hasn't used the term "price-fixing."  I

24   understand you are just following the orders, but I guess I am

25   not quite sure why, given what he didn't tell the truth about,

Robert Bryant - Voir Dire

1   why there can't be some other way to distinguish it from what

2   he has been testifying about now.

3          MS. CALL:  And I suppose perhaps it's a little too

4   particular, but given that the conduct did relate to conduct of

5   others at Pilgrim's as well, and he has spoken quite a bit of

6   others at Pilgrim's, it's difficult for me to ask a question to

7   separate what he lied about from the conduct he has described

8   broadly because he talked about a fair number of things,

9   including many people at Pilgrim's in their roles.

10         MR. TUBACH:  I don't think that's difficult at all.

11  She is about to say exactly that he lied to the government and

12  had nothing to do with what's being discussed here today.  It's

13  very simple.

14         THE COURT:  Or sharing information with competitors or

15  there is several ways you could do it, I think.

16         MS. CALL:  That is helpful.  Thank you.

17      (In open court:)

18  BY MS. CALL:

19  Q.  All right.  Mr. Bryant, did what you lied to the government

20  about have anything to do with collaborating with competitors

21  about prices?

22  A.  No.

23  Q.  And what did you do after this meeting you are describing?

24  A.  I requested a follow-up meeting with the government so I

25  could correct the record.

Robert Bryant - Voir Dire

1   *Q.*   Thank you.  Mr. Bryant, I want to ask you about some

2   specific negotiations in which you were involved.  When did you

3   first become aware of the price collaboration with competitors

4   that you have described?

5   *A.*   In 2014.

6   *Q.*   And what was your role in 2014?

7   *A.*   I was the divisional planner for fresh food service.

8   *Q.*   Now, had you previously been involved in price negotiations

9   regarding those customers?  Go ahead.

10  *A.*   Yeah, not with the national accounts like this.  I recall

11  this was really my first year visiting most of these accounts.

12  *Q.*   Coming into 2014 were you aware of year-to-year pricing

13  changes for national accounts?

14  *A.*   I was.

15  *Q.*   How so?

16  *A.*   You know, before I was the divisional planner for fresh

17  food service, I was what they call a sales coordinator for the

18  Mayfield, Kentucky plant.  And probably for eight to 10 years I

19  ran a report weekly looking at those national account prices

20  and the revenue drivers for that plant and continued that on

21  until I was the divisional planner reviewing those reports and

22  looking at changes of those in pricing.

23  *Q.*   So moving into 2014, based on your experience what was the

24  typical year-to-year price change for a customer like KFC?

25  *A.*   A few cents either way, a very few, like one or two.

Robert Bryant - Voir Dire

1    Q.  All right.  So could you describe particularly when you

2    became aware of a plan to increase pricing that year?

3    A.  I don't recall exactly.  It was probably late June, early

4    July.  I had a conversation with Jason McGuire where he called

5    and asked me to help him build a presentation.  It was part of

6    a basis for price increases from our customers.

7    Q.  All right.  And did he use a term for those presentations

8    to your customers?

9    A.  He did.

10        MR. LAVINE:  I am going to object, Your Honor,

11   hearsay.

12        THE COURT:  Overruled.

13   A.  During that phone call when he asked for -- asked for my

14   help in developing the basis for the price increases, he said

15   once we got that done, we were going to blitz the customers

16   with basically what the plan was.  So we were going to use two

17   reasons to justify a price increase to our customers, and those

18   same two points were going to be made to basically all those

19   customers.

20   BY MS. CALL:

21   Q.  Which customers were you going to blitz?

22   A.  Initially it was the -- when I first had the conversation,

23   it was the QSR group we were going to blitz.  Later that

24   changed into all customers.

25   Q.  All right.  So you said Mr. McGuire asked you to help with

Robert Bryant - Voir Dire

1    a presentation.  Did you actually build a presentation?

2    A.   I did.  I helped build a presentation, yes.

3    Q.   What was your specific role?

4    A.   It was supply and demand, basically.  As I said, I was

5    responsible for demand planning, supply chain at the time, so

6    one of those points was that the basis of the price increase

7    was because of the decrease in supply and demand and basic

8    economics, right, supply and demand.  And the supply had

9    contracted over the last five years in certain segments that

10   needed a certain size bird, so I was -- I just -- I formulated

11   a PowerPoint to illustrate that.

12   Q.   Thank you.  If you could slow down just a little bit,

13   Mr. McGuire -- or Mr. Bryant, sorry.  So after Mr. McGuire told

14   you about this plan, did you, in fact, blitz the customers?

15   A.   Yes.  We went to several meetings, yes.

16   Q.   What customers did you visit?

17   A.   I remember going to KFC, Popeye's, Church's, and I may have

18   went to a few more, but I do recall going to those three.

19   Q.   Okay.  To be clear, when you said KFC, what entity did you

20   visit?

21   A.   Back then -- they've changed names a couple times, but KFC

22   has like a buying co-op.  So at one point they were called the

23   UFPC or United Food Purchasing Cooperative, and then they

24   changed to RSCS, Restaurant Supply Chain Solutions.  So usually

25   when I say KFC, I am referring to RSCS, which was the buying

2050

Robert Bryant - Voir Dire

1    part for these franchisees.

2    Q.  So you used those terms kind of interchangeably?

3    A.  That's correct, yes.

4    Q.  When you say Popeye's, is there a purchasing cooperative

5    for Popeye's?

6    A.  There is, SMS, I think Supply Managing Solutions or

7    something to that effect, but yes, they have the same --

8    similar structure as KFC.

9    Q.  Let's get back to the meetings you were talking about in

10   the customer blitz.  Starting with Church's and Popeye's, when

11   were those meetings?

12   A.  I believe they were the last week of August of 2014.

13   Q.  Of August?

14   A.  I am sorry, of July of 2014, not August.

15   Q.  Were those two meetings near in time?

16   A.  They were; they were.

17   Q.  Why?

18   A.  I believe they were back to back.  They are both like north

19   Atlanta and probably -- their offices may be a mile away.  And

20   what I recall is we kind of piggy-backed off an established

21   meeting to go to both.

22   Q.  When you said we, who attended those meetings?

23   A.  I recall attending.  Jason McGuire.  I recall Roger Austin.

24   I believe Justin Gay was there.  I -- of course, the customer.

25   I am not sure if anyone else was there from Pilgrim's.

Robert Bryant - Voir Dire

1    Q.  What message was delivered in those meetings from Popeye's

2    and Church's?

3    A.  The two points that we had developed and shared with most

4    of the customers in 2014.  The first was the supply and demand

5    in that particular segment was contracting; therefore, they

6    needed to give a price increase.  And the second point was that

7    there was more profitable segments in a larger bird, so if a

8    price increase wasn't given, then there could be further

9    contraction in that small bird segment.

10   Q.  So those two things you mentioned that were shared, the

11   supply shortage and the relative profitability, what was the

12   purpose in conveying those messages to Church's and Popeye's?

13   A.  First thing a buyer normally would ask when you say -- when

14   you ask for a price increase is why, so you have to give them a

15   basis for your price increase.  And those -- that was our

16   justification, those two points were our justification for the

17   price increases.

18   Q.  So when you were justifying this price increase at this

19   time, did you tell them the size of the anticipated price

20   increase at these meetings?

21   A.  Not that I recall, no.

22   Q.  Now, I guess back into the room at these meetings, do you

23   recall a time when one of those customers left the room?

24   A.  I do.

25   Q.  Was the door open or closed when the customer left the

Robert Bryant - Voir Dire

1    room?

2    A.   It was closed.

3    Q.   And who do you recall being in the room?

4    A.   Myself, and I do recall Jason McGuire and Roger Austin.  I

5    don't know if Justin Gay would have stepped out.  I just

6    remember the three of us because I remember the comment that

7    was made.  And I don't remember who else was in the room at

8    that point in time other than the customers were not.

9    Q.   Do you recall specifically which customer's office this

10   meeting was at?

11   A.   I thought it was Church's, but I am not a hundred percent

12   sure which customer's office it was.

13   Q.   All right.  Now, is there a conversation that you recall

14   happening after the customer left the room?

15   A.   Yes.

16   Q.   Could you please describe it?

17   A.   I just remember that Jason McGuire in referencing the

18   PowerPoint presentation said -- told Roger Austin, "I need you

19   to put this out to the industry."

20   Q.   What did you understand Mr. McGuire to mean when he told

21   Roger Austin to put this out to the industry?

22           MS. PAGE:  Objection, calls for speculation.

23           THE COURT:  Response?

24           MS. CALL:  I asked for the witness's understanding

25   based on his experience in the room in that very conversation.

Robert Bryant - Voir Dire

1          *THE COURT:*  Sustained.

2     *BY MS. CALL:*

3     *Q.*  Did you have an understanding of the meaning of the term

4     "industry"?

5     *A.*  Yes.

6     *Q.*  And what --

7               *MR. TUBACH:*  Objection, Your Honor.

8               *THE COURT:*  Sustained.  No side conversations between

9     the attorneys.

10              *MS. CALL:*  May I ask the basis of the witness'

11    understanding?

12              *THE COURT:*  Well, the question was -- it has to deal

13    with someone else's meaning of terms or what he understood the

14    meaning of certain terms were.

15              *MS. CALL:*  Yes, Your Honor.  And respectfully, he was

16    a participant in this conversation, so I am asking for his

17    understanding of the meaning of terms that were said to him.

18              *THE COURT:*  It wasn't said to him.  It sounded like it

19    was said to somebody else.

20              *MS. CALL:*  All right.  I will move on.

21    *BY MS. CALL:*

22    *Q.*  In your time in the QSR business and working with those

23    people, did the term "industry" have a particular meaning?

24    *A.*  Yes.

25    *Q.*  And what is the basis of your understanding of the meaning

Robert Bryant - Voir Dire

1    of the term "industry"?

2    A.  Conversations with Tim Stiller, Roger Austin.  You know, in

3    the context of doing business or the course of doing business,

4    that term was used to describe competitors.

5            MR. LAVINE:  Objection, Your Honor, hearsay.

6            THE COURT:  Overruled.

7            Can you look for a breaking spot, Ms. Call?

8            MS. CALL:  This would be a fine time, Your Honor.

9            THE COURT:  Ladies and gentlemen, we will go ahead and

10   take the mid-afternoon break.  Why don't we plan on reconvening

11   3:30.  Keep the admonitions in mind.  The jury is excused.

12   Thank you.

13           (Jury excused.)

14           THE COURT:  We will be in recess.  Thank you.

15       (Recess at 3:15 p.m. until 3:32 p.m.)

16           THE COURT:  Why don't we get Mr. Bryant back.

17           (Jury present.)

18           THE COURT:  Go ahead, Ms. Call.

19   BY MS. CALL:

20   Q.  All right.  Mr. Bryant, back to the customer meeting you

21   were just talking about.  When you overheard Mr. McGuire tell

22   Defendant Austin to put this out to the industry, what had

23   immediately prior been being discussed?

24   A.  The price increases or the basis for or the justification

25   for price increases to our customers.

Robert Bryant - Voir Dire

1    *Q.* Now, what was your reaction when you heard Mr. McGuire say

2    this?

3    *A.* Yeah.  When I heard that, I -- like I said, it was one of

4    my first customer-facing meetings at this level and I just

5    remember a thought going through my head like, wow, this is how

6    it's done.

7    *Q.* I apologize.  I think there is a box being moved.  I did

8    not hear your response.  Could you repeat yourself?

9          *MS. LaBRANCHE:* Objection, asked and answered.

10         *THE COURT:* Sustained.

11   *BY MS. CALL:*

12   *Q.* All right.  Did you observe Defendant Austin's reaction?

13   *A.* I did.

14   *Q.* How did he react?

15   *A.* It was like a normal business conversation.  There wasn't

16   really a reaction, maybe a slight nod or something,

17   acknowledgment.

18   *Q.* Now, where did you say this conversation took place?

19   *A.* I am not a hundred percent certain.  I thought it was at

20   Church's.  It could have been at Popeye's, but it was at one of

21   those locations down in northern Atlanta.  I just remember

22   being in that customer boardroom and then stepping out.

23   *Q.* Did you have an understanding as to whether the customer

24   heard that directive?

25   *A.* I don't believe so, no.

Robert Bryant - Voir Dire

1   *Q.* And why do you remember this conversation taking place in

2   the customer's office?

3   *A.* I just felt like it was very unusual.  I mean, although I

4   hadn't participated in those negotiations before, just to have

5   a discussion of that nature inside their boardroom when they

6   just left the -- that room seemed inappropriate.

7          *MR. FAGG:* Objection, Your Honor.

8          *THE COURT:* Overruled.

9   *BY MS. CALL:*

10  *Q.* When the customer came back into the room -- I guess first

11  did the customer come back into the room after that?

12  *A.* Yes.

13  *Q.* When they came back, did you report the conversation that

14  had happened to the customer?

15  *A.* No.

16  *Q.* All right.  Now, after this meeting you just described, did

17  there come a time when you had a similar meeting in the

18  customer blitz with KFC?

19  *A.* Yes.

20  *Q.* And when was that?

21  *A.* I believe it was August 1st.

22  *Q.* Now, did you give a presentation to KFC?

23  *A.* We did.

24         *MS. CALL:* Ms. Pearce, could you please pull up

25  Government Exhibit 1055 at this time for the witness, the Court

Robert Bryant - Voir Dire

```
 1   and the parties.
 2   BY MS. CALL:
 3   Q.  Mr. Bryant, I believe it is Tab 2 of your binder, if you
 4   would like the paper version.
 5   A.  Yes.
 6   Q.  Do you recognize Exhibit 1055?
 7   A.  I do.
 8   Q.  What is it?
 9   A.  It's the cover page for the presentation that we presented
10   to KFC or RSCS on August 1st of 2014.
11   Q.  And what was your role in this presentation?
12   A.  I presented the supply/demand slide.
13          MS. CALL:  Government offers Government's Exhibit 1055
14   into evidence.
15          THE COURT:  Any objection to the admission of
16   Exhibit 1055?
17          All right.  1055 will be admitted.
18          MS. CALL:  Permission to publish?
19          THE COURT:  You may.
20          MS. CALL:  All right.  And, Ms. Pearce, could we turn
21   to the second page, please?
22   BY MS. CALL:
23   Q.  Mr. Bryant, who attended this meeting with KFC or RSCS?
24   A.  Roger Austin and myself, Jason McGuire, Tommy Lane, Justin
25   Gay and Scott Tucker from Pilgrim's.  I believe from KFC there
```

Robert Bryant - Voir Dire

1    would have been Pete Suerken, Steve Campisano, Rich Eddington,

2    Sara Fisher.  I don't remember if there was anyone else in the

3    room from KFC.

4    Q.  Just to be clear, when you say from KFC, where do those

5    individuals work?

6    A.  RSCS.

7    Q.  Thank you.  Thomas Lane, I don't believe you mentioned him

8    today.  Who was he?

9    A.  Tommy Lane, he was like a business analyst, so he would

10   help us develop the pricing cost model for KFC among other

11   customers.

12   Q.  All right.  He worked at Pilgrim's?

13   A.  That's correct.

14   Q.  Now, could we please turn to page 3?  What is this,

15   Mr. Bryant?

16   A.  That is the slide that I helped create for the -- this

17   PowerPoint presentation.

18   Q.  Could you describe what you were trying to convey with this

19   slide?

20   A.  Yes.  It had a transition on this slide.  That's why it

21   looks a little blurry or busy on this -- on a printed version.

22   So what this shows was the availability in different size

23   categories of birds five years prior to 2014, so 2019 -- 2009,

24   and then in 2014 the reduction of availability in those given

25   size ranges of 5 percent and 7 percent.

Robert Bryant - Voir Dire

1   Q.   What was the purpose in showing this slide to KFC?

2   A.   That was part of the justification for the price increases,

3   the arrows with the 5 and the 7 percent reduction are over the

4   sizes, the size of bird that KFC purchased.

5   Q.   Now, at this August 1st meeting, at this time did you tell

6   KFC what the size of the price increase would be?

7   A.   Not that I recall, no.

8   Q.   Why not?

9   A.   Generally speaking, we did a pre-bid meeting where each

10   side kind of laid out their expectations for the bid coming up.

11   And this was us, Pilgrim's that is, giving our position on why

12   a price increase was warranted, however not necessarily giving

13   the amount of the price increase at that time.

14   Q.   All right.  Now, this summer did there come a time when you

15   learned of the magnitude of the price increase that Pilgrim's

16   would be seeking?

17   A.   Yes.

18   Q.   Who did you learn it from?

19   A.   Jason McGuire.

20   Q.   And what did you learn?

21   A.   It was going to be a historically high price increase in

22   the neighborhood of 15 to 20 cents a pound.

23   Q.   Now, what was your reaction when you heard about a 15- to

24   20-cent increase?

25            MS. LaBRANCHE:  Objection, relevance.

Robert Bryant - Voir Dire

1      THE COURT:  Overruled.

2  *A.*  I was concerned that we were going to lose a lot of

3  business.  At the time when I first learned of that, I

4  didn't -- I didn't believe that our competition, our

5  competitors, would come to that same level of price increase

6  during the bid negotiations.  As I mentioned earlier, you know,

7  a few cents either way was a typical price increase, so I was

8  concerned that they wouldn't come to that same -- same

9  conclusion.

10  *BY MS. CALL:*

11  *Q.*  All right.  Now, you testified earlier about the two

12  justifications that you were giving to KFC.  Did you have a

13  personal belief as to the magnitude of the price increase that

14  would be justified by those reasons?

15      *MS. PAGE:*  Objection, 701, 702.

16      *THE COURT:*  Sustained.

17      *MR. TUBACH:*  Lack of foundation.

18      *THE COURT:*  Sustained.

19  *BY MS. CALL:*

20  *Q.*  Now, Mr. Bryant, what was the typical year-to-year change

21  in price for KFC?

22      *MR. LAVINE:*  Objection, Your Honor, asked and

23  answered.

24      *THE COURT:*  Sustained.  Maybe not as to KFC.  I will

25  allow you to ask that.

Robert Bryant - Voir Dire

1    *BY MS. CALL:*

2    *Q.*  What was the typical year-to-year price change for KFC?

3    *A.*  A few cents either way, pennies.

4    *Q.*  And had you ever seen a 15- to 20-cent increase for a

5    customer like KFC?

6    *A.*  No.

7    *Q.*  Now, these price increases that you learned about, was it

8    just for KFC?

9    *A.*  No.

10   *Q.*  What other customers?

11   *A.*  For all of the QSR customers initially, and then it

12   expanded to basically all the small -- small bird or fresh food

13   service customers.

14   *Q.*  Was there a strategy that Pilgrim's had as to the ordering

15   of the price increases?

16        *MR. TUBACH:*  Lack of foundation.

17        *THE COURT:*  Sustained.  If you can lay foundation.

18   *BY MS. CALL:*

19   *Q.*  Mr. Bryant, were you involved in strategy discussions

20   regarding these price increases?

21   *A.*  I was.

22   *Q.*  And based on those discussions and your involvement in

23   them, was there a strategy as to the ordering of the price

24   increase?

25   *A.*  There was.

Robert Bryant - Voir Dire

1   *Q.* And what was it?

2   *A.* Pilgrim's we -- Pilgrim's wanted to do KFC first.  At the

3   time they were the largest QSR customer that we had, and we

4   felt as if we got KFC price increases done, that the other --

5   it would make the other QSR customers more or less fall in line

6   or be easier to get.

7   *Q.* All right.  Now, you've testified about that prebid

8   meeting, and I want to go into the actual negotiations.  Could

9   you just explain the bidding process that KFC had that year in

10  2014?

11  *A.* Yes.  There would have been a RFP or request for pricing.

12  Typically they gave a week or two for the various competitors

13  to submit pricing back to them.  You know, they typically --

14  they wanted a cost model price or a -- it's called a cost model

15  where you have your cost-plus margin submitted back to them.

16  That would have been what I would describe as a blind bid or a

17  blind process where we submitted our bid and KFC would have

18  been the only one to see that bid.

19  *Q.* All right.  And did you have an understanding as to why

20  RSCS used the blind bidding process?

21          *MS. PAGE:*  Objection, calls for speculation.

22          *MR. FELDBERG:*  And lack of foundation, Your Honor.

23          *THE COURT:*  Sustained.  If you could lay foundation.

24  *BY MS. CALL:*

25  *Q.* Do you have an understanding as to the benefits of a blind

Robert Bryant - Voir Dire

1   bidding process?

2   A.   Yes.

3           MR. FAGG:   Same objections.

4           MR. TUBACH:   And 701 and 702.

5           THE COURT:   Sustained.   If you could lay foundation.

6   BY MS. CALL:

7   Q.   Mr. Bryant, have you been involved in blind bidding

8   processes?

9   A.   Yes.

10  Q.   How many times?

11  A.   More than I could count, a lot, as I have said earlier,

12  I've been involved in bids directly since 2014 through 2021,

13  you know, a lot of years, a lot per year.   You know, the QSRs,

14  you know, those were more three-year contracts, but --

15          MR. TUBACH:   Objection, Your Honor, this is now just a

16  narrative.   There is not really a question pending.

17          THE COURT:   Overruled.

18  A.   The retail customers generally did annual bids, you know,

19  so there was -- it was over the years, it was a constant,

20  constant bidding process that I was a part of.

21  BY MS. CALL:

22  Q.   Now, based on your years involved in blind bidding

23  processes, yes or no, do you have an understanding as to the

24  benefit of a blind bidding process?

25  A.   I do.

Robert Bryant - Voir Dire

1    *Q.*  And what your understanding?

2           *MR. TUBACH:*  Your Honor, objection to the benefit.

3    Benefit to whom?

4           *THE COURT:*  Sustained as to vagueness.  If you could

5    define the benefit to whom.

6    *BY MS. CALL:*

7    *Q.*  Do you have an understanding as to the benefit to the

8    customer of a blind bidding process?

9    *A.*  I do.

10   *Q.*  And what is your understanding?

11          *MR. TUBACH:*  That lacks foundation, Your Honor.

12          *THE COURT:*  Overruled.

13   *A.*  My understanding is through those conversations with

14   various customers and their reasoning for using that process as

15   part of their strategy to negotiate with the various

16   competitors.

17   *BY MS. CALL:*

18   *Q.*  Okay.  So then what is your understanding of the benefits?

19   *A.*  The benefit to --

20          *MR. FAGG:*  Your Honor, his entire understanding is

21   based on hearsay.

22          *THE COURT:*  Overruled.

23   *A.*  The benefit to the customer is so they are -- the customer

24   is the one with all the knowledge where the competitors only

25   have their bid.  They do not know what the other bids are, so

Robert Bryant - Voir Dire

1    therefore the customer can elicit the most competitive bid from

2    the competitors because they don't -- it's like paying poker.

3    They don't -- they are not showing their cards to the various

4    competitors.

5    BY MS. CALL:

6    Q.  Now, in 2014 for KFC's bidding process, did Pilgrim's

7    actually follow the rules of the blind bidding process?

8            MR. FAGG:  Objection, Your Honor.

9            MR. TUBACH:  Directly contrary to what the Court has

10   previously ordered.

11           THE COURT:  Let's have a side bar.

12      (At the bench:)

13           THE COURT:  Mr. Tubach, go ahead.

14           MR. TUBACH:  Ms. Call is now trying to elicit

15   testimony that somehow bidding in violation of some "rules,"

16   rules apparently she is trying to elicit were maybe rules that

17   were to various customers, I think is exactly what the Court

18   said is not relevant here.

19           THE COURT:  Ms. Call?

20           MS. CALL:  I may be thinking of the incorrect ruling,

21   but I think it is entirely relevant that the customer has a

22   process.  And he has described the process because it is

23   relevant and it's relevant that Pilgrim's did not follow the

24   rules.  And that's the conduct we are about to get into, so

25   it's just a precursor to asking about the actual conduct.

Robert Bryant - Voir Dire

1          *THE COURT:*  Mr. Feldberg?

2          *MR. FELDBERG:*  There has been no testimony about any

3     rules imposed by any customer.  The most that we've gotten is

4     this witness' interpretation of a process.  There is nothing

5     about rules.

6          *THE COURT:*  Well, yeah, there hasn't been anything

7     about the rules yet, but also this -- I believe my previous

8     orders have talked about the irrelevancy of whether or not the

9     documents broke some type of internal standard or rule.  It is

10    okay, and there has been testimony, but we've already had it --

11    well, I anticipate that we are going to have it from

12    Mr. Bryant, but it should not be characterized in terms of

13    breaking rules or violating rules.

14         You can talk about it in terms of it was a blind

15    bidding process, and then you will undoubtedly have testimony

16    from him about how they shared or exchanged information, but to

17    couch it in terms of rule breaking is -- I think does violate a

18    previous order of the Court.

19         *MS. CALL:*  I apologize, Your Honor.  I can rephrase.

20       (In open court:)

21   *BY MS. CALL:*

22   *Q.*  Mr. Bryant, you have described the bidding process used by

23   KFC.  Now, in this bid in 2014, did you learn about

24   competitors' pricing?

25   *A.*  In 2014, I did not.

Robert Bryant - Voir Dire

1    Q.  All right.  And do you have an understanding as to whether

2    others at Pilgrim's discussed pricing with competitors?

3    A.  Yes.

4    Q.  And what's the basis of that understanding?

5    A.  Conversations with Jason McGuire.  There was an e-mail sent

6    where there was an understanding of where our competitors

7    had --

8         MR. TUBACH:  Objection, Your Honor, understanding.

9         THE COURT:  Overruled.

10   A.  In an e-mail where Roger Austin and Jason McGuire conveyed

11   to me where our competitors had placed their bids relative to

12   Pilgrim's bids.

13   BY MS. CALL:

14   Q.  All right.  Let's get toward that time frame.  So

15   describing the bidding process, around when was that first

16   round bid for KFC due?

17   A.  I believe it was around the third week of August of 2014,

18   somewhere around the 20 something.

19   Q.  Now, come the time when this first round bid is due, were

20   you still concerned that the price increase wouldn't stick?

21   A.  I was.

22   Q.  And did there become a time when you became less concerned?

23   A.  Yes.

24        MS. CALL:  Let's pull up just for the Court, the

25   witness and the parties right now Government's Exhibit 1066.

Robert Bryant - Voir Dire

1    *BY MS. CALL:*

2    *Q.*  Mr. Bryant, this is Tab 3 in your binder.  Do you recognize

3    Exhibit 1066?

4    *A.*  I do.

5    *Q.*  What is it?

6    *A.*  It's an e-mail from Jason McGuire to myself on August 21st

7    of 2014.

8    *Q.*  And does it relate to a particular customer?

9    *A.*  It does.

10   *Q.*  What customer?

11   *A.*  KFC.

12        *MS. CALL:*  Government offers Exhibit 1066 into

13   evidence.

14        *THE COURT:*  It's been admitted already my records

15   show.

16        *MS. CALL:*  Thank you, Your Honor.  Permission to

17   publish?

18        *THE COURT:*  One second.  Yes, you may.

19   *BY MS. CALL:*

20   *Q.*  Just briefly, starting at the top of the conversation here,

21   are you on the top e-mail in this chain?

22   *A.*  I am.

23   *Q.*  Are you on the lower down e-mails of this chain?

24   *A.*  Not the beginning, no.

25   *Q.*  So how did you go about receiving these e-mails?

Robert Bryant - Voir Dire

1    *A.*  It was forwarded to me from Jason McGuire.

2    *Q.*  All right.  Did you review the underlying e-mails at the

3    time?

4    *A.*  I did.

5    *Q.*  Let's start at the bottom e-mail in this chain.

6            *MS. CALL:*  Ms. Pearce, if you could zoom down towards

7    the bottom.

8    *BY MS. CALL:*

9    *Q.*  Now, the very first e-mail in this chain, Mr. Bryant, did

10   it have any content in it?

11   *A.*  No.

12   *Q.*  What was the subject line?

13   *A.*  Any word from them on our proposal.

14   *Q.*  Did you have an understanding as to what that meant?

15   *A.*  I did.

16   *Q.*  And what is your understanding?

17   *A.*  "Any word from them on our proposal" was Jason McGuire

18   asking Roger Austin if he had any feedback about our bid

19   submission to KFC.

20   *Q.*  And how did Mr. Austin respond?

21   *A.*  I heard they made a couple of calls and were surprised.

22   *Q.*  What was your understanding of that?

23   *A.*  My understanding was that I heard --

24           *MR. FELDBERG:*  Objection.  He is interpreting

25   communications between other people that he is not a

Robert Bryant - Voir Dire

1   participant in.

2           THE COURT:  Response?

3           MS. CALL:  I believe this was sent on to the witness

4   and he reviewed it, and it was sent on to have an impact on

5   him.

6           THE COURT:  Sustained.

7   BY MS. CALL:

8   Q.  All right.  How did Mr. McGuire respond to Mr. Austin?

9   A.  Surprised like how much higher everyone else was.

10  Q.  Now, at the time of this e-mail, did you have an

11  understanding as to where Pilgrim's competitors had bid?

12  A.  Not before this e-mail.

13  Q.  After receiving this e-mail, did you have an understanding

14  as to where Pilgrim's competitors bid?

15  A.  Yes.

16  Q.  And what was your understanding?

17  A.  My understanding based on the contents of this e-mail --

18          MR. FAGG:  Objection.

19          THE COURT:  Mr. Fagg, go ahead.

20          MR. FAGG:  Same objections that were just raised,

21  interpreting this e-mail.

22          THE COURT:  Sustained.

23  BY MS. CALL:

24  Q.  How did Defendant Austin respond to Mr. McGuire when he

25  said, "Surprised like how much higher everyone else was"?

2071

Robert Bryant - Voir Dire

1   A.   Yes.

2   Q.   That was the response?

3   A.   That's correct.

4   Q.   Now, what was Mr. McGuire's response to Defendant Austin?

5   A.   Can you smell their dirty drawings from where they crapped

6   their pants?  Ha.

7   Q.   All right.  And how did Defendant Austin respond to that?

8   A.   Definitely.

9   Q.   Now, do you have an understanding as to why this was

10  forwarded to you?

11  A.   I do.

12  Q.   What is your understanding?

13          MR. FAGG:  Objection, foundation.

14          THE COURT:  Overruled.

15  A.   As I've stated earlier, I had concerns that the strategy to

16  increase prices was not going to be successful because I did

17  not believe our competitors would raise prices along with

18  Pilgrim's.  And this was Jason McGuire's effort to reassure me

19  that the strategy was working and that our competitors were, in

20  fact, increasing prices similar or along with Pilgrim's.

21          MR. FELDBERG:  Objection, move to strike, Your Honor.

22  There is no foundation for that statement.

23          THE COURT:  Overruled.

24  BY MS. CALL:

25  Q.   Now, back to Exhibit 1066, how did you respond to Jason

Robert Bryant - Voir Dire

1    McGuire?

2    *A.*  That's good ...

3         When I wrote that, like I said --

4         *MR. LAVINE:*  There is no question pending.  It's asked

5    and answered.

6         *THE COURT:*  Next question.

7    *BY MS. CALL:*

8    *Q.*  Mr. Bryant, what did you mean when you said,

9    "That's good ..."?

10   *A.*  I was -- this was the first indication that I had that the

11   strategy was successful, so it was good news, but I was still

12   not convinced that our competitors, all of our competitors

13   would go along and that we would ultimately be successful.

14   *Q.*  Now, after you said, "That's good," did Mr. McGuire respond

15   to you?

16   *A.*  He did.

17   *Q.*  And what did he say?

18   *A.*  Yup, that should help you all out some.

19   *Q.*  Now, what did you understand that to mean when Mr. McGuire

20   said it to you?

21        *MS. PAGE:*  Objection, calls for speculation.

22        *THE COURT:*  Response?

23        *MS. CALL:*  This was an e-mail to Mr. Bryant that he

24   received, and he can testify to his understandings and

25   inferences he drew from the words that were said to him.

Robert Bryant - Voir Dire

1        THE COURT:  That alone does not justify it.

2    Sustained.

3    BY MS. CALL:

4    Q.  Mr. Bryant, after you received this e-mail saying, "That

5    should help y'all out some," did you have a meeting coming up?

6    A.  Yes, the next day.

7    Q.  Who was that meeting with?

8    A.  With KFC.

9    Q.  Did the information conveyed in this e-mail affect your

10   presentation to KFC the next day?

11   A.  It affected our negotiations, not necessarily our

12   presentation.

13   Q.  How did it affect your negotiations?

14   A.  This e-mail gave confirmation that we did not have to

15   concede price in our negotiations with KFC.

16   Q.  Why?

17   A.  Because --

18        MR. FAGG:  Objection, Your Honor, same ground as

19   before that was sustained where he is interpreting this e-mail.

20        THE COURT:  He is doing it, but he is describing what

21   he used it for.  Overruled.

22   A.  Because we now had confirmation that our competitors were

23   increasing prices with us, so pricing was going to be discussed

24   in that meeting the following day, so this gave us reassurance

25   that we didn't have to concede price.

Robert Bryant - Voir Dire

1    *BY MS. CALL:*

2    *Q.*  All right.  Now, did you attend that meeting with KFC the

3    following day?

4    *A.*  I did.

5    *Q.*  Who else from Pilgrim's attended?

6    *A.*  I know myself, Roger Austin and Scott Tucker.  I don't

7    recall if anyone else from Pilgrim's attended or not.

8    *Q.*  Who do you recall from RSCS or KFC attending?

9    *A.*  Pete Suerken, Rich Eddington, Steve Campisano and Sara

10   Fisher.

11   *Q.*  And what happened at that meeting?

12   *A.*  They did ask for pricing concessions from us in that

13   meeting.  And I remember Roger's response to that request to

14   KFC or RSCS team was that, "The price was the price.  I just

15   need to know how many loads you want at that price."  There was

16   no negotiation on price.

17   *Q.*  Did you have the occasion to observe Defendant Austin's

18   demeanor at that meeting?

19   *A.*  He was very confident in his negotiating position.

20   *Q.*  Now, did you have internal meetings at Pilgrim's around the

21   time of this KFC meeting?

22   *A.*  Yes.  Generally before a KFC meeting, we had a pre-meeting

23   and then a post-meeting.  The pre-meeting was to review the

24   information that we were going to present, who was going to

25   present it, and then anticipate questions and who was going to

Robert Bryant - Voir Dire

1    answer and how they were going to answer those questions.  And

2    then the post-meeting was just to review whatever happened in

3    the meeting and the key take-aways.

4    Q.  And those pre and post-meetings, who were they between?

5    A.  Who were they?

6    Q.  Between.

7    A.  The Pilgrim's team, the Pilgrim's team that attended that

8    individual meeting.

9    Q.  Now, around this time did you have the occasion to observe

10   Roger Austin on the phone?

11   A.  I did.

12   Q.  What did you observe?

13   A.  I don't recall if it was before or after this meeting, but

14   I remember pacing in Roger's office and he was on the phone.

15   There were two conversations or he had two different phone

16   calls while I was in and out of his office.  And he was kind of

17   bragging or saying rather loudly, "I just told them the price

18   is the price.  I just need to know how many loads you want at

19   that price."  And then after he got done -- when he hung up the

20   phone, he said, "That was Kantola."

21        He had a similar conversation when I was in the room a

22   short time later.  And when he hung up, after he said, "I just

23   told them the price is the price.  I just need to know how many

24   loads you want at that price," same thing.  When he finished

25   his conversation, he hung up the phone, he said, "That was

Robert Bryant - Voir Dire

1   Brady."  I don't remember the order and how long the calls

2   were.  I just remembered those -- that comment made to both and

3   then Roger hang up the phone announcing who he was -- had just

4   talked to.

5   Q.  When Defendant Austin told you he had been talking to

6   Kantola, who did you understand that to be a reference to?

7   A.  Bill Kantola.

8   Q.  When he told you he was talking to Brady, who did you

9   understand that to be a reference to?

10  A.  Scott Brady.

11  Q.  Now, you stated at that meeting with KFC that Mr. Austin

12  conveyed the message, "The price is the price."  Do you have an

13  understanding as to why Pilgrim's took that position in the

14  negotiations with KFC?

15          MR. FELDBERG:  Objection, foundation.

16          THE COURT:  The question is whether he had an

17  understanding.  He can answer yes or no.

18  A.  Yes, I had an understanding.

19  BY MS. CALL:

20  Q.  What's the basis of your understanding?

21  A.  Internal conversations with Roger Austin and Jason McGuire.

22  Q.  During those negotiations?

23  A.  That's correct.  Before that the negotiations on -- was it

24  the 22nd, I believe, or the 23rd of August.

25  Q.  So what was your understanding as to why Pilgrim's refused

2077

Robert Bryant - Voir Dire

1    to negotiate with KFC?

2    A.  We were going to get our price increase from them.  You

3    know, we had information that the competitors were increasing

4    prices along with us, so we didn't have to concede price.

5    Q.  All right.  Back to the message you were talking about

6    earlier in the customer blitz, part of that message was a small

7    bird shortage, right?

8    A.  That's correct.

9    Q.  And did you have any other conversations with Jason McGuire

10   relating to the spreading of that small bird shortage message?

11   A.  We did.  We had many conversations.

12   Q.  Do you recall receiving a phone call from Jason McGuire?

13   A.  I do.

14   Q.  What did he tell you?

15        MR. FAGG:  Objection, Your Honor, hearsay.

16        THE COURT:  Overruled.

17   A.  After the negotiations with KFC, I don't recall the exact

18   date, but Jason McGuire called me and told me that he and Bill

19   were messing with Roger, that --

20        MR. FAGG:  Objection, Your Honor.  Can we be heard on

21   side bar, please?

22        THE COURT:  Yes.

23      (At the bench:)

24        THE COURT:  Mr. Fagg, go ahead.

25        MR. FAGG:  Sure, Your Honor.  We object to this line

Robert Bryant - Voir Dire

1    of questioning.  It's soliciting hearsay from this witness.

2    Ms. Call is asking him about a conversation that he is

3    conveying to the -- supposedly between Bill Lovette and

4    Mr. McGuire or, I am sorry, between -- there is two

5    conversations that they are seeking to elicit.  One is the

6    conversation apparently between Mr. Lovette and Mr. McGuire and

7    then another one between somebody and Mr. Lovette and

8    Mr. McGuire or one of the other and Mr. Austin and it's

9    hearsay.

10          THE COURT:  Well, McGuire is an identified

11   co-conspirator in the *James* order, so it falls within a hearsay

12   exception.

13          MR. TUBACH:  Your Honor, doesn't that depend on what

14   the nature of the communication is?  And that wasn't disclosed

15   as part of the *James* hearing.  It's no different than a

16   document that hasn't been disclosed.

17          THE COURT:  I am not sure.

18          Ms. Call, response?

19          MS. CALL:  Well, it's certainly disclosed at least

20   during the last trial.  And the defendants elicited this

21   testimony from Mr. Bryant on cross-examination.  But outside of

22   these statements qualifying as 801(d)(2)(E), they are further

23   being elicited for the effect on the listener.  I am happy to

24   lay grounds for that in advance, but I believe the statements

25   are still admissible.

 1          MR. FAGG:  Your Honor, from Mr. Bryant's last trial on

 2   cross-examination, I did not ask him a single question.

 3          THE COURT:  Well, it wouldn't matter if you did since

 4   that was a different trial.

 5          Ms. Call, so as to the statement, is this a statement

 6   that was on the James log?

 7          MS. CALL:  No, Your Honor.  This was elicited on

 8   cross-examination I believe from counsel for Defendant Penn

 9   when shown Defense Exhibit I -- believe it's 852.  Mr. Bryant

10   described his understanding that he received -- after receiving

11   that particular e-mail, he understood his -- he testified to

12   his understanding of what was actually meant in it based on his

13   conversation with Jason McGuire.

14          And when I say it's offered for the effect on the

15   listener, it's because Mr. Bryant will testify upon reading

16   this e-mail he was concerned about a plant conversion.

17   However, he received this call from Jason McGuire telling him

18   that it wasn't a real threat and it wasn't actually going to

19   happen.  So that's the effect, that it alleviated his concerns.

20          MR. TUBACH:  That's certainly not testimony that I

21   would have elicited.  Perhaps it's testimony that he

22   volunteered in response to my questioning about another matter,

23   but I certainly never elicited any communications between Bill

24   Lovette and Jason McGuire which was then supposedly relayed by

25   Mr. McGuire.

Robert Bryant - Voir Dire

1          MS. HENRY:  I don't know how that would be in

2    furtherance of the conspiracy, to be messing with Roger Austin.

3          THE COURT:  I am not sure the government is offering

4    it in furtherance of the conspiracy.  It sounds like it's just

5    being offered for effect on the listener.  Is that the only

6    hearsay exception or is that what you are offering it for?

7          MS. CALL:  Yes, Your Honor.  I do believe both

8    actually apply, but we are offering it for effect on the

9    listener.

10          THE COURT:  Okay.  And what does he do in response to

11    this again?

12          MS. CALL:  It alleviated his concerns about the plant

13    conversion.  And then there is other relevance to the effect on

14    the listener, the actual e-mail which we may get to shortly.

15          THE COURT:  I am going to sustain the objection as to

16    this particular statement.  I haven't heard of any effect on

17    the listener.  Maybe it will come in through some other

18    document, but I don't -- I haven't seen the effect on the

19    listener.  And because this wasn't part of the *James* log, it

20    doesn't come in through a ruling of mine.  And it doesn't sound

21    like it's part of the conspiracy either, so I don't hear a

22    hearsay exception so far, so the objections will be sustained.

23          MR. FAGG:  Your Honor, I would ask that the beginning

24    of the witness' testimony be stricken from the record and the

25    objection be sustained.

Robert Bryant - Voir Dire

1        THE COURT:  I am going to refuse that request.  Thank

2   you.

3        (In open court:)

4        MS. CALL:  A brief moment to confer, Your Honor?

5        THE COURT:  You may.

6        MS. CALL:  Thank you, Your Honor.

7   BY MS. CALL:

8   Q.  All right, Mr. Bryant.  Now -- one moment.

9        Did Pilgrim's actually secure the price increases it

10  was seeking for KFC in 2014?

11  A.  Yes.

12  Q.  And who were Pilgrim's competitors for KFC that year?

13  A.  Tyson, Koch, Claxton, Mar-Jac.  I am drawing a blank.  I am

14  sorry.  George's, probably Perdue.  I am not sure.  There were

15  probably some others, but there was several.

16  Q.  All right.  Did you have an understanding as to whether

17  there was an agreement between Pilgrim's and its competitors in

18  2014 to raise prices?

19        MR. FELDBERG:  Objection, Your Honor, lack of

20  foundation, Rule 701, no basis for the witness based on the

21  testimony so far to answer the question.

22        MS. CALL:  It is a yes or no question.

23        THE COURT:  You can answer it yes or no.  Overruled.

24  A.  Can you ask again?  Sorry.

25  BY MS. CALL:

Robert Bryant - Voir Dire

1    *Q.* Did you have an understanding as to whether there was an

2    agreement between Pilgrim's and its competitors to raise prices

3    in 2014 for KFC?

4    *A.* Yes.

5    *Q.* And what was the basis for your understanding?

6    *A.* The phone calls I overheard, the ultimate price increase

7    and the e-mails and conversations between myself and Jason

8    McGuire.

9         *MR. LAVINE:* Your Honor, I am going to object and

10   request a side bar, please.

11        *THE COURT:* Sure.

12   (At the bench:)

13        *THE COURT:* Go ahead, Mr. Lavine.

14        *MR. LAVINE:* Thank you, Judge.

15        I am going to renew my objection I had before and for

16   these reasons now. We are -- all we are hearing is, based on

17   my understanding of conversations with others or e-mails. We

18   have no specificity. And when I had objected before on this,

19   government counsel said that they were going into the details.

20   And they have not gone into any details whatsoever except for

21   these two phone calls eight years ago that he walked into

22   somebody's office and heard something. There is no specificity

23   for the basis of his understanding whatsoever. We would like

24   some dates and times. We are talking '12 to '19 basically.

25   There is no basis for -- there is no basis for the foundation

Robert Bryant - Voir Dire

1    here, Your Honor.

2         THE COURT:  Ms. Call, are you going into more

3    specificity?

4         MS. CALL:  Your Honor, I believe we spent the last

5    hour going into this specificity regarding the basis for his

6    understanding that year.  But with respect to him providing the

7    basis at this moment, I am happy to inquire as to what

8    particular calls and e-mails he is referring to when he

9    describes that basis.

10        THE COURT:  All right.

11        MR. TUBACH:  Your Honor, then he is doing nothing more

12   than slapping a label on the testimony he has already given.

13        MR. LAVINE:  May I proceed, Your Honor?

14        THE COURT:  Yes.

15        MR. LAVINE:  Thank you.  Again, for the

16   understandings, as he has already said about four, five, six,

17   seven times, everything is based on my understanding of what I

18   heard and what my e-mails here.  We have no specificity

19   whatsoever.  And for counsel to come up with a couple phone

20   calls or something right now doesn't justify what has happened

21   already, Your Honor.  There is no basis for foundation.

22        THE COURT:  As I indicated, Ms. Call needs to, and she

23   indicated that she will, ask him about particular ones.  But I

24   do think that there is a general point that before he is

25   allowed to express a general understanding, he needs -- the

Robert Bryant - Voir Dire

1    foundation for the understanding needs to be laid out.  So to

2    the extent that this mode of interrogation is going to be

3    repeated as to, say, 2017, he needs to lay a foundation for it

4    before he expresses his general understanding, all right?

5              MS. CALL:  Yes, Your Honor.

6              MR. LAVINE:  Thank you, Your Honor.

7         (In open court:)

8    BY MS. CALL:

9    Q.  Mr. Bryant, I believe I just asked you about the basis for

10   your understanding as to whether there was an agreement between

11   Pilgrim's and its competitors.  And you referenced several

12   phone calls.  Could you describe what phone calls and

13   conversations you were referring to?

14   A.  Yes.  So one was a follow-up call with Mr. McGuire after

15   the e-mail that we reviewed where --

16             MR. FAGG:  Objection, Your Honor, what we discussed

17   earlier, and the objection was sustained.

18             THE COURT:  True.  Can you direct the witness more,

19   Ms. Call?

20             MS. CALL:  Yes.

21             For the witness and the parties, Mr. Bryant, could you

22   please look at -- and Ms. Pearce, could you please pull up

23   Exhibit D-925?  It's Tab 15 of your binder.

24   BY MS. CALL:

25   Q.  Mr. Bryant, when you were just referring to an e-mail that

Robert Bryant - Voir Dire

1    served as part of the basis for your understanding, was this

2    the e-mail that you were referring to?

3    A.  Actually, I was referring to the one that -- the first

4    indication I had was with the previous e-mail that we reviewed

5    where Mr. McGuire had shared the conversation -- the exchange

6    between himself and Roger Austin.

7            MR. TUBACH:  I am sorry.  Sorry for interrupting.  The

8    question is whether this e-mail is what he was referring to and

9    he hasn't answered that.  I believe the answer was no, but then

10   he went on.

11           MS. CALL:  I can ask a new question.

12           THE COURT:  Go ahead.

13   BY MS. CALL:

14   Q.  Mr. Bryant, what e-mail were you referring to?

15   A.  On the question basis -- there was two different -- we have

16   covered two different topics.  I am sorry, I am not trying to

17   confuse the Court or anyone else.  So there was two different

18   e-mails.  The first one was the one that we have already

19   reviewed was the first basis for my understanding of

20   cooperation on the pricing in 2014.  And the second was -- and

21   there was a follow-up phone call about that e-mail with

22   Mr. McGuire.

23           THE COURT:  Hold on, Mr. Bryant.

24           MS. LaBRANCHE:  Non-responsive.  Move to strike.

25           THE COURT:  Ms. Call, once again, you need to direct

Robert Bryant - Voir Dire

1    the witness.

2            *MS. CALL:*  Yes.

3    *BY MS. CALL:*

4    *Q.*  You referred to an e-mail we reviewed earlier.  Is that

5    e-mail Government Exhibit 1066 we reviewed earlier in Tab 3 of

6    your binder?

7    *A.*  That's correct.

8    *Q.*  All right.  Now, you described a follow-up conversation to

9    that e-mail; is that correct?

10   *A.*  That's correct.

11   *Q.*  What was the follow-up conversation to that e-mail?

12   *A.*  It was -- the conversation was between myself and Jason

13   McGuire and him reassuring me that our competitors are going

14   along with the price increases.

15   *Q.*  All right.  And then you are referring to several items, I

16   think you said a phone call, an e-mail.  Was there anything

17   else that provided the basis of your understanding as to

18   whether there was an agreement between competitors?

19   *A.*  Yes.

20   *Q.*  What else?

21   *A.*  There was a second phone call later with Mr. McGuire.

22           *THE COURT:*  Ms. Call, once again, you need to be more

23   specific.

24           *MS. CALL:*  Yes, Your Honor.

25   *BY MS. CALL:*

2087

Robert Bryant - Voir Dire

1   Q.  Were there any phone calls that you overheard of Defendant

2   Austin's that served as the basis of your understanding?

3   A.  Yes.

4   Q.  And are those the ones you described earlier?

5   A.  That's correct.

6   Q.  And now putting aside the phone call with Jason McGuire

7   that you were trying to talk about, is there anything else that

8   serves as the basis of your understanding as to whether there

9   was an agreement between competitors?

10  A.  There was a basis for the conversations, yes, between

11  competitors, yes.

12  Q.  What do you mean by that?

13  A.  An additional phone call between myself and Jason McGuire.

14  Q.  And did this relate to any particular e-mail or not?

15  A.  It did.

16          MR. FAGG:  Objection, Your Honor.

17          THE COURT:  Let's have a side bar.

18      (At the bench:)

19          THE COURT:  So Ms. Call, you need to somehow identify

20  through some, you know, term like, "except for that phone call

21  with Mr. McGuire, the second one," or something like that, and

22  then tell him that you don't want him to talk about that so he

23  doesn't keep mentioning it, "putting that aside" or, you know,

24  I don't know, some other way you need to do it so he doesn't

25  keep referring to that particular phone call.

Robert Bryant - Voir Dire

1        MS. CALL:  Yes, Your Honor.  I believe I did do that.

2   I said putting aside the call with Jason McGuire.

3        THE COURT:  Every question you ask him has got to be

4   prefaced or something because he keeps circling back to that.

5   And you need to, you know, ask him a question that somehow, you

6   know, say, you know, "In terms of your understanding, other

7   than that phone call," or something of that nature so he

8   doesn't keep referring to that call.

9        MS. CALL:  Yes, Your Honor.  I think he actually was

10   referring to a different phone call, but I will inquire of a

11   specific way to confirm that.

12        THE COURT:  Okay.  Mr. Fagg, anything else?

13        MR. FAGG:  No, Your Honor.  I just feel like this is

14   trying to back-door in around the hearsay.  And the other

15   problem is that we have to continue objecting because I believe

16   this witness is trying to talk about the phone call that the

17   Court has excluded, and so I would just ask that the questions

18   be extremely precise.

19        THE COURT:  Well, we shall see.  Hopefully, we will

20   wall it off so that he understands he is not to talk about

21   that.  All right.  Thank you.

22      (In open court:)

23   BY MS. CALL:

24   Q.  Mr. Bryant, if you could look at, just so we know what I am

25   referring to, D-925 in Tab 15 of your binder.  The phone call

Robert Bryant - Voir Dire

1    you are about to talk about that served as a basis of your

2    understanding, was it a phone call in relation to this e-mail

3    or a different phone call?

4    A.   It was in relation to this e-mail.

5    Q.   All right.  I will not ask you about that phone call.  All

6    right.  So based on the calls and e-mails you just described,

7    did you have an understanding as to whether there was an

8    agreement between competitors about raising prices in 2014?

9            MS. HENRY:  Objection, asked and answered.

10           MS. CALL:  Your Honor, I believe there was an

11   objection.

12           THE COURT:  I could barely hear that.  Ms. Henry, did

13   you say asked and answered?

14           MS. HENRY:  Yes.

15           THE COURT:  Overruled.

16   A.   Yes.

17   BY MS. CALL:

18   Q.   And what was your understanding?

19   A.   My understanding is that there was an agreement between the

20   competitors to increase prices in 2014.

21   Q.   Independently or together?

22           MS. PAGE:  Objection, vague as together.

23           THE COURT:  Sustained.

24   BY MS. CALL:

25   Q.   Who was the agreement between?

2090
Robert Bryant - Voir Dire

1    A.   The competitors.

2    Q.   Which competitors?

3    A.   Tyson, Koch, Claxton, George's, the various competitors

4    that we've talked about before.

5    Q.   Competitors for what business?

6    A.   KFC.

7    Q.   Now --

8         MR. POLLACK:  Your Honor, I apologize, but can we do

9    another side bar?

10        THE COURT:  Yes.

11      (At the bench:)

12        THE COURT:  Mr. Pollack, go ahead.

13        MR. POLLACK:  Your Honor, there has been no foundation

14   laid whatsoever for Mr. Bryant to opine that George's was part

15   of an agreement.  He has been testifying for several hours.  He

16   has not mentioned a single e-mail involving George's.  He

17   hasn't mentioned a single phone call involving George's, so I

18   object to him offering that as a conclusion and move to strike.

19        THE COURT:  Ms. Call, response?

20        MR. GILLEN:  Before she responds, may I also say he

21   put Tyson in his conclusion and yet he has provided no direct

22   concrete evidence of any overhears or anything else that would

23   put Tyson in the category that he presently is, so I would also

24   move to strike as it relates to Tyson.

25        MS. HENRY:  We would also move to strike on behalf of

Robert Bryant - Voir Dire

1    Mr. Kantola because we don't believe that anything that has

2    been put forward suggests that this opinion is rationally based

3    on any perception of the witness.

4            MR. FAGG:  Your Honor, may I raise one final point?

5            THE COURT:  Yes.

6            MR. FAGG:  That is that the companies are not on trial

7    here, so to the extent that there is an agreement, there is an

8    agreement between specific individuals and not an agreement

9    between companies, which this witness continues to gloss over.

10           MR. LAVINE:  Your Honor, I join in these objections on

11   behalf of Mr. Brady.

12           THE COURT:  Right.  I think we have a rule on one

13   objection serves for all.

14           Ms. Call?

15           MS. CALL:  Yes, Your Honor.  I believe this witness

16   has testified and laid foundation for his understanding of the

17   agreement.  He has testified to specific phone calls with

18   specific individuals from certain of these companies, including

19   Mr. Brady from Claxton -- or observing, sorry, a phone call

20   between Defendant Austin and Defendant Brady, as well as

21   observing a phone call between Defendant Austin and Defendant

22   Kantola.

23           As to the other companies, he has described

24   conversations and e-mails he received confirming the price

25   increases taken by competitors after Defendant Austin was

Robert Bryant - Voir Dire

 1   instructed to put the increase out to the industry.  And I

 2   believe this lays sufficient foundation for his understanding

 3   when he saw that the competitors who he had been concerned

 4   would not raise their prices along with Pilgrim's all followed

 5   along.  And it's his understanding that they all did so.

 6        MR. POLLACK:  Your Honor, the understanding is based

 7   on an e-mail that says that somebody talked to a couple of

 8   unidentified competitors, and based on that the customer was

 9   surprised and the graphic description of the reaction.  There

10   has been no identification of George's as being a company about

11   which Mr. Bryant had any information.

12        MS. HENRY:  Your Honor, I do need to disagree with my

13   colleague here.  The e-mail did not say, in fact, that there

14   had been any conversations with any competitors.  In fact, the

15   e-mail only refers to, Did you call and speak with people at

16   RSCS.  So I do need to correct the record on that.

17        THE COURT:  Okay.  Mr. Gillen?

18        MR. GILLEN:  Yes, Your Honor.  The point being that

19   the government has represented the basis for their testimony as

20   it relates to Tyson based upon e-mails or specific conversation

21   overhears which simply do not exist, and the representations

22   made by government counsel in that respect I believe are

23   inaccurate.

24        MR. LAVINE:  Your Honor, may I respond?

25        THE COURT:  Yes.

Robert Bryant - Voir Dire

1          MR. LAVINE:  Thank you, Your Honor.  In reference to

2    Mr. Brady, all he has got right now is -- his story has changed

3    now, which we will deal with on cross, Your Honor, but all he

4    said is he walked in.  He overheard Mr. Austin say something.

5    He has no way to assert -- to in any way infer there is an

6    agreement with Mr. Brady in regard to raising prices.  There is

7    nothing in the record to substantiate that type of a statement.

8          THE COURT:  Anything else, Ms. Call?

9          MS. CALL:  Yes, Your Honor.  Just very briefly, the

10   e-mail obviously used the term how much higher everyone else

11   was.  The witness has testified his understanding -- well, he

12   would have testified to his understanding that everyone meant

13   Pilgrim's competitors for KFC.  And I think the term "everyone"

14   clearly implies that from the e-mail that is in evidence.

15          Regarding Tyson, government counsel certainly didn't

16   make a representation about anything in questioning of the

17   witness, so I perhaps didn't follow what that issue was.  But

18   under lay witness testimony, a lay witness does not have to be

19   an expert and compile every possible piece of data imaginable

20   to come to an understanding as to an agreement.

21          In ECF-1118, the government, and that's -- I have been

22   referring to this several times today, that is the brief where

23   it's described lay opinion testimony, and as to a witness'

24   understanding is certainly proper under the Rules of Evidence.

25   And in antitrust cases specifically witnesses are permitted to

Robert Bryant - Voir Dire

1   testify as to their understandings of agreements.

2          This witness has been on the stand now for hours, half

3   of which has been regarding these price increases in 2014, the

4   conversations he learned of or overheard between competitors,

5   so I think he certainly has more than adequate foundation to

6   testify to his understanding as to an agreement.

7          MR. GILLEN:  As it relates to the representations

8   concerning Tyson, counsel seemed to have overlooked the

9   apparent contradiction between their two cooperators.  Whereas

10  this gentleman is saying that there was an understanding

11  concerning prices, Mr. Pepper had spent a couple days on the

12  stand saying he received no pricing information and gave no

13  pricing information out.  They gloss over that.

14         There is no -- the representation concerning what a

15  lay witness can testify to simply can't be based upon an

16  absolute guess or speculation or some sort of dream that he

17  had.  It has to be based on evidence, and that's not what we

18  have here.  There are no -- this witness has not testified to

19  any conversation overhears regarding Mr. Roberts, Mr. Mulrenin

20  or anyone, frankly, from Tyson.  And of course, there is no

21  indication that Pilgrim's had Tyson pricing nor does this

22  e-mail, 1066, reference Tyson.

23         So simply saying that a lay witness can get up and

24  give his opinion is in our view flawed and certainly under

25  403(1) cannot permit someone to get up and lay that kind of

Robert Bryant - Voir Dire

1    speculation about what he believes existed between entities

2    concerning -- without a factual personal foundation, so we

3    would object.

4         THE COURT:  All right.  Ms. Call, I will give you the

5    last word real quick.

6         MS. CALL:  Your Honor, nothing further said, just to

7    point out that the witnesses were consistent and they both

8    testified regarding sharing information or their knowledge of

9    information sharing regarding a substantial price increase this

10   summer.

11        THE COURT:  This was an issue that we kind of talked

12   about before in terms of the use of the word "understanding."

13   Understandings can quite properly be discussed by a lay witness

14   when that understanding is just based upon observations or

15   knowledge of facts.  Here we are crossing into the use of the

16   term "understanding" that does relate much more to an opinion

17   that he has formed, and the opinion that he has formed I think

18   is appropriate to examine the basis of.

19        When Mr. Bryant was asked how he formed this

20   understanding, he didn't mention anything about the fact that

21   there was a congruence of price increases or that they were

22   able to get a price and that led him -- sorry, that because

23   Pilgrim's got this price increase, that that then caused him to

24   infer that there must have been a more widespread agreement

25   that would include such companies as George's or Tyson's.  And

Robert Bryant - Voir Dire

1    therefore, I don't find that there is a basis for his

2    understanding.

3            His understanding seems to be based on -- I am not

4    sure what, but he didn't include that.  So I am going to

5    sustain the objection because this understanding of his is more

6    in the nature of an opinion based upon not facts that he's

7    observed, but rather on somehow some type of conclusion that he

8    is drawing from things other than from his experience, so I am

9    going to sustain the objection.

10       MS. CALL:  Your Honor, very briefly, are defense

11   counsel going to continue to be permitted to ask the

12   government's witnesses whether they had knowledge of

13   price-fixing?  Because it does seem extremely prejudicial to

14   the government's case if the witnesses who participate in the

15   conspiracy cannot testify to their understandings of an

16   agreement, but witnesses without knowledge can be asked, And

17   you don't have any knowledge of price-fixing?  It seems

18   extremely one-sided.

19       THE COURT:  They are two different things.  That's

20   really not what we are talking about right now.  However, when

21   we are talking about the word "price-fixing," the fact that,

22   you know, asking someone if they are aware of anything going on

23   like a customer, that doesn't require any deep understanding of

24   what the term means, and if someone says, nope, that's of a

25   different caliber, than if you ask a witness like Mr. Bryant

Robert Bryant - Voir Dire

1    whether he believes that price-fixing existed.  I think that

2    those are two different things.  To know that it existed, you

3    would have to have a much deeper understanding of what the term

4    meant.  So in and of itself a question that the attorney

5    expects a one-word answer to, no, is of a different character.

6            MR. FELDBERG:  I am sorry, Your Honor.

7            THE COURT:  I am not sure who is talking.

8    Mr. Feldberg?

9            MR. FELDBERG:  Will the Court strike the testimony of

10   this witness about his understanding that there was an

11   agreement in light of the ruling the Court just made?

12           THE COURT:  Yeah, I am going to do that because it's

13   hanging out there, so I will do that.  Thank you.

14       (In open court:)

15           THE COURT:  Let me instruct the jury.  So ladies and

16   gentlemen, you heard testimony from Mr. Bryant where he

17   expressed an opinion that there was an agreement to raise

18   prices in 2014.  I am going to strike that particular testimony

19   and instruct you to disregard that.

20           Go ahead, Ms. Call.

21           MS. CALL:  Thank you, Your Honor.

22   BY MS. CALL:

23   Q.  The price increases Pilgrim's was seeking in 2014, did

24   Pilgrim's obtain those price increases?

25   A.  We did.

Robert Bryant - Voir Dire

1   Q.  Do you have an understanding as to whether any of Pilgrim's

2   competitors obtained similar price increases?

3   A.  Yes.

4   Q.  And what is the basis of that understanding?

5   A.  Conversations with our customers and information,

6   conversations with Roger Austin and, you know, you could see --

7   things like that.  Sorry, I fumbled that.

8   Q.  What is your understanding as to whether any of Pilgrim's

9   competitors -- and if you could be specific as to any

10  particular competitor -- what is your understanding as to

11  whether any of them obtained similar price increases?

12  A.  My understanding is that they did receive similar price

13  increases as Pilgrim's.

14  Q.  Are you aware of any competitor not receiving a similar

15  price increase?

16  A.  I am not aware of anyone in 2014 that did not.

17  Q.  For KFC?

18  A.  That's correct, yes.

19  Q.  All right.  Based on conversations you observed in your

20  personal knowledge, do you have an understanding as to whether

21  Defendant Austin and Defendant Kantola were part of an

22  agreement to raise prices together in 2014?

23          MR. FELDBERG:  Your Honor, same objection we just

24  discussed.

25          THE COURT:  Sustained.

Robert Bryant - Voir Dire

1        *MS. CALL:*  Moment to confer, Your Honor?

2        *THE COURT:*  You may.

3   *BY MS. CALL:*

4   Q.  All right.  And the contract that was negotiated in 2014

5   when Pilgrim's got those price increases, how long did it last?

6   A.  Three years.

7   Q.  What years?

8   A.  It began in January of 2015 through the end of

9   December 31st of 2017.

10  Q.  Now, so the contract went through 2017.  When did it come

11  up for renegotiation?

12  A.  I think KFC made their initial request in December of 2016,

13  and we started negotiations in January of 2017.

14  Q.  And what was your role in those negotiations?

15  A.  I was the director of sales for fresh food service at that

16  time.

17  Q.  What were your responsibilities at the time with respect to

18  those 2017 KFC negotiations?

19  A.  I would have been responsible -- I mean, I was responsible

20  for the business unit and the overall profitability, so I would

21  have been directly responsible for the outcome of those

22  negotiations.  Roger Austin was still the account owner, so to

23  speak, so he would have been involved as well.

24  Q.  All right.  So heading into those negotiations in 2017, did

25  you have an understanding as to what direction the prices or

Robert Bryant - Voir Dire

1   Pilgrim's prices would go for KFC?

2   A.  I do.

3   Q.  And what was the basis of your understanding?

4   A.  The current market conditions.  And there was a new entrant

5   into the small bird market, so there was more availability.  So

6   those current market conditions and prior bids that we had in

7   the fall of 2016 indicated that prices would decrease.

8   Q.  All right.  You said there was a new entrant.  Who was the

9   new entrant into the small bird market?

10  A.  OK Foods converted a plant into that segment in between the

11  2014 and 2017 negotiations.

12  Q.  Now, going into those 2017 negotiations with KFC, what was

13  the status of the relationship between Pilgrim's and RSCS?

14  A.  It was damaged.

15  Q.  Why?

16  A.  The relationship was hurt because of the price increases of

17  2014 and they were unhappy about that.  They felt like

18  Pilgrim's was the price leader in those negotiations and, you

19  know, cost them a lot of money.

20  Q.  What do you mean by price leader?

21  A.  We were the ones that -- by that I mean that KFC perceived

22  Pilgrim's as --

23          MS. HENRY:  Objection, Your Honor, lack of foundation

24  of what KFC perceived.

25          THE COURT:  Sustained.  If you can lay foundation.

Robert Bryant - Voir Dire

1    *BY MS. CALL:*

2    Q.   Do you have an understanding, Mr. Bryant, as to whether

3    Pilgrim's was the price leader following those 2014

4    negotiations?

5    A.   Yes.

6    Q.   And what is your basis of that understanding?

7    A.   Communications with Roger Austin and Jason McGuire from the

8    outcome of those negotiations and that we were the highest

9    priced.

10   Q.   Sorry.  The highest price among whom for what?

11   A.   Among our competitors to KFC.

12   Q.   Now, did there come a time when Pilgrim's was invited to

13   submit a bid for those 2017 negotiations?

14   A.   There was, yes.

15   Q.   When was that bid due?

16   A.   It was the first week of February when the bid was due

17   back.

18   Q.   February of what year?

19   A.   2017.

20   Q.   Did you have an understanding as to what other suppliers

21   would be bidding for KFC that year?

22   A.   I did.

23   Q.   And what was your understanding?

24   A.   My understanding --

25          *MR. FELDBERG:*  Your Honor, could we have a foundation?

Robert Bryant - Voir Dire

1          THE COURT:  Overruled.

2     A.   The understanding of what their prices would be?

3     BY MS. CALL:

4     Q.   Just what -- who would be bidding.

5     A.   Oh, yes, the normal competitors, so that had been -- the

6     normal suppliers to KFC, so Tyson, Koch, Claxton, Mar-Jac,

7     George's, so the normal participants in the bid.

8     Q.   When you say normal, was it typical for the same suppliers

9     to supply KFC year to year?

10    A.   That's correct.  And I did forget to mention since there

11    was a new entrant I didn't expect, OK Foods too participated in

12    the bid, and that meant that there would be a risk in volume.

13    Q.   What do you mean by that?

14    A.   Since OK Foods was a new entrant into the 2017 bid with

15    small birds, this was an opportunity for KFC to diversify their

16    portfolio.  So since we were the highest price and the

17    relationship was damaged, I felt that that was a risk

18    particularly to Pilgrim's.

19    Q.   A risk that Pilgrim's would lose volume to OK Foods?

20    A.   That's correct.

21    Q.   Now, you mentioned a pre-bid meeting for the 2014

22    negotiations.  Was there a pre-bid meeting in 2017?

23    A.   There was.

24    Q.   What kinds of things were typically discussed at those

25    meetings?

Robert Bryant - Voir Dire

1   A.  Each side's position on the upcoming bid.  For instance, in

2   2014 we made clear we expected a price increase.  And in 2017

3   RSCS made clear that they wanted a decrease.

4   Q.  All right.  I'll ask you about that in a moment.  But

5   first, did you do anything to prepare for the prebid meeting?

6   A.  I did.

7   Q.  Could you please take a look at Government's Exhibit 1882.

8        MS. CALL:  If we could show that for the parties and

9   the Court and the witness.  It's Tab 5 in your binder,

10  Mr. Bryant.

11  BY MS. CALL:

12  Q.  Do you recognize Exhibit 1882?

13  A.  I do.

14  Q.  What is it?

15  A.  It's an e-mail from myself to Roger Austin on January 17,

16  2017.

17  Q.  And does it relate to a particular negotiation?

18  A.  It does.

19  Q.  Which one?

20  A.  The KFC meeting in 2017.

21       MS. CALL:  Government moves to admit Exhibit 1882.

22       THE COURT:  I show it's been admitted already.

23       MS. CALL:  I apologize.  Permission to publish?  And I

24  believe there is a limiting instruction, Your Honor.

25       THE COURT:  Ladies and gentlemen, this particular

Robert Bryant - Voir Dire

1    exhibit, and we can go ahead and publish it, but you will see

2    that there is a statement about what a person who is identified

3    as Sara wants.  That portion of it describing what Sara wants

4    cannot be considered for the truth of those matters asserted,

5    but rather for the effect that they may have on the listener.

6         *MS. CALL:*  Ms. Pearce, if you could zoom in on the

7    bottom of the chain.

8    *BY MS. CALL:*

9    *Q.*  Mr. Bryant, who wrote this e-mail?

10   *A.*  I did.

11   *Q.*  And what were you trying to convey generally speaking in

12   this e-mail?

13   *A.*  Just the items that I felt like we needed to be prepared to

14   speak to in the meeting.

15   *Q.*  The meeting with KFC?

16   *A.*  That's correct.

17        *MS. CALL:*  Could we move up to the next e-mail.

18   Ms. Pearce, and perhaps just zoom in on the rest of the chain?

19   *BY MS. CALL:*

20   *Q.*  Mr. Bryant, I believe you refer to someone named Pete in

21   your e-mail.  Who are you referring to?

22   *A.*  Pete Suerken or Suerken.

23   *Q.*  And what day of the week was this e-mail, the second one

24   down in the chain?

25   *A.*  Tuesday.

Robert Bryant - Voir Dire

1   *Q.*   And who was it from?

2   *A.*   It was from Roger Austin.

3   *Q.*   Could you please read the last two sentences of the e-mail

4   aloud.

5   *A.*   Claxton meets with them in Thursday and I will get a blow

6   by blow Friday morning.   Koch meets with them in Friday.

7   *Q.*   All right.   You said this was on Tuesday, the 17th; is that

8   correct?

9   *A.*   That's correct.

10  *Q.*   So when would that Thursday be?

11  *A.*   The 19th.

12  *Q.*   And when was Pilgrim's meeting scheduled for?

13  *A.*   I believe it was the 27th.

14  *Q.*   Okay.   Now, could you explain your understanding of the

15  meeting with that first sentence starting with Claxton?

16  *A.*   Yes.   My understanding is that Claxton was going to meet

17  with KFC on Thursday, and then Roger Austin and Scott Brady

18  would have the conversation on Friday about the contents of

19  that meeting, and they would share that information with Roger

20  Austin.

21  *Q.*   Now, the e-mail uses the term "Claxton."   Why did you

22  understand it to mean Defendant Austin would speak to Defendant

23  Scott Brady?

24  *A.*   Scott Brady handled those QSR accounts for Claxton and, you

25  know, prior, you know, the conversation that I overheard in

Robert Bryant - Voir Dire

1    2014 and, you know, other references to Brady from Roger

2    Austin.

3    Q.   Okay.   Now, this is an e-mail between yourself and Roger

4    Austin, right?

5    A.   That's correct.

6    Q.   Why did you care about what would happen at the Claxton KFC

7    meeting?

8    A.   It would give us an indication of what KFC had told our

9    competitors and what their position was with our competitors

10   and if it differed from the position that they took with

11   Pilgrim's.   It may give us some insight into how these

12   negotiations would actually unfold.

13   Q.   Now, that second line, "Koch meets with them in Friday,"

14   what did you understand that to mean?

15   A.   Similar to the Claxton, so he was -- Roger Austin was

16   telling me that Koch, and I associate that to be Bill Kantola,

17   was meeting with them Friday, and that he would have a

18   follow-up with Bill Kantola and relay whatever information he

19   gained from that conversation.

20   Q.   Why do you associate Koch with Bill Kantola?

21   A.   Same reason as Scott Brady with Claxton.   I knew Bill

22   Kantola handled the QSR accounts and that those -- you know, in

23   conversations with Roger Austin, you know, when he relayed

24   information from Koch, it came -- generally speaking, it came

25   from Bill Kantola.

Robert Bryant - Voir Dire

1    *Q.*  Now, did you respond to Defendant Austin's e-mail?

2    *A.*  I did.

3    *Q.*  What did you say?

4    *A.*  I would like to know where we need to be No. 2 in price, if

5    you could find out.

6    *Q.*  Mr. Bryant, what did you mean when you said, "I would like

7    to know where we need to be to be No. 2 in price"?

8    *A.*  I was asking Roger to help me determine where our bid

9    submission to KFC needed to be to place us second highest in

10   price amongst our competitors.

11   *Q.*  When you said, "If you can find out," what were you

12   directing Defendant Austin to do?

13   *A.*  To see if he could find out from our competitors where

14   their pricing was going to be and help me determine where our

15   price needed to be before we submitted the bid.

16   *Q.*  Now, before I go on, I see Scott Tucker was copied on the

17   bottom e-mail, but not on your response.  Why was that?

18   *A.*  I was recently promoted to that sales director role.  You

19   know, I had seen how -- you know, the actions that took place

20   in 2014.  This was my first attempt to ask for those -- that

21   same type of information.  I was unsure of how to really go

22   about doing it.  And I didn't really feel comfortable with it,

23   didn't know if I should copy anyone else.

24        *MS. HENRY:*  Objection, Your Honor.  The question has

25   been asked and answered and the witness just seems to be going

Robert Bryant - Voir Dire

1   on and on.

2            THE COURT:  Overruled.

3   BY MS. CALL:

4   Q.  I believe you were interrupted, Mr. Bryant.  What were you

5   saying?

6   A.  I think I answered the question.

7   Q.  Just for the record, since there were two people talking at

8   once, did you say you weren't sure if you should copy anyone

9   else?

10  A.  Yes.

11           MR. LAVINE:  Objection, Your Honor, asked and

12  answered.

13           THE COURT:  Overruled.

14  BY MS. CALL:

15  Q.  You asked to find out where you needed to be to be No. 2.

16  Why No. 2?

17  A.  As I stated earlier, I knew the relationship with KFC was

18  damaged from the 2014 negotiations.  And I knew there was a new

19  entrant, so I knew we didn't need to be the highest price.

20  Being No. 2 in price would still maximize profitability without

21  sacrificing any more price than we had to to try to salvage the

22  relationship with KFC.

23  Q.  Is there a reason you then wrote, "If you can find out"?

24  A.  Yeah, you know, I was unsure if this was the right way to

25  go about asking -- asking for this information.  And I was

Robert Bryant - Voir Dire

1    trying to be polite about it, and, yeah, just like I said, I

2    was unsure.

3    Q.  And then when you say "this information," what information

4    were you asking for?

5    A.  The pricing guidance or the bid information from Roger

6    to -- so we could place our bid No. 2 in price.

7    Q.  And in terms of this point in time, had any bids been

8    submitted to KFC yet?

9    A.  Not that I'm aware of.

10        MS. HENRY:  Objection, Your Honor, lack of foundation.

11        THE COURT:  Overruled.

12   BY MS. CALL:

13   Q.  Had any bids been submitted to KFC yet?

14   A.  Not that I was aware of, no.

15   Q.  Had Pilgrim's submitted its bid?

16   A.  No.

17   Q.  All right.  Now, you said you believed Pilgrim's meeting

18   was January 27th; is that right?

19   A.  Yes.

20   Q.  Who else from Pilgrim's attended that meeting?

21   A.  Myself, Roger Austin, Scott Tucker, Justin Gay, Tim

22   Stiller.

23   Q.  Who from RSCS do you recall attending that meeting?

24   A.  Pete Suerken, Steve Campisano, Rich Eddington, I believe

25   Sara Fisher was there.  I am not sure if anyone else.

Robert Bryant - Voir Dire

1    *Q.*  What was Pete Suerken's role in these negotiations?

2    *A.*  He was like their lead buyer, for lack of a better word,

3    responsible for the overall program.

4    *Q.*  Now, you mentioned earlier that I think KFC made its

5    expectations clear at that meeting.  What did you learn from

6    KFC?

7    *A.*  Pete said that he was going to --

8            *MS. PAGE:*  Objection, hearsay.

9            *THE COURT:*  Sustained.

10   *BY MS. CALL:*

11   *Q.*  Did the statement by Mr. Suerken at this meeting have an

12   effect on Pilgrim's as to how it would price its bid?

13   *A.*  Yes.

14   *Q.*  And did it affect your expectation as to the direction that

15   Pilgrim's was being asked to go with respect to its pricing?

16   *A.*  Yes.

17   *Q.*  What did Mr. Suerken tell you at that meeting?

18           *MS. PAGE:*  Your Honor, I am going to object.  It still

19   is hearsay.  Mr. Bryant is saying it had an effect on

20   Pilgrim's, not Mr. Bryant, and this is not effect on the

21   listener.

22           *THE COURT:*  Objection is overruled.  He can -- the

23   statement, ladies and gentlemen, will be admitted not for the

24   truth of the matter asserted, but rather for the effect on the

25   listener.

2111

1    *BY MS. CALL:*

2    *Q.*  What did Mr. Suerken say?

3    *A.*  He said he was going to beat us down with a baseball bat or

4    hammer on price and take volume from us.

5    *Q.*  And when you say "us," who do you mean?

6    *A.*  By "us," he meant Pilgrim's.

7    *Q.*  Now, this meeting, this was after this e-mail we just

8    reviewed, right?

9    *A.*  That's correct.

10   *Q.*  At this meeting did you tell RSCS about your direction to

11   Roger Austin?

12   *A.*  No.

13   *Q.*  Did you tell RSCS about Mr. Austin's statements about

14   getting a blow-by-blow from Claxton?

15   *A.*  No.

16   *Q.*  And did you tell RSCS about Mr. Austin's statements about

17   Koch's meeting with RSCS?

18   *A.*  No.

19   *Q.*  Now, Exhibit 1882, did Roger Austin ever respond to that?

20   *A.*  Not that I recall.

21        *MS. CALL:*  Your Honor, seeing the time, this may be a

22   good breaking point.

23        *THE COURT:*  Yes, good.

24        Ladies and gentlemen, we will go ahead and break for

25   the day.  Let me mention one other thing to you, and that is

1    there has now been a General Order that applies to this

2    courthouse that does away with the mask requirement.  However,

3    not in this courtroom.  It gives the judges the discretion to

4    require a mask.  And I am going to require that masks be worn

5    in the courtroom and inside the jury suite.  That doesn't mean

6    you have to wear your mask once you get outside of the

7    courtroom, even other places within the courthouse, but this

8    goes back to what I was talking about in the first couple of

9    days of the trial.

10           The vaccines, and that's the basis on which the CDC

11   has made their most recent recommendation which the General

12   Order reflects, talks about how effective the vaccines are to

13   keep people from landing in the hospital.  And as we talked

14   about, they are very effective.  But we are not talking about

15   you landing in the hospital now.  We don't want you to get

16   sick.  We don't want anyone to get sick.  Because if someone

17   were to get sick and not even be able to come in for a day,

18   then the trial stops because we need all of you, you know, for

19   purposes of continuing.  So that's why I am adopting more

20   protective measures.

21           And if you look around here, we typically have between

22   90 and 115 people in the courtroom at any given time.  It's

23   fairly crowded, and therefore it's important that everyone wear

24   masks so that we have protections.  There could be a time, I

25   haven't decided yet, where we might except witnesses or some

1   witnesses, I haven't decided that yet, but other than that,

2   everyone else, including the jury, of course, is going to be

3   required to wear a mask, once again, because I want to make

4   sure that we are all healthy and in the event that someone

5   happened to be contagious, it doesn't spread among everyone,

6   all right?

7           I hope you have a good evening.  Keep the admonitions

8   in mind, 8:30 tomorrow.  The jury is excused.

9           (Jury excused.)

10          Thank you, Mr. Bryant.  You are excused for the day.

11          Everyone else can be seated.

12          So we are going to talk about some exhibits.  That's

13  one of our topics.  And because that one keeps getting bumped

14  back, why don't we take that up first so it doesn't get bumped

15  back.

16          Ms. Call, go ahead.

17          *MS. CALL:*  Thank you, Your Honor.  The first is

18  Government's Exhibit 247.

19          And Ms. Pearce, if you could please pull that up.

20          This is an e-mail between Defendant Little --

21          *MR. FAGG:*  May we just have about two minutes to

22  transition from Mr. Bryant to these exhibits?  This one is hard

23  to see.

24          *THE COURT:*  Yeah, it is hard to see.  It's faint.  So

25  go ahead and make sure you have a chance to look at it.

1           MR. FAGG:  Thank you.

2           THE COURT:  Okay.  Ms. Call, go ahead.

3           MS. CALL:  Yes, Your Honor.  This is being sought to

4   be admitted under 801(d)(2)(A), I believe only as to Defendant

5   Little.

6           THE COURT:  All right.  Response by Mr. Little or

7   first Mr. Little?

8           MR. CANTY:  No objection, Your Honor.

9           THE COURT:  All right.  Anyone else?

10          We should have a limiting instruction, Mr. Canty,

11  would you agree, that it only can be considered against

12  Mr. Little, and that the statements of Ms. Knust and I think

13  it's a Mr. Adams should only be admitted for the effect on the

14  listener and not for the truth or do you -- or do you care?

15          MR. CANTY:  I don't.

16          THE COURT:  Thank you, Mr. Canty.

17          Mr. Tubach?

18          MR. TUBACH:  If you will give the limiting instruction

19  with respect to the other defendants, thank you.

20          THE COURT:  Okay.  Anyone else?  Then Exhibit 247 will

21  be admitted pursuant to 801(d)(2)(A), and the limiting

22  instruction will indicate that it can be considered only

23  against Mr. Little and that the statements of Ms. Knust and

24  Mr. Adams may be considered only for the effect on the

25  listener, not for the truth of the matters asserted.

 1              Next one?

 2         MS. CALL:  Next is Government's Exhibit 1700.  This is

 3    an e-mail chain between Defendant Brady and Defendant Fries.

 4    And the government is seeking admission only against Defendant

 5    Brady.  I should note it was admitted in the previous trial.

 6         THE COURT:  You are saying it was admitted?

 7         MS. CALL:  Yes, Your Honor.

 8         THE COURT:  Anything from Mr. Brady or anyone else on

 9    this one?

10         MR. LAVINE:  No objection, Your Honor.

11         MR. TUBACH:  The Court again will be giving the

12    limiting instruction?

13         THE COURT:  Yeah, let's clarify that.  So Ms. Call,

14    you are moving the admission of this against -- as to Mister --

15    actually, it's an e-mail chain between Mr. Penn, Mr. Austin,

16    Mr. Lovette, right, and their statements of each of those?

17         MS. CALL:  1700 is just statements of Defendant Brady.

18    It's an e-mail with Mr. Fries, but it is only --

19         THE COURT:  No, we are going back to 1256.

20         MS. CALL:  I don't believe we have gotten there yet.

21         THE COURT:  We are talking about 1700 now?  Sorry, I

22    was out of order.  And you are -- we have got 1700-1 and that

23    omits the top e-mail, but now you are moving the admission of

24    1700 to bring in the top e-mail?

25         MS. CALL:  Correct, Your Honor.

 1              *THE COURT:*  And let's see.  Okay.  And you are moving

 2      the admission pursuant to what?

 3              *MS. CALL:*  801(d)(2)(A).

 4              *THE COURT:*  Okay.  Sorry, I was looking at the wrong

 5      exhibit.

 6              Mr. Lavine, did you say there is no objection?

 7              *MR. LAVINE:*  No objection, Your Honor.

 8              *THE COURT:*  But Mr. Tubach, you are requesting that

 9      there be a limiting instruction that the top e-mail is

10      admissible only against Mr. Brady.

11              *MR. TUBACH:*  Thank you, yes.

12              *THE COURT:*  Got it.  Anyone else?

13              Then 1700 will be admitted, but with a limiting

14      instruction that the top e-mail from Mr. Brady is admissible

15      only against Mr. Brady.

16              Okay, Ms. Call.  Go ahead.

17              *MS. CALL:*  The next is Government's Exhibit 1256,

18      which I think Your Honor was looking at.

19              And Ms. Pearce, if you could pull that up.

20              *THE COURT:*  Actually I was looking at 1258.

21              *MS. CALL:*  We can go there now if you would prefer.

22              *THE COURT:*  No, it's -- no, I was looking at 1256.

23      Sorry.  So 1256, go ahead.

24              *MS. CALL:*  That is an e-mail chain between Defendant

25      Penn, Austin and Lovette.  And the government is seeking to

1    admit it under 801(d)(2)(A) against all three of them.

2            THE COURT:  All right.  And comments on that?

3    Mr. Tubach, anything?

4            MR. TUBACH:  The only thing I would object is the top

5    e-mail has no real relevance at all.  And there is a

6    prejudicial reference to it being on a plane, which I think the

7    jury will understand to be a corporate jet, so I think we would

8    ask that that top one be redacted and not introduced.

9            THE COURT:  Okay.  Anyone else?

10           That objection will be overruled.  In the context of

11   this particular e-mail, just the fact that there is a plane,

12   they might understand that, but it doesn't seem to be in any

13   way prejudicial.  I will admit it subject to a limiting

14   instruction that indicates that the e-mail can only be used

15   against Mr. Penn, Mr. Austin and Mr. Lovette.

16           MS. CALL:  Next is government Exhibit 1713.  And I

17   believe the lowest e-mail in this chain has already been

18   admitted as Exhibit 1713-1 during the testimony of Mr. Ledford.

19   We are now seeking the e-mail chain just containing the next

20   one up where Defendant Austin says, "We can talk in the morning

21   after I do some scouting."  Exhibit 1713 then has the top

22   e-mail of the chain redacted which is based on the Court's

23   ruling in the prior trial.

24           MS. HENRY:  Your Honor, I believe it was admitted as

25   1713 with the redactions.  I just want to be certain that the

2118

1    record is clear whatever we are doing that we are not just

2    using the same numbers on two different exhibits.

3              THE COURT:  I am not sure.

4              MS. CALL:  Yes, Your Honor.  This is 1713 I believe as

5    it was admitted in the last trial as 1713.

6              THE COURT:  Can you blow up 1713-1 just so comparison

7    so we can answer Ms. Henry's question?  So yeah, Ms. Henry, can

8    you see that now?

9              Okay, Ms. Call.  So can we display now 1713.  Any

10   objections to the admission of 1713 which would be accompanied

11   by a limiting instruction that the statement of Mr. Austin at

12   the top of the e-mail can only be considered against

13   Mr. Austin.

14             Mr. Tubach?

15             MR. TUBACH:  No objection.  I just want to note -- I

16   want to make sure the government isn't going to argue that that

17   e-mail that Mr. Austin wrote went to anyone other than

18   Mr. Tucker and Mr. Gay because given that he probably sent it

19   from his iPhone, it doesn't say who he is sending it to, so the

20   e-mail itself doesn't tell us who it was.  We know who it was

21   because we know who responded.  I just wanted to make sure

22   there wasn't going to be any argument that anyone else was on

23   that e-mail because we have now redacted the remainder.

24             THE COURT:  When you say the e-mail, do you mean the

25   e-mail from Mr. Tucker?

2119

1          MR. TUBACH:  The e-mail from Mr. Austin doesn't say

2   who the recipients are.  So I just want to make sure we are not

3   through redaction somehow going to be arguing that anyone other

4   than Mr. Gay and Mr. Tucker would have gotten that e-mail.

5          MS. CALL:  I don't believe the government would given

6   that it's only being admitted against Defendant Austin.

7          THE COURT:  Okay.  Then 1713 will be admitted and will

8   be accompanied by a limiting instruction regarding that top

9   e-mail from Mr. Austin, namely that it can only be considered

10  against Mr. Austin.

11         Next?

12         MS. CALL:  Next is Government's Exhibit 1258.  And

13  this is being sought again under 801(d)(2)(A) against Defendant

14  Lovette.

15         THE COURT:  Is it just a one-page exhibit?

16         MS. CALL:  No, Your Honor.

17         Ms. Pearce, if you could pull up the second page side

18  by side with the first page?  There are e-mails by Chad Baker

19  and a David Blackmon from Pilgrim's in the chain that are not

20  being offered for the truth.

21         THE COURT:  So you would propose a limiting

22  instruction as to statements from them?

23         MS. CALL:  Yes, Your Honor.

24         THE COURT:  Response?

25         MR. FAGG:  No objection, Your Honor.

1          THE COURT:  Then I will admit Exhibit 1258 and provide

2    a limiting instruction as to two things.  It can only be

3    considered as against Mr. Lovette, and that the statements of

4    Mr. Blackmon and Mr. Baker should be considered not for the

5    truth of the matters asserted, but rather only for the effect

6    those statements may have on the listener.  Does that -- do you

7    have other ones?

8          MS. CALL:  One more, Your Honor, and it was in the

9    government's notice as 8098.  As I mentioned at the end of the

10   day yesterday, that has been excerpted to include only the one

11   message we intended to introduce which is contained in

12   Exhibit 9991, if Ms. Pearce, you could pull that up.  It's one

13   text message from Defendant Lovette offered against him.

14         THE COURT:  Any objection to the admission of 9991?

15   And I may have missed what you said.  Is it only against

16   Mr. Lovette?

17         MS. CALL:  Yes, Your Honor.

18         MR. FAGG:  No objection.

19         THE COURT:  Okay.  Then that will be admitted as 9991

20   only against Mr. Lovette.

21         MS. CALL:  That gets us through the list from the

22   government's notice.  I did want to inform the parties that at

23   some point before the government's case, there are at least two

24   more exhibits I believe we will be introducing without a

25   witness.  One is already subject to a stipulation regarding

1    803(6) foundation and that's Government's Exhibit 900.  And the

2    second has already been authenticated by a witness but not yet

3    offered, and that is Exhibit 7046.

4         THE COURT:  Okay.  Additional topics to raise?

5         Mr. Tubach at the ready.

6         MR. TUBACH:  Very briefly, Your Honor.  There was some

7    objections in the examinations today to lack of foundation when

8    a witness was -- a document was being introduced pursuant to a

9    stipulation that we have with the government under 803(6).  The

10   stipulation provides the document is admissible.

11        THE COURT:  Yeah, there was one example of that, but

12   it was cleared up.  I assume that that may have been a mistake,

13   Ms. Sweeney; is that right?

14        MS. SWEENEY:  Your Honor, I am happy to explain.  We

15   agree to the 803(6) foundation.  I believe I used the wrong

16   word.  The objection was just to relevance.  Counsel had not

17   shown that the witness had seen the document or it was

18   relevant.  And we specifically left open in our agreement

19   between the parties that we could object on relevance grounds,

20   so that was the ground.  The basic question, "Do you recognize

21   this document," had not been asked.  That was the basis of the

22   objection.

23        MR. TUBACH:  That's fine.  We just heard lack of

24   foundation several times, so we want to make the sure

25   stipulation is still valid.  We can introduce any document.

2122

1          THE COURT:  No, I interpreted it as maybe a mistake.

2    And if there is an independent foundation for it, the fact that

3    it may not be relevant to the witness wouldn't keep the

4    document from coming in.  It just may prevent the witness from

5    answering questions on it if the witness has never seen it

6    before or is unfamiliar with it, okay?

7          MS. SWEENEY:  Yes, Your Honor.

8          THE COURT:  Anything else that we should take up at

9    this time?

10         One thing I will remind people of.  On the whole

11   people have been very good about this, but there have been a

12   few phones that have been making noises.  So I can't attribute

13   any of those to the audience.  I think the audience has been

14   very good.  But do make sure that you try to silence your

15   phones because for those of you who may not have heard this

16   during the first trial, if the problem gets worse, I will

17   gradually increase the sanctions and it will end up in your

18   phone being confiscated until after 5:00 o'clock.  I am not

19   sure you could live with that, but in any event, people on the

20   whole have been very good.  There's just been a few instances

21   of it.

22         We will be in recess, then, until 8:30.  Thank you.

23      (Recess at 5:20 p.m.)

24

25

1                              INDEX

2     WITNESSES

3         Sara Fisher

4             Direct Examination Continued By Ms. Sweeney      1854

5             Cross-examination By Ms. Carwile                 1863

6             Cross-examination By Ms. Bracewell               1891

7             Cross-examination By Ms. Johnson                 1910

8             Cross-examination By Mr. Quinn                   1948

9             Cross-examination By Ms. Price                   1955

10            Cross-examination By Ms. Prewitt                 1955

11            Cross-examination By Mr. Tegtmeier               1965

12            Cross-examination By Ms. Henry                   1967

13        Robert Bryant

14            Direct Examination By Ms. Call                   1977

15                            EXHIBITS

16    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

17    1                        1974

18    2                        1974

19    3                        1974

20    7                        1974

21    I-054                    1870

22    C-207                    1859

23    247                      2114

24    C-264                    1969

25    C-265                    1969

| | | | INDEX (Continued) | | | |
|---|---|---|---|---|---|---|
| | | | EXHIBITS | | | |
| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
| C-465 | | 1855 | | | |
| G-474 | | 1859 | | | |
| F-747 | | 1859 | | | |
| F-754 | | 1905 | | | |
| F-756 | | 1902 | | | |
| F-764 | | 1914 | | | |
| F-765 | | 1915 | | | |
| F-774 | | 1924 | | | |
| F-783 | | 1859 | | | |
| F-789 | | 1859 | | | |
| F-796 | | 1859 | | | |
| F-852 | | 1855 | | | |
| F-853 | | 1855 | | | |
| F-868 | | 1900 | | | |
| F-915 | | 1897 | | | |
| F-916 | | 1898 | | | |
| B-963 | | 1859 | | | |
| I-979 | | 1946 | | | |
| 1055 | | 2057 | | | |
| 1256 | | 2117 | | | |
| 1258 | | 2120 | | | |
| 1700 | | 2116 | | | |

  
```
 1                          INDEX (Continued)

 2                              EXHIBITS

 3     Exhibit       Offered   Received  Refused  Reserved  Withdrawn

 4     1713                    2119

 5     1920                    1855

 6     1930                    1855

 7     9271                    2039

 8     9723                    2035

 9     9991                    2120

10

11                       REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct transcript from

13     the record of proceedings in the above-entitled matter.  Dated

14     at Denver, Colorado, this 24th day of May, 2022.

15

16                                   S/Janet M. Coppock

17

18

19

20

21

22

23

24

25
```