1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
2

 Criminal Action No. 20-CR-00152-PAB
3 In Re: Penn II
 UNITED STATES OF AMERICA,
4

   Plaintiff,
5

 vs.
6

 JAYSON JEFFREY PENN,
7 MIKELL REEVE FRIES,
 SCOTT JAMES BRADY,
8 ROGER BORN AUSTIN,
 TIMOTHY R. MULRENIN,
9 WILLIAM VINCENT KANTOLA,
 JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
 GARY BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12   Defendants

13 _____

       REPORTER'S TRANSCRIPT
14       Trial to Jury, Vol. 11

15 _____

16    Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:27 a.m., on the 10th day of March,

19 2022, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
  Produced via Computer by Janet M. Coppock, 901 19th Street,
25   Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4    Washington, DC 20530, appearing for Plaintiff.
 5          Anna Tryon Pletcher and Michael Tubach of
 6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7    San Francisco, CA 94111-3823;
 8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10          David Beller, Richard Kornfeld and Kelly Page of
11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12    CO 80202, appearing for Defendant Fries.
13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15          Laura Kuykendall and Megan Rahman of Troutman Pepper
16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17    appearing for Defendant Brady.
18          Michael Felberg of Reichman, Jorgensen, Lehman,
19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20    10017;
21
22
23
24
25
```

1          APPEARANCES (Continued)

2               Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5               Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7               Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1                    APPEARANCES (Continued)

 2            Craig Allen Gillen and Anthony Charles Lake of

 3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4    Atlanta, GA 30339;

 5            Richard L. Tegtmeier of Sherman & Howard, LLC,

 6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7    for Defendant Roberts.

 8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11            Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                       PROCEEDINGS

16        THE COURT:  We are back on the record in 20-CR-152.

17    The jury is not present.

18            Mr. Koenig had an issue.  Go ahead.

19        MR. KOENIG:  I just wanted to discuss the timing of

20    Mr. Brink's testimony.  We requested the length of cross and

21    didn't get a response.  So in order to be cautious to make sure

22    that he gets on and off the stand today, we have asked him to

23    arrive at the courthouse at 9:00.  I guess whenever is between

24    one of the crosses if we could put him on, that would be --

25            THE COURT:  Well, the question is, I mean, do we
```

1    really think that the cross-examination of Mr. Bryant is going

2    to go all day?

3              MR. KOENIG:  Well, I have no idea.  I mean, I asked.

4              MS. HENRY:  Your Honor, I -- quick canvas this

5    morning, the folks who I know who have just recently looked

6    through what they are doing, and we are -- I think we are

7    looking at maybe an hour.

8              THE COURT:  Okay.  Mask, Ms. Henry, too.

9              MR. KOENIG:  I guess the other thing is we would

10   prefer to call Mr. Lewis first before Mr. Brink, but again --

11             THE COURT:  Well, it sounds like if you are going to

12   have Mr. Brink here at 9:00, you should call Mr. Brink if he

13   has got the problem.

14             MR. KOENIG:  Okay, thank you.

15             THE COURT:  How are we doing jury-wise?  We are not

16   there yet, so we will be in recess until we've got the jury.

17   Thank you.

18        (Recess at 8:30 a.m. until 8:45 a.m.)

19             THE COURT:  Are we ready to bring the jury in?  Why

20   don't we get Mr. Bryant.  Mr. Pollack, if you want to get ready

21   for the last line there, you can.

22             MR. BYRNE:  Your Honor, Mr. Brian, not with a T, but

23   with an N, was just going to the restroom.

24             THE COURT:  All right.  We can wait for just a minute

25   then.

Robert Bryant - Cross

1          (Jury present.)

2          THE COURT:  Good morning, Ladies and Gentlemen.  As

3    you will recall, Mr. Pollack was continuing with his

4    cross-examination.

5          Mr. Pollack, go ahead.

6          MR. POLLACK:  Thank you, Your Honor.

7              **CROSS-EXAMINATION CONTINUED**

8    BY MR. POLLACK:

9    Q.  Mr. Bryant, we are almost done, but I would like to go back

10   to where we left off yesterday, and I believe we were down to

11   the last line of demonstrative J-0012.

12         MR. POLLACK:  So with the Court's permission, could we

13   publish that with everything except the last line?

14         THE COURT:  Any objection to that, Ms. Call?

15         MS. CALL:  No, Your Honor.

16         THE COURT:  You may do so.

17   BY MR. POLLACK:

18   Q.  The last supplier, Mr. Bryant, we have not spoken about is

19   George's.  Do you have George's 2017 contract in front of you?

20   It should be F-765.

21   A.  You said 765?

22   Q.  765.

23   A.  Okay, yes.

24   Q.  And what was George's price starting May 21st, 2017 for the

25   eight-piece COB?

Robert Bryant - Cross

1    *A.*  On here it's .9537.

2           *MR. POLLACK:*  With the Court's permission, may I

3    publish in its entirety J-012?

4           *THE COURT:*  Yes, you may.

5    *BY MR. POLLACK:*

6    *Q.*  Mr. Bryant, is it fair to say that each supplier for 2017

7    negotiated a different price with RSCS?

8    *A.*  You know, we went through those documents.  I have not seen

9    those documents before, so I guess my point is I am trusting

10   that they are accurate.  Like I said, I have not seen those

11   documents before.  I can't say that Pilgrim's price looks

12   accurate to me.

13   *Q.*  Okay.  And are each of the prices on J-012 different?

14   *A.*  Yes, if that was their actual --

15   *Q.*  Are each of the prices on J-012 different?

16   *A.*  Yes.  But what I was going to say is I wasn't involved in

17   all these negotiations or these contracts, and I haven't seen

18   these contracts before.

19   *Q.*  I appreciate that, Mr. Bryant, and you have said it several

20   times.

21   *A.*  In my normal course of business in reviewing a contract, I

22   normally would have taken a week or two, possibly months, to

23   review those contracts and know the details of those

24   contracts --

25   *Q.*  Mr. Bryant?

Robert Bryant - Cross

1   A.   -- before making -- before agreeing to --

2   Q.   Let me ask you another question, okay?  These prices are

3   different.  You've confirmed that.  I want to go back to where

4   we started.  You said you're not sure you've even met

5   Mr. Blake.

6   A.   Yes, I am not sure.

7   Q.   Fair to say you did not reach any understanding or

8   agreement with Ric Blake to align Pilgrim's bids with George's

9   bids?

10           MS. CALL:  Objection.

11           THE COURT:  Overruled.

12   A.   Like I said, I don't recall speaking to him.

13   BY MR. POLLACK:

14   Q.   And you didn't reach any understanding or agreement with

15   Ric Blake for George's and Pilgrim's not to compete with each

16   other for volume?

17   A.   Like I said, I have not spoken to him.

18           MR. POLLACK:  I don't have anything further,

19   Mr. Bryant.  Thank you.

20           THE COURT:  Thank you, Mr. Pollack.

21           Additional cross, Ms. Henry.

22                    **CROSS-EXAMINATION**

23   BY MS. HENRY:

24   Q.   Good morning, Mr. Bryant.  My name is Roxann Henry, and I

25   represent Mr. Bill Kantola.  Since you did not identify

Robert Bryant - Cross

1    Mr. Bill Kantola for the jury, he is the individual sitting

2    right over there.

3            Now, I have a number of different questions for you.

4    First of all, you testified on direct that you had engaged in

5    certain pricing conduct related to US Foods.  Remember that?

6    A.   That's correct.

7    Q.   And this conduct that you engaged in had absolutely nothing

8    to do with Mr. Kantola, did it?

9    A.   That's correct.

10   Q.   In fact, it didn't have to do with anyone in this courtroom

11   at all except you.

12   A.   That's correct.

13   Q.   And in the past, you've agreed when asked that restaurants,

14   purchasing agents, and distributors are all part of the poultry

15   supply industry?

16   A.   That's correct.  The term was used --

17   Q.   You have used that term.  That's the only question.

18           Now, before the government ever talked to you, you had

19   read the charges in this case, hadn't you?

20   A.   I don't know that I have read them in their entirety,

21   but --

22   Q.   But you were familiar with them?

23   A.   Yes, yes.

24   Q.   And from that, you had a good understanding of where the

25   government was going in terms of the cooperation from you.

Robert Bryant - Cross

1          MS. CALL:  Objection, foundation.

2          THE COURT:  Overruled.

3   A.  I am not sure what you mean by that.  My understanding was

4   that the government just wanted to -- wanted to find out what I

5   knew about -- about those things.

6   BY MS. HENRY:

7   Q.  You're saying you are not smart enough to have figured out

8   generally what type of testimony would help their case?

9          MS. CALL:  Objection, that's clearly improper.

10         THE COURT:  Overruled.  He can answer.

11  A.  My understanding was they just wanted me to tell the facts

12  that I knew regardless of --

13  BY MS. HENRY:

14  Q.  Right.  We understand, sir.

15         We have already heard a lot about the one and only

16  time you claim to have overheard a conversation between

17  Mr. Austin and Mr. Kantola, so I am not going to go over all of

18  it again.  But other than your purported recollection of

19  Mr. Austin's spontaneously announcing who was on the call, you

20  have no knowledge of who he was talking to.

21  A.  That's correct.

22  Q.  And you say you were wandering in and out, but you don't

23  remember anything but this one phrase, "I told him the price is

24  the price.  How many loads do you want," right?

25  A.  That's correct.

Robert Bryant - Cross

1    *Q.* You didn't hear Mr. Austin on that call say any actual

2    pricing.

3    *A.* Not that I recall, no.

4    *Q.* No specific numbers or ranges of numbers, just no numbers

5    at all.

6    *A.* That's correct.

7    *Q.* And you personally have never talked to Mr. Kantola about

8    prices.

9    *A.* No, I have not.

10   *Q.* In fact, you could count on your fingers every time you've

11   ever even seen Mr. Kantola; isn't that correct?

12   *A.* More than likely, yes.

13   *Q.* You didn't know what strategy Koch Foods had in 2014?

14   *A.* That's correct.

15   *Q.* You weren't there and don't know what Mr. Kantola heard

16   from RSCS or what he said to them.

17   *A.* Yeah, that's correct.

18   *Q.* Now, the story you've told here is that you lept to the

19   conclusion that suppliers had increased prices because

20   Mr. Austin said that he had gotten feedback indicating the

21   customer was surprised by how high the bids were and because

22   your boss told you that that should help you in negotiations.

23   But you're saying you didn't know how much the other suppliers

24   had actually increased prices to KFC in 2014, did you?

25            *MS. CALL:* Objection, compound question.

2380

Robert Bryant - Cross

1      THE COURT: Overruled. He can answer if he

2  understands it.

3  A.  My understanding was the increases they submitted were

4  similar to our own.

5  BY MS. HENRY:

6  Q.  Right. But you didn't know how much those actual prices

7  were, right?

8  A.  No, I did not know the exact price, that's correct.

9  Q.  Now, in a competitive world you said that if you go too

10  aggressively on your pricing, you would be exposed to actually

11  losing volume.

12  A.  Potentially, yes.

13  Q.  And conversely, if a customer is asking about more volume,

14  that can raise the question, does that mean we're too cheap

15  because the customer would try to buy all they could from the

16  cheaper-priced person?

17  A.  Correct, potentially, yes.

18  Q.  And your concern in 2014 that you felt reassured would not

19  happen was if we were the only ones that raised prices and our

20  competitors didn't, our customers could buy all they could find

21  from our competitors and then only buy from Pilgrim's what it

22  had to; isn't that correct?

23  A.  That's correct.

24  Q.  I would like to go to the government interviews for a

25  moment. Now, in the course of your 25 interviews with the

Robert Bryant - Cross

1    government to prep for your testimony, they didn't show you

2    that it was Mr. Kantola's company, Koch Foods, that was the

3    company that most dramatically undercut Pilgrim's in terms of

4    gaining volume in 2014 negotiations, did they?

5    A.   Not that I recall, no.

6    Q.   They didn't show you the actual bids?

7    A.   Say that again.

8    Q.   They didn't show you the actual bids.

9    A.   That's correct.

10   Q.   They didn't show you the actual results of the

11   negotiations.

12   A.   That's correct.

13   Q.   They didn't show you the contract information with actual

14   prices of the other suppliers.

15   A.   Not that I recall, no.

16   Q.   They didn't show you that Koch Foods was almost 5 cents

17   lower priced than Pilgrim's.

18   A.   Not that I recall, no.

19   Q.   So when you decided to identify the individual you claim

20   Mr. Austin talked to, you did not know that Koch had undercut

21   Pilgrim's on pricing.

22   A.   I wasn't aware of their pricing.

23   Q.   In fact, you had no knowledge or memory that George's and

24   Koch took volume from Pilgrim's because they offered a lower

25   price; isn't that correct?

Robert Bryant - Cross

1    *A.*  That's correct.

2    *Q.*  And the government, they never showed that to you.

3    *A.*  Not that I recall, no.

4    *Q.*  The government has never had you explain how your story

5    just doesn't fit with the facts that Koch undercut Pilgrim's,

6    have they?

7    *A.*  I don't recall having that discussion.

8    *Q.*  And it's fair to say that despite what the actual facts

9    are, the government has not told you you're wrong.

10         *MS. CALL:*  Objection, hearsay and ungrounded in fact,

11    the question set.

12         *THE COURT:*  Overruled.

13    *A.*  I don't know -- like I said, I am just relating my -- my

14    recollection.

15    *BY MS. HENRY:*

16    *Q.*  I am just asking --

17    *A.*  What I knew.  I am not here to -- right, to draw a

18    conclusion.

19    *Q.*  Let's go to 2017.

20         *MS. HENRY:*  Can we pull up and publish Government

21    Exhibit 1919?  Can we go to the page with the numbers on it?  I

22    think it's -- yes, that's the page.

23         Now, can we publish that to the jury, Your Honor?

24         *THE COURT:*  Yes, you may.

25    *BY MS. HENRY:*

2383
Robert Bryant - Cross

1    *Q.*  Now, you claimed repeatedly it was your understanding that

2    the numbers were the plan for bid submissions of the other

3    suppliers listed.  And I think we've all got that clear.  But

4    you're saying you told that to the government?

5    *A.*  I believe I did, yes.

6    *Q.*  And you discussed this exact document with the government

7    when you prepped with them for your testimony?

8    *A.*  I believe so, yes.

9        *MS. HENRY:*  Can we pull up and publish the document

10   that is the RSCS document that shows what period prices were in

11   February 2017?  And I am sorry, I forgot to write down the

12   exhibit number.  This is the one that was produced by RSCS.

13       *MR. FELDBERG:*  I-054.

14       *MS. CALL:*  Once again, objection to counsel describing

15   evidence the witness has never seen, showing how it was

16   produced, what it is, what it shows.

17       *THE COURT:*  Sustained.

18       *MS. HENRY:*  Can we pull up I-054?  Can we publish that

19   to the jury as well, sir?

20       *THE COURT:*  Let me just double-check that.

21       Yes, you may.

22       *MS. HENRY:*  Thank you.

23   *BY MS. HENRY:*

24   *Q.*  And the government never showed you this document either?

25   *A.*  Not that I recall, no.

2384

Robert Bryant - Cross

1    *Q.* And I just have to pull up --

2           *MS. HENRY:* And if we could publish C-465.

3           *THE COURT:* Ms. Henry, Ms. Call, I have indicated

4    before, if you want a side conversation, ask permission to do

5    so; otherwise, don't have one.

6           C-465 has been admitted, so it may be published.

7           *MS. HENRY:* Could we go to page 3 and highlight the

8    .9935?

9    *BY MS. HENRY:*

10   *Q.* Mr. Bryant, when you were talking with the government,

11   you're saying they never gave you that Koch's bid submission

12   number was .9935 and not 1.0125?

13   *A.* Not that I recall, no.

14   *Q.* And they didn't -- and if you can go back to the first page

15   of that exhibit, and they didn't show you that that number had

16   been submitted to RSCS well over a week before you wrote down

17   the numbers in your book?

18   *A.* No.

19   *Q.* Everyone here has already seen way too many numbers and

20   documents, but let's kind of go through this quickly.

21          You claim that you were never shown any of the other

22   documents either that would show, if you saw them, Koch Foods'

23   bid submissions and contract numbers and that they were never

24   the 1.0125 number that you had?

25   *A.* I don't recall seeing the information from Koch, no.

2385

Robert Bryant - Cross

1    Q.   In your 25 interviews with the government, you never had

2    occasion to explain how you were wrong when you claimed that

3    the numbers were bid submission numbers?

4    A.   I don't understand your question.

5    Q.   When you were with the government, you never explained to

6    them how you were wrong when you claimed that those numbers

7    were bid submission numbers.

8         MS. CALL:   Objection, misstates documentary evidence.

9         THE COURT:   Overruled.   He can answer.

10   A.   Once again, the information that I had when we submitted

11   the bid, it was my understanding that was bid submission

12   numbers, and that's how the information was used.

13   BY MS. HENRY:

14   Q.   But you knew nothing other than what you wrote down and did

15   not even know anything about where the competitors were in

16   their process; isn't that correct?

17   A.   That's correct.

18   Q.   And when you gave your understanding, belief, or guess that

19   Mr. Austin received those bid submission numbers from

20   competitors, the government signaled no distress about your

21   cooperation, did they?

22   A.   Not that I recall.

23   Q.   It would have been important to you if they had, wouldn't

24   it?

25   A.   I don't know that.

Robert Bryant - Cross

1    Q.  All right.  You're saying, though, the prosecutors didn't

2    ever tell you, Wait a minute, and instead just continued to

3    prep you for your testimony.

4    A.  That's correct.

5    Q.  And, in fact, what you were really asked was just your kind

6    of understanding or expectation, assumption or really a guess

7    of whether Mr. Austin ever shared that pricing with other

8    suppliers.

9    A.  It was my understanding, yes.

10   Q.  And you never claimed to have personally heard or seen the

11   actual price sharing that you were guessing about, right?

12   A.  That's correct.

13   Q.  You know separately here, you know that Mr. Austin knows

14   distributors and franchisees, right?

15   A.  That's correct, yes.

16   Q.  And you do know that Mr. Austin knows a bunch of the people

17   at RSCS, right?

18   A.  That's correct, yes.

19   Q.  He was close to a lot of the folks at RSCS.  It was why he

20   was in Louisville, right?

21   A.  That's correct.

22   Q.  And you have also testified to some knowledge of

23   Mr. Suerken's personality?

24   A.  Yes.

25   Q.  I believe you mentioned about a baseball bat or hammer.

Robert Bryant - Cross

 1    A.   Yeah, that's correct.

 2    Q.   You thought that was funny?

 3    A.   Not at the time.

 4    Q.   Yeah.  If Mr. Suerken was upset about prices he was

 5    getting, given what you said about Mr. Suerken, you would not

 6    be surprised that filtered down to a bunch of people at RSCS,

 7    would you?

 8    A.   I would have assumed that they had internal discussions,

 9    yes.

10    Q.   So not only did the prosecutors -- not only did you tell

11    the prosecutors that suppliers were free to make independent

12    decisions; you had no idea of the decision-making process at

13    Koch Foods; isn't that correct?

14    A.   That's correct.

15    Q.   And Koch Foods undercutting Pilgrim's, that independent

16    decision is not something you remember happening or -- and it's

17    not what you expected.

18    A.   I don't -- I don't recall that.

19    Q.   Right.  And you say the government never showed you what

20    actually happened.

21    A.   No, not that I remember, no.

22         MS. HENRY:  I have no further questions.  Thank you.

23         THE COURT:  Thank you, Ms. Henry.

24         Additional cross?

25         Mr. Fagg.

Robert Bryant - Cross

1          MR. FAGG:  Thank you, Your Honor.  May I approach

2     through Ms. Grimm?

3          THE COURT:  Yes.

4                    **CROSS-EXAMINATION**

5     BY MR. FAGG:

6     Q.  Good morning, Mr. Bryant.

7     A.  Good morning.

8     Q.  My name is John Fagg, and I represent Bill Lovette.  I just

9     have a few questions for you this morning.  Hopefully this will

10    be fairly straightforward.

11         Mr. Lovette retired from Pilgrim's Pride in 2019,

12    correct?

13    A.  I believe that's correct, yes.

14    Q.  And when he worked at Pilgrim's Pride, you never reported

15    to him, correct?

16    A.  That's correct.

17    Q.  And, in fact, there were several people, several layers

18    between you and Mr. Lovette at all times?

19    A.  That's correct, at least two.

20    Q.  And you testified the other day that Mr. Penn was one of

21    the people who reported to Mr. Lovette, correct?

22    A.  That's correct.

23    Q.  And in your direct testimony with the government, they

24    showed you an organizational chart that the Department of

25    Justice created for purposes of your testimony at this trial,

Robert Bryant - Cross

1   right?

2   A.   That's correct.

3   Q.   And that chart did not show any other reports that

4   Mr. Lovette had, did it?

5   A.   That's correct.  And he did have a lot of reports that

6   weren't on that demonstrative.

7   Q.   He had --

8   A.   I don't know how many, but I know he had --

9   Q.   More than 10?

10  A.   I would assume so, yes.  His staff was larger than that

11  that I recall.

12  Q.   Thank you.

13          So if we're just focusing on the year 2014, which is

14  the year of that chart that the Department of Justice created

15  for you, there were groups like the finance department that

16  reported to him, correct?

17  A.   Yeah, I mean, he was the CEO, so, yes, he had all --

18  everybody, yes.

19  Q.   Thank you.

20          So HR?

21  A.   That's correct.

22  Q.   He would have had logistics?

23  A.   That's correct, quality.

24  Q.   Operations?

25  A.   Operations.

Robert Bryant - Cross

1    Q.   Quality control?

2    A.   Our grain buying.

3    Q.   Let me just ask you the questions, okay, sir?

4         Commodity risk management?

5    A.   That's correct.

6    Q.   International operations like Mexico.

7    A.   Yes.

8    Q.   Okay.  And so none of those groups -- none of those

9    individuals even were listed on the chart that the Department

10   of Justice used for your testimony, correct?

11   A.   That's correct.

12   Q.   And so if you wanted to understand what Mr. Lovette's role

13   was and who his -- what he was responsible for from a reporting

14   standpoint, that chart was incomplete, wasn't it?

15   A.   Yes.  His scope was a lot larger than what was displayed on

16   that chart.

17   Q.   And so let's switch gears, sir.  This US Foods thing that

18   you talked about with Mr. Stiller, that didn't have anything to

19   do with Mr. Lovette, correct?

20   A.   That's correct.

21   Q.   And the e-mail exchange that you testified about where you

22   were responding to Mr. Stiller related only to US Foods,

23   correct?

24   A.   That's correct.

25   Q.   It just so happened that you were responding to an e-mail

Robert Bryant - Cross

1   about Sysco, but it had nothing to do with Sysco, correct?

2   A.  That part of that e-mail, that's correct, yes.  There was

3   two.  There was one where --

4   Q.  I understand, sir.  As it related to your agreement with

5   US Foods, the work that you were doing with Mr. Stiller, that

6   was just related to US Foods, correct?

7   A.  That's correct.

8   Q.  And you testified about these phone calls that you

9   overheard when you were in Mr. Austin's office, right?

10  A.  Yes.

11  Q.  And you never told Mr. Lovette about those phone call --

12  those discussions, correct?

13  A.  That's correct.

14  Q.  And you have no personal knowledge that anyone ever told

15  Mr. Lovette about those conversations, correct?

16  A.  That's correct.

17  Q.  And you testified about these meetings in Atlanta that were

18  at SMS or Church's or Popeye's, wherever.  You never told

19  Mr. Lovette about those, that discussion, correct?

20  A.  That's correct.

21  Q.  And you have no personal knowledge that anybody ever told

22  Mr. Lovette about that, correct?

23  A.  That's correct.

24  Q.  And you never heard Mr. Lovette give an instruction to

25  anyone to coordinate with a competitor regarding a bid or a

Robert Bryant - Cross

1    price, correct?

2    A.  That's correct.

3    Q.  And you have no personal knowledge that Mr. Lovette ever

4    told anyone to coordinate with another supplier about a bid or

5    a price, correct?

6    A.  That's correct.

7    Q.  And you have no personal knowledge that Mr. Lovette ever

8    agreed with any competitor to raise a price, correct?

9    A.  That's correct.

10   Q.  And you have no personal knowledge that Mr. Lovette ever

11   agreed with any competitor to prevent a decrease in a price,

12   correct?

13   A.  That's correct.

14   Q.  And you have no personal knowledge that Mr. Lovette ever

15   agreed with any competitor to rig a bid, correct?

16   A.  That's correct.

17          MR. FAGG:  Thank you, sir.  That's all I have.

18          Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Fagg.

20          Mr. Canty?

21                        CROSS-EXAMINATION

22   BY MR. CANTY:

23   Q.  Good morning, Mr. Bryant.

24   A.  Good morning.

25   Q.  My name is Dennis Canty.  I represent Jimmie Little.  Just

Robert Bryant - Cross

1    have a few questions for you this morning.

2            Recall just generally that you were asked about

3    conduct in 2014 which you described as collaborating with

4    competitors.  Do you remember that?

5    A.  I do.

6    Q.  And do you recall that Ms. Call asked you, What is your

7    basis for saying that Mr. Little participated in the conduct

8    that you described?  Do you remember that?

9    A.  I do.

10   Q.  And you said, Phone conversations with Mr. Little where he

11   had relayed information after talking to a competitor.  Do you

12   remember that?

13   A.  Yes.

14   Q.  Okay.  Now, isn't it true that the only people that you say

15   Mr. Little relayed information from were a person at

16   Holmes Foods and a person at Tyson Foods?

17   A.  There may have been someone at George's, but to be clear,

18   my recollection of all that is not the best.

19   Q.  We have heard a lot about the testimony you gave in a prior

20   proceeding this past November, right?

21   A.  Yes.

22   Q.  You sat in that chair?

23   A.  Yes.

24   Q.  And Judge Brimmer was here.

25   A.  Correct.

Robert Bryant - Cross

1    Q.   And Mr. Koenig asked you questions?

2    A.   Correct.

3    Q.   And I asked you questions?

4    A.   Correct.

5    Q.   And you swore to tell the truth?

6    A.   Correct.

7    Q.   The whole truth.

8    A.   Correct.

9    Q.   And you knew it was important to tell the whole truth.

10   A.   Correct.

11   Q.   To be complete in your testimony.

12   A.   Correct.

13   Q.   And make sure you didn't leave anything out that was

14   important.

15   A.   To the best of my ability, yes.

16   Q.   And like you told Ms. Page yesterday morning, you were

17   doing your best, right?

18   A.   Correct.

19   Q.   I have a transcript too.  And the transcript on page 30

20   reads like this:

21            Question:  Now, you mentioned that Jimmie Little was

22   someone at Pilgrim's who engaged in this conduct that we are

23   talking about.

24            Answer:  Correct.

25            Question:  What's your basis for saying that?

Robert Bryant - Cross

1        Answer:  Phone conversations that we had where he

2   relayed information from conversations he had with -- I can't

3   remember their name, but a person at Holmes and a person at

4   Tyson Foods.

5        Was that testimony true when you gave it, sir?

6   *A.*   Yes.

7   *Q.*   Like you told Ms. Page yesterday, you were doing your best,

8   right?

9   *A.*   Correct.

10  *Q.*   You didn't even remember the names of the people Mr. Little

11  supposedly spoke with, true?

12  *A.*   That's correct, yes.

13  *Q.*   And you don't remember when those conversations took place.

14  *A.*   That's correct, yes.

15  *Q.*   You can't even remember the year these conversations

16  supposedly took place.

17  *A.*   That's correct, yes.

18  *Q.*   Turning specifically to Holmes, you believe Mr. Little had

19  a contact at Holmes.

20  *A.*   That's correct.

21  *Q.*   But you don't know who that contact was.

22  *A.*   I do not remember, no.

23  *Q.*   And you say that Mr. Little talked with you about a

24  customer that Pilgrim's and Holmes shared.

25  *A.*   That's correct, yes.

Robert Bryant - Cross

1    *Q.* But you don't remember what customer was supposedly

2    involved, do you?

3    *A.* I do not.

4    *Q.* Holmes is a small chicken processor in Texas?

5    *A.* That's correct.

6    *Q.* About 400 employees.  It processes about 700,000 broilers

7    per week.  Would that be fair?

8    *A.* I don't -- I don't know their scope.  I just know that it's

9    a small, small processor.

10   *Q.* How many employees does Pilgrim's have?

11   *A.* Now I think about 56,000 possibly.

12   *Q.* How many chickens does Pilgrim's process in a day?

13   *A.* In a day?  How about 28,000 -- 28 million a week roughly.

14   *Q.* Okay.  Can you name any national account to which

15   Holmes Foods is a competitor with Pilgrim's?

16   *A.* Not off the top of my head, no.

17   *Q.* Mr. Little retired in 2016, right?

18   *A.* I am not sure of the date.  That sounds about right.

19   *Q.* Do you recall that Mr. Little's last day at Pilgrim's was

20   September 30, 2016?

21   *A.* I don't.

22       *MR. CANTY:*  Can we pull up H-322 for identification?

23   *BY MR. CANTY:*

24   *Q.* Mr. Bryant, can you identify that for us?

25   *A.* It's an e-mail from Roger Austin on September 22nd, 2016 to

Robert Bryant - Cross

1  a group of people, and I am included.

2  Q.  Does it refresh your recollection that Mr. Little's last

3  day was September 30, 2016?

4  A.  Yes.  I didn't recall the date, but, yes, I believe this is

5  accurate.

6  Q.  Thank you, sir.

7       You don't have any recollection of Mr. Little doing

8  any work with Pilgrim's following September 30, 2016, do you?

9  A.  Not that I am aware of, no.

10  Q.  Certainly he didn't participate in any of the KFC

11  negotiations in 2017, right?

12  A.  That's correct.

13       MR. CANTY:  That's all I have.  Thank you, Mr. Bryant.

14       THE COURT:  Thank you, Mr. Canty.

15       Ms. LaBranche.

16       MS. LaBRANCHE:  Thank you, Your Honor.

17                       **CROSS-EXAMINATION**

18  BY MS. LaBRANCHE:

19  Q.  Mr. Bryant, my name is Marci LaBranche, and I represent

20  Tim Mulrenin.

21       On direct examination, you identified certain chicken

22  suppliers who you allege engaged in conduct related to

23  cooperation with each other regarding prices and bids, correct?

24  A.  Correct.

25  Q.  And one of the companies you talked about was Tyson Foods.

Robert Bryant - Cross

1  A.  Correct.

2  Q.  And that is where Mr. Mulrenin worked in 2014?

3  A.  I am not aware.

4  Q.  Do you know if Mr. Roberts worked there in 2014?

5  A.  I am not aware.

6  Q.  Because you haven't testified about Mr. Mulrenin or

7  Mr. Roberts at all in the past three days.

8  A.  That's correct.  I don't know that I have ever met those

9  two individuals.

10  Q.  Never had any communication with them at all.

11  A.  That's correct.

12  Q.  The only person that you did talk about as it related to

13  Tyson was someone named Carl Pepper, correct?

14  A.  That's correct.

15  Q.  And just to be clear, you yourself never spoke to

16  Carl Pepper directly, correct?

17  A.  Not in the context that we've been discussing.  I believe

18  he may have been at some of the social events that we talked

19  about.

20  Q.  But you never got any of this information that you have

21  been talking about from him yourself?

22  A.  That's correct.

23  Q.  And when you testified earlier about overhearing certain

24  conversations that Mr. Austin had with other chicken suppliers,

25  that was not about Mr. Pepper, correct?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Mr. Bryant, you were asked yesterday about six meetings

3    that you had with the government between the proceeding in

4    November and your testimony here this week.  Do you remember

5    that?

6    A.   Yes.

7    Q.   And you testified that during those six meetings you

8    practiced your trial testimony with the government.

9    A.   Correct.

10   Q.   And specifically, you said you practiced your direct

11   examination?

12   A.   Correct.

13   Q.   You also practiced cross-examination.

14   A.   Correct.

15   Q.   Of those six meetings, some of them even took place after

16   this trial had started, right?

17   A.   I believe so, yes.  I am not sure the exact date the trial

18   started, yes.

19   Q.   Now, when you practiced your direct examination with the

20   government's lawyers, they asked you the exact same questions

21   that you testified with Ms. Call about the last few days.

22   A.   For the most part, yes.  I am not sure that they were all

23   exactly the same.

24   Q.   And then they pretended to be defense attorneys and asked

25   you some cross-examination questions?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   And then they all kind of critiqued what your answers were.

3    A.   I don't know that they really critiqued.  It was practiced,

4    yes.  It was for my benefit.

5    Q.   Well, they told you if some of your answers were

6    problematic, didn't they?

7    A.   I don't know.  I don't recall that exact word being used.

8    Q.   They told you how to react to certain questions that they

9    believed the defense attorneys were going to ask you?

10   A.   I don't know that it was like that, no.

11   Q.   And they told you how not to react to some of the questions

12   we were going to ask you also?

13   A.   I don't know that that came up.

14   Q.   Well, you practiced at least six times, correct?

15   A.   Correct.

16   Q.   And during this practice --

17            MS. CALL:  Vague, unclear whether she is talking about

18   cross-examination or direct at this point.

19            THE COURT:  Overruled.

20   BY MS. LaBRANCHE:

21   Q.   And during these six practice sessions that you had with

22   the government, sometimes they suggested that you use certain

23   words in your answers, right?

24   A.   I am not sure about that.

25   Q.   Well, let me ask you, when you testified on Tuesday, you

2401

Robert Bryant - Cross

1  used a phrase "substantial price increase."  Do you remember

2  that?

3  A.  I believe so, yes.

4  Q.  And you used that to describe the amount of the increase

5  that Pilgrim's included in its 2014 bid to KFC.

6  A.  Correct.

7  Q.  And so that's an example of language that the government

8  practiced you using during your meetings.

9  A.  I don't recall them giving me -- I mean, I know I have used

10 "historic" before.  You know, it's just the way to describe the

11 magnitude of the price increase.

12 Q.  Because you didn't know what the actual numbers were.

13 A.  No.  I mean, I knew the numbers were around 15 to 20 cents,

14 like I said, you know, but, once again, it was a large price

15 increase.

16 Q.  And so "substantial price increase" was a phrase that the

17 government encouraged you to use when you testified.

18 A.  I don't know that they encouraged for me to use that.  I

19 just did my best to describe the price increase.

20 Q.  And you used the phrase "substantial price increase" when

21 you practiced your testimony with the government, yes or no?

22 A.  I may have.  I don't recall.

23 Q.  Now, the reason that you spent so much time -- well, let me

24 ask you this.  Because of all the time that you spent

25 practicing your testimony with the government, it's been kind

Robert Bryant - Cross

1    of frustrating for you during this trial if you sometimes

2    haven't gotten an answer right; is that fair?

3    A.   I don't know that I haven't gotten an answer right.  I just

4    answered the questions the best that I can, you know, and you

5    change one word, and the answer may be different.  For

6    instance, yesterday when Mr. Penn's attorney asked --

7    Q.   Excuse me.  I would just ask you to stop and answer the

8    questions that I ask you.  I have a specific example I want to

9    ask you about.  You were upset during your testimony on Tuesday

10   when you fumbled one of your answers in response to a question

11   that Ms. Call asked you, yes or no?

12   A.   I don't know that I was upset.

13   Q.   Well, you recall that on Tuesday Ms. Call asked you about

14   the price increase that Pilgrim's was seeking in 2014?

15   A.   I am sure she asked me, but I don't recall that exchange.

16   Q.   You recall that she asked you whether -- that she asked you

17   what the basis of your understanding was as to whether

18   competitors obtained similar price increases?

19   A.   I am sure she did.  I just don't recall that exchange

20   precisely.

21   Q.   Sure.  Let me ask you this.  You started answering the

22   question, and then you kind of fumbled a little bit, and you

23   actually said, Sorry, I fumbled that.  Do you remember that?

24   A.   Yes.

25   Q.   Okay.

Robert Bryant - Cross

1    *A.*  I believe I said that because I was --

2    *Q.*  Is that a yes?

3    *A.*  I was stuttering and not making a complete sentence.

4    *Q.*  Mr. Bryant, please answer the questions I ask you.

5    *A.*  I was attempting to answer your question.  I apologize.

6    *Q.*  Here is a yes-or-no question.  When you said on Tuesday,

7    Sorry, I fumbled that, you were referring to fumbling the

8    answer to the question Ms. Call had asked you, yes or no?

9    *A.*  No.

10   *Q.*  No, that's not what you meant?

11   *A.*  That's correct.  I meant because I was stuttering and not

12   being very articulate in my response.

13   *Q.*  Now, Mr. Bryant, you testified that in each of the six

14   meetings where you met with the government to practice your

15   testimony your attorney was also there in the room with you,

16   correct?

17   *A.*  That's correct.

18   *Q.*  And he has actually been with you at all 25 of the meetings

19   that you have had with the government?

20   *A.*  That's correct.

21   *Q.*  So he was there when you practiced your direct examination

22   with the government?

23   *A.*  That's correct.

24   *Q.*  And he was there when you practiced cross-examination with

25   the government.

Robert Bryant - Cross

1    A.   Yes.  My attorney and I practiced cross-examination.

2    Q.   And your attorney is actually here with you in court today,

3    right?

4    A.   That's correct.

5    Q.   And, in fact, he has been in court every day that you have

6    testified.

7    A.   That's correct.

8    Q.   And at the end of each trial day, you talk to your

9    attorney, right?

10   A.   Yes.  We have --

11           MS. CALL:   Objection, relevance, and I think we are

12   going into a privileged area.

13           MS. LaBRANCHE:   That was my last question on that,

14   Your Honor.

15           THE COURT:   Overruled.

16   A.   Yes, we have conversations.   Normally it's about

17   scheduling.

18   BY MS. LaBRANCHE:

19   Q.   I don't want to know the details of your conversations

20   because that would be privileged.   But the fact is you talked

21   to him, correct?

22   A.   Correct.

23   Q.   Now, Mr. Bryant, the reason that you and the government met

24   and practiced your testimony so many times is because the

25   government wants you to answer questions a certain way,

Robert Bryant - Cross

1   correct?

2   *A.*   No.

3   *Q.*   The reason that you and the government met and practiced

4   your testimony so many times is because you want to make sure

5   that you are answering the questions for the government a

6   certain way.

7   *A.*   No.

8   *Q.*   Mr. Bryant, testifying -- well, Mr. Bryant, testifying the

9   way that you have been practicing with the government for these

10  months is how you cooperate, correct?

11  *A.*   Correct.

12  *Q.*   And that's how you fulfill your side of your agreement with

13  the government.

14  *A.*   Well, and being here today.

15  *Q.*   And that's how you avoid sitting out here like all of these

16  men?

17  *A.*   That's part of it, yes.

18  *Q.*   And, Mr. Bryant, when both I and other defense counsel had

19  asked you questions today and yesterday, you said that what

20  you're doing here is you're just telling the truth, correct?

21  *A.*   I am giving my best recollection of the events, yes.

22  *Q.*   But you shouldn't need to practice testimony if it's the

23  truth, should you?

24  *A.*   The truth is the truth.

25  *Q.*   Right.  And you shouldn't need to practice it.  And you

Robert Bryant - Cross

1  shouldn't need to be interviewed 25 times about it.

2  *A.*  A lot of those interviews were fact-finding, reviewing the

3  documents that was displayed, yes.

4  *Q.*  And if what you're doing is coming here today and telling

5  the truth, then you shouldn't need the government attorneys to

6  tell you what to say, fair?

7  *A.*  Fair.

8         *MS. LaBRANCHE:*  I have no further questions.

9         *THE COURT:*  Thank you.

10        Is that everyone?  Any additional cross?

11        Redirect.

12        *MS. CALL:*  May we have a brief side bar before we get

13  started?

14        *THE COURT:*  Yes.

15     (At the bench:)

16        *THE COURT:*  Go ahead, Ms. Call.

17        *MS. CALL:*  Yes, Your Honor.  Two items I want to flag

18  just because they relate to prior orders, and, of course, this

19  witness has been properly instructed, but I wanted to bring

20  them to the Court's attention and kind of preview how the

21  government would plan to perhaps lead the witness around some

22  areas to rebut some things that came up on cross-examination.

23        The first is Mr. Bryant's motive for truthfulness and

24  his motive in interviews with the government.  They actually

25  both relate to that.  This clearly has been the subject of

Robert Bryant - Cross

1    extensive cross-examination, including part of Ms. Page's

2    cross-examination regarding at what point he was motivated to

3    lie to the government and questions about whether he was

4    terrified to become a two-time felon at the time he came into

5    the doors of the Department of Justice.

6         He attempted to answer and describe a time, I believe,

7    back in 2017 where he first came to peace with the fact that he

8    would at one point likely have to speak to the government about

9    his own conduct.  And Ms. Page stopped him from answering.  We

10   do intend to elicit that testimony.  And I wanted to flag it

11   because it does bring up some issues we talked about relating

12   to the civil litigation and the defendants' filing at ECF-763

13   and some items we talked about over the last couple days.

14        What we plan to elicit, and I would seek leave to lead

15   the witness through this to make sure we do not elicit anything

16   about the civil litigation, although he does know not to, but

17   what we plan to do is ask him questions where we would

18   basically elicit facts that back in 2017 there came a time when

19   Pilgrim's was collecting documents.  He looked through his own

20   documents.  He found his handwritten notes in Government

21   Exhibit 1919, looked specifically at that document, and knowing

22   that put it in the box knowing that there may come a time where

23   he would have to speak to the government and answer questions

24   relating to this conduct.

25        We brought this up the other day when discussing what

Robert Bryant - Cross

1   time Mr. Bryant was aware that his conduct may have been

2   price-fixing, because that is the time, and that is in 2017,

3   before Mr. Bryant ever came into the doors of the Department of

4   Justice.  And I think it can be, as I described it, without

5   referencing the civil litigation and without referencing

6   Mr. Stiller's statement which was specifically related to this

7   time and instructed him to perhaps comb through the documents

8   before he provided them to the company.

9          That statement of Mr. Stiller was subject to the

10  Court's prior ruling in the prior hearing saying that that may

11  not be relevant and may be prejudicial regarding Mr. Stiller

12  and his obstructive conduct, but I certainly think this

13  testimony can be elicited without reference to the civil

14  litigation, without reference to Mr. Stiller's statements and

15  in a way that just makes clear Mr. Bryant's state of mind,

16  which has clearly been attacked almost five times or so on

17  cross-examination.

18         So that's the first one, and I will let the parties

19  state their opinion on that if needed.

20         THE COURT:  Well, Mr. Bryant already mentioned

21  something, I think even Ms. Page asked him a leading question

22  about this, but already mentioned something to the effect of --

23  or maybe -- I can't remember, but there was this oblique

24  reference to that civil litigation.  And then on another

25  occasion Mr. Bryant made a reference to Exhibit 1919, somewhat

Robert Bryant - Cross

1   of a volunteered statement, but something to the effect that,

2   yeah, it was, you know, like I knew that because of those notes

3   that something was going to happen.  So there have been a

4   couple of references already.

5          What I am worried about is that an attempt to ask him

6   questions about putting 1919 in a box will necessarily raise

7   the issue of, you know, document collection by Pilgrim's, and,

8   of course, the natural but unstated issue is for what purpose.

9   And, of course, that purpose would seem to implicate some type

10  of litigation.  So those are some of my concerns.

11         *MS. CALL:*  If I may address those briefly.

12  Agent Taylor already testified to the government's

13  investigation beginning as early as 2017, and I think the bell

14  has already been rung on document collection by companies.

15  Nearly every defense counsel has raised the fact that there are

16  16 million documents in this case, and there is no way those

17  came from individuals.

18         So I don't see that the fact of a document collection

19  by a company, which Mr. Bryant already actually stated on

20  cross-examination with Ms. Page, necessarily creates any issue.

21  And there is no implication that it was for anything other than

22  the criminal investigation, which Agent Taylor did say started

23  as early as 2017.

24         *MR. TUBACH:*  The problem with eliciting that testimony

25  is it would be utterly false.  The criminal investigation did

2410

Robert Bryant - Cross

1  not seek any documents from Pilgrim's in 2017, and Ms. Call

2  knows it.  That document collection was done purely for the

3  purpose of the civil litigation.  It had nothing to do with

4  this criminal litigation, and to try to draw that inference

5  would be utterly wrong.

6       THE COURT:  I think Ms. Call's point is not that she

7  is trying to suggest something otherwise.  It's that it did, in

8  fact, happen.  It may have been in response to the civil

9  litigation, but the fact that the civil litigation is being

10 mentioned would just avoid the prejudice that would inure to

11 the defendants from that fact, but not from the collection

12 itself.

13      MR. TUBACH:  The problem, Your Honor, is this would

14 suggest that he was worried the Department of Justice would

15 come talk to him at some point.  And the Department of Justice

16 was nowhere on the horizon when Mr. Bryant was collecting

17 documents.  This was the civil litigation that perhaps he was

18 concerned at some point that maybe the lawyers for the

19 plaintiffs might come talk to him or something, but he couldn't

20 have possibly thought the Department of Justice was going to be

21 doing anything because they weren't on the horizon at that

22 point.

23      THE COURT:  Let's hear from Ms. Call on that point,

24 and then I will get some other viewpoints.

25      Go ahead, Ms. Call.

Robert Bryant - Cross

 1          MS. CALL:  Mr. Tubach is clearly speculating about

 2   Mr. Bryant's state of mind.  I believe his concern was that he

 3   believed this was potentially criminal behavior and that the

 4   Department of Justice may come one day and -- you know, I don't

 5   know whether he was aware of the criminal investigation at this

 6   time in 2017, but that doesn't affect his state of mind at all

 7   as to whether he believed this was potentially criminal

 8   behavior and that he may have to answer for it one day, which

 9   is the testimony I expect he would say, which is what's

10   extremely relevant to this line of redirect, his state of mind

11   and his beliefs at the time.

12          THE COURT:  Has he actually stated that before that

13   his state of mind when he put Exhibit 1919 in a box was that it

14   would implicate him criminally at some point?

15          MS. CALL:  Yes, Your Honor, yesterday it did come up

16   in his very first interview, his state of mind at the time.  I

17   don't know whether at the time he specified criminal versus

18   civil as to who he would be answering to.  But I do not -- I

19   know that it wasn't specifically a reference to I may need to

20   speak to plaintiffs' lawyers one day.  I believe it was the

21   other way, but I am looking for a specific.

22          THE COURT:  Why don't we get some other points of

23   view.

24          Mr. Canty?  I can't remember who was talking.

25          MR. CANTY:  Your Honor, I think Ms. Call has addressed

Robert Bryant - Cross

1    it for me.  I was going to point out the fact that the -- it

2    was designed, the question would be designed to elicit the fact

3    that when he had the document collected, that he at one point

4    would likely have to speak to the government.  And, again, I

5    agree with Mr. Tubach that that's simply not supported by the

6    facts.

7         THE COURT:  Mr. Canty, did you find a reference in the

8    302 to that effect, you would have to talk to the government?

9    You are just saying that's what the government's position is?

10        MR. CANTY:  I was just going to reiterate that's what

11   I heard the government was going to elicit.

12        MR. TUBACH:  We are looking for the summary of the

13   interview now.

14        THE COURT:  Okay.

15        MS. HENRY:  Your Honor, Roxann Henry.  I don't fully

16   understand how the putting of it in the box is anything that's

17   particularly relevant here.  I think what Mr. Bryant's state of

18   mind was was that he knew he had certain documents in his

19   possession that were in his mind problematic.  I don't know if

20   it goes beyond that.  That is the issue that was in his mind.

21   I don't understand how putting it in the box really changes any

22   issues here.

23        THE COURT:  I think that Ms. Call's -- as I understood

24   her point was that in rebuttal to Ms. Page's cross that when he

25   walked into the doors of the Department of Justice, he thought

Robert Bryant - Cross

1   that he was going to be doubly charged, I think that that was

2   to suggest that he knew long before that that one day he may

3   have to answer, but that's at least what I understood.

4          MR. FAGG:  Your Honor, John Fagg.

5          THE COURT:  Go ahead.

6          MR. FAGG:  In Mr. Bryant's second interview with the

7   Department of Justice on July 12, 2021, his 302 reflects that

8   people at Pilgrim's did not take the litigation serious when it

9   was merely civil.  Once the DOJ got involved, people took the

10  litigation more serious.

11         And so I do agree with Ms. Henry.  What is at issue

12  here is Mr. Bryant's state of mind, what he understands he was

13  doing when he engaged in the underlying conduct, not what did

14  he believe when he was putting a batch of documents into a box.

15  And so I do believe that this is incredibly dangerous, and it

16  would be incredibly prejudicial to the defendants, and it is

17  counter factual to what Mr. Bryant told the government in his

18  second interview.

19         THE COURT:  Ms. Call?

20         MS. CALL:  I think we are getting far afield of the

21  actual issue and the point for redirect, which is his

22  motivation to be honest to the government, not necessarily his

23  state of mind at the time, although I do believe it's

24  indicative.  So, first of all, Mr. Bryant putting it in the box

25  is entirely relevant.

Robert Bryant - Cross

1        He was asked direct questions, and I think they are

2   direct for a reason, on cross about whether he had ever

3   reported to compliance at Pilgrim's, whether he ever reported

4   to anyone.  And in effect he did.  He gave his incriminating

5   documents and looked at a very specific document, knowingly put

6   it in the box knowing he would have to answer for that one day.

7   And I believe when Ms. Page stopped and he said, I came at

8   peace as to what happened long ago and that's what he was

9   referring to.

10       Mr. Fagg has been referring to an interview report

11   when Mr. Bryant is talking about others retrieval in the civil

12   litigation, and it's with reference to Mr. Stiller I believe he

13   would say had told him that plaintiffs went judge shopping

14   until they found one that would take the case and not to worry

15   about it.  But what's obvious from the facts at the time in

16   2017, including the text message 3039, no comp names in e-mail,

17   they were taking it seriously.

18       So although Mr. Stiller tried to sway Mr. Bryant's

19   concerns by saying the civil litigation isn't real, people were

20   taking it seriously.  People were starting to not put comp

21   names in e-mail.  People were trying to draw the conspiratorial

22   acts underground.

23       And then these KFC negotiations in 2014, despite

24   initial coordination between competitors, it all fell apart

25   after Mr. Bryant and others had their documents collected by

Robert Bryant - Cross

1   the company, because they became much more mindful of this

2   conduct, and it affects -- seriously affected their state of

3   mind, which is the exact state of mind that we think rebuts the

4   motive to lie which the defendants have all cross-examined

5   Mr. Bryant on.

6            THE COURT:  Ms. Call, just so we are real clear again,

7   so what questions do you intend to pose to Mr. Bryant again and

8   what answers do you expect?

9            MS. CALL:  Yes, Your Honor.  So I believe that it will

10  go something along the lines of asking if he was asked on

11  cross-examination about when he first reported conduct to the

12  company.  And going specifically to, Before you ever met with

13  the government, before there were ever hopes of an immunity

14  agreement, did there come a time when you were faced with a

15  choice about whether to provide certain documents to your

16  company?  I would ask what happened or I could lead

17  specifically saying, Did you receive a box from your company?

18  Did you decide what documents to put in it?  What did you find

19  and what did you do?  And then, How did you feel about doing

20  that, which is where I would then expect the answer to be that

21  he knew one day that he would have to answer for the documents

22  that he was placing in this box.

23           MR. TUBACH:  Here is the problem, I am reading from

24  the first interview summary.  The only thing about this that I

25  can find in that first interview summary is the following:

Robert Bryant - Cross

1    Pilgrim's sent Bryant a box for him to pack all his relevant

2    documents and send back to the attorneys at the start of the

3    civil litigation.  Then it goes on to talk about a conversation

4    he had with Stiller.  That's it.

5            THE COURT:  Okay.  Mr. Canty?

6            MR. CANTY:  My comment, I was going to read you the

7    same excerpt that Mr. Tubach just did and indicate that really

8    we're not talking -- we don't have any indication from a 302 of

9    what Bryant's state of mind is.  We are talking about what

10   Stiller told him, and it's hearsay.

11           THE COURT:  Mr. Lavine?

12           MR. LAVINE:  Ms. Page was trying to talk.

13           THE COURT:  Ms. Page.

14           MS. PAGE:  My impression of this is the Court really

15   has to do a two-part analysis.  What Ms. Call is saying is that

16   questions about his motive to lie, meaning his wife, his kids,

17   his good job, has suddenly opened the door to an explanation of

18   the 2017 civil litigation.  These are basic questions that are

19   allowed under 611(b) to question the witness' credibility.  The

20   jury is entitled to know that he is differently situated than

21   the two-time felon sitting in a supermax with the only benefit

22   or the only thing he has to lose is moving from one cell block

23   to another.  So that was the purpose of those questions.

24           And Mr. Bryant's explanation that he came to peace

25   with that I think is enough of an explanation, more than enough

Robert Bryant - Cross

1    of an explanation, and it did not open the door to any 2017

2    litigation.

3         The second part of this is I think what Ms. Call is

4    trying to elicit is really objectionable under 704, because

5    what Mr. Bryant is going to say is that Exhibit 1919 was

6    evidence of criminal activity when, in fact, the

7    cross-examination has shown that these were current prices, and

8    the Court is well aware that the black letter law says the mere

9    sharing of pricing information is not illegal.

10        So I believe it embraces an ultimate issue that's for

11   the jury, and Mr. Bryant should not be allowed to opine on

12   whether that piece of paper is evidence of criminal activity

13   that he would have to answer for.

14        THE COURT:  Well, he has a particular opinion of it,

15   but -- and he is entitled to the opinion.  The jury has heard

16   all about it, so I don't find that particularly material.

17        Mr. Fagg?

18        MR. FAGG:  One last point for me at least.  In looking

19   at the 302 that Mr. Tubach was reading from, Mr. Bryant's first

20   interview with the government, what it says in addition to him

21   receiving this box for him to pack his relevant documents is it

22   says Stiller knew there was potentially damaging information in

23   the documents and may have seen it, a moment, as an opportunity

24   to do so.  It doesn't say Bryant knew; it says Stiller knew.

25        THE COURT:  Yeah, once again, the fact that something

Robert Bryant - Cross

1   may come up on cross-examination, you know, that doesn't mean

2   that the witness had to have a 302 about it.  I mean, all sorts

3   of things could come up.  I think the real issue here is

4   whether or not the witness going into these issues which come

5   with the possibility of significant prejudice under 403 should

6   be allowed.

7          And the witness has already mentioned some things

8   about 1919.  He has already talked about, as I said before,

9   some allusion, he alluded to provide some things, I can't

10  remember exactly what it was, but I think that Ms. Call's line

11  of questioning is going to raise a distinct possibility that

12  the jury is going to think that documents were being gathered

13  up for some litigation purpose, and that's the potential real

14  prejudice.

15         I do agree with Mr. Tubach that this -- that there

16  doesn't seem to be any awareness that there is going to be some

17  type of criminal consequence from throwing that document in a

18  box, and, as a result, Ms. Call, I am not going to allow you to

19  go into that.  You can go into those subjects that Mr. Bryant

20  has already talked about, but you need to be really careful

21  when you do so, so we don't get this possible inference that

22  there must have been a document collection related to

23  litigation.

24         *MS. CALL:*  Your Honor, without specifying an

25  approximate time frame, would it be appropriate to ask

Robert Bryant - Cross

1   Mr. Bryant, Did you provide Exhibit 1919 to your company before

2   you first spoke to the government?  I don't think that elicits

3   anything about a possible -- other litigation as long as it's

4   before the time frame that he first spoke to the government,

5   and I think his state of mind when he did that, as long as it's

6   before June of 2021, which it, of course, was, wouldn't go to

7   those concerns.

8        THE COURT:  Well, I assume that's factually true too,

9   and I imagine that document had already been provided to the

10  DOJ?

11       MR. TUBACH:  It had, Your Honor.  The problem with

12  that is the only reason the jury is going to draw from that

13  conclusion is that Mr. Bryant did so because he knew he was

14  cooperating with the Department of Justice.  There is no other

15  reason for someone to give a document like that to the company.

16  So the inference the jury would draw, which is a false one, is

17  that he provided this document to the company knowing it would

18  be used in this criminal investigation, and that is simply not

19  true.

20       THE COURT:  Well, what about the inference that

21  although he may not have known then, that he knew by the time

22  he talked to the Department of Justice that it had been

23  provided?

24       MR. TUBACH:  At the time of his interview in 2021,

25  absolutely, at least for myself, I don't see a problem with him

Robert Bryant - Cross

1   saying that he knew the Department of Justice had his notes at

2   that point, but that's a very different question than whether

3   sometime earlier in 2017 and way back or at any other point

4   that he provided the documents to the company knowing they

5   would be used in a criminal investigation.  That's just not

6   accurate.

7        THE COURT:  Ms. Call, so is that ultimately what you

8   are suggesting is that you ask him whether he knew by the time

9   he talked to the Department of Justice that the Department of

10  Justice would have had Exhibit 1919?

11       MS. CALL:  I think it's kind of just the reverse, that

12  he actually -- well, two things:  He actually provided it to

13  the company knowingly; and secondly, he actually told the

14  government about it before he was ever asked about it.  So I

15  think those two things really go to his motivation and his

16  independent desire to be truthful.

17       THE COURT:  Yeah, I will allow the question whether he

18  knew at the time he went to the Department of Justice that the

19  Department of Justice had 1919, but not that he had previously

20  provided it, like the suggestion that he volunteered something

21  to the -- to his company and then knowing that it was going to

22  come back to bite him.

23       MS. CALL:  All right.  Frankly, Your Honor, I just

24  want to know that -- the prejudice, I think this does prevent

25  the government from rebutting the inference that Mr. Bryant did

Robert Bryant - Cross

1   not report anything to his company, which is exactly what

2   Ms. Page threw out when asking, Did you report to compliance,

3   did you report to an ethics hotline, when he actually did give

4   the document knowingly back in 2017 to the company.

5          THE COURT:  As I said before, he has already made

6   those statements, made statements about 1919 that -- I can't

7   remember his exact words -- that he provided it to someone, so

8   he has already put that in.  But I don't think that the

9   phrasing that you were suggesting is appropriate because I

10  think it comes with a danger of undue prejudice under 403.

11         What's the second topic?

12         MS. CALL:  The second topic is the truth telling and

13  the lies to the government which I think have been thoroughly

14  explored on cross-examination.  The only thing that I wanted

15  to -- I was hoping to elicit that has not come out on either

16  direct or cross without going into any specific nature of the

17  conduct is what you didn't -- essentially an answer to the

18  question of is what you didn't disclose to the government

19  something embarrassing.  I think that the jury now thinks that

20  there is, you know, 500 different crimes that Mr. Bryant lied

21  about when really there was one occasion.

22         And I have looked through the transcript eight times.

23  Despite counsels' references, the only reference in the prior

24  trial transcript of multiple occasions of lies was the fact

25  that defense counsel on cross-examination asked, And isn't it

Robert Bryant - Cross

1    true that you are not being prosecuted despite the fact that

2    you lied to the government about multiple issues multiple times

3    on multiple occasions?  So it was a very loaded question that

4    he answered when he said, Yes, and it was not I lied on

5    multiple occasions.  Mr. Feldberg had asked him multiple times,

6    and he said yes.

7              But I believe Mr. Bryant's testimony in this trial has

8    made clear that was on one occasion, and I realize we are

9    splitting hairs there, but I do think it's proper to go into

10   the kind of personal nature of the conduct, just the fact that

11   it was embarrassing to provide some, you know, lessening the

12   specter the defense counsel have created about what in the

13   world these lies were about.

14             THE COURT:  Yeah, I am not going to allow you to do

15   that.  You will recall that one of the reasons that I decided

16   that the defendants could not go into the subject matter of

17   those incidents was because of their embarrassing nature, but

18   then to, you know, ask him on redirect without an opportunity

19   to cross again they were embarrassing, it's kind of -- why

20   can't the defense go into them?  Of course, it's perfectly fine

21   to talk as has been referred to on several different occasions

22   that those did not involve any of the subject matter of --

23   those didn't involve anything related to the charges in this

24   case.  That's okay.  But I won't let you ask about the

25   embarrassing nature because that is one of the reasons that I

Robert Bryant - Cross

1    didn't allow the defendants to ask specific questions about

2    that.

3              MS. CALL:  Your Honor, may I ask the nature of the

4    question that he was asked before he lied, which I believe was

5    something along lines of, Have you ever been involved in any

6    misconduct at work?  I don't think that goes into the

7    appearance or the substance of the lie, and, frankly, we are in

8    a situation where the government cannot rebut aside from what

9    was already elicited from direct anything the defendants have

10   created of the specter that Mr. Bryant may get dragged away in

11   handcuffs, which none of these defendants were even arrested,

12   so it was a ridiculous proposition to think this is what

13   happened to these defendants, which is the allusion they were

14   trying to create.

15             THE COURT:  What question did you want to ask him?

16             MS. CALL:  Just the question that he was asked that

17   elicited his lie.

18             MR. TUBACH:  I am, frankly, stunned that Ms. Call

19   believes there was still only one lie when the testimony is

20   directly contrary to that.  If the government were to do that,

21   we would want an opportunity to recross on the fact that when

22   he was asked in his prior trial:  Mr. Bryant, you testified

23   yesterday that you lied to prosecutors and agents in some of

24   your interviews, plural, correct?

25             Answer:  I did.

Robert Bryant - Cross

1           And you lied on multiple times?

2           That's correct.

3           About multiple issues in your interviews with the

4   prosecutors, correct?

5           That's correct.

6           Now she is trying to say that he only lied one time.

7   It's just an utter fabrication.  And we go into the fact on his

8   third interview he lied about the misconduct he said was so

9   extensive in the second interview and to backtrack on that.

10          MR. FELDBERG:  Your Honor, if I may, the question

11  Ms. Call proposes to ask would open the door and we would

12  request the opportunity, then, to do a full and thorough

13  recross on the subject of his lies.

14          THE COURT:  Ms. Call, I still don't quite understand

15  what the question is.  What question do you propose to ask him?

16          MS. CALL:  Yes, Your Honor.  It's limited to just, Do

17  you recall the question that you were asked at the time that

18  you lied, which I believe he would elicit testimony something

19  along the lines if he was ever involved in any misconduct at

20  work.

21          THE COURT:  Yeah, once again, we are not going into

22  the subject matter of that.  Instead, the ruling was in the

23  first trial, the ruling always has been that the subject matter

24  of his misconduct is not going to be before the jury, and that

25  defendants were all constrained by that ruling and the

Robert Bryant - Cross

1    government has to be constrained by that on redirect as well.

2         MS. CALL:  Respectfully, the question was only

3    eliciting the term "misconduct," which is precisely the term

4    the defendants used on cross-examination.

5         MR. TUBACH:  That doesn't allow us to get into the

6    substance of his other lies, which he has already admitted he

7    made under oath.  That's the problem.

8         THE COURT:  I can't remember exactly what term was

9    used.

10        MR. TUBACH:  The term "misconduct," which was used, I

11   believe, but the problem is his lie about having misconduct at

12   work is only the first lie.  There are multiple lies, and he

13   has admitted under oath there were multiple lies, and we would

14   then be prevented from going into what those other lies were.

15        THE COURT:  Well, there is all sorts of factual debate

16   about whether multiple lies or multiple occasions, what

17   "occasions" means.  The government can phrase the question that

18   may infer that it was just one occasion.  That doesn't open the

19   door to anything.  That's an issue for the jury to resolve.  So

20   if the defendants used the term "misconduct" after all, it must

21   have been some type of activity that could -- you know, it

22   related to the lie, then that's a phrase the government can

23   use.  But in terms of the occasions and that whole debate,

24   there is nothing -- the government can phrase the question as

25   it wants to.

Robert Bryant - Cross

1          MS. HENRY:  Your Honor, I think, and I don't have the

2     transcript reference, but I think the term "misconduct" was

3     used in connection with the lie.

4          THE COURT:  Well, I don't know.  I don't have a

5     recollection of that.

6          Mr. Feldberg?

7          MR. FELDBERG:  Your Honor, the term "misconduct" was

8     used in connection with a lie, and the problem with Ms. Call's

9     proposed question is it would allow the government to create an

10    inference that there was a single lie when we all know there

11    were multiple lies on multiple occasions as the witness has

12    acknowledged.  And asking the simple question, you know, What

13    question prompted the lie, creates the impression, which is

14    factually incorrect, that there was a single question that

15    elicited a single lie when there is a wave of embarrassing and

16    arguably criminal conduct that he lied about in interview one,

17    interview two, interview three.  And we would -- unless we are

18    allowed recross on the subject, we would have no opportunity to

19    address that.

20         THE COURT:  So, Ms. Call, give me your question one

21    more time.  I hate to belabor this, but I want to complete my

22    understanding.

23         MS. CALL:  I think I have a proposal that might

24    resolve this understanding that the parties are going to

25    continue to have factual disagreement, but I think what would

Robert Bryant - Cross

1    perhaps be appropriate was:  Do you recall the question that
2    you were asked that initially spurred your lie to the
3    government?  So that addresses the fact that defense counsel
4    made about multiple lies in response to multiple questions.

5           THE COURT:  What's he going to say to that?

6           MS. CALL:  I believe it would be something along the
7    lines of, Were you ever involved in any misconduct at work?
8    Yeah, that would be it.

9           THE COURT:  I am not going to allow you to do that.
10   If he is going to answer about misconduct at work, that's the
11   subject matter of the questioning which we're not going into,
12   so I am not going to allow that question.

13          MS. CALL:  Is the issue the term "misconduct," or it's
14   just the part of the answer "at work," because perhaps we could
15   lead to ask if just the question had to do with misconduct
16   because that's precisely what the defendants have been
17   eliciting in cross-examination.

18          THE COURT:  I am assuming that Ms. Henry is right that
19   the misconduct that was used in questions by defense counsel
20   related to him lying, not talking about the work-related
21   misconduct, but, you know, were you to ask him that question,
22   then he is now for the first time disclosing the subject matter
23   of what he was lying about, and the defense hasn't had any
24   opportunity whatsoever because they are following the Court's
25   ruling to explore the subject matter of his lies.  So, yeah, I

Robert Bryant - Cross

1    don't consider that to be appropriate.

2         MS. CALL:  Your Honor, reviewing the transcript from

3    yesterday, Mr. Feldberg did specifically describe the conduct

4    as misconduct, not the lies.  It was on September 14, he gave

5    another interview in which he described certain misconduct,

6    correct?  So I believe what we are eliciting is exactly in line

7    with what was elicited on cross.

8         THE COURT:  Well, I am not sure it was objected to,

9    but two wrongs don't make a right, so just in case he did say,

10   I don't recall it exactly, but we are not going to do it again.

11        Anything else?

12        MS. CALL:  No, Your Honor.  I, frankly, just thought

13   that was in line with your ruling from yesterday morning, and I

14   am looking at it.  You said something like misconduct or the

15   subject matter of the false statements, that's fine.  So what

16   the government was proposing we had believed was in line with

17   your ruling from yesterday morning on the issue.

18        THE COURT:  Well, I am not sure what that conversation

19   was about, frankly, but you can't have him talk about the

20   subject matter of the misconduct that he was lying about.

21        MS. CALL:  All right, Your Honor.

22        THE COURT:  Thank you.

23     (In open court:)

24        THE COURT:  Go ahead, Ms. Call.

25        MS. CALL:  Thank you, Your Honor.

Robert Bryant - Redirect

1      One moment to set up.

2                    **REDIRECT EXAMINATION**

3   *BY MS. CALL:*

4   *Q.*  Good morning, Mr. Bryant.

5   *A.*  Good morning.

6   *Q.*  Now, Mr. Bryant, you were asked at length over the last two

7   days about the truthfulness and your truthfulness and the times

8   you have sat down with the government and in your testimony

9   before this jury; is that correct?

10  *A.*  Correct.

11  *Q.*  Now, you have an agreement in writing with the government

12  where you are required to tell the truth; is that correct?

13  *A.*  That's correct.

14          *MS. LaBRANCHE:*  Objection, leading.

15          *THE COURT:*  Overruled.

16  *BY MS. CALL:*

17  *Q.*  Now, whatever happens in the outcome of this trial, does

18  that in any way have an impact on your agreement with the

19  government?

20  *A.*  It does not.  That's my understanding.  It does not.

21  *Q.*  And those truth-telling provisions that you have testified

22  about, do they apply in the same way to the questions that I

23  asked you on direct or redirect as to the questions you were

24  asked on cross-examination?

25  *A.*  Yes.

Robert Bryant - Redirect

1   Q.  What is your understanding if you were not to tell the

2   truth to questions asked by defense counsel in this case?

3   A.  I would be charged.

4   Q.  Thank you.

5        All right, Mr. Bryant.  I want to go back in time to

6   2014 and the conduct we've talked about there, all right?  Do

7   you recall being asked on cross-examination about the phone

8   calls you overheard between Defendant Austin, Defendant Brady,

9   and Defendant Kantola where Mr. Austin shared his direction to

10  KFC that the price was the price?

11  A.  I do.

12  Q.  And as you testified on direct, was that the position that

13  Defendant Austin took in the meeting with KFC that day?

14  A.  We did.

15  Q.  And the date of that meeting, was that August 22nd?

16  A.  I believe so, yes.

17  Q.  Now, do you recall on cross-examination you were questioned

18  about how you could possibly remember these phone calls from

19  years ago?

20  A.  I do.

21  Q.  And do you recall counsel calling them supposed calls with

22  Defendants Brady and Kantola?

23  A.  I do.

24  Q.  Now, counsel also asked you whether you had any notes of

25  those calls; is that correct?

Robert Bryant - Redirect

1    A.   That's correct.

2    Q.   Now, and I believe it was counsel on cross that asked you,

3    you know, you never mentioned those calls?

4         MS. PAGE:   Your Honor, I am going to object to leading

5    at this point.   This is more than just foundation.

6         THE COURT:   Overruled.

7    BY MS. CALL:

8    Q.   I believe that the question from yesterday was you never

9    mentioned those calls you say you overheard until you began

10   interviewing with prosecutors and agents in connection with

11   your immunity agreement.   Do you recall that?

12   A.   I do.

13   Q.   Mr. Bryant, who told the government about those phone

14   calls?

15   A.   I did.

16   Q.   Has the government ever shown you any e-mails or text

17   messages reflecting those calls?

18   A.   Not that I can remember, no.

19   Q.   So to date, what has been the sole basis of your

20   recollection of those phone calls?

21   A.   My memory.

22         MS. CALL:   Let's now pull up Government Exhibit 1237.

23   And I have copies for counsel.

24   BY MS. CALL:

25   Q.   The copy I am handing out isn't a stickered one, but it is

2432
Robert Bryant - Redirect

1    the precise same page shown on your screen now, Mr. Bryant.

2           MS. CALL:  Ms. Pearce, could we pull up Exhibit 9748

3    alongside Exhibit 1237?  The second page is fine for that

4    document.

5           Your Honor, I believe these have both been admitted,

6    and I would seek permission to publish.

7           THE COURT:  1237.  I am checking on the other one.

8           MS. CALL:  I believe 9748 was admitted last Monday.

9           THE COURT:  What exhibit number is it again?

10          MS. CALL:  9748, and it is a stipulation between the

11   parties.

12          THE COURT:  Yes, that has been admitted, and you may

13   display both.

14          MS. CALL:  Thank you.

15   BY MS. CALL:

16   Q.  All right.  Mr. Bryant, do you see the record on the

17   left-hand side of your screen?

18   A.  I do.

19   Q.  Do you see the name at the top of this record?

20   A.  I do.

21   Q.  Whose name is it?

22   A.  Roger Austin.

23   Q.  Have you ever seen this record before?

24   A.  No.

25   Q.  What's the date on this record?

Robert Bryant - Redirect

1    A.   At the top it's October 16 of 2014.

2    Q.   I should be clear, the dates on the left-hand side in the

3    left-hand column of the phone calls reflected there, what are

4    the dates on that?

5    A.   8/22.

6    Q.   And 8/22, that's August 22nd?

7    A.   That would be my understanding, yes.

8    Q.   And do you see the year at the top of the record as well?

9    A.   Yes, 2014.

10   Q.   2014.

11        All right.  Now, if you can look at the right-hand

12   side, Exhibit 9748.  Do you see where it lists Bill Kantola?

13   It's in the middle of the page.

14   A.   Yes, I do.

15   Q.   What is the second number listed there next to

16   Bill Kantola's name?

17   A.   770-329-7505.

18        MS. CALL:  Could you highlight that, Ms. Pearce?

19   BY MS. CALL:

20   Q.   And now, Mr. Bryant, if I could direct your attention to

21   Exhibit 1237 on the left-hand side of the screen.

22        MS. CALL:  Ms. Pearce, could you please highlight the

23   call at 7:56 a.m.?

24   BY MS. CALL:

25   Q.   Mr. Bryant, what phone number do you see reflected there?

Robert Bryant - Redirect

1   A.   770-329-7505.

2   Q.   Is that number the same or different from the number

3   reflected for Mr. Kantola on the right-hand side of the screen?

4   A.   They are the same.

5        MS. CALL:   Now, looking again at Exhibit 9748,

6   Ms. Pearce, could you please highlight the area next to the

7   name Scott Brady.

8   BY MS. CALL:

9   Q.   And, Mr. Bryant, what is the second number listed next to

10  Mr. Brady's name?

11  A.   256-536-6120.

12       MS. CALL:   And turning back to 1237 on the left-hand

13  side, Ms. Pearce, could you highlight the very next call on

14  this record from August 22nd?

15  BY MS. CALL:

16  Q.   What number is reflected there, Mr. Bryant?

17  A.   256-536-6120.

18  Q.   Is that the same or different from the number for Mr. Brady

19  in Exhibit 9748?

20  A.   It's the same.

21  Q.   And this August 22nd, 2014 date, is that the date of your

22  meeting with KFC in Louisville?

23  A.   I believe so, yes.

24  Q.   And is that the date you were in Mr. Austin's office in

25  Louisville when you overheard his phone calls?

Robert Bryant - Redirect

1    A.  I believe so, yes.

2    Q.  And who did he tell you those phone calls were with?

3    A.  Mr. Brady and Mr. Kantola.

4    Q.  Until today, had you ever seen this phone record?

5    A.  No.

6    Q.  Thank you.

7           MS. CALL:  We can take those down, Ms. Pearce.

8    BY MS. CALL:

9    Q.  Let's fast-forward to 2017 and some of the conduct you

10   described there.  Mr. Bryant, do you recall on

11   cross-examination being asked about your handwritten notes from

12   Government's Exhibit 1919?

13   A.  Yes.

14   Q.  And do you recall being shown a bunch of competitors' -- I

15   believe they described them as current prices in effect around

16   that time?

17   A.  Yes.

18   Q.  And the numbers you had, they largely matched those current

19   prices, right?

20   A.  Yes.

21   Q.  Now, could you just remind the jury, Mr. Bryant, what

22   direction was KFC trying to get prices to go in 2017 in your

23   negotiations.

24   A.  They were seeking a decrease.

25   Q.  Now, if -- and this is a bit of math maybe, but if KFC is

Robert Bryant - Redirect

1    trying to get prices to go down, what's the starting point?

2    A.  Your current price or your -- yeah, your current price.

3    Q.  And, Mr. Bryant, is that because at the time of these

4    negotiations did Pilgrim's have a contract in effect with KFC?

5    A.  That's correct.

6    Q.  And do you have a belief as to whether Pilgrim's

7    competitors also had contracts in effect with KFC?

8    A.  I was shown many yesterday, yes.

9    Q.  So now you know that Pilgrim's competitors had contracts in

10   effect with KFC.  So would those competitors have had current

11   prices just like Pilgrim's did?

12   A.  That would be my assumption, yes.

13   Q.  Now, back to your testimony on direct again, what did you

14   say was the purpose of the conspiracy in 2017?

15   A.  To limit a price decrease.

16   Q.  Now, this isn't rocket science, but if you were a hundred

17   percent effective in the coordination that you had with

18   competitors to limit a price decrease, how would your price

19   change?

20        MR. TUBACH:  Objection, Your Honor.  That's

21   speculation, and it's leading and argumentative.

22        THE COURT:  Overruled.

23   A.  If we were completely successful, there would not be a

24   price decrease.

25   BY MS. CALL:

Case No. 1:20-cr-00152-PAB   Document 1439   filed 07/12/22   USDC Colorado   pg 69 of 224

Robert Bryant - Redirect

1   Q.  Zero price decrease.

2   A.  Correct.

3           THE COURT:  Ms. Call, it's 10:15 now, but if you have

4   a few more questions, go ahead.

5           MS. CALL:  You know, I think this is probably a good

6   time to break.

7           THE COURT:  Ladies and Gentlemen, we will go ahead and

8   take the mid-morning break at this time.  Keep the admonitions

9   in mind at this time.  The jury is excused.  Thank you.

10          (Jury excused.)

11          THE COURT:  Mr. Bryant, you are excused for the break.

12  Everyone else may be seated.

13          MR. LAVINE:  Yes, Your Honor.

14          THE COURT:  Go ahead, Mr. Lavine.

15          MR. LAVINE:  Thank you, Your Honor.

16          In light of the fact that government counsel has

17  brought up a document that was never introduced or shown to the

18  witness in direct, I would request the opportunity to recross

19  on that phone record that they just showed Mr. Bryant.  It

20  would be very short, five, six questions, and that's about it,

21  Your Honor.

22          THE COURT:  Denied.  The fact that a new document is

23  brought up on redirect doesn't open the door to recross.  This

24  is the same subject matter that he was asked about on numerous

25  occasions, so it's appropriate to redirect.

Robert Bryant - Redirect

1          *MR. LAVINE:*  Thank you, Your Honor.

2          *THE COURT:*  All right.  We will be in recess.  Thank

3    you.

4          (Recess at 10:16 a.m. until 10:31 a.m.)

5          *THE COURT:*  Let's bring Mr. Bryant back.

6          (Jury present.)

7          *THE COURT:*  Go ahead, Ms. Call.

8    *BY MS. CALL:*

9    *Q.*  Mr. Bryant, I think we were talking about 2017.  Now,

10   before we get more into what was reflected in Exhibit 1919, do

11   you recall on cross-examination being shown what I believe

12   counsel described as period prices or current pricing?

13   *A.*  I do.

14   *Q.*  And that pricing, about how long is it in effect?

15   *A.*  A month, I believe, yes, each period.  It could change.

16   *Q.*  Did it typically change from period to period?

17   *A.*  Depends, yeah.

18   *Q.*  Now, do you remember being asked whether the government

19   showed you all of your competitors' bids or current prices when

20   you were being interviewed?

21   *A.*  Yes.

22   *Q.*  Now, Mr. Bryant, when you were interviewed, did the

23   government typically show you documents written by you or

24   written by other people?

25   *A.*  They showed documents that pertained to myself.

Robert Bryant - Redirect

1   Q.  All right.  And let's move on to some of those prices in

2   your handwritten notes.  Now, during cross-examination do you

3   recall being shown many of the cover letters accompanying your

4   competitors' bids?

5   A.  I do, some of those, yes.

6   Q.  Just some.  And do you recall being referred to the precise

7   numbers in the bids?

8   A.  That's correct, yes.

9   Q.  And I believe you were asked to compare the numbers in the

10  bids to the numbers in your notes?

11  A.  Yeah.  I think most of it was the final contract price, not

12  the bids.  I am not sure if I was shown the bids or not.

13  Q.  Well, let's take a look at some documents.

14       MS. CALL:  Ms. Pearce, if you could pull up

15  Exhibit 1930.

16       Your Honor, I believe this is previously admitted, so

17  permission to publish.

18       THE COURT:  Let me check.  Yes, it has been admitted.

19  You may display it.

20  BY MS. CALL:

21  Q.  One moment, Mr. Bryant.  Let me see if I have an extra copy

22  for you so you can read it.

23  A.  It's on the screen.

24       MS. CALL:  Ms. Pearce, could you zoom above the

25  signature line to make it a little bit bigger.

Robert Bryant - Redirect

1    *BY MS. CALL:*

2    *Q.*  Can you read that, Mr. Bryant?

3    *A.*  Yes, I can read it, yes.

4    *Q.*  Who does this appear to be from?

5    *A.*  Tim Mulrenin.

6    *Q.*  And what is the date?

7    *A.*  February 6 of 2017.

8    *Q.*  Is February 6 around the time that those first-round bids

9    were due for KFC?

10   *A.*  Yes.

11   *Q.*  And who is this to?

12   *A.*  It's to Rich Eddington and Sara Fisher.

13   *Q.*  All right.  So is this just days before your call with

14   Defendant Austin that you described in relation to 1919 or

15   after?

16   *A.*  This should have been after.

17   *Q.*  All right.  Now, if you could look at just the second

18   sentence in this e-mail starting with "our pricing."  Could you

19   read that?

20   *A.*  "Our pricing model will remain the same, with the exception

21   of the pricing outlined below."

22   *Q.*  And then below there are -- are there several kind of

23   concessions described in the pricing area?

24   *A.*  Yes.

25            *MS. CALL:*  Now, if we could turn to one more document,

2441
Robert Bryant - Redirect

1   and that is F-852.  If you could please show that, Ms. Pearce.

2           And, Your Honor, I believe this has been admitted as

3   well.

4           THE COURT:  What was the exhibit number again?

5           MS. CALL:  F-852.

6           THE COURT:  Yes.  It has been admitted.

7           MS. CALL:  Permission to publish?

8           THE COURT:  Yes, you may.

9           MS. CALL:  Ms. Pearce, if you could just zoom in on

10  that first top e-mail on the chain.  Thank you.

11  BY MS. CALL:

12  Q.  Mr. Bryant, do you see this?

13  A.  I can, yes.

14  Q.  Who does this e-mail purport to be from?

15  A.  Scott Brady.

16  Q.  And what's the date on this e-mail?

17  A.  February 3rd of 2017.

18  Q.  Is that around the deadline for those first round KFC bids?

19  A.  Yes.

20  Q.  And do you recall, is this the same day that Pilgrim's

21  submitted its bid?

22  A.  I believe it was.

23  Q.  Now, in this e-mail, could you read the second to the last

24  sentence in this paragraph starting with "we reduced our profit

25  line"?

Robert Bryant - Redirect

1   *A.*  I am looking for that.  "We reduced our profit line to

2   maintain the same cost to you that we currently have in place."

3   *Q.*  All right.  Now, Mr. Bryant, based on your experience with

4   KFC cost models, do the terms "our pricing model will remain

5   the same" mean the proposed price would go up, down, or not

6   budge from the current price?

7          *MR. FAGG:*  Objection, Your Honor, foundation.

8          *THE COURT:*  Overruled.

9   *A.*  It would remain the same.  There would not be a price

10  change.

11  *BY MS. CALL:*

12  *Q.*  And based on your experience with KFC cost models, does a

13  statement that a company will maintain the same cost to you

14  mean the price would go up, down, or not budge from the current

15  price?

16         *MS. PAGE:*  Objection, calls for speculation about what

17  other companies are doing.

18         *THE COURT:*  Overruled.  He can answer.

19  *A.*  Can you repeat?  Sorry.

20  *BY MS. CALL:*

21  *Q.*  Yes.  Based on your experience with KFC cost models, does a

22  statement that a company will maintain the same cost to you

23  mean that the price would go up, down, or not budge from the

24  current price?

25         *MR. LAVINE:*  Objection, Your Honor.  I would like to

Robert Bryant - Redirect

1    be heard on side bar, please.

2         THE COURT:  All right.

3      (At the bench:)

4         THE COURT:  Go ahead, Mr. Lavine.

5         MR. LAVINE:  Your Honor, this is about as deceiving as

6    they can possibly get.  If they want to show him the cost

7    model, show him the cost model, but, Your Honor, there is a

8    bigger problem here.  Government counsel knows very well that

9    the numbers in 1919 are current prices.  That was brought out

10   in the last trial.  And they continue to try and get this

11   witness to say that this was future pricing.  And now they are

12   trying to deceive the jury by using a few sentences out of here

13   without even showing them the cost model.

14        Your Honor, this has got to stop at some point in time

15   because government counsel knows from the last trial and they

16   know it now that this is current pricing.  And they are trying

17   to put forth an argument that that is future pricing.  It's

18   not, and they know it.

19        THE COURT:  The jury figures out the facts and will

20   have to do so here.  Objection is overruled.

21      (In open court:)

22   BY MS. CALL:

23   Q.  Mr. Bryant, you may answer the question, but let me know if

24   you need it repeated.

25   A.  There would be no change in price.

Robert Bryant - Redirect

1   Q.  Now, if there is no change in price with a bid, how does a

2   bid relate to your current price?

3   A.  They would be the same.

4   Q.  Mr. Bryant, let's move on.  You were asked a lot on

5   cross-examination about volume changes among Pilgrim's

6   competitors; is that right?

7   A.  That's correct.

8   Q.  Now, first off, the volume you were shown on

9   cross-examination, had you ever even seen many of those numbers

10  before?

11  A.  No.  And like I said in direct, I didn't have -- I didn't

12  remember losing the KFC business in 2014 or going into 2015.

13  Q.  So was Pilgrim's losing KFC business in 2014 a big deal to

14  you?

15  A.  Not that I recall.  Like I remember, I mean, we replaced

16  all the business, so it wasn't something that I had to work to

17  overcome like the Walmart loss.

18  Q.  Now, volume, just to make this clear, who makes the

19  decisions on volume awards, the suppliers or the customers?

20  A.  The customers.

21  Q.  Who makes the decision on bid prices, the suppliers or the

22  customers?

23  A.  The suppliers.

24  Q.  And, Mr. Bryant, could you remind the jury, what was the

25  magnitude of Pilgrim's price increase in 2014?

Robert Bryant - Redirect

1    A.   It was -- I believe it was around 18 cents, but the ask was

2    between 15 and 20.

3    Q.   And did you have an understanding as to whether Pilgrim's

4    competitors received similar price increases?

5    A.   That's my understanding is that they received similar

6    increases.

7    Q.   Now, you were asked on cross-examination about your

8    knowledge of whether Pilgrim's competitors undercut Pilgrim's

9    in those negotiations, and I believe the highest number I heard

10   was up to 5 cents; is that right?

11   A.   That's correct.

12   Q.   All right.  So taking Pilgrim's 18- to 20-cent increase, if

13   a competitor undercut Pilgrim's by 5 cents, how much were they

14   raising prices?

15   A.   12, 13 cents, somewhere in there.

16   Q.   12, 13 cents.  How significant is that compared to the

17   average year-to-year change in KFC prices?

18   A.   That's still a very large price increase.

19   Q.   All right.  Now, I want to give you an opportunity to say

20   something I think you were stopped from saying on

21   cross-examination when Ms. Page was asking you about how you

22   could possibly remember events from 10 years ago.  Do you

23   recall that questioning?

24   A.   I do.

25   Q.   And first off, to be clear, how long ago was 2017?

2446
Robert Bryant - Redirect

1    A.   2017?

2    Q.   Uh-huh.

3    A.   Five years ago now.

4    Q.   So half that amount of time?

5    A.   Yeah.

6    Q.   So I think a hand was put up, and you were cut off when you

7    were about to answer that question.  You said -- you asked if

8    you could finish your answer, and you had started saying, There

9    is certain things that happen in your life.  What were you

10   trying to say, Mr. Bryant?

11   A.   Yeah, there is just certain things that happen during the

12   course of your life that just stick in your memory for some

13   various reason.  Maybe you understand the significance or it's

14   an important time in your life.  There is just certain memories

15   that stay with you.

16   Q.   And the conduct you've been describing over the last two

17   days, has that stuck with you?

18   A.   Yes.

19            MS. CALL:  One moment to confer, Your Honor?

20            THE COURT:  You may.

21   BY MS. CALL:

22   Q.   All right, Mr. Bryant.  One topic I want to ask you about

23   or one more before hopefully we're done.  Do you recall the

24   very beginning of direct exam I asked you about the

25   organizational structure at Pilgrim's?

Robert Bryant - Redirect

1    A.   Yes.

2    Q.   I am not going to ask you about org charts right now, but

3    do you recall describing those separate sales channels in the

4    fresh food service group?

5    A.   I do.

6    Q.   On cross-examination you were asked about something called

7    the Otis principle at Pilgrim's.  Do you recall that?

8    A.   I do.

9    Q.   Could you describe again for the jury what the Otis

10   principle was?

11   A.   Yes.  So it was basically there is -- not covering

12   shortages for a competitor in an effort to convert business

13   permanently from a supplier to us as Pilgrim's.

14   Q.   So is it fair to say, does "convert business" mean taking

15   business from your competitor?

16   A.   That would be correct, yes.

17   Q.   And I believe counsel on cross-examination called this an

18   example of flat-out hard-nosed competition and asked if you

19   agreed.  Do you remember that?

20   A.   I do.

21   Q.   And did you agree?

22   A.   I did.

23   Q.   Now, counsel asked you about times where Pilgrim's did

24   steal business from several competitors; is that right?

25   A.   Yes.

Robert Bryant - Redirect

1    Q.  Do you recall they asked about Fresh Market?

2    A.  Yes.

3    Q.  H-E-B?

4    A.  Yes.

5    Q.  King Soopers.

6    A.  Yes.

7    Q.  Are any of those customers QSR customers?

8    A.  No.

9    Q.  Did you ever even hear the Otis principle used for QSR

10   business?

11   A.  No.

12   Q.  Was the Otis principle consistent with the way business was

13   done in the QSR channel?

14   A.  No.

15   Q.  Can you please explain why?

16   A.  So like the Otis principle, for instance, we -- in retail,

17   for instance, I think we used like Walmart and others, but we

18   didn't cover each other's shortages in an effort to take volume

19   from our competitors.  In the QSR group we cooperated with our

20   competitors, sold them product in an effort to help them cover

21   their business so there wasn't a service disruption to the

22   customer.  That's contrasting the two ways that it was used.

23   Q.  So did that flat-out hard-nosed competition exist in

24   Defendant Austin's group?

25   A.  No.

Robert Bryant - Redirect

1          MS. CALL:  No further questions.

2          THE COURT:  Is Mr. Bryant subject to recall?

3          MR. LAVINE:  We are not going to release him, Your

4    Honor.  Yes.

5          THE COURT:  Got it.

6          So, Mr. Bryant, other than being subject to recall,

7    you are excused.  Thank you.

8          Go ahead, Ms. Call.

9          MS. CALL:  The government has several documents to

10   publish at this time.

11         THE COURT:  All right.

12         MS. CALL:  First the government seeks to offer

13   Exhibits 18 and 19.

14         THE COURT:  Any objection to the admission of

15   Exhibits 18 or 19 subject to previous objections?

16         18 and 19 will be admitted.

17         MS. CALL:  Permission to publish Government

18   Exhibit 18?

19         THE COURT:  Yes, you may.  Can you display that for me

20   first?

21         MS. CALL:  It's published right now.

22         THE COURT:  So, Ladies and Gentlemen, Exhibit 18 is

23   another of those exhibits, and there may be some others, we'll

24   see, that is what I referred to as a summary exhibit.  As I

25   just mentioned, I have admitted those over the objection of

Robert Bryant - Redirect

1    each of the defendants.  Those exhibits are admitted into

2    evidence because they may assist you in understanding the

3    evidence that has been presented.

4         But a summary itself is not evidence of the material

5    it summarized and only is as valid and reliable as the

6    underlying material it seeks to summarize.  You may give a

7    summary exhibit entire weight, some weight, or no weight at all

8    depending on your assessments of the underlying material and

9    the accuracy of the summary.

10        Ms. Call, you wanted to display 18?

11        MS. CALL:  Yes, the first page to start with.

12        Ms. Pearce, if you could please zoom in on the

13   content.

14        THE COURT:  You may.  All right.  Next page?

15        MS. CALL:  Ms. Pearce, could you please publish

16   page 2?

17        Permission to publish Government's Exhibit 19?

18        THE COURT:  You may.  Ladies and Gentlemen, this is

19   another summary exhibit, same admonition.

20        All right.  Next page.

21        MS. CALL:  That was a one-page.

22        So now there is several documents, text message

23   strings, so I think they will not take all that long, starting

24   with Government's Exhibit 6235.

25        THE COURT:  You may display that.  All right.

Robert Bryant - Redirect

1          MS. CALL:  The next four are going to be 1846 through

2     1849.

3          THE COURT:  Go ahead with 1846.

4          MS. CALL:  Thank you, Your Honor.

5          THE COURT:  All right.

6          MS. CALL:  Next is 1847, the next is 1848, and then

7     1849.  Next I believe is a nine-message string.  Would it make

8     sense to read all of the numbers now?

9          THE COURT:  Are they consecutive or --

10         MS. CALL:  Yes.

11         THE COURT:  Go ahead.

12         MS. CALL:  Well, mostly consecutive, so 1850 through

13    1854, and then it's 1856 to 1858 after that, and 1862.

14         THE COURT:  You can do that.  Just start with -- if

15    you can just mention the first one, then.

16         MS. CALL:  1850 will be the first.

17         THE COURT:  All right.

18         MS. CALL:  Thank you.

19         THE COURT:  All right.

20         MS. CALL:  1851.

21         THE COURT:  All right.

22         MS. CALL:  1852.

23         THE COURT:  All right.

24         MS. CALL:  1853.

25         THE COURT:  All right.

                          Robert Bryant - Redirect

 1              MS. CALL:  1854.

 2              THE COURT:  All right.

 3              MS. CALL:  1856.

 4              THE COURT:  We're good.

 5              MS. CALL:  1857.

 6              THE COURT:  That is not in evidence.

 7              MS. CALL:  You are right, and that is not the number I

 8   meant to say.  1858 would be the next.

 9              THE COURT:  Ms. Call, did you want to display 1858,

10   then?

11              MS. CALL:  Yes, Your Honor.  Permission to publish,

12   please.

13              THE COURT:  Yes.  All right.

14              MS. CALL:  The last of the text messages is 1862.

15              THE COURT:  That can be displayed.

16              MS. CALL:  Thank you.  I believe it is.

17              THE COURT:  All right.

18              MS. CALL:  There are two e-mails, Your Honor.  The

19   first is Exhibit 6198, and I believe this is subject to a

20   limiting instruction.

21              THE COURT:  Okay.  That has been admitted, and it is

22   subject to a limiting instruction.

23              Ladies and Gentlemen, this particular exhibit, 6198,

24   can be considered by you for a limited purpose; namely, you can

25   consider it for proof of the existence of a conspiracy, but not

2453
Robert Bryant - Redirect

1    as to whether any defendant was a member of that conspiracy.

2         *MS. CALL:*  Permission to publish, Your Honor?

3         *THE COURT:*  You may.

4         *MS. CALL:*  Your Honor, may we take this down?  I

5    believe this is actually the wrong exhibit that is being

6    published right now.  We have located the correct exhibit and

7    permission to publish.

8         *THE COURT:*  Let's have a brief side bar.

9       (At the bench:)

10        *THE COURT:*  So what exhibit number was displayed to

11   the jury?

12        *MS. CALL:*  Yes, Your Honor.  That was Exhibit 6199.

13   There was some mistake in our display software that had it

14   saved as 6198, but the sticker actually did say 6199.  So I

15   don't know the appropriate solution, perhaps striking anything

16   regarding that exhibit.  We don't intend to offer it and we did

17   not intend for the jury to see it either.

18        *THE COURT:*  Comments from -- I think it would be

19   appropriate to instruct the jury to disregard that exhibit.  It

20   has not been admitted, and therefore they should disregard the

21   contents of that document.  Any disagreement?

22        *MR. TUBACH:*  No, Your Honor.

23        *MR. FELDBERG:*  No, Your Honor.

24        *THE COURT:*  Thank you.

25      (In open court:)

Robert Bryant - Redirect

1    THE COURT:  Ladies and Gentlemen, that exhibit that
2    was just shown to you was the wrong exhibit.  That is not an
3    admitted exhibit, and therefore the contents of that e-mail
4    should be disregarded by you, all right?
5        MS. CALL:  Permission to publish the actual
6    Exhibit 6198?
7        THE COURT:  Yes.  And, Ladies and Gentlemen, that
8    limiting instruction that I gave you applies to this one that
9    you are about to see.  In other words, the jury can only
10   consider this particular exhibit for proof of the existence of
11   a conspiracy, not that any particular defendant was a member of
12   that conspiracy.
13       MS. CALL:  Scroll down to the bottom of the e-mail
14   first.
15       THE COURT:  We can scroll to the top.
16       MS. CALL:  The last is Government Exhibit 3037, which
17   I believe is also subject to a limiting instruction.
18       THE COURT:  All right.
19       Ladies and Gentlemen, as to this particular exhibit,
20   same as the last time.  You can consider the e-mail to prove
21   the existence of a conspiracy, but not as to whether any
22   defendant was a member of that conspiracy.
23       You may display it.
24       MS. CALL:  Just to clarify, was that limiting
25   instruction only as to the lower e-mail in the chain?

Joseph Brink - Direct

1        THE COURT:  Good clarification.  Yes.  Could we go to

2    the lower e-mail?

3        MS. CALL:  I believe they are both on the screen at

4    the moment.

5        THE COURT:  Yes.  Ladies and Gentlemen, that

6    admonition applies to the lower e-mail only, all right, the

7    lower e-mail only.  All right.

8        MS. CALL:  The United States will now call its next

9    witness, Mr. Joe Brink.

10       (**Joseph Brink** was sworn.)

11       THE WITNESS:  I do.

12       COURT DEPUTY CLERK:  Please state your name and spell

13   your first and last name for the record.

14       THE WITNESS:  Joseph Wade Brink; J-O-S-E-P-H, Brink,

15   B-R-I-N-K.

16       THE COURT:  Go ahead, Mr. Koenig.

17                      **DIRECT EXAMINATION**

18   BY MR. KOENIG:

19   Q.  Good morning, Mr. Brink.  Where do you work?

20   A.  I work for Fiesta Restaurant Group.

21   Q.  What is your current position at Fiesta Restaurant Group?

22   A.  Chief procurement officer.

23   Q.  I didn't hear your middle word.

24   A.  Procurement.

25   Q.  Procurement, okay.  How long have you held that position?

Joseph Brink - Direct

1    A.  Since 2016.

2    Q.  What are your principal job responsibilities as the chief

3    procurement officer?

4    A.  Purchasing all foods and packaging and all supply chain

5    management distribution for the restaurants.

6    Q.  And does Fiesta Restaurant Group buy chicken?

7    A.  Yes, we do.

8    Q.  What responsibilities do you have for the purchase of

9    chicken?

10   A.  I am in charge of purchasing chicken for the company.

11   Q.  Does that include negotiations --

12   A.  Yes.

13   Q.  -- with suppliers?

14   A.  Correct.

15   Q.  And how long have you worked at Fiesta?

16   A.  Since 2011.

17   Q.  Does Fiesta Restaurant Group operate a chain of

18   restaurants?

19   A.  Yes, we do.

20   Q.  And what is that called?

21   A.  We currently have one restaurant chain called

22   Pollo Tropical.

23   Q.  Currently.  Did you previously have other restaurant

24   chains?

25   A.  Yes, we did.

Joseph Brink - Direct

1    Q.   And what were those?

2    A.   We had Taco Cabana and Cabana Grill.

3    Q.   Cabana Grill?

4    A.   Yes.

5    Q.   What does the name "Pollo Tropical" mean?

6    A.   It means tropical chicken.

7    Q.   And could you explain to the jury the concept behind the

8    Pollo Tropical restaurant?

9    A.   We are a quick-service, fast, casual, hybrid restaurant

10   chain that specializes in grilled tropical flavored chickens

11   that emphasizes flavors from Cuba, Central America, and

12   South America, Caribbean flavors.

13   Q.   How many locations are there?

14   A.   Currently there is 138 restaurants.

15   Q.   Where are those located?

16   A.   Florida.

17   Q.   May seem like an obvious question, but is chicken on the

18   menu at Pollo Tropical?

19   A.   Yes, it is.

20   Q.   How would you describe the importance of chicken to Pollo?

21   A.   It's very important.

22   Q.   What is Pollo's annual spend on chicken approximately?

23   A.   About 40 to $50 million.

24   Q.   Was that true in 2014?

25   A.   About that -- probably was, probably a little less, but

2458

Joseph Brink - Direct

1    probably 30 to 40 million back then.

2    Q.  And in 2015?

3    A.  Probably 35 to 45.

4    Q.  And what percent of Pollo's annual spend is on chicken?

5    A.  It's about 55 percent.

6    Q.  Is there a particular type of chicken that you buy for

7    Pollo Tropical?

8    A.  I don't understand what you're asking.

9    Q.  Oh, I'm sorry.  Is there a particular size chicken?

10   A.  Yes.  We buy what's called the small bird chicken.

11   Q.  Okay.  And why is it that you buy small bird?

12   A.  The small bird chickens, if you buy the large -- we bought

13   small bird chickens, whole chickens, that have been -- they are

14   split to the breast so they can grill.  We buy them small

15   because they are the size that we can marinate and cook.  It

16   has the texture and the bite that we are looking for for our

17   customers.

18   Q.  And why not buy big birds?

19   A.  It does not work for us.  They don't marinate right.  They

20   can't cook in the amount of time, and it's just too tough.

21   Q.  By "tough," what do you mean?

22   A.  The meat texture and everything else.

23   Q.  So you said you negotiate with chicken suppliers for

24   chicken, right?

25   A.  Yes.

Joseph Brink - Direct

1   Q.  What considerations do you take into account when you are

2   negotiating chicken prices?

3   A.  We look at suppliers' ability to buy us, say, chickens at

4   the volumes they can provide for us, the ability to maintain

5   our product specifications, the ability to get the products to

6   our distributor, the location of the plants, and the ability to

7   provide quality product and consistently on time.

8   Q.  How important is price as a factor in your negotiations?

9   A.  It's pretty important.

10  Q.  Okay.  And so how do you go about -- so your goal is to

11  obtain the best price, or that's one of your goals.

12          MR. CANTY:  Objection, leading.

13          THE COURT:  Sustained.

14  BY MR. KOENIG:

15  Q.  What is one of your goals in negotiations?

16  A.  To get the best price that I can.

17  Q.  All right.  And how do you go about doing that?

18  A.  We ask suppliers to submit their pricing to us with the

19  amount of quantities they can provide and at the pricing they

20  can do for the term of the contract, and they submit it to us

21  individually.  And then we review it and make decisions from

22  there.

23  Q.  All right.  Now, going back a little bit to the first part

24  of your answer, "they submit to you individually," what does

25  that mean?

Joseph Brink - Direct

 1   *A.*  Each supplier submits pricing to us individually, so when I

 2   get the e-mails and the letters of pricing agreements, we have

 3   the ability to look at the pricing agreements proposals and put

 4   them side by side and review it as a company and make a

 5   decision on which suppliers get what volumes.

 6   *Q.*  Why --

 7        MR. LAVINE:  Your Honor, may I be heard for a moment,

 8   please?

 9        THE COURT:  Sure.

10      (At the bench:)

11        THE COURT:  Go ahead, Mr. Lavine.

12        MR. LAVINE:  Your Honor, I didn't know how to else to

13   do this, but I would like to move the lectern a little bit to

14   the left so Mr. Roberts can see the witness.  We can't see the

15   witness, and I didn't want to get up and move with Mr. Koenig

16   doing the examination.  That was all it was.

17        THE COURT:  Sure.  Mr. Koenig, if you don't mind,

18   could you try to reposition?  Which way would you want --

19        MR. LAVINE:  I can -- I know exactly where that leg

20   needs to go.

21        THE COURT:  If that's all right with you, Mr. Koenig,

22   if he assists you to get that positioned right.

23        MR. LAVINE:  Thank you, Your Honor.

24      (In open court:)

25        MR. McLOUGHLIN:  Can we go back on side bar for a

Joseph Brink - Direct

1   second, please?

2       (At the bench:)

3           THE COURT:  Go ahead, Mr. McLoughlin.

4           MR. McLOUGHLIN:  Your Honor, the last question that

5   Mr. Koenig was in the process of asking was a why question to

6   Mr. Brink.  I am going to object to the why because that is the

7   door-opening mechanism to a lecture on the competition issue

8   and the need for secrecy and how it preserves competition and

9   all of the issues we have gone over so many times that the

10  Court has held are not appropriate at this trial.

11          So I object to any question, and particularly this

12  question from Mr. Koenig, with respect to why again because it

13  opens the door for this witness to say it's wrong to share

14  information and all those other issues.

15          THE COURT:  Well, Mr. Koenig has got the right to ask

16  him about the bid system used and the fact it's a closed

17  bidding system, assuming that's what he is going to say.

18          Mr. Koenig, I assume you do not anticipate he is going

19  to talk about morally wrong or anything of that nature because

20  he has been prepared that that is not an appropriate topic,

21  correct?

22          MR. KOENIG:  Yes, we have told him many times, so I

23  don't anticipate he would say that.  If I think that he might

24  start to go there, I will just cut him off.

25          THE COURT:  Okay.  Anything else, Mr. McLoughlin?

2462

Joseph Brink - Direct

1    MR. McLOUGHLIN:  No, Your Honor.  Thank you.

2        (In open court:)

3        THE COURT:  Go ahead, Mr. Koenig.

4    BY MR. KOENIG:

5    Q.  Mr. Brink, why do you set up the bidding system the way you

6    did?

7    A.  We do that so we can get the pricing individually so we can

8    try to get the best pricing from each supplier, and we can

9    review it and determine which supplier we will issue the

10   contracts to based upon pricing and their ability to supply

11   products to us.

12   Q.  And did you use that process in the 2013 negotiations?

13   A.  Yes.

14   Q.  And the 2014 negotiations?

15   A.  Yes.

16   Q.  And those predicate facts -- were -- the 2013 negotiations

17   were for what, what time period?

18   A.  2014.

19   Q.  Okay.  And then the 2014 negotiations were for what time

20   period?

21   A.  2015.

22   Q.  Okay.  I want to talk about both 2013 and 2014, okay?

23   A.  Okay.

24   Q.  In 2013, did you have multiple suppliers that you

25   negotiated with?

Joseph Brink - Direct

1    A.   Yes.

2    Q.   And which ones were those?

3    A.   2013?

4    Q.   If you can --

5    A.   2013?  I do believe it was Pilgrim's and Claxton.

6    Q.   In 2013, did you consider those two companies, Pilgrim's

7    and Claxton, to be competitors?

8    A.   Yes.

9    Q.   2014, did you have multiple suppliers you negotiated with

10   for 2015?

11   A.   Yes.

12   Q.   Which suppliers were those?

13   A.   We had Pilgrim's, Claxton, and Holmes.

14   Q.   And at that time did you consider those three companies to

15   be competitors?

16   A.   Yes.

17   Q.   All right.  If you could just -- let's start with Holmes.

18   What is Holmes?

19   A.   Holmes is a regional chicken company out of Nixon, Texas,

20   that specializes in small bird chickens.

21   Q.   And what is Claxton?

22   A.   They are another regional player, a chicken supplier out of

23   Claxton, Georgia, that specializes mostly in small bird

24   chickens.

25   Q.   And finally, what is Pilgrim's?

Joseph Brink - Direct

1   A.  Pilgrim's is a very large chicken company that has multiple

2   plants across the country that has both small and large bird

3   facilities.

4   Q.  If I could ask you to turn your binder to Tab 19, which is

5   Government Exhibit 561.  Did we not get you a binder?

6           MR. KOENIG:  May I approach?

7           THE COURT:  You may.

8   BY MR. KOENIG:

9   Q.  Now, in your actual binder, can you turn to Tab 19, please,

10  which is Government Exhibit 561?

11          Do you recognize Government Exhibit 561?

12  A.  Yes.

13  Q.  What is it?

14  A.  These are e-mails between myself and Jimmie Little

15  regarding a meeting at the restaurant to go over some specs for

16  our sister brand, Taco Cabana.

17  Q.  And what is the date of the e-mail?

18  A.  August 15th, 2014.

19  Q.  Is it 14th?  I know it's hard to read, but...

20  A.  The top one says the 14th.

21  Q.  Okay.

22  A.  And 13th, yeah.  I'm sorry, I can't see a three and a five.

23          MR. KOENIG:  Your Honor, the government moves to admit

24  Government Exhibit 561.

25          THE COURT:  Any objection to the admission of 561?

Joseph Brink - Direct

1          MR. KOENIG:  And I believe it had a limiting

2    instruction.

3          THE COURT:  Okay.  Mr. Canty?

4          MR. CANTY:  No objection, Your Honor.

5          THE COURT:  Oh, sorry, didn't hear you.  Let me check

6    on the limiting instruction.  I am not sure about that.  Let's

7    have a side bar briefly.

8       (At the bench:)

9          THE COURT:  So, Mr. Koenig, the limiting instruction

10   was that Mr. Brink's statements would be admitted not for the

11   truth of the matters asserted, but only for the effect of those

12   statements on the listener.  I am not sure whether this

13   particular exhibit came in through someone other than Mr. Brink

14   last time.  Do you know?

15         MR. KOENIG:  I believe it did come in through him.

16   I -- we would have to check the transcript, but I am not really

17   going to dwell on this, so it comes in with or without a

18   limiting instruction.

19         THE COURT:  I am just wondering why we would need that

20   type of limiting instruction with the witness on the stand.  I

21   don't know.

22         MR. KOENIG:  I was just going by what I read on the

23   transcript from last time, so ...

24         THE COURT:  Mr. Canty, you don't have to stand.

25         MR. CANTY:  For what it's worth, I agree with

Joseph Brink - Direct

1    Your Honor.

2            MR. BELLER:  Your Honor, if I may be of assistance, I

3    am looking at a tracking sheet.  It does look like it was

4    introduced through the government in the last case.  I don't

5    have recollection or notes on why the limiting instruction was

6    given and take no position on it.

7            THE COURT:  Okay.  Yeah, I don't think the limiting

8    instruction was appropriate in the case of this particular

9    exhibit with Mr. Brink on the stand.

10           All right.  And I will admit 561.

11           MR. KOENIG:  Thank you.

12      (In open court:)

13           THE COURT:  Exhibit 561 is admitted, and there is no

14   limiting instruction on that one.

15           MR. KOENIG:  Thank you, Your Honor.

16   BY MR. KOENIG:

17   Q.  Actually, we will come back to 561.

18           MR. KOENIG:  If we could pull up Exhibit I-228.

19   BY MR. KOENIG:

20   Q.  And that is not in your binder.  All right.  Do you

21   recognize I-228?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is a chicken contract between Pollo Tropical and

25   Pilgrim's Pride for chicken products.

Joseph Brink - Direct

1    *Q.*  And what time period does the contract cover?

2    *A.*  I can't see the dates.  It's for the calendar year 2014.

3         *MR. KOENIG:*  If we could go to the last page of the

4    exhibit, please.

5         *MR. TUBACH:*  Your Honor, could we have a side bar,

6    please?

7         *THE COURT:*  Yes.

8      (At the bench:)

9         *THE COURT:*  Mr. Tubach, go ahead.

10        *MR. TUBACH:*  Your Honor, the portion of the document

11   that the government wants to display to this witness has a

12   confidentiality provision in it, and we have talked about that.

13   That's not something that the jury should be evaluating in

14   deciding whether or not there was a conspiracy.  If the only

15   purpose of showing the last page is to show Mr. Penn signed the

16   document, then we should be showing only that portion of the

17   document, not the portion that relates to confidentiality.

18        *THE COURT:*  Response, Mr. Koenig?

19        *MR. KOENIG:*  I don't intend to show the

20   confidentiality paragraph at all.  I just want to use it for

21   comparison in price for the following year.

22        *THE COURT:*  Do you intend to admit the exhibit?

23        *MR. KOENIG:*  Yes.

24        *MR. TUBACH:*  We will be objecting on the admission of

25   the portion that relates to confidentiality.

Joseph Brink - Direct

1        THE COURT:  Mr. Tubach, is your suggestion that it be

2   redacted, or how would that be accomplished?

3        MR. TUBACH:  Yes, exactly.

4        THE COURT:  Mr. Canty?

5        MR. CANTY:  I was just going to point out that this

6   document is the subject of stipulation, so we don't have to go

7   through a foundation on it.

8        THE COURT:  Well, it sounds like even if it's

9   stipulated, we have got a redaction issue.

10        Mr. Koenig, on that issue, the redaction issue?

11        MR. KOENIG:  I really don't see why that's necessary

12   given that we're not going to be relying on it at all.  There

13   is all sorts of provisions in there and nobody is pointing out

14   the confidentiality designation and it's certainly not our

15   doing that pursuant to the Court's previous orders that that's

16   something that the jury should focus on or anything, so I

17   really don't see the necessity.

18        THE COURT:  Okay.  But for the same reason you are

19   okay with redacting it?

20        MR. KOENIG:  Sure, yeah.

21        THE COURT:  Okay.  Thank you.

22     (In open court:)

23        MR. KOENIG:  All right.  We are on page 9, I believe.

24   BY MR. KOENIG:

25   Q.  Is it showing on your screen, Mr. Brink?

2469

Joseph Brink - Direct

1   A.   Yes.

2   Q.   Okay.  Who signed the contract on behalf of Pollo?

3   A.   I did.

4   Q.   And who signed the agreement on behalf of Pilgrim's?

5   A.   Jayson Penn.

6   Q.   Do you know Mr. Penn?

7   A.   Not personally.

8          MR. KOENIG:  Government moves to admit I-228.

9          THE COURT:  Any objection to the admission of I-228

10  other than previous objections?

11         I-228 will be admitted.

12         MR. KOENIG:  Permission to publish, Your Honor?

13         THE COURT:  You may.

14         MR. McLOUGHLIN:  Pursuant to the discussion we just

15  had, I believe the entire last paragraph --

16         MR. KOENIG:  I am sorry, I meant to say -- oh, I guess

17  it is.  Can we just zoom on the signature block?

18  BY MR. KOENIG:

19  Q.   Those were the signatures you were looking at when you

20  answered the last question?

21  A.   Yes.

22  Q.   Okay.

23         MR. KOENIG:  Now, could we go to page 1, please.

24  Thank you.

25  BY MR. KOENIG:

Joseph Brink - Direct

1    Q.  All right.  Can you -- if I can direct your attention to

2    the table in the middle of the page.  Do you see that?

3    A.  Yes.

4    Q.  Can you explain to the jury what that table represents?

5    A.  That table states the product that we're purchasing, the

6    pack size, the estimated annual volume in pounds, and the

7    product price per pound delivered.

8    Q.  And what are the two products?

9    A.  The split breast WOGs and the breast filet skinless.

10   Q.  Okay.  So are the split breast WOGs, those are the ones you

11   said you grilled flat on the grill?

12   A.  Correct.

13   Q.  And that's a bone-in product?

14   A.  Yes.

15   Q.  And then what is the -- the other one, the breast filet

16   skinless boneless?

17   A.  It's a skinless breast like you buy at a grocery store.

18   Q.  And what is the -- and this is a contract with -- between

19   whom?

20   A.  Between Pollo Tropical and Pilgrim's Pride.

21   Q.  And you participated in negotiations in 2013 for the 2014

22   year?

23   A.  Yes.

24   Q.  And this is the contract with Pilgrim's that resulted from

25   those negotiations?

Joseph Brink - Direct

1    A.   Yes.

2    Q.   What is the price per pound for these split breast WOGs?

3    A.   88 cents per pound.

4         MR. KOENIG:   Thank you.   If we could also pull up

5    Exhibit I-231.

6    BY MR. KOENIG:

7    Q.   Do you see I-231?

8    A.   Yes.

9    Q.   Do you recognize it?

10   A.   Yes.

11   Q.   And what is it?

12   A.   This is a contract between Pollo Tropical and Claxton

13   Poultry.

14   Q.   And if you turn to the final page, page 9 again, who signed

15   this contract?

16   A.   Walter Cooper.

17   Q.   On behalf of Claxton?

18   A.   Yes.

19   Q.   Who signed it on behalf of Pollo?

20   A.   I did.

21   Q.   And I am sorry, I can't remember if I asked you this.   What

22   is -- if you go back to page 1, what is the term of the

23   contract?

24   A.   It's for calendar 2014.

25        MR. KOENIG:   Government moves -- and also subject to

Joseph Brink - Direct

1   what we just discussed with the last contract, the government

2   moves to admit I-231.

3           THE COURT:  Any objection to I-231?

4           MR. BELLER:  Subject to that one minor revision, no.

5           THE COURT:  Then I-231, with that provision, will be

6   admitted.

7           MR. KOENIG:  All right.  Ms. Pearce, if you could zoom

8   in on the signature block on page 9.

9           And then permission to publish?

10          THE COURT:  You may.

11  BY MR. KOENIG:

12  Q.  All right.  Is this the signature block you just read from?

13  A.  Yes.

14  Q.  And you said Walter Cooper on the right there.  Who is

15  Walter Cooper?

16  A.  He was my national account manager for Claxton Poultry.

17  Q.  He worked for Claxton?

18  A.  Yes.

19  Q.  Was he the guy from Claxton you negotiated with?

20  A.  Yes.

21  Q.  And who at Pilgrim's did you negotiate with primarily?

22  A.  Jimmie Little.

23          MR. KOENIG:  If we could go to page 1 of I-231.

24  BY MR. KOENIG:

25  Q.  All right.  You see where there is a similar-looking table

2473

Joseph Brink - Direct

1   in the middle?

2   A.   Yes.

3   Q.   All right.  Now, this one you see it says split-breast

4   WOGs.  Do you see that?

5   A.   Yes.

6   Q.   But it doesn't have the boneless skinless line?

7   A.   Yes.

8   Q.   Why is that?

9   A.   The only thing we agreed to purchase from Claxton was just

10  the split-breast WOGs.  They didn't really have enough volume

11  to supply us on breast meat.

12  Q.   For calendar 2014, who did -- what companies supplied you

13  with the split breast?

14  A.   For Pollo Tropical?

15  Q.   Yeah.

16  A.   Would be Pilgrim's Pride.

17  Q.   And?

18  A.   Split-breast WOGs or split breasts?

19  Q.   WOGs, sorry.

20  A.   Split-breast WOGs would be Pilgrim's and Claxton.

21  Q.   And could you explain to the jury what a WOG is?

22  A.   A WOG is the whole chicken.  It doesn't have the giblets,

23  the hearts and livers and gizzards.

24  Q.   And what was the price per pound that you negotiated with

25  Mr. Cooper at Claxton for calendar year 2014 for the WOGs?

Joseph Brink - Direct

1    *A.*  88 cents per pound.

2    *Q.*  And is that the same or different than the price you

3    negotiated with Pilgrim's for that year?

4    *A.*  It's the same.

5    *Q.*  If I could ask you to turn in your binder to Tab 13.  Are

6    you there?

7    *A.*  Yes.

8    *Q.*  Do you recognize -- and that's Government Exhibit 9726.  Do

9    you recognize Government Exhibit 9726?

10   *A.*  Yes.

11   *Q.*  What is it?

12   *A.*  It's a contract between Pollo Tropical and Claxton Poultry

13   for 2015 calendar year.

14   *Q.*  All right.

15        MR. KOENIG:  And if we could turn to page 9 and look

16   at the signature block.

17   *BY MR. KOENIG:*

18   *Q.*  Who signed this contract?

19   *A.*  It was never signed.

20   *Q.*  Why is that?

21   *A.*  When this contract was done, it's the same contract that

22   we've used for several years, Claxton wanted to make some

23   changes to the contract.  And when that happens, it goes to our

24   legal -- it was going back and forth between the legal

25   companies -- departments for several months.  By September and

2475

Joseph Brink - Direct

1   October, it still wasn't done yet.

2   Q.   So it just never got signed?

3   A.   Correct.

4   Q.   But in your view was this the contract for calendar year

5   2015 between you -- between Pollo Tropical and Claxton?

6   A.   Yes.

7          MR. KOENIG:   The government, subject to same

8   limitations, moves to admit Government Exhibit 9726.

9          THE COURT:   With those same limitations, any objection

10  to the admission of Exhibit 9726?

11         9726 will be admitted.

12         MR. KOENIG:   All right.   If we go to page 1.   Can you

13  just, Ms. Pearce, zoom in on the table and the four lines

14  underneath that, please.

15         Permission to publish?

16         THE COURT:   You may.

17  BY MR. KOENIG:

18  Q.   Okay, Mr. Brink.   So similar to the last contract we looked

19  at, can you explain the table that you see there?

20  A.   This is a table that shows that we're purchasing

21  split-breast WOGs, 17 million pounds at 98 cents a pound and

22  45.08 per case with an asterisk.   And below it, it shows that

23  this is a stair-stepping pricing.

24         So we had the first pricing increase started January

25  1st through March 31st, 98 cents per pound, 45.08 per case.

Joseph Brink - Direct

1    Then from April 1st, 2015 through June 30th, 2015, the pricing

2    would be $1.02 per pound at $46.92 per case.  Then from

3    July 1st through December 31st, 2015, the pricing will be $1.07

4    per pound at $49.22 per case.

5    Q.  Do you remember when we looked at Government Exhibit I-231,

6    the contract from Claxton the previous year?

7    A.  Yes.

8    Q.  Do you recall the price per pound?

9    A.  88 cents per pound.

10   Q.  And then the final price that you ended up at in the

11   following year for July 31st to December 31st, what is that

12   price per pound?

13   A.  $1.07 per pound.

14   Q.  What is the difference between $1.07 and 88 cents?

15   A.  19 cents per pound.

16        MR. KOENIG:  And let's go to Tab 5, please.

17        I am sorry.  Bear with me, please, a moment, Your

18   Honor.

19        THE COURT:  Sure.

20        MR. KOENIG:  I am sorry, I meant Tab 7.

21   BY MR. KOENIG:

22   Q.  Do you recognize -- that's Government Exhibit 572.  Do you

23   recognize Government's Exhibit 572?

24   A.  Yes.

25   Q.  And what is it?

2477

Joseph Brink - Direct

1  *A.*  It's a contract between Pollo Tropical and Pilgrim's Pride

2  for calendar year 2015.

3  *Q.*  All right.  And if we could turn to the last page.  Who

4  signed the contract for Pollo Tropical?

5  *A.*  I did.

6  *Q.*  And who signed it for Pilgrim's Pride?

7  *A.*  Jayson Penn.

8       *MR. KOENIG:*  Government moves to admit Government

9  Exhibit 572.

10      *THE COURT:*  Subject to?

11      *MR. KOENIG:*  The same limitations, yes.

12      *THE COURT:*  Any objection to the admission of 572?

13      572 will be admitted.

14      *MR. KOENIG:*  Permission to publish?

15      *THE COURT:*  You may.

16  *BY MR. KOENIG:*

17  *Q.*  Is this the signature block you just referred to?

18  *A.*  Yes.

19      *MR. KOENIG:*  Can we go to page 1, please, Ms. Pearce?

20  Thank you.

21  *BY MR. KOENIG:*

22  *Q.*  You see the table in the middle?

23  *A.*  Yes.

24  *Q.*  Now, the first line of it says "split-breast WOGs."  Do you

25  see that?

Joseph Brink - Direct

1    A.   Yes.

2    Q.   Is that the same product or a different product that we

3    just talked about with respect to Claxton's 2015 contract?

4    A.   It's the same product.

5    Q.   And what is the price per pound for 2015 for the

6    split-breast WOGs?

7    A.   $1.07 per pound.

8    Q.   And what was the previous year's price with

9    Pilgrim's Pride?

10   A.   88 cents per pound.

11   Q.   And what is the difference between $1.07 and 88 cents?

12   A.   19 cents per pound.

13   Q.   And for this contract who did you primarily interact with

14   at Pilgrim's Pride for negotiations?

15   A.   Jimmie Little.

16   Q.   Thank you.

17             All right.  I would like to go back now to Tab 19,

18   which is the --

19             MR. KOENIG:  I believe it was admitted.  If not, we

20   move to admit 561.

21             THE COURT:  It has been admitted.

22   BY MR. KOENIG:

23   Q.   Do you recognize 561?

24   A.   Yes.

25   Q.   Okay.  And just -- I know we went through this, but it was

Joseph Brink - Direct

1    a little bit ago, can you just remind the jury, what is 561?

2           *MR. KOENIG:*  Oh, permission to publish?

3           *THE COURT:*  You may.

4    *BY MR. KOENIG:*

5    *Q.*  What is it?

6    *A.*  It's an e-mail between myself and Jimmie Little talking

7    about specifications and chicken for our sister brand,

8    Taco Cabana, and we are going to have a lunch at our restaurant

9    to discuss it.

10   *Q.*  Which restaurant?

11   *A.*  Pollo Tropical.

12   *Q.*  Where?

13   *A.*  In Addison, Texas.

14   *Q.*  On August 14 of 2014?

15   *A.*  For lunch, yes.

16   *Q.*  Did you end up actually meeting Defendant Little for lunch?

17   *A.*  Yes, we did.

18   *Q.*  And you remember that meeting?

19   *A.*  Yes.

20   *Q.*  All right.  I believe you said that you started out talking

21   about specifications for, was it, Taco Cabana or the other --

22   *A.*  Taco Cabana.

23   *Q.*  Did the conversation turn eventually to Pollo Tropical?

24   *A.*  Yes.

25   *Q.*  And what was discussed?

Joseph Brink - Direct

1    *A.*  We discussed -- basically Jimmie kind of said pricing for

2    next year is going to be two.

3    *Q.*  Two?

4    *A.*  I said, 2 cents per pound?

5    *Q.*  You are talking about an increase?

6    *A.*  Increase, right.  And he said, No, it will start with a

7    two.

8    *Q.*  All right.  And did you have an understanding as to what he

9    meant?

10   *A.*  20 cents or higher.

11          *MR. McLOUGHLIN:*  Objection to current, to put an

12   understanding on what the words were.  The words are in

13   evidence, Your Honor.  The jury can decide what they might

14   mean, but he should not speculate as to what -- the meaning.

15          *THE COURT:*  Overruled.

16   *BY MR. KOENIG:*

17   *Q.*  What was your understanding of what Mr. Little was

18   conveying to you?

19   *A.*  That the pricing is going to be a -- 20 cents a pound or

20   higher.

21   *Q.*  An increase?

22   *A.*  Increase.

23   *Q.*  And then what happened next?

24   *A.*  The meeting ended.  I left.  I said, No, it's not going to

25   happen; we are not discussing chicken in August and have a

Joseph Brink - Direct

1   20-cents-a-pound price increase.  So the meeting ended, and I

2   went home -- back to the office.

3   *Q.*  So you just up and left.

4   *A.*  Yes.

5   *Q.*  In your experience negotiating with chicken suppliers, how

6   would you characterize the 20-cent increase relative to other

7   years?

8   *A.*  I never had that before.  Usually increases were plus or

9   minus 3 to 5 cents each way, increase or decrease, but we never

10  have had an increase of 20 cents per pound on whole chickens.

11  *Q.*  So it was a surprise to you?

12  *A.*  Yes.

13          *MR. KOENIG:*  You can take this exhibit down.  This

14  might be a good time.

15          *THE COURT:*  It is a good time.  Ladies and Gentlemen,

16  we will go ahead and break for lunch at this point in time.

17  Keep the admonitions in mind.  Keep those yellow juror buttons

18  visible if you go out or even in the hallways.  The jury is

19  excused for the lunch break.  We will reconvene at 1:30.

20          (Jury excused.)

21          *THE COURT:*  Mr. Brink, you are excused for lunch.  And

22  everyone else may be seated.

23          Anything to take up at this time?  All right.  We will

24  be in recess.  Thank you.

25      (Recess at 12:00 o'clock p.m. until 1:32 p.m.)

Joseph Brink - Direct

1        THE COURT:  Mr. Koenig, go ahead.

2        MR. KOENIG:  I just wondered if the Court might

3   inquire if there is an updated witness list, because they said

4   that Mr. Bryant is subject to recall, and he is not on their

5   list, so I don't know if it's changed or what's going on.

6        THE COURT:  Mr. Lavine, go ahead.

7        MR. LAVINE:  I will be honest with you, I haven't

8   looked at it right now.  I was reacting to what happened with

9   the redirect, especially by government counsel, so I have to

10  reassess that tonight.

11       THE COURT:  All right.  Are we ready for Mr. Brink?

12  Let's bring Mr. Brink back in and get the jury.

13            (Jury present.)

14       THE COURT:  Mr. Koenig, go ahead.

15       MR. KOENIG:  Thank you, Your Honor.

16  BY MR. KOENIG:

17  Q.  Good afternoon, Mr. Brink.  I think where we left off is

18  the lunch you walked out of; is that right?

19  A.  Yes.

20  Q.  I am going to ask you to turn to Tab 2, which is

21  Government's Exhibit 566.  Do you recognize Government's

22  Exhibit 566?

23  A.  Yes, I do.

24  Q.  And what is it?

25  A.  It's e-mails between myself and Jimmie Little regarding

2483

Joseph Brink - Direct

1  chicken for 2015 on freight and FOB pricing.

2  Q.  And what's the date?

3  A.  From the bottom of the page is October 1st and the top of

4  the page is October 2nd.

5       MR. KOENIG:  The government moves to -- the government

6  offers Exhibit 566.

7       THE COURT:  All right.  Any objection to the admission

8  of Exhibit 566?

9       MR. CANTY:  No objection, Your Honor.

10       THE COURT:  Exhibit 566 will be admitted.

11       MR. KOENIG:  Thank you.

12       Permission to publish?

13       THE COURT:  You may.

14       MR. KOENIG:  All right.  If we could just zoom in on

15  the October 2nd, the first October 2nd e-mail and above.

16  BY MR. KOENIG:

17  Q.  All right.  Can I direct your attention to the sentence

18  beginning with "again"?

19  A.  Yes.

20  Q.  Could you go ahead and read that to the jury, please?

21  A.  "Again, this is not going to work, and Pilgrim's needs to

22  match pricing from your competitors."

23  Q.  What were you intending to convey when you said that?

24  A.  Telling him his pricing was too high.  He needs to get

25  lower.  I had lower prices from other people.

2484

Joseph Brink - Direct

1    Q.   From whom?

2    A.   From Holmes.

3    Q.   How much lower?

4    A.   About half the price.

5    Q.   And so when you say "half the price," you mean half --

6    A.   Half the increase, I am sorry.

7    Q.   What was Holmes' increase that they were proposing?

8    A.   I believe it was 8 or 10 cents.

9    Q.   And what was Pilgrim's proposing?

10   A.   19 cents.

11   Q.   What was Claxton proposing?

12   A.   19 cents.

13   Q.   And then let me direct your attention to the first sentence

14   in the first e-mail, if we could read that, that starts with

15   "Joe."

16   A.   Sorry.  "Joe, we will need to hold on our pricing."

17   Q.   Did you have an understanding of what that meant?

18   A.   The pricing that they had provided for 2015 was the pricing

19   that they were going to stick with, not going to change.

20   Q.   Was that a consistent message that Defendant Little had

21   been delivering to you?

22   A.   Yes.

23   Q.   Throughout these negotiations I mean.

24   A.   Yes.

25   Q.   How many years have you negotiated with Defendant Little?

Joseph Brink - Direct

 1   *A.*   Several.  I don't know exactly how many years.

 2   *Q.*   If you had to compare his style of negotiating in 2014

 3   versus, say, 2013 or 2015, how would you compare it?

 4   *A.*   This was different.

 5   *Q.*   How so?

 6   *A.*   There was no discussion, that the pricing -- as I said,

 7   this was the pricing.  I asked about cost of grain going down,

 8   everything else, and he basically -- I was told this is not a

 9   discussion point.  This is the pricing.  We have to have the

10   margins on small bird plants that the large bird plants get.

11   *Q.*   And so how was that different, or can you compare it to the

12   others?  What had happened in other years?

13   *A.*   Other years we would get pricing, we would tell them to

14   sharpen their pencils and come back, and we would have better

15   pricing or not better pricing, but typically there was

16   discussion, but there wasn't at this time.

17   *Q.*   There wasn't what?

18   *A.*   No compromise or discussions.

19   *Q.*   Could you please turn to Tab 20.  That's Government

20   Exhibit 567.  Do you recognize 567?

21   *A.*   Yes.

22   *Q.*   What is it?

23   *A.*   It's an e-mail between myself and Jimmie Little.

24   *Q.*   All right.  And who else is copied on it?

25   *A.*   Roger Austin.

Joseph Brink - Direct

1    Q.  What's the e-mail about?

2    A.  2015 supply pricing agreement.

3    Q.  And the date?

4    A.  October 3rd, 2014.

5         MR. KOENIG:  At this time, the government offers

6    GX-567.

7         THE COURT:  Any objection to the admission of 567?

8         MR. CANTY:  No objection, Your Honor.

9         THE COURT:  Exhibit 567 will be admitted.

10        MR. KOENIG:  Permission to publish?

11        THE COURT:  You may.

12   BY MR. KOENIG:

13   Q.  Before I ask you about anything in the substance here, the

14   CC line, you said it says Roger Austin?

15   A.  Yes.

16   Q.  Do you know Defendant Austin?

17   A.  No, I do not.

18   Q.  All right.  If I could direct your attention to the second

19   line down starting with "but," and just read to the end of that

20   sentence.

21   A.  "But supply will continue to shrink if satisfactory margins

22   are not secured by the producers."

23   Q.  Did you have an understanding what that meant?

24   A.  My understanding was that the supply of small birds will

25   continue to decrease, conversion of small bird plants to the

                              Joseph Brink - Direct

 1   large bird plants, if they don't get the margins that they are

 2   wanting.

 3   Q.   Who do you mean by "they"?

 4   A.   The producers, the industry.

 5   Q.   So just Pilgrim's?

 6   A.   No.

 7   Q.   Who?

 8   A.   Pilgrim's, Claxton --

 9          MR. BELLER:  Objection, speculation.

10          THE COURT:  Sustained.

11   BY MR. KOENIG:

12   Q.   And what is your understanding of the word "margin"?

13   A.   Margin is the profit margin you want to make.

14   Q.   So it's, like, above the cost?

15   A.   Yes.

16   Q.   If I could direct your attention to a certain date,

17   September 22nd of 2014.  Do you recall that day?

18   A.   Yes.

19   Q.   What do you recall about that day?

20   A.   We had a meeting -- we had a meeting on the phone with

21   Pilgrim's to discuss chicken pricing for 2015.

22   Q.   And who is "we"?

23   A.   Myself, Jimmie Little, and Lynn Schweinfurth, our CFO at

24   the time.

25   Q.   Why was your CFO there?

Joseph Brink - Direct

1    A.   Because she had to be a part of it because that's all the

2    finances, and it directly relates to the company and pricing

3    and everything else.

4    Q.   Was she typically involved in negotiations?

5    A.   No.  She was part of listening.

6    Q.   This particular call with Defendant Little?

7    A.   Yes.

8    Q.   Why was she there if she is not normally involved?

9    A.   I wanted her to be there to hear the impact so they could

10   be prepared financially and get ready for what we had to do on

11   the menu for our company.

12   Q.   The impact of what?

13   A.   The impact on the chicken price increase.

14   Q.   For 2015?

15   A.   Yes.

16   Q.   All right.  Do you recall anything that -- do you recall

17   what time of day that was?

18   A.   11:30 Central time.

19   Q.   Why do you remember that?

20   A.   Because I was the one who initiated the meeting.  We had a

21   call in.

22   Q.   And did you verify your memory in any way?

23   A.   Yes.  I went through my calendar and verified the date when

24   we had a meeting.

25   Q.   And what did Mr. Little talk about in that call?

Joseph Brink - Direct

1    *A.*  He talked about the supply.  He talked about the pricing

2    for 2015 and said, There's no negotiation.  This is the new way

3    we're doing it.

4          I asked about cost of feed going down, everything

5    else, and they said, This is not a discussion point.  This is

6    the price it's going to be, no negotiation, and we have people

7    who want your chicken volume, so we have to make a decision

8    here soon or you won't have any chicken for next year.

9    *Q.*  And did he say what the price increase would be in that

10   situation?

11   *A.*  19 cents.

12   *Q.*  Did you also have any interactions with Mr. Cooper from

13   Claxton that day?

14   *A.*  Yes.

15   *Q.*  What was your interaction with him?

16   *A.*  I got an e-mail from Walter Cooper.

17   *Q.*  All right.  Let's turn to Tab 17, which is Government

18   Exhibit 9740.  Do you recognize 9740?

19   *A.*  Yes.

20   *Q.*  And what is it?

21   *A.*  It's e-mails between Walter Cooper and myself.

22   *Q.*  Is this the e-mail that you were referring to a moment ago?

23   *A.*  Yes.

24   *Q.*  So -- and what's the date?

25   *A.*  September 22nd.

Joseph Brink - Direct

1   *Q.*  All right.  Was this before or after your call with

2   Defendant Little?

3   *A.*  This is after my phone call.

4   *Q.*  All right.

5   MR. KOENIG:  The government moves to admit 9740.

6   THE COURT:  Any objection to the admission of

7   Exhibit 9740?

8   9740 is admitted.

9   MR. KOENIG:  Permission to publish, please.

10   THE COURT:  You may.

11  *BY MR. KOENIG:*

12  *Q.*  All right, Mr. Brink.  Could I direct your attention to the

13  bottom of page 2, top of page 3?

14  *A.*  Okay.

15  *Q.*  Do you see the carryover e-mail that goes from the bottom

16  of page 2 to the top of page 3?

17  *A.*  Yes.

18  *Q.*  That's an e-mail from Walter Cooper?

19  *A.*  Yes.

20  *Q.*  If I could direct your attention to the number four where

21  it says "step pricing"?

22  *A.*  Yes.

23  *Q.*  Could you explain what that means and what the lines below

24  it are?

25  *A.*  Step pricing is a process where you take a price increase

Joseph Brink - Direct

1    and you put it over a period of time, so they were proposing a

2    step price increase starting in 2014 in October with a 5-cent

3    price increase; November 1st another 5 cents; December 1st

4    another 5 cents; and then January 15 -- January 1st to the 15th

5    the remaining 4 cents.

6    Q.  And what do those increases end up to?

7    A.  19 cents per pound.

8    Q.  All right.  And what -- if you look at the next e-mail up,

9    the one at 1:50 p.m.

10   A.  Yes.

11   Q.  Could you read the first two sentences?

12   A.  This is a larger increase than Pilgrim's.  I thought

13   Claxton was going to work with us.

14   Q.  What do you mean by that?

15   A.  Well, the increase is larger than Pilgrim's because they

16   were wanting to start the pricing for 2015 in 2014, so

17   therefore my pricing would be higher.

18   Q.  And what about you thought Claxton was going to work with

19   us?

20   A.  When I spoke to Walter, we were talking about chicken and

21   all the years doing business, I thought he was going to work

22   with us and get better pricing.

23   Q.  All right.  Now, if I could direct you to page 1.  And the

24   bottom e-mail there from Mr. Cooper, and you see the end of the

25   second paragraph where it says, Is Pilgrim's willing to do all

2492

Joseph Brink - Direct

1    this?

2    A.  Yes.

3    Q.  Did you have an understanding of what Mr. Cooper meant?

4         MR. BELLER:  Objection, speculation.

5         THE COURT:  Overruled.

6    A.  He was talking about the benefits of Claxton and the things

7    that Claxton could do, and he says, Pilgrim's willing to do

8    this, about volume, spec size, weights, and everything else.

9    BY MR. KOENIG:

10   Q.  If you could read from where it says "my guess" and then to

11   the ellipse.

12   A.  "My guess is no.  They have simply been billing catch

13   weight to Kelly.  They probably have told Pollo or will tell

14   Pollo no extra pounds, and the price is the price with no

15   consideration or explanation, take it or leave it."

16   Q.  And how would you -- well, if you had to compare your phone

17   conversation with Defendant Little earlier in that day with

18   Mr. Cooper's statement here, how would you compare them?

19   A.  Very similar.

20   Q.  Did you ever ask Defendant Little and Mr. Cooper to discuss

21   their negotiations in 2014?

22   A.  To whom?

23   Q.  With each other.

24   A.  Us?

25   Q.  No.  Did you ask Defendant Little and Walter Cooper to have

2493

Joseph Brink - Direct

1  discussions between themselves about the Pollo negotiations in

2  2014?

3  *A.*  No.

4  *Q.*  Did they ever tell you they were having discussions about

5  the negotiations for Pollo Tropical between the two of them?

6      *MR. BELLER:*  Objection, calls for hearsay, assumes

7  facts not in evidence.

8      *MR. McLOUGHLIN:*  Same objection, Your Honor.  There is

9  no foundation laid for these, him having any discussion of any

10  kind with respect to Pollo Tropical.  There is no basis for the

11  question.

12      *THE COURT:*  Response?

13      *MR. KOENIG:*  Your Honor, this question has been asked

14  of many, many witnesses.  And I think it's very relevant, and

15  certainly there is, you know, inferences to be drawn that would

16  support --

17      *THE COURT:*  Sustained as to the form of the question,

18  if you could rephrase.  Assumes facts not in evidence.

19  *BY MR. KOENIG:*

20  *Q.*  Did Defendant Little and Walter Cooper ever tell you that

21  they were talking on the phone during this time period?

22      *MR. McLOUGHLIN:*  Your Honor, same objection.  There

23  is -- no foundation has been laid in the evidence for that

24  allegation, and the form of a question.

25      *THE COURT:*  Sustained.

2494

Joseph Brink - Direct

 1    *BY MR. KOENIG:*

 2    *Q.*  Mr. Brink, did you ever have knowledge of any price fixing

 3    or bid rigging?

 4              *MR. BELLER:*  Objection.

 5              *THE COURT:*  Sustained.

 6              *MR. KOENIG:*  Your Honor, that is the exact same

 7    question that Mr. Tubach asked yesterday.

 8              *THE COURT:*  A little different.  Let's have a side

 9    bar.

10        (At the bench:)

11              *THE COURT:*  Yeah, here is -- in a side bar that we had

12    involving Ms. Call, I am not sure if you had a chance to

13    monitor that, Mr. Koenig, but the same position was noted by

14    the government.  Why can't we ask the question?  And my ruling

15    on that was that it's one thing to ask a witness who you

16    anticipate that the answer is going to be no from, are you

17    aware of any price fixing or -- and they just say like, no, and

18    maybe that's the case with Mr. Brink, I am not sure, but it

19    would be different if you asked -- used the term "price fixing"

20    with a witness such as Mr. Bryant who would then launch into an

21    explanation or have some understanding of it, and his

22    understanding may be colored by some type of legal information.

23              So what answer do you anticipate that you would

24    receive from Mr. Brink?

25              *MR. KOENIG:*  I anticipate him to say no.

Joseph Brink - Direct

1              *THE COURT:*  Okay.  Mr. McLoughlin or anyone else?

2              *MR. BELLER:*  Your Honor, this is David Beller speaking

3     for Mr. Fries.  The difference between the government's

4     question and the defense question is that the defense question,

5     to the best of my knowledge, has always been very carefully

6     asked and that is whether the witness has any personal

7     knowledge regarding any particular conduct.

8              The problem with the government's request, and

9     specifically Mr. Koenig's request, is not asking about personal

10    knowledge, but rather talking about knowledge in general.  And

11    because, of course, we don't know where that knowledge may have

12    come from, it's simply a conclusion based on what he may have

13    learned and/or been told as opposed to something that he

14    personally observed or is aware of.

15             And so quite respectfully, I don't believe that the

16    legal analysis predicates necessarily on what we anticipate the

17    answer to be.  It's the danger of the question itself and not

18    knowing what the source of that individual's knowledge is

19    coming from.  Certainly while we may be very happy with the

20    result, it's the problem with the question itself that is

21    objectionable, not necessarily the answer that is given.

22             *MR. McLOUGHLIN:*  Your Honor, in that regard, I would

23    add that there is a difference between cross-examination, which

24    is the context in which the defendants have asked it of a

25    witness, and here, direct examination, where the rules under

Joseph Brink - Direct

1   701 require the government to lay a foundation of personal

2   knowledge with respect to the events.

3          And the government asks this conclusion with no effort

4   indeed having failed to establish personal knowledge.  They are

5   now trying to get around that fact with this type of question.

6   So without that foundation, it is also objectionable due to its

7   absence.

8          THE COURT:  Well, if Mr. Koenig qualifies the

9   questions Mr. Beller suggested, then it wouldn't call for

10   anything but some knowledge of fact, so it wouldn't have any

11   problem like that.

12          Mr. Koenig, any problem with your rephrasing the

13   question, just ask, Do you have any personal knowledge?

14          MR. KOENIG:  No, Your Honor.  As a matter of fact, the

15   purpose of my questions about the phone calls was to lay a

16   foundation that he didn't know anything about it.

17          THE COURT:  Okay.  So you can rephrase the question.

18   Thank you.

19      (In open court:)

20   BY MR. KOENIG:

21   Q.  Mr. Brink, in 2014 did you have any personal knowledge of

22   any price fixing or bid rigging among suppliers to

23   Pollo Tropical?

24   A.  No.

25          MR. KOENIG:  Moment to confer?

2497
Joseph Brink - Cross

1          *THE COURT:*  Yes, go ahead.

2          *MR. KOENIG:*  Nothing further.

3          *THE COURT:*  Thank you.

4          Cross-examination?

5          Mr. Canty, go ahead.

6                          **CROSS-EXAMINATION**

7    *BY MR. CANTY:*

8    *Q.*  Good afternoon, Mr. Brink.  I am Dennis Canty.  I represent

9    Mr. Little.  I have a few questions for you.  Let me get set up

10   here.

11          In your work for Pollo Tropical, you maintain multiple

12   suppliers; is that correct?

13   *A.*  For chicken?

14   *Q.*  Correct.

15   *A.*  Yes.

16   *Q.*  Okay.  And you verify what those suppliers tell you about

17   the market by comparing their pricing, right?

18   *A.*  I check their prices, yes.

19   *Q.*  But you verify what suppliers tell you about the market by

20   comparing the suppliers' pricing, right?

21   *A.*  Supplier pricing to what?

22   *Q.*  To each other.

23   *A.*  I check -- I get the pricing from each person individually,

24   yes.

25   *Q.*  And using multiple suppliers can help you to verify the

Joseph Brink - Cross

1    pricing assertions that are made by those suppliers regarding

2    the market trends.  Is that fair to say?

3    A.  Yes.

4    Q.  If one supplier gives you a high price and tells you it's

5    due to market trends, you can look at pricing from other

6    suppliers, and if their pricing isn't as high, then you have

7    evidence that market trends don't support the price, right?

8    A.  Yes.

9    Q.  And conversely, if you check with other suppliers and their

10   prices are similar, could that be evidence that market trends

11   do support the price increase?

12   A.  Yes.

13   Q.  It's nice to get pricing information from multiple

14   suppliers because it keeps all of them honest, right?

15   A.  Yes.

16   Q.  It's important to you that suppliers are honest with you in

17   negotiations, yes?

18   A.  Yes.

19   Q.  That they give you truthful information?

20   A.  Yes.

21   Q.  Because if you're not truthful, the relationship between

22   the parties who are negotiating can break down, yes?

23   A.  Yes.

24   Q.  Now, in negotiating with chicken suppliers, you will tell

25   one supplier that their competitor has a lower price in order

2499

Joseph Brink - Cross

1   to encourage another supplier to lower their price, right?

2   A.  Yes.

3   Q.  And it's a strategy you use regularly, right?

4   A.  A strategy, yes.

5   Q.  And from your perspective, there is nothing wrong with

6   doing that.  It's part of your job, right?

7   A.  Correct.

8   Q.  And you used that strategy in 2013 in negotiating the

9   Pilgrim's and Claxton year 2014 contracts.

10  A.  I assume so.

11  Q.  You negotiated with Pilgrim's and Claxton on behalf of

12  Pollo Tropical for the 2014 contract year, yes?

13  A.  Yes.

14  Q.  And you used information about competitors' prices to

15  encourage Pilgrim's to lower its price for split WOGs in 2014.

16  A.  Yes.

17  Q.  Who is Matthew Boarman?

18  A.  Matthew Boarman --

19          MR. KOENIG:  Objection to foundation.

20          THE COURT:  The question was who he is.  He can

21  answer.  Overruled.

22  A.  He is a salesperson at Pilgrim's.

23  BY MR. CANTY:

24  Q.  You negotiated with him for the purchase of chicken from

25  Pilgrim's for their 2014 contract year, yes?

Joseph Brink - Cross

1    A.  I don't remember.  Matt is one of the new salespersons that

2    started off with Pilgrim's.  We changed many suppliers over the

3    years.

4    Q.  Okay.  I would like to show you Exhibit I-226 that we

5    marked for identification.  You can find it on the screen

6    there.

7            Sir, does that refresh your recollection that you

8    negotiated with Mr. Boarman for the purchase of chicken for

9    Pilgrim's for the 2014 contract year?

10   A.  Yes.

11           MR. CANTY:  Okay.  We can bring that down.

12   BY MR. CANTY:

13   Q.  You wanted Pilgrim's to lower its price on split WOGs for

14   the 2014 contract year, yes?

15   A.  Yes.

16   Q.  And you shared with Mr. Boarman in November of 2013 what

17   his competitors' prices were?

18   A.  I don't know.  I don't remember.

19   Q.  Well, let's look at Exhibit I-226 again.  This e-mail

20   concerns the 2013 negotiations for the 2014 contract year, yes?

21   A.  Yes.

22   Q.  Which you were then involved in, yes?

23   A.  Yes.

24   Q.  And this e-mail that you wrote accurately reflects events

25   that were happening to your knowledge at the time of those

Joseph Brink - Cross

1    negotiations?

2    A.   Yes.

3    Q.   Mr. Brink, did you share with Mr. Boarman in November of

4    2013 what his competitors' prices were?

5    A.   Yes.

6    Q.   Did you list his competitors by name in giving him

7    competitive pricing?

8    A.   Yes.

9    Q.   Who were those competitors?

10   A.   Claxton and Holmes.

11   Q.   And did you give Mr. Boarman the exact price to the penny

12   that Claxton and Holmes were charging?

13   A.   Yes.

14   Q.   What was that price?

15   A.   88 cents a pound.

16   Q.   Mr. Brink, why did you share with Mr. Boarman his

17   competitors' pricing?

18   A.   I wanted Pilgrim's to lower their pricing.

19           MR. CANTY:   Your Honor, we would move I-228 into

20   evidence.

21           THE COURT:   You mean I-226?

22           MR. CANTY:   I-226, pardon me.

23           THE COURT:   Any objection to the admission of I-226?

24           MR. KOENIG:   Hearsay.

25           MR. CANTY:   It's effect on the listener, Your Honor.

Joseph Brink - Cross

1           THE COURT:  Can it be displayed again for me?

2    Objection will be overruled.  I --

3           MR. KOENIG:  If I may, the statement is down farther.

4           THE COURT:  Yeah, I only see the top e-mail.  Is

5    there -- okay, hold on.

6           MR. CANTY:  I am perfectly happy redacting every

7    statement below Mr. Brink's e-mail at the top.

8           THE COURT:  After his signature block there or

9    whatever?

10          MR. CANTY:  Yes.

11          THE COURT:  With that limitation, Mr. Koenig, any

12   objection to the admission of I-226?

13          MR. KOENIG:  No.

14          THE COURT:  All right.  Then that top e-mail from

15   I-226 will be admitted.

16          MR. CANTY:  Can we publish, Your Honor?

17          THE COURT:  You may.

18   BY MR. CANTY:

19   Q.  Now, following this e-mail, both Claxton and Holmes in the

20   year 2013 for the 2014 contract year did sign contracts with

21   Pollo Tropical, yes?

22   A.  Yes.

23   Q.  And we've seen those contracts, and they are in evidence.

24          MR. CANTY:  Let's, if we can, put up I-228, first page

25   only.

2503

Joseph Brink - Cross

1          May we publish, Your Honor?

2          THE COURT:  Yes.  Wait a minute.  Yes, you may.  Go

3   ahead.

4   BY MR. CANTY:

5   Q.  Is that the Claxton contract?

6   A.  No.

7   Q.  Pardon me, that's the Pilgrim's contract, isn't it?

8   A.  Yes.

9   Q.  And what's the split WOG price?

10  A.  Split WOG price is 88 cents per pound.

11  Q.  And let's look at I-231.

12          MR. CANTY:  May we publish, Your Honor?

13          THE COURT:  You may.

14  BY MR. CANTY:

15  Q.  Is that the Claxton contract this time?

16  A.  Yes.

17  Q.  And the WOG price?

18  A.  88 cents per pound.

19  Q.  Identical, right?

20  A.  Yes.

21  Q.  That's a product of your tough negotiation, isn't it?

22  A.  Yes.

23  Q.  You wanted the competitors to have the same price, didn't

24  you?

25  A.  I wanted to have the best pricing, and they were the same.

2504

Joseph Brink - Cross

1    Q.  You wanted them to have the same price, though, right?

2    A.  Eventually, yes, my goal.

3    Q.  Because that was good for Pollo Tropical's business?

4    A.  Yes.

5    Q.  So you shared with each of them what the other's price was.

6    A.  Yes.

7    Q.  Now, for the 2015 contract year, Mr. Little was the

8    Pilgrim's representative that you worked with, right?

9    A.  Yes.

10   Q.  Let's turn to Government's Exhibit 561.  I think it's

11   Tab 19 in your binder.  And remind us, what do we see in

12   Government's Exhibit 561?

13   A.  This is an e-mail between myself and Jimmie to me talking

14   about chicken specs for Taco Cabana at our restaurant.

15          MR. CANTY:  May we publish?

16          THE COURT:  You may publish.

17   BY MR. CANTY:

18   Q.  And you testified that you did meet Mr. Little for lunch at

19   Pollo Tropical, right?

20   A.  Yes.

21   Q.  And this is the discussion where towards the end you had a

22   discussion about 2015 pricing, right?

23   A.  Yes.

24   Q.  You said, 2 cents.  He said, No, we'll start with a two,

25   right?

Joseph Brink - Cross

 1   *A.*  He said, 2 cents -- he said, Two.  And I said, 2 cents?  He

 2   said, No, it starts with a two.

 3   *Q.*  And then you left.

 4   *A.*  Basically, yes.

 5   *Q.*  You said, We are not discussing chicken in August.

 6   *A.*  Correct.

 7   *Q.*  And you left.

 8   *A.*  Uh-huh.

 9   *Q.*  You were upset.

10   *A.*  Yes.

11   *Q.*  Did you have an understanding of why Mr. Little was

12   preparing you for a price increase in 2015?

13            *MR. KOENIG:*  Objection, foundation.

14            *THE COURT:*  Overruled.

15   *A.*  At the time, no.

16   *BY MR. CANTY:*

17   *Q.*  Did you subsequently learn?

18   *A.*  Afterwards, yes.

19   *Q.*  Tell us what it was.

20   *A.*  Because the market was high.

21   *Q.*  Let's take a look at Government's Exhibit 9740 that you

22   were asked about.  I'm not sure if I have the tab on that.  Do

23   you know which one it is?

24            *MR. CANTY:*  Can we pull that up?  We have 9740.

25            May we publish, Your Honor?

Joseph Brink - Cross

1           THE COURT:  You may.  It's Tab 17.

2       BY MR. CANTY:

3       Q.  So let's look at the bottom of 9740 where the first e-mail

4       starts.  And, Mr. Brink, this is when you first received

5       Claxton pricing for 2015; is that right?

6       A.  Yes.

7       Q.  And on September 22nd, Mr. Cooper gives you pricing of

8       $1.07 delivered on split WOGs, yes?

9       A.  Yes.

10      Q.  When you go into negotiations with chicken suppliers for

11      the coming year, you have an idea of the volume that

12      Pollo Tropical is going to need, right?

13      A.  Yes.

14      Q.  And one of the things you are trying to figure out in the

15      negotiations is how much volume each supplier can do for you.

16      A.  Yes.

17      Q.  With the idea that each of the suppliers will take a part

18      of the volume that makes up your annual need.

19      A.  Yes.

20      Q.  Now, Mr. Cooper in No. 3, numeral 3 of this e-mail, says,

21      Increase in volume between 500K to 1 million pounds on splits.

22              Do you see that?

23      A.  Yes.

24      Q.  He is saying he can give you more volume on the splits,

25      right?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   In doing so, he is competing with the other suppliers, yes?

3    A.   Yes.

4    Q.   And in 9740, if we scroll up, you responded to Mr. Cooper,

5    yes?

6    A.   Yes.

7    Q.   And you told Walter that this is a larger increase than

8    Pilgrim's.

9    A.   Correct.

10   Q.   Was that true?

11   A.   Yes, because he wanted to start the stair-stepping process

12   in 2014.

13   Q.   Did you have Pilgrim's pricing at that point?

14   A.   I had pricing from Jimmie from a phone conversation.

15   Q.   In the phone conversation.

16   A.   Correct.

17   Q.   Walter responds to you, right?

18        MR. CANTY:   Let's scroll up a little.

19   BY MR. CANTY:

20   Q.   Now, I want to talk a little bit about some of the things

21   that Walter says to you in his e-mail of September 22nd at

22   1:56, okay?

23        One of the things he says is that Pilgrim's should be

24   your lowest cost supplier as they have more pounds to spread

25   their cost over and more pounds to -- I am guessing -- sell

Joseph Brink - Cross

1    than we do.  Is that fair reading?

2    A.   Yes.

3    Q.   Do you have an understanding what he meant by that?

4    A.   He was saying they should be lower because they have more

5    pounds, their company, than Claxton.

6    Q.   And that would affect the pricing that he could offer you.

7    A.   Yes.

8    Q.   And he also says, We have been approached by other

9    customers requesting pricing and supply agreements.  Not all

10   are within your spec, but some are.

11            Do you see that?

12   A.   Yes.

13   Q.   Do you have an understanding of what he meant by that?

14   A.   Yes.

15   Q.   What did he mean?

16   A.   There were other customers who want the chicken.

17   Q.   In your spec.

18   A.   Correct.

19   Q.   He has other customers that want the same chicken you want.

20   A.   Correct.

21   Q.   He also says, We are able to accept more volume if need be,

22   and we are willing to stair-step the pricing so there will not

23   be a hit for Pollo.

24            Do you see that?

25   A.   Yes.

Joseph Brink - Cross

1    Q.   What does he mean by that?

2    A.   Exactly what it says, if you accept more volume, then we

3    are willing to stair-step the pricing.

4    Q.   He wants more volume that would otherwise go to another

5    competitor, right?

6    A.   He knew we were also in growth mode, and we needed more

7    chicken because we had more stores opening up.

8    Q.   And he says, Is Pilgrim's willing to do all this?

9            Do you see that?

10   A.   Yes.

11   Q.   And ultimately, further down, he says, So if we are higher

12   than Pilgrim's, we are worth it.

13           Do you see that?

14   A.   Yes.

15   Q.   So in this e-mail, Walter is pointing out how Claxton is

16   different from Pilgrim's, yes?

17   A.   Yes.

18   Q.   He is pointing out things that Claxton will do for Pollo

19   that Pilgrim's will not, yes?

20   A.   Yes.

21   Q.   He points out that they will accept more volume, more

22   business from Pollo?

23   A.   Yes.

24   Q.   He points out that Claxton will stair-step pricing.

25   A.   Yes.

Joseph Brink - Cross

1    Q.  He asks the rhetorical question, Is Pilgrim's willing to do

2    this, inviting you to compare what Claxton is willing to do

3    versus what Pilgrim's is willing to do, yes?

4    A.  I am sorry, repeat that again.

5    Q.  He is inviting you to compare what Claxton is willing to do

6    versus what Pilgrim's is willing to do.

7    A.  I don't think so.  He never said --

8    Q.  He says they are higher than Pilgrim's because they are

9    worth it, right?

10   A.  That's a statement.  That's what he said.

11   Q.  He is telling you why Claxton is a better choice for Pollo

12   than Pilgrim's, right?

13   A.  Yes.

14   Q.  He is competing against Pilgrim's for Pollo's business, is

15   he not?

16   A.  Yes.

17   Q.  You respond to Walter.

18           MR. CANTY:  We can scroll up.

19   BY MR. CANTY:

20   Q.  In the second paragraph of your response, you tell him, The

21   increase is 19 cents per case, and that is basically what

22   Pilgrim's is charging us, right?

23   A.  Yes.

24   Q.  And you're telling him that because you want him to lower

25   his price.

Joseph Brink - Cross

1  A.  Yes.

2  Q.  Now, you tell him that the increase is 19 cents per case,

3  and that is basically what Pilgrim's is charging us, but,

4  Mr. Brink, again, you don't have pricing from Pilgrim's on

5  September 22, 2014, do you?

6  A.  Not in writing, no.

7  Q.  You said you had a conference call with Jimmie Little on

8  September 22, 2014, right?

9  A.  Yes.

10  Q.  You testified that you had a conference call with

11  Mr. Little and your CFO?

12  A.  Yes.

13  Q.  And Mr. Little told you a price.

14  A.  Yes.

15  Q.  And that price was a 19-cent increase.

16  A.  Yes.

17  Q.  And he said, The price is the price.

18  A.  Yes.

19  Q.  And he said, You have until 2:00 p.m. to accept the price.

20  A.  Yes.

21  Q.  That's your testimony.

22  A.  Yes.

23  Q.  Would you agree with me, sir, that if Mr. Little didn't yet

24  have a price from Pilgrim's to give you on September 22, that

25  your testimony is just plain false?

Joseph Brink - Cross

1    *A.*   No.  He gave me a price on the phone.

2    *Q.*   At this time I would like to show you what's marked

3    Government Exhibit 5.  It's what the government has marked as

4    one of its summary exhibits.  Do you see the dates at the top,

5    August 13 to October 8, 2014?

6    *A.*   The very top one?

7    *Q.*   Yes.

8    *A.*   Yes.

9    *Q.*   Do you see there is entries that mention Jimmie Little,

10   Walter Cooper, and yourself?

11   *A.*   Yes.

12   *Q.*   Have you seen this document before?

13   *A.*   No.

14   *Q.*   Have you seen anything like it?

15   *A.*   No.

16   *Q.*   In the 11 or so meetings that you have had with the

17   government, have they shown this document to you?

18   *A.*   No.

19   *Q.*   Did the government tell you they were putting together a

20   summary related to the Pollo Tropical 2015 contract?

21   *A.*   Summary of what?

22   *Q.*   The Pollo Tropical 2015 contract.

23   *A.*   I don't understand the question, I am sorry.

24   *Q.*   Okay.  Pollo Tropical in 2014 --

25   *A.*   Yeah.

Joseph Brink - Cross

1    *Q.*  -- contracted with folks for the 2015 contract year, yes?

2    *A.*  Yes.

3    *Q.*  Okay.  Did the government tell you in all their meetings

4    with you that they were going to prepare a summary of what

5    happened in the negotiation period?

6    *A.*  I don't understand the government -- I don't understand

7    your question.

8    *Q.*  Did the government ask for help putting together the

9    document that's in front of you?

10   *A.*  No.

11   *Q.*  Okay.  Did they tell you about the evidence that they were

12   going to reference in that document?

13   *A.*  No.

14   *Q.*  Okay.  Now I want to talk to you about Exhibit 563,

15   Government's Exhibit 563.

16          *MR. CANTY:*  Your Honor, it's in evidence.  May we

17   publish?

18          *THE COURT:*  Let me check it.  You may.

19   *BY MR. CANTY:*

20   *Q.*  Mr. Brink, did you understand that in getting pricing and

21   offering you and Pollo Tropical pricing for the year 2015, that

22   Mr. Little would need to go to the Pilgrim's pricing group and

23   get that pricing in order to give it to you?

24          *MR. KOENIG:*  Objection, foundation.

25          *THE COURT:*  He can answer if he knows.  Overruled.

2514

Joseph Brink - Cross

 1   *A.*  I don't know the structure of Pilgrim's, how who approves

 2   pricing, so do not know.

 3   *BY MR. CANTY:*

 4   *Q.*  Was it your understanding in your course of dealing with

 5   Mr. Little over the years that he would come up with the

 6   pricing or that he would have to go to the pricing group at

 7   Pilgrim's to get the pricing?

 8   *A.*  I am sure he had to go to someone else to get approval for

 9   pricing.

10   *Q.*  In the 11 meetings you had with the government in 2021, did

11   they show you this document?

12   *A.*  No, I don't recall.

13   *Q.*  Let's look at Government's Exhibit 564.  Do you see

14   Government Exhibit 564?

15   *A.*  Yes.

16   *Q.*  It's an e-mail from Mr. Little to Mr. Boarman on

17   September 23rd, right?

18   *A.*  Yes.

19   *Q.*  I will represent to you that's UTC time, so it's about

20   9:47 p.m. on September 22.  Do you see that?

21   *A.*  It says September 23.

22   *Q.*  Right.  If it's UTC time, we back it off four hours, and we

23   are talking about roughly 9:46 -- let me ask you this.

24   September 22 is the date you claim you had this conference call

25   with Jimmie Little, right?

2515

Joseph Brink - Cross

1    A.  Yes -- conference call, no, we had a lunch.

2    Q.  September 22?

3    A.  September 22 -- September 22, correct, we had the phone

4    call, correct.  I am sorry.

5    Q.  In your meetings with the government in 2021, did the

6    government ever show this document to you?

7    A.  I do not recall.  I don't think so.

8    Q.  I showed you this document and the previous document,

9    Exhibit 563, when we met in November at a prior proceeding.  Do

10   you remember that?

11   A.  Yes.

12   Q.  You met with the government lawyers and agents four or five

13   times since then, right?

14   A.  Yes.

15   Q.  In those instances, have they ever talked to you about it?

16   A.  About this?

17   Q.  In those meetings, have they ever talked to you about

18   either one of those documents?

19   A.  No.

20   Q.  Mr. Koenig and Mr. Torzilli met with you on March 7, right?

21   A.  Yes.

22   Q.  Three days ago?

23   A.  Yes.

24   Q.  Mr. Koenig prepared you for your direct examination?

25   A.  Yes.

Joseph Brink - Cross

1    *Q.* Mr. Torzilli did a mock cross, right?

2    *A.* Yes.

3    *Q.* Did he put on a great suit and pretend to be Mr. Beller?

4            *MR. KOENIG:* Objection, relevance.

5            *THE COURT:* I think it was just a joke, Mr. Koenig.

6            *MR. KOENIG:* Well, I guess the broader point, I

7    thought you already ruled we weren't going to be personalizing

8    this to individual prosecutors.

9            *THE COURT:* Sustained.

10           Go ahead, Mr. Canty.

11   *BY MR. CANTY:*

12   *Q.* Did you work with Mr. Torzilli on your response to some

13   questions?

14           *MR. KOENIG:* Objection.  We just went over this.

15           *THE COURT:* Sustained.  You can ask about whether he

16   met with the prosecutors or people generally.

17           *MR. CANTY:* Thank you, Your Honor.

18   *BY MR. CANTY:*

19   *Q.* In your work preparing for today's testimony, did you

20   discuss Exhibits 563 or 564 with the government lawyers or

21   agents?

22   *A.* Which ones are 563, 564?

23           *MR. CANTY:* Can we put them up side by side?

24   *A.* No.

25           *THE COURT:* Do you want those displayed, Mr. Canty?

Joseph Brink - Cross

1        MR. CANTY:  Can we publish, please, Your Honor?

2        THE COURT:  You may.

3   BY MR. CANTY:

4   Q.  I would next like to call your attention to Government's

5   Exhibit 542, which I believe was also in evidence.

6        THE COURT:  It is.

7        MR. CANTY:  May we display, Your Honor?

8        THE COURT:  You may.

9   BY MR. CANTY:

10  Q.  Have you ever seen that document, Mr. Brink?

11  A.  No.

12  Q.  Okay.  You see it's an e-mail exchange between Mr. Stiller

13  and Mr. McGuire?

14  A.  Yes.

15  Q.  Do you see that a third of the way down the page

16  Mr. Stiller reports to Mr. McGuire, Should have PT to Jimmie

17  today.  Probably go up about 50 cents on boneless.

18       Do you see that?

19  A.  Yes.

20  Q.  This e-mail exchange is on September 23rd, right?

21  A.  Yes.

22  Q.  And that's the day after your conference call, right?

23  A.  Yes.

24  Q.  When the government was preparing you to testify, did it

25  tell you that by the time you walk through that door today,

Joseph Brink - Cross

1  they would have already admitted evidence showing that

2  Mr. Little didn't have 2015 pricing on September 22?

3          MR. KOENIG:  Objection, relevance.

4          THE COURT:  And it assumes facts not in evidence.

5  Sustained.

6  A.  No, they did not.

7  BY MR. CANTY:

8  Q.  Do you recall that perhaps during that conference call

9  Mr. Little gave you a range of what you might expect to see in

10  2015 and not an actual price?

11  A.  Did I recall?  All I remember is 19 cents.

12  Q.  Okay.  I think we are going to move to Exhibit 566,

13  Government 566.  Do you remember being asked about this e-mail

14  today?

15  A.  Yes.

16  Q.  Mr. Koenig addressed with you today the top portion of the

17  e-mail that we can see on the screen now, right?

18          MR. CANTY:  Can we publish, Your Honor?

19          THE COURT:  You may.

20  BY MR. CANTY:

21  Q.  He addressed with you the portion of the e-mail we see on

22  the screen, right?

23  A.  Yes.

24  Q.  He didn't address any other portion of that e-mail with

25  you.

Joseph Brink - Cross

1    *A.*  I don't understand your question.

2    *Q.*  Okay.  Let's go to the bottom, start from the bottom.

3    *A.*  Yes.

4         *MR. CANTY:*  I think we have got to go down further.

5    *BY MR. CANTY:*

6    *Q.*  This is September 29, and Mr. Little is sending you pricing

7    and supply for 2015 via e-mail, right?

8    *A.*  Yes.

9    *Q.*  What's his split price on that day?

10   *A.*  $1.02 FOB.

11   *Q.*  And aside from the conference call we've discussed, this is

12   the first time you are receiving pricing for 2015 from

13   Mr. Little, right?

14   *A.*  In writing, yes.

15   *Q.*  Okay.  And he gives you $1.02 FOB, right?

16   *A.*  Yes.

17   *Q.*  What does "FOB" mean?

18   *A.*  It means the cost before the freight is added to it.

19   *Q.*  So this is a price without freight.

20   *A.*  Correct.

21   *Q.*  Okay.  Is that a 19-cent increase over the 88 cents from

22   2013?

23   *A.*  88 cents is delivered price.  This is FOB.

24   *Q.*  Right.  Is $1.02 19 cents over 88?

25   *A.*  No.

Joseph Brink - Cross

1    *Q.  Now, Mr. Little doesn't give you the freight component*

2    *until October 2nd, 2014; isn't that right?*

3         *MR. CANTY:  Can we scroll up and find that?*

4    *A.  Yes.*

5    *BY MR. CANTY:*

6    *Q.  On October 2nd with the freight added, we then come to*

7    *$1.07125, correct?*

8    *A.  Yes.*

9    *Q.  But it's not until October 2 that you get that full price*

10   *from Mr. Little?*

11   *A.  In writing, yes.*

12        *MR. CANTY:  Now, let's go back down to the first*

13   *couple e-mails in that chain beginning with Mr. Brink's e-mail*

14   *replying on September 30th.*

15   *BY MR. CANTY:*

16   *Q.  Now, Mr. Little is giving you $1.02 FOB pricing on the*

17   *split WOGs, right?*

18   *A.  Yes.*

19   *Q.  And you reply to him, among other things, Your competitors*

20   *have submitted pricing that matches you, but it was delivered*

21   *pricing.*

22        *Do you see that?*

23   *A.  Yes.*

24   *Q.  And, again, farther down on this e-mail, you say, Again,*

25   *your pricing below should be delivered to current final*

Joseph Brink - Cross

1   destination points, and then you match your competitors.

2          Do you see that?

3   A.   Yes.

4   Q.   As of September 30, 2014, had any other supplier offered

5   you a price of $1.02 delivered on split WOGs?

6   A.   Yes.

7   Q.   Who was that?

8   A.   I do believe it was Holmes.  I think Holmes' poultry was

9   about $1.02, around that range.

10  Q.   You talked to Mr. Koenig about who the competitors were.

11  One was Claxton, right?  And they weren't at $1.02, right?

12  A.   Uh-huh.

13  Q.   And your testimony was that Holmes was at somewhere between

14  8 and 10; is that right?

15  A.   Increase, yes.

16  Q.   8- and 10-cent increase from 88.  That's not $1.02, is it?

17  A.   It's a range.

18  Q.   It's a range.  When you are telling Mr. Little that you

19  have a competitor at $1.02 delivered, that's not true, is it?

20  A.   Yes and no.  I had pricing that was lower than Pilgrim's.

21  Q.   Did you have an imaginary friend who was bidding on chicken

22  in 2014?

23          MR. KOENIG:  Objection.

24          THE COURT:  Sustained.

25          MR. CANTY:  October 2 at 11:08, can we go up and see

2522

Joseph Brink - Cross

1  that?

2  *BY MR. CANTY:*

3  *Q.*  You, again, tell Mr. Little, Again, your competitors are

4  lower than you with delivered pricing compared to FOB pricing.

5        Do you see that?

6  *A.*  Yes.

7  *Q.*  Pilgrim's needs to match to show compromise.

8        Do you see that?

9  *A.*  Yes.

10  *Q.*  You're telling Mr. Little that Pilgrim's needs to match

11  $1.02 to show compromise, right?

12  *A.*  No.  I was saying he needs to lower his pricing because his

13  competitors were lower.

14        *MR. CANTY:*  At 8:22 a.m., if we can go up.

15  *BY MR. CANTY:*

16  *Q.*  We do it again.  Now we get to the point -- the sentence

17  that you read with Mr. Koenig, right?  Again, this is not going

18  to work, and Pilgrim's needs to match pricing from your

19  competitors.

20        Do you see that?

21  *A.*  Yes.

22  *Q.*  And, again, what you're telling Mr. Little is you have

23  competitors at $1.02 delivered, and he -- and he needs to

24  match, right?

25  *A.*  No, by this time he had all the total cost.  He had freight

Joseph Brink - Cross

1    and FOB, everything together.  His total package was more than

2    his competitors.

3    Q.  So your testimony to this jury is you are not telling

4    Mr. Little he needs to match the $1.02 in your e-mail below.

5    A.  No.

6              MR. CANTY:  That's all I have, Your Honor.

7              THE COURT:  Thank you.

8              Let's display Exhibit 542 one more time because there

9    is a limiting instruction on that.

10             MR. CANTY:  I apologize, Your Honor.

11             THE COURT:  If we could pull up 542.  And does it have

12   more to it than what I am seeing?

13             Okay, Ladies and Gentlemen, you will see in that

14   e-mail there are statements from a person named Andrea Lawson.

15   So Ms. Lawson's statements can only be considered for their

16   effect on the recipient, not on the truth of anything that she

17   asserts, all right?

18             Okay.  Then we can take that one down.

19             Mr. Beller, go ahead.

20             MR. BELLER:  Thank you, Your Honor.

21                        **CROSS-EXAMINATION**

22   BY MR. BELLER:

23   Q.  Good afternoon, Mr. Brink.

24   A.  Hello.

25   Q.  Mr. Brink, my name is David Beller.  I represent

Joseph Brink - Cross

1    Mikell Fries of Claxton Poultry.

2            So I want to start with your testimony on direct

3    examination regarding your surprise at the high price, okay?

4    And so if we can start really with an understanding as to how

5    you identify it to be a high price.

6            So in your role in obtaining poultry, you conduct

7    market research to maintain an awareness about current and

8    future market pricing.

9    *A.*  Yes.

10   *Q.*  You use tools like the Urner-Barry market index to research

11   market trends.

12   *A.*  Yes.

13   *Q.*  And in so doing, I want to identify what categories you're

14   looking at.  You had testified to the jury that you purchase

15   WOG or without giblets?

16   *A.*  Yes.

17   *Q.*  And obviously, Pollo Tropical and Fiesta Group sells

18   Grade A chicken, right?

19   *A.*  Yes.

20   *Q.*  There is no category in the Urner-Barry market for

21   split-breast WOG, fair?

22   *A.*  Correct.

23   *Q.*  You have WOG, but not necessarily split-breast WOG.

24   *A.*  Correct.

25   *Q.*  And when we say "split-breast WOG," what I am talking about

Joseph Brink - Cross

1    is that your chickens get, more or less, spread out flat on the

2    grill?

3    A.  Correct.

4    Q.  That means they have to be cut up the middle, and there

5    also has to be a notch on the wings that allows them to lay

6    flat.

7    A.  Correct.

8    Q.  And this unique cutting is not classified in the

9    Urner-Barry market.

10   A.  No.

11   Q.  Also on the Urner-Barry market is something called an

12   eight-piece price; is that right?

13   A.  Yes.

14   Q.  Eight-piece price means that the WOG is cut up into eight

15   different pieces?

16   A.  Yes.

17   Q.  So when you're looking at the Urner-Barry marketplace,

18   you're looking really in the categories of somewhere in between

19   that whole bird WOG price versus the eight-piece price.

20   A.  Yes.

21   Q.  You are in the restaurant industry.

22   A.  Yes.

23   Q.  Of course, right?  Restaurant industry supplying or

24   purchasing birds.

25   A.  Yes.

Joseph Brink - Cross

1    Q.  And individuals such as yourself in the restaurant industry

2    rely on the Urner-Barry market.

3    A.  Yes.

4    Q.  You use the market reports to inform your perspective as

5    you are negotiating with the different poultry suppliers.

6    A.  Yes.

7    Q.  One of the other things that you look at, Mr. Brink, is the

8    price of feed and things that go into the cost of the chicken.

9    A.  Yes.

10   Q.  Trends within those commodity markets.

11   A.  Yes.

12   Q.  You verify different pricing assertions made by the

13   different suppliers regarding those market trends.

14   A.  Yes.

15   Q.  So you take the market reports, you look at the reports as

16   a guide to determine what the pricing should look like based

17   upon all the facts that are out there.

18   A.  Yes.

19   Q.  Now, we already established that in 2014 Claxton Poultry's

20   price to you for chicken was 88 cents.

21   A.  Yes.

22   Q.  And that 88-cent price that they were selling to you was

23   substantially below the market price.

24   A.  Yes.

25   Q.  Below the market price because at 88 cents the 2014 average

Joseph Brink - Cross

1    for WOG was $1.05.

2    A.   I don't recall.

3    Q.   Well, do you recall, then, that the market price for

4    eight-piece was even significantly higher than that WOG price?

5    A.   I don't recall.

6    Q.   You were purchasing chicken at what we call a fixed price;

7    is that right?

8    A.   Yes.

9    Q.   Fixed price meaning that your price did not change based on

10   the cost of feed.

11   A.   Correct.

12   Q.   Okay.  And I know that in prior years you had what's called

13   a grain-based market -- or a grain-based model, but in 2014 it

14   was a fixed model.

15   A.   Correct.

16   Q.   And it didn't change depending on the price of feed.  What

17   we're talking about is that if corn prices went way up, your

18   price for chicken did not change.

19   A.   Correct.

20   Q.   And if corn prices or corn futures went way down, your

21   price that you were paying for chicken again did not change.

22   A.   For that contract period, yes.

23   Q.   For that contract period.  Where it may change, I think

24   here is where you're going, is that for future years it's

25   something, again, one of those different factors that you take

Joseph Brink - Cross

1   into consideration in negotiating for the next year.

2   A.   Yes.

3   Q.   Now, these futures markets regarding grain aren't going to

4   tell you with certainty what's going to happen to these feed

5   markets two years from now.

6   A.   No.

7   Q.   Because as you know, because of your Texas stores, you may

8   have an unexpected freeze that completely changes the

9   marketplace.

10  A.   Yes.

11  Q.   But by having these fixed contracts with your suppliers, it

12  really gives you some assurance, some protection that your

13  feeds are going -- excuse me, that your price is going to be

14  constant throughout a contract year.

15  A.   Yes.

16  Q.   And Pollo Tropical's contracts are sometimes one year,

17  sometimes two years.

18  A.   Yes.

19  Q.   Now, we spoke about you being in the restaurant industry.

20  That's different than you being in the chicken industry, right?

21  A.   Yes.

22  Q.   Mr. Brink, it's fair that you don't know what chicken

23  companies do internally regarding their pricing.

24  A.   Correct.

25  Q.   You don't know what their practices are in terms of how

Joseph Brink - Cross

1    they grow their chickens.

2    A.   I don't understand that question.

3    Q.   Well, you don't know how much they're fed, for example.

4    A.   No.

5    Q.   You don't know when they process their chickens or at what

6    age they process their chickens.

7    A.   We went to the plants.  We saw the stuff.  We saw the days.

8    They pulled them on certain times on the weights and everything

9    else, so they pull them based upon the weights and the ranges.

10   So they do vary based upon the dates and how old they are and

11   how much they weigh.

12   Q.   Absolutely, they do.  I agree with you.  You have gone on

13   these tours with some of the people in this room, right?

14   A.   Yes.

15   Q.   And they've taught you some of these things.

16   A.   Yes.

17   Q.   But because you are in the restaurant industry, not the

18   chicken-growing industry, you're not particularly educated on

19   the ins and outs of growing chickens.

20   A.   Correct.

21   Q.   Or the math behind growing chickens.

22   A.   Not the fine details.

23   Q.   You don't know the correlation, for example, between corn

24   prices and chicken processing.

25   A.   Not exactly, no.

2530

Joseph Brink - Cross

1   Q.  Now, because we were talking about who you know with some

2   of the individuals in this courtroom, I want to be a little bit

3   more specific regarding who you dealt with in 2014.  You did

4   not negotiate at all with my client, Mikell Fries.

5   A.  No, I did not.

6   Q.  And not just in 2014, but at any point you have not

7   negotiated with Mikell Fries.

8   A.  Correct.

9   Q.  There is another gentleman here from Claxton Poultry, and

10  that's Mr. Scott Brady.

11  A.  Yes.

12  Q.  You did not negotiate with Mr. Scott Brady at

13  Claxton Poultry regarding anything having to do with

14  Pollo Tropical, right?

15  A.  Correct.

16  Q.  So we've spoken a little bit about what was happening in

17  the marketplace -- or, rather, I should say, the different

18  things that you consulted to understand what was happening in

19  the marketplace in 2014.  And I want to go into a little more

20  detail about that.

21        Mr. Brink, something happened with both the beef and

22  the pork industry in the summer of 2014; is that right?

23  A.  Yes.

24  Q.  And when we say something happened with those two markets,

25  really what we mean is that prices for beef and pork were going

Joseph Brink - Cross

1   through the roof.

2   A.   Some of the meat cuts were going up, correct.

3   Q.   And in the summer of 2014 and the fall of 2014, chicken

4   continued to be the lowest priced protein for the public.

5   A.   I guess.  I don't know what cuts and everything else.  It's

6   hard to compare chicken legs to pork chops.

7   Q.   Understood.

8        There was a great demand for chicken in the summer of

9   2014.

10  A.   According to the reports.

11  Q.   Can you get a little closer to the microphone?  I didn't

12  quite understand you.

13  A.   According to what the reports were saying, yes.

14  Q.   Now, actually, let me back up.  And corn prices, also corn

15  and soy were also starting to come down in 2014.

16  A.   Correct.

17  Q.   So we have corn and soy that is starting to come down.  We

18  have beef and pork prices that are going up.  And then we have

19  chicken that's sort of out there that we are going to talk

20  about more; is that fair?

21  A.   Yes.

22  Q.   It's a very convoluted question, Mr. Brink, so I appreciate

23  you having followed that.

24       Pollo Tropical in the summer and fall of 2014 budgeted

25  an increase in the cost of chicken.

Joseph Brink - Cross

1    *A.*  Correct.

2    *Q.*  So even though we have corn and soy, their feed, that's

3    coming down, you knew that the price of chicken was going up,

4    and you budgeted accordingly.

5    *A.*  Yes.

6    *Q.*  Now, you would agree with me, Mr. Brink, that chicken size

7    depends on a lot of different factors.

8    *A.*  I don't understand your question.

9    *Q.*  How big the chicken gets depends on a lot of different

10   factors.

11   *A.*  Correct.

12   *Q.*  How much meat the chicken produces depends on a lot of

13   different factors.

14   *A.*  Correct.

15   *Q.*  One of those factors, for example, is the age of the

16   chicken?

17   *A.*  Yes.

18   *Q.*  Let me clarify.  Let me be more precise.  The age of the

19   chicken at the time it's processed.

20   *A.*  Yes.

21   *Q.*  How much the chicken is fed.

22   *A.*  Yes.

23   *Q.*  And for how many weeks that chicken is fed.

24   *A.*  Yes.

25   *Q.*  So when corn prices are low, it is economical to continue

Joseph Brink - Cross

1    to feed the chickens to grow larger.

2    A.   Yes.

3    Q.   Because, of course, if you have a larger chicken, you have

4    more meat yield and presumably more profit for the chicken

5    grower.

6    A.   Yes.

7    Q.   On the other hand, when corn and soy prices are

8    particularly expensive, it may make sense to process the

9    chicken at a younger age and a smaller size.

10   A.   Yes.

11   Q.   In 2014, it was much more economically advantageous for a

12   chicken grower to grow a larger chicken.

13   A.   2014?

14   Q.   Yes.

15   A.   I don't know.

16   Q.   Profit on large birds was much higher in 2014 than what it

17   was for small birds.

18   A.   Okay.  I don't know the internal of each company chickens.

19   Q.   Okay.  We'll talk about that a little bit more in just a

20   moment.  It's the same amount of manpower to process a small

21   bird as it is a large bird.

22        MR. KOENIG:  Objection, foundation.  He has already

23   testified he doesn't know how these things work.

24        THE COURT:  He can answer if he knows.  Overruled.

25   A.   What was the question again?

2534

Joseph Brink - Cross

1    BY MR. BELLER:

2    Q.  I am happy to ask the question again.  It takes the same

3    amount of manpower to process a large bird as it does a small

4    bird.

5    A.  I do not know exactly about the manpower it takes each

6    plant.

7    Q.  How about -- well, let's do this.  Do you recall me asking

8    you questions similar to this on November the 17th?

9    A.  Yes.

10          MR. BELLER:  Okay.  Counsel, it's 3265, lines 4

11   through 5.

12   BY MR. BELLER:

13   Q.  And I asked you:  It's the same amount of manpower to

14   process a large bird as it is a small bird.

15          And you answered:  Correct.

16          Does that sound familiar?

17   A.  I don't -- I guess so.

18   Q.  Okay.  Suppliers are moving towards a larger breed size in

19   order to maximize the volume of meat as it relates to labor.

20   A.  Okay.

21   Q.  Is that a yes?  Do you agree with that?

22   A.  Yes.

23   Q.  So as we are talking about small birds, let's focus you in

24   on the specific small bird market in 2014, okay?

25   A.  Okay.

Joseph Brink - Cross

1    *Q.*  The supply of small birds in 2014 was very, very tight.

2    *A.*  Yes.

3    *Q.*  And when we say the "supply is tight," really what we mean

4    is that there weren't enough small birds to meet the demand for

5    those birds.

6    *A.*  Correct.

7    *Q.*  The demand was up, right?

8    *A.*  Yes.

9    *Q.*  And because of the basic principle of supply and demand,

10   the market was showing increases for small birds.

11   *A.*  Yes.

12   *Q.*  In fact, Mr. Brink, you yourself as a buyer for

13   Pollo Tropical were trying to -- were contacting other

14   suppliers in 2014, additional suppliers in 2014, and you were

15   being told, Sorry, we don't have chickens, right?

16   *A.*  Yes.

17   *Q.*  And so when you say that the price that you had heard in

18   2014 was historically high prices, you would agree with me the

19   demand for these chickens was also historically high.

20   *A.*  I don't know historically high, but it was high.

21   *Q.*  Well, in the past.  I think you said you bought chickens

22   for Pollo Tropical for many years.

23   *A.*  Yes.

24   *Q.*  Right?  For these many years, you have never had an

25   occasion where you were going to different suppliers saying,

Joseph Brink - Cross

1    Please sell me chickens, and they were saying, Sorry, we don't

2    have any for you.

3    A.   This is the first time.

4    Q.   The first time.  And so with this shockingly high price

5    that you were told by I think you said Mr. Little in 2014, even

6    at that shockingly high price, Pilgrim's was offering you fewer

7    chickens.

8    A.   Yes.

9    Q.   A lower volume even at this high price.

10   A.   Yes.

11   Q.   Because even at that high price, Pilgrim's simply didn't

12   have the chickens to sell you in excess of what they were

13   offering.

14   A.   At the original, it was lower.  By the time it finished,

15   they offered us what we were getting currently.

16   Q.   Exactly, because they continued to negotiate with you, and

17   they continued to, I guess, try to provide you with what you

18   needed in terms of volume.

19   A.   Yes.

20   Q.   Now, anyplace, any restaurant that serves chicken is a

21   competitor of Pollo Tropical; is that right?

22   A.   Yes.

23   Q.   You compete with other regional and national fast-food

24   chains.

25   A.   Yes.

Joseph Brink - Cross

1    *Q.* Other regional fast-food chains like Kentucky Fried

2    Chicken.

3    *A.* Yes.

4    *Q.* Church's.

5    *A.* Yes.

6    *Q.* Bojangles.

7    *A.* They are in our markets, yes.

8    *Q.* If they are in your markets, that's fair.  If they are in

9    your markets.  And also Popeye's, right?

10   *A.* Correct.

11   *Q.* And so all of these different companies that I just listed,

12   they also sell small birds, right?

13   *A.* Yes.

14   *Q.* They also purchase small birds is probably the better way

15   to put that.

16   *A.* Yes.

17   *Q.* So a tight supply of small birds in 2014, a limited supply

18   of small birds in 2014 means that you are also competing with

19   KFC, Popeye's, Bojangles, any other company that sells or

20   purchases small birds, you're competing with them for the same

21   limited supply of these birds.

22   *A.* Yes.

23   *Q.* You would agree with me, Mr. Brink, that when

24   competitors -- excuse me, when buyers are competing for a

25   limited number of small birds, basic economics says that the

Joseph Brink - Cross

1    price goes up.

2    A.  Yes.

3    Q.  So even if corn prices and grain prices are down, the price

4    for the bird still goes up because of the demand for them.

5    A.  Yes.

6          MR. BELLER:  Your Honor, if we may pull up

7    Government's Exhibit 9740, the Court will recall this is

8    already in evidence, and I will ask to publish.

9          THE COURT:  You may.

10         MR. BELLER:  If we can please, Mr. Brian, scroll down

11   to the bottom of that page.  And let me give you that number

12   again.  It's Government's Exhibit 9740.  And if we can go up,

13   please.  And if you can, I am sorry, scroll down just a little

14   bit.  You are getting warmer.

15         If I could have just one brief moment, Your Honor.

16         THE COURT:  You may.

17         MR. BELLER:  If we can go to the bottom of page 1,

18   please.

19         Thank you, Your Honor.

20   BY MR. BELLER:

21   Q.  Are you able to see that on your screen, Mr. Brink?

22   A.  Yes.

23   Q.  Mr. Koenig and Mr. Canty asked you about this, so I am not

24   going to spend a lot of time on it.  I just have a couple of

25   additional questions.

2539

Joseph Brink - Cross

1          In addition to the things that Mr. Koenig asked you to

2    highlight, another line that was included in this particular

3    e-mail from Mr. Cooper is, We have to be very careful,

4    especially in a fixed agreement, with who we partner with.  We

5    only have so many pounds and have to do our best to place them

6    correctly.

7          Right?

8    *A.*  Yes.

9    *Q.*  "Fixed," again, meaning the agreement that doesn't vary

10   based on corn and soybean meal prices.

11   *A.*  Correct.

12   *Q.*  Mr. Cooper also tells you, We have been approached by other

13   customers requesting pricing and supply.

14         Right?

15   *A.*  Yes.

16   *Q.*  He also references some problems that you've had with their

17   competitor, Pilgrim's, and reminds you, We, meaning Claxton

18   Poultry, did the right thing.

19   *A.*  Correct.

20   *Q.*  And this is all in response to you informing Mr. Cooper

21   that Claxton Poultry's price is higher than Pilgrim's.

22   *A.*  Yes.

23   *Q.*  Now, if we can scroll down to the e-mail from you to

24   Mr. Cooper that came -- I believe it's at 1:50 p.m., the same

25   exhibit.

Joseph Brink - Cross

1          MR. BELLER:  And if we can zoom in just on that time

2     when you have a moment.

3     BY MR. BELLER:

4     Q.  Do you see in that same exhibit, Mr. Brink, this is your

5     e-mail to Mr. Cooper where you say, I thought Claxton was going

6     to work with us?

7          Right?

8     A.  Yes.

9     Q.  And what is the time on that e-mail?

10    A.  1:50 p.m.

11         MR. BELLER:  And if we can go back to Mr. Cooper's

12    e-mail in response, please.

13    BY MR. BELLER:

14    Q.  What time does Mr. Cooper respond to you?

15    A.  1:56 p.m.

16    Q.  So, excuse me, I spoke over you, Mr. Brink.  Would you say

17    that again, please?

18    A.  1:56 p.m.

19    Q.  Thank you.

20         So within six minutes of you writing to Mr. Cooper, he

21    responds to you saying, in essence, Pilgrim's is charging you

22    an amount, and, frankly, Claxton is better than Pilgrim's,

23    right?

24    A.  He never mentioned Pilgrim's pricing, but he mentioned

25    Pilgrim's, and he was selling the benefits of Claxton.

Joseph Brink - Cross

1   Q.   He is selling the benefits of Claxton.  He is trying to

2   compete, fair?

3   A.   I don't understand your question.

4   Q.   Well, let me ask a better one.  He is telling you, If we,

5   meaning Claxton, is higher than Pilgrim's, it's because

6   Pilgrim's is too high.

7   A.   No.  He says, If they're higher, meaning Claxton --

8   Q.   Right.

9   A.   If we're higher than Pilgrim's, we are worth it.

10  Q.   And Pilgrim's should be your lowest price.

11  A.   On the top line, top paragraph, yes.

12  Q.   Yes.  Pilgrim's should be your lowest price because of the

13  volume that Pilgrim's does.

14  A.   Correct.

15  Q.   Right?  They are selling you so much volume that you should

16  be getting a lower price simply because of volume.

17  A.   They are not selling us volumes, larger volumes.  Claxton

18  was selling us more volumes than Pilgrim's.

19  Q.   And Pilgrim's had larger facilities and more plants.

20  A.   Correct.

21  Q.   Claxton Poultry, Mr. Cooper never tells you their price is

22  take it or leave it.

23  A.   No.

24  Q.   Never in a text message?

25  A.   I do not think so.

Joseph Brink - Cross

1   *Q.*   Never in a pricing proposal.

2   *A.*   No.

3   *Q.*   They were seeking out the same profit margin as that of a

4   large bird.

5   *A.*   Yes.

6   *Q.*   You had spoken with Mr. Koenig about Holmes' poultry.

7   Holmes, again, was a competitor of Pilgrim's and Claxton?

8   *A.*   Yes.

9   *Q.*   Holmes is a single-plant facility based in Texas.

10  *A.*   Yes.

11  *Q.*   Claxton, Georgia is a single -- excuse me, Claxton Poultry

12  is a single-plant facility in Claxton, Georgia.

13  *A.*   Yes.

14  *Q.*   And at this time in 2014, you had stores in Florida.  You

15  also had stores in Texas.

16  *A.*   Yes.

17  *Q.*   Your two primary locations.

18  *A.*   Correct, of states.

19  *Q.*   Of states again at that time, right?

20  *A.*   Yes.

21  *Q.*   So primarily Holmes is providing chicken to your stores in

22  Texas.

23  *A.*   Yes.

24  *Q.*   And Claxton is providing their chicken primarily to your

25  stores in Florida?

Joseph Brink - Cross

1    A.   Yes.

2    Q.   Freight, freight is a factor that has to be weighed into

3    the cost of your product, right?

4    A.   Yes.

5    Q.   How much it costs to transfer your product from the chicken

6    facility to the distributor's warehouse?

7    A.   Yes.

8    Q.   You would agree with me that it is much less expensive to

9    transport chicken from Claxton, Georgia, to Miami than what it

10   is Texas to Miami.

11   A.   Yes.

12   Q.   Now, Holmes came in in late 2014.

13   A.   I don't recall when they came in.  We opened up the market

14   in Texas.  I don't recall exactly the dates we opened up the

15   stores.

16   Q.   If you told the government a few times it was late 2014,

17   would you agree with your own statements?

18   A.   I don't recall.

19   Q.   And you testified to the jury that Holmes was 9 to 10 cents

20   less than Claxton and Pilgrim's, right?

21   A.   Yes.

22   Q.   Even then, even then in 2014, they were still 7 cents

23   higher than what you had thought they were going to be.

24   A.   Yes.

25   Q.   7 cents higher than even you had forecasted?

Joseph Brink - Cross

1    *A.*   Yes.

2    *Q.*   And you said that Holmes was 10 cents less than Claxton and

3    Pilgrim's, but you would agree with me that Holmes did a

4    two-year contract.

5    *A.*   I don't understand that question.

6    *Q.*   Holmes did a two-year contract in 2014.  They had one price

7    from 2015 to 2016, and they had a separate price for the next

8    year.

9    *A.*   Each year has to have a price, yes.

10   *Q.*   And it was a two-year contract completely?

11   *A.*   Correct.

12   *Q.*   And so Holmes was 10 cents less than Pilgrim's and Claxton,

13   but Holmes also did stair-step pricing?

14   *A.*   I guess.

15   *Q.*   Holmes did a 10-cent increase the first year, right?

16   *A.*   I guess so.  I would have to look at the contract again.

17   *Q.*   And then they did another 5 cents the next year.

18   *A.*   Okay.  I don't recall, but yes.

19   *Q.*   And so if Claxton and Pilgrim's were at a 19-cent increase,

20   Holmes when you look at the contract was at a 15-cent increase.

21   *A.*   Over two years.

22   *Q.*   Over the course of two years.

23   *A.*   Yes.

24   *Q.*   Because they stair-stepped their increase the exact same

25   way but in different amounts that Claxton stair-stepped their

Joseph Brink - Cross

1   increase.

2   A.   The exact same amount?  They weren't the exact same amount.

3   Q.   I said not the exact same amount, but they stair-stepped

4   their increase the same way Claxton stair-stepped theirs?

5   A.   In different time periods, yes.

6   Q.   We are going to get into the time periods here in just a

7   moment.  I asked you about stair-stepping.  They stair-stepped

8   their price.

9   A.   Yes.

10  Q.   Holmes attributed their prices to regional labor issues,

11  right?

12  A.   Yes.

13  Q.   Now, we spoke about the competitors of Claxton.  I spoke

14  about Holmes.  Now I want to switch gears and talk a little bit

15  about Pilgrim's and Jimmie Little, okay?  You testified to the

16  jury that Mr. Little refused to negotiate with you.

17  A.   Correct.

18  Q.   Mr. Little tried calling you to talk about the pricing,

19  right?

20  A.   Yes.

21  Q.   He tried calling you multiple times.

22  A.   Yes.

23  Q.   He wanted to speak with you about the pricing.

24  A.   Yes.

25  Q.   He offered to meet you at one of the restaurants to discuss

Joseph Brink - Cross

1    the pricing.

2    A.   Yes.

3    Q.   And your response is that your pricing will not work.   You

4    need to match the pricing of your competitors.

5    A.   Yes.

6    Q.   That was your response, that Mr. Little needed to match the

7    pricing of the competitors.

8    A.   Yes.

9    Q.   As Mr. Canty asked you, you bluffed when you told

10   Mr. Little that his competitors' prices were less than his and

11   included freight.

12   A.   They were lower.

13   Q.   Well, we haven't gotten to the stair-stepping, because what

14   you testified to Mr. Koenig is that both Claxton and Pilgrim's

15   was 19 cents higher.

16   A.   They were, correct.

17   Q.   That they went from 88 cents, and you added 19 cents,

18   right?

19   A.   Correct.

20   Q.   And that was for both Claxton and for Pilgrim's.

21   A.   Yes.

22   Q.   And your answer to the jury to clarify in response to my

23   question is that they weren't the same, that Claxton was

24   actually lower than Pilgrim's.

25   A.   No, Claxton wasn't lower than Pilgrim's.   The original

Joseph Brink - Cross

1    proposal, Claxton had their stair-stepping starting in October

2    of 2014.

3    Q.  And so I am trying to figure out which is correct.  You

4    bluffed to Mr. Little when you told him that his competitors'

5    prices were less than his.

6    A.  And they were.

7    Q.  You asked Mr. Little to see his market-related pricing.

8    A.  Yes.

9    Q.  That Urner-Barry market that we were talking about is one

10   example, right?

11   A.  Yes.

12   Q.  Mr. Little offered to sell you chicken at a market-based

13   price instead of a fixed price.

14   A.  Yes.

15   Q.  You, however, Mr. Brink, ultimately agreed to a fixed price

16   instead.

17   A.  Yes.

18   Q.  And that was $1.02 FOB for split chicken.

19   A.  Yes.

20   Q.  Okay.  $1.02 FOB, as you told Mr. Canty, meaning that was

21   just at the back dock of Pilgrim's plant.

22   A.  Yes.

23   Q.  That did not include that delivery fee to the distributor

24   or their warehouse, right?

25   A.  Correct.

Joseph Brink - Cross

1          THE COURT:  Can you look for a convenient breaking

2    spot?

3          MR. BELLER:  This is a great time.  Thank you, Your

4    Honor.

5          THE COURT:  Ladies and Gentlemen, we will take our

6    afternoon break.  Keep the admonitions in mind.  We will

7    reconvene at 3:30.  Thank you.

8          We will be in recess.  Thank you.

9       (Recess at 3:16 p.m. until 3:31 p.m.)

10         THE COURT:  All right.  Why don't we go ahead and get

11   Mr. Brink.

12         MR. KOENIG:  One thing, we had meant to introduce

13   Government's Exhibit 500.  We were going to try to do it on

14   redirect.  It's on our list of unsponsored exhibits, but we

15   were going to do it with Mr. Brink.  But if -- if the

16   defendants want to cross on it, then I think that is why I am

17   raising it right now before the jury is out here.

18         THE COURT:  Okay.

19         (Jury present.)

20         THE COURT:  Mr. Beller, whenever you are ready.

21         MR. BELLER:  Thank you, Your Honor.

22   BY MR. BELLER:

23   Q.  Mr. Brink, welcome back, sir.

24   A.  Thank you.

25   Q.  When we were -- right before the break, you and I were

2549

Joseph Brink - Cross

1    talking a little bit about Pilgrim's price and whether

2    Pilgrim's price included freight or did not include freight,

3    right?

4    A.   Yes.

5    Q.   Okay.  So to help orient both you as well as our jury, you

6    would agree with me that Pilgrim's price was $1.02?

7    A.   FOB?

8    Q.   FOB.

9    A.   I don't remember, $1.02, $1.03, whatever it was.

10   Q.   Well, I am happy to show you an exhibit.  Does $1.02 plus

11   freight sound about right?

12   A.   Yes, it does, yes.

13   Q.   So $1.02 does not include the delivery from the dock of the

14   plant to the distribution center.

15   A.   Yes.

16   Q.   And the cost to deliver is roughly 5 cents in that

17   contract, right?

18   A.   Yes.

19   Q.   Just a little bit over 5 cents?

20   A.   Yes.

21   Q.   And that little bit over 5 cents means that you are paying

22   Pilgrim's approximately $1.07 delivered.

23   A.   Yes.

24   Q.   And that $1.07 delivered is to start January 1st.

25   A.   Yes.

Joseph Brink - Cross

1   *Q.* Now I want to switch gears, and let's talk a little bit

2   more about your discussions with Claxton, okay?  So you are now

3   negotiating with Mr. Cooper of Claxton Poultry.  Mr. Cooper

4   informs you that Claxton's delivered price is $1.07.

5   *A.* Yes.

6   *Q.* Now at the time Mr. Cooper tells you that Claxton's price

7   delivered is $1.07, you're negotiating with Pilgrim's

8   nondelivered at $1.02?

9   *A.* No.  When I got the pricing from Walter, that was the day I

10  had the meeting with Jimmie, and he told me it was going to be

11  $1.07 per pound on the phone, not in writing.  That was the

12  price that he gave to me.

13  *Q.* Do you recall that he did not yet know the freight but

14  would get back to you on the freight cost?

15  *A.* That was later on.

16  *Q.* So let me understand your testimony.  On September 22, you

17  have a phone call with him.

18  *A.* Yes.

19  *Q.* He gives you a freight price.

20  *A.* No.  He gave me a total cost of $1.17 -- $1.07.

21  *Q.* Not knowing at that point how much of that would be freight

22  and how much of that would be chicken cost?

23  *A.* Yeah, it was just total cost.

24  *Q.* Total cost, $1.07.

25  *A.* Yes.

Joseph Brink - Cross

1   *Q.*  Thank you for that explanation.

2         Claxton Poultry, Mr. Cooper gives you a price of $1.07

3   that includes freight.

4   *A.*  Correct.

5   *Q.*  You then respond asking for a stair-step increase starting

6   in January.

7   *A.*  Yes.

8   *Q.*  So when Mr. Cooper is speaking to you about starting the

9   price early, it's also in relation to the stair-step price.

10  *A.*  Yes.

11  *Q.*  So in other words, you don't want to go from 88 cents to

12  $1.07 delivered overnight, right?

13  *A.*  Correct.

14  *Q.*  You want to graduate it up over the course of as long of a

15  period of time as really you can, fair?

16  *A.*  Yes.

17  *Q.*  Now, during the course of that negotiations, Mr. Cooper

18  also lowers the price by a penny.

19  *A.*  That's not what we finally got to.

20  *Q.*  Let's talk about that, okay?  He lowers your price by a

21  penny because he is able to source freight at a lower cost.

22  *A.*  Okay.

23  *Q.*  Does that sound familiar?

24  *A.*  Yes.

25  *Q.*  I am going to show you what is in your binder --

Joseph Brink - Cross

1        MR. BELLER:  And this is Government's Exhibit 500,

2   Mr. Koenig.  I do not know the tab number.

3            Excuse me, Your Honor.  If I may address Mr. Koenig.

4        THE COURT:  And it's Tab 3.

5   BY MR. BELLER:

6   Q.  If you will take a moment and look at Tab 3 and let me know

7   when you have had the opportunity to take a look at that.

8            Have you had a chance to review that, sir?

9   A.  Yes.

10  Q.  And does this exchange look familiar?

11  A.  This is not between -- no.

12  Q.  This exchange -- if you can actually switch over and I want

13  you to look at the very first e-mail exchange.

14       MR. BELLER:  If we can scroll down, please.

15  A.  Yes.

16  BY MR. BELLER:

17  Q.  Okay.  Does this e-mail exchange look familiar?

18  A.  From Walter and I, yes.

19       MR. BELLER:  Your Honor, at this time I would move for

20  the admission of Government's Exhibit 500.

21       THE COURT:  Any objection to the admission of

22  Exhibit 500?

23       MR. KOENIG:  No.

24       THE COURT:  Exhibit 500 will be admitted.

25  BY MR. BELLER:

2553

Joseph Brink - Cross

1   Q.   So, Mr. Brink, you would agree with me that Mr. Cooper was

2   able to source the freight rate lowering the price by a penny.

3   A.   Right here it says 19 cents per pound.

4   Q.   Mr. Brink, if you would switch down and scroll down --

5        MR. BELLER:   And I say if you would scroll down.   Let

6   me have Mr. Brian scroll down.

7        Your Honor, may we publish to the jury?

8        THE COURT:   Yes.

9   BY MR. BELLER:

10  Q.   Mr. Brink, if you would look at the e-mail exchange between

11  you and Mr. Cooper dated October the 2nd, 2014, at 7:56 a.m.

12  A.   Yes.

13  Q.   You would agree with me that Mr. Cooper lowered the price

14  by a penny.

15  A.   Yes.

16  Q.   That puts your cost at $1.06 per pound including freight.

17  A.   At this time, yes.

18  Q.   You request a dime increase go into effect in January of

19  2015, right?

20       MR. BELLER:   I am done with the exhibit.   Thank you,

21  Mr. Brian.

22  BY MR. BELLER:

23  Q.   Is that right?

24  A.   Yes.

25  Q.   And an additional 8-cent increase that goes into effect in

Joseph Brink - Cross

1   July of 2015 is -- eventually was a counteroffer that you make?

2   A.  I don't remember, but it sounds right.

3   Q.  If there is a 10-cent increase in January, that would make

4   your chicken 98 cents delivered for the month of January,

5   right?

6   A.  Yes.

7   Q.  And, in fact, that's exactly what you had negotiated for Q1

8   or Quarter 1 of 2015 is simply this -- excuse me for saying

9   "simply," is the 10-cent increase?

10  A.  Yes.

11  Q.  Making it 98 cents for Q1.

12  A.  Yes.

13  Q.  98 cents for Quarter 1 was the exact same price as Holmes'

14  chicken.

15  A.  Yes.

16  Q.  So when you say that Holmes' chicken was significantly less

17  than Claxton for Quarter 1, you are paying 98 cents to Claxton,

18  98 cents to Holmes, and $1.07 to Pilgrim's, right?

19  A.  Correct.  Holmes' pricing was for the whole year, so there

20  is a difference.

21  Q.  Understood.  I am talking about Q1.  We are going to get to

22  the others.

23  A.  Q1, yes.

24  Q.  So for Q1, Holmes and Claxton are the same price.

25  A.  Correct.

Joseph Brink - Cross

1    *Q.*  Pilgrim's is at $1.07.

2    *A.*  Yes.

3    *Q.*  Q2, Claxton's price goes up.

4    *A.*  Yes.

5    *Q.*  And Claxton's price goes up and stair-steps and doesn't

6    reach $1.06 until July of 2015?

7    *A.*  $1.07.

8    *Q.*  If we can go back to Exhibit 500. If we can go back to the

9    exchange between you and Mr. Cooper, the same one that we had

10   just looked at.  If you would read the exchange between you and

11   Mr. Cooper on October the 2nd of 2014.  It starts with "Joe."

12   *A.*  We were able to source freight rates lowering the price by

13   a penny.  So that would put us at $1.06 per pound delivered.

14   Please consider the following:  December 1st go up a dime, and

15   January 1st go up 8 cents.

16   *Q.*  And that ultimately, that graduated pricing is something --

17   or that stair-step pricing is something that you had engaged

18   in, although not specifically those months and at that pace,

19   right?

20   *A.*  Correct.

21   *Q.*  Because you had continued to negotiate and then split it up

22   over a few different stair-step increases?

23   *A.*  Yes.

24   *Q.*  So the average price for Pilgrim's -- excuse me, the

25   average price for Claxton for all of 2015, including these

Joseph Brink - Cross

1   stair-steps, comes out at about $1.03 for the year, right?

2   A.   Sounds about right.

3   Q.   Roughly, without handing you a calculator, about $1.03?

4   A.   I would have to take your word for it.

5   Q.   Holmes is 98 cents delivered for the year?

6   A.   Uh-huh.

7   Q.   Pilgrim's is $1.07 delivered for the year, right?

8   A.   Yes.

9   Q.   And then in 2016, Holmes' price goes up an additional

10  5 cents.

11  A.   Sounds right.

12  Q.   So let's put that into context just a little bit as we wrap

13  up.  I want to go back to what you and I were talking about in

14  terms of the Urner-Barry report.

15          You had testified to the jury for purposes of

16  orienting you that you asked suppliers to show you these market

17  reports.

18  A.   Yes.

19  Q.   To justify their prices.

20  A.   To give me some clarification, yes.

21  Q.   To get clarification.  Urner-Barry does not include

22  freight.

23  A.   Correct.

24  Q.   Freight is a cost, again, for the transport of the chicken.

25  A.   Correct.

Joseph Brink - Cross

1    Q.  Mr. Cooper told you that Claxton's price reflected the

2    market pricing.

3    A.  Okay.

4    Q.  Is that a yes?

5    A.  Yes.

6    Q.  Okay.  Now, when you met with the government on October the

7    4th of 2021, you believed that the market price at the time of

8    negotiation to be 95 cents.

9    A.  I don't remember.

10   Q.  Do you recall meeting with the government on October the

11   4th of 2021?

12   A.  Yeah, yes.

13   Q.  Yeah, about six months ago?

14   A.  Yes.

15   Q.  You met with the government?

16   A.  Yes.

17   Q.  And when you met with the government and you were talking

18   to the government about this shocking price, you also spoke to

19   the government about the market price, right?

20   A.  Yes.

21   Q.  And you told the government that you believed that at the

22   time of negotiation the market price was 95 cents.

23   A.  I don't recall.

24   Q.  In September of 2014 when you were negotiating with

25   Pilgrim's and when you were negotiating with Claxton, the

Joseph Brink - Cross

1    market price was $1.17.

2    A.   Okay.

3    Q.   Is that correct?

4    A.   I don't recall.

5    Q.   I am happy to show you the Urner-Barry report if it would

6    help refresh your recollection.

7    A.   Okay.  I don't recall exact prices from everything.

8    Q.   Let me be clear, because six months ago you told the

9    government that you thought it was 95 cents.

10   A.   I don't remember saying that.

11   Q.   Would it help refresh your recollection as to the market

12   price, the Urner-Barry market price in September of 2014 if you

13   had the opportunity to view the Urner-Barry market report?

14   A.   That would help.

15        MR. BELLER:  If we can have Exhibit I-295, please.  If

16   that's not coming up, Mr. Brian, we can use a different

17   exhibit, Your Honor.  I-236, please.

18        MR. KOENIG:  Last time when he was refreshing, he

19   described a document that he was going to use to refresh.  Now

20   they are moving to a different document.  I would ask that not

21   be done.  More of a proper refreshment, Is there something that

22   I can use to refresh your recollection?

23        THE COURT:  He asked whether a particular type of

24   document would refresh.  Mr. Brink said yes.  So that was an

25   appropriate way to do it.

Joseph Brink - Cross

1              MR. BELLER:  Your Honor, I understand the system,

2    there is a little bit of a lag, so if you don't mind the

3    pauses, it should be coming up quickly.

4              THE COURT:  Sure.

5              Mr. Beller, which exhibit is this one?

6              MR. BELLER:  Your Honor, this is I-236.

7    BY MR. BELLER:

8    Q.  If you can take just a moment, Mr. Brink, and review I-236.

9    Specifically, I want to draw your attention to September of

10   2014.

11   A.  Yes.

12   Q.  Have you had a chance to review that?

13   A.  Yes.

14   Q.  Does that refresh your recollection as to what the

15   Urner-Barry market price was for eight-piece in September of

16   2014?

17             MR. KOENIG:  Objection, improper refreshment.  He

18   should take the exhibit down after he says whether it

19   refreshes.

20             THE COURT:  That's fine.  He should not be looking at

21   it.  He can either look at Mr. Beller or it can be taken down.

22   BY MR. BELLER:

23   Q.  Does that refresh your recollection?

24   A.  Yes.

25   Q.  You would agree with me that the eight-piece Urner-Barry

2560

Joseph Brink - Cross

1    price for eight-piece in September of 2014 at the time you were

2    negotiating with Claxton, Holmes, and Pilgrim's was $1.175?

3    A.   Yes.

4    Q.   Now, I want to be very clear because we spoke about the

5    fact that your product is in between two different markets,

6    right?

7    A.   Yes.

8    Q.   The other market that we should be looking at is the WOG

9    market, right?

10   A.   Yes.

11          MR. BELLER:  If I may have a moment.

12          THE COURT:  Yes.

13   BY MR. BELLER:

14   Q.   So the WOG again is the whole chicken without the special

15   cuts that you need done before it's sold to you, right?

16   A.   Yes.

17   Q.   Because it costs money for your chicken to be processed and

18   cut in the way that you need it.

19   A.   Yes.

20   Q.   There is labor associated with doing that.

21   A.   Yes.

22   Q.   And so when we're talking about WOG, that WOG market price

23   does not include that labor that is required, right?

24   A.   Yes.

25   Q.   And so the WOG price for the chicken is actually lower or

Joseph Brink - Cross

1   less expensive than the chicken that you're buying.

2   A.   Rephrase that again.

3   Q.   Yeah.  Because the Urner-Barry market price for WOG does

4   not include the labor of cutting it, it's actually lower than

5   the price of the chicken or than the type of chicken that

6   you're purchasing.

7   A.   Correct.

8   Q.   Do you recall that the Urner-Barry market price in

9   September of 2014 when you were negotiating with Claxton and

10  Pilgrim's and Holmes, the WOG market price was $1.07?

11  A.   Yes.

12  Q.   And so that WOG $1.07 price did not include the freight.

13  A.   Correct.

14  Q.   And so if we take the 5-cent freight out, you were actually

15  paying at least 5 cents less than the market price.

16  A.   Okay.

17  Q.   That's a yes or no.  It's $1.07 minus 5 cents.

18  A.   Yes.

19  Q.   And if the market for WOG is $1.07, you are paying at least

20  5 cents less than the Urner-Barry market price for chicken.

21  A.   Yes.

22  Q.   For a chicken that has not been as processed as the chicken

23  that you're buying.

24  A.   Yes.

25  Q.   So when Mr. Little says to you, I'm willing to sell you

Joseph Brink - Cross

1    chicken at market price, you said no, it's because the price

2    would have been more expensive.

3    A.   No.  That's not really why I said no.

4    Q.   Market price was more expensive than the price that you

5    were given on a fixed -- on a flat rate or a fixed price.

6    A.   Right.  That was not the reason why I said no.

7    Q.   So when, Mr. Brink, you testified to Mr. Koenig on direct

8    examination that Claxton and Pilgrim's gave you the exact same

9    shocking price, it also happened to be the exact same price as

10   the market price, only Claxton and Pilgrim's price included

11   freight.

12   A.   For eight-piece cut -- no, for the WOGs, yes.

13   Q.   Eight-piece cut was $1.17; WOG was $1.07, right?

14   A.   Yes.

15   Q.   And WOG at $1.07, if you could remind the jury what

16   Pilgrim's and Claxton was charging you in 2015.

17   A.   2015?

18   Q.   Yes.

19   A.   At the end, $1.07 delivered.

20   Q.   $1.07.  Thank you, Mr. Brink.

21            MR. BELLER:  Your Honor, I have no further questions.

22            THE COURT:  Additional cross?

23            Ms. Pletcher, go ahead.

24            MS. PLETCHER:  Thank you, Your Honor.

25                              **CROSS-EXAMINATION**

Joseph Brink - Cross

1    *BY MS. PLETCHER:*

2    *Q.*  Good afternoon, Mr. Brink.  My name is Anna Pletcher, and I

3    represent Jayson Penn.  You know it's been a long afternoon, so

4    I just have a few short questions for you.

5           You said earlier today that you do not know Mr. Penn;

6    is that right?

7    *A.*  Correct.

8    *Q.*  You have never met him?

9    *A.*  Never have.

10   *Q.*  Never spoken to him?

11   *A.*  Never have.

12   *Q.*  Now, on direct examination you were shown a contract

13   between Pollo Tropical and Pilgrim's Pride for calendar year

14   2014.  Do you remember that?

15   *A.*  Yes.

16   *Q.*  Your signature was on that contract?

17   *A.*  Yes.

18   *Q.*  And Mr. Penn's signature was on that contract?

19   *A.*  Yes.

20   *Q.*  But to be clear, you did not negotiate that contract with

21   Mr. Penn.

22   *A.*  Correct.

23   *Q.*  You had no communications with Mr. Penn about that

24   contract.

25   *A.*  Correct.

Joseph Brink - Cross

1    *Q.*  You were also shown a contract between Pollo Tropical and

2    Pilgrim's Pride for the calendar year 2015.  Do you remember

3    that one?

4    *A.*  Yes.

5    *Q.*  And that contract also had your signature on it and

6    Mr. Penn's signature?

7    *A.*  Yes.

8    *Q.*  But, again, you did not negotiate that contract with

9    Mr. Penn.

10   *A.*  Correct.

11   *Q.*  And you had no communications with him about that contract.

12   *A.*  Correct.

13          *MS. PLETCHER:*  I have no further questions.  Thank

14   you.

15          *THE COURT:*  Thank you.

16          Additional cross?

17          Mr. Gillen.

18                         **CROSS-EXAMINATION**

19   *BY MR. GILLEN:*

20   *Q.*  My name is Craig Gillen, and I represent Brian Roberts.

21   Just a few very quick questions.

22          All of this testimony that you've given has nothing to

23   do with Tyson, does it?

24   *A.*  No, it does not.  No, it does not.

25   *Q.*  It doesn't have anything to do with Brian Roberts, does it?

Joseph Brink - Cross

1    A.   No.

2    Q.   Or Tim Mulrenin?

3    A.   No.

4            MR. GILLEN:   That's all I have, Your Honor.

5            THE COURT:   Thank you.

6            Ms. Henry.

7                        **CROSS-EXAMINATION**

8    BY MS. HENRY:

9    Q.   Good afternoon, Mr. Brink.   My name is Roxann Henry, and I

10   represent Mr. Bill Kantola.

11           Again, whatever you were talking about with the

12   government with regard to the negotiations 2013, 2014, they had

13   nothing to do with Koch Foods?

14   A.   Correct.

15   Q.   And nothing to do with Mr. Bill Kantola.

16   A.   Correct.

17   Q.   But Koch Foods did come in as a new competitor in 2016 to

18   Pollo Tropical, didn't it?

19   A.   Yes.

20   Q.   And when it came in, it took away sales volume that

21   otherwise would have gone to the incumbents or other suppliers?

22   A.   We brought in Koch to take over a change of our

23   specification that we made.   We had a third-party processor,

24   and we made changes to our specs, so Koch was a new supplier.

25   Q.   So it came in as a new supplier and took volume that could

2566

Joseph Brink - Redirect

1  have gone to other people, correct?

2  A.  Correct.

3  Q.  And the first time you spoke to the government, that was in

4  March 2021, a year ago?

5  A.  Sounds about right.

6          MS. HENRY:  Thank you.

7          No further questions, Your Honor.  Thank you.

8          THE COURT:  Thank you, Ms. Henry.

9          Mr. Pollack, go ahead.

10                      **CROSS-EXAMINATION**

11  BY MR. POLLACK:

12  Q.  Mr. Brink, my name is Barry Pollack.  I represent

13  Ric Blake.  Ric Blake used to work at George's.  George's was

14  not a supplier of yours?

15  A.  Correct.

16          MR. POLLACK:  Thank you.  That's all I have.

17          THE COURT:  Thank you.

18          Additional cross?

19          All right.  Redirect?

20          MR. KOENIG:  Thank you.

21                    **REDIRECT EXAMINATION**

22  BY MR. KOENIG:

23  Q.  All right, Mr. Brink, you were shown a lot of -- several

24  exhibits that you weren't on, e-mails internal to Pilgrim's and

25  so forth.  Do you recall that?

2567

Joseph Brink - Redirect

1    A.   Yes.

2    Q.   You were asked if the government showed you those in

3    preparing for your testimony.  Do you remember that?

4    A.   Yes.

5    Q.   What is your understanding as to why you're here to

6    testify, personal experience?

7            MR. McLOUGHLIN:  Objection, Your Honor, as to this

8    gentleman's understanding as to why he is here to testify.  I

9    assume it's per subpoena.

10           THE COURT:  Overruled.

11   A.   What's the question again?

12   BY MR. KOENIG:

13   Q.   Basically, are you here to testify about your own firsthand

14   knowledge?

15   A.   Yes, it is.

16   Q.   And at any point when you met with the government, did you

17   ever feel like the government was trying to influence your

18   testimony?

19   A.   Never.

20   Q.   All right.  You were also asked about the pricing for

21   Claxton and Pilgrim's in 2014, so in like the 2013

22   negotiations, and you were asked about whether they were the

23   same at 88 cents.  Do you recall that?

24   A.   Yes.

25   Q.   And you said it was important to have the same price

Joseph Brink - Redirect

1   between suppliers; is that right?

2   A.  Yes.

3   Q.  Can you just explain why it's important to have them at the

4   same price?

5   A.  It's important for our system when we're in a regionality

6   with the one area that we have multiple chicken suppliers

7   coming in and we are in a Florida market, if they are the same

8   price, it's much easier to operate for operations and have the

9   same pricing.

10  Q.  Gotcha.  In order to get the same price between the two

11  competitors, Claxton and Pilgrim's, did you ever ask

12  Defendant Little and Mr. Cooper to cooperate to come up with

13  the same price?

14  A.  No.

15  Q.  You also mentioned you were asked about Claxton wanting the

16  profit for -- the same profit as big bird.  Do you recall that?

17  A.  Yes.

18  Q.  Does Claxton even make big birds?

19  A.  I do not believe so.

20  Q.  One other thing.  You were just talking to Mr. Beller about

21  the Urner-Barry Index?

22  A.  Yes.

23  Q.  Okay.

24      MR. KOENIG:  Could we pull up I-236 for the witness?

25  Can we ask the defendants' IT person to pull it up?

Joseph Brink - Redirect

1          *THE COURT:*  Sure.

2     *BY MR. KOENIG:*

3     Q.  Now, before I ask you anything about this document, how

4     many pounds in 2014 of the split-breast WOG did Pollo purchase

5     approximately?

6     A.  About 35 million pounds.

7     Q.  Where on this chart do you see the volume of purchases

8     reflected?

9     A.  Nowhere.

10    Q.  So in other words, is it your understanding that if I

11    wanted to go buy one chicken, I could get it at that price

12    that's on there?

13            *MR. TUBACH:*  Objection, leading.

14            *THE COURT:*  Sustained.

15    *BY MR. KOENIG:*

16    Q.  What is your understanding about the amount of volume you

17    would need to purchase to get one of the prices listed there?

18            *MR. McLOUGHLIN:*  Objection, lack of foundation.

19    *BY MR. KOENIG:*

20    Q.  Do you have an understanding?

21            *THE COURT:*  Let the objection take place.  Sorry,

22    Mr. McLoughlin.  Go ahead.

23            *MR. McLOUGHLIN:*  Lack of foundation, lack of

24    demonstrated personal knowledge.

25            *THE COURT:*  Overruled.

Joseph Brink - Redirect

1              MR. McLOUGHLIN:  Calls for an expert opinion on that

2       index, 702, Your Honor.

3              THE COURT:  Overruled.  He can answer if he

4       understands.

5       A.  This is the open market price.  That's the price of chicken

6       that's out there for open market.  If you want to buy market,

7       that's the starting price.  Volume typically does help lower

8       pricing with suppliers.

9       BY MR. KOENIG:

10      Q.  You are in the tens of millions of pounds, right?

11      A.  Yes.

12      Q.  You were also shown Government's Exhibit 5.  Do you recall

13      that?

14      A.  I don't know which one it is.

15      Q.  Okay.  It was the colorful --

16      A.  Oh, that one, yes.

17             MR. KOENIG:  At this time the government would move to

18      admit Government's Exhibit 5.

19             THE COURT:  Any objection to the admission of

20      Exhibit 5?

21             MR. TUBACH:  Other than as previously stated.

22             THE COURT:  Yes, other than as previously objected to

23      and ruled upon.

24             Mr. Beller?

25             MR. BELLER:  Thank you, Your Honor.  I am going to

Joseph Brink - Redirect

1  object to the relevance of this at this time given the

2  statements on cross-examination, which is a lack of

3  understanding or knowledge that this witness has regarding this

4  document.  So I have no objection to its admission; rather, its

5  relevance and publishing and questioning of that document with

6  this witness.

7          THE COURT:  We will see what the questions are.  Any

8  objection to the admission?

9          MR. BELLER:  No, thank you.

10         THE COURT:  So, Ladies and Gentlemen, Exhibit 5 is

11 another summary exhibit.  Same admonition.  Over the objection

12 of the defendants, I have admitted that exhibit, and as I

13 mentioned to you before, those summaries on the far right-hand

14 side list certain exhibits.  Those exhibits have been admitted

15 into evidence.  The summaries are being admitted because they

16 may assist you in understanding the evidence that has been

17 presented, but a summary itself is not evidence of the material

18 that it summarizes and is only valid and reliable as the

19 underlying material that it seeks to summarize.

20         You may give a summary exhibit entire weight, some

21 weight, or no weight at all depending on your assessment of the

22 underlying material and the accuracy of the summary.

23         Mr. Koenig, go ahead.

24         MR. KOENIG:  Permission to publish the portion that he

25 was questioned about.

2572

Joseph Brink - Redirect

1          *THE COURT:*  You may.

2          *MR. KOENIG:*  I think we need controls switched back

3     over.  Your Honor, I believe it's not published.

4          *THE COURT:*  It may be published.

5          *MR. KOENIG:*  Thank you.

6     BY MR. KOENIG:

7     Q.  Do you see there in the second line that says 12:26 p.m.

8     Eastern time?

9     A.  Yes.

10    Q.  All right.  What is the first name listed there?

11    A.  Jimmie Little.

12    Q.  Okay.  And going over, what does it say in the middle

13    column?

14    A.  Phone call.

15         *MR. BELLER:*  Your Honor, I am objecting to the

16    relevance of this.

17         *MR. KOENIG:*  It's very relevant.  He was questioned on

18    it, and it wasn't just, show it to him, I don't know anything

19    about it.  I mean, they went through a couple of the entries.

20         *THE COURT:*  Objection is sustained.

21    BY MR. KOENIG:

22    Q.  What time did you say your call with Jimmie Little was on

23    September 22nd, 2014?

24         *MR. BELLER:*  Your Honor, I am objecting again, and we

25    now have the witness who is studying the exhibit and testifying

 1   from the exhibit.

 2          THE COURT:  We need to remove the exhibit.

 3   BY MR. KOENIG:

 4   Q.  What time was your phone call?

 5          MR. BELLER:  Objection, foundation.

 6          THE COURT:  He can answer if he knows.

 7   A.  11:30 Central time.

 8   BY MR. KOENIG:

 9   Q.  So what time would that be approximately Eastern time?

10   A.  12:30 Eastern time.

11   Q.  Did you ask -- after that phone call or during that phone

12   call, did you ask Defendant Little to contact Walter Cooper at

13   Claxton?

14   A.  No.

15          MR. KOENIG:  One moment.

16          THE COURT:  Yes.

17          MR. KOENIG:  Nothing further.  Thank you.

18          THE COURT:  Is Mr. Brink subject to recall?

19          Okay.  Mr. Brink, you are excused.  Thank you very

20   much.

21          THE WITNESS:  Thank you.

22          MR. LAVINE:  Your Honor, I believe that the next

23   witness is going to be Mr. Lewis?

24          THE COURT:  I am not sure.  That could be the next

25   witness.  Let's see if Ms. Call wanted to do something other

1    than call a witness.

2          *MS. CALL:*  Yes, we have several documents to publish

3    at this time and several to offer as well.

4          *MR. LAVINE:*  If I may beg the Court's indulgence,

5    Ms. Kuykendall is going to help me when Mr. Lewis testifies.

6          *THE COURT:*  Yes, that's perfectly fine.

7          *MS. CALL:*  First the government seeks to publish

8    Government's Exhibit 5.

9          *THE COURT:*  You may.

10         *MS. CALL:*  If you could start with the first page and

11   zoom in on the portion with content in the table, please.

12         Your Honor, I believe you already provided the

13   limiting instruction for this exhibit?

14         *THE COURT:*  Yeah.  All right.

15         *MS. CALL:*  Turn to page 2 of Government's Exhibit 5,

16   and if you could zoom in on the portion with content.

17         *THE COURT:*  All right.

18         *MS. CALL:*  If you would now turn to page 3.

19         *THE COURT:*  Okay.

20         *MS. CALL:*  Permission to publish Government's Exhibit

21   559.

22         *THE COURT:*  Yes, you may.

23         Ladies and Gentlemen, Exhibit 559 has a limiting

24   instruction; namely, that you will see statements of

25   Mr. Boarman in that e-mail.  His statements are admitted not

1   for the truth of the matters that he asserts, but rather for

2   the effect that his statements may have on the recipients or

3   listeners.

4              You may display that.

5              MS. CALL:  Thank you, Your Honor.

6              THE COURT:  All right.

7              MS. CALL:  While the jury is reading, can I approach

8   to grab a binder from the Court?

9              THE COURT:  You may, of course.  All right.

10             MS. CALL:  If you could scroll up to the top e-mail.

11  Thank you.

12             THE COURT:  All right.

13             MS. CALL:  The next document, Your Honor, is

14  Exhibit 546, which I believe is previously admitted as well.

15             THE COURT:  That may be displayed.

16             MS. CALL:  Thank you, Your Honor.

17             THE COURT:  All right.

18             MS. CALL:  The next document, Your Honor, is

19  Government's Exhibit 564.

20             THE COURT:  That may be displayed.

21             MS. CALL:  Thank you, Your Honor.

22             For sake of time, I think there is about 15 documents

23  we are going through.  The next one is 519-1, and I believe

24  this one has a limiting instruction.

25             THE COURT:  Let's do a side bar.

1        (At the bench:)

2            THE COURT:  I don't find a limiting instruction for

3    that one, but does it have to do with Mr. Long's statements?

4            MS. CALL:  Yes, Your Honor.

5            THE COURT:  Any disagreement on that?  Okay.  I will

6    give a limiting instruction on that.

7        (In open court:)

8            THE COURT:  Ladies and Gentlemen, as to Exhibit 519-1,

9    it contains statements from a Mr. Randy Long.  Those

10   statements, Ladies and Gentlemen, should be considered only for

11   their effect on the listener, not for the truth of the matters

12   that Mr. Long has asserted.  That may be displayed.

13           MS. CALL:  Thank you, Your Honor.

14           THE COURT:  All right.

15           MS. CALL:  The next document the government is now

16   offering is Government's Exhibit 7046, and that is being

17   offered under 801(d)(2)(A).

18           THE COURT:  Any objection to the admission of

19   Exhibit 7046?

20           MR. FELDBERG:  I don't think so, Your Honor, as long

21   as the exhibit is the entire document which I believe goes back

22   to the year 2000.

23           THE COURT:  Actually, I think there is a limiting

24   instruction on that.  I see that now.  Other than that limiting

25   instruction, Mr. Feldberg, you made an objection.

1          Ms. Call?

2          *MR. FELDBERG:*  It's not actually an objection if the

3     document is complete.

4          *THE COURT:*  Yeah, we are just checking on that aspect.

5          *MS. CALL:*  Yes, Your Honor.  This has not been

6     modified.  This is in the original form.

7          *THE COURT:*  Then Exhibit 7046 will be admitted.

8     However, Ladies and Gentlemen, that particular exhibit can only

9     be considered against Mr. Austin, only against Mr. Austin.

10         *MS. CALL:*  Your Honor, for purpose of publishing, we

11    are happy to publish it now, but as Mr. Feldberg noticed, it

12    does go back many years and has many tabs, so we may just

13    display one tab.

14         *THE COURT:*  Yes.  If you could just indicate for the

15    record what tab you are displaying so the jury understands the

16    nature of that document.

17         *MS. CALL:*  Yes, Your Honor.  The tab currently up --

18    and I don't believe it's published right now, so permission to

19    publish?

20         *THE COURT:*  You may.

21         *MS. CALL:*  The tab currently reads 2014 on the tab

22    name.

23         *MR. FELDBERG:*  Your Honor, the context is only one tab

24    is going to be displayed.  Would it be possible to tell the

25    jury what years are covered by this document?

1          MS. CALL:  I believe it is visible on the bottom side

2     at this moment.

3          THE COURT:  Does what's being displayed now at the

4     very bottom --

5          MR. FELDBERG:  If the controllers are able to zoom in

6     on the years listed on the bottom, that would be fine.

7          THE COURT:  Any objection to that, Ms. Call?

8          MS. CALL:  I don't believe that is possible with the

9     native file, but perhaps you can go back to the first tab, and

10    that may be sufficient.

11         MR. FELDBERG:  First and last.

12         MS. CALL:  Of course.

13         THE COURT:  Ladies and Gentlemen, at the very bottom,

14    you'll see some years.

15         All right.

16         MS. CALL:  And if you could please go to the last tab

17    of the file.

18         THE COURT:  All right.

19         MS. CALL:  The government will now seek to offer

20    Government's Exhibit 247, and I believe this will have a

21    limiting instruction as well under 801(d)(2)(A).

22         THE COURT:  Any objection to the admission of

23    Exhibit 247 with two different limiting instructions on that

24    exhibit?

25         Then Exhibit 247 will be admitted.

1        Ladies and Gentlemen, let me mention the limiting

2   instructions to you.  First of all, this particular exhibit can

3   only be considered against Mr. Little.

4        Second, there are statements from Ms. Knust and

5   Mr. Adams.  Those statements can only be considered for their

6   effect on the recipient or listener, not for the truth of the

7   matters that those two individuals assert.

8        It may be published.

9        MS. CALL:  Thank you, Your Honor.

10       THE COURT:  All right.

11       MS. CALL:  The government will now offer Government's

12  Exhibit 14.  I apologize, I think we have to zoom up on this

13  document for 247.  Apologize.

14       Permission to publish?  I believe it's not on the

15  screen, 247, which was probably my doing.  We didn't finish

16  showing 247.  I believe we had the higher portion.

17       Permission to publish?

18       THE COURT:  Yes, you may.

19       MS. CALL:  The government now offers Exhibit 14.

20       THE COURT:  Any objection to Exhibit 14 other than as

21  already stated?

22       Exhibit 14 will be admitted.

23       Ladies and Gentlemen, once again, this is a summary

24  exhibit, so the same admonition as I have given you as to the

25  summary exhibits applies to this one as well.

1          *MS. CALL:*  Permission to publish?

2          *THE COURT:*  You may.  All right.

3          *MS. CALL:*  Could you please turn to the second page?

4          *THE COURT:*  All right.

5          *MS. CALL:*  The government will now offer Exhibit 15.

6          *THE COURT:*  Any objections otherwise stated as to

7    Exhibit 15?

8          Exhibit 15 will be admitted.

9          Ladies and Gentlemen, once again, this is one of those

10   summary exhibits.  Same admonition as for the other summary

11   exhibits.

12         *MS. CALL:*  Permission to publish?

13         *THE COURT:*  You may.  All right.

14         *MS. CALL:*  If you could turn to the second page,

15   please.

16         *THE COURT:*  All right.

17         *MS. CALL:*  Government will next offer Government's

18   Exhibit 16.

19         *THE COURT:*  Any objection other than ones already

20   stated to Government's Exhibit 16?

21         Government's Exhibit 16 will be admitted.

22         Ladies and Gentlemen, once again a summary exhibit,

23   same admonition as to this exhibit as to the other summary

24   exhibits.

25         You may display it.

1          *MS. CALL:*  Thank you, Your Honor.  Permission to

2     publish?  I don't believe it's actually being displayed.

3          *THE COURT:*  It may be.

4          *MS. CALL:*  Thank you.

5          *THE COURT:*  All right.

6          *MS. CALL:*  If you could please turn to the second page

7     of Exhibit 16.

8          *MR. FELDBERG:*  Your Honor, could we have a brief side

9     bar on this?

10         *THE COURT:*  Yes.

11       (At the bench:)

12         *THE COURT:*  Mr. Feldberg, go ahead.

13         *MR. FELDBERG:*  Your Honor, it is possible I am

14    misremembering, but my recollection is that the entries at the

15    end, which are remote in time by a couple of months to the

16    other entries, the January 29th entries Your Honor had ruled

17    should be removed from this exhibit.  If I am misremembering, I

18    apologize, but that's --

19         *THE COURT:*  I don't have my book of exhibits here, but

20    since it's not being displayed, I don't remember.  Which

21    exhibit is this one?

22         *MS. CALL:*  Exhibit 16, Your Honor.

23         *MR. FELDBERG:*  Apology.  The last entry is January 29,

24    2013, which are remote in time.

25         *THE COURT:*  I am not 100 percent sure.  I think I left

1    those in.  I think I overruled the objection, but let's --

2    people can correct me if that's mistaken.

3            MR. TUBACH:  We are checking right now, Your Honor.

4            MS. CALL:  Your Honor, I think Mr. Feldberg may be

5    right.  We are looking at the transcript from -- I am not sure

6    what day it is, but it is on page 9 of the transcript.  The

7    government had sought to remove everything Your Honor had

8    ordered, and we sent defendants copies of these the same day as

9    our last hearing on the issue, but it looks like we may have

10   missed this item.

11           We are happy to redact this one at the moment, and

12   perhaps a curative instruction can instruct the jury to ignore

13   the bottom several lines of the summary they just saw.

14           THE COURT:  Mr. Feldberg, response?

15           MR. FELDBERG:  Ms. Call's proposal is acceptable,

16   Your Honor.

17           THE COURT:  So what we'll do, if it can only be

18   displayed, those portions of it that have been admitted, and I

19   will instruct the jury that any other portions of the document

20   that they may have seen that aren't currently being displayed

21   they should ignore.  Is that acceptable to you, Mr. Feldberg?

22           MR. FELDBERG:  Yes, Your Honor, thank you.

23           THE COURT:  Ms. Call, is that acceptable to the

24   government too?

25           MS. CALL:  Yes, Your Honor.

1          (In open court:)

2               THE COURT:  Ladies and Gentlemen, for that last page

3    that you were just looking at, the bottom portion of it should

4    not have been shown to you.  What's being shown to you now,

5    this can be displayed, can be shown to you.  So any other

6    portions of this document that you may recall, you should

7    disregard that portion of the document.  What you can regard as

8    for this page is being displayed to you now, all right?

9               All right.

10              MS. CALL:  Next the government will seek to publish

11   Government's Exhibit 1546, which I believe has previously been

12   admitted.

13              THE COURT:  Ms. Call, that was 1546?

14              MS. CALL:  Correct, and after this we will be

15   publishing D-839 and I-141.

16              THE COURT:  You may publish that.

17              MS. CALL:  Thank you, Your Honor.

18              THE COURT:  All right.

19              MS. CALL:  Now the government will seek to publish

20   D-839.

21              THE COURT:  You may.

22              MS. CALL:  Thank you.

23              Next the government will seek to publish I-141.

24              THE COURT:  You may.  All right.

25              MS. CALL:  The government will now seek to publish

1    Government Exhibit 1547, and I believe this does have a

2    limiting instruction.

3              THE COURT:  All right.

4              MR. TUBACH:  Can we have a brief side bar?

5              THE COURT:  You may.

6         (At the bench:)

7              THE COURT:  Mr. Tubach, go ahead.

8              MR. TUBACH:  I believe for this document the Court

9    admitted a subsequent Roger Austin's response to the Tyson

10   under the rule of completeness because the inference of the

11   question the Tyson price idea suggests that Mr. Penn was asking

12   Mr. Austin to go speak to Tyson and, in fact, Mr. Austin's

13   response makes very clear he is giving an educated guess about

14   the market.

15             THE COURT:  Yeah, and that was Exhibit No. E-570.

16             Ms. Call?

17             MS. CALL:  Yes, Your Honor.  That's the very next

18   document we will seek to publish.

19             MR. TUBACH:  We would ask they be published together.

20             THE COURT:  I am not sure we did that at the first

21   trial.

22             MS. CALL:  I don't believe we did, Your Honor.

23             THE COURT:  I don't recall.

24             MR. TUBACH:  If it's technically feasible, I would ask

25   those two be published together so the jury understands that

1    the one relates to the other.

2          THE COURT:  I will overrule that objection, but

3    Ms. Call is going to do it afterwards.  I think that is

4    acceptable.  And I will provide a limiting instruction as to

5    each as they are shown to the jury.

6          MR. TUBACH:  Thank you.

7       (In open court:)

8          THE COURT:  1547 may be shown to the jury.  However,

9    Ladies and Gentlemen, that does have a limiting instruction;

10   namely, it can only be considered as to Mr. Penn.  All right.

11         MS. CALL:  Next the government will seek to publish

12   E-570.

13         THE COURT:  Ladies and Gentlemen, as to this document,

14   there is a limiting instruction for it; namely, that it can be

15   considered only against Mr. Penn and Mr. Austin, all right?

16         You may publish it.

17         MS. CALL:  Thank you.

18         THE COURT:  All right.

19         MS. CALL:  I think we are in the home stretch.  We

20   have about five documents.

21         THE COURT:  We only have five minutes.

22         MS. CALL:  It may work out.

23         THE COURT:  We shall see.

24         MR. KOENIG:  May we let our next witness go because he

25   has a tight flight to catch?

1          *THE COURT:*  I think that is a safe bet and a good

2     idea.

3          *MS. CALL:*  The next exhibit we would seek to publish

4     is 1782.

5          *THE COURT:*  You may publish it.

6          *MS. CALL:*  Thank you, Your Honor.

7          *THE COURT:*  All right.

8          *MS. CALL:*  Can you please scroll up?

9          *THE COURT:*  All right.

10         *MS. CALL:*  Could you please scroll up one more time?

11         *THE COURT:*  All right.

12         *MS. CALL:*  Now for the next section of the e-mail,

13    please.

14         *THE COURT:*  All right.

15         *MS. CALL:*  And now the top of the e-mail chain.

16         *THE COURT:*  All right.  We made it through one.

17         *MS. CALL:*  We can perhaps move to the rest on Monday

18    morning.

19         *THE COURT:*  Ladies and Gentlemen, we won't have court

20    tomorrow, as you know, so you will be coming back on Monday.

21    We will start Monday same time as usual.

22         So we are going to have three days off, but I want you

23    to be vigilant.  Do not let people start trying to talk to you

24    about the case, okay?  So, you know, if anyone starts to try to

25    do that, just cut it off, because, once again, just like I told

1    you last Thursday, over the weekend or maybe tomorrow if you go

2    back to work or something, you may be coming into contact with

3    people that you don't normally see.  Some of those people may

4    be curious and want to try to engage you, and just resist it,

5    because you don't want to be exposed to anything they really

6    want to tell you.  So be tough on them in that regard.

7            Have a good weekend, and we will see you on Monday.

8        (Jury excused.)

9            THE COURT:  Anything that we should take up at this

10   time?

11           Mr. Beller?

12           MR. BELLER:  Your Honor, quickly, No. 1, this morning

13   Exhibit 6199 was accidentally shown to the jury for quite some

14   time.  I think for purposes of the record we should probably

15   mark that and somehow keep it in the Court file so that there's

16   record of what was shown to the jury.

17           The defendants will determine whether there are any

18   additional requests of the Court to be done with that, but I do

19   think that that just needs to be properly preserved.

20           THE COURT:  Yeah, I think that is a good idea.

21   Ms. Grimm, why don't we mark that.  Have we been -- are we

22   going to use a separate number series for jury notes?  In any

23   event, let's make sure it's marked as a court exhibit.

24           MR. BELLER:  The only other thing, Your Honor, if we

25   could get an approximation on when the government plans on

1    closing so that -- or, excuse me, resting so that we can make

2    determinations regarding when to have witnesses here.

3           THE COURT:  Sure.  Ms. Call, based upon estimates of

4    the number of exhibits you will be showing to the jury without

5    a witness and also the testimony, your prediction as to

6    Mr. Lewis, when do you think that that may occur?

7           MS. CALL:  One moment, Your Honor.  Yes, Your Honor.

8    So we have four more documents left for Monday morning, and

9    then Mr. Lewis' direct is anticipated to be about 30 or 40

10   minutes.  So then we will allow time for cross-examination,

11   which we are a little not equipped to predict, and then it will

12   be about, I believe, 19 more documents, but let me confirm.

13          That number was not correct.  38 documents to publish

14   after Mr. Lewis' testimony, many of them that have limiting

15   instructions, which is why we will be publishing them.

16          THE COURT:  Okay.  And I don't know, Mr. Tubach, have

17   you been doing your per-document calculations yet?

18          MR. TUBACH:  I have been sleeping on the job, Your

19   Honor.  I will defer to others.

20          MS. CALL:  I believe it took us 45 minutes to go

21   through about 19, so 38 may take about an hour and a half.

22          THE COURT:  So anyway, people can do their own

23   estimations.  Thank you.

24          Ms. Johnson, go ahead.

25          MS. JOHNSON:  Yes, Your Honor, just asking again about

1    a response to our document 1130.

2         THE COURT:  I believe that was going to be filed

3    today.

4         MS. JOHNSON:  Yes, sir.  And I just wanted to confirm.

5    I know the Court said Friday is too late, and --

6         THE COURT:  The offer by Mr. Koenig was Thursday, and

7    I said that's fine.

8         MR. KOENIG:  We are planning to file it this evening.

9         MS. CALL:  The only other thing I did want to flag for

10   the parties, which I think was anticipated, but Exhibit 561 was

11   entered today without a limiting instruction.  There had been a

12   limiting instruction on Exhibit 5 where that is excerpted, so

13   the government did make a revision over the lunch break today.

14   And the version that was published to the jury did not have the

15   limiting instruction for Mr. Brink's statements on Government's

16   Exhibit 5, and we will provide an updated version of that to

17   the parties as well, but that is the only change.

18        THE COURT:  Okay.  Yeah, I think I understand what you

19   are talking about.  And you'll send that around to people?

20        MS. CALL:  Yes.

21        THE COURT:  Okay.  Anything else that we should talk

22   about today?

23        All right.  Then we will be in recess until Monday at

24   8:30.  Thank you.

25        (Recess at 5:05 p.m.)

1                                INDEX

2    WITNESSES

3       Robert Bryant

4             Cross-Examination Continued By Mr. Pollack      2374

5             Cross-examination By Ms. Henry                  2376

6             Cross-examination By Mr. Fagg                   2388

7             Cross-examination By Mr. Canty                  2392

8             Cross-examination By Ms. LaBranche              2397

9             Redirect Examination By Ms. Call                2429

10      Joseph Brink

11            Direct Examination By Mr. Koenig                2455

12            Cross-examination By Mr. Canty                  2497

13            Cross-examination By Mr. Beller                 2523

14            Cross-examination By Ms. Pletcher               2563

15            Cross-examination By Mr. Gillen                 2564

16            Cross-examination By Ms. Henry                  2565

17            Cross-examination By Mr. Pollack                2566

18            Redirect Examination By Mr. Koenig              2566

19                              EXHIBITS

20   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

21   14                        2579

22   15                        2580

23   16                        2580

24   18                        2449

25   19                        2449

1                         INDEX (Continued)

2                           EXHIBITS

3     Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | I-226 | 2502 |
| 2 | I-228 | 2469 |
| 3 | I-231 | 2472 |
| 4 | 247 | 2579 |
| 5 | 500 | 2552 |
| 6 | 561 | 2466 |
| 7 | 566 | 2483 |
| 8 | 567 | 2486 |
| 9 | 572 | 2477 |
| 10 | 9726 | 2475 |
| 11 | 9740 | 2490 |

12                        REPORTER'S CERTIFICATE

13       I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.  Dated

15  at Denver, Colorado, this 28th day of May, 2022.

16

17                               S/Janet M. Coppock

18

19

20

21

22

23

24

25