1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2

3   Criminal Action No. 20-CR-00152-PAB
    In Re: Penn II
    UNITED STATES OF AMERICA,
4

        Plaintiff,
5

6   vs.

7   JAYSON JEFFREY PENN,
    MIKELL REEVE FRIES,
    SCOTT JAMES BRADY,
8   ROGER BORN AUSTIN,
    TIMOTHY R. MULRENIN,
9   WILLIAM VINCENT KANTOLA,
    JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
    GARY BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12      Defendants

13  _____

                      REPORTER'S TRANSCRIPT
14                     Trial to Jury, Vol. 18

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:32 a.m., on the 23rd day of March,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                              APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4    Washington, DC 20530, appearing for Plaintiff.
 5            Anna Tryon Pletcher and Michael Tubach of
 6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7    San Francisco, CA 94111-3823;
 8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10            David Beller, Richard Kornfeld and Kelly Page of
11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12    CO 80202, appearing for Defendant Fries.
13            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15             Laura Kuykendall and Megan Rahman of Troutman Pepper
16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17    appearing for Defendant Brady.
18            Michael Felberg of Reichman, Jorgensen, Lehman,
19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20    10017;
21
22
23
24
25
```

```
 1                    APPEARANCES (Continued)

 2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7              Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

1                APPEARANCES (Continued)

2         Craig Allen Gillen and Anthony Charles Lake of

3  Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4  Atlanta, GA 30339;

5         Richard L. Tegtmeier of Sherman & Howard, LLC,

6  633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7  for Defendant Roberts.

8         Barry J. Pollack of Robbins, Russell, Englert, Orseck

9  & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10 DC 20006;

11        Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13 for the Defendant Blake.

14

15                    PROCEEDINGS

16     *THE COURT:*  So one thing I will mention, and that is

17 we may need to take some stretch breaks.  So if I notice that,

18 I hope you will pardon the interruption, but it's probably

19 worth it to have a minute or two for jurors to stretch.

20 We set to go?  Anything to take up?

21     *MR. KORNFELD:*  Your Honor, just very briefly, so I am

22 first.  Mr. Lavine is second.  I will not be using all of my 45

23 minutes.  Mr. Lavine may need a few minutes, so I will give him

24 five minutes.  I don't think he will need it, but if that's

25 amenable.

1          THE COURT:  Is somebody going to do a 55-minute?

2          MR. KORNFELD:  No.  I was a little confused.  I am

3    first.  I have someone to my left might take the extra time, I

4    am not sure.

5          THE COURT:  Yeah, that's not your proximate left.

6          MR. KORNFELD:  So I don't know the answer to that, but

7    I am not.

8          MR. TUBACH:  I would be happy to take five of those 10

9    minutes.

10         THE COURT:  Yeah, I appreciate knowing that.

11         MR. KORNFELD:  Thank you.

12         THE COURT:  All right.  Let's bring the jury back in.

13         Good morning, ladies and gentlemen.  So we are going

14   to then continue with the closings.  And Mr. Kornfeld is going

15   to give the first today on behalf of Mr. Fries.

16         Mr. Kornfeld, go ahead.

17                        **CLOSING ARGUMENT**

18         MR. KORNFELD:  Thank you, Your Honor.

19         Good morning.  After you have spent a full month of

20   your life serving as jurors in this case, the United States

21   Government has proven a single fact to you, that when a table

22   full of prosecutors and law enforcement officials decides on a

23   false theory, they will prove it no matter what.  They will try

24   to prove it no matter what.  They will be undeterred by the

25   truth even when confronted with contradictory evidence and

1    contradictory witnesses at every stage of their case.

2           They will be undeterred by witnesses telling them

3    they're wrong, undeterred by experts telling them they are

4    wrong, undeterred by calendars, by time lines, by phone

5    records, by contracts, by bids, by business records telling

6    them they are wrong, undeterred by market reports and market

7    conditions telling them they are wrong, undeterred by the law,

8    undeterred by the facts, undeterred by missing facts and

9    undeterred by the realities of this unique broiler chicken

10   industry.

11          When a closed mind and stubbornness get in the way of

12   truth and justice, people lose.  Mikell Fries has lost years of

13   his life.  His personal and professional reputations have been

14   trampled, but the government can't take the rest his life away

15   from him because of you, because of law, because of justice

16   and, most importantly, because of truth.

17          Mikell Fries is an innocent man.  No matter how many

18   times the government tries to hide the context of his

19   communications from you, hide the actual bid numbers from you,

20   hide witnesses from you, he is still not guilty and you must

21   find him so.

22          What is proof?  What is doubt?  These aren't just

23   words that roll off the tongue or appear on a black and white

24   piece of paper.  They are words we have heard our whole lives,

25   but here you must feel those words because in a courtroom they

1   are vital protections, vital protections that affect someone's

2   life, vital protections that affect lots of people, someone's

3   future, someone else's family.  They are the protections that

4   form the very basis of our system of justice.

5         And don't let the government or anybody else minimize

6   their significance.  Don't let the government lessen their

7   burden in this case.  Give Mikell Fries and these other nine

8   innocent men back their lives.  The law is what Judge Brimmer

9   instructs you, and he instructed you on it yesterday, not what

10  the government wishes the law was or wishes the law would be.

11  The government has spent hour after hour, day after day

12  desperately trying to prove conduct that is perfectly legal.

13  It is perfectly legal to exchange pricing information whether

14  past, current or future prices.  It's not illegal to do so.

15  And no matter how many times they argue otherwise, it doesn't

16  change the law.

17        They must prove an agreement, a quid pro quo, not an

18  exchange of information.  And the government for the first time

19  yesterday finally conceded that most of the evidence pertains

20  to current or past pricing.  So now they draw a distinction

21  between current pricing, what you've heard referred to as

22  period pricing, and future pricing.  But I will direct your

23  attention not now, but in the jury room, to Instruction 22.

24  The law makes no distinction.  Either or both is perfectly

25  legal.  It is the quid pro quo, the agreement that is the

 1   issue, not the sharing of price information, not acting on that

 2   price information.

 3         And here, members of the jury, there was no illegal

 4   agreement.  And your role is not to do the government's job for

 5   them.  It's not to piece together a story or a narrative.  It's

 6   not to dig for evidence.  It's to do one job and one job only,

 7   and that's to determine whether the government has met its

 8   burden of proving to you beyond a reasonable doubt the

 9   existence of an illegal conspiracy and Mr. Fries' participation

10   in it.

11         If you have questions now, you don't understand the

12   facts, you don't understand the government's case, if you have

13   a pause, if you have a hesitation, then you cannot let the

14   government prevail.  Justice must prevail and innocence must

15   prevail.

16         Now, I want to talk about the government's evidence

17   and, frankly, the government's lack of evidence against

18   Mr. Fries.  56 words in six text messages over eight years,

19   that is the core evidence that the government is using to prove

20   that Mikell Fries voluntarily and intentionally joined an

21   illegal conspiracy, and not one of these messages proves that

22   he did.

23         The case against Mikell isn't based on Carl Pepper or

24   Robbie Bryant.  Lord knows you are going to hear a lot about

25   those people, two people the government put on a pedestal as

1    so-called industry insiders, two people the government put up

2    on that stand after immunizing them; one person, Mr. Bryant who

3    they put up after he repeatedly lied to them.  And they were

4    supposed to get up and they were supposed to explain to you the

5    inner workings of this vast eight-year conspiracy involving all

6    these 10 men and others involving multiple companies; but after

7    a combined 24 hours or so of testimony, they utterly failed to

8    do that.

9         The only thing these two men told you about Mikell

10   Fries, they never had a conversation with him, never.  And the

11   government's recitation of the insider testimony yesterday,

12   Ms. Call didn't mention Mikell Fries.  Why?  Because these

13   witnesses didn't implicate Mr. Fries.  They didn't even mention

14   Mr. Fries.  They don't know Mr. Fries.

15        The case against Mikell is not based on a thorough

16   investigation into the broiler chicken industry.  No one at the

17   Department of Justice ever asked knowledgeable industry

18   witnesses, people like Mike Ledford, Rich Eddington, Greg

19   Finch, Kent Kronauge, people that negotiated literally over

20   millions and millions of pounds of broiler chicken, never asked

21   them to teach them about how the industry actually works.  You

22   might think that would be relevant to know.

23        The only thing that the Department of Justice really

24   cared about was whether these witnesses knew that the suppliers

25   talked to each other and sometimes shared prices, but again I

1    will remind you that is not illegal.  The Department of Justice

2    never tried to interview Mr. Fries, never tried to interview

3    Mr. Brady, never tried to interview anyone at Claxton Poultry,

4    never tried to understand how Claxton does business.

5            The case against Mikell is a fairy tale that the

6    government desperately wants to be true, but the burden is

7    theirs and it's theirs alone.  It's not a balancing of scales.

8    It's the government's burden to prove to you beyond a

9    reasonable doubt that he and these other nine men entered into

10   an illegal price-fixing agreement and that burden rests

11   squarely at that table and it never leaves.  It never goes to

12   the rest of us.  It never goes to the defense.  It is a burden

13   that the government hasn't met.  They haven't come close.

14           The government instead wants you to focus on things

15   like the differences in bar charts.  Remember the half hour we

16   spent on that, on their distorted summary charts.  They are

17   incomplete and unfair summary charts.  But that is not good

18   enough.  And when the facts are brushed off as "explaining the

19   evidence away," it means you have to look closer.

20           Yesterday the government flashed their favorite Mikell

21   Fries text in front of you as evidence of what they called his

22   active and enthusiastic participation in this alleged

23   conspiracy.  So let's talk about every single one of Mikell

24   Fries' texts, and there aren't that many.

25           The first one, Exhibit 1427, Tell him we're trying.

1    This text exchange is the reason the government said Mr. Fries

2    knowingly entered into an agreement and knew of the existence

3    and the purpose of the conspiracy.  But what the government

4    knows or claims to know is without any factual support.  And

5    why do I say that?  Because the government provided you with

6    zero explanation, zero context about this text.  The government

7    asked you to look at this text, look at the sharing of prices

8    and focus on the buzz words, "Tell him we're trying,"

9    suggesting to you that that's your aha moment that Mr. Fries

10   participated in this conspiracy.

11        If that was enough to convict Mr. Fries, the

12   government would have shown you the bids and the contracts both

13   before and after this exchange.  They didn't do that.  We did.

14   The government asked you to ignore that this text message --

15   and this is important -- occurred a month after the first round

16   of bids were in.  Just as importantly, the government asked you

17   to ignore what actually happened after this exchange.  And this

18   is what happened.  Claxton undercut Mr. Austin of Pilgrim's and

19   stole business from Pilgrim's, took away volume.  "Tell him

20   we're trying" is not a conspiracy.  It's a bluff the government

21   is asking you to use as serious evidence to convict someone of

22   a federal felony offense.  You have to do the work in

23   understanding this text that the government didn't bother to

24   do.

25        Let's talk about the exchange of dark meat formula.

1    .30 back is Pilgrim's and George's current dark meat formula.

2    How did Mikell use this information?  Claxton lowered its dark

3    meat price from the first round to .3050 in order to take

4    business from the competitor.  Let's go to the next part of the

5    text, a text with the words "this month."  The government

6    conceded yesterday it is current period pricing.  Well, thank

7    you, it says "this month," pricing that Mikell would learn from

8    other suppliers, distributors and customers.  There is no

9    agreement to raise prices here.  And finally, the quote he said

10   to raise our prices, he being Mr. Austin, Tell him we're

11   trying.

12          The government utterly ignores and asks you to ignore

13   what actually happened after that text message was sent.  There

14   are no phone calls to Roger Austin immediately after from

15   Mr. Brady, from Mr. Fries or anybody else at Claxton.  And you

16   can bet with 99,000 pages of phone records, if there were, you

17   would hear about that.  There were no e-mails to Mr. Austin

18   confirming some type of action regarding prices.  There were no

19   text messages to Mr. Austin from Mr. Brady or Mr. Fries or

20   anybody else at Claxton.

21          But most importantly, what happens the very next day

22   is Claxton Poultry reduces its price on wings after its

23   first-round submission.  What happened three weeks later in the

24   third-round submission that comes in an hour after Mike Ledford

25   gave directional guidance to Claxton to lower its prices?

1     Claxton reduces its prices on wings and dark meat and in the

2     process undercuts Pilgrim's even further.

3           Didn't Robbie Bryant say that the purpose of the

4     conspiracy was not to take away business from competitors, from

5     the co-conspirators?  Time and time again, contract after

6     contract, the evidence proves that Mr. Bryant is exactly what

7     he admitted he was from that witness stand, a liar.

8           Now, let's talk about the August 26, 2014 text between

9     Mr. Brady and Mr. Fries regarding KFC.  This is Government's

10    Exhibit 1238.  And by the way, these exhibits are in Ms. Call's

11    greatest hit list in what she showed you yesterday.  They are

12    also referred to in the summary charts.  In 2014 Mikell Fries

13    knew that the other suppliers were taking a firm stance in

14    their negotiations with the customers.  Why?  Because the basic

15    economic principles of supply and demand gave the suppliers

16    more leverage than they enjoyed in previous years.

17          Knowing a supplier's negotiation strategy is not a

18    crime.  There is no exchange of future pricing information in

19    this text.  There is no agreement to raise prices in this text.

20    In fact, it's very clear that Mr. Fries was surprised that

21    Pilgrim's was holding instead of responding to the guidance of

22    its customer.  That's why he says, Wow.

23          If you're Claxton Poultry and you have heard evidence

24    that Claxton always responds to the directional guidance of its

25    customer, it is surprising to you that Pilgrim's would cross

1    its arms and hold firm.  That wasn't Claxton's strategy.

2    Claxton used that to their advantage.

3         And the direction of -- Claxton responding to the

4    directional guidance of its customer, you heard that from

5    Mr. Eddington, Mr. Ledford and Mr. Kronauge.  How many times

6    yesterday did the government mention the price is the price or

7    holding firm, everyone is holding firm?  The evidence has

8    established nobody has at Claxton, including Mr. Fries, ever

9    told a buyer the price is a price, take it or leave it.  The

10   evidence establishes that Claxton never held firm.  They always

11   responded to directional guidance, and at the risk of stating

12   the obvious, the directional guidance was always lower your

13   prices.  No buyer ever said to them, hey, it would be a great

14   idea if you charged us more money.  You didn't do that.

15        Mr. Fries used Pilgrim's strategy of holding firm and

16   the knowledge that another competitor was going down 4 cents to

17   lower the price and gain more volume.  Classic example of using

18   market intelligence as a data point in independently setting in

19   this case Claxton's price.  Why would the government not show

20   you the actual contracts?  Because lowering your price 4 cents

21   is the exact opposite of an illegal agreement to raise your

22   price or hold firm.

23        And perhaps the most outrageous example of

24   manufactured evidence in this text is "Tench is at 11"

25   referring to Greg Tench who is a buyer for Mar-Jac -- excuse

 1  me, a supplier, Mar-Jac.  Read the text.  Mr. Brady and

 2  Mr. Fries were discussing the meetings that Mr. Lewis told you

 3  he had with all the suppliers, a meeting time that Rich

 4  Eddington told you was no secret.  But the government told you

 5  yesterday there was a phone call between Mr. Fries and

 6  Mr. Tench and, you know, they weren't just talking about

 7  meeting times, you know, they were coordinating price.

 8          Where is the evidence of that?  There is zero evidence

 9  of that.  That's conjecture.  And the Judge already instructed

10  you that arguments of counsel are not evidence.  There is no

11  evidence of that phone call, let alone the substance, the

12  alleged substance of the phone call that the government sort of

13  narrated yesterday.  It's not in the text message.  There is no

14  support for that in the testimony from any witness.  And there

15  is certainly no support of that through the fact that Claxton

16  decided to lower their price the very same day.  Actions speak

17  louder than words, particularly words that don't even exist.

18          Now, let's talk about Government's Exhibit 1615.

19  Finally, finally the government finds the word "agreement" in

20  the mountain of documents that were produced in this case.  And

21  believe me, if "agreement" or "agree" or any words like that

22  existed in other of the millions of documents, they would have

23  trotted those out before you as well.

24          But the government waits until Mr. Ledford is off the

25  stand to wave this around the courtroom.  Notice they didn't

1    ask him a single question about this.  Why?  Because they

2    didn't want the answer.  They didn't want you to have the

3    context, because they hoped that if they show you smoke, you'll

4    be tricked into convicting of a fire.  But thankfully Greg

5    Finch, the CFO of Claxton, he told you about this.

6         He told you that Mike Ledford asked all the suppliers

7    if it was possible to grow a smaller chicken.  And as Mr. Finch

8    testified, the answer was no, it wasn't possible.  This wasn't

9    a request for a contract.  This wasn't a request for a bid.

10   And if the government didn't believe that or if they wanted to

11   challenge that fact, they would have asked Mr. Finch about it.

12   They would have asked Mr. Ledford about it.  They would have

13   talked about it in their closing argument.  Silence is a

14   concession by the government.  It's an admission of not giving

15   you the facts and hoping that you won't look.

16        Now, let's talk about Government's Exhibit 1734,

17   another text that occurs after the suppliers received their

18   first-round bid submissions, their first round prices.  Now,

19   here the government is urging you to assume a rigged bid once

20   you see the exchange of a dark-meat formula, an eight-piece

21   price and the impact that the dark-meat formula had on Mikell

22   Fries.  What you are seeing here is independent decision making

23   in real-time.

24        First Mr. Fries says, Okay, can go to 31 if you want.

25   Then he says, Oh, we'll stay at 3050 then.  Both undercut

1    Pilgrim's, both prices in this case undercut Pilgrim's and took

2    volume away.  The government waits for cross-examination of

3    Mr. Finch to include the portion of this text, the taller

4    portion that says, Ledford told Roger to be at 9250.  Here it

5    is.  We are not afraid of it.

6              Why didn't the government ask Mr. Ledford about it on

7    the stand when he told you that he gave out pricing information

8    down to the fourth decimal point?  Because they didn't want to

9    risk his answer.  Was it real?  Did it happen?  Was it a bluff?

10   Did Mr. Austin do what Mr. Ledford told him to do?  And most

11   importantly, there is nothing in there that suggests an illegal

12   agreement.

13             All this text demonstrates is that Mr. Brady learned

14   Pilgrim's dark-meat formula is .30 back and Mr. Fries

15   considered that formula to independently determine his own

16   price, his own -- what Claxton's dark-meat formula would be.

17   At no point did Claxton match Pilgrim's dark-meat price or

18   their eight-piece price.  There is no agreement whatsoever in

19   that text.  As I said, actions speak louder than words.

20             So let's look at the result of Claxton's 2014

21   negotiations with KFC.  These numbers are bid submissions to

22   KFC round by round.  For the first bid to the very last,

23   Claxton responds to the guidance of Mr. Ledford reducing its

24   price 4 cents, lowering its dark-meat price 4 cents in the

25   process.  Again, the government ignores the facts, ignores

4118

1    where these prices actually went, and urges you to do the same

2    thing.  What kind of price-fixing conspiracy has one of the

3    co-conspirators dropping its price significantly at the request

4    of the buyer?  That makes absolutely zero sense.

5          Now, let's turn to the 2014 NAE text involving

6    Chick-fil-A.  This is Government's Exhibit 355.  Remember this?

7    You actually may not because the government, again without a

8    witness, flashed this up on the screen and quickly moved on

9    hoping that their failure to explain it would confuse you and

10   you would simply infer an agreement.  It doesn't work that way.

11   Justice does not work that way.

12         The government told you that Mr. Fries, Mr. Brady and

13   in this case Mr. Mulrenin conspired to coordinate costs in 2014

14   when Chick-fil-A made its own decision to convert to

15   antibiotic-free chicken.  How are you supposed to find a

16   conspiracy to coordinate costs when the government fails to put

17   any of the costs before you, fails to call a Chick-fil-A

18   witness, fails to show you any cost or price associated with

19   moving to antibiotic-free chicken?

20         The government also failed to tell you another

21   important point about this, and that is this is a pass-through

22   cost.  Whatever the cost was going to be, it was going to be --

23   and Chick-fil-A was going to pay it and Chick-fil-A had to

24   approve it.  This wasn't a profit center or a source of any

25   additional revenue for the chicken suppliers.  There is zero

1    motive or benefit to Mr. Fries or Claxton or anybody else to

2    coordinate a cost associated with Chick-fil-A -- incurred by

3    Chick-fil-A.

4         And what else did the government fail to tell you

5    about this?  Oh, they didn't tell you that ABF, antibiotic-free

6    and NAE, no antibiotics ever, are completely different programs

7    under the USDA guidelines.  They didn't tell you that CFA,

8    Chick-fil-A, didn't decide to go to NAE until the summer of

9    2014.  They didn't tell you that NAE is more expensive than the

10   antibiotic-free program.  So while this text message talks

11   about ABF pricing, Claxton and Chick-fil-A ultimately chose

12   NAE.

13        They didn't tell you that Claxton didn't convert its

14   plant to antibiotic-free chicken until 2017.  And most

15   importantly, they didn't tell you that Claxton consulted with

16   other suppliers like Purdue about this at the direction of the

17   customer, Chick-fil-A told them go talk to Perdue.  Go talk to

18   some others that have some experience in this.

19        Now, finally let's look at the text about

20   Chick-fil-A's different models, and this is Government's

21   Exhibit 982.  And honestly, I almost don't know where to begin

22   with this because of the absolute absurdity that it is being

23   used to try to prove an alleged price-fixing agreement.

24   Despite the government not bringing this up once in their

25   closing argument, they want you to think that discussions about

4120

1   different types of cost models means that the suppliers were

2   conspiring together to cheat and steal from Chick-fil-A.

3          Not a single Chick-fil-A witness came into the

4   courtroom and said the suppliers should not be talking about

5   pricing models.  Greg Finch explained that Claxton was the last

6   supplier on the breast or market model and that all the other

7   suppliers were on the grain-based model.  In order to figure

8   out the impact of transitioning to the grain-based model,

9   Mikell and Mr. Brady asked other suppliers to find out the

10  impact of switching models.  That's just good business.  That's

11  smart business.  What about that says agreement and what

12  witness told you otherwise?

13         And let me spend a minute talking about the testimony

14  of Greg Finch, the CFO.  The government told you yesterday that

15  Mr. Finch did not speak about the circumstance of all these

16  texts that I have just gone through.  Were they in the same

17  courtroom as the rest of us?  Of course he did.  He went

18  through every single one of these six texts and explained to

19  you the underlying facts.  He went through seven of the

20  government's summary charts that pertained to these texts and

21  pointed out their flaws, their inaccuracies and their

22  omissions.  But then on cross-examination the government

23  accuses him of trying to explain away the evidence by giving

24  you the facts.  Why?  Because he was able to expose the

25  government's case against Mr. Fries for what it is, a fairy

1    tale.

2            And speaking of fairy tails, yesterday the government

3    told you that Mr. Fries was Mr. Brady's supervisor, that

4    Mr. Brady reported to Mr. Fries during the time period relevant

5    to the case.  There is zero evidence of that in the record,

6    zero.  And we can take that down.

7            Why is the government asking you to reach conclusions

8    that are not supported by the evidence?  I will tell you why.

9    Because long ago the government decided its theory, decided its

10   conclusion, and then took out its scissors and its magnifying

11   glasses and tried to find and slice up from the millions of

12   records some words that they could use to piece together a

13   narrative of Mr. Fries' alleged guilt in their so-called

14   summary exhibits.  The government did not show you a single

15   business record or a single e-mail that shows that Mikell Fries

16   voluntarily and intentionally joined this alleged illegal

17   agreement.

18           They didn't call a single witness to the stand who

19   implicated Mr. Fries and said he voluntarily and intentionally

20   became a member of this illegal agreement let alone that he

21   knew about it or its goal or its purposes as the law requires.

22   And don't let them argue that the reason is that there is so

23   little proof because the conspirators kept everything a secret.

24   They were members of an exclusive club.

25           The government tried to argue yesterday that the

1    Claxton board minutes demonstrate that Mikell Fries announced

2    to his board that he is part of a criminal conspiracy to raise

3    prices in August 2014, a month after Claxton's prices were

4    submitted.  If he was engaged in criminal conduct, there is no

5    way he would want that memorialized in the permanent board

6    minutes of his company.

7            The government spent years investigating this case.

8    There are 14-plus million documents.  There are 99,000 pages of

9    phone records.  There were well north of 200 witness

10   interviews.  There are two so-called conspiracy insiders who

11   don't implicate Mr. Fries in any illegal agreement.

12           The United States Government has a lot of power.

13   They've got the power of the Department of Justice, the FBI,

14   other federal law enforcement agencies and the sole ability to

15   immunize witnesses and force them to take the stand.  And in

16   this case they were not shy about using that power to immunize

17   witnesses.  With all that power, all those documents, they

18   bring you 56 words, six text messages over eight years, and not

19   one of them proves the government's case against Mr. Fries.

20           The fact is that the government's evidence is what it

21   is.  It's easier for them to argue that the conspiracy was a

22   giant secret than to admit what it is not, proof of an illegal

23   agreement.  The government made no attempt, zero, to determine

24   how Claxton does business, let alone how it prices its chicken,

25   how it operates in the supply chain, how as a small regional

1    supplier with less than 1 percent of the market it operates

2    within the larger chicken industry.

3         The government made no attempt, zero, to dissect bids,

4    contracts and negotiations to actually see if the prices

5    Claxton was charging fell in line with their narrative that

6    suppliers entered a conspiracy to cheat customers, to fix bids,

7    rig prices.  Had they done that, had they bothered to do that,

8    they would have learned that Claxton lowered its prices at the

9    directional guidance of its customers every single time, but

10   that fact, that uncontroverted fact doesn't fit their theory.

11        The government made no attempt, zero, to challenge

12   their conspiracy insiders, their so-called insiders on the

13   details or the lack of details in their testimony of their

14   coerced, vague, and manipulated stories.

15        Question:  Mr. Bryant, if the purpose of the

16   conspiracy was to steal volume from -- not to steal volume from

17   each other, why did Pilgrim's lose volume every year?

18        Question:  Mr. Pepper, how do you rig a bid or fix a

19   price if no one saw Claxton's cost model that is meticulously

20   put together by Greg Finch using Claxton's actual cost for the

21   year?

22        The biggest unanswered question:  Since the buyer had

23   access to all of the suppliers' cost models, wouldn't the

24   suppliers need to align on cost?

25        The government showed you absolutely no evidence that

1   the suppliers ever gave each other actual line items that make

2   up the price.  And as buyers like Mike Ledford and Kent

3   Kronauge told you, they compare models looking for outliers,

4   and not one buyer told you they had knowledge of price-fixing.

5   This is a transparent process.  That is the entire point of the

6   cost-plus model, and you heard that from the witness stand.

7           But instead of asking these pointed questions, the

8   government defaulted to brow beating their immunized insider

9   witnesses to finally say agreement with the theft of

10  prosecution hanging over their heads.  Had the government with

11  the resources of the Department of Justice, the FBI, the

12  Commerce Department, the Agriculture Department just been lazy,

13  that would be disturbing and scary and unacceptable.

14          But the government wasn't lazy in this case.  It

15  actively attempted time after time to ignore facts, to

16  manipulate facts and to keep facts away from you, and they are

17  asking you to return a guilty verdict that is not based on the

18  evidence.  Do not let them mislead you.  The Department of

19  Justice is not just another adversary or party in a legal case.

20  The DOJ represents the United States of America and in the

21  process all of us.  And the sacred duty of the DOJ and its

22  prosecutors and its agents is to do justice, not to obtain

23  convictions at all cost.  It is, after all, the Department of

24  Justice, not the department of injustice.

25          And the DOJ has every right, every right to attempt to

4125

1   strike hard blows in prosecuting a case, but those blows must

2   be fair.  And in this case the actions of the DOJ have not been

3   fair.  They have been low blows designed to keep evidence away

4   from you and to deprive you of a full and fair picture of the

5   facts.  The DOJ has put its thumb on the scales of justice by

6   presenting a case it knows is incomplete and more important

7   factually inaccurate.  The government spent a month as an

8   example trying to tell you with respect to Popeye's that

9   2 cents was a conspiracy, the 2-cent promotion, that the

10  14-cent price increase was part of a conspiracy, that moving to

11  a two-year contract was part of a conspiracy.

12         What they didn't tell you is that the customer, Kent

13  Kronauge, said they were wrong.  We had to subpoena Kent

14  Kronauge.  We had to bring him into the courtroom and yesterday

15  he put, you know, he put an end to all that.  And then the

16  government, they know that and then they try to hide it by not

17  calling him as a witness.  Well, we called him.  And notice

18  that the government barely talked about Popeye's yesterday?

19  Why?  Because if one domino falls, so do the rest.

20         Why did the government not say a word about volume in

21  their closing?  Because another domino falls.  The government

22  seriously wants you to believe that Pilgrim's losing 20 percent

23  of its volume with KFC was no big deal?  Well, it was certainly

24  a big deal for Claxton because Claxton increased its volume

25  with KFC by 14 percent by undercutting Pilgrim's on price and

1    stealing their volume.

2         Who in the conspiracy decided Claxton got to be the

3    winner and Pilgrim's had to be the loser in that example?

4    Nobody.  The buyers made the decision because Claxton offered

5    the best price.  The evidence simply cannot be trusted.  The

6    charts simply cannot be trusted, and the demands for a guilty

7    verdict by the government simply cannot be trusted.  The DOJ

8    cherry-picked evidence and put incomplete summaries and

9    demonstratives before you.  And it's not me saying that.  We

10   have shown you through witnesses how they have unfairly crafted

11   their summary exhibits.

12        The government throws phone records into the

13   summaries, asks you to assume they were conspiratorial calls,

14   but there is no evidence of that.  When the evidence shows an

15   e-mail for a purchase order and a cover, for example, showing

16   that the government is just plain wrong, they resort to saying,

17   well, they could have been discussing more than one topic in

18   that call.  The problem is the call we are talking about was

19   zero minutes and zero seconds.  There was no call and it's

20   still in their summary chart.

21        In United States District Court we do not convict

22   people based on unproven theories and rank speculation.  The

23   bottom line that cannot be ignored after you have seen and

24   heard the evidence in this case is that Claxton competed over

25   pricing in order to steal volume.  Mikell Fries always

1    competed.  He never cheated.

2            The burden, the burden of proof, as you know, is

3    beyond a reasonable doubt.  It's the highest standard we have

4    in this country.  It's higher than the standard used when

5    companies are fighting over billions of dollars.  It's higher

6    than the standard used when the State wants to take children

7    away from their parents because as a society we long ago

8    decided that before we brand someone a criminal and potentially

9    deprive them of their liberty, we must be convinced beyond a

10   reasonable doubt of their guilt.  And in this case there are

11   many, many reasons to doubt, not just based on the evidence you

12   saw and the testimony you heard, but also based on what you

13   didn't see and what you didn't hear.

14           The government in this case would not let the facts

15   get in the way of their narrative.  If you have any hesitation

16   about whether the government has firmly established an illegal

17   agreement and Mr. Fries' participation in it, then your verdict

18   must be not guilty.  This isn't a contest where you decide,

19   well, do you believe the government more or do you believe the

20   defense more?  It's the government's burden.  And because it's

21   the government's burden, they get to stand up and argue their

22   case again.  They get the last word in their rebuttal close

23   after all of us are done.

24           And no matter what the government argues to you in

25   their rebuttal, remember that it is not the defense's burden to

 1   disprove the government's case.  Listen carefully to their

 2   words in their rebuttal closing.  Will they argue their facts

 3   or will they complain about what the defense said, what the

 4   defense argued, that the defense could have put more evidence

 5   in front of you.

 6           Listen if they refer to my argument or Mr. Lavine's or

 7   any of my colleagues because every time they talk about the

 8   defense instead of their evidence, ask yourself whether this is

 9   an admission by the government that it's easier to argue

10   against the defense than it is for their case, for their

11   evidence.  When they do that, ask yourself are they admitting

12   that they didn't prove their case because they know it and so

13   do you.

14           So let me conclude where I started, with the critical

15   and overarching fact in this case.  Not a single witness, not

16   one, implicates Mikell Fries, says Mikell Fries is involved in

17   an illegal price-fixing agreement, not a single e-mail or

18   business record.  Not one out of more than 14 million shows

19   that Mikell Fries voluntarily and intentionally joined some

20   illegal price-fixing conspiracy.

21           Do not do what the government has done.  Do not ignore

22   the facts of the case.  You cannot ignore utter and profound

23   lack of evidence in this case against Mr. Fries.  Give

24   Mr. Fries back his peace.  Give him back his reputation.  Give

25   him back his dignity and give him back his life.  Do not let

1    the government continue to hide the facts and the evidence from

2    you.  Don't let them push Mikell and his innocence and his life

3    into the shadows.

4         Mikell Fries is not guilty.  He is innocent.  Deliver

5    the justice he deserves and that the government is trying to

6    take from him.  Find Mikell Fries not guilty.

7         Thank you.

8         *THE COURT:*  Thank you, Mr. Kornfeld.

9         All right.  Next closing?

10        Mr. Lavine?

11                        **CLOSING ARGUMENT**

12        *MR. LAVINE:*  Trials have often been called a search

13   for the truth, but trials are about what can be proved through

14   the evidence.  The evidence is what you have heard from

15   witnesses on that witness stand and documents that have been

16   admitted into evidence.  That's it.  And after you've sorted

17   through all of it, you will find that the evidence proves that

18   Scott Brady is absolutely innocent, and that is the real truth

19   of this case.

20        The government's version of the truth that the only

21   reason competitors exchanged pricing information is because

22   they had an agreement to fix prices is simply not correct and

23   is unsupported by the evidence.  The government's version of

24   the truth requires speculation, conjecture, the willingness to

25   ignore what you heard from the witness stand, and the blatant

1    disregard of the law in Judge Brimmer's instructions.

2         To the government these individuals are nothing more

3    than suppliers, competitors, or, worse, no more than the

4    companies they work for.  But these are 10 men and you have to

5    assess the evidence against each one of them individually.  So

6    today I want to talk to you about the lack of evidence against

7    one of these men, Scott Brady.

8         Scott is a salesman for Claxton Poultry.  As you have

9    repeatedly heard from Mr. Ledford, Mr. Lewis, Ms. Fisher,

10   Mr. Eddington, Mr. Kronauge and Mr. Finch, Claxton's CFO, Scott

11   did not have pricing authority.  Mr. Finch told you how it was

12   his job to put together the cost model for the fast-food

13   customers, how he inputted the costs on all of the line items

14   and then inserted the margin to come up with Claxton's initial

15   bid.  Mr. Finch was directly involved in the pricing process at

16   Claxton, and he told you that pricing at Claxton was done

17   independently each and every time without reliance on any

18   future pricing of its competitors and without an agreement with

19   anyone to fix prices and rig bids.

20        Claxton pricing was a result of independent business

21   decisions.  It was not the result of any understanding or

22   agreement with competitors.  And the government has failed to

23   show you any evidence to rebut this, none.

24        Now, after Mr. Finch put together the cost model, it

25   was only then that he sent the cost model to Mr. Fries and

1    Scott to use during the negotiations with the QSRs.  During the

2    negotiations, Mr. Finch would meet with Mr. Fries and Scott to

3    hear the feedback from the customers and he would adjust the

4    cost model accordingly.

5           Scott's job was to sell chicken.  You heard how he did

6    that from Mr. Finch and Ms. Warble.  And this is more than just

7    covers and shorts as the government would have you believe.

8    Scott coordinates production with plants.  He makes sure orders

9    are filled.  Scott makes sure that the trucks are there to

10   deliver the products.  Scott deals with quality issues and

11   customer complaints.  Scott does that every day, and it

12   requires time spent on the phone with his customers, many of

13   whom are other suppliers.

14          Scott's job was not to put together the cost model.

15   Scott's job was not to come up with the pricing for Claxton's

16   customers.  Scott talked to customers about the numbers and

17   negotiated volume, but Scott did not have pricing authority.

18          While Scott may have signed a contract, it was done

19   only at the request of Mr. Fries and only after pricing and

20   volume had been agreed upon.  Scott and Claxton responded to

21   the directional guidance of the customers each and every time,

22   lowered pricing during negotiations and always competed for

23   more volume.  The evidence was very clear that Scott always

24   asked his customers for more loads during the negotiations.

25   And by lowering prices, Claxton undercut its customers to make

 1   money.  That is what Scott's job was all about and that was

 2   competition.

 3          It was the government's burden to prove to you beyond

 4   a reasonable doubt that Scott Brady knowingly and voluntarily

 5   entered into an agreement to fix prices and rig bids.  The

 6   burden of proof beyond a reasonable doubt is one of the highest

 7   burdens in law.  And to meet that extremely high burden, the

 8   government has tried to build a case against Scott around two

 9   so-called conspiracy insiders, a handful of text messages and a

10   couple charts with telephone calls between Scott and other

11   suppliers.

12          And while you may have seen the exchange of pricing

13   information, that is not an agreement to rig bids and fix

14   prices.  Members of the jury, that is not sufficient evidence

15   to prove beyond a reasonable doubt that Scott Brady is guilty

16   of price-fixing.

17          So let's talk about the so-called insiders, Mr. Pepper

18   and Mr. Bryant.  Mr. Pepper was interviewed over 25 times by

19   the government and yet he knew and told you almost nothing.

20   How could he?  Mr. Pepper had no specific recollection of any

21   events.  Remember what Mr. Pepper actually said about Scott

22   Brady?  It wasn't much.  He testified that he did not give

23   Scott any pricing information and Scott did not give him any

24   pricing information.

25          But Mr. Pepper told you he had a call about a

1   substantial pricing increase with Scott in August of 2014,

2   almost eight years ago, a call where Mr. Pepper didn't tell

3   Scott Brady what he meant by substantial price increase and

4   where he didn't learn anything specific about a substantial

5   price increase at Claxton.

6           What was clear was that Mr. Pepper was not seeking an

7   agreement with anyone.  He was chasing to ground a rumor, a

8   rumor he heard about an increase in prices in the industry.

9   And the government wants you to believe that Mr. Pepper's

10  confirmation of that rumor is somehow evidence of an agreement

11  to fix prices.  Use your reason and common sense when you look

12  at these facts.  If you do, it should be clear that Mr. Pepper

13  offers no evidence that Scott Brady entered into any agreement

14  to fix prices with anyone.

15          But the bigger question for you to ask is not what

16  information was discussed on the call, but did Mr. Pepper

17  really have a call with Scott about a substantial price

18  increase?  Let's take a look at that call.  One of the few

19  things Mr. Pepper testified clearly about was that any calls he

20  had about a substantial price increase occurred after a meeting

21  in Steve Cullen's office in Springdale Arkansas, a meeting that

22  Mr. Pepper attended in person.  And we all know, you know,

23  Mr. Pepper knows, and the government knew that the date of that

24  meeting was August 19, 2014.  And we all know, Mr. Pepper now

25  knows, and the government knew when it called Mr. Pepper to

1    that witness stand that the only calls Mr. Pepper had with

2    Scott in the month of August were on August the 15th, four days

3    before the meeting in Mr. Cullen's office.

4        And what did Mr. Pepper say when confronted with this?

5    He said he didn't have a call with Scott about a substantial

6    price increase.  But that wasn't good enough for the

7    government.  It wasn't good enough for the government when

8    Mr. Pepper was on the witness stand and it wasn't good enough

9    for the government yesterday.

10       After Mr. Pepper said he did not have a call with

11   Scott about a substantial price increase, the government stood

12   up and asked Mr. Pepper to ignore those facts, ignore his prior

13   testimony just given under oath, ignore the documents he was

14   confronted with, both the calendar invites and his own phone

15   bills, and testify that notwithstanding all of that, he still

16   had a phone call with Scott about a substantial price increase.

17   And they told you that yesterday also, completely ignoring

18   Mr. Pepper's testimony about the August 19th meeting and his

19   August the 15th calls with Scott.

20       Members of the jury, not only is that a complete

21   distortion of the actual evidence; worse, it is a complete

22   distortion of the truth.  And that action by the government

23   should offend the conscious of each and every one of you.

24   Ignoring the documents, ignoring what Mr. Pepper said when

25   confronted with those documents and ignoring what Mr. Pepper

1   said about his lack of recollection of any actual phone call

2   with Scott, government counsel turned a blind eye to the

3   evidence and asked you and Mr. Pepper to do the same thing.

4          After Mr. Pepper told you that he was mistaken and

5   that no call with Scott happened, the government still wants

6   you and Mr. Pepper to believe that there was a call between the

7   two about a substantial price increase.  That is just wrong.

8          If that testimony wasn't misleading enough, the

9   government then tried to elicit testimony that the Popeye's

10  2-cent promotion was the creation of the suppliers who had

11  conspired together to come up with 2 cents and offer it to

12  Mr. Kronauge.  The government is wrong again.

13         You just heard from Mr. Kronauge yesterday who told

14  you he came up with the 2-cent for the promotion, a fact the

15  government just ignored just like they ignored Mr. Pepper's

16  testimony about calls with Scott.  The government didn't think

17  you needed to know that.  And more importantly, because it

18  didn't fit their story, you didn't hear that evidence from

19  them, did you?

20         One more thing about Mr. Pepper.  Yesterday government

21  counsel said to you Mr. Pepper testified Scott was one of his

22  norms, one of the people he heard about this coordination with

23  competitors just all the time.  This was just plain false.

24  Mr. Pepper never said that or even suggested that.  Mr. Pepper

25  remembered nothing about his conversations with Scott except

4136

1    that he called Claxton a lot to buy chicken and that he and

2    Scott exchanged -- never exchanged pricing information.  The

3    government took advantage of Mr. Pepper by preying on his

4    confusion about what really happened to advance their

5    narrative.  Don't let them take advantage of you.

6        Another government witness interviewed more than 20

7    times, Mr. Robert Bryant.  Let's be perfectly clear, Mr. Bryant

8    never testified that he had an agreement with Scott Brady to

9    fix prices.  He did not testify that anyone ever told him that

10   they had an agreement or an understanding with Scott Brady to

11   fix prices, whether that was to increase prices in 2014 or

12   limit a decrease in 2017.  Mr. Bryant never said that Scott

13   entered an agreement to do anything.  Mr. Bryant has not even

14   spoken to Scott since Scott started working at Claxton in 2012,

15   no phone calls, no text messages, no e-mails, nothing.

16       So what did Mr. Bryant actually say about Scott Brady?

17   He overheard a telephone call in Mr. Austin's office in August

18   of 2014, a call that happened after the first-round bids had

19   been submitted to RSCS.  And when I said overheard, he didn't

20   hear anything Scott said on that telephone call.  He heard two

21   things, Mr. Austin say, The price is the price, and tell me how

22   many loads you want.  That's it.  He didn't hear Mr. Austin

23   convey any price to the person on the phone.  He didn't hear

24   Mr. Austin ask the person on the phone to agree to anything.

25   And he certainly didn't hear anything that the person on the

1    phone might have said to Mr. Austin.  Members of the jury, this

2    conversation is not evidence of anything whatsoever let alone

3    evidence of an agreement to fix prices.

4        Now, the government showed Mr. Bryant Mr. Austin's

5    phone bill during his testimony in order to confirm the calls

6    he overheard, and they put up a chart about these two calls

7    yesterday.  They highlighted two calls for you.  On their chart

8    they occurred in the morning back to back.  But let's look at

9    Mr. Brady's telephone bill which the government could have

10   showed you but did not.  Mr. Brady's phone bill shows you the

11   length of the call to the second, unlike Mr. Austin's bill.  It

12   rounds up to a minute.  The call Mr. Bryant overheard was 19

13   seconds, 19 seconds.  The odds were clearly in Mr. Bryant's

14   favor that morning.

15       Now, Mr. Bryant told you that Pilgrim's got pricing

16   information and used that pricing information to change its

17   price before submitting its bids to the customers in 2014.

18   Mr. Bryant did not know where that information came from, and

19   Mr. Bryant did not know whether any other supplier had pricing

20   information or, if they did, whether any other supplier used

21   competitor pricing information to change their bid before

22   submitting it to a customer.

23       Contrary to what the government told you yesterday

24   about a two-way street or coordination among suppliers,

25   Mr. Bryant does not know and the government has no evidence

1    that Scott Brady or Claxton had or used any competitor

2    information to rig a bid or fix a price in 2014 for the 2015

3    contract.  In fact, the only evidence shows that Scott Brady

4    and Claxton acted independently.

5          Mr. Finch gave you that evidence.  He told you that

6    Claxton did not have competitor pricing information in 2014,

7    and it did not use any competitor pricing information to create

8    or change its bid.  Mr. Finch told you exactly how Claxton came

9    up with its initial price, and it did not include Scott Brady.

10          Mr. Finch developed the pricing model for the 2015

11    contract in late July, and he approached it just like he did

12    with all of Claxton's other contract negotiations.  He figured

13    out Claxton's actual costs for the input line items on the cost

14    model and added a 10-cent supplier margin, Claxton's usual

15    starting point for negotiations.

16          Next, since RSCS was willing to pay a premium to

17    suppliers to bridge that gap between the big-bird and the

18    small-bird profitability and address the change in market

19    conditions, Mr. Finch assessed what he thought such a premium

20    would look like for Claxton.  Now, since Claxton didn't sell a

21    big bird, he focused on the opportunity cost for staying with

22    KFC versus to moving to Chick-fil-A.  At the time Chick-fil-A

23    paid more and was a growing QSR customer of Claxton.

24          Mr. Finch calculated the opportunity cost at 12 cents,

25    and that is what he placed on the cost model for the big-bird

1 adjustment.  The 12-cent on top of the 10-cent supplier margin

2 is what Claxton submitted to KFC on August 19, 2014, which is

3 the exact same price Mr. Finch arrived at in late July when he

4 did the initial calculations and the exact same price he

5 forwarded to Mr. Fries and Scott on August the 1st, 2014.  And

6 the government has failed to present you evidence to rebut any

7 part of this, so instead they just disregard it.

8       Mr. Bryant also talked about a blitz to the customers.

9 There is no evidence that Claxton or Scott Brady participated

10 in any blitz.  Pilgrim's wanted to be the price leader and was

11 always aggressive with its pricing.  The price is the price.

12 Pilgrim's refused to negotiate.  Claxton wanted to be in the

13 middle.  You heard that from Mr. Suerken, Mr. Eddington,

14 Mr. Finch and Mr. Kronauge.  Claxton, the regional player,

15 asked RSCS to keep it competitive.  Claxton put its trust in

16 RSCS during those negotiations.

17       If Claxton knew the pricing of its competitors at the

18 time during the negotiations, Claxton would not have had to ask

19 RSCS to put it in the middle and keep it competitive.  It could

20 have done that on its own.  And it wasn't just Claxton and

21 Pilgrim's with competing strategies.  George's always wanted to

22 be the lowest.  Tyson was pushing for a deal to be closed with

23 RSCS in July before the first-round bids were even due.  And

24 during the negotiations, Claxton came down over 4 cents.  You

25 heard that from Mr. Suerken, Mr. Lewis and Mr. Finch.

1          You saw the bar charts.  No matter which bar chart you

2     want to look at, no matter which bar chart you want to create,

3     the numbers were still the same.  4 cents is 4 cents.  And

4     Mr. Eddington and Mr. Lewis both told you that even 1 cent has

5     a significant impact on RSCS.  Claxton did negotiate.

6     Mr. Lewis and Mr. Eddington told you that.  Different

7     strategies for different companies.  For Claxton and Scott

8     Brady the evidence was clear, the price was not the price.

9          Whatever Mr. Bryant understood, it was based on his

10    knowledge that all of the suppliers received the price increase

11    for the 2015 contract.  No one told him there was an agreement

12    among any of the suppliers.  The government interviewed him

13    time and time again and made him believe that there was some

14    understanding between the suppliers.  But you, unlike

15    Mr. Bryant, have the benefit of hearing from folks like

16    Mr. Lewis and Mr. Eddington, who told you about what really

17    happened during the negotiations in 2014 for the 2015 contract.

18         Mr. Eddington was brought in as the poultry expert for

19    RSCS, told you that the market conditions were not favorable to

20    RSCS.  There were no birds available and KFC was running out of

21    chicken.  RSCS was paying a premium to secure supply and large

22    birds were a dollar per bird more profitable than small birds

23    that KFC was buying.  Mr. Lewis told you the same thing.  It

24    was the perfect storm and it was all true.  Not one witness

25    told you otherwise.  This was not some made-up story by

1    suppliers to try and scare customers into paying more for

2    chicken.  It was the reality of the market conditions at the

3    time of those negotiations.

4           So RSCS asked the suppliers to break out a big-bird

5    premium from the margin number on the cost model.  It was for

6    everyone.  RSCS allowed all of its suppliers to provide numbers

7    for the big-bird premium, even Claxton.  RSCS knew the

8    importance of providing an opportunity for everyone to get this

9    premium whether they currently participated in the large bird

10   arena or not.

11          There is no dispute that the initial bids in 2014 were

12   high and RSCS was not happy.  But Mr. Eddington testified that

13   he, unlike other members of his team, expected close to an

14   18-cent all-in margin.  He thought that the big-bird premium

15   might be somewhere between 5 and 10 cents on top of the

16   supplier margin.  And at the end of the negotiations,

17   Mr. Eddington told you that the pricing for 2015 ended up at

18   the high end of the range that he expected.  And Mr. Eddington

19   and Mr. Suerken testified that the market conditions justified

20   an increase in pricing.  Mr. Suerken said he believed the price

21   increase was deserved.

22          The government wants you to focus on margins, but

23   remember, as Professor Snyder said, buyers pay prices, not

24   margins.  By the time Claxton signed its contract for 2015,

25   Claxton had come down 4 cents and received more volume from

1  RSCS, and Mr. Eddington told you that these increases helped to

2  stabilize the small bird market.  And as Mr. Eddington also

3  told you, Claxton, because RSCS asked it to, came down an

4  additional 3 cents in December of 2015, only one year into a

5  three-year contract even though they were not legally obligated

6  to do so.

7       Now, that 3-cent decrease for the last two years of

8  the 2015 to 2017 KFC contract, that was a preview of what was

9  to come.  By 2017 the landscape had changed.  The small-bird

10 market had stabilized.  There was a new supplier in the mix,

11 and the Mother's Day crisis, that was a thing of the past.  And

12 what happened?  It was QSR's turn to take advantage of the

13 market conditions which they did.  RSCS pushed Claxton down

14 more than 10 cents during the negotiations in 2017 for the next

15 three-year contract and asked Claxton to renegotiate a 1-cent

16 decrease for the last six months of the existing contract.  And

17 what did Claxton do?  Claxton gave RSCS more than 5 cents for

18 the last seven months of the year.  The pendulum had swung back

19 just as Mr. Eddington explained.

20       But Mr. Bryant, well, he also believed there was an

21 understanding in 2017 to limit price decreases, and he

22 testified that his handwritten notes reflected competitor bid

23 information he was provided by Mr. Austin.  And because he had

24 this information, the government again wrongly convinced him

25 that these notes were evidence of a conspiracy.  But Mr. Bryant

1    never testified that he was acting pursuant to an agreement and

2    Mr. Bryant never testified that he coordinated prices with

3    anyone.  He received pricing and he came up with Pilgrim's

4    price based on what was best for Pilgrim's.  He did not know

5    what anyone else planned to do or did.

6            And let's talk about those experiences Mr. Bryant had

7    that gave him his understanding for 2017.  He told you that he

8    had no concern about being undercut or having volume stolen.

9    But as we all saw, Pilgrim's lost over 500,000 pounds of

10   chicken a week after 2014 negotiations and they lost some of

11   that volume to Claxton.  Collusion or competition?  Mr. Bryant

12   didn't even know Pilgrim's lost volume.  He had no idea what

13   actually happened during the negotiations, what the pricing

14   was, who got more volume, who lost volume.  Mr. Bryant told you

15   about his understanding of what happened internally at

16   Pilgrim's, but Mr. Bryant had no knowledge about what happened

17   at Claxton.  And how could he?  He never spoke with anybody at

18   Claxton.

19           Mr. Bryant may have believed at the time his

20   handwritten notes on Government's Exhibit 1919 were future bid

21   submissions, but it's clear now that those numbers were nothing

22   more than current pricing.  Look at Exhibit I-054.  It shows

23   the period two pricing.  You can compare it to Exhibit 1919

24   just as we did with Mr. Bryant during his testimony.  But the

25   government wants you to think that Government 1919 is future

1    pricing.  And to convince you of this, they told you yesterday

2    that Claxton's first-round bid matched the number on

3    Government's Exhibit 1919, and that is completely wrong.

4            Yesterday the government put up a slide and told you

5    that Claxton's first-round bid matched Mr. Bryant's handwritten

6    notes, that it was the same price.  The number on Government's

7    Exhibit 1919 for Claxton is .9943.  Claxton's first-round bid

8    on price on Exhibit F-853, Ms. Fisher testified about Claxton's

9    first-round bid, that number is .9939, right there on the bid

10   submission, .9939.  .9939 is not the number on Mr. Bryant's

11   handwritten notes.  These are not the same numbers.  All the

12   government had to do was look at the bid submissions.  The

13   government never bothered to look at the actual bid submission,

14   yet argued the truth of the number anyway.

15           What did Mr. Bryant really say about 2017?  He got

16   pricing information from Mr. Austin and he used it to lower

17   Pilgrim's bid from what its costs actually reflected.  And why

18   did he do this?  Because RSCS was mad at Pilgrim's and

19   Pilgrim's was trying to improve the relationship with RSCS, but

20   that has nothing to do with Scott Brady or Claxton.  Mr. Bryant

21   doesn't even know where Mr. Austin got the information.

22   According to Mr. Bryant's testimony, he had one number over the

23   course of the alleged conspiracy that purported to be Claxton's

24   pricing information, one number in eight years, and that number

25   wasn't even what he thought it was.

1          Mr. Bryant has no evidence that Scott Brady gave any

2     information to Pilgrim's.  He has no evidence that Scott had

3     any pricing information, and he has no evidence that Scott used

4     any pricing information.  Most importantly, Mr. Bryant has no

5     evidence that Scott Brady entered into any agreement.

6          Now, Ms. Fisher and Mr. Eddington, they told you about

7     the 2017 negotiations.

8          One, Scott on behalf of Claxton asked for more volume

9     on more than one occasion during the negotiations.  Scott asked

10    for 25 percent more volume for Claxton during those

11    negotiations.  This flies in the face of Mr. Bryant's testimony

12    that no suppliers would ask for more volume.

13         Two, Mr. Eddington told you how RSCS would set up its

14    initial meetings with messaging because RSCS knew that the

15    suppliers talked and wanted to take advantage of it.

16         Three, Claxton renegotiated its contract at the

17    request of RSCS before its current contract was even up and

18    once again decreased its price.

19         Four, Claxton came down more than 10 cents.

20         And five, Pilgrim's lost volume once again.

21         Mr. Pepper and Mr. Bryant's testimony is not evidence

22    of an agreement with Scott Brady.  It's not even evidence that

23    the competitors exchanged pricing information because

24    Mr. Pepper testified he didn't exchange pricing information

25    with Scott Brady.  And Mr. Bryant had no actual knowledge as to

1   where the competitor pricing information he had in 2017 came

2   from.  It's the government's burden to prove to you the

3   existence of an agreement to fix prices and rig bids.

4   Mr. Pepper and Mr. Bryant's testimony don't even come close to

5   helping the government reach this burden.

6        Five weeks ago in our opening statement we told you

7   there was only one question for you to decide, and five weeks

8   later nothing has changed.  That question is the same today as

9   it was at the very beginning of this case.  Did the government

10  prove beyond a reasonable doubt that Scott Brady conspired with

11  anyone to fix prices and rig bids?  And just as that question

12  hasn't changed, neither has the answer.  The answer after five

13  weeks of trial remains unequivocally no.  Scott Brady is

14  innocent.

15       The government wants you to believe that the only

16  reason the suppliers exchanged pricing information was because

17  they had an agreement to fix prices and that the exchange of

18  pricing information is sufficient evidence of such an

19  agreement.  Now, as Judge Brimmer instructed you in Instruction

20  No. 21, the exchange of pricing information is not illegal in

21  the absence of additional evidence of an agreement.  It is not

22  unlawful for competitors to meet and exchange information

23  necessary to prepare a bid.  It is not unlawful for competitors

24  to meet and discuss common aims or objectives.  And it is not

25  unlawful for competitors to exchange information on

1    independently derived prices.

2         As Judge Brimmer instructed you, there may be

3    legitimate reasons that would lead competitors to exchange

4    pricing information other than fixing prices and rigging bids.

5    It is not illegal for a competitor to obtain, rely upon, act on

6    pricing and other information received from competitors so long

7    as there is no agreement to fix prices and rig bids.  And it is

8    because of this that we told you that the question for you to

9    answer isn't whether prices were shared with competitors or

10   whether competitors talked because in the absence of an

11   agreement to fix prices and rig bids, neither is illegal.  And

12   exchanging pricing and talking with competitors standing alone

13   or together without evidence of an agreement are not sufficient

14   evidence of Scott Brady's guilt because a conspiracy to fix

15   prices requires an agreement.  The government wants to skip a

16   step in their case against Scott.  Do not let them.

17        The government's theory of the case makes no sense.

18   It makes no sense because the evidence does not support it.

19   And when you cannot make sense of the very basics of the

20   conspiracy, who Scott Brady agreed with, when he entered into

21   an agreement, what the objective of the agreement was, how

22   Scott carried out a price-fixing agreement with no authority to

23   set pricing, then why Scott asked for more business from every

24   customer if the stated purpose of the conspiracy was not to

25   compete for more volume.  That is reasonable doubt.

1            The government has crafted quite a story for you.  You

2    heard the evidence they presented.  In July of 2014 Tyson, was

3    trying to close a deal with RSCS in July for the price

4    increase, July, before any of the other bids were in.

5    Mr. Pepper, he didn't know that.  But apparently according to

6    the government, he was calling other suppliers toward the end

7    of August after initial meetings with RSCS and after initial

8    bids were in to try and craft some agreement around an

9    unspecified substantial price increase without revealing any of

10   Tyson's information.

11           And Mr. Pepper, a salesman with no pricing authority

12   whatsoever who knew little about what was going on with the

13   actual negotiations, was in charge of orchestrating and

14   securing this agreement with other salesmen who had no pricing

15   authority.

16           On the other end of the spectrum, you have Pilgrim's.

17   Mr. Bryant, another employee who seemed to know almost nothing

18   about the actual negotiations, testified it was actually

19   Pilgrim's who was blitzing the customers in sending messages to

20   the industry about price increases.  Of course, the government

21   presented no evidence that any message was actually delivered

22   to anyone.  Well, which was it?  Was Mr. Pepper and Tyson

23   leading the charge in August or was Pilgrim's blitzing the

24   industry during the summer or was it neither?  Was it really

25   just two employees singing for their supper and trying

1      desperately to fit their stories into the government's

2      narrative, a narrative the government was so desperate to

3      advance that they didn't realize the stories just do not work.

4      In either event, not one witness for the government told you

5      what Scott Brady or Claxton was doing.  Not one witness for the

6      government told you that Scott Brady entered into an agreement

7      to fix prices and rig bids, not one.

8              Now, the government counsel spent a lot of time

9      talking about these summary charts yesterday.  They don't

10     deserve your time and effort.  Recall Ms. Evans, she could not

11     tell you whether the charts contained all the relevant e-mails,

12     contracts or phone calls or even whether the charts were even

13     complete.  Ms. Evans told you that the charts are missing

14     context and often do not even include the entire contents of an

15     exhibit or its critical attachments with the data with numbers.

16     And the government has cherry-picked phone calls off of

17     thousands of pages of phone records and included them on charts

18     based on nothing more than the date of the call.

19             The government is asking you to believe that these

20     calls were in furtherance of some agreement to fix prices, but

21     that is just wrong.  Let's look at Government's Exhibit 7 and

22     17.  You saw during Mr. Finch's testimony that the calls on

23     these charts that the government claims are calls of

24     competitors fixing prices are really nothing more than Scott

25     buying and selling product with Pilgrim's and Tyson.  They are

1    not in furtherance of any conspiracy.

2            And let's look at Government's Exhibit 19.   On

3    February 17, Mr. Stiller is apparently irate to discover that

4    Mr. Eddington is asking for $49 a case and wants Mr. Austin to

5    tell the industry that Pilgrim's is not going to do that.   And

6    the government wants you to believe that there was this

7    coordination among competitors between February 20th and

8    February 23rd involving this $49 a case price, that Pilgrim's

9    was getting the message out to the competitors not to agree to

10   the $49 case.   But you heard Mr. Eddington.   He told Scott on

11   February 22nd he wanted $49 a case and Scott said okay the very

12   next day, and he asked for more volume.   Where is that on this

13   chart?

14           Government's Exhibit 3 has an e-mail from Searcy

15   Wildes and Kevin Ilardi.   Who are these people?   The government

16   included an e-mail between the two of them on a chart because

17   it has current competitor pricing information.   There is no

18   evidence in this case that this information came from Scott, no

19   calls, no text messages, no e-mails, nothing.

20           Let's look at Government Exhibit 10 and in particular

21   Page 4.   The government wants you to infer that Scott provided

22   Claxton's pricing information to Mr. Austin.   In the top of the

23   chart, Claxton's current margin was not .0675.   The contract is

24   in evidence at Government's Exhibit 1728.   The margin is at

25   .0673.   And let's look at the ranges that Claxton was allegedly

1    going in with.  This e-mail is dated August the 18th.  Claxton

2    submitted its first-round bid the very next day.  And what was

3    the total increase it went in with?  It was not 14 to 16 cents

4    a pound.  It was almost 19 cents a pound and it had been 19

5    cents a pound since late July.  The bids and the current

6    contract are both in evidence and confirm this fact.

7    Mr. Finch's testimony also confirms this fact.

8         The government told you that Pilgrim's had this

9    information so it could go in as the price leader, but Claxton

10   went in as the highest, clearly not knowing where anyone else

11   was in the bid going in because given Claxton's pricing

12   strategy that it did not want to be at the top, but it went in

13   at the top, so Claxton relied on the directional guidance of

14   RSCS to come down over 4 cents and land in the middle, which is

15   exactly where it wanted to be.

16        Pilgrim's price was where it was, the price leader, in

17   accordance with its internal strategy.  This is not

18   coordination.  And Pilgrim's' information about Claxton was

19   just wrong, just like the government's summary exhibits.  So

20   let's talk about some of these documents that the government

21   wanted to show you.  Let's look at Government's Exhibit 1700 --

22        *THE COURT:*  Two minutes, Mr. Lavine.

23        *MR. LAVINE:*  -- where Scott tells Mr. Fries he will

24   make some calls after Claxton received feedback on a bid in

25   2013 from KFC.  The government has shown you calls Scott made

1    to competitors including a zero-second call after this e-mail,

2    but they didn't show you -- I am sorry, but did they show you

3    any calls Scott had made to his customers?  They just want you

4    to assume his calls with other suppliers were about this bid,

5    but we know that the calls he made after this e-mail were about

6    covers and shorts.  Mr. Finch told you that.  We looked at

7    Government's Exhibit 7 and there is no evidence that Scott had

8    received or had any pricing information.

9            The government argues that Scott made calls to resist

10   feedback, but as we have seen, Claxton never resisted feedback.

11   Mr. Ledford, Mr. Eddington and Mr. Kronauge all told you that,

12   and numbers don't lie.

13           Government's Exhibit 6282 and 6046, they contain

14   nothing but period pricing.  And remember what Mr. Ledford said

15   about period pricing, it had no impact on negotiations.  It

16   gives no one a competitive advantage.  And if you look at the

17   date on the e-mails, it was not done during any negotiations

18   for anything.  And the government told you yesterday that

19   period pricing doesn't matter.  When the government lacks

20   proof, they beg you to speculate.

21           The government has the burden of proof and only the

22   government, and in trying to meet it, the government

23   intentionally excluded any evidence that did not advance their

24   theory.  The government expects you to answer questions that

25   they should have answered for you.  That is not your job.  It

1    is the government's job to provide answers for all of your

2    questions.  Don't do the job for them.  This is not how the

3    burden works.

4         The burden to prove beyond a reasonable doubt is

5    always on the government and it never shifts from them.  The

6    burden is not on Scott Brady.  It is not on any one of these

7    gentlemen here.  It is not on defense attorneys.  It is not on

8    the Judge and it is not on any of you.

9         Let me be very clear.  Scott Brady is a salesman.

10   Scott Brady talked on the phone with competitors.  Scott Brady

11   exchanged pricing information with competitors, but Scott Brady

12   did not have pricing authority and Scott Brady could not effect

13   an agreement to fix prices and rig bids.  Scott Brady did not

14   enter into an agreement to fix prices and rig bids, and the

15   government has no evidence that it did.

16        So where does that leave us?  With one question.  And

17   that question is the same today as it was in the very beginning

18   of this case.  Did the government prove beyond a reasonable

19   doubt that Mr. Brady conspired with anyone to fix prices and

20   rig bids?  And the answer unequivocally is no.  Scott Brady is

21   innocent.  There is only one verdict that can be returned in

22   this case against Scott Brady, and that is a finding of not

23   guilty.  Scott Brady is innocent.

24        Thank you.

25        THE COURT:  Thank you, Mr. Lavine.

1          Ladies and gentlemen, we will time our breaks a little

2     bit according to the -- where we are in between arguments, so

3     why don't we take our mid-morning break at this time and plan

4     on reconvening at 10:20.  The jury is excused.  Thank you.

5          (Jury excused.)

6          Mr. Tubach.

7          MR. TUBACH:  Your Honor, I didn't know if this was the

8     proper to handle what happened.  The Court I think had given

9     Mr. Lavine 45 minutes and I thought Mr. Kornfeld had ceded five

10    of his.

11         THE COURT:  I didn't understand he had ceded it to

12    Mr. Lavine, that's why.

13         MR. TUBACH:  And I apologize for going to Ms. Grimm.

14         THE COURT:  No, that's fine.  I didn't mean to

15    interrupt Mr. Lavine.  That's fine, and it did not create a

16    problem.  And let's see, Mr. Tubach, you have got an extra

17    five, right?  Okay.  So we will be in recess, then, until

18    10:20.  Thank you.

19        (Recess at 10:05 a.m. until 10:20 a.m.)

20         THE COURT:  Ready for the jury?

21         MR. TUBACH:  One very brief request.  I am going to be

22    going after Ms. Nielsen.  I would perhaps ask for a stretch

23    break after Ms. Nielsen.  If the Court would is willing to do

24    that, that would be great.

25         THE COURT:  Yeah, we can do that.

1          *MR. TUBACH:*  I had stolen five minutes from

2     Mr. Kornfeld.  I am willing to cede half of that to Mr. Gillen.

3          *THE COURT:*  Well, I don't know if I have a second hand

4     on me yet on my computer up here.  Okay.  We will do so.

5          *MS. NIELSEN:*  Not to make things more complicated, but

6     my understanding is Mr. Kornfeld had about 10 minutes left.

7          *THE COURT:*  He did.

8          *MS. NIELSEN:*  With five minutes ceded to Mr. Gillen

9     and Mr. Tubach, I would ask for an additional two minutes from

10    mine that Mr. Kornfeld has agreed to cede to me.

11         *THE COURT:*  So two minutes for Ms. Nielsen, with two

12    and a half more to Mr. Gillen and Mr. Tubach two and a half.  I

13    will try to keep that all in mind in addition to when the

14    heads-up goes as well.  Okay.

15         All right, ladies and gentlemen.  We will proceed with

16    the next opening.  Ms. Nielsen, I believe you are up next.

17                              **CLOSING ARGUMENT**

18         *MS. NIELSEN:*  Thank you, Your Honor.

19         I want to start with a reminder, a reminder of what's

20    at stake, the lives and the liberty of these 10 men.  I proudly

21    represent one of these individuals, one human being, this man,

22    Bill Lovette.  In the words of a witness who actually knows the

23    man, Bill Lovette is the button-downed former CEO of Pilgrim's

24    Pride who is held in the highest of esteem by those who worked

25    in the chicken industry.

1        The prosecution didn't present to you any facts about

2   the man; and more importantly, they didn't present any facts or

3   evidence of his individual actions.  Instead, they seem to have

4   lumped him into this case because of his position and his title

5   in a company.  But in this country and this great state where

6   we live, we don't judge a man based on a chart or a sound bite

7   or a title that he holds.  In this courtroom you must judge

8   Bill Lovette based solely on the evidence and, in Bill's case,

9   the lack of evidence the prosecution has presented.

10        You have sat here patiently and respectfully for over

11   a month now listening to these federal prosecutors' case, but

12   now it's your turn.  The single question you have to answer is

13   did these federal prosecutors prove to you beyond any

14   reasonable doubt that Bill Lovette entered into an agreement to

15   rig a bid or fix the price of chicken.  And if you're sitting

16   here right now thinking all I really know about Bill Lovette is

17   that he was the CEO of Pilgrim's, that's completely

18   understandable, because the prosecution didn't present to you

19   any evidence that Bill Lovette was involved in a price-rigging

20   conspiracy.  All they have proven is that he is the CEO of

21   Pilgrim's, and it's pretty obvious why.  They want to bring him

22   into this case even though there is no connection.

23        Bill Lovette never entered into any agreement with

24   anyone to rig a bid or fix the price of chicken.  He did not

25   know of any such agreement, direct any agreement and nor did he

1    or would he intentionally participate in a conspiracy to rig

2    bids and fix prices.  He is innocent.

3         I want to focus on facts, not rhetoric.  From the

4    first words out of the prosecutors' mouth to their last

5    yesterday, what the federal prosecutors have told you has no

6    basis in fact.  On their opening statement they told you

7    Defendant Lovette ran a crew at Pilgrim's.  That's a catchy

8    phrase and they want you to latch on to it.  But the

9    fundamental problem with their catchy phrases and sound bites

10   is that they are not grounded in fact.

11        Instead, think of what Robbie Bryant, who the

12   government coins the so-called conspiracy insider, actually

13   said.  He told you that Bill Lovette had no involvement in the

14   so-called conspiracy.  He said he didn't know if Bill Lovette

15   was even involved in pricing for the QSR unit.  Think about

16   that for a moment.  The one witness who the government calls

17   Pilgrim's insider says Bill Lovette was not involved.

18        If that gives you hesitation, if that gives you pause

19   about whether the prosecution has proven beyond a reasonable

20   doubt that Bill Lovette participated in this so-called

21   conspiracy, that feeling, that pause, that hesitation, that is

22   reasonable doubt.  And since you need to just have one single

23   reasonable doubt, the government's own witness gives you on a

24   silver platter the precise testimony that you need to find Bill

25   Lovette not guilty.

1          But instead of catchy phrases and rhetoric, let's talk

2    about the facts.  The first thing the government has to prove

3    beyond a reasonable doubt is that the price-fixing and

4    bid-rigging conspiracy even existed.  Let's look at the facts.

5    The fact is the simple law of supply and demand is what caused

6    the chicken suppliers to justifiably seek higher prices in

7    2014.  Every single witness in this case from Mike Ledford to

8    Robbie Bryant at Pilgrim's to Pete Suerken, Rich Eddington and

9    Pete Suerken, each and every one of them told you that low

10   supply and high demand was a fact in 2014, and because of that

11   fact, all of them expected to see higher prices in 2014.

12          In 2014, KFC ran out of chicken.  KFC is out there

13   begging for chicken.  They are willing to pay 50 percent above

14   their contracted price and they still can't find it.  These are

15   the uncontroverted facts.  Despite these facts the prosecution

16   still tries to get you to disregard what every single one of

17   their own witnesses said about low supply and high demand, and

18   they try to get you to believe beyond a reasonable doubt that

19   the price of chicken went up and down because of some secret

20   exclusive illegal agreement.

21          The federal prosecutors have a theory, but they simply

22   don't have the facts and the data to back it up.  They didn't

23   call their own economist to present the economic data and

24   facts.  It was the defense that presented you a former

25   Department of Justice economist to give you the actual data and

1    the analysis.   Remember how Professor Snyder approached his

2    analysis.   He too started with a theory.   He started with the

3    government's theory that the price changes were a result of a

4    price-fixing conspiracy.

5          And what did he tell you after if he analyzed the

6    data?   The data doesn't support the government's theory.   What

7    does Professor Snyder say caused the price increase?   He says

8    there are simple and reasonable explanations supported by

9    economics for observed outcomes, meaning the price changes,

10   unrelated to bid-rigging and price-fixing.   If what Professor

11   Snyder tells you causes you to question the government's case,

12   that is reasonable doubt.

13         The government has nothing, presented you nothing to

14   counter Professor Snyder's compelling analysis of the economic

15   data.   They have no data and no economist to suggest that data,

16   in fact, supports their theory of bid-rigging and price-fixing.

17   So what do they do instead?   They get up here yesterday and

18   tell you Professor Snyder's testimony, simply irrelevant.

19   Market forces, market conditions, they don't matter in

20   determining whether there is an antitrust violation.

21         Don't you think, though, that Professor Snyder, an

22   economist who has studied approximately 250 antitrust cases,

23   the former dean of the university of Chicago and the current --

24   a current professor at the Yale School of Management, a man who

25   worked five years as an economist with the Department of

1    Justice, don't you think he would know what the data is that's

2    relevant?  Don't let the prosecutors dismiss his opinion simply

3    because they don't like what he has to say.

4          The government has not even proven beyond a reasonable

5    doubt that an illegal agreement even existed.  But because I

6    represent Bill Lovette, I am going to focus specifically and

7    individually on Bill Lovette and what the government has to --

8    what proof the government supposedly has presented.  What they

9    have to prove beyond a reasonable doubt is whether Bill Lovette

10   knowingly, and that means voluntarily and intentionally, became

11   a member of a conspiracy charged in the Indictment knowing of

12   its goals and intending to help accomplish it.

13         My colleague, John Fagg, stood up here on day one and

14   told the -- told you that the prosecutors would fail, they

15   would fail to show you when, where and how Bill Lovette

16   supposedly entered into an agreement to rig bids and fix

17   prices.  Well, here we are at the end of the trial and what

18   Mr. Fagg said is true.  With all of the federal government's

19   resources, with all of their power, their 14 million documents,

20   their rehearsed testimony and made-up charts, the prosecution

21   cannot and has not presented you with evidence and witness

22   testimony to answer these very basic elements of a crime.

23         The government has articulated no answer as to who,

24   what, when and how Bill Lovette supposedly agreed with any

25   competitor to rig a bid or fix a price.  As you know, the

1    government scoured over 14 million documents in this case

2    spanning an eight-year-long period.  Yesterday Ms. Call listed

3    what the government thinks is their key evidence against

4    Mr. Lovette.  You saw her so-called key evidence slide.

5              First of all, presumably what the prosecutor listed on

6    her key evidence slide supposedly relates to Mr. Lovette.

7    These text messages, this isn't even Mr. Lovette's phone number

8    and the government knows that.  The text messages that don't

9    involve Bill Lovette, they don't reference him.  They don't

10   have anything to do with him.  The same thing with these

11   handwritten notes.  The government knows these don't relate to

12   Bill Lovette.  Look at all of these exhibits from the list

13   Ms. Call showed you and put on her list.  They don't have

14   anything to do with Mr. Lovette.

15             And what is really shocking, what is astounding and

16   what shows how desperate the government is to lump Mr. Lovette

17   into this case, two of the exhibits listed on the key evidence

18   slide aren't even exhibits at all.  If you wrote down 1256 and

19   1258, those exhibits don't even exist.

20             So now I want to talk to you and walk you through what

21   Ms. Call argued was her key evidence against Mr. Lovette and

22   show you that their so-called key evidence against Mr. Lovette

23   isn't evidence at all that he agreed with anyone to rig a bid

24   or fix a price of chicken.

25             You will recall yesterday that Ms. Call started her

1    argument by saying that these 10 defendants conspired to fix

2    prices and rig bids on some of the most important fast-food

3    contracts in the business.  Then after about an hour and a half

4    into her argument, Ms. Call explained how she had now talked to

5    you about nine defendants and how she had shown you evidence

6    that these nine defendants were communicating with their

7    competitors in the fast-food QSR space.  After all, that's what

8    we have been talking about for a month now, contracts for

9    fast-food restaurants.

10         Who did she not name?  She didn't name Bill Lovette

11   because she can't.  She can't point to a single communication

12   that Bill Lovette had with any competitor in the fast-food

13   business space.  But as you can tell, the government is

14   desperate to try to bring Bill Lovette into this case.  How do

15   you know they are desperate?  Because the government for the

16   first time, even though they presented no witness to you in

17   this trial, no testimony, no contest, for the first time the

18   government brings up Sysco, which is not even a fast-food

19   customer.

20         So let's break that down.  The prosecutors put into

21   evidence a single page e-mail, Exhibit 803, about Sisco's

22   demand that it sent out to all of its suppliers for longer

23   credit terms.  They put into evidence this e-mail without

24   giving you actual facts, without giving you a witness, without

25   giving you any testimony to explain what the heck this is

1    about, which brings us to Brenda Ray.

2         We, the defense, who have no burden whatsoever, we

3    brought this witness to show you what this e-mail was really

4    about and to show you that it is completely unrelated to the

5    allegations in this case.  At the time of this Sysco demand for

6    higher credit terms, Ms. Ray worked in the broad-line sales

7    division who dealt with Sysco, the same broad-line division

8    where Robbie Bryant said there was no conspiracy other than his

9    little side hustle with US Foods.  Ms. Ray testified that this

10   unprecedented demand by Sysco to all of its suppliers to revise

11   credit terms was not part of any bid process.  What Ms. Ray

12   told you is that the Sysco credit demand was not part of any

13   RFP or any contract negotiation for chicken.  It was a demand,

14   an unreasonable demand by Sysco, a giant company, that Sysco

15   sent out to all of its suppliers.

16        What else did Ms. Ray tell you about this?  Ms. Ray

17   testified under oath that Bill Lovette was not even involved in

18   responding to Sysco's demand to credit terms.  And I want you

19   to think back to Ms. Ray's testimony.  You all got to see live

20   and in person what the prosecutors do when someone tells them

21   something that doesn't support their theory.  When the

22   government heard that Ms. Ray had just gutted their case on the

23   Sysco e-mail, they tried to change the facts on you.

24        After Ms. Ray testified that the Sysco e-mail had

25   nothing to do with a bid or a contract negotiation for chicken

1   and that Bill Lovette was not involved in any discussion with

2   Sysco for credit terms, the government tried to mislead Ms. Ray

3   and they tried to mislead you.  They showed her a calendar

4   invite to try to suggest that Bill Lovette attended a meeting

5   on Sysco credit terms.  Wrong.

6           Brenda Ray had to correct the government.  She had to

7   tell them the calendar invite wasn't a meeting about credit

8   terms at all.  It was a meeting about a massive chicken recall.

9   How do we know what Ms. Ray said is true?  Because all the

10  other people on the calendar invite weren't people who worked

11  in sales or dealt with credit terms.  They were the folks who

12  worked in quality assurance and the person who managed the

13  plant that caused this massive recall.

14          A massive recall is the type of problem that Bill

15  Lovette as a CEO would get involved in, not as Ms. Call said

16  herself a trivial little thing like credit terms.  When we the

17  defense brought you facts, you see that the Sysco e-mail is

18  evidence of nothing.  It most certainly is not evidence that

19  Bill Lovette conspired with a competitor to rig a bid or fix

20  the price of chicken.

21          These prosecutors in that instance just showed you

22  that they will stop at nothing, not even the truth.  Don't be

23  misled by their tactics here.  It's plain and simple.  This

24  e-mail, Exhibit 803, an e-mail between Joe Grendys, who you

25  have heard nothing from, and Bill Lovette has nothing to do

1    with the alleged conspiracy to rig bids and fix the price of

2    chicken in contracts in the fast-food industry, none.  So cross

3    this off the list of the government's so-called key evidence

4    against Bill Lovette.

5         Let's see what else the government has come up with on

6    Bill Lovette after scouring 14 million documents.  As you know,

7    the government has put together these summary charts.  And in

8    their voluminous charts that scan an eight-year period of time,

9    they have a total of six references to Bill Lovette, six

10   references in an eight-year period of time.  Since the

11   government has told you that this is their key evidence against

12   Bill, I am going to quickly dispel with each one of them.

13        As to Bill Lovette, the government points to one

14   single call that Bill Lovette was on, one call, one call to

15   Roger Austin in 2014.

16        Now, before we get into the chart, let's talk about

17   context.  The government's own witnesses have told you that in

18   the summer of 2014, everyone in the chicken industry knew that

19   market forces would lead to an increase in prices on small

20   birds.  Look at what Pete Suerken told you.  He tells you in

21   this time period, spring/summer of 2014, he was out begging for

22   chicken, and he was willing to pay, RSCS was willing to pay one

23   and a half times the contract price.  He also told you he knew

24   going into those negotiations in 2014 that RSCS was going to

25   take a beating on price.  He knew it, but he still didn't like

1    it, and he didn't like the prices that Roger Austin quoted him.

2           So let's turn back to this call between Roger Austin

3    and Bill Lovette and let's look at what the government left off

4    their chart.  Roger Austin e-mailed Jayson Penn a rundown on

5    the discussion that he had had with Pete Suerken at RSCS

6    regarding Pilgrim's bid.  I am not going to read you the entire

7    two-page very detailed summary of Mr. Austin's conversation

8    with Pete Suerken, but let's look at the highlights.

9           RSCS wasn't happy with Pilgrim's bid.  Roger Austin

10   had informed RSCS that Pilgrim's had calculated the price it

11   needed to continue to supply small birds.  Mr. Austin explained

12   to RSCS Pilgrim's' strategy, the reason it reached its price,

13   and that Pilgrim's would stand firm with its number.  Roger

14   Austin tells Jayson Penn that he is sure Steve will call Bill

15   after he holds firm.  Remember, Steve is Steve McCormick, and

16   he was the CEO of RSCS.  Bill is Bill Lovette, the CEO of

17   Pilgrim's.

18          So what happened next?  Mr. Penn forwarded this

19   detailed recap of the negotiations to Bill Lovette to give Bill

20   a heads-up, hey the CEO of RSCS, he is going to give you a

21   call, so we need to be prepared.  Now that you have this

22   context, you can understand what was going on when Mr. Lovette

23   had this call.  Look at the evidence, not the prosecutors' fill

24   in the blank, let me tell you what's on the call that I know

25   nothing about.

1          This call between Roger Austin and Bill Lovette is not

2     evidence of an agreement to rig a bid or fix a price.  It's

3     simply a call between two Pilgrim's employees discussing their

4     own strategy and preparing for a call with the CEO of a major

5     customer.  And, of course, after Bill Lovette and Roger Austin

6     talk, Bill Lovette did indeed have a call with Pete Suerken --

7     I am sorry, not with Pete Suerken.  Pete Suerken was on the

8     call, but the call that was set up was CEO to CEO, Bill Lovette

9     to Steve McCormick.

10         And in his testimony, you heard Mr. Suerken testify

11    about this call, and he admitted that when Bill Lovette is

12    talking to the RSCS CEO, Bill Lovette presented a very

13    methodical economic case for the 2014 price increase.

14    Mr. Suerken admitted to you that what Bill Lovette said in that

15    call made sense and that it was tough to argue against.  And

16    you just don't have to rely on Mr. Suerken's testimony to know

17    that what Bill Lovette was an economical case that made sense.

18    Let's look at the government's own evidence, GX-979.

19         This chart validates everything Mr. Lovette told

20    Mr. McCormick on that call.  In 2015, Pilgrim's didn't need to

21    sell chicken to KFC for a low price.  It could and it did sell

22    the exact same chickens to retail customers for a higher price.

23    The chart shows Pilgrim's gained business from grocery stores

24    like King Soopers, Safeway and Roundys, and it sold those birds

25    to these grocery stores for a higher price than it sold chicken

1    to the QSRs, to KFC and Church's.

2         This is precisely the economic methodical case that

3    Bill Lovette explained to Mr. Suerken, and it is precisely the

4    independent business strategy that Mr. Lovette was pursuing so

5    that Pilgrim's could get a fair market price.  You know why it

6    was tough for Pete Suerken to argue with Bill's case?  Because

7    what Bill said on that call was a hundred percent true, and you

8    can see that from the data and the facts of the government's

9    own exhibit.  What Mr. Lovette said had absolutely nothing to

10   do with a conspiracy.  He was talking facts.  So let's cross

11   Bill Lovette's call with Roger Austin off the list because it

12   has nothing to do with rigging a bid or fixing a price.

13        Now, yesterday you heard Ms. Call tell you that you

14   would see all these text messages between competitors to prove

15   that there was a conspiracy to fix prices.  How many text

16   messages are there between Bill Lovette and competitors?  None.

17   So let's look at the one and only text exchange involving Bill

18   Lovette on the government's summary charts.

19        The single text exchange that the government has on

20   Bill Lovette is one text between himself and a fellow Pilgrim's

21   employee, Mr. Penn.  What they are talking about on this text

22   is Golden Corral.  Here again, the prosecutor presented no

23   context, no witness and no testimony about Golden Corral at

24   all.  This text exchange is simply not any evidence of a

25   price-fixing conspiracy.  It's a sarcastic text between

1    co-workers.  "We will officially call for an all company panic

2    if you don't lower prices to them.  I am trying to call my

3    therapist on their emergency weekend number.  I am really

4    afraid."

5            Now, you might not love the tone or the sarcasm in

6    that e-mail, but this is really nothing more than Pilgrim's

7    employees kind of poking fun at Golden Corral.  The only thing

8    the one and only text exchange proves is that Bill Lovette

9    didn't really like Golden Corral, but Bill Lovette talking

10   sarcastically or venting to a co-worker is absolutely not any

11   evidence of a price-fixing conspiracy, yet they put it on their

12   summary charts.  Really what it is is just another attempt by

13   the government to dirty up Bill Lovette and make him look bad.

14   That's it.  So cross it off your list.  This is no evidence

15   whatsoever.

16           So we've dealt now with the single text message and

17   the single call that involves Bill Lovette, neither of which

18   are any evidence of his involvement in a conspiracy.  Now let's

19   talk about the e-mails on the prosecutors' charts or, better

20   yet, the lack of e-mails that involve Bill Lovette.  The

21   government tells you that they looked through a mountain of

22   e-mails in this case, and yet they don't have a single e-mail

23   that Bill Lovette sent, that he actually sent, on any of their

24   summary charts.  Instead, over eight years and 14 million

25   documents the prosecution has a mere two entries where a

1    Pilgrim's employee sent an e-mail to Bill Lovette.

2            So the prosecution is relying heavily on these two

3    e-mails and they are asking you to give them weight, but let's

4    look at what the e-mails really show.

5            If we can pull up government summary 16, please.

6            What we see here is another example of the government

7    not showing you the actual facts.  In this summary chart, the

8    prosecution includes just a snippet of the e-mail that Mr. Penn

9    forwards to Mr. Lovette.  Let's take a little time to look at

10   what the underlying e-mail actually says.  Mr. Penn forwards an

11   e-mail with the subject Price Reduction Impact that states,

12   "Please see the attached spreadsheet showing the impact of

13   reducing eight-piece price and also proposed numbers on the FP

14   wings."

15           You will notice in the e-mail to Mr. Lovette, the

16   e-mail doesn't ask Mr. Lovette to do or say or respond to

17   anything, and he doesn't.  He doesn't respond to this e-mail at

18   all.  Now let's look at the actual spreadsheet.  What it is

19   showing is Pilgrim's' own independent analysis of how a price

20   reduction to KFC would affect Pilgrim's.  So what we have here

21   are employees of the same company, Pilgrim's, a Pilgrim's

22   employee forwarding Mr. Lovette Pilgrim's own internal

23   analysis, not about a price increase, but the impact to

24   Pilgrim's of a price reduction.

25           The government completely ignored the point of the

1    e-mail, price reduction impact on Pilgrim's.  Even if we assume

2    that Mr. Lovette reviewed this e-mail, the fact that a

3    Pilgrim's employee forwarded a spreadsheet to Mr. Lovette that

4    may have competitor information on it, it's not illegal.

5    Because remember, as the jury instruction tells you, the mere

6    exchange of information even regarding price or, to be more

7    accurate in this situation, the mere unsolicited receipt of

8    competitor information is not illegal.  And remember here what

9    Professor Snyder told you.  Not only would he not be surprised

10   to see competitors in this industry sharing information, but he

11   expected it to occur.

12          So at the end of the day, what we have here is that

13   Bill Lovette may have received a perfectly legal e-mail and

14   spreadsheet from his own employee to which he didn't even

15   respond.  There is absolutely nothing in this e-mail about any

16   agreement with a competitor, much less anything in the e-mail

17   that would prove to you beyond a reasonable doubt that Bill

18   Lovette joined a conspiracy to rig a bid or fix a price.

19          How can receiving a perfectly legal e-mail that you

20   don't even respond to show that Bill Lovette entered into a

21   conspiracy?  It simply doesn't.  Cross it off the list.  It

22   doesn't prove anything as to Bill Lovette.

23          Next, let's look at summary Exhibit 9.  Surprisingly,

24   the government didn't even put this on their key evidence slide

25   that they showed you yesterday, perhaps because they realized

1    it's evidence of nothing.  But because summary Exhibit 9, one

2    of their self-made summary charts, lists Bill on the chart, I

3    have to address it.

4          We see an e-mail to Bill Lovette at the top of the

5    chart from another Pilgrim's employee.  And then notice the

6    next thing we see is a communication not involving Bill Lovette

7    two months later.  Why are they putting Bill Lovette's name on

8    this chart?  Again, what the government conveniently kept off

9    the summary was the actual e-mail that Bill Lovette wrote to

10   the Pilgrim's employee that prompted this response.

11         Let's pull up Exhibit 920, please.

12         Here is the first thing they left off.  It's just a

13   Chick-fil-A employee sending out an announcement to suppliers

14   that Chick-fil-A had hired Mike Ledford.  Next, we see a

15   Pilgrim's employee just forward forwarding on this announcement

16   to Mr. Lovette saying, "FYI, if you haven't heard."  They left

17   that off their chart too.  The prosecution also left off Bill's

18   words.  Let's read Bill's words.  "Yes, I had.  What's your

19   view on this?"

20         Is the government really trying to suggest that Bill

21   Lovette asking another employee what his view is on something

22   is evidence of a conspiracy with a competitor?  Obviously,

23   there is nothing criminal at all about Mr. Lovette asking

24   another employee what's his view.  This is not evidence of

25   anything.  It's frankly ridiculous.  Cross it off the list.

1          The prosecution's reaching to try to find some facts,

2    any facts relating to Mr. Lovette becomes even more apparent in

3    their last two charts.

4          And if we could please pull up summary Exhibit 10.

5          What they put on this chart is simply, "Will review

6    with Bill in a.m."  Let's see the actual e-mail.  What we see

7    is Jayson Penn sending out an e-mail to another Pilgrim's

8    employee saying, "Will review with Bill in a.m."  Is it

9    reasonable for you to assume that Bill is Bill Lovette?

10   Absolutely.  But can you assume that Jayson Penn and Bill

11   Lovette met and discussed an agreement to rig bids and fix

12   prices?  Absolutely not.

13         Look, we are here on a criminal case.  My client is

14   charged with a federal crime where the prosecution has the

15   burden to prove beyond a reasonable doubt the highest standard

16   in the law that Bill agreed to rig a bid or fix a price.  That

17   standard, that burden of proof, does not allow these

18   prosecutors to guess, to get up here and fill in the blanks, to

19   ask you to speculate when you have in your hands this man's

20   life.

21         Now, we know Mr. Lovette never even received this

22   e-mail.  And the prosecution has presented no proof that Bill

23   Lovette ever discussed this e-mail with Jayson Penn and we see

24   no action whatsoever coming out of this as it relates to Bill.

25   But let's look at the actual content of the e-mail that was

1   sent to Jayson Penn.  In 1074, what we see is Jason McGuire

2   talking about again Pilgrim's own cost model, Pilgrim's own

3   margins, and what their own strategy was going to be going into

4   the negotiations.  So even if you play along with the

5   government's misleading game here, even if Jayson Penn did

6   review with Bill Lovette in the a.m., so what?  There is

7   nothing illegal about the content of this e-mail.  Information

8   sharing is not illegal.

9          The bottom line here is that there is nothing in this

10  e-mail that says there is an agreement with any competitor.

11  And there is certainly nothing about Jayson Penn maybe

12  discussing this e-mail with Bill Lovette that is evidence of

13  Bill Lovette participating in, knowing of or directing any

14  conspiracy to rig a bid or fix a price.  So cross it off the

15  list.  Once again, it's proof of nothing.

16         Finally, we get to the last summary chart that merely

17  mentions Bill Lovette's name.  Again, this entry doesn't show

18  Bill Lovette doing anything much less actively and

19  enthusiastically participating in a conspiracy.  It's a chart

20  dated 2017.  And what we see is that Jayson Penn sends a text

21  to another Pilgrim's employee, "Come to BL's office.  Let's

22  discuss KFC."  Again, is it reasonable to assume that BL is

23  Bill Lovette?  Absolutely.  But what the government wants you

24  to do, what they are asking you to do is they are asking you to

25  speculate, that even assuming Bill Lovette participated in a

4175

1    meeting in 2017 to discuss KFC, that there was something

2    improper or illegal that was said in that potential meeting.

3    They are asking you to fill in the blanks.

4         The text, look at it.  It's just an ordinary text like

5    a text we get every day.  Let's discuss a customer.  Let's go

6    to lunch.  But the prosecution wants to use this as evidence to

7    convict a man of a crime?  You must not allow them to bait you

8    into guessing, to speculating that there was something

9    nefarious going on when the evidence does not support their

10   theory.

11        The prosecution stood up here yesterday and made up

12   what was supposedly discussed in a meeting that they don't even

13   know happened.  The mentioning of Bill Lovette's name is not

14   evidence of anything.  This is frankly more than ridiculous.

15   This is misleading and it's wrong that the government -- what

16   they are asking you to do to this man.  Cross it off the list.

17   That's it.  That's all of the government's key evidence that

18   they have against Bill Lovette.

19        Now, there is one more e-mail that the government

20   didn't list as part of their key evidence, but I am going to

21   address it anyway because if I don't, they will try to present

22   it to you in their rebuttal case with no context in an entirely

23   misleading manner.

24        Let's pull up that government's exhibit, please.

25        Why don't you take a second to read that.  That phrase

1    in the e-mail "illegal spiel" sounds kind of bad, but instead

2    of the sound bite, let's look at the facts, and you will see

3    once again this is evidence of nothing.  You may be asking

4    yourself, why did you call the National Chicken Council

5    witness, Mike Brown, about a conference in 2013?  Why did you

6    do that?  The reason is that even though the burden of proof is

7    a hundred percent here and it never moves, we called him so

8    that we could show you the truth about this e-mail because we

9    feared the government would focus again on a sound bite, not

10   the facts.

11        In 2013 as you heard, Bill Lovette was the chairman of

12   the NCC, and as chairman, his duties included giving some

13   prepared remarks to the conference.  You will recall that the

14   speech that Bill Lovette gave at the conference, he didn't even

15   write it.  The NCC wrote the speech.  Mr. Brown and the general

16   counsel for the NCC approved the speech and they e-mailed it to

17   Mr. Lovette.  Mr. Lovette simply delivered the speech that was

18   written to him to an audience of hundreds, not only chicken

19   suppliers, but customers like KFC, Popeye's, Church's.  Members

20   of the media were there and so were the NCC lawyers.

21        Obviously, NCC would not have written an illegal spiel

22   speech with illegal content, and obviously Bill Lovette did not

23   deliver such a speech.  As Mike Brown testified under oath,

24   there was nothing illegal about what Bill Lovette said.  So we

25   know this illegal spiel was a joke by Mr. Penn, yet still the

1   prosecution introduces in evidence into this criminal trial

2   against this man this e-mail and they ask you to consider it

3   and to rely on it.  That's worse than misleading.  That is

4   false.

5        And if you think about what the prosecutors are trying

6   to do, if you're questioning their tactics, if you're

7   questioning their presenting of a sound bite rather than actual

8   evidence, if you're questioning their case, if you're

9   questioning whether they are presenting the truth, that is

10  reasonable doubt.  And any reasonable doubt that you have means

11  that you must find Bill Lovette not guilty.

12        As we predicted from the very beginning of this case,

13  the government's case against Bill Lovette seems to hinge on

14  the fact that Bill Lovette was the head of Pilgrim's, that he

15  was a supervisor as they said.  Being a CEO, being a

16  supervisor, is not evidence of anything.  Bill Lovette is to be

17  judged in this courtroom not by what the prosecutors speculate

18  may have happened, but on facts of his own individual actions.

19  The reality is on that chart every single instance where you

20  see Bill Lovette's name is actually an example of him doing his

21  job, not evidence that he is participating in a conspiracy.

22        If you want to know what it meant for Bill Lovette to

23  be a supervisor, look at the evidence in this case to know

24  everything he supervised.  He oversaw issues and personnel from

25  finances, breeder supplies, the bird flu in China, logistics,

1   quality assurance and recalls, human resources, that's what

2   Bill Lovette supervised.  Do not let the government confuse you

3   that the authority that every CEO has somehow implies something

4   improper or that this title, this title of CEO makes him

5   criminally responsible for something he did not do.

6          Despite the government's efforts to try to twist and

7   turn legal business activities, there is absolutely nothing the

8   prosecution has shown you that moves the needle from

9   straight-laced CEO to criminal.  Think about what you heard

10   from Mike Brown.  He described Bill Lovette as a

11   straight-laced, well-respected leader held in the highest of

12   esteem by those who work in the chicken business.  That's Bill

13   Lovette the person.

14          If Bill Lovette was the kingpin as the prosecution

15   implies running a crew at Pilgrim's, where is that evidence?

16   Where are his instructions?  Where are the actions he took to

17   further this alleged goal?  Where is the witness?  Where is the

18   document in 14 million documents?  There isn't a single one.

19   The reason the government has not presented proof beyond a

20   reasonable doubt against Bill Lovette is because it doesn't

21   exist.

22          I have to sit down now and I don't get another chance

23   to get up, and you may be relieved about that, but I really

24   don't want to and I hope you can understand why.  This isn't

25   just a long federal antitrust case that involves 10 defendants.

1    One of those individuals, those individual men is Bill Lovette,

2    Bill Lovette who was lumped into this criminal case not based

3    on evidence that he engaged in a conspiracy to fix a bid or rig

4    the price of chicken, but because they want a trophy.  They

5    want the CEO.  But in this setting, in this federal courthouse,

6    in this courtroom you don't have to do what they ask you to do.

7    Instead, it's your obligation and your duty to follow the law

8    that Judge Brimmer has given you.

9         There is no evidence that the prosecution has

10   presented in this trial that would allow you to be firmly

11   convinced beyond any reasonable doubt that Mr. Lovette knew of

12   the existence of a conspiracy, directed any conspiracy or

13   intentionally entered into any conspiracy.

14        When you go back there to deliberate, put an end to

15   this.  Tell these prosecutors no.  In this country and in this

16   state, we don't convict people based on make-believe charts,

17   misleading evidence, catch phrases and rhetoric.  What we are

18   focused on is the truth and the truth is Bill Lovette is not

19   guilty.

20        Thank you.

21        THE COURT:  Thank you, Ms. Nielsen.

22        Ladies and gentlemen, why don't we take a stretch

23   break right now and then we will have our next closing.

24        All right.  Mr. Tubach, go ahead.

25        MR. TUBACH:  Thank you, Your Honor.

1        **CLOSING ARGUMENT**

2            *MR. TUBACH:*  Thank you, Your Honor.

3            Two phone calls, a handful of documents and no

4   witnesses, that's what I told you at the beginning of this case

5   would be the evidence that the government introduces about

6   Jayson Penn.  And that's exactly what's happened.  That is the

7   entirety of the government's case against Jayson Penn after

8   four weeks of trial.  Because the government's case against

9   Mr. Penn is so weak, the government took a strategy of taking

10  documents out of context, showing you cherry-picked sound bites

11  and not giving you the whole story.  Why?  Because there is an

12  obvious and enormous hole in the government's case against

13  Jayson Penn.

14          Where are the witnesses?  This is supposed to be a

15  price-fixing case, so where are the witnesses who got on that

16  stand and told you that Jayson Penn fixed prices with anyone?

17  The government didn't call any because there aren't any.

18  Instead, the government just dumped hundreds of exhibits into

19  evidence and asked you to guess what they mean.  How do we end

20  up in this position, a price-fixing case against Jayson Penn

21  where there are no witnesses saying that he fixed prices?

22          It is a disturbing tale of abuse of power.  It is the

23  power of the government, these men and women sitting at this

24  table, to destroy a man's life and reputation in a single

25  moment just by filing charges against him.  You see, when

1    Jayson Penn was charged in this case, he had just become the

2    CEO of Pilgrim's Pride.  He had worked incredibly hard for his

3    entire life, for decades in the chicken industry and he had

4    finally made it to the very top, and that made him an inviting

5    target for these prosecutors.  So in a single stroke with no

6    warning, these people sitting here took away the life that he

7    had built for three decades.

8         And here is the worst part of it all.  When they filed

9    those charges against Mr. Penn, they hadn't even done the basic

10   investigative work required to know whether he had actually

11   done anything wrong.  The government had not interviewed anyone

12   at Pilgrim's Pride where Jayson Penn worked for the entire time

13   they say there was a price-fixing conspiracy going on.  They

14   hadn't interviewed anyone who is on all those many documents,

15   any of them that related to Jayson Penn.

16        And I will tell you right now, if the government does

17   a thorough investigation and they conclude that a CEO has

18   committed a crime, then they should file those charges, no

19   special treatment, no favors; but the reverse is also true.

20   The government should not file serious charges against anyone,

21   including a CEO, until they have done that investigation.  But

22   that's what these people did.  The way the government proceeded

23   here is abuse of power at its worst, and that's why Jayson Penn

24   stands accused of price-fixing when there is not one person on

25   this earth who says that he did it.

1          I am now going to go through the evidence the

2     government introduced that relates to Jayson Penn, and I am

3     going to show you that in no way it adds up to proof beyond a

4     reasonable doubt that Jayson fixed prices or rigged bids, not

5     even close, because the truth is Jayson Penn never fixed prices

6     with anyone.  He is not guilty.

7          Now, before I get into the evidence, I want to remind

8     you of an important legal principle the Court gave you

9     yesterday.  Of course, you should follow all the Court's

10    instructions, but I want to highlight one of them here.  The

11    government has charged Mr. Penn with agreeing with his

12    competitors to fix prices and rig bids, but let's be absolutely

13    clear about one thing.  It is 100 percent legal to get and use

14    competitor information in making your own pricing decision.

15    Here is the instruction the Court gave you.

16         It is not illegal for a competitor to obtain, rely

17    upon, and act on pricing and other information received from

18    competitors so long as there is no agreement to fix prices or

19    to rig bids.  Why is it so important?  Because the government

20    spent most of its case introducing evidence that suppliers

21    sometimes shared information and used that information to help

22    make their own decisions.  In the instructions the Court gave

23    you, that is 100 percent legal.

24         Now, some of the customers testified they didn't want

25    competitors talking to each other.  Of course, they didn't.

1    They wanted all the bargaining power for themselves.  As

2    Professor Snyder told you, that's what everybody wants in a

3    negotiation, to have all the bargaining power.  Essentially

4    what the customers wanted was to play a game of poker where

5    they get to look at everybody's cards.  It's a nice way to set

6    up a game if you can do it, but it's not the law.  Under the

7    instructions the Court gave you, what the customers wanted is

8    irrelevant.  We are in a court of law and you have to apply

9    this instruction that the Court gave you.

10         This instruction is particularly important as you

11   evaluate the evidence related to Jayson Penn because the case

12   against him is entirely circumstantial.  They have no direct

13   evidence, none, that he entered into any agreement to fix

14   prices or rig bids.  There are no witnesses who say so and

15   there are no documents that describe any conspiracy or any

16   agreement at all.  Instead, DOJ wants you to speculate that

17   Jayson must have agreed with his competitors to fix prices

18   simply because he received competitor pricing information on a

19   handful of occasions, but this instruction specifically tells

20   you that Jayson was entitled to obtain, rely on and act on that

21   information in doing his job.  That's not price-fixing.  That's

22   not bid-rigging.  It's legal conduct.

23         Let's get into the evidence itself.  The government

24   has alleged an eight-year conspiracy to fix prices and rig bids

25   for broiler chicken products.  And to try to prove this

1    conspiracy, the government introduced evidence relating to all

2    sorts of random topics.  They talked about freezer charges.

3    They talked about credit terms.  They talked about

4    antibiotic-free chicken.  In its opening statement, the

5    government described this as an exclusive club and tried to

6    make it sound like it was some kind of American Express

7    Platinum card type thing.

8            But in reality, these allegations look more like a

9    yard sale.  They are just throwing out a lot of allegations on

10   the front yard and they are hoping that you'll buy something.

11   But it's not your job to sift through the evidence to see if

12   there is a crime in there somewhere.  It's the government's job

13   to prove its case to you beyond a reasonable doubt, and as to

14   Jayson Penn they have failed.

15           What I am going to do this morning is go through the

16   evidence that relates to Jayson so you can see for yourselves

17   that the government has failed.  I am not going to talk about

18   these summary charts.  The summary charts don't mention Jayson

19   Penn very much at all, and to the extent there is any evidence

20   on those summary charts that mentions Jayson, I am going to go

21   through it.

22           But what you will find if you look at the key evidence

23   that the government put on its chart relating to Jayson Penn,

24   there are exhibits in there that aren't even in evidence, and

25   there are many exhibits that don't mention his name at all

 1    where he is just not even mentioned.  You will have to guess

 2    about why it is the government put that evidence on there.

 3              Let's talk about the witnesses.  What I am going to do

 4    is I am going to go through each of the allegations that the

 5    government has made, and we are going to talk about the

 6    evidence relating to each one.  But I want to start with the

 7    witnesses.  There are literally tens of thousands of employees

 8    who work at these chicken suppliers.  Out of all those many

 9    employees, the government chose to call Carl Pepper and Robbie

10    Bryant.  These are the two witnesses the government claimed

11    were conspiracy insiders and they were the only such witnesses

12    the government called.

13              Let's talk first about Carl Pepper.  He doesn't even

14    know Jayson Penn.  Here was his testimony under oath:

15              You don't know Jayson Penn at all, do you?

16              No, sir.

17              You have never met him?

18              Not that I know of.

19              You have never spoken to him?

20              I am almost sure of that.

21              And you have never communicated with him in any way as

22    far as you know.  No.

23              Sir.

24              That's Carl Pepper.

25              Then there is Mr. Bryant, the admitted liar.  It is

1    frankly shocking that DOJ would call a witness like that to

2    support its case.  But rather than thinking about whether they

3    should be relying on Mr. Bryant at all, these lawyers practiced

4    with Mr. Bryant how to downplay his dishonesty in his testimony

5    to you.  That's disgusting.

6            You've heard a lot about Mr. Bryant.  You're going to

7    hear a lot more.  But as it relates to Jayson Penn, there is

8    only one thing you need to know.  Although he worked the entire

9    time at Pilgrim's when Mr. Penn was there and this supposed

10   conspiracy is going on, here is what he had to say:

11           You have no personal knowledge of Jayson Penn agreeing

12   with any competitors to fix prices; is that correct?

13           Correct.

14           You have no personal knowledge of Jayson Penn agreeing

15   with any competitor to rig bits; is that correct?

16           Correct.

17           You have no personal knowledge of Jayson Penn telling

18   anyone to fix prices or rig bids?

19           That's correct.

20           And you have no personal knowledge of Jayson Penn

21   knowing of anyone rigging bids or fixing prices.

22           That's correct.

23           Those are the two conspiracy insiders.  That's the

24   government's -- essentially their entire witness case.  Now,

25   the government called other witnesses and here is what they had

1    to say about Jayson Penn.  Flo Becker, remember Flo Becker

2    testifying from Gainesville, Georgia, testified she does not

3    know Jayson Penn.  Joseph Brink does not know Jayson Penn.

4    Sara Fisher, the RSCS buyer, does not know Jayson Penn.  Bob

5    Lewis, the man who came out of retirement to work for RSCS for

6    a while, he said he met Jayson two or three times sometime

7    before he retired in 2009 which is before Jayson even joined

8    Pilgrim's.  And finally, Pete Suerken, he said he met Jayson

9    Penn one time during a meeting.  This, along with what I just

10    told you about Carl Pepper and Robbie Bryant, is the sum total

11    of all of the witness testimony that relates to Jayson Penn.

12         Now, according to Agent Taylor, the government has

13    been investigating this case since 2017.  In other words, the

14    government has had five years to find someone, anyone who would

15    say that Jayson Penn was fixing prices.  The fact that they

16    couldn't find any such witness in all of those years alone

17    tells you the government's failed to prove this case beyond a

18    reasonable doubt.

19         So we can cross the witnesses off the list because

20    they say nothing about Jayson Penn.  That's it for the

21    witnesses.  What's left?  A handful of documents and a couple

22    of phone calls.  That's the government's case against Jayson,

23    and I am going to go through that evidence now.

24         Let me talk first about the contract negotiations that

25    relate to -- in 2012 for the 2013 contract pricing.  The

1    government alleges that Jayson was part of an effort to fix

2    prices during these negotiations.  These allegations make no

3    sense whatsoever.  The negotiation followed the normal usual

4    pattern for KFC involving multiple rounds of bidding and in

5    each round Pilgrim's dropped its bid.  This happened because

6    Mike Ledford, a seasoned negotiator, drove the chicken

7    suppliers to exactly the prices he wanted.  And he was quite

8    pleased at the end of the negotiations.  Here is how he

9    described it.

10            We had anticipated there may be a need to have

11   follow-up calls with a couple of suppliers, Tyson and

12   Pilgrim's.  However, they had come back generally in line with

13   where we asked them to get on their best and final numbers.

14            So what is DOJ complaining about and what does this

15   have to do with Jayson Penn?  In the last round of negotiations

16   when Mr. Austin and others were trying to convince Mr. Penn to

17   lower the price yet again, they included some pricing

18   information from other suppliers.  And here it is.  It's

19   called -- the spreadsheet was titled, as Ms. Nielsen said,

20   price reduction impact, and the spreadsheet calculated what the

21   revenue loss would be to Pilgrim's if they lowered the price in

22   the way that Mr. Austin was recommending.  And as part of that,

23   they included information about some bids for other suppliers.

24            It was perfectly lawful for Mr. Penn to obtain, to

25   rely on and act on that information.  That's the law, and

1    that's exactly what Mr. Penn did in these negotiations.  So

2    when he got this spreadsheet, he noticed that Tyson wasn't on

3    it.  So he asked Mr. Austin, Do we have Tyson price idea?  Now,

4    the government showed you this, but they didn't show you the

5    response.

6         Look at this e-mail.  This e-mail is not asking

7    Mr. Austin to call up Tyson and make an agreement with them.

8    He asking if he has any information about Tyson, and that's

9    exactly how Mr. Austin understood it because he responded, I

10   can give you an educated guess.  They are currently a quarter

11   of a cent below George's, so I would guess they are around 96

12   flat.  We know that number didn't come from Tyson because then

13   it wouldn't be a guess.  And Mr. Austin's guess was also wrong

14   because we can now look at the bid data and, in fact, Tyson was

15   quite a bit higher.

16        The government showed you Mr. Penn's initial e-mail,

17   but they didn't show you the response because they wanted you

18   to think this was part of some price-fixing agreement, but

19   there is no evidence of that.  So what did Mr. Penn do when he

20   got this information and was being asked to reduce the price

21   further?  He went along with the recommendation to reduce the

22   price.

23        Here is a very simple chart.  These are the bids that

24   Pilgrim's submitted in this round of negotiations.  The first

25   bid and the second bid, and between the second and third bid is

4190

1    when he is sent this spreadsheet.  And he goes along with the

2    recommendation and, in fact, Pilgrim's reduces the price

3    further.  So that's it.  In the third round of bidding,

4    Mr. Penn received some market intelligence suggesting that

5    Pilgrim's price was the highest which was sent to him to

6    convince him to reduce the price and, in fact, he did.  That's

7    not price-fixing.  That's competition.

8         And here's the kicker.  Months after these

9    negotiations were done and the contracts were signed and

10   dusted, Roger Austin sent Jayson information about where one of

11   the other suppliers ended up.  He said, FYI, Case is 90 cents,

12   lower than us on eight-piece and 32 back on dark meat.  And

13   Jayson responded, Figured they would need to be lower to gain

14   access.  Because they had just joined the small bird business,

15   of course they priced lower.  What about the rest of the

16   players?  And then Mr. Austin goes on and gives the information

17   that he has.

18        But this shows that there was no conspiracy.  If there

19   was a conspiracy, they wouldn't be needing to go find out after

20   the fact what happened.  There is literally zero evidence that

21   Jayson Penn fixed prices with anyone in this negotiation, zero.

22   This is what happens when you indict a case without conducting

23   even a rudimentary investigation.  That's the 2013.

24        Let's talk about 2015 supply.  The government focused

25   much of its case on these negotiations, but it turns out it's

1    just more of the same, information sharing followed by

2    companies making their own decisions.  In the government's

3    opening statement, they conceded that prices were going to go

4    up in 2015.  Everybody says that.  There complaint seems to be

5    that the prices went up too much, but it was indisputably

6    market forces that drove up those prices, not any agreement

7    among competitors.  It was the basic law of supply and demand.

8          In the summer of 2014, the market for small-bird

9    chicken was red hot.  And I am just going to remind you of a

10   couple of those.  There is a historic shortage, a very limited

11   supply of small birds.  There is increasing demand.  There is

12   the Mother's Day fiasco when KFC ran out of chicken.  And there

13   was panic buying by KFC at wildly high prices.  And then Rich

14   Eddington told you -- Rich Eddington who was the buyer at RSCS,

15   the customer -- told you that the profit gap between big bird

16   and small bird was 34 cents a pound.

17         There is no evidence, none, that any of what I have

18   just shown you is the result of an agreement of any kind

19   between suppliers.  It was just the reality in the marketplace.

20   And KFC knew these negotiations -- KFC new these dynamics just

21   like everybody else because in July, a month before the

22   negotiation started, they sent an e-mail out to their -- they

23   sent an e-mail out to all of their suppliers asking them to

24   address a series of topics in advance.  I just want to focus on

25   two.

1          The first was update your margin-over-feed model to

2     reflect current cost.  Mr. Lewis told you they had beaten down

3     the supplier so badly on price that the cost wasn't even

4     accurately reflected in their model, so they wanted them to

5     update it.  The other part is profit margin needed and how that

6     compares to big-bird profitability.

7          I want to pause on this because it's a huge signal

8     from RSCS.  RSCS was telling its suppliers it recognized that

9     as the profit margin for small birds didn't go up, they were in

10    deep trouble.  And RSCS left no doubt about what benchmark it

11    wanted the suppliers to use in deciding what profit margin they

12    needed, big-bird profits.

13         So in early August of 2014, RSCS asked the suppliers

14    to submit their bids that Pilgrim's, the financial

15    professionals, put together a draft bid and they sent it to

16    Jayson Penn.  The draft bid updated the cost as RSCS had asked

17    them to do.  Some went up; some went down.  It was an increase

18    of 6 cents per pound all in, and the proposed margin increase,

19    10 cents per pound.

20         Mr. Penn for his part reviewed the draft bid, looked

21    at the supporting data, spoke with those who prepared the bid,

22    asked them a lot of questions, made them redo their bids, and

23    sent the proposed bid to his boss, Bill Lovette, for approval.

24    Mr. Lovette approved the recommendation to increase the margin

25    by 10 cents, and that was an independent decision based on what

1    was in Pilgrim's best interest based on the objective data.

2    That's the bid Pilgrim's submitted and you can see it here.

3    It's all the cost items and there is that supplier margin, and

4    the difference is 10 cents per pound.

5           Why 10 cents?  Pilgrim's' whole strategy was to start

6    getting small birds up to the profitability of big birds.  As

7    Rich Eddington told you, that difference was 34 cents per

8    pound, but Pilgrim's was only requesting a 10-cent-per-pound

9    margin increase.

10          There is another reason.  In prior meetings with RSCS,

11   Pilgrim's employees had already told RSCS to expect a 10-cent

12   margin increase.  Here is how Jason McGuire put it in

13   recommending the 10-cent increase to Jayson Penn:  I believe we

14   should do the 10-cent per pound because we have been prepping

15   them for that for the last few meetings.

16          What this evidence shows is Pilgrim's was calculating

17   its own price using its own numbers based on its own view of

18   the market and what price it needed to charge.  Did Pilgrim's

19   look at what other companies were doing to help them make their

20   own decision?  Absolutely, they did.  It's not just legal.

21   It's smart business and it's common sense, and it's backed up

22   by economics.  As Professor Snyder told you, there is a whole

23   body of literature devoted to this idea and it's called

24   relational contracting.

25          And after analyzing the industry, Professor Snyder

1  concluded, and he has spent decades in this profession

2  including five years at the Department of Justice, concluded

3  that this is precisely the kind of industry where he would

4  expect to see information snaring.

5       So where did the suppliers all end up?  Does the

6  objective economic data support DOJ's claim of price-fixing?

7  It does not.  As Professor Snyder explained, he analyzed the

8  data and it told him the initial bids were different.  The

9  final prices were different.  They had gotten more different

10  than they had been the year before, and suppliers took volume

11  away from each other.

12       I want to focus on volume here because, as Mr. Bryant

13  testified, the supposed conspiracy insider, the key feature of

14  this was that suppliers wouldn't take volume away from each

15  other.  Let's take a look at that.  This is the result of the

16  negotiations in 2015.  It's the change in volume between the

17  2014 contract and the 2015 contract.  And you can see here that

18  Pilgrim's lost a huge amount of business, more than $500,000 of

19  chicken every single week to KFC.  Who in their right mind

20  would enter into a price-fixing conspiracy where you are going

21  to be the guy in the red bar?  Is this some kind of pinata

22  conspiracy where the other conspirators just beat up on you and

23  take your volume away from you?  These undisputed facts show

24  there was no agreement on pricing to KFC.

25       So what evidence does the government have to suggest

1  that Mr. Penn fixed prices and rig bids on this occasion?  The

2  government points to one e-mail and two phone calls.  Let's

3  look at the e-mail.  It's the "Roger did some checking around,"

4  and he had some ranges of what other suppliers might be going

5  in with.  Now, these are all expressed in exactly 2-cent ranges

6  which suggests that whoever gave him the information didn't

7  want him to have the exact information.  Maybe that was the

8  customer.  But honestly, it doesn't matter where it came from.

9  And we now know that some of the information was inaccurate.

10      The government also points to a spreadsheet that came

11  attached to this, but it's really more of the same information.

12  It's market intelligence.  Remember, this was just one of many,

13  many spreadsheets that people inside Pilgrim's put together,

14  and you can see that.  We have introduced them all into

15  evidence and you can see them.  You can see for yourself how

16  much work they did to try to come up with this bid.

17      And so what they did, Pilgrim's did what any good

18  company does.  They gathered information from wherever they

19  could get it to help them make their own decision, and the law

20  says Mr. Penn was absolutely entitled to rely on and act on

21  that information.  Now, DOJ pointed out that Mr. McGuire said

22  he wanted to be the leader on price.  That's not a crime.

23  That's a strategy.  Brenda Ray told you that it had been

24  Pilgrim's strategy since Bill Lovette and Jayson Penn joined

25  the company.  He insisted that Pilgrim's have the courage to

1    price its products for what they're worth and not just let the

2    prices get blown around by the customers' desires.

3           Remember, she said that some Pilgrim's employees had

4    been through bankruptcies and didn't have any confidence in

5    their product.  Mr. Lovette and Mr. Penn gave them that

6    confidence to be leaders in the industry.  That's what

7    Mr. McGuire meant by describing Pilgrim's as a price leader.

8    So that's the one e-mail the government points to.  Let's look

9    at the two calls.

10           First, the government points to a phone call that

11    Mr. Penn had with Brian Roberts at Tyson.  They want you to

12    speculate that that was somehow related to these bids.  There

13    is zero evidence of that.  First, the government put in three

14    different calls in their charts.  Maybe they are trying to show

15    you that there was a lot of phone calls going on.  One of them

16    is zero seconds and one of them is 38 seconds, and then they

17    finally connect and speak for 15 minutes.  Why is the

18    government putting zero-second calls on its summary charts?

19           Here is something else the government didn't tell you.

20    August 15, 2014 was the first time that Jayson Penn and Brian

21    Roberts had ever spoken on the phone before.  They have all the

22    phone records, they have all the data, and they know this is

23    true.  Do you really think that Jayson Penn and Brian Roberts

24    would be agreeing to fix prices the very first time they are

25    speaking on the phone?  Common sense tells you that's not what

1  happened.

2          So what did Mr. Penn and Mr. Roberts talk about?  The

3  government has no idea and they want you to speculate, but

4  there is one thing we can be pretty sure they did not talk

5  about and that's the KFC bid.  How do we know that?  Well,

6  let's look back at that spreadsheet that got circulated three

7  days after the phone call with Brian Roberts.  Remember, Brian

8  Roberts worked at Tyson.  What company is not on that list?

9  Tyson.  You can be sure that if Mr. Penn had learned any

10  information about this KFC bid, it would have ended up on the

11  list.  So there is literally not a shred of evidence, pure

12  speculation, that that phone call had anything to do with the

13  KFC bids.  That's the first call.

14          Let's look at the second call.  It relates to someone

15  named Pete Martin.  The government points to some handwritten

16  notes perhaps written by Pete Martin at Mar-Jac.  The

17  government called his former secretary, Flo Becker, who told

18  you she thought it might be his handwriting.  But why didn't

19  the government just call Pete Martin?  He could have told you

20  it was his handwriting and he could have told you what the

21  notes meant.  Apparently, the government doesn't want that

22  explanation because it doesn't fit their theory.  Instead, they

23  just called his secretary and threw the notes into evidence and

24  they want you to speculate about what they mean.  You shouldn't

25  do that.

1          Let's look at these notes.  What can we really tell

2    about them?  Well, not much.  What we can tell is it's got a

3    date on top, August 29, 2014, and there is a guy named Mark

4    McEwen.  Flo Becker testified he was a broker.  The other name

5    is Steve Campisano.  We know he worked at RSCS.  So it looks

6    like this information came from those two.  The government

7    points out at the bottom it says, Talked to Jayson Penn, and

8    there is a record of a phone call between someone at Mar-Jac

9    and Mr. Penn's cellphone number, but that doesn't tell us

10   anything about who called Mr. Penn or what was discussed.

11         The notes themselves immediately below Jayson Penn

12   say, $433 are better to get out.  And we know because the Court

13   took judicial of this that the soybean meal futures contract on

14   August 28th, 2014 was $433.20.  And we also know that RSCS had

15   sent an e-mail the day before requesting that suppliers buy

16   soybean meal futures at that price on August 28.

17         Now, the government points out that next to Mr. Penn's

18   name it says plus 8 cost, plus 11 margin.  But we know that

19   doesn't relate to Mr. Penn or Pilgrim's because Pilgrim's bid

20   was never plus 8 cost or plus 11 margin.  It was plus 6 cost

21   and plus 10 margin.  So those numbers must have been referring

22   to something else.

23         Whatever those notes mean, they are a total red

24   herring because by August 29th, Pilgrim's had already submitted

25   its bid 10 days earlier, and they had already told RSCS three

1    days before this that they weren't going to move.  That's it on

2    the 2015 contract.  That's what the government spent its entire

3    time in this case talking about.

4         Now, I want to go on and talk about the 2018 contract.

5    The government -- this one is just baffling, I have to tell you

6    honestly.  The government introduced a single text trying to

7    show that Jayson Penn was involved in fixing prices for the

8    2018 contract.  The government listed a number of other

9    exhibits on their key evidence chart, none of whom relate to

10   Jayson Penn.  He is not on any of them.  Here is the one text:

11   Come to BL office.  Let's discuss KFC.  There is no evidence of

12   what this meeting was about, what was discussed or who was

13   there.  And there is absolutely nothing suspicious about

14   Mr. Penn, Mr. Lovette and Mr. Stiller, who is the recipient to

15   the text, talking about KFC.  They all work for Pilgrim's and

16   KFC was a big customer.

17        This is the worst form of speculation imaginable.  It

18   has no place in a court of law.  If the government had any

19   actual evidence that Mr. Penn was involved in price-fixing

20   related to this bid, they would have shown it to you, not that

21   text.

22        All right.  Let's go on and talk about Golden Corral.

23   The government suggested that Mr. Penn was involved in somehow

24   fixing prices to Golden Corral in 2015, but there is no

25   evidence of that whatsoever.  In fact, the government didn't

1    even introduce the bids or the contracts or any communications

2    with competitors relating to Golden Corral in 2015.  The only

3    reason the government brought up Golden Corral was so they

4    could show you a couple of texts Mr. Penn wrote to try to make

5    him look bad.  On these text face these texts have nothing to

6    do with price-fixing.  They just showed them to you for cheap

7    sound bites.

8         Here is the first one, and this is a text you have

9    seen before.  And it's a text between Mr. Stiller and Mr. Penn

10   and they are going back and forth, and Mr. Stiller references

11   Scott and Roger at Pilgrim's and he also references Mar-Jac.

12   And he says, They are listening to my direction.  So Jayson

13   Penn says, Wait, who is listening to your direction?  Because

14   if Mr. Stiller meant Mar-Jac, that would have been different

15   than anything else we have heard anywhere in this case, you

16   know, that Mr. Stiller is directing another competitor what to

17   do.  And then he says, If they is illegal, don't tell me.

18        In the middle of this confusion, that's what he

19   writes; but it turns out that wasn't what Mr. Stiller was

20   talking about at all.  He meant that Scott and Roger were

21   listening to his direction.  That's what he says, was referring

22   to Roger listening.  Roger works at Pilgrim's.  He is one of

23   Mr. Stiller's employees.  And then it goes on to give other

24   information that he has heard in the market and there is

25   Mr. Penn referring to his supposed conspirator as a moron.

1          Now, there is some market intelligence in here about

2     Mar-Jac, but it's just death wrong.  Mr. Stiller says Mar-Jac

3     is 2 cents higher and they are not going to negotiate?  Well,

4     it turns out they are actually 2 cents lower than Pilgrim's and

5     they did negotiate.  So this is just more market intelligence

6     that's worth exactly what you pay for it, not much.

7          Now, the second text is equally meaningless.  This is

8     the text about Golden Corral.  The only reason the government

9     wanted to show you this is so they can show you that Mr. Penn

10     called one of his customers an A-hole.  There is no other

11     reason for that.  And there is a good reason why Mr. Penn, not

12     the language he would choose in a court of law, but he

13     explained exactly why there was no trust between Golden Corral.

14     Here it is right here.  In this very text exchange, he sends a

15     little chart showing various customers and showing trust.  And

16     look at that, the only one on the list where there is no trust,

17     Golden Corral.

18          All this tells you is that Pilgrim's didn't trust

19     Golden Corral and that was that.  The A-hole premium was just a

20     sarcastic way of referring to that lack of trust.  There is

21     nothing remotely relating to price-fixing on here.

22          Okay.  Now to address all the bids and negotiations

23     that the government talked about that relate to Jayson Penn in

24     any way.  I now want to talk about some stray e-mails that the

25     government introduced that don't really relate to anything in

4202

1    particular, but they threw them out there, so I want to address

2    them now.

3            The first is the e-mail from Brenda Ray.  And she

4    wrote, I received a call today from a friendly competitor

5    telling me it's all over the market that Pilgrim's is taking

6    contract pricing up.  They thanked us for taking the lead and

7    told me that contrary to what we might hear regarding their

8    company, they are following as are others.  Courage.  Keep it

9    up guys.

10           And we called Brenda Ray as a witness, and she told

11   you that she got a call from Greg Nelson at George's about the

12   fact that Pilgrim's had already taken up pricing to the halal

13   market in the northeast.  She told you Jayson Penn had nothing

14   to do with that decision and that she had already taken up the

15   contract pricing before she ever got that call.  She also

16   testified unequivocally it had nothing to do with price-fixing

17   or bid-rigging, nothing.  She had just gotten some market

18   intelligence and passed it on.

19           Now, Mr. Penn forwarded that e-mail, and this is the

20   part the government loves, he forwarded this on and said, FYI,

21   not exactly a legal conversation.  But as we now know, Mr. Penn

22   was just wrong.  There was nothing illegal at all about that

23   call.  You know more about that call than he did.  He just

24   forwarded the e-mail on.

25           You know what is the worst part about this?  The

1    government knows this.  They interviewed Ms. Ray.  They showed

2    her the e-mail.  She explained what it was about and they

3    decided not to call her as a witness.  They were perfectly

4    content to just throw that e-mail up and have you think, oh, it

5    must have been illegal because that's what it says there.  We

6    had to bring Ms. Ray into court to tell you what it was about.

7    This is the government trying to deceive you.  It's shameful.

8          The next stray e-mail is an e-mail in which Mr. Penn

9    says a few owners of small bird companies thanked us via me for

10   getting our act together, and that, I guess, is supposed to be

11   part of some conspiracy.  This has got nothing to do with any

12   conspiracy.  It doesn't have to do with price-fixing.  It

13   doesn't even have to do with a price.  This is a meeting that

14   Mr. Penn had with a customer called H-E-B in which he was

15   trying to convince the customer to go to a bigger bird.  And

16   you can see on the chart there, there is a shift in the weights

17   from the left to the right.  That would be better for Pilgrim's

18   and it would also be better for the customers -- I am sorry,

19   for the other suppliers.  That was the context in which he is

20   talking about this.  It has got absolutely nothing to do with

21   price-fixing.  That's just suppliers commenting on Pilgrim's

22   turn-around story which you have heard about already.

23         Finally, and this is one that Ms. Nielsen also

24   addressed, the government put up this illegal -- you know,

25   apparently your boy was not listening to your illegal spiel on

1   forward pricing.  This is just another example of the

2   government trying to throw up an e-mail and not give you any

3   context at all.  The government literally told you nothing

4   about this e-mail.  It's embarrassing.

5        They know the NCC stands for the National Chicken

6   Council.  It's located just down the street in Washington where

7   the FBI and the DOJ are located.  How hard would it have been

8   to send Agent Taylor a few blocks down the road and ask the

9   NCC, hey, what was going on there in July of 2013?  They didn't

10   even bother.  They just put this up there and wanted you to

11   guess that this has something to do with price-fixing.  It

12   doesn't.

13        So we brought Mike Brown in and he told you there is

14   nothing illegal going on whatsoever.  This was just Jayson

15   ribbing his boss for having to go to a chicken marketing

16   seminar and give a public speech to a hundred, 200 people.  And

17   you can see there, there is no price-fixing because the Tyson

18   price he mentioned at the bottom is about 20 cents lower than

19   Pilgrim's price.  This e-mail is a zero and it just shows how

20   desperate the government is to seek a conviction.

21        I want to talk about refusing to cover Tyson shorts.

22   The government hasn't talked a lot about this, but they have

23   put it into evidence and this is one of the key pieces of

24   evidence they want you to rely on.  This is without a doubt one

25   of the strangest parts of this case because the government is

1    trying to turn something into the opposite of what it actually

2    is.

3           Here is what happened.  In 2014, Tyson took a lot of

4    business away from Pilgrim's including Wal-Mart.  Nothing wrong

5    with that.  That's just competition.  The problem was Tyson had

6    sold more chicken than it could produce.  So what do they do?

7    They made sure they made -- got the chicken to their new good

8    customer, Wal-Mart, and then they started asking Pilgrim's to

9    backfill and cover their shortages.  Mr. Penn refused.  We

10   don't have to guess why he refused because we have it in

11   writing.

12          Mr. Penn explained, he explained using an analogy.

13   Remember, we heard some testimony about this.  He called Tyson

14   Otis after Otis Campbell, the town drunk on the Andy Griffith

15   show.  And he says, For Thanksgiving should we give Otis a

16   bottle of Crown a/k/a loads of chicken or take him to AA, a/k/a

17   make him face the music, the shortage music?  We are straight

18   up taking Otis to AA.  No juice for Otis.  Otis must face the

19   music for his misguided actions.  Selling cheap in a short

20   market - no bailout for you.  And the reason why they didn't

21   want to bail out Tyson has nothing to do with price-fixing.

22   It's because they wanted to take the business away from Tyson,

23   and that's exactly what Mr. Penn said.

24          The goal is to add this Denver distribution center to

25   our business.  How?  We will prove that we are committed to

1    being a valuable supplier to Kroger and enable them to grow

2    their business.  And in the end, that's exactly what happened.

3    Pilgrim's took the business away from Tyson.  This is the

4    epitome of competition, not price-fixing.

5         There is one final document I need to mention because

6    the government seems to think this has to do with price-fixing

7    also.  This one makes as little sense as the Otis principle.

8    In its closing yesterday, the government talked about how

9    Mr. Penn in 2014, the end of the year, described 2014 as

10   chicken nirvana for the suppliers.  Well, you have been sitting

11   around for a month listening to testimony.  I think even you

12   know at this point absolutely 2014 was chicken nirvana for the

13   suppliers.  The market was red hot and that was great for the

14   suppliers.

15        But what's so odd is that the government again ignores

16   what this e-mail is actually about.  Here is -- the whole point

17   of this e-mail was to -- they were analyzing Tyson's financial

18   results that had just been reported.  And Mr. Penn was making

19   fun of Tyson because they hadn't done very well in a red hot

20   market.  And his whole point was, if you can't do well in

21   chicken nirvana, just think of how badly you're going to do

22   when the market turns.  It has nothing to do with price-fixing.

23   Why the government is introducing this, I have no idea.

24        There is another comment in here that I want to raise

25   only because the government has talked about it.  There is

1    nothing suspicious about this at all.  Mr. Penn says -- he is

2    talking about improving our business.  With must understand

3    what our competition is doing both wrong and right.  Tyson took

4    this strategy of not worrying about what the competition is

5    doing and it led to the unraveling on a competitive advantage.

6    Have to keep our enemies close and ensure that we are not

7    zigging when the competition is successfully zagging.

8         I have no idea what this e-mail has to do with

9    price-fixing.  What Mr. Penn is saying is common sense in the

10   business world.  You have to know what your competitors are

11   doing because if they are doing something right, you should

12   follow it.  Remember Motorola, they used to be the biggest

13   cellphone maker in America.  They forgot to look left and

14   right.  I don't think there is a lot of people in this room who

15   have a Motorola cellphone anymore.

16        I want to end with a very simple point.  At bottom the

17   government's case is that Jayson was not a competitor, they

18   didn't compete; but that is contrary to Jayson Penn's very

19   nature.  He is a competitor and a tough competitor.  That's who

20   he is.  His competitive spirit is engrained deeply in him and

21   his co-workers saw that.  As Brenda Ray put it, he wanted to be

22   the best, provide the best, be able to support the customer

23   with the best.  And the only way you can be the best is to beat

24   the competition.

25        I can't explain this any better than Jayson's own

4208

1    words about how he felt about his competitors.  Here is what he

2    had to say about his competitors in the middle of when the

3    government alleges he was agreeing to fix prices with them.

4    Mr. Lovette says:  I hate that company and everything about it.

5    He was talking about Tyson.  Mr. Penn's response:  I hate Tyson

6    but I hate Sanderson more.  This is supposed to be when they

7    are conspiring.

8            Here is another example.  In 2014 Mr. Penn forwarded

9    Mr. Lovette a weekly financial report internally at Pilgrim's.

10   And he said:  Best week as a company we have ever had and we

11   have much, much more to get.  Personal mission is it to send

12   Sanderson Farms into a tailspin.  No need to mess with Tyson

13   because they have taken their own poison pill with their new

14   structure.  Foot on the throat.  Both of these boys will be

15   going down.  Our team is far from being good.  Teams need to

16   commit to being the best in our industry or hit the door.

17   These are not the words of a price-fixer.  They are the exact

18   opposite, the words of a tough competitor, and that's exactly

19   who Jayson Penn is.

20           The government bears the burden to prove beyond a

21   reasonable doubt that Jayson Penn committed the crime with

22   which he has been charged.  From what you heard in this case,

23   there are many, many reasons to doubt.  Remember, the

24   government brought these charges.  They hadn't even interviewed

25   anyone at Pilgrim's.  And they don't have a single witness who

1    says that Mr. Penn did anything wrong.  They didn't have it

2    back then.  They didn't bring it in the courtroom today even

3    though they spent five years looking for one.

4         And that's why the government's whole case against him

5    is made up of innuendo, inference, cherry-picked sound bites

6    and trying to keep you from learning the actual facts.  As I

7    showed you, this is what the government did time and again in

8    this case.  They looked for a word or a sound bite, threw it up

9    against the wall, and tried to pretend it was price-fixing and

10   hoped nobody would look behind it.  They should not be doing

11   that.  The government's job, their job is to seek justice.

12   That's why it's called the Department of Justice.  But they are

13   not seeking justice here.  They are just seeking convictions.

14   It's honestly anyone's worst nightmare.  There you are working

15   hard at your job doing your best to make your company

16   successful, and the government swoops in one day, no warning,

17   and destroys your life in one stroke.

18        A not guilty verdict will never give Mr. Penn back the

19   reputation he worked for 30 years to earn, but it will at least

20   show that our system of justice ultimately works because in our

21   country the prosecutor can't just label someone a criminal.

22   They have to prove it in court with evidence to a jury.  Give

23   Jayson Penn his life back.  Return the only verdict that the

24   facts support, not guilty.

25        Thank you.

1          THE COURT:  Thank you, Mr. Tubach.

2          Ladies and gentlemen, we will go ahead and take the

3    lunch break.  We are going to take just an hour, so why don't

4    we plan on reconvening at 1:00 o'clock, okay?  Keep the

5    admonitions in mind, yellow juror buttons visible.  Really

6    windy again today as you can probably hear, so the jury is

7    excused.  Thank you.

8          So doing the math, even with starting up again at

9    1:00, it looks like we will probably have one of the defendants

10    close tomorrow and the government's rebuttal tomorrow;

11    otherwise, I think we would be here too late in any event.  And

12    I think that will probably work out well otherwise, all right?

13          Anything to talk about before lunch?

14          All right.  We will be in recess until 1:00.  Thank

15    you.

16       (Recess at 12:00 p.m. until 1:00 p.m.)

17

18          THE COURT:  All right.  Are we ready for the jury?  I

19    will take that as yes.  Let's get the jury.

20          (Jury present.)

21          THE COURT:  Ladies and gentlemen, I asked you

22    yesterday to see if you could stay late.  We are not going to

23    stay late tonight.  Doing the math on it, we are going to be

24    ending around 5:00.  Then we will have a couple arguments

25    tomorrow morning, but then you will be released to begin your

4211

1    deliberations.

2            Mr. Feldberg, looks like you are ready to go.

3                              **CLOSING ARGUMENT**

4            *MR. FELDBERG:*  Thank you, Your Honor.  Thank you,

5    members of the jury.

6            We don't convict people in this country on speculation

7    or theory.  We try them on evidence.  And we only convict if

8    there is proof beyond a reasonable doubt sufficient for the

9    prosecution to overcome the presumption of innocence.  Let's

10   look at what the evidence shows.

11           Pilgrim's eight-piece year over year pricing.  Does it

12   like a conspiracy to agree to raise?  Prices go up one year

13   because of the market forces we have spent five weeks hearing

14   about.  They go down other years.  Does this look like an

15   agreement to fix prices and rig bids?  Prices are all

16   different.  And if you look at, for example, 2012 to 2013, some

17   of the suppliers go up, some of the suppliers go down.

18           I told you in my opening that the evidence would show

19   that the five suppliers involved in this case had five

20   different strategies, and that's exactly what the evidence has

21   shown.  Pilgrim's wanted higher prices, a shift to more

22   profitable bigger birds from KFC to Chick-fil-A.  Koch wanted

23   to increase its volume with KFC.  George's wanted lower prices

24   and to add volume.  Claxton had one plant.  It wanted to be not

25   too high, not too low, in the middle so it could maintain its

1   business.  And Tyson wanted to lock in its bid early at a

2   19-cent margin.  Different strategies.

3          I told you in my opening statement that the evidence

4   would show that all of the suppliers had different prices and

5   margins, and that's exactly what the evidence has shown.  In a

6   business in which as the prosecutor told you in his opening

7   statement even a fraction of a penny means a lot of money, the

8   suppliers' prices and margins were different every single year.

9          This is a very busy chart and I apologize for it, but

10  the point of it is to show you all of the suppliers' prices for

11  each of the years in question in this case and they are all

12  different.  This might be a slightly easier slide to absorb.

13  It shows you the bids and prices for the eight-piece contract

14  for KFC in 2015.  There are two important points here.  No. 1,

15  all the bids were different -- three important points.  All the

16  bids were different.  All the final prices were different.  And

17  everybody came down in price from their initial bids to the

18  final contract.

19         These numbers are important because they represent

20  business strategies and millions of dollars of profit and loss

21  for the suppliers.  And in 2015, the year the prosecutors have

22  focused on the most, the range in prices among the suppliers

23  widened from less than 1 cent in 2014 to 5-1/2 cents in 2015.

24  If the suppliers were fixing prices, wouldn't you expect the

25  prices to get closer together rather than five-plus times

1  farther apart?

2      I told you that the evidence would show that the

3  suppliers competed with each other, undercut each other and

4  took business from each other, and again that's exactly what

5  the evidence has shown.  You heard it from Mike Ledford.  You

6  heard it from Rich Eddington.  You heard it from Pete Suerken.

7  They took volume from the higher priced suppliers and awarded

8  it to the lower priced suppliers.  It's just the essence of

9  competition.  Each buyer testified that the suppliers were

10  competing for volume.

11      I am going to show you a couple of charts.  This chart

12  compares the volume award to KFC in 2015 and 2018.  The

13  difference, Pilgrim's is the big loser.  Tyson is the big

14  winner.  Volume shifts.  Next chart.  Again, it's a little bit

15  busy, but it shows you the changes in volume from 2014 to 2015

16  for KFC.  Winners and losers.  Pilgrim's is the big loser.

17  Koch is the big winner.  Pilgrim's lost 559,935 pounds per week

18  in volume to KFC.

19      In what world would Roger Austin enter an agreement to

20  lose 559,935 pounds per week in volume to his customer?  The

21  prosecution may argue that, well, Pilgrim's was able to make up

22  some of that volume with other customers, but Pilgrim's is not

23  on trial here.  Roger Austin is.  And Roger is a KFC guy, has

24  been for decades.  Whether he was at Gold Kissed or ConAgra or

25  Pilgrim's, KFC was his main customer.  He was all in for KFC,

 1    taking care of them, arguing for lower prices, advocating for

 2    his customer, building his company, whichever company he was

 3    at, up to supply nearly half of KFC's volume.  Why in the world

 4    would Roger ever agree to lose KFC business to other suppliers?

 5         There are lots of examples in the evidence of Roger

 6    advocating for KFC and arguing with his superiors for lower

 7    prices.  I will call up just one.  This is an exchange between

 8    Mr. Austin and his boss, Jayson Penn, in November in 2012.

 9    Mr. Austin writes:  We just had the semi final round call with

10    Mike -- that's Mike Ledford of RSCS -- and his team.  The

11    result of the call is, I think we have to come down another

12    three-quarters of a cent give or take.

13         And how does Mr. Penn respond?  He asks for the math.

14    What will we be giving up in dollars on eight-piece and dark if

15    we do lower the pricing to your recommended number, to

16    Mr. Austin's recommended lower number.  There are lots of

17    examples like that.  And then Roger and a colleague prepare a

18    price reduction spreadsheet to show the math from the lower

19    price that Roger was recommending.  This is someone in a

20    conspiracy to raise prices?  This is someone trying to cheat

21    KFC?

22         The prosecutor suggested to you yesterday the

23    different prices in volume shifts don't really matter.  If that

24    were true, what was the point of the bidding?  KFC was buying

25    about 200 truckloads a week of chicken.  A 5-1/2 cent price

difference as there was in 2015 equals $368,500 per week or $19.162 million per year.  Every penny is a $3.5 million win for one supplier and a $3.5 million loss for another supplier. That's competition.

I told you in opening that the evidence would show that Roger had no authority to make pricing or bid decisions at Pilgrim's and the evidence shows exactly that.  Roger was the customer guy, the salesman based in Louisville so he could be close to his customer.  He even opened an R&D facility in Louisville for KFC.  Pilgrim's decision makers were based at headquarters in Greeley.  Roger advocated for his customer. The business strategists made the decisions.

I told you that Pilgrim's made independent data-driven decisions on its bids and prices and that's exactly what the evidence shows.  I am holding in my hand a stack of internal communications, analyses and spreadsheets within Pilgrim's entirely internal among Pilgrim's people for just one week in August of 2014, the week the first-round bid for 2015 was due.

You will have these documents available for you in the jury room.  They are on a thumb drive.  I am not going to read out all the numbers.  They are on the slide there, but think for looking for exhibits in the D and E ranges, and if you have an interest, please take a look.  Please ask yourselves, if the price was fixed, if the bid was rigged, why did all of these people do all of this work and analysis?  For that matter,

1     every time the prosecution argues about scouting around,

2     checking around, getting the pulse, getting a blow-by-blow,

3     please ask yourselves if the price was fixed and the bid was

4     rigged, why did Roger need to check around?  Wasn't he just

5     getting market intelligence of a sort that every sensible

6     business person would try to obtain?  And if the price was

7     fixed and the bid was rigged, why was so much of the

8     information that Roger got wrong?

9              Roger's January 29th, 2013 e-mail, Exhibit 1722.

10    Could we call that up, please?  It says it all.  Actually, we

11    don't need to call it up because Mr. Tubach showed it to the

12    jury in his closing.  Months after the bidding for the 2013

13    contract had been closed, Roger is still trying to find out

14    where everyone went on dark meat.  He doesn't know and it's

15    months after the bidding had closed.

16             Roger's communications with his customers,

17    distributors, competitors were all about gathering market

18    information, data points, so his superiors could make the best

19    independent decisions.  And as the Court instructed you

20    yesterday, exchanges of information, even regarding price --

21    could I go back to the --

22             Exchanges of information even regarding price are not

23    illegal unless there is an agreement to engage in unlawful

24    activity.  And there is no agreement here.  Judge Brimmer, as

25    Judge Brimmer instructed you, it is not, not illegal for a

1    competitor to obtain, rely upon and act on pricing and other

2    information received from competitors, customers, et cetera, so

3    long as there is no agreement to fix prices or rig bids.

4         So let's talk about the Jason McGuire to Jayson Penn

5    e-mail on August 18th, 2014, that says that Roger did some

6    checking around and lists some suppliers' ranges.  Mr. Tubach

7    showed it to you earlier today.  First, these are ranges, not

8    specific numbers.  How could you even possibly agree to fix a

9    price when you don't have a price?  You have a range.  Second,

10   many of the prices -- many of the ranges listed in that exhibit

11   turned out to be wrong.  Third, there is nothing wrong with

12   knowing competitors' pricing information as long as there is no

13   agreement to fix prices.

14        And most importantly, the document itself shows you

15   there was no agreement.  Pilgrim's wanted to be the price

16   leader and bid higher than its competitors.  That document,

17   it's Exhibit 1054, actually shows the absence of an agreement.

18   Pilgrim's didn't want to agree with its competitors on price.

19   It wanted to disagree with them and charge a different higher

20   price.

21        And the other e-mails from August 2014 the prosecutor

22   discussed with you yesterday that had margin information,

23   Exhibits 1035 and 1036, had nothing to do with Roger.  He

24   didn't write them.  They weren't sent to him.  There is no

25   evidence he ever saw them or that anyone ever discussed them

1    with him.

2         I told you in my opening there would be no evidence

3    that Roger had any motive to enter into a conspiracy to agree

4    to fix prices and rig bids and there has been not one bit of

5    evidence of motive, zero, period.  Roger had the opposite of a

6    motive.  He wanted Pilgrim's to lower its prices so that he

7    could sell more chicken to his customer KFC.  And I told you

8    there would be no evidence of an agreement to fix prices and

9    rig bids and there has been none.

10        The prosecutor told you in opening statement that the

11   defendants are charged with having an illegal agreement that

12   they conspired for years.  Really?  Who agreed with whom to do

13   what?  What were the terms of the agreement?  When was it

14   formed?  What was its purpose?  Who agreed to win volume and

15   who agreed to lose volume?  The prosecution argued that the

16   conspiracy was to raise prices, but the evidence shows that the

17   prices went up in 2015 because of market forces and down in

18   other years.

19        As the bar chart I showed you at the beginning

20   demonstrates, Pilgrim's price to KFC was actually lower at the

21   end of the so-called conspiracy than it was at the beginning of

22   the so-called conspiracy.  That's the bar chart.  And the

23   prosecution's argument that the price increase in 2015 was

24   historic is simply wrong.  As a chart introduced through

25   Professor Snyder's testimony demonstrates, there were

1    comparable increases in 2008 and 2011, years in which there is

2    no allegation of any conspiracy.  The claim that there was an

3    agreement is pure fiction.

4         Finally, I told you in opening statement that the

5    evidence would show that the customer, RSCS, drove pricing, and

6    that's exactly what the evidence showed.  Time after time Mike

7    Ledford told Pilgrim's where it had to be on price and

8    Pilgrim's went along with it.  There are countless examples in

9    the evidence, but let me just show you a couple.

10        This is Exhibit 544.  Roger writes to colleagues in

11   November of 2012:  We had a semi final round call yesterday

12   with Mike and his team.  We are going to have to -- I think we

13   are going to have to go down another three-quarters of a cent

14   give or take.  And Mr. Penn responds, what will be giving up on

15   math if we follow your price -- or your recommended price?

16        Can we call up D-546, please?  And could we -- thank

17   you.

18        Mike Ledford to Roger Austin, December 4, 2012, we are

19   disappointed, a word Mr. Ledford used a lot with Roger, to say

20   the least that you did not adjust some prices.  You are too

21   high, and he tells him exactly how much he is too high.

22        Could we call up D-564, please?  And could we

23   highlight the first line under the bold heading Pilgrim's in

24   the middle.  There we go.

25        Communication from Mary Hester at RSCS to Pilgrim's

4220

1    telling them exactly how much they're too high on eight-piece,

2    3 percent, they are 3 percent off of the competitive price.

3    And there are many, many such communications in which RSCS

4    tells Pilgrim's what it has to bid and Pilgrim's generally, not

5    always, but generally goes along with it.

6           The same is true with Rich Eddington in 2017.  He

7    demanded that Pilgrim's reduce its price to $49 per case and

8    that's what Pilgrim's did.  Sara Fisher testified that RSCS was

9    happy with the results of the 2017 negotiations, just as Mike

10   Ledford testified or actually prepared a PowerPoint -- can I go

11   back, please -- just as Mike Ledford had prepared a PowerPoint

12   at the end of the 2012 negotiations talking about how satisfied

13   he was with the results of those negotiations and how much

14   money RSCS had saved for KFC as a result of those negotiations.

15          So what about the conspiracy insiders, Carl Pepper and

16   Robbie Bryant?  Mr. Pepper really says nothing about Roger.  He

17   says he rarely spoke with him.  His testimony is he didn't have

18   any specifics.  He is clearly a sad, scared man, would say

19   anything to avoid prosecution.

20          Robbie Bryant is a different character.  He is a liar

21   trapped in his own lies.  He lied to the government, a felony,

22   a felony for which the government could, but has not,

23   prosecuted him.  He lied to you when he testified that he only

24   lied once to the government when it was multiple lies on

25   multiple occasions.  He has a deep motivation to say whatever

4221

1    the prosecutors want him to say because they have the sole

2    discretion to prosecute him for the felony of lying to the

3    government and he knows he risks prosecution.  He talked mostly

4    in generalities, heard this, he understood that.  But the few

5    times he was forced to get specific what he said was

6    demonstrably false.

7              Take July 2014.  Mr. Bryant claims he heard Jason

8    McGuire tell Roger to get the word out to the industry that

9    Pilgrim's was raising prices. First he said this happened at a

10   meeting at Popeye's.  But when we showed that Roger wasn't at

11   that meeting, Mr. Bryant said, well, maybe it was at Church's.

12   But then we showed that there was no meeting at Church's

13   between Pilgrim's and Church's in July of 2014.  And we showed

14   that in any event, Roger was at a conference when Mr. Bryant

15   claims the meeting took place.

16             He claimed that Roger regularly got information from

17   Carl Pepper, but Pepper said he hardly ever spoke to Roger.

18   And then Mr. Bryant claims that on August 22nd of 2014, the day

19   of a meeting between Pilgrim's and RSCS, he walked into Roger's

20   office twice and heard Roger say the exact same words twice.  I

21   told them the price is the price.  The only question is how

22   many loads you want.

23             And he claims that after one call Roger announced,

24   That was Brady; and after the other call Roger announced, That

25   was Kantola.  Seriously, he just happens to walk into Roger's

4222

1   office twice and heard Roger say the exact same thing, never

2   told anybody about it, and now, seven and a half years later,

3   happens to remember it.  These calls, if they happened at all,

4   had to be after the meeting between RSCS and Pilgrim's because

5   what Mr. Bryant says he heard Roger say is, I told them, past

6   tense, the price is the price.

7          We know from the calendar invite, Exhibit J-081 that

8   the meeting took place from 11:00 to 1:00.  But the phone

9   records for August 22nd, 2014 show that the only calls between

10  Roger and Mr. Brady and Roger and Mr. Kantola were listed in

11  Mr. Austin's phone records for 1 minute.  It turns out in

12  Mr. Brady's phone records that call was just a few seconds, and

13  they are first thing in the morning, 7:56 a.m. and 8:18 a.m.,

14  before, hours before the meeting took place.  And the phone

15  records show there were no calls between Roger and Mr. Brady or

16  Roger and Mr. Kantola that afternoon after the meeting.  These

17  calls are obviously just another fiction.

18         But even if you credit Mr. Bryant's testimony, so

19  what?  Roger did not give Pilgrim's price.  He did not ask

20  anyone for their price.  And he did not ask anyone to agree to

21  anything.  That is the sum total of what Mr. Bryant says about

22  Roger in 2014.  It's implausible.  It's far-fetched.  It's

23  unbelievable.  But even if you believe it, it proves nothing.

24         Mr. Bryant does not say anything else about Roger

25  until 2017 when he claims that Roger in early February gave him

competitors' future bid prices which he wrote by hand in his

notebook.  The chart before you has on the left Mr. Bryant's

handwritten notes.  On the right is Exhibit I-054, which is a

document prepared and circulated by RSCS showing their period

two 2017 current prices in effect in early February 2017 at the

time Mr. Bryant claims he had this phone call with Mr. Austin.

And as you will see, with the exception of one

transcription error in the fourth place to the right of the

decimal point for Koch, which is just a transcription error,

the prices that -- the notes that Mr. Bryant made exactly match

the current prices, exactly.  Mr. Bryant's claim that the

information Roger gave him were future bids -- by the way, none

of the companies had decided on their future bids by that time.

His claim that they were future bids is just plain wrong.  What

he wrote down in his notebook were the current prices.

And we know from Mr. Ledford and Mr. Eddington that

current prices do not tell you anything about future bids.

Even the prosecutor conceded in her closing yesterday that this

case is not about current pricing.  Once again, in his zeal to

give the prosecutors what they wanted, Mr. Bryant gave you

nothing but falsehoods.

But perhaps Mr. Bryant's biggest lie of all was his

claim that the purpose of the so-called conspiracy was to

protect volume, was for the suppliers not to undercut each

other so that they could all maintain their volume.  Once

4224

 1    again, this is flat out false.  The chart before you shows

 2    KFC's weekly estimated volume of purchases from Pilgrim's

 3    during the years in controversy here.  In 2012 Pilgrim's was

 4    selling 3.2 million pounds a week of chicken to KFC.  By 2018

 5    that number was reduced to 1.34 million, reduced by more than

 6    half.  Mr. Bryant's testimony that the purpose of the

 7    conspiracy was to protect volume is completely contradicted by

 8    the evidence.

 9            A couple of other points about the 2017 negotiations

10    for the 2018 contract.  The prosecutor pointed to e-mails

11    between Tim Stiller and Roger on Friday, February 17, 2017.

12    Rich Eddington of RSCS has just told Pilgrim's that unless

13    Pilgrim's lowers its price to $49 per case, a 3.75 to 4 cent

14    reduction, RSCS is going to take away even more business.

15    Mr. Stiller clearly gets angry and tells Roger he needs to tell

16    the industry we are going to hold.  And at 9:14 p.m. on a

17    Friday night in February, Roger ends the exchange with a

18    simple, Will do.  But then he doesn't.

19            By the next business day, Tuesday, February 21st after

20    the President's Day holiday, at 8:09 a.m., Stiller e-mails --

21    Mr. Stiller e-mails Mr. Bryant, Call me at 7:30 Mountain to

22    discuss KFC.  Let's only speak fact-based data when we discuss

23    and leave emotions aside.  There was a blow-up on Friday night.

24    By Tuesday, the next business day, everybody has calmed down

25    and what happened?  Pilgrim's reduced its price to the $49 per

4225

1    case that Mr. Eddington from RSCS had demanded, and both

2    Mr. Eddington and Sara Fisher from RSCS testified that they

3    were happy with the discount and satisfied with the

4    negotiations.

5         One more point about Mr. Bryant.  The prosecutor in

6    her closing yesterday argued that Mr. Bryant testified about a

7    conspiracy with US Foods that involved a subordinate of

8    Roger's, but that was not Mr. Bryant's testimony.  Your

9    recollection of his testimony will control, but here is what

10   the unofficial transcript says.

11        Question:  You testified on direct -- this is

12   Mr. Bryant's testimony -- that you had engaged in certain

13   pricing conduct related to US Foods.  Remember that?

14        Answer:  That's correct.

15        And then he was asked:  And this conduct you engaged

16   in had absolutely nothing to do with Mr. Kantola, did it?

17        Answer:  That's correct.

18        In fact, it didn't have to do with anyone in this

19   courtroom at all except you.

20        That's correct.

21        The only person in the courtroom who conspired with US

22   Foods was Mr. Bryant, yet another thing for which he has not

23   yet been prosecuted.  And Mr. Bryant testified that he didn't

24   notice that Pilgrim's lost KFC volume.  Roger certainly did.

25   Roger noticed that during the time of the so-called conspiracy,

1    Pilgrim's lost more than half of its volume to KFC,

2    1.86 million pounds per week of sales of chicken to KFC.

3         Now, the prosecutor argued a bit yesterday about the

4    2012 negotiations for the 2013 contract and the 2014

5    negotiations -- I am sorry, the 2013 negotiations for the 2014

6    contract.  I want to take a couple minutes to clean that up.

7         First, let's talk about the 2012 negotiations for the

8    2013 contract.  Here is what the evidence shows.  On

9    October 26, 2012, Roger e-mailed his boss, Mr. Penn:  Having

10   talked to Mike Ledford, he wants us all to go to .31 back on

11   dark meat.  That's Exhibit 1528.  On November 13, 2012, Scott

12   Brady of Claxton texts his boss, Mikell Fries, that this month

13   Roger is 3 cents higher.  That's current pricing.  No issue.

14   Then Mr. Brady texts that, quote, He said to raise our prices

15   on wings.  He is at market and market plus 10.  And Mr. Fries

16   responds, probably jokingly, Tell him we're trying.

17        But what happens?  The next day Claxton lowers its

18   price from 1.812 on wings to 1.760.  Mr. Fries may have been

19   joking.  He may have been bluffing, just like Mr. Kronauge from

20   SMS testified happens all the time in these negotiations, but

21   when he said tell him we're trying to raise our prices, that

22   didn't happen.  The next day Claxton lowers its price so that

23   Claxton could undercut Pilgrim's, which, in fact, it did.

24        What about the 2013 negotiations for the 2014

25   contract?  On November 18, 2013, Mike Ledford e-mails Roger

4227

1    that once again he is disappointed with Pilgrim's bid.  It's

2    Exhibit 1713.  There is a text exchange between Mr. Brady and

3    Mr. Fries at Claxton which includes Roger is at .30 back and

4    not moving and Mr. Fries says, Stay at 30 and a half then, i.e.

5    bid lower and undercut Pilgrim's.  But the very next day

6    unbeknownst to Claxton Pilgrim's does move the very next day

7    and lowers its price to 30 and a half back.  Claxton is trying

8    to undercut Pilgrim's, and if Roger really said Pilgrim's

9    wasn't moving, he was bluffing because Pilgrim's reduced its

10   price the next day to try to undercut Claxton.

11          And we know from Exhibit E-799 -- can we just flash up

12   the top e-mail on that?  We know from this document, Exhibit

13   E-799, that Mr. Ledford was controlling the pricing.  He writes

14   to Mr. Austin on November 19, 2013, purple, that's the

15   eight-piece COB, if you went down 1-1/2 cents, you'd still be

16   higher than average, but not in a different ball park like now.

17   And he tells him where he needs to be on other products and

18   that's where Pilgrim's goes.

19          One more point about 2013.  The prosecutor mentioned

20   yesterday a text in which Scott Brady said:  Roger is, quote,

21   in agreement with us.  They like the word agreement, but they

22   didn't give you the context.  Mr. Lavine did earlier today.

23   Greg Finch, Claxton's CFO, provided the context in his

24   testimony.

25          In March 2013, Mr. Ledford asked all of the suppliers

1    if they could switch to a smaller 2.4-ounce bird.  It was

2    impossible for the suppliers to do so as Mr. Finch explained,

3    so all that text was is a recognition that Pilgrim's, like

4    Claxton, recognized that Mr. Ledford's request was impossible.

5    The government called Mr. Ledford as a witness.  They could

6    have asked him about it and he could have explained it, but

7    they didn't ask him.

8           Now, I want to talk for a moment about the

9    government's summary charts.  As the Judge instructed you

10   yesterday, they are only as valid and reliable as the

11   underlying material they seek to summarize.  These charts leave

12   out key facts.  They are highly selective and they are

13   unreliable, and I just want to give you one example.

14          This is Government's Exhibit 16, a chart covering the

15   period from November 28, 2012 to January 29, 2013.  This is

16   Exhibit D-839, an e-mail from Roger Austin to a colleague right

17   in that period, November 29th, 2012.  I think so, but put us in

18   a column of suggested pricing for the FP products as well as

19   competition prices.  And then the key language in Roger

20   Austin's own words that tell you everything you need to know

21   about this case:  We don't want them to think we are suggesting

22   meeting those prices.  We don't want them, meaning the

23   superiors in Greeley, to think we are suggesting meeting those

24   prices.  That's Roger Austin's state of mind.  Is it included

25   on the government's summary chart?  No, it's not.

4229

1            But look how the chart looks if we add in two things,

2     Exhibit D-839, We don't want them to think we are suggesting

3     meeting those prices, and another phone call that was left off

4     on 12:39 when Roger Austin called Mike Ledford at RSCS right

5     before Mr. Tucker wrote an e-mail entitled Price Reduction

6     Spreadsheet.

7            Now, I would like to say a word about Bruce Bagshaw

8     and Marcus Shelton.  They are the only KFC owners, the supposed

9     victims of this so-called conspiracy, who came here to testify

10    before you.  They owned between them 46 KFC franchises.  RSCS

11    worked for them.  The franchisees are the owners.  And what did

12    they tell you?  They know this man.  They've done business with

13    him for decades, and they flew across the country to tell you

14    the type of person Roger is, honest, trustworthy, fair.  They

15    know him and he is not a man who would fix prices.  He is not a

16    man who would cheat KFC.

17           Are they friends with Roger?  Of course, friendships

18    started and has continued through business dealings.  Whether

19    Roger was at Gold Kissed or ConAgra or Pilgrim's, his passion

20    was taking care of KFC, doing right by them, treating them

21    fairly, even returning money to them when he wasn't

22    contractually obligated to do so.  Mr. Shelton even told you

23    that Roger was chosen by the franchisees to be the vendor

24    liaison to the southeast KFC franchisee association board

25    representing all the vendors, not just chicken.  This testimony

4230

 1    shows you that the idea that Roger would cheat KFC is absolute

 2    nonsense.

 3             This case is a terrible injustice for Roger and for

 4    the other nine wrongly accused people.  The fact that the

 5    prosecution -- the prosecutors are using their power this way

 6    to prosecute 10 innocent men is frightening.  This prosecution,

 7    this misguided prosecution has imposed a terrible burden on

 8    Roger and all of these men and wreaked havoc on their lives.

 9             Maybe somewhere people get tried on speculation

10    instead of evidence, but this is an American courtroom and you

11    are an American jury.  And now, thankfully, you can right this

12    terrible wrong, lift this terrible burden and reach the only

13    verdict that justice requires, not guilty.

14             Thank you.

15             THE COURT:  Thank you, Mr. Feldberg.

16             Ladies and gentlemen, why don't we take a stretch

17    break.

18             (Brief recess.)

19             Mr. Byrne, go ahead.

20                          **CLOSING ARGUMENT**

21             MR. BYRNE:  Thank you, Your Honor.

22             Mark Twain said never let the truth get in the way of

23    a good story.  Throughout its investigation of this case and

24    throughout this trial, the government has stuck to the fanciful

25    story it wants to tell at the expense of truth.  The government

1    saw a significant price increase in 2015 for small birds.  They

2    saw evidence of communications between salesmen for competing

3    suppliers, something they did not understand, and they

4    concluded there was a conspiracy to fix prices.

5            The government then set out to prove their theory.

6    During the investigation they ignored evidence that did not

7    support their theory and they pushed ahead weaving together

8    phone call records between competing suppliers with bits and

9    pieces of e-mail communications and text messages that

10   seemingly reflect pricing information being shared by

11   competitors.

12           During this trial time and time and time again the

13   defendants have shown that the government misunderstood or

14   misrepresented the information contained in those

15   communications.  It is one thing to make a mistake, but instead

16   of recognizing that their theory was wrong, the government

17   continued to pursue it despite the mounting evidence to the

18   contrary.

19           Mark Twain was a great story teller and he had a

20   point.  Why let the truth get in the way of a good story?  But

21   this is the United States Government pursuing criminal

22   convictions of 10 men.  The truth is more important than a good

23   story.

24           Good afternoon, Ladies and Gentlemen of the Jury.  My

25   name is Mark Byrne and along with Dennis Canty we have the

4232

1   privilege and honor of representing Mr. Jimmie Little.  This

2   has been a long trial.  There have been many witnesses and

3   numerous exhibits.  We appreciate your patience and your

4   attention.  Obviously, this is a very important matter because

5   Mr. Little is on trial along with the other defendants for

6   violating federal criminal laws.  These are serious charges

7   with very serious ramifications.

8         Already Mr. Little's life has been upended.  He

9   retired in September of 2016.  He kept up with his friends, but

10  he has had nothing to do with selling chicken since he retired.

11  He was charged in October 2020, and he has been living under

12  the cloud of the charges since then.  And he has been forced to

13  sit in this courtroom and listen to the government attempt to

14  paint him as a bad person, as a criminal.

15        But now Mr. Little's fate is in your hands.  You, not

16  the government, now are in charge.  This is your decision to

17  make, and it should be based upon all of the evidence presented

18  during the trial, not just the evidence that the government

19  wants you to see, but also the evidence that the government

20  tried to keep from you to keep you from seeing.

21        Before we get into the evidence, I want to go over

22  something very important.  The judge has instructed you that

23  each defendant must be considered individually.  Specifically

24  the judge has told you that the rights of each of the

25  defendants in this case are separate and distinct.  You must

4233

1    consider separately the evidence against each defendant and

2    return a separate verdict for each.  Your verdict as to one

3    defendant, whether it is guilty or not guilty, should not

4    affect your verdict as to any other defendant.

5         In other words, although all the defendants are

6    charged in the same conspiracy, you must consider the evidence

7    against each defendant separately.  Throughout the trial the

8    government kept lumping them together.  They don't want you to

9    focus on each individual, but the law requires you to consider

10   the evidence against each defendant to determine whether he was

11   a knowing participant in the alleged conspiracy.

12        Another important thing to keep in mind, you must also

13   separate the individual from the company.  Pilgrim's is not on

14   trial.  Mr. Little is on trial.  And you must consider the

15   evidence that the government has offered to establish that

16   Mr. Little engaged in any wrongdoing.  As you consider the

17   evidence, please be sure to keep in mind jury instruction

18   No. 21.  Some of the other counsel have already talked about

19   it.  I am sure some of the other ones will also.

20        The instruction says in part:  Mere exchanges of

21   information are not necessarily illegal in the absence of

22   additional evidence of an agreement.  It is not unlawful for

23   competitors to meet and exchange.  It is not illegal for a

24   competitor to obtain, rely upon, and act on pricing or other

25   information received from competitors so long as there is no

4234

1    agreement to fix prices or to rig bids.

2          What this means, ladies and gentlemen, is that you may

3    not find Mr. Little guilty of conspiracy based solely on

4    evidence that he received information or gave it to somebody

5    else.  What the information -- what the government is required

6    to show is that he knowingly and willfully entered into an

7    agreement to rig a bid or fix a price.  There is no such

8    evidence before you.

9          Now I am going to walk through how the actual evidence

10   that came out during the trial shows that Mr. Little is not

11   guilty.  So what is the evidence against Mr. Little?  What has

12   the government presented and, more importantly, what has the

13   government left out?  You have now sat through about four weeks

14   of testimony and have been shown hundreds of documents, but you

15   have not heard much about Mr. Little.

16         What you have learned about Mr. Little, he was a

17   salesman, the customer service representative for Church's,

18   Pollo Tropical and a few other fast-food restaurant accounts.

19   Like other salesmen in this room, he dealt with all the

20   day-to-day issues that arise delivering fresh chicken around

21   the country.

22         He spent a of lot of time on the phone.  That is how

23   he did his job.  He spoke with customers and suppliers about

24   covering shorts, spoilage issues, delivery issues and other

25   customer service issues.  Sometimes he called to gripe about a

difficult customer.  Once a year when contracts came up for
renewal, Mr. Little was the customer's contact on his accounts,
but Mr. Little had no pricing authority.  Those decisions were
not made at his level or in his department.

          Although you have heard a lot of evidence about KFC,
Mr. Little was not involved in contract negotiations for KFC.
There is no evidence that Mr. Little entered into any
conspiracy at all, let alone the big huge conspiracy that the
government alleges and must prove in order to convict
Mr. Little or any of the defendants.

          So now I am going to focus on the summary charts and
talk about the conspiracy insiders because that's what the
government case focuses on and that's what the government
focused on in its closing statement.  But first let me caution
you as other counsel have done about the summary charts.
Remember, Ms. Evans testified that she was told exactly what to
put into the charts, and the only thing she did was to check
the snippets in the summary charts and that they appeared in
the underlying documents.

          But who gave her the things to put into the summary
charts?  The government lawyers.  They cherry-picked what they
wanted to include so the things they selected would fit into
the story they want to tell, not what really happened.  The
judge has instructed you, you may give a summary exhibit entire
weight, some weight or no weight at all depending upon your

4236

 1     assessment of the underlying material and the accuracy of the

 2     summary.

 3            So if you look at those summary charts when you are

 4     back in the jury room, remember, they are incomplete.  They

 5     leave out very important pieces of the story.  So now let's go

 6     through the summary charts that reference Mr. Little.  And

 7     while we are doing so, we'll talk about the testimony of the

 8     conspiracy insiders and what they have to say about Mr. Little.

 9            So I am going to start with summary chart No. 5.

10     That's the Pollo Tropical episode because that's the one that

11     the government alleges most involves Mr. Little.  And maybe the

12     government considers it their best evidence against Mr. Little,

13     but if it is the government's best evidence against Mr. Little,

14     then it betrays how weak their case is against him.  It shows

15     how the government is offering inaccurate witness testimony

16     along with misleading excerpts from exhibits to advance a false

17     narrative.

18            You remember Joe Brink, right?  Joe Brink is the Pollo

19     Tropical buyer who was shocked at the amount of the price

20     increase.  Why was Joe Brink shocked?  He shouldn't have been.

21     The Urner-Barry report, a report of the market prices for

22     different chicken products that Mr. Brink relied upon, had the

23     September 2014 price for WOGs at 1.07 without freight.  So

24     Pilgrim's price, if you remember, was $1.02 which was 5 cents

25     lower than the Urner-Barry market price.  So the Urner-Barry

4237

1    report that Mr. Brink relied upon was higher than the Pilgrim's

2    price.   The fact of the matter is that Mr. Brink was upset that

3    he didn't have the bargaining power that he had had in prior

4    years.   That's why he was shocked, if he was shocked at all.

5         Remember Rich Eddington?   He had extensive experience

6    in the industry, and he testified that the landscape in 2014

7    had changed for the 2015 negotiations.   Remember, he said that

8    up until then KFC controlled the negotiations, but in 2014 the

9    market, supply and demand, switched things so that the

10   suppliers had the leverage during those negotiations.   And this

11   was true for the entire chicken industry that year.   And this

12   upset Joe Brink, who was used to having the leverage.   He was

13   used to telling the chicken suppliers how much he would pay.

14        So what did Mr. Brink do?   He concocted a story in his

15   mind that Jimmie Little at Pilgrim's and Walter Cooper at

16   Claxton must have conspired to fix prices.   The government put

17   him on the stand to tell his story even though they knew it

18   wasn't true because it promotes the government's false

19   narrative.

20        Let me explain.   The government wants you to believe

21   that Mr. Little and Walter Cooper at Claxton conspired to

22   increase the prices Pilgrim's and Claxton charge Pollo

23   Tropical.   They have some e-mails and phone calls and they

24   string these together with Mr. Brink's testimony to try to tell

25   a story that they say shows this conspiracy.   But let's look at

1    what actually happened, what the evidence shows, including what

2    the government did not include on this chart.

3         Let's talk about the September 22nd phone call.

4    Mr. Brink testified that on September 22nd, he and Pollo

5    Tropical's CFO, Lynn Schweinfurth, had a call with Mr. Little.

6    During that call Mr. Little supposedly gave Mr. Brink and

7    Ms. Schweinfurth Pilgrim's price, the final price, a 19-cent

8    increase over the prior contract price.  Mr. Brink testified

9    that Mr. Little said there was no negotiation over the price.

10   There were other customers who wanted the volume, so he had to

11   make a decision soon.  Brink said that Mr. Little said that the

12   price is the price and gave him a 2:00 p.m. deadline to accept.

13        Mr. Brink testified that the same day as the phone

14   call with Mr. Little, he received an e-mail from Mr. Cooper

15   with Claxton's bid of $1.07 for split WOGs which represented a

16   19-cent increase over the prior contract price.  What the

17   government wants you to believe is that Mr. Cooper and

18   Mr. Little had talked and they were so synced up that they

19   submitted the same 19-cent increase on the same day.  It's a

20   good story, right?  But we know the story is not true.  And the

21   government knew it wasn't true when they put Mr. Brink on the

22   stand to answer those questions.

23        How can we be so sure that Mr. Brink's testimony was

24   false and the government knows it and is relying upon it?

25   Because before the government put Mr. Brink on the stand, they

1   put their own government exhibit stickers on five documents,

2   the government's evidence which proved that the story is false.

3   They even put some of these exhibits on summary Exhibit No. 5,

4   although the government didn't include all of the relevant

5   information on that exhibit.

6           So I am going to go through those with you right now

7   and show you how this is false.  First, I would like to put up

8   Exhibit 563.  It's an e-mail that Mr. Little sent on

9   September 22nd to Tim Stiller and Tommy Lane at Pilgrim's, two

10  of Pilgrim's pricing guys, and he said, I need 2015 pricing for

11  splits and breast.  Now, remember Mr. Brink during his trial

12  testimony, he acknowledged that Mr. Little had no pricing

13  authority.  Mr. Brink said, I am sure that Mr. Little had to go

14  to someone else to get approval for pricing.  So as of

15  September 22nd, the day of the call with Mr. Brink and his CFO

16  when supposedly Mr. Little gave the 19-cent increase to Pollo

17  Tropical, Mr. Little does not have a price to give to Joe

18  Brink.  He has to get it from the Pilgrim's pricing guys, not

19  from Walter Cooper, from the Pilgrim's pricing guys.

20          Now, if we could display Exhibit 564, another one of

21  the government's exhibits.

22          Now, let's look at the entire e-mail, not just the

23  portion the government put on the chart.  After his call with

24  Mr. Brink, Mr. Little e-mails his co-worker, Mr. Boarman, about

25  his discussion with Mr. Brink.  And he says, Joe didn't handle

4240

1    the 15 to 22-cent increase well as expected.  Do you see that

2    on the highlighted portion there?  Note that Mr. Little did not

3    say the 19-cent increase.  He referred to a range because the

4    Pilgrim's pricing people hadn't given Mr. Little a final number

5    yet.

6         Mr. Little then says, I'm guessing that we will be

7    about 16 cents up on splits.  Mr. Little turned out to be

8    wrong, but note that Mr. Little doesn't know.  He says to

9    Boarman, I'm guessing.  In fact, Mr. Little goes on to say, I

10   should have the final number in a.m. meaning the morning.  So

11   it's clear that Mr. Little did not have a number to give to Joe

12   Brink during the call earlier that day.

13        Now, let's look at Exhibit 542, if we could.

14        The following morning, and now we are on

15   September 23rd, Tim Stiller sends an e-mail to Jason McGuire,

16   both in the pricing group at Pilgrim's, and says, Should have

17   PT, Pollo Tropical, to Jimmie today.  Probably go up about 50

18   cents on boneless.  So not only does Mr. Little not have the

19   price yet, the Pilgrim's price guys don't even have the price

20   yet.  They are still calculating it.

21        Fourth, let's look at Exhibit 566, another one of the

22   Government's Exhibits.

23        On September 29th, seven days after the September 22nd

24   phone call, Mr. Little provides Mr. Brink with an actual price

25   for splits.  1.02 FOB.  The price provided is FOB.  And

1    Mr. Little notes that he will provide delivered pricing once

2    they have distribution.  And there isn't even -- this isn't

3    even a 19-cent increase.  So as of September 29, there still

4    wasn't a final price let alone a 19-cent increase.

5         But there is more.  Let's look get at 566, another

6    portion of that.  This portion of the e-mail chain is not on

7    the government's chart.  On October 1, Mr. Little e-mails Joe

8    Brink and says, Joe, what's a good number to call you at?  I

9    have the freight.  And the following day, and if we can move up

10   to the next highlighted portion, Mr. Little e-mails Brink that

11   the freight is .05125.  This is when Mr. Little provides the

12   delivered price that reflects a 19-cent increase from the prior

13   contract price on October 2nd, not during the September 22nd

14   phone call.

15        The evidence is clear and completely contradicts

16   Mr. Brink's testimony and the government's narrative.  And one

17   last thing about this.  Why didn't the government call the CFO,

18   Lynn Schweinfurth, to testify about the call?  If she was on

19   the call, then couldn't she have corroborated what Joe Brink

20   said?  The government didn't call her.

21        What else do we know about Pollo Tropical and Joe

22   Brink?  Joe Brink was providing competitor information.  The

23   government wants you to believe that Mr. Little called

24   Mr. Cooper, exchanged pricing information and agreed on what to

25   charge Pollo Tropical.  But there is a problem with that theory

1    because, in fact, it is Joe Brink who tells the chicken

2    suppliers what each other's prices are.  And he does it so that

3    the prices will be lower.  And he does it so that the prices

4    will be the same because that's better for Pollo Tropical.

5    It's part of Joe Brink's business strategy.

6          The government knew it was part of his business

7    strategy.  They knew because that's what we can see him doing

8    with Mr. Little in Government's Exhibit 566 and with Mr. Cooper

9    in Government's Exhibit 9740.  Mr. Brink's statements in both

10   of these exhibits conflict with the story the government was

11   trying to tell.

12         So first I would like to put up 566.  In this e-mail

13   Mr. Brink tells Mr. Little that he has competitor pricing at

14   $1.02 delivered.  And three times he demands that Pilgrim's

15   match the price of competitors.  Of course, Mr. Brink had no

16   such pricing, but Mr. Brink asks Mr. Little to match his

17   imaginary competitor price.

18         So let's look at this highlighted.  First, Mr. Brink

19   says, Your competitors have submitted pricing that matches you,

20   but it was delivered pricing.  And then in the next highlighted

21   portion, Your pricing below should be delivered to current

22   final destination points and then you match your competitors.

23   And then he says again, Pilgrim's needs to match to show

24   compromise.  And finally he says, Pilgrim's needs to match

25   pricing from your competitors.

1          So Mr. Brink is telling Mr. Little what his

2     competitors' price is and telling him that Pilgrim's must match

3     that price.  Now, this is similar to what we see Mr. Brink

4     doing with Mr. Cooper in Government's Exhibit 9740.  In 9740,

5     Mr. Brink tells Mr. Cooper of Claxton what Pilgrim's price is.

6     This is another example of Mr. Brink's not being honest with

7     the customer because he doesn't actually have a price from

8     Pilgrim's yet.  But he tells Mr. Cooper that Pilgrim's is

9     basically at 19 in order to get Claxton to lower its price.

10         This was Mr. Brink's business strategy.  He used the

11     same strategy against Claxton and Pilgrim's in negotiations for

12     the 2014 contract, remember?  He was shown his own e-mails

13     during his testimony from that time period and he admitted that

14     he told Pilgrim's representative at that time Mr. Boarman his

15     competitors' exact prices to the penny in order to drive

16     Pilgrim's price down.  He got the same price of 88 cents per

17     pound for split WOGs from Pilgrim's and Claxton for the 2014

18     contract.

19         The government wants you to believe that competitors

20     called each other and shared pricing information, but the

21     evidence shows that in any contract negotiation any competitor

22     could learn about where the competition was by simply talking

23     to their customer, Joe Brink.

24         Finally, the Joe Brink incident shows and the Pollo

25     Tropical incident shows that there was competition, not

1   collusion.  The government also wants you to believe that

2   Mr. Little and Mr. Cooper agreed on a price to charge Pollo

3   Tropical in 2015.  But Greg Finch, Claxton's CFO, testified

4   that he had no knowledge of any other supplier's price when

5   setting Claxton's price for Pollo Tropical in 2015.  And in

6   addition to Mr. Finch's direct testimony, the evidence shows

7   that Claxton was competing with Pilgrim's for Pollo Tropical's

8   business, not colluding or conspiring with Pilgrim's.

9        Some of the best evidence is in the government's own

10  exhibit, 9740, and these portions that I am about to show you

11  are not on the summary chart.  The first excerpt I want to show

12  you, Mr. Cooper had given Mr. Brink a price and told him that

13  Claxton would like more volume, so it's -- I will give you a

14  second to look at that, but the price is down below.  And then

15  if we move up to the next excerpt, Mr. Brink complains and he

16  says, This is a larger increase than Pilgrim's.  But, of

17  course, at that time he had no price from Pilgrim's.

18       Then if we move up to the next excerpt, Mr. Cooper

19  replies with an e-mail that is best paraphrased as yes, we are

20  more expensive than Pilgrim's.  We are different than

21  Pilgrim's.  We are better than Pilgrim's and here is why.  So

22  even if you accept that Mr. Cooper has market intelligence

23  about what Pilgrim's might do, what is he doing with that

24  information?  He is competing with Pilgrim's.  He wants to take

25  business away from Pilgrim's.

1          What was the result of this competitive behavior?

2     There were different bids.  At the end of the day, there were

3     different bids.  Pilgrim's initial bid was FOB pricing.

4     Claxton's was delivered pricing.  They submitted the bid weeks

5     apart.  Claxton had submitted its pricing while Mr. Little was

6     still asking Tim Stiller at Pilgrim's for a price.  And

7     Pilgrim's and Claxton finished with different pricing.  Claxton

8     stair-stepped its pricing while Pilgrim's refused to do so.

9     This meant that Pollo Tropical did not pay Claxton a 19-cent

10    increase.  Claxton's price for split WOGs for 2015 averaged out

11    to $1.03 delivered.  And Pilgrim's price for 2015 was 1.07

12    delivered.  Bottom line, Claxton and Pilgrim's prices were

13    different.

14         So what's the take-away from all this?  Joe Brink was

15    upset about not getting the price he wanted even though it was

16    way below the Urner-Barry market price, the index that he knew

17    about and relied upon.  Pilgrim's unwillingness to lower its

18    prices in response to Brink's demand was not because there was

19    an agreement between suppliers to fix prices.  There was a

20    shortage of small birds.  Demand for those birds outstripped

21    the available supply.  Pilgrim's knew that if Pollo Tropical

22    did not agree to buy chicken at the offered price, there were

23    other buyers who would.

24         There was competition between Claxton and Pilgrim's,

25    not collusion, which resulted in the final 2015 contract

4246

1  pricing that was different.  And finally, the government went

2  along with Joe Brink's false story about Pilgrim's and Claxton

3  providing the same bid on September 22nd because it fits their

4  theory of the case.  Never let the truth get in the way of a

5  good story.

6       Now, in her closing Ms. Call made it seem nefarious or

7  even illegal that Pilgrim's would want to wait until after the

8  KFC negotiations were finished before finalizing the Pollo

9  Tropical contract.  But of course Pilgrim's would wait.  KFC

10  was a huge Pilgrim's customer while Pollo Tropical represented

11  a very small portion of Pilgrim's business.

12       Of course Pilgrim's would wait until the KFC contract

13  was finished to see how much chicken they had committed to KFC

14  and at what price.  Then they would turn to Pollo Tropical and

15  finalize that contract.  This was good business, not anything

16  illegal.

17       Now I am going to turn to KFC.  You have heard a lot

18  about the contract negotiations between KFC and suppliers, but

19  we know from the evidence that Mr. Little had nothing to do

20  with KFC negotiations.  We know this from the testimony of the

21  government's own witnesses.

22       The government called Mr. Ledford, Mr. Suerken,

23  Ms. Fisher and Mr. Lewis who worked at RSCS, the purchasing

24  co-op for KFC.  They each identified the Pilgrim's employees

25  who worked on the KFC account and contract.  Mr. Little was not

1    one of them.  Mr. Ledford testified that Mr. Little had nothing

2    to do with contract negotiations at KFC.  The defense also

3    called Mr. Eddington who worked at RSCS and he did not identify

4    Mr. Little as one of the people he worked with at Pilgrim's.

5    Even Robbie Bryant testified about Little's accounts and KFC

6    was not one of them.  And Mr. Bryant did not recall attending

7    any meetings with Mr. Little during the KFC negotiations.

8         The government has included Mr. Little on three charts

9    related to KFC, 10, 14 and 17.  I am going to start with

10   Exhibit 10.  This is the big KFC negotiations in August of 2014

11   for the '15 contract.  This is what the government has focused

12   on.  I believe they said this is all you need.  This supposedly

13   illustrates the whole conspiracy.  But Mr. Little was not part

14   of these contract negotiations.

15        Look at Exhibit 1055, which I would like to be put up.

16   On Page 2 it shows who is on Pilgrim's fresh foodservice team.

17   Mr. Little is not on that team.  He is not there for any of

18   these presentations.  Nevertheless, the government tries to

19   insert Mr. Little into these negotiations through the testimony

20   of Mr. Pepper and a couple of random phone calls that they

21   include on chart 10.

22        Let's look at Carl Pepper's testimony, Mr. Pepper who

23   met with the government 13 times before he got his

24   non-prosecution agreement and then he met with the government

25   another 13 times before trial.  What did Mr. Pepper say about

4248

1    his calls with Mr. Little?  Pepper initially said that he

2    called Mr. Little because he knew Tyson was doing a substantial

3    price increase.  That decision had already been made, by the

4    way, at Tyson to see if Pilgrim's also was doing a substantial

5    increase.  Based upon their conversations, Pepper understood

6    that Pilgrim's was also doing a substantial price increase.

7         So what?  Everybody knew.  Everybody knew that.

8    Everybody in the industry knew that there was going to be a

9    substantial price increase, suppliers, customers, everybody

10   knew that because of the supply and demand for small birds, but

11   Pepper never said he had an agreement with Mr. Little about a

12   substantial price increase.

13        And more importantly, Mr. Pepper specifically said

14   that he never share pricing -- Tyson's pricing information with

15   Mr. Little, never, ever, ever.  He testified that he never even

16   told Mr. Little what he meant by a substantial price increase

17   or the amount of the substantial price increase.  How can two

18   people rig a bid or fix a price if they don't discuss pricing

19   information and if they don't know the amounts or if they

20   exchange information that's all over the market anyway?

21        But remember what Mr. Pepper told the government

22   during two different interviews, one less than a week before

23   this trial started.  The government showed Mr. Pepper a phone

24   record of a call between him and Mr. Little on August 5th, the

25   day of the RSCS Tyson meeting in Louisville, Kentucky.  Do you

1    remember that?  Mr. Pepper told the government that during this

2    call, he told Mr. Little what had happened at the meeting.  He

3    told the government this twice in interviews.  But that call

4    happened at 9:11 a.m. Eastern time and the meeting in

5    Louisville, Kentucky with RSCS wasn't until 1:00 p.m. in the

6    afternoon, so Mr. Little could not have been reporting what

7    happened during the meeting.  It is clear he didn't remember

8    what was discussed during that call.  He was just trying to

9    tell the government what they wanted to hear, what would fit

10   their narrative, but it doesn't fit the facts.

11          When you go back to the jury room to deliberate, if

12   you look at chart 10 and if you see calls between Pepper and

13   Mr. Little, ask yourselves why the government didn't ask

14   Mr. Pepper about those calls.  I think there is two calls on

15   chart 10, one on August 15, one on August 18th.  Why didn't the

16   government ask them what was said on those calls?  They had the

17   opportunity to do so and they didn't.  Ask yourselves why not.

18   If it was about KFC, surely they would have asked Mr. Pepper

19   about it, and the same is true with Mr. Little about other

20   calls on chart 10.  We know that Mr. Little was not involved

21   with KFC.

22          The government also has a couple of calls, phone calls

23   and texts that supposedly connect Mr. Little to summary charts

24   14 and 17.  Those charts are related to KFC negotiations in

25   2012 and '13.  But we already know and I have told you that

1    Mr. Little was not involved in KFC pricing.  Mr. Ledford, who

2    was responsible for KFC's contract negotiations with suppliers

3    during that time, testified that Mr. Little was not involved in

4    contract negotiations.  Other than these phone calls and texts

5    with no idea of what was discussed, there is no evidence

6    establishing that Mr. Little conspired to rig bids and fix

7    prices as to any KFC contracts, including charts 14 and 17.

8         Now, yesterday when Ms. Call was talking about the

9    2014 KFC contract, Ms. Call showed you an excerpt from an

10   e-mail from Mr. Little, Exhibit 933.  This is what Ms. Call

11   showed you and she said that -- this is from Mr. Little to

12   Jason McGuire at Pilgrim's, and it says, I am hearing everyone

13   is going up significantly.  That's what she showed you.

14        But she didn't show the rest of this e-mail.  And what

15   is this e-mail about in context?  This e-mail shows first it's

16   about Church's because Church's is Mr. Little's account, not

17   KFC.  But more importantly, this e-mail shows that Mr. Little

18   and Pilgrim's is competing with Tyson.

19        If you read this e-mail, it shows that the customer

20   Church's needs to understand supply.  They are meeting with a

21   competitor, Tyson.  That competitor may offer more volume if

22   Church's will make a concession on how wide the bird weight

23   range can be.  Pilgrim's might lose as much as 10 loads per

24   week to Tyson.  And then here is the kicker.  Mr. Little says

25   he does not have -- I do not have a clue as to price.

1            Why didn't Ms. Call show you that?  Because that

2      contradicts their narrative.  He is hearing everyone is going

3      up significantly.  Well, duh, everybody knew that everything

4      was going up significantly.  As they say in their opening, the

5      rising tide lifts all boats, but that's market forces, not a

6      conspiracy.

7            But this entire e-mail didn't fit the government's

8      story, so Ms. Call cut out that portion of the quote.  She just

9      showed you the small portion that would fit her story.  Never

10     let the truth get in the way of a good story.  The government

11     is desperate to include Mr. Little in the KFC negotiations

12     because it's the centerpiece of their case.  The government's

13     attempt to insert Little into the KFC negotiations fails.  All

14     the government can show is that Mr. Little had a few phone

15     calls with suppliers during the time period of the KFC

16     negotiations, but we know that Mr. Little spoke to other

17     suppliers.  It was part of his job.

18            The government has not established that these calls

19     had anything to do with KFC contract negotiations and the

20     government has not established that he was involved in any of

21     these incidents, much less that he entered into an agreement to

22     fix prices and rig bids with respect to KFC.  Carl Pepper, the

23     government's own conspiracy insider, proves that.

24            There was a couple other incidents that I am going to

25     talk about that relate to Mr. Little, supposedly relate to

1    Mr. Little, Church's freezing costs and the QA requirements.  I

2    am going to discuss those pretty briefly because I think other

3    counsel are going to handle those.

4          But first I want to remind you of a jury instruction

5    the Court read to you because it's especially important for

6    these two incidents.  It's not illegal for a competitor to

7    obtain and act upon pricing and other information received from

8    competitors as long as there is no agreement to fix prices or

9    to rig bids.  It's not illegal for Mr. Little to share

10   information with a competitor.

11         The only evidence that the government has offered with

12   respect to Church's is that Mr. Little shared some information

13   related to Pilgrim's.  There is no evidence that anyone acted

14   upon that information.  There is no evidence of any agreement

15   between Mr. Little and Mr. Pepper to fix a price.

16         So first the freezing charge, which is summary chart

17   No. 1, government summary chart No. 1.  In May of 2013,

18   Church's asked Pilgrim's and Tyson how much it would cost to

19   provide frozen chicken in addition to the fresh chicken they

20   were already providing.  Church's wanted to start having frozen

21   chicken on hand in case of a weather issue or a shortage.  This

22   was not part of the existing contract.  Church's was asking the

23   suppliers for a quote to do something additional after the

24   fact, an add-on.

25         The government wants you to believe that Mr. Pepper

4253

1    and Mr. Little agreed on a charge, but the government has shown

2    you no evidence of any quote by Pilgrim's that Pilgrim's

3    actually sold frozen chicken to Church's in 2013 or what charge

4    Church's actually agreed to pay.  What does Mr. Little do after

5    he receives a request from Mr. Bradley at Church's?  He

6    contacts the pricing guys at Pilgrim's.

7         So if we could put up Exhibit 109, which is not on the

8    government's summary chart, presumably because the government

9    doesn't want you to focus to it.

10        The initial request from Mr. Bradley came in on

11   May 9th.  And Mr. Little responds, I've got our folks working

12   on it.  That's the next part.  "Our folks" are the pricing guys

13   at Pilgrim's.  Mr. Bradley follows up on May 31st, which is the

14   next part.  And Mr. Little sends an e-mail to Tommy Lane, a

15   pricing guy at Pilgrim's, at 12:19 p.m. asking Tommy, When will

16   we have this pricing?  So then in the next section Tommy Lane

17   e-mails Mr. Little back and says, We'll have something Monday.

18   And we can see on Exhibit 109 that May 31st, 2013 was a Friday.

19   So Mr. Little says, Thanks.  So Mr. Little had to wait until

20   Monday to get pricing from Tommy Lane at Pilgrim's.

21        Mr. Little testified -- I am sorry, Mr. Pepper

22   testified that Mr. Little provided the information about

23   Pilgrim's freezing charge to him.  There is nothing illegal

24   about sharing information unless there is an agreement to fix a

25   price.  Mr. Pepper testified about this incident and he never

said that he and Mr. Little agreed on what to charge Church's.
Think about that for a minute.  If he had an agreement with
Mr. Little about the freezer charge, the government absolutely
would have elicited that from Mr. Pepper.  That alone should
put this to rest.

The simple fact is that Mr. Pepper and Mr. Little
didn't reach any agreement during the call or any time after.
You also heard from Darrell Bowlin, and I expect there will be
some discussions about him in some of the other closing
arguments.  Mr. Bowlin from Tyson testified that he and the
pricing team calculated Tyson's freezing charge based on what
it would cost Tyson.  He explained it was a straight
pass-through cost.  And he testified that the pricing
department at Tyson initially calculated the cost at 4 cents,
eventually determining that Tyson's cost was lower and they
provided a lower quote.

Tyson's freezer charge was a result of the pricing
department at Tyson calculating what the cost would be, not any
agreement between salespeople.  Was Mr. Bowlin lying about
this?  You saw him testify.  Of course he wasn't.  There is no
evidence that Mr. Little and Mr. Pepper conspired to fix a
price for Church's freezing charge.

Mr. Pepper, the government's cooperating witness, the
so-called conspiracy insider, never said there was any such
agreement, and all the evidence shows that Tyson independently

1    calculates its freezer costs.  And by the way, out of 15

2    million documents and all the government's witnesses at this

3    trial, there is absolutely no evidence in the record that

4    Pilgrim's ever charged a freezer cost to Church's or that

5    Church's ever paid a freezer cost to Pilgrim's in 2013.

6         But ladies and gentlemen, yesterday Ms. Call's

7    closing -- in Ms. Call's closing statement the government

8    changed its story with respect to the freezer costs, and I am

9    going to explain that now.  Here is what Ms. Call told you

10   yesterday during her closing.  Of course, your recollection

11   controls, but this is what I remember her saying:  You heard

12   about cost pass-throughs and sometimes it's actually just a

13   legitimate cost that's passed and there is no negotiation.  You

14   still have to make a decision about whether they are going to

15   charge that cost to the customer, and they made that decision

16   together, presumably "they" meaning Mr. Pepper and Mr. Little.

17   And you can see that here in the next exhibit, Exhibit 108, and

18   she showed that to you.  On a Friday before he ever heard from

19   his pricing team, Defendant Little responds to Church's saying,

20   I'll have pricing for you Monday.  There will need to be a

21   freezing charge for both.

22        Now, I just showed you that.  Then she says.  You just

23   heard Pilgrim's, they were already supplying frozen product,

24   but they were not charging for it.  So he makes a decision to

25   change his mind and charge based upon those discussions with

4256

 1    Carl Pepper and Defendant Kantola.  That's what Ms. Call said

 2    yesterday.

 3             This is completely false.  The portion of Exhibit 108

 4    that Ms. Call did not show you proves this.  So now let's look

 5    at 108, if we could put that up, and let's look at the bottom

 6    portion.  Now, Mr. Bradley at Church's is telling Mr. Little

 7    that Church's would like to get Pilgrim's approved to be a

 8    frozen eight-piece and dark-meat supplier because they aren't

 9    yet.  They are not supplying frozen to Pilgrim's at this time.

10    Pilgrim's didn't supply any frozen eight-piece and dark meat to

11    Church's.  So Mr. Bradley needs a case of each sent to QA to

12    test it out to see if Pilgrim's can meet with specs.  They want

13    frozen in case of emergencies.

14             Not only is Pilgrim's Pride not providing frozen to

15    Church's, but they haven't even submitted a sample yet in order

16    to be approved to do so.  Ladies and gentlemen, the

17    government's tactics should be plain to you by now.  They put

18    an e-mail in front of you where Mr. Pepper claims to have

19    received information regarding a freezer cost from Mr. Little,

20    and he sends that information to others at Tyson.  The

21    government wanted you to believe that Mr. Pepper and Tyson did

22    what they heard Mr. Little would do and that there was some

23    sort of an agreement about it.  But you heard testimony from

24    Mr. Bowlin and saw evidence that Tyson independently calculated

25    the freezer charge.  The truth didn't fit the story.

1           Did that stop the government?  Heck no.  In closing

2    Ms. Call got up and made up another story.  Now she says it was

3    reverse.  Now it was Mr. Little who after talking to Mr. Pepper

4    decided to charge for freezing when Pilgrim's previously had

5    provided it to Church's free of charge, but that's false.  As

6    the evidence shows, the truth doesn't fit that story either.

7    Facts are very stubborn things.

8           Now let's talk about Church's QA requirements,

9    government summary chart No. 2.  This incident is about

10   Church's adding new quality assurance requirements in December

11   of 2013 after the 2014 contract with Church's suppliers had

12   already been negotiated and finalized.  So what's the real

13   take-away from this chart?  Some chicken suppliers were upset

14   that Church's added on new QA requirements after the contract

15   had been negotiated.  There are no allegations that there was

16   any bid-rigging or price-fixing with respect to the underlying

17   contract, but the additional QA requirements would result in

18   some nuisance costs, so they groused and complained about it,

19   but then what happened?

20          Well, Mr. Pepper himself testified that Tyson's

21   pricing unit calculated what it would cost for Tyson to comply

22   with the new requirements.  And Mr. Bowlin from Tyson confirmed

23   that the pricing department calculated that cost, and

24   information about what other suppliers might charge for the QA

25   would not cause Tyson to increase the cost quoted because

1    Tyson's cost was Tyson's cost.  And similar to the freezer

2    charge, there is absolutely no evidence that Pilgrim's ever

3    tried to charge Church's for any costs associated with the QA

4    requirements.  Where is the evidence of an agreement?

5            So in sum, the government's charts don't sustain their

6    burden of proving beyond a reasonable doubt that Mr. Little

7    entered into any agreement with anyone to rig bids or to fix

8    prices.  He spoke with other suppliers.  Sure, he did.  He

9    spoke about many things.  There is nothing illegal about

10   speaking to other suppliers.  And the Court has told you that

11   there is nothing illegal about sharing pricing information even

12   assuming that Mr. Little did any of that.  And by the way,

13   remember this very important fact.  Carl Pepper, the

14   government's conspiracy insider, testified that he did not

15   provide Mr. Little with Tyson's pricing information.  I repeat,

16   he did not give Little Tyson's pricing information.  The

17   government's so-called conspiracy insider exonerates

18   Mr. Little.

19           So the last thing I want to touch on is Boston Market.

20   This was something that they brought out with Mr. Pepper and

21   then Ms. Call in her closing referenced it very briefly.

22           *THE COURT:*  Two minutes.

23           *MR. BYRNE:*  She talked about Exhibit 5016.  So this is

24   another example of the government trying to mislead you into

25   thinking something was part of a conspiracy to fix prices, but

1    it wasn't, and here is why.

2            Remember, the government showed Mr. Pepper

3    Exhibit 5016.  And the government, as I just said, made a

4    passing reference to it yesterday in their closing.

5            If we could display 5016.  This is an e-mail exchange

6    in June 2015 between Mr. Pepper and Mr. Little about Boston

7    Market where Mr. Pepper asks Mr. Little about Pilgrim's next

8    quarter billing weight.  The government wanted you to conclude

9    that the exchange of that information was in furtherance of

10   some bid-rigging and price-fixing conspiracy.

11           But remember on cross-examination Mr. Pepper testified

12   that Boston Market had complained about Tyson's billing weight

13   and that's what prompted Mr. Pepper to e-mail Mr. Little.

14   Mr. Pepper explained that this is a customer service issue, and

15   knowing Pilgrim's and Tyson's billing weights would address

16   Boston Market's complaints.  It would help Boston Market.

17   Tyson doesn't bill Boston Market for the actual weight of each

18   individual case of chicken.  Tyson assumes an average case

19   weight and it bills that way.

20           The billing weight is based upon the last quarter's's

21   average case weight.  The accounting department calculates it.

22   And billing weights were important because Boston Market didn't

23   want its stores to be paying substantially different prices for

24   the cases of chicken they brought from different suppliers

25   because they buy by the pound and they sell by the piece.  One

4260

1    store can't be paying more for the same 16 chickens in a case

2    than the store down the street.  Boston Market wanted the

3    billing weights from different suppliers to be very similar, if

4    not the same.

5          But you don't have to take Mr. Pepper's word for it.

6    Remember Kent Kronauge, the SMS president and buyer for

7    Popeye's?  He has already been discussed today.  He testified

8    about case weight and billing weight and he said the same thing

9    that Mr. Pepper did.  He himself shared with suppliers

10   information about each other's case weights in order to fix the

11   problem created when one supplier's case weights were higher

12   than the other.

13         This was a customer service issue.  It had nothing to

14   do with contract negotiations or rigging a bid or fixing a

15   price.  The government saw an e-mail where it appeared that

16   Mr. Pepper and Mr. Little exchanged what they wanted you to

17   think was pricing information.  They threw it out there without

18   telling you.  It had nothing to do with fixing a price or

19   rigging a bid.  This is a perfect example of how the government

20   is misleading you, perhaps even intentionally, to try to win

21   their case rather than show you the truth.

22         I am going to talk for one minute.

23         THE COURT:  That's all, actually, you have left, one

24   minute.

25         MR. BYRNE:  One minute?

4261

1          THE COURT:  One more minute.

2          MR. BYRNE:  All right.  I will be quick.  Robbie

3    Bryant, I was going to talk a little bit about Robbie Bryant,

4    but the bottom line is Robbie Bryant testified that he

5    talked -- that he understood that Mr. Little, his conversations

6    were with a person at Holmes and a person at Tyson.  We know

7    the Tyson person was Mr. Pepper who testified that he never

8    shared pricing, Tyson pricing information with Little.  And the

9    only evidence before you regarding Holmes concerns Pollo

10   Tropical, and we know that Holmes was 10 cents less than

11   Pilgrim's.  So that couldn't have been pursuant to a

12   conspiracy.

13          Mr. Bryant has nothing to say about Mr. Little.  So

14   what's going on here?  What is this all about?  Why is

15   Mr. Little even sitting here?  Why is he charged with this

16   crime?  The government just got it wrong.  When with the truth,

17   they would not let go of a story that they wanted to tell.

18   Mr. Little is a hard-working, honest man who has been unjustly

19   accused of something that he did not do.  And now during the

20   trial in this case we saw the evidence that the government has

21   offered about his role in the supposed conspiracy to attempt to

22   prove that he committed a crime.

23          It is unjust that Mr. Little has had to live since

24   October of 2020 under the shadow of these charges.  It's unjust

25   that Mr. Little is facing a federal criminal conviction because

1    of the government's actions in this case.  You, ladies and

2    gentlemen of the jury, have the power to remedy the injustice

3    that the government has committed against Mr. Little.  He

4    didn't do anything wrong.  He hasn't committed any crimes.  And

5    he certainly doesn't deserve what the government has done to

6    him.  He is not a criminal.  He is not guilty.

7           Now that you have seen the truth, you can see for

8    yourself that the real story is better than the government's

9    version because the real story in this case is the truth.  And

10   when you examine all the evidence, especially the evidence that

11   the government doesn't want you to see and hear, you will come

12   to the only conclusion supported by the evidence.  We ask that

13   you return a verdict of not guilty as to Mr. Little, the only

14   verdict supported by the evidence, and then justice will be

15   done in this case.

16          Thank you.

17          *THE COURT:*  Thank you, Mr. Byrne.

18          Ladies and gentlemen, why don't we take about five

19   minutes, so if someone wants to go to the restroom, you can, so

20   we are going to do 5 minutes or you can hang out here, whatever

21   you choose to do.

22          (Brief recess.)

23          *THE COURT:*  We are all present and assembled.  And

24   Ms. Henry is ready to go.  Ms. Henry, whenever you are ready.

25                         **CLOSING ARGUMENT**

1          *MS. HENRY:*  Thank you.

2          Good morning, I am Roxann Henry, and as you may know

3    by now, along with Mr. James Backstrom I represent Mr. Bill

4    Kantola.  You don't know much about Mr. Kantola and we are kind

5    of squeezed over there, so I wanted to give you a picture.

6    After all our time here, you have heard about Koch Foods, his

7    employer.  You have heard a lot of generalized statements about

8    suppliers, but actually very little about Mr. Kantola.  And

9    while I will point to how the government is, in fact, wrong

10   about Koch Foods, Koch is not who is on trial here.

11   Mr. Kantola is not a supplier or a company.  He is a flesh and

12   blood individual, and it is his future that is at stake.

13         Mr. Kantola is a customer service guy and a salesman,

14   but he is only one of the many employees at Koch and not even

15   the only salesman who worked on the KFC account.  One of his

16   responsibilities was to find covers for shorts.  He did not

17   have pricing authority.  And the government has chosen not to

18   provide you with any evidence to connect Mr. Kantola with how

19   decision making was even made at Koch Foods.

20         You do know he talked on the phone with four

21   individuals.  Each of those also had responsibilities for

22   covering shorts and also did not set the prices at their

23   companies.  The government says that you can accept that covers

24   and shorts happened, that you know that, and it's true, you do,

25   but then they would like you to forget it happened.  They said

4264

1    this case isn't about covers and shorts or current pricing, but

2    we'll show you why those covers and shorts are relevant.  It's

3    more likely that Mr. Kantola's calls that they want to talk

4    about seven to eight years ago had more to do with covers and

5    shorts.

6           The government's case against Mr. Kantola is not

7    circumstantial.  It's speculative.  Mr. Kantola is charged with

8    a crime, but whatever it's supposed to be is not really clear

9    because talking on the phone is not illegal.  There are some

10   things, though, where the record is clear.  What is

11   established?  Mr. Kantola did not decide Koch's pricing.

12   Mr. Kantola never gave Koch's bid numbers to another supplier.

13   And I know that you've heard that that's not true, but we're

14   going to show you he did not.  Mr. Kantola was never given bid

15   numbers of another supplier and there is no evidence on that at

16   all that he did.

17          And while you've heard a lot about market conditions

18   and how each supplier had a different strategy, Koch's strategy

19   was extremely unique, and it was to invest in new small-bird

20   capacity for the fast-food customers.  And Mr. Kantola competed

21   aggressively for more volume.

22          I cautioned you in my opening to look for what

23   actually happened.  And now you have seen for yourself what I

24   have told you.  Mr. Kantola consistently sought to gain volume

25   to fill that new capacity his company was creating.  That was

1   his job.  He could not and did not intentionally enter into any

2   price-fixing agreement.

3          The prosecution in closing emphasized repeatedly that

4   the goal of a price-fixing agreement is to avoid being undercut

5   by another supplier, and this is a point of agreement.  That

6   concept makes sense.  In fact, applying that basic common sense

7   is one of the reasons why Mr. Kantola cannot be found guilty in

8   this case.  The customers testified consistently that

9   Mr. Kantola asked for more volume.  They remembered how Koch

10  Foods was making this investment to grow capacity.

11         Mr. Lewis, you will remember he talked about working

12  with Mr. Kantola to expand the capacity at the Chattanooga

13  facility, and that was only one of the facilities.  Various

14  witnesses have confirmed this point about how taking away the

15  volume of a competitor is how you undercut the competitor.

16  What was it they were competing for?  You heard numerous people

17  say that they were competing for volume.

18         When Mr. Bryant said he felt reassured that suppliers

19  had communicated, what was it he said?  He said he was

20  reassured that he wouldn't lose volume based on the prices of

21  other suppliers.  And the prosecution yesterday said that too.

22  But what really happened?  Precisely that.  The government's

23  first witness, the very first witness you heard from,

24  Mr. Suerken, he said, What I did was I took volume from my

25  highest priced supplier, and on the basis of the prices, I gave

4266

1  that volume to my lower priced suppliers.  And you've seen how

2  Koch in that negotiation was the supplier who got the most

3  volume because it undercut Pilgrim's prices.  The government's

4  speculation of price-fixing doesn't even fit the facts of the

5  very first witness it gave you.

6      And subsequent evidence confirmed the government's

7  fanciful theory here is basically baseless.  I want to go

8  through a few examples here of Koch Foods aggressively

9  competing because that's what you heard about.  And I am not

10  going to go through all of them.  I think we have a problem

11  there.  Can we put them all up, please?  I am not going to go

12  through them all.  You have seen a lot of this evidence.  I

13  want to talk specifically about the first one.

14      We are hearing that Claxton and Koch were pretty

15  aggressive with pricing as well as Tyson.  Well, the reason I

16  want to focus on that, because yesterday the government listed

17  that document as the key evidence against Mr. Kantola.  First

18  of all, Mr. Kantola's name isn't on that document, and that was

19  the only thing that was said about Koch Foods, Koch aggressive.

20  And you won't see that part of the document on the government's

21  charts although the government lists this on the chart.

22      The prosecution said there were a batch of calls

23  between Mr. Kantola and Mr. Austin right prior and that from

24  this document you would be able to tell that there was a

25  price-fixing agreement.  Well, what this shows is that Koch had

1     already undercut Pilgrim's.  It had already happened, and it

2     had already undercut them in this 2012 negotiation.  And if

3     Mr. Austin did try to verify that Koch had been aggressive, we

4     will show you he didn't get from Mr. Kantola any of

5     Mr. Kantola's bid numbers.

6            Examples of aggressive competition are a record that

7     should make Mr. Kantola proud, and instead we now have him in a

8     tailspin just wondering how his work could be twisted to get

9     him here.  Again, most of what you saw and heard throughout

10    this entire time here has had nothing to do with Mr. Kantola.

11    In the 14.7 or .8 million documents and with the full force of

12    the FBI and all the agents, the prosecution has shown almost

13    nothing about him.  The government's charts, the -- I am going

14    to -- the snippets of charts, Golden Corral, Pollo Tropical,

15    Popeye's, Chick-fil-A, Boston Market, I don't really know what

16    the prosecution is claiming about any of those because none of

17    them have anything to do with Mr. Kantola, absolutely no

18    connection.  Sysco, no connection to Mr. Kantola.

19           And Mr. Kantola was glaringly absent from Carl

20    Pepper's lengthy testimony.  One thing you can forget about is

21    the freezing costs.  Mr. Pepper did say that he thinks he

22    talked to Mr. Kantola nine years ago.  Never told Mr. Kantola

23    what Tyson would do.  In fact, he didn't even know what Tyson

24    would do.  The chart that the government has pointed to has on

25    it a 50-second phone call to a Koch office line.  And the

1    document that it points out had nothing to do with Mr. Kantola

2    on it.  And most importantly, the government offered nothing,

3    nothing at all about what Koch did or didn't do about freezing

4    costs.  There is nothing there.  If Koch had somehow agreed on

5    something, you would have seen it.

6         The government's second chart, the one that they label

7    Church's QA cost, well, go back and look at it because there is

8    nothing, nothing at all in evidence and not on that chart that

9    has anything to do with Mr. Kantola and Church's QA costs.

10   Instead, what the government did, they inserted onto that chart

11   a document about Mr. Kantola telling a colleague, Hey, I hear

12   that Tyson undercut us for the contract for the next year.  It

13   was already done.  It already happened.  There is no way you

14   can possibly suggest that that has to do with an agreement.

15        In fact, in all the government's charts, there are

16   three, three text messages, three text documents, excuse me --

17   there are no text messages -- that relate to Mr. Kantola.  Why

18   is what I just talked about the Tyson undercut us, just telling

19   a colleague about it.  The second one is about the dark meat

20   price formula for Koch's initial 2012 KFC bid, and I'll say

21   more on that, but it's telling that the chart doesn't include

22   what Mr. Kantola said about that decision.

23        And the third document is in 2017, and the only thing

24   that is is Mr. Kantola sending over the price submission to

25   Sara Fisher.  We talked about that in the testimony.  It's

1   about as innocuous as anything you can get.  But once again,

2   it's somewhat critical to look at what the chart doesn't show

3   because the chart didn't put on what the bid number that

4   Mr. Kantola had given to Ms. Fisher.  And why?  That bid number

5   isn't the number that Mr. Bryant had.  And you will remember we

6   talked about that and we will go through that a little more

7   too.

8          And the phone calls, yup, Mr. Kantola had phone calls

9   with other suppliers, friends and people with whom he bought

10  chicken, but there is no evidence that Mr. Kantola agreed to

11  fix prices for customers on those phone calls.  That would be

12  an amazing amount of speculation as he is a salesman and a

13  customer service guy and not even setting the prices.  The

14  customers confirmed that they knew he wasn't deciding the bids

15  for their employers.

16         And Mr. Little who appears on the charts for KFC, he

17  wasn't involved with the KFC negotiations, but he was involved

18  with covers and shorts.  The prosecution would have to be deaf

19  not to have heard the witnesses testify that cover sales

20  happened all the time.  Witness after witness starting with

21  Mr. Suerken through Mr. Ledford and ending with Mr. Kronauge

22  confirmed that shortages happened all the time and that

23  particularly in the summer of 2014 supplies were really tight.

24         Common sense.  What does common sense tell you when

25  there is tight supply and you are trying to find a cover?  It's

1    going to take more calls to find available chicken.  It does

2    smack of desperation that the government doesn't want you to

3    think about the covers and shorts.

4         You heard the last thing that I talked to Mr. Kronauge

5    about, our very last witness.  He said right during the time

6    frame of these KFC negotiations that the government has said

7    these are the only negotiations you really even need to think

8    about.  What did he say?  He said, yeah, I was dealing with a

9    big cover-and-short problem.  They were happening all

10   throughout that summer.  It was tight supply.  And I even was

11   asking Mr. Kantola and others to coordinate to help me get the

12   chicken I needed.

13        There is a lot that the government would like you to

14   ignore.  No one testified that he has agreed with Mr. Kantola

15   about price-fixing and bid-rigging.  Not a single document

16   shows such an agreement with Mr. Kantola.  Yet the evidence

17   would have to prove for a conviction beyond a reasonable doubt

18   that Mr. Kantola voluntarily, intentionally, willfully agreed

19   to fix prices and rig bids 2012 to 2019.  And as the Court

20   instructed, that is what the government charged.

21        The government points to the KFC negotiations because

22   nothing else relates to Mr. Kantola, and that alone should cast

23   doubt on whether he can be found guilty of this conspiracy

24   which supposedly includes all this stuff.  Well, let's go to

25   KFC, and unlike the prosecution, let's look at what actually

1  happened because trying to guess the meaning of calls, common

2  sense says look at the results.

3         You will remember in opening I told you to watch the

4  numbers.  Well, you're probably more than sick of numbers at

5  this point.  I understand that.  But the hard facts of those

6  numbers contradict the government's fanciful cobwebs.  This is

7  a criminal felony case, and when the government's speculation

8  is full of holes, you cannot convict.  The government's theory

9  is based on wrong numbers.

10        And can we have that slide?

11        For each of the three KFC negotiations the government

12 discussed the prosecution asks you to speculate and to

13 speculate based on these documents what it is that Mr. Kantola

14 had phone calls about.  They say these -- they literally said

15 yesterday these documents, these numbers show you that

16 Mr. Kantola had given his bid numbers to Pilgrim's.  The

17 government has an obligation to be right.  It has the burden of

18 proof to show facts beyond a reasonable doubts, but the entire

19 premise of its argument against Mr. Kantola is wrong,

20 repeatedly wrong.

21        Maybe this looked tantalizing when someone first saw

22 it, but by now everyone knows the facts.  Those numbers are not

23 Koch's numbers and there is no reason to speculate from this

24 wrong information that Mr. Kantola had agreed with competitors

25 to fix prices and rig bids.  Frankly, you would have a right to

4272

1    feel insulted being told that that's what you should do.  The

2    prosecution is suffering from some bizarre fixation that is

3    making it blind to the truth, to the facts.

4        For the 2013 KFC contract you saw how the actual

5    evidence showed the government wrong.  Remember, I kept asking

6    Mr. Ledford, This is not .9561.  This is not .9561.  This is

7    not .9561.  The facts don't match any claim of Mr. Kantola

8    telling a competitor Koch's bid submission, and they don't

9    match that Koch didn't independently set its prices and

10   compete.

11       And I want to go back to that e-mail about trying to

12   get a little bit more for dark meat, and that's Exhibit 1409 if

13   you want to go back to it.  The government's chart shows

14   Mr. Kantola saying a decision was made to see if they might get

15   a little bit more on the dark meat by changing the formula.

16   It's an ordinary business document.  It happens all the time

17   that people look at these things.  But what the chart left off,

18   what it clipped off was what Mr. Kantola said next.  I don't

19   think it will stick.  That doesn't sound much like an

20   agreement.

21       The prosecution carefully didn't highlight

22   Mr. Kantola's opinion of the decision.  And the prosecution

23   telling you that that showed that phone calls were about fixing

24   the price of dark meat is just another demonstration of

25   fixation on trying to get a conviction and ignoring facts.

1          What actually happened?  The bids came in -- and this

2     is the RSCS document about that.  The bids came in all over the

3     place for dark meat.  The red bar is the bar that shows the

4     dark meat initial bids all over.  Then if you look quickly at

5     the Koch one, you'll see it immediately changed its formula and

6     lowered the price of dark meat right away.

7          And why did it lower its price?  Well, we've talked

8     about this.  Koch needed more volume.  Remember when I asked

9     Mr. Ledford about whether Koch was the only one of the

10    incumbents to get an increase in its commitment for dark-meat

11    award?  He said you could just do the contract, take the

12    contracts for 2012 and 2013 and compare them.  Well, we've done

13    that.  You'll see most of the suppliers didn't change in terms

14    of their allocation of dark meat.  Pilgrim's lost volume, but

15    Koch, Koch gained volume.

16         And I want you to remember Mr. Kantola is sitting

17    right there.  Can you understand how he must feel hearing the

18    prosecution say this negotiation proves him guilty of a felony

19    that you should find him guilty of?  The government chose not

20    to show how the 2014 contract prices decreased and decreased to

21    even lower than they had been as a result of the negotiations

22    before the claimed conspiracy.

23         The prosecution did focus with some exuberance on the

24    2015 contract negotiations.  Those suffer from the same

25    problems of just being wrong.  Koch was never increasing its

4274

1    price by 14 to 16 cents.  I've put in here the 11 cents and you

2    have seen that in other documents as well.  This is a number

3    that is not with any issues of memory or guessing.  The facts

4    are in the actual documents and anyone can do the math.  And

5    keep in mind the testimony you heard about how much a penny

6    difference makes.

7         Also, I want you to note Pilgrim's used the same club

8    numbers for three different suppliers and they did that in all

9    of these numbers that they were looking at in 2014.  You would

10   think that would have been a tip-off that the numbers weren't

11   all coming from the suppliers.  And margins, you heard the

12   testimony the customers never made purchases based on the

13   margins.  They looked at the final price, the prices we just

14   talked about, the prices that don't match.

15        There is no evidence that Koch Foods did anything but

16   independently formulate its bid prices, nothing at all that

17   Koch's people set strategy based on information from other

18   suppliers.  The evidence was directly to the contrary.  The

19   evidence was that Koch's owner had decided a strategy to

20   increase capacity.  It was a unique strategy.  And most

21   importantly, it needed sales to fill that new capacity that was

22   being built.  And that, that was Mr. Kantola to help with that.

23   That's where he came in.  That was his role to kind of help

24   with that.

25        And as for the numbers that Pilgrim's wrote, maybe

1    someone made an educated guess.  That's what folks do, try to

2    get a sense of where the competition will be and customers help

3    with that, and not just customers at KFC.  You heard

4    Mr. Kronauge and you heard a lot about how RSCS and others were

5    discussing the big bird/small bird margin difference.  You

6    heard Mr. Bryant say that if Mr. Suerken were upset about what

7    he was hearing on pricing, that was going to filter down to a

8    bunch of people.  And if Pilgrim's was blitzing customers in

9    July of 2014, that would have filtered down to the suppliers

10    too pretty quickly.  The evidence, however, was straightforward

11    that Mr. Kantola was not deciding these numbers, any numbers

12    for his company.

13         The government also pointed to where other salesmen

14    were reporting thoughts on whether Koch or others would hold

15    prices.  But whatever those guys psyched out of their

16    conversations with customers or other suppliers, go back and

17    look at the dates and the numbers in the bids and the contracts

18    because those are the hard facts, the information the

19    government tried not to show.  And you have seen a number of

20    these charts and it's been presented in various ways, but Koch

21    Foods did not hold on its pricing.

22         And that was true also, you heard in 2017 both Sara

23    Fisher and Mr. Eddington talked about how Koch Foods went down

24    and then ultimately agreed with how they wanted to do it at

25    RSCS to go down to that stair-step pricing.

1            Now, the law is clear that when considering an

2     individual, an individual, what that person would have

3     understood, whether it was the intent of that individual person

4     to agree to fix prices or rig a bid, you have to look at it

5     from the standpoint of what that individual would have seen and

6     heard and done, what was in his mind.  So I want you to think

7     from the standpoint of Mr. Kantola, what he would see.

8            And I asked you to think about bucketing the evidence

9     and let's do that.  He didn't set the prices, but his goal was

10    to help get more sales.  This gentleman has been ripped out of

11    his life to sit here as a defendant in this courtroom, but what

12    I want is for you to think back do his life seven to eight

13    years ago.

14           RSCS tells him they are in a total panic over

15    sustainable supply.  Mr. Suerken says, We are willing to invest

16    whatever necessary to fix this.  RSCS says it's got a new

17    mindset.  The opening of a request for proposal process asks

18    for the needed profitability compared to big birds, and you

19    heard a lot about how that was a big differential and how

20    people were talking about that left and right.

21           Koch's owner meanwhile is choosing to invest in small

22    birds.  It requires financial support and more sales to fill

23    the capacity.  It's a sustainable supply win-win.  So Koch puts

24    together its proposal, and in putting together its proposal, it

25    considers the market conditions and the investment support and

1    the proposal is a high price.  RSCS complains a bit, but they

2    always complain, but they respond we are making good progress,

3    and RSCS asks Koch for more loads.  Mr. Kantola's company gives

4    him prices to lower that price.  That's what Mr. Kantola would

5    have seen his company doing.  He would have seen his company

6    competing.

7         And if a 2- to 4-cent increase was a huge increase,

8    being almost 5 cents lower than the high price, that was

9    dramatically meaningful.  And, of course, it was.  This is what

10   actually happened.  Koch Foods got an increase over what it had

11   been supplying.  That increase, that half million pounds per

12   week translates to about 70 million extra pounds of chicken

13   over the three-year contract.  That was a lot of chicken.  And

14   remember, to get it, how did they get it?  They undercut

15   Pilgrim's.

16        That 8.6, it's greater than the 8.6 million number,

17   you get there by looking at the differential between what

18   Pilgrim's bid was and what Koch's bid was.  That differential

19   was .0487, a little less than 5 cents.  You apply that against

20   the volume and that is how much KFC saved by taking volume from

21   Pilgrim's and giving it to Koch.  It's also a pretty important

22   measure when looking at how much Koch left on the table.  I

23   don't know whether you are familiar with that concept.  It's a

24   concept of maybe if they had -- how much the differential was

25   between the high price and the low price in looking at how much

4278

1    you gave up to be able to get the volume.  That's a lot of

2    money.

3            There is no concept that there was any agreement to

4    leave that type of money on the table.  If there had been an

5    agreement, you simply would not see this happening.  The

6    prosecution now at least knows these facts, and you heard a

7    pretty pathetic attempt to kind of side-step around them.  But

8    there is no getting around that Mr. Bryant's guess that

9    competitors if they were sharing bid information, that this

10   would not happen.  So he just doesn't recall that it happened

11   and the prosecutors chose not to tell him.  And you heard Mr.

12   Suerken testify how much Mr. Austin wanted those sales.

13           Let's go to the 2017 negotiations because they truly

14   top off the absurdity of the government's speculation showing

15   that the government was wrong again and with the prosecution

16   pushing Mr. Bryant to tell you what was not true.  And then it

17   was pretty upsetting yesterday to hear what was not true

18   repeated, and it's somewhat ridiculous too.

19           You heard Ms. Fisher because I asked her, every

20   proposal, every number she was given in the bids, bid

21   submission numbers, they were not 1.0125.  She confirmed it

22   again and again and again.  And there was a slight mistake made

23   here earlier saying that at the time that Mr. Bryant wrote

24   this, the bids hadn't been actually formulated.  Well, that's

25   not true.  Koch not only had formulated its bid prior to the

4279

1   time Mr. Bryant wrote down these numbers, prior to the time

2   that there was supposedly any calls that related to those

3   numbers, they had been submitted on January 20, 2017 and

4   confirmed again in a letter on January 30, 2017.

5           Ladies and gentlemen, those are not bid submission

6   numbers.  There is no way that they can be.  There is no

7   concept that you can even consider the idea that that somehow

8   proves that Mr. Kantola gave its bid submission numbers to

9   Pilgrim's.  It doesn't happen.  This craziness of a

10  consistently wrong basis for guessing does leave you to wonder

11  how is Mr. Kantola pulled out of his life to be here?  While

12  you initially might think that Mr. Bryant had something to do

13  with it, I think you have already heard and you probably

14  already understand he didn't.  They had already charged

15  Mr. Kantola long before they talked to Mr. Bryant, and that was

16  true of the most of the witnesses that you heard.

17          The government charged Mr. Kantola and these other

18  individuals and then went about trying to figure how to really

19  put together its case.  And at some point it should have been

20  able to do the math too to look at the numbers.  The

21  government's well-rehearsed opening testimony of Mr. Bryant

22  demonstrated how the prosecutors have ignored the facts.  Maybe

23  there is institutional pressure because you heard about how

24  much the resources had gone into this investigation and then it

25  really came up blank, at least there is nothing there for

1    Mr. Kantola.

2          Mr. Bryant is a criminal who is scared that he is

3    going to be prosecuted if he doesn't cooperate to what he

4    thinks at least the government is going to deem cooperation.

5    And as the government prepared him, they deliberately did not

6    show him the facts or ask him to explain why his story totally

7    didn't match with the facts.  But the prosecutors did show him

8    documents in a dramatic flourish in this courtroom to help try

9    to bolster up their fanciful theory.  But even then it was

10   misleading.

11         They got him to identify the call by pointing to a

12   telephone record that hid that the call was for only 24 seconds

13   and probably never connected to Mr. Kantola.  We have already

14   seen some of these phone records.  You also saw maybe two days

15   ago, maybe yesterday, I have lost track, the stipulation about

16   Verizon phone records.  You will see that the call that the

17   government showed you, the Verizon phone records say it was a

18   minute.  Now, the government didn't focus on that either when

19   they showed it to you, but it shows a minute.  But the

20   stipulation that you were shown also explained that how Verizon

21   rounds up everything to a minute if it's less than a minute.

22         The AT&T records, however, are much more granular.

23   They break out all the little legs of the call and they broke

24   out this call which was 24 seconds into two separate little

25   legs.  And it makes it pretty clear it never got to

4281

1    Mr. Kantola.  But I want to pause for a minute to consider this

2    call because the prosecution yesterday, they made this

3    practically the linchpin of their case.  It's the only thing

4    they talked about on opening with them and it's not on their

5    charts.  I told him the price is the price.  How many loads do

6    you want?

7          I don't need to go through it really again because you

8    have heard it.  That's not a price-fixing agreement.  It's not

9    anything about fixing a price.  And, in fact, what it reflects

10   is the price was already given.  And it wasn't about holding on

11   price because we have already gone through that too.  And the

12   holding issue wouldn't even be a decision that was

13   Mr. Kantola's.

14         What actually happened is that Koch lowered its price,

15   was almost 5 cents lower than Pilgrim's and took a lot of

16   volume because of that undercutting, the very company that

17   supposedly this whole thing was agreed to by Mr. Kantola.  This

18   call, if it happened, was meaningless, and it certainly did not

19   cause Mr. Kantola not to compete and not to undercut Pilgrim's

20   because that's what he did.

21         Indeed when Mr. Bryant testified, you heard that the

22   prosecutors only asked him about his understandings, his

23   expectations, his guesses, his assumptions because by that

24   point it was pretty clear, he did not know anything about any

25   of the gentlemen in this room communicating about bid

4282

1    submissions.  He didn't know anything.

2         *THE COURT:*  Two minutes, Ms. Henry.

3         *MS. HENRY:*  I want to pull up instruction No. 6

4    because I think this is critical.  The government has asked you

5    to make inference upon inference, but an inference can only be

6    drawn from facts that have been proved.  And in making the

7    momentous decision about Mr. Kantola's life, that's what we

8    want you to do is think about the facts.  Think about the

9    layers of guesswork here.

10        First, they are trying to say that these calls were

11   about bid submissions.  They haven't proved that.  Then they

12   have to prove again that somehow that was about price-fixing,

13   and they haven't proved that.  We've got layers here.  And

14   there is no reason to believe that the pattern of phone calls

15   was any different during the times of bid negotiations.

16        You heard about the shorts and covers, how they

17   happened, idle chatter like a meeting, like when a meeting is

18   or whether you have already finished or guessing about how

19   grain may affect current prices.  That's not illegal.  We ask

20   you to apply the law as the Judge has told you.  Independent

21   decision making is the opposite of price-fixing, and that is

22   what Mr. Kantola saw his company doing.  He neither knew of nor

23   participated in any agreement to fix prices.

24        The evidence is clear and the prosecution doesn't have

25   a lesser burden against one individual just because they

1    charged a lot of people, and that seems to be what's going on

2    here.  The prosecution offered no evidence of Koch's decision

3    making, its processes, its personnel, its organization or

4    anything.  They suggested that all you needed to know was that

5    Mr. Kantola signed a contract, but as Mr. Finch and even Flo

6    Becker explained, in a privately held company especially all

7    you have to do is have authority to sign a contract is for

8    somebody to tell you take care of the paperwork.

9         The prosecution said Mr. Kantola committed a crime to

10   get money and showed you Exhibit 901 saying it showed large

11   price increases for Koch Foods, but again they confuse

12   Mr. Kantola with the company.  He didn't get the money.  And

13   the price increases are not a crime, but more importantly, a

14   revenue increase is not a price increase.  And that document

15   shows you more about Mr. Kantola helping his company take more

16   volume from competitors than it does about anything else.

17        The government's theory, please think about it.  There

18   is no price-fixing agreement.  Who made the agreement?  Not

19   Mr. Kantola.  How was it made?  Nothing Mr. Kantola did.  What

20   were the terms?  Well, you heard Mr. Bryant explain the terms

21   and you heard the government explain the terms, and that's not

22   consistent with what Mr. Kantola did either.

23        You see here a man who was going about his job and

24   then he finds his conduct turned on its head.  He needs to go

25   back home to his wife and seven dogs.  He is counting on you

1    for his future.  The evidence is utterly insufficient to find

2    beyond a reasonable doubt Mr. Kantola guilty of the criminal

3    felony alleged.  He is not guilty and we respectfully request

4    that you enter a judgment of not guilty.

5         Thank you very much.

6         *THE COURT:*  Thank you, Ms. Henry.

7         Ladies and gentlemen, let's -- why don't we take

8    another five minutes and then we will reconvene, all right?

9    Five minutes.  The Court will be in recess.

10        (Brief recess.)

11        *THE COURT:*  Who would like to go next?

12        Ms. Prewitt.

13                          **CLOSING ARGUMENT**

14        *MS. PREWITT:*  Thank you, Your Honor.

15        May it please the jury.  I am standing here on behalf

16   of Tim Mulrenin.  As you have heard during this trial, Tyson

17   set its prices independently.  There is absolutely nothing that

18   you've seen, there is nothing that you've heard that shows

19   anything other than Tyson pricing independently.  That's for

20   every bid.  That's every single cost quote.  And that is one of

21   the critical failures of the prosecution case against Tim

22   Mulrenin and also Brian Roberts and others here.

23        What we have learned is before they charged Tim

24   Mulrenin, they did not do the work, the necessary work to

25   understand how what they claimed happened could not happen, how

4285

1    it didn't happen.  Salespeople at Tyson, Tim Mulrenin, Brian

2    Roberts, Carl Pepper, anyone from the sales team did not have

3    the authority to set prices, didn't have the ability, couldn't

4    do it.  They weren't the price setters.  We put the price

5    setters on the stand, not the government.

6         Ladies and gentlemen, these men could not fix a price.

7    They couldn't align a price.  They couldn't agree to fix a

8    price.  They couldn't have joined a conspiracy as the

9    government claims.  Those are not my words.  The words about

10   who set the prices at Tyson, who set the costs at price, those

11   are not my words.  My words mean nothing in this courtroom.

12   The prosecutors' words mean nothing in this courtroom.  It is

13   the witnesses' words, that is the evidence you consider.  It is

14   the documents, the words on the documents, that is evidence for

15   you to consider.

16        And I want to show you a more recent photo of Tim

17   Mulrenin.  The one we had that was in evidence before was an

18   older picture.  He has a few more gray hairs in this one.  That

19   is what recent years has brought to Mr. Mulrenin.  This is an

20   innocent man whose life has been shattered, shattered by the

21   cloud of this charge, this criminal felony charge that he lives

22   with, this good man, this trusted man, this trusted salesman.

23   He has had to endure this.  He has had to endure this despite

24   the fact that there is no evidence, zero evidence of his

25   involvement in a conspiracy to fix prices.

1          You have not seen any evidence that he tried to do

2    anything to raise or fix prices.  There is not one point in

3    time during this whole eight-year supposed conspiracy after

4    scouring every text, every e-mail, thousands of pages of phone

5    records, there is nothing, nothing from any witness that you've

6    heard from that says anything different.

7          Look at the documents, the documents they picked out,

8    the prosecutors, as their key evidence.  Judge them by that.  I

9    ask you, I want you to look at every single one.  I want you to

10   look at it closely.  You deserve more than that to be even

11   asked to consider whether someone should be guilty of a federal

12   criminal offense.  There should be more, more than what they

13   are showing you.

14         This is absolutely laughable, what they have shown you

15   and tried to pass off as proof of Tim Mulrenin's participation

16   in a crime.  What they have shown you, it would be laughable if

17   it were not so serious, so serious for him, for his future, for

18   his reputation, for all those that hold him dear.

19         You have learned the opposite of what the prosecution

20   has told you.  You heard how Tim Mulrenin pressure pushed, beat

21   down the pricing people to lower prices for his customers.  Why

22   did he do that?  You've heard why.  You heard from witnesses

23   who took the oath on the stand.  Because he cared.  He cared

24   about more volume.  He cared about sales.  He cared about his

25   customers.  He wanted them happy.  He wanted to win contracts

4287

1    for them to sell more chicken.

2            The prosecution has thrown a full and awesome power of

3    the Federal Government against Tim Mulrenin, a salesman.  You

4    had have the Department of Justice.  You have got the FBI.  You

5    have got the Department of Commerce.  They tread through

6    15 million documents, millions of phone records, texts, and

7    they spit out a story board, story board charts, charts that

8    paint a picture, a false and distorted picture.  The

9    prosecution used this immense power, this immense power to

10   squeeze witnesses, to squeeze out the word that they felt they

11   needed.  And even that, there just wasn't enough.  It's nothing

12   even close and it is shocking.

13           There is no evidence whatsoever that Tim Mulrenin had

14   any involvement, any knowledge of anyone's involvement in

15   coordination of bids or bidding strategy, nothing at all.  It

16   just didn't happen.  So let's talk about what the prosecution

17   said that they would show you when they came and offered their

18   opening statements in this case.

19           They talked about this club, this exclusive club, this

20   price-fixing club that supposedly Tim Mulrenin and others

21   sitting here facing trial were part of, how that club

22   formulated a plan.  They formulated this plan and with the plan

23   in hand they went back to their businesses and they submitted

24   higher prices.  That's what they did.  But that's what the

25   prosecutor said.  But we've learned in the course of this trial

1  through evidence that that couldn't happen at Tyson, not

2  without the pricing people, the business unit, the pricing

3  unit, without those people, those people part of this exclusive

4  club, but they weren't.  We showed you that.  The prosecution

5  could have, but they didn't.

6          You heard from those witnesses how the prosecution's

7  so-called insider, Carl Pepper, was an outsider when it came to

8  setting prices or costs.  To fix prices, you need to be able to

9  fix a price.  Tim Mulrenin could not, did not fix a price and

10  no one in sales could or did.  You learned how the pricing and

11  business units at Tyson set prices and costs, that sales didn't

12  the ability to do so, they didn't have the authority, that

13  sales couldn't execute on any supposed plan.

14          During the trial you learned about Tyson's structure

15  from witnesses, witnesses we put on the stand, and all the

16  units and the people, the big machine that is Tyson pulling

17  these things together to come up with numbers to be

18  competitive.  The prosecution did not put a single one of those

19  witnesses on the stand for you to hear from when this is a case

20  about price-fixing supposedly.

21          You heard from Brandon Campbell, a pricing manager at

22  Tyson Foods at the time.  He testified that Tyson arrived at

23  that KFC 2015 price for the supply of chicken on the bone

24  independently apart from communications that involved any other

25  supplier.  He testified that was not just actually

1   Mr. Campbell, we also had Mr. Bowlin.  Mr. Bowlin in the

2   business unit, the one who owned the price, decided the price,

3   he testified to it as well.  He was willing to lose sales.  He

4   wanted that price, that 19 cents.

5          He testified also about the freezing and the quality

6   assurance costs for Church's and how they amounted to -- the

7   prices came from Tyson figuring out what the cost would be and

8   passing it on, cost pass-throughs, straight pass-throughs, no

9   profit, and how he would not have listened to anyone trying to

10   push costs up, not above what they actually were.  And he

11   expected to charge for those costs.  You have heard nothing

12   different.

13          In the closing statement, the prosecutor through out a

14   new argument about whether they would charge it or not, the

15   quality assurance or freezing.  You heard no testimony about

16   this, ladies and gentlemen, and the prosecutor can't testify.

17   More than that, he remembered sales, Tim Mulrenin specifically

18   trying to push down prices, push costs down; but he didn't

19   remember a single occasion, a single occasion where anyone from

20   sales tried to push up prices or costs.  To him, that just

21   wouldn't make sense.  Why would that happen because he

22   understood that salespeople are paid on volume.  That's how

23   they were awarded, unlike the pricing people, unlike the

24   business unit.

25          Even Carl Pepper testified to that.  He denied giving

4290

pricing information to other suppliers.  The government's own witness testified to that.  He never testified that he looped in anyone from the pricing unit or business unit for some -- as part of some scheme.  There is no link, no link between his communications, Mr. Pepper, if you believe them, no link between that and the people who actually decide the price at Tyson.

And it was so obvious, this fundamental fact about Tyson, so obvious that even the buyer, Mr. Eddington, who took the stand and took an oath, because the defense put him on, he said that he knew it wasn't the salespeople.  It was the pricing people at Tyson who made the decision on price.  There is nothing in the record that puts that in dispute.  More than that, there is not a shred of evidence, not a shred of evidence of anyone from the sales team, not Brian Roberts, not Tim Mulrenin who did anything to try to push up a price.

Darrell Bowlin testified he knew what went into the sales negotiations.  He knew the price that went in and he knew what came out.  What he did say about that?  He said they always when they could, as much as he could remember, they always came out on the low end.

I want you to focus on something, and I will talk about it more, but it's important.  The single piece of evidence the prosecution put before you they pulled out from Mr. Pepper on the stand was about an incident that made him

1    recall that there was one time when the sales unit actually

2    went with less than the bottom of the range.  It was with the

3    Popeye's 2015 negotiation.  The prosecution elicited testimony

4    that is demonstrably false by witnesses that took the stand and

5    by documents that are in evidence and we will show you those.

6    There is more on that.

7          At Tyson you heard how the business unit set the

8    price.  They took a lot of factors into account, but collusion,

9    coordination with competitors was not among them.  You learned

10   how they came to Carl Pepper.  His conversations were about

11   learning where the market was or where it might be going.  But

12   that's all he could have talked about.  That's as far as they

13   could have gone.  There is no evidence that connects any

14   discussion between Carl Pepper and a rigged bid or a fixed

15   price.  There is no evidence that connects discussion with

16   anybody at Tyson to a rigged bid or a fixed price.  There is no

17   evidence that Tim Mulrenin or anyone at Tyson shared any prices

18   or is aware of any price sharing.

19         So let's talk about Carl Pepper.  When it came to

20   those 2015 KFC negotiations, the prosecutor tried, the

21   prosecution tried to make Carl Pepper into someone he is not.

22   Carl Pepper is who he is.  They can't remake him into someone

23   who fits a role they need to have play a part in this fictional

24   story.  He is not a price fixer who belonged to an exclusive

25   price-fixing club.  He is not the person Tyson sent in to fix

1    prices for a three-year massive contract with KFC.  He was a

2    nervous front-line salesman who didn't negotiate contracts,

3    didn't set prices.

4          Carl Pepper testified about wanting to know what other

5    suppliers were thinking about to calm anxiety, to get comfort

6    from knowing, from understanding that Tyson was not out of

7    whack with the market.  You heard how the prosecution worked

8    Mr. Pepper over, worked him over two and a half years, how to

9    make him into someone he was not, to give their bogus

10   manufactured conspiracy story that little bit of juice that

11   they needed.

12         They pushed him to recall conversations he had over

13   eight years ago in a certain way with certain words, all to

14   make such conversations seem like they were something that they

15   were not and they could not be if you understood the market and

16   what Tyson was about and what they did.  He never testified to

17   an agreement to fix prices.  I could have a shared

18   understanding with any one person in this courtroom that

19   increased demand and reduced supply of small birds could lead

20   to or might lead to or should lead to or normally would lead to

21   high prices or higher prices.  I could have that understanding.

22   It doesn't mean I have the ability with any person in this

23   courtroom to make it so.

24         What they put to you is fanciful.  We can share common

25   beliefs about facts or events that we expect will happen or

4293

1   hope will happen, but that is not an agreement to make them so.

2   Salespeople at Tyson could not agree to anything on price.

3        You also hear and you heard a lot already about how

4   Tyson competed aggressively in the market against the same

5   suppliers that they were supposedly conspiring with.  This is

6   at the very same time the prosecution says they are linked

7   together arm in arm as partners in crime.  At this very time

8   Tyson is stealing business away with lower prices.

9        Tyson and Pilgrim's in particular, you have heard

10  about it, fierce rival, foot on the throat.  These are not

11  words of conspiracy, ladies and gentlemen.  These are words of

12  combat.  Tyson isn't part any I club.  When the prosecution

13  talked to you yesterday, their final slides flashed up as

14  evidence of communications about supposed bid prices of other

15  competitors.  Now, the prosecution like goes back to that,

16  their key evidence, so let's look at that.

17       You'll see time and time again that Tyson's pricing is

18  missing.  This is what the prosecutor claims is bid information

19  and you have heard enough to understand why that shouldn't be

20  taken for what it is, for what she says.  The prosecution --

21  Tyson's information, if you look here, doesn't show up

22  anywhere.  This is in the course of this conspiracy, ladies and

23  gentlemen.  How does this make sense?  Tyson, we are talking

24  about Tyson, one of the largest, most sophisticated chicken

25  suppliers in the country.

1           And let's talk about the current pricing.  Let's look

2    at what the prosecution has shown you.  None of the other

3    suppliers had Tyson's actual future bids.  Let's look at this

4    1919.  Look, I will tell you this was disturbing to me.  I do

5    not have a good poker face, I'll admit it.  And I am happy I

6    was wearing a mask yesterday because when the prosecutor stood

7    up and said the things she said, my jaw dropped.  I was

8    shocked.  It's not something I would expect.  This is current

9    pricing.  This is indisputable fact.  The fact that the

10   prosecutor tried to fudge this yesterday is not okay.

11          You saw it clear as day when you looked at I-054,

12   which showed period two pricing for 2017.  The price for

13   eight-piece in Robbie Bryant's notes are the exact same as the

14   pricing for the period two.  Don't let them confuse you.  That

15   price, that period pricing was already set on January 20th,

16   2017, seven days before his notes.  It wasn't being negotiated,

17   couldn't have been fixed.  And on the subject of Robbie Bryant,

18   he has nothing to add to the story.  I am surprised they even

19   put him on the stand as a cooperator, an admitted liar, a

20   non-prosecution agreement with an admitted liar to say what he

21   said.

22          Now, talking about this Exhibit 1030, these

23   handwritten notes, we don't know who they came from.  The

24   prosecution has a view.  They have a date of August 29.  Where

25   the number came from, the price there is wrong, and you'll see

4295

1   that that's a theme.  You saw in these November 13, 2012 text

2   messages the prosecution showed you, the ones that involved

3   Mr. Brady and Mr. Fries involving KFC, they showed you no

4   backup, and you will understand why, because the price is

5   wrong.  The price submitted to the customer on November 14th

6   was not .31 back.  It was .30 back.  Once again, the price that

7   the competitors had for Tyson, wherever they got it from was

8   wrong.

9           So where do you think this price most likely came

10  from?  Well, if you look at the text string, it refers to Ol

11  Mike, Ol Mike bluffing hard.  This is KFC.  Might that have

12  been Mike Ledford?  I wonder.  The defense put on Ledford,

13  Kronauge, Eddington, Finch on the stand, and they said that's

14  what the industry did.  That's what buyers did, they bluffed.

15          So let's switch into some of the episodes and we will

16  try to move through them quickly.  When you go back to

17  deliberate, you really need to consider what you actually heard

18  was evidence in trial, not argument, not the selected charts

19  the prosecution made where they chose to put on things and they

20  left other things off, not the slides the government showed you

21  in closing that highlighted the snippets they wanted you to

22  see, not the prosecutor's argument, not what she said about

23  what took place during a call when they did not put a single

24  witness on the stand.

25          Ask yourselves, who took the stand and testified to

1    that?  The answer will be no one.  Carl Pepper was so vague,

2    had no recollection, he couldn't do it.  That's why they tried

3    to prop him up, prop him up with this sort of summary of phone

4    records.  That wasn't allowed.

5         And when you go back to the jury room and deliberate,

6    you need to ask yourself why the prosecution, why is their

7    whole case about these charts with this sort of circle thing

8    with like the connecting dotted lines all over the place?  If

9    they have evidence, why not just present the evidence?  Why not

10   put the witnesses on the stand?  It's their burden, not yours.

11   You don't have to put this together for them.  You don't have

12   to like look at a chart and try to figure it out.

13        You recall when the prosecutor stood up yesterday, she

14   had a list of negotiations involving two Popeye's episodes, but

15   she skipped past them in her closing.  Let's talk about that.

16   You know why after you heard what Mr. Kronauge had to say.

17   Let's look at the evidence regarding Popeye's.  When it came to

18   Mr. Kronauge, it's what I said to you in my opening.  You heard

19   how suppliers were not fixing prices.  Popeye's was fixing the

20   price it was willing to pay to suppliers, not what the

21   government has spun to you which is the opposite.

22        Let's turn to the evidence.  We will talk to you about

23   Popeye's 2-cent discount.  There really isn't much to say, so I

24   am going to move through this one.  Kronauge requested the 2

25   cents for Popeye's.  It was his idea.  The fact of the

1    discount, the amount of the discount, that's what he testified

2    to.  He got initial buy-in from suppliers and then corralled

3    the rest.  He was willing to let it go, that discount, if

4    suppliers didn't agree; but they did, just like they did

5    before, just like they did before for the big box discount, and

6    that's what they agreed to in the contracts thereafter.

7         The government wants you to believe that the fact that

8    they all agreed to the same discount is because of collusion,

9    because of a conspiracy.  And you know that's not true because

10   Mr. Kronauge, a witness we put on the stand, said that wasn't

11   true.  Judge them for keeping this evidence away from you.

12   Judge them for that.  That's what they did here and that's what

13   they did with other episodes.

14        Let's talk about Popeye's 2015.  This is what I talked

15   about in the beginning.  This is important and you are going to

16   hear more about this, this 2015 Popeye's bid process.

17   Remember, they showed you a Pepper e-mail.  It was an internal

18   Tyson e-mail about this 14-cent increase for Popeye's.

19   Remember that?  And they got Mr. Pepper to testify something

20   with some very specific questions.  They got him to testify

21   that this was one example, a particular example, the one thing

22   he could think of when sales was going above the range provided

23   by the pricing people.  But you've learned that that's totally

24   wrong.

25        The defense brought in Mr. Campbell from the Tyson

1    pricing group and he testified that this was wrong.  He then

2    showed you the documents proving that the 14 cents was within

3    the range provided by the pricing team, provided by

4    Mr. Campbell, not above the range as they got Mr. Pepper to

5    testify to, but within the range.  The questions to Mr. Pepper

6    were specific to get him to give testimony that did not line up

7    with the facts in the government's possession.

8         And you know, you know how that could be, how the

9    prosecution manipulated Mr. Pepper to give false testimony.  He

10   was an easy target.  The man pushed and pulled to his breaking

11   point and beyond.  They did this because they know they have a

12   major problem when it comes to Tyson.  They have a major

13   problem for their whole conspiracy.  They are missing the

14   critical missing link, the missing link between competitor

15   conversations on one hand and pricing on the other.  Pricing

16   prices.  Sales sells at Tyson.  And this is just another

17   example of how the prosecution has been blinded to the truth,

18   unwilling to share it with you in their quest for convictions.

19        The prosecution has a responsibility to investigate

20   and a responsibility to present you with the truth.  When you

21   stand up and you square your shoulders and you say, I am here

22   to represent the United States, that means something.  It's

23   bigger than yourself.  It stands for something.  You cannot --

24   and I say this with a heavy heart -- you cannot trust the

25   conclusions they ask you to reach.  You cannot trust the

1    inferences they ask you to draw.  You cannot trust what the

2    prosecution shows you.

3          Defendants do not have any obligation to prove their

4    innocence.  The burden, as you have heard and you will hear,

5    always rests on the prosecution.  But defendants do not have

6    the same power the prosecutor has.  They do not have the power

7    to provide immunity.  Look at the charts, all those people the

8    government says are part of this conspiracy, people that they

9    didn't put on the stand.  What would they say if they didn't

10   have the fear that so many of the people in this industry have

11   as a result of this prosecution?  If you are left with

12   questions about what those people would say, their answers

13   would be important to you in this monumental decision with each

14   of one of these individual defendants, if you have a question,

15   that is reasonable doubt.  They have not met their burden.

16         When it came to Popeye's 2018, we want to show you one

17   set of slides on one of these charts.  It's chart No. 7.  And

18   this is important for the note takers, and I know you all have

19   been paying attention here through this whole trial and working

20   very hard, this is an important chart in how misleading it is.

21   You will notice chart 7 has this series of phone calls on

22   September 5.  Putting these calls on this chart the government

23   wants you to believe that the calls must have been about

24   Popeye's RFP.  This is what these calls are about.  They are

25   making that argument to you by placing these calls here.

4300

1    Remember, the prosecution did not call a witness, did not call

2    a witness to testify that these calls were about this Popeye's

3    RFP, but they are suggesting that they were.

4         They weren't about Popeye's.  You heard from the

5    testimony of Mr. Finch, the CEO of Claxton.  You were shown

6    Exhibit J-041.  Claxton was short on Chick-fil-A supply.  And

7    he needed to buy a load.  He is part of a supply chain.  You

8    heard testimony, actual sworn testimony about that.  You saw

9    evidence put in the record on that.  And so we know what

10   happened.

11        You have only in the government's chart Carl Pepper

12   calling Scott Brady, but they left out a call immediately

13   before that.  That's where Mr. Brady is reaching out to get the

14   load.  He is in need.  Who does he call?  He calls Tyson.  He

15   calls Carl Pepper, and that eventually goes to Mr. Mulrenin,

16   who we know is the head account rep for Chick-fil-A at Tyson.

17   These calls have absolutely nothing to do with the Popeye's

18   RFP.  They shouldn't be in this chart.  They are pure argument.

19        But it's not just what they put in.  It's also what

20   they leave out.  The prosecution also ignores 13 other phone

21   calls between Tyson employees and also with the customer and

22   Mr. Mulrenin and Carl Pepper.  Why are all these calls left

23   out?  Take a look at them.  These phone records show that there

24   are no competitor calls happening over this period of time.

25        What's happening here?  What's happening here is you

4301

1    have the Tyson pricing people and the business unit people

2    working with the Tyson sales team.  The sales team is talking

3    to the customer.  It's round and round, no competitor calls.

4    What they are doing, you know what they are doing because you

5    saw Exhibit G-56, a calendar entry showing that the business

6    unit and sales had a call to discuss Tyson's response to the

7    RFP after these discussions at the internal workup and touching

8    base with the customer.

9         Darrell Bowlin there, Steve Cullen, the prosecution

10   did not show this to you because it's the inconvenient truth.

11   It doesn't fit their story.  When you look at the full picture,

12   you will also see other things and you will learn more about

13   how this information from the RFP came from the customer,

14   Mr. Kronauge, because we know from hearing from him that's what

15   he did.  He communicated with his suppliers.  He tried to beat

16   them down on price and he did it in his own way.

17        Church's, let's talk about Church's.  When I look at

18   this and these episodes I am knocking off, these are the one

19   that the prosecution says are connected to Mr. Mulrenin, and I

20   feel like the analogy to a yard sale is an apt one.  It's a

21   good one.  It's throw it up on the wall and see what sticks.

22   It's the yard sale, and the prosecution wants to see if you are

23   going to buy a broken toaster.

24        The prosecution did not put a Church's witness on the

25   stand much like they didn't put a witness from Popeye's on the

4302

1    stand.  And you know why?  The prosecution only points to these

2    two cost-throughs.  But ladies and gentlemen, let's think about

3    that.  You have got annual contracts with Church's, annual big

4    RFP contracts, and the prosecution brings you a freezer charge

5    and a quality assurance charge from 2013.  All the same

6    suppliers are still involved.  What about the 2012, 2013, 2014,

7    2015, '16, '17, '18, '19, what about those RFPs with Church's?

8    You have heard nothing about that.

9         It says everything about how they put together their

10   case.  The trivial stuff is in the prosecutor's own words.  How

11   does it make sense?  You heard about these are straight

12   pass-throughs.  And then you heard testimony from the

13   prosecutor about how they needed to make a decision about

14   whether to charge this pass-through or not for the Church's or

15   the quality assurance, but we had Darrell Bowlin on the stand.

16   He always intended to charge for these things.  You saw the

17   workup and we are going to show you some more.

18        The Church's freezer charge.  We learned how Tyson

19   sales would try to drive things down, drive prices down for

20   costs.  And that's what happened with the freezer charge, the

21   price was brought down.  Initially the cost for this was

22   estimated from the people who do the work, from the business

23   unit, at between 4 and 6 cents, but ended up reducing it to 3

24   cents.  That's what the sales team ultimately did.

25        Now, Mr. Pepper testified that at the time in 2013,

1   May 2013, there already was a between 4- and 6-cent cost quote

2   for that.  That was the price that he knew -- that was what was

3   expected.  That was the cost quote and went down from that.

4   And you heard from Carl Pepper himself that later in 2013 when

5   the buyer, Mr. Bradley from Church's, came forward and said,

6   hey, I am getting other prices from suppliers, Mr. Mulrenin was

7   the one who proposed a lower price, 2.7 cents.

8         I am going to show you another chart, the Church's QA.

9   This is the quality assurance one and this is one where they

10  say that Mr. Pepper reached out to Mr. Little and had somehow

11  an influence on the process of what would be charged or what

12  wouldn't.  I don't really actually understand.  But Mr. Pepper

13  told you what it was about.  This wasn't about reaching out to

14  Jimmie Little to fix a price.  He was reaching out to Church's

15  because he was annoyed.  This thing popped up.  They just two

16  days earlier negotiated a contract, and then here you have this

17  thing tacked on.

18        But the prosecution only showed you the last part of

19  the e-mail, the last piece of the chain.  Exhibit 221, and I

20  recommend you looking at that.  This is something we discussed

21  with Mr. Pepper.  The prosecution is depending upon you just

22  relying on their charts, not looking at the documents.

23        You can see in Exhibit 221 a list of officials at

24  Tyson, high-ranking people who are talking about what is that

25  charge going to be, how much it's going to cost.  There is not

1    a word about whether they are going to charge it or not.  That

2    is fictional.  Mr. Pepper is not part of this discussion.  It's

3    Mr. Roberts that loops him in as a salesperson after the senior

4    people are like, how much is this going to cost?  We need to

5    figure it out.  So he responded to the sales team.  That's what

6    they showed you.  It's all salespeople.  There is not a single

7    person with pricing authority on that.

8          Brandon Campbell worked up the charges and put them

9    on, but in this whole process there is not a single person --

10   and Mr. Pepper conceded this on cross-examination.  No one

11   cared what his musings were, what his thoughts were about what

12   other suppliers might or might not do.  And you understand why

13   that's the case because you met Mr. Bowlin and you know how

14   much he cared about working up the costs.  You met Mr. Campbell

15   and you know how precise he was.

16         The Carl Pepper who was -- the prosecution says was

17   the insider for this conspiracy for the pricing to the customer

18   had no idea that this chart should be included, never checked

19   the model.  The prosecution left that off the start.  They also

20   left off G-444.  That's the one where Mr. Pepper says he didn't

21   even know where the QA charge came from.  They left that out

22   too.  And then they also left out the part where the QA charge

23   was not even charged.  It was removed.

24         There is one final thing and it's a little bit

25   separate, but counsel for Mr. Kantola referenced this, so I

4305

1    think I will touch upon it here.  The chart includes an e-mail

2    between these Koch employees that list Tyson prices .8849.  Of

3    course, that's current period pricing.  We have heard more than

4    you will ever want to hear about that.

5            The government says these e-mails show you that

6    somehow Carl Pepper is talking with his competitors about

7    pricing.  This is misleading because had they included the

8    actual contract price, you would see that that is not Tyson's

9    price.  Tyson's January price to Church's was actually .859.

10   That's in Exhibit G-424, one the defense once again put in.

11           Wouldn't that be relevant for you to know?  Why would

12   you put one price down there when you could so easily just put

13   the actual contract price?  They did not want you to see that

14   the two were different.

15           The Chick-fil-A NAE episode, ABF, this is the one

16   involving the cost, the cost to convert chicken to

17   antibiotic-free.  The prosecution wants you to convict Tim

18   Mulrenin of a conspiracy to raise prices charged to Chick-fil-A

19   when we are really talking about cost, cost pass-throughs, but

20   did not call a single witness to the stand to talk to you about

21   it, not one.  Not a single person sat on the stand and told you

22   about whether Chick-fil-A believes that its suppliers were

23   conspiring on this cost.

24           The defense actually only gave you one witness on

25   this -- the defense gave you the only witness on this and that

1   was Greg Finch.  The prosecution gave you chart 3 and wants you

2   to believe that Tyson and Claxton were somehow not supposed to

3   talk to each other.  They want you to think that's somehow

4   wrong, but that's not what you learned.  Mr. Finch took the

5   stand.  He took an oath and he testified when Chick-fil-A

6   announced its plan to move to antibiotic-free, it asked its

7   suppliers to work together, suppliers like Tyson that had more

8   experience.

9          A final point about this episode is that it ends

10  suddenly.  It ends on April 18th.  It ends when the texts end,

11  when there is a text that says work in progress.  It's not the

12  end of the story.  It's just the best sound bite they had.  It

13  just got worse after then and that's why the chart ends.

14  Because you know with Exhibit G-815 that Tyson was still having

15  internal meetings about the cost of this.  There was no cost.

16  There was no finished price.  Live weight, live cost is not the

17  same as a finished price.  There is nothing that they have to

18  show you after work in progress.

19         And, in fact, you know beyond that, not only was Tyson

20  still considering what this cost would be; the decision had not

21  been made yet.  You heard that from testimony.  The decision

22  had not been made yet whether they were going to go with an ABF

23  or an NAE program.

24         So let's look -- I want to look at one of these

25  smoking gun e-mails, the ones that the prosecution put by

4307

1    Mr. Mulrenin's name.  Let's look at Exhibit 9714, and this is

2    what I want you to be sensitized to about why you cannot rely

3    on these charts.  What the prosecution wants you to do with

4    this is to focus on one word, but let's look at the context.

5    Mr. Mulrenin is sending an e-mail to a whole group of people at

6    Tyson.  This press release just came out on this big news.

7    They are issuing a press release about a type of chicken.  I

8    mean, this in the chicken world is a big thing.  He is saying

9    don't blab to everybody.  They haven't picked their suppliers

10   out.  They don't know who the suppliers are.  Things are up in

11   the air.

12        The prosecution just wants you to focus on the word

13   "confidential" to kind of add a sinister or like sleezy piece

14   to the fact that there is some text about costs about a live

15   weight price.  It's deceptive.  It's misleading.  They are all

16   like this.  Please have at it.  Look at every single one of

17   these exhibits they place by Mr. Mulrenin's name.  None of them

18   comes close to actual evidence of a conspiracy and they are not

19   worth spending time on, but I fully recommend you to do it

20   because I think it really exposes this case for what it is.

21        So let's talk about the KFC negotiations.  For those

22   negotiations we learned from Mr. Bowlin and Mr. Campbell that

23   the price was set.  They could come up with what they were

24   going to go for back in June.  They testified sales had no

25   influence, not just that they weren't going to have an

4308

1   influence with this kind of important price when they were

2   losing money.  Mr. Bowlin talked about the fact that he wanted

3   to fire KFC three times, that KFC just because of the way they

4   did their model, the way they had their model, that they didn't

5   get paid for everything in the box unlike Popeye's.

6        They tried to change the model.  They wanted to get

7   paid for everything in the box.  They wanted to stop losing

8   money because they cared about profitability.  That's what they

9   cared about and they weren't going to let salesmen give them a

10  problem about that by pushing down that price.  They changed

11  how they calculated the cost.  It was the same thing in terms

12  of the profit margin for Tyson.

13       Mr. Bowlin testified that he was prepared to lose

14  volume, lose sales.  He wanted that price.  He wasn't going to

15  leave it up to salesmen.  That's how it was at Tyson.  You

16  heard about the calls Mr. Pepper testified.  He was so confused

17  about it.  He just couldn't be the man they wanted him to be.

18  He couldn't say the things they wanted him to say.  They don't

19  match up with his testimony.  He talked about this meeting in

20  Cullen's office and calls happened right after, but you can see

21  the calls the prosecution wanted you to believe were with

22  conspirators was before.

23       So let's talk about this chart 10.  There is a flurry

24  of calls -- the prosecutor talked about this -- right before,

25  right before the bid is due.  You've got pages and pages of

4309

1    competitor calls on -- supplier calls on chart 10.  The

2    prosecution claims they are coordinating.  So let's take a look

3    at it.  First it starts in August 2014.  We already heard the

4    price had been set by Tyson long ago, two months ago.  On this

5    chart most of Tim's calls are with his boss, Brian Roberts.

6    You know they work in different states.  You know they conduct

7    business every day.  No surprise in August there are 74 calls

8    between Brian Roberts and Tim Mulrenin.

9         Ladies and gentlemen, this man is on trial for a

10   federal offense, a federal criminal offense, and they are

11   putting in evidence calls with his boss that happened -- you

12   could throw a dart on a calendar and find calls during this

13   period on any day, any weekday between those two individuals.

14        So here is the punchline of the prosecution's chart.

15   You will see it on Page 4.  It's an internal Pilgrim's e-mail

16   from Jason McGuire to Jayson Penn that said Roger did some

17   checking around.  This is the sum of this flurry of phone

18   calls.  Where is Tyson?  Where were they allegedly working with

19   these other suppliers to fix prices after this flurry of calls?

20   Where are the results, the product of all these discussions?

21        Tyson doesn't appear.  And if Tyson doesn't appear, it

22   should fundamentally cause you to question everything you have

23   been told about this case when you understand Tyson and its

24   importance in the market.  2018, and this is one that was

25   just -- this was a shocking one for me yesterday to hear about.

1    This is the one where Ms. Fisher took the stand and testified

2    how Tyson went in with a real low price.  They kind of got in

3    early and they started with the 2017 model and then applied

4    these volume discounts that led to substantial savings and

5    caused KFC to give 300,000 pounds a week of chicken to Tyson,

6    millions of dollars of savings.

7            In the closing argument, the prosecutor said something

8    to you.  She showed you part of the e-mail and pointed to it

9    and says our pricing model stays the same.  She said that

10   Defendant Mulrenin submitted his bid saying the pricing model

11   remained the same, which she said meant that the pricing model

12   is going to stay the same as it currently is.  There is more to

13   that sentence and you know that because you saw Ms. Fisher take

14   the stand.

15           That e-mail went on.  With the exception of the

16   pricing outlined below.  It goes on to say that substantial

17   pricing increases for increased volume, volume that would only

18   come from these supposed partners in crime.  How is

19   Mr. Mulrenin in a conspiracy with people he is actively

20   competing with volume over?

21           The same thing you heard with respect to Koch Foods

22   and you are going to hear it again.  Mr. Mulrenin is saying,

23   Give us more chicken.  We will give you a lower price, taking

24   volume away.  Now, Ms. Fisher testified about this episode.

25   She told you that they bid early.  Think about that.  Think

1    about that.  Do you recall her testimony being that Tyson's

2    pricing model in 2018 was the same as it was in 2017?  Is that

3    what she testified to?  That's not my recollection.  And I am

4    sorry to say that the prosecution here is really just making it

5    up as they go along.  How do we know this?

6         Let's look at Government's Exhibit 18 and 19.  These

7    are their story board charts that they are giving you for this.

8    No one, Tim Mulrenin, Carl Pepper not on this.  Mr. Roberts has

9    left Tyson at this point.  Tyson is not involved in this.

10        Ladies and gentlemen, the prosecution invites you to

11   speculate, to assume that all these conversations between

12   suppliers were to conspire to raise prices, but you know and

13   you have seen that not to be true.  These conversations with

14   suppliers you heard happened all the time.  I mean, what a trap

15   this is.  They had to talk to each other for legitimate

16   reasons.  The chicken industry is a food distribution industry.

17   It's a chain.  They rely upon each other.  They have to

18   communicate.  The chicken will not get in the stores if there

19   is a short and these things happen.  We are talking about

20   fresh, we are talking about live product, a fresh product, and

21   it needs to get to the stores.  This industry functions on

22   communication.

23        Suppliers needed, needed to cooperate, and along the

24   way they sometimes developed friendly relationships as well.

25   And in the course of the trial, you have heard about that.  And

1    again if you throw a dart at the calendar, if you throw a dart

2    at the calendar, you are going to find calls and texts between

3    these suppliers or even between buyers, between buyers, because

4    on some of these same days, the days where you throw the dart,

5    you are going to find that they were working to supply the

6    customer, and you are also going to find that there was a bid

7    negotiation going on or a price quote request.  These things

8    are happening at the same time.

9           So this is what it's like to be a chicken salesman, a

10   chicken salesman where you are doing your job day-to-day, and

11   someone just lines a calendar up against that, puts on sort of

12   bids or price quote dates, and they are putting these lines and

13   arrows together, and all of the sudden here you are.  This is

14   the absolutely frightening reality that all these men and Tim

15   Mulrenin faces.  By doing their jobs they are placed in

16   jeopardy.  They are placed at risk. Tim would regularly get

17   calls from other suppliers to fill loads or to supply an

18   ingredient or do all sorts of things to supply and support this

19   network for the benefit of the customer.

20          You heard Eddington, Kronauge, Ledford, people we put

21   on the stand, people even the government put on the stand talk

22   about this.  You heard from Bowlin.  You heard from Finch.  You

23   heard from others.  Now, suppose that when you are supplying

24   the customer, you're picking up the call, you are texting, a

25   call, that call happens around the time of contract

1    negotiations.  Wham, the prosecution assumes the call is about

2    conspiracy even when they don't have any proof at all, even

3    when the documents show that what was really happening was

4    there was a short being supplied or there was something else

5    going on that they needed to do in their job.

6          The problem is -- you are facing here is cost quotes

7    and contract negotiations were happening all the time.  You saw

8    all these contracts.  What a trap.  If the prosecution cared to

9    understand or cared to learn, cared about getting to the truth,

10   they would have tried to understand the bigger picture about

11   the legitimate reasons and what might have been happening on

12   those days.  Why do we have to bring that to you?  This is the

13   Department of Justice.  This is the FBI.  Look at all of these

14   people here.  Why do we have to put those people on the stand?

15   Because we don't.  It's not our burden.  But look at everything

16   that is at stake for all of these men.  How can you not do

17   everything you can?  The fact that we have had to show you some

18   of this evidence, the fact that we had to put defense exhibit

19   stickers on it is wrong.

20          THE COURT:  Two minutes.

21          MS. PREWITT:  As you sit here today as individual

22   jurors, you know far more about the chicken industry than the

23   prosecutors sitting at this table and the agents combined.  You

24   know more now than they knew when they charged this case.  If

25   they knew, if they had been willing to understand about the

1   reality of this industry, about how Tyson functioned,

2   Mr. Mulrenin wouldn't be sitting here today.  None of these men

3   would.

4        Instead, you have got antitrust lawyers that parachute

5   into the industry, don't do the work to understand, walk into

6   the false assumption that somehow prosecutors can only wear one

7   hat at a time, competitor, that's it.  That's not how the

8   industry functioned.  From there through their distorted lens,

9   every call, every text, every e-mail is about conspiracy.  It's

10  like blinders.  They can't see anything else.

11       It's a place where being a salesman is a dangerous job

12  in circumstances where prosecutors where blinders, where the

13  search for convictions eclipses the search for the truth.  But

14  the evidence shows that no one in Tyson sales could have tried

15  to influence bids in any way, no link whatsoever.  There is no

16  evidence, nothing at all.

17       Remember, ladies and gentlemen, the prosecution had a

18  rebuttal case.  If they had a problem with any of the witnesses

19  that we put in, any of the evidence and they thought they could

20  challenge it, they could do that.  They have the power, the

21  exclusive power to provide immunity.  I am left here to wonder

22  if the prosecution strategy here is to overwhelm and confuse

23  you and to think something improper must have happened, because

24  if you are not able to sort it out, something bad must have

25  happened.  The charts and the codes, just like I was seeing

4315

1    dots at the end, the prosecution would not have to work this

2    hard to give you charts if they had evidence.

3          This case, this case is -- it's full of reasonable

4    doubt.  And the thing about reasonable doubt is it's an

5    individual one.  It's a determination that you have to make.

6    You were instructed to be unanimous.  You have to be unanimous

7    to convict these men, any one of these men, but you have to

8    reach your own verdict.

9          You each could have a different reason for finding

10   doubt, a different reason to find that you are not firmly

11   convinced beyond a reasonable doubt that they, they have given

12   you the proof.  If you think that there is still a question

13   about whether Tim Mulrenin, Brian Roberts, Tyson employees are

14   partners in crime with folks at Pilgrim's, that's reasonable

15   doubt.  If you may think the government has not proven that Tim

16   had the ability to fix a price, that's reasonable doubt.

17   Someone else could think there is not enough evidence that they

18   were part of this exclusive club.  You can doubt a witness.

19         There is so many different reasons that each one of

20   you can come to.  They can be completely different.  It is your

21   duty, your duty and a burden that is grounded in fundamental

22   principles that are important.  They are critical.  They are

23   critical as an expression of who we are.  When you look at the

24   evidence in this case, when you give -- you honor that duty,

25   you'll -- you will find the prosecution has failed to meet that

1    burden.

2           Ladies and gentlemen, when I leave this podium, I am

3    powerless.  It's a long walk back to that table to know there

4    is no more I can do for that man and for the people that care

5    about him.  But I am not afraid and I am not fearful and I am

6    not daunted because I leave this podium, and when the case is

7    over, you take over.  You have the power.  You have the power

8    to end this, to let this man be released from the burden that

9    has crushed his life so that he can go back living the life as

10   the innocent man to the people who care about him, to continue

11   to be the person that is trusted by his customers.

12          Ladies and gentlemen, I know that when you look at the

13   evidence and you honor that burden that you hold, a burden on

14   your shoulders, one that I don't carry, there is not a single

15   person in this room that carries the burden you have, the

16   burden to accept the responsibility of finding that the

17   defendant here, Tim Mulrenin, is not guilty.

18          On behalf of Tim Mulrenin, I thank you.

19          *MR. GILLEN:*  Your Honor, may I have a side bar,

20   please?

21          *THE COURT:*  Yes, you may.

22       (At the bench:)

23          *THE COURT:*  Mr. Gillen, go ahead.

24          *MR. GILLEN:*  It's been a long day.  The jury has heard

25   eight arguments and I have seen some heavy eyelids over there.

1    I am next and I would ask that the Court, since we are going to

2    have arguments in the morning, that the Roberts argument be

3    first thing in the morning so that we get a fresh jury and that

4    we can -- we will finish up with the three arguments before

5    lunch, so I don't think it will really matter much as it

6    relates to scheduling, but I do think that I deserve a fresh

7    jury.  They have heard eight closings.  They have gone on all

8    day long.

9         THE COURT:  I am going to deny that.  I think the

10   jury, they look good right now.  It's been a long time, but I

11   would like to, as I told them, get in another one today, so

12   we'll go ahead.  Thank you.

13      (In open court:)

14        THE COURT:  Ladies and gentlemen, do you want to do a

15   stretch break?  Okay.  Why don't we take a couple minutes of

16   stretch break.

17        (Brief recess.)

18        THE COURT:  Whenever you are ready, Mr. Gillen, go

19   ahead.

20                        **OPENING STATEMENT**

21        MR. GILLEN:  Thank you, Your Honor.

22        Not a single man, not a single man in this courtroom

23   is guilty of being in a conspiracy to violate antitrust laws to

24   fix prices, to fix or set prices, not a single man.

25        Now, I represent Brian Roberts and I am going to be

1    focusing on Brian Roberts.  I want to tell you what I am going

2    to be doing and what I am not going to be discussing.  What I

3    am going to be discussing, Brian Roberts started at Tyson in

4    June of 2012.  He left in February of 2016, so a lot of the

5    evidence you have heard here over the last several weeks

6    dealing with 2016 and 2017 I won't address because it doesn't

7    apply to Mr. Roberts because he was gone.

8         I am going to be talking about KFC, the 2015 contract.

9    I am going to talk a little bit about Church's and frozen and

10   QA, and I am going to talk about Popeye's 2015.  Now, the

11   center of the government's case is focused on this KFC issue.

12   And the one thing that we need to remember about Brian Roberts,

13   of all the witnesses, of all the 16 -- whether it's 14, 15 or

14   16 million documents, there hasn't been a single document

15   introduced showing that he ever gave away Tyson pricing

16   information or agreed with anyone to fix or rig bids, not a

17   single person out of 16 million pages of documents.

18        Now, let's set the stage.  When I talk about KFC, I am

19   going to do it this way.  Briefly I am going to talk about the

20   marketplace, the external factors.  Then I am going to talk

21   about internally within Tyson.  And then I am going to talk a

22   little bit about what the government has alleged in their

23   chart.  So that's going to be the three ways that I am talking

24   about this KFC regarding Mr. Roberts.

25        The perfect storm, that's how Mr. Eddington described

1    it.  Now, he was a specialist for RSCS.  He was the chicken guy

2    they brought in.  He described it as the perfect storm.

3    Competitors are growing, the competitors of KFC were growing,

4    creating additional demand for small birds.  Then we have a

5    trend of conversion of small-bird plants to big-bird plants.

6    That combination makes a situation where you've got a greater

7    demand on the smaller supply and you've got greater demand,

8    smaller supply.  That's -- that is the perfect storm that

9    created the marketplace.

10          Now, KFC doesn't want to pay more money, but the

11   bottom line is, as you have seen from the charts, the trends

12   would go up and down.  And in 2014 it was a situation where it

13   was the perfect storm for KFC and others that were buying small

14   bird for those very reasons, the fact that literally Mother's

15   Day being a disaster.  And then what do they do?  They are then

16   trying to buy chicken they can't even buy for 50 percent more

17   than what they were paying for in their contract, up to $1.45 a

18   pound.

19          Now, keep in mind what Eddington told you is if you

20   think about what you should do in terms of big bird and small

21   bird, that literally the profit for a big bird he said was

22   about -- could be up to 34 cents a pound more profit, 34 cents

23   a pound more profit.  So the marketplace is going to take -- is

24   going to take into account what is going to be happening here.

25   Prices in the marketplace was driving up prices.

4320

1          As a matter of fact, Eddington, as you know, testified

2    that had it not been for these increases that stabilized the

3    small-bird industry, if it had not been for those increases,

4    then it would have been even worse because the small bird,

5    there would have been more small-bird plants going to big bird.

6    Smaller supply, greater demand.  It would have been even worse.

7    So in a sense the way that he describes is it is this -- the

8    negotiations that took place incentivized, his word,

9    incentivized folks to stay in small bird and also incentivized

10   people to come in to small bird because they started paying,

11   you know, a fair profit or a fair margin on the small birds.

12   That's why OK Foods came in.

13          Now, what did Pete Suerken say, the quarterback for

14   the RSCS team?  What he said, and he was their witness, he said

15   look, if I had owned a small-bird plant back then, I wouldn't

16   have even done small bird.  I would have converted to big bird.

17   The very man who was negotiating on the other side of the table

18   from us is telling this jury, I wouldn't have even been in

19   small bird the margins were so bad and the difference between

20   the money for big birds so dramatic.

21          Now, let's talk a little bit about what was going on

22   internally in Tyson.  That's the number we need to keep in

23   mind.  That's the No. 19 that I talked about earlier.  That's a

24   key number that is consistent throughout the process for Tyson

25   in the KFC negotiations.  What we have here, and Ms. Prewitt

4321

1   talked a little bit this, the process is such that the

2   small-bird business unit, Charlie Solomon, would get together

3   and give the strategy to the pricing unit, Brandon Campbell,

4   and the sales unit would then receive that information and be

5   told about the strategy.

6        Nobody took the stand and ever said anything different

7   about the fact that in Tyson, don't know about other companies,

8   but in Tyson sales had no authority to set prices, no authority

9   whatsoever.  We are going to walk through some of the

10  documents.  And Campbell testified and explained to you the

11  fact that this is the way that it's done at Tyson.  So we have

12  that process going forward.

13       And what's the motivation?  Why did Tyson want to

14  change?  Well, it's just down to dollars and cents, isn't it?

15  Mr. Bowlin testified Tyson was losing money on KFC, losing

16  money.  They sell a lot of chicken, but they were losing money

17  on it.  And he said he actually tried to fire KFC as a

18  customer.  Three times he wanted to get rid of them.

19       What did Brandon Campbell testify, the guy that set

20  the prices and he was the numbers guy.  He said Tyson was

21  losing money on their entire small-bird business.  So what they

22  were going to do in 2014 is they were going to change the way

23  that they approached pricing on small bird, not just for KFC,

24  for everybody buying the small bird.  The reason is we are in

25  the business of making money and we are losing money on KFC.

4322

1   We are losing money on the entire small-bird unit.

2          So what do they do?  And this is before there is any

3   RFP sent out by Kentucky Fried Chicken through RSCS, even

4   before the contacts were made in July.  Tyson had a plan.

5   Tyson's plan was formulated in June of 2014.  And this is

6   critical to understand because the motive is we have got to

7   start making money.

8          Now, you've heard people talk here in this courtroom

9   saying, well, you know, it's okay, and it is okay to get

10  competitive market intelligence and competitive information and

11  talk with your competitors as long as you make your decision

12  about your price independently.  Now, in the case of KFC in the

13  summer of 2014, they didn't even have -- in June of 2014, they

14  didn't have any of this chitchat back and forth with their

15  competitors about what they intended to do.  They didn't have

16  any of that.  There hadn't even been an RFP set out yet.

17         So what they did is they said we are going to set our

18  price now and that's what they did.  And they did it

19  independently of anybody because they were making a business

20  decision about why they had to make money, so that is critical

21  that we are talking about that.  We then have -- coming into

22  this day here, we've got June of 2014.  And you can see that in

23  June of 2014 this is when Brandon Campbell is setting the price

24  down there increasing it to nine -- excuse me, 19 cents.  That

25  is when the decision maker is getting out the orders about

4323

1    what's going to happen.  He is sending that to Brian Roberts.

2         June 19 from Campbell to Mr. Roberts, this is where we

3    want to be with KFC next year.  He is telling him what they are

4    going to do.  It's not let's get together, what do you think?

5    Let's have Brian's input.  He is telling him because they are

6    going to change the dynamics of the way they do small bird.

7         Now, Charlie Solomon, the big guy who is involved in

8    this who is like hey, tell me what the margins are, tell me

9    what we need to do, get me this answer if you can by noon, and

10   Mr. Campbell got him the answer and told him in the e-mail kind

11   of what they had planned to do saying the true price increase

12   is 19 cents per pound, 19 again, 19.  You will see that

13   consistency.

14        But what they tried to do -- and they had a different

15   model than anybody else.  The different model at Tyson was we

16   want to get paid for the marination and we don't want to have

17   to subtract out that water weight out of the box.  So that was

18   different than all the rest of the folks here.  And another

19   thing that was different about the way that they handled it was

20   they sent it in early.

21        Now, Mr. Eddington testified that Tyson had submitted

22   a proposed cost model to RSCS in July, July, before there was

23   even an RFP coming out from Kentucky Fried Chicken through

24   RSCS.  So we wanted to get it out to them before everybody

25   else.  Maybe we could close a deal with them or at least find

4324

1    out where we stood because if we are not going to make a

2    profit, it's time to move on, so that's what was going on in

3    July.  Now, that is a critical time period because that's

4    different.  And people go up and say, I was shocked in August

5    when we saw their cost reports.  I was shocked.

6         Well, what does Eddington tell you?  He said, well,

7    everyone wasn't really shocked.  We got it in July.  So the

8    false "I'm shocked" reaction is a little much because they

9    already had it in July.

10        Now, what happens is in August 2014, August 11,

11   remember they have now sent out an RFP and they said everyone

12   get your bids in by August the 19th.  We are going to jump the

13   gun on anybody.  We are going to get ours in early, not only

14   get it in early, we are going to say, hey, can we close or wrap

15   this up by the end of the week?  We wanted to get a deal before

16   the others even submitted.  We weren't conspiring with these

17   people.  We were competing against them and trying to lock down

18   the business before they even got off jump street.  So that's

19   what was happening with us.

20        So not only the three things that were unique about

21   us, we submitted early, we had a different marination issue and

22   we wanted the 48-hour drain weight.  And that on our profit

23   margins under that model, it was 16 cents, but when they did

24   away with that, we are back to what they said in the e-mails,

25   the true price, apples to apples 19 cents.

1          So they, as you know, Mr. Campbell said, yeah, that's

2    the cost model that I generated back in June before anybody had

3    any discussions with anybody that we see in the government's

4    charts, and he said that's what we wanted to do.  So we get

5    that in.

6          Well, what happens?  Now, Mr. Eddington who just

7    arrived, he testified about the uniqueness of the model.  He

8    testified about he gets this thing on August the 11th.  And you

9    remember when the government initially talked about this, look

10   at this e-mail.  Look what's happened.  Mr. Eddington is afraid

11   he is going to be fired.  Read the e-mail.  And then, of

12   course, they knew, they knew what Eddington -- Eddington was

13   needling his friend Brian Roberts.  They didn't tell you that,

14   did they?  They have lost their way, frankly.  They have lost

15   their way, because that's the kind of information that a jury

16   needs to know.  They are not in the business of hiding

17   information.  They are in the business of revealing information

18   and truth in the courtroom.  And you will judge the evidence

19   as -- and we shouldn't have had to put up a single witness from

20   Tyson, but oh, we had to, oh, we had to.  And boy, did it gut

21   their theory.

22          So Eddington goes, hey, I was just needling the guy

23   when I said I was going to get fired.  I wasn't going to go

24   along with their marination and their 48 hours, so it didn't

25   work out.  It didn't work out.  But the thing about this threat

4326

1    of, oh, he is shocked, he told you that they already had it

2    before.

3            What happens then?  What happens then is, all right,

4    we go back to the guy making the decision, the man behind the

5    screen, and that's Brandon Campbell and Charlie Solomon.  And

6    what happens?  Well, what happens is that he comes up with a

7    new model and drops all the stuff.  We don't get our

8    marination.  The margin has increased to 19 which delivers the

9    same case price as was originally presented.  So what we wanted

10   back in June once you take away all of the things they are not

11   going to give us, it's the same thing, just like we said in

12   June, the true price, 19 cents.  So that's what was going on

13   there.

14           We then have a situation where, you know -- then they

15   call Pete Suerken.  Here is your e-mail on September the 3rd

16   where he sent an e-mail to Brian Roberts and said, oh, you told

17   me this is a ridiculous price and how can we do this?  And, you

18   know, and then used a little profanity in there that RSCS is

19   blank.  So then that's what you see from the government like

20   that's really something that bothered him.  Well, what did Mr.

21   Suerken tell you?  I am sure the government didn't like it, but

22   what he told you is he said, look, that was a friendly banter

23   between business associates and friends.  That's what he said

24   about the e-mail that he sent to Mr. Roberts.

25           So anyway, what happens the next day?  They tout up

 1   this e-mail sent by Suerken saying, oh, I am outraged.  The

 2   next day on September the 4th, he said, hey, if I hit your

 3   number, I need an additional 11 loads.  So he wasn't outraged.

 4   He was happy, if you will, in a relative term because he wanted

 5   to give us 11 more loads after he saw our final numbers because

 6   we were competing and, frankly, we were lower than our No. 1

 7   adversary, and I say adversary, Pilgrim's.  We weren't friends

 8   with Pilgrim's.  They didn't like us.  And I wouldn't think

 9   Tyson would like them very much.  We didn't conspire with them.

10   We didn't agree with them.  We didn't do anything other than

11   compete against them in this matter.

12        Now, what you have in the final analysis is you have

13   Campbell sending to -- down to Mr. Roberts the final KFC

14   pricing, again increased margin and that 1931, that is the 19.3

15   cents.  That is the ultimate deal we ended up with.  Started

16   out in June at 19, ended up at 19.3 cents, all directed by the

17   pricing unit.

18        Now, let's talk about what the government has done.

19   The government said we have a blizzard, a blizzard of calls on

20   August the 15th.  There is a blizzard.  You can see it in our

21   Exhibit 10.  People are calling.  They don't know what people

22   are saying to each other, but they are just saying they are

23   calling each other back and forth.  And, oh, look, this is

24   really showing that this is a conspiracy.  And, look, there is

25   a call.  There was a call that Mr. Penn had talked to

1    Mr. Roberts on the 15th.  They must be up to something.  They

2    want you to guess.

3          And, you know, when you listen to the closing argument

4    of counsel and she starts putting from her mouth words that she

5    attributes to conversations and calls that there is no record

6    of and she has no idea what was said, that's a problem.  They

7    have lost their way.  They have lost their way.

8          Now, what happens is there are documents which show

9    exactly what was said and not said.  And you've seen this so

10   many times I am sure you could probably memorize it.  It's

11   worthy of going over again.  This is what Pilgrim's was saying

12   inside the Pilgrim's group on August the 18th.  And they have

13   been doing their market intelligence, which there is absolutely

14   nothing illegal about that.  They are doing their due

15   diligence.  They are making -- and what they are doing is this

16   is what they put out among themselves.

17         The only company not there is their old enemy Tyson.

18   They don't have our prices.  And this is -- the government has

19   flouted this in opening statement and all their witnesses and I

20   do too.  This is the best piece of evidence for Brian Roberts

21   and Tim Mulrenin out of the 17 million.  That tells you we're

22   not in any conspiracy with Pilgrim's or anybody else.  So

23   that's what happened there.

24         We've got a situation there where we've got those

25   calls, and that shows you exactly that that call with Penn and

4329

1    Roberts, they didn't get the Tyson number because nobody got

2    the Tyson number.  They did not get the Tyson number in these

3    calls and that's what's up there.

4          Now, here is something which is somewhat offensive and

5    this is why.  This is an Exhibit 1030 dated August the 29th,

6    2014.  And on this you have a situation where the government is

7    saying, look, someone testified that this was Pete Martin's

8    handwriting, and someone, it says talk to Mitch.  They are

9    holding at 19 and holding.  Who is Mitch?  And then it has

10   Tyson 1.0976 per Tommy.  Who is Tommy?  Well, I guess we don't

11   know, but there is one way -- what they did the other day is

12   offensive.

13         They said, well, you know, maybe that's Brian Roberts

14   giving information to his friend, Tommy Francis, and Tommy

15   Francis gave the information to Pete Martin.  Guess, guess,

16   guess, guess, suppose, suppose, suppose, speculate, speculate,

17   speculate, speculate.  But you don't have to speculate when you

18   have got this power here.  You don't have to try to guess

19   somebody into a felony conviction.

20         What you can do is you can take your immunity orders

21   and you can put anybody in America on that witness stand.

22   They've got that power.  And they can say, all right,

23   Mr. Martin, was that your signature?  What were you saying to

24   Mr. McEwen?  What about Steve Campisano?  What about those

25   people?  Did they bring them in?  Did they ask them what this

1    note was about?  No.

2          They should have done their work.  They had the power

3    to make sure that when they start throwing somebody's name

4    around in the courtroom and alleging that they gave out

5    information, that they know what they're talking about and that

6    they have done their due diligence and they haven't.  But they

7    want you to say, yeah, maybe that's Tommy Francis.  Get Tommy

8    in here.  Throw him on the stand.  Get Pete Martin in here.

9    They've got the power.  Oh, no, they don't want to do that.

10   They just want you to guess like they guessed.  And I find it

11   offensive, frankly, and I find it disturbing.  They have lost

12   their way.

13         Now, there is one thing I actually agree with

14   government counsel about when they said yesterday -- when they

15   showed you this and they said, you know, the pattern, there is

16   a pattern you see, and they said in the 2012 there was a

17   pattern and it's the same pattern they had in 2014.  Thank you.

18   Let's look at the pattern.  What is the pattern?  They showed

19   you this exhibit about again Pilgrim's doing market

20   intelligence in 2012 and they said this is just like 2014.

21   They have got one thing in common.  They were doing market

22   intelligence and here are all of the good guys, the Durbins,

23   the George's, the Claxton, the Koch's, except for one company,

24   their archenemy Tyson.  They didn't have our number just like

25   they didn't have our number in 2014 because we are not pals

4331

1    with them.  We are not giving them any market intelligence.

2    That is what it was about.

3          And when you talk about 2014 when you talk about the

4    government's witnesses, keep in mind that their witness said

5    that he was so worried, that he thought that the Tyson number

6    given the strength of Tyson and the advantages that Tyson had,

7    they -- he thought the number for Tyson was too low compared to

8    Pilgrim's.

9          What did their witness do?  When all the bids were in,

10   after all the second bids were in, he picked up the telephone

11   and he called Brian Roberts because he was worried Brian was

12   going to get fired because the Tyson position was too weak,

13   fired.  He was worried he was going to lose his job because

14   Tyson's negotiating position he thought was too weak.

15   Conspire?  You see the difference would be in the profit margin

16   is about 2-1/2 cents between Pilgrim's and Tyson on that

17   contract.  Over a three-year contract, tens of millions of

18   dollars.  The government would have you believe that we would

19   go, hey, I've got a good idea.  Why don't you, since you are my

20   chief competitor and you hate us, why don't we enter into a

21   conspiracy where you get the money.  No, I want you to have the

22   tens of millions of dollars, not me.  Use your common sense.

23   That's not what happened.  That's not what happened.  It

24   doesn't fit.  They take a square peg and try and pound it into

25   a round hole.

4332

1          And what about Pepper?  Well, Pepper comes in and

2     Pepper tells you the bid was calculated, the Tyson bid was

3     calculated before, before he had any contact with any

4     competitors.  And he also tells you that he didn't give any

5     Tyson numbers out to anybody.  He didn't give Tyson numbers out

6     and he didn't receive any Tyson numbers, so that's what he told

7     you.

8          And the other thing that he said, and I am sure it was

9     just a mistake when the government got up and said that he had

10     spoken with Roberts about this, because what he testified from

11     the stand, not what the government wanted him to testify to,

12     was that he, when asked whether or not he talked with anyone

13     other than Mulrenin about this, this KFC thing in the summer of

14     2014, he said, well, I just can't answer that.  I just can't.

15     He could not remember.  He could not answer the question.

16          Remember that long pause he had?  He had a long pause

17     before he answered that, and he says I just -- I just don't

18     have the answer for you on that.  And the reason is that the

19     evidence that was introduced was Mr. Pepper who worked for

20     Mr. Roberts, but they worked in different states, from July the

21     16th until September the 4th, they had no calls.  They had no

22     contact with each other, none.  He is supposed to be working on

23     the conspiracy, but the bottom line is the Tyson cake has

24     already been baked.  It was baked in June.  They are not

25     sitting around conspiring with folks about what to do.  The

1    cake is baked.  And the people who made the decisions and had

2    the decision authorities, that's the business unit and the

3    pricing unit.  And the cake was baked.

4           Now, when you talk about -- we've had so many

5    different -- you talk about the Tyson relationship with

6    Pilgrim's.  I mean, goodness gracious, you see some of this

7    stuff, but this is important.  I want you to remember this one.

8    In October, this is the same time period, October 2014, we are

9    supposed to be conspiring.  We are a member of a secret club

10   you see.  We are conspiring with Pilgrim's.

11          Well, what's happening?  In your summaries you will

12   see one on Golden Corral in October of 2014, same time period

13   as the KFC.  And the Pilgrim's people are trying to guess what

14   the prices are, and they say -- Golden Corral said that

15   somebody is 7 cents cheaper.  And the Pilgrim's people, because

16   they don't know, we don't give them our stuff because we are

17   not in a conspiracy with them or anybody else, they say, I

18   guess that's Tyson's.  And what does Mr. Penn say about them?

19   Morons.

20          And that's okay.  We don't care if he thinks that

21   we're morons.  At the same time and same year, 2014, they are

22   calling us Otis the town drunk, morons.  They are saying they

23   are not going to help us out.  They are upset about us selling

24   cheap chicken and they want us to face the music.  Mr. Penn is

25   talking about stepping on the throat.  And that's what they are

4334

1    doing.  You know, I am not -- we are not upset with Mr. Penn or

2    anybody at Pilgrim's doing that.

3            It's called very rough, tough competition.  That's

4    what it's called.  It's called throwing yourself in there and

5    if I can whip you in that competition, I'm going to whip you.

6    They thought they could whip us.  Did a pretty good job of

7    running their business and Tyson did too, but they didn't run

8    their businesses together.  They ran it against each other.

9    That's what happened.

10           One of the things that is so disturbing is the -- I

11   want to talk a little bit about the -- and Church's frozen,

12   that was done so well by other folks that I won't address that

13   very much, but I will say that's all just a pass-through.  It's

14   just what's the cost and Mr. Roberts in his e-mail saying, I

15   just don't want to be -- what's it going to cost us?  Are we

16   going to be the frozen chicken bank for Church's or what?  It

17   was all about just passing the cost on.  Is that so remarkable?

18   Is that so difficult for the government to understand?  And

19   these people from Tyson who came in, all we want to do is get

20   paid for our cost; but oh, no, the government, we have a

21   conspiracy involving freezing charges.

22           Well, actually even their own witness, Mr. Pepper,

23   said, well, our actual cost was between 4 and 6 cents.  And the

24   bottom line is it ended up being, you know, we ended up paying

25   less because of Mr. Mulrenin trying to help the client out,

4335

1    Church's.  He's the man that got them to say let's go down, not

2    up, not even getting the hundred percent of our cost.  Let's

3    help them out because that's what you do for people when you

4    work for them, when you work with them like Mr. Mulrenin was

5    working with the client, not against the client.

6           Now, then we have a situation that's disturbing, and I

7    want to take a quick look at -- that has to do with -- this is

8    the Popeye's is done and I find this disturbing.  The

9    disturbing part is the government threw this up, and this is

10   one of their big first exhibits with Pepper.  Popeye's is done.

11   It's agreed upon from Brian Roberts, almost 14-cent increase.

12   Yes, Brandon, I changed the margin line.

13          Isn't it a fact, Mr. Pepper, that this shows that

14   Mr. Roberts had negotiating authority for the Popeye's?

15          Yes, it does, says Pepper.  He had been trained well.

16   When you go through a rehearsal 25 times, sometimes you find

17   out what the answer is supposed to be during the practice

18   sessions, the practice sessions, the practice sessions.

19          But now we know that they were misleading you, don't

20   we?  We know they were misleading you because what we know is

21   that on August the 1st, that this is August the 1st

22   Mr. Campbell is saying as it relates to KFC, and it's no

23   negotiation there, 19 again, but it's a range and there is

24   Popeye's.  Then we have Mr. Kent Kronauge coming in to say, who

25   set the prices at 14?  Was it hard thought negotiation by

1    Mr. Roberts?  No.  He just told everybody, We are doing 14.

2          And I am disturbed by that.  I am disturbed that they

3    would have you believe, Ladies and Gentlemen of the Jury, as

4    one of their principal exhibits that they threw up and flaunted

5    around this courtroom that they knew better.  All these

6    documents, these 15 million documents, they have gone over all

7    these things and they know better.

8          Now, there has been a lot of what I call red herrings,

9    red herrings I have just got to address.  No. 1 red herring is

10   they throw up an e-mail from Scott Brady that has some numbers

11   on it and some initials, might be some present -- some present

12   pricing or whatever or period pricing.  Don't know.  And he

13   said, Don't forget about me.  That's what we call a red herring

14   because there is no evidence whatsoever that there was any

15   pending bid from anybody during that time, the time period of

16   that e-mail from Scott Brady, none.  Do they tell you that?

17   No.  They have lost their way.

18         Now, another is that there is the illegal spiel e-mail

19   that we have seen earlier where Mr. Penn is needling

20   Mr. Lovette, and the subject line there is Brian Roberts.  And

21   it says, It doesn't sound like your boy is following your

22   illegal spiel, because Tyson had done some pricing on

23   Albertson's and Super Valu.  Anything that has the word

24   "illegal" or "I don't want to hear that," they are going to

25   throw it up there, but it's so misleading and they know it.

4337

1   The reason they know it is because Brian Roberts wasn't even on

2   the Albertson and the Super Valu accounts.  That wasn't his

3   thing.  But if you didn't know that -- Carl Pepper testified to

4   that.  If you didn't know it, then we would have a problem.

5           Same way with an e-mail they introduced that talked

6   about Wal-Mart, and there is a Brian mentioned in the e-mail.

7   That's not Brian Roberts.  That's Brian from Wal-Mart.  So if

8   you get to that part in your deliberations, don't trip over

9   that little red herring that they laid out there for you.

10          I want to talk to you briefly about a few things other

11  than some of these episodes.  I want to talk to you about hope.

12  I want to talk to you about fear.  I want to talk to you about

13  courage and I want to talk to you about power.  Let's talk

14  about fear first.

15          Fear, fear is an element in all of us.  All of us are

16  afraid of something.  How we deal with fear is unique to us.

17  The fear here deals with the two individuals who took the stand

18  after 25 sessions of jumping through the government hoop to

19  find out what they needed to say in order to make these people

20  happy, fear.  The fear of someone knocking on your door and

21  saying, I'm with the FBI.  I'm Agent Taylor.  You're under

22  arrest or please come down to the courthouse.  You have been

23  indicted.  So that's the fear, the fear of not pleasing them,

24  the fear of every single day.

25          Let's think about the fear of Carl Pepper who went

4338

1  through two years and he said hundreds of hours of interviews

2  with the government.  I asked him every single time, and did

3  you?  No, it wasn't enough.  It wasn't enough.  A little bit

4  more, Carl.  No, not enough for immunity.  You are not singing

5  from the music sheet.  You are doing better, come on, come on.

6       The fear of him waking up every morning knowing he has

7  got to go to Washington to meet these people to see if he can

8  dance to their tune to get what he wants to alleviate the fear

9  and to feel safe and that this, whatever is happening here,

10  this, he will not be out here sitting out here with a mask on

11  and a suit on staring at some fine folks in a jury box

12  wondering what the fate of their liberty and their reputation

13  and their lives will be.  That's the fear that consumed Bryant

14  and it consumed -- it also consumed Carl Pepper, that fear.  I

15  desperately want to have that fear.

16       And the hope, the hope is that if I get a little bit

17  better, a little bit better, maybe they'll give me what I want,

18  which is for them to leave me alone and not make me sit out

19  here with these folks wondering what's going to happen to the

20  rest of my life.  That's the hope.  Pepper talked about that.

21  He said, yeah, that's what I had hoped.  I had hoped.

22       And then after two years of not doing quite enough,

23  what happens?  After two years of not doing quite enough, tears

24  come to his eyes.  His eyes welled up because they told him no

25  protection for you.  No non-prosecution deal for you.  Talk to

4339

 1     you later.  And fear creeps back in.  But time passes.

 2             About a week and a half before this trial or about two

 3     weeks before this trial, hope springs a turtle.  They come

 4     back.  We are going to give you a second chance.  I want a

 5     second chance.  Give me a second chance.  I'll be better.

 6     Because when you think about why did they turn him down?

 7     Because, you know, he had told them for two years about the

 8     fact that he said he had been checking around and checking out

 9     to get comfort for Tyson within the market for getting market

10     intelligence.  He told them all that.

11             But you know what?  That wasn't good enough.  And you

12     want to know why?  Please remember this.  The reason why that

13     wasn't good enough is that even the government knows that

14     collecting market intelligence, discussing prices is not enough

15     to make an unlawful act.  They knew that, so they needed more.

16     Please come back.  And he came back.  And what did he get?

17             He was asked, Are you going to say that you had some

18     kind of agreement with people in 2014?  Are you going to say

19     you had an agreement even though you didn't share prices, even

20     though they didn't give prices to you, even though none of that

21     happened, even though Tyson is already baked in in June, even

22     though you are not a decision maker, even though you are

23     talking to somebody on the phone allegedly who is not a

24     decision maker?  If you just say it, we'll give you your

25     cherished deal.  And that's what he got.  So that was the hope.

4340

1          So courage, courage.  I submit to you we have seen

2     courage in this courtroom.  We have seen courage from people

3     who have taken the stand who are not called by the government

4     who testified and destroyed the government's theories.  The

5     defense case, the defense witnesses in this case destroyed

6     their theories.  Brandon Campbell, Bowlin, Greg Finch, Brenda

7     Ray, Eddington, courage.  They showed courage in coming in here

8     and giving truthful testimony in the defense case when they

9     knew that it wasn't on the government's music sheet; because

10    let me tell you something, after we have seen all of this,

11    after we have seen everything that's happened here, the one

12    thing we conclude is nobody is safe.  Nobody is safe unless you

13    sing their song.  So that's courage.

14         Power, let's talk about power.  The power that these

15    folks have to change lives, to give immunity, not to give

16    immunity, to indict, to change, to drag people into court, to

17    put their reputations, their liberty, everything on the line,

18    they have that power, and the power to bring in the Carl

19    Peppers and the Bryants in the world and put them in there and

20    grind them for 25 sessions.

21         I asked you this.  If you're going to talk to somebody

22    and ask them a question, you think they're going to tell you

23    the truth?  It only takes one time, doesn't it?  If they are

24    going to tell you the truth, you bring them in.  You ask them

25    the question one time; but no, no, 25 times.  It's like making

1    a sculpture.  And every time a little bit of adjustment, a

2    little bit of adjustment, a little bit of adjustment until we

3    bring it up and we put it in the witness box like they are

4    fresh and new, as they practice and they practice and they

5    practice.  And that's what happened.

6          Now, the one thing that we need to focus on, you know,

7    Albert Einstein taught us that, you know, there are forces in

8    the universe that are so powerful in space, the density and

9    mass, that light, light itself can be bent.  And I thought that

10   was one of the most powerful things in the universe other than

11   the divine, but something is more powerful, the power of man's

12   desire to be free.  And we did not see light bent in this

13   courtroom, but we saw the truth bent so that Pepper and Bryant

14   could be free.

15         Now, you're going to have -- there is -- one other

16   thing we need to remember that's been said, people talk about

17   Tyson and Pilgrim's.  These folks out here aren't corporate

18   representatives.  They're human beings.  Behind the masks and

19   the suits they are human beings with families and hopes and

20   dreams.  They are not a corporation, so please remember that as

21   the government throws around Tyson this and Pilgrim's that.

22   Remember that they are individuals and that's the way that it

23   is.  They are in a unique situation in terms of what's

24   happening to them now.

25         Now, when you talk about -- when you talk about the

4342

1    Carl Peppers and the Bryants, remember you are going to get a

2    jury instruction from the Court that you have to take those

3    guys and consider their testimony with greater care and caution

4    than the testimony of an ordinary witness.  Why?  Well, because

5    the law recognizes that you have to judge their credibility.

6    And unless you can find, unless they are corroborated, which

7    you can't, then you cannot believe them unless you find what

8    they said beyond a reasonable doubt.

9            The other thing this instruction says is that

10   Mr. Pepper can be prosecuted for perjury for making a false

11   statement.  Who decides whether he makes a false statement from

12   the jury box, from the witness box?  These folks right here,

13   not me, not the Court, not you.  They decide.  Oh, he can be

14   prosecuted for a false statement, not if he sings the

15   government song.  That's one way of knowing you are not going

16   to be prosecuted for making a false statement.

17           The power of the government is not -- the power of the

18   government is not all omnificent.  Their power is great.  We

19   have seen it.  We have heard about it.  We have talked about

20   it.  Their power stops at that jury railing.  That is where

21   their power stops.  They cannot take their power into your jury

22   box or into your jury room.  When you get this case, all the

23   power is transformed to you for your responsibility to find the

24   truth, your responsibility to do, exactly.

25           And Your Honor, how am I on time?

1          *THE COURT:*  Two minutes left.

2          *MR. GILLEN:*  Thank you, Your Honor.

3          Your responsibility to find the truth.  Their power is

4    zapped away.  They can put the Peppers and the Bryants and they

5    can indict these good folks out here, but that jury railing

6    they can't go beyond and all that power belongs to you.  That

7    is what makes our country great, that we don't have a country

8    where we have governmental agents or bureaucrats or lawyers

9    deciding who is guilty or who is not guilty, who gets the stain

10   of a felony conviction.  We rely on you and our system, thank

11   goodness.

12          It's come time where for me it's difficult because I

13   have to now sit down, can't get up and say another word.  I

14   have to pass the questions, the answers to the questions they

15   may pose in rebuttal to you.  What would Mr. Gillen say to the

16   rebuttal by counsel of the government?  What would Penn's

17   lawyer or Mulrenin's lawyer, what would they say?  We can't say

18   anything.  We are counting on you in the jury room to do

19   exactly that and say, well, that doesn't make any sense.

20   That's not consistent with the evidence.  Are they trying to

21   pull another fast over us that we have seen time and time again

22   as they have lost their way?  So it will rest with you.  It

23   will rest with you.

24          What we are asking is that you take this evidence, you

25   look at this.  It is beyond any doubt Brian Roberts is not

4344

1    guilty of these charges.  The people in this room are not

2    guilty of these charges.  The government has failed to meet its

3    burden of proof beyond a reasonable doubt.  I will ask you to

4    return a verdict that speaks the truth, a verdict of not

5    guilty.  It's time that this nightmare ends.

6         Thank you.

7         THE COURT:  Thank you, Mr. Gillen.

8         So ladies and gentlemen, as I mentioned earlier today,

9    tomorrow will be a little bit different.  Come back at 8:30.

10   We have got two more arguments left, but then you will be

11   released to commence your deliberations.  The Court tomorrow

12   will provide lunch for you.  This is a tradition that we do in

13   our district and you will actually be able to -- Ms. Grimm will

14   give you a menu and you can make some choices there.

15        Two things about that.  No. 1, that does not mean that

16   you have to deliberate through lunch.  It's not some type of

17   coercion technique.  You can do whatever you want.  That does

18   not mean you have to order lunch.  You can choose to go out for

19   lunch if you want or not have that lunch or, once again, that's

20   totally up to you, but I just wanted to give you that heads-up

21   just so you know about the fact that we'll do that for you, all

22   right?

23        Keep the admonitions in mind, all the same ones.

24   Can't deliberate yet, obviously, even though you are close.

25   The jury is excused until 8:30 tomorrow.  Thank you.

1          Anything to take up before we recess?

2          All right.  We will be in recess.

3          Did you have anything, Mr. Pollack?

4      *MR. POLLACK:*  Your Honor, if any of the defendants

5  didn't use their time, I will take it tomorrow.

6      *THE COURT:*  No.  Defendants collectively are in a bit

7  of a time deficit.  Do you want to cede some time.

8      *MR. POLLACK:*  If Ms. Call didn't use some of her time,

9  I will take that.

10     *THE COURT:*  We won't know that until the very end, so

11 we will be in recess.  Thank you.

12    (Recess at 5:25 p.m.)

13                          INDEX

14 CLOSING ARGUMENT

15    By Mr. Gillen                                4317

16    By Mr. Kornfeld                              4105

17    By Mr. Lavine                                4129

18    By Ms. Nielsen                               4155

19    By Mr. Tubach                                4180

20    By Mr. Feldberg                              4211

21    By Mr. Byrne                                 4230

22    By Ms. Henry                                 4263

23    By Ms. Prewitt                               4284

24

25

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 20th day of June, 2022.


                              S/Janet M. Coppock