1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn III

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN,
   MIKELL REEVE FRIES,
8  SCOTT JAMES BRADY,
   ROGER BORN AUSTIN,
9  WILLIAM WADE LOVETTE,

10      Defendants

11 _____

                    REPORTER'S TRANSCRIPT
12                   Trial to Jury, Vol. 4

13 _____

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15 Chief Judge, United States District Court for the District of

16 Colorado, commencing at 8:30 a.m., on the 9th day of June,

17 2022, in Courtroom A201, United States Courthouse, Denver,

18 Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106

1                              APPEARANCES

2              Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3      Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4      Washington, DC 20530, appearing for Plaintiff.

5              Anna Tryon Pletcher and Michael Tubach of

6      O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7      San Francisco, CA 94111-3823;

8              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9      N.W., Washington, DC 20006, appearing for Defendant Penn.

10             David Beller, Richard Kornfeld and Kelly Page of

11     Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12     CO 80202, appearing for Defendant Fries.

13             Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14     Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15     3000, Atlanta, GA 30308;

16             Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17     1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18     Brady.

19             Michael Felberg of Reichman, Jorgensen, Lehman,

20     Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21     10017;

22             Laura F. Carwile of Reichman, Jorgensen, Lehman,

23     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24     CA 94065; appearing for Defendant Austin.

25

1          APPEARANCES (Continued)

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3     South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5     Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6     Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                    PROCEEDINGS

9          THE COURT:  Anything to take up before we bring the

10    jury back in?

11         MR. HART:  Nothing for the government, Your Honor.

12         THE COURT:  Why don't we get Mr. Bryant.

13         And, Ms. Buchanan, you can go ahead and get the jury.

14         (Jury present.)

15         THE COURT:  Good morning, ladies and gentlemen.  I

16    hope you had a good evening.  While I think of it, let me

17    mention the following, and that is, if you want, we've got some

18    limited supply, I am not sure how many, of KN95 masks.  I know

19    a number of you are wearing KN95s.  But if you are not and you

20    wanted to wear one, ask Ms. Buchanan.  Like I said, I don't

21    know if we would have one for you every day for the trial, but

22    she has got some, so if you want to do that, let me know.

23         All right.  Mr. Bryant is on the witness stand and

24    Mr. Torzilli can continue with his direct at this time.

25         Go ahead.

Robert Bryant - Direct

1          *MR. TORZILLI:*  Thank you, Your Honor.

2                    **DIRECT EXAMINATION CONTINUED**

3     *BY MR. TORZILLI:*

4     *Q.*  Good morning, Mr. Bryant.

5     *A.*  Good morning.

6     *Q.*  Let's pick up where we left off yesterday.  We were talking

7     about the meeting in July 2014 that you were present at where

8     your boss, Mr. McGuire, instructed Defendant Austin to put this

9     out to the industry when he was gesturing to the slide deck.

10              Now, I would like to ask you the question that was

11    pending when we broke for the day, and that's this, Mr. Bryant.

12    How, if at all, did what you heard from Mr. McGuire instructing

13    Defendant Austin to put this out to the industry affect your

14    future work in sales and bidding to fast-food customers?

15    *A.*  It affected my future work as it was the basis for my

16    understanding of how the cooperation between the competitors

17    worked.  It was the beginning of that understanding.

18    *Q.*  And what was -- did you develop an understanding as to the

19    cooperation between competitors, then?

20    *A.*  I did.

21    *Q.*  And by competitors, what are you referring to or who are

22    you referring to?

23    *A.*  Various other poultry companies like Koch, Claxton, Tyson,

24    for instance.

25    *Q.*  Are they competitors of Pilgrim's or were they competitors

Robert Bryant - Direct

1    of Pilgrim's for fast-food restaurant customer business?

2    A.   They were.

3    Q.   And you said cooperation.

4    A.   That's correct.

5    Q.   Can you tell us what you mean by cooperation?

6           MR. TUBACH:  Your Honor, I am going to object, lack of

7    foundation.

8           THE COURT:  Overruled.

9    A.   Yes.  What I mean by cooperation is sharing strategy both

10   before bid and during a bid, pricing information around bid

11   times and other times; sharing information on confidential

12   meetings between a common customer and various competitors;

13   e-mails between myself, Mr. Austin, my boss Jason McGuire, and

14   Tim Stiller on those conversations; and giving direction to

15   Mr. Austin to give strategy during the middle of those bids.

16   BY MR. TORZILLI:

17   Q.   So let's break that down a little bit.  I think first you

18   said sharing strategy?

19   A.   That's correct.

20   Q.   Can you explain to the jury what sharing strategy was?

21   A.   For instance, to put it out to the industry comment, that

22   particular slide deck was Pilgrim's strategy for raising

23   prices, the basis of raising prices, and sharing that with our

24   competitors, that strategy was an attempt to influence their

25   decision-making prebid.  After bids, there were phone calls

Robert Bryant - Direct

1   sharing Pilgrim's negotiation posture during those

2   negotiations, for instance, that Pilgrim's was not going to

3   concede any price in subsequent rounds and sharing that with

4   competitors so they could use that to formulate their own

5   response.

6   Q.  And by -- you were using the word "they" or "their" in that

7   previous answer.  Were you referring to Pilgrim's competitors

8   as the "they" or the "their"?

9   A.  I was, yes.

10  Q.  Now, you also mentioned pricing information.  Can you

11  explain to the jury what pricing information was shared?

12  A.  Bid information and just ongoing price sharing between

13  various competitors.

14  Q.  You said bid information.  What is bid information?

15  A.  That's the bid proposal or the price that you intend to

16  submit for a customer's bid.

17  Q.  Was there ever a sharing of bid information at a time

18  before a bid was actually submitted to a common customer?

19  A.  Yes.

20  Q.  Is KFC an example of a common customer?

21  A.  Yes.

22  Q.  Popeye's?

23  A.  Yes.

24  Q.  Church's?

25  A.  Yes.

Robert Bryant - Direct

1   Q.  You also mentioned the sharing of information about I think

2   you called it confidential meetings?

3   A.  That's correct.

4   Q.  Could you explain what confidential meetings are?

5   A.  Typically, there was a prebid meeting and even post-bid

6   meetings with these common customers, and Mr. Austin would

7   regularly talk to his counterparts at the various competitors

8   to get the details of those meetings and share that with others

9   at Pilgrim's.

10  Q.  You mentioned that it was done to I think you said

11  influence the outcome of the bid; is that right?

12  A.  That's correct.

13          MR. FAGG:  Objection, Your Honor.  Can we get some

14  specification on the time period that we are talking about

15  here?

16          THE COURT:  The objection is vague as to time?

17          MR. FAGG:  Yes, Your Honor.

18          THE COURT:  Sustained.  If you could lay some

19  foundation on that.

20          MR. TORZILLI:  Sure.  Thank you, Your Honor.

21  BY MR. TORZILLI:

22  Q.  So for the year 2014, was there sharing of the information

23  you just identified for purposes of influencing the outcome of

24  a bid?

25  A.  There was.

Robert Bryant - Direct

1   Q.  For what customer or customers to your knowledge was there

2   sharing of that information for purposes of influencing the

3   outcome of a bid?

4   A.  For KFC specifically, but to put it out to the industry

5   wasn't necessarily just directed to KFC.  That was directed to

6   all customers in my view.

7   Q.  What do you mean by all customers?

8         MR. BELLER:  Objection, foundation regarding how

9   Mr. Bryant knows this information.

10        THE COURT:  Overruled.

11  A.  The reason why I say all customers, because initially when

12  we developed the PowerPoint presentation, Mr. McGuire told me

13  we were going to target our QSR customers first, but eventually

14  that same information was used towards all customers.

15  BY MR. TORZILLI:

16  Q.  Now, let's get back to influencing the outcome of the bid.

17  And just sticking with the year 2014, can you describe what you

18  mean by sharing of the information you identified a moment ago

19  for purposes of influencing the outcome of the bid?

20  A.  So, yes, sharing the basis for price increases with our

21  customers -- I am sorry, our competitors; you know, e-mail

22  confirmations from Mr. McGuire to me that confirmed our

23  competitors did, in fact, submit higher prices along with

24  Pilgrim's; and overheard conversations between Mr. Austin and

25  competitors sharing -- sharing Pilgrim's refusal to negotiate

Robert Bryant - Direct

1   in subsequent rounds of negotiations and actually delivering

2   that message in person to that common customer.

3   Q.  And what was the purpose of all of that in 2014 and bidding

4   with KFC and other customers?

5           MR. FELDBERG:  Foundation.

6           THE COURT:  Sustained, if you could lay foundation.

7   BY MR. TORZILLI:

8   Q.  Sure.  Do you have an understanding, Mr. Bryant, of the

9   purpose of sharing all of that information you identified a

10  moment ago to influence the outcome of the bid to KFC and other

11  fast-food restaurant customers in 2014?

12  A.  I do.

13  Q.  What's your understanding based on?

14  A.  My understanding is based on the conversations between

15  myself, Jason McGuire, conversations between myself, Roger

16  Austin, overheard phone calls between Mr. Austin and various

17  competitors, e-mails from Jason McGuire confirming actions

18  taken, message delivered to the customer, and the eventual

19  outcome of the bidding process.

20  Q.  And what was the overall purpose to get to the outcome of

21  the bidding process?

22          MR. FELDBERG:  Objection.  There was nothing specific

23  in the attempt to lay a foundation.

24          THE COURT:  Overruled.

25  A.  Sorry, can you ask again?

431

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.* Yeah. What was the overall purpose or overall purpose you

3   were trying to achieve in the, as you just said a moment ago,

4   the outcome of the bid?

5   *A.* The overall purpose was to increase prices together with

6   our competitors.

7   *Q.* Together with Pilgrim's competitors?

8   *A.* That's correct.

9   *Q.* Such as Claxton?

10  *A.* Correct.

11  *Q.* Such as Koch?

12  *A.* Correct.

13          *MR. BELLER:* Objection, leading.

14          *THE COURT:* Sustained.

15  *BY MR. TORZILLI:*

16  *Q.* Could you identify the competitors that you were achieving

17  your outcome together with?

18  *A.* Koch, Claxton, Tyson are the ones I was most aware of,

19  although I did receive pricing from other competitors as well.

20  *Q.* What other competitors did you receive pricing from?

21  *A.* Mar-Jac, George's, I believe there was another one.

22          *MR. TUBACH:* Your Honor, this is vague and ambiguous

23  as to time. Again, we don't have a time frame here.

24          *THE COURT:* Overruled.

25  *BY MR. TORZILLI:*

Robert Bryant - Direct

1   Q.  Please complete your answer, sir.

2   A.  I believe there was others.  I can't remember them right

3   now.  I do have some notes that would refresh me, my memory.

4   Q.  And we'll get to that in a few moments, Mr. Bryant.  But

5   let's go back to -- thank you for that.

6           Let's go back to the conference room in July of 2014

7   where you heard Mr. McGuire tell Defendant Austin put this out

8   to the industry, and he used the word "industry"; am I correct?

9   A.  That is correct.

10  Q.  What was Mr. McGuire's relationship to you at that point in

11  time?

12  A.  He was my manager.

13  Q.  Had you ever heard your manager, Mr. McGuire, use the term

14  "industry" before you heard him use that term at that meeting?

15  A.  I have.

16  Q.  Approximately how many times had he used the word

17  "industry"?

18  A.  Many times.  I couldn't -- many, many times.  It was

19  commonplace.

20  Q.  So based on hearing Mr. McGuire use that word many, many,

21  many times, did you have an understanding of what Mr. McGuire

22  meant by the word "industry" when he was giving his direction

23  to Defendant Austin?

24  A.  I did.

25  Q.  Okay.  What was your understanding of what Mr. McGuire

Robert Bryant - Direct

1   meant by the word "industry"?

2   A.  Our competitors.

3   Q.  And by our competitors, who do you mean?

4   A.  The same list like -- I am sorry, Koch, Claxton, Tyson, all

5   of our direct competitors for that QSR business.

6   Q.  Now, did there come a time when the customer opened the

7   door and came back into the conference room?

8   A.  Yes.

9   Q.  When the customer came back in the room, did you report to

10  the customer what Mr. McGuire had instructed Defendant Austin

11  to do?

12  A.  No.

13  Q.  Why not?

14  A.  Well, it was one of my earlier meetings with this customer.

15  I didn't feel comfortable, and had I shared that information,

16  it would have alerted the customer that the bidding process was

17  compromised or could be compromised.

18  Q.  When the customer came back into the room, did Mr. McGuire

19  inform the customer of what he had instructed Defendant Austin

20  to do?

21  A.  No.

22  Q.  When the customer came back into the room, did Defendant

23  Austin apprize the customer of what Mr. McGuire had instructed

24  him to do?

25  A.  No.

Robert Bryant - Direct

1  *Q.*  At the I think you called them yesterday blitz meetings, at

2  the blitz meetings, was a specific price increase amount or

3  even range ever disclosed to a customer?

4  *A.*  Not that I remember, no.  I think that came later.

5  *Q.*  And at the time you were attending those blitz meetings,

6  did you know what the price increase or price increase range

7  that Pilgrim's planned to go in with to the fast-food customers

8  was going to be?

9  *A.*  No.  I just knew it was going to be significant.  I just

10  didn't know the amount.

11  *Q.*  Did there come a time when you did learn the magnitude of

12  the price increase that Pilgrim's would be requesting in its

13  bids to fast-food customers in 2014?

14  *A.*  Yes.

15  *Q.*  From whom did you learn that?

16  *A.*  Jason McGuire.

17  *Q.*  How did you learn that from Jason McGuire?

18  *A.*  It was over a phone call when we were discussing the bids.

19  *Q.*  And what did you learn on that phone call with Mr. McGuire

20  discussing the bids?

21  *A.*  It was going to be about a 20-cent-per-pound price

22  increase.

23  *Q.*  20-cent per --

24  *A.*  Per pound.

25  *Q.*  Okay.  And approximately, do you have a sense of how much

Robert Bryant - Direct

1    revenue a 1-cent-per-pound increase would be worth to Pilgrim's
2    to sales of KFC at the time?
3    A.  I don't remember exactly how much volume Pilgrim's was
4    supplying to KFC at the time, but, you know, I remember we were
5    doing 50 loads a week at a time, so it would have been a
6    hundred million times.  You know, we were up $10 million for a
7    hundred million pounds -- I am sorry, $20 million for a hundred
8    million pounds.  It's about a million dollars per penny on a
9    hundred million pounds, so ...
10   Q.  What type of increase is 15 to 20 cents per pound -- well,
11   and, actually, what product are you referring to when you say a
12   15 to 20-cent-per-pound price increase?  What's the product
13   that you are referring to?
14   A.  I was referring to their eight-piece.  It's called
15   eight-piece COB or chicken on the bone.  It's their, like, what
16   you would buy in the bucket was the primary product up for bid,
17   although they did have dark meat and then some other
18   supplemental items.
19   Q.  What kind of increase is 15 to -- or what kind of increase
20   was in 2014 a 15 to 20-cent-per-pound increase in percentage
21   sense?
22   A.  It was probably around a 20 percent increase.  I don't
23   recall what our exact price was at the time.
24   Q.  So if I am understanding you correctly, Mr. McGuire was
25   telling you, in essence, Pilgrim's was going to go in with

Robert Bryant - Direct

1   about a 20-cent -- a 20 percent increase in its bid?

2   A.   Yes, somewhere in that neighborhood, yes.

3   Q.   Did you have a reaction when you learned the plan to raise

4   prices 15 to 20 cents per pound?

5   A.   I did.

6   Q.   What was your reaction?

7   A.   I was concerned we were going to lose all our business.

8   Q.   What do you mean you were concerned you were going to lose

9   all your business?

10  A.   Well, I didn't -- at the time, I didn't believe that our --

11  all of our competitors would raise their prices that much.   I

12  had not heard a price increase of that magnitude before in my

13  career.   I don't think we have done that since on that type

14  product, but anyway, and that KFC would buy from our

15  competitors before they took such a substantial increase from

16  us.

17  Q.   If you had lost business as you were concerned about at

18  that moment, what effect would that have had on Pilgrim's

19  profit?

20          MR. FAGG:   Objection, foundation.

21          THE COURT:   Sustained.

22  BY MR. TORZILLI:

23  Q.   Sir, do you have an understanding of how sales and loss of

24  sales in Pilgrim's fresh-food services division affects the

25  profit and loss or P and L of Pilgrim's fast-food -- fresh-food

Robert Bryant - Direct

1    services division?

2    A.   I do.

3    Q.   Can you explain briefly the basis for that understanding?

4    A.   I was responsible for the P and L for some years.

5    Q.   Approximately how many years were you responsible for P and

6    L?

7    A.   Well, I answered for the P and L whenever I was the

8    sales -- director of sales.  Sales does drive that.  And then I

9    was the general manager for fresh-food service for a couple

10   years, which responsible for the entire business unit.

11   Q.   And as a result of that experience, did you develop an

12   understanding as to how the loss of sales to a fast-food

13   restaurant customer such as KFC affects the bottom-line profit

14   or loss of Pilgrim's fresh-food services division?

15   A.   Yes.

16   Q.   So going back to 2014 when you are learning from

17   Mr. McGuire of the price increase that Pilgrim's was going to

18   go in with to KFC and your concern about losing business, what

19   effect would that loss of business have had on Pilgrim's profit

20   or loss?

21            MR. TUBACH:  Your Honor, the timing is all off.  He

22   said he didn't learn any of this information until years later.

23   He couldn't possibly have an understanding in 2014.  I object

24   to lack of foundation.

25            MR. FAGG:  And speculation, Your Honor.

Robert Bryant - Direct

1        THE COURT:  Sustained.  You can ask him if he had an

2    understanding at the time.

3    BY MR. TORZILLI:

4    Q.  Did you have an understanding at the time, so in 2014 as

5    Mr. McGuire is telling you about the price increase and your

6    concern about it, how, if at all, the loss of sales to KFC

7    would affect the bottom-line profitability of Pilgrim's

8    fresh-food services division?

9    A.  I did.

10   Q.  What was the basis of that understanding?

11   A.  Well, I had also worked through bankruptcy with Pilgrim's,

12   so I had seen the negative effects of losing business and not

13   having sales in that particular division, so, you know,

14   suffered a few years of losses there, and that did affect my

15   understanding in 2014 where if we lost a substantial amount of

16   business and we were not able to resell that product elsewhere,

17   we could have turned a profitable sale into a distressed sale

18   which could have turned our profit negative, yeah.

19   Q.  So based on that understanding, then, what is your

20   understanding that in 2014 of whether the loss of sales to KFC

21   would result in a change in the profit or loss of the

22   fresh-food service division of Pilgrim's?

23        MR. TUBACH:  Lack of foundation.  His testimony is

24   about bankruptcy.  It has nothing to do with profit and loss.

25        THE COURT:  Sustained.

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   Q.   Sir, what were you concerned would happen if Pilgrim's

3   proposed this magnitude of a price increase?

4   A.   I was concerned we were going to lose business.

5   Q.   To whom?

6   A.   To KFC among others.

7   Q.   And who did you -- were you concerned you were going to

8   lose business to?

9   A.   Our competitors.

10  Q.   Pilgrim's competitors?

11  A.   That's correct.

12  Q.   Now, you testified earlier about two factors in the

13  industry that supported a price increase.  Could you remind us

14  of what those were?

15  A.   A contraction or decrease in supply for the bird size that

16  the QSR restaurants were purchasing and then the opportunity

17  cost or the profit difference between small birds and other

18  segments of the poultry industry, so if we were to raise a

19  different bird-size category, the profit margin was better.

20  Q.   Based on your experience of participating in I think you

21  said hundreds of fast-food restaurant bids during your career,

22  was a price increase of some amount justified by the conditions

23  you just identified?

24  A.   Yes.

25  Q.   Was a price increase of 15 to 20 cents per pound justified

440

Robert Bryant - Direct

1    by those market conditions?

2         MR. TUBACH:  He has no foundation for that statement.

3    I object.

4         THE COURT:  Sustained.  If you can lay foundation.

5    BY MR. TORZILLI:

6    Q.  Sir, have you ever participated in a bid for a fast-food

7    restaurant customer in your career?

8    A.  Yes.

9    Q.  Did you participate in any bids to fast-food restaurant

10   customers in your career before you received the phone call

11   from Mr. McGuire in the summer of 2014?

12   A.  Yes, mostly internal discussions with Mr. McGuire and

13   others.

14   Q.  At that point in time, how many bids to fast-food

15   restaurant customers had you participated in approximately?

16   A.  I don't know, but it was several.  I mean, it was several.

17   From what I recall, I had been in that regional role I think

18   since 2010, and Mr. McGuire and I talked regularly about each

19   bid.

20   Q.  And how long had you been in the chicken industry in sales

21   at the time you received that call from Mr. McGuire?

22   A.  From my early days as just a sales -- probably close to a

23   decade.

24   Q.  As part of your sales job you worked in close to a decade,

25   did you have -- as part of your responsibilities need to keep

441

Robert Bryant - Direct

1   up on the market conditions in the chicken industry?

2   A.   I did.

3   Q.   Including for the products like eight-piece COB sold to KFC

4   and other fast-food restaurant customers?

5   A.   I did.

6   Q.   And based on that, did you have an understanding of how

7   market conditions changes result in price increase or

8   decreases?

9   A.   I did.

10  Q.   Okay.  So based on that experience, was an increase of 15

11  to 20 cents justified in your view by the market conditions?

12          MR. BELLER:  Objection, 701.

13          MR. FELDBERG:  Same objection.

14          THE COURT:  Sustained.  Not on 701, on foundation

15  grounds.

16  BY MR. TORZILLI:

17  Q.   How typical, sir, in your experience with fast-food

18  respondent bids is a planned price increase of 15 to 20 cents?

19  A.   I have not seen one before that, and I haven't seen one

20  since then.

21  Q.   How much greater is a 15 to 20-cent price increase from the

22  typical price increase Pilgrim's had obtained from fast-food

23  restaurant customers such as KFC?

24          MR. FAGG:  Objection, Your Honor, foundation and

25  vague.

Robert Bryant - Direct

1          *THE COURT:*  Overruled.

2     *A.*  Normally prices moved a penny or two annually.

3     *BY MR. TORZILLI:*

4     *Q.*  Now, this price increase, was it just to KFC; or was it to

5     other customers as well?

6     *A.*  It started with KFC, but it expanded out to other customers

7     as well.

8     *Q.*  Did that include other fast-food restaurant customers?

9     *A.*  That's correct.

10    *Q.*  Did you become aware of a strategy within Pilgrim's of

11    which fast-food restaurant customers would get the price

12    increase first?

13    *A.*  I did.

14    *Q.*  What was that strategy?

15    *A.*  Mr. McGuire told me he wanted to get KFC done first.  He

16    felt that was our largest fast-food customer at the time, and

17    if we got that particular customer done first, that the others

18    would be easier.  The risk factor would lower after that

19    because you got your largest customer done, and then they would

20    decrease in risk.

21    *Q.*  Now, you said you were concerned about the 15 to 20 percent

22    planned price increase because it resulted -- may result in

23    lost sales to Pilgrim's.  Can you explain why?

24    *A.*  Can you ask that again?  Sorry.

25    *Q.*  Sure.  You had said you were concerned about a planned 15

Robert Bryant - Direct

1  to 20-cent price increase resulting in lost sales.  Can you

2  explain why you were concerned about that?

3  A.  Well, at the time, I didn't believe our competitors would

4  have an equally high price increase asked to the customer, and

5  I was afraid we were going to be so far and above the other bid

6  submissions that we would be uncompetitive.

7  Q.  Are you familiar with the term "undercut"?

8  A.  Yes.

9  Q.  What's that mean to you?

10  A.  That means that a customer intentionally or a competitor

11  internally lowers their price significantly in order -- on a

12  condition that they would gain additional volume from a

13  competitor.

14  Q.  Were you concerned competitors would undercut Pilgrim's at

15  the time you learned from Mr. McGuire about the planned 15 to

16  20-cent price increase?

17  A.  At that time, I was.

18  Q.  Now, let's talk a little bit about the KFC bid, bidding for

19  KFC.  So first, can you explain what type of bidding process --

20  well, first let me ask you if you have an understanding of the

21  KFC bidding process in 2014.

22  A.  I do.

23  Q.  What's that based on?

24  A.  Participating in that bid and among others.

25  Q.  What type of bidding process did KFC use in 2014?

Robert Bryant - Direct

1    *A.* I called it or I described it as a blind-bidding process

2    where the various competitors submit a bid, and the customer is

3    the only one that knows each of the customer's proposal, and

4    then they use that information --

5            *MR. FAGG:* Objection, foundation as to what the

6    customer knows.

7            *THE COURT:* Sustained. If you could lay foundation.

8    *BY MR. TORZILLI:*

9    *Q.* Mr. Bryant, prior to participating in the KFC bid in 2014,

10   had you ever participated in a blind bid for a fast-food

11   restaurant customer?

12   *A.* Yes.

13   *Q.* Approximately how many?

14   *A.* Several, like I said earlier. McGuire and I spoke

15   practically about every bid even before I was customer facing

16   in 2014.

17   *Q.* For approximately how many years were you speaking to your

18   supervisor, Mr. McGuire, about nearly every fast-food

19   restaurant bid?

20   *A.* Probably three years.

21   *Q.* Did you as part of those discussions with Mr. McGuire

22   develop an understanding of the customer's perspective on the

23   bidding process that the customer set up to invite Pilgrim's to

24   participate in the bid?

25   *A.* Yes.

445

Robert Bryant - Direct

1    Q.   So based on that, can you explain what the customer's

2    perspective is on the blind bid in KFC in 2014?

3              MR. FAGG:   Objection, Your Honor, foundation.

4              THE COURT:   Overruled.

5    A.   They would solicit proposals from the various competitors.

6    They would use the information that they had from those various

7    competitors to negotiate with other competitors, for instance,

8    you're too high on this or you're too high on this, to try

9    to -- they would use multiple rounds each time trying to

10   negotiate a lower price to eventually they got to their best

11   price.

12   BY MR. TORZILLI:

13   Q.   You mentioned multiple rounds.  What do you mean by that?

14   A.   Generally, you would submit what's called your first round

15   or your first bid.  They would ask -- there would be a RFP was

16   a common term used or request for pricing.  Generally you would

17   have a week or two to submit that.  So you would submit the

18   pricing.  They would have a week or two to digest that

19   information.  They would come back with a counterproposal to

20   you from them from the information they gleaned from that

21   initial bid submission and ask you to revise your bid and

22   usually give you some here is why we would like you to revise

23   your bid.  And that may happen multiple times until you finally

24   get to a final.

25   Q.   Based on your extensive experience with blind bids to

Robert Bryant - Direct

1   fast-food customers, did you have an understanding to the

2   benefits to a fast-food restaurant such as KFC of using blind

3   bids?

4           MR. TUBACH:  Objection, Your Honor, 701.

5           MR. TORZILLI:  Your Honor, there was a prior ruling.

6   You overruled that objection.  I am happy to explain on side

7   bar.

8           THE COURT:  Let's do a side bar.

9       (At the bench:)

10          THE COURT:  Go ahead, Mr. Torzilli.

11          MR. TORZILLI:  I have from the transcript of the prior

12  hearing:  Okay.  So then what is your understanding of the

13  benefits.

14          And then he began to answer:  The benefit to?

15          And Mr. Fagg objected.

16          And the Court said:  Overruled.

17          And then he answered:  The benefit to the customer is

18  so they are -- the customer is the one with all the knowledge

19  where the competitors only have their bid.

20          And then it goes on.

21          MR. TUBACH:  I don't have the full context of that

22  testimony.  Obviously we heard one snippet, but it seems to me

23  he is veering into 701 testimony where he is now offering lay

24  expert opinions about what the competitive landscape is.  I

25  also object on the grounds that we are not getting back into

Robert Bryant - Direct

1    the subject, which is are we violating some rules or standards

2    that the customer set up as opposed to the Sherman Act.

3        THE COURT:  Mr. Torzilli, response?

4        MR. TORZILLI:  Yes.  This is a motion for

5    reconsideration.  I haven't heard any changed circumstances, so

6    the motion should be denied.

7        MR. FAGG:  Your Honor.

8        THE COURT:  Go ahead.

9        MR. FAGG:  Thank you, Your Honor.

10       I also object on the grounds that it's not relevant,

11   and this is a per se case, and he is asking what the benefits

12   to the customer are, not the benefits to his own employer, the

13   benefits to the customer, and I object as not relevant.

14       THE COURT:  Go ahead, Mr. Torzilli.

15       MR. TORZILLI:  I just want to respond to that because

16   that's, of course, false.  The purpose of the benefits of the

17   customer is competition, and competition is what the Sherman

18   Act is about, so if there is undermining of a bidding process

19   that's trying to engender competition.  That disengendering of

20   competition, if it's the product of an agreement or mutual

21   understanding among competitors, is exactly a violation of the

22   Sherman Act and is exactly what makes it relevant.

23       THE COURT:  Yeah, I am going to sustain the objection.

24   I couldn't tell, just like Mr. Tubach, I couldn't quite tell

25   from the excerpt that Mr. Torzilli read, you know, exactly what

Robert Bryant - Direct

1   was going on.  I assume that may have been from the second

2   trial, but, you know, basically what we have is Mr. Bryant

3   going to testify about, you know, ultimate benefits to

4   customers and I do -- I am concerned, as Mr. Fagg articulated,

5   that we're straying into talking about ultimate benefits to

6   consumers and things of that nature.  I also don't think that

7   Mr. Bryant, although he may have a common-sense basis to

8   believe things of that nature, I really don't think it's

9   relevant, so I will sustain the objection.

10          *MR. TUBACH:*  Your Honor, would the Court sustain the

11   objection on the record because the jury has just heard the

12   question, I mean, in open court; otherwise, the question is

13   sort of pending.

14          *THE COURT:*  Yeah, I will do some of that.  There is

15   some side bars where it's not necessarily appropriate because

16   we've gone off into other subject matters or things, but I

17   will -- I will just -- I will make a few more rulings on the

18   record just so the jury has a sense of what's been going on

19   with the pending objection.  Thank you.

20          (In open court:)

21          *THE COURT:*  The objection will be sustained.

22          Go ahead, Mr. Torzilli.

23          *MR. TORZILLI:*  Moment to confer, Your Honor?

24          *THE COURT:*  Yes.

25          *MR. TORZILLI:*  Thank you, Your Honor.

Robert Bryant - Direct

1    *BY MR. TORZILLI:*

2    Q.  We were talking, Mr. Bryant, about the blind-bidding

3    process.  What did you understand your obligations to be in the

4    blind-bidding process to KFC?

5         MR. TUBACH:  Objection, Your Honor.  The Court just

6    indicated he couldn't ask him about it.

7         MR. TORZILLI:  This is, of course, a different

8    question.

9         MR. TUBACH:  We can go on side bar if you want, but

10   it's the difference between the Sherman Act and whatever else

11   he is asking about.

12        THE COURT:  Yeah, I am going to sustain the objection

13   on lack of foundation.  I am not sure if he has described

14   anything, any role that he had at this point in time.

15   *BY MR. TORZILLI:*

16   Q.  Sir, did you participate in the bid to KFC in 2014?

17   A.  I did.

18   Q.  Could you briefly explain what your role was in the bid to

19   KFC in 2014?

20   A.  I prepared -- helped to prepare our basis for price

21   increases.  I attended the prebid meeting with KFC.  I had

22   internal discussions with Mr. McGuire about our bid submission

23   and the formulation of that bid submission, attended follow-up

24   meetings with KFC in at least one subsequent round that I

25   remember.

Robert Bryant - Direct

1    *Q.*  Based on your participation in the bid to KFC, did you have

2  an understanding of what your obligations were?

3        *MR. FELDBERG:*  Objection, Your Honor.  We can take it

4  up at side bar.

5        *THE COURT:*  Let's do side bar.

6    (At the bench:)

7        *THE COURT:*  Go ahead, Mr. Feldberg.

8        *MR. FELDBERG:*  Thank you, Your Honor.

9        His understanding of his obligations could only, if he

10 had an understanding, be based on procedures set by the

11 customer having nothing to do with the Sherman Act, internal

12 concerns or procedures set by the customer.  Your Honor has on

13 multiple occasions ruled that inquiry into the internal rules

14 or regulations or procedures of the customer are not relevant.

15       *THE COURT:*  Mr. Torzilli?

16       *MR. TORZILLI:*  Yes, Your Honor.  He, I think, had an

17 understanding of an obligation to submit an independent bid,

18 and that's precisely what the Sherman Act requires.  That's not

19 the subject of coordination, mutual understanding, or agreement

20 among competitors.

21       *THE COURT:*  I am going to sustain the objection.  Now

22 we are definitely straying into, you know, having a person like

23 Mr. Bryant who at that point in time was just kind of a

24 back-room helper person, but he is being asked about his

25 obligations and being talked about, you know, potentially

451

Robert Bryant - Direct

1   violating things when these are -- you know, what he is being

2   asked about are just internal rules.  We've already had quite a

3   bit of testimony about the blind-bid process, so that is not a

4   subject matter that really needs much further explanation.

5           But to then, you know, talk about Mr. Bryant's

6   obligations under just some bid system is definitely straying

7   into that area that we had -- that I had disallowed previously,

8   which seems to be an attempt to, you know, make it seem like he

9   is violating something by not following the bid system.  That

10  would, therefore, run a risk of confusing the jury as to that

11  type of violation and a violation of what's charged in the

12  Indictment.

13          MR. FELDBERG:  Would the Court sustain the objection

14  in open court?

15          THE COURT:  Yes.  As I said before, I will -- if it's

16  clear on the side bar that we just limited it to this

17  particular conversation, I will make those -- you know, make

18  the rulings explicit on the record in front of the jury.  Thank

19  you.

20          (In open court:)

21          THE COURT:  The objection will be sustained.

22          MR. TORZILLI:  Thank you, Your Honor.

23  BY MR. TORZILLI:

24  Q.  Mr. Bryant, when was the first bid to KFC due in 2014?

25  A.  August.

Robert Bryant - Direct

1   *Q.*  Do you know when August?

2   *A.*  Around the middle of August.

3   *Q.*  Did Pilgrim's first-round bid submission seek a price

4   increase?

5   *A.*  It did.

6   *Q.*  How much approximately of a price increase did Pilgrim's

7   first-round bid seek?

8   *A.*  Around 20 cents.

9   *Q.*  At the time that Pilgrim's submitted its first-round bid to

10   KFC, were you still concerned Pilgrim's price increase would

11   result in loss of, I think you said, a lot of sales?

12   *A.*  I was.

13   *Q.*  Around that time, Mr. Bryant, did you become aware of a

14   plan by Pilgrim's and some of its competitors to get that

15   significant price increase from KFC?

16         *MR. FAGG:*  Objection, leading.

17         *THE COURT:*  Sustained.

18   *BY MR. TORZILLI:*

19   *Q.*  Did you become aware of a plan relating to the bids to KFC

20   around the time the first-round bids were submitted?

21         *MR. FAGG:*  Objection, leading.

22         *THE COURT:*  Overruled.

23   *A.*  Yes.

24   *BY MR. TORZILLI:*

25   *Q.*  What is that based on?

Robert Bryant - Direct

1   A.   An e-mail I received from Mr. McGuire.

2         MR. TORZILLI:  Your Honor, permission to approach the

3   witness with binders.

4         THE COURT:  Yes, you may.

5         MR. TORZILLI:  Your Honor, permission to publish to

6   the Court, the witness, and the parties Government's Exhibit

7   1066.

8         THE COURT:  Yes, of course.

9         MR. TORZILLI:  Thank you.

10  BY MR. TORZILLI:

11  Q.   Mr. Bryant, if you could look in tab 3 of the binder, if

12  you would like to look at a hard copy, or the screen to your

13  left if you would like to look at it on the screen.

14  A.   Okay.

15  Q.   What's been marked as Government's Exhibit 1066.  First let

16  me ask you whether this is the e-mail you were referring to a

17  moment ago.

18  A.   It is.

19  Q.   So you recognize it?

20  A.   I do.

21  Q.   And can you just tell me, is there one e-mail in here; or

22  is it a series of e-mails?

23  A.   There are multiple e-mails.

24  Q.   So focus for the moment on the top e-mail.  What is it?

25  A.   It's an e-mail from Jason McGuire to myself on August 21st,

1    2014.

2    *Q.*  What does it relate to?

3    *A.*  It relates to our KFC bid submission, and it's

4    preparation -- or I had a meeting with KFC the following day,

5    so it was information that Mr. McGuire thought would be useful

6    for that meeting.

7    *Q.*  Had the first-round bids to KFC been submitted by Pilgrim's

8    and its competitors at the time you received this e-mail on

9    August 21st, 2014?

10   *A.*  Yes.

11          *MR. TORZILLI:*  Move to admit Government's Exhibit

12   1066.

13          *THE COURT:*  Any objection to the admission of

14   Exhibit 1066?

15          *MR. TUBACH:*  Other than --

16          *THE COURT:*  Yeah, any previous out-of-court objections

17   will, of course, be preserved.

18          1066 will be admitted.

19          *MR. TORZILLI:*  Permission to publish 1066, Your Honor.

20          *THE COURT:*  Yes, you may.

21   *BY MR. TORZILLI:*

22   *Q.*  So if we can focus for the moment, Mr. Bryant, on the very

23   top e-mail, the one that you said Mr. McGuire wrote to you on

24   August 21st, 2014.  You said there was a meeting with KFC the

25   next day.  Can you explain what you mean by that?

455

Robert Bryant - Direct

1  A.  Yes.  We had already submitted our first-round bids, and I

2  was attending a meeting about -- as I have said before, there

3  is generally multiple rounds, so this was the next round that

4  we had a meeting with KFC the next day.

5  Q.  Was Mr. McGuire planning to attend that meeting?

6  A.  No.

7  Q.  Did you know that Mr. McGuire was not planning to attend

8  that meeting at the time you received the e-mails contained in

9  this exhibit?

10  A.  That's correct, yes.

11  Q.  Okay.  Looking at the top, very top e-mail, it's just a

12  one-line, one-sentence e-mail there.  Can you read that aloud,

13  please?

14  A.  Yep, that should help y'all out some.

15  Q.  Now, did you read the entirety of this e-mail at or around

16  the time you received it?

17  A.  I did.

18  Q.  Did you find reading the entirety of the e-mail at or

19  around the time you received it useful to you in your

20  preparations for the meeting the next day?

21  A.  I did.

22  Q.  Did you find it helpful in your preparations for the

23  meeting that was going to occur with KFC the next day?

24  A.  I did.

25  Q.  What did you understand that line that Mr. McGuire wrote to

456

Robert Bryant - Direct

1   you at the top e-mail there to mean?

2           MR. FELDBERG:  Objection, Your Honor.  It speaks for

3   itself.

4           THE COURT:  Overruled.

5           MR. FAGG:  Objection, Your Honor, speculation.

6           THE COURT:  Overruled.

7           MR. TORZILLI:  I did, just to be clear, I asked him

8   what your understanding is of what Mr. McGuire said to you.

9   A.  Mr. McGuire was conveying that the information in this

10  e-mail would be helpful in our negotiations with KFC the

11  following day.

12  BY MR. TORZILLI:

13  Q.  And what was -- that gets to my next question.  What was

14  the purpose of you and were there others from Pilgrim's who

15  attended the meeting?

16  A.  Yes.

17  Q.  What was the purpose of you and others at Pilgrim's meeting

18  with KFC the next day?

19  A.  It was the next round of bidding with KFC.

20  Q.  So you had understood Mr. McGuire was viewing this

21  information in this e-mail to be helpful to you in preparing

22  for the meeting?

23          MR. FELDBERG:  Objection, leading.

24          THE COURT:  Sustained.

25  BY MR. TORZILLI:

Robert Bryant - Direct

1   Q.  Was, Mr. Bryant, was the information in this e-mail helpful

2   to you in your preparations for the meeting?

3   A.  Yes.

4   Q.  Let's take a look at some of the e-mails that were

5   contained within Government's Exhibit 1066, starting with the

6   very first e-mail, so it would be on the second page of the

7   paper copy if you want to look at it that way.

8        MR. TORZILLI:  Ms. Pearce, if we could go down to the

9   very initial e-mail.  Thank you.

10  BY MR. TORZILLI:

11  Q.  So what's the very initial e-mail contained in this e-mail

12  chain?

13  A.  Just the date and who sent it, August 20, 2014 from Jason

14  McGuire.

15  Q.  Now, you said you -- that the bids for KFC in the first

16  round were due, I think you said, in the middle of August.  Is

17  that around the time this initial e-mail from Mr. McGuire was

18  written?

19  A.  Yes.

20  Q.  Now, let's look at the second e-mail in this exhibit.  Who

21  wrote that one?

22  A.  Roger Austin.

23  Q.  Defendant Roger Austin?

24  A.  That's correct.

25  Q.  Who did he send it to?

Robert Bryant - Direct

1    A.   He sent it to Jason McGuire.

2    Q.   Does it have a subject line?

3    A.   It does.

4    Q.   What's the subject line mean?  What's the subject line say?

5    A.   Any word from them on our proposal?

6    Q.   Did you read this e-mail at or around time you received it?

7    A.   I did.

8    Q.   Did you find it useful in the preparation for your meetings

9    that you were personally going to participate in the next day

10   with KFC?

11   A.   I did.

12   Q.   Did you find it helpful reading this for your preparation

13   of the meeting with KFC the next day?

14   A.   Yes.

15   Q.   Did you have an understanding of what this part of the

16   e-mail means?

17   A.   Yes.

18   Q.   What's your understanding of what this part of the e-mail

19   means?

20   A.   That has KFC commented or given feedback on our first-round

21   bid submission.

22   Q.   Who did you understand the word "them" to be referring to?

23   A.   KFC.

24   Q.   Who did you understand the word "our" to be referring to?

25   A.   Pilgrim's.

Robert Bryant - Direct

1   Q.   And what did you understand the word "proposal" to mean?

2   A.   Our bid.

3   Q.   First-round bid?

4   A.   That's correct.

5   Q.   Now, is there a body or a text in this e-mail?

6   A.   There is.

7   Q.   Could you read that aloud, please.

8   A.   I heard they made a couple of calls and were surprised.

9   Q.   Did you read this at or around the time you received it?

10  A.   I did.

11  Q.   Found it useful in preparing for the meeting the next day?

12  A.   I did.

13  Q.   Helpful to you?

14  A.   Yes.

15  Q.   How was it helpful to you?

16  A.   I learned that Mr. Austin had heard from some of our

17  competitors --

18        MR. FELDBERG:   Objection.   May we be heard on this?

19  There is nothing to this to indicate it's from competitors.   I

20  heard they made a couple of calls and were surprised.   The

21  "they" is KFC.

22        THE COURT:   I will sustain the objection.   If you can

23  lay foundation for that understanding.

24        MR. TORZILLI:   Sure.

25  BY MR. TORZILLI:

Robert Bryant - Direct

1    Q.   Mr. Bryant, did you read this e-mail at or around the time

2    it was sent to you by Mr. McGuire?

3    A.   Yes.

4    Q.   Did you find it -- what was the purpose of reading the

5    entirety of this e-mail?

6    A.   To help with our negotiations with KFC.

7    Q.   Were you going to be personally participating in those

8    negotiations with KFC?

9    A.   I was.

10   Q.   Were you at or around the time you received this e-mail

11   preparing to personally participate in those negotiations with

12   KFC?

13   A.   I was.

14   Q.   Okay.  And did you find this particular sentence that

15   Defendant Austin wrote to Mr. McGuire to be helpful to you in

16   your preparations?

17           MR. TUBACH:  Asked and answered, Your Honor, twice.

18           THE COURT:  Overruled.

19   A.   Yes.

20   BY MR. TORZILLI:

21   Q.   Helpful?  Okay.

22           And based on that, what did you understand at the time

23   you received this and read it and found it helpful in your

24   participation in the meeting the next day to mean?

25           MR. FELDBERG:  Same objection, Your Honor.  There is

Robert Bryant - Direct

1    no foundation for what I suspect the witness is about to say.

2           THE COURT:  Let's have a side bar.

3       (At the bench:)

4           THE COURT:  I think what the issue is is that you had

5    Mr. Bryant define "them," and he defined "them" to mean KFC.

6    Admittedly, you haven't asked him to define "they," which is

7    the sentence that you're focusing on now, but it seems as if

8    Mr. Bryant's understanding of this relates to KFC's reaction,

9    not competitors' reaction, so that, and Mr. Feldberg can

10   correct me if I'm wrong, but that would seem to be the

11   foundation objection is that he hasn't -- he seems to have done

12   the opposite of interpreting the word -- or the sentence to

13   refer to competitors.

14          MR. FELDBERG:  That's correct, Your Honor.

15          MR. TORZILLI:  Your Honor, I realize I am getting

16   ahead of the witness' testimony, but I think we've had, you

17   know, numerous 302s that the defendants, of course, are well

18   aware of going back months, and we'll be hearing probably in a

19   few hours about all the meetings where we asked all the

20   questions, so they know full well that his interpretation of

21   this sentence is "I," meaning Roger Austin who actually wrote

22   this e-mail, heard "they," meaning KFC, made a couple of calls,

23   and "they" meaning KFC, were surprised.

24          THE COURT:  Yeah, I suppose that is probably true.

25   It's just that based on the testimony so far, the impression

1     left based on the testimony is that he has interpreted "them"

2     at least to mean KFC, so, once again, that seems to be the

3     basis of the objection, so you can ask additional questions

4     about that, but to lay a foundation for his understanding, that

5     confusion would need to be cleared up.

6          MR. FELDBERG:  Your Honor, just to be clear, from the

7     face of this e-mail, all it indicates is that Mr. Austin heard

8     from KFC that they made a couple of calls and were surprised.

9     That's who the "they" is.

10         MR. TORZILLI:  That's precisely my point.

11         THE COURT:  All right.  Well, once again, the

12    confusion is because you asked him to define "them," them as in

13    the re: line, and he defined "them" to mean KFC, so the

14    impression is that the "they" in the text or in the body of the

15    e-mail presumably also refers to KFC.  But if he has a

16    different understanding, you can ask him about that.  But you

17    just asked him whether -- you know, what he understood was

18    going on with the sentence without kind of breaking it down in

19    terms of how he -- you know, what his basis was for

20    interpreting the sentence.

21         MR. TORZILLI:  I think now I understand, Your Honor.

22    I am perfectly happy to back up and clarify and get these

23    pronouns and the associated references to those before asking

24    him what he understood the entirety of the sentence to mean.

25         THE COURT:  The basis of Mr. Feldberg's objection was

Robert Bryant - Direct

1  that it was a foundational one because it appeared as if he

2  interpreted that sentence differently.

3         MR. TORZILLI:  I am happy to lead the witness through

4  that if that would clarify that.

5         THE COURT:  Well, I am not sure if you would

6  necessarily have to lead him, but, once again, that's the

7  ambiguity that exists.

8         MR. FELDBERG:  Your Honor, we would be concerned if

9  Mr. Torzilli is going to lead the witness because he might try

10 to lead him to reverse his answer.

11        THE COURT:  Well, we'll see, but Mr. Feldberg or other

12 defendants are free to make objections, all right?

13        MR. BELLER:  Your Honor, this is Mr. Beller, sorry, if

14 I can be heard on this.  I think the objection that I have is

15 slightly different and that is one of 701.  Your Honor, what we

16 have here is actually quite clear statements that are typed

17 out.  What the government is doing is having this witness go

18 through and interpret otherwise clear statements.  And the

19 reason we believe it violates 701 is it's an issue of

20 hopefulness, but when a statement is clear despite I think this

21 long discussion regarding pronouns, but when the statement is

22 otherwise clear, testimony on that statement is not at all

23 helpful to a jury, and for that reason, it's a 701 objection.

24        And I simply wanted to make that point to the Court.

25        THE COURT:  Yeah, I am going to overrule that

Robert Bryant - Direct

1    objection.  I think as we have been talking, in fact, the

2    sentence is not so clear, so I think that -- moreover, it's

3    appropriate under the circumstances here that Mr. Bryant who

4    has testified that he took actions based upon and developed

5    understandings based upon this particular e-mail, that his

6    understanding of what was said would, you know, even if he

7    would get it wrong, is nonetheless relevant, so for that reason

8    I think it's appropriate that he be able to testify about what

9    he understood at the time that he reviewed it.

10            Thank you.

11            (In open court:)

12       MR. TORZILLI:  Permission to publish 1066 where we had

13   left off?

14            THE COURT:  Yes, you may.

15       MR. TORZILLI:  Thank you, Your Honor.

16   BY MR. TORZILLI:

17   Q.  Where we left off was the sentence at the top of page 2 of

18   Government's Exhibit 1066.  And let me back up and ask you

19   about some of these pronouns here if you can clarify for us in

20   the sentence that starts with "I heard."  So what did you

21   understand the "I" to be referring to?

22   A.  Mr. Austin.

23   Q.  And who did you understand the "they" to be referring to?

24   A.  KFC.

25   Q.  So based on that, what is your understanding of the

Robert Bryant - Direct

1    sentence that Defendant Austin wrote here?

2    A.  He had heard that KFC had called some of our competitors

3    and were surprised at their price increases.

4    Q.  How do you know it was -- or how do you have an

5    understanding that Defendant Austin had called some competitors

6    rather than learning the information from KFC?

7            MR. FELDBERG:  Objection, that is -- I move to strike

8    the question.

9            THE COURT:  Gentlemen, you can't talk at the same

10   time.  Even though we have two, they are not doing separate

11   people, so you can't talk at the same time.

12           MR. TORZILLI:  My apologies.

13           Mr. Feldberg, go ahead.

14           MR. FELDBERG:  Thank you, Your Honor.

15           Objection, move to strike the question.  The witness

16   did not testify --

17           THE COURT:  I am not going to strike the question, but

18   the objection is sustained.

19           MR. FELDBERG:  Thank you.

20   BY MR. TORZILLI:

21   Q.  So, Mr. Bryant, in your answer, you said that he had heard

22   that he called -- that KFC had called competitors and were

23   surprised at their price increase.  How -- what is your basis

24   for that being your understanding of the sentence?

25   A.  Well, conversations with Mr. McGuire about this and my

466

Robert Bryant - Direct

1    understanding of this particular sentence.  I mean, when I read

2    it at the time, I heard they made a couple of calls and were

3    surprised, that's a code that he had talked to some of his

4    contacts in the --

5            MR. FAGG:  Objection, Your Honor.

6            MR. FELDBERG:  Objection, move to strike, no basis.

7            MR. FAGG:  Also hearsay.

8            THE COURT:  Overruled.

9    BY MR. TORZILLI:

10   Q.  How do you know or how do you have an understanding that

11   Defendant Austin didn't receive that information directly from

12   KFC?

13   A.  KFC didn't in my experience share competitor pricing during

14   the bids with other competitors.  They actually used that

15   information to try to leverage the negotiation to get a better

16   price.  So in my experience, they wouldn't have said -- told us

17   that everybody else came in higher.

18           THE COURT:  Hold on one second.

19           MR. FAGG:  Can we be heard on side bar?

20           THE COURT:  Yes.

21       (At the bench:)

22           THE COURT:  Go ahead, Mr. Fagg .

23           MR. FAGG:  Thank you, Your Honor.

24           And this is pure speculation by this witness.  We have

25   established that this is the first bid process with KFC that he

1   has participated in, and now he is testifying "based on my

2   experience."  We are objecting on the witness' response that

3   it's speculation.

4           *MR. FELDBERG:*  May I add one point, Your Honor?

5           *THE COURT:*  Go ahead, Mr. Feldberg.

6           *MR. FELDBERG:*  In addition to the fact this was his

7   first experience so there is no basis for his testimony, there

8   is no reference in anything in this e-mail to a price, so the

9   witness' comment that in his experience, limited though it was,

10  KFC didn't share price, there is nothing about price in here.

11          *THE COURT:*  Mr. Torzilli?

12          *MR. TORZILLI:*  Sure.  I have got to clarify a couple

13  of these points.  Of course, Mr. Fagg is incorrect.  By saying

14  speculation, of course, the question asks for his

15  understanding, not someone else's understanding or some sort of

16  objective knowledge, so that objection to the extent it is one

17  should be, of course, overruled.

18          Second is in terms of his experience with the bidding

19  process, his actual testimony is this is the first time he was

20  customer facing with a customer, not that it was his first ever

21  bidding process.  As he testified just a few moments ago, he

22  had worked on numerous bids to fast-food restaurants, including

23  KFC, before 2014.

24          But as to the objection that's pending, of course, we

25  just established that KFC has a blind bid, and the whole

1    purpose of the blind bid is so the customer doesn't reveal to

2    the competitors what's going on with the prices.  It would be

3    completely counter to their interest to be telling competitors

4    that everyone went in with higher prices.  It would be

5    basically a suicide and irrational thing to be doing.  So

6    someone like Mr. Bryant who has got decades of experience in

7    this industry knows full well that when he reads this sentence

8    what's going on, especially, because as Your Honor ruled in the

9    *James* proceeding, all of these individuals who are on this

10   e-mail were all co-conspirators, and each and every one of

11   these statements was made during the course and in furtherance

12   of that conspiracy.

13         *THE COURT:*  Mr. Feldberg?

14         *MR. FELDBERG:*  Putting aside the non sequiturs, the

15   fact of the matter is that the witness has testified that KFC

16   would take the first-round bids and use them to negotiate with

17   the suppliers, you are X percent too high and the like, so --

18   or, you know, whether it's X percent or X cents too high, and

19   they would use bids from competitor A to negotiate with

20   competitor B, et cetera, so they do -- it's contrary to what

21   Mr. Torzilli just said.

22         There is simply no basis for the witness to speculate

23   in the way he is being asked to speculate.

24         *THE COURT:*  Both objections will be overruled.  I

25   agree with Mr. Torzilli, this statement is not only very

Robert Bryant - Direct

1    contrary to what you would anticipate in applying the bid

2    process, particularly in reaction to the first round of the

3    bids, but also the process that Mr. Feldberg just articulated,

4    which is true, Mr. Bryant did talk about this particular

5    sentence, would describe a type of feedback that you would not

6    anticipate from the customer.  You know, they would be using it

7    strategically to drive prices down and not tell people, Well,

8    we were surprised.  You wouldn't anticipate that.

9             So I think that Mr. Bryant has -- you know, his

10   interpretation of this particular sentence has a proper basis,

11   and so for that reason, the objections will be overruled.

12            Thank you.

13            (In open court:)

14            *THE COURT:*  Objections are overruled.

15            Go ahead, Mr. Torzilli.

16            *MR. TORZILLI:*  Thank you, Your Honor.  Just one

17   moment.

18   *BY MR. TORZILLI:*

19   *Q.*  So, Mr. Bryant, in the previous answer before we had the

20   side bar, you said that you had heard that he called -- that

21   KFC had called -- I am sorry, that, yeah, KFC had called --

22   that Defendant Austin had called competitors and were

23   surprised.  What was your basis for your understanding that

24   Defendant Austin didn't receive the information directly from

25   KFC?

Robert Bryant - Direct

1   *A.*  Conversations with Mr. Austin, and Jason McGuire, you know,

2   also knew from previous conversation with Mr. Austin that he

3   had regular phone calls with various competitors.

4   *Q.*  And can you remind us what type of bid method KFC was using

5   at this point in time?

6           *MR. TUBACH:*  Objection, asked and answered.

7           *THE COURT:*  Sustained.

8   *BY MR. TORZILLI:*

9   *Q.*  Did KFC telling one competitor that other competitors' bids

10  were high contrary to KFC's bargaining position?

11  *A.*  Yes.

12  *Q.*  How so?

13          *MR. BELLER:*  Objection, speculation, lack of

14  foundation.

15          *THE COURT:*  Sustained.

16  *BY MR. TORZILLI:*

17  *Q.*  Mr. Bryant, were you preparing for a meeting with KFC the

18  next day?

19  *A.*  I was.

20  *Q.*  What kind of meeting with KFC the next day were you

21  preparing for?

22  *A.*  The next round of negotiations about our bid.

23  *Q.*  Is part of preparing to negotiate with KFC trying to get an

24  understanding of what KFC's negotiating position in the meeting

25  might be?

Robert Bryant - Direct

1    A.   That's correct.

2    Q.   And is that a basic thing that someone in business would do

3    if they are negotiating is try to understand what the other

4    side might say?

5    A.   That is correct.

6    Q.   And that's true in this case too; is that correct,

7    Mr. Bryant?

8    A.   That's correct.  Normally when we negotiate with KFC, we

9    had a pre-meeting, internal pre-meeting, and a post-meeting to

10   anticipate and discuss what may happen and what did happen.

11   Q.   And so in preparation for that, did you have an

12   understanding as to what KFC might reveal to Pilgrim's about

13   the bids?

14   A.   Yes.

15   Q.   Would it be in KFC's interest to tell Pilgrim's about other

16   people's bids in 2014?

17        MR. BELLER:  Again, speculation.  There is still a

18   lack of foundation as to what KFC -- would be in their

19   interests.

20        MR. TUBACH:  Especially the time frame, Your Honor,

21   the first customer phase.

22        THE COURT:  I am going to overrule the objection.  If

23   he had an understanding going into the meeting, he can testify

24   as to it.

25   BY MR. TORZILLI:

Robert Bryant - Direct

1   Q.   Go ahead, Mr. Bryant.

2   A.   My understanding would be this type of information would be

3   harmful to KFC in negotiations.

4   Q.   Can you explain your understanding of how revealing this

5   information to Pilgrim's would be harmful to KFC in this

6   circumstance?

7           MR. BELLER:  Objection as to relevance now.

8           THE COURT:  Overruled.

9   A.   It would weaken the negotiation, negotiating position.  If

10  KFC told us that our competitors came in extremely high in

11  price, then that would reveal that we didn't -- we wouldn't --

12  that we were in a strong negotiating position.  They would lose

13  leverage.

14  BY MR. TORZILLI:

15  Q.   And KFC would not want to do that, right?

16  A.   That's correct.

17  Q.   Let's look at the next e-mail in Government's Exhibit 1066.

18  Is there a response to Defendant Austin's e-mail?

19  A.   There was.

20  Q.   Who wrote that one?

21  A.   Jason McGuire.

22  Q.   What did he say?

23  A.   Surprised like how much higher everyone else was?

24  Q.   Do you have an understanding as to -- well, first let me

25  ask you, did you read this e-mail at or around the time you

Robert Bryant - Direct

1   received it?

2   *A.*   I did.

3   *Q.*   Did you find it useful in your preparations for the

4   negotiating meeting you were going to have with KFC the very

5   next day?

6   *A.*   I did.

7   *Q.*   Was this helpful to you in your preparations for that

8   meeting that was going to occur the next day?

9   *A.*   It was.

10  *Q.*   Now, I see the word "everyone" is in there.  Do you see

11  that?

12  *A.*   I do.

13  *Q.*   Did you have an understanding when you read this after you

14  received it what the word "everyone" meant?

15  *A.*   Our competitors, all of our competitors.

16  *Q.*   All of your competitors?

17  *A.*   All of our competitors that were participating in this

18  particular KFC bid, yes.

19  *Q.*   So that would include, say, Claxton?

20  *A.*   That's correct.

21  *Q.*   Koch?

22  *A.*   Correct.

23  *Q.*   Tyson?

24  *A.*   Correct.

25          *MR. BELLER:*  Objection, leading.

Robert Bryant - Direct

1    *BY MR. TORZILLI:*

2    *Q.*  Mar-Jac?

3    *A.*  Correct.

4         *THE COURT:*  True, but we kind of know what those are.

5    Overruled.

6    *BY MR. TORZILLI:*

7    *Q.*  George's?

8    *A.*  Correct.

9    *Q.*  Case Farms?

10   *A.*  I believe so, but I don't remember receiving information on

11   them.

12        *MR. FAGG:*  Objection, speculation.

13        *THE COURT:*  Overruled.

14        *MR. TORZILLI:*  Thank you, Your Honor.

15   *BY MR. TORZILLI:*

16   *Q.*  Now, can you tell us what the sentence -- I realize it's

17   posed as a question, but the sentence in its entirety meant to

18   you when you received and read it?

19   *A.*  Yes.  So surprised like how high everyone else was?

20   Mr. McGuire was confirming that our competitors came in equally

21   as high as Pilgrim's in their bid submissions.  And KFC was

22   basically caught offguard.

23   *Q.*  And how, if at all, was that helpful to you in preparing

24   for your negotiating meeting with KFC that was going to occur

25   the very next day?

Robert Bryant - Direct

 1   *A.*  It was helpful that we had confirmation now that our bid

 2   submission was equally as high as our competitors.  Our

 3   competitors had submitted similar bids.  Therefore, we were in

 4   a better negotiating position.

 5   *Q.*  You said there was a time when you first learned about that

 6   15 to 20-cent-per-pound increase from Mr. McGuire and you were

 7   concerned.  After reading this e-mail that he sent to you, what

 8   was your level of concern?

 9   *A.*  I became less concerned.

10   *Q.*  Let's go to the next e-mail in Government's Exhibit 1066.

11   And why were you less concerned after reading this, the e-mail

12   we just looked at?

13   *A.*  This was the first confirmation that I remember receiving

14   that our competitors were going along with the increased

15   prices.

16   *Q.*  Okay.  And if we can look at the very next e-mail.  Who is

17   that from?

18   *A.*  Roger Austin to Jason McGuire.

19   *Q.*  When was that?

20   *A.*  August 20th, 2014.

21   *Q.*  What did he say?

22   *A.*  He was answering Mr. McGuire's question with a yes.

23   *Q.*  Did you read that at or around the time you received it?

24   *A.*  I did.

25   *Q.*  Did you find it useful?

Robert Bryant - Direct

1  A.  Yes.

2  Q.  Helpful to you in preparing for the meeting with KFC the

3  very next day?

4  A.  I did.

5  Q.  And what did you understand Defendant Austin's e-mail here

6  to mean?

7  A.  Confirming that our competitors had submitted similar price

8  increases to Pilgrim's.

9  Q.  Now, you mentioned a moment ago confirmation of the

10  competitors being -- having high bids like yours.  Was that

11  confirmation of a plan that you were talking about a little

12  earlier this morning about the plan to raise prices together?

13          MR. FAGG:  Objection, leading.

14          THE COURT:  Sustained.

15  BY MR. TORZILLI:

16  Q.  Did reading this set of e-mails that we've been going over

17  the past few minutes confirm a plan in your mind?

18  A.  It did.

19  Q.  What plan did it confirm in your mind?

20  A.  That early on it was -- Pilgrim's was going to go after

21  significant price increases, and there was discussions that

22  Pilgrim's was going to be the price leader in those discussions

23  that follow, and this was confirmation that it was actually

24  starting to take shape.

25  Q.  Now, you mentioned Pilgrim's being the price leader.  Whom

Robert Bryant - Direct

1   were -- whom was or were Pilgrim's going to lead?

2   A.   The competition.

3   Q.   Pilgrim's competitors?

4   A.   Correct.

5   Q.   Let's look at the next e-mail in this chain.  Who wrote

6   that one?

7   A.   Mr. McGuire.

8   Q.   When did Mr. McGuire write this one?

9   A.   On August 20th.

10   Q.   What did he say on August 20th?

11   A.   Can you smell their dirty drawers where they crapped their

12   pants?  Ha.

13   Q.   Did you read that at or around the time you read it?

14   A.   I did.

15   Q.   Received it, I'm sorry?

16   A.   I did.

17   Q.   Found it useful in your preparations for the meeting the

18   next day?

19   A.   Yes.

20   Q.   And besides probably having a chuckle when you read it, how

21   did you find it helpful in your meeting -- for your

22   preparations for the meeting that you were going to have with

23   KFC the next day?

24   A.   My first thought was that we got 'em.

25   Q.   We got 'em?

Robert Bryant - Direct

1   A.   Yeah.

2   Q.   What does that mean?

3   A.   That we got KFC, that we submitted the higher prices and

4   our competitors followed suit, so we had them boxed in.

5        MR. TUBACH:   Objection.   There is no foundation at all

6   for the competitors following suit and the plan.   It is pure

7   speculation.

8        THE COURT:   Overruled.

9   BY MR. TORZILLI:

10  Q.   Complete your answer, Mr. Bryant.

11  A.   When I read that line, that was my first instinct is that

12  we got 'em, that the plan was working, that KFC was boxed in,

13  and that we had all submitted higher prices to KFC and that

14  they didn't know what they were going to do in these

15  negotiations.

16  Q.   By "we" got them, who are you referring to with "we"?

17  A.   Everyone, Pilgrim's and their competitors, that we all had

18  got them.

19  Q.   Including Claxton?

20  A.   Correct.

21  Q.   Now, there are a couple of pronouns here I would like you

22  to help us understand.   So when you read this, what did you

23  understand the "you, can you smell," who is that referring to?

24  A.   Roger Austin.

25  Q.   And then "smell their dirty drawers," whose dirty drawers

Robert Bryant - Direct

1  were the subject of that?

2  *A.*   KFC.

3  *Q.*   Okay.  KFC's dirty drawers?

4  *A.*   Correct.

5  *Q.*   What did you understand KFC to be having dirty drawers,

6  what that meant?

7  *A.*   Because they were shocked at the amount of price increases,

8  and not only did Pilgrim's submit, everybody else submitted as

9  well, and they weren't expecting, weren't expecting that.  I

10  mean, they were prepared for a price increase but not to the

11  magnitude --

12       *MR. TUBACH:*  Objection.  That's speculation.  He is

13  not testifying to what KFC expected.  He has no foundation for

14  that.

15       *THE COURT:*  Overruled.

16  BY MR. TORZILLI:

17  *Q.*   Please complete your answer, Mr. Bryant.

18  *A.*   I think I was finished.

19  *Q.*   There is one more pronoun in this line or two more pronouns

20  in this line.  Let's get those clarified.  So first there is a

21  "they, from where they crapped."  Who is the "they" there?

22  *A.*   KFC.

23  *Q.*   KFC?

24  *A.*   Uh-huh.

25  *Q.*   And then "their pants, crapped their pants," who is the

480

Robert Bryant - Direct

1    "their"?

2    A.   KFC again.

3    Q.   So it's KFC crapped KFC's pants?

4    A.   Correct.

5    Q.   And what did you understand that part of this to mean?

6    A.   Well, they were -- they crapped their pants because they

7    didn't know what they were going to do, they were so caught

8    offguard.

9    Q.   Caught offguard about what?

10   A.   The price increases.

11   Q.   That everyone submitted?

12   A.   Correct.

13   Q.   Now, is there another e-mail in this chain?

14   A.   There is.

15   Q.   Let's take a look at that one.  Who wrote the next one?

16   A.   Roger Austin.

17   Q.   Defendant Roger Austin?

18   A.   That's correct.

19   Q.   Who did he write that one to?

20   A.   Jason McGuire.

21   Q.   And what did Defendant Austin say to Mr. McGuire?

22   A.   Definitely.

23   Q.   Did you read that at or around the time you received it

24   from Mr. McGuire?

25   A.   I did.

Robert Bryant - Direct

1   Q.   Found it useful in preparing for the meeting with KFC the

2   next day?

3   A.   I did.

4   Q.   Helpful to you?

5   A.   I did, yes.

6   Q.   What did it mean to you?

7   A.   He was confirming that the plan was coming together, the

8   strategy was working with KFC.

9   Q.   What plan was coming together?

10   A.   To increase prices to KFC and that our competitors were

11   coming along.

12   Q.   Now, you had -- in all the e-mails we talked about from the

13   bottom up so far, you haven't been on any of those; am I

14   correct?

15   A.   That's correct.

16   Q.   Let's look at the next e-mail.  Are you on this one?

17   A.   I am.

18   Q.   Okay.  Who sent it to you?

19   A.   Jason McGuire.

20   Q.   When did he send it?

21   A.   August 21st, 2014.

22   Q.   What did he say to you?

23   A.   It was just FYI.

24   Q.   What does that mean?

25   A.   For your information.

482

Robert Bryant - Direct

1    *Q.*  What did you understand that to mean?

2    *A.*  He wanted me to have this information because I was

3    attending the meeting the following day with KFC.

4    *Q.*  He wanted you to be informed?

5    *A.*  Correct.

6    *Q.*  Is there another e-mail in this chain?

7    *A.*  There is.

8    *Q.*  Who wrote that one?

9    *A.*  I did.

10   *Q.*  What did you say?

11   *A.*  That's good ...

12   *Q.*  What did you mean that's good ...?

13   *A.*  Like I said earlier, this is the first confirmation I had

14   about the plan coming together, so I was optimistically

15   cautious, I guess is a good word to use, so I wasn't a hundred

16   percent that this was going to work and that we were going to

17   be successful, but I was also trying to acknowledge how helpful

18   this information was.

19   *Q.*  Helpful to you?

20   *A.*  Correct.

21   *Q.*  And we've already looked at the very top e-mail, so let's

22   put that aside.

23          *MR. TORZILLI:*  And, Ms. Pearce, if you can take that

24   down, thank you.

25   *BY MR. TORZILLI:*

Robert Bryant - Direct

1   Q.  We have been talking about your preparations or part of

2   your preparations for the meeting with KFC that was going to

3   come a day after the e-mails we looked at.  Did the meeting

4   with KFC actually occur?

5   A.  It did.

6   Q.  Did it occur the very next day?

7   A.  Yes.

8   Q.  Okay.  Are there events outside of that meeting that

9   occurred on that day that you recall being part of the plan for

10  everyone to raise prices to KFC?

11  A.  Yes.

12  Q.  Okay.  Where did that event or those events occur?

13  A.  Roger Austin's office.

14  Q.  Where is Roger Austin's or where was Roger Austin's office?

15  A.  At the time, we had, Pilgrim's that is, had a small office

16  in Louisville in Pilgrim's -- I am sorry, Roger Austin had his

17  own personal office in that -- that space.

18  Q.  Where did the meeting with KFC take place?

19  A.  At RSCS's office in Louisville.

20  Q.  Remind us what RSCS stands for.

21  A.  Restaurant Supply Chain Solutions.

22  Q.  What is RSCS?

23  A.  It's like a buying co-op or the procurement arm for KFC.

24  Q.  Is it also the buying co-op and procurement arm for other

25  Yum Brands, to your knowledge?

484

Robert Bryant - Direct

1    *A.*  I believe so, yes.

2    *Q.*  If I refer to RSCS as just KFC, is that something that you

3    would be able to understand and follow?

4    *A.*  Yes, generally that's how we referred to them, as KFC,

5    because that's generally who we negotiated with.

6    *Q.*  So can you tell us what happened in the office in

7    Louisville that Defendant Austin uses on the day you were going

8    to meet with KFC to negotiate the first-round bid?

9    *A.*  I was in Roger Austin's office.  My memory -- I was in

10   front of his desk pacing back and forth, and he was on the

11   phone, I don't remember, I don't recall him announcing at this

12   time, with someone, and he was having a conversation, and I

13   remember him telling them that I told him the price is the

14   price; I just need to know how many loads you want at that

15   price.

16          And when he hung up the phone, he told me who he was

17   speaking with, and one time he said, That was Brady.  And then

18   it was a short time later he was on the phone with someone

19   else, and I remember him repeating that same statement, I told

20   him the price is the price; I just need to know how many loads

21   you want at that price.  And when he finished his conversation,

22   he announced who he was speaking with again, and he said,

23   Kantola, that was Kantola.

24          I don't remember the order.  I just remember the two

25   phone calls, and I remember that sentence being said on both.

Robert Bryant - Direct

1    *Q.*  So two phone calls?

2    *A.*  That's correct.

3    *Q.*  You don't remember which one was first and which one was

4    second?

5    *A.*  No.

6    *Q.*  You said one -- you said the name Brady?

7    *A.*  That's correct.

8    *Q.*  Was that one of the persons that Defendant Austin said was

9    on the call?

10   *A.*  That's correct.

11   *Q.*  Who did you understand Brady to be referring to?

12   *A.*  Scott Brady.

13   *Q.*  Do you see Defendant Scott Brady?

14        *MR. LAVINE:*  Your Honor, we will stipulate for the

15   record the witness can identify Mr. Brady.

16        *THE COURT:*  Do you accept the stipulation,

17   Mr. Torzilli?

18        *MR. TORZILLI:*  That's acceptable to the government.

19        *THE COURT:*  Go ahead.

20   *BY MR. TORZILLI:*

21   *Q.*  You understood that to be Defendant Scott Brady?

22   *A.*  That's correct.

23   *Q.*  So that was one of the calls.  And then you said Kantola?

24   *A.*  That's correct.

25   *Q.*  That's a person?

1   A.   Yes.

2   Q.   Who is Kantola?

3   A.   Bill Kantola.

4   Q.   Who is Bill Kantola?

5   A.   He would be, like, Roger's equivalent at Koch Foods.

6   Q.   What do you mean by Roger's equivalent at Koch Foods?

7   A.   At the time, I believe he was handling KFC account for

8   Koch, probably others.  I don't remember what all accounts he

9   called on, but I know he called on KFC.

10   Q.   So a counterpart as a sales executive?

11   A.   That's correct, yes.

12   Q.   And what did you understand Defendant Scott Brady's role to

13   be with respect to KFC?

14   A.   Similar to Mr. Austin's.  He was national accounts for

15   Claxton.

16   Q.   Now, at the time, was Claxton competing with Pilgrim's for

17   the KFC bid?

18   A.   That's my understanding, yes.

19   Q.   Was Koch competing with Pilgrim's for the KFC bid?

20   A.   Yes.

21   Q.   Now, let's back up to the office where you overheard these

22   two phone calls.  You said it's Defendant Austin's office.  Can

23   you describe where it is or what it looked like at the time?

24   A.   It was one of those office parks where you could rent a

25   suite, and there was a bunch of suites there.  We had one of

Robert Bryant - Direct

1   those suites.  I believe we -- at the time, we were sharing

2   that with Long John Silvers actually.  We had a small

3   conference room in there, Roger's office, a few offices with

4   some other people, a conference room, and we actually had a

5   test kitchen in there as well.

6   Q.  A test what?

7   A.  A test kitchen.

8   Q.  Where did the calls that -- the two calls that you

9   overheard, where did they actually take place within the office

10  suite?

11  A.  In Roger Austin's office.

12  Q.  And where were you when you overheard those two phone

13  calls?

14  A.  I was standing in front of his desk pacing.

15  Q.  Pacing back and forth?

16  A.  Yeah.

17  Q.  And where was Defendant Austin when the two calls occurred?

18  A.  He was behind his desk.

19  Q.  Was he standing or seated or --

20  A.  I believe he was seated.

21  Q.  He was seated?

22          So I realize you said you don't remember the sequence

23  of the calls.  So let's just take the call with Defendant Scott

24  Brady first.  So what happened on that call that you overheard?

25  A.  I don't remember the whole conversation, but --

Robert Bryant - Direct

1          MR. LAVINE:  Objection, already asked and answered.

2          THE COURT:  Overruled.

3  A.  I remember that one sentence because Roger was loud, almost

4  to the point like bragging that, you know, I told him the price

5  is the price; I just need to know how many loads you want, and

6  he was laughing and carrying on.  That's why I remember that

7  because -- and he repeated that again on the second call.

8  BY MR. TORZILLI:

9  Q.  Now, why is that specific statement that you overheard

10  memorable to you?

11  A.  Because we delivered that same statement to KFC.

12  Q.  What do you mean by that?

13  A.  In our meeting with KFC, I don't remember who on the side

14  of KFC asked --

15          MR. FAGG:  Objection, hearsay.

16          THE COURT:  Sustained.

17          MR. TORZILLI:  Your Honor, offered not for the truth,

18  but for its effect on the listener.

19          MR. TUBACH:  Then it lacks foundation, Your Honor.

20          THE COURT:  Well, I haven't heard what the effect is

21  yet.

22  BY MR. TORZILLI:

23  Q.  When you heard what you just said about KFC, what, if

24  anything, did you do in response?

25  A.  I am not following the question, sorry.

Robert Bryant - Direct

1    Q.  Okay.  Let me -- I will move on and maybe we will come back

2    to it.

3            Sir, let me ask you about the second call or the other

4    call.  I realize you don't know the sequence, the other call.

5    What happened on the other call, the call with Kantola,

6    Mr. Kantola?

7    A.  Similar.  He was -- the way I took the conversation, he was

8    bragging, you know, about --

9            MR. FELDBERG:  Objection.  That's lack of foundation.

10           THE COURT:  Overruled.

11   A.  Bragging from his tone and, you know, how loud he was

12   speaking on the phone, you know, saying, I just told him the

13   price is the price; I just need to know how many loads they

14   want at that price.

15   BY MR. TORZILLI:

16   Q.  And that was memorable to you why?

17   A.  Well, because -- a couple reasons.  You know, we did

18   deliver that exact same message to KFC, and he was giving our

19   response to the next round bid to at least two of our

20   competitors in the middle of that bid.

21   Q.  Now, you had said going back to a few moments ago that you

22   had been concerned about losing sales if you went in with a 15

23   to 20-cent-per-pound price increase.  Based on the e-mails we

24   looked at a few moments ago and these two overheard phone

25   calls, what was your level of concern going into that meeting

Robert Bryant - Direct

1   with KFC?

2   *A.*  I felt that the meeting was a formality more or less, that

3   we needed to go and deliver that message in person, but the bid

4   was the bid.

5   *Q.*  What did you mean by the meeting was just a formality?

6   *A.*  There weren't going to be any subsequent rounds because we

7   were not going to negotiate.  And we had -- we knew that our

8   competitors had submitted similar bids with -- to KFC and that

9   we had shared that strategy with our competitors.

10  *Q.*  But what about the worry about losing sales, what happened

11  to that?

12  *A.*  Well, if --

13            *MR. FAGG:*  Objection, leading.

14            *THE COURT:*  Overruled.

15  *A.*  If there's not a material difference in price, then there

16  is not a distinction between the bids.

17  *BY MR. TORZILLI:*

18  *Q.*  So let's talk about the actual meeting with KFC.  Who

19  attended that meeting for Pilgrim's?

20  *A.*  Myself, Roger Austin, Justin Gay, and Scott Tucker, I

21  believe.

22  *Q.*  Who attended for KFC or RSCS?

23  *A.*  I am not sure of everybody, but I believe Bob Lewis was

24  there, Steve Campisano, I believe Mary Hester, possibly Pete

25  Suerken, I am not sure if he was there or not then.

Robert Bryant - Direct

1   Q.   Pete -- I didn't hear.  Can you speak into the microphone?

2   A.   Suerken.

3   Q.   Who is Pete Suerken?

4   A.   He was the lead negotiator for KFC.

5   Q.   And you mentioned Bob Lewis, did you say?

6   A.   Yes.

7   Q.   Who is Mr. Lewis?

8   A.   During 2014, there was a transition in negotiations.  I

9   remember they brought Bob Lewis in to negotiate the 2014 bid.

10  Q.   What happened at the meeting?

11  A.   I don't recall who, but on KFC's side asked Roger about

12  negotiating, about price concessions.  And Roger told them --

13         MR. FAGG:  Objection, Your Honor, hearsay.

14         THE COURT:  Overruled.

15  A.   Roger told them, The price was the price; I just need to

16  know how many loads you want at that price.  And someone on KFC

17  said, There is no negotiation?  And Roger said, Nope, no

18  negotiation, not on price, none.

19  BY MR. TORZILLI:

20  Q.   Where were you sitting?

21  A.   Probably next to Roger.  Generally we sit on one side and

22  they sit on the other.

23  Q.   Now, going into this meeting, you had read the e-mails that

24  we looked at a few moments ago.

25  A.   That's correct.

492

Robert Bryant - Direct

1    *Q.*  The e-mails where Defendant Austin and Mr. McGuire are

2    talking about KFC crapping their pants?

3    *A.*  That's correct.

4    *Q.*  Did the meeting that you participated in bear that out?

5    *A.*  Yes.

6    *Q.*  Can you tell us how so?

7    *A.*  When Roger delivered the message about our refusal to

8    negotiate, the team for KFC seemed deflated to me, unsure of

9    what to do.  It was a little bit of empathy for them.

10   *Q.*  And were you able to observe the demeanor or the

11   expressions of the people on the Pilgrim's side?

12   *A.*  Roger was very confident, yeah.  The team was confident.

13   We knew we had leverage over -- over the customer.

14   *Q.*  Why was the team so confident and knowing you had leverage

15   over KFC in that meeting?

16        *MR. BELLER:*  Objection, speculation, lack of

17   foundation.

18        *THE COURT:*  Overruled.

19   *A.*  We knew we had the strategy, we knew our competitors were

20   following that strategy, and that the plan was working.

21   *BY MR. TORZILLI:*

22   *Q.*  The plan for everyone to raise price?

23   *A.*  Correct.

24   *Q.*  Up to 15 to 20 cents?

25   *A.*  Correct.

Robert Bryant - Direct

1          MR. FELDBERG:  Objection.

2          MR. TORZILLI:  I will move on.

3          THE COURT:  Sustained.

4   BY MR. TORZILLI:

5   Q.  Did Pilgrim's achieve its planned price increase for KFC?

6   A.  Yes.

7   Q.  Did it achieve its planned price increase for other

8   fast-food restaurant customers to the best of your knowledge?

9   A.  Yes.

10  Q.  What was -- is there a way to describe the magnitude of the

11  price increases that Pilgrim's achieved in 2014 for its

12  fast-food restaurant customers?

13  A.  I would say historic.

14  Q.  Historic?

15  A.  Yes.

16  Q.  Why do you say historic?

17  A.  I think I have said before, I don't recall us getting price

18  increases from these QSR customers before or since 2014.

19  Q.  How long did the contract that was negotiated and awarded

20  in 2014 run?

21  A.  Three years.

22  Q.  So for what years would it be?

23  A.  2015, 2016, and calendar year 2017.

24          MR. TORZILLI:  Your Honor, I realize it's a few

25  moments before the break, but this would be a breaking -- a

494

Robert Bryant - Direct

1  good breaking point.

2          THE COURT:  Why don't we go ahead and take our

3  mid-morning break at this time, ladies and gentlemen.  We will

4  plan on reconvening at 25 minutes after, all right?

5          The jury is excused for the mid-morning break.

6          (Jury excused.)

7          THE COURT:  Any issues to take up?

8          We will be in recess, then, until 25 after.  Thank

9  you.

10      (Recess at 10:11 a.m.)

11      (Reconvened at 10:30 a.m.)

12          THE COURT:  Ms. Buchanan, let's go ahead and get the

13  jury.

14          (Jury present.)

15          THE COURT:  Mr. Torzilli, go ahead.

16          MR. TORZILLI:  Thank you, Your Honor.

17  BY MR. TORZILLI:

18  Q.  Mr. Bryant, before we go any further discussing the broiler

19  chicken industry and bidding, I want to ask you whether you are

20  here today under an agreement with the government in which the

21  government's agreed it won't prosecute you for certain crimes?

22  A.  That's correct.

23  Q.  What is the conduct that you participated in, sir, that is

24  covered by your non-prosecution agreement with the government?

25  A.  Manipulating the outcomes of bids.

Robert Bryant - Direct

1   Q.  Does that include for the conduct that we've discussed both

2   yesterday afternoon and this morning?

3   A.  That's correct.

4   Q.  Does that also cover conduct that occurred in the year

5   2017?

6   A.  That's correct.

7   Q.  Have you met with the government to discuss your knowledge

8   and your participation in conduct to manipulate the outcome of

9   bids?

10  A.  I have.

11  Q.  Did you discuss other topics as well?

12  A.  We did.

13  Q.  During those meetings with the government, did you always

14  provide completely truthful, accurate, and complete information

15  to all the government's questions?

16  A.  No.

17  Q.  How many times did you fail to provide fully truthful,

18  complete, and accurate information to the government?

19  A.  Multiple times.

20  Q.  Mr. Bryant, did you understand that failing to provide

21  truthful, complete, accurate information to the government

22  would be considered by the government a lie?

23  A.  Yes.

24  Q.  Did the government learn that you weren't fully

25  truthfully -- truthful, complete, and accurate in your answers

496

Robert Bryant - Direct

1   to the government's questions?

2   A.   Yes.

3   Q.   How did the government learn of that?

4   A.   I -- I -- I told them.

5   Q.   How did that happen?

6   A.   We had a meeting where -- with the government where I

7   didn't disclose everything I should have, so I asked my counsel

8   to set up a additional meeting so I could correct the record.

9   Q.   Did that additional meeting to correct the record, in fact,

10  occur?

11  A.   It did.

12  Q.   Did you correct the record?

13  A.   I did.

14  Q.   Since that time, have you provided to the government

15  truthful, complete, and accurate information to all the

16  government's questions?

17  A.   I have.

18  Q.   Did the information that you later disclosed to the

19  government to correct the record have anything to do with your

20  participation in the manipulation of bids?

21  A.   No.

22  Q.   Did any of the information that you later disclosed to the

23  government when you corrected the record have anything to do

24  with your knowledge of any of these defendants' manipulating of

25  bids?

Robert Bryant - Direct

1   A.   No.

2          MR. TUBACH:  Objection, Your Honor, lacks foundation.

3          THE COURT:  Overruled.

4   BY MR. TORZILLI:

5   Q.   What was your answer, sir?

6   A.   No.

7   Q.   Did the government prosecute you for failing to disclose

8   the information you failed to disclose the first time?

9   A.   They have not.

10  Q.   I want to ask you some questions about your employer,

11  Pilgrim's Pride.  Approximately how large a company is

12  Pilgrim's in terms of revenues per year?

13  A.   Last time I remember, it was around 13 to 15 billion.

14  Q.   Is that billion with a B?

15  A.   That's correct, yes.

16  Q.   Approximately how many people work for the company?

17  A.   The last time I looked, I think it was 56,000.

18  Q.   Now, you mentioned earlier today a bankruptcy.  Did there

19  come a time when the company filed for bankruptcy?

20  A.   Yes.

21  Q.   All right.  Let's talk about that.  Were you an employee

22  there at the time?

23  A.   I was.

24  Q.   Approximately how long had you been employed at Pilgrim's

25  around the time it filed for bankruptcy?

498

Robert Bryant - Direct

1    *A.*  Possibly five to seven years.  I don't -- yeah, I don't

2    remember exactly, but, yeah.

3    *Q.*  Approximately when did the bankruptcy filing occur?

4    *A.*  Around 2007 or 2008, I believe.

5    *Q.*  Around the time Pilgrim's filed for bankruptcy, did the

6    company inform you and other employees about the bankruptcy?

7    *A.*  They did.

8    *Q.*  And how long had you been in the chicken industry at that

9    time, approximately?

10   *A.*  Probably 15 years.

11   *Q.*  What was your role at Pilgrim's around the time it filed

12   for bankruptcy?

13   *A.*  May have been in sales then.  I'm unsure which position I

14   held.  I held several positions while I was still at the

15   Mayfield plant.

16   *Q.*  Did you have a role where you had occasion to speak to

17   Pilgrim's customers?

18   *A.*  Yes.

19   *Q.*  As part of speaking to Pilgrim's customers around the time

20   of the bankruptcy as part of your job responsibilities, did you

21   need to provide them information about the bankruptcy?

22   *A.*  Yes.

23        *MR. FAGG:*  Objection, Your Honor, relevance.

24        *THE COURT:*  Overruled.  I will give him a few more

25   questions to point that out.

Robert Bryant - Direct

1          MR. TORZILLI:  Thank you, Your Honor.

2     BY MR. TORZILLI:

3     Q.  Did you do your best to provide customers with accurate

4     information about the bankruptcy?

5     A.  Yes.  We were provided some talking points.

6     Q.  Did you need to stay informed about the developments in

7     order to inform your customers?

8     A.  Yes.

9     Q.  Why did Pilgrim's file for bankruptcy based on your

10    understanding?

11    A.  What I understood at the time it was a combination of

12    things.

13         MR. TUBACH:  This calls for speculation, and it's

14    lay -- it violates 701 and 702.

15         MR. FAGG:  And I would renew the relevance objection,

16    Your Honor.

17         THE COURT:  Let's have a side bar.

18       (At the bench:)

19         THE COURT:  So, Mr. Torzilli, what's the relevance of

20    the bankruptcy testimony?

21         MR. TORZILLI:  Sure.  It's relevant to motive.  After

22    the company came out of bankruptcy, it was struggling in terms

23    of profitability, obviously.  It hired a new sales team that

24    included two of these five defendants.  When the two -- those

25    two defendants took leadership positions at the company, they

Robert Bryant - Direct

1    focused more on the bottom line in part by a focus on

2    increasing the price of the product, and that is in part a

3    motive for them and some of their subordinates, including

4    Mr. Bryant, including Defendant Austin, including other

5    co-conspirators, to engage in an agreement of mutual

6    understanding to increase with their competitors the price of

7    chicken.

8            *THE COURT:*  Mr. Fagg?

9            *MR. FAGG:*  Your Honor, there is a number of objections

10   on this one.  He is talking about 2007 when -- at the time of

11   the bankruptcy.  I don't think there is any way he can lay a

12   foundation with this witness about that narrative that

13   Mr. Torzilli just conveyed.  And the part of the problem is

14   this witness, remember, he has a tendency to just provide a

15   very long narrative response.  We don't know where any of this

16   is going.  And I continue to believe that this is -- it's not

17   relevant.  It's particularly not relevant to this witness.

18           *THE COURT:*  Mr. Tubach, anything?  Did you want to

19   expand on your objection?

20           *MR. TUBACH:*  Yes, Your Honor.  He is now going to

21   ask -- he is being asked why the company declared bankruptcy.

22   That's often a very complex determination made by experts.  He

23   can't possibly know that.  In 2007 and '08, he was nowhere near

24   any of the decisions about whether to declare bankruptcy, and

25   he is going to now opine about why that happened, which is at

Robert Bryant - Direct

1    this point five years before Mr. Penn joined the company.  It's

2    pure speculation, and it's irrelevant.

3         THE COURT:  Mr. Torzilli?

4         MR. TORZILLI:  I am asking for his understanding.  I

5    am not asking for some sort of quantitative analysis that led

6    to him -- I am asking for his understanding based on -- and

7    incidentally he needed to be apprized of information precisely

8    like this to inform the customers who obviously would be highly

9    interested in knowing what's going on, including why the

10   company declared bankruptcy and other details about it, so I

11   don't think there is any sort of speculation here that's being

12   introduced with this line of questioning whatsoever.

13         In terms of the relevance, obviously I have already

14   indicated that this is a highly relevant piece to the motive

15   evidence that we want to present at this trial and that he is

16   able to while, not comprehensively provide every scrap of

17   evidence that we will be interested in accumulating in this

18   case, certainly he will be helpful to providing that

19   information on the motive issue that we want to ultimately

20   present argument to the jury.

21         THE COURT:  I am going to sustain the objection on two

22   grounds.  First of all, foundation, I agree with Mr. Tubach

23   that his understanding about the bankruptcy has not been

24   demonstrated.  And the fact that he may have discussed it with

25   clients doesn't somehow make it relevant.  He may have had a

Robert Bryant - Direct

1   reason to talk about it with clients, but that still doesn't

2   mean that he actually understood it.

3          And second of all, I do agree with Mr. Fagg that there

4   is no relevance to this.  There may be overall relevance to the

5   bankruptcy, but in terms of through this witness' testimony,

6   the mere fact that he once again talked about it with clients

7   doesn't somehow make it, you know, that conversation relevant.

8   So I will sustain the objections.

9          Thank you.

10          (In open court:)

11          THE COURT:  The objection is sustained.

12          MR. TORZILLI:  Thank you, Your Honor.

13   BY MR. TORZILLI:

14   Q.  So when the company was in bankruptcy, you were part of the

15   sales team?

16   A.  That's correct.

17   Q.  From what you personally observed, did the bankruptcy

18   affect the sales team you were on?

19   A.  Yes.

20   Q.  How?

21   A.  Several of them lost their jobs.

22   Q.  What do you mean by lost their jobs?

23   A.  They were terminated.

24   Q.  Fired?

25   A.  Correct.

503

Robert Bryant - Direct

1    *Q.*  Was the company unprofitable at that point in time?

2    *A.*  Yes.

3    *Q.*  Did there come a time when Pilgrim's emerged from

4    bankruptcy?

5    *A.*  Yes.

6    *Q.*  Approximately when did that occur?

7    *A.*  2009 or 2010.

8    *Q.*  Do you recall who the first CEO was when Pilgrim's emerged

9    from bankruptcy?

10   *A.*  I believe it was Don Jackson.

11   *Q.*  Did there come a time when someone replaced Mr. Jackson?

12   *A.*  Yes.

13   *Q.*  Who?

14   *A.*  Bill Lovette.

15   *Q.*  Defendant Bill Lovette?

16   *A.*  Correct.

17   *Q.*  Do you know Defendant Bill Lovette?

18   *A.*  I do.

19   *Q.*  Do you see him in the courtroom today?

20   *A.*  I do.

21        *MR. FAGG:*  Your Honor, we will stipulate the witness

22   can identify Mr. Lovette.

23        *THE COURT:*  Do you accept the stipulation,

24   Mr. Torzilli?

25        *MR. TORZILLI:*  That's acceptable to the government,

Robert Bryant - Direct

1   Your Honor.

2   *BY MR. TORZILLI:*

3   Q.   When Defendant Bill Lovette became CEO of Pilgrim's, did he

4   bring anyone else onboard to help manage the company?

5   A.   He did.

6   Q.   Who?

7   A.   Jayson Penn among others.

8   Q.   Defendant Jayson Penn?

9   A.   That's correct.

10  Q.   Do you know how Jayson Penn spells his first name?

11  A.   J-A-Y-S-O-N.

12  Q.   Is there anyone else named Jayson in Pilgrim's that spells

13  it with a Y that you are aware of?

14  A.   Not that I'm aware of, no.

15  Q.   How long have you known Defendant Jayson Penn?

16  A.   Probably now around a decade.

17  Q.   Have you met him?

18  A.   Yes.

19  Q.   In person?

20  A.   Yes.

21  Q.   Worked with him?

22  A.   Yes.

23  Q.   Do you see him in the courtroom today?

24  A.   Yes.

25          MR. TUBACH:   Your Honor, we will stipulate that

Robert Bryant - Direct

1    Mr. Bryant can identify Mr. Penn who is sitting right here.

2             THE COURT:  Do you accept that stipulation?

3             MR. TORZILLI:  That's acceptable to the government.

4    Thank you, Your Honor.

5    BY MR. TORZILLI:

6    Q.  Now, we talked a little bit this morning about the

7    fresh-food services division of Pilgrim's.  Did Defendant

8    Jayson Penn work in the fresh-food services division?

9    A.  He was responsible for it among others.

10   Q.  You said responsible for it.  What did you mean?

11   A.  He was responsible for, like, sales and operations, what I

12   recall.

13   Q.  Can you explain you mean by sales?

14   A.  So he was responsible for sales and operations, that

15   business unit, so, like, the senior executive responsible for

16   the business unit.

17   Q.  Were you part of the sales team of fresh-food services when

18   he was responsible for sales and operations?

19   A.  Yes.

20   Q.  Does that include the time period 2014 to 2017?

21   A.  Yes.

22   Q.  And remind us who your boss was in 2014.

23   A.  Jason McGuire.

24   Q.  Who was Mr. McGuire's boss in 2014?

25   A.  Jayson Penn.

Robert Bryant - Direct

1   Q.   Did Defendants Lovette and Penn have a management style

2   that differed in any way from previous management styles of the

3   company to your knowledge?

4   A.   Yes.

5   Q.   How did their management styles differ?

6   A.   It was facts and data-driven ownership and accountability.

7   Q.   Let's break that down.   You said facts and data-driven.

8   Can you explain what that means?

9   A.   They expected you to have done your due diligence, have

10  facts behind decisions and data behind decisions, so it was

11  data-driven decisions, not just, I think we should do this or I

12  hope this happens.   It was fact-based.

13  Q.   Now, how did that approach differ from the previous

14  management styles that you had observed at the company?

15  A.   Prior to bankruptcy, I would have said that Pilgrim's was a

16  sales-driven company.

17  Q.   What does sales-driven company mean?

18  A.   They were whatever sales instructed us to do, that was the

19  way that we -- that was the instructions and we needed to

20  follow the sales direction.

21  Q.   Was there more of a focus on the bottom-line profitability

22  of the company?

23          MR. FAGG:   Objection, leading.

24          THE COURT:   Sustained.

25  BY MR. TORZILLI:

Robert Bryant - Direct

1   Q.  Did you have a sense of whether there was more of a focus

2   on the bottom-line profitability of the company?

3   A.  After bankruptcy, yes.  Before bankruptcy, there were

4   instructions given that were completely opposite of that.  They

5   may call and tell you to ship one pallet across the country

6   that you knew the cost of the freight was --

7        MR. TUBACH:  Objection, this is pre-bankruptcy in

8   2007.  He is testifying about instructions given.

9        THE COURT:  Overruled.

10  A.  For instance, a person on the sales team may call me and

11  tell me to ship one pallet, you know, halfway across the

12  country, and, you know, I would know that the cost of the

13  freight alone was valued more than the value of the product

14  that we were shipping.  But it was about taking care of the

15  customer.  After bankruptcy with the ownership accountability

16  and the fact-driven decision-making, we were empowered to

17  challenge those types of decisions that weren't profitable and

18  weren't the right thing to do.

19  BY MR. TORZILLI:

20  Q.  So was there a change in the way that you and others on the

21  sales team operated?

22  A.  Yes.

23  Q.  Could you summarize how?

24  A.  When you made a decision, it needed to be fact-based and

25  profitable, and you had to be able to defend that decision,

508

Robert Bryant - Direct

1   that it was the right thing to do and here is why it was the

2   right thing to do.

3   Q.  You mentioned facts and data.  Can you give us some

4   examples or give us a sense of what sorts of facts and data

5   were involved?

6   A.  Benchmarking, current market conditions, prior bid

7   experience, opportunity, your next best opportunity or your

8   next best sale, so what's your next best sales was a common

9   question.  So if you took this deal or you didn't take this

10  deal, what's your next best deal to get a measure of whether or

11  not that was equally as profitable or more profitable.

12  Q.  Did you attend sales team meetings as part of your job?

13  A.  Yes.

14  Q.  When?

15  A.  We had a weekly call with -- started with Mr. McGuire, and

16  I assume it continues to this day, to review numbers.  And I

17  also attended monthly sales meetings, I believe, starting in

18  2015.

19  Q.  Did Defendant Penn participate in any sales meeting that

20  you attended?

21  A.  Yes.

22  Q.  Which ones?

23  A.  Early on I remember him being on some of the weekly calls

24  with Mr. McGuire, and occasionally he would pop in, but then he

25  regularly attended the monthly sales meetings.

509

Robert Bryant - Direct

1   Q.  Approximately how many people attended those weekly sales

2   meetings?

3   A.  Probably maybe 15 to 20.  I am unsure of the exact number.

4   Q.  And how many people approximately would attend the monthly

5   sales meetings?

6   A.  I would say 30, possibly 40.

7   Q.  When Defendant Penn attended the weekly sales meetings, was

8   he the senior-most person in attendance?

9   A.  Yes.

10  Q.  What, if anything, did Defendant Penn do to change the way

11  that the sales team operated?

12  A.  He would ask the type questions about, what's your next

13  best sale?  Why did you take that deal?  Is that the right

14  decision?  Questions like that.  Once again, that was early on.

15  He didn't attend those through my entire career.

16  Q.  In the weekly meetings that you mentioned, were upcoming

17  and in-process bids to fast-food customers like KFC discussed

18  during those sales meetings?

19  A.  I don't recall those being discussed on the weekly sales

20  meeting other than Mr. McGuire may share, like, the progress of

21  those bids with the sales managers that were on the call

22  because they did affect them.  We did discuss smaller bids on

23  that call that the individual sales managers were handling, but

24  the national account bids, that would have been an update given

25  to those sales managers to keep them informed.

510

Robert Bryant - Direct

1    *Q.*  What about those monthly meetings you mentioned, were

2    upcoming and in-progress bids to fast-food customers ever

3    discussed during those meetings?

4    *A.*  Normally, yes.

5    *Q.*  And what do you mean by normally, yes?

6    *A.*  During that season, you were supposed to talk about things

7    of that nature.  We would discuss what our bids were

8    outstanding and/or coming up and the financial impact to the

9    company weekly normally, the weekly financial impact to the

10   company.

11   *Q.*  You mentioned that season.  Can you explain what you mean

12   by that season?

13   *A.*  A lot of bids are negotiated in the fall, so that's -- I am

14   referring to the bid season, we would call it the bid season

15   that would start sometimes as early as August and carry through

16   until late fall, because a lot of contracts were annual, so you

17   renegotiate those, what's called Q3 to get everything in place

18   for the new year.  Some were more than that, and some had

19   different -- different times.  Retail in particular were more

20   annual where you were constantly bidding, bidding retail.  But

21   we called that fall, the season.

22   *Q.*  Did that include fast-food restaurant bids?

23   *A.*  Yes.

24   *Q.*  Include typically KFC bid?

25   *A.*  Yes.  Up until 2014, I believe they were annual, and then

511

Robert Bryant - Direct

1   after 2014 I believe is when they switched to the three-year.

2   Q.  Now, how large of a customer was KFC for Pilgrim's?

3   A.  In 2014, they were the largest QSR customer.

4   Q.  Did that change at any point in time?

5   A.  Yeah.  After 2014 -- when I say "largest," I mean bone-in.

6   After 2014, their volume started to dwindle, and there was a

7   different person that buys more from Pilgrim's now.

8   Q.  Are they still a large customer for Pilgrim's?

9   A.  Fairly, fairly large, yeah.

10  Q.  Did Defendant Lovette ever participate in the sales

11  meetings that you attended?

12  A.  He participated.  He was there, yes.

13  Q.  How often?

14  A.  Most of them, unless he got a scheduling conflict, but on

15  most of them, yes.

16  Q.  What, if anything, did Defendant Lovette do to your

17  knowledge to change the way the sales team operated?

18  A.  It was the challenging of the decisions that were made and

19  how they were made.  It was -- you know, it got us to think

20  more in lines of profitability and not only just are you making

21  money, but, I mean, and in cash flow like, for instance,

22  inventory and things of that nature, more all encompassing of

23  running a business.

24  Q.  I want to ask you a few questions now about negotiating

25  chicken supply contracts.  Do you have experience in

Robert Bryant - Direct

1    negotiating chicken supply contracts?

2    A.   Yes.

3    Q.   How much experience?

4    A.   A lot.

5    Q.   How long have you been negotiating chicken supply

6    contracts?

7    A.   Many years.

8    Q.   In your experience, do chicken supply contracts contain a

9    credit term or a payment term?

10   A.   They generally do.  There is some component of terms in

11   those negotiation and -- in initial pricing negotiations.  That

12   is part of the process is to settle on an agreement on terms.

13   Q.   Would you explain to the jury what a credit or a payment

14   term is as it's contained in a chicken supply contract you have

15   experience negotiating?

16   A.   Generally speaking, yeah, you -- a customer will want some

17   sort of term, so it's like your electric bill, for instance, or

18   your credit card bill.  You get your credit card bill and you

19   have got 30 days to pay it.  You have already spent the money

20   or accrued that money that you have spent.  So they have

21   already ordered enough product.  And then once they receive

22   that product, they may have 10 days or 30 days to pay for that

23   product.

24   Q.   Now, in your experience of negotiating chicken supply

25   contracts, does Pilgrim's prefer that customer pay it sooner or

Robert Bryant - Direct

1    later?

2    *A.*   Sooner.

3    *Q.*   Why is that?

4    *A.*   Cash flow.

5    *Q.*   Could you explain that, please?

6    *A.*   Because you have got all the cost of that product in there

7    in your product, so you may have produced a customer's product.

8    If there terms were 10 days and they were ordering every day

9    like a load a day, so you provided them with 10 loads of

10   product before they have ever paid for the first one, at least

11   10 loads because it's generally, you know, receipts.  So if

12   there is transit time and other factors in there, it could be

13   even longer.  So it's the amount of capital, it's how you

14   deploy your capital, right?  You are either spending money out

15   of your bank account to produce that or you are putting it on

16   your company credit card, so to speak.  It's how much of your

17   cash do you want to devote to producing that product for a

18   customer before you receive money.

19   *Q.*   Thank you, Mr. Bryant.  Now I would like to switch gears a

20   little bit and talk about the year 2017 and the bid to KFC that

21   occurred at that time.

22         So let's start with was there a bid in 2017 for KFC?

23   *A.*   Yes.

24   *Q.*   When approximately did the bidding process first begin for

25   the bid in that year for KFC?

514

Robert Bryant - Direct

1   *A.*   The first time I got notified that KFC wanted to negotiate

2   the bid was probably actually in December of 2016 because I

3   recall pushing back about negotiating the bid practically a

4   year early.

5   *Q.*   Why did you push back negotiating on the bid a year early?

6   *A.*   Well, we were -- we had a three-year contract.  We had a

7   full year of that contract still to go.  Market conditions were

8   not favorable to us for negotiating that bid that early.  And I

9   knew negotiating it that early would mean concessions.

10  *Q.*   Price concessions?

11  *A.*   That's correct.

12  *Q.*   Now, did your role change between the time of the 2014 bid

13  that we talked about earlier this morning and the 2017 bid we

14  are discussing now?

15  *A.*   Yes.

16  *Q.*   How?

17  *A.*   I was promoted to the director of sales.

18  *Q.*   And what did the director of sales position entail?

19  *A.*   All the sales for the fresh-food service, both pricing and

20  strategy.

21  *Q.*   Pricing and what?

22  *A.*   Strategy.

23  *Q.*   Strategy?  Sir, you mentioned market conditions not being

24  favorable.  So heading into that bid, did you have a forecast

25  for the direction of the prices you were ultimately going to

515

Robert Bryant - Direct

1   negotiate with KFC?

2   A.   I did.

3   Q.   What was your -- what was your forecast based on?

4   A.   Current market conditions and prior negotiations with other

5   customers.

6   Q.   And so what was your -- what was your forecast where prices

7   were headed with KFC?

8   A.   They were going down.

9   Q.   And, sir, did you have an understanding of why KFC started

10   the bidding process more than a year before the three-year

11   contract was completed?

12   A.   I did.

13   Q.   What's that based on?

14   A.   Negotiating the contract in my own internal -- my own

15   discussions with Roger Austin and others at Pilgrim's.

16   Q.   Who were on the contract team?

17   A.   That's correct.

18   Q.   Okay.  So what is your understanding of why KFC started the

19   bidding process a year out?

20   A.   They knew that the market conditions were in their favor to

21   get a more favorable term -- or not term, but price.

22   Q.   Now, what was the nature of the relationship between

23   Pilgrim's and KFC at the time when the bidding was going to

24   begin?

25   A.   It was not good.

Robert Bryant - Direct

1   *Q.*  Why?

2   *A.*  They had blamed Pilgrim's for the price increases in 2014.

3   The relationship, the way I understood it, was broken.

4   *Q.*  Broken?

5   *A.*  Broken, yes.

6   *Q.*  When were the bids due in 2017 to the best of your

7   recollection?

8   *A.*  Around the first of February, first week of February.

9   *Q.*  Did there come a time when you and others at Pilgrim's had

10  a meeting with KFC before those bids were due?

11  *A.*  Yes.

12  *Q.*  Did you have an understanding at the time as to what

13  suppliers Pilgrim's was competing against in that bid?

14  *A.*  Yes.

15  *Q.*  Which suppliers did you understand Pilgrim's was competing

16  against?

17  *A.*  Koch, Claxton, Tyson, Mar-Jac, George's, and I expected OK

18  Foods which had converted a plant in between the last to be a

19  new participant that was going to help KFC with leverage

20  against us in those negotiations.

21  *Q.*  You said OK Foods, I think you said, converted a plant?

22  *A.*  That's correct.

23  *Q.*  Can you explain to the jury what that means?

24  *A.*  They converted one of their plants from one size category

25  to be a small-bird, fast-food size plant, so they entered that

517

Robert Bryant - Direct

1    market.

2    Q.   Entered into the small-bird market?

3    A.   That's correct.

4    Q.   Do you know approximately what year OK Foods entered into

5    the small-bird market?

6    A.   It was either '15 or '16.  I don't recall.  I just remember

7    hearing about it.

8    Q.   Do you know when the meeting that was scheduled between

9    Pilgrim's and KFC, when that meeting was scheduled to occur?

10   A.   I think it was January 27.

11   Q.   Of?

12   A.   2017.

13   Q.   What kind of things were generally discussed at prebid

14   meetings?

15   A.   Each side stated their expectation at those meetings.  If

16   there was any outstanding issues between the two companies,

17   those would be brought up and discussed in those meetings, and

18   then the date for the actual bid submission.

19   Q.   Did you attend the meeting?

20   A.   I did.

21   Q.   Did you prepare for it?

22   A.   I did.

23   Q.   What, generally speaking, did you do to prepare for the

24   meeting you were going to have with KFC?

25   A.   I would do due diligence.  I would do market analysis.  I

518

Robert Bryant - Direct

1   would ask -- I would request information of any outstanding

2   topics that I felt could come up in the meeting so we would

3   have -- be prepared to answer any of those questions that would

4   come up.

5   Q.  Did you write down any of your thoughts?

6   A.  I did.

7   Q.  Where?

8   A.  Sent an e-mail.

9        MR. TORZILLI:  If we can, just for the parties, the

10  Court, and the witness, call up Government's Exhibit 1882.

11  BY MR. TORZILLI:

12  Q.  And, Mr. Bryant, Government's Exhibit 1882, if you want a

13  paper copy, is at tab 7 of the binder in front of you, or you

14  can look at it on the screen if you would prefer to do it that

15  way.

16        Do you recognize this?

17  A.  I do.

18  Q.  What is it?

19  A.  It's an e-mail from myself on January 17th, 2017.

20  Q.  Is it a single e-mail or more than one e-mail?

21  A.  It's multiple e-mails.

22  Q.  What does it -- what do the e-mails relate to?

23  A.  Our -- the upcoming KFC prebid meeting in 2017.

24        MR. TORZILLI:  Your Honor, government moves to admit

25  1882 into evidence.

Robert Bryant - Direct

1        THE COURT:  Any objection to the admission of 1882?  I

2   think there is a limiting instruction that's associated with

3   that.  Is that correct, Mr. Torzilli?

4        MR. TORZILLI:  That's my understanding, Your Honor.

5        THE COURT:  Okay.  1882 will be admitted.

6        And, ladies and gentlemen, this -- I just mentioned

7   the term "limiting instruction."  You may recall when I read

8   you that preliminary jury instruction that I indicated that

9   certain exhibits could come in for a limited purpose only.

10  This particular e-mail has statements regarding what Sarah

11  wants.  Can only be considered, ladies and gentlemen, for the

12  effect on the listener, not for the truth of the matters

13  associated, so in other words, not for the truth of what the

14  statement may be, but rather what effect that statement may

15  have on the person who receives the e-mail or who listens to

16  the message, all right?

17        1882 will be admitted.

18        MR. TORZILLI:  Thank you, Your Honor.  And permission

19  to publish 1882.

20        THE COURT:  You may.

21        MR. TORZILLI:  Ms. Pearce, if you could zoom in on the

22  bottom e-mail in this chain.

23  BY MR. TORZILLI:

24  Q.  So, Mr. Bryant, the bottom e-mail of the chain, who wrote

25  that one?

Robert Bryant - Direct

1    A.   I did.

2    Q.   And is this the notes that you had written to yourself that

3    you referenced a moment ago?

4    A.   Yes.

5    Q.   So can you tell us just generally speaking if you could

6    summarize the notes that you put into this e-mail that appears

7    in 1882.

8    A.   They were just topics that I thought would come up and

9    starting to develop our strategy, for instance, do we want to

10   offer more than 50 loads?  Do we want to show more volume to

11   them or not, just things I thought may be pertinent for the

12   meeting.

13   Q.   There is a reference on the line that begins "Will Pete."

14   Do you see that line?

15   A.   Yes.

16   Q.   The reference to Pete?

17   A.   Yes.

18   Q.   Who did you mean by Pete?

19   A.   Pete Suerken.

20   Q.   And remind us who Pete Suerken is?

21   A.   He was the lead negotiator for KFC.

22   Q.   For the 2017 bid?

23   A.   That's correct.

24   Q.   And are there other e-mails in this chain?

25   A.   Yes.

Robert Bryant - Direct

1   *Q.*  Did you get a response to your message?

2   *A.*  I did.

3   *Q.*  Who responded to your message?

4   *A.*  Roger Austin.

5         MR. TORZILLI:  Ms. Pearce, if we could focus on the

6   second e-mail in the chain, please.

7   *BY MR. TORZILLI:*

8   *Q.*  And in general, what is he saying to you here?

9   *A.*  Basically, he is telling me that we need to have a model

10  ready to show, and he was going to be providing me with more

11  information.

12  *Q.*  Let's focus in on the second-to-the-last line of Exhibit

13  1882.  Could you read that aloud for the jury, please.

14  *A.*  Claxton meets with them in Thursday and I will get a blow

15  by blow Friday morning.

16  *Q.*  Now, did you read Mr. Austin's e-mail at or around time he

17  sent it to you?

18  *A.*  I did.

19  *Q.*  Did you use it for any reason?

20  *A.*  Yes.

21  *Q.*  What did you use it for?

22  *A.*  To help prepare for the KFC meeting.

23  *Q.*  Did you find Defendant Austin's e-mail to you helpful in

24  preparing for the upcoming meeting with KFC?

25  *A.*  Yes.

Robert Bryant - Direct

1   Q.  Did you find the passage that begins with the word Claxton

2   in the second to the last line helpful?

3   A.  Yes.

4   Q.  How did you find it helpful?

5   A.  I knew that Roger was going to get information from Claxton

6   to help us in our meeting with KFC.

7   Q.  Now, there are some pronouns here.  I just want to make

8   sure I clarify them based on your understanding.  It says,

9   "Claxton meets with them."  Who did you understand "them" to be

10  referring to?

11  A.  KFC.

12  Q.  In Thursday.  And then it says, "I will get a blow by

13  blow."  Who did you understand the "I" to be referring to?

14  A.  Roger Austin.

15  Q.  And what did you understand that sentence as a whole to be

16  referring to?

17  A.  That Claxton was meeting with KFC on Thursday and that

18  Roger would talk to Scott Brady on Friday morning.

19  Q.  What day of the week was Defendant Austin's e-mail to you

20  written on?

21  A.  Tuesday.

22  Q.  When was Pilgrim's meeting with KFC scheduled to occur?

23  A.  I believe it was 10 days later, the 27th.

24  Q.  So, for example, a week from Friday?

25  A.  Correct.

Robert Bryant - Direct

1    Q.   And did you have an expectation that -- well, what does

2    blow by blow mean?

3    A.   A download of whatever they discussed in the meeting.

4    Q.   Now, you mentioned earlier this morning one of the

5    categories of information Defendant Austin would obtain is

6    information about I think you called it confidential one-on-one

7    meeting?

8    A.   Correct.

9    Q.   Is this an example of that?

10   A.   Correct.

11   Q.   How is receiving information about a competitor's

12   confidential one-on-one meeting with a customer helpful in

13   preparation for you going into a meeting with that same

14   customer?

15   A.   Knowing what they told other suppliers would help us

16   formulate our strategy towards KFC.

17   Q.   And what was the strategy you were developing at this point

18   in time for your bidding with KFC?

19   A.   To limit a price decrease.

20   Q.   And how, if at all, was getting a blow by blow from

21   Claxton's meeting with KFC going to be relevant to that

22   strategy?

23   A.   It would be relevant to know what they told them, whether

24   they told them they were expecting a price increase or whether

25   they would let them maintain price, if they would increase

Robert Bryant - Direct                                                  524

1   volume.  There was a whole host of reasons to want to know why

2   or what was discussed in that meeting because it could be

3   different from what they told Pilgrim's as part of their

4   negotiating strategy.

5   Q.  Was the -- do you have an understanding of what type of bid

6   KFC was using during its bidding process in 2017?

7   A.  Yes.

8   Q.  What type of bid was it using?

9   A.  A blind bid.

10   Q.  Let's look at the last line of Defendant Austin's message

11   here in Government's Exhibit 1882.  Could you read it aloud for

12   the jury, please?

13   A.  Koch meets with them in Friday.

14   Q.  First of all, did you read this sentence at or around the

15   time Defendant Austin e-mailed it to you?

16   A.  Yes.

17   Q.  Did you find it useful in your preparations for the meeting

18   upcoming with KFC?

19   A.  It did.

20   Q.  How was it helpful?  I should say was it helpful?

21   A.  Yes.

22   Q.  How was it helpful?

23   A.  Because we were going to have information about what KFC's

24   position was going to be not only with Claxton, but also with

25   Koch, to help us prepare for our KFC meeting.

Robert Bryant - Direct

1   Q.   At the time, did you know who the lead negotiator for Koch

2   was for the KFC bid?

3   A.   Yes.

4   Q.   Who?

5   A.   Bill Kantola.

6   Q.   And did you know at the time who the lead negotiator for

7   Claxton was for the 2017 KFC bid?

8   A.   Yes.

9   Q.   Who?

10   A.   Scott Brady.

11           MR. BELLER:   Objection, foundation.

12           THE COURT:   Overruled.

13   BY MR. TORZILLI:

14   Q.   Defendant Scott Brady?

15   A.   Correct.

16   Q.   If we can focus on the very first or the top -- I should

17   say the top e-mail on Government's Exhibit 1882.

18           MR. TORZILLI:   Thank you, Ms. Pearce.

19   BY MR. TORZILLI:

20   Q.   Who wrote this?

21   A.   I did.

22   Q.   Who did you send it to?

23   A.   Roger Austin.

24   Q.   When?

25   A.   Same day, January 17th, 2017.

526

Robert Bryant - Direct

1    Q.  So this is 10 days before the meeting you were planning to

2    attend with KFC?

3    A.  Yes.

4    Q.  What did you tell Defendant Roger Austin?

5    A.  I asked him if he could find out where we needed to price

6    our bid to be second highest in price.

7    Q.  Okay.  There is some pronouns here I just would like to

8    clarify.  The "I would" refers to who?

9    A.  Me.

10   Q.  And then it says in the middle there "where we need to be."

11   What is the "we" referring to?

12   A.  Pilgrim's.

13   Q.  And then it says, "If you can find that out."  Who is the

14   "you"?

15   A.  Roger Austin.

16   Q.  Now, what did you mean by need to be No. 2 in price?

17   A.  So our bid submission would be second highest in price.

18   Q.  So what were you asking Defendant Austin to do?

19   A.  To see if he could find out where the competitors were

20   going to submit so we could place our bid second highest in

21   price.

22   Q.  Did you have an understanding of how Defendant Austin was

23   going to accomplish your request?

24   A.  Yes.

25   Q.  How?

Robert Bryant - Direct

1   *A.*  Based off what I had seen in the 2014 bid where Mr. McGuire

2   told him put it out to the industry, the phone calls he had

3   with competitors during the bidding process, my expectation was

4   that he would reach out to his contacts at competitors and find

5   out where their bid submissions were going to be and report

6   back to me.

7   *Q.*  Now, based on the e-mail that you had -- we just looked at

8   that you had received from Defendant Austin, did you have an

9   understanding that Defendant Austin would be in contact with

10  Defendant Brady in the upcoming days?

11  *A.*  Yes.

12  *Q.*  Did you have an understanding based on that same e-mail

13  that Defendant Austin would be in contact with Mr. Kantola in

14  the upcoming days?

15  *A.*  Yes.

16  *Q.*  Did you expect that Defendant Austin would obtain the bid

17  information you were seeking from them during those planned

18  upcoming calls?

19          *MR. FELDBERG:*  Objection.  First of all, this is

20  prebid; and second of all, all the e-mail says is "blow by

21  blow."

22          *THE COURT:*  Overruled.

23  BY MR. TORZILLI:

24  *Q.*  You can answer, Mr. Bryant.

25  *A.*  What was the question again?  Sorry.

528

Robert Bryant - Direct

1        MR. TORZILLI:  I will read it to you.

2    BY MR. TORZILLI:

3    Q.  Mr. Bryant, did you expect that Defendant Austin would

4    obtain the bid information you were seeking from them, meaning

5    Mr. Kantola and Defendant Brady, during those planned upcoming

6    calls?

7    A.  That was my expectation, yes.

8    Q.  Now, it says in your e-mail "need to be No. 2."  What does

9    that mean?

10   A.  I asked to be -- or wanted to be second highest in price

11   because the relationship with KFC was damaged and I didn't want

12   us to be highest in price.

13   Q.  What did you -- where did you understand Pilgrim's to be

14   ranking in the level of price to KFC at the time you wrote this

15   e-mail?

16   A.  The highest.

17   Q.  So you wanted to go down?

18   A.  Correct.

19   Q.  And why to No. 2 as opposed to some other number in the

20   order?

21   A.  No. 2 would have gotten us away from being the highest

22   price, and I viewed it would maximize our profitability and

23   help possibly repair the relationship with the customer from

24   2014.

25   Q.  Did there come a time when the meeting between Pilgrim's

529

Robert Bryant - Direct

1  and KFC I think you said on January 27, did it, in fact, occur?

2  A.  It did.

3  Q.  Did you attend?

4  A.  I did.

5  Q.  Who else from Pilgrim's attended?

6  A.  Roger Austin, Tim Stiller, Justin Gay, Scott Tucker, I

7  believe.

8  Q.  Who from KFC attended?

9  A.  I remember Pete Suerken, Sara Fisher, Rich Eddington, Steve

10  Campisano I believe were there.

11  Q.  You said you remember Pete Suerken.  Was there something

12  memorable about that meeting with respect to Pete Suerken?

13  A.  There was.

14  Q.  What was that?

15  A.  He made a pretty blunt comment.

16  Q.  What was the blunt comment Mr. Suerken made?

17  A.  He made a comment in the meeting, and it was pretty -- he

18  said that he was going to beat us down on price with a baseball

19  bat or a hammer and take loads from us, which in my mind

20  confirmed what -- about the relationship.

21  Q.  What was the message you took away from when Mr. Suerken

22  made that memorable comment about a baseball bat or a hammer?

23  A.  He was going to be very aggressive in negotiations to get

24  our price -- to get significant price reductions, and he had

25  every intention of taking volume from us.

530

Robert Bryant - Direct

1   *Q.*   What does taking volume from us mean?

2   *A.*   If you were supplying them 50 loads, then in the

3   negotiations you may only be supplying them 40 loads a week.

4   *Q.*   So buy less chicken from Pilgrim's?

5   *A.*   Correct.

6   *Q.*   Now, at the time -- you referred to earlier this morning

7   historic price increases.  Were those historic price increases

8   still in effect at the time of the meeting that we're talking

9   about?

10  *A.*   Yes.

11  *Q.*   How are they still in effect even though we are talking

12  about 2017 and you negotiated those historic price increases in

13  2014?

14  *A.*   It was a three-year contract.

15  *Q.*   And when was the three-year contract set to expire,

16  approximately?

17  *A.*   At the end of 2017.

18  *Q.*   Calendar year 2017?

19  *A.*   Correct, yes.

20  *Q.*   Now, going back to Government's Exhibit 1882, did Defendant

21  Roger Austin ever respond to your e-mail?

22  *A.*   Not that I recall, no.

23  *Q.*   And approximately how long before the bid was due did you

24  ask him for the information?

25  *A.*   I think the bid was due the first week of February, so it

Robert Bryant - Direct

1   was probably at least three weeks.

2           MR. TORZILLI:  Okay.  We can take that exhibit down,

3   thank you.

4           Moment to confer?

5           THE COURT:  You may.

6           MR. TORZILLI:  Permission to publish 1882 to the jury

7   again, please.

8           THE COURT:  You may.

9           MR. TORZILLI:  Thank you, Your Honor.

10  BY MR. TORZILLI:

11  Q.  Going back to Exhibit 1882, if we can look at the middle

12  e-mail.

13  A.  Yes.

14  Q.  Is there someone cc'd there?

15  A.  Yes.

16  Q.  Who?

17  A.  Scott Tucker.

18  Q.  Now, you responded to that e-mail as the top e-mail in this

19  chain, right?

20  A.  That's correct, yes.

21  Q.  Was Mr. Tucker cc'd when you responded to Defendant

22  Austin's e-mail?

23  A.  No.

24  Q.  How did that happen?

25  A.  I took him off.

Robert Bryant - Direct

1    *Q.*   You took him off what?

2    *A.*   I took him off the e-mail string.

3    *Q.*   Why?

4    *A.*   I didn't -- didn't feel comfortable sending that to anyone

5    other than Roger at the time.

6    *Q.*   Why didn't you feel comfortable sending to anyone but

7    Defendant Austin at the time?

8    *A.*   I didn't know at the time Scott Tucker's involvement in

9    talking to our competitors.

10   *Q.*   Was there a time when you found out that he did?

11   *A.*   Yes, later.

12   *Q.*   Later than January of 2017?

13   *A.*   Yes.

14   *Q.*   Do you have a specific memory of writing the e-mail that

15   appears at the top of Government's Exhibit 1882?

16   *A.*   I do.

17   *Q.*   Even after all this time?

18   *A.*   Yes.

19   *Q.*   How many e-mails do you think you wrote in January of 2017?

20   *A.*   Thousands.

21   *Q.*   Of those thousands of e-mails, you remember this one?

22   *A.*   I do.

23   *Q.*   Why do you remember this one e-mail out of the thousands

24   you wrote in January of 2017?

25   *A.*   Because I regretted sending it.  I wish I could have taken

Robert Bryant - Direct

1    it back.

2    Q.  Mr. Bryant, why did you regret sending the e-mail at the

3    top of Government's Exhibit 1882?

4    A.  Well, I sent it because I knew there was an expectation

5    from my boss to get this information, but then immediately

6    after I sent it, I didn't feel comfortable with it, and I

7    regretted sending it, and I just -- morally I didn't feel

8    comfortable with it.

9    Q.  Did you ever, though, retract it or tell Defendant Austin

10   not to go forward?

11   A.  No.  I just -- after I sent it, he didn't respond, I had no

12   intention of following back up on it.  I wished it just -- it

13   went away.

14   Q.  You mentioned a reference, an expectation of your boss.

15   Can you tell for the jury who your boss was at the time?

16   A.  Tim Stiller.

17   Q.  And what was the expectation that was in your mind as you

18   wrote the e-mail that we are looking at here at the top of

19   Government's Exhibit 1882?

20   A.  That I would need to provide him with this information,

21   this type of information as part of the bid.

22   Q.  Information about competitors?

23   A.  Correct.

24   Q.  Pilgrim's competitors?

25   A.  That's correct, yes.

534

Robert Bryant - Direct

1    Q.  About the upcoming KFC bid?

2    A.  That's correct, yes.

3            MR. TORZILLI:  We can take Government's Exhibit 1882

4    down.

5    BY MR. TORZILLI:

6    Q.  Now, you said you never got a response from Defendant

7    Austin, but did there come a time when another person other

8    than you at Pilgrim's made a same or similar request?

9    A.  Yes.

10   Q.  What happened?

11   A.  It was after our January 27 meeting, Tim Stiller, my

12   manager at the time, called me and it was the week the bid was

13   due, I remember that, and was probing me for information about

14   the KFC bid.  And he was asking if I had the type of

15   information I requested from Roger earlier.  And he was saying,

16   What's Roger saying?  What -- do you have anything?  And I told

17   him I didn't.  I hadn't heard from Roger.  I didn't have any

18   information.  And he got upset with me, and he said that, You

19   don't know shit; I'll get it myself or I'll find out for

20   myself.  And that's when he hung up the phone on me.

21   Q.  When approximately did you receive this call from

22   Mr. Stiller?

23   A.  It was early in the week of that first week of February

24   before the bid was due.

25   Q.  And he said -- when he said to you, You don't know shit,

Robert Bryant - Direct

1  what does that mean?

2  A.  I didn't have any of the information he was after.  I

3  didn't have any pricing information.  I didn't have any

4  information from Roger.  He was seeking information that Roger

5  normally would divulge.  You know, he would use terms like,

6  What's Roger saying?  Has Roger done his due diligence?  Has

7  Roger made some calls, things of that nature, and he was upset

8  that I didn't have any type of that information for him.

9  Q.  On the call, did you observe Mr. Stiller's demeanor?

10  A.  He was upset.

11  Q.  What did his voice sound like?

12  A.  Well, like I said, he used some pretty derogatory terms

13  before he hung up the phone on me.

14  Q.  Was his voice loud or soft?

15  A.  He was angry.  I mean, I could hear that tone in his voice.

16  Q.  Okay.  After you hung up the phone with your boss,

17  Mr. Stiller, after that conversation, what did you do next?

18  A.  I called Roger Austin.

19  Q.  And what happened on that call with Defendant Roger Austin?

20  A.  I called Roger and basically told -- gave him a recap of

21  the conversation that I had with Stiller and asked him for the

22  information that Tim Stiller was seek -- was looking for.  And

23  I remember Roger saying that he had a similar phone call with

24  Stiller and that he would make some calls and get back to me.

25  Q.  And what happened next?

Robert Bryant - Direct

1   *A.*   I don't remember if -- I think it was the next morning, I

2   am not a hundred percent certain, but it was relatively quick,

3   Roger called me and said, Are you ready?  I got it.  And when

4   he called me, he gave me competitors' pricing information.  And

5   I remember saying on the call after he gave me that information

6   I was surprised at how quickly he got that, was able to get

7   that information.  And I remember him saying or bragging, I got

8   everybody's prices dating back to the '90s.

9   *Q.*   So when you got the call from Defendant Austin, he said,

10  You ready, I got it, what did you do?

11  *A.*   I wrote it down.

12  *Q.*   What do you mean by you wrote it down?

13  *A.*   I wrote down the information he shared with me, because

14  after I had the phone call with Tim Stiller, I wanted to make

15  sure that I could give him that information accurately, so I

16  wrote it down so I could -- I didn't want to get on there and

17  say, Well, George's is around here or someone is around here.

18  I wanted to be able to give it to him verbatim.

19  *Q.*   You wanted it to be precise about what Defendant Austin

20  related to you?

21  *A.*   That's correct, yes.

22  *Q.*   And were you able to observe Defendant Austin's demeanor as

23  you were having the phone call with him?

24  *A.*   Not observe.  I mean, he was proud.  Whenever I mentioned

25  to him I was surprised, how did you get this so quick, and, you

537

Robert Bryant - Direct

1    know, he was like, I got everybody's information going back to

2    the '90s.

3    Q.  So he was proud and bragging?

4    A.  Yeah.

5    Q.  You said you wrote it down.  Where did you write the

6    information down that Defendant Austin provided to you?

7    A.  In my notebook.

8    Q.  What kind of notebook?

9    A.  My personal notes.  It was handwritten.

10          MR. TORZILLI:  If we could look at, just for the

11   Court, witness, and the parties, Government's Exhibit 1919.

12   BY MR. TORZILLI:

13   Q.  And, Mr. Bryant, if you would like a paper copy of that,

14   that's at tab 9 of the binder that you are flipping through.

15   So what, Mr. Bryant, is -- well, do you recognize Exhibit 1919?

16   A.  I do.

17   Q.  What is it?

18   A.  It's my handwritten notes.

19   Q.  Now, why, Mr. Bryant, did you decide that you were going

20   to -- that you were going to handwrite in your notebook the

21   information you got from Defendant Austin rather than, say,

22   typing it in an e-mail or something like that?

23   A.  Well, I generally kept my notebook on my desk for -- it was

24   just my personal use.  It was -- that's just the way I did it.

25   I don't -- it's just my method.

Robert Bryant - Direct

1    Q.   And this was, you said, your personal notebook?

2    A.   That's correct, yes.

3    Q.   What did you mean by personal notebook?

4    A.   So I would pack this with me pretty much everywhere until

5    it was exhausted, and then I would start a new one, and I did

6    that for many years.

7    Q.   Is it like a nice -- like a moleskin or a nice notebook or

8    one from CVS or Walgreens?

9    A.   Fairly cheap.  I got 10 of them for a dollar.

10   Q.   Okay.  All right.  So what is -- just generally speaking,

11   what's the information written on the pages of your notebook

12   that are appearing here in Exhibit 1919?

13   A.   The first one is my personal notes from the KFC meeting.

14   Q.   And is there another page?

15   A.   There is.

16   Q.   What's on the other page?

17   A.   The -- I mean, it's the pricing information I received from

18   Roger Austin and then some of my -- the top part of that is

19   actually me working on some KPIs.

20        MR. TORZILLI:  At this time, Your Honor, the

21   government moves to admit Government's Exhibit 1919 into

22   evidence.

23        THE COURT:  Any objection to the admission of

24   Exhibit 1919.

25        MR. FELDBERG:  Subject to all of the previous

Robert Bryant - Direct

 1  discussion, no objections, Your Honor.

 2          *THE COURT:*  Yes, as always.

 3          Exhibit 1919 will be admitted.

 4          *MR. TORZILLI:*  Thank you, Your Honor.

 5          And permission to publish to the jury Exhibit 1919.

 6          *THE COURT:*  You may.

 7          *MR. TORZILLI:*  Thank you, Your Honor.

 8  *BY MR. TORZILLI:*

 9  *Q.*  Mr. Bryant, tell us what we are looking at here on the

10  first page of Exhibit 1919.

11  *A.*  The first page is my notes from the KFC meeting on

12  January 27, 2017.

13  *Q.*  Is that the same meeting we were talking about a few

14  moments ago?

15  *A.*  Yes.

16  *Q.*  And can you now look at the second page?

17          *MR. TORZILLI:*  And permission to publish the second

18  page?

19  *BY MR. TORZILLI:*

20  *Q.*  And what's on the -- you said that the notes of the pricing

21  information were on this page?

22  *A.*  That's correct.

23          *MR. TORZILLI:*  Ms. Pearce, if we could zoom in on the

24  bottom half of the second page of Exhibit 1919.

25  *BY MR. TORZILLI:*

Robert Bryant - Direct

1   Q.  Is what's being zoomed in on here, Mr. Bryant, is this the

2   price information that you wrote down as you were talking to

3   Defendant Austin?

4   A.  It is.

5   Q.  So what -- let's walk through this together.  So there is a

6   column of numbers on the left-hand side.  And it looks like

7   there are two sets of numbers, but can you explain what the

8   numbers on the left-hand side represent?

9   A.  Price per pound.

10  Q.  Price of what?

11  A.  Of eight-piece on the top part from each of those

12  competitors, and the bottom part is, I believe the bottom part,

13  the 49.38, for instance, I believe that's their case weight for

14  dark meat.

15  Q.  What do you mean by case weight, Mr. Bryant?

16  A.  So you negotiate a price per pound, and then it's -- you

17  also negotiate a -- it's called a fixed billing weight.  So

18  their spec may be from 50 to 55 pounds that's an allowable

19  weight.  But then, for instance, on the right there, your

20  billable weight would only be 52.50 no matter if it weighed 50

21  pounds or 55 pounds, for instance, so you had a fixed case

22  weight billing.

23  Q.  Now, you mentioned these were price per pound.  Tell us

24  what product this is.

25  A.  The top part is for the eight-piece COB, chicken on the

Robert Bryant - Direct

1    bone.

2    Q.   Now, the next column has some words.   What are the words in

3    the next column?

4    A.   Those are the various competitors, Koch, Claxton, Mar-Jac,

5    Tyson, George's.

6    Q.   Pilgrim's competitors?

7    A.   Correct.

8    Q.   For the KFC bid?

9    A.   That's correct.

10   Q.   Now, who is the very first, the very first competitor

11   listed there?

12   A.   Koch.

13   Q.   Who was the KFC lead negotiator for Koch at this time, to

14   your knowledge?

15   A.   Bill Kantola.

16   Q.   Was that a person who you had understood Defendant Austin

17   would be calling to get information about Koch's confidential

18   one-on-one meeting with KFC that was occurring back in January?

19   A.   That's correct.

20   Q.   What's the next competitor that's listed?

21   A.   Claxton.

22   Q.   Was Claxton one of the -- or was -- who was the, to your

23   knowledge, the lead negotiator for Claxton for the KFC bid

24   occurring at this time?

25   A.   Scott Brady.

542

Robert Bryant - Direct

1   *Q.*  And based on the e-mail we looked at a few moments ago, was

2   Defendant Scott Brady a person you understood Defendant Austin

3   was going to be in touch with to get, I think you said, a blow

4   by blow after that confidential one-on-one meeting?

5   *A.*  That's correct.

6   *Q.*  Who is the third competitor listed?

7   *A.*  Mar-Jac.

8   *Q.*  Who or what is Mar-Jac?

9   *A.*  Another poultry company.

10  *Q.*  Do you know who the lead negotiator was at the time?

11  *A.*  I am not sure.  It may have been Kevin Grindle, but I am

12  not confident on that.

13  *Q.*  Who was the next competitor listed?

14  *A.*  Tyson.

15  *Q.*  Tyson Foods?

16  *A.*  That's correct.

17  *Q.*  Do you have an understanding of who the lead negotiator was

18  at the time of the KFC bid?

19  *A.*  Carl Pepper.

20  *Q.*  Can you spell that name, please?

21  *A.*  I am not sure how he spells it, but I assume it's C-A-R-L.

22  *Q.*  And the last name, please?

23  *A.*  P-E-P-P-E-R.

24  *Q.*  And then who is the competitor listed next?

25  *A.*  George's.

Robert Bryant - Direct

1   Q.   What is George's?

2   A.   Another poultry company.

3   Q.   So what price for eight-piece COB did Defendant Austin give

4   you for, say, for example, Koch?

5   A.   1.0125.

6   Q.   Per?

7   A.   Per pound.

8   Q.   Now, over in the right-hand column, there is some notations

9   next to some of the competitors, and I would like to ask you

10  about those.  So it looks like Claxton and Tyson you have noted

11  NHA for both of those?

12  A.   That's correct.

13  Q.   What did NHA mean?

14  A.   No human antibiotics.

15  Q.   And what's the significance of that for purposes of

16  getting -- selling chicken to KFC?

17  A.   KFC had -- as part of the 2017 negotiations wanted to

18  source NHA product, so there was a discussion of which

19  competitors had already converted and whether or not we were

20  going to charge KFC to supply that product.

21  Q.   What considerations, if any, within Pilgrim's during the

22  KFC bid were given to the NHA issue?

23  A.   Can you repeat?

24  Q.   Sure.  What, if any, considerations did you and others at

25  Pilgrim's give to serving -- let me withdraw that and ask a far

544

Robert Bryant - Direct

1   better question, which is, why, if at all, was it important to

2   you to write down that Claxton and Tyson had NHA chicken?

3   A.  Because we were wondering if we could pass that cost along

4   to KFC and which of our competitors had already converted plant

5   to NHA that may not have a position to push back about passing

6   that cost along to KFC, so they had already converted for a

7   different customer so they may or may not be able to pass that

8   cost along.

9   Q.  And how was that information, the ability or inability to

10  pass the cost along, helpful to you in preparing to bid and

11  negotiate with KFC at this point in time?

12  A.  If our other competitors weren't passing that cost along to

13  KFC, then it was going to make it more difficult for us to pass

14  that cost along.  So if they were going to just give NHA to KFC

15  and not include a charge, it was going to be -- make it more

16  difficult for Pilgrim's to charge for NHA.

17  Q.  Now, next to -- it's the third competitor down, Mar-Jac,

18  you have two words noted in there.  Can you tell us what those

19  two words are?

20  A.  New price.

21  Q.  Okay.  And what did new price mean with respect to Mar-Jac?

22  A.  That Roger had just gotten that.  They just finished it.

23  Q.  Now, at the bottom there are a series of words and then

24  there are a series of negative numbers.  Do you see that?

25  A.  Yes.

Robert Bryant - Direct

1    Q.  Can you tell us what the significance of those two columns

2    are?

3    A.  That's for the dark meat, and the dark-meat pricing was

4    cheaper than eight-piece, so you negotiated the eight-piece

5    price, and then the dark-meat price just for the drumstick and

6    the thigh was -- we called it back of.  So if you negotiated

7    your eight-piece at a dollar a pound and you sold your dark

8    meat at 25 back, that would mean 75 cents, so it would be minus

9    the 25 cents.

10   Q.  How was receiving the dark-meat information relevant at all

11   to you in the upcoming bid for KFC?

12   A.  Well, it gave us guidance on where ours needed to be.  And

13   it was significant because you had case weights and price which

14   gave you the actual dollar value of that individual product.

15   If you look at George's, for instance, they have -- they are

16   only .28 back, but their case weight is lower, so others are

17   .30 back, but their case weights are higher.

18   Q.  So was it your understanding that the KFC bid would also

19   include a bid for dark meat?

20   A.  It did, yes.

21   Q.  That was separate from the bid for eight-piece chicken on

22   the bone?

23   A.  That's correct.  It was part of the whole bid package.

24   Q.  Now, did you receive this information from Defendant Austin

25   before or after the first-round bids to KFC were due in 2017?

Robert Bryant - Direct

1    *A.*  Before.

2    *Q.*  How, if at all, did you use the information that Defendant

3    Austin gave you that you wrote down here in bidding for the KFC

4    business in 2017?

5    *A.*  I used it to develop a bid for KFC.

6    *Q.*  Did you find this information helpful?

7    *A.*  Yes.

8    *Q.*  How did you find it helpful?

9    *A.*  Developed a bid that placed us second in price.

10   *Q.*  Which was your goal?

11   *A.*  That was correct.

12   *Q.*  Now, you had said when you were on the phone with Defendant

13   Austin, he was bragging about the information, did he give any

14   other explanation or qualification or caveats or anything about

15   the information he was giving to you on that call?

16   *A.*  Not that I recall, no.

17        *MR. TORZILLI:*  We can take this exhibit down, please.

18   *BY MR. TORZILLI:*

19   *Q.*  So after you got off the phone with Defendant Austin, you

20   had your notes from your call with him, what did you do next?

21   *A.*  Developed a model.

22   *Q.*  What does that mean, develop a model?

23   *A.*  For most of the QSR customers we do what's called a cost

24   model which is -- or it's sometimes called a margin over feed

25   because it's a cost model that has the cost to produce the

Robert Bryant - Direct

1   product, and a big part of the cost is the feed input, and then

2   there was a margin, and we would call that below the line.  And

3   whenever they asked for a bid submission, that's basically what

4   they were asking for is your cost model.

5   Q.  Now, is a cost model something that in your experience is

6   typical in fast-food restaurant bids?

7   A.  It is, yeah.

8        MR. TORZILLI:  If we can call up, Ms. Pearce, for the

9   parties, the Court, and the witness Government's Exhibit 1890.

10  BY MR. TORZILLI:

11  Q.  And, Mr. Bryant, if you would like to look at the paper

12  copy of that, that's in tab 8.

13       Do you have it, sir?

14  A.  Yes.

15  Q.  Have you had a chance to look at it?

16  A.  Yeah.

17  Q.  Do you recognize it?

18  A.  I do.

19  Q.  What is Government's Exhibit 1890?

20  A.  It's the preliminary bid for KFC.  It's the one that I

21  prepared.

22  Q.  And is 18 -- what type of document is Government's Exhibit

23  1890?

24  A.  It begins with an e-mail attachment that I sent to

25  Mr. Stiller that contained an Excel file.

548

Robert Bryant - Direct

1        MR. TORZILLI:  Government moves to admit Government's

2    Exhibit 1890.

3        THE COURT:  Any objection to the admission of Exhibit

4    1890 other than previously objected to at some point?

5        1890 will be admitted.

6        MR. FELDBERG:  Your Honor, we need -- at least in the

7    copy we have, I think a redaction is required.  You can't see

8    the whole thing on the screen so -- yeah.

9        THE COURT:  Let's have a side bar.  I am not quite --

10        MR. FELDBERG:  I am sorry, bottom left, Your Honor.

11        THE COURT:  Oh, yes.  And the copy that you have,

12    Mr. Torzilli, is that what would be admitted?

13        MR. TORZILLI:  It will be admitted as it appears on

14    the screen at the moment.

15        THE COURT:  Yeah, Mr. Feldberg, if you need to

16    reposition to get a look at that, go right ahead.

17        MR. FELDBERG:  In that form, no objection.

18        THE COURT:  I understand.  Then 1890 as redacted will

19    be admitted.

20        MR. TORZILLI:  And, Your Honor, appreciate counsel

21    raising the issue.

22        Permission to publish 1890, Your Honor?

23        THE COURT:  You may.

24    BY MR. TORZILLI:

25    Q.  Sir, just if you could briefly walk us through what is in

Robert Bryant - Direct

549

1    Government's Exhibit 1890.

2    A.   It's the preliminary cost model for the first-round bid to

3    KFC in 2017.

4    Q.   This consists of how many e-mails?

5    A.   Two.

6    Q.   What's the first e-mail in the chain?

7    A.   It's from Tim Stiller to myself, February 3rd, 2017.

8    Q.   Was February 3rd the day the bid was due to KFC?

9    A.   I believe it was.

10   Q.   What did Mr. Stiller say to you?

11   A.   Call in about 30 minutes to discuss KFC that work?

12   Q.   What did that mean?

13   A.   He wants to talk about our bid before it's submitted.

14   Q.   Did you respond?

15   A.   I did.

16   Q.   What did you say?

17   A.   I responded and I believe I attached a cost model and said

18   ready.

19           MR. TORZILLI:   We can take this exhibit down.   Thank

20   you.

21   BY MR. TORZILLI:

22   Q.   If you can flip in your binder to the next page.

23           MR. TORZILLI:   If we can, Ms. Pearce, call up for the

24   parties, the witness, and the Court Government's Exhibit 1891.

25   BY MR. TORZILLI:

Robert Bryant - Direct

1  Q.  Do you recognize Government's Exhibit 1891?

2  A.  I do.

3  Q.  What is 1891?

4  A.  It's the preliminary bid for KFC in 2017.

5  Q.  Who prepared this preliminary bid to KFC?

6  A.  I did.

7  Q.  And you said preliminary.  What did you mean by

8  preliminary?

9  A.  It had not been submitted to KFC at this time.

10  Q.  And what is --

11       MR. TORZILLI:  First move to admit Government's

12  Exhibit 1891, Your Honor.

13       THE COURT:  Any objection to the admission of Exhibit

14  1891?

15       1891 will be admitted.

16       MR. TORZILLI:  Thank you, Your Honor.  And permission

17  to publish it.

18       THE COURT:  You may.

19       MR. TORZILLI:  Thank you.

20  BY MR. TORZILLI:

21  Q.  So, sir, could you just briefly walk us through the model

22  that's presently being displayed to the jury in 1891.

23  A.  It's the cost model.  So each line basically has some sort

24  of cost associated with it to bill the product for KFC until

25  you get to near the bottom, I think it's the fourth line from

Robert Bryant - Direct

1   the bottom that gives a total cost to KFC.  And then one column

2   is the current, and then the column that has 2018 cost would

3   be -- that would be our proposed new pricing for the bid.

4   Q.  So there is a column called Current Model?

5   A.  Correct.

6   Q.  And that represents what?

7   A.  The current contract that we were operating under or

8   current cost to KFC.

9   Q.  And there is a column called 2018 Cost?

10  A.  Correct.

11  Q.  And was that the preliminary bid that you personally had

12  drafted?

13  A.  That's correct.

14  Q.  And then there is a line called Variance.  What does

15  variance mean?

16  A.  That's the difference between the Current and the 2018

17  column.

18  Q.  Okay.  And what was the -- is there a bottom line kind

19  of -- what's -- is there a bottom-line bid that you had

20  prepared that appears in here?

21  A.  It's the line that says Total Cost.

22  Q.  So you had prepared a bid that would result in a bid of how

23  much?

24  A.  .9947 per pound.

25  Q.  For what product?

Robert Bryant - Direct

552

 1   *A.*  That would be for the eight-piece.

 2   *Q.*  Now, next to it in the Variance column, what number appears

 3   there?

 4   *A.*  .0336.

 5   *Q.*  Now, that's appearing here as -- is it appearing here as a

 6   positive number or a negative number?

 7   *A.*  Positive.

 8   *Q.*  Does that mean that your 2018 preliminary bid was going to

 9   be higher than your current price?

10   *A.*  No.  That means it's a good guy for KFC.

11   *Q.*  So price -- your bid was going to be lower?

12   *A.*  Correct.

13   *Q.*  By about 3-1/3 cents?

14   *A.*  Yes.

15   *Q.*  Now, we had looked at an e-mail that you had written that

16   said to get information to enable you to be, I think you said,

17   No. 2 in price?

18   *A.*  That's correct.

19   *Q.*  Did you prepare this bid to be No. 2 in price?

20   *A.*  That's correct.

21   *Q.*  Compared to what?

22   *A.*  Our competitors.

23   *Q.*  And where did you get the information to figure out how you

24   could be No. 2 in price and prepare the bid we are looking at

25   here?

Robert Bryant - Direct

1    A.  I used those handwritten notes from the information Roger

2    Austin gave me.

3         MR. TORZILLI:  Your Honor, at this time, permission to

4    publish 1891 side by side with Government's Exhibit 1919?

5         THE COURT:  You may.

6         MR. TORZILLI:  Thank you, Your Honor.

7    BY MR. TORZILLI:

8    Q.  So, Mr. Bryant, presently on the screen and in front of you

9    are the preliminary bid submission we are talking about and

10   your handwritten notes.  And can you walk the jury through how

11   you used your handwritten notes that contain the information

12   Defendant Austin gave you to prepare the bid we're looking at.

13   A.  Yeah, I used these notes and seen that Koch -- or I am

14   sorry, Koch was 1.0125, Claxton was 99.43, so I put us in

15   between Koch and Claxton at 99.47.

16   Q.  Now, did you understand the information in your handwritten

17   notes to be the bids that those competitors were likely to go

18   into KFC with in the first round?

19   A.  That's correct.

20   Q.  Why did you believe that or why did you have that

21   understanding?

22   A.  That was -- multiple reasons.  I mean, the conversations

23   with Roger Austin and that was the way the information was

24   presented to me and I presented to Tim Stiller.

25        MR. TORZILLI:  We can take these exhibits down,

Robert Bryant - Direct

1   please.

2   *BY MR. TORZILLI:*

3   *Q.*   Now, is what we just looked at, the 9947 number, where you

4   landed for your ultimate bid that you submitted to KFC?

5   *A.*   No.

6   *Q.*   Why not?

7   *A.*   I had calls with Tim Stiller and Roger Austin where we

8   reviewed that preliminary bid submission, and in the course of

9   those calls, I was asked to modify it.

10  *Q.*   In what way were you asked to modify the preliminary bid?

11  *A.*   I was asked to make it more middle of the pack.

12  *Q.*   What does make it more middle of the pack mean?

13  *A.*   I was reviewing the cost model with Tim Stiller and Roger

14  Austin, and while we were on that call reviewing the second

15  place price potential bid submission.  I remember Roger Austin

16  telling or counseling me that he felt that we needed to be more

17  middle of the pack, so as a result of that suggestion, I

18  ultimately changed the bid to be third highest in price.

19  *Q.*   You changed the bid?

20  *A.*   That's correct, yeah.

21  *Q.*   Do you have an understanding as to why Mr. Stiller wanted

22  Pilgrim's to be more middle of the pack?

23  *A.*   It wasn't Mr. Stiller; it was Mr. Austin.

24  *Q.*   I am sorry, Defendant Austin wanted to be more middle of

25  the pack?

Robert Bryant - Direct

1   *A.*  I don't remember the why other than I just remember him

2   saying, I think we need to be more middle of the pack.  I don't

3   remember asking if it was relationship or what, why he was

4   giving that guidance.  I just remember that he said he thought

5   we needed to be more middle of the pack, so we adjusted the

6   model down before we submitted to be third highest in price.

7        *MR. TORZILLI:*  If we could call up for the parties,

8   the witness, and the Court Government's Exhibit 1825.

9        Moment to confer?

10       *THE COURT:*  Yes, you may.

11       *MR. TORZILLI:*  Your Honor, permission to publish 1825.

12  I understand it's already in evidence.

13       *THE COURT:*  Yes, you may.

14       *MR. TORZILLI:*  Thank you.

15  *BY MR. TORZILLI:*

16  *Q.*  Mr. Bryant, on your screen is Government's Exhibit 1825.

17  Is this something you recognize?

18  *A.*  I don't know that I have seen this before or not.

19  *Q.*  What do you understand the e-mail header information to be?

20  *A.*  Our 2018 proposal.

21       *MR. TORZILLI:*  If we can take that down and permission

22  to publish Government's Exhibit 1826, which I believe is also

23  in evidence, Your Honor.

24       *THE COURT:*  You may.

25       *MR. TORZILLI:*  Thank you.

556

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  Do you recognize this, Mr. Bryant?

3   *A.*  Not that page, no.

4   *Q.*  How about the next page?

5   *A.*  Yeah.

6   *Q.*  What's this?

7   *A.*  That should be our final -- our first-round bid submission

8   to KFC.

9   *Q.*  And what was the bid amount that appears here?

10  *A.*  9849.

11  *Q.*  And do you know how that compares to the information in

12  your handwritten notes?

13  *A.*  I believe it should be third in price.

14          *MR. TORZILLI:*  If we can take 1826 down.  And

15  permission to publish Exhibit 1919.

16          *THE COURT:*  You may.

17          *MR. TORZILLI:*  Thank you, Your Honor.

18          And if we can zoom in on the bottom of page 2 of 1919.

19  *BY MR. TORZILLI:*

20  *Q.*  So can you walk us through how the bid we just looked at,

21  that 9849 number, stacks up compared to the bid information

22  that you had in Government's Exhibit 1919?

23  *A.*  It would place us ahead of Mar-Jac, but behind Claxton in

24  price.

25          *MR. TORZILLI:*  Thank you.  We can take that down.

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  And you said that Pilgrim's did, in fact, submit that bid

3   to KFC?

4   *A.*  That's correct.

5       *MR. TORZILLI:*  Your Honor, it is slightly before the

6   typical break, but this would be a good breaking point if Your

7   Honor wants to do that.

8       *THE COURT:*  We are pretty close.

9       Ladies and gentlemen, we will go ahead and break for

10  lunch.  Let's plan on reconvening same time, 1:30.  Keep the

11  admonitions in mind, ladies and gentlemen.  Try to keep your

12  yellow juror buttons visible if you are in the hallways, in the

13  courthouse or if you go outside the courthouse, and we will

14  reconvene at 1:30.  The jury is excused.

15      (Jury excused.)

16      *THE COURT:*  Any issues to take up?

17      *MR. HART:*  Nothing from the government, Your Honor.

18      *THE COURT:*  All right.  We will reconvene at 1:30.

19  Thank you.

20     (Recess at 12:00 o'clock p.m. until 1:30 p.m.)

21      *THE COURT:*  Are we ready for the jury?

22      *MR. HART:*  The government is ready, Your Honor.

23      *THE COURT:*  Ms. Buchanan, let's get the jury.  And we

24  will get Mr. Bryant too.

25      (Jury present.)

558

Robert Bryant - Direct

1        *THE COURT:*  Go ahead, Mr. Torzilli.

2        *MR. TORZILLI:*  Thank you, Your Honor.

3   *BY MR. TORZILLI:*

4   *Q.*  Good afternoon, Mr. Bryant.

5   *A.*  Good afternoon.

6   *Q.*  We before the lunch break were talking about that KFC bid

7   in 2017.  I think where we left off was Pilgrim's first-round

8   bid submission.  And what I would like to ask you first is

9   whether you had understood KFC to be conducting a

10  multiple-round bid in 2017.

11  *A.*  That's correct, yes.

12  *Q.*  Now, did Pilgrim's put its very best bid into its

13  first-round submission?

14  *A.*  We felt that was competitive, yes.

15  *Q.*  Was it typical for you to be putting your very, very best

16  bid into the first round of what you knew would be a

17  multiple-round bid process?

18  *A.*  Not normally, no.

19  *Q.*  Why was that not normally the case?

20  *A.*  Well, normally one of the questions in preparation for a

21  bid would be to ask whoever the salesperson was how many rounds

22  they expected there to be in a bid so you could build in some

23  additional money in the bid so you had something to offer the

24  negotiators in each round.  For instance, if they said there

25  was three rounds of bid, I may have added 3 cents so I could

559

Robert Bryant - Direct

1  give them a penny in each round.

2  Q.  So a cushion to be able to go around?

3  A.  Correct.

4  Q.  Now, Mr. Bryant, from your meeting with KFC regarding the

5  2017 bid, did you have an understanding as to how much KFC

6  wanted Pilgrim's to reduce its price?

7  A.  I didn't know the amount exactly.  I just knew that they

8  were expecting a price increase, and at the time, you know, we

9  offered them over 3 cents, which I felt was a substantial price

10  increase.

11  Q.  Do you mean a price decrease?

12  A.  Decrease, I am sorry, yes, decrease.

13  Q.  Was there a time when you understood KFC to want a 7-cent

14  price decrease?

15  A.  Yes.

16  Q.  How did you learn that?

17  A.  Feedback from our first-round bid submission from

18  Mr. Austin.

19  Q.  And how did you understand Defendant Austin to get that

20  feedback?

21  A.  From KFC.

22  Q.  Did Pilgrim's reduce its bid by the 7 cents KFC was looking

23  for?

24  A.  Ultimately, I think we did, yes.

25  Q.  Initially did you?

Robert Bryant - Direct

1    A.  No.

2    Q.  Why not?

3    A.  There was some pushback.  I remember my boss, Mr. Stiller,

4    was upset by the request and did not want to concede any more

5    in price.

6    Q.  Did you have discussions with any of your colleagues at

7    Pilgrim's regarding the feedback from KFC after Pilgrim's

8    submitted its first-round bid?

9    A.  I did.

10   Q.  Who did you have the discussions with?

11   A.  With Mr. Austin and Tim Stiller independently, as I recall.

12   Q.  So with each of them separately?

13   A.  Correct, yes.

14   Q.  What do you recall about those discussions?

15   A.  With Mr. Stiller, I remember having a phone call with him

16   about KFC's request, and he relayed to me that he had a

17   conversation with Mr. Austin the night before where he told

18   Mr. Austin to tell the industry we were going to hold or we

19   would not do business with KFC.  We would pull our supply from

20   KFC.

21   Q.  Okay.  So let's break that down a little bit.

22        First of all, I heard that word "industry" again.  Can

23   you remind us what that means?

24   A.  Generally our competition.

25   Q.  Okay.  So Mr. Stiller told you that Mr. Stiller had told

Robert Bryant - Direct

1   Defendant Austin to put it out to the industry we're going to

2   hold?

3   *A.*   That's correct, yes.

4   *Q.*   And what did the "we" mean there?

5   *A.*   Pilgrim's.

6   *Q.*   And what did you understand that direction to mean?

7   *A.*   To tell our competition that we were not going to concede

8   any more in price, similar to what happened in 2014.

9   *Q.*   Did you have an understanding of the purpose of providing

10  Pilgrim's competitors with the information that Pilgrim's was

11  going to hold?

12  *A.*   Yes.

13  *Q.*   What was the purpose of communicating that to Pilgrim's

14  competitors?

15  *A.*   To manipulate the outcome of the bid.

16  *Q.*   Of the KFC bid?

17  *A.*   That's correct.

18  *Q.*   And who would be involved in manipulating the outcome of

19  it?

20         *MR. FAGG:*   Objection, Your Honor.  Can we be heard on

21  side bar?

22         *THE COURT:*   Yes.

23     (At the bench:)

24         *THE COURT:*   Go ahead, Mr. Fagg.

25         *MR. FAGG:*   Your Honor, this testimony goes to the

Robert Bryant - Direct

562

1    issue that we filed a response to the government's court notice

2    about eliciting this testimony about manipulation from

3    Mr. Bryant.  We don't believe that this manipulation reference

4    Mr. Bryant used or is using in court, it's not something that

5    he had used previously either in his documentation or in his

6    prior testimony.  It would go against the ultimate issue of

7    this case, and that's a way for the government to try and get

8    around the Court's prior rulings regarding an agreement and the

9    ultimate issue, and we think it's improper, and we object.

10            THE COURT:  Mr. Torzilli?

11            MR. TORZILLI:  It's certainly not an ultimate issue.

12   I think the defendants have used the use of the term

13   "price-fixing" and "bid-rigging" which they used as recently as

14   yesterday in cross-examination with Ms. Fisher, words that go

15   to the ultimate issue.  I asked a question for him to

16   essentially tell us what's going on, and he provided an answer.

17            THE COURT:  Mr. Fagg, anything more?

18            MR. FAGG:  I also think there is a foundational issue

19   here in whether it's manipulation.  Mr. Bryant has been

20   interviewed 35 times and testified twice in two prior

21   proceedings, and as we mentioned in our motion or response to

22   the government's notice they filed, this is a late-breaking

23   interpretation by Mr. Bryant, and we think it's improper.

24            THE COURT:  Objection will be overruled.  Unlike

25   before when there was an indication at least that Mr. Bryant

563

Robert Bryant - Direct

1    was going to use -- I think the term was "bid-rigging" which is

2    a term that appears in the jury instructions and is more of an

3    ultimate issue phrase, I sustained an objection to that.  The

4    term "manipulation" is not that.  It doesn't appear in the jury

5    instructions.  You wouldn't expect a lay jury to equate that

6    term with a legal concept.  Lawyers, you know, may be

7    different.  You know, you hear manipulation used in connection

8    with, for instance, bid-rigging, but -- or stock manipulation,

9    but I don't think it would appear that way to a jury.

10          Of course, his -- in terms of my recollection,

11   probably his new use of this terminology could be fodder for

12   cross-examination, but I don't find that it is something that

13   would justify sustaining an objection to his use of that

14   particular term, so I will overrule the objection.

15          Thank you.

16          MR. TUBACH:  I am sorry.

17          THE COURT:  Mr. Tubach?

18          MR. TUBACH:  An entirely separate issue, Mr. Torzilli

19   has taken up Ms. Call's habit of repeating words that he likes

20   in the answer in the following question, and he seems to do

21   that with some regularity, and I would simply ask he ask the

22   next question rather than repeating the words he wants the jury

23   to rehear.

24          THE COURT:  Mr. Torzilli?

25          MR. TORZILLI:  Your Honor, I certainly, if that's

Robert Bryant - Direct

1    occurring, it's not intentional, but, of course, there are

2    certain words that come up in answers that I want to follow up

3    on and to cue the witness to the words I want to follow up on,

4    I need to use the words to the answer in order to pose the

5    follow-up question that's based on the previous answer.

6          THE COURT:  Some looping or cueing I think is okay,

7    but I would agree with Mr. Tubach that it does appear to be

8    regular, and, you know, there is a great deal of repetition, so

9    it probably would be appropriate to try to minimize that.

10   Otherwise, the question is just kind of repeating testimony.

11   All right?

12         MR. TORZILLI:  Absolutely, Your Honor.

13         THE COURT:  Thank you.

14         (In open court:)

15         THE COURT:  The objection will be overruled.

16         MR. TORZILLI:  Thank you very much, Your Honor.

17   BY MR. TORZILLI:

18   Q.  So, Mr. Bryant, the question for you is, who was involved

19   in manipulating the outcome, and we are talking about the 2017

20   KFC bid?

21         MR. BELLER:  Objection, foundation and vague, Your

22   Honor.

23         THE COURT:  Sustained.  If you could focus the

24   question a little bit.

25         MR. TORZILLI:  Sure.

565

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   Q.  Were you involved in the manipulation of the KFC bid in

3   2017?

4   A.  Yes.

5   Q.  What was your role in manipulating the KFC 2017 bid?

6   A.  Information received from Roger Austin, pricing

7   information; also those confidential conversations between

8   various competitors and KFC; and the second-round bid strategy

9   that was -- I was aware of that instruction given to Mr. Austin

10  to share that strategy with our various competitors.

11  Q.  Was anyone else from Pilgrim's involved?

12  A.  I know myself, Tim Stiller, Roger Austin were involved.  I

13  am not sure about anyone else.

14  Q.  Are you aware of anyone outside of Pilgrim's involved in

15  the manipulation of the KFC bid in 2017?

16  A.  As we looked at the e-mails before the bid, you know, the

17  sharing of that information between Roger and Claxton and Koch

18  as part of that and the pricing that I received from Roger

19  Austin from the various competitors prior to the bid

20  submission.

21  Q.  Who from Koch?

22  A.  My assumption is -- I did not ask Mr. Austin.

23          *MR. TUBACH:*  Objection.

24          *THE COURT:*  Sustained.

25  A.  Who he spoke to exactly --

Robert Bryant - Direct

1      MR. TUBACH:  There is no question pending.

2      THE COURT:  Yeah, I sustained the objection.  You can

3  ask a new question.

4  BY MR. TORZILLI:

5  Q.  Who from Claxton was involved to the extent you know?

6  A.  It would have been --

7      MR. BELLER:  I am going to object again as to

8  foundation.

9      THE COURT:  Sustained.  If you could lay foundation.

10 BY MR. TORZILLI:

11 Q.  Do you have an understanding of who from Claxton was

12 involved in the manipulation of the KFC bid in 2017?

13 A.  Yes.

14 Q.  What's the basis of your understanding?

15 A.  Prior conversations with Roger Austin and overhearing the

16 conversations between Roger Austin and an employee at Claxton.

17 Q.  And based on that understanding, who at Claxton was

18 involved in the manipulation of the KFC bid in 2017?

19     MR. LAVINE:  I would like to be heard on side bar,

20 please.

21    (At the bench:)

22     THE COURT:  Go ahead, Mr. Lavine.

23     MR. LAVINE:  Yes, Your Honor.  This witness is

24 testifying as to what happened in 2017 right now, and he is

25 trying to use a conversation that he overheard three to four

567

Robert Bryant - Direct

1    years before as an indication of who was involved in 2017, and

2    I think that is entirely too remote, and there is no foundation

3    for this answer.

4           THE COURT:  Response, Mr. Torzilli?

5           MR. TORZILLI:  My response is that although it was

6    three years prior, let's not lose sight of the fact that this

7    was the very next KFC bid, so at the time of the overheard

8    conversations in August of 2014, Defendant Scott Brady and

9    Mr. Kantola, who are on the other end of those conspirator

10   calls with Mr. Austin, were the lead negotiators for Claxton --

11   or the lead negotiators for Claxton and Koch, and they were the

12   lead negotiators for Claxton and Koch at the very next bid

13   which was occurring in the winter of 2017.

14          THE COURT:  Mr. Lavine, anything more?

15          MR. LAVINE:  Your Honor, I don't think that in any way

16   connects it as far as the remoteness of the three to four years

17   between two actions.  There is nothing to indicate that that

18   conversation had anything to do with or that that indicated

19   Mr. Brady's involvement in 2017.

20          THE COURT:  I am going to overrule the objection.

21   First of all, this is his understanding.  Even if it's based on

22   something three years ago, it nonetheless I think is

23   appropriate for him to be able to describe his understanding.

24   It could be challenged on cross-examination.  But even if there

25   was an issue that remoteness could be the proper basis for an

Robert Bryant - Direct

1    objection, I don't find that three years prior is so remote

2    that it would preclude him from testifying about his

3    understanding, so I will overrule the objection.

4              (In open court:)

5              THE COURT:  The objection will be overruled.

6    BY MR. TORZILLI:

7    Q.  So, Mr. Bryant, the question for you, then, is based on

8    that understanding which you were just providing in your

9    previous answer, who at Claxton was involved in the

10   manipulation of the KFC bid in 2017?

11   A.  Scott Brady.

12   Q.  Defendant Scott Brady?

13   A.  Correct.

14   Q.  Okay.  And now, do you have an understanding of who at Koch

15   was involved in the manipulation of the KFC bid in 2017, just a

16   yes-or-no question.

17   A.  Yes.

18   Q.  What's the basis of that understanding?

19   A.  The conversations with Roger Austin and the phone calls I

20   overheard in 2014 among -- and the e-mail that I had received

21   in 2017 about the meetings between KFC and Koch.

22   Q.  That's the meeting where Defendant Austin wrote, I'll get

23   the blow by blow?

24   A.  Correct.

25   Q.  Based on that understanding you just provided, who at Koch

Robert Bryant - Direct

1    was involved in the manipulation of the bid in 2017?

2    A.  Bill Kantola.

3    Q.  Now, you were talking about the phone call that you had

4    with Mr. Stiller where Mr. Stiller was reporting to you that he

5    instructed Defendant Austin to put this out -- tell the

6    industry we're going to hold.

7    A.  That's correct.

8    Q.  And he said something about a customer?

9    A.  That's correct.

10   Q.  Can you explain what you understood him to mean when he was

11   talking about a customer?

12   A.  KFC.

13   Q.  Okay.  And what did he say about KFC?

14   A.  That we were going -- we were going to hold.  He told -- he

15   said that he instructed Roger Austin to tell the industry we

16   were going to hold, and if they continued to press for further

17   price increases, that we were going to find a new hundred

18   million pound customer, because at the time that's the amount

19   of business that we had with KFC.

20   Q.  Did you have an understanding as to what he meant by find

21   another hundred million pound customer?

22   A.  That we would pull our supply from KFC and force them to

23   source the supply from the remaining competitors.

24   Q.  And did you have an understanding of what purpose that

25   would serve in the ongoing bidding and negotiation with KFC?

Robert Bryant - Direct

1    *A.*   That would serve to help manipulate the bid in that telling

2    our competitors, industry, that we were going to hold would

3    give them support, and if KFC continued and we pulled our

4    supply from them, it would give them more grounds to hold or

5    actually could actually cause the negotiations to shift into a

6    price increase.

7    *Q.*   How so?  How would they shift?

8    *A.*   It could.  It didn't go that direction, but a decreased

9    supply --

10          *MR. FAGG:*   Objection, speculation.

11          *THE COURT:*   Overruled.

12   *A.*   A decreased supply --

13          *MR. TORZILLI:*   I am sorry, I didn't hear you, Your

14   Honor.

15          *THE COURT:*   Overruled.

16   *BY MR. TORZILLI:*

17   *Q.*   Please continue your answer, Mr. Bryant.

18   *A.*   The supply and demand, the same scenario we presented in

19   2014.  If we decreased the KFC's access to the birds that

20   Pilgrim's had to offer, then there would be fewer birds

21   available, so they should command more money.

22   *Q.*   Now, Mr. Bryant, did Pilgrim's ultimately enter into a

23   contract with KFC?

24   *A.*   We did.

25   *Q.*   What -- just generally speaking, what prices were

Robert Bryant - Direct

1   ultimately landed on, what direction?

2   A.   I believe we eventually did concede to the 7 cents.   I

3   don't remember exactly.

4   Q.   And do you have an understanding of how long the contract

5   that was agreed to was in effect?

6   A.   It was going to be another three-year contract.

7   Q.   So for what years?

8   A.   2018, 2019, and 2020.

9   Q.   And the contract was going to end on what date?

10  A.   It should have been at the end of 2020, calendar year 2020.

11  Q.   So, like, December 31st, 2020?

12  A.   Yeah, whatever KFC's calendar year ended there, but it's

13  around the end of the calendar year.

14  Q.   Did Pilgrim's, in fact, sell chicken to KFC under that

15  contract?

16  A.   We did.

17  Q.   Do you recall approximately how long the negotiations and

18  the bidding went on in 2017 for that contract?

19  A.   I recall they were stretched out for a few months.

20  Q.   Okay.   Now, the specific events that we've been talking

21  about now have occurred in what approximate month time frame?

22  A.   January, February.

23  Q.   Did the coordination between Pilgrim's and its competitors

24  continue throughout those months of negotiations to your

25  knowledge?

Robert Bryant - Direct

1          MR. BELLER:  Objection, foundation.

2          THE COURT:  Overruled.  He said "to your knowledge."

3     A.  After the phone call with Mr. Stiller, I don't recall

4     receiving any additional information after that.

5     BY MR. TORZILLI:

6     Q.  Do you have an understanding as to why?

7     A.  Yes.

8     Q.  What's your understanding based on?

9     A.  My personal experience there.  I don't know how much I can

10    talk about that piece.

11    Q.  Let me ask you another question.  Was there scrutiny --

12    A.  Yes.

13    Q.  -- that was brought to bear on the conduct of you and

14    others?

15         MR. BELLER:  Your Honor, I am going to object.  We

16    need to go to side bar.

17        (At the bench:)

18         THE COURT:  Go ahead, Mr. Beller.

19         MR. BELLER:  Thank you, Your Honor.

20         I am going to object to this line of questioning.  I

21    do believe that we are going into an area that has been ruled

22    inadmissible in the past and specifically the civil litigation

23    and the fact that there was an increased interest in Pilgrim's

24    and their activity and their conduct.  This particular witness

25    has already offered without any type of soliciting, I don't

573

Robert Bryant - Direct

1    know how much I can get into this as opposed to simply

2    answering Mr. Torzilli's question with a yes-or-no question,

3    which is exactly what he was asked.  This, of course, is the

4    danger in allowing a witness to be able to testify in the

5    narrative, which this witness has done throughout the day and

6    has offered many narrative answers.  So I am objecting to

7    further questioning along these grounds.  I do believe that it

8    is unduly prejudicial.

9         THE COURT:  All right.  Mr. Torzilli?

10        MR. TORZILLI:  Thank you, Your Honor.

11        What I propose to do is to potentially ask him a

12   question in a leading fashion that would enable him to say yes

13   to the answer he provided in the previous hearing, which the

14   transcript reflects that answer at I think it's page 2153 where

15   he said there was some outside interest in the communications

16   between the competitors, so it's my understanding that it

17   stopped.

18        So I could form a leading question that would embody

19   that prior answer, and he could just agree to it, and I can

20   move on.

21        THE COURT:  What was the answer that you would

22   anticipate -- yeah, the answer to the question again?  What did

23   you say, Mr. Torzilli, outside interests from --

24        MR. TORZILLI:  I can repeat it, and I will say it

25   slowly.  And just for the record, this is from certified

Robert Bryant - Direct

1    transcript page 2153.

2              THE COURT:  Of the second trial?

3              MR. TORZILLI:  Yes.  So his answer was to essentially

4    the same question that's the pending question.  He said, There

5    was some outside interest in the communications between the

6    competitors, so it's my understanding that it stopped.

7              MR. TUBACH:  This is Michael Tubach.  There is no way

8    we can cross-examine him on that without getting the issue of

9    the civil litigation and the fact he said in a prior hearing

10   that no one took it seriously.

11             THE COURT:  And when did he learn, Mr. Torzilli, I

12   mean, was that -- I can't remember now.  I know that there was,

13   like, a subpoena at some point, but is he talking about, you

14   know, an understanding that he has derived from later events as

15   opposed to some contemporaneous understanding of why

16   Mr. Stiller didn't get back to him about anything else?

17             MR. TORZILLI:  This is contemporaneous, and that's why

18   Your Honor permitted this question in the previous trial

19   overruling the objection that Mr. Tubach is in effect seeking

20   reconsideration of with his last comment, so that's why Your

21   Honor allowed this question is because this was

22   contemporaneous.  And if Your Honor will recall, there is a

23   text message, we haven't gotten to it but we will hopefully get

24   to it momentarily, where at this approximate time a couple

25   months later Mr. Stiller's boss tells in a text message to this

Robert Bryant - Direct

1   witness, No comp names in e-mails, so no competitor names in

2   e-mails.  So he is well aware at this point in time that there

3   is scrutiny.  That means that they need to be more furtive

4   about the conspiracy's activities.

5          So this would juxtapose with some of the other events

6   that occurred that Mr. Bryant knew about that were more, as

7   Your Honor observed, after the fact that Your Honor has

8   disallowed because they were indeed after the fact, but this is

9   a situation where it was contemporaneous, and that's why this

10  testimony has been allowed previously.

11         THE COURT:  Mr. Tubach, anything more from you?

12         MR. TUBACH:  The only thing I would say, we think it's

13  very prejudicial for him to be able to get that out and for us

14  to effectively have the ability to cross-examine him on why he

15  is saying what he is saying without getting into areas the

16  Court has ruled are off limits.

17         THE COURT:  Mr. Fagg?

18         MR. FAGG:  In the first trial, the Court ruled that

19  because of 403 that Mr. Bryant was not going to be allowed to

20  testify to anything that was hinting at the civil litigation,

21  and I believe that Mr. Torzilli already has the testimony in

22  this trial that he needs, and he just asked Mr. Bryant if there

23  was something else that was going on and, in fact, Mr. Torzilli

24  led him a bit and said, Was there scrutiny, and he said, Yes.

25  And I don't think that there is any additional communication --

Robert Bryant - Direct

1    any additional questions are necessary that wouldn't raise

2    these significant 403 issues that we --

3         MR. BELLER:   It's already been articulated by my

4    colleagues, thank you.

5         THE COURT:   Mr. Torzilli?

6         MR. TORZILLI:   As I said, Your Honor, you are

7    essentially facing what is a motion for reconsideration.   These

8    have been argued before.   The testimony has been elicited

9    before.   As I said, I would go one step further to deal with

10   any issues, and I know the Court was concerned in the last

11   trial in overruling these very same objections that -- and I

12   think Your Honor said as long as the witness is not going to

13   spontaneously launch into some prohibited testimony in

14   overruling the objection, so I am more than happy to lead the

15   witness to elicit, like I said, the same testimony that he

16   provided and that the Court permitted previously.

17        THE COURT:   Okay.   Well, we started off with

18   Mr. Beller talking about how and this witness was -- he was

19   blurting things out, and there was things that he was

20   mentioning without a logical response -- or there being made

21   outside the logical response to a question.   So, Mr. Torzilli,

22   I will -- I will overrule the objections about him getting into

23   a topic that can't be cross-examined, but you will need to lead

24   him so that we don't get any more statements about scrutiny or

25   things of that nature.

Robert Bryant - Direct

1        MR. TORZILLI:  Thank you, Your Honor.  Just for a

2   point of clarification, then, would it be permissible for me to

3   ask the one question in the form of a leading question to

4   basically have him agree to the testimony that he testified to

5   in the prior occasion, prior hearing, prior trial, and then

6   move on to a different topic?

7        THE COURT:  Well, I will hear from Mr. Beller on that.

8   It's kind of a highly canned-type question.

9        MR. TUBACH:  He has already given the testimony that

10  the government needs to show that there is some outside

11  interest or scrutiny.  I don't think there is anything.  As

12  Mr. Fagg pointed out, we are now just repeating and

13  highlighting this area, especially after this long side bar,

14  and it's going to give this canned answer to an obviously

15  canned question, and the jury will think it must have been the

16  DOJ investigation, which everybody in the room knows, except

17  for the jury, knows is not the case.

18       THE COURT:  In fact, the scrutiny thing may be even

19  worse, but I don't know.

20        Mr. Torzilli, anything else?

21       MR. TORZILLI:  Nothing further, thank you.

22       THE COURT:  I am not going to allow the canned

23  question, just him recounting back the testimony, although that

24  is the most leading way you can do it, but you need to focus on

25  something very specific so that he especially doesn't think he

Robert Bryant - Direct

1    is going to talk about the civil litigation.

2             *MR. TORZILLI:*  Very well, thank you, Your Honor.

3             (In open court:)

4             *MR. TORZILLI:*  Thank you, Your Honor.

5    *BY MR. TORZILLI:*

6    *Q.*  So, Mr. Bryant, was there outside interest in the

7    communications between competitors?

8    *A.*  There was.

9    *Q.*  And is that your understanding of why they stopped?

10   *A.*  That's my understanding, yes.

11   *Q.*  Now, you mentioned earlier today your agreement not to be

12   prosecuted.  Do you recall that?

13   *A.*  Yes.

14   *Q.*  Did there come a time when your boss, Mr. Stiller,

15   referenced that agreement in a conversation with you?

16   *A.*  Yes.

17   *Q.*  Did he tell you something about owning the contract?

18   *A.*  Yes.

19   *Q.*  What did he say?

20   *A.*  He came to my desk and showed me --

21            *MR. TUBACH:*  I am sorry, we are going to need to go on

22   side bar again.  I am very sorry about this.

23        (At the bench:)

24            *THE COURT:*  Mr. Tubach, go ahead.

25            *MR. TUBACH:*  I am worried this witness is going to say

Robert Bryant - Direct

1    that he reviewed an indictment by Claxton -- against Claxton in

2    which there is a reference to putting it out to the industry.

3    That's the first public mention of any document and that he

4    owned the 2017 contract and that's why Stiller said to him,

5    said to the witness, Oh, you can own it because it was your

6    responsibility.  A reference to another indictment would be

7    very prejudicial.

8         THE COURT:  Mr. Fagg?

9         MR. FAGG:  If I can just add on this, in the first

10   trial on November 1st, the transcript 779, rows 9 to 21, this

11   exact line of questioning came up, and the Court excluded

12   testimony about this for the reasons that Mr. Tubach just

13   articulated and said this really would be an attempt to get in

14   testimony that's already been excluded in a motion for

15   reconsideration.

16        THE COURT:  Mr. Torzilli.

17        MR. TORZILLI:  Your Honor, what we have is the most

18   recent trial.  We have testimony along the lines of precisely

19   what we're eliciting here, that there came a time when one of

20   Mr. Bryant's colleagues referenced the non-prosecution

21   agreement in a conversation with him and then about owning the

22   contract.  And what contract did he refer to?

23        Answer:  The 2017 KFC contract.

24        And then further questions about it after an extended

25   side bar where many of these same objections were overruled.

Robert Bryant - Direct

1          THE COURT:  Right, but did the Stiller conversation,

2     did that also involve Mr. Stiller showing Mr. Bryant an

3     indictment?

4          MR. TORZILLI:  The answer to your question is yes.

5          THE COURT:  Okay.  And what do you anticipate that

6     Mr. Bryant is going to say?

7          MR. TORZILLI:  I think he will give the same or

8     similar answers to questions such as, Mr. Bryant, I believe you

9     said the conversation about owning the contract, that related

10    to a particular one?

11          Answer:  That's correct.

12          Which contract was that?

13          Answer:  The 2017 KFC contract.

14          So the ones we have been talking about?

15          That's correct.

16          What did you believe Mr. Stiller meant when he told

17    you you owned that contract?

18          That question was sustained by the Court.

19          THE COURT:  Okay.  Mr. Tubach?

20          MR. TUBACH:  The problem is what he just started to

21    answer was he came to my desk and showed me.  Obviously they

22    know exactly what this is about, and they are trying to elicit

23    testimony about another indictment.  I don't know -- I don't

24    know how that isn't totally inappropriate.

25          THE COURT:  Mr. Torzilli?

Robert Bryant - Direct

1          *MR. TORZILLI:*  We are talking about posing the same or

2     similar questions to what was admitted previously in a

3     proceeding and the same or similar testimony, so this is a

4     motion for reconsideration without any articulation of any

5     basis for a reconsideration to be taken on and granted.

6          *THE COURT:*  Well, I disagree with that.  There is a

7     real danger now that Mr. Bryant having been asked a question

8     about something that he was shown will feel that he should or

9     can answer about that which apparently is an indictment, so,

10    Mr. Torzilli, you can ask a much more directed question, but it

11    has to be in a way that you believe will not cause him to talk

12    about that indictment because that's a problem.

13         *MR. TORZILLI:*  Your Honor, then I can ask him about

14    Mr. Stiller telling him that he owns the KFC contract?

15         *THE COURT:*  Yes, those objections will be overruled.

16         *MR. TORZILLI:*  Thank you, Your Honor.

17         *THE COURT:*  Thank you.

18         (In open court:)

19         *THE COURT:*  Mr. Tubach, do you think that your

20    transceiver, maybe it's a battery problem?

21         *MR. TUBACH:*  I just plugged it in again, Your Honor.

22    It stopped.

23         *THE COURT:*  Does it seem to be working now?  Does it

24    seem to have power?

25         *MR. TUBACH:*  Mr. Beller gave me his.

Robert Bryant - Direct

1          THE COURT:  But I was just saying for the future just

2    in case --

3          MR. TUBACH:  It does seem to have power now, and I

4    have got it plugged in.

5          THE COURT:  Ms. Buchanan has an extra one just in

6    case.

7          MR. TORZILLI:  Your Honor, while we are on the subject

8    of potentially upgrading equipment, if we could see about

9    potentially a new headset?  This one is not functioning I think

10   as well as it should be.

11         THE COURT:  Okay.  Let's swap one out, then.

12         Go ahead, Mr. Torzilli.

13         MR. TORZILLI:  Thank you, Your Honor.

14   BY MR. TORZILLI:

15   Q.  So, Mr. Bryant, we were talking about your conversation

16   with Mr. Stiller?

17   A.  Yes.

18   Q.  And he said to you something about owning a contract?

19   A.  That's correct.

20   Q.  What contract did you understand him to be referring to?

21   A.  Well, he told me which contract.  He told me that I needed

22   to own the 2017 KFC contract.

23   Q.  Is that the contract that we've been discussing this

24   afternoon and this morning?

25   A.  Yes.

583

Robert Bryant - Direct

1  *Q.*  We talked about information that you personally received

2  from Defendant Roger Austin that was obtained from competitors.

3  My question to you is whether you ever used that information to

4  undercut a competitor.

5  *A.*  No.

6  *Q.*  Are you aware of anyone else at Pilgrim's using what

7  Defendant Austin received from competitors to undercut one of

8  Pilgrim's competitors?

9  *A.*  No.

10  *Q.*  I would like to now move on to a few months later in 2017,

11  but before I do, let me just ask you, why not?

12  *A.*  You would only do that once and then the competitor would

13  stop sharing that information with you if you used it against

14  them to take their business.  And if that competitor shared

15  that information and lost a significant amount of business and

16  that was discovered, then they would have more than likely

17  lost their position.

18        *MR. TUBACH:*  Objection, speculation.

19        *THE COURT:*  Overruled.

20  *BY MR. TORZILLI:*

21  *Q.*  You can complete your answer.

22  *A.*  They would have more than likely lost their job for sharing

23  information and losing the business and --

24        *MR. TUBACH:*  Now we are really into speculative

25  territory, and I object.

584

Robert Bryant - Direct

1        *THE COURT:*  Overruled.

2   A.  So if you used the information to undercut your competitor,

    then your competitor would stop cooperating with you.

3

4   *BY MR. TORZILLI:*

5   Q.  I would like to move on to a few months later in the year

6   2017.  Did there come a time when you participated in a plan to

7   raise prices with one of your competitors for boneless breast

8   products?

9   A.  Yes.

10  Q.  What customer is that?

11  A.  US Foods.

12  Q.  Now, what is US Foods?

13  A.  They are a broad-line distributor.

14  Q.  And remind us what a broad-line distributor means.

15  A.  They buy a lot of different products, beef, pork, chicken,

16  and paper goods, pretty much everything a restaurant could

17  order.

18  Q.  Could you give us another example or two of other

19  broad-line distributors that you have done business with over

20  the years?

21  A.  Sysco, Gordon, Reinhart, PFG.

22  Q.  Now, as you're participating in this plan, what is your

23  position within Pilgrim's?

24  A.  Director of sales.

25  Q.  And are you still reporting to Mr. Stiller?

Robert Bryant - Direct

1    *A.*   I am.

2    *Q.*   Was Pilgrim's seeking a price increase from US Foods on

3    boneless breast at the time?

4    *A.*   We were.

5    *Q.*   Why?

6    *A.*   We felt that the boneless was underpriced because of the

7    demand and the whole host of reasons, but we felt like it

8    warranted a price increase.

9    *Q.*   Did you have any discussions with your supervisor,

10   Mr. Stiller, about increasing the price of boneless breast

11   products being sold to US Foods?

12   *A.*   We had a discussion about it.  I don't remember who

13   initiated the conversation, if it was him or me, but we had a

14   strategy session about it or a phone call or multiple calls

15   about it.

16   *Q.*   Could you tell us what was said on that call or calls to

17   discuss strategy for a price increase on boneless breast to US

18   Foods?

19   *A.*   We both agreed that we needed to seek a price increase.

20   However, we were concerned that if we went after a price

21   increase, that US Foods wouldn't just accept the price increase

22   and they may, probably would, go to what we perceived as our

23   largest competitor for that market to offer our business rather

24   than just to accept the price increase, so there was some risk

25   to it.

586

Robert Bryant - Direct

1    Q.  Who was Pilgrim's largest competitor in sales to US Foods

2    for boneless breasts?

3    A.  At that time, what we perceived it to be was Mar-Jac.

4    Q.  Who were you concerned you would lose business to?

5    A.  Mar-Jac.

6    Q.  So what, if anything, did you do to deal with that concern?

7    A.  During that conversation when we were strategizing, I

8    believe it was me that said, Well, I think Tucker used to work

9    over there and may have a contact there.  Mr. Stiller said --

10   asked me to reach out to Scott Tucker and see if his contact

11   would be willing to increase prices along with Pilgrim's.

12   Q.  Now, you mentioned Tucker and then you said Scott Tucker.

13   Can you tell us who he is and what his role was within the

14   company at this time?

15   A.  Scott Tucker was another national account salesperson, and

16   he worked for Roger Austin at the time.

17   Q.  He -- correct me if I'm wrong, but he is the person that

18   you took off the e-mail chain that we looked at this morning?

19   A.  That's correct.

20   Q.  And did you, in fact, reach out to Mr. Tucker after your

21   discussions with Mr. Stiller?

22   A.  I did.

23   Q.  And what did you say to Mr. Tucker?  Well, did you make

24   contact with Mr. Tucker?

25   A.  I did.

Robert Bryant - Direct

1   Q.  When you made contact with him, what did you tell him?

2   A.  I told him that we wanted to seek price increases.  We were

3   concerned about Mar-Jac, and I asked him if he knew someone

4   over there that he could reach out to.

5   Q.  And what did he say in response to your inquiry?

6   A.  He said that he did know somebody at Mar-Jac that he used

7   to work with, and he would call him and feel him out.

8   Q.  Did you have a subsequent conversation with Mr. Tucker on

9   this topic?

10  A.  I did.

11  Q.  Approximately when did that occur compared to your initial

12  conversation with him?

13  A.  I don't recall how much time passed, but probably a week or

14  two.

15  Q.  What did he tell you?

16  A.  He told me that -- and I don't recall the name for sure

17  that he talked to at Mar-Jac, said that they were interested in

18  raising prices with us.  However, they wanted to give it a

19  couple weeks to submit so it didn't look like we were working

20  together basically.  They didn't want to submit at the same

21  time.  They wanted to give it a couple weeks.

22  Q.  Mar-Jac didn't want to submit at the same time?

23  A.  That's correct.

24  Q.  Why?

25  A.  Because they wanted to have the appearance to the customer

Robert Bryant - Direct                    588

 1   that we weren't talking.

 2   Q.   The customer being US Foods?

 3   A.   That's correct, yes.

 4   Q.   Now, did Pilgrim's actually submit the price increase that

 5   it was contemplating?

 6   A.   Yes.

 7   Q.   Do you have an understanding of whether Mar-Jac did as

 8   well?

 9   A.   Yes.

10   Q.   What's the basis for your understanding?

11   A.   Feedback from Scott Tucker that they, in fact, did submit

12   price increases.

13   Q.   And did you later hear back from the customer?

14   A.   I did.

15        MR. TORZILLI:  If we could call up for the Court, the

16   witness, and the parties Government's Exhibit 9140.

17   BY MR. TORZILLI:

18   Q.   And, Mr. Bryant, if you would like a paper copy of

19   Government's Exhibit 9140, it's behind tab 13 in your binder.

20   Have you had a chance to review Government Exhibit 9140?

21   A.   I have.

22   Q.   Do you recognize it?

23   A.   I do.

24   Q.   What is it?

25   A.   It's an e-mail from myself to Tim Stiller April 18, 2017.

Robert Bryant - Direct

1   Q.  Does it relate to the sale -- at least in part to the sale

2   of boneless breast to US Foods in the time frame that we've

3   been talking about for the last few minutes?

4   A.  It does.

5          MR. TORZILLI:  Your Honor, at this time, the

6   government moves to admit 9140 into evidence, please.

7          THE COURT:  Any objection to the admission of

8   Exhibit 9140?

9          Exhibit 9140 will be admitted.

10         MR. TORZILLI:  Thank you, Your Honor.  And permission

11  to publish to the jury 9140.

12         THE COURT:  You may.

13  BY MR. TORZILLI:

14  Q.  Mr. Bryant, what customer or customers does this set of

15  e-mails we are looking at relate to?

16  A.  Both Sysco and US Food Service.

17  Q.  Now, what customer name is in the subject line of the

18  e-mails that are in 9140?

19  A.  Sysco.

20  Q.  How, then, do you know that it also relates to US Foods?

21  A.  Because of the contents that I wrote.

22  Q.  Did it -- did the e-mails we are looking at here in 9140

23  have anything to do with the conversations we were talking

24  about before we started looking at this e-mail?

25  A.  Yes.

Robert Bryant - Direct

1    *Q.* If we could focus in on --

2            *MR. TORZILLI:* And, Ms. Pearce, if you could zoom in

3    on the very top e-mail in 9140.

4    *BY MR. TORZILLI:*

5    *Q.* Who wrote this?

6    *A.* I did.

7    *Q.* Who did you send it to?

8    *A.* Tim Stiller.

9    *Q.* What did you say to Mr. Stiller?

10   *A.* Yes, and Janine, and I've got feedback from Mar-Jac.

11   *Q.* When did you write this e-mail to Mr. Stiller?

12   *A.* April 18, 2017.

13   *Q.* At what time?

14   *A.* 1:15 p.m.

15   *Q.* And you mentioned in here Mar-Jac.  Who is Mar-Jac?

16   *A.* That's the competitor that we were looking to increase

17   prices with to US Food Service.

18   *Q.* What are you meaning to communicate to Mr. Stiller in this

19   e-mail that you wrote to him April 18 at 1:15 p.m.?

20   *A.* That I had gotten feedback from Scott Tucker with a

21   response from Mar-Jac or some feedback, some information from

22   him that I wanted to share with Tim Stiller.

23   *Q.* So you personally did not get the feedback directly from

24   Mar-Jac.

25   *A.* That's correct.

Robert Bryant - Direct

1    Q.  You got it through whom?

2    A.  Scott Tucker.

3    Q.  Mr. Tucker?  Did you, Mr. Bryant, write another e-mail this

4    afternoon -- on this same afternoon on this same topic?

5    A.  I did.

6          MR. TORZILLI:  If we could take this exhibit down,

7    please.  And if we can show to the parties, the witness, and

8    the Court Government's Exhibit 9139.

9    BY MR. TORZILLI:

10   Q.  Which, Mr. Bryant, if you would like to refer to a paper

11   copy is tab 12 in the binder in front of you.  Sir, have you

12   had a chance to review Government's Exhibit 9139?

13   A.  Yes.

14   Q.  Do you recognize it?

15   A.  I do.

16   Q.  What is it?

17   A.  It's an e-mail from myself to Tim Stiller on April 18,

18   2017.

19   Q.  Does it relate to the same topic that we're talking about?

20   A.  Yes.

21   Q.  And who wrote the e-mail that appears at the top of 9139?

22   A.  I did.

23          MR. TORZILLI:  Your Honor, government moves to admit

24   Exhibit 9139 at this time.

25          THE COURT:  Any objection to the admission of

Robert Bryant - Direct

1    Exhibit 9139?

2           *MR. BELLER:*  I have no objection to the admission of

3    the exhibit.  I do have an objection to the witness

4    interpreting or otherwise reading the exhibit under 701

5    helpfulness.

6           *THE COURT:*  I think that that objection is probably

7    premature, we'll see, but I will admit 9139.  And you may

8    publish it if you wish, Mr. Torzilli.

9           *MR. TORZILLI:*  Thank you, Your Honor.

10   *BY MR. TORZILLI:*

11   *Q.*  So, Mr. Bryant, what customer or customers does this set of

12   e-mails relate to?

13   *A.*  Sysco and US Food Service.

14   *Q.*  And when did you write this e-mail that we're looking at?

15   *A.*  April 18, 2017.

16   *Q.*  At what time?

17   *A.*  1:15.

18   *Q.*  And what was the date and time of the e-mail that we were

19   just looking at in the previous exhibit?

20   *A.*  April 18, 2017.  It was also 1:15 p.m.

21   *Q.*  So less than a minute apart?

22   *A.*  Yeah.

23   *Q.*  What did you write in this e-mail at the top of

24   Government's Exhibit 9139?

25   *A.*  They told Mar-Jac the same thing on boneless.

Robert Bryant - Direct

1    Q.  Who did you tell that to?

2    A.  Tim Stiller.

3    Q.  And what did you mean when you wrote that to your boss?

4         MR. BELLER:  Your Honor, I believe my objection is now

5    ripe.  Thank you.

6         THE COURT:  Yes.  And I will overrule that objection.

7    A.  Sorry, can you ask that again?

8    BY MR. TORZILLI:

9    Q.  Sure.  What did you mean when you wrote the e-mail to

10   Mr. Stiller that we are looking at here in 9139 when you say,

11   They told Mar-Jac the same thing on boneless?

12   A.  I was conveying to him -- we had received feedback from our

13   price increases from US Food Service, and I was conveying to

14   him that they told Mar-Jac -- they gave Mar-Jac the same

15   feedback that they gave us on their price increase.

16   Q.  Now, first of all, let's get the pronouns down again.

17   There is a pronoun "they" right at the beginning of the

18   sentence.  Who were you referring to when you said "they"?

19   A.  US Food Service.

20   Q.  US Foods told Mar-Jac?

21   A.  That's correct, yes.

22   Q.  Now, how did you know that US Foods told Mar-Jac the same

23   thing they told Pilgrim's on boneless breasts?

24   A.  Through my discussions with Scott Tucker.

25   Q.  How did you understand Scott Tucker to know?

594

Robert Bryant - Direct

1    A.  He had a contact at Mar-Jac that he was communicating with

2    through this process.

3    Q.  Do you recall whether Mr. Stiller responded to the e-mail

4    we are looking at here at the top of Government's Exhibit 9139?

5    A.  He did not respond by e-mail.  He did by text.

6    Q.  So the answer is yes, he did respond?

7    A.  He did.

8    Q.  And what form did his response come in did you say,

9    Mr. Bryant?

10   A.  Well, he texted and called me, yes.

11          MR. TORZILLI:  If we can take this down, Ms. Pearce,

12   thank you.  If we can call up just for the parties, the Court,

13   and the witness Government's Exhibit 3039.

14   BY MR. TORZILLI:

15   Q.  Mr. Bryant, if you would like to refer to a paper copy of

16   that, that should be behind tab 11 in the binder in front of

17   you.

18          Mr. Bryant, have you had an opportunity to familiarize

19   yourself with Government's Exhibit 3039?

20   A.  I have.

21   Q.  Do you recognize it?

22   A.  I remember it, yes.

23   Q.  What is it?

24   A.  It's a text from Tim Stiller to myself.

25          MR. TORZILLI:  At this time, Your Honor, government

Robert Bryant - Direct

1    moves to admit Exhibit 3039.

2             THE COURT:  Any objection to the admission of

3    Exhibit 3039?

4             3039 will be admitted.  And you may publish it if you

5    wish.

6             MR. TORZILLI:  Thank you, Your Honor.

7             If we can zoom in a little bit on this.

8    BY MR. TORZILLI:

9    Q.  So what type of communication is this, Mr. Bryant?

10   A.  It's a text.

11   Q.  What is the date the text was sent?

12   A.  April 18, 2017.

13   Q.  At what time?

14   A.  Excuse me?

15   Q.  At what time, sir?

16   A.  1:20 p.m.

17   Q.  So how close in time relative to the e-mails that we're

18   looking at did this text get transmitted to you by Mr. Stiller?

19   A.  Five minutes later.

20   Q.  Could you read to the jury what Mr. Stiller texted to you

21   at that time?

22   A.  No comp names in e-mail, exclamation point.

23   Q.  Now, when you read this, what, if anything, did you do in

24   response to this?

25   A.  At first I was confused on what he meant, but then I

Robert Bryant - Direct

1   realized he was scolding me for putting a competitor name in an

2   e-mail.

3   Q.  Okay.  Now, how do you know that Mr. Stiller was -- or how

4   did you understand Mr. Stiller to be referring to competitor

5   name?

6   A.  Because I had just sent him the two e-mails with Mar-Jac in

7   the e-mail.

8   Q.  What did you understand that second word in this text

9   message "comp" to mean?

10  A.  Competitor.

11  Q.  Now, at or around the time you received this text from

12  Mr. Stiller, did you have a phone call with Mr. Stiller?

13  A.  I did.

14  Q.  And what was the nature of the phone call that you had at

15  or around this same time?

16  A.  He was scolding me for sending him competitor names in

17  written form and told him that we can't do that anymore and

18  that I needed --

19          MR. TUBACH:  Your Honor, we are having a narrative.

20          THE COURT:  I am sorry?

21          MR. TUBACH:  We are having a narrative again.

22          THE COURT:  Sustained.  If you can ask a new question.

23  BY MR. TORZILLI:

24  Q.  And did he say something about -- did he describe or use a

25  word of how conversations going forward needed to be conducted?

597
Robert Bryant - Direct

1    A.   Yes.  He said I needed to be more strategic.

2    Q.   And did you understand that at least in part to mean that

3    you couldn't put the names of Pilgrim's' competitors into

4    e-mails?

5    A.   Exactly, yes.

6    Q.   Work e-mails?

7    A.   That's correct, yes.

8         MR. TORZILLI:  Okay.  We can take this exhibit down.

9    Thank you.

10        Brief indulgence, Your Honor.

11        THE COURT:  Sure.

12   BY MR. TORZILLI:

13   Q.   Mr. Bryant, at this point in 2017, to whom were you

14   reporting?

15   A.   Tim Stiller.

16   Q.   Who was Mr. Stiller reporting to?

17   A.   Jayson Penn.

18   Q.   And who was Defendant Jayson Penn reporting to?

19   A.   Bill Lovette.

20   Q.   Who was Defendant Roger Austin reporting to at this time in

21   2017?

22   A.   I believe he was reporting to Tim Stiller.  At some point,

23   I am not sure exactly the timing, Roger did report to Tim

24   Stiller.  Earlier I know he reported to --

25        MR. TUBACH:  We are having another narrative.  There

Robert Bryant - Direct

1   is no question pending.

2           THE COURT:  If you could ask another question,

3   Mr. Torzilli.

4           MR. TORZILLI:  Absolutely, Your Honor.

5   BY MR. TORZILLI:

6   Q.  So to the best of your knowledge, to the best of your

7   knowledge in 2017, to whom was Defendant Austin reporting?

8   A.  I believe Tim Stiller.

9   Q.  Do you know what Mr. Stiller's job title was at that time?

10  A.  I don't remember, no.

11  Q.  And now let's talk about 2014.  In 2014, who was Defendant

12  Austin reporting to, to the best of your knowledge?

13  A.  Jayson Penn.

14  Q.  And who was Defendant Penn reporting to in 2014?

15  A.  Bill Lovette.

16  Q.  We talked about Mr. McGuire a little this morning or quite

17  a bit this morning.  Who was Mr. McGuire reporting to?

18          MR. TUBACH:  Your Honor, can we have a time frame?

19  Objection, vague.

20          THE COURT:  Sustained.  Can you ask him a time frame?

21  BY MR. TORZILLI:

22  Q.  In 2014, Mr. Bryant, who did you understand Mr. McGuire to

23  be reporting to?

24  A.  Jayson Penn.

25  Q.  And Defendant Penn was reporting to whom?

Robert Bryant - Direct

1   *A.*   Bill Lovette.

2   *Q.*   We have talked about communications between competitors

3   related to bids.  Did those communications impact Pilgrim's

4   strategy in the bidding process?

5   *A.*   Yes.

6   *Q.*   How?

7   *A.*   We used those -- the information from the pre-meetings to

8   help us formulate strategy and the information that we

9   received, the pricing that we received to help us formulate

10  bids.

11  *Q.*   For what purpose?

12  *A.*   It depended on the circumstances, but to either increase or

13  limit a decrease in price.

14  *Q.*   What about the circumstances you faced in 2017 in the KFC

15  bid?

16  *A.*   That was to limit a decrease in price.

17  *Q.*   How about the circumstances in 2014 for the KFC bid?

18  *A.*   That was to increase price.

19  *Q.*   Did you, Mr. Bryant, ever tell any customer that you were

20  aware that competitors for their business were coordinating

21  their bids?

22  *A.*   Not that I remember, no.

23  *Q.*   Do you have any knowledge of anyone else at Pilgrim's ever

24  telling a customer that competitors for their business were

25  coordinating their bids?

Robert Bryant - Direct                600

1    *A.* Not that I am aware of, no.

2    *Q.* Did the communications between Pilgrim's and its

3    competitors relating to fast-food restaurant bids give

4    Pilgrim's an advantage?

5    *A.* I believe so, yes.

6    *Q.* Against who did it give Pilgrim's an advantage?

7    *A.* The customer.

8    *Q.* How so?

9    *A.* We gave -- it gave us negotiating leverage against the

10   customer knowing what they told our competitors and knowing

11   what competitors had submitted as pricing.

12   *Q.* Was it a fair advantage against the customer?

13          *MR. FELDBERG:* Objection, Your Honor,

14   characterization.

15          *THE COURT:* Overruled.

16          *MR. BELLER:* I am objecting under 701, Your Honor.

17          *THE COURT:* Overruled.

18   *BY MR. TORZILLI:*

19   *Q.* Was it a fair advantage against the customer, Mr. Bryant?

20   *A.* I would say it was an unfair advantage against the customer

21   and their process.

22   *Q.* How so?

23   *A.* Circumvented their process because we had all the

24   information that --

25          *MR. TUBACH:* Your Honor, I object again, talking about

Robert Bryant - Direct

1    the process which the Court has ruled upon multiple times, Your

2    Honor.

3             THE COURT:  It seems like that's where he is going.

4    Sustained.

5             MR. TORZILLI:  Sure.  I will move on.

6    BY MR. TORZILLI:

7    Q.  Mr. Bryant, are you familiar with how gas stations display

8    their prices?

9    A.  I am.

10   Q.  How are you knowledgeable about how gas stations display

11   their prices?

12   A.  I use them --

13   Q.  You fill up?

14   A.  -- too often.

15   Q.  You fill up at the pump?

16   A.  Especially now.

17   Q.  So how do gas stations display their prices?

18   A.  They display them like a billboard so you know exactly how

19   much they are going to charge.

20   Q.  For all the public to see?

21   A.  Yes, all the public to see.

22   Q.  Now, let's talk about the bids that are the subject of your

23   testimony here today and yesterday.  How are the bids that

24   you're involved in displayed to the customer?

25   A.  Supposed to be confidential.

602

Robert Bryant - Direct

1   *Q.* So is there a difference between the way that bids that

2   you're involved in with fast-food customers are displayed to

3   the customer and the way gasoline stations display their prices

4   to their customers?

5   *A.* Yes.

6   *Q.* What's the difference?

7   *A.* The difference is the gas stations are fully public.  Our

8   bids are supposed to be one on one and negotiable between the

9   buyer and the seller.

10        *MR. TUBACH:* I am going to object.  We are talking

11  about the process again, which the Court has ruled on multiple

12  times.

13        *THE COURT:* Sustained.

14  *BY MR. TORZILLI:*

15  *Q.* Sir, you yesterday mentioned that you worked at the -- I

16  think it was the Mayfield, Kentucky, processing plant for

17  Pilgrim's?

18  *A.* Yes.

19  *Q.* How many years did you work there?

20  *A.* Many, probably 15 years, 10 to 15 years.  I officed out of

21  there.

22  *Q.* How did you get to work there?

23  *A.* Drove.

24  *Q.* Drive up to the facility and then park in the parking lot?

25  *A.* Correct, yes.

Robert Bryant - Direct

1   Q.  Did the Mayfield, Kentucky, facility ever post outside the

2   bids that it was providing to its fast-food customers?

3   A.  No.

4   Q.  Does that sound like a silly question?

5   A.  A little bit, yes.

6   Q.  Why?

7   A.  We generally didn't --

8           MR. TUBACH:  Your Honor, asked and answered.

9           THE COURT:  Overruled.

10  A.  We didn't generally share pricing with many people.

11          MR. TORZILLI:  Thank you, Mr. Bryant.

12          We can now look at, just for -- Ms. Pearce, if we

13  could display just for the parties, the witness, and the Court

14  Government's Exhibit 979.

15  BY MR. TORZILLI:

16  Q.  And, Mr. Bryant, if you would like to see a paper copy of

17  that, that is in or behind tab 1 of your binder.

18          Sir, have you had an opportunity to look at

19  Government's Exhibit 979?

20  A.  Yes.

21  Q.  What is it?

22  A.  It's a chart about price increases.

23  Q.  And is there a second page to it?

24  A.  Yes.

25  Q.  What's that?

604

Robert Bryant - Direct

1    *A.*  It's additional information about the price increases.

2    *Q.*  Is there information on the second page that indicates the

3    time period of the document?

4    *A.*  Yes.

5    *Q.*  What does it tell you?

6    *A.*  It's for 2015.

7    *Q.*  Thank you.

8         *MR. TORZILLI:*  At this time, government moves to admit

9    Exhibit 979.

10         *THE COURT:*  Any objection to the admission of

11   Exhibit 979?

12              979 will be admitted.

13         *MR. TORZILLI:*  And permission to display to the jury

14   979, please?

15         *THE COURT:*  You may.

16         *MR. TORZILLI:*  Thank you, Your Honor.

17   *BY MR. TORZILLI:*

18   *Q.*  We are looking here at the first page of Exhibit 979.  Can

19   you explain to the jury what this slide means?

20   *A.*  It's showing weekly volume cent-per-pound price increases

21   and the weekly impact by customer and the ones that are

22   outstanding and the ones that are completed.

23   *Q.*  Which are the ones that are completed?  How are they

24   displayed?

25   *A.*  The ones that are shaded.

Robert Bryant - Direct

1   Q.   And what's the title of the slide?

2   A.   Price Increases.

3   Q.   What is the first entry under the titles there?

4   A.   KFC.

5   Q.   Now, if we focus in on KFC, can you tell us what the very

6   first entry there, that 2.5 million number, means?

7   A.   That's the weekly volumes of 2.5 million pounds per week.

8   Q.   And what's the next number represent?

9   A.   The price increase that we got.

10  Q.   And the last number?

11  A.   The weekly dollar impact or increase in price.

12  Q.   What is the weekly dollar impact of the increase in price,

13  what does that mean, sir?

14  A.   That means how many additional dollars we will receive as a

15  result of that price increase.

16  Q.   Does that tell you whether Pilgrim's actually got a price

17  increase for KFC for that year?

18  A.   Yes.

19  Q.   And does it indicate the magnitude of the price increase it

20  obtained?

21  A.   Yes.

22  Q.   Is that the number that appears in the middle there?

23  A.   Yes.

24       MR. TORZILLI:   Now, if we could look at the second

25  page of Exhibit 979 and permission to display page 2 to the

Robert Bryant - Direct

1   jury, please.

2        *THE COURT:*  Yes.

3   *BY MR. TORZILLI:*

4   *Q.*  What does this slide mean?

5   *A.*  It's similar to the other one.  It's got the similar

6   information about the weekly price increases, but it also shows

7   how much business was lost during negotiations and how much

8   business was gained and the net effect.

9   *Q.*  So let's focus on that right-hand side of page 2 of 979 and

10  what you were referring to, the Lost Business area there.  Is

11  KFC one of the customers that's reflected in the Lost Business

12  section of this chart?

13  *A.*  Yes.

14  *Q.*  Where is it within this chart?

15  *A.*  It's on the lost, the second line down.

16  *Q.*  In the second row?

17  *A.*  Yes.

18  *Q.*  How much business did Pilgrim's lose for KFC for this

19  particular year?

20  *A.*  900,000 pounds per week.

21  *Q.*  And then in the next column, the header is Price there, do

22  you see that?

23  *A.*  Yes.

24  *Q.*  What does that represent?

25  *A.*  The sales price of the lost volume.

607

Robert Bryant - Direct

1   Q.   And the very last column says Revenue.  Do you see that?

2   A.   Yes.

3   Q.   What does that represent?

4   A.   The revenue had we sold the 900,000 pounds to KFC at the 89

5   cents, what that value was.

6   Q.   So how much revenue was lost to Pilgrim's because of volume

7   that Pilgrim's lost to KFC?

8   A.   800,000.

9   Q.   And was KFC the only customer that Pilgrim's lost volume to

10  during the time period reported here?

11  A.   No.

12  Q.   How many other customers, approximately?

13  A.   There was, like, seven.

14  Q.   Is Golden Corral one of them?

15  A.   Yes.

16  Q.   Church's?

17  A.   Yes.

18  Q.   In total, how much revenue was lost from lost volume at

19  least as reflected here on page 2 of 979?

20  A.   A little over 2 million a week.

21  Q.   Now, is there also a part of page 2 of Exhibit 979 that

22  talks about gained business?

23  A.   Yes.

24       MR. TORZILLI:  Okay.  If we could, Ms. Pierce, focus

25  in on the portion of the chart for gained business.

Robert Bryant - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  Now, can you explain generally speaking what this chart

3   represents?

4   *A.*  It represents the amount of business and who we wrote new

5   business to to replace business that we lost and the revenue

6   that was associated with that business.

7   *Q.*  Does -- well, first let me ask you, what does the first

8   column of numbers where it says Per Week, what does that mean?

9   *A.*  That's the volume per week of the new business.

10  *Q.*  And the next column entitled Price, what does that mean?

11  *A.*  That's the price that the new business was contracted at.

12  *Q.*  And the final column all the way at the right, Revenue,

13  what does that mean?

14  *A.*  That's the weekly dollar impact of that sale.

15  *Q.*  And for the customers that are represented on this portion

16  of the chart, how much revenue did Pilgrim's gain from business

17  during the time period reported?

18  *A.*  2.3 million.

19  *Q.*  Is that number greater than the amount of revenue that

20  resulted from lost volume that we looked at a moment ago?

21  *A.*  Yes.

22  *Q.*  What was the difference between the revenue from gained

23  business compared to the revenue lost from lost business?

24  *A.*  243,000 weekly, almost a quarter of a million a week.

25  *Q.*  And do you have an understanding of an annualized

Robert Bryant - Direct

1    representation of the $243,000 per week?

2    A.   Without doing the math, I would say that it's probably that

3    3 million at the bottom.

4    Q.   Okay.  And there is an entry second from the bottom that

5    says Annualized Price/Mix Increase.  Do you see that?

6    A.   Yeah.

7    Q.   Do you have an understanding of what that is?

8    A.   My assumption is it's the combination of both the price

9    increases and the lost subtotal.

10        MR. FELDBERG:  Objection, Your Honor.

11        THE COURT:  Sustained.

12   BY MR. TORZILLI:

13   Q.   Do you -- just yes or no, do you have an understanding of

14   what that entry represents?

15   A.   The total gain.

16   Q.   Just yes or no.

17   A.   Yes.

18   Q.   What is the basis of your understanding for what that

19   entry, the annualized price/mix increase is?

20   A.   We used those terms commonly to represent a price increase

21   or if we traded it up, that would be called a mix increase

22   where we sold something more in transition form.

23   Q.   In your previous answer, you said "we."  Can you tell us

24   what you mean by "we"?

25   A.   Yes.  It was a term used to describe sales, upgrading sales

610

Robert Bryant - Direct

1   either in price or in mix.

2   Q.  Okay.  So based on that, what is your understanding of what

3   this entry means?

4        MR. FELDBERG:  Objection.  A minute ago he said he

5   assumed.

6        THE COURT:  Sustained.

7   BY MR. TORZILLI:

8   Q.  Sir, if we can go back -- I will withdraw the question.  I

9   do want to go back to the 243,000 number.

10  A.  I was just doing the math in my head.

11  Q.  I believe it's your lucky day, sir, that there is a

12  calculator somewhere in the vicinity of that witness box, and

13  it looks like you've located it.

14       Can you explain the computations you are working on,

15  Mr. Bryant?

16  A.  I was just -- I was annualizing the 243,600, I was just

17  multiplying by 52, which was a little over 12 million, and then

18  I was doing the 1.8 million by 52, so those two combined,

19  1.8 million on price increase was 94,000.  And if you took the

20  243, that would be a little over 12 million, so ...

21  Q.  Okay.  That was a lot of numbers.  So I heard 12 million.

22  So can you tell us what the -- how you got to 12 million and

23  what it represents?

24  A.  So the 243,600 times 52, so all these numbers are

25  represented in a weekly basis, so the difference between the

Robert Bryant - Direct

1   top and the bottom on lost and gained business was $243,600 on

2   a weekly basis.  So if you multiply that by 52 weeks, that

3   would give you a little over $12 million.

4   Q.  Per year?

5   A.  Annualized, yes.

6        MR. TORZILLI:  Your Honor, I realize it's a few

7   minutes before our typical break.  I am ready to proceed to a

8   new topic.

9        THE COURT:  Why don't we go ahead because we are 20

10  minutes early, so why don't you keep going.

11       MR. TORZILLI:  Proceed?

12       THE COURT:  Yes.

13  BY MR. TORZILLI:

14  Q.  Mr. Bryant, let's talk about Pilgrim's a little bit more.

15  Based on your experience, do you have an understanding how the

16  fresh-food services division that you worked in generates

17  revenue for Pilgrim's Pride?

18  A.  Yes, through the various contracts with our customers,

19  sales of those products to our various customers.

20  Q.  Now, how do you know that?

21  A.  I entered into those contracts with those customers.

22  Q.  You negotiated them?

23  A.  Yes.

24  Q.  Did you work on the bids that led to the contracts?

25  A.  Yes.

Robert Bryant - Direct

1    Q.  Other than the contracts, are there any other sources of

2    revenue for the fresh-food services division at Pilgrim's?

3    A.  There are some spot business where things are sold on what

4    I would call a commodity market, but it's still a sale.

5    Q.  As we talked a little bit about bankruptcy, going back to

6    that point in time, was Pilgrim's profitable immediately coming

7    out of bankruptcy?

8            MR. TUBACH:  Object, Your Honor, lack of foundation.

9            THE COURT:  Sustained.

10   BY MR. TORZILLI:

11   Q.  Mr. Bryant, do you know of a time when the fresh-food

12   services division of Pilgrim's became significantly more

13   profitable than it had been?

14   A.  Yeah.

15   Q.  When was that?

16   A.  It was after the 2014 time period.

17   Q.  How do you know that?

18   A.  I was working there.  I would receive weekly P and Ls from

19   the various plants and reviewed those weekly.

20   Q.  How did the fresh-food services' revenue during the 2015

21   contracts affect Pilgrim's profitability?

22   A.  We increased in profitability.

23   Q.  What's that understanding based on?

24   A.  Working there during the time and the results of that

25   business unit immediately after.

613
Robert Bryant - Direct

1    Q.  Now, Mr. Bryant, do you have an understanding of what those

2    higher contract prices you just identified, do you have an

3    understanding of whether those were the results of the bids

4    that you testified to were manipulated in 2014?

5    A.  That was part of it, yes, the increased prices, yes.

6    Q.  Were the results of the bids that were manipulated in 2014?

7    A.  Yes.

8           MR. TUBACH:  Asked and answered, Your Honor.

9           THE COURT:  Overruled.

10   BY MR. TORZILLI:

11   Q.  So what is your understanding of whether those higher

12   contract prices were the result of manipulated bids in 2014?

13   A.  They were.

14          MR. FAGG:  Objection, asked and answered.

15          THE COURT:  Overruled.

16   BY MR. TORZILLI:

17   Q.  What was that?

18   A.  They were.

19          MR. TORZILLI:  Moment to confer, Your Honor?

20          THE COURT:  You may.

21          MR. TORZILLI:  No further questions, Your Honor.

22          THE COURT:  All right.  Cross-examination?

23          MR. BELLER:  Thank you, Your Honor.  If I may have

24   just a moment to set up.

25          THE COURT:  Of course.

Robert Bryant - Cross

1          **CROSS-EXAMINATION**

2      *BY MR. BELLER:*

3      *Q.*  Mr. Bryant, my name is David Beller.  I represent Mikell

4      Fries.

5              Mr. Bryant, I want to start with the immunity

6      agreement that you have with the prosecutors, okay?

7      *A.*  Uh-huh.

8      *Q.*  Is that a yes?

9      *A.*  Yes.

10     *Q.*  Thank you.

11             Mr. Bryant, one of the provisions of this immunity

12     agreement is that you respond fully and truthfully to all

13     inquiries by the prosecutors; is that right?

14     *A.*  I believe so, yes.

15     *Q.*  Well, you say you believe so.  There is not a question that

16     you have an obligation to testify truthfully and honestly,

17     right?

18     *A.*  That's correct.

19     *Q.*  Okay.  So when I say immunity, Mr. Bryant, I am talking

20     about the fact that you are not going to be charged with a

21     crime, right?

22     *A.*  That's correct.

23     *Q.*  Is that what you understand that to be?

24     *A.*  That's correct, yes.

25     *Q.*  Okay.  So let's put that in simple terms.  You have to tell

615
Robert Bryant - Cross

1    the truth.

2    A.   That's correct.

3    Q.   And it's the prosecutors who are sitting at this table

4    right here to my right who decide whether you, Mr. Bryant, are

5    telling the truth.

6    A.   I don't know that's the case, no.  I don't know that's --

7    how that works.

8            MR. TORZILLI:  Your Honor, may we have a side bar?

9            THE COURT:  Yes.

10       (At the bench:)

11           THE COURT:  Mr. Torzilli, go ahead.

12           MR. TORZILLI:  Your Honor, I object to the questions

13   that personalize the prosecution or other members of the

14   government team.  I understand that questions need to be asked

15   in terms of meeting with the government and so forth, but I

16   think personalizing is something that's unnecessary,

17   inappropriate, and Your Honor has sustained objections to

18   questions that personalize to the government and the

19   prosecutors and members sitting at the government table.

20           THE COURT:  Well, the objections that I sustained were

21   when during the first trial specific names were named and, you

22   know, who was at these meetings and things of that nature, but

23   the question that Mr. Beller asked is a more generic one

24   talking just about the prosecutors, and I think we had a line

25   of questioning like this in the second trial, and I find that

616

Robert Bryant - Cross

1    it's not inappropriate for him to use just the term

2    "prosecutors."  So I will overrule the objection.

3              (In open court:)

4    *BY MR. BELLER:*

5    *Q.*  Mr. Bryant, the question that had been asked is it's

6    federal prosecutors who determine whether you're telling the

7    truth.

8    *A.*  Like I said, first of all, I guess there is only one

9    version of the truth, so I don't know that that's really, like,

10   someone's job to determine.  I don't -- you know what I'm

11   saying?

12   *Q.*  Well, let me ask this again because I feel like you're

13   answering a question other than what you were asked.  I asked

14   you a yes-or-no question.  It is prosecutors who determine

15   pursuant to your immunity agreement whether or not you are

16   telling the truth.

17             *MR. TORZILLI:*  Objection, asked and answered.

18             *THE COURT:*  Overruled.

19   *A.*  I don't know how that -- who makes that decision.

20   *BY MR. BELLER:*

21   *Q.*  Very good.  And I don't know is a perfectly fine answer.

22             You do know, Mr. Bryant, that I, as a defense

23   attorney, don't get to decide whether or not your immunity

24   agreement is broken or continues, right?

25   *A.*  That's correct, yes.

Robert Bryant - Cross

1   Q.  I'm not the one who gets to decide if you're telling the

2   truth for purposes of your immunity agreement.

3   A.  That's the way I understand it, yes.

4   Q.  And this jury are not the ones who get to decide if you're

5   telling the truth for purposes of your immunity agreement.

6         MR. TORZILLI:  Objection, Your Honor, that's an

7   incorrect statement of the law.

8         THE COURT:  I am not sure it's an incorrect statement

9   of the law.  He is just saying that the jury would not decide.

10  I don't think that's a statement of the law per se, so I will

11  overrule the objection.

12  BY MR. BELLER:

13  Q.  So let me ask that again.  It's not this jury who gets to

14  decide whether or not you are telling the truth for purposes of

15  your immunity agreement.

16  A.  That's correct.

17  Q.  If at any point the prosecutors believe that you are not

18  telling the truth, they are the ones who decide to revoke your

19  immunity agreement.

20  A.  Yeah, I don't know how that process works.  I know someone

21  at Justice or an agent -- I don't know who or how that works,

22  but I know that it would be someone in government, yes.

23  Q.  Someone in the Federal Government.

24  A.  Correct, yes.

25  Q.  Someone in the Department of Justice.

618

Robert Bryant - Cross

1   A.  I don't know.  I don't know if it's Justice or who.

2   Q.  Well, it's not the department of Army that decides whether

3   or not your immunity agreement gets revoked, right?

4   A.  What I meant by that, if it would be like the FBI, the

5   department -- I don't know who and how that process works.  I

6   am not familiar with that.

7   Q.  Well, let's talk more about that.  You said you don't know

8   if it's the FBI.  The FBI are federal law enforcement agents.

9   A.  Correct, yes.

10  Q.  Who work for the prosecutors, right?

11  A.  I don't know that they -- I thought they were independent.

12  Q.  Fair enough.  You said you don't know if it's the

13  Department of Justice.

14  A.  Correct.

15  Q.  What department do these prosecutors work for, Mr. Bryant?

16  A.  The Department of Justice.

17  Q.  All right.  So if it's the Department of Justice, it would

18  be these prosecutors who make that decision.

19  A.  I don't know if it would be their decision or someone else

20  higher up at the Department of Justice, I don't know.

21  Q.  Mr. Bryant, you have had the benefit of a lawyer for the

22  last at least year, correct?

23  A.  That's correct, yes.

24  Q.  Okay.  I am not asking you what conversations you've had

25  with your lawyer, all right?  I want to be clear.  You have had

Robert Bryant - Cross

1    the opportunity to at least have a lawyer with you for every

2    one of the 31 interviews that the Department of Justice has

3    done with you.

4           MR. TORZILLI:  Objection, assumes facts that are not

5    in evidence.

6           THE COURT:  Sustained.

7    BY MR. BELLER:

8    Q.  Mr. Bryant, you have done 31 interviews with the Department

9    of Justice; is that correct?

10   A.  I believe I have met with them five or six times for this

11   trial and then I think approximately 25 times as part of the

12   investigation and a couple other proceedings.

13   Q.  Good.  What's 25 plus six, Mr. Bryant?

14   A.  31.

15   Q.  So let me back up to my question that I asked you.  You

16   have met with the Department of Justice 31 times.

17   A.  Approximately, yes.

18   Q.  Okay.  Your lawyer was with you for all 31 of those times.

19   A.  That's correct.

20   Q.  You have been operating or you have had this immunity

21   agreement on the table all 31 times while you were assisted by

22   your lawyer, right?

23   A.  That's correct.

24   Q.  Okay.  So if your immunity agreement is revoked,

25   Mr. Bryant, the Department of Justice can charge you with a

Robert Bryant - Cross

1    federal felony, right?

2    A.   That's correct.  That's the way I understand it, yes.

3    Q.   Okay.  And so you have to tell the truth in order to not

4    have your immunity agreement pulled.

5    A.   That's correct.

6    Q.   The truth that is determined by someone other than me.

7    A.   Correct.

8    Q.   So does it make sense to you, Mr. Bryant, if you entered

9    into an immunity agreement with the Department of Justice, that

10   they would be the ones to determine whether or not to grant you

11   ongoing immunity versus revoking it?

12   A.   I didn't enter into the agreement.  It was entered into on

13   my behalf without my --

14   Q.   I understand that.  That wasn't my question.  So let me ask

15   my question.  It would make sense to you that the Department of

16   Justice would be the ones to decide whether or not that

17   immunity agreement is ongoing for you or gets revoked.

18   A.   I -- I really don't know how that would transpire.  I don't

19   know how that works.  It's with whoever in the government.  I

20   really don't.

21   Q.   Okay.  So let's back up.  Mr. Bryant, you testified in

22   another hearing on March the 9th; is that right?

23   A.   I believe so, yeah.

24   Q.   March the 9th of this year?

25   A.   I believe so, yes.

Robert Bryant - Cross

 1   *Q.*  On March 9th of this year, you agreed to testify

 2   truthfully?

 3   *A.*   Correct.

 4   *Q.*   You agreed to testify under oath?

 5   *A.*   Correct.

 6   *Q.*   You raised your right hand and promised to tell the truth?

 7   *A.*   Correct.

 8   *Q.*   When you raised your right hand and you promised to tell

 9   the truth, you were asked if at any point they, the Department

10   of Justice, believe you're not telling the truth, they can not

11   only revoke your immunity agreement, but they can charge you

12   with a federal felony offense.  You answered in response to

13   that question yes.

14   *A.*   Yes.

15   *Q.*   Okay.  So let's do this again, all right?  I am really not

16   trying to make this difficult on you, Mr. Bryant.  In March of

17   2022 when you testified under oath in a hearing, at that point

18   you knew that if you testified untruthfully, that the

19   Department of Justice could pull your immunity agreement.

20          *MR. TORZILLI:*  Object.  The question misstates the

21   prior testimony.

22          *THE COURT:*  Overruled.

23          *MR. TORZILLI:*  I would be happy to be heard on side

24   bar to elaborate.

25          *THE COURT:*  No, overruled.

622

Robert Bryant - Cross

1    *A.*   The way -- the question that you just read was two parts,

2    so, yes, I understand they could prosecute me, but I still

3    don't understand or know exactly how that process would go

4    about if they were to decide to revoke the immunity, who would

5    make that decision or determination.  But, yes, I do understand

6    that if the decision was made to charge me, that that would --

7    that the Department of Justice would be the one that -- that

8    would prosecute me, yes.

9    *BY MR. BELLER:*

10   *Q.*   Is that a yes to my yes-or-no question?  Was that a yes?

11   *A.*   I believe so, yes.

12   *Q.*   Okay.  If they charge you with a federal felony, they can

13   use everything you have told them in your interviews against

14   you.

15   *A.*   That's correct, yes.

16   *Q.*   They can use everything that you have testified about

17   against you.

18   *A.*   That's my understanding, yes.

19   *Q.*   If they don't believe you, Mr. Bryant, they can choose to

20   indict you and charge you with any offense they have knowledge

21   of.

22   *A.*   I don't know if it's that simple, but if they -- if my

23   immunity agreement was revoked, then, yes, they could charge me

24   with everything that they have knowledge of.

25   *Q.*   Is that a yes to my yes-or-no question?

623

Robert Bryant - Cross

1   A.   Yes.

2   Q.   Okay.   They could also charge you with a crime for lying to

3   them.

4   A.   That's correct.

5   Q.   If they decide after your testimony today or possibly

6   Monday that you are not truthful, they could charge you.

7   A.   I don't -- once again, I don't know how that process would

8   work and how quickly that process would work.

9   Q.   Mr. Bryant, did I ask you anything about timing?

10  A.   Yes.   You said Monday.

11  Q.   I said if they determine on Monday --

12  A.   Yes.

13  Q.   -- that you're not telling the truth whenever your

14  testimony is over --

15  A.   When you said Monday, I took -- I understood your question

16  to mean that they could charge me on Monday, so, yes, that's

17  what I was trying to answer.

18  Q.   Okay.   Listen to my question.   If they decide after your

19  testimony ends that you were not truthful, they could charge

20  you.

21  A.   Once again, I don't know how quickly that process would

22  work or -- I don't know how that process would work.

23  Q.   Did I ask you about when that process may happen,

24  Mr. Bryant?

25  A.   You said that they could charge me after my testimony, so,

Robert Bryant - Cross

1   yes, that's the way I understood your question.

2   Q.  Well, they are certainly not going to charge you before

3   your testimony with lying, right?

4   A.  That would be my understanding.

5   Q.  Okay.  So if they can charge you for lying, they are not

6   going to be able to charge you before you lie, right?

7   A.  Correct.

8   Q.  Okay.  So they would have to charge you after the lie?

9           MR. TORZILLI:  Object to form on the prior question.

10          THE COURT:  Overruled.

11          And also, Mr. Beller, we are almost at the break, if

12  you could look for a convenient spot.

13          MR. BELLER:  This is a great spot, Your Honor, thank

14  you.

15          THE COURT:  Ladies and gentlemen, let's go ahead and

16  take the afternoon break.  We will plan on reconvening at 3:30.

17  Keep the admonitions in mind.  The jury is excused.  Thank you.

18          (Jury excused.)

19          THE COURT:  We will be in recess.  Thank you.

20          (Recess at 3:15 p.m. until 3:35 p.m.)

21          THE COURT:  Mr. Torzilli, I understand you have an

22  issue.  Go ahead.

23          MR. TORZILLI:  Correct, Your Honor.  I wanted to raise

24  one brief thing before the witness and the jury come in.  So

25  there was a question posed, in essence, asking the witness

Robert Bryant - Cross

1    whether he understood the jury would be standing in judgment of

2    whether he was lying or not.  I had objected.  My basis for the

3    objection was misplaced, and I understood the objection to be

4    overruled, but I just want to make clear that I do intend to

5    object to the same or similar type questions in the future

6    because I think it's inappropriate to be putting the jury in

7    the place of judging anything other than the charged conspiracy

8    that they are here to judge in this case.

9           THE COURT:  Anything on that score, Mr. Beller?  I

10   think usually you can't use the jury as a prop, and you can't

11   do that.  The question as it came up, you know, may be

12   borderline, but presumably Mr. Beller doesn't have anything

13   similar, but I understand your concern, Mr. Torzilli.

14          All right.  Are we ready for Mr. Bryant to be brought

15   back in and for the jury?  Yes, we can bring Mr. Bryant in, and

16   we can get the jury as well.

17          (Jury present.)

18          THE COURT:  Mr. Beller, whenever you are ready.

19          MR. BELLER:  Thank you, Your Honor.

20   BY MR. BELLER:

21   Q.  Mr. Bryant, when we broke, we were talking about the

22   different provisions of your immunity agreement.  The first one

23   we have already covered is that you provide truthful

24   information.  Another component, Mr. Bryant, is that of your

25   immunity agreement requires your continuing cooperation with

Robert Bryant - Cross

1  the prosecution, right?

2  A.  Correct.

3  Q.  So let's talk about what continuing cooperation means.  It

4  means that you sit down for interviews with the prosecutors and

5  the agents whenever they ask.

6  A.  Correct.

7  Q.  In fact, you've been interviewed multiple days in a row,

8  right?

9  A.  That's correct, yes.

10  Q.  You were interviewed multiple days in a row as recently as

11  just last week.

12  A.  Correct.

13  Q.  You were interviewed on Wednesday, June 1st.

14  A.  I don't recall the dates.

15  Q.  Do you recall being interviewed on Thursday, June 2nd?

16  A.  I don't.  I don't recall the dates.  I really don't.

17  Q.  Understood.  Do you recall that you were interviewed again

18  on Monday, June 6th?

19  A.  Is that this Monday?

20  Q.  That's correct.

21  A.  Yes.

22  Q.  That's the day this trial began, right?

23  A.  I believe it started Monday, yes.

24  Q.  You were interviewed again on Tuesday, June 7th.

25  A.  Yes.

Robert Bryant - Cross

1   Q.  And that was the day of opening statements were given by

2   the government and the defense.

3          MR. TORZILLI:  Objection, foundation, calls for

4   speculation.

5          THE COURT:  Sustained.  You can ask him if he

6   understands.

7   BY MR. BELLER:

8   Q.  Do you know if your lawyer appeared in court for opening

9   statements?

10  A.  I know my lawyer has been in court.  I don't know when

11  opening statements were.

12  Q.  Okay.  Do you know if your lawyer appeared for opening

13  statements?

14  A.  I believe he has been present for most, if not all, the

15  proceedings.

16  Q.  Does that include, Mr. Bryant, opening statements?

17  A.  I would assume so, yes.

18  Q.  Okay.  After -- well, let me back up.  So you indicated

19  that you were interviewed on Tuesday, June 7th; is that right?

20  A.  That's correct, yes.

21  Q.  At the end of the day on Tuesday, you met with the

22  government -- or excuse me, you met with the prosecutors on

23  that day as well.

24  A.  That's correct.

25  Q.  At the end of the day after court.

628

Robert Bryant - Cross

1  A.  That's correct.

2  Q.  You were interviewed again yesterday, Wednesday, June 8th,

3  right?

4  A.  That's correct, yes.

5  Q.  Right before you took the witness stand you were

6  interviewing with the government.

7  A.  It was during the lunch break.

8  Q.  And you took the witness stand in the afternoon?

9  A.  Correct.

10  Q.  So right before you took the witness stand, you met with

11  the government.

12         MR. TORZILLI:  Objection, asked and answered.

13         THE COURT:  Overruled.

14  A.  Like I said, it was during lunch break.  I don't recall

15  exactly what time I got on the stand yesterday.

16  BY MR. BELLER:

17  Q.  Mr. Bryant, you testified that you don't recall all the

18  different dates in which you were interviewed.

19  A.  That's correct, yes.

20  Q.  Do you recall the dates in which you gave testimony in

21  prior hearings?

22  A.  No.

23  Q.  Would it assist you if you had the opportunity to see a

24  demonstrative that listed all the different dates?

25  A.  You can show it to me, but it won't, like, refresh my

Robert Bryant - Cross

1   memory.  Like, I would have to trust that the information was

2   correct, not that I, you know -- I haven't tracked those dates

3   independently, no.

4   Q.  Okay.  So if you had the opportunity to look at a list of

5   the dates in which you were either interviewed or you provided

6   testimony in prior hearings, would you -- would that assist you

7   in either recalling or would you agree that those are the dates

8   in which you were interviewed and offered prior testimony?

9        MR. TORZILLI:  Objection to an improper refreshment

10  technique.

11       THE COURT:  Overruled.

12  A.  I mean, I could look at them and see, but I don't know that

13  it would -- I can say I don't have an independent recollection

14  of those dates.

15       MR. BELLER:  Your Honor, if I may display only for the

16  witness a document, Defense Exhibit J-292, please.

17       THE COURT:  You may.

18  BY MR. BELLER:

19  Q.  Mr. Bryant, if you can take just a moment and look at

20  J-292.

21       Do any of those dates look familiar, Mr. Bryant?

22  A.  No, not really.

23  Q.  Okay.  So let me ask you this --

24       MR. BELLER:  Well, actually, Your Honor, if I may, I

25  would ask the government if they would be willing to stipulate

Robert Bryant - Cross

1    that those are the dates in which Mr. Bryant either offered

2    prior interviews or testimony.

3            THE COURT:  Let's have a side bar.

4            (At the bench:)

5            THE COURT:  I am not sure what Mr. Torzilli would say,

6    but I am concerned about this because if you look at it and you

7    see these blocks of time that consecutive dates -- and the

8    exhibit is not up right now, but I am worried that the jury may

9    infer that these hearings may have been trials, and, you know,

10   I think nothing wrong with going into the multiple times that

11   he has testified, things of this nature, but this type of an

12   exhibit I think may cause the jury to start putting two and two

13   together, and I am concerned about that.

14           MR. BELLER:  Your Honor, as the Court may imagine,

15   that certainly is not my intent.  I will say if the concern is

16   with the dates that are italicized which are the testimony

17   dates, certainly I would be willing to remove those.  This is

18   being offered purely for the purpose of we are going to be

19   doing a lot of different interviews, and it helps orient the

20   jury in time.

21           If the Court were to deny this, then what I think

22   would be inappropriate on my part is making Mr. Torzilli

23   respond to my request in front of the jury, and I would simply

24   stand up and withdraw my request.

25           THE COURT:  Why don't we find out, first of all, what

Robert Bryant - Cross

1    Mr. Torzilli would have said in response to your request.

2         *MR. TORZILLI:*  Your Honor, I am extremely concerned

3    that this is going to lead to perhaps inadvertently giving the

4    jury an impression of exactly the most dangerous thing here,

5    which is that, what those prior hearings actually were, and

6    that we're going to be facing the prospect of a mistrial here

7    pretty quickly.  So I absolutely object to this exhibit on

8    background and foundational grounds as well.  He has clearly

9    indicated he has met with the government on I think 30 or 31

10   occasions he testified to, so I completely understand that, but

11   as far as the specific dates, he said he doesn't have a

12   specific recollection on which dates, so I object to that, and

13   I also object to the use of this exhibit further.

14         *MR. FELDBERG:*  May I?

15         *THE COURT:*  Yeah.

16         *MR. FELDBERG:*  Just looking at J-292, there are

17   consecutive or near consecutive dates that are not prior

18   hearings, so if the consecutive dates or thereabouts are not

19   limited to prior hearings, Mr. Beller's earlier suggestion of

20   de-italicizing certain things, you know, may be the solution to

21   this.

22         *THE COURT:*  Yeah, I am going -- I will not allow this

23   to be used.  Now, it may not come in anyway because Mr. Bryant

24   claims that it's not refreshing his memory, but I would not

25   allow the hearing dates to come in potentially, you know, if as

Robert Bryant - Cross

1   Mr. Beller suggested those hearing dates are taken off and the

2   dates of interviews remain, then we can see what use may come

3   of it and whether it may be admissible somehow.  But I think we

4   are taking a big chance if we're, you know -- I don't -- I

5   don't think that the dates of the hearings as a general matter

6   are very material, although perhaps there needs to be some

7   distinction between the first trial, the second trial, that

8   type of thing, so maybe talking about months would be okay, but

9   I am worried about, you know, listing consecutive dates, big

10  blocks of time.  I just think that the jury may start -- or

11  may -- some jurors may put two and two together, all right?

12          Anything else, Mr. Beller?

13          *MR. BELLER:*  No, Your Honor, I don't believe so.  I

14  will be moving on the record to not use this as a demonstrative

15  at this time.

16          *THE COURT:*  Understood.  Thank you.

17          (In open court:)

18          *MR. BELLER:*  Your Honor, I do withdraw my request for

19  a stipulation, and I am going to move on.

20          *THE COURT:*  Certainly.  Go ahead.

21  *BY MR. BELLER:*

22  *Q.*  Mr. Bryant, I do want to focus, however, on these 31

23  interviews, okay?  A part of these meetings with the

24  prosecutors was practicing your testimony.

25  *A.*  Partly, yes.  So they had asked questions.  Some of those

Robert Bryant - Cross

1   were asked today.  Some of them weren't, yes.

2   Q.  So yes?

3   A.  Yes.

4   Q.  You practiced role playing with the government.

5   A.  Define role play.

6   Q.  Well, you rehearsed with them?

7   A.  I wouldn't categorize it as rehearse, no.

8   Q.  Mr. Bryant, you testified in March of this year at a

9   hearing.

10  A.  Yes.

11  Q.  When you testified in March of this year in a hearing, you

12  agreed to tell the truth?

13  A.  Yes.

14  Q.  You testified under your immunity agreement.

15  A.  That's correct, yes.

16  Q.  Your immunity agreement that requires truthful cooperation?

17  A.  That's correct.

18  Q.  You were asked the question:  Mr. Bryant, you rehearsed

19  your testimony with them.

20          Do you recall that question?

21  A.  I don't, no.

22  Q.  Your answer, Mr. Bryant, to that simple question was:  Yes.

23          Right?

24  A.  I don't recall rehearsed, no.

25  Q.  You practiced with the government being cross-examined.

634

Robert Bryant - Cross

1   A.   Correct.

2   Q.   They pretended to be a defense attorney like me --

3   A.   I --

4   Q.   Let me finish my question.  They pretended to be a defense

5   attorney and asked you questions.

6   A.   I wouldn't -- I -- pretended, I wouldn't define it as

7   pretended, no.

8   Q.   Mr. Bryant, when you testified in March of this year, sir,

9   you were asked under oath that exact question verbatim, and

10  your answer under oath was:  That's correct.

11  A.   I don't recall that verbatim, pretended.  I recall

12  practiced.

13  Q.   I am sorry.  Let me back up because when I asked you about

14  practiced, I believe that your testimony was that you weren't

15  sure that you agreed with the word "practiced."

16  A.   Yeah, but --

17  Q.   And now I am asking you about the word "pretended."

18  A.   Correct.

19  Q.   So your testimony in March was that the prosecutors

20  pretended to be a defense attorney and asked you questions.

21          MR. TORZILLI:  Your Honor, I object.  May I be heard

22  on side bar?

23          THE COURT:  Yes.

24     (At the bench:)

25          THE COURT:  Go ahead, Mr. Torzilli.

Robert Bryant - Cross

1          MR. TORZILLI:  So, Your Honor, this is -- the problem

2     here is that the witness is being asked the questions about

3     preparation.  And it's unclear whether it's being -- or it's a

4     reference to preparation for this trial or preparation for the

5     prior hearing, so there is an improper impeachment technique

6     going on that's using the prior hearings questions about prep

7     for that hearing to try to impeach him regarding preparation

8     for this hearing, so this is completely improper.  It's

9     extremely confusing, and I ask that the evidence be excluded

10    under 403 because it's misleading and confusing.

11         THE COURT:  Well, you are right, there could be some

12    confusion between preparation for the last trial and

13    preparation for this trial, but I don't think that the question

14    about whether he had given that answer in March was confusing,

15    and so that question I think was, you know, appropriately

16    asked.  So in that regard, I will overrule the objection.

17         MR. TUBACH:  Your Honor, Michael Tubach.  I would also

18    add that the practicing of the testimony and the pretending to

19    be defense counsel is really the exact subject matter that he

20    is testifying about now.  This is a proper subject of

21    impeachment that he practiced the testimony.  It is the same

22    testimony he has given today.  The fact they had additional

23    opportunity to practice with him doesn't negate the relevance

24    of the impeachment of the prior practicing.

25         THE COURT:  Yeah, I think the subject matter was

Robert Bryant - Cross

1   appropriately presented through the question regarding prior

2   testimony by Mr. Beller, and, of course, you're right that, you

3   know, if it had occurred at some point in the past, it wouldn't

4   necessarily be irrelevant to what may have happened more

5   recently.

6          MR. TORZILLI:  Questions aren't being framed in that

7   way, and that way it's confusing to the witness, and it's going

8   to be confusing to the jury.  And one other point is when he

9   says he doesn't recall what happens -- which happens for a

10  number of these, that's not a basis upon which impeachment can

11  occur.  Its just he doesn't recall as opposed to giving a

12  statement that's inconsistent with a statement that he made in

13  the past.

14         THE COURT:  I guess it may depend on what the prior

15  answer is being used for.  I am not sure that it was

16  necessarily clear, but I think that you could refresh

17  recollection through prior testimony like that.  In any event,

18  the objection is overruled, and let's go ahead.

19         Thank you.

20         (In open court:)

21  BY MR. BELLER:

22  Q.  Mr. Bryant, the question that was on the table is whether

23  you agree that in March you were asked if the government

24  pretended to be defense attorneys and asked you questions, and

25  you answered:  That's correct.

637

Robert Bryant - Cross

1   *A.*  I said I don't remember the -- I remember practice, but I

2   don't remember pretended.

3   *Q.*  You had many practice sessions.

4   *A.*  Yes.

5   *Q.*  The lawyer was -- your lawyer, rather, was present.  I am

6   not asking for any discussions that you had with just him.

7   Your lawyer was present when the government practiced your

8   cross-examination with you.

9   *A.*  That's correct.

10  *Q.*  There were at least six times that you practiced your

11  cross-examination.

12  *A.*  I don't know the number.

13  *Q.*  Mr. Bryant, in prior testimony, you were asked:  Well, you

14  practiced at least six times.

15       And your answer to that question under oath was:

16  Correct.

17  *A.*  I don't remember the number, the exact number.

18  *Q.*  Do you agree with me that you have testified that it was at

19  least six times?

20       *MR. TORZILLI:*  Objection.  The witness has said he

21  doesn't recall.

22       *THE COURT:*  Overruled.

23  *A.*  I don't remember the exact number, and I don't know the

24  exact number.

25  *BY MR. BELLER:*

Robert Bryant - Cross

1    Q.  But my question is, did you testify that it was at least

2    six times?

3    A.  I don't remember.

4    Q.  Okay.

5    A.  I am not trying to debate you.  I just -- I don't remember

6    that, that specific question and answer.

7    Q.  It was multiple times, Mr. Bryant, that you practiced

8    direct examination and cross-examination with federal

9    prosecutors.

10   A.  Correct.

11   Q.  Mr. Bryant, as we're going through -- well, let me stop.

12   Have there been any questions that I have asked you thus far

13   this afternoon that you previously practiced with the

14   government?

15   A.  I don't recall.

16   Q.  Maybe?

17   A.  I don't know.

18   Q.  Okay.  Well, if I ask you questions that you recall having

19   practiced with the government, I want you to let me know.

20   A.  Okay.

21   Q.  Not only did you practice, Mr. Bryant, being

22   cross-examined, but you also practiced giving direct

23   examination.

24   A.  Yes.

25   Q.  So the testimony you gave yesterday, the testimony that you

Robert Bryant - Cross

1    gave most of the day today, that was all direct examination; is

2    that right?

3    A.   Correct.

4    Q.   And that is what you also practiced with the government.

5    A.   Correct.

6    Q.   Now, Mr. Bryant, you said something earlier and I want to

7    ask you more about that, and that is the truth doesn't change,

8    right?

9    A.   Correct.

10   Q.   The truth, you would agree with me, Mr. Bryant, does not

11   change with practice either, does it?

12   A.   That's correct.

13   Q.   So let's talk a little bit more, Mr. Bryant, about

14   information that you shared with prosecutors and agents in

15   these 31 interviews.  I want to start by asking a little bit

16   about your role in the prosecution and assisting the

17   prosecutors in their knowledge about the case, okay?

18   A.   Okay.

19   Q.   You would agree with me that through these 31 interviews,

20   the government has spent a lot of time with you.

21   A.   Yes.

22   Q.   A lot of time getting you ready for your testimony.

23   A.   Probably say more time in the investigation stage than

24   preparing for proceedings.

25   Q.   Good.  So of those 31 interviews, more time was spent in

Robert Bryant - Cross

1  the investigation phase as opposed to the preparation phase?

2  A.  Yeah, maybe now maybe it's equal, but, yeah, quite a bit.

3  Q.  Excuse me.  I interrupted you.  Go ahead.

4  A.  I was just going to say quite a bit of time, yes.  Like I

5  said, it may be closer to equal amount of time now, I'm not

6  sure.

7  Q.  Great.  So if it's an equal amount of time and you have

8  been interviewed 31 times, that means 15 or 16 of those

9  sessions were spent on the interview or I think you said

10  investigation stage.

11  A.  Correct.

12  Q.  Which means that 15 or 16 times were spent practicing your

13  testimony.

14  A.  I guess correct.  I wouldn't characterize it that way.

15  There were -- a lot of the times it was repeating the same

16  thing multiple times, but it was to different people because

17  there were different agents and DOJ people, so it was just

18  rehashing the same thing repeatedly.

19  Q.  Good.

20  A.  Same information.

21  Q.  Right.  Same practice, larger audience.

22      MR. TORZILLI:  Objection to mischaracterizes his prior

23  testimony.

24      THE COURT:  Overruled.

25  A.  No, it wasn't larger audience.  A lot of times it was

Robert Bryant - Cross

1   different people wanting to hear the same information.

2   *BY MR. BELLER:*

3   Q.   Wanting to help prepare you for your testimony and practice

4   your testimony with you.

5   A.   No, it was -- once again, it was because there were

6   different people, different DOJ people or different agents, so

7   it was -- new people that needed to hear the same information

8   that's already been discussed.

9   Q.   Okay.  And a lot of time was spent by all of these people

10  gaining an understanding of what you know?

11  A.   Yeah.

12  Q.   And also gaining an understanding of what you don't know,

13  right?

14  A.   That's correct.

15  Q.   They asked you about topics for which you had firsthand

16  knowledge?

17  A.   That's correct.

18  Q.   And I think on direct examination you were asked several

19  times about specific incidents for which you had personal

20  knowledge, right?

21  A.   That's correct.

22  Q.   And they also asked you about topics for which you did not

23  have firsthand personal knowledge of.

24  A.   That's correct.

25  Q.   And your role in that investigation stage as you call it

642

Robert Bryant - Cross

 1   was to teach them in part how the chicken industry works.

 2          MR. TORZILLI:  Objection, foundation, calls for

 3   speculation.

 4          THE COURT:  Overruled.

 5   A.  I don't know that it was to teach them.  I don't know that

 6   I would characterize it as that.  I mean, they were just

 7   questions.  They had questions, and I answered the questions.

 8   I don't know that it was teaching as much as investigating.

 9   BY MR. BELLER:

10   Q.  Well, you were teaching them what you knew, right?

11   A.  I wouldn't call it teaching.  They would ask questions, and

12   I would answer them.

13   Q.  Okay.  So you -- I don't want to quibble with you over

14   words.  I want to make sure I get it right.  You told them what

15   you knew.

16   A.  I answered their questions.

17   Q.  By telling them the answer.

18   A.  I answered their questions.

19   Q.  Is that a yes?

20          MR. TORZILLI:  Your Honor, this has been asked and

21   answered.

22          THE COURT:  Overruled.

23   A.  I don't understand the distinction.  They asked questions,

24   and I answered them.

25   BY MR. BELLER:

Robert Bryant - Cross

1   *Q.* By telling them what you knew.  You did this verbally.  You

2   told them what you knew.

3   *A.* I answered the questions asked.

4   *Q.* Okay.  And some of the questions were about the chicken

5   business.

6   *A.* Yes.

7   *Q.* So you told them about the chicken business.

8   *A.* I told them, like I said, I answered whatever questions

9   they asked me.

10  *Q.* All right.  Let's make this easy.  Did they ask you

11  questions about the chicken business?

12        *MR. TORZILLI:* Objection, asked and answered.

13        *THE COURT:* Overruled.

14  *A.* I don't recall specifically.  I mean, that's pretty broad.

15  *BY MR. BELLER:*

16  *Q.* It is.  Did they ask you questions about the chicken

17  business?  That's a yes or no.

18  *A.* I don't know exactly what you're trying to ask me.

19  *Q.* Let me stop for just a moment, Mr. Bryant.  Did they ask

20  you your name?

21  *A.* Yes.

22  *Q.* Did you answer them?

23  *A.* Yes.  I answered their question.

24  *Q.* Did they ask you questions about Pilgrim's Pride?

25  *A.* Yes.

Robert Bryant - Cross

1    Q.  Did you answer them?

2    A.  Yes.

3    Q.  Did they ask you questions about contracts?

4    A.  Yes.

5    Q.  Were those contracts part of the chicken business?

6    A.  Yes.

7    Q.  Did you answer their questions?

8    A.  Yes.

9    Q.  All right.  They also asked you questions about the bidding

10   process; is that right?

11   A.  That's correct, yes.

12   Q.  Did you answer their questions about the bidding process?

13   A.  Yes.

14   Q.  Was the bidding questions or the questions about the

15   bidding process related to the chicken business?

16   A.  In that form, yes, yes.

17   Q.  Did you answer their questions about the bidding process in

18   the chicken business?

19   A.  Yes.

20   Q.  Mr. Bryant, you will agree with me, sir, that there is a

21   difference between an assumption, an inference, and having

22   firsthand personal knowledge?

23   A.  Yes.

24   Q.  When you were being interviewed by the prosecutor, it was

25   important, sir, for you to make clear when you were answering

645

Robert Bryant - Cross

1   their questions by making assumptions or by making an inference

2   or by telling them what you had personal knowledge over.

3          MR. TORZILLI:  Objection to form and to foundation.

4          THE COURT:  Overruled.

5   A.  I would try to make those distinctions, yes.

6   BY MR. BELLER:

7   Q.  Great.  When you are testifying in this courtroom, when you

8   are testifying now in this courtroom, you would agree with me,

9   Mr. Bryant, that there is a difference between testifying about

10  assumptions, testifying about inferences, and testifying about

11  what you have firsthand knowledge over.

12  A.  Yes.

13  Q.  When the prosecutors were interviewing you, they cautioned

14  you to identify for them what was an assumption on your part.

15         MR. TORZILLI:  Objection, calls for hearsay and

16  foundation.

17         THE COURT:  Overruled.

18  A.  I don't remember having those specific conversations, no.

19  BY MR. BELLER:

20  Q.  Okay.  So if they didn't ask you to identify what was an

21  assumption, did they ask you to identify what was an inference?

22  A.  I don't recall.

23  Q.  If they didn't ask you or you don't recall to be accurate,

24  if you don't recall them asking you to identify what was an

25  assumption, what was an inference, did they ask you to at least

646

Robert Bryant - Cross

1   identify what you had personal firsthand knowledge about?

2   A.  There were times that they did ask personal firsthand

3   knowledge, yes.

4   Q.  Okay.  Now, when you were practicing your testimony those

5   15 or 16 times with prosecutors, did you practice identifying

6   assumptions?

7   A.  I don't remember.

8   Q.  When you were practicing those 15 or 16 times with federal

9   prosecutors, did you practice identifying inferences?

10  A.  I don't remember.

11  Q.  When you were practicing your testimony with prosecutors

12  those 15 or 16 times, did you practice identifying when you had

13  firsthand personal knowledge?

14  A.  I don't remember calling that specific out, no.

15  Q.  Okay.  Well, and that's important, Mr. Bryant, to you, of

16  course, because you know that important facts can get lost

17  through layers of hearsay, right?

18  A.  I honestly, I don't exactly know the legal term of hearsay,

19  so you would have to help me with that.

20  Q.  Good.  Let me ask you another question.

21       Mr. Bryant, did you know the childhood game telephone,

22  the telephone game?

23  A.  No.

24  Q.  Do you know or have you ever heard of a situation in which

25  one person tells a story to another person who tells a story to

Robert Bryant - Cross

1   another person, and at the end, everybody compares notes to see

2   how the story changed during those different layers of story?

3   A.   I've heard that, yes.

4   Q.   Good.  So for our purposes, I am going to call this the

5   telephone game, okay?

6   A.   Okay.

7   Q.   All right.  Is that something that you played when you were

8   a kid, Mr. Bryant?

9   A.   No, not that I remember, no.

10  Q.   Okay.  Well, in this situation, the idea, and tell me if

11  you agree or can imagine, that at the end of the story or at

12  the end of this telephone line the story may be different,

13  right?

14  A.   That's the point of the game.

15  Q.   Right.  And so because details can get changed, lost, or

16  misremembered.

17  A.   Correct.

18  Q.   And you would agree with me, Mr. Bryant, that depending on

19  the number of layers to this story and the passage of time, the

20  chance of that story changing at the end is greater.

21  A.   That's the point of the game.

22  Q.   That it makes it even more pronounced, this warped sort of

23  conclusion even more pronounced, right?

24  A.   Once again, that's the point of the game, to try to draw

25  that out.

Robert Bryant - Cross

1   *Q.*   So, Mr. Bryant, sticking with these interviews for just a

2   moment, insofar as you know, you were able to answer their

3   questions and tell them your knowledge of how the industry

4   works, right?

5   *A.*   I answered the questions, yes.

6   *Q.*   About the industry?

7   *A.*   Once again, I answered their questions, yes.

8   *Q.*   Did they ask you about the industry, Mr. Bryant?

9   *A.*   In what context are you referring?

10  *Q.*   Did they ever ask you to -- any question that used the word

11  "industry"?

12  *A.*   Yes.

13  *Q.*   Great.  Were you able to answer that?

14  *A.*   It depends on the context, how you are forming the

15  question, what that industry means, but when you're in the

16  business, industry generally means your competition.

17  *Q.*   Yeah, no, I recognize that.  You have said that many times

18  on direct, but that wasn't my question.  My question was, did

19  you answer their questions about industry?

20  *A.*   I don't recall that specific question.

21  *Q.*   All right.  Did you teach them, we are going to do this

22  again, did you teach them how the bidding works?

23  *A.*   We discussed the bidding, how the bidding worked for

24  multiple customers, not just QSR, but Sysco and retail, yes.

25  *Q.*   And so did I understand your answer, is that a yes?

Robert Bryant - Cross

1  A.  We talked about the bidding process, yes.

2  Q.  Is that a yes?

3  A.  We talked about the bidding process, yes.

4  Q.  Excuse me.  I wasn't hearing the yes at the end, okay?  I

5  am not trying to be difficult with you.

6          It was important in the 15 interviews in which you

7  were discussing or assisting with the investigation, it was

8  important for you to be forthcoming with them.

9  A.  That's correct.

10  Q.  It was important for you to try to be helpful, right?

11  A.  I was doing my best to cooperate under the terms of the

12  agreement, yes.

13  Q.  Right.  I asked you about helpful.  Was it important for

14  you to try to be helpful?

15  A.  It was important for me to live up to the terms of the

16  agreement, yes.

17  Q.  Yes, yes is the answer?

18  A.  Once again, it was important for me to live up to the

19  agreement, yes.

20  Q.  Okay, let me back up because I think we are running into

21  problems with semantics.  Important for you to live up to the

22  agreement is your language.  I am using the word "helpful."

23  Are those different things to you?

24  A.  The difference is that it's the cooperation agreement.  You

25  know, that's part of the agreement, yes.  I am not sure I

Robert Bryant - Cross

1   understand your distinction with helpful and why you are

2   debating me trying to live up to the spirit of the agreement.

3   Q.  Is cooperating by answering their questions completely

4   something that you tried to do?

5   A.  Yes.

6   Q.  Part of teaching them the industry was, in fact, you having

7   to make certain assumptions.

8   A.  I don't know -- I mean, we are back to the teaching thing.

9   I mean, they asked questions, and I answered those questions to

10  the best of my ability.  I am not trying to be difficult, it's

11  just --

12  Q.  I understand.

13  A.  It's the characterization that I was, like, a teacher, and

14  I -- like, I schooled the Department of Justice, and that's not

15  the way I perceived it.  They asked questions.  I answered

16  those questions as part of their investigation.  That's the way

17  I would characterize it.

18  Q.  Mr. Bryant, there isn't a question posed to you at the

19  moment, sir.  What verb would you feel comfortable with me

20  using?

21  A.  In what context?

22  Q.  In context to your answers to their questions during your

23  assistance in their investigation.

24  A.  I just answered the questions they asked me.

25  Q.  Okay.  When they asked you questions and you answered those

Robert Bryant - Cross

1    questions, you sometimes made assumptions.

2    A.   Probably, yes.

3    Q.   When you answered their questions, you also sometimes made

4    inferences.

5    A.   Possibly.

6    Q.   And in answering their questions, you sometimes gave them

7    firsthand knowledge.

8    A.   Most of the time probably, yes.

9    Q.   Your first interview with the Department of Justice was in

10   June of 2021, right?

11   A.   I believe so.

12   Q.   About a year after the Indictment came out; is that

13   correct?

14   A.   I don't know the date of the Indictment, but it's

15   probably -- I remember it was the summer before, yes.  I just

16   don't know the exact time frame.

17   Q.   Your first interview was about a year after the Indictment

18   came out.

19   A.   Possibly, yes.

20   Q.   So meeting with them and answering their questions has

21   taken about a year.

22   A.   You mean to this point.

23   Q.   Yes.

24   A.   Yes.

25   Q.   A year and 31 interviews.

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   So I want to better understand and summarize your

3   testimony, your direct testimony.  You testified to the jury

4   about the bidding process.

5   A.   Correct.

6   Q.   You testified to the jury about e-mails that you received

7   from Mr. Austin and Mr. Austin then explaining -- excuse me,

8   that was a bad question.  You testified about e-mails you

9   received with -- from Mr. Austin, and then in certain

10  situations you explained what Mr. Austin meant in those

11  e-mails.

12  A.   That's my understanding, yes.

13  Q.   Well, it's your testimony.  So is that what you did?

14  A.   I don't know what e-mail you are referring to.

15  Q.   I am speaking generally.  You testified to the jury about

16  e-mails.

17  A.   I believe my testimony was an e-mail from Mr. McGuire and

18  phone calls and overheard conversations between Roger Austin

19  and competitors.  I don't remember specifically an e-mail.

20  Q.   And I may have misspoken about that, so I appreciate you

21  correcting me.  Let me speak a lot more broadly for just a

22  moment, Mr. Bryant.  Mr. Bryant, you testified about e-mails.

23  A.   I remember, yes, specifically the e-mail I was referencing

24  was the one from Mr. McGuire.

25  Q.   So, yes, you testified about e-mails.

Robert Bryant - Cross

1  A.  E-mail, yes.

2  Q.  Well, you testified about e-mails with Mr. Stiller as well?

3  A.  I believe so, yes.

4  Q.  You testified about e-mails with Mr. Tucker?

5  A.  I don't believe Mr. Tucker, no.

6        MR. TORZILLI:  Objection, misstates the testimony.

7        THE COURT:  Overruled.

8  A.  I don't know Mr. Tucker.  I believe I said phone calls with

9  Mr. Tucker.

10  BY MR. BELLER:

11  Q.  So let me ask you my question now.  You testified,

12  Mr. Bryant, about e-mails.

13  A.  Yes.

14  Q.  Great.  All right.  So you testified about e-mails.  You

15  also testified about those e-mails, and you interpreted what

16  other people meant in those e-mails.

17  A.  I believe I interpreted my understanding of the e-mail.

18  Q.  Right, your assumption about what those people meant in

19  that e-mail.

20  A.  I testified about my understanding, yes.

21  Q.  Yes.

22  A.  My understanding.

23  Q.  And in order for you to understand what was in somebody

24  else's head when they were typing, that required you to make

25  certain assumptions.

Robert Bryant - Cross

1    *A.*  Once again, I testified about my understanding about the

2    e-mail, yes.

3    *Q.*  And so when you were asked who is being referenced by

4    somebody else regarding a pronoun of "them," you testified what

5    you assumed the other person meant by the word "them."

6          *MR. TORZILLI:*  Objection, misstates the testimony.

7          *THE COURT:*  Overruled.

8    *A.*  No, I testified my understanding and my interpretation of

9    the e-mail.

10   *BY MR. BELLER:*

11   *Q.*  Okay.  That somebody else wrote.

12   *A.*  That's correct, yes.

13   *Q.*  All right.  You also made inferences about what somebody

14   else meant, so we are talking about assumptions and also

15   inferences.

16   *A.*  I stated my understanding of the e-mail and how I used

17   that -- the information in that e-mail.

18   *Q.*  Perfect.  So let's go on that for just a moment,

19   Mr. Bryant.  You testified about your understanding of those

20   e-mails, but you would agree with me that you don't know what

21   somebody else -- what was in somebody else's head and what

22   their intention was when they were the ones who wrote it.

23   *A.*  That's correct.  I didn't try to represent that, no.

24   *Q.*  Right.  So to the extent that there is a misunderstanding

25   as to what was in somebody else's head or what was somebody

Robert Bryant - Cross

1    else's intent, you agree that you are without a basis to be

2    able to say.

3    *A.*  I couldn't testify about what somebody else was thinking,

4    no.

5    *Q.*  Great.  You also, because we are still summarizing your

6    direct examination, Mr. Bryant, you testified about a call you

7    overheard between Mr. Austin and Mr. Brady.

8    *A.*  That's correct, yes.

9    *Q.*  A call you overheard between Mr. Austin and Mr. Kantola?

10   *A.*  That's correct, yes.

11   *Q.*  You testified about a meeting where Mr. McGuire instructed

12   Mr. Austin to, quote/unquote, put this out to the industry?

13   *A.*  That's correct, yes.

14   *Q.*  You testified about Pilgrim's strategy to, quote/unquote,

15   do KFC first.

16   *A.*  That's correct.

17   *Q.*  You testified about a communication in which somebody said,

18   quote/unquote, I heard they made a couple of phone calls.

19   *A.*  Yes.

20   *Q.*  Now, in your direct testimony, you mentioned a Mr. McGuire.

21   *A.*  That's correct.

22   *Q.*  You mentioned I believe a Mr. Gay.

23   *A.*  Yes.

24   *Q.*  A Mr. Stiller.

25   *A.*  Yes.

656

Robert Bryant - Cross

1   Q.  Mr. Kantola.

2   A.  Yes.

3   Q.  Mr. Pepper.

4   A.  Yes.

5   Q.  Mr. Tucker.

6   A.  Yes.

7   Q.  Mr. Bryant, on direct examination, the prosecutor asked you

8   to identify certain people in this courtroom.  Do you recall

9   that?

10  A.  Yes.

11  Q.  Mr. Bryant, I want you to look out into the courtroom and

12  tell us if you see Mr. McGuire, Mr. Gay, Mr. Stiller,

13  Mr. Kantola, Mr. Pepper, or Mr. Tucker.

14  A.  I haven't seen them here today, no.

15        MR. BELLER:  If I may have just a brief moment, Your

16  Honor.

17        THE COURT:  You may.

18  BY MR. BELLER:

19  Q.  All right.  Let's talk a little bit about your role, your

20  job with Pilgrim's Pride from 2010 to 2016, okay?

21  A.  '16?

22  Q.  That's correct.

23  A.  Okay.

24  Q.  You testified that you were a divisional planner; is that

25  right?

Robert Bryant - Cross

1    A.   That's right.

2    Q.   All right.  So as a divisional planner, part of your job

3    was to have conference calls with seven different plants.

4    A.   That's correct, yes.

5    Q.   You had to make sure that there was enough chicken supply.

6    A.   I was responsible for the supply chain, yes.

7    Q.   Enough supply of the correct bird sizes.

8    A.   Yes.

9    Q.   Enough supply of the correct bird sizes and no shortages?

10   A.   That was the goal, yes.

11   Q.   You also had to make sure that customer orders were met.

12   A.   That's correct.

13   Q.   Now, the government has asked you a lot about KFC bidding.

14   It was not, Mr. Bryant, part of your role as a divisional

15   planner to have direct negotiations with customers.

16   A.   Not at first, no.

17   Q.   Your role as a divisional planner was indirect.

18   A.   At the beginning, yes.

19   Q.   Indirect because you were a part of the supply chain

20   logistics?

21   A.   Yes, but -- but it was just -- it was more than that,

22   assisted my boss in the day-to-day activities, so we worked

23   very closely together.

24   Q.   Mr. Bryant, do you recall that on September 14th of 2021

25   you were interviewed by the Department of Justice?

Robert Bryant - Cross

1    A.  I don't recall the date, no.

2    Q.  Do you recall that you were interviewed by the Department

3    of Justice four times in September of 2021?

4    A.  No.

5    Q.  Do you recall, Mr. Bryant, being interviewed by federal

6    agents in September of 2021?

7    A.  I don't, no.  I am not saying I wasn't.  I just don't

8    remember.

9    Q.  Do you recall being interviewed at all by anyone,

10   Mr. Bryant?

11   A.  I don't remember September of 2021.

12   Q.  Do you remember being interviewed by the Department of

13   Justice?

14   A.  Yes, many times.

15   Q.  All right.  So I want to ask about an interview that you

16   did early on.  I want to ask about an interview in September of

17   2021.  You told federal agents and prosecutors in an interview

18   that you had an indirect role because you were a part of supply

19   chain logistics, period.

20        Do you recall that statement?

21   A.  No.

22   Q.  Okay.  Is that an accurate statement that you gave to the

23   Department of Justice sometime in the last 31 interviews?

24        MR. TORZILLI:  Objection, time frame for the question

25   being posed is unclear and, therefore, confusing to the jury

Robert Bryant - Cross

1    any response.

2           THE COURT:  Overruled.

3    A.  I don't remember that exact statement.

4    BY MR. BELLER:

5    Q.  Okay.  If you said that to the Department of Justice and

6    federal agents, would that be correct?

7           MR. TORZILLI:  Objection, calls for speculation.

8           THE COURT:  Overruled.

9    A.  I don't remember that exact statement.

10   BY MR. BELLER:

11   Q.  No, I am only asking you if you had an indirect role

12   because you were a part of supply chain logistics.

13   A.  At first, yes, it was indirect in early -- you know, when I

14   first started 2010, and then I had more direct roles with lower

15   customers until I was customer facing to the national accounts.

16   Q.  Right.

17   A.  I was still in that role.

18   Q.  Excuse me.  I interrupted you.  Did you finish your

19   sentence, sir?

20   A.  I was saying while I was still in that role.

21   Q.  Okay.  Mr. Bryant, when you were a divisional planner for

22   10 years, you monitored prices to KFC.

23   A.  Actually, monitored prices to KFC before I was divisional

24   planner.

25   Q.  Yes.

Robert Bryant - Cross

1   *A.*  When I was at the Mayfield plant, I remember running a

2   weekly report for the complex manager there that had KFC

3   pricing on there on a weekly basis along with KFC case weights.

4   *Q.*  Are you done?

5   *A.*  Yes.

6   *Q.*  Let me ask my question.  For 10 years, Mr. Bryant, you

7   monitored prices to KFC.

8   *A.*  Probably, yes.

9   *Q.*  Okay.  You monitored prices to KFC.  You also monitored

10  prices to Popeye's.

11  *A.*  Yes, yes.

12  *Q.*  You monitored prices to KFC, Popeye's, and others?

13  *A.*  Yes.

14  *Q.*  You tracked pricing?

15  *A.*  Yes, got weekly reports on pricing from individual

16  customers.

17  *Q.*  You became accustomed to seeing pricing.

18  *A.*  Yes.

19  *Q.*  But you had not participated in negotiations.

20  *A.*  I had participated in negotiations with other customers,

21  not national accounts and not customer facing.  You know,

22  McGuire and I would speak regularly about bids.

23  *Q.*  Mr. Bryant, you offered testimony in November of 2021.  Do

24  you recall offering testimony in November of 2021?

25  *A.*  I remember doing some testimony, yes.

Robert Bryant - Cross

1   *Q.*   Do you recall taking an oath to tell the truth?

2   *A.*   Yes.

3   *Q.*   Do you recall being asked questions about your involvement

4   in negotiations when you were in your role as a divisional

5   planner?

6   *A.*   No.

7   *Q.*   Do you recall providing the following testimony:

8        I would see what those increases were or decreases, so

9   I was familiar with it, although I hadn't participated in

10   negotiations.

11   *A.*   That sounds familiar, yes.

12   *Q.*   Okay.  So my question, Mr. Bryant, is you hadn't

13   participated in negotiations.

14        *MR. TORZILLI:*  Objection.  It misstates the testimony.

15        *THE COURT:*  Overruled.

16   *A.*   Yeah, that statement was referencing negotiations with

17   national accounts, but it was not -- and that was direct

18   negotiations with national accounts, not conversations that

19   Mr. McGuire and I had before I was customer facing and not the

20   other customers that I did participate in.

21   *BY MR. BELLER:*

22   *Q.*   Great.  So let me go back to my questions.  I asked you

23   about KFC, Popeye's, and others, right?

24   *A.*   Correct.

25   *Q.*   So KFC and Popeye's, those are national accounts.

662

Robert Bryant - Cross

1    A.   That is correct.

2    Q.   My question is you had not participated in negotiations for

3    KFC or Popeye's.

4    A.   Not customer facing, no.

5    Q.   Okay.  So your testimony now is that you participated in

6    negotiations from behind the scenes.

7    A.   Once again, it was internal discussions with my manager on

8    those negotiations, so, yes.

9    Q.   And when you testified in November, your testimony did not

10   have any sort of conditions that your manager engaged in

11   contact or communications with you.  Your testimony was that

12   you had not participated in negotiations.

13   A.   The meaning in November was customer facing.  There is a

14   distinction there, yes, so we had internal deliberations prior

15   to that about those negotiations, but being customer facing is

16   the distinction I am trying to make.

17   Q.   Okay.  Well, and to be fair, in 2014, your role changed a

18   little bit.

19   A.   Correct.

20   Q.   You still had the same title.  You are still divisional

21   planner in 2014, right?

22   A.   That's correct.

23   Q.   But you were brought in to assist with some of the KFC

24   negotiation.

25   A.   Correct.

Robert Bryant - Cross

1    Q.  This is the very first time in your entire career that you

2    had a direct role in the KFC negotiation.

3    A.  That I recall, yes.

4    Q.  Well, no, not that you recall.  You either had a direct

5    role or you didn't.  Your testimony was that you didn't, so my

6    question to you is, this is the first time in your career that

7    you did not have a direct role -- or that you had a direct

8    role.

9    A.  I was trying to answer you.  I'm sorry, I apologize.  Once

10   again, it was customer facing with the customer and actually

11   speaking, participating in those customer-facing meetings.

12   Q.  Can we call customer-facing meetings a direct role?

13   A.  Yes.

14   Q.  And so in 2014, it was the first time you had a direct role

15   in the KFC negotiations.

16   A.  That's what I recall, yes.

17   Q.  Okay.  You were there to talk volume regarding small-bird

18   prices.

19   A.  Volume?  I was there to talk about the supply contraction

20   in small birds.

21   Q.  Mr. Bryant, when you gave an interview to the FBI in

22   September of 2014, you told the FBI and prosecutors under your

23   immunity agreement that you were there to talk volume regarding

24   small birds' prices.

25              MR. TORZILLI:  Your Honor, I have to object.  He was

Robert Bryant - Cross

1   not interviewed by the FBI in 2014 I am certain.

2          MR. BELLER:  Excuse me for my misstatement.  I am more

3   than happy to --

4          THE COURT:  Sustained.  If you will rephrase, please.

5          MR. BELLER:  I am happy to.

6   BY MR. BELLER:

7   Q.  My fault.  I accidentally said 2014 instead of 2021, so let

8   me ask my question again, Mr. Bryant, with the proper words.

9   When you were interviewed by the FBI and federal prosecutors in

10  September of 2021, they asked you questions about your role in

11  the KFC negotiation.

12  A.  Which negotiation?

13  Q.  The 2014 KFC negotiation.

14  A.  I don't recall that interview.

15  Q.  I am not asking about a specific interview.  I am asking

16  you if they have interviewed you about KFC negotiations.

17  A.  They have interviewed me about KFC negotiations.

18  Q.  They have asked you questions about KFC negotiations.

19  A.  Yes.

20  Q.  They have asked you pointed questions regarding your role

21  in the KFC negotiations.

22  A.  They asked what parts I participated in.

23  Q.  Great.  And an answer that you gave them is that you were

24  there, meaning at KFC in the KFC negotiations, to

25  quote/unquote, talk volume regarding small-bird prices.

Robert Bryant - Cross

1  A.  I don't recall that.

2  Q.  Okay.  Because your role in the supply chain, your role as

3  a divisional planner was to deal with covering shortages on a

4  daily basis.

5  A.  It was part of the job, yes.

6  Q.  More often than not, when Pilgrim's was short on product,

7  Mr. Austin or someone on his team reached out to a competitor

8  to purchase product.

9  A.  I don't know if it was more often than not.  I would say

10  more often than not we figured it out internally, but if we

11  were unable to figure it out internally, then we would look

12  externally.

13  Q.  Mr. Bryant, do you recall offering testimony under oath in

14  this courtroom in November of 2021?

15  A.  Yes.

16  Q.  Do you recall, Mr. Bryant, being asked questions by the

17  Department of Justice prosecutors?

18  A.  Yes.

19  Q.  Do you recall, Mr. Bryant, answering their questions

20  completely, fully, and accurately?

21  A.  To the best of my ability, yes.

22  Q.  Do you recall, Mr. Bryant, quibbling at all with any of

23  their questions?  And if you did, did you correct it?

24  A.  I don't recall either way.

25  Q.  Do you recall, Mr. Bryant, being asked verbatim the

Robert Bryant - Cross

1    question I just asked you and you responding, and I quote,

2    Probably more often than not when we were short that Roger or

3    someone on his team reached out to a competitor to purchase

4    product.

5    A.   Yeah, in that context, yes, because there is a distinction

6    there.  When you asked the question, you said more often than

7    not did you source -- when you were short did you source

8    product externally.  And the way I interpreted your question,

9    the answer would be no, because more often than not when we

10   were short, we figured out ways to cover those shortages

11   internally before we went externally.  However, when we were --

12   exhausted those resources and were actually short, then we

13   would reach outside for assistance.

14   Q.   Are you done, Mr. Bryant?

15   A.   I was hoping I answered your question.

16   Q.   You didn't because my question had nothing to do with

17   anything that you just answered, so I want you to listen to my

18   question.

19        I asked you a question, did you or did you not on

20   November 1st, 2021 in this courtroom under oath sitting in the

21   chair you are sitting in now say the following, and I quote,

22   Probably more often than not when we were short that Roger or

23   someone on his team reached out to a competitor to purchase

24   product?

25        MR. TORZILLI:  Your Honor, I object.  Can we have a

Robert Bryant - Cross                                    667

1   side bar, please?

2          THE COURT:  Yes.

3      (At the bench:)

4          THE COURT:  Go ahead, Mr. Torzilli.

5          MR. TORZILLI:  Your Honor, I have got to object to

6   this line of questioning.  Not only the line of questioning but

7   the technique being used references to in this very chair in

8   this very courtroom, et cetera.  I think what is happening

9   here, and I am sure it's not intentional, is we are running

10   huge, huge risks that we are going to wind up inadvertently in

11   a mistrial posture very, very soon.  So there has to be a

12   different and, frankly, proper impeachment technique to be

13   employed to avoid what I view as a massive risk that we are

14   going to run into exactly what Your Honor has tried to guard

15   against, which is references to prior trials.

16          THE COURT:  Mr. Beller?

17          MR. BELLER:  Your Honor, I am desperately trying to

18   make sure that I am asking the proper questions.  I am

19   desperately trying to make sure that I am doing the proper

20   impeachments.  If there is different language that Mr. Torzilli

21   or the Court have for me, I say this with earnestness, I am

22   very open to doing so.  If Mr. Torzilli would rather -- I can

23   certainly have the Court take judicial notice of the transcript

24   and prior testimony, that is a way to do it.  That tends to be

25   prejudicial to the opposing party, so that's the reason why I

Robert Bryant - Cross

1    haven't done it.  So I -- No. 1, I don't think it's improper.

2            No. 2, if there is suggestions, we don't need to be on

3    the record for Mr. Torzilli to notify me what it is he would

4    like me to rather do, I am happy to do so.

5            THE COURT:  Mr. Tubach?

6            MR. TUBACH:  Your Honor, I think it's also not

7    prejudicial at all to say that Mr. Bryant was sitting in that

8    chair.  The fact that we are talking about prior hearings

9    trying to avoid the word "prior trials," it wouldn't be a

10   surprise at all to the jury that a prior hearing in this case

11   would be in this courtroom, so I don't think there is anything

12   prejudicial about that at all.

13           THE COURT:  Yeah, I am going to overrule the

14   objection.  I do think that if a defense counsel adopted a

15   cross-examination strategy to simply confront a witness with

16   prior testimony, that the likelihood of a misstatement, an

17   inadvertent statement goes up, but I don't find that

18   Mr. Beller's strategy is that.  Rather, it appears that

19   Mr. Beller is just trying to get answers to some fairly

20   straightforward questions from Mr. Bryant, but Mr. Bryant is

21   qualifying a lot of his answers.  And it appears to me that

22   Mr. Beller at some point as a backup to try to make the point

23   about what the -- what answer he has given in the past has

24   confronted him with some previous statements.  And so it's

25   certainly not Mr. Beller's strategy; it's Mr. Beller resorting

Robert Bryant - Cross

1    to that.  But so far, even though, once again, it always

2    carries with it some risk, I don't see that Mr. Beller is

3    adopting a strategy of, you know, unduly taking those risks.

4            So at the present time, I'll overrule the objection.

5            MR. TORZILLI:  Your Honor, just to be clear, I mean,

6    the riskiest thing is the signal or the inference of questions

7    that include what I view as unnecessary references to sitting

8    in that very chair.  I mean, I understand that prior

9    inconsistent statements, including prior sworn testimony, are

10   things that can be used as impeachment techniques, but it seems

11   unnecessary to have to talk about whether he was sitting in

12   that very chair.  I mean, there can just be a reference to a

13   prior hearing or prior sworn testimony, et cetera, which

14   creates far less risk than the risks that are being created

15   presently.

16           THE COURT:  I am not so sure about that.  No. 1, if we

17   kept vague about where the testimony took place, that could

18   cause the jury to speculate that there must have been other,

19   you know, unrelated things which wouldn't be fair or good,

20   so -- and once again, if it's taking place in the context of

21   this case and this is as far as the jury knows my courtroom,

22   then one would anticipate that a witness would sit in the

23   witness chair, so I don't think that that in and of itself is

24   unduly prejudicial or risky.

25           MR. TORZILLI:  Thanks for hearing me out, Your Honor.

Robert Bryant - Cross

1          *THE COURT:*  Certainly.  Thank you.

2              (In open court:)

3     *BY MR. BELLER:*

4     *Q.*  Mr. Bryant, when competitors covered shorts for each other,

5     they learned each other's prices?

6     *A.*  At times, yes.

7     *Q.*  Covering shorts happened on a daily basis.

8     *A.*  I wouldn't say it was daily, no.

9     *Q.*  Mr. Bryant, in your role as a divisional planner, you dealt

10    with those types of issues meaning covering shortages on a

11    daily basis.

12    *A.*  I solved problems, yes, that the plants had, didn't

13    necessarily these shortages, but there was -- there was a lot

14    of moving parts there.

15    *Q.*  Mr. Bryant, you had previously said:  I dealt with those

16    types of issues on a daily basis.

17    *A.*  Yeah, that was part of the job.

18    *Q.*  Okay.  So yes is the answer.

19    *A.*  The way you asked the question before, though, is shortages

20    on a daily basis, and we didn't necessarily short KFC every day

21    is the reason I asked the question.

22    *Q.*  I didn't ask you why you answered the question the way you

23    did.  I asked you if yes is your answer.

24    *A.*  It was just misleading in my opinion, so I felt the need to

25    clarify.  I am not --

Robert Bryant - Cross

1    Q.  You are not in a back and forth right now, Mr. Bryant.  I

2    am asking you questions, and you are giving testimony.  My

3    question is -- the answer to my question is yes.

4    A.  I did deal with shortages, yes.

5    Q.  And you dealt with those types of issues on a daily basis.

6    A.  I dealt with many issues on a daily basis.

7    Q.  You dealt with those types of issues on a daily basis?

8    A.  If they were an issue, yes, I dealt with them.

9    Q.  Mr. Bryant, you said previously that you dealt with those

10   types of issues on a daily basis, quote/unquote.

11   A.  Okay.

12   Q.  Yes?

13   A.  If it was an issue, I dealt with it, yes, on a daily basis.

14   Q.  Thank you.

15          In a cover -- well, let me back up.  There are times

16   when Pilgrim's is buying from another supplier that the other

17   supplier is conveying to Pilgrim's exactly to the thousandth of

18   a cent what their price is to KFC.

19   A.  I believe that has happened before, yes.  More often than

20   not, I remember seeing the per-case price, but I do believe at

21   times they did share their per-pound price.

22   Q.  Mr. Bryant, I didn't ask you about case price, did I?

23   A.  No.  I am trying to be clear.

24   Q.  So, no, I did not ask you about case price.  I am going to

25   do this again, and I want you to listen to my question and

672

Robert Bryant - Cross

1    answer the question that you are asked.

2           There are times that Pilgrim's is buying from another

3    supplier that other supplier is conveying to Pilgrim's exactly

4    to the thousandth of a cent what their price is to KFC.  Is

5    that correct?

6    A.   There are times, yes.

7    Q.   So the answer is yes, that's correct.

8    A.   Yes.

9    Q.   In a cover and short situation, Mr. Bryant, you might need

10   the help of a competitor in order to meet your contractual

11   obligations.

12   A.   There is more than one way that shortages could be covered.

13   Q.   Do you want me to ask the question again?

14   A.   No, I know the question.  I just don't want you to -- I

15   mean, there is more than one way that a shortage can be

16   covered.  One way is with a competitor's help.

17   Q.   So if I say in a cover/short situation, you might need the

18   help of a competitor in order to meet your contractual

19   obligations.

20   A.   It's the way you are characterizing the question the reason

21   I am having difficulty with it, but you can just notify the

22   customer you are going to be short and they can source it.  We

23   did at times, we did a lot of times reach out to a competitor

24   and ask for help.

25   Q.   Great.  Thank you.

Robert Bryant - Cross

1          Conversely, a competitor might need Pilgrim's help to

2   meet its contractual obligations.

3   A.   That's correct.

4   Q.   These shorts took up a large portion of your time,

5   Mr. Bryant.

6   A.   At times it did, yes.  It ebbed and flowed with demand.

7   Q.   And assisting in either buying or selling is not just your

8   role, Mr. Bryant, but it's an account owner's job too.

9   A.   I didn't assist with the buying and selling.  I would

10  normally reach out to Roger or someone on his team and ask them

11  for help to cover the short.

12  Q.   Good.  So you would pass it on to an account owner such as

13  Roger Austin.

14  A.   Correct.

15  Q.   Roger Austin, a salesperson assigned to a particular

16  customer.

17  A.   Correct.

18  Q.   You, Mr. Bryant, had to communicate with salespeople about

19  shorts.

20  A.   That would be correct, yes.

21  Q.   And when you had to communicate with people about shorts,

22  you did so via e-mail.

23  A.   That's correct, yes.

24  Q.   You did so via e-mail and phone call.

25  A.   That's correct.

674

Robert Bryant - Cross

1    *Q.*   E-mail, phone call, and text.

2    *A.*   Yes.

3    *Q.*   Whatever was available depending on the circumstances.

4    *A.*   Whatever is most convenient or, you know, I couldn't be on

5    a call, so I would send a text or an e-mail or whatever, but

6    however, the most efficient way to try to contact them.

7    *Q.*   So, yes.  Mr. Bryant, you would agree with me that there

8    was some significant shortages in 2014.

9    *A.*   Yes, that's what I recall, yes.

10   *Q.*   Now, yesterday -- I want to ask a little bit about these

11   shortages and your experience with volume.  You testified that

12   you helped put together a PowerPoint presentation.

13   *A.*   That's right, yes.

14   *Q.*   Okay.  A presentation used for this customer blitz.

15   *A.*   Correct, yes.

16   *Q.*   Now, I want to stop for just a moment when we talk about

17   the blitz.  Mr. Bryant, the blitz was simply you and your

18   colleagues going and meeting with all your customers.

19   *A.*   Yes, a bunch of customers, yes.

20   *Q.*   That was the blitz, just the meetings.

21   *A.*   That's just what he called it, yes.  It was just a bunch of

22   meetings, and he said blitz the customers.  It was just a bunch

23   of meetings with a bunch of customers, relatively similar

24   information.

25   *Q.*   Right.  And these meetings happened pretty close in time

675

Robert Bryant - Cross

1   with each other.

2   A.   That's correct, yes.

3   Q.   And so when you say assisted with putting together a

4   presentation, you were tasked with the creation of a slide.

5   A.   That's correct, yes.

6   Q.   One slide.

7   A.   I recall one.  I may have helped on others, I don't recall,

8   but the one in particular.

9   Q.   Good.  A slide that was part of a much larger presentation.

10   A.   That's correct, yes.

11   Q.   A slide deck that you, as you said, helped prepare.

12   A.   Correct.

13        MR. BELLER:  If I may have just a brief moment, Your

14   Honor.

15        THE COURT:  You certainly may.

16        MR. BELLER:  Your Honor, may I display to the witness

17   and counsel Government's Exhibit 1055, please.

18        THE COURT:  You may.

19   BY MR. BELLER:

20   Q.   Mr. Bryant, you are more than welcome to look at this on

21   the screen, or I believe it's also in your binder, sir, so

22   whichever you prefer is fine with me.  If you could take a

23   brief moment and tell us if you recognize what is shown on the

24   screen.

25   A.   Yes.  It looks like the PowerPoint presentation for the KFC

676

1     meeting on August 1st, 2014.

2    *Q.*  So that was the PowerPoint presentation you were speaking

3    with on -- Mr. Torzilli on direct examination and I am now

4    asking you about when I was asking you about slides, right?

5    *A.*  One of them, yes.

6    *Q.*  Mr. Bryant, this particular PowerPoint presentation, was

7    this kept in the ordinary course of Pilgrim's business?

8    *A.*  It was part of our presentation, yes.  I mean, we showed it

9    to our customer.

10   *Q.*  I am sorry, I have to ask really fancy lawyer questions

11   here.

12          Mr. Bryant, you recognize this.  This is the document

13   that you helped prepare; is that right?

14   *A.*  Yes, yes, it looks like it, yes.

15          *MR. BELLER:*  Your Honor, in the interest of time, I

16   would offer it at this time.  I am happy to lay more foundation

17   if necessary.

18          *THE COURT:*  Any objection to the admission of

19   Exhibit 1055?

20          *MR. TORZILLI:*  We will stipulate to its admission.

21          *THE COURT:*  Exhibit 1055 will be admitted.

22          *MR. BELLER:*  Thank you.

23          Your Honor, I am moving to a different chapter.  This

24   is a good time.  I recognize I have five minutes.  What would

25   you like me to do?

1              THE COURT:  We can go ahead and break now.

2              MR. BELLER:  That's great.  Thank you, Your Honor.

3              THE COURT:  Ladies and gentlemen, we are going to

4     recess for the day but also for the week.  As you know, we are

5     not going to have court tomorrow.  We don't have court on

6     Fridays.  So let me talk to you about that.

7              So perhaps some of you tomorrow may go into work or

8     perhaps over the weekend some of you would be doing different

9     activities than you would since you are spending all day in

10    court and you might go to social activities or other things and

11    thereby put yourself in contact with a different group of

12    people than you've been, for instance, going home to, you know,

13    in the evenings this week.

14             And that means that you need to be really careful.

15    Don't let the topic of the barbecue be your jury service.

16    Don't let people try to weasel information out of you about

17    what you're doing.  Don't let people try to engage you in some

18    conversation to guess what trial you are involved in or any of

19    those things, because what I am worried about is even though

20    you may not be saying anything, they may be saying things to

21    you.  They may be trying to guess, get a rise out of you, tell

22    you things.  So just, once again, as we talked about the past

23    couple of nights, you know, be disciplined about that and just

24    cut that conversation off and tell them, Can't talk to you

25    about that.  Don't want to hear it.

 1           Now, at some point once the trial is all over with and

 2   you have been excused from your service in this case, you can

 3   write a book about this case.  You can tell them anything you

 4   want about this case.  You can, you know, put them to sleep

 5   talking to them about this case, but not right now, okay?  So

 6   be a little bit careful about that because you may come in

 7   contact with different people over the course of the weekend.

 8   And make sure to follow the other admonitions as well.  See you

 9   back Monday at 8:30.  Hope you have a good weekend.

10           (Jury excused.)

11           THE COURT:  Thank you, Mr. Bryant.  You are excused

12   until Monday at 8:30.

13           And everyone else may be seated.  Thank you.

14           Anything that we should discuss at this time?

15   Mr. Hart?

16           MR. HART:  Nothing from the government, Your Honor.

17           THE COURT:  Thank you.

18           On behalf of anyone else?  Mr. Beller?

19           MR. BELLER:  I don't believe so.  Have a nice weekend.

20           THE COURT:  Same to everyone else.  We will in recess

21   until Monday at 8:30.  Thank you.

22       (Recess at 4:55 p.m.)

23

24

25

1                                INDEX

2    WITNESSES

3        Robert Bryant

4            Direct Examination Continued By Mr. Torzilli    425

5            Cross-examination By Mr. Beller                 614

6                              EXHIBITS

7    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

8    979                      604

9    1055                     676

10   1066                     454

11   1882                     519

12   1890                     548

13   1891                     550

14   1919                     539

15   3039                     595

16   9139                     592

17   9140                     589

18                       REPORTER'S CERTIFICATE

19       I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.   Dated

21   at Denver, Colorado, this 9th day of June, 2022.

22

23                                    S/Janet M. Coppock

24

25