1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3   In Re: Penn III

4   UNITED STATES OF AMERICA,

5        Plaintiff,

6   vs.

7   JAYSON JEFFREY PENN,
    MIKELL REEVE FRIES,
8   SCOTT JAMES BRADY,
    ROGER BORN AUSTIN,
9   WILLIAM WADE LOVETTE,

10       Defendants

11  _____

                    REPORTER'S TRANSCRIPT
12                  Trial to Jury, Vol. 5

13  _____

14        Proceedings before the HONORABLE PHILIP A. BRIMMER,

15  Chief Judge, United States District Court for the District of

16  Colorado, commencing at 8:25 a.m., on the 13th day of June,

17  2022, in Courtroom A201, United States Courthouse, Denver,

18  Colorado.

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

1                          APPEARANCES

2            Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5            Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10           David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13           Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16           Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19           Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22           Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25

```
 1                    APPEARANCES (Continued)

 2              Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

 3    South, Suite 720, Denver, CO 80209;

 4              John Anderson Fagg, Jr. and Frank Schall of

 5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

 6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

 7                         *    *    *    *    *

 8                           PROCEEDINGS

 9         THE COURT:  We are back on the record in 20-CR-152.

10    One of the jurors, No. 5, informed us this morning that over

11    the weekend her aunt passed away.  She is a little bit upset

12    about that but indicated that she will -- you know, she is

13    willing to try to listen to the testimony today and everything,

14    so we'll see how that goes.  Hopefully she will be all right.

15              The funeral, and she will a part of that, probably

16    participating in it in some respect, will be in the Denver

17    area, but there is at least a chance that we may have to

18    recess.  If we want to preserve her as an alternate -- not as

19    an alternate, if we want to preserve her and not rely upon an

20    alternate, that we may need to recess, you know, for a period

21    of time to allow her to go, but I just wanted to raise that

22    issue before we get going.

23              All right.  Mr. Tubach contacted the Court over the

24    weekend and indicated that there was an issue to take up this

25    morning.  And then today the defendants filed a joint motion to
```

1    permit additional cross-examination of Robert Bryant.

2            Mr. Hart, did the United States receive a copy of the

3    motion that I just mentioned, which is Docket No. 1382?

4            MR. HART:  Yes, we did, Your Honor.

5            THE COURT:  Then would someone from the defense like

6    to -- I have read it over, am familiar with it.  We probably

7    can dispense with a little bit of argument on that, but in any

8    event, Mr. Tubach, go ahead.

9            MR. TUBACH:  I won't re-raise everything we put in the

10   brief.  I realize we just filed this recently, and if the

11   government wants additional time, we could argue it during the

12   break, perhaps.  We think Mr. Bryant's cross-examination will

13   go through the mid-morning break, but we are prepared to argue

14   it now.  We are, we think, at this time clear in light of the

15   change of his testimony in trial 3 versus 1 and 2 in scripted

16   testimony that he both having testified that it was simply an

17   active omission rather than affirmative lie, and then,

18   secondly, that he placed his morality at issue.

19           THE COURT:  You are right about the use of the term

20   "morally" or -- I think that was the word he used.  That is

21   different.  But we had hashed -- we had talked a lot at the

22   second trial about whether he corrected his statements in one

23   occasion or two, so that was -- that's not new.  But in any

24   event, why don't we hear what Mr. Torzilli has, and I will give

25   you have the last word.  We will see whether the government

1    wants to finish talking about this now --

2         *MR. TORZILLI:*  I am happy to finish talking about it

3    now.  Don't need additional time.  Read the brief filed 40

4    minutes ago or so.  I think on the first issue, this has been

5    hashed out, as Your Honor indicated, numerous times.

6         I think Your Honor has struck the correct balance as

7    far as what the appropriate area of inquiry is and isn't

8    because of the significant 403 issue raised by deeper inquiry

9    into Mr. Bryant's lies, and I think there has been nothing in

10   terms of opening the door that would permit that additional

11   inquiry into the highly unfairly prejudicial realm.

12        On the moral issue, I think this ultimately comes down

13   to the nature of what this case is about.  As I think, Your

14   Honor, going all the way back to the denial to the motion to

15   dismiss back in October where the Court observed I think in the

16   opinion saying the defendants, quote/unquote, misread the

17   Indictment.  The Indictment charges that the defendants

18   conspired to violate Section 1 of the Sherman Act including by

19   exchanging information with each other on bids and prices.

20        So this is not an information exchange in and of

21   itself.  It's being done for the purpose of rigging bids and

22   fixing prices and that's what Mr. Bryant was talking about.  He

23   was reaching out -- he was instructing Defendant Roger Austin

24   to get the bid information for purposes of colluding with the

25   competitors, so that's what he is talking about regretting.

685

1    That's what he is talking about regretting because it raised

2    moral issues with him, not the morality of just some sort of

3    exchange of price information for informational purposes only,

4    so I don't think that that is an area that requires any sort of

5    additional inquiry into his moral compass or moral fiber more

6    generally.

7         THE COURT:  Mr. Tubach?  Then I will give other

8    counsel an opportunity to add anything they wish as well.

9         MR. TUBACH:  Just briefly on those two issues, Your

10   Honor.  Of course, we did hash out the correction in two and

11   three quite a bit, but what's different now is he has now

12   claimed affirmatively he corrected the record on one occasion

13   and then in some improper self-bolstering said, I was

14   completely truthful from then on.  That is not possible.

15        First he lies about doing it.  Then he sort of,

16   quote/unquote, comes clean.  Then there is a second version of

17   coming clean, two, which are irreconcilable.  So there is no

18   way that he was completely truthful from then on because one of

19   those two versions is false, and there is no way for us to

20   probe that without probing -- I have no interest in getting

21   into details of any of that stuff, but we have to be able to

22   probe on the fact he admitted misconduct, characterized it one

23   way and then characterized it completely differently on a

24   follow-up interview after testifying in this bolstering way

25   that he was completely truthful on the record after he was

1    asked to correct the record and come forth.  That's the crux of

2    our first argument.

3            Second argument, the Court specifically held after

4    watching these witnesses that testimony about morality and all

5    this was out of bounds.  The government prepped Mr. Bryant, and

6    he said exactly that and then elicited testimony in direct

7    examination.  I think it opens the door to his moral beliefs

8    generally.

9            Here is a man who doesn't apparently have any moral

10   beliefs, yet he is standing up here testifying that this act of

11   asking Mr. Austin to get competitor pricing information is such

12   an immoral thing he regretted it immediately.  That opened the

13   door.  And the government knew it when they asked him the

14   question.

15           THE COURT:  Thank you, Mr. Tubach.

16           Anyone else?  Mr. Beller, go ahead.

17           MR. BELLER:  Thank you, Your Honor.  I won't repeat

18   argument.  I would simply draw the Court's attention to Rule

19   608, Subsection (b).  I do believe this is directly on point

20   with extrinsic evidence and specific conduct.  And it's the

21   fact that he did testify that he was truthful, so I believe the

22   defense has the opportunity to go more into the specific acts

23   and specifically what he stated regarding his untruthfulness.

24   And it's not simply the fact that he lied to the government,

25   but it is untruthfulness in terms of the way he went about

1    fashioning his conduct and using different avenues in order to

2    do so that I believe are also evidence of untruthfulness.

3              THE COURT:  Thank you.

4              All right.  So first of all, let's take up the issue

5    of, you know, whether there was -- he corrected himself on one

6    occasion or multiple occasions.  That is an issue that we

7    talked about at the second trial.  The argument here is that

8    there is more of an -- there is actually kind of a lie going on

9    because of Mr. Bryant's testimony Thursday of last week and

10   that that lie merits opening the door into the nature of the

11   misconduct so that the defendants have a better ability to

12   confront him.

13             I really don't think that his testimony on Thursday

14   opened the door in that respect.  This is basically the same

15   thing that's going on, and, of course, except now the

16   defendants have more of a record, namely the second trial, to

17   get after Mr. Bryant and correct the testimony.

18             As I mentioned last week, of course, the danger of

19   confronting him with testimony is that jurors may glean the

20   fact that these hearings may not really be hearings, and, you

21   know, that's something that I think is bad, but, you know, on

22   the other hand, this is an example of where I think the

23   defendants may have to confront in that regard in order to make

24   the points.

25             So while unfortunate in that regard, namely increasing

1    the risk of the jurors putting two and two together, I don't

2    believe that that opens the door to asking him about the nature

3    of the misconduct, which, of course, we are not going to use

4    the word "misconduct," but I will just for purposes of

5    shorthand.

6            Now let's talk about Mr. Bryant's use of the term --

7    so the first part of the motion I will deny.

8            The second part of the motion has to do with a term

9    that Mr. Bryant used on Thursday where he said, and it's quoted

10   on page 6 of the defendants' motion, Morally I didn't feel

11   comfortable with it.

12           Mr. Tubach is exactly right that when Mr. Lewis and

13   other witnesses in the first trial used that first term, I

14   sustained an objection to use of that.  Mr. Torzilli is correct

15   that there is a little bit of a distinction in the context of

16   which those witnesses used it.  At least with Mr. Lewis the use

17   of the term "morality" had to do with the blind-bidding

18   process.  Here, as Mr. Torzilli correctly mentions, this is

19   having to do with the actual commission of, this Mr. Bryant's

20   view, colluding with competitors.

21           But the argument of the defendants is that when you

22   use the term, you know -- if you raise the morality, violates

23   his morality, you open the door then, and that's not a bad

24   argument.  I am going to deny that aspect of it for the

25   following reasons, and that is while I hope Mr. Bryant doesn't

1    go into more of that, nonetheless, that did not come up in

2    either of the previous two trials in terms of Mr. Bryant's

3    testimony; and as a result, the defendants do have a means of

4    cross-examining him on it and challenging whether indeed it

5    really was something that had to do with his morality because

6    they can point out that it's a term that's being used for the

7    first time.

8            Now, I am not saying that that doesn't have risks in

9    and of itself.  That may just prompt Mr. Bryant to expound on

10   that, I don't know.  You know, once again, it is dangerous, but

11   there is a way to control it because he is bringing it up for

12   the first time.  And also, you know, all of this ultimately

13   goes back to the Court's initial ruling on this issue, and that

14   is that impeachment with this or impeachment with the actual

15   conduct that he engaged in carries with it a substantial

16   prejudice to the government because the conduct itself is just

17   completely unrelated to what's going on in this particular

18   trial.  So that has always been the basis for the Court's

19   ruling that the defendants can't go into the nature of it.

20           I don't think that the line has been crossed at this

21   point in time, so I will deny the second part of the

22   defendants' motion as well.

23           Anything else to take up briefly before we bring the

24   jury back in?

25           MR. HART:  There are a few issues the government wants

1    to raise with the Court, but we are mindful with the jury's

2    time, so we can just do it at another break.

3            THE COURT:  Why don't we do that.  I don't want to

4    start too late.

5            MR. FELDBERG:  One question, Your Honor, Juror No. 5,

6    when is the funeral scheduled for?

7            THE COURT:  It's not scheduled yet.  That's part of

8    the uncertainty of things.  And Juror No. 5 indicated that she

9    would be involved to some extent in the planning but is not

10   solely responsible, not the lead person, but probably would --

11   things are, you know, obviously with today being the first day

12   of the week, there is probably, as you can imagine, a lot of

13   things that need to happen today in that regard.

14           Mr. Fagg?

15           MR. FAGG:  Thank you, Your Honor.

16           Just back on the questions -- of the issue regarding

17   defendants' motion, I would request -- Mr. Bryant's counsel is

18   in the courtroom.

19           THE COURT:  I am sorry, what's that?

20           MR. FAGG:  Mr. Bryant's counsel is in the courtroom,

21   so I would request that Mr. Bryant be advised that he should

22   not go into issues about morality or his feelings about

23   morality of certain conduct in his future testimony unless he

24   is asked about that issue.

25           THE COURT:  Well, once again, it's difficult for me to

1   contemplate what question could be asked of him.  You can't --

2   having mentioned it before, you can't all the sudden have

3   amnesia now, so I am not going to give any type of specific

4   directive in that regard.  But if the United States wishes

5   before we bring the jury back in just a couple minutes to

6   consult with Mr. Bryant's counsel, you know, that's perfectly

7   fine, but otherwise, yeah, I am leery of doing that, Mr. Fagg.

8           Any request?

9           MR. TORZILLI:  Yes, Your Honor.

10          THE COURT:  Why don't you just -- if you don't mind,

11  why don't you just step out right now unless you think it will

12  take longer, unless you want me to take a brief recess.

13          MR. TORZILLI:  I think it can be done briefly.

14          THE COURT:  Perhaps you can just step outside the door

15  there.

16          MR. TORZILLI:  Thank you.

17          (Brief recess.)

18          MR. TORZILLI:  Thank you, Your Honor.  I had a brief

19  moment to speak with Mr. Bryant's counsel.

20          THE COURT:  Yeah, that's great.

21          Ms. Carwile, should we wait for Mr. Feldberg?  I am

22  perfectly happy to do so.

23          MR. TUBACH:  I will just see if he is outside.

24          MS. CARWILE:  If we could wait one minute.  And if he

25  is not back, we are happy to call the jury in.

Robert Bryant - Cross

1          MR. BELLER:  May I set up?

2          THE COURT:  Yes, you absolutely can.  No problem being

3   at the podium and being set up at the time the jury comes in.

4   And in the meantime, why don't we go ahead and have Mr. Bryant

5   come back in.

6          All right.  Why don't we go ahead and bring the jury

7   back in.

8          (Jury present.)

9          THE COURT:  Good morning, ladies and gentlemen.

10         As you will recall, Mr. Beller was cross-examining

11  Mr. Bryant, so we will continue with that.

12         Mr. Beller, go ahead.

13         MR. BELLER:  Thank you, Your Honor.

14                   **CROSS-EXAMINATION CONTINUED**

15  BY MR. BELLER:

16  Q.  Mr. Bryant, when we broke on Thursday, we were talking

17  about the slide that you created for the meeting with your

18  customers.  Do you recall that?

19  A.  I recall the slide, yes.

20  Q.  That slide pertained to supply and demand as one of the

21  bases for seeking the price increases.

22  A.  That's correct, yes.

23  Q.  It was about bird availability showing the decrease in

24  supply over a period of time in that particular size.

25  A.  That's correct.

Robert Bryant - Cross

1    *Q.*  And when I say "that particular size," we are talking about

2    the size that KFC purchased?

3    *A.*  That's correct.  There was two components that caused that

4    shift.  The first one was that there were people that had

5    transitioned out of that small-bird market which decreased the

6    overall availability; and, secondly, people were shifting their

7    weights higher because of the retail delis, so there was two

8    components that caused that shift in availability.

9    *Q.*  Okay.  So let's break that down for just a moment.  I want

10   to make that simple.  There was a decreased supply?

11   *A.*  On overall numbers, correct.

12   *Q.*  Yes.  And there was an increase demand.

13   *A.*  Demand was at least equal or if not -- I don't remember

14   the -- exactly the demand, but let's just say it was equal, and

15   this was a decreased supply, then technically that percentage

16   would -- the demand for that smaller pie would be greater, if

17   that makes sense.

18   *Q.*  So I want to talk a little bit more about the slide that

19   was on the screen when you claimed that Mr. McGuire made a

20   gesture, okay?  This is the same slide in which he also said,

21   Put this out to the industry; is that right?

22   *A.*  That's correct, yeah.

23   *Q.*  So we are going to talk about the word "industry" in just a

24   moment, Mr. Bryant, but I want to focus on the slide itself.

25   There was a table on that slide, right?

694

Robert Bryant - Cross

1    *A.*  That's right.

2            *MR. BELLER:*  Your Honor, last Thursday Exhibit 1055

3    was admitted but not published.  May I publish that now,

4    please?

5            *THE COURT:*  Yes, you may.

6            *MR. BELLER:*  If we can pull up 1055.

7    *BY MR. BELLER:*

8    *Q.*  Mr. Bryant, this is the slide deck that we were talking

9    about on Thursday; is that right?

10   *A.*  I believe so, yes.

11   *Q.*  And I want to go, please, to page 8 of this slide deck.

12   Are you able to see page 8 on your screen, Mr. Bryant?

13   *A.*  Yes.

14   *Q.*  And this is the table from the slide deck, right?

15   *A.*  Yes.  I mean, this particular presentation was for KFC, but

16   the one I was talking about was obviously tailored to a

17   different customer other than KFC, but it should be the same,

18   if not very, very similar information.

19   *Q.*  Okay.  So let me ask that again.  This is the table that we

20   are talking about when you said there was a table on the

21   screen, very similar to this one.

22   *A.*  That's correct, yes.

23   *Q.*  Okay.  So this particular slide relates to the

24   profitability of small bird versus big bird.

25   *A.*  Correct, and case ready, yes.

695
Robert Bryant - Cross

1    *Q.* And case ready. And also over a period of time, 2006 to

2    2013, and then 2014 is broken up by months; is that right?

3    *A.* That's correct, yes.

4    *Q.* So this was really the time, the 2014 -- or 2012 to 2014

5    when we are talking about an increased demand or a reduced

6    supply; is that right?

7    *A.* That's correct, yes.

8    *Q.* This slide, Mr. Bryant, illustrates the profitability point

9    and was created using publicly available data.

10   *A.* I don't know if it's publicly available. I believe this is

11   AgriStats data, so I think it's just to the participants. But

12   the industry, the entire industry that participates in

13   AgriStats should have had this information.

14   *Q.* I appreciate that. Let's talk for just a moment about

15   AgriStats. AgriStats is a benchmarking index that anyone can

16   access if they pay for it, right?

17   *A.* I don't know that anyone can or if it's only the

18   participants that supply the information, but in general, most,

19   if not all, of the industry does participate.

20   *Q.* Okay. So -- and AgriStats produces reports and graphs to

21   identify how one supplier performed in a given period.

22   *A.* Correct.

23   *Q.* And how that supplier compared to similar suppliers in the

24   industry.

25   *A.* We would use the term "the industry." When they are giving

696

Robert Bryant - Cross

1    you comparisons, you can see what your plants and your company

2    did compared to a big bucket of everybody else, but not

3    necessarily individuals.  They are trying to maintain

4    confidentiality for the rest of the industry.

5    Q.  So what you're saying is, and if I understand you, what you

6    are saying is you can't see, like, Pilgrim's versus Tyson's

7    numbers through AgriStats.

8    A.  You do see it, but you don't know who Tyson is.

9    Q.  That's right.  So you can see Pilgrim's versus other

10   suppliers, not necessarily specifying which ones.

11   A.  That is correct, yes.  And it goes to the detail of the

12   plant, but you don't know whose plant it is.  It's just a blank

13   there with a bunch of numbers.

14   Q.  So let's be clear.  Are you saying that AgriStats also

15   produces data not just per company, but also per plant within a

16   company.

17   A.  That is correct, yes.

18   Q.  So Pilgrim's, for example, during this period of time had

19   six or seven small-bird plants.

20   A.  That's correct, yes.

21   Q.  So AgriStats would break that down and actually show

22   profitability of plant without listing the name of the plant.

23   A.  That's correct.  There would be -- there was a profit book.

24   There is several books.  There is a sales book, a profit book,

25   a live book, you know, an accrual book, but anyway, inside

Robert Bryant - Cross

1    those books, you can see the individual plants and a roll-up

2    of, like, the business unit or the total company.

3    Q.  Every supplier can purchase access to AgriStats?

4    A.  And most do, yes.

5    Q.  Every customer can purchase access to AgriStats.

6    A.  I don't know if customers have access to that data, but

7    AgriStats does some conferences a few times a year where you

8    can pay to attend those conferences, and they give their market

9    analysis.

10   Q.  And this, Mr. Bryant, is market analysis.

11   A.  That is -- I don't know what -- I have not attended one of

12   AgriStats, the conferences for the customers.  I think they

13   call it EMI Express Markets that they do these things for, but

14   I don't know what all they share there, but this is an example

15   of what would have been taken out of the profit book that

16   the -- at least the industry players would have seen.

17   Q.  Sir, I want you to answer my questions, Mr. Bryant, okay?

18   This is market analysis?

19   A.  Part of it, yes.

20   Q.  Thank you.

21        Certainly you believe, Mr. Bryant, that everyone in

22   the broiler chicken business knew that supply was tight of

23   small birds.

24   A.  They should have, yes.

25   Q.  Okay.  If they didn't know that supply was tight, they

698

Robert Bryant - Cross

1    certainly should have.

2    A.   They should have, yes.

3    Q.   If they didn't, they probably shouldn't have been in the

4    business, right?

5    A.   That would -- that would be my assessment, or they had a

6    very, very weak sales program.

7    Q.   So to circle back to this particular slide that was part of

8    Pilgrim's pitch to KFC, this was presented as one of the

9    reasons why Pilgrim's thought they should get a price increase

10   for small birds in 2015.

11   A.   2014.

12   Q.   For the 2015 contract.

13   A.   Correct.  The answer to your question is correct, yes.

14   Q.   Thank you.

15        MR. BELLER:  We can take this slide down for just a

16   moment, please.  Thank you.

17   BY MR. BELLER:

18   Q.   So speaking of the word "industry," let's talk about that

19   for a moment, Mr. Bryant, okay?

20   A.   Okay.

21   Q.   You claimed that -- well, Mr. McGuire told Mr. Austin, Put

22   this out to the industry, right?

23   A.   That's correct, yes.

24   Q.   Okay.  And you claim that Mr. McGuire by using the word

25   "industry," it meant a reference to other chicken suppliers or

Robert Bryant - Cross

1  competitors, right?

2  A.  That's correct, yes.

3  Q.  Now, Mr. Bryant, you are making an assumption as to what

4  Mr. McGuire meant when he used the word "industry."

5  A.  I am giving my understanding of what he meant.  I did not

6  ask him for clarification or Mr. Austin for clarification.

7  Q.  Okay.  And so your understanding was an assumption as to

8  what Mr. McGuire meant.

9  A.  Yeah, it was my -- it was my understanding, yes.

10 Q.  So it was your understanding that when Mr. McGuire said,

11 Put this out to the industry, it was what information is being

12 pulled from publicly available AgriStats data.

13 A.  You know, my understanding was that he was asking who to

14 share our basis for price increases with our -- with the

15 industry.

16 Q.  Right, the AgriStats data?

17 A.  Not only that, but the supply demand.  I took it to -- my

18 understanding was it was all encompassing, not just the slide

19 on the screen, but I did remember that slide on the screen when

20 he made the statement.

21 Q.  Okay.  So you did not ask him I think you said if industry

22 is to mean other suppliers.

23 A.  That's correct.

24 Q.  Or if industry means other customers wanting to buy

25 chicken.

700

Robert Bryant - Cross

1    A.  I did not ask for any clarification, that's correct.

2    Q.  Or if industry means other customers and other suppliers.

3    A.  That's correct.

4    Q.  "Industry," that term, also means purchasing agents.

5    A.  Sometimes we have used that term interchangeably, yes.

6    Q.  Okay.  Industry also means distributors.

7    A.  I don't recall using industry to mean distributors.

8    Someone may have.  I don't recall that specifically.

9    Q.  Industry also means suppliers.

10   A.  It could be.  It could.

11   Q.  And industry also means restaurants.

12   A.  I don't believe -- I don't recall hearing it used in that

13   context, no.

14   Q.  Mr. Bryant, you testified as we established on November the

15   2nd, 2021 in a hearing in this case, right?

16   A.  I believe so, yes.

17   Q.  On your screen, Mr. Bryant, Mr. Brian is going to show

18   page 1095.

19        MR. BELLER:  Just a brief moment, Your Honor, please.

20        THE COURT:  Sure.

21        MR. BELLER:  I want to focus for just a moment on

22   lines 11 through 16, if we can highlight that.

23   BY MR. BELLER:

24   Q.  Mr. Bryant, do you see lines 11 through 16 on your screen?

25   A.  Yes.

701

Robert Bryant - Cross

1   Q.  Mr. Bryant, on November the 2nd, you were asked a question.

2          Question -- let me know if I am reading this

3   properly -- Now, you tried to help us out a little bit to

4   understand the poultry supply chain.  Is it fair to say that

5   you've got purchasing agents, distributors, suppliers and

6   restaurants that are all part of the poultry supply industry?

7          Your answer was:  So to speak, yes.

8          You are asked a question:  And each plays a role in

9   that industry.

10         MR. BELLER:  And, Mr. Brian, if we can go to the next

11  line, please, line 18.

12  BY MR. BELLER:

13  Q.  You answered:  That's correct?

14  A.  That's correct, yes.

15  Q.  So they are all part of the poultry supply industry?

16  A.  That's correct, yes.

17  Q.  Each plays a role in that industry?

18  A.  That's correct, yes.

19  Q.  What you heard is, Put this out to the industry.

20  A.  That's correct, yes.

21  Q.  You did not hear Mr. McGuire say to Mr. Austin, for

22  example, tell them we'll charge this much but only if they do

23  too, right?

24  A.  That's correct.

25  Q.  You didn't hear them say, we'll do it if they'll do it?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   Even then after you heard or claimed to hear this statement

3   pointing to that table, even then you are not personally aware

4   of what discussions happened between Mr. Austin and any other

5   chicken supplier.

6   A.   That's correct, yes.

7   Q.   You also don't know what discussions happened between

8   Mr. Austin and any other chicken customer or buyer.

9   A.   Can you repeat that?  I am sorry.

10  Q.   Yeah.  You don't know what discussions happened between

11  Mr. Austin and any other customers or buyers of chicken.

12  A.   Just the meetings I attended.

13  Q.   You don't know what discussions happened between Mr. Austin

14  and any other franchisees?

15  A.   That's correct.

16  Q.   And you say just the other meetings that you attended, so

17  the other meetings that you attended also presented very

18  similar information to the table that the jury saw, right?

19  A.   That's correct, yes.

20  Q.   You have no knowledge of any discussions that happened

21  other than this phone call that we're going to talk about that

22  Mr. Austin delivered a message to Mr. Brady.

23  A.   That's correct, yes.

24  Q.   Mr. Bryant, speaking of this, I want to talk just a little

25  bit about your memory in general.  You would agree with me,

703

Robert Bryant - Cross

1  sir, that, generally speaking, memory fades with the passage of

2  time?

3  A.  Absolutely, yes.

4  Q.  So this 2014 meeting that we've been talking about,

5  specifically where the presentation was given for a price

6  increase, okay?  So I know that there was a KFC meeting.

7  A.  Yes.

8  Q.  And before that there was another meeting?

9  A.  Yeah, at least two, the Popeye's and Church's meeting, and

10  there may have been more, but we are talking about -- I don't

11  recall if there were others before the KFC meeting.

12  Q.  Okay.  So I want to focus on this meeting where you see the

13  gesture and the head nod, okay?

14  A.  Yes.

15  Q.  You don't recall who that customer was.

16  A.  No.  I thought it was Church's, but if could have been

17  Popeye's.  I am not a hundred percent sure which customer it

18  was.

19  Q.  But the meeting occurred prior to the KFC meeting.

20  A.  That's what I remember, yes.

21  Q.  In October of 2021, that would have been seven years after

22  this meeting, right?

23  A.  That's correct, yes.

24  Q.  Seven years after the meeting is when you met with the

25  Department of Justice to tell them what you knew.

704

Robert Bryant - Cross

1   A.   That's correct, yes.

2   Q.   In October of 2021, you were not certain if Roger Austin

3   was even present at those earlier meetings.

4   A.   I don't know that.  I don't recall that.  I don't -- I

5   don't remember that specifically.

6   Q.   Well, you remember on Wednesday or Thursday of last week

7   testifying conclusively to this jury that Mr. Austin was

8   present at that meeting with the gesture.

9   A.   I remember Mr. Austin and Mr. McGuire standing in front at

10  a meeting, yes, with that table on the screen, yes.

11  Q.   All right.  So stick with my question.  Do you recall last

12  week testifying to this jury that Mr. Austin was at that

13  meeting?

14  A.   He was at a meeting, yes.

15  Q.   And so you recall testifying to the jury that Mr. Austin

16  was at a meeting.  So my question is, that was in June of 2022,

17  do you recall in October of 2021 when you met with the

18  Department of Justice with the prosecutors indicating that you

19  weren't certain if Mr. Austin was present at a meeting?

20  A.   No, I don't remember -- recall that.

21  Q.   Do you recall telling these prosecutors on October the 12th

22  of 2021 that Mr. Austin may have been there, using the word

23  "may"?

24  A.   No, I don't recall that.

25  Q.   When you testified to this jury last week with the passage

Robert Bryant - Cross

1   of now eight years and seven months after one of your

2   interviews with the government using the word that he "may"

3   have been there?

4   A.  No, I don't recall using "may."

5   Q.  So since that interview in October of 2021, you have met

6   with the prosecutors many more times, right?

7   A.  Yes.

8   Q.  Okay.  As we established, you practiced your direct

9   examination testimony with them.

10  A.  Okay, yes.

11  Q.  The prosecutors pretended to be defense attorneys and asked

12  you cross-examination questions.

13  A.  Yes.

14  Q.  And on June 8th after the passage of seven months and many

15  practices, when you testified, your memory had improved

16  regarding Mr. Austin actually being there.

17  A.  I don't believe so, no.  I think I have been consistent on

18  him being there and just unsure about which meeting.

19  Q.  Okay.  So you deny, Mr. Bryant, ever having told the

20  Department of Justice, the prosecutors, that he may have been

21  there, using the equivocal word "may."

22  A.  I don't know if I ever used that word or not.  I don't

23  remember.  But I have been consistent on remembering the

24  meeting and that Mr. McGuire and Mr. Austin were both present,

25  and the comment that was --

Robert Bryant - Cross

1   Q.  I am going to stop you, Mr. Bryant, you need to answer my

2   question, okay?

3   A.  I thought I was, I am sorry.

4   Q.  That's okay.  You weren't.

5        My question is, Mr. Bryant, do you deny having told

6   federal prosecutors that Mr. Austin may have been there?

7   A.  I don't remember using the word "may."

8   Q.  Okay.  So now, by June 8th, 2022, well, last week,

9   June 8th, 2022, you claimed to remember that Mr. Austin was, in

10  fact, present.

11  A.  I mean, he was present, yes.

12  Q.  Okay.  And in June, you claimed to remember not only that

13  he was present, but actually where he was standing in that

14  room.

15  A.  That's correct, yes.

16  Q.  Where he was standing in the room and that he was nodding.

17  A.  He nodded to Mr. McGuire after he made the comment.

18  Q.  Okay.  And this is the same meeting where you claim to

19  remember this slide of AgriStats' public data being up on the

20  screen.

21  A.  That's correct, yes.

22  Q.  The same meeting where you remember a gesture having been

23  made.

24  A.  That's correct, yes.

25  Q.  So to remind the jury, we have had 31 interviews with the

Robert Bryant - Cross

1   prosecution over a year and you have given testimony in

2   hearings in this case, right?

3   *A.*  That's correct, yes.

4   *Q.*  In those interviews, Mr. Bryant, you had plenty of time to

5   answer the prosecutors' questions completely, didn't you?

6   *A.*  That's correct, yes.

7   *Q.*  You had plenty of time to answer the prosecution's

8   questions accurately.

9   *A.*  That's correct, yes.

10  *Q.*  Through 31 interviews and testifying two different times,

11  the very first time you've ever stated that there was a

12  so-called gesture was last week.

13  *A.*  Yes, the first time they asked me in that level of detail

14  about the meeting.

15  *Q.*  So let me ask again because you are qualifying.  The very

16  first time you ever mentioned to federal prosecutors that

17  Mr. McGuire gestured was last week.

18  *A.*  I think that is correct.  I don't know that I have said

19  that before.

20  *Q.*  Through 31 interviews, testifying twice, the very first

21  time you ever stated that there was a slide up on the screen at

22  the time was last week.

23  *A.*  I don't know that's accurate.  I believe I've mentioned

24  that before.

25  *Q.*  Through 31 interviews and testifying in hearings, the very

Robert Bryant - Cross

 1   first time you've ever stated that Mr. Austin nodded was last

 2   week.

 3   A.   I don't believe that's accurate either.  I believe I have

 4   said that before.

 5   Q.   Mr. Bryant, has the government shown you their reports of

 6   your 31 interviews and had you go through those?

 7   A.   No.

 8   Q.   Has the government shown you any of your transcript from

 9   two different hearings and asked you to go through those?

10   A.   I don't believe so, no.

11   Q.   Would you agree with me, Mr. Bryant, had you had that

12   opportunity, if those -- well, let me back up.  Had you had

13   that opportunity to do so, you would be able to accurately

14   point to a time in which you said that there was a table up and

15   that Mr. Austin nodded.

16   A.   I don't know that I would be able to point to it or not.  I

17   don't know.  I don't know that.

18   Q.   Well, would you agree with me that, to the best of your

19   knowledge, it simply doesn't exist; it's not there?

20   A.   I -- no, I wouldn't agree.  I believe -- I have spoken of

21   that before.  I don't know why you don't -- I don't know.  I

22   don't know what you're referencing to, but I believe I have

23   spoken about that before, yes.

24   Q.   Okay.  So let's talk -- and you would agree with me that

25   your memory now is that you have said it.

709

Robert Bryant - Cross

 1    *A.*  No, I believe I have.

 2    *Q.*  Okay.  So you believe you have said it because, Mr. Bryant,

 3    just like the word Mr. Austin "may" have been there, your

 4    memory has gotten better with time.

 5    *A.*  No -- no, no, I mean, I think I have been consistent on

 6    that all along.

 7    *Q.*  So let's talk about another thing that your memory has

 8    gotten better of, and I want to talk a little bit about the

 9    word "manipulating" that you testified to last week, okay?

10    *A.*  Okay.

11    *Q.*  Mr. Bryant, do you recall on Thursday of last week the

12    prosecutor asking you a question using the words "manipulation

13    of bids"?

14    *A.*  Yes.

15    *Q.*  You then adopted that phrase, Mr. Bryant, "manipulation of

16    bids" throughout the remainder of your testimony last week,

17    right?

18    *A.*  I wouldn't say adopted it.  It was a word that I have used

19    before.

20    *Q.*  Okay.  It's a word you used, and you used it specifically

21    in testimony of last week.

22    *A.*  I did use it last week, yes.

23    *Q.*  Mr. Bryant, through 31 interviews and prior testimony on

24    two other occasions in this case, you would agree with me that

25    never once, never once until last week have you referenced

Robert Bryant - Cross

1    manipulation of bids.

2    A.   I don't know when the first time I used that word.

3    Q.   Does June 2nd sound right?

4    A.   I don't know, but there has been some guardrails on how to

5    describe that, so --

6    Q.   Mr. Bryant, I asked you a yes-or-no question.  Let me stop.

7    The very first time you used the phrase "manipulation of bids"

8    was in June of this year.

9    A.   I don't know that to be accurate.  I think I have used that

10   before.

11   Q.   Mr. Bryant, there are two other hearings with transcripts.

12   Would you agree with me that throughout your testimony in two

13   other hearings, you never used the phrase "manipulation of

14   bids"?

15   A.   I don't know how I described it prior to -- in those other

16   proceedings.

17   Q.   Would you agree with me, Mr. Bryant, that in your testimony

18   last week of Wednesday and Thursday, you never used the term

19   "manipulation of bids" until it was used in a question asked by

20   the federal prosecutor?

21   A.   I don't know who said it first.

22   Q.   So let's switch gears just a little bit, Mr. Bryant.  Let's

23   talk about the market in 2014, your first year of working on a

24   KFC bid, directly working, excuse me.

25              So as we've already discussed, the industry as a whole

Robert Bryant - Cross

1   in 2014 was feeling a shortage of small birds.

2   A.   Correct.

3   Q.   Big birds were more profitable?

4   A.   Correct.

5   Q.   The price per bird was much higher for large birds than it

6   was for small birds.

7   A.   That's correct.

8   Q.   And going into the negotiations, Mr. Bryant, or in the

9   negotiations, for example, you believed that Popeye's

10  recognized that there would have to be a price increase.

11  A.   I believe so, yes.  I believe that customer conceded that

12  in one of those opening meetings, yeah.

13  Q.   So is that a yes?

14  A.   Yes.

15  Q.   You believed they thought that it was fair for Pilgrim's to

16  be seeking a price increase.

17  A.   That's correct, yes.

18  Q.   And as you testified, Mr. Bryant, you yourself thought it

19  was fair to be seeking a price increase.

20  A.   That's correct, yes.

21  Q.   And these beliefs were based on the supply contraction and

22  the profitability of birds.

23  A.   That's correct, yes.

24  Q.   Now, when you testified, you described the 2015 contract

25  price increases as being historic, right?

Robert Bryant - Cross

1    A.   Correct, yes.

2    Q.   Now, to be fair, you're not an agricultural economist,

3    right?

4    A.   No.

5    Q.   Pricing, you would agree, depends on a lot of different

6    factors?

7    A.   It does.

8    Q.   A lot of factors can cause price availability.

9    A.   Correct.

10   Q.   It can be supply, for example.

11   A.   Correct.

12   Q.   Government regulation.

13   A.   Yes.

14   Q.   Freight.

15   A.   Yes.

16   Q.   Packaging.

17   A.   Yes.

18   Q.   Labor.

19   A.   Correct.

20   Q.   Unforeseen circumstances like avian flu.

21   A.   Correct.

22   Q.   Grain.

23   A.   Especially grain.

24   Q.   Especially grain, like the availability and price of corn?

25   A.   Correct, soy.

713

Robert Bryant - Cross

1   Q.  And soybean meal.  So grain, for example, when gas prices

2   are really high, maybe there is more production of ethanol, for

3   example?

4   A.  That's correct.

5   Q.  And if there is more production of ethanol, that means corn

6   prices go up?

7   A.  That's correct, yes.

8   Q.  And corn prices don't go up just for the production of

9   ethanol, but also for feed, right?

10  A.  That's correct.  It's a commodity.

11  Q.  Okay.  And so all of these different factors factor into

12  how the pricing of chicken happens.

13  A.  That's correct, yes.

14  Q.  Mr. Bryant, prices spiked in the QSR market, small-bird

15  market, they spiked in 2008.

16  A.  That's right.  You mean commodity market -- commodity

17  price, not the price of chicken.

18  Q.  I actually mean the price of chicken.  There was a price

19  increase to the small-bird consumer, the small-bird buyer like

20  KFC in 2008.

21  A.  I don't remember that specific one.  I remember the

22  commodity prices, it was either 2008 or 2007, spiking because

23  of the ethanol act, yes.

24  Q.  Okay.  It also spiked in 2011.

25  A.  I don't remember -- I don't recall if the 2011 -- I recall

714

Robert Bryant - Cross

1    the 2007, 2008 spike.

2    Q.  And the reason I asked you, Mr. Bryant, is because you

3    testified to the jury that for 10 years you monitored prices,

4    right?

5    A.  I did.  I did on a weekly basis, yes.  I developed a report

6    for my manager at the time, yes.

7    Q.  Is that a yes?

8    A.  Yes.

9    Q.  Yes, you monitored prices.

10   A.  Yes.

11   Q.  So you monitored prices.  You don't specifically

12   remember -- well, you remember a spike in roughly 2007, and you

13   don't specifically remember the spike in 2011; is that right?

14   A.  I don't recall the 2011.  I remember the 2007, 2008 because

15   of the grain piece, yes.

16   Q.  Okay.  So just as prices go up, prices also come down,

17   right?

18   A.  Correct.

19   Q.  Okay.

20   A.  Sometimes.  Prices are sticky, right?  A lot easier to go

21   up than they are to come down.

22   Q.  Sure.  Well, but prices in 2018, for example, were less

23   than they were 10 years earlier.

24   A.  Say that again.

25   Q.  Yeah.  Prices in 2018 were lower than what they were in

Robert Bryant - Cross

1    2008.

2    A.   I don't know that.

3    Q.   Well, here is what I am getting at --

4    A.   When you say "prices," are you saying chicken prices, or

5    are you saying commodity prices?

6    Q.   Unless I say otherwise, you and I are always going to be

7    talking chicken, okay?

8    A.   When you are talking chicken -- the reason why I am asking

9    is if when you are talking chicken, are you talking about the

10   contract price to KFC, or are you talking about the Urner-Barry

11   price or what do you mean -- that's why I am asking that

12   question is they're different.

13   Q.   Let's take -- let's zoom the lens back, Mr. Bryant.  Let me

14   ask you a series of questions that are going to be more

15   general, okay?  Over a period of time prices go up and prices

16   come down.

17   A.   That's correct, yes.

18   Q.   And then they go back up again.

19   A.   They do.

20   Q.   And then they may come back down again?

21   A.   That's correct, yes.

22   Q.   And so it doesn't necessarily go up in a linear fashion

23   with inflation.  It may be a spike up and down.

24   A.   Yeah, on the commodity market, that's true.  It's a general

25   march -- it's a cyclical nature to it, and it's often sometimes

716

Robert Bryant - Cross

1  seasonal that you will see spikes, and you do see normally

2  spikes in the summer and a decline in the winter.

3  Q.  So, yes, prices go up and prices go down.  It's not a

4  continual up the way it would be with inflation.

5  A.  Correct.

6  Q.  Okay.  So 2014 was your first year ever being directly

7  involved in KFC pricing.

8  A.  Customer facing, yes, but like I said before, we had

9  discussion -- internal discussions with my manager prior to

10  that, yes.

11  Q.  So I am going to take that as a yes, Mr. Bryant, and move

12  on.

13       You testified on direct examination that you were

14  surprised by the amount of decrease in 2015.

15  A.  Increase.

16  Q.  Yes.  Did I say decrease?

17  A.  You did.

18  Q.  Then I misspoke.  Let me ask my question again.  You were

19  surprised by the amount of the increase in 2015.

20  A.  Correct.

21  Q.  Your surprise at the amount is your own opinion, right?

22  A.  That's correct.

23  Q.  Okay.  So let's look again at --

24       MR. BELLER:  Your Honor, if we may, 1055, page 8.

25       THE COURT:  Yes.

Robert Bryant - Cross

1          MR. BELLER:  Mr. Brian, if we can have that up on the

2    screen, please.  And actually, if we can just leave it right as

3    is.

4    BY MR. BELLER:

5    Q.  As we talked about, the chart shows the cents behind or

6    better than the market average per bird for each sector per

7    year, right?

8    A.  That's correct.

9    Q.  The numbers, as we've already established, were industry

10   data and not specific to Pilgrim's?

11   A.  That's correct.  That's the whole segment.

12   Q.  It's the whole segment.  The product we are talking about

13   here, QSR product, is really small bird, so we can look at that

14   one column, right?

15   A.  That's correct, yeah.

16   Q.  So in 2007, for example, if we can highlight 2007, big-bird

17   profitability was 29 cents over average; is that right?

18   A.  That's correct, yeah.

19   Q.  Small bird was 11 cents under average?

20   A.  Correct.

21   Q.  And that is a 40-cent difference.

22   A.  Correct.

23   Q.  And I am either rounding up or rounding down a penny, okay?

24   A.  Yeah.

25   Q.  So you would agree with me that's about 40 cents.

718

Robert Bryant - Cross

1   *A.*  Correct, yes.

2   *Q.*  The following year, 2008, that's the year that we talked

3   about that there was a price increase, either 2007 or 2008,

4   right?

5   *A.*  That's correct, yes.

6   *Q.*  So there was a price increase on that year for small birds.

7   *A.*  Correct.

8   *Q.*  And what happened is that small-bird profitability went up?

9   *A.*  Like I say, I believe that was tied to those grain

10  contracts.  Grain went up so their prices went up.

11  *Q.*  So because they went up, now by producing a small bird you

12  could make 3 cents over average.

13  *A.*  Correct.

14  *Q.*  All right.  The 2009 and 2010, let's look at those two

15  years.  The difference between big bird and small bird in those

16  two years was 31 cents and 28 cents respectively, right?

17  *A.*  Correct, yes.

18  *Q.*  Now, you said that you don't specifically remember a price

19  increase in 2011, but looking at the averages, you would

20  certainly agree with me that it makes sense that there was,

21  right?

22  *A.*  Well, or big bird for some reason, their prices fell so

23  much that the small-bird average was better, right; or maybe

24  prices remained flat, I don't know by looking at this, but

25  there was a change in the industry that made small bird more

Robert Bryant - Cross

1   attractive than big bird.

2   Q.  And one of those changes could very well be that small-bird

3   prices went up.

4   A.  Yeah, and I don't recall.  It could be they went up or big

5   bird just fell that much, I don't remember.

6   Q.  So we spoke about a 40-cent difference in 2007, a 31-cent

7   difference in 2009, 28-cent difference in 2010.  Let's talk

8   about 2013.  In 2013, there was a 50-cent difference.

9   A.  Correct, yes.

10  Q.  So big birds were making 31 cents over average.  Small bird

11  was losing 19 cents over average.

12  A.  Correct, yes.

13  Q.  Compare 2006 to 2013, you would agree with me that that

14  difference, that difference of 50 cents was historic.

15  A.  Yes.

16  Q.  It was a historic loss, right?

17  A.  Yes.

18  Q.  By March of 2014, so let's remember, 2013, 50 cents was

19  historic.  By March of 2014, the difference was 53 cents,

20  right?

21  A.  That's correct, yes.

22  Q.  Also historic, right?

23  A.  Well, let me be clear.  With the data, you could say that,

24  yes, but I -- at this time, I didn't follow big bird, so I

25  wasn't looking at it in the way you are presenting it.

720

Robert Bryant - Cross

1   Q.  I am asking you what was on the screen being produced for a

2   customer for a presentation that you assisted in drafting.  So

3   my question, Mr. Bryant, is that in March the delta between big

4   bird and small bird was historic.

5   A.  It was, what, 52 cents.

6   Q.  That's right.

7   A.  Yes.

8   Q.  More than any other year before.

9   A.  What I see is May of '14 would have -- according to this

10  data would have been -- have been the largest.

11  Q.  Oh, we are going to get to May, but my question was March

12  of 2014 was historic and that it was larger than any other year

13  before, that delta.

14  A.  Yes.

15  Q.  In April, it got even worse.  In April, it was almost

16  92-cent difference between big-bird and small-bird

17  profitability?

18  A.  That's correct, yes.

19  Q.  Almost a dollar per bird?

20  A.  Almost, yes.

21  Q.  Mr. Bryant, you would agree with me that a dollar per bird

22  is monumental price difference.

23  A.  That is a lot of money, yes.

24  Q.  It's a lot of money that small-bird producers are losing in

25  April of 2014.

721

Robert Bryant - Cross

1   *A.*  As I testified before, it's the opportunity cost, right,

2   participating in the small bird versus a larger bird.

3   *Q.*  And this is why, Mr. Bryant, you would be a fool to stay in

4   the small-bird industry in April of 2014 when you can switch to

5   making big bird and make a dollar more per average per bird.

6   *A.*  That was the discussion, yes.

7   *Q.*  May.  May of 2014 there is a Mother's Day catastrophe,

8   right?

9   *A.*  I don't specifically recall the Mother's Day catastrophe,

10  but Mother's Day in general around this time was a very

11  difficult time to be in small bird, particularly for KFC.

12  *Q.*  Well, you recall that KFC literally ran out of birds.

13  *A.*  I don't remember how much we shorted.  It was, like I said,

14  an annual thing that happened.  I don't specifically remember

15  2014.

16  *Q.*  Do you recall, Mr. Bryant, that KFC had to close

17  restaurants early on the busiest day of their year?

18  *A.*  I don't, no.

19  *Q.*  Do you recall, Mr. Bryant, you mentioned Urner-Barry, do

20  you recall that KFC was buying supplemental loads of chicken

21  for a 50 percent premium?

22  *A.*  No, I don't remember that.

23  *Q.*  Well, certainly you do remember that there wasn't enough

24  chicken to go around.

25  *A.*  I remember the shortages, yes.  I just don't remember the

Robert Bryant - Cross

1   magnitude.

2   Q.  And in May of 2014, you beat me to the punch just a little

3   bit, that one was historic.  There was a difference of $1.09

4   between big-bird profitability and small-bird profitability.

5   A.  Correct.

6   Q.  And that, Mr. Bryant, was historic, right?

7   A.  That's correct.

8   Q.  So to understand this, by converting a plant to produce big

9   birds, a supplier could make $1.08 more per bird than they

10  could by continuing to grow small birds.

11  A.  Correct.

12  Q.  So the delta was $1.08, and your testimony is that a 15 to

13  20-cent increase surprised you.

14  A.  Yes.

15  Q.  During this time in 2014, sales decisions at Pilgrim's --

16  A.  Sorry, I was just going to say --

17  Q.  The question was, it surprised you.

18  A.  Well, I was going to try to put it in context.

19  Q.  I understand that, but that's not the question.  The

20  question, Mr. Bryant, the question in front of you is that the

21  increase of 15 to 20 cents surprised you, and you answered yes.

22          Mr. Bryant, during that time in 2014, sales decisions

23  at Pilgrim's had to be fact-based and they have to be

24  profitable, right?

25  A.  That's correct, yes.

Robert Bryant - Cross

1    *Q.*  Sales decisions required benchmarking and current market

2    conditions.

3    *A.*  Correct.

4    *Q.*  So, Mr. Bryant, once we have broken down sort of your role

5    in Pilgrim's in 2014, I want to talk about those events for

6    which you have firsthand personal knowledge, okay?

7    *A.*  Okay.

8    *Q.*  You testified on direct -- you testified on direct

9    examination that you overheard a telephone call between

10   Mr. Austin and Mr. Brady, and that's what I want to ask you

11   about, okay?

12   *A.*  Yes.

13   *Q.*  So to understand this a little bit more, you happened to be

14   walking in and out of Mr. Austin's office.

15   *A.*  I was just pacing in front of his desk, and the hall was

16   directly out his door, and I was pacing out to the hall and

17   back and forth in front of his desk, yes.

18   *Q.*  All right.  Let me ask my question again.  You were walking

19   in and out of his office.

20   *A.*  Yes.

21   *Q.*  Okay.  You walked in to Mr. Austin's office and he was on

22   the telephone.

23   *A.*  I believe so, yes.

24   *Q.*  You don't know what the person on the other end of the line

25   was saying, right?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   You don't know who initiated this phone call?

3   A.   No.

4   Q.   You did not hear the entire conversation?

5   A.   That's correct.

6   Q.   Any thought on what the person on the other end of the line

7   was saying would be an assumption on your part.

8   A.   I don't -- I didn't hear anything from the other side of

9   the conversation.

10  Q.   When you overheard this phone call, you inferred that

11  Mr. Austin was talking about KFC.

12  A.   That was my understanding, yes.

13  Q.   That was your inference?

14  A.   Because of the meeting.

15  Q.   Right.  So that's an inference.  That was your inference,

16  right?

17  A.   Yes.

18  Q.   So let's talk about the inference for just a moment.  You

19  overheard this phone call sometime during the 2014 KFC

20  negotiations.

21  A.   That's correct, yes.

22  Q.   It was after Pilgrim's already submitted their bid during

23  those negotiations.

24  A.   The first round, yes, that's correct.

25  Q.   You're not aware of any call with Mr. Brady prior to

Robert Bryant - Cross

1  submitting that bid.

2  *A.*  No.

3  *Q.*  Or you're not aware of any call between Mr. Austin and

4  Mr. Kantola of Koch Foods.

5  *A.*  Prior to the bid?

6  *Q.*  Yeah.

7  *A.*  No --

8  *Q.*  Or any other --

9  *A.*   -- no.

10  *Q.*  I am sorry, I spoke over you.

11  *A.*  I said not that I am aware of, no.

12  *Q.*  Or any other supplier, right?

13  *A.*  Not that I recall, no.

14  *Q.*  You can't remember if this call happened before or after a

15  meeting with KFC.

16  *A.*  That's correct.

17  *Q.*  But when the call ended, Mr. Austin announced that that was

18  Mr. Brady on the other end of the line.

19  *A.*  That's correct, yes.

20  *Q.*  These details, Mr. Bryant, you recall happening you recall

21  from 2014, right?

22  *A.*  That's correct, yeah.

23  *Q.*  And you never otherwise told anyone about this call until

24  2021 when you met with the prosecution.

25  *A.*  That's correct, yes.

Robert Bryant - Cross

1  *Q.*  Okay.  So let's talk about what you claim you remember

2  overhearing from this phone call and that is Mr. Austin saying,

3  I told them the price is the price; I just need to know how

4  many loads you need.

5  *A.*  Correct.

6  *Q.*  All right.  Mr. Austin did not convey a price.

7  *A.*  I didn't hear one, no.

8  *Q.*  Not a Pilgrim's price?

9  *A.*  Correct.

10 *Q.*  Not a supplier's price?

11 *A.*  That's correct.

12 *Q.*  You did not hear the other person's response to

13 Mr. Austin's statement.

14 *A.*  No.

15 *Q.*  Or even know if the other person responded at all.

16 *A.*  That's correct.

17 *Q.*  No discussion about prices.

18 *A.*  Not that I remember, no.

19 *Q.*  Again, not future price and not current price.

20 *A.*  That's correct.

21 *Q.*  Mr. Austin did not try to get the person on the other end

22 to agree to anything during this phone call.

23 *A.*  I don't remember hearing -- hearing that, no.

24 *Q.*  You certainly don't remember him saying, We'll hold firm on

25 our price if you will too?

727

Robert Bryant - Cross

1   A.  No, I don't remember that statement, no.

2   Q.  You didn't hear him say, We're going to raise our price if

3   you will.

4   A.  No.

5   Q.  You didn't hear him say, We'll do it if you do it.

6   A.  No.

7   Q.  So let's move on because you hear a second call,

8   Mr. Bryant.

9   A.  That's correct, yes.

10  Q.  The second phone call you believe is with Bill Kantola of

11  Koch Foods.

12  A.  That is correct, yes.

13  Q.  It just so happens that Mr. Austin also tells that person,

14  I told them the price is the price; I just need to know how

15  many loads you need.

16  A.  That's correct, yes.

17  Q.  You also walked in during the middle of this phone call.

18  A.  Yes.  I -- what I remember, I didn't stop that pacing, you

19  know, the walking back and forth.

20  Q.  And going in and out of the office.

21  A.  Correct.

22  Q.  Mr. Austin again announced who he was on the phone with.

23  A.  That's correct, yes.

24  Q.  And in this second phone call, this time with Mr. Bill

25  Kantola, you still didn't hear Mr. Austin tell the caller a

728

Robert Bryant - Cross

1   price.

2   *A.*   No.

3   *Q.*   Not a future price.

4   *A.*   Correct.

5   *Q.*   Not a current price.

6   *A.*   That's correct.

7   *Q.*   You did not hear a quid pro quo.

8   *A.*   No.

9   *Q.*   Okay.  And by that I mean --

10  *A.*   I understand -- I understand what it is.

11  *Q.*   But we have got a larger audience, okay?

12  *A.*   Yes.

13  *Q.*   You didn't hear him say, I will raise my price if you raise

14  your price.

15  *A.*   That's correct.

16  *Q.*   You didn't hear him say, I am going to hold on my price,

17  but only if you will too?

18  *A.*   No.

19  *Q.*   No, I'll do it if you do it.

20  *A.*   That's correct.

21  *Q.*   Mr. Bryant, aside from those two phone calls in which no

22  prices were discussed and no quid pro quo was discussed, you

23  have no personal knowledge of other calls with competitors of

24  men in this courtroom, right?

25  *A.*   Not that I can recall, no.

Robert Bryant - Cross

1    *Q.*  You certainly never participated in a single one?

2    *A.*  No.

3    *Q.*  You never overheard a single telephone call other than

4    these two that you've testified about.

5    *A.*  That's all I can remember, yes.

6    *Q.*  You yourself, Mr. Bryant, have never had a single telephone

7    call with any competitor where they gave you pricing

8    information.

9    *A.*  Well, I used to buy commodity loads from competitors, so,

10   yes, but not in the context that we're here to discuss.

11   *Q.*  Fair enough.  So let's talk about that.  So what you mean

12   is that you used to have to buy chicken to cover a load.

13   *A.*  Correct.

14   *Q.*  Okay.

15   *A.*  I would buy what we used to call spot WOGs like three ups.

16   *Q.*  Sure, sure.  And so other than you covering what I am going

17   to call supplemental and learning price that way, in this

18   context for what we are talking about here, you never had

19   communication with other competitors directly.

20   *A.*  That's correct, yes.

21   *Q.*  You never had a single communication -- I should say

22   conversation where you directly received your competitor's

23   pricing information?

24   *A.*  No, not that I can remember.

25   *Q.*  Okay, other than again you having to purchase product from

Robert Bryant - Cross

1    time to time?

2    A.   Yeah.

3    Q.   Let's not speak over each other, I am sorry.

4    A.   I just didn't know if one of the competitors, like,

5    responded to one of Roger's, may have copied me where I

6    received it directly, but I don't know that.  I didn't reach

7    out to get it personally.

8    Q.   Well, and certainly the government has never shown you a

9    single e-mail where you received competitors' pricing

10   information.

11   A.   I don't believe so.

12          MR. TORZILLI:  Objection, misstates the evidence.

13          THE COURT:  Overruled.

14   BY MR. BELLER:

15   Q.   Or -- you have no direct information where you offered to

16   set Pilgrim's price on the condition that any competitor do the

17   same.

18   A.   That's correct.

19   Q.   Or whether they offered to set a price on the condition

20   that you do the same.

21   A.   That's correct.

22   Q.   Every single other incident you testified about regarding

23   contact with suppliers is something that one of your co-workers

24   supposedly told you about.

25   A.   That's correct.

731

Robert Bryant - Cross

1    Q.   So breaking that down, under your theory, Mr. Bryant, the

2    supplier, a competitor, would talk to a co-worker.  A co-worker

3    then would speak to you.

4    A.   That's correct.

5    Q.   And then years later you spoke to the government.

6    A.   That's correct.

7    Q.   The government then used that information to ask you some

8    questions, right?

9    A.   That's right.

10   Q.   And now you're testifying to this from years back, right?

11   A.   That's correct, yes.

12   Q.   So I want to hone in for just a moment on a few examples of

13   that pattern, okay?  Let's talk about getting KFC done first,

14   all right?

15          On direct examination, you testified that Mr. McGuire

16   said that it was Pilgrim's strategy to get KFC done first.

17   A.   That's correct.

18   Q.   Pilgrim's strategy, a multi-billion dollar corporation, had

19   a strategy and you testified to that strategy, right?

20   A.   That's right.

21   Q.   The former CEO of Pilgrim's is here in this courtroom.  You

22   know that, right?

23   A.   Yes.

24   Q.   You did not have a discussion with Bill Lovette about

25   setting Pilgrim's strategy to get KFC done first.

Robert Bryant - Cross

1    A.   No.

2    Q.   You did not have a discussion with Jayson Penn about this,

3    quote/unquote, Pilgrim's strategy to get KFC done first.

4    A.   That's correct.

5    Q.   You did not have a discussion with anyone on the Pilgrim's

6    board about Pilgrim's strategy to get KFC done first.

7    A.   That's correct.

8    Q.   And you, Mr. Bryant, did not have any conversations with

9    any competitors about getting KFC done first.

10   A.   That's correct.

11   Q.   You spoke to Jason McGuire.

12   A.   My manager, yes.

13   Q.   All right.  So some unknown person spoke to Mr. McGuire,

14   your co-worker, your manager, right?

15   A.   I don't know where -- that could have been Mr. McGuire's

16   strategy.  I don't recall whose strategy it was.  I was just --

17   that was what I was told by my manager.

18   Q.   Right.  And so that's just it.  You don't know.  So we

19   don't know where Mr. McGuire got this information from.

20   A.   That's correct.

21   Q.   Years later, Mr. Bryant, you then spoke to the government,

22   right?

23   A.   Correct.

24   Q.   The government then put together questions to ask you last

25   week.

Robert Bryant - Cross

1    A.  Correct.

2    Q.  You practiced those questions with the government.

3    A.  Yes.

4    Q.  And now you're testifying to this jury that it was

5    Pilgrim's strategy to get KFC done first, right?

6    A.  Correct.

7    Q.  So when you testified that it was Pilgrim's strategy,

8    that's an example of you speaking about something as a fact

9    when really it's a product of a telephone game, right?

10   A.  I don't know if it's a product of a telephone game.  I

11   mean, that was the instruction my manager gave me.

12   Q.  You certainly don't have any firsthand knowledge of

13   Mr. McGuire speaking to anyone else at Pilgrim's about this

14   strategy.

15   A.  That's correct.

16   Q.  You don't have any firsthand knowledge of any suppliers

17   speaking to Mr. McGuire about this strategy.

18   A.  That's correct.

19   Q.  So I guess guessing about where this information came from

20   would be an assumption on your part.

21   A.  Well, that was the direction given by my manager.

22   Q.  So you don't know, Mr. Bryant, if that was, quote/unquote,

23   Pilgrim's strategy at all, right?

24   A.  I don't.  All I know is what my manager told me.

25   Q.  All right.  Well, let's talk about -- more about this

Robert Bryant - Cross

1   pattern.  So you testified that in 2014 you had an e-mail

2   discussion with Mr. McGuire about the negotiations for KFC,

3   right?

4   A.  That e-mail, yes.

5   Q.  Okay.

6        MR. BELLER:  And if we can please publish for the jury

7   Exhibit 1066, Your Honor?

8        THE COURT:  You may.

9        MR. BELLER:  Mr. Brian, if we can scroll down, please.

10  BY MR. BELLER:

11  Q.  Okay.  Mr. Bryant, when you said the e-mail that you spoke

12  about, you're talking about 1066, right?

13  A.  Correct, yes.

14  Q.  Now, in 1066, and we're at the bottom of the page, you were

15  not on this particular portion of the e-mail; is that right?

16  A.  That's correct, yes.

17  Q.  Now, you were asked at length on direct examination who

18  everyone meant, right?

19  A.  I believe so, yes.

20  Q.  Okay.  And your testimony about this e-mail for which you

21  were not a participant is that everyone meant all of the

22  suppliers, right?

23  A.  That's correct, yes.

24  Q.  And when you said all of the suppliers, you also mentioned

25  my client or my client's company, Claxton Poultry.

735

Robert Bryant - Cross

1   A.   That's correct, yes.

2   Q.   The fact of what Mr. McGuire meant by the word "everyone"

3   was an assumption on your part.

4   A.   It was my understanding, yes.

5   Q.   Okay.  We're getting stuck on understanding versus

6   assumption, and I want to see if we can't break that down just

7   a little bit.  Mr. Bryant, if you could look at me, please.

8   What is the difference to you between understanding and

9   assumption?

10   A.   Your world view.  When I say my understanding, it's my

11   understanding from that time.  An assumption would be a guess.

12   A guess may be educated, may -- may be not.  My understanding

13   is based off my time working with Mr. McGuire and others and my

14   time in the industry where an assumption would be a guess.  You

15   may or may not have a foundation when you make an assumption.

16   Q.   Thank you.  And I appreciate that.  So let's talk about a

17   foundation for an assumption as it relates to this particular

18   e-mail.  You never went to Mr. McGuire and asked Mr. McGuire to

19   clarify who he meant by everyone.

20   A.   I don't believe I asked that specific question, but I

21   believe Mr. McGuire -- Mr. McGuire and myself had a discussion

22   about this prior to the meeting, yes.

23   Q.   And -- okay.  And so this discussion that you had with

24   Mr. McGuire prior to the meeting, it's not included in this

25   e-mail and also that you did not testify to when you were asked

Robert Bryant - Cross

1   about it, right?

2   A.  That's correct.

3   Q.  Okay.  So this is something that you're remembering now

4   after I am asking you to clarify assumption versus

5   understanding as to the word "everyone."

6   A.  No.  I believe -- I mean, I don't believe I was asked

7   questions last week about it, but Mr. McGuire and myself had

8   regular phone calls during this negotiation, so --

9   Q.  Great.

10  A.  Not this one, but others, but --

11  Q.  So let's take a break from this e-mail for just a moment

12  because I want to go down this trail with you.

13        So your testimony to this jury now is that you had

14  discussions with Mr. McGuire that happened on the phone, right?

15  A.  Yes, many, many phone calls.

16  Q.  And that Mr. McGuire was able to tell you what he meant by

17  the word "everyone."

18  A.  No.

19  Q.  That Mr. McGuire was able to clarify who was participating

20  in this.

21  A.  I don't recall us going through it line by line like -- I

22  don't recall us, like, specifically everyone, no, I don't.  It

23  was more of a general conversation.

24  Q.  It was a general conversation.  So but your testimony to

25  the jury last week is that Claxton was a participant and that

Robert Bryant - Cross

1   Mr. McGuire intended the word "everyone" to include Claxton.

2   A.   I believe I testified that was my understanding.

3   Q.   Okay.  And your understanding that came from a telephone

4   call that happened prior to this e-mail.

5   A.   I don't believe --

6           MR. TORZILLI:  Objection, misstates prior testimony.

7           THE COURT:  Overruled.

8   A.   I don't believe -- I don't remember if the phone call

9   happened before or after this one, but we had several phone

10  calls around the time of the negotiation.  I do remember a

11  phone call where we discussed this and how everything was

12  coming together, and he was trying to reassure me that we'd be

13  successful.

14  BY MR. BELLER:

15  Q.   Good.  So sticking with me for just a moment, Mr. Bryant.

16  So Mr. McGuire had a phone call at some point in time where he

17  was trying to assure you that everything would be successful.

18  Fast-forward eight years -- well, let me back up.  Mr. McGuire

19  had got this information from some unknown competitor, right?

20  A.   No.  I don't recall.  I believe -- my understanding is he

21  got this information from Mr. Austin.

22  Q.   Okay.  And Mr. Austin got the information from a

23  competitor, that they were onboard and everything would be

24  successful.

25  A.   Correct.

738

Robert Bryant - Cross

1   Q.   And an unknown competitor, right?

2   A.   Yes.

3   Q.   At an unknown time.

4   A.   Well, looks like it's August 20th, 2014.

5   Q.   But you don't know when Mr. Austin had this conversation

6   with an unknown competitor.

7   A.   Correct.

8   Q.   All right.  So at an unknown time, according to you, your

9   testimony is that Mr. Austin had a conversation with an unknown

10  competitor at an unknown time with an unknown company, and then

11  after Mr. Austin had that conversation, Mr. Austin told

12  Mr. McGuire, Mr. McGuire told you, eight years later you told

13  the government, the government then formulated questions to ask

14  you for you to now be able to testify about as fact; is that

15  right?

16  A.   Yes.

17  Q.   Okay.  All right.  Perfect.

18         So let's go back to that telephone call for just a

19  moment.  Did the government at any time show you your telephone

20  records to substantiate a telephone call between you and

21  Mr. McGuire?

22  A.   No.

23  Q.   Do you know, Mr. Bryant, that you have zero telephone calls

24  with Mr. McGuire on August 20th of 2014?

25  A.   I don't believe the call happened on August 20th.  I don't

Robert Bryant - Cross

1    know, but --

2    Q.  You said before or after, so let's go on, and we'll go

3    after.  How about August 21st, did the government ever show you

4    your telephone records to substantiate that there is no

5    telephone call between you and Mr. McGuire on August 21st of

6    2014?

7    A.  I don't believe they showed me any telephone records.

8    Q.  Nothing to substantiate the telephone game, right?

9    A.  Correct.

10   Q.  Okay.  So let's go back to my e-mail, now, right?  So we're

11   talking about 1066.  The word "everyone" and the assumptions,

12   you never asked Mr. McGuire to clarify what he meant by the

13   word "everyone."

14   A.  No.

15   Q.  And when you were asked by the prosecutor on direct

16   examination what Mr. McGuire intended by everyone, you did not

17   testify that you were making an assumption as to what was in

18   his head.

19   A.  Correct.  I was giving my understanding.

20   Q.  Then Mr. Austin responds with the word "yes," right?

21   A.  Correct.

22   Q.  Okay.  And when you were asked about the word "yes," you

23   never asked Mr. Austin if that included Claxton.

24   A.  That's correct.

25   Q.  Okay.  You never asked him if that included Tyson, for

Robert Bryant - Cross

1    example.

2    *A.*   That's correct.

3    *Q.*   Or Koch.

4    *A.*   That's correct.

5    *Q.*   Or George's.

6    *A.*   That's correct.

7    *Q.*   And so when you were testifying on direct examination and

8    you listed all of the different suppliers as meaning everyone,

9    that was an assumption that you were making on your part.

10   *A.*   That was my understanding, yes.

11   *Q.*   Without a foundation, because we just clarified that you

12   never asked anyone what that meant, right?

13   *A.*   Well, I believe I had foundation at the time, yes.

14   *Q.*   All right.  And when the government interviewed you, the

15   government didn't ask you what assumptions you were making in

16   interpreting certain words and pronouns that were uttered by

17   people other than you?

18   *A.*   I believe they asked me for my understanding.

19   *Q.*   On direct examination.

20   *A.*   And in interviews, yes.

21   *Q.*   Oh, good.  Did they ask you to say, Is this an assumption

22   on your part?

23   *A.*   I don't recall that --

24   *Q.*   All right.

25   *A.*   -- that question.

Robert Bryant - Cross

1   Q.  So you testified about the line "surprised like how much

2   higher everyone else was?"  And that that line meant that the

3   competitor came in equally as high as Pilgrim's bid submission,

4   right?

5   A.  That's correct, yes.

6   Q.  Equally as high as Pilgrim's bid submission is not included

7   in that e-mail.

8   A.  That's correct, yes.

9   Q.  An e-mail for which you were not a participant.

10  A.  Not until later, that's correct.

11  Q.  Again, it's your impression, right?

12  A.  That's my understanding, yes.

13  Q.  Competitors came in equally as high, that is not something

14  that you discussed with Mr. McGuire.

15  A.  I don't know.

16  Q.  Well, you certainly didn't ask Mr. McGuire what he meant.

17  A.  I don't remember exactly.

18  Q.  And that's because you're making an assumption about that

19  too.

20  A.  I just don't remember.

21  Q.  Well, you're assuming that Mr. Austin got that information

22  from other suppliers as opposed to anyone else in the industry.

23  A.  You know, I don't remember if Mr. Austin and I had a

24  conversation about this e-mail when we were in his office or

25  not.  I just don't remember.

Robert Bryant - Cross

1  *Q.*  Well, but we're testifying in a criminal trial, sir.

2  *A.*  Yes.

3  *Q.*  Right?  So we need to focus on facts for just a moment.

4  *A.*  And I am.  That's what I was saying.  When you asked the

5  question, I was trying to remember if, you know, if we had a

6  conversation about this before we went to that meeting.

7  *Q.*  Well, Mr. Bryant, you had a year during the government's

8  investigation for them to ask you questions as to how you knew

9  this, right?

10  *A.*  That's correct, yes.

11  *Q.*  Okay.  And if you knew how you knew this information you

12  were assuming, you certainly would have told them, right?

13  *A.*  Yeah, if I remembered, yes.

14  *Q.*  So you simply didn't remember, which is why you have never

15  told them.

16  *A.*  Yeah, I can't recall.

17      *MR. BELLER:*  If I may have just a moment, Your Honor,

18  please.

19      *THE COURT:*  You may.

20  *BY MR. BELLER:*

21  *Q.*  Mr. Bryant, certainly Government's Exhibit 1066 does not

22  say anything about a quid pro quo, right?

23  *A.*  That's correct, yes.

24  *Q.*  There is no, Tell them that we'll raise our prices if they

25  will too.  That's not in this e-mail.

Robert Bryant - Cross

1    *A.*  Correct.

2    *Q.*  I'll raise my prices, but only if you raise your prices.

3    *A.*  That's correct.

4    *Q.*  I told them that Pilgrim's is willing to do it if they do

5    it too, also not in this e-mail.

6    *A.*  That's correct.

7         MR. BELLER:  Thank you.  If we can remove that,

8    Mr. Brian.

9    *BY MR. BELLER:*

10   *Q.*  Mr. Bryant, I want to switch gears still staying with

11   assumptions, and I want to talk about the word "plan" that you

12   talked about last week, okay?

13   *A.*  Okay.

14   *Q.*  Mr. Bryant, on direct examination, you testified that this

15   was your understanding that there was a plan amongst the

16   chicken suppliers to raise prices.

17   *A.*  Correct.

18   *Q.*  And I want to focus on the use of that word "plan" in the

19   context of what you previously said about how Pilgrim's uses

20   competitor information, okay?

21   *A.*  Okay.

22   *Q.*  Mr. Bryant, Pilgrim's received competitor information so

23   that they could make decisions based on that information.

24   *A.*  That's correct, yes.

25   *Q.*  Mr. Austin attempting to obtain competitor information was

Robert Bryant - Cross

1    part of the decision-making process?

2    A.   That's correct, yes.

3    Q.   You testified that despite you never once speaking to

4    competitors, you believed competitors discussed and knew what

5    each other were doing, right?

6    A.   That's correct, yes.

7    Q.   Despite your testimony last week about a plan amongst --

8    actually, you know what?

9          MR. BELLER:   Judge, excuse me, if I can please back

10   up.

11         THE COURT:   Sure.

12   BY MR. BELLER:

13   Q.   Mr. Bryant, you testified that you personally used

14   competitor information to make the best economical decision for

15   Pilgrim's.

16   A.   That's right.

17   Q.   Not a quid pro quo, Mr. Bryant.

18   A.   That's correct.

19   Q.   It wasn't a, We have this information, and now let's figure

20   out the rest -- with the rest of the group and put together a

21   plan, right?

22   A.   That's correct.

23   Q.   Okay.   I am going to switch gears and talk a little bit

24   more specifically about my client, Mr. Fries.

25         Mr. Bryant, you have never spoken to Mr. Fries about

Robert Bryant - Cross

1   Claxton's prices.

2   A.   That's correct.

3   Q.   You have never spoken to Mr. Fries about how Claxton goes

4   about determining its prices.

5   A.   That's correct.

6   Q.   You've never spoken to Mr. Fries about what data points

7   Claxton considers in determining its bids.

8   A.   That's correct.

9   Q.   You have never spoken to Mr. Fries about Claxton's volume

10  of business.

11  A.   That's correct.

12  Q.   You have never spoken with Mr. Fries about other suppliers'

13  pricing.

14  A.   That's correct.

15  Q.   And by other suppliers' pricing, I'm talking about Tyson's,

16  right?  You have never had a conversation with him about

17  Tyson's pricing?

18  A.   That's correct.

19  Q.   Or Koch's?

20  A.   That's correct.

21  Q.   Or George's.

22  A.   That's correct.

23  Q.   And you have never given Mr. Fries Pilgrim's price even if

24  it was legal to do so, right?

25  A.   That's correct.

Robert Bryant - Cross

1   Q.   You have never talked to Mr. Fries about Pilgrim's business

2   strategy even if that was legal for you to do so?

3   A.   That's correct.

4   Q.   And you have never called Mr. Fries, and Mr. Fries has

5   never called you.

6   A.   Not that I'm aware of, no.

7   Q.   You have never e-mailed Mr. Fries or had Mr. Fries e-mail

8   you.

9   A.   Not that I can remember, no.

10  Q.   You have never exchanged text messages with Mr. Fries.

11  A.   Not directly, no.

12  Q.   And you have never, Mr. Bryant, agreed with Mr. Fries to

13  raise the price or reduce a decrease in price of chicken to

14  your customers.

15  A.   That's correct.

16  Q.   You have never said to him, I'll do it if you do it.

17  A.   That's correct.

18  Q.   And he has never said to you, Okay, I'll do it, right?

19  A.   That's correct.

20  Q.   All right.  Now, let's talk a little bit about Mr. Brady.

21  You met Mr. Brady while he was still an employee of Pilgrim's

22  Pride?

23  A.   That's correct, yes.

24  Q.   You met him at the Mayfield plant, right?

25  A.   Yes.

Robert Bryant - Cross

1    Q.  You met him one time when he gave a customer a tour of the

2    plant.

3    A.  That was one time we met, yes.

4    Q.  The customer was Cracker Barrel, right?

5    A.  Yes, yes, yes.

6    Q.  A company we are not talking about today.

7    A.  Yes.

8    Q.  And you certainly did not work with him on that Cracker

9    Barrel account, right?

10   A.  No, no.  I was still, like I said, working at Mayfield at

11   the time.

12   Q.  And that was about 10 years ago?

13   A.  Yeah, I don't recall exactly when.

14   Q.  And while he was an employee at Pilgrim's Pride, he never

15   shared other suppliers' pricing information with you.

16   A.  That's correct.

17   Q.  Not pricing information from Claxton Poultry, his

18   competitor at the time?

19   A.  That's correct.

20   Q.  No pricing information from Tyson's?

21   A.  That's correct.

22   Q.  Or Koch or George's.

23   A.  That's correct.

24   Q.  And after Mr. Brady left Pilgrim's Pride, you know, sir,

25   that he took a job at Claxton in August of 2012.

748

Robert Bryant - Cross

1    A.   I didn't recall the year, but I knew he went to Claxton,

2    yes.

3    Q.   About 10 years ago, does that sound right to you?

4    A.   Like I said, I am not sure exactly when.

5    Q.   Well, let's talk about the period of time in which he has

6    been at Claxton.   You, Mr. Bryant, never directly received

7    Claxton's pricing information from Mr. Brady.

8    A.   That's correct.

9    Q.   You've never received Claxton's pricing information from

10   Mr. Brady, but you've also never received any other suppliers'

11   information from Mr. Brady.

12   A.   That's correct.

13   Q.   You never spoke to Mr. Brady about how Claxton goes about

14   determining its prices.

15   A.   That's correct.

16   Q.   You've never spoken to Mr. Brady about what data points

17   Claxton considers in determining its bids to customers.

18   A.   That's correct.

19   Q.   You have never spoken to Mr. Brady about Claxton's volume

20   of business.

21   A.   That's correct.

22   Q.   And you, sir, have never shared Pilgrim's pricing

23   information with Mr. Brady.

24   A.   That's correct.

25   Q.   In fact, Mr. Bryant, when Mr. Brady left Pilgrim's and went

Robert Bryant - Cross

1   to Claxton, you did not have any further contact with him

2   except for maybe minor business interactions.

3   A.   Yeah, just some social events.

4   Q.   Okay.  Chicken-industry-related social events, right?

5   A.   That's correct, yes.

6   Q.   You have not had any substantive conversations with

7   Mr. Brady since he left Pilgrim's Pride.

8   A.   That's correct.

9   Q.   No phone calls?

10  A.   Not that I remember, no.

11  Q.   No text messages?

12  A.   No.

13  Q.   You have never exchanged e-mails with Mr. Brady?

14  A.   Not that I remember, no.

15  Q.   Mr. Bryant, you have never agreed with Mr. Brady to raise

16  the price of chicken or reduce a reduction in price of chicken

17  to their customers.

18  A.   That's correct.

19  Q.   You identified Mr. Brady as Claxton's lead negotiator for

20  the 2017 KFC bid, right?

21  A.   That's correct.

22  Q.   You have no personal knowledge of that.

23  A.   No.

24  Q.   Yet again, that's an assumption that you're making, right?

25  A.   That was my understanding, yes.

750

Robert Bryant - Cross

1  *Q.*  Sure.  And when you were asked by the prosecutor who was

2  Claxton's lead negotiator in 2017, you certainly didn't say,

3  Well, I'm making an assumption that it was Mr. Brady?

4  *A.*  I probably would have said, I believe it would have been

5  Scott Brady.

6  *Q.*  Without personal knowledge?

7  *A.*  Correct.

8  *Q.*  So without personal knowledge, you were willing to answer

9  the question by saying Scott Brady, right?

10  *A.*  Correct.

11  *Q.*  Sticking with Claxton and its employees for a moment, you

12  don't know Greg Finch?

13  *A.*  No.

14  *Q.*  The CFO of Claxton Poultry?

15  *A.*  That's correct.

16  *Q.*  You don't know Jerry Lane who is the president of Claxton

17  until 2016.

18  *A.*  No.

19  *Q.*  You certainly don't know and you have never interacted with

20  Tom Scarborough, the directer of sales for Claxton Poultry?

21  *A.*  No.

22  *Q.*  You don't know Claxton's labor costs.

23  *A.*  No.

24  *Q.*  You don't know Claxton's chick costs.

25  *A.*  No.

751

Robert Bryant - Cross

1   Q.  Their freight costs.

2   A.  No.

3   Q.  Their margin.

4   A.  Correct.

5   Q.  What they are paying for soybean meal?

6   A.  Correct.

7   Q.  If there is an NHA adder, what that adder is, right?

8   A.  No.

9   Q.  So I want to break that down just because I used some terms

10  that not everybody may be familiar with, NHA meaning no hormone

11  antibiotic?

12  A.  No human antibiotic.

13  Q.  No human antibiotic, excuse me.  NHA, no human antibiotic.

14  And sometimes an adder meaning at a little bit of an upcharge

15  for this product, right?

16  A.  Yes, sometimes, yes.

17  Q.  So you don't know if Claxton was charging their customer

18  this adder.

19  A.  That's correct.

20  Q.  You don't know what their grower pay is.

21  A.  That's correct.

22  Q.  And you don't know any of Claxton's exact costs that go

23  into their cost-plus model, right?

24  A.  No.

25  Q.  Mr. Bryant, I want to sort of tap into your knowledge here

752

Robert Bryant - Cross

1   for just a moment and your experience.  You do know that

2   determining these individual costs is very important when

3   you're filling out a cost-plus model for a bid submission to a

4   customer.

5   A.  That's correct, yes.

6   Q.  It is all of these actual costs that go into what I am

7   going to call a spreadsheet for the purpose of figuring out

8   what the price is that's going to be submitted to the customer.

9   A.  That's correct.

10  Q.  And all of these different factors that I went through

11  amongst dozens of others make up that price, right?

12  A.  They are supposed to, yes.

13  Q.  Okay.  And you don't know who was in charge of figuring out

14  those costs for Claxton Poultry?

15  A.  That's correct.

16  Q.  And you don't know who was involved in the process of them

17  putting these costs into this cost-plus model, right?

18  A.  That's correct.

19  Q.  On top of not knowing Claxton's cost or the people involved

20  in putting together the cost-plus model, you have no knowledge

21  as to what data points Claxton uses to formulate their bid

22  submissions.

23  A.  That's correct.

24  Q.  You don't know if Claxton uses AgriStats, for example, that

25  table we were looking at.

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Benchmarking services.

3    A.   That's correct.

4    Q.   If they use or consider their current pricing for their

5    customer.

6    A.   That's correct.

7    Q.   Historical pricing for the customer.

8    A.   That's correct.

9    Q.   Public SEC filings for big companies like Pilgrim's.

10   A.   That's correct.

11   Q.   Feedback from the buyer.

12   A.   That's correct.

13   Q.   Market conditions.

14   A.   That's correct.

15   Q.   Opportunity costs.

16   A.   Correct.

17   Q.   All things that according to you are important to consider

18   in determining a bid, right?

19   A.   That's correct, yes.

20   Q.   You would agree with me, Mr. Bryant, that how Claxton works

21   internally and how Pilgrim's works, they are different

22   companies.

23   A.   That's correct.

24   Q.   They are not just different companies in the sort of

25   literal sense, but they are also different companies in the

Robert Bryant - Cross

1    more generalized sense in terms of business setup and

2    structure.

3    A.   That's correct, yes.

4    Q.   And that's because in part Claxton, for example, is a

5    single plant operation, right?

6    A.   I don't know if they are single plant.  I thought they

7    built another plant or debone operation that was separate or

8    something.

9    Q.   Okay.  And so a debone operation is, to clarify, is where

10   some product is transferred for purposes of just additional

11   processing?

12   A.   Yeah, an additional site.

13   Q.   And so while there may be according to you -- well, you

14   have memory that they have recently built a deboning facility,

15   it still makes them a single plant operation.

16   A.   I wouldn't consider that a single plant.  I would agree

17   with you they have one slaughter facility.

18   Q.   Okay, thank you.  Thank you for clarifying that.

19            Their production serves primarily the state of

20   Florida, right?

21   A.   I don't know their entire geographic region.  I would

22   assume Florida and Georgia.  I'm not sure their entire

23   footprint.

24   Q.   Well, certainly you know that Claxton Poultry based in

25   southeast Georgia is, generally speaking, not putting chicken

Robert Bryant - Cross

1    on a truck and transporting it to Seattle, right?

2    A.   Stranger things have happened.

3    Q.   And that's the reason, frankly, Mr. Bryant, why Pilgrim's

4    has so many different plants, right?

5    A.   Yes.

6    Q.   Pilgrim's has, I think, 25 to 28 plants at the time?

7    A.   At one time -- it was 28 in the U.S.  I don't know exactly

8    the number today.

9    Q.   And of those 28 U.S. plants, six or seven of them were

10   small-bird plants.

11   A.   That's correct, yes.  Actually there is 11, I think, total

12   small bird, but around six of those were specifically for the

13   QSR segment that we've been discussing.

14   Q.   Very good.  Thank you for the clarification.

15            Claxton has about 1300 employees?

16   A.   I don't know.  I don't know their employee base.  I don't

17   know that number.

18   Q.   Fair enough.  Pilgrim has 60,000 employees?

19   A.   Last time I looked, it was 56.  It could have grown a

20   little bit since then.

21   Q.   Okay.  Claxton you know is a privately held company?

22   A.   Correct, yes.

23   Q.   Pilgrim's is publicly traded.

24   A.   Correct.

25   Q.   Claxton has less than 1 percent of the QSR market?

756

Robert Bryant - Cross

1   A.   I don't know their number.

2   Q.   Well, Pilgrim's has about 20 percent of the QSR market?

3   A.   It was 38 percent of total small-bird market.  That was all

4   11 plants.

5   Q.   Okay.  So my number is low.  It's closer to 40 percent?

6   A.   It's 38 percent total small-bird production, yeah, is what

7   it was.  And that included all 11 plants, not just the QSR

8   plants, but, yes.

9   Q.   Thank you for that clarification.

10          Claxton only sells small birds.

11  A.   Correct, yes.

12  Q.   Pilgrim's, on the other hand, sells small, medium, and

13  big-bird products.

14  A.   Correct, yes.

15  Q.   Pilgrim's, Mr. Bryant, is more akin to, like, a Tyson

16  Foods; is that right?

17  A.   Yes.  That would be their near peer in the market, yes.

18  Q.   And Tyson is also publicly traded.

19  A.   That's correct, yes.

20  Q.   And Tyson, like Pilgrim's, also has a very large percentage

21  of the QSR market.

22  A.   I believe so, yes.

23  Q.   And are you aware or are you aware if Tyson has about

24  115,000 employees?

25  A.   I don't know their number, no.

Robert Bryant - Cross

1  Q.  While we have spoken a lot about Claxton, you also don't

2  know how Tyson's, for example, goes about formulating their

3  pricing during bid submission.

4  A.  That's correct.

5  Q.  And the same is true for all the other companies that you

6  have testified about, including Koch, right?

7  A.  That's correct, yes.

8  Q.  And including George's?

9  A.  That's correct.

10 Q.  Case?

11 A.  That's correct.

12 Q.  And I think you mentioned OK Foods at one point came in as

13 well, right?

14 A.  That's correct, yes.

15 Q.  Am I missing any?

16 A.  Perdue.

17 Q.  Perdue, thank you.  Perdue is another one.  You don't know

18 how they go about formulating their pricing during bid

19 submissions.

20 A.  That's correct.

21 Q.  You don't know who's involved in the process for any of

22 those companies, right?

23 A.  That's correct.

24 Q.  So any testimony you've given on this again is either an

25 assumption or an inference.

Robert Bryant - Cross

1    *A.*  Just my understanding, that's correct.

2    *Q.*  Okay.  You're not aware, sir, going to the 2014

3    negotiations that Claxton submitted three different rounds of

4    bids to KFC.

5    *A.*  I don't know, no.

6    *Q.*  You have no idea how many rounds of bids Claxton submitted

7    in those particular negotiations, right?

8    *A.*  That's correct.

9    *Q.*  You're not aware that from round 1 to the final contract

10   price Claxton reduced its price 4 cents.

11   *A.*  I'm not aware, no.

12   *Q.*  And so your testimony regarding knowledge of the plan, at

13   no point during this entire bidding process did you learn

14   Claxton's bid.

15   *A.*  That's correct.

16   *Q.*  At no point did you learn in round 1, round 2, or round 3

17   what number they were sending over to KFC.

18   *A.*  That's correct.

19   *Q.*  This lack of knowledge about the bids submitted in 2014

20   does not just apply to Claxton, but you don't know any of the

21   bids submitted by any of the other competitors either, do you?

22   *A.*  That's correct.

23   *Q.*  No idea what Tyson's bid for the 2015 contract.

24   *A.*  That's correct.

25   *Q.*  No idea what Koch bid for the 2015 contract.

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Or George's?

3    A.   Correct.

4    Q.   Or Mar-Jac?

5    A.   Correct.

6    Q.   Or any of the other suppliers, competitors that we've been

7    speaking about, right?

8    A.   That's correct.

9            MR. BELLER:   Your Honor, this is a good time unless

10   the Court would like me to continue.

11           THE COURT:   No, this is a good time.

12           Ladies and gentlemen, we will go ahead and take our

13   mid-morning break at this time, so we will plan on reconvening

14   at 10:30.   The jury is excused for the mid-morning break.

15   Thank you.

16           (Jury excused.)

17           THE COURT:   We will be in recess.   Thank you.

18       (Recess at 10:15 a.m. until 10:35 a.m.)

19           THE COURT:   Are we ready for the jury?   Let's bring

20   the jury in and Mr. Bryant.

21           (Jury present.)

22           THE COURT:   Go ahead, Mr. Beller.

23           MR. BELLER:   Thank you, Your Honor.

24   BY MR. BELLER:

25   Q.   So, Mr. Bryant, we were speaking about your knowledge of

Robert Bryant - Cross

1    competitors' prices, and I also want to speak with you a bit

2    about volume, okay?

3                Mr. Bryant, you were not concerned about Pilgrim's

4    losing volume to other competitors because that was not part of

5    the plan, right?

6    A.   Correct.

7    Q.   You and the competitors were to keep the volume the same

8    and just deal with price.

9    A.   Correct.

10   Q.   And we talked about last week, you were the volume guy in

11   2014.

12   A.   Correct.

13   Q.   If Pilgrim's were to lose volume, this could be something

14   that you were aware of.

15   A.   That's correct, yes.

16   Q.   So you're aware, then, Mr. Bryant, that from 2014 to 2015

17   contract, Pilgrim's lost 560,000 pounds of chicken a week for

18   KFC.

19   A.   I don't have a -- I don't remember that.  I really don't.

20   Q.   Well, you would agree with me that 560,000 pounds of

21   chicken is a lot of chicken.

22   A.   It's about 12 loads a week.

23   Q.   12 loads a week.  You're aware that in 2014 for the 2015

24   contract Claxton gained 77,000 pounds of chicken a week.

25   A.   I am not aware of that, no.

Robert Bryant - Cross

1          MR. BELLER:  Mr. Brian, if we can please pull up

2    March 9th, 2022, page 2327.

3    BY MR. BELLER:

4    Q.  Mr. Bryant, do you recall being asked these questions in

5    March of 2022?

6    A.  No.

7    Q.  Okay.  On your screen is going to be a transcript in just a

8    moment.  And if you can take a moment and review that when it

9    comes up.

10         MR. BELLER:  Lines 13 through 15, please, Mr. Brian.

11   BY MR. BELLER:

12   Q.  Mr. Bryant, you were asked when you testified in March of

13   2022, the question, read along with me:  So in 2015, Claxton

14   gained almost 77,000 pounds per week over the 2014 contract; is

15   that correct?

16         And your answer was:  That's correct.

17         Right?

18   A.  Correct.

19         MR. TORZILLI:  Objection.  This mischaracterizes his

20   testimony.  Can we have a side bar?

21         THE COURT:  Yes.

22      (At the bench:)

23         THE COURT:  Mr. Torzilli, go ahead.

24         MR. TORZILLI:  Thank you, Your Honor.

25         So these questions are entirely misleading.  These are

Robert Bryant - Cross

1   questions that the witness, including the one that was just

2   flashed up on the screen, are questions he was asked while

3   reviewing contracts he had never seen before in his life, so

4   for a line of questioning that was geared around lack of

5   personal knowledge, this is misleading at that level.  But it's

6   also misleading because the only way he was ever testifying to

7   this information is because the defendants put on their

8   contracts that have been put into evidence that he had never

9   seen before, and he was asked to read information and make

10  arithmetic calculations as to whether volume was going up or

11  down and so forth.  So it leaves a incredibly misleading

12  impression to the jury that he somehow had access to this

13  information at the time.

14         So I object to any and all questions where it's just

15  going to be a rehash of information from a prior trial that is

16  somehow dressed up as pseudo personal knowledge.

17         *THE COURT:*  Response, Mr. Beller?

18         *MR. BELLER:*  Your Honor, I believe that the proper

19  objection under those circumstances is one of foundation.  If

20  Mr. Torzilli would like me to lay a foundation and go through

21  the exhaustive multi-hour examination that Mr. Bryant underwent

22  in the last trial, we can certainly do so.  However, I don't

23  believe that it is necessary.  I do not plan on going through

24  any volume questions other than the one that I just asked.  It

25  is, in fact, accurate prior testimony that that was the

Robert Bryant - Cross

1    question that was asked and that was the answer that was given.

2    That's No. 1.

3           The secondary issue, Your Honor, is that Mr. Torzilli

4    repeatedly objects, and the basis of his objection is

5    mischaracterizes.  Your Honor, that is a personal attack.  It

6    is a personal attack has been done repeatedly in front of this

7    jury.  It is wholly, wholly inappropriate.  I would ask that

8    Mr. Torzilli be admonished to not make such an objection.  It

9    is not a proper objection as, quote/unquote, I as the lawyer am

10   mischaracterizing, and I would ask that the jury be advised

11   regarding that particular objection.

12          THE COURT:  All right.  Response, Mr. Torzilli?

13          MR. TORZILLI:  Thank you, Your Honor.

14          I think I probably posed two or three objections

15   without the course of the day when I probably could have

16   interposed numerous others.  I have been trying to be -- use

17   the objection advisedly, but there have been a couple of

18   occasions where there have, in fact, been mischaracterizations

19   like in this situation where it leaves an incredibly misleading

20   impression in front of this jury that he somehow knew this

21   information as opposed to it being stuck under his nose as a

22   prior hearing and he was asked to read off the contract.  So I

23   believe it is mischaracterizing the circumstances in which he

24   provided that prior testimony.

25          THE COURT:  Okay.  Well, two things.  First of all,

Robert Bryant - Cross

1    let me take them in reverse order.  In terms of Mr. Beller's

2    objection to the objection concerning the term

3    "mischaracterizes," I do agree that it would have been -- that

4    I really don't think that this is a mischaracterization of

5    prior testimony.  As Mr. Beller points out, this is his prior

6    testimony.  However, at the time it was put up, once again, on

7    the screen, it was only visible to the witness, not to the

8    jurors.  That did relate to him looking at some numbers that he

9    had not seen before, so in that regard I think that the proper

10   objection probably would have been something along the lines of

11   foundation or since we're on a side bar no explanation but,

12   rather, the explanation being provided at the side bar.  Simply

13   an objection would have sufficed.  So I do think we have to be

14   careful about throwing around a loaded term like

15   "mischaracterizes" when technically that is not exactly what

16   was happening.

17          And also a speaking objection, we have to be careful

18   in front of the jury, may be appropriate -- well, speaking

19   objections shouldn't happen anyway, but objections can be

20   explained during side bars.

21          Getting back to this particular objection by

22   Mr. Torzilli, I think that given the fact that Mr. Beller has

23   indicated that he is not going to further go along this

24   particular route, I am going to overrule the objection, but, of

25   course, Mr. Torzilli is perfectly free to ask Mr. Bryant about

Robert Bryant - Cross

1    whether or not he actually had any foundation for answering the

2    questions or had seen the document before and all those other

3    things that would put this in an appropriate context.  So in

4    that regard, I will overrule the objection.  It doesn't look

5    like we're going down a similar path.

6            Thank you.

7            (In open court:)

8            *THE COURT:*  The objection will be overruled.  Thank

9    you, Mr. Beller.

10   *BY MR. BELLER:*

11   *Q.*  So, Mr. Bryant, what we have is that Pilgrim's lost volume

12   going into 2015; Claxton gained volume going into 2015; is that

13   right?

14   *A.*  That's correct.

15   *Q.*  Okay.  And we're talking about 560,000 pounds of chicken,

16   that's about 17 different loads per week, right?

17   *A.*  40,000 pounds a load, 10 would be 400, so that's the reason

18   why I said 12 earlier.

19   *Q.*  12, excuse me.  That means semi truckloads.

20   *A.*  Correct.

21   *Q.*  And Claxton gained at least two semi truckloads per week.

22   *A.*  That's correct, yes.

23   *Q.*  Two semi truckloads per week is roughly $4 million, right?

24   *A.*  I don't know the profit on that.  Do you mean

25   4 million pounds?

Robert Bryant - Cross

1    Q.   Yeah.  Well, that's actually better.  I am trying to

2    simplify it for purposes of understanding.

3    A.   One load a week is approximately 2 million pounds.

4    Q.   Okay.

5    A.   Annualized.

6    Q.   And so if we have one load a week is, I am sorry, did you

7    say 2 million pounds?

8    A.   Correct.

9    Q.   Annualized over the course of a year is approximately how

10   much?

11   A.   One load a week is 2 million pounds annualized.  So if you

12   got two loads, it would be 4 million.

13   Q.   So about $4 million a week?

14   A.   4 million pounds, yes.

15   Q.   Thank you.  That's the reason I am a lawyer, not math.

16        All right.  Now, Mr. Bryant, at any point, did you

17   have a discussion with anyone at Claxton and said, You know

18   what, we don't want the 4 million; you guys take it?

19   A.   No.

20   Q.   At any point, did you or anyone else at Pilgrim's Pride

21   say, How about this go-around, you guys make all the money?

22   A.   No.

23   Q.   We're good over here; you can have this extra money.

24   A.   No.

25   Q.   Let's switch gears just a little bit, Mr. Bryant, and let's

Robert Bryant - Cross

1    go with the 2017 contract, okay?

2    A.   Yes.

3    Q.   This is a good time to discuss supply chain.  Fair to say

4    that Pilgrim's Pride does not have the capacity to supply KFC

5    with a hundred percent of its chicken.

6    A.   No.

7    Q.   Tyson's cannot supply KFC with a hundred percent of its

8    chicken.

9    A.   Let me back up, yes, either company could, if they chose

10   to, supply a hundred percent of the chicken to KFC.  However,

11   their bird size was not set up to do that with the current

12   sales mix.  They would have had to make some substantial

13   changes.  Number of birds, yes.  Size of birds, no.  Could we

14   have done things to create them, yes.

15   Q.   Sure.

16   A.   Potentially, yes.

17   Q.   So as Pilgrim's Pride was set up in 2015, Pilgrim's Pride

18   could not have served all of the chicken to KFC that they

19   needed.

20   A.   That's correct.  I think KFC was buying probably I think --

21   last number I remember was, like, 180, 180 loads a week.

22   Q.   So the answer is no.

23   A.   No.

24   Q.   Pilgrim's Pride could not have, right?

25   A.   That's correct.

Robert Bryant - Cross

1   *Q.* Tyson's couldn't have.

2   *A.* That's correct.

3   *Q.* So it's really one of supply chain meaning you've got many

4   different suppliers that are supplying KFC with chicken.

5   *A.* That's correct.

6   *Q.* And that's to be certain that product can be distributed to

7   all stores across the country, right?

8   *A.* There is many reasons, right, plant location, company --

9   the company -- geographic and then bird availability.

10  *Q.* So when we say that companies bid, it's not a bidder takes

11  all type of a bid, right?

12  *A.* That's correct.

13  *Q.* Year to year it's, generally speaking, all the same

14  suppliers with little to no variation in who's participating?

15  *A.* That's correct.  It's just about to share the pie and the

16  price.

17  *Q.* Right.  It's just the share of the pie and the price.  So

18  everyone gets a contract; it's just a matter of balancing that

19  volume with price, right?

20  *A.* That's correct.  I'm not aware of KFC cutting someone off.

21  *Q.* Okay.  So I want to go to a prebid meeting.  So you spoke

22  on direct examination regarding prebid meetings.  In a prebid

23  meeting with KFC, each side states their expectation.

24  *A.* Correct.

25  *Q.* They discuss any outstanding issues between the companies.

Robert Bryant - Cross

1    A.   Correct.

2    Q.   There is a discussion about the date for a price

3    submission, right?

4    A.   Usually, yes.

5    Q.   Okay.

6         MR. BELLER:  And if we can show the witness Exhibit

7    1882.

8         Your Honor, I believe this has already been admitted

9    and published.

10        THE COURT:  Yes.  It has been admitted, and you may

11   publish it.

12        MR. BELLER:  Thank you, Your Honor.

13        Mr. Brian, if we may show Exhibit 1882, please.

14   BY MR. BELLER:

15   Q.   Mr. Bryant, do you see Exhibit 1882 on your screen?

16   A.   I do.

17   Q.   So this is an e-mail in preparation for that prebid

18   meeting, right?

19   A.   That's correct, yes.

20   Q.   And Mr. Austin in this particular e-mail says, Claxton

21   meets with them on Thursday, and I will get a blow by blow by

22   Friday morning -- or a blow by blow Friday morning, right?

23   A.   That's correct, yes.

24   Q.   You are making an assumption that Mr. Austin is talking

25   about Mr. Brady there, right?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   So that this blow by blow is coming from Mr. Brady at

3    Claxton is an assumption that you're making.

4    A.   Yeah, that would be my understanding, yes.

5    Q.   Because that's not stated in this e-mail.

6    A.   That's correct, yes.

7    Q.   And even then what we're doing is we're talking about

8    expectations, right?

9    A.   Correct.

10   Q.   Okay.  Expectations that each side may have, right?

11   A.   Correct.

12   Q.   Outstanding issues that have occurred between Claxton and

13   KFC, right?

14   A.   Correct.

15   Q.   And a date when bids will be due, right?

16   A.   Yes.

17   Q.   Okay.  And there is nothing in this e-mail about pricing,

18   right?

19   A.   That's correct.

20   Q.   Okay.  Nothing about --

21   A.   Well, I guess there is, the second line, pricing model, but

22   no prices.

23   Q.   No prices, right.  Okay.  So nothing in this e-mail about

24   I'll get Claxton to share our prices so we can agree with them,

25   right?

771

Robert Bryant - Cross

 1    A.   That's correct.

 2    Q.   Nothing in this e-mail about, We'll do it if they do it

 3    too, right?

 4    A.   Yes.

 5    Q.   Nonetheless, you wanted this information so you could

 6    formulate your own strategy towards KFC.

 7    A.   Correct.

 8    Q.   You wanted to know competitors' bid prices according to you

 9    so you could decide where to place Pilgrim's price.

10    A.   Correct.

11    Q.   And you wanted to undercut the highest bidder to be No. 2

12    in price.

13    A.   Correct.

14    Q.   Undercutting the No. 1 competitor would maximize

15    profitability for Pilgrim's Pride.

16    A.   Correct.

17           MR. BELLER:  I am done with that, Mr. Brian.  Thank

18    you.

19    BY MR. BELLER:

20    Q.   So let's talk about the list that you ended up receiving.

21    You send an e-mail --

22           MR. BELLER:  And actually, Mr. Brian, if we can put

23    1882 up again please.  I had you take it down a little too

24    early.

25    BY MR. BELLER:

Robert Bryant - Cross

1    Q.  So you send an e-mail that says, I would like to know where

2    we need to be No. 2 in price if you can find out, right?

3    A.  Correct.

4    Q.  You don't actually ask for future bid information in this

5    e-mail at all.

6    A.  Well, that's what I am asking, yes.

7    Q.  That's what you intended that to say, right?

8    A.  That's what I am asking, yes.

9    Q.  Yes.  Is for future bid information.

10   A.  Yes.

11   Q.  So you were intending future bid information, and you are

12   assuming that Mr. Austin understood that you meant future bid

13   information, right?

14   A.  That's correct.

15   Q.  Okay.  You don't give him direction on who it is he is

16   supposed to call.

17   A.  That's correct.

18   Q.  Or how he is to receive this information?

19   A.  That's correct.

20   Q.  You assume that he was going to get this information from

21   competitors.

22   A.  That's correct.

23   Q.  And you assumed that Mr. Austin would call Mr. Brady.

24   A.  Correct.

25   Q.  Likewise, you assumed that Mr. Austin would call

773

Robert Bryant - Cross

1   Mr. Kantola.

2   A.   Correct.

3   Q.   And you assumed that Mr. Austin would obtain future bid

4   information.

5   A.   Correct.

6   Q.   All of this, even though the e-mail does not say so, right?

7   A.   That's correct.

8   Q.   Okay.  Now, in response to this, Mr. Austin never replies,

9   right?

10  A.   I don't recall him ever responding to this, no.

11  Q.   Okay.  You also testified, Mr. Bryant, that you assumed

12  your boss, Tim Stiller, would expect you to provide him this

13  information as part of the bid.

14  A.   That's correct.

15  Q.   All right.  If you could go through this.  Is Mr. Stiller

16  mentioned on this e-mail at all?

17  A.   No.

18  Q.   Okay.  So that, again, is an assumption that you were

19  making on your part, right?

20  A.   Yeah, it was my understanding, yes.

21  Q.   So now you then call Mr. Austin, and he says, I'll make

22  some calls, right?

23  A.   Yes, after Mr. Stiller called me, yes.

24  Q.   So let's go back to sort of this knowledge and assumption

25  thing that we're talking about.  You have no idea, Mr. Bryant,

Robert Bryant - Cross

1    who Mr. Austin called.

2    A.   Correct.

3    Q.   You don't know what was said on any of those phone calls.

4    A.   Correct.

5    Q.   You don't know that he made the phone calls at all.

6    A.   That's correct.

7    Q.   You don't know what information he obtained, if any, right?

8    A.   The only information I know is what he conveyed and I put

9    in my notes, that's it.  I don't recall asking him how he got

10   that information.

11   Q.   All right.  That's 1919.  We are going to talk about that

12   in just a moment.

13         Even if Mr. Austin did obtain information, you don't

14   know who the person was that gave it to him.

15   A.   Correct.

16   Q.   All right.  So the information that you end up receiving

17   are these handwritten notes that we spent a lot of time talking

18   about on direct, right?

19   A.   Yes.

20   Q.   Okay.  And that's Exhibit 1919.

21         MR. BELLER:  And if we can pull 1919 up, please, Your

22   Honor, and may I also publish 1919.

23         THE COURT:  You may.

24         MR. BELLER:  And if we can go, Mr. Brian, I believe --

25   yes, thank you.

775

Robert Bryant - Cross

1    *BY MR. BELLER:*

2    *Q.*  Mr. Bryant, you believed these handwritten notes were

3    future bids, right?

4    *A.*  That's correct, yes.

5    *Q.*  Okay.  Information that Mr. Austin provided to you, right?

6    *A.*  That's correct, yes.

7    *Q.*  Mr. Austin spoke with you, gave you these numbers.  You

8    then spoke to Mr. Stiller; is that right?

9    *A.*  That's correct, yes.

10   *Q.*  Okay.  And you spoke to Mr. Stiller for purposes of the bid

11   submission for the eight-piece KFC product for 2018, right?

12   *A.*  That's right.

13   *Q.*  So that means, Mr. Bryant, that these particular notes are

14   approximately five years old; is that right?

15   *A.*  Yeah -- well, a little over.  It was 2017 -- yeah, I guess

16   so, yeah.

17   *Q.*   '17 to '22?

18   *A.*  5-1/2, yeah.

19   *Q.*  We already established that when Pilgrim's buys or sells to

20   other competitors, you learn the others' current price, right?

21   *A.*  Correct.

22   *Q.*  And Pilgrim's, Mr. Bryant, buys a lot of chicken from

23   Claxton.

24   *A.*  Yeah.  I don't recall how much, but, yes, they were one of

25   the folks that we bought from.

Robert Bryant - Cross

1    Q.  Well, Pilgrim's is not just a competitor, but they are also

2    a customer of Claxton, right?

3    A.  I wouldn't use it in that context really, maybe an

4    unwilling customer at times.

5    Q.  Well, you are buying and selling from each other?

6    A.  I don't know if Claxton bought from us.

7    Q.  All right.  But at the very least, Claxton sold to

8    Pilgrim's.

9    A.  Correct, yes.

10   Q.  In 2017 alone, Mr. Bryant, Claxton sold $1.3 million worth

11   of chicken to Pilgrim's.

12   A.  I don't know the number.

13   Q.  Does that sound about right?

14   A.  I don't know that I have ever looked at it.  I don't know.

15   Q.  Okay.  So and Pilgrim's did not just buy from Claxton.

16   A.  That's correct, yes.

17   Q.  Pilgrim's also bought from -- bought KFC products from

18   other competitor customers, right?

19   A.  Yes, Mar-Jac would come to mind, yes.

20   Q.  And Tyson's?

21   A.  I don't remember buying from Tyson.  I am not saying we

22   didn't.  I just don't -- I would -- I would say Claxton and

23   Mar-Jac were probably the two most common.

24   Q.  The two biggest.

25   A.  The two most common.

777

Robert Bryant - Cross

1    Q.   The two most common, excuse me.

2              So five years after getting this information, you then

3    interview with the government, right?

4    A.   Correct.

5    Q.   The government then used your information to draft their

6    questions.

7    A.   Correct.

8    Q.   You practiced those questions with the government.

9    A.   Correct.

10   Q.   They're asking you their questions that you practiced so

11   that you can testify in this courtroom, right?

12   A.   That's correct.

13   Q.   Testify about how you used these future bid numbers --

14   A.   That's right.

15   Q.    -- to formulate Pilgrim's bid?

16   A.   That's correct.

17   Q.   Formulate Pilgrim's bid so that you would not lose

18   business?

19   A.   Yeah, well, not necessarily not lose business, but to help

20   repair the relationship.

21   Q.   Right.  And maintain volume?

22   A.   As much as we could, but --

23   Q.   Yeah, as much as you could, because, again, one of the

24   purposes of the plan was to not take volume from any of your

25   competitors.

Robert Bryant - Cross

1    A.   Correct.

2    Q.   Okay.  So still no, in 2017, We'll bid this if you bid

3    that, right?

4    A.   Say it again, I'm sorry.

5    Q.   Yeah.  There was no conversations with competitors of,

6    We'll agree to bid this if you agree to bid that.

7    A.   Not that I'm aware of, no.

8    Q.   No, We'll do it if you do it too, right?

9    A.   That's correct.

10   Q.   And the other person then agreeing.  That didn't happen.

11   A.   That's correct.

12   Q.   Okay.  So your testimony is that you used these numbers in

13   1919 to develop a model to put Pilgrim's second in price.

14   A.   Well, initially it was second, but I think ultimately we

15   submitted third, yes.

16   Q.   You anticipated my next question.  Later you submitted it

17   to be in third -- third in price, right?

18   A.   Correct, yes.

19   Q.   Now, Mr. Bryant, on direct examination, you testified to

20   the federal prosecutor that you've never used competitor

21   information to undercut other competitors, right?

22   A.   Correct.

23   Q.   But you did, in fact, use the information learned in 1919

24   to undercut the highest and the second highest company given

25   what you assumed to be their bid prices, right?

Robert Bryant - Cross

1  *A.*  I wouldn't consider that undercutting.  My understanding --

2  the way I would -- the way I used the word "undercut" would be

3  to purposefully go below someone to gain market share, and that

4  wasn't the purpose here.

5  *Q.*  So you purposefully went below the highest bidder.

6  *A.*  Correct.

7  *Q.*  And then later at Mr. Austin's urging, you purposefully

8  went below the highest bidder and the second highest bidder for

9  Pilgrim's price to come in third?

10  *A.*  That's correct, yes.

11  *Q.*  Believing these prices to be future prices?

12  *A.*  That's correct, yes.

13  *Q.*  And you trusted them to be true and accurate, right?

14  *A.*  That's correct, yes.

15  *Q.*  Now, even though you trusted them to be true and accurate,

16  you agree with me, Mr. Bryant, that bluffing also happens,

17  right?

18  *A.*  That's correct, yeah.

19  *Q.*  Sometimes buyers bluff?

20  *A.*  Correct.

21  *Q.*  And sometimes competitors bluff too.

22  *A.*  I would assume so, yes.

23  *Q.*  So keeping 1919 up, Mr. Austin calls you and gave you the

24  numbers, and you wrote the numbers down in your notes, right?

25  *A.*  That's correct, yes.

Robert Bryant - Cross

1    Q.  You did not have discussions with anyone at Claxton.

2    A.  Correct.

3    Q.  Or any of the other suppliers that are listed on this

4    screen?

5    A.  That's correct.

6    Q.  You just wrote them down as Mr. Austin was giving them to

7    you.

8    A.  That's correct, yes.

9    Q.  Now, Mr. Bryant, you assumed that Mr. Austin spoke to

10   someone to obtain these prices.

11   A.  That's my assumption, yes.

12   Q.  Right.  A person or persons unknown to you.

13   A.  Well, I don't know who -- if anyone he talked to, yes.

14   Q.  No idea who he may have spoken to.

15   A.  Correct.

16   Q.  No idea what companies those unknown people worked for to

17   be able to get these numbers.

18   A.  Correct.

19   Q.  Because you yourself, Mr. Bryant, personal knowledge here,

20   you did not have any discussion with any competitor about these

21   numbers.

22   A.  That's correct.

23   Q.  So you made assumptions about their source.

24   A.  That's correct, yes.

25   Q.  And you made assumptions that this was future bid pricing.

Robert Bryant - Cross

 1   *A.*   That's the way it was represented, yes.

 2   *Q.*   Yeah.  And when you sat down with the government, you told

     the government that this was future bid pricing, right?

 3

 4   *A.*   Correct.

 5   *Q.*   You did not tell the government that you were assuming or

 6   that you were guessing, right?

 7   *A.*   I wasn't guessing.  I mean, that's what they are.

 8   *Q.*   That's what they are.

 9   *A.*   Yeah.

10   *Q.*   That's what they are.  And you know that that's what they

11   are because that's what Mr. Austin told you.

12   *A.*   Correct.

13   *Q.*   That Mr. Austin got from somebody else.

14   *A.*   I don't recall asking him where -- I don't think I asked

15   him where he got them from.  I remember being surprised when he

16   shared this information with me, but I don't remember asking

17   him who he spoke to to get it.

18   *Q.*   Other than perhaps some memory that you may have five years

19   later that Mr. Austin said these were future bid prices.

20   *A.*   I don't remember him using that exact phrase.  I don't

21   remember us talking about it, like, that explicitly.

22   *Q.*   So there wasn't an explicit discussion between you and

23   Mr. Austin as to what these numbers represented.

24   *A.*   You know, like I said before, we had the conversation, I

25   believe it was the day before, about what Mr. Stiller -- the

Robert Bryant - Cross

1   information he was seeking, and then when he gave me the

2   information, all I can really remember about that is, Are you

3   ready?  I got it.  And then he relayed all the information.  I

4   wrote it down, and I remember saying how surprised I was to get

5   the information, and that's -- that's pretty much what I

6   remember of the call.

7   Q.   So let me ask you my question again.  You did not have a

8   discussion with Mr. Austin where he explicitly told you what

9   these numbers represent or where he got these numbers?

10  A.   That's correct.

11  Q.   Okay.  So, Mr. Bryant, at the top, you have a dollar --

12  1.0234.

13  A.   Yes.

14  Q.   And that represents Pilgrim's Pride current pricing, right?

15  A.   I believe so, yes.  I believe that's where we were at.

16  Q.   Okay.  So when I say "current pricing," I am talking about

17  an old contract, right?

18  A.   That it is -- well, whatever we are selling for at that

19  time, yeah.

20  Q.   So there was an old contract.  Those prices were still in

21  place under that old contract.

22  A.   The 2014 contract.

23  Q.   And I'm saying "old."  What I really should be saying is

24  the existing contract, right?

25  A.   Correct.

Robert Bryant - Cross

1    *Q.*  So the existing contract was at $1.0234, right?

2    *A.*  Correct, yes.

3    *Q.*  And that number, the $1.0234, that represented Pilgrim's

4    Pride's period 2 pricing; is that fair?

5    *A.*  I don't know.  I don't remember that.

6    *Q.*  But nonetheless, that was the current price.

7    *A.*  That was our -- yes, that's what we were selling for, yes.

8    *Q.*  And so if another supplier was buying chicken from KFC --

9    or KFC chicken from Pilgrim's for covering a short, for

10   example, that's the price that they would have paid in February

11   of 2017.

12   *A.*  Either January or February, whenever that -- that was --

13   correct.

14   *Q.*  Mr. Bryant, I want to show you another exhibit that has

15   already been admitted and published and that is I-054.

16        *MR. BELLER:*  Your Honor, may we please publish that

17   again?

18        *THE COURT:*  Yes, you may.

19   *BY MR. BELLER:*

20   *Q.*  Mr. Bryant, I am showing you an exhibit, I-054.  If you

21   could take just a moment and review this.  Let me know when you

22   have had a chance to review.

23   *A.*  Okay.

24   *Q.*  Okay.  Mr. Bryant, do you see Pilgrim's Pride price of

25   1.0234?

784

Robert Bryant - Cross

1   A.   I see it, that, yes.

2   Q.   Okay.

3            MR. BELLER:   Actually, if we can go down to the

4   bottom, Mr. Brian, and highlight that one, please.

5   BY MR. BELLER:

6   Q.   Okay.   1.0234.   And do you see that that is period 2 purple

7   label?

8   A.   I do.

9   Q.   Okay.   Period 2 means, in the interest of trying to make

10  this easy, there is -- instead of doing monthly, KFC does

11  periods instead of per month, right?

12  A.   That's right.

13  Q.   Okay.   And KFC has 13 periods in a year.

14  A.   I believe that's right, yeah.

15  Q.   All right.   So period 2 pricing means February-ish of 2017

16  Pilgrim's Pride price was $1.0234.

17  A.   That's right.

18  Q.   And when we say "purple label," purple label is really just

19  an insider's way of saying KFC eight-piece bucket price, right?

20  A.   Yes.

21  Q.   So Pilgrim's Pride is $1.0234.   And, Mr. Bryant, what is

22  Claxton's price for period 2?

23  A.   According to this, it's .9943.

24  Q.   .9943.

25           MR. BELLER:   If we can go back to Exhibit 1919,

Robert Bryant - Cross

1    please.

2    *BY MR. BELLER:*

3    Q.  Mr. Bryant, what price did you write down as Claxton's

4    future -- what you believed to be their future bid price when

5    you had the conversation with Mr. Austin?

6    A.  .9943.

7    Q.  Is that the same as their current period 2 pricing as shown

8    in Exhibit I-054?

9    A.  Those two numbers match, yes.

10   Q.  All right.  So let's do a couple more.  On Exhibit 1919,

11   what is the number that you assumed was the future bid price

12   for Mar-Jac?

13   A.  .9835.

14   Q.  Okay.  Now let's switch over to Exhibit I-054, and let's

15   look at the bottom again.  What is the number for Mar-Jac for

16   that current price period 2?

17   A.  .9835.

18   Q.  All right.  Again, that's the same, right?

19   A.  I believe so.

20   Q.  All right.  Let's do one more.  How about we do Tyson's.

21   On -- well, we can look at Exhibit 1919.  What was the

22   current -- excuse me, what you assumed to be the future bid

23   price for Tyson's?

24   A.  .9783.

25   Q.  Let's go back to I-054.  So 9783 is on 1919.  What is

Robert Bryant - Cross

 1   Tyson's current price for that exact same time period?

 2   A.   .9783.

 3   Q.   The same.

 4   A.   Correct.

 5   Q.   Let's do one last one, and that's Koch.  On Koch, what is

 6   Koch's period 2 price for -- excuse me, let me back up because

 7   we are showing 1919.  What is Koch's price that you assumed was

 8   a future bid on 1919?

 9   A.   1.0125.

10   Q.   Now let's switch over to Exhibit I-054.  What was Koch's

11   period 2 price down on the bottom?

12   A.   1.0123.

13   Q.   You would agree with me, Mr. Bryant, that 3s and 5s are

14   easy to inverse when you are writing them down, don't you?

15   A.   I don't know about that.

16   Q.   Okay.  Well, the difference between Koch on 1919 and on

17   I-054 is .0002 cents difference, right?

18   A.   Correct, yes.

19   Q.   Okay.  The only difference being a 3 instead of a 5.

20   A.   Correct.

21   Q.   Mr. Bryant, you would agree with me that the assumptions

22   about 1919 representing future pricing is just wrong, right?

23   A.   No.

24   Q.   Your numbers in 1919 showing future bid pricing are

25   identical with the exception of Koch Foods with the current

787

Robert Bryant - Cross

1   period 2 price that was in place at the time.

2         *MR. BELLER:*  We can put them side by side.  If we

3   could, please.

4   *A.*  I -- I have not seen this other document, but once again,

5   you know, the way they were represented and used at the time,

6   they were used as bid prices.

7   *BY MR. BELLER:*

8   *Q.*  Oh, I understand that they were bid prices, sir.  I am

9   asking you if but for the exception of Koch, if they are

10  identical to the period 2 current pricing that was in place.

11  *A.*  It appears that they are -- yes.

12  *Q.*  Now, thank you.

13        You just said something, Mr. Bryant, and that is you

14  have not seen that before.

15  *A.*  I don't remember seeing it, no.

16  *Q.*  All right.  Well, let's talk a little bit more about that.

17  How many times have you interviewed with the government?

18  *A.*  I don't -- 30 something, yeah.

19  *Q.*  31.  I think you said 25 plus six, right?

20  *A.*  I believe that's right, yes.

21  *Q.*  And in those 25 plus six interviews, the government has

22  never asked you to explain how your belief of future bid

23  prices, future bid prices are identical to current prices that

24  Pilgrim's was buying and selling chicken at.

25  *A.*  I don't remember that, no.

Robert Bryant - Cross

1   Q.  Mr. Bryant, would you agree with me that sometimes when you

2   make assumptions, details get lost.

3   A.  I don't know about details.  You are just making an

4   assumption, so if you -- you may not have all the information.

5   Q.  You may not have all the information.  Fair enough.

6   Sometimes the information you have is just plain wrong, right?

7   A.  The assumption may be wrong, yes.

8          MR. BELLER:  All right.  We can take that down.  Thank

9   you, Mr. Brian.

10  BY MR. BELLER:

11  Q.  Mr. Bryant, you testified that you placed Pilgrim's to be

12  third in line, right?

13  A.  Correct, yes.

14  Q.  Third in line right behind Claxton Poultry.

15  A.  Correct.

16  Q.  You also testified that Claxton's future price would have a

17  case weight of $51.

18  A.  I don't remember that.

19         MR. BELLER:  Can we show 1919 again, please, to

20  Mr. Bryant?  If we can zoom in.

21  BY MR. BELLER:

22  Q.  What case weight did you have written down for Claxton

23  Poultry's future bid price?

24  A.  I think the bottom here is dark meat case weights, I

25  believe.  It's not dollars.  I think that -- I think that was

789

Robert Bryant - Cross

1   51 pounds, I think.  I don't recall exactly, but I think that

2   was the case weight, not dollars.  I don't remember.

3   *Q.*  I agree, so case weight is 51, right?

4   *A.*  Yeah.  And that should be .30 back of their eight-piece

5   price, so it would be the 9943 minus 30 cents.

6   *Q.*  All right.  And so what it would be -- so let me break that

7   answer down just a little bit.  Case weight is 51.

8   *A.*  Correct.

9   *Q.*  And dark meat would be their eight-piece price minus 30

10  cents, so 51 is case weight, dark-meat price would be 6943.

11  *A.*  Correct, yes.

12  *Q.*  Did I do that math properly?

13  *A.*  Yes.

14  *Q.*  Mr. Bryant, I am showing you Exhibit F-853.

15         *MR. BELLER:*  Your Honor, this has been admitted and

16  published, and I am asking to do so again, please.

17         *THE COURT:*  Yes, you may.

18         *MR. BELLER:*  Thank you.

19  *BY MR. BELLER:*

20  *Q.*  Mr. Bryant, take just a moment and review F-0853.

21         *MR. BELLER:*  And, Mr. Brian, if we can go to tab 1,

22  please.

23  *BY MR. BELLER:*

24  *Q.*  Mr. Bryant, do you recognize this as a bid sheet?

25  *A.*  It looks like a cost model, yeah.

Robert Bryant - Cross

1   Q.  And at the top, it's labeled Claxton Poultry Company for

2   period 1, 2018, right?

3   A.  Yes.

4   Q.  That round 1 number, that future bid that you had written

5   down, you believe to be 9943; is that right?

6   A.  I believe so, yes, yes.

7   Q.  All right.  The number on the bid sheet is not that future

8   bid price of 9943, but instead is 9939, right?

9   A.  Correct.

10  Q.  So you would agree with me that your Exhibit 1919 is wrong.

11  A.  No.

12  Q.  Certainly you don't see 9943 --

13  A.  No, I don't.

14  Q.  -- on this exhibit?

15  A.  That's correct.  But it says for period 1, 2018, so that

16  would have been after the 2017 bid, correct.

17  Q.  That's right.  So you were bidding in 2017 for a 2018

18  contract; is that right?

19  A.  Correct, yes.

20  Q.  So if you are bidding for a 2018 contract, the bid would

21  say 2018 bid, right?

22  A.  I mean, yes, it will have current -- normally you put

23  current pricing and then, you know, bid price of 2018,

24  whatever.

25  Q.  Yeah, absolutely, absolutely you would.  And if 1919 was

791
Robert Bryant - Cross

1    correct, what you would see in that column in that row would be

2    9943 and that is not, in fact, the number that is on that page.

3    Yes or no?

4    A.   No.

5    Q.   All right.  You also said that you believed the dark-meat

6    price for Claxton Poultry's future pricing would be 9943.

7         Let's scroll down.  Let's go to the dark-meat line.

8    You would agree with me that Claxton's round 1 bid was not, in

9    fact, 6943, but was 6939, right?

10   A.   I would not agree with that statement, no.

11   Q.   It's the eight-piece price.

12   A.   May I ask one clarifying question?

13   Q.   Please.

14   A.   Are we looking at Claxton's first-round bid, or is this

15   their contract, because when I look at the top, it makes me

16   think this was the contract.

17        MR. TORZILLI:  I object the same reason we went to

18   side bar on.  This is the precise issue that I was raising.

19        THE COURT:  I am sorry, what's the objection?

20        MR. TORZILLI:  The objection is the same one that I

21   made that led to the side bar, the same --

22        THE COURT:  Foundation?

23        MR. TORZILLI:  Foundation and the other objection that

24   I raised.

25        THE COURT:  Response?

Robert Bryant - Cross

1          MR. BELLER:  Your Honor, I am asking the witness to

2   compare the different documents, which he is fully capable of

3   doing.  I am not asking about his personal knowledge for this

4   particular document.

5          THE COURT:  I am going to sustain the objection.  The

6   witness can generally do some comparisons, but the witness now

7   has questions about the nature of the document, and they appear

8   to be appropriate concerns, so I will sustain the objection.

9          MR. BELLER:  Thank you.

10  BY MR. BELLER:

11  Q.  Can we compare -- I am not asking you to comment, okay?

12  Can we compare, Mr. Bryant, 1919 dark-meat price with Exhibit

13  F-0853, dark-meat price.  Are they the same or are they

14  different?

15  A.  I don't remember what was on the -- can we put them side by

16  side, please?

17  Q.  Absolutely, we can.

18          So, Mr. Bryant, is Claxton's -- excuse me, is the

19  eight-piece -- third time is a charm.  Is 1919 dark-meat price

20  for Claxton that you have written down the same or different as

21  the dark-meat price as you see it on 853?

22  A.  They are not the same.

23  Q.  They are different, right?

24  A.  Correct.

25          MR. BELLER:  We can take down 853.  If we can leave up

Robert Bryant - Cross

1   1919, please.

2   *BY MR. BELLER:*

3   *Q.*   You believed that you were pricing Claxton -- or, excuse

4   me, you believed that you were pricing Pilgrim's to be third in

5   line in price, right?

6   *A.*   That's correct, yes.

7   *Q.*   Okay.   Behind Claxton in price.

8   *A.*   Correct.

9   *Q.*   Behind meaning less expensive than Claxton's price.

10  *A.*   That's correct, yes.

11  *Q.*   And Pilgrim's price that was bid was 9849, right?

12  *A.*   I believe that's right.

13  *Q.*   And 9849 was what put Claxton third in line -- excuse me.

14  *A.*   Pilgrim's.

15  *Q.*   Excuse me, what put Pilgrim's in place third in line using

16  what you thought were future bids, right?

17  *A.*   That's correct, yes.

18  *Q.*   What's the difference in price between Pilgrim's bid price

19  of 9849 and Claxton's bid price of 9839?

20  *A.*   A 10th of a cent.

21  *Q.*   A 10th of a cent, meaning Pilgrim's was actually more

22  expensive than Claxton's; is that right?

23  *A.*   If that -- I don't know what -- I don't know where you are

24  getting that number from.

25  *Q.*   We just read, did we not, 9839 for Claxton?

Robert Bryant - Cross

1    A.  You know, I asked earlier -- I don't know if that was the

2    first-round bid or the contract.  By looking at that page, it

3    looked like it was a contract for January of 2018 which would

4    have been after a couple more rounds of negotiations if, in

5    fact, that was the final contract.  That's what I was asking

6    clarification for earlier.

7    Q.  That's very fair.  If you don't know the answer, I don't

8    know is okay.  So what your testimony is, that looked like a

9    contract.  So I am asking you, you are making an assumption

10   that it was; is that fair?

11   A.  No, I was asking what it was because I didn't know, because

12   at one point, you were asking me or representing as a bid, but

13   whenever I looked at the document, it looked like it was a

14   completed contract.  So I wasn't sure what document -- what the

15   document was we were discussing.

16   Q.  Fair enough.  Let me ask you a much more simple question.

17   Is 9849 more or less than 9939?

18   A.  It's more.

19   Q.  Mr. Bryant, in your 15 or 16 times practicing, did the

20   government ever practice any of this with you?

21   A.  I don't recall reviewing this.

22   Q.  Okay.

23        MR. BELLER:  Your Honor, if I may have a moment to

24   confer.

25        THE COURT:  Yes, you may.

795

Robert Bryant - Cross

1          MR. BELLER:  Thank you.

2     BY MR. BELLER:

3     Q.  Mr. Bryant, we have been speaking about you assisting the

4     government in their investigation, okay?  And I want to talk a

5     little bit more about that.  Your desire to help the government

6     in their investigation.

7     A.  No.  It's not a desire to help, no.  I am -- I am living up

8     to the best of my ability the cooperation agreement, yes.

9     Q.  Very good.  Let's talk about how the 31 interviews with the

10    prosecutors worked, okay?  Fair?

11    A.  Yes.

12    Q.  Before the prosecution team asks you a question in your

13    interviews, they explain the interview process to you, right?

14    A.  I believe they did, yes.

15    Q.  They did early on certainly?

16    A.  Yes, I remember early on, yes.

17    Q.  Maybe after 31 times you don't need that advisement

18    anymore; is that fair?

19    A.  Yes.

20    Q.  They tell you several things like you're free to take

21    breaks if you want to, right?

22    A.  That's correct, yes.

23    Q.  They tell you that you can consult with your attorney at

24    any time.

25    A.  I believe so, yes.

Robert Bryant - Cross

1    Q.  Your attorney was present for every one of these

2    interviews.

3    A.  Yes.

4    Q.  From the very first one to the very last one.

5    A.  That's correct, yes.

6    Q.  Did they tell you that it's a crime to lie to federal

7    agents?

8    A.  That's correct, yes.

9    Q.  And not just any crime, but a federal felony offense to lie

10   to federal agents.

11   A.  I don't know if they detailed out it was a federal felony

12   offense.  I do know that they informed me it was a crime, yes.

13   Q.  And they told you that it was a crime to lie to federal

14   prosecutors.

15   A.  Yes.

16   Q.  You were told this in your first interview, right?

17   A.  Yes.

18   Q.  Certainly you were told this in your second interview?

19   A.  I believe so, yes.

20   Q.  Any other interviews after that did they tell you this?

21   A.  I don't recall.

22   Q.  You agreed, Mr. Bryant, to tell the prosecutors the truth,

23   right?

24   A.  That's correct, yes.

25   Q.  And after you agreed to tell prosecutors the truth, in each

Robert Bryant - Cross

1   of 31 interviews you spent several hours answering their

2   questions.

3   A.   That's correct, yes.

4   Q.   You believed that the federal prosecutors believed you when

5   you were interviewing with them, right?

6   A.   I don't know that.

7   Q.   Well, you certainly did your best to tell the truth.

8   A.   I did.

9   Q.   You wanted to be helpful in June of 2021 when you spoke to

10  them for the first time.

11  A.   No, I just -- once again, it was part of the cooperation

12  agreement.

13  Q.   Right.  You wanted to answer completely, right?

14  A.   I answered all their questions, yes.

15  Q.   Completely.

16  A.   The best I could, yes.

17  Q.   Good.  Do you think, Mr. Bryant, that answering their

18  questions completely is helpful?

19  A.   I mean, that's living up to the cooperation agreement, so,

20  yes.

21  Q.   Good.  You wanted to be helpful in July of 2021 when you

22  spoke to them the second time, right?

23  A.   I don't know if it was July when I spoke to them the second

24  time or not.  I don't remember the dates, but --

25  Q.   You wanted to be helpful.

Robert Bryant - Cross

1    A.  Wanted to live up to the cooperation agreement, yes.

2    Q.  You wanted to be complete?

3    A.  Yes.

4    Q.  You wanted to be accurate.

5    A.  Yes.

6    Q.  You interviewed with them four times in December of 2021.

7    A.  I believe that's correct.  I'm not sure of the dates.

8    Q.  You wanted to be helpful in those interviews as well,

9    right?

10   A.  As part of the cooperation agreement, yes.

11   Q.  Now, Mr. Torzilli already asked you about lying, and we're

12   going to talk a little bit more about that.  These lies

13   happened while you were cooperating with the government, right?

14   A.  That's correct.

15   Q.  Completely and totally unrelated to this case.

16   A.  That's correct, yes.

17   Q.  When I say "in this case," I mean the allegations that

18   bring us all into this courtroom today.  Your lies were

19   completely unrelated to that.

20   A.  That's correct, yes.

21   Q.  They were not about your denying an involvement in any,

22   quote/unquote, plan as you put it, right?

23   A.  That's correct.

24   Q.  Not related at all to an illegal agreement?

25   A.  That's correct.

Robert Bryant - Cross

1    *Q.* Not about antitrust laws at all.

2    *A.* That's correct.

3    *Q.* And your lies, these lies at all were not about any of the

4    five men in this courtroom who are defendants in the case.

5    *A.* That's correct.

6    *Q.* Mr. Bryant, when the prosecutors found out that you lied to

7    them, they could have charged you right then and there, right?

8    *A.* I believe that's correct, yes.

9    *Q.* You certainly did not have immunity from lying to them.

10   *A.* That's correct, yes.

11   *Q.* And you know that they could have charged you, right?

12   *A.* That's correct.

13   *Q.* They could have put you in handcuffs.

14   *A.* That's correct, I guess.

15   *Q.* Well, if you're committing a federal crime, you could be

16   arrested for the commission of a federal crime.

17           *MR. TORZILLI:* Objection, no foundation.

18           *THE COURT:* Overruled.  He can answer if he

19   understands.

20   *BY MR. BELLER:*

21   *Q.* You can be arrested for the commission of a federal crime.

22   *A.* That's my understanding, yes.

23   *Q.* And you certainly know that being arrested could involve

24   handcuffs, right?

25   *A.* That's correct.

Robert Bryant - Cross

1   Q.   Okay.  They could have brought you into a federal courtroom

2   like this one here?

3   A.   Correct.

4   Q.   Prosecuted you for that crime?

5   A.   That's correct.

6   Q.   Prosecuted you for the crime of lying to them?

7   A.   Correct.

8   Q.   Making you a felon for life?

9   A.   That's correct.

10   Q.   The last thing, Mr. Bryant, that you would want is to be a

11   felon; is that fair?

12   A.   No, I don't want to be a felon, no.

13   Q.   Okay.  Mr. Bryant, you know they could still prosecute you

14   for that, right?

15   A.   I assume so, yes.

16   Q.   Now, I want to be clear.  In practicing your testimony with

17   the government 15 or 16 times, they've always told you to tell

18   them the truth, right?

19   A.   They have.

20   Q.   Okay.  That was true in the 15 or 16 practice sessions,

21   right?

22   A.   That's correct.

23   Q.   That was also true in the 15 or 16 investigation sessions

24   that you had with them?

25   A.   That's true.

Robert Bryant - Cross

1    *Q.*  The investigation sessions that you had with them that

2    occurred after they indicted these five men.

3    *A.*  I was trying to think when the Indictments were.  I know

4    four were prior to them speaking to me.  I don't know that all

5    of them were.

6    *Q.*  Fair enough.  We established that the Indictment came out

7    in this case of June of 2020, right?

8    *A.*  Correct, yes.

9    *Q.*  And you were first interviewed in June of 2021.

10   *A.*  Correct.

11   *Q.*  A year later.

12   *A.*  Yes.

13   *Q.*  A year after they indicted, they did investigation with

14   you.

15   *A.*  That's correct, yes.

16   *Q.*  Okay.  So despite the government being the ones to decide

17   what the truth is for purposes of your immunity agreement,

18   they've only stressed that you tell the truth as you know it,

19   right?

20   *A.*  That's correct.

21   *Q.*  You've certainly never been told to bend the truth in any

22   way.

23   *A.*  No.

24   *Q.*  Or just say something because it helps them, right?

25   *A.*  That's correct.

Robert Bryant - Cross

1    Q.   Okay.  Before you testified here last week, the government

2    told you to just tell the truth, didn't they?

3    A.   That's correct.

4    Q.   And you agreed to do just that.

5    A.   That's correct.

6    Q.   In September of 2021 when you were interviewing with the

7    government, they told you then just tell the truth, right?

8    A.   I don't remember if they used that in September, they

9    reminded me then or not, no.

10   Q.   Let's focus more on the September interviews, and I want to

11   focus on September 8th.  Do you recall a September 8th

12   interview?

13   A.   No.

14   Q.   I am sorry?

15   A.   No.

16   Q.   Mr. Bryant, you remember the dimensions of a conference

17   room table in 2014.  You remember the body movements at a

18   meeting.  But you don't remember the circumstances of having

19   committed a federal felony by lying to the federal agents and

20   prosecutors.  Is that your testimony?

21   A.   Yes.

22   Q.   So this incident where you saw the gestures was so life

23   changing for you that it emblazed on your brain to be able to

24   remember it.  But the same cannot be true for having lied to

25   the FBI.  That's your testimony?

Robert Bryant - Cross

1    *A.*  You asked me a specific date, and I don't have a -- an

2    independent memory of September 8th of -- did you say 2021?

3    *Q.*  It doesn't stand out for you.

4    *A.*  Not September 8th, no.

5    *Q.*  Okay.  So September 8th of 2021 was 10 months ago last

6    week, right?

7    *A.*  That's correct, yeah.

8    *Q.*  So I want to really since you don't remember, let's try to

9    draw it out here.  There were 15 to 20 people in the room,

10   right?

11   *A.*  When?

12   *Q.*  When you lied to federal agents, there were 15 to 20 people

13   in the room.

14   *A.*  That sounds about right, yes.

15   *Q.*  The first time, right?

16   *A.*  That's correct.

17   *Q.*  Just as there are a lot of people in a room today, right?

18   *A.*  That's correct.

19   *Q.*  There were at least two federal law enforcement agents

20   present.

21   *A.*  I don't remember how many were there, no.

22   *Q.*  Just as there is an agent present here today.

23   *A.*  That's correct, yes.  I know there was an agent there, at

24   least one.  I don't know how many.

25   *Q.*  There were about eight federal prosecutors there.

Robert Bryant - Cross

 1   *A.*  I don't remember how many.  There was several prosecutors

     there and interns or whatever they call them.

 2

 3   *Q.*  Just as there are several here today.

 4   *A.*  Correct.

 5   *Q.*  You were in person.

 6   *A.*  That's correct, yes.

 7   *Q.*  Just as you are in person today, right?

 8   *A.*  That's correct, yes.

 9   *Q.*  The room in September was intimidating.

10   *A.*  I don't -- I don't know that.  They are all any more

     intimidating than any other meeting with the government.

11

12   *Q.*  When you lie, that's not intimidating?

13   *A.*  You didn't say that.  You said an intimidating meeting.  I

     just said that all the meetings with the government are pretty

14

     stressful.

15

16   *Q.*  And the meeting that you had with the Federal Government in

     September of 2021 in which you lied was an intimidating

17

     meeting.

18

19   *A.*  It was similar to all the other meeting, yes.

20   *Q.*  So, yes, it was intimidating.

21   *A.*  Similar to all the other meetings we've had.

22   *Q.*  Just as this room is intimidating, Mr. Bryant, right?

23   *A.*  It's not comfortable being here, no.

24   *Q.*  Your lawyer was with you for this meeting.

25   *A.*  That's correct.

Robert Bryant - Cross

1   *Q.*  Just as your lawyer is with you for your testimony today.

2   *A.*  That's correct.

3   *Q.*  You were nervous at this meeting.

4   *A.*  I don't know that I was nervous.

5   *Q.*  You were nervous as you testified here today.

6   *A.*  I was last week to get started, but I am more comfortable

7   with it now.

8   *Q.*  You sat -- you are comfortable with this, Mr. Bryant?

9   *A.*  I said I am more comfortable with it now.

10  *Q.*  You sat in a chair in your September meeting.

11  *A.*  Yes.

12  *Q.*  Just as you sit in a chair today.

13  *A.*  Correct.

14  *Q.*  You looked the prosecutors in the eye as you answered their

15  questions in that September meeting.

16  *A.*  That's correct.

17  *Q.*  Just as you looked prosecutors in the eye as you answered

18  their questions last week in this courtroom.

19  *A.*  That's correct.

20  *Q.*  In these meetings in which you lied, you said you would

21  tell the truth, right?

22  *A.*  I am sorry, can you repeat.

23  *Q.*  Yes.  In the meetings in which you lied, you had promised

24  to tell them the truth.

25  *A.*  That's correct.

Robert Bryant - Cross

1    *Q.*  Just as you sat in a chair last week, raised your right

2    hand and promised to tell the truth in this courtroom, right?

3    *A.*  That's correct.  I mean, I guess it's different.  Here you

4    are under oath, and there it's just -- it's a con -- it's an

5    instruction from the federal prosecutors.

6    *Q.*  Absolutely right, it's different.  The truth, Mr. Bryant,

7    whether you are committing a federal crime of lying to agents,

8    whether you are committing a federal crime of lying to federal

9    prosecutors, that truth is no different than if you are raising

10   your right hand as you did in this courtroom and promised to

11   tell the truth, right?

12   *A.*  The truth is the truth.

13   *Q.*  The truth doesn't change, correct?

14   *A.*  Correct.

15   *Q.*  All right.  So in September and October in the meetings in

16   which you lied, you answered the government's questions.

17   *A.*  That's correct.

18   *Q.*  Just as you answered the government's questions in court

19   last week.

20   *A.*  That's correct.

21   *Q.*  You told the government then that you would tell the truth,

22   right?

23   *A.*  That's correct.

24   *Q.*  Just as you did last week when you said you would tell the

25   truth.

Robert Bryant - Cross

1    *A.*   That's correct.

2    *Q.*   You said -- you explained to the government in September,

     October how the chicken business works, right?

4    *A.*   Say it again.

5    *Q.*   Yes.   You answered questions about the chicken business in

6    September and October of last year.

7    *A.*   Yes.

8    *Q.*   Just as you did last week and this week.

9    *A.*   That's correct.

10   *Q.*   And in September 8th, Mr. Bryant, nervous, sitting in a

11   chair with a room full of people listening, answering their

12   questions, teaching about how the business works, talking about

13   who you know and what you know, you looked them in the eye with

14   the agents listening, you opened your mouth to speak and you

15   lied to them.

16   *A.*   That's correct.

17   *Q.*   You lied multiple times.

18   *A.*   That's correct.

19   *Q.*   About multiple issues in your interviews with the

20   prosecutors.

21   *A.*   That's correct.

22   *Q.*   Now, Mr. Bryant, last week when you were asked about this,

23   you characterized your lie as a failure to disclose everything,

24   right?

25   *A.*   That's correct.

Robert Bryant - Cross

1  *Q.*  Mr. Bryant, that too, sir, on the stand last week was a

2  lie.

3  *A.*  Excuse me?

4  *Q.*  This was not -- your lie to these federal prosecutors and

5  federal agents was not a failure to disclose; it was an

6  affirmative lie.

7  *A.*  No, that's not correct.

8  *Q.*  You were asked about something you did and you denied it.

9  *A.*  That's not correct.

10  *Q.*  You then changed your version of what you did, right?

11  *A.*  That's not correct.

12  *Q.*  Did you practice your answer with the government to

13  characterize it as a failure to disclose?

14  *A.*  No.

15  *Q.*  You were asked, Mr. Bryant, by the federal prosecutors in

16  September of last year a yes-or-no question regarding your

17  conduct, right?

18  *A.*  I don't recall that.

19  *Q.*  Do you recall in response to them asking you a yes-or-no

20  question about your conduct, you answering them no?

21  *A.*  I don't -- I don't recall what you're asking me about, no.

22  *Q.*  Well, Mr. Bryant, what you said, sir, is that after you

23  lied, you reached out to your lawyer to contact the Department

24  of Justice to set up a meeting so that you could correct your

25  lie, right?

Robert Bryant - Cross

1   A.  That's correct, yes.

2   Q.  And your lie was answering no to a question that should

3   have been answered yes.

4   A.  I don't remember that.

5   Q.  That should have been answered yes about something that you

6   did, right?

7   A.  That's correct, yes.

8   Q.  About something that you did, and then later after you,

9   quote/unquote, came clean, you changed your version of what you

10  did.

11  A.  That's incorrect.

12  Q.  You lied, Mr. Bryant, when you denied your conduct.

13  A.  I -- I did, yes.

14  Q.  And ever since then, Mr. Bryant, ever since you lied to the

15  government about having engaged in conduct, you have practiced

16  with them 15 or 16 different times, right?

17  A.  We've practiced, yes.

18  Q.  Practicing the truth as they determine it to be, right?

19  A.  I thought we already agreed the truth is the truth.

20  Q.  The truth is the truth.  Mr. Bryant, I want to stop because

21  you laughed.

22  A.  Okay.

23  Q.  Listen to my question closely.  Is you telling the truth

24  worthy of a laugh in your mind, yes or no?

25  A.  No.

Robert Bryant - Cross

1   *Q.*  So the truth, sir, is the truth, right?

2   *A.*  That's correct.

3   *Q.*  And you practiced the truth with the government 15 or 16

4   times.

5   *A.*  That's correct.

6   *Q.*  Because it took practice for you.

7   *A.*  That's incorrect.

8        *MR. BELLER:*  Your Honor, if we can go on side bar,

9   please.

10       (At the bench:)

11       *THE COURT:*  Mr. Beller, go ahead.

12       *MR. BELLER:*  Thank you, Your Honor.

13       Judge, the substance of my examination is complete.

14   However, the problem we have, of course, is that Mr. Bryant is

15   minimizing his conduct.  He is also minimizing the series of

16   events that occurred with the government.  Your Honor, on

17   September the 8th, Mr. Bryant was asked directly if he engaged

18   in any misconduct at work.  Mr. Bryant's answer to that

19   question was no.

20       Mr. Bryant then in a subsequent interview admitted to

21   the conduct that the Court is already aware of, the substance

22   of which I don't need to get into.  Following that, Your Honor,

23   there was then a third interview in which Mr. Bryant changed

24   the factual scenario that he had disclosed and revealed in

25   interview No. 2.  And so this has been characterized as a

Robert Bryant - Cross

1    failure to disclose when, in fact, let me say it's not just

2    Mr. Bryant's answer, but it's also the government's questioning

3    has characterized it as a failure to disclose, which I believe

4    is a minimization.

5           I do believe that Mr. Bryant has now by denying under

6    608, I do believe we are permitted to get into extrinsic

7    evidence and specific questions.  I would ask the Court to

8    allow me to do so.  But obviously while it's our position he

9    opened the door and under 608(b) it would for it, I didn't want

10   to do that without checking in with the Court.

11          THE COURT:  Yes, I appreciate the heads-up.

12          Mr. Torzilli, response?

13          MR. TORZILLI:  Mr. Bryant has been pretty clear that

14   he lied.  I think he said yes to a series of questions about

15   multiple circumstances, multiple situations, multiple

16   occasions, et cetera, et cetera.  I think he has been clear the

17   nature of the lie was his failure to disclose, so I think some

18   of this gets to the level of being sort of moving semantics

19   around.  So ultimately I would object to undoing and any sort

20   of reconsideration of the numerous rulings the Court has made

21   about what can or can't be gotten into in terms of the

22   underlying details of the lie, so I object.  I think it's not

23   appropriate and the unfair prejudice to the government under

24   403 would be very, very, very significant if further details

25   were allowed into in terms of inquiry.

Robert Bryant - Cross

1              *THE COURT:*  Mr. Beller, anything more?

2              *MR. BELLER:*  No, Your Honor.

3              *THE COURT:*  Yeah, so much of the argument that

4    Mr. Beller just made is already contained in Docket No. 1382.

5    I have denied that particular motion.  So the question becomes

6    whether in Mr. Beller's questioning of Mr. Bryant this morning

7    since the Court ruled on Docket No. 1382 Mr. Bryant has said

8    something that would open the door or at least permit

9    Mr. Beller to get into specifics regarding the so-called

10   misconduct that was the subject matter of his lies.

11          Mr. Beller is making or trying to make a distinction

12   between a failure to disclose and some type of an affirmative

13   act.  He, of course, Mr. Beller, did pose that question to

14   Mr. Bryant, but I have not heard anything from Mr. Bryant that

15   would constitute any change or difference that would open the

16   door.  In fact, I think that we're at the same position that we

17   were last trial when we discussed the same issues between the

18   different interviews that he had and whether he corrected them

19   in, you know, one prior interview or two.  And I haven't heard

20   him say anything that would, once again, cause me to allow the

21   door to be opened to ask him about the specifics of the

22   so-called misconduct.  So I appreciate Mr. Beller giving me the

23   heads-up on that, but I, at this point, I don't find that the

24   door would be opened and as a result won't permit specific

25   questions about the so-called misconduct.

813

Robert Bryant - Cross

1            Thank you.

2            MR. FAGG:  Your Honor, this is John Fagg.  If

3   Mr. Beller is finished, I am up next, and I could use a very

4   brief break to step out of the courtroom if it is at all

5   possible.  I realize that we are 10 minutes before the hour.

6   If the Court's preference is we continue, I certainly can, but

7   I was wondering if the Court would be amenable for breaking for

8   lunch and coming back at 1:15.

9            THE COURT:  Mr. Beller, are you done now?

10           MR. BELLER:  I am.

11           THE COURT:  Yeah, I will go ahead and we'll take the

12  lunch break now.  There is a little bit of a change.  Once

13  Mr. Beller announces that he is finished, I will go ahead and

14  indicate we will take the lunch break, and we will reconvene at

15  1:20.

16           Thank you.

17           THE COURT:  Go ahead, Mr. Beller.

18           MR. BELLER:  Thank you, Your Honor.  I am done with my

19  questioning of this witness.

20           THE COURT:  Ladies and gentlemen -- are there

21  additional cross?  I assume there may be, but why don't we go

22  ahead since we are in between to go ahead and take our lunch

23  break just a little bit early.  Why don't we plan on

24  reconvening at 1:25, ladies and gentlemen, so just five minutes

25  early since we are breaking about five minutes early, so we

Robert Bryant - Cross

 1   will break until then.  If you go outside, ladies and

 2   gentlemen, I know you all have your yellow juror buttons

 3   visible, so keep doing that, and then be careful in the

 4   hallways too.

 5         Also keep in mind, ladies and gentlemen, not to look

 6   up any information about the case.  You keep hearing some new

 7   terminology perhaps, but, once again, what all that means is it

 8   all has to come from the evidence in the case as opposed to you

 9   doing some independent research.

10         The jury is excused until 1:25.  Thank you.

11         (Jury excused.)

12         THE COURT:  Mr. Bryant, you are excused until 1:25.

13   Thank you very much.

14         So real quickly before we go into recess, of course at

15   the last trial when there were 10 defendants, the fact that

16   there were two different -- there is a Superseding Indictment,

17   you know, that was not such a big deal.  Now with five

18   defendants, it potentially could be.  Mr. Bryant, of course,

19   mentioned that the first Indictment had four.  That's not a

20   problem fortuitously, but, you know, if we were then to talk

21   about a superseding that added six, then all of the sudden

22   that's something that is an area that we don't need to get into

23   and we want to avoid, so I just want to flag that, all right?

24         Anything else real quick?

25         We will be in recess until 1:25.  Thank you.

Robert Bryant - Cross

1          (Recess at 11:55 a.m. until 1:29 p.m.)

2              THE COURT:  Mr. Hart, you had an issue real quick?

3              MR. HART:  Actually, two issues, Your Honor.  First I

4    wanted to provide an update with respect to the Touhy

5    situation.  I think we are working with defense counsel, but

6    there could be an issue with respect to one of the agents who

7    is traveling abroad.  We have several sort of scenarios we can

8    handle it.  We are working with defense counsel.  They offered

9    to enter into a stipulation or to agree to a VTC when he is

10   over there, but I just wanted to alert the Court to that.

11             And the second issue is that the government's next

12   witness is going to be a custodian of records.  He will be

13   authenticating a group of documents, and then we'll seek to

14   introduce some evidence.  Perhaps that can be done outside the

15   scope of the jury or at the end of the day so we don't use the

16   jury's time.  It's -- some of the exhibits are the ones that

17   Your Honor had reserved on, so I just wanted to get some

18   guidance.

19             THE COURT:  You are talking about Mr. Sangalis?

20             MR. HART:  Yes, sir.

21             THE COURT:  What are the ones that have to be handled

22   outside the presence of the jury?

23             MR. HART:  The one sort of the chicken rocket, Fonzie,

24   those types of things we raised during the pretrial conference.

25             THE COURT:  Yes.  We will have to do that, maybe we

816
Robert Bryant - Cross

1   can do some of those, like, at 5:00.

2          MR. HART:  And the final thing is that after

3   Mr. Bryant is done with cross, the government intends to

4   introduce a significant volume of evidence, but I just wanted

5   to alert the Court to that.

6          THE COURT:  Before the next witness.

7          MR. HART:  That's correct.  Thank you.

8          THE COURT:  All right.  Otherwise ready to bring the

9   jury in?

10         Okay.  Ms. Buchanan, why don't we get the jury, and we

11  can bring Mr. Bryant as well.

12         (Jury present.)

13         THE COURT:  All right.  Additional cross-examination

14  of Mr. Bryant?

15         Mr. Fagg, go ahead.

16                    **CROSS-EXAMINATION**

17  *BY MR. FAGG:*

18  *Q.*  Good afternoon, Mr. Bryant.

19  *A.*  Good afternoon.

20  *Q.*  My name is John Fagg, and I represent Bill Lovette.  I

21  think we can run through this fairly quickly today.  I would

22  like to start by making sure that we're clear on a few things

23  regarding your testimony as it relates to Mr. Lovette, okay?

24  *A.*  Okay.

25  *Q.*  You never heard Mr. Lovette give an instruction to anyone

Robert Bryant - Cross

1   to coordinate with a competitor regarding a bid or a price,

2   correct?

3   *A.*   That's correct.

4   *Q.*   You never heard him encourage anyone to do that either, did

5   you?

6   *A.*   That's correct.

7   *Q.*   And you have no personal knowledge that Mr. Lovette ever

8   told anyone to coordinate with another supplier about a bid or

9   a price.

10   *A.*   That's correct.

11   *Q.*   And you have no personal knowledge that Mr. Lovette ever

12   agreed with any competitor to raise a price.

13   *A.*   That's correct.

14   *Q.*   Or that he agreed with any competitor to prevent a decrease

15   in a price.

16   *A.*   That's correct.

17   *Q.*   Or that he agreed, sir, with any competitor to rig a bid,

18   right?

19   *A.*   That's correct.

20   *Q.*   And you have no personal knowledge that Bill Lovette knew

21   of anyone rigging any bids or fixing any prices, correct?

22   *A.*   That's correct.

23   *Q.*   Sir, you never told Mr. Lovette about the two phone calls

24   involving Mr. Austin that you supposedly overheard, right?

25   *A.*   That's correct.

818
Robert Bryant - Cross

1    *Q.*  And you have no personal knowledge that anyone discussed

2    those phone calls with Mr. Lovette.

3    *A.*  That's correct.

4    *Q.*  And, sir, you testified about a meeting with Mr. McGuire

5    that you can't say whether it was at Popeye's or Church's; is

6    that right?

7    *A.*  That's correct.

8    *Q.*  Wherever this supposed meeting happened, Mr. Lovette was

9    not there, right?

10   *A.*  That's correct.

11   *Q.*  And you never told him about that meeting?

12   *A.*  That's right.

13   *Q.*  And you never told him about the gesture or the nodding or

14   anything else, right?

15   *A.*  That's correct, yes.

16   *Q.*  And you have no personal knowledge, sir, that anyone ever

17   told Mr. Lovette about any of that, correct?

18   *A.*  That's correct.

19   *Q.*  On direct examination, sir, you testified about discussions

20   that you had with Mr. McGuire and Mr. Stiller.  Do you recall

21   those discussions?

22   *A.*  Yes.

23   *Q.*  You never told Mr. Lovette about those discussions,

24   correct?

25   *A.*  That's correct.

Robert Bryant - Cross

1    *Q.*  And you have no personal knowledge that anyone told

2    Mr. Lovette about those discussions.

3    *A.*  That's correct.

4    *Q.*  The thing that you testified about regarding US Foods and

5    Mr. Stiller, that didn't have anything to do with Mr. Lovette,

6    correct?

7    *A.*  That's correct.

8    *Q.*  And you never told Mr. Lovette about it?

9    *A.*  No.

10   *Q.*  And you have no personal knowledge that anybody ever told

11   Mr. Lovette about it.

12   *A.*  That's correct.

13   *Q.*  Now, I would like to switch topics, sir, and talk a little

14   bit about Pilgrim's business, okay?

15   *A.*  Yes.

16   *Q.*  You testified on both direct and cross-examination,

17   Pilgrim's is a large publicly traded company?

18   *A.*  Yes.

19   *Q.*  Approximately 56,000 employees?

20   *A.*  Yes.

21   *Q.*  And Pilgrim's had the capacity to process over 34 million

22   chickens per week.

23   *A.*  Yeah, 30 million plus, plus or minus.

24   *Q.*  30 million plus.

25   *A.*  Yeah.

820

Robert Bryant - Cross

 1   *Q.*  And that's at 27 to 30 facilities?

 2   *A.*  That's right.

 3   *Q.*  And those plants or facilities are located all across the

 4   United States.

 5   *A.*  Correct, yeah, primarily in the south, southeast, but not

 6   on the West Coast, but, yeah.

 7   *Q.*  But otherwise spread out.

 8   *A.*  Yes.

 9   *Q.*  And Pilgrim's also has facilities in Puerto Rico?

10   *A.*  Yes.

11   *Q.*  And also has facilities in Mexico.

12   *A.*  That's correct.

13   *Q.*  And from those facilities, Pilgrim's supplies to customers

14   all across the United States.

15   *A.*  Correct.

16   *Q.*  And even supplies to customers outside of the United

17   States.

18   *A.*  That's correct.

19   *Q.*  Fair to say that Pilgrim's supplies to customers in more

20   than 50 different countries?

21   *A.*  At least 50, if not more.

22   *Q.*  So very large geographical footprint from both a production

23   standpoint?

24   *A.*  Correct.

25   *Q.*  And a production standpoint?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And Pilgrim's has thousands and thousands of customers,

3   right?

4   A.   Yeah, I don't know the number, but a lot, yes.

5   Q.   More than 5,000?

6   A.   More than likely, yes.

7   Q.   And of those customers, some are large grocery store

8   chains, right?

9   A.   That's correct, yes.

10   Q.   Like Kroger meaning King Soopers?

11   A.   Yes, that's correct.

12   Q.   Sells to Costco?

13   A.   Yes.

14   Q.   And Wal-Mart?

15   A.   Yes.

16   Q.   Safeway?

17   A.   Yes.

18   Q.   But those are just a few of the customers.  It's a very

19   broad spectrum of customers that Pilgrim's has, right?

20   A.   That's correct, yes.

21   Q.   And part of the reason for that is Pilgrim's has six

22   different business units where it produces chicken products,

23   right?

24   A.   Five or six, yes.

25   Q.   Okay.  And you discussed on your direct examination that

Robert Bryant - Cross

1   you worked in the fresh-food services business unit, right?

2   A.  Yeah, for most of my career, yes.

3   Q.  Another business unit for Pilgrim's is the small-bird

4   deboning business unit?

5   A.  That's right.

6   Q.  Case ready?

7   A.  That's right.

8   Q.  Commercial?

9   A.  That's correct.

10  Q.  Prepared food?

11  A.  Correct.

12  Q.  And then pet food?

13  A.  Yeah, protein conversion, yes.

14  Q.  And it is the collection of all six of those business units

15  that collectively make up the entirety of Pilgrim's business

16  from a production and sales standpoint, right?

17  A.  Correct, in the U.S., yes.

18  Q.  And, sir, does it sound right to you that in 2014 these six

19  different business units combined processed and sold over

20  7 billion pounds of chicken?

21  A.  Probably.  I don't remember the exact figure.

22  Q.  But no reason to dispute that.

23  A.  No.

24  Q.  Let's switch gears for a minute, sir, and talk about your

25  job responsibility at Pilgrim's compared to Mr. Lovette's job,

Robert Bryant - Cross

1    okay?

2    A.   That's not much of a comparison.

3    Q.   Mr. Lovette was the CEO, correct?

4    A.   That's correct, yes.

5    Q.   And he was the CEO until he retired in 2019, right?

6    A.   Yes.

7    Q.   When he was the CEO, you never reported to him.

8    A.   That's correct.

9    Q.   And, in fact, at all times there were always multiple

10   layers of people between you and Mr. Lovette.

11   A.   Two or more, yes.

12   Q.   One of the people that reported to Mr. Lovette was

13   Mr. Penn, right?

14   A.   That's correct, yes.

15   Q.   But Mr. Penn was just one of 11 people who reported to

16   Mr. Lovette?

17   A.   I don't know how many direct records Mr. Lovette had.

18   Q.   Well, let's go through that.  You are aware that he had a

19   number of people who reported to him in different aspects of

20   the business, correct?

21   A.   Yes, yes.

22   Q.   And that included individuals in the finance department,

23   right?

24   A.   Correct.

25   Q.   The CFO?

824

Robert Bryant - Cross

1    A.   That's correct, yes.

2    Q.   HR also reported to Mr. Lovette?

3    A.   I wasn't sure on that one, if they reported to Jayson or

4    Bill, then, yes.

5    Q.   How about food safety and quality assurance?

6    A.   Yes.

7    Q.   Logistics?

8    A.   Once again, I didn't know if they reported to him or not on

9    the logistics piece.

10   Q.   Exports?

11   A.   I thought they reported to Mr. Penn, but they may have.

12   Q.   You don't know.  You just simply don't know.

13   A.   I don't know.

14   Q.   Operations.

15   A.   Once again, I don't know.  I thought some operations

16   reported to Mr. Penn, and I wasn't sure who on operations would

17   have reported to Mr. Lovette.

18   Q.   So, sir, if you testified in March of this year that those

19   divisions did report to Mr. Lovette, is it fair to say that you

20   simply have forgotten between then and now?

21   A.   Well, what I mean by that is I am not -- without a name

22   there who in operations, but Mr. Lovette was responsible for

23   operations.  He was the CEO ultimately, but what I was trying

24   to convey is that is there -- was there a specific person in

25   operation that reported to him over all Pilgrim's operations,

Robert Bryant - Cross

1    and that's why I was unsure on how to answer your question.

2    Q.   Sir, if I asked you in March of this year if food safety

3    and quality assurance reported to Mr. Lovette and you said

4    yes --

5    A.   That would be yes, yes.

6    Q.   And the same is true for commodity risk management, right?

7    A.   Correct.

8    Q.   Now, sir, you didn't work in any of these departments or

9    divisions that we just talked about, right?

10   A.   No.

11   Q.   So I think you alluded earlier a little bit to the

12   difference in your role and Mr. Lovette's, but I want to talk

13   for a moment, sir, about what you know or what you don't know

14   about how Mr. Lovette spent his day as CEO, okay?

15   A.   Okay.

16   Q.   You did not interact with Mr. Lovette on a daily basis,

17   correct?

18   A.   That's correct.

19   Q.   Or anything close to a daily basis, right?

20   A.   That would be correct, yes.

21   Q.   And, in fact, sir, your limited interactions with

22   Mr. Lovette were in large group meetings, right?

23   A.   Generally speaking, yes.

24   Q.   And those were the monthly sales meetings that you

25   testified about.

Robert Bryant - Cross

1    *A.*   Correct.

2    *Q.*   Those monthly sales meetings, there were 30 to 40 people in

3    attendance.

4    *A.*   Generally speaking, yes.

5    *Q.*   And I want to be sure that we are crystal clear, sir, you

6    have -- as you sit here today, you have no recollection

7    whatsoever of any discussion in any of those sales meetings

8    about coordinating with other suppliers regarding bids,

9    correct?

10   *A.*   That's correct.

11   *Q.*   And you also have no recollection of any discussion in any

12   of those meetings about coordination with other suppliers

13   regarding prices, right?

14   *A.*   That's correct.

15   *Q.*   And I know that these monthly sales meetings are the ones

16   that you testified where you can recall you had a meeting where

17   Mr. Lovette was present, but I just want to be sure that we are

18   clear, and that is you have no recollection of any meeting

19   where Mr. Lovette was present at any time in which there was

20   any discussion about coordination with competitors on prices.

21   *A.*   That's correct.

22   *Q.*   Or coordination with competitors on bids.

23   *A.*   That's correct.

24   *Q.*   Or coordination with any competitor on negotiations with

25   any customer.

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And, sir, I want to circle back for just a moment, but --

3   and talk about pricing for fast-food restaurants, okay?

4   A.   Uh-huh.

5   Q.   You have no personal knowledge about Bill Lovette's

6   involvement in pricing for fast-food restaurants, correct?

7   A.   That's correct.

8   Q.   Let's switch gears again, and I told you this was going to

9   go quickly.  I think we are on the home stretch here.

10          You and Mr. Beller discussed this morning that during

11  2014 you were the volume person for Pilgrim's in fresh-food

12  services, fair?

13  A.   Yes.

14  Q.   I would like to follow up a little on that.  So you

15  understood at that time that Pilgrim's was one of seven or

16  eight chicken suppliers that provided chicken to KFC, right?

17  A.   That's correct.

18  Q.   And you understood that KFC purchased a significant amount

19  of chicken from Pilgrim's at that time, right?

20  A.   That's correct.

21  Q.   And you knew at that time that for the next year Pilgrim's

22  was going to supply some chicken to KFC.  The question was just

23  the amount of the volume and the price, right?

24  A.   Correct.

25  Q.   And as the volume person for Pilgrim's in the small-bird

828

Robert Bryant - Cross

1    plants, you were aware in 2014 that Pilgrim's decreased the

2    volume of chickens that it produced that fit the KFC

3    specifications, right?

4    A.  We had a shift, yes.

5    Q.  And there was a plan to shift to produce slightly larger

6    birds, right?  Is that what you mean by the plan?

7    A.  Are you talking about our retail deli shift?  Is that what

8    you mean?

9    Q.  Yes.

10   A.  Yes.

11   Q.  What that means, just so the jury understands, is a shift

12   to producing slightly larger birds, right?

13   A.  Correct.

14   Q.  Still within the small-bird business, but it's a slightly

15   larger bird, and it would be outside of KFC's specifications,

16   right?

17   A.  That's correct.

18   Q.  And so what this meant was that Pilgrim's had less small

19   birds available under this plan to supply to KFC, correct?

20   A.  Correct.

21   Q.  And you talked earlier, sir, about the Mayfield, Kentucky,

22   plant.  You knew that in 2014 the Mayfield, Kentucky, plant

23   produced a very significant number of chickens for KFC, right?

24   A.  That's correct.

25   Q.  And, in fact, Mayfield was the largest single KFC supplier

Robert Bryant - Cross

1    in Pilgrim's system in 2014.

2    A.   They were.   And they may have been the largest in the

3    country at that time.

4    Q.   You anticipated my next question, sir.

5             And in addition to being very large, the Mayfield

6    plant was also a very desirable plant for customers, right?

7    A.   For some, yes.

8    Q.   And the reason for that is because it is located in very

9    close proximity to a significant amount of fresh corn, right?

10   A.   Correct.

11   Q.   And so what that means is that it's very cost advantageous

12   to get the corn from the field to the chickens, right?

13   A.   Correct.

14   Q.   And because there was that lower cost of getting that corn

15   to the chickens, it makes it more economically advantageous for

16   the customers, right?

17   A.   For the cost-plus customers, yes.

18   Q.   And in addition to that, its actual physical location was

19   also appealing, right?

20   A.   Yes.

21   Q.   And the reason why it was appealing is because from the

22   Mayfield plant you can ship chickens out in many different

23   directions and cover a large number of, for example, fast-food

24   store locations.

25   A.   There was a freight advantage to a lot of those places from

Robert Bryant - Cross

 1   Mayfield.

 2   Q.   Exactly.  So if it's closer, the freight is cheaper, right?

 3   A.   Correct.

 4   Q.   So you knew in 2014 that Pilgrim's planned to make this

 5   production change at Mayfield in 2015, right?

 6   A.   I don't know if I knew that then to be -- I don't remember

 7   when I first learned of the plan to convert Mayfield.

 8   Q.   And would it help refresh your recollection to see a

 9   document?

10   A.   You can show me to, yeah.

11   Q.   Sure.

12        MR. FAGG:  So let's pull up for the witness, the

13   Court, and the parties, if we can, please, H-722.

14   BY MR. FAGG:

15   Q.   And just take a look at that e-mail, sir.  And after you've

16   finished reviewing it, let me know.

17   A.   Yes, I remember this.

18   Q.   Okay.  And so, sir, does that refresh your recollection

19   that you knew in 2014 that Pilgrim's planned to make --

20        MR. FAGG:  We can take that down, thank you.

21   BY MR. FAGG:

22   Q.   That you knew in 2014 that Pilgrim's planned to make

23   production changes at Mayfield for 2015.

24   A.   Yes.

25   Q.   And part of the production changes that you were talking

Robert Bryant - Cross

1   about earlier was increasing the weight of the small birds that

2   Pilgrim's was producing there, right?

3   A.   Yes.  It was a slight change, yes.

4   Q.   And this is -- fair to say this is part of that

5   optimization that you testified about on direct?

6   A.   I don't remember exactly what we were doing here pretty

7   much, but, yeah, we were changing our debone area.  We were

8   supplying a customer.  We were tailoring that to a different

9   customer at the time that required a little change in the mix,

10  yes.

11  Q.   But Pilgrim's determined it would make more economic sense

12  to make these changes, right?

13  A.   That's correct.

14  Q.   And so Pilgrim's went through with this, right?

15  A.   We did.

16  Q.   And by increasing the weight of those birds at Mayfield, it

17  meant that the birds would be too big for KFC to purchase,

18  right?

19  A.   Not all.  There would be a shift, yes.  We would decrease

20  availability in that size.  I don't remember precisely how

21  much, but, yes, sir, there would be a decrease.

22  Q.   A decrease in the birds that are available to KFC.

23  A.   Yes, that's what I was saying, yes.

24  Q.   Thanks.

25        And so part of your presentation -- remember when you

832

Robert Bryant - Cross

1    talked earlier both -- or at least with Mr. Beller about the

2    August 1 presentation to KFC?

3    A.   I do.

4    Q.   Do you recall that?  And part of that presentation, sir,

5    was actually about this decrease in production that would be

6    available for KFC, correct?

7    A.   Yeah.  I don't know that it was this specific one.  What I

8    remember is I used, I think, five years of data leading up to,

9    so that was to change over a 5-year period is what I think.  I

10   don't believe I included the Mayfield change in that.  I may

11   have, but I don't recall that.

12   Q.   What you included, sir, in there was five years of data

13   showing the shift in bird size, correct?

14   A.   Both in number and in size, yes.

15   Q.   And the purpose of that message was to show the decreased

16   availability to KFC of birds in its specifications, right?

17   A.   That is correct, yes.

18   Q.   And so while you may not have used this exact conversion

19   that we were just talking about, the general message was still

20   the same, correct?

21   A.   Yes.  The 5-year data was a lot more impactful than just

22   the Mayfield plant itself.

23   Q.   When you say "a lot more impactful," you mean it tells a

24   more complete picture, right?

25   A.   That's correct, yes.

Robert Bryant - Cross

1    *Q.* And so it gives the customer, here KFC, a better idea of

2    what that production availability within its specs really looks

3    like, correct?

4    *A.* That's correct, yes.

5    *Q.* And when you talk about that particular presentation to KFC

6    about that bird availability, all of that was 100 percent

7    accurate, correct?

8    *A.* Correct.

9        *MR. FAGG:* That's all I have, sir. Thank you very

10   much.

11       *THE COURT:* Thank you, Mr. Fagg.

12       Mr. Feldberg?

13       *MR. FELDBERG:* Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15   *BY MR. FELDBERG:*

16   *Q.* Mr. Bryant, I am Roger Austin's lawyer.

17   *A.* Yes.

18   *Q.* I am not going to repeat the material you've gone over last

19   week and this morning including your history of lying to the

20   prosecution, but you remember that testimony, correct?

21   *A.* Correct.

22   *Q.* So let's talk about 2014. 2014 was your first year in a

23   customer-facing role in national sales, correct?

24   *A.* That's what I recall, yes.

25   *Q.* You didn't have authority or final authority in any event

Robert Bryant - Cross

1    to make pricing decisions, did you?

2    A.   That's correct.

3    Q.   Pricing decisions were made at headquarters in Greeley,

4    correct?

5    A.   I am sorry, someone coughed.

6    Q.   Pricing decisions were made at headquarters in Greeley,

7    correct?

8    A.   Yes.

9    Q.   And there was a whole financial analytics team in Greeley

10   that worked on pricing decisions, correct?

11   A.   I don't know if that's the case in 2014 or not.  I would

12   have said Mr. McGuire would have had the authority over that.

13   Q.   And you mentioned in your direct exam last Thursday a

14   gentleman named Tommy Lane who worked in Greeley?

15   A.   That's correct, yes.

16   Q.   And he was involved on the financial analytics team?

17   A.   Well, he would have prepared the data for the model, yes.

18   Q.   And when you say "prepared data," there were multiple

19   spreadsheets developed internally at Pilgrim's every time a bid

20   was prepared?

21   A.   At least for the cost-plus models, yes, Tommy would have

22   done them -- pulled all the information that went in there.

23   Q.   And that was true in 2014?

24   A.   I believe Tommy was with us in 2014 or whoever was in that

25   chair would have done that, yes.

835

Robert Bryant - Cross

1   Q.  And you saw a lot of those spreadsheets in 2014, correct?

2   A.  I believe I did, yes.

3   Q.  And just as you were not the final decision-maker on price

4   in 2014, neither was Mr. Austin, was he?

5   A.  That's correct.

6   Q.  Now, you told us about overhearing in your memory two

7   conversations while you were pacing in and out of Mr. Austin's

8   office in Louisville on August 22nd, 2014, correct?

9   A.  Correct.

10  Q.  And that was the day of a meeting between Pilgrim's and

11  RSCS, the buying cooperative for KFC, correct?

12  A.  That's correct, yes.

13  Q.  And what you told us you heard Mr. Austin say is, I told

14  them the price is the price, correct?

15  A.  Correct, yes.

16  Q.  Past tense, I told them.

17  A.  Yes.

18  Q.  And you say you heard Mr. Austin say that twice, correct?

19  A.  That's correct, yes.

20  Q.  Exact same words.

21  A.  Yes, the same statement, yes.

22  Q.  Didn't hear what whoever was on the other end of the call

23  said, correct?

24  A.  No.

25  Q.  Heard nothing about an agreement, correct?

Robert Bryant - Cross

1    *A.*   No.   The only thing I recall really is that statement.

2    *Q.*   Okay.   So the meeting between Pilgrim's and RSCS was

3    scheduled for 11:00 o'clock in the morning to 1:00 o'clock in

4    the afternoon, wasn't it?

5    *A.*   I don't remember when the meeting was scheduled for.

6            *MR. FELDBERG:*   Could we call up, please, J-081, not

7    for the jury yet.

8    *BY MR. FELDBERG:*

9    *Q.*   Do you see Exhibit J-081, Mr. Bryant?

10   *A.*   I do.

11   *Q.*   That's a calendar invite, isn't it?

12   *A.*   It is.

13   *Q.*   And it's a calendar invite for the Pilgrim's/RSCS meeting

14   on August 22nd, 2014.

15   *A.*   Yes.

16   *Q.*   And it was originally sent from Mr. Suerken at RSCS to a

17   bunch of people at RSCS and to Mr. Austin, correct?

18   *A.*   That's correct, yes.

19   *Q.*   And then Mr. Austin forwarded it to you and others,

20   correct?

21   *A.*   That's correct.

22   *Q.*   Mr. Suerken's calendar invite at the bottom says 11:00 a.m.

23   to 1:00 p.m., correct?

24   *A.*   That's correct.

25           *MR. FELDBERG:*   Your Honor, I believe J-081 is

Robert Bryant - Cross

1  stipulated as a business record, and we offer it at this time.

2      THE COURT:  Any objection to the admission of J-081?

3      MR. TORZILLI:  Your Honor, may I ask the defendants to

4  provide us a paper copy.

5      MR. FELDBERG:  Oh, I am sorry.  My apologies.

6      MR. TORZILLI:  And, Your Honor, a moment to confer?

7      THE COURT:  You may.

8      MR. TORZILLI:  Your Honor, we have no objection to the

9  admission of J-081.

10     THE COURT:  J-081 will be admitted.  And you may

11 display.

12     MR. FELDBERG:  I would like to, Your Honor.

13 BY MR. FELDBERG:

14 Q.  Now, you see, do you not, Mr. Bryant, that when Mr. Suerken

15 sent the calendar invite, it was for 11:00 a.m. to 1:00 p.m.,

16 correct?

17 A.  Correct.

18 Q.  And then in Mr. Austin's e-mail, it says 3:00 p.m. to

19 5:00 p.m., correct?

20 A.  Correct.

21 Q.  And do you recall, sir, that on Pilgrim's e-mail server

22 e-mails are often presented in Universal time code?

23 A.  I don't know that.  I know it gets confusing.

24 Q.  Universal time code is most times of the year four hours

25 ahead of East Coast time, correct?

Robert Bryant - Cross

1    *A.*  I don't know that.

2            *MR. TORZILLI:*  Objection, lacks foundation.

3            *THE COURT:*  He can answer if he knows.

4    *A.*  I don't know that.

5    *BY MR. FELDBERG:*

6    *Q.*  Okay.  But does this refresh your recollection that the

7    meeting was scheduled for 11:00 to 1:00?

8    *A.*  No, it doesn't.

9    *Q.*  Do you have any reason to doubt that the meeting took place

10   from 11:00 a.m. to close to 1:00 p.m.?

11   *A.*  I don't know when it was scheduled for.  I really don't.  I

12   don't remember.

13   *Q.*  Do you have a recollection of it occurring at some

14   different time?

15   *A.*  I don't have any recollection on the time to be honest.  I

16   just don't.

17   *Q.*  Okay.  Well, fortunately, sir, we have some phone records

18   that we can review.

19   *A.*  Okay.

20           *MR. FELDBERG:*  Let's call up not yet for the jury,

21   please, Government's Exhibit 90-10.

22           Your Honor, Exhibit 90-10 is a list of phone numbers

23   which I believe is one of the exhibits that the government

24   proposes to introduce without a witness, if I remember

25   correctly, and we offer it at this time.

Robert Bryant - Cross

1          THE COURT:  Any objection to the admission of

2    Exhibit 90-10?

3          MR. TORZILLI:  We have no objection, Your Honor.

4          THE COURT:  90-10 will be admitted.

5          MR. FELDBERG:  Thank you.  And may we publish it, Your

6    Honor?

7          THE COURT:  You may.

8    BY MR. FELDBERG:

9    Q.  Mr. Bryant, I don't expect you to remember other people's

10   phone numbers, so let's take a look at Exhibit 90-10.

11         MR. FELDBERG:  Brian, could you please highlight

12   Mr. Austin's phone number beginning with 770.  And could you

13   also highlight Mr. Brady's telephone number beginning with 256.

14   And on the second page, could you highlight Mr. Kantola's phone

15   number beginning with 770.  It's the 770-329 number.

16   BY MR. FELDBERG:

17   Q.  Now, Mr. Bryant, these are phone numbers that by

18   stipulation belong respectively to Mr. Austin and Mr. Brady and

19   Mr. Kantola.  Do you see that?

20   A.  I see that.

21         MR. FELDBERG:  Okay.  Could we call up, please, not

22   yet for the jury Government's Exhibit 1237.

23         Your Honor, similarly, 1237 is -- I don't think it's

24   been admitted yet, but I think it's on the government's list of

25   documents to be admitted without a witness, and we offer it at

Robert Bryant - Cross

1    this time.

2            THE COURT:  Any objection to the admission of Exhibit

3    1237?

4            MR. TORZILLI:  No objection.

5            THE COURT:  1237 will be admitted.

6            MR. FELDBERG:  And may we publish it, Your Honor?

7            THE COURT:  Yes, you may.

8            MR. FELDBERG:  Now, Brian, could you highlight at the

9    top Detail for Roger Austin?  Thank you.

10           And in the third entry down at 7:56 a.m., could you

11   please highlight the entry that's for one minute from a 770

12   number to -- from Mr. Austin to a 770 number.

13   BY MR. FELDBERG:

14   Q.  That 770 number is Mr. Kantola's number, is it not,

15   Mr. Bryant?

16   A.  I didn't memorize it, sorry.

17   Q.  Would you accept my representation that that's the number

18   on Exhibit 90-10?

19   A.  I will accept your representation.

20   Q.  And that call was at 7:56 in the morning, and it's listed

21   as one minute.  Do you see that?

22   A.  I do.

23   Q.  And do you know, sir, that Verizon, the provider, rounds up

24   to a minute no matter how short the call -- if the call is less

25   than a minute?

841

Robert Bryant - Cross

1          MR. TORZILLI:  Objection, lacks foundation.

2          MR. FELDBERG:  If he knows.

3          THE COURT:  He can answer if he knows.

4     A.  No, I don't know that.

5     BY MR. FELDBERG:

6     Q.  You don't know that.

7          MR. FELDBERG:  Let's highlight the next call down at

8     8:18 a.m. to a number beginning with 256.

9     BY MR. FELDBERG:

10    Q.  Do you see that call, Mr. Bryant?

11    A.  I do.

12    Q.  And that 256 number is Mr. Brady's number, is it not?

13    A.  I didn't memorize the number, but --

14    Q.  Will you accept my representation that that's the number we

15    saw in the list of phone numbers?

16    A.  Yes.

17    Q.  Okay.  And that call was at 8:18 in the morning also for

18    one minute, correct?

19    A.  Correct.

20    Q.  And if we go two more entries down, you'll see a call --

21         MR. FELDBERG:  Could we highlight, please, a call to

22    the same 256 number at 8:55 a.m.

23    BY MR. FELDBERG:

24    Q.  And that says it's incoming to Mr. Austin for five minutes,

25    correct?

842

Robert Bryant - Cross

1   A.   Correct.

2   Q.   And that's a called from Mr. Brady, correct?

3   A.   Correct.

4   Q.   And you know from your experience as the supply guy at

5   Pilgrim's that when suppliers need to cover shorts for each

6   other, those calls very often happen first thing in the

7   morning.

8   A.   Generally speaking, yes.

9   Q.   And would you agree with me, sir, that each of the three

10  calls we've seen, one with Mr. Kantola and two with Mr. Brady,

11  occurred well before 11:00 a.m.

12  A.   Yes.

13  Q.   Do you see any other calls on August 22nd, 2014 between

14  Mr. Austin and either Mr. Brady or Mr. Kantola?

15          MR. TORZILLI:   Objection, lacks foundation.

16          THE COURT:   Overruled.   He can answer.

17  A.   Not on what you're displaying, no, I don't.

18  BY MR. FELDBERG:

19  Q.   Not in Mr. Austin's phone records, right?

20  A.   Not with what I could see here, no.

21  Q.   Now, the other conversation that you say you heard or

22  observed in 2014 was in your memory a conversation that

23  involved Mr. McGuire, correct?

24  A.   Yes.

25  Q.   Mr. McGuire is not here in this courtroom, correct?

843

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Now, you testified at a prior hearing that this

3    conversation between Mr. McGuire and Mr. Austin occurred at a

4    meeting at SMS, which is the buying cooperative for Popeye's,

5    correct?

6    A.   I don't know if it was Church's or Popeye's.  I don't know.

7    Q.   Well, you testified in a prior hearing that it was at

8    Popeye's, and then we showed you a calendar invite that showed

9    Mr. Austin was not at the Popeye's meeting, correct?

10   A.   I believe so, yes.

11   Q.   You recall that?

12   A.   I do.

13   Q.   And then you testified at a prior hearing, Well, maybe the

14   meeting was at Church's, correct?

15   A.   I think I said I was unsure which meeting it was, yes.

16   Q.   Have you seen any calendar invite or any e-mail or any memo

17   that refers to a meeting between Pilgrim's and Church's in July

18   of 2014?

19   A.   I don't believe I have, no.

20   Q.   And you say this happened in July of 2014 around the time

21   of that e-mail that Mr. McGuire sent, correct?

22   A.   Which e-mail are you --

23   Q.   I am sorry, withdrawn.

24        You say this occurred sometime in July of 2014,

25   correct?

Robert Bryant - Cross

1    *A.*  That's correct, yes.

2    *Q.*  Has the government in any of your meetings with them shown

3    you a calendar invite, a note, a memo, any evidence whatsoever

4    that there was a meeting between Pilgrim's and Church's in July

5    of 2014?

6    *A.*  I don't remember.  I don't remember seeing one, no.

7    *Q.*  And you don't remember seeing one whether it was with the

8    prosecution or on your own, correct?

9    *A.*  That's correct, yes.

10   *Q.*  Now, let's talk about what you say happened at this meeting

11   if there was one.

12          *MR. FELDBERG:*  Could we call up, please, Exhibit 1055,

13   page 8.

14   *BY MR. FELDBERG:*

15   *Q.*  Mr. Bryant, this is the slide you say was up on the screen

16   when Mr. McGuire was speaking, correct?

17   *A.*  Yes, a similar slide, yes.

18          *MR. FELDBERG:*  Could we publish it, please?

19          *THE COURT:*  Yes, you may.

20   *BY MR. FELDBERG:*

21   *Q.*  And you prepared this slide, correct?

22   *A.*  No.

23   *Q.*  You helped prepare this slide, did you not?

24   *A.*  No.

25   *Q.*  This slide comes from AgriStats data?

845

Robert Bryant - Cross

1    A.   It does.

2    Q.   And AgriStats data I think you told us was widely available

3    to people in the broiler chicken industry if they chose to

4    purchase it?

5    A.   Correct.

6    Q.   Which most people in the industry did, correct?

7    A.   Correct.

8    Q.   And what you say you remember is that Mr. McGuire was

9    standing on one side of the screen, correct?

10   A.   Correct.

11   Q.   Mr. Austin was standing on the other side of the screen,

12   correct?

13   A.   Correct.

14   Q.   And the people from the customer had all vacated the

15   conference room?

16   A.   Yeah, they left for some reason.  I don't remember why.

17   Q.   Do you ever remember a meeting at a customer's office where

18   all of the customer representatives left the room?

19   A.   I remember one.

20   Q.   This is the only one.

21   A.   Well, no, I think it's happened before.  It's not common,

22   but, yes.

23   Q.   And what you say you remember is that Mr. McGuire said to

24   Mr. Austin across the screen, Put this, meaning this slide, out

25   to the industry.

Robert Bryant - Cross

1    *A.*  He said put in out to the industry.

2    *Q.*  Gesturing toward the slide, correct?

3    *A.*  Yes, in my understanding --

4    *Q.*  Not -- you answered my question.  He said gesturing toward

5    the slide, Put this out to the industry, correct?

6    *A.*  Correct.

7    *Q.*  And the first time you discussed this with the government

8    in one of your interviews, you said Mr. Austin shook his head.

9    Do you recall that?

10   *A.*  Yes.  I know that --

11   *Q.*  And then in your direct testimony, you changed it to

12   Mr. Austin nodded.

13   *A.*  Well, that's -- it's the same thing.

14   *Q.*  Well, if I am shaking my head, am I indicating yes or no.

15   *A.*  Well, whenever I was describing that, I was indicating his

16   acknowledgment.

17   *Q.*  Whatever you were indicating, the first time you discussed

18   this you said he shook his head.  And then when you came to

19   court to testify before the jury, you said he nodded, correct?

20   *A.*  I mean, I --

21   *Q.*  Sir; is that right?

22   *A.*  I don't know that.

23            *MR. TORZILLI:*  I object to counsel continually cutting

24   the witness off prior to the completion of the answer.

25            *THE COURT:*  Overruled.  Mr. Bryant can answer.

Robert Bryant - Cross

1   *A.*  I am being consistent with saying that he acknowledged,

2   shook his head, yes, since the beginning.

3   *BY MR. FELDBERG:*

4   *Q.*  Let's say he shook his head.  He didn't say anything as far

5   as you recall, correct?

6   *A.*  I don't recall him saying one way or the other, no.

7   *Q.*  Now, this slide which you say Mr. McGuire told Mr. Austin

8   to put out to the industry contains AgriStats data that

9   everybody in the industry knew, correct?

10  *A.*  They had access to it, yes.

11  *Q.*  And, in fact, you've testified I think today and in a prior

12  hearing that if someone in the industry didn't know that big

13  birds were more profitable than small birds, they shouldn't be

14  in the industry, correct?

15  *A.*  Correct.

16  *Q.*  So your testimony is that Mr. McGuire told Mr. Austin, Put

17  this out to the industry, and the "this" is something everybody

18  in the industry already knew.

19  *A.*  No, that's not the way I understood it.

20  *Q.*  Well, the "this" is this slide.  That's what Mr. McGuire

21  was gesturing to, correct?

22  *A.*  My understanding of the "this" was --

23  *Q.*  No, no, no, no.  Mr. McGuire was gesturing towards this

24  slide.  That's what you told this jury?

25  *A.*  He was gesturing towards this slide.

Robert Bryant - Cross

1    Q.  And the information in this slide is information that

2    everybody in the industry knew, correct?

3    A.  They should -- they had access to it, yes.

4    Q.  Sure.  For the three alleged conversations that you say you

5    heard in 2014, the overheard conversation in which Roger said

6    he was speaking to Mr. Kantola and you heard one sentence, the

7    overheard conversation in which Mr. Austin said he was speaking

8    to Mr. Brady and you overheard one sentence, and the

9    Mr. McGuire alleged conversation, for any of those

10   conversations do you have any contemporaneous notes?

11   A.  What do you mean by "contemporaneous"?

12   Q.  Did you make any notes of those conversations at the time?

13   A.  No.

14   Q.  Did you write any memos about them?

15   A.  No.

16   Q.  Did you call the FBI?

17   A.  No.

18   Q.  You're simply relying on what you say is your memory of

19   snippets of conversations from eight years ago.

20   A.  Correct.

21   Q.  Now, let's turn to 2017.  By 2017, you had been promoted.

22   So unlike in 2014, you were involved in discussions about

23   pricing, correct?

24   A.  Correct.

25   Q.  And the discussions in 2017 were about the contract that

Robert Bryant - Cross

1   was to go into effect in 2018, correct?

2   A.  Correct.

3   Q.  You wanted Pilgrim's to position itself to be second

4   highest in price among the suppliers, correct?

5   A.  That's correct.

6   Q.  Mr. Austin wanted Pilgrim's to position itself to be third

7   highest in price, correct?

8   A.  He didn't say third.  He said more middle of the pack.

9   Q.  Which you interpreted to mean third.

10  A.  That's what -- yes.

11  Q.  So Mr. Austin wanted Pilgrim's to charge a lower price than

12  you wanted to charge, correct?

13  A.  Correct.

14  Q.  And regardless of whether it was positioning itself to be

15  No. 2 or No. 3, Pilgrim's was setting its own price

16  independently, correct?

17  A.  We did.

18  Q.  And you know, do you not, Mr. Bryant, that after Pilgrim's

19  presented its first bid in 2017, RSCS demanded that Pilgrim's

20  reduce its bid, correct?

21  A.  They did.

22  Q.  And you know that Pilgrim's reduced its bid by as much as

23  7 cents per pound.

24  A.  I believe that's right, yes.

25  Q.  And you know that Pilgrim's did that even though its costs

Robert Bryant - Cross

850

1    had gone up which would have warranted a price increase, not a

2    decrease, correct?

3    A.   That's correct.

4    Q.   So RSCS demanded that Pilgrim's reduce its price, and

5    Pilgrim's gave in to that demand, correct?

6    A.   Eventually, yes.

7    Q.   And no matter how much Pilgrim's may have been initially

8    angry at RSCS for demanding a reduced price, Pilgrim's gave in

9    to that demand, correct?

10   A.   In the end.

11       MR. FELDBERG:  Can we call up, please, Exhibit 1894,

12   not yet for the jury.

13   BY MR. FELDBERG:

14   Q.   Mr. Bryant, do you see Exhibit 1894?

15   A.   I do.

16   Q.   Do you recognize it?

17   A.   I do.

18   Q.   What is it?

19   A.   It's an e-mail from Tim Stiller to myself February 21st,

20   2017.

21       MR. FELDBERG:  Your Honor, this is on the government's

22   list of exhibits to be offered without a sponsoring witness.

23   We offer it at this time.

24       THE COURT:  Any objection to the admission of Exhibit

25   1894?

Robert Bryant - Cross

1     MR. TORZILLI:  Yes, Your Honor.  It is an 801(d)(2)(E)

2  statement that this party can't offer but the government can,

3  so we object to the defendants offering it.

4          THE COURT:  Sustained.

5     MR. FELDBERG:  Could we take the exhibit down, please?

6  BY MR. FELDBERG:

7  Q.  Mr. Bryant, this is an e-mail from Mr. Stiller to you on

8  February 21st, 2017, correct?

9  A.  I believe that's correct.

10  Q.  That was the Tuesday after the President's Day holiday in

11  2017, correct?

12  A.  I don't know that.

13  Q.  Okay.  We'll go to another source for that.

14          And does this refresh your recollection, sir, that

15  Mr. Stiller told you essentially, Let's only speak fact-based

16  data when we discuss and leave emotions aside?  Do you remember

17  that?

18          MR. TORZILLI:  Objection.  Counsel is reading from a

19  document that is not in evidence.

20          THE COURT:  Sustained.

21  BY MR. FELDBERG:

22  Q.  Do you recall Mr. Stiller saying anything about putting

23  emotions aside?

24  A.  I do.

25  Q.  What did he say?

852

Robert Bryant - Cross

1    A.  I remember Mr. Stiller and I had a conversation about the

2    KFC bid after -- there was -- the -- we stopped getting some

3    information, so -- at that point, so we had to reevaluate our

4    bid to KFC internally.

5    Q.  And after you reevaluated it, you reduced it by 7 cents,

6    correct?

7    A.  That's correct.

8    Q.  Now, I'm not going to go through again the whole set of

9    questions about your handwritten notes, but just a couple of

10   things.  You knew Mr. Austin kept track of current prices going

11   back to the 1990s, correct?

12   A.  I learned that when he gave me those hand -- when I wrote

13   the handwritten notes, yes.

14   Q.  And he kept records of historical prices because it helped

15   him in his job, correct?

16   A.  I didn't ask him -- other than that comment he made when he

17   gave me the -- I don't recall hearing that, that information

18   before or since really.  I don't even remember asking him

19   context to it.

20   Q.  But he did tell you that he kept track of current prices

21   going back many years, correct?

22   A.  He -- he said he has everybody's pricing going back to the

23   '90s is what I remember him saying.

24   Q.  Everybody's contemporaneous current pricing going back to

25   the '90s, correct?

Robert Bryant - Cross

1      MR. TORZILLI:  Objection, foundation.

2      THE COURT:  Overruled.  He can answer if he knows.

3   A.  We didn't go into that level of detail.  I just remember

4   whenever he gave me the prices, I told him -- I was shocked how

5   quickly he got it.  He just said, I've got everybody's prices

6   going back to the '90s, and that was really the end of it.  I

7   didn't remember us having a discussion about it.

8   BY MR. FELDBERG:

9   Q.  And when he said, I have everybody's prices going back many

10  years, what he said is, I have everybody's then current prices,

11  correct?

12  A.  He didn't qualify it.

13  Q.  But that's what you understood, correct?

14  A.  I didn't qualify it.

15  Q.  Okay.  Do you recall being interviewed by prosecutors and

16  agents as one of your 31 interviews on February 27, 2022?

17  A.  No.

18  Q.  Do you recall being interviewed --

19      MR. FELDBERG:  Well, let's call up just for the

20  witness Exhibit I-799.

21  BY MR. FELDBERG:

22  Q.  Mr. Bryant, does Exhibit 799 --

23      MR. FELDBERG:  We can take it down.

24  BY MR. FELDBERG:

25  Q.  -- refresh your recollection that you were interviewed by

                                    Robert Bryant - Cross                              854

 1   prosecutors and agents on February 27, 2022?

 2   A.  No.

 3   Q.  Notwithstanding this piece of paper, you have no memory of

 4   that?

 5   A.  There has been a lot of interviews.  I don't know the

 6   dates.  I just don't.

 7   Q.  Did you tell the prosecutors and agents when they

 8   interviewed you on February 27, 2022 or some date around then,

 9   Subject:  2017-handwritten notes, semicolon, current prices and

10   not bids, semicolon?

11        MR. TORZILLI:  I object.  Counsel is again reading

12   from a document that is not in evidence.

13        MR. FELDBERG:  I am asking him a question, Your Honor.

14        THE COURT:  I am going to sustain.  He can be shown a

15   document, but I will sustain the objection.

16        MR. FELDBERG:  Let's call up I-799 again, please, not

17   for the jury.

18        May I ask if this refreshes his recollection, Your

19   Honor?

20        THE COURT:  Certainly.

21        MR. FELDBERG:  Thank you.

22   BY MR. FELDBERG:

23   Q.  Mr. Bryant, does Exhibit I-799 refresh your recollection

24   that you told the prosecutors and agents on February 27,

25   Subject:  2017-handwritten notes, semicolon, current prices and

Robert Bryant - Cross

1    not bids, semicolon?

2            MR. TORZILLI:  Same objection, also asked and

3    answered.

4            MR. FELDBERG:  It's not been answered.

5            THE COURT:  He hasn't answered it yet, but the

6    document should be shown but not read to the witness.

7            MR. FELDBERG:  Let's take the document down.

8    BY MR. FELDBERG:

9    Q.  Mr. Bryant, does Exhibit I-799 refresh your recollection

10   that you told the prosecutors and agents that the notes were

11   current prices and not bids?

12   A.  No.

13   Q.  It doesn't refresh your recollection.

14   A.  No.

15   Q.  Do you think the agent who wrote this got it wrong?

16   A.  It appears so, yes.

17   Q.  Do you think he in an official report of an interview of a

18   government witness, your testimony is that the agent who wrote

19   this got it wrong?

20           MR. TORZILLI:  Objection, lacks foundation.

21           THE COURT:  He already just said that, so Mr. Feldberg

22   is just following up.  Overruled.

23   A.  Sorry, can you say it again?

24   BY MR. FELDBERG:

25   Q.  Your testimony is, Mr. Bryant, that the author is

Robert Bryant - Cross

1   Mr. Nowicki of the Office of Inspector General in an official

2   report of a witness interview, he got it wrong?

3           MR. TORZILLI:  Objection, lacks foundation, also

4   assumes facts not in evidence.

5           THE COURT:  Overruled.  He has already testified that

6   he believes the agent got it wrong.

7   A.  I don't -- like I said, I don't remember making that

8   statement, and I think I've been pretty consistent throughout

9   that those handwritten notes were bids and represented as bids

10  through the process.

11  BY MR. FELDBERG:

12  Q.  Now, Mr. Bryant, we have talked a lot about volume.  KFC

13  was Mr. Austin's main customer, correct?

14  A.  It was.

15  Q.  And that was the customer he spent the bulk of his time

16  working with?

17  A.  I would say the bulk of his career.

18  Q.  Bulk of his career.  And his career was, what, 40 years in

19  the poultry business?

20  A.  Probably.  I don't remember how many years exactly.

21  Q.  Okay.  And do you recall testifying, sir, at a prior

22  hearing that Mr. Austin was an advocate for his customer, KFC?

23  A.  I do.

24  Q.  And do you recall testifying at a prior hearing that

25  Mr. Austin knew his customer well, the customer being KFC, and

Robert Bryant - Cross

1   would have the tough conversations internally that he felt he

2   needed to have for his customer, KFC?  Do you recall that?

3   A.  I do.

4   Q.  Do you recall testifying that he was an advocate for his

5   customer?  Correct?

6   A.  I do.

7   Q.  And that was true, correct?

8   A.  I believe that to be true, yes.

9        MR. FELDBERG:  Nothing further, Your Honor.

10       THE COURT:  Thank you, Mr. Feldberg.

11       Mr. Tubach?

12                      **CROSS-EXAMINATION**

13   BY MR. TUBACH:

14   Q.  Good afternoon, Mr. Bryant.  My name is Michael Tubach.  I

15   represent Jayson Penn.

16   A.  Good afternoon.

17   Q.  Let's start with some questions specifically about

18   Mr. Penn.  You have no personal knowledge that Jayson Penn

19   agreed with any competitors to fix prices; is that right?

20   A.  That's correct.

21   Q.  You have no personal knowledge that Jayson Penn agreed with

22   any competitor to rig bids; is that right?

23   A.  That's correct.

24   Q.  You have no personal knowledge of Jayson Penn telling

25   anyone to fix prices or rig bids; is that right?

858

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   You have no personal knowledge of Jayson Penn instructing

3    anyone to coordinate prices or bids with a competitor; is that

4    right?

5    A.   That's correct.

6    Q.   And you have no personal knowledge of Jayson Penn knowing

7    of anyone rigging bids or fixing prices; is that right?

8    A.   That's correct.

9    Q.   We are going to talk about some meetings in a little bit,

10   but you didn't attend any meeting at which Mr. Penn was present

11   at which anyone discussed coordinating prices or bids with

12   competitors, correct?

13   A.   Correct.

14   Q.   Now, in all your years working for Pilgrim's, you never

15   reported directly to Mr. Penn, correct?

16   A.   That's correct.

17   Q.   There was always at least one layer between you and

18   Mr. Penn?

19   A.   That's correct.

20   Q.   And your understanding is that Mr. Penn had something north

21   of 20 direct reports?

22   A.   Yes.

23   Q.   In other words, 20 people who reported directly to him?

24   A.   Correct.

25   Q.   And those would have been from all different business

Robert Bryant - Cross

1    units, both in sales and operations all over the company,

2    correct?

3    A.  Correct.

4    Q.  Now, you testified that you started attending monthly sales

5    meetings.  You were asked some questions about that previously,

6    right?

7    A.  Correct.

8    Q.  And you believe you started attending those in 2015,

9    correct?

10   A.  I may have attended some in 2014.  I just -- the 2015 I

11   believe is when I started attending them on a regular basis,

12   but before that, it had been irregular attendance.

13          MR. TUBACH:  Why don't we pull up for the witness, the

14   parties, and the Court J-321.

15   BY MR. TUBACH:

16   Q.  It's small, but if you can see that.  I have a physical

17   copy for you, if that would be easier to read, Mr. Bryant.

18   Mr. Bryant, would you like a physical copy?

19   A.  It may help, if you don't mind.

20   Q.  Do you recognize J-321, sir?

21   A.  It looks like a meeting invitation.

22   Q.  It's a meeting invitation for the monthly sales meeting for

23   October of 2015, correct?

24   A.  Correct.

25   Q.  And there is something like, if I count them, there is

Robert Bryant - Cross                                                   860

1   something like 42 invitees on here?

2   A.   Correct.

3   Q.   And you are not on here, are you?

4   A.   I don't see, no.

5   Q.   So at least as of October of 2014, you were not invited to

6   the monthly sales meetings; is that right?

7   A.   Correct.  If I would have went, it would have just been my

8   managers say, Hey, I want you to come, but I would not have

9   been attending regularly in 2014, no.

10  Q.   And you have no memory of attending any monthly sales

11  meeting in the summer of 2014 when all these negotiations with

12  KFC were going on, correct?

13  A.   No.

14  Q.   I think we have established this, but these sales meetings,

15  these were not one-on-one meetings, correct?

16  A.   That's correct.

17  Q.   There were 30 to 40 people in the room?

18  A.   Correct.

19  Q.   And each business unit took a turn sort of giving a summary

20  of what was happening in their business unit, right?

21  A.   Correct.

22  Q.   So this wasn't a one-on-one meeting that you ever had with

23  Mr. Penn, correct?

24  A.   Correct.

25  Q.   Or with Mr. Lovette.

Robert Bryant - Cross

1    *A.*   Correct.

2    *Q.*   Now, even though you never reported to Mr. Penn, there was

3    a brief time when your expense reports were going directly to

4    Mr. Penn; is that right?

5    *A.*   That's correct, yes.

6    *Q.*   And the reason for that is because Tim Stiller to whom you

7    had been reporting got promoted and there wasn't anyone yet in

8    his job, correct?

9    *A.*   Correct.

10   *Q.*   So for a short time there until Mr. Stiller's replacement,

11   your expense reports were going directly to Mr. Penn, do you

12   remember that?

13   *A.*   I do.

14   *Q.*   During that period, Mr. Stiller warned you to be careful

15   about your expense reports because they were going directly to

16   Mr. Penn.  Do you remember that?

17   *A.*   I do.

18        *MR. TORZILLI:*  Objection, calls for hearsay.

19        *THE COURT:*  Response?

20        *MR. TUBACH:*  He has already answered the question,

21   Your Honor.

22        *THE COURT:*  Overruled.

23   *BY MR. TUBACH:*

24   *Q.*   And you understood Mr. Stiller to be warning to make sure

25   there was nothing fishy in your expense reports because they

862

Robert Bryant - Cross

1   were going to Mr. Penn, right?

2   *A.*   No.

3   *Q.*   That's not what you understood.

4   *A.*   That's not what I understood, no.

5   *Q.*   Even though he was warning you to be careful because they

6   were going for Mr. Penn?

7   *A.*   The reason why he was warning me was because Mr. Penn had a

8   reputation to be very scrutinous on expense reports, for

9   instance --

10  *Q.*   I am not asking for a narrative.  I will ask you another

11  question, Mr. Bryant.  It's because you thought Mr. Penn would

12  scrutinize your expense reports, right?

13  *A.*   Not in the context that you're implying, no.

14  *Q.*   I want to shift gears and talk about 2014 negotiations.

15  There are a lot of things about the time period in 2014 that

16  you don't know about.  You did know that the supply of

17  small-bird chicken was tight in 2014, correct?

18  *A.*   Correct.

19  *Q.*   Now, did you know that it was so tight that KFC or RSCS,

20  rather, the buying cooperative for KFC hired a consultant named

21  McKinsey and Company to help you evaluate the small-bird

22  business?

23          *MR. TORZILLI:*  Objection, lacks foundation.

24          *THE COURT:*  Overruled.  He can answer if he knows.

25  *A.*   I don't.

863

Robert Bryant - Cross

1   *BY MR. TUBACH:*

2   *Q.*  You weren't aware of that?

3   *A.*  I was not.

4   *Q.*  Were you aware that RSCS asked Pilgrim's, a Pilgrim's

5   contingent to go down to Louisville in June of 2014 to make a

6   big presentation about the small-bird business?

7   *A.*  No, I don't remember that, no.

8   *Q.*  You were not invited to that meeting, right?

9   *A.*  Not that I remember, no.

10  *Q.*  Did you know that RSCS before the bids were -- bid request

11  even went out was asking its suppliers what profit margin they

12  needed to stay in the business?

13  *A.*  I don't remember that, no.

14  *Q.*  Let's take a look at F-384.

15       MR. TUBACH:  I have a hard copy if you prefer that.

16  It's a pretty small document on there.

17  *A.*  I am okay with the screen.

18  *BY MR. TUBACH:*

19  *Q.*  Exhibit F-384 is an e-mail from Mr. Lewis to Mr. Austin,

20  correct?

21  *A.*  Correct, yes.

22  *Q.*  In July of 2014.

23  *A.*  Yes.

24  *Q.*  Have you ever seen this document before?

25  *A.*  Not that I remember.

864

Robert Bryant - Cross

1    Q.  This document was never forwarded to you, was it?

2    A.  I don't remember seeing it, no.

3    Q.  And you don't remember seeing it ever in preparation for

4    that August 1, 2014 meeting that you attended at RSCS, do you?

5    A.  I don't remember seeing it, no.

6    Q.  Sir, did you know that it was RSCS that requested that

7    meeting in August 1st, 2014?

8    A.  I don't recall who set the meeting up.

9    Q.  Did you recall that it was RSCS that decided the topics

10   that would be discussed in that August 1, 2014 meeting?

11   A.  Generally, they would give a list of topics that they would

12   want at a meeting.  It's common for a customer to give some

13   topics they would want to cover, along with us some topics we

14   would want to cover.

15   Q.  Do you have any idea whether the topics that are discussed

16   on the August 1, 2014 presentation are exactly the topics that

17   Mr. Lewis told Mr. Austin he wanted to discuss?

18   A.  I don't remember.

19   Q.  Now, you testified earlier about this strategy that

20   Pilgrim's had about trying to get KFC done first and then going

21   to other customers.  You recall that.

22   A.  Yes.

23   Q.  Okay.  But it wasn't actually Pilgrim's that decided when

24   to have a meeting with RSCS, was it?

25   A.  I don't know.

Robert Bryant - Cross

1    Q.   That would be RSCS, right?

2    A.   I don't know who initiated the meeting.

3    Q.   Okay.  But it would be RSCS who would decide when those

4    bids were due, correct?

5    A.   Correct.

6    Q.   That's not something that Pilgrim's would decide.

7    A.   Not normally, no.

8    Q.   Not ever, right?

9    A.   I mean, you could push a customer, but that's not the

10   normal, yes.

11   Q.   It was RSCS that decided when the bids would be due in

12   2014, correct?

13   A.   That's what I remember, yes.

14   Q.   And it was RSCS that decided to negotiate earlier in 2014

15   than it had ever negotiated in prior years; isn't that right?

16   A.   I believe so, yes.

17   Q.   Because normally the negotiations for an annual contract

18   would start later in the year, correct?

19   A.   Normally, yes.

20   Q.   And this was the first time they had started as early as

21   August, right?

22   A.   I believe so, yes.

23   Q.   And it was RSCS that decided it wanted a three-year deal

24   rather than a one-year deal; isn't that right?

25   A.   I didn't know that.  I thought at the time that we, we

Robert Bryant - Cross

1    Pilgrim's were pushing for the three-year deal, not KFC.  And

2    maybe that was a mutual agreement, but I was under the

3    understanding that we wanted a three-year deal.

4    Q.   That was an assumption on your part; is that right?

5    A.   That was my understanding, yes.

6    Q.   Is that back to the assumption/understanding you had with

7    Mr. Beller?  You guys have no idea who first proposed a

8    three-year contract; is that fair?

9    A.   Well, I heard about it from Mr. McGuire.

10   Q.   Is that a yes to my answer?

11   A.   That's where I had my understanding that we wanted a

12   three-year deal.

13   Q.   And you do understand that never before in your memory at

14   least had there ever been a three-year deal for chicken at KFC;

15   is that right?

16   A.   That's correct.

17   Q.   This is the first time ever.

18   A.   That's what I recall, yes.

19   Q.   Now, let's talk about these 2014 negotiations.  You've

20   testified about this meeting that was either at Popeye's or was

21   at Church's, the one that you remember the length of the table,

22   that one?

23   A.   Yes.

24   Q.   That meeting had nothing to do with Jayson Penn; is that

25   correct?

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   He wasn't at that meeting, right?

3   A.   Correct.

4   Q.   He wasn't dialed in on a conference call in some way?

5   A.   That's correct.

6   Q.   And you never told Jayson Penn about some gesture that

7   Mr. McGuire made?

8   A.   That's correct.

9   Q.   Or any shake of the head or nod of the head that Mr. Austin

10  may or may not have made, correct?

11  A.   That's correct.

12  Q.   And you don't have any personal knowledge that anyone had

13  told Mr. Penn about any of that.

14  A.   That's correct.

15  Q.   You testified about two meetings at RSCS in August of 2014.

16  The first was August 1st of 2014, correct?

17  A.   Yes.

18  Q.   And you attended that meeting with others at Pilgrim's,

19  right?

20  A.   Correct.

21  Q.   Mr. Penn was not at that meeting?

22  A.   That's correct.

23  Q.   He didn't attend the pre-meeting?

24  A.   That's correct.

25  Q.   Didn't attend the meeting itself?

Robert Bryant - Cross

1    A.  Correct.

2    Q.  Didn't attend any post-meeting, correct?

3    A.  Correct.

4    Q.  And he wasn't on any conference call or anything like that.

5    A.  Correct.

6    Q.  Now, your role in the August 1st, 2014 meeting was to talk

7    about one slide in that presentation, right?

8    A.  Correct.

9    Q.  Page 3.

10   A.  Correct.

11          MR. TUBACH:  Let's pull up Exhibit 1055 if we could.

12   And go to page 3, please, Mr. Fronzaglia.

13   BY MR. TUBACH:

14   Q.  This was your slide, correct, Mr. Bryant?

15   A.  That's correct.

16   Q.  And the whole point of this slide was to tell RSCS that the

17   number of birds --

18          MR. TUBACH:  Can we publish this to the jury, please.

19          THE COURT:  You may.

20          MR. TUBACH:  Thank you.

21   BY MR. TUBACH:

22   Q.  The whole point of this slide was to tell RSCS that the

23   bird availability that KFC needed was going down, right?

24   A.  That's correct.

25   Q.  Okay.  And everything on that slide was a hundred percent

Robert Bryant - Cross

1    accurate, right?

2    A.  At the time, yes.

3    Q.  You made sure it was, right?

4    A.  Yes.

5           MR. TUBACH:  We can take this down, thank you.

6    BY MR. TUBACH:

7    Q.  Now, you testified about a second meeting with KFC on

8    August 22nd, 2014.  Do you recall that?

9    A.  Yes.

10   Q.  And you attended that meeting with others at Pilgrim's?

11   A.  Correct.

12   Q.  Mr. Penn was not at that meeting?

13   A.  That's correct.

14   Q.  He wasn't at any pre-meeting?

15   A.  That's correct.

16   Q.  Didn't go to the meeting itself?

17   A.  Correct.

18   Q.  Didn't go to any post-meeting?

19   A.  Correct.

20   Q.  Wasn't dialed in on a conference call in some way?

21   A.  Correct.

22   Q.  And you didn't tell Mr. Penn about these phone calls that

23   you say you overheard between Mr. Austin and others, correct?

24   A.  That's correct.

25   Q.  And you don't have any personal knowledge that anybody else

Robert Bryant - Cross

1    told Mr. Penn about those phone calls, right?

2    A.  That's correct.

3    Q.  Now, you testified that you were unaware that Pilgrim's

4    lost sales to KFC in 2015, correct?

5    A.  I -- I don't remember that.  I know at the time I was aware

6    because I would have -- you know, it was part of my job, but I

7    don't remember losing that much volume, no.

8    Q.  You don't remember that.  But you do remember that

9    Pilgrim's lost a lot of business to other suppliers that year,

10   right?

11   A.  What I remember is we may --

12   Q.  That's a yes-or-no question.  I am not asking for a

13   narrative.  That's a yes-or-no question.

14   A.  No.

15   Q.  You didn't know.  Okay.

16           Do you recall that Pilgrim's lost 850,000 pounds a

17   week in chicken sales to Wal-Mart?

18   A.  Yes.

19   Q.  So you do recall that Pilgrim's lost a lot of business that

20   year.

21   A.  No.

22   Q.  You don't recall.  Well, which is it, Mr. Bryant, do you

23   recall losing 850,000 pounds a week or not?

24   A.  Well, we lost business, but we also wrote new business.  So

25   what I recall is we remained whole, and we transitioned from

Robert Bryant - Cross

1    the QSR into a more retail tilt is what I recall.  So the

2    reason why I am answering no is I don't recall us technically

3    losing any business because any business we may have lost with

4    one customer we wrote with another customer.

5    Q.  That's a great story, Mr. Bryant.  That's not the question

6    I asked you.  To Wal-Mart Pilgrim's lost 850,000 pounds in

7    chicken sales a week in 2015, yes or no?

8    A.  I don't know the number, but, yes, we lost business to

9    Wal-Mart, yes.

10   Q.  A lot of business, right?

11   A.  Yes.

12   Q.  I'm not asking you whether Pilgrim's was able to make other

13   sales elsewhere to make up for that loss.  That's what you are

14   trying to talk about, right?  That's not my question.  My

15   question is they lost business to Wal-Mart, correct?

16   A.  We did, yes.

17   Q.  Now, Pilgrim's also took a lot of business away from other

18   suppliers, correct?

19   A.  Correct.

20   Q.  In fact, they had a particular method for doing that.  It

21   had to do with suppliers who weren't very good at their job of

22   supplying chicken to customers.  Do you recall that?

23   A.  I do.

24   Q.  Sometimes a competing supplier would be unable to fulfill

25   its volume commitment to its customer; is that right?

872

Robert Bryant - Cross

1   A.   That's correct.

2   Q.   And a competitor would come to Pilgrim's and say, Hey, I am

3   short; could you cover me?

4   A.   A customer.

5   Q.   Sometimes a competitor would come to you and say, I'm

6   short; could you cover for me over at that customer, correct?

7   A.   Yes, for QSR, yes.

8   Q.   And sometimes Pilgrim's refused to bail out those

9   customers, right?

10   A.   That's correct.

11   Q.   Now, for QSRs, it's a little bit of a different story,

12   correct?

13   A.   Correct.

14   Q.   Because you are not going to let a chicken restaurant run

15   out of chicken if you've got it, right?  If you've got it.

16   A.   That wasn't the strategy in QSR, correct.

17   Q.   Because you are not going to let KFC run out of chicken if

18   you have got chicken at the plant that you can sell to KFC,

19   correct?

20   A.   Correct.

21   Q.   But if there was a systemic problem where someone just

22   couldn't -- for other customers could not supply the chicken

23   that they had been contracted to cover, sometimes the customer

24   would come to you and say, Hey, can you fulfill this because

25   the other guys can't do it, right?

Robert Bryant - Cross

1    A.   That's correct.

2    Q.   Okay.  And that happened while you were at Pilgrim's,

3    right?

4    A.   That's correct.

5    Q.   And Pilgrim's answer to that often was no, right?  We're

6    not going to cover for the other supplier who can't fulfill its

7    commitments, right?

8    A.   Most of the time in retail, yes, that was the answer.

9    Q.   And the reason why Pilgrim's wouldn't do that is because it

10   didn't want to be the Band-Aid solution for another supplier's

11   problem, correct?

12   A.   We wanted to be the permanent supplier, not the

13   fair-weather friend.

14   Q.   We wanted to take away all the business, not just sweep up

15   behind the other supplier who wasn't doing a good job, right?

16   A.   That's correct.

17   Q.   And Pilgrim's actually had a name for that strategy, didn't

18   it?

19   A.   It did.

20   Q.   Tell the jury what the name for the strategy was.

21   A.   Otis.

22   Q.   Otis?  What does Otis mean?

23   A.   It's the town drunk from Andy Griffith.

24   Q.   And Andy -- for anyone perhaps not old enough to remember,

25   the Andy Griffith show is a show on television in the 1950s or

Robert Bryant - Cross

1    '60s?

2    A.   It had to be explained to me as well.

3    Q.   The reason it was called the Otis strategy was because the

4    idea was if you just kept giving beer to the town drunk, he

5    would never have to change his ways, right?

6    A.   That's correct.

7    Q.   And Otis was the town drunk on the Andy Griffith show?

8    A.   That's correct.

9    Q.   So instead what Pilgrim's would say, We are not going to

10   keep giving beer to the town drunk; we are going to cut you

11   off, and we would be happy to take all the business, right?

12   A.   That's correct.

13   Q.   And Pilgrim's used the strategy repeatedly to take business

14   away from other suppliers; isn't that right?

15   A.   That's correct.

16   Q.   Including Tyson?

17   A.   Most of the time Tyson.

18   Q.   Biggest chicken supplier in the country, and Pilgrim's was

19   taking business away from it, right?

20   A.   That's correct, yes.

21   Q.   King Soopers is an example of that, right?

22   A.   That's correct.  Well, I am not a -- I don't remember them

23   specifically.  I remember others, but, yes.  We used the

24   strategy a lot.

25   Q.   King Soopers was one of the ones we used the strategy with,

Robert Bryant - Cross

1    right?

2    *A.*   I don't remember that one specifically.  I remember others,

3    but, yes, we used it a lot.

4    *Q.*   Why don't we take a look at your testimony on November 2,

5    2021, page 1077, lines 15 to 17.

6            *MR. TUBACH:*  If we could pull that just for the

7    witness, Mr. Fronzaglia, and for the Court and the parties.

8    *BY MR. TUBACH:*

9    *Q.*   You were asked the question:  Pilgrim's took a lot of

10   business away from other suppliers in relation to customer King

11   Soopers, right?

12           Answer:  That's correct.

13   *A.*   That's correct, yes.  The reason why I wasn't sure if it

14   was like the Otis strategy on that specific one when you asked

15   me that question, but, yes, we did gain King Soopers' business.

16   *Q.*   And we took two -- Pilgrim's took 200,000 pounds a week of

17   business away from other suppliers to customer Bob Evans,

18   correct?

19   *A.*   I believe so, yes.

20   *Q.*   Fresh Markets is another customer that Pilgrim's did that

21   with?

22   *A.*   We did.

23   *Q.*   H-E-B was another one?

24   *A.*   Yes.

25   *Q.*   H-E-B for those who don't know is the largest supermarket

Robert Bryant - Cross

1    chain in Texas?

2    *A.*   That's correct, yes.

3    *Q.*   And there Pilgrim's took all the business away from

4    Keystone, correct?

5    *A.*   Correct, yes.

6    *Q.*   Fair to say, Mr. Bryant, this Otis strategy was just flat

7    out hard-nosed competition?

8    *A.*   It was.

9    *Q.*   Let's move on to 2017.  You testified about the 2017

10   negotiations for the 2018 contract with KFC.  At this point,

11   you were the director of sales for fresh-food service at

12   Pilgrim's, right?

13   *A.*   That's correct, yes.

14   *Q.*   So the 2018 contract that was being negotiated in 2017,

15   that was your responsibility, right?

16   *A.*   Correct.

17   *Q.*   You had ownership of that, right?

18   *A.*   Correct.

19   *Q.*   You owned that contract, right?

20   *A.*   Yes.

21   *Q.*   Now, you talked about a January 27, 2017 meeting with RSCS,

22   right?

23   *A.*   Yes.

24   *Q.*   You had some notes that you took of that meeting, right?

25   *A.*   Yes.

877

Robert Bryant - Cross

1    *Q.*   Mr. Penn was not at that meeting, was he?

2    *A.*   That's correct.

3    *Q.*   In fact, you didn't attend any internal meetings at

4    Pilgrim's with Mr. Penn about that negotiation at all, did you?

5    *A.*   Not that I remember, no.

6    *Q.*   And those handwritten notes that you thought were future

7    bids, maybe weren't, what we spent so much time talking about

8    here, you didn't tell Mr. Penn about any of that, did you?

9    *A.*   No.

10   *Q.*   As far as you know, no one else did either, did they?

11   *A.*   Correct.

12   *Q.*   Now, I want to switch topics and talk about this side

13   hustle you had going about US Foods.  Do you recall that

14   testimony?

15   *A.*   Yes.

16   *Q.*   You testified last week that you believed it was your idea

17   to ask Scott Tucker to reach out to someone at Mar-Jac because

18   he used to work there, right?

19   *A.*   I believe I -- in discussions with -- when Tim and I were

20   having the call about the -- I believe I -- the one that said I

21   believe Tucker used to work there and have a contact and

22   Stiller said, Why don't you reach out to him and see if he can

23   make contact with this person over there, yes.

24   *Q.*   That's what you said, right?

25   *A.*   Yes.

Robert Bryant - Cross

1    Q.   Okay.  Was that different than what I just asked you?

2    A.   I don't know.

3    Q.   Okay.  And that was in mid April of 2017, correct?

4    A.   Correct, yes.

5    Q.   Why don't we take a look at Government's Exhibit 9140, if

6    we could.

7            MR. TUBACH:  I believe this has been admitted, Your

8    Honor.  I ask it be published to the jury.

9            THE COURT:  Yes, it may be.

10           MR. TUBACH:  Thank you.

11   BY MR. TUBACH:

12   Q.   Now, this is an e-mail exchange between you and

13   Mr. Stiller, correct?

14   A.   That's correct, yes.

15   Q.   And even though the e-mail itself only talks about Sysco,

16   it's your testimony that, in fact, this reference to Mar-Jac at

17   the very top line there refers to US Foods, correct?

18   A.   Yeah, after the "and," yes.

19   Q.   And there is nothing on the document that says that, right?

20   A.   That's correct.

21   Q.   We just have to take your word for that?

22   A.   That's correct.

23   Q.   Now, your testimony was that the idea was to get Mar-Jac to

24   go along with a price increase on boneless breast to US Foods,

25   correct?

Robert Bryant - Cross

1    *A.* Correct.

2    *Q.* And Mr. Tucker was supposed to reach out to some contact he

3    had at Mar-Jac to see if they would be willing to do that,

4    correct?

5    *A.* That's correct.

6    *Q.* Now, this Exhibit 9140 is when you first got feedback from

7    Scott Tucker about his conversation with Mar-Jac in trying to

8    get those prices up, correct?

9    *A.* I believe this is after US Foods had already given us and

10   Mar-Jac feedback from our bid submission.

11   *Q.* Okay. Well, it certainly doesn't say that on 9140, right?

12   *A.* No.

13   *Q.* Let's look at your prior testimony. And it's November 2,

14   2021, page 1062, line 23 through 1063, line 10. You were asked

15   the following questions and gave the following answers,

16   Mr. Bryant.

17          Question: When you testified earlier about what that

18   feedback meant on Government's Exhibit 9140, what you said was

19   the feedback that I got from Scott Tucker from Mar-Jac is that

20   they agreed to raise prices similar to ours. However, they

21   wanted to wait a couple weeks to submit these price increases

22   so there would be the appearance that we were not working

23   together, right?

24          Answer: That sounds accurate.

25          And that's the feedback you're talking about on

Robert Bryant - Cross

 1   Exhibit 9140?

 2          Answer:  Yeah.

 3          Question:  That's what you testified to earlier,

 4   right?

 5          Answer:  Yes.

 6          That was the testimony you gave before, correct?

 7   A.  It appears so, yes.

 8   Q.  So according to your earlier testimony, 9140 is the very

 9   first time that Mr. Tucker told you that Mar-Jac might be

10   interested in going along in this price increase that you

11   testified about here, correct?

12   A.  I believe --

13   Q.  That's what you testified about, right?

14   A.  Yes.

15   Q.  Now, based on the way you described this, first Pilgrim's

16   was going to have to increase its price, and then Mar-Jac was

17   going to have to wait a couple weeks, and then they would get

18   feedback from the customer, right?

19   A.  Correct.

20   Q.  So as of the time of Government's Exhibit 9140, it would

21   take several weeks for the customer to give feedback to

22   Mar-Jac, correct?

23   A.  Yes, probably --

24   Q.  Based on your earlier testimony, correct?

25   A.  Probably four weeks would be -- you know, if they waited

Robert Bryant - Cross

1    two weeks and the customer digested the information for a

2    couple weeks.

3    Q.  Okay.  And this e-mail, 9140 --

4          MR. TUBACH:  You can put that back up again.

5    BY MR. TUBACH:

6    Q.  -- was April 18, 2017 at 1:15 in the afternoon and 21

7    seconds.  Do you see that?

8    A.  Yes.

9    Q.  Okay.  Now let's look at Government's Exhibit 9139.

10         MR. TUBACH:  I believe, Your Honor, this is in

11   evidence, and I would ask it be published to the jury.

12         THE COURT:  It may.

13   BY MR. TUBACH:

14   Q.  Now, in this e-mail is 29 seconds after the one we just

15   looked at, correct?

16   A.  Correct.

17   Q.  In here what you are writing to Mr. Stiller is they told

18   Mar-Jac the same thing on boneless, correct?

19   A.  Correct.

20   Q.  So are you saying that those four weeks you testified about

21   went by in 29 seconds?

22   A.  No.

23   Q.  Now, the account rep for US Foods, the person that actually

24   owned that account was a man named Eric Oare, correct?

25   A.  That's correct.

Robert Bryant - Redirect

1    *Q.*  You didn't tell him anything about this thing you asked

2    Mr. Tucker to do, did you?

3    *A.*  No.

4    *Q.*  And Eric Oare's boss, a woman named Brenda Ray, you didn't

5    tell her about this either, did you?

6    *A.*  Not that I remember, no.

7    *Q.*  And you certainly didn't tell Mr. Penn about it, did you?

8    *A.*  Correct.

9    *Q.*  In fact, Mr. Bryant, this side hustle you had going with US

10   Foods, the only person in this entire courtroom that it relates

11   to is you.

12   *A.*  Correct.

13            *MR. TUBACH:*  I have nothing further.

14            *THE COURT:*  Thank you.

15            All right.  Any other cross?

16            All right.  Redirect?

17                        **REDIRECT EXAMINATION**

18   *BY MR. TORZILLI:*

19   *Q.*  Good afternoon, Mr. Bryant.

20   *A.*  Good afternoon.

21   *Q.*  I want to follow up on a handful of topics that you have

22   been asked both today and at the end of last week by defense

23   counsel.  First, you were asked this morning a series of

24   questions about things that can influence the price of chicken

25   sold to customers.  Do you remember that?

Robert Bryant - Redirect

1   A.   Yes.

2   Q.   What I would like to do, Mr. Bryant, is I would like to ask

3   you some questions about things that did influence the price of

4   chicken sold to customers, okay?

5   A.   Okay.

6   Q.   So do you know if the manipulation of bids that you're

7   aware of to fast-food and other customers including KFC

8   influenced the price of chicken sold to those customers?

9        MR. BELLER:   Objection, vague and lack of foundation,

10  vague as to which supplier we are discussing.

11       THE COURT:   Overruled.  He can answer.

12  A.   I believe it did, yes.

13  BY MR. TORZILLI:

14  Q.   How do you know that?

15  A.   The outcomes of the bids in 2014 and the conversations that

16  I had internally with Mr. Austin, Mr. McGuire, and Mr. Stiller.

17  Q.   And in what way, Mr. Bryant, did the manipulation of the

18  bids influence the prices of the chicken sold to customers?

19       MR. BELLER:   Same objection.  I would also add 701.

20       THE COURT:   Overruled.  He can answer.

21  A.   Giving negotiation strategy during the bidding process, you

22  know, telling various competitors not to lower bid prices,

23  sharing bid information prior to bid submission so you know

24  what price to submit your bid at, and that continual sharing of

25  information both prebid meetings to help influence strategy in

Robert Bryant - Redirect

1    the formulation of those bids.

2            *MR. LAVINE:*  Objection, Your Honor.  Can we be heard,

3    please?

4            *THE COURT:*  Yes.

5        (At the bench:)

6            *THE COURT:*  Go ahead, Mr. Lavine.

7            *MR. LAVINE:*  Yes, Your Honor, I think this is

8    basically a foundation question.  In light of the fact --

9    foundation objection, not question.  This witness has not

10   testified to anything on direct or cross about anything that

11   just came out of his mouth.  This testimony is completely new,

12   and there is no foundation for what he is saying at this point

13   in time, and that's my objection.

14           *THE COURT:*  Thank you.

15           Mr. Torzilli?

16           *MR. TORZILLI:*  Sure.  He was asked on

17   cross-examination about what can influence the price of

18   chicken.  He testified on direct that there was a manipulation

19   of bids of which he was aware of that had the purpose and

20   effect of raising prices in the case of 2014 and resisting

21   lower prices in 2017, so there has been a plethora of

22   foundation for it, first.

23           And second, he was, like I said, asked a litany of

24   questions, but not the one that was most germane to the case

25   that's being tried here, which is whether and to what extent

Robert Bryant - Redirect

1    the manipulation of bids that were done in coordination amongst

2    competitors influenced the pricing process.

3             MR. FELDBERG:  May I, Your Honor?

4             Those are entirely conclusory statements.  What he

5    just testified to, the outcome of bids, he testified he didn't

6    know the outcome of bids.  He has not given a single instance

7    of personal knowledge of anyone sharing bid information or

8    sharing other information or sharing strategy information with

9    anyone else.  He has simply lept to conclusory statements that

10   have no foundational factual evidence.

11            MR. FAGG:  Your Honor, may I expand on that?

12            THE COURT:  Yeah, Mr. Fagg, go ahead.

13            MR. FAGG:  Thank you, Your Honor.

14            To echo Mr. Feldberg's point, what Mr. Bryant is

15   saying here is he is talking about specific prices of which

16   competitors were going to bid, and he testified that he did not

17   have that sort of information.  He is not aware of those sorts

18   of discussions from any sort of personal knowledge that he has,

19   and so he is being permitted to or he has given a narrative

20   explanation when the responses to the questions he said he

21   doesn't have that underlying foundation.

22            THE COURT:  Mr. Torzilli?

23            MR. TORZILLI:  Your Honor, as I said, well, first of

24   all, I think it's clear that he has plenty of foundation

25   because he was involved in the bidding for 2014 on behalf of

Robert Bryant - Redirect

1    Pilgrim's.  He was personally aware of numerous pieces of

2    information about how the plan was being put together to raise

3    the prices to KFC and then to other QSRs together, and he has

4    firsthand knowledge of that and obviously has years of

5    experience in bidding and bidding for KFC and other

6    quick-service restaurant customers.

7            Also, he was asked about what goes into the pricing.

8    And he is aware of that part of what went into the pricing in

9    2014 to KFC was the price-fixing that he, some of the

10   defendants and other co-conspirators engaged in, so absolutely

11   he has foundation to know that as opposed to numerous of the

12   other things he was asked on cross-examination which are, you

13   know, details compared to this question which was to,

14   basically, the heart of this case.

15           THE COURT:  Mr. Beller, go ahead.

16           MR. BELLER:  Thank you, Your Honor.

17           Your Honor, I would note this morning at 10:11 a.m.

18   that Mr. Bryant was asked if at any point did he learn in round

19   1, round 2, or round 3 what bids any of the competitors were

20   submitting.  His answer repeatedly as to not just Claxton, but

21   every other customer, was that he had no knowledge of any of

22   the bids that were actually submitted.  The question that was

23   asked by Mr. Torzilli is the outcomes of the bids in 2014.

24           He was also asked about the negotiation strategy

25   during the bidding process and then is being asked to make

Robert Bryant - Redirect

1    conclusions and opinions based on that for which he has no

2    foundation of since he actually never had any bidding

3    information for 2014.

4           THE COURT:  All right.  So the objections initially by

5    Mr. Lavine and Mr. Feldberg went to the fact that Mr. Bryant

6    just made conclusory statements that were not supported by

7    personal foundation.  And, of course, we had hours of

8    cross-examination concerning Mr. Bryant's foundation for

9    believing certain things.  I do agree with Mr. Lavine that the

10   statement that Mr. Bryant just made is sweeping and to a large

11   extent conclusory, and it would lead the jury with a

12   misimpression.  As a result, there was an objection until after

13   he testified to it.  As a result, I am going to allow very

14   limited recross on that particular statement because I think

15   that that's an appropriate remedy to the conclusory statement.

16   But he -- you know, it's tedious to have to go back through,

17   and the jury is going to get frustrated.  So, Mr. Torzilli, we

18   have to be careful about these asking him questions that he may

19   then, you know, make grand-type statements as opposed to what

20   he has testified to in terms of specific knowledge.

21          MR. TUBACH:  Rather than forcing us to do another

22   recross and retreading this ground as the Court said tediously

23   for hours, I think it would be much easier if the Court struck

24   the testimony and had him ask more specific questions.  We

25   couldn't know exactly what he was going to say in answer to the

Robert Bryant - Redirect

1    question what does affect the outcome of bids, and his sweeping

2    answer is not something that we could have anticipated before

3    it came out.

4           MR. BELLER:  I respectfully disagree with Mr. Tubach

5    and would ask for the opportunity to recross.

6           THE COURT:  I am going to deny Mr. Tubach's request.

7    The problem is when you have extended side bars too, the jury

8    may not really recall what the -- they may not have the

9    immediate recall of that testimony.  I am a little bit worried

10   that it may not have as much effect as it normally would to

11   tell the jury to disregard an answer, so all right.  Thank you.

12          (In open court:)

13          MR. TORZILLI:  Thank you very much, Your Honor.

14          THE COURT:  Go ahead, Mr. Torzilli.

15   BY MR. TORZILLI:

16   Q.  Had you finished your answer, Mr. Bryant?

17   A.  I believe so, yes.

18   Q.  You were asked a few minutes ago about Otis, the Otis

19   principle.

20   A.  Yes.

21   Q.  Do you remember that?

22   A.  I do.

23   Q.  Did the Otis principle or the Otis strategy apply to

24   fast-food restaurant customers?

25   A.  No.

Robert Bryant - Redirect

1    Q.   Including KFC?

2    A.   That's correct.

3    Q.   Can you explain why the Otis principle or Otis strategy did

4    not apply to fast-food restaurant customers?

5    A.   We -- we cooperated with each other to cover shorts.  You

6    know, we didn't take each other's volume outside of bids, and

7    that was commonplace with Otis.  You know, we made sure that

8    each -- each other's customers or volume was covered.  We

9    cooperated to cover those independent volumes.

10   Q.   Thank you.

11          Mr. Bryant, you were asked about hard-nosed

12   competition a few moments ago.

13   A.   Yes.

14   Q.   Did the coordination by Pilgrim's and other competitors on

15   the KFC bid in 2014, was that hard-nosed competition?

16          MR. FELDBERG:  Objection, the same issue we discussed

17   at side bar, Your Honor.

18          THE COURT:  Overruled.

19   A.   I didn't consider it that way, no.

20   BY MR. TORZILLI:

21   Q.   You didn't consider it what way?

22   A.   Competition against the competitors.  I viewed it more as

23   competition against the customer.

24   Q.   In 2017 when you and others at Pilgrim's were coordinating

25   bids with your competitors on the KFC bid in 2017, was that

Robert Bryant - Redirect

1    hard-nosed competition?

2         *MR. BELLER:*  Objection, compound and argumentative.

3         *THE COURT:*  Overruled.

4    *A.*  Once again, I viewed it as competition against the common

5    customer, not -- we were collaborating, not competing against

6    each other.

7    *BY MR. TORZILLI:*

8    *Q.*  When you say "we were collaborating," who was the "we"?

9    *A.*  The various competitors.

10   *Q.*  You were asked many, many questions about truthfulness and

11   untruthfulness and the number of times that you met with the

12   government both today and at the end of last week.  You do

13   remember all that, right?

14   *A.*  Yes.

15   *Q.*  Do you, sir, have a written agreement with the government

16   that requires you to tell the truth?

17   *A.*  Yes.

18   *Q.*  And requires you to meet with the government when you are

19   asked to do so.

20   *A.*  Yes.

21   *Q.*  I want to take you back in time to before you even met with

22   the government, so can you place in the approximate time frame,

23   place the approximate time frame when you first met with the

24   government in this matter?

25   *A.*  Last summer.

Robert Bryant - Redirect

 1    Q.  Do you remember the month or --

 2    A.  I believe it was June.

 3    Q.  And do you remember how that meeting was conducted?

 4    A.  Video.

 5    Q.  Okay.  So I want to ask you about your mind, what you were

 6    thinking at that time.  But first I just want to talk about one

 7    piece of terminology, a saying.  Are you familiar with the

 8    saying throwing someone under the bus or throw you or throw me

 9    under the bus?

10    A.  Yes.

11    Q.  Can you explain what you understand that term to mean?

12    A.  You push someone under the bus to save yourself.

13    Q.  So back to the time when you were about to meet with the

14    government last summer.  Did you, in your mind, sir, have any

15    reason to throw anyone under the bus when you started meeting

16    with the government on this matter?

17    A.  No.

18    Q.  Can you explain to the jury why not?

19         MR. BELLER:  I am going to object as to bolstering,

20    Your Honor.

21         THE COURT:  Overruled.

22    A.  Because there was already a immunity and cooperation

23    agreement in place before I ever met with the government.

24    BY MR. TORZILLI:

25    Q.  That applied to you?

Robert Bryant - Redirect

1    *A.*  Correct.

2    *Q.*  And that agreement, can you explain what the most important

3    thing that you needed to do with respect to that agreement?

4    *A.*  Cooperate and tell the truth.

5    *Q.*  Cooperate truthfully?

6    *A.*  Correct.

7    *Q.*  Now, does that agreement that requires truthful cooperation

8    cover the testimony you have given today and last week?

9    *A.*  That's my understanding, yes.

10   *Q.*  Does -- to the best of your understanding, does that

11   truthful cooperation provision apply to the questions that I've

12   asked you and will ask you?

13   *A.*  Yes.

14   *Q.*  Does that also apply to the questions that counsel for the

15   defendants have asked you?

16   *A.*  Yes.

17   *Q.*  We heard a lot of testimony about you lying to the

18   government.  And you I believe testified that the lie was

19   completely and totally unrelated to this case.  Is that your

20   testimony?

21   *A.*  That's correct.

22   *Q.*  And that lie occurred in a meeting or meetings that you had

23   with the government?

24        *MR. TUBACH:*  Your Honor, I object.  Can we go on side

25   bar briefly?

Robert Bryant - Redirect

1              THE COURT:  All right.

2         (At the bench:)

3              THE COURT:  Mr. Tubach, go ahead.

4              MR. TUBACH:  Your Honor, I didn't want to make an

5    objection in front of the jury that it mischaracterizes the

6    testimony, but Mr. Bryant has now testified repeatedly that

7    there were multiple lies, and Mr. Torzilli keeps asking about a

8    single lie, which is a mischaracterization of Mr. Bryant's

9    testimony.  I don't want to make that objection in front of the

10   jury, but it's just blatantly false to call it a single lie.

11             THE COURT:  Mr. Torzilli?

12             MR. TORZILLI:  Your Honor, if I can withdraw that

13   question and ask another one, it would be most appreciated.

14             THE COURT:  I will sustain the objection.  Thank you.

15             (In open court:)

16             THE COURT:  Objection sustained.

17   BY MR. TORZILLI:

18   Q.  So, Mr. Bryant, is it true that your -- that the lies were

19   completely and totally unrelated to this case?

20   A.  That's correct.

21   Q.  Now, in this trial as you have been testifying, did I ask

22   you any questions that are completely and totally unrelated to

23   this case?

24   A.  Say that again.

25   Q.  Have I during the course of your testimony asked you any

894

Robert Bryant - Redirect

1  questions that are completely and totally unrelated to this

2  case?

3  A.  Not that I remember, no.

4  Q.  And, sir, who brought the lie that you stated to the

5  attention of the government?

6         MR. TUBACH:  Your Honor, same objection as before.

7         THE COURT:  Sustained.

8  BY MR. TORZILLI:

9  Q.  Do you, sir -- I will withdraw the question.  I will move

10  on.

11         Do you have an understanding, Mr. Bryant, whether the

12  outcome of this trial has any impact on your agreement with the

13  government?

14  A.  I do have an understanding.

15  Q.  Okay.  And what is your understanding?

16  A.  It has no impact.

17  Q.  I am sorry, I didn't hear the end of your answer.

18  A.  It has no impact.

19  Q.  Thank you.

20         Sir, you were asked on cross-examination whether

21  Defendant Austin on his calls that you overheard in August of

22  2014 right before that KFC meeting, you were asked about those.

23  Do you remember that?

24  A.  I do.

25  Q.  Okay.  Can you remind the jury what stage of the bidding

Robert Bryant - Redirect

1    process was active at the time you overheard those

2    conversations?

3    A.   The second round.  The first-round bid submission had been

4    placed with KFC, and we were proceeding into the second round.

5    Q.   What typically -- well, first, can you remind the jury up

6    to that point in time how many fast-food restaurant bids you

7    had experience with in your career?

8    A.   Several, you know, we went through this a lot.  Customer

9    facing this was the first year, but participating in those

10   bids, yeah, many.

11   Q.   Now, typically after a supplier like Pilgrim's submits its

12   first-round bid, what happens next in the bidding process?

13   A.   You get feedback from the customer and ask you to submit a

14   next-round bid, and there may be multiple rounds of that.

15   Q.   What's the general nature of the feedback that you are

16   getting from the customer with respect to your first-round bid?

17   A.   General nature is how high -- how much higher you are or

18   where your bid is relative to where they would like to see it.

19   Q.   And where typically does the customer want Pilgrim's to go

20   with its second-round bid?

21   A.   Down.

22   Q.   And was to your knowledge the same true for the KFC bid in

23   2014?

24           MR. TUBACH:  Objection, Your Honor, lacks foundation.

25           THE COURT:  Overruled.

Robert Bryant - Redirect

1   *A.*  That's correct.

2   *BY MR. TORZILLI:*

3   *Q.*  So what were Pilgrim's options going into the second-round

4   bid?

5   *A.*  To either hold, no change, or concede on price down.

6   *Q.*  So, Mr. Bryant, how did the instructions, how did the

7   statements that you overheard Mr. Austin saying about the price

8   is the price help the plan among competitors to coordinate on

9   the bid against the customer?

10        *MR. FELDBERG:*  Objection, assumes facts not in

11   evidence.

12        *MR. TUBACH:*  Also leading, Your Honor.

13        *THE COURT:*  Objection will be overruled as to leading.

14   If you could lay more foundation for the other objection,

15   Mr. Torzilli.  That will be sustained.

16        *MR. TORZILLI:*  Sure.

17   *BY MR. TORZILLI:*

18   *Q.*  At the time you overheard Defendant Austin make those

19   calls, have those calls with Mr. Kantola and Defendant Brady,

20   were you aware of a plan amongst competitors to coordinate

21   their bids with KFC?

22        *MR. FELDBERG:*  It's the same issue we discussed at

23   side bar, Your Honor.

24        *THE COURT:*  Overruled.

25        *MR. BELLER:*  And objection as to foundation, thank

Robert Bryant - Redirect

1    you.

2              *THE COURT:*  Overruled.

3    *A.*  Yes.

4    *BY MR. TORZILLI:*

5    *Q.*  What was the basis for you being aware of that plan amongst

6    competitors to coordinate on the KFC bids?

7    *A.*  The meeting, to put it out to the industry meeting, the

8    conversations with Mr. McGuire and the e-mail that we spent a

9    lot of time over.

10   *Q.*  Okay.  So let me ask my earlier question again.  How, if at

11   all, did the instructions that you overheard Defendant Austin

12   discussing with Defendant Brady and Mr. Kantola help the plan

13   amongst competitors to coordinate the KFC bids in 2014?

14             *MR. FELDBERG:*  Objection to the words "instructions."

15   There has been no testimony about that.

16             *MR. BELLER:*  Same objection, Your Honor.  It's arguing

17   facts not in evidence.

18             *THE COURT:*  I am going to sustain the objection.

19   We'll do a side bar, but in the meantime, it's 3:15,

20   Mr. Torzilli, so why don't we go ahead and take the

21   mid-afternoon break.

22             Ladies and gentlemen, we will be in recess until 3:30,

23   all right?

24             The jury is excused for the afternoon break.

25             (Jury excused.)

Robert Bryant - Redirect

1          *THE COURT:*  Mr. Bryant, you may be excused until 3:30.

2     Thank you.

3          All right.  I sustained the objection because I can't

4     recall Mr. Bryant indicating that he knew that anything that he

5     overheard did influence any prices, so that's the basis for me

6     sustaining the objection.  So if there is, then, Mr. Torzilli,

7     you simply need to ask him that.

8          We will be in recess until 3:30.  Thank you.

9          (Recess at 3:16 p.m. until 3:35 p.m.)

10         *MR. HART:*  One issue, Your Honor, if we could address,

11    Mr. Loveland will address it.

12         *MR. LOVELAND:*  Thank you, Your Honor, very briefly.

13    Your Honor, after Mr. Sangalis' testimony, the government will

14    intend to call Ms. Florence Becker, and she will be remoting in

15    through VTC.  I wanted to ask that before she is connected in

16    front of the jury, we could maybe have the jury out of presence

17    so that Your Honor could instruct Ms. Becker on the record as

18    to the not mentioning prior proceedings.  The government hasn't

19    had the chance to prep her as a witness, and I think out of an

20    abundance of caution, it would be good.

21         I also think that it would be helpful to remind

22    Ms. Becker potentially to not answer questions if objections

23    are pending because I know that was something that we faced

24    during the last trial as well.

25         *THE COURT:*  It's difficult when you are by VTC, but

Robert Bryant - Redirect

1    any thoughts on that subject?  It sounds like it might be

2    appropriate just to mention that in front of she and her

3    attorney.

4           MR. TUBACH:  No objection, Your Honor.  We could --

5    perhaps government counsel could speak with her attorney and

6    tell her that, but I have no objection if the Court wants to do

7    it outside the presence of the jury.

8           MR. LOVELAND:  We have spoken to Ms. Barron numerous

9    times about this.  I just think it would be helpful for

10   Ms. Becker to hear it from the Court.

11          THE COURT:  Well, it might be good to just make sure

12   she is all hooked up and things are smooth on that front too.

13   We will take a brief recess right before she testifies.

14          MR. LOVELAND:  Thank you, Your Honor.

15          I also want to forecast for the Court after

16   Mr. Bryant's testimony is done, the government will be moving

17   to admit a number of exhibits that were noticed at Docket No.

18   1378 as well as publish some of those for the jury.  We'll also

19   be admitting and publishing a handful that have limiting

20   instructions at that time as well.

21          THE COURT:  Okay.

22          MR. LOVELAND:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Why don't we bring Mr. Bryant

24   back and also bring the jury back in.

25          (Jury present.)

Robert Bryant - Redirect

1        *THE COURT:*  Go ahead, Mr. Torzilli.

2        *MR. TORZILLI:*  Thank you, Your Honor.

3    *BY MR. TORZILLI:*

4    *Q.*  Welcome back, Mr. Bryant.  I want to follow up on a couple

5    things that we were discussing before the break.  My first

6    question to you, sir, is how did the government first become

7    aware of your lies during interviews?

8    *A.*  I told them.

9    *Q.*  Who told them?

10   *A.*  I did.

11   *Q.*  Okay.  Right before the break, we were talking about the

12   phone calls you overheard Defendant Austin having with

13   Mr. Kantola and Defendant Brady.  And can you just remind us,

14   you were talking about what the options were at that point in

15   the bidding process.  Can you remind us what the options were,

16   please?

17   *A.*  Hold or lower price.

18   *Q.*  Okay.  And what did you hear Defendant Austin say to

19   Defendant Brady and Mr. Kantola on those calls you overheard?

20   *A.*  The price is the price.  I just need to know how many loads

21   you need at that price.

22   *Q.*  Based on going into round 2 of the bid as you stated before

23   the break, did the information that Defendant Austin conveyed

24   to them, was that sufficient for those companies, Koch,

25   Claxton, and Pilgrim's, to coordinate on bid strategy going

Robert Bryant - Redirect

1    forward?

2           *MR. FELDBERG:*  Objection, foundation, calls for

3    speculation, no basis for the witness to have any answer to

4    that question that's based on firsthand knowledge.

5           *MR. BELLER:*  And I would add 701, please.

6           *THE COURT:*  I will overrule the 701 objection.  I will

7    sustain the foundation objection.

8    *BY MR. TORZILLI:*

9    *Q.*  Sir, at that point in time, did you have an understanding

10   as to how chicken suppliers could coordinate on bid strategy?

11   *A.*  Yes.

12   *Q.*  Could you explain the basis for your understanding?

13   *A.*  Those -- the meetings where the instruction was given to

14   share information with competitors.

15          *MR. FELDBERG:*  Objection, move to strike.  There is no

16   evidence of that.  There is no evidence of any instruction

17   given to anyone by anyone.

18          *THE COURT:*  I am going to sustain that objection.  If

19   you could ask him specifically about his knowledge.

20   *BY MR. TORZILLI:*

21   *Q.*  Sir, did you receive a set of e-mails the day before you

22   overheard these phone calls?

23   *A.*  Yes.

24   *Q.*  Did that inform you in any way of a plan regarding a bid, a

25   coordination of bid strategies amongst competitors?

Robert Bryant - Redirect

1          MR. FELDBERG:  Objection, calls for a conclusion

2     without supporting evidentiary foundation.

3          THE COURT:  Mr. Beller?

4          MR. BELLER:  Thank you, Your Honor.  It's also

5     argumentative and assuming facts not in evidence.

6          THE COURT:  Both objections overruled.

7     A.  Yes.

8     BY MR. TORZILLI:

9     Q.  Okay.  And can you explain how the information you received

10    in that set of e-mails informed you about the coordination on

11    bid strategy?

12    A.  It confirmed that our competitors had increased price along

13    with Pilgrim's to the common customer.

14    Q.  Now, fast-forwarding to the next day.  As you are

15    overhearing the calls Defendant Austin is having with Defendant

16    Brady and Mr. Kantola, did the info, information, excuse me,

17    that Defendant Austin conveyed to them, was that sufficient for

18    those companies to coordinate their strategies?

19         MR. FELDBERG:  Objection, foundation.

20         THE COURT:  Sustained.

21    BY MR. TORZILLI:

22    Q.  Was the fact that Pilgrim's was going to hold its price one

23    of the options on the table?

24    A.  Yes.

25    Q.  Which option was it taking?

Robert Bryant - Redirect

1    *A.*   To hold price.

2    *Q.*   What was the -- what was the message that Defendant Austin

3    was conveying to Defendant Brady and Mr. Kantola on the calls

4    you overheard?

5           *MR. FELDBERG:*   Objection.   The words are the words.

6    He is calling for a characterization.

7           *THE COURT:*   I am going to sustain the objection as it

8    was asked -- sorry, as the question was asked.

9    *BY MR. TORZILLI:*

10   *Q.*   Mr. Bryant, how many options were on the table at that

11   moment?

12          *MR. BELLER:*   Objection, asked and answered.

13   *A.*   Two.

14   *BY MR. TORZILLI:*

15   *Q.*   Was one of those two options to keep price at or near where

16   Pilgrim's had submitted its first-round bid?

17   *A.*   Yes.

18   *Q.*   Is that the message you understood Defendant Austin to be

19   conveying to Defendant Brady and Mr. Kantola?

20          *MR. FELDBERG:*   Same objection I raised previously.

21          *THE COURT:*   Overruled.

22   *A.*   Yes.

23   *BY MR. TORZILLI:*

24   *Q.*   Thank you, Mr. Bryant.

25          Now, sticking with the year 2014, do you recall being

Robert Bryant - Redirect

1    asked questions about the slide 8 of the slide deck that you

2    were looking at?

3    *A.*   Yes.

4    *Q.*   And I think you testified there was information that you

5    understood to be from AgriStats depicted on there?

6    *A.*   Correct, yes.

7    *Q.*   Now, I believe there were some questions that Defendant

8    Austin's counsel asked you that you didn't have an opportunity

9    to complete that relate to that information.  Do you remember

10   that?

11   *A.*   Yes, yes.

12   *Q.*   Can you please complete the information you were trying to

13   get out.

14   *A.*   Yes.  I was just going to say that although the competitors

15   had access to that information, that doesn't necessarily mean

16   that they would have compiled that information and looked at it

17   the same way that we had looked at it on that table for, you

18   know, comparing the different segments.  Most of the time you

19   are kind of siloed into your individual segment, so although

20   they had access to the same data, they may have not formatted

21   it and compared it in that way to come to the same or similar

22   conclusion.

23   *Q.*   Was the slide that was the focus of the cross-examination,

24   the AgriStats slide, was that the only slide that was included

25   in the presentation to the customer where during an

Robert Bryant - Redirect

1  intermission in the meeting you heard Mr. McGuire instruct

2  Defendant Austin to put this out to the industry?

3  A.  No.

4  Q.  Were there other slides?

5  A.  Yes.

6  Q.  Could you summarize what the overall purpose of the slide

7  deck was?

8  A.  It was our basis for increasing prices in 2014.

9  Q.  So what message did you understand Mr. McGuire wanting

10  Defendant Austin to put out to the industry?

11       MR. FELDBERG:  Objection, 701, calls for a conclusion.

12  He has testified as to what he says the words were.  This is

13  now calling for a conclusion -- an assumption essentially.

14       THE COURT:  Overruled.

15  A.  My understanding was that he was instructing him to put out

16  our strategy or our basis for seeking price increases.

17  BY MR. TORZILLI:

18  Q.  Price increases from whom?

19  A.  Our customers.

20  Q.  Did that include fast-food restaurant customers?

21  A.  Yes.

22  Q.  Did that include KFC?

23  A.  Yes.

24  Q.  Do you recall being asked questions on cross-examination --

25  actually, I withdraw that.

Robert Bryant - Redirect

1              We were just talking about your overheard calls.

2     Mr. Bryant, within about 24 hours of overhearing those calls,

3     did you receive an e-mail from your boss?

4     A.   Yes.

5     Q.   Who was your boss at the time?

6     A.   Jason McGuire.

7              MR. TORZILLI:  If we could pull up Government's

8     Exhibit 1066.

9              And, Your Honor, permission to publish Government's

10    Exhibit 1066 which has been received into evidence.

11             THE COURT:  You may.

12             MR. TORZILLI:  Thank you, Your Honor.

13    BY MR. TORZILLI:

14    Q.   Is this an e-mail you received from your boss?

15    A.   Yes.

16    Q.   If we can focus on the very, very top e-mail.  What was the

17    date and time that the e-mail was sent to you by your boss?

18    A.   August 21st, 2014 at 1:51 p.m.

19    Q.   Did the e-mail that your boss, Mr. McGuire, sent to you at

20    that time also include a number of other e-mails within it?

21    A.   Yes.

22    Q.   So it was an e-mail chain?

23    A.   That's correct, yes.

24    Q.   Did the e-mail chain that you received from him, is that

25    something that you read at or near the time you received it?

Robert Bryant - Redirect

1          MR. TUBACH:  Your Honor, this is all asked and

2    answered.

3          THE COURT:  I think it's beyond the scope.  I think

4    it's beyond the scope of the crosses.  Sustained.

5    BY MR. TORZILLI:

6    Q.  Did reading this e-mail put into context the message that

7    Defendant Austin was providing to Defendant Brady and

8    Mr. Kantola on the calls you heard the next day?

9          MR. FELDBERG:  Objection, leading and foundation, Your

10   Honor.

11         THE COURT:  Overruled.

12         MR. FELDBERG:  Beyond the scope.

13         THE COURT:  Overruled.

14         MR. TORZILLI:  Thank you, Your Honor.

15   BY MR. TORZILLI:

16   Q.  You can answer.

17   A.  Yes, yes.

18   Q.  Can you explain how so?

19   A.  This was the first indication that competitors were

20   coordinating or sharing or similar prices on the bid and the

21   strategy was working, and then the phone calls confirmed that

22   we were giving guidance on the next round of the bidding.

23         MR. TORZILLI:  If we can, Ms. Pearce, focus in on the

24   lower half of the first page of Government's Exhibit 1066,

25   please.

908

Robert Bryant - Redirect

1   *BY MR. TORZILLI:*

2   Q.   Now, Mr. Bryant, do you recall being asked earlier today

3   about e-mails that are now on the screen?

4   A.   Yes.

5   Q.   Do you recall in particular the e-mail at the bottom of

6   what's being displayed on the screen from Mr. McGuire being

7   something you were asked about?

8   A.   Yes.

9   Q.   Okay.  Now, you had said that you read the e-mails at or

10  around the time you received them.  My question is whether --

11  did you read each e-mail in isolation, or did you read them as

12  a whole?

13  A.   I read them as a whole.

14  Q.   And when you -- I think you testified on direct examination

15  that you used the information in these e-mails to help prepare

16  for the meeting you were about to attend the very next day?

17  A.   Yes.

18  Q.   Is that accurate?

19  A.   That's correct, yes.

20  Q.   So having read the e-mails as a whole and used them as a

21  whole for preparation for your meeting the next day, can you

22  explain how reading the e-mails as a whole got you to the

23  understanding of what Mr. McGuire meant when he used the word

24  "everyone"?

25  A.   Yes.  It's -- when you read it as a whole, it's that he is

Robert Bryant - Redirect

1    asking for feedback on our bid submission, and Roger says he

2    heard they made a few calls.  Roger Austin said he heard that

3    they made a few calls, meaning KFC, and they were surprised how

4    high everyone was, being our competitors.

5    Q.  And typically, Mr. Bryant, when you in the ordinary course

6    of your business receive e-mails, do you read them in what I

7    will call chronological order kind of from the first to the

8    top?

9    A.  I would generally read from the bottom up because it

10   usually makes -- unless it's solved, unless I can see that

11   whatever was sent to me was solved when it was forwarded to me

12   like an FYI that everything is good, generally I read from the

13   bottom up, so I do better understanding it that way.

14   Q.  So let's look at the e-mail you were asked on

15   cross-examination by Mr. McGuire.  And could you just read that

16   aloud, please.

17   A.  The bottom line?

18   Q.  The one that starts with "surprised."

19   A.  Surprised like how much higher everyone else was?

20   Q.  And then you would have -- you then read the subsequent

21   e-mails in sequence?

22   A.  I would have went up.

23   Q.  Up?  Okay.  So let's see what the next one up is.  And what

24   does that say?

25   A.  Yes.

Robert Bryant - Redirect

1    *Q.*  What's the one above that?

2    *A.*  Can you smell their dirty drawers from where they crapped

3    their pants?  Ha.

4    *Q.*  So you would not have read just the e-mail that starts with

5    "surprised."  You would have also read the e-mails that

6    followed that e-mail to fully understand the context of the

7    lower e-mails.  Is that fair to say?

8    *A.*  Yes.

9    *Q.*  So based on that, what was your understanding of what the

10   word "everyone" meant?

11   *A.*  Our competitors.

12   *Q.*  Pilgrim's competitors?

13   *A.*  Correct.

14   *Q.*  For the KFC business?

15   *A.*  That's correct.

16       *MR. TORZILLI:*  We can put that exhibit aside.  Thank

17   you, Ms. Pearce.

18   *BY MR. TORZILLI:*

19   *Q.*  Now, Mr. Bryant, let's fast-forward to the year 2017.  Do

20   you recall being asked about the KFC bid that occurred in 2017

21   on cross-examination?

22   *A.*  Yes.

23   *Q.*  Do you recall being asked about your handwritten note in

24   Government's Exhibit 1919?

25   *A.*  Yes.

911

Robert Bryant - Redirect

1   *Q.*  And do you recall seeing a chart of what was described to

2   you as being current prices in effect around that time?

3   *A.*  Yes.

4   *Q.*  Is it fair to say, Mr. Bryant, that the numbers on that

5   chart match the numbers that you wrote in your notebook?

6   *A.*  They were similar, yes.

7   *Q.*  Okay.  Now, Mr. Bryant, can you remind the jury what

8   direction was KFC trying to get prices to go during the 2017

9   bidding.

10   *A.*  Down.

11   *Q.*  Lower prices?

12   *A.*  Correct.

13   *Q.*  And what did you say the purpose of the competitors'

14   coordination on the KFC bids in 2017 was?

15   *A.*  To limit a price decrease.

16   *Q.*  So, sir, since KFC was trying to get prices to go down,

17   what was Pilgrim's starting point at least for preparation of

18   its first-round bid?

19   *A.*  To be near our competitors that submitted their bid.

20   *Q.*  And you were involved in the preparation of that

21   first-round bid?

22   *A.*  That's correct, yes.

23   *Q.*  At the time of the bidding, did Pilgrim's have a contract

24   that was in effect with KFC?

25   *A.*  Yes.

Robert Bryant - Redirect

1    *Q.*  And do you have an understanding of whether Pilgrim's

2    competitors also had contracts in effect with KFC?

3    *A.*  I believe they did, yes.

4    *Q.*  You at this point in your life now have seen some?

5    *A.*  Yeah, yeah.

6    *Q.*  Including -- so now you know that Pilgrim's competitors had

7    contracts --

8    *A.*  Correct.

9    *Q.*  -- in place?  And that would have meant that they had

10   current prices in place too.  Is that fair to say?

11   *A.*  Correct, yes.

12   *Q.*  Now, Mr. Bryant, had you been 100 percent effective in the

13   coordination with competitors to limit a price decrease, how

14   would your price have changed, if at all?

15          *MR. FELDBERG:*  Objection, calls for speculation.

16          *MR. BELLER:*  Also vague and requests opinion

17   testimony.

18          *THE COURT:*  I am sorry, what was the last part,

19   Mr. Beller?

20          *MR. BELLER:*  Excuse me, and calls for 701 testimony.

21          *THE COURT:*  I am going to sustain the objection that

22   it calls for speculation.

23   *BY MR. TORZILLI:*

24   *Q.*  Mr. Bryant, had you been 100 percent effective in the

25   coordination, how, if at all, would Pilgrim's price have

Robert Bryant - Redirect

1    changed?

2            MR. FELDBERG:  Objection, same objection, Your Honor.

3            THE COURT:  Sustained.

4    BY MR. TORZILLI:

5    Q.  What was in your view a fully effective coordination on the

6    KFC bid?  Where would that have placed you with your price to

7    KFC?

8            MR. BELLER:  I am going to object as to foundation,

9    vague, and also relevance.

10           THE COURT:  This was more limited.  Overruled.

11   A.  Say it again.

12   BY MR. TORZILLI:

13   Q.  Sure.  Had Pilgrim's been 100 percent effective --

14           MR. TORZILLI:  Actually, moment to confer, Your Honor?

15           THE COURT:  Sure.

16   BY MR. TORZILLI:

17   Q.  Okay, Mr. Bryant.  The question was:  What was in your view

18   a fully effective coordination on the KFC bid?  In other words,

19   where would that have placed you, meaning Pilgrim's, with your

20   price to KFC?

21   A.  It would have been that middle of the pack, our first bid

22   submission in 2017.

23   Q.  Before we get more into what was reflected in

24   Exhibit 1919 -- sorry, let me withdraw that.

25           Where would that have been -- where would Pilgrim's

Robert Bryant - Redirect                                                914

1    price then have been, Mr. Bryant, if you had been second or

2    third in relation to Pilgrim's current price?

3    A.   I think it was around a little over 3 cents lower.

4    Q.   Now, before we get more into what's reflected in

5    Exhibit 1919, you do recall the chart of the current prices?

6    A.   Yes.

7    Q.   Now, do you have an understanding of how long those prices

8    are in effect?

9    A.   A month or more, depending on any changes.

10   Q.   Do the prices change from period to period?

11   A.   They can.

12   Q.   During your cross-examination, do you recall being shown a

13   pricing model this morning?

14   A.   Yes.

15   Q.   And you were unsure what that represented?

16   A.   Yes.

17   Q.   And you were asked to compare some of the numbers that were

18   on that chart to numbers in your notes?

19   A.   Yes.

20   Q.   Okay.  Let's take a look at some other information and

21   compare that to what is in your notes.

22        MR. TORZILLI:  Ms. Pearce, if we could call up Defense

23   Exhibit F-852.

24        Your Honor, I believe this has been received into

25   evidence.

Robert Bryant - Redirect

1          *THE COURT:*  Yes, it has.

2          *MR. TORZILLI:*  Permission to publish this?

3          *THE COURT:*  You may.

4          *MR. TORZILLI:*  Thank you.

5  *BY MR. TORZILLI:*

6  *Q.*  What type of document, Mr. Bryant, do you understand

7  Defense Exhibit F-852 to be?

8  *A.*  It's an e-mail from Scott Brady to -- at Claxton to Sara

9  Fisher and Rich Eddington at RSCS.

10  *Q.*  What's the date that's printed on the second line of

11  Exhibit F-852?

12  *A.*  February 3rd, 2017.

13  *Q.*  How does that date compare to the date that the first-round

14  bids to KFC were due?

15  *A.*  They were due around that time, if not that day.

16  *Q.*  Around February 3rd, 2017?

17  *A.*  That's correct, yes.

18  *Q.*  And did you understand Claxton to be one of Pilgrim's

19  competitors in that bid?

20  *A.*  Yes.

21  *Q.*  And did you understand who was in charge of the bidding for

22  Claxton for the KFC 2017 bid?

23  *A.*  Yes.

24  *Q.*  Who was it?

25  *A.*  Scott Brady.

Robert Bryant - Redirect

1    Q.   Okay.   I want to draw your attention to the second to the

2    last line of the main paragraph of this e-mail.

3    A.   Okay.

4    Q.   And about halfway across, there is a sentence that says --

5    that starts with:   We reduced our profit.

6    A.   Yes.

7    Q.   Can you see that?

8    A.   Yes.

9    Q.   And then it goes to the next line.

10   A.   Yes.

11   Q.   Could you read that sentence aloud, please.

12   A.   We reduced our profit line to maintain the same cost to you

13   that we currently have in place.

14   Q.   Thank you.

15          Now, based on your experience with KFC cost models,

16   Mr. Bryant, do the words "our pricing model will remain the

17   same" mean the proposed price would go up, down, or stay the

18   same?

19   A.   Stay the same.

20   Q.   So there would not be a price change?

21   A.   Correct.

22   Q.   And did you see the word "current" or "currently" in the

23   e-mail passage that you just read aloud?

24   A.   I do.

25          MR. LAVINE:   Your Honor, I am going to object to this

Robert Bryant - Redirect

1   line of questioning and ask for a side bar, please.

2       (At the bench:)

3           THE COURT:  Mr. Lavine, go ahead.

4           MR. LAVINE:  Your Honor, there is no foundation for

5   this witness to testify about this document.  He has never seen

6   it.  He is not on it.  He is asking him to interpret what that

7   means.  And there is no basis for him to testify about the

8   document.  And if they wanted to do the simple way, all they

9   have to do is turn the page and find out exactly what the bid

10  number is, and it's going to be different.

11          THE COURT:  Mr. Torzilli, were you going to ask

12  Mr. Bryant for his interpretation of the word "current" or

13  "currently"?

14          MR. TORZILLI:  I wasn't going to ask him for the

15  interpretation of that term.  What I actually was now going to

16  ask him without the document is whether in cross-examination

17  the questions were brought up as to whether his notes had

18  current prices.

19          THE COURT:  Okay.  Anything more from you, Mr. Lavine?

20          MR. LAVINE:  No, Your Honor.

21          MR. TUBACH:  Defendant Penn then, Your Honor, I don't

22  understand the purpose of showing that document.  He is being

23  asked about current prices.  What is that document doing up on

24  the screen and why is he reading it?  He is obviously trying to

25  draw that link to interpret this e-mail he has never seen and

Robert Bryant - Redirect

1    didn't write nor has ever seen.

2           THE COURT:  He hasn't asked him to interpret it.  He

3    has called out a sentence in it, and there could be that

4    implication, but the objection from Mr. Lavine, and Mr. Lavine

5    anticipated that he was going to ask Mr. Bryant to interpret a

6    document that he may have never seen or at least certainly

7    doesn't have any basis to interpret, and Mr. Torzilli has

8    indicated that he is not going to ask him that, so it doesn't

9    sound like we have the problem that Mr. Lavine intended.

10          All right.  Thank you.

11          (In open court:)

12   BY MR. TORZILLI:

13   Q.  So, Mr. Bryant, you were asked on cross-examination whether

14   you understood the information in the handwritten notes that we

15   looked at were current prices.  Is that fair to say?

16   A.  That's correct.

17   Q.  And based on your understanding, was the information

18   contained in your notes current pricing?

19   A.  No.

20   Q.  What did you understand it to be instead?

21   A.  Bid pricing.

22   Q.  For what?

23   A.  The 2017 KFC bid, the first round.

24   Q.  If there was no change in price with a bid, how does a bid

25   relate to a current price?

Robert Bryant - Redirect

1    *A.* Say that again.

2    *Q.* Sure. If there was no change in price with a bid being

3    submitted, how does a bid relate to your current price?

4         *MR. BELLER:* Your Honor, I am going to object as vague

5    and also speculative.

6         *THE COURT:* Overruled.

7    *A.* They would be the same.

8    *BY MR. TORZILLI:*

9    *Q.* The same?

10   *A.* Correct, yes.

11   *Q.* You were asked on cross-examination about Pilgrim's losing

12   volume at KFC for that three-year contract, the 2015 to 2017

13   contract. Do you remember that?

14   *A.* Yes.

15   *Q.* You were not asked about whether Pilgrim's profits from KFC

16   went up or down; is that right?

17   *A.* That's correct.

18   *Q.* Okay. Well, let's take a look at that.

19        *MR. FELDBERG:* If he was not asked about it, how can

20   it be within the scope of cross?

21        *THE COURT:* We'll see.

22        *MR. TORZILLI:* If we can call up Government's Exhibit

23   10120.

24        *MR. TUBACH:* I will object if this line of question is

25   going to be beyond the scope of cross-examination.

Robert Bryant - Redirect

1          THE COURT:  Let's wait for the question.  Then we'll

2     see if.

3          MR. TORZILLI:  If I may approach with some copies of

4     some documents.

5          THE COURT:  You may.

6          MR. TORZILLI:  May I proceed?

7          THE COURT:  Yes.

8          MR. TORZILLI:  Thank you, Your Honor.

9          If we could call up, I think we have 10120 being

10    displayed for the witness, the Court, and the parties.

11    BY MR. TORZILLI:

12    Q.  Sir, I would like to ask you to refer to a document that's

13    in front of you.  It is marked as Government's Exhibit 1729.

14    Do you have that in front of you?

15    A.  Yes.

16    Q.  If you can flip over from the cover page to the next page

17    that has at the bottom paginated No. 1.  Do you see that?

18    A.  Yeah.

19    Q.  Okay.  What do you understand this to be?

20    A.  It looks like our Pilgrim's cost model to KFC.

21    Q.  Are there signatures at the bottom?

22    A.  Yes.

23          MR. TORZILLI:  Your Honor, government moves to admit

24    GX 1729.

25          THE COURT:  Any objection to the admission of 1729?

Robert Bryant - Redirect                                              921

1          Exhibit 1729 will be admitted.

2          MR. TORZILLI:  Thank you, Your Honor.

3    BY MR. TORZILLI:

4    Q.  And, Mr. Bryant, do you understand what year or what time

5    period the information in 1729 covers?

6    A.  It looks like it's calendar year 2014.

7    Q.  Can you flip to the second to the last page of 1729?  Are

8    you there?

9    A.  Is it Exhibit 6?

10   Q.  Yes, it is.

11   A.  Yes.

12   Q.  Do you see an estimated weekly volume for KFC eight-piece

13   chicken on the bone?

14   A.  Yes.

15   Q.  What's the number of estimated volume of eight-piece

16   chicken on the bone per week?

17   A.  2.6 million pounds.

18   Q.  And now if you can look on your screen at the first column

19   of numbers.  Do you see that?

20   A.  Yes.

21   Q.  Does the number you just read aloud match the number in the

22   top box of the first column?

23   A.  Yes.

24   Q.  Now, if you can continue to look at what's on the screen

25   there, in the second row is the word "margin."  Do you see

Robert Bryant - Redirect

1   that?

2   *A.*  Yes.

3   *Q.*  What do you understand the word "margin" to mean in

4   relation to contracts between Pilgrim's and KFC?

5          *MR. FAGG:*  Objection, Your Honor.  Can we be heard on

6   side bar?

7          *THE COURT:*  Yes.

8      (At the bench:)

9          *THE COURT:*  Go ahead, Mr. Fagg.

10         *MR. FAGG:*  Your Honor, Mr. Torzilli is getting into

11  this line of questioning, and it's clear that this is outside

12  the scope.  There were no questions of this witness regarding

13  margin, and Mr. Torzilli is clearly attempting to have this

14  witness interpret two different documents which were not asked,

15  this witness was not asked about on cross and then to create a

16  summary chart or to validate a summary chart with this

17  Government's Exhibit 10120 which had not been disclosed to the

18  defendants prior to right now when it was shown to the witness.

19  And I think the objections earlier that this is outside of the

20  scope are now ripe, and it is clear that this is going well

21  outside of the scope.

22         *THE COURT:*  Additional objections?  I know that a

23  couple of people were standing up.  I just wanted to give

24  someone an opportunity.

25             Mr. Torzilli, response?

Robert Bryant - Redirect

1           MR. TORZILLI:  Sure, a couple things.  Of course, the

2    volume argument which is I think pours throughout two, if not

3    more maybe, cross-examinations was raised with this witness,

4    and this is in response to that.  So both at the level of the

5    volume going down, but also the very closely related point that

6    actually rebuts that and would seem to be perfectly appropriate

7    for redirect is, although the volume went down, the profits

8    went up, which undercuts the argument that the volume went

9    down, which is the purpose for the cross-examination.  So this

10   is entirely appropriate for redirect to respond to points made

11   on cross.

12          In terms of this being a summary exhibit, of course

13   this is something we are using on redirect solely to respond to

14   cross-examination and haven't sought to move the summary, the

15   exhibit into evidence as a summary, so I think that that issue

16   is premature at this point.

17          THE COURT:  But it would seem that the question is

18   leading up to that; otherwise, you wouldn't be asking him,

19   right?

20          MR. TORZILLI:  Well, the other possibility would be to

21   display it as a demonstrative, of course, for demonstrative

22   purposes only.  And another point, Your Honor, that I think

23   shouldn't be lost here is the defendants have spent certainly

24   in previously hearings numerous, including with this witness,

25   countless hours having him read other companies' contracts for

Robert Bryant - Redirect                                924

1   purposes of assembling their summary exhibits which, of course,

2   were moved into evidence on cross-examination of this very

3   witness.  So I think it's certainly a big case of what's good

4   for the goose is good for the gander here.

5          THE COURT:  Mr. Fagg, response?

6          MR. FAGG:  Sure, Your Honor.  It may have been a

7   different scenario if Mr. Torzilli had attempted to get this

8   witness to do this on direct examination.  He did not.  He

9   chose not to.  These issues were not explored with this

10  witness, and now he is trying to do this through redirect, and

11  he is, frankly, doing it improperly.

12         THE COURT:  Well, I mean, Mr. Torzilli is absolutely

13  correct that in the past, witnesses without a direct foundation

14  for knowledge have taken admitted exhibits, testified as to

15  various numbers, those numbers then appear in a so-called

16  summary, and the summary is then constructed through a witness

17  without personal knowledge in that fashion.

18         Why is this different?

19         MR. FAGG:  This is different, Your Honor, because it

20  is on redirect.  And so the scope of this line of questioning

21  is simply well beyond anything that was covered in cross.  In

22  addition, I anticipate that what Mr. Torzilli will seek to get

23  this witness to do is to offer some sort of opinion testimony

24  about why those margin differentials or what those margin

25  differentials mean, which is not something that the defendants

Robert Bryant - Redirect

1  or I believe government has tried to do in any of the prior

2  trials.

3          *THE COURT:*  Let me ask you about that, Mr. Torzilli,

4  because the question that was objected to focused in on what he

5  understood it seemed as if the term "margin" in the summary

6  meant.  Why would he have any idea what margin in a summary --

7  or why would that be relevant?  Because that's not taking a

8  number from an admitted exhibit.  That's asking for his

9  understanding of, you know, your summary chart.  So and

10  generally on that whole issue of margin, you're right that

11  volume was definitely asked on cross-examination, but why would

12  it be -- why wouldn't it be beyond the scope to now go into the

13  issue of margin with Mr. Bryant?

14          *MR. TORZILLI:*  Two things, Your Honor.  First just to

15  clarify the opening party remarks, if I was asking, and I may

16  have been inartful the way I worded it, but the question -- I

17  will have to go back, but I am not at the transcript, my

18  question was directed as what his understanding of margin was

19  as it appears, in essence, a contract between Pilgrim's and KFC

20  which I think would be well within his wheelhouse based on his

21  extensive experience in doing this in this business, so that's

22  No. 1.

23          And I am now being handed the transcript here, and my

24  question was:  What do you understand the word "margin" to mean

25  in relation to contracts between Pilgrim's and KFC, so that's

926

Robert Bryant - Redirect

1    what I was hoping to elicit from him is what that means.

2            Now, second, in terms of the responding -- I mean,

3    this is the government's direct response to the defendants'

4    so-called volume argument.  Their volume argument so-called is

5    that this company Pilgrim's lost somewhere in round numbers

6    500,000 I guess pounds of chicken per week and that that means

7    there was no price-fixing conspiracy.

8            Now, of course, that's wrong on the law as you can

9    lose or gain unlimited amounts of volume.  The question is

10   whether there was an agreement to fix prices, and that's the

11   end of the inquiry.  But what's important here on the facts is

12   that Pilgrim's lost, you know, substantial volume, but their

13   total profits went up by selling less chicken, they were

14   profiting more.  And that's what is about to be illustrated in

15   the next few minutes of testimony with this witness.

16           And if I can just add onto this one other point about

17   some opinion margin which I think Mr. Fagg is concerned about,

18   certainly, first of all, if I ask a question like that,

19   Mr. Fagg would be at liberty to interpose an objection, and the

20   Court would have an opportunity to sustain it or not depending

21   on circumstances.  But second, frankly, I hadn't intended to

22   having him opine on that.  What I wanted him to do is get the

23   numbers down and be able to explain the math, the arithmetic

24   indicating volume going down, profits going up.

25           *MR. TUBACH:*  This is Michael Tubach.  Very briefly.

Robert Bryant - Redirect

1   That sounds like a fine argument for closing argument, but it

2   doesn't explain why it is proper rebuttal testimony when he

3   wasn't asked a single question about margin and comparing

4   margins between years.  So if Mr. Torzilli wants to make this

5   argument in closing, he is obviously free to do so, but it's

6   still beyond the scope of this witness' cross-examination.

7          THE COURT:  Mr. Fagg, anything more from you?

8          MR. FAGG:  Sure, Your Honor.  The last thing I would

9   raise is this witness has testified that the purpose of the

10  conspiracy was not to lose volume, and now the government is

11  trying to fix that through this entirely new topic, through

12  this entirely newly disclosed exhibit when the issue of margin

13  was never explored on cross-examination.

14         THE COURT:  Yeah, both objections will be overruled.

15         This is -- No. 1, I think that the relationship

16  between volume and profit is one that has come up, so it's not

17  beyond the scope.  And in the past, summary exhibits like this,

18  as I said before during the side bar, have been used, and I'm

19  not saying that, you know, there couldn't be objections to some

20  of the numbers in here.  We'll have to see.  But the exercise

21  that Mr. Torzilli is using at the present time is similar to

22  what's been allowed in the past.  I think it's permissible as

23  long as the witness isn't offering any opinions on things

24  beyond his knowledge, but as long as he is using numbers from

25  admitted exhibits, then this has been allowed in the past, and

Robert Bryant - Redirect

1    it's proper here, all right?

2         Thank you.

3         *MR. FAGG:*  Your Honor, sorry, just briefly.  I would

4    just reiterate one other objection for the purposes of the

5    record.  We do object under 403 that the government is being

6    allowed to display to the jury what is an amount, large

7    numbers, and believe that that in light of the scope that was

8    addressed previously on direct and cross, this is objectionable

9    under 403.

10        *THE COURT:*  Yeah, as I said, I am not sure what those

11   large numbers are at the far right of this exhibit, but

12   certainly Mr. Fagg, Mr. Lovette has the opportunity to

13   interpose objections.  We will have to see what those are

14   exactly, but they are large numbers, and I am not sure that

15   we're going to have any type of proper basis to put them in

16   this particular exhibit.  We will just have to see.

17        (In open court:)

18        *THE COURT:*  Go ahead, Mr. Torzilli.

19        *MR. TORZILLI:*  Thank you.

20   BY MR. TORZILLI:

21   *Q.*  So my question to you, Mr. Bryant, that's pending is do you

22   have an understanding of the term "margin" as it appears in

23   contracts between Pilgrim's and KFC?

24   *A.*  Yes.

25   *Q.*  What does it represent?

Robert Bryant - Redirect

1    A.   The profit per pound for that particular product.

2    Q.   Now, if we can look -- continue to have you, sir, refer to

3    the document that you've been referring to.  And if you can

4    flip to what's the third page, but the pagination says 2, and

5    it's Government's Exhibit 1729 is what we're looking at.

6            And on that page, do you see an entry for the

7    suppliers' margin?

8    A.   Yes.

9    Q.   And what is reflected on the line for suppliers' margin?

10   A.   .1175.

11   Q.   And now if you look at the chart on your screen for the row

12   for margin per pound for the 2014 contract, do you see that

13   same number?

14   A.   Yes.

15   Q.   Okay.  Now, sir, if you can -- there is a calculator

16   somewhere in your grab area.  If you can do the multiplication

17   of the two numbers that you just identified and tell us what

18   the product of that is.

19   A.   313776.

20   Q.   And how many cents?

21   A.   .11.

22   Q.   Does that match what appears on the third row of the

23   column 2014 Contract?

24   A.   Yes.

25            MR. TORZILLI:  Your Honor, at this time, permission to

Robert Bryant - Redirect                                          930

1    publish the title rows and the first column of Government's

2    Exhibit 10120?

3           MR. LAVINE:  Your Honor, I do have an objection if I

4    can be heard to side bar, please.

5           THE COURT:  You may.

6        (At the bench:)

7           THE COURT:  Go ahead, Mr. Lavine.

8           MR. LAVINE:  Government counsel is asking the witness

9    to testify as to what the total margin is, but we don't even

10   know whether this is an accurate number in the sense that the

11   2014 contract allocates 267,000 pounds, but we know from prior

12   testimony that KFC doesn't always buy the full amount.  So we

13   don't know whether this is an accurate number or not in 2014 so

14   whether their margin was actually 313,000 or not.  It could

15   have been much less.  So he is putting this out there as though

16   this is a final number when we have no -- he has no basis at

17   this point to say whether or not this is an accurate number.

18           THE COURT:  Mr. Torzilli?

19           MR. TORZILLI:  Thank you, Your Honor.

20           Yes, we've had numerous exhibits throughout the course

21   of this litigation that defendants have used that are based on

22   this volume of information being pulled from these exact same

23   contracts.  We haven't heard from any of the defendants about

24   inaccuracies or other ways to look at the information or, you

25   know, other inferences that be drawn.  We have plenty of

Robert Bryant - Redirect

1    summary exhibits and probably numerous ones that will be

2    admitted before this trial is over that have -- drawing the

3    same information from precisely these same contracts without

4    the caveats that are now being interposed here.  So I think

5    that it's a situation where we're using the same or very, very

6    similar methodology for the defendants to draw relevant

7    information from these contracts, apply some arithmetic and to

8    display it in a chart.

9              THE COURT:  Mr. Lavine, anything else?

10             MR. LAVINE:  I understand where government counsel is

11   coming from, but they could have objected at the time.  There

12   is no way for government counsel to say this is an inaccurate

13   number.  And when he is pulling this up here, this comes across

14   as a very accurate number to the jury, and there is no way for

15   this witness to substantiate the accuracy of that number.

16             THE COURT:  The objection will be overruled.  The

17   document -- what's asked to be displayed right now is a row --

18   sorry, a column that says 2014 Contract.  Mr. Bryant took a

19   look at Exhibit 1729.  There is nothing inaccurate about them

20   doing so.  That's where he testified he got the information

21   from, so I don't find that the qualifications that Mr. Lavine

22   has mentioned would in any way mislead the jury.  He is just

23   testifying from one particular source of information, so that's

24   appropriate, and I'll overrule the objection.

25             (In open court:)

Robert Bryant - Redirect

1           *THE COURT:*  Objection will be overruled.

2           Mr. Torzilli, you may display that particular row

3    along with those headings.

4           *MR. TORZILLI:*  Thank you, Your Honor.

5    *BY MR. TORZILLI:*

6    *Q.*  Now, Mr. Bryant, if we can -- if I can have you look at the

7    other document that was handed to you.  It's got a government's

8    exhibit sticker, and it's marked as 1126.  Do you have that?

9    *A.*  I do.

10   *Q.*  I would like to do a similar type walk-through with you in

11   this.  So, first of all, if you can turn to, even though it's

12   the second page of the exhibit, it's got page No. 1 paginated

13   at the bottom.  Do you see that?

14   *A.*  Yes.

15   *Q.*  And what do you understand this to be?

16   *A.*  KFC model for 2015 through 2017.

17   *Q.*  Is it signed?

18   *A.*  It is.

19   *Q.*  Who signed it?

20   *A.*  Roger Austin.

21   *Q.*  And what time period does it cover?

22   *A.*  2015 through 2017.

23   *Q.*  And, again, if you can look, and this is -- in this

24   document it's on what's called Exhibit 2.

25   *A.*  Yes.

933

Robert Bryant - Redirect

1    Q.   Are you there?

2    A.   Yes.

3    Q.   And do you see on that page an estimated weekly volume

4    commitment for KFC eight-piece chicken on the bone?

5    A.   Yes.

6    Q.   What's the number there?

7    A.   2.110500.

8    Q.   And if you can look at the chart that's being displayed on

9    the screen.

10   A.   Yes.

11   Q.   Do those numbers match for the top row for the weekly

12   volume?

13   A.   They do.

14   Q.   And then next is Margin, if you could go back to that

15   second page that has page No. 1 on it.

16   A.   Yes.

17   Q.   Do you see a Supplier Margin row?

18   A.   I do.

19   Q.   What's the number displayed there?

20   A.   .2175.

21   Q.   Does that match the second row of the second column of the

22   exhibit to your screen?

23   A.   Yes.

24   Q.   And then if you can get that calculator out again and do

25   the multiplication, please, and let us know what the product

Robert Bryant - Redirect

1   is.

2   A.   I did that.

3   Q.   You did it already?

4   A.   Yes.

5   Q.   And what's the number that you came up with?

6   A.   459033.75.

7   Q.   And does it match the number on the bottom row of the

8   second column of the exhibit being displayed on the screen?

9   A.   Yes.

10        MR. TORZILLI:   Your Honor, permission to publish now

11   incrementally the second column of numbers in Government's

12   Exhibit 10120.

13        THE COURT:   You may.

14        MR. TORZILLI:   Thank you, Your Honor.

15   BY MR. TORZILLI:

16   Q.   So we've looked at the 2014 contract and the 2015 to 2017

17   contract.   Now what I would like you to do, sir, is to do a

18   little additional arithmetic.   So if you can for the first row

19   there, the one that says Weekly Volume, can you figure out the

20   difference between the $2.6 million number and the $2.1 million

21   number.

22   A.   Those are pounds, not dollars.

23   Q.   I am sorry, pounds, the 2.6 million-pound number and the

24   2.1 million-pound number.

25   A.   559935.

Robert Bryant - Redirect

1    Q.  And is that the same number reflected in the third column?

2    A.  Yes.

3    Q.  Now, what do you understand that to be?

4    A.  The weekly volume commitment from KFC.

5    Q.  Do you understand the weekly volume that Pilgrim's was

6    contracted to sell to KFC to go up, down, or stay the same?

7    A.  It was going down.

8    Q.  And is that what defense counsel was talking to you about

9    on cross-examination?

10   A.  Yes.

11   Q.  Okay.  Now, if we can go to the next row, the Margin Per

12   Pound row.  And if you can take the difference between those

13   two numbers.

14   A.  Yeah, it's 10 cents.

15   Q.  And is that accurately reflected on Government's Exhibit

16   10120?

17   A.  Yes.

18   Q.  And what does that reflect?

19   A.  The margin per pound increase between the two contracts.

20   Q.  And then if we can go down to the third row.  Have you done

21   the difference between those two?

22   A.  Yes.

23   Q.  And is the number reflected in that third column accurate?

24   A.  Yes.

25   Q.  And do you have an understanding of what margin means in

Robert Bryant - Redirect                                          936

1  the context of Pilgrim's KFC contracts?

2  A.  Yeah, it's profit.

3  Q.  Whose profit?

4  A.  Pilgrim's.

5  Q.  Pilgrim's profit from sales of chicken to KFC?

6  A.  Correct.

7  Q.  And what specific product are we talking about here?

8  A.  The eight-piece COB.

9  Q.  How popular is the eight-piece COB as far as you know at

10  KFC?

11  A.  It was the most popular.

12       MR. TORZILLI:  Your Honor, at this time, permission to

13  publish the third column of numbers in Government's Exhibit

14  10120.

15       THE COURT:  You may.

16  BY MR. TORZILLI:

17  Q.  Okay.  Now, what -- we have been looking at volume and

18  margin information.  For what period of time are these numbers

19  applicable to?

20  A.  Weekly.

21  Q.  Okay.  So how many weeks in a year?

22  A.  52.

23  Q.  Now, could you take the 145,257.64 number and multiply it

24  by --

25       MR. TORZILLI:  I am sorry.

Robert Bryant - Redirect

1          THE COURT:  Go ahead, Mr. Fagg.

2          MR. FAGG:  Object, Your Honor, under 401 and 403, for

3   the reasons I articulated earlier.

4          THE COURT:  Both of the objections overruled.

5   BY MR. TORZILLI:

6   Q.  If you could take the 145,257.64 number, multiply it by 52,

7   what do you get?

8   A.  7553397.28.

9   Q.  And how does that number compare to the number in the

10  fourth column in Exhibit 10120?

11  A.  It's the same.

12         MR. TORZILLI:  Permission to publish the fourth column

13  of Government's Exhibit 10120.

14         THE COURT:  You may.

15  BY MR. TORZILLI:

16  Q.  Now, Mr. Bryant, how long was the contract that Pilgrim's

17  and KFC arrived at in the bidding that occurred in 2014?

18  A.  Three years.

19         MR. TUBACH:  Could we have a brief side bar?

20         THE COURT:  Yes.

21     (At the bench:)

22         THE COURT:  Mr. Tubach, go ahead.

23         MR. TUBACH:  Yes.  Your Honor, I believe this contract

24  was only valid for one year and was subject to annual

25  renegotiation as it says in page 1 of the contract, which is at

Robert Bryant - Redirect

1    Exhibit 1126, so for Mr. Torzilli to put up a three-year

2    difference is misleading.

3         THE COURT:  Mr. Torzilli, response?

4         MR. TORZILLI:  Sure.  I think it was just probably an

5    hour ago where Defendant Penn's counsel was cross-examining

6    this very witness about the contract being a three-year

7    contract and asking him about whose idea it was for it to be a

8    three-year contract and whether MacKenzie and whoever came in

9    and was advising about the contract and so forth, so it seems

10   like they have committed to the one version of events where

11   this is a three-year contract.  And, of course, by its own

12   terms on the front page, as the witness identified, it

13   indicates that the contract was effective for the period --

14   calendar year period 2015 through 2017.

15        MR. TUBACH:  Your Honor, I was very careful.  The

16   question was what KFC wanted to do, not what they actually

17   accomplished, and I think there are differences in the

18   contracts between the different suppliers.  I believe it's

19   misleading to characterize this as a binding three-year

20   contract.

21        MR. FAGG:  Your Honor, this is John Fagg.  I would

22   echo that and raise the 403 objection.  In the very language of

23   the agreement says that it's a cost model, which is where

24   Mr. Torzilli is deriving this information, is subject to annual

25   review, and there is no testimony or other evidence that -- how

Robert Bryant - Redirect                                   939

1    that changed year over year.

2          THE COURT:  Mr. Torzilli, I will give you the last

3    word.

4          MR. TORZILLI:  I rest on my prior record.

5          THE COURT:  I am going to sustain this objection.

6    Mr. Tubach's questions didn't open the door to anything that

7    wouldn't be some type of precedent for my not sustaining the

8    objection because he was just asking about a fact, namely the

9    term of the agreement.  It was in a different -- as compared to

10   previous contracts before 2014.  I do think that the nature of

11   this particular summary chart would suggest that the three-year

12   difference would be some type of realized cost savings, and

13   there is no dispute that although this was a three-year

14   contract at the time of negotiations, it was subject to

15   adjustment after one, so that implication would be misleading.

16         Moreover, I think that the annual difference not

17   subject to that same objection, that's fine, but the point I

18   think is made, but a three-year price, I think, would have the

19   danger of being misleading, so I will sustain that objection.

20         MR. BELLER:  Thank you for allowing me to jump in,

21   Your Honor, because we did not ask about --

22         THE COURT:  That's a good point, and I will allow

23   some -- I will add this to the topic of limited recross,

24   because this, I think it's fair to allow some questions about

25   this particular summary exhibit.  Once again, it depends on

Robert Bryant - Redirect

1   what Mr. Torzilli does with it.  You know, if he asks that it

2   be displayed as a demonstrative or if he admits it, then it

3   would be appropriate to have some additional recross which I

4   will allow.

5           Thank you.

6           (In open court:)

7           MR. TORZILLI:  Thank you, Your Honor.  And permission

8   to publish the first four columns of Government's Exhibit

9   10120.

10          THE COURT:  You may.

11  BY MR. TORZILLI:

12  Q.  So, Mr. Bryant, if you can look at the chart that's on your

13  screen.  What do you understand to have happened with the

14  weekly volume of eight-piece COB sold to KFC between the

15  contract for calendar year 2014 and the three-year contract

16  2015 to 2017?

17  A.  We sold less but made more.

18  Q.  And what happened to the margin or profit as you said for

19  that same product for that same two contracts?

20  A.  We increased our profit.

21  Q.  So is it fair to say Pilgrim's sold less chicken but made

22  more profit?

23          MR. FAGG:  Objection, asked and answered.

24          THE COURT:  Sustained.

25  BY MR. TORZILLI:

Robert Bryant - Redirect                                          941

1   *Q.* Did Pilgrim's make more profit?

2   *A.* Yes.

3   *Q.* On how many units did it make that additional profit?

4   *A.* Fewer.

5   *Q.* Than the prior contract year?

6   *A.* Correct.

7           *MR. TORZILLI:* At this time, Your Honor, government

8   moves to admit the exhibit, Government's Exhibit 10120, as it

9   is presently being displayed.

10          *THE COURT:* Any objection to the admission of

11  Exhibit 10120 as displayed?

12          *MR. TUBACH:* Yes, Your Honor.  It's not voluminous

13  under 1006.

14          *THE COURT:* All right.  Any others?  The objection is

15  overruled.  10120 will be admitted.

16  *BY MR. TORZILLI:*

17  *Q.* Mr. Bryant, just a few more questions.  I want -- I do want

18  to touch on the subject about which you talked quite

19  extensively today and last week about the assumptions and

20  inferences and firsthand knowledge.  Do you remember that?

21  *A.* Yes.

22  *Q.* I want to talk to you about things you have personal

23  knowledge of, okay?

24          How, Mr. Bryant, did you know Mr. McGuire told

25  Defendant Austin to put this out to the industry?

Robert Bryant - Redirect

1   A.   I was there.

2   Q.   Did you hear him say that?

3   A.   Yes.

4   Q.   Did you see him when he was saying that?

5   A.   Yes.

6   Q.   Did you see Defendant Austin when Mr. McGuire was saying

7   it?

8   A.   Yes.

9   Q.   How did you know that Defendant Austin had a phone call

10   with Defendant Brady where he said, I told them the price is

11   the price; I just need to know how many loads you want?

12          MR. LAVINE:   Objection, Your Honor, asked and

13   answered.

14   BY MR. TORZILLI:

15   Q.   How do you know?

16   A.   I was there.

17   Q.   You were where?

18   A.   In Roger's office.

19   Q.   Did you see him make the call?

20   A.   I seen him on the phone.

21   Q.   Did you hear what he was saying?

22   A.   Yes.

23   Q.   How did you know that Defendant Austin had a call with

24   Mr. Kantola where he said the same thing, I told them the price

25   is the price; I just need to know how many loads you want?

943
Robert Bryant - Redirect

1   A.   I heard him.

2   Q.   You heard who?

3   A.   Roger Austin.

4   Q.   Did you see him when he was having that telephone

5   conversation?

6   A.   Yes.

7   Q.   How do you know that Defendant Austin told the KFC people

8   in a meeting on August 22nd, The price is the price; I just

9   need to know how many loads you want?

10   A.   I was present.

11   Q.   Present where?

12   A.   In the meeting.

13   Q.   When he said that?

14   A.   That's correct.

15   Q.   Did you see Defendant Austin as he was saying those words?

16   A.   Yes.

17   Q.   And you heard Defendant Austin as he was saying those

18   words?

19   A.   Yes.

20   Q.   How do you know that Defendant Austin in January of 2017

21   was requested to find out where we need to be to be No. 2 in

22   price?  How do you know?

23   A.   I sent him an e-mail.

24   Q.   You wrote it?

25   A.   Yes.

Robert Bryant - Redirect

1    *Q.*  With your fingers.

2    *A.*  Yes.

3    *Q.*  On your keyboard.

4    *A.*  Yes.

5    *Q.*  On your computer.

6    *A.*  Correct.

7    *Q.*  We saw a lot of and talked a lot about your handwritten

8    notes in Government's Exhibit 1919.  You said that it's your

9    belief that that was bid information.

10         *MR. LAVINE:*  Object, Your Honor, asked and answered.

11         *THE COURT:*  Overruled.

12   *BY MR. TORZILLI:*

13   *Q.*  How do you know?

14   *A.*  That's the way it was represented by to me by Mr. Austin.

15   *Q.*  You heard Defendant Austin provide you the information?

16   *A.*  He did.

17   *Q.*  Based on the e-mail that you typed out on your computer?

18         *MR. BELLER:*  Objection, leading.

19         *THE COURT:*  Overruled.

20   *A.*  Actually, I don't recall him responding to that e-mail.  He

21   got the information based off the phone call around the first

22   week of February.

23   *BY MR. TORZILLI:*

24   *Q.*  Do you have, sir, personal knowledge of e-mails between

25   Defendant Austin and Mr. McGuire in which Mr. McGuire tells

Robert Bryant - Recross

1    Defendant Austin KFC was surprised like how much higher

2    everyone else was?

3    A.   Yes.

4    Q.   How do you know?

5    A.   I received the e-mail.

6            MR. TORZILLI:  Moment to confer, Your Honor?

7            THE COURT:  You may.

8            MR. TORZILLI:  No further questions.

9            Thank you, Mr. Bryant.

10           THE COURT:  Thank you, Mr. Torzilli.

11           I will allow some limited recross on the two topics

12   that I mentioned at side bar.

13           Go ahead, Mr. Beller.

14           MR. BELLER:  Thank you, Your Honor.

15                        **RECROSS-EXAMINATION**

16   BY MR. BELLER:

17   Q.   Mr. Bryant, I want to start at the same place that

18   Mr. Torzilli started with his redirect.  And that is you were

19   asked a question:  Did the manipulation of bids influence the

20   prices of chicken sold to customers, right?

21   A.   Yes.

22   Q.   And you gave your assumed opinion that the answer was yes,

23   right?

24   A.   I gave my understanding, yes.

25   Q.   All right.  Your understanding.  So you gave the

Robert Bryant - Recross

1   understanding that the answer is yes and gave that

2   understanding based on telling various competitors not to lower

3   their bid prices, right?

4   A.   Partly, yes.

5   Q.   Well, that was your answer in part.  We are going to get to

6   the other parts, telling various competitors not to lower their

7   bid prices?

8   A.   Correct.

9   Q.   What you heard were two telephone calls in which Mr. Austin

10  said, The price is the price; I just need to know how many

11  loads, right?

12  A.   Correct.

13  Q.   So you have no personal knowledge outside of those two

14  telephone calls of anyone telling competitors not to lower bid

15  prices.

16  A.   Correct.

17  Q.   You also gave your opinion, your assumed opinion of sharing

18  bid information prior to bid submissions, right?

19  A.   Correct.

20  Q.   So 1919 we have talked about.  Mr. Torzilli's question was

21  based on 2014, so that's what I am going to ask you about as

22  well.  Mr. Bryant, you never received bid information from any

23  of your competitors in 2014.

24  A.   Correct.

25          MR. TORZILLI:  Objection.

947

Robert Bryant - Recross

1          *THE COURT:*  Overruled.

2     *A.*  Correct.

3     *BY MR. BELLER:*

4     *Q.*  So when you were asked that question and you said sharing

5     bid information prior to bid submissions, that was also an

6     assumption on your part, right?

7     *A.*  That's -- I was giving my understanding.

8     *Q.*  Because you have no personal knowledge of that.

9     *A.*  Just an e-mail.

10    *Q.*  You have no personal knowledge of that.

11    *A.*  Correct.

12    *Q.*  Thank you.

13         You said that your opinion, your assumed opinion was

14    also based on what price to submit your bid at, right?

15    *A.*  Correct.

16    *Q.*  It was your words, what price to submit your bid at,

17    meaning the competitors.

18    *A.*  Correct.

19    *Q.*  You also have no personal knowledge of anyone telling

20    anyone else, any other competitor -- let me ask that even

21    better.  You have no personal knowledge of anyone at Pilgrim's

22    telling anyone else, any other competitor, what price to submit

23    their bids at.

24    *A.*  Correct.

25    *Q.*  So when your opinion was based on what price to submit your

Robert Bryant - Recross

1    bid at, that was also based on an assumption on your part,

2    right?

3    A.   Correct.

4    Q.   Now, when you made all of these assumptions in answering

5    Mr. Torzilli's question, what you did not do is say, My

6    opinion, my general opinion is based on assumptions that I am

7    making, right?

8    A.   I was giving my understanding.

9    Q.   You were giving your opinion based on an assumption that

10   you were making, fair?

11   A.   Like I said, I was giving my understanding, yes.

12   Q.   So your understanding, Mr. Bryant, is what Mr. Torzilli was

13   asking you about on direct examination was your assumptions and

14   your understanding, right?

15   A.   Correct.

16   Q.   You would agree with me that all of your cross-examinations

17   have been focused on identifying what you have personal

18   knowledge of, right?

19   A.   I am not sure if it was just what I had personal knowledge

20   of, but ...

21   Q.   Mr. Bryant, Pilgrim's Pride made independent pricing

22   determinations based on what was in Pilgrim's Pride best

23   interest, right?

24            MR. TORZILLI:  Objection, scope.

25            THE COURT:  Response?

Robert Bryant - Recross

1        MR. BELLER:  Your Honor, it goes directly to the

2   question of the manipulation of bids.

3        THE COURT:  Overruled.  He can answer.

4   A.   It's hard for me to answer that one.  I mean, we used the

5   bid information, for instance 2017, to formulate the bids, so

6   saying it's completely independent, I couldn't agree with that.

7   BY MR. BELLER:

8   Q.   Well, no, let's be clear here.  Because what you didn't do

9   is get on the phone with a competitor and decide what each

10  competitor's price was going to be.

11  A.   That's correct, yes.

12  Q.   You never sent an e-mail to any competitor deciding on what

13  everybody's price was going to be?

14  A.   That's correct, yes.

15  Q.   You received certain information?

16  A.   Correct.

17  Q.   And you made an independent decision based on that

18  information as to what was in the best interests of Pilgrim's

19  Pride.

20        MR. TORZILLI:  Objection, asked and answered.

21        THE COURT:  Overruled.

22  A.   Correct.

23  BY MR. BELLER:

24  Q.   So when you say, Mr. Bryant, Did the manipulation of bids

25  influence the prices of chicken sold to customers, your answer

Robert Bryant - Recross

1    is based on assumptions for which you have no personal

2    interest -- or no personal knowledge.

3    A.   No.

4    Q.   Mr. Bryant, speaking of bids for just a moment, you

5    indicated that it was -- going back to this, The price is the

6    price, I just need to know how many loads you want, you have

7    absolutely no knowledge whatsoever if Claxton Poultry held its

8    round 1 price or lowered its bid, right?

9    A.   That's correct.

10        MR. TORZILLI:  Objection, outside the scope.

11        THE COURT:  Overruled.

12   A.   That's correct.

13   BY MR. BELLER:

14   Q.   So you have no knowledge of any competitors' bids in 2014

15   at all, one way or the other.

16   A.   Correct.

17        MR. BELLER:  Mr. Brian, if we can go to Government's

18   Exhibit 10120, please.

19        And if we can show that and publish it to the jury,

20   please, Your Honor.

21        THE COURT:  Yes, you may.

22   BY MR. BELLER:

23   Q.   Mr. Bryant, is 10120 on your screen?

24   A.   It is.

25   Q.   Now, I want to be clear that the plan as you call it was to

951

Robert Bryant - Recross

1    focus on price, not on volume, right?

2    A.   Correct.

3    Q.   Okay.  So Claxton -- excuse me, Pilgrim's Pride lost

4    600 pounds of chicken per week between the 2014 and the 2015

5    contract, right?

6    A.   Yeah, 560,000 pounds.

7    Q.   All right.  560,000 pounds, losing that volume was not part

8    of the plan as you call it, right?

9    A.   Correct.

10   Q.   Mr. Bryant, do you have a calculator in front of you, sir?

11   A.   Yes.

12   Q.   Let's take 560,000 pounds or we can do 559,935, that is the

13   lost volume, and I want you to multiply that times the margin

14   for the 2015, 2017 contract, .2175.  What is that number,

15   Mr. Bryant?

16   A.   121785.86.

17   Q.   And if you can multiply that times the 52 weeks of the

18   year, please.

19   A.   It would be 6,332,864.85.

20   Q.   So in volume that was lost between the 2014 and the 2015

21   contract, it was roughly $6.3 million worth of chicken had it

22   been sold at the .2175 profit margin, right?

23   A.   Correct, to KFC.

24   Q.   And that, Mr. Bryant, was also not part of the plan,

25   correct?

1    *A.*   Correct.

2              *MR. BELLER:*  Thank you, Your Honor.

3              Thank you, Mr. Beller.

4              Additional recross?

5              Mr. Bryant, you are excused.

6              Is he subject to recall?

7              Thank you, Mr. Bryant.

8              Ladies and gentlemen, we will go ahead and break for

9    the day.  It's just about 5:00 o'clock.  So, ladies and

10   gentlemen, keep the admonitions in mind we talked about before.

11   Hope you have a good evening, and we will see you back tomorrow

12   same time, 8:30.  Thank you very much.

13             (Jury excused.)

14             Yes, Mr. Torzilli, go ahead.

15             *MR. TORZILLI:*  We are going to subject Mr. Bryant to

16   recall.  We may call him in a rebuttal case if we put on a

17   rebuttal case.

18             *THE COURT:*  In releasing him, I was more interested in

19   whether the defendants thought that they might call him, but,

20   yeah, the fact that the government may call him in rebuttal is

21   perfectly appropriate.

22             *MR. TORZILLI:*  Thank you.

23             *THE COURT:*  My guess is that our discussion of Docket

24   No. 1378 and those other exhibits may take a while.  Is that

25   our prediction?  The reason I am asking is I am wondering

1     whether we should take a break now because some people may want

2     it and then reconvene in 10 minutes or so in order to go

3     through the exhibits.  I don't have a real good feel for what

4     we are about ready to do.

5          MR. LOVELAND:  Your Honor, I would hate to speak for

6     the defense, but I think that the things set forth in 1378 all

7     have a pretty specific justification, so I don't know that it

8     will take very long.  Maybe the defense would like a moment to

9     confer.

10          MR. BELLER:  Would the Court allow just a couple of us

11     to step out and excuse us, and certainly I don't have an

12     objection to court business continuing if you don't mind the

13     disruption.

14          THE COURT:  Well, we'll wait, but if it's just to make

15     sure defendants' attorneys are on the same page or to talk a

16     little bit, that's fine, and I'll just stay on the bench, and

17     I'll allow you to do that.

18          MR. BELLER:  Thank you, Your Honor.  I think it may be

19     a bit more a personal break that's needed just briefly.

20          THE COURT:  That's what I was wondering because we can

21     always take a real quick one.  Why don't we take 10 minutes,

22     and then we will reconvene.  The Court will be in recess.

23     Thank you.

24        (Recess at 5:00 o'clock p.m. until 5:13 p.m.)

25          THE COURT:  We are back on the record.  Jurors are not

1    present.

2            Mr. Loveland, go ahead.

3            *MR. LOVELAND:*  Yes, Your Honor.  I had a moment to

4    confer with Mr. Quinn, and he'll correct me if I say anything

5    wrong.  If Your Honor would permit us to do this outside the

6    presence of the jury, what we would propose is to move into

7    evidence everything that is contained in Docket No. 1378 with

8    the exception of the summary exhibits and those exhibits that

9    have been listed separately as requiring a limiting

10   instruction.

11           And Mr. Quinn has said that there is no objection from

12   the defense on that point.

13           *THE COURT:*  Let me, first of all, ask you,

14   Mr. Loveland, so you would be moving the admission of

15   everything in Attachment A to Docket No. 1378?

16           *MR. LOVELAND:*  Mr. Quinn is coming up, so I am going

17   to see if he is going to correct something I said.

18           *MR. QUINN:*  I misunderstood what Mr. Loveland was

19   asking for.  I thought was just asking to move the documents in

20   1378 in cover filing and not in the two attachments, Attachment

21   A and Attachment B, but if you are moving everything now, I

22   believe that we've got through those and have verified their

23   accuracy, but I would love a moment to confer just to ensure

24   that.

25           *THE COURT:*  Here is another thing.  I require that all

1    exhibits be moved into evidence in front of the jury.  Now, in

2    this case, one wonders why because, you know, this may be one

3    of my little hobgoblins, but I still think it's a good idea, so

4    we won't be doing that, but we can set the stage for it by

5    finding out whether there is specific objections.  So if

6    Mr. Quinn wants to confer with defense counsel just to

7    double-check.

8            Am I right, Mr. Loveland, you would be intending to

9    clear for introduction not only those that are mentioned in the

10   body of 1378 but also in the attachments?

11           MR. LOVELAND:  Yes, Your Honor, and those with

12   limiting instructions are specifically listed out separately

13   for the purpose, and those were in Attachment B, so we would

14   not be moving to admit those because we will be doing them on a

15   case-by-case basis.  At the time that we move, we will publish

16   them consistent with what Your Honor said I believe on the very

17   first day of trial.

18           So just to set the stage for tomorrow morning, we

19   would be moving to admit everything in 1378.  We believe that

20   these documents should be noncontroversial, and the basis for

21   their admissibility is spelled out in the attachment as well,

22   Your Honor.

23           THE COURT:  In Attachment A?

24           MR. LOVELAND:  Yes.

25           MR. QUINN:  Your Honor, I think that's fine.  And we

956

1  have already cleared the documents that appear on 1378.  I just

2  want a chance to talk to my colleagues about the attachments.

3  What I would propose is we send Mr. Loveland an e-mail tonight

4  letting him know we are clear and the government move in the

5  remainder tomorrow before court.

6          THE COURT:  That sounds reasonable.  We can always

7  meet at 8:15 if there is a request to do so.  Someone maybe

8  tonight at some point could send something to chambers, and if

9  we need to talk about that at 8:15, we can.  Does that sound

10  workable?

11          MR. LOVELAND:  That sounds great to the government,

12  Your Honor.

13          MR. QUINN:  Seems fine as well for the defendants,

14  Your Honor.

15          THE COURT:  Anything else to talk about before we

16  recess?

17          Mr. Lavine, go ahead.

18          MR. LAVINE:  If I can just talk briefly about

19  scheduling, something we all like to talk about.  I have talked

20  to government counsel over the weekend, and I wanted to preview

21  for the Court an issue that I think is going to come up for us.

22          We sent a revised witness list yesterday.

23          THE COURT:  Yeah, I have got that.

24          MR. LAVINE:  To preview for the Court, several of the

25  names there have asterisks on that.  We are going to reevaluate

1    as soon as the government rests, and many of those may come off

2    the witness list, and if that's the case, Your Honor, we will

3    file a new witness list tomorrow after the government rests, if

4    it's tomorrow or if it's Wednesday morning.  I am not pushing

5    one way or the other.

6            THE COURT:  Sure.

7            MR. LAVINE:  We have one witness, Mr. Richard

8    Eddington, we have to get out of here by Wednesday night

9    because he has to catch a 5:30 morning flight Thursday morning.

10   So I think we're going to be okay even if the government rests

11   on Wednesday morning, I still have an opening, and then I think

12   we can get Mr. Eddington on, but I would ask the Court's

13   indulgence if we had to go a little bit later just to get him

14   done and out because he has got to catch that 5:30 flight.

15           THE COURT:  Which --

16           MR. LAVINE:  On Wednesday night if it's necessary,

17   which I don't know if it will be.

18           THE COURT:  Let me ask you a rhetorical question,

19   Mr. Lavine.  What time does the first game of the Stanley Cup

20   finals start?

21           MR. KORNFELD:  6:00 p.m., Your Honor.

22           THE COURT:  Thank you, Mr. Kornfeld.  A Denver person

23   would know.

24           MR. LAVINE:  We did discuss that this week, and we did

25   not come to any conclusions.

1           THE COURT:  I have no idea whether the jury are hockey

2    fans, but that could loom in the minds of some of them.  Yeah,

3    I think that -- I don't know what the schedule -- what does the

4    government anticipate in terms of when it may rest?  I am a

5    little word worried about that schedule.

6           MR. HART:  The government -- well, it depends on the

7    crosses, but as of right now, it will be sometime either late

8    tomorrow or early Wednesday.

9           THE COURT:  Okay.  So we might be okay.  But, yeah,

10   let's try to work him in.  I mean, you know, I can't remember,

11   where does Mr. Eddington live?

12          MR. LAVINE:  From Atlanta, but he is not going back to

13   Atlanta.  He is going somewhere else on Thursday morning.

14          THE COURT:  On Thursday morning?  We will play that by

15   ear, but remind me we might want to compress the lunch hour,

16   something of that nature, just to avoid -- going past

17   5:00 might be okay, but I am worried some of the jurors may be

18   quite anxious to get home on a Wednesday for the reason I

19   mentioned.

20          MR. LAVINE:  We should be able to assess it on

21   Wednesday morning once we determine when the government is

22   going to rest.

23          THE COURT:  Yeah.

24          MR. LAVINE:  The other issue I want to raise for the

25   Court is Thursday.  We have had a difficult time because of

1    surgeries and spousal surgeries in getting people in here.  And

2    if -- depending on what happens with the government's case, if

3    we remove quite a bit of those people from the list, we are not

4    going to be able to fill the entire Thursday.  We may be able

5    to do the morning, we are going to have empty spots on

6    Thursday, because everything else will have been pushed from

7    the 27th to about the 29th or 30th at the latest, and I think

8    we probably will be resting at that point in time.

9         THE COURT:  On when?

10        MR. LAVINE:  On the 29th or 30th.

11        THE COURT:  Here is what I suggest in that regard.

12   Let's talk about that once the defendants have an opportunity

13   to reassess after the government rests.  The jury I don't think

14   will mind having a shortened day on Thursday if they know that

15   that does not mean that they are going to be here, you know,

16   deep into July, so if they have a sense that, oh, actually

17   things are moving quickly and the fact that we're not here,

18   say, Thursday afternoon is not going to extend our stay on the

19   trial.  So if anything, they will probably be happy about that.

20   That would not be a problem in my mind.

21        Any reaction to the government from that?

22        MR. HART:  Well, Your Honor, obviously we find that a

23   little bit problematic since we have always for about a month

24   now telegraphed that we expect to rest prior, and the defense

25   witness list was very broad, and it seemed to suggest that they

1    had lots of witnesses, so it's -- we find it problematic, but

2    that's sort of where we are.

3              THE COURT:  Yeah.  I am trusting Mr. Lavine.  I have

4    no reason not to.  There are some -- of course the defendants

5    have a little bit more of scheduling issues because it's

6    somewhat of a moving target when they are going to be on, and

7    if there are some personal issues or things getting in the way,

8    then I am not going to, you know, try to cause a great

9    disruption if we, you know, have that assurance that in reality

10   things are going quickly, and it's not going to extend things

11   unduly.

12             MR. LAVINE:  Thank you, Your Honor.

13             THE COURT:  So we will talk about that as soon as the

14   defendants get a sense of what the witness list more

15   realistically looks like.

16             Anything else that we should talk about tonight?

17             MR. HART:  Nothing from the government, Your Honor.

18             THE COURT:  We will look for an e-mail that may

19   suggest we may need to meet at 8:15.  Otherwise, we will

20   reconvene tomorrow at 8:30.  Thank you.

21        (Recess at 5:22 p.m.)

22

23

24

25

1                                    INDEX

2     WITNESSES

3        Robert Bryant

4            Cross-Examination Continued By Mr. Beller        692

5            Cross-examination By Mr. Fagg                    816

6            Cross-examination By Mr. Feldberg                833

7            Cross-examination By Mr. Tubach                  857

8            Redirect Examination By Mr. Torzilli             882

9            Recross-examination By Mr. Beller                945

10                                   EXHIBITS

11    Exhibit        Offered  Received  Refused  Reserved  Withdrawn

12    J-081                    837

13    90-10                    839

14    1237                     840

15    1729                     921

16    10120                    941

17                           REPORTER'S CERTIFICATE

18        I certify that the foregoing is a correct transcript from

19    the record of proceedings in the above-entitled matter.  Dated

20    at Denver, Colorado, this 13th day of June, 2022.

21

22                                   S/Janet M. Coppock

23

24

25