1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3   In Re: Penn III

4   UNITED STATES OF AMERICA,

5       Plaintiff,

6   vs.

7   JAYSON JEFFREY PENN,
    MIKELL REEVE FRIES,
8   SCOTT JAMES BRADY,
    ROGER BORN AUSTIN,
9   WILLIAM WADE LOVETTE,

10      Defendants.
    _____

11
                    REPORTER'S TRANSCRIPT
12                  Trial to Jury, Vol. 10
    _____

13

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:16 a.m., on the 28th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Therese Lindblom, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2105

APPEARANCES

1
2        Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel
3   Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,
4   Washington, DC 20530, appearing for Plaintiff.
5        Anna Tryon Pletcher and Michael Tubach of
6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
7   San Francisco, CA 94111-3823;
8        Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
9   N.W., Washington, DC 20006, appearing for Defendant Penn.
10        David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13        Bryan B. Lavine and Laura Anne Kuykendall of Troutman
14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite
15   3000, Atlanta, GA 30308;
16        Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,
17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant
18   Brady.
19        Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22        Laura F. Carwile of Reichman, Jorgensen, Lehman,
23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,
24   CA 94065; appearing for Defendant Austin.
25

APPEARANCES (Continued)

1

2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4          John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                        *   *   *   *   *

8                        PROCEEDINGS

9          (In open court at 8:16 a.m.)

10          *THE COURT:*  Thank you.  Please be seated.

11          All right.  We're back on the record in 20-cr-152.

12    The lights are on, the microphones are working, and the jury is

13    not present.  The parties requested meeting early to talk about

14    an issue.  Who wants to talk about that?

15          Mr. Torzilli, go ahead.

16          *MR. TORZILLI:*  Sure.

17          Good morning, Your Honor.  We asked to convene ahead

18    of the jury's arrival time at 8:30 to discuss the defendants'

19    motion to exclude the incremental compensation information for

20    Professor Snyder, and we filed an opposition, short opposition

21    last night.  In essence, frankly, we were initially inclined to

22    agree to the limitation proposed in the motion, provided that

23    the defendants could provide some information -- billing

24    information about what the billings were.  And we learned

25    yesterday that he has billed something in the neighborhood of

1    an incremental $350,000, which was, frankly, extremely

2    surprising to us.

3           THE COURT:  What do you mean by "incremental"?

4           MR. TORZILLI:  As I understand it, since the

5    conclusion of the last trial.  I think at the end of the last

6    trial on cross-examination, he said his total billing, he and

7    his staff, was about a half million dollars.  Now we understand

8    he's up to $850,000.

9           THE COURT:  Okay.  Got it.

10          MR. TORZILLI:  Frankly, we thought it was going to be

11   in the neighborhood of 10, 20, 30, 40, $50,000, which seemed

12   like, at least based upon my experience in these types of

13   cases, a reasonable number to kind of get back up to speed on

14   things.  But with where the incremental billings are, it either

15   seems like he's done substantial additional work that's changed

16   his results, which is very much appropriate fodder for

17   impeachment on cross-examination, or he's done a lot of work

18   that hasn't changed his results, which potentially would be,

19   you know, fodder for appropriate impeachment on

20   cross-examination.  So we oppose -- we oppose the motion.

21          THE COURT:  All right.  Ms. Pletcher, go ahead.

22          MS. PLETCHER:  Thank you, Your Honor.

23          Just to clarify.  The way Professor Snyder gets

24   compensated is not as straightforward as just, he bills for his

25   hours, and he receives the compensation.  As Professor Snyder

1    explained the first time he testified, there are two different

2    components, the direct -- the hourly billing, and he gets an

3    attribution from his team's billings, and those billings come

4    in over time.  The $500,000 that he testified to before is what

5    he had received, and now because of the lag time, he's received

6    the full compensation for work that he had done previously, in

7    addition to some of what he's billed for this current trial.

8            So it's actually quite nuanced and complicated.  And

9    we are very concerned that if we don't have the ability to go

10   into this, to explain the nature of the compensation, then that

11   will really prejudice us, because it will leave this impression

12   that Professor Snyder was billing all of this time and made

13   this inordinate amount of money, but we won't be able to

14   explain the way it actually worked.

15           We understand the Court's ruling about the limitation

16   on discussing three trials, but without being able to get into

17   that --

18           THE COURT:  Why -- let's -- why does that prevent you

19   from being able to explain his compensation?

20           MS. PLETCHER:  The concept of a hearing is not

21   sufficient in our view, because it just diminishes the nature

22   of the work that he needs to do.  Trial requires significant

23   preparation, significant analysis, and it's -- it requires,

24   frankly, quite a bit of preparation because it is such a

25   weighty event, and we want to make sure the jury fully

1    understands that.  And --

2         THE COURT:  Yeah, but why -- I mean, if the question

3    is prejudice, why would you want to educate the jury?  You

4    know, why -- you want to educate the jury on the difference

5    between a trial and a hearing so they can appreciate the

6    prejudice?  That doesn't seem like it would be a very good

7    idea.

8         MS. PLETCHER:  I understand what Your Honor is saying,

9    but this -- if the Government elicits the fact that he received

10   $850,000 in compensation, presumably --

11        THE COURT:  What's his hourly rate?

12        MS. PLETCHER:  $1,400 an hour.

13        THE COURT:  You can't get away from the fact that he

14   charges a fabulous amount of money.  You can't get away from

15   the fact that even up and through the second trial, he earned a

16   fabulous amount of money.  You're never going to get away from

17   that.  Yes, the numbers are going to be even bigger if the

18   Government can get into the third time.

19        But, you know, that sense of equity didn't keep the

20   defendants from drilling Robbie Bryant on all of the different

21   times that he got prepped and had to testify and everything

22   else.  You know, why can't the defendants deal with this, since

23   they didn't feel that, you know, equity caused them not to --

24   to limit their questioning of Robbie Bryant, just up to the

25   second trial?

1          MS. PLETCHER:  I understand that, Your Honor.  We

2     maintain that being able to explain to the jury that this was

3     the -- he prepared for three trials and it's $850,000 was --

4     involved preparation for three trials is the -- is critical to

5     our being able to have a full and fair explanation of the

6     context of his compensation.

7          THE COURT:  Okay.  Thank you, Ms.  Pletcher.

8          MS. PLETCHER:  Thank you.

9          THE COURT:  Mr. Torzilli, anything else?

10          MR. TORZILLI:  Nothing further.

11          THE COURT:  We really have two things going on:  One,

12     we have the defendants' motion, which I'm going to deny.  But

13     we are not going to get into any trials.  There is not going to

14     be any discussion about trials; it's going to be hearings.  The

15     jury just does not appreciate the distinction -- you wouldn't

16     anticipate that they would appreciate the distinction between a

17     hearing and a trial on how much work it's going to take.  I

18     mean, you know, anyone who is going to testify would take that

19     very seriously.  And the jury wouldn't have any basis to, you

20     know, think that you wouldn't spend time to get ready for that.

21          So that disposes of that motion.  I think that that

22     would also, then, take care of the Government's response.  But

23     the Government's response has a built-in motion, which in and

24     of itself is improper, you know, talking about, you know, they

25     want billing records and things of that nature, which there is

 1   zero support for.  Not that the Government can't ask Professor

 2   Snyder about things, not that they can't, you know, explore

 3   those things on cross-examination.  But to the extent that the

 4   Government moves to have access to certain billing records, I'm

 5   going to deny that request as well.

 6          Anything else on that particular issue that we need to

 7   talk about?

 8          *MR. TORZILLI:*  Not from the Government.

 9          *MS. PLETCHER:*  No, Your Honor.

10          *THE COURT:*  Anything else that we need to talk about

11   with the five minutes remaining?

12          Mr. Fagg, go ahead.

13          *MR. FAGG:*  Thanks, Your Honor.  This will be brief.

14          So as we were going through the exhibits that were

15   admitted during the Government's case in chief, there is an

16   underlying exhibit, which is Exhibit 9748, which is the

17   stipulation from the first trial, which is phone numbers and

18   places of employment for any number of individuals, and we

19   noticed in there that it is a -- I'm happy to hand a copy up

20   for the Court, if you would like, or we could pull it up.

21          *THE COURT:*  Yeah, I think it may be -- it's being

22   displayed right now.

23          *MR. FAGG:*  The issue here I think is fairly

24   straightforward.  Lists all ten defendants.  In the caption,

25   the text of the --

1        THE COURT:  All right.

2        MR. FAGG:  -- language also references ten defendants.

3   We talked to the Government and are proposing a redacted

4   version of this that would substitute in place of 9748.

5        THE COURT:  Well, it would strike me as odd to redact

6   it.  It should just be rewritten and substituted.

7        MR. FAGG:  We talked about this with the Government.

8   We understand that, Your Honor.  So 9748 is then relied upon in

9   Government Exhibit -- summary Exhibit 90-10, and then 90-10 is

10  then cross referenced to --

11       THE COURT:  90-10 -- the documents that are -- the

12  exhibit that relies upon 9748 relies on some of the information

13  about other now-dismissed defendants.

14       MR. FAGG:  No, I think the issue, Your Honor, is that

15  9748 serves as the basis for another -- a Government's summary

16  exhibit, which is 90-10.  And so 90-10 relies on 9748, and then

17  in turn, 90-10 serves as the basis for and cited in virtually

18  all of the Government's summary charts.

19       That is actually what we had discussed with the

20  Government, and I think they fairly pointed out the burden that

21  would be on them if we were to actually create a new exhibit.

22  They'd have to revise all of the summary exhibits which have

23  been displayed to the jury, which is why we're proposing just

24  to submit a redacted version of 9748.

25       THE COURT:  What does the Government think of that

1    solution?  Ms. Wulff.

2         *MS. WULFF:*  Yes.  Good morning, Your Honor.  We did

3    talk about this with Mr. Fagg last night.  We -- the Government

4    is amenable to either the redacted version of 9748 or we would

5    be happy to create a new -- I mean, containing the same

6    substance, but visually presented differently, that would still

7    be called 9748, whatever the Court's preference is.  And I

8    think we would both -- I can't, of course, speak for the

9    defendants, but I think both parties would defer to whatever

10   the Court's preference is in terms of whether it's redacted

11   or --

12        *THE COURT:*  It doesn't matter to me.

13        *MS. WULFF:*  Okay.

14        *THE COURT:*  Whatever the parties want to do is fine.

15   If the redacted 9748 works, that seems like the easiest,

16   less -- why go through extra brain damage to create something

17   new.

18        *MS. WULFF:*  I think we're mindful of the fact that the

19   Court has been -- that there is consideration given to the

20   extent that an exhibit was used in prior trials, not keeping

21   the same exhibit number but then changing the exhibit, but

22   that's why we wanted -- as long as we wanted to keep the same

23   exhibit number, that's why we wanted to redact it rather than

24   change it, because we felt like that was consistent with what

25   the Court had --

1    *THE COURT:*  I think that is a good point, and you're

2    right, it would then create an inconsistency with the same

3    number.  So the redaction, I think, makes sense.

4         *MS. WULFF:*  Okay.  Thank you.

5         Just to clarify, 9748 has not been shown to the jury.

6    Obviously, we would have caught that.

7         *THE COURT:*  We would have caught that.

8         Anything further?

9         *MR. FAGG:*  Just one other point.  Since we're making a

10   change to an exhibit after the Government has rested its case,

11   we've asked the Government to agree that the change to that

12   exhibit doesn't in any way impact or prejudice the defendants'

13   rights under Rule 29, and they've agreed to that.  And so I

14   just wanted to -- we don't believe that that creates any issue,

15   but just wanted to raise it with the Court.

16        *THE COURT:*  Is that right, Ms. Wulff?

17        *MS. WULFF:*  That's correct.  We don't believe it would

18   create an issue, and we view this as a housekeeping matter

19   related to preparing the exhibits for submission to the jury

20   rather than some other sort of issue.

21        *THE COURT:*  I think that is exactly right.

22        *MS. WULFF:*  Thank you, Your Honor.

23        *THE COURT:*  Thank you.

24        Anyone want to have a brief recess before we bring the

25   jury back in, or is everyone good?

KENT KRONAUGE – Direct

1          I take silence as consent in this case, so why don't

2    we go ahead and bring the jury in.

3          MR. KORNFELD:  Mr. Kronauge is our next witness.

4    Should I get him?

5          THE COURT:  I think it's a bit more efficient to bring

6    him in.

7          (Jury in at 8:31 a.m.)

8          THE COURT:  Thank you.  Please be seated.

9          Good morning, ladies and gentlemen.  We've got power,

10   so we've got microphones, so we'll keep our fingers crossed and

11   proceed.  So we finished with the witness, and now defense may

12   call another witness.

13         MR. KORNFELD:  Thank you, Your Honor.

14         Mr. Fries called Kent Kronauge.

15         THE COURT:  Mr. Kronauge, ladies and gentlemen, is

16   already in the courtroom and will take the oath at this time.

17              (**KENT KRONAUGE, DEFENDANTS' WITNESS, SWORN**)

18         COURTROOM DEPUTY:  Please be seated.

19         Please state your name and spell your first and last

20   name for the record.

21         THE WITNESS:  Kent Kronauge, K-E-N-T, K-R-O-N-A-U-G-E.

22         THE COURT:  Mr. Kornfeld, go ahead.

23                        **DIRECT EXAMINATION**

24   BY MR. KORNFELD:

25   Q.  Good morning, Mr. Kronauge.  Where do you currently work?

KENT KRONAUGE – Direct

1  A.  At SMS, Supply Management Systems –– Services.  I'm sorry.

2  Q.  And what is SMS?

3  A.  We are the buying co-op for Popeyes.

4  Q.  When you say a "buying co-op," can you just briefly

5  describe what that means?

6  A.  Yes.  So we're responsible for any goods and distribution

7  to all the Popeyes restaurants across the United States.

8  Q.  And does that include purchasing of broiler chicken

9  products?

10  A.  It does.

11  Q.  And what kind of broiler chicken products does SMS purchase

12  for Popeyes?

13  A.  We have a bone-in chicken, which is a small-bird product,

14  that's fresh chickens to the restaurants.  We also have a

15  chicken fillet, chicken strips, and chicken nuggets.

16  Q.  Would you mind maybe just moving the microphone a little

17  bit closer.  Now that we have microphones today, I want to make

18  sure everyone hears you.

19  A.  Sure.

20  Q.  How long have you –– how long have you worked at SMS?

21  A.  Since 2000 –– I've been there about 12 years now.

22  Q.  2008-ish?

23  A.  "Ish," yeah.

24  Q.  And I may have neglected to ask you the type of broiler

25  chicken products that SMS purchases for Popeyes.

KENT KRONAUGE – Direct

1    A.   The type of chicken products we purchase, bone-in chicken,

2    fresh bone-in chicken.  We purchase fillets for the sandwiches,

3    strips, and nuggets.

4    Q.   Are you familiar with what are known as small birds?

5    A.   Correct.

6    Q.   Does Popeyes purchase small birds or larger birds?

7    A.   All our bone-in chicken is small birds.

8    Q.   Okay.  Thank you.  And your current job title at SMS?

9    A.   I'm currently the president.

10   Q.   When did you become president?

11   A.   Roughly 2015.

12   Q.   Can you briefly describe your responsibilities as president

13   of SMS.

14   A.   So I'm responsible for all the activities in our

15   organization, you know, for the distribution and, ultimately,

16   the procurement of all products.  But I also have a dual role

17   in that I'm responsible for all the protein procurement at SMS.

18   I've had that since I started and continue that today.

19   Q.   And when you say "protein procurement," is that a fancy way

20   of saying buying chicken?

21   A.   Well, I buy chicken.  It also include seafood; but, yes,

22   all the chicken products.

23   Q.   Okay.  Thank you.

24        Did you hold any other job titles at SMS before you

25   were president?

KENT KRONAUGE – Direct

1  A.  I was -- initially was different titles, but basically what

2  I did is buy the chicken.

3  Q.  Okay.

4  A.  So I was the director of procurement and then COO at one

5  time, and then the CEO, so --

6  Q.  And I'm assuming -- but please correct me if I'm wrong --

7  that in terms of buying the chicken, those responsibilities

8  didn't change as your titles changed?

9  A.  Not at all, as far as the chicken piece of this.

10  Q.  Okay.  Is it fair to say that if someone wanted to know

11  anything related to how Popeyes buys chicken, you would be the

12  go-to person?

13  A.  I would probably be the only person in the organization or

14  Popeyes that would be able to answer those questions.

15  Q.  Okay.  Have you worked anywhere else besides SMS related to

16  the chicken industry?

17  A.  Yes.  For 20 years I worked for Gold Kist, which was a

18  chicken producer.  They got bought by Pilgrim's Pride.  I

19  worked for Pilgrim's for about a year, and then I went to work

20  for SMS.

21  Q.  And at Gold Kist -- now, they're a supplier, right?

22  A.  Yes.

23  Q.  And Pilgrim's Pride is also a supplier?

24  A.  Right.  Pilgrim's acquired Gold Kist.

25  Q.  Okay.  And at Gold Kist, what was your title before you

KENT KRONAUGE – Direct

1    left?

2    A.   I was the director of big-bird operations.  I was

3    responsible for the sales of all of our big-bird facilities.

4    Q.   Okay.  As director of big-bird sales on the supplier side,

5    did you gain experience negotiating contracts?

6    A.   I did.

7    Q.   Can you briefly describe that experience?

8    A.   Well, I mean, throughout my Gold Kist career, I worked in

9    small birds, big birds, some retail.  But in all of those

10   facets, you know, we negotiated prices yearly and dealt with

11   multiple companies securing contracts throughout the year.

12   Q.   So if my math is right, would it be fair to say you've had

13   about 21 years of experience negotiating chicken contracts on

14   the supplier side?

15   A.   That's correct.

16   Q.   And about 15 years negotiating chicken contracts on the

17   customer side?

18   A.   That's correct.

19   Q.   Okay.  If someone wanted to know about the differences

20   between negotiating on the customer side versus the supplier

21   side, would it be fair to say that you would be able to offer a

22   lot of insight on that process?

23   A.   I believe I could, yes.

24   Q.   Okay.  Approximately how much chicken on the bone does SMS

25   purchase through the contracts it negotiates with suppliers on

KENT KRONAUGE – Direct

1   behalf of Popeyes?

2   A.  We've been around 300 million pounds a year of chicken on

3   the bone, small-bird chicken on the bone.

4   Q.  Does Popeyes solely purchase small-bird product?

5   A.  That's correct.

6   Q.  Okay.  Do you consider SMS to be a large purchaser of small

7   birds?

8   A.  Yes.

9   Q.  What other customers does Popeyes compete with over the

10  purchase of small birds?

11  A.  Over the purchase of bone-in small birds, basically

12  Bojangles, KFC, Church's, any other grocery store that may be

13  in our price range -- I'm sorry -- our size range, and any, you

14  know, gas station type eight-piece program, as well.

15  Q.  How frequently does SMS negotiate contracts with its

16  suppliers?

17  A.  It varies, depending on the -- we basically negotiate every

18  year.  We, for the most part, do a one-year deal.  There is a

19  few years that we've done a two-year deal, if I feel like the

20  market is advantageous for us to do that.

21  Q.  Okay.  How many suppliers typically does Popeyes or SMS

22  purchase from?

23  A.  We typically use from everybody that's in the small-bird,

24  bone-in business, so, you know, it's somewhere around that

25  ten -- ten supplier mark for small-bird, bone-in.

KENT KRONAUGE – Direct

1   Q.   Does that include Pilgrim's Pride?

2   A.   It does.

3   Q.   And Claxton?

4   A.   Correct.

5   Q.   I want to talk to you a little bit generally about your

6   negotiation process.  Can you describe for the jury your

7   specific role in negotiating contracts on behalf of Popeyes'

8   franchisees?

9   A.   Basically, we're trying to secure enough volume for our

10  system at a competitively priced product in making sure that

11  restaurants that -- you know, Popeyes is in trouble if they

12  don't have chicken to serve.  That's our main objective, is to

13  make sure we've got chicken to serve the stores -- the stores

14  to serve the customer.

15  Q.   You're personally involved in those negotiations?

16  A.   All of them.

17  Q.   Okay.  Do you have a process for initiating negotiations

18  with the suppliers?

19  A.   Yes.  Usually I'll send out just a blanket email saying

20  we're going to, you know, start the negotiations, please submit

21  to me your bid by X period.  I usually have several phone

22  conversations with all of the processors in between that time.

23  Q.   And based on your years of experience on both the supplier

24  side and the customer side, is it fair to say that your

25  negotiation process for Popeyes is less formal than it is for

KENT KRONAUGE – Direct

 1   other quick-service restaurants?

 2   A.   I'd say I was very non- –– I'm not formal at all.

 3   Q.   Okay.  And you touched on this, but you generally kick off

 4   the process with an email?

 5   A.   Usually, yes.

 6   Q.   And do you do anything to prevent other suppliers from

 7   learning who else you're emailing, who else is bidding?

 8   A.   Not really.  I mean, if you're in the small-bird business,

 9   you know who is all bidding on our business, so it's all the

10   suppliers.  They all know it.  I don't try to hide that.

11   Q.   It's not a secret in your experience?

12   A.   Not at all.

13   Q.   In what format do you ask suppliers –– is your email

14   effectively an RFP, request for proposal?

15   A.   It is.

16   Q.   In what format do you ask suppliers to respond?

17   A.   Usually I'll send out our cost-plus agreement or ask them

18   to send back the cost-plus agreement with any changes.

19   Q.   Okay.  After you get that response, generally, how do the

20   negotiations proceed?

21   A.   Depending on where we are or what we have in mind, we may

22   go back and forth on certain components of the cost-plus or,

23   basically, all I really care about is the bottom line.  If one

24   company's got a particular thing they've got a goal to

25   increase, whatever, if they can still reduce the bottom line, I

1733

KENT KRONAUGE – Direct

1    don't care -- I'm leaning on the pieces of the cost-plus, all

2    I'm trying to do is get a better bottom line.

3    Q.  When you say "bottom line," meaning price per pound?

4    A.  Correct.

5    Q.  Okay.  During your negotiations with the suppliers, what

6    are the suppliers competing for with Popeyes?

7    A.  Usually volume that best fits that particular supplier.

8    You know, some suppliers may have a lot of pounds they're

9    trying to acquire.  You know, other suppliers may be at

10   capacity.  So it depends on the year, and it changes yearly,

11   based on what they've lost throughout the year or what they may

12   have to sell.  So it's usually volume.

13   Q.  And is it a winner-take-all kind of negotiation?

14   A.  I try not to be.  It -- you know, it doesn't do us any good

15   to win all of the time and drive these guys out of the

16   small-bird arena.  We try to make it a win-win.

17   Q.  In terms of the suppliers, would it be -- even be possible

18   for one supplier to get all of Popeyes' business?

19   A.  They can't, no, it's not.  We've got a small part of the

20   bell curve on that small-bird piece, which means we have about

21   20 percent of those birds available to us.  There is not one

22   supplier that can handle all of our business.

23   Q.  Is it your sense that Popeyes' size gives it -- gives you

24   or Popeyes some leverage in the negotiation with the suppliers?

25   A.  I think the amount of volume we pull does.  Our size is

1734

KENT KRONAUGE – Direct

 1   probably a little bit of a disadvantage to us.  You know,

 2   they -- all of those suppliers want to grow a little bit bigger

 3   bird.  We're on the bottom side of that bird, but we do carry

 4   enough volume.  It works strategically for them to supply us,

 5   KFC, and Church's, because we do pull out of the bell curve.

 6   We do have a large chunk of those birds on the bottom half of

 7   that.

 8   Q.  Okay.  The jury has seen the bell curve.  So when you were

 9   talking about a large chunk of the birds on the bottom half,

10   what are you referring to?

11   A.  Just when they're running a standard live weight, the

12   amount of birds that are going to fall within our weight range,

13   we can pull that bottom half of that bell curve for them, and

14   they have a home for all of those birds if they're running, you

15   know, a 3.85 live weight, whatever it may be.  We can capture a

16   good bit of those birds on the back half of the bell curve.

17   Q.  Okay.  That's based on -- that's a chunk of the birds

18   within a certain weight range on the curve?

19   A.  Correct.

20   Q.  You mentioned the cost-plus model a little bit earlier, and

21   the jury has heard a bit about that.  You mentioned during the

22   negotiation process that you're looking at the current

23   cost-plus model, and are you also looking at the new model that

24   you're negotiating over for the next year, as -- it was a lousy

25   question.

1735

KENT KRONAUGE - Direct

1   A.  Well, I mean, the cost-plus model doesn't change.

2   Components of the cost-plus model will change.  During the

3   year, the cost-plus stays the same I think is what you're

4   asking.

5   Q.  Yes.

6   A.  I may be looking next year at which direction it could go.

7   I mean, generally over my course of time at Popeyes, it's been

8   a win for Popeyes as we've gone -- you know, been able to eat

9   away at pieces of the cost-plus.  There are certain years where

10  I know that there is a change coming and that, you know, it may

11  go the other way.  So --

12  Q.  So if I'm understanding your testimony -- which I think was

13  a lot more clear than my question -- is it fair to say you're

14  comparing maybe some of the inputs on the current -- the

15  current cost-plus and the proposed next year's model?

16          MR. HART:  Objection.  Leading.

17          THE COURT:  Overruled.

18          THE WITNESS:  I do look at certain pieces.  I can tell

19  you this year, you know, with where labor has gone and

20  everything else, we knew we were going to take labor hits.

21  Packaging we knew was up.  Those components I knew we were

22  going to have increase in pricing based on how the market is

23  and, you know, what it was driving into this year.

24          Every year, yes, we look at those things we know are

25  factors throughout the year and what it will do to our

KENT KRONAUGE - Direct

1  cost-plus in the negotiation period.

2  *BY MR. KORNFELD:*

3  *Q.* And when you say you know that some, for instance, labor,

4  some of the factors are going to change, your knowledge is

5  based on what?

6  *A.* Several things. So for the chicken side of it, I -- you

7  know, I was fortunate enough to work in the industry for

8  21 years, so I have friends at multiple plants, a lot of them

9  that I don't even use for our mix, so I can -- I can gauge what

10  big birds are doing, based on guys that used to work with me.

11  You know, they don't have a -- any reason to sway me one way or

12  the other; they're not getting any part of my business. So I

13  get a good gauge on the industry based on what they're telling

14  me.

15      I go to, you know, the NCC. I try to go to EMI and

16  just industry events. And, then, of course, I've got a pool of

17  ten or twelve suppliers that I currently use that I can

18  independently try to gauge where the market -- you know, see

19  what is going to happen.

20  *Q.* You mentioned NCC. What is that?

21  *A.* National Chicken Council. So they have a -- they used to

22  have -- it's under a different format now, but it was a yearly

23  meeting where they, you know, would talk about state of the

24  industry and different -- how to market, things like that.

25  But, you know, it was a good time to pull some of that

KENT KRONAUGE - Direct

1    knowledge.

2    Q.  And you mentioned EMI.  What is EMI?

3    A.  It's another industry event where they just basically talk

4    about the direction or -- used to talk a lot more about, you

5    know, where markets were and where they thought the industry

6    was, you know, in segments, as far as small bird, big bird,

7    things like that.  It was a good gauge for me to check on that.

8    Q.  Going into these negotiations, is it important for you to

9    be aware, you know, of the types of changes, be it labor, fuel

10   cost, whatever, economic factors that might be relevant to your

11   negotiations?

12   A.  Yes.

13   Q.  At the risk of asking the obvious, why?

14   A.  Well, just so I understood what was coming at me.  You

15   know, in some of the years where I know the headwinds were

16   changing, so to speak, I get in front of the Popeyes community

17   and let them know, look, we're going to be taking an increase

18   this year, let them know it wasn't going to be going the other

19   way, ready the brand, ready myself, and try to lessen the cost

20   of the system, so --

21   Q.  Can you be in your experience an effective negotiator on

22   either side, supplier or customer, if you don't take current

23   economic factors into account?

24   A.  I would not think so, no.

25   Q.  Going back to the cost-plus model, roughly how many

KENT KRONAUGE – Direct

1   different components are in the Popeyes cost-plus model?

2   A.  Roughly, 20.

3   Q.  Okay.  And does this allow this to get your eyes on all of

4   the supplier components each year, when you're negotiating?

5   A.  It does.  And I need to clarify that.  So there is 20 on

6   the actual page list and -- roughly 20, and probably 9 or 10 on

7   the back half for the feed component.  All combined, there is

8   probably 30, you know, when you're looking at it.  But, yes,

9   all of those components factor into what the cost-plus yields.

10  Q.  And given your experience with the cost-plus models, would

11  you say that the model offers a level of transparency?

12  A.  It does.

13           MR. HART:  Objection.  Leading.

14           THE COURT:  Sustained.

15  BY MR. KORNFELD:

16  Q.  Let me ask you, from your perspective -- let's start with

17  the customers, your current role.  Is the cost-plus model

18  beneficial to you while -- as a customer?

19           MR. HART:  Objection.  Leading.

20           THE COURT:  Overruled.

21           THE WITNESS:  It's very good for me.  I mean,

22  basically, I'm able to lay out the system's cost-plussed -- I

23  mean, I do it monthly, so I use it to go against everybody's

24  costs, see where things are turning.  Even though that

25  cost-plus is negotiated for the year, someone may have a yield

KENT KRONAUGE – Direct

1    figure or something that is constantly getting them out of

2    whack during the year.  I may even get to a slight adjustment

3    somewhere just to keep everybody -- it's our advantage to have

4    them all be as close as possible on that bone-in contract, you

5    know, so --

6    *BY MR. KORNFELD:*

7    *Q.*  Outside of what you just testified to, do you have

8    knowledge as to why Popeyes uses the cost-plus model?  Are

9    there additional reasons?

10   *A.*  Well, it started before I came to Popeyes, and I was on the

11   supplier side, but I was initially brought in to basically keep

12   the small-bird arena whole.  So we were having trouble

13   competing with the retail side and the big-bird side from the

14   supplier side.  The small-bird side of this would get hit hard.

15   If everything was fixed, corn elevated like it had this past

16   year, soybean meal, then the suppliers were on a fixed -- you

17   know, they're pulling in -- their input costs are exceeding

18   what their output costs are.  And it's easier for them to make

19   money on, you know, a lot of meat on a shackle if they're

20   running an 8-pound bird versus a 3.85 or 3.95.  So the

21   cost-plus was put in there to keep the small-bird side

22   relevant.  And, obviously, we want as many suppliers in that

23   arena as possible, so it was basically put in help keep -- like

24   I said earlier, have a win-win for both the suppliers and the

25   QSRs to buy that product.

1740

KENT KRONAUGE – Direct

1    Q.  Do your decades of experience as a supplier and a purchaser

2    help you evaluate the proposals and cost models that you

3    receive every year?

4    A.  Yes.

5    Q.  How so?

6    A.  I don't have any -- I mean, trying to explain some of the

7    cost models and input costs and what it does to someone that

8    doesn't understand chicken sometimes doesn't ever happen.  So,

9    I mean, it's -- I'm able to understand what the suppliers are

10   talking about, I'm able to understand where the industry is

11   going or where I think I can get an advantage from them as

12   well, so --

13   Q.  So I want to talk a little bit more about the negotiation

14   process.  So after you review the suppliers' current and new

15   cost-plus models, what's the next step in the negotiation

16   process?

17   A.  Usually I try to find the -- you know, the agreement area,

18   wherever -- where I'm trying to get to on the negotiation based

19   on some of the feedback I received or preconceived going into

20   the negotiation, and then I usually start calling the guys and

21   try to get them down before they submit a bid or resubmit a

22   bid.

23        You know, after I get one proposal, we'll go back at

24   it, and we'll talk about where we need to be, or I may say,

25   This is where we're going to be.  On some occasions, I may go

KENT KRONAUGE – Direct

1  back and say, We're going to be at X, and I need everybody to

2  be here.   It depends on the year and where the -- it changes

3  yearly.

4  Q.   And is it common for suppliers to ask you if they're within

5  the range you expect or want them to be?

6  A.   Yes.

7  Q.   And is it common also sometimes for you to tell them, Hey,

8  you're out -- you're outside my range, or you're not in the

9  ballpark?

10  A.   Yes, more so than the other, but, yes.

11  Q.   And these communications that I think you referred to it as

12  feedback, are these oral, written?   How do you go about this?

13  A.   It's all over the board.   But I tend to operate a lot more

14  just picking up the phone and calling somebody than I'm back

15  and forth with emails, but there is times too if I'm out of the

16  office, we may email back and forth, but usually it's verbal.

17  Q.   And you talked about -- and we talked about a range.   When

18  you're given feedback, why do you even care about a range, as

19  opposed to just a bunch of different prices?

20  A.   Well, I mean, I want to get the -- I mean, it would be

21  great if I had just one particular price every time.   But, you

22  know, it -- it's hard to get everybody on exactly the same

23  page.   But what I try to do is keep it as tight as possible,

24  because I have 450 franchisees.   And if someone is buying

25  something at 10 cents more than everybody else, you know, they

KENT KRONAUGE - Direct

1    think I'm playing favoritism and everything else.  So it's

2    advantageous for me to get the price component along with

3    weights to be -- we buy by the pound, sell by the piece.  So I

4    want that piece weight -- piece cost to be as close as I can

5    for the system.

6          So I may even want somebody to have a little bit

7    different price if I know they're a heavier producer.  Some

8    people run on the heavier side, some on the lighter side of my

9    weight, so it's -- I'm trying to get to a piece cost that is

10   fair and across the board for the most part even to the system.

11   *Q.*  And when you say "fair," fair to the hundreds of

12   franchisees that Popeyes has?

13   *A.*  Correct.

14   *Q.*  Is bluffing during some of these informal discussions, is

15   bluffing a strategy you've used to negotiate prices with

16   suppliers?

17   *A.*  It is.

18   *Q.*  And is there anything in your experience unusual with

19   bluffing going on either side?

20   *A.*  No.

21   *Q.*  And in your experience, on the supply side, also as a

22   buyer, do you believe that the suppliers also bluff?

23   *A.*  Yes.

24   *Q.*  And do you find that -- that at times to be an effective

25   strategy to help get you where you want to be?

KENT KRONAUGE – Direct

1  *A.*  For me, it's harder for them to bluff because I've got a

2  lot of -- you know, I've got 10 or 12 people I can go to and

3  reconfirm or, you know, find out what the number is.  But --

4  and I've got a few confidants in the industry that I -- you

5  know, that I can call that are -- pretty much shoot me

6  straight, so...

7  *Q.*  I want to talk to you a little bit about some other

8  business strategies you've used in your negotiations and some

9  of the day-to-day interactions that you have with chicken

10  suppliers.  We touched a moment ago on the type of feedback you

11  provide suppliers during negotiations, but I'm wondering if you

12  provide suppliers feedback at other times of the year when

13  you're not actively negotiating a contract.

14  *A.*  Yes.  If -- like I said, it's to try to get to that

15  piece-count cost, so if weights get out of range -- we let the

16  suppliers run their weights for a quarter.  We use that

17  combined weight for the next quarter.  If they've been running

18  heavy and I'm trying to get them in line, I'll say they're too

19  heavy based on what their price is.  Like I said, if there is a

20  component of the cost-plus that may be on the back half, those

21  ten components I was talking about, get their weight out of

22  range or -- I'm sorry -- their chick cost out of whack, I'll

23  try to bring them in.

24          Usually every year, I have one or two suppliers that

25  will negotiate -- not negotiate -- try to sway to get something

KENT KRONAUGE – Direct

1    back in line.

2    Q.  So I want to unpack that a little bit.  If I understand

3    your testimony correctly, I think -- please correct me if I'm

4    wrong -- I think what you're saying is you may have a contract

5    in place, but because of the -- some of the various components

6    of the -- of the cost factors, to use your words, the price or

7    the weight could get out of whack, correct?

8    A.  Correct.  So we'll try to keep those in line, and, you

9    know -- I may go at supplier X and just say, Hey, your weights

10   are getting too big; you're out of whack compared to the

11   system; we need you to be a pound less in your cost-plus for

12   next quarter and things like that.

13   Q.  Have you ever tried to get a price concession in the middle

14   of a contract year?

15   A.  I did.  In our -- in 2015, we went -- I wanted everybody --

16   and tried to get a 2-cent-a-pound discount, which we were able

17   to get from the suppliers, and pass that along to the

18   franchisees.  Now I put it in the contract, so we do one month

19   a year where we do that discount.

20   Q.  And I'll ask you a little bit more about that in a minute.

21          But in order to -- if you're trying to get different

22   suppliers to come down, are you -- what type of communications

23   are you having with those suppliers?

24   A.  Well, in this particular instance, I called a couple of

25   suppliers, got them onboard, and then put it out there to try

KENT KRONAUGE - Direct

1    to get everybody onboard.  You always have one or two companies

2    that don't want to do it.  We had an agreement in place, and

3    they didn't want to come off their agreement to give us a

4    discount, but eventually I was able to get everybody to give us

5    the discount.

6    Q.  And in that process, are you sharing information with one

7    supplier about what other suppliers are doing regarding their

8    costs?

9    A.  Once I got them committed, yes.

10   Q.  Okay.  Let's walk through just a couple of emails to give

11   the jury an idea how the strategy works in practice.

12        MR. KORNFELD:  If we could please show Mr. Kronauge

13   Defense Exhibit A-304, and that -- if you could show it to the

14   parties and the Court and Mr. Kronauge.

15   BY MR. KORNFELD:

16   Q.  Do you have that in front of you on the monitor?

17   A.  I do.

18   Q.  Okay.  I've got a paper copy.  If for some reason you want

19   to do it the old-fashioned way, let me know.

20        Do you recognize the document?

21   A.  Yes.

22   Q.  And what is it?

23   A.  It looks like I sent something to Scott at Claxton and just

24   was trying to get them down -- it looks like I'm probably

25   telling them their weight, along with their prices, putting

KENT KRONAUGE – Direct

1  them out of whack compared to the system.

2  Q.  Okay.  What's the date of the email?

3  A.  May 1, 2015.

4  Q.  When you said Scott at Claxton, are you referring to

5  Mr. Brady?

6  A.  Yes.

7       MR. KORNFELD:  Your Honor, at this time, I would move

8  to admit and publish it.  The -- this exhibit, Your Honor, has

9  been redacted through prior agreement of the parties.

10      THE COURT:  All right.  Any objection to the admission

11 of A-304?

12      MR. HART:  No objection, Your Honor.

13      THE COURT:  Okay.  A-304 as redacted will be admitted.

14      (Exhibit A-304 admitted.)

15      MR. KORNFELD:  May we publish it, please?

16      THE COURT:  You may.

17 BY MR. KORNFELD:

18 Q.  Mr. Kronauge, now the jury can see the same exhibit.  Why

19 did you send this email to Mr. Brady?

20 A.  It -- I don't recall exactly, but it looks like I was

21 trying to get them down on either price or weight.  I would say

22 probably weight, based on what it's highlighted there.  And

23 just looking at the email, looks like they were higher than

24 everybody else on their weight.

25 Q.  So on the bullet points, those are different weights and

KENT KRONAUGE – Direct

1  different prices?

2  A.  It's different price than weight for each of the suppliers.

3  Q.  Okay.  So at the end of each bullet point there is a

4  letter.  What do those letters represent?

5  A.  T for Tyson, P for Pilgrim's, G for George's, K for Koch, C

6  would be Case, and M would be Mar-Jac.

7  Q.  Was it sometimes your practice to send suppliers pricing

8  information to get, in this example, Claxton to come down,

9  whether it's weight or price?

10  A.  It just depends.  If there was a -- you know, an agreement

11  to just do it, we may have had some back and forth as -- I'm

12  saying, Hey, look, you can check and see you're out of whack,

13  but I don't remember the steps around this, so --

14  Q.  Sure.  When you sent this email, based on your years of

15  experience, how many years have you negotiated with Claxton,

16  roughly?

17  A.  Since I started with Gold -- started with SMS, so I've been

18  negotiating with them for -- what is that -- 14, 15 years.

19  Q.  Okay.  Who do you typically negotiate with at Claxton?

20  A.  Typically, Scott.

21  Q.  Okay.  And based on your years of experience negotiating

22  with Claxton, did you have an expectation as to what Mr. Brady

23  would do, if anything, with this pricing information in the

24  email?

25  A.  Typically, he'd get with the plant and, you know --

KENT KRONAUGE - Direct

1   Claxton's real good about adjusting to the system -- you know,

2   if we needed to make them -- they don't want to be higher than

3   everybody else or lower than -- you know, they're comfortable

4   being in the middle.  They do a lot of extra stuff for us at

5   Popeyes, so we try to accommodate them and keep them -- you

6   know, like I said, a win-win for both of us.

7   Q.  Do you recall whether Claxton lowered the price or the

8   weight in this instance?

9   A.  To be honest, I don't.  I'd say, based on the history, they

10  lowered it.

11  Q.  So based on your history with them, when you provide

12  feedback, they, being Claxton, usually follow it?

13  A.  Correct.

14  Q.  Okay.  Let's look --

15      MR. KORNFELD:  We can take that one down.  Thank you.

16      If we could please look at, just for the parties and

17  the Court, Government Exhibit 6034.

18  BY MR. KORNFELD:

19  Q.  Do you see that in front of you?

20  A.  I do.

21  Q.  Do you recognize this document?

22  A.  Can you -- yeah, I do.

23  Q.  Okay.  And what is it?

24  A.  I'm basically showing them that, you know, they're

25  producing a lot of the -- their weight -- we have a double

KENT KRONAUGE - Direct

1    range to incorporate as much product as we can in our size

2    range.  We have two 6-ounce ranges.  The suppliers are able to

3    run anything they can that fits within our range to give us

4    availability to a larger swath of birds.  I'm basically telling

5    Claxton here they're running too much in the higher range.

6    It's driving their weight up.  And I'm sure I was trying to get

7    their weight down for a quarter.

8    Q.  Is this document -- let me back up.  Is this document an

9    email?

10   A.  Yes.

11   Q.  From whom to whom?

12   A.  It was from me to Scott.

13   Q.  And what's the date?

14   A.  September 11, 2015.

15       MR. KORNFELD:  Your Honor, at this time, I would move

16   to admit and publish it.  It also has been redacted by prior

17   agreement of the parties.

18       THE COURT:  All right.  Any objection to the admission

19   of Exhibit 6034 as redacted?

20       MR. HART:  As redacted, no objection, Your Honor.

21       THE COURT:  All right.  6034 will be admitted and may

22   be published.

23       (Exhibit 6034 admitted.)

24       MR. KORNFELD:  May I have a moment, Your Honor, to

25   make sure the redaction is redacted?

KENT KRONAUGE - Direct

1          THE COURT:  Sure.

2    BY MR. KORNFELD:

3    Q.  So -- and I know you explained this, but if you'll indulge

4    me now that the jury has it in front of you -- can you -- can

5    you just explain why you would have shared this type of

6    information with Mr. Brady?

7    A.  Based on probably going at him earlier in the year in May,

8    and then now in September, where the weights were up, I was

9    probably wanting to let them know I wasn't just trying to beat

10   them up over weight, I wanted them to see where they're out of

11   whack and why and, you know, be able to get their weights

12   adjusted.

13   Q.  At the subject line of the email, it says, "Please don't

14   share except Mikell."  Who does Mikell refer to?

15   A.  Mikell Fries.

16   Q.  And do you recall -- well, do you recall why you asked

17   Mr. Brady not to share this information with anyone except

18   Mr. Fries?

19   A.  I don't.  I don't even know why I really probably put that

20   on there.  I was just probably saying, don't -- I mean, I know

21   they would have shared it internally in the company.  I was

22   probably just trying to keep all of the components together

23   with the two of them.

24   Q.  And this subject line notwithstanding, would you in your

25   experience and practice have shared similar information with

KENT KRONAUGE – Direct

1    other suppliers like Pilgrim's?

2    A.   Yes.

3    Q.   A few minutes ago, you testified that you have a few

4    confidants to shoot me straight.  Do you recall that testimony?

5    A.   Repeat that.

6    Q.   When you were talking about folks that you reach out to in

7    the industry, you testified that you have confidants to shoot

8    me straight.  Do you remember that testimony?

9    A.   Yes, I do.

10   Q.   Is Mikell Fries among those confidants?

11   A.   I would say he's probably the top one.

12        MR. KORNFELD:  Okay.  We can take that down.  Thank

13   you.

14   BY MR. KORNFELD:

15   Q.   I want to talk to you briefly about your interactions with

16   Claxton during negotiations, and I know we've touched on it.

17   In the years that you've been negotiating with Claxton, have

18   you become familiar with Claxton's negotiation strategy?

19   A.   Yes.

20   Q.   And how would you describe their strategy?

21   A.   Pretty much they want to be somewhere in the middle of the

22   cost-plus.  Like I said, they do a lot of extracurricular-type

23   things for us.  They run things that other companies don't want

24   to run.  That slows their lines down, kind of hurts their mix

25   and their productivity, so we try to keep them somewhere in the

KENT KRONAUGE – Direct

1    middle of the cost that -- that piece cost, whether it be

2    weight and -- cost, combined piece cost.  So they don't want to

3    be the highest; they don't want to be the lowest; they want to

4    be somewhere in the middle.

5    Q.   And from your experience on both sides, is that strategy --

6    did that strategy make sense to you?

7    A.   Yes.

8    Q.   Why?

9    A.   Well, like I said, it's a win-win for both of us.  I -- I

10   don't have to go back and forth with them a lot.  We keep them

11   somewhere in the middle, and they do a lot of extra things for

12   Popeyes' system.

13   Q.   Was there ever a time when Claxton refused to sort of fit

14   in, for lack of a better phrase, where you wanted them to be?

15   A.   Nothing that comes to my mind.  I'm sure we've had, you

16   know, some negotiations back and forth on where to be, but

17   overall, no, I don't have any thought that they would not

18   submit to whatever area they were -- we needed them to be.

19   Q.   And in your experience negotiating with Claxton, did

20   Claxton ever refuse to negotiate and just tell Popeyes, Take it

21   or leave it?

22   A.   No, there has been some items they could not do at times

23   for us, but never on small-bird, bone-in, no.

24   Q.   When you say "could not do," could not produce?

25   A.   Correct.

KENT KRONAUGE – Direct

1   Q.   Okay.  Now I want to talk to you briefly about the

2   negotiations for the '14/'15 contract.  In that time frame, do

3   you recall who Popeyes' suppliers were?

4   A.   Yes.

5   Q.   If you could tell the jury the ones that you remember.

6   A.   Tyson, Pilgrim's, George's, Claxton, Case, Koch, Mar-Jac, I

7   think OK Foods at that time as well.

8   Q.   Okay.

9   A.   And Holmes Foods.

10  Q.   Holmes?

11  A.   Yes.

12  Q.   They're another supplier?

13  A.   Yes.

14  Q.   During the '14/'15 contract negotiations, who was your

15  point of contact at Claxton?

16  A.   Scott Brady.

17  Q.   Okay.  How about at Pilgrim's?

18  A.   Justin Gay.

19  Q.   Tyson's?

20  A.   Carl Pepper.

21  Q.   How about Koch?

22  A.   Bill Kantola.

23  Q.   How about George's?

24  A.   Would have been Ric Blake.

25  Q.   Okay.  And, again, still talking about the '14/'15 time

KENT KRONAUGE – Direct

1    frame, when you were negotiating that contract, were you taking

2    into account the then-current market conditions?

3    A.  Very much so.

4    Q.  During those negotiations, what market conditions do you

5    recall as being relevant to your negotiations?

6    A.  The industry was tight on product, and then in the poultry

7    industry, it's -- it's very much supply and demand.  When the

8    market is tight, prices elevate fairly quick.  Big bird and

9    deboned were bringing extremely good prices.  The small-bird

10   side was underperforming comparative to case-ready and big-bird

11   facilities.

12   Q.  Were you aware of whether any small-bird producers were

13   going out of business or converting?

14   A.  We have -- we've had several convert to -- from one size

15   facility up to a case-ready plant or a big-bird plant or

16   small-bird, deboned facility, yes.  I don't recall who at that

17   time other than George's.  George's was moving a facility

18   around that time.  We had Tyson move some in the past, as well.

19   Q.  So just to be clear, in this time frame, were the number of

20   small-bird facilities decreasing?

21   A.  Correct.

22   Q.  Okay.  And did that market condition, among others, impact

23   your expectation of price during the negotiations?

24   A.  Yes, it did.

25   Q.  How so?

KENT KRONAUGE – Direct

1   *A.* We knew we were going to take a price increase, probably

2   starting somewhere in the second quarter of that year. We were

3   hearing things and knowing that, you know, where the market

4   was, that we needed to -- both sides, actually -- I mean, we

5   knew, internally, that we needed to do some kind of adjustment

6   to keep the -- like I said, make it a win-win. You didn't want

7   suppliers, you know, changing their mix or their plant size and

8   leaving us with less birds.

9   *Q.* So is it fair to say that going into these negotiations you

10  knew that there was going to be a significant price increase?

11  *A.* I did.

12          *MR. HART:* Objection. Leading.

13          *THE COURT:* Overruled.

14  *BY MR. KORNFELD:*

15  *Q.* And with that and what you testified earlier about the

16  number of small-bird producers going down, did you have a

17  strategy about how to incentivize suppliers to stay in the

18  small-bird industry?

19  *A.* I didn't have a strategy to keep them in it. We knew we

20  had to make them whole. We had several conversations with our

21  board and everything about that. So there wasn't a definitive

22  thing, this is what we need to do to keep them there, but we

23  knew we had to pay more, it was obviously going to be in the

24  cards, and try and partner with that small-bird community.

25  *Q.* So knowing that there was going to be a significant price

KENT KRONAUGE – Direct

1   increase, what did you do on behalf of Popeyes to, you know,

2   address that situation during these contract negotiations?

3   A.  When the negotiations started, we got several original

4   proposals in for a lot higher than what we thought we could

5   stomach, and I had gone to -- actually went to Mikell and tried

6   to develop a true cost on what I thought the market was going

7   to go up.  He gave me a number, and with the number he gave me,

8   we tried to come in under -- a little bit under that.

9          And I went to the field and said, Look, I need

10   everybody to be at 14 cents on the cost-plus, we're going to go

11   up.  And, basically, I tried to be the first one in front of

12   KFC, Church's, and everybody else, and take a hit, stabilize

13   that small-bird group, let them know that we were there to

14   support them and try to get that number for everybody.  Then if

15   they needed to get more anywhere else, I was hoping they would

16   do that.

17   Q.  Did this negotiation process that contract year start

18   earlier than normal for you?

19   A.  I'll be honest, I can't recall the exact time frames.

20   Q.  But you said a moment ago your strategy was to basically

21   get out in front of your competitors?

22   A.  Yes.  I didn't drag on the RFP.  Once we started, as soon

23   as I got a couple of the higher numbers, I had people coming in

24   at 20, 21 cents over the cost-plus, immediately I started

25   figuring out where we needed to be and tried to get it done as

KENT KRONAUGE – Direct

1    quick as possible.

2    *Q.*  Do you know roughly when you realized there was going to be

3    a substantial price increase for that contract year?

4    *A.*  I think in -- like I said, Q2, we knew there was going to

5    be an increase.  I probably didn't realize the extent of it

6    until August or -- probably sometime in August is when, you

7    know, the numbers started floating.

8    *Q.*  And based on your knowledge of the industry and your

9    experience, do you think -- well, do you have an opinion as to

10   whether similarly knowledgeable folks would know a significant

11   price increase was coming?

12   *A.*  Oh, yes, I mean, I'm sure at the time -- I mean, the guys

13   that were buying for KFC, I know they were fully -- I mean,

14   they had the same kind of knowledge I did.  So I'm sure they

15   thought that, as well.

16   *Q.*  Would -- in your experience, would you consider a

17   2-to-4-cent increase in that time period an appropriate

18   increase given the market conditions?

19   *A.*  Not at all.

20   *Q.*  In your -- based on your experience, would you consider a

21   2-to-4-cent increase enough of an incentive for the small-bird

22   producers to stay in the small-bird supply side?

23            *MR. HART:*  Objection.  Foundation.

24            *THE COURT:*  Sustained.

25   *BY MR. KORNFELD:*

KENT KRONAUGE - Direct

1  Q.  Sir, you talked about your -- remind the jury how many

2  years of experience you have on the purchasing and selling

3  chicken.

4  A.  Well, 15ish on the buying side and 21 on the selling side.

5  Q.  And approximately how many chicken procurement eight-piece

6  COB contracts would you estimate that you have negotiated

7  during that 30-plus years?

8  A.  You know, 150 with individual suppliers; and, you know, the

9  number I do for each year.

10  Q.  And based on your knowledge, that you testified to earlier,

11  of what was happening with small-bird suppliers, am I correct

12  in understanding that from the buyer perspective, you thought

13  you needed to incentivize the producers to stay in the

14  small-bird industry?

15          MR. HART:  Objection.  701.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes, we knew we had to get them

18  equivalent or close to case-ready and big-bird facilities in

19  order to sustain -- I mean, the most important thing we have is

20  product.  So if we -- it does us no good to buy something dirt

21  cheap if I only get half that product.  So I need to keep these

22  guys in the small-bird arena.  We knew we were going to pay

23  more -- substantially more for our product to -- to secure that

24  volume.

25  BY MR. KORNFELD:

1759

KENT KRONAUGE – Direct

1  Q.  And some of your understanding of the pressures on

2  small-bird suppliers, were they based on conversations with

3  small-bird suppliers?

4  A.  That was part of it, yes.

5  Q.  Okay.  So based on all of these conversations, all of your

6  knowledge of the industry, all of your experience negotiating

7  these contracts over 30 years, would you at the time have

8  considered a 2-to-4-cent increase enough of an incentive to

9  keep the small-bird suppliers in the small-bird business?

10  A.  No.

11  Q.  I think you indicated that the increase for Popeyes ended

12  up at 14 cents.

13  A.  I came at that number and went out to the field, yes.

14  Q.  And who proposed the 14 cents?

15  A.  I proposed it.

16  Q.  Okay.  And just briefly, how did SMS and you come up with

17  14 cents rather than 19 cents or 10 cents or any other number?

18  A.  I'll be honest, I don't recall the exact details of it.

19  But roughly, I was getting 20- and 21-cent increases.

20       In my head, I was probably thinking, you know,

21  somewhere more, like, 12 to 14ish number.  I talked to Mikell,

22  I talked to some others and said, Look, what's truly going to

23  get small birds where they need to be and to -- I told them the

24  numbers I was getting back, so to be frank -- in this

25  conversation, Mikell said, Look, 21 is not the number --

KENT KRONAUGE - Direct

1          MR. HART:  Objection.  Hearsay.

2          THE COURT:  Sustained.

3    BY MR. KORNFELD:

4    Q.  Without describing what Mr. Fries specifically told you,

5    you can go ahead and answer.

6    A.  So I -- I talked to several companies.  They said that, you

7    know, they gave up profitability -- they gave up -- they cost

8    themselves money getting me to a spot where I thought I was

9    good, and then I still lowered the price and tried to get it at

10   a little bit better.  Probably, their number was, you know 4 or

11   5 cents.  They thought it should be less.  I came in at 6 or 7

12   and came to 14, and that's where we tried to make the deal

13   work.

14   Q.  Was the 14-cent number -- the 14-cent increase communicated

15   to all of Popeyes' suppliers?

16   A.  Yes.

17   Q.  And did any of the suppliers push back at the 14?

18   A.  A lot of them did.

19   Q.  Did any of the suppliers ultimately not go with the 14?

20   A.  I believe Koch ended up not doing the 14.  I believe

21   they're the only ones that didn't.  I had a harder time with

22   Pilgrim's getting them to switch too, but they ultimately did

23   the deal, as well.

24   Q.  Again, at the risk of asking an obvious question, based on

25   your experience and your duties to the Popeyes' franchisees,

KENT KRONAUGE - Direct

1   would you have offered the 14-cent increase if you thought

2   something less was warranted?

3   A.   No.

4   Q.   Would you have offered 14 cents if you thought 4 cents was

5   warranted?

6   A.   No.   During those times, no.   We knew we had to pay more to

7   get these guys competitive to the other two categories, and I

8   know that's confusing from the other side, but we need these

9   guys in bone-in -- the fresh, bone-in business, so --

10  Q.   And when you say "these guys," you're talking about the

11  small-bird suppliers?

12  A.   Correct.

13  Q.   So what would happen to Popeyes if small birds weren't

14  available?

15  A.   We would not have bone-in chicken to sell, as we have it

16  today.

17  Q.   And based on your knowledge of the industry, what would

18  happen to other small-bird customers like KFC if small-bird

19  suppliers weren't producing small birds?

20       MR. HART:   Objection.   Foundation.

21       THE COURT:   Overruled.   He can answer generally.

22  BY MR. KORNFELD:

23  Q.   Yeah, just generally.

24  A.   Generally, if the -- there would be no mom-and-pop type

25  eight-piece or anything like that.   Probably Popeyes and KFC

KENT KRONAUGE - Direct

1    would warrant what volume we could get, but both of us would be

2    significantly short if you didn't have enough suppliers to

3    sustain the system.  So there would be a big void in small

4    bone-in chicken, not just Popeyes, KFC, but, you know, multiple

5    gas station type, grocery store, things like that,

6    applications.

7    Q.  Now I want to switch topics briefly.  You talked about

8    this -- we touched on a little earlier about the promotional

9    pricing and this 2-cent discount.  Can you just explain briefly

10   to the jury what we're talking about when you say a 2-cent

11   discount or promotional pricing?

12   A.  So we wanted to run a bone-in ad in -- I came up with, we

13   had taken that price increase the year before, and I thought I

14   could show a little bit of good faith for the franchisees,

15   since we were running the bone-in ad and trying to run it at a

16   reduced price, if it would help the franchisees if they could

17   get it at a 2-cent savings, so I went to the field and asked

18   for the month of September -- I think it was September -- to

19   have 2 cents off their cost-plus arrangement and just run it

20   for that monthly period.

21   Q.  When you say "run an ad," are you talking -- what are you

22   talking about?

23   A.  The Popeyes community ran an ad -- you know, a lower price

24   for their bone-in, to try to drive traffic, so the company --

25   we usually on the bone-in side, they don't have as much

KENT KRONAUGE - Direct

1    structure or, you know, they're allowed to charge a little bit

2    more for bone-in than, say, a sandwich.  So this, they were

3    trying to run at a specific price point, and we tried to get

4    2 cents to help them all run it at a reduced price.

5    Q.  They're selling it for less, and you wanted them -- them

6    being the franchisees -- to be buying chicken for less money?

7    A.  That's correct.

8    Q.  This was in 2015, you said?

9    A.  I believe that's correct, yes.

10   Q.  Okay.  Did you need all of the suppliers to agree on a

11   discount, be it 2 cents or whatever, in order for this to work?

12   A.  Yes, I would not have -- this was driven by me, so I would

13   not have gone to the franchisees and said, you know, 10 percent

14   or 15 or whatever the number would be, have to be the -- price

15   the others get a discount, I wouldn't have gone to the system

16   without the full support of our suppliers.

17   Q.  You talked to all of Popeyes' suppliers in that time frame?

18   A.  Correct.

19   Q.  And were these kind of the informal conversations that

20   you've testified about, if you recall?

21   A.  They started more informal.  I got buy-in from Scott and

22   somebody else.  And for the life of me, I can't remember who

23   else.  But then I started going -- put it out there like I was

24   trying to solicit it from all of them, and then immediately

25   said, hey, I got Claxton, and if it was George's, and -- I got

KENT KRONAUGE - Direct

1   their buy-in, and then started to get the Mar-Jacs and

2   everybody else in the world.

3   Q.   The 2-cent figure was the number you came up just like the

4   14 we just talked about?

5   A.   Yes.  That was just a -- you know, I knew we had a contract

6   in place.  I was going at them and just picked a number.

7   Q.   And was it any secret that you were asking all of the

8   suppliers for the same discount?

9   A.   No.  I mean, I went and told them all I wanted 2 cents.

10  Q.   Ultimately, did all of the suppliers give you that 2-cent

11  discount?

12  A.   Yes.

13  Q.   Were you able to run the promotion in 2015?

14  A.   Yes.

15  Q.   I think you testified earlier that now a discount is baked

16  into the yearly contract?

17  A.   Correct.

18  Q.   Can you just briefly explain how that works?

19  A.   I just have in the contract that we will run a discount one

20  month out of the year, and now we do it for 3 cents.  We bake

21  that in the contract.  We run a 3-cent discount.  We're

22  actually running it in the month of July, so they're getting

23  ready to submit all of that for next month's pricing.  So

24  it's -- it's baked in every year, if we run a bone-in ad.  If

25  we don't run a bone-in ad, we don't take the 3 cents.

KENT KRONAUGE – Direct

1   *Q.* Basically, the suppliers are agreeing that if you -- if

2   you, Popeyes, want to do this, that's part of the contract,

3   when -- the period of time Popeyes determines to run it?

4   *A.* Correct.

5   *Q.* Okay. I want to circle back and, again, draw your

6   experience on the supplier side and customer side, and briefly

7   just talk about how the suppliers interact with each other in

8   the supply chain. Okay?

9        Is one of the most important things to SMS as a

10  purchasing co-op constant supply of chicken?

11  *A.* It is the most important thing.

12  *Q.* And why is that?

13  *A.* The stores can't run -- you know -- I shouldn't say it's

14  the most important. The -- consistent supply is the most

15  important thing for all of our product mix.

16  *Q.* And have you heard of the terms "shorts" and "covers" in

17  the context of the chicken industry?

18  *A.* Yes.

19  *Q.* And what is a short and a cover?

20  *A.* So if one supplier has large birds during the week or if

21  their plants shut down for a day or even if they have a truck

22  wreck or if a snowstorm or ice storm hit, they'll be short

23  their loads going into any one of our DCs, and they get covered

24  by any one of the other suppliers to make sure the franchisees

25  have no net effect of any of the supply-type issues on the back

KENT KRONAUGE – Direct

1   side.  They -- it's seamless to our franchisees.

2   Q.  How does SMS expect the suppliers to cover for each other

3   or to, you know, make this happen if there is a short?

4   A.  I highly encourage them to -- if they're short on their

5   mix, to get it covered within that supply, you know -- our

6   supplier base.  So in years past, I mean, we basically -- if

7   they can't get it done, I get involved.  But usually I highly

8   encourage them to talk and get it covered and get that

9   transferred over to a DC and, like I said, be as seamless as

10  possible to the system.

11  Q.  DC is a distribution center?

12  A.  Correct.  I'm sorry.

13  Q.  That's okay.

14        How -- again, from just a very high level --

15  especially if the expectation is that you're not micromanaging

16  this, how does one supplier go about covering a load for

17  another supplier, if there is a short?

18  A.  If we were going into a Sysco Foods, for example, and if

19  supplier A is going to be short one or two loads of chicken,

20  and they know in advance it's a live-weight issue or their

21  plant is going to be down a certain day, I expect them to go to

22  supplier B and say, Hey, can we get you to cover two of our

23  loads going into Sysco, wherever it says, Denver, you know, and

24  they'll get those products in.  Usually we try to keep the

25  pricing close enough to where they can go in at that other --

KENT KRONAUGE – Direct

1   it was a seamless transition.  They would deliver that product

2   at whatever that supplier A's price was.  Supplier B, go in

3   there, delivery it to Sysco, Denver.  And no one in the

4   Popeyes' system at Denver would be any wiser that it was, you

5   know, made up -- make up product for the original supplier.

6   Q.  So is SMS involved at all, typically?

7   A.  Yes.  I mean, sometimes they can't get supply, they don't

8   know who has got it, I do get involved.  More times than not,

9   no.

10  Q.  Okay.  And are the -- how are the invoices sent in that

11  situation?

12  A.  They'll just cut -- they'll cover it at whatever the

13  supplier's current pricing is, you know, whatever they're going

14  in there for, the backup supplier usually just goes in at that

15  price, or if they have -- you know, in the odd instance

16  something crazy happened, they may deduct the difference off of

17  the original supplier.

18  Q.  So you said a moment ago that if supplier B is covering for

19  supplier A, supplier B will go in at supplier A's price?

20  A.  Correct.

21  Q.  So to ask another obvious question, are the suppliers

22  learning each other's prices during covers and shorts?

23  A.  Yes.

24  Q.  How often do covers and shorts occur?

25  A.  Unfortunately, quite often.

KENT KRONAUGE - Direct

1   *Q.* I want to ask you, sir, do you have any personal knowledge

2   of Mr. Fries being a part of any conspiracy to fix bids?

3   *A.* No.

4   *Q.* To rig bids or fix prices?

5   *A.* No.

6           *MR. HART:* Objection. Foundation.

7           *THE COURT:* Overruled.

8   *BY MR. KORNFELD:*

9   *Q.* Do you have any personal knowledge of Mr. Brady being a

10  part of any conspiracy to fix prices or rig bids?

11  *A.* No.

12  *Q.* Do you know Bill Lovette?

13  *A.* I do.

14  *Q.* Do you have any knowledge of -- personal knowledge of

15  Mr. Lovette being a part of a conspiracy to fix prices or rig

16  bids?

17  *A.* No.

18  *Q.* Do you know Roger Austin?

19  *A.* I do.

20  *Q.* Do you have any personal knowledge of Mr. Austin being a

21  part of a conspiracy to fix prices or rig bids?

22  *A.* No.

23  *Q.* Do you know Jayson Penn?

24  *A.* I do.

25  *Q.* Do you have any personal knowledge of Mr. Penn being a part

KENT KRONAUGE – Direct

1   of a conspiracy to fix prices or rig bids?

2   *A.*   No.

3   *Q.*   Are you, in fact, aware of any conspiracy in the chicken

4   industry to fix prices or rig bids?

5   *A.*   I do not know of any.

6   *Q.*   Now, I want to wrap up just very briefly by talking about

7   your involvement in this investigation.

8          When did you learn about the Indictment in this case?

9   *A.*   When the Indictment came out, I was actually -- I got a

10   call from somebody that both Mikell and Scott had been

11   indicted.  So I found out third party through another buyer.

12   *Q.*   Did you understand that some of the allegations in the

13   Indictment related to Popeyes?

14   *A.*   Originally, no, not until I later received the Indictment,

15   you know.  Originally I just found out, you know, it was about

16   them.  Then I read about it being Popeyes related.

17   *Q.*   Did the Department of Justice or any federal law

18   enforcement, FBI, Department of Commerce, anybody else,

19   interview you before the Indictment was sent up?

20   *A.*   No.

21   *Q.*   Did the Department of Justice interview you prior to your

22   testimony today?

23   *A.*   Yes.

24   *Q.*   How many times did the DOJ interview you?

25   *A.*   Just once.

KENT KRONAUGE - Direct

1  *Q.*  Do you recall roughly when that was?

2  *A.*  I think it was about six months after that Indictment was

3  done, roughly.

4  *Q.*  And was that an in-person interview?

5  *A.*  No, sir, it was a Skype type --

6  *Q.*  Zoom?

7  *A.*  Zoom deal.

8  *Q.*  Do you recall how many people were on the Zoom on behalf of

9  the United States Government during that interview?

10  *A.*  I don't.  It was about ten.

11  *Q.*  Did the Government ask you about similar topics that we

12  discussed today?

13  *A.*  Yes.

14  *Q.*  And did the Government ever contact you again after your

15  November 2020 interview?

16  *A.*  Not me personally, no.

17        *MR. KORNFELD:*  Your Honor, may I have a moment,

18  please?

19        *THE COURT:*  You may.

20        *MR. KORNFELD:*  Mr. Kronauge, thank you.  I appreciate

21  it.

22        *THE WITNESS:*  You bet.

23        *MR. KORNFELD:*  Thank you, Your Honor.

24        *THE COURT:*  Thank you, Mr. Kornfeld.

25        Cross-examination.

KENT KRONAUGE – Cross

1       MR. FELDBERG:  May I do a few more additional

2  questions on direct?

3       THE COURT:  We're only going to have one direct, but

4  if you want to ask a few questions on cross-examination, you

5  may.

6       MR. FELDBERG:  Fair enough.  May I do that now?

7       THE COURT:  Yes.

8                     **CROSS-EXAMINATION**

9  BY MR. FELDBERG:

10  Q.  Mr. Kronauge, I'm Roger Austin's lawyer.

11       There has been testimony in the case about a meeting

12  at SMS in July of 2014.

13       MR. FELDBERG:  I wonder if we could call up Exhibit

14  E-174, just for the Court, the lawyers, and the parties.

15       MR. HART:  Objection, Your Honor, outside the scope.

16       THE COURT:  Let's see what the -- what any questions

17  are, first.

18  BY MR. FELDBERG:

19  Q.  Do you have E-174 in front of you, sir?

20  A.  I have the -- yes, I do.

21  Q.  Okay.  Do you recognize it?

22  A.  I don't.

23  Q.  Is your name on it?

24  A.  It is.

25  Q.  Is -- was it addressed -- are you one of the addressees?

KENT KRONAUGE - Cross

1    A.  Yeah, it looks -- yes, I am.

2    Q.  Is it a calendar invite?

3    A.  Yes, sir.

4    Q.  And is it a calendar invite for a meeting that you were

5    invited to?

6    A.  It looks like that, yes.

7           MR. FELDBERG:  Your Honor, we offer E-174.

8           THE COURT:  Any objection to the admission of E-174?

9           MR. HART:  Objection.  It's outside the scope.

10          THE COURT:  I'm going to overrule that objection.  Any

11   additional objections?

12          MR. HART:  No, Your Honor.

13          THE COURT:  All right.  E-174 will be admitted.

14          (Exhibit E-174 admitted.)

15          MR. FELDBERG:  Thank you, Your Honor.

16   BY MR. FELDBERG:

17   Q.  Mr. Kronauge, does Exhibit E-174 refresh your recollection

18   that there was a meeting between some people from Pilgrim's and

19   some people from SMS, including you, in July 2014?

20   A.  It does not.

21          MR. FELDBERG:  Could we publish E-174, Your Honor?

22          THE COURT:  You may.

23          MR. FELDBERG:  Thank you.

24   BY MR. FELDBERG:

25   Q.  Well, let me ask you this question, Mr. Kronauge.  Do you

KENT KRONAUGE - Cross

1    have any recollection of Roger Austin attending a meeting at

2    SMS in July of 2014?

3         MR. HART:  Objection, Your Honor.  He said he had no

4    recollection of the meeting.

5         MR. FELDBERG:  This is a different question, Your

6    Honor.

7         THE COURT:  Overruled.

8         THE WITNESS:  I can speak to Roger.  We had a lady

9    that worked for Popeyes that used to deal with KFC a lot at the

10   time, so she did not want Roger coming to our offices because

11   she thought he was too tied in with KFC on the Pilgrim's side,

12   so Roger was not involved in our office very -- as a matter of

13   fact, at the time -- I mean, Jayson and Justin would have been,

14   you know, there a lot.  But Roger was -- I mean, Roger and I go

15   way back, we talk -- he wasn't -- he didn't come to our office.

16   BY MR. FELDBERG:

17   Q.  And you told us under Mr. Kornfeld's examination that your

18   principal contact at Pilgrim's was Justin Gay, correct?

19   A.  That's correct.

20        MR. FELDBERG:  Thank you, Mr. Kronauge.  Nothing

21   further.

22        THE COURT:  Thank you.

23        Additional cross, Mr. Tubach.

24                      **CROSS-EXAMINATION**

25   Q.  My name is Michael Tubach.  I represent Jayson Penn.

KENT KRONAUGE - Cross

1          When you mentioned Jayson in your answer just now, you

2    were referring to Jayson McGuire?

3    A.  That's correct.  I had meetings with Jayson Penn, but he

4    didn't usually come to the office for certain other things.

5          MR. TUBACH:  That's all I had.

6          THE COURT:  Thank you.

7          Additional cross?

8          MR. HART:  I have some questions, Your Honor.

9          THE COURT:  All right.  Mr. Hart, go ahead.

10          MR. HART:  Your Honor, can I have a sidebar before I

11    start?

12          THE COURT:  Yes, you may.

13          (Hearing commenced at the bench.)

14          THE COURT:  Go ahead.  Mr. Hart.

15          MR. HART:  Yes, I just wanted to revisit an issue that

16    we talked about yesterday in terms of leading questions and

17    sort of the defense being able to cross-examine on -- during

18    this, and I just wanted to alert the Court that this is the

19    second time when we have seen one party, the defense counsel,

20    give another party of the defense counsel notes during direct,

21    and I wanted to emphasis with the Court, we think that's

22    improper, and we just wanted to be mindful that the Court was

23    aware of that.

24          THE COURT:  I'm aware of it.  I don't think that

25    that's improper.  You know, in fact, the trial is much more

KENT KRONAUGE - Cross

1    efficient if there is some level of coordination and, you know,

2    if a person who is asking questions can by virtue of being

3    handed a note can obviate the need for someone else to stand up

4    there and go through it, I can't imagine any prejudice to the

5    United States, because, of course, if it weren't in that

6    attorney's interest to even ask the question, he or she

7    wouldn't.  So it seems to me that, you know, that -- that kind

8    of basic level of coordination, reminding or, you know, ask the

9    jury -- you know, do you want to have it displayed to the jury,

10   that type of thing is just basically helping the trial run more

11   efficiently.

12        Anything else on that, Mr. Hart?

13        MR. HART:  No, just, again, we would just point out to

14   the Court that there has been some language in terms of second

15   direct and so forth.  We think that goes into the mix of our

16   concerns that we've addressed earlier.

17        THE COURT:  Well, I'm not allowing -- that's why I'm

18   calling this cross-examination, because I don't want to get

19   into the idea of, you know, having multiple redirects.  But by

20   the same token, I'm not going to cut off someone from asking a

21   question outside the scope, because the problem is that -- and

22   Mr. Kornfeld, for instance, he may choose to limit his direct

23   examination in some ways that, you know, may not cover an issue

24   that Mr. Feldberg has.  So even though we're calling it

25   cross-examination, I don't think it would be fair to restrict

KENT KRONAUGE – Cross

1    some questions that may be outside of the scope of the direct.

2    But on the other hand, Mr. Feldberg would not have the

3    opportunity to ask redirect questions.  All right.

4           MR. HART:  Thank you, Your Honor.  That's very

5    helpful.

6           THE COURT:  All right.  Thank you.

7           (Hearing continued in open court.)

8                    **CROSS-EXAMINATION**

9    BY MR. HART:

10   Q.  Good morning, Mr. Kronauge.

11   A.  Good morning.

12   Q.  Sir, you're the president of SMS, Popeyes Louisiana Chicken

13   purchasing co-op?

14   A.  Yes.

15   Q.  And you serve operators of Popeyes' restaurants nationwide?

16   A.  Yes.

17   Q.  It's your job to get the franchisees competitively priced

18   products?

19   A.  Correct.

20   Q.  It's not only your job, but it's your mission, sir, right?

21   A.  Yep.

22   Q.  It's on your website?

23   A.  That's right.

24   Q.  And it's your company's website, it says it's -- the

25   mission of SMS is to save its franchisees money?

KENT KRONAUGE - Cross

1    *A.*  We try to get them consistent supplies at the most

2    reasonable price we can get them, yep.

3    *Q.*  That means, including procuring competitively priced

4    chicken?

5    *A.*  Correct.

6    *Q.*  And chicken is the most important product to get for

7    Popeyes Louisiana Kitchen restaurants, right?

8    *A.*  It's one of the most, yes.

9    *Q.*  And, sir, isn't part of your compensation is directly tied

10   to delivering this cost savings to your operators, correct?

11   *A.*  Correct.

12   *Q.*  Now, on direct, Mr. Kronauge, you mentioned that you're

13   friends with Defendant Mikell Fries?

14   *A.*  Correct.

15   *Q.*  And Defendant Brady?

16   *A.*  Correct.

17   *Q.*  In fact, you're close friends, right?

18   *A.*  Correct.

19   *Q.*  And on direct, you actually referred to Mr. Fries as your

20   top confidant?

21   *A.*  Yes, he's one of them, for sure.

22   *Q.*  And you're such close friends with Defendant Fries and

23   Defendant Brady that you were the one who actually told them

24   that they were indicted, didn't you?

25   *A.*  Yes.

KENT KRONAUGE - Cross

1   *Q.*  Not their lawyers?

2   *A.*  I know Scott.  I don't know if I was the first one to tell

3   Mikell.  I called them both when I found out they were

4   indicted, yes.

5   *Q.*  So you were the one who broke the news to?

6   *A.*  I know Scott I was.  I don't know if I was first to Mikell

7   or --

8   *Q.*  You're a family friend of Defendant Fries, correct?

9   *A.*  Correct.

10  *Q.*  You socialize together?

11  *A.*  Not regularly, but, yes, we do.

12  *Q.*  You go on hunting trips together?

13  *A.*  Yes.

14  *Q.*  Trips to Texas?

15  *A.*  I don't know what you're referring to.  I don't think so.

16  I don't know if I've been with Mikell to Texas or not.

17  *Q.*  Trips to Africa?

18  *A.*  No.

19  *Q.*  And the Fries family owns Claxton?

20  *A.*  Yes.

21  *Q.*  And you wouldn't want a family friend being convicted of a

22  crime, would you?

23  *A.*  Well, if he's guilty, I mean, that's on them.

24  *Q.*  Let's shift topics a little bit.  Do you remember being

25  asked questions on direct examination about the bidding

KENT KRONAUGE - Cross

1    process?

2    A.   Yes.

3    Q.   Let's talk about that.   When Popeyes bid out its chicken

4    supply contracts, it typically had multiple rounds?

5    A.   It varied every year, but, yes.

6    Q.   And the number of rounds might vary from year to year

7    because of the circumstances, correct?

8    A.   Correct.

9    Q.   And the purpose of multiple rounds was to get the most

10   competitive price, right?

11   A.   Right.

12   Q.   Because that's your company's mission?

13   A.   Right.

14   Q.   Now after you received and reviewed the bids, you would

15   communicate back to the bidders and provide feedback?

16   A.   Correct.

17   Q.   And when you did this, you did this on a one-on-one basis,

18   correct?

19   A.   Yes, company-wise.   I mean, there may have been two people

20   with the company there, but, yes.

21   Q.   Sure, for example, for feedback for a Claxton bid, you

22   would deal with Claxton people?

23   A.   That's correct.

24   Q.   A bid for Pilgrim's, you'd deal with Pilgrim's people,

25   correct?

KENT KRONAUGE - Cross

1    A.   That's correct.

2    Q.   Sir, the reason why you gave them feedback was to get them

3    to submit lower prices, correct?

4    A.   That's correct.

5    Q.   Because you're the customer, and you want a low price?

6    A.   Correct.

7    Q.   And they're on the other side of the table, they're

8    bidders, they want to be able to avoid or resist lower prices,

9    correct?

10   A.   Right.

11   Q.   Now, sir, when you gave them feedback to the suppliers, you

12   understood that they would keep these feedback to themselves

13   within the company?

14   A.   Most of the time.  Like on 14, I wanted them to all know

15   they were getting the 14 cents.  For the most part, yes.

16   Q.   We'll put 14 aside.  We'll get to that a little later on.

17   A.   All right.

18   Q.   But for the most part, you'd want the feedback to be

19   cabined to their company, correct?

20   A.   Correct.

21   Q.   That was your expectation throughout the bidding process,

22   right?

23   A.   That's correct.

24   Q.   Because you independently negotiated with each supplier

25   separately, correct?

KENT KRONAUGE - Cross

1    A.   That's correct.

2    Q.   And if you shared feedback with other companies, that could

3    undermine the bidding process that you had set up, right?

4    A.   That's correct.

5    Q.   And that could hurt your ability to try to get the best

6    price?

7    A.   Yes.

8    Q.   And you never provided feedback to them to increase their

9    bids, did you?

10   A.   No, not -- no.

11   Q.   That's -- the reason why is because that would cost more

12   for your operators and go against your mission, right?

13   A.   That's correct.

14   Q.   Okay.  Sir, let's shift gears a moment and talk about some

15   of the documents that you were shown earlier this morning.  You

16   were shown emails during direct examination that you wrote to

17   Defendant Brady, which included information about prices, other

18   suppliers, other than Claxton, right?

19   A.   Right.

20   Q.   That information you provided in the email, you weren't

21   providing bids of competitors, were you?

22   A.   No, it was in the middle of a contract year.

23   Q.   Right, you weren't providing requests for pricing?

24   A.   No.

25   Q.   You weren't providing negotiation strategy or information

KENT KRONAUGE - Cross

1    about competitors for negotiations?

2    A.   Not for negotiations, no.

3    Q.   Rather, you were sharing current or past pricing, right?

4    A.   That's correct.

5    Q.   There is a big difference between current pricing and past

6    pricing and bid and RFP pricing, right?

7    A.   Correct.

8    Q.   An important difference, correct?

9    A.   Yes.

10   Q.   They're totally different, right?

11   A.   Well, I mean, yeah, one is upcoming and one is what we're

12   currently in.

13   Q.   Exactly.  Current and past pricing are for contracts that

14   have already been negotiated, right?

15   A.   That's correct.

16   Q.   And the price have already been agreed to?

17   A.   That's correct.

18   Q.   But RFP and bid information is about a process that hasn't

19   yet led to an agreement?

20   A.   Correct.

21   Q.   Hadn't yet led to a contract, right?

22   A.   That's correct.

23   Q.   So those contract terms are still being negotiated, right?

24   A.   Well, when the -- yes, when the RFP comes, that's correct.

25   Q.   Right.  So the price is still being negotiated?

KENT KRONAUGE - Cross

1   *A.*  Yes.

2   *Q.*  And the volume is still being negotiated?

3   *A.*  Yes.

4   *Q.*  And price is an important aspect of bid negotiation; isn't

5   that right?

6   *A.*  Yes.

7   *Q.*  Since past and current prices have already been negotiated,

8   but bid prices have yet to be negotiated, you're not okay with

9   competitors sharing bid information, correct?

10  *A.*  Yes.

11  *Q.*  That is because it could interfere with competition for

12  Popeyes' businesses, right?

13  *A.*  That's right.

14  *Q.*  And it could affect having your process to get

15  competitively priced chicken to your operators?

16  *A.*  That's correct.

17         *MR. HART:*  Ms. Pearce, could you please call up

18  GX-6034, already received into evidence.

19         Your Honor, permission to publish.

20         *THE COURT:*  You may.

21         *MR. HART:*  Thank you.

22  *BY MR. HART:*

23  *Q.*  Let's talk about this exhibit.  You were asked questions

24  about this email during your direct examination, right?

25  *A.*  Yes.

KENT KRONAUGE – Cross

1    Q.   The information on the chart is for current and past

2    prices, correct?

3    A.   That's correct.

4    Q.   The information is not for future or bid prices, correct?

5    A.   Correct.

6             MR. KORNFELD:   Excuse me, Mr. Hart, I'm going to

7    object on relevance.   There is no evidence in the record that

8    there was any sharing of bid information.

9             THE COURT:   Overruled.

10   BY MR. HART:

11   Q.   You may answer.

12   A.   Can you repeat that?

13   Q.   Sure, the information is not for future or bid prices,

14   correct?

15   A.   It's for future to get their weight down, "but for"

16   pricing, correct.

17   Q.   But it doesn't have to deal with bid prices, correct?

18   A.   Correct.

19   Q.   Let's go through this chart.   You sent this email on

20   September 11, 2015?

21   A.   Yes.

22   Q.   So, Mr. Kronauge, the first chart in the middle of the page

23   reflects prices from July 2015, right?

24   A.   Correct.

25   Q.   And July is two months before September, correct?

KENT KRONAUGE - Cross

1   A.   Correct.

2   Q.   The numbers indicated in the chart would be for past

3   pricing?

4   A.   Correct.

5   Q.   The next chart reflects prices for August, correct?

6   A.   That's correct.

7   Q.   And August is a month before September, so this also deals

8   with past pricing?

9   A.   Correct.

10  Q.   And next chart is for September, that would be for current

11  prices?

12  A.   Correct.

13  Q.   And that has nothing to do with bid prices or future

14  prices?

15  A.   No.   Like I said, I think a combination to get the weight

16  or the price down for the current --

17  Q.   Exactly, you're providing the type of feedback to get their

18  prices down, right?

19  A.   Right.

20  Q.   And appears Claxton's weight range was not competitive

21  compared to the other suppliers, right?

22  A.   That's correct.

23  Q.   And you would agree with me that the purpose for sending

24  this email to Defendant Brady was to get Claxton's weight to

25  be in a more competitive range, right?

KENT KRONAUGE - Cross

1    A.  Yeah, their percent of mix in the lower section, yes.

2    Q.  Exactly, sir.  This is an example of you providing feedback

3    to make the supplier more competitive, correct?

4    A.  That's correct.

5    Q.  The subject of the email says, Please don't share except

6    Mikell.  Is that a reference to Defendant Fries?

7    A.  It is.

8    Q.  And you trusted Defendant Fries and Brady, correct?

9    A.  Yes.

10   Q.  You didn't think they'd share this information contained in

11   the exhibit?

12   A.  Yes.

13   Q.  Mr. Kronauge, let's -- looking at the second row of the

14   charts, Claxton had 11.59 percent of the chicken volume for

15   Popeyes in 2015, correct?

16   A.  Those numbers weren't adjusted, but it would have been

17   somewhere in that ballpark.

18   Q.  Somewhere in that ballpark, so from July to September,

19   Claxton had approximately 11.59 share of Popeyes' business,

20   correct?

21   A.  That's correct.

22   Q.  And Claxton has a single processing plant, right?

23   A.  Yes.

24   Q.  But it provides nearly 12 percent of the approximately

25   300 million pounds of chicken Popeyes purchased in 2015?

KENT KRONAUGE - Cross

1    A.   Correct.

2    Q.   You would agree with me that nearly 12 percent is a lot

3    more than 1 percent?

4    A.   Oh, yeah, it's 11 percent more.

5              MR. HART:  Okay.  Ms. Pearce, you may take down the

6    exhibit.

7              Ms. Pearce, could you also call up Defense Exhibit

8    A-304, already received into evidence.

9              Your Honor, may we publish?

10             THE COURT:  You may.

11             MR. HART:  Thank you, Your Honor.

12   BY MR. HART:

13   Q.   You also discussed this email with counsel during your

14   direct examination.

15   A.   I did.

16             MR. LAVINE:  Objection, Your Honor.

17             THE COURT:  That's not a redacted version of it, I

18   think.

19             MR. HART:  Thank you for pointing that out.

20             May we have a minute, Your Honor?

21             THE COURT:  Yes.

22             MR. HART:  Your Honor, may we publish?

23             THE COURT:  Yeah.  That appears to be the

24   appropriately redacted version.  Any disagreement?

25             MR. KORNFELD:  No, Your Honor.

KENT KRONAUGE – Cross

1           THE COURT:  Okay.  A-304 as redacted may be displayed

2    to the jury.

3    BY MR. HART:

4    Q.  Sir, you discussed this email with counsel during your

5    direct examination, correct?

6    A.  Correct.

7    Q.  This is an email you wrote to Defendant Brady?

8    A.  It is.

9    Q.  These are current prices, as well, aren't they?

10   A.  Yes.

11   Q.  And they relate to current case weights?

12   A.  Correct.

13   Q.  There are no bids here?

14   A.  No.

15   Q.  No pricing information or request for pricing information

16   related to bids?

17   A.  Correct.

18   Q.  No other RFP information?

19   A.  Correct.

20           MR. HART:  All right, Ms. Pearce, you may take that

21   down.

22   BY MR. HART:

23   Q.  Let's talk about the timing of certain Popeyes bids if we

24   could do that.

25   A.  Uh-huh.

KENT KRONAUGE - Cross

1    Q.  When Popeyes issues its RFP or bids, it does so in

2    approximately September or in the fall?

3    A.  Yes.

4    Q.  And these -- and the prices that you seek are for prices

5    that will be enacted in January, correct?

6    A.  For bone-in, that's correct.

7    Q.  And so these would be for future prices, correct?

8    A.  Correct.

9    Q.  I now want to shift gears and talk about the way or how and

10   why Popeyes structures the bids the way it does.  Okay.

11   A.  Okay.

12   Q.  When it comes to bids and requests for pricing, you did not

13   want your suppliers calling each other about their bids or

14   RFPs, correct?

15   A.  Unless it was one that I -- like I said, you know,

16   something that was unusual, that --

17   Q.  Right.  We'll put 2014 aside.  We'll discuss that a little

18   later.

19   A.  Yes.

20   Q.  Other than that, yes?

21   A.  Correct.

22   Q.  And that's because it would put you at a disadvantage, sir?

23   A.  Correct.

24   Q.  It would potentially undermine the competitiveness of the

25   process, right?

KENT KRONAUGE – Cross

1    A.   Potentially, yes.

2    Q.   If competitors got together and shared the price component

     of their bids or strategy, Popeyes wouldn't get the full

3

4    benefit of competition?

5         MR. KORNFELD:   Objection, Your Honor.  Calls for

6    speculation, assumes a fact not in evidence.

7         THE COURT:   Overruled.

8         THE WITNESS:   Yes.

9    BY MR. HART:

10   Q.   You don't want the suppliers sharing information that could

11   help them in the upcoming bidding negotiations against you,

12   right?

13        MR. KORNFELD:   Your Honor, I'm going to object as to

14   the want of the customers.  We've litigated that issue.

15        THE COURT:   Sustained.

16   BY MR. HART:

17   Q.   And the reason why you didn't want competitors sharing that

18   information is because it would make it harder for SMS to get a

19   competitive price?

20        MR. KORNFELD:   Same objection, Your Honor.

21        THE COURT:   Sustained.

22   BY MR. HART:

23   Q.   Did you ask, sir, for the competitors to share their

24   information during the bidding process?

25        MR. FELDBERG:   Objection.  Facts not in evidence and

KENT KRONAUGE - Cross

1    relevance, Your Honor.

2              THE COURT:  Overruled.

3              THE WITNESS:  Unless it was something out of the

4    ordinary, no.

5    BY MR. HART:

6    Q.  And the reason why you didn't ask them to do that, sir, is

7    because it could potentially harm the competitive process?

8              MR. LAVINE:  Objection, Your Honor.  Asked and

9    answered.

10             THE COURT:  Overruled.

11             THE WITNESS:  I never asked them to -- yeah, I mean,

12   I'm not trying to get them to talk about the RFP, no.

13   BY MR. HART:

14   Q.  Okay.  Let's switch topics, sir, if we could.  During

15   direct examination, you talked about the cost-plus model?

16   A.  Correct.

17   Q.  Let's talk about that.  The cost-plus model is a way that

18   some -- the way the bidding supply contracts sometimes go down,

19   right?

20   A.  That's the only -- all of ours is cost-plus for bone-in

21   chicken.

22   Q.  Right, the cost-plus model started before you got to

23   Popeyes; they were using it before you got there?

24   A.  Correct.

25   Q.  It's also the way that KFC bids out its contracts?

KENT KRONAUGE - Cross

1    A.   Correct.

2    Q.   And you testified that the cost-plus model was used to keep

3    small-bird facilities growing and continuing to sell birds in

4    the market, right?

5    A.   Not growing, but to keep them relevant and competitive

6    with, you know, case-ready and retail -- big-bird facilities.

7    Q.   Thank you.  But there are other reasons why the cost-plus

8    model was developed, right?

9    A.   That -- that is my basic understanding of why it was

10   developed.  But --

11   Q.   You would agree with me that another reason why the

12   cost-plus model was developed is because there is no reliable

13   benchmarks in the industry as it relates to bidding out

14   chicken-on-the-bone contracts?

15   A.   I don't think that was a -- before then, they were getting

16   a fixed price, they were just comparing fixed -- they may have

17   gone against Georgia Dock a long time ago.  There was other

18   small birds people used.  I don't have the knowledge to tell

19   you that piece of it was accurate.

20   Q.   Okay.  Thank you.

21        But one of the reasons why people used the cost-plus

22   model is to get a competitive price?

23   A.   I mean, I think it benefits the supplier side more than our

24   side on that.  You know, if we could lock in a fixed price, and

25   regardless of what things do, sometimes it's not always the

KENT KRONAUGE - Cross

1    best competitive piece, but it does allow us to keep them

2    relevant to the other segments.

3    Q.   Okay.  But Popeyes uses a cost-plus model?

4    A.   We do.

5    Q.   In the cost-plus model, each bidder submits an independent

6    bid reflecting the true cost of profits and -- correct -- and

7    costs, right?

8    A.   Correct.

9    Q.   In other words, the customers get an understanding of the

10   market by what the suppliers are telling them about costs, for

11   instance, right?

12   A.   Correct.

13   Q.   But if the bidders coordinated on bidding strategy, that

14   would impact the cost-plus model, right?

15         MR. KORNFELD:   Objection, Your Honor.  Assumes facts

16   not in evidence, calls for speculation, lack of foundation.

17         THE COURT:   Overruled.

18         THE WITNESS:   They'd have to have 10 or 12 individual

19   companies do that for it -- because I've got visibility into

20   all of them.

21   BY MR. HART:

22   Q.   Right.  But -- so the answer to my question is yes?

23   A.   I mean -- you have -- if that was happening, it --

24   Q.   Yes, sir, then?

25   A.   Yeah, if someone was doing that, yes.

KENT KRONAUGE - Cross

1   Q.   Okay.  And if suppliers were exchanging pricing

2   information, that wouldn't be much of a comparison, right,

3   because in a cost-plus model, you get the bids, and you compare

4   each bidder's submission to each other?

5   A.   Correct.

6   Q.   So if they were coordinating on bid strategy or costs, that

7   would affect your ability to compare each supplier's

8   submission, right?

9           MR. KORNFELD:  Same objection as before, Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  Yes.

12  BY MR. HART:

13  Q.   And it would sort of defeat the whole purpose of the

14  cost-plus model, being able to compare each bidder's

15  submission?

16  A.   Yes, but I -- yeah.

17  Q.   All right.  So with the cost-plus model as the name

18  suggests, it has two primary inputs:  You have the cost side

19  and then the plus side, right?

20  A.   Correct.

21  Q.   And the cost side itemizes all of the costs that might be

22  associated with supplying chicken, right?

23  A.   Correct.

24  Q.   The plus side is the margin and the other fees that might

25  be part of -- part --

KENT KRONAUGE - Cross

1    A.   Basically, the margin.

2    Q.   Right.  And, again, just to confirm, you would compare each

3    of the costs and margins across all of the submissions, right?

4    A.   Yes, not -- even compare them to other segments, as well.

5    Q.   Okay.  I want to switch topics.  On direct examination, you

6    talked about price uniformity.  Do you remember that?

7    A.   Price uniformity?

8    Q.   The range in which you wanted suppliers' bids to come in?

9    A.   Yes.

10   Q.   You never asked suppliers to talk to each other about their

11   bids in order to get in that specific range, did you?

12   A.   Not -- not amongst themselves, no.

13   Q.   You never asked them to coordinate their bids to get them

14   in that range, did you?

15   A.   No.

16   Q.   Okay.  And on direct examination, you talked about the

17   Popeyes 2014 bid, correct?

18   A.   Correct.

19   Q.   And you negotiated that contract on behalf of Popeyes,

20   right?

21   A.   Correct.

22   Q.   And in that one, you negotiated the suppliers down from a

23   20-cent to a 14-cent?

24   A.   Well, I wouldn't say they were all at 20 cents, but they

25   were coming in 20, 21, you know, areas in there, 19.  So, yes,

KENT KRONAUGE - Cross

1   I -- I went from an elevated price to a 14-cent increase,

2   that's correct.

3   Q.  And that reduction was due to your feedback, correct?

4   A.  Yes.

5   Q.  And you didn't bid that -- that contract, right?  You told

6   the suppliers what rate you wanted them, correct?

7   A.  Correct.

8   Q.  So there wasn't really a bid.  You told supplier one --

9   A.  It started as a bid.  I think when I started getting some

10  input, then we went to the 14 cents.

11  Q.  Right.  But my point is, you, the customer, chose that

12  rate, correct?

13  A.  Yes.

14  Q.  And you would agree with me that it would have been a

15  different story if the suppliers got together and agreed to

16  submit bids all at that rate?

17          MR. KORNFELD:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes, I wouldn't have --

20  BY MR. HART:

21  Q.  They're two separate things, correct?

22  A.  Correct.

23  Q.  Here, the customer is telling the suppliers what to come

24  out, and the other instance over here, the suppliers are

25  getting together and coming together for a price increase,

KENT KRONAUGE - Cross

1  that's totally different?

2  A.  That's correct.

3       MR. FELDBERG:  Objection.  Lacks foundation, no facts

4  in evidence supporting the question.

5       THE COURT:  Overruled.

6       THE WITNESS:  Correct.

7       MR. HART:  May I have a minute, Your Honor?

8       THE COURT:  Yes.

9       MR. HART:  Thank you, Your Honor.

10 BY MR. HART:

11 Q.  On direct examination, you talked about a 2-cent discount,

12 right?  Do you remember that?

13 A.  Yes.

14 Q.  But that also wasn't for a bid, was it?

15 A.  No, it was not.

16 Q.  In fact, that had to deal with a discount from a contract

17 that had already been negotiated, right?

18 A.  That's correct.

19 Q.  So it had nothing to do with bids?

20 A.  That's correct.

21 Q.  The communication that you had or the -- with other

22 suppliers -- with suppliers had nothing to do about bid

23 information?

24       MR. KORNFELD:  Asked and answered, Your Honor.

25       THE COURT:  Overruled.

KENT KRONAUGE - Cross

1          *THE WITNESS:*  That's correct, that I just wanted a

2    2-cent discount.

3    *BY MR. HART:*

4    *Q.*  Dealing with the contract price, not the bid price,

5    correct?

6    *A.*  Correct.

7    *Q.*  On direct you were asked questions about meetings with

8    Pilgrim's on July 4, 2014; is that correct?

9    *A.*  Was that the -- yes.

10   *Q.*  Church's is also based in Atlanta area?

11   *A.*  It is.

12   *Q.*  Greensboro, Georgia, is about -- if you know, sir, about an

13   hour outside of Atlanta?

14   *A.*  I'm not real high -- I don't know that for a fact, but --

15   I'll take -- I don't know how far Greensboro is.

16          *MR. HART:*  Okay.  Ms. Pearce, if you could please pull

17   up 9505, already in evidence.

18          And permission to publish.

19          *THE COURT:*  You may.

20          *MR. HART:*  Thank you, Your Honor.

21          If you could turn to the second page.

22   *BY MR. HART:*

23   *Q.*  Sir, does this say Roger Austin on the top?

24   *A.*  Yes, it does.

25   *Q.*  And at the top right, it says, Arrival date, July 20, 2014?

KENT KRONAUGE - Cross

 1    *A.*  Correct.

 2    *Q.*  And the departure date, it says July 23, 2014?

 3    *A.*  Correct.

 4    *Q.*  At the bottom of this, does it say, Greensboro, Georgia?

 5    *A.*  It does.

 6         *MR. HART:*  Thank you.

 7    *BY MR. HART:*

 8    *Q.*  And you testified on direct, sir, that you had a pool of

 9    between 10 and 12 suppliers that you currently -- that you used

10    in terms of sourcing chicken?

11    *A.*  Bone-in -- yes.

12    *Q.*  And that you -- when you negotiate them, you want them to

13    independently negotiate their bids, correct?

14    *A.*  Correct.

15    *Q.*  And you deal with this pool independently, apart from each

16    other, correct?

17    *A.*  Through an RFP, yes.

18    *Q.*  And the reason why you do that is because you want to get a

19    competitive rate from each of those suppliers?

20    *A.*  Yes.

21    *Q.*  It helps competition if you deal with them on a one-on-one

22    basis rather than collectively?

23    *A.*  Correct.

24    *Q.*  Sir, on direct examination, you talked about small-bird

25    conversion to big-bird as a reason for price increase, right?

KENT KRONAUGE - Cross

1 | A. Explain what you're -- I'm not --

2 | Q. Sure, one of the reasons why there was a low -- prices were

3 | so high, there could be a conversion within the market from

4 | going from small birds to big birds, right?

5 | A. Well, or out of small birds, in one capacity or the other.

6 | Q. Right. And you talked to Defendant Fries about small-bird

7 | profitability, correct?

8 | A. Cost, yes.

9 | Q. But he has no first-hand knowledge about big-bird

10 | profitability, correct?

11 |         MR. KORNFELD:  Objection, Your Honor.  Foundation.

12 |         THE COURT:  Overruled.  He can answer if he knows.

13 |         THE WITNESS:  I wasn't asking about big-bird

14 | profitability; I was asking about where small birds needed to

15 | be, to be equivalent to case-ready and big-bird.

16 | BY MR. HART:

17 | Q. Well, but it had to do with big birds, correct, in part?

18 | A. Yeah, but Agri Stats -- all of these guys are very well

19 | astute in where they stand comparative to the other segments in

20 | the industry.

21 | Q. He works at Claxton?

22 | A. He does.

23 | Q. Claxton hasn't produced big birds, correct?

24 | A. Yes, but they get compared to those other segments.

25 | Q. Yeah, so the answer to my question, they don't produce big

KENT KRONAUGE – Cross

1    birds, sir?

2    *A.*   They don't.

3    *Q.*   And they also only produce small birds?

4    *A.*   No, they also produce case-ready.

5    *Q.*   So he has no first-hand knowledge about big-bird

6    profitability versus small-bird profitability, correct?

7            *MR. LAVINEj:*  Objection, Your Honor.  No way he's

8    going to know if Mr. Fries knows one way or the other.

9            *THE COURT:*  Overruled.

10           *THE WITNESS:*  He did have case-ready, and I don't know

11   what he knew about big bird.

12   *BY MR. HART:*

13   *Q.*   So the answer to my question is that he had no first-hand

14   knowledge about big birds?

15   *A.*   I don't know that.

16           *MR. LAVINEj:*  Objection.

17           *THE COURT:*  Overruled.

18           *THE WITNESS:*  I don't know.

19           *THE COURT:*  Mr. Hart, can you look for a convenient

20   breaking point?

21           *MR. HART:*  No time like the present, Your Honor.

22           *THE COURT:*  Ladies and gentlemen, we'll take the

23   mid-morning break at this time, and we'll reconvene at 10:30.

24   The jury is excused.

25           (Jury out at 10:14 a.m.)

KENT KRONAUGE - Cross

1          MR. FELDBERG:  Your Honor.

2          THE COURT:  Mr. Kronauge, you're excused.  Thank you

3    very much.  If you could be ready at 10:30.  Everyone else may

4    be seated.

5          MR. FELDBERG:  Your Honor, this is simply a personal

6    issue.  I have a family matter I've got to take care of, it may

7    take more than 15 minutes, in which case I'd ask that I be

8    permitted to be absent during the beginning of the next

9    witness' testimony.  My colleagues can cover with the Court's

10   permission.

11         THE COURT:  Yes.  Definitely.

12         MR. FELDBERG:  Thank you.

13         THE COURT:  We'll be in recess.

14         (Recess at 10:16 a.m.)

15         (In open court at 10:31 a.m.)

16         THE COURT:  Go ahead and bring the jury back in.

17         (Jury in at 10:32 a.m.)

18         THE COURT:  Thank you.  Please be seated.

19         Mr. Hart, go ahead.

20         MR. HART:  Thank you, Your Honor.

21   BY MR. HART:

22   Q.  Sir, do you remember being asked questions during direct

23   examination about shorts and covers?

24   A.  I do.

25   Q.  Let's talk about that.  Shorts and covers, they have

1803

KENT KRONAUGE - Cross

1  nothing to do with bids or RFPs, correct?

2  *A.*  Correct.

3  *Q.*  And the price of covering is past pricing, correct?

4  *A.*  It's the current price they're in for covering the load,

5  yes.

6  *Q.*  Right, but it has nothing to do with future prices or bids

7  or RFPs?

8  *A.*  Correct.

9  *Q.*  And those are prices that have already been negotiated,

10  correct?

11  *A.*  Correct.

12  *Q.*  And it has nothing to do with bids?

13  *A.*  Correct.

14  *Q.*  Do you remember being asked questions during your direct

15  examination about meeting with the Government?

16  *A.*  Correct.

17  *Q.*  And you testified that you met with the Government once?

18  *A.*  That's correct.

19  *Q.*  And you were also asked if the Government ever contacted

20  you again, correct?

21  *A.*  That's correct.

22  *Q.*  And you said, Not me personally.  Is that what you

23  testified to?

24  *A.*  That's correct.

25  *Q.*  Sir, didn't the Government -- isn't it true that the

KENT KRONAUGE – Redirect

1    Government asked to meet with you again and were told no by

2    your lawyer?

3    A.  Not to my knowledge.

4    Q.  Sir, did you ever ask anyone at a chicken supplier to

5    telephone, text, email, or contact others regarding their bid

6    prices?

7            MR. FELDBERG:  Objection.  No foundation, facts not in

8    evidence.

9            THE COURT:  Overruled.

10           THE WITNESS:  Not that I can recall, no.

11           MR. HART:  Can I have a moment to confer, Your Honor?

12           THE COURT:  You may.

13           MR. HART:  No further questions at this time, Your

14   Honor.

15           THE COURT:  Thank you.

16           Redirect.

17           MR. KORNFELD:  Thank you, Your Honor.

18                   **REDIRECT EXAMINATION**

19   BY MR. KORNFELD:

20   Q.  Mr. Kronauge, the prosecution just asked whether you were

21   contacted again by the Government.  Did the Government contact

22   you to testify in their case in this trial?

23   A.  No, they did not.

24   Q.  Who brought -- who subpoenaed you to testify in this trial,

25   the defense or the prosecution?

KENT KRONAUGE - Redirect

1   *A.*   The defense.

2   *Q.*   You were asked a bunch of questions about -- by the

3   prosecutor about the 14-cents and the 2-cent promotion, the

4   gist of the questions being, well, those weren't bids, were

5   they?  And you said, yeah, they weren't bids, correct?

6   *A.*   Correct.

7   *Q.*   But you -- those are things that actually happened, right?

8   You actually talked about the 14 cents with the suppliers,

9   correct?

10  *A.*   Correct.

11  *Q.*   You actually talked to the suppliers about the 2-cent

12  discount?

13          *MR. HART:*  Objection.  Leading, Your Honor.

14          *THE COURT:*  Overruled.

15          *THE WITNESS:*  Correct, I did.

16  *BY MR. KORNFELD:*

17  *Q.*   And as we -- as you sit here today, you were asked a bunch

18  of "what if" questions.  Well, what if the suppliers were

19  sharing their bids, and what if the suppliers all colluded some

20  of the factors -- conspired to cook the numbers on the

21  cost-plus models.  You were asked a bunch of "what if"

22  questions.  Do you recall those generally?

23          *MR. HART:*  Objection.  Misstates the evidence.

24          *THE COURT:*  Overruled.

25          *THE WITNESS:*  I do.

KENT KRONAUGE - Redirect

1

2    *BY MR. KORNFELD:*

3    *Q.*  Do you have any knowledge as you sit here today of any

4    lying, cheating, or stealing by any of the suppliers?

5    *A.*  I do not.

6    *Q.*  Do you have any knowledge of any of the five men who are in

7    this courtroom as defendants lying to you, cheating you, or

8    stealing from you?  When I say "you," I mean, Popeyes and SMS.

9    *A.*  I have none.

10   *Q.*  If you knew that a customer cheated you, what would your

11   business response be?

12   *A.*  We'd cut them off.

13   *Q.*  Have you ever -- have you ever -- we were talking earlier

14   about us, being the defense, subpoenaing you.  Have you ever

15   given an interview to any defense team?

16   *A.*  No.

17   *Q.*  Have you ever sat down with me as counsel for your -- for

18   your friend, Mr. Fries?

19   *A.*  No, I have not.

20   *Q.*  The prosecution asked you about your loyalty and friendship

21   to some of the customers, including Mr. Fries.  Are you also

22   friends with -- social friends with some of your franchisees?

23   *A.*  Yes, I am.

24   *Q.*  With other suppliers?

25   *A.*  Yes.

1  *Q.*  With other buyers?

2  *A.*  Yes.

3  *Q.*  Do any of your friendships compromise your loyalty or your

4  fiduciary duty to SMS?

5  *A.*  Not at all.

6  *Q.*  Do they change the truth of your testimony?

7  *A.*  No, they don't.

8  *Q.*  Do they affect your lack of personal knowledge regarding

9  whether there was a supposed illegal agreement?

10  *A.*  No.

11  *Q.*  Would you testify on -- well, if you had been cheated or

12  stolen from, would you testify to that fact?

13         *MR. HART:*  Objection.  Speculation.

14         *THE COURT:*  Overruled.

15         *THE WITNESS:*  I would, and we check prices, you know,

16  and, you know -- if labor is going up, I check with guys I deal

17  with in the industry that aren't even in the small-bird, I

18  check beyond what I deal with with just the small-bird guys.

19  If I see something out of whack, I'll go to somebody else --

20  *BY MR. KORNFELD:*

21  *Q.*  You have multiple sources of information, not just Mikell

22  Fries and maybe some of these other men, right?

23  *A.*  That's correct.

24  *Q.*  Is it accurate there is also -- besides talking to people,

25  there is data available to you?

KENT KRONAUGE - Redirect

1   A.   That's correct.

2   Q.   Through Agri Stats and other data services?

3   A.   That is correct.

4   Q.   And how many people would you estimate that you talk to on

5   a regular basis, people in the chicken industry, to sort of

6   keep up with what is going on?

7   A.   It's hard to quantify.   It depends on the situation.   But

8   if something is churning, and, you know, there is something in

9   the wind, I'll do it more regularly than others.   At an

10  industry event, I may talk to, you know, any number of people

11  that -- but on a regular basis, I touch base with guys that are

12  at Mountaire or other companies that we don't use or I just --

13  you know, kind of fact check and see what they're telling me,

14  where it's going.

15  Q.   Let's talk a little bit about that in the context of the

16  cost-plus model.   You were asked an "if" question, or assume

17  that your 10 or your 12 suppliers got together and tried to

18  manipulate one or more of the 25 factors on the cost-plus

19  model, do you remember that general line of questioning?

20  A.   I do.

21  Q.   And if they did that, then it would be possible,

22  theoretically, at least, to manipulate -- or to coordinate

23  their bids as a group, right?   Remember those questions?

24  A.   Yes, I do.

25  Q.   You don't have any knowledge, do you, sir, of that

KENT KRONAUGE - Redirect

1  happening?

2  A.  I've never had any suspicion of anybody coming in as a

3  group to me, you know, to get anything from the supplier side.

4  Q.  And going back to your testimony about your comparison of

5  the cost model and looking at the factors.

6        You've got 30-plus years in the industry, correct?

7  A.  Correct.

8  Q.  You keep up with what is going on in the industry, right?

9  A.  Correct.

10  Q.  Do you keep up with the factors like labor, chick costs,

11  transportation costs, the other 23-plus factors that are baked

12  into the cost-plus model?

13  A.  Yes, sir.

14  Q.  Do you think that if you saw those numbers out of whack,

15  that based on your experience, you would notice that?

16  A.  I -- it would be alarming to me, and I'd probably

17  cross-reference it with someone that I wasn't doing business

18  with.

19  Q.  And has that ever happened?

20  A.  No, sir.

21  Q.  You were asked if the suppliers were coordinating on

22  strategy.  That's an assumption that they were, correct?

23  A.  Yeah.

24  Q.  That question assumes that they were?

25  A.  Correct.

KENT KRONAUGE - Redirect

1   Q.  Do you have any knowledge of the suppliers, Pilgrim's,

2   Claxton, or the ten or so others that supply Popeyes, ever

3   coordinating on strategy?

4   A.  No, sir.

5   Q.  Do you have any knowledge of that ever happening?

6   A.  I do not.

7   Q.  Did you ultimately get the prices that you wanted or at

8   least that you thought were fair?

9   A.  There was times I probably wasn't as happy with some,

10  but -- out of the 15 years I've been doing this, I'd say I

11  probably won, they would feel, 13 out of the 15.  You know,

12  we're in the driver's seat more than they are for that.

13  Q.  And you never really -- I understand the leverage goes up

14  and down, but you really never lost that leverage, did you?

15  A.  No, sir.

16  Q.  And when you go through the negotiation process -- I mean,

17  it's -- I understand for you it's a little less formal.  But

18  you're not just winging it, if you'll pardon the pun; I mean,

19  you're looking at the data?

20  A.  Correct.

21  Q.  You're looking at the present cost-plus model, right?

22  A.  Correct.

23  Q.  You're comparing it to the future cost-plus model?

24          MR. HART:  Objection.  Leading.

25          THE COURT:  Sustained.

1811

KENT KRONAUGE - Redirect

1

2      *BY MR. KORNFELD:*

3      *Q.* Are you looking at the current cost-plus model?

4      *A.* I look at both.

5      *Q.* Are you comparing them?

6      *A.* I have them submit their current versus their new, so I

7      compare that against -- on every one of them.

8      *Q.* Are you considering other sources of information that you

9      testified about?

10     *A.* Yes.

11     *Q.* Human and data?

12     *A.* That's correct.

13     *Q.* And are you basing -- are you considering current market

14     conditions?

15     *A.* Yes.

16     *Q.* And are you basing your negotiation strategy on all of

17     those factors?

18     *A.* Yes, sir.

19     *Q.* And do those factors inform your negotiations with the

20     suppliers?

21     *A.* It does.

22     *Q.* Do your friendships with -- be it Mikell Fries or anybody

23     else, in any way compromise or affect how you go into these

24     negotiations?

25     *A.* No.

KENT KRONAUGE - Redirect

1        MR. HART:  Objection.  Asked and answered.

2        THE COURT:  Overruled.

BY MR. KORNFELD:

4   Q.  You can answer it, sir.

5   A.  It does not.  I'm friends with all the suppliers, so

6   it's -- you know, it's -- I would take a beating if I had -- if

7   I let that influence me.

8   Q.  From your perspective, you talked about you being in the

9   driver's seat, again, you being the customer.  Based on your

10  experience, did Popeyes and SMS control the bidding process

11  with the suppliers that it uses?

12  A.  Yes.

13  Q.  Did Popeyes maintain leverage over the suppliers?

14  A.  Yes.

15  Q.  Did Popeyes ultimately make the decision whether or not to

16  enter into a contract with the suppliers once you arrived at a

17  price?

18  A.  We did.

19  Q.  Is there anything about any of these "what if" assumption

20  questions you were asked on cross-examination that makes you

21  question the testimony you gave this jury on direct

22  examination?

23  A.  Not at all.

24  Q.  Is there anything you've heard in this courtroom, whether

25  it's on direct exam or cross-exam, that makes you in any way

KENT KRONAUGE - Redirect

1    question the truth of your testimony?

2    A.   Not at all.

3    Q.   The truth of your experience in the industry?

4    A.   It does not change it.

5    Q.   And the truth of your interaction with these five men?

6             MR. HART:  Objection.  Form of the question.

7             THE COURT:  Overruled.

8             THE WITNESS:  It does not.

9             MR. KORNFELD:  Thank you very much, sir.

10            THE COURT:  All right.

11            Is Mr. Kronauge subject to recall, Mr. Hart?

12            MR. HART:  No, Your Honor.

13            THE COURT:  Okay.  Mr. Kronauge, you're excused.

14   Thank you very much.

15            THE WITNESS:  Thank you.

16            THE COURT:  Ms. Pletcher, next witness.

17            MS. PLETCHER:  Thank you, Your Honor.  We'd call

18   Professor Edward Snyder.

19            THE COURT:  Professor Snyder, if you would come

20   forward and stand next to the witness stand there, Ms. Grimm

21   will administer an oath to you.

22            (**EDWARD SNYDER, DEFENDANTS' WITNESS, SWORN**)

23            COURTROOM DEPUTY:  Please be seated.

24            Please state your name and spell your first and last

25   name for the record.

1814

EDWARD SNYDER – Direct

1          THE WITNESS:  Good morning.  My name is Edward A.

2     Snyder, E-D-W-A-R-D, S-N-Y-D-E-R.

3          THE COURT:  Go ahead, Ms. Pletcher, whenever you're

4     ready.

5          MS. PLETCHER:  Thank you, Your Honor.  May I hand some

6     binders up to Ms. Grimm?

7          THE COURT:  Yes, you may.

8          MS. PLETCHER:  Thank you.

9                    **DIRECT EXAMINATION**

10    BY MS. PLETCHER:

11    Q.  Good morning, Professor Snyder.

12    A.  Good morning.

13    Q.  My name is Anna Pletcher, and I represent Jayson Penn.  We

14    have met before; is that right?

15    A.  Yes.

16    Q.  It's good to see you today.

17    A.  Likewise.

18    Q.  Today we're going to start off a bit talking about your

19    background, we'll get into your assignment in this case, your

20    economic analysis, and your conclusions.  Does that sound okay?

21    A.  Yes.

22    Q.  Great.  First, Professor Snyder, would you please introduce

23    yourself to the jury.

24    A.  Good morning.  Again, my name is Edward A. Snyder.  I'm a

25    professor of economics and management at Yale University School

EDWARD SNYDER – Direct

1    of Management, where I teach and conduct research.

2    *Q.*  Professor Snyder, have you served in other academic roles?

3    *A.*  Yes.  At Yale, until about three years ago, I was both dean

4    of the School of Management, that's the business school at

5    Yale, and professor.  Prior to Yale, I was dean and professor

6    of the business school at University of Chicago.  And prior to

7    that, I had the same pair of positions, dean and professor at

8    University of Virginia's Darden School.

9    *Q.*  Would you tell the jury, please, about your educational

10   background.

11   *A.*  Yes, I went to public schools.  I grew up in Pennsylvania,

12   Massachusetts, and Maine.  I went to Colby College, school in

13   Maine.  And then for my graduate work, I did a master's degree

14   in public policy and Ph.D. in economics at the University of

15   Chicago.

16   *Q.*  To earn your Ph.D. in economics, did you write a

17   dissertation?

18   *A.*  Yes.

19   *Q.*  What was your dissertation about?

20   *A.*  I studied 265 criminal antitrust cases brought by the U.S.

21   Department of Justice.  Those cases were brought over a 14-year

22   period; and they covered all kinds of different industries,

23   including agricultural industries and consumer goods

24   industries.

25   *Q.*  Did your research involve bid rigging and price fixing

                              EDWARD  SNYDER  -  Direct

1   matters?

2   A.   Yes.

3   Q.   Where did you start your professional career?

4   A.   At the antitrust division of the U.S. Department of

5   Justice.

6   Q.   How long did you work there?

7   A.   I worked for over five years as a staff economist.

8   Q.   What did your work consist of?

9   A.   Mainly, working on antitrust cases and investigations.

10  Q.   Do you have a specialty within the field of economics?

11  A.   I do.  My specialty within economics is called industrial

12  organization, or IO for short.  That's the subfield of

13  economics that deals most directly with antitrust.   IO

14  economists study how industries function, the products, the

15  buyers and sellers, the interactions between buyers and

16  sellers, important market factors, and things of that nature.

17  Q.   Separate from your work in academics, do you also do

18  consulting on antitrust matters?

19  A.   Yes, I've done consulting on antitrust matters for over

20  three decades.

21  Q.   How many matters have you been retained as an expert?

22  A.   Over that time period and over 30 separate matters.

23  Q.   Have you offered expert testimony in court before?

24  A.   Yes, about 12 times.

25  Q.   What kinds of cases have you testified in?

EDWARD SNYDER - Direct

1    *A.*   In cases involving antitrust and cases that call upon my

2    expertise in IO economics.

3    *Q.*   How many of those 12 times that you've testified in court

4    did you give testimony to a jury?

5    *A.*   Three times.

6    *Q.*   Now, other than this case, have you ever testified in court

7    in a criminal case?

8    *A.*   This is my first testimony in a criminal case.

9    *Q.*   Now, with respect to the testimony you're going to give

10   today and the analysis that you conducted, did anyone help you?

11   *A.*   Yes.  I'm supported by a team at Analysis Group.  They are

12   a consulting firm that specializes in data analysis.

13   *Q.*   Professor Snyder, I'm going to ask you to open your binder

14   to what has been marked as H-317.  That should be the first

15   tab.

16   *A.*   Yes.

17   *Q.*   Do you recognize this document?

18   *A.*   Yes.

19   *Q.*   What is it?

20   *A.*   This is my CV from December 2020.

21   *Q.*   Does it accurately summarize your professional background?

22   *A.*   Well, yes, some things have changed in terms of research

23   and so forth.  But this accurately summarizes my professional

24   background.

25          *MS. PLETCHER:*  Your Honor, I offer H-317 into

EDWARD SNYDER - Direct

 1    evidence.

 2           *THE COURT:*  Any objection to the admission of H-317?

 3           *MR. TORZILLI:*  No objection.

 4           *THE COURT:*  H-317 will be admitted.

 5           (Exhibit H-317 admitted.)

 6    *BY MS. PLETCHER:*

 7    *Q.*  Now, Professor Snyder, at this point, let's sit back and

 8    talk about your task in this case and how you went about

 9    approaching it.  What were you asked to do in this case?

10    *A.*  I was asked to conduct economic analyses, to see if I could

11    reach conclusions about the Government's allegations about bid

12    rigging and price fixing.

13    *Q.*  Did you reach conclusions?

14    *A.*  I did.

15    *Q.*  What was your bottom-line conclusion?

16    *A.*  My bottom-line conclusion is that the economics do not

17    support the Government's allegation of bid rigging or price

18    fixing.

19    *Q.*  Now, how did you go about reaching your conclusion in this

20    case?

21    *A.*  I applied the scientific method.

22    *Q.*  And we've -- many of us may have heard the scientific

23    method from our elementary school or middle school days, but

24    could you explain what that means in terms of economics?

25    *A.*  Well, in economics, the scientific method means you

EDWARD SNYDER – Direct

1   identify hypotheses, you collect information and data, you

2   analyze and evaluate the data using economic principles, like

3   demand and supply, and you assess whether the analysis yields

4   support for a particular hypothesis or not.

5   Q.  Do you have a slide that will help explain to the jury how

6   you applied the scientific method in this case?

7   A.  Yes.

8   Q.  Okay.  I'm going to ask you to turn in your binder to

9   J-268.

10         Let me know when you're there.  It's also on the

11   screen, Professor Snyder.

12   A.  It's not in my binder, but it's on the screen.

13   Q.  Was this the slide that you had in mind?

14   A.  Yes.

15         MS. PLETCHER:  Your Honor, we ask to publish J-268 for

16   demonstrative purposes only.

17         THE COURT:  Any objection to the publication of J-268

18   for demonstrative purposes?

19         MR. TORZILLI:  No objection.

20         THE COURT:  J-268 may be displayed for demonstrative

21   purposes only.

22   BY MS. PLETCHER:

23   Q.  Professor Snyder, could you explain to the jury what this

24   slide shows?

25   A.  Yes, this shows how an economist applies the scientific

EDWARD SNYDER - Direct

1   method at a very high level.  It shows the first step, which is

2   to identify the hypothesis that you want to focus on.

3   Q.  And in this case, what does this mean, identify the

4   hypothesis?

5   A.  It means that --

6   Q.  I'm sorry, Professor Snyder, I'm going to ask if we can

7   flip to the next slide -- the next page of this slide as you're

8   explaining that question.  There we go.

9   A.  Yes, the Government alleges that bid rigging and price

10  fixing occurred, so that's the hypothesis that I've identified.

11  Q.  And then what is the second step?

12  A.  The second step is to test that hypothesis using economic

13  data and economic principles.  And as part of that test, I'm

14  going to focus on objective economic data on outcomes, meaning

15  prices and quantities.

16  Q.  What is the third step?

17  A.  The third step is once you do those tests, it's -- the

18  third step is to assess whether you want to accept or reject

19  the hypothesis, and also whether you want to consider

20  alternatives.  So if the economic evidence is supportive of the

21  Government's hypothesis, that would lead me as an economist to

22  accept that hypothesis; if the economic evidence contradicts

23  the Government's hypothesis, then that would lead me to reject

24  the Government's hypothesis.

25  Q.  Thank you, Professor Snyder.  Now that we've heard the

1821

EDWARD SNYDER - Direct

1  framework that you've used to test the hypothesis in this case,

2  let's get a little more specific.  What specifically did you do

3  to test the Government's hypothesis?

4  A.  To implement the scientific method in this case, I

5  identified three questions that I wanted to pose and try to

6  answer.

7  Q.  Do you have a slide that demonstrates the three questions

8  that you looked at?

9  A.  Yes, I do.

10  Q.  Okay.  I'm going to ask you to turn in your binder to the

11  slide marked J-399.  Let me know when you're there.

12  A.  Yes, I have it in front of me.

13  Q.  All right.  Do you recognize this document?

14  A.  Yes.

15  Q.  And what is it?

16  A.  This is a document that shows the three questions that I

17  wanted to answer to implement the scientific method.

18       MS. PLETCHER:  Your Honor, I'd ask to publish J-399 to

19  the jury for demonstrative purposes only.

20       THE COURT:  Any objection to the publication of J-399

21  for demonstrative purposes only?

22       MR. TORZILLI:  No objection, Your Honor.

23       THE COURT:  All right.  It may be so displayed.

24       MS. PLETCHER:  Thank you.

25  BY MS. PLETCHER:

EDWARD SNYDER – Direct

1  *Q.*  Professor Snyder, what is the first question that you

2  sought to answer?

3  *A.*  The first question is:  Do information exchanges indicate

4  bid rigging or price fixing.

5  *Q.*  What do you mean by the term "information exchange"?

6  *A.*  I mean sharing of information across industry participants

7  with respect to prices and volumes, market conditions, future

8  trends, et cetera.

9  *Q.*  Is information exchange a topic that economists customarily

10  study?

11  *A.*  Yes.

12  *Q.*  Can you explain?

13  *A.*  Yes, it turns out that when I was at the University of

14  Chicago, I took two classes from George Stigler, who won the

15  Nobel Prize, 61 years ago.  Mr. Stigler wrote a very famous

16  article called Economics of Information, and I checked

17  recently, George's article on that topic was cited by

18  economists about 12,000 times, which is an indicator of how

19  important the economics of information is, and analyses that

20  economists conduct.  And the basic point is that information

21  exchange is part of what economists study in the context of

22  various industries.

23  *Q.*  Let's take a look at the second question that you asked

24  Professor Snyder.  What was that?

25  *A.*  Well, this is really part of the scientific method.  In

1823

EDWARD SNYDER – Direct

1  addition to considering a particular hypothesis, an economist

2  is also trained to ask, Are there alternative explanations for

3  observed outcomes?  That's the second question.

4  Q.  Is evaluating alternative explanations for observed

5  outcomes the kind of analysis that economists customarily do?

6  A.  Definitely.  That's really one of the staples, you know, if

7  you will, bread and butter, of economics.  For example, you see

8  a price increase, it could be because of price fixing, but it

9  also could be because of increased demand or supply issues.  It

10  could be because of inflation that we're experiencing now.  It

11  could be that suppliers are changing their strategies.  So that

12  assessment of alternative explanations is very much a part of

13  the economic analysis.

14  Q.  One follow-up question.  When you use the word "alternative

15  explanations," are you just saying a different explanation?

16  A.  Yes.  I mean, the -- there are explanations that are

17  different from in this context the Government's hypothesis, are

18  there other explanations other than price fixing for observed

19  outcomes.

20  Q.  Okay.  That term "observed outcomes," can you explain to

21  the jury what that means?

22  A.  Yes.  I mean, when an economist studies an industry, there

23  are a lot of things that you look at.  You look at prices, you

24  look at who buys and sells, you look at quantities, you look at

25  interactions of buyers and sellers, market conditions, but it's

EDWARD  SNYDER - Direct

1   very important for economists to get to outcomes.  Those are

2   observable economic data on prices and quantities.  What did --

3   what did somebody pay?  What -- whom did they pay it to?  Who

4   supplied that customer?  At what volume?  And when I say

5   "volume," I should just mention I mean pounds in this context.

6   Q.  Now, let's turn to the third question that you asked.  What

7   was that?

8   A.  The third question is:  Do the economic analyses indicate

9   bid rigging or price fixing?

10  Q.  What kind of economic analyses did you conduct in this

11  case?

12  A.  I conducted two basic kind of analyses.  One is, I looked

13  at the objective outcomes, the prices and quantities and bids,

14  of the suppliers who were alleged to have engaged in price

15  fixing.

16          Secondly, I also did a comparison of those outcomes to

17  the price and quantities that were associated with transactions

18  involving other suppliers, suppliers not alleged to have

19  engaged in price fixing, and that's called benchmarking, and I

20  referred to the other group of suppliers as the control group

21  sometimes or the benchmark group.

22  Q.  Thank you, Professor Snyder.  In a moment, we're going to

23  look in depth at each of those three questions.  But at this

24  point, I'd like to ask, did you reach conclusions about each of

25  those three questions?

1825

EDWARD SNYDER – Direct

1   MR. TORZILLI:  Your Honor, may we have a sidebar?

2   THE COURT:  Yes.

3   (Hearing commenced at the bench.)

4   THE COURT:  Mr. Torzilli, go ahead.

5   MR. TORZILLI:  Thank you, Your Honor.

6   I object to counsel interjecting this kind of punditry

7   in between in answering a question that's not a question.  It's

8   not a question, it's unnecessary, and inappropriate.

9   THE COURT:  And what do you mean by punditry?

10   MR. TORZILLI:  Commenting on either prior testimony or

11   upcoming testimony before the witness has testified to

12   anything, and not part of an actual question being posed.

13   THE COURT:  The objection will be overruled.  What

14   Ms. Pletcher did just now is some basic signposting.  That's

15   fine.  Thank you.

16   MS. PLETCHER:  Thank you.

17   (Hearing continued in open court.)

18   BY MS. PLETCHER:

19   Q.  Professor Snyder, before our short break there, I asked you

20   a question, did you reach conclusions about these three

21   questions?

22   A.  I did, and I prepared a slide summarizing those answers.

23   Q.  Now, I'd ask you to turn, Professor Snyder, to J-400.

24   A.  Yes.

25   Q.  Do you recognize this document?

EDWARD SNYDER – Direct

1    A.   Yes.

2    Q.   And what is it?

3    A.   This just summarizes my answers and my opinions about those

4    three questions.

5    Q.   Will this slide assist you in explaining to the jury what

6    your conclusions are?

7    A.   Yes.

8              MS. PLETCHER:   Your Honor, I ask to publish J-400 to

9    the jury for demonstrative purposes only.

10             THE COURT:   Any objection to the display of J-400 for

11   demonstrative purposes only?

12             MR. TORZILLI:   No objection, Your Honor.

13             THE COURT:   All right.  It may be so displayed.

14             MS. PLETCHER:   Thank you.

15   BY MS. PLETCHER:

16   Q.   Professor Snyder, would you please summarize your

17   conclusions for the jury.

18   A.   Yes.  No. 1, information exchanges are expected in this

19   industry for reasons that are unrelated to bid rigging and

20   price fixing, so that's an important conclusion, because when

21   you, as an economist, expect information exchanges to happen,

22   that can't be a reliable indicator of price fixing and bid

23   rigging.

24             Secondly, there are, indeed, simple, reasonable

25   explanations -- alternative explanations, if you will -- for

EDWARD SNYDER - Direct

1    the observed outcomes, especially 2015, that are unrelated to

2    bid rigging and price fixing.

3            And, then, third, the economic evidence and my

4    analysis of those outcomes do not line up with bid rigging or

5    price fixing based on economic tests.

6        *MS. PLETCHER:*  We can take this slide down.

7    *BY MS. PLETCHER:*

8    *Q.*  Professor Snyder, we're going to shift gears now, go from

9    that high-level overview into some more details.  Let's start

10   with that first question you wanted to answer.

11           *MS. PLETCHER:*  If we could please pull up J-399,

12   again, for demonstrative purposes only.

13           *THE COURT:*  You may.

14           *MS. PLETCHER:*  Thank you.

15   *BY MS. PLETCHER:*

16   *Q.*  Professor Snyder, remind the jury, what was the first

17   question that you sought to answer?

18   *A.*  Do information exchanges indicate bid rigging or price

19   fixing?

20   *Q.*  How did you go about answering this question?

21   *A.*  I studied the industry, I applied economic fundamentals to

22   assess whether there were factors in the chicken industry that

23   would lead to information exchanges.

24   *Q.*  Now, information exchange is a concept.  From your

25   experience as an economist, is this common in many industries?

EDWARD SNYDER - Direct

1    A.   Yes.   In textbook economics, buyers and sellers just come

2    to sort of a theoretical marketplace, and they exchange

3    products at the market price, and then they go their separate

4    ways.   In real-world industries, information plays a very

5    important role, especially in some industries where, for

6    example, the supply chains may be long, the particular

7    industries are going through changes and transformation.   So

8    it's exactly in those situations where an economist is trained

9    to look at and identify where you should expect to see

10   information exchanges.

11   Q.   So could you give an example to the jury of information

12   exchange -- of an industry where you would expect to see

13   information exchange?

14   A.   I could give a lot of examples, but one I thought of that

15   might be particularly helpful concerns computer chips, because

16   it's on the minds of a lot of people, and a lot of people are

17   aware that there is a shortage of computer chips.   Those

18   products are used in all kinds of things, these kinds of

19   displays, in smart phones, in trucks, and cars, and SUVs, and

20   what you see in the computer chip industry is a lot of

21   information exchange right now.

22          Industry participants are trying to figure out, how

23   long is this shortage going to last?   Which particular products

24   are the most in short supply?   What are the expected future

25   prices of particular products?   Where are buyers going to get

EDWARD  SNYDER  -  Direct

 1    them from, which companies?  Which countries?  Because now the

 2    chip industry is becoming part of this global kind of battle

 3    over, you know, where should these products come from?  So

 4    there is a huge amount of information exchange going on right

 5    now in the computer chip industry.

 6    *Q.*  So here is a very obvious question, but how do computer

 7    chips relate to chicken?

 8    *A.*  Well, on the surface, they're very different, of course.

 9    But to an economist, they actually share some commonalities.

10    Both industries involve investments that are made prior to when

11    the products actually can come to market.  So that -- that you

12    see that kind of required investments, advance planning, you

13    see that in both industries, and that kind of work, that kind

14    of effort often involves information sharing.

15          Another factor that you see in both industries is that

16    participants have to adjust to shortages, and, again, that

17    involves information sharing, so they -- obviously, very

18    different, but I see commonalities.

19    *Q.*  Let's talk more about the broiler chicken industry, that is

20    why we are here.  Professor Snyder, at the outset of your

21    engagement in this case, did you study the broiler chicken

22    industry?

23    *A.*  I did.

24    *Q.*  What did you do to study the industry?

25    *A.*  I studied -- this is what I always do, I studied the

EDWARD SNYDER - Direct

1    product, buyers, sellers, how they interact, contracts between

2    buyers and sellers, prices, volumes, but, ultimately, as I

3    indicated earlier, I focused on outcomes.

4    Q.  With respect to information exchange, would you expect to

5    see information exchange in the broiler chicken industry?

6    A.  I would for several reasons, and I think I have a slide

7    that identifies four particular factors.

8    Q.  Would you turn, please to J-213 in your binder, Professor

9    Snyder.

10   A.  Yes.

11   Q.  Is this a slide that you just referred to?

12   A.  Yes.

13   Q.  Will this slide assist you in explaining to the jury the

14   relevant features of the chicken industry?

15   A.  Yes.

16        MS. PLETCHER:  Your Honor, may I publish J-213 to the

17   jury for demonstrative purposes only?

18        THE COURT:  Any objection to the display of J-213 for

19   demonstrative purposes?

20        MR. TORZILLI:  No, Your Honor.

21        THE COURT:  That may be displayed, then.

22        MS. PLETCHER:  Thank you.

23   BY MS. PLETCHER:

24   Q.  Professor Snyder, what are the features of the broiler

25   chicken industry that make information exchange more likely?

EDWARD SNYDER - Direct

1    A.  Well, the first is reliability of supply.  QSRs need fresh

2    chicken supplied regularly, weekly basis or even with greater

3    frequency.  So that -- that ends up leading to information

4    exchange, especially when a supplier who has a volume

5    commitment to a particular QSR can't meet that commitment.

6    Q.  What are the other features that make information exchange

7    likely in this industry?

8    A.  The second one I identified here is flexibility of supply.

9    Buyers like to have multiple suppliers, so-called

10   multi-sourcing.  What you see in the industry is that an

11   individual buyer will have multiple suppliers that gives the

12   buyer flexibility, and it also supports the reliability of

13   supply.  And the result of that is that buyers do, in fact --

14   this is the third factor, it's related -- end up sourcing from

15   multiple suppliers.

16   Q.  What is the fourth factor that you've identified?

17   A.  The fourth factor is that those relationships, a buyer,

18   multiple suppliers, tend to be ongoing, and they continue

19   beyond one contract.  So if you think about this as sort of a

20   matching process, buyers and suppliers oftentimes are matched

21   together in what economists call a relational contracting

22   framework.

23   Q.  What does that phrase "relational contracting" mean?

24   A.  Relational contracting means the following:  Another Nobel

25   Prize winner, Oliver Williamson, developed this framework to

EDWARD SNYDER – Direct

1   describe situations, very much like the chicken industry, where

2   you have suppliers in ongoing relationships.  When they're in

3   one contract, they may be negotiating the next contract.  The

4   suppliers know each other.  There is information exchange from

5   buyers to sellers, sellers to buyers, there is feedback given

6   by the buyer to sellers.  And this all happens in the context

7   of these longer-term relationships involving oftentimes

8   sophisticated parties like suppliers in this industry and

9   buyers.

10  Q.  In the context of relational contracting, what type of

11  information do you expect to be exchanged?

12  A.  I expect that you'll see exchanging on all kinds of

13  information, volumes, expected volumes in the future, cost

14  trends, prices, expected future prices, changes in product mix,

15  and that exchange of information can go from -- different

16  directions, in terms of buyers to suppliers, suppliers to

17  buyers, and so forth.

18  Q.  You mentioned the exchange of future prices as the type of

19  information that you expect to be exchanged.  Could you explain

20  a little bit more about that?

21  A.  Well, just as I mentioned in the chip-industry context,

22  there is a lot of information being exchanged about future

23  prices, the idea is to understand where future prices are going

24  and make better decisions.

25  Q.  In your experience as an economist, in studying information

EDWARD SNYDER – Direct

1    exchange, is the information exchanged always accurate and

2    complete?

3    A.   No.  And that's an important point.  If you take the point

4    of view of any individual industry participant, they can have

5    benefits from sharing information, given they're going to get

6    information in return, but there are also costs of doing so.

7    If you take the point of view of a buyer, for example, the

8    buyer may not provide fully accurate and complete information.

9    They might want to give selective information to suppliers,

10   supplier by supplier, to provide them with an advantage in

11   terms of getting better terms.

12   Q.   To that point, Professor Snyder, how common is it for

13   parties in a business relationship to try and control

14   information as a negotiation tactic?

15   A.   Well, that is extremely common.  In almost all bidding

16   negotiation settings, the parties want to control the

17   information.

18         By controlling information, they can get informational

19   advantages and leverage over the other party.  Buyers want to

20   do that, sellers want to do that, that's expected.  And I

21   should note, there is no economic principle that says, well,

22   the leverage should all go to one side; it should all go to the

23   buyer's side or it should all go to the seller's side.

24   Q.   Professor Snyder, in the context of relational contracting

25   and negotiations, are you familiar with the permanent price

EDWARD SNYDER - Direct

1 verification?

2 *A.* Yes.

3 *Q.* What does that mean?

4 *A.* Price verification arises in different contexts where both

5 buyers and sellers may want to verify the information they have

6 received is accurate.

7 So, for example, if you take the point of view of a

8 seller, the seller may have gotten information from the buyer,

9 the buyer is giving, quote, feedback to the supplier and says,

10 this is -- this is what I want from you, and you need to do

11 this in order to get a contract for certain volume. Well, that

12 information, as I mentioned earlier, may or may not be

13 accurate. And before responding, a supplier may want to check

14 to see if the information is, indeed, accurate. That's price

15 verification.

16 *Q.* And could that go both ways, a seller, for example, might

17 want to verify pricing offers?

18 *A.* Yes. If you can -- yeah. Price verification is done by

19 both buyers and suppliers, and it involves information

20 exchange.

21 *Q.* With this testimony in mind, Professor Snyder, that you

22 just gave about information exchange, let's turn back to the

23 hypothesis that you were testing. Did you find support for the

24 Government's hypothesis that information exchanges indicate bid

25 rigging or price fixing?

EDWARD SNYDER – Direct

1      MR. TORZILLI:  Objection.  Misstates the Government's

2 allegation.

3      THE COURT:  Overruled.  He can answer based upon what

4 he understood his objective was.

5      THE WITNESS:  Well, my objective was to assess the

6 Government's theory that there was bid rigging or price fixing,

7 and the specific question I wanted to ask is, observing

8 information exchange, does that tell you reliably that there

9 was price fixing or bid rigging?  Is the information exchange

10 an indicator of that?  And what the economic analysis shows is

11 that the chicken industry has several factors that are going to

12 generate information exchange that have nothing to do with

13 price fixing.  So observation of information exchange is not a

14 reliable indicator of price fixing to me as an economist.

15 BY MS. PLETCHER:

16 Q.  Professor Snyder, let's shift gears and move to the second

17 question that you sought to answer.

18      MS. PLETCHER:  If we could again display J-399, Your

19 Honor, for demonstrative purposes only, please.

20      THE COURT:  Any objection -- have we displayed it

21 already?

22      MS. PLETCHER:  We have.

23      MR. TORZILLI:  No objection.

24      MS. PLETCHER:  Thank you.

25 BY MS. PLETCHER:

EDWARD SNYDER – Direct

1   Q.  Professor Snyder, can you remind the jury what was the

2   second question that you wanted to answer?

3   A.  Yes, the second question that I posed to implement the

4   scientific method is as follows:  Are there alternative

5   explanations for observed outcomes?

6   Q.  And you mentioned the scientific method.  How did you

7   employ the scientific method to answer that second question?

8   A.  Well, I focused on observed outcomes, especially the 2015

9   price increase to KFC, and the Government's theory, as I

10  understand it, is that price increase was the result of bid

11  rigging and price fixing.  So in this question, I'm asking very

12  simply, are there other explanations, alternative explanations

13  for that 2015 price increase.

14  Q.  Now, what analyses did you conduct related to that 2015

15  price increase?

16  A.  Well, I conducted several analyses, but I started with a

17  historical analysis.

18  Q.  And why did you start with a historical analysis?

19  A.  Well, a historical analysis can provide context for a

20  particular observation, like 2015, where prices went up.  So by

21  looking out, by, you know, widening your focus -- which I did,

22  I looked at I think it's a 19-year period -- I can look at how

23  that observed price increase in 2015 looks in comparison to

24  other price changes that I see over a longer time period.

25  Q.  Now, did you prepare a chart that reflects what you found

EDWARD SNYDER – Direct

1   when you conducted that historical price analysis?

2   *A.*  Yes.

3   *Q.*  Okay.  Professor Snyder, I'm going to ask you to turn to

4   J-208 in your binder.

5   *A.*  Yes.

6   *Q.*  Is this the historical analysis you just referred to?

7   *A.*  Yes.  It's -- it covers the period 2005 to 2019.  So it's a

8   15-year period.  And what I've portrayed in this chart --

9   *Q.*  I'm actually going to ask you to hold off on getting into

10  the chart, Professor Snyder, until we have the opportunity to

11  ask you a few more questions about it.

12  *A.*  Okay.

13  *Q.*  One is, who prepared this chart?

14  *A.*  The team at Analysis Group prepared this chart at my

15  direction.

16  *Q.*  And what data was used for this chart?

17  *A.*  The data used in this chart are from Pilgrim's Pride's

18  sales of small-bird, eight-piece COB to KFC.

19  *Q.*  Why did you choose to use Pilgrim's Pride data for this

20  chart?

21  *A.*  I have access to that data, I checked them, I found them to

22  be reliable.  Of course, Pilgrim's is an important supplier in

23  the industry.

24  *Q.*  Did you and your team analyze the data to confirm that the

25  chart was accurate?

EDWARD SNYDER - Direct

1  A.  I did.  I'm not sure if I should go into detail about what

2  I did.

3  Q.  Just to briefly explain how you confirmed the accuracy of

4  the chart.

5  A.  This chart shows annual price changes for Pilgrim's to KFC

6  from year to year.  So to get to that, the first step was to

7  use monthly data from Pilgrim's Pride sales to KFC, aggregate

8  those monthly data into annual data, and then calculate the

9  percentage price changes from year to year.  And I checked all

10  three steps.

11        MS. PLETCHER:  Your Honor, I move to admit J-208 into

12  evidence, please.

13        THE COURT:  Any objection to the admission of J-208?

14        MR. TORZILLI:  No objection.

15        THE COURT:  J-208 will be admitted.

16        MS. PLETCHER:  Thank you.

17        May we publish?

18        (Exhibit J-208 admitted.)

19        THE COURT:  You may.

20        MS. PLETCHER:  Thank you.

21  BY MS. PLETCHER:

22  Q.  Professor Snyder, the jury can now see your chart.  Can you

23  please describe to them what it shows.

24  A.  Yes.  So across the bottom are years, 2005 to 2019.  On the

25  vertical axis is the percent change in prices from year to

EDWARD   SNYDER  -  Direct

1  year.  And as indicated in the title, the price changes concern

2  Pilgrim's Pride sales of small-bird, eight-piece COB to KFC.

3  *Q.*  So --

4  *A.*  So each bar for each year shows the percentage change, and

5  bars above the zero line are increases from the previous year,

6  bars below the line are decreases from the previous year.

7  *Q.*  Okay.  So just to clarify, each bar shows the percentage

8  change from one year to the next?

9  *A.*  That's correct.

10       And if I can give an example, just to clarify it, if

11  that's okay.

12  *Q.*  Yes.  Please.

13  *A.*  So when you look at, say, 2014, you see the 6 percent price

14  decrease, that's the decrease from 2013, and then when you look

15  at the increase in 2015, nearly 15 percent, that's from the

16  lower prices that were charged in 2014.  So you have an -- in

17  time you have a move down from '13 to '14, followed by a move

18  up, '14 to '15.

19  *Q.*  Professor Snyder, can you explain what this chart shows in

20  terms of your analysis in this case.

21  *A.*  Yes.  This historical analysis I find very interesting.  It

22  shows that -- you see very large price increases in years 2008,

23  2011, and 2015.  The first two are before the period where the

24  Government alleges that the price fixing took place.  The 2015

25  increase is during the time period of the Government's

EDWARD SNYDER - Direct

1   allegations.

2           I also see a -- pretty substantial decreases.  So when

3   I look back at this, I say, this is a market where prices

4   fluctuate quite a bit.

5   Q.  Why do we see these kinds of price fluctuations in this

6   market?

7   A.  Well, it -- as an economist, I go to supply and demand.

8   And if you look at the combination of 2007 and 2008, that one

9   is interesting, because prices in '07 and 2008 increased by

10  7 percent, and then an additional nearly 14 percent.  So

11  that -- that suggests the possibility that there are supply and

12  demand changes that are influencing prices.

13          Now, I said that was interesting, because if I look at

14  2014 and '15, that's not the biggest two-year price increase.

15  So to an economist, you see this, and as I said earlier, it

16  provides context for what you're seeing in 2015.

17  Q.  Now, you did some quick math here.  I just want to make

18  sure that the jury is following along with you.  You looked at

19  two combined price periods in '07/'08 and '14/'15.  Can you

20  walk through those more slowly so we can follow your math?

21  A.  So '14/'15, it does look like a hockey stick, I'm not

22  trying to make a joke, but prices go down and then up.

23  Q.  So what is the total combined increase over a two-year

24  period based on your analysis?

25  A.  Roughly 9 percent.  Whereas, in '07/'08, it's 7 percent.

EDWARD SNYDER – Direct

1    And then on top of that, nearly 14 percent.  So that's going to

2    be a far bigger increase over that two-year time period, in the

3    neighborhood of 21 percent.

4    *Q.*  How common are price fluctuations in agricultural markets?

5    *A.*  They are very common.  In fact, economists have studied

6    price fluctuations in agricultural markets for a long time.

7    Back in 1934, economists developed something called the cobweb

8    model, which I'm happy to explain.

9    *Q.*  Well, since you mentioned it, Professor Snyder, can you

10   give just a very brief overview, what is this cobweb model and

11   how does it relate to what we're seeing here?

12   *A.*  Well, the things that are important to economists on

13   agricultural setting is you have supply and demand changes,

14   plus you've got the feature where suppliers make investments,

15   they plan ahead, and they plan ahead and make investments based

16   on what they expect the market to do, but they may not be

17   right.  So that lag between investments and when products

18   actually come to market, it can interact with supply and demand

19   changes to really move prices around, in the kind of a picture

20   of a cobweb, and that's the cobweb model.

21   *Q.*  How does a factor like weather impact price?

22   *A.*  Weather definitely impact price, what economists call

23   shock.  Even if the planning and investments were all done well

24   and matched up with conditions subsequently, there may be an

25   intervening weather shock, and that disrupts supply.

1842

EDWARD  SNYDER – Direct

1    Q.  So given what you've just explained, Professor Snyder,

2    what, if anything, does this analysis tell you about whether

3    there was bid rigging or price fixing in this case?

4    A.  It doesn't tell me anything by itself.  I can't conclude

5    anything from this chart.  But it does suggest to me that there

6    may be an alternative explanation grounded in supply and demand

7    for 2015, just as there was back in 2007 and '8.

8    Q.  So why is that?  What does it tell you that there may be an

9    alternative explanation?

10   A.  Well, in the earlier time period, there were no allegations

11   of price fixing, so that suggests that the demand and supply

12   are -- that's where economists tend to look -- affecting those

13   price increases.  And, in fact, there were demand and supply

14   factors, including regulations involving ethanol, which

15   increased the cost of corn, so that's a supply factor, and

16   given that we see demand and supply interacting in leading to

17   prices moving up and down, that suggests, as an economist, I

18   should look for whether there are alternative explanations for

19   2015.

20   Q.  And did you look for alternative explanations for 2015

21   prices?

22   A.  Yes, I did.

23   Q.  And what did you find?

24   A.  Yes.  I found that there are demand and supply explanations

25   for what is observed in 2015.

1843

EDWARD SNYDER - Direct

1   *Q.* Did you prepare a slide to assist your explanation to the

2 jury about your findings with respect to supply and demand?

3   *A.* I did.

4   *Q.* I'm going to ask you to turn to what has been marked as

5 J-209 in your binder.

6   *A.* Yes.

7   *Q.* Is this the slide that we just referenced?

8   *A.* Yes.

9   *Q.* And will this slide assist you in explaining your findings

10 to the jury?

11   *A.* Yes.

12      *MS. PLETCHER:* Your Honor, I ask to publish J-209 for

13 demonstrative purposes only.

14      *THE COURT:* Any objection to the display of J-209 for

15 demonstrative purposes only?

16      *MR. TORZILLI:* One moment, Your Honor?

17      *THE COURT:* Sure.

18      *MR. TORZILLI:* No objection.

19      *THE COURT:* All right.  It may be displayed.

20      *MS. PLETCHER:* Thank you.

21 *BY MS. PLETCHER:*

22   *Q.* Professor Snyder, what does this slide explain?

23   *A.* This slide summarizes that there is a demand factor at work

24 leading up to 2015, and it identifies two supply factors that

25 are at work leading up to 2015.

EDWARD SNYDER - Direct

1   *Q.* Well, let's start with your first bullet point on demand.

2   Please explain to the jury what you found with respect to

3   demand.

4   *A.* I found that the demand for chickens, including small

5   birds, was increasing leading up to 2015. And my analysis

6   focused on something that is very fundamental in economics,

7   which is the demand for a particular product, like chicken,

8   will depend on the prices of substitutes, and the two most

9   important substitutes for chicken, for U.S. consumers, are the

10  other two meats that are consumed in the greatest quantity,

11  beef and pork.

12  *Q.* Do you have a slide, Professor Snyder, that illustrates

13  your analysis?

14  *A.* Yes.

15  *Q.* I'd ask you to turn to J-249.

16  *A.* Yes.

17  *Q.* Is this the slide that shows your analysis on demand?

18  *A.* Yes.

19  *Q.* At a high level, what does this slide show?

20  *A.* This chart is application of a standard tool in economics

21  called price index. And what this chart displays -- I know you

22  can't see it yet -- is that over time the relative prices of

23  chicken, beef, and pork changed. So the chart is going to

24  track those three substitute products. And for beef and pork,

25  the chart uses data from the U.S. Department of Agriculture.

EDWARD SNYDER - Direct

1  Obviously, reliable, authoritative source on beef and pork

2  prices.  It turns out the USDA does not publish a price series

3  on chicken, so for chicken, I'm going to use the same data I

4  used earlier on Pilgrim's COB prices to KFC.

5  *Q.* With respect to the USDA data, Professor Snyder, is that

6  data that economists typically rely on?

7  *A.* Yes, economists turn to both Government and industry

8  sources for data.  As I mentioned, the USDA is a reliable

9  authority for data on those two products.

10 *Q.* Did you and your team verify the accuracy of the data in

11 this chart?

12 *A.* Yes, insofar as we made sure that we downloaded the data

13 properly from the USDA website and displayed the data

14 accurately.  These are, it turns out, monthly data.

15        *MS. PLETCHER:*  Your Honor, I move to admit J-249 into

16 evidence.

17        *THE COURT:*  Any objection to the admission of J-249?

18        *MR. TORZILLI:*  Yes, Your Honor.  May we have a

19 sidebar, please?

20        (Hearing commenced at the bench.)

21        *THE COURT:*  Mr. Torzilli, go ahead.

22        *MR. TORZILLI:*  Thank you, Your Honor.

23        I object to the admission of this exhibit, but more

24 importantly to questions related to -- relating to the

25 substitution between broiler chickens and beef and pork for

EDWARD SNYDER - Direct

1    consumers.  Your Honor was very clear in granting the

2    defendants' motion *in limine* back in the fall that we, the

3    Government, are prohibited from producing evidence that

4    consumers were harmed by bid rigging and price fixing in this

5    case.  Seems to me it's only fair that the defendants should

6    have to live by that, too, and keep consumers' economic effects

7    out of their presentation of testimony as well.

8            THE COURT:  All right.  Ms. Pletcher, respond.

9            MS. PLETCHER:  Thank you, Your Honor.

10           The economic analysis here is related to the demand,

11    substitution of beef and pork, and whether the demand is driven

12    by consumers or other purchasers is an economic matter.

13    Professor Snyder is not opining on harm to consumers; he is

14    merely looking at the demand factor in the overall industry.  I

15    think that's very clear.

16           This exhibit was admitted at the last trial as well,

17    and we even heard one of the witnesses in the last couple of

18    days talk about the fact that beef and pork as substitutes has

19    an impact on the market for the QSRs.  So for those reasons, I

20    think it is relevant and appropriate for Mr. -- Professor

21    Snyder to opine on.

22           THE COURT:  All right.  Mr. Torzilli, anything else

23    from you?

24           MR. TORZILLI:  Absolutely.  So this is just to

25    distinguish what's occurred prior to this moment, this moment,

EDWARD SNYDER - Direct

1    and you can see it in the legend for this exhibit as well.  The

2    legend for this exhibit talks about wholesale beef index and

3    wholesale pork index.  It says nothing about consumers.  So the

4    witness is injecting into the testimony and into this exhibit

5    considerations at the consumer level, which is inappropriate.

6    And certainly we would like to at an appropriate time in

7    rebuttal case potentially be able to address what I view as an

8    opening of the door here.

9              THE COURT:  Ms. Pletcher, anything more from you?

10             MS. PLETCHER:  The point about the wholesale prices,

11   actually I think that cuts in favor of Professor Snyder

12   describing more about this document, because it's pretty clear

13   that this is a wholesale price index, not a consumer price

14   index.

15             THE COURT:  Objection will be overruled.  This -- I

16   don't think that the Government's juxtaposition of my ruling

17   regarding a keeping out harm to consumers is the same as what

18   Professor Snyder is doing here, which is to compare

19   substitutes.

20             Moreover, to the extent that the data doesn't compare

21   apples to apples, based upon beef and pork being wholesale

22   indices, once again, that can be explored on cross-examination.

23   But at this point in time, I don't think there is anything

24   inappropriate about it.  I don't see any door opening at this

25   point in time; although, of course, the Government can develop

EDWARD SNYDER - Direct

1    that argument at a future time based upon the testimony

2    regarding this exhibit.  So the objection will be overruled.

3              MS. PLETCHER:  Thank you.

4              (Hearing continued in open court.)

5              THE COURT:  Objection overruled.

6              Go ahead, Ms. Pletcher.

7              MS. PLETCHER:  Your Honor, may we publish J-209?

8              THE COURT:  I should complete the ruling on that,

9    namely, J-249 will be admitted, and may be published.

10             (Exhibit J-249 admitted.)

11             MS. PLETCHER:  Thank you.

12   BY MS. PLETCHER:

13   Q.  Professor Snyder, can you explain to the jury what this

14   chart shows?

15   A.  Yes.  Try to take it step by step.  Covers the time period

16   2010 to 2016.  And it's trying to track the relative prices

17   among these three substitute meat products, beef, pork, and

18   chicken.  The way the price index works is that you start out

19   the prices at the same level, so here, in January 2010, I start

20   out the price at a dollar.  So if you think of that as, what

21   would a dollar buy if you were buying beef or pork or chicken,

22   you buy a chunk of that meat for a dollar.  And then you -- the

23   chart, then, shows what -- what is happening to the relative

24   prices of those three meats.

25             So right off the bat, in early 2010, the price of beef

1849

EDWARD SNYDER – Direct

 1    measured by the wholesale price index from the USDA, that's in

 2    blue, that's increasing.  And also from the USDA, the wholesale

 3    price of pork is increasing.

 4            Now, if chicken had started to move at the same rate

 5    as beef and pork, then the red line for chicken would have

 6    moved alongside the blue and orange lines for beef and pork,

 7    respectively.  So that's what the price index does.  It tracks

 8    the relative prices over time.

 9    Q.  Now, to be clear, does this chart show specific prices?

10    A.  No, it does not.  Because you go back to -- you start with

11    a dollar of beef, dollar of pork, dollar of chicken, you're

12    asking the question, how much would it cost to buy that same

13    size chunk of meat at different points in time.

14    Q.  Now, what does this chart tell you about the historical

15    price of chicken?

16    A.  Well, one thing that I found worthy and interesting for my

17    analysis is that if you look at the red line for chicken, and

18    you focus attention on -- from early to mid 2011 through the

19    next several years, the red line is pretty flat.  And this

20    chart starts before the conspiracy -- the alleged conspiracy

21    began.  The alleged conspiracy, according to the DOJ, starts in

22    2012.  But I'm seeing the red line flat.  So I took note of

23    that.  I think that's worthy of observation.  I don't see

24    evidence that chicken prices were even keeping up with the

25    other two.

EDWARD SNYDER - Direct

1   *Q.* You do see, though, Professor Snyder, a jump in 2015 of

2   that red line?

3   *A.* Yes, and that is the main purpose of this slide.  You're

4   right.  In early 2015, you see the sharp increase in the red

5   line.  And the reason why I'm looking at beef and pork is to

6   understand, is there a demand-side explanation for that

7   increase?  And I see it here.

8   *Q.* Can you explain that a little bit more.  What do you mean

9   that you saw a demand-side explanation?

10  *A.* Well, leading up to the gray area where the contract --

11  2015 contract was negotiated.  That's that -- that gray area is

12  summer and fall 2014.  Look at how the red line compares to the

13  other two.  It's -- it hasn't kept up with beef and pork.  So

14  the relative price of chicken is lower than the relative prices

15  of beef and pork.  What that does in economics is that some

16  consumers then will shift to the lower-priced meat product,

17  that increases demand for chicken, and that tends to drive up

18  the price of chicken.  So we have a demand factor that predicts

19  that there is going to be an increase in the price of chicken.

20  *Q.* So that's the demand factor.  Let's shift gears at this

21  point and talk about supply.

22          *MS. PLETCHER:* If we could go back to slide J-209.

23  Again, this has been shown for demonstrative purposes only, if

24  we could go back and show that again, please?

25          *THE COURT:* You may.

EDWARD SNYDER – Direct

1        MS. PLETCHER:  Thank you.

2   BY MS. PLETCHER:

3   Q.  Professor Snyder, what factors affected the supply of

4   broiler chickens at this time period?

5   A.  Two factors:  Factor A, lower stock of breeder birds;

6   factor B, lower profit margins on small birds relative to big

7   birds.

8   Q.  Let's look a little more closely at your analyses on both

9   of these points.  If you could turn to J-250, Professor Snyder.

10  A.  Yes.

11  Q.  What does this slide show?

12  A.  This is a chart showing the supply of breeder birds from

13  2008 to 2017, the millions of breeder birds, and it does so on

14  an annual basis, and the data are from the U.S. Department of

15  Agriculture.

16  Q.  I was going to ask you, what is the data underlying this

17  chart?

18  A.  U.S. Department of Agriculture.

19        MS. PLETCHER:  Your Honor, we move to admit J-250 into

20  evidence.

21        THE COURT:  Any objection to the admission of J-250?

22        MR. TORZILLI:  No objection.

23        THE COURT:  It will be admitted.

24        (Exhibit J-250 admitted.)

25        MS. PLETCHER:  May we publish?

EDWARD SNYDER – Direct

1       THE COURT:  You may.

2   BY MS. PLETCHER:

3   Q.  Professor Snyder, can you please explain to the jury what

4   this chart shows?

5   A.  On the vertical axis, that vertical axis starts at

6   47 million.  As I mentioned, it gives annual numbers from 2008

7   to 2017.  And just to pick a particular example, the blue bar

8   in 2010, based on the USDA, shows that there are 55 million

9   breeder birds available in terms of supply.

10  Q.  So let's pause for a minute and just talk about that term

11  "breeder bird."  What does that mean?

12  A.  Breeder bird, the way I think about it, it's the critical

13  input in terms of the production of broiler chickens.  So I

14  think of it as a pyramid.  At the top of the pyramid are the

15  breeder birds, they produce the hens, and the hens produce the

16  broiler chickens.  So that's -- that's the critical input.

17  Q.  So what does it mean, then, turning back to your chart,

18  that the supply of breeder birds was increasing prior to 2014

19  in the previous years, what does that mean to you?

20  A.  So you're focusing on what was happening from 2013, '14,

21  '15, correct?

22  Q.  That's right.  And let me give you a little more context

23  for that question.  So the year 2014 is highlighted on this

24  slide; is that right?

25       MR. TORZILLI:  Objection.  Leading.

EDWARD SNYDER - Direct

1      THE COURT:  Overruled.

2      THE WITNESS:  Yes.

BY MS. PLETCHER:

3

4    Q.  So could you explain what significance that highlighting

5    has.

6    A.  Well, as I mentioned earlier, in 2014, summer and fall,

7    that's when the 2015 contract was negotiated.

8    Q.  Okay.  And so what analysis do you draw from the numbers

9    shown on this chart with respect to the supply of breeder

10   birds?

11   A.  So I go back to basic points about the industry.  The

12   industry involves commitments and advance planning.  Secondly,

13   breeder birds are critical input.  And what you see in the

14   chart is, yes, the supply of breeder birds was increasing in

15   2014 compared to 2013.  It's 53 million compared to 52 million.

16   But it's noteworthy in 2014, the total supply of breeder birds

17   was still less than it was in previous years, like 2009 and

18   2010.

19       So even though the supply was starting to pick up,

20   because of the lag involved in planning, investment, production

21   of broiler chickens, you have a tight supply for the critical

22   input.

23   Q.  Did you look at the actual number of broiler chickens

24   produced during this time period?

25   A.  Yes.  And the number of broiler chickens produced and

1854

EDWARD SNYDER - Direct

1    brought to market in 2014 was, consistent with this analysis,

2    less than the previous year.  That, again, reflects the limited

3    supply of breeder birds in the earlier years.

4    Q.  Now, you mentioned another supply factor that you analyzed.

5    What was that second supply factor that you analyzed?

6            MS. PLETCHER:  If we could put J-209 up again?

7            THE COURT:  You may.

8            MS. PLETCHER:  Thank you.

9            THE WITNESS:  The second supply factor concerns the

10   lower margins, lower profit margins on small birds relative to

11   big birds.

12   BY MS. PLETCHER:

13   Q.  Before we get into the details of the analysis, Professor

14   Snyder, what's the difference between a small bird and big bird

15   from your perspective as an economist?

16   A.  Well, I just pay attention to what I see industry

17   participants say.  They don't all say the same thing about the

18   particular cutoffs between small, medium, and big.  But

19   overall, the cutoff that I see for small birds is 4.5 or maybe

20   a little bit less and below, 4.5 pounds or less live weight for

21   small birds.  And then for big birds, above 7.5 live weight,

22   that falls into the categories of big birds.

23   Q.  Now, in terms of your analysis of the supply, you mentioned

24   there were lower profit margins for small birds relative to big

25   birds, why is that meaningful to your analysis here?

EDWARD SNYDER – Direct

1   *A.*  It's meaningful because suppliers of chickens over time can

2   shift between small and big or big to small.  It takes

3   investments, in some cases pretty substantial investments in

4   terms of processing equipment, but they can make that shift.

5   And naturally, suppliers are going to want to shift to the bird

6   size, bird category that is most profitable.

7   *Q.*  Did you prepare a chart to help you explain how an -- this

8   shift in production affects prices in 2015 for KFC?

9   *A.*  I did.

10  *Q.*  Okay.  I'm going to ask you to turn to J-251.

11  *A.*  Yes.

12  *Q.*  What is this chart?

13  *A.*  This is a very simple chart.  It's just got two rows.  And

14  it compares industry-wide big-bird prices over the period 2008

15  to 2014 and compares that -- that price increase in percentage

16  terms to Pilgrim's Pride COB price to KFC.  So it's

17  fundamentally a comparison between prices industry-wide and

18  small-bird prices charged by Pilgrim's to KFC.

19  *Q.*  What data source did you use to determine the industry-wide

20  big-bird price?

21  *A.*  So for that I used two different data sources.  The USDA

22  does not actually produce a price series on big birds, but they

23  do produce price information on big-bird parts, leg quarters,

24  breasts, and wings.  So from the USDA, I got those -- those

25  prices on the components of big birds.

1856

EDWARD SNYDER – Direct

1      And then the other source for big-bird price increase

2  is a formula that was published by an industry source, Express

3  Markets, EMI, back in 2014.  And, obviously, as an economist --

4  again, I would use the USDA data, but I also use industry

5  publications that industry participants rely upon, and the EMI

6  publication is actually one that industry participants

7  subscribe to.  They pay to get that information.  And as an

8  economist, that's the kind of source and industry source that I

9  turn to.

10  Q.  So is using an industry source formula and applying that to

11  USDA underlying data the type of analysis an economist would

12  typically perform?

13  A.  Definitely.  I mean, you've got the formula from an

14  industry source that people pay money for, you've got the USDA

15  data on the underlying parts, those two together are exactly

16  the kind of things that an economist will do.

17  Q.  What data was used for the Pilgrim's prices on this chart?

18  A.  The same data that I referred to earlier, from KFC

19  contracts that identify the prices charged by Pilgrim's to KFC

20  for small birds.

21  Q.  And did you verify that the data used in your chart is

22  accurate?

23  A.  Yes.  I verified both the USDA data on the underlying parts

24  for big birds, made sure that we downloaded those properly,

25  made sure that we applied the formula to the parts to make sure

EDWARD SNYDER - Direct

1   we came up with overall big-bird price, calculated the change

2   in prices as the chart shows from 2008 to 2014, that's the

3   period running up to 2015.

4          For Pilgrim's prices, we checked the contracts and

5   made sure that we were calculating the price change properly.

6          *MS. PLETCHER:*  Your Honor, I move to admit J-251 into

7   evidence.

8          *THE COURT:*  Any objection to the admission of J-251?

9          *MR. TORZILLI:*  No.

10         *THE COURT:*  Exhibit J-251 will be admitted.

11         (Exhibit J-251 admitted.)

12         *MS. PLETCHER:*  Your Honor, I'm mindful of the time.

13  This is a good stopping point.

14         *THE COURT:*  This is fine.  We'll break for lunch.

15  Keep your yellow juror buttons visible if you're in hallways or

16  in restaurants.  We'll reconvene at the usual time, 1:30.  The

17  jury is excused.

18         (Jury out at 11:59 a.m.)

19         *THE COURT:*  Any issues over lunch or that we should

20  take up now?

21         We'll be in recess until 1:30.  Thank you.

22         (Recess at 12 p.m.)

23         (In open court at 1:32 p.m.)

24         *THE COURT:*  Thank you.  Please be seated.

25         We've got Professor Snyder, and why don't we go ahead

EDWARD SNYDER - Direct

1    and bring the jury back in.

2              (Jury in at 1:33 p.m.)

3         *THE COURT:* Ms. Pletcher, go ahead.

4         *MS. PLETCHER:* Thank you, Your Honor.

5    *BY MS. PLETCHER:*

6    *Q.* Professor Snyder, welcome back from the lunch break.

7    *A.* Thank you.

8    *Q.* Before we broke for lunch, you were talking about the

9    second supply factor that you had considered.  Do you remember

10   that?

11   *A.* Yes.

12   *Q.* Great.  And we had just talked about Exhibit J-251.  So

13   make sure that you've got that in front of you.

14   *A.* I do.

15   *Q.* Great.  I believe the Court admitted J-251.

16        *MS. PLETCHER:* And I'd ask to publish it at this

17   moment?

18        *THE COURT:* You may.

19        *MS. PLETCHER:* Thank you.

20   *BY MS. PLETCHER:*

21   *Q.* Professor Snyder, can you explain to the jury what this

22   chart shows?

23   *A.* This chart is pretty simple, but important.  It shows the

24   industry-wide big-bird prices rising 32 percent over the period

25   2008 to 2014, and the comparison is to Pilgrim's' prices of COB

1859

EDWARD SNYDER - Direct

1  to KFC, which rose at 14 percent, and that's -- that's

2  important, because from the point of view of a supplier, if

3  they have the ability to shift production, they're going to

4  shift production to where it's more profitable.  What this

5  chart is providing is the insight that big-bird prices running

6  up to the 2015 contract had increased by much more than

7  small-bird COB.

8  Q.  So can you just explain a little further what this mismatch

9  between the growth and prices across big bird and small bird

10 means to you in terms of your analysis?

11 A.  Well, I had already reviewed the demand factor, which had

12 to do with the relative price of chicken versus substitutes.  I

13 have already reviewed the reduced supply of breeder birds, the

14 first supply factor.  Now I have a third factor, and that's

15 this mismatch that's going to encourage supply to be shifted to

16 big birds.  So all of these factors, these three factors, push

17 in the same direction, which is to increase the wholesale

18 prices of chicken, small bird.

19 Q.  Professor Snyder, this analysis is focused on Pilgrim's,

20 but you were aware that many suppliers increased prices of

21 small birds in 2015.

22         MR. TORZILLI:  Objection.  Leading.

23         THE COURT:  Sustained.

24 BY MS. PLETCHER:

25 Q.  Professor Snyder, are you aware of the fact that many

1860

EDWARD SNYDER - Direct

1    suppliers increased prices to small birds in 2015?

2    A.   I am.

3    Q.   And how do you explain that fact?

4    A.   Well, the supply and demand factors that I've identified

5    aren't just to -- you know, related to Pilgrim's.  Suppliers

6    face those same demand and supply factors, and suppliers in the

7    industry are going to tend to respond in the same way to those

8    supply and demand factors.

9    Q.   And why is it that suppliers in the industry respond the

10   same way to market factors?

11   A.   Because they're all facing the same market factors, and the

12   incentives that those market factors create are not just for

13   Pilgrim's, they apply to industry suppliers generally.

14   Q.   So bringing this piece of your analysis, you know, to a

15   close here, Professor Snyder, let's look again at J-399.

16        MS. PLETCHER:  If we can put that up again for

17   demonstrative purposes only.

18        THE COURT:  You may.

19        MS. PLETCHER:  Thank you.

20   BY MS. PLETCHER:

21   Q.   Going back to that second question that you sought to

22   answer, what did you find after conducting your analysis with

23   respect to this second question?

24   A.   With respect to the 2015 price increase, I find that there

25   are alternative explanations for that observed outcome, and

EDWARD SNYDER – Direct

1  those alternative explanations are grounded in supply and

2  demand.

3  Q.  Let's shift gears now, Professor Snyder, and look at the

4  third question that you sought to answer.  We have that third

5  question up on the slide.  Can you remind the jury what that

6  was.

7  A.  Yes.  The third question is:  Do the economic analyses

8  indicate bid rigging and price fixing?

9  Q.  Now, earlier in our -- your testimony, you told the jury

10 there were two types of analysis that you conducted to test the

11 hypothesis here that the Government had.  One of those was an

12 analysis of prices and bids; is that correct?

13 A.  Yes, prices and bids by suppliers who are alleged to engage

14 in bid rigging and price fixing.

15 Q.  What was the second?

16 A.  Second analysis, benchmarking is basically a comparison of

17 what the suppliers who are alleged to have engaged in price

18 fixing and bid rigging, how those prices compared to another

19 group of suppliers that I'll refer to as either the benchmark

20 group or as the control group.

21 Q.  Let's start with the analysis of bids and prices.  What

22 specifically did you do to study the bids and prices at issue

23 here?

24 A.  The first thing I did was to answer a pretty

25 straightforward question, which is, are the bids and final

EDWARD SNYDER - Direct

1    prices across the suppliers who are alleged to have engaged in

2    price fixing, are they identical?  And I did that analysis for

3    2013 and 2015.

4    Q.  And why was that meaningful to you?

5    A.  Well, in my experience, a potential indicator of price

6    fixing is that suppliers are charging the same bids and the

7    same prices.

8    Q.  And did you prepare a slide reflecting what you found when

9    you conducted the analysis for the 2013 prices?

10   A.  Yes.

11   Q.  I'm going to ask you to turn to what has been marked as

12   J-252.  Let me know when you're there.

13   A.  Yes.

14   Q.  Okay.  Is this the slide that reflects your analysis for

15   2013?

16   A.  Yes.

17   Q.  Okay.  What does this slide show at a general level?

18   A.  This shows the initial bids and final prices as reflected

19   in contracts to KFC for the 2013 contract, and it shows that

20   information for six suppliers, and I can identify them if you'd

21   like.

22   Q.  Okay.  Let's do that in just a moment.

23          First, could you explain what data was used for this

24   chart.

25   A.  The final prices are reflected in KFC's contracts.  The

EDWARD  SNYDER  -  Direct

1    initial bids are reflected in documents such as emails that

2    transmit bids.

3    Q.  And how did your team and you verify this chart?

4    A.  We checked the contracts and made sure that the final

5    prices matched up to those.  And in terms of the initial bids,

6    we checked to make sure that what is presented in the chart

7    matches what was transmitted.

8           MR. TORZILLI:  Your Honor, if I may, the Government

9    agrees to the admission of this exhibit.

10          MS. PLETCHER:  I offer the exhibit into admission,

11   then.

12          THE COURT:  Okay.  Then J-252 will be admitted.

13          (Exhibit J-252 admitted.)

14          MS. PLETCHER:  Thank you.

15          May we publish?

16          THE COURT:  You may.

17          MS. PLETCHER:  Thank you.

18   BY MS. PLETCHER:

19   Q.  Professor Snyder, the jury can see the chart now.  Can you

20   please explain to them what it shows?

21   A.  Yes.  So across the bottom are six individual suppliers,

22   suppliers who are alleged to have engaged in price fixing, and

23   the focus here is on the small-bird, eight-piece COB being sold

24   to KFC per the 2013 contract, the vertical axis, which starts

25   at 96 cents, helps identify in blue the initial bids, which

EDWARD SNYDER - Direct

1   were submitted in October 2012, and the final prices that

2   resulted from the bidding and negotiations, and those final

3   prices are reflected in the 2013 contract.

4   Q.  And just to clarify briefly, the numbers with respect to

5   Claxton and with respect to Marshall Durbin look like they went

6   up from the initial bid to the final price.  Can you explain

7   what was happening there?

8   A.  Yes.  If you focus on Claxton, you see that that final

9   price is higher by an amount of .005.  Claxton did not,

10  however, increase its bid.  What happened was that RSCS, the

11  party that was organizing the bidding, imposed a surcharge

12  equal to that amount.

13  Q.  Now, Professor Snyder, did you and your team conduct a

14  similar analysis for the 2015 contract?

15  A.  Yes.

16  Q.  I'm going to ask you to turn to J-253 in your binder.  What

17  is this exhibit?

18  A.  This exhibit is very similar analysis for the 2015 KFC

19  contract for eight-piece COB, small bird.

20  Q.  What data was used for this analysis?

21  A.  Same types of data, the contract data and the data on

22  initial bids came from various documents, including the

23  transmittal emails.

24          MS. PLETCHER:  Your Honor, I offer J-253.

25          THE COURT:  Any objection to the admission of J-253?

1865

EDWARD SNYDER - Direct

1   MR. TORZILLI:  Not other than previously stated.

2   THE COURT:  All right.  Those objections will be

3   overruled, and J-253 will be admitted.

4   MS. PLETCHER:  Thank you.

5   May we publish, please?

6   THE COURT:  You may.

7   MS. PLETCHER:  Thank you.

8   (Exhibit J-253 admitted.)

9   BY MS. PLETCHER:

10  Q.  Professor Snyder, the jury can now see this exhibit.  Can

11  you please explain what it shows?

12  A.  Well, similar to the exhibit for the 2013 contract, this

13  shows the initial bids in blue, final contract prices in gold,

14  I guess, for the six suppliers who were supplying to KFC for

15  the 2015 contract.  There is one difference along the bottom

16  axis, and that's that Mar-Jac, due to an acquisition, is

17  represented in the last spot.  The other change I would just

18  note is now the vertical axis starts at one dollar.

19  Q.  Professor Snyder, even though these prices are not

20  identical, did you analyze whether the price increases were

21  identical?

22  A.  Well, yes.  Having identified in both of these charts that

23  the initial bids are not identical and the final prices are not

24  identical, I wanted to ask, well, could it be that the price

25  increases were the same?  Price increases either in dollar

EDWARD SNYDER – Direct

1    terms or in percentage terms.  So I did this next check.

2    Q.  Do you have a slide that shows that analysis?

3    A.  I do.

4    Q.  All right.  I'm going to ask you to turn to J-254.  Is this

5    the slide that you just referenced?

6    A.  Yes.

7    Q.  And what data was used for this analysis?

8    A.  This -- this analysis focuses on the price change from 2014

9    to 2015.  The source of the data are the KFC contracts for 2014

10   and 2015.

11          MS. PLETCHER:  Your Honor, I offer J-254.

12          THE COURT:  Any objection to the admission of J-254?

13          MR. TORZILLI:  Just one moment, Your Honor.

14          THE COURT:  Sure.

15          MR. TORZILLI:  No objection.

16          THE COURT:  J-254 will be admitted.

17          (Exhibit J-254 admitted.)

18          THE COURT:  And may be published.

19          MS. PLETCHER:  Thank you.

20   BY MS. PLETCHER:

21   Q.  Professor Snyder, can you explain what this chart shows?

22   A.  Well, prices went up from 2014 to 2015.  The question I

23   wanted to ask is, across the suppliers, were the price

24   increases identical in either dollar terms or cents terms, or

25   in percentage terms.  So I've got the six suppliers arranged on

EDWARD SNYDER - Direct

1    the horizontal axis, and I have on the vertical axis, dollars

2    and cents, and the height of the bar represents how much these

3    suppliers increased their prices from 2014 to 2015 in terms of

4    cents.

5         So, for example, Tyson increased their prices from '14

6    to '15 by approximately 14 cents.  So when I look across the

7    suppliers, the amount of the increase is not identical.  They

8    differ quite a bit.  I also checked the -- I'm using the same

9    chart to see if the percentage increases were the same.  And

10   you take, for example, Koch in red, they're the fourth, their

11   percentage increase was 12.4; whereas, Pilgrim's in percentage

12   terms was 17.3.

13   Q.  So what does this analysis tell you with respect to the

14   questions that you sought to answer in this case?

15   A.  Well, I don't see any evidence of bid rigging or price

16   fixing in terms of whether the price increases were coordinated

17   either in cents or in percentage terms.

18   Q.  Professor Snyder, let's dig a little deeper into this

19   particular issue.  What about the range of prices?  Did you

20   consider that question?

21   A.  I did.

22   Q.  And what did you find?

23   A.  Well, what I wanted to find -- figure out was, okay, prices

24   are not identical, the increases are not identical, but could

25   it be the case that the prices converged across the suppliers?

1868

EDWARD SNYDER - Direct

 1   Did they get closer together, as I would expect if there was

 2   price fixing.  And so I did an analysis of the range of prices

 3   in 2015 to see if that convergence had happened.

 4   Q.   Do you have a slide that shows that analysis?

 5   A.   Yes.

 6   Q.   Okay.  I'm going to ask you to turn to J-255.  Is this the

 7   slide that you referred to?

 8   A.   Yes.

 9   Q.   And what data was used for this chart?

10   A.   For each supplier, I identified the prices from the KFC

11   2014 and 2015 contracts.

12           MS. PLETCHER:  Your Honor, I offer J-255.

13           THE COURT:  Any objection to the admission of J-255?

14           MR. TORZILLI:  No objection.

15           THE COURT:  Exhibit J-255 will be admitted and may be

16   published.

17           (Exhibit J-255 admitted.)

18           MS. PLETCHER:  Thank you.

19   BY MS. PLETCHER:

20   Q.   Professor Snyder, what does this chart show?

21   A.   Again, I'm asking the question, did the prices converge in

22   2015, and I'm answering that by looking at the range, the

23   highest price to the lowest price.  And in 2014, that range was

24   .84 cents.  In 2015, that range expanded.  The prices didn't

25   converge, the range actually got substantially bigger, and that

EDWARD SNYDER - Direct

1  range is 5.49 cents.

2  *Q.*  So what does the fact that the range was wider in 2015 tell

3  you about whether bid rigging or price fixing occurred here?

4  *A.*  Well, it's not what I would have expected.  If there were

5  an effort to fix prices and rig bids, I'd expect convergence.

6  *Q.*  Professor Snyder, I'm going to shift gears for a moment.

7        *MS. PLETCHER:*  Because I want to change topics, we can

8  take this analysis down.

9  *BY MS. PLETCHER:*

10  *Q.*  Before we go any further, I want to be clear, do you do all

11  of this work for free?

12  *A.*  No.

13  *Q.*  How much are you being compensated here?

14  *A.*  My compensation has two components.  The hourly component

15  is $1,400 per hour, and I also receive a share of the billings

16  of the team at Analysis Group for the work they conduct.

17  *Q.*  Is that more than you typically charge?

18  *A.*  No.

19  *Q.*  That --

20  *A.*  That's my standard rate.

21  *Q.*  Okay.  That compensation is quite high.  Why is it so high?

22  *A.*  It's very high.  I am someone who has been working on

23  antitrust matters for over four decades.  I've been a dean at

24  three top business schools.  And on the demand side, people

25  value my work as an expert.  They find me to be reliable, that

EDWARD SNYDER - Direct

1    the work I do is accurate.  So there is demand-side effect, and

2    then there is a supply-side effect.  I am an economist.  On the

3    supply side, there is just a limit as to what I can do.  I have

4    teaching responsibilities and research responsibilities.  So I

5    end up taking a pretty small subset of the cases that

6    potentially come my way.

7    *Q.*  Does your compensation depend in any way on whether the

8    findings that you reach are favorable to the defendants or to

9    the outcome of this case?

10   *A.*  No.

11   *Q.*  How much time did it take you and your team to do the

12   analysis and prepare for your testimony?

13   *A.*  To do it in part, in steps, my time?  Leading up to the

14   last hearing, I had put in about 200 hours.  Leading up to this

15   trial, that increased to 250, 250 hours.  As to my team, they

16   put in far more hours than I have over the course of working on

17   this matter.  And we're now into our third year.  It's been a

18   lot of data analysis.

19   *Q.*  Does the time that you put into this matter include

20   preparation for two hearings in addition to this trial?

21   *A.*  Yes.

22   *Q.*  And testimony at a previous hearing?

23   *A.*  Yes.

24   *Q.*  Thank you, Professor Snyder.

25          All right.  Let's shift back to the economic analysis

EDWARD SNYDER – Direct

1    here.

2         Let's look at the final analysis that you did.  You

3    looked at bids and prices that we just discussed.  Is there

4    another step that you took that you'd like to share with the

5    jury?

6    A.   Yes.  And I think what's next is the benchmark analysis.

7    Q.   That's right.  What is benchmarking?

8    A.   Benchmarking is essentially a comparison.  You've got the

9    prices that the suppliers who allegedly fix prices, you can

10   compare those prices to what other suppliers charged, and these

11   other suppliers are not alleged to have fixed prices, so

12   they're in what I would call the control group or the benchmark

13   group.

14   Q.   Is benchmarking something that economists typically do?

15   A.   Yes, that tool has been around for a long time.

16   Q.   Is it a tool that economists typically use in price-fixing

17   cases?

18   A.   Yes.

19   Q.   Now, did you prepare a slide that reflects the results of

20   your benchmarking analysis?

21   A.   I did.

22   Q.   I'm going to ask you to turn to J-256.  Is this the slide

23   that shows your benchmarking analysis?

24   A.   Yes.

25   Q.   What data was used for this chart?

EDWARD SNYDER - Direct

1    *A.*  So this -- the data built up to identifying what prices

2    different suppliers charged in 2015.  The buildup is from

3    monthly sales data, and then I take those monthly sales and

4    aggregate them to particular years.  And I'm not sure how much

5    more I should say about this on the suppliers at this point.

6    *Q.*  Let's stop there in terms of suppliers.  We'll just ask a

7    few more questions focusing on the data here.  Where did the

8    data that you used for this chart come from?

9    *A.*  The monthly sales data that were then aggregated came from

10   a dataset that I had access to.

11   *Q.*  In what form did you receive that data?

12   *A.*  I received those data as monthly averages for the different

13   suppliers.  And in total -- I don't know if I should say -- I

14   received those data for a number of suppliers.

15   *Q.*  Yes.  Did you receive data in raw format?

16   *A.*  No.  What happens in these situations -- and I've been in

17   them a lot -- is that businesses keep track of their

18   transactions.  They do that in different ways.  There is no

19   standard format that all suppliers use.  So the transactional

20   data -- and there are millions of observations when it comes to

21   the transactional data involved here.  For me to use them, they

22   have to be compiled into a usable format, a common format.  So

23   that compilation process has to happen for the data to be

24   usable.  And the compilation was taking the individual

25   transactions, sorting through the ones that were relevant, and

EDWARD SNYDER - Direct

1    then identifying the monthly average.

2    Q.  Did you compile that data yourself?

3    A.  No, I did not.

4    Q.  Who did that?

5    A.  A consulting firm that was -- had access to data from 20

6    different suppliers.

7    Q.  Is it common for economists to use data compiled by

8    consulting companies in this manner?

9    A.  Yes.  And I'm familiar with the various consulting firms

10   that specialize in this kind of compilation and data analytics.

11   Q.  Did your team verify that the data used in this chart was

12   accurate?

13   A.  Yes.

14   Q.  And how did you and your team do that?

15   A.  Two ways:  One, we checked to make sure that the monthly

16   data, when aggregated into annual data for 2015, we checked to

17   make sure that that aggregation was done properly.

18          In addition, we checked the underlying transactional

19   data to the extent that that was available, and we made sure

20   that the aggregation -- the prior aggregation, the compilation

21   was done accurately.  What I mean by that is going from the

22   individual transaction data up to the monthly averages.

23          MS. PLETCHER:  Your Honor, I offer J-256.

24          THE COURT:  Any objection to the admission of J-256?

25          MR. TORZILLI:  May I voir dire?

EDWARD SNYDER - Examination

1        *THE COURT:*  You may.

2                          **EXAMINATION**

3    *BY MR. TORZILLI:*

4    Q.  Good afternoon, Professor Snyder.

5    A.  Good afternoon.

6    Q.  I have some questions for you on the testimony you've given

7    in response to counsel's questions the past few minutes about

8    the data.  Okay?

9    A.  Yes.

10   Q.  Okay.  So, first, I think you said that you used monthly

11   sales data and then rolled it up or added together to come up

12   with an annual amount of sales, correct?

13   A.  Yes, aggregated the monthly data into an annual number.

14   Q.  So the answer to my question is yes?

15   A.  Yes.

16   Q.  Okay.  And then you said as part of your discussion with

17   defense counsel that there was sorting through of what was

18   relevant.  You said that, right?

19   A.  Yes.

20   Q.  Okay.  Now, you and people working at your direction did

21   not sort through the observations that were relevant, correct?

22   A.  Well, not for all of the suppliers, but we did so to check

23   the quality of the data for suppliers for whom we had available

24   transaction data.

25   Q.  Okay.  So which suppliers did you or the team working at

EDWARD SNYDER - Examination

1  your direction sort through to determine which observations

2  were relevant?

3  *A.*  Pilgrim's, Foster, and GNP.

4  *Q.*  GNP?

5  *A.*  Also known as Gold'n Plump, I believe.

6  *Q.*  Gotcha.

7        So those three are the firms where you -- it wasn't

8  you personally doing it, I take it; it was someone working

9  under your direction, right?

10  *A.*  Correct.

11  *Q.*  Okay.  And they sorted through all of the observations for,

12  what, calendar year 2015, right?

13  *A.*  Just to clarify, when you say all of the observations --

14  *Q.*  Yeah, I'm asking you what the -- you and the people at your

15  direction are doing.  So you should be clarifying what you and

16  the people at your direction did.  I'm just trying to

17  understand what you did.

18  *A.*  Yes.

19  *Q.*  And your team did.

20  *A.*  So my team, for those three suppliers for whom we had the

21  underlying transaction data, we did checks for particular

22  months -- not all the months -- to make sure that the

23  aggregation from the transaction level up to the monthly level

24  was done accurately, and we found that the other consulting

25  firm had, indeed, done it accurately.

1876

EDWARD SNYDER - Examination

1  Q.  Which months did those checks occur for?

2  A.  I don't -- I don't know.

3  Q.  For any of the three firms, do you know which months were

4  used --

5  A.  No.

6  Q.  -- for spot checks?

7  A.  No.

8  Q.  Okay.

9  A.  I don't have that specific information.

10  Q.  So the process -- the sorting through to determine which

11  observations was relevant that you -- and the team that at your

12  direction did for Pilgrim's and Foster and GNP, that was not

13  replicated for the other firms' data that purport to be

14  represented on the exhibit that we're looking at on the screen

15  in front of you, right, Professor Snyder?

16  A.  That's correct.

17  Q.  Okay.  And you said there were -- I think you said 19 or

18  maybe you said 20 different suppliers, right?

19  A.  Yes, the other consulting firm did the compilation for 20

20  suppliers.

21  Q.  Okay.  Now, there are less than 20 suppliers depicted on

22  the exhibit that is displayed on your screen.  What happened to

23  the balance of the suppliers?  Why did they not make it on the

24  exhibit?

25          MS. PLETCHER:  Your Honor, object to the scope of *voir*

EDWARD SNYDER – Examination

1    *dire*.

2           *THE COURT:*  Overruled.

3    *BY MR. TORZILLI:*

4    *Q.*  You can answer, sir.

5    *A.*  Yes, the 20 suppliers include some suppliers that sold to

6    KFC and were alleged to have participated in the bid rigging

7    and price fixing.  So I'm trying to develop, of course, a

8    benchmark set of suppliers, so one of the steps is to not focus

9    on the ones that are alleged to have engaged in price fixing,

10   so that reduces the number from 20 down to, as I recall, 12 or

11   13.  And then I applied two additional criteria to identify the

12   benchmark group.  One is that they had to sell similar product,

13   eight-piece COB in 2015.  And then the last step in selecting

14   the benchmark group was to select only those suppliers who sold

15   that product in substantial volumes, cutoff that I defined as

16   more than a million pounds in that year.  So that process is

17   how we went from 20 down to five benchmark suppliers.

18          *MR. TORZILLI:*  Nothing further.  Thank you, Your

19   Honor.

20          *THE COURT:*  All right.  Any objection to the admission

21   of 256?

22          *MR. TORZILLI:*  I do have objection.  May I be heard on

23   sidebar?

24          *THE COURT:*  You may.

25          (Hearing commenced at the bench.)

1878

EDWARD SNYDER - Examination

1          THE COURT:  Go ahead, Mr. Torzilli.

2          MR. TORZILLI:  Your Honor, I object to the extent that

3    the exhibit displays firms on the right-hand side, dark blue

4    side, that were not subjected to an auditing process the way

5    that the Foster Farms and GNP were, and I would have no

6    objection to those two, but object to the depiction of the

7    balance of those firms.  So Fieldale, Mountaire, and Perdue.

8          THE COURT:  All right.  Ms. Pletcher, response.

9          MS. PLETCHER:  Yes, Your Honor, Professor Snyder was

10   clear that he used those other companies as spot checks to

11   verify the accuracy of the data.  He stated he believes the

12   data was accurate, and counsel's objections go more to the

13   weight rather than to the admissibility.

14         THE COURT:  Mr. Torzilli, anything else from you?

15         MR. TORZILLI:  Nothing further.  Thank you, Your

16   Honor.

17         THE COURT:  The objection will be overruled.

18   Professor Snyder did those spot checks based upon a dataset

19   that he happened to have, but there has been no suggestion that

20   the -- there is any distinguishing by the consultant, unnamed

21   consultant that put together the data on all of those different

22   chicken suppliers.

23         So the spot-check is simply that, to determine whether

24   or not the unnamed consulting company was doing the analysis

25   accurately.  And Professor Snyder testified that based on the

EDWARD SNYDER - Direct

1    spot checks, he believed that it was.  Therefore, no reason to

2    exclude the information regarding the suppliers who did not --

3    who Professor Snyder didn't have the information on to be able

4    to spot-check, since that spot-check presumably -- well,

5    rather, the unnamed consulting company would have done the same

6    thing for all of them.  So the objection is overruled.

7              (Hearing continued in open court.)

8              THE COURT:  The objection is overruled.  Go ahead,

9    Ms. Pletcher.

10             MS. PLETCHER:  Thank you, Your Honor.  I offer J-256.

11             THE COURT:  256 will be admitted.

12             (Exhibit J-256 admitted.)

13             MS. PLETCHER:  May I publish?

14             THE COURT:  You may.

15             MS. PLETCHER:  Thank you.

16                   **DIRECT EXAMINATION CONTINUED**

17   BY MS. PLETCHER:

18   Q.  Professor Snyder, what does this chart show?

19   A.  As I indicated, benchmarking is fundamentally a comparison,

20   so in this chart, I'm comparing on the left-hand side

21   Pilgrim's' prices charged to KFC, that's the first part of the

22   chart, and Pilgrim's' prices to other customers.  I should note

23   that the title correctly indicates that this is focused on

24   2015, eight-piece COB prices.  The vertical axis is in dollars

25   and cents.  It starts at 60 cents.  You see the prices charged

EDWARD SNYDER - Direct

1   by Pilgrim's to KFC and these others, then, on the right.  I

2   display the prices charged by the benchmark group, and the

3   benchmark group includes Fieldale, Foster, GNP, Gold'n Plump,

4   Mountaire, and Perdue.

5   *Q.*  Professor Snyder, could you -- you explained briefly on

6   *voir dire* how you selected this control group, but for the

7   benefit of the jury, now that they can see the chart, could you

8   walk through how it is that you selected this benchmark group

9   or control group?

10  *A.*  Three steps:  No. 1, not alleged to have been part of the

11  bid rigging, price fixing; two, sold the same product,

12  eight-piece COB in 2015; and, three, sold it in substantial

13  volumes to find out it's greater than a million pounds in that

14  year.

15  *Q.*  So what does this benchmark analysis show?

16  *A.*  This benchmark analysis to me -- well, it's -- it's what it

17  doesn't show.  What you would expect with price fixing is that

18  the benchmark suppliers would be charging lower prices than

19  Pilgrim's.  After all, they're not alleged to have been part of

20  the price fixing.  So when I say lower, I mean lower than

21  Pilgrim's sales to KFC and to other buyers.  So it's actually

22  the opposite of what I would have expected, and what you see in

23  the chart is the benchmark suppliers across the board, as a

24  group, are charging higher prices.  So this is a noteworthy,

25  surprising result, counter to the Government's hypothesis, and

EDWARD SNYDER - Direct                    1881

1   as I said, it's a standard tool.

2   Q.  What steps, if any, did you take to ensure that this

3   analysis was accurate?

4   A.  Well, one important step is already reflected on the slide,

5   and that is, I've got five benchmark suppliers.  I'm not

6   relying on just one.  So there is safety in numbers.

7        The second thing I did is, what economists call

8   sensitivity checks.  Now, being in the real world, even after

9   you get down to eight-piece COB products, there are differences

10  in specifications across buyers, so I can't control for the

11  huge number of variables across the suppliers, but I did two

12  sensitivity checks.

13       One is for marination.  Pilgrim's, when they sell to

14  KFC, doesn't -- they always sell marinated products, so to do a

15  sensitivity check on that, I took out the sales of

16  non-marinated products out of the sales for the benchmark

17  group.  The results don't change.  The pattern doesn't reverse.

18  We don't see the group of benchmark suppliers charging lower

19  prices.

20       I did a similar sensitivity check for antibiotic free.

21  Again, Pilgrim's doesn't sell antibiotic-free chicken to KFC.

22  So on the right-hand side, I took out those products from what

23  is represented here for that benchmark group of suppliers, and,

24  again, the results don't change.

25  Q.  Professor Snyder, you said that you can't control for every

1882

EDWARD SNYDER - Direct

 1    variable.  What variables did you control for?

 2    *A.*  Well, I controlled for the fact that it is eight-piece COB,

 3    it's sold in that year, it's sold in substantial volumes, but

 4    when you look at the right-hand-side suppliers, they're selling

 5    to lots of different customers who have a variety of

 6    specifications.  And it's simply not possible, nor is it

 7    necessary, for you to get down to the point where you control

 8    for every supplier's -- excuse me, every buyer's specification.

 9    *Q.*  Is that a situation that economists typically confront?

10    *A.*  Yes, in benchmarking.  Economists need to figure out what

11    to control for and what not to control for.  Because if you try

12    to control for everything, you can't do a comparison.

13    *Q.*  Professor Snyder, did you conduct any additional analyses

14    to test whether your conclusion from the benchmarking analysis

15    was valid?

16    *A.*  Yes.  I mean, my conclusion from the benchmarking analysis

17    is it contradicts the Government's hypothesis.  The blue bar

18    should be lower than the light blue bars for Pilgrim's Pride.

19    But I did do another check to see if possibly the prices on the

20    right-hand side in the control group were influenced by what is

21    sometimes referred to as the umbrella effect.

22    *Q.*  Do you have a slide that explains what the umbrella effect

23    is and how your analysis worked in this case?

24    *A.*  Yes.

25    *Q.*  Okay.  I'm going to ask you to turn to J-270.  That's

EDWARD SNYDER – Direct

1    2-7-0.

2    A.  Yes.

3          MS. PLETCHER:  Your Honor, I ask to publish J-270 for

4    the jury for demonstrative purposes only.

5          THE COURT:  Any objection to the display of J-270 for

6    demonstrative purposes only?

7          MR. TORZILLI:  One moment, Your Honor?

8          THE COURT:  Yes.

9          MR. TORZILLI:  No objection, Your Honor.

10         THE COURT:  All right.  J-270 may be displayed for

11   demonstrative purposes.

12   BY MS. PLETCHER:

13   Q.  Professor Snyder, could you explain to the jury what this

14   slide shows.

15   A.  Yes.  It goes through an explanation of the umbrella

16   effect.  The umbrella effect is an idea that economists in my

17   field, IO, developed back in the 1980s, and it was developed to

18   try to resolve situations where you found that the

19   control-group suppliers weren't charging lower prices.  The

20   idea of the umbrella effect is, well, maybe the following

21   happens, you get price fixing by a group of suppliers, that

22   creates an umbrella, and then the non-conspirators take

23   advantage of that coming into the umbrella.

24         So what that means in terms of objective outcomes is

25   that if there is an umbrella effect, the control-group

EDWARD SNYDER - Direct

1    suppliers take advantage of that umbrella and raise their

2    prices to follow the prices of the suppliers who are alleged to

3    have fixed prices.

4    Q.  And did you test whether the umbrella effect was operative

5    in this case?

6    A.  Yes, I did.  And I hope that my explanation was clear on

7    the following point:  The way an economist can test for the

8    umbrella effect is to focus on timing.  According to the

9    umbrella effect, the benchmark suppliers take advantage of the

10   higher prices, they follow in the wake -- mixing metaphors

11   here -- but it's after the price increase by those who engaged

12   in the price fixing.  They don't anticipate the higher prices

13   and move before.  So that's the test that I conducted.

14   Q.  And do you have a chart that shows your analysis when you

15   conducted that test?

16   A.  Yes, I do.

17   Q.  Okay.  I'm going to ask you to turn to J-271.  This is our

18   last slide here.

19        Is J-271 the slide that shows your analysis for the

20   timing on the umbrella effect?

21   A.  Yes, it is.

22   Q.  Okay.  And what data did you rely on in conducting this

23   analysis?

24   A.  So for the Pilgrim's data, I relied on monthly sales data

25   from Pilgrim's, and as I mentioned, Pilgrim's has reliable

EDWARD SNYDER - Direct

1  monthly sales data.  I've accessed the underlying transaction

2  data.  And for the five benchmark suppliers, the same set of

3  benchmark suppliers that I referred to earlier, I'm using

4  monthly data from each of them.  And I'm aggregating those

5  monthly data into annual numbers for 2012, 2013, and 2014.  And

6  what the chart does is simply takes the percentage difference

7  in prices from 2012 to 2014.

8  Q.  The data that you used, was this the same data that you

9  used for the benchmarking analysis that we saw a little bit

10 earlier today?

11 A.  Yes.

12 Q.  Was it compiled in the same manner that you've already

13 described?

14 A.  Yes.  And cross checked in the case of Pilgrim's, Foster,

15 and Gold'n Plump.  In the case of Pilgrim's, I had the

16 additional check with their contracts.

17 Q.  And, again, this data is the type of data that economists

18 typically rely on?

19 A.  Yes.

20 Q.  And in your check, did you find that it was reliable data?

21 A.  Yes, all the checks indicated that the data were reliable.

22 The -- the checks for Foster and GNP did not identify any

23 problems with the way those data were compiled.

24        MS. PLETCHER:  Your Honor, I offer J-271.

25        THE COURT:  Any objection to the admission of J-271?

1886

EDWARD SNYDER - Direct

1          MR. TORZILLI:  No objection, Your Honor.

2          THE COURT:  J-271 will be admitted and may be

3   displayed.

4          (Exhibit J-271 admitted.)

5          MS. PLETCHER:  Thank you.

6   BY MS. PLETCHER:

7   Q.  Professor Snyder, can you please explain to the jury what

8   this chart shows.

9          MR. TORZILLI:  Objection.  Calls for a narrative.

10          THE COURT:  Overruled.

11          THE WITNESS:  This chart depicts the percentage

12   increases, or in the case of one decrease, for the period 2012

13   to 2014.

14   BY MS. PLETCHER:

15   Q.  And what does this analysis tell you in terms of the

16   umbrella effect?

17   A.  Well, again, with the umbrella effect, the way you tell

18   whether it's happening is you focus on timing.  This is the

19   time period leading up to the 2015 increase by Pilgrim's to

20   KFC, and what I'm trying to figure out is whether the

21   control-group suppliers had already increased price, or did

22   they wait and follow Pilgrim's?  So the results that are here

23   help me distinguish between the idea of an umbrella effect and

24   support for an alternative hypothesis that goes back to supply

25   and demand.  Were there supply and demand factors hitting the

EDWARD SNYDER - Direct

1    market, leaving non-benchmark -- excuse me -- benchmark

2    suppliers to raise prices during this runup time period.

3    *Q.*  So, Professor Snyder, after analyzing the prices and

4    conducting this benchmarking analysis, what did you conclude in

5    terms of the third question that you were trying to answer

6    here?

7    *A.*  Well, the third question referred to economic analyses

8    using objective data on outcomes.  And from the analysis of

9    outcome data for the suppliers who are alleged to have engaged

10   in price fixing, I don't find any support for the Government's

11   hypothesis.  When I compare those outcomes to the outcomes for

12   the control group, the benchmark suppliers, I don't find any

13   evidence in support of the Government's theory, its hypothesis.

14   And instead, this -- in this particular analysis, the umbrella

15   effect, shows that these other suppliers were increasing prices

16   before 2015.  That is support for the alternative explanation,

17   that what is going on here in this market leading up to 2015 is

18   the combination of the demand and supply factors that I

19   discussed earlier.

20   *Q.*  Professor Snyder, then, based on all of your findings that

21   you've discussed today and all of your analysis that you've

22   shared with the jury, do you have a bottom-line answer as your

23   test of the DOJ's hypothesis?

24   *A.*  My bottom-line answer is that the economics do not line up

25   with the Government's theory.  And the economics support the

EDWARD SNYDER - Cross

1  alternative explanation for the observed outcomes that have

2  been the focus of this trial.

3          *MS. PLETCHER:*  Thank you, Professor Snyder.  I have no

4  further questions at this time.

5          *THE COURT:*  Thank you, Ms. Pletcher.

6          Any cross-examination from other defendants?

7          (No response.)

8          Cross-examination from the Government, Mr. Torzilli,

9  go ahead.

10                   **CROSS-EXAMINATION**

11  *BY MR. TORZILLI:*

12  *Q.*  Good afternoon, once again, Professor Snyder.

13  *A.*  Good afternoon.

14  *Q.*  So can you tell me, tell the jury, what your understanding

15  is of what you call the Government's hypothesis, please.

16  *A.*  Yes.  From the complaint, my understanding is that the

17  conspiracy started in 2012.  It was a far-reaching conspiracy,

18  and it continued through, I believe, 2019.  I may be wrong on

19  the end date.

20  *Q.*  The first two words of your answer were "the conspiracy,"

21  right?

22  *A.*  If I said that, that's what I meant.  The alleged

23  conspiracy -- the conspiracy as alleged in the complaint.

24  *Q.*  Correct.  And a conspiracy is an agreement, right?

25  *A.*  Yes.

EDWARD SNYDER - Cross

1   *Q.*   And --

2   *A.*   That's my understanding as an economist.

3   *Q.*   That's not just an understanding of you as an economist,

4   you actually worked at the antitrust division of DOJ, that's

5   what you said on direct examination, right?

6   *A.*   Yes.

7   *Q.*   You actually worked on price-fixing cases, right?

8   *A.*   Yes.

9   *Q.*   It's not just an understanding, it's actually part of your

10   professional psyche that a price-fixing conspiracy is an

11   agreement amongst competitors, right?

12   *A.*   Yes.

13   *Q.*   You don't deny that, right?

14   *A.*   Correct.

15   *Q.*   Okay.  Now, what you talked about on direct examination

16   with, among other things, the benchmarking analysis, so on and

17   so forth, that's all the product of reviewing economic

18   evidence, right?

19   *A.*   Yes.

20   *Q.*   I think you talked about contracts, right, you reviewed

21   contracts and relied on those as part of the opinions that you

22   gave today?  Right?

23   *A.*   Yes.

24   *Q.*   Some contracts, right?

25   *A.*   Well, you have you to go slide by slide.

EDWARD SNYDER - Cross

1    Q.   Sure.

2    A.   But definitely viewed contracts to find prices.

3    Q.   Contract prices, you relied on bids, right, that was part

4    of the economic evidence, as well?  Right?

5    A.   Yes.

6    Q.   And the sales data, right?

7    A.   Yes.

8    Q.   And anything else you can think of.

9         USDA data, right?

10   A.   Yes, while the -- while the USDA doesn't publish a specific

11   big-bird price index, I did, as I testified, relied on the USDA

12   for the underlying parts.  I also relied on the formula from

13   EMI.

14   Q.   And that's the economic evidence you relied on in forming

15   the opinions that you shared with the jury as part of your

16   direct examination, right?

17   A.   Yes.

18   Q.   Okay.  Now, none of that evidence tells you anything about

19   whether anyone agreed or conspired to fix prices, right?

20   A.   Well, the evidence that I can analyze are the objective

21   economic data, and I can't separate from that analysis evaluate

22   whether the parties entered into an agreement.  That's outside

23   of what I can do.

24   Q.   Yeah.  So the answer to my question is no, right?

25   A.   I just -- I don't want to restate what I just said.  I

1891

EDWARD SNYDER - Cross

 1   explained what I can do and what I can't do.

 2   Q.   Yeah.  So what you can't do is look at what you called the

 3   economic evidence, the contracts, the bid numbers, the sales

 4   figures, the equation from Express Markets, and so forth, and

 5   express an opinion that any of these defendants or, frankly,

 6   anyone else agreed to fix prices, right?

 7   A.   That's correct.  I cannot offer a separate opinion about

 8   agreement.

 9   Q.   Thank you, sir.

10        Now, I'd like to talk a little bit more about your

11   compensation.  Okay?

12   A.   Yes.

13   Q.   Okay.  So you said that you -- your billing rate is $1,400

14   an hour, right?

15   A.   Correct.

16   Q.   Now, you're here to testify, maybe not the entire day, but

17   between waiting to testify and actually testifying, you're

18   putting in basically a full day, right?

19   A.   Yes.

20   Q.   Now, like eight hours, right?

21   A.   Yes, I got up early.

22   Q.   Join the club.

23        But, Professor Snyder, how much in an eight-hour day

24   at your billing rate of $1,400 -- I mean, what does that mean

25   in terms of a day's worth of billings, if you did the

EDWARD SNYDER - Cross

1  multiplication?

2  A.  Eight times 1400.

3  Q.  Can you do it off the top of your head?  Or do you need a

4  calculator?  There should be one on the witness stand.

5  A.  I'll use the calculator.

6  Q.  I was going to say, you'd be a better person than I if you

7  can do it in your head.

8  A.  It's 11,200.

9  Q.  For eight hours?

10  A.  Correct.

11  Q.  So basically one day's worth of work?

12  A.  Correct.

13  Q.  Okay.  Now, you said you've been working on the case for a

14  while, have spent a good number of hours, can you give us an

15  all-in between your personal billings, and I think you said you

16  get a share of the billings of your team you're working with,

17  the consulting firm, right?

18  A.  I did say that, yes.  That's the second component.

19  Q.  Could you give us all in how much compensation to date

20  you've reaped from this matter?

21  A.  My personal compensation is in the range of $850,000, over

22  the time period, which began in 2020.  I'm well into the third

23  year.

24  Q.  And does that include a share of the billings from your

25  team?

EDWARD SNYDER - Cross

1    A.   That's what I took your question to mean.  Yes.

2    Q.   Okay.  So all -- everything all together?

3    A.   Correct.

4    Q.   Thank you.

5         I want to go back to what you did or did not rely on

6    in forming the opinions that you've expressed during your

7    testimony today.  So we talked about what you called economic

8    evidence, and we talked about some examples.

9         I want to ask you about some other things and see if

10   that's economic evidence or not.  Okay?

11   A.   Sure.

12   Q.   Okay.  So is trial testimony from Government trial

13   witnesses, is that economic evidence in your view or not?

14   A.   Well, the short answer is that trial testimony is subject

15   to cross-examination, and there are different witnesses, so it

16   certainly wouldn't be the kind of economic evidence that's

17   objective that I'm trained to analyze.

18   Q.   So you didn't rely on any testimony from any Government

19   witnesses in forming any of the opinions you've shared with us

20   today, correct?

21   A.   That's correct.

22   Q.   For example, including the testimony of Robbie Bryant,

23   right?

24   A.   That's correct.

25   Q.   Okay.  And you didn't rely on any of the trial exhibits

1894

EDWARD SNYDER - Cross

1   that have been received into evidence in this trial, other than

2   the contracts and the bid information, I realize some of those

3   are transmitted by email, but other than those, you haven't

4   relied on any trial exhibits that have been received into

5   evidence either, correct?

6   A.  Well, I don't know the whole set.  But I agree, the ones I

7   relied on are contracts and transmittal emails and so forth.

8   Q.  I'll give you an easier one, you didn't rely on any text

9   messages that have been received into evidence, correct?

10          MS. PLETCHER:  Objection, Your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  No, I did not.

13  BY MR. TORZILLI:

14  Q.  You did not rely on any phone records that have been

15  received into evidence, right?

16  A.  Correct, I did not.

17  Q.  So when you told the jury your views about price fixing,

18  you were not relying on trial testimony, emails, or bid

19  transmissions, text messages or phone records, right?

20  A.  That's correct.

21  Q.  And so the -- I think you called it the scientific method,

22  right?

23  A.  Correct.

24  Q.  So the scientific method, at least the way you employed it

25  here, didn't include that part of the evidence that's been

EDWARD SNYDER - Cross

1    received at this trial, right?

2    *A.*   Correct.  As an economist employing the scientific method,

3    I focus on objective economic evidence.

4    *Q.*   Okay.  I want to ask you about avoiding detection.  Is that

5    a concept you know of based on your extensive career in looking

6    at price-fixing cases?

7    *A.*   Yes.

8    *Q.*   Okay.  Can you tell the jury what avoiding detection means

9    in the context of price fixing and price-fixing conspiracies?

10           *MS. PLETCHER:*  Objection, Your Honor.  Lack of

11   foundation, speculation.

12           *THE COURT:*  Overruled.

13   *BY MR. TORZILLI:*

14   *Q.*   You can answer, sir.

15   *A.*   So with the risk of penalties from price fixing, the idea

16   of avoiding detection is that the parties may take action to

17   make it less likely that their actions will be detected.  And

18   that can take a variety of forms, and it would probably take a

19   long time to go through specific examples.  But that's the

20   idea.

21   *Q.*   Thank you, Professor Snyder.  So you agree with me that

22   people who are illegally fixing prices, though, don't want to

23   get caught, though, right?  That's your experience.

24           *MR. KORNFELD:*  Objection.  Calls for speculation,

25   foundation, beyond the scope of Ms. Pletcher's direct.

EDWARD SNYDER - Cross

1          THE COURT:  Overruled.

2          THE WITNESS:  Your question was about individuals,

3    right?

4    BY MR. TORZILLI:

5    Q.  My question is about individuals, Professor Snyder.  Thank

6    you for the qualification.

7    A.  Yes.  In a criminal antitrust case against individuals, the

8    penalties are severe, and I can go into more detail.  I'm not

9    sure I should.

10   Q.  That's -- thank you.  You've answered my question, sir.

11         My next question is, it's your experience that those

12   individuals do not want their illegal actions detected, right?

13         MR. KORNFELD:  Same objection.  Not a legal expert,

14   not a law enforcement expert, and he didn't testify about the

15   motivation or the lack thereof by any individuals, whoever

16   those individuals may be.

17         THE COURT:  Overruled.

18   BY MR. TORZILLI:

19   Q.  You can answer, Professor Snyder.

20   A.  Could you repeat the question, please.

21   Q.  Yes.  It's your experience, based on your extensive study

22   of price-fixing cases, including the several hundred that were

23   referenced by you in your dissertation work earlier today, that

24   those individuals do not want their illegal actions detected,

25   correct?

1897

EDWARD SNYDER - Cross

 1   *A.*  Well, I can't give testimony about any individual.  I would

 2   just say that as a general principle, individuals don't want to

 3   get caught and put in jail.

 4   *Q.*  Okay.  Now, in fact, in your dissertation, I believe you

 5   call some of this defensive measures, right?  Am I getting that

 6   terminology correct?

 7   *A.*  Close.  Defensive efforts.

 8   *Q.*  Okay.  And that means you don't expect price fixers to

 9   have, for example, a signed contract setting forth their

10   illegal price-fixing agreement, right?

11   *A.*  Correct.  Just for clarification, the idea of defensive

12   efforts isn't just to cover up illegal activity; it's also to

13   dispute charges made against them that may not be true.

14   *Q.*  And as part of defensive efforts, would you expect price

15   fixers to, for example, communicate about their price fixing on

16   the phone rather than putting things in writing?

17   *A.*  I haven't thought about that.  I wouldn't want to

18   speculate, not having given it some thought.

19   *Q.*  Okay.  And in terms of defensive efforts, which I know is

20   part of your dissertation -- thank you for correcting me a

21   moment ago -- price fixers, if they did communicate in writing,

22   you would expect them to use maybe coded words or other things

23   to make it harder for people to figure out what they're doing,

24   correct?

25            *MS. PLETCHER:*  Objection, again, Your Honor.  Beyond

1898

EDWARD SNYDER - Cross

1    foundation, knowledge, speculation.

2         THE COURT:  Overruled.  He can answer if he has

3    background.

4         THE WITNESS:  I -- this goes to my understanding as an

5    economist of a -- what is a price-fixing agreement, and if I

6    may, to me, a price-fixing agreement means a *quid pro quo*.

7    Hey, will you do this?  If you do this, I'll do that.  I think

8    you're asking me about, would -- is it likely that

9    communications would so plainly reflect a *quid pro quo*.

10   BY MR. TORZILLI:

11   Q.  No, what I'm asking is, in terms of defensive efforts --

12   which is, I think, the term that you referenced in your

13   dissertation -- as part of defensive efforts, if those

14   conspirators were communicating in writing, they would try to

15   do their writings in a way to avoid being detected, right?

16   A.  I thought I answered that question by saying, I wouldn't

17   expect them to have the following kind of exchange in text or

18   email, where, say -- what are you planning to charge?  I'm

19   planning to charge a dollar 10.  Hey, if I charge a dollar 12,

20   would you be willing to go to a dollar 12?  Yes or no.  If you

21   do that, I'll do this.  I wouldn't expect that kind of plain

22   exposition of the *quid pro quo* to be reflected in emails or

23   texts.

24   Q.  Thank you, sir.

25         Now I'd like to ask you about some of the slides that

EDWARD SNYDER - Cross

1    you -- that you used in your direct examination.  Okay.

2    A.  Sure.

3         MR. TORZILLI:  Okay.  So, Ms. Pearce, if you would be

4    so kind as to call up J-249.

5         Your Honor, this has been received into evidence, and

6    permission to publish it?

7         THE COURT:  You may.

8         MR. TORZILLI:  Thank you.

9    BY MR. TORZILLI:

10   Q.  This is one of the slides that you used on direct

11   examination, right?

12   A.  Yes.

13   Q.  Now, here, just to be clear, you are plotting prices over

14   time, correct?

15   A.  That's correct.

16   Q.  And you're not actually plotting any demand, demand curve,

17   anything like that here, right?

18   A.  Correct.

19   Q.  And the prices that are reflected here -- and I think you

20   said this -- aren't prices that anyone actually paid for any

21   product, right?

22   A.  That's correct.

23   Q.  Okay.  So, for example, the price of all three of these

24   lines here were all one dollar on, it looks like, January 1,

25   2010, it's not like you could go out and buy these products on

EDWARD SNYDER - Cross

1    that day and pay a dollar for each of them, right?

2    A.   That's correct.

3    Q.   Okay.  And you've got three different lines that you're

4    depicting here, right, Professor Snyder?

5    A.   Yes.

6    Q.   And one of them is the wholesale beef index, right?

7    A.   Yes, that's in blue.

8    Q.   And one of them is the wholesale pork index, right?

9    A.   Yes, that's in orange, both of those are from the USDA.

10   Q.   And then the Pilgrim's chicken-on-the-bone sales from KFC

11   that you indexed, right?

12   A.   That's in red, correct.

13   Q.   Right.  And those are three different -- actually, the

14   wholesale beef index and wholesale pork index, those aren't

15   even products, right?

16   A.   Well, beef and pork are sold wholesale, they are products.

17   I'm not sure if I understand your question.

18   Q.   Yeah, so with the red line, Pilgrim's chicken-on-the-bone

19   sales to KFC, you can go into a KFC restaurant, get some

20   chicken on the bone and walk out, and you've bought a product,

21   right, you would agree with me on that?

22   A.   There is a misunderstanding.  I want to be clear.  These

23   are not retail prices; these are wholesale prices.

24   Q.   For beef and pork, correct.  There is no -- there is

25   nothing -- there is no product in the world called a wholesale

EDWARD SNYDER - Cross

1    beef indexed product, right?

2    *A.*  Just want to -- I need to slow you down just a touch.

3    *Q.*  Absolutely, sir.

4    *A.*  So the Pilgrim's price, the COB, the KFC, that's a

5    wholesale product, as well.

6    *Q.*  Yeah.  That's a real product, right.  Eight-piece chicken

7    on the bone you can actually hold that in your hands, hold the

8    bucket in your hands eventually, right?

9    *A.*  It is.  But the way the price index works, as you pointed

10   out, is you start out with a dollar's worth of that, so you

11   have to just appreciate that that's how this tool works.

12   *Q.*  Absolutely.  Right.  But the wholesale beef index is not --

13   unlike chicken on the bone to KFC, wholesale beef index is not

14   an actual product that somebody can purchase?  It is an index,

15   correct?

16   *A.*  Correct.  Indexes are not actual products.

17   *Q.*  Okay.

18   *A.*  Excuse me, not actual product prices.

19   *Q.*  Thank you for that clarification.

20        And these three lines reflect three different types of

21   meat, correct?

22   *A.*  Yes.

23   *Q.*  Three different animals?

24   *A.*  Yes.

25   *Q.*  Beef comes from a cow, right?

EDWARD SNYDER - Cross

1    *A.* Yes.

2    *Q.* Pork comes from a pig, right?

3    *A.* Yes.

4    *Q.* And chicken, of course, comes from a chicken, right?

5    *A.* Although this particular chicken, COB, comes from a small

6    bird.

7    *Q.* And KFC -- that leads to my next question, sir.  KFC buys

8    small-bird chickens for their chicken-on-the-bone product,

9    right?

10   *A.* I would say products, but, yes.

11   *Q.* Okay.  Products.  KFC can't switch or substitute away from

12   chicken-on-the-bone products to pork, right?

13   *A.* Correct.  That would -- that would probably not make sense

14   for basic strategy.

15   *Q.* Or for -- incidentally, not only for KFC, but -- which, of

16   course, is your example but any other chicken restaurant,

17   right?

18   *A.* Right.  If a quick-service restaurant has staked its

19   identity, its brand, reputation on chicken, they typically

20   stick with that.

21   *Q.* And the same is true for beef, right?  KFC can't switch to

22   or substitute to beef, right?

23   *A.* Same answer.  I agree.

24   *Q.* Yeah.  So to the extent this attempts to plot demand, it

25   does not plot the demand that KFC is facing, you agree with me,

EDWARD SNYDER - Cross

 1    correct?

 2    A.  It doesn't plot demand at all.  I think you asked me that.

 3    Q.  And you agreed with me?

 4    A.  Correct.

 5    Q.  Now, sir, I'd like to talk with you about another one of

 6    your exhibits.  It's J-251.

 7              MR. TORZILLI:  And, Your Honor, I believe that's been

 8    received into evidence, and permission to publish J-251?

 9              THE COURT:  You may.

10              MR. TORZILLI:  Thank you.

11    BY MR. TORZILLI:

12    Q.  Do you have J-251, sir?

13    A.  Yes.

14    Q.  Okay.  Now, this slide compares big-bird prices and

15    Pilgrim's sales of chicken on the bone to KFC, correct?

16    A.  Yes.

17    Q.  And we just -- as you pointed out in response to one of my

18    questions a few minutes ago, KFC does not buy big bird,

19    correct?

20    A.  Correct.  The product that KFC is buying from Pilgrim's

21    Pride and others is eight-piece COB from small birds.

22    Q.  So this is not -- big bird is not a substitute, at least

23    for KFC, for the small bird that they actually purchase, right?

24    A.  That's correct.  They made what economists call specific

25    investments in size.  The fryers accommodate small birds.

EDWARD SNYDER - Cross

1   Q.  And not only that, they accommodate a specific size of

2   small bird, right?  Because there are different weights of

3   small bird, correct, as you mentioned with the bell curve this

4   morning?  Correct?

5   A.  I don't think --

6   Q.  The distribution of weights, I'm sorry.

7   A.  I didn't mention the bell curve, but you're right.  My

8   understanding is that KFC within the category of small birds

9   has a relatively narrow range of pounds that they'll buy.

10  Q.  And on your direct examination, you talked about suppliers

11  facing a choice between should I produce big birds, should I

12  produce small birds, right?  You talked about that on direct

13  exam?

14  A.  I did.

15  Q.  Okay.  Now how many plants at this time, I think you're

16  reporting here in the years 2008 to 2014, how many production

17  facilities did Claxton Poultry have?

18  A.  I did not focus on that.  I'm not sure.

19  Q.  I'm sorry, I didn't hear that.

20  A.  I don't know.

21  Q.  You don't know how many plants Claxton Poultry had during

22  this period of time?

23  A.  My recollection is that Claxton is small.

24  Q.  Okay.

25  A.  But I can't give you the number of plants.

1905
EDWARD SNYDER - Cross

 1   Q.  Okay.  Then we'll move on.

 2           MR. TORZILLI:  If we can take this down.

 3           If we can now, Ms. Pearce, display Defense Exhibit

 4   J-250.

 5           Your Honor, this has been received into evidence,

 6   permission to publish it.

 7           THE COURT:  You may.

 8   BY MR. TORZILLI:

 9   Q.  Okay.  So, sir, this is a chart entitled Supply of Breeder

10   Birds, right?

11   A.  Yes.

12   Q.  Now, I think, as you mentioned in response to the very

13   first question I asked you on cross-examination here, the

14   conspiracy in this case started in 2012, right?

15   A.  Correct.

16   Q.  Based on the charges, right?

17   A.  Yes.

18   Q.  Okay.  So -- and then they went past the year 2017,

19   correct?

20   A.  That's my understanding, yes.

21   Q.  And the supply of breeder birds as reported on your exhibit

22   here, J-250, increased every year during that time frame,

23   right?

24   A.  Yes.

25   Q.  So it started at 51 million breeder birds, right, in 2012?

EDWARD SNYDER - Cross

1    A.   Yes.

2    Q.   Then it went up a million in 2013?

3    A.   Yes.

4    Q.   And another million in 2014?

5    A.   Yes.

6    Q.   Another million in 2015, right?

7    A.   Yes.

8    Q.   Another million for each of the next two years, 2016 and

9    2017, right?

10   A.   Correct.

11   Q.   So the supply of breeder birds for each and every year of

12   the conspiracy, at least as depicted in your slide here, J-250,

13   was increasing each and every year, right?

14   A.   Correct.

15        MR. TORZILLI:   Okay.   We can take this exhibit down.

16   BY MR. TORZILLI:

17   Q.   Now, I want to ask you about information exchanges.   You

18   testified to that on direct examination, right?

19   A.   Yes.

20   Q.   But I want to ask you about the information exchanges that

21   are important in this case rather than the information

22   exchanges that you identified on direct examination.

23        On direct examination, you talked about a number of

24   different aspects of information exchange.   I think you

25   mentioned prices, right?

EDWARD SNYDER - Cross

1   *A.* Yes.

2   *Q.* Volumes?

3   *A.* Yes.

4   *Q.* Market conditions?

5   *A.* Yes.

6   *Q.* Future trends?

7   *A.* Yes.

8   *Q.* You may have said more. Those are the only ones that I was

9   able to capture. But one thing I noticed you did not mention

10  was bids, right?

11  *A.* I believe that I did in the context of price verification.

12  *Q.* I -- before that, you listed a number of ways in which

13  information was exchanged. I went back and looked at the

14  transcript, and you didn't mention bids in connection with

15  that. But I want to talk about that now.

16          So in this case, sir, the information being exchanged

17  that's important to the Government's case are the bids that are

18  shared by competitors leading up to the submission of bids to a

19  customer in a blind-bid process. You knew that, right?

20          *MR. KORNFELD:* Objection, Your Honor.

21          *MR. FELDBERG:* Objection. May we have a sidebar?

22          *THE COURT:* Yes.

23          (Hearing commenced at the bench.)

24          *THE COURT:* All right. Whoever wants to go ahead

25  first.

EDWARD SNYDER - Cross

1          *MR. FELDBERG:*  Thank you, Your Honor.

2          This is the fourth or fifth time at least that a

3    question has been asked on cross-examination that includes the

4    concept of sharing bids.  Sometimes it's expressed as sharing

5    bids; sometimes it's expressed as sharing spreadsheets.  There

6    is no evidence, none, zero, that any supplier shared bids or

7    shared spreadsheets or shared bid prices or bid information

8    with anyone outside of their own organization or their

9    customer.

10          And, therefore, the premise of this set of questions

11    is based on a -- insufficient evidence and is misleading and

12    should not be allowed.

13          *THE COURT:*  All right.  Mr. Kornfeld.

14          *MR. KORNFELD:*  Just to build on that, in essence, it's

15    almost a fact not in evidence; but it's improper signposting.

16    And I understand that the Government objected to Ms. Pletcher's

17    signposting, but she was really using it to orient the witness

18    based on things that he did or things he was prepared to

19    testify to.

20          But to amplify Mr. Feldberg's point, the signposting

21    is a signal that is being used -- and being articulated when

22    there is absolutely zero testimony and zero evidence in the

23    record.  And so I think it improperly casts and improperly

24    predicates what may be a legitimate line of questioning.  I'm

25    not objecting to the questioning as much as I'm objecting to

EDWARD SNYDER - Cross

1    the affirmative statements by the Government of things that are

2    not in the record.

3           MS. PLETCHER:  In addition to that, Your Honor, the

4    issue here that Mr. Torzilli is preparing his questions as

5    statements of the evidence, and that's what is objectionable.

6           THE COURT:  Mr. Torzilli.

7           MR. TORZILLI:  Your Honor, with all due respect to my

8    colleagues, I don't think we can seriously be having a

9    discussion about there being no evidence in the record about

10   the exchange of bids.  I mean, I could probably reel off the

11   top of my head, you know, a better part of half of those

12   exhibits, including 1069 and 1074, where clearly one competitor

13   in the days leading up to a bid being due have their hands full

14   of their competitors' bids.  So I really don't see this as

15   being something that is serious, frankly.

16          But more importantly here, we have a witness that

17   talks about there being, you know, no price fixing because the

18   information exchanged here is just totally copacetic, and he is

19   ignoring the information that actually matters in the case when

20   focusing on the information that is an entire red herring to

21   what is relevant to this case.  So it seems like, absolutely,

22   the highly probative questions that an expert witness like

23   Professor Snyder should be confronted with on

24   cross-examination.

25          THE COURT:  Anything further from defense counsel?

EDWARD SNYDER – Cross

1          *MR. KORNFELD:*  Your Honor -- and this is Rick

2     Kornfeld.  The only thing I would say is, this witness -- the

3     predicate of his expert testimony is his analysis of objective

4     data, not his analysis of subjective emails, not his

5     speculation of what somebody meant when they sent a text or an

6     email.  So I think the Government is really mixing apples and

7     oranges.  If they want to ask him, did you consider X, Y, and

8     Z, and the answer is no, that's one thing.  But to ascribe

9     meaning to something he didn't consider because it's not the

10    objective data I think is improper, when, in fact, the scope of

11    what he considered was the objective data.

12          *THE COURT:*  Mr. Torzilli.

13          *MR. TORZILLI:*  Thank you, Your Honor.  Just to briefly

14    respond to that.  That is -- to use the phrase "red herring"

15    twice in one sidebar, I apologize, but I think it is

16    appropriate here.  I'm asking him questions not about the

17    so-called objective data to just be entirely clear.  I'm

18    cross-examining him on the testimony that related to, I

19    believe, it's Defense Exhibit J-213, which is where he's

20    talking about the industry conditions relevant for information

21    exchanges, which has nothing to do with the sales data and the

22    contract information and the bids and so forth.  He provided an

23    opinion about information exchanges and how that related to his

24    ultimate conclusion there was no price fixing here.  I want to

25    ask him about the actual information exchange that matters to

EDWARD SNYDER - Cross

1    this case.

2           MR. SCHALL:  This is Frank Schall on behalf of

3    Mr. Lovette.

4           Mr. Torzilli has already asked Professor Snyder

5    whether or not he looked at any of the communications.  He

6    testified he did not.  There is no foundation for the questions

7    about specific communications.

8           Additionally, Professor Snyder's testimony on

9    information exchange is he would expect to see it in the

10   industry as a whole.  There was no analysis of individual

11   communications.

12          THE COURT:  Right.  So, anyway, it's, of course,

13   perfectly legitimate for Mr. Torzilli to ask Professor Snyder

14   about the limitation of information that he looked at.  And as

15   Mr. Schall noted, that to some extent has already been done,

16   namely, Professor Snyder has disclaimed having looked at

17   individual communications and information along those lines.

18          But to then posit specific instances of communications

19   to the witness who has already disclaimed knowledge of that

20   type of information is improper, and I'll sustain the objection

21   to it, because he didn't know.  So it's just an assertion by

22   the Government of facts in evidence or facts that support the

23   Government's case, which as Mr. Torzilli says, the Government

24   may firmly believe that there is evidence of that.  But that's

25   a contested issue in this particular trial.  So to predicate

1912

EDWARD SNYDER - Cross

1    the question on the truth of those exchanges and what they mean

2    would not be an appropriate or fair way to cross-examine this

3    particular witness, since he hasn't taken that information into

4    account.

5           Once again, perfectly appropriate for the Government

6    to bring out his limitations, but not to ask him to assume or,

7    you know, answer questions about specific communications that

8    he has no -- that he didn't consider at all as part of his

9    analysis.  So objection will be sustained.

10          (Hearing continued in open court.)

11          THE COURT:  The objection is sustained.

12          MR. TORZILLI:  Thank you, Your Honor.  May I proceed?

13          THE COURT:  Yes.

14   BY MR. TORZILLI:

15   Q.  Professor Snyder, just to be perfectly clear, in rendering

16   the opinions that you had today, you did not rely on any

17   communications between competitors or anyone else relating to

18   bids or bid submissions other than what is reflected in your

19   slides, right?

20   A.  Correct.  I focused on objective economic outcomes, not

21   communications.

22   Q.  Okay.  Now, sir, I'd like to look at some of your other

23   slides that you talked about on direct examination.  And before

24   I get to that, I do want to ask you, you do agree with me that

25   one shouldn't use graphs or charts to be misleading to the

EDWARD SNYDER - Cross

1   viewer or reader, right?

2   A.   That's not the objective.

3   Q.   Of course.   Thank you.

4        MR. TORZILLI:  Ms. Pearce, if we could call up Exhibit

5   J-252, please.

6        Your Honor, this is in evidence.  Permission to

7   publish J-252

8        THE COURT:  You may.

9   BY MR. TORZILLI:

10  Q.   Okay.  So this is one of the slides that you discussed on

11  direct examination, right?

12  A.   Yes.

13  Q.   And this purports to show for each of six competing chicken

14  suppliers the first-round bid and final contract price for

15  2013, right?

16  A.   Yes.

17  Q.   And the first-round bids are on the left-hand side, in that

18  bluish color, right?

19  A.   Yes.

20  Q.   And the final contract prices are adjacent to it, on the

21  right-hand side, right?

22  A.   Yes.

23  Q.   Okay.  I have the same problem seeing with my glasses.

24       I -- let's look at the information for Pilgrim's on

25  the left-hand side.  Do you see that all the way on the left?

EDWARD SNYDER - Cross

1  A.  Yes.

2  Q.  Okay.  Now, you're not saying that Pilgrim's lowered its

3  bid by half between their first-round bid and their contract

4  price, even though it visually looks that way, right?

5  A.  Well, I don't think it visually looks that way.  When I

6  presented this slide, I pointed out that the vertical axis

7  starts at 96.

8  Q.  Exactly --

9  A.  Excuse me.  And the slide indicates the dollar amounts, and

10  the dollar amounts don't indicate a reduction in half.

11  Q.  Right.  The dollar amounts indicate a drop of about 1.7,

12  1.8 cents?

13  A.  Yes.

14  Q.  All right.  But the size of the bars indicates a reduction

15  of at least half or more, right?

16  A.  No.

17  Q.  The bars don't?  So the bar on the right is smaller than

18  the bar on the left, correct, for Pilgrim's?

19  A.  Yes.

20  Q.  You do agree with me?

21  A.  Yes, and --

22  Q.  It's all --

23  A.  Excuse me.

24  Q.  Please complete your answer.

25  A.  Yes.  And as indicated in what you have highlighted in

                              EDWARD  SNYDER - Cross

1    yellow, the bars are identified with a dollar price.

2    Q.  They certainly are.  I'm now asking you about the size of

3    the bars.  Are you with me?

4    A.  Yes.

5    Q.  Okay.  So the size of the bar on the left -- do you see it?

6    A.  Yes.

7    Q.  -- is twice the size of the bar on the right for Pilgrim's.

8    Do you agree?

9    A.  Just asking about the height?

10   Q.  The height of the bars?

11   A.  Yes.  That's right.

12   Q.  Okay.  And if you look at Tyson, do you see that, that's

13   the third entry?

14   A.  Yes.

15   Q.  The height of the bar on the left is far more than twice

16   the size of the height of the bar on the right, right?

17   A.  Yes.

18   Q.  Even though the numbers at the top of those two bars, the

19   difference is about -- is that about 3 cents, maybe a little

20   less?

21   A.  Correct.

22   Q.  Okay.

23   A.  Approaching 3, less than 3 cents.

24   Q.  Close to 3.  Okay.

25            So let's --

EDWARD SNYDER – Cross

1          MR. TORZILLI:  Your Honor, may I approach with an

2   exhibit?

3          THE COURT:  Yes, you may.

4          MR. TORZILLI:  Thank you.  If we could call up,

5   Ms. Pearce, for the Court, the witness, and the parties,

6   Government Exhibit 10696.

7          THE WITNESS:  Thank you.

8   BY MR. TORZILLI:

9   Q.  Sir, have you had a chance to review Government

10  Exhibit 10696?

11  A.  Yes.

12         MR. TORZILLI:  What I'd like to ask you to do,

13  Ms. Pearce, if we could show Government Exhibit 10696 side by

14  side with J-252, please.

15  BY MR. TORZILLI:

16  Q.  Professor Snyder, do you see those on the screen side by

17  side?

18  A.  I do.

19  Q.  Okay.  Could you go through the numbers that are on top of

20  the bars from left to right on both of the exhibits and see if

21  the -- just the numbers, the numbers on the top of the bars are

22  identical going left to right.

23  A.  They are identical.

24  Q.  Okay.  And how about the logos at the bottom of the bars

25  going from left to right, are they identical for both of the

EDWARD SNYDER - Cross

1    two exhibits?

2    *A.* Yes.

3    *Q.* Okay.  And is the title of each of the slides substantially

4    the same in terms of its title?

5    *A.* Yes.

6    *Q.* Okay.

7         *MR. TORZILLI:* Your Honor, at this time, Government

8    moves 10696 into evidence.

9         *THE COURT:* Any objection to the admission of

10   Exhibit 10696?

11        That exhibit will be admitted.

12        (Exhibit 10696 admitted.)

13        *MR. TORZILLI:* Permission to publish Government

14   Exhibit 10696.

15        *THE COURT:* You may.

16        *MR. TORZILLI:* Thank you.

17   *BY MR. TORZILLI:*

18   *Q.* So this is a depiction of the same numbers and the same

19   firms for the Exhibit J-252.  Do you agree, sir?

20   *A.* Yes.

21   *Q.* Okay.  And this depicts on the left-hand side the

22   first-round bids that each of these competitors submitted to

23   KFC, correct?

24   *A.* Correct.

25   *Q.* And then the resulting contract price at the conclusion of

1918

EDWARD SNYDER - Cross

 1  the bidding and negotiations, correct?

 2  A.  Correct.

 3  Q.  Now, is it your experience, sir, studying this industry,

 4  that when bidders submit their first-round bids, they leave a

 5  little bit of cushion?

 6  A.  I -- based on what I've seen, I'm not able to reach that

 7  conclusion.  And I -- it's not something I focused on.

 8  Q.  Okay.  You just don't know one way or the other?

 9  A.  Well, in some cases, the bids are reduced, and they're

10  reflected in lower contract prices.  And then in other

11  situations, you don't see a reduction in the final contract

12  price, which would contradict the idea of having -- well,

13  actually, I don't know if it would contradict.  But I -- it

14  just depends when you look at the data.

15  Q.  Okay.  Thank you.

16          MR. TORZILLI:  We can take this down.

17          Now, if we can look at Exhibit J-253.

18          Your Honor, this has been received into evidence, I

19  believe.

20          THE COURT:  It has, and it may be published.

21          MR. TORZILLI:  Thank you, Your Honor.

22  BY MR. TORZILLI:

23  Q.  And this is, sir, on your screen, Exhibit J-253.  This is

24  another one of the exhibits that you discussed in your direct

25  examination, correct?

EDWARD SNYDER - Cross

1    *A.*   Yes.

2    *Q.*   And this one, the -- this one purports to depict

3    first-round bids for the 2015 contract on the left-hand side

4    for each of the suppliers, right?

5    *A.*   Yes.

6    *Q.*   And then resulting contract price for each of the six

7    suppliers on the right-hand side, right?

8    *A.*   Yes.  Pardon me.  Yes.

9    *Q.*   And you've got the vertical axis starting at one dollar per

10   pound, correct?

11   *A.*   Yes.

12   *Q.*   And if we look at George's, do you see them, one of the

13   competing suppliers, second to the right?  Do you see that?

14   *A.*   I do.

15   *Q.*   Okay.  So there, if you just look at their numbers, their

16   numbers indicate that they went down about 6 cents per pound

17   from their first-round bid to their final contract, right?

18   *A.*   Yes.

19   *Q.*   But based on looking at the bars, the bar on the left for

20   George's is about twice the size of the bar on the right.  You

21   agree with me, right?

22   *A.*   Yes.

23   *Q.*   Even though the numbers, if you take the difference between

24   the two, are about 6 cents, correct?

25   *A.*   I agree with the -- with your calculation and your

EDWARD SNYDER - Cross

1    statement about the size of the bars.

2    Q.  Okay.  Wonderful.  Thank you, sir.

3           MR. TORZILLI:  Ms. Pearce, if we could just for the

4    parties, the witness, and the Court, show this exhibit side by

5    side with Government Exhibit 10703.

6           May I approach with hard copies.

7           THE COURT:  Yes, you may.

8    BY MR. TORZILLI:

9    Q.  Professor Snyder, do you need another minute to review

10   or --

11   A.  No.

12   Q.  Oh, okay.  Thank you.

13          So, sir, you've had an opportunity to familiarize

14   yourself with Government Exhibit 10703?

15   A.  Yes.

16   Q.  Have you had an opportunity to compare the numbers at the

17   top of the bars on Government Exhibit 10703 to the numbers at

18   the top of the bars for Exhibit J-253?

19   A.  Yes.

20   Q.  Okay.

21   A.  They're the same.

22   Q.  They are the same.  And then have you had an opportunity to

23   compare the logos at the bottom of the sets of bars for each of

24   the two exhibits, J-253 and Government Exhibit 10703?

25   A.  Yes.  They're the same.

EDWARD SNYDER - Cross

1   Q.   Okay.  And how about the titles of the two exhibits, are

2   the titles of the two exhibits the same?

3   A.   Yes.

4        MR. TORZILLI:  Your Honor, Government moves 10703 into

5   evidence.

6        THE COURT:  Any objection to the admission of 10703?

7        All right.  That exhibit will be admitted.

8        (Exhibit 10703 admitted.)

9        MR. TORZILLI:  Permission to publish 10703, please.

10        THE COURT:  You may.

11   BY MR. TORZILLI:

12   Q.   Now, sir, 10703 depicts the first-round bids to KFC for the

13   contract year 2015, right, on the left-hand side?

14   A.   Yes.

15   Q.   Then the resulting contract prices on the right-hand side

16   for each of the suppliers listed?

17   A.   Correct.

18   Q.   And do you recall the duration of the contract that was put

19   in place that started in 2015?

20   A.   So up until that time, my recollection is that KFC was

21   using one-year contracts, and I don't know if they switched

22   from that to three-year contracts for the suppliers.  But my

23   recollection is that there was some possibility of doing so.

24        MR. TORZILLI:  Your Honor, I see it is close to our

25   break time.  This would be a convenient spot.

1922

EDWARD SNYDER – Cross

1      THE COURT:  Okay.  Ladies and gentlemen, we'll take

2  the mid-afternoon break at this time.  And we will plan on

3  reconvening at 3:30.  The jury is excused for the mid-afternoon

4  break.

5          (Jury out at 3:14 p.m.)

6      THE COURT:  All right.  We'll be in recess.  Thank

7  you.

8          (Recess at 3:14 p.m.)

9          (In open court at 3:32 p.m.)

10     THE COURT:  Thank you.  Please be seated.

11         Let's get the jury back in.

12         Thank you.  Please be seated.

13         (Jury in at 3:33 p.m.)

14     THE COURT:  Mr. Torzilli, go ahead.

15     MR. TORZILLI:  Thank you, Your Honor.

16  BY MR. TORZILLI:

17  Q.  Welcome back, Professor Snyder.

18  A.  Thank you.

19  Q.  I'd like to ask you about your price comparison, your

20  benchmarking comparison.

21  A.  Yes.

22     MR. TORZILLI:  So, Ms. Pearce, if you could display

23  Exhibit J-256.

24         Your Honor, this has been received into evidence, and

25  permission to publish?

EDWARD SNYDER - Cross

1        THE COURT:  You may.

2        MR. TORZILLI:  Thank you.

BY MR. TORZILLI:

4   Q.  Do you have it, Professor Snyder?

5   A.  Yes.

6   Q.  So to confirm, the number above the bar in blue on the

7   left, so the lighter blue, that's your computation of the

8   average price of eight-piece chicken on the bone that Pilgrim's

9   sold to KFC in calendar year 2015; is that right?

10  A.  Let me just make sure I understand your question.  You're

11  talking about the first bar.

12  Q.  The bar all the way on the left --

13  A.  Yep -- yes.

14  Q.  So it is the -- it is reflecting an average price of

15  eight-piece chicken on the bone that Pilgrim's sold to KFC in

16  calendar year 2015?

17  A.  Yes.

18  Q.  And those sales were made under a contract between

19  Pilgrim's and KFC that covered at least calendar year 2015,

20  correct?

21  A.  Correct.

22  Q.  Okay.  And the product that -- the product that KFC bought

23  that you reflect the average price here, I think we just

24  mentioned it a moment ago, but it's eight-piece chicken on the

25  bone, correct?

1924

EDWARD SNYDER - Cross

1   *A.*  Yes, from small birds.

2   *Q.*  Small birds.

3         Now I want to ask you about the numbers above the dark

4   blue bars, so the five bars on the right.  Those are your

5   computations of the average price of eight-piece chicken on the

6   bone that each of those suppliers sold to customers in calendar

7   year 2015, correct?

8   *A.*  Correct.

9   *Q.*  Now, is that all eight-piece chicken-on-the-bone sales at

10  least as reflected in the sales figures, the monthly sales data

11  that you relied on?

12  *A.*  Yes, monthly sales data aggregated up to a year, 2015.

13  *Q.*  So within the -- you didn't take any sales or any

14  observations out before running your average prices that you

15  then reflected here in the five bars on the right, correct?

16  *A.*  Well, the only sales I would take out, the team would take

17  out are the ones that don't fit the eight-piece COB small-bird

18  category.

19  *Q.*  Okay.

20  *A.*  I should just say, I did take out sales for the sensitivity

21  checks, but that was separate.

22  *Q.*  Okay.  Just so I understand your sensitivity check, the

23  sensitivity check is something you haven't -- you don't have

24  displayed within the figures that we're looking at right now,

25  correct?

EDWARD SNYDER - Cross

1    *A.*  Correct.

2    *Q.*  Okay.  So this is -- this is just all eight-piece

3    chicken-on-the-bone sales as reflected in your -- in the data

4    you relied on then, correct?

5    *A.*  Yes.

6    *Q.*  So it would be, for example, sales to all of the customers

7    of each of those five firms, correct?

8    *A.*  Of the product identified in 2015.

9    *Q.*  Of eight-piece COB for calendar year 2015.  And all bird

10   sizes within eight-piece chicken on the bone; is that right?

11   *A.*  When you say all bird sizes, they're all small birds, but

12   the sizes within the small-bird category could differ.

13   *Q.*  For example, you could have a two and a half pound

14   eight-piece chicken-on-the-bone product, right?

15   *A.*  Correct.

16   *Q.*  And you could have an -- I think you said a -- four and a

17   half pounds may have been the weight that you referenced in the

18   direct exam.  You could have a four and a half pound

19   eight-piece chicken on the bone, right?

20   *A.*  That's correct.

21   *Q.*  You reflect in here all transactions, whether they're under

22   a long-term contract, short-term contract, or spot sale, right?

23   *A.*  Correct.

24   *Q.*  It would all be in the average numbers that you show in the

25   five -- the five bars on the right, correct?

EDWARD SNYDER - Cross

1    A.   That's correct.

2    Q.   Okay.  Now, because the -- and I'm going to just focus on

3    the light blue bars on the left versus the dark blue bars on

4    the right.  If I say light blue and dark blue, will that be

5    something you can follow me on --

6    A.   Yes.

7    Q.   -- in terms of distinguishing?  Okay.  Because the numbers

8    above the light blue bars, the ones on the left, are smaller

9    than the numbers above the dark blue bars, so on the right --

10   that -- you conclude there is no price fixing, correct?

11   A.   I didn't say that.  What I said was that the benchmark

12   analysis yields evidence that contradicts the Government's

13   hypothesis.

14   Q.   Okay.  And in part, that's because you conclude the numbers

15   on the right reflect prices that are not the result of price

16   fixing, correct?

17   A.   The suppliers on the right, in dark blue, are suppliers not

18   alleged to have engaged in price fixing by the U.S. Department

19   of Justice.

20   Q.   Right.  So if they had fixed prices, then your comparison

21   would not show what you've told us -- told the jury that it

22   shows, right?

23   A.   Well, the comparison would be the same, if the -- all of a

24   sudden, the benchmark suppliers are conspirators in the alleged

25   price fixing, then this would not be a benchmark analysis.

EDWARD SNYDER - Cross

1   Q.   The benchmark -- it wouldn't be benchmarking against the

2   benchmark, right?

3   A.   I think I agree with you.

4   Q.   Okay.  But, sir, you do not know whether any of those five

5   firms actually fixed prices of eight-piece chicken on the bone

6   in 2015, correct?

7   A.   The selection of suppliers on the right included the

8   criterion that they were not alleged to have been part of the

9   price-fixing conspiracy, according to the DOJ.

10  Q.   So that's your assumption, right?

11  A.   No, I wouldn't call it an assumption.  That's objective.

12  Q.   Your assumption is that the Department of Justice is

13  correct that it hadn't included any of those firms in

14  price-fixing allegations, right?

15  A.   Now you're talking about the DOJ's assumption, not mine.  I

16  had a methodology for selecting the benchmark suppliers, and I

17  followed that.

18  Q.   Right.  And you assumed that DOJ was correct, right?

19  A.   I went by the complaint, and I went by which suppliers were

20  identified as participants, given who -- whom was indicted in

21  terms of individual executives.

22  Q.   Yeah, and you accepted all of that as true, correct?

23  A.   I don't think there is a truth to it.  It's just simply,

24  who was in the category or not.

25  Q.   Well, these are the benchmark suppliers, right?  So you're

EDWARD SNYDER - Cross

1    saying that they are benchmark suppliers, because if they

2    weren't, as you just said a moment ago, this wouldn't be a

3    benchmark, right?

4    A.   These are benchmark suppliers because of the three criteria

5    I identified, the first of which is they were not alleged to be

6    involved with the price-fixing conspiracy.

7    Q.   Right.  Which -- and you're accepting that that's true,

8    that the -- exactly, the allegation they haven't engaged in

9    price fixing is true?  You're accepting that proposition as

10   true?

11   A.   No, I'm using objective information about who was

12   identified as part of the alleged conspiracy and who was not.

13   Q.   But you haven't tested -- maybe I'll ask it in another way.

14   You haven't tested in any way whether any of those five firms

15   engaged in price fixing, right?

16   A.   This test proceeds based on the DOJ's complaint.

17   Q.   Right.

18   A.   I did not do an economic analysis to see if the DOJ

19   complaint left out suppliers who should have been included.

20   Q.   Right.  Exactly.  Now -- so you -- you used the work of DOJ

21   to include the suppliers on the right, but you did not trust

22   the work of DOJ when it comes to the numbers on the left,

23   correct?

24   A.   I don't understand the question.

25   Q.   Sure.  You accepted as true the information that led you to

EDWARD SNYDER - Cross

1    include the five suppliers on the right, but you didn't accept

2    it as true for the numbers on the left, correct?

3    A.  Could you clarify what information you're talking about?

4    Q.  Sure.  The information that led you to conclude that the

5    five suppliers on the right are valid benchmark suppliers

6    because they did not engage in price fixing in calendar year

7    2015 for eight-piece chicken-on-the-bone products?

8    A.  This seems repetitive to me.  But I am just saying that the

9    benchmark suppliers were not connected to the DOJ's complaint.

10   Q.  Right.  Which is different than whether they actually

11   engaged in price fixing or not.  Do you agree with me on that,

12   Professor Snyder?  Right?

13   A.  Again, I think I answered that.  I took the DOJ's complaint

14   to mean what it said.

15   Q.  Well, only when it came to selecting the people on the

16   right.  You did not accept it as true when it came to whether

17   the individuals charged in this case actually engaged in price

18   fixing?

19   BY MR. TORZILLI:

20   Q.  So you cherrypicked what you took from the DOJ to accept as

21   true or not, right?

22         MR. KORNFELD:  I'm going to object.  This question has

23   been asked and answered a number of times.

24         THE COURT:  Overruled.

25         THE WITNESS:  I used the same methodology to identify

EDWARD SNYDER - Cross

1    KFC as being part of the alleged conspiracy, as I did to

2    identify the suppliers on the right, and that methodology is

3    just looking at the DOJ complaint, who was connected to the

4    alleged conspiracy, who was not.

5    *BY MR. TORZILLI:*

6    *Q.*   The first word in the title there is comparison, right?

7    *A.*   Yes.

8    *Q.*   Now, you agree with me that for a comparison to be helpful

9    to the jury the comparison must be apples to apples, right?

10   *A.*   Well, in the real world, there are differences among apples

11   to apples.  What a benchmark analysis has to do is control for

12   the most important factors, which I did, and then check to see

13   if other factors make a difference, like marination and

14   antibiotic free.  But you can't have a benchmark analysis that

15   gets everything exactly alike.

16   *Q.*   You can't have a comparison of apples to oranges and have a

17   valid benchmarking comparison, right?

18   *A.*   Apples to oranges would not be a valid comparison.

19   *Q.*   Okay.  Further on that theme, I want to ask you about

20   contract sales versus spot sales, okay?  So a contract sale,

21   Professor Snyder, you agree with me, is a planned sale for a

22   set period of time; is that fair to say?

23   *A.*   Yes.

24   *Q.*   And the spot sale is sold, I mean, on the spot,

25   quote-unquote, so for relatively immediate delivery, correct?

EDWARD SNYDER - Cross

1   *A.*  It gets into the definition of what is a contract.  But I

2   think what you're saying is, in the case of spot transactions,

3   there is no, for example, annual contract that would cover

4   that.  There might be a relationship, there might be sales

5   agreements and so forth.

6   *Q.*  Now, we know from testimony that you gave a few moments ago

7   that the number on top of the bar on the left -- so the

8   1.0308 -- that's all contract sales, right?

9   *A.*  Yes, these are sales in 2015, governed by the 2014

10  contract.

11  *Q.*  You do not know, though, because the sales information you

12  relied on doesn't provide it, the extent to which the

13  transactions that are included in the numbers on the right in

14  the dark blue are reflective of contract sales or spot sales,

15  correct?

16  *A.*  Correct.  And that same statement applies to the second

17  light blue bar.  I don't have information reflected there that

18  separates out contract sales by Pilgrim's to its various other

19  customers.

20  *Q.*  And it's true, Professor Snyder, is it not, that for

21  eight-piece chicken-on-the-bone spot prices and contract prices

22  for the same product can differ by a lot, right?

23  *A.*  They can differ.

24  *Q.*  By a lot?

25  *A.*  Depends on the market situation.  As I testified about the

EDWARD SNYDER - Cross

1    cobweb model, there are times when the planning and investments

2    made still, even if they were accurate, still lead to price

3    fluctuations when the product comes to market.

4            MR. TORZILLI:  Ms. Pearce, could you be so kind as to

5    retrieve Exhibit J-014.

6            Your Honor, may I approach with some paper copies?

7            THE COURT:  You may.

8            MR. TORZILLI:  Your Honor, my notes say J-014 has been

9    received into evidence.

10           THE COURT:  That's correct.

11           MR. TORZILLI:  May I publish it to the jury, please?

12           THE COURT:  You may.

13   BY MR. TORZILLI:

14   Q.  Professor Snyder, have you had an opportunity to

15   familiarize yourself with J-014?

16   A.  No.  I do need some more time.

17   Q.  You need another moment?  Sure.

18           MR. KORNFELD:  Your Honor, while Professor Snyder is

19   reviewing this, may we be briefly heard on sidebar?

20           THE COURT:  You may.

21           (Hearing commenced at the bench.)

22           THE COURT:  Go ahead, Mr. Kornfeld.

23           MR. KORNFELD:  Your Honor, we object to the use of

24   this exhibit.  The benchmarking -- first of all, Tyson was not

25   one of the producers that Professor Snyder used to benchmark.

EDWARD SNYDER - Cross

1    I don't believe this is relevant.

2            Second of all, this pertains -- if you look at the

3    second page of this document, to 2014, and the benchmarking was

4    2015, so it's not relevant for that purpose.

5            And, third, what I think the Government is doing, if

6    you see on the first page, it talks about comment 6 incremental

7    loads, this then assumes that the producers or suppliers that

8    were the benchmark suppliers were selling incremental loads,

9    and there is no evidence of that either.  I don't understand

10   the relevance of this document to a cross-examination regarding

11   benchmarking.

12           THE COURT:  Mr. --

13           MR. TORZILLI:  I'll try to respond to each of the

14   three points.  First, I'm certainly happy to try to swab out on

15   the fly here the Tyson information for some Pilgrim's

16   information.  I think the defendants used a Pilgrim's email

17   to make the point about spot sales in the cross-examination of

18   Bob Lewis, if we can find that and switch that out.  But I

19   think the Tyson invoice is just a better way to represent the

20   cross-examination I'd like to accomplish.

21           Second, in terms of the year 2014 versus 2015, I mean,

22   all I'm trying to get the witness to acknowledge is that there

23   is a substantial difference potentially between contract sales

24   and spot sales, so I don't think the particular year within

25   reason is a necessary condition to its relevance.

EDWARD SNYDER - Cross

1          And, then third, on the incremental point, I think

2     I -- the point is absolutely yes.  The difference between spot

3     sales or incremental loads, which are a synonymous terminology

4     in contract sales, is a very significant difference, as you can

5     see from this very document and the other documents that the

6     defendants -- that are similar to this, that the defendants

7     have used on cross-examination.  And that's exactly what I want

8     to convey in the upcoming cross-examination of this witness.

9     And those are sales that are included in the bars on the right

10    but are not included in the sales in the bar on the left.

11         And, therefore, that makes this an apples-to-oranges

12    comparison, at least on that dimension.

13         THE COURT:  Okay.  Mr. Kornfeld, anything else?

14         MR. KORNFELD:  Well, Your Honor, it's the Government

15    that is throwing the oranges into the fruit basket, so to

16    speak.  Here in the -- looking at the transcript, roughly

17    15:47:50, the Government asks Professor Snyder:  It's true, is

18    it not, for eight-piece chicken-on-the-bone spot prices and

19    contract prices for the same product can differ by a lot.  He

20    says:  They can differ by a lot.

21         And Professor Snyder says:  Depends on the market

22    situation.

23         So the market situation has to be analogous here.

24    It's not analogous; therefore, I think it's improper to use --

25    they want to pull out another example that might be relevant,

EDWARD SNYDER - Cross

1    that is one thing, but it doesn't all of a sudden make this

2    Tyson exhibit relevant for the reasons I stated earlier.

3             THE COURT:  Okay.  The objections will be overruled.

4    It depends on the questions that are asked.  Mr. Kornfeld, of

5    course, is right about the supplier, Tyson not being part of

6    the benchmarking analysis.  The year not being part of the

7    benchmarking analysis.  I disagree with Mr. Kornfeld about the

8    relevance of a spot sale that's part of Mr. Torzilli's point.

9    So that's legitimate.  If Mr. Torzilli is going to be using

10   this as just an example of an invoice, as opposed to, you know,

11   representative example of an invoice, and then amend his

12   questions so that they fit within the benchmarking analysis

13   that Professor Snyder used, then I suppose this may have some

14   utility.  But Mr. Torzilli can, of course, substitute something

15   in as well.  But those -- Mr. Torzilli can still make a go of

16   it, depending on the questions.

17             So objection will be overruled.  Thank you.

18             (Hearing continued in open court.)

19             THE COURT:  Objection overruled.

20             Go ahead, Mr. Torzilli.

21             MR. TORZILLI:  Thank you, Your Honor.

22   BY MR. TORZILLI:

23   Q.  Professor Snyder, have you had an opportunity to

24   familiarize yourself with Exhibit J-014?

25   A.  Yes.

1936

EDWARD SNYDER - Cross

1    Q.  Do you understand it to be a Tyson invoice dated July 22,

2    2014?

3    A.  Yes.

4    Q.  See the very first entry in the body of the invoice under

5    the column heading Item Description?

6    A.  Yes.

7    Q.  And you see in there, it says 8 PCE MRN CKN CVP ?

8    A.  Yes.

9    Q.  Do you understand that to be a description for type of

10   eight-piece marinated chicken?

11   A.  Yes, I don't know what CVP means, but this is otherwise

12   consistent with what you said.

13   Q.  And if you look at the -- towards the upper left-hand

14   corner, kind of beneath the Tyson logo, there is the words

15   "bill to"?

16   A.  Yes.

17   Q.  Then the second line, and there is an address block there,

18   do you see that?

19   A.  Yes.

20   Q.  That says "KFC."  Do you see that?

21   A.  I do.

22   Q.  Okay.  Now, if you could -- if you're looking at the paper

23   copy, if you could flip it over.

24   A.  Yes.

25            MR. TORZILLI:  Ms. Pearce, if we could look at

EDWARD SNYDER - Cross

1  published page 2.

2  BY MR. TORZILLI:

3  Q.  Do you see a column kind of towards the right-hand side

4  that says Invoice Price?

5  A.  Yes.

6  Q.  And what is the dollar amount that is populated in all of

7  the rows under Invoice Price?

8  A.  A dollar 45.

9  Q.  For all of them?

10  A.  Yes.

11  Q.  Okay.

12       MR. TORZILLI:  We can take that down.

13  BY MR. TORZILLI:

14  Q.  Professor Snyder, are you aware that spot sales of

15  eight-piece chicken on the bone can be as much as 1.45 per

16  pound?

17  A.  Yes.

18  Q.  Have you seen that in the data as part of your analysis?

19  A.  Yes, you just showed me that the invoice price in July 2014

20  for what looks to me to be a spot transaction is a dollar 45.

21  That's exactly when the demand and supply factors that I

22  testified about were kicking in, so I'm not surprised to see a

23  spot market price at a dollar 45.

24  Q.  And how much higher was the spot price just sticking with

25  the dollar 45 compared to the then-contract price that KFC had

EDWARD SNYDER - Cross

1    in place with Tyson Foods?

2    A.   Well, I assume -- and that -- well, I should not assume.

3    It might be the column to the left.

4    Q.   Okay.  Well --

5    A.   But I'd have to check the contract.  I do have information

6    on what Tyson was bidding during that same period for future

7    contract prices.  I have that in a separate exhibit.

8    Q.   Let's -- let me try to do it this way, Professor Snyder.

9    Let me see if we can call up on your screen --

10           MR. TORZILLI:  And permission to publish Exhibit

11   J-255.

12           THE COURT:  You may.

13           MR. TORZILLI:  Thank you, Your Honor.

14   BY MR. TORZILLI:

15   Q.   Do you see -- okay.  Do you have J-255 in your notebook

16   there, Professor Snyder?

17   A.   I do.

18   Q.   Okay.  Now, does this chart have contract prices for Tyson?

19   A.   Yes.

20   Q.   Including --

21   A.   Third row.

22   Q.   I'm sorry.  Including for the year 2014?

23   A.   Yes.

24   Q.   What's the contract price for Tyson for the year 2014?

25   A.   0.9299.

EDWARD SNYDER - Cross

1    Q.  How much higher was that spot -- dollar 45 spot sale than

2    the then-existing contract price?

3    A.  It looks to me to be about 7 cents plus 45, about 52 cents.

4    Q.  52 cent difference.  Is that maybe a little bit more than a

5    52 percent difference in price?  Right?

6    A.  Yes.

7    Q.  Okay.

8          MR. TORZILLI:  Okay.  Now, if we can go back,

9    Ms. Pearce, to publishing Exhibit J-256.

10   BY MR. TORZILLI:

11   Q.  So, Professor Snyder --

12         MR. TORZILLI:  Permission to publish to the jury, Your

13   Honor?

14         THE COURT:  256?

15         MR. TORZILLI:  Yes, Your Honor.

16         THE COURT:  J-256 may be published.

17         MR. TORZILLI:  Thank you.

18   BY MR. TORZILLI:

19   Q.  So the numbers on the right row, the numbers at the top of

20   the dark blue bars, those include spot sales, correct?

21   A.  Yes, as does the second light blue bar.

22   Q.  And the second light blue bar, but the light blue bar all

23   the way on the left, the KFC one, does not, right?

24   A.  That's my understanding, because Pilgrim's sales to KFC for

25   2015 were governed by a contract.

EDWARD SNYDER - Cross

1    Q.  Now, if there are sales -- spot sales for each of those

2    benchmark suppliers contained in their bars, then there would

3    be spot sales there, but no spot sales in the sales from

4    Pilgrim's to KFC, correct?

5            MR. KORNFELD:  Your Honor, I'm going to object.  It

6    assumes facts not in evidence.  There is no evidence that any

7    of the benchmark suppliers --

8            MR. LAVINE:  Your Honor, there's also no evidence that

9    there were any spot sales in 2015 between Pilgrim's and KFC.

10           THE COURT:  Overruled.  The professor can answer based

11   on his understanding of the data.

12           THE WITNESS:  My understanding -- I'm sorry.  I should

13   wait for the question.

14   BY MR. TORZILLI:

15   Q.  Would you like me to repeat the question?

16   A.  Yes, please.

17           MR. TORZILLI:  Just one moment.

18   BY MR. TORZILLI:

19   Q.  If there are spot sales for each of those benchmark

20   suppliers contained in their bars, as you stated a few moments

21   ago, then there would be spot sales for -- in their average

22   price numbers you report here, but there would be no spot sales

23   reported in the average price number you're reporting for

24   Pilgrim's sales to KFC, so the one all the way on the left,

25   correct?

EDWARD SNYDER - Cross

1    A.  Correct.  And that's the same -- the same is true for the

2    light blue bar.

3    Q.  Right.

4    A.  What the data are about on the right-hand side are sales by

5    the suppliers to a large number of customers, and the question

6    is right in that, I do not know if those sales include spot

7    sales to particular customers.  And the same is true -- I think

8    it's, you know, critically important to keep mentioning it, the

9    same is true for the second light blue bar.

10   Q.  So if you were able to take the spot sales out of the

11   average prices in the dark blue bars, it could very well be

12   that those numbers would all come down, correct?

13   A.  You just want to take them out of the right-hand side?

14   Q.  Just want to take them out of the right-hand side.  We

15   don't need to take them out of the 1.0308 number on the left,

16   because, as you said, there are no spot sales attributable to

17   that, right?

18   A.  To the extent that -- and I don't know the extent of spot

19   sales -- if the spot sales during this time period are higher

20   than the contract prices, because of supply and demand factors,

21   then that would bring the dark blue bars down.  By how much,

22   it's speculation.

23   Q.  So it could bring it down enough so that it's below the

24   1.0308, we just don't know, correct?

25   A.  I think I gave you the best answer I could.  I don't know

1942

EDWARD SNYDER - Cross

1  the extent of the spot sales reflected in the blue bars.  I

2  don't know the prices at which those sales would have occurred,

3  so I can't tell you anything about how much in principle the

4  dark blue bars would come down.

5  Q.  Just so I understand your answer, you don't know how much

6  they would come down, is the point you're trying to make,

7  correct?

8  A.  I think I gave you the best answer.  I'll say it again.  I

9  don't know the extent of spot sales for Pilgrim's to all

10  others, nor do I know that for the benchmark suppliers.  If

11  there are spot sales in those columns and one could identify

12  them, and if the spot sales were at higher prices than the

13  contract sales, then those bars, the dark blue and the second

14  light blue, would come down.  I can't speculate about whether

15  it is trivial or something more than that.

16  Q.  Okay.  Thank you, Professor Snyder.

17      MR. TORZILLI:  We can take this exhibit down.

18  BY MR. TORZILLI:

19  Q.  Just a couple more questions to end where we started

20  talking about the economic evidence.

21      So I think you -- you said that in relying on your

22  opinions that you've given here today you relied on I think you

23  called it objective economic evidence, right?

24  A.  Yes.

25  Q.  And that objective economic evidence doesn't tell you

EDWARD SNYDER – Redirect

1  anything about whether anyone conspired to fix prices, correct?

2  A.  Well, the objective economic evidence wouldn't tell me

3  whether a legal threshold of an illegal agreement had been

4  crossed.  All the economic evidence can do is point to whether

5  the alleged agreement had objective effects that I can see in

6  the objective data.

7       MR. TORZILLI:  Thank you very much, Professor Snyder.

8  No further questions.

9       Thank you, Your Honor.

10      THE COURT:  Thank you.

11      Redirect.

12      MS. PLETCHER:  Thank you, Your Honor.

13                    **REDIRECT EXAMINATION**

14  BY MS. PLETCHER:

15  Q.  Try to be brief here.

16      Professor Snyder, you were asked some questions to

17  compare two different charts, 10703 and J-253.

18      MS. PLETCHER:  Could we please pull those up next to

19  each other?

20      These are all admitted.  If we could please publish

21  for the jury.

22      THE COURT:  You may.

23  BY MS. PLETCHER:

24  Q.  Professor Snyder, in your professional career, you've

25  worked for a number of academic institutions; is that right?

EDWARD SNYDER - Redirect

 1  A.  Yes, four.

 2  Q.  In your jobs at those academic institutions, did you teach

 3  students?

 4  A.  Yes.

 5  Q.  How many students have you taught over your career?

 6  A.  I haven't thought about it, but it's in the thousands.  For

 7  example, last fall I had 130.

 8  Q.  Was that when you were teaching at Yale?

 9  A.  Yes.

10  Q.  Do you teach your students at Yale to start every graph at

11  zero?

12  A.  No.

13  Q.  And why is that?

14  A.  Well, the purposes differ.  But if I could just speak to

15  the purpose here --

16  Q.  Please do.

17  A.  The purpose here was to identify whether the initial bids

18  across the six suppliers were the same.  And also to see if the

19  final prices reflected in the contracts across the six

20  suppliers were the same.  That's a lot easier to answer with a

21  chart that I presented.  And obviously, I'm careful when I

22  presented that chart, I identified the vertical axis as

23  starting at a dollar.

24  Q.  And in the chart on the left, Government Exhibit 10703, do

25  you notice that there are increments of 20 cents on the Y axis?

EDWARD SNYDER - Redirect

1    *A.*  Yes.

2    *Q.*  Do you notice that the very last increment is only

3    14 cents?

4    *A.*  I had not noticed it, but I see it now.

5    *Q.*  Would you teach your students at Yale to have inconsistent

6    increments on a Y axis?

7    *A.*  No.

8    *Q.*  Thank you, Professor Snyder.

9         *MS. PLETCHER:*  Let's take these down.

10   *BY MS. PLETCHER:*

11   *Q.*  You were asked about J-249 on cross-examination.

12        *MS. PLETCHER:*  If we can pull that one up.

13   *BY MS. PLETCHER:*

14   *Q.*  J-249, this is the exhibit relating to beef and pork and

15   chicken prices.

16   *A.*  Yes.

17   *Q.*  So, Professor Snyder, you were asked on cross-examination

18   about whether beef and pork were substitutes for KFC, if KFC

19   only produces chicken.  Do you recall that question?

20   *A.*  Yes.

21   *Q.*  So can you please explain to the jury, then, how this chart

22   is relevant to prices charged to KFC?

23        *MS. PLETCHER:*  Let's make sure this is published for

24   the jury, please.

25        *THE COURT:*  You may.

EDWARD SNYDER - Redirect

1          MS. PLETCHER:  Thank you.

2          THE WITNESS:  Well, economists have a concept of

3   derived demand.  And the demand that KFC has for chicken is

4   derived from the demand that final consumers have.  And what

5   this chart shows is that final consumers would respond to the

6   relative increase in beef and pork by buying more chicken.  And

7   because KFC sells chicken, their demand for chicken would

8   increase.

9   BY MS. PLETCHER:

10  Q.  And how, Professor Snyder, does that affect the price?

11  A.  Well, the demand factor that I identified with this chart

12  means that overall demand for chicken is increasing in the time

13  period leading up to 2015.

14  Q.  Thank you, Professor Snyder.

15         MS. PLETCHER:  You can take this one down.

16  BY MS. PLETCHER:

17  Q.  Now, you were asked on cross-examination about Exhibit 256.

18  That's the benchmarking slide.

19         MS. PLETCHER:  If we could pull that one up, please.

20  Please publish for the jury.

21         THE COURT:  You're talking about J-256; is that

22  correct?

23         MS. PLETCHER:  Yes, that's correct.

24         THE COURT:  Yes, you may publish.

25         MS. PLETCHER:  Thank you.

EDWARD SNYDER – Redirect

1

2      *BY MS. PLETCHER:*

3      *Q.* So, Professor Snyder, you were asked about differences

4      between spot sales and contract prices. Do you recall those

5      questions?

6      *A.* Yes.

7      *Q.* Okay. Does the second bar in this chart in the

8      light-colored blue, second from the left, does that reflect

9      spot sales?

10     *A.* It can, just like the ones on the right in dark blue can.

11     *Q.* Now, does the fact that spot sales are included in all of

12     these numbers, with the exception of the one on the far left,

13     does that change your analysis in any way?

14     *A.* Not at all. And the other exhibit, if I may, that showed

15     the spot sales for the Tyson invoice at a dollar 45 actually

16     confirms other parts of my analysis.

17     *Q.* Explain how that is, Professor Snyder.

18     *A.* Well, in 2014, when Tyson –– that invoice was presented,

19     that's right when, according to basic economics, you have the

20     demand factor increasing chicken prices, and you have the two

21     supply factors increasing chicken prices. So the fact that

22     there was a –– an example of a spot sale that high confirms

23     that supply and demand factors were at work.

24              It's also the case that when you look at the bidding

25     by Tyson to KFC for the next year, their bids and ultimate

EDWARD SNYDER - Redirect

1    contract prices were also higher.

2    Q.  So, Professor Snyder, just has that changed your analysis

3    of the ultimate conclusion you reached in this case?

4    A.  Certainly doesn't change the benchmark analysis, because I

5    have the second light blue bar.  And the fact that there are

6    spot sales at high prices during this time period confirms my

7    analysis of supply and demand, which provides the alternative

8    explanation for the price increases that were seen in 2015.

9    Q.  Thank you.

10         MS. PLETCHER:  We can take this one down.

11   BY MS. PLETCHER:

12   Q.  Professor Snyder, you were asked some questions about your

13   testimony on information exchange.  Do you remember those?

14   A.  Yes.

15   Q.  Mr. Torzilli said that you did not mention bids as the type

16   of information that could be exchanged.  Do you remember that

17   question?

18   A.  I do remember the question.

19   Q.  Are there reasons why suppliers would share bid information

20   other than price fixing, in your experience?

21   A.  Yes.  As I testified, buyers give feedback to suppliers in

22   the context of bidding and negotiation.  And I also testified

23   and explained that the information provided in general -- not

24   just from buyers to sellers, but in general -- is not

25   necessarily complete or accurate.  It's in the interest of the

EDWARD SNYDER - Redirect

1    buyer to control the narrative and maintain information

2    advantages.  That leads to situations, as I testified, where a

3    supplier may want to check to see if the information provided

4    to it was accurate.  And that information can certainly involve

5    bids, prices, claims about what other suppliers are charging.

6    Q.  Thank you.  I'm going to shift to another topic.  The

7    Government asked you questions about the evidence that you

8    relied on in reaching your conclusions.  Do you remember those

9    questions?

10   A.  Yes.

11   Q.  You were specifically asked whether you relied on emails

12   and texts and Government witness testimony.  Do you remember

13   that?

14   A.  Yes.

15   Q.  Did you -- you stated that you did not rely on any

16   Government witness testimony; is that right?

17   A.  That's correct.

18   Q.  You also didn't rely on any defense witness testimony

19   either; is that right?

20   A.  That's correct.

21          MR. TORZILLI:  Objection.  Leading.

22          THE COURT:  Overruled.

23   BY MS. PLETCHER:

24   Q.  I'm going to switch topics again.  So, Professor Snyder,

25   you were asked about the definition of price fixing and asked

EDWARD SNYDER - Redirect

1  whether that means an agreement.  Do you remember that?

2  A.  Yes.

3  Q.  I believe that you started to offer an explanation of what

4  price fixing is to an economist.  Could you please explain to

5  the jury what an economist understands price fixing to be?

6  A.  Underscore, as an economist, I'm not a lawyer.  To me, as

7  an economist, price fixing means that because of an agreement,

8  sellers who are party to that agreement will charge different

9  prices than they would have charged without the agreement.  And

10  I tried to explain that in the context of the *quid pro quo*

11  where there is -- the parties enter into an agreement, and it

12  changes what the individual suppliers would charge because they

13  had the expectation that the other supplier will follow the

14  agreement and charge a higher price.

15          Now, that's an economist's understanding of price

16  fixing.

17  Q.  Professor Snyder, in your analysis of the objective data in

18  this case, did you see any evidence of such a *quid pro quo*?

19  A.  No.  All of the objective economic evidence concerning

20  bids, prices, price increases, ranges of prices, the benchmark

21  analysis, the umbrella test, all of those do not support the

22  Government's hypothesis and, in particular, do not support the

23  idea that there were *quid pro quos* in place.

24  Q.  Professor Snyder, you were asked questions about price

25  fixers attempting to avoid detection.  Do you recall those

EDWARD SNYDER - Redirect

1  questions?

2  *A.*  Yes, it was nice that somebody read my Ph.D. dissertation.

3  *Q.*  Professor Snyder, fair to say, that question -- did you

4  understand that question to be asking you to make assumptions

5  about the motivations of individuals?

6  *A.*  To the extent that it asked for a -- you know, my views

7  about any particular individual, that would involve

8  assumptions.  However, what I tried to say -- and this is what

9  I believe -- is that in general, individuals don't want to get

10  convicted for price fixing.

11  *Q.*  So that question, then, you're saying, asks you to make

12  some assumptions, but there was no question asking you about

13  the objective data showing any type of deceptive conduct?

14  　　　*MR. TORZILLI:*  Objection.  Leading.

15  *BY MS. PLETCHER:*

16  *Q.*  Was there?

17  　　　*THE COURT:*  Overruled.

18  　　　*THE WITNESS:*  Could you repeat the question, please.

19  *BY MS. PLETCHER:*

20  *Q.*  Let me ask that differently.  Even if an individual acts to

21  avoid detection, if a price fixing agreement exists, wouldn't

22  you expect to see some objective economic data that shows the

23  price fixing agreement existed --

24  　　　*MR. TORZILLI:*  Objection.  Leading.

25  　　　*THE COURT:*  Overruled.

EDWARD SNYDER – Redirect

1

2    *BY MS. PLETCHER:*

3    *Q.*  Especially -- if I may finish the question.  Especially in

4    a conspiracy that was alleged to have lasted almost nine years?

5         *MR. TORZILLI:*  Object to form.

6         *THE COURT:*  Well, if by form you mean the last part of

7    the question, that did -- does make it leading.  Sustained.

8    *BY MS. PLETCHER:*

9    *Q.*  I'll ask the question again and rephrase.

10        Professor Snyder, even if an individual acts to avoid

11   detection -- to avoid detection, if a price-fixing agreement

12   actually existed, wouldn't you expect to see some objective

13   economic evidence of that agreement?

14        *MR. TORZILLI:*  Objection.  Leading.

15        *THE COURT:*  Overruled.

16        *THE WITNESS:*  I would, especially in the context of

17   this industry where you've got buyers dealing with multiple

18   suppliers in the relational contract that I described and over

19   a long period of time.  You would expect to see objective

20   economic evidence that a *quid pro quo* was in place.  My

21   analysis focused on where the Government focused, which is

22   especially on 2015, and there is no objective economic evidence

23   that supports the Government's hypothesis.

24        *MS. PLETCHER:*  Thank you, Professor Snyder.

25        Thank you, Your Honor.

Gregory Finch – Direct

1          THE COURT: All right. Thank you, Ms. Pletcher.

2          All right. Is Professor Snyder subject to recall by

3    the United States?

4          MR. TORZILLI: No, Your Honor.

5          THE COURT: All right. Professor Snyder, you are

6    excused. Thank you.

7          THE WITNESS: Thank you, Your Honor.

8          THE COURT: Next witness.

9          MR. BELLER: Thank you, Your Honor. At this time,

10   Mr. Fries calls Gregory Finch, please.

11         THE COURT: All right. Mr. Finch, if you'll please

12   come forward, Ms. Grimm will administer an oath to you.

13         MR. BELLER: If I may just have a moment, Your Honor.

14         THE COURT: Yes, you may. He can be sworn in at this

15   time.

16         (**GREGORY FINCH, DEFENDANTS' WITNESS, SWORN**)

17         COURTROOM DEPUTY: Please be seated.

18         Please state your name and spell your first and last

19   name for the record.

20         THE WITNESS: My name is Gregory Scott Finch,

21   G-R-E-G-O-R-Y, F-I-N-C-H.

22         THE COURT: Go ahead, Mr. Beller.

23         MR. BELLER: Thank you, Your Honor.

24                    **DIRECT EXAMINATION**

25   BY MR. BELLER:

Gregory Finch – Direct

1  Q.  Good afternoon, Mr. Finch.

2  A.  Good afternoon.

3  Q.  Would you please tell the jury where you live?

4  A.  I live in Statesboro, Georgia.

5  Q.  Is that near the town of Claxton, Georgia?

6  A.  Yes.

7  Q.  How far is Statesboro from Claxton?

8  A.  Approximately 30 minutes.

9  Q.  Mr. Finch, do you have an education beyond high school,

10  sir?

11  A.  Yes.

12  Q.  What is that?

13  A.  Bachelor of science degree in accounting.

14  Q.  Mr. Finch, how are you currently employed?

15  A.  I'm employed by Norman W. Fries, Inc. doing business as

16  Claxton Poultry.

17  Q.  Is it okay if I refer to that as Claxton Poultry?

18  A.  Yes.

19  Q.  How long have you worked for Claxton Poultry, sir?

20  A.  I went to Claxton April 4 of 2011, so a little over

21  11 years.

22  Q.  What is your position at Claxton Poultry?

23  A.  I'm a chief financial officer.

24  Q.  And have you been the chief financial officer or the CFO

25  since you joined Claxton in April of 2011?

Gregory Finch - Direct

1      A.  Yes.

2      Q.  And will you explain to the jury, Mr. Finch, what are your

3      responsibilities as CFO?

4      A.  Sure.  It's what one might think, general ledger, bank

5      accounts, bank reconciliations, account reconciliations,

6      banking relationships, insurance relationships, contract

7      negotiations with vendors and suppliers, year-end audits,

8      insurance, legal matters, workers comp, and Claxton is a pretty

9      small shop, so IT reports to me as well.

10     Q.  So fair to say, a little bit of everything, if it has to do

11     with money?

12     A.  Yes, I wear many hats.

13     Q.  Okay.  In these many hats that you wear, Mr. Finch, do you

14     also have a general knowledge of the operations?

15     A.  Yes.

16     Q.  Does -- when I say operations, Mr. Finch, does that also

17     include the supply of chicken?

18     A.  Yes.

19     Q.  Does knowledge of operations include cost information in

20     connection with supplying chicken to various customers?

21     A.  Yes.

22     Q.  Do you also have a general knowledge of Claxton Poultry's

23     different products?

24     A.  Yes.

25     Q.  Do you have knowledge of the sale of chicken to other

Gregory Finch - Direct

1    chicken producers?

2    *A.*   Yes.

3    *Q.*   Do you have a knowledge regarding the growing of chickens?

4    *A.*   Yes.

5    *Q.*   Now, if I say QSR, what does QSR mean, Mr. Finch?

6    *A.*   Quick-service restaurant.

7    *Q.*   And can you tell the jury what a QSR or a quick-service

8    restaurant is insofar as you have knowledge of?

9    *A.*   Sure.  A QSR would be names like KFC, Popeyes, Chick-fil-A,

10   McDonald's, Wendy's, Subway, just to name a few.

11   *Q.*   If I say QSR and also, like, a fast-food restaurant, would

12   that be an appropriate sort of, I guess, term for the same type

13   of restaurant?

14   *A.*   I would say they're fairly interchangeable, yes.

15   *Q.*   Okay.  So in terms of your knowledge of Claxton Poultry, do

16   you also have knowledge of selling chicken to Claxton's various

17   QSR competitors?

18   *A.*   Yes.

19   *Q.*   Mr. Finch, have you worked in your I guess adult life or

20   professional life anywhere other than Claxton Poultry?

21   *A.*   Yes.

22   *Q.*   And where are the other locations or who have been your

23   prior employers other than Claxton Poultry?

24   *A.*   Well, just prior to coming to Claxton Poultry, I worked at

25   Harrison Poultry.

Gregory Finch – Direct

1    Q.  And what was your position at Harrison Poultry?

2    A.  Chief financial officer.

3    Q.  How long were you the chief financial officer of Harrison

4    Poultry?

5    A.  I went to work at Harrison in July of '97, and I left at

6    the end of March of 2011, so approximately 14 years.

7    Q.  So the 14 years with Harrison, plus your years at Claxton,

8    what is the math?  What is the total amount of time in which

9    you've been a CFO for a poultry company?

10   A.  Approximately 25 years.

11   Q.  Okay.  So, Mr. Finch, are you familiar with Claxton

12   company's background?

13   A.  Yes.

14   Q.  How many employees, for example, does Claxton Poultry have?

15   A.  Approximately 2,000.

16   Q.  And will you tell the jury a little bit about Claxton

17   Poultry's background, including how long it's been in business?

18   A.  Sure.  Claxton Poultry started in business in 1949 in

19   Savannah as a distribution company.  So we've been in business

20   for almost 73 years.

21   Q.  And who started Claxton Poultry?

22   A.  Mr. Norman Fries, Sr., and his wife, Doris Fries.

23   Q.  And so how far is Claxton, geographically, to give the jury

24   an idea, how far geographically is Claxton, Georgia, from

25   Savannah, Georgia?

Gregory Finch – Direct

1   A.   Approximately an hour, depending on which side of Savannah

2   you might be going to.

3   Q.   Okay.  You mentioned Norman W. Fries and his wife.  How is

4   Norman W. Fries, Sr. related to my client, Mikell Fries?

5   A.   That's his grandfather.

6   Q.   Is Norman W. Fries still alive?

7   A.   No.  He passed in 2001.

8   Q.   So Norman W. Fries was Mikell's grandfather, how -- well,

9   is Norman W. Fries' son, Mikell's father, still alive?

10  A.   No.

11  Q.   When did he pass?

12  A.   June of 2011.

13  Q.   And you also mentioned Norman W. Fries' wife.  Who is that?

14  A.   Doris Fries.

15  Q.   And is Mrs. Fries still alive?

16  A.   Yes.

17  Q.   Okay.  Mrs. Fries is whom to Mikell Fries?

18  A.   That's his grandmother.

19  Q.   How old is Mrs. Fries?

20  A.   She turned 94 in January.

21  Q.   So from this point forward, Mr. Finch, when I say

22  Mr. Fries, unless I say otherwise, I'm always going to be

23  referring to my client, Mikell, okay.

24  A.   That's fair.

25  Q.   Okay.  All right.  How many plants does Claxton Poultry

Gregory Finch – Direct

1    have?

2    A.  We have one processing plant in Claxton, and we have a

3    further processing plant that we do deboning in for

4    Chick-fil-A.

5    Q.  Okay.  So if we were to simplify it, so when we say

6    deboning or further processing, can you give the jury a little

7    bit more understanding as to what that means?

8    A.  Sure.  That means that it's taking a raw product that is a

9    front half or a cap and then taking that off the bone and

10   making it a boneless breast or a tender, and then cutting that

11   to the specification that Chick-fil-A has required.

12   Q.  Okay.  And you say that you have this other deboning

13   facility for Chick-fil-A, what does it mean it's for

14   Chick-fil-A?

15   A.  They asked us to build it, so we built it for them.

16   Q.  Okay.  So while there is this one location in Claxton plus

17   a deboning facility, if I were to ask you how many plants does

18   Claxton have, despite the deboning facility, from an industry

19   perspective, is it still proper to say they're a single-plant

20   company?

21   A.  Correct.  That's how we think of ourselves, single plant.

22   Q.  Mr. Finch, who controls -- and I'm asking you in your role

23   as CFO of Claxton, who controls the ownership of the company?

24   A.  Doris Fries and her daughter.

25   Q.  Who is Doris Fries' daughter?

Gregory Finch - Direct

1    A.   Pamela Fries Usher.

2    Q.   And so is Mrs. Usher Mr. Fries' aunt?

3    A.   She is.

4    Q.   Okay.  So does that mean -- well, let me ask it more

5    bluntly.  Does Mikell Fries own the company?

6    A.   No.

7    Q.   When I say Mikell Fries, Mr. Finch, what is Mr. Fries'

8    current position at Claxton Poultry?

9    A.   Currently, he's the president.

10   Q.   When was Mr. Fries promoted to the position of president of

11   Claxton Poultry?

12   A.   We announced that internally in February of '14, and we

13   announced it publicly in March.

14   Q.   Okay.  So I'm going to ask that question again.  You said

15   2014; is that correct?

16   A.   That's what I said.  I meant '15.

17   Q.   Okay.

18   A.   I'm sorry.

19   Q.   That's okay.

20        What was Mr. Fries' role prior to that?

21   A.   He was a sales manager.

22   Q.   How long has Mr. Mikell Fries worked at Claxton Poultry?

23   A.   Mikell started when he was 14 in various roles, so he's

24   been with the company over 30 years.

25   Q.   So what does a 14-year-old do at a chicken plant?

Gregory Finch - Direct

1   A.   Good question.  He swept out trailers, washed trailers, you

2   know, things -- mainly outside the plant.

3        MR. LOVELAND:  Your Honor, I'm going to object.  I

4   don't believe the witness was present at this time.  It lacks

5   foundation.

6        THE COURT:  Overruled.

7   BY MR. BELLER:

8   Q.   You may continue your answer, Mr. Finch.

9   A.   As a 14-year-old, he would not be allowed in the plant.  He

10  would be doing things outside the plant, cleaning the yard,

11  cleaning trailers, those types of things.

12  Q.   I want to focus for just a moment, Mr. Finch, on Mr. Fries'

13  role at Claxton Poultry prior to becoming president, and

14  specifically, I'm talking about the time period in which he was

15  the sales manager.  Okay.

16  A.   Okay.

17  Q.   Who supervised Mr. Fries when he was a sales manager?

18  A.   Jerry Lane.

19  Q.   Who is Jerry Lane?

20  A.   At the time, Jerry Lane was president of the company.

21  Q.   And was there also a director of sales by the name of Tom

22  Scarboro?

23  A.   Yes.

24  Q.   Is it -- who did Mr. Scarboro report to?

25  A.   Jerry Lane.

Gregory Finch – Direct

1   Q.  Do you know what responsibilities Mr. Fries had when he was

2   a sales manager?

3   A.  Yes.

4   Q.  What are those, sir?

5   A.  He was responsible primarily for our QSR segment, and in

6   that, he would be coordinating production at the plant.  He

7   would be making sure orders were filled, making sure trucks

8   showed up to deliver orders, make sure orders were delivered

9   properly and timely, those kind of things, as well as pricing

10  to those QSR customers.

11  Q.  And how many -- how large was the sales team or the sales

12  unit at Claxton in the '14, '15, '16 time frame?

13  A.  We probably had five salesmen at the time, would be my

14  guess.

15  Q.  And is that the same number of salesmen or salespeople that

16  Claxton has currently?

17  A.  We have five currently.

18  Q.  Mr. Finch, have you discussed your testimony today with

19  Mr. Fries?

20  A.  No, absolutely not.

21  Q.  Have you discussed your testimony today with Scott Brady?

22  A.  No, absolutely not.

23  Q.  Do you, as you sit here today testifying in this courtroom,

24  Mr. Finch, feel any obligation or allegiance to Mr. Fries or

25  Mr. Brady to say anything other than the truth?

Gregory Finch - Direct

1    *A.*   No.

2    *Q.*   So I mentioned, Mr. Finch, Scott Brady.  How is Scott Brady

3    employed at Claxton Poultry?

4    *A.*   Scott is one of two national account sales reps -- or sales

5    managers, rather.

6    *Q.*   What are the responsibilities of a national account sales

7    rep?

8    *A.*   Well, particular to Scott, he's in charge of the QSR

9    segment, on most of the QSR segment for us, very similar to

10   what the role Mikell had prior to his promotion.

11   *Q.*   How, Mr. Finch, are you aware of Mr. Brady's

12   responsibilities as a national account sales manager?

13   *A.*   Well, as an officer of the company and a member of its

14   board of directors, I have a knowledge of what our salespeople

15   are doing, and I work with Scott pretty regular, almost on a

16   daily basis, in his job to sell chicken.

17   *Q.*   How long have you worked with Mr. Brady?

18   *A.*   Scott came in August of 2012.

19   *Q.*   So you mentioned that he's responsible for the QSR segment.

20   Let me ask you, what are his main accounts?

21   *A.*   Scott's main accounts are Popeyes, KFC, and Chick-fil-A.

22   *Q.*   Does he sell to other broiler producers also?

23   *A.*   Yes.  The other broiler producers that are in the joint

24   supply network with those QSRs are also our customers.

25   *Q.*   Okay.  You said something which is joint supply network.

Gregory Finch – Direct                    1964

1   Will you explain to the jury what you mean by joint supply

2   network?

3   *A.*   Sure, within each QSR's segment of business, they have

4   broiler producers that are approved suppliers, and they jointly

5   make sure that the supply of that QSR, whether it be Popeyes,

6   KFC, Chick-fil-A, is stable and when you pull up to the

7   drive-through window or go to the counter there is chicken in

8   the store to fill your order.

9   *Q.*   Do you know if Mr. Finch -- excuse me -- Mr. Brady is

10  having contact with or -- should say, how does he go about

11  selling to other QSR suppliers within this joint supplier

12  network that you speak about?

13         *MR. LOVELAND:*   Objection to foundation, Your Honor.

14  We don't know where this term comes from.

15         *THE COURT:*   I'm not sure about the term, but,

16  otherwise, objection sustained.

17  *BY MR. BELLER:*

18  *Q.*   Mr. Finch, do you know who decides who the other suppliers

19  are for QSRs?

20  *A.*   The QSRs themselves.

21  *Q.*   Meaning whom?   I don't mean proper names; I'm talking about

22  companies.

23  *A.*   Who does -- who makes the decision who they are?

24  *Q.*   That's right.

25  *A.*   Oh, KFC or Popeyes or Chick-fil-A.

1965

Gregory Finch – Direct

1    Q.   Does Mr. Brady have pricing authority to set the prices for

2    any of Claxton's customers?

3    A.   No.

4    Q.   How about does Mr. Brady have authority to sign contracts

5    with different customers?

6    A.   Well, authority is a little bit of a stretch.  We prefer

7    corporately that an officer of the company execute a contract.

8    But an officer has the latitude to delegate signing contracts

9    to sales folks, and from time to time, Mikell will delegate

10   that authority to Scott or whoever the salesman happens to be

11   on a particular account.

12   Q.   So, Mr. Finch, I want to switch gears and talk with you now

13   just a little bit about how Claxton goes about determining

14   pricing.  Is that something that you as the CFO have knowledge

15   of?

16   A.   Yes.

17   Q.   And is that something that you are involved in?  Is that a

18   process you're involved in, that is determining pricing for

19   Claxton products?

20   A.   Yes.

21   Q.   What is your role in determining pricing, generally, and

22   then I'll get to QSRs in just a moment, okay?

23   A.   Okay.  So generally, I'm responsible for coming up with the

24   cost construct of what the particular contract is going to be,

25   depending on who the customer is.  And in some situations, I'm

Gregory Finch - Direct

1    the front-line negotiator on some of the contracts that we

2    have.

3    Q.   And is that different for QSR customers?

4    A.   Which part?

5    Q.   Well, your role in determining pricing for QSR contracts.

6    A.   No, I'm responsible for costing of all contracts regardless

7    of what they are.  Someone in my office would be responsible

8    for coming up with those costs.

9    Q.   Okay.  And so when I'm talking about different customers,

10   does Claxton Poultry sell to customers other than quick-service

11   restaurants or other than fast-food?

12   A.   Yes.

13   Q.   What are the other types of customers that Claxton Poultry

14   sells to?

15   A.   Oh, retail customers, distributors, so might sell to a

16   Walmart, for instance, on the retail side, distributors, those

17   types of folks, as well as rendering company.

18   Q.   So focusing for just a moment, Mr. Finch, on QSR customers,

19   quick-service restaurant customers, are you involved with

20   determining the initial price that is offered to the customer

21   or the initial bid for product?

22   A.   Yes.

23   Q.   How is that done, very high level?

24   A.   So at a very high level, I would take my general ledger and

25   run the cost that it takes to make the particular bird we're

Gregory Finch – Direct

1   bidding on, and I would use those actual costs as well as any

2   known increases that may be coming to us, maybe a labor

3   increase or we might know about a utility increase or packaging

4   increase, whatever those may be, I put those into a cost model

5   that's been dictated to us that we use by that particular

6   quick-service restaurant.

7   Q.  So I want to focus for just a moment, because you said

8   something, which is labor.  And I want to ask about the unique

9   labor situation in Claxton, okay?  What is the nearest town,

10  nearest large city to Claxton, Georgia?

11  A.  Nearest large one would be Savannah.

12  Q.  So does that mean that the largest sort of population core

13  from Claxton is at least an hour away?

14  A.  Yes.

15  Q.  So, Mr. Finch, does that mean, does Claxton Poultry have

16  unique labor challenges compared to a producer that's in, say,

17  Athens, Georgia?

18  A.  Yeah.  Yes, the rural location that Claxton is in does have

19  its own challenges versus a producer that may be closer to a

20  metropolitan area.

21  Q.  And so you said that labor is one of those costs that you

22  calculate and put into that pricing model.

23  A.  Yes.

24  Q.  And so does that change when there are episodes in the

25  community, such as, say, COVID, because it changed that sort of

Gregory Finch - Direct

1    labor cost that you put into the model?

2    A.  Sure.

3    Q.  What are Claxton's goals in choosing a price for its QSR

4    chicken?

5           MR. LOVELAND:  Objection.  Vague, Your Honor.

6           THE COURT:  Overruled.

7           THE WITNESS:  Could you ask that again?  I'm sorry.

8    BY MR. BELLER:

9    Q.  Yeah, I'm happy to.

10          What are Claxton Poultry's goals in choosing a price

11   or in setting a bid price for its QSR chicken?

12   A.  Well, our price is set initially based off of our actual

13   costs.  And what we're trying to do is maintain the volume that

14   we presently have and then grow that volume with the QSR.  So

15   we try -- you know, we -- that's our goal, is to maintain what

16   we have, keep what we have, and then grow that or take that

17   away from another broiler producer.

18   Q.  How about profits, is profit or making money one of the

19   goals that Claxton Poultry has?

20   A.  Certainly, we're in business to make money.  So we would

21   like to sell our product for as much as the QSR would allow us

22   to sell it for.  But the construct, this cost-plus model that's

23   dictated to us, is based on cost, with the plus being a margin.

24   Q.  Does Claxton Poultry have a particular strategy regarding

25   how to go about maximizing -- maintaining or maximizing volume

1969

Gregory Finch - Direct

 1   and maintaining or maximizing profits, and specifically

 2   regarding negotiation?

 3            MR. LOVELAND:  Objection.  Compound question, Your

 4   Honor.

 5            THE COURT:  Overruled.

 6            THE WITNESS:  Yes.

 7   BY MR. BELLER:

 8   Q.  What is that strategy, Mr. Finch?

 9   A.  Well, we're a small kind of niche player within the

10   industry -- the industry as a whole and within the QSR network

11   of supply chain.  And so we understand kind of what our lot in

12   life is, so we can't compete heavily with the big guys and the

13   guys that have multiple plant operations.  So we try to be

14   somewhere in the middle of where pricing is, and we communicate

15   that goal to the QSR up front so they understand, hey, we want

16   to keep what we have, we want to grow it or take away from the

17   other producers, but we don't want to stick out like a sore

18   thumb, we want to be somewhere in the middle of the pricing.

19   Q.  So why not try to be at the highest price?

20   A.  Well, we'd love to sell our chicken for the most they allow

21   us to do, but we can't compete at the highest level with the

22   guys that have deeper pockets that can just run the price up

23   and kind of say, you know, hey, come what may on what the

24   pricing is, because we're not big enough to be able to go toe

25   to toe with the big boys in the industry that way.  Because of

Gregory Finch – Direct

1   that, it makes no sense for us to try to adopt that kind of

2   strategy; it makes a whole lot more sense for us to try to be

3   in the middle.  You know, it won't work for everybody.  It's

4   kind of weird, actually, if you think about it, but it works

5   for us.  It works for Claxton.  It may not work for someone

6   else.  But, you know, we've been in the supply chain for 20,

7   40, 50 years, depending on who the QSR customer is, so the

8   strategy works for Claxton.

9   Q.  If, Mr. Finch, Claxton Poultry went in and the strategy was

10  to always be the highest-cost producer, does that risk

11  Claxton's volume?

12          MR. LOVELAND:  Objection.  Calls for speculation, Your

13  Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes.

16  BY MR. BELLER:

17  Q.  You can answer.

18  A.  Yes, certainly.  The QSRs are very blunt in their

19  directional guidance they give to us and are not shy about

20  saying, If that's your price, you're going to lose volume.  And

21  so it's -- they control the process with a pretty heavy hand.

22  And so, yeah, we would be -- we would certainly risk losing

23  volume if we tried to go in and be the highest-priced producer.

24  Q.  So, Mr. Finch, if Claxton was to lose, say, 600,000 pounds

25  of business a week, what does that do to Claxton Poultry?

Gregory Finch – Direct

1   A.   That's about a 14 to 16 percent hit in the head.   That

2   would be a pretty substantial jolt to our business, to lose

3   that kind of business.

4   Q.   So by going in and being in the middle, is Claxton able to

5   undercut competitors by being in the middle?

6   A.   Yes.

7   Q.   And what happens to Claxton's business if Claxton is able

8   to undercut a competitor's price?

9   A.   We typically get to grow it.

10   Q.   What do you mean by get to grow, what does that mean in

11   terms of volume?

12   A.   Sure.   Well, sometimes within the supply chain, some of the

13   other broiler producers are having quality issues or something,

14   and the QSRs juggle that tonnage between the suppliers, so

15   let's say company A has run a while off, you know,

16   quality-wise --

17        MR. LOVELAND:   Objection to undercutting price.   He's

18   now talking about something else.

19        THE COURT:   Overruled.

20   BY MR. BELLER:

21   Q.   You can finish what you were saying.

22   A.   Thank you.

23        So they shift within that existing supply block.   So,

24   then -- so we might take a load or two loads or three loads

25   from an existing producer, right?   And then on top of that, the

Gregory Finch – Direct

1   QSR's business may be growing itself, so they might be growing

2   5 percent, 10 percent, 20 percent, so there is additional

3   volume loads on their growth that we can also take.

4   Q.  And so you mentioned that Claxton may be able to undercut

5   and take two or three loads from another producer.  So I'm

6   going to focus on that.

7        When we say load, does that mean a semi truckload?

8   A.  Yes.

9   Q.  Okay.  And so it's two to three loads that you're taking

10  from another competitor, is that significant to Claxton

11  Poultry?

12  A.  Yes.  That would be approaching 80,000 pounds a week or

13  4 million pounds a year.

14  Q.  And is 4 million pounds of chicken a year significant or

15  substantial to a one-plant chicken company?

16  A.  Yes.

17  Q.  By contrast, what is -- if you know, if you have knowledge,

18  is two loads to a Pilgrim's, for example, significant?

19       MR. LOVELAND:  Objection.  Foundation and speculation,

20  Your Honor.

21       THE COURT:  Sustained on foundation.

22  BY MR. BELLER:

23  Q.  Mr. Finch, how long have you been in the chicken broiler

24  industry?

25  A.  25 years.

Gregory Finch - Direct

1   Q.   How many companies have you worked for in the

2   chicken-producing company -- chicken-producing business?

3   A.   Two.

4   Q.   In your 25 years, have you learned who the other chicken

5   producers are in the industry?

6   A.   Yes.

7   Q.   Have you learned how much volume a company like Tyson's has

8   generally?

9   A.   Yes, they're publicly traded, so that information is

10  publicly available.

11  Q.   What about Pilgrim's Pride?

12  A.   Same answer, they're publicly traded, so their volumes are

13  publicly available.

14  Q.   Have you formed a knowledge or do you have knowledge

15  regarding the larger industry in terms of the amount of chicken

16  that the United States goes through in a given week?

17  A.   Yes.  Part of my job is market intelligence.  Certainly

18  that includes broiler production as well as turkeys, beef,

19  hogs, fish, so certainly, yes.  I would definitely have a

20  reference for that.

21  Q.   So you also mentioned there are producers out there that

22  are publicly traded.  What does the fact that producers are

23  publicly traded have to do with you gaining knowledge about

24  their business?

25  A.   Well, that makes their -- they're a competitor, and it

Gregory Finch - Direct                    1974

1    makes their information readily available to me.

2    Q.  And is it also available to the general public?

3    A.  Yes.

4    Q.  And do you have from time to time opportunity to learn

5    about some of that information with the publicly traded

6    company?

7    A.  Yes.  I'm a little weird myself, so oftentimes I listen in

8    to their earnings calls, or I listen to the recording of the

9    earnings call later, or I will read their 10-Ks or 10-Qs.

10   Q.  That makes one of us, Mr. Finch.

11        So let's talk a little bit more about that, because my

12   basic question to you is, do you have an opinion or do you -- I

13   should say, do you have knowledge based on all of this

14   information you just shared, what kind of impact two truckloads

15   has on a publicly traded company like Pilgrim's Pride?

16   A.  Yes.

17   Q.  Is it a significant impact?

18   A.  No, it's minuscule.

19   Q.  Is it --

20   A.  Our --

21   Q.  Excuse me.  You may finish your answer.

22   A.  Claxton Poultry's entire production is a rounding error for

23   Pilgrim's Tyson or Sanderson.

24   Q.  Is two truckloads for Claxton Poultry business changing?

25   A.  Yes.

Gregory Finch – Direct

1  *Q.* So you mentioned telling the customer that -- excuse me,

2  let me back up.  I want to reorient myself for just a moment,

3  excuse me.

4  *A.* Sure.

5  *Q.* You mentioned that Claxton's strategy is to go in and try

6  to price in the middle, right?

7  *A.* Yes.

8  *Q.* Okay.  How does Claxton convey that information, if at all,

9  to the buyer, to the customer?

10  *A.* Oh, we tell them.  They -- I mean, like -- we tell them up

11  front, We want to be in the middle; we want to take volume;

12  this is how many loads we would like to have in addition to the

13  business we already have.  As I said earlier, you know, for

14  Popeyes, for instance, we've been buying from them for over 20

15  years, KFC over 40, Chick-fil-A over 50, so we've worked many,

16  many years of those years with the same buyers.  They already

17  know going into the process kind of what our strategy is.

18  *Q.* Do you ever ask the customer to place Claxton in the middle

19  of the pricing range?

20       *MR. LOVELAND:* Objection, Your Honor.  Hearsay and

21  also foundation.  He's not testified to having customer-facing

22  relations.

23       *THE COURT:* Overruled.

24  *BY MR. BELLER:*

25  *Q.* Does Claxton Poultry ever direct or ask the buyer to place

Gregory Finch – Direct

1     Claxton Poultry in the middle of the pricing?

2     A.   Yes.  We -- yeah, I mean, and -- you know, we -- they're

3     the only ones that can place us in the middle because they're

4     the only ones that have all eight or ten or twelve bids from

5     all of the producers.  So we not only ask them, we tell them,

6     and we have to trust that they're going to put us in the

7     middle.

8     Q.   Does Claxton receive feedback from its customer or buyer

9     regarding where Claxton should price itself from one round to

10    the next in order to be in the middle?

11    A.   Yes.

12    Q.   Is that something that -- to the best of your knowledge, as

13    CFO of this company, does Claxton Poultry follow that feedback?

14    A.   Well, it's a multi-round process, as you just said.  So

15    on -- on some of the individual rounds, we may not.  But I'm

16    not aware of any time that Claxton never followed their

17    directional guidance when it came to the final price for the

18    contract.  If they said, Go down 3 cents, we went down 3 cents.

19    Q.   Did you -- to the best of your knowledge, has Claxton

20    Poultry ever taken a negotiation position of the price is the

21    price?

22    A.   Not to my knowledge, and we wouldn't be big enough to stand

23    behind something like that.  You know, being a small player, we

24    just don't -- we can't exert that kind of pressure on any of

25    these large QSRs.

1     *Q.*  To the best of your knowledge, has Claxton Poultry ever

2     taken a business position of, We're not negotiating; we just

3     need to know how many loads you want?

4     *A.*  Not to my knowledge.

5     *Q.*  Has Claxton Poultry to the best of your knowledge ever

6     refused to reduce its price when the customer gave feedback on

7     what it would take to be priced in the middle of the pack?

8     *A.*  Not on final pricing, no.

9           *THE COURT:*  Is now a good breaking spot, Mr. Beller?

10    If not, you can ask a few more questions.

11          *MR. BELLER:*  This is -- excuse me for interrupting the

12    Court.  This is a great breaking point, Judge.  Thank you.

13          *THE COURT:*  Ladies and gentlemen, we'll recess for the

14    day.  We'll reconvene tomorrow same time, 8:30.  Keep the

15    admonitions in mind, ladies and gentlemen.  The jury is

16    excused.  Thank you.

17          (Jury out at 4:59 p.m.)

18          *THE COURT:*  Thank you, Mr. Finch.  You are excused for

19    the day.

20          Everyone else may be seated.

21          All right.  Jury instructions, I would propose but I'm

22    open to suggestion, that we maybe talk about that at the end of

23    the day on Thursday.  Does that work for people?  Are people --

24    Mr. Feldberg's --

25          *MR. FELDBERG:*  I'm sighing because I'm hoping to catch

1  a flight.

2  THE COURT:  I was wondering about that.  We could do

3  it tomorrow night, too, as an alternative if that works better

4  for people.  Any preference, other than Mr. Feldberg?  Why

5  don't we plan on talking about the jury instructions then at

6  the end of the day tomorrow.

7  MR. FELDBERG:  Thank you, Your Honor.

8  THE COURT:  No problem.

9  Anything that we should talk about today?

10  MR. LOVELAND:  Yes, Your Honor.

11  THE COURT:  Mr. Loveland, go ahead.

12  MR. LOVELAND:  I was hoping we could resolve the fact

13  of Tactical Specialist Rebecca Nelson's testimony.  It also

14  dovetails --

15  THE COURT:  I don't think the defendants have

16  responded to that in writing, is that --

17  MR. LAVINE:  We are planning on filing a response this

18  evening.

19  THE COURT:  Let's defer that until tomorrow -- we'll

20  get a response at that time.

21  MR. LOVELAND:  Okay.

22  THE COURT:  Unless there is some issue you wanted to

23  bring up.

24  MR. LOVELAND:  The only concern is flying her out

25  here, with the -- the issues that the airlines have had, in

1     giving her the notice she needs to know if she needs to fly on

2     Thursday, which also dovetails with scheduling and whether the

3     defense is in a position to represent whether Special Agent

4     Taylor or Kendra Waldbusser will be called, things of that

5     source, Your Honor.

6          *THE COURT:*  Right.  That is important.  I would

7     suggest the following, that after we recess today, that the

8     defendants give their best estimates to the Government on that,

9     in that respect, because if the last two witnesses were not

10     called, if Mr. Eddington finishes somewhat early, then we'd

11     have a gap, and the Government -- it would be great if there

12     were time to put on a rebuttal witness, but the Government will

13     have to be prepared to do that.

14          *MR. LOVELAND:*  Yes.  I'm just concerned about telling

15     TS Nelson to book a flight tomorrow at 8:00 p.m. to be here on

16     Thursday, for example.  So that's why I raised it.

17          *THE COURT:*  Yeah.  Let's -- I don't think we would be

18     able to, really, resolve that right now.  But why don't we try

19     to talk about that -- even if we need to talk about it in the

20     morning, like at the first break or something, you know, that

21     would be better than 5 o'clock in terms of trying to arrange --

22     hastily arrange a flight.

23          *MR. LOVELAND:*  I think the Government would prefer

24     earlier.  That would be appreciated.

25          If I may, I also wanted to ask if the Court had given

1980

further consideration to the timing of closing arguments.

1

2          THE COURT:  I haven't -- yeah, I remembered that, but
I hadn't really thought that through yet.  I'll keep thinking
it through.  I'll think about that tonight.

5          MR. LOVELAND:  Thank you very much, Your Honor.

6          Just a moment.

7          THE COURT:  Okay.

8          MR. LOVELAND:  Nothing further from the Government,
Your Honor.

10          THE COURT:  All right.  Mr. Fagg.

11          MR. FAGG:  Thank you, Your Honor.  We will confer
among the defendants and talk to the Government later this
evening about the witnesses.  We had indicated to the
Government earlier this week, we may rest as early as Thursday.
We have run into some scheduling issues on our end with some of
our witnesses, and so we did want to let the Court know and the
Government know that after Mr. Finch testifies, depending on
how long his testimony goes, we expect that the next two
witnesses would be Mike Brown and then Mr. Bagshaw.

20          MR. FELDBERG:  Mr. Bagshaw is scheduled to fly in
tomorrow morning.  Hopefully we can get him teed up for the
afternoon.

23          MR. FAGG:  Right.  Which would -- just wanted to alert
everyone to that.

25          THE COURT:  Okay.

1        *MR. HART:*  Can we confirm the witness order?

2        *THE COURT:*  Yeah, I'll let people talk -- let people

3   talk about that.  But here is one thing to think about -- and

4   I -- I haven't received any information to this effect from any

5   of the jurors, but when a team wins the Stanley Cup, there is a

6   parade, and here these jurors are, and they're downtown, as a

7   matter of fact could walk down to the parade in ten minutes.

8   The parade is starting at Union Station at 10:00 a.m. on

9   Thursday.  If -- now, once again, you know, no one has said

10  anything.  If no one says anything, I think we'll not worry

11  about it.  But who knows.  Who knows.

12       But the only reason I bring that up is just in case

13  there is some gap in the scheduling that kind of coincides

14  happily with something like that -- it may not be totally

15  unreasonable to give people an hour for anyone who is

16  interested, you know, to run down there.  But I don't know.  I

17  just throw that out in case someone on the jury is, like, gosh,

18  are we going to be able to do that?

19       *MR. FAGG:*  Just for the Court's awareness, a number of

20  the defense witnesses are not available after Thursday.

21       *THE COURT:*  Oh, no -- believe me, we're going to -- if

22  it worked out, but if we need to get them in, you know, that

23  will be our preference.

24       *MR. FAGG:*  Sure.  Understood.

25       Then the last thing, Your Honor, is for Mr. Brown, his

1 counsel is unable to travel to Denver and would like to be able

2 to participate telephonically, presumably silently, and wanted

3 to see if --

4        *THE COURT:*  I think we could arrange that.  Ms. Grimm,

5 do you agree?  Yeah, we could do that.

6        *MR. FAGG:*  Okay.  Great.  Thank you.

7        *THE COURT:*  Okay.  Other matters to take up at this

8 time?  All right.  We'll be in recess, then, until 8:30.  Thank

9 you.

10        (Recess at 5:06 p.m.)

11

12                  **I N D E X**

13 **Item**                               **Page**

14

15   KENT KRONAUGE
     Direct Examination By Mr. Kornfeld     1726
     Cross-examination By Mr. Feldberg     1772

16      Cross-examination Q.     1774
     Cross-examination By Mr. Hart     1777

17      Redirect Examination By Mr. Kornfeld     1805
  EDWARD SNYDER

18      Direct Examination By Ms. Pletcher     1815
     Examination By Mr. Torzilli     1875

19      Direct Examination Continued By Ms. Pletcher     1880
     Cross-examination By Mr. Torzilli     1889

20      Redirect Examination By Ms. Pletcher     1944
  GREGORY FINCH

21      Direct Examination By Mr. Beller     1954

22

23

24

25

1                        DEFENDANTS' EXHIBITS

2    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

3    A-304                    1747
     E-174                    1773
4    H-317                    1819
     J-208                    1839
5    J-249                    1849
     J-250                    1852
6    J-251                    1858
     J-252                    1864
7    J-253                    1866
     J-254                    1867
8    J-255                    1869
     J-256                    1880
9    J-271                    1887

10                      GOVERNMENT'S EXHIBITS

11   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

12   6034                     1750
     10696                    1918
13   10703                    1922

14

15

16                      REPORTER'S CERTIFICATE

17        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
18

19        Dated at Denver, Colorado, this 28th day of June,
     2022.
20

21

22

23   _____

24                 Therese Lindblom, CSR, RMR, CRR

25